# EXHIBIT A

1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                         Alexandria Division




---------------------------------:
                                 :
                                 :
BMG RIGHTS MANAGEMENT (US) LLC,  :
et al.,                          :
                                 :
            Plaintiffs,          :
                                 : Case No. 1:14-cv-1611
     vs.                         :
                                 :
                                 :
COX ENTERPRISES, INC., et al.,   :
            Defendants.          :
---------------------------------:



                              VOLUME 1 (a.m. portion)




                              TRIAL TRANSCRIPT

                              December 2, 2015

                     Before:  Liam O'Grady, USDC Judge

                              And a Jury
```

619

1  appreciate BMG working to get the witnesses here.  Mr. Allan, I
2  had a nice cell in the back of the courthouse ready for you.
3          MR. ALLAN:  I am glad I didn't get to see it.
4          THE COURT:  I knew Mr. Warin would designate you as
5  the person to take responsibility.
6          MR. BUCKLEY:  Your Honor, I hate to do this as you
7  were about to escape, there is one more issue.
8          THE COURT:  All right.
9          MR. BUCKLEY:  So I just learned that we did get
10 notice that the plaintiffs would like us to have Roger
11 Vredenburg here on Monday.  He does not fly or drive, so we are
12 going to have somebody drive him from Virginia Beach up here on
13 Sunday night, and I just want to make sure that we should do
14 that and he is going to go on Monday.
15         THE COURT:  He is subject to the subpoena power.  He
16 is a witness who, you know, BMG has the right to call live if
17 they so choose.  And I didn't find any technical issues that
18 would rise to a level to quash it, so yes.
19         MR. BUCKLEY:  Okay.  He will be available Monday.
20 Oh, and you did indicate that there should be a proffer of what
21 the evidence was going to be through Mr. Vredenburg.
22         THE COURT:  Why he was necessary.  I mean, I think I
23 know the answer based on listening to some of the deposition
24 testimony that was actually used in Sikes, but tell me why
25 Vredenburg isn't repetitive and unnecessary and counter-

R. Vredenburg - Direct

828

1   Q.   All right.  And where are you located?
2   A.   The office is in Chesapeake, Virginia.
3   Q.   All right.  And how long have you been working for Cox
4   Communications?
5   A.   I started there in 2004.
6   Q.   2004?  And have you always been in the same location?
7   A.   With Cox, yes.
8   Q.   Okay.  And what's your present title?
9   A.   Right now, network security tech.
10  Q.   All right.  And do you work with a particular group?
11  A.   Yes, sir.
12  Q.   And what's the name of the group?
13  A.   It goes by different names.  Sometimes it's called TOC,
14  T-O-C, sometimes it's Network Security or sometimes it's Tier
15  2.5.
16  Q.   All right.  That's a lot to remember.  Is TOC also known
17  as Technical Operation Center?
18  A.   Yes, sir.
19  Q.   All right.  So there's another way to refer to you as
20  well.
21  A.   Yes, sir.
22  Q.   All right.  And how long have you been working with the
23  TOC group?
24  A.   Since about 2008, I believe.
25  Q.   2008?  And are you aware of an Acceptable Use Policy?

R. Vredenburg - Direct

829

1   A.   Yes, sir.

2   Q.   All right. Let's -- okay. This is 1343.

3        All right. Mr. Vredenburg, do you recognize what I

4 showed you as Exhibit 1343?

5   A.   Yes, sir. It looks like our Acceptable Use Policy.

6   Q.   All right. Can we put that up, please, Karl? It's

7 already an exhibit. Thanks.

8        And part of your job responsibilities as a TOC or a

9 Tier 2.5 rep is to address violations of the Acceptable Use

10 Policy; is that correct?

11   A.   Yes, sir.

12   Q.   All right. And as far as you know, every subscriber has

13 to follow the terms of an Acceptable Use Policy to use Cox's

14 Internet service; is that correct?

15   A.   They should, yes, sir.

16   Q.   All right. And that's indicated -- can we take a quick

17 look at page 1 of PX 1343?

18        And if you look at the sentence, "All users of the

19 service might abide by this AUP," do you see that? In the

20 middle of the first paragraph there, or near the end. You

21 understand all users have to abide by the AUP and its policies,

22 right?

23   A.   Yes, sir.

24   Q.   Okay. And, in fact, the -- if we go down a little bit

25 further, Cox emphasizes this. Can we go to the -- okay. All

1    Q.    All right.  And isn't it true, as it indicated a little
2    bit further down, that if the customer gets his own router, Cox
3    requires that customer to put its own password on it; isn't
4    that correct?
5    A.    Yes.
6    Q.    And also, that Cox tells the customer again that it's
7    responsible for any, any misuse that occurs with an open WiFi,
8    is that correct?
9    A.    Yes.
10   Q.    And you understand that to be the policy of Cox?
11   A.    As written in the AUP, yes.
12   Q.    All right.  And finally, just looking at the end of that
13   Section 8, Cox has even obtained the permission from its
14   subscribers to detect unsecured WiFi connected to the
15   subscriber's home; is that correct?
16   A.    It says that there, but I don't know if we actually do
17   that.
18   Q.    All right.  But it has permission -- Cox has permission to
19   do that?
20   A.    It has permission.
21   Q.    All right.  Okay.  So what are your job responsibilities
22   in connection with the AUP?
23   A.    I work with the AUP as far as Acceptable Use Policy for
24   copyright infringement and other things that go on with
25   copyrights or something, a violation within network security.

R. Vredenburg - Direct

833

