# Exhibit I

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
BMG RIGHTS MANAGEMENT (US) LLC, :
et al.,                        :
             Plaintiffs,       :
                               : Case No. 1:14-cv-1611
      vs.                      :
                               :
                               :
COX ENTERPRISES, INC., et al., :
             Defendants.       :
-------------------------------:
```

VOLUME 1 (a.m. portion)

TRIAL TRANSCRIPT

December 2, 2015

Before:  Liam O'Grady, USDC Judge

And a Jury

2

APPEARANCES:


COUNSEL FOR THE PLAINTIFFS:

Michael J. Allan
John M. Caracappa
Jeremy D. Engle
William G. Pecau
Roger E. Warin
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.   20036


Walter D. Kelley, Jr.,
HAUSFELD LLP
Suite 650
1700 K Street N.W.
Washington, D.C.   20006


COUNSEL FOR THE DEFENDANTS:

Andrew P. Bridges
Guinevere L. Jobson
Jedediah Wakefield
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94194

Brian D. Buckley
FENWICK & WEST LLP
1191 2nd Avenue, 10th Floor
Seattle, WA  98101

Craig C. Reilly
CRAIG C. REILLY, ESQ.
111 Oronoco Street
Alexandria, VA 22314

# Pages
# 223-25

223

1          The code for the Cox system that was provided to me

2   includes both programs and some other configuration data those

3   programs use.  One piece of that information is called a black

4   list.  And it's a list of e-mail addresses that the system will

5   reject, and that is to say not process.  And what the Cox

6   system does for an address that's on the black list is it

7   deletes the e-mail and then takes no further action on it.

8          In the call that I reviewed in the files that I

9   reviewed, the right Rightscorp e-mail that's used when it sends

10  a copyright notice is on that black list.  And so what that

11  means is that the e-mail comes into Cox's server, but then the

12  program that goes to read the e-mail off the server reads the

13  header part, the to/from information on the e-mail.  It checks

14  it against the black list.  It sees that Rightscorp is on the

15  black list, so that e-mail is then just deleted and no further

16  processing occurs for it.

17  BY MR. CARACAPPA:

18  Q.   Ms. Frederiksen-Cross, we talked a little bit about this

19  when going over your background, but maybe you can go into a

20  little bit more detail about the materials you've considered in

21  preparing your opinions in this case?

22  A.   Oh, certainly.

23          When I was first involved in this case, I received

24  some of the source code for the Rightscorp system.  Subsequent

25  to that, I received also some documents related to this case,

B.A. Frederiksen-Cross - Direct

224

1    things like -- there's an exchange of information called

2    interrogatories where each side asks the other questions and

3    then their technical people answer or their business people,

4    depending on the nature of the question, answer those questions

5    and sometimes they attach documents that give the answer.  And

6    so I was provided those kind of documents to review as well,

7    the questions that were asked of Cox and of Rightscorp by the

8    opposing parties and the answers that were given.

9         I reviewed the Cox CATS system, which I actually

10   traveled to a Cox facility to review.  And then -- or to a

11   facility where they were having the code hosted.  And then I

12   reviewed deposition testimony, which is the sworn testimony

13   given by people who are witnesses that you may or may not see

14   on the stand during the course of this trial, but they were

15   witnesses that the parties agreed could be interviewed in this

16   matter.  And those were the principal pieces of data.

17        In addition to that then, I also requested and

18   received at various times during my investigation some of the

19   data that the Rightscorp system collects or some of the notices

20   that it sends.  You know, I would ask can I see a sample of two

21   weeks' worth of data for a song or can I see a sample of

22   notices or -- you know, at various times I was given different

23   views into the data.

24        And then finally I did some of my own testing of

25   BitTorrent clients and of Rightscorp's ability to detect the

225

1  activity that I was conducting when I was using BitTorrent

2  to -- in this control test to do testing.

3          THE COURT:  Mr. Caracappa, let's end our questioning

4  for tonight.  It's 5:30.  I promised the jury I would let them

5  go home at 5:30, and I think this is a good time to break in

6  the testimony.

