# Exhibit 12

CENTER FOR
COPYRIGHT INFORMATION

# THE COPYRIGHT ALERT SYSTEM
## PHASE ONE AND BEYOND

MAY 28, 2014

## INTRODUCTION

In February 2013, the Center for Copyright Information (CCI), along with its member ISPs, entertainment community representatives, and Consumer Advisory Board launched a voluntary initiative designed to engage and educate consumers about the use and distribution of digital entertainment content. The program – the Copyright Alert System (CAS) – is a tiered notice and response system aimed at reducing copyright infringement over peer-to-peer (P2P) networks. It is built simultaneously to encourage consumers to embrace the growing number of affordable licensed sources of films, music, and television programming content available online from a variety of different services and in many different formats. The first-of-its-kind collaboration, the CAS is a multi-stakeholder effort focused on approaching the issue of digital copyright infringement in a fair and consumer-friendly manner.

Our work in 2013, the first ten months of operation, represented the initial "ramp-up" phase for the CAS, during which just over 1.3 million Alerts were sent to ISP account holders. While we are only now ready for full operation, we believe the program has already made significant strides in reaching consumers and is beginning to see progress towards its goals. The number of Alerts already sent represents a small percentage of the instances of copyright infringement alleged to be occurring over P2P networks using US Internet subscriber accounts, nonetheless, we are particularly proud to report that:

- **The beginning period of launch, "ramp up" and operation for the CAS has been – and continues to be – smooth and successful.** The multi-year consensus-building effort among rights holders, content owners, ISPs and consumer representatives has resulted in a fair, user-friendly program with built-in consumer protections that protects the ethos of the Internet.

- **The CAS sent more than 1.3 million Copyright Alerts** to account holders across America and the program is slated to at least double the number of notices sent and processed in size in the coming year.

- **The vast majority of the Copyright Alerts delivered to account holders - more than 70% - occurred at the initial educational stages,** with less than 3% of the Alerts sent occurring at the final mitigation stage.

- **The program was designed to operate in a way that protected consumer privacy,** with content owners generating notices of alleged copyright infringement through the use of publicly available IP address data - and ISPs delivering Alerts to account holders without sharing their personally identifiable information with content owners or otherwise jeopardizing their privacy.

- **The "easy-to-access" independent review process, managed by the American Arbitration Association (AAA),** enabled account holders to challenge Alerts they believed were sent in error, and account holders filed only 265 requests for review with AAA based on the more than 1.3 million Alerts generated during 2013. In fact, during the 10 month review period, account holders requested independent review of a mere 0.27% of qualifying Mitigation Alerts (and that volume represents, in turn, just 0.02% of all Alerts sent to participating ISPs' account holders). Of the review cases filed, there was not one single case in which an invalid notice – or false positive – was identified. Indeed there were only 47 successful challenges in 2013, and the vast majority of those were based on an "unauthorized use of account" defense, indicating that the account holder had made a satisfactory case that someone other than the account holder or a known (authorized) person was using the account in question to engage in impermissible P2P filing sharing of copyrighted content.

Although Alerts are generated based on the content being shared, not the behavioral characteristics of the end user, the CAS is ultimately aimed at influencing the vast majority of internet users who may not fully understand the legal, economic or social consequences of their behavior (as well as those whose lack of understanding of the technology meaning that they may not recognize that they are in fact sharing files). Alerts sent under the program are designed to educate Internet users, modify attitudes and change behavior by helping account holders to understand the importance of copyright protection and the risks inherent in using P2P programs to obtain or share digital content. An equally important goal of the Alerts is to inform account holders, members of their households and consumers in general of the diverse and continually expanding array of legal sources of content available to consumers in today's vibrant digital marketplace.[1]

Both before and after launch of the CAS, CCI engaged in qualitative and quantitative external consumer research into consumer awareness of, and attitudes toward, the tough issues surrounding online copyright infringement. Our most recent research was performed by the respected research firm Ipsos that has performed many surveys of the digital marketplace for a wide range of clients.[2] CCI commissioned Ipsos to conduct a nationwide survey among consumers of digital content, recruited from Ipsos' Online Sample Community. The intent of the research was to understand trends with regard to digital content consumption, online piracy, and how CAS fits into this landscape.

CCI also gleaned valuable information about the ways in which consumer behavior has changed as the marketplace for legally authorized digital entertainment has transformed to enable consumers to readily find the content that they want in myriad ways at attractive price points. Understanding and educating the consumer has been a priority during 2013 and will continue to inform the CAS going forward.

