**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

SONY MUSIC ENTERTAINMENT, *et al.*,

     Plaintiffs,

v.

COX COMMUNICATIONS, INC., *et al.*,

     Defendants.

Case No. 1:18-cv-00950-LO-JFA

**PLAINTIFFS' MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS' MOTION TO COMPEL**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION………………………………………………………......     1

II.    COX'S DEMAND FOR MORE "ACTUAL DAMAGES" DISCOVERY ……........     3

    A.     Cox's Requests at Issue …………………………………………………..     3

    B.     Plaintiffs' Response to Cox's Argument ……………………………     5

III.   COX'S DEMAND FOR MORE OWNERSHIP AND VALIDITY DISCOVERY ...    10

    A.     Cox's Requests at Issue …………………………………………………..    11

    B.     Plaintiffs' Response to Cox's Argument ……………………………    12

IV.    COX'S DEMAND FOR MORE DOCUMENTS CONCERNING COX …………..    15

    A.     Cox's Requests at Issue …………………………………………………..    15

    B.     Plaintiffs' Response to Cox's Argument ……………………………    15

V.     COX'S DEMAND FOR DOCUMENTS CONCERNING THE COPYRIGHT
    ALERT SYSTEM ("CAS") AND THE ACTIONS OF OTHER ISPS ……………..    17

    A.     Cox's Requests at Issue …………………………………………………..    17

    B.     Plaintiffs' Response to Cox's Argument ……………………………    19

VI.    COX'S DEMAND FOR MORE DOCUMENTS CONCERNING
    MARKMONITOR …………………………………………………………    22

    A.     Cox's Requests at Issue …………………………………………………..    22

    B.     Plaintiffs' Response to Cox's Argument ……………………………    23

VII.   COX'S DEMAND FOR MORE DOCUMENTS CONCERNING THE RIAA …….    25

    A.     Cox's Requests at Issue …………………………………………………..    26

    B.     Plaintiffs' Response to Cox's Argument ……………………………    26

VIII.  THE EFFECT OF INFRINGMENT ON PEER-TO-PEER NETWORKS …………    28

    A.     Cox's Requests at Issue …………………………………………………..    28

    B.     Plaintiffs' Response to Cox's Argument ……………………………    29

IX.    CONCLUSION …………………………………………………………..    30

## I.       INTRODUCTION

Cox filed a scattershot Motion to Compel seeking an order requiring initial or further responses to 59 of its 175 Requests for Production ("RFPs") and 2 of its Interrogatories. For many of its requests, Cox does not even attempt to explain why discovery should be compelled, relying instead on footnotes identifying requests by number without any specific discussion of them. Cox also overlooks the fact that Plaintiffs already have produced or agreed to produce substantial documents in response to a number of requests raised in the motion. Moreover, for many of Cox's other RFPs, Plaintiffs have informed Cox that no responsive documents exist. As explained in Plaintiffs' accompany declarations, even where documents may exist, Cox's demands are often so patently unreasonable they would require a herculean search, review, and production -- efforts that are wildly disproportionate to any marginal relevance the requested information may have to any issues in the case. Cox postulates theories of relevance but its speculation falls far short. Given the disproportionate burden that production would impose, this Court should deny Cox's motion.

Cox's motion must be understood in context, as it paints a distorted picture of discovery in this case. Indeed, Cox's disingenuous presentation suggests that Plaintiffs are stonewalling and resisting basic discovery. Nothing could be further from the truth. Plaintiffs have already produced nearly 300,000 documents to date, and continue to produce documents on a rolling basis, including copyright registration records, chain of title documents, infringement evidence including, *inter alia*, infringement notices, financial information, corporate reports, and organizational charts. Collection and review of electronic documents, including emails from relevant custodians, are underway, with production to follow. In contrast to Cox's approach, Plaintiffs served a reasonable 76 RFPs, tailored to a targeted set of documents, 10 of which followed the December 21 hearing and were drafted to incorporate the Court's guidance. Unlike Cox's motion to compel, Plaintiffs' motion is limited to important and identifiable documents

(rather than all documents concerning a vague topic), tailored to specific requests, and filed only after Cox unequivocally refused to produce the responsive documents.

Cox has taken a different tack. Its entire production, much of it the result of this Court's order, consists of some (but not all) trial exhibits and deposition transcripts from the *BMG v. Cox* case, along with some (but not all) of Plaintiffs' infringement notices to Cox. Importantly, Cox has not produced a single document or email from its own files other than Plaintiffs' own infringement notices. It has yet to produce key discovery, including, for instance: Cox's financial information; Cox's repeat infringer data; Cox's policies and procedures relating to copyright notices; Cox's internal communications on copyright notices; and infringement notices from others that involve the same subscribers who were the subject of Plaintiffs' notices. Cox has even refused to discuss document custodians and search terms, despite Plaintiffs' repeated requests to do so.

In addition to sheer volume, 130 of Cox's 175 RFPs include the impossibly broad demand for "all documents"—often concerning expansive subject matter far afield from any issue related to the case. Cox's motion takes the same blunt hammer approach and seeks to burden Plaintiffs with extensive, massively burdensome, and pointless discovery on a variety of irrelevant issues. The Federal Rules and cases interpreting them do not permit Cox to bury Plaintiffs in crushing discovery as a strategy that deflects from the merits. Ultimately, this is a case about Cox's misconduct. Plaintiffs will produce all documentation necessary to prove their claims. Cox should not be permitted to make the cost of enforcing one's rights so high that it is impossible to proceed.

Cox apparently hopes that by bundling together a slew of overreaching requests into a single motion and discussing only a favored few, the Court might be inclined to rule in its favor on at least some. But the motion cannot withstand scrutiny and should be denied in its entirety.[1]

---

[1] Not only does the motion lack merit, but Cox's gamesmanship should not be countenanced. The parties were in the midst of active meet and confers on several of the issues in its motion. Cutting those discussions short without warning, Cox filed its motion on the eve of the Martin Luther King holiday weekend, leaving Plaintiffs to scramble to prepare this brief and obtain detailed client declarations on a variety of issues over the federal holiday.

## II.   COX'S DEMAND FOR MORE "ACTUAL DAMAGES" DISCOVERY

Cox argues that its demands relating to actual damages merely call for Plaintiffs "to produce the most basic financial information" and claims that it is "readily available." (ECF No. 72 ("Memo.") at 1).   This characterization it utterly divorced from reality.   Cox seeks highly detailed profit and loss analyses on a recording-by-recording and composition-by-composition basis for every one of the thousands of works in the case, broken down by channel of distribution, for five years or more.  (Memo. at 3).   Contrary to Cox's misrepresentation, not a single one of the Plaintiffs maintains such profit and loss information on a track-by-track basis.  Plaintiffs are not required to create documents to respond to discovery.

### A.  Cox's Requests at Issue

Without discussing its requests, Cox makes the vague and overreaching demand that this Court requires Plaintiffs to produce "[a]t a minimum . . . Plaintiffs' per-work, per-channel revenue from the works-in-suit and other information bearing on Plaintiffs' profits per work."  (Memo. at 3).  Based on citations in footnotes, along with a listing in its motion, Cox appears to move on:

Request No. 27
Your detailed and itemized profit and loss statements or reports, provided in a readable and useable format (*e.g.*, Microsoft Excel or Access) organized by each of the Copyright Works for each of the last ten (10) years.

