UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

SONY MUSIC ENTERTAINMENT, *et al.*,

    Plaintiffs,

v.

COX COMMUNICATIONS, INC., *et al.*,

Defendants.

Case No. 1:18-cv-00950-LO-JFA

**DECLARATION OF CHRISTOPHER BELL ON BEHALF OF THE WARNER MUSIC PLAINTIFFS IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL**

I, Christopher Bell, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am currently employed as Vice President, Technology and Anti-Piracy for Warner Music Inc. ("WMI"). I have held that position since September 11, 2017. I have personal knowledge of the facts set forth below and/or have learned of these facts as a result of my position and responsibilities at WMI. If called upon and sworn as a witness, I could and would testify competently as to the matters set forth herein.

2. Plaintiffs Atlantic Recording Corporation, Bad Boy Records LLC, Elektra Entertainment Group Inc., Fueled By Ramen LLC, Nonesuch Records Inc., Roadrunner Records, Inc., and Warner Bros. Records Inc. are individual companies under the Warner Music Group umbrella (collectively, "Warner Music").

3. I am generally familiar with Warner Music's practices and procedures for developing, exploiting, and distributing sound recordings and Warner Music's anti-piracy efforts and other efforts to enforce its copyrights covering its sound recordings.

4. I understand this declaration is to be submitted to the Court in opposition to a motion to compel discovery from Warner Music Group's record company plaintiffs and music publishing plaintiffs by Defendants Cox Communications, Inc. and CoxCom, LLC (collectively, "Cox").

### Discovery Relating to Anti-Piracy, Recording Industry Association of America ("RIAA") and MarkMonitor

5. RIAA is the record industry trade group that Warner Music and the other record company plaintiffs have worked closely with for many decades. RIAA supports and promotes the creative and financial vitality of the major record companies. To that end, RIAA assists the record company plaintiffs in a variety of ways, with departments and personnel helping with, among other things: (1) anti-piracy investigation and enforcement, both in the physical and digital realms; (2) copyright litigation matters, including as counsel and pre-litigation counsel in numerous cases, including in cases like *Napster*, *Aimster*, *Grokster, Limewire*, and many others; (3) legislative issues at the federal and state level; (4) regulatory matters with the Copyright Office and other agencies such as the Federal Communications Commission, the U.S. Patent & Trademark Office, and the United States Trade Representative; (5) industry relations issues such as overseeing the program for Gold and Platinum awards based on artist sales success; (6) coordinating with international organizations and governments on music protection; and (7) research and technology review.

6. The scope and quantity of the documents responsive to Cox's requests regarding the RIAA is staggering, with much of the material not identifying or concerning Cox or even copyright infringement issues in any manner at all. And even if the requests were limited to issues involving RIAA's anti-piracy work, it would still be impossibly overbroad. For well over

twenty years, RIAA has had an entire team of online anti-piracy personnel whose sole and full-time responsibility is to identify infringing activity, to prepare notice-and-takedown requests, and to inform lawyers for the record companies regarding piracy issues.

7. This means that a request for all documents and communications with or involving RIAA concerning copyright infringement or any of the works in suit could span hundreds of anti-piracy investigations, monitoring and enforcement efforts, pre-litigation analyses or lawsuits. It would entail preparation of a massive privilege log. While it is hard to assess the resulting costs and disruption, I anticipate that costs alone could easily exceed several hundred thousand dollars, if not higher.

8. Over the last decade, MarkMonitor and/or its predecessor, Dtecnet, Inc., have been involved in a variety of notice programs at RIAA's bequest to protect the record companies' copyrights. MarkMonitor and/or Dtecnet have sent millions of infringement notices on behalf of Warner Music and other record companies over the years that have nothing to do with Cox. In addition, MarkMonitor and/or DtectNet have provided litigation support to RIAA in cases protecting the record companies' copyrights.

