# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

SONY MUSIC ENTERTAINMENT, *et al.*,

      Plaintiffs,

v.

COX COMMUNICATIONS, INC., *et al.*,

      Defendants.

Case No. 1:18-cv-00950-LO-JFA

**DECLARATION OF ALASDAIR MCMULLAN ON BEHALF OF THE UMG PLAINTIFFS IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL**

I, Alasdair McMullan, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.     I am currently employed as Senior Vice President, Legal Affairs and Head of Litigation for Universal Music Group. I have held that position or a similar position at all times relevant to this declaration. I have worked in the music industry for over twenty years. I have personal knowledge of the facts set forth below and/or have learned of these facts as a result of my position and responsibilities at Universal Music Group. If called upon and sworn as a witness, I could and would testify competently as to the matters set forth herein.

2.     Universal Music Group ("UMG") is the colloquial name given to the group of music-related companies owned by Vivendi S.A. UMG is one of the largest music groups in the world and consists of record companies, music publishing companies, and manufacturing and distribution companies. Plaintiffs UMG Recordings, Inc. and Capitol Records, LLC (collectively the "UMG Record Companies"); and Universal Music Corp., Universal Music – MGB NA LLC, Universal Music Publishing Inc., Universal Music Publishing AB, Universal Music Publishing Limited, Universal Music Publishing MGB Limited, Universal Music – Z Tunes LLC,

Universal/Island Music Limited, Universal/MCA Music Publishing Pty. Limited, Universal – Polygram International Tunes, Inc., Universal – Songs of Polygram International, Inc., Universal Polygram International Publishing, Inc., Music Corporation of America, Inc. d/b/a Universal Music Corp., Polygram Publishing, Inc., Rondor Music International, Inc., and Songs of Universal, Inc. (collectively, "UMPG") are companies or divisions within UMG.  UMG develops, exploits, and distributes sound recordings under the auspices of various record labels, including Capitol Records, Def Jam Recordings, Island Records, and Universal Music Group Nashville, and many others.

3.    I am generally familiar with UMG's practices and procedures for creating, distributing and otherwise exploiting  its copyrighted sound recordings and musical compositions, as well as the costs and revenues associated with those activities.  I am also generally familiar with the process by which UMG accounts for revenues earned and costs incurred in connection its copyrighted works, and the manner in which UMG and its affiliates keep and maintain their records with respect to those revenues and expenses.  In addition, through my position at UMG, I am familiar with the books and records of UMG and its record label and music publisher affiliates, including documents such as copyright certificates and agreements pursuant to which UMG Record Companies and UMPG acquire and maintain rights in the sound recordings and musical compositions at issue in this litigation.  I am also familiar with UMG's anti-piracy efforts and other efforts to enforce its copyrights.

4.    I understand that this declaration is to be submitted to the Court in connection with requests for discovery and a motion to compel filed by Defendants Cox Communications, Inc. and CoxCom, LLC (collectively, "Defendants" or "Cox").

5.     As explained below, production of the categories of documents Cox seeks would be a massive undertaking—literally requiring thousands of hours of time from UMG employees to locate, identify, and review such documents.  Such an effort would likely impose costs on UMG in the hundreds of thousands, or even millions, of dollars.  The burden and expense are further compounded by the fact that much of UMG's business is conducted by email.  Consequently, as explained below, the task of locating responsive documents (particularly electronic communications) is magnified dramatically as a result of the fact that the electronic files of hundreds of UMG employees could conceivably have documents falling within the broad categories of documents requested by Defendants.

### Discovery Concerning the UMG Plaintiffs' Financial Information

6.     The manifest problems with Cox's requests are twofold: (1) the requests would entail collection of reams and reams of information that literally would take thousands of hours to gather and produce and (2) Cox also requests that UMG create bespoke reports, organizing this information into summary profit and loss statements at the individual recording, or individual composition, level.

