SONY MUSIC ENTERTAINMENT, *et al.*,

    Plaintiffs,

v.

COX COMMUNICATIONS, INC., *et al.*,

    Defendants.

Case No. 1:18-cv-00950-LO-JFA

### DECLARATION OF WADE LEAK ON BEHALF OF SONY MUSIC AND SONY PLAINTIFFS IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

I, Wade Leak, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am currently employed as Senior Vice President and Deputy General Counsel for Plaintiff Sony Music Entertainment. I have held that position or a similar position at all times relevant to this declaration. I have worked in the music industry for over twenty years. I have personal knowledge of the facts set forth below and/or have learned of these facts as a result of my position and responsibilities at Sony Music Entertainment. If called upon and sworn as a witness, I could and would testify competently as to the matters set forth herein.

2. Plaintiffs Arista Music, Arista Records LLC, LaFace Records LLC, Provident Label Group, LLC, Sony Music Entertainment US Latin, Volcano Entertainment III, LLC, Zomba Recordings LLC are companies or divisions within Sony Music Entertainment (collectively, "Sony Music"). Sony Music develops, exploits, and distributes sound recordings under the auspices of various record labels, including Epic Records, Jive Records, Columbia Records, RCA Records, Sony Music Nashville, Sony Music Latin and many others.

3. I am generally familiar with Sony Music's practices and procedures for producing, marketing, exploiting, and distributing sound recordings and the costs and revenues associated therewith. I am also generally familiar with the process by which Sony Music accounts for income and costs in connection with the sound recordings it produces, distributes, and offers for sale to the public, and the manner in which Sony Music and its labels keep, maintain, and account for their records with respect to such income and expenses. In addition, I am generally familiar with the books and records of Sony Music and its record labels, including documents such as copyright certificates and agreements pursuant to which Sony Music possesses rights in the sound recordings at issue in this litigation. I am also familiar with Sony Music's anti-piracy efforts and other efforts to enforce its copyrights.

4. I understand that this declaration is to be submitted to the Court in connection with requests for discovery and a motion to compel filed by Defendants Cox Communications, Inc. and CoxCom, LLC (collectively, "Defendants" or "Cox").

5. As explained below, production of the categories of documents Cox seeks would be a massive undertaking—literally requiring thousands of hours of time from Sony Music employees to locate, identify, and review such documents. The burden and expense are further compounded by the fact that much of Sony Music's business is conducted by email. Such an effort would likely impose expenses on Sony Music in the hundreds of thousands or millions of dollars. . Consequently, as explained below, the task of locating responsive documents (particularly electronic communications) is magnified dramatically as a result of the fact that the electronic files of hundreds of Sony Music employees could conceivably have documents falling within the broad categories of documents requested by Defendants.

**Discovery Concerning the Sony Music Plaintiffs' Financial Information**

6. I understand Cox requests: (1) reams and reams of financial related information and documents that would take thousands of hours to gather and produce and (2) that Sony Music create reports organizing this information into profit and loss statements for each individual recording at issue in this case. Putting aside the creation of specific profit and loss statements which cannot be required of Sony in discovery as discussed below, any effort to identify and unearth every document or piece of financial data that relates to each sound recording would be a massive and perhaps impossible undertaking. Given the thousands of works at issue in this lawsuit, locating, collecting, and reviewing all the financial documentation Cox requests would be unending. Cox apparently seeks full documentation about the revenues and costs involved in the creation, marketing, administration and exploitation of recorded music and compositions—the whole of Sony Music's business. It would require a full-time staff working many months, with thousands of hours of employee time, and additional time from in-house and outside attorneys to oversee such a process

6a. With respect to Cox's requests relating to track level profit and loss statements, Sony Music does not create or maintain profit and loss statements organized on a sound recording-by-sound recording basis in the ordinary course of business. To do so, Sony Music would need to identify and analyze scores of financial data and information at tremendous burden. Conducting the analysis to then provide the information in the manner Cox demands would require burdensome analysis and creation of documents outside the ordinary course of Sony Music's business.

7. [intentionally left blank]

8. The below paragraphs provide context for the complexity and breadth of the financial information that would be required to conduct the analysis Cox demands Sony Music

undertake. Creating, marketing, distributing, and/or administering a sound recording is an extremely lengthy process that involves many categories of both income and expenses. At each stage, each source of income and cost is documented in myriad ways, including through email communications, documents and/or in different databases or systems, by a large number of employees, including at Sony Music's various record labels located across the country.

