UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

SONY MUSIC ENTERTAINMENT, *et al.*,

    Plaintiffs,

v.

COX COMMUNICATIONS, INC., *et al.*,

    Defendants.

Case No. 1:18-cv-00950-LO-JFA

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL THE NUMBER OF SUBSCRIBERS COX TERMINATED FOR VIOLATING ITS ACCEPTABLE USE POLICY AND PAYMENT TERMS**

Plaintiffs submit this memorandum of law in support of their motion to compel discovery from Defendants Cox Communications, Inc. and CoxCom, LLC (collectively "Cox"). As explained below, Plaintiffs request an order compelling Cox to state the number of subscribers whose internet service it terminated each month from 2010 through 2014 for (i) violation of its Acceptable Use Policy, broken out by the provision of the Acceptable Use Policy violated, and (ii) failure to pay for service. Cox's right and ability to terminate users, and decision to do so when it served *its* interests, is directly relevant to Plaintiffs' claims.

## INTRODUCTION

This action is brought by major record companies and music publishers against one of the nation's largest internet service providers. Plaintiffs allege that Cox is contributorily and vicariously liable for infringement of their copyrighted sound recordings and musical compositions. For years, copyright owners sent Cox notices, made under penalty of perjury, identifying specific Cox subscribers who were using Cox's service to infringe. But Cox

deliberately turned a blind eye to that infringement and refused to take reasonable measures to limit it—even after Cox became aware of particular customers engaging in specific, repeated acts of infringement. Instead, Cox continued to provide Internet service to specific subscribers it knew were using its service to infringe.

Plaintiffs move to compel Cox to provide the number of subscribers it terminated for (i) violations of its Acceptable Use Policy *other* than copyright infringement, such as spam and hacking, and (ii) failure to pay for service. Cox claims to take spam, hacking and similar misconduct seriously because it harms Cox's network and customers. And it no doubt terminates subscribers for not paying their bills. By contrast, Cox turned a blind eye to copyright infringement it knew was occurring on its network and continued to provide Internet service to subscribers it knew were using it to infringe. A comparison of how Cox responds to violations that potentially hurt Cox, as opposed to the music industry, is highly probative of Cox's liability and willfulness. If Cox regularly terminated customers for spam, hacking or non-payment violations—while continuing to provide service to and profit from infringing subscribers—that demonstrates Cox's right and ability to terminate service and control infringement on its network and willfulness in turning a blind eye to infringement.

## BACKGROUND

Cox maintains an Acceptable Use Policy that prohibits use of its network for certain purposes, including, *inter alia*, hacking, spam, and intellectual property infringement. (DTX 140 at ¶¶ 2, 7, 11, attached as Ex. A.) "Violation of any term of this AUP may result in the immediate suspension or termination of either your access to the Services and/or your Cox account." *Id.* at 1. Cox also maintains a Subscriber Agreement that sets forth the terms and conditions pursuant to which Cox agrees to provide internet service to subscribers. *Id.* at 4-10. Among other things, it

requires subscribers "to pay all monthly fees" and provides that "Service may be terminated" if payment is not received by the due date. *Id.* at 4.

Against that backdrop, Plaintiffs seek discovery concerning Cox's termination of service for subscribers who violated its AUP and payment terms. Specifically, Interrogatory No. 6 seeks the following:

> INTERROGATORY NO. 6: Identify the number of Subscribers You terminated for violation of your Acceptable Use Policy, broken out by the provision of the Acceptable Use Policy violated. For Subscribers terminated for violating more than one provision of the Acceptable Use Policy, organize Your response by grouping the provisions violated (*i.e.*, X number of Subscribers terminated violating provisions A and B; Y number of Subscribers terminated violating provisions C and D).

