## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

SONY MUSIC ENTERTAINMENT, *et al.*,

      Plaintiffs,

v.

COX COMMUNICATIONS, INC., *et al.*,

      Defendants.

Case No. 1:18-cv-00950-LO-JFA

## REPLY IN FURTHER SUPPORT OF PLAINTIFFS' MOTION TO COMPEL

Careful parsing of Cox's Opposition makes clear that Cox has the three requested categories of documents, each is relevant, and the burdens involved in production are proportional to the needs of the action. The roadblocks Cox has constructed to hinder the requested discovery are unavailing. Cox concedes that the requested revenue and notice data are relevant and that Cox possesses such data in two specifically identified databases (the financial data in ICOMS and notice information in CATS). Asking Cox to extract relevant data from these two databases is hardly a novel or unreasonable request. And emails concerning Cox's copyright abuse handling easily pass the bar for relevance. Cox withholds the responsive documents only because it knows they hurt its case. It should be ordered to produce them.

## ARGUMENT

### I.    Revenue Information for Infringing Subscribers

Whether Cox calls it "revenue information" or "billing information," Cox has financial data showing the payments it received from its infringing subscribers. Cox concedes that this information is relevant. It should be ordered to produce records detailing the monies it received,

from 2011 to present, by quarter and year, from each subscriber who was the subject of an infringement notice from Plaintiffs. If it is easier for Cox to produce the information by month, because that is how its system stores the data, that is obviously fine.

### a.   Cox Possesses the Requested "Revenue Information"

In arguing that it does not have revenue data at the subscriber level, Cox apparently wants the Court to believe the unbelievable—namely, that it provides service and sends bills to millions of customers without tracking whether or not they pay. It is impossible that Cox—or any other business—could operate that way. The declarations upon which Cox relies confirm that it has revenue information and can produce it, notwithstanding its unnecessarily complex and implausible claims to the contrary.

Citing paragraphs 3 through 5 of the Sanford Mencher declaration, Cox argues that it "does not track revenue by subscriber, and does not keep records that would permit it to retrieve or produce revenue information on a per-subscriber basis." (Opp. at 4.) However, the Mencher declaration is terse, cryptic, and unavailing. Without indicating how Cox tracks payments, Mr. Mencher summarily states, "Cox does not track revenue … at the subscriber level, and does not generate reports containing such information in the ordinary course of business." (Mencher Decl., at ¶ 3.) In the same paragraph, he adds that "[he] is not aware of any *existing* reports" that would show, on a subscriber-by-subscriber basis, the revenue attributable to the Cox subscribers who were the subject of Plaintiffs' infringement notices. *Id.* (emphasis added).

Whatever those statements mean, nowhere does Mr. Mencher clearly and unambiguously assert that Cox lacks records with information showing revenue it received from infringing subscribers. When Mr. Mencher discusses Cox's ICOMS database system, he does not state that it lacks revenue information for subscribers. Just the opposite, in apparent conflict with his earlier

statements, Mr. Mencher indicates that "[t]he ICOMS system does not maintain or store **complete** revenue information, and lacks information that is necessary for **accurately** calculating revenue." (*Id.*, at ¶ 5 (emphasis added).)

Mencher fails to explain what revenue information ICOMS contains and why he deems it not to be "complete" or a means for "accurately calculating revenue."  Nor does Mencher explain anything at all about how Cox tracks payments against billings, as any business must do.  His declaration is insufficient.  *See Equal Employment Opportunity Comm'n v. Health*, No. 16-MC-55-WJM-CBS, 2017 WL 3821781, at *7 (D. Colo. Sept. 1, 2017) ("conclusory assertions in declarations" on difficulty of retrieving data "are not sufficient to support an objection to discovery").  Cox should be ordered to produce whatever revenue information it has for the infringing subscribers cited in Plaintiffs' infringement notices.  Cox can later argue the weight that information should be afforded.

