1

```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
                        Alexandria Division




-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
              Plaintiffs,       :
                               :
     -vs-                       :     Case No. 1:18-cv-950
                               :
                               :
COX COMMUNICATIONS, INC., et al.,:
              Defendants.        :
                               :
-------------------------------:
```

HEARING ON MOTIONS

February 15, 2019

Before:  John F. Anderson, U.S. Mag. Judge

<u>APPEARANCES:</u>

Matthew J. Oppenheim, Scott A. Zebrak, and Jeffrey M. Gould,
Counsel for the Plaintiffs

Thomas M. Buchanan and Jennifer A. Golinveaux,
Counsel for the Defendants

2

```
 1              NOTE:  The case is called to be heard at 10:04 a.m.
 2    as follows:
 3              THE CLERK:  Sony Music Entertainment, et al. versus
 4    Cox Communications, Inc., et al., civil action number
 5    18-cv-950.
 6              THE COURT:  Okay, everyone will need to introduce
 7    themselves and tell me who is going to argue the motion for
 8    each side.  Thank you.
 9              MR. ZEBRAK:  Good morning, Your Honor.  Scott Zebrak,
10    counsel from plaintiffs.  With me are my colleagues Matthew
11    Oppenheim and Jeffrey Gould.  I will be arguing on behalf of
12    the plaintiffs.
13              THE COURT:  All right.
14              MR. OPPENHEIM:  Good morning, Your Honor.
15              THE COURT:  Good morning.
16              MR. BUCHANAN:  Good morning, Your Honor.  Thomas
17    Buchanan and Jennifer Golinveaux on behalf of the defendant
18    Cox.
19              Ms. Golinveaux will be arguing the subscriber by
20    subscriber financial information component of the motion to
21    compel, and I'll be arguing the other two regarding the third
22    party notices and the e-mails and communications.
23              THE COURT:  Well, let me -- I'm just a little -- we
24    have one motion.  And tag-teaming motions doesn't really seem
25    to be a very efficient way to do things.
```

3

1          I mean, I'll let you go ahead and do it today, but,

2   you know, when we have a motion, we're not going to be having

3   teams of lawyers arguing a single motion in the future.

4          So make plans to --

5          MR. BUCHANAN:  Yes, Your Honor.

6          THE COURT:  -- you know, have one person address what

7   we need to do so that we can just get it done, go through it

8   from beginning to end, and we don't have to do this sort of

9   stand up/sit down.

10          All right.  So I have reviewed all the pleadings, all

11   the exhibits, and I just want to let you know I kind of

12   appreciate the opportunity to have the chance to read them all,

13   other than late at night the night before the motion.

14          I know sometimes things get tight, but I just want to

15   acknowledge that I do appreciate that.  And it did give me a

16   little bit more of an ability to go over it and prepare it and

17   make sure that I'm understanding the issues that are involved.

18          But I will go ahead and give the plaintiff a chance

19   to make any arguments that it wants to make on the three

20   issues.  And I have got some questions on -- certainly on issue

21   number two.  But go ahead.

22          MR. ZEBRAK:  Yes, Your Honor.  I am happy to approach

23   this in whatever order that the Court would prefer.  I would

24   like to let the Court know though that with two minor

25   exceptions, we have, just on the eve of walking in here, have

4

1    worked out a solution with two caveats for the third section of

2    the motion.  I don't know if you want me to begin with that.

3            It has some spill-over to the first section as well

4    because there is an interrelatedness between the notice data

5    about specific subscribers cited in our -- in our notices and

6    the financial information about those subscribers.  But --

7            THE COURT:  Well, go ahead and tell me what it is --

8            MR. ZEBRAK:  Sure.

9            THE COURT:  -- that you all have worked out, and then

10   we will try and parse through what it means.

11           MR. ZEBRAK:  Sure.  Sure.  So, Your Honor, there is a

12   screen shot on page 13 of our reply brief that contains the

13   document that -- well, excuse me.  That's the -- that's the

14   beginning part of a -- of a ticket that shows that their CATS

15   system actually has summary level data about the subscribers in

16   our notices.  And Cox has now agreed to provide us with that

17   summary level data for the -- Cox has identified about 58,000

18   subscribers implicated by our notices.

19           So with respect to the data fields it's going to

20   provide, it will give us the sorts of fields that Your Honor

21   sees here, including the Abuse Type Copy/Other, and then the

22   left-most column in yellow highlight is the Ticket Number, then

23   there is a date of the -- for that ticket.  And then there are

24   some other fields, including the action that Cox took.  So Cox

25   will give us all that.

1        And then, so the two areas where there is still

2   disagreement concern the time period for this data and whether

3   Cox excludes what Your Honor will see at the top where it says:

4   ICOMS ID.  Whether it will exclude that or instead just give a

5   unique identifier that it sort of substitutes in place of that.

6        As we understand it, Cox internally has a concern

7   that that could constitute personally identifiable information.

8   The plaintiffs disagree with that.

9        While the parties earlier on were talking about

10  perhaps assigning a proxy number to identify each subscriber

11  implicated by our notices, what became apparent to plaintiffs

12  during the course of the briefing on this and Cox's

13  declarations is that its CATS system, as Your Honor sees here,

14  has this reference to the financial data that we want about the

15  subscribers.

16        And when we see other e-mail in the case, it's

17  possible e-mail might reference an ICOMS ID number, and that

18  would allow us to know if e-mail talks about this subscriber

19  and then in working with Cox's witnesses it's not going to know

20  whatever unique identifier Cox's counsel puts on this data now,

21  but it will know an ICOMS ID number.

22        So that's the first issue.  We just think it's far

23  simpler and more practical in the conduct of the litigation to

24  retain the ICOMS ID number.

25        And the second issue on this concerns the -- just the

6

1    time period.  This was a period of time in which Cox was

2    receiving lots of notices.  And, you know, this case is about

3    Cox's continued provision of service to subscribers it knew was

4    engaging in infringement.

5           So what the plaintiffs want to be able to do is

6    understand and present to the jury what Cox knew about those

7    subscribers and the moneys it received from those subscribers.

8    And so, if -- again, not for all the notices it got, but just

9    for notices about the subscribers implicated by our notices,

10   you know, if Cox got an infringement notice from some other

11   third party saying, you know, subscriber John Smith was

12   infringing and, you know, Cox is already on notice about that

13   bad subscriber, we would like to tell that more complete story.

14          THE COURT:  Why would you need two years of pre-claim

15   information?  I mean, that's what you've been asking for,

16   right?

17          MR. ZEBRAK:  Yes, Your Honor.

18          THE COURT:  You are asking for 2011 --

19          MR. ZEBRAK:  Yes, sir.

20          THE COURT:  -- 2012, 2013, and 2014?

21          MR. ZEBRAK:  Yes, Your Honor.

22          THE COURT:  So why would something two years before

23   the notice period be appropriate?

24          MR. ZEBRAK:  Well, just expanding somewhat on -- on

25   what I was just alluding to --

1              THE COURT:  Well, I can see one year, but I'm trying

2    to figure out --

3              MR. ZEBRAK:  Sure --

4              THE COURT:  -- why you went two years out.

5              MR. ZEBRAK:  Yes, Your Honor.

6              THE COURT:  One year gives you some history.

7              MR. ZEBRAK:  Yes, Your Honor.

8              THE COURT:  Two, if there was a notice two years

9    earlier about, you know, a possible copyright infringement and

10   there hadn't been anything for the next two years --

11             MR. ZEBRAK:  Yeah, yeah.

12             THE COURT:  That doesn't seem to be as strong of an

13   indication that they should have taken immediate action because

14   it would have been a one-off thing.

