EXHIBIT B

R. Vredenburg - Direct

836

1    handle?

2    A.   We handle viruses, infections, mail comps.  We work with

3    digital attacks, and that's pretty much it.

4    Q.   Okay.  Now, is there a manual on how abuse tickets are

5    handled?

6    A.   There is.

7    Q.   All right.  Well, let's mark as -- oh, it's already in

8    evidence.  Let me show you what's been already marked in

9    evidence as PX 1330.

10          Mr. Vredenburg, I show you what's been marked as -- I

11   mean, it's in evidence as PX 1330, but I'm going to ask you if

12   that's what you're referring to as the manual on how abuse

13   tickets are handled?

14   A.   It looks like the manual.  I'm not -- because there's

15   different revisions on it.  So I'm not sure if this is

16   actually, you know, the latest revision, but, yes, they're all

17   pretty similar.

18   Q.   All right.  And what do you call this manual?

19   A.   Abuse manual.

20   Q.   What's that?

21   A.   The abuse manual.

22   Q.   All right.  Do you also call this a methods and procedures

23   manual?

24   A.   Yes.

25   Q.   All right.  And is that the -- you keep that manual or the

R. Vredenburg - Direct

837

1    latest version on your desk; isn't that correct?

2    A.    No, it's on our computer.

3    Q.    It's on your computer?

4    A.    Access it on a hard drive.

5    Q.    All right.

6              THE COURT:  I need you to keep your voice up, please,

7    sir, and get a little closer.  Thank you.

8    BY MR. PECAU:

9    Q.    Okay.  So can we just go to the front page there of

10   PX 1330, and this is a Residential Abuse Ticket Handling

11   Procedures.  I guess that's the formal name for it?

12   A.    That would be the formal name.

13   Q.    Okay.  And underneath -- and then it says "Revision

14   History."  This one says the date is, oh, boy, 10/18/12.  Can

15   you see that?

16   A.    Yes, sir.

17   Q.    As far as you know, is that the most recent one?

18   A.    Without seeing what I have, I don't know.

19   Q.    Okay.  And under "Stakeholders," it has "Corporate

20   Customer Safety."  Who are -- what department is that?

21   A.    That's network security.  It's just another name for it.

22   Q.    That's you -- that's another name for you as well?

23   A.    Yes, sir.

24   Q.    Okay.  And "Tier 2 NetSec"?

25   A.    That's me.

R. Vredenburg - Direct

838

1    Q.    That's you, too?  All right.

2    A.    I believe Tier 2 NetSec is what we're officially listed as

3    at Cox.

4    Q.    Well, I guess we could fill up a page with all your

5    different names.

6            All right.  Well, let's move to page, let's see, what

7    do I have here, I think it's page 9.  Do you see page 9?  And

8    near the bottom you see "Copy Other"?

9    A.    Yes.

10   Q.    Can you tell me what Copy Other is?

11   A.    I don't know what Copy Other is.

12   Q.    You don't know what Copy Other is?

13   A.    Without reading the whole thing, I don't know what it is.

14   Q.    All right.

15   A.    What the procedures are.

16   Q.    Well, maybe under the purpose, it will help us.  It

17   says, "These procedures define the steps in responding to

18   copyright infringement take-down notices."

19   A.    Okay.  Then that's what the procedure is for Copy Other.

20   I don't know why it's called Copy Other.  I don't --

21   Q.    All right.  And so the copyright infringement take-down

22   notices, those are the same thing we're talking about as the

23   copyright infringement abuse notices?

24   A.    Yes, those would be the notices that we receive.

25   Q.    All right.  And when it says "Scope" right underneath

839

1    that, it says, "These procedures apply to Tier 2 NetSec" -- I

2    think that's you; is that correct?

3    A.    Yes, sir.

4    Q.    "And Corporate Abuse."  What's corporate abuse?

5    A.    We call Corporate Abuse the Atlanta office.

6    Q.    All right.  And is that the Atlanta office that Tier 2

7    NetSec reports to?

8    A.    Yes, sir.

9    Q.    And let's go to the next page, please.  And do you see

10   where it says "4.0 Investigation"?

11   A.    Yes, sir.

12   Q.    All right.  And, and right next to that, it says "Action

13   Items," and below it says "Action Items."  So, so the first --

14   underneath the first action items, it says, "Verify the notices

15   in the ticket are valid.  A valid DMCA notice should contain

16   the following."

17          And do you understand those six things that follow

18   are what should be in a valid DMCA notice?

