## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

SONY MUSIC ENTERTAINMENT, ARISTA
MUSIC, ARISTA RECORDS, LLC, LAFACE
RECORDS LLC, PROVIDENT LABEL GROUP,
LLC, SONY MUSIC ENTERTAINMENT US LATIN,
VOLCANO ENTERTAINMENT III, LLC, ZOMBA
RECORDINGS LLC, SONY/ATV MUSIC
PUBLISHING LLC, EMI AL GALLICO MUSIC
CORP., EMI ALGEE MUSIC CORP., EMI APRIL
MUSIC INC., EMI BLACKWOOD MUSIC INC.,
COLGEMS-EMI MUSIC INC., EMI CONSORTIUM
MUSIC PUBLISHING INC. D/B/A EMI FULL KEEL
MUSIC, EMI CONSORTIUM SONGS, INC.,
INDIVIDUALLY AND D/B/A EMI LONGITUDE
MUSIC, EMI FEIST CATALOG INC., EMI MILLER
CATALOG INC., EMI MILLS MUSIC, INC., EMI
UNART CATALOG INC., EMI U CATALOG INC.,
JOBETE MUSIC CO. INC., STONE AGATE MUSIC,
SCREEN GEMS-EMI MUSIC INC., STONE
DIAMOND MUSIC CORP., ATLANTIC
RECORDING CORPORATION, BAD BOY
RECORDS LLC, ELEKTRA ENTERTAINMENT
GROUP INC., FUELED BY RAMEN LLC,
ROADRUNNER RECORDS, INC., WARNER BROS.
RECORDS INC., WARNER/CHAPPELL MUSIC,
INC., WARNER-TAMERLANE PUBLISHING
CORP., WB MUSIC CORP., W.B.M. MUSIC CORP.,
UNICHAPPELL MUSIC INC., RIGHTSONG MUSIC
INC., COTILLION MUSIC, INC., INTERSONG
U.S.A., INC., UMG RECORDINGS, INC., CAPITOL
RECORDS, LLC, UNIVERAL MUSIC CORP.,
UNIVERSAL MUSIC – MGB NA LLC,
UNIVERSAL MUSIC PUBLISHING INC.,
UNIVERSAL MUSIC PUBLISHING AB,
UNIVERSAL MUSIC PUBLISHING LIMITED,
UNIVERSAL MUSIC PUBLISHING MGB
LIMITED., UNIVERSAL MUSIC – Z TUNES LLC,
UNIVERSAL/ISLAND MUSIC LIMITED,
UNIVERSAL/MCA MUSIC PUBLISHING PTY.

Case No. 1:18-cv-00950-LO-JFA


**FIRST AMENDED COMPLAINT AND
JURY DEMAND**

LIMITED, MUSIC CORPORATION OF AMERICA,
INC. D/B/A UNIVERSAL MUSIC CORP.,
POLYGRAM PUBLISHING, INC., AND SONGS OF
UNIVERSAL, INC.,

         Plaintiffs,

   v.

COX COMMUNICATIONS, INC. AND COXCOM,
LLC.

         Defendants.

Plaintiffs Sony Music Entertainment, Arista Music, Arista Records LLC, LaFace

Records LLC, Provident Label Group, LLC, Sony Music Entertainment US Latin, Volcano

Entertainment III, LLC, Zomba Recordings LLC, Sony/ATV Music Publishing LLC, EMI Al

Gallico Music Corp., EMI Algee Music Corp., EMI April Music Inc., EMI Blackwood Music

Inc., Colgems-EMI Music Inc., EMI Consortium Music Publishing Inc. d/b/a EMI Full Keel

Music, EMI Consortium Songs, Inc., individually and d/b/a EMI Longitude Music, EMI Feist

Catalog Inc., EMI Miller Catalog Inc., EMI Mills Music, Inc., EMI Unart Catalog Inc., EMI U

Catalog Inc., Jobete Music Co. Inc., Stone Agate Music, Screen Gems-EMI Music Inc., Stone

Diamond Music Corp., Atlantic Recording Corporation, Bad Boy Records LLC, Elektra

Entertainment Group Inc., Fueled By Ramen LLC, Roadrunner Records, Inc., Warner Bros.

Records Inc., Warner/Chappell Music, Inc., Warner-Tamerlane Publishing Corp., WB Music

Corp., W.B.M. Music Corp., Unichappell Music Inc., Rightsong Music Inc., Cotillion Music,

Inc., Intersong U.S.A., Inc., UMG Recordings, Inc., Capitol Records, LLC, Universal Music

Corp., Universal Music – MGB NA LLC, Universal Music Publishing Inc., Universal Music

Publishing AB, Universal Music Publishing Limited, Universal Music Publishing MGB

Limited, Universal Music – Z Tunes LLC, Universal/Island Music Limited, Universal/MCA

Music Publishing Pty. Limited, Music Corporation of America, Inc. d/b/a Universal Music Corp., Polygram Publishing, Inc., and Songs of Universal, Inc., (collectively, "Plaintiffs"), for their Complaint against Defendants Cox Communications, Inc. and CoxCom, LLC (collectively, "Cox" or "Defendants"), allege, on personal knowledge as to matters relating to themselves and on information and belief as to all other matters, as set forth below.

## NATURE OF THE CASE

1.      Plaintiffs are record companies that produce, manufacture, distribute, sell, and license commercial sound recordings, and music publishers that acquire, license, and otherwise exploit musical compositions, both in the United States and internationally.  Through their enormous investments of not only money, but also time and exceptional creative efforts, Plaintiffs and their representative recording artists and songwriters have developed and marketed the world's most famous and popular music.  Plaintiffs own or control exclusive rights to the copyrights to some of the most famous sound recordings performed by classic artists and contemporary superstars, as well as the copyrights to large catalogs of iconic musical compositions and modern hit songs.  Their investments and creative efforts have shaped the musical landscape as we know it, both in the United States and around the world.

