Case 1:18-cv-00950-PTG-JFA Document 147-3 Filed 05/15/19 Page 1 of 15 PageID# 3654
Case 1:18-cv-00950-LO-JFA Document 93 Filed 02/01/19 Page 49 of 87 PageID# 2110

49

1  gotten, what you have -- the process that you've taken to
2  search the results from your search terms, and what types of
3  information that have been categoried out of the production.
4  Okay?
5          So that one --
6          MS. GOLINVEAUX:  Your Honor, may I ask one point of
7  clarification?
8          THE COURT:  Okay.
9          MS. GOLINVEAUX:  In what forms do you -- would you
10 anticipate that would take place, that they would provide us
11 with information about the categories?
12         THE COURT:  Informal.  I mean, discussions, letters.
13         MS. GOLINVEAUX:  Oh, letters.  Thank you, Your Honor.
14         THE COURT:  Something like that.  It's not something
15 that I'm going to have them file with the Court at this time.
16 If it becomes the subject of a motion, then we will do it, but
17 after that.  Okay.
18         So I guess now we're to your areas, Mr. Buchanan.
19         MR. BUCHANAN:  Yes, Your Honor.  We're now discussing
20 the defendants' motion to compel documents concerning CAS and
21 the Copyright Alert System, which was established in February
22 of 2013 on 18 companies involved in the copyright industry,
23 including vendors and ISPs, as well as Sony and
24 other defendants -- or other plaintiffs.
25         So there is no real issue about burden here.  It's --

Case 1:18-cv-00950-PTG-JFA Document 147-2 Filed 05/15/19 Page 2 of 15 PageID# 3655
Case 1:18-cv-00950-LO-JFA Document 93 Filed 02/01/19 Page 50 of 87 PageID# 2111

50

1   there is one short paragraph and three declarations that really
2   just says, the discussions and the negotiations went on for a
3   long time.
4          The plaintiffs refuse to produce any documents with
5   regard to CAS. And you just heard from plaintiffs' counsel to
6   suggest that they don't want to search "Cox" and "CAS"
7   together. Suggesting that that's going to produce documents
8   which we think are relevant, as Ms. Golinveaux just pointed
9   out.
10         And they are relevant because throughout the
11  complaint in this matter the plaintiffs assert that the manner
12  by which Cox handled the notices of infringement were
13  unreasonable and arbitrary and a violation of the copyright
14  laws.
15         I can just read you just briefly --
16         THE COURT: Well --
17         MR. BUCHANAN: Well, I won't read.
18         THE COURT: I understand the argument.
19         MR. BUCHANAN: Okay. So they go on and on, paragraph
20  after paragraph, how arbitrary and unreasonable we were in the
21  parameters that we set up, and the notices and the limitations
22  on them.
23         So we know that through CAS all of these entities got
24  together, you know, copyright owners and vendors and ISPs, and
25  they came up with a formula by which it would be acceptable to

Case 1:18-cv-00950-PTG-JFA Document 147-3 Filed 05/15/19 Page 3 of 15 PageID# 3656
Case 1:18-cv-00950-LO-JFA Document 93 Filed 02/01/19 Page 51 of 87 PageID# 2112

51

1  the copyright owners, like the plaintiffs, many of the
2  plaintiffs, and the ISPs.  And they put caps on the number of
3  notices that would be acceptable and whether they needed to
4  terminate or not.  And we believe that they didn't require them
5  to terminate.
6          So the plaintiffs' counsel in their papers suggest
7  that that's meaningless because it's not a legal standard.
8  Well, there is no legal standard.  There is no statute or
9  regulation that states you must accept so many notices in a
10 day, and you must act on them in a certain fashion, and you
11 must accept so many per complainant or subscriber.
12         THE COURT:  Or that you can turn down any notices.  I
13 mean, there is no legal standard that you can only accept a
14 certain amount as opposed to a legal standard that you're not
15 required to accept every copyright notice, every notice of
16 infringement.
17         MR. BUCHANAN:  Right, correct.  So but if the
18 plaintiffs and 18 others in the industry, including most of the
19 ISPs, had an agreement during the time period in question that
20 said, look, accept this amount of notices, and Sony is a big
21 player, they are driving the train, accept 500 a day, that
22 works, and you don't need to terminate, just work with us.
23         Then they come into court and argue for the jury, and
24 it's all through their complaint, 200, 300, 500 was arbitrary,
25 it was unreasonable, they just did it to save money, they are

