```
                                                                    1

                    UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
                         ALEXANDRIA DIVISION

SONY MUSIC ENTERTAINMENT, et al.,.  Civil Action No. 1:18cv950
                                  .
            Plaintiffs,           .
                                  .
      vs.                         .  Alexandria, Virginia
                                  .  May 17, 2019
COX COMMUNICATIONS, INC., et al.,.   10:01 a.m.
                                  .
            Defendants.           .
                                  .
. . . . . . . . . . . . X

                    TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE JOHN F. ANDERSON
                   UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:               SCOTT A. ZEBRAK, ESQ.
                                  Oppenheim + Zebrak, LLP
                                  4530 Wisconsin Avenue, N.W.
                                  5th Floor
                                  Washington, D.C. 20015

FOR DEFENDANTS COX                THOMAS M. BUCHANAN, ESQ.
    COMMUNICATIONS, INC.;         Winston & Strawn LLP
    AND COXCOM, LLC:              1700 K Street, N.W.
                                  Washington, D.C. 20006-3817


TRANSCRIBER:                      ANNELIESE J. THOMSON, RDR, CRR
                                  U.S. District Court, Third Floor
                                  401 Courthouse Square
                                  Alexandria, VA 22314
                                  (703)299-8595




                         (Pages 1 - 18)




(Proceedings recorded by electronic sound recording, transcript
 produced by computerized transcription.)
```

1           P R O C E E D I N G S

2           THE CLERK: Sony Music Entertainment, et al., versus

3  Cox Communications, Inc., et al., Civil Action No. 18cv950.

4           MR. BUCHANAN: Good morning, Your Honor.

5           THE COURT: Good morning.

6           MR. BUCHANAN: Thomas Buchanan on behalf of

7  defendants Cox.

8           THE COURT: Thank you.

9           Mr. Zebrak?

10          MR. ZEBRAK: Good morning, Your Honor.

11          THE COURT: Thank you.

12          Well, Mr. Buchanan, I'll hear from you, but I suggest

13 you just focus anything you want to add to your pleadings as to

14 Lessler -- Lesser and Sheckler. I think I'm comfortable with

15 allowing the depositions as to 30(b)(6) as to RIAA and to

16 MarkMonitor, but the two individuals I need to hear a little

17 bit more about.

18          MR. BUCHANAN: Okay. So Victoria Sheckler, she

19 worked for the RIAA, and during the time period in question,

20 2012, '13, and '14, she negotiated the notice limit on behalf

21 of the RIAA and the plaintiffs with Cox.

22          THE COURT: And she did all that as a corporate

23 representative of RIAA?

24          MR. BUCHANAN: Yeah.

25          THE COURT: None of that was done in her individual

3

1 roles, right?

2 MR. BUCHANAN: Yes.

3 THE COURT: And so -- okay.

4 MR. BUCHANAN: So the, the plaintiffs have pointed
5 out, I think the Court is getting to this point, that they've
6 offered Steve Marks, a corporate representative, to testify to
7 30(b)(6), so they say he will cover this correspondence.

8 THE COURT: And that, that was one of the topics that
9 you laid out in the 30(b)(6) notice, the communications and
10 negotiations or whatever having to do with the limit.

11 MR. BUCHANAN: Yes.

12 THE COURT: Okay.

13 MR. BUCHANAN: Yes, Your Honor. But we feel that
14 since the e-mails came from Ms. Sheckler and she, you know, had
15 discussions beyond the e-mails with our personnel and our
16 people, that she would be a better 30(b)(6).

17 Now, obviously, we can't dictate that, but
18 considering that it wouldn't be that long a deposition, they
19 represent her and RIAA, it would be in D.C. and would be half a
20 day at most, and considering the stakes here, that we're
21 concerned that Mr. Marks, who we've deposed in other cases, you
22 know, he's a good witness, a professional witness, is that
23 we're not going to get the same type of testimony first, he
24 acknowledged, testimony that we would get from Ms. Sheckler.

