# Exhibit 3

    
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 24

1      A.    I believe so.  Senior research scientist

2   or something like that.  It was made up.

3      Q.    Did Dr. Nielson also assist Dr. Rubin

4   with expert reports?

5      A.    Correct.

6      Q.    Did he have any expertise that was

7   different from yours?

8           MR. GOULD:  Objection.  Foundation.

9           THE WITNESS:  Yes.

10   BY MS. LEIDEN:

11      Q.    What was his expertise?

12           MR. GOULD:  Same objection.

13           THE WITNESS:  His expertise is in -- his

14   Ph.D. research was in BitTorrent network protocols

15   and the behavior of social con- -- constructs that

16   arise in those situations and in networking in

17   general and in security, so he -- he had worked in

18   numerous security contexts before that.

19   BY MS. LEIDEN:

20      Q.    Did you ever work directly with

21   Dr. Nielson on any of the expert reports that you

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 25

1    mentioned?

2        A.   Yes.

3        Q.   What -- how did that relationship work?

4        A.   For particularly large cases, there was

5    enough for two people to work independently on

6    different code reviews and different parts of the

7    report.  It wasn't typical for us to work together,

8    but occasionally it did happen.

9        Q.   And you -- I believe you said that prior

10   to Harbor Labs, you had also worked at Google?

11       A.   Correct.

12       Q.   And what was your position there, if you

13   remember?

14       A.   By the time I left, it was senior

15   software engineer, and I had been a tech lead two

16   times as well.

17       Q.   And what precipitated the termination of

18   your employment from Harbor Labs?

19       A.   Better pay and health insurance

20   elsewhere.

21       Q.   Any other reason?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 41

1              MR. GOULD:  Objection.  Foundation.

2              THE WITNESS:  I think there are numerous

3     ways you could measure such things.  Most of them

4     would be in retrospect, after an investigation is

5     conducted by humans instead of the system, and it

6     is determined that this person was not assigned the

7     particular IP address or some other thing that the

8     system found was a destination for a download, for

9     example.  There are several other things that could

10    be done, but that's one example.

11    BY MS. LEIDEN:

12       Q.   And is it your recollection that the

13    Stroz report did not measure false positives?

14       A.   That is my recollection, yes.

15       Q.   And then, finally, on -- on the bottom of

16    that first page of that same document, do you see

17    that there's three -- a three-stage engagement

18    set -- set out at the bottom?

19       A.   Yes, I see.

20       Q.   Were you involved in coming up with those

21    three stages of the engagement?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 42

1      A.   I don't remember being directly involved
2   in this.  We may have had some brainstorming
3   sessions.
4      Q.   Is it fair to say that Dr. Nielson was
5   the primary drafter of this document?
6           MR. GOULD:  Objection.  Foundation.
7           THE WITNESS:  That fits my recollection,
8   and the authorship is listed on the document.
9   BY MS. LEIDEN:
10     Q.   You can set that aside.  Thank you.
11          Dr. Monson, were you involved in putting
12  together the consulting agreement between the
13  Center for Copyright Information and Harbor Labs?
14     A.   I don't remember.  I probably had
15  conversations about it leading up to it, but I
16  don't remember if I was involved any more deeply
17  than that.  It was not typical for me to be
18  involved in that.
19     Q.   Typically, who at Harbor Labs would be
20  involved in putting together a consulting
21  agreement?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 47

1      Q.   So, just to close that loop, do you

2  recall having any conversations, even if you don't

3  remember their -- their names, with individuals

4  associated with the Center for Copyright

5  Information about the project?

6           MR. GOULD:  Objection.  Foundation.

7           THE WITNESS:  Again, if -- if the people

8  we spoke to were associated with the Center for

9  Copyright Information directly, we -- I do not

10  remember, but they were associated with the

11  MarkMonitor system.

12           MS. LEIDEN:  I'm going to mark this as

13  Defendants' Monson 3.

14           (Whereupon, Defendants' Monson Deposition

15  Exhibit 3, Evaluation of the MarkMonitor AntiPiracy

16  System, marked for identification.)

17  BY MS. LEIDEN:

18      Q.   This is a document titled, Evaluation of

19  the MarkMonitor Antipiracy System.  It has Bates

20  number RIAA_127758.

21           Dr. Monson, feel free to take a few

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 48

1    minutes and look through this document, and then

2    I'll probably ask you if you recognize it.

3              (Whereupon, there was a pause for

4    document examination.)

5    BY MS. LEIDEN:

6         Q.   Did you have a chance to -- to look

7    through it?

8         A.   Yes.   Thank you.

9         Q.   And do you recognize this document?

10        A.   I do.

11        Q.   What -- what is this document?

12        A.    This is either the report provided by

13   Harbor Labs to -- it looks like it's to CCI, or a

14   draft thereof.

15        Q.   And looking through it today, do you have

16   any reason to believe that it's not the final

17   version?

18        A.   Some of the language is a little bit

19   stronger than I recall the final report having, but

20   my recollection is pretty old, so --

21        Q.   And what -- did you have an involvement

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 49

1    in drafting this document?

2        A.    Yes.

3        Q.    And what was your involvement?

4        A.    Mostly the -- the non-security-related

5    sections, the sections on testing, and

6    infrastructure, and resiliency, reliability, and

7    anything to do with machine-running metrics, like

8    high recall and high precision was mine.

