Exhibit 19

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

SONY MUSIC ENTERTAINMENT, *et al.*,

*Plaintiffs*,

v.

COX COMMUNICATIONS, INC., *et al.*,

*Defendants*.

Case No. 1:18-cv-00950-LO-JFA

## ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO COMPLAINT[1]

## ANSWER

Defendants Cox Communications, Inc., and CoxCom, LLC (collectively, "Cox" or "Defendants"), by and through their counsel, hereby answer the Complaint ("Complaint") of Plaintiffs Sony Music Entertainment, Arista Music, Arista Records LLC, LaFace Records LLC, Provident Label Group, LLC, Sony Music Entertainment US Latin, Volcano Entertainment III, LLC, Zomba Recordings LLC, Sony/ATV Music Publishing LLC, EMI Al Gallico Music Corp., EMI Algee Music Corp., EMI April Music Inc., EMI Blackwood Music Inc., Colgems-EMI Music Inc., EMI Consortium Music Publishing Inc. d/b/a EMI Full Keel Music, EMI Consortium Songs, Inc., individually and d/b/a EMI Longitude Music, EMI Feist Catalog Inc., EMI Miller Catalog Inc., EMI Mills Music, Inc., EMI Unart Catalog Inc., EMI U Catalog Inc., Jobete Music Co. Inc., Stone Agate Music, Screen Gems-EMI Music Inc., Stone Diamond Music Corp., Atlantic Recording Corporation, Bad Boy Records LLC, Elektra Entertainment Group Inc., Fueled By Ramen LLC, Nonesuch Records Inc., Roadrunner Records, Inc., Warner Bros. Records Inc.,

---

[1] Defendants file this Answer concurrently with moving to transfer venue to the Northern District of Georgia pursuant to 28 U.S.C. § 1404. Nothing in this Answer is intended to waive Defendants' position that this case should be transferred for the convenience of the parties and witnesses, and in the interests of justice.

Warner/Chappell Music, Inc., Warner-Tamerlane Publishing Corp., WB Music Corp., W.B.M. Music Corp., Unichappell Music Inc., Rightsong Music Inc., Cotillion Music, Inc., Intersong U.S.A., Inc., UMG Recordings, Inc., Capitol Records, LLC, Universal Music Corp., Universal Music – MGB NA LLC, Universal Music Publishing Inc., Universal Music Publishing AB, Universal Music Publishing Limited, Universal Music Publishing MGB Limited, Universal Music – Z Tunes LLC, Universal/Island Music Limited, Universal/MCA Music Publishing Pty. Limited, Universal – Polygram International Tunes, Inc., Universal – Songs of Polygram International, Inc., Universal Polygram International Publishing, Inc., Music Corporation of America, Inc. d/b/a Universal Music Corp., Polygram Publishing, Inc., Rondor Music International, Inc., and Songs of Universal, Inc., (collectively, "Plaintiffs") as follows:

## NATURE OF CASE[2]

1.      Plaintiffs are record companies that produce, manufacture, distribute, sell, and license commercial sound recordings, and music publishers that acquire, license, and otherwise exploit musical compositions, both in the United States and internationally. Through their enormous investments of not only money, but also time and exceptional creative efforts, Plaintiffs and their representative recording artists and songwriters have developed and marketed the world's most famous and popular music. Plaintiffs own or control exclusive rights to the copyrights to some of the most famous sound recordings performed by classic artists and contemporary superstars, as well as the copyrights to large catalogs of iconic musical compositions and modern hit songs. Their investments and creative efforts have shaped the musical landscape as we know it, both in the United States and around the world.

---

[2] For the Court's convenience, Defendants reproduce the headings from Plaintiffs' Complaint. Defendants do not thereby concede, affirm, or otherwise adopt any of those headings.

<u>Answer</u>:   Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 1 of the Complaint and on that basis deny those allegations.

2.      Cox is one of the largest Internet service providers ("ISPs") in the country. It markets and sells high-speed Internet services to consumers nationwide. Through the provision of those services, however, Cox also has knowingly contributed to, and reaped substantial profits from, massive copyright infringement committed by thousands of its subscribers, causing great harm to Plaintiffs, their recording artists and songwriters, and others whose livelihoods depend upon the lawful acquisition of music. Cox's contribution to its subscribers' infringement is both willful and extensive, and renders Cox equally liable. Indeed, for years, Cox deliberately refused to take reasonable measures to curb its customers from using its Internet services to infringe on others' copyrights—even once Cox became aware of *particular customers* engaging in *specific, repeated acts* of infringement. Plaintiffs' representatives (as well as others) sent hundreds of thousands of statutory infringement notices to Cox, under penalty of perjury, advising Cox of its subscribers' blatant and systematic use of Cox's Internet service to illegally download, copy, and distribute Plaintiffs' copyrighted music through BitTorrent and other online file-sharing services. Rather than working with Plaintiffs to curb this massive infringement, Cox unilaterally imposed an arbitrary cap on the number of infringement notices it would accept from copyright holders, thereby willfully blinding itself to any of its subscribers' infringements that exceeded its "cap."

<u>Answer</u>:   Defendants admit that CoxCom, LLC operates as an Internet service provider, with support from Cox Communications, Inc., and that they market and sell high-speed Internet services to consumers.  Defendants lack knowledge or information sufficient to admit or deny that Plaintiffs' representatives (as well as others) sent hundreds of thousands of statutory infringement

notices to Cox, and on that basis deny those allegations. Defendants deny the remaining allegations of Paragraph 2 of the Complaint.

3. Cox also claimed to have implemented a "thirteen-strike policy" before terminating service of repeat infringers but, in actuality, Cox never permanently terminated any subscribers. Instead, it lobbed "soft terminations" with virtually automatic reinstatement, or it simply did nothing at all. The reason for this is simple: rather than stop its subscribers' unlawful activity, Cox prioritized its own profits over its legal obligations. Cox's profits increased dramatically as a result of the massive infringement that it facilitated, yet Cox publicly told copyright holders that it needed to reduce the number of staff it had dedicated to anti-piracy for budget reasons.

Answer:  Defendants deny the allegations of Paragraph 3 of the Complaint.

4. Congress created a safe harbor in the Digital Millennium Copyright Act ("DMCA") that limits the liability of ISPs for copyright infringement when their involvement is limited to, among other things, "transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(a). To benefit from the DMCA safe harbor, however, along with meeting other preconditions, an ISP must demonstrate that it "has adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers . . . who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

Answer:  Defendants admit that Paragraph 4 accurately quotes portions of 17 U.S.C. §§ 512(a) and 512(i)(1)(A).  Paragraph 4 does not otherwise contain factual allegations to which Defendants are obligated to admit or deny.

5. Cox's "thirteen-strike policy" has already been revealed to be a sham, and its ineligibility for the DMCA safe harbor—for the period of (at least) February 2012 through

4

November 2014—has been fully and finally adjudicated by this Court and affirmed by the Court of Appeals for the Fourth Circuit. In a related case, *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc. and CoxCom, LLC*, 149 F. Supp. 3d 634, 662 (E.D. Va. 2015), *aff'd in relevant part*, 881 F.3d 293 (4th Cir. 2018) ("*BMG Rights*"), this Court established, as a matter of law, that Cox could not invoke the DMCA safe harbor to limit its liability. *Id.* at 655-662.

Answer:  Defendants admit that they were defendants in *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc. and CoxCom, LLC*.  Defendants deny the allegations of Paragraph 5 of the Complaint that reflect Plaintiffs' characterization of the court opinions on the basis that the opinions of this Court and the Fourth Circuit Court of Appeals speak for themselves.  Defendants deny the remaining allegations of Paragraph 5 of the Complaint.

6.      Specifically, the Court concluded:

> Cox did not implement its repeat infringer policy. Instead, Cox publicly purported to comply with its policy, while privately disparaging and intentionally circumventing the DMCA's requirements. Cox employees followed an unwritten policy put in place by senior members of Cox's abuse group by which accounts used to repeatedly infringe copyrights would be nominally terminated, only to be reactivated upon request. Once these accounts were reactivated, customers were given clean slates, meaning the next notice of infringement Cox received linked to those accounts would be considered the first in Cox's graduated response procedure.

*Id.* at 655. The Court further found that starting in September 2012, Cox abandoned its tacit policy of temporarily suspending and reactivating repeat infringers' accounts, and instead stopped terminating accounts altogether. *Id.* at 655-58.

Answer:  Defendants admit that Paragraph 6 includes accurate quotes from the Court's summary judgment opinion in *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc. and CoxCom, LLC*, with the exception of Plaintiffs' apparent correction of a typographical error in the Court's

opinion. Defendants deny the allegations of Paragraph 6 of the Complaint that reflect Plaintiffs'

characterization of the Court's opinion on the basis that the opinion of this Court speaks for itself.

7. The Fourth Circuit affirmed this Court's holding, explaining that although "Cox

formally adopted a repeat infringer 'policy,' . . . both before and after September 2012, [Cox] made

every effort to avoid reasonably implementing that policy. Indeed, in carrying out its thirteen-strike

process, Cox very clearly determined *not* to terminate subscribers who in fact repeatedly violated

the policy." 881 F.3d at 303. The former head of Cox's Abuse Group, Jason Zabek, summed up

Cox's sentiment toward its DMCA obligations best in an email exclaiming: "f the dmca!!!"

Unsurprisingly, the Fourth Circuit affirmed this Court's ruling, holding that "Cox failed to qualify

for the DMCA safe harbor because it failed to implement its policy in any consistent or meaningful

way—leaving it essentially with no policy." *Id.* at 305. The *BMG Rights* decision that Cox is

ineligible for the DMCA safe harbor from at least February 2012 through November 2014 controls

here.

Answer: Defendants admit that the first, second and fourth sentences of Paragraph 7

include accurate quotes from the Fourth Circuit's summary judgment opinion in *BMG Rights*

*Mgmt. (US) LLC v. Cox Commc'ns, Inc. and CoxCom, LLC.* Defendants deny the remaining

allegations of Paragraph 7 of the Complaint that reflect Plaintiffs' characterization of the Fourth

Circuit's opinion on the basis that the opinion of the Fourth Circuit speaks for itself. Defendants

deny the remaining allegations of Paragraph 7 of the Complaint.

