**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT, *et al.*, | |
| Plaintiffs, | Case No. 1:18-cv-00950-LO-JFA |
| v. | COX'S OPPOSITION TO PLAINTIFFS' JUNE 21, 2019 MOTION TO COMPEL (ECF NO. 176) |
| COX COMMUNICATIONS, INC., *et al.*, | |
| Defendants. | |

**COX'S OPPOSITION TO PLAINTIFFS'**

**JUNE 21, 2019 MOTION TO COMPEL**

## I.    INTRODUCTION

With the instant motion, Plaintiffs seek information at the very end of fact discovery that

is irrelevant to any claims or defenses in this case and amounts to nothing more than an intrusive

fishing expedition that far exceeds the scope of permissible discovery. Plaintiffs' eleventh-hour

omnibus motion belatedly seeks extensive and burdensome discovery covering categories of

documents that Plaintiffs have been aware of for months, in some cases nearly half a year.[1]

Specifically, Plaintiffs seek:

1. The entirety of the confidential audited financial statements for Cox

    Communications, Inc., that go far beyond the comprehensive financial data Cox has

    already produced, and is neither relevant, nor proportional to the needs of the case.

    The data Cox has produced is more than sufficient, and Plaintiffs fail to explain in

    any meaningful way how the additional information is either relevant or necessary.

---

[1] *See*, in particular, topics 1, 3, 5, 6, 7, 8, discussed in detail below.

2. Data "underlying" charts in a slideshow presentation from 2011, showing that 96% of Cox subscribers who are accused of copyright infringement never proceeded beyond the fifth step of Cox's Graduated Response Program. Notwithstanding that Plaintiffs raised this issue late, *see* Plaintiffs' Ex. 8 at 5,[2] and moved on it prematurely, Cox will agree to produce the data in question.

3. At least several thousands of CATS work log notes for Cox Business subscribers. While Plaintiffs' motion vaguely describes these as "[d]ocuments regarding Cox's implementation of its graduated response policy with respect to business subscribers[,]" in reality, they are simply free-form text notes that, to the extent they are relevant, reflect information that Cox has already provided in another form.

4. A hearsay expert report from the *BMG* litigation, prepared by an expert who was excluded from testifying at trial in that case, has not been engaged by either party in this case, and was not deposed and will not testify in this case.

5. Video recordings of depositions from the *BMG* litigation, which Plaintiffs have never formally requested in discovery despite having known of their existence for months.

6. Employment documents of Jason Zabek, Joseph Sikes, and Roger Vredenburg. Plaintiffs can point to no claim or defense to which these personnel documents are relevant. Moreover, Plaintiffs already obtained the separation letters of Messrs. Zabek and Sikes in response to subpoenas to those individuals, and they fail to explain why such documents concerning Mr. Vredenburg (who retired from Cox years ago) are

---

[2] Plaintiffs raised this issue on June 17, 2019, despite having had the document for months and having deposed multiple witnesses about it. *See* Plaintiffs' Ex. 8 at p.5 (June 17, 2019 email).

relevant. Moreover, Plaintiffs took the videotaped depositions of Mr. Sikes in this case, are taking Mr. Zabek's next Tuesday, and opted not to depose Mr. Vredenburg.

7.   "Weekly abuse reports" for 2012-2014, purportedly showing the numbers of complaints Cox received, by "abuse type." But Plaintiffs already have detailed information about the number of copyright-related complaints Cox received during that period, and fail to explain why information about the raw numbers of other complaint types is relevant.

8.   Witness testimony concerning a purported "three strikes" policy. As Cox's 30(b)(6) witness already explained, however, Cox "never had" such a policy, and "[c]ertainly not for the Graduated Response Program" that was in effect during the relevant time period. Contrary to Plaintiffs' contention, the two documents they point to as support for their motion do not show that Cox had a three strikes policy.

Plaintiffs' Motion should be denied in its entirety for the reasons further detailed below.

