1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                        Alexandria Division




--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
              Plaintiffs,       :
                                :
    -vs-                        :    Case No. 1:18-cv-950
                                :
                                :
COX COMMUNICATIONS, INC., et al.,:
              Defendants.       :
                                :
--------------------------------:
```

HEARING ON MOTIONS

June 28, 2019

Before:  John F. Anderson, U.S. Mag. Judge

APPEARANCES:

Scott A. Zebrak, Counsel for the Plaintiffs

Thomas M. Buchanan, Counsel for the Defendants

2

1          NOTE:  The case is called to be heard at 10:41 a.m.

2   as follows:

3          THE CLERK:  Sony Music Entertainment, et al. versus

4   Cox Communications, Inc., et al., civil action number

5   18-cv-950.

6          THE COURT:  Well, I feel like it's Ground Hog Day.

7   You know, just time and time again.  I thought we were going to

8   get by without anymore motions to compel in this case, but I

9   guess not.

10          Mr. Zebrak, go ahead and -- each of you introduce

11   yourselves for the recording.

12          MR. ZEBRAK:  Good morning, Your Honor.  Scott Zebrak

13   on behalf of the plaintiffs with the law firm of Oppenheim +

14   Zebrak, LLP.

15          And to the extent it's not immediately before Your

16   Honor, you'll be happy to recall that July 2 is the extended,

17   extended, final, no-more-to-be-extended close of discovery.

18          THE COURT:  Well, I'm glad you recognize that because

19   I'm not so sure your motion is indicative of you having fully

20   recognized that fact.

21          Mr. Buchanan.

22          MR. BUCHANAN:  For the record, Thomas Buchanan of the

23   law firm of Winston & Strawn on behalf of the defendants, Your

24   Honor.  Good morning.

25          THE COURT:  Okay.  All right.  Well, having read all

3

1    the pleadings and exhibits and all like that relating to this

2    motion, before we get into the, I guess, seven issues that

3    remain to be resolved, Mr. Buchanan, when is it that you're

4    going to produce the data supporting the 96 percent stop issue?

5            MR. BUCHANAN:  We think in a matter of days.

6            THE COURT:  Okay.

7            MR. BUCHANAN:  I don't think it's a lot of

8    information.

9            THE COURT:  All right.

10           MR. BUCHANAN:  It's just, I think, a handful of

11   pages.

12           THE COURT:  All right.

13           MR. BUCHANAN:  It's an attachment to a document that

14   they have.  So that -- that can be done almost immediately.

15           THE COURT:  Can -- can we put a deadline of July 3 on

16   that?

17           MR. BUCHANAN:  Yes, that's fine, Your Honor.

18           THE COURT:  Okay.  I'll go ahead and say that that

19   information needs to be produced by no later than close of

20   business on Wednesday, July 3.  Which would give them plenty of

21   time to look at it and decide whether they want to include it

22   in their list of witnesses and list of exhibits that need to be

23   filed in the case now on, I believe, July 16.  Right?  Under

24   the new date.  Okay, thank you.

25           Now, I'm going to -- what I plan to do is we've got

4

1   seven topics.  I'm going to deal with them one by one.  So

2   we'll deal with topic 1.  I'll hear whatever argument I need as

3   necessary.  I will rule on 1.  And then we'll go to 2.  Do that

4   through to 7.

5        Okay.  So let's start with the audited financials for

6   2012 through '14.

7        MR. ZEBRAK:  Thank you, Your Honor, both with respect

8   to these seven and your patience with the case to date.

9        You know, it's a big, complicated case, and there is

10  a lot of issues that swirl around it.  And, you know, we've

11  done our -- done our best to avoid coming here unnecessarily.

12  And these are kind of stacked up at the end, but, you know, our

13  hope was to get them resolved earlier the way we have

14  successfully done without coming to court on a multitude of

15  other issues where the parties have worked out their

16  differences.

17       With respect to the audited financial statements, I'm

18  happy to speak to this at whatever level of detail would be

19  helpful to the Court.

20       THE COURT:  Well, I'm just curious, what is it that

21  you think you need in the other 20, 30 pages -- I know, you

22  know, you've gotten pages 23, 24, 27.

23       MR. ZEBRAK:  Sure.

24       THE COURT:  Or something in what would be a more

25  fulsome report.

5

1          MR. ZEBRAK:  True.

2          THE COURT:  But I'm -- you know, you've got revenue

3    information.  You've got, you know, the basic information.  And

4    your expert hasn't come forward and said, you know, I was

5    unable to adequately prepare my report.  And your expert isn't

6    going to be able to supplement his report because that time has

7    come and gone.

8          You know, I'm just curious, what really is it that

9    you think you're going to be getting in these if I require the

10   full audited financial report to be produced?  What is it that

11   you think is going to be in there that is going to be helpful?

12         MR. ZEBRAK:  Sure.  Let me speak directly to that.

13   And then I would also like to -- to speak on the issue more

14   generally.

15         So audited financial statements have notes.  They

16   have explanations.  There is -- you know, it's recognized that

17   they are more helpful than the basic underlying document.

18         THE COURT:  Well, but the pages you've got, there is

19   only one indication that there -- you know, look to footnote 4.

20   Right?

21         If you look at -- and I don't want to be --

22         MR. ZEBRAK:  I have it here.

23         THE COURT:  You know, what, Exhibit 5?

24         MR. ZEBRAK:  I have it here.  I may be able to just

25   grab it, Your Honor.

1            THE COURT:  There is only one indication on any of

2    these documents that I see that there is a reference to a

3    footnote.  And it has to do with -- I mean, all of them say:

4    See notes consolidated -- but there is only one entry that

5    relates to a footnote.  If you look at page 23 -- I mean, 24.

6            MR. ZEBRAK:  Yes, Your Honor.

7            THE COURT:  The income loss from discontinued

8    operations net of tax.  That's the only indication in any of

9    the documents that I've seen that has a specific reference to a

10   note.

11           MR. ZEBRAK:  Well, I'm -- Your Honor is -- I mean,

12   clearly looked at it very closely.  I don't take issue with

13   that point.

14           But let me speak to the fact that every -- well,

15   first of all, every page is just an excerpt within a much

16   larger document that puts these figures into context and

17   typically tell a much larger story, including a story that can

18   be considered by our expert.  Even if it's not a new opinion,

19   it can corroborate, further reinforce his opinion.  It can be

20   used in cross-examination against their experts when they make

21   certain points.

22           And every single page here says:  See notes to

23   consolidated financial statements.

24           And, you know, it's recognized that auditor reports

25   tell a much larger story.  They put numbers into context.  They

7

1    have -- you know, they may have risk disclosures.  They may

2    have other information.  They may explain how the -- you know,

3    what some of the numbers mean and put them into context.  And

4    it's a -- it's a much richer data set.

5            And, you know, it's for those reasons why we would

6    like to see it, including for the fact that -- honestly, I

7    recognize the importance of Your Honor's question, but at the

8    same time they're the ones that chose to utilize it in their

9    30(b)(6), making testimonial use of it.

10           So, really, they're the ones that should have to bear

11   the burden of explaining why they have chosen to produce only

12   an excerpt.  I mean, clearly they're doing that for a reason.

13   You know, courts that have considered this question, we cited

14   some courts that discuss the value of audited financial

15   statements generally as opposed to the unaudited statements.

16           But then in our reply brief we cited one in the

17   specific context of a motion to compel where the Court

18   granted -- you know, granted the motion, recognizing that the

19   document is incomplete without it.

20           And, you know -- so our -- our view is that the

21   document is relevant.  There is no question about relevance.

22   We've -- you know, that --

23           THE COURT:  Well, the document has relevant

24   information contained in it.  I mean, that part, obviously, if

25   they produced this, if their expert has relied on it, there are

8

1    portions of a document that have relevant information.

2            The question is whether they get to pick and choose

3    which parts of a larger document that they produce that they

4    say has the relevant information.

5            MR. ZEBRAK:   Yes, Your Honor, and I recognize that.

6    The parties -- you know, that -- you know, that's a -- that's a

7    slippery slope that I'm sure the Court doesn't want to see

8    happen in discovery where in every document people go line by

9    line and say, well, this line, you know, is responsive, not

10   that.

11           And, you know, I just -- it puts numbers in context

12   in a case where financial information is going to be a big part

13   of any trial on the damages.

14           And, you know, the idea that they want to restrict

15   our expert to the unaudited financial statements after they

16   chose to put the audited statements into the case and now want

17   to give us just an incomplete document when there could be

18   narrative notes, things that courts regularly recognize make it

19   a richer more useful document -- look, I don't -- despite what

20   clients sometimes think, you know, counsel don't have -- we

21   don't have a crystal ball.

22           I can't tell you exactly that if we -- if we get it,

23   it's going to -- it's going to have a statement saying, well,

24   gee, there is some major risk on copyright infringement and --

25   or it's going to say that profit -- I mean, audited statements

9

1    actually reflect something higher than the unaudited

2    statements.  I'm speculating now, I admit that.  But that's the

3    whole points of these notes and explanations, it's the auditor

4    vouching for the numbers and putting them into context.

5           And we just think, you know, the case is big and

6    complicated enough, why not have the experts on a level playing

7    field and not having their experts or ours testifying on the

8    unaudited versions.

9           THE COURT:  Okay.  Well, let me hear from Mr.

10   Buchanan on this one.

11          Mr. Buchanan, you produced, what, three pages from

12   each of these reports?  Why shouldn't I order you to produce

13   the entire report?

14          MR. BUCHANAN:  Your Honor, because what we agreed to

15   do in this 30(b)(6) deposition was to provide testimony on the

