UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> COX COMMUNICATIONS, INC., *et al.*, <br><br> Defendants. | Case No. 1:18-cv-00950-LO-JFA |

### REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL

Cox distorts the issues before the Court. It has been stonewalling, hoping to run out the clock. Plaintiffs' motion to compel concerns timely discovery that easily passes the test for relevance. Cox's contentions on burden are overblown. Indeed, for most of the categories in Plaintiffs' motion, the discovery sought is narrow and should be easy to produce. Cox should be ordered to provide the discovery it has been wrongfully withholding.

**I.  Cox's Audited Financial Statements For 2012-2014**

Plaintiffs seek Cox's complete audited financials because they are necessary to understand Cox's overall financial situation, a factor the jury may consider in assessing statutory damages. Cox concedes the relevance of its audited financial statements by relying on them in depositions and producing cherry-picked excerpts from them. But the produced financial statements are incomplete and cannot be fully understood without the narrative and explanatory notes that courts routinely recognize are integral parts of financial statements. They should be produced for multiple reasons.

*First*, each page of the excerpted financials that Cox produced directs the reader to "see notes to consolidated financial." ECF No. 177-6. Courts routinely find that "notes to the financial statements are an integral part of any financial statement" and that the statements are incomplete without them. *See, e.g., In re Sunpoint Sec., Inc.*, 377 B.R. 513, 532 (Bankr. E.D. Tex. 2007); *San Francisco Bay Area Rapid Transit Dist. v. Spencer*, No. C 04-04632 SI, 2006 WL 3782853, at *1 (N.D. Cal. Dec. 21, 2006) (finding "financial records produced contain clear gaps" where accompanying notes to financial statements were not included); *In re Saco Local Dev. Corp.*, 30 B.R. 862, 864 (Bankr. D. Me. 1983) (explaining that notes "are an integral part of the financial statement" and excluding financials statements because notes were missing).

Courts thus compel production of complete financial statements in precisely this situation. In *Austrum v. Fed. Cleaning Contractors, Inc.*, the defendant produced balance sheets and income statements but withheld accompanying notes, as Cox has done here. No. 14-81245-CIV, 2015 WL 6555081, at *3 (S.D. Fla. Oct. 28, 2015). The Court granted plaintiff's motion to compel the notes because "[t]he accompanying notes are an integral part of these financial statements" and "the balance sheets and income statements are not complete without the accompanying notes." The same is true here.

Plaintiffs' financial expert, Dr. William Lehr, relied on Cox's financials for portions of his opinions but was limited to the incomplete excerpts Cox provided. Consistent with the cases cited above, Dr. Lehr explained in his deposition that "often to interpret, you know, financial things, you want to have some more context to do them. . . . [K]nowing that there are these audited statements, part of which has been provided, having the whole thing would be a useful thing to have[.]" (Gould Decl. ¶ 3, Ex. 1 at 65-67 (Lehr deposition).) Absent the ability to review the entire document, Dr. Lehr could not say whether it would change his opinions, *id.*, because of

course he does not know what they reveal, but there is no question the financial statements he reviewed are incomplete. *See Austrum*, 2015 WL 6555081, at *3. Cox's refusal to produce the notes and explanations of the financial statements suggests it is hiding something. That is improper, especially where Cox has conceded the relevance of the financial statements by relying on them and producing portions thereof.

*Second*, Cox voluntarily made the decision to have its 30(b)(6) witness review and rely upon its audited financials. It is well-established in the Fourth Circuit that parties must produce documents relied upon in a deposition. *See, e.g., Wells v. Liddy*, 37 F. App'x 53, 67 (4th Cir. 2002) (ordering production of privileged documents referenced in deposition, applying "normal rules of evidence" (rather than privilege rules) because the witness made "testimonial use" of the documents by indicating that he had relied upon such materials); *Brown v. Tethys Bioscience, Inc.*, No. CIV.A. 3:11MC11, 2011 WL 4829340, at *2 (E.D. Va. Oct. 11, 2011) (noting that even privileged documents are discoverable if they "ha[d] an impact upon the testimony of the witness[,]" though holding that the documents at issue were not discoverable because plaintiff did not specifically describe the manner in which the witness relied upon them). This alone mandates that Cox produce the documents.

