# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT, *et al.*, | |
| *Plaintiffs,* | |
| v. | Case No. 1:18-cv-00950-LO-JFA |
| COX COMMUNICATIONS, INC., *et al.*, | |
| *Defendants.* | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR DISCOVERY SANCTIONS AND TO PRECLUDE PLAINTIFFS' USE OF MARKMONITOR EVIDENCE

### REDACTED PUBLICLY FILED VERSION

# <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  LEGAL STANDARD ......................................................................................... 4

III.  FACTS AND PROCEDURAL HISTORY ......................................................... 5

  A.  What the MarkMonitor Spreadsheets Purport to Show ........................... 5

  B.  Plaintiffs and MarkMonitor Produced Substantially Incomplete Versions
      of a Spreadsheet Purportedly Verifying that the Files Downloaded by Cox
      Subscribers Were Copies of Plaintiffs' Copyrighted Works .................... 6

  C.  The Audible Magic Transaction Logs ...................................................... 8

  D.  MarkMonitor Failed to Retain Its Contemporaneous Copy of the Audible
      Magic Data ............................................................................................... 9

  E.  The Destroyed Data Was Material ........................................................... 10

IV.  THE COURT SHOULD PRECLUDE PLAINTIFFS' USE OF THE
     MARKMONITOR SPREADSHEET .................................................................. 12

  A.  The MarkMonitor Spreadsheets Are Incomplete, Incompetent and
      Unreliable Evidence of What They Purport to Show .............................. 13

    1.  The MarkMonitor Spreadsheet is Missing Critical Information.............. 13

    2.  Neither Version of the MarkMonitor Spreadsheet Shows that the
        Files Were Verified at the Time that Infringement Notices Were
        Sent to Cox ............................................................................................ 14

  B.  The Court Should Preclude Plaintiffs' Use of the MarkMonitor
      Spreadsheets ............................................................................................. 15

    1.  The MarkMonitor Spreadsheet Is a Summary for Which the
        Foundation Cannot Be Laid .................................................................... 17

    2.  Plaintiffs Had a Duty to Preserve the Evidence and Failed to Do So....... 18

    3.  The MarkMonitor Spreadsheet is Not Reliable Evidence of Direct
        Infringement ............................................................................................ 20

V.  CONCLUSION .................................................................................................... 200

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arista Records LLC v. Usenet.com, Inc.*,
  608 F. Supp. 2d 409 (S.D.N.Y. 2009)..........................................................................4, 17, 20

*U.S. ex rel. Bunk v. Birkart Globistics GmbH & Co.*,
  No. 1:02CV1168 AJT/TRJ, 2011 WL 5005313 (E.D. Va. Oct. 19, 2011)............................15

*Holmes v. Wal-Mart Stores E., L.P.*,
  No. 1:10CV75, 2011 WL 1842868 (E.D. Va. Apr. 27, 2011).................................................15

*Kettler Int'l, Inc. v. Starbucks Corp.*,
  81 F. Supp. 3d 495 (E.D. Va. 2015) ......................................................................................16

*Larson v. Bank One Corp.*,
  No. 00 C 2100, 2005 U.S. Dist. LEXIS 42131 (N.D. Ill. Aug. 18, 2005)..............................17

*Levi v. Twentieth Century Fox Film Corp.*,
  No. 3:16CV129, 2017 WL 1227933 (E.D. Va. Mar. 31, 2017) ................................................1

*M&T Mortg. Corp. v. Miller*,
  No. CV 2002-5410 (NG)(MDG), 2007 U.S. Dist. LEXIS 60610 (E.D.N.Y.
  Aug. 17, 2007) ........................................................................................................................17

*Pillay v. Millard Refrigerated Servs., Inc.*,
  No. 09 C 5725, 2013 WL 2251727 (N.D. Ill. May 22, 2013) ................................................17

*Rambus, Inc. v. Infineon Techs. AG*,
  220 F.R.D. 264 (E.D. Va. 2004) ............................................................................................19

*Silvestri v. General Motors Corp.*,
  271 F.3d 583 (4th Cir. 2001) .......................................................................................5, 16, 18

*Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*,
  No. 1:10cv651, 2010 WL 4645791 (E.D. Va. Nov. 8, 2010)....................................................1

*Suntrust Mortg., Inc. v. AIG United Guar. Corp.*,
  Civ. Action No. 3:09cv529, 2011 WL 1225989 (E.D. Va. Mar. 29, 2011)..............................4

*Taylor v. Mitre Corp.*,
  No. 1:11-cv-01247 (LO/IDD), 2012 U.S. Dist. LEXIS 163854 (E.D. Va. Sep.
  10, 2012) .................................................................................................................................16

*Trigon Ins. Co. v. United States*,
  204 F.R.D. 277 (E.D. Va. 2001) ........................................................................................4, 16

*Vir2us, Inc. v. Invincea, Inc.*,
     235 F. Supp. 3d 766 (E.D. Va. 2017) ....................................................................15

*Vodusek v. Bayliner Marine Corp.*,
     71 F.3d 148 (4th Cir. 1995) ....................................................................................16

*West v. Goodyear Tire & Rubber Co.*,
     167 F.3d 776 (2d Cir. 1999)..............................................................................4, 20

