# Exhibit 4

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

BMG RIGHTS MANAGEMENT (US) LLC, and )
ROUND HILL MUSIC LP, )
  )
        Plaintiff, ) Case No. 1:14-cv-1611 (LOG/JFA)
  )
  v. )
  )
COX ENTERPRISES, INC., COX )
COMMUNICATIONS, INC., and )
COXCOM, LLC, )
  )
        Defendants. )
  )

### COX'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE PORTIONS OF THE EXPERT REPORT AND LIMIT THE TRIAL TESTIMONY OF WILLIAM ROSENBLATT

**NON-CONFIDENTIAL PUBLIC VERSION**

documentation produced by Cox in discovery, and the testimony of Brent Beck, who has the responsibility to maintain, modify and support CATS.  *See id.*  Further, Plaintiffs do not challenge this testimony anywhere in their motion, so there is no basis to preclude Mr. Rosenblatt from testifying about this subject matter.  *See generally* Rosenblatt MTE.

> **H. Comparison with Community Standards Concerning Graduated Response Procedures for Handling Allegations of Copyright Infringement**

Having developed an overview of Cox's overall graduated response procedures, including its technical implementation by CATS, Mr. Rosenblatt will also offer testimony to place Cox's overall procedures in a relevant industry context.  *See* Engle Dec., Ex. 1 at ¶¶ 74-110, 113-119; Ex. 3 at ¶¶ 82-93.  "It is appropriate for experts to testify about the ordinary practices of a profession or trade to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry."  *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F. Supp. 1314, 1372 (S.D.N.Y. 1982) (internal quotations omitted).  And the Copyright Alert System seems a natural point of comparison.

The Copyright Alert System is the single most publicized and best documented graduated response system for handling allegations of copyright infringement; thus it offers a relevant guidepost of industry practices for service providers (and copyright monitoring agencies) dealing with notices of alleged infringement.  When asked why he thought the Copyright Alert System was relevant to his testimony in this, Mr. Rosenblatt answered:

> Three reasons. One reason is that this – the Copyright Alert System represents an agreed-upon set of best practices for addressing allegations of copyright infringement on ISPs . . . . that the major stakeholders regarding online copyright infringement allegations have agreed [upon]. . . .
>
> Reason No. 2 is, the level of detail that the Copyright Alert System Memo of Understanding goes into, plus that of the information that each of the participating ISPs has published about it, enables us to gain enough detail about how the process works to be able to legitimately compare it to Cox's graduated response process. . .

21

No. 3 is that the ISPs involved are peers of Cox in terms of being major ISPs in the United States. . . .

**Ex. D** at 260:7-262:15. (Once again, Plaintiffs omit this testimony from their filing.) Evidence produced in this case demonstrates that some major ISPs, ▌▌▌▌▌▌▌▌▌▌, do not act upon any allegations of copyright infringement *except* those of the Copyright Alert System. *See, e.g.*, Dkt. No. 311 at ¶ 4(q), (u), Exs. 2, 9, 11. AT&T has publicly stated that it will only terminate account holders based on "conclusive determinations of infringement by a court."[20] *See* Engle Dec., Ex. 3 at ¶ 82 n.23. In fact, in deposition, Plaintiffs' putative industry expert, Dr. McGarty, candidly admitted that he was unaware of any ISP that terminated its customers based on mere allegations of copyright infringement. Dkt. No. 489, Ex. D at 165:1-21.

These facts suggest that the Copyright Alert System has at least *some* probative value that would help the jury assess the reasonableness of aspects of Cox's graduated response procedures. Some of the operational details of the Copyright Alert System offer points of comparison with CATS as well. For instance, just as CATS has limits on the number of notices in will act on from a given copyright complainant in a given day, so too does the Copyright Alert System impose similar limits that can serve as a data point for comparison.[21] *See* Engle Dec., Ex. 3 at ¶ 91. An expert evaluating a graduated response procedure would be unreasonable *not* to at least consider the Copyright Alert System.

---

[20] The complete article referenced in Mr Rosenblatt's Reply Report, which is also available at http://www.businessinsider.com/att-wont-disconnect-over-six-strikes-2013-9, appears as **Exhibit F** to this brief.

[21] As they do with Mr. Rosenblatt's refusal to credit the volume of *blacklisted* complaints, Plaintiffs argue that Mr. Rosenblatt does not give adequate weight to the volume of notices above Cox's daily limits. *See* Rosenblatt MTE at 12. Again, that proposed alternative goes to weight not admissibility. *See Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999). The jury can decide whether Mr. Rosenblatt properly relied on comparisons to the Copyright Alert System on Cox's daily limits or whether he should have taken the volume of notices over the daily limit (or, in the alternative, the size of the daily limit itself) into account.

