**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> COX COMMUNICATIONS, INC., *et al.*, <br><br> Defendants. | Case No. 1:18-cv-00950-LO-JFA |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO PRECLUDE
CERTAIN EXPERT TESTIMONY BY DR. LYNNE WEBER**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ..........................................................................................................................1

BACKGROUND ............................................................................................................................2

ARGUMENT ..................................................................................................................................4

    I.    LEGAL STANDARD................................................................................................4

    II.    COX IS ESTOPPED FROM USING DR. WEBER'S TESTIMONY TO RELITIGATE ISSUES ALREADY DECIDED AGAINST IT ....................................5

    III.    DR. WEBER'S PROPOSED TESTIMONY CONCERNING THE "EFFECTIVENESS" OF COX'S POLICY WILL NOT ASSIST THE JURY ............7

    IV.    DR. WEBER'S OPINION ON "EFFECTIVENESS" IS NOT A REBUTTAL REPORT ..................................................................................................................10

    V.    DR. WEBER'S PROPOSED TESTIMONY CONCERNING THE "EFFECTIVENESS" OF COX'S POLICY IS UNRELIABLE ................................11

    VI.    DR. WEBER CANNOT BE USED AS A VEHICLE FOR INADMISSIBLE AND IRREVLEVANT HEARSAY ...................................................................................15

CONCLUSION ..............................................................................................................................16

## TABLE OF AUTHORITIES

Cases

*Alevromagiros v. Hechinger Co.*, 993 F.2d 417 (4th Cir. 1993) .................................................14

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293 (4th Cir. 2018) ...........2, 5, 6

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634
  (E.D. Va. 2015) ..................................................................................................................2, 5, 6

*Capital Concepts, Inc. v. Mountain Corp.*, 936 F. Supp. 2d 661 (W.D. Va. 2013) .......................15

*Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194 (4th Cir. 2001) ...............................................5, 11

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ...............................................5, 11, 14

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .............................................................................14

*Gilbert v. Gulf Oil Corp.*, 175 F.2d 705 (4th Cir. 1949) ................................................................14

*In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322 (4th Cir. 2004) ..............................................5

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ........................................8

*Keystone Transp. Sols., LLC v. Nw. Hardwoods, Inc.*,
  No. 5:18-cv-00039, 2019 WL 1756292 (W.D. Va. Apr. 19, 2019) ..................................... 8-9

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V.*,
  14 F. Supp. 2d 391 (S.D.N.Y. 1998) ................................................................................... 7-8

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ..................................................................11

*Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448 (4th Cir. 2010) ..............................................14

*Sedlack v. Braswell Servs. Grp., Inc.*, 134 F.3d 219 (4th Cir. 1998) ..............................................5

*R.F.M.A.S., Inc. v. Mimi SO*, 748 F. Supp. 2d 244 (S.D.N.Y. 2010) ............................................12

*United States v. Barile*, 286 F.3d 749 (4th Cir. 2002) ...................................................................7

*United States v. Offill*, 666 F.3d 168 (4th Cir. 2011)..................................................................5, 7

*United States v. Tsoa*, No. 1:13CR137, 2013 WL 6145664 (E.D. Va. Nov. 20, 2013) .................9

## TABLE OF AUTHORITIES
(Continued)

*Viterbo v. Dow Chem. Co.*, 826 F.2d 420 (5th Cir. 1987) ............................................................14

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) .............................................5, 7

*Woods v. Lecureux*, 110 F.3d 1215 (6th Cir. 1997) ........................................................................7

*Zuckerman v. Wal-Mart Stores E., L.P.*, 611 F. App'x 138 (4th Cir. 2015) .................................14

Rules

Fed. R. Evid. 702 ...............................................................................................................4, 5, 7, 14

**INTRODUCTION**

Cox's trial strategy is to parade out a cadre of expert witnesses to distract, sow confusion, and offer opinions untethered to the facts. Its objective is to hide behind experts with extensive resumes, who will tell the jury what to think and how to decide the case. This motion addresses the improper testimony of Cox's proposed expert, Dr. Lynne Weber.

