UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

SONY MUSIC ENTERTAINMENT, *et al.*,

   Plaintiffs,

   v.

COX COMMUNICATIONS, INC. and COXCOM, LLC,

   Defendants.

Case No. 1:18-cv-00950-LO-JFA

**COX'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY OF PUTATIVE EXPERT BARBARA FREDERIKSEN-CROSS**

## I. INTRODUCTION

Pursuant to Federal Rules of Evidence 702, 402, and 403, Cox respectfully requests that the Court exclude the opinions and testimony of Plaintiffs' putative expert Barbara Frederiksen-Cross insofar as they rely on a spreadsheet created by Plaintiffs' agent, MarkMonitor, and produced as Plaintiffs_00286431 (The "'431 Spreadsheet").[1] The foundational evidence which the '431 Spreadsheet allegedly summarizes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As such, the '431 Spreadsheet is not admissible as a summary of that evidence under Fed. R. Evid. 1003, because the foundation for the '431 Spreadsheet has not and cannot be produced. Moreover, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ from which the '431 Spreadsheet was allegedly derived, occurred at a time when MarkMonitor was on notice of its duty to preserve evidence relevant to this litigation. As such, preclusion of the '431 Spreadsheet is an appropriate sanction for MarkMonitor's spoliation of this evidence. Such a sanction is particularly apposite here, because some of the Audible Magic data that the '431 Spreadsheet allegedly summarizes still exists, both in Audible Magic's files, and (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) in MarkMonitor's. The Audible Magic data that still exists is inconsistent with what is reported in the '431 Spreadsheet, making the need for the destroyed data critical.[2] Finally, the creator of the '431 Spreadsheet testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1] *See* Declaration of Cesie C. Alvarez ("Alvarez Decl."), Ex. A (Plaintiffs_00286431 (the '431 Spreadsheet)).

[2] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.



. In the witness' words, it is ████████████████████████████████████████████

████████████████████████████████████████████████[3]

Cox has moved before Magistrate Judge Anderson to preclude the '431 Spreadsheet and certain related documents.[4] That motion will be heard on September 27, 2019. Cox submits that, in the event that Cox's Motion is granted, Ms. Frederiksen-Cross' opinions based on the '431 Spreadsheet should be deemed impermissibly based on insufficient facts and data. Ms. Frederiksen-Cross should therefore be precluded from testifying with respect to any opinion based in whole or in part on the '431 Spreadsheet. Since we obviously do not know what the Magistrate Judge will hold, a ruling from him that does not grant Cox's motion may or may not moot this motion. Additionally, in a parallel pleading, Cox has raised these issues as a basis for a summary judgment ruling in a brief filed today. A grant of the summary judgment motion would moot this motion. Denial of the summary judgment motion, depending on the basis for that denial, may or may not moot the *Daubert* relief requested here.

Ultimately, the relief sought by Cox on this motion is an order precluding Ms. Frederiksen-Cross from opining as to at least the following matters listed at pages 8 and 9 of her report:

- 

---

[3] *See* Alvarez Decl., Ex. xx (Deposition of Slowmir Pazskowski, 129:2-5) (Testifying about the spreadsheet produced by MarkMonitor as MM000236. The '431 Spreadsheet was a derivative of MM000236).

[4] The other document at issue in the motion before Magistrate Judge Anderson is an earlier version of the '431 Spreadsheet that was produced by MarkMonitor as MM000236.

[redacted]

## II. LEGAL STANDARD

"[O]n the most basic level, to be admissible, [] expert testimony must be 'scientific, technical, or other specialized knowledge.'" *Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019) (quoting Fed. R. Evid. 702(a)). Moreover, expert testimony is only admissible if it "will help the trier of fact to understand the evidence or determine a fact in issue …." Fed. R. Evid. 702(a).

Federal Rule of Evidence 702 requires a trial court to play a "gatekeeping role" in evaluating whether proposed expert testimony is admissible. *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 596-97 (1993); *see also Small*, 927 F.3d at 176. This "gatekeeping" function is important to the integrity of the trial process, because an expert's status or experience may lead the jury to attach more significance to the expert's testimony than is reasonably warranted. *See Small*, 927 F.3d at 176 ("Expert witnesses have the potential to be 'both powerful and quite misleading'") (citations omitted); *see also Daubert*, 509 U.S. at 595 ("Because of the risk, the judge weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.") (citations omitted).

