**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

SONY MUSIC ENTERTAINMENT, *et al.*,

     Plaintiffs,

v.

COX COMMUNICATIONS, INC., *et al.*,

     Defendants.

Case No. 1:18-cv-00950-LO-JFA

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iv

CITATION GUIDE ........................................................................................... vii

INTRODUCTION ...............................................................................................1

STATEMENT OF UNDISPUTED FACTS ("SUF") ..................................................3

    A.  Ownership of Plaintiffs' Copyrighted Works ......................................................3

    B.  Cox's Users Directly Infringed Plaintiffs' Works ...............................................4

    C.  Contributory and Vicarious Liability for the Infringement .................................9

    D.  Cox's Affirmative Defenses ..........................................................................16

ARGUMENT ....................................................................................................17

    I.      THE LEGAL STANDARD ..........................................................................17

    II.    PLAINTIFFS OWN OR CONTROL EXCLUSIVE RIGHTS UNDER COPYRIGHT FOR EACH OF PLAINTIFFS' WORKS ....................................17

    III.   COX'S USERS DIRECTLY INFRINGED PLAINTIFFS' WORKS ......................19

    IV.   COX IS LIABLE FOR CONTRIBUTORY INFRINGEMENT ...............................24

        A.  Cox's Knowledge ..................................................................................24

            1.  Cox Had Actual Knowledge of Specific Instances of Infringement ...............25

            2.  Cox Willfully Blinded Itself to Specific Instances of Infringement ...............27

        B.  Cox Materially Contributed To Its Subscribers' Infringement ...........................28

    V.    COX IS LIABLE FOR VICARIOUS INFRINGEMENT ........................................29

        A.  Cox Had the Right and Ability to Supervise Infringement ..................................29

        B.  Cox Derived A Direct Financial Benefit from Infringement ................................30

            1.  By Not Terminating Known Infringers, Cox Obtained Revenues It Would Not Have Otherwise Received, and Avoided Costs ...............................................30

2.   Cox Admitted that it Prioritized Collecting Subscription Payments Over Limiting the Infringement ..............................................................................31

3.   The "Repeat Infringer" Subscribers Were Particularly Profitable to Cox ...... 32

4.   This is Precisely the Non-Ordinary Case Where Flat Periodic Payments are Sufficient to Prove a Direct Financial Benefit from the Infringing Activity .........................................................................................................33

5.   The Facts Also Show That the Infringing Activity Was a Draw ....................34

VI.   COX'S AFFIRMATIVE DEFENSES .........................................................................35

A.   Defenses Seeking to Negate Elements of Plaintiffs' Prima Facia Case Are Not Affirmative Defenses (Nos. 6-11, 16, 18-20) ........................................................35

B.   There Is No Basis for Cox's Affirmative Defense of Failure to Join Indispensable Parties (No. 4) ...........................................................................................................37

C.   Cox Is Not Entitled To An Innocent Infringement Defense .................................37

D.   Failure to Mitigate Damages Is Not A Proper Affirmative Defense Here ...........38

E.   Constitutionality of Statutory Damages Is Not An Affirmative Defense .............39

CONCLUSION.....................................................................................................................40

# TABLE OF AUTHORITIES

<u>Cases</u>

*A&M Records, Inc. v. Napster, Inc.,* 114 F. Supp. 2d 896 (N.D.Cal.2000) *rev'd on other grounds*, 239 F.3d 1004 (9th Cir. 2001) ...........................................................................31

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ....................................23, 29

*American Broadcasting Companies, Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014) ...........................24

*Arista Records, Inc. v. Flea World, Inc.*, 356 F. Supp. 2d 411 (D.N.J. 2005) .......................38, 39

*Arista Records LLC v. Lime Wire LLC*, No. 06 Civ. 05936 (KMW), 2010 WL 10031251 (S.D.N.Y. Aug. 9, 2010).......................................................................................................20

*Arista Records LLC v. Myxer Inc.*, No. 08 Civ 03935 (GAF) (JCX), 2011 WL 11660773 (C.D. Cal. Apr. 1, 2011)......................................................................................................20

*BMG v. Cox*, 149 F. Supp. 3d 634 (E.D. Va. 2015), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018).........................9, 10, 11, 12, 14, 18, 19, 23, 25, 27, 28, 29, 30, 38

*BMG v. Cox*, 881 F.3d 293 (4th Cir. 2018) ................................................9, 15, 18, 24, 26, 36, 37

*BMG v. Cox*, 199 F. Supp. 3d 958 (E.D. Va. 2016) .............................................................19, 28

*Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-cv-6646 (AJN), 2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015) ..................................................................................................20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................................................17

*Clements v. HSBC Auto Fin., Inc.*, 2010 WL 4281697 (S.D. W.Va. 2010) .................................38

*Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090 (W.D. Wash. 2004), *rev'd on other grounds*, 606 F.3d 312 (9th Cir. 2010) ................................................................................25

*CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004) ................................................24

*Disney Enterprises, Inc. v. Hotfile Corp.*, No. 11-20427-CIV, 2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) ...................................................................................................33

*Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)................................................ 30, 33-34

*EMI Christian Music Grp., Inc. v. MP3tunes*, LLC, 844 F.3d 79, 91 (2d Cir. 2016), *cert. denied sub nom. Robertson v. EMI Christian Music Grp., Inc.*, 137 S. Ct. 2269 (2017)................27

# TABLE OF AUTHORITIES

## (Continued)

*Energy Intelligence Grp., Inc. v. CHS McPherson Refinery, Inc.*, 300 F. Supp. 3d 1356
(D. Kan. 2018) ........................................................................................................39

*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)............................................28

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159
(2d Cir. 1971)................................................................................................24

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F. 3d 199, 203
(4th Cir. 1997) ............................................................................................ 22-24

*In re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003) ......................................................27

*In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322 (4th Cir. 2004) ............................................9

*In re Rawson Food Service, Inc.*, 846 F.2d 1343 (11th Cir.1988) ................................................35

*J & J Sports Prods., Inc. v. Ramirez Bernal,* No. 1:12–cv–01512–AWI–SMS, 2014 WL 2042120
(E.D. Cal. May 16, 2014) ......................................................37

*Joe Hand Promotions, Inc. v. Havens,* No. 2:13–cv–0093, 2013 WL 3876176
(S.D. Ohio July 26, 2013)......................................................37

*Keeler Brass Co. v. Cont'l Brass Co.*, 862 F.2d 1063, 1066 (4th Cir. 1988) ........................35, 36

*Malibu Media, LLC v. Peterson*, No. 16-CV-786 JLS (NLS), 2017 WL 1550091
(S.D. Cal. May 1, 2017) ......................................................39

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ....................17, 19

*Maverick Recording Co. v. Harper*, 598 F.3d 193 (5th Cir. 2010) ............................................38

*Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913
(2005) ..............................................................................19, 29, 30, 33, 39

*Metro–Goldwyn– Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197
(C.D. Cal. 2007) ..........................................................20

*Montgomery County Assoc. of Realtors, Inc. v. Realty Photo Master Corp.*, 878 F. Supp. 804
(D. Md. 1995) ..........................................................18

# TABLE OF AUTHORITIES

## (Continued)

*Moothart v. Bell*, 21 F.3d 1499 (10th Cir. 1994) .......................................................................38

*Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731 (1st Cir.1995) ....................................23

*News & Observer Publ'g Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 580 n.7
    (4th Cir. 2010) .........................................................................................................................23

*Purzel Video GmbH v. St. Pierre*, 10 F.Supp.3d 1158 (D. Colo. 2014) ........................................38

*Rice v. Rose & Atkinson*, 176 F. Supp. 2d 585, 592 n.6 (W. Va. 2001), aff'd, 36 F. App'x 97
    (4th Cir. 2002).........................................................................................................................35

*Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182 (2d Cir. 2012) .........................36

*Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304 (2d Cir. 1963) ..........................29, 30

*Sedlack v. Braswell Servs. Group*, 134 F.3d 219 (4th Cir. 1998) ...................................................9

*Spin Master Ltd. v. Alan Yuan's Store*, 325 F. Supp. 3d 413 (S.D.N.Y. 2018) ..........................36

*Sony BMG Music Entm't v. Tenenbaum*, 672 F. Supp. 2d 217 (D. Mass. 2009) .........................39

*Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487 (1st Cir. 2011) .......................................33

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006
    (9th Cir. 2013) .........................................................................................................................20

*Universal Furniture Int'l, Inc. v. Collozione Europa USA, Inc.*, 618 F.3d 417
    (4th Cir. 2010)..........................................................................................................................18

*X-It Products, L.L.C. v. Walter Kidde Portable Equipment, Inc.*, 155 F. Supp. 2d 577
    (E.D. Va. 2001) .......................................................................................................................17

## Statutes

17 U.S.C. § 106.............................................................................................................................40

17 U.S.C §§ 401(d) and 402(d) ....................................................................................................38

17 U.S.C. § 402(b) and (c) ...........................................................................................................17

**TABLE OF AUTHORITIES**

**(Continued)**

17 U.S.C. § 410(c) ...................................................................................................18, 36

17 U.S.C. § 501(b) ........................................................................................................17

17 U.S.C § 504(c)(2) .....................................................................................................37

17 U.S.C. § 512(g)(3) ......................................................................................................8

17 U.S.C. § 512(c)(3)(A) .................................................................................................7

<u>Rules</u>

Fed. R. Civ. P. 8(c) ......................................................................................................36

Fed. R. Civ. P. 19(a)(1) ................................................................................................37

Fed. R. Civ. P. 56(a) ....................................................................................................17

Fed. R. Evid. 201(c) .....................................................................................................18

<u>Books and Articles</u>

3 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 13.01[A] (1993).................18

## CITATION GUIDE

**Declarations**:

- o  "**Bahun Decl**." refers to the Declaration of Samuel Bahun.

- o  "**Blietz Decl**." refers to the Declaration of Jeremy Blietz.

- o  "**Frederiksen-Cross Decl**." refers to the Declaration of Barbara Frederiksen-Cross.

