**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

SONY MUSIC ENTERTAINMENT, *et al.*,

        *Plaintiffs*,

        v.

COX COMMUNICATIONS, INC., *et al.*,

        *Defendants.*

Case No. 1:18-cv-00950-LO-JFA

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# Contents

INTRODUCTION ................................................................................................................ 1

STATEMENT OF UNDISPUTED FACTS .......................................................................... 3

ARGUMENT ..................................................................................................................... 15

I.    COX IS ENTITLED TO SUMMARY JUDGMENT OF NO DIRECT
      INFRINGEMENT............................................................................................... 15

      A.    Plaintiffs cannot prove that the files shared through Cox's subscribers' IP
            addresses were copies of the works in suit. .......................................... 15

      B.    Plaintiffs' evidence shows, at most, "making available" of their alleged works,
            which is insufficient to prove either reproduction or distribution. ...... 19

            1.    Plaintiffs cannot prove that any Cox subscribers directly infringed
                  Plaintiffs' § 106(1) reproduction right. ..................................... 19

            2.    Plaintiffs cannot prove that any Cox subscribers infringed Plaintiffs'
                  § 106(3) distribution right. ....................................................... 20

II.   COX IS ENTITLED TO SUMMARY JUDGMENT OF NO INFRINGEMENT FOR
      CLAIMS WHERE PLAINTIFFS' NOTICES FAILED TO IDENTIFY WORKS-IN-
      SUIT............................................................................................................... 22

      A.    The Label Plaintiffs failed to notify Cox of the majority of alleged infringements.
            ........................................................................................................... 23

      B.    The Publisher Plaintiffs failed to notify Cox about any infringements. ...... 25

            1.    There is no evidence that Cox possessed actual knowledge of infringement
                  of any musical composition, and constructive knowledge is insufficient as
                  a matter of law. .......................................................................... 26

      C.    There is no evidence that Cox was willfully blind to infringement of sound
            recordings not identified in any notice, or any musical compositions.................. 28

III.  PLAINTIFFS FAILED TO PROVIDE SUFFICIENT NOTICE OF ALLEGED
      INFRINGEMENT BY COX BUSINESS SUBSCRIBERS. ............................................. 29

      A.    Evidence that infringement has occurred at a Cox Business subscriber's IP
            address is insufficient to support liability for infringement by the Cox Business
            subscriber. .......................................................................................... 30

      B.    Cox cannot be held contributorily liable for the infringing conduct of unspecified
            individuals using the networks of its business subscribers.................................. 31

IV.   COX IS ENTITLED TO SUMMARY JUDGMENT OF NO VICARIOUS LIABILITY.
      ........................................................................................................................ 32

      A.    Plaintiffs have no evidence that Cox derives a direct financial benefit from any
            alleged infringements of Plaintiffs' works by Cox's subscribers. ...................... 32

B.     Plaintiffs have no evidence that that Cox derived a direct financial benefit from alleged infringement by Cox Business subscribers' end users ............................. 35

C.     There is no evidence that Cox had the practical ability to supervise the alleged infringements by Cox Business subscribers' end users. ....................................... 36

V.     COX IS ENTITLED TO SUMMARY JUDGMENT LIMITING CERTAIN OF PLAINTIFFS' STATUTORY DAMAGES CLAIMS TO ONE AWARD PER WORK. 36

A.     Plaintiffs are limited to one award of statutory damages for each album registered as a single work..................................................................................................... 36

B.     Plaintiffs are not entitled to separate statutory damages awards for a sound recording and the music composition it embodies................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arista Records LLC v. Usenet.com, Inc.*,
    608 F. Supp. 2d 409 (S.D.N.Y. 2009)....................................................................17

*Atlantic Recording Corp. v. Howell*,
    554 F. Supp. 2d 976 (D. Ariz. 2008) ...................................................................20

*BMG v. Cox*,
    149 F. Supp. 3d at 670 [*BMG I*]............................................................... *passim*

*BMG v. Cox*,
    199 F. Supp. 3d 958 (E.D. Va. 2016) ...................................................................33

*BMG v. Cox*,
    881 F.3d 293 (4th Cir. 2018) ...........................................................21, 24, 27, 31

*Capitol Records, Inc. v. MP3Tunes, LLC*,
    28 F. Supp. 3d 190 (S.D.N.Y. 2014).....................................................................38

*Capitol Records, Inc. v. Thomas*,
    579 F. Supp. 2d 1210 (D. Minn. 2008)............................................................20, 38

*Cobbler Nevada, LLC v. Gonzales*,
    901 F.3d 1142 (9th Cir. 2018) ......................................................................28, 29, 30

*Columbia Pictures Indus., Inc. v. Fung*,
    710 F.3d 1020 (9th Cir. 2013) .........................................................................19, 27

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
    844 F.3d 79 (2d Cir. 2016)....................................................................................38

*M&T Mortg. Corp. v. Miller*,
    2007 U.S. Dist. LEXIS 60610 (E.D.N.Y. Aug. 17, 2007).....................................17

*Newton v. Diamond*,
    204 F. Supp. 2d 1244 (C.D. Cal. 2002) ...............................................................24

*Perfect 10, Inc. v. Giganews, Inc.*,
    847 F.3d 657 (9th Cir. 2017) ...........................................................................32, 33

*Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*,
    761 F. Supp. 2d 367 (E.D. Va. 2011) (Cacheris, J.) .............................................14

*Spooner v. EEN, Inc.*,
  2010 WL 1930239 (D. Me. May 11, 2010) ...........................................................38

*Sullivan v. Flora, Inc.*,
  2019 U.S. App. LEXIS 24928 (7th Cir. Aug. 21, 2019) .......................................38

*Towler v. Sayles*,
  76 F.3d 579 (4th Cir. 1996) ..................................................................................19

*UMG Recordings, Inc. v. Grande Communs. Networks, LLC*,
  2018 U.S. Dist. LEXIS 160492 (W.D. Tex. Sep. 20, 2018)..................................33

*UMG Recordings, Inc. v. Hummer Winblad Venture Partners (In re Napster, Inc.)*,
  377 F. Supp. 2d 796 (N.D. Cal. 2005) ..................................................................20

*VHT, Inc. v. Zillow Grp., Inc.*,
  918 F.3d 723 (9th Cir. 2019) ...........................................................24, 25, 27, 35

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012)....................................................................................27

*Xoom, Inc. v. Imageline, Inc.*,
  323 F.3d 279 (4th Cir. 2003) ................................................................................38

*Yellow Pages Photos, Inc. v. Ziplocal, LP*,
  795 F.3d 1255 (11th Cir. 2015) ............................................................................36

**Statutes**

17 U.S.C. § 101............................................................................................35, 37

17 U.S.C. § 106(1) ............................................................................................18

17 U.S.C. § 106(3) ............................................................................................18

17 U.S.C. § 203..................................................................................................37

17 U.S.C. § 410(c) ............................................................................................37

17 U.S.C. § 504(c)(1)....................................................................................35, 36

17 U.S.C. § 512(c)(3)(A)(ii) .........................................................................23, 26

Digital Millennium Copyright Act.................................................................. *passim*

**Other Authorities**

Fed. R. Evid. 1003 .............................................................................................17

iv

## INTRODUCTION

Founded over a century ago, with a rich history in print, radio, and television, Defendant Cox's many businesses include an Internet Service Provider (ISP) that provides Internet access to diverse subscribers, from individuals, to hospitals, to schools and other businesses. Cox's ISP acts as a vital pipeline connecting users to the internet, but does not create or post content, and cannot act as the Internet's police department. Yet here, the 53 remaining Plaintiffs in this case, comprising both "Label Plaintiffs," which claim copyrights to sound recordings, and "Publisher Plaintiffs," which claim rights to musical compositions, have sued Cox for alleged copyright infringement committed by Cox Internet subscribers from February 1, 2013 to November 26, 2014 (the "Claims Period").[1] Plaintiffs' claims suffer from a fundamental and fatal flaw: a distinct paucity of proof. They simply cannot prove their case.

