**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

SONY MUSIC ENTERTAINMENT, *et al.*,

        *Plaintiffs*,

        v.

COX COMMUNICATIONS, INC., *et al.*,

        *Defendants.*

Case No. 1:18-cv-00950-LO-JFA

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR DISCOVERY SANCTIONS AND TO**
**PRECLUDE PLAINTIFFS' USE OF MARKMONITOR EVIDENCE**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. THE MISSING AUDIBLE MAGIC DATA IS RELEVANT AND MATERIAL
TO PLAINTIFFS' DIRECT INFRINGEMENT CLAIMS ................................. 3

    A. The Missing Data is Relevant to Whether the Allegedly Infringing Files
"Matched" Plaintiffs' Works ................................................................... 3

    B. The Small Amount of Data that Was Retained Demonstrates that Files
Were Erroneously Recorded as Matching Plaintiffs' Works.................... 6

    C. The Missing Audible Magic Data Is Material to Whether Files Were
Verified at the Time that Infringement Notices Were Sent to Cox ......... 9

    D. Plaintiffs' Contention that Cox Could Have Confirmed Matches by
Listening to Audio Files on a Hard Drive Produced by Plaintiffs is Both
Irrelevant and Demonstrably False ....................................................... 11

III. THE COURT SHOULD PRECLUDE PLAINTIFFS' USE OF ANY VERSION
OF THE MARKMONITOR SPREADSHEET ............................................... 13

    A. Evidentiary Sanctions Are Appropriate Because Plaintiffs Failed to
Preserve Material Evidence ................................................................... 13

        1. Plaintiffs and MarkMonitor Had a Duty to Retain the Relevant
Data ........................................................................................... 13

        2. The Destruction of Data in this Case was not Inadvertent........ 16

    B. In the Alternative, Plaintiffs Should Not Be Permitted to Rely on the
MarkMonitor Spreadsheet Because it is a Summary, and the Underlying
Data Was Destroyed ............................................................................. 18

        1. The MarkMonitor Spreadsheet is a Summary ......................... 18

        2. The Audible Magic Data Summarized by the MarkMonitor
Spreadsheet Was Destroyed and Cannot Possibly Be Made
Available for "Examination or Copying" ................................. 20

IV. CONCLUSION ............................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
   149 F. Supp. 3d 634 (E.D. Va. 2015), aff'd in part, rev'd in part, 881 F.3d 293
   (4th Cir. 2018)...................................................................................................................1, 16

*U.S. ex rel. Bunk v. Birkart Globistics GmbH & Co.*,
   2011 WL 5005313 (E.D. Va. Oct. 19, 2011).........................................................................18

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   803 F. Supp. 2d 469 (E.D. Va. 2011) ...................................................................................17

*E.I. DuPont De Nemours & Co. v. Kolon Indus., Inc.*,
   2011 WL 1597528 (E.D. Va. Apr. 27, 2011) ................................................................13, 14

*Ganz Bros. Toys v. Midwest Importers of Cannon Falls, Inc.*,
   834 F. Supp. 896 (E.D. Va. 1993) ........................................................................................12

*Last Atlantis Capital LLC v. AGS Specialist Partners*,
   262 F. Supp. 3d 641 (N.D. Ill. 2017) ...............................................................................19, 20

*Trigon Ins. Co. v. United States*,
   204 F.R.D. 277 (E.D. Va. 2001) ....................................................................................13, 16

*Turner v. U.S.*,
   736 F.3d 274 (4th Cir. 2013) ...............................................................................................13

*United States v. Mermelstein*,
   487 F. Supp. 2d 242 (E.D.N.Y. 2007) ..................................................................................20

**Other Authorities**

Fed. R. Evid. 1006 .........................................................................................................3, 18, 19, 20

## I.    INTRODUCTION

Plaintiffs do not dispute that their agent, MarkMonitor, continuously received and routinely destroyed numerous categories of data supplied by Audible Magic as part of the audio verification process both prior to and during Plaintiffs' claims period. Because Plaintiffs and MarkMonitor had a duty to retain this data and because it is unquestionably relevant to what Plaintiffs concede is "the crucial link between the files 'shared' by Cox subscribers and Plaintiffs' copyrighted works," Cox's motion to preclude the MarkMonitor Spreadsheet and any testimony relying on them should be granted.

