# Exhibit 6

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
BMG RIGHTS MANAGEMENT (US) LLC, :
et al.,                         :
             Plaintiffs,        :
                                : Case No. 1:14-cv-1611
     vs.                        :
                                :
                                :
COX ENTERPRISES, INC., et al.,  :
             Defendants.        :
--------------------------------:
```

HEARING ON MOTIONS

November 20, 2015

Before:  Liam O'Grady, USDC Judge

<u>APPEARANCES</u>:

Walter D. Kelley, Jr., John M. Caracappa, Jeremy D. Engle,
Jeffrey M. Theodore, William G. Pecau, and Michael J. Allan,
Counsel for the Plaintiffs

Andrew P. Bridges, Brian D. Buckley, Jed Wakefield, and
Craig C. Reilly, Counsel for the Defendants

Case 1:14-cv-00950-PTG-JFA    Document 372-7   Filed 09/24/19   Page 3 of 114 PageID# 13473
Case 1:14-cv-01611-LO-JFA    Document 676-7   Filed 11/23/15   Page 2 of 113 PageID# 17860

2

1          THE CLERK:  Civil action 1:14-cv-1611, BMG Rights

2    Management, LLC, et al. versus Cox Communications Incorporated,

3    et al.

4          If counsel would please identify themselves for the

5    record.

6          MR. KELLEY:  Walter Kelley on behalf of the

7    plaintiffs.  With me are John Caracappa, Jeremy Engle, Jeff

8    Theodore, and Will Pecau.

9          THE COURT:  All right, good afternoon.

10          MR. CARACAPPA:  Good afternoon, Your Honor.

11          MR. BRIDGES:  Good afternoon, Your Honor.  Andrew

12    Bridges for defendant, Cox Communications.  With me are Brian

13    Buckley, Jed Wakefield, Craig Reilly.  And from the client,

14    Marcus Delgado.

15          THE COURT:  All right, thank you.  Good afternoon to

16    each of you.

17          All right, we've got a lot of paper here, and I'll

18    let you all highlight what you want to highlight.  We've gone

19    over the pleadings.  I can't tell you that I am intimately

20    familiar with every one of your motions, I just haven't gotten

21    there yet.

22          But you got my order from last night talking about

23    limitations in the case, so that will take care of some of

24    these witnesses and some of the issues, but let me say this.

25    And I'm sure you've heard from Mr. Reilly and Mr. Kelley, we're

Case 1:14-cv-00950-PTG-JFA   Document 372-7   Filed 09/24/19   Page 4 of 114 PageID# 7347
Case 1:14-cv-01611-LO-JFA   Document 676-7   Filed 11/23/15   Page 3 of 113 PageID# 17361

3

1   going to try a copyright infringement case.  We're not going to

2   try the Copyright Act's public policy issues.  And we're not

3   going to reference issues that aren't relevant either to

4   infringement, or vicarious liability, or damages.

5          So clearly what I have been looking at are the

6   admissibility of the survey, or what economic evidence is

7   necessary from the plaintiff given that you're asking for

8   statutory damages.  What are your intent -- what's your intent

9   with the use of economic damages in proving vicarious

10  liability, which I believe is appropriate.  And then the use of

11  some of these independent reports to the extent the experts are

12  going to testify.

13         We have all these studies that have been objected to,

14  and I want to know whether BMG still seeks to use the Sandvine

15  study or the NetNames or Envisional or Procera; and if so,

16  through what witness and what the purpose of that will be.  So

17  I want to hear about that.

18         I want to hear about whether third party handling of

19  other -- well, whether other Internet service providers'

20  treatment of Rightscorp's notices is admissible; and if so, for

21  what purpose.

22         And I want to hear about the advice of counsel

23  evidence and it's relevance to our case.

24         So those are things I would like to hear about.  I

25  will hear argument.  We are not going to be here at 5 o'clock

4

1   tonight, and I have got a jury that is undoubtably going to

2   interrupt us on multiple occasions.

3           So why don't we go in 15-minute bites on the motions

4   either to strike or exclude or limit.  And why I don't start

5   with BMG, and tell me what you would like to about the motions

6   that you have filed, and highlight the ones that you think are

7   still highly relevant and most important to you, and additional

8   points that you want to emphasize to me as I'm going through

9   them over the next several days.

10          MR. KELLEY:  Okay.  Just for purposes of kind of

11  getting our hands on it, we have got the Daubert motions for

12  each side, and then we've got the motions in limine for each

13  side.

14          THE COURT:  Understood.

15          MR. KELLEY:  So do you want to start with the Daubert

16  motions and do those?  Or do you want us to just kind of roll

17  through the entire BMG array of motions?

18          THE COURT:  I want to you roll through them.  Some of

19  them are no longer relevant.

20          MR. KELLEY:  Right.

21          THE COURT:  And I think I have indicated that --

22  there has been objections to Dr. Lehr's testimony, and we're

23  not going to listen a lot of the extraneous stuff that Lehr is

24  would be testifying about, it's not relevant to this case, I

25  don't think.  But perhaps a portion of what Dr. Lehr might say

5

1    about the economic damages is.

2          So if you still want -- so focus on what you think is

3    still improper about Cox's experts to the extent you want to

4    continue to bring that, and also the in limines.

5          MR. KELLEY:  Okay.  Well, BMG has got <u>Daubert</u> motions

6    as to three witnesses.

7          THE COURT:  Right.

8          MR. KELLEY:  The first one is Mr. Rosenblatt.  And

9    we've divided these up, so I'm going to be in some ways a

10   master of ceremonies for the plaintiff's side.

11         THE COURT:  Okay.

12         MR. KELLEY:  We've got Rosenblatt.  Then we've got

13   Karaganis, if I'm pronouncing that correctly.  And then we've

14   got Sullivan.

15         So let me start with Rosenblatt, and we will just hit

16   on whether that is still relevant quickly.  And if so, what

17   does it matter.

18         Jeremy -- Mr. Engle is going to take care of that.

19         THE COURT:  You two haven't talked about what is

20   relevant based on my ruling from last evening?

21         MR. KELLEY:  No.  It didn't give us much time to

22   figure it out.

23         Okay, Jeremy, do you want to address Rosenblatt?

24         MR. ENGLE:  Good afternoon, Your Honor.  I think the

25   bulk of Mr. Rosenblatt's opinions are related to whether Cox

6

1    met safe harbor, so most of that is out.

2            THE COURT:  Right.

3            MR. ENGLE:  The problem with most of the rest of Mr.

4    Rosenblatt's opinion is he lacks specialized knowledge to make

5    those opinions.  He is not an industry expert.  He has never

6    worked for an ISP.  Cox labels him as a technologist, so his

7    testimony should be limited to technology.

8            We haven't moved to exclude his technical overview of

9    BitTorrent or his opinions about how Rightscorp's code works.

10   That's what he purports to have expertise in, and that's what

11   his opinion should be limited to.

12           In our brief we gave a couple examples of the

13   opinions where he has no specialized knowledge.  That, for

14   example, is what other ISPs do with infringement notices.  He

15   doesn't have any inside knowledge about that, no specialized

16   knowledge.  He only knows what they publicly state.  And as

17   we've seen in this case, what an ISP publicly claims to do can

18   be far different from what they actually do.

19           Another example is MarkMonitor.  That is a company

20   that detects infringement and sends notice.  Mr. Rosenblatt

21   claims to know everything he needs to know about MarkMonitor's

22   code based on a redacted 13-page summary and because some

23   employees of MarkMonitor have been on panels he's hosted.

24           That's an ironic position by Cox.  They have been

25   very upset about not reviewing every single piece of source

Case 1:14-cv-00950-PTG-JFA   Document 372-7   Filed 09/24/19   Page 8 of 114 PageID# 7848
Case 1:14-cv-01611-LO-JFA   Document 676-7   Filed 11/23/15   Page 8 of 113 PageID# 17865

7

1   code from Rightscorp over the last three-and-a-half years, yet

2   they claim that based on his 13-page redacted summary and

3   because some employees have been on panels, that Mr. Rosenblatt

4   is able to fully analyze MarkMonitor's system for detecting

5   infringement.

6          Our bottom line with Mr. Rosenblatt, he should be

7   limited to offering opinions within his purported area of

8   specialized knowledge, that is overview of the BitTorrent, and

9   opinions on the technical aspects of the Rightscorp source

10  code.

11         Thank you, Your Honor.

12         THE COURT:  All right, thank you.

13         Why don't we do one -- go ahead and respond to that.

14         MR. BRIDGES:  Thank you, Your Honor.

15         I am pleased at least we have some overlap with the

16  other side as to certain things that Mr. Rosenblatt can offer.

17  I would point primarily to the things that he had issued in

18  rebuttal to the plaintiff's case.  There is the technical

19  tutorial, no debate about that.

20         Analysis of Rightscorp's code and how it was

21  unreliable.  But beyond that, also Rightscorp's failure to

22  confirm infringements, failure to detect infringements.  It's

23  failure to count infringements is very, very important.

24         He also is able as a technologist who is active where

25  technology and business processes work against a backdrop of a

8

1    legal framework, his familiarity is how companies provide

2    implementations and processes in this overall copyright

3    environment.  We can't ignore that there is a legal

4    environment.  And on that, he can assess what types of

5    supervision are and are not possible by Cox.

6            He also has technical skills that can explain at a

7    technical level why Cox could not easily alter the notices that

8    Rightscorp on the one hand didn't want to be altered but on the

9    other hand is asking why Cox didn't alter it.

10           THE COURT:  That goes to what, willful blindness?

11           MR. BRIDGES:  That's right, in part that goes to

12   willful blindness because the question is should Cox have been

13   altering notices so that they could accept them and process

14   them.  And it goes to why Cox wasn't processing notices.  And

15   that is at the core of the willful blindness part of

16   contributory.

17           But, Your Honor, he is knowledgeable as an industry

18   observer about a variety of practices.  He has not worked in

19   one of those companies, but he has been in the interface

20   between technology and business process and copyright for a

21   number of years.  He is familiar -- it's not strictly relevant,

22   but functionally or practically relevant, not only is it a

23   Copyright Alert System, which is not a DMCA system, it's a best

24   practices system that was publicly negotiated and in which Cox

25   participated until it decided not to join.  He is familiar with

Case 1:18-cv-01611-LO-JFA  Document 676-7  Filed 11/23/18  Page 9 of 113  PageID# 17067

9

1    those best industry practices.

2           He is familiar with the French HADOPI process, which

3    is similar, which was the French implementation of best

4    practices.

5           So at the summary judgment hearing, Your Honor, I

6    think the Court expressed some interest in what other ISPs do

7    when there are industry standards at issue.  I'm not usually

8    aware that you actually have people from the specific companies

9    come through and testify, but you have people who are familiar

10   with the industry practices.  That is -- that is a role that is

11   important, very important for him.

12          I confess that in light of the Court's ruling last

13   night, we're still trying to figure out what that means for

14   exact proof at trial.  It's not clear to us whether plaintiffs

15   need or still intend to provide evidence about the number of

16   steps of Cox's process or Cox's termination practices and the

17   like.

18          It may be that that's now out of the case altogether.

19   If it's in the case, then Mr. Rosenblatt's testimony about

20   industry practices is relevant.

21          Thank you, Your Honor.

22          THE COURT:  Thank you.  Why don't you reply.  And

23   start with the last comment, which is, are any of the Cox

24   practices at this stage regarding the way they did their

25   notices or when they sent out notices or the number of

1   violations necessary.  I don't think that is relevant anymore,

2   but you tell me if you think I'm wrong.

3          MR. ENGLE:  Your Honor, we're still digesting how it

4   fits in, but we think there is some relevance to some of the

5   practices, such as these fake terminations.  It goes to

6   willfulness, willfulness can be part of damages.  You get a

7   much higher statutory cap if you can show that the defendants

8   were willful.

9          It can also go to material contribution because they

10  knew these people were infringing, they turned them off, but

11  they turned them right back on, allowing contribution.  And

12  there may be other ways that it's relevant that we're still

13  working through.

14         THE COURT:  Okay.

15         MR. ENGLE:  I will address, Mr. Bridges talked about

16  the Copyright Alert System and a French system that I won't try

17  to pronounce as he did.

18         You know, Mr. Rosenblatt, he's familiar with what

19  they say they do.  I mean, that's the point here.  They're

20  trying to establish an industry bench mark.  There is no

21  industry bench mark.  They don't know these ISPs do.  They only

22  know what they say they do.

23         That's exactly what happened with Cox.  You know,

24  they say they do one thing with terminations.  They do a whole

25  bunch of different things.

 1          He also talked about willful blindness.  And he said

 2    that's about Cox's decision not to process.  Well, willful

 3    blindness isn't about not processing.  Willful blindness is

 4    about not even hooking at the notices when they came in.  I

 5    mean, they just threw them away.

 6          And then he is calling Mr. Rosenblatt a technologist

 7    and an industry observer.  I don't know what those words mean

 8    and what type of expertise that is.  I looked up "technologist"

 9    in the dictionary, there is not really a definition for it.

10    There is a definition for technology, but it's basically

11    applying knowledge to fix problems.

12          I don't think that gives Mr. Rosenblatt a license to

13    testify about all the facts in the case.

14          THE COURT:  Well, if he had sufficient experience and

15    gained knowledge of an industry through practices, then that's

16    what I equate a technologist to in this instance.

17          MR. ENGLE:  So I would contrast him with Dr. McGarty.

18    Dr. McGarty has actually run ISPs, operated them from the

19    ground up, and he has got decades of industry experience.

20          Unless there is anything else Your Honor would like.

21          THE COURT:  Nope.  Thank you.

22          All right, who is next?

23          MR. KELLEY:  All right.  The next Daubert motion that

24    BMG filed is Karaganis.  Mr. Theodore is going to argue that.

25          MR. THEODORE:  Your Honor, I wonder if it makes sense

                                                                          12

 1   to address Lehr and Sullivan and Karaganis all together since

 2   they are all the damages experts.

 3           THE COURT:  All right.  I think it does.

 4           MR. THEODORE:  So let me start by explaining why we

 5   put Lehr on, and what we intend to do with him, and why he is

 6   appropriate, and then how Cox responds to him with their two

 7   rebuttal experts Sullivan and Karaganis.

 8           So Dr. Lehr is a telecommunications industry and

 9   digital media economist.  His expertise is in the economics of

10   distribution of digital content over the Internet.  It's the

11   exact industry, it's the exact conduct that we're talking about

12   here.  I mean, really his expertise is absolutely precisely on

13   point.  This is what he does at MIT, is focus, is focus on

14   this.

15           And what we asked him to do is four things.  First,

16   what he is going to do is he is going to calculate the profits,

17   or he does calculate the profits that Cox makes off

18   subscribers, and he explains why infringing subscribers are

19   likely to be more profitable than the average subscriber.

20           THE COURT:  I think based on what I read, Cox doesn't

21   really disagree with much of that, but I will hear from them in

22   a minute.  But the 97 percent margins or whatever that were

23   thrown out there were not disagreed with.

24           MR. THEODORE:  Well, Dr. Sullivan, he argues that the

25   margin -- he chooses a different -- so there is a debate

Case 1:18-cv-00950-PTG-JFA Document 676-7 Filed 09/24/19 Page 14 of 114 PageID# 13484
Case 1:14-cv-01611-LO-JFA Document 816 Filed 11/23/15 Page 13 of 113 PageID# 17871

13

 1  between the experts whether you should use contribution margin

 2  or controllable margin, and I think one is 97 percent and one

 3  is like 66 percent.

 4          And that's sort of -- I mean, that is quite

 5  literally -- that's a question for expertise, which of these --

 6  you know, which of these questions of profit, which of these

 7  calculations of profit actually represents, actually reflects

 8  Cox's incentives in this case.  Right.  Which calculation of

 9  profit maps on to Cox's motivations to tolerate infringement.

10  And that is something that Dr. Lehr can explain to the jury.

11          Looking at Cox's financials, breaking down Cox's

12  financials, putting aside the fixed network costs and

13  explaining why they have such an incentive, which is the

14  second -- which is the second piece of this.

15          You know, having calculated Cox's profits which --

16  and actually, I'm sorry, let me go back very briefly, Your

17  Honor, because what they do say is that his calculation of

18  profits is irrelevant.  And it's quite relevant for three

19  reasons.  First of all, profits are, just as a matter of law, a

20  factor in the statutory damages analysis.

21          Number two, they go to the question of deterrence,

22  which is also a factor in the statutory damages analysis.

23          And third, they go to Cox's economic incentives to

24  tolerate infringement, which is a factor for vicarious

25  liability.  So we think it's highly relevant.

 1              So then this second opinion is regarding economic

 2      incentives.  And he explains how Cox's profits, the structure

 3      of Cox's system, and how it makes money off its subscribers

 4      gives Cox such a substantial incentive to tolerate

 5      infringement.

 6              And again, that incentive to tolerate infringement is

 7      a major piece of the vicarious liability analysis.  And I

 8      actually don't think that they argue that the economic

 9      incentive is irrelevant.  They argue that the profit

10      calculation is irrelevant, but I don't take them to argue that

11      the economic incentive is irrelevant.

12              Then third, what he does is he looks at the question

13      of harm to the plaintiffs.  And what he says is that in this

14      case he explains why we don't have data to calculate exactly

15      what plaintiff's damages are, to quantify plaintiff's damages.

16              And I think we will talk about that in more detail

17      when we talk about Dr. Sullivan, but -- so he explains why

18      there can't an exact quantification here, but he does testify

19      that the overarching economic literature, the academic

20      consensus is that there is very substantial harm to copyright

21      holders as a result of piracy.

22              And I think it's common and appropriate expert work

23      to explain the academic consensus in the field.  These are

24      complicated economic articles which require expert

25      interpretation for a jury to understand.

15

