# Exhibit 3

HIGHLY CONFIDENTIAL

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2
    - - - - - - - - - - - - - - -x
 3    SONY MUSIC                  :
      ENTERTAINMENT, et al.,      :
 4                                :
        Plaintiffs,               :
 5                                :  Case No.
         v.                       :  1:18-cv-00950-LO-JFA
 6                                :
      COX COMMUNICATIONS,         :
 7    INC., and COXCOM, LLC,      :
                                  :
 8      Defendants.               :
    - - - - - - - - - - - - - - -x
 9                                  Thursday, June 20, 2019
                                    Washington, D.C.
10
11
12  Highly Confidential Videotaped Deposition of:
13             GEORGE P. MCCABE, Ph.D.,
14  called for oral examination by counsel for the
15  Defendants, pursuant to notice, at the law offices of
16  Winston & Strawn, LLP, 1700 K Street, Northwest,
17  Washington, D.C. 20006-3817, before Christina S.
18  Hotsko, RPR, CRR, of Veritext Legal Solutions, a
19  Notary Public in and for the District of Columbia,
20  beginning at 10:04 a.m., when were present on behalf
21  of the respective parties:
22
```

Page 83

1 90 percent to 100 percent, basically.
2     Q. So Dr. McCabe, what do you consider
3 yourself to be an expert in? What area of
4 statistics?
5     A. Applied statistics.
6     Q. And did you utilize applied statistics to
7 develop your reports in this case?
8     A. To the extent that applied statistics
9 includes the analysis of data and the summary --
10 analysis includes a summary of data, so it's
11 learning from data and then explaining what the
12 data say, being the voice of the data. That would
13 be my strength, my expertise. And that's what
14 I -- that's what's in my report.
15     Q. So what is it -- I know the data that you
16 looked at. But what -- what is the -- the voice
17 that you provided to the data? You described that
18 you gave a voice to it. So what was that voice?
19 And -- what did that voice say about the data?
20     A. Well, that's what's in my -- that's the
21 substance of my report. It's not my -- well, I
22 don't know if you want to call it my voice or the

HIGHLY CONFIDENTIAL

Page 214

1  count, the number of times it was infringed.  And
2  I just printed out the -- I sorted the number and
3  printed out a collection of the highest ones.  I
4  think --
5      Q.  So did -- you do not know whether any of
6  the artists' works under track 149 in appendix 8
7  were actually infringed by any Cox subscriber, do
8  you?  You're not actually opining that a Cox
9  subscriber infringed on these works-in-suit?
10     A.  There was a notice that documented the
11  infringement.
12     Q.  So you're assuming that the notice equals
13  direct infringement?  Are you opining on that or
14  are you assuming that?
15     A.  I'm telling you what --
16         MR. GOULD:  Objection.  Calls for a legal
17  conclusion.
18         THE WITNESS:  Sorry.
19         My expertise is limited to the
20  information in the data sets that I was given to
21  analyze.  So I have notice data.  My working
22  definition is notices are for infringements.  So

Page 215

1  this appendix was generated in part by the
2  information in that notice data.  So that's what I
3  have -- that's what I'm using in my analysis --
4  BY MR. BUCHANAN:
5      Q.  So you're assuming a notice equals --
6  equates to infringement for purposes of your
7  analysis; is that right?
8      A.  I'm not sure how to answer that question
9  because I'm not sure what you mean by
10 infringement.  If -- my working definition of
11 infringement is that's what the notices are.
12 They're infringement notices.  So when I say
13 notice, I'm saying infringement notice.
14     Q.  Okay.
15     A.  I don't know if I'm implying an action
16 taken by a subscriber at a particular time.
17     Q.  So in this paragraph you say, "Many of
18 the sound recordings and compositions at issue in
19 the case were repeatedly infringed."
20         So what do you mean by "repeatedly"?
21     A.  I mean like 739 times for Kanye West All
22 of the Lights, Amy Winehouse, Back to Black, 664

HIGHLY CONFIDENTIAL

Page 219

1          MR. GOULD:  Objection.
2     BY MR. BUCHANAN:
3          Q.  -- is that correct?
4          MR. GOULD:  Objection.  I'd like to
5     unpack that and make sure my objection is clear.
6     Objection to form.  Compound.  Argumentative.
7     Misstates the opinions in the report.  Misstates
8     testimony provided today.
9          You may answer if you can, Dr. McCabe.
10         THE WITNESS:  Could I have the question
11    back?
12    BY MR. BUCHANAN:
13         Q.  Sure.  Your task in this case was to
14    determine whether there was a notice sent on a
15    works-in-suit to a Cox subscriber after that same
16    subscriber had received one or two other notices?
17         MR. GOULD:  Objection to form.
18         THE WITNESS:  That's the question?  Yes?
19    BY MR. BUCHANAN:
20         Q.  Is that what you were tasked to do?
21         A.  Yes.  That's what I wrote.
22         Q.  Okay.  And it wasn't to determine whether

HIGHLY CONFIDENTIAL

Page 220

1  there was actual direct infringement by any Cox
2  subscriber, was it?
3      A.  I don't understand how I could possibly
4  do something like that.  The way I understand your
5  statement, I would have to go into the house of
6  the infringer and know what they did.
7      Q.  Okay.
8      A.  So all I can do, again, is tell you what
9  is in the data that I was given and what that
10 says.  And --
11     Q.  Okay.
12     A.  -- and I take it at face value for what
13 it is.
14     Q.  So back to paragraph 52.  You say, "Many
15 of the sound recordings and compositions at issue
16 in this case were repeatedly infringed."
17         Is what you meant to say that they
18 received a lot of notices?
19         MR. GOULD:  Objection to form.
20         THE WITNESS:  I didn't -- I meant to say
21 what I said.  But --
22

1            MR. GOULD:  Hold on a second, please.
2            Objection to form.  Vague and ambiguous.
3    Confusing.
4            You can answer if you understand the
5    question.
6            THE WITNESS:  It's difficult to say.
7    Many of the questions that you ask, why didn't I
8    do something.  I can tell you why I did something.
9    So I wrote something in paragraph 52.  And rather
10   than just leaving it at that, I gave a little
11   context.  And I could have given this table
12   differently.
13           This was very easy to generate.  I
14   generated it for every work-in-suit, and I sorted
15   it largest to smallest.  And I cut that off and --
16   cut it off at the top.  I could have done many
17   other things, including include every possible --
18   all 7,000.
19           So I didn't think -- to support what I
20   was saying in paragraph 52, I believed that this
21   was sufficient, to take a handful of tracks and
22   say, look, there's some serious infringement going

Page 226

1  on here.
2  BY MR. BUCHANAN:
3       Q.  Notice of infringement?
4       A.  Yes.
5       Q.  I want to ask you just about a couple of
6  the headings.  And maybe this is just shorthand
7  reference that you used.
8           On appendix 8 you have artist 190.  You
9  know, there's different artists, but it has
10 artist 190.  What does that mean?
11          MR. GOULD:  Where are you looking, Tom?
12          MR. BUCHANAN:  Appendix 8.
13          THE WITNESS:  There's a long version and
14 a short version of this story, but basically --
15 BY MR. BUCHANAN:
16      Q.  The short version is good.
17      A.  When you take data in Excel and import it
18 into SAS, there's a calculation that's done
19 that -- you know, like, we were talking about the
20 values in each column.
21      Q.  Right.
22      A.  It tries to figure out how much space it