**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT, *et al.*,<br><br>         Plaintiffs,<br><br>v.<br><br>COX COMMUNICATIONS, INC., *et al.*,<br><br>         Defendants. | Case No. 1:18-cv-00950-LO-JFA |

**COX'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO
<u>PRECLUDE CERTAIN EXPERT TESTIMONY BY DR. LYNNE WEBER</u>**

# TABLE OF CONTENTS

Page

I.   Introduction ................................................................................................ 1

II.  Argument ................................................................................................... 3

    A.   Dr. Weber's opinions are proper expert testimony that will assist the jury ............ 3

        1.   Dr. Weber clearly defines the term "effectiveness" and what it means to her analysis. ................................................................. 3

        2.   Dr. Weber's proposed testimony is proper expert opinion—not inviting "jury nullification." .......................................................... 6

    B.   Dr. Weber's opinion is reliable and admissible. .................................. 11

        1.   Dr. Weber is qualified to perform her analysis. ......................... 11

        2.   Dr. Weber applied a sound and generally accepted methodology. ........... 12

        3.   Plaintiffs misconstrue Dr. Weber's opinions on causation. ..................... 17

    C.   Dr. Weber's analysis and opinions squarely rebut Plaintiffs' case. ..................... 22

        1.   Dr. Weber rebuts Dr. McGarty's report. ..................................... 22

        2.   Dr. Weber rebuts Professor McCabe's report. ........................... 23

        3.   Dr. Weber rebuts Dr. Lehr's report. ........................................... 24

    D.   The doctrine of collateral estoppel is inapplicable here and does not serve as a basis to exclude any of Dr. Weber's opinions. ................................. 25

    E.   Dr. Weber's factual exposition is necessary to her opinions and is therefore the subject of proper expert testimony. .................................. 27

    F.   Plaintiffs' erroneous arguments regarding hearsay are no basis to exclude Dr. Weber's relevant opinions. ........................................... 28

III. Conclusion ............................................................................................... 30

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
 149 F. Supp. 3d 634 (E.D. Va. 2015) ............................................................ *passim*

*Bressler v. Wilmington Tr. Co.*, 855 F.3d 178 (4th Cir. 2017) ....................................22

*Cooper v. Smith & Nephew, Inc.*,
 259 F.3d 194 (4th Cir. 2001) ....................................................................19

*Keystone Transportation Sols., LLC v. Nw. Hardwoods, Inc.*,
 No. 5:18-CV-00039, 2019 WL 1756292 (W.D. Va. Apr. 19, 2019)........................9

*In re M/V MSC FLAMINIA*,
 No. 12-CV-8892 (KBF), 2017 WL 3208598 (S.D.N.Y. July 28, 2017)................................28

*In re Microsoft Corp. Antitrust Litigation*,
 355 F.3d 322 (4th Cir. 2004) ....................................................................25

*Perkins v. United States*,
 626 F. Supp. 2d. 587 (E.D. Va. 2009) ......................................................19

*Pugh v. Louisville Ladder, Inc.*,
 361 Fed App'x 448 (4th Cir. 2010) ....................................................21, 22

*In re Rezulin Prod. Liab. Litig.*,
 309 F. Supp. 2d 531 (S.D.N.Y. 2004).................................................9, 12

*Schmude v. Tricam Indus.*,
 556 F.3d 624 (7th Cir. 2009) ....................................................19, 20

*United States v. Barile*,
 286 F.3d 749 (4th Cir. 2002) ......................................................................8

*Ward v. Dixie Nat. Life Ins. Co.*,
 595 F.3d 164 (4th Cir. 2010) ....................................................................29

**Other Authorities**

Fed. R. Evid. 402 ....................................................................................18

Fed. R. Evid. 702(a) ..................................................................................18

Fed. R. Evid. 703 ....................................................................................29

Fed. R. Evid. 704(a) ...........................................................................................................8

Fed. R. Evid. 801(c)(2) ....................................................................................................29

Fed. R. Evid. 803 ............................................................................................................28

## I.     INTRODUCTION

Plaintiffs seek to exclude the opinion of Dr. Weber, an eminently qualified statistician with expertise in consumer behavior and customer satisfaction, from opining that when measuring for whether specific customers continued to receive subsequent infringement notices, Cox's response to receiving notices was effective.  Notably, Plaintiffs do not object to Dr. Weber's extensive analyses that support her conclusions (which are based on the same data Plaintiffs' experts use and for similar reasons).  Instead, Plaintiffs only object that she utilizes the *terms* "effective" or "effectiveness" when describing what the data in this case irrefutably demonstrates.  However, Dr. Weber's use of these terms is entirely appropriate rebuttal to Dr. McGarty's use of the same term, as well as the implications about Cox's response to receiving notices that are readily drawn from the opinions of Dr. McGarty, Professor McCabe, and Dr. Lehr.  Moreover, her use of this term is in accordance with its historical application throughout the industry, most prominently in the Copyright Alert System, where the parties agreed to data regarding how many notices subscribers received over time for the express purpose of "assess[ing] the effectiveness" of that notice program.

Plaintiffs also present several straw-man arguments that are easily dismissed.  *First,* Plaintiffs argue that Dr. Weber's definition of "effective" is about whether Cox's acts were "justified or proper," or that it did not act willfully with respect to the alleged infringement.  But she clearly explained her definition is not whether what Cox did was "justified or proper"; rather, it is a measure of whether a subscriber did or did not continue receiving a notice at each step along Cox's graduated response program.  *Second*, Plaintiffs argue that Dr. Weber's analysis is barred by collateral estoppel based on this Court's rulings in *BMG*.  But no one in *BMG* performed the type of analysis Dr. Weber has done here and, in any event, collateral estoppel is inapplicable under these circumstances.  *Third*, Plaintiffs erroneously argue that Dr. Weber performed a

"causation" analysis, that is, opining that a specific act Cox took did or did not cause a reduction in infringement. Plaintiffs further claim that Dr. Weber should have utilized a control group. Plaintiffs are wrong on both counts. If by a "causation analysis," Plaintiffs mean that Dr. Weber was opining that any choice Cox made with regard to a specific step in its graduated response program was better than any other choice it could have made, she simply did not do that. Nor did she attempt to rule out every possible contributing cause to changes in the behavior of the 57,000 Cox subscribers who allegedly infringed the works in suit. Rather, she studied the data in this case to opine as to what it demonstrates: that the vast majority of Cox's subscribers stopped receiving subsequent notices after intervention by Cox through its graduated response at each step along the way. Thus, she opines that the choices Cox did make had *an* effect for the vast majority of accounts. *Fourth*, Plaintiffs argue that Dr. Weber's analysis is not a rebuttal—but they fail to acknowledge that their expert Dr. McGarty opined on the effectiveness (or lack of effectiveness) of Cox's approach; and both Professor McCabe and Dr. Lehr implied as much. Moreover, Plaintiffs' case is premised on the notion that Cox (and its system, CATS) was ineffective and thus Cox's infringement was willful; so Dr. Weber is responding to the heart of Plaintiffs' case against Cox. *Lastly*, Plaintiffs argue that certain of Dr. Weber's calculations would constitute improper factual testimony. Those arguments are meritless on their face. Dr. Weber performed complex analyses based on the voluminous data in this case.

Dr. Weber performed a sound, reliable, and generally accepted analysis, which would aid the jury in this highly complex case. Plaintiffs' motion should be denied in its entirety.

