**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

SONY MUSIC ENTERTAINMENT, *et al.*,

      Plaintiffs,

v.

COX COMMUNICATIONS, INC., *et al.*,

      Defendants.

Case No. 1:18-cv-00950-LO-JFA

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. iii

CITATION GUIDE ......................................................................................................... v

CORRELATION TABLE FOR STATEMENT OF ADDITIONAL FACTS ............................ vii

INTRODUCTION .......................................................................................................... 1

STATEMENT OF ADDITIONAL MATERIAL FACTS ("SOAF") .......................................... 3

    A.   Background ...................................................................................................... 3

    B.   Cox's Users Directly Infringed Plaintiffs' Works ............................................ 4

    C.   Cox's Contributory and Vicarious Liability for the Infringement ................... 12

ARGUMENT ................................................................................................................. 16

  I.   PLAINTIFFS HAVE AMPLE EVIDENCE OF DIRECT INFRINGEMENT AND COX
     IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE .......................... 16

    A.   Cox's Subscribers Engaged in Infringing Reproductions and Distributions ............... 17

       1.   Cox Ignores Evidence of Cox's Subscribers Directly Infringing Plaintiffs'
          Reproduction Right ................................................................................ 19

       2.   Cox Ignores Evidence of Cox's Subscribers Directly Infringing Plaintiffs'
          Distribution Right ................................................................................. 19

    B.   Cox's Arguments Based on its Motion to Preclude Certain MarkMonitor Evidence
       Have No Merit and There is Ample Evidence of Direct Infringement in Any Event. . 21

  II.  PLAINTIFFS HAVE AMPLE EVIDENCE THAT COX IS LIABLE FOR
     CONTRIBUTORY INFRINGEMENT ................................................................. 24

    A.   By Continuing to Provide Known Repeat Infringers With the Tool to Infringe, Cox is
       Liable for their Subsequent Infringement and its Liability is Not Limited to Works
       Expressly Listed in Prior Infringement Notices. ...................................................... 24

       1.   Cox Misstates the Fourth Circuit Standard for Knowledge ..................... 25

       2.   Cox Had Specific Knowledge, Not Mere Generalized Knowledge ............ 25

       3.   Cox Conflates the "Control" Element Necessary for Vicarious Liability in its
          Contributory Infringement Analysis ....................................................... 27

    B.   Cox Willfully Blinded Itself to the Infringement of the Works in Suit ..................... 28

C.    Cox's Contributory Liability Does Not Hinge on Precisely Identifying the Direct Infringers Using its Business Subscribers' Accounts ................................................... 29

III.   THERE IS AMPLE EVIDENCE OF COX'S VICARIOUS LIABILITY ...................... 31

A.    Cox Derived a Direct Financial Benefit from Infringement ......................................... 31

1.    This is Precisely the Non-Ordinary Case Where Flat Periodic Payments are Enough to Prove Direct Financial Benefit from the Infringing Activity ................................ 32

2.    By Not Terminating Known Infringers, Cox Obtained Revenues it would Not Have Otherwise Received, and Avoided Costs .................................................................. 33

3.    Cox Admitted that it Prioritized Collecting Subscription Payments Over Limiting the Infringement .......................................................................................................... 34

4.    The "Repeat Infringer" Subscribers were Particularly Profitable and Cox's Revenues Varied Based on the Manner and Purpose for which Subscribers Used its Internet Service ....................................................................................................................... 35

5.    There is Sufficient Evidence for a Jury to Conclude that the Infringing Activity was a Draw ....................................................................................................................... 36

B.    Plaintiffs Do Not Need to Show that Cox Derived a Financial Benefit from Infringement by Cox's Business Subscribers' End Users ........................................... 36

C.    Cox Had the Practical Ability to Control Infringements by Business Subscribers ...... 37

IV.   COX'S ARGUMENTS ON STATUTORY DAMAGES ARE FLAWED ...................... 37

A.    A Per-Track Award Applies, Not a Per-Album Award ................................................. 38

B.    Sound Recordings and Musical Compositions That Have Separate Copyright Owners are Entitled to Separate Statutory Damage Awards ....................................................... 38

CONCLUSION ..................................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
114 F. Supp. 2d 896 (N.D.Cal.2000),
*rev'd on other grounds*, 239 F.3d 1004 (9th Cir. 2001) ..................................................... 21, 33

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001). ........................................................................................ 37

*Arista Records LLC v. LimeWire LLC*,
No. 06 Civ. 05936 (KMW), 2010 WL 10031251 (S.D.N.Y. Aug. 9, 2010) ........................... 18

*Arista Records LLC v. Myxer Inc.*,
No. 08 Civ 03935 (GAF) (JCX), 2011 WL 11660773 (C.D. Cal. Apr. 1, 2011) .................... 18

*B&D Boatworks, Inc. v. Doors, Inc.*,
No. 2:05-CV-38 F(3), 2007 WL 9718184 (E.D.N.C. Sept. 7, 2007) ...................................... 22

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
149 F. Supp. 3d 634 (E.D. Va. 2015),
*aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018) .................................................. passim

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
199 F. Supp. 3d 958 (E.D. Va. 2016),
*aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018), ................................................... 38

*Capitol Records, Inc. v. Thomas*,
579 F. Supp. 2d 1210 (D. Minn. 2008) ................................................................................ 17

*Capitol Records, LLC v. Escape Media Grp., Inc.*,
No. 12-cv-6646 (AJN), 2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015) ................................... 18

*Cobbler Nevada, LLC v. Gonzalez*,
901 F.3d 1142 (9th Cir. 2018) ..................................................................................... 29, 30

*Disney Enterprises, Inc. v. Hotfile Corp.*,
No. 11-20427-CIV, 2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) ........................................ 35

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) ................................................................................. 2, 31, 32

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
844 F.3d 79 (2d Cir. 2016) ..................................................................................... 38, 39, 40

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*,
118 F. 3d 199 (4th Cir. 1997) ............................................................................................ 20

*In re Microsoft Corp. Antitrust Litig.*,
  355 F.3d 322 (4th Cir. 2004) ........................................................................ 12

*Luvdarts, LLC v. AT & T Mobility, LLC*,
  710 F.3d 1068 (9th Cir. 2013) ..................................................................... 27

*Metro–Goldwyn– Mayer Studios, Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007) ............................................... 18, 37

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
  545 U.S. 913 (2005) ........................................................................... 2, 31, 35

*Newton v. Diamond*,
  204 F. Supp. 2d 1244 (C.D. Cal. 2002) ...................................................... 39

*Samsung Elecs. Co. v. Rambus, Inc.*,
  439 F. Supp. 2d 524 (E.D. Va. 2006) .......................................................... 22

*Sedlack v. Braswell Servs. Group*,
  134 F.3d 219, 224 (4th Cir. 1998) .............................................................. 12

*Sony BMG Music Entm't v. Tenenbaum*,
  660 F.3d 487 (1st Cir. 2011) ....................................................................... 35

*Teevee Toons, Inc. v. MP3.com, Inc.*,
  134 F. Supp. 2d 546 (S.D.N.Y. 2001) ......................................................... 40

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
  718 F.3d 1006 (9th Cir. 2013) ..................................................................... 17

*VHT, Inc. v. Zillow Group*,
  918 F.3d 723 (9th Cir. 2019) ....................................................................... 28

**Statutes**

17 U.S.C. § 102 ....................................................................................................... 39

17 U.S.C. § 504 ...................................................................................... 3, 37, 39, 40

17 U.S.C. § 512 ................................................................................................ passim

**Rules**

Rule 1006 ................................................................................................................ 25

**CITATION GUIDE**

| Citation | Description |
|---|---|
| Abitbol | Declaration of Michael Abitbol (attached) |
| Bahun I | Declaration of Samuel Bahun originally submitted in support of Plaintiffs' Motion for Summary Judgment (ECF No. 325-6). |
| Bahun II | Declaration of Samuel Bahun originally submitted in opposition to Cox's Motion for Discovery Sanctions (ECF No. 352-1) |
| Blietz I | Declaration of Jeremy Blietz originally submitted in support of Plaintiffs' Motion for Summary Judgment (ECF No. 325-10) |
| Blietz II | Declaration of Jeremy Blietz (attached) |
| Frederiksen-Cross I | Declaration of Barbara Frederiksen-Cross originally submitted in support of Plaintiffs' Motion for Summary Judgment (ECF No. 325-7) |
| Frederiksen-Cross II | Declaration of Barbara Frederiksen-Cross (attached) |
| Glass | Declaration of Jon Glass (attached) |
| Gould | Declaration of Jeffrey M. Gould (attached) |
| Ikezoye | Declaration of Vance Ikezoye originally submitted in opposition to Cox's Motion to Discovery Sanctions (ECF No. 352-2) |
| Kearney | Declaration of Thomas Kearney originally submitted in support of Cox's Motion for Summary Judgment |
| Kokakis I | Declaration of David Kokakis originally submitted in support of Plaintiffs' Motion for Summary Judgment (ECF No. 325-8) |
| Kokakis II | Declaration of David Kokakis (attached) |
| Leak I | Declaration of Wade Leak originally submitted in support of Plaintiffs' Motion for Summary Judgment (ECF No. 325-3) |
| Leak II | Declaration of Wade Leak (attached) |
| Lehr | Declaration of William Lehr, Ph.D. originally submitted in support of Plaintiffs' Motion for Summary Judgment (ECF No. 325-11) |
| Marks | Declaration of Steven Marks originally submitted in opposition to Cox's Motion to Discovery Sanctions (ECF No. 352-3) |

| McCabe | Declaration of George P. McCabe, Ph.D. originally submitted in support of Plaintiffs' Motion for Summary Judgment (ECF No. 325-2) |
|---|---|
| McMullan I | Declaration of Alasdair McMullan originally submitted in support of Plaintiffs' Motion for Summary Judgment (ECF No. 325-9) |
| McMullan II | Declaration of Alasdair McMullan (attached) |
| Patel | Declaration of Anish Patel originally submitted in support of Plaintiffs' Motion for Summary Judgment (ECF No. 325-4) |
| Poltorak | Declaration of Steven Poltorak originally submitted in support of Plaintiffs' Motion for Summary Judgment (ECF No. 325-5) |
| Bates No. | Bates number of a document produced in this case |
| *BMG* or *BMG v. Cox* | Case captioned *BMG Rights Mgmt. (US) LLC v.Cox Commc'ns, Inc.*, Civ. No. 14-cv-1611 (E.D. Va.) |
| Cox | Defendants CoxCom, LLC and Cox Communications, Inc. |
| Depo. or Tr. | Transcript of a deposition taken in this case |
| ECF No. | Document filed publicly via ECF in this case |
| Interr. | Interrogatories |
| Motion to Strike | Memorandum in Support of Plaintiffs' Motion to Strike Portions of the Declaration of Thomas Kearney (ECF No. 389) |
| Rept. | Report produced by an expert retained by any party |

## CORRELATION TABLE FOR STATEMENT OF ADDITIONAL FACTS

The following table correlates the paragraph numbers of Cox's proposed "undisputed" facts with the paragraphs in which they are denied or admitted in Plaintiffs' Statement of Additional Material Facts in this Opposition.

