# EXHIBIT 47

(Redacted)



PLAINTIFF'S
EXHIBIT
255

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP, <br><br>                   Plaintiff, <br><br> v. <br><br> COX ENTERPRISES, INC., COX COMMUNICATIONS, INC., and COXCOM, LLC, <br><br>                   Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) )     Case No. 1:14-cv-1611 (LOG/JFA) |

**DECLARATION OF JASON ZABEK IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**FILED UNDER SEAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP,    ) <br> ) <br> ) <br> Plaintiff,    ) <br> ) <br> v.    ) <br> ) <br> COX ENTERPRISES, INC., COX <br> COMMUNICATIONS, INC., and <br> COXCOM, LLC,    ) <br> ) <br> ) <br> ) <br> Defendants.    ) <br> ) | Case No. 1:14-cv-1611 (LOG/JFA) |

**DECLARATION OF JASON ZABEK IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Jason Zabek, submit this declaration pursuant to 28 U.S.C. § 1746.

1.     I am the Manager of Customer Abuse Operations at Cox Communications, Inc.  I submit this declaration in support of Defendants' opposition to Plaintiffs' motion for partial summary judgment.  I have personal knowledge of the facts in this declaration.

2.     On September 21, 2015, I submitted a declaration with exhibits in this matter in support of Cox's motion for summary judgment, which I incorporate by reference into this declaration.  Dkt. 321.

3.     In my earlier declaration, I described the various positions I have held at Cox since joining the company in 1991.  Dkt. 321 at ¶¶ 1-5.  I also described my current position as Manager of Customer Abuse Operations.  *Id.* at ¶ 5.  As Manager of Customer Abuse Operations, I manage two employees, Andrew Thompson and Joseph Sikes, who are both Abuse Engineers on the Customer Abuse Team (also called the "Customer Safety Team" or the "Safety Team").  I supervise their daily workload, conduct meetings, answer questions, and review their performance.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

I also interact with other departments to protect the safety and integrity of the Cox network.  In recent years, I temporarily assisted with managing Cox's Security Department, where I worked with that department to track and research malware and online threats that attempt to infiltrate the Cox Corporate network and to ensure compliance to payment card industry standards.  During that time, my main focus was to create a new team to investigate issues affecting Cox internally, such as hacking and loss of Cox intellectual property, and to strengthen our ability to protect our account holders' personal information, including developing methods and procedures for these internal issues.  Because I focused on internal-facing issues, I turned over a significant portion of the day-to-day operations of the Customer Safety Team to my team, Mr. Thompson and Mr. Sikes, and remained available to them in my capacity as manager if they needed my assistance.  I have now transitioned back to managing the Customer Safety Team on a full time basis.

### Overview of Cox's Methods & Procedures and Graduated Response Procedure

4.      I described in my first declaration the responsibilities of the Customer Safety Team. *Id.* at ¶¶ 6-14, 23-27.  The Customer Safety Team is primarily responsible for the enforcement of the Cox Acceptable Use Policy.  The Acceptable Use Policy is part of our agreement with our Internet account holders and governs the ways in which account holders are authorized to use, or are prohibited from using, our services.  We are also responsible for addressing various forms of abuse on the Cox network.  The issues (or "abuse types") that we handle range from highly dangerous threats, like botnets and malware that threaten the network and account holders, to more routine matters such as open wireless connections.  Among the many other challenges we face are phishing scams (trickery to gain access to personal information), denial of service (DOS) attacks, security breaches compromising account holders' personally identifiable information, spam, and claims of copyright infringement.  Our Acceptable Use Policy provides that Cox may terminate the account holder's Internet service for copyright infringements and other abuses, and the Customer

2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Safety Team manages the methods, procedures, and processes by which Cox enforces this provision. At multiple points, we warn our account holders of a potential for termination if they violate the Acceptable Use Policy.

