# Exhibit K1

**Plaintiffs' SUF and Cox's Responses**

| Plaintiffs' SUF | Cox's Response |
|---|---|
| 1. Plaintiffs are the leading record companies and music publishers in the world, and are the owners and stewards of the copyrighted works of the most legendary artists and songwriters of our time. Their businesses depend on developing this musical talent and protecting the sound recordings and musical compositions that these artists and songwriters create. *See* Blietz Decl. ¶¶ 1, 5; Kokakis Decl. ¶¶ 1, 4; Leak Decl. ¶¶ 1, 3-4; McMullan Decl. ¶¶ 1, 3-4; Patel Decl. ¶¶ 1, 4; and Poltorak Decl. ¶¶ 1, 3-4. | **1. Disputed.** Argumentative. Plaintiffs' businesses depend on exploiting copyrighted works. |
| 2. As a matter of corporate practice and policy, Plaintiffs protect their copyrights, including through registration with the U.S. Copyright Office and by entering into written agreements through which they own or control exclusive rights under copyright. *See* Blietz Decl. ¶ 5; Kokakis Decl. ¶ 5; Leak Decl ¶ 4; McMullan Decl. ¶ 4; Patel Decl. ¶ 4; and Poltorak Decl. ¶ 4. | **2. Disputed.** Argumentative. No evidentiary basis; states a legal conclusion. |
| 3. Plaintiffs own, or have an exclusive license to, the rights under the Copyright Act to reproduce and distribute each of the copyrighted works identified in the Appendices to their respective declarations ("Plaintiffs' Works"). *See* Blietz Decl. ¶¶ 5-111; Kokakis Decl. ¶¶ 5-89; Leak Decl. ¶¶ 4-58; McMullan Decl. ¶¶ 4-57; Patel Decl. ¶¶ 4-136; and Poltorak Decl. ¶¶ 4-39. | **3. Disputed.** Argumentative. States a legal conclusion. Plaintiffs failed to establish ownership or exclusive license to the rights under the Copyright Act, for numerous works. Lane Decl., ¶¶9-166. |
| 4. In an effort to combat online piracy, the record company Plaintiffs authorized their trade association, the Recording Industry Association of America ("RIAA"), to conduct certain anti-piracy activities as to infringement on BitTorrent, Gnutella, eDonkey and Ares peer- to-peer ("P2P") networks. RIAA hired MarkMonitor to identify and report instances of infringement on these networks. *See* Bahun Decl. ¶¶ 4, 7. | **4.** Undisputed that MarkMonitor was hired for the purpose of identifying instances of infringement. Disputed that it was able to do so, as stated in response to SUFs 8, 10, 12, 16, and 17. |
| 5. MarkMonitor is an anti-piracy company headquartered in San Francisco, California. Over half of the Fortune 100 companies, as well as over 1,300+ customers in over 50 countries, including leaders in the technology, fashion, sports, entertainment, pharmaceuticals, media, automotive and healthcare industries, rely on MarkMonitor to help them protect their brands and content online. *See* Bahun Decl. ¶¶ 1-2. | **5. Disputed.** Argumentative. No evidentiary basis of the extent to which companies "rely on MarkMonitor" for purposes relevant to this case: identifying online infringement and sending notices. |
| 6. Cox Communications, Inc. is a broadband communications and entertainment company, providing advanced digital video, highspeed Internet, telephone and home security and automation services over its own nationwide IP network to approximately six million residences and businesses. It is the third-largest U.S. cable TV company based on revenues. CoxCom, LLC is a wholly | **6. Disputed.** Not material as to Cox's cable TV operation and services unrelated to its ISP service. |

1

**Plaintiffs' SUF and Cox's Responses**

| Plaintiffs' SUF | Cox's Response |
|---|---|
| owned subsidiary of Cox Communications, Inc., operates as an Internet Service Provider ("ISP") with support from Cox Communications, Inc., and together they market and sell high-speed Internet services to consumers. Gould Ex. 1 at 2, 53; ECF No. 21 at ¶ 22. | |
| 7. Plaintiffs have not authorized Cox, or its subscribers, to copy or distribute any of Plaintiffs' Works. *See* Blietz Decl. ¶ 10; Kokakis Decl. ¶ 9; Leak Decl. ¶ 10; McMullan Decl. ¶ 10; Patel Decl. ¶ 8; and Poltorak Decl. ¶ 10. | **7. Disputed.** Argumentative; states a legal conclusion. Plaintiffs made no attempt to identify the majority of Cox subscribers, or obtain discovery from any of them. Kearney Dec. ¶¶9-11. Contradicts Plaintiffs' SUF 47. There is no evidence that Plaintiffs are the sole licensing agents for the works in suit. Immaterial as Plaintiffs do not allege direct infringement by Cox. |
| 8. For more than a decade, MarkMonitor has searched for potentially infringing files being copied and distributed on peer-to-peer networks, for RIAA. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *See* Bahun Decl. ¶ 15; Frederiksen-Cross Decl. ¶ 30; Gould Ex. 2. | **8. Disputed.** Not material as to duration of MarkMonitor's activity; no foundation that MarkMonitor always used digital fingerprinting the first time it downloaded a file. For works in suit, the best evidence is that 75% were never matched to an Audible Magic fingerprint. No basis for these claims as to any of the works in suit, as the foundational data for such a claim was spoliated and the summary is inadmissible. *Id.* ¶28, 36 & Exs. K18, K26; *see* ECF 237, 364. |
| 9. A cryptographic hash value is an alphanumerical representation of the contents of a file. Files with the same hash value are identical and will have the same contents. *See* Bahun Decl. ¶¶ 10-11; Frederiksen-Cross Decl. ¶ 16; Gould Ex. 3 (Feamster Tr.) at 186:13–198:03. | **9. Disputed** that a cryptographic hash value is a representation of a file's contents, as it cannot be used to reverse the process from the hash value back to the input from which it was calculated. Declaration of Dr. Nick Feamster ("Feamster Dec.") ¶¶3-8. No evidentiary basis that reported hash values are accurate. Kearney Dec. ¶15, Ex. K8; ¶25, Ex. K15. |
| 10. Prior to sending an infringement notice to Cox, MarkMonitor's proprietary software ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ During that process, Cox subscribers reported, and MarkMonitor's software recorded, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ he Cox subscribers identified in MarkMonitor's notices overwhelmingly reported ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Some of those Cox subscribers, observed by MarkMonitor on different dates over time, reported | **10. Disputed.** States a legal conclusion. No foundation for the source, contents, or accuracy of any notices, and nothing to confirm that files in the Audible Magic database were copies of works in suit, as opposed to other works with the same Artist, Title, and/or Album. Disputed that Cox subscribers reported the percentage of a "confirmed infringing file": no evidence any Cox subscriber reported (or even knew) how much of the work was in the file. Contradicted by SUF 13 (Plaintiffs' agent unable to detect copying between peers). No basis that any file was "confirmed infringing." Kearney Dec. ¶7, |

