**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

SONY MUSIC ENTERTAINMENT, *et al.*,

       *Plaintiffs*,

       v.

COX COMMUNICATIONS, INC., *et al.*,

       *Defendants.*

Case No. 1:18-cv-00950-LO-JFA

**DEFENDANTS' MEMORANDUM IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**[PUBLIC VERSION]**

# Contents

INTRODUCTION ................................................................................................................ 1

RESPONSE TO STATEMENT OF DISPUTED MATERIAL FACTS ...................................... 3

ARGUMENT ................................................................................................................... 11

I.    PLAINTIFFS CANNOT ESTABLISH THE ALLEGED UNDERLYING DIRECT
      INFRINGEMENT................................................................................................... 11

      A.    Plaintiffs lack admissible evidence that Cox's subscribers possessed copies of the
            works in suit, and if so, whether those copies were unlawfully obtained............. 12

      B.    Plaintiffs lack evidence as to the identities of the allegedly directly infringing Cox
            Business subscribers. ....................................................................................... 18

      C.    Plaintiffs lack evidence sufficient to prove a violation of either the reproduction
            right or the distribution right conferred by 17 U.S.C. §106................................. 19

            1.    Plaintiffs lack evidence of unlawful reproduction. ................................... 19

            2.    Plaintiffs lack evidence of unlawful distribution. ..................................... 21

II.   PLAINTIFFS LACK SUFFICIENT EVIDENCE OF OWNERSHIP FOR MANY
      WORKS IN SUIT. ................................................................................................. 23

III.  PLAINTIFFS LACK EVIDENCE OF CONTRIBUTORY INFRINGEMENT BY
      DEFENDANTS ..................................................................................................... 26

      A.    Plaintiffs Cannot Establish Cox's Knowledge of Alleged Infringements ........... 27

            1.    The Music Publisher Plaintiffs never provided any notice to Cox ........... 27

            2.    Alleged infringement occurring at a Cox Business subscriber's IP address
                  is insufficient to support liability by the Cox Business subscriber.......... 27

            3.    Plaintiffs' notices identified fewer than 2,000 works in suit ................... 28

            4.    Plaintiffs' notices were otherwise insufficient to give Cox knowledge. .. 28

            5.    Plaintiffs lack evidence of willful blindness............................................ 29

      B.    There is no evidence that Cox materially contributed to alleged infringement.... 31

IV.   PLAINTIFFS LACK EVIDENCE TO SUPPORT VICARIOUS LIABILITY.............. 31

      A.    There is no evidence that Cox had an obvious and direct financial interest in
            infringement of works in suit. ........................................................................... 32

      B.    Cox did not have the right and ability to supervise alleged infringing activity.... 34

V.    PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON COX'S
      AFFIRMATIVE DEFENSES. ................................................................................. 36

      A.    Plaintiffs' motion for summary judgment on "improper" affirmative defenses is
            legally inadequate and untimely. ....................................................................... 36

      B.    Plaintiffs are not entitled to summary judgment on innocent infringement. ........ 36

C.      Plaintiffs are not entitled to summary judgment on failure to mitigate. ............... 38

VI.    PLAINTIFFS CANNOT ASSERT NONMUTUAL OFFENSIVE COLLATERAL
       ESTOPPEL AGAINST COX. ........................................................................................... 39

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allen v. Zurich Ins. Co.*,
    667 F.2d 1162 (4th Cir. 1982) ............................................................40

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
    2001 WL 1180469 (W.D. Va. 2001) .....................................................36

*Arista Records, Inc. v. MP3Board, Inc.*,
    2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002).......................................23

*Arista Records v. Flea World*,
    356 F. Supp. 2d 411 (D.N.J. 2005) .....................................................39

*BMG v. Cox*,
    881 F.3d 293 (4th Cir. 2018) .........................................................22, 26

*BMG v. Cox*,
    149 F. Supp. 3d 634 (E.D. Va. 2015) ............................................ *passim*

*BMG v. Cox*,
    199 F. Supp. 3d 958 (E.D. Va. 2016) .....................................................34

*Cobbler Nevada, LLC v. Gonzales*,
    901 F.3d 1142 (9th Cir. 2018) ............................................12, 18, 19, 27

*Columbia Pictures Indus., Inc. v. Fung*,
    710 F.3d 1020 (9th Cir. 2013) .......................................................19, 20

*Corbis Corp. v. Amazon.com, Inc.*,
    351 F. Supp. 2d 1090 (W.D. Wash. 2004) (cited at Mot. 25)................29

*DeliverMed Holdings, LLC v. Schaltenbrand*,
    2012 WL 13028117 (S.D. Ill. Oct. 15, 2012) .......................................26

*Ellison v. Robertson*,
    357 F.3 1072, 1079 (9th Cir. 2004) .....................................................33

*Foster v. Univ. of Maryland-Eastern Shore*,
    787 F.3d 243 (4th Cir. 2015) ...............................................................39

*Harper v. Maverick Recording Co.*,
    562 U.S. 1080 (2010) (Alito, J., dissenting from the denial of cert.) ......38

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*,
    118 F.3d 199 (4th Cir. 1997) .................................................22

*Marano v. Aaboe*,
    No. 05 CIV. 9375 BSJ RLE, 2010 WL 6350785 (S.D.N.Y. Oct. 20, 2010) ..........................26

*In re Microsoft Corp. Antitrust Litigation*,
    355 F.3d 322 (4th Cir. 2004) ........................................39, 40

*In re Napster, Inc. Copyright Litig.*,
    191 F. Supp. 2d 1087 (N.D. Cal. 2002) ........................25, 26

*Nelson–Salabes, Inc. v. Morningside Dev., LLC*,
    284 F.3d 505 (4th Cir.2002) ..........................................32

*Newton v. Diamond*,
    204 F. Supp. 2d 1244 (C.D. Cal. 2002) .......................27

*Perfect 10, Inc. v. Visa Intern. Svc. Assn.*,
    494 F.3d 788 (9th Cir. 2007) ........................................35

*Silicon Knights, Inc. v. Epic Games, Inc.*,
    551 F. App'x 646 (4th Cir. 2014) ...............................39

*Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*,
    761 F. Supp. 2d 367 (E.D. Va. 2011) .........................11

*The Carrolton of Fayetteville v. Pine Manor Rest Home*,
    215 BR 341 (EDNC 1997).............................................39

*Towler v. Sayles*,
    76 F.3d 579 (4th Cir. 1996) ....................................12, 19

*UMG Recordings, Inc. v. Grande Comm's Networks, LLC*,
    No. A-17-CA-365-LY, 2018 WL 1096871 (W.D. Tex. Feb. 28, 2018)................................33

*Univ. Furniture Int'l, Inc. v. Collezione Europa USA*,
    618 F.3d 417 (4th Cir. 2010) ........................................24

*Williams v. Studivent*,
    2009 WL 3837627 (E.D.N.C. 2009).........................39

**Statutes**

17 U.S.C. ....................................................................37

17 U.S.C. § 101...........................................................25

17 U.S.C. §106.............................................................19

17 U.S.C. §106(1) ...................................................................................................19

17 U.S.C. § 402(b) .................................................................................................37

17 U.S.C. § 402(c) .................................................................................................37

17 U.S.C. §402(d) ........................................................................................36, 37, 38

17 U.S.C. § 410(c) .................................................................................................24

17 U.S.C. § 411 .....................................................................................................26

17 U.S.C. § 412 .....................................................................................................26

17 U.S.C. §504(c)(2) ...............................................................................................37

Fed. R. Civ. P. 12(f) ................................................................................................36

Fed. R. Civ. P. 12(f)(2) ...........................................................................................36

Fed. R. Civ. P. 30(b)(6) ...........................................................................................38

Fed. R. Evid. 703 ....................................................................................................13

Fed. R. Evid. 1006 ..................................................................................................14

**Other Authorities**

9, Ex. L1. While the Copyright Act ...........................................................................23

*Goldstein on Copyright* § 7.5.1 (3d ed. 2012 Supp.) ..................................................23

## INTRODUCTION

Plaintiffs' summary judgment brief begins with a series of bullet points stating how many Cox subscribers were caught infringing ███████████████████████████████ ████████████████████████████████████████████ Plaintiffs mischaracterize this as "compelling" evidence that Cox ignored widespread copyright infringement on its network. But the evidence puts these numbers in a different light.

First, the jury will hear that by "caught infringing," what Plaintiffs really mean is that their agent, MarkMonitor, sent Cox a notice *accusing* a Cox subscriber of infringement. The evidence will also show that MarkMonitor's investigations underlying these notices and notices themselves were slipshod, incomplete, inaccurate, and massively unreliable:

- <u>Plaintiffs have exactly zero evidence that any Cox subscriber unlawfully copied or distributed the works in suit</u>. Plaintiffs rely almost exclusively on the fact that Cox subscribers were *offering* to share copies of some of the works. But in *BMG*, this Court joined other courts holding that such evidence is insufficient to show infringement;



  and

- <u>For a substantial number of works, there is no evidence of Plaintiffs' ownership of an exclusive copyright</u>. Instead, for hundreds, Plaintiffs provide only a hodge-podge of incomplete ownership documents, web indices, and conclusory testimony.

Second, in addition to hearing evidence that Plaintiffs cannot prove the alleged underlying infringement in this case, Cox did not ignore Plaintiffs' notices, but responded aggressively to them. As such, based upon the undisputed evidence, Plaintiffs cannot establish secondary liability. <u>The undisputed evidence shows that Cox processed virtually all of the more than</u> ██████████ <u>sent on Plaintiffs' behalf, and</u> ██████████████████████████████████████**d**.

In the early 2000's, Cox created its "CATS" platform for handling customer-facing internet related issues. CATS mixed automated with human interaction in a series of progressively more intense responses to copyright complaints. CATS was built on the expectation that repeated and extended engagement with accused infringers was more likely to change their behavior than was summary termination of internet access. It was the state of the art policing for online copyright misconduct in 2012, when the music industry and the country's largest ISPs entered into an agreement establishing copyright response standards for ISPs. The resulting inter-industry system, known as CAS, mimicked Cox's CATS system, but entailed less exhaustive engagement with accused infringers and was *more* tolerant of alleged infringement.

As it turned out, Cox was right that progressive engagement was an effective way to curtail copyright abuse. A 2010 study showing the effect of the CATS system indicated that ███████ ████████████████████████████████████████████████████████████████.[1] In this case, Cox processed virtually all of Plaintiffs' 250,000+ notices of infringement. Cox also took action each of the 125,000+ times a subscriber was accused of infringement on more than a single occasion. Put the numbers that open Plaintiffs' brief into context, by taking into account the effect on subscriber behavior at each stage of Cox's progressive response system, and the true picture emerges:

|  |  | Still "Infringing" | Stopped "Infringing" | Incremental Decrease (versus net-listed level) |
|---|---|---|---|---|
| Total subscribers who were subject to notices | ██ | ██ |  |  |
| Subscribers receiving 3 Notices | ██ | ██ | ██ | ██ |
| Subscribers receiving 6 Notices | ██ | ██ | ██ | ██ |
| Subscribers receiving 10 Notices | ██ | ██ | ██ | ██ |
| Subscribers receiving 13 Notices | ██ | ██ | ██ | ██ |
| Subscribers receiving 14+ Notices | ██ | ██ | ██ | ██ |

---

[1] *See* the concurrently filed Declaration of Thomas Kearney ("Kearney Dec.") ¶6, Ex. K5.