1  Q.   All right.  And do you have other responsibilities as well
2  as part of your job in addition to this copyright infringement
3  responsibility?
4  A.   Yes, sir.
5  Q.   Can you tell me just briefly what they are?
6  A.   We -- as I said, Tier 2.5, we're technicians.  We take
7  escalations from Tier 2, and we work on tickets that they
8  cannot resolve, and we try to resolve them.  If we can't
9  resolve them, we send them up to a repair agency that can fix
10 them.
11 Q.   All right.  You referred to a peer 2?
12 A.   A Tier 2.
13 Q.   Tier 2, I'm sorry.  What's a Tier 2?
14      THE COURT:  Would you move a little closer to the
15 microphone so we can hear you, sir?  Thank you.
16      THE WITNESS:  Tier 2 is a technician that's on the
17 telephone and they're taking inbound calls from customers to
18 try to repair their issues or problems they have, and if they
19 can't resolve them, they send to us.
20 BY MR. PECAU:
21 Q.   Okay.  So the Tier 2 people are when I pick up the phone
22 and I call my Internet service provider and things aren't
23 working so well, those are the folks I'd be talking to?
24 A.   Probably not right away.  You'd probably talk to Tier 1.
25 Q.   All right.  I've gone through that experience.

1  handle?

2  A.   We handle viruses, infections, mail comps.  We work with

3  digital attacks, and that's pretty much it.

4  Q.   Okay.  Now, is there a manual on how abuse tickets are

5  handled?

6  A.   There is.

7  Q.   All right.  Well, let's mark as -- oh, it's already in

8  evidence.  Let me show you what's been already marked in

9  evidence as PX 1330.

10           Mr. Vredenburg, I show you what's been marked as -- I

11  mean, it's in evidence as PX 1330, but I'm going to ask you if

12  that's what you're referring to as the manual on how abuse

13  tickets are handled?

14  A.   It looks like the manual.  I'm not -- because there's

15  different revisions on it.  So I'm not sure if this is

16  actually, you know, the latest revision, but, yes, they're all

17  pretty similar.

18  Q.   All right.  And what do you call this manual?

19  A.   Abuse manual.

20  Q.   What's that?

21  A.   The abuse manual.

22  Q.   All right.  Do you also call this a methods and procedures

23  manual?

24  A.   Yes.

25  Q.   All right.  And is that the -- you keep that manual or the

R. Vredenburg - Direct

854

1          THE COURT: All right. That will be allowed.
2     BY MR. PECAU:
3     Q.   Okay. Let's take a look at -- let's see -- okay. So to
4     get to you, we've gone through 11 -- well, 12 offenses, and
5     then it gets to you; is that correct?
6     A.   The twelfth one, yes.
7     Q.   Okay. Now, when it comes to you, the CATS system
8     automatically generates a copyright infringement notice on your
9     computer; is that correct?
10    A.   In the tool, the CATS tool, yes.
11    Q.   Right. And it also gives you the customer's history; is
12    that correct?
13    A.   Yes.
14    Q.   And that's provided by the, I think you called it the
15    ICOMS system?
16    A.   The history is in CATS. That's the -- that's -- they
17    provide all the -- with the suspensions and warnings and
18    everything. That's all part of CATS.
19    Q.   Okay. So the CATS system, it shows you the complaint,
20    right? And then it gives you the customer's history; is that
21    correct?
22    A.   Exactly.
23    Q.   All right. Does, does the system automatically suspend
24    the customer at this point?
25    A.   On the twelfth one? No. What it will come up -- it will

R. Vredenburg - Direct

865

1              THE COURT:  Any objection?

2              MR. BUCKLEY:  No objection, Your Honor.

3              THE COURT:  It's received.

4    BY MR. PECAU:

5    Q.   Okay.  And this e-mail is from you.  It starts out,

6    "Hello."  And you have 7442149.  I assume that's a subscriber

7    identification?

8    A.   That would be a ticket.

9    Q.   That would be the ticket.

10             And you say, "Here's another example of a customer

11   that I consider an habitual abuser.  In a year, he was

12   terminated twice and turned back on.  I suspended him again

13   since no e-mail address, and according to procedure, he'll

14   start over in the process."

15             And what was Mr. Zabek's comment to you?

16   A.   He said, "It is fine.  We need the customers."

17   Q.   You need the customers?  Okay.

18             And finally, let's mark as PX 1378 -- here you go,

19   sir.

20             Okay.  Mr. Vredenburg, the top e-mail is your

21   forwarding on an e-mail around April 10, 2010; is that correct?

22   A.   Yes, that's what it appears to be.

23             MR. PECAU:  Okay.  Your Honor, I'd like to offer into

24   evidence PX 1378.

25             MR. BUCKLEY:  A matter of foundation and hearsay.  I

1437

1  Team was following?
2  A.  If there was the procedure, I wasn't aware of it.  And I
3  wasn't aware of the e-mail.
4  Q.  Okay.  So you weren't aware that they were telling each
5  other DMCA equals reactivate?
6  A.  I am certainly not aware of this e-mail, and I don't know
7  anything about what you described.
8  Q.  Fair enough.  All right.  Let's go to another one.  Let's
9  take a look at PX 2060.  All right.  2060 is an e-mail from
10 Andrea Dameri dated February 15, 2012.
11         Do you know who Andrea Dameri is?
12 A.  No, sir.
13 Q.  So she -- it says, "CCI-Virginia."  What is that?
14 A.  CCI-Virginia is a name used for some of our locations in
15 Virginia.
16 Q.  All right.  And what is the CCI part?
17 A.  Cox Communications.
18 Q.  And you see here where Ms. Dameri says, "It seems that no
19 one has let them know in SAN the DMCA terms are not really
20 terminations any longer."
21         Do you see where it says that?
22 A.  I do see that, yes.
23 Q.  Okay.  What is SAN?
24 A.  That probably means San Diego.
25 Q.  Okay.  And Cox has a system there, right?