7          So, I'm going to excuse you for tonight.  Very, very

8  important that you go home and enjoy yourselves or listen to

9  the news where you'll receive some really horrible news on some

10  California shootings.  But don't do any investigation.  Don't

11  discuss the testimony or the case with anybody else tonight.

12  Don't do any research.

13          It causes -- it's a complete -- causes a complete

14  breakdown of the judicial system if you don't decide this case

15  based on what you hear in this courtroom and you instead do

16  things on your own to -- to make your decisions.  That defeats

17  our whole system.  So it's really important that you not do

18  that.

19          The first thing tomorrow I'm going to ask you whether

20  you had adhered to my order, and it's an order.  You know,

21  if -- I know you may have read about people who don't listen to

22  the judge -- because every judge gives the same speech I'm

23  giving you -- and have done something to pollute the entire

24  proceeding.  It causes mistrials; it costs lots of money,

25  inconveniences.  It subjects you to criminal penalties.  It's a

# Pages
# 619-20

619

1  appreciate BMG working to get the witnesses here.  Mr. Allan, I

2  had a nice cell in the back of the courthouse ready for you.

3          MR. ALLAN:  I am glad I didn't get to see it.

4          THE COURT:  I knew Mr. Warin would designate you as

5  the person to take responsibility.

6          MR. BUCKLEY:  Your Honor, I hate to do this as you

7  were about to escape, there is one more issue.

8          THE COURT:  All right.

9          MR. BUCKLEY:  So I just learned that we did get

10  notice that the plaintiffs would like us to have Roger

11  Vredenburg here on Monday.  He does not fly or drive, so we are

12  going to have somebody drive him from Virginia Beach up here on

13  Sunday night, and I just want to make sure that we should do

14  that and he is going to go on Monday.

15          THE COURT:  He is subject to the subpoena power.  He

16  is a witness who, you know, BMG has the right to call live if

17  they so choose.  And I didn't find any technical issues that

18  would rise to a level to quash it, so yes.

19          MR. BUCKLEY:  Okay.  He will be available Monday.

20  Oh, and you did indicate that there should be a proffer of what

21  the evidence was going to be through Mr. Vredenburg.

22          THE COURT:  Why he was necessary.  I mean, I think I

23  know the answer based on listening to some of the deposition

24  testimony that was actually used in Sikes, but tell me why

25  Vredenburg isn't repetitive and unnecessary and counter-

620

1      balances the inconvenience.

2              MR. ALLAN:  Sure.  Your Honor, there are a number of

3      documents he is on.  He is -- we intend to talk to him about

4      essentially the right and ability to control subscribers.

5      That's what he does.  He terminates and he suspends people.

6              And, you know, we are dealing with having to play --

7      to put Cox witnesses in through discovery depositions.  We

8      should be entitled to examine a witness at trial and present

9      this evidence this way.

10             Frankly, we don't think that the right and ability to

11     control issue should really be an issue, but it still is, so we

12     need to be able to present this testimony.  He is the only Cox

13     witness that is within the subpoena power.

14             THE COURT:  All right.  His testimony is going to be

15     different than Sikes who was the overall supervisor and was --

16     well, some of his e-mails were control type issues, right?

17             MR. ALLAN:  That's right, Your Honor.  But he also --

18     I promise you he will not be very lengthy.

19             THE COURT:  Okay.  All right.  Well, for the reasons

20     I have said, I think it's appropriate to bring him up here.

21     And hopefully it won't be too inconvenient for him.  How old is

22     he?

23             MR. BUCKLEY:  66.

24             THE COURT:  Oh, he's a youngster.

25             MR. BUCKLEY:  A baby, Your Honor.

# Pages 1055-58

W. Lehr - Direct                                                                    1055

1   resume?

2   A.   Yes.

3   Q.   All right.  Karl, if I could draw your attention to the

4   bottom of page 2 there?