Indeed, our most recent research into attitudes about P2P use and copyright infringement found a population ripe for education around the following important issues:

- Overall, 62% of users said they believe it is **never** appropriate to engage in copyright infringement.

- More than 60% of Internet users surveyed also report that they are confused about which online sources are or are not legal – and they confirm that this confusion includes the use of P2P networks. In addition, they believe more easily accessible information to help users understand digital copyright infringement is needed.

- Generally however, the present availability of large amounts of authorized entertainment content online **has** led to an increase in the number of people who report accessing content from authorized sources, with more than 50% reporting using such sources for movies or TV shows in the last six months, and more than 70% doing so for music.

- 57% of users surveyed stated that they would stop engaging in copyright infringement immediately upon receiving an Alert, with only 9% reporting they would ignore such a notification.[3]

In the end, we believe that voluntary private sector collaborations are beginning to play a key role in discouraging digital copyright infringement and enhancing the digital entertainment marketplace. All of our research suggests that it will be important to our success going forward to reach a greater number of account holders now that the ramp-up and testing period is behind us. And, the program is slated to double during its second year. We have also found that consumer awareness, established through education, is key to deterrence and CCI will be developing additional educational programming and engaging in copyright awareness-building activities in the coming months. Finally, we will explore other ways in which the stakeholders can work together to meet our dual goals of reducing online infringement and helping to grow the digital marketplace.

## SOME COPYRIGHT ALERT SYSTEM HISTORY

The CAS was developed by the nation's largest owners of copyrighted entertainment content along with five of the largest Internet service providers (ISPs)[4], and input from consumer advocacy groups. When the effort began there was general agreement about the need to address copyright infringement among the stakeholders, but no specific agreement about whether and how distributors and content owners could

work together to educate consumers and modify infringing behavior. However, as the marketplace for digital content expanded and the impact of widespread infringement was better understood, distributors and content owners came together to discuss the creation of a voluntary program aimed at deterring illegal behavior and educating consumers about the importance of digital copyright protection and the availability of the many legal sources of video and musical content.

This collaborative effort culminated in the execution of a Memorandum of Understanding (the "MOU") in July 2011 that established the CAS, and also prescribed and set up the CCI to oversee and administer the CAS.[5] The CCI was also chartered to look more broadly at digital copyright infringement – and, hopefully, to modify consumer behavior through education. With this foundation in place, the hard work of developing and launching the CAS and working to understand consumer attitudes toward, and understanding of, digital copyright protection followed.

Over the course of eighteen months, the CCI, along with its Executive Board and Consumer Advisory Board, used the guidelines set forth in the MOU to develop and launch the CAS.[6] The implementation phase of the CAS consisted of a number of key work streams:

1. Understanding consumer attitudes toward, and awareness of, online copyright infringement in order to maximize the CAS's impact;
2. Development of a system of copyright notice generation and Alert delivery that protected consumer privacy while ensuring a high degree of accuracy;
3. Development of an Alert interface and delivery mechanism by each ISP designed to perform in a manner consistent with the requirements of the MOU and the technological infrastructure of each company's systems;
4. Creation of a neutral and independent review process that would enable consumers to challenge Alerts they believed were mistaken or delivered in error; and
5. Creation of educational materials and initiatives aimed at encouraging users to embrace the many new legal options for enjoying digital content.[7]

The first phase of CCI's and its member organizations' work culminated in the launch of the CAS in late February 2013. The program was designed to ramp up slowly over the first year to allow member content owners and ISPs to test the design and implementation of their systems in a manageable way, and to identify and address any issues that might surface during the ramp-up period.  In its first ten months, more than 2 million notices of alleged infringement were delivered to ISPs and approximately 1.3 million Alerts were sent to account holders based on those notices.

It is important to understand that by design, not all notices delivered to ISPs result in Alerts.  There are several reasons for this, most important of which is CAS's built in grace period that enables account holders and other authorized users time to

assimilate the information provided in the Alerts and to investigate and correct their personal behavior and that of people using their accounts. This seven-day grace period is one of the ways in which the CAS was designed to be both consumer-friendly and effective in reducing copyright infringement.