Request No. 28
Documents that contain information in a readable and useable format (*e.g.*, Microsoft Excel or Access) sufficient to demonstrate the claimed lost sales or licenses due to the infringement of the Copyright Works by Cox's subscribers, account holders, or customers, as alleged in Your Complaint and for which you seek relief in this litigation, organized by each of the Copyright Works.

Request No. 29
Documents that contain information in a readable and useable format (*e.g.*, Microsoft Excel or Access) sufficient to demonstrate the claimed lost sales or licenses due to infringement of the for the (sic.) Copyright Works on peer-to-peer file sharing sites, organized by each Copyright Work and for each of the last ten (10) years.

Request No. 36
All documents concerning trends, forecasts, projections, or any other financial plans related to royalties, sales, revenue, or profits generated through streaming of the Copyright Works that You are asserting in this litigation.

Request No. 41
Documents that contain information in a readable and useable format (*e.g.*, Microsoft Excel or Access) sufficient to demonstrate Your total annual revenue from each Copyright Work by medium and for each of the last ten (10) years, including Your revenue less expenses from payments to the artists who created the Copyright Works as well as all other documented costs and expenses.

Request No. 43
Documents that contain information in a readable and useable format (*e.g.*, Microsoft Excel or Access) sufficient to demonstrate Your total annual profit from each Copyright Work by medium and for each of the last ten (10) years.

Request No. 44
Documents that contain information in a readable and useable format (*e.g.*, Microsoft Excel or Access) sufficient to demonstrate Your total annual expenses from each Copyright Work by medium and for each of the last ten (10) years.

Interrogatory No. 2
For each work identified in response to Interrogatory No. 1, state on an annual basis for each of the past ten (10) years Your gross and net revenue generated by each work organized by medium and how such gross and net revenue was calculated.[2]

Interrogatory No. 3
For each work identified in response to Interrogatory No. 1, state on an annual basis for each of the past ten (10) years Your gross profit, operating profit, and pre-tax profit generated by each work organized by medium and how such gross profit, operating profit, and pre-tax profit was calculated.

(Memo. at 3-4 n.5-8; Mot. at 1).

---

[2] Interrogatory No. 1 asked Plaintiffs to "Identify all copyrighted works that You claim that Cox's subscribers, account holders, or customers have infringed and for which You seek relief in this litigation."

### B.  Plaintiffs' Response to Cox's Argument

Cox's motion for more financial information should be denied on multiple grounds.

#### 1.   Plaintiffs Do Not Maintain the Requested Information or Documents

In the requests above, Cox demands spreadsheets containing a variety of data, for each of the individual copyrighted works, broken down by medium, concerning profits, losses, expenses, lost sales, or lost licenses.  As Plaintiffs have told Cox, that information does not currently exist.[3] Beyond certain aspects of raw revenue, no Plaintiff maintains or records this expansive information at the recording–by–recording or composition-by-composition level.[4]

Although it is unclear from Cox's briefing, it apparently now demands—without supporting discovery requests—that Plaintiffs search for and produce documents that would allow (at least theoretically) for the creation of a detailed profit and loss statement for each individual recording and composition at issue, broken down by channel, *i.e.*, download, stream, CD sale, etc. (Memo. at 4-5).  If that is what Cox actually seeks, the request is impractical and pointless, raising a burden so enormous that such a requirement would effectively deny copyright owners the ability to protect their rights.  Again, nor does the actual discovery even call for such a production.

#### 2.   Cox's Demand Presents an Undue Burden

The process of creating, marketing, distributing, and/or otherwise exploiting a sound recording or musical composition spans nearly every aspect of each Plaintiff's business and practically every act involves either generation of income or expense at some level.  It includes everything from finding the artist or songwriter; negotiating acceptable terms within a highly

---

[3] Abitbol Decl. ¶ 6; Flott Decl. ¶ 6; Kahn Decl. ¶ 6; Leak Decl. ¶ 6; McMullan Decl. ¶ 8.

[4] *Id.*  Request No. 36, which Cox cites but does not discuss, is a bit different than the others.  Cox's failure to even address the request mandates denial.  On the substance though, it calls for production of "all documents concerning trends, forecasts, projections, or any other financial plans related to royalties, sales, revenue, or profits generated through streaming" of the copyrighted works in suit.  The request is overly broad, unduly burdensome, and improper on its face.  Moreover, requests for all documents concerning a general topic fail the particularity requirement and are not proportional where, as here, the requesting party has not demonstrated how any such materials will assist in resolving the claims at issue in the action.

competitive marketplace; signing them (including payment of advances); creating, recording and manufacturing the single or album in various formats; marketing the artist and the work; distributing the works via a variety of channels; licensing efforts; collection, allocation, accounting and payment of royalties, including Plaintiffs' participation or entitlement to shares of the same, after deduction of expenses and recoupments of royalties; and much more.[5]   To the extent it is even possible to obtain what Cox seeks, Plaintiffs would have to dedicate significant staff, on a full-time basis, to this collection and review effort for many months, incurring tremendous costs and disruption to ongoing business.[6]   The activity required to generate such income and expense detail for each work at issue involves multiple offices, departments, and hundreds of employees.[7]

The burdens that Cox seeks to inflict upon Plaintiffs would require years for discovery.   It is highly doubtful that Cox would actually have an accounting firm go through the millions of documents in order to try to create profit and loss statements for each of the thousands of works in suit.   There are so many varied documents and other significant complexities involved that it is hard to imagine the time required.   Even after the many months (or more) it would take for Plaintiffs to try to gather and produce the documents, Cox would then need months (or more) to review them.   Cox would also need to take a great number of depositions after reviewing the documents, and also before doing its analysis in order to understand the documents.

### 3.   The Relevance or Usefulness of the Documents Sought Is Limited or None

Cox's brief includes snippets of decisions to give the false impression that statutory damages cannot be awarded in a copyright case without some direct correlation to a plaintiff's actual damages.   (Memo. at 5-6).   That is not the case at all.   The Supreme Court explained that

---

[5] Abitbol Decl. ¶ 9; Flott Decl. ¶ 9; Kahn Decl. ¶ 9; Leak Decl. ¶¶ 9–10; McMullan Decl. ¶¶ 11–12.
[6] Abitbol Decl. ¶ 7; Flott Decl. ¶ 7; Kahn Decl. ¶ 7; Leak Decl. ¶ 7; McMullan Decl. ¶ 7.
[7] Abitbol Decl. ¶ 8; Flott Decl. ¶ 8; Kahn Decl. ¶ 8; Leak Decl. ¶ 8; McMullan Decl. ¶ 9.

statutory damages need not bear a relationship to actual damages.   In *F.W. Woolworth Co. v. Contemporary Arts*, the Court said:

> The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct. The discretion of the court is wide enough to permit a resort to statutory damages for such purposes. Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy."

344 U.S. 228, 234 (1952).  The Fourth Circuit has reinforced that a copyright Plaintiff need not show any actual damages in order to justify statutory damages.  *See Tattoo Art Inc. v. TAT Int'l LLC*, 498 F. App'x 341, 348 (4th Cir. 2012) (upholding statutory damages award of $20,000 per infringement, stating that proportionality to actual damages does not limit "statutory damages awards where Congress has limited the district court's discretion by establishing a statutory range"); *Superior Form Builders*, 74 F.3d 488, 496 (4th Cir. 1996) (upholding then-maximum statutory damages award despite plaintiff's inability to identify damages or lost profits).