9. Warner Music's anti-piracy efforts (many of which occur in cooperation and common interest with other plaintiffs, the RIAA, and/or MarkMonitor) contain sensitive information concerning the means, methods, and strategies by which we combat piracy of sound records and their associated musical compositions. This is information that is guarded as extremely confidential. Unauthorized access and use of that information could provide a roadmap for infringers and significantly undermine the efforts to deter infringing activity.

**Discovery concerning the Copyright Alert System and Third-Party ISPs**

10. I understand that Cox seeks production of "all documents concerning CAS," or the Copyright Alert System, as well as the copyright infringement practices of other Internet Service Providers (ISPs), including all documents concerning a multitude of topics such as (1) negotiations related to CAS, (2) any memorandum of understanding concerning CAS, (3) any agreements entered concerning CAS, (4) Warner Music's status as a signatory to a CAS Memorandum of Understanding ("MOU"), (5) Cox's compliance or non-compliance with policies or procedures in CAS, (6) any technological system used in connection with CAS, (7) all reviews, assessments, evaluations, reports, or the like, concerning CAS, and (8) notifications sent pursuant to CAS.

11. In addition, I understand Cox seeks production of "all documents" concerning a host of issues concerning third-party ISPs, including (9) any ISP's response to receiving an infringement notice from any entity, regardless of whether it involved Plaintiffs, RIAA or MarkMonitor, (10) communications with ISPs other than Cox regarding copyright infringement notices, (11) policies and practices concerning termination or suspension of subscribers, and (12) documents concerning transmitting "information" to ISPs' subscribers with no limit on subject matter.

12. CAS was a private agreement between 18 private parties (30 parties, including all affiliated entities), including trade groups, copyright holders, and ISPs, designed to educate consumers, deter online infringement, and direct consumers to lawful online legitimate sources of content. Cox did not participate in CAS.

13. Negotiations leading up to the formation of CAS spanned years. A separate corporate entity called the Center for Copyright Infringement, Inc. ("CCI") was created to

administer and oversee CAS. The creation and administration of CCI and CAS involved dozens of individuals at dozens of companies from multiple industries engaged in dialogue over the course of years. Each participating company was involved in the oversite and activities of CCI. The terms and agreement implementing CAS contain strict confidentiality provisions governing the handling of the participating members' sensitive business information and records and data relating to the CAS notice program. Certain information cannot be disclosed without the prior written consent of all 30 parties involved. CCI has since dissolved.

14. CAS did not establish, or attempt to establish, an industry standard. The MOU setting forth CAS's framework acknowledged that "the limitations on ISP liability under the DMCA are conditioned on an ISP's adoption and reasonable implementation of a policy that provides for the termination in appropriate circumstances of subscribers and account holders who are repeat infringers." (MOU at 9 n.1, attached as Ex. 13 to J. Golinveaux Decl. (ECF No. 75-14).) The MOU further acknowledged that "entering into this Agreement is not, by itself, intended to address whether a Participating ISP has adopted and reasonably implemented a DMCA Termination Policy." *Id.*

15. MarkMonitor was engaged to conduct monitoring and notice sending on behalf of the record companies and movie studios in connection with CAS. In that context, MarkMonitor sent millions of infringement notices to five major ISPs who contractually agreed to participate in CAS. None of those notices involved Cox. Many of those notices would have pertained to Warner Music works (including works in suit in this action), as well as other third parties, including movie studios whose copyrights are not at issue in this case. Ongoing coordination and communication between the 18 parties to CAS (plus a dozen more affiliated entities) spanned years.

16.     Searching for and producing all the documents sought by Cox's overbroad requests concerning CAS and other ISPs would be a major undertaking and impose a significant burden. The search for documents would span roughly seven years and involve documents and communications concerning dozens of companies, dozens of individuals, the negotiations and creation of an independent corporation, millions of infringement notices to ISPs *other* than Cox, follow-up concerning millions of notices, independent review of the CAS program, and all with strict confidentiality obligations, some of which require notice to and written consent from third parties before disclosing.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*[signature]*

Christopher Bell

Executed this 23rd day of January 2019, in New York.