7.     Putting aside that the Federal Rules do not require that UMG create specific profit and loss statements in discovery that it does not maintain in the ordinary course of business, as discussed below, any effort to identify and unearth every document or piece of financial data that would be needed to calculate profit or loss figures per sound recording or composition would be a massive and perhaps impossible undertaking.  Given the thousands of works at issue in this lawsuit, locating, collecting, and reviewing all the financial documentation Cox requests would be unending.  Cox apparently seeks full documentation about the revenues and costs involved in the creation, marketing, administration and exploitation of recorded music and compositions—the

whole of UMG's business.  It would require a full-time staff working many months, with thousands of hours of employee time, and additional time from in-house and outside attorneys to oversee such a process.

8.      As mentioned, UMG has no business need to  create or maintain profit and loss statements organized on a sound recording-by-sound recording basis.  While UMPG can run certain reports on a musical composition level basis, those reports would not provide the complete profit and loss analysis that Cox demands.   In order to meet Cox's demands, UMG would need to identify and analyze terabytes of financial data and information at tremendous burden.  Conducting the analysis to then provide the information in the tailored manner Cox requires would entail further burdensome manipulation of the material, and the creation of documents outside the ordinary course of UMG's business.

9.      To put into perspective the effort required to conduct the analysis Cox apparently requests on track-level profits and losses, in the rare instance in which UMG has attempted to conduct such an analysis for a single album or sound recording, UMG's finance department generally requires 8-10 weeks to deliver such a report.  Doing such an analysis even for one recording requires the diversion of resources from the day-to-day operations and demands of the financial departments of the company. Indeed, for even a single recording or album, the process requires coordination of volumes of information across multiple departments at the company (including central finance, label artist and repertoire ("A&R") administration, artist royalties, copyright royalties, manufacturing and logistics, among others).  For this case, the substantial effort involved in creating a single profit and loss analysis then necessarily would be multiplied by the thousands of works at issue here.  This would be hugely disruptive to UMG's business

operations. Based on my experience and knowledge of that process, I believe the costs and burden of such a review and analysis would be astronomical.

10. Below, I provide some further context for the complexity and breadth of the financial information that would be required to conduct the analysis Cox demands UMG undertake. Creating, marketing, exploiting, and/or administering a sound recording or musical composition is an extremely time-intensive and complex process that involves many categories of both income and expenses. At each stage, each source of income and cost is documented in myriad ways, including through email communications, documents and/or in different databases or systems, by numerous employees in offices located across the country (indeed, around the world).

11. Identifying and analyzing cost data with respect to a given sound recording (or the album or EP on which it appears) would be extremely complicated. Some of the types of costs include: recording costs, such as payments or advances to artists; direct payments to recording studios for recording session time; payments to producers, engineers, mixers, and other creative contributors to the process; costs of goods sold, such as manufacturing and distribution costs and royalty payments to artists, producers, and music publishers; marketing costs, such as publicity, advertising and video production costs; independent promotion costs; costs related to artist publicity tours and appearances, tour support, digital marketing; and overhead costs. Many of these costs are not allocated within UMG's financial systems on a track-by-track or even album-by-album basis. Revenue data would be similarly voluminous and include documents or information relating to the millions and millions of track and album sales made each year, as well as licensing deals with television and movie studios, retailers, streaming services, satellite and cable services, and more.

12.     On the music publishing side, the data generated or received in the course of acquiring, administering, publishing, licensing, or otherwise exploiting UMPG's catalogue of hundreds of thousands of musical compositions is similarly vast.  This material would include financial information related to at least: acquiring songs or artists; administering mechanical, synchronization, and other licenses; and maintenance and payment of royalties to songwriters, co-publishers, and other copyright holders in connection with income generated from the exploitation of their copyrighted works.

13.     Given the challenges of collecting the detailed financial information Cox seeks, UMG has provided its parent company's annual financial reports for the years 2010 through 2014. These reports include UMG's annual revenues from music publishing and recorded music (broken down by physical sales, digital sales, licensing and other), operating expenses, interest and tax expenses, and net income (or profit), among other financial information. UMG has also provided information concerning revenue earned per digital download.  As explained above, it would be extremely difficult and burdensome to provide the millions of data points needed to theoretically conduct the analysis Cox apparently intends—analyses which are not kept in the ordinary course.