9. Sound recording revenue is generated from many different types of exploitation – including physical sales, digital downloads, interactive streaming, webcasting, licensing for advertisements, movies and television and other ancillary uses (even into greeting cards). Determining all the revenue generated on a track by track basis (or even worse, including albums or "EPs") in a particular time period going back a number of years is extremely time consuming, even if the inquiry is limited to U.S. revenue. Since digital distribution has proliferated, the number of files sent to Sony by its digital partners reporting revenue has exploded. Some digital reports contain millions of lines of data. Revenues are often tracked in different databases – for example, revenues generated from licenses to third parties for use on television, movies or in advertisements are stored in a separate system than digital revenues. And if Cox is truly demanding "all" related documentation, this would also encompass items such as invoices and payment related documents from numerous physical retailers.

10. Identifying and processing cost data with respect to a given sound recording (or the album or EP on which it appears) would be extremely complicated. Some of the types of costs include: recording costs, such as payments or advances to artists, payments for studio time, producers, engineers, mixers, and other contributors; costs associated with the negotiation, drafting, and ultimate execution of the recording agreement; costs of goods sold, such as manufacturing costs and royalty payments to artists, producers, and publishers; marketing costs,

such as video production costs; independent promotion costs; costs related to publicity tours and appearances, tour support, digital marketing, and physical advertising; and necessary overhead costs, which would include the salaries of the label marketing employees, hard IT costs and shared services costs such as the cost of the digital business unit that is responsible for our digital distribution deals. Many costs are not allocated on a track-by-track or even album-by-album basis. Figuring out how to allocate many of these costs on a track basis, even for a modest amount of sound recordings, would be extremely difficult and time consuming. To do it for thousands of recordings would be impossible as a practical matter.

11. Given the practical impossibility of collecting the detailed financial documentation Cox seeks, Sony Music has provided a summary profit or loss statement for the years 2010 through 2014. Such statement includes the following annual U.S.-based financial detail for Sony Music: net sales; total revenue; total cost of sales; sales, general, and administrative expense; operating expenses; interest and tax expense; and net income, among other financial income. Sony Music has also provided information concerning revenue earned per digital download. As explained above, it would be extremely difficult, expensive, and burdensome to provide the additional detailed financial information Cox seeks.

**Discovery Concerning Ownership of Sony Music's Sound Recordings**

12. Sound recordings are the foundation of Sony Music's business. In the course of regular operations, Sony Music's routine practice is to obtain copyright ownership of its works through registrations with the U.S. Copyright Office or other transactions. We have produced or are producing the documents necessary to show that we own the sound recordings in this case. In most cases, that is a copyright registration certificate showing that a Sony Music plaintiff owns the work. Many of the documents that Cox seeks go well beyond what is necessary to prove ownership

5

or exclusive rights. It would be extremely burdensome to produce every document or piece of correspondence that may have been generated in the course of acquiring a copyright.

13. I estimate that Sony Music has registered copyrights in, at least, hundreds of thousands of sound recordings (both albums and singles). When an album is registered in its entirety, the registration covers all of the songs on that album that have not been previously released, which generally is between 10 and 15 songs. Sony Music has obtained these copyrights directly by entering into recording agreements with the artists, or companies with whom the artist has an agreement, or by forming joint ventures, or indirectly by acquiring catalogs of sound recordings from other companies, or by acquiring other companies (who themselves have entered into recording agreements).

14. When Sony Music enters into a recording agreement with an artist to create sound recordings (often referred to as "master recordings"), the agreement will provide that the master will be created as a "work made for hire" for Sony, such that Sony is considered the "author." However, the recording agreement will also include an assignment provision, to the extent the masters are determined not to be a work made for hire. This "belt and suspenders" approach is used to ensure that Sony Music owns the recordings, the creation of which it is financing.

15. Of course, for any specific sound recording, the so-called "chain of title" of any single sound recording may be complicated. There may be agreements with companies who in turn have direct agreements with the artist. There may be multiple amendments that relate to a specific artist. There may be assignments between companies. There may have been transfers between internal entities. Some of the relevant documents may be in physical form only. Locating, review and producing all such documents for thousands of recordings would be an expensive and burdensome undertaking.