Cox initially refused to provide information responsive to this interrogatory on the basis of relevance, breadth and burden. (Cox's Responses and Objections to Plaintiffs' First Set of Interrogatories, attached as Ex. B.) It later agreed to provide the requested information but only for copyright infringement. To satisfy that production, Cox relied on a BMG trial exhibit that includes termination numbers for copyright infringement by month, for January 2010 through February 2015. (PX 1610 at 24-27, attached as Ex. C.)[1] Cox still refuses to produce information concerning any other AUP violations.

Additionally, Interrogatory No. 11 requests the following:

> INTERROGATORY NO. 11: State the number of Subscribers, per quarter and year from January 1, 2008 through December 31, 2014, whose internet service you terminated for failing to pay amounts owing on the Subscriber's account.

---

[1] Plaintiffs dispute that PX 1610 is confidential given its public use in the public BMG trial. Cox did not object to the admission of PX 1610 or ask the Court to take steps to protect it from outright public disclosure. Cox has nevertheless designated it as Highly Confidential—Attorneys' Eyes Only under the Stipulated Protective Order (ECF No. 58) and therefore Plaintiffs have filed the accompanying motion to seal. As explained in the seal motion, Plaintiffs have challenged the designation of this and other BMG trial exhibits pursuant to the provisions of the Stipulated Protective Order.

Cox refuses to provide any information responsive to this interrogatory on the basis of relevance, breadth and burden. In subsequent discussions, Cox focused its objection on relevance.

The parties are in active discussion concerning their respective discovery requests, have exchanged numerous letters and discussed these and other issues by phone for many hours. Though the parties' discussions are ongoing, the issues set forth herein are ripe for consideration by the Court.

## ARGUMENT

**I. Termination of subscribers for other AUP violations and failure to pay for service is relevant to Cox's right and ability to control infringement and willfulness.**

Cox's handling of subscribers violating its AUP terms and payment policies is relevant to Cox's right and ability to control infringement and willfulness. Vicarious infringement requires a showing that Cox had the right and ability to supervise the infringing activity. *BMG Rights Mgmt. (US) LLC V. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 992 (E.D.V.A. 2016), *aff'd in part, rev'd in part*, 881 f.3d 293 (4th Cir. 2018). Infringement is willful if done knowingly, with willful blindness or with reckless disregard. *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 312–13 (4th Cir. 2018).

In determining whether a defendant had the right and ability to control infringing activity, courts look to whether the defendant could and did take action against violations of its policies, including those that are not related to infringement. *See Arista Records, Inc. v. Usenet*, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009) (the ability to block users for "any reason whatsoever" is "evidence of the right and ability to supervise" infringing activities) (internal quotes omitted); *Arista Records, Inc. v. MP3Board, Inc.*, No. 00 CIV. 4660 (SHS), 2002 WL 1997918, at *11 (S.D.N.Y. Aug. 29, 2002) (same).

In *Arista Records, Inc. v. Usenet*, the court held that Usenet (a file distribution service) had the right and ability to control its users' infringing activity, based on its actions against violations of various other policies. 633 F.Supp.2d at 157. The *Usenet* court relied on the fact that the defendant had the functionalities to limit questionable conduct—and actually did so by "terminating or limiting access of subscribers who posted 'spam'," "restricting download speeds for subscribers who downloaded what they considered a disproportionate volume of content," and "taking measures to restrict users from posting or downloading articles containing pornography[.]" *Id*. at 157. This led the court to conclude that Usenet could have but "never used the same filtering capabilities to search for, limit or eliminate infringement on their service[,]" despite their "unfettered ability to control access" and "total dominion" over their service's content. *Id.* at 153, 157.

Similarly, in *Arista Records, Inc. v. MP3Board, Inc.*, the court determined that the MP3Board (a website operator) could have but failed to control infringing activity, based on the its actions against its subscribers for other policy violations. 2002 WL 1997918, at *11. The court noted that MP3Board "had stated a policy of restricting users from posting certain types of links, such as those linking to pornography, hate, and hacker and 'warez' (illegally copied and distributed commercial software) sites" and "did in fact remove offending links from the site and banned repeat offenders of MP3Board's rules from posting any additional links." *Id*. From this, the court concluded that MP3Board also "had the right and ability to remove links to infringing works and bar the participation of users who transmitted those infringing files." *Id.* (citing *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1024 (9th Cir. 2001)).