### b.   Alternately, Cox Should Produce What It Calls "Billing Information"

Proceeding on the questionable predicate that it lacks data to show payments from a given subscriber, Cox discusses the possibility of producing billing information in lieu of revenue information.  (Opp. at 4.)  Cox unnecessarily complicates this option, no doubt hoping the Court will become frustrated and deny the request.

As a threshold matter, it is unclear why Cox describes this alternative as something different than producing revenue information.  Cox has already identified the precise subscribers identified in Plaintiffs' notices, which it indicates to be roughly 58,000 subscribers in total.  (Opp. at 4, citing Jarchow Decl., at ¶ 5.)  Cox acknowledges that its ICOMS database system includes the "actual billing information" as well as "accounts receivable data" to track "account aging, accounts receivable, and debits and credits."  (*Id.*, at ¶ 3.)  Cox further explains that the system

tracks pricing, discounts, and net billing to the subscriber.  (*Id.*, at ¶ 4.)  Cox even indicates that it can produce "a billed-dollars report similar to a spreadsheet."  (*Id.*, at ¶ 6.)  Thus, it would appear that this system tracks what Cox billed subscribers who infringed Plaintiffs' works versus what amounts, if any, remain unpaid.

 Cox argues that the billing data "would be extremely burdensome to extract and produce." (Opp. at 4.)  To prop up this argument, Cox walks through the time it would take to retrieve this information manually.  (*Id.*)  Of course, a data pull for 58,000 infringing subscribers would be automated, not manual.  Cox contends that extracting the data on an automated basis would cost roughly $15,000 and that such cost is not warranted, given what Cox describes as the "marginal relevance" of the information.  (*Id.*, citing Jarchow Decl., at ¶6.)  This argument has no merit.

First, Cox's proportionality argument ignores context and its own efforts to impede this discovery.  Plaintiffs have no doubt that Cox has already incurred at least $15,000 (and likely much more) in resisting this discovery, which it concedes is relevant.  If Cox's motivation were to avoid costs, rather than prevent Plaintiffs from obtaining relevant discovery to prepare their case, it would have been much more efficient for Cox to provide the documents.[1]

Second, this is a large case, with important issues and significant potential damages at stake.  The case involves Cox's infringement of nearly 11,000 of Plaintiffs' copyrighted works, spanning years, and the burden and expense of the proposed discovery is proportional to the needs of the case.  Against that backdrop, along with the breadth of the back and forth discovery, the expense that Cox cites is something that each side is bearing in the ordinary course.

---

[1] *See SAP America, Inc. v. Investpic, LLC*, Civil Action No. 3:16-CV-02689-K, at *4, 10 (N.D. Tex., Dec. 04, 2018), attached hereto as Gould Decl. Ex. A (noting the billing rates of Winston & Strawn's intellectual property attorneys, "which range from $745.00 – $1,175.00 per hour for partners and from $405.00 – $650.00 for associates").

Third, Cox has demanded, and this Court has required, that Plaintiffs incur far greater costs in pulling revenue information more attenuated than the relevant information Plaintiffs seek in this motion.  For each of the thousands of works in suit, Plaintiffs are required to assemble documents showing historic revenue data by work and by four separate channels, in many cases from multiple locations—information that speaks only to past revenue for a work, not the revenue that Plaintiffs lost each time a Cox subscriber infringed the work.  On the other hand, information as to the revenue that Cox received from its infringing subscribers, including those it chose not to terminate, is far more probative, falling squarely within a jury's considerations when assessing statutory damages.