15             MR. ZEBRAK:  Yes, Your Honor I appreciate the

16   question.  I mean, to be perfectly frank, there is probable

17   multiple scenarios at play.  There may be a scenario where

18   subscribers implicated in our notices were, you know, routinely

19   implicated by notices from others in 2011 and 2012.  For

20   others, it may just be 2012.

21             And our view though is that Cox's behavior is that

22   much more egregious for purposes of what needs to be deterred

23   and for willfulness, that, you know, the greater its knowledge

24   about a subscriber's bad activities.  And so, I think there is

25   a legitimate ground for it.

1           And if there was some burden -- you know, Cox's

2    declarations go on and on about the burden involved in going

3    into the tickets and manually excluding information.  None of

4    that is an issue here.  It is an automated data pull.  There is

5    really, once it runs a script for that, it's no additional

6    burden.

7           And our point is just going to be if thousands of

8    these subscribers were, you know, implicated by notice after

9    notice, it's important.

10          THE COURT:  All right.  Okay.  So who is going to

11   deal with those issues?  We will go ahead and take care of the

12   third category --

13          MR. ZEBRAK:  Yes, Your Honor.

14          THE COURT:  And then I guess we'll do this category

15   by category.

16          MR. BUCHANAN:  Good morning, Your Honor.  And with

17   regard to the date, we compromised.  They asked for 2011 to

18   2014.  We agreed to go to 2012.  We think that is plenty of

19   additional time for them to show what they want to attempt to

20   show.  And we think that's a fair compromise.

21          The Court has in a number of other cases with regard

22   to discovery requests has balanced the two competing interests

23   by going back a year or so.  And that's what we have done here,

24   to try to follow the Court's lead on that.

25          So we think that's reasonable.  And it is burdensome,

9

1    there is a lot of work involved.  And we don't think it's

2    relevant.  And so, we think that's a fair compromise.

3            In terms of the unique number, the ICOMS number, they

4    suggest now, even though we've had discussions before about

5    using a separate number to protect the identity of the

6    customers --

7            THE COURT:  Well, what -- giving them the ICOMS

8    number doesn't give anybody the identity of anybody.  I mean,

9    that is a number that if I looked at, I would have no idea who

10   that relates to, right?

11           MR. BUCHANAN:  Correct, on its face.  But our client

12   tells us that that number can be utilized to track the identity

13   of the customer, and that's what --

14           THE COURT:  Well, an IP address can be used to do

15   that too, right?

16           MR. BUCHANAN:  Not as easily according to our client.

17   But that's what they've advised us, Your Honor.  That's the

18   only reason.

19           It's not to frustrate the effort of the plaintiffs.

20   It's just something we believe is necessary to protect our

21   customers' identity or to make it as safe as possible.

22           And we don't think it's really relevant because we

23   don't think these ICOMS numbers are floating around in a lot of

24   e-mails by which they have got to connect the e-mails to this.

25           I mean, the whole issue here is really they wanted

1    numbers.  They want to show that they had 58,000 subscribers to

2    whom they sent notices about and 168,000 notices.  Now they

3    want more notices to try to show they all equate with

4    infringement, and they put us on notice, to enhance their

5    damages.

6            So this number is not really relevant.  It's just

7    that they want to create a chart with all these numbers.

8            THE COURT:  Well, it's more work for you to have to

9    do something to replace that number; is that right?

10           MR. BUCHANAN:  I don't think it is because we're

11   going to create a different type of formatted screen shot.  And

12   so, it would just leave that off.

13           Again, we would have no problem with giving it if we

14   didn't think it was an issue and if we thought it was really

15   relevant.  I don't see this notion that this number is going to

16   connect them to all these e-mails and they will be able to

17   depose people about Joe Jones who infringed in 2013 and 2014

18   and '12 on their copyrights and then on some other copyrights.

19   I just don't think there is e-mails out that there that are

20   like that.  So --

21           THE COURT:  All right.  Let me -- what is the purpose

22   of you needing to have the ICOMS number as opposed to just some

23   unique identifier that you know that, you know, that relates to

24   this issue with this IP address, or whatever?

25           MR. ZEBRAK:  Yes, Your Honor.  I would like to answer

11

1    that, and also respond to a couple of other things very

2    briefly.

3           So I think the starting point should be on Cox to

4    justify why it needs to change the number.  From our

5    perspective, the reason we want the number is that's how it's

6    records exist in the normal course.  E-mail May cite to it.

7           And more importantly, when we work with witnesses in

8    depositions, they're not going to understand some unique number

9    that Winston & Strawn assigns to this.  They will understand --

10   they will understand an ICOMS field.

11          And when we put a witness on the stand at trial,

12   we're going to walk through the interrelatedness of the revenue

13   information from its financial database with the notice data

14   from its CATS database.

15          And the idea that somehow this could be used to

16   identify a subscriber is really just preposterous.  It's an

17   internal database ID number within Cox.  It's not the

18   customer's account number on their billing statement.  This is

19   just an internal unique serial number they have ascribed to a

20   subscriber for purposes of cross-referencing things internally.

21          So -- and there is no declaration in the Court about

22   risks of disclosure of someone's personal identity from this.

23          THE COURT:  Well, no, there is some information about

24   their being concerned about the personal identifying

25   information being included.  But I understand your argument.

12

1          MR. ZEBRAK:  Yes, Your Honor.  And that, of course,

2     that information though is about what could be subsumed within

3     the tickets.  It has nothing to do with the personal nature of

4     an ICOMS ID.

5          And Cox's counsel just mentioned that there is some

6     burden involved here.  There is no articulated burden in

7     producing a summary level information, nor any burden involved

8     in going back to 2011 versus '12.

9          And as Your Honor seized on already, their changing

10    normal course by assigning a proxy number to it that, you

11    know -- that only creates more work.  So ...

12          THE COURT:  All right.  Okay.  For item number 3, I

13    am going to go ahead --

14          MR. ZEBRAK:  Oh.  And, Your Honor, the only other

15    thing I would like to say on this, if we could, is at the last

16    hearing plaintiffs were required by Court order to produce

17    historical revenue data on its tracks at issue in the case

18    going back to 2011.

19          So there seems to be sort of a parallel that we would

20    like to keep consistent.

21          THE COURT:  Well, revenue data and complaints are

22    apples and oranges.

23          MR. ZEBRAK:  Yes, Your Honor.

24          THE COURT:  Okay.  Anything else?

25          MR. ZEBRAK:  No, Your Honor.

1          THE COURT:  All right.  On item number 3, I'm going

2    to require that they produce the information with the ICOMS ID.

3    And that the time period will be 2012 through 2014.

4          Okay.  So that takes care of item number 3.

5          Do you want to go 1 or 2 next?  Which --

6          MR. ZEBRAK:  Yes, Your Honor.

7          THE COURT:  Let's do the revenue one.

8          MR. ZEBRAK:  Yes, Your Honor.  So as I mentioned a

9    little while ago, the case, of course, is about Cox's continued

10   provision of service to subscribers it knew were engaged in

11   infringement.  And what we want to be able to do is to

12   correlate what Cox knew about those subscribers' infringement

13   along with Cox's receipt of revenues from those infringers.