19   A.    Yes.

20   Q.    All right.  And so, so looking at -- well, let's look at

21   item C.  So a valid DMCA notice has to have an IP address, a

22   port, a URL, etc., of the infringing content; is that correct?

23   A.    Yes.

24   Q.    Okay.  And then the other things that they have to

25   provide, they have to provide the complainant's contact

R. Vredenburg - Direct

840

1    information, a statement of good faith belief, and a statement

2    of under penalty of perjury.

3              What do those statements under E and F, what do they

4    refer to?

5    A.   Those are on the ticket on the complaint, and they have to

6    be there, that they're acting in good faith, that they are the

7    agent for that copyright holder.  And, of course, under penalty

8    of perjury, they're not lying on the complaint.

9    Q.   All right.  And then on the third action item, it says,

10   "Verify that the correct subscriber was identified by checking

11   the infringement date and time and compare it with CATS DHCP

12   records."  What does that mean?

13   A.   DHCP is dynamic host control protocol.  That is what

14   assigns the IP address to the customer's equipment.

15   Q.   It assigns the IP addresses to the customer's equipment or

16   modem; is that correct?

17   A.   Yes.

18   Q.   And that's something that's done automatically?

19   A.   Yes.

20   Q.   All right.  And DHCP is accessible from your desk on your

21   computer; is that correct?

22   A.   We can see the logs, yes.

23   Q.   All right.  And you have what's called a DHCP button, I

24   think you referred to your deposition.  What is that?

25   A.   It's just part of the CATS system.  You can click on it,

R. Vredenburg - Direct

841

1    and it pulls up the logs.

2    Q.   All right.  So on -- under item 3, it means that when you

3    get one of these copyright infringement notices with the date

4    and time and this other information, you can compare it to

5    Cox's own records to figure out who the subscriber is; isn't

6    that correct?

7    A.   Yeah.  We can see what account it's assigned to, who the

8    subscriber is.

9    Q.   Right.  And that's the way -- that's the only way a

10   copyright owner can find out is through Cox who the actual

11   subscriber would be; isn't that true?

12            MR. BUCKLEY:  Foundation.

13            THE COURT:  Overruled.

14            THE WITNESS:  I'm not sure I understand your

15   question, sir.

16   BY MR. PECAU:

17   Q.   All right.  This probably wasn't a very good question.

18            So Cox is really the gatekeeper as to what the -- as

19   to who the actual subscriber is that has the particular IP

20   address, port, URL, etc., that's identified in a copyright

21   infringement notice; is that correct?

22   A.   I would say yes to that.

23   Q.   Okay.  Now, let's look at pages 10 and 11, beginning at

24   "5.0 Resolution, First Offense," and going to page 11.  Can you

25   tell me what's listed there?

R. Vredenburg - Direct

842

1    A.    The first offense for the -- I'm sorry.

2    Q.    All right.  Maybe that's too broad of a question.  Let's

3    go back a little bit.  So one of the tools that you have is the

4    DCHP.  Do you have another monitoring tool called NetFlow?

5    A.    There -- NetFlow is there, is available, yes.

6    Q.    Could you tell me what NetFlow does?

7    A.    NetFlow checks the customer's IP and it checks the words

8    connecting to, on what port, and what port it's going to and

9    what IP address it's going to.

10   Q.    And when you say what port it's going to, what are you

11   referring to?

12   A.    Port is in the Windows operating system.  You've got

13   thousands of ports, and programs use it to get out and connect

14   to other systems.

15   Q.    All right.  Now, looking back again at the -- on the 4.0

16   investigation and the list of things that you have to verify to

17   make sure that a copyright infringement complaint is proper,

18   even if a copyright infringement complaint has satisfied all

19   the items that are shown on page 10, Cox, as part of its

20   process, doesn't always forward all of those complaints to its

21   subscribers; isn't it true?

22   A.    We don't -- do we take action on them?

23   Q.    No, no, no.  So you get a copyright infringement

24   complaint, correct?

25   A.    All right.

843

1   Q.   Okay.  And let's say that the copyright infringement

2   complaint satisfies all the things that have to be verified,

3   shown in the 4.0 investigation.  That doesn't mean necessarily

4   that Cox as part of its process is going to automatically send

5   that notice to its subscriber, does it?

6   A.   Automatically, it depends on where it's at in the, the

7   flow of the process.

8   Q.   Right.  But there are other things that are involved as

9   well.  I mean, you know, don't you, that Cox blacklists some

10  copyright complainants, don't you?