2.      Cox is one of the largest Internet service providers ("ISPs") in the country.  It markets and sells high-speed Internet services to consumers nationwide. Through the provision of those services, however, Cox also has knowingly contributed to, and reaped substantial profits from, massive copyright infringement committed by thousands of its subscribers, causing great harm to Plaintiffs, their recording artists and songwriters, and others whose livelihoods depend upon the lawful acquisition of music.  Cox's contribution to its subscribers' infringement is both willful and extensive, and renders Cox equally liable.  Indeed, for years, Cox deliberately refused to take reasonable measures to curb its customers from using its

Internet services to infringe on others' copyrights—even once Cox became aware of *particular customers* engaging in *specific, repeated acts* of infringement.  Plaintiffs' representatives (as well as others) sent hundreds of thousands of statutory infringement notices to Cox, under penalty of perjury, advising Cox of its subscribers' blatant and systematic use of Cox's Internet service to illegally download, copy, and distribute Plaintiffs' copyrighted music through BitTorrent and other online file-sharing services.  Rather than working with Plaintiffs to curb this massive infringement, Cox unilaterally imposed an arbitrary cap on the number of infringement notices it would accept from copyright holders, thereby willfully blinding itself to any of its subscribers' infringements that exceeded its "cap."

3.      Cox also claimed to have implemented a "thirteen-strike policy" before terminating service of repeat infringers but, in actuality, Cox never permanently terminated any subscribers.  Instead, it lobbed "soft terminations" with virtually automatic reinstatement, or it simply did nothing at all.  The reason for this is simple:  rather than stop its subscribers' unlawful activity, Cox prioritized its own profits over its legal obligations.  Cox's profits increased dramatically as a result of the massive infringement that it facilitated, yet Cox publicly told copyright holders that it needed to reduce the number of staff it had dedicated to anti-piracy for budget reasons.

4.      Congress created a safe harbor in the Digital Millennium Copyright Act ("DMCA") that limits the liability of ISPs for copyright infringement when their involvement is limited to, among other things, "transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider."  17 U.S.C. § 512(a).  To benefit from the DMCA safe harbor, however, along with meeting other pre-conditions, an ISP must demonstrate that it "has adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers . . . who are

repeat infringers." 17 U.S.C. § 512(i)(1)(A).

5.       Cox's "thirteen-strike policy" has already been revealed to be a sham, and its ineligibility for the DMCA safe harbor—for the period of (at least) February 2012 through November 2014—has been fully and finally adjudicated by this Court and affirmed by the Court of Appeals for the Fourth Circuit.  In a related case, *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc. and CoxCom, LLC*, 149 F. Supp. 3d 634, 662 (E.D. Va. 2015), *aff'd in relevant part*, 881 F.3d 293 (4th Cir. 2018) ("*BMG Rights*"), this Court established, as a matter of law, that Cox could not invoke the DMCA safe harbor to limit its liability.  *Id.* at 655-662.

6.       Specifically, the Court concluded:

> Cox did not implement its repeat infringer policy. Instead, Cox publicly purported to comply with its policy, while privately disparaging and intentionally circumventing the DMCA's requirements. Cox employees followed an unwritten policy put in place by senior members of Cox's abuse group by which accounts used to repeatedly infringe copyrights would be nominally terminated, only to be reactivated upon request. Once these accounts were reactivated, customers were given clean slates, meaning the next notice of infringement Cox received linked to those accounts would be considered the first in Cox's graduated response procedure.

*Id.* at 655.  The Court further found that starting in September 2012, Cox abandoned its tacit policy of temporarily suspending and reactivating repeat infringers' accounts, and instead stopped terminating accounts altogether.  *Id.* at 655-58.

7.       The Fourth Circuit affirmed this Court's holding, explaining that although "Cox formally adopted a repeat infringer 'policy,' . . . both before and after September 2012, [Cox] made every effort to avoid reasonably implementing that policy.  Indeed, in carrying out its thirteen-strike process, Cox very clearly determined *not* to terminate subscribers who in fact repeatedly violated the policy."  881 F.3d at 303.  The former head of Cox's Abuse Group, Jason Zabek, summed up Cox's sentiment toward its DMCA obligations best in an email exclaiming: "f the dmca!!!"  Unsurprisingly, the Fourth Circuit affirmed this Court's ruling,

holding that "Cox failed to qualify for the DMCA safe harbor because it failed to implement its policy in any consistent or meaningful way—leaving it essentially with no policy." *Id.* at 305. The *BMG Rights* decision that Cox is ineligible for the DMCA safe harbor from at least February 2012 through November 2014 controls here.

8.      It is well-established law that a party may not assist someone it knows is engaging in copyright infringement.  Further, when a party has a direct financial interest in the infringing activity, and the right and practical ability to stop or limit it, that party must act. Ignoring those basic responsibilities, Cox deliberately turned a blind eye to its subscribers' infringement.  Cox failed to terminate or otherwise take meaningful action against the accounts of repeat infringers whose identities were known.  It also blocked infringement notices for countless others.  Despite its professed commitment to take action against repeat offenders, Cox routinely thumbed its nose at Plaintiffs by continuing to provide service to individuals it knew to be serially infringing copyrighted works and refusing to even receive notice of any infringements above an arbitrary cap.  In reality, Cox operated its service as an attractive tool, and as a safe haven, for infringement.