Case 1:18-cv-00950-PTG-JFA Document 147-3 Filed 05/15/19 Page 4 of 15 PageID# 3657
Case 1:18-cv-00950-LO-JFA Document 93 Filed 02/01/19 Page 52 of 87 PageID# 2115

52

1  totally greedy, and they don't care, and they only pass on so
2  many notices and only terminate so many people.
3             Well, if that's what they're saying is an
4  unreasonable and arbitrary standard and, therefore, we should
5  be hit with a billion dollars in damages involving deterrence
6  because they're saying you need to deter them because they're
7  unreasonable and arbitrary in the way they handled the notices
8  and how many they processed, then we suggest -- we think that
9  these documents are reasonable and that they be produced and
10 they are relevant.
11            And the Court in BMG found the same thing with regard
12 to BMG and Rightscorp.  They found that the plaintiffs in that
13 case needed to produce documents that showed that the
14 plaintiffs may have had different communications and different
15 requirements and treated other ISPs differently than they were
16 treating Cox.  So we already have a prior ruling that is almost
17 directly on point.
18            And this is not burdensome.  It's very limited
19 documents.  We want the master contract, the agreements they
20 had with the other ISPs, maybe eight or ten of them, the
21 communications that led up, and just the documents that just
22 show what's the standard they were utilizing.  Because if they
23 are going to tell them these guys are the outliers, they did it
24 different than anyone else -- because if we did it the same as
25 everyone else and it was acceptable to them, how can it not be

Case 1:18-cv-00950-PTG-JFA Document 147-2 Filed 05/15/19 Page 5 of 15 PageID# 3658
Case 1:18-cv-00950-LO-JFA Document 93 Filed 02/01/19 Page 53 of 87 PageID# 2114

53

1  acceptable in this case?
2       THE COURT: Well, it's --
3       MR. BUCHANAN: They didn't sue any of those people.
4       THE COURT: That doesn't make it right. I mean, two
5  wrongs don't make a right.
6       MR. BUCHANAN: No, it doesn't, but also it suggests
7  that you can't argue to the jury that you're arbitrary and
8  unreasonable when you negotiate and do side deals with all the
9  others where you don't even require them to terminate.
10 Certainly it's relevant at this stage of the case, Your Honor.
11      THE COURT: All right. Let me -- give me an
12 understanding as to -- and it's unclear to me how this worked.
13      Apparently there was a memorandum of understanding
14 and then there may be certain implementation agreements. Are
15 there separate documents, or was there a memorandum of
16 understanding that people would sign on to or not?
17      MR. OPPENHEIM: Here is my understanding, Your Honor.
18 Over the course of many years there was a negotiation with
19 movie studios, record companies, ISPs, and technology companies
20 about creating an entity that would have a couple different
21 components to it, an educational component, and a technology
22 component, and a notice component with respect to copyright
23 infringement.
24      Those entities negotiated for several years, created
25 a corporate entity. That corporate entity was run by

Case 1:18-cv-00950-PTG-JFA Document 147-3 Filed 05/15/19 Page 6 of 15 PageID# 3659
Case 1:18-cv-00950-LO-JFA Document 93 Filed 02/01/19 Page 54 of 87 PageID# 2115

54

1   representatives from all the different industries.  And that
2   entity used vendors to send millions and millions of notices
3   and engage in an education campaign.  All of which, I
4   understand, the details of which are subject to confidentiality
5   agreements to that entity, which has now been dissolved because
6   it doesn't exist anymore.
7           So I presume those confidentiality obligations now
8   exist, you would have to get some kind of approval from each of
9   the different movie studios and other entities involved.
10          So it was a lengthy effort from negotiation to its
11  creation of the entity.  The entity existed for several years,
12  and then there --
13          THE COURT:  From when to when?
14          MR. OPPENHEIM:  I don't have the exact dates, Your
15  Honor.  I am not privy to them as I stand here.  It was several
16  years.
17          THE COURT:  Well, apparently there is some indication
18  of a memorandum of understanding that was signed on July 6,
19  2011, is that --
20          MR. OPPENHEIM:  I think that's right, Your Honor.
21          THE COURT:  Okay.
22          MR. OPPENHEIM:  And then, so it operated for several
23  years and then was dissolved.  And dissolved in 2017.  And the
24  dissolution, I think negotiations went on for quite sometime as
25  well.