25 Considering again that they're suing us for a billion

4

1 dollars, we're talking about a witness they represent that
2 would take place at their law firm here in D.C. for a half a
3 day, that that would be a reasonable request of the Court.
4 It's not too much of a burden.
5     Discovery doesn't end until July 2, and then
6 Ms. Lesser we could do almost the same day or the same time.
7 She's also represented by them. And that would also take place
8 in D.C. We think she's an important witness because of her
9 role with the Center for Copyright Information, which
10 established the copyright alert system, which we think is very
11 important as a comparable to what Cox did in terms of the way
12 it reviewed notices and acted on notice of copyright
13 infringement from the plaintiffs in this case.
14     THE COURT: Well, obviously, they, they, they don't
15 believe that the Center for Copyright Information has any
16 bearing on this case. I mean, help me understand where you see
17 that really fitting into the issues that are going to be
18 litigated in the trial of this case.
19     MR. BUCHANAN: Okay. So obviously, we're in
20 discovery at this point --
21     THE COURT: Right.
22     MR. BUCHANAN: -- so, as Your Honor knows --
23     THE COURT: It seems to never end, either, I might
24 add.
25     MR. BUCHANAN: Right. Well, we're getting there, and

5

1   we appreciate the Court continuing it to July 2, but again,
2   this will not be a long deposition, but here's why she's an
3   important witness:  So as you know, the essence of the
4   plaintiffs' case is our copyright review --
5           THE COURT:  Right.
6           MR. BUCHANAN:  -- system, that we didn't -- the first
7   notice that came in, we didn't pass it on.
8           We didn't pass on the next ones, and we had a cap,
9   and it was 600 wasn't enough.
10          I will point out that now that we've analyzed that
11  information, it turns out they never even exceeded the old cap
12  of 450 during the time period in question but six times, even
13  though we gave them 600, and that goes to, back to
14  Ms. Sheckler.  She negotiated that cap.
15          They're making a big issue of that in their expert
16  depositions and their complaint and in their allegations, when
17  it terms out they never even came close to that.  They never
18  adjusted for that.
19          So where Ms. Lesser is important is she establishes
20  this system called CAS, and what they did, the plaintiffs
21  claim, well, it's not relevant because it wasn't legally
22  required.
23          Well, we weren't legally required to give them 600
24  notices or 450 notices on a daily basis.  We weren't legally
25  required to terminate after one, two, or three notices, which

6

1  they're claiming in their damage theory that we should have
2  terminated after the first notice, just terminated the people
3  completely.
4          So what we're showing is, look, what is a comparable
5  here?  What is reasonable in the industry at the time?  So we
6  know what we did.  So what did all the other ISPs do in
7  coordination and agreement with the plaintiffs and the RIAA?
8  They did one notice per complainant a week, every seven days.
9  They terminated no one.
10         So what is the standard here to the jury?  There's no
11 statutory requirement that you terminate after a certain amount
12 or that you accept so many notices in a day or over a week.
13 There's no regulation.  There's no prior case law.  So -- and
14 yet they're saying we should have terminated after one notice
15 56,000 subscribers.
16         THE COURT:  What, what was Cox's relationship with
17 CAS?  I mean --
18         MR. BUCHANAN:  So --
19         THE COURT:  -- my understanding was they were not a
20 part of that.
21         MR. BUCHANAN:  That's right.
22         THE COURT:  Okay.
23         MR. BUCHANAN:  So CAS establishes this graduated
24 response system, which is much more lenient than our CAS
25 system, and so we say we already have a system in place where

1   we go through this process and people drop off along the way.
2          I'll add to you, Your Honor, that under our system,
3   30,000 -- 30 percent, rather, of the people where one notice
4   came in, we've now determined 30 percent never got another
5   notice.  In fact, they never got a notice because we never
6   forwarded the first notice.
7          After the third notice, 75 percent of our subscribers
8   that got notices from RIAA never got another notice.  So the
9   system worked.  When you got to five, you're up into the 80s.
10         THE COURT:  Well, the system worked if you agree that
11  there can be a cap on the number of notices.  I mean, if --
12         MR. BUCHANAN:  Well, we --
13         THE COURT:  But, I mean, that's one of the other
14  issues in this case is if they had thousands of other notices
15  that they couldn't provide you with, that doesn't necessarily
16  mean there wasn't continuing infringement by people who had
17  gotten a single notice.  It's just they got cut off in the
18  number game, right?
19         MR. BUCHANAN:  No.  Well -- no.  So -- well, the way
20  our system worked is when -- the first notice created a ticket,
21  and we didn't forward it, and what the evidence will show and
22  our statistician will show is that, in fact, that was a proper
23  decision business-wise because of those people, 30 percent
24  never got another notice at all.  In other words, it was a
25  mistake, the kid did it, they caught it, it's hard to know.