9        Q.    So, you were the primary drafter of the

10   sections that you just listed, including testing,

11   infrastructure.  Was design another one of those

12   sections?

13       A.    Design of system.

14       Q.    On page --

15       A.    This was a collaborative document.  I do

16   not recall exactly who wrote what word, but I was

17   the final proofer of it and drafted the -- I don't

18   about -- remember about the design section.  That

19   was probably a collaborative effort.

20       Q.    And in addition to drafting and proofing

21   at least sections of this report, were you involved

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 50

1    in the underlying analysis of the MarkMonitor

2    system?

3        A.    Yes.

4        Q.    And what was your involvement?

5        A.    Well, it would be saying a bit much to

6    say we analyzed the system.  We did not have access

7    to the system.  What we analyzed was what was

8    represented to us about the system.

9        Q.    And in that vein, looking on the -- the

10   first page on the bottom there, do you see the

11   section that says, Materials Relied Upon?

12       A.    Yes.

13       Q.    Okay.  And the first bullet point says,

14   The Memorandum of Understanding; do you see that?

15       A.    Yes, I do.

16       Q.    Do you know what the Memorandum of

17   Understanding was?

18       A.    I have no recollection of that.

19       Q.    Okay.

20             MS. LEIDEN:  I'm going to mark as Exhibit

21   Defendants' Monson 4.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 103

1   percentage of the data be downloaded.  In addition

2   to these, an agent should be subjected to a test

3   where it receives a full piece, but not enough of

4   the download and a test where it receives enough of

5   the download, but never a full and complete piece.

6   In both of these cases, such tests would verify

7   that the agent cannot generate an infringement

8   report; do you see that?

9       A.   Yes.

10      Q.   Do you know what this refers to as a -- a

11  BitTorrent piece?

12      A.   That's a term of art with which

13  Dr. Nielson would be much more familiar than me.

14      Q.   Generally speaking, is this

15  recommendation that if additional testing were

16  done, there would be increased confidence that

17  enough of the BitTorrent file was being downloaded?

18          MR. GOULD:  Objection.

19          THE WITNESS:  I really didn't hear the

20  first part of the question.  I was thinking about

21  something else.  I apologize.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 71

1  be a lack of false positives?

2      A.    Yeah, as defined previously where that

3  means people are not accused wrongly of copyright

4  infringement.

5      Q.    Okay.  And your conclusion here was that

6  the only measure of precision, as we just defined,

7  in the MarkMonitor system was a lack of appeals,

8  successful appeals, excuse me, by users who

9  had -- had been identified as infringing?

10          MR. GOULD:  Objection.  Form.  The

11  document speaks for itself.

12          THE WITNESS:  I -- yes.  As -- yeah.

13  BY MS. LEIDEN:

14      Q.    And going to the next page of the --

15  of -- of the MarkMonitor report in front of you

16  there, the next page is titled, Security; do you

17  see that?

18      A.    Yes.

19      Q.    And remind me, was -- was that the

20  section that you said that you had or had not had

21  involvement in drafting?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 72

1      A.   I had involvement in drafting all of the

2   sections, but this would have been Dr. Nielson's

3   purview.

4      Q.   Okay.  If you want to turn the page,

5   there's a -- the next section on the page, on the

6   bottom right, which is 127763, --

7      A.   Um-hum.

8      Q.   -- there's a section titled, Reliability;

9   do you see that?

10      A.   Yes.

11      Q.   Okay.  And can you read that first

12   paragraph under Reliability?

13      A.   Sure.

14           THE WITNESS:  Was that slow enough last

15   time?  Okay.

16           While the design of the MarkMonitor

17   identification system is apparently precise under

18   stated assumptions, the practical accuracy of the

19   system is determined by the reliability of the

20   software, which can affect the validity of those

21   assumptions.  System reliability typically has many

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 112

1     Q.    Sure.

2     A.    -- have no reason to disbelieve.  This

3   mechanism is subject to human error and, in

4   worst-case scenario, tampering by a compromised

5   employee.

6     Q.    And what -- what -- what do you mean

7   there by tampering?

8     A.    Any time a human enters data into a

9   system, that human has a choice and can enter

10  accurate data or inaccurate data according to their

11  understanding.

12    Q.    And one of the recommendations -- sorry.

13  Excuse me.  Strike that.

14          Was one of the recommendations to

15  MarkMonitor that they convert that verification

16  into a more automated system rather than a manual

17  system?

18          MR. GOULD:  Objection.

19          THE WITNESS:  I think it would be more

20  accurate to say that it was suggested that certain

21  cryptographic techniques be applied to parts of the

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 113

1   system.  I do not recall whether automation was

2   specifically part of the recommendation.

3   BY MS. LEIDEN:

4       Q.   And can you describe what those

5   cryptographic techniques might be?

6       A.   I could if I were Dr. Nielson.

7   I -- that -- that is much more his field than mine.

8   I have some expertise in the area, but it is

9   expertise I have acquired since this time.  And so

10  I'm not fully confident that I could tell you

11  precisely what was meant at the time this was

12  written.

13      Q.   Understood.  And those -- those

14  cryptographic techniques, generally would the

15  purpose of those techniques be to reduce the

16  instance of human error?

17          MR. GOULD:  Objection.

18          THE WITNESS:  Digital signatures, which

19  are here listed, would be used to make tampering

20  evident as the primary use case for those in this

21  context, I believe.