8. It is well-established law that a party may not assist someone it knows is engaging

in copyright infringement. Further, when a party has a direct financial interest in the infringing

activity, and the right and practical ability to stop or limit it, that party must act. Ignoring those

basic responsibilities, Cox deliberately turned a blind eye to its subscribers' infringement. Cox

failed to terminate or otherwise take meaningful action against the accounts of repeat infringers whose identities were known. It also blocked infringement notices for countless others. Despite its professed commitment to take action against repeat offenders, Cox routinely thumbed its nose at Plaintiffs by continuing to provide service to individuals it knew to be serially infringing copyrighted works and refusing to even receive notice of any infringements above an arbitrary cap. In reality, Cox operated its service as an attractive tool, and as a safe haven, for infringement.

<u>Answer</u>:  The first two sentences of Paragraph 8 of the Complaint constitute Plaintiffs' characterization of copyright law and legal conclusions to which Defendants are not obligated to respond.  Defendants deny the remaining allegations of Paragraph 8 of the Complaint.

9.      Cox has derived an obvious and direct financial benefit from its customers' infringement. The unlimited ability to download and distribute Plaintiffs' works through Cox's service has served as a draw for Cox to attract, retain, and charge higher fees to subscribers. Moreover, by failing to terminate the accounts of specific recidivist infringers known to Cox, Cox obtained a direct financial benefit from its subscribers' infringing activity in the form of illicit revenue that it would not have received had it shut down those accounts. Indeed, Cox affirmatively decided not to terminate infringers because it wanted to maintain the revenue that would come from their accounts.

<u>Answer</u>:  Defendants deny the allegations of Paragraph 9 of the Complaint.

10.      The infringing activity of Cox's subscribers that is the subject of Plaintiffs' claims, and for which Cox is secondarily liable, occurred *after* Cox received multiple notices of a subscriber's infringing activity. Specifically, Plaintiffs seek relief for claims of infringement that accrued from February 2013 through November 2014, with respect to works infringed by Cox's subscribers *after* those particular subscribers were identified to Cox in multiple infringement

notices. Those claims are preserved through tolling agreements entered into with Cox, and Cox cannot limit its liability for claims in this period under the DMCA safe harbor.

Answer: Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 10 of the Complaint regarding the nature of Plaintiffs' claims, but deny that Plaintiffs are entitled to any relief, including for any period of time. Defendants admit that they entered into tolling agreements with certain of the Plaintiffs, but deny that those tolling agreements preserved all of Plaintiffs' claims. Defendants deny the remaining allegations of Paragraph 10 of the Complaint.

## **JURISDICTION AND VENUE**

11.     This is a civil action in which Plaintiffs seek damages for copyright infringement under the Copyright Act, 17 U.S.C. § 101, *et seq.*

Answer: Defendants admit that Plaintiffs have filed this action under the copyright laws of the United States, but deny that there has been any wrongdoing.

12.     This Court has original subject matter jurisdiction over Plaintiffs' copyright infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

Answer: Defendants admit that this Court has subject matter jurisdiction over Plaintiffs' claims.

13.     This Court has personal jurisdiction over Cox because Cox resides in and/or does systematic and continuous business in Virginia and in this judicial district. Cox provides a full slate of services in Virginia, including TV, Internet and phone services, among others. Cox also has a number of retail stores and customer service centers within this judicial district, including stores located at 5958 Kingstowne Town Ctr., Ste. 100, Alexandria, Virginia 22315 and 11044 Lee Hwy, Suite 10, Fairfax, Virginia 22030 and 3080 Centerville Road, Herndon, Virginia 20171.

Answer: Defendants admit that they conduct business in Virginia and in this judicial district. Defendants admit that they provide TV, Internet and phone services to customers in Virginia. Defendants admit that they have retail stores and customer service centers within this judicial district, including Cox Solutions Stores located at 5958 Kingstowne Towne Ctr., Suite 100, Alexandria, Virginia 22315 and 11044 Lee Hwy., Suite 10, Fairfax, Virginia 22030. Defendants deny that they have a retail store or customer service center in Herndon, Virginia.

14. Each of the Cox defendants has in the past been (or is presently) a party, as a plaintiff or a defendant, in this Court, including in the related case of *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns., Inc. and CoxCom, LLC*, No. 14-cv-1611-LO-JFA.

Answer: Defendants deny that *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns., Inc. and CoxCom, LLC*, No. 14-cv-1611-LO-JFA is a related case. Defendants admit the remaining allegations of Paragraph 14 of the Complaint.

15. Cox continuously and systematically transacts business in the Commonwealth of Virginia and maintains sizable operations in Virginia—employing thousands of employees and providing an array of services to customers within the Commonwealth. Additionally, Cox has engaged in substantial activities purposefully directed at Virginia from which Plaintiffs' claims arise, including, for instance, establishing significant network management operations in this district, employing individuals within Virginia who have responsibility for managing its network, enforcing subscriber use policies against violators, and/or responding to notices of infringement. Much of the conduct alleged in this Complaint arises directly from Cox's forum directed activities—specifically, repeated acts of infringement by specific subscribers using Cox's network and Cox's awareness of those activities, Cox's receipt of and failure to act in response to Plaintiffs'

notices of infringement activity, and Cox's failure to take reasonable measures to terminate repeat infringers.

Answer: Defendants admit that CoxCom, LLC conducts business in Virginia, has employees in Virginia, provides services to customers in Virginia, and maintains network management operations in Virginia. Defendants admit that Cox Communications, Inc. has employees in Virginia. Defendants admit that certain steps of Cox's procedure in handling copyright infringement notices were handled by Cox employees located in Omaha, Nebraska and Hampton Roads, Virginia in 2013 and 2014. Defendants deny that there has been any unlawful conduct giving rise to the claims in this case. Defendants deny the remaining allegations in Paragraph 15 of the Complaint.

16. Many of the acts complained of herein occurred in Virginia and in this judicial district. For example, a number of egregious repeat infringers, who are Cox subscribers, reside in and infringed Plaintiffs' rights in Virginia and this judicial district.

Answer: Defendants deny that there has been any unlawful conduct giving rise to the claims in this case. Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 16 regarding the residence of any alleged infringers. Defendants deny the remaining allegations in Paragraph 16 of the Complaint.

17. Indeed, Plaintiffs have identified hundreds of Cox subscribers suspected of residing in Virginia, who have repeatedly infringed one or more of Plaintiffs' copyrighted works. For example, Cox subscriber account having IP address 216.54.125.50 at the time of the infringement, believed to be located east of Richmond, Virginia, was identified in infringement notices 97 times between November 15, 2013 and March 6, 2015. A different Cox subscriber believed to be located in Norfolk, Virginia, having IP address 72.215.154.66 at the time of infringement, also was

identified in infringement notices 97 times between February 6, 2013 and March 6, 2015. Yet another Cox subscriber having IP address 174.77.93.179, believed to be from Virginia Beach, was identified in infringement notices 34 times between February 8, 2013 and March 25, 2015.

_Answer_:  Defendants deny that there has been any unlawful conduct giving rise to the claims in this case.  Defendants lack knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 17 of the Complaint and on that basis deny those allegations.

18.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and 1400(a), because a substantial part of the acts of infringement, and other events and omissions complained of herein occur, or have occurred, in this district, and this is a district in which Cox resides or may be found.

_Answer_:  Defendants deny that venue is proper in this district and deny that there has been any wrongful activity giving rise to the claims in this case.

## PLAINTIFFS AND THEIR COPYRIGHTED MUSIC

19.     Plaintiffs are the copyright owners of and/or control exclusive rights with respect to millions of sound recordings (_i.e._, recorded music) and/or musical works (_i.e._, compositions), including many by some of the most prolific and well-known recording artists and songwriters in the world.

_Answer_:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 19 of the Complaint and on that basis deny those allegations.

20.     Plaintiff Sony Music Entertainment ("Sony") is a Delaware general partnership, the partners of which are citizens of New York and Delaware. Sony's headquarters and principal place of business are located at 25 Madison Avenue, New York, New York 10010.

11

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 20 of the Complaint and on that basis deny those allegations.

21.    Plaintiff Arista Music ("Arista Music") is a New York partnership with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 21 of the Complaint and on that basis deny those allegations.

22.    Plaintiff Arista Records LLC ("Arista Records") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 22 of the Complaint and on that basis deny those allegations.

23.    Plaintiff LaFace Records LLC ("LaFace") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 23 of the Complaint and on that basis deny those allegations.

24.    Plaintiff Provident Label Group, LLC ("Provident") is a Delaware Limited Liability Company with its principal place of business at 741 Cool Springs Boulevard, Franklin, Tennessee 37067.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 24 of the Complaint and on that basis deny those allegations.

25.    Plaintiff Sony Music Entertainment US Latin ("Sony Latin") is a Delaware Limited Liability Company with its principal place of business at 3390 Mary St., Suite 220, Coconut Grove, Florida 33133.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 25 of the Complaint and on that basis deny those allegations.

26.     Plaintiff Volcano Entertainment III, LLC ("Volcano") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 26 of the Complaint and on that basis deny those allegations.

27.     Plaintiff Zomba Recording LLC ("Zomba") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 27 of the Complaint and on that basis deny those allegations.

28.     Plaintiff Atlantic Recording Corporation ("Atlantic") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 28 of the Complaint and on that basis deny those allegations.

29.     Plaintiff Bad Boy Records LLC ("Bad Boy") is a Delaware Limited Liability Company with its principal place of business at 1633 Broadway, New York, New York 10019.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 29 of the Complaint and on that basis deny those allegations.

30.     Plaintiff Elektra Entertainment Group Inc. ("Elektra") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 30 of the Complaint and on that basis deny those allegations.

31.     Plaintiff Fueled By Ramen LLC ("FBR") is a Delaware Limited Liability Company with its principal place of business at 1633 Broadway, New York, New York 10019.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 31 of the Complaint and on that basis deny those allegations.

32.     Plaintiff Nonesuch Records Inc. ("Nonesuch") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 32 of the Complaint and on that basis deny those allegations.

33.     Plaintiff Roadrunner Records, Inc. ("Roadrunner") is a New York corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 33 of the Complaint and on that basis deny those allegations.

34.     Plaintiff Warner Bros. Records Inc. ("WBR") is a Delaware corporation with its principal place of business at 3300 Warner Boulevard, Burbank, California 91505.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 34 of the Complaint and on that basis deny those allegations.

35.     Plaintiff UMG Recordings, Inc. ("UMG") is a Delaware corporation with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 35 of the Complaint and on that basis deny those allegations.

36.     Plaintiff Capitol Records, LLC ("Capitol Records") is Delaware corporation with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 36 of the Complaint and on that basis deny those allegations.