## II.   ARGUMENT

### A.   Plaintiffs' Motion to Compel Lacks Merit

#### 1.   Financial Statements

Plaintiffs' RFP Set 3 #1 broadly seeks Cox's "complete audited financial statements for 2011-2014 . . . includ[ing] the full auditor reports, notes, letters, opinions and narrative discussions and explanations concerning the financial statements[.]" Plaintiffs' Ex. 7. But Plaintiffs concede that Cox has already produced substantial company-wide financial information for Cox Communications, Inc., including Cox's consolidated balance sheets for

2011-2014; consolidated statements of operations for 2010-2014; and consolidated statements of cash flows for 2010-2014.[3] ECF 177 at 3.

Plaintiffs argue that Cox "concedes the relevance" of its complete audited financial statements and that Plaintiffs are entitled to them in their entirety, merely because Cox's 30(b)(6) witness reviewed them to prepare for his deposition. ECF 177 at 2. But Cox has produced all of the financial statements that the witness relied on. *See* Ex. A (Mencher Dep. Tr.) at 71:15-17 (stating that Mr. Mencher reviewed "Cox Communications' audited financial statements, which shows revenues, expenses, all the way down through net income"); *and compare, e.g.*, Ex. A (Mencher Dep. Tr.) at 52:2-5, 12-17 (stating he "would have to look at [Cox's] financial statement reports" to answer specific questions concerning dividends") *with* Plaintiffs' Ex. 5 at 2, 4; *and compare* Ex. A (Mencher Dep. Tr.) at 54:13-23 (questions concerning Cox's retained earnings) *with* Plaintiffs' Ex. 5 at 2; *and compare* Ex. A (Mencher Dep. Tr.) at 80:7-82:4 (questions concerning Cox's revenue, net income, and total expenses for 2013 and 2014) *with* Plaintiffs' Ex. 5 *passim*. Moreover, far from "conceding" the relevance of Cox's audited financial to this topic, Cox specifically objected to it on the basis that "Cox's revenues, expenses and profits unrelated to its ISP service lack relevance to this litigation[,]" and because it sought discovery that was not proportional to the needs of the case. Ex. C (Cox's Objections and Responses to Plaintiffs' March 20, 2019 Notice of 30(b)(6) Deposition to Defendants Cox Communications, Inc. and CoxCom LLC) at 4-5.  As with any other means of discovery, the

---

[3] Plaintiffs incorrectly assert that Cox provided financial information only for 2012-2014. ECF 177 at 3. As reflected in Plaintiffs' sealed Exhibit 5, in fact Cox provided balance sheet information going back to 2011, and statements of operations and statements of cash flows going back to 2010. *See* Plaintiffs' Ex. 5 [filed under seal] at pp. 2-4 (document page numbers 23, 24 and 26).

mere fact that Plaintiffs sought 30(b)(6) testimony on this topic does not, of course, make it relevant to the litigation.

Plaintiffs' Motion also ignores the substantial additional, detailed financial information Cox has already produced in this case, including:

- Financial statements for Cox's residential Internet, Video, and Telephony services, for 2011 through 2014;

- A detailed breakdown of the financial statement for Cox's residential Internet service for 2011 through 2014;

- Month-by-month billing and payment information for the period 2012-2016, for each of the approximately 58,000 subscribers whose alleged infringement is at issue in this case; and

- Detailed financial information from 2011 through 2014 for Cox Business services (including Internet, telephony, Video, Security service, Hospitality Network, and Corporate services).

The information Cox has produced to date is more than adequate for any conceivable proper use by Plaintiffs. Moreover, Plaintiffs have elected statutory damages, not actual damages, and have failed to articulate any connection between the expansive financial information they seek, and any of the claims or defenses in this case, or their damages theory. Tellingly, Plaintiffs' Motion lacks any supporting affidavits from their damages expert that support the need for the so-called additional "context." And neither Plaintiffs' vicarious liability claim (which requires a showing of direct financial benefit from the alleged infringement), nor their claim for statutory damages (which are assessed on a per-work basis) has any nexus to the additional financial information they seek. Plaintiffs cannot point to any legitimate purpose for

which the additional information ("auditor reports, notes, letters, opinions and narrative discussions and explanations concerning the financial statements") is relevant, let alone necessary. Instead, they argue vaguely that it will "allow them to understand [Cox's] financials in context"—a statement so vague as to be meaningless. ECF 177 at 1.