16   revenues, expenses, and profits for the years 2011 to 2014.

17   That's not in dispute.  The witness was fully qualified to

18   testify about that.  He provided testimony on 2014, 2013, 2012

19   in terms what the profits were, what the expenses were, and the

20   revenue.

21          And then he --

22          THE COURT:  Well, he didn't -- he didn't have these

23   documents in front of him at the time, right?

24          MR. BUCHANAN:  He did not, but he gave general

25   numbers.  And he said, I relied on audited financials, but also

1    said financial statements within the audited financials.

2              So anyone with any experience with audited financials

3    would know, he's not relying on notes, qualifications,

4    opinions, contingent liabilities, and accounting descriptions.

5    Which is what they're asking us to give them.

6              Cox is a privately held company.  You know, they do

7    not want their information to be distributed.  The witness

8    never relied on the information they are requesting.  We gave

9    them the precise information he relied on.

10             This is a fishing expedition.  He says that the

11   burden is on us because he referred to audited financials.

12             Now, their expert witness --

13             THE COURT:  Well, they -- whoa.  First of all,

14   they've now in their third set of document requests asked for

15   this specifically.  You know, I think their first set where

16   they asked for documents sufficient to show, that probably

17   covers it.

18             But their third set of document requests is specific

19   asking for, you know, this full report now.

20             So, you know, I have to understand why you think that

21   isn't -- that those reports don't contain relevant information.

22   And if they do contain relevant information, then why you only

23   should be required to produce a portion of those reports as

24   opposed to the full report.

25             MR. BUCHANAN:  So, first, the burden is on the

1   plaintiff.  And the plaintiffs here have identified what they

2   want, notes, qualifications, opinions.  They've never said how

3   any of that information is in any way relevant.  And we're

4   feeding off a 30(b)(6) deposition.

5          So even though they filed a new document request, it

6   refers back to the 30(b)(6) and the witness.  Their expert

7   witness, who has testified in the BMG case, testifies in other

8   copyright cases, he is an expert witness, he testifies about

9   audited financials all the time.  He testified: So I know

10  that, you know, there always going to be some litigation to

11  what you can get.  It seems to me -- or some limitations to

12  what you can get.  It seems to, for example, in that context,

13  knowing that there are these audited statements, part of which

14  have been provided, having the whole thing would be a useful

15  thing to have, but I'm not sure it would change anything or

16  cause me to offer any different opinions were I to have it now

17  or had it before.

18         I deposed the witness.  That's what he testified to.

19  And his expert opinion has nothing to do with these audited

20  financials.  His expert opinion is the benefit to Cox.  And how

21  he determined that, Your Honor, in his expert opinion, in his

22  reports, he took the average amount of revenue received from a

23  subscriber of Cox for Internet service over a five-year period,

24  he determined that to be $5,200.

25         Then he multiplied it by every subscriber that got

1   one notice, three notices, or five notices.  That's all he did.

2   He was told to do that by counsel.

3          That is their damages report.  They are saying that

4   that benefit to Cox, which is like 250 million, 180 million,

5   and 99 million over those three frequencies -- he doesn't need

6   the rest of these audited financials.  He basically admitted

7   that.

8          So what is the relevance?  Their expert admitted that

9   he it probably has no relevance.  And I just articulated his

10  opinions, which show that they have no relevance to their

11  damages theory in this case, which is the benefit to Cox based

12  on that theory.  Which we have figured -- we will submit is

13  completely unfounded.

14         So if the Court has any other questions on that of

15  issue --

16         THE COURT:  Well, just help me understand -- and, you

17  know, I'm not as familiar with financial statements as you all

18  are.

19         So this document that you produced these three pages

20  from and a couple of different documents, I mean, what is

21  included in that document?

22         You've got at least 20 pages preceding this.  What

23  comes after this document?

24         MR. BUCHANAN:  So are you asking me what's in -- in

25  the audited financials beyond what we gave?

13

1          THE COURT:  Yeah.  I'm, you know -- I'm just trying

2    to get a handle on what it is that we're really talking about.

3          I mean, if you're required to produce the complete

4    document, of which you have now produced a portion of, what is

5    it that you're going to be producing?

6          MR. BUCHANAN:  So we -- as the plaintiffs have

7    articulated in their pleadings, they want notes, and

8    qualifications, opinions, continuing liabilities, accounting

9    descriptions.  Just a lot of narrative and discussion that has

10   nothing to do with their damages theory or the testimony that

11   they requested and received.

12         So it's not a -- again, Cox is a privately held

13   company.  They don't want to be giving out information in

14   litigation that's not necessary.  And they recognize the power

15   of the Court and they will abide by any decision of the Court,

16   of course, but the burden is on the plaintiffs.

17         He says there could be something out there, that's

18   what he said.  I'm speculating, there's something out there.

19   Maybe he uses it, maybe he won't use it.

20         And what did the expert say?  I don't really think I

21   need it.  I don't think I need it before or now.

22         So how do they meet their burden?  The burden is not

23   on us to say, gee, let me -- they could do this with every

24   single document at Cox.  And they say, well, gee, you gave them

25   a portion of this document, why not give them all of it.

1   Because only the portion is relevant.

2            We gave them the data that they asked for, what were

3   the revenues, and the expenses, and the profits for Cox for

4   2011 to 2014 for the Triple Play business.

5            THE COURT:  Well, I think I've heard enough on this

6   one.

7            You know, there is a protective order in place.  A

8   portion of a larger document has been produced.  There are

9   indications even in that portion that have been produced, you

10  know, you are supposed to see notes.  Some are vague statements

11  that just say, see notes to consolidated financial statements.

12  Others have specific indications of which note to actually look

13  at.

14           But, you know -- and I -- there is a lot of back and

15  forth as to whether parties have the ability to redact.  And

16  that is really what you're doing, is you're redacting all the

17  other pages of this document and only producing what you

18  believe to be are the particularly responsive document or

19  portions of a much larger document.

20           You know, I think under the circumstances there is

21  some merit to the argument that the preceding 20-some pages and

22  however many other pages there may be with the notes included

23  in there could help put this in context and perspective.  It

24  may or may not be helpful.

25           It certainly will be under the terms of the

15

1   protective order, so it won't be disclosed outside of -- any

2   further than this curtain information on these pages.

3           But I am going to go ahead and require that the

4   complete document -- and we're not going beyond this, of going

5   to the auditors and getting them to give any background

6   information or anything.  It is whatever document this is, the

7   complete document needs to be produced for 2012 through 2014.

8           Okay.  The CATS work log notes having to do with

9   whether -- this has to do with whether business customers were

10  actually called; is that correct, Mr. Zebrak?

11          MR. ZEBRAK:  Yes, Your Honor.

12          THE COURT:  What -- help me understand why you need

13  that.

14          MR. ZEBRAK:  Sure.

15          THE COURT:  And I'll kind of get to the point.  If

16  they're not going to be able to use any documents, that is come

17  in and use any work log notes to say, see, we did call, you

18  know, this customer or that customer -- which I suspect Mr.

19  Buchanan is going to be hard pressed to say, we didn't produce

20  it in discovery, but we're going to try and use it at trial --

21          MR. ZEBRAK:  Sure.

22          THE COURT:  Why should they be going through and

23  producing these work log notes for several thousand business

24  customers that may or may not have relevant information.

25          MR. ZEBRAK:  Sure.  So let me -- let me speak to

1   that.  That I agree that's the -- the starting point on this

2   issue.

3              So, first of all, just by way of context on this.  In

4   the BMG/Cox case this issue, as far as I know, didn't arise

5   because the notices weren't received by -- by Cox.  You know,

6   it black listed those notices.  So at that trial they didn't

7   know which specific customers were -- were at issue the way we

8   do here.

9              And so, this whole -- as Your Honor knows, knows very

10  well now, how Cox chose to implement or proceeded with

11  implementing its -- its graduated response policy was fleshed

12  out.  But I'm unaware of it being fleshed out on -- on the

13  business side in the way that it is here where a certain

14  segment of the subscribers at issue were business customers.

15             And Cox has a written graduated response policy where

16  for business customers, there is no dispute about this, the

17  early steps are supposed to be a call, a telephone call from

18  Cox.

19             And based on our understanding of the resources that

20  this very wealthy set of companies chose to limit to these

21  purposes, we don't think they had sufficient resources devoted

22  to making these calls.  And we doubt that they occurred.

23             And at the same time, what we're very concerned about

24  is that they have both experts and fact witnesses that are

25  going to say, our policies were effective.  They have two

17

1   experts that we're going to have <u>Daubert</u> motions on, but one of

2   them says, Cox's policies were effective at limiting

3   infringement.

4           And the other one says, Cox's response to notices of

5   infringement was reasonable given all the things that they had

6   to deal with, all the other issues.

7           And, you know, on our end, we're in this funny spot

8   where we -- we strongly believe that they didn't implement this

9   and they weren't calling these customers.  And, you know, from

10  our perspective both on liability and damages, it's going to be