*Third*, Cox's unsupported attorney argument that it has already produced "substantial additional, detailed financial information" rendering the information sought duplicative or unnecessary is misleading. Cox cites a list of financial documents produced, but cites to no declaration and no bates numbers, leaving the Court and Plaintiffs to wonder what that all is. (Opp. at 4.) Nevertheless, all Cox has produced is cherry-picked pages from its audited financials, time-limited profit and loss statements for residential products and Cox Business service, and billing reports for its subscribers that infringed Plaintiffs' works. None of those unaudited statements

3

include auditor notes, explanations, qualifications, opinions, contingent liabilities, accounting descriptions, statements regarding corporate structure, intercompany transfers, risk factors or other disclosures commonly contained in audited financials. *Id.*

*Fourth*, though Cox feigns ignorance of why its financials are relevant, it is undisputed that Cox's overall financials will be important evidence for a jury as it assesses statutory damages, including the need for deterrence in light of Cox's overall profits. *See, e.g., EMI Apr. Music, Inc. v. White*, 618 F. Supp. 2d 497, 508 (E.D. Va. 2009) (emphasizing the "important deterrent effect served by statutory damages" for copyright infringement) (citing *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233 (1952)); *UMG Recordings, Inc. v. MP3.Com, Inc.*, No. 00 CIV. 472 JSR, 2000 WL 1262568, at *6 (S.D.N.Y. Sept. 6, 2000) (noting that "the defendant's size and financial assets are highly relevant to arriving at the appropriate level of statutory damages" for copyright infringement).

Cox cannot credibly contend these relevant documents are burdensome to produce. It should be ordered to provide them.

## II. Data underlying Cox's claim that 96% of infringers stop after 5 notices

This category of Plaintiffs' motion appears to be moot because Cox has finally agreed to produce the data. (Opp. at 7.)

## III. Documents regarding Cox's implementation of its graduated response policy with respect to business subscribers

Cox's Graduated Response Policy for business customers includes Cox calling business customers who are the subject of infringement notices. Based on Cox's internal emails and the sheer volume of the infringement notices to some business customers, there are strong grounds to believe that Cox routinely failed to call its business customers as required under its policy. There is certainly a lack of evidence in Cox's document production showing that Cox actually called its

business customers. Unless Cox will admit that it routinely failed to call its business customers to inform them of infringement notices, Plaintiffs must have the opportunity to test Cox's compliance with its own policy.

The document discussed in Plaintiffs' memorandum shows a strong example of Cox staff not contacting its business customers. Cox offers attorney argument that the example in the document was an "isolated incident." (Opp. at 9.) But, notably, there is no declaration from a fact witness willing to say as much. Cox's statement that it "took pains to ensure that its customer service representatives followed Cox's notice handling procedures to the letter" stretches credulity. It certainly flies in the face of this Court's rulings in the *BMG v. Cox* case. (*BMG v. Cox*, Case No. 1:14-cv-01611-LO-JFA, ECF No. 703 at 31 (Memorandum Order on Summary Judgment, finding that "Cox did not implement its repeat infringer policy … Instead, Cox publicly purported to comply with its policy, while privately disparaging and intentionally circumventing the DMCA requirements.").)

Cox next disingenuously asserts that the work logs are "largely duplicative" of "information that Cox has already provided in another form." (Opp. at 2, 8.) This is simply not true. Cox produced a spreadsheet at COX_SONY_00515539 called "ticket action data" with no information whatsoever on steps taken to call business customers about infringement notices. There is no option for "call customer" or anything analogous, nor any customer service notes about any interactions with customers (or lack thereof) beyond automated actions taken by CATS. (Gould Decl. ¶ 5.)

In opposing Plaintiffs' motion, Cox speculates what the work logs "potentially includ[e] or "could include." (Opp. at 8.) Its declarant likewise speculates what the work log notes "may also contain" or "could include." (Beck Decl. at ¶ 7.) Notably, Cox does not indicate whether the

5

work log notes contain references to its representatives calling business customers to inform them of infringement notices. Nor does Cox indicate where or how its representatives were supposed to record making such calls to business customers other than in the work log notes.

Cox presents a red herring in arguing that production would require it to review the work logs for "an individual's private information." (Opp. at 8.) This objection is unfounded and pure speculation. Plaintiffs seek the work log notes for business customers only. Cox has already disclosed the names, addresses and account numbers of virtually all of the 2,793 business customers implicated by Plaintiffs' notices, pursuant to a stipulated order. (ECF No. 140; Gould Decl. ¶ 6.) Cox ignores that fact and speculates that the work log notes *might* include the name or home phone number of "a business customer's designated contact." Even accepting this speculation as true, a protective order is in place, and reviewing an excerpt of work log notes for a couple thousand business customers (out of the roughly 57,000 customers who received Plaintiffs' notices) presents no disproportionate burden given what is at stake here. In seeking work log notes for business customers only, Plaintiffs tailored their request to avoid any undue burden.