*Zubulake v. UBS Warburg LLC*,
     220 F.R.D. 212 (S.D.N.Y. 2003) ...........................................................................18

**Other Authorities**

Fed. R. Civ. P. 26(a) ......................................................................................................15

Fed. R. Civ. P. 26(e) ......................................................................................................15

Fed. R. Evid. 401-402 ....................................................................................................20

Fed. R. Evid. 1006 ...................................................................................................15, 17

## I.     INTRODUCTION

Plaintiffs propose to rely on documentary evidence compiled by their agent, MarkMonitor,[1] to prove direct infringement of the works-at-issue by Cox subscribers.[2]  Plaintiffs' evidence for direct infringement purports to show that the files found on the computers of Cox subscribers were actually copies of the works asserted by Plaintiffs in this action.  However, MarkMonitor failed to retain critical portions of this evidence, and the document that Plaintiffs intend to rely on is, at best, a partial and inaccurate summary of these analyses.  Because Plaintiffs' agent destroyed the underlying data, leaving no way to assess the accuracy of this summary, Cox respectfully requests that the Court enter discovery sanctions against Plaintiffs in the form of a preclusion order prohibiting Plaintiffs from relying on the incomplete and unreliable MarkMonitor evidence.

The document at issue is a spreadsheet (the "MarkMonitor Spreadsheet") that was created by Plaintiffs and/or their agent for this litigation and relied on by Plaintiffs' experts to opine that the files in the possession of Cox subscribers (the alleged direct infringers) were copies of Plaintiffs' works asserted in this case.  MarkMonitor scanned peer-to-peer networks and matched a unique identifier, the "hash value" of allegedly infringing subscriber files to the hash value of files that had been digitally "fingerprinted," i.e., authenticated, by a company called Audible Magic in order to confirm that the allegedly infringing peer-to-peer files in question were in fact

---

[1] MarkMonitor was the agent of the Recording Industry Association of America, ("RIAA"), an industry trade organization which acted as agent for Plaintiffs in matters concerning so-called "anti-piracy" enforcement of their copyrights. ███████████████████████████████████████████████████████████████████

[2] Direct copyright infringement is one of the elements of the contributory and vicarious copyright liability claims that Plaintiffs are asserting against Cox.  *See Levi v. Twentieth Century Fox Film Corp.*, No. 3:16CV129, 2017 WL 1227933, at *8 (E.D. Va. Mar. 31, 2017) ("One infringes contributorily by inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it.") (citing *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)); *see also Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*, No. 1:10cv651, 2010 WL 4645791, at *3 (E.D. Va. Nov. 8, 2010) (explaining that "[t]here can be no contributory infringement without direct infringement by another party." (citing *U–Haul Intern., Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723, 731 (E.D. Va. 2003)).

copies of the works in suit.  The MarkMonitor Spreadsheet will be offered by Plaintiffs to show that MarkMonitor "matched" files located on peer-to-peer networks to the Audible Magic "fingerprints" of the works in suit, before relying on the hash value identifying that "match" to detect subsequent infringing works on the computers of Cox subscribers, and before sending a copyright infringement notice to Cox.

Two versions of the MarkMonitor Spreadsheet were provided to Cox in discovery. ███ ███████████████████████████████████████████████████ and produced to Cox by MarkMonitor on March 22, 2019 in response to Cox's third-party subpoena with the Bates number "MM000236" (hereinafter, the "'236 Spreadsheet"). ████████████████████████ ███████████ and that version was produced to Cox twice, on February 28 (without metadata), and March 25, 2019 (with metadata) by Plaintiffs.  The March 25, 2019 version of the spreadsheet has the Bates number "Plaintiffs_00286431" (hereinafter, the "'431 Spreadsheet").[3] The '431 Spreadsheet was relied on by Plaintiffs' experts to show that MarkMonitor submitted copies of the digital files that were the subject of the Cox notices to Audible Magic's music fingerprinting database and determined that there was a "match" between the files located by MarkMonitor and Plaintiffs' copyrighted content.  Plaintiffs' experts did not review the '236 Spreadsheet.

While the two versions of the MarkMonitor Spreadsheet have critical differences, *both* versions are manifestly incomplete and unreliable because MarkMonitor destroyed the underlying data that was sent to it by Audible Magic and from which the MarkMonitor Spreadsheet was allegedly compiled.  Both versions of the MarkMonitor Spreadsheet were prepared by drawing data from a MarkMonitor database which purportedly included all of the information sent to

---

[3] *See* Leiden Decl., Ex. E.

MarkMonitor by Audible Magic and relating to the comparisons between peer-to-peer files found by MarkMonitor and the corresponding Audible Magic "fingerprint" of the works in question. However, deposition testimony confirms that the MarkMonitor database was materially incomplete ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

This "matching" data is crucial to detecting the alleged infringements at issue because MarkMonitor uses it as the basis for concluding that the files purportedly downloaded by Cox subscribers can reliably be treated as copies of the works in suit by matching a unique identifier for the file known as a "hash" value.  Therefore, because MarkMonitor did not retain the information received from Audible Magic, the evidence of whether files were verified during the period when MarkMonitor sent over 250,000 infringement notices to Cox—was destroyed.