Nevertheless, Plaintiffs try to dismiss "the Copyright Alert System [as] an agreement between a small group of ISPs and copyright holders" that has no bearing on the facts of this case.[22] Rosenblatt MTE at 15-16. In fact, in one of their motions *in limine*, Plaintiffs seek to exclude all mention of the Copyright Alert System or the DMCA procedures of other ISPs. *See* Dkt. No. 551. In evaluating the Memorandum of Understanding detailing the Copyright Alert System, Plaintiffs ignore over thirty pages of the document to pluck one line out-of-context from a paragraph-long footnote and impose their own interpretation on it. Rosenblatt MTE at 16. Careful review of the overall language of Footnote 1 of the Memorandum of Understanding reveals that it takes no position about whether participation in the Copyright Alert System has any impact on an ISP's compliance with the DMCA:

> . . . Notwithstanding the foregoing, (1) this Agreement does not and is not intended to create any obligation on a Participating ISP to adopt, implement, enforce, or otherwise take any action in furtherance of a DMCA Termination Policy; (2) the adoption, implementation, enforcement, or other action in furtherance of a DMCA Termination Policy is not part of any step of the Copyright Alert program or enforceable under this Agreement; and (3) entering into this Agreement is not, by itself, intended to address whether a Participating ISP has adopted and reasonably implemented a DMCA Termination Policy. This Agreement does not and is not intended to establish any legal inference regarding any ISP that does not participate in the Copyright Alert program or to address whether or not any ISP has adopted and reasonably implemented a DMCA Termination Policy. . .

Engle Dec., Ex. 10 at 9 n.1.[23] Read in context, the final sentence that the Plaintiffs quote in their *Daubert* motion adopts the neutral position that election not to participate in the Copyright Alert

---

[22] The members in that "small group" include half of the top 10 largest ISPs in the U.S., all of the major recorded music companies, and all of the major movie studios. *See* Engle Dec., Ex. 10 at 21-25, 36.

[23] Elsewhere, the Memorandum of Understanding offers similar equivocal language: "in addition to these Mitigation Measures, the Participating ISP may also adopt, in appropriate circumstances, those measures specifically authorized by section 512 of the Digital Millennium Copyright Act ('DMCA') and/or actions specifically provided for in the Participating ISP's AUP and/or TOS including temporary suspension or termination, except that nothing in this Agreement alters, expands, or otherwise affects any Participating ISP's rights or obligations under the DMCA."

23

System does not mean that an ISP has not satisfied the provisions of the DMCA with respect to a termination policy, nor does election to participate mean that it has. And Mr. Rosenblatt does not intend to opine otherwise. But that does not render the Copyright Alert system irrelevant to the issues before the jury in this case.

Rather, the footnote leaves the question of the extent to which the Copyright Alert System has any bearing on the reasonableness of an ISP's implementation of its DMCA termination policy where it belongs—with the finder of fact. The jury is entitled to hear Mr. Rosenblatt's reasoned views on that question as one who has substantial knowledge of the history, details, and role in industry practices of the Copyright Alert System.

Nor does the fact that the Copyright Alert System does not require termination as one of its graduated steps render it irrelevant to the DMCA issues in this case, as plaintiffs insist. Mr. Rosenblatt will not testify that the Copyright Alert System implies that Cox need not terminate repeat infringers to satisfy the DMCA. Nor will he testify that doing more than the Copyright Alert System requires automatically satisfies the DMCA. But Cox's termination procedures, like all graduated response procedures, involve many steps and components, and comparison to the steps and components of a procedure agreed among major copyright holders and major ISPs is certainly relevant to the jury's evaluation of Cox's overall procedures and whether they reasonably lead to termination in appropriate circumstances.

### I. Effectiveness of Cox's Graduated Response Procedures at Addressing the Conduct that Gives Rise to Allegations of Copyright Infringement

In connection with developing his primary testimony, Mr. Rosenblatt also renders certain opinions about the effectiveness of Cox's graduated response procedures. *See, e.g.*, Engle Dec., Ex. 3 at ¶¶ 45-58. Drawing upon his two decades of experience as a technologist in the digital

---

Engle Dec., Ex. 10 at 7; *see also id. at* 8 ("[I]n addition to these Mitigation Measures, the Participating ISP may also adopt, in appropriate circumstances. . . .").

rights realm, and his review of all the materials described in the sections above, Mr. Rosenblatt bases his analysis on an evaluation of Cox's *overall* process: "To judge the reasonableness of a service provider's implementation of a repeat infringer policy, it is therefore necessary to examine the overall process that the service provider uses to determine whether account holders are subject to termination 'in appropriate circumstances.'" Dkt. No. 390 at ¶ 67. In determining how to evaluate the "effectiveness" of Cox's graduated response procedures, Mr. Rosenblatt has decided to focus on "the effectiveness of the process in curbing allegedly infringing behaviors," given that Cox personnel have indicated that this was their concern when dealing with subscribers who were the subject of infringement complaints. Engle Dec., Ex. 3 at ¶ 47; *see, e.g.*, Dkt. No. 476 at ¶ 12. And, in determining what metric to use to evaluate how well Cox's procedures curb allegedly infringing behavior, he looks at suspensions as well as terminations.