Dr. Weber proposes to provide rebuttal testimony that Cox's policy for addressing repeat infringement was "effective" in reducing the number of subsequent copyright infringement notices for those subscribers. This testimony is problematic for several reasons. First, Cox is collaterally estopped from using Dr. Weber's testimony to relitigate issues already decided against it in a prior proceeding. Second, her opinion amounts to classic *ipse dixit*. It is a blatant attempt at jury nullification. Third, her opinion is not rebuttal. Dr. Weber admits that Plaintiffs' experts did not do an "effectiveness" analysis. Fourth, Dr. Weber repeatedly opines on causation but her analysis lacks any of the intellectual rigor an expert must apply in testing for or determining causation.

Cox is secondarily liable for its continued provision of Internet service to specific known repeat infringers and the financial benefits it received from the infringing activity. The alleged "effectiveness" of Cox's policy is not an element of any of the claims or affirmative defenses in the case. By anointing Cox's graduated response policy as "effective," Dr. Weber essentially tells the jury that Cox was justified in how it proceeded. This seal of approval improperly usurps the role of the judge as to the law and the role of the jury in applying the law to the facts. The jury is more than capable of resolving the factual issues in the case without the confusing, misleading, and irrelevant testimony of Dr. Weber.

Cox's attempt to use Dr. Weber in this manner also is estopped by this Court's and the Fourth Circuit's determination that Cox's policy concerning repeat infringers was a sham and not

1

reasonably implemented. *See BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 655-62 (E.D. Va. 2015), *aff'd in relevant part*, 881 F.3d 293 (4th Cir. 2018). Cox cannot relitigate those issues. In particular, Cox cannot argue that its response to infringement notices was effective when this Court made binding findings to the contrary.

## BACKGROUND

Dr. Weber is a paid professional expert at a consulting firm, has a master's degree in statistics, and claims to have expertise in market analysis, market research, market modeling, and quantitative analysis. Gould Ex. 1, ¶¶ 5-11 (Rebuttal Expert Report of Lynne J. Weber, Ph.D., dated May 15, 2019 ("Weber Rept.")). She claims to know how to use control groups, conduct research and consumer surveys, and assess consumer behavior by moderating focus groups and interviewing consumers. *See id.* ¶ 6; Gould Ex. 2, 32:24-33:1 (Deposition Transcript of Lynne J. Weber, Ph.D., dated June 7, 2019 ("Weber Tr.")). Yet she did none of that here. Dr. Weber did not use any of those tools to undertake her analysis on the "effectiveness" of Cox's policy in addressing repeat infringement by Cox subscribers. *See* Gould Ex. 2, 31:16-33:6, 35:21-24, 50:19-24 (Weber Tr.).

Dr. Weber seeks to testify that Cox's response to receiving notices of copyright infringement was "effective, both overall and for the vast majority of single family residential and of commercial accounts." *See, e.g.*, Gould Ex. 1, ¶ 133 (Weber Rept.). Dr. Weber opines that, for some percentage of accused accounts, each of the actions taken by Cox in response to receiving RIAA notices or tickets[1] had a "substantial effect" on the occurrence of additional notices or tickets. *See, e.g., id.* ¶¶ 74, 92, 137. For example, she states that ███████████████████████████████████████████████████████████

---

[1] A "ticket" is generated after Cox receives a notice of copyright infringement from RIAA or other copyright holder. *See* Gould Ex. 1, ¶ 14 (Weber Rept.). This motion applies to Dr. Weber's analyses of both notices and tickets.

2

██████████████████████████████████████████

██████████ *Id.* ¶ 74. Without regard to what Cox actually did or did not do in response to those notices, Dr. Weber observes that a percentage of accounts received no additional notices, such that Cox's response was overall "effective." *Id.* ¶ 77.