At a minimum, an expert's opinion must be based on "sufficient facts or data." Fed. R. Evid. 702(b). Where an expert fails to consider a material fact in forming his or her opinion, the opinion may be deemed speculative and unreliable and, hence, inadmissible. *Zellars v. NexTech Ne., LLC*, 895 F. Supp. 2d 734, 741 (E.D. Va. 2012); *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) (An expert's testimony is admissible under Rule 702 only if it "rests on a reliable foundation and is relevant.").

3

### III. BACKGROUND

#### A. Procedural Background

Ms. Frederiksen-Cross issued her opening report on April 10, 2019.[5] On June 13, 2019, Ms. Frederiksen-Cross issued a reply report in which she responded to the rebuttal report of Dr. Nick Feamster, which was served on May 15, 2019.[6] Cox deposed Ms. Frederiksen-Cross on June 28, 2019.[7]

#### B. Plaintiffs' Theory of the Case and Ms. Frederiksen-Cross's Analysis

Plaintiffs allege in their Complaint that they "seek relief for claims of infringement that accrued between February 1, 2013 through November 26, 2014, with respect to works infringed by Cox's subscribers *after* those particular subscribers were identified to Cox in multiple infringement notices." ECF No. 136, Am. Compl, ¶ 10 (emphasis in original). As confirmed throughout the record, Plaintiffs used the MarkMonitor infringement detection and notification system to monitor the works at issue and send Cox copyright infringement notices where MarkMonitor had purportedly detected copies of Plaintiffs' works in suit at IP addresses registered to Cox's subscribers.[8] Indeed, as part of her analysis, Ms. Frederiksen-Cross was asked to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[9]

In order to perform her analysis of the MarkMonitor system and ultimately conclude that it had ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ms. Frederiksen-Cross also had to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[10] Audible Magic was

---

[5] *See* Alvarez Decl., Ex. D (Frederiksen-Cross Rpt.).
[6] *See* Alvarez Decl., Ex. E (Frederiksen-Cross Reply Rpt.); Ex. G (Feamster Rebuttal Rpt.).
[7] *See* Alvarez Decl., Ex. F (Frederiksen-Cross Dep.).
[8] *See* Alvarez Decl., Ex. K (RIAA and MarkMonitor Master Agreement); Ex. J (P2P Enforcement Process); Ex. D (Frederiksen-Cross Rpt., ¶ 59).
[9] *See id.*, Ex. D (Frederiksen-Cross Rpt., ¶ 1).
[10] *Id.* at ¶ 17.

4

responsible for verifying that files detected by MarkMonitor on peer-to-peer networks were copies of the works at issue. Audible Magic accomplished this through a digital "fingerprinting" process.[11] MarkMonitor used Audible Magic's service for two main purposes. The first was to ███████████████████████████████████████████████████████. The second was to determine whether the files MarkMonitor located on peer-to-peer networks when scanning for works owned by Plaintiffs matched those fingerprinted files.[12] MarkMonitor ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

███ When a match was found, MarkMonitor relied on the Audible Magic data to conclude that, if a file having the same unique identifier as the fingerprint-matched file – known as a hash value – was found on the computer of a Cox subscriber, then file sharing that hash value was a copy of one of the Plaintiffs' works. Thus, the fingerprinting process was the basis on which MarkMonitor

---

[11] *See* Alvarez Decl., Ex. J (P2P Enforcement Process, 10) ███████████████████████████████████████████████████████████████████████████████████

[12] *See* Alvarez Decl., Ex G (Feamster Rebuttal Rpt., ¶ 109) ███████████████████████████████████████████████████████████████████████████ However, ███████████████████████████████████ *Id.* at ¶ 134; *see also* Alvarez Decl., Ex. J (P2P Enforcement Process, 24) 

*see also* Ex. D (Frederiksen-Cross Rpt., ¶¶ 77-79).

concluded that copyright infringement was occurring and the basis on which a copyright infringement notice would be sent to Cox.[13]

In an operational audit of the MarkMonitor system, the Audible Magic verification was characterized as "crucial to ensure that content owners are not enforcing anti-piracy measures on non-protected works, and is a key part of MarkMonitor's ongoing success in the proper identification of P2P [peer-to-peer] copyright infringement."[14]  Ms. Frederiksen-Cross ▮▮▮