- o  "**Gould Decl**." refers to the Declaration of Jeffrey M. Gould.

- o  "**Gould Ex**." refers to a document filed as an Exhibit to the Gould Decl.

- o  "**Lehr Decl**." refers to the Declaration of William Lehr, Ph.D.

- o  "**Kokakis Decl**." refers to the Declaration of David Kokakis.

- o  "**Leak Decl**." refers to the Declaration of Wade Leak.

- o  "**McCabe Decl**." refers to the Declaration of George P. McCabe, Ph.D.

- o  "**McMullan Decl**." refers to the Declaration of Alasdair McMullan.

- o  "**Patel Decl**." refers to the Declaration of Anish Patel.

- o  "**Poltorak Decl**." refers to the Declaration of Steven Poltorak.

**Other References**:

- o  "**Bates No**." refers to the bates number of a document produced in this case.

- o  "*BMG*" or "*BMG v. Cox*" refers to the case captioned *BMG Rights Mgmt. (US) LLC v.Cox Commc'ns, Inc.*, Civ. No. 14-cv-1611 (E.D. Va.).

- o  "**BMG ECF**" refers to a document filed publicly via ECF in *BMG*.

- o  "**BMG Ex**." refers to a document used as a trial exhibit in *BMG.*

- o  "**Cox**" refers to Defendants CoxCom, LLC and Cox Communications, Inc.

- o  "**Depo.**" or "**Tr**." refers to the transcript of a deposition taken in this case.

- o  "**ECF**" refers to a document filed publicly via ECF in this case.

- o  "**Interr**." refers to Interrogatories.

- o  "**Rept**." refers to a report produced by an expert retained by any party.

**INTRODUCTION**

Cox told the world that it respects copyrights and prohibits use of its Internet service for illegal activity, but its conduct tells a vastly different story.  Discovery has starkly revealed that Cox's stated copyright "policy" was a sham.  In reality, Cox cared about maximizing corporate profits rather than meeting basic legal obligations.  For years, and with knowledge of its subscribers' massive infringement of Plaintiffs' works, Cox materially assisted, and greatly profited from, its subscribers' illegal conduct.

Cox admittedly received hundreds of thousands of infringement notices from Plaintiffs (and even more from other copyright holders) identifying specific subscribers of its Internet service who were illegally copying and distributing Plaintiffs' copyrighted works.  From January 2012 through November 26, 2014, Plaintiffs alone sent Cox 260,873 infringement notices.  At all times, Cox had both the right and ability to stop its subscribers from using its Internet service to infringe.  It chose not to do so.  Instead, Cox deliberately operated a digital safe haven for known infringers, willfully blinded itself to countless specific instances of infringement, and lined its pockets with hundreds of millions of dollars in revenues as a result—revenues inextricably linked to the infringing activity.

Plaintiffs assert claims of infringement that accrued from February 1, 2013 through November 26, 2014 (the "Claim Period").  During the Claim Period, Plaintiffs alone put Cox on notice of 163,148 specific instances of infringement on Cox's network, involving 57,679 specific Cox subscribers.  Cox knew the identity of each of those subscribers.  Plaintiffs' notices (all made under penalty of perjury) reveal that *thousands* of Cox subscribers were implicated in multiple notices.  Specifically,

- ██████ Cox subscribers were caught infringing 3 or more times;

- ███ Cox subscribers were caught infringing 6 or more times;

- ███ Cox subscribers were caught infringing 10 or more times;

- ███ Cox subscribers were caught infringing 13 or more times; and

- ███ Cox subscribers were caught infringing 14 or more times.

Not a single one of those Cox subscribers sent a counter-notification pursuant to the Digital Millennium Copyright Act, or contacted RIAA or MarkMonitor, to dispute that they infringed during the Claim Period.  Most egregiously, Cox was fully aware that thousands of its subscribers who had received multiple warnings—some of whom even had their service temporarily suspended under Cox's "sham" policy—were continuing to infringe.  Cox nonetheless continued to provide virtually all of them with the Internet access they needed to infringe.  Indeed, Cox claims to have terminated a mere ██ of such repeat infringers.

The reason for Cox's inaction in the face of its subscribers' massive infringement is simple: Cox was earning ████████████ as a direct result.  By continuing to provide Internet service to the ████ residential subscribers who received three or more infringement notices from February 2013 to November 2014, Cox raked in at least ████████ in subscription revenues.  As explained below, these repeat infringing subscribers were especially profitable for Cox.

Finally, Cox concedes—as it must in light of this Court's and the Fourth Circuit's opinions in *BMG v. Cox*—that its shameful conduct renders it ineligible for any of the "safe harbor" defenses under the DMCA.  Yet, in the face of uncontroverted and overwhelming evidence of its liability to Plaintiffs, Cox has steadfastly refused to take responsibility for its actions and instead raised a litany of baseless affirmative defenses—all of which are ripe for dismissal.  Cox grasps at the irrelevant and previously excluded arguments that, somehow, its

copyright enforcement policy was "reasonable" and "effective."  Even if Cox's arguments provided a defense to Plaintiffs' secondary infringement liability claims (and they do not), Cox is wrong on both counts, as this Court's prior rulings in *BMG v. Cox* established.[1]

As set forth herein, along with the accompanying declarations and related documents, the record is clear that Cox had knowledge of its subscribers' blatant infringement of Plaintiffs' works and nonetheless assisted them with it.  By consciously continuing to provide Internet service to known infringers, while ignoring its own copyright policies as written, Cox materially contributed to that infringing activity, and reaped substantial financial benefits as a result.  Accordingly, summary judgment should be granted holding Cox liable for contributory infringement and vicarious infringement, and the Court should reject its frivolous defenses.[2]

## STATEMENT OF UNDISPUTED FACTS ("SUF")

### A. <u>Ownership of Plaintiffs' Copyrighted Works</u>

1.      Plaintiffs are the leading record companies and music publishers in the world, and are the owners and stewards of the copyrighted works of the most legendary artists and songwriters of our time.  Their businesses depend on developing this musical talent and protecting the sound recordings and musical compositions that these artists and songwriters create.  *See* Blietz Decl. ¶¶ 1, 5; Kokakis Decl. ¶¶ 1, 4; Leak Decl. ¶¶ 1, 3-4; McMullan Decl. ¶¶ 1, 3-4; Patel Decl. ¶¶ 1, 4; and Poltorak Decl. ¶¶ 1, 3-4.

---

[1] Cox's expert opinions, including those about Cox's supposed "reasonableness" and "effectiveness," are each the subject of preclusion motions.  As explained therein, Cox's proposed use of its experts is palpably improper.

[2] The Claim Period is slightly narrower for the Sony / ATV and EMI Publisher Plaintiffs, i.e., August 1, 2013 through November 26, 2014.  For the other plaintiffs, the Claim Period is February 1, 2013 through November 26, 2014.

2.      As a matter of corporate practice and policy, Plaintiffs protect their copyrights, including through registration with the U.S. Copyright Office and by entering into written agreements through which they own or control exclusive rights under copyright.  *See* Blietz Decl. ¶ 5; Kokakis Decl. ¶ 5; Leak Decl ¶ 4; McMullan Decl. ¶ 4; Patel Decl. ¶ 4; and Poltorak Decl. ¶ 4.

3.      Plaintiffs own, or have an exclusive license to, the rights under the Copyright Act to reproduce and distribute each of the copyrighted works identified in the Appendices to their respective declarations ("Plaintiffs' Works").  *See* Blietz Decl. ¶¶ 5-111; Kokakis Decl. ¶¶ 5-89; Leak Decl. ¶¶ 4-58; McMullan Decl. ¶¶ 4-57; Patel Decl. ¶¶ 4-136; and Poltorak Decl. ¶¶ 4-39.

**B.  Cox's Users Directly Infringed Plaintiffs' Works**

4.      In an effort to combat online piracy, the record company Plaintiffs authorized their trade association, the Recording Industry Association of America ("RIAA"), to conduct certain anti-piracy activities as to infringement on BitTorrent, Gnutella, eDonkey and Ares peer-to-peer ("P2P") networks.  RIAA hired MarkMonitor to identify and report instances of infringement on these networks.  *See* Bahun Decl. ¶¶ 4, 7.

5.      MarkMonitor is an anti-piracy company headquartered in San Francisco, California.  Over half of the Fortune 100 companies, as well as over 1,300+ customers in over 50 countries, including leaders in the technology, fashion, sports, entertainment, pharmaceuticals, media, automotive and healthcare industries, rely on MarkMonitor to help them protect their brands and content online.  *See* Bahun Decl. ¶¶ 1-2.

6.      Cox Communications, Inc. is a broadband communications and entertainment company, providing advanced digital video, highspeed Internet, telephone and home security and automation services over its own nationwide IP network to approximately six million residences

and businesses.  It is the third-largest U.S. cable TV company based on revenues.  CoxCom, LLC is a wholly owned subsidiary of Cox Communications, Inc., operates as an Internet Service Provider ("ISP") with support from Cox Communications, Inc., and together they market and sell high-speed Internet services to consumers.  Gould Ex. 1 at 2, 53; ECF No. 21 at ¶ 22.

7.     Plaintiffs have not authorized Cox, or its subscribers, to copy or distribute any of Plaintiffs' Works.  *See* Blietz Decl. ¶ 10; Kokakis Decl. ¶ 9; Leak Decl. ¶ 10; McMullan Decl. ¶ 10; Patel Decl. ¶ 8; and Poltorak Decl. ¶ 10.

8.     For more than a decade, MarkMonitor has searched for potentially infringing files being copied and distributed on peer-to-peer networks, for RIAA.  █████████████████ ████████████████████████████████████████████████████  It then used ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████     *See* Bahun Decl. ¶ 15; Frederiksen-Cross Decl. ¶ 30; Gould Ex. 2.