During the Claims Period, the Recording Industry Association of America ("RIAA"), acting as the agent of the Label Plaintiffs, sent Cox notices alleging copyright infringement by Cox subscribers. The RIAA relied on a vendor, MarkMonitor, to scan the Internet and find online peer-to-peer network users (called "peers") who appeared to be making copies of Plaintiffs' works available for download. When MarkMonitor encountered such a file, ██████████████ ████████████████████████████████████████████████████████████████ ██████. MarkMonitor would then seek out the peers offering to share the file, and download from each peer basic information *about* the file (so-called "metadata"). If the peer had an IP address registered to a Cox subscriber, MarkMonitor would notify Cox that the peer/subscriber was in-

---

[1] Two Plaintiff groups (the Sony/ATV and EMI Plaintiff groups, defined below) only have claims for Aug. 1, 2013 to Nov. 26, 2014. ECF 20. For purposes of this motion only, Cox defines the "Claims Period" as the Feb. 1, 2013 to Nov. 26, 2014 period that covers all claims of all Plaintiffs.

fringing one of Plaintiffs' works. But ████████████████████████████████████████

████████████████████████████████████████████████████████████████

There is absolutely no evidence, however, ███████████████████████████████████████

███████████████████████████████████████, and no evidence that any of the

files being offered for sharing by Cox subscribers were actually copied by anyone. Based solely

on this chain of ████████████████████████ MarkMonitor created, and the RIAA sent, no-

tices alleging copyright infringement to Cox.

Each notice claimed that a Cox subscriber, identified only by an IP address, had infringed

a sound recording. Although the RIAA sent notices identifying just 1,998 unique sound recordings,

Plaintiffs seek to hold Cox contributorily and vicariously liable for alleged infringements of nearly

*10,500* separate copyrighted works: 7,057 sound recordings and 3,421 musical compositions.

In short, Plaintiffs seek damages for works they cannot prove were infringed, based on

notices that did not identify fully 80% of those works. Moreover, they have no evidence that Cox

knew about the infringement, obtained any direct financial benefit from it, or had the practical

ability to prevent it, such that it could be secondarily liable.

Cox moves for summary judgment on five grounds: (a) Plaintiffs lack sufficient evidence

to prove direct infringement; (b) because the RIAA Notices failed to identify the vast majority of

sound recordings or *any* of the musical compositions allegedly infringed, Cox cannot be second-

arily liable for infringement of those unidentified works; (c) Plaintiffs cannot prove that any Cox

Business subscriber was an infringer, or hold Cox indirectly liable for their alleged actions;

(d) Plaintiffs have no evidence that Cox derived a direct financial benefit from the alleged infringe-

ment, and so cannot be held vicariously liable; and (e) under the plain language of the Copyright

Act, Plaintiffs are entitled to only one award of statutory damages for each album registered as a

single work, and one award for a sound recording and the musical composition it embodies.

## STATEMENT OF UNDISPUTED FACTS

### A.  Cox's Service

1.     Defendants Cox Communications, Inc. and CoxCom LLC (collectively, "Cox") are Internet Service Providers ("ISPs") that provide Internet access service to both residential and Cox Business subscribers. Declaration of Thomas Kearney ("Kearney Dec.") ¶ 18.a & Ex. 17; ¶ 54 & Ex. 43.

2.     Cox offers Internet service for a flat monthly fee. Cox does not monitor or control the information its subscribers transmit or download, and the flat monthly fees Cox charges to its users do not depend on what its subscribers use the service for. Kearney Dec. ¶ 12.a & Ex. 11; ¶ 16.a & Ex. 15; ¶ 11.a & Ex. 10; ¶ 10.a & Ex. 9; ¶ 55 & Ex. 44-51.

3.     During the Claims Period, Cox did not charge a fee to users who exceeded the amount of data allotted by their subscription. Kearney Dec. ¶ 13.a, b & Ex. 12.

4.     During the Claims Period, individual users who accessed the Internet through a Cox Business customer's service did not pay Cox directly to do so. Kearney Dec. ¶ 54.c & Ex. 43.

### B.  Plaintiffs

5.     Plaintiffs include 16 record companies ("Label Plaintiffs"), ECF 136,[2] and 37 music publishers ("Publisher Plaintiffs") ECF 136.[3]

---

[2] The "Label Plaintiffs" are: Arista Music; Arista Records LLC; LaFace Records LLC; Provident Label Group, LLC; Sony Music Entertainment; Sony Music Entertainment US Latin; Volcano Entertainment III, LLC; and Zomba Recordings LLC ("Sony Music Entertainment" Plaintiff group); UMG Recordings, Inc. and Capitol Records, LLC ("Universal Music Group" Plaintiff group); and Atlantic Recording Corporation; Bad Boy Records LLC; Elektra Entertainment Group Inc.; Fueled by Ramen LLC; Roadrunner Records, Inc.; and Warner Bros. Records Inc. ("Warner Music Group" Plaintiff group).

[3] The "Publisher Plaintiffs" are: Sony/ATV Music Publishing LLC; EMI Al Gallico Music Corp.; EMI Algee Music Corp.; EMI April Music Inc.; EMI Blackwood Inc.; Colgems-EMI Music, Inc.;

6.  Plaintiffs' claims in this litigation are restricted to the Claims Period.

7.  The Label Plaintiffs allege infringement of 7,057 sound recordings. ECF 136, 172-1 (FAC & Amd. Ex. A). Ex. A refers to a work's title as the "track." Each sound recording listed on Ex. A has a unique title-and-artist combination. *Id.*

8.  The Publisher Plaintiffs allege infringement of 3,421 musical compositions. ECF 136, 172-2 (FAC & Amd. Ex. B). Ex. B refers to a work's title as the "track." Ex. B lists multiple works with the same title, and does not list the artist for any title. *Id.*

9.  6,777 of the 7,057 sound recordings alleged in this case were registered as albums.[4] 6,766 of the 7,057 sound recordings were registered as "works made for hire." Kearney Dec. ¶ 35-36 & Ex.33, 34; Ex. 20; Ex. 21; ¶ 9.a & Ex. 8; ¶ 7.a, b & Ex. 6. Of the work-for-hire sound recordings, 6,443 are registered as 1,113 albums (i.e., the registrations that cover these works all cover multiple sound recordings), and 280 are registered as singles (i.e., the registrations cover single sound recordings.) *Id.* Ex. 33.

---

EMI Consortium Music Publishing Inc. d/b/a EMI Full Keel Music; EMI Consortium Songs, Inc., individually and d/b/a EMI Longitude Music; EMI Feist Catalog Inc.; EMI Miller Catalog Inc.; EMI Mills Music, Inc.; EMI Unart Catalog Inc.; EMI U Catalog Inc.; Jobete Music Co. Inc.; Stone Agate Music (a division of Jobete Music Co., Inc.); Screen Gems-EMI Music Inc.; and Stone Diamond Music Corp. ("Sony/ATV and EMI" Plaintiff group); Music Corporation of America, Inc. dba Universal Music Corp.; Polygram Publishing, Inc.; Songs of Universal, Inc.; Universal Music - MGB NA LLC; Universal Music - Z Tunes LLC; Universal Music Corp.; Universal Music Publishing AB; Universal Music Publishing Limited; Universal Music Publishing MGB Limited; Universal Music Publishing, Inc.; Universal/Island Music Limited; and Universal/MCA Music Publishing Pty. Limited ("Universal Music Publishing Group" Plaintiff group); and Warner/Chappell Music, Inc.; Warner-Tamerlane Publishing Corp.; WB Music Corp.; W.B.M. Music Corp.; Unichappell Music Inc.; Rightsong Music Inc.; Cotillion Music, Inc.; and Intersong U.S.A., Inc. ("Warner/Chappell Music" Plaintiff group).

[4] Many of the works-in-suit were initially registered by third parties, and Plaintiffs bear the burden of proving that they own the rights to those works. For purposes of this motion only, without waiver and unless otherwise stated, Cox does not challenge Plaintiffs' ownership of such works.

C.    **The RIAA and MarkMonitor**

10.    The RIAA was the authorized agent of the Label Plaintiffs for purposes of submitting notices of alleged infringement to Cox during the Claims Period ("RIAA Notices"). Kearney Dec. ¶ 5.a & Ex. 4; ¶ 7.c & Ex. 6; ¶ 14.a & Ex. 13. Each RIAA Notice claimed to "have identified a user on [Cox's] network reproducing or distributing an unauthorized copy of a copyrighted sound recording." *E.g.*, Kearney Dec. ¶ 30-33 & Ex. 29-32. The RIAA sent Cox approximately 163,148 Notices during the Claims Period. Kearney Dec. ¶ 27-29 & Ex. 26.