Plaintiffs' excuses for their conduct are unavailing.

First, their claim that they had no reason to anticipate that the missing data would be needed for litigation is, to put it politely, surprising. The foundational agreement between MarkMonitor and the RIAA (dated December 2011) is explicit that one of MarkMonitor's responsibilities was

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████[1]

Moreover, Plaintiffs concede that the MarkMonitor Spreadsheet is not only the "crucial link" between their works and the alleged infringements, but that their "case is organized around it." The reason for this is simple: Rather than pay an agent to verify infringement by downloading full infringing files from subscriber computers (as BMG hired Rightscorp to do in the *BMG v. Cox*

---

[1] *See* Declaration of Diana Hughes Leiden (ECF No. 238-1) ("Leiden Decl."), Ex. U (2011 Master Agreement, ¶ 2.1 - 2.2).

case), Plaintiffs elected from the beginning to save money by relying solely on MarkMonitor's records of Audible Magic's "matching" evidence to make this "crucial link" in their direct infringement proof.  This means, of course, that Plaintiffs have been on notice since day one that these records should be preserved for the purposes of litigation.

Plaintiffs' insistence that the destroyed Audible Magic data was "superfluous" is equally insupportable.  MarkMonitor freely admits that it destroyed data ███████████████████████ ████████████████████████████████████████████████████████████████████ ███████████  Plaintiffs argue that such data was unnecessary because *other* data that was maintained was sufficient to show that a match had been made.  But, critically, the discarded data and the retained data are inconsistent.  The '236 Spreadsheet ████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████. And there are multiple entries where ████████████████████████████████████████ ███████████████████████████████████████████████████████████████████. In other words, the spoliated data shows that, at least in some instances, ████████████████ ████████████████████████████████  How often that happened is unknowable because the data is gone.  But the materiality of the missing data cannot be disputed.

Because Plaintiffs and their agent failed to preserve and therefore spoliated material evidence they knew they should have retained, the Court should issue evidentiary sanctions precluding Plaintiffs from relying on the MarkMonitor Spreadsheet.  But even if this case were not an instance of spoliation, the MarkMonitor Spreadsheet should be precluded because the data underlying that summary was properly requested, but was not produced in discovery, as required

by Fed. R. Evid. 1006.  Therefore, even if the Court does not impose spoliation sanctions, it should

preclude Plaintiffs' reliance on the MarkMonitor Spreadsheet because of their discovery failures.

## II.    THE MISSING AUDIBLE MAGIC DATA IS RELEVANT AND MATERIAL TO PLAINTIFFS' DIRECT INFRINGEMENT CLAIMS

Plaintiffs do not dispute that the data at issue in Cox's motion was destroyed by

MarkMonitor.  Instead, Plaintiffs' opposition brief focuses on the argument that the missing

Audible Magic data at issue is "superfluous" and "irrelevant" to whether there was a "match"

between a "suspect file" and "the fingerprint of a copyrighted work."  They contend that:

> Audible Magic provided MarkMonitor with a 'yes' or 'no' answer as to whether there was a match.  If yes, Audible Magic provided ████████████ ████████████ which was retained by MarkMonitor.  At that point, MarkMonitor had the relevant information—the works contained in the infringing files matched the works owned by the Plaintiffs.

Opp'n at 3.  This is simply not true.  Indeed, to the extent that a simply "yes or no" answer was

received from Audible Magic, exactly that data was discarded.

### A.    The Missing Data is Relevant to Whether the Allegedly Infringing Files "Matched" Plaintiffs' Works

The MarkMonitor Spreadsheet ████████████████



████████ .  *See* Mot. at 6.  Plaintiffs' experts relied on ████████████ *Id*.