```
 1              So what these articles do is they attempt to compile
 2    data from a number of sources.  So, for example, someone
 3    will -- an academic will do a survey of how people infringe, of
 4    how much infringement they do.  And they will also do -- they
 5    will also use survey data or market data to come up with data
 6    regarding consumer behavior.  And then they will use
 7    econometrics, regressions, statistical analyses to try to
 8    understand the relationship between infringing behavior and
 9    purchases.
10              This is not something that a jury can understand on
11    its own.  It is something that we think is appropriate for an
12    economic expert to present to the jury.
13              And then the final piece that Dr. Lehr talks about,
14    and this may be your concern, Your Honor, so let me focus
15    exactly on what Dr. Lehr is trying to do here.  Dr. Lehr talks
16    about the larger economic impacts to the media eco chain of
17    piracy.  He is talking -- he is not making policy arguments.
18    He is not saying, this is what policy should be.  He's saying,
19    these are the economic impacts, this is what happens.
20              And he is also talking about Cox's place in the value
21    chain and why Cox is in a unique position to act on this.  Sort
22    of the economics of responding to infringement.  And how Cox is
23    especially well placed to cost effectively and practically
24    respond to infringement, and in many ways essential to respond
25    to infringement.  So that's what Dr. Lehr does.
```

Case 1:18-cv-09050-RTG-JFA   Document 372-7   Filed 09/24/19   Page 17 of 114 PageID#: 13487
Case 1:14-cv-01611-LO-JFA   Document 616-7   Filed 11/23/15   Page 18 of 119 PageID#: 17874

16

1          Now, they have two experts.  Their first expert is

2     Dr. Sullivan, who in all -- they talk a lot about Dr. Lehr's

3     qualifications, but, I mean, in all fairness, Dr. Sullivan is

4     essentially a general purpose professional damages expert

5     witness.  His knowledge -- so if we're going to talk about

6     knowledge of the issues here, industry expertise, Dr. Lehr

7     outshines Dr. Sullivan unquestionably.

8          Now, that said, we don't have -- we have

9     disagreements with Dr. Sullivan on a lot of issues, but we

10    don't have any problem with Dr. Sullivan responding to Dr.

11    Lehr's analysis of the expert literature.  We don't have any

12    problem with Dr. Sullivan critiquing Dr. Lehr's profits

13    calculation.

14         What we do have -- we do have a problem with is Dr.

15    Sullivan's purported effort to come up with a precise or a

16    purported precise quantification of damages to BMG and Round

17    Hill.

18         So we talked about the studies that Dr. Lehr

19    discussed.  They involve data collection, sampling.  You know,

20    they look for inputs based on consumer behavior.  They take

21    inputs based on the number of infringements and actual evidence

22    of consumer behavior, and they try to relate those two.  They

23    use regression techniques to try and relate actual data

24    regarding consumer behavior and infringement and figure out

25    what the connection is.

Case 1:18-cv-00950-PTG-JFA   Document 672-7   Filed 10/24/19   Page 19 of 114 PageID#
13488
Case 1:14-cv-01611-LO-JFA   Document 816-7   Filed 11/23/15   Page 19 of 119 PageID# 17875

1          But that's not what Dr. Sullivan did.  What Dr.

2    Sullivan did was essentially choose arbitrary numbers, multiply

3    them together, and come to a result.  He is essentially

4    assuming his conclusions and covering it up in arithmetic.  And

5    let's see how that happens.

6          So the first and most significant number here is the

7    number of infringements.  I don't think that anybody is in

8    disagreement that if you want to calculate a displaced sales

9    analysis, if you want to calculate displacement of legal sales

10   from infringement, the first thing you have to know is how many

11   infringements there are.  You just can't do a displacement

12   analysis without knowingly how many infringements.

13         And here, there could be tons more uploads, tons more

14   downloads.  And I think we explain this in our motion, but the

15   Rightscorp data show when a party is making available.  The

16   Rightscorp instances are instances where Rightscorp observed a

17   Cox subscriber making available one of plaintiffs' works over

18   BitTorrent.  But doesn't tell you exactly how many times those

19   works were uploaded and downloaded.

20         So what does Dr. Sullivan do to avoid this problem?

21   First of all, he decides he is just going to exclude all

22   uploads from his analysis entirely, he is just going to move

23   them out of the way.  And the way he does this a legal

24   conclusion, which is contrary to law.  What he decides is that

25   uploads by Cox subscribers do not have any economic effect, do

Case 1:18-cv-00950-PTG-JFA   Document 876-7   Filed 11/23/25   Page 19 of 114 PageID#
13489
Case 1:14-cv-01611-LO-JFA   Document 816   Filed 11/23/15   Page 19 of 19   PageID# 17876

18

```
 1    not have any economic effect because if Cox were to upload that

 2    work to -- say a Cox subscriber uploads a work to say a Verizon

 3    subscriber, well, that Verizon subscriber just could have

 4    gotten the work from say a Comcast subscriber.

 5         But that's not the law.  I mean, this strikes at the

 6    heart of the 106(3) distribution right.  I mean, the idea that

 7    a distributor doesn't have an economic effect, can get out of

 8    liability and damages, doesn't have an economic effect on the

 9    defendant just because there are other potential distributors

10    of the same bootleg work, I mean, that's not the law.

11         And in fact, in the BitTorrent context, I mean, it's

12    not just one copy.  I mean, they're sending this out to the

13    world.

14         Cox in its brief does not try to defend that legal

15    argument.  I mean, they make no effort to claim that the law is

16    as Dr. Sullivan assumes it is.  And this is a core piece of Dr.

17    Sullivan's analysis.  His calculation of the number of

18    infringements, the basis for his entire mathematical arithmetic

19    is based on excluding uploads from the number of infringements,

20    he just wipes it out.  And that's not the law, and that is what

21    requires --

22         THE COURT:  You're repeating yourself now.  Keep

23    moving.

24         MR. THEODORE:  So that requires exclusion.

25         But now let's say we put -- let's say we get rid of
```

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 20 of 114 PageID# 13490
Case 1:14-cv-01611-LO-JFA Document 816 Filed 11/23/15 Page 19 of 113 PageID# 17877

19

1   uploads.  He also -- he also makes what he admits to be an

2   arbitrary decision about the number of downloads.  I mean, he

3   agrees -- when Dr. Bardwell uses the same assumption, although

4   for different purposes, and I think we explain in a footnote

5   why it is appropriate for Dr. Bardwell, Dr. Sullivan describes

6   it as completely arbitrary.  A completely arbitrary measure of

7   infringement is underlying his entire analysis.

8          And then he proceeds to compound that by multiplying

9   that underlying arbitrary number of infringements with other

10  figures for which he has no empirical support.  Dr. Sullivan

11  has collected no data regarding Cox user behavior.  He has no

12  idea how many fewer purchases Cox users make based on the

13  number of infringements.  He doesn't try to calculate how many

14  fewer purchases Cox users make based on the number of

15  infringements.  He makes an assumption.  He arbitrarily assumes

16  both the number of fewer purchases and the variety of future

17  purchases.  That's the exact opposite of what an analysis is

18  supposed to be.

19          THE COURT:  Okay.  All right.  Thank you.

20          MR. THEODORE:  Oh, I am sorry, should I also address

21  Dr. Karaganis?

22          THE COURT:  Yes, please do.

23          MR. THEODORE:  Dr. Karaganis we think is just

24  completely unqualified to offer the opinions at issue here.  He

25  is a self-described sociologist.  He has doctorate in social

1    theory cultural studies in U.S. and Latin American literature.

2            Just looking at the summary portion of his report, I

3    mean, he's talking about the changes in paradigms of

4    distribution of content.  Trying to understand file sharing

5    within the context of the broader turbulence and ongoing

6    transformation of the business.

7            And then he talks about this entirely from a public

8    policy perspective, what copyright policy should be.  I mean,

9    he's up there to essentially tell the jury that copyright

10   infringement is good, at least in some amount, and copyright

11   law should tolerate it to some amount.  But copyright law

12   doesn't tolerate it.  It is an irrelevant and inappropriate

13   opinion for him to offer.

14           And it's compounded by the fact that he was

15   introduced for only one reason, one reason only, and that's to

16   rebut Dr. Lehr.  But Dr. Lehr's analysis is economic analysis.

17   And Dr. Karaganis admits that he is not qualified to perform

18   the economic analysis which is needed to respond to Dr. Lehr.

19   He is not qualified to assess Cox's financials.  He's not

20   qualified to assess the sophisticated economic literature

21   regarding the costs of infringement.  He has no economic

22   training.  He can't do statistical analysis.  He can't --

23           THE COURT:  How about the comparison of the source

24   codes, Rightscorp 's to MarkMonitor's, I think that's --

25           MR. THEODORE:  I don't think -- does Dr. Karaganis --

1    I thought that was Dr. Rosenblatt.

2              THE COURT:  Oh, you're right, that's Rosenblatt.

3              All right, I'm sorry, go ahead.

4              MR. THEODORE:  I mean, he was put in for one purpose

5    only, to rebut Dr. Lehr.  But Dr. Lehr's testimony is economic

6    testimony, and Dr. Karaganis is not an economist.

7              THE COURT:  All right.  Thank you.

8              MR. BUCKLEY:  Your Honor, Brian Buckley for Cox.

9              So Dr. Lehr, as you've heard, is an economist.  And

10   there is only one thing in his report that involves any

11   economic analysis at all, and that's the calculation of the

12   97 percent profit margin.  We absolutely take issue with that.

13   Dr. Sullivan does a fairly detailed analysis of why it's wrong.

14             You are going to hear at trial from Sandy Mencher,

15   the VP of finance at Cox, he's going to say it's wrong.

16             Ultimately the specific number doesn't matter because

17   Dr. Lehr doesn't do anything with that number.  He doesn't

18   connect it to anything.  He doesn't show that there is an

19   economic incentive for Cox to retain subscribers because it's

20   97 percent versus something else.

21             When it gets to the point where he's trying to

22   connect it up to economic incentive, all he says is,

23   subscribers are profitable.  And we have said, yes, they are,

24   that's why we're in the business.  The jury doesn't need to

25   hear that money is good and that subscribers are profitable and

1    that profit is good.

2           So we're going to spend all of this time with experts

3    going back and forth, and ultimately all the jury is going to

4    take away from that is absolutely Cox wants to hold onto its

5    subscribers for lots of reasons, and profit is one of them.

6           So the only economic analysis in his report gets the

7    jury nowhere, but it's going to be a long trip to get there.

8           THE COURT:  Well, doesn't the jury have to decide

9    what profits Cox has made in order -- one, it's relevant to

10   vicarious liability.  But two, it's also facts that I then use

11   to look at statutory damages, right, if infringement is found?

12          MR. BUCKLEY:  Your Honor, yes, if they had undertaken

13   that analysis, but they didn't.  They did not retain Dr. Lehr

14   as a damages expert.  That is not what he is doing.  He didn't

15   take his profitability figure and multiple it by some other

16   number and say, well, there is Cox's profit.

17          In fact, he very expressly didn't do that.  Every

18   time he was asked about, well, so how does this match Cox, how

19   does that relate to Cox subscribers, how many people should

20   they have terminated, he said, I have no idea.  He ran

21   screaming from anything that had to do with the facts of this

22   case.

23          Had they brought him in as a damages expert to say,

24   here's the calculation that gets you to Cox's profits, we

25   wouldn't be arguing, we would just put up Dr. Sullivan to rebut

```
 1    that.  That's not at all what they're saying.

 2            Your Honor, that's what insidious, frankly, about Dr.

 3    Lehr's testimony.  He is a credentialed man.  He is an

 4    impressive man.  He is going to get up here and say things that

 5    sound like they matter, and they don't.  The jury, again, does

 6    not need to be told that subscribers are profitable.

 7            So if you get past that, which again is the only

 8    economic piece of his report, the things at the bottom as you

 9    march down, harm to the copyright industry generally, Your

10    Honor, that's why we have Dr. Karaganis to come in and rebut

11    that, it's not right.  But if he's not going to be -- if Dr.

12    Lehr is not going to be able to testify that piracy is bad,

13    then we don't need Dr. Karaganis to say the opposite, so he's

14    out.

15            The only issue that is maybe at the edge is this

16    issue of economic incentive.  But again, Your Honor, it's not

17    an economic analysis, it's profits are good.  So if he's not

18    going to be allowed to testify to that, then we don't need Dr.

19    Karaganis to say the opposite there either.  So the two can

20    cancel one another out.

21            But I do think where you land, Your Honor, is that

22    they don't need Dr. Lehr.  If the issue is are our subscribers

23    profitable, Dr. Sullivan will say that they are.