## II.     ARGUMENT

### A.     Dr. Weber's opinions are proper expert testimony that will assist the jury.

Notably, Plaintiffs do not object to Dr. Weber's analyses, which are described below, only that she utilizes the terms "effective" or "effectiveness" when describing what the data demonstrates. For the reasons set forth below, Plaintiffs' Motion should be denied in its entirety.

#### 1.     Dr. Weber clearly defines the term "effectiveness" and what it means to her analysis.

Dr. Weber analyzed Plaintiffs' copyright notices (the "RIAA Notices") and additional data from the Cox Abuse Tracking System ("CATS") (the "Ticket" data), to assess whether Cox's handling of copyright infringement notices was "effective." Contrary to Plaintiffs' assertion that Dr. Weber did not define this term, *see* Mot. at 3,[1] Dr. Weber repeatedly and consistently provided a clear definition:

- In her report, Dr. Weber's definition is laid out clearly: ██████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████[2]

---

[1] Remarkably, Plaintiffs claim: "Dr. Weber's Report centers on Cox's effectiveness, but the Report itself does not define the term." *Id.*

[2] *See* Gould Decl., Ex. 1 (Weber Rpt. at 21, n.54) (emphases added). Dr. Weber reiterates this clear definition repeatedly. *See, e.g. id.* ¶¶ 50, 51, 70, 74-75 (for Notices) and ¶¶ 81, 92-93, 94 (for Tickets). In paragraph 94, Dr. Weber explains that ███████████████████████ ███████████████████████████████████████████ *Id.*

- As an example of how she applies this definition, Dr. Weber explains in her report that

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  Gould Decl., Ex. 1 (Weber Rpt. ¶ 50) (emphases added).  Furthermore, and as described
  in more detail below (*see infra* at 6), Dr. Weber also determined the period of time after
  the Notices stopped was on average around 500 days and that 87.9% of these accounts
  have no more Notices for more than a year after the last Notice.[3]

- Moreover, during her deposition, Dr. Weber explained that her definition of
  effectiveness is: "████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ██████████" Buchanan Decl., Ex. 1 (Weber Dep. Tr. 112:22-113:14).[4]  Similarly, she

---

[3] *Id.*, ¶ 54.  Exhibit C-6 to the Weber Report provides additional details (*e.g.*, the average number of days after the last Notice, for accounts with 1 Notice, for accounts with 2 Notices, etc.).  *Id.*, Ex. C-6
[4] *See also id.* 114:6-22, 121:18-122:10, 136:25-137:3, 138:20-139:1.

explained: ███████████████████████████████████

████████████████████████████████ *Id.* at 142:1-14.[5]

This meaning should be abundantly clear to Plaintiffs for the additional reason that Dr. Weber readily admits that Cox's policy was *ineffective* with respect to certain subscribers, such as those who continued to receive notices despite Cox's response. *See, e.g.* Buchanan Decl., Ex. 1 (Weber Dep. Tr. 280:2-12). Such an observation is possible, indeed expected, because Dr. Weber is not opining that Cox's policy as a whole is good or bad. She is opining that some percentage of the time it worked (the vast majority), in that there were no more notices for that account. And for others, it did not.

While Plaintiffs feign confusion (or perhaps frustration) at Dr. Weber's definition and calculations,[6] their own expert Dr. McGarty clearly understood the term and attempted to respond accordingly. *See infra* at 22-23.[7] Moreover, as demonstrated further below, this method of measuring effectiveness is generally accepted in the industry, ***including by Plaintiffs***. *See infra* at 14-17. Plaintiffs' arguments that this term is undefined or otherwise confusing are unfounded and, in any event, serve as no basis to exclude her opinion.

---

[5] Plaintiffs failed to quote this testimony in their motion and instead misleadingly quoted other testimony without context.

[6] This may be for good reason, as it plainly undermines their case. Unlike in *BMG*, which Plaintiffs repeatedly seem to be attempting to re-litigate, here there is no DMCA safe-harbor defense and the identity of specific subscribers is known. Thus, an analysis of Cox's response to receiving notices as determined by those subscribers who received them—and not whether Cox reasonably implemented repeat infringer termination policy across the board—is relevant.

[7] Buchanan Decl., Ex. 2 (McGarty Rpt., ¶ 11).

2.   **Dr. Weber's proposed testimony is proper expert opinion—not inviting "jury nullification."**

a.   **Dr. Weber's analysis is not *ipse dixit*.**

Despite the depth of Dr. Weber's report, which includes numerous exhibits tabulating her calculations, with which not one of Plaintiffs' experts found error, Plaintiffs nevertheless claim that Dr. Weber's opinion is "classic *ipse dixit*" because she "merely looked at her calculations, saw that for some percentage of accounts Cox received no further notices, and did nothing more to determine that Cox's policy was 'effective' than simply declaring it so."  Mot. at 1, 10.

As a preliminary matter, Plaintiffs' gloss overlooks a significant portion of Dr. Weber's analysis, which undergirds her opinion.  Namely, Dr. Weber also measured the average number of days *after* specific subscribers received their last Notice to the end of the Claim Period.  She did this to determine how many subscribers actually stopped receiving notices, which rebuts the claim that a subscriber who received only 1, 3, or 5 notices, for example, did so only because the time period for which there is data cut off (*i.e.*, the subscriber may have received more notices after the time period for which there is no data and would not be counted).  For example, Dr. Weber explains the data demonstrates ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

*See* Gould Decl., Ex. 1 (Weber Rpt., ¶¶ 52-54); *see also id.*, ¶ 55; Buchanan Decl., Ex. 1 (Weber Dep. Tr. 200:13-201:22, 201:23-202:6).  Plaintiffs fail to even acknowledge these analyses in their Motion, let alone challenge their accuracy.

Moreover, Dr. Weber's analysis provides relevant context to data in this case—which Plaintiffs produced or requested and utilize in their own case in chief.  For example, Dr. Weber contextualizes the data from the 284,444 RIAA Notices and the over 315,000 Tickets, which concern over 57,000 subscribers and span three-and-a-quarter and three years, respectively.  In

fact, Plaintiffs' own expert Professor McCabe characterized Dr. Weber's analysis as ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████   *See* Buchanan Decl., Ex. 3 (McCabe Dep. Tr. 204:19-207:12)

(referring to Weber Rpt., Ex. C-2).  She also corrected many faulty assumptions made by Plaintiffs'

own experts with respect to this data.  In their Motion, Plaintiffs even appear to concede that her

explanations of this data "to make it more accessible to the jury" are proper.  Mot. at 9.[8]

Plaintiffs separately argue that Dr. Weber's "opinion that Cox's response to receiving

notices of infringement was 'effective' is put forward merely to convey an expert's seal of approval

and persuade the jury that Cox's conduct was justified or proper."  Mot. at 8.  However, nowhere

in their Motion do they quote either Dr. Weber's report or deposition testimony to support this

claim.  In actuality, Dr. Weber opines that ████████████████████████████████████

██████████████████████████████████████████   *See* Gould Decl.,

Ex. 1 (Weber Rpt., ¶ 93).  Since the vast majority of the accounts ████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████   Dr. Weber further opines that

Cox's response to receiving Notices was therefore effective overall for the vast majority of

subscribers who were the subject of RIAA Notices.  *Id.*, ¶ 108.  Despite Plaintiffs' protestations,

this is not at all a claim regarding whether Cox was justified or proper, whether its acts were willful

---

[8] Again, Plaintiffs utilize this same data to attempt to demonstrate the exact opposite.  That is,
Cox's response was unreasonable and ineffective and that it should be held liable for the alleged
infringement.  In addition, Dr. McGarty, does not even challenge Dr. Weber's mathematical
calculations.  *See* Buchanan Decl., Ex. 4 (McGarty Dep. Tr. 198:11-199:2).

or not, whether it should have done more or less, and it certainly cannot be characterized as an unsupported stamp of approval regarding the same.