Plaintiffs' responses are subject to an overarching objection to Cox's use of the term "metadata," which appears 29 times in 46 paragraphs. Cox confuses the record by repeatedly replacing specific technical terms such as "cryptographic hash" or "Bitfield" with "metadata," a broad term that generally means data that provides information about other data. Plaintiffs admitted or denied Cox's proposed facts using specific technical terms in place of "metadata."

| Cox "Undisputed" Fact | Responsive Fact Paragraph in Plaintiffs' Opposition | Admitted or Denied |
|---|---|---|
| Cox Fact 1 | | Admitted |
| Cox Fact 2 | 40-41, 43 | Admitted in part, denied in part |
| Cox Fact 3 | 40-41, 43 | Admitted in part, denied in part |
| Cox Fact 4 | 30, 41 | Denied |
| Cox Fact 5 | 1 | Admitted |
| Cox Fact 6 | 2, 20, 31-33, 43 | Admitted |
| Cox Fact 7 | | Admitted |
| Cox Fact 8 | | Admitted |
| Cox Fact 9 | 2-3; Motion to Strike | Denied |
| Cox Fact 10 | 6, 20 | Admitted |
| Cox Fact 11 | 6-8 | Admitted |
| Cox Fact 12 | 8 | Admitted |
| Cox Fact 13 | 8 | Admitted in part, denied in part |
| Cox Fact 14 | 8-9 | Admitted |
| Cox Fact 15 | 8-9 | Admitted in part, denied in part |
| Cox Fact 16 | 8-10 | Denied |
| Cox Fact 17 | 8-9, 12-13, 16 | Admitted in part, denied in part |
| Cox Fact 18 | 8-9, 12-13, 16 | Admitted in part, denied in part |

| Cox Fact 19 | 8-9, 12-13, 16 | Admitted in part, denied in part |
| Cox Fact 20 | 8-9, 12-13, 14, 16, 20 | Admitted in part, denied in part |
| Cox Fact 21 | 8-9, 16 | Admitted in part, denied in part |
| Cox Fact 22 | 15-20 | Admitted in part, denied in part |
| Cox Fact 23 | 8, 12-13, 16-18 | Denied |
| Cox Fact 24 | 7, 8, 12-14, 16, 20 | Admitted in part, denied in part |
| Cox Fact 25 | 8-10, 14 | Denied |
| Cox Fact 26 | 8-10 | Admitted in part, denied in part |
| Cox Fact 27 | 8-12, 23; Motion to Strike | Denied |
| Cox Fact 28 | 7, 8-10, 12, 23 | Admitted in part, denied in part |
| Cox Fact 29 | 13, 16, 20 | Admitted in part, denied in part |
| Cox Fact 30 | 13, 16, 20 | Admitted in part, denied in part |
| Cox Fact 31 | 8, 12-13, 15-16, 23 | Admitted in part, denied in part |
| Cox Fact 32 | 13, 16 | Admitted in part, denied in part |
| Cox Fact 33 | 13, 15, 16 | Admitted in part, denied in part |
| Cox Fact 34 | 10, 13, 16, 23 | Admitted in part, denied in part |
| Cox Fact 35 | 8-13, 16 | Admitted in part, denied in part |
| Cox Fact 36 | 8, 12-13, 16, 20, 23 | Admitted |
| Cox Fact 37 | 8, 12-13, 16, 20, 23 | Admitted |
| Cox Fact 38 | 2, 5-6, 20 | Admitted in part, denied in part |
| Cox Fact 39 | 8, 12-13, 16, 20, 23 | Admitted in part, denied in part |
| Cox Fact 40 | 8, 12-13, 16, 20, 23 | Admitted in part, denied in part |
| Cox Fact 41 | 20 | Admitted |
| Cox Fact 42 | 20 | Admitted |
| Cox Fact 43 | 8, 12-13, 16, 20, 23 | Denied |
| Cox Fact 44 | 20 | Admitted in part, denied in part |
| Cox Fact 45 | 20 | Admitted |
| Cox Fact 46 | 2, 20, 22, Motion to Strike | Denied |
| Cox Fact 47 | 1-2, 6, 20 | Admitted in part, denied in part |
| Cox Fact 48 | 28, 41 | Admitted in part, denied in part |

## INTRODUCTION

Cox raises one meritless argument after another in its motion for summary judgment.  The record evidence and relevant law conclusively establish that Cox is liable for contributory and vicarious copyright infringement.  For years, Cox knew of massive copyright infringement occurring on its network and the identities of thousands of specific subscribers who were repeatedly infringing Plaintiffs' copyrights.  Yet Cox chose not to stop the infringement by terminating their accounts.  Instead, Cox continued supplying these known repeat infringers with Internet service—the tool used to infringe—because it valued their rich monthly payments over its legal obligations.   Each of Cox's litany of summary judgment arguments should be rejected.

*First*, in contending there is insufficient proof of direct infringement, Cox asks this Court to believe that each of the 57,679 specific Cox subscribers identified in MarkMonitor's 163,148 infringement notices to Cox in the Claim Period was falsely accused.  That absurd proposition is flatly contradicted by the record.  MarkMonitor, one of the top anti-piracy firms in the world, identified Cox subscribers using peer-to-peer ("P2P") file sharing programs to upload and download files that were confirmed as infringing, and it has produced extensive evidence.  There is no proof of a mistaken notice for any subscriber, much less a substantial number of them.  Fearful of that record, Cox invents a groundless spoliation dispute regarding certain MarkMonitor evidence.  Cox also baselessly argues that Plaintiffs have no evidence of an unlawful reproduction or distribution of any of the copyrighted works in suit.  However, the *uncontroverted* evidence— including copies of the infringing files, MarkMonitor's records of its interactions with Cox's subscribers, and more—establishes that Cox's subscribers engaged in direct infringement.

*Second*, contrary to the Fourth Circuit's decision in *BMG v. Cox*, Cox argues that knowledge of infringement requires knowledge of specific *works* infringed, rather than specific knowledge of infringing *acts* by particular subscribers.  MarkMonitor's infringement notices to

1

Cox identified the specific infringing subscribers, the specific infringing files, and a representative sample work infringed per file.  Cox claims that it lacked knowledge for contributory infringement of the works that were contained in those infringing files but not listed in the notice as representative sample works infringed.  Cox invents a world in which contributory liability can only attach when the direct infringer steals the same exact copyrighted work time and time again.  However, it is Cox's knowledge of an *act* of infringement by its subscriber, rather than the *name of the work* infringed, that satisfies the knowledge requirement.  Cox had specific enough information to do something about the infringers, and this meets the Fourth Circuit's standard for knowledge.

*Third*, for purposes of Cox's contributory liability, Cox's knowledge that a subscriber's account is being used for infringement is enough.  Regardless of whether the underlying direct infringement is through a Cox residential or business account, Plaintiffs are not required to uncover the precise identity of the individual engaged in the infringement.  Indeed, for Plaintiffs to identify more than the particular accounts being used to infringe would require thousands of John Doe actions and related discovery, which would defeat a key purpose of secondary liability.  That is neither feasible nor effective and, critically, it is not required to establish contributory liability.  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 929–30 (2005).  In arguing otherwise with respect to direct infringement through Cox business accounts, Cox ignores that it already lost on this issue in the *BMG* case.  The same result applies here.

*Fourth*, Cox derived a direct financial benefit from the infringement.  For establishing vicarious liability, this case presents the non-ordinary circumstance where continued collection of service fees is a direct financial benefit from the infringement.  *See Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004).  Cox purposely chose █████████████████████

███████████████████████████████████████████████████

████████████████████████ Cox's own testimony, records, and emails acknowledge it. Cox also avoided costs it would have otherwise incurred had it acted responsibly and addressed the infringement. Finally, and critically, the evidence shows that the accounts of infringers – especially repeat infringers – ███████████████████████████████

*Fifth*, Cox's arguments for limiting statutory damages each lacks merit. Cox ignores this Court's determination in *BMG* that a per-work recovery is appropriate for infringement of works published as part of a compilation or collective work (album) and individually (track). That is the situation here and a per-work recovery applies. In addition, a sound recording and the musical composition it embodies are not a single work for purposes of calculating statutory damages. Cox's effort to punish different rights holders of different infringed works for joining their claims in a single case, and force them instead to commence multiple separate cases, is contrary to the plain text of the Copyright Act and makes no sense.

## STATEMENT OF ADDITIONAL MATERIAL FACTS ("SOAF")

### A. Background

1.      Plaintiffs are 16 record labels (the "Record Company Plaintiffs") and 37 music publishers (the "Music Publisher Plaintiffs"). The Record Company Plaintiffs are comprised of the Sony Music Plaintiffs, Universal Music Group Plaintiffs, and Warner Music Plaintiffs. The Music Publisher Plaintiffs are comprised of the Sony/ATV and EMI Publishers, Universal Music Publishing Group, and Warner Chappell Music Plaintiffs.[1] *See* Leak II ¶ 1; McMullan II ¶ 1; Glass ¶ 2; Blietz II ¶ 2; Kokakis II ¶ 1; Abitbol ¶ 2.

---

[1] Footnotes 2 and 3 of Cox's memorandum correctly identify the "Label Plaintiffs" and "Publisher Plaintiffs" except insofar as "EMI Blackwood Inc." is actually "EMI Blackwood Music Inc."