5.     As I described in my earlier declaration, Cox's Residential Abuse Ticket Handling Procedures, which we sometimes refer to as the "Methods and Procedures" or "M&Ps," set forth how Cox handles different abuse types, and we refer to the steps for handling complaints as the "graduated response procedure." *Id.* at ¶ 9. The graduated response procedure encompasses actions by customer service representatives, automatic actions by the Cox Abuse Tracking System (referred to as "CATS"), and actions by the Customer Safety Team working with CATS and customer service representatives.[1] The current Methods and Procedures, which I attached to my earlier declaration (Dkt. 321, Ex. 1) are **Exhibit 1** to this declaration.

6.     I described the Methods and Procedures in my earlier declaration, explaining that they set forth in detail the approach that Cox takes with respect to *all* abuse types occurring on the Cox network. Dkt. 321 at ¶¶ 8-9. The Methods and Procedures instruct and inform the Customer Safety Team and Cox customer service representatives about how to respond to the distinct problems and considerations arising with each abuse type.

---

[1] In my first declaration, I described the structure of our customer service representative team. Dkt. 321 at n. 1, ¶¶ 7, 24. Tier 1 is the first level of customer service representatives. They answer routine questions and often reroute more specialized questions to the appropriate department. Tier 2 representatives have more specialized training, including how to handle basic questions relating to notices of copyright infringement. The Technical Operations Center, also referred to as "TOC" or "Tier 2.5," is a small team of more senior customer services representatives who address the most complex or serious circumstances of account holders who receive multiple abuse complaints. Members of the Technical Operations Center may ask a member of the Customer Safety Team (Mr. Thompson, Mr. Sikes, or me) for guidance in dealing with especially difficult account holders or complex questions, and occasionally they refer such account holders to a member of the Customer Safety Team so we may speak with the account holder directly. The National Support Center (NSC) focuses on answering questions from Business account holders.

3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

7.      The procedure for addressing abuse on the network varies according to abuse type. For example, certain types of abuse such as DOS attacks, spam, hacking, or malware, can damage and in some instances even cripple our network, preventing Internet access or otherwise significantly and immediately harming large numbers, and sometimes all, of our customers on the network.  In contrast, while we take seriously and make every effort to address behavior on the network that leads to complaints of copyright infringement, we approach those complaints differently because the behavior does not disable the Cox network servers or shut down Internet services for our customers across the network.  I am aware that Plaintiffs filed as an exhibit an email in connection with their motion for partial summary judgment (Dkt. 317, Ex. 24) in which I stated that I was "not that concerned about the DMCA."  That email is **Exhibit 2** to this declaration.  When I said that, I was referencing this concept, that copyright complaints do not pose a giant risk to our network or to the public like phishing, DOS attacks, or hacking.  In addition, in that particular instance, I was discussing a Cox business account that itself operated as an Internet service provider, providing WiFi service to its customers.  We spoke with the account holder and helped to secure the account holder's system, after which we have not received another complaint of infringement.  Ultimately, as I explained in my earlier declaration, the variety of abuse types that Cox deals with requires that our team focus its efforts by taking into account the level of perceived threat to the network and the public, immediacy of the threat, relative volume of complaints, and other factors that affect how we process complaints corresponding to each abuse type.  Dkt. 321 at ¶ 7.

### Cox's Graduated Response Procedure for Complaints of Copyright Infringement

8.      In my earlier declaration, I described at a high level Cox's current process for addressing complaints of copyright infringement under its graduated response procedure and in

4

view of the current Methods and Procedures.  Dkt. 321 at ¶ 9.  I now provide a more detailed description of this process.

9.      Broadly speaking, throughout my time as Manager of Abuse Operations and currently, the graduated response procedure proceeds in three phases before the final stage of termination.  The three phases consist of (1) sending email warnings to an account holder setting forth the complaints of infringement and providing information to the account holder about how to secure the account to avoid further issues, (2) suspending an account and requiring the account holder to review and acknowledge information that Cox provides on an online landing page before he or she can "click" to exit the landing page and "self-reactivate" the service, and (3) suspending an account with a requirement that the account holder to call and speak to a customer service representative, where the account holder will have to speak to higher level representatives as the number of complaints increases and where, at a certain point, the account undergoes review for termination.  In my experience, in the vast majority of cases we are able to assist the account holder with addressing the behavior that led to the complaints through the interactive warning and suspension steps before termination.  As the current Methods and Procedures (Exhibit 1) reflect, the process for addressing complaints[2] of copyright infringement operates as follows



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



---

[3] I discuss below our process for addressing complaints of copyright infringement against IP addresses for which we do not have a valid email address.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



- ATTORNEYS' EYES ONLY



8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



f.