**Plaintiffs' SUF and Cox's Responses**

| Plaintiffs' SUF | Cox's Response |
|---|---|
| ███████████████████████████████ Thereafter, MarkMonitor would then send infringement notices to Cox. *See* Bahun Decl. ¶¶ 12-14, 16; Frederiksen-Cross Decl. ¶¶ 29, 31- 32, 38-45; Gould Exs. 4, 3 (Feamster Tr.) at 203:13-204:07; 227:25-228:11; 273:13-274:04; 275:11-279:16. | Ex. K6; ¶15, Ex. K8; ¶28-29, Ex. K18 & K19; ¶36 Ex. K26; ¶40, Ex. K30. MarkMonitor destroyed Audible Magic data showing extent to which a file matched a work in suit. *See* ECF 364-11. Fragmentary data MarkMonitor retained shows 42% of downloaded files matched less than 50% of any Audible Magic fingerprint; 48% matched less than 90%. ECF 238-1 at ¶12. The best evidence is that roughly 75% of works in suit were never matched to files located on Cox subscribers' computers. Kearney Dec. ¶36, Ex. K26 (at ¶¶35, 156-159). |
| 11. Examples of Cox subscribers downloading Plaintiffs' Works ████████████████████████ For example, on two different dates in September 2014, MarkMonitor detected a Cox subscriber downloading one of Plaintiffs' Works, eventually amassing the complete audio files. A table reflecting information regarding these detections is below, showing the increasing percentage of the files the Cox subscriber downloaded. ████████████████████████████████████████████████ Frederiksen-Cross Decl. ¶¶ 43-45. | 11. Disputed. Incomplete and misleading. No evidentiary basis for the source of any portion of the file. Mischaracterizes evidence because MarkMonitor's system only obtains metadata from a peer, does not download any content, and cannot show that a peer actually possesses a copy of a file. No evidentiary basis that the 1.65% increment contains a work in suit, or any portion of one. *Id.* ¶8, 11-12, 23; ¶24, Ex. K14; ¶36, Ex. K26. |
| 12. Peer-to-peer networks, including BitTorrent, operate on a "tit for tat" model where peers generally both retrieve and supply files simultaneously. *See* Frederiksen-Cross Decl. ¶ 22; Gould Ex. 5 (Feamster Rept.) at ¶ 71, 3 (Feamster Tr.) at 198:04–201:19. | 12. Disputed. Vague as to "generally," and mischaracterizes evidence: no basis as to protocols other than BitTorrent, or that peers perform "simultaneously," or for what occurred in any particular instance. Merely detecting a peer does not indicate it is either downloading *or* uploading. *Id.* ¶36, Ex. K26; ¶40, Ex. K30; |
| 13. Peer-to-peer networks, including BitTorrent, are designed so that instances of copying files between two peers are unobservable to anyone other than those two peers. As such, it was impossible for MarkMonitor (or any rights holder or vendor) to observe the number of times Cox subscribers downloaded and distributed confirmed infringing files. *See* Bahun Decl. ¶ 14; Frederiksen-Cross Decl. ¶ 33; Gould Ex. 6 (Tregillis Tr.) at 71:22–72:10. | 13. Disputed. Not material: "number of times" alleged infringement occurred is irrelevant to Plaintiffs' claims. No basis that it was "impossible" to make accurate observations; MarkMonitor's witness is not qualified as an expert in any relevant area, and Plaintiffs failed to seek discovery from, or about, any accused Cox subscriber. No basis that BitTorrent (or any network) was "designed" to make copying "unobservable." *Id.* ¶23; ¶24, Ex. K14; ¶25, Ex. K15; ¶39, Ex. K29. |