In other words, *using Plaintiffs' own data*, the incidence of repeat infringement dropped by roughly *half* for each incremental tier of Cox's interventions, with the result that ███ of alleged infringers stopped infringing Plaintiffs' works by the time the CATS system had run its course. Cox's expert analyzed this data more carefully than have Plaintiffs. Her conclusions are that ███████████

████████████████████████████████████████

████████████████████████████████████████

████████████████ Kearney Dec. ¶35, Ex. K25 (at ¶¶57, 54).

Simply put, the evidence does not support Plaintiffs' claims that Cox subscribers directly infringed works in suit, or that Cox was culpable for any subscriber infringement that may have occurred. Far from entitling Plaintiffs to summary judgment, as set forth in Cox's pending motion for summary judgment, the undisputed facts compel judgement for Cox on both direct and indirect infringement. We respectfully submit that the Court should deny Plaintiffs' motion in its entirety.

## RESPONSE TO STATEMENT OF DISPUTED MATERIAL FACTS

**1. Disputed.** Argumentative. Plaintiffs' businesses depend on exploiting copyrighted works.

**2. Disputed.** Argumentative. No evidentiary basis; states a legal conclusion.

**3. Disputed.** Argumentative. States a legal conclusion. Plaintiffs failed to establish ownership or exclusive license to the rights under the Copyright Act, for numerous works. Lane Decl., ¶¶9-166.

**4.** Undisputed that MarkMonitor was hired for the purpose of identifying instances of infringement. Disputed that it was able to do so, as stated in response to SUFs 8, 10, 12, 16, and 17.

**5. Disputed.** Argumentative. No evidentiary basis of the extent to which companies "rely on Mark-Monitor" for purposes relevant to this case: identifying online infringement and sending notices.

**6. Disputed.** Not material as to Cox's cable TV operation and services unrelated to its ISP service.

**7. Disputed.** Argumentative; states a legal conclusion. Plaintiffs made no attempt to identify the

majority of Cox subscribers, or obtain discovery from any of them. Kearney Dec. ¶¶9-11. Contradicts Plaintiffs' SUF 47. There is no evidence that Plaintiffs are the sole licensing agents for the works in suit. Immaterial as Plaintiffs do not allege direct infringement by Cox.

**8. Disputed.** Not material as to duration of MarkMonitor's activity; no foundation that MarkMonitor always used digital fingerprinting the first time it downloaded a file. For works in suit, the best evidence is that ██████████████████████████████████████ No basis for these claims as to any of the works in suit, as the foundational data for such a claim was spoliated and the summary is inadmissible. *Id.* ¶28, 36 & Exs. K18, K26; *see* ECF 237, 364.

**9. Disputed** that a cryptographic hash value is a representation of a file's contents, as it cannot be used to reverse the process from the hash value back to the input from which it was calculated. Declaration of Dr. Nick Feamster ("Feamster Dec.") ¶¶3-8. No evidentiary basis that reported hash values are accurate. Kearney Dec. ¶15, Ex. K8; ¶25, Ex. K15.

**10. Disputed**. States a legal conclusion. No foundation for the source, contents, or accuracy of any notices, and nothing to confirm that files in the Audible Magic database were copies of works in suit, as opposed to other works with the same Artist, Title, and/or Album. Disputed that Cox subscribers reported the percentage of a "confirmed infringing file": no evidence any Cox subscriber reported (or even knew) how much of the work was in the file. Contradicted by SUF 13 (Plaintiffs' agent unable to detect copying between peers). No basis that any file was "confirmed infringing." Kearney Dec. ¶7, Ex. K6; ¶15, Ex. K8; ¶28-29, Ex. K18 & K19; ¶36 Ex. K26; ¶40, Ex. K30. MarkMonitor destroyed Audible Magic data showing extent to which a file matched a work in suit. *See* ECF 364-11. Fragmentary data MarkMonitor retained shows ███████████████ █████████████████████████████████████████████████████████ ECF 238-1 at ¶12. The best evidence is that roughly ██████████████████████ to files located

on Cox subscribers' computers. Kearney Dec. ¶36, Ex. K26 (at ¶¶35, 156-159).

**11. Disputed.** Incomplete and misleading. No evidentiary basis for the source of any portion of the file. Mischaracterizes evidence because MarkMonitor's system only obtains metadata from a peer, does not download any content, and cannot show that a peer actually possesses a copy of a file. No evidentiary basis that the 1.65% increment contains a work in suit, or any portion of one. *Id.* ¶8, 11-12, 23; ¶24, Ex. K14; ¶36, Ex. K26.

**12. Disputed.** Vague as to "generally," and mischaracterizes evidence: no basis as to protocols other than BitTorrent, or that peers perform "simultaneously," or for what occurred in any particular instance. Merely detecting a peer does not indicate it is either downloading *or* uploading. *Id.* ¶36, Ex. K26; ¶40, Ex. K30;

**13. Disputed.** Not material: "number of times" alleged infringement occurred is irrelevant to Plaintiffs' claims. No basis that it was "impossible" to make accurate observations; MarkMonitor's witness is not qualified as an expert in any relevant area, and Plaintiffs failed to seek discovery from, or about, any accused Cox subscriber. No basis that BitTorrent (or any network) was "designed" to make copying "unobservable." *Id.* ¶23; ¶24, Ex. K14; ¶25, Ex. K15; ¶39, Ex. K29.

**14. Disputed.** States a legal conclusion. RIAA Notices were not "made under penalty of perjury," did not comply with the DMCA, and did not contain a "sample" of infringed content. Because a cryptographic hash function cannot be used to reverse the process from the hash value back to the input, the hash value does not "pertain" to the file in any meaningful way. *Id.* ¶13, Ex. K7; ¶14; ¶15, Ex. K8; ¶25, K15; ¶26, Ex. K16; ¶27, Ex. K17; ¶40, Ex. K30; Feamster Dec. ¶¶3-4, 8.

**15. Disputed.** Cox's CATS system tracks notices by account number, not "subscriber." Kearney Dec. ¶44, Ex. K34. These numbers do not match those in McCabe SJ Dec. ¶8.

**16. Disputed.** States a legal conclusion. No foundation for the source, contents, or accuracy of any

notices. The RIAA Notices identified only 1,998 works by Title and Artist. *Id.* ¶21-22, Ex. K13_A,

B. Incomplete and misleading as to testimony of Tregillis, who was only able to perform his anal-

ysis based on information Plaintiffs produced in discovery. Tregillis did not analyze audio files

but only performed hash-value matching. *Id.* ¶37, Ex. K27 (at, e.g. ¶¶13, 35, 38).

**17. Disputed.** No evidentiary basis to link digital audio files to Audible Magic, MarkMonitor, or

any online source; no foundation that the files are copies of works in suit. Hash values do not

"identify" a digital file in any meaningful sense. Feamster Dec. ¶¶3-4, 8. No one has listened to all

33,000 recordings on the hard drive and no reference files have been produced in discovery to

which the hard drive files can be matched. Approximately ███████████████████████

███████████ r do not match any hash value in the hard drive directory. ECF 364-8, 9, 10. No

reliable basis to infer that files the hard drive are copies of all works in suit on a hash matched

basis, because fewer than ███ of works in suit have been matched to an Audible Magic reference

file. Kearney Dec. ¶5, Ex. K4; ¶7, Ex. K6; ¶15, Ex. K8; ¶36, Ex. K26 (at ¶¶35, 156-159).

**18. Disputed.** The term "directed" mischaracterizes the documents. Kearney Dec. ¶18.

**19. Disputed.** States a legal conclusion. Contradicted by Plaintiffs' documents. Highly misleading

because multiple Cox subscribers contacted MarkMonitor by means other than email. Immaterial

because § 512(g)(3) does not apply. *Id.* ¶14; ¶19, Ex. K11; ¶20, Ex. K12.

**20. Disputed.** Legal conclusion; misleading; testimony contradicts this. *Id.* ¶47-48, Ex. K37, K38.

**21. Disputed.** States a legal conclusion and is argumentative. Misleading as there is no evidence

that Cox's ISP network was used, and Internet access is widely available from multiple sources.

Collateral estoppel is inapplicable, *see infra* at § VI.

**22. Disputed.** States a legal conclusion, argumentative, and mischaracterizes documents. Cox's

Acceptable Use Policy speaks for itself. Collateral estoppel is inapplicable, *see infra* at § VI.

Kearney Dec. ¶34, Ex. K24 (at ¶¶146, 147-152, 153-158).

**23. Disputed.** No evidentiary basis for 2003-2010 or fn. 5; argument, not fact. States a legal conclusion. No basis for the contents, accuracy, or reliability of third party notices which (like Plaintiffs' notices) are not by themselves evidence of infringement. The Rightscorp notices are not part of the record in this case, entirely lack foundation, and are disputed. *Id.* ¶3, Ex. K2.

**24. Disputed** for the reasons stated below. Each sub-paragraph states a legal conclusion and is argumentative. Collateral estoppel is inapplicable here, *see infra* at § VI.

  **a) Disputed.** Cox did not "ignore" notices, and the record shows that many subscribers never received a second notice. Kearney Dec. ¶1, Ex. K9; ¶41, Ex. K31; ¶47, Ex. K37; ¶48, Ex. K38.

  **b) Disputed.** Immaterial as to policies in effect, and actions taken, before the Claims Period. Cox's Customer Safety personnel had discretion and could "consider" terminating (and actually terminate) a subscriber at any time. *Id.* ¶41, Ex. K31.

  **c) Disputed.** Limit applied over a rolling 24-hour period, not a calendar day. *Id.* ¶44, Ex. K34. Undisputed that Cox raised the cap to 600 for RIAA. Collateral estoppel is inapplicable here.

  **d) Disputed.** Contradicted by SUF 23. Cox "counted" each ticket regardless of whether it was "rolled up." Kearney Dec. ¶44, Ex. K34. No evidentiary basis for ███████ being "rolled up" into one ticket. Collateral estoppel is inapplicable here, *see infra* at § VI.

  **e) Disputed.** No evidentiary basis, misstates evidence. The number of notices was counted over a rolling 6-month window; there could only be a "reset" if the subscriber had zero notices for 6 straight months. Kearney Dec. ¶44, Ex. K34. Collateral estoppel is inapplicable here.

  **f) Disputed.** No evidentiary basis for the contents, accuracy, or reliability of third party notices which (like Plaintiffs' notices) are not by themselves evidence of infringement. The Rightscorp notices are not part of the record in this case, entirely lack foundation, and are disputed. Immaterial

as Cox did not block Plaintiffs' notices at any relevant time. Kearney Dec. ¶3, Ex. K2.

**g) Disputed.** Cox had many employees in call centers around the country. *Id.* ¶47, Ex. K37.

**h) Disputed.** Misleading, as Cox personnel could (and did) manually suspend subscribers; the limit could be temporarily lowered in response to emergencies (like hurricanes). Misleading as to whether suspensions were "temporary." *Id.* ¶47, Ex. K37.