5            Are those some of the courses?

6   A.   Yes.

7   Q.   Do they continue over onto page 3?

8   A.   Yes.

9   Q.   Have you done any work in connection with this lawsuit?

10  A.   Yes.

11  Q.   All right.  What were you asked to do?

12  A.   I was asked to provide economic analysis of a number of

13  the issues of importance in this case, and more specifically, I

14  was asked to opine or analyze three issues:  first, to take a

15  look at what the economics says about whether or not copyright

16  holders suffer economic harm as a result of infringement; two,

17  to take a look at what might be the incentives and economic

18  impacts on Cox of tolerating infringement or acting so as to

19  deter infringement; and three, looking at actually, you know,

20  what the economic benefit -- to estimate the economic benefit

21  to Cox of retaining and having subscribers on its network.

22  Q.   All right.  Are you giving any legal opinions concerning

23  copyrights today or copyright infringement?

24  A.   No.

25  Q.   All right.  What documents did you review in order to form

W. Lehr - Direct                                                      1056

1   your opinions on those three issues you just listed?

2   A.   Well, in addition to the materials I consider in the

3   normal course of my research and work, I looked at a number of

4   documents that were specific to this matter.  Those included

5   financial documents relating to the costs and revenues

6   associated with different services that Cox offers, a number of

7   other documents describing how Cox thinks about some of those

8   services, a number of the depositions in this matter, and then

9   some other research that, you know, I discovered and found

10  useful in coming to the opinions I've come to.

11  Q.   Did you read any general articles on Internet economics

12  and the economics of copyright infringement on the Internet?

13  A.   Yes.  I mean, I read a lot of that kind of stuff in the

14  normal course of my business, but I examined the literature on

15  this topic quite extensively as part of the basis of

16  formulating my opinions today.

17  Q.   All right.  Are you charging for your work on this case?

18  A.   I am.  I bill hourly at the rate of $650 an hour.

19  Q.   And approximately how many hours have you spent so far in

20  getting -- preparing your report and getting ready for your

21  testimony today?

22  A.   Between 200 and 250 hours.

23  Q.   All right.  Is the payment of your fees in any way

24  contingent on the outcome of this case?

25  A.   No.  I bill on an hourly basis, and whatever happens is

W. Lehr - Direct                                                      1057

1   whatever happens.

2   Q.   Were you able to form any opinions on those topics you

3   were asked to research, namely, the economic impact that online

4   copyright infringement has on copyright holders, to determine

5   how much revenue and profit Cox makes from its residential

6   high-speed Internet services, Cox's economic incentives, etc.,

7   the ones you listed earlier?

8   A.   Yes, I was.

9             MR. WARIN:  All right.  Your Honor, I would offer

10  Dr. Lehr as an expert in the field of economics, Internet

11  telecommunications, and media industries.

12            THE COURT:  Any objection?

13            MR. BUCKLEY:  No objection, Your Honor.

14            THE COURT:  Proceed.

15  BY MR. WARIN:

16  Q.   All right.  Dr. Lehr, I'd like to walk you through a

17  summary of the opinions or conclusions that you've reached.

18  Have you prepared a slide that summarizes your opinions?

19  A.   I have.

20  Q.   All right.  Karl, could we have that displayed, please?

21            All right.  Is this the slide that you prepared that

22  summarizes the three principal conclusions you've reached?

23  A.   Yes, it is.

24  Q.   Why don't you walk through somewhat briefly each of those

25  and explain them to the jury, because we'll spend a little more

W. Lehr - Direct                                                    1058

1   time going through each of these and ask you to explain the

2   underlying basis for your conclusions.  All right, let's start

3   with this overall slide.

4   A.    So, so the first opinion is that copyright infringement

5   causes significant economic harm to copyright holders, and

6   that's broadly supported by the economic literature, but

7   because the economic literature includes a diversity of data

8   sets and methods and all of that, it's not possible in the

9   context of the literature to accurately estimate or come up

10  with a single estimate of what that harm is for the industry,

11  and it's impossible in the context of an individual rights

12  holder.