## THE CHANGING DIGITAL ENTERTAINMENT MARKETPLACE

In conjunction with the program, it is important to recognize the ever-expanding ecosystem for digital entertainment and its key role in positively influencing user choices online. The last three years have seen an explosion not only in new business models, but also in technologies used to deliver content in compelling ways. At the same time, consumer attitudes and behaviors have changed and, while infringing activity remains a significant problem for creators, consumers have quickly embraced new services and formats for enjoying content.

Today, the digital entertainment marketplace is thriving and continuing to expand. In 2009, there were fewer sources of legal sources for digital movies, music and TV shows. However, currently in the video entertainment marketplace, the number of places for users to find compelling content has more than doubled in the last five years. And, in the case of music, the sources have literally exploded. With this expansion of Internet radio and music and video streaming and subscription services like Spotify, Beats Music, Hulu and Netflix, the marketplace for digital content is diverse, easily accessible and affordable.[8] Indeed, in 2013 U.S. consumers viewed, rented or purchased 5.7 billion movies (up fifteen-fold since 2009) and 56 billion TV shows (up 175% from 2009) through the various methods including ad-supported and subscription streaming, according to Screen Digest.[9] During the same period 5-year period, subscribers to paid on-demand music services grew over 400%. And if we look over the past decade, digital music download sales in the U.S. grew over 1400% from $183 million to $2.8 billion, with over 30 million tracks available online today.[10]

At the same time, we've seen consumer attitudes toward copyright infringement continue to evolve. In CCI's most recent research conducted in February 2014, we looked at a general cross-section of the U.S. Internet-using population between the ages of 13 and 59, and found that the majority of peer-to-peer copyright infringement is fueled by a small group of younger, predominately male digital consumers.[11] It appears that most consumers (65%) believe that it is never okay to engage in infringing activity and that the need to protect artists' rights resonates strongly with consumers.[12] Perhaps most interesting for our work is that 65% of the respondents also agree that more resources need to made available that make clear which sources and activities are/are not legal. For example, a majority of consumers are not certain about the legal status of P2P networks, even given that there is plenty of evidence that they are predominantly used for illegal activities. At the same time, 69% of those surveyed believe that people need to be made more aware of the direct impact of copyright infringement on artists and content creators.[13]

## HOW THE CAS WORKS

The CAS is a multi-level system with three levels of Alerts – Educational, Acknowledgement and Mitigation – with up to two Alerts at each stage.[14] An Alert is a "notification" of alleged copyright infringement forwarded to an account holder by an ISP, indicating that an instance of alleged copyright infringement involving their account was detected by a content owner.[15]

The CAS is based on the premise that most consumers will take corrective action if alleged copyright infringement involving their Internet account is brought to their attention.[16] This theory is supported by research regarding consumer attitudes that was conducted on CCI's behalf both prior to the program's launch and also more recently. In our recent survey, we found that 79% of respondents believe that the receipt of an Alert would be "somewhat" or "very influential" in getting them to stop engaging in infringing behavior.[17] Our focus group research completed in the summer of 2012, found similar attitudes.

CCI has previously explained the process for generating an Alert in more detail on its website.[18] The process begins with the content owners identifying a list of content files (films, music tracks and albums or television programs) for their technology vendor to focus on for a particular period of time.  That list is then sent to their technology vendor, and is updated continually.  Currently, all of the member content owners use the same vendor to generate notices, a company called MarkMonitor. This vendor is responsible for scanning public P2P networks to identify instances where the files containing the listed content assets are being shared without authorization.  For every single notice, the company employs a sophisticated process to verify that the file shared does indeed contain copyrighted content and that the IP addresses identified can be matched to one of the CAS' participating ISPs.  Only after an instance of alleged infringement is verified and confirmed to be related both to a listed work AND to an IP address associated with a participating ISP, does the vendor send a notice to an ISP.[19]

Diagram A illustrates the notice generation process.

Once a case has been verified[20] and a notice has been generated, it is sent to the ISP to which the identified IP address is assigned by IANA (Internet Assigned Names and Numbers), which is the entity responsible for coordinating the Internet's globally unique identifiers, and is operated by the Internet Corporation for Assigned Names and Numbers (ICANN),  (this information is publicly available.)  Without sharing any personally identifiable information with the content owner or the technology vendor, the ISP then attempts to match the IP address in that notice to a subscriber's account and generates an Alert to the primary account holder if a match is identified and an Alert is warranted.  As noted above, there are three levels of Alerts and generally a total of up to six Alerts[21] (with a maximum of two Alerts at each level) delivered to any one account under the core program.