The discovery Cox seeks is too attenuated to pass muster given its limited relevance and disproportionate burden.  With respect to any damages analysis Cox might undertake, its requests for financial information are flawed because they concern only one variable in a two-variable equation—where the second variable is unknown (namely, the overall scope of infringing activity that took place on Cox's network).  Neither Plaintiffs nor Cox has any idea how many millions or billions of infringements took place.  We only know that it was massive.  Without a number of unauthorized uploads or downloads that took place over Cox's network, which then would need to be multiplied by Plaintiffs' revenue or profits per download, the information that Cox seeks is of no value.

Even if there were some quantification as to the number of infringements, Plaintiffs' overall profit or loss on a particular work is obviously not the measure of lost profits that Plaintiffs sustained each time a Cox subscriber infringed one of Plaintiffs' works.  When determining the

amount   of statutory damages to   award   for copyright infringement,   courts   consider:   (1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) **the revenue lost by the copyright holder**; (4) the deterrent effect on the infringer and third parties; (5) the infringe's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties. *Bryant v. Media Right Prods., Inc*. 603 F.3d 135, 144 (2d Cir. 2010) (emphasis added). Plaintiffs' lost revenues are <u>not</u> measured by Plaintiffs' overall revenues, costs, and profits (or losses) for the work. Rather, Plaintiffs' lost revenues are measured by the "lost license fee" or "lost sale revenue." For instance, if an infringement through the Cox network displaced a 99-cent download through iTunes, the relevant figure is the amount of revenue that Apple would have paid to Plaintiffs for the lost download. Cox has no basis for the overall financial information it seeks.

Other courts have correctly rejected this kind of request.   In *Capitol Records Inc. v. MP3Tunes*, No. Civ. 9931 (WHP), Doc 168 (S.D.N.Y. Apr. 12, 2010), the court affirmed a Magistrate Judge's decision to deny production of historical profitability data where the relevance of the documents was limited, both because of the election of statutory damages and the lack of usefulness of such data in assessing actual damages.[8]  The same applies here.  The *MP3Tunes* court also relied upon the fact that the burden would be great.  The same applies here.

### 4. The *BMG v. Cox* Discovery Ruling Cox Relies on Does Not Apply and There Are Less Onerous Means for Cox to Do its Actual Damages Analysis

Cox cites to a discovery ruling in *BMG v. Cox* in which the Court ordered BMG to produce certain financial information.  (Memo. at 6-8.)  Cox does not, however, remind the Court that BMG neither contested the relevance of information sought as Plaintiffs do here, nor claimed any burden in producing it.[9]  BMG did not provide the Court with declarations like those from Plaintiffs

---

[8] Gould Decl., Ex. C.
[9] *See BMG v. Cox*, Hr'g Tr., 25:22-34:12 (June 26, 2015) (Gould Decl., Ex. D).

explaining the enormous burdens posed by Cox's requests.  At the hearing BMG's counsel told the Court, "I'm not exactly sure how the records are kept."[10]  Nor was there a response from BMG as to the consideration of actual damages in the context of an award of statutory damages.[11]

Even then, the Court expressed great skepticism with Cox's requests to BMG for song-level revenue broken down by channel or medium.[12]  While the Court ultimately granted the request, it warned Cox that there would be consequences if it did not use the song-level revenue by channel it had demanded.[13]  Of course, Cox proceeded to do essentially just that.

At the *BMG* trial, Cox's financial expert did not use the song-level revenue involving CDs or other physical media sales at all.[14]  He also did not use the song-level licensing revenue.  *Id.* Dr. Sullivan used song-level revenue by channel only to estimate the relative ratio of displaced downloads compared to displaced streams allegedly caused by Cox's infringement.[15]  By averaging revenues from all works in suit, he concluded that, of the lawful sales allegedly displaced by Cox's infringement, "76.3 percent goes to downloads, 23.7 percent goes to streaming."[16]  Given this was his only need for the information, there were far less burdensome ways to proceed.

Even discounting other fundamental flaws in Dr. Sullivan's report, Cox's minimal use of track-level revenue by channel cannot stand scrutiny to support Cox's motion here.  The Federal Rules place a premium on proportionality.  Fed. R. Civ. P. 26(b)(1).  Far less burdensome paths exist than requiring Plaintiffs to undertake the back-breaking endeavor described herein and in the accompanying declarations.  Public information available from reliable sources provides the same analyses that Dr. Sullivan derived from BMG's financial data.  The International Federation of the

---

[10] *Id.,* at 32:01–02.
[11] *Id.* at 30:03–31:01.
[12] *Id.* at 24:17-25:01.
[13] *Id.* at 33.
[14] *BMG v. Cox,* Trial Tr., at 1686–97, 1713-19 (Gould Decl., Ex. 9).
[15] *Id.* at 1691-92.
[16] *Id.*

Phonographic Industry (IFPI), a trade group that represents the recording industry worldwide, including the record companies in this case, reports on the ratio of downloads versus streams.[17]

Dr. Sullivan then sought to calculate lost revenue by multiplying his estimated number of lost downloads by a price per song. Critically, however, he did not even use the revenue information BMG provided. Instead, he simply "multiplied each one of those by a price of $1.17. This is the -- kind of like an average retail price that's coming out of places such as iTunes and Amazon Music."[18] To be clear, Cox had actual revenue per track by channel, for each year at issue in that case, and its expert instead used "kind of like an average retail price" as his metric, essentially doing exactly what this Court warned Cox not to do.

### 5. Cox's "Goliath v. Goliath" Argument is Preposterous

Finally, Cox erroneously attempts to justify its requests by arguing there are 58 separate plaintiffs who collectively seek more than $1.6 billion in damages. (Memo. at 7). Plaintiffs made no such specific monetary demand in their Complaint. Nor does the number of different plaintiffs transform inappropriate discovery into appropriate discovery.[19] Proportionality requires consideration of the relative importance of the information to the issues and the burdens involved.

### III.   COX'S DEMAND FOR MORE OWNERSHIP AND VALIDITY DISCOVERY

Plaintiffs are already producing a tremendous number of documents, including copyright registration and any necessary chain of title records, that prove their ownership of the works. Cox's

---

[17] In 2014, IFPI reported that the music "industry now derives 27 per cent of its digital revenues from subscription and ad-supported streaming services, up from 14 per cent in 2011. The digital download model remains a key revenue stream, however. Downloads still account for a substantial two-thirds of digital revenues (67 per cent)." *See* IFPI Digital Music Report 2014, available at https://www.ifpi.org/downloads/Digital-Music-Report-2014.pdf (last visited Jan. 23, 2018) (Gould Decl., Ex. F) Warner Music Group Corp. reported the same in its 2014 Form 10-K already produced to Cox. "According to IFPI, digital downloads accounted for 67% of digital revenues in 2013. Streaming revenue, which includes revenue from ad-supported and subscription services, accounted for 27% of digital revenues in 2013, up from 14% in 2011." (Ex. WBR_0002105-2287, at 2117).

[18] *BMG v. Cox,* Trial Tr., at 1695 (Dec. 11, 2015) (Gould Decl., Ex. E).