**Ownership of UMG's Sound Recordings / Musical Compositions**

14.     Sound recordings and musical compositions are the core assets owned by UMG, and the foundation of UMG's business.  In the course of regular operations, UMG's routine practice is to obtain copyright ownership of its works through registrations with the U.S. Copyright Office or other transactions.

**Copyrights in Sound Recordings**

15.     Since 2006, the UMG Record Companies have filed over 20,000 copyright registrations for albums and individual recordings, covering more than 200,000 sound recordings.

The UMG Record Companies have obtained these copyrights directly by entering into agreements with the artists (or companies furnishing the artists' services) or indirectly by acquiring catalogs of recordings from other companies, or by acquiring other companies (who themselves have entered into direct and indirect agreements with artists or other copyright owners).

16.     We have produced or are producing the documents necessary to show that we own the sound recordings in this case.  In most cases, that is a copyright registration certificate showing that a UMG Record Company plaintiff owns the work.  Many of the documents that Cox seeks go well beyond what is necessary to prove ownership or exclusive rights.  It would be extremely burdensome to produce every document or piece of correspondence that may have been generated in the course of acquiring a copyright.  That is because the process of negotiating and finalizing all of the agreements related to the UMG Record Companies' copyrights for each sound recording is often multifaceted.  The record company frequently negotiates and enters into agreements with the recording artists, agreements with producers, and license agreements with third-party copyright owners that may relate to, for example, "samples" that may appear in the recording.  As a result, the documentation attendant to acquiring the rights for any single sound recording may involve agreements and communications between many people, the use of outside "clearance" companies (e.g., for sample license negotiations), correspondence with copyright owners and their representatives, drafts and negotiations for agreements and licenses, and input from lawyers or even musicologists.  These documents (e.g., the correspondence, agreements and licenses) are not contained in a single file, and are not kept in a central location.  Rather, oftentimes they are located in numerous hard copy and electronic files maintained by individual employees working within UMG's various labels and divisions, and also at outside clearance companies, and others.

17.     It is also important to emphasize from the outset that disputes over and challenges to the UMG Record Companies' asserted ownership of their copyrighted works are quite rare. Accordingly, Cox's request that UMG produce all documents reflecting any "disputes or challenges" to UMG's ownership of the works at issue, or the validity of its copyright registrations, is made all the more burdensome because any documents concerning any such disputes (as rare as such challenges or disputes are) also are not maintained in a centralized location or fashion.  As it is an aberrant occurrence dealt with, if ever, on an ad hoc basis, the UMG Record Companies do not maintain a single repository, or even have a consistent filing system, for so-called "challenges" to ownership of their sound recordings.  Searching for documents regarding any challenges or disputes regarding the validity or ownership of the UMG Record Companies' copyrights would involve dozens or more employees, including business affairs attorneys at each of the record labels that are part of the Universal Music Group, in-house litigation attorneys, and UMG's copyright department, as such files are not centrally maintained or even tracked.  This problem is even more complex given the timespan covered by the works in suit, and the turnover of employees at UMG over this same amount of time.  Any search for responsive documents would require literally searching the files of individual business and legal affairs department personnel, and in-house litigation attorneys (past and present) over the course of decades, potentially from the 1970s through the present day.  Of course, if a challenge to its ownership or the validity of any copyrights had been successful, the UMG Record Companies would remove such works in their repertoires and, accordingly, would not have included such works in this lawsuit

18.     When the UMG Record Companies have acquired companies or catalogs, the documentation relating to such acquisitions can itself be quite voluminous, particularly if the acquisition was of an entire company.  In those and other instances, however, when the claimant

on the copyright certificate may reflect a person or entity other than a named UMG Record Company plaintiff in this action, we have produced or are in the process of producing chain of title documents that demonstrate how and why the UMG Record Company plaintiff owns or controls the work at issue.