16. It is also important to emphasize from the outset that disputes over and challenges to Sony Music's asserted ownership of their copyrighted works are quite rare. Accordingly, Cox's request is made all the more burdensome because any documents concerning any questions, challenges, uncertainties or disputes regarding the validity or ownership of Sony Music's copyrights in its sound recordings (as rare as such challenges or disputes are) also are not maintained in a centralized location or fashion. As it is an aberrant occurrence dealt with, if ever, on an ad hoc basis, Sony Music does not maintain a single repository, or even have a consistent filing system, for challenges to ownership for their sound recordings. Given the breadth of the requests, it could also include documents relating to situations in which Sony Music distributed a track containing a sample or interpolation of a different recording or musical composition that had allegedly not been cleared. These documents are obviously irrelevant. Searching for documents regarding any challenges or disputes regarding the validity or ownership of Sony Music's copyrights would involve dozens or more employees, including attorneys at each of the record labels which are part of Sony Music, and Sony Music's copyright department, as such files are not centrally maintained or even tracked. Further, if a challenge to its ownership or the validity of any copyrights had been successful, Sony Music would not include such works in its repertoire and, likewise, would not have included such works in this lawsuit.

17. When Sony Music has acquired companies or catalogs, the documentation relating to such acquisitions can itself be quite voluminous, particularly if the acquisition was of an entire company. We have produced or are in the process of producing chain of title documents for instances when the copyright certificate lists a name other than a Sony Music entity that is a plaintiff in this action. These documents connect Sony Music to the person or entity listed on the copyright certificate.

18.     An effort to locate, collect and review all of the documentation associated with Sony Music's ownership of all of its copyrights in sound recordings—including the validity, ownership, chain of title, artist agreements, challenges or disputes, and all forms of assignments and licenses that could back many decades—would be an enormous undertaking. Because these materials are not always maintained in a centralized database or in a centralized location, it is difficult to determine even the precise amount of material involved. I estimate that hundreds of thousands of documents would need to be located, collected and reviewed in such an effort. This process would require thousands of hours of employee time in addition to the substantial time and expense required by in-house and outside attorneys to manage this process. I would estimate that the expense of such an undertaking could easily cost in the hundreds of thousands or even millions of dollars.

**Discovery Relating to Anti-Piracy, RIAA and MarkMonitor**

19.     The RIAA is the record industry trade group and Sony Music and the other record company plaintiffs have worked closely with it for many decades. RIAA supports and promotes the creative and financial vitality of the major record companies. To that end, RIAA assists the record company plaintiffs in a variety of ways, with departments and personnel helping on, among other things: (1) anti-piracy investigation and enforcement, both in the physical realm and online; (2) copyright litigation matters, including as counsel in numerous cases, including in cases like *Napster*, *Aimster*, *Grokster, Limewire* and many others; (3) legislative issues at the federal and state level; (4) regulatory matters with the Copyright Office and other agencies such as the Federal Communications Commission, the U.S. Patent & Trademark Office, and the United States Trade Representative; (5) industry relations issues such as overseeing the program for Gold and Platinum

awards based on artist sales success; (6) coordinating with international organizations and governments on music protection; and (7) conducting research.

20. The scope and quantity of the documents responsive to Cox's requests regarding the RIAA is staggering, with much of the material not identifying or concerning Cox or even copyright infringement issues in any manner at all. And even if the requests were limited to issues involving RIAA's anti-piracy work, it would still be impossibly overbroad. For well over twenty years, the RIAA has had an entire team of online anti-piracy personnel whose sole and full-time responsibility is to identify infringing activity, to prepare notice-and-takedown requests, and to inform lawyers for the record companies regarding piracy issues.

21. This means that a request for all documents and communications with or involving the RIAA concerning copyright infringement or any of the works in suit could span a multitude of anti-piracy investigations, monitoring and enforcement efforts, pre-litigation analyses or lawsuits. It would entail preparation of a massive privilege log. While it is hard to assess the resulting costs and disruption, I anticipate that costs alone could easily exceed several hundred thousand dollars, if not higher.