Both *Usenet* and *MP3Board* show that courts find a direct correlation between (i) a defendant's ability to control (and actual control of) its users' violations of other terms or policies,

and (ii) its right and ability to control its users' infringing activities. Thus, if Cox regularly terminated the accounts of subscribers engaged in spam, hacking, non-payment or other misconduct as it had the right to pursuant to its terms, then it could have done the same for subscribers it knew repeatedly infringed copyrights.

Cox's termination of subscribers' accounts for other AUP violations and non-payment is also relevant to willfulness and would demonstrate to a jury the extent to which Cox turned a blind eye to infringement. Beyond a few token subscribers, Cox did not terminate repeat infringers. (*See* PX 1610 at 23-27.) By contrast, Cox claims that it took seriously other AUP violations that it deemed harmful to its network, including spam and hacking. And Plaintiffs have no doubt that Cox regularly terminated subscribers for non-payment of service. Cox's Manager of Customer Safety and Abuse Operations, Jason Zabek, drew a distinction between spam and hacking as harmful to Cox's network and customers, and copyright infringement that merely injures copyright holders.

> Q: Let me ask it this way: Why were you making a distinction between DMCA violations and all the other violations?
>
> A: Spammers and hackers pose a great risk to our network and our customers, especially their data, their identities, credit cards, Social Security numbers, everything, which can be incredibly devastating if you have some type of malware on the computer. It's incredibly horrific when that does happen. And these folks, once we can lay proof onto them, we don't want to give them another chance on the network, as they affect so many -- can affect so many lives. It can be very devastating.
> . . .
>
> Q: Do you think alleged copyright infringement hurts anyone other than the network? outside of the network?
>
> A: Can you be clearer on what you mean by "hurt"?
>
> Q: "Hurt": causes injury; damages someone.
>
> A: Yes.

Q: Who?

A: The copyright holder.

(PX 5003 at 208:11-209:05, attached as Ex. D.)[2] In other words, when use violations damage Cox's network or customers, Cox took it seriously. But when it knew about hundreds of thousands of instances of its subscribers stealing from Plaintiffs, it wagged its finger and issued fake terminations. When considering Cox's willfulness, a jury should be able to compare the number of subscribers Cox terminated for copyright infringement against the number of subscribers it terminated for other AUP violations and failure to pay for service.

## **CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request an order compelling Cox to state the number of subscribers whose internet service it terminated each month from 2010 through 2014 for (i) violation of its Acceptable Use Policy, broken out by the provision of the Acceptable Use Policy violated, and (ii) failure to pay for service. Given that Cox provided a month-by-month chart of terminations for copyright infringement (PX 1610), Cox should be required to produce the information requested here in the same monthly format for other terminations so a jury can reasonably compare Cox's approach to these different policy violations.

Respectfully Submitted,

Dated January 18, 2019

/s/ Scott A. Zebrak
Scott A. Zebrak (38729)
Matthew J. Oppenheim (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW, 5th Floor

---

[2] Plaintiffs dispute the confidentiality of PX 5003 but, like PX 1610, have sought to file it under seal because Cox designated it as Confidential under the Stipulated Protective Order. PX 5003 is a copy of Mr. Zabek's designated trial testimony. It was played in open court by video. According to the trial transcript, Cox took no steps during the proceeding to protect as confidential the information in his designated testimony.

7

Washington, DC 20015
Tel: 202-480-2999
scott@oandzlaw.com
matt@oandzlaw.com
jeff@oandzlaw.com

*Attorneys for Plaintiffs*