Cox's argument that Plaintiffs' election of actual damages means the relevance is "at best attenuated" holds no water.  Statutory damages are "not fixed or readily calculable from a fixed formula."  *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352–53.  In assessing damages, a jury is certainly entitled to consider Cox's ill-gotten gains, including revenue from subscribers who infringed Plaintiffs' works.  A jury is also entitled to see the relationship between Cox's receipt of revenue for a subscriber correlated against Cox's receipt of infringement notices for that subscriber.  Cox labors to keep this information out of the case because it fears how a jury may regard it while assessing the need for deterrence, a core consideration.  *See, e.g., Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010) (citing the deterrent effect on the infringer and third parties as a factor for juries to consider when assessing statutory damages for copyright infringement); *EMI Apr. Music, Inc. v. White*, 618 F. Supp. 2d 497, 508 (E.D. Va. 2009) (emphasizing the "important deterrent effect served by statutory damages" for copyright

infringement) (citing *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233, 73 S.Ct. 222, 97 L.Ed. 276 (1952)).[2]

Cox raises the idea that it "would provide exemplar information on billing for a small sample group of customers, say 5 per tier of service, for plaintiffs to get a sense of the billing at a product tier level manually." (Opp. at 4 n.1, citing Jarchow Decl. ¶ 8.) While better than nothing, that sampling is grossly insufficient (and relates to a different document request the parties have been discussing, but is not part of Plaintiffs' motion). It fails to provide the aggregate revenue Cox received from infringing subscribers and fails to provide the revenue Cox received from specific subscribers it knew were infringing Plaintiffs' works. For these same reasons, Cox's production of Cox's overall revenues for its residential telephone, television, and internet divisions (see Opp. at 5, 7), does not satisfy the need for the requested data concerning revenue from infringing subscribers.

### c.   While the Time Period Is Appropriate, Plaintiffs are Flexible

Finally, the time period requested, 2011 to present, is appropriate. It is the exact period for which the Court ordered Plaintiffs to produce revenue information for the works in suit. Cox does not contest the relevance of the revenue information for 2013 through 2014, which encompasses the time period of Plaintiffs' claims. Revenue from 2015 forward is clearly relevant too. Had Cox terminated a repeat infringer subscriber, it would have lost revenues for that subscriber. If it did not terminate, and instead continued to generate revenue from that subscriber after 2014, those ill-gotten gains are relevant. In assessing the need to deter Cox and third-parties, a jury needs to know about the illicit revenue that Cox obtained by continuing to provide service to known repeat

---

[2] Cox is wrong on what is required to prove the direct financial benefit prong of vicarious liability. For this motion, however, it is not necessary to delve into that issue further because the requested information is clearly relevant to the statutory damage analysis.

infringers.  For 2011 and 2012, the revenue information is relevant because it provides some basic context for the years that follow, including seeing changes in the services that the subscriber received from Cox.  In the event the Court disagrees about 2011 and 2012, it should nevertheless compel production for 2013 to present.

## II.   Emails and Communications Concerning Cox's Responses To, Handling Of, and Attitude Towards Infringement Notices

Cox should be ordered to produce emails and communications concerning its response to, handling of, and attitude towards infringement notices, for the period of 2010 through 2014.  As it does so, Cox should be transparent with Plaintiffs about the custodians and search terms it uses and any subsequent decisions on responsiveness.  Cox does not argue there is any burden involved in producing the requested documents.  This is for a good reason as Cox no doubt already searched for and produced many or all of these documents in the *BMG* action.  Instead, Cox misleads the Court by responding to the initial discovery requests that support this more tailored motion for "emails and communications" (rather than "all documents"), while ignoring the substance and relevance of what the motion actually seeks.  Cox attempts to exclude those probative documents from this case by making strained arguments about relevance.

### a.   Cox Misreads this Court's Prior Rulings

Hoping to avoid production, Cox overstates and mischaracterizes an earlier ruling from this Court.  (Opp. at 8, 10.)  In December 2018, this Court ruled that Plaintiffs' request for all copyright notices that Cox received during the period of 2010 through 2014, without limitation to the copyright holder, sender, or work, was overbroad, unduly burdensome and not proportional to the needs of the case.  The ruling concerned copies of infringement notices, not emails, and was not a relevance determination.  As Plaintiffs understand it, the ruling also does not mean that Cox's *emails* are irrelevant unless they involve Plaintiffs or Plaintiffs' works.