14         And here Cox has -- you know, it's unclear, quite

15   frankly, put in declarations that we think -- you know, the

16   purpose of a declaration is, of course, to clarify and put the

17   parties and the Court in a position to resolve the dispute.  We

18   think that these declarations were more designed to just oppose

19   the discovery rather than clarify what they have and how they

20   have it.

21         But whether they call it revenue information or

22   billing information, you know, Cox knows what its subscribers

23   paid to it over time.

24         THE COURT:  Well, it knows what it billed, and at

25   least it is indicating that it can track or it is contained in

14

1  the ICOMS system what was billed.  And whether they don't

2  collect on their bills or not, I don't know.  But, you know,

3  apparently they are trying to mistake a distinction as to what

4  was billed and what are revenues.

5        MR. ZEBRAK:  Yes, Your Honor.  But if I could expound

6  on that slightly because I think it's a little more refined

7  than that based on how they briefed it.

8        So on the one hand they say, we don't track or

9  maintain revenue information in this ICOMS database.  At the

10  same time they say, I don't have the exact words in front of

11  me, but what we have here, we don't maintain complete revenue

12  information.  And that database lacks info next for accurately

13  calculating revenue.

14        THE COURT:  Does it make any real difference to you

15  whether it's billing information or revenue information?  We're

16  not getting down to, you know, nickels and dimes here.

17        MR. ZEBRAK:  Of course, Your Honor.  Of course, Your

18  Honor.

19        THE COURT:  And if somebody didn't pay their bill one

20  month and they paid it the next month, and they maybe had to

21  have an interest charge or something --

22        MR. ZEBRAK:  Yes, Your Honor, right.

23        THE COURT:  This is not going to get into the

24  granular nature of those kinds of things.

25        MR. ZEBRAK:  Right.  Right.  Well, come at trial they

1    no doubt will attack us for our experts and our use with their

2    witnesses.  And when we try and calculate the sum total of what

3    Cox received from these subscribers that it knew were engaged

4    in infringement, it no doubt is going to try to beat us up

5    saying it doesn't accurately reflect what it received.

6           But on the billing information, it does say that the

7    ledger side of that system includes not just what it billed,

8    but also information about accounts receivable and credits.

9           So it's unclear to us the nomenclature they're using

10   about -- about revenue versus billing.  And if they want to

11   produce billing information instead of revenue information, if

12   they'll -- if they'll stipulate right now that they won't at a

13   trial say that what they actually received is less than what

14   the system reflects on billing, that's fine with us.

15          You know, but the bottom line is, it knows who these

16   subscribers are.  It has information on how it benefitted from

17   these subscribers financially.

18          And, you know, the information, Cox says it's only of

19   marginal relevance.  Nothing could be further from the truth

20   than that.  I mean, this goes squarely at a number of core

21   issues in the case.

22          You know, there is a difference between us and Cox's

23   counsel in our views of how to prove the financial interest

24   prong of vicarious infringement.  We think when it decides to

25   keep a subscriber rather than terminating it, obviously all

16

1    that ill-gotten revenue after that is a direct financial

2    benefit.

3         But without even delving into that issue, which is a

4    little more legally dense, Cox has no argument against why the

5    information we seek isn't super-strongly relevant to the

6    statutory damages issues of Cox's profits as well as Cox's --

7    you know, the need to deter Cox.

8         And we need to see not just the aggregate Cox got

9    from these subscribers it knew was infringement, but then

10   correlate it against its decisions not to terminate them.

11   That's incredibly powerful evidence, and it's why Cox really

12   doesn't -- doesn't want to produce that.

13        And quite frankly, it cites -- you know, it goes on

14   in its declarations about the costs of doing it manually.  But

15   we're not interested in them doing this manually.  Just as

16   plaintiffs are required to do in response to a number of

17   discovery requests, we're running reports to figure out how to

18   pull information out.  And in the context of this case and

19   these issues, $15,000 is something that the parties are

20   routinely absorbing.

21        So, you know, again, we just think it's very

22   relevant.  It's all in one database, and we would like it

23   produced.  And we would like them, if they are not going to

24   produce revenue information, which we don't think they have

25   articulated that they lack, we would like them to produce at

1   least this billing information and be held to --  be held to

2   the proposition of that's what it received in revenue.

3           THE COURT:  Okay.

4           MR. ZEBRAK:  Thank you, Your Honor.

5           THE COURT:  Thank you.

6           First help me understand the difference between the

7   billing and the revenue argument.

8           MS. GOLINVEAUX:  Yes, Your Honor.  So ICOMS is Cox's

9   subscriber management system.  The records that the plaintiffs

10  are seeking, this is not the kind of report that Cox could run.

11  It doesn't track revenue on a per subscriber basis.  So it

12  doesn't have a business need to run that type of report in the

13  ordinary course.

14          So as is described in the Jarchow declaration, this

15  would require, to do this in an automated way -- automated way,

16  hiring an outside engineer to come in and write code to create

17  this special report they are seeking --

18          THE COURT:  I mean, you have got the information,

19  it's just how are you going to access it.  Okay.

20          So what I'm trying to find out is, you know, what's

21  the word game between billing and revenue?  I mean, if I called

22  Cox up right now and if I had a Cox account and I gave them my

23  account number, they could pull up something that had, I

24  assume, my billing information that would include what was I

25  billed and whether those bills were paid, right?

18

1          MS. GOLINVEAUX:  Your Honor, there is, as described

2     in the declaration, there is the ledger section of ICOMS.

3          THE COURT:  Right.

4          MS. GOLINVEAUX:  And it does contain, in addition to

5     the amount billed, certain account receivable information, like

6     debits and credits.

7          And my understanding is that to create the report

8     that processed all that in a meaningful way to show what was

9     actually paid versus what was billed, is a more complicated

10    process and more involved process.

11         THE COURT:  Is there any generic information as to

12    Cox receives 98 percent of its billings?  I mean, if this is a

13    situation where you're going to try and make some, you know,

14    cute argument that they were only billed and that doesn't

15    indicate what we actually got as revenues, I want them to have

16    some generic information they can use to say, okay, they only

17    gave us the billing information, but historically Cox, you

18    know, gets money in the door for 98 percent of its billings, or

19    90 percent of its billings, or whatever it actually -- the

20    realization rate for its billings for subscribers.

21         Is there that kind of information available?

22         MS. GOLINVEAUX:  For the time period at issue, Your

23    Honor, I am just not sure if they have that, that information

24    about percentages of dollars they collect off of the billing

25    information.  Off the bills, the amounts billed.

1          THE COURT:  Well, that's the kind of information that

2   you would think would routinely be looked at and analyzed by

3   the business people within the organization, wouldn't it?

4          MS. GOLINVEAUX:  It certainly may, Your Honor.

5          THE COURT:  Okay.  All right.  So the billing

6   information, help me understand what the situation is with

7   that.  You have to pay somebody $15,000 to prepare some type of

8   script or program or program to run to get this information

9   from the database that you have maintained.  Okay?

10         MS. GOLINVEAUX:  That's correct, Your Honor.  And we

11  think that -- counsel talked about the relevance of this

12  information.  We think that they are just wrong about the

13  vicarious liability issue.  Vicarious liability requires right,

14  ability to control, and a direct financial benefit.