11            MR. BUCKLEY:  Foundation.

12            THE COURT:  Yeah, ask --

13            MR. PECAU:  What?

14            THE COURT:  Ask a foundational question as to whether

15  he understands that.

16  BY MR. PECAU:

17  Q.   Well, I'm -- well, do you know if Cox blacklists any

18  complainants for any reason?

19  A.   I know that in the corporate -- in Atlanta, they will not

20  accept complaints from certain complainants, yes.

21  Q.   Okay.

22  A.   But how that's done or anything, I don't know.

23  Q.   All right.  Do you, do you know that Cox places a hard

24  limit on the number of copyright infringement complaints that

25  it will receive from a particular complainant each day?

R. Vredenburg - Direct

844

1   A.   Yes, they do.

2   Q.   Okay.  And the hard limit, this hard limit on the number

3   of copyright infringement complaints that Cox will receive from

4   a particular complainant each day, that isn't listed in your

5   message -- in these methods and procedures that are in

6   PX 1330, are they?

7   A.   I don't recall it being in there, no, sir.

8   Q.   Okay.  Now, another thing, do you know that Cox only

9   accepts one complaint for a Cox subscriber in a 24-hour period,

10  no matter how many songs or albums the subscriber has copied or

11  distributed?

12  A.   My understanding, the program is designed only to do one

13  complaint within a 24-hour period.

14  Q.   Okay.  So for the, for the copyright complaints that Cox

15  does accept, are the steps that are shown beginning on page 10,

16  which is the resolution first offense, through the steps from 2

17  through 12 and then continued offenses, are those all the steps

18  that the copyright infringement complaints that get through go

19  through in terms of your subscribers?

20       And if you don't understand my question, I didn't

21  understand it either?

22  A.   It appears to meet all the steps, yes.

23  Q.   Okay.  So -- so someone getting a first complaint within a

24  six-month period, Cox doesn't do anything with that?

25  A.   No, sir.

R. Vredenburg - Direct

845

1    Q.    Now, on the second offense, Cox sends an e-mail warning;

2    is that correct?

3    A.    Yes.

4    Q.    Do you know what is contained in the e-mail warning?

5    A.    E-mail warning contains the letter from us requesting they

6    take action.  It has all the evidence from the complaint all in

7    there, and it has the complainant's contact information, also.

8    Q.    And what does Cox tell its subscriber about the -- this

9    second offense?

10   A.    We just ask them to investigate it and take care of it and

11   remove any files that they may have.

12   Q.    All right.  And --

13              MR. BUCKLEY:  Your Honor, could I have a brief

14   sidebar?

15              THE COURT:  Yes, sir.

16              (Sidebar on the record.)

17              MR. BUCKLEY:  So, Your Honor, in light of the DMCA

18   ruling, we had a discussion about the extent to which we were

19   going to get into the details of the graduated response, and

20   the hope I took from you said we're not going to harp on that.

21   It looks like we are about to go through every step.  If that's

22   what he wants to do, so be it, but I think he's opening the

23   door for us to come back and do the whole thing.

24              THE COURT:  Well, I didn't want to do that and the

25   consequences was perhaps we would get into how many people were

1    really terminated by Cox.  I think that's where we are.  They

2    decided that they wanted to get into the graduated steps that

3    are being taken, and if and when evidence is presented about

4    terminations, I'll rule on that at that time.

5            But I'm going to allow this now.  This is the -- as

6    Mr. Warin said early on, "This is our theory of the case.  This

7    is what we want to do," and so I'm going to allow it.  You can

8    respond accordingly.

9            MR. BUCKLEY:  Thank you.  I just asked for the

10   sidebar because of the sensitivity.

11           THE COURT:  Yeah, I understand.

12           MR. PECAU:  What was that?  I didn't hear the last

13   part.

14           THE COURT:  Well, he just said he wanted a sidebar so

15   it wouldn't endanger any kind of information getting to the

16   jury that wasn't --

17           MR. PECAU:  Thank you.  I appreciate that.

18           MR. BUCKLEY:  Thank you, Your Honor.

19           (End of sidebar.)

20           THE COURT:  Should I keep trying to lower the

21   temperature a little bit more, or are you all comfortable?

22   You're all right?

23                        (Jurors nodding heads.)

24           THE COURT:  All right.  Thanks.

25           All right.  Please continue, Mr. Pecau.

847

1           MR. PECAU:  Thank you, Your Honor.

2  Q.   Okay.  Now, for the third, fourth, fifth, sixth, and

3  seventh notices that go for the same subscriber, in each one of

4  those, the subscriber gets an e-mail warning?