9.      Cox has derived an obvious and direct financial benefit from its customers' infringement.  The unlimited ability to download and distribute Plaintiffs' works through Cox's service has served as a draw for Cox to attract, retain, and charge higher fees to subscribers. Moreover, by failing to terminate the accounts of specific recidivist infringers known to Cox, Cox obtained a direct financial benefit from its subscribers' infringing activity in the form of illicit revenue that it would not have received had it shut down those accounts.  Indeed, Cox affirmatively decided not to terminate infringers because it wanted to maintain the revenue that would come from their accounts.

10.      The infringing activity of Cox's subscribers that is the subject of Plaintiffs'

claims, and for which Cox is secondarily liable, occurred *after* Cox received multiple notices of a subscriber's infringing activity.  Specifically, Plaintiffs seek relief for claims of infringement that accrued from February 1, 2013 through November 26, 2014, with respect to works infringed by Cox's subscribers *after* those particular subscribers were identified to Cox in multiple infringement notices.  Those claims are preserved through tolling agreements entered into with Cox, and Cox cannot limit its liability for claims in this period under the DMCA safe harbor.

**JURISDICTION AND VENUE**

11.     This is a civil action in which Plaintiffs seek damages for copyright infringement under the Copyright Act, 17 U.S.C. § 101, *et seq*.

12.     This Court has original subject matter jurisdiction over Plaintiffs' copyright infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

13.     This Court has personal jurisdiction over Cox because Cox resides in and/or does systematic and continuous business in Virginia and in this judicial district.  Cox provides a full slate of services in Virginia, including TV, Internet and phone services, among others.  Cox also has a number of retail stores and customer service centers within this judicial district, including stores located at 5958 Kingstowne Town Ctr., Ste. 100, Alexandria, Virginia 22315 and 11044 Lee Hwy, Suite 10, Fairfax, Virginia 22030 and 3080 Centerville Road, Herndon, Virginia 20171.

14.     Each of the Cox defendants has in the past been (or is presently) a party, as a plaintiff or a defendant, in this Court, including in the related case of *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns., Inc. and CoxCom, LLC*, No. 14-cv-1611-LO-JFA.

15.     Cox continuously and systematically transacts business in the Commonwealth of Virginia and maintains sizable operations in Virginia—employing thousands of employees and

providing an array of services to customers within the Commonwealth.  Additionally, Cox has

engaged in substantial activities purposefully directed at Virginia from which Plaintiffs' claims

arise, including, for instance, establishing significant network management operations in this

district, employing individuals within Virginia who have responsibility for managing its

network, enforcing subscriber use policies against violators, and/or responding to notices of

infringement.  Much of the conduct alleged in this Complaint arises directly from Cox's forum-

directed activities—specifically, repeated acts of infringement by specific subscribers using

Cox's network and Cox's awareness of those activities, Cox's receipt of and failure to act in

response to Plaintiffs' notices of infringement activity, and Cox's failure to take reasonable

measures to terminate repeat infringers.

16.     Many of the acts complained of herein occurred in Virginia and in this judicial

district.  For example, a number of egregious repeat infringers, who are Cox subscribers, reside

in and infringed Plaintiffs' rights in Virginia and this judicial district.

17.     Indeed, Plaintiffs have identified hundreds of Cox subscribers suspected of

residing in Virginia, who have repeatedly infringed one or more of Plaintiffs' copyrighted

works.  For example, Cox subscriber account having IP address 216.54.125.50 at the time of

the infringement, believed to be located east of Richmond, Virginia, was identified in

infringement notices 97 times between November 15, 2013 and March 6, 2015.  A different

Cox subscriber believed to be located in Norfolk, Virginia, having IP address 72.215.154.66 at

the time of infringement, also was identified in infringement notices 97 times between February

6, 2013 and March 6, 2015.  Yet another Cox subscriber having IP address 174.77.93.179,

believed to be from Virginia Beach, was identified in infringement notices 34 times between

February 8, 2013 and March 25, 2015.

18.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and 1400(a),

because a substantial part of the acts of infringement, and other events and omissions complained of herein occur, or have occurred, in this district, and this is a district in which Cox resides or may be found.

## PLAINTIFFS AND THEIR COPYRIGHTED MUSIC

19.     Plaintiffs are the copyright owners of and/or control exclusive rights with respect to millions of sound recordings (*i.e.*, recorded music) and/or musical works (*i.e.*, compositions), including many by some of the most prolific and well-known recording artists and songwriters in the world.

20.     Plaintiff Sony Music Entertainment ("Sony") is a Delaware general partnership, the partners of which are citizens of New York and Delaware.  Sony's headquarters and principal place of business are located at 25 Madison Avenue, New York, New York 10010.

21.     Plaintiff Arista Music ("Arista Music") is a New York partnership with its principal place of business at 25 Madison Avenue, New York, New York 10010.

22.     Plaintiff Arista Records LLC ("Arista Records") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

23.     Plaintiff LaFace Records LLC ("LaFace") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

24.     Plaintiff Provident Label Group, LLC ("Provident") is a Delaware Limited Liability Company with its principal place of business at 741 Cool Springs Boulevard, Franklin, Tennessee 37067.

25.     Plaintiff Sony Music Entertainment US Latin ("Sony Latin") is a Delaware Limited Liability Company with its principal place of business at 3390 Mary St., Suite 220,

Coconut Grove, Florida 33133.