Case 1:18-cv-00950-PTG-JFA Document 147-2 Filed 05/15/19 Page 7 of 15 PageID# 3660
Case 1:18-cv-00950-LO-JFA Document 93 Filed 02/01/19 Page 55 of 87 PageID# 2116

55

1            So I think that's an overview.  I think there is --
2    as I understand it, it could, based on the defendants'
3    requests, which again are massively overbroad --
4            THE COURT:  Right, and we're focusing on -- not all
5    documents relating to, not all documents concerning certain
6    things.
7            MR. OPPENHEIM:  So -- okay.  So I have a few more
8    details --
9            THE COURT:  Okay.
10           MR. OPPENHEIM:  -- with the benefit of my colleague.
11   Thank you, Mr. Gould.
12           The negotiations went on between 2009 and 2011.  The
13   program itself existed from 2013 to 2017.  Dissolved in 2017.
14   I know that the negotiations over the dissolution took quite
15   some time as well.
16           But the point here, Your Honor, is -- is Mr. Buchanan
17   made a legal point that's just not right.  He said, there is no
18   legal standard on notices.  And there is a hundred years of
19   case law on what somebody is supposed to when they receive a
20   notice of infringement.  It goes back to -- to cases where, you
21   know, somebody found an entity playing music that they
22   shouldn't, and they sent a cease and desist letter, and then
23   that entity didn't respond.  There is a huge number of cases
24   over a long, long period of time.
25           And in none of those cases do courts say, well, it

Case 1:18-cv-00950-PTG-JFA Document 147-3 Filed 05/15/19 Page 8 of 15 PageID# 3661
Case 1:18-cv-00950-LO-JFA Document 93 Filed 02/01/19 Page 56 of 87 PageID# 2117

56

1  was okay for that bar to continue to play that music because
2  other bars were violating the law and not getting a license,
3  for example.
4         Or for a movie theatre to say -- to say, it was okay
5  for us to show a pirated copy of a movie because other movie
6  theatres did that.  That's the argument that the defendants are
7  making here, that their legal obligation should be measured by
8  a comparison to others.
9         And that's not the law.  And that's not -- we don't
10 say anything about Cox as compared to others in the industry in
11 our complaint.  It is nowhere to be seen, contrary to their
12 statements.
13        Their conduct is measured against the legal standards
14 which are well-known and have been articulated by the Supreme
15 Court.  And those standards don't ask for a comparison to the
16 rest of the industry.
17        So that's number one, Your Honor.
18        Number two, they say that we have not articulated a
19 burden in our documents, and that's not true.  In Wade Leak's
20 declaration from Sony, just by way of example, we have it,
21 there is an entire paragraph about the burden.
22        But you don't even need to look at that declaration
23 to see that.  All you have to do is look at the ridiculous
24 number of requests and the overbreadth of those requests to
25 understand the burden.  I mean, they are moving on things that

Case 1:18-cv-00950-PTG-JFA Document 147-2 Filed 05/15/19 Page 9 of 15 PageID# 3662
Case 1:18-cv-00950-LO-JFA Document 93 Filed 02/01/19 Page 57 of 87 PageID# 2118

57

1   on their face are just ridiculously overbroad and burdensome
2   and certainly not proportional.
3           So, Your Honor, I think you don't need to get to the
4   burden or proportionality issues because I think as a matter of
5   law the legal standards don't look at what others are doing.
6           But if you -- if you want to look at burden and
7   proportionality, it's on its face a ridiculous request. And
8   the idea that they have narrowed it in their papers is, again,
9   not the way this should work.
10          THE COURT: Well, help me understand that. We -- and
11  I am frustrated with this often in dealing with these types of
12  motions.
13          The Court requires the parties to have a good faith
14  consultation in order to try and narrow the issues. So you
15  send out arguably what may be a very broad, sweeping document
16  request. In the scope of those negotiations, the propounding
17  party agrees to narrow it to a certain subset of what was
18  initially requested.
19          As much as the Court would like to be able to look
20  and just say, well, you have got to stand by the document
21  request that you sent out and, you know, I can't order them to
22  produce it, that would ignore the requirement of the parties
23  having to go through a good faith consultation.
24          So, you know, it can't be, well, you know, if that's
25  really what you want, you have got to go back and ask for it