8

1        THE COURT:  Well, then --

2        MR. BUCHANAN:  So then you get in -- okay.  If you're
3    talking about the caps --

4        THE COURT:  The notice, let, let me make sure I
5    understand what you mean by notice, because notice means what
6    Cox received, right?

7        MR. BUCHANAN:  That's right, from the RIAA, from the
8    plaintiffs.

9        THE COURT:  And so the plaintiffs were limited to the
10   number of notices that they could provide to Cox, right?

11       MR. BUCHANAN:  Six hundred a day.

12       THE COURT:  A day, okay.  So because they were
13   limited with the number of notices that they could provide to
14   Cox per day, that doesn't mean there wasn't continuing
15   infringement by a customer of yours.  It's just you didn't have
16   any notice of it, right?

17       MR. BUCHANAN:  So we've analyzed their notices, and
18   during the time period in question, they, they rarely, if ever,
19   reached the 600 notices.  It was only by mistake.

20       Six times over the two-year period, they exceeded the
21   450 limit in a day by a couple.  That's because even though it
22   was like 7 cents a notice, for some reason, they maintained the
23   old cap.  So when you say, well, wait a second, they could have
24   been going to 650, 700, that never happened.

25       Would it have happened?  I don't know.  It did not

1 happen because they never bothered to adjust the system.

2 And, and so the same 600 cap -- the cap with the
3 other is relevant with CAS because I think it was the same for
4 the five others ISPs.  The difference is we allowed one per day
5 per complainant, per subscriber.  They under CAS was one a
6 week.  Every seven days, you only -- the individual subscriber
7 of the five other ISPs could get one notice a week.  So -- and
8 they did not terminate them ever, no termination requirement.

9 Well, the plaintiffs will say, well, this was just an
10 educational operation, that's all it was, but if you read the
11 agreement, you read their web page, this was a serious attempt
12 by the other ISPs -- Comcast, AT&T, Verizon, Cablevision, Time
13 Warner -- to work with the plaintiffs in this case and their
14 representative, RIAA, and that's where we get into CAS and the
15 CCI, that's why it's relevant, and that's what our experts are
16 going to testify.

17 Because their experts are saying this is ridiculous.
18 They should have terminated after one or two.  They should have
19 had a higher cap.  They should have invested more resources,
20 more computers, more people, and they should have terminated
21 more.  Yet these same entities negotiated a whole different
22 system which is much more lenient.

23 So what do you compare it to to the jury?  Is there a
24 statute?  Is there a jury instruction based on a regulation and
25 some cases?  No.

1	Here's what they did with everybody else. We
2	employed a much more rigorous, tougher system, and I think we
3	should be able to pursue this.
4	Now, at the end of the day, Judge O'Grady can say no,
5	but in that case, before we tried to get this evidence in in
6	the *BMG* case but because we had not developed it during
7	discovery, we tried to just put an expert up without ever
8	developing the facts, it was denied. It was never found to be
9	not relevant but just never developed to give the plaintiffs in
10	that case an opportunity to, to explore our theory.
11	THE COURT: Well, I guess you probably need to
12	address if this was such an important part of your defense in
13	this case and was so significant, why is it that it wasn't one
14	of the five that you necessarily would have been able to take
15	without leave of Court? I mean --
16	MR. BUCHANAN: Well --
17	THE COURT: You get five nonparty, nonexpert
18	depositions. You've already taken four. We've already talked
19	about my inclination to let you take two more. So that's one
20	over the element already.
21	MR. BUCHANAN: Right.
22	THE COURT: So if this person or this entity, but
23	you're going to depose this person in their personal capacities
24	if the entity isn't around anymore, why, oh, and this one a
25	little bit earlier in the game, so to speak?

11

1  MR. BUCHANAN: Well, that's a fair point, and, and
2 it's sort of a moving target. So what we tried to negotiate
3 with the plaintiffs is you've read about the Harbor Labs
4 consulting company.
5  THE COURT: Right.
6  MR. BUCHANAN: And, and that was, that was beyond
7 difficult. The general counsel of Harbor Labs was telling the
8 two scientists, the doctors, that they were going to violate
9 their NDA if they talked to us. So we had to go back and
10 forth.
11  And so, you know, that should just be one in our view
12 because they hid the ball -- not the plaintiffs but the Harbor
13 Labs. They were very difficult.
14  MarkMonitor, we're still litigating to try and depose
15 them. They fought every subpoena for documents. They're
16 fighting our ability to depose people. They say they're in
17 Europe. And it has been extremely difficult.
18  So they are a key witness in the case. You would
19 think the plaintiffs, who have total access to them, would, you
20 know, not cause them to resist us to the point we can make an
21 argument that if we can't get to them, you shouldn't be able to
22 use them.
23  And then Audible Magic. They were not identified by
24 the plaintiffs in their initial disclosure. They, they
25 disclosed two entities. They disclosed MarkMonitor and RIAA.