37.     Plaintiffs Sony, Arista Music, Arista Records, LaFace, Provident, Sony Latin, Volcano, Zomba, Atlantic, Bad Boy, Elektra, FBR, Nonesuch, Roadrunner, WBR, UMG, and Capitol Records are referred to herein collectively as "The Record Company Plaintiffs."

Answer:  Paragraph 37 of the Complaint does not contain factual allegations to which Defendants are obligated to respond.

38.     The Record Company Plaintiffs are some of the largest record companies in the world, engaged in the business of producing, manufacturing, distributing, selling, licensing, and otherwise exploiting sound recordings in the United States through various media. They invest substantial money, time, effort, and talent in creating, advertising, promoting, selling, and licensing sound recordings embodying the performances of their exclusive recording artists and their unique and valuable sound recordings.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 38 of the Complaint and on that basis deny those allegations.

39.     Plaintiff Sony/ATV Music Publishing LLC ("Sony/ATV") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 39 of the Complaint and on that basis deny those allegations.

40.     Plaintiff EMI Al Gallico Music Corp. ("EMI Al Gallico"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

<u>Answer</u>:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 40 of the Complaint and on that basis deny those allegations.

41.     Plaintiff EMI Algee Music Corp. ("EMI Algee"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

<u>Answer</u>:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 41 of the Complaint and on that basis deny those allegations.

42.     Plaintiff EMI April Music Inc. ("EMI April"), an affiliate of Sony/ATV, is a Connecticut corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

<u>Answer</u>:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 42 of the Complaint and on that basis deny those allegations.

43.     Plaintiff EMI Blackwood Music Inc. ("EMI Blackwood"), an affiliate of Sony/ATV, is a Connecticut corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

<u>Answer</u>:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 43 of the Complaint and on that basis deny those allegations.

44.     Plaintiff Colgems-EMI Music Inc. ("EMI Colgems"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

<u>Answer</u>:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 44 of the Complaint and on that basis deny those allegations.

45. Plaintiff EMI Consortium Music Publishing Inc. d/b/a EMI Full Keel Music ("EMI Full Keel"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 45 of the Complaint and on that basis deny those allegations.

46. Plaintiff EMI Consortium Songs, Inc., individually and d/b/a EMI Longitude Music ("EMI Longitude"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 46 of the Complaint and on that basis deny those allegations.

47. Plaintiff EMI Feist Catalog Inc. ("EMI Feist"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 47 of the Complaint and on that basis deny those allegations.

48. Plaintiff EMI Miller Catalog Inc. ("EMI Miller"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 48 of the Complaint and on that basis deny those allegations.

49. Plaintiff EMI Mills Music, Inc. ("EMI Mills"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

Answer: Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 49 of the Complaint and on that basis deny those allegations.

50.     Plaintiff EMI Unart Catalog Inc. ("EMI Unart"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

Answer: Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 50 of the Complaint and on that basis deny those allegations.

51.     Plaintiff EMI U Catalog Inc. ("EMI U"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

Answer: Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 51 of the Complaint and on that basis deny those allegations.

52.     Plaintiff Jobete Music Co. Inc. ("Jobete"), an affiliate of Sony/ATV, is a Michigan corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016. Plaintiff Stone Agate Music ("Stone Agate") is a division of Jobete.

Answer: Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 52 of the Complaint and on that basis deny those allegations.

53.     Plaintiff Screen Gems-EMI Music Inc. ("Gems-EMI"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

Answer: Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 53 of the Complaint and on that basis deny those allegations.

54.     Plaintiff Stone Diamond Music Corp. ("Stone"), an affiliate of Sony/ATV, is a Michigan corporation with its principal place of business at 245 Fifth Avenue, Suite 1101, New York, New York 10016.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 54 of the Complaint and on that basis deny those allegations.

55.     Plaintiff Warner/Chappell Music, Inc. ("Warner/Chappell") is a Delaware corporation with its principal place of business at 10585 Santa Monica Boulevard, Los Angeles, California 90025.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 55 of the Complaint and on that basis deny those allegations.

56.     Plaintiff Warner-Tamerlane Publishing Corp. ("Warner-Tamerlane") is a California corporation with its principal place of business at 10585 Santa Monica Boulevard, Los Angeles, California 90025.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 56 of the Complaint and on that basis deny those allegations.

57.     Plaintiff WB Music Corp. ("WB Music") is a California corporation with its principal place of business at 10585 Santa Monica Boulevard, Los Angeles, California 90025.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 57 of the Complaint and on that basis deny those allegations.

58.     Plaintiff W.B.M. Music Corp. ("W.B.M.") is a Delaware corporation with its principal place of business at 10585 Santa Monica Boulevard, Los Angeles, California 90025.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 58 of the Complaint and on that basis deny those allegations.

59.     Plaintiff Unichappell Music Inc. ("Unichappell") is a Delaware corporation with its principal place of business at 10585 Santa Monica Boulevard, Los Angeles, California 90025.

<u>Answer</u>:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 59 of the Complaint and on that basis deny those allegations.

60.     Plaintiff Rightsong Music Inc. ("Rightsong Music") is a Delaware corporation with its principal place of business at 10585 Santa Monica Boulevard, Los Angeles, California 90025.

<u>Answer</u>:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 60 of the Complaint and on that basis deny those allegations.

61.     Plaintiff Cotillion Music, Inc. ("Cotillion") is a Delaware corporation with its principal place of business at 10585 Santa Monica Boulevard, Los Angeles, California 90025.

<u>Answer</u>:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 61 of the Complaint and on that basis deny those allegations.

62.     Plaintiff Intersong U.S.A., Inc. ("Intersong") is a Delaware corporation with its principal place of business at 10585 Santa Monica Boulevard, Los Angeles, California 90025.

<u>Answer</u>:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 62 of the Complaint and on that basis deny those allegations.

63.     Plaintiff Universal Music Corp. ("UMC") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

<u>Answer</u>:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 63 of the Complaint and on that basis deny those allegations.

64.     Plaintiff Universal Music – MGB NA LLC ("MGB") is a California Limited Liability Company with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 64 of the Complaint and on that basis deny those allegations.

65.     Plaintiff Universal Music Publishing Inc. ("Universal Music Publishing") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 65 of the Complaint and on that basis deny those allegations.

66.     Plaintiff Universal Music Publishing AB ("AB") is a company organized under the laws of Sweden.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 66 of the Complaint and on that basis deny those allegations.

67.     Plaintiff Universal Music Publishing Limited ("Publishing Limited") is a company incorporated under the laws of England and Wales.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 67 of the Complaint and on that basis deny those allegations.

68.     Plaintiff Universal Music Publishing MGB Limited ("MGB Limited") is a company incorporated under the laws of England and Wales.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 68 of the Complaint and on that basis deny those allegations.

69.     Plaintiff Universal Music – Z Tunes LLC ("Z Tunes") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 69 of the Complaint and on that basis deny those allegations.

70.     Plaintiff Universal/Island Music Limited ("Island") is a company incorporated under the laws of England and Wales.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 70 of the Complaint and on that basis deny those allegations.

71.     Plaintiff Universal/MCA Music Publishing Pty. Limited ("MCA Limited") is a company organized under the laws of the Australia.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 71 of the Complaint and on that basis deny those allegations.

72.     Plaintiff Universal – Polygram International Tunes, Inc. ("Polygram International") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 72 of the Complaint and on that basis deny those allegations.

73.     Plaintiff Universal – Songs of Polygram International, Inc. ("Songs of Polygram") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 73 of the Complaint and on that basis deny those allegations.

74.     Plaintiff Universal Polygram International Publishing, Inc. ("Polygram International Publishing") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 74 of the Complaint and on that basis deny those allegations.

75.     Plaintiff Music Corporation of America, Inc. d/b/a Universal Music Corp. ("Music Corp.") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 75 of the Complaint and on that basis deny those allegations.

76.     Plaintiff Polygram Publishing, Inc. ("Polygram Publishing") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 76 of the Complaint and on that basis deny those allegations.

77.     Plaintiff Rondor Music International, Inc. ("Rondor") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 77 of the Complaint and on that basis deny those allegations.

78.     Plaintiff Songs of Universal, Inc. ("Songs of Universal") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 78 of the Complaint and on that basis deny those allegations.

79.     Plaintiffs Sony/ATV, EMI Al Gallico, EMI Algee, EMI April, EMI Blackwood, EMI Colgems, EMI Full Keel, EMI Longitude, EMI Feist, EMI Miller, EMI Mills, EMI Unart, EMI U, Jobete, Stone Agate, Gems-EMI, Stone, Warner/Chappell, Warner-Tamerlane, WB Music, W.B.M., Unichappell, Rightsong Music, Cotillion, Intersong, UMC, MGB, Universal Music Publishing, AB, Publishing Limited, MGB Limited, Z Tunes, Island, MCA Limited,

Polygram International, Songs of Polygram, Polygram International Publishing, Music Corp., Polygram Publishing, Rondor, and Songs of Universal are referred to herein collectively as "The Music Publisher Plaintiffs."

Answer:  Paragraph 79 of the Complaint does not contain factual allegations to which Defendants are obligated to respond.

80.     The Music Publisher Plaintiffs are leading music publishers engaged in the business of acquiring, owning, publishing, licensing, and otherwise exploiting copyrighted musical compositions. Each invests substantial money, time, effort, and talent to acquire, administer, publish, license, and otherwise exploit such copyrights, on its own behalf and on behalf of songwriters and other music publishers who have assigned exclusive copyright interests to The Music Publisher Plaintiffs.

Answer:  Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 80 of the Complaint and on that basis deny those allegations.

81.     Plaintiffs own and/or control in whole or in part the copyrights and/or exclusive rights in innumerable popular sound recordings and musical compositions, including the sound recordings listed on Exhibit A and musical compositions listed on Exhibit B, both of which are illustrative and non-exhaustive. All of the sound recordings and musical compositions listed on Exhibits A and B have been registered with the U.S. Copyright Office.

Answer:  Defendants admit that Exhibits A and B to the Complaint purport to list the works alleged by Plaintiffs in this action.  Defendants lack knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 81 of the Complaint and on that basis deny those allegations.

## DEFENDANTS AND THEIR ACTIVITIES

82.     Defendant Cox Communications, Inc. is a Delaware corporation with its principal place of business at 1400 Lake Hearn Drive NE, Atlanta, Georgia. Cox Communications, Inc. operates as a broadband communications and entertainment company for residential and commercial customers in the United States.  Specifically, Cox Communications, Inc. offers digital video, high-speed Internet, telephone, voice, and long distance, data and video transport, high definition video, digital cable television, and DVR services over its IP network.