The two out-of-circuit decisions Plaintiffs cite do not support this additional, intrusive discovery. Both concern situations where one party's production of financial information was demonstrably incomplete or contradictory, such that additional discovery was necessary to provide an accurate picture of the party's financial situation. That is not the case here. First, Plaintiffs misleadingly quote a portion of a Mississippi federal court's decision in *Midwest Feeders*, using that out-of-context snippet of text to argue that if any *portion* of financial statements is "pertinent" to damages, then the entire document must be produced. ECF 177 at 2 (citing *Midwest Feeders, Inc. v. Bank of Franklin*, No. 5:14cv78-DCB-MTP, 2016 U.S. Dist. LEXIS 90062, at *15 (S.D. Miss. Feb. 26, 2016)). But in that case, the court ordered additional discovery in order to resolve a specific issue of fact directly relevant to Plaintiffs' damages claim, since "[the plaintiff's] claimed damages [did] not properly align with" the amounts of alleged fraudulent transactions at issue. Accordingly, the court granted the defendant's motion for the plaintiffs' audits, financial statements, and tax returns for a limited time period. Similarly, in *Beltran v. Interexchange*—an employment case—the defendant had produced portions of its audited financial statements, but only with redactions that were "so significant it [was] difficult to understand what remain[ed][.]" Among other things, the defendant had redacted information on its balance sheets, and also redacted "significant payments to affiliates for … costs related to the … program" at issue. Because the "extensive" redactions "prevent[ed] any real understanding of the scope of what was removed[,]" the court ordered production of unredacted

audited financial statements covering the relevant time. *Id.* at 7. Neither of these cases justifies

the expanded financial discovery Plaintiffs are seeking here. Cox has not redacted data from the

balance sheets it has produced, and Plaintiffs do not and could not argue that the substantial

financial information that Cox has already produced is insufficient for their damages

calculations, or difficult to understand.

Plaintiffs fail to identify any claim or defense to which the information they seek is

relevant, and do not argue that there is any issue with understanding the meaning of the financial

information Cox has already provided. Plaintiffs' argument that they seek further "context" is so

vague as to be meaningless—a hallmark of a fishing expedition. The Court should deny

Plaintiffs' motion with respect to these broad financial documents.

### 2.    Underlying data for "96% stop by 5 notices" presentation

Plaintiffs argue that they are entitled to the "data underlying" a document that Cox

produced months ago, and which Plaintiffs have already deposed Cox's fact and expert witnesses

about. Plaintiffs raised this issue late, *see* Plaintiffs' Ex. 8 at 5,[4] and moved on it prematurely.

Notwithstanding that, Cox will agree to produce a copy of the data in question. This portion of

Plaintiffs' motion is thus moot.

### 3.    CATS work log notes for Cox Business subscribers

Plaintiffs ask the Court to compel Cox to produce work log notes from Cox's CATS

system, for Cox Business customers, for the period of 2012 through 2014. ECF 176; ECF 177 at

4.[5] These "work log notes" are text entries in a ticket's "work log," which is simply a free-form

---

[4] Plaintiffs raised this issue on June 17, 2019, despite having had the document for months and having deposed multiple witnesses about it. *See* Plaintiffs' Ex. 8 at p.5 (June 17, 2019 email).
[5] In their supporting memorandum, Plaintiffs vaguely describe these as "[d]ocuments regarding Cox's implementation of its graduated response policy with respect to business subscribers[.]" ECF 177 at 4.

text field within a ticket that contains textual information about the ticket. Declaration of Brent