11  very important that for -- for the business customers,

12  notwithstanding however many times we sent notices, they didn't

13  call.

14          Now, I'm not saying they never, ever made a call, but

15  the one document that -- that we have shows an instance -- I

16  mean, it reinforces that the policy was to call --

17          THE COURT:  Well, yes and no.  It shows that a

18  mistake was made.  But it also shows some pretty forceful

19  action that was being taken to try and correct that mistake.

20          MR. ZEBRAK:  Well, yeah, I'm not saying that that

21  disposes of the issue.  I'm saying what we have --

22          THE COURT:  That predates the issues involved in this

23  case as well, right?

24          MR. ZEBRAK:  Well, quite frankly, their -- their

25  behavior with respect to -- to notices of infringement, you

18

1    know, a counterbalance on that was the BMG suit.  There was a

2    lot of bad behavior occurring over an extended period of time,

3    and I'm not saying it was static across that period, but --

4              THE COURT:  Well, that -- which -- just before -- I

5    mean, the e-mail that you're talking about was before the BMG

6    suit got instituted, wasn't it?

7              MR. ZEBRAK:  That very well may be, Your Honor.

8              Yes, Your Honor, it was, that was 2011.  But let

9    me -- let me speak to that e-mail since Your Honor has raised

10   that question.  So, you know --

11             THE COURT:  It is Exhibit 16, right?

12             MR. ZEBRAK:  Yes, Your Honor, it's Exhibit 16.  And

13   that e-mail is in the 2011 -- late 2011.

14             So, yes, it was before the BMG case, but it -- you

15   know, notices coming in in this period -- our notices in this

16   case, you know, involve 2012, '13, '14.

17             So, you know, this is activity happening in this

18   period and afterward.  And it doesn't -- so, first of all, this

19   document reinforces that the policy was to call.  And this

20   wasn't -- you know, this wasn't a mistake.  You know, a mistake

21   is spilling a glass of water.  This was a customer service

22   representative just closing it by design, deliberately ignoring

23   what the rule required.

24             And, you know, there are times when -- you know, for

25   all we know, this isn't indicative of how they were doing it

19

1    across the board.  And in the sense that -- you know, perhaps

2    just because this got brought to the attention and Mr. Zabek

3    sent a strong e-mail in one instance correcting it, that

4    doesn't mean that all the other reps weren't ignoring the

5    policy routinely.

6            Our point though is that they're the ones that are

7    making these claims that our policy was effective, it was

8    reasonable.  And they're going to claim they followed their

9    policy.

10           THE COURT:  Well, this department -- the evidence is,

11   if you got a notice from a business customer once, and there

12   were no further notices about that business customer, then

13   arguably, you know, that business customer has stopped

14   infringing.

15           I know there are flaws in that to some extent as to,

16   you know, notices received and all those kinds of things --

17           MR. ZEBRAK:  Yes.

18           THE COURT:  But, you know, whether they called or

19   didn't call, the question is whether you have multiple notices

20   to business customers.

21           And if -- if you have multiple notices to business

22   customers, if they fail to take action or if they take action

23   that doesn't remedy the problem, the end result is the same,

24   right?

25           MR. ZEBRAK:  Well, I mean, Your Honor, I -- I fully

1  well agree that in the event they had a -- well, first of all,

2  their policy was the first notice that comes in, we ignore it,

3  we don't do anything.

4       But on the second notice -- but their policy for

5  business customers was just to place telephone calls.  And I

6  agree with Your Honor, if -- even if they did that, they chose

7  to continue to provide service to these known repeat

8  infringers, some of which just got an inordinate number of

9  notices, yes, Your Honor, we would -- we would certainly have

10 the case that -- that there is a strong ground for liability

11 there.

12      But it's that much more willful from a damages

13 standpoint, all issues juries can consider.  Plus, even on

14 liability, if they weren't following their own policy, and in

15 effect for some large percentage or, you know, as opposed to an

16 episodic mistake, they simply were ignoring the issue and not

17 calling, I think it strikes right to the heart of liability and

18 damages.

19      And the problem is, they are the ones making the

20 affirmative claim saying, we had a policy and we followed it.

21 And how -- how else can we respond to this other than looking

22 at the documentation?

23      In their -- in their briefing, it's telling.  They --

24 first of all, they say it was an isolated incident.  Okay.  The

25 only statement for that we have is attorney argument from

1   Winston & Strawn.  There is no declaration saying, this is an

2   isolated incident, I've done a review, we routinely followed

3   it, I've looked at 100.  It's just empty attorney argument.

4   It's not a factual statement from a declarant.

5           THE COURT:  Well, if there were more e-mails like the

6   one that you've attached as Exhibit 16, I suspect you would

7   have seen them and, you know, attached them as Exhibits 17, 18,

8   and 19.

9           MR. ZEBRAK:  Well, sure.  But, Your Honor, that --

10  that speaks directly to the issue.  You know, I don't know why

11  in this instance it came to Mr. Zabek's attention and he chose

12  to send that e-mail.

13          But, you know, folks who aren't following the rules,

14  despite some of the e-mails in this case, don't make it a

15  practice to create documentation showing they didn't follow

16  their own rules.

17          And, you know, to the extent there is any declaration

18  from a fact witness on this issue, both in briefing and the

19  declaration they say that what they've already produced makes

20  this request largely duplicative.

21          THE COURT:  Right.  So when they say that they've

22  produced summary information about copyright related CATS

23  tickets, what information do you have --

24          MR. ZEBRAK:  Yes, Your Honor --

25          THE COURT:  -- in that summary information relating

1    to business customers?

2            MR. ZEBRAK:  Sure.  So if Your Honor looks at the

3    declaration attached to our reply brief yesterday -- I'm going

4    to answer the question now.

5            THE COURT:  Right.

6            MR. ZEBRAK:  But it's set forth in more detail with

7    some screen shots.

8            So at an earlier hearing -- well, without -- without

9    revisiting step by step, they produced a spreadsheet with --

10   with information on actions they've taken.  None -- and

11   attached to our declaration are screen shots showing the types

12   of -- the customer service representative has a choice of one

13   of a number of boxes to check to fill in it.  None of these

14   make references to calling a customer.

15           And so, as far as we can tell, nothing they've

16   produced shows one -- even a single instance of calling a

17   customer.  There is no entry to call a customer, which is what

18   Mr. Zabek's e-mail in the policy says they're supposed to do.

19           Now -- and notably, in this brief and the declaration

20   they say it's duplicative.  It's not.  And what they don't say

21   is where they produced information showing they made any calls.

22           And I think that is notable because I think the

23   answer is, they either didn't make the calls and they know

24   there is no documentation and they don't want to say that, or

25   it's just not in the production and they don't want to produce

1  more.

2          So we're looking for something.  And if the issue,

3  Your Honor, is the late stage in discovery and not wanting to

4  produce this for thousands, if we need to move to some smaller

5  subset, we would be open to that.  That's not our first choice.

6          It's a -- it's a big case.  It's an automated data

7  pull.  It's not a manual data pull.  When they run a script to

8  pull this -- they've already run a script to pull other data

9  from these systems.

10          They claim that it will require a manual review of

11  this data.  Quite frankly, Your Honor, this is data about

12  business customers.  They've already, except for a handful of

13  customers, already disclosed the customers' names.  We're not

14  aware of any supposed privacy issues that they speculate would

15  be arise -- could arise here.  They have already acknowledged

16  it's business information about business customers.

17          And we just need something to use when their experts

18  stand up and say, it was efficacious, it was reasonable, we

19  followed our policies.  And whether it's all or some subset,

20  we're just looking for something, Your Honor.

21          THE COURT:  Okay.  Mr. Buchanan, help me understand

22  the context of your statement in the brief that what they're

23  seeking is largely duplicative of information that you've

24  previously provided to them in the summary information about

25  copyrighted related CATS tickets.

1          Where in that information is there any notation that

2     business customers were called or contacted?

3          MR. BUCHANAN:  So in that ticket data, that -- that

4     is not there.  There is not any line that says, we called a

5     business customer.

6          However, that was all the data we have.  And so, we

7     provided everything we have.  And what we're saying is, for us

8     to go search in this other database and do this manual review,

9     is not going to reveal anything more than what that does.

10         So, yes, our position is that the policy -- or the

11     policy is, it's clear, that we didn't forward notices of

12     infringement to other ISPs, or hospitals, or military bases, or

13     universities.  That's who we're talking about here.  The idea

14     is that we're supposed to terminate another ISP that serves

15     10,000 households over five or six, you know, notices.

16         THE COURT:  It's also hotels and other --

17         MR. BUCHANAN:  Either hotels or hospitals.

18         THE COURT:  Yeah.

19         MR. BUCHANAN:  There are some ISPs that serve rural

20     communities funded by the United States government that serve

21     10,000 people.  And they get, you know, maybe a couple thousand

22     notices over a two- or three-year period.  But if you average

23     that out, it doesn't come to a lot, the idea that we're

24     supposed to terminate them.

25         And that's how we worked it out.  They were totally

1    different than residential households.

2              And so, your question is, does that data reflect

3    specifically an entry that says, did you call a business?  It

4    does not.

5              But what I'm saying is the other data that we would

6    have to go through that, the cost of going through all of that