Cox next complains about the size of the potential production and speculates that unexpected complications *might* arise in trying to retrieve the data. (Opp. at 8 and 10 n. 6.) Cox neglects to mention that the work log notes are in Cox's CATS database from which it has already run a script to export data. (Gould Decl. ¶ 6.) Cox is not starting this additional data pull from scratch.

In sum, given the serious questions about whether Cox followed its policy for calling business subscribers, Plaintiffs must have the opportunity to test the assertion by reviewing the work log notes.

## IV. William Rosenblatt Expert Report(s)

Cox's arguments concerning William Rosenblatt's expert reports are unpersuasive. The question before the Court is one of discoverability, not admissibility at trial. Cox does not deny that Mr. Rosenblatt made statements on Cox's behalf concerning MarkMonitor in his reports. Nor can Cox deny those statements are relevant to its defenses, including its expert's contention in this case that the MarkMonitor system is unreliable. If Cox's various experts have made contradictory statements on its behalf from case to case concerning MarkMonitor, that is highly probative information and Plaintiffs (and the jury) are entitled to know that.

As for admissibility, Cox also gets it wrong. Cox invents the notion that its expert's statements in one case are an admission by Cox only in the case where it sought to use that testimony. That is incorrect. A party admission is just that and may be used against that party in subsequent proceedings. *See*, *e.g.*, *Samaritan Health Ctr. v. Simplicity Health Care Plan*, 459 F.Supp.2d 786, 799 (E.D. Wis. 2006). Cox's position is even more unsustainable given that in this case it has already inspected MarkMonitor's source code, taken a 30(b)(6) deposition of MarkMonitor on a number of issues, and is trying to pursue a further 30(b)(6) deposition of MarkMonitor in Lithuania solely on source code issues. (Gould Decl. ¶ 7.) At the same time, Cox is withholding discovery of Mr. Rosenblatt's report where, according to BMG, he "claims to know everything he needs to know about MarkMonitor's code based on a redacted 13-page summary and because some employees of MarkMonitor have been on panels he's hosted." (ECF No. 177-21 (November 20, 2015 Hearing transcript excerpt).)

Cox's admonishment that Plaintiffs "plow your own road" as the Court indicated is inapposite. Cox should not be permitted to hide the fact that it appears to have taken contradictory positions on the issue of MarkMonitor's capability. The experts and the jury should be able to

7

hear that. Plaintiffs have hired their own experts and are not on a fishing expedition. The relevance of Mr. Rosenblatt's statements concerning MarkMonitor on Cox's behalf is clear: Cox has squarely challenged the reliability of the MarkMonitor system and Cox's record of prior inconsistent statements, presented through Mr. Rosenblatt, are squarely relevant. There is no burden to Cox in making the production. It should be ordered to provide Mr. Rosenblatt's report(s). Admissibility and use at trial is for another day.

### V. Video recordings of the depositions of Cox's fact witnesses in the BMG case

Cox's continued refusal to produce the videos of depositions in the *BMG v. Cox* case for which it produced the written transcripts is untenable. *First*, Cox is overly formalistic in suggesting that Plaintiffs have never "formally" requested these. Plaintiffs requested them repeatedly in writing and conversations with counsel and they are encompassed by Plaintiffs' underlying document request. *Second*, Cox does not rule out the possibility that it may use the video recordings. (Opp. at 12.) If there is even the slightest chance of Cox using the video, Plaintiffs should receive it now and not have to scramble at the eleventh hour when Cox decides to address the issue. *Third*, even if Cox does not intend to use these videos, Plaintiffs likely will. They include sworn testimony by Cox's employees and former employees on many key issues in this case. When the jury hears this testimony, it should have the benefit of seeing the witnesses testify, not just hearing excerpts read by someone else.

### VI. Documents Concerning Messrs. Zabek, Sikes, and Vredenburg's Employment

Messrs. Zabek and Sikes have a long record of contemptuous attitudes and emails towards copyright laws and rights, as amply demonstrated in the *BMG* case. (*BMG v. Cox*, Case No. 1:14-cv-01611-LO-JFA, ECF No. 703 at 31-36.) Mr. Vredenburg implemented Cox's policies at their direction. Cox's internal views on these employees during their tenure with the company is critical

8

to understanding Cox's attitude towards and handling of copyright infringement it knew was occurring on its network. These employees worked at Cox for years and Cox knew them well. A continuing endorsement of their work, performance and attitudes when Mr. Zabek and Mr. Sikes were declaring "f the dmca" (Zabek), "f the DRC" (Sikes, regarding Digital RightsCorp), and declining to terminate repeat infringements so they could hold on to every penny of incoming revenue (Sikes), speaks volumes about Cox's attitude towards copyright infringement. It bears directly on willfulness and damages, among other things.