The materiality of the destroyed evidence omitted from the MarkMonitor Spreadsheet is incontestable. ████████████████████████████████████████████████ ██████████ itself; i.e., a version of the data that was discarded by MarkMonitor.  That analysis shows that, ████████████████████████████████████████████████ And the ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

The '431 Spreadsheet, which was the only version shown to Plaintiffs' experts, is even more problematic than the '236 Spreadsheet. ████████████████████████████

████████████████████████████████████████████████████████

---

[4] Plaintiffs seek to recover for alleged infringements occurring only between February 2013 and November 2014. However, Plaintiffs are also relying on infringement notices that pre-date this timeframe to claim that Cox was on notice of so-called "repeat infringers."

██████████████, before the '431 Spreadsheet was produced to Cox, before it was provided to Plaintiffs' experts, and after the filing of this litigation.

As a consequence of all of these shortcomings, one of the authors of the original MarkMonitor Spreadsheet testified that ████████████████████████████ ████████████████████████████████[5]   Because MarkMonitor's notices stated that they *were* verified, because the MarkMonitor '236 and '431 Spreadsheets will be offered to prove that they *were* verified, and because Plaintiffs' experts relied exclusively on the '431 Spreadsheet in opining that they *were* verified, the failure to produce (or even retain) the data from which the MarkMonitor Spreadsheet was supposedly compiled means that the use of any version of the MarkMonitor Spreadsheet in this case is improper.  Cox therefore requests a ruling from the Court that Plaintiffs be precluded from relying on any versions of this document.

## II.    LEGAL STANDARD

Courts have broad discretion to award discovery sanctions when relevant evidence has been spoliated.  *See Suntrust Mortg., Inc. v. AIG United Guar. Corp.*, Civ. Action No. 3:09cv529, 2011 WL 1225989, at *14 (E.D. Va. Mar. 29, 2011) ("spoliation of evidence is an abuse of the judicial process that is sanctionable under the inherent power" of the district court); *see also Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 443 (S.D.N.Y. 2009); *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 780 (2d Cir. 1999) (finding preclusion to be an appropriate remedy for plaintiffs' spoliation).  The party seeking a spoliation order in this Circuit must show that material evidence was destroyed, "that the adverse party had a duty to preserve the allegedly spoiled documents and that the documents were intentionally destroyed." *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 286 (E.D. Va. 2001). As this Court held in the *BMG* litigation, the duty to

---

[5] *See* Declaration of Diana Hughes Leiden ("Leiden Decl."), Ex. J (Paszkowski Dep., at 129:2-5).

retain and preserve evidence extends to a plaintiff's agents and "to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation."[6] *See also Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001).

## III.   FACTS AND PROCEDURAL HISTORY

### A.   What the MarkMonitor Spreadsheets Purport to Show

MarkMonitor used Audible Magic's service for two main purposes. The first was to create a database of "fingerprints" of the works owned by Plaintiffs that MarkMonitor monitored on peer-to-peer networks.  The second was to determine whether the files MarkMonitor located on peer-to-peer networks when scanning for works owned by the Plaintiffs matched those fingerprinted files.[7]

[8]  Indeed, one of Plaintiffs' experts, Dr. McCabe, used a version of the MarkMonitor Spreadsheet to calculate how many of the notices Plaintiffs sent to Cox were verified.[9]  Likewise, Plaintiffs' expert Barbara Frederiksen-Cross used

---

[6] *See* Leiden Decl., Ex. BB (*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, Case No. 1:14-cv-01611-LO-JFA, ECF. No. 447 at 4, Order on Defendants' Motion for Evidentiary Sanctions.
[7] *See* Leiden Decl., Ex T (Dr. Nick Feamster Rebuttal Report at 3,

However,

*Id*. at 23.

*See also* Leiden Decl., Ex. M (MM000189) at 24

[8] *See* Leiden Decl., Ex M (MM000189 at 10)

[9] *Id*. at 6-7.

that same version to support her opinion that the MarkMonitor infringement investigations reliably identified the infringement of protected works.[10]

**B.     Plaintiffs and MarkMonitor Produced Substantially Incomplete Versions of a Spreadsheet Purportedly Verifying that the Files Downloaded by Cox Subscribers Were Copies of Plaintiffs' Copyrighted Works**

Plaintiffs produced the first version of the MarkMonitor Spreadsheet on February 22, 2019 with Bates numbers "Plaintiffs_00286281."[11]  As illustrated below, the spreadsheet ███████████ ████████████████████████████████████████████████████████████████████ ██████████████████████  The existence of such a match was allegedly shown by the value ██████████████████████████████████████████[12]  The spreadsheet also contained the file's name, hash, Audible Magic ID, and size

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

*(Screenshot of Plaintiffs_00286281)*

Because the origin and support for this spreadsheet was unknown, Cox requested the associated metadata, and Plaintiffs re-produced it on March 25, 2019 with Bates numbers "Plaintiffs_00286431."  The metadata included in the '431 Spreadsheet indicates that it was created at █████████████████████████████████████████████████ ████████████████████████████████████[13]  Plaintiffs' experts relied on the '431

---

[10] *Id.*, Ex. W (Frederiksen-Cross Initial Report at ¶¶ 51-63).
[11] *See* Leiden Decl., Ex. B.
[12] *See* Leiden Decl., Ex. W (Frederiksen-Cross Initial Report, ¶ 153); *id.* Ex. J, (Paszkowski Dep. at 89:17-22).
[13] *See* Leiden Decl., Ex. F (Screenshot of '431 and '236 Spreadsheet metadata).