Plaintiffs maintain that every one of Mr. Rosenblatt's methodological choice here is wrong. Rather than evaluate the overall process, Plaintiffs maintain he should have looked only at isolated, anecdotal cases of specific behavior. *See* Rosenblatt MTE at 9. Instead of considering effectiveness in terms of curbing allegedly infringing behaviors, which Plaintiffs deem "irrelevant," he should have considered only those circumstances in which Cox terminated (rather than suspended) an account holder.[24] *See id.* at 9-10. Although Plaintiffs may disagree with his conclusions, Mr. Rosenblatt's methodology for evaluating Cox's termination procedures is sound. The point of terminating repeat infringers is to stop them from engaging in further infringement. And the final step of Cox's graduated procedure is to terminate those account

---

[24] Plaintiffs' argument that curbing allegedly infringing is "irrelevant" to an ISP's reasonable implementation of a repeat infringer termination policy just reinforces that this case has never been about stopping infringement of Plaintiffs' copyrights; rather, it has focused only on termination, and in particular monetizing the threat of termination of Internet access based on unverifiable allegations of infringement.

25

holders for whom the other steps have failed to curb the allegedly infringing behavior. But in Mr. Rosenblatt's view, a well-designed graduated response procedure will aim to stop allegedly infringing behavior, through escalating consequences, without relying solely on the drastic final step of termination. If a procedure is effective at doing so, a small number of terminations may nevertheless reflect circumstances in which it was ultimately appropriate to impose a termination. For these reasons, Mr. Rosenblatt examined both suspensions (penultimate steps before terminations) and terminations, and the relationship between the two, to make an assessment of whether Cox's procedures were eliminating allegedly infringing behavior before reaching the termination step. Mr. Rosenblatt makes clear the basis and rationale of his methodology as well as the conclusions he draws based on that methodology. Again, just because Plaintiffs disagree with his ultimate *conclusions* does not render *his principles and methodology* unreliable. *See Daubert*, 509 U.S. at 595. Plaintiffs also attack Mr. Rosenblatt for purportedly "cherry pick[ing] 'evidence' to conclude that Cox has reasonably implemented a repeat infringer termination policy." Rosenblatt MTE at 5. (In doing so, they simultaneously "cherry pick" the evidence that they contend Mr. Rosenblatt should have given greater weight.)

The very nature of these disputes demonstrates exactly why Mr. Rosenblatt's ultimate opinion on the effectiveness of Cox's termination procedure can be adequately tested by vigorous cross-examination in front of a jury. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, No. 2:10-cv-00248, 2011 WL 7036049, *3 (E.D. Va. July 15, 2011) (holding that defendant's argument that damages expert "cherry-picked" certain agreements in establishing a reasonable royalty rate went "to the weight and not the admissibility of [the expert's] testimony"). A jury can (and should) consider whether Mr. Rosenblatt (and Cox) appropriately considered effectiveness in terms of "curbing allegedly infringing behavior," or whether he should have instead focused only

26

on the number and specific circumstances of each individual termination. Similarly, a jury can decide what weight Mr. Rosenblatt should have given to Plaintiffs' evidence on isolated cases. *See Westberry*, 178 F.3d at 265; *Kannankeril,* 128 F.3d at 809.

Because Mr. Rosenblatt fully discloses his extensive basis and methodology for his testimony that Cox's graduated response procedures, taken as a whole, are effective at curbing the incidence of alleged infringement, the Court should allow Mr. Rosenblatt to offer this this to the jury.

### J.   Rebuttal of Opinions by Plaintiffs' Putative Industry Expert

Finally, Mr. Rosenblatt will offer testimony rebutting the opinions offered by Plaintiffs' putative industry expert, Dr. McGarty. Dr. McGarty offers various opinions about  *See* Dkt. No. 464, Ex. A at ¶ 15. Mr. Rosenblatt responds to all of these arguments in his expert reports. *See* Engle Dec., Ex. 2 at ¶¶ 110-130; Ex. 3 at ¶¶ 59-65, 72-80, 94-100. Mr. Rosenblatt's basis for his rebuttal testimony comes from his review of Cox's internal technical documentation about Cox's graduated response procedures; his analysis of CATS, its source code, and related documentation; and his review of the deposition testimony of Cox personnel. Plaintiffs do not appear to challenge the admissibility of Mr. Rosenblatt's rebuttal testimony on these subjects, and the Court should allow Mr. Rosenblatt to testify to these matters if it decides to admit the testimony of Dr. McGarty. If this Court were to

27