Dr. Weber ignores that Cox implemented its policies to artificially reduce the number of notices it could receive, including by imposing caps on the number of notices per day per rights owner and by refusing to accept any notices from certain entities such as Rightscorp. *See id.* ¶ 75. Moreover, Dr. Weber opines on the impact of Cox's policy without using a control group. *See* Gould Ex. 2, 50:19-24 (Weber Tr.). According to Dr. Weber, "it wasn't necessary." *Id.*

Dr. Weber's Report centers on Cox's effectiveness, but the Report itself does not define the term. In her deposition, Dr. Weber testified that the "definition of 'effectiveness' as it's used in the report means whether or not or for what percentage of accounts, after Cox actions or inactions, additional notices or tickets, depending on the analysis, are no longer received within the timeframe of that analysis." *Id.* 115:1-6. The Court need examine no further than that tortured construct to preclude Weber's testimony, though her opinion becomes even more difficult for her to articulate, let alone for a jury to follow and benefit from:

- Effectiveness "has a different scope of notice, notice versus tickets, or it has a different time frame." *Id.* 115:7-11.

- "I'm not opining on infringement for which there is no accusation, assertion, nor evidence. I'm only opining on what the data shows for notices by RIAA and/or tickets, depending on the analysis." *Id.* 122:2-10.

- "I'm opining—my opinion is that at each—at each step, at each notice that—from the RIAA—RIAA that was received from plaintiffs, there is some effect of the Cox response to that RIAA notice. But I'm not opining—so there was some effect, is what's opining, sort of notice by—when I'm opining about notice by notice. But the overall effectiveness is about the response—it is about, after—you know, after a certain number of responses by Cox, there are no additional RIAA notices in the case of this analysis that we're talking about now. So that's—that's the opinion about the overall effectiveness, the—being effective, overall, for the vast majority of single-family residential or commercial accounts. There is also

3

- an opinion that each—for each additional notice that—for the first or each additional notice that Cox received, there is some effect on the generation of additional notices for that account that we can see for each step. But I'm not opining that each step is effective, just that each step has some effect, and the cumulative effect of Cox's response is effective for the vast majority of accounts." *Id.* 137:3-138:4.

- Effectiveness is "a yes or no; it's not a percentage. And the opinion is that that effectiveness—meaning, no additional notices that we observe in the data from RIAA—that effectiveness is true for the vast majority of the single-family residential and commercial accounts." *Id.* 144:13-145:1.

While Dr. Weber concludes that Cox's response was effective, she refuses to identify the reason it was effective. When asked what percentage she would conclude that Cox's policy was no longer effective, Dr. Weber responded: "I don't have an opinion about a sharp dividing line—effective, not effective." *Id.* 141:19-22. Similarly, while Dr. Weber makes an "affirmative judgment" of "effective," she is unable (or unwilling) to make the same judgment as to whether Cox's policy was "ineffective." *See id.* 156:13-17. Dr. Weber cannot say whether Cox's response was ineffective for any account (*id.* 112:7-14), even for those accounts that received 13 or more notices (*id.* 155:25-156:10).

Dr. Weber opines that the data on the number of notices has "some relationship to whether or not—the likelihood of whether or not a—an account continued to infringe." *Id.* 127:2-6. But her report does not quantify that relationship or the likelihood of a subscriber stopping the use of a peer-to-peer network to infringe based on the absence of another notice. *See id.* 206:2-14. Nor does she opine on whether any specific subscriber stopped infringing in response to any action by Cox. *See id.* 206:23-207:14.

## ARGUMENT

### I. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under Rule 702, scientific, technical, or other specialized knowledge may be presented to the jury by an

4

expert witness if: (1) it is potentially helpful to the jury; (2) it is based on sufficient facts or data; (3) it is the product of reliable principles and methods; and (4) the testimony is applied to the facts of the case. Fed. R. Evid. 702. The "touchstone of the rule is whether the testimony will assist the jury." *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011).

Trial courts act as gatekeepers to ensure that expert testimony is reliable and relevant. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The Court must determine if the "reasoning or methodology underlying the expert's proffered opinion is reliable" and "whether the opinion is relevant to the facts at issue." *See Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999).

The burden is on the party proffering the expert to prove by a preponderance of the evidence that the expert's testimony is admissible and that the requirements of the Federal Rules of Evidence are satisfied. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001); *Daubert*, 509 U.S. at 592 n.10.