▮▮▮[15]

### C.   Ms. Frederiksen-Cross' use of the '431 Spreadsheet

Ms. Frederiksen-Cross' conclusions about MarkMonitor's ability to identify and notify Cox of infringing copies of the works in issue, in short, rested on MarkMonitor's verification of the files' infringing contents, which, in turn, rested on MarkMonitor's use of the Audible Magic system.  Her opinion ▮▮▮[16]

---

[13] *See* Alvarez Decl., Ex. J (P2P Enforcement Process, 10) ▮▮▮.

[14] *See* Alvarez Decl., Ex. L (Stroz Friedberg Assessment, 16).  The same audit warned MarkMonitor that certain of its practices "▮▮▮" *Id.* The practices were not discontinued.

[15] *See* Alvarez Decl., Ex. F (Frederiksen-Cross Dep., 44:2-21; 47:14-48:9) ("▮▮▮").

[16] *See* Alvarez Decl., Ex D (Frederiksen-Cross Rpt., ¶¶ 51-63); *see* Alvarez Decl., Ex. A (the '431 Spreadsheet).

6

### D. Why the '431 Spreadsheet is not reliable.

The problem with Ms. Frederiksen-Cross' analysis is that the '431 Spreadsheet is an incomplete and inaccurate summary of the Audible Magic verification process. This is true for several reasons.[17]

First, the '431 Spreadsheet contains no evidence from which Ms. Frederiksen-Cross could have concluded that the works that were the subject of notices to Cox were positively identified as the works in suit at the time the notices were prepared. ███████████████████████████████████████████████████████████████████████████████████████████ ███████████████████████ in connection with a variety of projects (not just the project for the Recording Industry Association of America (the "RIAA") project ("the RIAA project"). In the RIAA project, the files were ████████████████████████████████████████ ████████████████████████████. The verification process, thus, was a separate operation from the downloading process. And multiple files were downloaded on multiple occasions for multiple projects, but they were not necessarily verified by Audible Magic each time they were downloaded. The '431 Spreadsheet records only the current verification status of each listed file. But the '431 Spreadsheet was ████████████████████████████████████████████████.[18]

Thus, while the '431 Spreadsheet recorded the ████████████████████████████ ████████████████, it does not record when Audible Magic first verified the work, simply that

---

[17] As described above, the '431 Spreadshee████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████. *Id.* Ex. I (Deposition of Vance Ikezoye at 175:25-177:22).

[18] *See* Alvarez Decl., Ex. B (Screenshot of the '431 Spreadsheet metadata).

the work was verified at some point.[19] Thus, as the creator of the '431 Spreadsheet testified, the information within the '431 Spreadsheet ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Accordingly, as he further acknowledged, it is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[20]

Second, the '431 Spreadsheet purports to summarize Audible Magic's findings during 2012-2014 as to whether files were verified.[21] MarkMonitor made a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[22]

However, the data received directly from Audible Magic confirming that a match had been made was a different record: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Audible Magic also supplied data ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[25] This data made it possible to calculate the extent to which a file found on the internet matched one of the works at issue.

The problem is that MarkMonitor ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



---

[19] Alvarez Decl., Ex. H (Paszkowski Dep., 128:14-25).
[20] *Id.* at 129:2-5.
[21] *See* Alvarez Decl., Ex. H (Paszkowski Dep. at 97:19-98:12).
[22] *Id.* at 89:17-22.
[23] *See* Alvarez Decl., Ex. M (Audible Magic OEM Application and Programming Guide, 91).
[24] *Id.* at 80:22-81:5.
[25] This data was transmitted under the heading ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Alvarez Decl., Ex. H (Paszkowski Dep., 81:6-11).