9.     A cryptographic hash value is an alphanumerical representation of the contents of a file.  Files with the same hash value are identical and will have the same contents.  *See* Bahun Decl. ¶¶ 10-11; Frederiksen-Cross Decl. ¶ 16; Gould Ex. 3 (Feamster Tr.) at 186:13–198:03.

10.    Prior to sending an infringement notice to Cox, MarkMonitor's proprietary software ████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████  During that process, Cox subscribers reported, and MarkMonitor's software recorded, ████████████████████████████ ██████████████████████████  The Cox subscribers identified in MarkMonitor's

notices overwhelmingly reported 

Some of those Cox subscribers, observed by MarkMonitor on different dates

over time, reported

Thereafter, MarkMonitor would then send

infringement notices to Cox.  *See* Bahun Decl. ¶¶ 12-14, 16; Frederiksen-Cross Decl. ¶¶ 29, 31-

32, 38-45; Gould Exs. 4, 3 (Feamster Tr.) at 203:13-204:07; 227:25-228:11; 273:13-274:04;

275:11-279:16.

11.     Examples of Cox subscribers downloading Plaintiffs' Works

For example, on two different dates in September 2014,

MarkMonitor detected a Cox subscriber downloading one of Plaintiffs' Works, eventually

amassing the complete audio files.  A table reflecting information regarding these detections is

below, showing the increasing percentage of the files the Cox subscriber downloaded.



Frederiksen-Cross Decl. ¶¶ 43-45.

12.     Peer-to-peer networks, including BitTorrent, operate on a "tit for tat" model

where peers generally both retrieve and supply files simultaneously.  *See* Frederiksen-Cross

Decl. ¶ 22; Gould Ex. 5 (Feamster Rept.) at ¶ 71, 3 (Feamster Tr.) at 198:04–201:19.

13.     Peer-to-peer networks, including BitTorrent, are designed so that instances of

copying files between two peers are unobservable to anyone other than those two peers.  As

such, it was impossible for MarkMonitor (or any rights holder or vendor) to observe the number

of times Cox subscribers downloaded and distributed confirmed infringing files.  *See* Bahun

Decl. ¶ 14; Frederiksen-Cross Decl. ¶ 33; Gould Ex. 6 (Tregillis Tr.) at 71:22–72:10.

14.     From January 2012 through November 26, 2014, MarkMonitor sent Cox 260,873

infringement notices.  During the Claim Period alone, MarkMonitor sent Cox 163,148

infringement notices.  The foregoing notices were made under penalty of perjury by RIAA and

included the elements of information required under the Digital Millennium Copyright Act, 17

U.S.C. § 512(c)(3)(A).  The notices contained, *inter alia*, an identification of the Cox subscriber

by IP address, the specific date and time of the infringing act, a cryptographic hash value

pertaining to the file, a representative sample of what was infringed, and the peer-to-peer

network used.  *See* Bahun Decl. ¶¶ 17-18, 21-22; Gould Exs. 7, 8 (Beck Tr.) at 45:05-23, 9.

15.     Upon receipt of MarkMonitor's infringement notices, Cox ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████.  Cox's records indicate that MarkMonitor's notices in this case pertained to a

total of 57,679 Cox subscribers:  54,886 (95%) were residential customers; and 2,793 (5%) were

business customers.  Gould Ex. 10 at ¶ 3, 11 (Stipulated Order); McCabe Decl. ¶ 8.

16.     Each of Plaintiffs' Works was the subject of infringement notices from

MarkMonitor to Cox during the Claim Period.  In other words, each of Plaintiffs' Works was

contained within the digital files identified by hash value in MarkMonitor's infringement notices

to Cox.  The infringement notices informed Cox that the subscribers identified in those notices

downloaded and/or distributed the infringing digital files identified in the notices.  In fact, each

of Plaintiffs' Works was the subject of infringement notices from MarkMonitor to Cox during

the Claim Period regarding a subscribers' *third* or later infringement notice.  *See* McCabe Decl. ¶ 7; *see also* Gould Ex. 12 (Tregillis Rebuttal Rept.) at ¶ 26.[3]

17.     The digital files identified by hash values in MarkMonitor's notices of infringement to Cox have been produced in discovery.  Anyone can listen to the audio recordings within those files.  *See* Bahun Decl. ¶ 24; Gould Ex. 7, 13.

18.     When Cox forwarded MarkMonitor's notices to Cox's subscribers, Cox directed its subscribers to ███████████████████████████████████████████████ ████████████████████████████████████  Gould Ex. 14.

19.     None of the Cox subscribers who were the subject of MarkMonitor's notices to Cox during the Claim Period provided a counter-notification to Cox to dispute the allegations of infringement pursuant to 17 U.S.C. § 512(g)(3).  Nor did any of those Cox subscribers send an email to RIAA or MarkMonitor to dispute the infringement allegation.  *See* Bahun Decl. ¶ 21; Gould Decl. ¶¶ 6-7.

20.     Cox was aware not only that its subscribers were infringing but that they were doing so intentionally.  *See* Gould Exs. 15-18.

---

[3] As of his June 24, 2019 deposition, Cox's expert, Christian Tregillis, had matched over 95% of Plaintiffs' Works to the infringing files referenced in the infringement notices.  As to the remaining 5%, Mr. Tregillis did not dispute Professor McCabe's finding that there are corresponding infringement notices that Cox received.  Rather, Mr. Tregillis simply had not yet made the connection or was unable to do so.  Gould Ex. 6 (Tregillis Tr.) at 18:12–19:7.  Under the more stringent "third or later" paradigm, Mr. Tregillis had matched over 90% of Plaintiffs' works in suit to the allegedly infringing files referenced in the infringement notices as of the date of his Rebuttal Report (May 15, 2019).  Tregillis testified that he found additional matches after the date of his rebuttal report.  Gould Ex. 6 (Tregillis Tr.) at 116:4-119.

## C. **Cox's Contributory and Vicarious Liability for the Infringement**

21.     Cox subscribers required Internet access to upload and download digital files on the BitTorrent, Gnutella, eDonkey and Ares peer-to-peer networks.  *See BMG v. Cox*, 149 F. Supp. 3d 634, 674 (E.D. Va. 2015);[4] *see also* Bahun Decl. ¶ 8; Frederiksen-Cross Decl. ¶¶ 6-15.

22.     Cox's Acceptable Use Policy ("AUP"), which was a condition of use for a Cox subscriber to use Cox's Internet service, prohibited subscribers from infringing anyone's copyrights and prohibited subscribers from violating the law.  Under the AUP, at all relevant times, Cox had the right to terminate its subscribers' access to its Internet service, including the right to terminate service for any subscriber who uses Cox's service to infringe copyrights.  *See BMG v. Cox*, 149 F. Supp. 3d at 640; s*ee also* Gould Exs. 19-21.

23.     The volume of copyright infringement notices that Cox received and accepted from copyright owners or their agents informing Cox of specific subscribers using its Internet service to infringe ▮▮▮▮▮▮▮▮▮▮▮:



---

[4] Some of these Statements of Undisputed Fact cite this Court's summary judgment decision in favor of BMG against Cox on Cox's DMCA safe harbor defense and/or the Fourth Circuit's affirmance of the decision.  *BMG v. Cox*, 149 F. Supp. 3d 634 (E.D. Va. 2015), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018).  Cox is bound by those factual determinations.  "Collateral estoppel forecloses the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom issue preclusion is asserted had a full and fair opportunity to litigate."  *Sedlack v. Braswell Servs. Group*, 134 F.3d 219, 224 (4th Cir. 1998) (internal quotations and citations omitted).  The facts that underpin this Court's summary judgment decision against Cox involve Cox's own behavior and meet each of the elements for collateral estoppel to apply.  *See In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004) (setting forth elements).

*See* Gould Exs. 22; 24 at Interr. No. 5; 25.[5]

24. As the volume of infringement notices spiked, Cox took the following steps:

a) Cox implemented a policy whereby it ignored, and failed to alert a subscriber concerning, the first copyright infringement notice Cox received for that subscriber. *See BMG v. Cox*, 149 F. Supp. 3d at 640-41; *see also* Gould Ex. 22.

b) 

*See* Gould Exs. 26 at 5; 27 at 11; 28 at 13; 29 at 11-12.

c) Cox capped the number of incoming infringement notices it would accept per day per entity, set at a default of 200, but later raised the cap to 600 for RIAA. *See BMG v. Cox*, 881 F. 3d at 299; *see also* Gould Ex. 30-31.

d) Cox counted only 1 notice per subscriber per day such that if a subscriber generated 10 notices in a day, they were all "rolled up" into a single ticket. *See BMG v. Cox*, 881 F. 3d at 299; *see also* Gould Ex. 32 at ¶ 8.

e) Cox reset a subscriber's 13-strike counter every 6 months. *See BMG v. Cox*, 881 F. 3d at 299; *see also* Gould Ex. 32 at ¶ 12.

f) Cox blacklisted various entities, including Rightscorp, and refused to process, or even accept, millions of copyright infringement notices from them. *See* Beck Depo. 68-73; Gould. Exs. 30; 24 at Interr. No. 5.

g) 

*See* Gould Ex. 33.

h) 

*See* Gould Ex. 34.

---

[5] These numbers include Plaintiffs' notices, though they understate the amount of infringement on Cox's Internet service for multiple reasons. For instance, they do not count notices not sent to Cox because of the daily limit on notices per rights owner that Cox imposed. In addition, they do not include the voluminous infringement notices that Cox blocked at the mail server level (*e.g.*, from Rightscorp) and thus never processed.

25.     Prior to the fall of 2012, Cox did not follow its policy for terminating the accounts of repeat infringer subscribers.  Instead, Cox employees followed an unwritten policy put in place by senior members of Cox's abuse group whereby accounts that were used to repeatedly infringe copyrights would be nominally terminated—only to be reactivated upon request, and the subscriber would start the graduated response process all over again with a clean slate.  *See BMG v. Cox*, 149 F. Supp. 3d at 655-58; *see also* Gould Ex. 35 (Zabek Tr.) at 137:10–140:20.