11.    The RIAA hired MarkMonitor to monitor the Internet for apparent infringements of sound recordings, including those claimed by the Label Plaintiffs here. Kearney Dec. ¶ 23-25 & Ex. 22-24; ¶ 48 & Ex. 40. ██████████████████████████████████████████████████████████████████████████████ *Id.* ¶ 14.b & Ex. 13; ¶ 19.a & Ex. 18.

12.    ████████████████████████████████████████ Kearney Dec. ¶ 19.a & Ex. 18.

13.    ████████████████████████████████████████████████████████████████████████ Kearney Dec. ¶ 19.a & Ex. 18. Importantly, there is no evidence that this initial download was obtained from a particular IP address assigned to a Cox subscriber.

14.    ██████████████████████████████████████████████████████████████████. Kearney Dec. ¶ 4.a, b & Ex. 3; ¶ 19.b & Ex. 18. ██████████████████████████████████████████████████████████████████

15. █████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████

16. █████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████ *Id*. ¶ 8.b, c & Ex. 7.

17. ███████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Kearney Dec. ¶ 3.a & Ex. 2.

18.   ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

19.   ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████   *See* Kearney Dec. ¶ 19.c & Ex. 18.

20. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████ Kearney Dec. ¶ 26.g & Ex. 25.

21. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Kearney Dec. ¶ 14.d & Ex. 13, ¶ 3.c & Ex. 2.

22.      When two peers contact each other, there is an initial period when one peer can—but is not required to—download content without first offering any content to the other peer in exchange. Kearney Dec. ¶ 19.d & Ex. 18. Thus, merely because a peer is a member of a P2P network, that does not mean it has already either uploaded or downloaded any content. ████████

████████████████████████████████████████████

████████████████████ Kearney Dec. ¶ 2.c & Ex. 1; ¶ 26.c & Ex. 25.

23. ████████████████████████████████████████



Kearney Dec. ¶ 14.f & Ex. 13; ¶ 15.a & Ex. 14.

24.

Kearney Dec. ¶ 23.c & Ex. 22; ¶ 24.b & Ex. 23.

25.

Kearney Dec. ¶ 26.h & Ex. 25.

26.

27. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████

28. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████

29.  ████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

30.  ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

31.  ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████

32. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████

33. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

34. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████

35. ███████████████████████████████████

███████████████████████████████████████████████



36.

37.

38.

39.

40.

**D.**     **The RIAA Notices**

41.     The RIAA Notices sent to Cox encoded data about alleged infringements in a stand-ardized, machine-readable format known as ACNS which provides information in delimited fields. Kearney Dec. ¶ 14.j & Ex. 13; ¶ 49.c & Ex. 41.

42.     The RIAA Notices identified allegedly infringing content files that MarkMonitor claimed to have detected on a peer's computer, by providing ACNS fields with metadata about the content file, including: its name ("<FileName>"); its size ("<FileSize>"); the type of content the file contained ("<Type>"); the date and time when the content file was allegedly detected ("<TimeStamp>"); and a hash value corresponding to a dot-torrent file allegedly associated with the particular content file ("<Hash>"). Kearney Dec. ¶ 27-28 & Ex. 26; ¶ 49.c & Ex. 41; Ex. 29-32; Ex. 13.

43.     The metadata does not contain any portion of the content file to which it refers. Nor can any content be derived from the metadata. And because the filename of the allegedly infringing file is arbitrary, it cannot be relied on to be informative or accurate as to the file's actual contents. Kearney Dec. ¶ 31-32 & Ex. 30, 31.

44.     The RIAA Notices identified allegedly infringed works by their Title and Artist, encoded in ACNS fields <Title> and <Artist>. Kearney Dec. ¶¶ 27-28 & Ex. 26; Ex. 27-28; Ex. 29-32.

45.     The RIAA Notices did not provide copyright registration numbers for works alleg-edly infringed; did not indicate whether the work was a single song, an album, or multiple albums or songs; and did not indicate the authors of any musical composition embodied in a work, or the owner of any musical composition copyright. Kearney Dec. ¶¶ 27-28 & Ex. 26; Ex. 29-32.

46.     The RIAA Notices sent during the Claims Period identified ███████ title-and-artist combinations. Kearney Dec. ¶ 29 & Ex. 26, 27-28.

47. ███████████████████████████████████████

████████████████████████████████████

48.     When Cox offered to identify a sampling of Cox subscribers who had been the subject of notices alleging infringement, Plaintiffs declined the offer. Kearney Dec. ¶ 51. At Plaintiffs' request, Cox did subsequently identify thousands of Cox Business subscribers who had received such notices, but Plaintiffs did nothing with that information. *Id.* Plaintiffs did not attempt to obtain discovery from any Cox subscriber in this litigation. *Id.* ¶ 51-52.

## ARGUMENT

## I.     Cox Is Entitled to Summary Judgment of No Direct Infringement.

"Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party." *Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*, 761 F. Supp. 2d 367, 375 (E.D. Va. 2011) (Cacheris, J.) (quotation omitted). Plaintiffs' secondary liability claims rest on alleged direct infringement by Cox subscribers. But Plaintiffs cannot prove that any Cox subscriber directly infringed any copyrighted work. First, the MarkMonitor records on which Plaintiffs rely are unreliable and incomplete: the evidence from which they were derived was spoliated. Second, those records, even if admissible, would not establish that Cox subscribers infringed Plaintiffs' reproduction or distribution rights. Cox is therefore entitled to summary judgment on all of Plaintiffs' secondary liability claims.

### A.     Plaintiffs cannot prove that the files shared through Cox's subscribers' IP addresses were copies of the works in suit.

The direct infringement for which Plaintiffs seek to hold Cox liable is alleged infringement by Cox subscribers. Plaintiffs' proof (they claim) is that their agent, MarkMonitor, determined that Cox's subscribers were making copies of works-in-suit available for sharing. But all MarkMonitor "determined" was that a device connected to a Cox subscriber's IP address had transmitted

15

*metadata* indicating that the device had a particular file (or a portion thereof) available for download. MarkMonitor did not determine that the connected device was owned or used by a Cox subscriber, and did not confirm that the file in question actually existed. Rather, MarkMonitor concluded that ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████. SUF 15, 17-21.[5]

The Audible Magic fingerprinting process is thus the linchpin of Plaintiffs' direct infringement claims. Indeed, an operational audit of the MarkMonitor system determined ████████████

████████████████████████████████████████████████████████████████████

████████████████████████ SUF 25. But the evidence on which Plaintiffs rely to establish this "crucial" link is fatally flawed.

On August 14, Cox filed its Motion for Discovery Sanctions and to Preclude Plaintiff's Use of MarkMonitor Evidence. ECF 237. The MarkMonitor "evidence" at issue in the motion is a spreadsheet (the "MarkMonitor Spreadsheet") purporting to show that the files that were the subject of notices to Cox were files that Audible Magic had matched to its fingerprint database. That spreadsheet is the sole evidence that Plaintiffs offer to establish this critical fact. SUF 15. Cox's motion seeks to preclude the MarkMonitor Spreadsheet because it is flawed in several ways.

---

[5] As discussed more fully in Section I.B. below, ████████████████████████████████████
████████████████████████████████████████████████. Had they done so, there would be no need to match the files' hash values to the hash values of fingerprinted works. Plaintiffs could have simply provided the downloaded files to show that they were copies of the works in question. Since ████████████████████████████████████████████████████
████████████████████████████████████████████████████████t.

First, █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ SUF 15,

17-20. This is curious, because ████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████ Kearney Dec. ¶ 8 & Ex. 7. However, ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ SUF 16;

Kearney Dec. ¶ 27 & Ex. 26. Thus, the MarkMonitor Spreadsheet was the only evidence showing

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████

The problem is that this conclusion cannot be tested against the actual Audible Magic re-

sults sent to MarkMonitor during the relevant period because ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████.[6] In addition, MarkMonitor's witness testified that ████████████████████████████

_____

[6] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

████████████████████████████ SUF 27. That data similarly indicates that the MarkMonitor summary of Audible Magic's testing was deeply unreliable.[7]

This history of data destruction makes the MarkMonitor Spreadsheet inadmissible for two reasons. **First**, as a summary of the Audible Magic findings, it cannot be admitted unless the underlying Audible Magic data that it purports to summarize is produced. Fed. R. Evid. 1003. Because that evidence does not exist, the predicate for admissibility cannot be established. **Second**, ██████████████████████████████████████████ justifies preclusion of the spreadsheet because the evidence was spoliated. MarkMonitor was on notice of its duty to retain this evidence, ██████████████████████████████████████. SUF 24, 29.