Plaintiffs, MarkMonitor, and Audible Magic ████████████ ████████████ Opp'n at 12; Ikezoye Decl., ¶ 11; Bahun Decl., ¶¶ 22-23. ████████████ Instead, Audible Magic provided ████████

████████████, Ikezoye Decl., ¶ 13, and ███████████████████████████ ████████████████.[2] Thus, the accuracy of █████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ ███████████████████████████████████████████ ██████████, yet all of it is directly relevant to whether the works purportedly located on the computers of Cox subscribers ██████████████████████████. Indeed, the missing fields of data were, in several instances, ███████████████████████████████████████ ████████████████████████████████████████████████████████. We discuss two exemplary fields here.

Plaintiffs' expert, Barbara Frederiksen-Cross, has acknowledged that, in response to a matching inquiry from MarkMonitor, ██████████████████████████████████████ ████████████████████████████████████████████████[4] MarkMonitor's 30(b)(6) technical witness testified that ████████████████████████████ ████████████████████████████████████████████████████████ ██████[5] Audible Magic itself describes ██████████████████



[2] Leiden Decl., Ex. W (Frederiksen-Cross Initial Report, ¶ 153); Ex. J (Paszkowski Dep. at 89:17-22).
[3] Leiden Decl., Ex. O (REV00003444); *see also* Ex. J (Paszkowski, Dep., 81:6-14).
[4] Leiden Decl., Ex. W (Frederiksen-Cross Rpt., ¶69).
[5] Leiden Decl., Ex. J, (Paszkowski Dep., 80:22-81:5).

Ikezoye Decl., ¶ 14 (emphasis added).  In short, ██████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████   As such, it was manifestly material and should not have been destroyed.

Apparently recognizing the centrality of the destroyed ████████████, Plaintiffs argue

that ██████████████████████████████████████████████████████████████████████

██████████████████████████████████, which MarkMonitor did

retain.  *See* Opp'n at 11.  But the declaration they submit from Audible Magic is explicit in

acknowledging that Plaintiffs have it backwards.  Audible Magic's ability to ████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████   In the words of Ikezoye, ████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████   Ikezoye Decl., ¶ 14.  Thus, when Audible Magic sent

MarkMonitor ██████████████████████████████████████████████████████

██████████████████.  Thus, there is no foundation for the ████████████████

████████████████████████████████████████████████████████████████████████

██████████████   Audible Magic routinely supplied MarkMonitor with ████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████

Another manifestly material piece of spoliated data is ████████████████ reported by

Audible Magic.  This data represents ██████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████   ██████████████████████████████████████████████████

██████████████████████████████████   Bahun Decl., ¶ 21 (emphasis added).

Of necessity, therefore, if there is no ██████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* The significance of this data was

further explained by a consultant who audited the effectiveness of MarkMonitor's system:



Thus, these fields contain data that ███████████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████. And they provide the "driver's license" that ████████████

█████████████████████████████. Accordingly, Plaintiffs' repeated argument that

these additional fields are "superfluous" and "irrelevant" to the question of whether an allegedly

infringing file matched an Audible Magic reference fingerprint is inconsistent with how

MarkMonitor and Audible Magic themselves define and describe these data fields. Moreover, it

begs the question—if all of these Audible Magic fields were unnecessary, why did Audible Magic

compile them in the first place, and why did MarkMonitor ██████████████████████?

**B.   The Small Amount of Data that Was Retained Demonstrates that Files Were Erroneously Recorded as Matching Plaintiffs' Works**

The version of the MarkMonitor Spreadsheet relied on by Plaintiffs experts (the '431

Spreadsheet) includes neither the Audible Magic ████████████████████████████████

---

[6] Gould Ex. 2, (Stroz Friedberg, *Independent Expert Assessment of MarkMonitor AntiPiracy Methodologies*, at RIAA_00127775).