24            On the issue of whether Dr. -- so regardless of what

25    happens with Dr. Lehr, they have attacked Dr. Sullivan on this
```

Case 1:18-cv-00950-PTG-JFA   Document 672-7   Filed 09/24/19   Page 25 of 114 PageID# 
13495
Case 1:14-cv-01611-LO-JFA   Document 616   Filed 11/23/15   Page 24 of 139 PageID# 17382

24

1    notion that he is making up an actual damages calculation.

2    First of all, as Your Honor just recognized, actual damages is

3    relevant to statutory damages.  The law is clear on that, it's

4    one of the things you're supposed to look at.

5           We're only the ones who retained a damages expert.

6    And Dr. Sullivan is the only one who has tried to calculate

7    actual damages.  And what he did was he took the evidence that

8    the plaintiffs have put forward from their very first complaint

9    as the evidence of infringements.  What they've said is, we

10   know there is infringement on Cox's network because Rightscorp

11   saw it, it's all these Rightscorp's observations.

12          We disagree with that for lots of reasons, but what

13   Dr. Sullivan said was, okay, I'm going to take every one of

14   those, every Rightscorp observation, and I'm going to attach

15   damages to it.  Call it an upload, call it a download, call it

16   making available -- there is no evidence of anything else,

17   there no evidence of a transmission or a download by anybody

18   else, so all we've got is the Rightscorp data.  He said, I am

19   going to take every single observation, I am going to give the

20   plaintiffs credit for it.  So I'm going to calculate the

21   maximum actual damages they could ever have come up with if

22   they took that approach.

23          That is relevant, Your Honor, it's either relevant

24   for you or it's relevant for the jury to know.  They can

25   certainly argue that it understates the number, that it's

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 26 of 114 PageID#
13496
Case 1:14-cv-01611-LO-JFA Document 876 Filed 11/23/15 Page 25 of 119 PageID# 17883

1   unreliable, they can cross him on that, but the law is clear

2   that that is one of the elements of the statutory analysis, and

3   he is the one only who has done it.

4           And I don't think his credentials, Your Honor, just

5   briefly -- Dr. Sullivan's credentials are not in question.  He

6   has testified at trial 16 times.  He has testified in hundreds

7   of cases.  That's what damages experts do.  And you would

8   typically expect to see one on each side, it just happens to be

9   the case where we are the only ones with a damages expert.

10          THE COURT:  Tell me, BMG argues that he discounted

11  all uploads.  Do you disagree with that?  Do you think he took

12  all of the notices in whatever form they came in?

13          MR. BUCKLEY:  Absolutely.  And here is why.  He

14  didn't make any legal exclusions at all.  In fact, he disclaims

15  legal conclusions.  Dr. Bardwell assumes that the Rightscorp

16  data equates to liability.

17          THE COURT:  Right.

18          MR. BUCKLEY:  Dr. Sullivan said, I'm assuming

19  infringement.  I'm going to take every observation in the

20  Rightscorp data, call it what you want, call them up all

21  uploads, and I am going to attach damages to every one.

22          So the answer to that is, it doesn't matter whether

23  it's an upload or a download.  It's the only evidence they've

24  put forward of infringement in whatever form, and he's

25  crediting every single one of those using their financial data

Case 1:18-cv-00950-PTG-JFA   Document 672-7   Filed 09/24/19   Page 27 of 114 PageID# 13497
Case 1:14-cv-01611-LO-JFA   Document 876   Filed 11/23/15   Page 26 of 119 PageID# 17384

26

 1   and saying, here is the most they could ever have gotten.  If

 2   they had come in and instead chosen actual damages, here is

 3   their home run.

 4          That's relevant, it's relevant for a jury to know.

 5   They might decide that that understates it.  Maybe there is

 6   some reason to jack that up or reduce it, but it's a relevant

 7   data point.

 8          THE COURT:  Okay.

 9          MR. BUCKLEY:  Thank you, Your Honor.

10          MR. THEODORE:  If I could just briefly respond, Your

11   Honor.

12          THE COURT:  Yes, please do.

13          MR. THEODORE:  So, first of all, as to Dr. Lehr, I

14   think the critical point that Mr. Buckley is not acknowledging

15   is that the level of profit, which he concedes is in dispute,

16   that matters.  How much profit they make, that goes to

17   statutory damages.  That is a statutory damages factor.  It

18   goes to economic incentive.  It is an economic incentive.  It's

19   a vicarious liability factor.

20          THE COURT:  So you don't think you need somebody who

21   wraps it all up and says, Cox made a $1.43 a month extra

22   because they allowed all these infringers to remain as

23   customers?

24          MR. THEODORE:  That was the next thing I was going to

25   address, Your Honor.  What Dr. Lehr did is he said -- he took

1   the 97 percent figure and then he calculated a value per

2   subscriber.  So he said, okay, we used this 97 percent figure.

3   He looked at the financials, he figured out how much Cox makes

4   per subscriber.  He looked at their average subscriber tenure.

5   He applied a discount rate.  And he came up with a lifetime

6   value figure, essentially the value of a subscriber to Cox.

7          And he did that -- the reason he did that on a per

8   subscriber level is because it's up to the jury to decide

9   exactly what Cox should have done here.  How many repeat

10  infringers there were.  How many they should have terminated.

11  That's a fact question that Dr. Lehr is not -- is not an expert

12  to answer.  Dr. Lehr doesn't know how many repeat infringers

13  there were.  He calculated on a per repeat infringer basis so

14  that the jury can then take that number per infringer and

15  decide what Cox's cost would be through a --

16          THE COURT:  Did his report -- and I get confused, I

17  apologize.  Did his report include the retention of customers

18  for the average period of time?

19          MR. THEODORE:  Yes, that's right.  I think this is --

20  I think it's 9, it might be 8, it's either appendix 8 or 9 to

21  his report where he shows the calculation and he comes out with

22  the subscriber lifetime value figure.  And it's per subscriber

23  because he's not offering an opinion on how many subscribers

24  are at issue.

25          The jury can look, it can look at Dr. Bardwell's

28

1    evidence of how many subscribers are at issue.  Dr. Bardwell

2    tries to figure out, all right, we've got 160,000 IP addresses,

3    how many subscribers does that really mean given that IP

4    addresses are dynamic and Cox destroyed the DHCP logs.

5           So Dr. Lehr can't come to a number by himself.  Dr.

6    Lehr and Dr. Bardwell together give the jury the ability to

7    simply multiple those two numbers together and come to the

8    figure that Mr. Buckley asked about.

9           THE COURT:  Okay.

10          MR. THEODORE:  Now, turning to Dr. Sullivan.  Mr.

11   Buckley is proceeding under a false premise.  And that false

12   premise is that the observations that Dr. Sullivan relied on

13   are the universe, the universe of potential uploads and

14   downloads, the universe of infringements.  But the trouble is,

15   when you see an instance in the Rightscorp data, that means

16   that a Cox subscriber is making that file available.  So at a

17   minimum, they've downloaded it.  At a minimum, they've

18   downloaded it.  And most likely they've uploaded it many, many,

19   many times.

20          The observations are not a limit, they are not a

21   limit on the number of infringements, and Dr. Sullivan presumes

22   that they are.  And the way he gets there, the way he justifies

23   this is by saying that uploads don't count.  But there are

24   potentially a very large number of uploads.

25          When Rightscorp observes over and over and over again

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 30 of 114 PageID#
13500
Case 1:14-cv-01611-LO-JFA Document 816-7 Filed 11/23/15 Page 29 of 113 PageID#17387

29

 1  -- so we have 160,000 IP addresses, and around two million

 2  observed infringements.  So when Rightscorp observes a Cox

 3  subscriber making available a file over and over for over a

 4  long period of time, multiple observations, what that really

 5  means is that they have downloaded it and they have uploaded it

 6  an unknown number of times.  There is an unknown upside to the

 7  number of infringements.  And that is what Dr. Sullivan is

 8  trying to get around with his false conclusion that uploads

 9  don't materially contribute to infringement.

10          So that's the flaw in their sort of -- in their

11  assertion that he has taken into account every Rightscorp

12  observation.  He is mischaracterizing the nature of the

13  Rightscorp observations.

14          And then on that basis he's building a damages model

15  that doesn't try to analyze the connection between infringement

16  and subscriber conduct.  He doesn't run any regressions.  He

17  doesn't have a data set regarding what Cox subscribers do, how

18  their purchases are affected.  He creates a false data set as

19  to the number of infringements, but he doesn't have a data set

20  at all as to what those infringements need to be connected to.

21          He's not taking two data sets and trying to figure

22  out they're connected.  He's making arbitrary assumptions to

23  get to the number of purchases.  He just assumes no physical

24  downloads, but there is no backing for that assumption.

25          That's what his research should try to be

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 31 of 114 PageID#
13501
Case 1:14-cv-01611-LO-JFA Document 876-7 Filed 11/23/15 Page 30 of 113 PageID#17388

30

1    calculating.  He should be trying to figure out that it doesn't

2    displace physical sales.  How many physical sales does it

3    display?  How many digital downloads?  How many streams?

4    That's what the research should be directed at.  He's just

5    assuming those numbers.  And as a result, he is assuming his

6    conclusion.

7         THE COURT:  Okay.  All right.  Thank you.

8         MR. BUCKLEY:  Your Honor, can I make one very brief

9    point?

10        THE COURT:  Yes, very briefly.

11        MR. BUCKLEY:  Mr. Theodore said that the jury is

12   supposed to take Dr. Lehr's number, top end number and multiply

13   it by Mr. Bardwell's data.  That's exactly what Sullivan did.

14   And for whatever reason, they didn't have their own expert do

15   that.

16        Your Honor, would you like me to address Dr. McGarty

17   briefly because it came up in Mr. Theodore's argument.  I'm

18   happy to handle that now.  Or do you want to wait?

19        THE COURT:  Let's just keep rolling.  Go ahead.

20        MR. BUCKLEY:  So we moved to exclude Dr. McGarty's

21   testimony.  He is basically -- so he has no direct information

22   about Cox.  He doesn't really know how Cox's systems operate.

23   He is essentially opining on the reasonableness of our repeat

24   infringer termination policy.

25        So based on your ruling last night and your comments

 1    today, I think he's out.

 2             THE COURT:  Okay.

 3             MR. BUCKLEY:  Thank you, Your Honor.

 4             MR. ENGLE:  Your Honor, if I could just address Dr.

 5    McGarty.

 6             THE COURT:  Yes.

 7             MR. ENGLE:  Your Honor, he didn't opine about whether

 8    Cox met the safe harbor.  We listed in our reply brief a list

 9    of opinions that Dr. McGarty gave.  And those -- and intends to

10    give.  And those aren't related to the DMCA safe harbor.  I

11    mean, he is an industry expert.  He didn't read the DMCA, they

12    pointed that out in their briefs.  He didn't opine on what

13    reasonableness is.  He didn't opine that they met the safe

14    harbor.

15             THE COURT:  What do you want him to testify about?

16             MR. ENGLE:  So he is going to testify that Cox

17    provides its subscribers the means by which to use BitTorrent.

18    That Cox routinely monitors and controls its subscribers'

19    access to the Internet services.  That Cox treats copyright

20    infringement abuse violations differently than they treat other

21    abuse violations, such as spam violations.

22             THE COURT:  Well, why is that relevant anymore?

23             MR. ENGLE:  Again, this goes to willfulness, and to

24    the degree that Cox was benefiting from this infringement on

25    their network.

Case 1:18-cv-00950-PTG-JFA   Document 672-7   Filed 09/24/19   Page 33 of 114 PageID# 13503
Case 1:14-cv-01611-LO-JFA   Document 816-7   Filed 11/23/15   Page 32 of 119 PageID# 17890

32

 1          He makes other opinions about the operation and

 2    logistical reasons, including that Cox had no operation or

 3    logistical reason to reject the notices from Rightscorp.  And

 4    that's certainly relevant.  I mean, they're trying to argue

 5    that we couldn't take these notices from Rightscorp.  And based

 6    on his experience in the ISP industry, he set up systems

 7    whether it's customer service or something else, they have ways

 8    to address those.

 9          And one of the major arguments they make against Dr.

10    McGarty is they say, you know, look, he didn't review the CATS

11    source code line by line.  And let me just grab a document.

12          They say he didn't review the source code line by

13    line, and that means he knows absolutely nothing about CATS.

14    Well, no, he didn't review it line by line.  He is not a coder,

15    he doesn't purport to be.  He is approaching this as a chief

16    operating officer of an ISP.

17          And what he did look at was all the deposition

18    testimony about CATS, dozens of documents about CATS.  And he

19    looked at this, it is a 171-page manual called the CATS Abuse

20    Automation System Implementation Plan.  And this tells you how

21    CATS operates.  It tells you how the code works.  It tells you

22    how CATS was set up.  It tells about its capabilities.  And he

23    became very familiar with this.

24          So it's just not true that his opinions don't fit the

25    case.

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 34 of 114 PageID#
13504
Case 1:14-cv-01611-LO-JFA Document 876 Filed 11/23/15 Page 33 of 113 PageID# 17391

33

1          THE COURT:  Okay.  Thank you.

2          MR. BUCKLEY:  Your Honor, just briefly.

3          THE COURT:  Please.

4          MR. BUCKLEY:  Every point Mr. Engle just mentioned is

5    a question they can ask a Cox witness, and they can argue

6    whatever they want from that in their closing.

7          Putting Dr. McGarty up because, again, he is

8    well-credentialed, he's an impressive guy, just to be a

9    mouthpiece for their factual arguments, which is what every one

10   of those was, is improper.  That's exactly what Daubert says,

11   you don't get to bring an expert in just to sound smart and

12   convince the jury that he is right.

13         So they are certainly free to ask Cox about all of

14   the operational issues he just brought up and his conclusion

15   that there was no logistical reason to reject Rightscorp's

16   notices.  We've said all along we could have taken those

17   notices in, we just chose not to because they were

18   extortionate.  So Mr. McGarty adds nothing to that analysis.

19         THE COURT:  Okay.  All right, I will look at it.

20         Joe, let's get our people back together and give them

21   a copy of this note.  Okay.

22         All right.  Where are we going now?

23         MR. KELLEY:  Well, we have got three more Daubert

24   motions.  All of which were filed by Cox.

25         THE COURT:  Yes.

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 35 of 114 PageID#
13505
Case 1:14-cv-01611-LO-JFA Document 816 Filed 11/23/15 Page 34 of 119 PageID#17892

1          MR. KELLEY:  So we've got Nowlis, Bardwell, and Oman.

2          THE COURT:  Okay.  Let's have Cox --

3          MR. BRIDGES:  Your Honor, Jed Wakefield will address

4    Mr. Bardwell and Mr. Nowlis, and then I will bring up the rear

5    addressing Mr. Oman.

6          THE COURT:  All right.

7          MR. BRIDGES:  Thank you.

8          MR. WAKEFIELD:  Good afternoon, Your Honor.  Dr.

9    Bardwell is a mathematician, I will start with his study of the

10   two studies that I will address, Bardwell and Nowlis.  He did

11   nothing but look at Rightscorp's data, and he purports to have

12   applied a mathematical model to it, and will now testify that

13   he can tell from that data that there is repeated infringement

14   of plaintiffs' copyrights and their songs by individual Cox

15   subscribers.

16         And there are three fundamental problems with this.

17   First, those opinions are not tethered to the facts.  They are

18   not based on facts or data as Rule 702 requires.  Their

19   argument and their prejudicial value far exceeds any probative

20   value under Rule 403.

21         Second, he is not qualified.  He is a mathematician.

22   He is not qualified to testify about infringement, about

23   subscribers.

24         And third, he doesn't adequately disclose how he did

25   this model, and it can't be tested or determined to be reliable

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 36 of 114 PageID#
13506
Case 1:14-cv-01611-LO-JFA Document 876-7 Filed 11/23/15 Page 36 of 119 PageID# 17593

35

1   as a result.

2           So on the first point, he wants to say to the jury

3   that this data shows subscribers were repeatedly infringing.

4   But when he is asked, he admits that when he says infringement,

5   he doesn't mean infringement as the law would mean it or as the

6   jury is going to be instructed, and that he is not talking

7   about a subscriber to Cox when he says a subscriber.  He

8   doesn't actually mean a person at all.  He is referring to a

9   node on a network to which an Internet protocol address has

10  been assigned.

11          And when he talks about it being repeated activity --

12          THE COURT:  His definition of "repeated" is that

13  there are multiple hits on the node, right?

14          MR. WAKEFIELD:  Right.  That the Rightscorp system

15  observed it repeatedly.  Which means the only volitional act

16  occurring is that Rightscorp is pinging a network address and

17  seeing over and over again the same thing.  And he admits, if

18  you see one thing again and again, that he wants to say that a

19  Cox subscriber repeatedly did something.  So that's highly

20  problematic.

21          And he also wants to say that what it's seeing is a

22  song when he can't testify that the Rightscorp system actually

23  detected the presence of a full song.  It's detecting a portion

24  of a torrent that may or may not contain that song.  And that's

25  a major point of contention as to which Dr. Bardwell has no

Case 1:18-cv-00950-PTG-JFA    Document 672-7    Filed 09/24/19    Page 37 of 114 PageID#
13507
Case 1:14-cv-01611-LO-JFA    Document 816-7    Filed 11/23/15    Page 38 of 119 PageID# 17894

1    expertise.

2            Which takes me to point two, which is his

3    qualifications.  He doesn't know anything about the Rightscorp

4    system or the software that generated it.  He is not an expert

5    in ISP technology, in studies to identify Internet users or

6    Internet user behavior, about music technology, peer-to-peer

7    technology, or any of that.

8            And then the third problem is that he doesn't

9    disclose how his model worked.  He uses some mathematical

10   terms, he attaches some formulas, but when pressed, he can't

11   explain how he arrived at the values and estimates he assigned

12   to different parts of his equations.  He says it was all done

13   by code that was written, but he didn't write it, he didn't

14   expertise it, and he has never seen it run.

15           Dr. Sullivan tried to get it to run, has experience

16   with that kind of code, and testified it doesn't run.

17           And in rebuttal, Dr. Bardwell just says, oh, no, I

18   think you have the wrong setup.  But he still, even in his

19   deposition after this had been pointed out, had never seen it

20   run.

21           So on every prong of the Rule 702 analysis, Dr.

22   Bardwell fails.  This is an attempt to have someone, again with

23   great credentials, come in and meet one of the key elements of

24   the case and say to the jury, there is a ton of infringement,

25   when he really doesn't know that and he is not qualified to say

 1    it.

 2            THE COURT:  Okay, thank you.

 3            MR. WAKEFIELD:  Shall I talk about Nowlis?

 4            THE COURT:  Yes, go ahead.

 5            MR. WAKEFIELD:  Okay.  Dr. Nowlis did a different

 6    kind of study, he did a survey.  And he purports to do a survey

 7    that goes to whether the ability to infringe using BitTorrent

 8    is a draw to the Cox Internet service.  And the problem --

 9            THE COURT:  I looked at that pretty closely.  So tell

10    me the --

11            MR. WAKEFIELD:  Yeah.  The highlights are he asked

12    the wrong questions to the wrong people.  He didn't get the

13    universe of people who download music illegally.  He asked

14    questions that said first, to qualify:  Do you download music

15    for free?  And then he gave examples in less conspicuous type.

16    And if you look at the whole survey question, we pasted it into

17    the brief so you could see how a jury -- I mean, how a

18    respondent would see it.

19            The way you would read those questions is to say, do

20    you download music?  Do you surf the Internet?  You don't need

21    to say, well, do I use Google?  What do these three examples

22    have in common?  And if I use something other an Google, do I

23    say yes or no?  The answer is yes, if you download free music

24    perfectly legally from something like iTunes or Amazon, the