Accordingly, Dr. Weber is not simply stating that Cox's approach is effective.  She has rigorously compiled and analyzed data to *demonstrate* that it is true and Plaintiffs do not meaningfully rebut that.  Dr. Weber's thorough and clear analysis will aid the jury in determining whether Cox's actions were sufficient or insufficient to establish liability.

> **b.** **Dr. Weber's opinion will not usurp the role of the jury.**

In addition, Plaintiffs argue that Dr. Weber's opinion will usurp the role of the jury.  In support of this theory, Plaintiffs inconsistently claim that "[e]ffectiveness is not an element of any claim in suit" but that "[t]here is no significant distinction between Dr. Weber's opinions … and opinions on whether Cox acted willfully, knew of ongoing infringement, and/or failed to act sufficiently to stop or limit the infringement."  Mot. at 7-8.  The thrust of Plaintiffs' argument appears to be that Dr. Weber addresses an "ultimate issue."  As demonstrated below, Dr. Weber's testimony does not address an ultimate issue and this is no basis to exclude her opinion.[9]

*First*, Plaintiffs rely on inapposite case law, citing *Kidder, Peabody & Co. v. IAG Int't Acceptance Grp. N.V.*, 14 F. Supp. 2d 391, 398, 403-44 (S.D.N.Y. 1998) for the apparent proposition that Dr. Weber's opinion tells the jury what to think with respect to an element of their claim for contributory infringement.  Mot. at 8.  But in that case, unlike here, the plaintiff's claim

---

[9] Even if it did address an ultimate issue, such an opinion would not be improper in this case.  *See* Fed. R. Evid. 704(a).  Moreover, Plaintiffs' reliance on *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002), albeit merely for the basis *Daubert* standard as quoted by the Sixth Circuit, is nevertheless misplaced.  In that case, the court excluded an expert's testimony because it was found to be legal conclusion (whether a misstatement in a security filing was "material").  Dr. Weber does not opine on any specific element of either of Plaintiffs' claims (or Cox's defenses).

(malicious prosecution) required the jury to determine whether the defendant acted with malice. The defendant put forward a putative expert who opined that there was no such malice.[10]

Here, Plaintiffs seek to establish that Cox is contributorily liable for its subscribers' alleged acts of infringement.  In order to do so, Plaintiffs must establish that Cox acted (1) "with knowledge of the infringing activity," (2) "induce[d], cause[d] or materially contribute[d] to the infringing conduct of another."  *See BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 670 (E.D. Va. 2015).  Thus, Plaintiffs' claims do not require the jury to make a finding regarding Cox's motivation and, more importantly, Dr. Weber's opinion in no way deals with such issues.  For this reason, Dr. Weber's testimony does not supplant the jury's determination of any elements of Plaintiffs' claims.

*Second*, in connection with this argument, Plaintiffs also cherry-pick and contort a few of Dr. Weber's opinions (ignoring the rest) in an attempt to tie them to their argument that she will somehow supplant the jury's determination.  For example, Plaintiffs claim that Dr. Weber ████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████  Mot. at 8.  Plaintiffs' reference to "*repeat* infringers" who receive only *one* offense is nonsensical and Dr. Weber forms no such opinion.  Rather, Dr. Weber opines that based on her analysis that because most subscribers stop

---

[10] Plaintiffs also cite *In re Rezulin Prod. Liab. Litig.,* 309 F. Supp. 2d 531, 544 (S.D.N.Y. 2004), in which the court excluded putative experts who offered to opine on whether a defendant "acted in an unethical manner" with respect to its responses to clinical testing of a new drug.  *Id.* Because Dr. Weber does not opine on Cox's motive, or state of mind, this case, like Plaintiffs' others, is inapposite.  Plaintiffs also cite, without context, *Keystone Transportation Sols., LLC v. Nw. Hardwoods, Inc.*, No. 5:18-CV-00039, 2019 WL 1756292, at *1 (W.D. Va. Apr. 19, 2019). In that case, a putative expert was excluded not only because he was unqualified, but because he was simply offered to argue the plaintiffs' case from the stand—Dr. Weber does not purport to argue—but rather explain what the unrebutted data in this case irrefutably demonstrates—this case too is inapposite.

receiving notices after only a few, *terminating* a subscriber after only one or a small number of notices is, in her opinion, operationally unnecessary.  Gould Decl., Ex. 1 (Weber Rpt., ¶¶ 134, 78).  Moreover, the concept of "repeat infringers" is not directly relevant to this case.

Plaintiffs also quote Dr. Weber's opinion that



Mot. at 8.  Contrary to Plaintiffs' implication, Dr. Weber does not opine that sending the first notice is unnecessary.  Nor does she form any opinion about what the impact on the effectiveness of Cox's approach would be if it elected to do so.  Rather, based on her analysis showing

.[12]

*Third*, Plaintiffs additionally argue that Dr. Weber's opinion "will lead a jury to ignore the fact that Cox chose to put its pecuniary interests over terminating specific subscribers for whom Cox received notice after notice but failed to terminate."  Mot. at 8.  To the contrary, Dr. Weber's opinion does not at all deal with Cox's purported financial incentives to permit infringement on its network, including its revenue or profits from subscribers (whether alleged to have infringe or otherwise), or its costs in implementing (or avoiding) an appropriate response to infringement notices.  Plaintiffs will no doubt examine Cox's employees to elicit facts relevant to those issues,

---

[11] *See* Gould Decl., Ex. 1 (Weber Rpt., ¶¶ 87, 92, Ex. C-28).
[12] *Id.*, ¶¶ 93, 100, 109, 134.

and Plaintiffs' own experts have put forward reports in which they form opinions related to the same.  Moreover, contrary to Plaintiffs' claim, Dr. Weber's opinion actually puts front and center the precise number of subscribers who received different quantities of notices during the relevant time periods, including, notably, those who received more than 12 ███████[13]  Thus, Plaintiffs' assertion that Dr. Weber's opinion in which she rigorously analyzes *all of* the notice data will somehow overwhelm the jury's determination regarding whether Cox did enough with subscribers who received many notices is entirely unwarranted.  This information about how notices each subscriber received and over time will greatly aid in their determination.

**B.    Dr. Weber's opinion is reliable and admissible.**

**1.    Dr. Weber is qualified to perform her analysis.**

Plaintiffs do not object to Dr. Weber's qualifications, though they choose to inaccurately portray both her role in this case and her credentials and experience.  Plaintiffs omit that Dr. Weber earned a Doctorate in Operations Research, which is the application of mathematics to business problems, from Stanford University (to go along with her Master's degree in Statistics also from Stanford and a Bachelors in Mathematics from Cornell University).