2.      Plaintiffs assert claims that accrued between February 1, 2013 (August 1, 2013 for the Sony/ATV and EMI Plaintiffs) and November 26, 2014 (the "Claim Period").  Plaintiffs allege that, during the Claim Period, Cox's subscribers directly infringed 7,057 sound recordings and 3,421 compositions, respectively, through P2P networks using Cox's Internet service, and Cox is contributorily and vicariously liable.  No Record Company Plaintiff asserted an interest in the musical compositions and no Music Publisher Plaintiff asserted an interest in the sound recordings. *See* Leak II ¶ 2; McMullan ¶ 2; Glass ¶ 3; Blietz II ¶ 3; Kokakis II ¶ 2; Abitbol ¶ 3.

3.      The Record Company Plaintiffs protect their sound recordings via copyright registrations on Form SR, which allows applicants to register single or multiple sound recordings on a single form.  For sound recordings in suit that were registered in conjunction with a compilation or collective work (album), the Record Company Plaintiffs own or exclusively control the copyright both in and to the album and the separate copyright in and to the individual sound recordings embodied on the albums.  At the time of the infringement by Cox's subscribers, those sound recordings were distributed both individually and as part of an album, and each copyrighted asset had its own economic value.  *See generally* Leak I; McMullan I; Poltorak; *see also* Leak II ¶ 5; McMullan II ¶ 5; Glass ¶ 5; Gould Exs. 70, 71.

4.      The Music Publisher Plaintiffs protect their musical compositions via copyright registrations on Form PA.  *See generally* Blietz I ¶ 11; Kokakis I ¶ 8; and Patel ¶¶ 3-4.

5.      A musical composition and a sound recording are two separate works, each with its own economic value.  *See* Blietz II ¶¶ 6-11; Kokakis II ¶¶ 5-9; Abitbol ¶¶ 6-10; Leak II ¶¶ 5-9; McMullan ¶¶ 5-9; and Glass ¶¶ 5-9.

**B. Cox's Users Directly Infringed Plaintiffs' Works**

6.      To combat piracy, the Record Company Plaintiffs' trade association, Recording Industry Association of America ("RIAA"), hired MarkMonitor to conduct certain anti-piracy

activities.  MarkMonitor's work included sending infringement notices to ISPs, including Cox, as

to the ISP's subscribers downloading and distributing infringing copies of sound recordings and,

by necessity, the underlying musical compositions.  *See* Gould Ex. 10 (Bahun I) ¶¶ 2, 4, 7.

7.   MarkMonitor's February 2012 contract and Statement of Work ("SOW") with

RIAA set forth the terms of MarkMonitor's work on a ███████████████████████████

Kearney Ex. 23 (2012 SOW).  The contract defined the ███████████████████ services

MarkMonitor was to provide, and expressly stated that, ████████████████████████████

██████████████████████████████████  *Id.*  Later SOWs included the same

language.  ████████████████████████████  While the possibility of

litigation theoretically existed, and the contract included a routine provision on recordkeeping,

litigation was not anticipated.  The purpose of the notice program was to move away from litigation

against P2P end users, and work with ISPs to address the problem of infringement by their

subscribers.  *See Id.*; Gould Ex. 16 (Bahun II) ¶¶ 11-14; Gould Ex. 18 (Marks) ¶¶ 5-6.

8.   From 2008 through 2014, MarkMonitor searched for potentially infringing files

being copied and distributed on P2P networks for RIAA.  Upon the first instance of encountering

a file, ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████ *See* Gould Exs. 10 (Bahun I)

¶ 15; 16 (Bahun II) ¶¶ 10, 15–17; 11 (Frederiksen-Cross I) ¶ 30; 68 (Audible Magic data).

9.      When Audible Magic found a match, ███████████████████████████

██████████████████████████████████████████ MarkMonitor retained that

data. Any other data that Audible Magic provided was superfluous to the "yes" or "no" question

of whether an unknown audio file matched a reference fingerprint in Audible Magic's database of

copyrighted works. *See* Gould Exs. 16 (Bahun II) ¶ 17, 21-23; 17 (Ikezoye) ¶ 11, 13-15, 17-18.

10.     In discovery, █████████████████████████████████████████

████████████████████████████████████████████ The produced

records include █████████████████████████████████████████

████████████████ *See* Gould Exs. 10 (Bahun I) ¶ 23; 16 (Bahun II) ¶ 18.

11.     Cox contends that a document Audible Magic produced in discovery,

REV0003444, is ██████████████████████████████████████████

██████████████████ (Kearney Ex. 40.) At Audible Magic's deposition, Cox did

not authenticate the document or ask a single question about REV0003444 to understand what it

purported to be or what it included. Cox asked general questions about a ████████████ in the

abstract but did not present the witness with a purported ██████████ or confirm what

document the witness had in mind. Audible Magic testified that █████████████████

████████████████████████████████████████████████

███████████████████████ Gould Ex. 6 (Ikezoye Tr.) at 175:8–178:11.

As a result, assuming REV0003444 is what Cox believes it to be, ███████████████

████████████████████████████████████████████████████████

████████████████████████████████ █

12.     A cryptographic hash value is an alphanumerical representation of the contents of a file.  Files with the same hash value are identical and will have the same contents, regardless of when downloaded.  *See* Gould Exs. 10 (Bahun I) ¶¶ 10-11; 19 (Feamster Tr.) at 186:13–198:03; 11 (Frederiksen-Cross I) ¶ 16.

13.     Prior to sending Cox an infringement notice, █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

In that process, Cox's subscribers reported, ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████   MarkMonitor would then send infringement notices to Cox.  The foregoing is depicted in several bodies of evidence collected ███████████

███████████████████████████████████████   *See* Gould Exs. 10 (Bahun I) ¶¶ 12-14, 16; 11 (Frederiksen-Cross I) ¶¶ 29, 31-32, 38-45; 19 (Feamster Tr.) at 203:13–204:07, 227:25–228:11, 273:13–274:04, 275:11–279:16; 20.

14.     MarkMonitor's system was evaluated by independent consultants who "conducted an assessment of the MarkMonitor Methodologies for monitoring, verifying, and enforcing online

---

[2] Plaintiffs have filed a motion to strike the REV0003444 document on the grounds that it is inadmissible, along with other improper testimony and documents in the Kearney Declaration filed in support of Cox's summary judgment motion.

copyright infringement on P2P file sharing networks." They reported that MarkMonitor's methodologies effectively identify P2P infringers, are well-developed, and include appropriate checks and balances to ensure accuracy, and its evidence collection is robust, defensible, and will withstand scrutiny or evidentiary challenges. *See* Kearney Ex. 25.[3]

15. Cox has no evidence that, at the time MarkMonitor observed Cox's subscribers on P2P networks, they had not already uploaded or downloaded content. Cox has no evidence that its subscribers lied to MarkMonitor about what they were "sharing."

16. MarkMonitor's records show that, for each and every infringing file that was the basis for an infringement notice to Cox, ███████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████ *See* Gould Exs. 10 (Bahun I) ¶ 10-11; 16 (Bahun II) ¶¶ 17-20; 11 (Frederiksen-Cross I) ¶ 16; 19 (Feamster Tr.) at 186:13–198:03; Kearney Ex. 23 (2012 SOW).

---

[3] This report evaluating MarkMonitor was prepared in the context of the Copyright Alert System ("CAS"). Plaintiffs intend to file a motion in limine to exclude evidence and argument concerning CAS. Plaintiffs nevertheless cite to the report here because it is necessary context for understanding and opposing Cox's spoliation motion, which forms the foundation for several of Cox's summary judgment arguments.

17.     P2P networks, including BitTorrent, operate on a "tit for tat" model where peers generally both upload and download files simultaneously.  *See* Gould Exs. 11 (Frederiksen-Cross I) ¶ 22; 19 (Feamster Tr.) at 198:04–201:19; Kearney Ex. 18 (Feamster Rept.) at ¶ 71.

18.     P2P networks, including BitTorrent, are designed so that instances of copying files between two peers are unobservable to anyone other than those two peers.  As such, it was impossible for MarkMonitor (or any rights holder or vendor) to observe the number of times Cox's subscribers downloaded and distributed confirmed infringing files.  *See* Gould Exs. 10 (Bahun I) ¶ 14; 11 (Frederiksen-Cross I) ¶ 33; 21 (Tregillis Tr.) at 71:22–72:10.

19.     When confronted with multiple users on a P2P network with the unique file, identified by its hash value, it is extremely likely that those users uploaded and downloaded the files on the P2P network.  *See* Frederiksen-Cross II ¶¶ 10-11.

20.     Between January 2012 and November 26, 2014, MarkMonitor sent Cox 260,873 infringement notices.  In the Claim Period alone, MarkMonitor sent Cox 163,148 infringement notices.  All the notices were made under penalty of perjury and included the information required under the Digital Millennium Copyright Act, 17 U.S.C. § 512(c)(3)(A).  Cox was informed of the identification of the Cox subscriber by IP address, the specific date and time of the infringing act, a cryptographic hash value pertaining to the file, a representative sample of what was infringed, and the P2P network used. ███████████████████████████████████

███████    *See* Gould Exs. 10 (Bahun I) ¶¶ 17-18, 21-22; 11 (Frederiksen-Cross I) ¶ 34; 56; 22 (Beck Tr.) at 45:05-23, 9.

21.     Upon receipt of MarkMonitor's infringement notices, ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████   Cox's records indicate that MarkMonitor's notices in this case pertained to 57,679 Cox subscribers:  54,886 (95%) were residential customers and 2,793 (5%) were business customers.  *See* Gould Exs. 23 (Beck Decl.) at ¶ 3; 24 (Stipulated Order); 7 (McCabe) ¶ 8.

22.    Each of Plaintiffs' works in suit was the subject of infringement notices to Cox in the Claim Period.  Each was contained within the files identified by hash value in MarkMonitor's infringement notices.  The infringement notices informed Cox that the subscribers identified in those notices downloaded or distributed the infringing digital files identified in the notices.  In fact, each of Plaintiffs' works in suit was the subject of infringement notices from MarkMonitor to Cox during the Claim Period regarding subscribers' *third* or later infringement notice.[4]  *See* Gould Ex. 7 (McCabe I) ¶ 7; *see also* Gould Ex. 25 (Tregillis Rept.) at ¶ 26.