10.     The process I described above for addressing complaints of copyright infringement differs for account holders who do not have a valid "cox.net" or other valid email address on file because Cox has no reliable way of contacting those account holders by email. We therefore do not ███████████████████████████████████████████████████, and instead the process proceeds as follows: ███████████████████████████

10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



. In addition, in some instances an account holder without an email address on file will contact us after ███████████, at which time we will add an email address to the file with the account holder's consent; after that, ███████████

███████████

11.     The table below summarizes Cox's current graduated response procedure for addressing complaints of copyright infringement and illustrates how the steps in the graduated response procedure differ depending on whether we have a valid email address on record for the account holder.

| Cox's Graduated Response Procedure for Complaints of Copyright Infringement | | |
|---|---|---|
| | Account Holder **With** Valid "Cox.net" Email Address[4] Available | Account Holder **Without** Valid "Cox.net" Email Address Available |

---

[4] In recent years and presently, we try, when possible, to ask account holders who call in and do not have a "cox.net" email address or who have a different preferred email address to provide that email address for our records. Where an account holder does provide an email address, we will use that email address to contact him or her when appropriate under the graduated response procedure.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



12.     As I explained in my earlier declaration, over time, the procedures outlined in the

Methods and Procedures have changed to reflect our evolving understanding of the best way to

engage with and educate account holders to curb alleged abuse, including adjustments based on our

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

increasing ability to automate the processing of complaints through CATS. Dkt. 321 at ¶ 10.  For example, Cox increased the number of "steps" in the graduated response procedure to arrive at the current framework I describe above as we have learned how to better curb infringements on the Cox network.  In 2011 and part of 2012, our graduated response procedure for addressing complaints of copyright infringement was quite similar to the process I describe above, except it

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████  As the current Methods and Procedures, which were updated in October 2012, reflect,

we eventually ████████████████████████████████████████████████████

██████████████████████████████████████████████████  ████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████  The

Methods and Procedures that were previously in effect are **Exhibit 3** (Dkt. 317, Ex. 16) to this declaration.  We increased the number of steps in the graduated response procedure over time in this manner because we found that, the more contact we have with account holders, the better we can educate them to stop the actions or behavior that led to the complaint and assist them with removing allegedly infringing files, disabling file sharing applications, securing their wireless Internet connection, identifying malware or other viruses infecting their system, or taking any other action that helps prevent the actions or behavior leading to complaints.

13.     While the Methods and Procedures detail and guide the procedure I described above for addressing complaints of copyright infringement, they are not the exclusive resource informing and instructing the Customer Safety Team and customer service representatives as to the process for addressing complaints of copyright infringement under the graduated response procedure.  The Customer Safety Team also communicates information about the copyright

14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

complaint handling process internally and to customer service representatives by informal mechanisms and at team meetings. Additionally, and as I stated in the my first declaration, the Customer Safety Team meets weekly, both internally and with the Technical Operations Center and National Support Center, to discuss and address unusual complaints, new potential threats or abuse types, staffing issues, changes in policy, possible improvements to procedures, and any other issues that arise. Those meetings further inform the graduated response procedure. Dkt. 321 at ¶ 7. The Customer Safety Team also applies, and empowers Cox Tier 2 and Technical Operations Center representatives to apply, the graduated response procedure with a certain level of flexibility and discretion in addressing complaints of copyright infringement and other abuse issues. This allows us to work with each account holder on a case-by-case basis to ensure that we have done everything we can, within reason, to assist and educate account holders for whom we receive complaints of infringement and to avoid conditions that led to claims of infringement.