**Plaintiffs' SUF and Cox's Responses**

| Plaintiffs' SUF | Cox's Response |
|---|---|
| 14.  From January 2012 through November 26, 2014, MarkMonitor sent Cox 260,873 infringement notices. During the Claim Period alone, MarkMonitor sent Cox 163,148 infringement notices. The foregoing notices were made under penalty of perjury by RIAA and included the elements of information required under the Digital Millennium Copyright Act, 17 U.S.C. § 512(c)(3)(A). The notices contained, inter alia, an identification of the Cox subscriber by IP address, the specific date and time of the infringing act, a cryptographic hash value pertaining to the file, a representative sample of what was infringed, and the peer-to-peer network used. *See* Bahun Decl. ¶¶ 17-18, 21-22; Gould Exs. 7, 8 (Beck Tr.) at 45:05-23, 9. | 14. **Disputed.** States a legal conclusion. RIAA Notices were not "made under penalty of perjury," did not comply with the DMCA, and did not contain a "sample" of infringed content. Because a cryptographic hash function cannot be used to reverse the process from the hash value back to the input, the hash value does not "pertain" to the file in any meaningful way. *Id.* ¶13, Ex. K7; ¶14; ¶15, Ex. K8; ¶25, K15; ¶26, Ex. K16; ¶27, Ex. K17; ¶40, Ex. K30; Feamster Dec. ¶¶3-4, 8. |
| 15.  Upon receipt of MarkMonitor's infringement notices, Cox [REDACTED]. Cox's records indicate that MarkMonitor's notices in this case pertained to a total of 57,679 Cox subscribers: 54,886 (95%) were residential customers; and 2,793 (5%) were business customers. Gould Ex. 10 at ¶ 3, 11 (Stipulated Order); McCabe Decl. ¶ 8. | 15. **Disputed.** Cox's CATS system tracks notices by account number, not "subscriber." Kearney Dec. ¶44, Ex. K34. These numbers do not match those in McCabe SJ Dec. ¶8. |
| 16.  Each of Plaintiffs' Works was the subject of infringement notices from MarkMonitor to Cox during the Claim Period. In other words, each of Plaintiffs' Works was contained within the digital files identified by hash value in MarkMonitor's infringement notices to Cox. The infringement notices informed Cox that the subscribers identified in those notices downloaded and/or distributed the infringing digital files identified in the notices. In fact, each of Plaintiffs' Works was the subject of infringement notices from MarkMonitor to Cox during the Claim Period regarding a subscribers' third or later infringement notice. *See* McCabe Decl. ¶ 7; *See also* Gould Ex. 12 (Tregillis Rebuttal Rept.) at ¶ 26.<br><br>fn.3    As of his June 24, 2019 deposition, Cox's expert, Christian Tregillis, had matched over 95% of Plaintiffs' Works to the infringing files referenced in the infringement notices. As to the remaining 5%, Mr. Tregillis did not dispute Professor McCabe's finding that there are corresponding infringement notices that Cox received. Rather, Mr. Tregillis simply had not yet made the connection or was unable to do so. Gould Ex. 6 (Tregillis Tr.) at 18:12–19:7. Under the more stringent "third or later" paradigm, Mr. Tregillis had matched over 90% of Plaintiffs' works in suit to the allegedly | 16. **Disputed.** States a legal conclusion. No foundation for the source, contents, or accuracy of any notices. The RIAA Notices identified only 1,998 works by Title and Artist. *Id.* ¶21-22, Ex. K13_A, B. Incomplete and misleading as to testimony of Tregillis, who was only able to perform his analysis based on information Plaintiffs produced in discovery. Tregillis did not analyze audio files but only performed hash-value matching. *Id.* ¶37, Ex. K27 (at, e.g. ¶¶13, 35, 38). |