**25. Disputed.** Incomplete and misleading. Cox's Customer Safety personnel had discretion and could "consider" terminating (and actually terminate) a subscriber at any time. *Id.* ¶41, Ex. K31. Collateral estoppel is inapplicable here, *see infra* at § VI.

**26. Disputed.** Misleading. Cox's Customer Safety personnel had discretion and could "consider" terminating (and actually terminate) a subscriber at any time. *Id.* ¶41, Ex. K31. Collateral estoppel is inapplicable here, *see infra* at § VI.

**27. Disputed.** Argumentative. Cox's Customer Safety personnel had discretion and could "consider" terminating (and actually terminate) a subscriber at any time. Collateral estoppel is inapplicable here. Cox terminated subscribers, unlike other major ISPs. *Id.* ¶41, Ex. K31; ¶34, Ex. K24.

**28. Disputed**. Argumentative and misleading. *Id.* ¶42, Ex. K22. Cox actually terminated subscribers, unlike other major ISPs. *Id.* ¶34, Ex. K24 (at ¶¶146, 147-152, 153-158). Collateral estoppel is inapplicable here, *see infra* at § VI.

**29.** Undisputed but immaterial. No basis for comparing non-payment disconnections to copyright infringement terminations.

**30. Disputed.** Misleading: ███████ figure erroneously conflates "subscribers' accounts" and "infringement notices." Given approximately 6 million Cox subscribers, *see* SUF 6, this averages less than ½ notice per subscriber per year.

**31. Disputed.** Legal conclusion. Misleading. The record shows that Cox's Graduated Response

Program was effective in stopping infringement on Cox's network. *Id.* ¶35, Ex. K25 (at ¶57). No evidentiary basis for the accuracy or contents of third-party notices; misleading as to Plaintiffs' notices, whose accuracy is disputed. Kearney Dec. ¶3, Ex. K2. Cox actually terminated subscribers, unlike nearly every other ISP. *Id.* ¶34, Ex. K24 (at ¶¶146, 147-152, 153-158).

**32. Disputed.** Legal conclusion. No foundation for third-party notices, whose contents, accuracy, and reliability are unsubstantiated. Notices are "[a] manifestation of the system" that generated them, and cannot be relied on as "accurate evidence of infringement." *Id.* ¶3, Ex. K2.

**33. Disputed**, for the same reasons as SUF 32. Legal conclusion. To the extent accounts are for business subscribers, they serve multiple end-users.

**34. Disputed.** No evidentiary basis or foundation for the contents, accuracy, or reliability of third party notices which (like Plaintiffs' notices) are not by themselves evidence of infringement. *Id.* ¶3, Ex. K2. The Rightscorp notices are not part of the record in this case, entirely lack foundation, and are disputed. Collateral estoppel is inapplicable here, *see infra* at § VI.

**35. Disputed.** No evidentiary basis or foundation for the contents, accuracy, or reliability of third party notices which (like Plaintiffs' notices) are not by themselves evidence of infringement. *Id.* ¶3, Ex. K2. The Rightscorp notices are not part of the record in this case, entirely lack foundation, and are disputed. Collateral estoppel is inapplicable here, *see infra* at § VI.

**36. Disputed.** Document does not reflect a "Data Usage Allowance." During Claims Period, Cox did not charge for excessive data consumption. *Id.* ¶31, Ex. K21; ¶43, Ex. K33; ¶45, Ex. K35.

**37. Disputed.** Misleading; argument, not fact. The cited document shows how much Cox billed these subscribers based on available ICOMS data.

**38. Disputed.** Legal conclusion, and lacks evidentiary basis. Dr. Lehr's declaration is unsubstantiated, and he admitted that he did not attempt to quantify what, if any, costs Cox saved by not

terminating specific repeat infringers. *Id.* ¶30, Ex. K20.

**39. Disputed.** Argument, not fact. No evidentiary basis that Cox had such a "goal" or that it "drove Cox's decisions." Drs. Lehr and McGarty are not experts in this area, and their speculations rely solely on internal Cox documents and employee testimony. *Id.* ¶42, Ex. K32; ¶31, Ex. K21 (at Appx. B); ¶49, Ex. K39. Collateral estoppel is inapplicable here, *see infra* at § VI.

**40. Disputed.** Legal conclusion, misleading, and argumentative. There is no evidence that subscribers elected higher-tiered plans to infringe, and Dr. Lehr admitted that the data does not show anything but that subscribers paid a flat rate for the service they elected. Peer-to-peer applications have many legitimate uses. *Id.* ¶25, Ex. K16; ¶30, Ex. K20; ¶31, Ex. K21; ¶45, Ex. K35.

    **a) Disputed.** Legal conclusion, misleading. Cited testimony does not support this statement. In addition, peer-to-peer applications have many legitimate uses, and there is no basis to assume, and the testimony cited does not support, that peer-to-peer traffic involves infringement. *Id.* ¶25, Ex. K15; ¶40, Ex. K30; ¶46, Ex. K36; ¶47, Ex. K37.

    **b) Disputed.** No basis to apply unauthenticated third party summary data for 2011, covering "Total US usage," to Cox subscribers during 2013 and 2014. Immaterial. *Id.* ¶32, Ex. K22.

    **c) Disputed.** Legal conclusion, and argument, not fact. Lacks evidentiary basis, and so vague as to render this statement meaningless. Peer-to-peer applications have many legitimate uses. *Id.* ¶25, Ex. K15; ¶40, Ex. K30; ¶46, Ex. K36; ¶47, Ex. K37.

    **d) Disputed.** Misleading, and no basis for this testimony as Fuenzalida has no personal or expert knowledge and does not work for Cox. Cox does not make marketing decisions based on peer-to-peer usage metrics. *Id.* ¶32, Ex. K22; ¶44, Ex. K35.

    **e) Disputed.** Misleading: no basis to extrapolate from 1,525 subscribers to 6 *million* subscribers (SUF 6). No evidence subscribers elected higher-tiered plans to infringe. Lehr admitted

the data shows only that subscribers paid a flat rate for the service they elected. *Id.* ¶30, Ex. K20.

**41. Disputed.** No evidentiary basis; argument, not fact. Plaintiffs have failed to prove they own multiple works at issue, and have failed to join the true owners. *See infra*, § II.

**42. Disputed.** Argument, not fact; no evidentiary basis; mischaracterizes evidence; misleading. Plaintiffs did not pursue legal action against any subscribers listed in the RIAA Notices, and sent fewer than the 600 notices per day that were permitted. *Id.* ¶11-12; ¶38, Ex. K28.

**43. Disputed.** Several of Plaintiffs' works were registered either after the claim period, or during the claim period but after the alleged infringement. Lane Dec., ¶166.

**44. Disputed.** Plaintiffs intentionally registered sound recordings in suit as works made for hire, for an improper purpose. Lane Dec., ¶12. Kearney Dec. ¶33, Ex. K23.

**45. Disputed.** Misleading as to a legal conclusion on which Plaintiffs have the burden of proof.

**46. Disputed.** Legal conclusion, and factually incorrect: a digital file cannot be so marked. *See* SUF 47 (Plaintiffs' Works "widely available on authorized Internet-based digital music services.")

**47. Disputed.** Plaintiffs' notices failed to identify particular sound recordings or musical compositions allegedly infringed, since they "identified" only sound recordings, and provided only a title and recording artist, which is ambiguous. Contradicts SUF 7 claiming Plaintiffs did not "authorize" Cox or its subscribers to copy or distribute works in suit.

## ARGUMENT

### I.    Plaintiffs cannot establish the alleged underlying direct infringement.

In order to hold Cox secondarily liable for its subscribers' alleged direct infringement of the 10,000 plus works in suit, Plaintiffs must first prove that each of those works was directly infringed by a Cox subscriber. *Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*, 761 F. Supp. 2d 367, 375 (E.D. Va. 2011) (Cacheris, J.). Plaintiffs' evidence is insufficient to do so.

Plaintiffs' agent MarkMonitor sent Cox 116,186 notices relating to alleged acts of infringement by Cox subscribers for which damages are sought in this case. Kearney Dec. ¶37, Ex. K27 (at ¶¶11-20). To prove that the notices sent to Cox during the claims period relate to not just alleged, but actual acts of direct infringement, Plaintiffs must show (1) that the subscriber who was the subject of a notice, (2) engaged in either (a) unauthorized copying or (b) unauthorized distribution of (3) a copyrighted work. *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142, 1147 (9th Cir. 2018) (plaintiff must show who infringed); *Towler v. Sayles*, 76 F.3d 579, 581 (4th Cir. 1996); *BMG Rights Mgt. (US) LLC v. Cox Comms., Inc.*, 149 F. Supp. 3d 634, 670 (E.D. Va. 2015) ("*BMG I*") (unauthorized dissemination). Plaintiffs lack sufficient evidence to establish these elements.

### A. Plaintiffs lack admissible evidence that Cox's subscribers possessed copies of the works in suit, and if so, whether those copies were unlawfully obtained.

Plaintiffs cannot prove direct infringement by Cox's subscribers unless they can show that a copy of each work in suit was actually present on a Cox subscriber's computer *and unlawfully* copied or disseminated. Plaintiffs lack evidence to support summary judgment on either issue.

In the *BMG* case, plaintiff's agent determined that a Cox subscriber possessed a copy of a work in suit by actually downloading the file and confirming what it was a copy of. In this case, Plaintiffs' agent MarkMonitor █████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██▌ ███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

─────────────────────

[2] A hash value is a string of letters and digits that is generated based on the content of a file.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████. Kearney

Dec. ¶ 29, Ex. K19.

Cox's expert, Feamster, analyzed the Audible Magic records[4] from 2012-2014,[5] and found

that roughly ████ of the works at issue (listed on Complaint Ex. A and B) were never matched to

an Audible Magic fingerprint during that period. Kearney Dec. ¶36, Ex. K26. That is, the Audible

Magic records show that when putative copies of ████ of the works in suit were compared to the

Audible Magic fingerprint database, they did not match. But if a work was never matched to an

Audible Magic fingerprint, and never downloaded from the device of an alleged infringer for iden-

tification, there was no basis to conclude it was a copy of a copyrighted work. All that could be

inferred was that it was a copy of something that matched another file that was a copy of the same

unknown thing. Moreover, the fact that ████ of the works were never matched to a downloaded

file by Audible Magic means that whatever the "something" in the hash-matched files might have

been, it was not a copy of a work in suit. Thus, Plaintiffs have no evidence of direct infringement

---

[3] Some of the Audible Magic records are missing data for ████████████████████████████
████████████████████████ *See* Kearney Dec. ¶29, Ex. K19.
[4] The records on which Dr. Feamster relied are a set of ████████████████████████████
████████████ Kearney Dec. ¶29,
Ex. K19. The logs were produced by Audible Magic in a spreadsheet bearing the Bates No.
REV00003444. (The "Audible Magic Spreadsheet.") *See* ECF No. 353-2. Plaintiffs have ques-
tioned whether a foundation has been established for this document, but the Audible Magic witness
provided the requisite foundational testimony, *id.*, and, at a minimum, that witness provided
enough evidence to justify Dr. Feamster's belief, *see* ECF No. 353-2, that the Audible Magic
Spreadsheet contains the "kinds of facts" on which, "experts in [his] field would reasonably rely
… in forming an opinion on the subject," Fed. R. Evid. 703, on which he opined.
[5] Though the damages period is 2013-2014, MarkMonitor started sending RIAA notices to Cox in
2012. The pre-2013 notices are not in suit because, among other things, MarkMonitor destroyed
the 94,474 "evidence packages" supporting them. Kearney Dec. ¶25, Ex. K15 (at ¶99).

of ▇▇ of the works. Feamster's analysis more than justifies a reasonable juror to conclude that whatever Cox's subscribers had on their devices, it was not a copy of ▇▇ of the works in suit.