13  Q.    All right, that's your first conclusion.  What's your

14  second conclusion or opinion?

15  A.    That subscribers to Cox are very valuable, and there's

16  evidence that indicates that a number of Cox subscribers are

17  infringing, and those subscribers are also very valuable, so

18  that Cox is deriving significant financial economic benefit

19  from having infringing subscribers on its network.

20  Q.    And your third conclusion?

21  A.    That in light of that second conclusion, if you look at

22  the economic incentives that Cox has to tolerate infringement,

23  they're substantial, and were it to take actions that would

24  deter the infringement, that would actually -- that would be

25  likely to disrupt their relationship with their subscribers,

# Page 1437

R.J. Cadenhead - Cross

1437

1    Team was following?

2    A.   If there was the procedure, I wasn't aware of it.  And I

3    wasn't aware of the e-mail.

4    Q.   Okay.  So you weren't aware that they were telling each

5    other DMCA equals reactivate?

6    A.   I am certainly not aware of this e-mail, and I don't know

7    anything about what you described.

8    Q.   Fair enough.  All right.  Let's go to another one.  Let's

9    take a look at PX 2060.  All right.  2060 is an e-mail from

10   Andrea Dameri dated February 15, 2012.

11           Do you know who Andrea Dameri is?

12   A.   No, sir.

13   Q.   So she -- it says, "CCI-Virginia."  What is that?

14   A.   CCI-Virginia is a name used for some of our locations in

15   Virginia.

16   Q.   All right.  And what is the CCI part?

17   A.   Cox Communications.

18   Q.   And you see here where Ms. Dameri says, "It seems that no

19   one has let them know in SAN the DMCA terms are not really

20   terminations any longer."

21           Do you see where it says that?

22   A.   I do see that, yes.

23   Q.   Okay.  What is SAN?

24   A.   That probably means San Diego.

25   Q.   Okay.  And Cox has a system there, right?

# Pages
# 1654-55

R. Sullivan - Direct

1654

1    A.   Yes.  There are really four tasks that I was presented

2    with, and I had prepared a slide that summarizes this.

3              So the first item is that I was asked to evaluate the

4    analysis that was put forth by Dr. Bardwell.  I was also asked

5    to evaluate the analysis put forth by Dr. Lehr.

6    Q.   Can I stop you for a second, Dr. Sullivan?

7              Can you just remind the jury who Dr. Bardwell and

8    Dr. Lehr are, please.

9    A.   Yes, certainly.  So Dr. Bardwell is a statistician, and he

10   put together what he claims to be a statistical model to

11   determine the number of subscriber accounts associated with the

12   infractions that have been alleged in the Rightscorp data.

13             Dr. Lehr is an economist who evaluated or looked at

14   the effects of the alleged infringement on Cox.

15   Q.   Sorry, I cut you off.  Please continue what you were asked

16   to do.

17   A.   Sure.  So the first two items was evaluating the work that

18   each of those two individuals had performed.  Items 3 and 4 --

19   so item 3 was to determine and calculate what was the harm that

20   would have been incurred by BMG as a result of the allegations

21   that had been put forth here of alleged infringement.

22             Now when I do this analysis, I had been asked to do

23   that under an assumption of liability.  Effectively what that

24   means is that when I perform that analysis, I don't evaluate

25   whether there has been infringement or whether Cox would be

R. Sullivan - Direct

1655

1    liable for that infringement.  I am simply asked to assume that

2    that is indeed the case so that then I can perform the

3    calculations of, under that assumption, what would be the harm

4    to BMG.

5            And then additionally, I have been asked under those

6    very same assumptions to determine and calculate what would be

7    the benefit to Cox as a result of the alleged infringement.

8    Q.   Okay.  We are going to talk about each of these in some

9    detail, but can you please summarize your evaluation of

10   Dr. Bardwell's testimony.

11   A.   Yes.  So at a very high level, he has constructed a

12   statistical model that in my view is fundamentally flawed.  It

13   effectively assumes its conclusions by engineering the results

14   that he obtained.