DIAGRAM A



- **Educational Alerts** inform users that allegedly infringing activity has been detected involving their account and identify the specific content that was allegedly shared illegally. The Alerts also inform the account holder of steps that can be taken to prevent further infringement, and provide information about authorized sources for digital entertainment content.

- If an ISP continues to receive notices of alleged infringement involving the same account, up to two **Acknowledgement Alerts** are then sent that require a user to acknowledge that they received the Alert(s). Importantly, the Acknowledgement does not require the user to admit or deny any wrongdoing.

- Finally, if an ISP still continues to receive notices of alleged infringement involving the same account after the Acknowledgement stage, the ISP will send up to two **Mitigation Alerts** which also require acknowledgement and have consequences such as the following as the ISPs do not all employ the same mitigation measures:

  » Re-direction to a landing page for a set period of time or until the account holder has reviewed copyright education materials;

  » A temporary reduction in Internet speed;

  » A temporary downgrade in the subscriber's Internet service tier.

Each of the ISPs has a certain degree of discretion in how they execute the program.[22] However, key elements of the program are consistent across all ISPs, including the following:

1. All of the participating ISPs maintain user privacy by delivering Alerts to consumers while communicating no personally identifiable information back to content owners or their vendors;

2. All of the participating ISPs use language in their Educational Alerts providing not only information about the alleged infringement, but also about where to find legal sources of content;

3. All ISPs offer assistance to consumers to help them avoid future allegations of infringement by securing their wireless routers and home networks and uninstalling unwanted P2P software;

4. All ISPs provide links to information that helps users find authorized copyrighted content, including through the CCI website;

5. All ISPs offer a streamlined linkable process for their customers to request that the American Arbitration Association (AAA) review Alerts the customers believe were mistaken or sent in error.

As stated above, the independent review process offered under the CAS is administered by the AAA – which is the oldest and largest alternative dispute resolution organization in the United States. The AAA review process is an important way in which the parties worked to build in fundamental fairness to the program, as it enables consumers to challenge the validity of Mitigation Alerts, and any previous Alerts, once they have reached the Mitigation Stage if the account holder believes they are mistaken or believes they may have been sent in error.[23] While there is a nominal $35 fee to submit an appeal, consumers who cannot afford the fee can and have requested a fee-waiver and, in any event, the fee is refunded if a user's challenge is successful.  As stated earlier, the system's goal is to educate customers, and education is best accomplished by delivering accurate Alerts that reach the correct account holders.  In other words, the CAS has placed a premium on accuracy, while also offering consumers an "easy-to-use" way to challenge the system if they believe mistakes have been made.

## THE YEAR 2013 IN NUMBERS:

At the end of the 10-month review period analyzed in this report, the CAS was still in its early stages as a program and, while we do not have a significant pool of data to evaluate yet, the data we do have is instructive.  As noted above, we can report that during the first ten months of the CAS's operation, more than 2 million notices of alleged infringement were sent to ISPs and more than 1.3 million Alerts were sent to 722,820 customer accounts.[24] The vast majority of those Alerts were Educational Alerts (72%), while a very small fraction were Mitigation Alerts (8%), with less than 3% at the final (or second) Mitigation level.

| ACCOUNT PROFILES – BY ALERTS SENT | | |
|---|---|---|
| Number of Alerts Received During the Analysis Period | Number of Accounts Receiving Specific Alerts During the Analysis Period | Type of Alert |
| Only 1 Alert | 722,820 | Educational |
| 2 Alerts | 214,654 | Educational |
| 3 Alerts | 165,065 | Acknowledgment |
| 4 Alerts | 94,599 | Acknowledgment |
| 5 Alerts | 60,477 | Mitigation |
| 6 Alerts | 37,456 | Mitigation |



Alert Distribution Across Accounts
From Inception through 12/31/2013

As shown above, the data thus far confirms that a much smaller proportion of accounts reach the Mitigation Stage of the program when compared against the proportion of accounts that only receive Educational Stage Alerts. While further analysis of future data will need to be done, we already believe that many accounts sent Alerts appear to be deterred after the first Alert is received. However, while the data we have is encouraging, we are also cognizant that there are many reasons that an account is not seen again as infringing again under the program- and we do not feel justified in attributing the steep reduction from Educational Alerts to Mitigation Alerts solely to the CAS.  Nonetheless, we believe the results at this early stage support the view that an educational program like the CAS can make a material difference in influencing the behavior of digital content consumers once the possibility of copyright infringement on their account is bought to their attention.