[19] For sake of clarity, while technically there are 58 separate legal entities, they actually fall into just six corporate families: Universal Music Group; Universal Music Publishing Group; Warner Music Group; Warner/Chappell; Sony Music; and Sony-ATV/EMI.

demand for a more expensive, and unnecessarily burdensome, production goes too far.  It is a fishing expedition.  Cox has no basis to believe there are ownership or validity issues.  It demands Plaintiffs pursue an exercise that is pointless and extraordinarily time-consuming and expensive.

### A. Cox's Requests at Issue

Cox makes the demand that this Court require Plaintiffs to produce the "[i]nformation concerning the ownership and validity of the works-in-suit, including ownership agreements, challenges to ownership or validity, and work-for-hire agreements."  (Memo. at 1).  Cox does not discuss the requests themselves.  Based on footnotes and its motion, Cox apparently moves on:

Request No. 10
All documents concerning the validity of the copyright registrations of the Copyright Works.

Request No. 13
Documents sufficient to demonstrate whether any of the Copyright Works were created as a work for hire.

Request No. 14
All documents concerning whether any of the Copyright Works is a work for hire.

Request No. 15
All documents evidencing, referring, or relating to the chain of title for the Copyright Works.

Request No. 16
All documents concerning ownership of or claims of right in the Copyright Works.

Request No. 18
All documents concerning disputes related to ownership at any time of the Copyright Works, including documents between You and any person concerning any question, uncertainty, litigation, or disputes over Your ownership, co-ownership, administration, control of, or other rights to, the Copyright Works.

Request No. 21
All documents concerning all forms of assignments of the copyrights that You claim cover the Copyright Works for each of last ten (10) years.

Request No. 22
All documents concerning all forms of licenses of the copyrights that You claim cover the Copyright Works and that were in effect at any time during the last ten (10) years.

(Memo. at 8-9, n. 19-22; Mot. at 1).

### B. Plaintiffs' Response to Cox's Argument

Plaintiffs have already produced and are continuing to produce documents concerning copyright registration and chain of title.  It is clear that Cox seeks more documents without even completing its review of what it has received.  However, Cox cannot demonstrate the need for the additional, extensive production.  Cox has zero evidence or reason to justify looking beyond what has been and is being produced—which, indisputably, constitutes prima facie evidence of Plaintiffs' copyright ownership and validity—let alone anything that could justify the massive burden or expense.  Other courts that have considered these types of blanket and blind requests for documents beyond copyright registrations and chain of title have rejected them.

As an initial matter, Cox in fact concedes (as it must) that Plaintiffs' copyright registrations constitute *prima facie* evidence of copyright ownership and validity.  Plaintiffs have already produced records demonstrating that each of the works in suit is protected by a copyright registration.[20]  They have also produced, and are in the process of completing their production of, various "chain of title" documents that link each named Plaintiff to the claimant listed on the copyright registrations, where it is other than a Plaintiff.[21]  This suffices to prove Plaintiffs own the works in suit.  In *BMG v. Cox,* the Court specifically rejected Cox's argument that "chain of title must relate back to the author[.]"  149 F. Supp. 3d 634, 645 (E.D. Va. 2015) (collecting cases). (granting summary judgment to BMG on ownership based on chain of title documents connecting named claimant on the registration certificate to named plaintiffs).

Cox's request for all the underlying documents through which Plaintiffs obtained their rights in the works-in-suit is a fishing expedition.  None of the cases cited in Cox's brief remotely require such expansive proof of copyright ownership.  (Memo at 8-12).  Cox's demand that Plaintiffs produce all assignments or exclusive licenses through which Plaintiffs obtained their

---

[20] Gould Decl. ¶ 3.
[21] *Id.*

rights in the copyrighted works, along with work-for-hire agreements, would be a significant undertaking, requiring the location and review of hundreds of thousands of documents, thousands of hours of review time, and likely millions of dollars in costs.[22]  It would be a pointless exercise, as it only would confirm what Plaintiffs' registrations with the U.S. Copyright Office already demonstrate.  The acquisition and exploitation of copyrighted works are the foundation of Plaintiffs' respective businesses, and Cox and its counsel know perfectly well that Plaintiffs secure ownership interests in such works as a matter of course regardless of whether that interest is secured through an assignment alone or, in the alternative, both work-for-hire and assignment provisions set forth in any agreement(s) concerning the works at issue.[23]  Plaintiffs' connection with these artists and songwriters who created the works at issue is also a matter of public record (including as the works are commercialized).

Cox lacks any facts to support the notion that Plaintiffs do not own the works in suit.  And it is axiomatic that conjecture and argument are not a basis for discovery.  *See Surles v. Air France*, No. 00 5004 (RMB) (FM), 2001 WL 1142231, at *2 (S.D.N.Y. Sept. 27, 2001) ("the information sought by Defendant does not become relevant merely because Defendant speculates that it might reveal useful material"); *In re Alliance Pharmaceutical,* 1995 WL 51189, *1 (S.D.N.Y. Feb. 9, 1995) ("[D]iscovery requests . . . cannot be based on pure speculation or conjecture.").[24]

---

[22] Abitbol Decl. ¶ 15; Blietz Decl.¶ 9; Leak Decl. ¶ 18; McMullen Decl. ¶ 18; Parry Decl. ¶ 11.

[23] Abitbol Decl. ¶ 13; Blietz Decl.¶ 7; Leak Decl. ¶¶13–15; McMullen Decl. ¶ 15; Parry Decl. ¶¶ 6–8.

[24] Under the Copyright Act, "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a) (providing for transfer of copyright ownership).  But, it is well established that absent a dispute between the author and a copyright transferee about ownership of the copyright, a third party accused of infringement may not invoke Section 204(a).  *See Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 36 (2d Cir.1982) (in situations where "the copyright [author] appears to have no dispute with its [assignee] on this matter, it would be anomalous to permit a third party infringer to invoke [Section 204(a)'s signed writing requirement] against the [assignee]"); *Imperial Residential Design, Inc. v. Palms Dev. Group, Inc.*, 70 F.3d 96, 99 (11th Cir.1995) (adopting the rule of *Eden Toys*); *see also Metropolitan Regional Information Systems, Inc. v. American Home Realty Network*, 722 F.3d 591, 601 (4th Cir. 2013) (expressing skepticism of the "anomaly" of allowing the accused infringer to "fabricate for its own benefit" a dispute between the author and assignee over copyright ownership).

Courts have rejected Cox's impractical and needless scorched-earth approach. *See Yash Raj Films (USA) v. Kumar*, No. 05-CV-3811 (FB)(KAM), 2006 WL 3257215, at *1 (E.D.N.Y. Nov. 9, 2006) (denying a request for chain-of-title documents for hundreds of copyrighted works because "[p]laintiff . . . is entitled to the presumption of validity" and the defendants had "not shown why the Court should compel the chain of title information for over one hundred works . . . given the significant burden that this would place on plaintiff"); *Warner Bros. Records Inc. v. Seeqpod, Inc.*, No. CV 08-335 (VBF) (PLA), Doc. 31 at *12 (C.D. Cal. Mar. 31, 2008) ("Here, there is no assertion by defendant that would raise a serious question as to the validity of plaintiffs' claims of ownership in the works in question.  As such, discovery beyond the certificates is not warranted at this stage.").[25]

Cox's demand that Plaintiffs produce "any documents concerning challenges to either the validity or their ownership of the works-in-suit" is also specious.  To this day, Cox refuses to narrow or clarify what it seeks, instead demanding all documents concerning a vague and broad topic.  Moreover, Cox does not even attempt to articulate how a dispute that may have been raised 20 years ago, for example, over a work that was created in the 1980s or 1990s (which obviously was resolved in favor of any of the Plaintiffs, given their continued assertion of ownership) serves in any way to rebut the presumption of ownership and validity of Plaintiffs' registration certificates that are still in full force and effect today.   But, as a practical matter, none of the Plaintiffs maintains centralized files cataloguing ownership or validity disputes that may have been raised concerning the thousands of works at issue here.[26]  Even trying to search for the documents sought by Cox would require a vast undertaking spread across offices, departments, and personnel.[27]

---

[25] Gould Decl. Ex. 11 (unpublished decisions cited herein are attached to the Gould Declaration).