19.     Collecting, reviewing and producing all of the documentation associated with the UMG Record Companies' ownership of all of their copyrights in sound recordings—including chain of title, artist agreements, challenges or disputes, and all forms of assignments and licenses over the course of a ten-year period—would be an enormous undertaking.  Because these materials are not maintained in a centralized manner or  location, it is difficult to determine even the precise amount of material involved.  I estimate that hundreds of thousands of documents would need to be located, collected and reviewed in such an effort.  This process would require thousands of hours of employee time in addition to the substantial time and expense required by in-house and outside attorneys to manage this process.  I would estimate that the expense of such an undertaking could easily cost in the hundreds of thousands or even millions of dollars.

## Copyrights in Musical Compositions

20.     In addition to copyrights in sound recordings, UMG also owns copyrights in musical compositions, which are owned or controlled by the 16 UMPG companies included as Plaintiffs.  Plaintiffs are producing documents that demonstrate their ownership of these works.

21.     Production of every document that may have been generated in the course of acquiring a copyright would be extremely burdensome.  Similar to obtaining rights in a sound recording, the process for obtaining the rights to a composition is also extensive.  A publishing company, including UMPG, typically obtains rights to a composition either by directly entering into an agreement with a songwriter or indirectly by acquiring catalogs of musical compositions

from other companies, or by acquiring other companies (who themselves have entered into the direct agreements with songwriters).  The acquisition of rights in any single composition may involve agreements and communications between many people, correspondence with songwriters and their representatives, drafts and negotiations of agreements and licenses, input from lawyers or musicologists, and the like.  The documentation relating to such acquisitions can itself be quite voluminous, particularly if the acquisition was of an entire company.

22.    The burden that I described  on the sound recording side associated with collecting and producing documents concerning any questions, challenges, uncertainties or disputes regarding the validity or ownership of  copyrights is also true in the case of musical compositions.  Such challenges have also been rare.  Searching for documents regarding any challenges or disputes regarding the validity or ownership of UMPG's copyrights could involve many employees, including attorneys.  UMPG would not include works in its repertoire if a challenge to its ownership or validity of its copyrights was successful and, likewise, would not have included such works in this lawsuit.

23.    As with sound-recording rights, an effort to locate, collect and review all of the documentation associated with UMPG's ownership of copyrights in musical compositions— including the validity, ownership, chain of title, artist agreements, challenges or disputes, and all forms of assignments and licenses for a decade—would be an enormous undertaking.  I estimate that additional tens of thousands of documents or more beyond those associated with sound-recording rights, would need to be located, collected and reviewed in such an effort.  This process would require thousands of hours of employee time in addition to the substantial time and expense required by in-house and outside attorneys to manage this process. I would estimate that the expense of such an undertaking could easily cost hundreds of thousands of dollars or more.

## Discovery Relating to Anti-Piracy, RIAA and MarkMonitor

24.     The RIAA is the record industry trade group, with which UMG and the other record company plaintiffs have worked closely for many decades.  RIAA supports and promotes the creative and financial vitality of the major record companies.  To that end, RIAA assists the record company plaintiffs in a variety of ways, with departments and personnel helping on, among other things: (1) anti-piracy investigation and enforcement, both in the physical realm and online; (2) copyright litigation matters, including as counsel in numerous cases, including cases like *Napster*, *Aimster*, *Grokster, Limewire* and many others; (3) legislative issues at the federal and state level; (4) regulatory matters with the Copyright Office and other agencies such as the Federal Communications Commission, the U.S. Patent & Trademark Office, and the United States Trade Representative; (5) industry relations issues such as overseeing the program for Gold and Platinum awards based on artist sales success; (6) coordinating with international organizations and governments on music protection; and (7) conducting research.