22. Over the last decade, MarkMonitor or its predecessor, Dtecnet, Inc., has been involved in a variety of notice programs to protect the record companies' copyrights. MarkMonitor and/or Dtecnet have sent millions of infringements notices on behalf of Sony Music and other record companies over the years that have nothing to do with Cox. In addition, MarkMonitor and/or DtectNet has provided litigation support in cases protecting the record companies' copyrights.

23. Sony Music's anti-piracy efforts (many of which occur in cooperation and common interest with other plaintiffs, the RIAA and/or MarkMonitor) contain sensitive information

concerning the means, methods, and strategies by which we combat piracy of sound records and their associated musical compositions. This is information that is guarded as extremely confidential. Unauthorized access and use of that information could provide a roadmap for infringers and significantly undermine the efforts to deter infringing activity.

### Discovery concerning the Copyright Alert System and Third-Party ISPs

24. I understand that Cox seeks production of "all documents concerning CAS," or the Copyright Alert System, as well as the copyright infringement practices of other Internet Service Providers (ISPs), including all documents concerning a multitude of topics such as (1) negotiations related to CAS, (2) any memorandum of understanding concerning CAS, (3) any agreements entered concerning CAS, (4) Sony Music's status as a signatory of a CAS MOU, (5) Cox's compliance or non-compliance with policies or procedures in CAS, (6) any technological system used in connection with CAS, (7) all reviews, assessments, evaluations, reports, or the like, concerning CAS, and (8) notifications sent pursuant to CAS.

25. In addition, I understand Cox seeks production of "all documents" concerning a host of issues concerning third-party ISPs, including (9) any ISP's response to receiving an infringement notice from any entity, regardless of whether it involved Plaintiffs, RIAA, or MarkMonitor, (10) communications with ISPs other than Cox regarding copyright infringement notices, (11) policies and practices concerning termination or suspension of subscribers, and (12) documents concerning transmitting "information" to ISP's subscribers with no limit on subject matter.

26. CAS was a private agreement between 18 private parties (30 parties, including all affiliated entities), including trade groups, copyright holders and ISPs designed to educate

consumers, deter online infringement, and direct consumers to lawful online legitimate sources of content. Cox did not participate in CAS.

27. Negotiations leading up to the formation of CAS spanned years. A separate corporate entity called the Center for Copyright Infringement, Inc. ("CCI") was created to administer and oversee CAS. The creation and administration of CCI and CAS involved dozens of individuals at dozens of companies from multiple industries engaged in dialogue over the course of years. Each participating company was involved in the oversite and activities of CCI. The terms and agreement implementing CAS contain strict confidentiality provisions governing the handling of the participating members' sensitive business information and records and data relating to the CAS notice program. Certain information cannot be disclosed without the prior written consent of all 30 parties involved. CCI has since dissolved.

28. CAS did not establish, or attempt to establish, an industry standard. The Memorandum of Understanding setting forth CAS's framework acknowledged that "the limitations on ISP liability under the DMCA are conditioned on an ISP's adoption and reasonable implementation of a policy that provides for the termination in appropriate circumstances of subscribers and account holders who are repeat infringers." (MOU at 9 n.1, attached as Ex. 13 to J. Golinveaux Decl. (ECF No. 75-14).) The MOU further acknowledged that "entering into this Agreement is not, by itself, intended to address whether a Participating ISP has adopted and reasonably implemented a DMCA Termination Policy." *Id.*

29. MarkMonitor was engaged to conduct monitoring and notice sending on behalf of the record companies and movie studios in connection with CAS. In that context, MarkMonitor sent millions of infringement notices to five major ISPs who contractually agreed to participate in CAS. None of those notices involved Cox. Many of those notices would have pertained to Sony

Music works (including works in suit in this action), as well as other third parties, including movie studios whose copyrights are not at issue in this case. Ongoing coordination and communication between the 18 parties to CAS (plus dozen more affiliated entities) spanned years.

30. Searching for and producing all the documents sought by Cox's overbroad requests concerning CAS and other ISPs would be a major undertaking and significant burden. The search for documents would span roughly seven years and involve documents and communications concerning dozens of companies, dozens of individuals, the negotiations and creation of an independent corporation, millions of infringement notices to ISPs *other* than Cox.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____
Wade Leak

Executed this 23rd day of January, 2019.