As Plaintiffs have explained, in the *BMG* case this Court rejected the precise limitations Cox has imposed here, denying Cox's motion to exclude as irrelevant Cox's emails from prior to the claim period, concerning works not in suit, regarding notices from other copyright holders. Critically, the Court held that emails demonstrating Cox's response to, handling of, and attitude towards infringement notices are "highly probative on the issue of willfulness and willful blindness," even though they pre-date the claim period and do not involve the plaintiffs' notices or works. *BMG v. Cox*, Case No. 1:14-cv-1611, ECF No. 1018 at 2. The Court explained that "Cox should not be able to characterize its response to infringement notices as made in good faith while preventing the jury from seeing evidence to the contrary." *Id.* It further explained that "Cox's internal policies and procedures related to infringement were of course established prior to [the claim period], and it is those policies and procedures that Cox applied when it received notices of infringement for BMG's work at issue.

In this case as well, Cox should not be able to hold back relevant evidence demonstrating its practices for ignoring infringement so that it could continue profiting from subscriber revenue. The differences in parties and works in suit between this case and *BMG* do not obviate the logic behind Judge O'Grady's ruling. Cox refused to accept any infringement notices from BMG through its anti-piracy vendor, Rightscorp. Here, Cox accepted some infringement notices from Plaintiffs but put a cap on the amount. Regardless of whether internal emails discuss that cap as to Plaintiffs or others, Cox's reasoning behind and decision to impose such caps is relevant to whether Cox willfully blinded itself to infringement of Plaintiffs' works. Both cases encompass Plaintiffs' claims period, along with Cox's continued provision of service to particular subscribers it knew were using its service to infringe. Just as in *BMG*, Cox's emails do not need to specifically reference Plaintiffs or Plaintiffs' works in order to be relevant to proving Cox's willful

infringement and the need to deter BMG and others through a statutory damage award.  As in the *BMG* case, Cox's handling of DMCA notices from Plaintiffs and reckless disregard for their copyrights during Plaintiffs' claim period cannot be understood in context without understanding Cox's attitude towards and treatment of DMCA notices in the years that preceded that period (i.e. "F the dmca!!!" and "[e]very terminated Customer becomes lost revenue . . .").

### b.  Cox's Responses to Other Requests Are Irrelevant Where They Do Not Call for Production of the Requested Documents Sought Herein

Where it concedes relevance, Cox misleadingly argues that the probative documents that Plaintiffs seek "are also the subject of one or more different discovery requests, for which Cox has already agreed to provide information and produce documents."  (Opp. at 7.)  Cox lays out what it is willing to produce in response to separate requests (Opp. at 9), but fails to mention that its responses to those other requests would not include the sorts of probative emails that Plaintiffs highlighted in their Memorandum.  For instance, an email showing a Cox employee that disregards infringement so Cox can receive more subscription revenue would not fall within Cox's responses to those other requests unless it discusses Plaintiffs and copyright infringement.

To be clear, Cox has agreed to produce merely "written policies," "documents sufficient to show Cox's policies," documents regarding caps on the number of notices placed on Plaintiffs' agent, and documents concerning Plaintiffs and copyright infringement.  (Opp. at 9.)  That is not what this motion seeks, which is emails regarding Cox's responses to, handling of, and attitude towards infringement notices.  Cox patently misleads the Court in claiming it has already agreed to produce "documents sufficient to show how its policies were actually implemented."  (Opp. at 9.)  The discovery response they cite in support of that assertion says nothing of the sort.  (*See* ECF No. 95-3 at 18.)   Days before Plaintiffs filed their motion, Plaintiffs asked Cox to "please confirm [that] your agreement to produce 'documents concerning Cox's policies relating to

copyright infringement…' includes (i) documents concerning the implementation of such policies." (ECF No. 95-17 at 5.)  In response, Cox clarified that Cox will "produce documents sufficient to show or identify Cox's copyright infringement related policies in effect during Plaintiffs' Claim Period[.]" (ECF No. 95-18 at 4.)