15         There is no dispute that Cox bills for its services,

16  its Internet service.  The amount it billed to each of these

17  58,000 subscribers is not relevant to the direct financial

18  benefit prong of vicarious.

19         And in light of the marginal relevance and the fact

20  that Cox cannot create these reports in the ordinary course and

21  is going to have to hire an engineer to go in and write a

22  script to extract it, we think it's not appropriate.

23         THE COURT:  Okay.  What about the time period, your

24  argument on that.

25         MS. GOLINVEAUX:  Your Honor, they're asking for the

1    information for more than eight years, from 2011 to the

2    present.  If Your Honor is inclined to order it, we think that

3    the claims period is the relevant time period.  They're saying

4    it's relevant to damages.  What Cox billed these subscribers

5    before or after their claims period can't possibly be relevant

6    to statutory damages or actual damages.

7          THE COURT:  Well, why wouldn't -- if in fact you

8    should have terminated a customer in let's say January of 2014

9    based on, you know, 13 or 14 or 15 different complaints.  And,

10   you know, you decided that, you know, we need to keep every

11   customer.  And, you know, that customer is continuing to pay

12   Cox money now, why wouldn't that, to some extent, come into

13   play as to, you know, it was important for you not to terminate

14   this customer because you wanted that revenue stream going in

15   the future?

16         MS. GOLINVEAUX:  Well, Your Honor, that can't

17   possibly be relevant to damages.  They can't seek -- they can't

18   show --

19         THE COURT:  Why wouldn't it go to willfulness?  My

20   willful act so that I could get this revenue stream for four or

21   five more years, or whatever the standard industry rate is

22   that, you know, somebody doesn't change their Internet service

23   or these kinds of providers, why doesn't that come into play as

24   to willfulness?

25         MS. GOLINVEAUX:  Because, Your Honor the standard for

1  willfulness is whether Cox was aware that its actions with

2  respect to the plaintiffs' works constituted infringement.  And

3  whether it was receiving revenue from these subscribers at

4  issue years before or years after the claims period is not

5  relevant to that inquiry.

6  THE COURT:  Okay.  The script that would be written

7  to do this, would it produce -- I mean, you made some comment

8  about you only have this monthly.  Would this be monthly

9  information, or quarterly information, or what's the process

10  that you would anticipate that information being generated?

11  MS. GOLINVEAUX:  If the -- if we're writing a script,

12  I think it could be either monthly or annually because the

13  script could roll it up by year.

14  THE COURT:  Okay.  All right.  Let me hear from the

15  plaintiff about the time period information and whether yearly

16  or -- I assume you would want it -- you want it quarterly and

17  yearly.  I don't -- I am not sure why if you got it quarterly,

18  why you would need it to be quarterly and yearly.

19  But I assume you would want it on a monthly basis as

20  opposed to a yearly basis; is that right?

21  MR. ZEBRAK:  Yes, Your Honor.  Given that it's just

22  pulling it out of a database, it's -- it will be more useful at

23  a trial for us to be able to slice and dice the data different

24  ways.  And if it just wants to give us a report giving --

25  giving the data monthly, that's absolutely fine with us.

22

1              Your Honor, there are several statements I would like

2    to respond to, but if Your Honor is already inclined to find

3    that the information is relevant, I won't need to speak to

4    that.

5              THE COURT:  Well, the time period I do need to hear

6    you.

7              MR. ZEBRAK:  Yes, Your Honor.

8              THE COURT:  And I can understand why a brief,

9    historical time period might be appropriate, just to know if,

10   you know, whether this was a new big customer or a long-term

11   big customer, whatever.

12             MR. ZEBRAK:  Yes, Your Honor.

13             THE COURT:  But I'm still a little unsure as to how

14   significant the amount is to the present as opposed to whether

15   that customer continued for a year, or two years, or something

16   like that.

17             MR. ZEBRAK:  Yes.

18             THE COURT:  So why is the information going to, you

19   know, the present time significant?

20             MR. ZEBRAK:  Yes, Your Honor.  So to be clear, there

21   are two issues on the time period.  There is the claims period,

22   and then there is the before and the after.

23             THE COURT:  Right, right.

24             MR. ZEBRAK:  But I will begin with the after, as Your

25   Honor asked.

23

1          THE COURT:  Okay.

2          MR. ZEBRAK:  So in terms of Cox's profits, and sort

3    of ill-gotten gains from continuing to provide service to these

4    subscribers it knew was engaging in infringement, obviously

5    however much money it kept receiving, you know, those

6    ill-gotten gains didn't stop at the end of our claims period.

7          You know, had it terminated that subscriber -- I

8    mean, Cox is free to make whatever arguments it wants to make

9    at a trial about our use of the revenue information being too

10   expansive or not.  That really is a question for trial.

11         But if, you know, if Cox didn't terminate a customer,

12   and then that customer continued for another two years, or

13   continued to the present day, that's all ill-gotten revenue

14   that Cox shouldn't have received, and speaks to its profits, as

15   well as the need to deter Cox --

16         THE COURT:  Well, revenue and profits are two

17   different things.

18         MR. ZEBRAK:  Yes, Your Honor.

19         THE COURT:  And, you know -- and I'm -- well, keep

20   going.

21         MR. ZEBRAK:  Well -- no, sure.  And it's certainly

22   entitled to come in and try and say, here is what we actually

23   made on these subscribers, not the gross receipts.

24         But even putting aside whether -- how you prove

25   profits and the interaction between offsetting revenue with

24

1    costs, just the need to deter Cox, it's incredibly powerful

2    if -- you know, it shows -- you know, what Cox wants to do is

3    just produce the raw aggregate amount of money it made from

4    certain division of its business.  And then come at trial it's

5    going to say, that's overbroad because it includes lots of

6    subscribers who never infringed.

7            And what we want to do is just have the information

8    showing how Cox received moneys from these subscribers it knew

9    was engaging in infringement but chose to keep them.

10           And so, you know, we just think -- you know, going

11   back earlier than the claims period, given Your Honor's ruling

12   on the notice data being just 2012 rather than 2011, having it

13   coterminous with that, you know, makes sense in terms of 2012

14   rather than going back to '11 because we can then see, okay,

15   here is a subscriber, John Smith, here is what Cox was getting.

16   It knew he was engaged in infringement, but yet Cox kept

17   providing service.  And look at how the revenues kept growing,

18   maybe through to today.

19           And so, our experts, you know, might produce a report

20   that calculates that.

21           I mean, the reason why they're fighting this so hard

22   is because it's incredibly probative.  And there is no

23   additional burden -- you know, they're running a report to pull

24   data from a database, and once they're doing that, I mean, I

25   think the relevance is clear.

25

1            THE COURT:  Well, a monthly report for 58,000

2    customers for additional years, you know, takes computer time

3    to do that.  I am not sure how much computer time.

4            MR. ZEBRAK:  Yeah.

5            THE COURT:  But, I mean, it generates a lot of

6    information that then -- does that really bear any significant

7    benefit to the parties in having what was -- you know, what

8    this customer was billed in 2017 when you're talking about an

9    infringement period that ended in 2014.

10            MR. ZEBRAK:  Yeah.  I mean, I just think, you know,

11    when a -- look, if a company terminates my account with them, I

12    am less likely to probably sign up with them again.