5  A.   They get an e-mail warning if the subscriber has an e-mail

6  address on file.

7  Q.   All right.  And if it does have an e-mail address on file,

8  it gets all these e-mail warnings?

9  A.   Yes.

10  Q.   And are all these e-mail warnings the same warning?

11  A.   They're --

12  Q.   Well, do the warnings change?  I mean, do they

13  progressively get more --

14  A.   No.  The only --

15  Q.   -- stringent, or are they pretty much the same thing?

16  A.   They're pretty much the same thing.  The only thing that

17  changes is the complainant's info.

18  Q.   All right.  Well, let's mark as Exhibit 1432, this is just

19  marked for identification.

20           Mr. Vredenburg, I'll show you what's been marked as

21  Plaintiff Exhibit 1432.  Do you recognize this form?

22  A.   Yes, sir.  It looks like the letter we send out.

23  Q.   All right.  And this is a form that Cox sends out for the

24  second through seventh steps; is that correct?

25  A.   Yes, sir.

848

1   Q.   Of the offenses?

2          All right.  And each of these e-mails, if you look at

3   the second-to-last paragraph, it says -- oh, Your Honor, I'm

4   sorry.  I'd like to introduce this Plaintiff Exhibit 1432 into

5   evidence.

6          THE COURT:  Any objection?

7          MR. BUCKLEY:  No objection, Your Honor.

8          THE COURT:  It's received.

9   BY MR. PECAU:

10  Q.   All right.  Let's take a look at the second-to-last

11  paragraph here.  It says, "If we continue to receive

12  infringement claims such as this one concerning your use of our

13  service, we will suspend your account and disable your

14  connection until you confirm you have removed the infringing

15  material."

16         Do you see that?

17  A.   Yes.

18  Q.   All right.  So they send that out, the first one, with

19  that notice on it, but in the second one, they're sending out

20  the exact same message, right?  So on the second offense, they

21  send out this notice?

22  A.   Yes.

23  Q.   On the third offense, they send out this notice.  On the

24  fourth offense, they send out this notice.  On the fifth

25  offense, they send out this notice.  On the sixth offense, they

R. Vredenburg - Direct

849

1    send out this notice, and the seventh offense, they send out

2    the same notice.  Is that correct?

3    A.    They send six warnings, right.

4    Q.    Right.  And wouldn't you say that that's a fairly stern

5    warning, that if we continue to receive infringement claims

6    such as this one concerning your use of our service, we will

7    suspend your account and disable your Internet connection until

8    you confirm you have removed the infringing material?

9    A.    Yes, sir.

10   Q.    Okay.  All right.  So we're up to the -- and this is for

11   the same subscriber.  We're up to the eighth warning.  What

12   happens to them then?  It says here, "Suspend" -- and I'm

13   looking at page 11 of Exhibit PX 1330.  It says, "Suspend," and

14   "the customer has the option to self-activate."  What does that

15   mean?

16   A.    It means that the customer -- we're going to suspend the

17   account, and when the customer tries to get online, it will

18   pull up a screen, basically a walled garden.  It will give them

19   information on what happened and who to call or what -- who can

20   go to check online some information, and it gives them the

21   option to just reactivate the account.

22   Q.    What -- I'm sorry, I didn't hear the option part.

23   A.    It just gives him the option to reactivate his account.

24   Q.    Okay.  So that means they read the warning and they can

25   push a button and reactivate; is that correct?

850

1   A.   Yes.

2   Q.   All right.  Now, is this suspension, is this done

3   electronically through the CATS system?

4   A.   Yes.

5   Q.   Okay.  So there's no human intervention there.  And how,

6   how does the CATS system actually do this, do you know?

7   A.   How does it do it?

8   Q.   Yeah.  So the CATS system, I guess, automatically looks at

9   the history of this subscriber and determines that the customer

10  is going to be suspended?

11  A.   Yes.  It knows where it's at in the progression, and then

12  it will go ahead and do whatever it needs to do, suspensions or

13  mails or whatever.

14  Q.   And then the CATS sends an AUP code to ICOMS -- what you

15  call the ICOMS system?

16  A.   Correct.

17  Q.   And that code is placed on the subscriber's modem; is that

18  correct?

19  A.   Correct.

20  Q.   Okay.  And that code blocks a subscriber from going

21  anywhere on the Internet except for seeing the words that the

22  subscriber will see when they've been suspended?