26.     Plaintiff Volcano Entertainment III, LLC ("Volcano") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

27.     Plaintiff Zomba Recording LLC ("Zomba") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

28.     Plaintiff Atlantic Recording Corporation ("Atlantic") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

29.     Plaintiff Bad Boy Records LLC ("Bad Boy") is a Delaware Limited Liability Company with its principal place of business at 1633 Broadway, New York, New York 10019.

30.     Plaintiff Elektra Entertainment Group Inc. ("Elektra") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

31.     Plaintiff Fueled By Ramen LLC ("FBR") is a Delaware Limited Liability Company with its principal place of business at 1633 Broadway, New York, New York 10019.

32.     Plaintiff Roadrunner Records, Inc. ("Roadrunner") is a New York corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

33.     Plaintiff Warner Bros. Records Inc. ("WBR") is a Delaware corporation with its principal place of business at 3300 Warner Boulevard, Burbank, California 91505.

34.     Plaintiff UMG Recordings, Inc. ("UMG") is a Delaware corporation with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404.

35.     Plaintiff Capitol Records, LLC ("Capitol Records") is Delaware corporation with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404.

36.     Plaintiffs Sony, Arista Music, Arista Records, LaFace, Provident, Sony Latin,

Volcano, Zomba, Atlantic, Bad Boy, Elektra, FBR, Roadrunner, WBR, UMG, and Capitol

Records are referred to herein collectively as "The Record Company Plaintiffs."

37.     The Record Company Plaintiffs are some of the largest record companies in the

world, engaged in the business of producing, manufacturing, distributing, selling, licensing, and

otherwise exploiting sound recordings in the United States through various media.  They invest

substantial money, time, effort, and talent in creating, advertising, promoting, selling, and

licensing sound recordings embodying the performances of their exclusive recording artists and

their unique and valuable sound recordings.

38.     Plaintiff Sony/ATV Music Publishing LLC ("Sony/ATV") is a Delaware

Limited Liability Company with its principal place of business at 25 Madison Avenue, New

York, New York 10010.

39.     Plaintiff EMI Al Gallico Music Corp. ("EMI Al Gallico"), an affiliate of

Sony/ATV, is a Delaware corporation with its principal place of business at 245 Fifth Avenue,

Suite 1101, New York, New York 10016.

40.     Plaintiff EMI Algee Music Corp. ("EMI Algee"), an affiliate of Sony/ATV, is a

Delaware corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New

York, New York 10016.

41.     Plaintiff EMI April Music Inc. ("EMI April"), an affiliate of Sony/ATV, is a

Connecticut corporation with its principal place of business at 245 Fifth Avenue, Suite 1101,

New York, New York 10016.

42.     Plaintiff EMI Blackwood Music Inc. ("EMI Blackwood"), an affiliate of

Sony/ATV, is a Connecticut corporation with its principal place of business at 245 Fifth

Avenue, Suite 1101, New York, New York 10016.

43.     Plaintiff Colgems-EMI Music Inc. ("EMI Colgems"), an affiliate of Sony/ATV,

is a Delaware corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

44.     Plaintiff EMI Consortium Music Publishing Inc. d/b/a EMI Full Keel Music ("EMI Full Keel"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

45.     Plaintiff EMI Consortium Songs, Inc., individually and d/b/a EMI Longitude Music ("EMI Longitude"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

46.     Plaintiff EMI Feist Catalog Inc. ("EMI Feist"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

47.     Plaintiff EMI Miller Catalog Inc. ("EMI Miller"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

48.     Plaintiff EMI Mills Music, Inc. ("EMI Mills"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

49.     Plaintiff EMI Unart Catalog Inc. ("EMI Unart"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

50.     Plaintiff EMI U Catalog Inc. ("EMI U"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

51.     Plaintiff Jobete Music Co. Inc. ("Jobete"), an affiliate of Sony/ATV, is a

Michigan corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New

York, New York 10016.  Plaintiff Stone Agate Music ("Stone Agate") is a division of Jobete.

52.     Plaintiff Screen Gems-EMI Music Inc. ("Gems-EMI"), an affiliate of

Sony/ATV, is a Delaware corporation with its principal place of business at 245 Fifth Avenue,

Suite 1101, New York, New York 10016.

53.     Plaintiff Stone Diamond Music Corp. ("Stone"), an affiliate of Sony/ATV, is a

Michigan corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New

York, New York 10016.

54.     Plaintiff Warner/Chappell Music, Inc. ("Warner/Chappell") is a Delaware

corporation with its principal place of business at 10585 Santa Monica Boulevard, Los

Angeles, California 90025.

55.     Plaintiff Warner-Tamerlane Publishing Corp. ("Warner-Tamerlane") is a

California corporation with its principal place of business at 10585 Santa Monica Boulevard,

Los Angeles, California 90025.

56.     Plaintiff WB Music Corp. ("WB Music") is a California corporation with its

principal place of business at 10585 Santa Monica Boulevard, Los Angeles, California 90025.

57.     Plaintiff W.B.M. Music Corp. ("W.B.M.") is a Delaware corporation with its

principal place of business at 10585 Santa Monica Boulevard, Los Angeles, California 90025.

58.     Plaintiff Unichappell Music Inc. ("Unichappell") is a Delaware corporation with

its principal place of business at 10585 Santa Monica Boulevard, Los Angeles, California

90025.

59.     Plaintiff Rightsong Music Inc. ("Rightsong Music") is a Delaware corporation

with its principal place of business at 10585 Santa Monica Boulevard, Los Angeles, California

90025.

60.     Plaintiff Cotillion Music, Inc. ("Cotillion") is a Delaware corporation with its principal place of business at 10585 Santa Monica Boulevard, Los Angeles, California 90025.