58

1  again.
2           MR. OPPENHEIM:  So I have two responses to that, Your
3  Honor.  One is the way I think it's supposed to work.  Right.
4           First off, you shouldn't issue -- the requests as
5  they were issued were grossly overbroad to begin with.  I mean,
6  we're the plaintiffs in the case.  Cox's conduct is at issue.
7  We issued half the number of document requests that Cox did,
8  just by comparison.
9           THE COURT:  Okay.
10          MR. OPPENHEIM:  So they same at it both fists -- or I
11 should say octopus style, Your Honor.
12          But beyond that, in the meet and confer process, if
13 you're going to narrow, you then memorialize that in writing,
14 have a discussion about that narrowing, and then you move to
15 compel on that narrowed request.  They moved to compel on the
16 underlying request.
17          And they never narrowed in the meet and confers.  We
18 would repeatedly ask them to narrow and they would never
19 concede an inch of territory.
20          Having said that, Your Honor, we're happy to have
21 those meet and confers and we're happy to work on it.  It
22 shouldn't happen in front of the Court, in my view.
23          Now, we were here in December on our motion with
24 respect to notices Cox had received from other ISPs.  And we
25 had a discussion and you said, our request is too broad.  If we

Case 1:18-cv-00950-PTG-JFA Document 147-3 Filed 05/15/19 Page 11 of 15 PageID# 3664
Case 1:18-cv-00950-LO-JFA Document 93 Filed 02/01/19 Page 59 of 87 PageID# 2120

59

1  had issued a request with respect to just the IP addresses at
2  issue in the case, well, then maybe that, you know, would be
3  acceptable.
4          So Your Honor didn't allow us to narrow it, didn't
5  order them.  So we issued new requests.  They still haven't
6  responded to them.
7          THE COURT:  Well, we will deal with those when the
8  time comes.
9          MR. OPPENHEIM:  So anyway, getting back -- somehow we
10 got afield.  I apologize if that was my -- my doing, Your
11 Honor.
12         But with respect to CAS, if we're going to create a
13 whole kind of separate trial on how Cox is compared to the rest
14 of the industry, we are moving -- we are totally changing over
15 100 years of case law here.  There is -- there is -- there are
16 notice cases where they say that you compare to what the rest
17 of the industry was doing.
18         The Supreme Court articulated what the contributory
19 and vicarious standards were in the Grokster case.  And those
20 standards, nowhere in them do they -- do they look to other
21 courts or other -- other players to justify conduct.
22         MR. BUCHANAN:  Your Honor, just briefly.
23         THE COURT:  All right.
24         MR. BUCHANAN:  In terms of the meet and confer, yes,
25 we did issue 13 broad and narrow requests regarding CAS.  And

60

1   the response from the plaintiffs in every meet and confer was
2   you get zero documents on CAS.
3           In terms of that paragraph that was supposed to
4   educate the Court about the burden, I will just read it
5   briefly.  It says:  CAS was a private agreement between 18
6   parties.  30 parties, including all entities, including trade
7   groups, copyrighted holders, ISPs, designed to educate
8   consumers, deter online infringement, and direct consumers to
9   lawful online legitimate sources and content.  Cox did not
10  participate in CAS.
11          There is nothing, the word "burden" --
12          THE COURT:  Sure.  You go to paragraph 24, it talks
13  about everything that you've asked for:  All documents
14  concerning CAS or the copyright system as well as copyright
15  infringement practices of other ISP providers, including all
16  documents concerning a multitude of topics such as, and then
17  they outline those eight topics.
18          And then they go in paragraph 25 and say:  All
19  documents concerning a host of issues.
20          So, I mean, they certainly -- the negotiations
21  spanned years.  Each participating company, 30 parties
22  involved.  I mean, the idea that they don't talk about the
23  burden --
24          MR. BUCHANAN:  Well, they say the length of time.
25  But if you look at what we're asking for, what we're asking for