1  Audible Magic, it turns out, is half of the competition of the
2  technology they used to identify their infringement.  They
3  can't prove their case without Audible Magic.
4          And they told this Court that we should have known
5  about this on February 22, when they provided us with an Excel
6  spreadsheet with thousands of data entries in 11 columns and in
7  the lower case on one of the lower columns, there's this little
8  Audible Magic, you know, as a header, that we were supposed to
9  look at that and figure out we needed to depose Audible Magic.
10         They can't prove their case without Audible Magic.
11 They should have identified them in their initial disclosures.
12         So if, if the Court is going to say you're only going
13 to get seven, obviously, we would prefer to do Lesser, then
14 Sheckler.  So -- if that's what we have to do.  But, you know,
15 it is a big case, and, you know, as you know, this -- the five
16 limit, I think, is something maybe Judge Bryan came up with a
17 long time ago and is something I don't think is a hard limit in
18 every case.  I think you come to the Court and you, and you
19 make an argument that in certain cases, the size of the case,
20 the complexity, there should be some leniency there.  And these
21 are only half-day depositions, and the stakes are enormous, and
22 we are in discovery.
23         So, Your Honor --
24         THE COURT:  Okay.  Thank you.
25         MR. BUCHANAN:  -- I appreciate your consideration.

1                THE COURT:  Let me hear from you on the Lesser
2    deposition.  I think I'm comfortable in ruling on Sheckler
3    without -- I'm comfortable ruling on Sheckler without hearing
4    any more argument from you, but I do want to hear --
5                MR. ZEBRAK:  Okay.
6                THE COURT:  -- argument from you on Lesser, that
7    deposition.
8                MR. ZEBRAK:  Yes, Your Honor.  So I won't, I won't
9    focus on Ms. Sheckler or the RIAA, but to begin with, both in
10   their briefing and now in the oral argument, there are just so
11   many flat-out incorrect statements about what our positions are
12   and what's occurred during the course of discovery.
13               And, you know, to begin with, Cox's counsel just says
14   the plaintiffs at least should not cause MarkMonitor to resist.
15   MarkMonitor's its own third party and --
16               THE COURT:  Well, let's just talk about whether
17   Lesser should be deposed or not.
18               MR. ZEBRAK:  Okay.  I just, I just don't want a
19   transcript where things are said and, you know, the
20   implications arise from it.
21               THE COURT:  Okay.  You're not admitting any
22   statements that Mr. Buchanan said.
23               MR. ZEBRAK:  Well, okay.  Because another court
24   criticized their approach on that in several ways.
25               So first of all, there's a couple reasons why we've

1 opposed -- I mean, first of all, we tried to work with Cox and
2 said we're fine to stipulate, with the Court's permission, to
3 one above the limit.
4     Let me first explain the prejudice to us in the
5 overall landscape of where we stand in the case and sort of
6 what wakes me up at night, which is that currently, there's 31
7 business days left in discovery as extended, and by my count --
8     THE COURT: And there are no more.
9     MR. ZEBRAK: Right.
10     THE COURT: I've made it clear that, that is --
11     MR. ZEBRAK: Right.
12     THE COURT: That's it.
13     MR. ZEBRAK: Understood that. It was not, it was not
14 a light, a light request from the parties to do that, but
15 within that calendar period already, and this isn't exact
16 because a couple depositions aren't necessarily noticed, by my
17 count, there's 28 depositions left in 31 calendar days, and
18 that includes 9 experts, and expert reports, reply reports
19 still have to happen and pretrial preparation and high school
20 graduations. I mean, there's a lot going on, you know?
21     And, you know, Mr. Buchanan mentioned Mr. Marks is a
22 professional witness, which he's not. The professional
23 witnesses are the five experts they dropped on us yesterday,
24 with reports about this thick. So there's a lot going on.
25     And this notion that there's no burden is, is kind of