Answer:  Defendants admit that Cox Communications, Inc. is a Delaware corporation but deny the remaining allegations in the first sentence of Paragraph 82 of the Complaint.  Defendants admit that Cox Communications, Inc. operates as a broadband communications company. Defendants deny the remaining allegations of Paragraph 82 of the Complaint.

83.     Defendant CoxCom, LLC is a Delaware Limited Liability Company with its principal place of business at 1400 Lake Hearn Drive NE, Atlanta, Georgia. CoxCom, LLC conducts business in Virginia as Cox Communications of Northern Virginia. CoxCom, LLC is a wholly-owned subsidiary of Cox Communications, Inc. CoxCom, LLC provides Internet and related services to Cox subscribers including in Virginia and this judicial district.

Answer:  Defendants admit that CoxCom, LLC is a Delaware limited liability company, but deny the remaining allegations in the first sentence of Paragraph 83 of the Complaint. Defendants admit the remaining allegations of Paragraph 83 of the Complaint.

84.     The Cox defendants, individually and collectively, are ISPs.  Cox has approximately 4.5 million Internet subscribers.  At all pertinent times, Cox's customers have paid Cox substantial subscription fees for access to Cox's high-speed Internet network, with Cox

offering a tiered pricing structure, whereby for a higher monthly fee, a subscriber can have even faster downloading speeds.

    <u>Answer</u>:  Defendants admit that CoxCom, LLC operates as an Internet service provider, with support from Cox Communications, Inc.  Defendants admit that, during the time period relevant to Plaintiffs' allegations, Cox offered a tiered pricing structure, whereby subscribers could pay different flat monthly fees for different download speeds.  Defendants deny the remaining allegations of Paragraph 84 of the Complaint.

    85.    For many of Cox's subscribers, the ability to use Cox's network to download music and other copyrighted content—including unauthorized content—as efficiently as possible is a primary motivation for subscribing to Cox's service. Accordingly, in its consumer marketing material in 2014, Cox touted how its service enabled subscribers to download large amounts of content "Faster Than A Speeding Bullet" and at "The Speed You Need." In exchange for this service, Cox charged its customers monthly fees ranging in price based on the speed of service. https://web.archive.org/web/20140616085246/http://www.cox.com:80/residential/internet.cox. To satisfy its customers' need for speed, "Cox has increased internet speeds more than 1,000 percent over the past 17 years," making it even easier and faster for subscribers to illegally download and upload infringing sound recordings and musical compositions. http://newsroom.cox.com/2018-01-09-Cox-Expands-Gigabit-Speeds-at-Rapid-Pace.

    <u>Answer</u>:  Defendants deny the allegations in the first sentence of Paragraph 85 of the Complaint.  Defendants admit that the archived website available at https://web.archive.org/web/20140616085246/http://www.cox.com:80/residential/internet.cox displays three levels of pricing for Cox High Speed Internet and states "The Speed You Need:  Go faster with Cox High Speed Internet service," but denies that the archived website "touts how its

service enabled subscribers to download large amounts of content 'Faster Than A Speeding Bullet.'" Defendants admit that the news release available at http://newsroom.cox.com/2018-01-09-Cox-Expands-Gigabit-Speeds-at-Rapid-Pace states that "Cox has increased internet speeds more than 1,000 percent over the last 17 years." Defendants deny the remaining allegations of Paragraph 85 of the Complaint.

86.     On its "Frequently Asked Questions" page on its website, Cox describes a process called "bandwidth throttling" that is often used by ISPs to reduce infringement by subscribers who have a history of illegal behavior. Cox tells its customers and prospective customers that bandwidth throttling "can interfere with the download speed, upload speed and overall performance of your network's Internet service," and assures actual and prospective customers that "[a]t Cox, we never throttle Internet speeds. And we never block or otherwise interfere with your desire to go where you want to go on the Internet." https://www.cox.com/residential/internet.html.

Answer:  Defendants admit that the page currently located at the URL reflected in Paragraph 86 of the Complaint states: "At Cox, we never throttle Internet speeds. And we never block or otherwise interfere with your desire to go where you want to go on the Internet. As your Internet service provider (ISP), Cox has always been committed to providing our customers a quality, high-speed Internet experience. Bandwidth throttling can interfere with the download speed, upload speed and overall performance of your network's Internet service." Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 86 of the Complaint regarding the practices of ISPs, and on that basis deny those allegations.

87.     At the same time, Cox has consistently and actively engaged in network management practices to suit its own purposes. This includes monitoring for, and taking action against, spam and other unwanted activity. But Cox has gone out of its way *not* to take action

against subscribers engaging in repeated copyright infringement at the expense of copyright owners, ultimately forcing Plaintiffs to bring this litigation.

Answer:  Defendants admit that they monitor and take action against spam and other unwanted activity on Cox's network.  Defendants deny the remaining allegations in Paragraph 87 of the Complaint.

88.     At all pertinent times, Cox knew that its subscribers routinely used its networks for illegal downloading and uploading of copyrighted works, especially music. As described below, Plaintiffs repeatedly notified Cox that many of its subscribers were actively utilizing its service in order to infringe; those notices gave Cox the *specific identities of its subscribers*, referred to by their unique Internet Protocol or "IP" addresses. Yet Cox persistently turned a blind eye toward the massive infringement of Plaintiffs' works. Cox condoned the illegal activity because it was popular with subscribers and acted as a draw in attracting and retaining subscribers. In return, Cox's customers purchased more bandwidth and continued using Cox's services to infringe Plaintiffs' copyrights. Cox recognized that if it prevented its repeat infringer subscribers from using its service, or made it less attractive for such use, Cox would enroll fewer new subscribers, lose existing subscribers, and lose revenue. For those account holders and subscribers who wanted to download files illegally at faster speeds, Cox obliged them for higher rates. The greater the bandwidth its subscribers required for pirating content, the more money Cox made.

Answer:  Defendants deny the allegations in Paragraph 88 of the Complaint.

### PLAINTIFFS' ENFORCEMENT ACTIVITIES AND COX'S EFFORTS TO THWART THEM

89.     Over the past two decades, Internet piracy over so-called "peer-to-peer" ("P2P") networks has become rampant, and music owners and other copyright owners have employed litigation and other means to attempt to curtail the massive theft of their copyrighted works. Cox

has been keenly aware of those efforts. Cox has also been acutely aware of the use of its network for P2P piracy, including the specific identities of subscribers who are using its network to infringe.

<u>Answer</u>:  Defendants lack knowledge or information sufficient to admit or deny the allegations in the first sentence of Paragraph 89 of the Complaint, and on that basis deny those allegations.  Defendants deny the remaining allegations in Paragraph 89 of the Complaint.

90.     Indeed, Cox was made aware of its subscribers using its network for such infringing activities before the time frame at issue in this suit, when a number of copyright holders, including The Record Company Plaintiffs, initiated a multi-year effort to enforce their copyrights against individuals using P2P systems to directly infringe copyrighted musical or other works. As part of that effort, because the copyright holders could only determine the unique IP addresses of an ISP's infringing subscribers, but not their actual identities, they served subpoenas on Cox and other ISPs to obtain the infringing subscribers' names and contact information. Cox was required to provide identifying information about infringing subscribers.

<u>Answer</u>:  Defendants admit that they received and responded to subpoenas seeking information regarding certain of its subscribers.  Defendants deny the remaining allegations of Paragraph 90 of the Complaint.

91.     Thereafter, The Record Company Plaintiffs began sending notices to Cox (and other ISPs) identifying additional specific instances of their subscribers' infringement through P2P activities. From early 2013 through March 2015 alone, Cox received more than *200,000 notices*, provided under penalty of perjury, detailing specific instances of its subscribers using its network to infringe copyrighted music.

Answer: Defendants lack knowledge or information sufficient to admit or deny the allegations in the first sentence of Paragraph 91 of the Complaint, and on that basis deny those allegations. Defendants deny the remaining allegations in Paragraph 91 of the Complaint.

92.     But those hundreds of thousands of notices Cox received represented only a fraction of the infringements that occurred through Cox's network in the same time frame. For years, Cox has arbitrarily capped the number of infringement notices it is willing to receive—refusing to even hear any complaints in excess of the cap. Starting in 2008, Cox refused to accept any more than 200 infringement notices per day from Plaintiffs' representatives. In early 2009, Cox agreed to increase that number to 400 per day. In July 2009, many of The Record Company Plaintiffs asked Cox to increase the limit to 800 or 1,000 per day but Cox denied the request on the grounds that it was "currently at the maximum number of notices [Cox could] process, measured against the staff [they] have to process calls from customers." In 2013, Plaintiffs' representatives again asked Cox to increase the limit, this time more modestly from 400 to 500 or 600 per day, to which Cox finally agreed. Thus, while Cox received 200,000 infringement notices from 2013 to 2015 from Plaintiffs' representatives, the actual number of infringements identified through Cox's network in those years was vastly more. In other words, Cox willfully blinded itself to scores of infringements by refusing to accept notices beyond its arbitrary cap.

Answer: Defendants admit that they negotiated with Plaintiffs' representatives to raise the number of infringement notices that Cox processed per day. Defendants deny the remaining allegations in Paragraph 92 of the Complaint.

93.     The infringement notices provided to Cox the unique IP address assigned to each user of Cox's network and the date and time the infringing activity was detected. By reviewing its subscriber activity logs, Cox alone had the ability to match an IP address in an infringement notice

to a particular subscriber. Importantly, only Cox, as the provider of the technology and system used to infringe, had the information required to match the IP address to a particular subscriber, and to contact that subscriber or terminate that subscriber's service.

<u>Answer</u>:  Defendants lack knowledge or information sufficient to admit or deny the allegations in the first sentence of Paragraph 93 of the Complaint, and on that basis deny those allegations.  Defendants admit that Cox generally has the ability to match an IP address, accompanied with the date and time, to particular subscribers, but deny that Cox has the ability to determine the identity of the individual using the device on its service.  Defendants deny the remaining allegations in Paragraph 93 of the Complaint.

94.    Plaintiffs' infringement notices concerned clear and unambiguous infringing activity by Cox's subscribers—that is, unauthorized downloading and distribution of copyrighted music. There was no legal justification for Cox's subscribers to download or distribute digital copies of Plaintiffs' sound recordings and musical compositions to thousands or millions of strangers on the Internet.

<u>Answer</u>:  Defendants deny the allegations in the first sentence of Paragraph 94 of the Complaint.  Defendants lack knowledge or information sufficient to admit or deny the allegations in the first sentence of Paragraph 93 of the Complaint, and on that basis deny those allegations.