K. Beck ("Beck Dec.") at ¶ 3. Work log notes are maintained at the ticket level, not the

subscriber level. *Id.* ¶ 4. This means that if there are multiple tickets associated with a particular

subscriber, there would also be multiple work logs, each potentially containing multiple work log

notes. *Id.* ¶ 5-6. Given the number of Cox Business subscribers in this case, there will be at least

several thousand tickets—and likely well in excess of that number—each with its own work log

notes. *Id.* ¶ 2, 5, 6. These text fields may contain a wide variety of different types of information,

potentially including private information of an individual associated with the Cox Business

subscriber. *Id.* ¶ 7. Such information could include, for example, the name, home or work

address, personal or work telephone number, personal or work email address, or other private

information, for a business customer's designated contact. *Id.* Accordingly, in order to be sure

that any given CATS work log note field does not contain information that would implicate an

individual's private information, each such text field would have to be reviewed individually. *Id.*

¶ 8. This review would have to be done manually, and any necessary redactions before the

information could be produced would also have to be done manually. *Id.*

    The information Plaintiffs seek is also largely duplicative of information that Cox

previously provided to Plaintiffs pursuant to the parties' agreement, according to which Cox

produced summary information about copyright-related CATS tickets. *Id.* ¶ 9; *see* Feb. 15, 2019

Hearing Tr. at 4-5 (discussing Cox's agreement to provide summary level data for copyright-

related tickets associated with subscribers who were the subject of Plaintiffs' notices, including

the abuse type, ticket number and date, and action that Cox took on the ticket). Indeed, the

purpose of that agreement was to avoid precisely the sort of extremely burdensome production

and review that Plaintiffs are again seeking to compel Cox to undertake. *See* ECF 103-1

(Declaration of Brent K. Beck in support of Cox's Opposition to Plaintiffs' Feb. 1, 2019 Motion

to Compel) at, e.g., ¶ 13-14 (discussing necessity of manual review to prevent disclosure of

personally identifiable information).

Plaintiffs argue that there are "substantial questions about whether Cox contacted its

business customers to inform them of infringement reports or did anything at all," ECF 177 at 4,

based on a single email thread from 2011— nearly a year and a half before the alleged

infringements in this case occurred—that does not show what Plaintiffs claim it does. *See*

Plaintiffs' Ex. 16. Far from being a "telling" email that justifies extensive, overbroad discovery,

it shows instead that Cox took pains to ensure that its customer service representatives followed

Cox's notice handling procedures to the letter, and that Cox took prompt measures to deal with

any deviation from its procedures. The email concerns an isolated incident in 2011, in which

Cox's Manager of Customer Safety Jason Zabek discovered that one customer service

representative had not followed Cox's policies. Mr. Zabek immediately took steps to notify the

supervisor, providing a detailed analysis of what had occurred, and then taking steps to rectify

the situation, including re-opening the tickets in question and handling them in accordance with

Cox's procedures. *Id.* This single email thread, which shows Cox identifying and promptly

resolving an isolated incident, does not justify the extremely burdensome discovery Plaintiffs

seek. Moreover, the discovery is highly unlikely to provide useful evidence: as Plaintiffs

concede, they hope to use this discovery to show the *absence* of evidence. ECF 177 at 5 ("The

absence of work log entries indicating calls to business subscribers would be indicative of Cox's

failure to implement its own graduated response policy."). But there may be many reasons why a

customer service representative might not enter a note in a ticket's work log, and the absence of a

note is not a reliable indication that an action was *not* taken. Beck Dec. ¶ 10. The speculative

basis for Plaintiffs' request, the improbability of obtaining meaningful "negative" evidence, and the degree of burden to Cox to extract,[6] review, and produce this duplicative evidence, is too attenuated to justify this discovery. The Court should deny Plaintiffs' motion.

### 4.  William Rosenblatt expert reports

Plaintiffs seek to compel the production of expert reports from William Rosenblatt, a Cox expert in the *BMG* litigation who was not retained by either party in connection with this litigation, has not been deposed in this case, and was not permitted to testify at trial in *BMG*. His expert reports from the BMG litigation are hearsay and irrelevant to this case.