7    data to try to find whether there is a note within a log or the

8    daily day for tens of thousands of logs and entries, would be

9    incredibly costly and time consuming.

10             THE COURT:  Well, but let's go back.  You said that

11   it's largely duplicative.  Which means that if I required you

12   to produce that information, that information would already

13   have been included in these CATS tickets.

14             That's what I'm trying to get to, your statement that

15   says:  Plaintiffs seek what -- the information plaintiffs seek

16   is largely duplicative of information that Cox previously

17   provided to plaintiffs.

18             So -- and, you know, the information that they're

19   asking is -- relates to, you know, information to support

20   whether in fact these business customers were called.

21             MR. BUCHANAN:  That's correct.

22             THE COURT:  And what you're telling me is none of

23   that information is contained in the CATS tickets; is that

24   right?

25             MR. BUCHANAN:  So there is not an entry in there, no.

1   There is not an entry that they would check.  Whether somewhere

2   buried in there, whether there was a note taken in a text file

3   by somebody that refers to a business call, it may or may not

4   be the case.  And that's the same with regard to the other

5   data.

6           But the cost of going through all that other data to

7   try to find within all these logs and all these entries and all

8   these text entries, whether there is a reference that somebody

9   called a business subscriber on a certain day, it's highly

10  unlikely.  And the cost of trying to find it.

11          However, I think the original point Your Honor made

12  was that if we go to trial, obviously we do not have any

13  evidence that we called a business customer on a certain date,

14  we can't make that case.

15          So the question is, should we go on a fishing

16  expedition to prove that somehow we did call them or we didn't

17  call them?  And at a huge cost.

18          And we have looked at a few of these -- these logs,

19  and they do indicate that they have the information, the

20  personal information of the person who was the contact, whether

21  it's a military base or a hotel.  And it has his e-mail

22  address, phone number, and other personal information.  So

23  we're going to have to redact that.

24          So, you know, they have what they want.  They are

25  going to argue that we didn't call them and there is no proof.

1    And we're not going to be able to counter that.

2             THE COURT:  Okay.  All right.  Well, you know, this

3    is pretty late in the stage of discovery.  I think at this

4    point, making it clear that the defendants are not going to be

5    use any -- not going to be able to use any of these CATS work

6    log notes to argue that they did in fact contact business

7    customers.  So, I mean, if you haven't produced it, you're not

8    going to be able to use it.

9             So I'm not -- I'm going to deny the motion to compel

10   as to this second issue with the understanding that the

11   plaintiffs are not going to be hamstrung or sandbagged or

12   whatever the right word is by them coming in at some point and

13   saying, you know, here are a bunch of indications that we did

14   in fact call these people routinely.  Or, you know, here is

15   documentary proof that we did follow our guidelines.

16            So the case will go forward on the lack of any real

17   notations other than what's already been produced as to whether

18   business customers were actually called or contacted.

19            All right, so I'm denying it as to that issue.

20            The Rosenblatt expert report.  This is somebody who

21   did not testify.  Who a motion in limine was granted.  Who you

22   have an excerpt from a motion relating to whether he believes

23   MarkMonitor is or isn't sufficient based on information that he

24   had available to himself, which apparently once I was arguing

25   was sort of limited.

1          I'm confused as to how you think that could be used

2    in any respect in this case.

3          MR. ZEBRAK:  Yes, Your Honor.  And so, obviously, we

4    haven't seen the report.  We understand -- and I can cite Your

5    Honor to the --

6          THE COURT:  I saw what you cited in the brief as to

7    what they said about the -- what -- you know, he made some

8    opinion based on a 13-page summary or something like that.

9          MR. ZEBRAK:  Sure.  Yeah.  So this has arisen in two

10   places, and the exhibits are attached, I believe it is

11   Exhibit 21 and another exhibit.

12         So there is a brief filed with the Court where BMG's

13   counsel does bullet point descriptions of what's in this

14   report.  It's my understanding that Mr. Rosenblatt did an

15   initial 178-page expert report along with a rebuttal report.

16   And -- yes, it was Exhibit 21.  And included within this report

17   is a description comparing Rightscorp, which obviously is not

18   the company at issue here, to MarkMonitor, which is the vendor

19   whose notices, you know, are at issue here.

20         THE COURT:  Right.

21         MR. ZEBRAK:  And whether or not he testified in

22   court, those are -- those are statements in his report that are

23   party admissions by Cox.

24         THE COURT:  All right, Help me understand that.

25   Every statement that an expert report makes in an opinion, you

1    say becomes a party admission?

2           MR. ZEBRAK:  Well, I don't know if it's as expansive

3    as that, Your Honor.  I mean -- but at least when one looks at

4    the cases we've seen, at least the scope of what those cases

5    cover in terms of a party admission of an expert would apply

6    here.

7           And, you know, in particular I'm looking at this case

8    we cited in our reply brief, which is Samaritan Health Center.

9    And the defendant in their -- in their brief conflates the

10   issues.  Sometimes people want to use an expert report from

11   their own expert affirmatively without the expert being in

12   court.  That's not this situation.  You know, we're not trying

13   to use our expert's report without having the expert appear.

14   That kind of situation is hearsay.  Those are the confusing

15   cases they cited.

16          The cases we've cited are when the opposing party has

17   an expert.  And that's exactly what happened in the Samaritan

18   case where, if I'm recalling it correctly, it was -- it was a

19   -- the other side's expert's statement from a prior proceeding.

20          And, you know, these are statements made on Cox's

21   behalf.  And ultimately Judge O'Grady might decide how and to

22   what extent we can and can't use it.

23          But in this case, two things are happening.  Number

24   one, Cox is attacking, you know, MarkMonitor, saying it's not

25   reliable.  So --

1        THE COURT:  Based on the information it has in this

2   case at this present time.

3        MR. ZEBRAK:  Well, sure.  But -- and if they want to

4   explain that and explain why in doing a less limited review

5   they made a prior statement saying that it's the bee's knees --

6        THE COURT:  The expert -- an expert that is not

7   involved in this case made a prior statement years ago relating

8   on a case that is -- that is different than this one.

9        MR. ZEBRAK:  And, look, ultimately, in the context of

10  a trial, whether that comes in, and if it does, what weight the

11  jury affords it, that can be explained away.

12        But certainly if Cox through its expert has made

13  prior inconsistent statements about MarkMonitor, even based on

14  a different limited review, that's relevant to us.

15        And let me explain another reason.  Cox is pursuing

16  very extensive discovery of MarkMonitor, both document --

17  they've already inspected the source code.  They've already

18  taken the 30(b)(6) witness.

19        Now they want to meet with one of the developers for

20  MarkMonitor, who is Lithuania.  And there is a whole dispute

21  going on between Cox and MarkMonitor about it.

22        And Cox has already threatened in this case that if

23  they don't get what they want, they're going to move to exclude

24  MarkMonitor evidence.  That if they don't get to have the

25  deposition they want the way they want it, they're going to

1    move to exclude.

2            And in this very expert report -- and again, we

3    haven't seen it, but Mr. Rosenblatt apparently, according to

4    what we divined from the transcript and the brief, appears to

5    favorably discuss MarkMonitor, and to do so without a source

6    code review.

7            And so, we can't anticipate exactly in what ways we

8    may need this, but this is a file sitting on their computers.

9    Whether or not it comes in evidence, I feel we've made some

10   very legitimate arguments for it.  There is zero burden in

11   producing it.

12           And whether we somehow use it affirmatively as a

13   party admission the way the Samaritan and other cases show, or

14   we somehow find a way to use it for impeachment, or it somehow

15   comes up in motions practice, it just feels like they shouldn't

16   be able to hide what an expert made on their behalf in this

17   prior proceeding.  Why not get all the stuff on the table?  At

18   least between counsel, even if it's not in front of a jury,

19   though we believe it should be.

20           THE COURT:  All right.  Well, you know, I -- I've

21   read what the parties have submitted on this one.  And I just

22   don't see how the Rosenblatt expert report has any real

23   relevance in this case.

24           One, it's too late.  You've known about it forever.

25   It is too attenuated to what's going on here.  This is someone

1   who did not testify.  They didn't necessarily have him testify

2   in the BMG case, weren't allowed to have him testify for

3   whatever reason.

4            That the report itself, you know, would have been

5   based on information that is completely different than the

6   information that is currently available to their current

7   expert.  And, you know, we're not going to be having a case

8   within a case having to do with, you know, what one expert said

9   in a different case and what this expert is saying and having

10  this expert have to try and go back and reconstruct what

11  Rosenblatt may have said earlier.

12           So I'm going to deny the motion as to the Rosenblatt

13  expert report.

14           The videos of the Cox fact witnesses.  I'm at a loss

15  as to figuring out how the -- how a deposition that was taken

16  in a case in which the plaintiffs were not a party to could be

17  used in this case in any way whatsoever.

18           So you've got the BMG case in which Sally or Joe were

19  deposed and they had a video of that deposition.  Cox is not

20  going to be able to use that deposition in this case, is it,

21  Mr. Buchanan?

22           MR. BUCHANAN:  No, Your Honor, we don't intend to try

23  to use those.  All those same witnesses were deposed in this

24  case, videotaped.  So to the extent they are unavailable, we

25  would use those videotapes.  And they have them.

33