Attempting to stave off an order to produce the relevant documents, Cox claims that Plaintiffs rely on "unsupported conjecture." Cox is wrong. In fact, Cox's closing argument at the *BMG v. Cox* trial is telling:

> Now, there are those cases when somebody goes through the process and it's time to terminate, and there have been some e-mails and some chats between employees, mostly Mr. Zabek and his colleagues, about termination, reactivation, and connecting those things to revenue. People have said, we need the revenue. We need the customers. We've all seen those e-mails.
>
> Those e-mails reflect bad judgment. They reflect bad decisions. I think they're offensive, but they're not Cox's policy, and they are not about this case. Not one of those e-mails was about a BMG notice, not about a situation with Rightscorp at all. They're not about the response to Rightscorp or BMG.

(Gould Decl. ¶ 8, Ex. 2 (*BMG v. Cox* Trial Transcript at 2213:03-15).)

This type of statement, likely to be repeated by counsel and witnesses here, underscores the need to discover how Cox viewed those employees, whether it praised and rewarded them for Cox's copyright policies and their implementation, and the circumstances of their departures. Separation letters and deposition testimony from these individuals cannot possibly reveal *Cox's contemporaneous internal views* on those key individuals, all of whom abruptly left Cox's employ following the BMG trial.

### VII. Abuse Reports for 2012-2014

Cox pretends that Plaintiffs did not explain the relevance of these abuse reports. But that is simply not so. Plaintiffs cited Cox's argument that it acted reasonably given that copyright infringement is only one of "a number of different Internet threats and issues, including spam, phishing, malware, hacking, and denial of service (DOS) attacks." (ECF No. 177-28 (Dr. Kevin Almeroth's Rebuttal Expert Report excerpt).) In addition, Cox made the following statements at closing argument in the *BMG v. Cox* case:

> Copyright infringement is a big global problem, but it's not the only problem. There's hacking. There's security problems. There's spam. There's denial of service attacks. There's viruses and malware that can take control of people's accounts, that can take their credit card information, that can wreak havoc on people, and Cox is dealing with all of those problems.

(Gould Decl. ¶ 8, Ex. 2 (*BMG v. Cox* Trial Transcript at 2212:19-25).) Similarly, in his 30(b)(6) testimony, Matthew Carothers stated that CATS processes abuse notices relating to not only copyright infringement, but also malware infections, spam, harassment, stalking, and other issues. (Gould Decl. ¶ 8, Ex. 3 (Matthew E. Carothers Deposition Transcript excerpt).)

Accordingly, the requested abuse report documents are needed so a jury can understand how the number of copyright infringement reports compare to those for other issues such as spam and phishing. As Cox acknowledges, the present record does not illustrate how the number of copyright complaints compare to the number of abuse complaints for non-copyright issues. Tellingly, nor does Cox indicate whether the weekly abuse reports contain narrative text in addition to raw figures breaking down complaints by abuse type. (Opp. at 15.)

### VIII. Testimony concerning Cox's "3-strike" policy

As Cox acknowledges, its 30(b)(6) designee, Matt Carothers, denied that Cox ever had a three strikes policy. (Opp. at 16.) Other relevant witnesses, Randy Cadenhead and Brent Beck,

did not know anything about it when asked at deposition. But the two documents attached to Plaintiffs' motion describes such a policy for copyright infringement, including what Cox does upon each "strike." The second document instructs its call center personnel "not [to] use the verbiage 'three strikes' with [Cox's] customers." (ECF No. 177-30 (Cox internal document titled "Q&A for Cox DMCA Process").) Contrary to Cox's attacks, Plaintiffs did not "misrepresent" the second document. Notwithstanding references within the document to the year 2003, its metadata shows a creation date in 2013 and a modification in 2014, and it was attached to an email in 2014. (Gould Decl. ¶ 9.) Plaintiffs want to get to the bottom of whether Cox had another policy that it disregarded, as this could have profound implications on both liability and damages. Even though Plaintiffs did not show these documents to Mr. Carothers, he was asked about a three-strikes policy and denied that it existed. Cox should have a witness who can speak to the documents and the existence of any three-strikes policy.

Dated June 27, 2019

Respectfully Submitted,

/s/ Scott A. Zebrak
Scott A. Zebrak (38729)
Matthew J. Oppenheim (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20015
Tel: 202-480-2999
scott@oandzlaw.com
matt@oandzlaw.com
jeff@oandzlaw.com

*Attorneys for Plaintiffs*