Spreadsheet to opine that the files that were the subject of infringement notices sent to Cox were actually copies of the works in suit.  For example, Plaintiffs' expert Barbara Frederiksen-Cross opined that the '431 Spreadsheet showed ████████████████████████████████████ ████████████████████████████ and Plaintiffs' expert George P. McCabe described it as ████ ████████████████████████████████████████████████████████████ [14]

On January 7, 2019 and April 15, 2019, respectively, Cox served document subpoenas on MarkMonitor and Audible Magic, the third parties that were primarily responsible for detecting (MarkMonitor) and verifying (Audible Magic) all of the alleged infringements in this case.[15]  Cox sought from MarkMonitor, among other things, databases concerning the notices of alleged infringement created by the MarkMonitor system and sent to Cox and any downloads of the works in suit. Following motion practice in the Northern District of California, MarkMonitor produced documents responsive to these requests under court order in late March 2019.[16]   One of the documents that MarkMonitor produced was the '236 Spreadsheet, which according to its metadata ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ [17]

---

[14] *Id.*, Ex. X (Frederiksen-Cross Reply Report at ¶11); Ex. Z (McCabe Report, Appendix 2).
[15] *See* Leiden Decl., Ex. A (MarkMonitor Subpoena); Ex. N (Audible Magic Subpoena).  Cox did not immediately serve a third party subpoena on Audible Magic because Plaintiffs did not disclose the company as a relevant witness in their initial disclosures. Leiden Decl., ¶13; Ex. R.  It is worth noting that it was incredibly difficult for Cox to obtain responsive documents and information from MarkMonitor, despite their critical importance to Plaintiffs' claims.  Cox served the document subpoena in January and had to move to compel in the Northern District of California in order to receive a complete set of documents and examine the source code months later.  Cox then had to go back to that court multiple times in order to take the 30(b)(6) deposition of MarkMonitor because MarkMonitor insisted that certain relevant witnesses were located abroad and refused to educate U.S. witnesses.  Cox ended up taking one such deposition of MarkMonitor's Lithuanian technical witness by video on the final day of discovery because MarkMonitor and Plaintiffs refused to agree that Cox's counsel could depose the individual in person. *See id.*, ¶23.
[16] *Id.*, Ex. C (*Cox Communications, Inc., et al v. MarkMonitor, Inc.*, Case No. Case No. 3:19-mc-80050-SK, ECF No. 14 ordering MarkMonitor to comply with Cox's Subpoena); *see also* Ex. D (March 19, 2019 letter from MarkMonitor stating "In the interim, we will move forward with processing the non-source code related requests for production.").
[17] *See* Leiden Decl., Ex. F (Screenshot of '431 and '236 Spreadsheet metadata).

MarkMonitor's 30(b)(6) designee on technical topics confirmed in deposition that he had participated in the creation of the '236 Spreadsheet, that it was compiled for purposes of litigation, and that it was supposed to be a ███████████████████████████████████ ██████████████[18]

As set forth in more detail below, both versions of the MarkMonitor Spreadsheet omit the foundational data necessary to support their alleged identification of the files that were purportedly fingerprint verified by Audible Magic.  This missing foundational data was omitted because it was not retained by Plaintiffs or MarkMonitor.

## C.      The Audible Magic Transaction Logs

After learning that Audible Magic provided MarkMonitor with the fingerprinting service relevant to this case, Cox subpoenaed Audible Magic, seeking, among other things, "databases, indices, or other repositories of information concerning the fingerprinting, identification, and/or verification conducted by Your System" of the works at issue.[19]  Audible Magic produced a spreadsheet with the Bates number "REV00003444" (the "Audible Magic Spreadsheet"), which, according to its 30(b)(6) deponent, ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████[20]  Specifically, the Audible Magic Spreadsheet ███████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████.[21]  MarkMonitor

---

[18] *Id.,* Ex. J (Paszkowski Dep. at 114:4-10); ¶13.
[19] Leiden Decl., Ex. N (Audible Magic Subpoena, Request No. 6).
[20] *Id.* Ex. O (REV00003444). REV00003444 also bore the Bates No. AUDIBLE-MAGIC-0007657.
[21] Leiden Decl., Ex. Q (Deposition of Vance Ikezoye at 138:10-139:6, ███████████████████████ ███████████████████████████████; *see also* Ex. P.

then was supposed to determine which Cox subscribers had copies of the verified files by determining whether an identifier unique to the fingerprinted file, its "hash value," was the same as the hash value for the file on the subscriber's computer.