## II. COX IS ESTOPPED FROM USING DR. WEBER'S TESTIMONY TO RELITIGATE ISSUES ALREADY DECIDED AGAINST IT

"Collateral estoppel forecloses the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate." *Sedlack v. Braswell Servs. Grp., Inc.*, 134 F.3d 219, 224 (4th Cir. 1998) (internal quotation marks omitted). The facts that underpin this Court's summary judgment decision against Cox in *BMG* involve Cox's own behavior and satisfy the elements for collateral estoppel to apply. *See In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004).

In *BMG*, this Court already determined, and the Fourth Circuit affirmed, that Cox did not reasonably implement a repeat infringement policy. *See BMG*, 149 F. Supp. 3d at 655-62; *BMG*, 881 F.3d at 303-05. This Court found that "Cox employees followed an unwritten policy put in

5

place by senior members of Cox's abuse group by which accounts used to repeatedly infringe copyrights would be nominally terminated, only to be reactivated upon request." *BMG*, 149 F. Supp. 3d at 655-56. The emails in the *BMG* record "strip[ped] Cox of any innocence" and made "clear" that Cox's repeat infringer policy on the books was an "absolute mirage" given how Cox acted. *Id.* at 658. The Fourth Circuit further explained that "Cox created only a very limited automated system to process notifications of alleged infringement" and that, "in carrying out its thirteen-strike process, Cox very clearly determined *not* to terminate subscribers who in fact repeatedly violated the policy." *BMG*, 881 F.3d at 299, 303. "Cox formally adopted a repeat infringer 'policy,' but, both before and after September 2012, made every effort to avoid reasonably implementing that policy." *Id.* at 303.

In addition, this Court in *BMG* precluded Cox's putative expert, William Rosenblatt, from opining on topics identical to those proffered by Dr. Weber. Specifically, the Court precluded Mr. Rosenblatt's testimony that Cox's procedures were effective at curbing infringement. *See* Gould Ex. 3, ¶ 9 (*BMG*, No. 1:14-cv-1611, ECF No. 691, Order).[2]

Cox previously litigated and lost when the Court and the Fourth Circuit rejected its DMCA defense. Cox cannot now proffer Dr. Weber's opinion inconsistent with the findings underlying the Court's judgment. This is basic collateral estoppel. Cox is not entitled to a second bite at the apple.

---

[2] Plaintiffs have not had the opportunity to review Mr. Rosenblatt's report; Cox refused to produce it. But the briefing indicates that Mr. Rosenblatt performed an analysis on "effectiveness" similar to Dr. Weber. *See* Gould Ex. 4, at 7-11 (ECF No. 450, Plaintiffs' Memo.); Gould Ex. 5, at 24-27 (ECF No. 597, Cox's Opp.); Gould Ex. 6, at 4-6 (ECF No. 646, Plaintiffs' Reply).

6

### III. DR. WEBER'S PROPOSED TESTIMONY CONCERNING THE "EFFECTIVENESS" OF COX'S POLICY WILL NOT ASSIST THE JURY

Dr. Weber offers opinions that will not "help the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702(a). "[T]estimony offering nothing more than a legal conclusion—i.e., testimony that does little more than tell the jury what result to reach—is properly excluded under the Rules." *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002) (quoting *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997)); *see also Offill,* 666 F.3d at 175 ("[I]t does not help the jury for an expert to give testimony that states a legal standard or draws a legal conclusion by applying law to the facts, because it supplies the jury with no information other than the witness's view of how the verdict should be read." (internal quotation marks and citations omitted)). Here, Dr. Weber's opinion "has a greater potential to mislead than to enlighten" and thus should be excluded. *See Westberry*, 178 F.3d at 261.

The plain purpose of Dr. Weber's opinion is to invite the jury to nullify the law and to ignore the standards for determining liability and damages. Effectiveness is not an element of any claim in suit. Her opinion that Cox's response to receiving notices of infringement was "effective" is put forward merely to convey an expert's seal of approval and persuade the jury that Cox's conduct was justified or proper. This opinion impermissibly supplants ultimate legal issues that are entrusted to the jury.