▆▆ when MarkMonitor was sending 250,000 notices to Cox, and ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.[26] Moreover, the ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.[27] That is, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.[28] This discrepancy was ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.[29]

---

[26] *Id*. at 97:19-98:12. Specifically, MarkMonitor was not ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *Id.* at 82:2-83:16. MarkMonitor's witness could not specify ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *Id.* Mr. Paszkowski ultimately confirmed that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *Id.* at 95:23-97:14.
[27] *See* Alvarez Decl., Ex. H (Paszkowski Dep. at 89:17-22).
[28] *See* Alvarez Decl., ¶ 4-5, Ex. C (Sorted MM000236 spreadsheet).
[29] *See* Alvarez Decl., Ex. G (Feamster Rebuttal Rpt., ¶¶ 35, 156-159). Notably, Ms. Frederiksen-Cross does not dispute the accuracy of Dr. Feamster's calculation. Alvarez Decl., Ex. F (Frederiksen-Cross Dep., 87:5-89:12). Arguably, the 2012-2014 Audible Magic data would solve the problem ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ and provide a foundation for the '431 Spreadsheet. After all, the '431 Spreadsheet ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, and Audible Magic's 30(b)(6) witness testified that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ He further testified ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Alvarez Decl., Ex. I (Ikezoye Dep. at 175:25-177:22). Plaintiffs' problem is that, as noted in the text, the Audible Magic data is ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, and, hence, does not provide a foundation for it. Moreover, Ms. Frederiksen-Cross has opined that the Audible Magic data is ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Plaintiffs cannot both argue that the Audible Magic data for 2012-2014 is incomplete and unreliable

9

Thus, Ms. Frederiksen-Cross' opinion that ███████████████████████████████████████████████████████████. She was never shown an earlier version of the '431 Spreadsheet ████████████████████████ Audible Magic data, instead relying solely on the '431 Spreadsheet.[30]  Moreover, Ms. Frederiksen-Cross conducted her analysis and formed her opinions before MarkMonitor's witness acknowledged that ███████████████████████████████████████████████████████████████████████████████ (not the period in dispute).[31]  Finally, Ms. Frederiksen-Cross had access to, but specifically refused to consider the contemporaneous data from Audible Magic, even though she ██████████████████████████████████████████████████████.[32]

## IV. ARGUMENT

### A. Any testimony related to Ms. Frederiksen-Cross's opinions relying on the '431 Spreadsheet is inadmissible under Federal Rule of Evidence 702.

#### 1. Ms. Frederiksen-Cross did not rely on sufficient facts or data to make her conclusions.

For a putative expert's testimony to be admissible, it must rely on "sufficient facts or data." Fed. R. Evid. 702(b); *see also E.E.O.C. v. Freeman*, 778 F.3d 463, 472 (4th Cir. 2015) ("'A court may conclude that there is simply too great an analytical gap between the data and the opinion offered,' and accordingly choose to exclude the opinion.") (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "Courts widely agree that 'trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to

---

███████████████████████████████████████████████████████████████████████████████████████████████

[30] *See* Alvarez Decl., Ex. D (Frederiksen-Cross Rpt., ¶ 14(d)) (Materials Considered).
[31] *See* Alvarez Decl., Ex. H (Paszkowski Dep., 97:19-98:12, 128:14-20).
[32] *See* Alvarez Decl., Ex. F (Frederiksen-Cross Dep., 87:5-89:12).

mark the expert's testimony as reliable.'" *See Freeman*, 778 F.3d at 472 (quoting *Milward v. Acquity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011)); *see also Blunt v. Lower Merion Sch. Dist.,* 767 F.3d 247, 276 (3d Cir. 2014); *In re TMI Litig.,* 193 F.3d 613, 697 (3d Cir. 1999); *United States v. City of Miami,* 115 F.3d 870, 873 (11th Cir. 1997).

Indeed, "courts often caution experts against drawing broad conclusions from incomplete data." *Freeman*, 778 F.3d at 468; *see also Lilly v. Harris-Teeter Supermarket*, 720 F.2d 326, 337 (4th Cir. 1983) (excluding an expert's conclusions on a broad class because they were based on a more limited class of data); *see also EEOC v. Am. Nat'l Bank,* 652 F.2d 1176, 1195 (4th Cir.1981) (concluding that the expert's opinion was unreliable because it was based on data for only one of seven relevant years).