26.     After the fall of 2012, Cox essentially stopped terminating repeat infringer subscribers altogether despite receiving an increasing number of infringement notices every year and continuing to receive infringement notices informing it of specific repeat infringing subscribers.  *See BMG v. Cox*, 149 F. Supp. 3d at 658-62; *see also* Gould Ex. 23 at Interr. No. 8, 35 (Zabek Tr.) at 101:14–102:15.

27.     Throughout 2013 and 2014, Cox's automated system for responding to infringement notices employed a 13-strike policy before a subscriber even would be considered for termination.  Under that policy, Cox took no action upon receiving a first notice reporting a subscriber's infringement.  The second through seventh notices each resulted in CATS generating an email from Cox to the subscriber explaining the alleged infringement and including the complete text of the infringement notice Cox received from the copyright owner. When Cox received an eighth and ninth notice for a particular subscriber, it suspended the subscriber's account and placed the subscriber in what Cox called a "soft-walled garden," meaning that the subscriber's internet access was temporarily limited to a single webpage that displayed a warning message.  The subscriber could exit the soft-walled garden and self-reactivate his or her Internet service simply by clicking a link on the webpage.  Upon Cox's receipt of a tenth and eleventh notice, the subscriber would be placed in a "hard-walled garden,"

11

which directed the subscriber to a webpage with instructions to call Cox customer service.  When the subscriber called Cox, he or she was reactivated upon request.  The twelfth and thirteenth notices also resulted in subscribers being placed in a hard-walled garden, but they had to speak to a higher-level Cox customer service representative to be reactivated.  It was only upon receipt of a *fourteenth* complaint in an abuse cycle that Cox would review the full account history of the subscriber and consider termination. Termination was never automatic, however, and was left to the discretion of Cox employees.  *See BMG v. Cox*, 149 F. Supp. 3d at 640-41; *see also* Gould Exs. 29, 36 at ¶¶ 8-11.

28.     Cox made every effort to avoid terminating subscribers, even those that were the subject of fourteen or more infringement notices.  Despite having a repeat infringer policy in concept, Cox's implementation of the policy, or lack thereof, rendered the policy an "absolute mirage."  Cox very clearly determined not to terminate subscribers who in fact repeatedly violated Cox's policy.  *See BMG v. Cox*, 149 F. Supp. 3d at 658-62; *see also* Gould Exs. 23 at Interr. No. 8, 25.

29.     In 2013 and 2014, Cox terminated approximately ██████ residential subscribers for non-payment of subscription fees.  *See* Gould Exs. 37-38.  Yet, in that same time frame, Cox claims to have terminated only █ subscribers for copyright infringement.  *See* Gould Ex. 23 at Interr. No. 8.

30.     During the Claim Period, which is slightly narrower than the full 2013 and 2014 calendar years, Cox accepted ██████ copyright infringement notices, but sent only ██████ warnings to subscribers, and terminated only █ subscribers' accounts (██████).  *See* Gould Exs. 23 at Interr. No. 8, 24 at Interr. No. 5, 25.

31.     Despite receiving MarkMonitor's infringement notices reporting specific Cox subscribers who were engaging in repeated infringement, Cox virtually always continued to provide those subscribers with Internet access.  Of the 57,679 Cox subscribers who were the subject of MarkMonitor's notices during the Claim Period, Cox's records reflect that from 2012-2014:

    a)  ██████ subscribers appeared in 3 or more notices;

    b)  ██████ subscribers appeared in 6 or more notices;

    c)  █████ subscribers appeared in 10 or more notices;

    d)  ██████ subscribers appeared in 13 or more notices;

    e)  ██████ subscribers appeared in 14 or more notices; and

    f)  Cox terminated only ██ of those subscribers' accounts.

*See* McCabe Decl. ¶ 9; *see also* Gould Ex. 39.

32.     During the Claim Period, Cox also received infringement notices from other rights owners concerning thousands of the same Cox subscribers identified in MarkMonitor's infringement notices.  At least ████████████ of the same Cox subscribers in MarkMonitor's notices were the subject of at least one infringement notice from another copyright owner during the Claim Period.  *See* McCabe Decl. ¶ 8; *see also* Gould Ex. 39.

33.     By way of example, the following residential Cox subscribers, identified by their ICOMS IDs, were the subject of ████████████████████████████████████████ ████████████, including during the Claim Period.  ████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████.



Gould Exs. 7, 39-40.

34.     During the Claim Period, Cox refused to accept infringement notices from Rightscorp on behalf of BMG Rights Management (US) LLC.  Cox "blacklisted" Rightscorp resulting in Cox automatically deleting millions of incoming infringement notices from Rightscorp.  *See BMG v. Cox*, 149 F. Supp. 3d at 642; *see also* Gould Ex. 42 (BMG Cadenhead Tr.) at 82:15–87:2; Gould Exs. 41, 24 at Interr. No. 5.

35.     The Rightscorp infringement notices, which Cox automatically blocked without processing, ███████████████████████████████████████████████████████

███████████████████████████.  For example, Cox's Ticket Data identifies a subscriber with

██████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████████.  Gould Ex. 43.  An excerpt of the Rightscorp notice data limited to the same IP address and time period is nearly 100 pages long.  Gould Ex. 44. Additional examples are shown in exhibits to the Gould declaration.  *See* Gould Exs. 45-48.

36.     Cox had a tiered pricing structure through which it charged Internet subscribers higher monthly fees for increased data allowances.  Below is an example of Cox's tiered pricing structure applicable during the Claim Period.



*See* Gould Ex. 49.

37.     Cox received ████████████████████████████ by continuing to provide
Internet service to specific Cox subscribers who were repeatedly identified in infringement
notices, rather than terminating those subscribers' accounts.  Cox revenues from retaining ████
residential subscribers who were the subject of 3 or more infringement notices during the Claim
Period were at least ██████████, and in that same period Cox's revenues from retaining ████
residential subscribers who were the subject of 5 or more infringement notices were at least ██
████.  *See* Lehr Decl. ¶¶ 10, 18; *see also* Gould Ex. 39, 50-53.

38.     By not terminating specific repeat infringer subscribers, Cox also avoided direct
incremental costs it would have otherwise incurred.  *See* Lehr. Decl. ¶¶ 10, 15.

39.     The goal of keeping revenue from paying subscribers drove Cox's decisions not
to terminate the Internet service of its subscribers who repeatedly appeared in infringement
notices.  In assessing whether to terminate subscribers based on receipt of multiple copyright
infringement notices, Cox prioritized its financial interest in keeping customer relationships and
obtaining revenue.  *See BMG v. Cox*, 881 F.3d at 304-05; *see also* Gould Exs. 52, 54-56, 62-67,
35 (Zabek Tr.) at 144:5–145:23

40.     The increased data consumption from infringing peer-to-peer activity on the
Internet also inured to Cox's financial benefit, as subscribers who consumed more data paid
higher monthly fees for Internet service.

a) Peer-to-peer file sharing, including the unlawful uploading and downloading of copyrighted works, ████████████████████████████████████
████ . *See* Gould Ex. 57 (Summers Tr.) at 34:19–35:2.

b) According to a ████████████████████████████████ " presentation by Cox's consultant, inCode, ████████████████████████████████
████████████████████ . *See* Gould Ex. 58 at 4.

c) Peer-to-peer activity frequently involved copyright infringement. *See* Gould Exs. 16; 59 (Fuenazlida Tr.) at 172–73, 127–30; 60 (Basquin Tr.) at 126–27; Lehr Decl. ¶ 22.

d) 
████████████████████████████████████ . *See* Gould Ex. 59 (Fuenzalida Tr.) at 165–169.

e) ████████████████████████████████████
████████████████████████████████████
████████████████████████████████ .
*See* Lehr Decl. ¶¶ 23-24.

## D. Cox's Affirmative Defenses

41. Cox adduced no evidence that Plaintiffs have failed to join any indispensable parties.

42. Cox adduced no evidence that Plaintiffs failed to mitigate damages.

43. For each of Plaintiffs' Works, Cox adduced no evidence that the copyright registrations upon which Plaintiffs rely in this action were issued after the alleged infringements and more than three months after first publication of the works.

44. For each of Plaintiffs' Works, Cox adduced no evidence of any intentional misstatements or fraud in obtaining the copyright registrations upon which Plaintiffs rely in this action.

45. For each of Plaintiffs' Works, Cox adduced no evidence that Plaintiffs failed to comply with any renewal, notice or registration requirements.

46.     It is Plaintiffs' general practice to publish their sound recordings with copyright notices in the form and position set forth 17 U.SC. § 402(b) and (c).  *See* Leak Decl. ¶ 8, McMullan Decl. ¶ 8, and Poltorak Decl. ¶ 8.

47.     At all relevant times, including but not limited to when Cox received infringement notices from Plaintiffs, Cox had access to published copies of Plaintiffs' Works.   Plaintiffs' Works have been made widely available on authorized Internet-based digital music services.  *See* Blietz Decl. ¶ 7; Kokakis Decl. ¶ 4; Leak Decl. ¶ 8; McMullan Decl. ¶ 8; Patel Decl. ¶ 6; and Poltorak Decl. ¶ 8.

## ARGUMENT

## I.     THE LEGAL STANDARD

A party may move for summary judgment as to a "part of each claim or defense."  Fed. R. Civ. P. 56(a).   "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden then shifts to the non-movant to "come forward with specific facts showing there is a genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    PLAINTIFFS OWN OR CONTROL EXCLUSIVE RIGHTS UNDER COPYRIGHT FOR EACH OF PLAINTIFFS' WORKS

A plaintiff may sue for copyright infringement if it is the "legal or beneficial owner" of the exclusive right (or rights) alleged to have been infringed in the pertinent work.  17 U.S.C. § 501(b); *see also X-It Products, L.L.C. v. Walter Kidde Portable Equipment, Inc.*, 155 F. Supp. 2d 577, 603 (E.D. Va. 2001) (The "copyright owner, or the owner of exclusive rights under the copyright . . .