The spoliation makes it impossible to establish the reliability of the MarkMonitor Spreadsheet. And the contemporaneous—and even the *ex post facto*—evidence of the Audible Magic testing is inconsistent with what the spreadsheet purports to show. Under comparable circumstances, courts routinely preclude similar evidence. *See, e.g.*, *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 443 (S.D.N.Y. 2009); *M&T Mortg. Corp. v. Miller*, No. CV 2002-5410 (NG)(MDG), 2007 U.S. Dist. LEXIS 60610, at *38 (E.D.N.Y. Aug. 17, 2007).

In addition, the author of the MarkMonitor Spreadsheet testified ███████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████



Kearney Dec. ¶ 8 & Ex. 7. He also testified 

The Spreadsheet is not probative on the only issue it purports to prove, and can only serve to confuse the jury.

If the Court grants Cox's sanctions motion,[8] there will be no basis for Plaintiffs' claim that the works-in-suit were identified on devices associated with Cox's subscribers' IP addresses, and Cox respectfully submits that the Court should enter summary judgment as to all Plaintiffs' claims.

**B.      Plaintiffs' evidence shows, at most, "making available" of their alleged works, which is insufficient to prove either reproduction or distribution.**

Plaintiffs' also cannot prove that Cox subscribers directly infringed because they "reproduced and distributed" Plaintiffs' works "using Internet access and services provided by Cox[,]" ECF 136 ¶¶ 101, 110; *see* 17 U.S.C. § 106(1), 106(3), because Plaintiffs have no evidence of reproduction or distribution by any Cox subscriber. The Court should therefore grant Cox summary judgment as to both of Plaintiffs' theories of direct infringement.

**1.      Plaintiffs cannot prove that any Cox subscribers directly infringed Plaintiffs' § 106(1) reproduction right.**

To hold Cox indirectly liable for a subscriber's direct infringement of the reproduction right, Plaintiffs must prove that the subscriber actually made an infringing copy of a work at issue using Cox's network. *Towler v. Sayles*, 76 F.3d 579, 581 (4th Cir. 1996); *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013).

---

[8] Briefing on Cox's sanctions motion concludes on Sept. 20, and the motion will be heard by Magistrate Judge Anderson on Sept. 27, three weeks before the summary judgment hearing.

But Plaintiffs have *no* evidence that any Cox subscriber made unauthorized copies of any of the works-in-suit, because there is no evidence showing how any Cox subscribers obtained those works. The MarkMonitor system cannot determine whether the purported copies of Plaintiffs' works on devices associated with Cox subscribers' IP addresses were initially purchased from iTunes, legally uploaded from a purchased CD, or obtained from another legal source. Indeed, there is no evidence that the MarkMonitor system can or does detect whether a given peer is *downloading* data, as opposed to merely making data (obtained from whatever source) available for possible download by others. Plaintiffs' own expert carefully circumscribed her opinions to a claim that the MarkMonitor monitoring system detects the "distribution" of works, and offered no opinion that MarkMonitor detects downloading by a subscriber. SUF 24. And Plaintiffs made no attempt to obtain discovery from any Cox subscriber on this issue. SUF 49.

Thus, even assuming that Plaintiffs' detection system was reasonably accurate, the most they can show is that some Cox subscribers may have possessed copies, or partial copies, of certain works. Absent evidence showing that Cox subscribers *illegally* copied works-in-suit, Plaintiffs' claim for direct infringement of their reproduction right fails.[9]

### 2. Plaintiffs cannot prove that any Cox subscribers infringed Plaintiffs' § 106(3) distribution right.

Plaintiffs also seek to hold Cox secondarily liable for infringement of their § 106(3) distribution rights, claiming that Cox subscribers made copies of Plaintiffs' works available download. As this Court has held, though, "making available" is not an infringing act. Rather, "to establish a direct infringement of its distribution right, [a plaintiff] must show an actual dissemination of a

---

[9] Even if Plaintiffs could show that Cox subscribers obtained copies of Plaintiffs' works without authorization, because there is no evidence that the copies were obtained *using Cox's network*, there would still be no basis to hold Cox secondarily liable for the hypothetical infringements.

copyrighted work." *BMG v. Cox*, 149 F. Supp. 3d at 670 [*BMG I*] (discussing cases).[10]

Here, Plaintiffs cannot prove "actual dissemination" of any work to anyone—including their agent, MarkMonitor. *See, e.g.*, *BMG I* at 663 ("[plaintiff's agent] *itself downloaded* ... full copies of BMG's works using Cox's service"); *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1216 (D. Minn. 2008) (stating that "Plaintiffs' agent, MediaSentry, *copied songs*" at issue and that "distribution *to MediaSentry* can form the basis of an infringement claim") (emphases added). Plaintiffs' purported evidence of distribution rests entirely on 175,968 "Evidence Packages," each of which purportedly records an instance where MarkMonitor's software detected *metadata* purporting to show the presence of a file at IP addresses assigned to Cox subscribers, and matched that metadata to *other* metadata, which (according to MarkMonitor's records) was associated with one of Plaintiffs' works. SUF 14, 17-19, 24, 35. But MarkMonitor's metadata records derived from reference copies of content files that MarkMonitor had downloaded previously, from a different source.[11] SUF 13, 17-18. Those records are not evidence that the *file associated with* the metadata was distributed by the Cox subscriber to anyone.

Moreover, the MarkMonitor system was ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[10] *See, e.g.*, *Atlantic Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 983 (D. Ariz. 2008) ("Merely making an unauthorized copy of a copyrighted work available to the public does not violate a copyright holder's exclusive right of distribution."); *UMG Recordings, Inc. v. Hummer Winblad Venture Partners (In re Napster, Inc.)*, 377 F. Supp. 2d 796, 802 (N.D. Cal. 2005) ("merely listing a copyrighted musical composition or sound recording in an index of available files falls short of satisfying these 'actual dissemination' or 'actual transfer' standards.")

[11] MarkMonitor obtained these reference copies in an entirely separate process, and there is no evidence that it obtained them (or any part of them) from a Cox subscriber. SUF 13.

[black redaction bar]

[black redaction bar] SUF 35, 37-38.[12]) Nor is there any evidence that any Cox subscriber actually provided a copy of the work to anyone else. SUF 22. Without such evidence, there is no evidence that any Cox subscriber "distributed" any copyrighted work, and thus no evidence of direct infringement.[13] The Court should thus grant summary judgment to Cox of no infringement as to the 7,057 sound recordings and 3,421 musical compositions at issue.

## II.   Cox Is Entitled to Summary Judgment of No Infringement for Claims Where Plaintiffs' Notices Failed to Identify Works-in-Suit.

To hold a defendant liable for contributory infringement, a plaintiff must prove that the defendant had sufficient knowledge of the specific acts of infringement to have contributed to or induced them. *BMG I* at 663; *BMG v. Cox*, 881 F.3d 293, 310 (4th Cir. 2018) ("*BMG II*"). Here, the Label Plaintiffs failed to notify Cox of more than *two-thirds* of the alleged sound recording infringements, and the Publisher Plaintiffs failed to notify Cox of *any* infringements. And with respect to alleged infringement by Cox Business subscribers, the RIAA Notices failed to identify the alleged infringers with sufficient particularity to place Cox on notice of even the alleged infringements. Without knowledge of what was supposedly being infringed or who was infringing it, Cox cannot be held contributorily liable. Because Cox lacked such knowledge, Plaintiffs also

---

[black redaction block]

[black redaction block] SUF 39.

[13] To the extent Plaintiffs argue that the BitTorrent protocol requires an *exchange* of data between peers, it is undisputed that there is no such requirement during *at least* the initial contact period "where a peer can begin a download without first offering pieces of content." SUF 22. Because [black redaction] they also lack evidence that any data was exchanged after this initial period.

cannot show that Cox had the requisite ability to supervise those infringements, so Plaintiffs' vicarious liability claims also fail.