████████████████████████████████████.  However, the '236 Spreadsheet, which is an earlier version of the '431 Spreadsheet that was produced by MarkMonitor, ████████████████████ ████████████████████.  *See* Mot. at 12.  The extract below juxtaposes extracts from the '236 and '431 Spreadsheets and shows what is missing from the '431 Spreadsheet produced by Plaintiffs and relied upon by their experts:

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

A review of what is in the data fields missing from the '431 Spreadsheet, but in the '236 Spreadsheet seriously calls into question the accuracy of the "yes" or "no" answers that dictated whether a notice was sent to Cox.

Specifically, for a substantial number of files, ████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ even though all of these files were



. This is illustrated in Exhibit A, a portion of which is reproduced below:[7]

[8]  The fact that MarkMonitor

and, at a very minimum, Plaintiffs

and their agent MarkMonitor should have preserved and produced this data for *all* of the works in

suit so that Cox and its experts could have analyzed the accuracy                    "[9] and

---

[7] Declaration of Michael L. Brody, Ex. A (Matching Data Excerpts of MM000236).  In addition,

Mot. at 12.

[8]

[9]

jurors could have decided for themselves which evidence was the more probative. Similarly, the

fact that ████████████████████████████████████████████████ raises at

least a question that a juror would want to answer about whether such a fingerprint was matched

at all. And since the ██████████████████████████████████████████████████

██████████████████████ a juror might have wanted to see it to confirm the match. Parties to a

litigation are not permitted to preempt the jury's fact-finding role by destroying the evidence that

is adverse to them in advance of trial.

> ### C. The Missing Audible Magic Data Is Material to Whether Files Were Verified at the Time that Infringement Notices Were Sent to Cox

As Cox pointed out in its opening brief, neither version of the MarkMonitor Spreadsheet

provided to Cox demonstrates that the files at issue were verified at the time that infringement

notices were sent to Cox. Mot. at 14-15. That information could have been determined ██████

███████████████████████████████████████████████████████████, [10]

but none of this data was retained, ███████████████████████████████████████

██████████████████████████ In response, Plaintiffs dismiss the significance of this fact

by noting that "[a] file that is confirmed to be infringing in 2008-2011 is still infringing when a

Cox subscriber is found downloading or distributing it in the Claim Period." Opp'n at 12. But,

the premise implicit in this argument that the MarkMonitor Spreadsheet shows which of the works

was matched to a fingerprint either *before* or *during* the claims period—is false. In fact,

MarkMonitor █████████████████████████████████████████████████████████████

██████████.[11] And the MarkMonitor Spreadsheet records only ███████████████████

---

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████████████████ Bahun Decl., ¶ 26.

[10] Leiden Decl., Ex. O (Audible Magic Spreadsheet).
[11] Leiden Decl., Ex. J (Paszkowski Dep. at 123:17-124:10, 125:6-13).

██████████████████████████████████████████████.  *See* Mot. at 2.  As a consequence, MarkMonitor's witness testified explicitly that █████████████████████████████████████ ██████████████.[12]  Therefore, without the Audible Magic data that Plaintiffs concede was not captured until 2015, there is no way to determine from the MarkMonitor Spreadsheet how many of the recorded matches were ███████████████████████████████████████ during which notices were being sent to Cox.

This opacity in the data reported in the '431 Spreadsheet is particularly concerning because the best substitute for the missing data indicates that allegedly infringing files were not, in fact, ██████████████████████████████████████████.  Audible Magic's ████████████████████████ ██████████████████████████████████████████—that is, the data that MarkMonitor spoliated—████████████████████████████████████████████████████████████ ██████████████████████████████████.  He determined that ████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████  *See* Mot. at 11-12.  Presumably, MarkMonitor's discarded copy of the data would match Audible Magic's.  Accordingly, the missing data would, at the very least, be relevant to the question of ██████████████████████████████████████████████████████████████████████.

Plaintiffs dismiss this notion by claiming that "[i]t makes perfect sense that the … [Audible Magic's 2012-2014] spreadsheet would not contain Audible Magic verifications for each of the works in suit" because █████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Opp'n at 10.  But this ignores the fact that matching was not commenced ████████████████████████████████████████

---

[12] *Id*. at 128:4-13, 123:17-124:10, 125:6-13.