25    answer is yes.  So we have an overinclusive universe.

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 39 of 114 PageID#
13509
Case 1:14-cv-01611-LO-JFA Document 816 Filed 11/23/15 Page 39 of 131 PageID# 17896

38

 1          And then second, there is no control.  So he didn't

 2   go to other ISP users and say, why do you subscribe?  And so,

 3   we don't have any data to indicate that Cox, anything about

 4   tolerating infringement, is a unique draw to the defendant in

 5   this case.  We just have people saying yes in answers to these

 6   multiple choice questions.

 7          And those questions themselves are closed-ended and

 8   misleading.  None of them say, why do you -- why did you

 9   subscribe to Cox?  Or, if Cox Internet service restricted what

10   you could do, would you change or would you just keep

11   subscribing because of all the other things you did?

12          And the best way to see that these results don't

13   really test what is a draw to a particular Internet service

14   provider is the results themselves on the other things that

15   were tested, like the ability to use Google and look for

16   things, or the ability send an e-mail.  90 percent or more of

17   the respondents listed that as a reason they subscribe to Cox

18   according to Dr. Nowlis.

19          We all know no one subscribes to an Internet service

20   provider because they want to send an e-mail.  They subscribe

21   because it comes with their TV service.  Or they subscribe

22   because there is a good price.  Or because in their

23   neighborhood it is just the best provider that is available,

24   there is good customer service.  No respondent had the ability

25   to answer any of those questions.

Case 1:18-cv-00950-PTG-JFA   Document 672-7   Filed 11/23/20   Page 40 of 114 PageID# 13510
Case 1:14-cv-01611-LO-JFA   Document 676   Filed 11/23/15   Page 39 of 113 PageID# 17897

39

1          THE COURT:  All right, thank you.

2          MR. PECAU:  Good afternoon, Your Honor.  Will Pecau.

3     I am going to address Cox's criticisms of Dr. Nowlis.

4          THE COURT:  Okay.

5          MR. PECAU:  All right.  So the first thing they

6     criticize is the universe, which is basically the population,

7     who are they asking questions.

8          Well, it's clear that Dr. Nowlis asked the right

9     people.  He asked Cox subscribers.  He asked them two main

10    questions in the survey.  The first question he asked them, he

11    says -- the first question is about use.  And basically what he

12    asked the Cox subscribers are:  Which, if any, of the following

13    Internet activities do you personally do in your current

14    residence?

15         So he is asking the people who actually subscribe to

16    Cox, what do you do in your residence?  And among those various

17    options, they had 11 options, one of them was:  Download or

18    upload free digital music through sites such as ThePirateBay,

19    Kickass Torrents, Torrentz, et cetera.

20         So the people who are being asked that particular

21    question are clearly relevant here.  And what was the result of

22    that question?  Well, the result of that question was that

23    about 16 percent of all these people who were asked said that

24    they in fact download -- they use -- they download or upload

25    free digital music through sites such as ThePirateBay, Kickass

1    Torrents, and Torrentz, et cetera.

2           All right.  So then Dr. Nowlis went on to ask those

3    people what reasons do they use various things.  So one

4    question is usage, the other is reasons.  And reasons goes

5    right to the heart of the question of what is a draw.

6           And in particular what Dr. Nowlis asked them:  Which,

7    if any, of the following are reasons why you subscribe to Cox

8    Internet service?  And again, there are 11 different things

9    that folks can answer.

10          Now, what they argue -- and the result of that is

11   that we find out that 10 percent of all Cox users, one of the

12   reasons that they subscribe to Cox is because they get to

13   download or upload free digital music through sites such as

14   ThePirateBay, Kickass Torrents, and Torrentz.

15          Now, Cox argues, well, you know, what if people don't

16   know what this thing is?  But Dr. Nowlis, as he testified, put

17   in a lot of protections against that.  First of all, he makes

18   clear both at the beginning of his survey and right before he

19   asks the main question, that if you don't know the answer --

20   for example, if you don't know what ThePirateBay is, you can

21   say, I don't know, I'm not sure.  And he says that that is just

22   the kind of answer that is a perfectly fine answer.

23          Also, they have the opportunity to say, no, I don't

24   do it.  So that is built into the survey itself.  And the

25   respondents are repeatedly told not to guess on the survey.

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 42 of 114 PageID# 13512
Case 1:14-cv-01611-LO-JFA Document 816 Filed 11/23/15 Page 41 of 113 PageID# 17899

41

1          So then the second question is, well, why didn't you

2   ask them -- you know, why didn't you ask them about BitTorrent?

3   Well, the reason is is that Dr. Nowlis, who has been doing this

4   for 25 years or -- well, more than 25 years, and is an expert

5   in this area, said that to make the question clear, it's much

6   better to give examples of what you're actually talking about

7   rather than something like BitTorrent because then all his

8   other questions would have to ask -- for example, he asks about

9   iTunes.  Let's see, so we go to:  Purchase digital music

10  through sites such as iTunes, Google Play, Amazon.com, et

11  cetera.

12         Well, he isn't going to describe the technology that

13  is used in that.  And then that creates confusion if you ask

14  different questions different ways.

15         So the fact is that he asked very clear, very

16  concrete questions so people could understand it.  And if they

17  didn't understand it, they could say they didn't know.

18         Then they say, well, you know, why didn't you ask

19  them, are you doing something illegal?  Well, the thing is that

20  there are a bunch of problems with that.  First of all, whether

21  it's illegal or not, or whether they know it's illegal, is

22  completely irrelevant to copyright law.

23         What Dr. Nowlis is looking for is two things.  One,

24  the first question was about usage, and the second question was

25  about motivation.  So people aren't motivated to do things

Case 1:18-cv-00950-PTG-JFA   Document 672-7   Filed 09/24/19   Page 43 of 114 PageID# 13513

42

1    illegally.  They are motivated to get free music.  But to get

2    free music through these kinds of sites, what they're doing is

3    naturally they're getting illegal music.

4          Now, the thing is that then they argue, well, you

5    know, you didn't ask -- you just asked if this is a reason why

6    you subscribe to Cox.  You didn't ask, well, is this the reason

7    you subscribe to Cox and didn't subscribe to other people, or

8    there were other places that you could go.  But that's not the

9    issue on the question of draw.

10         The question of draw, Your Honor, simply is whether

11   this is something that's important.  Is this a reason that you

12   subscribe to something?

13         It isn't a question whether you go to a site or

14   facility, one site or facilities as opposed to another site or

15   facilities.  If you look all the cases, like Fonovisa, the flea

16   market, the court didn't decide, well, this flea market is

17   worse than other flea markets.  In Napster, they didn't decide

18   that this particular service was worse than other services.  In

19   Arista Records, they didn't decide whether this swap meet was

20   worse than other swap meets.

21         The only question on draw, the only question is you

22   look to whether if going to this site, using these facilities

23   enhances the value to customers.  Is it a reason to use the

24   facilities and benefit?  As opposed to just some added benefit

25   that you might happen to get.

43

1          All right.

2          THE COURT:  Well, how do you -- Cox believes that

3     since he asked the question about why do you use your Internet,

4     and 97 percent say, I use Cox's Internet because of e-mails and

5     I want to use the Internet, that that has demonstrated that the

6     survey just asked improper questions and that the conclusions

7     he reaches are not sound.

8          MR. PECAU:  Well, actually, Your Honor, I think it is

9     pretty clear it shows just the opposite.  I mean, the thing is

10    that if I -- if I buy Internet -- if I am an Internet

11    subscriber, a reason that I subscribe to the Internet is so

12    that I can do e-mail, and that's a draw to me.  Because if

13    there was an Internet service that didn't provide e-mail, I

14    wouldn't use it.

15         And in fact, that's why Dr. Nowlis put in the control

16    questions, which are a very important part of a proper survey

17    design, he had examples of activities that were not things that

18    drew people to it.  I mean, for example, the -- well, he had

19    two of them.  He had one, the avatar, which there was a 10

20    percent response.  And another one was something about

21    collecting radiation, which is 3.2 percent response.

22         And Dr. Nowlis is very conservative, even more so

23    than I would probably like, by taking the 10 percent and just

24    lopping that off.  The 70 percent of the people who said --

25    70 percent of the people who said that they do this activity,

1    who said it was a reason that they subscribe to Cox.

2           At the end of the day, you have a huge percentage of

3    people that the very reason they identify going to -- buying

4    Cox's services is because they will have the ability to get

5    this free content and this free content is infringing.

6           Now, the evidence that we have that getting this free

7    digital music from sites such as ThePirateBay, Kickass

8    Torrents, and Torrentz, et cetera, that these bit torrent

9    sites, there is a lot of evidence in this case that shows that.

10          And, Your Honor, you referred to the NetNames and the

11   Envisional studies, which are --

12          THE COURT:  I don't want to deal with that right now.

13          MR. PECAU:  Okay.  Thank you, Your Honor.

14          THE COURT:  All right.  Thank you.

15          Do we have everybody here on our criminal case?

16          COURT SECURITY OFFICER:  Yes, sir, we do.

17          THE COURT:  Stay right there.

18          NOTE:  A recess in the hearing is taken to conduct

19   other court matters; at the conclusion of which the hearing

20   continues as follows:

21          THE COURT:  All right.

22          MR. CARACAPPA:  Good afternoon, Your Honor.  John

23   Caracappa.  I will address the points about Mr. Bardwell.

24          THE COURT:  Bardwell, please.

25          MR. CARACAPPA:  Yeah.  I won't reargue what's in our

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 46 of 114 PageID#
13516
Case 1:14-cv-01611-LO-JFA Document 816-7 Filed 11/23/15 Page 46 of 119 PageID# 17903

1    opposition, but let me address a couple of the points that Cox

2    makes.  Let me provide some context for Mr. Bardwell.

3            Cox is arguing that the IP addresses can change

4    frequently.  And even though one IP address receives a thousand

5    notices, those thousand notices may not necessarily be

6    associated with the same Cox subscriber.

7            So Dr. Bardwell looks at the IP address, he looks at

8    the port, and he looks at the hash value of the torrent.  And

9    he said, there is a 95 percent probability that the Cox

10   subscriber between dates X and Y is the same Cox subscriber.

11   And that the 400, 500, 3,000 notices that were sent or should

12   have been sent to this IP address, are the same subscriber.

13           That is what a mathematician is for, and that's why

14   he is a mathematician.  He does not need to understand the

15   technology.

16           In computing this 95 percent, there are hundreds of

17   thousands of calculations.  So he has people who are

18   experienced with software on his staff and they create programs

19   that are run, and Dr. Bardwell talks about the 95 percent.

20           We disclosed that code to Cox.  Mr. Sullivan says the

21   code doesn't work.  We didn't know that at the time.  They

22   never said to us during expert discovery, look, let's talk

23   about the code.  It's frankly more of a slight against Mr.

24   Sullivan than it is against Mr. Bardwell.

25           The model that he uses is the Markov model, and we

Case 1:18-cv-00950-PTG-JFA   Document 672-7   Filed 09/24/19   Page 47 of 114 PageID# 13517
Case 1:14-cv-01611-LO-JFA   Document 876-7   Filed 11/23/15   Page 48 of 119 PageID# 17904

46

 1   state in Note 8, is generality accepted.  A lot of their

 2   concerns with Mr. Bardwell they can bring up on cross.  The

 3   terminology that he uses, as Your Honor pointed out, he clearly

 4   defines.

 5           Again, we need this because of Cox's argument that

 6   the IP addresses change, and Dr. Bardwell's probability is

 7   relevant.

 8           One important point that Cox does not bring to the

 9   Court's attention is that Dr. Bardwell's model was confirmed by

10   Cox's own data.  And we will talk a little bit about this when

11   we talk about the DHCP records.  But we asked during discovery

12   for all the information that Cox has that is associated with

13   the IP addresses that we believe are infringing.  And Cox says,

14   well, we destroyed most of it, but here is 130 that we have.

15   Mr. Bardwell says, okay, let me take a look at the 130.  And it

16   confirms my model that it is accurate.

17           So Dr. Sullivan could test the model, he did test the

18   model, they received all the information associated with Dr.

19   Bardwell's analysis.

20           THE COURT:  All right, thank you.

21           MR. CARACAPPA:  Thank you, Your Honor.

22           THE COURT:  All right.  There was one more Cox --

23           MR. WAKEFIELD:  Brief response on that?

24           THE COURT:  Go ahead.  Briefly.

25           MR. WAKEFIELD:  Briefly.  Dr. Bardwell was retained

47

1    and had done his analysis well before this issue of the DHCP

2    logs came up.  It's not the purpose of his analysis.  It's not

3    what his analysis is about.  He is not simply saying that he

4    can link an IP address to an account.  He is saying that the

5    person at the end of that account is the same person, and that

6    it is a subscriber who is repeatedly infringing.  That's far

7    more.

8         It's also not accurate to say that there was any

9    confirmation by the customer account data we did provide.

10        THE COURT:  So 130 customer accounts that were

11   ultimately turned over --

12        MR. WAKEFIELD:  So what he does --

13        THE COURT:  Well, Bardwell took that --

14        MR. WAKEFIELD:  He takes that and he says, I am going

15   to compare those accounts to my analysis and see if, yes, they

16   were in fact the same accounts --

17        THE COURT:  The retention time.

18        MR. WAKEFIELD:  And he concludes they were.  But

19   again, he doesn't show how he does that.  What his data shows

20   is the subscriber, what they call the node, being assigned to

21   that address for maybe 140 days.  When he sees in the Cox data

22   that there is a match for a handful of days, he says, yep, it

23   confirms my analysis.  When in fact it doesn't.  And he doesn't

24   have any explanation for why that would confirm it.

25        But it's also, it's not a confirmation to say that

Case 1:18-cv-00950-PTG-JFA   Document 676-7   Filed 10/24/19   Page 49 of 114 PageID#
13519
Case 1:14-cv-01611-LO-JFA   Document 816-7   Filed 11/23/15   Page 48 of 113 PageID# 17906

48

1    some other data got you to the same result.  An eyewitness to a

2    car accident can say, I saw the light was red.  That doesn't

3    mean you get in somebody who read the tea leafs in a cup and

4    said, I believe the light was red from this.  It is not

5    confirmatory in any way.

6               THE COURT:  All right, thank you.

7               We had one other Cox, Mr. Bridges.

8               MR. BRIDGES:  Thank you, Your Honor.

9               The final Daubert motion concerns Ralph Oman.  We

10   actually believe that the Court's ruling yesterday evening has

11   dispensed with any possible role of his in the case.

12              If one looks at his expert report, throughout it is

13   about the Digital Millennium Copyright Act.  From the beginning

14   to the end when it's not in the heading, there are references

15   in the text to section 512 repeatedly.

16              He was introduced because he was a Register of

17   Copyrights with some experience pre-DMCA, but he testifies

18   about DMCA legislative history and the like.  So we think that

19   that is really out in its entirety.

20              If the Court doesn't believe that the order last

21   night addressed or has eliminated any relevance of him, then I

22   would like to say that, Your Honor, his expertise is in the

23   law, and in telling the Court what the law is, what the law

24   says, what the law stands for.

25              I asked him in deposition -- because he's been an

1     amicus individually, in his own capacity, a number of times.

2     And I asked him, what distinguishes your role as an amicus from

3     your role as an expert?  And he said, to put it bluntly, I get

4     paid to be expert.

5            So we've certainly seen -- we've learned our lesson,

6     Your Honor, about how the Court feels about certain types of

7     nonpercipient witness input.  His role is really functioning as

8     a paid amicus serving as an expert.

9            Even in his testimony when asked at one point what

10    his contribution was to the, I think it's International

11    Intellectual Property Institute, he said, well, I lend my name

12    and my prestige to that.

13           The very real concern here, Your Honor, is that this

14    is a gentleman who had a distinguished career in public service

15    that predated the DMCA who purports to come in and to explain

16    the jury -- explain to the jury copyright law.  He has not

17    represented any ISPs, he is not familiar with industry norms

18    regarding Internet service providers.  There is nothing to his

19    testimony other than trying to impress the jury with points of

20    law when in fact the Court will instruct the jury on the law.

21           THE COURT:  Do you --

22           MR. BRIDGES:  The one --

23           THE COURT:  Go ahead.

24           MR. BRIDGES:  The one thing he tries to do, or at

25    least the plaintiffs I think try to do is to use him to

Case 1:18-cv-00950-PTG-JFA  Document 672-7  Filed 11/23/15  Page 51 of 114 PageID# 17908
Case 1:14-cv-01611-LO-JFA  Document 876  Filed 11/23/15  Page 50 of 119  PageID#
13521

50

1  criticize the role of Randy Cadenhead for Cox.  And Mr.

2  Cadenhead, importantly, is a percipient witness.  He was not

3  some outside counsel that they commissioned for purposes of

4  litigation to give a noninfringement opinion.  He was having a

5  line function.

6          They say to him, do we do this or not?  What do we

7  do?  And he was giving those instructions based on his view.

8  And it was a view as much about extortion and blackmail as it

9  was about the DMCA.  It was what role should Cox have in

10  participating in this.  It was --

11          THE COURT:  Well, he is still going to testify -- you

12  think his testimony is still relevant to why Cox didn't accept

13  the notices?

14          MR. BRIDGES:  Absolutely, Your Honor, because the

15  question in the case is was it -- should Cox be liable

16  essentially in this case for refusing to accept and process the

17  Rightscorp notices.  And it was Mr. Cadenhead who basically

18  made that decision.

19          THE COURT:  Okay.  You know, I think he is.  But why

20  isn't then Mr. Oman's legal analysis as to whether -- and I

21  frankly, I don't know whether -- I can't remember whether he

22  actually gave it or not, whether in fact that advice was

23  consistent with the law.

24          MR. BRIDGES:  Your Honor, the question of willful

25  blindness goes to what was Cox's intent here.  And Mr.

51

1    Cadenhead will testify as to what he thought what the intent

2    was.  And it's about Cox's intent.

3            The DMCA is out of the case now.  And it's not a

4    question of did Cox conform with section 512.  The question is,

5    what was Cox's motivation?  And Mr. Oman has no proper role

6    addressing Cox's motivation here.

7            And the counsel are competent to argue -- we didn't

8    have a counterexpert to Mr. Oman, Your Honor, because it's my

9    understanding that the Court wants explanations of the law from

10   the counsel at counsel table.  And that's why we didn't have

11   some other person do it.

12           But the important thing here is that also Mr. Oman

13   basically testified he had no -- he has no experience giving

14   advice in-house.  There was a lot of criticism that Mr.

15   Cadenhead perhaps didn't write reasoned research memoranda.

16           Your Honor, most in-house lawyers aren't writing

17   themselves -- I'll wait.

18           THE COURT:  Let's copy that and give it to the

19   parties.

20           MR. BRIDGES:  Most in-house lawyers don't write

21   themselves research memorandums when they're the decision

22   makers.

23           So that's it, Your Honor.  I think that particularly

24   using Mr. Oman, whose actual knowledge of the DMCA, given his

25   previous role as Register of Copyrights, his knowledge of the

Case 1:18-cv-00950-PTG-JFA   Document 672-7   Filed 09/24/19   Page 53 of 114 PageID#
13523
Case 1:14-cv-01611-LO-JFA   Document 876-7   Filed 11/23/15   Page 52 of 113 PageID# 17910

52

1   DMCA is actually thinner than most copyright lawyers.  His