Plaintiffs also omit that Dr. Weber has more than 35 years of professional experience not only in market analysis, market research, market modeling, and quantitative analysis, but more specifically in data analytics, statistical analysis, and econometric analyses.  In characterizing Dr. Weber as a "paid professional expert,"[14] Plaintiffs ignore that she has led more than 200 ordinary

---

[13] Indeed, Dr. Weber's opinion and analyses are more comprehensive and balanced than those put forward by Plaintiffs' experts, who uniformly focus on only the most egregious cases (works with the largest number of notices, subscribers who were the subject of the most notices, etc.). *See, e.g.*, Buchanan Decl., Ex. 5 (McCabe Rpt., ¶¶ 16b, 48, App. 8); *id.*, Ex. 3 (McCabe Dep. Tr. 213:11-214:3, 216:8-10, 221:19-222:8); *id.*, Ex. 2 (McGarty Rpt., ¶¶ 33, 36) (bullet on 6-month "abuse cycle"), Attach. 4-5; *id.*, Ex. 4 (McGarty Dep. Tr. 138:6-13, 273:14-274:10).

[14] Plaintiffs' characterization of Dr. Weber as merely a "paid professional expert" is disingenuous, given that she has testified in only a modest 8 prior matters over the last four

course of business engagements and has conducted numerous data analyses for a broad range of business purposes. *See* Gould Decl., Ex. 1 (Weber Rpt., ¶ 6).

In alluding to Dr. Weber's experience assessing consumer behavior, Plaintiffs additionally omit that she has built over 100 models of consumer behavior, has moderated more than 200 focus groups, and has managed market research studies encompassing thousands of respondents. *Id.*

Dr. Weber has utilized this expertise to form her opinions in this matter, including her analyses of the data in this case, her opinion regarding the frequency with which Cox's response to receiving infringement notices was effective, and her analyses of Cox's customers' reactions to receiving notices. Dr. Weber is eminently qualified to provide her opinions in this case.[15]

## 2. Dr. Weber applied a sound and generally accepted methodology.

### a. An "effectiveness" analysis is a generally accepted methodology.

Plaintiffs claim that "absent from Dr. Weber's analysis is a standard or generally accepted technique used to determine 'effectiveness.'" Mot. at 12. Plaintiffs' criticism is confused, as the "technique" Dr. Weber used to determine effectiveness is statistical and data analysis. That is, she extensively analyzed the data in this case to determine the percentage of accounts implicated in infringement notices that cease receiving subsequent notices after corresponding steps in Cox's graduated response.[16] She is thus able to opine that Cox's approach was effective for different

---

years. Indeed, Plaintiffs take pains to quantify the number of times each of Cox's other experts have testified but elect to omit such quantification from the instant motion.

[15] Plaintiffs quote the language from *In re Rezulin Prod. Liab. Litig.,* 309 F. Supp. 2d at 544 that an expert must have "specialized knowledge or expertise that would be helpful in resolving the issues of fact presented by the lawsuit." Mot. at 9. When disposing of their straw-man argument that she is opining as to a legal conclusion, which she is not, they do not meaningfully argue Dr. Weber lacks such "specialized knowledge or expertise" to analyze data as she has done here.

[16] Indeed, Dr. Weber explained that she followed the typical ways data is collected and analyzed, *see* Buchanan Decl., Ex. 1 (Weber Dep. Tr. 50:6-12); Professor McCabe called her analysis ███████ *Id.*, Ex. 3 (McCabe Dep. Tr. 204:19-207:12).

subgroups of accounts and over different time periods.  Dr. Weber's definition of "effective" is therefore neither conclusory nor convoluted, as Plaintiffs claim without support or explanation.

Moreover, to the extent Plaintiffs claim they cannot find reference to Dr. Weber's "technique" in scientific or technical literature, they ignore the answer to their own (limited) set of questions during Dr. Weber's deposition.  Dr. Weber testified that an "effectiveness" analysis is analogous to a "failure analysis," and it may sometimes be referred to in the literature as a "failure or reliability analysis," as opposed to an "effectiveness analysis."  She also explained that these analyses are, in effect, an "ordinary course of business analysis," which is a generally accepted approach to studying the response to an issue in the context of a business' operations, and a type of analysis she herself has conducted for ordinary course of business purposes.  *See* Buchanan Decl., Ex. 1 (Weber Dep. Tr. 115:19-117:1).  Plaintiffs failed to ask any follow up questions or to examine Dr. Weber on her experience in this area and how she applied it to her analyses.

If they had, Plaintiffs would have learned that an "effectiveness" analysis for ordinary course of business is one in which a company analyzes its response to a certain issue.  An example of an "effectiveness" analysis for ordinary course of business purposes outside of the context of an ISP responding to infringement notices may be the following:  If FedEx wanted to know how effective their service is in providing on-time deliveries, they would measure it utilizing existing data.  In other words, they would check to see how often their deliveries are on-time.  They may parse the data by region, day of the week, time of day, type of package, season, etc.  But the analysis is the same—they look at existing data to determine whether something did or did not happen and how frequently.

Moreover, contrary to Plaintiffs' arguments, in performing her analysis, Dr. Weber does not opine that any specific choice Cox made caused the volume of notices to go up or down, which

renders their reliance on cases dealing with claims where causation is at issue moot.[17]  She does opine that the evidence shows that in individual cases, Cox subscribers changed their behavior after Cox's intervention, and that as the number of interventions increased, so did the number of subscribers who stopped their alleged infringement of plaintiffs' works.  While it is impossible to know what specifically made a difference for any individual subscriber, she opines that Cox's progressively increasing response to their conduct was part of the mix.  As discussed in more detail below,[18] there was no necessity for her to have used a control group to reach this conclusion.  The FedEx example is instructive of why this is the case: if FedEx wanted to determine how often it delivered on-time, it would not ask a portion of its delivery personnel to stop delivering or to work less diligently to see how on-time percentages will change.  That makes no sense.  Again, they would simply measure from existing data how often targets are met.  That is precisely what Dr. Weber did here.  It will be up to the jury to determine whether the data and Dr. Weber's opinion related thereto does or does not warrant finding Cox liable for the alleged infringement

> **b.     Dr. Weber's analysis has been utilized throughout the industry, including by or on behalf of Plaintiffs.**

Dr. Weber's analysis of Cox's data relating to infringement notices to determine how many subscribers received different quantities of notices over a set period of time and her opinions regarding effectiveness of Cox's response is the same as the types of studies that content owners perform in the industry to assess the effectiveness of copyright response systems.

For example, in 2010, ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[17] *See infra* at 17-22.
[18] *See infra* at 17-22.

█████   *See* Buchanan Decl., Ex. 6 (COX_SONY_00523050).   The RIAA ████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████   *Id.*   ████████████████████

█████████████████████████



*Id.*

In response to receiving the █████████████████████████████████████

████████████████████████████████████   Buchanan Decl., Ex. 7 (Cadenhead Dep.

Tr. 297:16-298:20).   ██████████████████████████████████████

█████████████████   *See* Buchanan Decl., Ex. 6.   ██████████████████████

███████████████████████████████████████████████████████████████

Buchanan Decl., 8 (Beck Dep. Tr. 28:2-7); *see also id.*, Ex. 9 (Carothers Dep. Tr. 127:23-130:15)

█████████████████████████████████████   In fact, Cox subsequently presented

its study to ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████   *Id.*, Ex. 7 (Cadenhead Dep. Tr. 283:4-285:1).[19]

Moreover, as part of this presentation, Cox also provided a ██████████████████

███████████████████████████████████████████████████████████████

---

[19] Contrary to Plaintiffs' assertion, the underlying data for Cox's analysis was produced in this case. *See* Buchanan Decl., Ex 10 (COX_SONY_00974461).