23.    The digital files identified by hash value in MarkMonitor's notices of infringement to Cox have been produced in discovery.  Anyone, including Cox, can listen to the audio recordings within those files.  *See* Gould Exs. 10 (Bahun I) ¶ 24; 56 (RIAA notice spreadsheet); 67 (audio files).  Cox has not pointed to a single misidentification of the audio recordings.

24.    When Cox sent MarkMonitor's infringement notices to Cox's subscribers, Cox told its subscribers to contact RIAA if they disputed the allegation of infringement and an email address for doing so was included in the notice.  *None* of the Cox subscribers who were the subject of MarkMonitor's notices to Cox during the Claim Period contacted RIAA or MarkMonitor, or provided a counter-notification to Cox pursuant to 17 U.S.C. § 512, to dispute the allegations of infringement.  Gould ¶¶ 5-6; Gould Exs. 10 (Bahun I) ¶ 21; 26.

---

[4] As of his June 24, 2019 deposition, Cox's expert, Christian Tregillis, had matched over 95% of Plaintiffs' works in suit to the infringing files referenced in the infringement notices and over 90% under the more stringent "third or later" paradigm.  Gould Ex. 21 (Tregillis Tr.) at 18:12–19:7 and 116:4-119.

25.     Cox was aware ███████████████████████████████████████

████████████████████████████████████     *See* Gould Exs. 27-30.

26.     Of the 57,679 Cox subscribers who were the subject of MarkMonitor's notices

during the Claim Period, Cox's records reflect that from ███████ :

     a)   ████  subscribers appeared in 3 or more notices;
     b)   ███  subscribers appeared in 6 or more notices;
     c)   ███ subscribers appeared in 10 or more notices;
     d)   ███ subscribers appeared in 13 or more notices;
     e)   ███ subscribers appeared in 14 or more notices; and
     f)   Cox terminated ███████ of those subscribers' accounts.

*See* Gould Ex. 7 (McCabe Decl.) ¶ 9; *see also* Gould Ex. 57 (Cox Ticket Data).

27.     During the Claim Period, Cox also received ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

See Gould Ex. 7 (McCabe Decl.) ¶ 8; *see also* Gould Ex. 57.  Documents attached to the Gould

declaration illustrate examples of ██████████████████████████████████

████████████████████████████████     Gould Exs. 56, 57, 58.

28.     In discovery, Cox identified to Plaintiffs the Cox subscribers who were the subject

of MarkMonitor's infringement notices, by each subscriber's unique ICOMS billing number.  Cox

also provided names of most of the Cox business subscribers at issue.  While some of those Cox

business subscribers were ███████████████████████████████████████

████████████████████████████████████████████████████████

███████████     *See* Gould Ex. 58.

### C. Cox's Contributory and Vicarious Liability for the Infringement[5]

29.     Cox's subscribers required Internet access to upload and download digital files on the BitTorrent, Gnutella, eDonkey and Ares P2P networks.  *See also* Gould Exs. 10 (Bahun I) ¶ 8; 11 (Frederiksen-Cross I) ¶¶ 6-15, 18-19.

30.     Cox's Acceptable Use Policy ("AUP"), which was a condition of use for a Cox subscriber to use Cox's Internet service, prohibited subscribers from using Cox's service to infringe copyrights.  Cox had the right to terminate its subscribers' access to its Internet service for violating the AUP.   Under the terms of the AUP, a subscriber—including a business subscriber—was responsible for all use, including any unlawful use, of Cox's Internet service that occurs through the subscriber's account.  *See BMG v. Cox*, 149 F. Supp. 3d at 640; Gould Exs. 31-33.

31.     As ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ *See BMG v. Cox*, 149 F. Supp. 3d at 640-41; *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293 (4th Cir. 2018); Gould Exs. 34; 36 at No. 5; 38 at 5; 39 at 11; 40 at 13; 41 at 11-12, 30-31, 33-34; 42 at ¶ 12; 22 (Beck Tr): 68:9–73:13.

---

[5] Some of these Statements of Undisputed Fact cite to this Court's summary judgment decision in favor of BMG against Cox on Cox's DMCA safe harbor defense and/or the Fourth Circuit's affirmance of the decision.  *BMG v. Cox*, 149 F. Supp. 3d 634 (E.D. Va. 2015), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018).  Cox is bound by those determinations.  "Collateral estoppel forecloses the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom issue preclusion is asserted had a full and fair opportunity to litigate." *Sedlack v. Braswell Servs. Group*, 134 F.3d 219, 224 (4th Cir. 1998) (internal quotations and citations omitted); *see also In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004) (setting forth elements).

32.     Prior to the fall of 2012, Cox did not follow its policy for terminating accounts of repeat infringer subscribers.  Instead, Cox employees followed an unwritten policy put in place by senior members of Cox's abuse group whereby accounts used repeatedly to infringe copyrights would be nominally terminated, only to be reactivated upon request, with the subscriber starting the graduated response process all over again with a clean slate.  *See BMG v. Cox*, 149 F. Supp. 3d at 655-58; Gould Ex. 46 (Zabek Tr.) at 137:10–140:20.

33.     After the fall of 2012, Cox essentially stopped terminating repeat infringer subscribers altogether despite receiving an increasing number of infringement notices every year and continuing to receive infringement notices informing it of specific repeat infringing subscribers.  *See BMG v. Cox*, 149 F. Supp. 3d at 658-62; Gould Ex. 35 (Cox's interrogatory responses) at Interr. No. 8; 46 (Zabek Tr.) at 101:14–102:15.

34.     Throughout 2013 and 2014, Cox's graduated response program employed a 13-strike policy before a subscriber would even be considered for termination.  "Strikes" under this policy were based upon abuse "tickets" generated by CATS without regard to whatever copyrighted work(s) was cited in an underlying notice.  Critically, Cox imposed a variety of rules that limited whether any given infringement notice would even result in a ticket.  As a result, the number of infringement notices Cox received was substantially higher than the number of tickets that resulted from such notices.  Upon receipt of a *fourteenth* strike in an abuse cycle, Cox would finally consider terminating the offending user.  Termination was never automatic, however, and was left to the discretion of Cox employees.  *BMG v. Cox*, 149 F. Supp. 3d at 640-41; *see also* Gould Exs. 41; 47 (Zabek Decl.) at ¶¶ 8-11.

35.     Cox made every effort to avoid terminating subscribers, even those that were the subject of 14 or more infringement notice tickets.  Despite having a repeat infringer policy in

concept, Cox's implementation of the policy, or lack thereof, rendered the policy an "absolute mirage." Cox very clearly determined not to terminate subscribers who in fact repeatedly violated Cox's policy. *See BMG v. Cox*, 149 F. Supp. 3d at 658-62; Gould Exs. 35 at No. 8; 37.

36.     In 2013 and 2014, Cox terminated approximately ███████████████████ for non-payment of subscription fees. *See* Gould Exs. 48; 49.  In that period, Cox claims to have terminated only ██ subscribers for copyright infringement. *See* Gould Ex. 35 at No. 8.

37.     During the Claim Period, which is slightly narrower than the full 2013 and 2014 calendar years, ██████████████████████████████████████████████ ████████████████████████████████████████ *See* Gould Exs. 35 at No. 8; 36 at No. 5, 25.

38.     Despite receiving MarkMonitor's infringement notices reporting specific Cox subscribers who were engaging in repeated infringement, Cox continued to provide those subscribers with Internet service—the tool used to infringe—in virtually every instance. *See* Gould Ex. 7 (McCabe) ¶ 9; *see also* Gould Ex. 57.

39.     During the Claim Period, Cox refused to accept infringement notices from Rightscorp on behalf of BMG Rights Management (US) LLC, a music publisher.   Cox "blacklisted" Rightscorp resulting in Cox automatically deleting or blocking millions of infringement notices from Rightscorp. *See BMG v. Cox*, 149 F. Supp. 3d at 642; Gould Exs. 51 (BMG Cadenhead Tr.) at 82:15–87:2; 50; 35, 36 at No. 5. ██████████████████ ████████████████████████████████████████████████████ *See* Gould Exs. 59-62.

40.     Cox is an ISP that, in exchange for a monthly subscription fee, provides Internet access service to subscribers.  At all relevant times, Cox had a tiered pricing structure through

which it both charged higher monthly fees for increased data allowances and ▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬   *See* Gould Exs. 41 at 6; 69.

41.   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬   *See* Gould Exs. 15 (Lehr Decl.)

¶¶ 10, 18; *see also* Gould Exs. 57; 63-66.

42.   By not terminating specific repeat infringer subscribers, Cox also avoided direct incremental costs it would have otherwise incurred.  *See* Gould Ex. 15 (Lehr Decl.) ¶¶ 10, 15.

43.   The flat monthly fees Cox charges to its users vary based on what its subscribers use its service for.  The increased data consumption from infringing P2P activity on the Internet inured to Cox's financial benefit, as subscribers consuming more data paid higher monthly fees.

a)   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *See*
Gould Ex. 55 (Summers Tr.) at 34:19–35:2.

b)   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬   *See* Gould Ex. 1 (Cox data usage
assessment) at 4.

c)   P2P activity frequently involved copyright infringement.  *See* Gould Exs. 28 (Cox internal email); 2 (Fuenzalida Tr.) at 172–73, 127–30; 3 (Basquin Tr.) at 126–27; 15 (Lehr Decl.) ¶ 22.



d)

*See* Gould Ex. 2 (Fuenzalida Tr.) at 165–169.

e)

*See* Gould Ex. 15 (Lehr Decl.) ¶¶ 23-24.

44.

*See BMG v. Cox*, 881 F.3d at 304-05; *see also* Gould Exs. 63-66; 52-54; 5, 9, 13, 43, 44; 46 (Zabek Tr.) at 144:5–145:23.

45.     Cox's internal documents regarding infringement notices require only that a notice

Gould Ex. 45.

## ARGUMENT

### I.     <u>Plaintiffs Have Ample Evidence of Direct Infringement and Cox is Not Entitled to Summary Judgment on the Issue</u>

Cox makes two flawed arguments in support of its request for a summary judgment finding of no direct infringement.  First, it argues that Plaintiffs cannot show direct infringement by Cox's subscribers, but merely that subscribers made infringing files available for distribution.  (Mot. at 19-22.).  Second, Cox relies on a meritless spoliation motion, hoping to exclude key evidence. (Mot. at 15-19.)  Both arguments fail.  A finding of direct infringement is the only reasonable inference from the evidence.  SOAF ¶¶ 8-10, 12-24.