**Cox's Graduated Response Procedure Aims to Balance the Goals of Curbing Infringement on the Network and Educating and Retaining Account Holders.**

14. Cox has long had a policy of terminating, in appropriate circumstances, account holders for whom we receive multiple complaints of copyright infringement. At the same time, Cox also makes every effort to educate account holders and help them to change problematic behaviors leading to complaints before Cox takes the drastic step of terminating an account.

15. Cox does not treat the implementation of its repeat infringer termination policy lightly; we understand that shutting off someone's Internet access is a drastic measure that can have dramatic consequences. Terminating an account holder's Internet service cuts off their lifeline to the world, isolating them from their friends and families. It can also hurt a person's ability to do his or her job or run a business (if, for example, he or she works from home), or even jeopardize one's safety (if, for example, someone operates an alarm system at home that relies on

15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

an Internet connection). We also seek to avoid a situation where one of our account holders is the victim of a bad actor infecting the account and is therefore not responsible for a complaint we receive. In some cases, the account holder may not be at all aware of what is going on, and it is our goal to work closely with the account holder to solve the issue before hastily resorting to the drastic measure of terminating the account.

16.     Because Cox's account holders form the foundation of its business, it is also true that, in implementing the graduated response procedure we keep in mind the effect on the business, including potential loss of revenue, of actions taken at various stages of the procedure. On this point, I have reviewed a number of emails that I understand Plaintiffs submitted in connection with their motion for partial summary judgment (Dkt. 317, Exs. 18-19, 21, 45) that contain statements by me referring to permitting account holders to stay on the network after we had received complaints supposedly in order to prevent revenue loss. Those emails are **Exhibits 4-7** to this declaration. As an illustrative example, in Exhibit 6, an email to the Safety Team and Technical Operations Center representatives, I mentioned that starting back at the beginning of the graduated response procedure after we permitted a previously terminated account holder to rejoin the network would allow us to "collect a few extra weeks of payments for their account." At the time I made this statement, I was referring to the fact that restarting the graduated response procedure allowed us to retain the account holder on the network for a longer period than we would be able to if we instead suspended that account holder. I meant that, if we could work with this account holder for "a few extra weeks" beyond what we would be able to do if we had suspended the account holder, payments would accrue, but this would also benefit the account holder because we could use that time to educate him or her and help resolve the issue. I believe that, under these circumstances, apart from the benefit Cox may receive in the form of payment from the account holder, Cox benefits *more* from the fact that our account holders know we are willing to work with, help, and

16

educate them. I also made this statement in the context of our belief that, as discussed further below, where a customer was able to resolve the issues that led to the complaints, we should give the account holder another shot by restarting the graduated response procedure cycle.

17.     From a practical and common sense standpoint, I am not aware of any business that "wants" to lose account holders or revenue; I think it makes sense that Cox, like any business, wants to make money providing its services in a way that satisfies account holders. My email in Exhibit 4 stating that "we want to hold on to every subscriber that we can" reflects this idea. But I in no way suggested by my statements in these emails that Cox avoids terminating account holders in appropriate circumstances solely to retain revenue. I am certainly not aware of any instance where Cox avoided terminating an account holder solely to avoid losing revenue.

18.     Because terminating Internet service is such a drastic measure, Cox tries to educate and help its account holders as much as possible before resorting to terminating service. In my earlier declaration, I described how the Customer Safety Team works to educate account holders. Dkt. 321 at ¶¶ 23-27. As I stated there, Cox representatives, including the Tier 2, Technical Operations Center, and Customer Safety personnel, work hard to process abuse notices and to assist and educate account holders, most of whom are trying to understand what gave rise to a complaint. Some account holders are less technologically sophisticated than others and will therefore require multiple conversations with one of our representatives before they sufficiently understand the issue and can address the activity that led to the complaint. The Methods and Procedures instruct Cox representatives to remind the account holder or authorized user that he or she may not use Cox Internet services to post, copy, transmit, or disseminate any content that infringes the copyrights of others, and that violation of the Cox Acceptable Use Policy could lead to suspension or termination of the account holder's Internet services. *See* Exhibit 1 at p. 2 & 10. After issuing that warning, Cox's customer service representatives (either Tier 2 or Technical