4

**Plaintiffs' SUF and Cox's Responses**

| Plaintiffs' SUF | Cox's Response |
|---|---|
| infringing files referenced in the infringement notices as of the date of his Rebuttal Report (May 15, 2019). Tregillis testified that he found additional matches after the date of his rebuttal report. Gould Ex. 6 (Tregillis Tr.) at 116:4-119. | |
| 17. The digital files identified by hash values in MarkMonitor's notices of infringement to Cox have been produced in discovery. Anyone can listen to the audio recordings within those files. *See* Bahun Decl. ¶ 24; Gould Ex. 7, 13. | **17. Disputed.** No evidentiary basis to link digital audio files to Audible Magic, MarkMonitor, or any online source; no foundation that the files are copies of works in suit. Hash values do not "identify" a digital file in any meaningful sense. Feamster Dec. ¶¶3-4, 8. No one has listened to all 33,000 recordings on the hard drive and no reference files have been produced in discovery to which the hard drive files can be matched. Approximately 10,000 hash values of files downloaded by MarkMonitor do not match any hash value in the hard drive directory. ECF 364-8, 9, 10. No reliable basis to infer that files the hard drive are copies of all works in suit on a hash matched basis, because fewer than 25% of works in suit have been matched to an Audible Magic reference file. Kearney Dec. ¶5, Ex. K4; ¶7, Ex. K6; ¶15, Ex. K8; ¶36, Ex. K26 (at ¶¶35, 156-159). |
| 18. When Cox forwarded MarkMonitor's notices to Cox's subscribers, Cox directed its subscribers to ███████████████████████████████ Gould Ex. 14. | **18. Disputed.** The term "directed" mischaracterizes the documents. Kearney Dec. ¶18. |
| 19. None of the Cox subscribers who were the subject of MarkMonitor's notices to Cox during the Claim Period provided a counter-notification to Cox to dispute the allegations of infringement pursuant to 17 U.S.C. § 512(g)(3). Nor did any of those Cox subscribers send an email to RIAA or MarkMonitor to dispute the infringement allegation. *See* Bahun Decl. ¶ 21; Gould Decl. ¶¶ 6-7. | **19. Disputed.** States a legal conclusion. Contradicted by Plaintiffs' documents. Highly misleading because multiple Cox subscribers contacted MarkMonitor by means other than email. Immaterial because § 512(g)(3) does not apply. *Id.* ¶14; ¶19, Ex. K11; ¶20, Ex. K12. |
| 20. Cox was aware not only that its subscribers were infringing but that they were doing so intentionally. *See* Gould Exs. 15-18. | **20. Disputed.** Legal conclusion; misleading; testimony contradicts this. *Id.* ¶47-48, Ex. K37, K38. |
| 21. Cox subscribers required Internet access to upload and download digital files on the BitTorrent, Gnutella, eDonkey and Ares peer-to-peer networks. *See BMG v. Cox*, 149 F. Supp. 3d 634, 674 (E.D. Va. 2015);[fn 4] *see also* Bahun Decl. ¶ 8; Frederiksen-Cross Decl. ¶¶ 6-15.<br><br>fn. 4   Some of these Statements of Undisputed Fact cite this Court's summary judgment decision in favor of BMG against Cox on Cox's DMCA safe harbor defense and/or the Fourth | **21. Disputed.** States a legal conclusion and is argumentative. Misleading as there is no evidence that Cox's ISP network was used, and Internet access is widely available from multiple sources. Collateral estoppel is inapplicable, *see infra* at § VI. |

**Plaintiffs' SUF and Cox's Responses**

| Plaintiffs' SUF | Cox's Response |
|---|---|
| Circuit's affirmance of the decision. BMG v. Cox, 149 F. Supp. 3d 634 (E.D. Va. 2015), aff'd in part, rev'd in part, 881 F.3d 293 (4th Cir. 2018). Cox is bound by those factual determinations. "Collateral estoppel forecloses the religitation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom issue preclusion is asserted had a full and fair opportunity to litigate." Sedlack v. Braswell Servs. Group, 134 F.3d 219, 224 (4th Cir. 1998) (internal quotations and citations omitted). The facts that underpin this Court's summary judgment decision against Cox involve Cox's own behavior and meet each of the elements for collateral estoppel to apply. See In re Microsoft Corp. Antitrust Litig., 355 F.3d 322, 326 (4th Cir. 2004) (setting forth elements). | |
| 22. Cox's Acceptable Use Policy ("AUP"), which was a condition of use for a Cox subscriber to use Cox's Internet service, prohibited subscribers from infringing anyone's copyrights and prohibited subscribers from violating the law. Under the AUP, at all relevant times, Cox had the right to terminate its subscribers' access to its Internet service, including the right to terminate service for any subscriber who uses Cox's service to infringe copyrights. See BMG v. Cox, 149 F. Supp. 3d at 640; See also Gould Exs. 19-21. | 22. **Disputed.** States a legal conclusion, argumentative, and mischaracterizes documents. Cox's Acceptable Use Policy speaks for itself. Collateral estoppel is inapplicable, see infra at § VI. Kearney Dec. ¶34, Ex. K24 (at ¶¶146, 147-152, 153-158). |
| 23. The volume of copyright infringement notices that Cox received and accepted from copyright owners or their agents informing Cox of specific subscribers using its Internet service to infringe ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮:<br><br>▮ ▮ ▮ ▮ ▮ ▮ ▮<br>▮ ▮ ▮ ▮ ▮ ▮ ▮<br><br>See Gould Exs. 22 [COX_BMG00213162, COX_SONY_00001408]; 24 at Interr. No. 5; 25. [fn 5]<br><br>fn. 5 These numbers include Plaintiffs' notices, though they understate the amount of infringement on Cox's Internet service for multiple reasons. For instance, they do not count notices not sent to Cox because of the daily limit on notices per rights owner that Cox imposed. In addition, they do not include the voluminous infringement notices that Cox blocked at the mail server level (e.g., from Rightscorp) and thus never processed. | 23. **Disputed.** No evidentiary basis for 2003-2010 or fn. 5; argument, not fact. States a legal conclusion. No basis for the contents, accuracy, or reliability of third party notices which (like Plaintiffs' notices) are not by themselves evidence of infringement. The Rightscorp notices are not part of the record in this case, entirely lack foundation, and are disputed. Id. ¶3, Ex. K2. |