Plaintiffs offer several arguments to the contrary. First, they contend that ▇▇▇



and they invite Cox and, presumably, the Court to listen to those files if there is any doubt about whether an allegedly infringing file is actually a copy of one of Plaintiffs' works. Neither argument has merit.

> **a.** **The MarkMonitor Spreadsheet does not show that files on Cox subscribers' computers matched the works in suit.**

As for the MarkMonitor Spreadsheet, Cox has moved for preclusive sanctions barring Plaintiffs from relying on that document or any version of it. Briefly, MarkMonitor admits that it routinely discarded the ▇▇▇▇▇▇▇ The Audible Magic data that exists strongly suggests that the matching results recorded in the MarkMonitor spreadsheet are deeply flawed. The motion seeks preclusion of the MarkMonitor Spreadsheet on the bases that (1) the data underlying the Spreadsheet was spoliated, and (2) that data was properly requested and ordered in discovery, but not produced, rendering the MarkMonitor Spreadsheet an inadmissible summary of the no-longer-existing data that must be precluded under Fed. R. Evid. 1006. The motion will be heard September 27.

Even if Cox's motion to preclude is denied, the issues raised in that motion will, at a minimum, pose a question of fact to the jury as to whether the MarkMonitor Spreadsheet is credible evidence of infringement. Cox will argue that the best evidence of whether allegedly infringing

files were ever matched to works in suit is the data relied on by Dr. Feamster.[6] Plaintiffs will argue

that the best evidence is the MarkMonitor Spreadsheet.[7] That is a quintessentially factual dispute.

Moreover, whichever data source the jury credits, there will still be no basis for concluding

that the works in suit have been infringed. Plaintiffs' proof depends on MarkMonitor's ability to

match downloaded files to the files in Audible Magic's database. But there is no foundation to

establish that the files in the Audible Magic database are copies of the works in suit. A song can

be recorded multiple times, even by the same artist, and each recording is a separate work. For

example, in addition to the recording of a work that comprises its first release, there may be noni-

dentical recordings that were (i) made during the initial recording session and are subsequently

released; or (ii) made during concert performances; or (iii) later made by the same artist in

performance with other artists; or (iv) later incorporated into a medley or a new album; or (v) that

constituted a later cover made by the same artist reinterpreting the song. The list can go on. But

the point is that, even if the jury fully credits the '431 Spreadsheet, the most Plaintiffs will have

shown is that an allegedly infringing work matches whatever is maintained in the Audible Magic

database. There is no evidence whatsoever that the work that Audible Magic has a copy of is the

same as the work covered by the copyright registration for the work in suit. Absent such evidence,

---

[6] Audible Magic's 30(b)(6) witness explained how h █████████████████████████████████████████████
████████████████████████████████████████. Kearney Dec. ¶29, Ex. K19. The MarkMonitor
Spreadsheet of necessity relies on the Audible Magic data to support any claim that a file was
matched to a work in suit by Audible Magic, *id.* ¶28, Ex. K18, but the portions of the Audible
Magic records showing what "fingerprint" a file was matched to and whether a match was made
were routinely discarded by MarkMonitor prior to 2015. *Id.* The evidence for and against the two
data sources is rehearsed at length in Docket Nos. 241, 328, and 364.

[7] Among other things, Plaintiffs' seek to bolster the accuracy of MarkMonitor's notices by claim-
ing that none of the accused Cox subscribers disputed their allegations of infringement. Mot. at 2
("Not a single one of those Cox subscribers sent a counter-notification pursuant to the
Digital Millennium Copyright Act, or contacted RIAA or MarkMonitor, to dispute that they
infringed during the Claim Period"); SUF 19. This is simply untrue. *See* Response to SUF 19.

whatever may have been copied, Plaintiffs cannot prove that it was one of the works in suit.

> **b.    The 33,000-file hard drive does not show that files on Cox sub-scribers' computers matched the works in suit.**

Nor is there any more force in Plaintiffs' suggestion that, if there is any question that Cox subscribers were copying the works in suit, Cox or the Court can compare the file to the ██████ ███████████ d audio files on its multi-gigabyte hard drive, PX 39. It is Plaintiffs' burden to lay a foundation for what is on the hard drive, but it is clear they cannot do so or that, at a minimum, a reasonable juror could conclude that the hard drive files are not probative of anything.

First, there is no one who claims to have listened to all the recordings on the hard drive and confirmed they are actually copies of the works in suit. Plaintiffs' expert, Frederiksen-Cross, claims to have confirmed that a ██████████████████ match copies of works downloaded from iTunes. But her Report does not identify ████████████████████████████████ ██████████████████████████████ or whether it was statistically representa-tive of the files on the hard drive. Absent someone with personal knowledge confirming the audio files are copies of the works in suit, the link between those files and the works in suit depends on the MarkMonitor Spreadsheet. But the reliability of that spreadsheet is a disputed question of fact.

Nor is it sufficient for Plaintiffs to simply propose that anyone who wants to, can listen. Simply dumping tens of thousands of unanalyzed sound files and telling the Court or Cox to listen in does not satisfy Plaintiffs' burden of proof. It is not Cox's burden to establish what is and is not on the hard drive, and it certainly is not the Court's job to figure it out.

Third, even if someone had listened to all of the ████████████, they would not be in a position to confirm that the files matched the alleged works. As noted above, each recording of a song is a separate work. An auditor of the hard drive files would have no basis on which to distin-guish between a work in issue, a studio recording of a song by an artist, a subsequent cover of the

same song by the same artist, or a concert recording of the same song. Cox requested a reference set of recordings of the works in suit during discovery, but Plaintiffs' refused. Absent some reference point for any review of whatever is on the hard drive, there is no basis on which a reasonable juror could conclude that the hard drive recordings match each work in suit.

Fourth, a review of the drive showing when its files were created or last modified, shows all of them date from 2016 or later. ECF 364-1 at ¶¶1-8. Whatever they are, the files on the drive ███████████████████████████████████████████████████████████ and cannot be evidence of what files were actually ███████████████████████████████ █████ in advance of those notices. Simply listening to something that was not in existence at the relevant time cannot confirm the content of what was in existence at the relevant point in time.

Fifth, the hard drive is not comprehensive. A count of unique files on it shows the number is ████████████████████████████████████████████████████████████████████ ███████████ Kearney Dec. ¶ 35, Ex. K25. Even if jurors wanted to confirm that the MarkMonitor Spreadsheet actually lists all of the works in suit by listening to the hard drive file corresponding to each entry, there would be ████████████████ the Spreadsheet for which that is impossible.

Finally, even if Plaintiffs could show that at least one of the files on the hard drive matches each of the 10,000+ works in suit, they will be unable to match all of those files to the notices sent to Cox. Plaintiffs' have taken the position that works are identified by the Artist/Title data for the work received from Audible Magic. But the database of the notices sent to Cox (Plaintiffs_00281430) contains under 2,000 Artist/Title pairs. Kearney Dec. ¶¶21-22, Ex. K13-A, B. Hence, once again, whatever is on the hard drive it cannot match to notices alleging infringement of all of the disputed works because there are not notices which identify all disputed works.

In short, there will be evidence from Cox's expert showing that the vast majority of the

allegedly infringing files were not works in suit. The evidence to the contrary, at most, creates an issue of fact. Its flawed, incomplete, and spoliated nature argues for its exclusion at trial and, at a minimum, provides a basis on which a reasonable juror may find it not credible.

### B.   Plaintiffs lack evidence as to identities of alleged infringing business subscribers.

There is also a failure of evidence—and at a minimum, an issue of fact—regarding the allegedly infringing conduct associated with an IP address assigned to a Cox business subscriber. Absent uncontested proof of who is alleged to have infringed their works, Plaintiffs cannot establish direct infringement by a Cox business subscriber. *Cobbler*, 901 F.3d 1147.

Of Plaintiffs' infringement notices sent to Cox, 43,949 (roughly a quarter) related to 2,792 commercial entities who subscribed to "Cox Business" service. Kearney Dec. ¶35, Ex. K25. These notices, like all of Plaintiffs' notices, identified the accused infringer solely by providing the IP Address at which an allegedly infringing copy of a work in suit was found. Kearney Dec. ¶21.

████████████████████████████████████████████████████

███████████████████████████████ Kearney Dec. ¶25, Ex. K15 (at ¶83); *id.* ¶36 & Ex. K26 (at ¶89). In general, that IP address can be linked by Cox to the broadband subscriber to whom it was assigned, but for Cox business subscribers it cannot be linked to the specific individual at that IP address who was engaging in allegedly infringing activity. *Id.* (at ¶¶57-58).

A Cox business subscriber is a commercial enterprise. Kearney Dec. ¶42, Ex. K32. If an alleged act of infringement occurs at a hotel, for example, identification of the hotel's IP address simply means that someone signed onto the hotel's network performed the alleged copying, but gives no indication whether the alleged infringer was an employee, a guest, a customer at the hotel bar, or someone parked outside in a car—let alone which employee, guest, or visitor. *Id.*

In such circumstances, the Ninth Circuit has held that the mere fact that infringement occurred at a business' IP address is insufficient to sustain a claim of direct infringement against the

business, because there is no evidence showing who at the IP address engaged in the accused conduct. *Cobbler,* 901 F.3d at 1147. Here, because Plaintiffs can only prove that the alleged infringer was signed onto a business' network, Plaintiffs lack evidence of direct infringement by the business and they do not accuse anyone else. A reasonable juror could conclude that Plaintiffs have failed to meet their burden of establishing who allegedly infringed their copyright.

### C. Plaintiffs lack evidence sufficient to prove a violation of either the reproduction right or the distribution right conferred by 17 U.S.C. §106.

Plaintiffs allege that Cox's subscribers infringed on their reproduction rights under 17 U.S.C. §106(1) or their distribution rights under §106(3). They lack evidence to prove either.