15   Q.   And can you please summarize your testimony or your

16   evaluation of Dr. Lehr's testimony.

17   A.   Yes.  In my view, Dr. Lehr's analysis is incorrect.  I

18   believe he has overstated the effect of the alleged

19   infringement on Cox for a variety of reasons.

20   Q.   And can you please summarize your findings relating to the

21   potential effects of alleged infringement on BMG in this case

22   assuming Cox were found liable.

23   A.   Yes.  So I have performed those calculations, and I have

24   calculated two different numbers.  The first is an estimate of

25   an upper bound on lost revenues, and that amount is $2,145,585.

# Pages
# 2000-5

2000

1   A.   I was the one that founded the company.  I ran it on a

2   day-to-day basis.  I had an office both in New Jersey and

3   primarily in Prague.

4   Q.   Dr. McGarty, have you got any teaching experience,

5   higher-education teaching experience?

6   A.   Yes, I was on the faculty of MIT from '69 through '75,

7   faculty and research staff.  I returned '89 to '91.  And when I

8   sold off my company in Europe, I returned pro bono from 2005 to

9   2012.

10         I also was on the faculty at GW down here in

11   Washington.  I was on the faculty at the business school at

12   Columbia where I taught telecommunications, finance, and

13   policy.  And I had a similar position at NYU Poly in New York

14   in the early '90s.

15         MR. ALLAN:  Thank you.  Your Honor, at this point we

16   would offer Dr. McGarty as an expert in the design and

17   implementation of Internet telecommunications networks,

18   including IP data networks in the operations of companies that

19   use such networks.

20         THE COURT:  Any objection?

21         MR. BUCKLEY:  That seems a little broader than maybe

22   what he spoke to, telecommunications generally.  I take

23   exception to the way it was described.

24         THE COURT:  All right.  I'll allow it.  I think he

25   has covered that much ground in the initial questions and

1   through his resumé.  Clearly he's been involved in a series of

2   different areas surrounding the Internet and its building and

3   structure.  So I'll allow him to be qualified to give his

4   opinion on those matters.

5          Thank you.

6          MR. ALLAN:  Very good.  Thank you, Your Honor.

7   BY MR. ALLAN: (Continuing)

8   Q.   Dr. McGarty, could you tell the jury what you were asked

9   to do in this case.

10  A.   I was asked to do two general tasks.  One was to examine

11  Cox's CATS system for copyright infringement focus, not all of

12  the parts of CATS system.  And determine its capabilities with

13  regards to dealing with copyright infringement notices.

14          And secondly, I was asked to specifically look at the

15  operational and logistical capabilities of that system to

16  handle Rightscorp infringement notices.

17  Q.   Very good.  And what types of materials did you look at in

18  forming your opinion?

19  A.   I had a wide variety of material that I looked at.  I

20  looked at depositions.  I looked at operational documents that

21  were provided to me through Cox, such as implementation plans,

22  specific values associated with those implementation plans.  I

23  looked at e-mails.

24          I looked at interrogatories that were provided by

25  Cox.  And I also looked at some of the trial transcript for the

T. McGarty - Direct

2002

1  trial up through Mr. Carothers, I believe, last week.

2  Q.   You've reviewed the trial transcript of this, in this

3  case?

4  A.   I did, yes.

5  Q.   Very good.  How about the AUP or the M&P?

6  A.   I've looked also at a variety of other Cox material which

7  included the AUP, which is the user policy that Cox has.  I've

8  looked at Cox Web sites and other material.

9  Q.   Thank you.  I would like you to flip in your book, if you

10 could, to what should be the first tab, PX 1344.

11 A.   1344?

12 Q.   1344.

13 A.   Okay.

14 Q.   Are you with me?

15 A.   I'm trying.  I have 1343.  Ah, I see it.  Yes.

16 Q.   Okay.  Do you recognize this document?

17 A.   Yeah, this -- yes, I do.

18 Q.   And is this one of the technical documents you looked at

19 provided by Cox?