As stated above, another important facet of the CAS is the opportunity for users who believe they were incorrectly identified as possible infringers to challenge that identification.  Over the first nine months of the program, 0.27% of the Alerts eligible for review by AAA were actually challenged – and we believe this fact reinforces the reliability of the notice and Alert generation process.[25] Of those requests for review that were filed, the AAA was able to confirm that in no cases did any Alerts mistakenly identify the details associated with an infringement or mis-identify the account being associated with an Alert.  In fact, the Alert/s and applicable Mitigation Measures were upheld in 77% of the cases.  In the remaining cases, 18% were settled in favor of the subscriber based primarily on the demonstration that his or her account had been used without authorization.[26,27] The graphs below lay out these facts.





## LOOKING AHEAD AT MEASURING THE IMPACT OF THE CAS

While we believe that looking at the numbers of Alerts generated in each category is instructive in evaluating the program, we also want to go deeper and review the CAS's operational data in more detail.

We can already see evidence that account holders presented with Alerts are, in meaningful numbers, not being seen again engaging in P2P copyright infringement. Of course, any such review – based on only ten months of data during the program's early ramp-up phase – is bound to be preliminary in nature and insufficient to make any definitive numeric predictions.  Clearly, there is a lot we still have left to learn about the program's impact over the short, medium and long term, and these additional analyses are ongoing.

Nevertheless, the analyses we have performed thus far support the notion that, when presented with clear, concise information about the problems associated with P2P file sharing of copyrighted content and information about how to find content from licensed sources, many subscribers will begin to change their behavior.

Over the coming months, we will look in more detail at our operational data to better assess and predict the CAS's impact both on user behavior, as well as on consumers' attitudes towards copyright infringement.  We will also evaluate the potential "network effects" of the notice program and our education efforts to try to determine whether account holders who were exposed to the program and deterred from further infringement told others either inside or outside of their households about the Alerts, and whether this kind of "word-of-mouth" information sharing has a deterrent effect on other users.  Our operating theory is that a program like the CAS will benefit from

the "network effect," particularly given the fact that our external research indicates that 79% of respondents who use P2P software said that knowing someone who "got in trouble" for copyright infringement would be "somewhat to very" influential on their own behavior.[28] We also know from our research that many consumers would like more guidance about how to engage online legally,[29] and therefore we believe that as CCI's educational efforts continue, the level of understanding and awareness about both the program, as well as about online copyright infringement generally, will increase and the the deterrent impact of our program will be enhanced.

## CONCLUSION

The first year of the CAS focused on ensuring operational success and we have met that goal. The CAS is still in its early stages, especially given that it is a first-of-its-kind program in the U.S. – However, the data that we have been able to review from the first ten months of "ramp up" activity is encouraging. We believe that our internal and external research into the impact of the CAS shows great promise in our ability to "move the needle" of user behavior in the U.S. away from copyright infringement and toward the use of the many legal sources of content available in today's digital marketplace.

In particular, CCI and its members believe:

- A cooperative effort of technology companies, content owners and consumer stakeholders provides an important pathway to educate users about copyright laws and to encourage them to enjoy entertainment content legally.

- A deliberate and methodical approach to implementation – including cooperation from a broad range of interests – was key to the program's success in a fair and accurate manner. Key to that fairness is the program's attention to important consumer protections with protecting user privacy at the top of the list.

- Using P2P technology to unlawfully exchange copyrighted content remains a problem for certain key demographics, but most consumers believe copyright infringement is never okay and harms artists and creators of all kinds.

- Awareness is key to increasing the effectiveness of a program like the CAS – awareness not only of the program and the possibility that an account holder could receive an Alert, but of the rules surrounding copyright protection and what constitutes infringing behavior, as well as the best ways to find and use digital entertainment content in affordable and legal ways.

## FOOTNOTES

1. Information about the digital marketplace is provided both through Alerts and on the CCI's website at http://www.copyrightinformation.org/a-better-way-to-find-movies-tv-music/

2. For more information about Ipsos' work see http://www.ipsos-na.com

3. "Internet Usage and Piracy Study Commissioned by CCI" conducted by Ipsos ("Ipsos Survey").