[26] Abitbol Decl. ¶ 13; Blietz Decl. ¶ 7; Leak Decl. ¶ 16; McMullen Decl. ¶ 18; Parry Decl.  ¶ 9.

[27] Abitbol Decl. ¶¶ 12–15; Blietz Decl. ¶ ¶6–9; Leak Decl. ¶¶ 16–18; McMullen Decl. ¶ ¶15–16, 18; Parry Decl.  ¶¶ 9–11.

## IV.   COX'S DEMAND FOR MORE DOCUMENTS CONCERNING COX

Plaintiffs are already producing substantial responsive documents concerning.  This aspect

of Cox's motion to compel is, at a minimum premature and, ultimately, may likely be moot.

### A.  Cox's Requests at Issue

In its brief, Cox discusses Request Nos. 64-65.  (Memo. at 13-14).  However, based on

citations in footnotes, along with a listing in its motion, Cox relies upon the following:

> Request No. 64
> All documents that mention, refer to, or relate to Cox that were created, received, or sent
> from 2013 to the present
>
> Request No. 65
> All documents concerning communications with Cox regarding copyright infringement
>
> Request No. 128
> All documents that reference or concern Cox's Cox Abuse Tracking System (the "CATS").
>
> Request No 129
> All documents concerning the technical abilities of the CATS, including its ability to process
> notices.
>
> Request No. 134
> All documents concerning communications with, or attempts to contact, Cox subscribers
> concerning allegations of copyright infringement.
>
> Request No. 135
> All documents concerning any communications, including the communications, with people
> who received copyright infringement notices sent by You, on Your behalf, or upon which You
> will rely in this litigation.

(Memo. at 13-14, n. 26-30; Mot. at 1).

### B.  Plaintiffs' Response to Cox's Argument

Cox's requests are patently overbroad and encompass all manner of non-relevant

documents.  In correspondence and conferences, Plaintiffs gave Cox an opportunity to narrow the

documents it seeks, yet Cox refused to do so.[28]   After much prodding, Cox made the narrow

---

[28] Gould Decl. ¶ 2.

concession that it was not interested in receiving documents containing "monthly invoices for Cox's services" or emails that simply use a cox.com domain.[29]   This does not come close to resolving the overbreadth for "all documents that mention, refer or relate to Cox."  Plaintiffs are already making a substantial production of documents concerning Cox and infringement.

Before Cox filed its motion, Plaintiffs had already responded that they are producing the following non-privileged documents in their possession, custody, or control, to the extent located following a reasonable search:

(1) notices of infringement in their possession, custody, or control that are related to the copyrighted works in suit and were sent to Cox by or on behalf of Plaintiffs;

(2) downloads of the unauthorized copies of the copyrighted works infringed by Cox's subscribers;

(3) documents (essentially technical data) sufficient to show information concerning infringement of the copyrighted works in suit by Cox's subscribers or customers;

(4) for the period 2012-2014, documents concerning analysis of the reliability of the MarkMonitor system used to produce the copyright notices sent to Cox upon which Plaintiffs will rely in this litigation;

(5) for the period 2012-2014, documents relating to Cox's response to receiving an infringement notice sent by or on behalf of Plaintiffs; and

(6) documents concerning the number of infringement notices Cox would accept from Plaintiffs or on behalf of Plaintiffs.

Critically, Cox has refused to discuss custodians and search terms.[30]   On multiple occasions, Plaintiffs have asked Cox to engage in a reciprocal dialogue regarding each side's custodians and search terms but Cox has outright refused.[31]   Notwisthanding this, Plaintiffs are conducting reasonable searches to target non-privileged documents concerning Cox and copyright infringement.[32]   Cox's demand for documents after 2014 is unreasonably broad and burdensome.

---

[29] *Id.*
[30] Gould Decl. ¶ 4.
[31] *Id.*, Ex. A.
[32] *Id.* ¶ 2.

The relevant time period at issue in this case is cabined. Plaintiffs should not have to incur the costs and efforts required to search beyond that period. There is a stipulation between the parties that the relevant time period is 2012 to 2014, and Cox has so limited its own discovery responses.[33]

## V.   COX'S DEMAND FOR DOCUMENTS CONCERNING THE COPYRIGHT ALERT SYSTEM ("CAS") AND THE ACTIONS OF OTHER ISPS

Cox's request for an order compelling Plaintiffs to produce a variety of categories of documents concerning CAS and the actions of other ISPs is without merit. This case is about Cox and its actions relative to its legal obligations. The attitudes and actions of Cox's competitors, whether in connection with CAS or otherwise, are irrelevant. A driver caught speeding cannot avoid a liability or pay a lesser ticket by arguing that others on the road drove just as fast or faster.

### A.   Cox's Requests at Issue

Cox mischaracterizes its document requests concerning CAS and the actions of other ISPs, inaccurately describing them as "narrowly tailored and straightforward." The truth is that Cox's requests before the Court seek "all documents concerning" a variety of broad topics. Tellingly, Cox attached its document requests but did not quote them in its brief. Based on citations in footnotes in Cox's brief, Cox brings the following litany of requests before the Court:

Request No. 118
All documents concerning an ISP's response to receiving an infringement notice from any entity, including the "representatives" identified in paragraph 2 of Your Complaint.

Request No. 126
All documents concerning Your communications or negotiations with ISPs other than Cox regarding the number of infringement notices that any of those other ISPs would accept from You, any other Plaintiff, or any other party attempting to enforce a copyright.

Request No. 127
All documents concerning the policies or practices of online service providers (including without limitation ISPs and Internet access providers) concerning the termination or suspension of their subscribers or account holders due to allegations of copyright infringement.

---

[33] *Id.*

Request No. 130
All documents concerning communications between You and any ISP other than Cox regarding Your request or demand for the ISP to transmit information to the ISP's subscriber, account holder, or customer.

Request No. 131
All documents concerning Your communications with anyone not employed or otherwise affiliated with an ISP concerning the number of infringement notices that any ISP would or would not accept from You, any other Plaintiff, or any other party attempting to enforce a copyright.

Request No. 165
All documents concerning CAS.

Request No. 166
All documents concerning negotiations related to CAS.

Request No. 167
All documents concerning any Memorandum of Understanding concerning CAS, including without limitation the July 6, 2011 Memorandum of Understanding (the "7/6/2011 MOU") to which the RIAA was a signatory (singly or collectively, a "CAS MOU").