25.     The scope and quantity of the documents responsive to Cox's requests regarding the RIAA is staggering, with much of the material not identifying or concerning Cox or even copyright infringement issues in any manner at all.  And even if the requests were limited to issues involving RIAA's anti-piracy work, it would still be impossibly overbroad.  For well over twenty years, the RIAA has had an entire team of anti-piracy personnel with responsibility to identify infringing activity, to prepare notice-and-takedown requests, and to inform lawyers for the record companies regarding piracy issues.

26.     This means that a request for all documents and communications with or involving the RIAA concerning copyright infringement or any of the works in suit could span numerous anti-piracy enforcement efforts, including lawsuits.  It would entail preparation of a massive privilege

log.  While it is hard to assess the resulting costs and disruption, I anticipate that costs alone could easily exceed several hundred thousand dollars or more.

27.     Over the last decade, MarkMonitor or its predecessor, Dtecnet, Inc., has been involved in a variety of notice programs to protect the record companies' copyrights. MarkMonitor and/or Dtecnet have sent hundreds of thousands or even millions of infringements notices on behalf of UMG and other record companies over the years that have nothing to do with Cox.  In addition, MarkMonitor and/or DtectNet has provided litigation support in cases protecting the record companies' copyrights.

28.     UMG's anti-piracy efforts (including those that occurred with the assistance of the RIAA and/or MarkMonitor) contain sensitive information concerning the means, methods, and strategies by which we combat piracy of sound recordings and their associated musical compositions. This information is guarded as extremely confidential.  Unauthorized access and use of that information could provide a roadmap for infringers and significantly undermine the efforts to deter infringing activity.

**Discovery concerning the Copyright Alert System and Third-Party ISPs**

29.     I understand that Cox seeks production of vast array of documents relating to the Copyright Alert System (CAS) and other ISPs.

30.     CAS was a private agreement between 18 private parties (30 parties, including all affiliated entities), including trade groups, copyright holders and ISPs designed to educate consumers, deter online infringement, and direct consumers to lawful online legitimate sources of content.  Cox did not participate in CAS.

31.     Negotiations leading up to the formation of CAS spanned years.  A separate corporate entity called the Center for Copyright Infringement, Inc. ("CCI") was created to

administer and oversee CAS.  The creation and administration of CCI and CAS involved dozens of individuals at dozens of companies from multiple industries engaged in dialogue over the course of years.  Each participating company was involved in the oversite and activities of CCI.  The terms and agreement implementing CAS contain strict confidentiality provisions governing the handling of the participating members' sensitive business information and records and data relating to the CAS notice program.  Certain information cannot be disclosed without the prior written consent of all parties involved.  CCI has since dissolved.

32.     CAS did not establish, or attempt to establish, an industry standard.  The Memorandum of Understanding setting forth CAS's framework acknowledged that "the limitations on ISP liability under the DMCA are conditioned on an ISP's adoption and reasonable implementation of a policy that provides for the termination in appropriate circumstances of subscribers and account holders who are repeat infringers."  (MOU at 9 n.1, attached as Ex. 13 to J. Golinveaux Decl. (ECF No. 75-14).)  The MOU further acknowledged that "entering into this Agreement is not, by itself, intended to address whether a Participating ISP has adopted and reasonably implemented a DMCA Termination Policy."  *Id.*

33.     MarkMonitor was engaged to conduct monitoring and notice sending on behalf of the record companies and movie studios in connection with CAS.  In that context, MarkMonitor sent millions of infringement notices to five major ISPs who contractually agreed to participate in CAS.  None of those notices involved Cox.  Many of those notices would have pertained to UMG works (including works in suit in this action), as well as other third parties, including movie studios whose copyrights are not at issue in this case.  Ongoing coordination and communication between the many parties to CAS (plus dozen more affiliated entities) spanned years.

34.     Searching for and producing all the documents sought by Cox's overbroad requests concerning CAS and other ISPs would be a major undertaking and significant burden.  The search for documents would span roughly seven years and involve documents and communications concerning dozens of companies, dozens of individuals, the negotiations and creation of an independent corporation, the operation of that corporation, and millions of infringement notices to ISPs *other* than Cox.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Alasdair McMullan

Executed this 23rd day of January, 2019.