Cox should not be permitted to mislead Plaintiffs and this Court and be rewarded by withholding important documents regarding core issues in the case.

### III.   Copyright Infringement Notices Involving the Same Cox Subscribers in Plaintiffs' Notices

This case involves Cox's continued provision of service to subscribers it knew were using its service to infringe.  There is no merit to Cox's argument that the timing and scope of its knowledge of those subscribers' infringement is irrelevant.  Its claim of undue burden in producing the requested information is misleading and unconvincing.

#### a.   The Requested Notice Data Is Relevant

This Court has already indicated that third-party infringement notices concerning the same subscribers identified in Plaintiffs' infringement notices may be relevant.  (Pls. Mem. at 9.)  In arguing otherwise, Cox takes the unsupportable position that such third-party notices are only relevant if they involve the *specific works* in suit in this case. (Opp. at 11.)  Cox cannot seriously claim it is irrelevant if it knew of specific subscribers infringing before Plaintiffs' claim period, or apart from Plaintiffs' notices, but continued to provide them with the service they used to infringe Plaintiffs' rights.  Recognizing that the information sought is relevant, Cox resorts to obfuscation.

Cox misleadingly argues that Plaintiffs are attempting to hold Cox liable for purported harm to third parties. (Opp. at 11–13.)  That is incorrect.  Plaintiffs seek to hold Cox responsible for the infringement of Plaintiffs' works only.  Nonetheless, as a jury considers statutory damages

and Cox's willfulness, it should understand when Cox first learned that the subscribers who infringed Plaintiffs' works were using its service to infringe and what Cox knew about it.

Cox also spins a yarn when it argues that Plaintiffs seek the notice data to show Cox's generalized knowledge of infringement on its system.  (Opp. at 12.)  Again, it is simply not so. The requested notice data reflects Cox's knowledge of "specific instances of infringement" that are relevant to the knowledge prong of contributory liability.  *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc*., 881 F.3d 293, 312 (4th Cir. 2018) (Cox is liable for contributory infringement if it "knew of specific instances of infringement or was willfully blind to such instances").  Third-party notices do not only show generalized knowledge that infringement was occurring somewhere on its network, as Cox contends.  Rather, they show specific instances of copyright owners informing Cox, under penalty of perjury, of particular infringing subscribers.  Those notices enable the "defendant [Cox] to have specific enough knowledge of infringement that the defendant [Cox] could do something about it."  *Id*.

Lastly, Cox contends that in order to be relevant to willfulness, Cox's emails must specifically reference Plaintiffs or Plaintiffs' works.  (Opp. at 11.)  Not so.  Even where an email does not mention a plaintiff or plaintiffs' works, it may still be relevant to whether a defendant willfully blinded itself to infringement or acted with reckless disregard for the plaintiff's copyrights.  Taking Cox's argument to its logical conclusion, it could have an email with the most egregious, anti-infringement statements ever made (i.e., "F the dmca!!!"), but it would not be evidence of willfulness unless it specifically referenced Plaintiffs or Plaintiffs' works.  To state the argument is to refute it.

11

### b. Cox's Arguments on Burden and Proportionality Are Inapplicable

Cox's arguments concerning undue burden and proportionality are perplexing and should be rejected.  Its argument is not responsive to Plaintiffs' motion and overlooks what it can do.