13            And the bottom line is, this is all revenue Cox

14    wouldn't receive.  It can make its arguments at trial, it can

15    have its experts make its argument, but all this revenue -- I

16    mean, what Cox wants to do is to say, look, this was a limited

17    period of bad behavior at our company.  And it wants to try and

18    cabin everything into just this claim period.

19            And it wants to, you know, just produce its -- again,

20    its overall data and not allow us to focus on the moneys it

21    received from these bad subscribers.  And in the context of

22    this case, running a report on just -- you know, revenues from

23    these subscribers, really just isn't -- isn't that demanding.

24            THE COURT:  Okay.  All right.  Well, I think I

25    understand what the issues are there.

1          I do think -- you know, I can appreciate the

2    defendants' argument that they don't agree this information is

3    relevant.  And whether it makes its way into the trial of this

4    case will be something for Judge O'Grady to decide.  But I do

5    think at this point in time it is discoverable information.

6          And it is discoverable information that is available

7    to Cox.  The method that they maintain it, if it makes it

8    difficult for them to gather that information, that still

9    doesn't make it not relevant information.

10          And the idea that it's going to cost $15,000 doesn't

11   overwhelm me, to be honest with you.  Given the nature of this

12   case and the amount that is being spent to litigate this case,

13   that doesn't really impact me on the proportionality argument.

14   That, you know, that kind of investment to get relevant

15   information to produce in this case doesn't tip the scales.

16          So I am going to require that revenue information

17   attributable -- well, that billing information, yes,

18   attributable to each subscriber for the time period from 2012

19   through 2016.  That gives you one year early during the period,

20   a five-year period.  I think that gives you at least a point

21   for your experts to look at to see, to generate, you know -- I

22   assume your experts are going to also then, you know, not only

23   try to do what they have gotten to date, but what will be going

24   in the future.  And this is -- that's enough information for

25   them to deal with.

1          It needs to be done on a monthly basis.  So that

2     needs to be generated on a monthly basis.  So it will be from

3     -- a monthly basis from 2012 to 2016.

4          I also want you to investigate and find out whether

5     there is available information concerning the realization rates

6     on billing information for that time period from 2012 through

7     2016.

8          So that, you know, we don't get into this, you know,

9     that was only what was billed, it wasn't really what was

10    received.  That there can be some general correlation as to

11    billing and actual receipts from the company since you've

12    indicated or represented to the Court that the revenue

13    information is much more difficult to obtain.  Okay.

14         All right, issue 2.  You need to help me understand

15    what it is really is you're asking for on this.  Because, you

16    know, if we're talking about every communication dealing with

17    every infringement, that's not going to win any argument.

18         MR. ZEBRAK:  Yes, sir.

19         THE COURT:  And so, I mean, it's a little unclear to

20    me -- and, you know, it's difficult to order something that's

21    unclear because I don't want to put the other side in a

22    position of coming back and not knowing what it is I'm

23    requiring them to do.  So that you come back and say, they

24    didn't do what you told them to do, and we have to come back in

25    and say, I interpreted it as this, I interpreted it as that.

28

```
 1              I mean, your motion talks about e-mails and -- let me
 2    make sure I have got the exact -- e-mails and communication
 3    concerning Cox's responses to handling of and attitude towards
 4    infringement notices.
 5              You know, responses to infringement notices, if you
 6    read that literally, that would mean every response relating to
 7    every notice, infringement notice that they got.
 8              So I'm trying to figure out a way -- and I understand
 9    your concerns.
10              MR. ZEBRAK:  Yes, Your Honor.
11              THE COURT:  The idea that, you know, the way that
12    they have parsed their response, some of the documents that we
13    are all very familiar with probably wouldn't fall within that,
14    and I think need to be produced.
15              MR. ZEBRAK:  Yes, Your Honor.
16              THE COURT:  So how do we get to that?
17              MR. ZEBRAK:  Right.  I -- quite frankly, we knew this
18    would be an issue that would come up at the hearing.
19              So the concern that Your Honor has raised is actually
20    already -- well, let me take a step back.
21              Obviously, Cox knows its documents better than we do.
22    You know, it knows how it's going about searching for things.
23    I mean, it's not speaking with us about it.  It's not telling
24    us what search terms it's willing to use or not use.
25              What it's doing is -- I mean, to date Cox has not
```

1    produced -- I mean, to date in this case they have produced the

2    BMG trial exhibits, the fact witness depositions, a good part

3    of plaintiffs' infringement notices, and certain documents

4    regarding the technical functioning of CATS.  No e-mails at all

5    yet.

6           And with respect to these requests, Cox has already

7    said it will provide documents.  It hasn't just flat out

8    objected.  But what it's done is -- so however it's planning to

9    go about searching for those things, whether it's already

10   subsumed within what they collected and produced in BMG, or

11   whether it's some additional searching, we don't know, but

12   they've already said, we will produce documents.

13          So what they've done though is they have put this

14   artificial limitation on it that is really designed to exclude

15   all the good stuff, right, because it's unreasonable to expect

16   that the documents of the type that Your Honor alluded to are

17   going to mention plaintiffs or plaintiffs' works.

18          And it's likewise not just cabining our claims --

19          THE COURT:  Well, they may or may not.  I don't know.

20          MR. ZEBRAK:  Right, but --

21          THE COURT:  Some of these e-mails may have been --

22          MR. ZEBRAK:  Right.

23          THE COURT:  There may be similar e-mails that relate

24   to specific infringement notices that were sent on behalf of

25   your clients.

1          MR. ZEBRAK:  Entirely possible.  But what it's done

2   is -- I mean, look, those types of e-mails, Cox can't seriously

3   argue lack relevance.  Right?  If they have an e-mail that

4   says:  F the DMCA.  Or:  Hee-hee, let's not terminate these

5   subscribers because we care about the revenue.  That's all

6   responsive.

7          But this -- and however they are going about planning

8   a search for it, again, it's in a black box to us, but they're

9   willing to do it.  So what we want them to do is proceed with

10  their search, but just have the Court order that it remove this

11  artificial limitation of -- that it must include plaintiffs,

12  plaintiffs' works, or the claim period.

13         Or to the extent that would impact how it goes about

14  searching for these things, we are happy to have a discussion

15  about it.  But we have asked 16 different ways and 16 different

16  times to have a discussion about search terms.

17         So what it wants to do is not work with us to narrow

18  it, and at the same time just not produce everything and

19  exclude these very relevant documents from the case.

20         I can explain why they're relevant, but I think the

21  Court already understands that.

22         THE COURT:  No, I understand that part.

23         MR. ZEBRAK:  And the arguments that it's making here

24  to try to exclude it are the precise ones that Judge O'Grady

25  addressed --

```
 1              THE COURT:  Well, there is a little bit of argument
 2    on that, but I --
 3              MR. ZEBRAK:  Right.  Okay.
 4              THE COURT:  But I understand your position on that.
 5              MR. ZEBRAK:  Yes, Your Honor.  So, you know, on our
 6    end, we know that there are these broad swaths of relevant
 7    documents.  And what Cox is in effect doing is saying, I'm not
 8    going to search for them.  I will only search for these things.
 9    And I won't tell you how I'm searching for it.
10              And we're just asking for them to -- you know,
11    clearly we don't need every communication they have ever had
12    about the DMCA.  But we can work them for some search terms to
13    try and get at this where Cox could be transparent with us
14    about how it's intending to go about it.
15              But if they have e-mails talking about let's not
16    terminate people to get revenue, it could come up with search
17    terms like -- with words like "terminate" and "lose money."
18    And we could come up with terms like this.
19              But, you know, where we are is we're struggling with
20    the fact that we know that there is these broad swaths of
21    documents that right now we're not going to get unless they
22    happen to have been a BMG trial exhibit, deposition exhibit, or
23    somehow mentioned plaintiffs or plaintiffs' works.  And we
24    think that that's just sort of gamesmanship designed to exclude
25    these things.
```

32

1          I mean, if Cox was really trying to let us receive

2    these responsive documents, it would have worked with us on

3    search terms.