23  A.   Correct.

24  Q.   And then when the subscriber pushes a button after he

25  reads those words, then the subscriber is back on the Internet?

851

1  A.   Yes, sir.

2  Q.   Is that immediately?

3  A.   As soon as the AUP is removed.

4  Q.   Okay.

5  A.   If it all goes through well.

6  Q.   All right.  And the words that the subscriber sees, does

7  that contain another stern warning?

8  A.   I don't remember exactly, sir, what the walled garden says

9  because I haven't seen it in a long time.

10  Q.   Okay.

11  A.   I know it's got information on it about for sites they can

12  look at to help them and see what's going on.

13  Q.   So you don't know if there's another stern warning

14  indicating if they continue doing this --

15  A.   I cannot remember if there's another warning or not, no,

16  sir.

17  Q.   Okay.  And after this automatic procedure -- let's see,

18  we're up to -- oh, we're up to the ninth procedure.  And what

19  happens if the -- a customer has gotten at least seven -- six

20  warnings and it's been suspended briefly on the ninth?  What

21  happens to them then?

22  A.   On the ninth suspension?

23  Q.   Yeah.

24  A.   Same thing.  It goes to the reactivation,

25  self-reactivation.

R. Vredenburg - Direct

852

1    Q.   And again, they get to automatically reinstate themselves;

2    correct?

3    A.   Yes.

4    Q.   All right.  And on -- let's move this along.  So on the

5    tenth and the eleventh, what happens there?

6    A.   They're suspended to the Tier 2 network security line.

7    Q.   Okay.  So, now, does the suspension happen automatically

8    again for the tenth and eleventh copyright infringement

9    offense?

10   A.   If the system can do it and there are no problems, it will

11   do it automatically.

12   Q.   Okay.  Well, it's intended to do it automatically?

13   A.   Yes.

14   Q.   All right.  And then the customer gets another warning,

15   and it's told it has to call somebody.

16   A.   Well, he goes to another walled garden, and it says --

17   Q.   Right.

18   A.   -- he has to call the network security number.

19   Q.   To get back to the Internet, is that correct?

20   A.   Yes.  He has to call in and talk to a tech.

21   Q.   All right.  And that's -- I think you called those folks

22   the Tier 2.0 folks?

23   A.   Yes, they are Tier 2.0.

24   Q.   All right.  And their job is to give another stern

25   warning; is that correct?

853

1   A.   Their job is to give warnings and provide education and

2   some information about what's going on.

3   Q.   All right.  And, and then they automatically un-suspend

4   the person and let them go back on; is that correct?

5   A.   Once they get the customer's understanding of what's going

6   on, they'll go ahead and reactivate, yes.

7   Q.   And that's automatic?

8   A.   They have to push a button to reactivate.

9   Q.   Oh, they have to push a button.  Okay.

10         And then on the -- and that happens both for the

11  tenth and the eleventh suspension; is that correct?

12  A.   Yes, sir.

13  Q.   All right.  And then so we're up to the twelfth offense,

14  copyright infringement offense.  Is that when it comes to you?

15  A.   Yes.

16         MR. BUCKLEY:  Your Honor, the questions include legal

17  conclusions.

18         THE COURT:  Okay.  I'm going to allow that question,

19  but let's ask factual questions.

20         MR. PECAU:  Well, Your Honor, I was just referring --

21  if you look at page -- the top of page 11, they call them

22  offenses.  I was trying to just be consistent with Cox's own

23  language.

24         THE COURT:  Okay.  All right.

25         MR. PECAU:  Thank you, Your Honor.

1    THE COURT:  All right.  That will be allowed.

2  BY MR. PECAU:

3  Q.   Okay.  Let's take a look at -- let's see -- okay.  So to

4  get to you, we've gone through 11 -- well, 12 offenses, and

5  then it gets to you; is that correct?

6  A.   The twelfth one, yes.

7  Q.   Okay.  Now, when it comes to you, the CATS system

8  automatically generates a copyright infringement notice on your

9  computer; is that correct?

10  A.   In the tool, the CATS tool, yes.

11  Q.   Right.  And it also gives you the customer's history; is

12  that correct?

13  A.   Yes.

14  Q.   And that's provided by the, I think you called it the

15  ICOMS system?

16  A.   The history is in CATS.  That's the -- that's -- they

17  provide all the -- with the suspensions and warnings and

18  everything.  That's all part of CATS.

19  Q.   Okay.  So the CATS system, it shows you the complaint,

20  right?  And then it gives you the customer's history; is that

21  correct?