61.     Plaintiff Intersong U.S.A., Inc. ("Intersong") is a Delaware corporation with its principal place of business at 10585 Santa Monica Boulevard, Los Angeles, California 90025.

62.     Plaintiff Universal Music Corp. ("UMC") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

63.     Plaintiff Universal Music – MGB NA LLC ("MGB") is a California Limited Liability Company with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

64.     Plaintiff Universal Music Publishing Inc. ("Universal Music Publishing") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

65.     Plaintiff Universal Music Publishing AB ("AB") is a company organized under the laws of Sweden.

66.     Plaintiff Universal Music Publishing Limited ("Publishing Limited") is a company incorporated under the laws of England and Wales.

67.     Plaintiff Universal Music Publishing MGB Limited ("MGB Limited") is a company incorporated under the laws of England and Wales.

68.     Plaintiff Universal Music – Z Tunes LLC ("Z Tunes") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

69.     Plaintiff Universal/Island Music Limited ("Island") is a company incorporated under the laws of England and Wales.

70.     Plaintiff Universal/MCA Music Publishing Pty. Limited ("MCA Limited") is a company organized under the laws of the Australia.

71.     Plaintiff Music Corporation of America, Inc. d/b/a Universal Music Corp. ("Music Corp.") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

72.     Plaintiff Polygram Publishing, Inc. ("Polygram Publishing") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

73.     Plaintiff Songs of Universal, Inc. ("Songs of Universal") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

74.     Plaintiffs Sony/ATV, EMI Al Gallico, EMI Algee, EMI April, EMI Blackwood, EMI Colgems, EMI Full Keel, EMI Longitude, EMI Feist, EMI Miller, EMI Mills, EMI Unart, EMI U, Jobete, Stone Agate, Gems-EMI, Stone, Warner/Chappell, Warner-Tamerlane, WB Music, W.B.M., Unichappell, Rightsong Music, Cotillion, Intersong, UMC, MGB, Universal Music Publishing, AB, Publishing Limited, MGB Limited, Z Tunes, Island, MCA Limited, Music Corp., Polygram Publishing, and Songs of Universal are referred to herein collectively as "The Music Publisher Plaintiffs."

75.     The Music Publisher Plaintiffs are leading music publishers engaged in the business of acquiring, owning, publishing, licensing, and otherwise exploiting copyrighted musical compositions.  Each invests substantial money, time, effort, and talent to acquire, administer, publish, license, and otherwise exploit such copyrights, on its own behalf and on behalf of songwriters and other music publishers who have assigned exclusive copyright interests to The Music Publisher Plaintiffs.

76.     Plaintiffs own and/or control in whole or in part the copyrights and/or exclusive rights in innumerable popular sound recordings and musical compositions, including the sound recordings listed on Exhibit A and musical compositions listed on Exhibit B, both of which are illustrative and non-exhaustive.  All of the sound recordings and musical compositions listed on Exhibits A and B have been registered with the U.S. Copyright Office.

## DEFENDANTS AND THEIR ACTIVITIES

77.     Defendant Cox Communications, Inc. is a Delaware corporation with its principal place of business at 1400 Lake Hearn Drive NE, Atlanta, Georgia.  Cox Communications, Inc. operates as a broadband communications and entertainment company for residential and commercial customers in the United States.  Specifically, Cox Communications, Inc. offers digital video, high-speed Internet, telephone, voice, and long distance, data and video transport, high definition video, digital cable television, and DVR services over its IP network.

78.     Defendant CoxCom, LLC is a Delaware Limited Liability Company with its principal place of business at 1400 Lake Hearn Drive NE, Atlanta, Georgia.  CoxCom, LLC conducts business in Virginia as Cox Communications of Northern Virginia.  CoxCom, LLC is a wholly-owned subsidiary of Cox Communications, Inc.  CoxCom, LLC provides Internet and related services to Cox subscribers including in Virginia and this judicial district.

79.     The Cox defendants, individually and collectively, are ISPs.  Cox has approximately 4.5 million Internet subscribers.  At all pertinent times, Cox's customers have paid Cox substantial subscription fees for access to Cox's high-speed Internet network, with Cox offering a tiered pricing structure, whereby for a higher monthly fee, a subscriber can have even faster downloading speeds.

80.     For many of Cox's subscribers, the ability to use Cox's network to download

music and other copyrighted content—including unauthorized content—as efficiently as possible is a primary motivation for subscribing to Cox's service.  Accordingly, in its consumer marketing material in 2014, Cox touted how its service enabled subscribers to download large amounts of content "Faster Than A Speeding Bullet" and at "The Speed You Need."  In exchange for this service, Cox charged its customers monthly fees ranging in price based on the speed of service.

https://web.archive.org/web/20140616085246/http://www.cox.com:80/residential/internet.cox. To satisfy its customers' need for speed, "Cox has increased internet speeds more than 1,000 percent over the past 17 years," making it even easier and faster for subscribers to illegally download and upload infringing sound recordings and musical compositions.

http://newsroom.cox.com/2018-01-09-Cox-Expands-Gigabit-Speeds-at-Rapid-Pace.

81.     On its "Frequently Asked Questions" page on its website, Cox describes a process called "bandwidth throttling" that is often used by ISPs to reduce infringement by subscribers who have a history of illegal behavior.  Cox tells its customers and prospective customers that bandwidth throttling "can interfere with the download speed, upload speed and overall performance of your network's Internet service," and assures actual and prospective customers that "[a]t Cox, we never throttle Internet speeds. And we never block or otherwise interfere with your desire to go where you want to go on the Internet."

https://www.cox.com/residential/internet.html.