61

1  is very simple.  It's just the master agreement, the individual
2  agreements, and any correspondence that relates to it.  And
3  that's what we said in the meet and confer.  That's what we
4  want.  It can't be that many documents.
5           We don't want the whole history of every phone call
6  and every e-mail.  What we want is what ultimately happened
7  because in their complaint, as I said before --
8           THE COURT:  All right.
9           MR. BUCHANAN:  -- they constantly say, we're
10 arbitrary, unreasonable in the way we handled complaints and
11 notices.
12          So it is pretty narrow, and we narrowed it in our
13 reply to try to capture and boil down what we thought was
14 ultimately relevant.
15          Thank you, Your Honor.
16          THE COURT:  All right.  Well, I think many of the
17 document requests that were served relating to this are
18 certainly overbroad, unduly burdensome, and I wouldn't require
19 additional responses.
20          The ones that do have some more, I would say,
21 reasonable basis for consideration or narrowing are 167 and 168
22 and 169.  Taking those ones into consideration, I am going to
23 require that the plaintiffs produce a copy of the memorandum of
24 understanding concerning CAS, which I assume is this July 6,
25 2011 memorandum of understanding, their -- if it's in their

Case 1:18-cv-00950-PTG-JFA Document 147-3 Filed 05/15/19 Page 14 of 15 PageID# 3667
Case 1:18-cv-00950-LO-JFA Document 93 Filed 02/01/19 Page 62 of 87 PageID# 2123

62

```
 1  possession, custody, or control.
 2          Any implementation agreements that they may have had
 3  with CAS.  So if the individual plaintiffs had any other
 4  implementation agreements with CAS, they should be provided.
 5          And documents that would be sufficient to show.  And
 6  that is not all documents relating to, but documents sufficient
 7  to show whether they were a signatory or member of this CAS
 8  organization from 2013 and 2014, at any time during that time
 9  period.
10          Yes, sir.
11          MR. OPPENHEIM:  Your Honor, we -- they already have
12  the memorandum of understanding, we provided it.
13          But with respect to the last point you made, whether
14  they were a participant, you are referring to the plaintiff
15  parties, not the defendant -- I'm just trying to understand.
16          THE COURT:  No, I know the defendant wasn't a party
17  to it.  And there are multiple plaintiffs in the case.  So we
18  need -- each plaintiff needs to get on the record as to whether
19  they were or weren't part of this.  Okay.
20          MR. OPPENHEIM:  Understood, Your Honor, we will
21  provide that in the form of an interrogatory type affirmation,
22  be all right, Your Honor?
23          THE COURT:  I think so.  The documents, obviously,
24  you need to -- the implementation agreements and the memorandum
25  of understanding, if there are any implementations.
```

63

```
 1              MR. OPPENHEIM:  I am sorry, Your Honor, just one
 2   logistics issue.  Under -- I believe under the logistics --
 3   excuse me, under the implementation agreement, we have to serve
 4   notice on each of the participants before we can produce it.
 5   So we will go through that process expeditiously, Your Honor.
 6              THE COURT:  Okay.
 7              MR. OPPENHEIM:  I wanted to make the Court aware.
 8              THE COURT:  All right, MarkMonitor.
 9              MR. BUCHANAN:  Your Honor, this is, I think you've
10   acknowledged with some others, is a bit of a moving target.
11              THE COURT:  Have you -- are you doing third-party
12   discovery on MarkMonitor?
13              MR. BUCHANAN:  Yes, Your Honor.
14              THE COURT:  Well, what -- let's focus on what you
15   think you need to get from the plaintiffs versus what you're --
16   and where is that going to take place?  I know you served them
17   on counsel, but where is MarkMonitor actually located?
18              MR. BUCHANAN:  I think they are in California.
19              THE COURT:  California.  So any issues having to do
20   with the scope and production are going to be in California,
21   not here, is that --
22              MR. BUCHANAN:  That's correct, Your Honor.
23              THE COURT:  Okay.
24              MR. BUCHANAN:  So we've narrowed it to sort of four
25   categories.  Documents relating to Cox, the present litigation,
```