1    an empty statement.  There is burden.  Witnesses need to get
2    ready for a deposition and be deposed, and counsel needs to be
3    involved.
4             As far as the relevance and why they're looking to
5    Ms. Lesser, two things on that.  First of all, we believe that
6    the Court not look at the request in isolation, but in the
7    larger landscape of what still needs to happen in discovery and
8    how they've chosen to use their depositions thus far, but with
9    respect to CCI, which is the entity that Ms. Lesser worked for
10   and which no longer exists, the arguments you just heard
11   highlight why this deposition is inappropriate.
12            Mr. Buchanan mentioned that the CAS, that Cox wishes
13   to look to as a comparable as to Cox's obligations.  It's
14   apples to oranges.  It's, in fact, to use another quote I heard
15   somewhere, it's apples to penguins; it's that far off.
16            The, the CAS was an experiment between certain
17   content holders and ISPs.  It was an education project.  It by
18   definition did not define the scope of the ISPs' legal
19   obligations.
20            Mr. Buchanan mentioned that, that the plaintiffs
21   believe CAS is irrelevant because it wasn't legally required.
22   That's not the reason it's irrelevant.  The reason it's
23   irrelevant is it was an education program.  It explicitly says
24   it's not a statement of your legal obligations under the law.
25            Whatever obligations they do or don't have to

1    terminate under the law, that's Cox's obligations.  You know,
2    they have the same legal obligations under the law, and that's
3    ultimately what a jury is going to adjudicate liability under.
4          What Cox wants to do is, is say that's a statement of
5    an ISP's legal obligations, and we're not infringers as a
6    result, and it -- one has nothing to do with the other, and
7    this discovery is, is really all aimed to deflect about their
8    own conduct.
9          As you heard, they're going to have their experts
10   come in -- and first of all, our experts haven't opined that
11   Cox ought to terminate after one notice.  I don't know where
12   this comes from.  It, it can't be a justification for a
13   deposition of Jill Lesser.
14         This is an education program, and what Cox wants to
15   do is make this false comparison to confuse and mislead a jury,
16   and ultimately, I have no doubt this will be the subject of a
17   motion in limine because they've, they've managed to squeak in
18   and spend a lot of their deposition time with others on this,
19   but the notion of now adding in yet another deposition that's
20   wholly irrelevant is, is something that we just think is a
21   bridge too far.
22         THE COURT:  All right.  Well, thank you.  I
23   appreciate the arguments.  I, you know, as I indicated, I think
24   the 30(b)(6) of RIAA and the deposition of MarkMonitor are
25   certainly appropriate.  I think given what I've heard here

```
 1  today and have read in the briefs, I also think allowing
 2  Ms. Lesser to be deposed is appropriate.
 3          Sheckler, on the other hand, you know, I think
 4  anything that she did she would have done as a corporate
 5  representative of RIAA.  The 30(b)(6) notice covers those
 6  particular topics, and I really don't see there being good
 7  cause to extend the number of depositions to allow the person
 8  wanting to take the deposition to designate who should be the
 9  30(b)(6) designee, which is, in essence, what they're trying to
10  do.
11          So I'm going to grant the motion in part.  I'm going
12  to allow the RIAA, MarkMonitor, and Lesser depositions but not
13  allow Ms. Sheckler to be deposed, okay?
14          One other thing.  You filed a motion that you noticed
15  for June 7.  I don't know, have you-all had a chance to look at
16  that yet -- this is the motion to amend the exhibits to the
17  amended complaint -- yet?
18          MR. BUCHANAN:  Your Honor, I, I do not believe that's
19  going to be an issue, and I think we just haven't had a chance
20  to look at the content.
21          THE COURT:  Okay.  The only reason I -- I'm committed
22  to do a program down in Georgetown that morning.  If I end up
23  needing to have an argument, which I certainly hope I don't
24  need to do, I'm just alerting you it's either going to be on
25  Thursday afternoon or Friday -- the Thursday afternoon before
```

1 or the Friday, late that Friday afternoon. So I just wanted to
2 alert you to that, but hopefully, I won't need to see you in
3 either of those times, okay?
4     MR. BUCHANAN: I don't think so, thanks.
5     THE COURT: Okay. Thank you.
6     MR. ZEBRAK: Thank you, Your Honor.
7     (Which were all the proceedings
8     had at this time.)
9
10     CERTIFICATE OF THE TRANSCRIBER
11   I certify that the foregoing is a correct transcript from
12 the official electronic sound recording of the proceedings in
13 the above-entitled matter.
14
15                             /s/
16                           Anneliese J. Thomson
17
18
19
20
21
22
23
24
25