95.    Apart from attesting to the sheer volume of the infringing activity on its network, the infringement notices sent to Cox pointed to specific subscribers who were flagrant and serial infringers. The infringement notices identified *almost 20,000* Cox subscribers engaged in blatant and repeated infringement. To cite just a few specific examples:

- During a 601-day period, Cox's subscriber with IP address 174.78.143.156 was identified in 142 infringement notices, which were sent on at least 116 separate days.

- During a 539-day period, Cox's subscriber with IP address 70.167.91.154 was identified in 104 infringement notices, which were sent on at least 96 separate days.

- During a 426-day period, Cox's subscriber with IP address 72.198.185.108 was identified in 96 infringement notices, which were sent on at least 80 separate days.

- During a 326-day period, Cox's subscriber with IP address 184.191.182.8 was identified in 84 infringement notices, which were sent on at least 71 separate days.

- During a 248-day period, Cox's subscriber with IP address 184.177.171.108 was identified in 64 infringement notices, which were sent on at least 52 separate days.

These examples and countless others amply illustrate that, rather than terminating repeat infringers—and losing subscription revenues—Cox simply looked the other way.

Answer:  Defendants deny the allegations in Paragraph 95 of the Complaint.

96.    During all pertinent times, Cox had the full legal right, obligation, and technical ability to prevent or limit the infringements occurring on its network. Under Cox's "Acceptable Use Policy," which its subscribers agreed to as a condition of using its Internet service, Cox was empowered to exercise its right and ability to suspend or terminate a customer's Internet access. Cox could do so for a variety of reasons, including a subscriber's "use [of] the Service to post, copy, transmit, or disseminate any content that infringes the patents, copyrights, trade secrets, trademark, moral rights, or propriety rights of any party." With respect to infringement, Cox is the gatekeeper of the network over which data—including infringing works—is transferred.

Answer:  Defendants admit that the language of the "Acceptable Use Policy" quoted in Paragraph 96 of the Complaint exists in current version of this policy that is available on Cox's website.  Defendants deny the remaining allegations in Paragraph 96 of the Complaint.

97.    Although Cox purported to create a repeat infringer policy, as this Court already found, it never implemented it, and thus it is ineligible for the DMCA's safe harbor. Cox's Copyright Policy provides that upon receipt of copyright infringement complaints regarding

subscribers, "Cox uses a graduated approach of increasing severity to notify subscribers, from in-browser and email notifications, to the suspension of Internet service for repeated or severe cases."

Answer: Defendants deny the allegations in Paragraph 97 of the Complaint.

98.     But, in denying Cox's motion for judgment as a matter of law after trial, this Court explained:

> The graduated response system is essentially a thirteen-strike policy. No action is taken on receipt of a subscriber's first notice. The second, third, fourth, fifth, sixth, and seventh notices generate an email to the subscriber, warning that if Cox "continues to receive infringement claims such as this one concerning your use of our service, we will suspend your account and disable your connection until you confirm you have removed the infringing material." On the eighth and ninth notices, Cox limits a subscriber's internet access to a single webpage containing a warning. The customer can self-reactivate by clicking an acknowledgment. On the tenth and eleventh notices, Cox suspends service and requires the subscriber to call a support technician. The technician explains the reason for the suspension, advises removal of the allegedly infringing file, and then reactivates service. On the twelfth notice, the subscriber is suspended and directed to specialized technicians. On the thirteenth notice, the subscriber is again suspended and this time considered for termination.

Answer: Defendants admit that Paragraph 98 includes an accurate quote from the Court's opinion on Defendants' motion for judgment as a matter of law in *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc. and CoxCom, LLC.*

99.     Regardless of whether a thirteen-strike policy could ever be reasonable, this Court previously found that Cox did not reasonably implement that policy. For example, in addition to its arbitrary cap on—and, in some instances, outright refusal to accept—Plaintiffs' infringement notices, any notice Cox did receive beyond its self-imposed limit was not counted in the graduated response. Cox also counted only one notice per subscriber per day. Thus, if a subscriber generated 10 or 50 or 100 notices in a day, they were "rolled up" into a single ticket. Cox also restarted the thirteen-strike count every six months, so an infringing subscriber with twelve notices would get

a "free pass" back to zero strikes if six months had passed since his or her first notice. When Cox did "soft terminate" subscribers for repeat copyright infringements, it enforced an unwritten policy of re-activating the subscribers shortly thereafter. And with few exceptions, starting in September 2012, Cox simply stopped terminating repeat infringers altogether.

Answer: Defendants deny the allegations of Paragraph 99 of the Complaint that reflect Plaintiffs' characterization of the Court's opinion on the basis that the opinion of this Court speaks for itself. Defendants deny the remaining allegations of Paragraph 99 of the Complaint.

100. Despite these alleged policies, and despite receiving hundreds of thousands of infringement notices, along with similar notices from other copyright owners, Cox knowingly permitted identified repeat infringer subscribers to continue to use Cox's network to infringe. Rather than disconnect the Internet access of blatant repeat infringers to curtail their infringement, Cox knowingly continued to provide these subscribers with the Internet access that enabled them to continue to use BitTorrent or other P2P networks to illegally download or distribute Plaintiffs' copyrighted works unabated. Cox's provision of high-speed Internet service materially contributed to these direct infringements.

Answer: Defendants deny the allegations of Paragraph 100 of the Complaint.

101. Cox's motivation for refusing to terminate or suspend the accounts of blatant infringing subscribers is simple: it valued corporate profits over its legal responsibilities. Cox did not want to lose subscriber revenue by terminating accounts. Jason Zabek, the former head of Cox's Abuse Group, made this clear by urging a Cox customer service representative (in an internal email that he instructed should not be forwarded) to "start the warning cycle over" for terminated customers with cox.net email addresses: "A clean slate if you will. This way, we can collect a few extra weeks of payments for their account. ;-)".

Answer: Defendants deny the allegations of Paragraph 101 of the Complaint.

102.     Nor did Cox want the possibility of account terminations to make its service less attractive to other existing or prospective users. Moreover, Cox was simply disinterested in devoting sufficient resources to tracking infringers, responding to infringement notices, and terminating accounts in appropriate circumstances. Considering only its own pecuniary gain, Cox ignored and turned a blind eye to flagrant, repeat violations by known specific subscribers using its service to infringe, thus facilitating and multiplying the harm to Plaintiffs. And Cox's failure to adequately police its infringing subscribers was a draw to subscribers to purchase Cox's services, so that the subscribers could then use those services to infringe Plaintiffs' (and others') copyrights.

Answer: Defendants deny the allegations of Paragraph 102 of the Complaint.

103.     The consequences of Cox's infringing activity are obvious and stark. When Cox's subscribers use Cox's network to obtain infringing copies of Plaintiffs' copyrighted works illegally, that activity undercuts the legitimate music market, depriving Plaintiffs and those recording artists and songwriters whose works they sell and license of the compensation to which they are entitled. Without such compensation, Plaintiffs, and their recording artists and songwriters, have fewer resources available to invest in the further creation and distribution of high-quality music.

Answer: Defendants deny the allegations of Paragraph 103 of the Complaint and deny that Plaintiffs are entitled to any relief.

## CLAIMS FOR RELIEF

### Count I – Contributory Copyright Infringement

104.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 103 as if fully set forth herein.

Answer: Defendants incorporate their answers to Paragraphs 1 through 103 of the Complaint.

105. Cox and its subscribers do not have any authorization, permission, license, or consent to exploit the copyrighted recordings or musical compositions at issue.

Answer: Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 105 of the Complaint, and on that basis deny those allegations.

106. Cox's subscribers, using Internet access and services provided by Cox, have unlawfully reproduced and distributed via BitTorrent or other P2P networks thousands of sound recordings and musical compositions for which Plaintiffs are the legal or beneficial copyright owners or exclusive licensees. The copyrighted works infringed by Cox's subscribers, which have been registered with the U.S. Copyright Office, include those listed on Exhibits A and B, and many others. The foregoing activity constitutes direct infringement in violation of 17 U.S.C. §§ 106 and 501 *et seq.*

Answer: Defendants admit that Exhibits A and B to the Complaint purport to list the works alleged by Plaintiffs in this action. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 106 of the Complaint, and on that basis deny those allegations.

107. Cox is liable as a contributory copyright infringer for the direct infringements described above. Through Plaintiffs' infringement notices and other means, Cox had knowledge that its network was being used for copyright infringement on a massive scale, and also knew of specific subscribers engaged in such repeated and flagrant infringement. Nevertheless, Cox facilitated, encouraged and materially contributed to such infringement by continuing to provide its network and the facilities necessary for its subscribers to commit repeated infringements. At

the same time, Cox had the means to withhold that assistance upon learning of specific infringing activity by specific users but failed to do so.

Answer:  Defendants deny the allegations in Paragraph 107 of the Complaint.

108.    By purposefully ignoring and turning a blind eye to the flagrant and repeated infringement by its subscribers, Cox knowingly caused and materially contributed to the unlawful reproduction and distribution of Plaintiffs' copyrighted works, including but not limited to those listed on Exhibits A and B hereto, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

Answer:  Defendants admit that Exhibits A and B to the Complaint purport to list the works alleged by Plaintiffs in this action.  Defendants deny the remaining allegations of Paragraph 108 of the Complaint.

109.    Each infringement of Plaintiffs' copyrighted sound recordings and musical compositions constitutes a separate and distinct act of infringement. Plaintiffs' claims of infringement against Cox are timely pursuant to tolling agreements.

Answer:  Defendants deny the allegations of Paragraph 109 of the Complaint.

110.    The foregoing acts of infringement by Cox have been willful, intentional, and purposeful, in disregard of Plaintiffs' rights. Indeed, the sound recordings on Exhibit A and the musical compositions on Exhibit B represent works infringed by Cox's subscribers *after* those particular subscribers were identified to Cox in multiple infringement notices.

Answer:  Defendants deny the allegations of Paragraph 110 of the Complaint.

111.    As a direct and proximate result of Cox's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed, or such other amount as may be

proper under 17 U.S.C. § 504(c). Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Cox's profits from the infringements, as will be proven at trial.

<u>Answer</u>:  Defendants deny the allegations of Paragraph 111 of the Complaint.

112.    Plaintiffs also are entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

<u>Answer</u>:  Defendants deny the allegations of Paragraph 112 of the Complaint.

## **<u>Count II – Vicarious Copyright Infringement</u>**

113.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 112 as if fully set forth herein.