The Federal Rules preclude use of expert opinion unless it is "base[d] . . . on facts or data *in the case* that the expert has been made aware of or personally observed." Fed. R. Evid. 703 (emphasis added). Expert opinions that are based on facts and data from outside the case are neither admissible nor relevant. Even if Mr. Rosenblatt were to qualify as an expert in this case—a finding no party has sought—his report would be inadmissible hearsay, since "[r]eports stating an expert opinion 'are not admissible without the preparer being present in court to testify as to his qualifications as an expert and to be cross-examined on the substance.'" *Tokio Marine & Fire Ins. Co. v. Norfolk & W. Ry.*, Case No. 98-1050, No. 98-1077, 1999 U.S. App. LEXIS 476, at *10 (4th Cir. Jan. 14, 1999) (quoting *Forward Communications Corp. v. U.S.*, 221 Ct. Cl. 582, 608 F.2d 485, 511 (Ct. Cl. 1979); *and see, e.g., SMD Software, Inc. v. Emove, Inc.*, Case No. 5:08-CV-403-FL, 2014 U.S. Dist. LEXIS 200896, at *7 (E.D.N.C. May 5, 2014) (noting that "the great weight of authority appears to hold that expert reports are generally inadmissible hearsay absent a contrary stipulation by the parties," and collecting cases).

---

[6] Given that Brent Beck, the engineer with primary responsibility for supporting Cox's CATS system, has never written a script to extract work log notes in CATS, it is impossible to predict what unexpected complications might arise. Beck Dec. ¶¶ 1, 11.

Plaintiffs suggest that Mr. Rosenblatt's expert reports might be "useful for impeachment," but fail to explain *whose* testimony they believe could be impeached with this hearsay evidence. Mr. Rosenblatt has not been engaged by either party in this case, and is not a witness. Plaintiffs cite no authority, and Cox is aware of none, supporting the dubious notion that the documents they seek—irrelevant, hearsay reports from a different case, from an expert who was not retained and will not be involved in this case—could possibly be admissible for purposes of impeaching a *different* witness in *this* case.

The two out-of-circuit cases Plaintiffs cite in support of their motion are readily distinguishable, since both of them involved experts who were involved in the case where the party sought to use their opinion testimony. In *Samaritan Health Ctr. v. Simplicity Health Care Plan*, 459 F. Supp. 2d 786, 799 (E.D. Wis. 2006), the court held that the opinion of a party's expert may qualify for an exception to hearsay, as a party admission, but only when it qualifies "by virtue of the party's proffering of the expert's opinion **as part of its case**." *Id.* at 799 (emphasis added). That narrow exception does not apply here, where Cox has not proffered Mr. Rosenblatt's opinion "as part of its case." Similarly, in *Long v. Fairbank Farms, Inc.*, Nos. 1:09–cv–592, 2:10–cv–60, 2011 WL 2516378, at *10 (D. Me. May 31, 2011), the expert had been retained *for the litigation*, not in an unrelated case.

As the Court held when Plaintiffs earlier attempted to obtain testimony and exhibits from experts who had testified in the *BMG* case, but had not been retained: "You['re] going to, as I said earlier, have to plow your own road. If you want to decide to use an expert witness, you need to contact that expert witness. You don't get to do a dry run in seeing what they did in a deposition before you do that." Dec. 21, 2018 Hearing Tr. at 15:22-25. Unlike the experts who have been retained in this case—whose opinions from other cases, if they conflict with those

expressed here, could potentially be relevant for impeachment or other purposes—there is no

basis for obtaining Mr. Rosenblatt's irrelevant, hearsay reports. The Court should deny

Plaintiffs' motion to compel these documents.