```
 1            We're not going to use the ones --

 2            THE COURT:  You mean the depositions that were taken

 3   in this case, not in the BMG case?

 4            MR. BUCHANAN:  Yes.  Yes.  So these same witnesses

 5   were taken, deposed in this case.

 6            No, the answer to your question is no, we're not

 7   going to use the videotapes from the deposition in the other

 8   case.  And if we even attempted to do that, assuming it was

 9   permissible, they would get a copy of it.  But we don't intend

10   to do that.

11            THE COURT:  Okay.  Mr. Zebrak, how -- how would that

12   video be used in this case?

13            MR. ZEBRAK:  Sure.  Let me -- let me speak to that.

14   And first, Your Honor, though I trust it was unintentional, Mr.

15   Buchanan is not correct in saying that every single person in

16   these videos for which they produced transcripts has been

17   deposed in this current case.  Just important to have an

18   accurate record.

19            So as Your Honor will recall -- so they've produced

20   the transcripts, the written transcripts.

21            THE COURT:  Right.

22            MR. ZEBRAK:  And --

23            THE COURT:  Which is what you asked for.

24            MR. ZEBRAK:  Well, yeah -- I mean, yes, Your Honor.

25   Formally we asked -- we said transcript without breaking down
```

1   whether that is a written transcript or the video.

2          Technically, court reporters use the term "video

3   transcripts" too in many cases.  But I recognize we didn't

4   directly tee the issue up.  Though as between counsel, for

5   many, many months we've been having discussions about the

6   videos without the notion that we didn't request the video.

7   That's -- that's something they've raised in opposition to this

8   request.

9          So it's a very formalistic way to defend the issue,

10  to say we didn't really request this from the defendants'

11  briefing.

12         So these are statements by Cox employees, okay, now

13  some of them are former, but Cox is bound to those.  That's why

14  we requested the transcripts.

15         So we may use that at trial for witnesses that aren't

16  -- aren't here.  Whether it's the video in this case or the

17  video in the last case, Cox is bound by that.

18         As Your Honor is aware, a transcript --

19         THE COURT:  It depends upon the employee.  You know,

20  not every employee that gets deposed binds Cox.  Right?

21         MR. ZEBRAK:  Well --

22         THE COURT:  I mean, you know, there has to be a

23  certain level of authority that an employee is being deposed

24  on.

25         MR. ZEBRAK:  Sure, yeah.

35

1          THE COURT:  A 30(b)(6), yes.  If it was a 30(b)(6)

2  deposition --

3          MR. ZEBRAK:  Sure.

4          THE COURT:  -- then, yes, that is binding on Cox.

5          MR. ZEBRAK:  Right.  But these aren't, you know --

6  Your Honor, I mean, this is not us asking a customer service

7  employee to opine on accounting principles for the audited

8  financial statements.

9          So -- but, look, I mean, the issue here -- I mean,

10  quite frankly, we were very surprised we even had to bring this

11  to the Court.

12          Come at trial, if we're restricted to using a

13  transcript, a juror doesn't see facial expressions.  They don't

14  see demeanor.  They see a written word.  It's boring.  Your

15  Honor sat through that.

16          It just seems like they're looking for an artificial

17  advantage.  They won't even say that they don't intend to use

18  it.  So if we use the written transcript, they may want to use

19  the video later.  And then we may get into designations and

20  counterdesignations, and then maybe we have to use the video.

21          But the point is, this is a big, complicated case.  I

22  don't know why they're saying, we'll give you only the

23  transcript, not the video.  It's a digital file.  It takes one

24  second to produce.  I'm sure Judge O'Grady and the jurors would

25  rather see video than a written transcript.

36

1          It just seems like, let's litigate this on the

2    merits, not on sort of gamesmanship about, we don't feel you're

3    entitled to have it because we don't want you to have it.  We

4    will give you the written transcript only.  There is zero

5    burden.  The jurors will benefit from it, you know.

6          And, obviously, our depositions now in this case are

7    less close in time to when some of these earlier depositions

8    are.  And we may not get, you know, the same answers or answers

9    where they recall things the way they did the first time.

10          So it's quite conceivable that we want to use some of

11    the earlier testimony, and we would much prefer to use video

12    where it makes sense to do so.

13          THE COURT:  Well, you know, obviously, I can't

14    enforce informal requests.  I can only look to what was

15    actually requested in discovery.

16          You know, I think they responded to document request

17    number 4 by producing the transcripts of the depositions.  I

18    don't find that that request was sufficient to request or ask

19    about the videos.

20          Again, I'm still kind of at a loss as to how the

21    videos may be used.  Obviously, if for some reason it's going

22    to get -- one is going to try and use it, it needs to be

23    provided to the other side in sufficient time to be reviewed

24    and understood.

25          But at this point in time I am going to deny number

37

1    -- the video recordings of the fact witnesses in response to

2    that, I think it was document request number 4.

3            Now, the employment records.  Again, let's -- of

4    these three employees.

5            Mr. Zebrak, where are we on why you think, you know,

6    the employment records of these three employees would be

7    something that the Court should require --

8            MR. ZEBRAK:  Sure.

9            THE COURT:  -- Cox to produce.

10            MR. ZEBRAK:  So, Your Honor, defendant wants to put

11    its case on through experts, not through very many fact

12    witnesses.  And, obviously, it's going to do its case as it

13    sees fit, but -- and we're going to have some Daubert motions

14    to file.

15            But, you know, in the last case, Your Honor, they

16    were critical of the behavior of these employees, as one would

17    expect they -- they sort of would be when a juror is counting

18    on how their company behaved here.

19            These three witnesses are not going to be at trial.

20    Which was the same reason we requested the video, because many

21    of these witnesses Cox won't bring even though it has

22    agreements that it could require them to appear under.

23            So we're going to be at a trial where witnesses are

24    appearing, we're going to be using the transcript now for those

25    others, but for here, for these three very critical people --

1    and it's more directly Zabek and Sikes than Mr. Vredenburg, but

2    these are people at the center of running the Abuse

3    Departments.

4            And we included in our -- in our papers an example of

5    how counsel, and no doubt witnesses as well, spoke about how

6    they don't approve of how these people behaved.

7            Now, that's easy to say in court four or five years

8    later.  And, obviously, we don't need to see how they allocated

9    their 401(k) plan.  But if every year in their performance

10   review they say, great job, Mr. Zabek, here is an award.  And

11   by the way, here are some of the things you did fantastic this

12   year.  You limited the number of calls in the call center.

13           Obviously, I haven't seen the personnel file, I don't

14   know -- and it doesn't -- you know, I don't need everything in

15   the personnel file.  But, you know, a review them where they

16   tell him what he has done well and we want you to do in a

17   coming year if that's there, or the awards they're given,

18   that's going to directly rebut an argument they've already made

19   in BMG/Cox.  They are no doubt going to make it here.

20           And by the way, some of this discovery could be moot

21   if they'd concede they won't make certain arguments.  You know,

22   like, for example, on the business customer issue that Your

23   Honor denied, if they'll say, we didn't call a single business

24   customer, or we didn't call them routinely, we don't need that

25   discovery.  It's now moot.

1           But here, you know, for these -- for these people, we

2    need to see, was Cox praising these people?  What was it saying

3    it did well?  What was it encouraging them to do?

4           And then, finally, these folks suddenly left after

5    the BMG trial.  Were they terminated?  If so, why?

6           THE COURT:  Well, you have those documents, right?

7           MR. ZEBRAK:  No, Your Honor.  We have a separation

8    agreement from these people.  Which, you know, that's a

9    document that doesn't speak to Cox's thinking and knowledge and

10   what it was doing contemporaneously.  It speaks to the terms

11   under which it separated with these people, including the

12   obligations where Cox has, you know, had them cooperate with

13   Cox and it controls these people now.

14          And we -- you know, we know they're going to speak

15   negatively about how they behaved.  This is a check and balance

16   on that.  And it allows us to see that they can't stand up and

17   say, you know, these are a few, you know, sort of rogue

18   employees off somewhere, you know, on a folic and detour doing

19   something we don't approve of now.  Which is an argument we

20   know they're making.  I'm not speculating here.

21          And so, there's a protective order in place.  We're

22   not talking about -- you know, we're talking about, you know,

23   the issues I described.  So we're --

24          THE COURT:  Why -- okay.  Well, you have deposed

25   those individuals, right?

1          MR. ZEBRAK:  Yes, Your Honor, but again --

2          THE COURT:  Did you ask them about, you know, what

3    were the terms and conditions --

4          MR. ZEBRAK:  Well --

5          THE COURT:  And when -- when were you fired or, you

6    know --

7          MR. ZEBRAK:  Yes, sir.  But, you know, as Your Honor

8    has seen from countless employment disputes, there is two sides

9    to a story.  There is the employee's side and then the

10   employer's side.

11         You know, we have asked certain questions of that.

12   Some of them were even in -- in the record we submitted, I

13   think it was Mr. Sikes saying that he didn't necessarily know

14   the answer to certain questions.

15         But ultimately what matters is not what these

16   employees say about how they were regarded.  What matters is

17   what Cox said and did and thought about them.  You know, did

18   Cox say, that a boy, Mr. Zabek, you've limited the number of

19   this and that, and here is a medal.

20         I'm, obviously, being a little exaggerative there,

21   but it directly rebuts an argument we know they're making.  And

22   it just seems like these are tidy and easy to produce.  Why not

23   produce them?  We can deal with protective order issues.

24         And again, if they're not going to make the argument

25   that we don't approve of what they did and they're not going to

1   roll these people under the bus the way they did in the last

2   trial, then we're okay.

3           But the issue we have, and that precipitates many of

4   these requests, Your Honor, is they're making arguments, but

5   they're denying us access to the documents to rebut it.  And we

6   think that, you know, we should be entitled to see that and try

7   to rebut the arguments they're making.

8           THE COURT:  Okay.  Mr. Buchanan, let me just hear

9   from you on the --

10          MR. BUCHANAN:  Your Honor, first of all, we're not

11  making the argument that these people were off the reservation

12  employees.  They've testified -- one is going to testify I

13  think on the 2nd.  Sikes has already testified.  They're going

14  to be testifying for seven hours.  They use every minute that

15  they are allotted and they go through every possible question

16  about why they were let go.  And they've told the truth.

17          And the idea that they are going to find this in an

18  employment file -- they have a separation agreement, which

19  would be in the file, they have that.

20          And that we're not going to call these people at