Cox's expert, Dr. Nick Feamster, relied on the Audible Magic Spreadsheet for his analysis of the MarkMonitor infringement investigations because he understood that it was a ███████████ ████████████████████████████████████████████████████████████████████, and that MarkMonitor was provided the same set of data.  In so doing, he relied on testimony to that effect by Audible Magic's 30(b)(6) designee, Vance Ikezoye.[22]   Based on his review of the Audible Magic Spreadsheet, Dr. Feamster concluded that █████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ █████████████████████[23]

### D.   MarkMonitor Failed to Retain Its Contemporaneous Copy of the Audible Magic Data

MarkMonitor never produced the database of Audible Magic transaction logs that Mr. Ikezoye testified it had received, despite the fact that this database was responsive to Cox's document subpoena.  After making its document productions to Cox in late March and early April 2019, MarkMonitor twice confirmed in writing that MarkMonitor had no other non-privileged, responsive documents in its possession, custody, or control beyond what it had already produced.[24]

After learning through the deposition of Audible Magic that MarkMonitor would have had Audible Magic data that was not produced (i.e., the transaction logs), Cox again followed up with

---

[22] *Id*. Ex. Q (Ikezoye Dep. at 175:25-177:22, ████████████████████████████████████████████████ *Id*. at 177:3-178:7, ████████████████████████████████████████
[23] *See* Leiden Decl., Ex. V (Feamster Rebuttal Report at ¶¶ 35, 156-159).
[24] *See* Leiden Decl., Ex. D (March 19, 2019 Letter from Castricone to Leiden) *Id*., Ex. H (March 26, 2019 emails).

MarkMonitor on July 12, 2019 specifically requesting the transaction logs.[25]  Cox explained what the transaction logs showed, how they were responsive to Cox's subpoena, and why the '236 Spreadsheet and other spreadsheets produced by MarkMonitor were not adequate substitutes for the logs themselves.[26,27]  As of the time of this filing, MarkMonitor has never responded to Cox's request and it has not produced the transaction logs or the underlying database.

Ultimately, Cox learned in a deposition on the last day of discovery that MarkMonitor did not produce the transaction logs at issue or the relevant database because it had destroyed them. The MarkMonitor 30(b)(6) designee testified that ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████.[28]  In other words, the copy of the 2012-2014 Audible Magic data—that is, the data from the timeframe when the alleged infringement occurred—was sent to MarkMonitor, but it was not retained.  MarkMonitor destroyed this data notwithstanding that ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████[29]  Moreover, in discharging this obligation, MarkMonitor was supposed to ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████[30]

### E.     The Destroyed Data Was Material.

The destroyed Audible Magic data was undeniably material and foundational to the

---

[25] *See* Leiden Decl., Ex. AA (July 12, 2019 email from Leiden to Castricone).
[26] MM00237-244 appear to be derivative spreadsheets that mirror the information in MM00236 and Plaintiffs_00286430, ████████████████████████████████
[27] Leiden Decl., Ex. AA (July 12, 2019 email from Leiden to Castricone).
[28] *See* Leiden Decl., Ex. J (Paszkowski Dep. at 97:19-98:12).
[29] *See* Leiden Decl., Ex. T ████████████████ at ¶ 2.1, RIAA_00000017-18).
[30] *See* Leiden Decl., Ex. U ████████████████████, at ¶ 3, RIAA_00000006)

MarkMonitor Spreadsheet.  For starters, the MarkMonitor Spreadsheet was supposed to be a summary of the matching results received from Audible Magic.  As such, its veracity necessarily rests on the extent to which it accurately summarized that information.  Without that underlying information, there is no way to assess the accuracy of the summary.  Yet, MarkMonitor's 30(b)(6) technical designee testified that ███████████████████████████████████

███████████████████████████████████████[31]  The Audible Magic data that was not captured until after 2015 included: ████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████[32]  Therefore, none of this contemporaneous information that the MarkMonitor Spreadsheet purports to summarize actually exists in MarkMonitor's files from the time that Plaintiffs allege that Cox subscribers downloaded their copyrighted works (2012-2014). This is critical because the files that MarkMonitor purportedly "matched" using Audible Magic were then used to match the subsequent infringing files downloaded by Cox subscribers, at which point notices were sent.

Moreover, for the reasons noted above, review of the Audible Magic version of this data from the 2012-2014 period, during which it was routinely destroyed by MarkMonitor, strongly suggests that the summary embodied by MarkMonitor Spreadsheet is inaccurate.  Plaintiffs' experts have opined that Plaintiffs' '431 Spreadsheet, a derivative of MarkMonitor Spreadsheet,

████████████████████████████████████████████████████████

---

[31] *See* Leiden Decl., Ex. J (Paszkowski Dep. at 126:13-17).
[32] *See* Leiden Decl., Ex. J (Paszkowski Dep. at 80:22-81:18).  *See also* Leiden Decl., Ex. P (Plaintiff's Dep. Exh. 150, Excerpts from 2012-2014 Audible Magic transaction log ███████████████████████████████
██████████████████████

 [33] But the Audible Magic data that exists in Audible Magic's files shows that cannot be true,

[34] Thus,

.[35]

Finally, there are a handful of records in the '236 version of the MarkMonitor Spreadsheet for which Audible Magic data was received and retained by MarkMonitor, albeit,

.[36]

.[37]

.[38]

indicates that it was roughly a coin flip as to whether the MarkMonitor system had actually identified an infringing work when it sent a notice.