The risk of jury nullification here is high. The jury, not an expert, should decide the ultimate issues. But Dr. Weber's opinions invite the jury to cast aside all facts relevant to the issues in the case and the relevant legal standards. There is no significant distinction between Dr. Weber's opinions on "effectiveness" and opinions on whether Cox acted willfully, knew of ongoing infringement, and/or failed to act sufficiently to stop or limit the infringement. *See Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V.*, 14 F. Supp. 2d 391, 398, 403-44

7

(S.D.N.Y. 1998) (excluding expert report on reasonableness of plaintiff's conduct where it was "functional equivalent" of opinion that plaintiff did not act with malice and told jury what result to reach on ultimate issue).

Indeed, Dr. Weber opines that, based on her analysis, terminating accounts of repeat infringers after a first offense is "unnecessary" because it causes "consumer confusion and customer dissatisfaction." Gould Ex. 1, ¶¶ 78, 134 (Weber Rept.). Dr. Weber opines that "Cox's policy of waiting for a second offense to take a customer-facing action . . . ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆" *Id.* ¶ 109. Cox no doubt hopes that Dr. Weber's *ipse dixit* blessing of Cox's graduated response as "effective" will lead a jury to ignore the fact that Cox chose to put its pecuniary interests over terminating specific subscribers for whom Cox received notice after notice but failed to terminate. The natural—but improper—implication from Dr. Weber's opinion is that Cox's policy works to stop infringement and that Cox can avoid liability or pay less damages.

Dr. Weber's opinion does not assist the jury. As discussed *supra*, Dr. Weber did not employ any scientific principles or methodology to arrive at her conclusion. She has no prior experience in studying the effectiveness of an ISP policy on copyright infringement. *See* Gould Ex. 2, 42:4-22 (Weber Tr.). She did not conduct any research surveys, consumer surveys, or focus groups. *See id.* 31:16-33:6. Nor did she speak with any Cox subscribers about their infringing conduct. *See id.* at 35:21-24. At bottom, Dr. Weber has no "specialized knowledge or expertise that would be helpful in resolving the issues of fact presented by the lawsuit." *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 538 (S.D.N.Y. 2004), *quoted in Keystone Transp. Sols., LLC v. Nw. Hardwoods, Inc.*, No. 5:18-cv-00039, 2019 WL 1756292, at *7 (W.D.

Va. Apr. 19, 2019). Her role is simply to "argue [Cox's] cause from the witness stand" and "to tell the jury what to think"—neither of which is proper for expert testimony. *See id.*

Further, what Dr. Weber proffers to tell the jury is directed to "lay matters which a jury is capable of understanding and deciding without the expert's help." *See United States v. Tsoa*, No. 1:13CR137, 2013 WL 6145664, at *8 (E.D. Va. Nov. 20, 2013). Dr. Weber's report presents various calculations on the percentage of accused accounts at each step in Cox's policy for which no additional notices or tickets occurred. *See, e.g.*, Gould Ex. 1, ¶¶ 74, 92 (Weber Rept.). For example, Dr. Weber opines that ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ *Id.* ¶ 74 & Ex. C-15. Dr. Weber's testimony as to the data and her calculations to make it more accessible to the jury is one thing. Her testimony as to the effect of Cox's action on the absence of notices is another thing entirely. The latter does not aid the jury in any way. Dr. Weber merely looked at her calculations, saw that for some percentage of accounts Cox received no further notices, and did nothing more to determine that Cox's policy was "effective" than simply declare it so. *See, e.g., id.* ¶¶ 74-77 (Weber Rept.); Gould Ex. 2, 115:1-6 (Weber Tr.). Certainly, the jury is capable of doing that itself.