Here, Ms. Frederiksen-Cross formulated multiple opinions resting on the premise that MarkMonitor verified that its notices related to copies of the works in suit, and she adopted that premise in exclusive reliance on the '431 Spreadsheet. The '431 Spreadsheet, however, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉[33] Based on the '431 Spreadsheet alone, which is the only Audible Magic data Ms. Frederiksen-Cross used, it is impossible to confirm whether the works that were subject to notices were verified before the notices were sent.[34] Additionally, the data that might have allowed Ms. Frederiksen-Cross to reach a conclusion as to whether or not the works were verified prior to being the subject of copyright infringement notices to Cox during the relevant period ▉▉▉▉▉▉▉▉▉▉.[35] Thus, because Ms. Frederiksen-Cross formulated her opinions on the overall accuracy and reliability of the MarkMonitor system on incomplete Audible Magic data, her opinions should be deemed unreliable and should be excluded.

---

[33] *See* Alvarez Decl., Ex. H (Paszkowski Dep., 128:14-25).
[34] *Id.* at 129:2-5.
[35] *Id*. at 97:19-98:12.

Furthermore, ███████████████████████████████████

███████████████████████████████████████████████████████

█████████ it is apparent that the '431 Spreadsheet is missing critical data and overstates the extent to which the listed files were verified as copies of the works in suit. Despite being made aware of the discrepancies between the '431 Spreadsheet and the Audible Magic data through Dr. Feamster's Rebuttal Report, Ms. Frederiksen-Cross refused to consider the Audible Magic data █

██████████████████████████[36] *See Freeman*, 778 F.3d at 469 (excluding expert testimony where the expert focused on certain, incomplete data, despite having the full data available for use). Thus, Ms. Frederiksen-Cross "cherry-picked" the data that supported her inaccurate conclusion that all of the works were verified, and that MarkMonitor's system was reliable.[37] *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 634 (4th Cir. 2018) ("Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion"). Numerous courts have held that selectively analyzing data makes the analysis unreliable. *See, e.g., Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. (USA) L.L.C.,* 752 F.3d 82, 92 (1st Cir. 2014). In sum, Ms. Frederiksen-Cross' analysis is factually deficient and for that her testimony should be excluded. *Overton v. City of Austin,* 871 F.2d 529, 539 (5th Cir. 1989) (per curiam) ("[A] trial court should not ignore the imperfections of the data used[.]").

---

[36] *See* Alvarez Decl., Ex. E (Frederiksen-Cross Reply Rpt., ¶ 12).

[37] Had Ms. Frederiksen-Cross used the more complete Audible Magic data that was made available to her, ███████████████████████████████████████████████. *See* Alvarez Decl., Ex. F (Frederiksen-Cross Dep., 87:5-89:12). Ms. Frederiksen-Cross objected to Dr. Feamster's use of the spreadsheet; not his calculation stemming from the data within it. *See* Alvarez Decl., Ex. E (Frederiksen-Cross Reply Rpt., ¶ 14).

## V. CONCLUSION

Based on the foregoing, the Court should exclude, in their entirety and for any purpose, the opinions and testimony of Plaintiffs' putative expert Barbara Frederiksen-Cross that rely on Plaintiffs_00286431.

Dated: August 30, 2019

                                                Respectfully submitted,

                                                <u>/s/ Thomas M. Buchanan</u>
                                                Thomas M. Buchanan (VSB No. 21530)
                                                WINSTON & STRAWN LLP
                                                1700 K Street, NW
                                                Washington, DC 20006-3817
                                                Tel: (202) 282-5787
                                                Fax: (202) 282-5100
                                                Email: tbuchana@winston.com

                                                *Attorney for Cox Communications, Inc.*
                                                *and CoxCom, LLC*

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone:  (212) 294-6700
Facsimile:  (212) 294-4700
Email:  melkin@winston.com
Email:  tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA  94111-5840
Telephone:  (415) 591-1000
Facsimile:   (415) 591-1400
Email:  jgolinveaux@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Telephone:  (213) 615-1700
Facsimile:   (213) 615-1750
Email:  dhleiden@winston.com

**CERTIFICATE OF SERVICE**

I certify that on August 30, 2019, a copy of the foregoing Cox's Memorandum of Law in Support of Its Motion to Exclude the Testimony of Putative Expert Barbara Frederiksen-Cross, was filed electronically with the Clerk of Court using the ECF system, which will send notifications to ECF participants.

/s/ Thomas M. Buchanan
Thomas M. Buchanan (VSB No. 21530)
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc. and CoxCom, LLC*