17

has standing to bring an action for infringement of those rights."). Copyright registrations are "prima facie evidence" of "the facts stated in the certificate." 17 U.S.C. § 410(c). That includes ownership. *See Universal Furniture Int'l, Inc. v. Collozione Europa USA, Inc.*, 618 F.3d 417, 428 (4th Cir. 2010) ("A certificate of registration issued by the Copyright Office is 'prima evidence of the validity of the copyright and of the facts stated in the certificate' such as ownership.") (quoting 17 U.S.C. § 410(c)). If a plaintiff possesses a copyright registration certificate, 'the only evidence required of the plaintiff to establish prima facie ownership . . . is evidence of plaintiff's chain of title from the original copyright registrant.'" *Montgomery County Assoc. of Realtors, Inc. v. Realty Photo Master Corp.*, 878 F. Supp. 804, 809-10 (D. Md. 1995) (quoting 3 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 13.01[A] (1993)).

Plaintiffs have proven that they own or control the exclusive rights under copyright for each of Plaintiffs' Works. Plaintiffs have produced either the registration certificate or, alternatively, a print-out of the registration information from the Copyright Office's official public catalog. SUF ¶¶ 2-3.[6] For the majority of Plaintiffs' Works, the registration lists a Plaintiff as a named claimant. *Id.* As to the rest of Plaintiffs' Works, the copyright registration lists a predecessor of a named Plaintiff as the claimant, or Plaintiffs purchased or otherwise acquired their rights from a third party or foreign affiliate. SUF ¶¶ 2-3. Accordingly, Plaintiffs' prima facie ownership of these works in suit has been established. *See BMG v. Cox*, 149 F. Supp. 3d at 644-

---

[6] The Court may *sua sponte* take judicial notice of copyright registration information available on the U.S. Copyright Office's public catalog, and "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c); *BMG v. Cox*, 149 F. Supp. 3d at 646 and n.5 (E.D. Va. 2015), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018) (taking judicial notice of Copyright Office public catalog entries demonstrating registration and citing cases). Plaintiffs' Motion Requesting Judicial Notice is filed contemporaneously with this motion for summary judgment; the relevant documents are exhibits to Plaintiffs' declarations.

53.  It is now Cox's burden to overcome that presumption and submit evidence sufficient to raise a genuine triable issue.  *Matsushita*, 475 U.S. at 586.

Plaintiffs served Requests for Admission on Cox to identify the specific works, if any, for which Cox disputes ownership.  Cox refused to respond to Plaintiffs, claiming undue burden and insufficient information to determine whether any of the works in suit were registered with the U.S. Copyright Office or whether Plaintiffs are the owners or exclusive licensees of such works. Cox failed even to admit that Plaintiffs own those works where Plaintiffs are identified as the claimant on the registration.  *See* Gould Decl. ¶ 8 & Ex. 72.

Cox cannot stave off summary judgment on the issue of ownership with bald denials, conjecture or hypothetical argument; rather, it must present credible evidence on a work-by-work basis sufficient to show some genuine issue for trial as to that particular work.  *BMG v. Cox*, 149 F. Supp. 3d at 645.  Cox cannot meet its burden, as Plaintiffs own or exclusively control all the works in suit.

### III.   COX USERS DIRECTLY INFRINGED PLAINTIFFS' WORKS

Downloading and distributing copyrighted music via online peer-to-peer networks constitute direct copyright infringement, violating the exclusive rights of reproduction and distribution, respectively.  *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd*., 545 U.S. 913, 918–23 (2005) (noting that P2P networks facilitate a staggering quantity of infringement of copyrighted music); *BMG v. Cox*, 199 F. Supp. 3d 958, 963 (E.D. Va. 2016) (same).  In the Claim Period, MarkMonitor sent 163,148 infringement notices to Cox, which included, *inter alia*, an identification of the Cox subscriber by IP address, the specific date and time of the infringing act, a cryptographic hash value pertaining to the infringing file, a representative sample of what was infringed, and the particular P2P file sharing network used.  SUF ¶ 9.  None

of the Cox subscribers identified in MarkMonitor's infringement notices to Cox disputed the allegations of infringement to RIAA or MarkMonitor, nor did any subscriber file a counter-notification pursuant to the DMCA.  SUF ¶¶ 19-20.

MarkMonitor is a well-established anti-piracy company that has been retained by half of the Fortune 100, as well as market leaders in a variety of industries.  SUF ¶ 5.  When MarkMonitor first encountered a suspected infringing file on a peer-to-peer network,

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████  SUF ¶ 8.

For over a decade, courts have recognized the use of the Audible Magic software as a proper method to identify the content of an audio file as a specific copyrighted work.  *See e.g.*, *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1012 (9th Cir. 2013) ("AudibleMagic's technology takes audio 'fingerprints' from video files and compares them to a database of copyrighted content provided by copyright holders."); *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-cv-6646 (AJN), 2015 WL 1402049, at *23 (S.D.N.Y. Mar. 25, 2015); *Arista Records LLC v. Myxer Inc.*, No. 08 Civ 03935 (GAF) (JCX), 2011 WL 11660773, at *5 (C.D. Cal. Apr. 1, 2011); *Arista Records LLC v. Lime Wire LLC*, No. 06 Civ. 05936 (KMW), 2010 WL 10031251, at *6 (S.D.N.Y. Aug. 9, 2010); *Metro–Goldwyn– Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1205–06 (C.D. Cal. 2007).

███████████████████████████████████████████████████████

████████████████████████████████████  SUF ¶¶ 8-10.  It is undisputed by all of the technical experts in this case—including Cox's own expert, Dr. Feamster—that use of cryptographic hash values is a reliable means for determining that one file is an exact copy of another; *i.e.*, that two files with the same hash value will invariably have the

same contents.  SUF ¶ 9.  In discovery, Plaintiffs provided Cox with a hard drive containing the

infringing audio files that Cox subscribers downloaded and distributed, ██████████████████

██████████████████████.  SUF ¶ 18.  Cox and its experts have not come forward with

any evidence of inaccuracies in Audible Magic's identification of the downloaded audio files.

     MarkMonitor detected Cox subscribers using Cox's Internet service to engage in

unauthorized copying (downloading) and/or distribution (uploading) of Plaintiffs' Works on

peer-to-peer networks.  Prior to sending an infringement notice to Cox, MarkMonitor ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████.  SUF ¶ 10.

     MarkMonitor monitored Cox subscribers on the peer-to-peer network at various stages of

downloading.  At times, Cox subscribers possessed less than 100% of a confirmed infringing file

while in the process of downloading the remainder of the file.  SUF ¶¶ 10-11.  In other instances,

the evidence shows ████████████████████████████████████████████████

████████████████████████████████████.  SUF ¶¶ 10-11.[7]  The foregoing is

conclusive proof that Cox subscribers directly infringed by making unauthorized reproductions

of Plaintiffs' Works.  Accordingly, Plaintiffs should be granted summary judgment that Cox

---

[7] By way of example, the following chart, *see* SUF ¶ 10, shows a Cox subscriber engaged in
unauthorized downloading:



subscribers directly infringed Plaintiffs' Works in violation of the exclusive right of reproduction.

Cox subscribers also engaged in unauthorized distribution (uploading) of Plaintiffs' Works. This fact is unsurprising given the nature of P2P protocols. Cox's own computer science expert confirmed, "[a] client cannot retrieve pieces without providing pieces to others – this is the so-called 'tit for tat' incentive model of BitTorrent" and even further admitted that "[i]n the BitTorrent protocol, any participating peer will generally be downloading or retrieving pieces of the file as well as providing – if you want to use the term uploading, that's fine." SUF ¶ 12. MarkMonitor detected the Cox subscribers online, running the P2P software, and "sharing" an unauthorized copy of Plaintiffs' Works. SUF ¶ 10. The foregoing satisfies the requirements for proving an unauthorized distribution.

It is undisputed that P2P networks were designed to make it impossible for anyone to collect records depicting how many times a peer distributes the infringing file. SUF ¶ 13. Interactions between two peers on a P2P network are unobservable to, and intentionally hidden from, anyone other than those two peers. SUF ¶ 13. Neither Cox nor anyone else maintains logs of the infringing files that Cox subscribers distribute, nor does Fourth Circuit law require such information.

The Fourth Circuit decision in *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F. 3d 199 (4th Cir. 1997), is instructive in that regard. In *Hotaling*, a publicly accessible library added copyrighted materials to its collection, listed the works in its catalog system, and made them available to the public. *Id.* at 201-02. The Fourth Circuit held that the library infringed *Hotaling*'s distribution rights because a distribution occurs where the defendant "makes the work available" and "has completed all the steps necessary for distribution to the

22

public[,]" without the need to show more—otherwise "a copyright holder would be prejudiced by a [defendant] that does not keep records of public use" and the [defendant] would unjustly profit." *Id.* at 203; *accord A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001) ("Napster users who upload file names to the search index for others to copy violate plaintiffs' distribution rights."). *Hotaling* applies here. Its logic applies equally to infringement in the digital environment.