### A.   The Label Plaintiffs failed to notify Cox of the majority of alleged infringements.

Although Plaintiffs seek damages for alleged direct infringements of 7,057 sound recordings and 3,421 compositions, the RIAA Notices for recordings sent during the Claims Period contain only 1,998 unique Title and Artist combinations. SUF 46. Unlike the *BMG* litigation, where there was no dispute that the notices at issue provided Title and Artist information sufficient to identify each of the works-in-suit, in this case the notices do not actually identify a majority of the asserted works. Because Cox lacked actual knowledge of specific infringement of these unidentified works, it cannot be held liable.

Although the RIAA Notices explicitly identify Title and Author for only 1,998 unique works, SUF 46, Plaintiffs' expert has opined that ███████████████████████████████████████████████████████████████████████████████ Kearney Dec. ¶ 6.a & Ex. 5; Ex. 16. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[14] Such torrents can, and often do, contain multiple works.[15] But because each notice specified only one particular work (Artist/Title pair),

---

[14] Plaintiffs' expert explains ███████████████████████████████████████████████████ An "Info Hash" is a unique identifier of a BitTorrent metadata file. *Id.* ¶ 15.c & Ex. 14.

[15] For example, Plaintiffs sent notices for *one* sound recording by "Weird Al Yankovic," a song titled "Another One Rides the Bus." Kearney Dec. ¶¶ 30 & Ex. 29; ¶ 38. Following discovery, it appears that the torrent associated with that track also contained other works never identified in

the opaque reference to an info hash in the notice did not on its face disclose that other works might have been on the subscriber's computer.[16] To understand that in fact multiple other works *might* be at issue, Cox would have to (1) guess that the RIAA intended to give notice about works other than the one actually identified; (2) go online and, using the hash value from the notice, locate a copy of the metadata file that the hash referred to; and (3) use the metadata file to download a copy of the shared file (infringing Plaintiff's copyright in the process) to identify the entirety of its contents. The task is so complex that Plaintiffs had to hire an expert to do it. Kearney Dec. ¶ 6.a & Ex. 5; ¶ 17, 17.b & Ex. 16. His report, which runs to 48 pages, ██████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████[17] Such a detailed and extremely burdensome investigation and analysis of the hundreds of thousands of notices sent by Plaintiffs would have been inconceivable, not only because of the sheer size of the task, but because necessary information about copyright ownership is non-public and unavailable to Cox. In any event, a defendant is not required to do extensive research and analysis to determine whether infringement is occurring. S*ee, e.g., VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 746 (9th Cir. 2019) (no vicarious liability where "ferreting out claimed infringement … was beyond hunting for a needle in a

---

notices. *Id.* ¶ 40 & Ex. 34; ¶ 30 & Ex. 29. As a result, Plaintiffs seek to hold Cox liable for infringement of a staggering *117* sound recordings and *7* musical compositions, based on their notice identifying this *single* work. *Id.*

[16] Even if the RIAA Notices were interpreted as giving notice of an *entire* album by identifying a single song with the same name—i.e., if the single song also happened to be the title of an album—the notices still fail to identify the vast majority of works at issue. Based on Cox's review of Plaintiffs' notices, it appears that *even if* a song is taken to refer to an album of the same name—although Plaintiffs' notices gave no hint that was the case—the notices still identified only approximately 2,288 tracks. Kearney Dec. ¶ 29.

[17] These notices were also insufficient to give Cox notice under the Digital Millennium Copyright Act, since "to be effective … a notification of claimed infringement must … include: [i]dentification of the copyrighted work claimed to have been infringed[.]" 17 U.S.C. § 512(c)(3)(A)(ii).

haystack").

Nor is Cox vicariously liable for alleged infringements by its subscribers unless it had, in addition to "a legal right to stop or limit the directly infringing conduct … the *practical ability* to do so." *Zillow*, 918 F.3d 723, 746 (9th Cir. 2019) (citation omitted, emphasis added). Cox was not on notice that unnamed, unidentified sound recordings were being infringed, and Plaintiffs cannot show that Cox had the practical ability to supervise infringing acts of which it was unaware.

The RIAA and its agent MarkMonitor knew which additional works were implicated by the *single* work they chose to identify. They could easily have notified Cox of the additional works for which they now belatedly seek windfall statutory damages. They chose not to do so. Accordingly, the Court should grant summary judgment in Cox's favor as to the alleged sound recordings and musical compositions that were not identified in the RIAA Notices.

**B.      The Publisher Plaintiffs failed to notify Cox about any infringements.**

It is undisputed that the 36 Publisher Plaintiffs, who collectively assert infringement of 3,421 copyrighted musical compositions, never sent any infringement notices to Cox. Instead, they rely on notices that the RIAA sent on behalf of someone else—the Label Plaintiffs. But those notices identified *only* sound recordings, and were insufficient to notify Cox of infringements of musical compositions.

"Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights." *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1248-1249 (C.D. Cal. 2002). The law is clear that without actual knowledge of, or willful blindness to, *specific* infringements of *identified* copyrighted works, Cox cannot be held contributorily liable. *BMG II* at 307. Because the RIAA Notices lacked sufficient information for Cox to identify musical composition copyrights, the Publisher Plaintiffs' contributory infringement claims fail.

25

1.   **There is no evidence that Cox possessed actual knowledge of infringe-ment of any musical composition, and constructive knowledge is insuf-ficient as a matter of law.**

If a defendant "did not have appropriately specific information necessary to take simple measures to remedy the violation," it cannot be held liable for contributory infringement. *VHT*, 918 F.3d at 745. The RIAA Notices provided no reasonable way for Cox to determine which, if any, music compositions might have been infringed when an allegedly infringing sound recording was copied, depriving Cox of the ability to "take simple measures" to remedy any infringement.

Indeed, the RIAA Notices claimed only to "have identified a user on [Cox's] network re-producing or distributing an unauthorized copy *of a copyrighted sound recording*." Kearney Dec. Ex. 32 (sample RIAA Notice) (emphasis added). And, while the notices are in a standardized, machine-readable format that purports to provide the title of the sound recording allegedly in-fringed, nothing in them purports to identify any underlying composition. SUF 41, 42, 43.

```
        <Content>
                <Item>
                        <TimeStamp>2013-06-16T07:29:12.60Z</TimeStamp>=20
                        <Title>MOTIVATION</Title>=20
                        <Artist>KELLY ROWLAND</Artist>
                        <FileName>Kelly Rowland - Motivation (feat. Lil Wayne) [2011-Single][=
MJN]</FileName>=20
                        <FileSize>9409268</FileSize>=20
                        <Type>Music</Type>=20
                        <Hash Type=3D"SHA1">0D1667906FCD5EF758BC8590435AB0B98874C73D</Hash>
                </Item>
        </Content>
```

Kearney Dec. Ex. 32 (detail of exemplary notice).

Further, the notices stated that the RIAA was "authorized to act on behalf of its member companies in matters involving the infringement of their sound recordings[.]" *See, e.g., id.* The RIAA Notices do *not* claim that the RIAA was authorized to send notices on behalf of the Publisher Plaintiffs, ▮▮▮▮▮▮▮ SUF 47.

Nor are the RIAA Notices sufficient to implicitly identify any musical compositions underlying a given sound recording. Determining which, if any, musical compositions may underlie a particular sound recording is no simple matter: it may require extensive research on a work-by-work basis, and may not even be possible without information solely in the possession of Plaintiffs. Among other possibilities:

- a sound recording may implicate a single musical composition copyright; multiple composition copyrights;[18] or none at all.[19]

- a sound recording may or may not have the same title as the underlying composition(s);

- a sound recording may include samples from dozens or even hundreds—or more—of musical compositions, none of which share the title of the sound recording; and

- a sound recording may have a common title—such as "Motivation" in the example pictured above—that is shared by multiple distinct musical compositions registered with the Copyright Office.[20] Plaintiffs' list of allegedly infringed sound recordings in this case illustrates the problem, with multiple alleged works having generic titles like "Intro" (6 tracks) or commonplace titles like "Home" (4 tracks).[21]

In short, the RIAA Notices do not provide a basis for the Publisher Plaintiffs to belatedly "pile on" infringement claims, long after the fact, and seek an additional $513 million in statutory

---

[18] *See, e.g.*, ECF 172-1 entry 6999 ("Medley: Sexy Ladies / Let Me Talk to You (Prelude)"); *id.* entry 2943 ("Close Encounters of the Third Kind/When You Wish Upon a Star Medley")

[19] Several of Plaintiff's alleged works are readily identifiable as recorded versions of public domain songs, including two versions of "Silent Night" (ECF 172-1 entries 301 and 5181), a medley of "Deck the Halls" and Silent Night" (*id.* entry 362), and a medley of Deck the Halls and The Twelve Days of Christmas (*id.* entry 441).