[13] and, in any event, ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮.[14]   Data showing that ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

strongly suggests that if MarkMonitor had retained its data from that period, a very different story

would emerge.  And as to the improbable suggestion that ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮, there simply is no evidence of that,

because, as noted, the MarkMonitor Spreadsheet ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ are gone.[15]

### D. Plaintiffs' Contention that Cox Could Have Confirmed Matches by Listening to Audio Files on a Hard Drive Produced by Plaintiffs is Both Irrelevant and Demonstrably False

Finally, Plaintiffs represent to the Court that the missing Audible Magic data is immaterial

because Cox has simply ignored the best evidence Cox subscribers downloaded audio files

containing Plaintiffs' copyrighted works—a hard drive that, Plaintiffs assert, contains copies of

the infringing audio files.  This argument is specious.

*First*, if the only evidence needed to validate the infringing nature of the downloaded files

is the hard drive, why did MarkMonitor seek validation from Audible Magic in the first place?

---

[13] Leiden Decl., Ex. J (Paszkowski Dep. at 123:17-124:10, 125:6-13).

[14] *See* Kearney Decl., Ex. D (Frederiksen-Cross Dep., 162:9-16 (acknowledging that 25% of the entries on the '431 Spreadsheet were first downloaded prior to 2012).

[15] Grasping at straws, Plaintiffs dispute that the Audible Magic Spreadsheet is the more reliable and complete record on the grounds that ▮▮▮▮▮▮▮▮▮
Opp'n at 10.  This is contradicted by the testimony of the Audible Magic 30(b)(6) witness, who
▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ *See* Declaration of Nick Feamster, ¶ 3.
Tellingly, this same witness, Vance Ikezoye, put in a declaration in support of Plaintiffs' opposition brief and did not dispute that the document referred to by Cox as the "Audible Magic Spreadsheet" with Bates No. REV00003444 was exactly what he was referring to.

*Second,* Plaintiffs have the burden to prove direct infringement.  No one has testified that they have listened to all of the tens of thousands of files on the hard drive and matched them to a validated copy of each of the works in suit. Plaintiffs attempt to shift the burden to Cox to come forward with evidence that the files on the hard drive are *not* infringing, but this turns the law on its head.  *See, e.g., Ganz Bros. Toys v. Midwest Importers of Cannon Falls, Inc.*, 834 F. Supp. 896, 899 (E.D. Va. 1993) ("Only where *the copyright holder* proves copying is infringement established.") (emphasis added).

*Third,* regardless of who has this burden, simply listening to the files on the hard drive cannot answer the question of whether they are copies of Plaintiffs' original works.  As a preliminary matter, Plaintiffs did not produce copies of their own original works, so it is unclear what Cox should have "matched" the allegedly infringing audio files to in determining that they are copies of those works.[16]  Furthermore, Cox has done a simple count of the audio files on the hard drive, and ████████████████████████████████████████████████████████

████████████████████████████[17]  So, even if someone wanted to listen to the hard drive file

████████████████████████████████████████████████████████████

███████████████████████████████.  Finally, all of the files on the hard drive were ████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████.[18]

---

[16] Kearney Decl., ¶ 9.
[17] Declaration of Lynne J. Weber, Ph.D., ¶ 8.
[18] Kearney Decl., ¶¶ 4-8.

### III.   THE COURT SHOULD PRECLUDE PLAINTIFFS' USE OF ANY VERSION OF THE MARKMONITOR SPREADSHEET

#### A.   Evidentiary Sanctions Are Appropriate Because Plaintiffs Failed to Preserve Material Evidence

In order to justify a preclusive sanction on the basis of spoliation, Cox must demonstrate that (1) material data, (2) was destroyed, (3) notwithstanding an obligation to preserve it and (4) the destruction was willful and not merely accidental. *See Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 287 (E.D. Va. 2001). The materiality of the Audible Magic data is discussed at length above, and the destruction of the data is uncontested. That leaves the question of whether there was a duty to preserve, and whether the destruction was inadvertent.