2   service predated the DMCA.

3          And his -- I asked him, Your Honor, to look at one of

4   Rightscorp's notices and to tell me if he thought it would meet

5   the notice requirements of section 512(c)(3).  I'm talking

6   about a three-page notice.  And he said, it would take me about

7   half an hour.  That was his response.

8          So he is not even bringing specialized expertise to

9   it, Your Honor.

10         Thank you, very much.

11         THE COURT:  All right.  Thank you.

12         Mr. Kelley.

13         MR. KELLEY:  Your Honor, this dovetails with the

14  motion in limine that we filed regarding Mr. Cadenhead.  And it

15  has to do with the advice of counsel.  Mr. Oman's sole role is

16  basically to respond to Mr. Cadenhead.

17         Mr. Cadenhead has got kind of a sparse e-mail track

18  record, and I assume he's going to testify that Cox rejected

19  Rightscorp's notices and blacklisted it because the notices

20  were not within the spirit of the DMCA, specifically the

21  settlement demand, settlement offer.

22         And what we're concerned about, frankly, is Mr.

23  Cadenhead getting up in front of the jury and Cox essentially

24  taking the role of, the lawyer said it was okay, so it must be

25  okay.

1          And so, we brought in Mr. Oman to say two things.

2    Number one, that the methodology I guess is a good word -- we

3    lawyers don't describe what we do that way very often -- but

4    the methodology that he used to come up with that opinion was

5    deficient.  The same sort of thing that you would find in a

6    patent case when somebody does a willfulness opinion.

7          And the second thing is, if he is going to be allowed

8    to testify as to what his thinking is on what the law is, then

9    we'll have somebody there to say he's wrong and to explain why

10   it is that he is wrong.  So Mr. Oman is there for two

11   functions.

12         But I think we have got to go back to the wellhead

13   really and decide whether or not Mr. Cadenhead gets to get up

14   and testify that settlement demands in a DMCA notice don't

15   conform to the spirit of the DMCA.

16         Now, I would like to think that that is out by virtue

17   of your ruling, that we don't even have to go down this path.

18   And it's not really relevant to anything because advice of

19   counsel is not a defense here.  I mean, Cox can't get up and

20   say, our counsel said it was okay; therefore, we're off the

21   hook.

22         THE COURT:  How about willful blindness?

23         MR. KELLEY:  It goes to the element of willful

24   blindness, but you don't have to get into the legal conclusion,

25   i.e. spirit of the DMCA, in order to talk about why they did

1   it.  Which is because it had settlement demands.

2         THE COURT:  Shouldn't Cox be able to explain why they

3   stopped --

4         MR. KELLEY:  Sure.

5         THE COURT:  -- agreeing to accept --

6         MR. KELLEY:  Because they had settlement demands,

7   that's the reason.  Now, the tag-along, which is what they want

8   to get in front of the jury, the tag-along is, our lawyer said

9   that that was outside the spirit of the DMCA.

10        We don't have to do the tag-along.  And if we get rid

11  of that, we get rid of Mr. Oman as well because there is no

12  reason for him to do anything.

13        They can get up here and say, you know, we didn't

14  like the demands, they were extortionate, blah, blah, all the

15  same old rag they have been chewing the whole case, but we

16  don't have to get into his opinion about what the law is.

17        And if we're going to go down that route, you

18  mentioned a slippery slope a moment ago, we're going to be

19  having a debate about the meaning of the DMCA in front of the

20  jury.  And most lawyers don't understand what it means because

21  it's pretty bereft of any kind of case law or context.

22        And we're going to have a jury try to decide whether

23  or not Mr. Cadenhead guessed right?  That seems like a step too

24  far.

25        So we would ask that Mr. Cadenhead not be allowed to

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 56 of 114 PageID# 13526
Case 1:14-cv-01611-LO-JFA Document 816 Filed 11/23/15 Page 55 of 113 PageID# 17913

55

1    testify about the spirit of the DMCA, just testify that he

2    didn't like the settlement demands, and we can get rid of Mr.

3    Oman.

4              THE COURT:  All right.  Do you want to reply?

5              MR. BRIDGES:  Your Honor, opposing counsel has just

6    made a suggestion that I hadn't much thought about, but I'm

7    open to it.  And that is that if Mr. Cadenhead doesn't refer to

8    the spirit of the DMCA, they don't need Mr. Oman.  I think

9    there may be a path forward here, Your Honor, because it may be

10   that we need find a way to cut the word "DMCA" out of the case

11   at this point.

12             It's complicated because we're dealing with actions

13   that existed against a framework of a legal safe harbor.  And

14   perhaps we could reach an agreement on that out in the hallway,

15   and I want to consult with my counsel on that because that's an

16   interesting question.

17             But I am hearing him say also that Cox can explain

18   why it did what it did.  And they can explain it did what it

19   did because of what the external e-mails called settlement

20   demands because they were being polite to Rightscorp, but what

21   all the internal e-mails referred to as extortion and

22   blackmail.  Mr. Cadenhead should be able to testify and other

23   people at Cox should be able to testify to that.

24             So perhaps if we just excise the word "DMCA," then

25   there is nothing here.  But we don't need Mr. Oman to explain

1    the DMCA, Your Honor.

2              THE COURT:  Okay.  Thank you.

3              MR. KELLEY:  Okay.  I didn't know whether we were

4    massing for another note.

5              THE COURT:  Well, we are, but they're not here yet,

6    so keep moving.

7              MR. KELLEY:  All right.  This rolls in naturally --

8    we have now done all of the Daubert motions, you may be

9    delighted to learn.  Now we roll into the multitudinous motions

10   in limine, but I think we've been touching on a lot of them, so

11   it should go a little faster.

12             One of the motions in limine that Mr. Caracappa is

13   going to address now has to do with Rightscorp.  And part of

14   that is the use of the words "extortionate" and things of that

15   nature as opposed to just explaining that they didn't like the

16   settlement demand.  I wasn't giving a black check for that kind

17   of language.

18             So Mr. Caracappa --

19             THE COURT:  I'm not going to allow the extortionate.

20   There is nothing extortionate about a $20 fee to settle a

21   matter.  That's so over the top and prejudicial, it's not going

22   to allowed.

23             MR. KELLEY:  Okay.  Very good.

24             THE COURT:  So what is your next point?

25             MR. KELLEY:  So Mr. Caracappa is going to address

57

1    Rightscorp's motions in limine.

2            THE COURT:  All right.

3            MR. BRIDGES:  Your Honor, before he speaks, I don't

4    know if what we just heard was a ruling on the first --

5            THE COURT:  That's a ruling.

6            MR. BRIDGES:  Sorry?

7            THE COURT:  That's a ruling.

8            MR. BRIDGES:  May I address other parts of that

9    motion that don't relate to the words, Your Honor?

10           THE COURT:  All I'm talking about are the words.

11   They are clearly over the top and -- well, is that going to be

12   part of your address?

13           MR. CARACAPPA:  Yes, Your Honor.

14           THE COURT:  Okay, then let's wait until we --

15           MR. CARACAPPA:  I think the only thing left is

16   post-2011 Rightscorp conduct.  I think that's what Mr. Bridges

17   may have wanted to address.

18           THE COURT:  Right.

19           MR. CARACAPPA:  As the Court knows, in 2011 Cox made

20   the decision to blacklist Rightscorp.  And it made that

21   decision based on one thing, and it's that we included in our

22   notices settlement language.  Cox agrees today that if we

23   remove that settlement language, they'll accept our notices.

24           Now, what Cox wants to do, and this is in their

25   brief, surprised me, confirm their suspicions.  So they want to

Case 1:18-cv-00950-PTG-JFA   Document 872-7   Filed 09/24/19   Page 59 of 114 PageID#
13529
Case 1:14-cv-01611-LO-JFA   Document 816   Filed 11/23/15   Page 58 of 113 PageID# 17916

1    look at everything that Rightscorp has done from 2011 until

2    today and they want to say, well, not only did we blacklist

3    them because of the $20, but we didn't really think we liked

4    them very much, and look at all the bad things they did.

5              I mean, if this was an assault case and I had filed

6    suit against Cox for punching me in the nose, they could

7    certainly talk about everything I did to them before they

8    punched them in the nose.  But if they're going to talk

9    everything I did afterwards, that's prejudicial.  That's why

10   403 is there.  It has no relevance at all to what Cox did in

11   2011 when it made its decision to ignore us.

12             THE COURT:  Okay.  I understand.

13             MR. CARACAPPA:  Thank you.

14             THE COURT:  Mr. Bridges.

15             MR. BRIDGES:  Thank you, Your Honor.  I think the

16   Court understands well that Rightscorp, its technology, and its

17   system, and its notices are central to this case.  As a matter

18   of fact, when the case --

19             THE COURT:  I do understand that.

20             MR. BRIDGES:  All right.  What's very, very important

21   here is there is massive --

22             THE COURT:  The point is, you made your decision

23   based on what they were doing in 2011.  And what's the

24   relevance of anything they did after that time?

25             MR. BRIDGES:  Well, Your Honor, after that -- up

 1   through 2011 there were no notices regarding the plaintiffs in

 2   this case.  And that's beyond the statute of limitations for

 3   the filing of this case.

 4          They want to exclude everything about Rightscorp at

 5   the time that Rightscorp started representing these plaintiffs.

 6   So I would be happy, Your Honor, to say that no evidence about

 7   Rightscorp after 2011 can come into evidence in this case.

 8   Because if that's the case, there is no evidence of anything by

 9   Cox for these plaintiffs.

10          So they want to have their cake and eat it too.  They

11   want to say, what we were doing all this time that we were

12   sending you notices for these plaintiffs, what we were doing

13   all that time is not relevant, you can only talk about what we

14   did before we represented these plaintiffs.  And, Your Honor,

15   that just doesn't make sense.

16          Just to frame it --

17          THE COURT:  I apologize, I jumped the gun.  And I

18   don't understand this issue based on what we have said so far.

19   So let's start over again.

20          MR. BRIDGES:  Yes, Your Honor.  This part of the

21   motion is that plaintiffs don't want any information about

22   Rightscorp after 2011 coming into this case.

23          THE COURT:  What information is it that they're

24   trying to keep out?

25          MR. BRIDGES:  There is information about Rightscorp's

Case 1:18-cv-00950-PTG-JFA   Document 672-7   Filed 09/24/19   Page 61 of 114 PageID#
13531
Case 1:14-cv-01611-LO-JFA   Document 876-7   Filed 11/23/15   Page 60 of 119 PageID#17918

1    practices in how it got settlements, which -- and the reason

2    it's relevant here, Your Honor, is that accuracy of

3    Rightscorp's system and notices is at the core of the case.

4              And when I questioned BMG's chief lawyer for the

5    Rightscorp relationship what BMG did to verify the accuracy,

6    what it did to verify the accuracy, his statement was, we got

7    settlements.  Settlements proved the accuracy.

8              And they did nothing else to investigate.  There was

9    no other due diligence.  It was, they got settlements, and

10   those results demonstrate the accuracy of Rightscorp's systems.

11   And the implication is, well, only guilty people would engage

12   in the settlements.

13             And for that reason, how Rightscorp gets those

14   settlements becomes very important.  And the fact that

15   Rightscorp in its phone script, which is evidence of a routine

16   practice in Federal Rule of Evidence 406, its phone script

17   says, if you deny the infringement, then you need to go to the

18   police and make a police report.  And they may take your

19   computer and devices away for five days.  And if you didn't

20   verify that it wasn't a neighbor, then you may be breaking

21   another law with the police.

22             That Rightscorp information shows that Rightscorp

23   knew that subscribers and account holders may not be

24   infringers, that it might be neighbors.  But it told them that

25   to get out of a settlement, they would have to go to the police

1    and turn their materials over, turn their --

2                THE COURT:  Is that part of Mr. Cadenhead's advice of

3    counsel?

4                MR. BRIDGES:  No, Your Honor, it's not part of advice

5    of counsel, but it is relevant to the accuracy of Rightscorp's

6    notices.  And it's relevant to whether the settlements that

7    occurred as a result of these phone script conversations are

8    evidence of the accuracy.  It also shows that the --

9                THE COURT:  Go ahead.

10               MR. BRIDGES:  It also shows that -- by the way, it

11   basically shows that the settlements that are being used to

12   verify accuracy were settlements that were gained through these

13   Rightscorp tactics.  It also shows what Rightscorp was willing

14   to do in order to bring the money in.  And it actually calls

15   into question Rightscorp's entire practice, its willingness to

16   lie in these phone exchanges and phone scripts there on the

17   page, relate to how Rightscorp even structured its system to

18   report infringements.  Because it was all about finding ways to

19   get lots of notices out to get money back.

20               And it fundamentally undermines the entire process

21   that Rightscorp used because it wasn't just a software company,

22   Your Honor.  It was a notice generation and settlement company.

23               THE COURT:  All right.  I think you're going down a

24   completely different road than we're going to be trying this

25   case about, but I will consider your argument.

1          I don't need to hear anything more.

2          MR. CARACAPPA:  Okay.  Your Honor, thank you.

3          THE COURT:  All right.  What else?

4          MR. KELLEY:  The next motion has to do with the 10

5    percent bitfield.  Mr. Caracappa is going to address that one

6    also.

7          THE COURT:  Okay.  I'm confused about when that

8    kicked in and whether it's relevant here or not.

9          MR. CARACAPPA:  The 10 percent bitfield did not kick

10   in and was not even written until after the complaint was

11   filed.  That is consistent with all the testimony.  It's

12   consistent with Mr. Boswell.  It's consistent with Mr. Steele.

13   And it's consistent with the date on the code itself.  It has

14   no relevance in this case.

15         THE COURT:  And you don't -- you're not continuing on

16   beyond the date of complaint alleging further infringement or

17   damages, right?

18         MR. CARACAPPA:  We are alleging that the infringement

19   did continue, but we're not using those numbers, and we are not

20   referring to specific examples of infringement.

21         And there is just no evidence that that code was used

22   during the relevant time period.  And what Cox says is, well,

23   it could have been.

24         Well, first of all, it couldn't have been because it

25   wasn't.  And the only testimony is that it wasn't.

1          THE COURT:  Is it relevant for cross-examining

2    whether using the 100 percent was proper and that you moved to

3    10 percent for some reason to cure something?

4          I am not sure -- you know, I just want to -- so

5    that's my question.

6          MR. CARACAPPA:  Understood.  Cox is trying to make

7    that argument.  We're not sure how it's relevant or to what

8    issue.  Again, it's outside the damages period.  We don't

9    understand the argument, so maybe if Cox can answer that

10   question, I would be happy to address it.

11         THE COURT:  Well, why don't we try that.

12         MR. CARACAPPA:  Okay.  Thank you, Your Honor.

13         THE COURT:  All right.  Mr. Buckley.

14         MR. BUCKLEY:  Your Honor, so from my perspective,

15   this is the single most important motion in limine, and here's

16   why.

17         So there is only one Rightscorp system that has been

18   produced, it was the system as of July 2015.

19         THE COURT:  Right.

20         MR. BUCKLEY:  And what Judge Anderson found was --

21         THE COURT:  Well, there was some portion of the --

22         MR. BUCKLEY:  Fragments.

23         THE COURT:  Fragments.

24         MR. BUCKLEY:  Couple little fragments from 2013,

25   right.  But what Judge Anderson concluded when he looked at all

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 10/24/19 Page 65 of 114 PageID#
13535
Case 1:14-cv-01611-LO-JFA Document 816-7 Filed 11/23/15 Page 64 of 119 PageID# 17922

1    of that, after six weeks of argument and briefing, was the

2    operation of the Rightscorp system starting in February 2012

3    through November 2014, which is the damages period, is material

4    information and plaintiffs failed to preserve that material

5    information.

6            So those systems are gone.  All the historical

7    systems are gone.  And that's now a fact.  That's what Judge

8    Anderson found.  They decided not to appeal that or challenge

9    it, which they could have done.  It's a fact in the case.

10           THE COURT:  They are going to have testimony as to

11   differences, the changes to the software.

12           MR. BUCKLEY:  Right.  And here is the problem, Your

13   Honor.  So what they want to say is, notwithstanding that those

14   systems are gone, that we intentionally destroyed all prior

15   versions, you should still let us go on, put on our case, have

16   testimony because we have an old system that operated

17   essentially like our current system, they're basically the

18   same.  There have been a few changes, but the old system was

19   just as accurate, just as reliable, did all the same things

20   with one exception.  There is one major flaw in our current

21   system, which is this 10 percent bitfield threshold, which

22   completely changes how we defined infringers, but really

23   increases the number of notices we send.  So it helps our

24   business model.

25           So our old system, take our word for it, there is no

 1   evidence, but we're going to have our witnesses say, our old

 2   system looks just like our new system with all of the

 3   improvements and all the iterations over time except for the

 4   one flaw.  It has all the good stuff, but it didn't have the

 5   bad stuff.

 6           And their position on that is, there is proof that it

 7   was implemented after the lawsuit was filed.  And the proof is

 8   somebody hard coded into the Rightscorp database a date that

 9   was conspicuously two weeks after the lawsuit was filed.  And

10   then their developer says, well, there is date in there,

11   somebody typed in a date.

12           So, first of all, we suggest, and Judge Anderson

13   found, that's not reliable, can't rely on that.  They refer to

14   Mr. Boswell, the developer.  Judge Anderson said, not reliable

15   testimony.  You can't rely on the 2013 code fragments, not

16   reliable.  So we don't know how the historical system worked.

17           So they not only want the benefit of the spoliation

18   so they get to characterize the old code however they want,

19   they also want the flip side of that, they want to be rewarded,

20   we can't say anything about how the current system works that

21   might undermine the way the old system works.  So it's a

22   beautiful --

23           THE COURT:  What you --

24           MR. BUCKLEY:  It's a great place to end up for them.

25           THE COURT:  What you want to -- stop.  What you want

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 67 of 114 PageID#
13537
Case 1:14-cv-01611-LO-JFA Document 816 Filed 11/23/15 Page 68 of 119 PageID# 17924

1    to do is use the 10 percent as cross-examination to show that

2    they've admitted that there were changes to the earlier system

3    that was in place during the infringing period?

4           MR. BUCKLEY:  Well, Your Honor, it goes well beyond

5    that.  We don't know what system was in place during the

6    infringing --

7           THE COURT:  You're going to hear testimony -- you

8    know, part of the problem here is everybody inflates how bad

9    everybody else is.  I mean, there is evidence that I am going

10   to allow that a BMG or a Rightscorp witness is going to

11   testify, I assume that's the only way they can prove

12   infringement, that they had a software program.  And that the

13   software program in place during the infringing period worked

14   as follows.  And they wrote over it without preserving copies

15   of it, that's our mistake.

16          You are going to get an instruction on the fact that

17   that was a mistake and it deprived Cox of evidence that they

18   may have used to check the accuracy of what I am testifying

19   about.

20          MR. BUCKLEY:  Correct.

21          THE COURT:  So where does the 10 percent fit in?

22          MR. BUCKLEY:  Okay.  So there will be no penalty for

23   the spoliation, but don't reward it.  Don't also hamstring us

24   from saying, but, Your Honor --

25          THE COURT:  Answer my question.  How are you going to