███████████████████████████████   *See* Buchanan Decl., Ex. 6; *id.,* Ex. 7

(Cadenhead Dep. Tr. 293:2-13); *id.*, Ex. 8 (Beck Dep. Tr. 26:5-31:3).[20]

In addition, the Copyright Alert System Memorandum of Understanding (the "CAS MOU"), which was an agreement to which each of the Record Company Plaintiffs (and the RIAA) were parties, and which outlines the parties' understanding of how participating ISPs were to respond to receiving infringement notices sent by the content owners, specifically contemplated an "effectiveness" analysis of the type performed by Dr. Weber. The CAS MOU states that "each Participating ISP shall provide … information about those Subscribers who have received Copyright Alert(s) during the applicable calendar month and the number of alleged P2P Online Infringements by each subscriber." Gould Decl., Ex. 7 (CAS MOU, § 4.I). The CAS MOU then states that the parties may use this data "to analyze the effectiveness of the Copyright Alert Program." *Id.* The CAS MOU explains what it means by "effectiveness" as follows:

> In order to assess the ***effectiveness*** of the Copyright Alert Program, CCI shall assess among other things ***(i) the proportion of Subscribers of each Participating ISP who ceased receiving Copyright Alerts at each step of the Copyright Alert Program***; (ii) the average overall number of P2P Online Infringements detected for Content Owner Representative assets over a weekly or monthly period … (iii) the number of ISP Notices received and the number of corresponding Copyright Alerts sent; ***(iv) the number and percentage of individual Subscribers who, after receiving one (1) or more Copyright Alerts, did not receive additional Copyright Alerts corresponding to their accounts (in general, and by Participating ISP)*** … ."

---

[20] Brent Beck, who is software engineer at Cox, explained the 

*See* Buchanan Decl., Ex. 8 (Beck Dep. Tr. 29:6-20).

*Id.*, § 9.D (emphases added).

As the foregoing demonstrates, Plaintiffs' confusion over, and concerns regarding, Dr. Weber's analysis are unfounded, as they, together with the rest of the online content and ISP industries, were using a methodology to determine the "effectiveness" of the response of ISPs participating in CAS to notices that was identical to the analysis Dr. Weber employed to determine the effectiveness of Cox's response to the RIAA's notices.  Dr. Weber's analysis is based on the sound, reliable, and generally accepted practice of reviewing data to calculate the percentage of subscribers who continue to receive notices after a certain number.  Her opinion that Cox was effective with respect to some portion of its subscribers is based on the results of the data analysis that she performed in this case that closely resembles the analysis performed and requested by industry participants for ordinary course of business purposes.

### 3.     Plaintiffs misconstrue Dr. Weber's opinions on causation.

Here, Plaintiffs present a straw-man argument: they claim "[a]t the heart of Dr. Weber's opinion on 'effectiveness' are her conclusions on causation."  Mot. at 12.  Plaintiffs thus argue that because Dr. Weber did not analyze whether each step in Cox's graduated response *caused* the concomitant reduction in subsequent notices, she cannot opine that Cox's approach was effective.

Putting aside that Plaintiffs, disregard their own historic adoption of Dr. Weber's methodology, and putting aside that they again misapply (or misunderstand) the definition of "effective," Dr. Weber made clear that she draws a distinction between opining on causation and *identifying evidence consistent with causation*.  Buchanan Decl., Ex. 1 (Weber Dep. Tr. 238:22-239:10) ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████  It is, of course, an axiom of the law of evidence that "relevant" is generally admissible where it "has any tendency to make a fact more or less probable

than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 402.  Evidence from which "causal connection can be inferred" is manifestly admissible under these standards, regardless of whether it definitively establishes a causal connection.  Indeed, one might want to view with skepticism and testimony which categorically asserted that a causal connection did or did not exist on the basis of these facts.  Plaintiffs fail to address this critical distinction between what the evidence tends to show and which it necessarily shows, let alone explain why it would be improper for an expert to explain an analysis that *the jury* may consider as they draw their own "infer[ences]" about causation.  *See* Fed. R. Evid. 702(a).

Moreover, Plaintiffs seem to assume that Dr. Weber has opined that what Cox did at any given step was better than something else it could have done.  But she offered no such opinion.  Rather, Dr. Weber opines that the behavior of Cox's subscribers is evidence that Cox's intervention, at each step along the way had an effect on the number of notices that individual subscribers received.  As discussed above, *see supra* at 3-5, when measuring for a reduction in notices over the course of Cox's graduated response program *and* for whether specific subscribers continued to receive notices over an extended period of time, Cox's approach was effective overall and for the vast majority of accounts in precisely the way that the industry measured "effectiveness."  Gould Decl., Ex. 1 (Weber Rpt., ¶¶ 28, 77); *see also id.*, ¶¶ 52-63.

Plaintiffs' related claim that Dr. Weber should have utilized a control group to support her opinions.  This argument is also baseless.  Mot. at 13.  As a preliminary matter, Plaintiffs ignore Dr. Weber's repeated testimony that a control group was unnecessary for her analysis.  Buchanan Decl., Ex. 1 (Weber Dep. Tr. 50:13-24, 51:18-24, 238:12-16).  Remarkably, Plaintiffs never asked her *why* a control group is unnecessary here.

But the reasons are clear.  *First*, as discussed above, Dr. Weber is not opining that what Cox did was better or more effective than something else it could have done, nor is she opining that what Cox did was definitively *the* cause of the changed behavior exhibited by its subscribers after Cox's interventions.  All she is opining is that, every time Cox intervened, some subscribers changed their behavior, and that it is a reasonable inference from this fact that Cox's interventions had an effect in curtailing the conduct in question.  Therefore, she does not need to control for alternate factors (*e.g.*, forwarding the first notice, accepting more notices, suspending earlier, etc.).[21]  *Second*, as noted above, the industry standard for measuring "effectiveness" did not contemplate a control group.  Why Cox should be subjected to a higher standard for assessing the effectiveness of its system than was the rest of the industry is unexplained by Plaintiffs.  *Third*, even setting aside that a control group was unnecessary, Plaintiffs have not proposed a single alternative explanation for the decrease in repeat infringement that would suggest that there were other causal factors at work that needed to be controlled for.  To the contrary, most of these alternative causal scenarios were ruled out by Dr. Weber's data, and to the extent that any of them are relevant to Dr. Weber's analysis, they go to the weight of her opinion—not admissibility.[22]

Plaintiffs' first alternative explanation for the decrease in repeat infringement following Cox's interventions, that "continued infringement may have gone undetected" (Mot. at 13), can be

---

[21] *Cf. Perkins v. United States*, 626 F. Supp. 2d. 587, 594-95 (E.D. Va. 2009) (requiring a *causation* opinion to adequately take into account alternate explanations).  For this reason, Plaintiffs' citation to *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194 (4th Cir. 2001) is inapposite, as that case deals with a medical expert providing a "differential diagnosis" who failed to consider other potential causes of the ailment, as is required for such an opinion under a distinct line of authorities.