**A.  Cox's Subscribers Engaged in Infringing Reproductions and Distributions**

In arguing no direct infringement, Cox speculates, overlooks the record, and—once again—"ignores the fact that [Plaintiffs] may establish direct infringement using circumstantial evidence that gives rise to an inference that Cox account holders or other authorized users accessed its service to directly infringe." *BMG v. Cox*, 149 F. Supp. 3d at 663; *see also Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1225 (D. Minn. 2008) ("[D]irect proof of actual dissemination is not required by the Copyright Act.  Plaintiffs are free to employ circumstantial evidence to attempt to prove actual dissemination.").

From January 2012 through November 26, 2014, MarkMonitor detected hundreds of thousands of instances of infringement by Cox's subscribers and sent Cox 260,873 infringement notices.  In the Claim Period alone, MarkMonitor sent Cox 163,148 infringement notices.  These notices were made under penalty of perjury by RIAA and included the elements of information required under the Digital Millennium Copyright Act, 17 U.S.C. § 512(c)(3)(A).  SOAF ¶ 20.

Every single MarkMonitor notice is supported by 

SOAF ¶¶ 8-9, 12-13, 16, 20.

---

[6] For over a decade, courts have recognized the use of the Audible Magic software as a proper method to identify the content of an audio file as a specific copyrighted work.  *See, e.g., UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1012 (9th Cir. 2013) ("Audible Magic's technology takes



SOAF ¶¶ 8-9, 12-13.

The digital files that were the basis of MarkMonitor's notices of infringement to Cox have been produced in discovery. Cox could have listened to those audio recordings if it chose to do so. Cox has not identified a single inaccurate identification of those audio files. When Cox forwarded MarkMonitor's notices to Cox's subscribers, Cox told its subscribers

*None* of the Cox subscribers who were the subject of MarkMonitor's notices to Cox sent an email to RIAA or MarkMonitor, or provided a counter-notification to Cox pursuant to 17 U.S.C. § 512(g)(3), to dispute the allegations of infringement during the Claim Period. SOAF ¶¶ 20-24.

A finding of direct infringement is the *only* reasonable inference from these facts.[7]

---

audio 'fingerprints' from video files and compares them to a database of copyrighted content provided by copyright holders."); *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-cv-6646 (AJN), 2015 WL 1402049, at *23 (S.D.N.Y. Mar. 25, 2015); *Arista Records LLC v. Myxer Inc.*, No. 08 Civ 03935 (GAF) (JCX), 2011 WL 11660773, at *5 (C.D. Cal. Apr. 1, 2011); *Arista Records LLC v. LimeWire LLC*, No. 06 Civ. 05936 (KMW), 2010 WL 10031251, at *6 (S.D.N.Y. Aug. 9, 2010); *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1205–06 (C.D. Cal. 2007).

[7]

## 1. Cox Ignores Evidence of Cox's Subscribers Directly Infringing Plaintiffs' Reproduction Right

Cox contends that Plaintiffs "have no evidence" of a subscriber making an unauthorized copy of Plaintiffs' copyrighted works. (Mot. at 20.) Cox is patently wrong. SOAF ¶¶ 13-20.

Each Cox subscriber who was the subject of a notice in the Claim Period was caught on a file sharing network notorious for infringement with a file confirmed to be infringing. Cox has no evidence to support its *speculation* that files identified by hash value in MarkMonitor's infringement notices "were initially purchased from iTunes, legally uploaded from a purchased CD, or obtained from another legal source." (Mot. at 20.) It is unfounded and the record is directly contrary. MarkMonitor caught Cox's subscribers on P2P networks ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████   SOAF ¶¶ 13-20.

## 2. Cox Ignores Evidence of Cox's Subscribers Directly Infringing Plaintiffs' Distribution Right

Cox next claims that Plaintiffs have no evidence of actual distribution, but rather only evidence of Cox's subscribers "making available" infringing works, which is insufficient to establish unauthorized distribution. (Mot. at 20.) This argument misreads the law and ignores the nature of P2P protocols and the overwhelming (and uncontroverted) circumstantial evidence of distribution. Cox's expert confirmed that "[a] client cannot retrieve pieces without providing pieces to others – this is the so-called 'tit for tat' incentive model of BitTorrent." SOAF ¶ 17. He further acknowledged that "[i]n the BitTorrent protocol, any participating peer will generally be downloading or retrieving pieces of the file as well as providing – if you want to use the term

uploading, that's fine." *Id.* Thus, when MarkMonitor detected the Cox subscribers online, running the P2P software, and "sharing" an unauthorized copy of Plaintiffs' works, there can be no reasonable question that the subscriber distributed the file. Cox's argument only succeeds if one fully disregards the fundamental and undisputed nature of P2P networks. SOAF ¶¶ 13-20, 24.[8]

Cox also ignores that P2P networks are designed to make it impossible for anyone to collect records depicting how many times a peer distributes an infringing file. Interactions between two peers on a P2P network are unobservable to, and intentionally hidden from, anyone other than those two peers. SOAF ¶ 18. Neither Cox nor anyone else maintains logs of the infringing files that Cox's subscribers distribute, nor does Fourth Circuit law require such information.

The Fourth Circuit decision in *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F. 3d 199 (4th Cir. 1997), stands for precisely this proposition. In *Hotaling*, a library added copyrighted materials to its collection, listed the works in its catalog system, and made them available to the public. *Id.* at 201-02. The Fourth Circuit held that the library infringed *Hotaling*'s distribution rights because a distribution occurs where the defendant "makes the work available" and "has completed all the steps necessary for distribution to the public[,]" without the

---

[8] Cox's contention that there is no proof of reproduction or distribution by any Cox subscriber completely ignores the context of the evidence presented. Plaintiffs' expert provided the following analogy: Suppose you are a teacher and have received term papers from your class. To your disappointment, you find that each student has not submitted a unique paper; in fact, almost all of your students submitted a paper that exactly matched that of one or more other students. Worse, you have found 100% of the papers on the internet. In addition, some of the papers are sets of essays identically titled and organized. Of course, it is theoretically possible that the students independently wrote identical papers, but common sense tells you that is incredibly unlikely. Likewise, in the context of P2P file-sharing networks, which are used solely for the purpose of downloading and sharing files, when identical files or sets of files are found shared from multiple users, there exists a theoretical possibility that the users observed with identical music files (or identically configured sets of music files in the case of BitTorrent) introduced them to these networks through off-network sources but did not distribute them to anyone, but the probability of that is extremely unlikely and unsupported by the evidence. SOAF ¶ 19.

need to show more—otherwise "a copyright holder would be prejudiced by a [defendant] that does not keep records of public use, and the [defendant] would unjustly profit." *Id.* at 203; *accord A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001) ("Napster users who upload file names to the search index for others to copy violate plaintiffs' distribution rights."). *Hotaling*'s logic applies equally to infringement in the digital environment and thus applies here.

Indeed, this case is exactly the type where *Hotaling* is intended to apply; *i.e.*, "cases where it is impossible for a copyright owner to produce proof of actual distribution." *BMG v. Cox*, 149 F. Supp. 3d at 666-70 (concluding direct infringement of the distribution right requires showing an "actual dissemination" and that circumstantial evidence can suffice). The facts here fall squarely within this Court's reading of *Hotaling*, as direct proof of actual dissemination is unobtainable. Because of the decentralized nature of a P2P network, it is impossible for MarkMonitor, or any other peer on the network, to track a peer's activity with other peers. This is true because any particular peer can only see the activity that peer is engaged in, not the activity that is occurring between other peers. SOAF ¶ 18.

### B. Cox's Arguments Based on its Motion to Preclude Certain MarkMonitor Evidence Have No Merit and There is Ample Evidence of Direct Infringement in Any Event.

In a separate motion, Cox requests discovery sanctions and to preclude Plaintiffs' use of a "MarkMonitor Spreadsheet" that shows that the files that were the subject of infringement notices to Cox contained Plaintiffs' works in suit. Relying entirely on that flawed motion and the hoped-for preclusion requested there, Cox contends that Plaintiffs cannot prove the files its subscribers distributed were copies of Plaintiffs' works. (Mot. at 15.) For the reasons explained in more detail in Plaintiffs' opposition to that motion and supporting declarations, *see* ECF No. 352, Cox's motion should be denied. The Fourth Circuit only permits a finding of spoliation where the movant can establish: (1) a duty to preserve, (2) destruction of material evidence, and (3) culpable conduct.

21

Cox has not shown those elements exist here at all and certainly not by clear and convincing evidence, as required.  Nor has Cox demonstrated the serious prejudice required to warrant the harsh sanction of evidentiary preclusion.  Regardless, there is ample additional evidence of direct infringement.

*First*, Cox has not shown that Plaintiffs or MarkMonitor had any duty to preserve.  RIAA hired MarkMonitor to conduct a ██████████████████████████████ and the entire purpose of the notice program was to move away from litigation against P2P end users and work with ISPs to address the problem of P2P infringement by their subscribers.  It was only Cox's disregard for the notices that necessitated litigation after-the-fact, not before.  SOAF ¶ 7.  Cox ignores these realities and attempts to convert a record-keeping term in a notice-program contract between MarkMonitor and RIAA into a common law preservation obligation that simply does not exist.  The theoretical possibility of litigation (which is always the case) does not create a preservation duty because is not the same as reasonably anticipating litigation.[9]

*Second*, Cox has not shown a failure to preserve any evidence, let alone material evidence favorable to Cox's case, as required.  Cox misdescribes the "MarkMonitor Spreadsheet" that it seeks to preclude as a ████████████████████████████████████████████████ ████████████████████████████████████ Cox also fails to recognize that, even where a duty to preserve exists, there is no requirement to retain every piece of data.  When Audible Magic ████████████████████████████████████████████████ ████████████████████████████████████████████████

---

[9] *See, e.g., Samsung Elecs. Co. v. Rambus, Inc.*, 439 F. Supp. 2d 524, 547 (E.D. Va. 2006) (duty to preserve is not triggered where litigation is a "vague or far-off possibility") (vacated on other grounds); *B&D Boatworks, Inc. v. Doors, Inc.*, No. 2:05-CV-38 F(3), 2007 WL 9718184, at *5 (E.D.N.C. Sept. 7, 2007) (duty to preserve evidence exists when litigation is "reasonably foreseeable[,]" but not when litigation is "merely possible").