17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Operations Center personnel) then work with the account holder to diagnose what might have led to the complaint and to remedy the problem. This sometimes involves identifying malware that has infected the account holder's computer, or educating the account holder to remove file sharing software from his or her computer or to secure the wireless connection so that others may not use it for abuse. *See id.* at p. 11-12 & 13. We find that we can often help our account holders address the activity that is the subject of complaints at the warning and suspension phases of our procedure, through an emphasis on education. In most instances, when we have to terminate account holders, it feels like we have failed them: we feel as though we have not given them enough information to make the right decisions, to secure their network, or to help them do whatever they needed to do to stop the alleged complaints. We do, however, recognize that, in some circumstances, the appropriate course of action is not just education but termination.

### Cox Terminates Account Holders Who Are the Subject of Multiple Complaints of Infringement.

19.     Cox's efforts to educate and retain its account holders do not take away from Cox's very real policy of terminating, under appropriate circumstances, account holders who are the subject of multiple complaints of copyright infringement that Cox processes. Under the current graduated response procedure, termination of an account after a final suspension includes disabling of the account holder's modem and removal of the account holder from Cox's billing system. Termination is *termination*. Cox will not permit a terminated account holder to rejoin the network

20.     Sometimes, shortly after we have terminated an account holder

18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

███████████████ This is very rare; we do not reactivate most terminated account holders and they remain off the network.   We do not make the decision to reactivate terminated account holders automatically or by default.  Instead, we consider the situations on a case-by-case basis and consider reactivating a terminated account holder *only* when ██████████ █ ████████

████████████████████████████████████████

█████████████████████████████████

21.  ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ In fact, we did not share this aspect of our process outside of the Customer Safety Team and the Technical Operations Center representatives. Instead, when this type of situation arises, ██████████████████████████

████████████████████████████████████████████

██████████████████████████ In my email in Exhibit 4, I described our ability to reactivate an account as "an unwritten semi-policy."  When I used that phrase, I meant that ██

████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

Reactivation is *not* normal procedure; it occurs in circumstances where we deem it appropriate using our judgment and discretion.

19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

22.     In some of the emails that Plaintiffs filed as exhibits in connection with their motion for summary judgment I refer to "reactivation" after termination of an account holder, including Exhibits 4-5, discussed above.  In one email in particular (Dkt. 317, Ex. 22), in response to an inquiry from a Technical Operations Center representative about what to tell an account holder who was awaiting a call and who was terminated three times, I replied, "DMCA = reactivate . . . ." That email is **Exhibit 8** to this declaration.  My statement did not mean that the Technical Operations Center representative should automatically reactivate the account.  In fact, we eventually terminated this account holder.  Instead, this statement was my shorthand way of stating my understanding that, where an account holder for whom we have received multiple copyright complaints calls in, the graduated response procedure provides that we *could*, in exceptional cases, reactivate where we determined it to be appropriate.  Reactivation is *never* automatic, and I simply meant that, in this scenario, the representative could have a conversation with that account holder and, if he or she felt it appropriate, could reactivate the account.[5]  Where we determine that the account holder continues to fail to correct the problematic behavior, we do terminate the account. For example, one email string that Plaintiffs filed as an exhibit with their motion for partial summary judgment (Dkt. 317, Ex. 23) contains my response to a Technical Operations Center representative seeking advisement about whether to terminate a customer who was previously warned that a next infraction could result in termination of service; I said, "Do it.  They have had plenty of chances to stop." **Exhibit 9** to this declaration is that email string,

---

[5] Reactivation is also not always immediate.  In this same email, I told the customer service representative who was working with the account holder that he could, "make him wait a day or so" if he wanted.  Because of the workload our representatives have in dealing with other abuse complaints, I was indicating that, if the customer service representative was not able to call the account holder today, he could wait a day or two before *calling* the account holder and determining whether to reactivate the account.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