**Plaintiffs' SUF and Cox's Responses**

| Plaintiffs' SUF | Cox's Response |
|---|---|
| 24. As the volume of infringement notices spiked, Cox took the following steps: | 24. **Disputed** for the reasons stated below. Each sub-paragraph states a legal conclusion and is argumentative. Collateral estoppel is inapplicable here, *see infra* at § VI. |
| a)      Cox implemented a policy whereby it ignored, and failed to alert a subscriber concerning, the first copyright infringement notice Cox received for that subscriber. *See BMG v. Cox*, 149 F. Supp. 3d at 640-41; *see also* Gould Ex. 22. | a) **Disputed.** Cox did not "ignore" notices, and the record shows that many subscribers never received a second notice. Kearney Dec. ¶1, Ex. K9; ¶41, Ex. K31; ¶47, Ex. K37; ¶48, Ex. K38. |
| b)      [REDACTED] *See* Gould Exs. 26 at 5; 27 at 11; 28 at 13; 29 at 11-12. | b) **Disputed.** Immaterial as to policies in effect, and actions taken, before the Claims Period. Cox's Customer Safety personnel had discretion and could "consider" terminating (and actually terminate) a subscriber at any time. *Id.* ¶41, Ex. K31. |
| c)      Cox capped the number of incoming infringement notices it would accept per day per entity, set at a default of 200, but later raised the cap to 600 for RIAA. *See BMG v. Cox*, 881 F. 3d at 299; *See also* Gould Ex. 30-31. | c) **Disputed.** Limit applied over a rolling 24-hour period, not a calendar day. *Id.* ¶44, Ex. K34. Undisputed that Cox raised the cap to 600 for RIAA. Collateral estoppel is inapplicable here. |
| d)      Cox counted only 1 notice per subscriber per day such that if a subscriber generated 10 notices in a day, they were all "rolled up" into a single ticket. *See BMG v. Cox*, 881 F. 3d at 299; *See also* Gould Ex. 32 at ¶ 8. | d) **Disputed.** Contradicted by SUF 23. Cox "counted" each ticket regardless of whether it was "rolled up." Kearney Dec. ¶44, Ex. K34. No evidentiary basis for 10 notices being "rolled up" into one ticket. Collateral estoppel is inapplicable here, *see infra* at § VI. |
| e)      Cox reset a subscriber's 13-strike counter every 6 months. *See BMG v. Cox*, 881 F. 3d at 299; *See also* Gould Ex. 32 at ¶ 12. | e) **Disputed.** No evidentiary basis, misstates evidence. The number of notices was counted over a rolling 6-month window; there could only be a "reset" if the subscriber had zero notices for 6 straight months. Kearney Dec. ¶44, Ex. K34. Collateral estoppel is inapplicable here. |
| f)      Cox blacklisted various entities, including Rightscorp, and refused to process, or even accept, millions of copyright infringement notices from them. *See* Beck Depo. 68-73; Gould. Exs. 30; 24 at Interr. No. 5. | f) **Disputed.** No evidentiary basis for the contents, accuracy, or reliability of third party notices which (like Plaintiffs' notices) are not by themselves evidence of infringement. The Rightscorp notices are not part of the record in this case, entirely lack foundation, and are disputed. Immaterial as Cox did not block Plaintiffs' notices at any relevant time. Kearney Dec. ¶3, Ex. K2. |
| g)      [REDACTED] . *See* Gould Ex. 33. | g) **Disputed.** Cox had many employees in call centers around the country. *Id.* ¶47, Ex. K37. |

**Plaintiffs' SUF and Cox's Responses**

| Plaintiffs' SUF | Cox's Response |
|---|---|
| h) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Gould Ex. 34. | h) **Disputed.** Misleading, as Cox personnel could (and did) manually suspend subscribers; the limit could be temporarily lowered in response to emergencies (like hurricanes). Misleading as to whether suspensions were "temporary." *Id.* ¶47, Ex. K37. |
| 25. Prior to the fall of 2012, Cox did not follow its policy for terminating the accounts of repeat infringer subscribers. Instead, Cox employees followed an unwritten policy put in place by senior members of Cox's abuse group whereby accounts that were used to repeatedly infringe copyrights would be nominally terminated—only to be reactivated upon request, and the subscriber would start the graduated response process all over again with a clean slate. *See BMG v. Cox*, 149 F. Supp. 3d at 655-58; *See also* Gould Ex. 35 (Zabek Tr.) at 137:10–140:20. | 25. **Disputed.** Incomplete and misleading. Cox's Customer Safety personnel had discretion and could "consider" terminating (and actually terminate) a subscriber at any time. *Id.* ¶41, Ex. K31. Collateral estoppel is inapplicable here, *see infra* at § VI. |
| 26. After the fall of 2012, Cox essentially stopped terminating repeat infringer subscribers altogether despite receiving an increasing number of infringement notices every year and continuing to receive infringement notices informing it of specific repeat infringing subscribers. *See BMG v. Cox*, 149 F. Supp. 3d at 658-62; *See also* Gould Ex. 23 at Interr. No. 8, 35 (Zabek Tr.) at 101:14–102:15. | 26. **Disputed.** Misleading. Cox's Customer Safety personnel had discretion and could "consider" terminating (and actually terminate) a subscriber at any time. *Id.* ¶41, Ex. K31. Collateral estoppel is inapplicable here, *see infra* at § VI. |
| 27. Throughout 2013 and 2014, Cox's automated system for responding to infringement notices employed a 13-strike policy before a subscriber even would be considered for termination. Under that policy, Cox took no action upon receiving a first notice reporting a subscriber's infringement. The second through seventh notices each resulted in CATS generating an email from Cox to the subscriber explaining the alleged infringement and including the complete text of the infringement notice Cox received from the copyright owner. When Cox received an eighth and ninth notice for a particular subscriber, it suspended the subscriber's account and placed the subscriber in what Cox called a "soft-walled garden," meaning that the subscriber's internet access was temporarily limited to a single webpage that displayed a warning message. The subscriber could exit the soft-walled garden and self-reactivate his or her Internet service simply by clicking a link on the webpage. Upon Cox's receipt of a tenth and eleventh notice, the subscriber would be placed in a "hard-walled garden," which directed the subscriber to a webpage with instructions to call Cox customer service. When the subscriber called Cox, he or she was reactivated upon request. The twelfth and thirteenth notices also resulted in subscribers being placed in a hard-walled garden, but they had to speak to | 27. **Disputed.** Argumentative. Cox's Customer Safety personnel had discretion and could "consider" terminating (and actually terminate) a subscriber at any time. Collateral estoppel is inapplicable here. Cox terminated subscribers, unlike other major ISPs. *Id.* ¶41, Ex. K31; ¶34, Ex. K24. |