### 1. Plaintiffs lack evidence of unlawful reproduction.

Even if the Court were to credit Plaintiffs' argument that Cox subscribers had copies of works in suit—as discussed above, Plaintiffs lack such evidence—Plaintiffs cannot show that such files (if any) were reproduced unlawfully. To hold Cox indirectly liable for a subscriber's direct infringement of the reproduction right, Plaintiffs must prove that the subscriber actually made *an infringing copy* of a work in suit using Cox's network. *Towler*, 76 F.3d at 581; *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013). But Plaintiffs have *no* evidence that any Cox subscriber made unauthorized copies of any work in suit, because there is no evidence showing *how* Cox subscribers obtained those works. The MarkMonitor system cannot determine whether Cox subscribers' purported copies of Plaintiffs' works were initially purchased from iTunes, legally uploaded from a purchased CD, or obtained from another legal source. Plaintiffs did not seek discovery from any Cox subscriber. Response to SUF 7, 13, *supra*. Absent evidence that Cox subscribers *illegally* copied works-in-suit, Plaintiffs cannot show unlawful reproduction.

Plaintiffs' only evidence of infringement of the reproduction right is ███████████

████████████████ d purportedly showing that in just *two* cases peers, each of which at one point

had reported having approximately ███ of a BitTorrent content file, later reported having 100%

of the file. Kearney Dec. ¶25, Ex. (at ¶¶44, 45). This evidence is insufficient for summary judg-

ment, for at least four independent reasons.

*First*, as discussed above, Plaintiffs' reliance on metadata comparisons is deeply flawed:

indeed, the data upon which Plaintiffs rely is insufficient even to establish that either of the two

accused peers actually possessed the content files for which Plaintiffs "detected" metadata. ***Sec-***

***ond***, even if the Court credits that a few Cox subscribers may have obtained a small portion

(approximately ███ *see id.*) of a BitTorrent content file by means of a peer-to-peer network, Plain-

tiffs lack evidence that any such fragments were of a work in suit, or any part of one. It is undis-

puted that BitTorrent content files can, and usually do, contain multiple works. *Id.* (at ¶65); *id.*

¶36, Ex. K26 (at ¶74). And Plaintiffs have no evidence of where the initial ███ of the file came

from. ***Third***, Plaintiffs have no evidence that the small increment of additional content (approxi-

mately ███ ) was obtained by means of Cox's ISP system. And *nothing* supports Plaintiffs' tacit

assumption that the initial portion ███ ) was obtained using Cox's ISP system. Internet users are

not, of course, limited to using a single ISP's network: Internet connectivity is ubiquitous at work,

at school, in coffee shops, hotels, libraries and elsewhere. ***Finally***, even if the Court were to credit

Plaintiffs' arguments as to the two alleged incidents of reproduction, Plaintiffs have adduced such

evidence for only *two* accused Cox subscribers, each accused of infringing just *one* work in suit.

Because it is Plaintiffs' burden to prove direct infringement, and because they lack

sufficient evidence of unlawful reproduction for even the two subscribers whose bitfield data is

discussed, their motion should be denied for those subscribers.[8] Because no evidence is offered to

---

[8] If, notwithstanding the multitude of failures of evidence, the Court were inclined to grant Plain-
tiffs summary judgment as to reproduction, its ruling should be limited to the only two works for
which Plaintiffs have adduced evidence, as they lack *any* other evidence of direct infringement.

show unlawful reproduction by the remaining ▇▇▇ subscribers, summary judgment is necessarily improper as to them as well.

### 2.     Plaintiffs lack evidence of unlawful distribution.

Plaintiffs also seek to hold Cox secondarily liable for infringement of their §106(3) distribution rights, claiming that Cox subscribers made copies of Plaintiffs' works available for download. But Plaintiffs concede they have no evidence of actual dissemination. Instead, the most they can show is that certain works were made available for potential download. As this Court has already held, evidence of "making available" is insufficient to establish infringement of the distribution right. Nor is this a case where a Court may deem that distribution occurred.

 "[T]o establish a direct infringement of its distribution right, [a plaintiff] must show an actual dissemination of a copyrighted work." *BMG I* at 670 (discussing cases). Plaintiffs do not claim to have evidence of "actual dissemination." *See* Mot. 22. Indeed, they claim that "direct proof of actual dissemination is unobtainable," and seek to prove distribution by circumstantial evidence. But the circumstantial evidence on which they rely fails in light of the *BMG* decision.

Plaintiffs argue, first, that the mere presence of a BitTorrent client on a subscriber's computer is sufficient to prove distribution, because "in the BitTorrent protocol, any participating peer will generally be downloading or retrieving pieces of the file" simultaneously as it uploads pieces to other peers. Mot. 22. Plaintiffs thereby conclude that because "MarkMonitor detected the Cox subscribers online, running the P2P software, and 'sharing' an unauthorized copy of Plaintiffs' Works," they have "satisfie[d] the requirements for proving an unauthorized distribution." *Id*. Plaintiffs are wrong for multiple reasons.

First, even if it were true that the BitTorrent protocol will "generally" be engaged in uploading simultaneously with downloading pieces of a file, that would not fix Plaintiffs' evidentiary problem, which is a lack of evidence that any particular peer was doing *either* of these things with

any work in suit.[9] Second, the act of "running the P2P software" and "sharing" a music file does nothing more than *make that file available* for downloading by others—and as this Court has already held in this very context, "making available" is not an infringing act. *BMG I* at 670. In *BMG*, this Court provided a roadmap for how a plaintiff might circumstantially prove distribution. The *BMG* plaintiff survived summary judgment on distribution where its authorized agent had "*itself downloaded* ... full copies of BMG's works using Cox's service." *BMG I* at 663. But Plaintiffs failed to follow that roadmap. It is undisputed that the RIAA could have paid MarkMonitor to download content files from Cox subscribers but chose not to. Kearney Dec. ¶4, Ex. K3 (at pg. 10 & App'x C). Unlike the *BMG* plaintiff, therefore, Plaintiffs cannot show that there was any "actual dissemination" of any work to anyone—not even to their authorized agent, MarkMonitor.[10]

Having failed to adduce any evidence to support their claims of infringement by distribution, Plaintiffs attempt to save it on a theory of "deemed distribution" based on *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199 (4th Cir. 1997). But this Court rejected precisely that argument in *BMG*, and its reasoning applies equally here. *See BMG*, 149 F. Supp. 3d at 666. Plaintiffs' attempt to distinguish this case from *BMG* on the ground that here, "direct proof of actual dissemination is unobtainable" is unavailing. Plaintiffs here had *exactly* the same ability to collect evidence of dissemination as BMG—by having its agent download files from subscribers' computers.[11] Plaintiffs chose not to pay to collect that evidence. Kearney Dec. ¶ ¶ 4, Ex. K3. They

---

[9] In addition, this statement—a general description of the BitTorrent protocol—says nothing about the functioning of the Ares, eDonkey, or Gnutella protocols.

[10] Plaintiffs also argue it is "impossible" for "anyone" to collect records of "how many times" a work has been distributed. Mot. at 22. Even if true, and there is no record support, it is irrelevant. A plaintiff need not show "how many times" a work was distributed, but whether it was *at all*.

[11] Notably, the Fourth Circuit rejected BMG's similar arguments on appeal, declining to hold Cox categorically liable for contributory infringement and instead holding that the issue was properly one for the jury. *BMG v. Cox*, 881 F.3d 293.

therefore lack any direct *or* circumstantial evidence of "actual dissemination" because they chose not to collect it.[12]

In addition, "deemed distribution" applies only "when the proof is impossible to produce *because the infringing [defendant]* has not kept records of public use." *BMG I* at 666 (emphasis added, quoting *Goldstein on Copyright* § 7.5.1 (3d ed. 2012 Supp.)); *see Arista Records, Inc. v. MP3Board, Inc.*, 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002). Here, *Plaintiffs* had access to data that could have supported (or refuted) their direct infringement claims, but they failed to collect, preserve, or produce it.[13] And Plaintiffs made no effort to obtain discovery from any alleged direct infringers, either before or during this litigation. There is no basis for Plaintiffs to proceed on a "deemed distribution" theory here.

## II.    Plaintiffs lack sufficient evidence of ownership for many works in suit.

Plaintiffs' copyright validity and ownership evidence is riddled with errors and inconsistencies, and does not support granting summary judgment to Plaintiffs as to many works in suit.[14]

First, for approximately 1,715 works, the *only* evidence of ownership is a "print out" of an index from the Copyright Office's website, as opposed to a registration certificate. *See* Lane Dec. ¶9, Ex. L1. While the Copyright Act plainly states that "the *certificate of a registration* made before or within five years after first publication shall constitute prima facie evidence of the

---

[12] Plaintiffs attempt to excuse their lack of evidence of actual dissemination by arguing that it is "impossible for MarkMonitor … to track a peer's activity *with other peers*." Mot. 23 (emphasis added). This unsupported claim is misleading: it is undisputed that MarkMonitor, which was *itself* a peer could have downloaded files from peers it targeted but chose not to. Kearney Dec. ¶7, Ex. K6; *id.* ¶27, Ex. K17.

[13] Any effort by Plaintiffs to argue that Cox should have kept such records fails because Cox could not have proactively monitored all the communications of its millions of Internet subscribers, *and* retained such records indefinitely, in case a particular subscriber might someday infringe.

[14] Plaintiffs assert 10,478 works in this case, *see* ECF Nos. 136, 172-1, 172-2, but move for summary judgment on hundreds fewer. Thus, Plaintiffs appear to concede that they lack proof of validity or ownership for the works for which they do not seek summary judgment. Lane Dec. ¶8.

validity of the copyright and of the facts stated in the *certificate,*" 17 U.S.C. § 410(c) (emphases

added); *see also Univ. Furniture Int'l, Inc. v. Collezione Europa USA*, 618 F.3d 417, 428 (4th Cir.

2010), there is nothing in the statute permitting Plaintiffs to substitute an index of certificates for

the certificates themselves. Plaintiffs nonetheless ask this Court to take judicial notice of these

indices and bless them with the same presumption that Congress reserved for registration

certificates.[15] Mot. 18, n.6; *see also* ECF No. 284. That request is the subject of a fully briefed

motion. ECF No. 283-284, 356, and 362. Plaintiffs' claim to own the works for which no certificate

have been proffered should stand or fall with that motion.[16]

Second, Plaintiffs are entitled to a presumption of ownership only if their works were reg-

istered within five years of first publication. *See* 17 U.S.C. § 410(c). Plaintiffs produced only a

registration certificate (or a "print out" from the Copyright Office website) for approximately 129

works that were registered *more* than five years after first publication and are therefore not entitled

to such a presumption. *See* Lane Dec. ¶11, Ex. L3. For these works, Plaintiffs needed to (but failed

to) further substantiate their claim to ownership.

Third, Plaintiffs move for summary judgment on hundreds of works for which either a

predecessor entity is listed on the registration certificate or the asserting Plaintiff acquired the cop-

yright from a third party. Mot. 17-19.[17] Where the asserting Plaintiff is *not* listed on a registration

certificate, "Plaintiffs must produce additional evidence of the chain of title from the claimant

---

[15] As argued in Cox's opposition to Plaintiffs' motion for judicial notice, ECF No. 284, Plaintiffs cite no authority for the Court doing so here. They rely on this Court's decision in *BMG* where the Court took judicial notice of information from the Copyright Office's website to **remedy** defects regarding **only two** registration certificates that were produced during discovery and that covered only **two works in suit** (out of the over 1,100 at issue). *See BMG* , 149 F. Supp. 3d at 646-647.