20 A.   Yes, it is.

21          MR. ALLAN:  I would move this into evidence, Your

22 Honor.

23          THE COURT:  Any objection?

24          MR. BUCKLEY:  Can we have a sidebar?

25          THE COURT:  Yes, sir.

2003

1          MR. BUCKLEY:  Actually, Your Honor, you know what, no

2     objection.

3          THE COURT:  Okay, it's received.

4          MR. ALLAN:  Thank you, Your Honor.

5     BY MR. ALLAN: (Continuing)

6     Q.   Dr. McGarty, tell us what this document is.

7     A.   This document is entitled CATS Abuse Automation System

8     Implementation Plan, and it is dated March 22, 2010.  And this

9     is an -- the way I read it, it's an implementation plan of what

10    the CATS system should do.

11          I've written a lot of functional specifications in

12    system documents, in requirements documents, and generally

13    these are the things that you have that says, this is what your

14    system should do and kind of how it should do it.  It's not a

15    coding document.  It's a document that says, you know, if it

16    does these things, then it's doing the right stuff per the

17    document.

18    Q.   And how did you use this document, Dr. McGarty, in forming

19    your opinion?

20    A.   Well, I examined the document to understand how the system

21    is architected.  And a lot of what I do is architecture work.

22    I mean, I'm at the top level and I want to know what goes into

23    what and what are the pieces.

24          So I used this document first to understand the

25    architectural structure of the system, what are its components

T. McGarty - Direct

2004

1   and elements, how they communicated with each other, what they

2   were supposed to do as, for example, copyright infringement

3   notices were sent to the system.  And, you know, where was

4   stuff stored and how did that storage kind of work and, you

5   know, what were the operator terminals going to look at.

6           And this document provides at a fairly high but

7   detailed level, in my opinion, a reasonable description of the

8   system.

9   Q.  Okay, thank you, Dr. McGarty.  Could you summarize your

10  opinions in this case for the jury.

11  A.   Yes.  Simply, the first opinion is with results to the

12  Rightscorp infringement notices, I felt that this system, the

13  CATS system for copyright infringement notices can reasonably

14  in an operational and logistical manner be received and

15  processed through the system.

16          The second opinion is that as I started to look

17  through the system and the design here and then the

18  specifications that they put in to make the design work,

19  frankly, what happens is that the system looks like it's doing

20  things, but what comes out the end is very little.  The system

21  as it gets configured by Cox may put a lot of stuff in, but

22  nothing ever comes out the other end.

23          So the ultimate infringements are not fully and

24  adequately processed.

25  Q.  Okay.  We'll talk about all that in detail in a moment.

T. McGarty - Direct

2005

1          Before we get into the specifics of all that, did you

2    arrive at an opinion as to whether Cox Communications and

3    CoxCom can control infringement on their network?

4    A.    Yes, I did.

5    Q.    What is that opinion?

6    A.    Well, two parts.  One is that Cox has an AUP, a user

7    policy, and it seems to me fairly clear, which says, don't

8    infringe on copyrights and, oh, by the way, if you do, we have

9    the right to suspend you or terminate you or take some action

10   if that infringement persists above a level.  Okay.

11         So it on the surface says, we have the right to take

12   action if you infringe.

13         The second part of it is that I was reading

14   Mr. Vredenburg's testimony from last week, and they actually

15   have the ability to do it with the push of a button.

16   Q.    What do you mean?

17   A.    So if there's somebody who is infringing, they just push

18   the button, the AUP goes into the modem, and off they go.

19         So they have both the right and the ability to take

20   action.

21   Q.    Thank you.  I want to switch gears a little bit and talk

22   about the Rightscorp notices.

23         What is your understanding of what Cox did with

24   respect to the Rightscorp notices?

25   A.    My understanding from, you know, the various materials