4. The initial ISP participants in the CAS include AT&T, Cablevision, Comcast, Verizon and Time Warner Cable. Content Owner participants include recording artists and music producers, filmmakers, and creators and distributors of movies and television shows represented by the members of the Recording Industry Association of America (RIAA) and Motion Picture Association of America (MPAA) – the entities which participated in the negotiation for CAS. However, after closure of the negotiation, member companies of MPAA and RIAA were joined as participants by their independent counterparts, represented by the Independent Film and Television Alliance (IFTA) and the American Association of Independent Music (A2IM).

5. The MOU can be found on CCI's website at http://www.copyrightinformation.org/resources-faq/

6. Our current Advisory Board members can be found at http://www.copyrightinformation.org/about-cci/.

7. See, for example, resources made available on CCI's website at http://www.copyrightinformation.org/a-better-way-to-find-movies-tv-music/

8. CCI provides links to tools to help users find digital entertainment from the manifold sources available in formats and price points that meet their needs at http://www.copyrightinformation.org/a-better-way-to-find-movies-tv-music/

9. http://technology.ihs.com/Industries/450465/media-intelligence

10. Source RIAA.

11. See Appendix 1 for more information about P2P usage survey results from the Ipsos Survey.

12. Indeed, only 12% believe that copyright infringement can be okay if the artist or movie is lesser known or independent and 14% believe that piracy harms no one and is a victimless crime.  Ipsos Survey.

13. Ipsos Survey

14. Under the CAS, ISPs have the flexibility to send either one or two Educational Alerts.  Currently, all but one ISP is sending two Educational Alerts.  For a video

explanation of the CAS please see http://www.copyrightinformation.org/the-copyright-alert-system/

15. It is important to make clear the terminology used in the program.  While the program is based on "Alerts" sent to account holders, the underlying evidence of alleged infringement is sent in a "copyright notice" that is generated by content owners (through their vendors) and sent to an ISP.   Not every "notice" generated gets sent to an ISP and not every notice received by an ISP becomes an Alert.  As described above, technical and operational rules of the CAS mean that there will always be more notices than Alerts generated under the Program.

16. The program applies primarily to residential broadband accounts although it is possible that some small business accounts could receive Alerts as well if they are purchasing retail broadband services marketed to residential customers.

17. Ipsos Survey

18. For more information and a video explaining the Alert generation process go to http://www.copyrightinformation.org/the-copyright-alert-system/what-is-a-copyright-alert/

19. Under the MOU, CCI was required to retain an independent expert to review the notice generation methodology employed by the content owners.  CCI has, in fact, hired two independent experts, one (Stroz Friedberg) performed a review prior to the program's implementation and a second expert (Harbor Labs) reviewed the methodology after the program was launched.

20. Each individual case is verified to ensure that there is sufficient evidence to support each notice that is sent to an ISP.

21. ISPs may choose to send additional Alerts to their subscribers, but this is not mandated by the MOU.

22. For example, ISPs can send either one or two Educational Alerts; all ISPs do not have to use the same language in their Alerts; and ISPs have the ability to issue one-time waivers of mitigation measures on a case-by-case basis.

23. CCI's website provides a clear explanation of how the review process works and when account holders are eligible to take advantage of it.  See http://www.copyrightinformation.org/the-copyright-alert-system/what-do-i-do-if-i-think-the-alert-was-wrongly-sent/

24. The difference between notices sent and Alerts delivered is a function of several factors including the fact that notices received during the grace period mandated by the MOU  do not generate Alerts.

25. Pursuant to the MOU, an account holder may initiate a challenge once his or her account has reached the Mitigation Stage, by receiving at least one Mitigation level Alert.

26. The MOU laid out several defenses or "reasons for review" on which a user could challenging an Alert. The most commonly used defense was "unauthorized use of account" and no challenge was made that the underlying material alleged to have been infringed was not in fact protected by copyright.

27. The remaining 5% of independent review cases received by 12/31/14 were still pending resolution at the "cut-off date" for this evaluation.

28. Ipsos Survey

29. Ipsos Survey

# APPENDIX

| | P2P Usage by Gender/Age | | | | |
|---|---|---|---|---|---|
| | Total | Male 13-34 | Female 13-34 | Male 35-59 | Female 35-59 |
| Base | 1000 | 249 | 245 | 246 | 260 |
| P2P User | 24% | 41% | 24% | 21% | 11% |
| Lapsed P2P User | 11% | 11% | 12% | 14% | 8% |
| Non-P2P User | 65% | 49% | 63% | 65% | 81% |