Request No. 168
All documents concerning any agreement You entered into pursuant to any CAS MOU or any related agreement, including without limitation any Implementation Agreement You entered into pursuant to the 7/6/2011 MOU.

Request No. 169
All documents concerning Your status as a signatory of a CAS MOU.

Request No. 170
All documents concerning Cox's compliance or non-compliance with policies or procedures reflected in CAS, a CAS MOU, or any Implementation Agreement concerning a CAS MOU.

Request No. 171
All documents concerning any technological system used to detect, monitor, or generate or send notifications concerning, copyright infringement in connection with CAS, a CAS MOU, or any Implementation Agreement concerning a CAS MOU.

Request No. 172
All reviews, assessments, evaluations, reports, or the like, concerning CAS, including without limitation any technological system utilized in connection with CAS.

Request No. 173
All documents concerning any reviews, assessments, evaluations, reports, or the like, concerning CAS or a CAS MOU, including without limitation drafts.

Request No. 174

All documents concerning notifications sent pursuant to CAS, any CAS MOU, or any Implementation Agreement, concerning allegations of copyright infringement of any Copyright Work.

(Memo at 14-16, n. 31-39; Mot. at 2).[34]

### B. Plaintiffs' Response to Cox's Argument

Cox attempts to justify this discovery based on false predicates and a misapplication of a discovery ruling from *BMG v. Cox*.

### 1. Cox Tries to Justify Its Discovery By Creating False Premises

Cox argues that "Plaintiffs' Complaint is replete with allegations . . . that Cox somehow stands apart from the industry" with respect to its handling of copyright infringement. (Memo. at 14). Cox fails to cite any such allegations in the Complaint, however, because they are not there. Plaintiffs' Complaint makes no makes no attempt to compare Cox's conduct to that of other ISPs. Plaintiffs, indeed, have indeed taken issue with Cox putting its corporate profits ahead of its legal obligations, its decision to limit the number of notices it would accept, and its willfulness in continuing to provide Internet service to known repeat infringers. Plaintiffs' allegations concern Cox's violation of its own legal obligations, not whether Cox acted better, worse, or the same as another ISP. The Complaint discusses Cox, never mentioning another ISP or industry standard.

Cox also misleads the Court regarding CAS. It was not an industry standard and cannot be held out as one.[35]   As set forth in Plaintiffs' declarations, CAS was a private, multi-industry agreement to work collectively to address copyright infringement. It involved 18 separate parties and the creation of an independent entity to administer it.   The very Memorandum of

---

[34] In its motion, Cox indicates that it "also requested that Plaintiffs identify whether they were signatories to the CAS." As supposed support, Cox cites to Interrogatory No. 8.  (page 15 at n.33).  However, Interrogatory No. 8 does no such thing.  Rather, it asks Plaintiffs to "Identify all of the ISPs with which You, either directly or indirectly, have communicated regarding the CAS, any agreements related to the CAS, and the processing of copyright infringement notices by ISPs."

[35] Bell Decl. ¶ 14; Leak Decl. ¶ 28; McMullan Decl. ¶ 32.

Understanding that created CAS expressly provides that it is not an interpretation of an ISP's legal obligations.[36]  Thus, the extensive documents that Cox demands that Plaintiffs produce concerning CAS are irrelevant to any issue in this lawsuit.  Cox should not be allowed to pursue this frolic and detour, prying into confidential and sensitive documents concerning the activities of its competitors.  Nor should Plaintiffs be forced to bear the costs and distractions of these searches.

### 2.   The *BMG v. Cox* Discovery Ruling that Cox Relies Upon is Distinguishable

Cox again claims that a discovery ruling from the *BMG v. Cox* action binds Plaintiffs. (Memo. at 18).  However, that particular situation was very different.  To begin with, CAS was not even at issue in that case, since BMG was not part of CAS.  The basis for Cox's entitlement to discovery relating to other ISPs in *BMG v. Cox* simply does not apply here.

BMG's claims centered on Cox's refusal to accept BMG's notices or forward them to its subscribers unless BMG or its vendor, Rightscorp, removed settlement language from the notices. While the Court recognized that what matters is whether Cox met its legal obligations, it allowed some discovery on how BMG and Rightscorp interacted with other ISPs, explaining that Cox should be able to see if BMG made admissions to other ISPs about their legal obligations. (June 26, 2015 Hearing Tr. at 16:18-16:22; 19:12-17; 20:02-06; 21:02-11).  Here, Plaintiffs' notices to Cox did not contain any such settlement language.  Thus, searching for communications about an ISPs refusal to forward notices is not a basis for any discovery.  Even more importantly, CAS was a very complicated, private agreement.  CAS was not a statement of obligations under the law and

---

[36] Specifically, the MOU and parties to it acknowledged that "the limitations on ISP liability under the DMCA are conditioned on an ISP's adoption and reasonable implementation of a policy that provides for the termination in appropriate circumstances of subscribers and account holders who are repeat infringers."  *See* MOU at 9 n.1, attached as Ex. 13 to J. Golinveaux Decl. (ECF No. 75-14).  The MOU further acknowledged that "entering into this Agreement is not, by itself, intended to address whether a Participating ISP has adopted and reasonably implemented a DMCA Termination Policy."  *Id.*

the MOU made that clear.  Thus, the rationale behind the discovery ruling – admissions to ISPs about their legal obligations – does not apply.

Nor is there any reason to believe that statements to ISPs outside the context of CAS would contain admissions relevant to the claims in suit.  Speculation and argument from Cox's attorneys that these documents will "refute and contextualize" Plaintiffs' allegations are not a basis for discovery.  *See Surles*, 2001 WL 1142231, at *2 (S.D.N.Y. Sept. 27, 2001); *In re Alliance Pharmaceutical,* 1995 WL 51189, at *1.  Moreover, the "admissions" that Cox supposedly seeks are not plausible.  Cox cannot credibly hope to find an email to an ISP saying, "you don't need to terminate accounts of repeat infringers but can instead feel free to let subscribers infringe unfettered."  Nor can Cox seriously expect to find an email to an ISP saying, "we don't mind infringement, you can restrict us to reporting just a few hundred infringing subscribers per day."

### 3.  Cox's Discovery is an Undue Burden

Finally, as explained in Plaintiffs' declarations discovery regarding CAS and the actions of other ISPs would create a large distraction in discovery and thrust an unnecessary burden upon Plaintiffs on tertiary issues.[37]  What Cox describes as narrowly tailored and straightforward is anything but that.  CAS was a complicated, private agreement between a number of copyright owners in the record industry and movie industry, as well as their respective trade associations, on the one hand, and a number of different ISPs, on the other hand.  Negotiations leading up to the formation of CAS spanned years.  A separate corporate entity called the Center for Copyright Infringement, Inc. ("CCI") was created to administer and oversee CAS.  The creation and administration of CCI and CAS involved dozens of individuals at dozens of companies from multiple industries engaged in dialogue over the course of years.  Each participating company was involved in the oversight and activities of CCI.  The agreement and activity pursuant to it went on

---

[37] Bell Decl. ¶ 12; Leak Decl. ¶ 26; McMullan Decl. ¶ 30.

for at least four years after the years-long lead-up, with multiple committees and workstreams. The terms and agreement implementing CAS contain strict confidentiality provisions governing the handling of the participating members' sensitive business information and records and data relating to the CAS notice program.  Certain information cannot be disclosed without the prior written consent of all 30 parties involved.  CCI has since dissolved.