Cox completely ignores that, in light of its earlier objection to gathering and producing the actual infringement notices, Plaintiffs issued a new request that does not ask for copies of the actual notices themselves.  To accommodate Cox's concerns, Plaintiffs asked for "documents sufficient to show" the third-party infringement notices it received concerning the same subscribers cited in Plaintiffs' notices.  Nevertheless, Cox provides a long and largely irrelevant recitation on what is supposedly involved in "[p]roducing all third-party infringement notices that were directed to any of the 58,000 Accused Subscribers [i.e., the Cox subscribers identified in Plaintiffs' infringement notices]."  (Opp. at 13.)  Rather than address Plaintiffs' motion (and underlying request), Cox presents the Court with arguments concerning production of the copyright infringement notices themselves (as subsumed into "tickets" within Cox's CATS system).

Cox bends over backwards to argue why it cannot produce data sufficient to show the third-party infringement notices regarding the 58,000 subscribers.  Yet it neglects to mention that it has already agreed to provide the very same data for those subscribers with respect to Plaintiffs' notices.[3]  If Cox can provide that information for those subscribers concerning Plaintiffs notices, there is no excuse for withholding notice data regarding those subscribers from other parties.

Cox does not want to produce the information, so it again makes the situation appear overly complex.  Cox argues that a manual, ticket-by-ticket review is required to review (i) tickets whose abuse type relates to copyright infringement to remove any complaints within that ticket

---

[3] In a January 31, 2019 letter from Defendants to Plaintiffs, Defendants stated that "Regarding your proposal for handling PII [personally identifiable information], Cox will agree to provide a unique identifier for each subscriber for whom Cox received an infringement notice from Plaintiffs during the relevant time period, along with associated information in the notice or notices, including the date and IP address."  (ECF No. 95-18 at 1.)

concerning non-copyright complaints, and (ii) tickets of other abuse types to identify copyright infringement complaints associated with those tickets.  (Opp. at 14.)  Cox omits that the CATS database contains summary level information as to complaints concerning a given subscriber.

For each Cox subscriber, CATS can display a summary of prior complaints, the type of each complaint, the associated date of each complaint, and the action taken on each complaint (e.g., "Sent Warning 'DMCA'" or "Sent Reply 'Hard Limit for Complaints'"), as shown below.



Gould Decl. Ex. C (highlights above added for emphasis).[4]

The "Copy Other" abuse type is an umbrella category for "the steps in responding to Copyright Infringement Take-down Notices."  Gould Decl. Ex. B.  Thus, for each of the 58,000

---

[4] Plaintiffs do not have a more legible copy of this document, which they have only because it was a deposition and trial exhibit in BMG.  Those documents as received by Plaintiffs appear to be scans of printed paper.  Cox has not produced the document (or any of the other trial or deposition exhibit) from its files, where presumably they exist in more readable condition.

subscribers, Cox could run a report on "Copy Other" and include this sort of summary information. Alternatively, Cox could provide the last in time ticket report for each subscriber, which, as above, would show their entire abuse record history.  That would enable Plaintiffs to identify the timing and scope of Cox's knowledge that a subscriber was using its service to infringe.  The CATS report even includes the subscriber's "ICOMS ID" (essentially the subscriber's account number), which would allow Plaintiffs to correlate infringement notices for a subscriber to the revenue information that Cox has for payments received from the subscriber.

### c.   The Third-Party Notices Will Not Create Time-Wasting Mini-Trials

Finally, Cox claims that introducing third-party notices into the case would be a costly distraction.  It is wrong.  To begin with, the Court is more than capable of managing the conduct of a trial without allowing counsel to go astray into an area then-deemed extraneous.  Moreover, Cox's concerns are overblown.  Mini-trials are unnecessary.  What matters is the third-party's allegation to Cox, made under penalty of perjury, and Cox's knowledge of and reaction to the notice and subsequent notices.

Dated February 8, 2019

Respectfully Submitted,

/s/ Scott A. Zebrak
Scott A. Zebrak (38729)
Matthew J. Oppenheim (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20015
Tel:  202-480-2999
scott@oandzlaw.com
matt@oandzlaw.com
jeff@oandzlaw.com

*Attorneys for Plaintiffs*

14