4          So I don't want to keep repeating myself.

5          THE COURT:  Yes, I understand your position.

6          MR. ZEBRAK:  Thank you, Your Honor.

7          THE COURT:  Thank you.  Okay.

8          MR. BUCHANAN:  Your Honor, as you know, the

9    plaintiffs asked for all notices of infringement by any third

10   party previously, and the Court rejected that.  Their argument

11   there was, well, they are relevant, they were sought in the BMG

12   cause, we should get them.  And the Court said, it's

13   non-proportional and it's just not that relevant, you have to

14   narrow it.

15         And so, they did narrow it with their third request

16   here, where they ask for information about -- subscriber

17   information about the same subscribers as they have alleged

18   infringe their copyrights.

19         But now they have come back with this request that

20   we're talking about now and asked for even more information.

21   Instead of just asking for the notice of infringement, now

22   they're saying all e-mail correspondence, all communications

23   any way touching on those infringements.

24         So basically they're really asking for the

25   infringement notices as well because they're going to be

33

1    discussing those in all these e-mails.

2          So every single subscriber who got a warning about an

3    infringement, you know, all the discussion, e-mail back and

4    forth about that with that person, would have to be produced.

5    And that person may well have said, okay, it was my kid, I

6    stopped, and they want all that information.  It's an enormous

7    amount of information.

8          So if the infringement notices shouldn't be produced,

9    why would all the e-mails and correspondence about those same

10   infringement notices have to be produced?

11         It's -- they didn't narrow it.  They talk about

12   search terms.  They haven't offered any search terms to deal

13   with that.  They have stuck with that.

14         So even though the Court already ruled and said,

15   look, that's too much, it's non-proportional, you are plowing

16   the ground from BMG, you need to narrow it.  So they narrowed

17   it with a request for information about infringers who are the

18   same people, subscribers, as alleged in their -- in their case.

19   We are willing to give that information.

20         But now they're asking for all these -- and it's on

21   them.  That's what they have put forward.  They have come in

22   and said, we want this information, we demand this information.

23         THE COURT:  Well, if -- if your client has documents

24   in its possession that says, we're going to take the position

25   on a BMG complaint or any kind of -- you know, this person

1    complained through the BMG system, and we have got 13 different

2    complaints to them, and we're going to say, to heck with it, we

3    want this customer because, you know, it's a good customer.

4    And to heck with, you know, the law.  Why is -- and that's

5    their policy.  Why shouldn't that document be produced?

6              MR. BUCHANAN:  So, in effect, all those documents

7    have been produced because they were part of the BMG case, and

8    they have been given to them.  So they have cited them all in

9    their brief.

10             THE COURT:  Right.

11             MR. BUCHANAN:  They said, look at this, look at this.

12             THE COURT:  Right.

13             MR. BUCHANAN:  So they are saying somehow there is

14   some more out there.

15             THE COURT:  Well, there may be.  I mean, that's --

16   that's what they don't know.  And the way that you have phrased

17   your response to this certainly seems like you are trying to

18   not go back and produce that kind of information if there is

19   information within your client's possession concerning its

20   approach to handling these kinds of infringement notices in

21   general, not just a particular infringement notice from the

22   plaintiff here, and that in dealing with these situations we

23   need to do X or we need to do Y or we need terminate him today

24   invite him to come back tomorrow, that's very significant

25   information.

35

1          MR. BUCHANAN:  And we are producing that with regard

2     to the complaints at issue in this case with regard to their

3     clients.  So the names --

4          THE COURT:  But if there is a policy that you're

5     going to deal with everybody and there are communications

6     relating to that policy, whether it's formal or informal, or,

7     you know, this is the way that we should be handling these

8     kinds of situations, and that kind of situation is not one of

9     the plaintiffs in this case, that's relevant information.

10          MR. BUCHANAN:  So we have agreed to produce all

11     formal and informal policies that were in place during the time

12     period in question whether that was in an e-mail discussion or

13     whether that was actually in a stated policy.  They have all

14     that.

15          THE COURT:  Well, what do you mean by "informal

16     policy"?

17          MR. BUCHANAN:  So if somebody --

18          THE COURT:  Will you acknowledge today that an

19     informal policy is, we take into consideration revenue before

20     we terminate a customer?

21          MR. BUCHANAN:  I think that -- well, they already

22     have that.

23          THE COURT:  Well, I mean, that is a document.  But if

24     you're saying, I'm going to produce formal and informal

25     policies, unless you are willing to admit that it was an

1    informal policy of the organization to take into consideration

2    revenue before we terminated them, then that kind of a document

3    wouldn't be responsive to the way that you're saying you're

4    going to be doing your search.  And that kind of information

5    really is significant and needs to be produced.

6            So that's why I'm concerned about the way that you're

7    parsing this information, is I don't know what you mean by

8    "informally policy."

9            MR. BUCHANAN:  So, Your Honor, what -- so we're

10   living in -- right now we're in a hypothetical world.  That

11   somehow there might be an e-mail out there where somebody at

12   some point in time said to somebody else about a particular

13   infringer, hey, we ought to keep this guy on board because he

14   is paying us $400 a month.  They have that.

15           All those e-mails that they're referencing, that they

16   have cited, they have all of those.  So the idea that there

17   might be one or two --

18           THE COURT:  They have what they have.

19           MR. BUCHANAN:  Right.  So let's assume that there is

20   one or two out there.  And we search millions of e-mails and we

21   find one or two more and where there is these same references

22   by Zabek, or Sikes, where they make some reference about

23   somebody, hey, keep them on board.  How is that adding anything

24   considering the proportionality of the search and the cost

25   versus what they have?

1          They have our policies and procedures, you know, that

2     the first person isn't counted.  That, you know, you go to 13

3     steps, there is warnings.  They have all that.  And they have

4     all these other e-mails they have cited with the references and

5     the obscenities, and they are going to put all those forward

6     and they are going to say, look, all they cared about was

7     money, that's all they cared about, they are a greedy

8     corporation.  And they have those e-mails.

9          Look at these where they talk about keeping people on

10    board.  They have that.

11         So the idea that we might find one or two or three

12    more, how is that proportional with regard to the cost of the

13    search?

14         THE COURT:  What if you found 10,000 were, wouldn't

15    be that significant?

16         MR. BUCHANAN:  That would have all been uncovered in

17    the BMG case.

18         THE COURT:  How do they know that?

19         MR. BUCHANAN:  Well, because they can look and see

20    what the request was and what the production was in that case.

21    They have that.

22         And the lawyers in that case put forward every single

23    e-mail that had any negative connotations with regard to

24    revenue and retaining customers, it's all there.

25         THE COURT:  Well, if what you're telling me is that

1   that was already produced in the BMG case, that you went

2   through and did a search and produced all that information in

3   the BMG case, and that the lawyers in the BMG case had access

4   to all that information and they found those documents, why are

5   you here arguing that you don't just produce what you produced

6   in the BMG case and that's going to be responsive?