22  A.   Exactly.

23  Q.   All right.  Does, does the system automatically suspend

24  the customer at this point?

25  A.   On the twelfth one?  No.  What it will come up -- it will

R. Vredenburg - Direct

855

1    say it's reached so many suspensions before, leaving for

2    investigation for termination or review for termination.

3    Q.   All right.  So until you look at it, the customer's access

4    to the Internet is not suspended; is that correct?

5    A.   That's correct, not suspended.

6    Q.   All right.  Well, let me show you what's been marked as

7    PX 1456.

8         Now, I think you saw this ticket in your deposition;

9    is that correct?

10   A.   I don't recall if it was this ticket.  I saw one similar.

11   Q.   All right.

12        THE COURT:  I need you to come -- you moved away from

13   the mic, so if you'd come closer again, please?

14        THE WITNESS:  I don't know if this is the same

15   ticket.  I believe there was one similar.

16   BY MR. PECAU:

17   Q.   But this is a copy of a CATS ticket; isn't that correct?

18   A.   Yes, it appears to be.

19        MR. PECAU:  Okay.  Your Honor, I'd like to introduce

20   PX 1456.

21        THE COURT:  Any objection?

22        MR. BUCKLEY:  No objection, Your Honor.

23        THE COURT:  All right.  It's received.

24   BY MR. PECAU:

25   Q.   All right.  Now, so this ticket is showing at the top the

R. Vredenburg - Direct

856

1    latest complaint; isn't that correct?

2    A.    Yes, latest.

3    Q.    And that's a February 23, 2015, complaint, is that right,

4    copyright infringement complaint?

5    A.    That was the abuse date.

6    Q.    Okay.  So the abuse date is February 23, 2015; is that

7    right?

8    A.    Yes.

9    Q.    And the abuse date, that reflects what date?  That's the

10   date --

11   A.    That's the date the infringement actually occurred on.

12   Q.    Okay.  All right.  Now, this particular ticket, it looks

13   like that this subscriber beginning on -- can we move down a

14   little bit? -- July 31, 2012, and it goes through January 15 --

15   it goes through January 2015, and you have to look at the next

16   page to see that, see the entire history.

17          Okay.  So let's just stay on the screen right now.

18   The "copy other" on the right-hand column, that indicates

19   copyright infringement complaints; is that correct?

20   A.    Yes.

21   Q.    All right.  Now, on the top one, it says -- on the top one

22   there, it says, "Sent warning DMCA."  What does that mean?

23   A.    That means the system sent a warning, one of the warning

24   letters.

25   Q.    Okay.  That's the e-mail that we've been talking about; is

857

1    that correct?

2    A.   Right.

3    Q.   All right.  And the next one says, "Sent reply hard limit

4    for complainants."

5              What does that mean?

6    A.   That's one of the hard limits that we -- they made a

7    complaint, but they were over their limit, so it's a hard

8    limit.  We didn't accept it.

9    Q.   So you didn't accept it, and this isn't counted as a

10   copyright infringement offense; is that correct?

11   A.   Exactly.  It's not supposed to be counted, I believe.

12   Q.   All right.  And that's true for the one on August 29, it's

13   true on the one in September, and the one following in

14   December; is that correct?  None of those were counted by

15   the CATS?

16   A.   You're talking about the hard limits?

17   Q.   Yes.

18   A.   No, they're not counted.  They shouldn't be.

19   Q.   Well, looking at the first two pages of this PX 1456, I

20   counted up 28 copyright other complaints in this two-and-a-half

21   years.  Does that look right to you?

22   A.   Sir, without sitting down going through this, I really

23   can't tell, because this is done by a computer, and sometimes

24   it takes me 15-20 minutes to go through one of these --

25   Q.   All right.

858

1    A.    -- trying to get through it.

2          But it -- just looking at it, it has had a lot of

3    complaints, yes.

4    Q.    All right.  And of those 28 complaints, 13 say, "Sent

5    reply hard limit for complainants," which nothing was done;

6    isn't that correct?

7    A.    I didn't count them all, but there are several, yes.

8    Q.    Okay.  Now, with all these complaints, did the customer

9    ever get anything more than an e-mail warning in its entire

10   two-and-a-half-year history of all these copyright infringement

11   complaints?

12   A.    From what I see, that's all he ever got was warnings.

13   Q.    All right.  And could you tell me what level of the, the

14   subscriber is at the very end?