82.     At the same time, Cox has consistently and actively engaged in network management practices to suit its own purposes.  This includes monitoring for, and taking action against, spam and other unwanted activity.  But Cox has gone out of its way *not* to take action against subscribers engaging in repeated copyright infringement at the expense of copyright owners, ultimately forcing Plaintiffs to bring this litigation.

83.     At all pertinent times, Cox knew that its subscribers routinely used its networks for illegal downloading and uploading of copyrighted works, especially music.  As described below, Plaintiffs repeatedly notified Cox that many of its subscribers were actively utilizing its service in order to infringe; those notices gave Cox the *specific identities of its subscribers*, referred to by their unique Internet Protocol or "IP" addresses.  Yet Cox persistently turned a blind eye toward the massive infringement of Plaintiffs' works.  Cox condoned the illegal activity because it was popular with subscribers and acted as a draw in attracting and retaining subscribers.  In return, Cox's customers purchased more bandwidth and continued using Cox's services to infringe Plaintiffs' copyrights.  Cox recognized that if it prevented its repeat infringer subscribers from using its service, or made it less attractive for such use, Cox would enroll fewer new subscribers, lose existing subscribers, and lose revenue.  For those account holders and subscribers who wanted to download files illegally at faster speeds, Cox obliged them for higher rates.  The greater the bandwidth its subscribers required for pirating content, the more money Cox made.

### PLAINTIFFS' ENFORCEMENT ACTIVITIES AND COX'S EFFORTS TO THWART THEM

84.     Over the past two decades, Internet piracy over so-called "peer-to-peer" ("P2P") networks has become rampant, and music owners and other copyright owners have employed litigation and other means to attempt to curtail the massive theft of their copyrighted works.  Cox has been keenly aware of those efforts.  Cox has also been acutely aware of the use of its network for P2P piracy, including the specific identities of subscribers who are using its network to infringe.

85.     Indeed, Cox was made aware of its subscribers using its network for such infringing activities before the time frame at issue in this suit, when a number of copyright holders, including The Record Company Plaintiffs, initiated a multi-year effort to enforce their

copyrights against individuals using P2P systems to directly infringe copyrighted musical or other works.  As part of that effort, because the copyright holders could only determine the unique IP addresses of an ISP's infringing subscribers, but not their actual identities, they served subpoenas on Cox and other ISPs to obtain the infringing subscribers' names and contact information.  Cox was required to provide identifying information about infringing subscribers.

86.     Thereafter, The Record Company Plaintiffs began sending notices to Cox (and other ISPs) identifying additional specific instances of their subscribers' infringement through P2P activities.  From early 2013 through March 2015 alone, Cox received more than *200,000 notices*, provided under penalty of perjury, detailing specific instances of its subscribers using its network to infringe copyrighted music.

87.     But those hundreds of thousands of notices Cox received represented only a fraction of the infringements that occurred through Cox's network in the same time frame.  For years, Cox has arbitrarily capped the number of infringement notices it is willing to receive—refusing to even hear any complaints in excess of the cap.  Starting in 2008, Cox refused to accept any more than 200 infringement notices per day from Plaintiffs' representatives.  In early 2009, Cox agreed to increase that number to 400 per day.  In July 2009, many of The Record Company Plaintiffs asked Cox to increase the limit to 800 or 1,000 per day but Cox denied the request on the grounds that it was "currently at the maximum number of notices [Cox could] process, measured against the staff [they] have to process calls from customers."  In 2013, Plaintiffs' representatives again asked Cox to increase the limit, this time more modestly from 400 to 500 or 600 per day, to which Cox finally agreed.  Thus, while Cox received 200,000 infringement notices from 2013 to 2015 from Plaintiffs' representatives, the actual number of infringements identified through Cox's network in those years was vastly

more.  In other words, Cox willfully blinded itself to scores of infringements by refusing to accept notices beyond its arbitrary cap.

88.     The infringement notices provided to Cox the unique IP address assigned to each user of Cox's network and the date and time the infringing activity was detected.  By reviewing its subscriber activity logs, Cox alone had the ability to match an IP address in an infringement notice to a particular subscriber.  Importantly, only Cox, as the provider of the technology and system used to infringe, had the information required to match the IP address to a particular subscriber, and to contact that subscriber or terminate that subscriber's service.

89.     Plaintiffs' infringement notices concerned clear and unambiguous infringing activity by Cox's subscribers—that is, unauthorized downloading and distribution of copyrighted music.  There was no legal justification for Cox's subscribers to download or distribute digital copies of Plaintiffs' sound recordings and musical compositions to thousands or millions of strangers on the Internet.

90.     Apart from attesting to the sheer volume of the infringing activity on its network, the infringement notices sent to Cox pointed to specific subscribers who were flagrant and serial infringers.  The infringement notices identified *almost 20,000* Cox subscribers engaged in blatant and repeated infringement.  To cite just a few specific examples:

- During a 601-day period, Cox's subscriber with IP address 174.78.143.156 was identified in 142 infringement notices, which were sent on at least 116 separate days.

- During a 539-day period, Cox's subscriber with IP address 70.167.91.154 was identified in 104 infringement notices, which were sent on at least 96 separate days.

- During a 426-day period, Cox's subscriber with IP address 72.198.185.108 was identified in 96 infringement notices, which were sent on at least 80 separate days.

- During a 326-day period, Cox's subscriber with IP address 184.191.182.8 was identified in 84 infringement notices, which were sent on at least 71 separate

days.