<u>Answer</u>:   Defendants incorporate their answers to Paragraphs 1 through 112 of the Complaint.

114.    Cox and its subscribers have no authorization, license, or other consent to exploit the copyrighted sound recordings or musical compositions at issue.

<u>Answer</u>:   Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 114 of the Complaint, and on that basis deny those allegations.

115.    Cox's subscribers, using Internet access and services provided by Cox, have unlawfully reproduced and distributed via BitTorrent or other P2P services thousands of sound recordings and musical compositions for which Plaintiffs are the legal or beneficial copyright owners or exclusive licensees. The copyrighted works infringed by Cox's subscribers, which have been registered with the U.S. Copyright Office, include those listed on Exhibits A and B, and many others. The foregoing activity constitutes direct infringement in violation of 17 U.S.C. §§ 106 and 501 *et seq.*

<u>Answer</u>:  Defendants admit that Exhibits A and B to the Complaint purport to list the works alleged by Plaintiffs in this action.  Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 115 of the Complaint, and on that basis deny those allegations.

116.    Cox is liable as a vicarious copyright infringer for the direct infringements described above. Cox has the legal and practical right and ability to supervise and control the infringing activities that occur through the use of its network, and at all relevant times has had a financial interest in, and derived direct financial benefit from, the infringing use of its network. Cox has derived an obvious and direct financial benefit from its customers' infringement. The ability to use Cox's high-speed Internet facilities to illegally download Plaintiffs' copyrighted works has served to draw, maintain, and generate higher fees from paying subscribers to Cox's service. Among other financial benefits, by failing to terminate the accounts of specific repeat infringers known to Cox, Cox has profited from illicit revenue that it would not have otherwise received.

<u>Answer</u>:  Defendants deny the allegations of Paragraph 116 of the Complaint.

117.    Cox is vicariously liable for the unlawful reproduction and distribution of Plaintiffs' copyrighted works, including but not limited to those listed on Exhibits A and B hereto, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

<u>Answer</u>:  Defendants deny the allegations of Paragraph 117 of the Complaint.

118.    Each infringement of Plaintiffs' copyrighted sound recordings and musical compositions constitutes a separate and distinct act of infringement. Plaintiffs' claims of infringement against Cox are timely pursuant to tolling agreements.

<u>Answer</u>:  Defendants deny the allegations of Paragraph 118 of the Complaint.

119.    The foregoing acts of infringement by Cox have been willful, intentional, and purposeful, in disregard of Plaintiffs' rights. Indeed, the sound recordings on Exhibit A and the musical compositions on Exhibit B are works infringed by Cox's subscribers *after* those particular subscribers were identified to Cox in multiple prior infringement notices.

Answer:  Defendants deny the allegations of Paragraph 119 of the Complaint.

120.    As a direct and proximate result of Cox's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed, or such other amount as may be proper under 17 U.S.C. § 504(c). Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Cox's profits from the infringements, as will be proven at trial.

Answer:  Defendants deny the allegations of Paragraph 120 of the Complaint.

121.    Plaintiffs further are entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

Answer:  Defendants deny the allegations of Paragraph 121 of the Complaint.

## AFFIRMATIVE AND OTHER DEFENSES

Defendants identify the following affirmative defenses and reserve the right to raise additional defenses as discovery proceeds.  Defendants do not assume the burden of proof on any issue, however characterized, on which it does not bear that burden.  Defendants reserve all affirmative defenses not stated herein under Rule 8(c) of the Federal Rules of Civil Procedure and any other defense at law or in equity that may now exist or in the future be available based upon discovery and further investigation in this case.

1.      The Complaint, and each cause of action within it, fails to state facts sufficient to constitute a cause of action.

2.      The statute of limitations bars Plaintiffs' claims to the extent Plaintiffs allege infringements that accrued outside the three-year limitations period, including any applicable tolling of the limitations period.

3.      The case should be transferred to the Northern District of Georgia pursuant to 28 U.S.C. § 1404(a) for the convenience of the parties and witnesses, and in the interests of justice.

4.      Plaintiffs' claims are barred by their failure to join indispensable parties.

5.      Plaintiffs' claims are barred or its damages are limited because any infringement was innocent and was not willful.

6.      Plaintiffs' claims based upon secondary liability are barred because Plaintiffs cannot establish primary liability.

7.      Plaintiffs' claims based on contributory liability are barred because Defendants did not have the requisite knowledge of the alleged primary infringement and did not cause, encourage, or induce the alleged primary infringement.

8.      Plaintiffs' claims based on contributory liability are barred because Defendants did not materially contribute to the alleged primary infringement.

9.      Plaintiffs' claims are barred because Defendants' ISP service has substantial non-infringing uses.

10.     Plaintiffs' claims based on vicarious liability are barred because Defendants did not obtain a direct financial benefit from the alleged primary infringement.

11.     Plaintiffs' claims based upon vicarious liability are barred because Defendants did not have the right or ability to control the alleged primary infringement.

12.     Plaintiffs' claims are barred by the doctrine of copyright misuse.

13.     Plaintiffs' failure to mitigate damages bars their claims or limits their recovery.

14.     The doctrine of unclean hands bars Plaintiffs' claims.

15.     The doctrines of waiver and estoppel bar Plaintiffs' claims.

16.     Plaintiffs' claims are barred to the extent they do not own copyrights in the works underlying their claims.

17.     The Court lacks subject matter jurisdiction over claims that depend upon works for which Plaintiffs have not obtained copyright registrations.

18.     To the extent that Plaintiffs or their predecessors did not register copyrights before alleged infringements or within three months of first publication of published works, the failure to register timely bars Plaintiffs' claims for statutory damages and attorneys' fees.

19.     To the extent that Plaintiffs rely upon copyright registrations that rest upon misstatements or fraud, those misstatements or fraud bar Plaintiffs' claims.

20.     To the extent that Plaintiffs failed to comply with renewal, notice, and registration requirements and/or other formalities, Plaintiffs' claim are barred.

21.     Plaintiffs' claims are barred because the statutory damages sought are unconstitutionally excessive and disproportionate to any actual damages that may be sustained, in violation of the Due Process clause of the U.S. Constitution.

22.     Application of the Copyright Act and its remedies to the conduct of Defendants and their customers as Plaintiffs request would violate due process.

23.     Laches bars Plaintiffs' claims to the extent Plaintiffs allege infringements earlier than three years before Plaintiffs began this lawsuit.

24.     Plaintiffs' claims are barred by the First Amendment to the United States Constitution.

## COUNTERCLAIMS

Defendants Cox Communications, Inc., and Coxcom, LLC (collectively, "Cox" or "Defendants"), by and through their counsel, hereby assert counterclaims to Plaintiffs' Complaint as follows:

## I.     Introduction

1.     Cox is an Internet service provider ("ISP") that provides its customers access to the Internet. Cox does not store infringing content on its servers, does not host websites that index infringing files, does not encourage infringement, and does not create or distribute peer-to-peer file-sharing software or other file-sharing software. Nevertheless, Plaintiffs seek to impose secondary liability on Cox for alleged copyright infringement by its subscribers, in an effort to create a substantial new set of liabilities and burdens for ISPs.

## II.     Factual Allegations

### A.     Cox's Business

2.     Cox, a family owned communications company with roots tracing to the late 1800s, offers a variety of communications services, including cable, telephone, and Internet access services.

3.     Cox provides Internet service to both residential subscribers and businesses: its ISP service provides some six million U.S. customers with Internet connections.

4.     As an ISP, Cox provides its customers with a gateway to the Internet, which has become virtually indispensable to functioning in the modern world.

5. The Internet provides access to a host of services, some of them critical. Individuals rely on Internet access to obtain services in the areas of healthcare, employment, education, banking, commerce, social interaction, news and entertainment, and many others.

6. As the Supreme Court recently emphasized in the case of *Packingham v. North Carolina*, for many people the Internet provides "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." 137 S. Ct. 1730, 1737 (2017).

7. For a subscriber to lose Internet access can have devastating consequences.

8. As an ISP, Cox provides connections and enables connected computers to access the Internet.

9. Cox provided Internet access service to its residential subscribers for a flat monthly fee.

10. Cox itself does not store infringing content on its servers. Cox does not host websites that index infringing files. And Cox does not create or distribute peer-to-peer file-sharing software or other file-sharing software.

11. Cox does not control the Internet.

12. Cox cannot remove third-party material from the Internet unless that material is stored on Cox's servers. Cox cannot control what its customers store on their own or others' computers.

13. Cox has no ability to remove or take down infringing content from its customers' computers. And Cox cannot restrict, or even detect, the specific content that its customers access or share.

14.     Cox cannot supervise the online activities of its customers. Nor can Cox control its customers' conduct online. While Cox could disable its customers' ability to access its ISP system, or terminate customers' accounts, that does not give Cox control over its customers' conduct online.

15.     Cox cannot determine whether a particular individual is accessing the Internet using Cox's services. Nor can Cox detect which user is using a particular device to access the Internet.

16.     The privacy of its customers is of paramount concern to Cox. Internet users frequently transmit private and sensitive information, and trust their ISP to safeguard their privacy and security.

17.     Cox does not spy on its customers or monitor their Internet traffic. Even if it could do so—and it cannot—it wouldn't. Engaging in surveillance in such a fashion would violate Cox's policies, ethics, and corporate culture.

18.     Operating an ISP service—and safeguarding customers and other Internet users— entails policing against a number of potential abuses: security threats, invasion of privacy threats, identity theft, denial of service attacks, botnets or other malware (such as viruses, spyware, and worms), spam, fraud, phishing scams, copyright infringement, and a host of others.

19.     Cox's Customer Safety group deals with issues like these that threaten Cox's network or customers, as well as other abuses of Cox's system. Among other things, the Customer Safety group assists law enforcement and cooperates with other ISPs to combat security and privacy threats; it addresses internal security issues; it assists customers; and it handles copyright infringement notices that Cox receives from copyright owners and their agents.

**B.** **Cox's Receipt of Copyright Infringement Notices**

20.     When Cox receives a copyright infringement notice from a third party, it reviews the notice to ensure that it complies with Cox's policies. Among other things, Cox requires the sender of a copyright infringement notice to identify the copyrighted work claimed to have been infringed, and identify the material that is claimed to be infringing. Copyright infringement notices must also comply with Cox's other policies, including Cox's privacy policy.

21.     Cox reserves the right to terminate subscribers who repeatedly infringe copyrights, and terminates repeat infringers when Cox deems it appropriate to do so.