### 5.    Video of Cox witnesses

Plaintiffs' request for copies of video recordings of depositions from the *BMG* litigation

is also without merit. First, Plaintiffs have never formally requested these recordings in

discovery, despite having had ample opportunity to do so. Neither the Federal Rules nor the

Local Rules provide any basis for a party to belatedly obtain discovery of documents that they

failed to request. Second, the video recordings themselves are redundant and unnecessary. As

Plaintiffs concede, they already have the transcripts of relevant depositions from the *BMG* case

in the only form they *did* request, namely, as written transcripts. ECF 177 at 9. Third, Plaintiffs'

Motion ignores the Court's admonition that Plaintiffs "[are] going to, as I said earlier, have to

plow your own road" in this litigation. Indeed, Plaintiffs have already deposed, or had ample

opportunity to depose, all of the witnesses whose *BMG* video recordings they seek, and Plaintiffs

have the accompanying video from all of those depositions.

Plaintiffs cite no authority supporting their claim that they are entitled to documents they

failed to request in discovery, merely because they may be "powerful and assistive to a jury."

ECF 177 at 9. Nor should the Court order production of these recordings based on Plaintiffs'

unfounded speculation that Cox "may try to use" the video at trial. There is obviously no way

Cox could "try to use" the video without giving Plaintiffs notice in advance: in the unlikely event

that Cox wishes to use any *BMG* deposition video footage in this trial, Cox will be required to

disclose the fact. Thus, although Cox has no present intent to use video recordings from the *BMG*

case at trial in this case, and does not foresee that their use will be necessary, Plaintiffs will have

ample opportunity to address this issue in the unlikely event that this changes. In the meantime, Plaintiffs' motion concerning these recordings is meritless, at the very best premature, and should be denied.

### 6. Employment documents for Zabek, Sikes, and Vredenburg

Plaintiffs seek "[d]ocuments concerning Jason Zabek, Joseph Sikes, and Roger Vredenburg's end of employment with Cox, performance evaluations, and salary/bonus history from the period of 2010 through 2016." ECF 176. Although Plaintiffs claim vaguely that these documents are relevant to "understanding Cox's internal views on key individuals that ran the abuse department during these years," ECF 177 at 11, they fail to explain say *why* this is relevant, or to which claims or defenses they are relevant. Instead, it appears that Plaintiffs' sole theory of relevance is an unsupported conjecture that "[a]t trial, Cox may try to place responsibility for Cox's failures at the feet of these employees." ECF 177 at 11. Unfounded speculation aside, Plaintiffs fail to explain how the employment histories of these individuals is relevant to their claims.

The cases Plaintiffs cite to support their demand for these sensitive—and irrelevant—documents are readily distinguishable, for in each case, unlike here, the circumstances of employment were directly relevant the issues in the case. In *Weller v. Am. Home Assur. Co.*, an insurance case, the court applied a two-part test to determine when personnel files should be discoverable: "(1) the material sought is clearly relevant and (2) the need for discovery is compelling because the information sought is not otherwise readily obtainable." Case No. 3:05-CV-90, 2007 WL 1097883, at *7 (N.D.W. Va. Apr. 10, 2007) (citations and quotations omitted). Because the work history of the employees who handled Plaintiffs' insurance claim were "critical to [Plaintiffs'] allegations of bad faith by Defendant," and it was "difficult to see how Plaintiffs

could obtain equivalent material from other sources," the court held their files discoverable. *Id.*

In *Johnson v. Morris*, 903 F.2d 996, 998 (4th Cir. 1990), a former prison warden had been

demoted and transferred following an investigation into an incident in which he had allegedly

struck a prisoner. He was provided copies of the investigative file against him, which included

"all statements, the inmate file, and the personnel files of all employees of the Department of

Corrections who supplied information during the investigation." *Id*. And in *Royse v. Tyco Elecs.*

*Corp.*, an age-related discrimination case, the plaintiff alleged his firing was motivated by

corporate policies and programs devoted to promoting younger managers. Case No. 5:05-CV-

380-FL(3), 2006 WL 8438621, at \*1, 3 (E.D.N.C. May 12, 2006), *supplemented*, No. 5:05-CV-

380-FL(3), 2006 WL 8438622 (E.D.N.C. May 18, 2006). The court found that personnel files of

the senior managers allegedly involved in the termination decision were relevant, because they

related to "whether these managers were rewarded for promotion of younger managers at the

expense of older workers." *Id.* at \*3.