21  trial, they're going to come here live, I don't know that

22  that's true at all.  I mean, some of these people we may bring

23  in.

24          But the idea that we're going to stipulate that we're

25  not going to trash them at trial -- I can tell you right now,

42

1   that's not going to happen.  Obviously, they may have made some

2   mistakes, and we're going to live with them.  And it's already

3   in the record in the prior depositions, and in this case, in

4   the trial.

5          And this is another fishing expedition.  They are

6   actually trying to get something in there negative about these

7   guys so they can cross them and try to say, we should have

8   fired them earlier.  And that's the real motivation, in my

9   view.

10         But it's not the least bit relevant.  This is not an

11  employment case.  This is a copyright case, and these people

12  have testified at length about their career, their jobs, what

13  they did every day, and why they left the company.

14         THE COURT:  Well, you know, I think having the

15  severance agreements, the only -- you know, I'm looking at

16  document requests 6, 7, and 8.  The only question that I've --

17  and, Mr. Buchanan, what about these performance reviews for the

18  employees?

19         What -- I guess the argument there is that it really

20  isn't relevant to the issues in this case?  Document request

21  number 8, performance reviews for Sikes, Zabek, and Vrendenburg

22  from 2010 to 2016.

23         MR. BUCHANAN:  So my understanding is they're going

24  for the whole employment file.  And, you know, performance

25  reviews, you know, I don't -- I'm not familiar with exactly

43

1    what they say or don't say, we've never focused on that.  But

2    they were employed for a certain period of time and they were

3    separated.

4           You know, what they were doing, how they were

5    doing -- obviously, if they had done something inconsistent

6    with the policies of Cox during the time period that they were

7    employed there, they would have been terminated.

8           But this is asking for the whole personnel file, is

9    the way I see it.

10          THE COURT:  Well, no -- yes and no.  I mean, what

11   they're -- what's really in front of me are document requests

12   6, 7, and 8.  So -- and this is in their third set of document

13   requests that were served last month, Exhibit 7 to their

14   opposition.

15          6 is documents concerning the circumstances under

16   which their employment terminated to show the dates of

17   employment was terminated.  I suspect the severance agreement

18   has certainly that kind of information in it.

19          7, the conclusion -- all documents concerning the

20   conclusion of their employment, including any agreements,

21   notices of termination, resignation, severance, or payments.  I

22   assume the severance agreement for the most part covers that.

23   And to the extent that it doesn't, they can ask the employees

24   about that.

25          The only one that then leaves open is request number

44

1  8 where they ask for the performance reviews of Sikes -- of

2  these three individuals from 2010 to 2016.

3          What -- let's just focus on that one.

4          MR. BUCHANAN:  I don't see how that's relevant to

5  this case.  They were employed during that period of time.  We

6  know why they left.

7          So the articulated reason that the plaintiffs say

8  they want it, because they said that we are going to call them

9  rogue employees, and that possibly these files -- and he didn't

10  even reference performance reports -- which show that they

11  received awards or medals.  Okay.  We're not going to talk

12  about awards or medals at the trial.  We're not going to talk

13  about their performance.  And we're not going to attempt to

14  minimize their role and say they were rogue employees.  That's

15  not going to happen.

16          You know, we're going to live with what they did, and

17  they're going -- I believe some of them are going to testify

18  live.

19          And if they -- if they were so concerned about the

20  performance, why didn't they ask these questions in a

21  deposition?  Why didn't they seek this information, you know,

22  months and months ago so they could use it in a deposition?

23  Why are they trying to get it now when they won't be able to

24  use it in a deposition?  It has no value.

25          THE COURT:  All right.  I do need to hear a response

45

1   to that part of it.

2          MR. ZEBRAK:  Yeah.  So I wish I could take back the

3   medal reference, Your Honor.  You know, sometimes discretion is

4   the better exercise than valor.

5          THE COURT:  Yeah.

6          MR. ZEBRAK:  I mean, look, Your Honor, at the last

7   trial they said that these people exercised bad judgment,

8   engaged in bad decisions, and what they did is offensive.

9          Again, easy to say when you're in front of a jury

10  hoping not to be facing a very large damages award and finding

11  of liability.

12         Your Honor, we would be very happy if they exercised

13  their control to bring some of these people live to the trial.

14  Whether or not that happens though is immaterial to this

15  question.

16         With Cox and its people, we're going to have these

17  records.  And whether or not we get to use them in a deposition

18  in the last few days is really beside the point.  It's still

19  information we can try to use with others whether for

20  impeachment or affirmative evidence.

21         These are documents.  They are self-authenticating

22  given that they come from Cox's files.

23         And, Your Honor, there are many twists and turns in a

24  trial.  I don't know exactly with which witness I will use it.

25  It may be if they bring one of these people live, it's a

46

1    document we use with them.

2           But, you know, we don't know what -- you know, Mr.

3    Buchanan said they haven't seen what's in the performance

4    evaluations.  For all we know, the performance evaluations talk

5    directly about some of the copyright issues in the case rather

6    than even just general performance.

7           So it just strikes me that, you know, they've

8    interjected these issues, and we just want to be in a position

9    to have a fair trial.

10          THE COURT:  All right.  Well, on this one, I think I

11   am going to deny it as to 6 and 7, that is the document

12   requests 6 and 7 in the third set of requests for production of

13   documents.

14          But I am going to require a response to request

15   number 8, that is the performance reviews for those three

16   individuals as requested in request for production of documents

17   number 8.

18          MR. BUCHANAN:  Your Honor, may I address one thing?

19          THE COURT:  Sure.

20          MR. BUCHANAN:  As I understand it, they have asked

21   for the performance reviews of Mr. Vrendenburg, who they

22   don't -- they never even deposed him in the case, and they said

23   he wasn't going to be a witness at trial.  So why would we give

24   his performance reviews?

25          THE COURT:  What --

1          MR. ZEBRAK:  So, first of all, I don't know if they

2    are or are not going to bring them, or if they are on a --

3    sitting here now, I don't know if he's on their list or not.  I

4    do know he is one of the people that took some of the different

5    actions at issue in the case.

6          Quite frankly, the guy, I apologize, I don't have the

7    witness lists in front of me for each side, but, I don't -- I

8    don't really have anything to add beyond that, Your Honor.

9          THE COURT:  Well, if nobody calls him, then certainly

10   they won't be used.  But in the event somebody calls him,

11   whether -- yeah, I'm going to go ahead and require that his be

12   produced as well.  I mean, you produced a severance agreement.

13         So -- all right, so that's -- the abuse reports.

14   Now, you have the information relating to copyright numbers; is

15   that right?

16         MR. ZEBRAK:  We do have copyright notice data

17   information, Your Honor.

18         THE COURT:  Okay.  What else is it -- and I assume

19   what you're talking about, or my impression is that you want to

20   know about other instances so that you can somehow or another

21   come out with a percentage as to how much were copyright, and

22   how much were spam, and how much were other kinds of

23   complaints?

24         MR. ZEBRAK:  So, Your Honor -- so again, they

25   affirmatively in this case through fact and expert witnesses

1    are going to make arguments that, you know, how we proceeded

2    here is reasonable.

3             Now, whether they claim that that is an issue that

4    speaks to liability or just damages, they want to say, we acted

5    reasonably.  And one of the ways they're doing it, they have an

6    expert saying, Dr. Almeroth, they face all these different

7    types of issues and, therefore, their response was reasonable.

8    Their 30(b)(6) testimony -- designee made similar testimony.

9             And we don't have information as to the quantity of

10   those other issues.  And there is two reasons why this is

11   relevant.  One is a sum total.  You could say in the course of

12   a year -- and actually, Your Honor, I don't know that, quite

13   frankly, we know the total number of copyright complaints they

14   get in a given year.  I do know that we have them with respect

15   to the subscribers at issue.  But they're the ones making the

16   argument, we face lots of issues and, therefore, we acted

17   reasonably.

18            And so, we would like to have data to rebut that and

19   put it in context from two levels.  One is to say overall you

20   have -- when you look at the scale, look at the volume of

21   copyright versus the volume of other things by type.  And

22   that's just rolled up statistical data.  And we do have that

23   with respect to termination data.  We had an earlier motion to

24   compel on copyright versus failure to pay license fees.

25            And so, we have it at the termination level, but not

49

1    at the raw complaint level, to my understanding.  And so, we

2    would like to see it in aggregate form across, you know, these

3    months and these time periods.

4           But then the other reason is, if -- if a core group

5    of people at Cox handling these issues got e-mails of this type

6    on a weekly and monthly basis saying, here's the number on

7    copyright, here's these other things, seeing that data, not

8    just data on an aggregate level, that's important to see some

9    of that.

10          And the other thing is, given that we haven't seen

11   the e-mails, we know there are these weekly or monthly reports,

12   there may be narrative text in it that also speaks to the

13   issues in the case.

14          And in their papers they take us to task for saying,

15   we haven't shown that there is any.  Well, notably, they

16   haven't -- you know, they're the ones in possession of it.

17   They haven't said that there is an absence of it.

18          And you're right, the depositions are over, we're

19   not -- there's a handful left.  But we're not using these

20   afresh.  But we can still use a document at trial whether or

21   not we've used it in a deposition.

22          And so, we would like to get the data on a monthly

23   basis at the aggregate level and see what some of these look

24   like.  And ideally, if it can be produced, just -- just have

25   them sent to us.

1          Quite frankly, I am surprised we haven't -- hadn't

2    received them earlier.  I don't know the genesis of how this

3    came to our attention exactly.  But it just strikes me that at

4    some level this is important data both for us to have

5    generally, but in particular to respond to the arguments they

6    are affirmatively making.

7          THE COURT:  Well, the request is included in a

8    document request that you sent out last month -- or earlier

9    this month, actually.  I mean, that's what I'm trying -- you

10   know, we fought over this early on in the case, about what it

11   is they do and don't need to produce.

12         MR. ZEBRAK:  Sure.

13         THE COURT:  And, you know, now on June -- I guess

14   I've just got the objections.  But count 15 days back from when

15   the objections were filed, I guess you must have served these

16   document requests back in the end of May.  Because the