## IV.   THE COURT SHOULD PRECLUDE PLAINTIFFS' USE OF THE MARKMONITOR SPREADSHEET

The MarkMonitor Spreadsheet relied on by Plaintiffs and their experts is not competent evidence that Cox subscribers downloaded Plaintiffs' works in suit. The MarkMonitor Spreadsheet purports to be a summary of the results of the Audible Magic fingerprinting analysis. However, given that the foundational data that would theoretically show this does not exist (because it was spoliated by Plaintiffs' agent, MarkMonitor), and given that what foundational

---

[33] *Id.*, Ex. X (Frederiksen-Cross Reply Report at ¶59).
[34] *See* Leiden Decl., Ex. V (Feamster Rebuttal Report at ¶¶35, 156-159).
[35] *Id.*
[36] *See* Leiden Decl. ¶10; Ex. J (Paszkowski Dep. at 97:19-98:12).
[37] *Id.* at ¶12; Ex. K (MM000236 spreadsheet, sorted).
[38] *See* Leiden Decl., Ex. W (Frederiksen-Cross Report at ¶81).

data does exist is inconsistent with the purported facts that the MarkMonitor Spreadsheet purportedly summarizes, Plaintiffs should be precluded from relying on any version of the MarkMonitor Spreadsheet for any purpose.

**A.      The MarkMonitor Spreadsheets Are Incomplete, Incompetent and Unreliable Evidence of What They Purport to Show**

1.      <u>The MarkMonitor Spreadsheet is Missing Critical Information</u>



. Neither version of the MarkMonitor Spreadsheet, nor the derivative spreadsheets, have Audible Magic data for the relevant period.

This confirmation (or disconfirmation) of a match was further documented by data sent by Audible Magic showing

[40]

The significance of the missing data is shown by

.[41]  As such,

---

[39] Leiden Decl., Ex. J (Paszkowski Dep., at 80:22-81:5).
[40] *Id.* (Paszkowski, Dep., at 81:6-14).
[41] *Id*. at ¶12; Ex. K (MM000236 spreadsheet, sorted).

the data that is in the '236 Spreadsheet, but missing from the '431 Spreadsheet, belies the claim that either Spreadsheet accurately summarizes data purporting to show that 100% of the works in suit were matched at all, ██████████████████████.[42]

Moreover, Dr. Feamster's analysis of the 2012-2014 data from Audible Magic itself (i.e., the data which is missing from both the '431 and the '236 versions of the MarkMonitor Spreadsheet) ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████[43]

MarkMonitor's version of the missing data would presumably show the same thing as Audible Magic's data, if it were extant.

2.    Neither Version of the MarkMonitor Spreadsheet Shows that the Files Were Verified at the Time that Infringement Notices Were Sent to Cox

In addition to the problems caused by the missing data, the MarkMonitor Spreadsheet is problematic because of the date on which it was created.  The '236 Spreadsheet was created in ██████████████ for purposes of litigation, and the '431 Spreadsheet was a ███████████ ██████████████████████████.[44]   MarkMonitor's 30(b)(6) deponent confirmed that the works listed in the MarkMonitor Spreadsheets were downloaded multiple times, but were not verified each time they were downloaded and that they were verified multiple times, but not each instance of verification was recorded.[45]   That is because, both versions of the MarkMonitor Spreadsheet reflect data not for each download or verification, but only for the last download or verification, as of the time they were created ███████████████████.[46]   As a consequence, ████ ████████████████████████████████████████████████████████████████

---

[42] See Leiden Decl., Ex. W (Frederiksen-Cross Report at ¶81).
[43] See Leiden Decl., Ex. V (Feamster Report at 25).
[44] See Leiden Decl., Ex. J (Paszkowski Dep. at 128:4-13 (stating that the spreadsheet was created ███████████████ ████████████████████████; see also id., Ex. F (screenshot of '236 and '431 metadata).
[45] See Leiden Decl., Ex. J (Paszkowski Dep. at 123:17-124:10, 125:6-13.).
[46] Id., at 128:14-129:5.

███████████████████████[47]   In other words, neither version of the MarkMonitor Spreadsheet contains any evidence that files were matched to Plaintiffs' fingerprinted works at or before the time that notices were sent to Cox.

### B.   The Court Should Preclude Plaintiffs' Use of the MarkMonitor Spreadsheets

A party is not permitted to produce evidence favorable to it, and withhold evidence that is unfavorable.  *See* Fed. R. Civ. P. Rule 26 (a) and (e) (requiring the parties to disclose all relevant information during discovery); *see also Holmes v. Wal-Mart Stores E., L.P.*, No. 1:10CV75, 2011 WL 1842868, at *6 (E.D. Va. Apr. 27, 2011) (ordering sanctions against plaintiff for, among other things, "intentionally failing to produce relevant documents" during discovery); *Vir2us, Inc. v. Invincea, Inc.,* 235 F. Supp. 3d 766, 779 (E.D. Va. 2017) (finding that sanctions were appropriate where defendants failed to produce responsive and relevant evidence).

This rule is particularly applicable to documents that are offered as summaries of large compilations of data, as they cannot be introduced as evidence unless the underlying data is "available for examination or copying or both."  Fed. R. Evid. 1006; *see also U.S. ex rel. Bunk v. Birkart Globistics GmbH & Co.*, No. 1:02CV1168 AJT/TRJ, 2011 WL 5005313, at *8 (E.D. Va. Oct. 19, 2011) (plaintiff failed to satisfy the requirement of Rule 1006 because it could not "produce the database or underlying documents that supported the exhibits" and defendants "had no real opportunity to test their accuracy or reliability").