Dr. Weber's report would overwhelm and confuse the jury with mystifying statistics and incomprehensible concepts. *See, e.g.*, Gould Ex. 1, ¶¶ 43-74 (Weber Rept.); Gould Ex. 2, 115:1-6, 122:2-10, 137:4-138:4, 143:24-145:1 (Weber Tr.). Further, Dr. Weber's report stops short of providing an opinion on the effect of Cox's policy on what really matters: stopping subscriber infringement. In her deposition, Dr. Weber referred to a relationship between the absence of notices and whether a particular subscriber continued to use a peer-to-peer network to infringe. *See* Gould Ex. 2, 127:2-6 (Weber Tr.). But Dr. Weber did not measure the likelihood that the

9

absence of additional notices meant that a subscriber had stopped infringing or opine on actual subscriber infringement. *See id.* 35:21-24, 126:10-127:14, 206:2-14.

Finally, Dr. Weber's opinion is unhelpful because it contains improper factual argument. Dr. Weber opines that Plaintiffs self-imposed a constraint on the number of notices below the limit to which Cox had agreed. *See* Gould Ex. 1, ¶¶ 113-122, 139 (Weber Rept.). She also opines on a price that RIAA paid per notice. *See id.* ¶¶ 120-121, 139. But it is a jury, not Dr. Weber, that is supposed to decide the facts. Dr. Weber's arguments would confuse and mislead the jury and usurp its role.

Dr. Weber's opinion on "effectiveness" goes beyond the bounds of permissible expert testimony and will not assist the jury. Her opinion should be excluded.

## IV. DR. WEBER'S OPINION ON "EFFECTIVENESS" IS NOT A REBUTTAL REPORT

Dr. Weber's "effectiveness" analysis as contained in sections 4.2-4.4 of her report purports to respond to the reports of Dr. McGarty and Professor McCabe. *See*, *e.g.*, Gould Ex. 1, ¶¶ 40-41, 83-84 (Weber Rept.). But Dr. Weber's "effectiveness" analysis is not a rebuttal to either report. As Dr. Weber acknowledged, neither the McGarty report nor the McCabe report opined on the efficacy of Cox's graduated response policy. *See* Gould Ex. 2, 197:12-25 (Weber Tr.).[3] Dr. Weber must not be allowed to offer affirmative testimony under the guise of rebuttal testimony.

---

[3] By contrast, sections 4.1 and 4.6 of Dr. Weber's report at least make an effort to critique the reports of Dr. McGarty and Professor McCabe. In those sections, Dr. Weber identifies alleged flaws or inaccuracies in their analyses of the data. *See*, *e.g.*, Gould Ex. 1, ¶¶ 30-39, 123-131 (Weber Rept.). Those sections are not the subject of this motion.

V. **DR. WEBER'S PROPOSED TESTIMONY CONCERNING THE "EFFECTIVENESS" OF COX'S POLICY IS UNRELIABLE**

Rule 702 bars Dr. Weber's opinions on the "effect" and "effectiveness" of Cox's response to infringement notices or Cox's infringement policy. In determining the reliability of an expert's testimony, a trial judge may consider several factors: "(1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Cooper*, 259 F.3d at 199 (citing *Daubert*, 509 U.S. at 592-94). The objective of *Daubert*'s gatekeeping requirement is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Dr. Weber's report and proposed testimony fail the basic requirements of *Daubert* and *Kumho*.

Absent from Dr. Weber's analysis is a standard or generally accepted technique used to determine "effectiveness." *See Cooper*, 259 F.3d at 199. Her definition of effectiveness is conclusory and convoluted. Without any explanation, she simply opines that the effect of each step of Cox's policy on eliminating the number of subsequent notices is "substantial," including when Cox does nothing. *See, e.g.*, Gould Ex. 1, ¶¶ 74, 137 (Weber Rept.). Without reference to any scientific or technical literature, Dr. Weber defines "effectiveness" based on whether or not there is a percentage of accounts, after action or inaction by Cox, additional notices or tickets are no longer received. *See* Gould Ex. 2, 115:1-6, 116:14-117:1 (Weber Tr.). With this contrived definition, she, of course, observed an effect after each step in Cox's policy. But her claim that there is "an effect" after each step is simply a statement that something did or did not happen after each notice. Further, she ascertains "effectiveness" on a "yes or no" basis but refuses to

11

identify the line or point between an ISP being effective and not being effective, nor does she provide any opinion on the difference between "effective" and "ineffective" or whether Cox's policy was ineffective for any subscribers. *See id.* 112:7-14, 141:19-22, 155:25-156:10.