This Court has expressed that "*Hotaling* did not announce a rule of general applicability, but instead articulated a principle that applies only in cases where it is impossible for a copyright owner to produce proof of actual distribution." *BMG v. Cox*, 149 F. Supp. 3d at 666-70 (concluding direct infringement of the distribution right requires showing an "actual dissemination" and that circumstantial evidence can suffice). The facts here fall squarely within this Court's reading of *Hotaling*, as direct proof of actual dissemination is unobtainable. Because of the decentralized nature of a peer-to-peer network, it is impossible for MarkMonitor, or any other peer on the network, to track a peer's activity with other peers. This is true because any particular peer can only see the activity it is engaged in, not the activity that is occurring between other peers. SUF ¶ 13. Thus, based on all the evidence, Plaintiffs should be granted summary judgment that Cox subscribers directly infringed Plaintiffs' Works in violation of the exclusive distribution right.[8]

---

[8] Guidance from the Fourth Circuit and U.S. Supreme Court provides further support. First, the Fourth Circuit has clarified that "summary judgment does not require ignoring logic or common sense to favor the nonmoving party." *News & Observer Publ'g Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 580 n.7 (4th Cir. 2010) (citing *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 743 (1st Cir. 1995) ("While the summary judgment mantra requires us to draw every reasonable inference in favor of the nonmoving party, inferences, to qualify, must flow rationally from the underlying facts; that is, a suggested inference must ascend to what common sense and human experience indicates is an acceptable level of probability.")). Second,

## IV.   COX IS LIABLE FOR CONTRIBUTORY INFRINGEMENT

Cox's conduct renders it liable for contributory copyright infringement.  A contributory infringer is one who, (1) "with knowledge of the infringing activity," (2) "induces, causes or materially contributes to the infringing conduct of another."  *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).  It is undisputed here that Cox had knowledge of the identities of specific Cox subscribers who were infringing Plaintiffs' Works, and Cox materially contributed to their infringing conduct by continuing to provide them with the Internet service that was indispensable to their infringement.

### A.  Cox's Knowledge

The Fourth Circuit held that the knowledge standard for contributory infringement "requires a defendant to have specific enough knowledge of infringement that the defendant could *do* something about it."  *BMG v. Cox*, 881 F.3d at 311-12 (emphasis in original).  That is, "knowledge that infringement is substantially certain to result from Cox's continued provision of Internet access to particular subscribers."  *Id.*  In this case, Cox both (1) had actual knowledge of ongoing infringement by specific Cox subscribers, and (2) intentionally blinded itself to the full extent of the ongoing infringement.

---

consistent with *Hotaling*, the U.S. Supreme Court has indicated that courts focus on the practical realities of the situation.  *American Broadcasting Companies, Inc. v. Aereo, Inc.*, 573 U.S. 431, 450 (2014) ("Insofar as there are differences, those differences concern not the nature of the service that Aereo provides so much as the technical manner in which it provides the service. We conclude that those differences are not adequate to place Aereo's activities outside the scope of the Act.").

### 1. Cox Had Actual Knowledge of Specific Instances of Infringement

Cox cannot contend that it lacked knowledge sufficient for contributory liability.  This Court has already found: "*[d]espite Cox's arguments to the contrary, DMCA-compliant notices are evidence of knowledge.*"  *BMG v. Cox*, 149 F. Supp. 3d at 671 (emphasis added).  As explained below, Cox had an abundance of knowledge of the specific instances of the infringement of its subscribers.  Particular infringing subscribers were repeatedly identified in hundreds of thousands of infringement notices from MarkMonitor, among many others.  SUF ¶¶ 14-15, 32-36.

The infringement notices that Cox received from MarkMonitor provided detailed information which included, *inter alia*, identification of specific Cox subscribers, their IP address, a date and time stamp of the infringing conduct, and the hash value pertaining to the underlying infringing file.  SUF ¶ 14.  Upon receipt of these DMCA-compliant infringement notices, Cox was able to identify the particular subscriber at issue.  SUF ¶ 15.  Cox ████████████

█████████████████████████████████████████████████████████

█████████████████████████████.  SUF ¶ 15.  Cox received notices from MarkMonitor time and again identifying specific subscribers engaged in infringement, including some subscribers caught infringing and identified in infringement notices dozens or more times.  SUF ¶¶ 14-15, 32-36.

These notices indisputably established Cox's actual knowledge of infringement by Cox subscribers.  *Id.*; *see also Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1107 (W.D. Wash. 2004), *rev'd on other grounds*, 606 F.3d 312 (9th Cir. 2010) ("[T]he most powerful evidence of a service provider's knowledge [is an] actual notice of infringement from the copyright holder.").  Cox's own records produced in discovery reveal that ████████

██████████████████████████████████████████████████████

████████████████████████████████. SUF ¶¶ 32-34.  Those notices

provided further support that Cox had knowledge of specific instances of those Cox subscribers'

infringing activities.

The record is also clear that, when receiving infringement notices, Cox understood its

subscribers were infringing and that they were doing so intentionally.  SUF ¶ 21.  As Jason

Zabek, the head of Cox's abuse team observed: "████████████████████████████

███████████████████" Gould Ex. 15; *see also id.* Ex. 16 ("██████████████

███████████"); Ex. 17 ("████████████████████████████████

██████████████████████████"); Ex. 18 ██████████████████

████████").

As the Fourth Circuit explained in *BMG*, "Cox created only a very limited automated

system to process notifications of alleged infringement" and "in carrying out its thirteen-strike

process, Cox very clearly determined *not* to terminate subscribers who in fact repeatedly violated

the policy." *BMG v. Cox*, 881 F.3d at 299 (emphasis added).  Against this backdrop, Cox is

clearly estopped from now contesting that it had any other intent, or that its policy, somehow,

was adequate "as written," not as Cox itself chose to implement it.  *See supra* at 9 n.2.

In the face of all of this knowledge, Cox easily could have done something to curtail

specific instances of infringement brought to its attention.  Cox had knowledge that infringement

was substantially certain to result from its continued provision of Internet access to subscribers

who failed to stop infringing despite repeated warnings and suspensions.  Cox explicitly reserved

to itself in its AUP the right to terminate subscribers who infringed.  Yet, rather than exercise the

that authority to stop the infringement, Cox did exactly the opposite, taking steps ████████

███ of infringement notices it would accept and process, Gould Ex. 22, and providing a safe

haven to specific infringers repeatedly cited in notices.  SUF ¶¶ 24-31.

### 2.   Cox Willfully Blinded Itself to Specific Instances of Infringement

Though Cox's actual knowledge is more than sufficient, Cox's willful blindness further

satisfies the knowledge requirement for contributory infringement.  *See, e.g., In re Aimster*

*Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003) ("Willful blindness is knowledge, in

copyright law . . . as it is in the law generally.") (internal citations omitted); *EMI Christian Music*

*Grp., Inc. v. MP3tunes*, LLC, 844 F.3d 79, 91 (2d Cir. 2016), *cert. denied sub nom. Robertson v.*

*EMI Christian Music Grp., Inc.*, 137 S. Ct. 2269 (2017) ("[A]t trial the plaintiffs could prevail by

demonstrating that [the defendant's] failure to track users who created links to infringing content

identified on takedown notices or who copied files from those links evidenced its willful

blindness to the repeat infringing activity of its users.").  As this Court held, "[a] person is

'willfully blind' or engages in 'conscious avoidance' amounting to knowledge where the person

was aware of a high probability of the fact in dispute and consciously avoided confirming that

fact."  *BMG v. Cox*, 149 F. Supp. 3d at 673 (internal quotations and citations omitted).

First, Cox deliberately refused to accept millions of infringement notices from

Rightscorp.  SUF ¶ 35.  Second, Cox further limited rights owners to a presumptive cap of 200

notices per day, including just 200-600 per day for the RIAA on behalf of all of the record

company Plaintiffs.  SUF ¶ 25.  If Cox had not imposed these limits, it would have been charged

with additional actual knowledge of infringement by the specific subscribers identified in notices

from Plaintiffs and other rights owners.

Indeed, Cox's records shows that ███████████████████████████████

███████████████████████████████████████████████████████

███████████████.  SUF ¶¶ 33-34.  A comparison of MarkMonitor's infringement notices to the Rightscorp notices that Cox refused to accept shows that they involved some of the same infringing Cox subscribers.  SUF ¶¶ 35-36.

Cox's arbitrary imposition of limits to the number infringement notices it would receive and process, while simultaneously looking the other way in the face of the ongoing infringement by known recidivist subscribers, plainly demonstrates that Cox willfully blinded itself to specific instances of infringement.  This satisfies the knowledge requirement.

### B. Cox Materially Contributed To Its Subscribers' Infringement

"[P]roviding the site and facilities for known infringing activity is sufficient to establish contributory liability."  *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996).  Cox's material contribution to the infringing activity is so obvious that Cox did not even challenge BMG's ability to establish this element when Cox moved for summary judgment in that case.  *BMG v. Cox*, 149 F. Supp. 3d at 671 n.25.

This Court left no doubt in the *BMG* case that the material contribution prong is satisfied here.  It explained, "*[t]here can be no question* that the provision of high-speed internet service materially contributes to infringement via BitTorrent and that Cox had the means to withhold that assistance upon learning of specific infringing activity." *BMG v. Cox*, 199 F. Supp. 3d 979 (emphasis added).  The Court determined, "[t]here cannot be any serious dispute that internet service is an essential component of the infringing activity."  *BMG v. Cox*, 149 F. Supp. 3d at 674 (explaining that "[f]ile-sharing programs are completely dependent on the internet to facilitate the download and upload of files").

The same determination governs here.  Both elements of the contributory infringement claim are satisfied.

28

## V.     COX IS LIABLE FOR VICARIOUS INFRINGEMENT

Cox's conduct also renders it liable for vicarious copyright infringement because it "profit[ed] from direct infringement while declining to exercise a right to stop or limit it."  *Grokster,* 545 U.S. at 930.  "When the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials—even in the absence of actual knowledge that the copyright monopoly is being impaired—the purposes of copyright law may be best effectuated by the imposition of liability upon the beneficiary of that exploitation."  *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963) (internal citations omitted).

### A.  Cox Had the Right and Ability to Supervise Infringement

For purposes of vicarious liability, Cox had sufficient control over its subscribers.  The Court's prior determination in *BMG* governs here:

> Cox has a contractual relationship with its users and that relationship gives Cox the legal right to withhold service in the face of infringing conduct.  Cox also provides a crucial service to the infringements alleged in this case, which gives Cox the practical ability to stop or limit infringement.

*BMG v. Cox*, 149 F. Supp. 3d at 675.

Cox is estopped from arguing otherwise now.  Indeed, even had the Court not determined this issue previously, the element is easily established.  The "control" element is determined by the defendant's "right and ability to supervise the direct infringer."  *Grokster,* 545 U.S. at 930 n.9.  "The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise."  *Napster II*, 239 F.3d at 1023.