[20] In the example pictured above, Plaintiffs' notice alleges that a sound recording titled "Motivation," performed by artist Kelly Rowland, was infringed by a file named "Kelly Rowland – Motivation (feat. Lil Wayne) [2011-Single] [MJN]." A search of Copyright Office records online shows 29 registrations for musical works titled "Motivation" since 1978, none of them authored by Kelly Rowland. Kearney Dec. ¶ 33.

[21] Plaintiffs' Complaint lists 6 different sound recordings and 4 different musical compositions with the title "Intro," as well as 3 sound recordings and 1 musical composition called "Untitled," and 5 different sound recordings and 2 different musical compositions titled "Home." ECF 172-1, 172-2. Plaintiffs sent notices to Cox identifying 4 different title-and-artist combinations with the title "Home," but by different artists. Plaintiffs_00286430.

damages for 3,421 musical compositions for which they completely failed to provide notice. The law does not require Cox to undertake the complex analysis that would have been required to identify musical composition copyrights that *may* have been infringed by a particular sound recording. *See Luvdarts, LLC*, 710 F.3d at 1073 (rejecting notices as insufficient that "do not identify which of the[] titles were infringed, who infringed them, or when the infringement occurred").

Plaintiffs' evidence is insufficient to establish Cox's liability for contributory infringement of musical compositions, *see BMG II* at 308 and n.4; the Court should grant summary judgment.

### C. There is no evidence that Cox was willfully blind to infringement of sound recordings not identified in any notice, or any musical compositions.

A finding of willful blindness "requires that the infringing party (1) subjectively believed that infringement was likely occurring on their networks and that they (2) took deliberate actions to avoid learning about the infringement." *Zillow.*, 918 F.3d at 748 (internal quotation omitted). The willful blindness standard generally does not impose an "affirmative duty to monitor" or investigate potential infringement on a recipient of copyright notices. *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 25 (2d Cir. 2012). Even if there were any evidence that Cox held the required "subjective belief" as to infringement of sound recordings not identified in any notice, there is certainly no evidence that Cox "took deliberate actions to avoid learning about the infringement[s]" for which Plaintiffs provided no notice whatsoever.

For the same reasons, Plaintiffs have no evidence that Cox subjectively believed that infringement of *any* of Plaintiffs' alleged musical composition copyrights "was likely occurring on" its network. That is particularly true because the RIAA Notices stated that they pertained *only* to sound recordings, were sent *only* on behalf of the Label Plaintiffs, *and* provided *no* reasonable way for Cox to determine which, if any, music compositions might also have been infringed. Again, even if there were any evidence of such a subjective belief, there is certainly no evidence that Cox

"took deliberate actions to avoid learning about the infringement" of the Publisher Plaintiffs' musical compositions. They could have sent their own notices to Cox, or the RIAA could have obtained authorization to send notices on their behalf. Either course of conduct could have notified Cox that particular additional copyrights were at issue. Because they failed to do either, Cox was not willfully blind to specific infringements of any musical compositions in suit.

### III. Plaintiffs failed to provide sufficient notice of alleged infringement by Cox Business subscribers.

Certain of Plaintiffs' claims relate to Cox's liability for alleged infringement by users of networks supported by Cox's "Cox Business" broadband services. Cox Business subscribers include large and small organizations whose networks may be used by dozens, hundreds, or thousands of end users. But Plaintiffs' evidence only identifies alleged infringers by the IP address of the Cox Business subscriber, which is shared by every end user on the business' network. As such, identification of a Cox Business IP Address where infringement is allegedly occurring is not sufficient to identify anyone who actually engaged in alleged infringement. That failure of evidence dooms these claims.

In the only decision to have considered the issue, the Ninth Circuit held that a plaintiff cannot make a claim of direct or contributory copyright infringement against a broadband subscriber merely by identifying the IP address of a business where some unidentified person has engaged in infringing activity. *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142 (9th Cir. 2018). *A fortiori*, if a business cannot be held liable for copyright infringement merely because some unidentified person is infringing on the network located at the business's IP address, then such evidence is insufficient to prove contributory infringement by an ISP that merely provides broadband services to the IP address registered to that business.

**A.      Evidence that infringement has occurred at a Cox Business subscriber's IP address is insufficient to support liability for infringement by the Cox Business subscriber.**

Proving the predicate act of direct infringement necessarily requires proof that a particular person did the infringing. *See, e.g.*, *Cobbler,* 901 F.3d at 1147 (to prove direct infringement, a plaintiff "must show that … the defendant himself violated" the copyright statute) With respect to alleged infringement by Cox Business subscribers, Plaintiffs have no such proof.

The only evidence of any Cox Business subscriber's direct infringement consists of "Evidence Packages" purporting to show that acts of infringement occurred at an IP address registered to a Cox Business subscriber. But Cox Business subscribers are (unsurprisingly) businesses. They operate networks which, in turn, provide internet access to multiple end users. Kearney Dec. ¶ 54 & Ex. 53. All of a Cox Business subscriber's end users access the internet using the same IP address—the one assigned to the business subscriber. *Id.* If the subscriber is (for example) a public university, then that single IP address would be associated with thousands of individual students, faculty, visitors, and employees. *Id.*

Plaintiffs' inability to prove *which* user of a particular Cox Business subscriber's IP address purportedly infringed a particular copyright is fatal to their direct infringement claims. In *Cobbler* the copyright owner traced apparent infringement to a particular IP address assigned to defendant Gonzales, whose account provided Internet service for residents of and visitors to the adult foster care home he operated. *Id.* at 1145. The plaintiff sought to hold Gonzales liable for direct infringement "by copying and distributing works himself," or in the alternative, for contributory infringement because he had failed to secure his internet connection. *Id.*

The district court dismissed the direct infringement claim on the pleadings, and the Ninth Circuit affirmed. The court explained that "[t]o establish a claim of copyright infringement," a plaintiff "must show that … *the defendant himself* violated one or more of the plaintiff's exclusive

rights under the Copyright Act." *Id*. at 1147 (emphasis added; internal quotation omitted). Plaintiff could not make that showing, because the defendant's IP address "did not permit identification of a specific party that is likely to be the infringer." *Id*. (quotation omitted). Because of this inherent uncertainty, the Ninth Circuit held that "an allegation that a defendant is the registered subscriber of an Internet Protocol ('IP') address associated with infringing activity" is insufficient to state a claim for direct infringement against the subscriber. *Cobbler*, 901 F.3d 1142. Notwithstanding the more than 400 infringement notices received by the *Cobbler* defendant, the Ninth Circuit also concluded that, under the circumstances, a claim for contributory infringement on his part was not sustainable, because "a bare allegation that Gonzales failed to police his internet service … does not sufficiently link Gonzales to the alleged infringement." *Id.* at 1147-1148.

The defects that were fatal to the direct and contributory infringement claims in *Cobbler* are equally fatal here. Cox Business customers, like the nursing home operator in *Cobbler*, provide Internet service to their employees, customers, guests, and visitors. Kearney Dec. ¶ 54.a, b, c & Ex. 43. Here, as in *Cobbler*, there is no evidence establishing a connection between any act of infringement and the Cox Business subscriber itself (beyond a generalized allegation that the subscriber failed to police its network), nor is there any evidence connecting any alleged act of infringement to any particular user of the subscriber's IP address. For precisely the reasons cited by the Ninth Circuit in *Cobbler*, mere evidences that a Cox Business subscriber's IP address has been used by someone to engage in infringement is insufficient to show that either any end-user or the business subscriber itself is a direct or contributory infringer. Absent proof of direct infringement by *someone*, no claim of contributory infringement by Cox can be sustained.

### B.   Cox cannot be held contributorily liable for the infringing conduct of unspecified individuals using the networks of its business subscribers.

Of necessity, if the Cox Business subscribers cannot be held liable for direct infringement

31

occurring on the networks that they administer, Cox cannot be held liable for that behavior merely because it connects the networks of Cox Business subscribers to the internet. In *BMG*, the Fourth Circuit specifically precluded expansion of the contributory infringement doctrine to Cox in its role as an internet service provider merely because it had "generalized knowledge …that infringement was occurring somewhere on its network." *BMG II* at 311. Such knowledge "is exactly what falls short" of the kind necessary to prove contributory infringement. *Id*.