##### 1.   Plaintiffs and MarkMonitor Had a Duty to Retain the Relevant Data

A party's duty to preserve material evidence arises "not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Turner v. U.S.*, 736 F.3d 274, 282 (4th Cir. 2013) (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001)); *E.I. DuPont De Nemours & Co. v. Kolon Indus., Inc.*, 2011 WL 1597528, at *10 (E.D. Va. Apr. 27, 2011) ("[a] party that anticipates litigation … is 'under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request'") (quoting *Samsung Elecs. Co. v. Rambus, Inc.*, 439 F. Supp. 2d 524, 543 (E.D. Va. 2006)).

Here, the duty to preserve the missing data is clear for a number of reasons.

*First*, MarkMonitor's preservation duty was explicit in its contract with the RIAA and it was expressly in anticipation of litigation:

13



- MarkMonitor acknowledged that ████████████████████████████████████████ [22]

MarkMonitor's 30(b)(6) witness further confirmed that the plain language of the agreement meant what it said; acknowledging that ████████████████████████



████████████████████████████ [23]  This was also confirmed by Plaintiffs' witnesses, one of whom testified that the ███████████████████████████████████████

████████████████████████████████████ [24] and another of whom

acknowledged that he ██████████████████████████████████████████████

██████████████ [25]

---

[19]  The entity referenced in the agreement is DtecNet, which was acquired by MarkMonitor prior to this case.
[20]  Leiden Decl., Ex. U at 2 (emphasis added).
[21]  *Id*. at 4.
[22]  *Id*. at 10.
[23]  Kearney Decl., Ex. A (Sam Bahun Dep., 110:23-112:1).  Plaintiffs attempt to rebut this by pointing to separate testimony by MarkMonitor's 30(b)(6) witness in which ███████████████████ ████████████████████████████████████████████████ Gould Decl., Ex. 7. But even in those excerpts, the witness ██████████████████ ████████████████████████████████████████████████████ Bahun Tr. at 27:4-8, 28:12-21.
[24]  Kearney Decl., Ex. B (Wade Leak Dep., 182:14-20).
[25]  Kearney Decl., Ex. C (Alasdair McMullan Dep., 193:19-194:3).

Case 1:18-cv-00950-PTG-JFA   Document 364   Filed 09/20/19   Page 18 of 25 PageID# 12827

Indeed, the declaration submitted by MarkMonitor in connection with Plaintiffs' opposition confirms the foreseeability of this litigation. Bahun Decl., ¶ 9 ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ It simply cannot be the case that MarkMonitor collected data and retained evidence in a manner intended to be defensible in litigation while simultaneously not having knowledge that this evidence could be used in future lawsuits.

Nonetheless, Plaintiffs argue that litigation was not reasonably foreseeable because "MarkMonitor was hired by the RIAA to conduct a ███████████ not a litigation program, and the contract expressly anticipated a separate contract in the event the parties mutually agreed to undertake a litigation program." Opp'n at 15 (citing Leiden Decl., Ex. T at 1). But the cited relevant document is a "Statement of Work" agreed to in implementing the parties' Master Agreement. The relevant passage states in full:



Plaintiffs' argument that the fact that MarkMonitor and the RIAA considered entering into a separate ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

─────────────

[26] Leiden Decl., Ex. T at 1.

15

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████. The only other "evidence" that Plaintiffs point to is the declaration

of the RIAA's 30(b)(6) witness who states that "MarkMonitor's efforts to monitor peer-to-peer

('P2P') networks and detect instances of infringement were part of a notice program, not a

litigation program."[27]  This misses the same point—even if not styled a "litigation program," the

contemporaneous agreements and deposition testimony confirms that it was not only reasonably

foreseeable, but expressly contemplated, that ███████████████████████████████

█████████████████████████████████████████████████████████[28]

## 2.   The Destruction of Data in this Case was not Inadvertent

There is no requirement that Cox show that Plaintiffs or their agent spoliated material

evidence in bad faith—it is enough that the destruction was intentional and not merely accidental.