```
1    use 10 percent?

2              MR. BUCKLEY:  We're going to say, we don't know how

3    the old system worked, but the current system has a 10 percent

4    bitfield threshold in it that is completely unreliable.  Jury,

5    you ought to conclude it had it back then too.

6              That's how we're going to use it.

7              THE COURT:  Okay.  All right, thank you.  See how

8    easy that was.

9              MR. BUCKLEY:  I apologize, Your Honor, I was trying

10   to be responsive.

11             MR. CARACAPPA:  30 seconds, Your Honor.

12             THE COURT:  Yes.

13             MR. CARACAPPA:  We don't think it's appropriate for

14   them to make that argument because there's just no evidence

15   that that is in fact the case.

16             THE COURT:  It's the way the software program

17   operates as of 2015, right?

18             MR. CARACAPPA:  After the date the complaint was

19   filed.

20             THE COURT:  Well, if you wrote over the code earlier

21   and now -- so you're totally relying on a witness' testimony

22   without corroboration to define how the program worked during

23   the infringing period.  And it's perfectly reasonable for them

24   to assess the credibility of the witness' testimony.

25             MR. CARACAPPA:  Understood, Your Honor.
```

 1          THE COURT:  All right.

 2          MR. CARACAPPA:  We think we do have support in the

 3     date, but we understand the Court's position.

 4          THE COURT:  It goes back way before that.  So that

 5     certainly is proper impeachment.

 6          MR. KELLEY:  Okay.  Moving right along, we have the

 7     Copyright Alert System, about keeping that out.  Mr. Engle will

 8     address that.

 9          THE COURT:  Well, why don't we have --

10          MR. KELLEY:  Do you have --

11          THE COURT:  Copyright alert, is that still relevant?

12     Why don't we have -- well, all right, we'll continue in the

13     same order.  You believe it is.

14          MR. BRIDGES:  Yes, sir.

15          THE COURT:  Okay.  Then let's have the argument.

16          MR. ENGLE:  Your Honor, just briefly, because I think

17     we've sort of touched on this with some of the other arguments.

18          Cox wants to hold out the Copyright Alert System and

19     whether ISPs -- as this benchmark for Cox and say, look, jury,

20     this is what other people were doing, and so Cox was fine to do

21     this.

22          Well, there is a big problem with that.  That is,

23     there is no evidence about how other ISPs actually handle

24     infringement notices.  I mean, everybody is just looking at

25     what they say they do.  We already know what an ISP says it

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 70 of 114 PageID#
13540
Case 1:14-cv-01611-LO-JFA Document 816-7 Filed 11/23/15 Page 69 of 113 PageID# 17927

69

1    does in the public --

2              THE COURT:  So nobody was disposed, no other ISPs

3    were deposed to determine when they took action on notices?

4              MR. ENGLE:  That's absolutely right.  They could have

5    taken third party discovery.  They didn't do that.

6              THE COURT:  Okay.

7              MR. ENGLE:  Thank you, Your Honor.

8              THE COURT:  All right.

9              MR. BRIDGES:  Your Honor, on this, I think the

10   Copyright Alert System has actually become more relevant since

11   the Court's decision last night for this reason.  The

12   plaintiffs originally filed this motion saying that it's

13   irrelevant to the DMCA.  And if it's irrelevant to the DMCA,

14   with the DMCA out, it's all the more obviously relevant for

15   other reasons.

16             Your Honor, no other ISP got deposed, but we do have

17   evidence of how other ISPs responded to Rightscorp's notices.

18   And in testimony --

19             THE COURT:  How are you going to get that in?  What

20   competent evidence is there of that that you are going to try

21   to admit?

22             MR. BRIDGES:  Admissions from Rightscorp, Your Honor,

23   deposition testimony.  I asked:  Does AT&T still ignore your

24   notices?  Yes.  Does Verizon still ignore your notices?  Yes.

25   More questions about Cablevision and others.

70

1          THE COURT:  How is that relevant?  That they also

2    choose to put themselves at risk for infringement because they

3    don't comply with the notice requirement?

4          MR. BRIDGES:  Your Honor, we're not talking about a

5    notice requirement anymore because the DMCA is out of the case.

6    We are now talking about purely willful blindness and whether

7    what Cox does is something that is inducing or materially

8    contributing to infringement.

9          The basic thrust of the case here -- let's talk about

10   what the case is about.  The case is Cox provides a general

11   Internet service, just like AT&T, just like Verizon --

12         THE COURT:  You keep saying the DMCA is out of the

13   case.  I'm sorry, I mean --

14         MR. BRIDGES:  I thought that was the thrust of the

15   Court's summary judgment decision last night.

16         THE COURT:  It was.  So tell me again why is it

17   relevant that AT&T or others ignore --

18         MR. BRIDGES:  And as well, Rightscorp got detailed

19   correspondence from many of these.  A number of ISPs wrote back

20   in explaining the flaws in Rightscorp's notices.  They wrote to

21   both of the actual plaintiffs in the case.

22         And the plaintiffs get these letters from ISPs

23   saying, your letters, your notices are flawed.  And the

24   plaintiffs didn't do anything.  They just sent them over to

25   Rightscorp and said, you deal with it.  And Rightscorp didn't

71

1    do anything.

2            Rightscorp had notice from other major ISPs that its

3    notices were flawed, and did nothing about it.  This goes right

4    back to the accuracy, validity of the notices on which this

5    whole case depends.  It also puts into perspective Cox's

6    decisions and Cox's choices in not handling the notices.  Which

7    goes to allegations of willful blindness to avoid knowledge of

8    infringement.

9            So for both of these reasons, for both of these

10   reasons what Rightscorp knew and what the plaintiffs knew about

11   what other ISPs were doing and not doing is relevant.

12           Now, what I fear, Your Honor, is they will want to

13   prevent Cox from bringing in competent evidence that is not

14   going to be hearsay in the record about Rightscorp's and

15   plaintiffs' dealings with other ISPs.  They are going to want

16   to keep that out and they're going to want to come in and say,

17   oh, but there is this university or this small ISP that did

18   handle our notices.

19           I would expect that the plaintiffs are going to try

20   to say that Cox didn't do what other ISPs did.  So there is

21   a -- you know, heads I win/tails you lose phenomenon here in

22   their argument.

23           So that's the main point.  It goes both to the

24   accuracy of Rightscorp's system, the validity of these notices

25   as ways of putting ISPs on notice of infringement.  Forget the

1    DMCA framework, just knowledge and willful blindness.

2            If I may, with the Court's liberty, one other thing I

3    left out of my last argument on the post-2011 Rightscorp

4    conduct is particularly what Rightscorp was doing during the

5    course of the years that it represented plaintiff and

6    plaintiffs and built this case.  All of that behavior does go

7    to our unclean hands defense which we look forward to

8    presenting in the case.  And we think it's very relevant to

9    unclean hands because it's directly related to the whole system

10   of notices at issue in the case, Your Honor.

11           THE COURT:  All right.  Thank you.

12           MR. BRIDGES:  Thank you.

13           THE COURT:  All right, Mr. Engle.

14           MR. ENGLE:  Just briefly.

15           THE COURT:  Yes.

16           MR. ENGLE:  And I think this bled over into one of

17   the other motions in limine about what other ISPs were doing

18   with the notices.

19           This has nothing to do with what other ISPs were

20   doing.  This is about Cox's behavior.  He wants to justify it

21   by what other ISPs were doing.  If ISPs were ignoring notice

22   that they had of infringement, that doesn't make it okay for

23   Cox to do the same thing.  So it's just not relevant.  It

24   doesn't go to contributory infringement or vicarious liability.

25           You know, he's talking about these letters, and they

73

1    are from other ISPs' lawyers.  And he says this is somehow

2    evidence or put Rightscorp on notice that their notices were

3    flawed.  Well, these letters are about six pages each, and it's

4    all legal argument and positioning.  They are almost all

5    written by the same lawyer.  They make a bunch of legal

6    arguments.  They cite a bunch of cases.  They aren't relevant.

7    They aren't from Cox.  Cox didn't know about them at the time.

8            And allowing the jury to review six pages of a lawyer

9    doing what lawyers do and advocate for their clients and their

10   clients' positions, it would be highly prejudicial.

11           Your Honor is going to instruct the jury what the law

12   is.  We shouldn't allow Cox to do that through a bunch of

13   letters that were sent to Rightscorp from lawyers.

14           THE COURT:  Okay.

15           MR. ENGLE:  Thank you.

16           THE COURT:  All right.  Thank you.

17           MR. BRIDGES:  Just one final word.  Certainly, Your

18   Honor, it is not just letters, it's testimony that the other

19   ISPs were not accepting the notices and acting on them either.

20           THE COURT:  That came from Rightscorp?

21           MR. BRIDGES:  That was testimony from Rightscorp.

22           THE COURT:  Okay.

23           MR. BRIDGES:  But it's Rightscorp acting as the

24   plaintiffs' agent.

25           THE COURT:  Right.  Okay.

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 75 of 114 PageID# 32
Case 1:14-cv-01611-LO-JFA Document 816-7 Filed 11/23/15 Page 40 of 119 PageID# 17932
13545

74

1      MR. KELLEY:  All right.  Well, we knocked out two

2  motions in one because they did bleed together.  So we are

3  gaining on it.

4      THE COURT:  Hold on one second.

5      Joe, what are parties doing now?

6      COURT SECURITY OFFICER:  They are ready.  They are

7  waiting outside.

8      THE COURT:  Okay.  Let's have them come in, please.

9      NOTE:  A recess in the hearing is taken to conduct

10  other court matters; at the conclusion of which the hearing

11  continues as follows:

12      THE COURT:  All right.

13      MR. CARACAPPA:  Your Honor, if I may go back just to

14  talk for two seconds about Mr. Bridges' unclean hands comment.

15  And we addressed that in footnote 1 to our reply in support of

16  our motion in limine, number 9.  And I will read you the quote.

17  "The alleged wrongdoing of the plaintiff does not bar relief

18  unless the defendant can show that he has personally been

19  injured."

20      None of the post-2011 conduct that Cox wants to bring

21  in relates to Cox subscribers.  Everything that Cox talks about

22  relates to non-Cox subscribers.  I think we've seen a theme,

23  they want to make this about everyone else except Cox, and that

24  is consistent with that theme.  It is not relevant to unclean

25  hands as a matter of law.

Case 1:18-cv-00950-PTG-JFA   Document 672-7   Filed 09/24/19   Page 76 of 114 PageID#
13546
Case 1:14-cv-01611-LO-JFA   Document 816-7   Filed 11/23/15   Page 76 of 114 PageID# 17933

75

1          THE COURT:  Okay.

2          MR. BRIDGES:  Your Honor, just a last bit on that.

3          THE COURT:  Yes.

4          MR. BRIDGES:  This case is entirely about what

5    happened after 2012 because the plaintiffs didn't enter the

6    picture until 2012, and it was Cox's refusal to participate in

7    the ongoing operation.

8          I would like to suggest, Your Honor, I think we're

9    about to move on to motions in limine, several motions in

10   limine where I would propose in the interests of time, Your

11   Honor, that I would be willing to submit them on the briefs.

12         And I would propose that we submit the Communications

13   Decency Act, number 4.  Number 7 regarding Cox's statistics and

14   effectiveness.  And number 8 on Mr. Rosenblatt.  Because I do

15   want to make sure that we can get to Cox's motions in limine

16   before the witching hour whenever the Court decides that

17   witching hour is.

18         THE COURT:  Getting closer every tick.  Well --

19         MR. KELLEY:  I think we can do them efficiently.

20   We're rolling along pretty good.

21         THE COURT:  Yeah, let's keep moving.

22         MR. KELLEY:  As you may recall, the issue about the

23   Communications Decency Act came up in the summary judgment

24   arguments.  So we have a motion in limine that addresses that.

25         MR. THEODORE:  Yes, Your Honor.

Case 1:18-cv-00950-PTG-JFA   Document 672-7   Filed 09/24/19   Page 78 of 119 PageID# 17934
Case 1:14-cv-01611-LO-JFA   Document 816   Filed 11/23/15   Page 77 of 114 PageID#
13547

76

1          THE COURT:  And don't regurgitate what you already

2    said.  What additionally do you want to talk about?

3          MR. THEODORE:  No.  I mean, I think our briefs make

4    the point, Your Honor.  I mean, this didn't come up at all.

5    It's not in the evidence.  It is pure legal argument that the

6    jury is not equipped to address.  And there is no evidence that

7    they actually considered the Communications Decency Act.

8          The first appearance in this case is by argument of

9    counsel.  And we asked their witness, their corporate

10   representative and their lawyer about it, and they both didn't

11   give this response.

12         THE COURT:  All right.

13         MR. BRIDGES:  Your Honor, I will have to respond --

14         THE COURT:  Right, even though that was in the brief.

15   Go ahead, respond.

16         MR. BRIDGES:  The last thing, Your Honor, I just want

17   to point out that plaintiffs introduced in the case the

18   questions as to why Cox didn't change the notices.  But they

19   never asked Cox to change the notices.  They didn't want Cox to

20   change the notices.

21         So if they want to introduce into the case why Cox

22   didn't when all along they didn't want Cox to, it's only fair

23   to let Cox respond.

24         So we can keep the Communications Decency Act out of

25   the case, Your Honor, if they don't try to bring this new

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 11/23/25 Page 79 of 114 PageID# 17935
Case 1:14-cv-01611-LO-JFA Document 816 Filed 11/23/15 Page 79 of 119 PageID# 13548

77

```
 1   question in of why Cox didn't change notices that they didn't

 2   want changed.

 3           MR. THEODORE:  Just very briefly.  It's not a new

 4   question.  We asked them --

 5           THE COURT:  Come on up.

 6           MR. THEODORE:  Your Honor, it's not a new question.

 7   We have been asking that question -- since the beginning of the

 8   case we asked their witnesses about that.

 9           The new question is the response that was made for

10   the first time at summary judgment after discovery when we had

11   no chance to investigate it and which isn't based on any of the

12   evidence.

13           THE COURT:  I understand.  Okay.

14           Mr. Kelley.

15           MR. KELLEY:  We do have one that we can submit on the

16   briefs.  That is the infringement by non-account holders.  You

17   know, the teenage kids getting on grandmother's account.

18           THE COURT:  All right.

19           MR. KELLEY:  This next one --

20           MR. BRIDGES:  Actually, that's one I would like to

21   address, Your Honor.