[22] *Schmude v. Tricam Indus.*, 556 F.3d 624, 625–26 (7th Cir. 2009) (rejecting the defendant's claim of error regarding the plaintiff's expert's failure to perform testing that replicated a ladder's collapse and noting that the defendant failed to establish what kind of test would prove whether the hypothesized cause for the collapse was correct).

easily repudiated by the analysis of the Notice data in Dr. Weber's report.  Dr. Weber looked at accounts with two different lengths of time for observation of Notices.[23]  As she opines, the █████

███████████████████████████████████████████████  *See* Gould Decl.,

Ex. 1 (Weber Rpt. ¶¶ 48, 52, 56).[24]  If Plaintiffs' conjecture were correct, having much more time to monitor for infringement should result in more additional Notices for habitual infringers—but it does not.  Using Plaintiffs' speed trap example, the longer you leave the speed trap set up, the more repeat speeders you will catch—but, again, the data in this case is to the contrary.  Thus, Plaintiffs' first alternative explanation fails.

Plaintiffs' second alternative explanation, that "continued infringement … may have been detected but not selected for reporting due to caps imposed by Cox on notices," (Mot. at 13-14), is similarly repudiated by the above analysis.  This is because even if you limit the number of speed traps you set, if you leave them set up for longer, you should catch repeat speeders more often—but again, the data demonstrates that this is not the case.  This proposed explanation also ignores Dr. Weber's analysis showing that RIAA only contracted with MarkMonitor to send, and MarkMonitor typically only sent, far fewer Notices than Cox had agreed to accept.  *See infra* at 27.  Moreover, as Dr. Weber's analysis establishes, ████████████████████████████████

████████████████████████████████████████████  If Cox had raised RIAA's cap to 700 or 1,000, it would have made no difference.

Plaintiffs' third alternative explanation, that "a subscriber may have left a BitTorrent swarm because she was successful in downloading all the music files she wanted," (Mot. at 14), is

---

[23] One with their first Notice in the first six months of the claim period, so there is about 16-22 months to see if subsequent Notices are received, and a more general group whose first Notice occurred anytime in the 22-month claim period, so on average there are about 11 months to see if subsequent Notices are received.

[24] *See also id.* (compare columns B and C of Exhibit C-27).

even more puzzling.  If a subscriber stops infringing, then there are no more Notices and Plaintiffs have nothing to complain about.  Moreover, there is no way to control for the *reason* a subscriber stops infringing; Cox (and Plaintiffs) have the Notices and nothing more.

Plaintiffs also claim, though without support or explanation, that Dr. Weber failed to account for "various factors that impacted the number of notices, such as 'blacklisting of entities other than RIAA, daily limits on notices from RIAA and other entities, auto-closing the first complaint received, resets after six months, limits on the number of accounts suspended in a day, reactivations, etc.'"  Mot. at 14.  Plaintiffs cite to paragraph 75 of Dr. Weber's report for this claim.  But this very paragraph of Dr. Weber's report directly contradicts this position, stating that her

████████████████████████████████████████████████████████ *See also* Buchanan Decl., Ex. 1 (Weber Dep. Tr. 221:1-3, 221:22-222:6); *see also id.* 281:2-8 ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████.[25]  Moreover, in referencing "daily limits," Plaintiffs entirely ignore that their agent the ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████  Plaintiffs have not rebutted this testimony.[26]

---

[25] Plaintiffs also claim that Dr. Weber failed to consider the import of Cox's policy to hold the first notice received for a subscriber.  Mot. at 14 (citing Weber Rpt., ¶ 74).  That is not true, of course, as Dr. Weber's policy takes into account all steps of the policy.  Buchanan Decl., Ex. 1 (Weber Dep. Tr. 132:21-133:10; 242:16-243:6).  Moreover, Plaintiffs ignore that Dr. Weber testified that the first action for an RIAA notice *could* be a customer-facing action, if there were a preceding ticket in CATS from another copyright owner.  Buchanan Decl., Ex. 1 (Weber Dep. Tr. 135:6-22); *see also* Gould Decl., Ex 1 (Weber Rpt. ¶ 88).  Plaintiffs do not rebut that, however.

[26] Because Dr. Weber's analyses takes these, and other, alternatives into account, including blacklisting entities such as Rightscorp, regardless of whether it was necessary, Plaintiffs' concerns, if anything, go to weight—not admissibility.  Indeed, Plaintiffs' own case *Pugh v.*

To summarize, a control group was unnecessary and would have been uninformative, and none of Plaintiffs' proposed alternative explanations would merit consideration of a control group, given the facts and data in this case.  Moreover, to the extent any of these alternative explanations are relevant to Dr. Weber's opinion, they go to its weight—not admissibility.  *Bressler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) ("[C]ourts may not evaluate the expert witnesses' conclusion itself, but only the opinion's underlying methodology.").

### C.    Dr. Weber's analysis and opinions squarely rebut Plaintiffs' case.

Plaintiffs devote only four sentences of their Motion to their argument that Dr. Weber's entire analysis relating to the effectiveness of Cox's response should be stricken because it does not rebut either Dr. McGarty's or Professor McCabe's reports.  *See* Mot. at 11.  Plaintiffs cite no authority for this argument and fail to explain it other than to misquote her deposition testimony.  As demonstrated below, however, Dr. Weber directly rebuts three of Plaintiffs' experts.

### 1.    Dr. Weber rebuts Dr. McGarty's report.

Plaintiffs' argument aside, Dr. Weber clearly states in her report that she is rebutting both Dr. McGarty's and Professor McCabe's reports.  For example, in Section 4.2 of Dr. Weber's report, which is titled ███████████████████████████ Dr. Weber states that the premise of her effectiveness analysis and opinion is ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Gould Decl., Ex. 1 (Weber Rpt., ¶ 40) ████████████

████████████████████████████████; *see also id.*, ¶ 83 ██████████

████████████████████████████████. Dr. McGarty added that Cox acted improperly

---

*Louisville Ladder, Inc.*, 361 Fed App'x 448 (4th Cir. 2010) supports this conclusion, as the expert's opinion was admitted and the court held any questions as to reliability of testing methods could be brought out on cross-examination. *Id.*

because it ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ *Id.*, Ex. 2 (McGarty Rpt., ¶ 16).  In response to these opinions, Dr. Weber opined that

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Gould Decl., Ex. 1 (Weber Rpt., ¶ 40).  Dr. Weber supported that

opinion in performing her analysis.

In addition, Plaintiffs ignore that Section VI.B of Dr. McGarty's report is titled: ████████

████████████████████████████████████████████████████████

████████████████████████████ Buchanan Decl., Ex. 2 (McGarty Rpt. at 12) (emphasis

added).  In this section, Dr. McGarty opines that ██████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████.[27]  Thus, Dr. Weber's report, including

the analyses in Section 4.2-4.4 squarely rebut Dr. McGarty's opinions.

## 2.    Dr. Weber rebuts Professor McCabe's report.

While Professor McCabe claims that Dr. Weber's analysis is not a rebuttal of his report,

*see* Buchanan Decl., Ex. 11 (McCabe Rebuttal Rpt., ¶ 8), Dr. Weber directly responded to his

opinions in the section of her report in which she presents her effectiveness analysis.[28]

Moreover, many of Professor McCabe's analyses *imply* that Cox's response to receiving

infringement notices—both from the RIAA and other content owners for which there is data in

---

[27] *See, e.g.*, *id.*, Ex. 4 (McGarty Dep. Tr. 255:5-21, 72:14-74:10, 89:14-90:10, 91:1-12, 179:16-180:2).
[28] *See* Gould Decl., Ex. 1 (Weber Rpt., ¶¶ 41-42, 65, 84).

this case—was ineffective or improper.  For example, Professor McCabe calculates ██████████

███████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████  But

Dr. Weber's analysis, in response, demonstrates not only that Professor McCabe miscalculated his

percentage but also that Cox's act of suspending these subscribers has a substantial impact on the

occurrence of additional notices, even though their accounts are reactivated.  *See* Gould Decl., Ex.