████████████████████████████████████████████████████████████████

███████████████████████████████ That is precisely what the governing contract required; no more.  Kearney Ex. 23 (SOW).  The other Audible Magic fields that Cox contends MarkMonitor should have retained in earlier periods are superfluous.  SOAF ¶¶ 8-10.

*Third*, Cox has not shown that MarkMonitor or Plaintiffs acted negligently, recklessly, or willfully by spoliating evidence that would have been favorable to Cox's cause.  MarkMonitor was

████████████████████████████████████████████████████████████████

█████████ At the time of the alleged spoliation, neither MarkMonitor nor Plaintiffs had reason to know the additional Audible Magic data that Cox claims was spoliated would be relevant (and they are not) to some unknown future litigation.  SOAF ¶¶ 7-10, 14.

*Finally*, Cox's requested remedy—exclusion of the MarkMonitor Spreadsheet—is grossly disproportionate to the alleged harm and wholly unwarranted.  Plaintiffs do not stand to benefit from the alleged spoliation.  Nor is Cox prejudiced.  Indeed, Cox has never even pursued the obvious manner of disproving the infringement by reviewing the infringing audio files produced.[10] By contrast, the MarkMonitor Spreadsheet ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

---

[10] Spinning a yarn, Cox argues that the full complement of Audible Magic data would show that Plaintiffs did not actually verify through Audible Magic the contents of the infringing files.  Cox argues that ███ ████████████████████████████████████████████████████████████████ Cox fails to inform the Court that such "testing records" were never authenticated during any questions or answers in Audible Magic's deposition and are, at best, ████████████████ and thus of course would not include the Audible Magic verifications that took place over the course of the preceding years (and which are in the MarkMonitor Spreadsheet).  Cox layers misunderstanding upon misunderstanding concerning the data, the processes, and their significance.  The foundation for this argument (REV0003444) is also inadmissible and the subject of Plaintiffs' contemporaneously filed motion to strike.

Nevertheless, and notwithstanding the importance of the MarkMonitor Spreadsheet, there is ample additional evidence demonstrating that the files that were the subject of infringement notices to Cox contained Plaintiffs' works in suit. In particular, each infringement notice sent to Cox included the hash value pertaining to the infringing file. Plaintiffs also produced a hard drive of audio files that were the subject of Audible Magic identifications. These audio files match to the infringement notices by hash value. With the notices and hard drive, one can identify the infringing files and listen to the corresponding audio file on the hard drive. SOAF ¶¶ 20, 23.

## II. Plaintiffs Have Ample Evidence that Cox is Liable for Contributory Infringement

### A. By Continuing to Provide Known Repeat Infringers With the Tool to Infringe, Cox is Liable for their Subsequent Infringement and its Liability is Not Limited to Works Expressly Listed in Prior Infringement Notices.

Evidence of a defendant's knowledge of, and material contribution to, the infringing activity proves contributory infringement. Cox concedes its material contribution to the infringing activity but argues that it lacked sufficient knowledge for the works in suit that were not listed by name. (Mot. at 22-28.). Cox contorts the Fourth Circuit's contributory liability knowledge standard beyond recognition to argue: (1) it can have actual knowledge of a specific subscriber engaged in repeated infringement, (2) continue to provide the subscriber with the tool to infringe, and (3) avoid liability for that subscriber's subsequent infringement unless the person stole the very same music over and over again. To state the position is to refute it. Cox's knowledge of a known repeat infringer is not cabined to particular works or notice senders.[11]

---

[11] Cox concedes that MarkMonitor's notices provided it with knowledge of specific Cox subscribers infringing 1,998 unique sound recordings identified by name in MarkMonitor's infringement notices. Cox contends that it cannot be held contributorily liable for the remaining 5,059 sound recordings in suit or the 3,421 copyrighted musical compositions in suit because these latter sets were not identified by name in MarkMonitor's notices. (Mot. at 25-26.). The basis for this argument and these figures is inadmissible testimony from, and an inadmissible Rule 1006 summary sponsored by, Cox's outside counsel, Thomas

## 1.   Cox Misstates the Fourth Circuit Standard for Knowledge

Cox tries to rewrite the Fourth Circuit's *BMG* decision to suit its summary judgment motion.  Cox misleadingly argues that, in *BMG*, the Fourth Circuit held that contributory liability requires "actual knowledge of, or willful blindness to, *specific* infringements of *identified* copyrighted works." (Mot. at 25.)  The Fourth Circuit said no such thing.

The Fourth Circuit held that the knowledge standard for contributory infringement "requires a defendant to have specific enough knowledge of infringement that the defendant could *do* something about it." *BMG*, 881 F.3d at 311-12 (emphasis in original).  It explained that a defendant's "generalized knowledge" that "some number of its subscribers were infringing" is not enough.  Rather, the Fourth Circuit made clear that Cox needs to know "which [subscribers] were infringing" so that it has "knowledge that infringement is substantially certain to result from Cox's continued provision of Internet access to *particular subscribers*." *Id.*  On this basis, the Fourth Circuit directed that, on remand, "the contributory infringement instruction should require that Cox knew of specific instances of infringement or was willfully blind to such instances." *Id.*

## 2.   Cox Had Specific Knowledge, Not Mere Generalized Knowledge

There is no support in the Fourth Circuit's decision (or anywhere else) for Cox's unprecedented argument that it can only be held responsible for subsequent infringement of specific works identified by title and copyright owner in an infringement notice.  MarkMonitor's infringement notices identified to Cox its *particular subscribers* (by IP address and timestamp) using Cox's Internet service to infringe.  MarkMonitor's infringement notices further informed Cox of the *specific infringing files* that those particular subscribers downloaded or distributed.  The

---

Kearney.  Plaintiffs have separately filed a motion to strike this improper attorney testimony and Rule 1006 summary.

infringing files identified in the infringement notices often included multiple copyrighted works, and the notices made clear that the work listed in the notice was a "sampling of the music shared." SOAF ¶ 20.  This is more than enough for Cox to *do something* about the infringement.  Contrary to Cox's assertions, Plaintiffs' notices provided far more than mere generalized knowledge that some unknown subscribers were somewhere engaged in some unknown infringement.

The interplay between knowledge for contributory liability and receipt of DMCA infringement notices also provides support.  This Court has made clear that DMCA-compliant notices are evidence of actual knowledge.  *BMG*, 149 F. Supp. 3d at 671 (citing cases).  The DMCA expressly provides that a legally compliant notice need not list each and every work being infringed, but merely "a representative list" of works infringed. 17 U.S.C. § 512 (c)(3)(A)(ii).

Cox tries to distract from the issue by taking the Court on a journey through the steps supposedly required for it to understand the scope of works that might be implicated by an infringement notice.  Cox argues it is not required to investigate beyond the face of the notice to understand what infringement is occurring.  (Mot. at 23-25.)  This argument is a red herring, divorced from the record and the law.  Cox received MarkMonitor's infringement notices, associated them with the subscribers who were the subject of the notices, and claims to have taken steps that were effective in stopping additional infringements.  Cox's policies, procedures, and practices ███████████████████████████████████████████████████████████████████

███████████████████████████████████████ SOAF ¶¶ 21, 30, 32-35, 45.  Indeed, its own internal documentation requires only ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ SOAF ¶ 45.

Cox's contention that, somehow, it would have acted differently if MarkMonitor had listed all the copyrights in the infringing files by title, or if the Music Publisher Plaintiffs had sent separate notices, is disingenuous to say the least.  All of Cox's supposedly "effective," but utterly toothless, graduated response procedures focus ██████████████████████████████████ ████████████████████████████  To Cox, that information was irrelevant.[12]

Cox's reliance upon the Ninth Circuit's decision in *Luvdarts* is misplaced.  (Mot. at 28.) In *Luvdarts*, "the notices were 150–page–long lists of titles, apparently just a transcription of every title copyrighted by Luvdarts, which indicated that they wanted 'accountability' for the unauthorized distribution of those titles for the period from May 2008 to November 2009."  *Luvdarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1073 (9th Cir. 2013).  The Ninth Circuit deemed those notices as indistinguishable from a mere generalized notice of infringement because they did not identify "which of these titles were infringed, who infringed them, or when the infringement occurred."  *Id.*  *Luvdarts* is obviously nothing like this case.  MarkMonitor's notices identified, among other things, the particular infringing subscriber, the infringing file, a representative sample of the copyrighted work infringed, and the date/time of the infringement. Plaintiffs' proof more than satisfies the Fourth Circuit's standard from *BMG*.

### 3. Cox Conflates the "Control" Element Necessary for Vicarious Liability in its Contributory Infringement Analysis

There are distinctly different elements for Plaintiffs' contributory infringement and vicarious liability claims.  Knowledge is not an element of vicarious liability.  Similarly, right and ability to control is not required to prove contributory infringement.  Cox nonetheless attempts to

---

[12] Cox's summary judgment argument flies in the face of how it behaved, ███████████████████ ████████████████████████████████████████████████████████████████████████████

merge the various elements of the different claims.[13]   The Court should be wary of that trap. Control for purposes of vicarious liability is irrelevant to the contributory infringement analysis. As described above, and in Plaintiffs' affirmative motion for summary judgment, MarkMonitor's infringement notices imbued Cox with knowledge.   As explained below, *see infra* at 36, Cox also had sufficient control for purposes of the distinct doctrine of vicarious liability.

### B.   Cox Willfully Blinded Itself to the Infringement of the Works in Suit

"A person is 'willfully blind' or engages in 'conscious avoidance' amounting to knowledge where the person was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."   *BMG v. Cox*, 149 F. Supp. 3d at 673 (internal quotations and citations omitted).   Willful blindness requires that "Cox consciously avoided learning about specific instances of infringement."   *BMG v. Cox*, 881 F.3d at 312.   Cox's misconduct meets that standard.