23.     In some instances, the Customer Safety Team also considers reinstating account holders who ███████████████████████████████████████████████. As in the copyright complaint context, if an account holder that we terminated for one of those issues ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ I am aware that Plaintiffs filed as an exhibit an email thread in connection with their motion for partial summary judgment (Dkt. 317, Ex. 20) in which I stated that a Technical Operations Center representative could reactivate an account holder whom we terminated due to a copyright complaint without the Customer Safety Team's "okay" but that, for other abuses such as spam and hacking she needed to give us "a heads up" so that we could collectively look at the account together. That email is **Exhibit 10** to this declaration. When I said this, I was again expressing the concept I described above, that copyright complaints do not pose a giant risk to our network or to the public like phishing, DOS attacks, or hacking, and that the Technical Operations Center representative, could therefore exercise her discretion as to whether the account should be reactivated without needing first to get our approval.

24.     There have been times in my experience dealing with complaints that I have had a gut feeling that a complaint we received was in fact pointing to some sort of bad behavior by one of our account holders.   But in those situations, it would be inappropriate for me to prioritize my "gut" feeling over the graduated response procedure that we have in place.  In Exhibit 2, which I discuss above, I express one of these gut feelings, explaining that I had a feeling the account holder was intentionally committing the behavior leading to the complaints of infringement.  Looking to this aspect of that exchange, although I had a gut feeling that later proved to be unfounded, I nevertheless felt that we had not yet worked with the account holder closely enough and given the holder all proper information to provide education and help the holder correct the situation.  In my

21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

experience, I have found that in the vast majority of cases, we are able to eventually impart to the account holder the knowledge he or she needs to change the behavior and avoid further complaints. In this case, as I discussed above, after speaking with this customer and helping secure the system, we received no further complaints of infringement. And when the account holder does not change the behavior and we continue to receive complaints, we do terminate the account.

### Cox's Work with Complainants and its Interactions with Rightscorp

25.     In my first declaration, I described how Cox works with the many copyright holders or agents who send multiple complaints to Cox to process those complaints. Dkt. 321 at ¶¶ 11-14. To begin with, Cox handles *allegations* of copyright infringement, but is not in a position to know or make a legal determination as to whether our account holders are actual infringers. We therefore do not determine infringement, but instead act on *accusations* of infringement in *proper* notices.

26.     Cox posts online its instructions detailing how copyright holders and their agents can submit notices of claimed infringement, and it communicates with complainants and acts in response to proper notices. As I described in my earlier declaration, when a new complainant submits a complaint, CATS opens a ticket for that complaint and a customer service representative handles it manually. Dkt. 321 at ¶ 11. The customer service representative either works directly with the complainant to resolve any issues and format notices properly for automatic processing by CATS or attempts to identify the account holder associated with the complaint and to forward the complaint to that account holder, along with the appropriate Cox cover email message. The cover email that Cox sends depends on the abuse type in the complaint. **Exhibit 11**, which I also attached to my earlier declaration (Dkt. 321, Ex. 2), is a compilation of form emails that Cox may send to account holders depending on the situation. As I described in my earlier declaration, in order to automate the notice process, we require that the complaint notices properly identify a Cox IP address, have a valid digital signature, and contain the required elements of information required

22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

by Cox in a form parsable by CATS. *See* Exhibit 1 at p. 10; Dkt. 321 at ¶ 12. Automating the notice intake enables Cox to process a much higher volume of abuse complaints than it could ever process manually and to provide a more prompt and efficient response to complainants.

27.    As part of the effort to automate the notice intake and therefore process tickets more efficiently and in higher volume, ███████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████████▌█

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████

————————————————

6 █████████████████████████████

█████████████████████████████

█████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 1:18-cv-00950-PTG-JFA   Document 398-47   Filed 09/25/19   Page 26 of 32 PageID# 16303

28.



29.