**Plaintiffs' SUF and Cox's Responses**

| Plaintiffs' SUF | Cox's Response |
|---|---|
| a higher-level Cox customer service representative to be reactivated. It was only upon receipt of a fourteenth complaint in an abuse cycle that Cox would review the full account history of the subscriber and consider termination. Termination was never automatic, however, and was left to the discretion of Cox employees. *See* BMG v. Cox, 149 F. Supp. 3d at 640-41; *See also* Gould Exs. 29, 36 at ¶¶ 8-11. | |
| 28. Cox made every effort to avoid terminating subscribers, even those that were the subject of fourteen or more infringement notices. Despite having a repeat infringer policy in concept, Cox's implementation of the policy, or lack thereof, rendered the policy an "absolute mirage." Cox very clearly determined not to terminate subscribers who in fact repeatedly violated Cox's policy. *See* BMG v. Cox, 149 F. Supp. 3d at 658-62; *See also* Gould Exs. 23 at Interr. No. 8, 25. | **28. Disputed**. Argumentative and misleading. *Id.* ¶42, Ex. K22. Cox actually terminated subscribers, unlike other major ISPs. *Id.* ¶34, Ex. K24 (at ¶¶146, 147-152, 153-158). Collateral estoppel is inapplicable here, *see infra* at § VI. |
| 29. In 2013 and 2014, Cox terminated approximately ▆ residential subscribers for non-payment of subscription fees. *See* Gould Exs. 37-38. Yet, in that same time frame, Cox claims to have terminated only ▆ subscribers for copyright infringement. *See* Gould Ex. 23 at Interr. No. 8. | **29.** Undisputed but immaterial. No basis for comparing non-payment disconnections to copyright infringement terminations. |
| 30. During the Claim Period, which is slightly narrower than the full 2013 and 2014 calendar years, Cox accepted ▆ copyright infringement notices, but sent only ▆ warnings to subscribers, and terminated only ▆ subscribers' accounts (▆). *See* Gould Exs. 23 at Interr. No. 8, 24 at Interr. No. 5, 25. | **30. Disputed.** Misleading: ▆ figure erroneously conflates "subscribers' accounts" and "infringement notices." Given approximately 6 million Cox subscribers, *see* SUF 6, this averages less than ½ notice per subscriber per year. |
| 31. Despite receiving MarkMonitor's infringement notices reporting specific Cox subscribers who were engaging in repeated infringement, Cox virtually always continued to provide those subscribers with Internet access. Of the 57,679 Cox subscribers who were the subject of MarkMonitor's notices during the Claim Period, Cox's records reflect that from 2012- 2014: | **31. Disputed.** Legal conclusion. Misleading. The record shows that Cox's Graduated Response Program was effective in stopping infringement on Cox's network. *Id.* ¶35, Ex. K25 (at ¶57). No evidentiary basis for the accuracy or contents of third-party notices; misleading as to Plaintiffs' notices, whose accuracy is disputed. Kearney Dec. ¶3, Ex. K2. Cox actually terminated subscribers, unlike nearly every other ISP. *Id.* ¶34, Ex. K24 (at ¶¶146, 147-152, 153-158). |
| a) ▆ subscribers appeared in 3 or more notices; | |
| b) ▆ subscribers appeared in 6 or more notices; | |
| c) ▆ subscribers appeared in 10 or more notices; | |
| d) ▆ subscribers appeared in 13 or more notices; | |
| e) ▆ subscribers appeared in 14 or more notices; and | |
| f) Cox terminated only ▆ of those subscribers' accounts. | |