[16] To the extent that registrations have been produced, 13 are facially deficient. Lane Dec. ¶10, Ex. L2. Thus, Plaintiffs lack proof of the validity of these copyrights and their ownership of them.

[17] *See also* Leak Dec. ¶¶19-48; Patel Dec. ¶¶33-176, Poltorak Dec. ¶¶20-39, Kokakis Dec. ¶¶20-89; McMullan Dec. ¶¶16-57; Blietz Dec. ¶¶18-111.

listed on the registration" to the asserting Plaintiff. *BMG*, 149 F. Supp. 3d at 645. In *BMG*, this Court determined that chain of title was sufficient where BMG paired a registration certificate with a document evidencing the relevant transaction (such as a merger certificate, purchase agreement, or agreement with another publisher). *Id.* Here, Plaintiffs' proof of ownership for hundreds of these works is deficient because such "additional evidence" is missing. Instead, Plaintiffs' declarants merely describe transactions with no documentary proof whatsoever. *See* Lane Dec. ¶¶13-165, Ex. L5-L14.[18] This is inadequate as a matter of law, precluding summary judgment.

Fourth, while the Record Company Plaintiffs registered nearly all of their albums (and all of their component parts or "tracks") as works "made for hire," they also registered approximately 238 *individual* sound recordings (*i.e.*, singles) as works "made for hire." *See* Lane Dec. ¶12, Ex. L4. A "work made for hire" is either (1) "a work prepared by an employee within the scope of his or her employment; or (2) a work specifically ordered or commissioned … as a compilation." 17 U.S.C. § 101. There is no evidence that any of these works were created by employees of the Record Company Plaintiffs. And because individual "sound recordings" are the antithesis of a compilation, they do not qualify as works "made for hire." Hence, these registrations must be deemed invalid and insufficient to sustain Plaintiffs' burden of proof. *See also In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1097–98 (N.D. Cal. 2002) ("Sound recordings are not one of the nine listed works. This glaring omission in the statutory requirements suggests that plaintiffs' works cannot be 'specially commissioned' works for hire.").[19]

---

[18] To the extent Plaintiffs argue that Cox cannot challenge their ownership or possession of an exclusive right to any of the copyrights in this case, it should be rejected. Cox is permitted to challenge whether Plaintiffs have standing to assert infringement in this case. *BMG,* 149 F. Supp. at 652 (permitting Cox to challenge "the written agreements [to] ask[] if that language conveyed the type of right necessary to support standing to bring an infringement claim").

[19] Any argument by Plaintiffs that their misrepresentations to the Copyright Office are insufficient

Fifth, 78 of Plaintiffs' works were registered either *after* the Claim Period or the alleged

infringement in this case. *See* Lane Dec. ¶166, Ex. L15. Plaintiffs irrevocably elected statutory

damages as their exclusive remedy. ECF 100.[20] To be entitled to such, Plaintiffs must demonstrate

that they possessed a valid registration *before* the alleged infringement. *See* 17 U.S.C. § 412. Their

failure to do so means that they are not entitled to any damages for these works.

## III.         Plaintiffs Lack Evidence of Contributory Infringement by Defendants

Because Plaintiffs lack sufficient evidence to prove direct infringement, they are not

entitled to summary judgment on their secondary claims. Plaintiffs also lack sufficient evidence to

establish the elements of contributory liability, which requires proof that the defendant had

sufficient knowledge of the specific acts of infringement to have contributed to or induced them,

and that the defendant materially contributed to the specific acts of infringement. *BMG I* at 663;

*BMG v. Cox*, 881 F.3d 293, 310 (4th Cir. 2018) ("*BMG II*"). Plaintiffs lack evidence that Cox either

had knowledge of the alleged infringements, or materially contributed to them.

---

to invalidate the registrations should be rejected. Record companies, including Plaintiffs and their agent the RIAA, have long tried to amend legislation to permit sound recordings to be included under the limited categories of works that can be deemed works "made for hire." *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1098, n.7 (N.D. Cal. 2002) (noting the "tremendous outcry" after a short-lived amendment to the Copyright Act permitting sound recordings to be registered as works made for hire was discovered and quickly repealed). There is no reasonable dispute that Plaintiffs' misrepresentations were knowing and intentional. These misrepresentations, which relate to the ownership of the work, are plainly material and serve to invalidate the registrations. *See, e.g.*, *DeliverMed Holdings, LLC v. Schaltenbrand*, 2012 WL 13028117, at *1 (S.D. Ill. Oct. 15, 2012). While Plaintiffs may elect to re-register these works, they are barred from asserting them in this action. *See* 17 U.S.C. § 411 ("[N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title.").

[20] Judge Anderson admonished Plaintiffs they could not back-track on this election. Jan. 25, 2019 Hr'g Tr. at 18:5-22 (ECF No. 93). Courts routinely reject efforts to backtrack this election. *Marano v. Aaboe*, No. 05 CIV. 9375 BSJ RLE, 2010 WL 6350785, at *3 (S.D.N.Y. Oct. 20, 2010), *report and recommendation adopted*, No. 05 CV 9375 BSJ, 2011 WL 1157553 (S.D.N.Y. Mar. 28, 2011) ("Although the statute allows a plaintiff to elect between actual damages and statutory damages, it does not provide a plaintiff with the right revise its election after it is clearly made.").

### A. Plaintiffs Cannot Establish Cox's Knowledge of Alleged Infringements

Plaintiffs cannot establish knowledge for multiple reasons.

#### 1. The Music Publisher Plaintiffs never provided any notice to Cox

It is undisputed that the 36 Music Publisher Plaintiffs, who collectively assert infringement of 3,421 musical compositions, never sent infringement notices to Cox. Instead, they rely entirely on notices the RIAA sent on behalf of the Label Plaintiffs. But those notices identified *only* sound recordings, and did not notify Cox of infringement of musical compositions. "Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights." *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1248-1249 (C.D. Cal. 2002). The law is clear that without actual knowledge of, or willful blindness to, *specific* infringements of *identified* copy-righted works, Cox cannot contributorily liable. *BMG II* at 307.

#### 2. Alleged infringement occurring at a Cox Business subscriber's IP address is insufficient to support liability by the Cox Business subscriber.

Plaintiffs also cannot show that Cox had actual knowledge of infringement with respect to notices directed at Cox Business subscribers. Plaintiffs' inability to prove *which* user of a particular business subscriber's IP address purportedly infringed a particular copyright is fatal not only to their direct infringement claims (*see supra* at I.B.), but also to their contributory infringement claims. *See Cobbler*, 901 F.3d at 1147-1148 (finding claim for contributory infringement not sustainable, because "a bare allegation that [the defendant] failed to police his internet service … does not sufficiently link [him] to the alleged infringement"). Like the defendant in *Cobbler*, Cox Business customers provide Internet service to their employees, customers, guests, and visitors. Kearney Dec. ¶42, Ex. K32. Here, as in *Cobbler*, there is no evidence establishing a connection between any act of infringement and the Cox Business subscriber itself, or to any particular user of the subscriber's IP address. For the reasons cited in *Cobbler*, mere evidence that a Cox Business

subscriber's IP address has been used by someone to engage in infringement is insufficient to show that any end-user or the business subscriber itself is an infringer.

### 3.   Plaintiffs' notices identified fewer than 2,000 works in suit

Although the RIAA sent notices identifying just 1,998 unique sound recordings, Plaintiffs seek to hold Cox liable for alleged infringements of nearly *10,500* separate copyrighted works: 7,057 sound recordings and 3,421 musical compositions. Kearney Dec. ¶21-22, Ex. K13_A, B. Unlike the BMG litigation, where there was no dispute that the notices at issue provided Title and Artist information sufficient to identify each of the works-in-suit, in this case the notices do not actually identify a majority of the asserted works. Because Cox lacked actual knowledge of specific infringement of these unidentified works, it cannot be held liable.[21]

### 4.   Plaintiffs' notices were otherwise insufficient to give Cox knowledge.

Proof of the knowledge necessary to establish contributory liability "require[s] that Cox knew of specific instances of infringement or was willfully blind to such instances." *BMG II* at 312. Plaintiffs can prove neither. Plaintiffs argue their notices gave Cox knowledge of "the identities of specific Cox subscribers who were infringing Plaintiffs' Works," and that the Court held in *BMG* that "DMCA-compliant" copyright infringement notices "are evidence of knowledge." Mot. 24-25. But, of necessity, that depends on what the notice says.

First, there are substantial questions raised by the vagueness of Plaintiffs' notices. Among other deficiencies, the notices did not even allege that a Cox subscriber was liable for infringement, instead merely alleging that "a user on your network" used an "Internet account" to "reproduce[e] or distribut[e]" a copyrighted work, and the user "may be liable" for infringement. Kearney Dec.

---

[21] Plaintiffs' notices identify only 1,998 works by Title and Artist, but because many of those Title-and-Artist combinations are not works in suit, even *fewer* works are actually identified than appears at first. *Compare id.* with ECF 172-1 (Amd. Ex. A to First Amd. Compl.).

¶13, Ex. K7. The notices were equally equivocal as to their accuracy, merely "assert[ing]" that the information in them was "accurate, based upon the data available to us."[22] Unsurprisingly, then, although Plaintiffs repeatedly argue that their notices are "evidence" of infringement, Plaintiffs' own cited authorities recognize that notices such as theirs—consisting of mere unsupported allegations—are insufficient, without more, to make a *prima facie* case of infringement. *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1105-06 (W.D. Wash. 2004) (cited at Mot. 25) explains that "[a]ctual knowledge of blatant, repeat infringement *cannot be imputed* merely from the receipt of notices of infringement. Instead, *there must be additional evidence* available to the service provider to buttress the claim of infringement supplied by the notices." (emphasis added).

Plaintiffs have no such "additional evidence" to prove knowledge. They cherry pick quotes out of context from just four internal Cox emails to argue that Cox "understood" that *all* the accused subscribers were intentionally infringing during the Claims Period. Mot. 26. But *nothing* in the record indicates that the customers who were the subject of the emails infringed Plaintiffs' works, or were the subject of Plaintiffs' notices, and a reasonable jury could easily find these emails not probative of Cox's knowledge of such infringements (or any others). As to the other two emails (both outside the Claims Period), Plaintiffs deliberately take them out of context. *See* Responses to SUF 20. For example, omitting the "winky" emoticon (" ;-)") that immediately followed the remark they quote. At deposition, the email's author explained what is common knowledge: this indicates the writer is "being funny and sarcastic[.]" Kearney Dec. ¶47, Ex. K47.

### 5.    Plaintiffs lack evidence of willful blindness.

Finally, Plaintiffs argue that Cox willfully blinded itself to infringement allegations in *third*

---

[22] Plaintiffs' claim that the notices were "made under penalty of perjury," Mot. 1, is misleading. The *only* statement so made was "the RIAA is authorized to act on behalf of its member companies in matters involving the infringement of their sound recordings[.]" Response to SUF 14.