## VI.   COX'S DEMAND FOR MORE DOCUMENTS CONCERNING MARKMONITOR

Plaintiffs are already making a substantial production of documents concerning MarkMonitor as described below.  This aspect of Cox's motion to compel may also likely be moot.

### A.  Cox's Requests at Issue

Cox's MarkMonitor-related discovery requests, which it cites in a footnote but does not include in its brief, belie any notion that Cox is proceeding reasonably.  The following are the actual requests that Cox brings before the Court:

Request No. 136
All documents concerning any of the copyright infringement notices upon which You will rely in this litigation or that were sent to Cox by You or on Your behalf.

Request No. 139
All documents concerning, and communications with, any entity, including the "representatives" identified in paragraph 2 of Your Complaint, that prepared and/or sent copyright infringement notices relating to the Copyright Works.

Request No. 141
All documents concerning and communications with MarkMonitor.

Request No. 144
Copies of business plans, prospectuses, marketing materials, investor materials, white papers, websites, or any other materials concerning the processes and procedures for monitoring peer-to-peer file sharing sites in order to identify potential copyright infringement from 2013 to the present maintained by You, any other Plaintiff, or someone working on behalf of You and/or any other Plaintiff.

Request No. 147
All documents concerning any computer code, computer program, software, hardware, system, process, or device through which copyright infringement was monitored and/or

detected and related copyright infringement notices were prepared and sent by You or on Your behalf to Cox for the Copyright Works.

Request No. 148

All documents concerning any computer code, computer program, software, hardware, system, process, or device utilized to monitor or detect copyright infringement through BitTorrent or peer-to-peer file sharing sites that resulted in the copyright infringement notices upon which You are relying in this litigation.

Request No. 156

All documents concerning the relationship, agreement, and/or communications, including the communications, between You and/or any other Plaintiff and MarkMonitor.

Request No. 159

All documents concerning any technical or qualitative analysis of any computer code, computer program, software, hardware, system, process, or device utilized to produce the copyright notices upon which You will rely in this litigation, including any documents drafted by either Stroz Friedberg or Harbor Labs.

Request No. 162

Correspondence with anyone who sent copyright infringement notices to Cox on Your behalf.

Request No. 163

Correspondence with anyone who sent copyright infringement notices to Cox upon which You are relying in this litigation.

(Memo at 19, n. 44-44; Mot. at 2).[38]

## B.  Plaintiffs' Response to Cox's Argument

Cox cannot justify discovery of every communication with or concerning MarkMonitor or its notices.  Trying to come across as reasonable, Cox indicates it is interested in analyses and other documents concerning the nature, efficacy, and reliability of the MarkMonitor system used to generate the notices that Plaintiffs rely upon in this action.  Yet Cox is already receiving those materials.  There is no dispute in that regard.  Plaintiffs have already responded that they are producing the following documents in their possession, custody, or control, to the extent located following a reasonable search and not privileged:

---

[38] Cox also cites Request Nos. 45 and 46, though those appear to be mistakes.

(1) notices of infringement in their possession, custody, or control that are related to the copyrighted works in suit and were sent to Cox by or on behalf of Plaintiffs;

(2) downloads of the unauthorized copies of the copyrighted works infringed by Cox's subscribers;

(3) documents (essentially technical data) sufficient to show information concerning infringement of the copyrighted works in suit by Cox's subscribers or customers;

(4) for the period 2012-2014, documents concerning analysis of the reliability of the MarkMonitor system used to produce the copyright notices sent to Cox upon which Plaintiffs will rely in this litigation;

(5) for the period 2012-2014, documents relating to Cox's response to receiving an infringement notice sent by or on behalf of Plaintiffs; and

(6) documents concerning the number of infringement notices Cox would accept from Plaintiffs or on behalf of Plaintiffs.

If it helps resolve this dispute, Plaintiffs will expand the date range beyond 2012 to 2014 regarding the reliability of the MarkMonitor system used to produce the copyright notices sent to Cox described in (4) above. Plaintiffs applied that time frame as it covers the period for the claims in suit. It is also broader than the limitations Cox has repeatedly applied with respect to its own documents, but Plaintiffs are willing to expand it nonetheless. Likewise, in an attempt to address the theoretical concerns Cox raises, Plaintiffs clarify that "analysis" is not restricted to a formal analysis but rather would include an informal analysis, review, or assessment.

Had Cox agreed to engage in a two-way discussion concerning custodians and search terms, it would know that, even beyond the six categories listed above, Plaintiffs are conducting reasonable searches to target non-privileged documents concerning MarkMonitor and a broad array of topics and keywords, including BitTorrent, P2P, copyright, Cox, piracy, infringement, illegal, and unlawful.[39]  The 2012 to 2014 time period is appropriate for these issues because MarkMonitor has supported a variety of work on behalf of record companies over the years.[40]

---

[39] Gould Decl. ¶ 4.
[40] Bell Decl. ¶ 8; Leak Decl. ¶ 22; McMullen Decl. ¶ 26.

Plaintiffs should not have to incur the burden of searching and reviewing those other documents, which are irrelevant, including to log for privilege.

Plaintiffs believe that their response outlined above is more than appropriate to satisfy these requests. No more should be required, particularly given the context of Cox's professed need for such discovery. Plaintiffs' strategies and techniques for approaching anti-piracy are sensitive information that courts routinely protect from unnecessary disclosures that could compromise their effectiveness. *See DirectTV v. Trone*, 209 F.R.D. 455, 459-60 (C.D. Cal. 2002) (protecting from discovery plaintiff's antipiracy technologies where alleged infringer claimed such materials were relevant to its own infringement liability). *See also UMG Recordings, Inc. v. Lindor*, No. 05-cv-1095-DGT-RML, ECF No. 240 (E.D.N.Y. May 16, 2008) (denying motion to compel antipiracy company's pricing and contractual relationship with copyright owners and explaining "the criteria that plaintiffs and [the antipiracy company] use in selecting targets for investigation, the timing and frequency of their efforts to monitor infringement, the methods infringers have developed to evade detection, and [the antipiracy company's] efforts to counteract them have no relevance to the claims of infringement against defendant and her defenses to them); *Disney Enterprises, Inc. et al. v. Hotfile Corp. et al.*, No 11-cv-20427-KMW, ECF No. 138 (S.D. Fla. Sept. 1, 2011) (same).[41] Nothing more should be required.

## VII.    COX'S DEMAND FOR MORE DOCUMENTS CONCERNING THE RIAA

As explained below, Plaintiffs are already making a substantial production of documents relating to the RIAA. Cox's request for more documents concerning and all communications with the RIAA, without regard to subject matter, is yet another instance where Cox seeks to wield discovery like a club. Cox's demand is massively overbroad and incredibly burdensome. This

---

[41] Gould Decl., Exs. 12-13.

lawsuit is about Cox's illegal conduct, not every communication each one of the Plaintiffs ever

had with the RIAA.  Cox has no legitimate need for this discovery and cannot justify it.

### A.   Cox's Requests at Issue

Cox's RIAA-related discovery requests, which it cites but does not include in its brief, are

patently absurd.  The following are the actual requests that Cox brings before the Court:

Request No. 153
All documents concerning the RIAA and either this lawsuit, Cox, and/or the Copyright Works.