7          MR. BUCHANAN:  Because we're going to have to go back

8   and do an additional search with regard to, you know, every

9   single infringer again.  So --

10          THE COURT:  Well, what did you produce in the BMG

11  case that you're saying is what, you know, you gave them all

12  that information in the BMG case?

13          MR. BUCHANAN:  I believe the request there was for

14  similar information, and was produced.  And those lawyers in

15  that case pulled out the most inflammatory, egregious types of

16  e-mail that they could find, and they put them in the trial and

17  they have all that.

18          So now we're going to have to go do this other

19  search, you know, for this period of time.  And we just don't

20  think we should do that.

21          THE COURT:  Why, why -- the BMG search, what was the

22  time period for the documents that were produced in the BMG

23  search?

24          MR. BUCHANAN:  I'm not sure what that time period

25  was, whether it was -- I don't know if it was 2010 to -- or

1    earlier 2008 -- but I am not sure what it was.  I mean, I can

2    honestly find that out.

3            I mean, if they want to articulate search terms to

4    capture -- but if you see, they have used the word

5    "termination."  So how many hits are going to come up with

6    "termination"?

7            You know, "revenue," we love revenue.  I mean, that

8    is just not going to produce anything.  If they want to come up

9    with particular search terms to make this a narrow focussed

10   search -- but the Court, you admonished them the last time that

11   the infringement notice was too broad, don't go back to BMG and

12   plow the same ground.  So they came up with a request that's

13   broader and it's more generic.

14           And so, that's what we're living with.  It shouldn't

15   be on us to come back and say, okay, here are the search terms.

16   And I just -- I just think it's overly broad and burdensome and

17   we shouldn't have to do it.

18           And look, I don't know how many e-mails it's going to

19   produce, but, you know, they have e-mails from that case in

20   which a lot of documents were produced and which were searched,

21   and they have all that --

22           THE COURT:  Well, they don't have all the e-mails or

23   documents that were produced in the BMG case.  They have the

24   ones that the lawyers in the BMG case decided to put into the

25   public record as trial exhibits.

40

1          MR. BUCHANAN:  And/or used in depositions.

2          THE COURT:  Or used in depositions, okay.

3          MR. BUCHANAN:  So I think it's a fair assumption that

4    those lawyers at that firm, Steptoe & Johnson, are excellent

5    lawyers and they would have pulled every single document to use

6    in a deposition that had any relevance to what they wanted to

7    prove with regard to our attitudes toward copyright

8    infringement at the time period in question.

9          THE COURT:  All right.  Mr. Zebrak, I will hear from

10   you.

11         What I'm -- I mean, this is an issue that needs to

12   get resolved, and it needs to resolved fairly quickly.  Because

13   I think these documents, we need to understand what the

14   situation is and what it is that you are actually producing and

15   not producing.

16         I want to know what was actually done in the search

17   in the BMG case.  What documents were actually produced in the

18   BMG case.  And then an explanation as to why the results of

19   what was produced in the BMG case, that is the sum total of

20   those documents, shouldn't be produced to the plaintiffs in

21   this case.

22         MR. BUCHANAN:  With regard to e-mails and

23   correspondence concerning infringement?

24         THE COURT:  Infringement, that's right.  I mean,

25   that's the issue that I'm addressing here because, you know,

1    the idea that it's going to be limited to only communications

2    having to do with what you define as a formal or informal

3    policy, which I don't know what that -- formal I can

4    understand.  What you would designate as an informal policy is

5    too fluid for me to say that I am going to limit it to what you

6    define as an informal policy.

7           And to limit it to only documents or e-mails or

8    communications relating to the plaintiffs' infringement notices

9    is too narrow.  Because if it relates to the way that we handle

10   these claims, either formally or informally, whether you deem

11   it a policy or not, is going to be relevant information.

12          And I think the time period from 2010 to 2014, which

13   I think is what was asked for; is that right, have I got that

14   right?

15          MR. BUCHANAN:  Yes.

16          THE COURT:  Is the relevant time period.

17          So, Mr. Zebrak, let me hear from you.  If we find out

18   that what they did in the BMG case was, you know, they searched

19   for -- they tell you what it was that they did in the BMG case,

20   what they searched for and what was produced in the BMG case,

21   and then you get the production in the BMG case, coming back

22   and saying, you know, this works or this doesn't work, how does

23   that sound?

24          MR. ZEBRAK:  I mean, I think that's likely to be

25   fine.  We know that that search in the BMG did not include the

42

1    sorts of artificial limitations that they are imposing here

2    because those salacious sorts of e-mails that reflect that it's

3    -- you know, didn't include the name BMG or BMG's works.

4            So I suspect that that BMG production would be

5    sufficient.  And the notion that right now we have everything,

6    to be clear, even the trial exhibits, what we have are scans of

7    printouts.  Which is why, you know, what we want to do is

8    receive original electronic documents of these so that we can

9    use them at a trial, not these messy documents that -- what

10   they are attempting to do is to sterilization their activity by

11   just showing us, here is what our policy was.  Not the

12   instances where we applied it and the jury can see context.

13           So I think that that BMG production would be

14   sufficient in this area.  But, again, Cox's counsel today said,

15   plaintiffs should propose some search terms.  That is

16   diametrically opposite to what they have been saying all along,

17   which is, we won't speak with you about search terms.

18           So, you know, they have been resisting discovery, and

19   now want to drag it out by asking us to give search terms.

20           I think Your Honor's idea of having them explain what

21   they are doing from BMG would be great and just make that

22   production.

23           THE COURT:  All right.  Well, give them that

24   information by Tuesday morning.  Okay?

25           MR. BUCHANAN:  So just to be clear, give the Court

43

1    that information --

2           THE COURT:  No, I -- well, I mean, you know, I don't

3    want to get involved unless I have to get involved.  I mean, I

4    think it's hopefully have provided at least some guidance to

5    the parties as to what I am going to, if I end up having to

6    rule on this, what the ruling is going to be.

7           What I think that, you know, I need to know

8    whether -- what it was that you did in order to do your

9    production in the BMG case.  Provide that to the plaintiffs as

10   to what it was, the efforts that were taken to provide

11   responsive documents relating to these items.  So we're limited

12   to that.

13          MR. BUCHANAN:  Communications and e-mails

14   regarding --

15          THE COURT:  Policies and procedures.  You know, what

16   we're going to do with infringement and those kinds of things.

17          And then, you know, talk with them about whether that

18   BMG production would satisfy their desire for information.  And

19   if so, then I think your client needs to seriously consider

20   just providing the BMG.  And if it decides it doesn't want to

21   and I have to rule on that issue, I will do so.

22          But I want you all to have a further conversation as

23   to that possibly being the way to deal with this situation.

24   And, you know, I don't -- I understand your position.  You

25   don't want to have to produce every single document relating to

44

1    every single infringement notice.

2            But you also have to understand that the way that you

3    have phrased what you're willing to do causes the plaintiff and

4    the Court some discomfort that what you're trying to do is to

5    not produce information that I think we're all aware of that is

6    out there that would be very significant information in this

7    case.

8            So, you know, I am going to go ahead and let you all

9    work on that.  Get them that information about the BMG, what

10   was done in order to prepare -- get those documents -- I

11   understand you all weren't involved in that, but the client was

12   involved in it.  You should have access to that information.