15         Let's go down to -- can you tell what level that is

16   he's at now with these 28 past complaints?

17   A.    You mean what level he's at?

18   Q.    Yeah.

19   A.    He's in the warning level.

20   Q.    You have a complaint now at the top, right?

21         That's the, the February 23, 2015, complaint.  What

22   level would he be at now?

23   A.    I'm not sure what level.  I mean, you asked me is he going

24   to get suspended or is he going to get another warning?

25   Because like I said, I --

859

1   Q.   Is he going to get another warning?

2   A.   I can't -- I'd have to sit there and go through step by

3   step to figure out what's going on.  It rolls on a six-month

4   rolling.

5   Q.   Okay.  Tell me about the six-month rolling.  What does

6   that mean?

7   A.   It means that if the customer gets through six months,

8   nothing happens in six months, it's good.  You keep rolling

9   down, though.  If he gets another complaint and then another

10  complaint and then he goes for a while, that six months will go

11  down, and then you start from that point and go back up.

12  Q.   Okay.  So, for example, with respect to the -- what was

13  going on in this one, we have a February 23, 2015, complaint,

14  and if we go to the last page -- can we go to the last page

15  here at the top with the complaints up there?  Thank you, Karl.

16        So right before the 23rd one, we have a sent warning

17  DMCA.  Well, that counts, right?  And then you have the sent

18  reply hard limit, sent reply hard limit, sent reply hard limit,

19  and sent warning, and that sent warning is in July 10 of 2014.

20        So based on this, on your rolling six-month system,

21  that this, this subscriber has had 28 copyright infringements

22  over the last two-and-a-half years would really be at a level

23  3, still just getting e-mail warnings; is that correct?

24  A.   Right.  Exactly, because he's out of that six-month window

25  on the last one.  The one he's on now, you look back, you see

R. Vredenburg - Direct

860

1    17th of 2015, so he had one there.  Then the one that would

2    count was up further, at 7/10/14.  So that wouldn't -- would

3    count, also.  He effectively would have two warnings.

4    Q.    Okay.  Now, the folks that you get are actually folks that

5    have gotten 12 copyright infringement offenses in a six-month

6    period that, that don't include any of these sent reply hard

7    limit for complaints; is that correct?

8    A.    Yes.

9    Q.    All right.  And when you get it, you said you review the

10   history?

11   A.    Yes, we review the complaint and the history.

12   Q.    And then you make a determination whether or not you'll

13   suspend or not?

14   A.    Correct.

15   Q.    Okay.  And how do you suspend them?

16   A.    Push the button.

17   Q.    Push a button.  Okay.

18         And what, what happens to the subscriber?

19   A.    What happens then is when we suspend to that level, we put

20   a different note in the ticket.  It says, "Final suspension."

21   Call whatever, whatever number our number is, and that way the

22   customer, when it pops up, he'll call the corporate number, not

23   the Tier 2 number.

24   Q.    And are you the person they'd be calling at the corporate

25   number?

R. Vredenburg - Direct

861

1    A.    Yes, sir.

2    Q.    Okay.  And that final notice goes the twelfth time, right?

3    A.    There's the twelfth -- I guess it was the twelfth time.

4    Q.    Yep.

5    A.    We do two final.

6    Q.    Yeah.  So you send two final notices?

7    A.    Yes, sir.

8    Q.    Okay.  And then after that, for continued offenses, the

9    account will be reviewed and considered for termination.

10   That's what it says on the bottom on page 11; is that correct?

11   A.    Correct.  After two offenses, though, it's normally

12   terminated.

13   Q.    All right.  Okay.  So let's see how the termination review

14   process has worked at Cox.  Let me show you, let's see, where

15   are we?

16         Okay.  Mr. Vredenburg, this is a string of e-mails;

17   isn't that correct?

18   A.    Yes, sir, it appears to be.

19   Q.    And these are a string of e-mails that -- if you look at

20   the second page of 449, these -- you instituted these e-mails,

21   is that right?  You began them, the string?

22   A.    Yes, it would appear that way.

23         MR. PECAU:  All right.  Your Honor, I'd like to offer

24   into evidence PX 1449.

25         MR. BUCKLEY:  No objection, Your Honor.

M. Carothers - Cross                                                    1536

1   A.   Yes.

2   Q.   And what that means was that the company put you up to

3   testify on a number of topics as though you were speaking on

4   behalf of the company itself?

5   A.   Yes.

6   Q.   And I asked you several questions about Rightscorp,

7   correct?