- During a 248-day period, Cox's subscriber with IP address 184.177.171.108 was identified in 64 infringement notices, which were sent on at least 52 separate days.

These examples and countless others amply illustrate that, rather than terminating repeat infringers—and losing subscription revenues—Cox simply looked the other way.

91.    During all pertinent times, Cox had the full legal right, obligation, and technical ability to prevent or limit the infringements occurring on its network.  Under Cox's "Acceptable Use Policy," which its subscribers agreed to as a condition of using its Internet service, Cox was empowered to exercise its right and ability to suspend or terminate a customer's Internet access.  Cox could do so for a variety of reasons, including a subscriber's "use [of] the Service to post, copy, transmit, or disseminate any content that infringes the patents, copyrights, trade secrets, trademark, moral rights, or propriety rights of any party."  With respect to infringement, Cox is the gatekeeper of the network over which data—including infringing works—is transferred.

92.    Although Cox purported to create a repeat infringer policy, as this Court already found, it never implemented it, and thus it is ineligible for the DMCA's safe harbor.  Cox's Copyright Policy provides that upon receipt of copyright infringement complaints regarding subscribers, "Cox uses a graduated approach of increasing severity to notify subscribers, from in-browser and email notifications, to the suspension of Internet service for repeated or severe cases."

93.    But, in denying Cox's motion for judgment as a matter of law after trial, this Court explained:

> The graduated response system is essentially a thirteen-strike policy.  No action is taken on receipt of a subscriber's first notice.  The second, third, fourth, fifth, sixth, and seventh notices generate an email to the subscriber,

warning that if Cox "continues to receive infringement claims such as this one concerning your use of our service, we will suspend your account and disable your connection until you confirm you have removed the infringing material."  On the eighth and ninth notices, Cox limits a subscriber's internet access to a single webpage containing a warning.  The customer can self-reactivate by clicking an acknowledgment.  On the tenth and eleventh notices, Cox suspends service and requires the subscriber to call a support technician.  The technician explains the reason for the suspension, advises removal of the allegedly infringing file, and then reactivates service.  On the twelfth notice, the subscriber is suspended and directed to specialized technicians.  On the thirteenth notice, the subscriber is again suspended and this time considered for termination.

94.     Regardless of whether a thirteen-strike policy could ever be reasonable, this Court previously found that Cox did not reasonably implement that policy.  For example, in addition to its arbitrary cap on—and, in some instances, outright refusal to accept—Plaintiffs' infringement notices, any notice Cox did receive beyond its self-imposed limit was not counted in the graduated response.  Cox also counted only one notice per subscriber per day.  Thus, if a subscriber generated 10 or 50 or 100 notices in a day, they were "rolled up" into a single ticket.  Cox also restarted the thirteen-strike count every six months, so an infringing subscriber with twelve notices would get a "free pass" back to zero strikes if six months had passed since his or her first notice.  When Cox did "soft terminate" subscribers for repeat copyright infringements, it enforced an unwritten policy of re-activating the subscribers shortly thereafter.  And with few exceptions, starting in September 2012, Cox simply stopped terminating repeat infringers altogether.

95.     Despite these alleged policies, and despite receiving hundreds of thousands of infringement notices, along with similar notices from other copyright owners, Cox knowingly permitted identified repeat infringer subscribers to continue to use Cox's network to infringe.  Rather than disconnect the Internet access of blatant repeat infringers to curtail their infringement, Cox knowingly continued to provide these subscribers with the Internet access

that enabled them to continue to use BitTorrent or other P2P networks to illegally download or distribute Plaintiffs' copyrighted works unabated.  Cox's provision of high-speed Internet service materially contributed to these direct infringements.

96.    Cox's motivation for refusing to terminate or suspend the accounts of blatant infringing subscribers is simple:  it valued corporate profits over its legal responsibilities.  Cox did not want to lose subscriber revenue by terminating accounts.  Jason Zabek, the former head of Cox's Abuse Group, made this clear by urging a Cox customer service representative (in an internal email that he instructed should not be forwarded) to "start the warning cycle over" for terminated customers with cox.net email addresses:  "A clean slate if you will.  This way, we can collect a few extra weeks of payments for their account.  ;-)".

97.    Nor did Cox want the possibility of account terminations to make its service less attractive to other existing or prospective users.  Moreover, Cox was simply disinterested in devoting sufficient resources to tracking infringers, responding to infringement notices, and terminating accounts in appropriate circumstances.  Considering only its own pecuniary gain, Cox ignored and turned a blind eye to flagrant, repeat violations by known specific subscribers using its service to infringe, thus facilitating and multiplying the harm to Plaintiffs.  And Cox's failure to adequately police its infringing subscribers was a draw to subscribers to purchase Cox's services, so that the subscribers could then use those services to infringe Plaintiffs' (and others') copyrights.

98.    The consequences of Cox's infringing activity are obvious and stark.  When Cox's subscribers use Cox's network to obtain infringing copies of Plaintiffs' copyrighted works illegally, that activity undercuts the legitimate music market, depriving Plaintiffs and those recording artists and songwriters whose works they sell and license of the compensation to which they are entitled.  Without such compensation, Plaintiffs, and their recording artists

and songwriters, have fewer resources available to invest in the further creation and distribution

of high-quality music.

## CLAIMS FOR RELIEF

### Count I – Contributory Copyright Infringement

99.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs

1 through 98 as if fully set forth herein.

100.     Cox and its subscribers do not have any authorization, permission, license, or

consent to exploit the copyrighted recordings or musical compositions at issue.