22.     Cox cannot verify infringement notices that it receives. In particular, Cox cannot verify whether the information in a notice is accurate.

23.     Cox cannot itself detect infringement, and cannot determine whether infringing content is crossing its network. Cox cannot control or examine material that is on its subscribers' computers. Even if it could, doing so would violate Cox's policies and violate its users' privacy.

24.     Copyright infringement notices that Cox receives for its ISP service always refer to acts of alleged infringement that were identified in the past. Cox cannot examine the content a customer allegedly made available in the past, detect what the customer did with that content, or know whether a subscriber was authorized to possess that content.

25.     Cox cannot confirm whether the sender actually owns the copyright, or is authorized to send notices on behalf of the true owner.

26.     Nor can Cox remedy alleged infringement short of terminating an accused infringer. Cox does not control what its customers store on their computers, and cannot look at, locate, or remove any content that its customers may be uploading, downloading, or accessing through its ISP service.

## C.  Cox's CATS (Cox Abuse Tracking System) System

27.  In this case, Plaintiffs seek relief for claims of infringement that accrued from February 2013 through November 2014 (the "Relevant Time Period").

28.  Cox receives different types of notifications concerning its ISP system. This includes security notices, notices about system issues, copyright infringement notices, and others.

29.  Prior to the Relevant Time Period, Cox created a system called CATS—the Cox Abuse Tracking System—to partially automate the handling of notifications that Cox receives. Among other things, Cox's Customer Safety team uses CATS as a tool for processing and addressing copyright infringement notices. This allows Cox to efficiently process, respond to, and address such notices.

30.  CATS converts copyright infringement notices that meet Cox's basic requirements into "tickets." If a single account is targeted with multiple notices in one day, the notices are combined, or "rolled up," into one ticket. CATS tracks the number of copyright notices received (if any) per subscriber.

31.  Cox uses CATS to implement, and partially automate, Cox's Graduated Response procedure. Depending on the number of notices and tickets a subscriber has, Cox responds to copyright infringement notices with steps that escalate from warnings, to suspensions, and ultimately to the possibility of termination.

32.  While the CATS system enables Cox to partially automate its Graduated Response procedure, the most serious consequences are not automated. For example, customers whose accounts have been suspended must call and speak to a Customer Safety representative in person before their accounts can be reinstated. And Cox takes account termination extremely seriously: a Customer Safety representative must affirmatively order this ultimate consequence.

**D. Cox and Plaintiffs Negotiated Reasonable Limits on the Volume of Copyright Notices Plaintiffs Submitted**

33. Like any system, CATS has inherent limitations in terms of what it can address. For example, CATS can process only a certain number of complaints on any given day. Of course, such limitations are not unique to an automated system. Any review system, whether based on human review or automation or (as here) a combination of the two, can only have a certain capacity.

34. Using the CATS system's technological capabilities, Cox implemented safeguards to ensure that its review system treated all notice senders fairly. These safeguards also prevented third parties from "gaming the system," such as by purposely trying to overwhelm the system, or crowding out other notice senders.

35. To keep the volume of complaints manageable and prevent particular complainants from demanding an unfair share of Cox's resources, Cox placed an upper limit on the volume of complaints that it would accept per day from any particular sender.

36. Cox informed a sender if it reached the daily limit. A sender could, of course, resubmit notices that exceeded the limit on another day.

37. Cox worked with complainants to ensure that its daily limit was reasonable. For example, if a single sender represented multiple copyright owners, Cox could increase the sender's daily limit accordingly.

38. On information and belief, the Recording Industry Association of America ("RIAA") was the agent of The Record Company Plaintiffs (as that term is defined in Plaintiffs' Complaint) for the purposes of submitting copyright infringement notices to Cox.

39. The RIAA was well aware of Cox's daily limits on the volume of copyright infringement notices it would accept. Thus, The Record Company Plaintiffs, through their agent

the RIAA, were also well aware during the Relevant Time Period of Cox's daily limits on the volume of copyright infringement notices it would accept.

40.      On information and belief, The Music Publisher Plaintiffs (as that term is defined in Plaintiffs' Complaint) were also aware during the Relevant Time Period of Cox's daily limits on the volume of copyright infringement notices it would accept.

41.      Beginning in late 2008, Cox and the RIAA worked together to set up a system under which the RIAA would submit copyright infringement notices to Cox. Cox would process the notices, using its CATS system, according to Cox's Graduated Response Program.

42.      In connection with this process, the RIAA asked if Cox had any limits on the volume of notices it would accept. Cox explained that its CATS system had a default limit of 200 notices per day.

43.      Plaintiffs' agent, the RIAA, actively negotiated volume limits with Cox. Cox increased the notice volume limits for the RIAA several times, at its request.

44.      In or about January 2009, Cox increased the volume limit for notices sent by the RIAA to 400 notices per day.

45.      In or about April 2013, the RIAA reached out to Cox to request an increase in the volume limit. The RIAA requested an increase to 500 or 600 notices per weekday.

46.      Within less than a week, Cox agreed to accept 600 notices per weekday from the RIAA.

**E.      The Copyright Alert System (CAS) Agreement**

47.      In February 2013, a number of copyright owners, entertainment industry associations, and ISPs collectively entered into an agreement (the "CAS Agreement") to establish a "Copyright Alert System" (the "CAS").

48.     Under the CAS, signatory copyright owners or entertainment industry associations could send notices of alleged copyright infringement ("ISP Notices") to ISPs. The ISPs would accept and process the ISP Notices.

49.     If an ISP received an ISP Notice that could be associated with the account of a particular ISP subscriber, then the ISP would send a notification—called a Copyright Alert—to the subscriber.

50.     Under the CAS Agreement, participating ISPs would be required to accept and process only a limited volume of ISP Notices. The CAS Agreement also provided that a participating ISP could temporary cease processing ISP Notices if it received more than its business processes and systems could reasonably address.

51.     The CAS permitted, but did not require, ISPs to terminate subscribers who were accused of infringement, and who continued to receive Copyright Alerts.

52.     At least some of Plaintiffs are, and during the Relevant Time Period were, well aware of the provisions of the CAS Agreement.

53.     On information and belief, Plaintiff Sony Music Entertainment was a signatory to the CAS Agreement.

54.     On information and belief, Plaintiff UMG Recordings, Inc. was a signatory to the CAS Agreement.

55.     On information and belief, all of The Record Company Plaintiffs are, or during the Relevant Time Period were, affiliates, subsidiaries, or successors of signatories to the CAS Agreement.

56.     On information and belief, all of The Music Publisher Plaintiffs are, or during the Relevant Time Period were, affiliates, subsidiaries, or successors of signatories to the CAS Agreement.

57.     The RIAA was a signatory to the CAS Agreement.

58.     On information and belief:

a.  Plaintiff Arista Music was a member of the RIAA during the Relevant Time Period.

b.  Plaintiff Arista Records, LLC was a member of the RIAA during the Relevant Time Period.

c.  Atlantic Recording Corporation was a member of the RIAA during the Relevant Time Period.

d.  Plaintiff Bad Boy Records LLC was a member of the RIAA during the Relevant Time Period.

e.  Plaintiff Capitol Records, LLC was a member of the RIAA during the Relevant Time Period.

f.  Plaintiff Elektra Entertainment Group, Inc. was a member of the RIAA during the Relevant Time Period.

g.  Plaintiff Fueled by Ramen LLC was a member of the RIAA during the Relevant Time Period.

h.  Plaintiff LaFace Records LLC was a member of the RIAA during the Relevant Time Period.

i.  Plaintiff Nonesuch Records Inc. was a member of the RIAA during the Relevant Time Period.

j.  Plaintiff Provident Label Group, LLC Inc. was a member of the RIAA during the Relevant Time Period.

k.  Plaintiff Roadrunner Records, Inc. was a member of the RIAA during the Relevant Time Period.

l.  Plaintiff Rondor Music International, Inc. was a member of the RIAA during the Relevant Time Period.

m. Plaintiff Sony Music Entertainment was a member of the RIAA during the Relevant Time Period.

n.  Plaintiff Sony Music Entertainment US Latin was a member of the RIAA during the Relevant Time Period.

o.  Plaintiff UMG Recordings, Inc. was a member of the RIAA during the Relevant Time Period.

p.  Plaintiff Universal Music Corp. was a member of the RIAA during the Relevant Time Period.

q.  Plaintiff Volcano Entertainment III, LLC was a member of the RIAA during the Relevant Time Period.

r.  Plaintiff Warner Bros. Records Inc. was a member of the RIAA during the Relevant Time Period.

s.  Plaintiff Zomba Recordings LLC was a member of the RIAA during the Relevant Time Period.

59.    Cox was also aware of the CAS Agreement during the Relevant Time Period, since Cox had been involved in the negotiations to establish the CAS. However, Cox was not a signatory to the CAS Agreement.

60.    On information and belief, one goal of the CAS Agreement was to establish industry standard practices for entertainment industry copyright owners to submit copyright infringement notices to ISPs, and for ISPs to process such notices and inform their subscribers of infringement allegations against them.

61.    Content owners participating in the CAS Agreement (including some of Plaintiffs here) and participating ISPs (including SBC Internet Services, Verizon Online, Comcast Cable Communications Management, CSC Holdings, and Time Warner Cable) established the Center for Copyright Information.

62.    An express goal of the Center for Copyright Information was "facilitating the involvement of non-participating ISPs in … the Copyright Alert program."

63.     In May 2014, RIAA Chairman and CEO Cary Sherman described the Center for Copyright Information as "a model for success."[3] Mr. Sherman lauded "the Alert program and all its accomplishments." He stated that the CAS was "moving the needle," and acknowledged that as the CAS program progressed, "there were fewer and fewer Alerts sent at each level."

**F.     Plaintiffs' Copyright Infringement Notices**

64.     On information and belief, The Record Company Plaintiffs, through their agent the RIAA, engaged the services of rights enforcement organization MarkMonitor to monitor and detect infringing activity and send notices alleging copyright infringement to Cox. MarkMonitor markets itself as an "antipiracy solution."

65.     Third-party notices such as those Plaintiffs' agents submitted to Cox can be unreliable.

66.     Indeed, studies and published reports show that such notices can be wildly inaccurate.

67.     Academic studies have demonstrated that copyright infringement notices sent by third parties to online service providers can be unreliable and are prone to error.

68.     For example, a 2016 study examined a sample of 288,675 copyright infringement notices that were sent to online service providers between May 1, 2013 and October 31, 2013 (the Study Period). Jennifer Urban, *et al.*, *Notice and Takedown in Everyday Practice* (2016) ("Urban Study").[4]

---

[3] Cary Sherman, "CCI: A Model for Success," RIAA.com (May 28, 2014) (available online at https://www.riaa.com/cci-a-model-for-success/).