Here, by contrast, Plaintiffs can point to no claim or defense to which these personnel

documents are directly or indirectly relevant. Moreover, Plaintiffs have already obtained the

separation letters of Messrs. Zabek and Sikes in response to subpoenas to those individuals, and

they fail to explain why such documents concerning Mr. Vredenburg (who retired from Cox

years ago) are relevant. Plaintiffs have already deposed Mr. Sikes, which included asking him

about his tenure at Cox and the terms of his separation. They are taking the deposition of Jason

Zabek next Tuesday, at which they may ask him the same questions. And both Zabek and Sikes

have already produced their separation letters with Cox, which contain the terms of their

separation. *See* Plaintiffs' Ex. 30 (Sikes Dep. Tr.). As Plaintiffs are well aware, Roger

Vredenburg retired from Cox on July 28, 2016. *See BMG* ECF 993. Plaintiffs have opted not to

depose Mr. Vredenburg, and have not attempted to subpoena employment documents (or indeed any documents) from him. Because Plaintiffs fail to explain the relevance of this information to their claims—there is none—the Court should deny the motion.

### 7.    Weekly Abuse Reports

Plaintiffs seek reports showing the number of different types of tickets Cox received, either week-by-week or month-by-month, broken out by abuse category. ECF 177 at 11. Plaintiffs argue that it is "important" to compare the numbers of different types of tickets, because it "counterbalances the notion that Cox personnel were focused on hacking, spam, and malware abuse, without awareness of the scope of copyright violations or how they eclipsed the volume of complaints for other abuse types." *Id.* at 12. Plaintiffs cite no source for this supposed "notion," for which there is no evidence in the record whatsoever. And Plaintiffs' speculation that Cox "cannot foreclose the possibility that they also contain relevant narrative text" lacks any basis.

Plaintiffs already have information about the number of copyright complaints Cox received, by month, from January 2010 through early 2015. There is no dispute that Cox received different types of abuse complaints in addition to copyright complaints, but Plaintiffs offer no explanation of how the raw numbers of different types of abuse complaints are remotely relevant to any claim or defense in this case, and the Court should accordingly deny Plaintiffs' motion to compel their production.

### 8.    Testimony concerning a purported "3-strikes policy"

Plaintiffs ask that the Court order Cox to provide a 30(b)(6) witness "prepared to testify to [a supposed] three-strike policy" that Plaintiffs speculate Cox may have had. ECF 177 at 15.

But Cox has already provided such a witness, who testified unambiguously that Cox *did not have* such a policy.

Plaintiffs did not notice testimony on the topic of a purported three-strike policy. However, Cox's 30(b)(6) witness Matt Carothers was designated and fully prepared to testify concerning the topics Plaintiffs did notice under Rule 30(b)(6): Topic 9 (Cox's Graduated Response Program); Topic 30 (Cox's policies and procedures for handling copyright infringement notices); Topic 31 (actions Cox took or considered taking against accused subscribers); and Topic 32 (actions Cox took or considered taking against subscribers for whom RIAA sent notices).[7] Contrary to Plaintiffs' contention, Mr. Carothers was not only prepared to testify, but did testify, concerning the subject of a supposed three-strike policy in addition to the aforementioned topics—and he unambiguously testified that Cox "never had a three strikes policy. . . [c]ertainly not for the Graduated Response Program" Ex. B (Carothers Dep. Tr. 165:2, 165:6-7).[8]

Plaintiffs nonetheless argue that two documents produced by Cox "indicate" that Cox had a three-strike policy for dealing with allegations of copyright infringement, because the phrase "three strikes" appears in them. Neither document supports their theory that Cox had a three-strikes program at any relevant time. The first of the documents simply instructs Cox's customer service representatives "not [to] use the verbiage 'three strikes' with [Cox's] customers." Plaintiffs' Ex. 29. As the document goes on to explain—in language Plaintiffs strategically omit from their Motion—the reason for this is that Cox *did not have* a three-strikes policy, but instead

---

[7] Plaintiffs concede that 30(b)(6) Topics 9, 30, 31, and 32—all of which are topics for which Mr. Carothers was Cox's designated 30(b)(6) witness—are the ones that cover "[w]hether, when and how Cox had or implemented a three-strike policy, procedure or practice. ECF 177 at 13 & n.4.
[8] Plaintiffs' claim that Cox's witnesses "denied knowing anything about" a supposed three-strike policy is thus—at best—highly misleading.