17   objections were served on June 10.

18         This is Exhibit 7, are the -- Cox's objections to

19   your third set of document requests, which apparently they

20   served on you on June 10.  Which means the responses were due

21   earlier this week.  And you would have served it probably on

22   May 26, something around there.

23         MR. ZEBRAK:  Yes, Your Honor.  Let me speak to that.

24   So we've worked very hard in discovery and --

25         THE COURT:  You have had a long time to do it.

51

1          MR. ZEBRAK:  Well, yes, Your Honor.  And I understand

2     that.  Having -- you know, I know Mr. Buchanan practices here

3     quite often.  Having clerked here myself 25 years ago, I

4     appreciate the time the Court has given us to try the case in

5     terms of the extended discovery period.

6          We had earlier requests, though we don't cite them

7     here.  What we did was in an abundance of caution, as the

8     issues become clearer during the case -- you know, their

9     expert, Dr. Almeroth, served an expert report as a rebuttal

10    report in mid-May making this argument that how Cox proceeded

11    is reasonable given all the other things they did.  The policy

12    they devised was a reasonable response.  And so, that was

13    mid-May.

14          Now, we have a bunch of earlier requests earlier in

15    the case that talk about -- that we didn't rely on them here.

16    In drafting the motion to compel, we cited the request that

17    most clearly tees it up.  And we served that request -- we

18    could have tried to proceed earlier on earlier requests, but we

19    wanted to directly tee it up and not have what -- what, quite

20    frankly, happened with the video request -- well, maybe that is

21    not the best example.  But we didn't want to have a situation

22    where we didn't have a request that was specific to these.

23          And whether it's them producing all the weekly or

24    monthly reports, or giving us the data rolled up, or some

25    combination of both, they're making these arguments.  The

52

1   issues became clear during the case, in particular in mid-May

2   with their expert.

3          And we're just -- we need to see how these compare to

4   one another in volume, and if these reports can be produced

5   too, they may have a lot of good, interesting information.

6          And, you know, it's still part of the discovery

7   period in which we're -- they have an obligation to respond to

8   document requests.  And we would like to -- we haven't seen

9   representations on burden on this.  We just have -- you know,

10  they just don't want to give it to us.  In the same way they

11  don't want to give their audited financials.  They don't want

12  us to have the information to put our case on and rebut their

13  arguments that they are affirmatively introducing.

14         And, respectfully, we just believe we need to have

15  that information.

16         THE COURT:  Okay.  Okay, Mr. Buchanan, you're

17  limiting this to -- your request has now been limited to 2012

18  through 2014.

19         Is that right, Mr. Zebrak, is that --

20         MR. ZEBRAK:  Yes, Your Honor, I believe we --

21         THE COURT:  Weekly or monthly abuse reports, you're

22  saying you want them through -- 2012 through 2014?

23         MR. ZEBRAK:  Yes, Your Honor.

24         MR. BUCHANAN:  All right.  Your Honor, I don't see

25  how reports about spam and phishing and malware have any

1    relevance to this case.

2          The plaintiffs' counsel just said here, you never

3    know, there could be stuff in there if we get it, they just

4    don't want to give it to us.  They should give it to us, it

5    could have some other references or notes in there that could

6    be really good to use at trial.

7          THE COURT:  Well, that's not exactly what he's

8    saying.  He's saying, you're going to make the argument that we

9    have all these terrible things that we have to deal with, you

10   know, spam, phishing, you know, attacks on the network, all

11   those other kinds of things.  And, you know, we prioritize our

12   resources to deal with certain issues.  And, you know, we have

13   all these really, really important things that we have to deal

14   with, and so that's what we're thinking about as well.

15         And, you know, if they can point out that, you know,

16   you had one spam attack in this three-year time period and only

17   two phishing attacks, then that argument doesn't really go that

18   far.

19         MR. BUCHANAN:  So they cite to one line from Dr.

20   Almeroth's report where he's -- a very lengthy report where

21   he's talking about, you know, ISPs generally, and the Internet,

22   and structures of ISPs, and how they deal with lots of issues.

23   And then Cox had lots of issues they dealt with.

24         There is no testimony we offered that they spent all

25   of our time, or a great majority of our time, or most of our

54

1    time on these other issues and we couldn't deal with these

2    issues.

3              Our defense will be that, yes, there is lots of

4    issues, and we have lots of people, but the resources that we

5    deployed in this case were sufficient.

6              And on that point, Dr. Weber, who plaintiffs' counsel

7    has referred to several times, she will testify that after one

8    notice, 50 percent of the RIA -- the subscribers at Cox who

9    received notices, after one notice, which was not forwarded to

10   them, they never got another one.

11             We will show by statistical evidence that by the

12   sixth notice 85 percent of all the subscribers who got notices

13   never got another RIA notice.

14             So this is not that the system was terrible and all

15   these people were terrible.  This is a different case.  We have

16   done the statistical analysis in this case, and it will show

17   that it was a graduated response.  It wasn't emphasized on

18   terminating, but it was much more aggressive than the CAST

19   system that used all the other ISPs.  They gave one a week.

20   They had a total of six, they terminated no one.  That's like

21   70 percent of the market.  And the plaintiffs represent

22   85 percent of the music.  And that was their agreement.

23             In contrast, we sent notices every day, every week.

24   We had certain restrictions, but it worked.  We wiped down most

25   of these people by the time they got the sixth notice, into the

1   80s.

2         So -- and so, this evidence is just -- it's not part

3   of the case.  They are totally speculating.  They give the

4   Court one line in which this Dr. Almeroth says, look, they

5   dealt with lots of issues.  Yeah, that's one sentence.

6         But the focus of our case -- and they point to

7   nothing, which they need to do in order to justify and to get

8   this evidence, is that our defense is that we concentrated over

9   here on these other issues, like malware, and we didn't have

10  enough resources to do this.  That doesn't even work.  That is

11  not our defense.

12        We had an obligation to deal with copyright

13  violations, and we did.  And statistically, as you can see, it

14  worked.

15        So this is just a red herring.  They are constantly

16  fishing and saying the burden is on the defense, they're going

17  to do this, they're going to going to do that.  Every single

18  representation counsel has made about what we're going to do is

19  wrong, we're not going to do any of those things.

20        THE COURT:  Well, what are these weekly or monthly

21  abuse reports that are generated by abuse category as described

22  by Zabek and Sikes?  I mean, what's --

23        MR. BUCHANAN:  They keep track of, you know, of

24  information that comes in concerning those issues.  Cox keeps

25  track of the information.

1           So if there is a malware attack and a phishing

2    attack, if someone complains that someone has hacked into their

3    computer, or is phishing an individual subscriber, you know, we

4    keep track of that.  If there is a malware attack on the

5    system, you know, we keep track of that, we record that.

6           It's not our defense that we were -- there were so

7    many of these issues that we just had no time to deal with

8    copyright infringement.  It's just not the case.

9           THE COURT:  All right.

10          MR. ZEBRAK:  Your Honor, I -- if I could have a word

11   on this.

12          THE COURT:  Okay.

13          MR. ZEBRAK:  Your Honor, I find it rich to be accused

14   of attributing to Cox positions it's not making.  I'm quoting

15   from arguments its own experts have made in reports and that it

16   has made at the prior trial.  I'm not making this up.

17          And Dr. Almeroth has a very long report.  Much of it

18   is just technical background on how the Internet works and how

19   ISPs work.  The very controversial aspect of his opinion that

20   we think is entirely inappropriate is for him to tell the jury

21   what to think about Cox's behavior.  He wants to say that it's

22   reasonable.  He has no standard for reasonableness.

23          And Mr. Buchanan gave Your Honor a preview of their

24   opening or closing argument about effectiveness.  We don't

25   think their experts can come in and give opinions about what's

57

1    reasonable.

2          But his opinion, to be clear, Your Honor -- and by

3    the way, this is not one line in a report.  This is in his

4    summary of his opinion.  I mean, this is -- this is in a key

5    area.  He says, Cox faced a lot of different issues.  And

6    within that paragraph and the following -- and he is saying in

7    light of all this, it acted reasonably with its graduated

8    response process.

9          It's making these arguments.  How are we not able to

10   put -- to put in context Cox's behavior against these other

11   issues?

12         And again, it can -- it cannot make the arguments and

13   it will moot this.  But, you know, these reports that include

14   copyright infringement --

15         THE COURT:  When you deposed the expert, and I assume

16   you did, right?  Did you ask for the basis for what were the

17   numbers or what -- or what was it that he relied upon in

18   saying, you know, there are these other issues that Cox was

19   dealing with?

20         MR. ZEBRAK:  So, Your Honor, we're going to have a

21   very lengthy Daubert motion.  This expert is -- is here to

22   present argument to a jury.  He doesn't know anything -- I'm

23   exaggerating a little bit, about Cox's implementation of these

24   policies and procedures.

25         He provides general testimony about how the Internet

1    and all this other technical things work.  Not in the context

2    of Cox exactly.  And then he wants to say, and now I'm opining

3    it's reasonable.  And he's comparing it to some educational

4    program that also will be the subject of a motion in limine.

5            But if he's going to come in and make these

6    statements or try to make statements that it's reasonable, we

7    need to be in a position to show how copyright compared to the

8    other issues that he is citing as a justification for why it's

9    graduated response policy as written was reasonable.

10           And, you know, Mr. Buchanan doesn't really know

11   what's in these weekly abuse reports.  He didn't opine about

12   whether it's specific numbers or a narrative text too.  But at

13   a minimum, if it's numbers comparing copyright to the other

14   issues, it will give some context to statements that they hope

15   to have their expert make.  And a jury can be in a position to

16   see, is copyright one of 20 issues that were all receiving the

17   complaint -- the number of complaints?  Or does copyright come

18   in at a ratio of a thousand to one compared to everything else.

19           THE COURT:  Well, are these abuse reports reflected

20   as something that the expert relied upon in making his decision

21   or his report?

22           MR. ZEBRAK:  Your Honor, we're going to -- I don't

23   believe that he cites abuse reports, but -- and we're going to

24   have -- if he's allowed to testify at all, and depending on the

25   scope of that, we're going to have what we hope to be very

1    effective cross-examination showing that he's there to present

2    ipse dixit argument.  And he hasn't done a review of -- I mean,

3    he hasn't considered how Cox implementing things.  He hasn't in

4    his report quantified the numbers.