Finally, a party certainly cannot destroy records that are inconsistent with the facts as it would like them to be.  "Spoliation is the willful destruction of evidence or the failure to preserve potential evidence for another's use in pending or future litigation." *Trigon Ins. Co. v. U.S.*, 204 F.R.D. 277, 284 (E.D. Va. 2001) (citing *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 778

---

[47] *Id.*

(2d Cir. 1999); *Silvestri*, 271 F.3d at 590 (noting that courts have "inherent power" to impose sanctions for spoliation, which "refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."). Indeed, "[i]t has long been the rule that spoliators should not be able to benefit from their wrongdoing." *Trigon*, 204 F.R.D. at 284 ("[r]ecognizing acts of spoliation and punishing the spoliators is the result of judicial recognition that the 'spoliated physical evidence' is often the best evidence as to what has really occurred and that there is an inherent unfairness in allowing a party to destroy evidence and then to benefit from that conduct.").

While courts have wide discretion to fashion an appropriate remedy for spoliation, "the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Silvestri*, 271 F.3d at 590; *see also Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) ("the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct."). Courts routinely grant evidentiary sanctions where, as here, relevant information and data has been spoliated or otherwise not retained. *See Kettler Int'l, Inc. v. Starbucks Corp.,* 81 F. Supp. 3d 495, 500 (E.D. Va. 2015) (noting that courts may sanction parties for spoliating evidence that disrupts the judicial process in a number of ways including, "dismissal or judgment by default, preclusion of evidence, an adverse inference instruction, a monetary fine, and/or an assessment of attorney's fees and costs") (citations omitted); *see also Taylor v. Mitre Corp.*, No. 1:11-cv-01247 (LO/IDD), 2012 U.S. Dist. LEXIS 163854, at *30 (E.D. Va. Sep. 10, 2012) (dismissing action because plaintiffs' destruction of evidence was particularly prejudicial to defendants and "dismissal is not an uncommon sanction imposed by courts to remedy spoliation caused by a party deleting files from its computer system"); *Pillay v. Millard*

*Refrigerated Servs., Inc.,* No. 09 C 5725, 2013 WL 2251727, at *1 (N.D. Ill. May 22, 2013) (sanctioning defendants with an adverse jury instruction for allowing its computer program to automatically delete underlying data); *see also Larson v. Bank One Corp.*, No. 00 C 2100, 2005 U.S. Dist. LEXIS 42131, at *48 (N.D. Ill. Aug. 18, 2005) (sanctioning defendants in the form of jury instructions and precluding defendants from cross-examining an expert upon finding that defendants spoliated "underlying data, calculations and documents," which prejudiced plaintiffs from proving defendant's material misrepresentations).

Furthermore, precluding a party from relying on incomplete or unreliable evidence is the appropriate sanction where the best or most complete evidence to prove a particular fact has been spoliated by that party. *Arista Records*, 608 F. Supp. 2d at 443 (because the defendant had spoliated its own records of actual downloads and uploads of digital music files by its paid subscribers, the defendant was precluded from presenting any evidence challenging the plaintiffs' statistical evidence of infringement on the Usenet platform, including incomplete usage data that "would provide a distorted picture of the level of infringing activity on Defendants' system"); *see also M&T Mortg. Corp. v. Miller,* No. CV 2002-5410 (NG)(MDG), 2007 U.S. Dist. LEXIS 60610, at *38 (E.D.N.Y. Aug. 17, 2007) (precluding defendants from offering summary evidence to oppose the plaintiff's allegations because they spoliated the direct records).

1.   The MarkMonitor Spreadsheet Is a Summary for Which the Foundation Cannot Be Laid

A document which purports to summarize underlying data cannot be admissible evidence unless the underlying data is made available for copying and inspection. *See* Fed. R. Evid. 1006 ("The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both …

[a]nd the court may order the proponent to produce them in court."). The data that underlies the MarkMonitor Spreadsheet is the transaction log compiled by Audible Magic, a copy of which was provided by Audible Magic to MarkMonitor. MarkMonitor's version of that data no longer exists, and the portions of the data that do exist contradict the "summary" that the MarkMonitor Spreadsheet purports to provide. Accordingly, the MarkMonitor Spreadsheet is not a competent summary that can be offered to prove any fact at issue in this case.[48]

### 2. Plaintiffs Had a Duty to Preserve the Evidence and Failed to Do So

It cannot be seriously disputed that Plaintiffs had a duty to retain their own evidence, and their agent's evidence, of the alleged direct infringements in this case. Plaintiffs anticipated the need for this data ███████████████████████████████████ and MarkMonitor was obligate to honor that contractual commitment. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (a litigant is under a duty to retain evidence that is likely to be requested by the other side); *see also Silvestri*, 271 F.3d at 591 (affirming the district court's dismissal of the action for plaintiffs' spoliation and noting that "[t]he duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation"). Indeed, this Court in the *BMG* litigation held as much when it sanctioned plaintiffs for spoliating material evidence because they had a duty to preserve evidence generated by its agent, Rightscorp, "since at least 2013."[49] Once a plaintiff reasonably foresees litigation, he or she "has a duty to suspend any

---

[48] Conceivably, the Audible Magic version of the transaction logs would cure this problem. However, Plaintiffs' expert has opined ████████████████████████████████ *See* Leiden Decl., Ex. X, (Frederiksen-Cross Reply Report, at ¶¶ 11-14). If this issue gets to trial, Cox will dispute Plaintiffs' claim that the Audible Magic Spreadsheet is materially incomplete. Regardless, for the purposes of this motion, Plaintiffs cannot contend both that the Audible Magic Spreadsheet is unreliable because it ████████████████████████████████ ███, and that the MarkMonitor Spreadsheet is reliable notwithstanding that is has none of that data.