At the heart of Dr. Weber's opinion on "effectiveness" are her conclusions on causation. She calculates the percentage of accused accounts at each step in Cox's policy for which no additional notices or tickets occurred. *See, e.g.*, Gould Ex. 1, ¶¶ 74, 92 (Weber Rept.). Because each step was followed by a reduction of additional notices for some percentage of those accounts, Dr. Weber attributes that reduction to Cox's policy. She opines that, for certain percentages of accounts that received a certain number of notices, "given the action taken by Cox in response to" that number of notices, "there were no further [n]otices for that account." *See id. id.* ¶ 74. Dr. Weber then leaps from these observations to conclude that each of the steps in Cox's response "had some effect on the occurrence of additional [n]otices for the accused account," that the effect was "substantial," and that Cox's policy was "effective."[4] *See, e.g., id.* ¶¶ 74-75, 77, 133, 137.

Dr. Weber provides no basis, much less a methodology, to explain how she arrived at her conclusions. Although one would expect someone with Dr. Weber's expertise to apply scientific principles and methods to test for a causal relationship between each step of Cox's policy and the number of subsequent notices, critically absent from her analysis is a control group. Gould Ex. 2, 50:19-24 (Weber Tr.). "It is plain that one cannot determine whether something caused an observed effect without controlling for other equally plausible causes of that effect." *R.F.M.A.S., Inc. v. Mimi SO*, 748 F. Supp. 2d 244, 273 (S.D.N.Y. 2010).

---

[4] Dr. Weber testified that she "can't say for sure there's a causal connection between each of these steps." Gould Ex. 2, 238:22-239:10 (Weber Tr.). But she has no qualms about providing an "affirmative judgment" on the "effect" and "effectiveness" of Cox's policy. *See, e.g., id.* 156:13-17; Gould Ex. 1, ¶¶ 74, 77, 133, 137 (Weber Rept.).

Without a control group, Dr. Weber cannot distinguish between the natural ebbs and flows of notices, other factors affecting the receipt of notices, and the impact of Cox's policy (if any). It is neither remarkable nor an indication of effectiveness that fewer accounts received more tickets when there are constraints on monitoring and reporting the illicit activity. A speed camera is not effective at reducing speeding simply because fewer people received two tickets than one. Some drivers may not live in the area, others may avoid the camera, and some may simply slow down in front of it or install a reflective license plate cover.

Here too, numerous factors can explain the reduction of additional notices for some percentage of accounts. For example, continued infringement may have gone undetected. It may have been detected but not selected for reporting due to caps imposed by Cox on notices. Or, as Cox's own computer science expert, Dr. Feamster, has explained, a subscriber may have left a BitTorrent swarm because she was successful in downloading all the music files she wanted. *See* Gould Ex. 7, ¶ 76 (Rebuttal Expert Report of Dr. Nick Feamster, Ph.D., dated May 15, 2019) (stating that individuals "often leave the network immediately after they have retrieved the file of interest"). Dr. Weber acknowledges the existence of various factors that impacted the number of notices, such as "blacklisting of entities other than RIAA, daily limits on notices from RIAA and other entities, auto-closing the first complaint received, resets after six months, limits on the number of accounts suspended in a day, reactivations, etc." *See* Gould Ex. 1, ¶ 75 (Weber Rept.). However, she failed to account for them.

Remarkably, Dr. Weber's own analysis demonstrates the existence of other potential causes of the absence of additional notices. Dr. Weber opines that, ███████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████ *Id.* ¶ 74. But Cox's policy provided that it would ignore the first notice it received

13

with respect to any particular user in a six-month period. *See id.* Ex. C-15 (Weber Rept.) ("Hold for further complaints" for "1st Offense, within a 6 month period"). Surely, factors other than Cox's policy of ignoring the first notice caused the notices to cease. Cox thus cannot claim credit for the lack of additional notices for those accounts.