Cox expressly retained the right in its AUP to suspend or terminate its subscribers' access to Internet service, including to condition the provision of its Internet service to subscribers who do not use it to violate copyrights.  SUF ¶ 23.   If subscribers listen when Cox exercises that

power, the infringement stops. *BMG v. Cox*, 149 F. Supp. 3d at 674. If subscribers do not

and Cox terminates their service, the infringement either stops or at least is limited. *Id.* Thus, in

addition to its legal control, Cox also has the practical ability to stop or limit infringement.

Nothing more is required to establish this element.

### B.  Cox Derived A Direct Financial Benefit from Infringement

The second element of vicarious liability requires a "causal relationship between the

infringing activity and *any* financial benefit a defendant reaps, regardless of how substantial the

benefit is in proportion to a defendant's overall profits." *Ellison v. Robertson*, 357 F.3d 1072,

1079 (9th Cir. 2004). Here, a direct causal link exists between Cox facilitating the infringing

activity and receiving a direct financial benefit. Dating back to the landmark case of *Shapiro*

*Bernstein*, which the Supreme Court cited approvingly in *Grokster*, 545 U.S. at 930, the relevant

question is whether the defendant has "an obvious and direct financial interest in the exploitation

of copyrighted materials." 316 F.2d at 307. In multiple ways, Cox obtained such direct financial

benefit from its subscribers' infringement.

#### 1.  By Not Terminating Known Infringers, Cox Obtained Revenues It Would Not Have Otherwise Received, and Avoided Costs

It is undisputed that, by not terminating the accounts of known repeat infringers, Cox

received substantial additional subscription revenues it would not have otherwise obtained and

avoided costs it would have otherwise incurred. Cox's financial benefit from retaining ▮▮▮▮

residential subscribers who were the subject of three or more infringement notices from February

2013 to November 2014 was at least ▮▮▮▮▮▮, and its financial benefit from retaining ▮▮▮▮

residential subscribers who were the subject of five or more infringement notices during that

same period was at least ▮▮▮▮▮. SUF ¶ 38. In addition, Plaintiffs' expert Dr. Lehr has

testified—unrebutted by Cox—that by tolerating the infringement, Cox avoided direct incremental costs it would have otherwise incurred to address the infringement.  SUF ¶ 39.

Reviewing an example is instructive.  Cox's residential subscriber with the ICOMS ID of

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████.  SUF ¶ 36.  In such circumstance, Cox has an obvious and direct financial interest in the infringement.  *See A&M Records, Inc. v. Napster, Inc.,* 114 F. Supp. 2d 896, 921 (N.D.Cal.2000) (direct financial benefit requires that "the defendant has economic incentives for tolerating unlawful behavior"), *rev'd on other grounds*, 239 F.3d 1004 (9th Cir. 2001).

## 2.  Cox Admitted that it Prioritized Collecting Subscription Payments Over Limiting the Infringement

Cox's own documents demonstrate that Cox prioritized revenues from infringers' monthly fees over addressing its rampant infringement problem.  SUF ¶ 40.  Cox's profit motives are starkly revealed in one email from its abuse team, reflecting the team's decision not to terminate one of its repeat infringer subscribers:  ████████████████████████████

████████████████████████████████████████  Gould Ex. 55.  Joseph Sikes, the second in command of the abuse group, similarly ██████████████████████████

████████████████████████████████████████████████████████

███████████████████████  Gould Ex. 61.

The examples go on.  For instance, a top-level abuse engineer, Roger Vredenberg, presented Mr. Zabek with "██████████████████████████████████████████

████████████████████████████████████"  Mr. Zabek responded: "█████████████████

██████████"  Gould Ex. 62.  Mr. Sikes also repeatedly explained that Cox was ██████████

31



████████████████████████████████████ Gould Ex. 63, and that a ██████

███████████████████████████████████████████████████████████████

██████████████████████████████ Gould Ex. 64.

Mr. Zabek instructed the Cox abuse team to ████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████ Gould Ex. 64.  He further instructed his team ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████ Gould Exs. 65-67.

By contrast, Cox did not hesitate to terminate users when its profit motives were not

being served, *i.e.*, for non-payment.  In 2013 and 2014 alone, Cox disconnected internet service

for almost ████████ residential subscribers, or approximately ████████ per month.  SUF ¶ 30.  In

comparison, notwithstanding its receipt of millions of infringement notices, Cox terminated just

██ subscribers in total in the same period for copyright infringement.  SUF ¶ 30.

The foregoing evidence clearly demonstrates how Cox's economic incentives aligned

with the known infringing activity of particular subscribers identified to Cox in infringement

notices.  They coalesced.

### 3.   The "Repeat Infringer" Subscribers Were Particularly Profitable to Cox

Cox knew that these infringing subscribers were particularly profitable.  Their infringing

activity led to higher monthly payments for Cox.

P2P networks often involve infringing activity.  SUF ¶¶ 41, 31-36.  Cases depicting the

rampant infringement via peer-to-peer networks are legion.[9]  Multiple witnesses in this case also

acknowledged that infringement is frequent on P2P networks.  SUF ¶ 41.  The millions of

infringement notices to Cox provide a glimpse of the incredible scale.  SUF ¶ 31-36.  Such use of

peer-to-peer networks requires substantial bandwidth, which in turn prompts customers to

purchase higher-priced service plans.  SUF ¶ 41.

Consistent with this fact, Dr. Lehr has described that P2P usage 

. SUF ¶ 41.  In other

words, Cox financially benefitted from the infringing activity with higher monthly payments.

Cox's own data demonstrates that

. SUF ¶ 41(e).  All of Dr. Lehr's foregoing conclusions stand

unrebutted by Cox.

**4. This is Precisely the Non-Ordinary Case Where Flat Periodic Payments are Sufficient to Prove a Direct Financial Benefit from the Infringing Activity**

Courts (including this one) have cited *Ellison* for the proposition that "flat periodic

payments for service . . . ***ordinarily*** would not constitute receiving a financial benefit directly

attributable to the infringing activity," unless "the value of the service lies in providing access to

infringing material."  *BMG v. Cox*, 149 F.3d at 676 (quoting *Ellison*, 357 F.3d at 1079 (quoting

---

[9] *See, e.g., Grokster*, 545 U.S. at 918–23; *Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 491–92 (1st Cir. 2011); *Disney Enterprises, Inc. v. Hotfile Corp.*, No. 11-20427-CIV, 2013 WL 6336286, at *35 (S.D. Fla. Sept. 20, 2013).

S. Rep. 105-90, at 44 (1988)) (emphasis added)).  But *Ellison* did not establish a fixed rule that charging flat fees precludes a finding of direct financial benefit.  On the contrary, *Ellison* and the legislative history it quotes expressly use the word "ordinarily," demonstrating an understanding that fixed payments can satisfy this element in appropriate circumstances.

The facts in *Ellison* and its progeny do not remotely resemble the facts before the Court in this case.  In *Ellison*, an author sued America Online, Inc. ("AOL") because the author's works were posted on an online newsgroup forum that AOL provided to its subscribers.  357 F.3d at 1075.  Pursuant to the DMCA, Ellison sent AOL an email notifying it of the infringing activity.  *Id.*  After that single email from Ellison went unheeded (because AOL had a non-working email address), Ellison filed suit.  *Id.*

This case is not a dispute about a single unheeded email and is precisely the non-ordinary case the *Ellison* court recognized could exist.  Cox had a corporate policy and systematic practice to continue delivering Internet service and accepting payments from specific known infringing subscribers—many of whom were given multiple opportunities to cease their infringing behavior but refused.  SUF ¶ 32.  Cox has admitted repeatedly that collecting monthly subscription payments from these repeat infringers drove decisions not to terminate their Internet access.  SUF ¶ 40.  The record makes clear that the bandwidth needed for infringement pushed subscribers into pricier monthly data plans, thereby driving revenues.  SUF ¶ 41.  The symbiotic relationship between Cox's financial interests and the infringing activity is unmistakable, and Cox intentionally exploited it.

### 5.  The Facts Also Show That the Infringing Activity Was a Draw

Finally, though Cox's direct financial benefit from the infringement obviates any need to show that the ability to use Cox's service to infringe constituted a draw to subscribers, that too is

34

satisfied.  The law is clear that the draw need not be substantial.  Here, the evidence adduced

clearly establishes that subscribers infringed repeatedly, even after dozens of warnings and

multiple suspensions.  This shows that their use of Cox's service to infringe was much more than

a mere added benefit to them—indeed, it was essential to the continuation of their infringing

activity.  The sheer volume of notices—over 5 million accepted in just the Claim Period, despite

Cox's daily limit on notices per rights owner, along with millions of blocked Rightscorp

notices—speaks volumes regarding how Cox's provision of Internet access to known infringers

helped Cox attract and retain subscribers.

## VI.   COX'S AFFIRMATIVE DEFENSES

In its Answer, Cox indiscriminately asserted 24 affirmative defenses, largely without

pleading any supporting facts whatsoever.  Defs.' Answer (ECF No. 21 at pp. 41–42).  Since that

time, Cox has abandoned eight.  The 16 remaining defenses are addressed below.  None belongs

in this case any longer.

### A.   Defenses Seeking to Negate Elements of Plaintiffs' Prima Facia Case Are Not Affirmative Defenses (Nos. 6-11, 16, 18-20)

Nearly half of Cox's remaining affirmative defenses are not proper affirmative defenses

recognized by the Fourth Circuit.  By definition, "[a]n affirmative defense raises matters

extraneous to the plaintiff's prima facie case . . . ."  *Keeler Brass Co. v. Cont'l Brass Co*., 862

F.2d 1063, 1066 (4th Cir. 1988) (quoting *In re Rawson Food Service, Inc*., 846 F.2d 1343, 1349

(11th Cir.1988)); *see also Rice v. Rose & Atkinson*, 176 F. Supp. 2d 585, 592 n.6 (W. Va. 2001),

aff'd, 36 F. App'x 97 (4th Cir. 2002) ("[A] general defense negates an element of plaintiff's

prima facie case, while an affirmative defense excuses the defendant's conduct even if the

plaintiff is able to establish a prima facie case.") (citations and quotations omitted).  Defenses

seeking to "negate an element of the plaintiff's prima facie case … are excluded from the

definition of affirmative defense" under Fed. R. Civ. P. 8(c).  *Keeler Brass Co.*, 682 F.2d at 1066.  Each so-called defense described in this section (Nos. 6-11, 16, and 18-20) speaks only to the elements of Plaintiffs' claims and thus should be dismissed.