## IV.    Cox Is Entitled to Summary Judgment of No Vicarious Liability.

Vicarious liability is "[a] variant on *respondeat superior*," by which a defendant may be held "accountable for third-party infringement if he (1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited copyrighted materials." *BMG I* at 673 (quotation omitted). Plaintiffs cannot prevail on their vicarious liability claims here, because they cannot provide evidence that Cox had a "direct financial interest" in the alleged infringement. And regarding alleged infringement by Cox Business subscribers, the undisputed evidence establishes that Cox lacked the ability to supervise or control it.

### A.    Plaintiffs have no evidence that Cox derives a direct financial benefit from any alleged infringements of Plaintiffs' works by Cox's subscribers.

Plaintiffs cannot show that Cox has a direct financial interest in the alleged infringements of Plaintiffs' works. The necessary "direct financial interest" requires proof of a "causal relationship" between "the infringing activities *at issue in th[e] case* and a direct financial benefit to the defendant." *BMG I* at 675-76 (emphasis in original) (quotation omitted).

Plaintiffs cannot establish any such "causal relationship." It is undisputed that the only

revenue Cox received from its subscribers was a monthly subscription fee.[22] While Cox offered different levels of service to meet the needs of its subscribers, and charged different flat rates for the different levels, Cox's revenues from these flat-rate subscriptions did not depend on the manner or purpose for which its subscribers used the service.[23] SUF 2; Kearney Dec. ¶ 55 & Ex. 44-51. In general, a flat fee-for-subscription revenue model is not sufficient to establish the necessary causal relationship with infringement by subscribers. As this Court explained in *BMG*, "flat periodic payments for service . . . ordinarily would not constitute receiving a financial benefit directly attributable to the infringing activity." *BMG I* at 676 (quotation omitted). The Court went on to explain that because "Cox provides a content-neutral commercial service that makes a wide selection of services and activities available to its subscribers … [and] charges the same flat monthly fees to its users whether they use Cox's service for infringing or non-infringing purposes … the relevant inquiry … is whether the infringing activity constitutes *a draw for [Cox's] subscribers*, not just an added benefit." *BMG I* at 676 (emphasis added) (citations and internal quotation marks omitted). Without evidence that "some portion of [Cox's] fees is generated from subscribers that are drawn to Cox's service at least in part *because* of the infringing activity alleged *in this case* … the requisite causal connection between the benefit and the infringing activity is not established." *Id*. (emphasis added). *See also, e.g.*, *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673-74 (9th Cir.

---

[22] Plaintiffs sought, and Cox produced, revenue reports for the Cox subscribers who were accused by Plaintiffs of copyright infringement during the Claims Period. These reports demonstrate that Cox charged a flat fee for service, which was unaffected by the alleged infringements of Plaintiffs' works. SUF 2; Kearney Dec. ¶ 55 & Ex. 44-51. The reports also show that Cox did not receive ongoing revenues from subscribers Cox terminated for copyright infringement. *Id.*

[23] In addition to offering different connection speeds, some of Cox's offerings during the Claims Period let subscribers use a certain amount of data a month. It is undisputed that during the Claims Period Cox did not charge a fee to users who used more than that amount. SUF 3.

2017);[24] *Ellison,* 357 F.3d at 1079; *UMG Recordings, Inc. v. Grande Communs. Networks, LLC*, 2018 U.S. Dist. LEXIS 160492, at *9 (W.D. Tex. Sep. 20, 2018) ("Plaintiffs contend the infringing subscribers infringed the Copyrighted Sound Recordings [is] by use of the internet and the Bit-Torrent protocol, which one can access through any ISP. Again, the draw must be something more than this to state a vicarious infringement claim.").[25]

There is no evidence showing that any subscribers were drawn to Cox's service by the availability of unauthorized copies of *Plaintiffs*' works, or for that matter the availability of any infringing works. Nor that the availability of Plaintiffs' music on Cox's network enhances the value of Cox's services to subscribers, that anyone subscribed to Cox's ISP service in order to obtain unauthorized copies of Plaintiffs' works, or that anyone chose Cox's service over another because of a perceived ability to obtain copyrighted works over Cox's network. This case is thus distinguishable from *BMG*, in which the plaintiff offered a customer survey purporting to show that for some fraction of Cox subscribers, the ability to obtain free music from certain websites was one reason (among many) they subscribed to Cox's service. *BMG I* at 676. While recognizing that BMG's disputed survey evidence was "hardly overwhelming," the Court nevertheless found

---

[24] As the Ninth Circuit noted, finding that an ability to infringe copyrights *in general* constitutes a "draw" for purposes of vicarious liability would be "difficult to reconcile with Article III's standing requirements," since "a rule [that] would allow cases to be built on the rights of owners and the actions of users not before the court . . . runs counter to the requirement that there be a 'causal connection between the injury and the conduct complained of[.]'" *Giganews*, 847 F.3d at 674 (citations omitted).

[25] The requirement of a "causal connection" between infringement and financial benefit dooms Plaintiffs' theory that Cox benefited from infringement by not terminating accused subscribers and continuing to receive revenue for its ISP service. *See* Complaint ¶ 9. And Plaintiffs have zero evidence that Cox's supposed failure to terminate alleged infringers was a draw to its service. Indeed, the only available evidence is to the contrary: that Cox, virtually alone among major ISPs, *did* terminate repeat infringers. Kearney Dec. ¶ 54.d, e & Ex. 43. This is, if anything, the exact opposite of a "draw."

that it was sufficient to present a genuine fact question for the jury.[26] *Id*. Here, because Plaintiffs lack any comparable evidence—or indeed any evidence at all—to support their essentially identical claim, vicarious liability is not a "close question." *See id.* No reasonable jury would hold otherwise. The Court should grant Cox summary judgment on Plaintiffs' vicarious liability claim.

## B.   Plaintiffs have no evidence that that Cox derived a direct financial benefit from alleged infringement by Cox Business subscribers' end users

The infirmities discussed above are fatal to Plaintiffs' vicarious liability claims, including those based on Cox's relationships with both residential and Cox Business subscribers. But Plaintiffs' claims with respect to the Cox Business subscribers have multiple additional infirmities.

First, Plaintiffs cannot prove that there is any difference in the revenues Cox receives from Cox Business subscribers accused of infringement, and those not so accused. Second, there is no evidence that any of the Cox Business subscribers are themselves *direct* infringers, and Plaintiffs have no evidence showing that any Cox Business subscriber met the criteria for contributory infringement *or* vicarious liability, either. There is no dispute that individual "end users" do not pay Cox directly for their use of the Cox Business customer's system, and Cox does not directly derive any revenue from them, nor derive any benefit from any alleged infringing activities. Plaintiffs therefore cannot show the essential "causal relationship" of Cox's revenues from Cox Business subscribers to "'the infringing activities at issue in th[e] case." *BMG I* at 675-76. Plaintiffs have no evidence whatsoever that any Cox Business subscribers were "drawn" to subscribe to Cox's service so that their end users could infringe Plaintiffs' works. Nor is there evidence, nor any plausible argument, that Cox Business subscribers are likely to purchase more expensive services

---

[26] Notably, the jury ultimately found Cox not liable for vicarious infringement, a finding that was not challenged on appeal. *BMG v. Cox*, 199 F. Supp. 3d 958, 969 (E.D. Va. 2016).

so that their end users can obtain unauthorized copies of Plaintiffs' works.

### C. There is no evidence that Cox had the practical ability to supervise the alleged infringements by Cox Business subscribers' end users.

Plaintiffs' vicarious liability claims against Cox Business subscribers also fail because Cox lacked the "practical ability" to supervise the alleged infringement by those users. Vicarious liability requires "both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Zillow*, 918 F.3d at 746 (citation omitted). Under this standard, a defendant is not required to do extensive research to "ferret[] out" and stop infringement when it had only generalized notice that it was occurring. S*ee id.* (no vicarious liability where "ferreting out claimed infringement … was beyond hunting for a needle in a haystack").

The alleged infringement on Cox Business networks was perpetrated by unidentified individuals with whom Cox had no relationship. Cox had no way to "stop or limit the direct infringing conduct." It is entitled to summary judgment of no vicarious liability for that conduct.