*See Trigon Ins. Co. v. U.S.*, 204 F.R.D. 277, 284 (E.D. Va. 2011) ("[s]poliation is the willful

destruction of evidence or the failure to preserve evidence for another's use in pending or future

litigation.") (citing *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 778 (2d Cir. 1999)).  The

missing MarkMonitor data was not preserved because MarkMonitor made a deliberate choice not

to preserve it; one which it later reversed.   And it made that choice at a time when it was

contractually obligated to preserve for use in future litigation ███  ████████████████

---

[27] Marks Decl., ¶ 5.

[28] Similarly, in *BMG v. Cox*, the Court found that BMG and its agent, Rightscorp, had a duty to preserve "material evidence, including how the Rightscorp system was allegedly detecting infringements and forwarding notices to Cox."  Leiden Decl., Ex. BB at 4.  Plaintiffs' attempt to distinguish MarkMonitor's duty to preserve evidence in this case from Rightscorp's duty in *BMG v. Cox* falls flat.  Here, as in *BMG*, Plaintiffs hired an agent to gather evidence of infringement prior to the claims period.  Leiden Decl., Ex. U (Master Agreement, Bates No. RIAA_00000003). Indeed, here, because the Audible Magic data was central to MarkMonitor's infringement evidence, the need to preserve the spoliated evidence was, if anything, more obvious.

16

████████████████████████████[29]   As such, the failure to maintain this evidence was not an accident, but a deliberate choice made with full knowledge that the evidence should have been preserved.

Plaintiffs argue that the destruction of Audible Magic data was inadvertent because the data was ███████████████████████████████ and claim that Cox has not shown that "MarkMonitor had a culpable mindset" when it destroyed that data.  Opp'n at 17-18.  But, as discussed at length above, the destroyed evidence was not "superfluous."  Moreover, "culpable mindset" is not the standard.  Willful destruction is, and that means that the destruction has to have been intentional notwithstanding a duty to preserve the data.  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 497 (E.D. Va. 2011) ("Destruction is willful when it is deliberate or intentional, whereas bad faith destruction occurs when a party engages in destruction for the purpose of depriving the adversary of evidence") (citations omitted).

Here, there is no evidence that MarkMonitor's destruction of the Audible Magic data was accidental, and, in fact, both Plaintiffs and MarkMonitor admit that MarkMonitor made a conscious decision not to retain the data fields at issue.  *See* Opp'n at 3 ████████████ ██████████████████████████████████████████████████████████████ ███████████████████████.[30]  In light of MarkMonitor's express obligation to retain this evidence in anticipation of litigation, a spoliation finding is warranted.

---

[29] *See* Leiden Decl., Ex. U (Master Agreement, Bates No. RIAA_00000003).

[30] While Cox is not required to prove that Plaintiffs or MarkMonitor acted in bad faith, it is notable that Plaintiffs do not come forward with any reason why they (presumably intentionally) did not include Audible Magic on their initial disclosures despite the fact that—as Plaintiffs now represent to the Court—Audible Magic's work product is the key to their entire case against Cox.  Cox discovered the relevance of Audible Magic from an abbreviation in a spreadsheet produced by Plaintiffs, while at the same time Plaintiffs' experts were working directly with Audible Magic.

**B.      In the Alternative, Plaintiffs Should Not Be Permitted to Rely on the MarkMonitor Spreadsheet Because it is a Summary, and the Underlying Data Was Destroyed**

Federal Rule of Evidence 1006 permits the use of summaries only if "[t]he proponent … make[s] the originals or duplicates available for examination or copying."  Where, as here, the underlying data was not preserved or was destroyed, the summary is inadmissible because there is no "opportunity to test [the summary's] accuracy or reliability."  *U.S. ex rel. Bunk v. Birkart Globistics GmbH & Co.*, 2011 WL 5005313, at *8 (E.D. Va. Oct. 19, 2011).