22           MR. KELLEY:  We tried.

23           THE COURT:  All right.

24           MR. BRIDGES:  I would like to say, Your Honor, this

25   is important because this is really a motion for summary
```

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 79 of 114 PageID#
13549
Case 1:14-cv-01611-LO-JFA Document 816 Filed 11/23/15 Page 79 of 119 PageID# 17936

 1    judgment in disguise.  It's really about they're arguing the

 2    law as to whom Cox is liable for.

 3            And the application of the law of the standards of

 4    contributory and vicarious would be very different if we're

 5    talking about whether Cox is inducing, causing, or materially

 6    contributing to infringements by its account holders or whether

 7    it's inducing or causing infringements by neighbors of its

 8    account holders.

 9            THE COURT:  Users.

10            MR. BRIDGES:  Users beyond its subscriber base.  Cox

11    has a financial relationship with its subscribers.  It doesn't

12    have a financial relationship with people who come in over the

13    wireless networks.

14            And it sort of stands to reason, Your Honor, I think

15    everybody assumes that online pirates are cheapskates.  That

16    they're people who want to get stuff for free without paying

17    for it.

18            Well, you know what they often do, they often use

19    other people's Internet for free just as well because if

20    they're not willing to pay for music, they may not be willing

21    to pay for Internet service, so they're going to come in on

22    somebody else's Internet service.

23            THE COURT:  Is there any evidence about that?  Do you

24    have evidence that 15 percent of people who download free music

25    unlawfully use somebody else's computer?

1          MR. BRIDGES:  We don't have specific evidence on

2     that, Your Honor, but we have -- not a statistic, but we have

3     from Rightscorp itself in the phone script that they want to

4     keep out, Rightscorp says the main reason for file sharing is

5     unsecured wireless.  Rightscorp says that in the document it

6     wants this Court to keep out of the case.  So it's from the

7     horse's own mouth, it's from Rightscorp's own mouth.

8          And I think we also have some statistics, I believe

9     in Rosenblatt or one of the experts, about how many people use

10    other people's unsecured wireless.  And please, I'm not

11    vouching for the number, but my general memory is something

12    like 27 percent.

13         So there are real statistics there.  But what is

14    important is they cited several cases, Fung, Aimster, Lime Wire

15    and Sega, those are all very, very different cases.  They were

16    like hosting services.  They were software providers.  This is

17    a general open Internet service provider, and the context is

18    very different.

19         And so, Cox's responsibility for people who actually

20    subscribe to its service is very different from its

21    responsibility for people who don't subscribe to its service.

22    And they want to keep that category out and to assume that Cox

23    has subscriber-like responsibility for anybody.  And that, Your

24    Honor, is contrary to law and contrary to what would be a fair

25    trial for the jury to decide, Your Honor.

80

1          THE COURT:  All right.  Thank you.

2          MR. CARACAPPA:  Your Honor asked the exact question.

3    There is no specific evidence of this fact.

4          The document that they point to is a Rightscorp

5    document that says, when we contact subscribers, they say, we

6    didn't do it, it was somebody else.  That's not surprising.

7    That's not evidence of the fact.

8          Cox's own policy says that its subscribers are

9    responsible for what's done on its network.

10          So we just think this is irrelevant and it just

11    doesn't have any place in the case, Your Honor.

12          THE COURT:  Okay.  Thank you.

13          MR. KELLEY:  Okay.  This next one may have been

14    mooted by your ruling yesterday.  It's the graduated response

15    as to its effectiveness.  I will turn it over to somebody from

16    this side to say whether that's still a matter of dispute.

17          MR. BRIDGES:  Your Honor, numbers 7 and 8, we think

18    they are still in, but we're concerned about getting to our

19    motions in limine, so we will submit those on the briefs, Your

20    Honor.

21          THE COURT:  All right.

22          MR. KELLEY:  All right.  Well, those are our motions

23    actually, not his to submit.

24          So, Jeremy, do you want to touch on it very quickly?

25          MR. ENGLE:  Just really briefly on the motion in

1    limine number 8 to add something sort of beyond the briefs.

2            This is the motion in limine where Mr. Rosenblatt

3    essentially says, I had private conversations with Mr. Zabek

4    and Mr. Sikes, and they tried to change this fake termination

5    thing.

6            THE COURT:  Right.

7            MR. ENGLE:  Well, despite the fact, Mr. Zabek is the

8    senior manager of the Abuse Group.  I mean, he is not just so

9    level employee, senior manager.  Mr. Sikes is second in charge.

10   They are responsible for the Abuse Group.  And those witnesses

11   are only on Cox's may call list.  And we have been told in no

12   uncertain terms by Cox's attorneys, we're not going to see them

13   again after the depositions.

14           And so, what Cox is trying to do is have private

15   conversations with them, introduce Cox's spin on those

16   conversations through Mr. Rosenblatt, and then they're

17   shielding the witnesses that are changing the testimony and the

18   evidence in this case from any cross-examination.  And that's

19   just not fair.

20           Thank you, Your Honor.

21           THE COURT:  All right.  Joe, what's going on?

22           COURT SECURITY OFFICER:  They're asking for water.

23   And I just made arrangements with the other officer to bring

24   some up.

25           THE COURT:  Great.  Thank you.

1    COURT SECURITY OFFICER:  They are awaiting your

2  response.

3    THE COURT:  They are continuing to deliberate, aren't

4  they?

5    COURT SECURITY OFFICER:  Oh, yes, sir, absolutely.

6    THE COURT:  All right, thank you.

7    All right.

8    MR. KELLEY:  Did we get a read on whether graduated

9  response is in or out of the case?  I don't recall it.

10    THE COURT:  Well, they submitted on the papers.

11    MR. KELLEY:  Well, no, no, it's not their motion.

12  It's our motion.

13    THE COURT:  If you want to argue it, argue it.

14    MR. KELLEY:  I don't see why it's relevant anymore.

15    THE COURT:  I thought that was the argument.

16    MR. KELLEY:  Is that the argument?

17    MR. ENGLE:  Your Honor, that is the primary argument.

18  It is just not relevant whether Cox's procedures are effective

19  at curbing infringement.  Mr. Rosenblatt set that up as the

20  test.  Under the DMCA, it's not relevant.

21    MR. BUCKLEY:  Your Honor, that's not the motion.

22    THE COURT:  All right, go ahead.

23    MR. BUCKLEY:  The motion is to exclude one graphic

24  from Mr. Rosenblatt's testimony that just summarizes statistics

25  from the CATS system.  So it's irrelevant to this issue of

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 84 of 114 PageID# 41
Case 1:14-cv-01611-LO-JFA Document 816-7 Filed 11/23/15 Page 83 of 119 PageID# 17941
13554

83

 1   whether the DMCA is in or out.  We have to talk about that, but

 2   that's not what this motion is about.

 3          THE COURT:  What is your understanding of what the

 4   motion is about?

 5          MR. BUCKLEY:  There is one graphic in Mr.

 6   Rosenblatt's report that summarizes statistics from CATS about

 7   how many suspensions we've given and how many warnings.  And

 8   they want to keep that out because they think the graphic is

 9   misleading.  The data is going to come in, and Mr. Rosenblatt

10   can talk about it, I don't know that we're going to use the

11   graph --

12          THE COURT:  Well, why would it come in now that the

13   safe harbor defense is out?

14          MR. BRIDGES:  The underlying data about what we

15   actually do?  I think that -- honestly, I think that's what

16   both sides are digesting right now.  And it's possible that it

17   won't, but this particular MIL, number 7, just says there is a

18   graphic in Mr. Rosenblatt's report and it's not proper.

19          THE COURT:  Okay.  All right, thank you.

20          MR. KELLEY:  Well -- I was about to pass it over.

21          MR. ENGLE:  I think he sort of either underestimates

22   or misstates what our motion is about.  Cox is trying to

23   introduce evidence through Mr. Rosenblatt who says that, you

24   know, their procedures are effective at curbing infringement

25   and he bases it on this data.

Case 1:18-cv-00950-PTG-JFA   Document 672-7   Filed 09/24/19   Page 85 of 114 PageID#
13555
Case 1:14-cv-01611-LO-JFA   Document 816-7   Filed 11/23/15   Page 84 of 113 PageID# 17942

1          He is not a statistician.  He is a technologist.  And

2   I don't think he should be able to get up there and give

3   statistics and say, well, this data shows this and this data

4   shows that.  It's just not relevant.

5          And the 96 percent effective data they use, it's from

6   a slide presentation from 2010.  They have no idea what the

7   data is underlying that.  But he looks at that and he says, oh,

8   it's 96 effective.

9          And then the takes the suspension data, and he

10  doesn't say the suspension data shows whether it's effective or

11  ineffective, he just says, well, this suspension data shows it

12  hasn't grown less effective since 2010.

13         But again, he is not a statistician.  And this is

14  completely irrelevant to any of the issues in the case at this

15  point.

16         THE COURT:  All right.  Thank you.

17         MR. KELLEY:  Now we go to Cox's motions in limine.

18         MR. BRIDGES:  I think -- yeah, you go ahead.

19         MR. BUCKLEY:  So, Your Honor, the first motion in

20  limine relates to the Rightscorp notices.  They have proposed

21  to bring in all two million, give or take, notices as exhibits

22  in the case.  Their position all along has been that the

23  notices themselves are evidence of infringement.  They're not.

24  And if they are used for that purpose, they're pure hearsay.

25         If they're brought in to show that all of the

85

1    statements contained in those e-mails from Mr. Zabek show that

2    the underlining infringement occurred, then it's hearsay.

3         They come back in the opposition and say, well, but

4    it goes to notice.  And there are a few problems with that.

5    One is reliability of the notices because we don't know how

6    they were generated because the Rightscorp systems are gone.

7         But then the second issue is, Cox didn't receive

8    those notices.  And there is no dispute about that, in fact

9    they rely on that fact.

10        So there might be other implications of that, willful

11   blindness and other things, but the fact is they're not notice

12   of anything.  Cox wasn't on notice of anything because they

13   didn't get them.

14        So I think the goal in bringing in two-plus million

15   notices is that the volume alone is going to suggest to the

16   jury that something must have been going on.

17        So I think there is a clear 402/403 balancing to be

18   done here.  And they don't -- the notices themselves don't add

19   anything, Your Honor.  So we're asking to have those excluded.

20        THE COURT:  All right.

21        MR. KELLEY:  All right.  Your Honor, you've seen the

22   notices, I know.  They contain a lot of detail in addition to

23   verbiage.  And specifically a time, a date, a song, all of that

24   sort of thing.  And they are computer generated.

25        So they go out and they ping.  They find the song

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 87 of 114 PageID# 17944
Case 1:14-cv-01611-LO-JFA Document 816-7 Filed 11/23/15 Page 88 of 119 PageID# 13557

86

1   available.  A generated notice goes straight on out.  It's well

2   established that the hearsay rules do not apply to computer

3   generated data.  And the fact that this is embedded in a

4   broader letter does not make the data and the way in which it

5   was done any different than any computer generated data.

6          As far as the notice issue, I am kind of reminded of

7   the classic definition of chutzpa, which is somebody who kills

8   his mother and failure and then throws himself on the mercy of

9   the Court as an orphan.

10          They were the ones who blacklisted Cox.  And they

11   didn't bounce back -- or blacklisted Rightscorp.  They didn't

12   bounce them back, they received the stuff and then it just went

13   into the trash can.

14          And so, then to turn around and say, well, we

15   shouldn't be responsible for all of these notices because we

16   threw them in the trash and didn't look at them, is really a

17   classic definition of chutzpa.

18          THE COURT:  So in the George case and in the Gardner

19   case that were cited for the proposition that the notices are

20   not hearsay because they're computer generated notices, did the

21   courts there have the additional -- were the notices similarly

22   containing substantive information about what pieces of art had

23   been infringed?  Or do you know offhand what they included?

24          MR. KELLEY:  I don't know offhand.  I can send you a

25   letter and tell you that.  But I don't know sitting here off

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 89 of 114 PageID#
13558
Case 1:14-cv-01611-LO-JFA Document 816-7 Filed 11/23/15 Page 89 of 119 PageID# 17945

87

1    the top of my head.

2            THE COURT:  Yeah.  It is not contained in the cases

3    themselves, you know, when do you get to hearsay even if it's

4    computer generated because the contents have been authored by a

5    human being, for lack of a better term.

6            MR. KELLEY:  In this case the contents -- I mean,

7    you've got all the verbiage, it's a form letter, and then the

8    data gets plugged into the middle of it.  So that's done by a

9    human.  The rest of it, of course, is a form that was drafted

10   by a human, but that's not really the key stuff as far as

11   whether something occurred or whether it didn't occur.

12           THE COURT:  That is all computer generated?

13           MR. KELLEY:  Right, that part of it, which is what

14   shows when the infringement occurred and what it was.

15           THE COURT:  All right.  Okay.

16           MR. BUCKLEY:  Your Honor, the notices aren't data.

17   The data that they're relying on would be in tables.  And

18   they've actually said that Rightscorp has it.  And the notices

19   are e-mails from Mr. Sabec.  They say, from Chris Sabec.  He

20   signs them at the bottom.  So if that's computer-generated

21   material, then every e-mail is computer-generated material.

22           The underlying data, if they want to rely on that,

23   they can introduce it in some other way.

24           The problem here is bringing in all of the notices

25   themselves.  If they want to have somebody testify, as Mr.

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 89 of 114 PageID#
13559
Case 1:14-cv-01611-LO-JFA Document 816-7 Filed 11/23/15 Page 89 of 119 PageID# 17946

88

1   Kelley just did, that we sent Cox all these notices and they

2   put them in the trash, testify about that.  But the notices

3   themselves add nothing and certainly distract.

4           THE COURT:  Well, we're not going to having two

5   million notices come into evidence.  I mean, that's --

6           MR. BUCKLEY:  Presumably not.

7           THE COURT:  Yeah.  Mr. Kelley.

8           MR. KELLEY:  If it were up to me, I would stack them

9   to the ceiling, but I don't think that's your idea of how we

10  ought to run the trial.

11          THE COURT:  No.  I mean, you can have a sampling and

12  talk about the numbers.

13          MR. KELLEY:  Right.

14          THE COURT:  Any more than that is --

15          MR. KELLEY:  Understood.  By the away, the format

16  is -- the format of the e-mail is the format that Cox wanted us

17  to use.  I don't know that that matters.  It's really the data

18  and what the data recorded that is the essential point here.

19          THE COURT:  Okay, thank you.  All right.

20          MR. BUCKLEY:  Your Honor, the second motion in limine

21  relates to BitTorrent and the argument that BitTorrent equates

22  with infringement.

23          So we objected to that sort of argument.  They

24  responded, well, we're not going to say that BitTorrent means

25  that a particular Cox subscriber infringed a copyright, but we

89

1   do want the ability to introduce evidence and argument -- do

2   you want me to pause, Your Honor?

3           THE COURT:  All right.

4           NOTE:  A recess in the hearing is taken to conduct

5   other court matters; at the conclusion of which the hearing

6   continues as follows:

7           THE COURT:  Okay, let's resume.  Mr. Buckley.

8   BitTorrent.

9           MR. BUCKLEY:  BitTorrent.  So, Your Honor, what the

10  plaintiffs want to argue is that there is a high level of

11  BitTorrent use that is infringing, and there is BitTorrent use

12  on the Cox network, and that when you put those two things

13  together, that's knowledge of mass piracy on the Cox network.

14  And we believe that's not proper argument.

15          THE COURT:  Well, you've got -- I mean, they've got

16  your own employees essentially saying that, right?  Are those

17  admissions?

18          MR. BUCKLEY:  I don't believe they're admissions.  I

19  don't think a low level employee speaking off-the-cuff is an

20  admission that binds Cox.

21          But more to the point, they admit themselves that

22  there are noninfringing uses of BitTorrent.  And seven years

23  ago, 2008, when Comcast was throttling BitTorrent, the FCC came

24  back and said, there are lots of noninfringing and proper uses

25  of BitTorrent, and sanctioned Comcast for standing in the way

90

1    of that.

2            So even if Cox wanted to in some way control or limit

3    or throttle BitTorrent -- which, by the way, it doesn't, that's

4    not the business we're in -- it couldn't to that.

5            So this proposition that they want to create that

6    because BitTorrent can infringe and because infringement and

7    other bad things happen on the Internet, Cox is aware of it and

8    responsible for it, we think that is not only unfair but

9    actually improper.  There isn't anything Cox could have done --

10           THE COURT:  What do you understand BMG is going to

11   use that to show, the notice?

12           MR. BUCKLEY:  Yes, exactly.  That it's going to stand

13   in for notice.  That because there is BitTorrent use on the

14   Internet, ergo we are not only aware of but tolerating

15   infringement.

16           And that, Your Honor -- not only does not follow as a

17   factual matter because there are other uses for BitTorrent, we

18   also think it's affirmatively contrary to what the FCC has

19   said.  Which is, you better not be trying to control or

20   throttle BitTorrent.

21           THE COURT:  Okay.  Yes, sir.

22           MR. PECAU:  Sorry for causing all kinds of ruckus.

23           Well, Your Honor, the fact that virtually every item

24   of music that is distributed by BitTorrent is infringing is a

25   very relevant fact in this case.

Case 1:18-cv-00950-PTG-JFA   Document 672-7   Filed 09/24/19   Page 92 of 114 PageID# 17949
Case 1:14-cv-01611-LO-JFA   Document 676   Filed 11/23/15   Page 91 of 191 PageID# 13562

91

1          It is certainly very relevant when we actually look

2     at the issues in the case.  So, for example, with respect to

3     the issue of financial incentive, which is the second prong of

4     vicarious liability, we have spoken about Dr. Nowlis' report.

5     And Dr. Nowlis' report shows that 16 percent of the people who

6     subscribe to Cox upload or download free music using BitTorrent

7     sites.  All right.  That's very relevant.

8          Now, Cox just got up here and said that, well, you

9     know, there isn't any evidence that any of our subscribers do

10    anything.  Well, this is direct evidence that a jury can take

11    that their subscribers actually do engage in infringing and

12    they do engage in infringing on a massive scale.

13         It's also relevant in terms of the draw to Cox, which

14    we had discussed before, Your Honor.  That 10 percent of these

15    users are drawn to Cox because they have this ability.  Very

16    key issues in this case.

17         And the fact that the traffic of copyrighted content,

18    music videos and other copyrighted content is prevalent on

19    Cox's site, is relevant to a lot of issues in this case in

20    addition to the vicarious liability where it's obviously

21    relevant.

22         I mean, it certainly explains -- it bears upon Cox's

23    financial incentive to allow infringement.  It explains Cox's

24    great efforts to avoid specific knowledge of infringement,

25    which is willfulness blindness, which obviously has to do with

Case 1:18-cv-00950-PTG-JFA   Document 872-7   Filed 11/23/15   Page 92 of 113 PageID# 17950
Case 1:14-cv-01611-LO-JFA   Document 816-7   Filed 11/23/15   Page 93 of 114 PageID#
13563

92

1    contributory infringement.

2           It explains Cox's incentive not to do anything with

3    specific knowledge of infringement.  Again, a material

4    contribution that explains to the jury why they're doing that.

5    It counters any argument that Cox is making that it has any

6    effective means to curb infringement.  That goes to material

7    contribution.

8           The amount and percentage of BitTorrent infringing

9    activity in general and using the Cox Internet system explains

10   why Rightscorp focussed on finding infringement of BMG and its

11   other clients using BitTorrent systems.  That's why their whole

12   system was set up, explains the whole hash values, why you have

13   a fingerprint and that's why they look for it, and why it was

14   such a rich environment to find infringement.

15          And Cox is continuously complaining.  It says, well,

16   you know, we had two-and-a-half million notices of

17   infringement.  Well, the reason they do is because a huge

18   percentage of their subscribers are infringing.  And that's

19   another reason why it explains it.

20          THE COURT:  Okay.  Thank you.

21          MR. PECAU:  Thank you.

22          MR. BUCKLEY:  Your Honor, briefly.  Mr. Pecau just

23   made my argument for me.  Dr. Nowlis didn't find that people

24   use BitTorrent to infringe.  He asked whether people download

25   music for free.  There is lots of ways to do that.

1          And this is -- these are exactly the sorts of

2     arguments that they're going to make to the jury that

3     contravene what the FCC said. Which is, there are lots of

4     legal ways to use BitTorrent, including to distribute video

5     programming to millions of online viewers, as do several

6     established distributors such as CBS, Twentieth Century Fox,

7     and Sports Illustrated.

8          So we can argue about whether it is 10 percent of our

9     BitTorrent users who are infringing, or 90 percent, but to come

10    in here and say, because people use BitTorrent, they're

11    infringers and Cox knows it, is not only wrong, but improper.

12    There is no link there, Your Honor. And it is highly

13    prejudicial and it's the basis for the Rightscorp system, as

14    you've heard.

15         So we think those sorts of arguments are out.

16         THE COURT: All right. Thank you, Mr. Buckley.

17         MR. PECAU: Your Honor, could I respond?

18         THE COURT: No, I'm good.

19         MR. PECAU: You're good. Thank you.

20         THE COURT: Okay. Next.

21         MR. BUCKLEY: Okay, Your Honor. One to go. So this

22    is our motion in limine on the DHCP logs. And as you know,

23    what they want to be able to do is come in and say, Cox

24    destroyed these DHCP logs, they destroyed evidence.

25         Whether they should be able to argue that should

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 95 of 114 PageID#
13565
Case 1:14-cv-01611-LO-JFA Document 816-7 Filed 11/23/15 Page 94 of 119 PageID# 17952

94