1 (Weber Rpt., ¶¶ 96-98).  Putting aside whether Plaintiffs agree with the opinion, which they can

explore on cross-examination, it is a direct response to Professor McCabe's analysis.

Separately, while Plaintiffs' characterize Dr. Weber's opinion in Section 4.4 of her report

as an "effectiveness analysis," it is not.  Rather, in Section 4.4, Dr. Weber directly responds to

Professor McCabe's incomplete and misleading calculation of the number of notices received by

Cox's business subscribers.  *See* Gould Decl., Ex. 1 (Weber Rpt., ¶¶ 110-112).  While Professor

McCabe ████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████████.  He noted that there █████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

Dr. Weber contextualized the implications from Professor McCabe's calculations.  Thus, there is

no basis for Plaintiffs' claim that this is not a direct rebuttal.

**3.   Dr. Weber rebuts Dr. Lehr's report.**

Plaintiffs fail to acknowledge in their Motion that Dr. Weber also rebuts, in part, their

expert Dr. Lehr.  Dr. Lehr utilizes the entire "lifetime" value of a Cox customer to calculate Cox's

purported financial incentive to permit infringement on its system.  Indeed, Dr. Lehr so opines

despite the fact that the data in this case can be used to demonstrate that most of the relevant subscribers were only implicated in infringement notices during very short periods of time (over the course of Dr. Lehr's purported 5.6-year customer tenure). In response to Dr. Lehr's assumption, Dr. Weber analyzed, for a representative group of accounts, the average length of time after the last RIAA Notice for which there are no additional notices (~500 days) and the percentage of observable time *after* the last RIAA Notice (88%).[29] In other words, Dr. Weber's analysis shows how the data in this case demonstrates that on average, the period of time over which Cox's subscribers who were the subject of Plaintiffs' notices were implicated in such notices (first notice to last) is a small fraction (12%) of the observable timeframe for those subscribers. This undermines Dr. Lehr's broad-stroke and untethered approach to quantifying the amount of Cox's profits that might be attributable to the alleged infringement.[30]

### D. The doctrine of collateral estoppel is inapplicable here and does not serve as a basis to exclude any of Dr. Weber's opinions.

Putting aside whether collateral estoppel would bar Cox from litigating any issues in this case that were previously litigated in *BMG*,[31] Plaintiffs' argument is factually inaccurate and therefore fatally flawed. For the reasons discussed below, collateral estoppel serves as no basis to exclude Dr. Weber's testimony from this case.

---

[29] *See, e.g.*, Gould Decl., Ex. 1 (Weber Rpt., ¶¶ 54-56, 58-62, 102-106, 135-136, Ex. C-6 & C-7). Dr. Weber performed this same analysis for Tickets, which are not only the RIAA Notices but CATS data relating to copyright infringement complaints from other rights holders. *See id.*, Ex. C-28.

[30] It should also be noted that Cox's expert Christopher Bakewell, who also rebuts Dr. Lehr's calculations, references Dr. Weber's report in further support of his opinion that Dr. Lehr failed to tie his calculations to the alleged wrongdoing.

[31] It does not. "To apply collateral estoppel or issue preclusion to an issue or fact, the proponent must demonstrate" that the issue or fact is identical to one previously litigated, actually resolved, and "critical and necessary" to the prior judgment, that the prior judgment is final and valid, and that the party to be precluded had a full and fair opportunity to litigate the issue. *In re Microsoft Corp. Antitrust Litigation*, 355 F.3d 322, 326 (4th Cir. 2004). Plaintiffs have not established any of these elements.

*First*, as Plaintiffs readily acknowledge in their Motion, in *BMG*, the Court granted summary judgment with respect to Cox's DMCA safe-harbor defense, finding, based on the specific facts before it, that Cox did not reasonably implement its policy terminating repeat infringers.  Here, there is no DMCA safe-harbor defense and the issues of whether Cox had a reasonable repeat infringer policy and whether it was reasonably implemented are plainly irrelevant.  Moreover, in *BMG*, the Court did not make any determinations as to whether steps in Cox's graduated response were effective when measuring for the cessation of subsequent notices for specific subscribers, as Dr. Weber does here.

*Second*, Dr. Weber does not offer any opinions as to whether Cox's response to repeat infringers was reasonable.  And Plaintiffs make no effort to tie that concept to her opinions.  To be clear, she does *not* opine that Cox did not need to terminate any number of subscribers.  She does *not* opine at what number of notices Cox should have terminated its subscribers.  And she does *not* opine that it was appropriate or reasonable for Cox to have as many subscribers receive 13 or more notices as it did.  Thus, there is no comparing the Court's ruling in *BMG* on Cox's DMCA safe harbor defense to Dr. Weber's opinion in this case.

*Third*, Plaintiffs claim that because the Court excluded William Rosenblatt's testimony in *BMG*, it should do the same to Dr. Weber here.  Plaintiffs misleadingly argue that Mr. Rosenblatt opined "on topics identical to those proffered by Dr. Weber," including an "effectiveness" analysis.  Mot. at 6.  But the documents they cite unquestionably belie this claim.  The briefs on the motion make clear that given Cox's asserted DMCA safe-harbor defense, Mr. Rosenblatt opined on whether Cox adopted and implemented a reasonable *repeat infringer termination policy*.  Buchanan Decl., Ex. 12 (*BMG*, ECF 597 at 21-26).  He also compared Cox's repeat infringer

policy to those of other ISPs.  *Id.*[32]  These opinions were unique to *BMG* and, in any event, are categorically distinct from those proffered by Dr. Weber.

Moreover, Dr. Weber's analysis in this case would obviously have been impossible to undertake in *BMG*.  In *BMG*, unlike here, Cox did not accept the Rightscorp notices.  Thus, no one (including Mr. Rosenblatt) could have determined the frequency with which specific Cox subscribers stopped receiving subsequent notices after Cox applied its graduated response policy.  Again, unlike Mr. Rosenblatt's opinion in *BMG*, Dr. Weber does not opine on the reasonableness of a Cox policy.  Rather, she measures the effect of its policy, *as implemented*.

Based on the foregoing, the Court's prior rulings in *BMG* do not serve as a basis to preclude Dr. Weber's testimony.