Cox cannot credibly claim it did not believe infringement was occurring.   (Mot. at 28-29.) Cox had actual knowledge of repeat infringers and, behind the scenes, Cox made clear that ███ ███████████████████████   SOAF ¶ 20-22, 24-27.   Cox also took deliberate actions to avoid learning about the infringement.   It imposed caps on all rights owners, including Plaintiffs, and refused to process any infringement notices over that amount per day.   Moreover, Cox blacklisted Rightscorp, which sent millions of infringement notices that Cox refused to accept—each identifying a specific instance of Cox subscribers infringing music.   SOAF ¶¶ 31, 34, 39.   The

---

[13] In attacking the element of knowledge for contributory infringement, Cox relies upon *VHT, Inc. v. Zillow Group*, 918 F.3d 723 (9th Cir. 2019) for the proposition that there is no practical ability to control the infringement where "ferreting out claimed infringement … was beyond hunting for a needle in a haystack." (Mot. at 24-25.)  Cox then argues that "it was not on notice that unnamed, unidentified sound recordings were being infringed" and thus lacked "the practical ability to supervise infringing acts of which it was unaware."  But this case is nothing like *VHT* and Cox improperly conflates the contributory and vicarious liability elements in arguing under *VHT*.  Here, Cox had knowledge of specific infringing acts for purposes of contributory liability, and had the right and ability to supervise or limit the infringement for purposes of vicarious liability.

foregoing is more than enough for a reasonable jury to find (again, as the *BMG* jury did) willful blindness.

### C. Cox's Contributory Liability Does Not Hinge on Precisely Identifying the Direct Infringers Using its Business Subscribers' Accounts

This Court already recognized that, "[w]hile identity is a key issue in many individual infringement suits, it has little relevance in a large-scale secondary liability suit." *BMG*, 149 F. Supp. 3d at 664. Cox nonetheless contends that it cannot be held contributorily liable for direct infringement through its business customers' accounts absent identification of the specific individual that infringed. Cox's argument is meritless and it is collaterally estopped from re-litigating the issue. Beyond that, the case Cox relies on does not help its cause.[14]

Cox deceptively discusses *Cobbler Nevada, LLC v. Gonzalez*, 901 F.3d 1142 (9th Cir. 2018). (Mot. at 29-32.) In *Cobbler*, the court held that a claim of direct infringement brought against an adult foster care home required something more than the mere allegation that the direct infringement occurred through an IP address assigned to the defendant. 901 F.3d at 1146–47. *Cobbler* did not hold, as Cox states, that "[p]roving the predicate act of direct infringement necessarily requires proof that a particular person did the infringing." Rather, the issue in *Cobbler* was whether there was a basis to allege that the defendant was the direct infringer.

Cox also blithely attempts to stand in the shoes of the *Cobbler* defendant in analyzing its potential contributory liability. Cox's confused argument is that if the Cox business subscribers cannot be held contributorily liable for direct infringement occurring on the networks they

---

[14] █████████████████████████████████████████████████████████████
████████████████████████████████████████████████

administer, Cox cannot be held liable for that behavior merely because it connects the networks of those Cox business subscribers to the Internet.  Cox is wrong.

First, the *Cobbler* court recognized that, while contributory infringement can be proven by knowledge of the infringing activity combined with material contribution, it premised its contributory infringement claim against the foster care home "on a bare allegation that Gonzales failed to police his Internet service.   This perfunctory allegation, without more, does not sufficiently link Gonzales to the alleged infringement." *Id.* at 1147-48.  Plaintiffs' claims against Cox are based on much more than a "perfunctory allegation."  Moreover, unlike the defendant in *Cobbler*, who was apparently unaware of who to cut off to stop the infringement, Cox knew exactly which repeat infringer subscribers to terminate.  Cox had to "*do something*" but chose not to.

Second, Cox and the defendant in *Cobbler* are differently situated.  Cox is an ISP, whereas the defendant in *Cobbler* was "a subscriber to internet service."  That difference weighs heavily. *Cobbler* explained that a subscriber to an Internet service "does not fit cleanly within our typical contributory liability framework, which often involves consumer-facing internet platforms." *Id.* at 1148.  In *Cobbler*, the court's concern was not to create "an affirmative duty for private internet subscribers to actively monitor their internet service for infringement [because] [i]mposing such a duty would put at risk any purchaser of internet service who shares access with a family member or roommate, or who is not technologically savvy enough to secure the connection to block access by a frugal neighbor." *Id.* at 1149.  For Cox, none of those concerns apply.[15]  Cox is a sophisticated, technologically savvy company in the business of providing access to its network to

---

[15] Based solely on its say-so, Cox makes broad statements such as its business subscribers "include large and small organizations whose networks may be used by dozens, hundreds, or thousands of end users." Cox has not offered any evidence, let alone admissible evidence, about the size of the organizations, the size of the location for which Cox provided Internet service, or the number of end users.

customers and it purported to have policies and procedures to receive infringement notices, work with subscribers to stop the infringement, and terminate accounts of repeat infringers.

Finally, Cox again misapplies the Fourth Circuit's *BMG* decision, contending that direct infringement occurring on the networks administered by Cox's business customers amounts to nothing more than "generalized knowledge … that infringement was occurring somewhere on its network." Cox's argument is a non sequitur. Cox had specific knowledge of specific direct infringement. Plaintiffs' notices identified the account being used for infringement, the infringing file, a representative copyrighted work in the file, the day/time of the detection, and the port number. That is not generalized knowledge of infringement occurring in some unknown location.

### III.    There is Ample Evidence of Cox's Vicarious Liability

Cox's conduct also renders it liable for vicarious copyright infringement because it "profit[ed] from direct infringement while declining to exercise the right to stop or limit it." *Grokster,* 545 U.S. at 930. Cox argues that it lacked a direct financial interest in the alleged infringement. (Mot. at 32-34.) Cox also contends that it lacked the ability to supervise or control the infringing activity by Cox's business subscribers.[16]  (Mot. at 36.)  Both arguments fall flat.

#### A.  Cox Derived a Direct Financial Benefit from Infringement

Vicarious liability requires a "causal relationship between the infringing activity and *any* financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004).  In multiple ways, Cox obtained such direct financial benefit from its subscribers' infringement.

---

[16] For purposes of its summary judgment motion, Cox does not dispute that it possesses the right and ability to control the infringing activity of the Cox residential subscribers who were the subject of MarkMonitor's notices.

### 1. This is Precisely the Non-Ordinary Case Where Flat Periodic Payments are Enough to Prove Direct Financial Benefit from the Infringing Activity

Courts (including this one) have cited *Ellison* for the proposition that "flat periodic payments for service . . . ***ordinarily*** would not constitute receiving a financial benefit directly attributable to the infringing activity," unless "the value of the service lies in providing access to infringing material." *BMG v. Cox*, 149 F.3d at 676 (quoting *Ellison*, 357 F.3d at 1079 (quoting S. Rep. 105-90, at 44 (1988)) (emphasis added). *Ellison* did not establish a fixed rule that charging flat fees precludes a finding of direct financial benefit. Cox concedes that the *Ellison* principle is only a "general" rule. (Mot. at 33.) *Ellison* and the legislative history it quotes expressly use the word "ordinarily," demonstrating that fixed payments can satisfy this element.

The facts in *Ellison* do not remotely resemble the facts here. In *Ellison*, an author sued America Online, Inc. ("AOL") because the author's works were posted on an online newsgroup forum that AOL provided to its subscribers. 357 F.3d at 1075. Under the DMCA, Ellison sent AOL an email notifying it of the infringing activity. *Id.* After that single email went unheeded (because AOL had a non-working email address), Ellison filed suit. *Id.*

This case is not a dispute about a single unheeded email and is precisely the non-ordinary case the *Ellison* court recognized could exist. Cox had a corporate policy and systematic practice to continue delivering Internet service to, and accepting substantial payments from, specific known infringing subscribers—many of whom were given multiple opportunities to cease their infringing behavior but refused. SOAF ¶¶ 21, 26-27, 31-38. Cox has admitted repeatedly that collecting monthly subscription payments from these repeat infringers drove its decisions not to terminate their service. SOAF ¶ 44. The bandwidth needed to engage in infringing activities necessitated pricier monthly data plans, thereby driving increased revenues for Cox. SOAF ¶¶ 40, 43. The

symbiotic relationship between Cox's financial interests and the infringing activity is undeniable, and Cox intentionally exploited it.

### 2. By Not Terminating Known Infringers, Cox Obtained Revenues it would Not Have Otherwise Received, and Avoided Costs

This Court's consideration of *Ellison* in the *BMG* case did not involve either the facts or the arguments set forth here.  Cox chose not to stop the infringement on its network precisely in order to collect revenues that it would lose if it terminated the particular accounts that were repeatedly the subject of infringement notices.  This was a direct financial benefit, as was Cox's avoiding costs it would have incurred had it addressed the infringement.

Cox received a direct financial benefit of at least ███████ by retaining ██████ residential subscribers who were the subject of three or more infringement notices from February 2013 to November 2014.  Further, it achieved a direct financial benefit from retaining ██████ residential subscribers who were the subject of five or more infringement notices during that same period of at least ██████ By tolerating the infringement, Cox avoided direct incremental costs it would have incurred to address the infringement.  SOAF ¶¶ 41-42.

Reviewing an example is instructive. ████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████ *See A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 921 (N.D.Cal.2000) (direct financial benefit requires that "the defendant has economic incentives for tolerating unlawful behavior"), *rev'd on other grounds*, 239 F.3d 1004 (9th Cir. 2001).

33

### 3. Cox Admitted that it Prioritized Collecting Subscription Payments Over Limiting the Infringement

Cox's own documents demonstrate how Cox's economic incentives coalesced with the known infringing activity of particular subscribers identified in infringement notices. Cox's profit motives are starkly revealed in ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Gould Ex. 53 (Cox internal email). Joseph Sikes, the second in command of the abuse group, similarly ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ Gould Ex. 4 (Cox internal email).

As another example, a top-level abuse engineer, Roger Vredenberg, presented Mr. Zabek with ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Gould Ex. 5 (Cox internal email). Mr. Sikes also repeatedly explained that ████████████████ █████████████████████████████████ Gould Ex. 9 (Cox internal communication), ████████████████████████████████████████████████████████████████ ████████████████████████████████████ Gould Ex. 54 (Cox internal communication).