24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



31.     As I explained in my earlier declaration, occasionally copyright complainants send Cox notices that include language that does not conform to Cox's notice requirements, such as settlement demands or marketing offers aimed at Cox account holders.  Beginning in 2010, Cox began receiving occasional copyright infringement notices that included demands that Cox account holders make payments in order to settle or resolve the alleged complaints, accompanied by threatening language regarding the risks to the account holder, including the potential loss of Internet service.  When we first began receiving such notices, the Customer Safety Team consulted in-house legal counsel Randy Cadenhead about the notices.  Mr. Cadenhead advised that Cox should decline to forward those notices to Cox account holders because those notices did not properly aim at curbing copyright infringement but instead aimed at coercing payments from Cox account holders by threatening that Cox might terminate Internet service if the account holder did not pay money to the sender of the notice.  Internally, Cox considered such complaints to be a form of blackmail or extortion of our account holders, in which we were not willing to participate. **Exhibit 12** to this declaration is an email string that plaintiffs submitted with their motion (Dkt. 317, Ex. 30) where I acknowledge Cox's years-long policy of refusing complaints containing improper settlement demand language.

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

32.     My interactions and experience with Rightscorp touch on both of the two most significant categories of notice issues that we deal with in working with complainants: improper complaint language and unmanageable (indeed abusive) complaint volumes of knowingly improper notices.  I described in detail in my earlier declaration the numerous issues we encountered when Rightscorp first began sending us complaints in March 2011, including the improper "settlement" language it included and the high volume in which it sent them.  Dkt 321 at ¶¶ 15-22.  Initially, because the notices from Rightscorp contained threats and monetary demands, and based on the guidance the Customer Safety Team had received from our counsel Mr. Cadenhead, we flagged the initial notices from Rightscorp for review and did not forward them to account holders.  After internal discussion, the Customer Safety Team concluded that Rightscorp's notices were not proper and we should not forward them to account holders.  I personally emailed the return address on the notices to notify Rightscorp that "Cox Communications does not accept nor process infringement notices that contain settlement offers.  Please remove the links to the settlement offers from your notices and [sic] will gladly process them."  On March 15, 2011, I followed up on my initial email. **Exhibit 13**, which I also attached to my first declaration (Dkt. 321, Ex. 5), contains that email string.

33.     As I stated in my earlier declaration, I had several conversations with Mr. Cadenhead regarding Rightscorp's' notices, and he confirmed that Cox should not process those notices because of their nature.  Based on Mr. Cadenhead's advice, I instructed the CATS administrator, Brent Beck, to configure CATS automatically to delete complaint notices from Rightscorp without taking any customer-facing action.  Internally, we often refer to that process as "blacklisting," and we have blacklisted complainants other than Rightscorp on the same basis.  Then, in October 2011, Rightscorp began flooding the abuse@cox.net inbox with thousands of notices, as many as 24,000 in one day, which severely burdened CATS's processing capability and

26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

impeded our ability efficiently to process proper notices.  The Customer Safety Team considered Rightscorp's actions hostile and retaliatory.  Based on this drastic increase in the volume of Rightscorp notices, I discussed with Mr. Cadenhead whether we could block Rightscorp's emails at the mail server level so that those notices would not flood the abuse@cox.net inbox with notices that we would not process.  Mr. Cadenhead approved that approach.  At my request, the High Speed Internet Messaging Operations Department, which manages the Cox mail servers, then blocked emails from Rightscorp at the server level, so that the abuse@cox.net inbox no longer accepted them.

34.     It is not true that, after Cox declines to process a deficient notice, we take no further action with respect to that notice.  Instead, Cox makes the effort to work with the complainant to bring the notices into proper form.  Cox is and always has been willing to work with complainants that it had previously blacklisted, and Cox will take them off the blacklist if their notices come into conformity with the proper form.

35.     We did not blacklist Rightscorp secretly or avoid explaining to it our choice to do so.  To the contrary, I communicated with Robert Steele of Rightscorp in an effort to conform Rightscorp's notices to content and a format we would accept.  But, as I mentioned in my previous declaration, Rightscorp refused to modify its form of complaints, and we informed Rightscorp that we would not forward or process its notices of claimed infringement in that form.  While it is true that Rightscorp is the only complainant that we blocked at the mail server level, we did so because it was the only complainant that refused to work with us and retaliated by flooding CATS with such massive numbers of deficient, extortionate notices.