9

**Plaintiffs' SUF and Cox's Responses**

| Plaintiffs' SUF | Cox's Response |
|---|---|
| 32.  During the Claim Period, Cox also received infringement notices from other rights owners concerning thousands of the same Cox subscribers identified in MarkMonitor's infringement notices. At least ███████ the same Cox subscribers in MarkMonitor's notices were the subject of at least one infringement notice from another copyright owner during the Claim Period. *See* McCabe Decl. ¶ 8; *See also* Gould Ex. 39. | **32. Disputed.** Legal conclusion. No foundation for third-party notices, whose contents, accuracy, and reliability are unsubstantiated. Notices are "[a] manifestation of the system" that generated them, and cannot be relied on as "accurate evidence of infringement." *Id.* ¶3, Ex. K2. |
| 33.  By way of example, the following residential Cox subscribers, identified by their ICOMS IDs, were the subject of ███████ including during the Claim Period. ███████ Gould Exs. 7, 39-40. | **33. Disputed**, for the same reasons as SUF 32. Legal conclusion. To the extent accounts are for business subscribers, they serve multiple end-users. |
| 34.  During the Claim Period, Cox refused to accept infringement notices from Rightscorp on behalf of BMG Rights Management (US) LLC. Cox "blacklisted" Rightscorp resulting in Cox automatically deleting millions of incoming infringement notices from Rightscorp. *See BMG v. Cox*, 149 F. Supp. 3d at 642; *See also* Gould Ex. 42 (BMG Cadenhead Tr.) at 82:15–87:2; Gould Exs. 41 [Zabek email thread re RC notices], 24 [Cox 3d Resp. to BMG 1st rogs] at Interr. No. 5. | **34. Disputed.** No evidentiary basis or foundation for the contents, accuracy, or reliability of third party notices which (like Plaintiffs' notices) are not by themselves evidence of infringement. *Id.* ¶3, Ex. K2. The Rightscorp notices are not part of the record in this case, entirely lack foundation, and are disputed. Collateral estoppel is inapplicable here, *see infra* at § VI. |
| 35.  The Rightscorp infringement notices, which Cox automatically blocked without processing ███████ For example, Cox's Ticket Data identifies a subscriber with ███████ Gould Ex. 43. An excerpt of the Rightscorp notice data limited to the same IP address and time period is nearly 100 pages long. Gould Ex. 44 [PX 34; BMG PX2538]. Additional examples are shown in | **35. Disputed.** No evidentiary basis or foundation for the contents, accuracy, or reliability of third party notices which (like Plaintiffs' notices) are not by themselves evidence of infringement. *Id.* ¶3, Ex. K2. The Rightscorp notices are not part of the record in this case, entirely lack foundation, and are disputed. Collateral estoppel is inapplicable here, *see infra* at § VI. |

**Plaintiffs' SUF and Cox's Responses**

| Plaintiffs' SUF | Cox's Response |
|---|---|
| exhibits to the Gould declaration. *See* Gould Exs. 45-48 [Various files showing Cox Ticket Data compared to Rightscorp Ticket data]. | |
| 36. Cox had a tiered pricing structure through which it charged Internet subscribers higher monthly fees for increased data allowances. Below is an example of Cox's tiered pricing structure applicable during the Claim Period.<br><br>*See* Gould Ex. 49 [Cox_Sony_00515537]. | **36. Disputed.** Document does not reflect a "Data Usage Allowance." During Claims Period, Cox did not charge for excessive data consumption. *Id.* ¶31, Ex. K21; ¶43, Ex. K33; ¶45, Ex. K35. |
| 37. Cox received ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ by continuing to provide Internet service to specific Cox subscribers who were repeatedly identified in infringement notices, rather than terminating those subscribers' accounts. Cox revenues from retaining ▮▮▮ residential subscribers who were the subject of 3 or more infringement notices during the Claim Period were at least ▮▮▮▮▮▮, and in that same period Cox's revenues from retaining ▮ residential subscribers who were the subject of 5 or more infringement notices were at least ▮▮▮▮▮▮. *See* Lehr Decl. ¶¶ 10, 18; *See* also Gould Ex. 39, 50-53. | **37. Disputed.** Misleading; argument, not fact. The cited document shows how much Cox billed these subscribers based on available ICOMS data. |
| 38. By not terminating specific repeat infringer subscribers, Cox also avoided direct incremental costs it would have otherwise incurred. *See* Lehr. Decl. ¶¶ 10, 15. | **38. Disputed.** Legal conclusion, and lacks evidentiary basis. Dr. Lehr's declaration is unsubstantiated, and he admitted that he did not attempt to quantify what, if any, costs Cox saved by not terminating specific repeat infringers. *Id.* ¶30, Ex. K20. |
| 39. The goal of keeping revenue from paying subscribers drove Cox's decisions not to terminate the Internet service of its subscribers who repeatedly appeared in infringement notices. In assessing whether to terminate subscribers based on receipt of multiple copyright infringement notices, Cox prioritized its financial interest in keeping customer relationships and obtaining revenue. *See BMG v. Cox*, 881 F.3d at 304-05; *See also* Gould Exs. 52, 54-56, 62-67, 35 (Zabek Tr.) at 144:5–145:23 | **39. Disputed.** Argument, not fact. No evidentiary basis that Cox had such a "goal" or that it "drove Cox's decisions." Drs. Lehr and McGarty are not experts in this area, and their speculations rely solely on internal Cox documents and employee testimony. *Id.* ¶42, Ex. K32; ¶31, Ex. K21 (at Appx. B); ¶49, Ex. K39. Collateral estoppel is inapplicable here, *see infra* at § VI. |
| 40. The increased data consumption from infringing peer-to-peer activity on the Internet also inured to Cox's financial benefit, as subscribers who consumed more data paid higher monthly fees for Internet service. | **40. Disputed.** Legal conclusion, misleading, and argumentative. There is no evidence that subscribers elected higher-tiered plans to infringe, and Dr. Lehr admitted that the data does |

11

**Plaintiffs' SUF and Cox's Responses**

| Plaintiffs' SUF | Cox's Response |
|---|---|
| | not show anything but that subscribers paid a flat rate for the service they elected. Peer-to-peer applications have many legitimate uses. *Id.* ¶25, Ex. K16; ¶30, Ex. K20; ¶31, Ex. K21; ¶45, Ex. K35. |
| a) Peer-to-peer file sharing, including the unlawful uploading and downloading of copyrighted works, ▮▮▮▮▮ *See* Gould Ex. 57 (Summers Tr.) at 34:19–35:2. | a) **Disputed.** Legal conclusion, misleading. Cited testimony does not support this statement. In addition, peer-to-peer applications have many legitimate uses, and there is no basis to assume, and the testimony cited does not support, that peer-to-peer traffic involves infringement. *Id.* ¶25, Ex. K15; ¶40, Ex. K30; ¶46, Ex. K36; ¶47, Ex. K37. |
| b) According to a ▮▮▮▮▮ presentation by Cox's consultant, inCode ▮▮▮▮▮ *See* Gould Ex. 58 at 4. | b) **Disputed.** No basis to apply unauthenticated third party summary data for 2011, covering "Total US usage," to Cox subscribers during 2013 and 2014. Immaterial. *Id.* ¶32, Ex. K22. |
| c) Peer-to-peer activity frequently involved copyright infringement. *See* Gould Exs. 16; 59 (Fuenazlida Tr.) at 172–73, 127–30; 60 (Basquin Tr.) at 126–27; Lehr Decl. ¶ 22. | c) **Disputed.** Legal conclusion, and argument, not fact. Lacks evidentiary basis, and so vague as to render this statement meaningless. Peer-to-peer applications have many legitimate uses. *Id.* ¶25, Ex. K15; ¶40, Ex. K30; ¶46, Ex. K36; ¶47, Ex. K37. |
| d) ▮▮▮▮▮ *See* Gould Ex. 59 (Fuenzalida Tr.) at 165–169. | d) **Disputed.** Misleading, and no basis for this testimony as Fuenzalida has no personal or expert knowledge and does not work for Cox. Cox does not make marketing decisions based on peer-to-peer usage metrics. *Id.* ¶32, Ex. K22; ¶44, Ex. K35. |
| e) ▮▮▮▮▮ *See* Lehr Decl. ¶¶ 23-24. | e) **Disputed.** Misleading: no basis to extrapolate from ▮ subscribers to 6 *million* subscribers (SUF 6). No evidence subscribers elected higher-tiered plans to infringe. Lehr admitted the data shows only that subscribers paid a flat rate for the service they elected. *Id.* ¶30, Ex. K20. |
| 41. Cox adduced no evidence that Plaintiffs have failed to join any indispensable parties. | 41. **Disputed.** No evidentiary basis; argument, not fact. Plaintiffs have failed to prove they own multiple works at issue, and have failed to join the true owners. *See infra*, § II. |
| 42. Cox adduced no evidence that Plaintiffs failed to mitigate damages. | 42. **Disputed.** Argument, not fact; no evidentiary basis; mischaracterizes evidence; misleading. Plaintiffs did not pursue legal action against any subscribers listed in the RIAA Notices, and sent fewer than the 600 notices per day that were |

**Plaintiffs' SUF and Cox's Responses**

| Plaintiffs' SUF | Cox's Response |
|---|---|
|  | permitted. *Id.* ¶11-12; ¶38, Ex. K28. |
| 43.  For each of Plaintiffs' Works, Cox adduced no evidence that the copyright registrations upon which Plaintiffs rely in this action were issued after the alleged infringements and more than three months after first publication of the works. | **43. Disputed.** Several of Plaintiffs' works were registered either after the claim period, or during the claim period but after the alleged infringement. Lane Dec., ¶166. |
| 44.  For each of Plaintiffs' Works, Cox adduced no evidence of any intentional misstatements or fraud in obtaining the copyright registrations upon which Plaintiffs rely in this action. | **44. Disputed.** Plaintiffs intentionally registered sound recordings in suit as works made for hire, for an improper purpose. Lane Dec., ¶12. Kearney Dec. ¶33, Ex. K23. |
| 45.  For each of Plaintiffs' Works, Cox adduced no evidence that Plaintiffs failed to comply with any renewal, notice or registration requirements. | **45. Disputed.** Misleading as to a legal conclusion on which Plaintiffs have the burden of proof. |
| 46.  It is Plaintiffs' general practice to publish their sound recordings with copyright notices in the form and position set forth 17 U.S.C. § 402(b) and (c). *See* Leak Decl. ¶ 8, McMullan Decl. ¶ 8, and Poltorak Decl. ¶ 8. | **46. Disputed.** Legal conclusion, and factually incorrect: a digital file cannot be so marked. *See* SUF 47 (Plaintiffs' Works "widely available on authorized Internet-based digital music services.") |
| 47.  At all relevant times, including but not limited to when Cox received infringement notices from Plaintiffs, Cox had access to published copies of Plaintiffs' Works. Plaintiffs' Works have been made widely available on authorized Internet-based digital music services. *See* Blietz Decl. ¶ 7; Kokakis Decl. ¶ 4; Leak Decl. ¶ 8; McMullan Decl. ¶ 8; Patel Decl. ¶ 6; and Poltorak Decl. ¶ 8. | **47. Disputed.** Plaintiffs' notices failed to identify particular sound recordings or musical compositions allegedly infringed, since they "identified" only sound recordings, and provided only a title and recording artist, which is ambiguous. Contradicts SUF 7 claiming Plaintiffs did not "authorize" Cox or its subscribers to copy or distribute works in suit. |