*party notices* (from Rightscorp) that are irrelevant to this case. The Rightscorp notices were sent on behalf of a non-party to this case, regarding alleged infringement of musical compositions not at issue here. Not only is there no foundation whatsoever for the contents or reliability of the Rightscorp notices—which were never the subject of *any* discovery in this case—but Plaintiffs do not even provide copies of those notices. Even if they were even marginally relevant—which they are not—they are very clearly not sufficient to find willful blindness on summary judgment here. Without any foundation, Plaintiffs provide three "excerpts," purportedly from an unauthenticated trial exhibit (PX-34) of unexplained origin. Although Plaintiffs' counsel Gould claims to have "personal knowledge" that each of these documents is a "true and correct cop[y]" of "[a] filtered excerpt of RightsCorp notice data," he fails to explain what the "notice data" consists of, where it came from, what it means, how it was "filtered," and by whom. Nor do Plaintiffs have any evidence concerning the provenance, meaning, accuracy, foundation, or admissibility of either the "Rightscorp notice data" *or* the underlying notices. This "evidence" provides no basis for summary judgment on knowledge.[23] Plaintiffs apparently are planning a trial within a trial in this case, in which they will need to prove up the accuracy and reliability of the Rightscorp system. That is inappropriate for many reasons that can be dealt with by *in limine* motions; for this purpose, it is sufficient that whatever foundational showing Plaintiffs plan to make, they have not made it.

Plaintiffs also argue that Cox was willfully blind because, they speculate, "*[i]f* Cox had not imposed … limits" on the number of notices the RIAA submitted, it "would have" been "charged" with "additional … knowledge of infringement by … specific subscribers[.]" Mot. 27. Plaintiffs'

---

[23] It is also irrelevant because the underlying notices from which the excerpts-of-the-summary were purportedly derived do not concern works in suit. Plaintiffs offer no evidence that their copyrights would be implicated by notices (still less extracts of summaries of notices) purporting to cover BMG's musical compositions.

unfounded speculation is not a basis upon which a reasonable jury could find Cox willfully blind to infringement. It is undisputed that RIAA and Cox freely negotiated the "limits" on number of notices RIAA would send, and RIAA voluntarily accepted them. ECF No. 136 (First Amd. Compl. ¶¶19-20. Indeed, during nearly the entire Claims Period, RIAA sent many *fewer* notices than it was allotted. Kearney Dec. ¶35, Ex. K25 (at ¶¶36, 117-118). No reasonable jury could give *any* weight to non-existent notices that never would have been sent.

**B.      There is no evidence that Cox materially contributed to alleged infringement.**

Nor can Plaintiffs prove the second prong of contributory infringement, which requires showing that the defendant materially contributed to the specific acts of infringement. *BMG I* at 663; *BMG II* at 310. As the Supreme Court explained in *Grokster*, an intent to infringe will not be presumed from "the equivocal conduct of selling an item with substantial lawful as well as unlawful uses," even when the seller has the "understanding that some of [his or her] products will be misused." *Grokster*, *545* U.S. at 932–33; *BMG II* at 306. The evidence shows that Cox's Graduated Response was industry leading, tougher than the CAS agreement negotiated between copyright claimants—including many of the Plaintiffs—and other leading ISPs, and effective in ending infringement ██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

Kearney Dec. ¶36 & Ex. K26 (at ¶54); *id.* ¶24, Ex. K24 (at ¶¶146, 147-152, 153-158). On this record, a reasonable jury could easily find that because Cox's Graduated Response was demonstrably effective, and Cox actually terminated subscribers who continued to infringe, Cox did not materially contribute to infringement by its subscribers.[24]

**IV.      Plaintiffs Lack Evidence to Support Vicarious Liability.**

---

[24] Tellingly, although Plaintiffs appear to believe Cox should have terminated more alleged infringers, they are unable to propose a coherent standard for when termination was warranted.

Vicarious liability requires proof that a defendant possessed both "an obvious and direct financial interest in the exploited copyrighted materials," and "the right and ability to *supervise* the infringing activity." *BMG I* at 673 (quoting *Nelson–Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir.2002)) (emphasis added). Plaintiffs lack evidence of either.

### A.    There is no evidence that Cox had an obvious and direct financial interest in infringement of works in suit.

The "direct financial interest" requires proof of a "causal relationship" between "the infringing activities *at issue in th[e] case* and a direct financial benefit to the defendant." *BMG I* at 675-76 (emphasis in original) (quotation omitted). Plaintiffs lack such evidence. The undisputed facts show that the only revenue Cox received from its subscribers was a monthly subscription fee that did not depend on the manner or purpose for which subscribers used the service.[25] As this Court explained in *BMG*, because "Cox provides a content-neutral commercial service that makes a wide selection of services and activities available to its subscribers … [and] charges the same flat monthly fees to its users whether they use Cox's service for infringing or non-infringing purposes … the relevant inquiry … is whether the infringing activity constitutes *a draw for [Cox's] subscribers*, not just an added benefit." *BMG I* at 676 (emphasis added) (citations and internal quotation marks omitted). Without evidence that "some portion of [Cox's] fees is generated from subscribers that are drawn to Cox's service at least in part *because* of the infringing activity alleged *in this case* … the requisite causal connection between the benefit and the infringing activity is not established." *Id*. (emphasis added). Plaintiffs' evidence falls far short.

---

[25] Plaintiffs sought, and Cox produced, revenue reports for Cox subscribers Plaintiffs accused of copyright infringement during the Claims Period. They demonstrate that Cox charged a flat fee for service, unaffected by the alleged infringement. *See* Gould Dec. Ex. 7, 39-40. They also show Cox did not receive ongoing revenues from subscribers Cox terminated for copyright infringement. *Id.*

Plaintiffs' attempt to skirt the Court's "direct financial benefit" standard arguing Cox obtained revenues "by not terminating the accounts of known repeat infringers." Mot. 30. But this is precisely what, according to both the seminal opinion in *Ellison v. Robertson*, 357 F.3 1072, 1079 (9th Cir. 2004) and this Court's *BMG* decision is *insufficient* for vicarious liability. Plaintiffs have zero evidence that Cox's supposed failure to terminate alleged infringers acted as a draw to its service. The only available evidence is to the contrary: that Cox, virtually alone among major ISPs, *did* terminate repeat infringers. Kearney Dec. ¶42, Ex. K32; *id.* ¶34, Ex. K24 (at ¶¶30, 146, 149).

Plaintiffs' attempt to rewrite this basic rule of vicarious liability relies on misrepresentations of both Congressional legislative history and the *Ellison* decision. Plaintiffs claim incorrectly that because "*Ellison* and the legislative history it quotes expressly use the word 'ordinarily,'" that "demonstrate[es] an understanding that fixed payments can satisfy this element in appropriate circumstances." Mot. 34. But the word "ordinarily" appears nowhere in the legislative history, and *Ellison* (along with this Court and Congress) explicitly states the *only* "exception" to the general rule that a flat fee-for-service is insufficient: namely, where "the value of the service lies in providing access to infringing material"—i.e., a "draw." *Ellison* at 1079; *BMG I* at 675-76; S. Rep. 105-90 at 44-45. Plaintiffs' proposed rule, that a defendant is vicariously liable if it receives multiple emails from a copyright owner, would swallow the rule, applying to *any* situation where a defendant who receives flat-fee revenues for providing a service is sued for infringement. *See UMG Recordings, Inc. v. Grande Comm's Networks, LLC*, No. A-17-CA-365-LY, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018), *report and recommendation adopted*, No. 1:17-CV-365-LY, 2018 WL 2182282 (W.D. Tex. Mar. 26, 2018); *report and recommendation adopted*, No. 1:17-CV-365-LY, 2018 WL 1905124 (W.D. Tex. Mar. 28, 2018) ("UMG only alleges that the existence of music and the BitTorrent protocol is the draw. But that would impose liability on every ISP, as the music

33

at issue is available on the Internet generally, as is the BitTorrent protocol, and is not something exclusively available through Grande's services."). It is unsurprising that Plaintiffs cite no authority to support their expansive rewriting of the vicarious liability standard.

This case is distinguishable from *BMG*, in which the plaintiff at least offered a customer survey purporting to show that for some fraction of Cox subscribers, the ability to obtain free music from certain websites was one reason (among many) they subscribed to Cox's service. *BMG I* at 676. While recognizing that BMG's disputed survey evidence was "hardly overwhelming," the Court nevertheless found that it was sufficient to present a genuine fact question for the jury.[26] *Id*. Here, because Plaintiffs lack any comparable evidence—or any evidence at all—to support their essentially identical claim, vicarious liability is not a "close question." *See id.*

Finally, there is no evidence showing that any subscribers were drawn to Cox's service by the availability of unauthorized copies of *Plaintiffs*' works, or for that matter the availability of any infringing works. Nor is there evidence that the availability of Plaintiffs' music on Cox's network enhances the value of Cox's services to subscribers, that anyone subscribed to Cox's ISP service in order to obtain unauthorized copies of Plaintiffs' works, or that anyone chose Cox's service over another because of a perceived ability to obtain copyrighted works over Cox's network. Notably, too, Plaintiffs' expert bases his analysis and findings on the number of "DMCA tickets" that a subscriber received, Lehr Dec., but fails to link that number to alleged infringement of Plaintiffs' works, so the required "causal relationship" simply cannot be shown.

**B.    Cox did not have the right and ability to supervise alleged infringing activity.**

Plaintiffs also misrepresent the Court's holding in *BMG*, and ignore the Fourth Circuit's *Nelson-Salabes* "right and ability to supervise" standard. They argue that Cox had "control over

---

[26] Notably, the jury ultimately found Cox not liable for vicarious infringement, a finding that was not challenged on appeal. *BMG v. Cox*, 199 F. Supp. 3d 958, 969 (E.D. Va. 2016).

its subscribers," Mot. 29, simply because it had the legal right to terminate their accounts, and that this "control" mandates summary judgment. But the mere right to terminate a subscriber's account does not give Cox the right and ability to *supervise* acts of allege infringement, and a reasonable jury—like the *BMG* jury—could easily find for Cox on this issue.

Contrary to Plaintiffs' claim, the Court did not "determine[]" this issue in *BMG*: rather, in that case the Court held that there *was* "a genuine issue of material fact as to whether [plaintiff] [could] establish the first element of its vicarious liability claim." *BMG v. Cox*, 149 F. Supp. 3d at 675. Plaintiffs' misplaced reliance on the Court's holding in *BMG* is fatal to its motion, since Plaintiffs adduce *no* factual evidence that Cox had either the right, or the ability, to "supervise the infringing activity." Plaintiffs do not even argue the point, claiming only that Cox "has the practical ability to stop or limit infringement" by terminating subscriber's accounts. Mot. 30. But so too does the electric company that supplies power to an infringer's computer; that does not make the electric company vicariously liable for infringement. *See Perfect 10, Inc. v. Visa Intern. Svc. Assn.*, 494 F.3d 788 (9th Cir. 2007). It is undisputed that Cox does not, and *cannot*, control the contents on its subscriber's devices, nor remove material from the Internet. And Plaintiffs fail to show, or even argue, that Plaintiffs' notices—which contained unsworn allegations of *past* acts of infringement that Cox had no way to verify—could have enabled Cox to supervise those acts, or any others.

Equally fatal to Plaintiffs' argument is the fact that the *BMG* jury—which *did* "determine" the issue previously—found Cox *not* vicariously liable, on similar facts. The issue of Cox's right and ability to supervise was argued extensively to the jury, and Plaintiffs cannot plausibly claim to know the basis for the jury's holding, which was not challenged on appeal. Nor can they plausibly argue that no jury could find Cox innocent of vicarious liability, when one already has. Plaintiffs' cited authorities do not support summary judgment on this issue, and Plaintiffs adduce

35

no facts to support Cox's purported right and ability to supervise alleged direct infringements at issue. Not only *could* a reasonable jury find Cox lacked the practical right and ability to supervise infringement, but a reasonable jury has *already done so*. The Court should deny Plaintiffs' motion.

**V.      Plaintiffs Are Not Entitled to Summary Judgment on Cox's Affirmative Defenses.**

>   **A.      Plaintiffs' motion for summary judgment on "improper" affirmative defenses is legally inadequate and untimely.**

Plaintiffs move for summary judgment on affirmative defenses 6-11, 16, and 18-20, arguing that they are not proper affirmative defenses because they merely negate an element of Plaintiffs' *prima facie* case. Plaintiffs' motion should be denied: even if Cox's defenses were not "true" affirmative defenses, that would not be grounds for entering judgment against them. The proper remedy, if any were necessary, would have been a motion to strike under Rule 12(f)(2)—but any such motion is long overdue, as it should have been filed not later than "within 21 days after [Plaintiffs were] served with" Cox's Answer. Fed. R. Civ. P. 12(f)(2).

Moreover, even if the Court were willing to consider Plaintiffs' motion a timely motion to strike, "[m]otions to strike a defense as insufficient ... even when technically appropriate and well-founded ... are often not granted in the absence of a showing of prejudice to the moving party … Thus, the movant under Rule 12(f) faces a sizeable burden." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 2001 WL 1180469, at 1 (W.D. Va. 2001) (citing Wright & Miller) (internal quotations omitted). Plaintiffs have not even alleged prejudice here, never mind proved it.

>   **B.      Plaintiffs are not entitled to summary judgment on innocent infringement.**

Plaintiffs seek judgment on Cox's innocent infringer defense, seeking to piggyback the court's denial of that defense in *BMG* and arguing that Cox is precluded from asserting the defense by 17 U.S.C. §402(d). Both arguments lack merit.

Plaintiffs argue that Cox is estopped from asserting an innocent infringer defense, because

in *BMG* the Fourth Circuit held "an innocent infringer instruction was not available to Cox." Mot. 37-38. Plaintiffs are wrong. As explained in Section VI, to preclude this defense on collateral estoppel grounds, Plaintiffs must first show that Cox's innocent infringer defense in this case is "identical" to the defense litigated in *BMG*. That, in turn, requires Plaintiffs to demonstrate that the evidence of Cox's knowledge or belief (or lack thereof) that it was infringing in *BMG* is the same as the evidence in this case. *See* 17 U.S.C. §504(c)(2) (innocent infringer defense applies where "infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright"). Plaintiffs cannot meet that burden, because the basis for Cox's alleged knowledge of infringement, the RIAA notices, is materially different than it was in *BMG*, because those notices do not identify most of the works in suit. And, unlike in *BMG*, Cox did not block but responded to Plaintiffs' notices, successfully ending ███████ the infringement.

Plaintiffs also argue that Cox cannot invoke the innocent infringer defense because it "had access to legitimate copies of Plaintiffs' Works on which Plaintiffs affixed copyright notices which complied with statutory requirements," which precludes an innocent infringer defense under 17 U.S.C. § 402(d). But Plaintiffs have no evidence to support this, and there is at minimum a genuine fact dispute on the issue. Section 402(d) precludes an innocent infringer defense "if a notice of copyright … appears in the published phonorecord or phonorecords to which a defendant … had access." Plaintiffs' evidence of "access" consists of unsourced assertions by three of its experts stating (in nearly identical terms) that "it is the Sony Music Plaintiffs' policy and practice to publish" sound recordings "with copyright notices in the form and position set forth 17 U.S.C. § 402(b) and (c)." Leake Dec. ¶8. Beyond these unsourced assertions, there is no evidence that any of the downloaded works included copyright notices. To the extent Plaintiffs intend to argue that the mere availability *to the public* of marked copies of the downloaded works is sufficient to constitute

"access," that proposition is a question of first impression in this Circuit—and the better answer is that §402(d) "access" requires more. *See, e.g., Harper v. Maverick Recording Co.*, 562 U.S. 1080 (2010) (Alito, J., dissenting from the denial of cert.) (noting that because "a person who downloads a digital music file generally does not see any material object bearing a copyright notice … there is force to the argument that § 402(d) does not apply" to preclude an innocent infringer defense).

Because the Fourth Circuit has not addressed this issue, Cox is free to argue that the mere public availability of marked copies of the allegedly copyrighted material is *not* sufficient to preclude an innocent infringer defense under § 402(d). If § 402(d) does not apply, then the relevant question is whether Cox "had reason to believe" that its acts constituted infringement under §504(c)(2). That in turn is a fact question, inappropriate for summary judgment.

### C.     Plaintiffs are not entitled to summary judgment on failure to mitigate.

Plaintiffs argue that Cox's failure-to-mitigate defense should fail because "it concerns damages, not liability, and is inappropriate as an affirmative defense" because Plaintiffs seek only statutory damages. Mot. 38. They also argue that "Cox has no factual evidence to suggest that Plaintiffs failed to mitigate their damages." *Id*. Both arguments are incorrect.

Although some courts have held that plaintiff's election to seek statutory damages invalidates a mitigation defense, in *BMG* this Court squarely held to the contrary, stating that although "District courts are divided on the question of whether a plaintiff's election of statutory damages invalidates a failure-to-mitigate defense," this *"Court agrees with those courts to hold that it does not*." *BMG I* at 677 (emphasis added). The same reasoning applies here.

Plaintiffs' claim that Cox has offered no evidence of failure to mitigate sufficient to avoid summary judgment requires it to ignore or explain away testimony by Cox's Rule 30(b)(6) designee explaining that they failed to mitigate damages because (1) they did not pursue direct infringers; (2) did not ask Cox to terminate any subscribers; and (3) did not utilize the full allotment

of 600 notices a day. Kearney Dec. ¶38, Ex. K28. Plaintiffs' effort to avoid that evidence does not eliminate the existence of a fact dispute. *First*, Plaintiffs' argument that "suing direct infringers is not a prerequisite to bringing secondary liability actions" is irrelevant to mitigation, and nothing in *Arista Records v. Flea World*, 356 F. Supp. 2d 411, 416 (D.N.J. 2005), cited at Mot. 39, suggests otherwise. *Second*, Plaintiffs' argument that "courts have uniformly rejected contentions that copyright owners are somehow at fault for the extent of illegal downloads" is irrelevant: the duty to mitigate is unrelated to "fault." Nothing in cases Plaintiffs cite suggests otherwise. In light of Delgado's testimony, there is a fact question as to whether Plaintiffs failed to mitigate damages.

## VI.   Plaintiffs Cannot Assert Nonmutual Offensive Collateral Estoppel Against Cox.

Plaintiffs make a cursory attempt to estop Cox from litigating certain factual and legal issues that (they claim) were raised and resolved in *BMG*. They fail procedurally and substantively. "To apply collateral estoppel or issue preclusion to an issue or fact, the proponent must demonstrate" that the issue or fact is identical to one previously litigated, actually resolved, and "critical and necessary" to the prior judgment, that the prior judgment is final and valid, and that the party to be precluded had a full and fair opportunity to litigate the issue. *In re Microsoft Corp. Antitrust Litigation*, 355 F.3d 322, 326 (4th Cir. 2004). Application of the doctrine is discretionary, and "should not be exercised" where it "would be unfair to a defendant." *Id.*

Plaintiffs make no attempt to apply these factors to the case, never mind to meet their burden to demonstrate that estoppel should apply. Indeed, Plaintiffs' assertion of estoppel is so cursory—primarily raised in a footnote, unaccompanied by any analysis—that the Court should simply disregard it as inadequately raised.[27] If the Court elects to consider Plaintiffs' estoppel

---

[27] *See, e.g., Williams v. Studivent*, 2009 WL 3837627, at *1 n.2 (E.D.N.C. 2009); *Silicon Knights, Inc. v. Epic Games, Inc.*, 551 F. App'x 646, 650 (4th Cir. 2014); *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 250 n.8 (4th Cir. 2015); *The Carrolton of Fayetteville v. Pine Manor*

arguments at all, it should reject them on the merits. "The burden is on the party asserting collateral estoppel to establish its predicates, and this of course includes presenting an adequate record for the purpose." *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982). Here, Plaintiffs' estoppel arguments fail because they provide no analysis of the predicate elements or specifically identifying the issues they believe are subject to estoppel. *See, e.g., id.* at 1166 (denying collateral estoppel where proponent failed to provide evidence demonstrating the issue had been litigated).

Finally, Plaintiffs' specific assertions of estoppel (to the extent they can even be identified) also fail for independent reasons. For example, Plaintiffs appear to seek preclusive effect for several facts and issues (or Plaintiffs' skewed characterizations of them) addressed by the Fourth Circuit in rejecting Cox's DMCA safe harbor defense in *BMG*. *See* Mot. SUF ¶¶24(d), 24(e), 25-28, 39. But because Cox has not raised a DMCA safe harbor defense here, the facts and conclusions recited there are not "identical" to any issue presented here, making estoppel unavailable. *See, e.g., Microsoft*, 355 F.3d at 326. Similarly, Plaintiffs appear to argue that Cox is estopped from disputing certain facts about Cox's relationship with Rightscorp. *See, e.g.,* Mot. SUF ¶34. But the Rightscorp facts are not "identical" to any issue presented in this case, because the Rightscorp notices are irrelevant to Plaintiffs' infringement claims. To the extent Plaintiffs hope to use the Rightscorp material to establish "willful blindness" to infringement, they cannot do so. "Willful blindness" means blindness to the infringement at issue *in this case*—not blindness to infringement in other cases, or in some abstract sense. Cox's conduct *vis a vis* Rightscorp has no bearing at all on the allegation of willfulness blindness to infringement of *Plaintiffs'* works.

For these reasons, Cox respectfully requests that the Court deny Plaintiffs' motion entirely.

---

*Rest Home*, 215 BR 341, 343 (EDNC 1997) (Issues "averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived for purposes of appeal.").

Dated: September 24, 2019

Respectfully submitted,

*/s/ /Thomas M. Buchanan/*
Thomas M. Buchanan (VSB No. 21530)
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.
and CoxCom, LLC*

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email: melkin@winston.com
Email: tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
Thomas Kearney (*pro hac vice pending*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
Email: jgolinveaux@winston.com
Email: tkearney@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750
Email: dhleiden@winston.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 24, 2019, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users.

<u>*/s/ Thomas M. Buchanan*</u>
Thomas M. Buchanan (VSB No. 21530)
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.*
*and CoxCom, LLC*