Request No. 154
All communications between You or any other Plaintiff and the RIAA concerning either Cox,
this lawsuit, the Copyright Works, and/or MarkMonitor.

Request No. 155
All documents concerning the relationship, agreement, and/or communications, including the
communications, between You and/or any other Plaintiff and the RIAA.

Request No. 158
All documents concerning the relationship, agreement, and/or communications, including the
communications, between the RIAA and any other person as it relates to either Cox, this lawsuit,
and/or the Copyright Works.

Request No. 162
Correspondence with anyone who sent copyright infringement notices to Cox on Your behalf.

(Memo at 22-23 n. 47-50; Mot. at 2).

### B.   Plaintiffs' Response to Cox's Argument

On its face, Request No. 155 literally seeks all communications that Plaintiffs have had

with the RIAA.  Cox cannot justify the outlandish additional discovery that it seeks concerning the

RIAA.  The RIAA is the trade group for the record industry and the record company plaintiffs

have worked closely with it for many decades.[42]  The RIAA assists the record company plaintiffs

in a variety of ways, with departments and personnel helping on: (1) anti-piracy investigation and

enforcement, both in the physical realm and online; (2) copyright litigation matters, including as

---

[42] Bell Decl. ¶ 5; Leak Decl. ¶ 19; McMullen Decl. ¶ 23.

counsel in numerous cases; (3) legislative issues at the federal and state level; (4) regulatory matters with the Copyright Office and other agencies such as the Federal Communications Commission, the U.S. Patent & Trademark Office, and the United States Trade Representative; (5) industry relations issues such overseeing the program for Gold and Platinum awards based on artist sales; (6) coordinating with international organizations and governments on music protection; and (7) research.[43]

While Cox is fully aware of the foregoing, it nonetheless propounded discovery seeking every communication the record company plaintiffs ever had with the RIAA, as well as every communication concerning those communications. (Request Nos. 155 and 162.) Even where Cox is more specific, its demands are beyond the pale. For instance, Cox reinforces that it seeks every communication with the RIAA concerning copyright infringement or the works in suit. (Memo at 22). There is no relevance to that request, which would encompass tens or even hundreds of thousands of communications including on some of the most famous litigations of our time, as well as numerous documents relating to lobbying on copyright issues.[44]

Cox is already receiving (1) documents concerning analysis of the reliability of the MarkMonitor system used to produce the copyright notices sent to Cox upon which Plaintiffs will rely in this litigation, (2) documents relating to Cox's response to receiving an infringement notice sent by or on behalf of Plaintiffs, and (3) documents concerning the number of infringement notices Cox would accept from Plaintiffs or on behalf of Plaintiffs. Had Cox not refused to engage in a two-way discussion concerning custodians and search terms, it would know that, even beyond those categories, Plaintiffs are conducting reasonable searches to target non-privileged documents concerning the RIAA and Cox during the 2012 to 2014 period.[45] Nothing more is required.

---

[43] Bell Decl. ¶ 5; Leak Decl. ¶ 19; McMullen Decl. ¶ 23.
[44] Bell Decl. ¶¶6–7; Leak Decl. ¶ 20-21; McMullen Decl. ¶¶ 24–25.
[45] Gould Decl. ¶ 4.

## VIII.   THE EFFECT OF INFRINGMENT ON PEER-TO-PEER NETWORKS

This portion of Cox's scattershot motion is unclear and hard to follow.  But, after careful

parsing, it appears that very little is actually in dispute.

### A.   Cox's Requests at Issue

For this section of its motion, Cox apparently relies upon the following document requests:

Request No. 50
All documents concerning the effect from copyright infringement over peer-to-peer file sharing
sites on Your actual total revenue and/or profits generated during Plaintiffs' Claim Period.

Request No. 51
All documents concerning the effect from copyright infringement over peer-to-peer file sharing
sites on Your total projected and/or expected revenue and profits from the Copyright Works
during Plaintiffs' Claim Period.

Request No. 52
All documents that reference BitTorrent or other types of peer-to-peer file sharing sites as it
relates to copyright infringement, whether actual or potential, of the Copyright Works.

Request No. 53
All documents that reference BitTorrent or other types of peer-to-peer file sharing sites as it
relates to sampling musical works, whether actual, perceived, or potential, of the Copyright
Works.

Request No. 54
All documents that reference BitTorrent or other types of peer-to-peer file sharing sites as it
relates to permitted or authorized uses, whether actual, perceived, or potential, of the Copyright
Works.

Request No. 55
All documents concerning the diminished or diminishing use of BitTorrent or other peer- to-
peer file sharing sites, whether actual, perceived, or potential, of the Copyright Works.

Request No. 56
All documents concerning the benefit to any Plaintiff due to that Plaintiff's Copyright Work
being made available, whether for download or otherwise, over peer-to-peer file sharing sites
during Plaintiffs' Claim Period.

Request No. 57
All documents concerning Your use of peer-to-peer file sharing sites or technology including
but not limited to BitTorrent.

<u>Request No. 58</u>
All documents concerning Your use of peer-to-peer file sharing sites or technology to promote, market, or otherwise benefit You, any of the Copyright Works, and/or any of the artists who created the Copyright Works.

(Memo. at 24-25 n. 54-57; Mot. at 2).

**B.      Plaintiffs' Response to Cox's Argument**

It is unclear why Cox included this in its motion because there seems to be very little in dispute.  First, Cox's arguments concerning Request No. 50 appear to be moot.  Cox asserts that Plaintiffs' search would not capture documents concerning the effect on Plaintiffs' businesses generally, as opposed to just on the works in suit.  Cox is mistaken.  Plaintiffs represent that their search is not limited just to the impact on the works in suit.[46]

Second, Cox questions the time limitation to Plaintiffs' response to Request Nos. 54 and 55.  Cox's objection is misplaced.  If any such documents exist, they would be completely irrelevant with respect to the time frame *after* the claims in suit (2012-2014).

Third, Cox raises Requests Nos. 52 and 53 without explaining why it believes Plaintiffs' response (as quoted in Cox's brief) is deficient.  Request No. 52 is obviously overbroad, as it would sweep in every infringement notice sent to any other ISP, or any litigation against a peer-to-peer service, involving any of the copyrighted works in suit.  Indeed, Cox itself claims notices other than those from Plaintiffs to Cox are not relevant.  Nor has Cox explained what it seeks with Request No. 53, or why it is not already subsumed within and covered by Plaintiffs' response to Request No. 50.  Finally, Cox raises Request Nos. 56-58, though there is not a dispute on those requests.  They are already subsumed within and covered by Plaintiffs' response to Request No. 54.  There, as requested, Plaintiffs agreed to produce documents concerning any permitted or authorized uses of Plaintiffs' copyrighted works in suit via BitTorrent or other peer-to-peer file

---

[46] Gould Decl. ¶ 4.

sharing sites during the 2012 to 2014 period, to the extent such documents can be located following a reasonable search.

## IX.   **CONCLUSION**

For these reasons, Plaintiffs respectfully request the Court deny Cox's motion to compel in its entirely.

Dated:  January 23, 2019                    Respectfully submitted,

*/s/ Scott A. Zebrak*
Matthew J. Oppenheim (*pro hac vice*)
Scott A. Zebrak (38729)
Jeffrey M. Gould (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW
Washington, DC 20016
Tel:  202-480-2999
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com

*Attorneys for Plaintiffs*