13   Talk to them about what that was and what the actual production

14   was.

15           And then see if whether the -- whether providing them

16   with that production relating to those types of documents would

17   satisfy this.  If not, then we'll need to come back and we will

18   deal with it.

19           MR. BUCHANAN:  Yes, Your Honor.

20           THE COURT:  Okay.  One other thing that I want to

21   talk about before we -- just is this procedure that's

22   followed -- and I am going to give you an opportunity to

23   address the sealing issues.

24           It's a little unclear to me, and I honestly haven't

25   gone back to try and -- the way that we typically do on sealing

45

1    is that you need to file a public version of everything that

2    you are seeking to file under seal.  But the actual sealed

3    document does get filed electronically, but gets filed

4    electronically under seal.

5         I think there may be some -- that the electric --

6    that the complete version of documents have not been getting

7    filed electronically under seal, but have only been presented

8    to the Court.

9         So let's follow that procedure going forward.

10        Whoever wants to talk on behalf of Cox, you know, I

11   have got this pending motion to seal the exhibits that were to

12   the memorandum in support, which I think are exhibits starting

13   with Exhibits G through I believe O, and then two of the

14   exhibits in the reply.

15        I want to give Cox any further opportunity to say

16   want they want to say about why these documents shouldn't be

17   unsealed.  I got the opposition -- or I got the response that

18   you filed, at least as to the motion to seal, Exhibits C

19   through O in the moving papers.

20        I mean, these are all -- there are no trade secrets.

21   There is no what I would term sensitive business information.

22   These are communications that have now been placed in the

23   public record through the BMG trial.

24        And I am -- these are documents that I actually

25   looked at and considered in deciding this motion.  Not like in

46

1    the other motion where they really weren't, I didn't think,

2    necessarily significant in my dealings.

3                So help me understand why these exhibits shouldn't be

4    unsealed in this case.

5                MS. GOLINVEAUX:  Yes, Your Honor.  As we mentioned in

6    our filing, looking at the transcript from the BMG trial, it is

7    not clear that these were all published publicly and lost their

8    protection.  And the BMG protective order specifically allowed

9    documents that were introduced during the trial to retain their

10   confidential status.  And Judge O'Grady specifically made sure

11   that there were not third parties in the courtroom while

12   certain of these documents were testified about.

13               So it's not --

14               THE COURT:  Which one of these documents would have

15   been -- the courtroom would have been cleared, is your

16   indication?  That he cleared the courtroom at any point in time

17   in the BMG case?

18               MS. GOLINVEAUX:  There are several times during the

19   transcript where there was confidential information that was

20   discussed, and Judge O'Grady made clear that there were no

21   third parties in the courtroom.  And they haven't -- it's not

22   clear that these specific documents were published up on the

23   screen during the trial such that they would have lost their

24   confidential status, Your Honor.

25               THE COURT:  Why would -- why would a trial exhibit

1   have to be put on a screen if it is admitted into evidence in a

2   trial in a case to lose its public, to lose its

3   confidentiality?  I mean, I don't understand that.

4              MS. GOLINVEAUX:  Your Honor, the mere fact that it

5   was used at the trial would not take away the confidential

6   status of the document.  And it's not clear that they were in

7   the public record.  And the plaintiffs haven't indicated that

8   that's the case.  So they would retain their confidential

9   status.

10             THE COURT:  Well --

11             MS. GOLINVEAUX:  And these documents specifically

12  discuss internal policies with respect to processing notices

13  that are confidential and not public.

14             THE COURT:  These are policies that are now five

15  years old.

16             MS. GOLINVEAUX:  Yes, Your Honor.

17             THE COURT:  And help me understand why these kinds of

18  e-mails should be -- even putting aside the fact that they were

19  trial exhibits in court, why any one of these exhibits, and you

20  can go through them and try and point out that are all dated

21  back in 2014 or earlier for the most part, should be considered

22  confidential at this stage.

23             MS. GOLINVEAUX:  Your Honor, making public

24  information about the termination policy and when users and

25  subscribers are being terminated, for example, is not something

48

1    that Cox would do because it would -- it could allow users, if

2    you will, to kind of cook the system or work around it.

3              THE COURT:  Well, that information was clearly made

4    public in the BMG trial.

5              MS. GOLINVEAUX:  Well, and we didn't --

6              THE COURT:  There was testimony for hours about what

7    Cox did and didn't do as far as termination, and what its

8    policies were and weren't.  So that one -- that ship has sailed

9    long ago.

10             MS. GOLINVEAUX:  And, Your Honor, we did not seek in

11   our briefing to maintain the confidentiality for certain of the

12   information, for example, that they put in their opposition

13   brief.  It's for the underlying documents that they attached to

14   the Gould declaration.

15             THE COURT:  All right.  Anything else as to why you

16   think any of these documents should remain under seal?

17             MS. GOLINVEAUX:  No, Your Honor, that's it.

18             THE COURT:  Okay.  All right.

19             Well, I will review that, but I plan to -- I will

20   wait to get the response to the other motion to seal before I

21   rule on that one, but I will probably rule on the first motion

22   to seal in the next few days.

23             MR. GOULD:  Your Honor, if I might, on the motion to

24   seal?

25             THE COURT:  Sure.

49

```
1              MR. GOULD:  Jeff Gould, Your Honor, for the

2    plaintiffs.  So I just want to touch on a couple of things.

3              First, we apologize for having to burden Your Honor

4    with so many seal motions.  We think they are unnecessary and

5    shouldn't be there in the first place.

6              Secondly, as to the specific issue, I think you hit

7    the nail on the head.  That although it's our motion, clearly

8    we don't think that the seal is warranted here.

9              THE COURT:  Right.

10             MR. GOULD:  We will follow the rules and have

11   complied with the protective order.

12             But you hit the nail on the head in asking why they

13   think that these should be sealed.  And the burden is on them

14   squarely to establish that it has.

15             So to come in with a paper and say, the record is

16   unclear whether those were publicly aired or whether anyone was

17   in the court, doesn't come close to meeting that standard.

18             More fundamentally, we're concerned that this is

19   going to be an issue that we and you're going to have to deal

20   with again and again and again.

21             So to the extent that you are ruling on this one

22   could provide some guidance to the parties, I think that would

23   be extremely helpful.

24             THE COURT:  Well, thank you.

25             All right.  Anything else in this case today?
```

50

1          MR. BUCHANAN:  No, Your Honor.

2          MR. ZEBRAK:  No, Your Honor.

3          THE COURT:  Okay.  Well, thank you.  Court will be

4  adjourned until 2 o'clock.

5          NOTE:  The hearing concluded at 11:12 a.m.

6  -------------------------------------------------

7

8

9     C E R T I F I C A T E  of  T R A N S C R I P T I O N

10

11          I hereby certify that the foregoing is a true and

12  accurate transcript that was typed by me from the recording

13  provided by the court.  Any errors or omissions are due to the

14  inability of the undersigned to hear or understand said

15  recording.

16

17          Further, that I am neither counsel for, related to,

18  nor employed by any of the parties to the above-styled action,

19  and that I am not financially or otherwise interested in the

20  outcome of the above-styled action.

21

22

23                        __/s/ Norman B. Linnell__

24                        Norman B. Linnell
                          Court Reporter - USDC/EDVA

25