8   A.   Yes.

9   Q.   And it's true, isn't it, that Cox never, never even

10  considered forwarding Rightscorp's notices without the

11  settlement offer?

12  A.   No, not to my knowledge.

13  Q.   And Cox never considered extracting out the settlement

14  language from Rightscorp's notices?

15  A.   No.  We wouldn't have altered it before forwarding it.

16  Q.   And Cox never considered forwarding the notice in an

17  amended way of some sort that didn't include the settlement

18  language?

19  A.   No.

20  Q.   And Cox never considered generating a separate notice to

21  inform subscribers consistent with Cox's responsibilities and

22  duties that they had been notifying subscribers that they'd

23  been the subject of an infringement notice?

24  A.   No.  We did not consider creating a separate process.

25  Q.   I'm going to hand you PX 1340, Mr. Carothers.  I believe

M. Carothers - Cross                                                    1537

1    this is admitted into evidence.

2              You've seen this, Mr. Carothers?

3    A.   Yes.

4    Q.   This is the e-mail where Mr. Zabek is saying F the DMCA,

5    and Mr. Sikes is saying F Rightscorp, right?

6    A.   Yes.

7    Q.   And at the very top here, you send an e-mail to those two

8    gentlemen, and you say, "Sorry to be Paranoid Panda here, but

9    please stop sending out e-mails saying F the law or F some

10   company.  If we get sued, those e-mails are discoverable and

11   would not look good in court."

12   A.   Yes.

13   Q.   You didn't tell them to knock it off because Cox is more

14   respectful as a company, did you?

15   A.   No.  Those are not my words.

16   Q.   And you didn't say, stop saying these words because, you

17   know, we, Cox, have an obligation to treat and respect

18   copyright infringement notices?

19   A.   That's correct.

20             MS. JOBSON:  Objection.  Argumentative.

21             THE COURT:  Overruled.

22   BY MR. ALLAN:

23   Q.   And you didn't say, stop saying e-mails like this because

24   we, Cox, respect the DMCA?

25   A.   Nope, I did not say that.

M. Carothers - Cross                                                      1538

1   Q.   And what you did was you told them to stop simply because

2   it might be discoverable and you might look bad in court,

3   right?

4   A.   Those are my words, yes.

5   Q.   A couple other things I wanted to go through from your

6   deposition.  Again, you were the corporate witness on a number

7   of topics.  We've talked a lot about the current iteration of

8   the residential abuse ticket handling procedures in this case,

9   and I asked you if you knew who is responsible for developing

10  and preparing that current iteration.  You didn't know, did

11  you?

12  A.   I don't recall exactly what my answer was, but if that's

13  what I said in my deposition, then I won't argue with you.

14  Q.   And I also asked you if you knew why the TOC work force

15  was reduced to four people in 2011, and you didn't know the

16  answer to that, either, did you?

17  A.   Actually, I did know the answer to that when it was

18  reasked in my second deposition.

19  Q.   Well, I have a question and answer here:  "Why did the

20  company reduce the staffing in terms of the number of employees

21  that the TOC had in 2011?"

22       You gave an answer, "I don't know"?

23       THE COURT:  Well, if he answered it in a subsequent

24  deposition, as he appears to have said, then that has been

25  supplemented, hasn't it, Mr. Allen?

2136

1    parties expect that you will carefully and impartially consider

2    all the evidence, follow the law as it is now being given to

3    you, and reach a just verdict regardless of the consequences.

4            Unless you are otherwise instructed, evidence in this

5    case consists of the sworn testimony of the witnesses

6    regardless of who called the witness, all exhibits received in

7    evidence regardless of who may have produced them, and all

8    facts and events that may have been admitted or stipulated to.

9            Statements and arguments by the lawyers are not

10   evidence.  The lawyers are not witnesses.  What they have said

11   in their opening statements or will say in their closing

12   arguments, and at other times, is intended to help you

13   understand the evidence, but it is not evidence.

14           However, when lawyers on both sides stipulate or

15   agree on the existence of a fact, unless otherwise instructed,

16   you must accept the stipulation and regard that fact as proved.

17           Any evidence to which I have sustained an objection

18   and evidence that I have ordered stricken must be entirely

19   disregarded.

20           If a lawyer asks a question containing an assertion

21   of fact, you may not consider the assertion as evidence of that

22   fact.  The lawyer's questions and statements are not evidence.

23           During the trial I may sometimes ask a witness

24   questions.  Please do not think I have a opinion about the

25   subject matter of my questions.  I may ask a question simply to