101.     Cox's subscribers, using Internet access and services provided by Cox, have

unlawfully reproduced and distributed via BitTorrent or other P2P networks thousands of sound

recordings and musical compositions for which Plaintiffs are the legal or beneficial copyright

owners or exclusive licensees.  The copyrighted works infringed by Cox's subscribers, which

have been registered with the U.S. Copyright Office, include those listed on Exhibits A and B,

and many others.  The foregoing activity constitutes direct infringement in violation of 17

U.S.C. §§ 106 and 501 *et seq.*

102.     Cox is liable as a contributory copyright infringer for the direct infringements

described above.  Through Plaintiffs' infringement notices and other means, Cox had

knowledge that its network was being used for copyright infringement on a massive scale, and

also knew of specific subscribers engaged in such repeated and flagrant infringement.

Nevertheless, Cox facilitated, encouraged and materially contributed to such infringement by

continuing to provide its network and the facilities necessary for its subscribers to commit

repeated infringements.  At the same time, Cox had the means to withhold that assistance upon

learning of specific infringing activity by specific users but failed to do so.

103.     By purposefully ignoring and turning a blind eye to the flagrant and repeated

infringement by its subscribers, Cox knowingly caused and materially contributed to the unlawful reproduction and distribution of Plaintiffs' copyrighted works, including but not limited to those listed on Exhibits A and B hereto, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

104.    Each infringement of Plaintiffs' copyrighted sound recordings and musical compositions constitutes a separate and distinct act of infringement.  Plaintiffs' claims of infringement against Cox are timely pursuant to tolling agreements.

105.    The foregoing acts of infringement by Cox have been willful, intentional, and purposeful, in disregard of Plaintiffs' rights.  Indeed, the sound recordings on Exhibit A and the musical compositions on Exhibit B represent works infringed by Cox's subscribers *after* those particular subscribers were identified to Cox in multiple infringement notices.

106.    As a direct and proximate result of Cox's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed, or such other amount as may be proper under 17 U.S.C. § 504(c).  Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Cox's profits from the infringements, as will be proven at trial.

107.    Plaintiffs also are entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

### Count II – Vicarious Copyright Infringement

108.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 98 as if fully set forth herein.

109.    Cox and its subscribers have no authorization, license, or other consent to exploit the copyrighted sound recordings or musical compositions at issue.

110.     Cox's subscribers, using Internet access and services provided by Cox, have

unlawfully reproduced and distributed via BitTorrent or other P2P services thousands of sound

recordings and musical compositions for which Plaintiffs are the legal or beneficial copyright

owners or exclusive licensees.  The copyrighted works infringed by Cox's subscribers, which

have been registered with the U.S. Copyright Office, include those listed on Exhibits A and B,

and many others.  The foregoing activity constitutes direct infringement in violation of 17

U.S.C. §§ 106 and 501 *et seq.*

111.     Cox is liable as a vicarious copyright infringer for the direct infringements

described above.  Cox has the legal and practical right and ability to supervise and control the

infringing activities that occur through the use of its network, and at all relevant times has had a

financial interest in, and derived direct financial benefit from, the infringing use of its network.

Cox has derived an obvious and direct financial benefit from its customers' infringement.  The

ability to use Cox's high-speed Internet facilities to illegally download Plaintiffs' copyrighted

works has served to draw, maintain, and generate higher fees from paying subscribers to Cox's

service.  Among other financial benefits, by failing to terminate the accounts of specific repeat

infringers known to Cox, Cox has profited from illicit revenue that it would not have otherwise

received.

112.     Cox is vicariously liable for the unlawful reproduction and distribution of

Plaintiffs' copyrighted works, including but not limited to those listed on Exhibits A and B

hereto, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

113.     Each infringement of Plaintiffs' copyrighted sound recordings and musical

compositions constitutes a separate and distinct act of infringement.  Plaintiffs' claims of

infringement against Cox are timely pursuant to tolling agreements.

114.     The foregoing acts of infringement by Cox have been willful, intentional, and

purposeful, in disregard of Plaintiffs' rights.  Indeed, the sound recordings on Exhibit A and the musical compositions on Exhibit B are works infringed by Cox's subscribers *after* those particular subscribers were identified to Cox in multiple prior infringement notices.

115.    As a direct and proximate result of Cox's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed, or such other amount as may be proper under 17 U.S.C. § 504(c).  Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Cox's profits from the infringements, as will be proven at trial.

116.    Plaintiffs further are entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment from this Court against Cox as follows:

a.  For a declaration that Defendants willfully infringed Plaintiffs' copyrights;

b.  For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Defendants' willful violations of Plaintiffs' rights under the Copyright Act or, in the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 504(b), Plaintiffs' actual damages, including Cox's profits from the infringements, in an amount to be proven at trial;

c.  Pursuant to 17 U.S.C. § 505, awarding Plaintiffs their costs in this action, including their reasonable attorneys' fees;

d.  For pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Defendants; and

e.  For such other and further relief as the Court deems proper.

**JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury of all issues that are so triable.

Dated:  April 8, 2019                                     Respectfully submitted,

                                                          *Scott A. Zebrak*
                                                          Matthew J. Oppenheim (*pro hac pending*)
                                                          Scott A. Zebrak (38729)
                                                          Jeffrey M. Gould (*pro hac pending*)
                                                          OPPENHEIM + ZEBRAK, LLP
                                                          5225 Wisconsin Avenue, NW, Suite 503
                                                          Washington, DC 20015
                                                          Tel:  202-480-2999
                                                          matt@oandzlaw.com
                                                          scott@oandzlaw.com
                                                          jeff@oandzlaw.com

                                                          *Attorneys for Plaintiffs*