[4] Available online at https://papers.ssrn.com/sol3/Delivery.cfm/SSRN_ID2938642_code1788303.pdf?abstractid=2755628&mirid=1 (last visited Sept. 11, 2018).

69.     The RIAA sent notices that were included in the sample that the Urban Study analyzed.

70.     MarkMonitor sent notices that were included in the sample that the Urban Study analyzed.

71.     Because some notices in the sample set for the Urban Study contained multiple requests, these notices together represented over 100 million claims of infringement. *Id.*

72.     The Urban Study found that 4.2% of the infringement claims examined "were fundamentally flawed because they targeted content that clearly did not match the identified infringed work." *Id.* at 88. In addition, 28.4% of notices that the Urban Study examined "had characteristics that raised clear questions about their validity," including notices with "multiple potential issues." *Id.*

73.     The Urban Study also discussed specific instances in which notices sent by MarkMonitor were "clear mismatches" between the allegedly infringed work, and the online content that was allegedly infringing. *Id.* at 92.

74.     The Urban Study also identified MarkMonitor as having sent tens of thousands of notices during the study period, alleging infringement by file-sharing websites that had been "dead more than 18 months." *Id.* at 89-90.

75.     Multiple news stories, including stories from the time period covered by Plaintiffs' copyright infringement allegations, reported errors in notices sent by MarkMonitor to online service providers. For example, in February and March of 2013, multiple news stories highlighted instances in which MarkMonitor (under the name Dtecnet, a division of MarkMonitor) had sent erroneous copyright infringement notices to online service providers.

76.    A February 3, 2013 news story reported that Dtecnet, a division of MarkMonitor, had sent copyright infringement notices to Google, alleging that HBO's own website contained infringing copies of HBO's copyrighted content. *See* Ernesto Van der Sar, "HBO Wants Google to censor HBO.com," TorrentFreak (February 3, 2013).[5]

77.    A March 1, 2013 news story reported that Dtecnet, a division of MarkMonitor, had misidentified a modified version of an online game as a television show, resulting in issuance of multiple incorrect copyright infringement notices. *See* Masnick, Mike, "System Used By New Six Strikes CAS, Falsely Identifies Game Mods As NBC TV Shows," TechDirt.com (Mar. 1, 2013).[6]

78.    MarkMonitor was also the rights enforcement organization that the Center for Copyright Information employed to detect instances of alleged infringement and send ISP Notices in connection with the CAS.

79.    In 2012, the Center for Copyright Information hired the firm Stroz Friedberg to perform an assessment of MarkMonitor's technology in connection with the CAS.

80.    Stroz Friedberg had been retained by the RIAA as a lobbying firm from 2004 through 2009.

81.    The Stroz Friedberg assessment contained six recommendations that "focused on improving the accuracy and reliability" of MarkMonitor's processes.

82.    However, all six of those recommendations were redacted. On information and belief, the Stroz Friedberg report has never been released to the public in unredacted form.

---

[5] Available online at https://torrentfreak.com/hbo-wants-google-to-censor-hbo-com-130203/ (last visited Sept. 11, 2018).
[6] Available online at https://www.techdirt.com/articles/20130224/22341022086/system-used-new-six-strikes-cas-falsely-identifies-game-mods-as-nbc-tv-shows.shtml (last visited Sept. 11, 2018).

83.     After it was reported that Stroz Friedberg has been a lobbyist for the RIAA between 2004 and 2009, the Center for Copyright Information hired a second consulting firm, Harbor Labs, to conduct another review of MarkMonitor's system.

84.     On information and belief, with the exception of a 2-page Executive Summary, the Harbor Labs report on MarkMonitor's technology has never been made public.

85.     The Executive Summary of the Harbor Labs report states that Harbor Labs did not review MarkMonitor's source code, and did not conduct its own tests of the MarkMonitor technology. Rather, the Executive Summary states that Harbor Labs relied on test results conducted previously by Stroz Friedberg as part of its assessment in 2012.

86.     On information and belief, Plaintiffs have not sued any BitTorrent sites directly for the infringements they allege here.

87.     On information and belief, Plaintiffs have not sued any individual direct infringers for the infringements they allege here.

88.     Cox brings these counterclaims for declaratory relief based upon explicit threats and actual litigation by Plaintiffs against Cox. An actual case or controversy exists within the meaning of 28 U.S.C. § 2201 as to whether Cox bears liability pursuant to the claims threatened by Plaintiffs in and out of court. A judicial determination is necessary and appropriate at this time so that the parties may ascertain their respective rights and obligations, if any.

## CLAIM ONE

### FOR A DECLARATORY JUDGMENT THAT COX IS NOT LIABLE FOR CONTRIBUTORY INFRINGEMENT OF PLAINTIFFS' WORKS AT ISSUE

89.     Cox repeats the allegations in Paragraphs 1 through 88 and incorporates them here.

90.     Cox provides an ISP system that enables its subscribers to access the Internet, and the host of services that Internet access enables and provides. Cox itself does not store infringing

content on its servers, does not host websites that index infringing files, does not and did not intend to encourage infringement, and does not create or distribute peer-to-peer file-sharing software or other file-sharing software.

91.     Cox's ISP system is capable of substantial non-infringing uses.

92.     Cox cannot itself detect infringement occurring on its system or the Internet.

93.     Cox lacked the ability to verify Plaintiffs' allegations of infringement.

94.     The systems Plaintiffs used to detect infringement and send copyright infringement notices were unreliable, and were known to be unreliable.

95.     Cox lacked knowledge of any acts of copyright infringement by others particularly claimed by Plaintiffs in this action.

96.     Cox lacked knowledge of any acts of copyright infringement by others generally claimed by Plaintiffs in this action.

97.     Cox has not materially contributed to any third party's violation of Plaintiffs' exclusive right to reproduce works in copies under 17 U.S.C. § 106(1).

98.     Cox has not materially contributed to any third party's violation of Plaintiffs' exclusive right to prepare derivative works based upon Plaintiffs' copyrighted works under 17 U.S.C. § 106(2).

99.     Cox has not materially contributed to any third party's violation of Plaintiffs' exclusive right to distribute copies of Plaintiffs' copyrighted works to the public by sale or other transfer of ownership, or by rental, lease, or lending under 17 U.S.C. § 106(3).

100.    Cox has not materially contributed to any third party's violation of Plaintiffs' exclusive right to perform Plaintiffs' copyrighted works publicly in copies under 17 U.S.C. § 106(4).

101.     Cox has not materially contributed to any third party's violation of Plaintiffs' exclusive right to display Plaintiffs' copyrighted works publicly works in copies under 17 U.S.C. § 106(5).

102.     Cox has not materially contributed to any third party's violation of Plaintiffs' exclusive right to perform Plaintiffs' copyrighted sound recordings publicly by means of a digital audio transmission under 17 U.S.C. § 106(6).

103.     Cox is entitled to a declaration that it is not liable to Plaintiffs, or any of them, on account of copyright infringement by others.

## CLAIM TWO

### FOR A DECLARATORY JUDGMENT THAT COX IS NOT VICARIOUSLY LIABLE FOR INFRINGEMENT BY THIRD PARTIES OF PLAINTIFFS' WORKS AT ISSUE

104.     Cox repeats the allegations in Paragraphs 1 through 103 and incorporates them here.

105.     At all relevant times, Cox lacked the ability, including the practical ability, to supervise its subscribers.

106.     At all relevant times, Cox lacked the ability, including the practical ability, to control its subscribers.

107.     At all relevant times, the sole means of control Cox had over a subscriber's use of the Internet was Cox's ability to disable Internet service or terminate the subscriber's account, thereby removing the customer's ability to access the Internet for any purpose.

108.     Cox did not, and does not, have a direct financial interest in infringement of Plaintiffs' works, if any, that occurred on Cox's system or network.

109.     Cox did not, and does not, receive a direct financial benefit as a result of any copyright infringement that may occur over its network.

110.     Copyright infringement occurring over Cox's ISP system can slow traffic and adversely impact the transmission of data for all users of the system. These effects harm both Cox and its users.

111.     At all relevant times, Cox provided Internet access service to its residential subscribers for a flat monthly fee. Cox's fees are not based on the particular uses customers make of its ISP system.

112.     Cox is entitled to a declaration that it is not vicariously liable to Plaintiffs, or any of them, on account of copyright infringement by others.

## DEMAND FOR JURY TRIAL

Defendants hereby request a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Defendants Cox Communications, Inc. and CoxCom LLC respectfully request that this Court enter judgment as follows:

a.     Judgment against Plaintiffs and in favor of Defendants on Plaintiffs' claims set forth in the Complaint and dismissal of such claims with prejudice;

b.     A declaratory judgment, holding that Defendants are not liable for contributory infringement of Plaintiffs' works at issue;

c.     A declaratory judgment, holding that Defendants are not vicariously liable for their subscribers' alleged infringements of Plaintiffs' works at issue;

d.     Ordering Plaintiffs to pay Defendants' reasonable attorneys' fees and costs incurred in connection with this action pursuant to 17 U.S.C. § 505; and

e.     Such other and further relief in Defendants' favor as the Court shall deem just and proper.

Dated: September 24, 2018

Respectfully submitted,

/s/ Thomas M. Buchanan
Thomas M. Buchanan (VSB No. 21530)
Winston & Strawn LLP
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.
and CoxCom, LLC*

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice* application pending)
Thomas Patrick Lane (*pro hac vice* application pending)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone:  (212) 294-6700
Facsimile:   (212) 294-4700
Email:  melkin@winston.com
Email:  tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice* application pending)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA  94111-5840
Telephone:  (415) 591-1000
Facsimile:   (415) 591-1400
Email:  jgolinveaux@winston.com

Diana Hughes Leiden (*pro hac vice* application forthcoming)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Telephone:  (213) 615-1700
Facsimile:   (213) 615-1750
Email:  dhleiden@winston.com

## CERTIFICATE OF SERVICE

I certify that on September 24, 2018, a copy of the foregoing ANSWER, AFFIRMATIVE

DEFENSES, AND COUNTERCLAIMS TO COMPLAINT was filed electronically with the Clerk

of Court using the ECF system which will send notifications to ECF participants.

/s/ Thomas M. Buchanan
Thomas M. Buchanan (VSB No. 21530)
Winston & Strawn LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc. and
CoxCom, LLC*