"follow[ed] a graduated warning process for escalating handling of infringement claims." *Id.* As

30(b)(6) witness Mr. Carothers explained, the phrase was used because it was common parlance:

"[t]hree strikes is just sort of a -- it's a baseball reference. It's a sports reference, right. So we

might have used the phrase 'three strikes and you're out' when talking about some kind of abuse

issue." Ex. B (Carothers Dep. Tr. 165:20-24); *id.* at 166:10-12, 15-18 ("Q: My question to you,

Mr. Carothers, is whether or not the Abuse Department used to use the expression 'three

strikes'? A: I'm quite certain that members of my Abuse Department have used the phrase 'three

strikes' because everyone in America has used the phrase 'three strikes.'").

      Plaintiffs misrepresent the second document in several ways.

      *First*, although they argue that Cox's witnesses were unprepared to testify about the

document, they fail to mention that they did not show the document to Mr. Carothers—Cox's

30(b)(6) witness on the relevant topics—and did not ask him a single question about it.

      *Second*, the document itself clearly states that the so-called "'3-Strike Rule' **acts as a**

**guideline** for dealing with repeat abusers. However, the Abuse Team manages suspension and

termination decisions **on a case-by-case basis**." Ex. 28 at 8 (emphases added). Other language in

the document bears this out, and plainly shows that there was no hard-and-fast "three strikes"

policy. *See id.* at 6 (noting that the process is "Not always this simple"); *id.* at 7 (explaining that

after "the third offense for the same abuse issue . . . the customer's CHSI service **could be**

terminated.") (emphasis added); *id.* at 31 ("Additional complaints **can ultimately result** in the

termination of the service.") (emphasis added).

      *Third*, numerous examples and screenshots in the body of the document show that the

document itself dates from mid-2003, a full decade before Plaintiffs' Claim Period, and well

outside any time period relevant to this case. *See id.* at 17 (screenshot showing an "abuse date"

and "work log date" of 2003-07-11); 10 ("News" window in screenshot showing dates on

6/29/2003 and 6/24/2003); 18 ("abuse date" of 2003-06-23); 20 (displaying "current ticket

history" dates 2003-07-11); 21 (showing "work log" date Jul 11, 2003).

Plaintiffs' are being deliberately misleading: Cox's 30(b)(6) witness Matt Carothers was

designated to testify about Cox's graduated response, was prepared on it, and did testify on it.

Plaintiffs had ample opportunity to question him on both documents, but chose to ask him about

only one of them—and in response, Carothers testified that Cox had no such policy. Ex. B

(Carothers Dep. Tr. 165:2, 165:6-7). The Court should deny Plaintiffs' motion.

## III.    CONCLUSION

For the reasons set forth above, the Court should deny Plaintiffs' motion to compel in its

entirety.

Dated: June 26, 2019

/s/ / Thomas M. Buchanan /
Thomas M. Buchanan (VSB No. 21530)
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorneys for Defendants Cox Communications, Inc.
and CoxCom, LLC*

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Tel: (212) 294-6700
Fax: (212) 294-4700
Email: melkin@winston.com
Email: tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
Tel: (415) 591-1000
Fax: (415) 591-1400
Email: jgolinveaux@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Tel: (213) 615-1700
Fax: (213) 615-1750
Email: dhleiden@winston.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2019, the foregoing was filed and served electronically by the

Court's CM/ECF system upon all registered users.

/s/ /*Thomas M. Buchanan*/
Thomas M. Buchanan (VSB No. 21530)
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.
and CoxCom, LLC*