5          But what he wants to do, they want to have a

6    professional testify or come in and say, they acted reasonably

7    because let me tell you about all the challenges an ISP faces.

8    And this distinction that they're not going to quantify the

9    numbers of copyright versus anything else, that's really

10   dancing on the head of a pin.  Because what they want a juror

11   to do is walk away saying, gee, copyright is one of 20 issues

12   and, you know, these guys weren't perfect, but they tried.

13         Mr. Buchanan wants to focus on the instances where a

14   subscriber didn't receive another ticket.  This case is about

15   the instances where it kept providing service to known repeat

16   infringers.  It's not about the instance where someone got

17   educated along the way and stopped early on.

18         You know, in terms of the infringements at issue,

19   it's focused on those repeat infringers.

20         And so, I just -- again, they're the ones making the

21   argument.  We need to be able to rebut it.

22         THE COURT:  All right.  Well, this is a case that

23   involves the copyright infringement.  You know, they have legal

24   obligations to do what they do.

25         I mean, it isn't like, you know, if you're really

60

1    busy with other things, you don't have to deal with the issues

2    having to do with copyright.

3            You know, I think this is -- the request that you

4    have laid out here for document request number 3 really is far

5    beyond anything that is necessary for the purposes of this

6    case.  I am going to deny the motion to compel to request

7    number 3.

8            The last one having to do with this three-strike

9    policy.  I mean, I read the testimony.  You may not like his --

10   his answers, but it doesn't appear to me that he was

11   unprepared.  You didn't show him a document.  But, you know --

12   you know, he said, there isn't such a thing as a three-strike

13   policy.

14           You know, if you've got some documents that may or

15   may not support, you know, well, yeah, there really is, but,

16   you know, you had the opportunity -- it was a 30(b)(6)

17   designee.  If in fact, you know, he testified that, you know, I

18   have no knowledge whatsoever of this document, then, you know,

19   maybe I could, you know, make him come back and testify about

20   that document.

21           But, I mean, my -- my -- you know, he talked about it

22   just being a reference to baseball.  He talks about no -- we

23   never had a three-strikes policy.

24           MR. ZEBRAK:  Well -- I'm sorry, Your Honor.

25           THE COURT:  No, go ahead.

61

1              MR. ZEBRAK:  I apologize.

2              THE COURT:  Certainly not for the graduated response

3    program.

4              MR. ZEBRAK:  So, Your Honor -- the testimony Your

5    Honor is referring to is the testimony of the Cox's 30(b)(6)

6    witness, Mr. Carothers.

7              In support of our motion, we cite two documents, they

8    are Exhibits 28 and 29.  Okay.  One of the two documents was

9    shown to Mr. Carothers.

10             THE COURT:  29.

11             MR. ZEBRAK:  Pardon me?

12             THE COURT:  It was 29 you did show him.

13             MR. ZEBRAK:  Yes, Your Honor.  It's on page 164 of

14   Mr. Carothers' testimony.

15             THE COURT:  Right.

16             MR. ZEBRAK:  So Mr. Carothers -- with respect to --

17   so again, he's a 30(b)(6) witness who has an obligation to

18   speak to the procedures.  That there is a multitude of topics.

19   There is really no issue about whether he was required to be

20   prepared to speak to whether Cox had a three-strike policy.

21             So, yes, we admit that we didn't show him Exhibit 28.

22   Okay.

23             With respect to Exhibit 29 -- but he did at his

24   deposition indicate, we don't have a three-strikes policy.

25   Whereas the document does speak about a three-strikes policy.

62

1          And I get that, you know, a reaction to that could

2     be, well, that may make for some very effective

3     cross-examination where he says we don't have something that a

4     document reflects, but -- or the other side of that coin, Your

5     Honor, could be that there is or was some three-strikes policy

6     and he was simply unprepared about it in saying he doesn't know

7     or that there wasn't one.  Because there is a document saying

8     that there is a three-strikes policy.

9          Now, they take us to task, accusing us of

10    misrepresenting the document.  I want to make sure I'm talking

11    about the correct one.  But this is the document with the 2003

12    timeframe in it.  It has metadata indicating 2013.  And it was

13    attached in an e-mail distributed in 2014.  So we're talking

14    about documents in the time frame that reference a

15    three-strikes policy.

16         He said there was no such thing.  So we acknowledge

17    we didn't use the document to impeach him and say, well, what

18    about this?  What does this mean?  But either way, he said

19    there was none, and we have a document saying that there is.

20         Now, with respect to the document that we did show

21    him, exhibit -- it's referred to as Exhibit 56 in his -- in his

22    testimony.  The document says:  Please don't use the verbiage

23    "three strikes" with our customers.

24         Now, they again take us to task for not pointing out

25    that later it says, we have a graduated response policy.  Your

63

1    Honor, I view that as how they wish to characterize what their

2    policy is.

3              You know, if your policy isn't to terminate on three

4    strikes the way the document is described, it would be

5    superfluous to have a need in a document to say, let's not

6    describe this as three strikes.  There would be no reason to

7    reference, don't call it a three-strikes policy.  If your

8    policy was 13 strikes, why would you ever call that a

9    three-strike policy?

10             So -- and on this document, which we showed him,

11   he -- you know, he wasn't prepared for it.

12             THE COURT:  And that was back on April 25 --

13             MR. ZEBRAK:  Well --

14             THE COURT:  Right, that's when he was deposed?

15             MR. ZEBRAK:  Yes, Your Honor.  I recognize --

16             THE COURT:  Two months ago.

17             MR. ZEBRAK:  Well, we --

18             THE COURT:  The order I entered was clear that all

19   discovery was going to be over by July 2.

20             MR. ZEBRAK:  Okay.

21             THE COURT:  You know --

22             MR. ZEBRAK:  Yes, Your Honor.

23             THE COURT:  -- I'm -- I don't understand why an issue

24   that you say, you know, this person was unprepared for back on

25   April 25, ends up being a part of a motion to compel that you

1    file in late June knowing that there is a hard discovery cutoff

2    date of July 2, being the second extended period that the Court

3    gave the parties in this case.  And I hand wrote on my order,

4    you know, this is it.

5            MR. ZEBRAK:  Yes, Your Honor.

6            THE COURT:  And so, if this was something that you

7    did a deposition last week --

8            MR. ZEBRAK:  Right.

9            THE COURT:  -- and, you know, you were bringing it to

10   me today, I might have some sympathy for you.  But this -- this

11   is an issue that, you know, I think generally read, he was

12   there, he was prepared to testify.  He did testify.  You know,

13   maybe it wasn't right, I don't know.

14           But -- you know, this one is -- unfortunately, I

15   think there is enough -- enough there to say that he was

16   prepared, that he testified the way that he did, and that this

17   one is just kind of brought too late.

18           MR. ZEBRAK:  Okay.

19           THE COURT:  So I am going to deny it as to that as

20   well.

21           MR. ZEBRAK:  Thank you, Your Honor.  May I ask one --

22           THE COURT:  Sure.

23           MR. ZEBRAK:  -- question?  If the answer is, I've

24   ruled, then there is no clarification to that.

25           I mean, I understand that Your Honor has denied our

1   request on the work log, on the -- on whether they called

2   business customers.

3            THE COURT:  Correct.

4            MR. ZEBRAK:  And I understand that they won't be able

5   to produce documentation they haven't produced and they can't

6   rely on that.

7            But one thing we offered today was the idea of doing

8   a sampling where we look at some measure of them, and at least

9   we and they can -- can see what's in or not in these things.

10           Is that something that Your Honor considered and

11   rejected?  And if so, I understand that, but I just want to

12   make sure it wasn't --

13           THE COURT:  Yeah.  No, I mean, I heard that

14   suggestion.  You know --

15           MR. ZEBRAK:  No is no.  Okay.

16           THE COURT:  No is no.  I mean --

17           MR. ZEBRAK:  Yes, Your Honor.

18           THE COURT:  -- there are a lot of reasons for that.

19   One has to do with, you know, I understand you have a trial

20   date that is fairly long from now.

21           MR. ZEBRAK:  Yes, Your Honor.

22           THE COURT:  But my -- I'm not being flexible in the

23   discovery cutoff.

24           MR. ZEBRAK:  It's coming to an end.  Okay.

25           THE COURT:  And so, you know --

66

1          MR. ZEBRAK:  Yes, Your Honor.  I just -- like I said,

2   I just wanted to make sure that something hadn't been

3   overlooked.

4          THE COURT:  No, no, I understand.

5          MR. ZEBRAK:  Okay.  Thank you, Your Honor.

6          THE COURT:  So just to sort of recap.  The audited

7   financial statements I am requiring you to produce.  You should

8   be able to get those produced fairly quickly, I imagine; is

9   that correct?

10          MR. BUCHANAN:  Yes.

11          THE COURT:  Okay.  And the same for the performance

12   reviews for the employees, you need to do that fairly quickly.

13   Certainly, hopefully, by the end of next week, if possible.

14   Okay?

15          MR. BUCHANAN:  Yes, Your Honor.

16          THE COURT:  I know Thursday is a holiday, but --

17          MR. ZEBRAK:  Your Honor, we are happy to work with

18   them on that.

19          THE COURT:  Yeah.  It just needs to be done in time

20   that if you're going to put them on your exhibit list -- you

21   know, nothing I have done today is modifying any of the dates

22   that I set out in my earlier order as to when other pretrial

23   matters need to be done.

24          MR. ZEBRAK:  And, Your Honor, just for -- because

25   Your Honor, obviously, wasn't with us when we had our pretrial

1    conference with Judge O'Grady, given -- and no one is looking

2    to extend discovery and asking for that.

3              THE COURT:  All right.  Well --

4              MR. ZEBRAK:  But Judge O'Grady did say, in light of

5    the different trial date, for efficiency and other reasons, it

6    may make sense to adjust some of the dates.

7              So we're happy to work with them on the timing of

8    production.

9              THE COURT:  All right.  Well, you all can work on

10   that, but --

11             MR. ZEBRAK:  Yes.  We are not going to let it dwell.

12             THE COURT:  The July -- July 2 date was my date.

13             MR. ZEBRAK:  Yes.

14             THE COURT:  I'm in charge of that date, and it's not

15   getting moved.

16             MR. ZEBRAK:  Yes, Your Honor.

17             THE COURT:  All right.  Thank you.

18             MR. ZEBRAK:  Thank you, Your Honor.

19             THE COURT:  Court will be adjourned.

20             NOTE:  The hearing concluded at 12:12 p.m.

21        -------------------------------------------------

22

23

24

25

68

1

2          C E R T I F I C A T E   of   T R A N S C R I P T I O N

3

4

5          I hereby certify that the foregoing is a true and

6   accurate transcript that was typed by me from the recording

7   provided by the court.  Any errors or omissions are due to the

8   inability of the undersigned to hear or understand said

9   recording.

10

11         Further, that I am neither counsel for, related to,

12  nor employed by any of the parties to the above-styled action,

13  and that I am not financially or otherwise interested in the

14  outcome of the above-styled action.

15

16

17

18

19

20                        /s/ Norman B. Linnell

21                     Norman B. Linnell

22                     Court Reporter - USDC/EDVA

23

24

25