[49] *See* Leiden Decl., Ex. BB (*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, Case No. 1:14-cv-01611-LO-JFA, ECF. No. 447, Order on Defendants' Motion for Evidentiary Sanctions).

routine document purging system that might be in effect and to put in place a litigation

hold." *Rambus, Inc. v. Infineon Techs. AG*, 220 F.R.D. 264, 290 (E.D. Va. 2004) (citing *Silvestri*,

271 F.3d at 591). Here, Plaintiffs used MarkMonitor to ██████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████.[50]   MarkMonitor did, in fact, retain the information relating to Audible Magic

fingerprinting summarized in the MarkMonitor Spreadsheet. They just did not retain the data on

which that Spreadsheet was based. But that is not enough. Plaintiffs had a duty to ensure that all

of this evidence was retained—and not just the portions favorable to them.

As set forth above, the MarkMonitor Spreadsheet is based on selected data from a database

that was not produced, and the source data that should have populated that database ██████████

████████████████████████████████████   *See supra*, Section B. While MarkMonitor retained

████████████████████████████████████   summarized in the MarkMonitor Spreadsheet, that

data was created in 2015 or later; that is, after the fact. Moreover, it is not just that this data was

not produced, but that the data from the period in question was destroyed. As set forth above,

critical Audible Magic data showing whether there was a "match" between an allegedly infringing

file located by MarkMonitor and Audible Magic's database of Plaintiffs' fingerprinted works from

the relevant timeframe was created by Audible Magic and shared with MarkMonitor, but not

retained by MarkMonitor. *See supra*, Section B. Because Plaintiffs failed to preserve and produce

the best and most complete—indeed, the only—evidence of the alleged direct infringements, the

Court should preclude Plaintiffs from relying on the '236 and '431 Spreadsheets, and any

---

[50] *See* Leiden Decl., Ex. T (2012 Statement of Work at RIAA_00000026) explaining how data collected by MarkMonitor for the RIAA is "recorded and stored in the infringement database as evidence of the infringing activity" and that DtecNet (MarkMonitor) could provide an affidavit or other legal documentation to support the evidence gathered).

derivative documents, which are merely incomplete and inaccurate summaries of what the data would have shown.  *See Arista Records*, 608 F. Supp. 2d at 443; *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 780 (2d Cir. 1999) (finding preclusion to be an appropriate remedy for plaintiffs' spoliation).

<blockquote>

3.   <u>The MarkMonitor Spreadsheet is Not Reliable Evidence of Direct Infringement</u>
</blockquote>

Furthermore, evidence is not admissible unless it is relevant.  Fed. R. Evid. 401-402. Plaintiffs intend to offer the MarkMonitor Spreadsheets to prove that MarkMonitor sent infringement notices to Cox on works downloaded by Cox subscribers that were verified to be Plaintiffs' copyrighted works.   But, for the reasons described above, the MarkMonitor Spreadsheets do not prove that—they are substantially incomplete and lack any evidence of contemporaneous verification.  *See supra*, Section B.   Indeed, the only possible evidence of verification was destroyed by MarkMonitor.  As MarkMonitor's 30(b)(6) witness acknowledged:

███████████████████████████████████████████████████████████

████████████████████████[51]  MarkMonitor created an incomplete spreadsheet after the fact which reflects only partial data and is not probative on the issue of whether the notices were sent with respect to copyrighted works.  As such, it is not probative of any fact making Plaintiffs' claim of direct infringement more or less likely to be true.  Therefore, it should be precluded from the record in this case.

## V.   CONCLUSION

For the reasons set forth above, Cox respectfully requests that the Court grant this Motion, issue discovery sanctions against Plaintiffs, and order that Plaintiffs and their experts are precluded from relying on the '236 and '481 Spreadsheets, and any derivative documents, for any purpose.

---

[51] *See* Leiden Decl., Ex. J (Paszkowski Dep. at 129:2-5).

Dated: August 14, 2019

Respectfully submitted,

*/s/ Thomas M. Buchanan /*
Thomas M. Buchanan (VSB No. 21530)
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Defendants Cox
Communications, Inc. and CoxCom, LLC*

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Tel: (212) 294-6700
Fax: (212) 294-4700
Email: melkin@winston.com
Email: tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
Tel: (415) 591-1000
Fax: (415) 591-1400
Email: jgolinveaux@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Tel: (213) 615-1700
Fax: (213) 615-1750
Email: dhleiden@winston.com

**CERTIFICATE OF SERVICE**

I certify that on August 14, 2019, a copy of the foregoing DEFENDANTS'
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO PRECLUDE
PLAINTIFFS' USE OF CERTAIN EVIDENCE was filed electronically with the Clerk of Court
using the ECF system, which will send notifications to ECF participants.

*/s/ Thomas M. Buchanan*
Thomas M. Buchanan (VSB No. 21530)
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.*
*and CoxCom, LLC*