By failing to consider and control for other plausible causes, Dr. Weber was not "in possession of such facts as would enable [her] to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture." *See Gilbert v. Gulf Oil Corp.*, 175 F.2d 705, 709 (4th Cir. 1949). Her opinions on causation thus are neither based on "sufficient facts or data" nor the "product of reliable principles or methods." *See* Fed. R. Evid. 702.

"[T]here is simply too great an analytical gap between the data and the opinion proffered" by Dr. Weber. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*; *see also Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 454 n.4 (4th Cir. 2010). Dr. Weber provides no explanation or principled basis as to how she arrived at her conclusions on causation and effectiveness. As such, Dr. Weber's testimony boils down to speculation and improper say-so that has no place before a jury. *See Zuckerman v. Wal-Mart Stores E., L.P.*, 611 F. App'x 138, 138 (4th Cir. 2015) (per curiam) ("Expert testimony rooted in 'subjective belief or unsupported speculation' does not suffice." (quoting *Daubert*, 509 U.S. at 590)); *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 421 (4th Cir. 1993) ("[W]e are unprepared to agree that 'it is so if an expert says it is so.'" (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 421 (5th Cir. 1987)). The Court should thus exclude her opinion.

14

## VI. DR. WEBER CANNOT BE USED AS A VEHICLE FOR INADMISSIBLE AND IRRELEVANT HEARSAY

Dr. Weber's proffered opinion on "effectiveness" purports to rely on Cox testimony and emails that are unsubstantiated hearsay. It is an improper end-run around the inadmissibility of that testimony and email.

For example, Dr. Weber relies on the deposition testimony of Cox employee Matthew Carothers, who testified that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *See* Gould Ex. 1, ¶ 95 (Weber Rept.). Yet there is no data to support the assertion. "An expert cannot simply parrot his client's findings or calculations and then pass that data off as his own expert opinion." *Capital Concepts, Inc. v. Mountain Corp.*, 936 F. Supp. 2d 661, 672 (W.D. Va. 2013). Further, this Court previously precluded Cox from using such evidence. *See* Gould Ex. 3, ¶ 18 (*BMG*, ECF No. 691, Order) (granting motion *in limine* to exclude Cox and its expert from using notice and warning statistics to argue that its graduated response is effective at curbing infringement). As with Dr. Weber's analyses, this statistic cannot be used to show that Cox's policy had any effect on reducing subscriber infringement.

As another egregious example, Dr. Weber relies on the deposition testimony of two Cox employees and 20 emails (an admittedly "small sample") that Cox received after sending an email warning to Cox customers after a second offense to opine that terminating customers without notice, or after a few number of warnings, is "unnecessary . . . compared to effective alternative measures" and also would "punish customers in some cases who are innocent and/or well-intentioned." *See* Gould Ex. 1, ¶¶ 78-79, 109 (Weber Rept.). As discussed *supra*, Dr. Weber conducted no analysis to determine whether a subscriber was infringing nor any inquiry as to a subscriber's behavior or intent. While Dr. Weber believes that her expertise in consumer behavior allows her to opine on whether a subscriber infringed or not based on the reading of a single email, her opinion that any subscriber was "innocent and/or well-intentioned"

15

is wholly without foundation. Certainly Dr. Weber should not be permitted to speak to the relative culpability of Cox subscribers based on her simple review of emails.

The testimony and documents relied upon by Dr. Weber lack any foundation and are not relevant. Cox cannot use Dr. Weber as a vehicle for inadmissible and irrelevant hearsay, and her opinion relying on such hearsay should be excluded.

## CONCLUSION

For the reasons discussed above, Plaintiffs respectfully request that the Court preclude the improper proffered testimony of Dr. Weber.

Respectfully submitted,

Dated August 30, 2019

/s/ Scott A. Zebrak
Scott A. Zebrak (38729)
Matthew J. Oppenheim (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
Kerry Mustico (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20015
Tel:  202-480-2999
scott@oandzlaw.com
matt@oandzlaw.com
jeff@oandzlaw.com
kerry@oandzlaw.com

*Attorneys for Plaintiffs*