Affirmative Defense Nos. 6 (failure to establish primary liability), 7 (lack of knowledge or inducement), 8 (no material contribution), 9 (substantial non-infringing uses),[10] 10 (no direct financial benefit), and 11 (no ability or right to control primary infringement) each seek to negate individual elements of Plaintiffs' claims for contributory and vicarious infringement, and therefore are not proper affirmative defenses.

Affirmative Defense No. 16 (lack of ownership) merely seeks to negate the basic element of any copyright infringement claim: Plaintiffs' ownership of the copyrights at issue.  Likewise, Affirmative Defense Nos. 18 (failure to timely register), 19 (misstatements or fraud in procuring registrations), and 20 (failure to comply with registration requirements) are not proper affirmative defenses because they each also seek to negate the validity of Plaintiffs' copyright registrations.  17 U.S.C. § 410(c);  *Spin Master Ltd. v. Alan Yuan's Store*, 325 F. Supp. 3d 413, 422 (S.D.N.Y. 2018) ("valid copyright registrations … [are] prima facie evidence of the first element of copyright infringement—ownership of a valid copyright."), citing *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir. 2012).  Nor did Cox even adduce any evidence to support these "affirmative defenses."  SUF ¶¶ 44-46.

---

[10] Cox's argument as to "substantial non-infringing use" is not an affirmative defense.  The "substantial non-infringing use" argument relates to the material contribution element of contributory infringement.  Moreover, this Court already rejected Cox's substantial non-infringing use defense.  On appeal, the Fourth Circuit rejected it again, calling Cox's argument "meritless."  *BMG v. Cox*, 881 F.3d at 306-308.  Accordingly, Cox is collaterally estopped from relitigating that issue here.

**B.**     **There Is No Basis for Cox's Affirmative Defense of Failure to Join Indispensable Parties (No. 4)**

Cox's Answer does not provide any factual basis for its Affirmative Defense No. 4 (failure to join indispensable parties), such as the identity or role of any alleged indispensable party or parties, as Rule 19 requires.  *See* Fed. R. Civ. P. 19(a)(1) (defining  a "required party" as a person in whose "absence, the court cannot accord complete relief among existing parties" or a person whose own interests would be adversely affected if he were not joined).  When asked to identify the "indispensable parties" in its affirmative defense, Cox's 30(b)(6) designee stated that he could not identify anyone, claiming only that "there may be parties that need to be joined that we're not aware of yet."  Gould Ex. 67 (Delgado Tr.) at 57:20–58:14.[11]  Cox adduced no evidence to support this affirmative defense.  SUF ¶ 42.  This affirmative defense must fail.  *See J & J Sports Prods., Inc. v. Ramirez Bernal,* No. 1:12–cv–01512–AWI–SMS, 2014 WL 2042120, at *5 (E.D. Cal. May 16, 2014) (striking affirmative defense of failure to join a "necessary and indispensable party" where answer failed to provide "any factual basis" for the defense); *Joe Hand Promotions, Inc. v. Havens,* No. 2:13–cv–0093, 2013 WL 3876176, at *3 (S.D. Ohio July 26, 2013) (same).

**C.**     **Cox Is Not Entitled To An Innocent Infringement Defense**

Cox has no basis for its innocent infringer defense, which "is only available if the infringer can prove that he or she 'had no reason to believe that his or her acts constituted an infringement'."  *BMG v. Cox*, 881 F.3d at 313 (quoting 17 U.S.C § 504(c)(2)).  Given how Cox proceeded both in response to MarkMonitor's notices, and more generally, Cox's innocent infringer argument is frivolous.  SUF ¶¶ 22-41.  Notably, the Fourth Circuit already held that the

---

[11] Mr. Delgado is an in-house litigator at Cox who oversaw this case and the BMG case before it. His deposition took place one day before the close of discovery.

district court "correctly concluded that an innocent infringer instruction was not available to Cox." *Id.* That ruling governs here. Cox's conduct and the rulings from BMG preclude it from arguing at trial that it is an innocent infringer.

In addition, because Cox had access to legitimate copies of Plaintiffs' Works on which Plaintiffs affixed copyright notices which complied with statutory requirements, *see* SUF ¶¶ 47-48, Cox is ineligible to claim the innocent infringement defense. *See* 17 U.S.C §§ 401(d) and 402(d); *see also Maverick Recording Co. v. Harper*, 598 F.3d 193, 199 (5th Cir. 2010) (when proper notices affixed, "the infringer's knowledge or intent" is irrelevant, and innocent infringement defense is foreclosed "as a matter of law").

### D.   Failure to Mitigate Damages Is Not A Proper Affirmative Defense Here

Cox's Affirmative Defense No. 13 (failure to mitigate damages) should be rejected. It concerns damages, not liability, and is inappropriate as an affirmative defense. At trial, Cox will inevitably present evidence and argument concerning statutory damages. But that evidence and argument as to what a jury should consider in assessing damages does not warrant cluttering up the liability phase of the case and trial with an improper "affirmative defense."[12]

In addition, Cox has no factual evidence to suggest that Plaintiffs failed to mitigate their damages. SUF ¶ 43. Cox's 30(b)(6) designee stated that Plaintiffs failed to mitigate damages because they did not pursue actions directly against Cox's subscribers, and because Plaintiffs did

---

[12] Multiple courts have held a that failure to mitigate defense is invalid if the plaintiff only pursues statutory damages. *See, e.g., Moothart v. Bell*, 21 F.3d 1499, 1506–07 (10th Cir. 1994); *Purzel Video GmbH v. St. Pierre*, 10 F.Supp.3d 1158, 1169 (D. Colo. 2014); *Clements v. HSBC Auto Fin., Inc*., 2010 WL 4281697, *11 (S.D. W.Va. 2010); *Arista Records, Inc. v. Flea World, Inc*., 356 F. Supp. 2d 411, 422 (D. N.J. 2005). Plaintiffs recognize that this Court came to a contrary conclusion in the *BMG* case in denying Cox's motion for summary judgment on liability, finding that "[b]ecause actual damages are relevant (as a consideration in determining statutory damages), so too are the actions a plaintiff took to mitigate those damages." *BMG v. Cox*, 149 F. Supp. 3d at 677. Nevertheless, relevance and affirmative defenses are not the same.

not submit over 600 notices per day.  Gould Ex. 67 (Delgado Tr.) at 62:13–63:2.  Suing direct

infringers is not a prerequisite to bringing secondary liability actions.  *See, e.g. Arista Records,*

*Inc. v. Flea World, Inc.*, 356 F. Supp. 2d 411, 416 (D.N.J. 2005) ("Plaintiffs need not sue the

numerous third party direct infringers in order to bring [claims for contributory and vicarious

liability] against Defendants.").  Courts have also uniformly rejected contentions that copyright

owners are somehow at fault for the extent of illegal downloads through online services or

for the inability to stop it.  *See Grokster*, 545 U.S. at 929-30 ("When a widely shared product is

used to commit infringement, it may be impossible to enforce rights in the protected work

effectively against all direct infringers . . . ."); *Sony BMG Music Entm't v. Tenenbaum*, 672 F.

Supp. 2d 217, 232–35 (D. Mass. 2009) (rejecting argument that plaintiffs acquiesced to

copyright infringement by taking insufficient steps to halt file-trading).

### E.   <u>Constitutionality of Statutory Damages Is Not An Affirmative Defense</u>

Finally, Cox's Affirmative Defenses Nos. 21 (excessive damages) and 22 (violation of

due process) should be stricken because the appropriate amount of damages is not an affirmative

defense.  *Energy Intelligence Grp., Inc. v. CHS McPherson Refinery, Inc.*, 300 F. Supp. 3d 1356,

1379 (D. Kan. 2018) (stating that defendant's defense regarding due process violation of

statutory damages "is not a proper affirmative defense").  Defenses regarding excessive damages

can only be addressed after an award has been entered.  *Malibu Media, LLC v. Peterson*, No. 16-

CV-786 JLS (NLS), 2017 WL 1550091, at *6 (S.D. Cal. May 1, 2017).  This is because these

defenses raise "a question of damage calculation, rather than an affirmative defense to the

misconduct alleged." *Id.*

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in Plaintiffs' favor, and against Cox.  The Court should find:  (1) Plaintiffs own or exclusively control exclusive rights under 17 U.S.C. § 106 to Plaintiffs' Works; (2) Cox subscribers directly infringed Plaintiffs' Works; (3) Cox had knowledge of, and materially contributed to, its subscribers' direct infringement; (4) Cox had a right and ability to control, and obtained a direct financial benefit from, its subscribers' direct infringement; and (5) Cox's affirmative defenses fail.


Dated:  August 30, 2019                      Respectfully submitted,

                                             */s/ Scott A. Zebrak*                    
                                             Scott A. Zebrak (38729)
                                             Matthew J. Oppenheim (*pro hac vice*)
                                             Jeffrey M. Gould (*pro hac vice*)
                                             Kerry M. Mustico (*pro hac vice*)
                                             OPPENHEIM + ZEBRAK, LLP
                                             5225 Wisconsin Avenue, NW, Suite 503
                                             Washington, DC 20015
                                             Tel: 202-480-2999
                                             matt@oandzlaw.com
                                             scott@oandzlaw.com
                                             jeff@oandzlaw.com
                                             kerry@oandzlaw.com

                                             *Attorneys for Plaintiffs*