### V. Cox Is Entitled to Summary Judgment Limiting Certain of Plaintiffs' Statutory Damages Claims to One Award per Work.

The Copyright Act provides for "an award of statutory damages for all infringements involved in the action, with respect to *any one work*[.]" 17 U.S.C. § 504(c)(1) (emphasis added). For the purposes of calculating statutory damages, "*all the parts* of a compilation … constitute one work." *Id.* (emphasis added). It is undisputed that many of the Label Plaintiffs' sound recordings were registered as compilations: not only were they registered together as albums, but the record also shows they were first released as albums. They were also registered as works made for hire, a designation available, by definition, *only* to compilations. 17 U.S.C. § 101.

### A. Plaintiffs are limited to one award of statutory damages for each album registered as a single work.

It is undisputed that the Label Plaintiffs registered and first issued 6,777 of the works-in-

suit as albums—not as individual tracks or "singles." SUF 9. "An album falls within the Act's expansive definition of compilation … [and] [b]ased on a plain reading of the statute, therefore, infringement of an album should result in only one statutory damage award." *Bryant*, 603 F.3d at 140-41. It does not matter that songs issued by the Label Plaintiffs on albums may *also* have been subsequently made available individually, such that they arguably have economic value independent of the album. The Second Circuit addressed this "independent economic value" principle in *Bryant* and squarely rejected it, explaining that because the Copyright Act "specifically states that all parts of a compilation must be treated as one work for the purpose of calculating statutory damages … [it] provides no exception for a part of a compilation that has independent economic value, and the Court will not create such an exception." *Bryant*, 603 F.3d at 142; *see also, e.g., Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1281 (11th Cir. 2015) ("[I]f the dispositive factor for whether a work has independent economic value is whether it can conceivably be sold on its own, Congress's express mandate in 17 U.S.C. § 504(c)(1) that 'all parts of a compilation [are to] constitute one work would be meaningless"). Indeed, the Copyright Act's definition of "collective work"—"a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole"—*presupposes* that each individual work in the collection has independent value. *Id.* (quoting 17 U.S.C. § 101). Allowing Plaintiffs to evade the statutory damages limitation by claiming independent economic value therefore makes no sense within the statutory scheme.

Moreover, there is no dispute that Plaintiffs' albums at issue here were registered as "works made for hire"—a designation that, by statute, is only available when *all* of the sound recordings covered by the *single* registration are parts of a *single* "compilation."

A "work made for hire" is—

> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas[.]

17 U.S.C. § 101. This form of registration provides a significant commercial advantage by establishing a corporate registrant as the work's "author" for purposes of copyright law, and precluding the work's human creators from asserting any rights in the future. Plaintiffs registered these as works-for-hire for precisely this reason.[27] *See* Kearney Dec. ¶ 9.b & Ex. 8. Plaintiffs can't have it both ways, seeking to protect their ownership of the works under one legal theory, then seeking windfall statutory damages on a different, incompatible theory.

It is undisputed that the Label Plaintiffs registered 6,766 of the 7,057 sound recordings at issue as "works made for hire." SUF 9. Of those, 6,496 are covered by 1,158 "work made for hire" registrations for multiple sound recordings (i.e., albums), and 237 are covered by registrations for a single sound recording (singles). *Id.* Plaintiffs do not claim—and lack evidence to show—that any of the recording artists were their employees. Nor can they show that any sound recordings at issue, and registered collectively as a work made for hire as an album, were "specially ordered or commissioned" as a part of an audiovisual work, nor as a translation, supplementary work, instructional text, test, answer material for a test, or atlas. That leaves only a "contribution to a collective work" or "compilation." Because "[t]he term 'compilation' includes collective works[,]" 17 U.S.C.

---

[27] Plaintiffs could have obtained ownership of the works by having artists *transfer* their copyrights to Plaintiffs, but then the artists or their heirs would have had the right to terminate the transfer after a period of time. 17 U.S.C. § 203. This termination provision does not apply to works made for hire, however. *Id.* Since there is no other plausible reason why Plaintiffs would seek work-for-hire registrations for these works, it is plain that Plaintiffs chose this form of registration so as not to risk losing a valuable asset at some future time.

§ 101, Plaintiffs' election of work-for-hire registrations for these sound recordings means that, by operation of law, they *cannot be anything but* compilations. Moreover, Plaintiffs' own copyright registrations "constitute prima facie evidence of … the facts stated in the certificate[s]" in "judicial proceedings." 17 U.S.C. § 410(c). There can be no reasonable dispute that Plaintiffs intentionally registered these sound recordings as compilations. They are bound by their choice.

Whether these sound recordings are deemed part of compilations because they are albums, or because they are registered as works made for hire—they are both—Plaintiffs are limited by the plain language of the Copyright Act to at most one statutory damages award for each such copyright registration. *See, e.g.*, *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 (4th Cir. 2003), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *Sullivan v. Flora, Inc.*, Nos. 17-2241, 18-2534, 2019 U.S. App. LEXIS 24928, at *11 (7th Cir. Aug. 21, 2019).

### B. Plaintiffs are not entitled to separate statutory damages awards for a sound recording and the music composition it embodies.

Courts routinely hold that a sound recording and the music composition it embodies are a *single work* for purposes of calculating statutory damages. *See, e.g.*, *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 94 (2d Cir. 2016); *Capitol Records, Inc. v. MP3Tunes, LLC*, 28 F. Supp. 3d 190, 191–92 (S.D.N.Y. 2014).

In *Capitol Records*, the court held that when the defendants "infringed the copyright covering a sound recording and music composition for the same song, they infringed only one work because the infringement was directed at the sound recording and the music composition was not exploited separately." *Capitol Records, Inc.*, 28 F. Supp. at 192; *see also Spooner v. EEN, Inc.*, No. 08 Civ. 262, 2010 WL 1930239, at *5 (D. Me. May 11, 2010). As the Second Circuit has explained, "[a] plain reading of the Copyright Act's text supports" a finding "that the plaintiffs could recover only one statutory damages award for a musical composition and its corresponding

sound recording, even where the composition and the recording were owned by separate plain-tiffs." *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 94-95 (2d Cir. 2016).[28] A contrary rule—that infringement of a single sound recording could entitle multiple plaintiffs to multiple statutory damages awards—could easily lead to absurd, unfair, and unpredictable results, as a single act of infringement could expose a defendant to one, two, or hundreds of separate stat-utory damages awards. In the age of sampling, this is no mere theoretical possibility.

Here, Plaintiffs allege that Cox's subscribers downloaded sound recordings—not musical compositions, such as song lyrics or sheet music. Moreover, Plaintiffs concede that the great ma-jority of the Publisher Plaintiffs' musical compositions—2,556 of them—are embodied in alleg-edly infringed sound recordings that are also at issue.[29] Plaintiffs are therefore not entitled to sep-arate awards of statutory damages for (at least) these 2,556 musical compositions, as they are part of the same "work" as the asserted sound recording.[30]

For these reasons, Cox respectfully requests that the Court grant this motion.

Dated: August 30, 2019

Respectfully submitted,

*/s/ Thomas M. Buchanan*
Thomas M. Buchanan (VSB No. 21530)
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787

---

[28] *See also id.* at 95 (quoting with approval Patry on Copyright § 22:186: "Sound recordings are defined in section 101 as a species of derivative work of the underlying musical composition, and, as such, both fall within the one work, one award rule for statutory damages that only award[s] for infringement of both works … regardless of whether there are different owners.").

[29] Kearney Dec. ¶ 53 & Ex. 42.

[30] The number of "works" for purposes of calculating statutory damages is further reduced because sound recordings were either included on albums registered as "works made for hire" or otherwise issued as parts of an album. *See supra* § V.A.

Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.
and CoxCom, LLC*

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone:  (212) 294-6700
Facsimile:   (212) 294-4700
Email: melkin@winston.com
Email: tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
Thomas Kearney (*pro hac vice pending*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA  94111-5840
Telephone:  (415) 591-1000
Facsimile:   (415) 591-1400
Email: jgolinveaux@winston.com
Email: tkearney@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Telephone:  (213) 615-1700
Facsimile:   (213) 615-1750
Email: dhleiden@winston.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2019, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users.

*/s/ Thomas M. Buchanan*
Thomas M. Buchanan (VSB No. 21530)
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc. and CoxCom, LLC*