1.      The MarkMonitor Spreadsheet is a Summary

As established above, 

As such, they contend, the spreadsheet is not a summary of the Audible Magic data, but rather an "extract" of certain fields from                                    This argument fails both factually and legally.

Plaintiffs' position that

Opp'n at 11; Bahun Decl., ¶ 17, is newly minted for their opposition to Cox's motion. As set forth above, Plaintiffs' own experts relied on



. And, as also noted above, ███████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████[31] Finally, whatever the significance of the

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████. At the very least, there is an inconsistency between

these data elements. More plausibly, the entry of values in the fields preserved ████████

████████████████. In any event, Cox should have had the opportunity to analyze all of the

relevant data as Rule 1006 requires.[32]

Further, the fact that a document consists of "extracts" from a database does not mean that it is not a Rule 1006 summary. All summaries are, by definition, extracts from the information source that they are summarizing. The fact that some of the underlying data is "extracted" for inclusion in a summary, and that some, is not is what differentiates the summary from the underlying data. Thus, cases have routinely treated data extracts as summaries whose admissibility must be evaluated under Rule 1006. *See Last Atlantis Capital LLC v. AGS Specialist Partners*, 262 F. Supp. 3d 641, 679 (N.D. Ill. 2017) (treating Plaintiffs' self-proclaimed "extracts" as

---

[31] Even if it were true that ████████████████████████████

██████████████████████████████████████

[32] Plaintiffs' argument also defies logic ████████████████████

██████████████████████████████████████

██████████████████████████████████████

summaries under Fed. R. Evid. 1006); *United States v. Mermelstein,* 487 F. Supp. 2d 242, 266 (E.D.N.Y. 2007) (treating an expert's extracts of data relevant to his testimony as a summary under Fed. R. Evid. 1006).

In addition, the '431 Spreadsheet ██████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████. But courts treat as summaries reports that "manipulate[ ]" and "add[ ] to" the underlying data. *See Last Atlantis* 262 F. Supp. 3d, 679 (N.D. Ill. 2017). As in *Last Atlantis*, Plaintiffs here "manipulated the [Audible Magic] information" and "added information" ███

███████████████████████████████████████████████ *Id.* Because of the failure to produce in discovery the data underlying this summary, it is not admissible.

2. The Audible Magic Data Summarized by the MarkMonitor Spreadsheet Was Destroyed and Cannot Possibly Be Made Available for "Examination or Copying"

The data underlying the summary represented by the MarkMonitor Spreadsheet—and specifically the Audible Magic data ███████████████████████████████████████

███████—was not produced in discovery, and cannot be made "available for examination or copying or both" because it was destroyed by MarkMonitor. As such, Rule 1006 mandates that the MarkMonitor Spreadsheet must be precluded.

## IV.   CONCLUSION

For the reasons set forth above and in its opening brief, Cox respectfully requests that the Court grant this Motion, issue discovery sanctions against Plaintiffs, and order that Plaintiffs and their experts are precluded from relying on the '236 and '431 Spreadsheets, and any derivative documents, for any purpose.

Dated: September 20, 2019

Respectfully submitted,

*/s/ Thomas M. Buchanan/*
Thomas M. Buchanan (VSB No. 21530)
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Defendants Cox*
*Communications, Inc. and CoxCom, LLC*

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Tel: (212) 294-6700
Fax: (212) 294-4700
Email: melkin@winston.com
Email: tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
Thomas Kearney (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA  94111-5840
Tel: (415) 591-1000
Fax: (415) 591-1400
Email: jgolinveaux@winston.com
Email: tkearney@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Tel: (213) 615-1700
Fax: (213) 615-1750
Email: dhleiden@winston.com

## CERTIFICATE OF SERVICE

I certify that on September 20, 2019, a copy of the foregoing DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO PRECLUDE PLAINTIFFS' USE OF CERTAIN EVIDENCE was filed electronically with the Clerk of Court using the ECF system, which will send notifications to ECF participants.

*/s/ Thomas M. Buchanan*
Thomas M. Buchanan (VSB No. 21530)
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.*
*and CoxCom, LLC*

22