```
 1     depend upon the relevance of the evidence.  If the evidence was
 2     immaterial, then the destruction should be immaterial.  And
 3     what Trigon says is what you need to do is you should look at
 4     what the universe look like if Cox had retained the DHCP logs
 5     that are gone.
 6               And the answer to that, Your Honor, categorically is
 7     nothing would change.  The case would look exactly like it
 8     looks today because rather than -- sorry, go ahead.
 9               THE COURT:  I mean, maybe it's presented at trial,
10     and obviously your relevance objection will be one that is
11     dependent on how the case goes in.  But during discovery and in
12     the give and take that has gone on for the last six months,
13     it's been Cox's position that the notices themselves were
14     insufficient, that there were no adjudications, and that,
15     therefore, infringements haven't been shown and that the
16     notices are insufficient.
17               So now you've got BMG in a position where they seek
18     to get customer information and it doesn't exist.  So why isn't
19     that relevant?
20               MR. BUCKLEY:  It's not relevant, Your Honor, because
21     they weren't seeking the customer information to prove
22     infringement.  It's exactly what Judge Anderson found --
23               THE COURT:  Well, you can use it for any purpose that
24     you get it, right?
25               MR. BUCKLEY:  That's exactly right.  And you know
```

Case 1:18-cv-00950-PTG-JFA   Document 672-7   Filed 09/24/19   Page 96 of 114 PageID# 17953
Case 1:14-cv-01611-LO-JFA   Document 816   Filed 11/23/15   Page 96 of 114 PageID#
13566

95

1   what they used it for?  Nothing.  They did 139 names and they

2   did exactly nothing with it.  They didn't contact anybody, they

3   didn't call anybody, they didn't send them a letter, they

4   didn't to any third-party discovery.  They did nothing.

5          So what they're saying is, we got 139.  So Judge

6   Anderson said, you get 250 to do with as you will.  They got

7   139.  They say, well, if they hadn't destroyed the logs, we

8   would have gotten another 111 names and addresses that we would

9   have done nothing with.

10         So it is not relevant -- and it has never been

11  relevant to infringement, Your Honor.  And that's really our

12  point, that this is straw man.  We've never said they can't

13  connect a particular IP address to a particular person.  We've

14  taken their claims at face value.  We've said, they don't

15  intend to connect a particular IP address to a particular

16  person, they still don't.  They think they don't have to.

17         So if you look at how would things look different --

18  and we've put this in the brief, so I will just put a final

19  point on it.  If you look at how would things be different

20  today if we hadn't destroyed or if we had retrained those

21  additional six months of logs, nothing would change.  They

22  wouldn't be making any different arguments.  Their theories

23  wouldn't be any different.  And that is quintessential

24  non-material spoliation.

25         And in that case, you shouldn't get to come into

Case 1:18-cv-00950-PTG-JFA Document 876-7 Filed 11/23/25 Page 97 of 114 PageID# 13567
Case 1:14-cv-01611-LO-JFA Document 816-7 Filed 09/24/19 Page 98 of 119 PageID# 17954

96

1  court and call Cox a spoliator for not holding onto something

2  that doesn't matter.

3          THE COURT:  Okay.

4          MR. CARACAPPA:  Thank you, Your Honor.

5          Judge Anderson already ruled on this issue.  He

6  already ruled that the --

7          THE COURT:  Now we're talking about whether it's

8  going to be used in trial now.

9          MR. CARACAPPA:  Yes.

10         THE COURT:  Why is it relevant?

11         MR. CARACAPPA:  And Judge Anderson ruled that if they

12  were --

13         THE COURT:  I don't care what Judge Anderson ruled.

14  He didn't define spoliation.  He found -- well, I don't want to

15  get started into this, down this road, but the way that the

16  discovery played out before Judge Anderson I thought was really

17  unfortunate.  I think that the aggressiveness in not responding

18  substantively to some of BMG's requests was real sharp.

19         But Judge Anderson rules there is no spoliation.  The

20  sample wasn't as complete as it should have been.  And Mr.

21  Buckley's point is you didn't do anything with it.  So why is

22  it relevant?

23         MR. CARACAPPA:  Yes, Your Honor.  Just to be clear,

24  he ruled that there was spoliation.  And he ruled that if Cox

25  uses the lack of that information against us --

Case 1:18-cv-00950-PTG-JFA   Document 672-7   Filed 09/24/19   Page 99 of 114 PageID# 955
Case 1:14-cv-01611-LO-JFA   Document 816   Filed 11/23/15   Page 97 of 119 PageID# 17955
13568

97

1        THE COURT:  Yeah, you're right, I apologize.

2        MR. CARACAPPA:  Then we're allowed to bring in the

3   fact that they destroyed the information.

4        THE COURT:  Okay.

5        MR. CARACAPPA:  And it's relevant because that's

6   exactly what Cox is doing.  Cox says over and over again, we

7   should have sued the subscribers.  We're allowed to tell the

8   jury the rest of the story, which is that had we tried to do

9   that, we would have learned that Cox destroyed the information,

10  and that would have been impossible.  And that's why the

11  information is relevant.

12       With respect to the point about how we didn't do

13  anything, they said nothing.  That's wrong.  As we stated

14  before, Dr. Bardwell uses this evidence to confirm his

15  statistical model.

16       And we have a declaration from a Cox subscriber.  And

17  that declaration says, I'm looking at the notice, it has my IP

18  address, and it has this song that I infringed.  And that's

19  exactly what I did.

20       And that was one out of 122.  And we couldn't have

21  gone back to get more because Cox destroyed that information.

22  And then they leave out that Judge Anderson said, I'll give you

23  250, but if you need more, come back and let us know.  And we

24  couldn't do that.

25       THE COURT:  Okay.

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 99 of 114 PageID# 17956
Case 1:14-cv-01611-LO-JFA Document 816 Filed 11/23/15 Page 99 of 114 PageID#
13569

98

1          MR. CARACAPPA:  Thank you, Your Honor.

2          THE COURT:  You're absolutely correct, I apologize.

3          MR. CARACAPPA:  Thank you.

4          THE COURT:  Do you want to respond, Mr. Buckley?

5          MR. BUCKLEY:  Yes, briefly.

6          Your Honor, again, it's not a situation where they

7   sought a bunch of PII, we stonewalled for horrible reasons, and

8   then the data was gone.

9          They sought our subscribers' personal information.

10  We pushed back, saying that not only does that violate their

11  privacy, it's also totally unrelated to your theories.

12         And Judge Anderson agreed.  He said, you're right, it

13  is not all coming in, you're not going to try to prove

14  infringement by a bunch of people, so I am going to give you

15  some to do with what you will.  And the answer is, nothing, we

16  did nothing with it.

17         So I really do think, Your Honor, that you've got to

18  hone in on if they got 111 additional names, what would they

19  have done with it?  It wouldn't change Dr. Bardwell's opinion

20  one iota.

21         THE COURT:  Well, go back to my question about

22  relevance that you brought up first.  And it is, what's Cox

23  going to say about the sufficiency of the evidence of

24  infringement that BMG is going to introduce, which will consist

25  of the notices?

Case 1:18-cv-00950-PTG-JFA Document 672-7 Filed 09/24/19 Page 100 of 114 PageID# 57
Case 1:14-cv-01611-LO-JFA Document 674 Filed 11/29/15 Page 99 of 113 PageID# 57
13570

99

1          MR. BUCKLEY:  Sorry.  I didn't mean to cut you off.

2          THE COURT:  What are you going to say about that?

3          MR. BUCKLEY:  We are going to say that is legally

4    insufficient.  That the strategy they've chosen, which is to

5    rely exclusively on circumstantial evidence and on notices, is

6    legally insufficient.

7          We are not going to say they could never have proven

8    infringement by a particular person.  And the statement that if

9    they had tried, it would have been is impossible, is just

10   wrong.  If they had done what every other copyright holder does

11   and sent us a subpoena, we would have sent them the name of

12   each person associated with the IP address.  They chose not to

13   do that.  This was a plan, it was a strategy.  That's what this

14   lawsuit is all about.

15         So we're not going to come in here and tell the jury,

16   oh, well, no, they can't connect this IP address to this

17   person.  What we're going to say is, they never tried.  They

18   want to rely exclusively on something else.

19         Now, look, if we come in and we make --

20         THE COURT:  You just heard that they used the

21   information that you did provide, and they gave it to their

22   expert, and their expert opined on it.

23         MR. BUCKLEY:  Right.  Incorporated it into his

24   opinion --

25         THE COURT:  He didn't do nothing with it, which is

1   what you keep repeating.

2          MR. BUCKLEY:  Which is fair.

3          THE COURT:  Which is why you all drive me crazy

4   sometimes.  This goes way beyond what is correct in making your

5   arguments because you're advocates.  And I understand the

6   advocacy part of it, but you've got to restrict it to the

7   evidence.

8          MR. BUCKLEY:  That's fair, Your Honor.  Dr.

9   Bardwell's report, and his model was created before there was

10  ever any DHCP issue, before I had ever heard the term "DHCP,"

11  his model didn't change.  It's the same model.  He took the

12  sampling and he said --

13         THE COURT:  Then I don't understand, did he

14  supplement his report to include this?  Or where is this coming

15  from?

16         MR. BUCKLEY:  He referred to it in his reply report.

17  So he got it in between.  He referred to it in his reply

18  report.

19         THE COURT:  Then his deposition was taken?

20         MR. BUCKLEY:  Deposition was taken, that's right.  So

21  he's incorporated it, he talked about it.  It didn't change his

22  opinion.  He said, it bolsters what I thought.

23         THE COURT:  Right.

24         MR. BUCKLEY:  They knew there were DHCP logs in

25  existence.  We have all the loss from after the lawsuit was

 1    filed.  They never asked for them.  He never suggested it would

 2    be helpful for him to see them.  They are all still sitting

 3    there, I could give them to them all today if they really

 4    thought it was useful.

 5            This is a smoke screen, Your Honor.  And that's why I

 6    say they did nothing with it.  They didn't do anything material

 7    with it.

 8            And so then the question is, marginal 402 relevance

 9    compared to the prejudice to us if they get to come in and say

10    we're spoliators.  We also don't keep the magazines in our

11    lobby, but you wouldn't let them come in and say, oh, they

12    destroyed documents.  And this is not much different, Your

13    Honor.

14            THE COURT:  Okay.

15            MR. CARACAPPA:  Your Honor, the fact that they have

16    the DHCP logs now is irrelevant.  As we've stated, we're not

17    accusing current Cox subscribers of infringing.  The

18    subscriptions exist between a current date, the IP addresses

19    change.

20            And what Cox tried to do is say, well, we only have

21    130, but here is 250 of the current ones, so you're really

22    getting more than you asked for.  When in fact the 250 are

23    irrelevant.

24            As the Court knows, we asked for all of them.  Cox

25    did stonewall.  The magistrate ordered 250.  And we did the

Case 1:14-cv-00950-BTG-AFA Document 876-7 Filed 11/23/15 Page 103 of 114 PageID#
13573
Case 1:14-cv-01021-LO-JFA Document 876 Filed 11/23/15 Page 102 of 119 PageID# 17960

1    best we had with what we could.

2          THE COURT:  All right, thank you.

3          MR. CARACAPPA:  Thank you.

4          THE COURT:  Mr. Reilly.

5          MR. REILLY:  Good afternoon, Your Honor.

6          THE COURT:  Yes, sir.

7          MR. REILLY:  Just a couple of housekeeping things

8    that the parties have discussed.  I will be very brief.

9          THE COURT:  Yes.

10          MR. REILLY:  We had a couple of issues we have been

11    discussing among ourselves to try to make the trial a little

12    more streamlined given the number of exhibits that each side

13    has designated.  Also, how we're going to present evidence at

14    trial.

15          First, we're going to need a computer order again, so

16    we'll prepare and submit one to you, to use computers in the

17    courtroom.

18          The parties anticipate actually displaying exhibits

19    as they are being used at trial.  They are also anticipating

20    playing videotape depositions.  And I wanted to address both of

21    those together.

22          With respect to the exhibits, having had some recent

23    experience with this in some patent cases here in this court,

24    bringing in the binders full of all 3,572 exhibits for

25    defendants, and all 4,000 -- actually, 2,004,000 and so on for

1    the plaintiffs, we thought that would simply put the courtroom

2    awash in paper.

3            THE COURT:  Mr. Ruelas, he may be armed, so you've

4    got to be careful.

5            MR. REILLY:  But it also presented a problem with,

6    Your Honor, I would like to now ask the witness about

7    Plaintiff's Exhibit No. 337, which I think is binder 62, and so

8    on like that.

9            So what we thought we would do is this.  Is, with the

10   Court's permission, not file the day before trial all of our

11   binders with the Court.  Each side has exchanged them on disk.

12   We all will have them.  We will all have computers with them

13   accessible on disk.  When a witness is being examined or

14   cross-examined, the documents being used will be on the screen

15   for all to see.  And then the examining counsel will have with

16   him or her paper copies of the exhibits actually used in the

17   direct or cross, either to distribute as needed or to turn over

18   to your deputy clerk to keep tabs of what has actually been

19   admitted.

20           So as they're being used, they would be displayed.

21   As they're admitted, they would be tendered in paper form,

22   rather than try and bring in all the notebooks at once.

23           THE COURT:  I don't have any objection to that.  I

24   think that's a good idea.

25           MR. REILLY:  Okay.

1          THE COURT:  And that's as to all the exhibits that

2     have been agreed are admissible --

3          MR. REILLY:  That have been preidentified.  I think

4     there would be -- obviously there will be some that will be

5     cross-examination, for impeachment only, or something like that

6     that may not have been on either side's lists, but those will

7     similarly be brought in in paper form and presented.

8          THE COURT:  All right.  Well, my concern would be the

9     jury looking at something that was not going to be admitted and

10    seeing it, and me having to give --

11         MR. REILLY:  Understood.  And I think we would

12    identify -- for example, I would like now to have the witness

13    take a look at Defendant's Exhibit No. 337.  Counsel could

14    stand up, there is an objection to that, Your Honor, we would

15    like to be heard.  It gets decided.  We use it or we don't use

16    it.  If it is not admitted, we don't turn in the paper copy.

17    If it's not admitted or you overrule our use of it, it doesn't

18    come up on the screen either.

19         THE COURT:  All right.

20         MR. REILLY:  Counsel will continue to refine this,

21    but that's the basic concept.

22         THE COURT:  All right.

23         MR. REILLY:  With respect to videotape depositions,

24    Your Honor, my other trial experiences here have been that they

25    are limited.  You don't want to put on -- counsel are often

1   admonished not to put on three and four hours of a witness, but

2   more like 20 to 30 minutes per witness.

3          I don't know if the Court has in mind a limitation

4   that you would like us to aim for.

5          THE COURT:  You know, I don't have a time limitation,

6   but I expect that the parties, you will designate what you

7   want.  There will be cross-designations.  You will splice the

8   video.  And you will play only the relevant part.

9          And if you have got a three-hour deposition that you

10  want to put on, then we have a conversation that we have to

11  have.  But if something is going to last 30 minutes or

12  40 minutes, then that's fine, if you think it's necessary.

13         MR. REILLY:  Understood, Your Honor.  And I think

14  there will be videotape depositions played.  We will aim for

15  the shorter rather than the longer.  And the parties are

16  already going through the designation and cross-designation

17  process, and we'll try and work that all out in advance.

18         Another question, and this is a personal question I

19  had because I have done it in different ways with different

20  judges, and I would like to ask you, the Local Rules require us

21  to turn in jury instructions with citations and another set

22  without citations.  I have done it with filing online the ones

23  with citations and delivering to the Court in paper form both

24  sets, with cites and without cites.  I don't know which way you

25  would prefer.

1          THE COURT:  Well, give me a copy of the ones with

2     cites.  We need a Word Perfect e-mail of the ones that do not

3     have the cites so that at the proper time we can turn them into

4     the final instructions.

5          MR. REILLY:  Would you like those on disk, or

6     e-mailed to your --

7          THE COURT:  I am not sure that matters.  As long as

8     we can modify them and play with them, you can do it any way

9     you want.

10         MR. REILLY:  So online we will file -- through the

11    ECF system we will file the ones with citations.  And we will

12    also deliver to the Court, not necessarily paper form -- or

13    both paper form and digital form of -- so you don't have to

14    print them all out.

15         THE COURT:  Yes, give me one copy of the--

16         MR. REILLY:  Okay.  Paper and --

17         THE COURT:  And the disk, so that we can --

18         MR. REILLY:  And disk.

19         THE COURT:  Okay.

20         MR. REILLY:  Unless you instruct us to do it by

21    e-mail.  You may want to --

22         THE COURT:  Yeah.  I mean, I don't think that

23    matters.  I may be wrong.  I am not the one that works with

24    them.

25         MR. REILLY:  All right.  Thank you, Your Honor.  I

1      think that's the housekeeping issues.

2                THE COURT:  Yeah.  While we're talking about --

3                LAW CLERK:  Judge, I think Chessie would like them

4      e-mailed to her in them Word document form.

5                LAW CLERK:  Not Word Perfect.

6                THE COURT:  Oh, not Word Perfect.  A word document.

7                MR. REILLY:  Okay, Word.  That's fine.

8                THE COURT:  I was close.  I had the first word right.

9                MR. REILLY:  This is my word professor here, Your

10     Honor.  So you're a step ahead of me if you've got Word

11     Perfect.

12               And will we get -- can we approach your clerk to get

13     an e-mail address that she would like us to use?

14               THE COURT:  Yes.

15               LAW CLERK:  I can get that to you.

16               MR. REILLY:  Thank you very much.  I think that's it

17     on my housekeeping.  Yes, you were going to ask --

18               THE COURT:  We're starting on Wednesday, is that

19     right?

20               MR. KELLEY:  That's right.

21               THE COURT:  And there was a reason why we're starting

22     Wednesday.  I guess it was a conflict that some counsel had?

23     Or was it an expert?  I don't remember.

24               And the reason I'm asking is, if you want to try and

25     start Tuesday, we're happy to do that.

1          MR. KELLEY:  I think it was out of consideration of

2     the Thanksgiving holiday.  And we've got folks from out of

3     town.  And so, it just logistically worked better for everyone.

4          THE COURT:  To start on Wednesday.

5          MR. REILLY:  That's correct.  The Thursday and Friday

6     before the trial are Thanksgiving and --

7          THE COURT:  You know, actually we've got a lot of

8     work to do before the trial, so maybe we need that extra day as

9     well.

10          MR. KELLEY:  I had a question about time in the sense

11     of we've got ten trial days set aside.

12          THE COURT:  Maybe.

13          MR. KELLEY:  Maybe.  And just doing a little back of

14     the envelope calculation, I figured we would probably get in

15     six hours of testimony in the course of that.

16          THE COURT:  We will start at 9 and we will go until

17     5:30 each day.  We will take an hour for lunch.  We will do

18     15 minutes in the mid-morning and 15 minutes mid-afternoon.

19     But at the end of the day, that's probably correct.

20          MR. CARACAPPA:  Is the time roughly split 50/50?  And

21     are we going to keep a clock on it?

22          THE COURT:  You can keep your own clock.  Because I

23     find that when I have my law clerks, it subsumes their

24     substantive work, and they are approached at every break to see

25     whether there was 16 minutes of cross-examination or

1   17 minutes.  And I don't want my clerks to have to do that.

2           So you all work that out.

3           MR. KELLEY:  Okay.  Well, we will each keep our own

4   time and then just huddle up at --

5           THE COURT:  At the end of the day, or twice a day

6   huddle up.  And have somebody designated to do it that is able

7   to work with opposing counsel, and we will see how that works.

8           MR. KELLEY:  Okay.  We will just coordinate that.

9           THE COURT:  I want objections to exhibits and this

10   next witness who is going to testify, Judge, we object to this

11   and that, to the extent I don't make rulings that take care of

12   that, I want that done before the jury comes in versus at

13   side-bar.  Juries hate sidebars, as you are all well aware.

14           So just give me some notice.  I always come back in

15   before I bring the jury in.  I always say, is there something

16   we need to discuss before we bring the jury in.

17           If there is things that are going to take awhile, I

18   want to do those before we start in the morning or at the end

19   of the day.

20           I expect the parties to have a running list each day.

21   The night before I expect Mr. Kelley and Mr. Reilly are going

22   to identify the witnesses they expect to call the following day

23   so that you can prepare and we can anticipate where there may

24   be disputes.

25           MR. KELLEY:  I think we're working out a protocol for

110

1   doing that.

2            MR. REILLY:  That's correct, Your Honor.

3            THE COURT:  All right.

4            MR. REILLY:  One last thing.  9 until 5:30 the second

5    day of the trial forward.  Day 1, 10 o'clock?

6            THE COURT:  First day is 10 o'clock because the jury

7    needs to get organized downstairs and make sure who we have

8    got.  And there are always last minute things that come in.

9    Even though the jury gets here by 8:30, we can't really start

10   until 10.

11           MR. REILLY:  Okay.

12           THE COURT:  And you will submit your voir dire

13   questions that you want me to ask.  I will look at them.  I do

14   the voir dire.  Generally I will ask most of the questions that

15   you would like me to ask.  And if I forget one, we will talk

16   about that at sidebar as to whether you want additional

17   questions.

18           With a case this long, I will probably pick four

19   alternates.  And as you are all aware, if you want the

20   alternates to actually deliberate at the end of the case,

21   that's a decision that if you unanimously agree, that's fine.

22   I think they enjoy it, being able to be part of the decision

23   after they've sat through the evidence.  But if somebody

24   objects, then we'll send them home at that time.

25           You know, I pick six to go into the box.  You use

Case 1:14-cv-00950-LO-JFA Document 876-7 Filed 11/23/15 Page 111 of 119 PageID# 17969
Case 1:12-cv-00950-BTG-JFA Document 372-7 Filed 09/24/10 Page 112 of 114 PageID# 13582

111

1   your strikes after we have done our strikes for cause.  If you

2   don't strike somebody, they're in.  And then we fill up the box

3   and we repeat the process until you run out of challenges.

4           I generally will pick as alternates, I will just pick

5   eight names, and require you each to excuse four -- or two.  So

6   we're going to pick four.  And I will have you each excuse two,

7   so we will wind up with four.

8           If you don't want to do that and you want to continue

9   on with the four in the traditional means, that's fine with me

10  as well.  So discuss that and see which way you want to do it.

11          MR. REILLY:  And as I was standing here, Your Honor,

12  another question occurred to me.  When I was saying that two

13  business days before the trial are Thursday and Friday,

14  Thanksgiving and the day after Thanksgiving, we were going to

15  be filing our proposed voir dire questions and jury

16  instructions, there is a Local Rule that requires five business

17  days before trial.  In the ordinary week that might be, if we

18  start on a Wednesday, the Wednesday before.  We were going to

19  go to file them on Tuesday before the trial.  That would be --

20  if that would be sufficient for the Court's purposes.

21          THE COURT:  Yes, that's fine.  I will be -- I am not

22  going anywhere, so I will be here on Wednesday before

23  Thanksgiving, so that will give me plenty of time to look at

24  it.  Monday before the trial is really not --

25          MR. REILLY:  I thought that would be too late.

112

1          THE COURT:  That is too late.  At least I would much

2     rather have them sooner if you can get them to me sooner.

3          MR. REILLY:  Yes, Your Honor.

4          THE COURT:  So Tuesday, close of business on Tuesday

5     would be terrific.

6          MR. REILLY:  Thank you, Your Honor.

7          THE COURT:  All right.  I haven't heard anybody

8     talking settlement, so keep an open mind.  And it may be that

9     you find a way to resolve this.  And that won't upset me a

10    whole lot, although we have had an interesting case this week,

11    and I am happy to have a different type of case in early

12    December.

13         All right.  We will get a decision to you as soon as

14    we can.  It may be piecemeal that it comes out so that we are

15    giving you as much notice as we can.  And it may be that in

16    certain aspects it's going to be a game time decision where I

17    say, I understand your arguments, I'm going to defer until I

18    hear the actual evidence.

19         But certainly the work that you've done will be

20    important to making those decisions.  So I appreciate very much

21    obviously the hard work that you've put in to get the case this

22    far.

23         All right, anything else?

24         MR. KELLEY:  I don't believe so.

25         THE COURT:  All right.  Thank you.  And enjoy your

113

1    Thanksgiving.  We will see you in December, if not sooner.

2            MR. REILLY:  Thank you, Your Honor.

3            MR. CARACAPPA:  Thank you, Your Honor.

4            THE COURT:  We are in recess.

5    -------------------------------------------------
                     HEARING CONCLUDED
6

7

8

9

10

11

12

13

14

15

16

17

18            I certify that the foregoing is a true and

19       accurate transcription of my stenographic notes.

20

21

22
                          /s/ Norman B. Linnell
23                Norman B. Linnell, RPR, CM, VCE, FCRR

24

25