**E.    Dr. Weber's factual exposition is necessary to her opinions and is therefore the subject of proper expert testimony.**

Plaintiffs seek to exclude two of Dr. Weber's opinions purportedly on the basis that they are "improper factual argument."  Mot. at 10.  In rebuttal to Dr. McGarty's opinions regarding the limits that Cox set on the number of copyright infringement notices it would accept in a day, and to the failure of both Dr. McGarty and Professor McCabe to clarify the distinction between RIAA hitting its hard limit and other entities hitting their hard limit,[33] Dr. Weber analyzed the RIAA's notice data.  She determined that Plaintiffs failed to send Cox the number of notices per day that Cox was willing to accept.  In particular, after Cox agreed to accept up to 600 notices per day (in April 2013, *i.e.*, early in the claim period), Plaintiffs ███████████████████████████

---

[32] Mr. Rosenblatt did cite in support of his opinion regarding Cox's repeat infringer policy an internal Cox study that demonstrated that only 4% of subscribers receive 6 notices (or 96% do not receive more than 5).  The Court allowed Cox's then in-house counsel to explain this study and admitted it into evidence.  The Court further allowed BMG's expert Dr. McGarty to rebut this testimony and the study.  Buchanan Decl., Ex. 13 (*BMG* Trial Tr. 1382:1383:22); *see also id.* 2019:23-2021:20); *id.*, Ex. 8 (COX_SONY_00519178 at COX_SONY_00519198).
[33] *See* Gould Decl., Ex 1 (Weber Rpt., ¶¶ 35-36, 113-114, 119, 126-129).

████████████████████████.  Gould Decl., Ex 1 (Weber Rpt., ¶¶ 113-119, 139).  Based on a review of the relevant agreements, Dr. Weber also calculated how much more it would have cost the RIAA to send the number of notices Cox was willing to accept ██████████████████████████████████████.  *Id.*, ¶¶ 120-122, 139.

It is disingenuous for Plaintiffs to argue that these analyses are "facts."  Plaintiffs make no effort to demonstrate how any witnesses on the stand, or the jury in the box, could sift through the hundreds of thousands of notices to reach Dr. Weber's *unrebutted* calculations of how many RIAA Notices were allegedly sent each day.[34]  Dr. Weber's analysis also demonstrates that MarkMonitor only sent Cox the number of notices for which the RIAA paid it ████████ not the number Cox was willing to accept.  This fact, which is established by Dr. Weber's analyses, rebuts one of Plaintiffs' experts' recurring themes.

Plaintiffs do not seek to exclude any of Dr. Weber's other factual expositions, which are necessary for her opinions.[35]

### F.   Plaintiffs' erroneous arguments regarding hearsay are no basis to exclude Dr. Weber's relevant opinions.

Plaintiffs additionally argue that Dr. Weber should be precluded from opining regarding an internal Cox business record in which it calculated that 96% stopped after receiving five notices.  Mot. at 15-16.  Contrary to Plaintiffs' claim, Dr. Weber does not *rely* on this study.  Rather, she merely points to it as an ordinary course of business analysis that is consistent with her own analysis.  Gould Decl., Ex 1 (Weber Rpt., ¶ 95).

Moreover, Plaintiffs' conclusory statement that this document is hearsay is unsupportable.  As a preliminary matter, the document is a business record, which readily falls within Federal Rule

---

[34] Indeed, not one of Plaintiffs' experts addresses these calculations in their reply reports.
[35] *See, e.g.*, *In re M/V MSC FLAMINIA*, No. 12-CV-8892 (KBF), 2017 WL 3208598, at *22 (S.D.N.Y. July 28, 2017).

of Evidence 803's exception to the rule barring hearsay.[36]   That aside, the foundation for this document is clearly established.  For example, Cox's former in-house counsel Randy Cadenhead, who commissioned this study, ███████████████████████████████████████ ████████████████████████   Buchanan Decl., Ex. 7 (Cadenhead Dep. Tr. 297:16-298:20).  A Cox software engineer, Mr. Beck, testified that ████████████████████████████████ ██████████████████████████████████████████████████   *Id.*, Ex. 8 (Beck Dep. Tr. 26:8-38:16).   Cox's Principal Security Architect, Matthew Carothers, also described this analysis and explained ██████████████████████████████████████████████ ████████████   *Id.*, Ex. 10 (Carothers Dep. Tr. 127:23-128:20).  While Plaintiffs claim "there is no data to support the assertion," they are wrong.  Cox produced the data supporting this analysis. *See supra* n.19.

Plaintiffs additionally argue that Dr. Weber should be excluded from relying on deposition testimony from Cox witnesses regarding Cox's customers' general responses to receiving infringement notices and actual emails from Cox customers that were produced in this case because the testimony and documents are hearsay.  Mot. at 15.  Plaintiffs fail to grasp that these documents, to the extent they would be offered at trial, would not be admitted for their truth—they are therefore not hearsay.  *See* Fed. R. Evid. 801(c)(2).  That one of Cox's customers may have responded to an infringement notice and stated ██████████████████████████████████ ██████████████████████████████████████████ or ████████████████████████ ████████████████████████████████████████████████ is not being used

---

[36] To the extent Cox's customer emails could be construed as hearsay, Dr. Weber's reliance on them, and any testimony she would give regarding his opinion based from them, would be proper.  Moreover, Plaintiffs' concern regarding the admission of hearsay through an expert is better addressed in a motion in *limine*.  *See* Fed. R. Evid. 703; *see also Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 182 (4th Cir. 2010).

by Dr. Weber to excuse that subscriber's alleged act of infringement.  Rather, as she explains, she reviewed the emails to understand the nature of Cox's customers' responses and to reach the conclusion that it is reasonable to assume that some are innocent and/or well-intentioned.  Gould Decl., Ex. 1 (Weber Rpt., ¶¶ 78-79, 109).[37]

Moreover, Plaintiffs criticize Dr. Weber for only reviewing 20 of the 1,700 available emails before she formed her opinion.  But Plaintiffs fail to explain why this is improper.  They do not cite any law or a rebuttal opinion from their expert.  Moreover, they also fail to address the fact that Dr. Weber is an expert in consumer behavior, has managed more than 200 market research studies, has moderated over 200 focus groups, has conducted or managed thousands of market research interviews, Weber Rpt., ¶ 6, and that part of her core competency is reviewing and interpreting oral or written statements by consumers.  Weber Dep. Tr. 256:17-257:9.

## III.    CONCLUSION

Based on the foregoing, Cox respectfully requests the Court deny Plaintiffs' Motion to preclude certain expert testimony by Dr. Lynne Weber in its entirety.


Dated: September 24, 2019          *s/ Thomas M. Buchanan*
                                   Thomas M. Buchanan (VSB No. 21530)
                                   WINSTON & STRAWN LLP
                                   1700 K Street, NW
                                   Washington, DC 20006-3817
                                   Tel: (202) 282-5787
                                   Fax: (202) 282-5100
                                   Email: tbuchana@winston.com

                                   *Attorneys for Defendants Cox Communications, Inc.
                                   and CoxCom, LLC*

---

[37] While it did not impact her opinion, Dr. Weber testified during her deposition that she reviewed more emails after she served her report.  Plaintiffs failed to ask her about any of those other emails or her opinions about them.  Buchanan Decl., Ex. 1 (Weber Dep. Tr. 34:12-19, 75:25-76:5, 250:22-25).  Dr. Weber intends to review all 1,700 such emails before trial.

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Tel: (212) 294-6700
Fax: (212) 294-4700
Email: melkin@winston.com
Email: tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
Thomas J. Kearney (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
Tel: (415) 591-1000
Fax: (415) 591-1400
Email: jgolinveaux@winston.com
Email: tkearney@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Tel: (213) 615-1700
Fax: (213) 615-1750
Email: dhleiden@winston.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 24, 2019, the foregoing was filed and served

electronically by the Court's CM/ECF system upon all registered users.


<u>s/ *Thomas M. Buchanan*</u>
Thomas M. Buchanan (VSB No. 21530)
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.*
*and CoxCom, LLC*