Mr. Zabek instructed the Cox abuse team to ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████ Gould Ex. 13. He further instructed his team ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

Gould Exs. 43, 44 (Cox internal emails).  These examples are not isolated instances.  Mr. Zabek

testified that 

Gould Ex. 46 (Zabek Tr.) 144:5–145:23.

By contrast, Cox did not hesitate to

SOAF ¶ 36.

### 4. The "Repeat Infringer" Subscribers were Particularly Profitable and Cox's Revenues Varied Based on the Manner and Purpose for which Subscribers Used its Internet Service

Cox knew that these infringing subscribers were particularly profitable, and the infringing

activity led to higher monthly payments.  Cox benefitted financially from the infringing activity

through higher monthly payments from its repeat infringer subscriber base.

P2P networks often involve infringing activity, which was a key driver of bandwidth

demand for Cox, pushing households above the most basic tier.  Cases depicting the rampant

infringement via P2P networks are legion.[17]  Multiple witnesses in this case acknowledged that

infringement is frequent on P2P networks.  The millions of infringement notices to Cox provide a

glimpse of the scale.  Such use of P2P networks requires substantial bandwidth, which in turn

prompts customers to purchase higher-priced service plans.  SOAF ¶¶ 40-43.  Cox's data

demonstrates that

_____

[17] *See, e.g., Grokster*, 545 U.S. at 918–23; *Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 491–92 (1st Cir. 2011); *Disney Enterprises, Inc. v. Hotfile Corp.*, No. 11-20427-CIV, 2013 WL 6336286, at *35 (S.D. Fla. Sept. 20, 2013).

██████████████████████████████████████████████

██████████████████████████████████████████████

████████ SOAF ¶ 43(e).

### 5.   There is Sufficient Evidence for a Jury to Conclude that the Infringing Activity was a Draw

Finally, though Cox's direct financial benefit from the infringement obviates any need to show that the ability to use Cox's service to infringe constituted a draw, there is sufficient evidence of it.  The law is clear that the draw need not be substantial.  The sheer volume of notices—over 5 million accepted in just the Claim Period, despite Cox's daily limit on notices per rights owner, and not including the millions of blocked Rightscorp notices—speaks volumes.   SOAF ¶ 37. Specific subscribers infringed repeatedly, even after dozens of warnings and multiple suspensions. SOAF ¶ 26. This shows that their use of Cox's service to infringe was much more than a mere "added benefit" to them.  The infringement was important enough to them that they continued to infringe despite the risk (on paper, not in reality) of losing their Internet access as a result.

### B.  Plaintiffs Do Not Need to Show that Cox Derived a Financial Benefit from Infringement by Cox's Business Subscribers' End Users

By not terminating accounts repeatedly used for infringement, Cox collected additional revenues it would not have otherwise received, and avoided incurring costs it would have expended, had it terminated service.  SOAF ¶ 41.  This is no different for a Cox business subscriber, and it alone is enough to demonstrate financial benefit for purposes of proving vicarious liability. It is not necessary for Plaintiffs to prove that the Cox business subscriber was the direct infringer, as Cox argues.  (Mot. at 35.)  Someone acting through the account of the Cox business subscriber was the direct infringer.  Rather than stop or limit that infringement, Cox chose to continue to provide service and collect more money while the infringement continued.  Infringement through Cox's business accounts was particularly egregious and Cox's revenue, in turn, was highest from

36

those accounts.  It does not matter that the business subscriber paid Cox the subscription revenues, as opposed to whichever individuals engaged in the infringing acts.  Cox had clear economic incentive to tolerate the infringement, which it exploited by letting the infringement continue.

### C.  Cox Had the Practical Ability to Control Infringements by Business Subscribers

For purposes of vicarious liability, Cox had sufficient control over its subscribers – both residential and, contrary to Cox's argument, business.  (Mot. at 36.)  The type of account makes no difference.  The "control" element is determined by the defendant's "right and ability to supervise the direct infringer."  *Grokster*, 545 U.S. at 930 n.9.  "The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise."  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001).  Cox has such control, both for residential and business subscribers, and the Court's prior determination in *BMG* governs here:

> Cox has a contractual relationship with its users and that relationship gives Cox the legal right to withhold service in the face of infringing conduct.  Cox also provides a crucial service to the infringements alleged in this case, which gives Cox the practical ability to stop or limit infringement.

*BMG*, 149 F. Supp. 3d at 675.  Cox is bound by that determination.

Cox's rules dictate that the subscriber is responsible for what happens through its account.  SOAF ¶ 30.  Cox has a relationship with its subscriber and can either tolerate the infringement or halt it by terminating service.  Cox thus had sufficient control for purposes of vicarious liability.

### IV.   Cox's Arguments on Statutory Damages are Flawed

Section 504(c)(1) of the Copyright Act indicates that "the copyright owner" may elect statutory damages "for all infringements involved in the action, with respect to one work," and that, for purposes of this subsection, "all the parts of a compilation or derivative work constitute one work."  17 U.S.C. § 504(c)(1).  On this basis, Cox asks the Court to decide an issue of damages

on summary judgment: what constitutes "one work," under the facts of this case, for purposes of statutory damages. Cox's attempt to limit how a jury is permitted to award damages is misguided.

### A.  A Per-Track Award Applies, Not a Per-Album Award

Cox baselessly argues that the Record Company Plaintiffs should be limited to one award of statutory damages per album, regardless of the number of individual tracks on that album that Cox's subscribers indisputably infringed. (Mot. at 36-39.) But this Court has already agreed with those decisions holding that "[n]othing in the Copyright Act bars a plaintiff from recovering a statutory damage award for a sound recording [or musical composition] issued as an individual track, simply because that plaintiff, at some point in time also included that sound recording [or composition] as part of an album or other compilation." *BMG*, 199 F. Supp. 3d 958, 984 (E.D. Va. 2015) (quoting *Arista Records, LLC v. Lime Grp, LLC*, No. 06-cv-5936, 2011 WL 1311771, at *2–3 (S.D.N.Y. Apr. 4, 2011)). Cox is precluded from re-litigating that issue.[18]

At the time of the infringement, the sound recordings in suit were published, distributed, and licensed by the Record Company Plaintiffs as individual works. SOAF ¶ 3. Thus, a per-track award applies. Sound recordings do not lose their status as individual works merely because they were also published as part of albums. This makes sense, as individual sound recordings have their own economic value, *e.g.*, as "singles" or as separately licensable works. *Id.*

### B.  Sound Recordings and Musical Compositions That Have Separate Copyright Owners are Entitled to Separate Statutory Damage Awards

The Record Company Plaintiffs and the Music Publisher Plaintiffs are separate and distinct companies that own different types of works and each has suffered its own harm. Nonetheless,

---

[18] The case that Cox relies upon for its other statutory damage argument, *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 101 (2d Cir. 2016), reached the same conclusion as this Court on the per-track versus per-album issue.

Cox asks this Court to grant summary judgment precluding Plaintiffs from recovering separate statutory damage awards for a sound recording and a musical composition it embodies. (Mot. at 39-40.) Cox contends those two different types of copyrighted works are a single work for calculating statutory damages. A plain reading of the statutory text demands otherwise.

Sound recordings and musical compositions are distinct copyrights. *See* 17 U.S.C. § 102(a)(2) & (a)(7); *see also* Mot. at 25. *See Newton v. Diamond*, 204 F. Supp. 2d 1244, 1248-49 (C.D. Cal. 2002) ("Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights."). They are separately registered as different types of works. SOAF ¶¶ 3-4.

Section 504(c) precludes the same "copyright owner" (singular) from recovering multiple statutory damages awards when the owner holds multiple copyrights in the same work (such as in a derivative work and the original work on which it is based). The repeated use of the singular term "copyright owner" in Section 504 assumes that the same person owns multiple copyrights implicated by the same infringement, and necessarily limits its application to such cases. Here, the owner of the copyright in and to the sound recording (i.e., a Record Company Plaintiff) is different from the owner of the copyright in and to the musical composition (i.e., a Music Publisher Plaintiff). SOAF ¶ 2.

The out-of-circuit case that Cox relies upon, *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F. 3d 79, 94-95 (2nd Cir. 2016), held that the derivative work and underlying work are "one work" for statutory damages even if owned separately. *MP3tunes* is not binding on this Court, nor should this Court adopt its result. *MP3tunes* considered the statutory text and legislative history but did not account for the deliberate decision by Congress to use the singular term "copyright owner" in the statutory provision. Nor did it apparently even consider the distinction.

The statutory text is unambiguous in its repeated use of the singular "copyright owner."  As Cox's motion highlights, the language has a very different meaning if read in the plural.  Congress knew how to use the plural and did not do so.  The Court should follow the statutory text as it is written.

Cox's argument fails under the plain statutory text for the additional reason that the "one work" language, however interpreted, applies only to a single lawsuit ("for all infringements in the action").  17 U.S.C. § 504 (c).  The owner of the derivative work and the owner of the underlying work could avoid the unduly harsh outcome that Cox seeks by bringing separate lawsuits.  All that would do is increase burdens on the courts and the parties.  As Judge Rakoff recognized, it would be an absurd result if suing separately allowed rights holders to each recover their own statutory damages award, but if suing in the same action they are limited to a single award.  *Teevee Toons, Inc. v. MP3.com, Inc.*, 134 F. Supp. 2d 546, 548 (S.D.N.Y. 2001), *disagreed with by*, *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F. 3d 79 (2d Cir. 2016).  For that reason, along with the statute's use of the singular "copyright owner," Judge Rakoff determined Congress meant only to preclude a single plaintiff from recovering multiple statutory damages for infringements of several different versions of a single work.  *Id.*

Before the Court are separate works with separate economic values and separate owners.  SOAF ¶¶ 2-5.  Applying the *entirety* of the statutory provision as written, there thus should be separate awards for Cox's infringement of a Record Label Plaintiff's sound recording infringed and a Music Publisher Plaintiff's corresponding musical composition infringed.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court deny Cox's motion for summary judgment in its entirety.

Dated:  September 24, 2019

Respectfully submitted,

*/s/ Scott A. Zebrak*
Scott A. Zebrak (38729)
Matthew J. Oppenheim (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
Kerry M. Mustico (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue NW, 5th Fl.
Washington, DC 20016
Tel: 202-480-2999
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com
kerry@oandzlaw.com

*Attorneys for Plaintiffs*