36.     As I explained in my earlier declaration, Cox processes a high volume of notices from many different complainants.  This can create a lot of work for my team, especially when a complainant stubbornly and in bad faith refuses to adhere to Cox's policies that enable us to handle

27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

complaints efficiently and effectively in an automated process and refuses to cooperate with us by correcting the problems in the notices.  In my earlier declaration, I discussed an email where I expressed frustration with the volume of notices my team handles and with Rightscorp's extortionate threats against Cox account holders, which Cox wanted to have no part of, to colleagues in the abuse department of another Internet service provider.  Dkt. 321 at ¶ 27.  That email, which I attached to my earlier declaration (Dkt. 321, Ex. 10), is **Exhibit 14** to this declaration.  I made a similar comment in an earlier online chat (Dkt. 317, Ex. 59) to my colleague, Brent Beck, when discussing a particular complainant, PayArtists, who had sent more complaints of copyright infringement in a single day than all other copyright complainants *combined* had sent that day.  That online chat is **Exhibit 15** to this declaration.  I regret these flippant comments that evidenced my frustration, but my frustration in both cases was real: it arose from both the burdens and the abuses I have observed in how some complainants use the complaint notification process that the Digital Millennium Copyright Act has established.  In particular, Rightscorp's abuses trying to "game" the DMCA system, and its unwillingness to address Cox's concerns with its extortionate "settlement" practices, were a significant cause of my frustration at the time I sent that email in response to a query about Rightscorp.  At times I become similarly frustrated when complainants attempt to flood CATS with an unreasonably high volume of complaints that can end up slowing or even crashing our system.

37.     As I stated in my first declaration, I understand that rights holders are generally not happy with the notification burdens that the Digital Millennium Copyright Act has placed on them.  On the other hand, the practical burdens on us to handle the notifications are also heavy.  My perception, as someone both handling numerous complaints from a wide variety of complainants and working with numerous account holders to curb infringements, is that bad-faith practices of companies like Rightscorp who exploit the DMCA for wrongful purposes have badly twisted the

28

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

DMCA's purpose.  I am aware that Plaintiffs filed a number of emails as exhibits in connection

with their motion for partial summary judgment (Dkt. 317, Exs. 31, 25), where I express my belief

that Rightscorp distorts the purpose of the DMCA.  **Exhibits 16-17** to this declaration are those

emails.  As I said in Exhibit 16 and continue to believe, "[t]he DMCA is about protecting the

copyright, not a new revenue stream."  In Exhibit 17, discussing Rightscorp, I express my lack of

fear of a lawsuit by Rightscorp and my confidence in Cox's handling of DMCA issues.  I also

make a passing comment about "destroying the DMCA."  The context for that statement is, as I

said in my deposition, my belief that the rapid pace at which the Internet grows and changes makes

it hard for a law like the DMCA to keep up.  This leaves room for companies like Rightscorp to

distort the law and its purpose, and the law might therefore need to be reworked because it is

susceptible to these kinds of abuses.  But, as I expressed both at my deposition and in a past email

which I attach to this declaration as **Exhibit 18**, a personal dislike of or frustration with the law

does not mean you break the law.  My perception that companies like Rightscorp exploit the

DMCA does not detract from the seriousness with which I take my responsibility to work with

both complainants and our account holders and to ensure that Cox handles abuse complaints in a

manner that balances the rights and needs of its account holders, the health of its network, and the

rights and needs of those who send us complaints of abuse, including claims of copyright

infringement.

     I declare under penalty of perjury that the foregoing is true and correct.  Executed on

October 12, 2015.

Jason Zabek

29

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2015, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users.

> _/s/ Craig C. Reilly_
> Craig C. Reilly (VSB No. 20942)
> 111 Oronoco Street
> Alexandria, VA  22314
> Tel:  703-549-5354
> Fax:  (703) 549-5355
> Email:  craig.reilly.@ccreillylaw.com
>
> _Counsel for Defendants_

30

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY