1

UNITED STATES DISTRICT COURT<br>
EASTERN DISTRICT OF VIRGINIA<br>
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
               Plaintiffs,     :
                               :
     -vs-                      :     Case No. 1:18-cv-950
                               :
                               :
COX COMMUNICATIONS, INC., et al.,:
               Defendants.     :
                               :
-------------------------------:
```

HEARING ON MOTIONS

September 27, 2019

Before:  John F. Anderson, U.S. Mag. Judge

APPEARANCES:

Matthew J. Oppenheim, Scott A. Zebrak, and Jeffrey M. Gould,
Counsel for the Plaintiffs

Thomas M. Buchanan, Michael L. Brody, and
Jennifer A. Golinveaux, Counsel for the Defendants

                                                                    2

1             NOTE:  The case is called to be heard at 2:00 p.m. as

2     follows:

3             THE CLERK:  Sony Music Entertainment, et al. versus

4     Cox Communications, Inc., et al., civil action number

5     18-cv-950.

6             THE COURT:  Well, go ahead and introduce yourselves

7     so we have it on the recording.  Thank you.

8             Mr. Zebrak.

9             MR. ZEBRAK:  Good afternoon, Your Honor.  Scott

10    Zebrak with -- for the plaintiffs.  With me are my colleagues

11    Matthew Oppenheim and Jeffrey Gould.

12            And Mr. Oppenheim will argue on our behalf today.

13            THE COURT:  Thank you.

14            MR. OPPENHEIM:  Good afternoon, Your Honor.

15            THE COURT:  Thank you.

16            MR. BUCHANAN:  Good afternoon, Your Honor.  Thomas

17    Buchanan, Winston & Strawn, on behalf of the defendant Cox.

18            With me is Michael Brody and Jennifer Golinveaux,

19    both of Winston & Strawn.

20            THE COURT:  Great.  And who is going to argue?

21            MR. BUCHANAN:  I will, Your Honor.

22            THE COURT:  Okay.  Thank you.

23            Well, sorry for the delay, but busy day today, but I

24    did at least keep you from having to wait no longer than one

25    hour for this.

3

1          You know, I've reviewed everything.  And, you know,

2     this was a case that I thought was worth having the extended

3     briefing schedule or the regular briefing schedule, and

4     everybody got stuff into me on time and things like that.  So

5     I've reviewed it all.  I want to hear the argument that counsel

6     want to make for this.

7          You know, I am viewing this motion -- and, you know,

8     there is a little bit of discussion back and forth in the

9     papers that goes beyond this.  So, you know, I'm the magistrate

10     judge.  Judge O'Grady is the district judge.  My ruling is

11     going to be on issues having to do with the discovery

12     sanctions, not necessarily the admissibility as far as, you

13     know, Federal Rules of Evidences and, you know, did you provide

14     me with the background information of the spreadsheet and those

15     kind of things.

16          I mean, I think the issue that has really been

17     presented to me is to whether, you know, a discovery sanction

18     for the failure to preserve electronically-stored information,

19     is appropriate in this case.

20          And there are two, two things that I really would

21     like to have Mr. Buchanan address directly.  One is, you know,

22     when did the duty to preserve in this case really arise.

23          Obviously, this is information that relates to a

24     2013/2014 time frame.  The case got filed in July of 2018.  You

25     know, under the current version, as of I think 1995 -- current

1    version within the last few years of 37(e), you know, you have

2    to look to whether the electronically-stored information should

3    have been preserved in the anticipation or conduct of

4    litigation.

5           And the second issue is, it has to have been lost

6    because of a party's action.

7           And my understanding through the contractual

8    relationship is none of the plaintiffs in this case had a

9    direct contractual relationship with MarkMonitor, or certainly

10   not with Audible Magic.

11          So, you know, I just want to make sure I understand

12   what the theory is as far as agency and some other things.  And

13   I'll just -- on the duty to preserve issue, this is a much

14   different case than the BMG case.  You know, I don't think I'm

15   saying anything out of school in that case.  But there was

16   communications in that case from the get-go about, you know,

17   we're going to be filing a lawsuit.  We're not in -- you know,

18   we're going to show them this, we're going to show them that.

19   You know, a lot of bravado about all of this stuff has to be

20   done for the purposes of litigation.

21          And so, the issue with Rightscorp, while I think, you

22   know, we had a fulsome discussion on the law in that case, the

23   facts in that case, at least having to go to the, you know,

24   duty to preserve issue, are different than this case.

25          So, with all of that caveat, Mr. Buchanan, let me

1     hear what you have got to say.

2          MR. BUCHANAN:  Thank you, Your Honor.

3          THE COURT:  Thank you.

4          MR. BUCHANAN:  Well, as the Court is aware, the

5     standard in terms of retaining the evidence is whether the

6     party that has the evidence has a reasonable belief that the

7     evidence in question would be discoverable in a case, whether

8     it would be admissible, whether it be requested by the other

9     side, whether it would have some value to the other side.

10         THE COURT:  Well, it has to be in anticipation of

11    litigation.  It's not, am I producing something that at some

12    point in the future may become the subject of a lawsuit.

13         I mean, otherwise it would be, you know, everybody

14    has to keep everything because you never know when you're going

15    to get sued.

16         So there has to be something more than -- there has

17    to be some -- I mean, the rule says:  Should have been

18    preserved in the anticipation or conduct of litigation.

19         MR. BUCHANAN:  So we could start with the testimony

20    of two of the representatives of the plaintiffs who own almost

21    all of the music in the case.  And Alasdair McMullan, he was

22    asked specifically about anticipation of litigation.  The

23    question was:  At the time UMG Recordings authorized the RIAA

24    to engage MarkMonitor, it understood the evidence that

25    MarkMonitor would be collecting could be used in a lawsuit,

6

1    correct?  His answer:  I think so.  I mean, there may have been

2    some reference to the MarkMonitor retention paperwork, to

3    potential litigation.

4            That's at 192/193 of his deposition, Exhibit 5 to the

5    Gould declaration.

6            And then Wade Leak, the vice-president of Legal

7    Affairs and Compliance at Sony, was asked:  Do you know why the

8    head of litigation of the RIAA would have been involved in this

9    program, the MarkMonitor program?  Answer:  Because we were

10   sending notices out under the Copyright Act and there was,

11   obviously, a potential for litigation in the process.

12           And then you listen to the -- even the declaration

13   offered by Mr. Bahun of MarkMonitor, it's paragraph 9, I

14   believe of that declaration, he says:  MarkMonitor takes

15   preservation obligations very seriously.  At all times when

16   MarkMonitor collects data concerning infringement, it preserves

17   evidence in a way that allows content owners to protect their

18   rights and pursue enforcement should they decide to do so.

19   That is true in all cases, including in connection with

20   MarkMonitor's work for RIAA at issue in this case.

21           When he was at asked at deposition:  So the agreement

22   between RIAA and MarkMonitor was entered into with the

23   understanding that the RIAA could use the reports and proposals

24   generated by MarkMonitor in litigation in the future?  Answer:

25   Yes.

1        And then you go to the Master Agreement.  It speaks

2   of evidence files, it defines them.  You know, they have this

3   role of, you know, collecting evidence and detection and

4   verification and notification.  And they talk about that

5   process.  And it says, they collect the evidence, it becomes

6   evidence files.  Evidence cases to be used in litigation.

7        Evidence cases are defined as:  All evidence

8   collected by MarkMonitor for RIAA in relation to any

9   peer-to-peer network, Web service, Internet file sharing

10  platform, or any Internet infringement.

11        Supply of evidence on page 4 of the Master Agreement:

12  MarkMonitor shall at all times be able to verify and prove the

13  integrity of any evidence it gathers for RIAA by way of

14  affidavit or otherwise requested by RIAA.  MarkMonitor will

15  keep backup copies of evidence for as long as reasonably

16  required for taking and pursuing of legal actions.  MarkMonitor

17  agrees to assist RIAA in litigation cases involving evidence

18  cases to the furthest extent as requested by RIAA.

19        THE COURT:  Well, do you have any evidence that these

20  documents were destroyed any time near, or not retained, or

21  whatever the proper term would be, any time in the 2018 time

22  frame that is six, seven months before the institution of this

23  action?

24        Do we -- do we know when it was that -- that the

25  information for up until the time period in February of 2015

1    was no longer retained?

2          MR. BUCHANAN:  So we know that throughout from 2008

3    onward, and as of the time of 2011 that this Master Agreement

4    was signed, that they were -- agreed to collect this evidence.

5          So you start with when the agreement is signed.  And

6    you look what the agreement says.  And you look what the two

7    representatives from the general counsel's office for the two

8    largest plaintiffs.  And they said, we retained, brought in

9    RIAA's general counsel, we signed this agreement, we obviously

10   sent out notices, we anticipated litigation.

11         Mr. Bahun himself says, that's part of the whole

12   process.  So when --

13         THE COURT:  Well, there is -- there is the part in

14   the agreement that says we are going to have a separate

15   engagement if there is actual litigation, right?

16         MR. BUCHANAN:  That's the -- that's the Statement of

17   Work.

18         THE COURT:  Statement of Work.

19         MR. BUCHANAN:  And it says -- it says that they will

20   enter into a separate agreement for university peer-to-peer

21   programs and corporate peer-to-peer litigation programs.

22         And if you look, this is a commercial, residential

23   litigation program, is what we are involved here, a commercial

24   program.

25         So just so you know, universities, obviously, you're

1    not going to terminate -- Cox is not going to terminate a

2    University or the University of Virginia on three notices when

3    they have got 30,000 students or 50,000 employees.

4           The same with Amazon if it moved here.  It is a

5    corporate program.  Totally different.  Those have nothing to

6    do with the residential notice peer-to-peer program,

7    infringement program that is involved here.

8           So we know from the testimony and from the agreements

9    that they were -- they were designed to retain this evidence so

10   they could give notices and bring litigation.  We have that, we

11   have that testimony.

12          And we know that Audible Magic was producing the

13   data.  Again, the plaintiffs describe Audible Magic and

14   MarkMonitor as the crème de la crème in the industry, the most

15   advanced technologically, they are the most reliable, most

16   credible.

17          So Audible Magic is sending this data, they are

18   retaining it.  It then is apparently retained only to a certain

19   degree.  A number of columns of information or fields of

20   information are not kept.

21          So we know they're not retaining it.  It is being

22   created every time MarkMonitor queries about a song, say Born

23   to Run.  They get a match, they don't get a match.  Once they

24   get that match, they get a hash, and then they go out, they

25   find a Cox subscriber's file, computer file, and they see if

10

1    that song is playing, then they send the notice.

2           THE COURT:  And the hash -- I mean, there is one hash

3    for each work, right?  I mean --

4           MR. BUCHANAN:  It's a little --

5           THE COURT:  -- what Audible Magic does is it verifies

6    the hash value of a file and how that file relates to a

7    particular work.  The hash value never changes.

8           MR. BUCHANAN:  That's correct.  The hash value is

9    contained in the notice.  But unlike the BMG case where

10   Rightscorp, they downloaded the file from the Cox subscriber.

11          THE COURT:  Right.  But --

12          MR. BUCHANAN:  Here they didn't do that.

13          THE COURT:  But if you have somebody who verifies

14   that the hash value is Born to Run -- so, you know, the file

15   that relates to this hash value is, you know, Bruce

16   Springsteen's Born to Run, original work --

17          MR. BUCHANAN:  Right.  So what happens is they

18   download what they -- so what happens is the RIAA or the

19   plaintiffs would give titles, artist names, or albums to

20   MarkMonitor.

21          THE COURT:  Right.

22          MR. BUCHANAN:  They would then go and then search the

23   net -- peer-to-peer network to download that.  So they would

24   off that information, author, title, album.  They would

25   download the content from the Torrent file.  They would

11

1    download that.  So then they would need to match that with the

2    Audible Magic database.

3            So they pull out -- they pull out metadata.  They

4    don't download the whole -- the metadata.

5            THE COURT:  Right.

6            MR. BUCHANAN:  So then according to the Audible Magic

7    witnesses and the MarkMonitor witnesses, what happens is they

8    have a duration for the downloaded song.  They have a duration

9    for the referenced or known file.  So the Born to Run, that's

10   on the Audible Magic database.  And they run it against there

11   for whatever, a minute, two minutes, and at least they want at

12   least 20 seconds of a match.

13           And once they get that, that's when they get this ID,

14   this driver's license ID information, which is not in the '431

15   spreadsheet.  And that's what, according to Ikezoye, the

16   witness from Audible Magic, says is -- allows you to drive the

17   car to get to artist, album, and track.

18           So that's the information that's been sanitized, some

19   of it, the match duration, the track duration, the match

20   percentage, and the ID.  And they've populated the '431 and the

21   '236 spreadsheets with a column we know -- it supposedly says:

22   Real.  We have no idea what the Real is based on.

23           THE COURT:  Well, the match could have been done in

24   2005, right?  I mean, and maybe I'm misunderstanding, and

25   that's why I'm trying to ask these sort of basic questions.

12

1          You have the Born to Run work that you've mentioned.

2     Audible Magic, through its expertise, then finds that, you

3     know, this file with this hash valve is actually the Born to

4     Run song.

5          MR. BUCHANAN:  Right.

6          THE COURT:  So whenever that hash value, a file with

7     that hash value is recognized, why -- why would they -- if the

8     hash value never changes, and you verify that that hash value

9     is what is being distributed, why do you have to go back and

10    reverify the hash, that actual file?

11         MR. BUCHANAN:  So --

12         THE COURT:  If the hash value has already been

13    verified.

14         MR. BUCHANAN:  So I think what, actually what happens

15    is the content is pulled off the downloaded file, it is

16    digitized, it is then verified by the Audible Magic database.

17    Then the hash is created, also an Audible Magic ID number.

18         But the point is, we're getting down the road to

19    matching a hash versus some file in Cox.  What we're talking

20    about is, is the match itself credible.

21         So we have a '431 spreadsheet that has removed

22    information as to at least 2 percent of the files on that

23    spreadsheet and sanitized.  Okay.

24         So we have a '236 spreadsheet that is created on

25    December 7, 2018, at the same time the '431 spreadsheet is.

1    Okay.  We get the '431 spreadsheet, initially has no metadata,

2    so we don't know when it was created.  It turns out it was

3    created in 2018 and changed and verified.  And then altered or

4    whatever and then produced.

5           So you have these two spreadsheets.  So let's start

6    off, why does the '236 spreadsheet have on it these files for 2

7    percent of the -- of the files on there?  The columns or the

8    fields for 2 percent.  And so, that -- why was that sanitized

9    if it's superfluous and means nothing?

10          And then we know we have the Audible Magic, the Rev

11   344, which, according to our expert, and their expert agrees,

12   when you look at that and examine that, it only shows a match

13   for 25 percent of the works in suit.

14          THE COURT:  Tell me what you mean by "a match."

15          MR. BUCHANAN:  So the match is, the way it works, as

16   I understand it from reading everything in this case, is once

17   MarkMonitor downloads, say Born to Run, and they create a file,

18   and then they run it against, remotely against the Audible

19   Magic database.  They run it for a certain period of time, an

20   unknown file against a known file.

21          At some point in time there is a match, and that's

22   the Match Offset column which has been removed from the '431

23   spreadsheet.

24          The Match Duration is how long the match takes place.

25   It is supposed to be 20 seconds.  So it is like Shazam, I don't

14

1   know if you have that app.  You hold it up to your TV, if there

2   is a song playing, it matches like in a second.

3          So that's how it works.  And so -- and then Track

4   Duration, which is also a field that has been removed, that's

5   the length of the known file in the Audible Magic database.

6   That's been removed.

7          And then the Match Percentage file, interestingly

8   enough, MarkMonitor added that as a field.  And that compares

9   the known -- the length of the known file with the unknown file

10  with the length of the match.  And they say that's not

11  relevant.

12         So the point is, once you start running, okay, the

13  unknown file against the known file inside -- within the

14  database of Audible Magic, at some point in time you're running

15  that over 20 seconds to make -- there is a match.  And that's

16  when this ID, this verification number comes out, which they

17  also say is not relevant.

18         So what we're saying is just step back, you say we go

19  to trial and we have the '431 spreadsheet.  And it says Real as

20  to everyone.  Yet there is a separate spreadsheet that they are

21  objecting to the admissibility, and which we never would have

22  obtained had MarkMonitor, okay, one -- when we moved to compel

23  them, there is a distinct possibility we would have never

24  gotten that.  We would have never known what was on there, and

25  that had been sanitized.

1          So then you look at that.  So we know for a fact that
2     for 2 percent of those files, that 2 percent, 10 percent do not
3     have a match.  It states right on there, it is 0 or negative 1.
4     There is no dispute about that.  For half of the 2 percent,
5     it's less than 50 percent.
6          So again, if you're running an unknown song against a
7     known song, and that might not be the proper technology --
8     terminology, but you're running them against Born to Run in a
9     digitized file against the equivalent on the Audible Magic
10    database, the unknown versus the known, and you run it for
11    20 seconds.
12         If only half of it matches, you're not sending a
13    notification.  That is not verification.
14         So at a minimum, we have all this data as to 2
15    percent of the files.  And what we're saying, what if we had
16    the entire 57,000 files, what would it project out?  We would
17    have 10 percent that would show no match.  And then we would
18    have -- we would have 50 have percent, that would be less than
19    half, or 42 percent that were less than half, 50 percent less
20    than 90 percent.
21         So before the jury, that would go definitely to the
22    credibility of that document.  We're talking about a
23    billion-and-a-half in damages.  So what's 10 percent?  That's
24    $150 million.  You get up to half, it is 750 million.
25         So what they're saying is, we don't get in the

16

1    Audible Magic database, that spreadsheet.  We don't get in

2    '236.  All that comes in is this sanitized version that

3    somebody created on behalf of the plaintiffs.  Someone removed

4    that data.  We don't who.  Why did they move it?  Who did it?

5    Those are questions that maybe the counsel for the plaintiffs

6    can answer.

7           But why, if it is so superfluous and irrelevant, did

8    they remove it?  And why does it show no match for 10 percent?

9    That is -- that is really significant.

10           And the case law is clear.  I mean, if you show that

11    you have data that is crucial to -- to the moving party that

12    could affect the jury, could be instrumental in

13    cross-examination or challenging the credibility of the

14    document, or challenging 750 million in damages, that is

15    something that should not be allowed in in that context unless

16    they prove -- put up the underlying data.  And they haven't.

17           They came up with this post hoc Hail Mary, that's

18    what -- the only way I can look at it, it is inconsistent with

19    all the testimony, that somehow --

20           THE COURT:  Again, let me just step back and make

21    sure I'm understanding.  You're saying they have information

22    that they've removed from this spreadsheet that hasn't been

23    produced to you?  Or are you saying that they destroyed

24    information that isn't currently available?

25           MR. BUCHANAN:  I'm saying that -- both.

1          THE COURT:  Well, I mean, the '236 spreadsheet you

2    said had certain information, and then they sanitized certain

3    information when they presented the '431.

4          MR. BUCHANAN:  Right.

5          THE COURT:  So, I mean, you have the information that

6    was in the '236 spreadsheet because you've got it.  So there is

7    no destruction of evidence on that, right?

8          MR. BUCHANAN:  Well, if you -- if you juxtapose the

9    '236 and the '431 -- so we have data for 2 percent of the

10   files.  That brings into question, you know, half of those

11   files.  10 percent 0 or negative 1.  42 percent less match,

12   less 50 percent match.

13         THE COURT:  Right.  And that's --

14         MR. BUCHANAN:  And then 50 percent.  So that's --

15         THE COURT:  And that's -- whether it's 50 percent,

16   it's really the match or not.  I mean --

17         MR. BUCHANAN:  So that is the data there, and that's

18   been taken off the '431.

19         But the key is, is we should have the data on both

20   the '236 spreadsheet and the '431 for all 57,000 files.  That

21   data should have been maintained according to the Master

22   Agreement, according to the testimony of the two general

23   counsels or deputy general counsels of two largest plaintiffs

24   who are suing us for 1.5 billion.

25         And keep in mind, they are objecting to the

1    admissibility of the '236 and the Audible Magic original, which

2    is contemporaneously created, which shows only 25.  They are

3    not only objecting to both -- the admissibility of both of

4    those documents, they're moving to strike our expert because he

5    relied, he had the gall to rely on the Audible Magic.  Again, a

6    witness that they never identified in their disclosures, which

7    is apparently key to their case.  That's another issue.

8            THE COURT:  What actual information did you get from

9    Audible Magic, the complete download of information that you

10   got from them?

11           MR. BUCHANAN:  So from Audible Magic, we got -- we

12   got a lot of information.  And I think relative for this

13   purpose is this 344 spreadsheet, which our expert looked, in

14   which, according to Vance Ikezoye, their 30(b)(6) witness, that

15   document is, you know -- what that represents is their

16   transaction logs of the queries by MarkMonitor simultaneously

17   created.

18           THE COURT:  For what time frame?

19           MR. BUCHANAN:  For -- I think for the -- for the time

20   frame -- for the works in suit.  So, in other words, any -- any

21   query that came for a works in suit in this case -- so, right,

22   they could be downloading in 2008 or 2009.  This is supposed to

23   show, according to Ikezoye -- Ikezoye, that there was a match.

24           And Nick Feamster, our expert, went through that and

25   said, I only see matches for 25 percent of the work.

1          Their expert, Barbara Frederiksen-Cross, agreed that

2    that data showed that result, but she claimed, well, according

3    to the testimony of Ikezoye, there is only substantially --

4    it's not substantially complete.  It doesn't contain

5    everything.

6          And these are, these transactions were 2012 to 2014.

7    So they -- we asked them, you know, about these logs and these

8    queries and the logs resulting from the queries.

9          So that is the pertinent time frame.  And that if

10   that -- so that is the only spreadsheet, the only data that

11   is -- was contemporaneously created and retained.

12         And the undisputed testimony is that at the same time

13   that those queries were resulting in that information,

14   MarkMonitor was getting the same information.  So they should

15   have all those columns.

16         Instead we've gone from like 17 columns in the

17   Audible Magic database to maybe seven or eight of those

18   columns, I think there is seven of those columns in the '236,

19   to three of those columns or fields in the '431 spreadsheet.

20         So -- and there is no dispute what happened.  It was,

21   it was not retained.  And I don't think there is any dispute

22   based on the testimony of their 30(b)(6) witnesses that they

23   knew when they established this program and hired MarkMonitor

24   that they were to retain the evidence.  And that the

25   MarkMonitor Statement of Work with the RIAA covers that.

20

1          And so does the testimony of Mr. Sam Bahun, who put a
2    declaration and says at all times we kept everything.

3          Now, they do have two witnesses who say, well, we
4    didn't anticipate litigation.  The general counsel of RIAA, Mr.
5    Bahun, his own testimony that I read under oath contradicts
6    what he said there.  He said, as I read, do you think there was
7    litigation anticipated here?  You know, why did you retain
8    these documents for litigation, for legal?  Yes.

9          So I think it's clear it should have been kept.
10   There is no question that this is not superfluous information.
11   If it were superfluous, why then did -- in 2015 did MarkMonitor
12   start retaining that information, at least as to certain files
13   and certain protocols?  And why was it sanitized from the '431
14   spreadsheet which was produced by the plaintiffs.

15         Remember, we got the '236 after litigating, you know,
16   for months from MarkMonitor that objected to giving us
17   anything.

18         And one other point on that.  The MarkMonitor Master
19   Agreement, Statement of Work, requires MarkMonitor to provide
20   affidavits, declarations, and evidence and bring witnesses to
21   the United States.  They blocked every single -- every time we
22   tried to get information from them, they blocked it.  They
23   opposed our entire subpoena, and they fought.

24         We couldn't get to their final witness until the last
25   day, he's in Lithuania.  We had to jump through all these hoops

1    and spend all this money.  Yet they could have -- they are

2    going to bring him to trial.  They are going to bring all these

3    documents -- they had access to all this information.  Their

4    experts had access.  Yet they fought us.

5            So, why?  Why?  Fortunately, we got the '236

6    spreadsheet.  And I think at the end of the day the only -- the

7    only fair resolution because of the significance of this data,

8    and the fact that it was destroyed, and the fact that the

9    witnesses said they were going to keep this for litigation

10   purposes, is that it be struck.

11           THE COURT:  Well, you're saying that back in 2013 and

12   '14 the plaintiffs said, keep this for litigation purposes that

13   I'm going to file in 2018?

14           MR. BUCHANAN:  That's -- well, they didn't say that,

15   but that's not the standard.  What it is is, it's not like

16   we're going to sue Cox for these particular claims for this

17   infringement on this day.

18           What their -- what their witnesses said was that they

19   anticipated litigation when they hired MarkMonitor through the

20   RIAA.  These were the general counsels of Sony and UMG's

21   statement.

22           Wade Leak, again, vice-president of Legal Affairs and

23   Compliance at Sony:  Do you know why the head of litigation of

24   the RIAA would have been involved in the program?  We're

25   talking about the monitor, MarkMonitor, from the inception --

22

1            THE COURT:  Well, and that program involves sending

2    notices and litigation, right?

3            MR. BUCHANAN:  Yes.  Because we are sending notices

4    out under the Copyright Act.  And there was, obviously, a

5    potential for litigation in the process.

6            And the same testimony from the vice-president,

7    deputy general counsel of UMG.  And the agreement itself talks

8    about evidence files.  And what -- an evidence file has nothing

9    to do with a notice, a notice program.  I mean, it could have

10   you know --

11           THE COURT:  Sure it does.  I mean, if -- when

12   you're -- when the customers get the notice, they can say, you

13   know, I didn't infringe that, show me, show me why you think

14   I'm infringing.  And then they would have to present evidence

15   to them to show why they think they're infringing.

16           MR. BUCHANAN:  So in the same section, the first

17   sentence that talks about:  MarkMonitor should at all times be

18   able to verify and prove the integrity of any evidence it

19   gathers.

20           The next sentence is:  MarkMonitor will keep backup

21   copies of the evidence for as long as reasonably required for

22   taking and pursuing legal actions.  MarkMonitor agrees to

23   assist RIAA in litigation cases involving evidence cases to the

24   furthest possible extent as required.

25           So one can -- let's assume MarkMonitor destroyed and

23

1    didn't keep anything.  They just, you know, didn't keep

2    anything.  They would -- they would be sued under this

3    agreement because -- for what?  Because they lost the evidence

4    that allowed them to sue us for $1.5 billion.

5            There is no question -- I mean, the testimony and the

6    documentation, that the purpose of them collecting this, yes,

7    was to send notifications, but that wasn't it.  That's what the

8    documents say.

9            I mean, they point to -- even Mr. Bahun, his

10   declaration, says:  At all times we were retaining this for

11   purposes of legal action.

12           I mean, so the idea that we have to say that -- we

13   have to produce a witness that said, yes, on such and such date

14   I told them to retain that evidence because we were going to

15   sue Cox for 1.5 billion in a couple years if they didn't shut

16   down every single person that infringed one time, that's not

17   the standard.

18           It's did they know or should they have known that the

19   evidence in question, you know, was somehow related to

20   litigation, be relevant in litigation.  And these are

21   sophisticated companies.  And the fact that they're suing us

22   for what they are suing us, $1.5 billion, and the idea that

23   they can put in the '431 spreadsheet and say, this shows this

24   Real column -- and by the way, how is that Real column created?

25   Again, that was created by MarkMonitor.

1          There is no, no witness for Audible Magic that said,

2    yes, we sent a signal and created a Real column.  And it goes

3    for every single file on those spreadsheets, even where the

4    file specifically says, there is no match, there is no

5    percentage match, there is no offset match, 0 or negative 1.

6          I would address the issue of the -- I mean, the '431

7    is a summary.  And, I don't know, the judge had indicated that

8    maybe you thought that was an evidentiary issue --

9          THE COURT:  Yeah.  I mean, you know -- and one of the

10   issues that I -- part of that is, you know, why isn't your

11   ability to attack the credibility of the document sufficient as

12   opposed to excluding the document?

13         And anything I say on that, obviously, is going to be

14   subject to Judge O'Grady's final decision as to admission.

15         But, I mean, you've got all these arguments as to,

16   you know, how did you come up with this?  How did you come up

17   with that.  Doesn't that really just go to the credibility or

18   the weight that should be given to the document as opposed to

19   striking the document completely?

20         MR. BUCHANAN:  Well, because if we had -- if they had

21   done what they were supposed to do on the '236 spreadsheet,

22   every single file would indicate, you know, the ID number, the

23   so-called driver's license, that key piece of evidence, the

24   match duration, the track duration, and we could see.

25         And, Judge, obviously, they're going to argue to keep

25

1    that out and they're going to say, well, that data, you know,

2    that's just for a small few, 2 percent.  Don't worry about

3    that, you know.

4            You can't -- and then they can't argue, you can't

5    extrapolate from that.  The fact is, if we had -- that's the

6    question.  But the answer is, why -- or the question is, why

7    didn't they produce the rest of that data?  And what impact

8    would it have on the document and the jury?

9            And you would have to agree that 2 percent versus

10   100 percent of this data, a full 10 percent with 0 match, and

11   42 percent with less than a 50 percent match, is devastating, I

12   think, to that document.  Far more --

13           THE COURT:  Why do you use the 50 percent number?

14           MR. BUCHANAN:  So if you look at the -- if you go to

15   the '236 spreadsheet, you know, there are, I think -- I don't

16   know, 57,000 files.  2 percent have the data that we're talking

17   about, that's four columns.

18           THE COURT:  Right.

19           MR. BUCHANAN:  And in the 2 percent, if you look at

20   it, 10 percent of that 2 percent have a 0 or negative 1.

21   50 percent -- 42 percent of the 2 percent have a match of less

22   than 50 percent.

23           So my argument --

24           THE COURT:  When you say "a match of less than

25   50 percent," what are you saying?

1          MR. BUCHANAN:  When you show -- look at the match

2     duration and match percentage, that's what it shows.  It's less

3     -- and we have those exhibits there.

4          THE COURT:  Yeah.

5          MR. BUCHANAN:  And so, I mean, if you're running,

6     okay, an unknown file music against a known music file,

7     digitized or whatever, and you run it and they're both five

8     minutes long, and you run them for 30 seconds or 40 seconds or

9     a minute, and if they match 100 percent, you know, then that's

10    a match.

11         But to give you an example, what very well could be

12    happening here is someone downloads -- MarkMonitor downloads

13    Bruce Springsteen's Born to Run from his Greatest Hits.  It

14    turns out I've made a video of my son Jimmy in a track meet,

15    I've called it Born to Run, and that picks it up.  They

16    download that content and it doesn't match, zero match, because

17    it's a video, or maybe it's a song I created.  Or maybe it's a

18    high school band.  Or maybe it's an orchestra's version of it.

19    It's not a match.  It doesn't match a work in suit.

20         And remember that they are using this evidence to

21    link, you know, the notifications to the detections,

22    downloading, to the verification.  This is the bridge from the

23    liability, to prove liability to get to their 1.5 billion in

24    damages.

25         And we should have the right to have all the

1    underlying data that brings into question the integrity and

2    credibility of that proposition based on that exhibit.

3             THE COURT:  All right.  Anything else?

4             MR. BUCHANAN:  Only if you wanted to hear on the 1006

5    -- I mean, this is a summary --

6             THE COURT:  Yeah.  I mean, as much as I'd love to

7    hear additional argument, I think that's an issue that is more

8    properly addressed to Judge O'Grady, if I don't strike it.

9             Okay.

10            MR. OPPENHEIM:  Good afternoon, Your Honor.

11            THE COURT:  Good afternoon.

12            MR. OPPENHEIM:  There is virtually nothing Mr.

13   Buchanan just said factually or legally that's right.  And I

14   hate to start that way --

15            THE COURT:  Well, no, I think that's unfair.  I think

16   he has expressed what the law is on sanctions and the duty to

17   preserve, it does arise at a time in which you anticipate the

18   conduct of litigation.  Some of that -- but the question is

19   whether this is -- in fact meets that standard.

20            And the -- the other thing I'm -- you need to explain

21   to me what it is that Audible Magic produced, what it means,

22   and how it relates to the spreadsheets.

23            MR. OPPENHEIM:  Absolutely, Your Honor.  But if I can

24   step back, please.

25            THE COURT:  Okay.

28

1          MR. OPPENHEIM:  Cox can't succeed on any of the

2     individual elements here, and I'm going to go through each of

3     them, yet alone all of them, by clear and convincing evidence,

4     which is the burden they need to show.

5          What controls here is Rule 37(e).  And under Rule

6     37(e), what the defendants -- excuse me, what Cox is seeking to

7     do is explicitly prohibited.  It's not permitted.

8          In order for them to get the type of sanction that

9     they're seeking, they would have to show a -- they would have

10    to have a finding that the plaintiffs acted with the intent to

11    deprive Cox of the information's use in the litigation.

12          THE COURT:  No, no.

13          MR. OPPENHEIM:  That's what --

14          THE COURT:  I can, under (e)(1), enter a sanction no

15    greater than I think is necessary to cure the prejudice.

16          MR. OPPENHEIM:  You are --

17          THE COURT:  So if I -- if I think the prejudice has

18    been serious enough that that exhibit should be excluded, I can

19    exclude that exhibit --

20          MR. OPPENHEIM:  Your Honor has broad --

21          THE COURT:  -- under (e)(1).

22          MR. OPPENHEIM:  I'm sorry, Your Honor, I didn't mean

23    to interrupt.

24          THE COURT:  (e)2) is where you get into, you know,

25    presumption that the lost information was unfavorable,

1    instructions to the jury, or dismissing an action.

2            So there is, you know -- the first step doesn't have

3    to show that they acted with the intent to deprive another

4    party of the use in the litigation.

5            MR. OPPENHEIM:  So, Your Honor, again, I apologize

6    for interrupting, it wasn't my intent.

7            If I could hand up to you, just because of ease of

8    reference, the Comments to Rule 37.  And for the clerk as well.

9    I am sorry.

10           There is a lot in these Comments very useful, Your

11   Honor.

12           THE COURT:  No, I know.

13           MR. OPPENHEIM:  And in particular, if I can draw your

14   attention to the Comment that starts at the bottom of page 16.

15   And this is the Comments to subdivision (e)(1).  It says:  In

16   an appropriate case, it may be that serious measures are

17   necessary to cure prejudice found by the Court, such as

18   forbidding the party that failed to preserve information from

19   putting on certain evidence, permitting the parties to present

20   evidence, and argument to the jury regarding the loss of

21   information, or giving the jury instructions to assist in its

22   evaluation of such evidence or argument other than instructions

23   to which subdivision (e)(2) apply.

24           And then here is the operative and critical language:

25   Care must be taken, however, to ensure that curative measures

30

1    under subdivision (e)(1) do not have the effect of measures

2    that are permitted under subdivision (e)(2) only on a finding

3    of intent to deprive another party of the lost information's

4    use in the litigation.  An example of an inappropriate (e)(1)

5    measure might be an order striking pleadings related to or

6    precluding a party from offering any evidence in support of the

7    central or only claim or defense in the case.

8           And that is precisely what they're seeking to do.

9    Now, I don't think we have to get there, Your Honor, because I

10   don't think they're going to meet the duty piece.  And when I

11   walk through what the evidence is, I think -- I think you're

12   going to agree that it's not material and nothing was

13   destroyed.  Nothing was -- what was the word that I kept

14   hearing, which I found -- "sanitized."

15          And I'm going to walk through the facts here, Your

16   Honor.  It's just not accurate.

17          Before I do, one of the things Mr. Buchanan said, and

18   I want this to be unambiguously clear, there is not a single

19   work in this case where there was a failed match.  Every single

20   work that is being sued on, there was a match.  And that match

21   was done based on Audible Magic's technology, and they have

22   said with a zero error rate.

23          THE COURT:  All right, but --

24          MR. OPPENHEIM:  But I will back up.

25          THE COURT:  So that's 50-some thousand works that you

1    say there was a match.  This case involves notices being sent

2    out many, many times other than those 50,000 works.

3            So there could be a notice that was sent out based

4    upon a non-match, I guess, is what the defendant is arguing

5    here.

6            MR. OPPENHEIM:  No.  So -- so let me walk through, if

7    I may, the history here.

8            So, first, the program began with the initial

9    contract in 2008 and then was subsequently amended.  And Mr.

10   Buchanan referred repeatedly to the preservation discussion in

11   those -- in the MSA and SOW.  But what he didn't describe is

12   that that document itself lays out in great detail, point by

13   point, exactly what will be preserved.

14           On pages --

15           THE COURT:  Which exhibit is this?  This is M --

16           MR. OPPENHEIM:  I'm sorry, it is Exhibit T to the

17   Leiden declaration, I believe.  I'm sorry.

18           THE COURT:  No, that's the statement -- T is the

19   Statement of Work.  Let's see, M is the --

20           MR. OPPENHEIM:  Yes, it's the Statement of Work --

21           THE COURT:  2012 --

22           MR. OPPENHEIM:  In the Statement of Work, Your Honor,

23   on --

24           THE COURT:  Okay.

25           MR. OPPENHEIM:  -- page 27, it's a little cut off

32

1    maybe on the bottom of the page, but -- there is a -- I'll wait

2    for --

3                THE COURT:  So this is the 2012 Statement of Work?

4                MR. OPPENHEIM:  This is the 2012 Statement of Work.

5                THE COURT:  I thought you said this started in 2018?

6                MR. OPPENHEIM:  Well, the first, the program did

7    first begin in 2008.  Put this SOW lays out in detail what was

8    being preserved.  And what it says here on this page under the

9    section Data Capture and Storage, there is a long list of

10   bullet points of what would be retained and preserved, what was

11   in each evidence package.

12               And you will see on the second page there, RIAA 28,

13   that it describes -- I'm sorry, did I get the page wrong?

14   Sorry, it starts on 27.  It does say:  Name of the infringing

15   file.  And then the date of the infringement.  Lists all these

16   things.

17               And then it says:  Details of the shared file list of

18   the user, peer or client for RIAA evidence only, full

19   repertoire details, including artist name and track name.

20               So they went to great length to describe in this

21   document what would be retained.  Now --

22               THE COURT:  Is all that information retained and

23   produced for the time period from February 2013 to

24   November 2014?

25               MR. OPPENHEIM:  Everything that MarkMonitor retained

33

1   according to this agreement was produced.

2            THE COURT:  So you're saying that MarkMonitor was

3   required to keep each of these bullet points that is listed on

4   pages 27 and 28?

5            MR. OPPENHEIM:  Yes.

6            THE COURT:  That they did maintain that information.

7   And that that information has been produced to the defendants

8   for the time period February 2013 through November 2014?

9            MR. OPPENHEIM:  It actually may be even on a slightly

10  broader time period, Your Honor, but at a minimum it's that

11  time period.

12           I will say, I believe there it was some tiny number

13  of files that weren't located, in the couple hundred I think,

14  out of hundreds of thousands.

15           But everything that MarkMonitor had which was

16  retained here, which is every one of these elements, was

17  preserved and produced.

18           And -- but I want to back up and I want to go through

19  what the different spreadsheets are.  And I want to -- and I

20  want to talk about it.  Because what was first produced to the

21  defendants -- so there are four spreadsheets at issue before

22  Your Honor.  There is the '281 spreadsheet and the '431

23  spreadsheets.  They were produced by the plaintiffs.  They are

24  exactly the same.

25           The only distinction is that after we produced the

1    '281, Cox asked the plaintiffs to produce it with the metadata

2    surrounding the spreadsheet.  So we did it.  We produced the

3    exact same spreadsheet again with the metadata.  And that's

4    what the '431 is.  Those were produced by the plaintiffs.

5         The '236 spreadsheet was a spreadsheet that the

6    defendants requested in a subpoena from MarkMonitor.  Now, this

7    is where they have asked for -- they asked MarkMonitor for a

8    much broader set of information that the plaintiffs agreed to

9    produce.

10        And by the way, they never came back -- when the

11   plaintiffs produced their spreadsheets, they never -- they

12   never asked for more.  They never moved the Court for more.

13   They took the '281 and '431, and that's what they relied on.

14   And they got those reasonably early in discovery.

15        The '236 spreadsheet that they got from MarkMonitor

16   had four tabs to it, Your Honor.  And those four tabs related

17   to each of the four different file sharing networks that are at

18   issue in the case.

19        In several of those tabs they -- MarkMonitor included

20   information that was gathered in 2015 and later.  And that's

21   what Mr. Buchanan keeps referring to.  Not what MarkMonitor

22   retained early on.

23        What the declaration of Sam Bahun sets forth is that

24   MarkMonitor, when they started this program, when they -- and I

25   should back up because Mr. Buchanan technologically said a few

1    things that weren't quite right.

2            MarkMonitor does a download of a file on a network.

3    That file already has a hash in it.  MarkMonitor doesn't create

4    the hash.  MarkMonitor doesn't create the file.  That has a

5    hash.  That file is unique to the hash, the experts agree on

6    that.  The hash is unique to the file.  That file may contain

7    one or many different recordings.

8            Once it's downloaded, they query Audible Magic to

9    understand what's it -- what are the recordings that are in

10   this file.  They get back an answer.  It's a yes or no

11   proposition.  And they get a bunch of data.

12           Up until 2015 MarkMonitor--

13           THE COURT:  Well, the bunch of data supports whether

14   it was a match or wasn't a match, right?

15           MR. OPPENHEIM:  If there was no match, they would --

16   if there was no match, they would never get an artist name,

17   track name, or album name.

18           THE COURT:  But if they get a match, Audible Magic

19   provides them with what data other than it's a match?

20           MR. OPPENHEIM:  They provide, I assume, the 17 fields

21   of data.

22           THE COURT:  That proves that it actually was a match,

23   or establishes the basis for their analysis that it was an

24   actual match?

25           MR. OPPENHEIM:  But -- but as soon as they return an

1    artist name, an album name, and a track name, that -- that

2    identifies that there was a match to those.

3           The only way Audible Magic can find that information

4    is if they use their proprietary number, which is the Audible

5    Magic ID.  That number is useless to anybody other than Audible

6    Magic.  It's just how they relate things within Audible Magic's

7    database.

8           So the notion that this is some secret, important

9    number, is absurd.  You could show it to a judge or a jury all

10   day long, they would have no idea.  They would go, okay, it's a

11   number.  And not even -- it's alphanumeric.

12          So -- so that is useless.  That piece of information

13   unlocks, right, it's the key to unlock the artist name, track

14   name and album name.  Which, once that's populated in a

15   spreadsheet, we know there's a match.

16          Now, that match could have been based on anywhere

17   from 20 seconds to the full length of a song.  And from --

18   sometimes they did 20 seconds, sometimes they did the full

19   length.

20          And if you look in the MarkMonitor spreadsheet -- and

21   if I may, can we hand up just a larger piece here -- not that.

22   This one, start with that one.  Let's start with that.

23          It may help Your Honor to just see what song it looks

24   like --

25          THE COURT:  Give it to Mr. Buchanan and his

1    colleagues.

2          MR. OPPENHEIM:  Thank you.  So this is the

3    MarkMonitor spreadsheet.  And it's filtered to exclude the 0s

4    and 1s for a moment.  Just so you can see it without the 0s and

5    1s.  And I'll go to the 0s and 1s in a minute, Your Honor, I am

6    happy to.

7          So this is the entirety of the spreadsheet.  Sorry.

8    I stand corrected.  It's only the Ares tab.  The entirety of

9    it, including the BitTorrent one, would be too many trees to

10   kill.

11         So -- so prior to 2015 MarkMonitor never kept the

12   highlighted columns.  And as the Sam Bahun declaration

13   explains, they didn't need to.  They didn't feel like they

14   needed to, they didn't use it.

15         And after 2015 they started to include it.  But --

16         THE COURT:  Why?  What changed in 2015?

17         MR. OPPENHEIM:  So he says in his declaration, Your

18   Honor, which in the end of his declaration describes that other

19   clients with other uses -- sorry.

20         So he says in paragraph 28 of his declaration, Your

21   Honor:  The core of MarkMonitor's business model, including as

22   it relates to this case, requires it to gather valid evidence

23   sufficient to protect our clients' copyrighted content.  As

24   stated herein, the superfluous data that Cox contends was

25   spoliated was something we were not required to gather, nor was

38

1    it relevant to our Statement of Work at the time, which was not

2    performed for active litigation or in anticipation of

3    litigation.

4            He goes on to say:  Moreover, the Audible Magic data

5    simply corroborates the file, the full audio files that

6    MarkMonitor secured as part of its detection of copyright

7    infringement -- Cox subscribers.  The absence of such data in

8    the spreadsheet at issue is immaterial to our ability to

9    establish that there was infringement.

10           He also, if you look at the Vance -- sorry.  Where is

11   the -- okay.  Sorry, I read the wrong paragraph to Your Honor.

12   Apologies.

13           Paragraph 25:  Nevertheless, given the increasing

14   power of data analytics and the prospect that such information

15   could potentially be useful for some unknown purpose in the

16   future, MarkMonitor began recording this additional information

17   sometime in 2015.

18           So that's what he says on that issue.

19           They, by the way, they took Mr. Bahun's deposition.

20   They took two depositions of the MarkMonitor witnesses.  Mr.

21   Bahun's deposition they took quite early.  They deposed him in

22   June.  Oh, okay, in June.  They deposed him for an entire day,

23   never once asked him about any of these columns, never once.

24           THE COURT:  They didn't have the document then, did

25   they?

39

```
 1              MR. OPPENHEIM:  They did.  They absolutely did.

 2              And so, if you look at this document, Your Honor, you

 3     see the M Item ID, which is the first highlighted column.  It's

 4     just an alphanumeric string.  It's not useful in any possible

 5     way for anybody.

 6              Match Offset just simply says where they would begin

 7     to look at the match.  Because sometimes you would start -- a

 8     file may have dead space at the beginning of it.  And so, you

 9     might not begin your match until somewhat in.

10              So you see on the first one, it started right away.

11     The third one it started a second in.  The fourth one,

12     28 seconds in.

13              The match duration on the first one shows it was a

14     534 second match duration on a 530 second -- 36 second file.

15     Right.

16              And if you go through this, and we organized this in

17     declining descending order, you will see that the very lowest

18     match is 20 seconds.  Which is the -- Vance Ikezoye, the

19     Audible Magic CEO, in his deposition, and I believe, but

20     certainly in his declaration, said 20 seconds is the minimum

21     they do.  And they know if that they get a 20-second match,

22     they have a zero error rate.

23              There is not a single piece of evidence that Cox can

24     point to say that a single work in suit did not match.

25              So what they're saying is, data that was collected in
```

40

1    2015 may impact information as to claims in 2013 and 2014.  It

2    doesn't make any sense.  But I also, I don't want to let --

3          THE COURT:  All right, let me just make sure I

4    understand your argument as it compares to what Mr. Buchanan

5    said.

6          He said, when you look at this information, there are

7    two components.  This is only 2 percent of the works; is that

8    right?

9          So that of the 56-some thousand works at issue, this

10   30-page spreadsheet only involves a certain percentage of those

11   works?

12         MR. OPPENHEIM:  These percentages, they are

13   staggeringly crazy and wrong.  And here is why.  They are doing

14   percentages also off of the Audible Magic spreadsheet, which we

15   haven't discussed yet.

16         So this is the MarkMonitor spreadsheet.

17         THE COURT:  Okay.

18         MR. OPPENHEIM:  Okay.  And I do want to address one

19   other thing in this MarkMonitor spreadsheet before we leave it

20   because it's a question that you asked earlier and something

21   Mr. Buchanan raised.

22         There are fields in the MarkMonitor spreadsheet that

23   say Null for those same columns, the highlighted columns.  You

24   don't see it there.  I can hand it up if you would like, Your

25   Honor.

41

1          THE COURT:  I don't need to.  You can just tell me.

2          MR. OPPENHEIM:  And when Mr. Bahun was asked why, he

3   said, well, we had no data for them.  There are fields that say

4   0 or negative 1, including, and Mr. Buchanan made reference to

5   this, that the Match Duration says 0 or negative 1.

6          And from that, Mr. Buchanan says because -- and this

7   is critical point.  Cox is saying because the field says 0 or

8   negative 1, there was no match.

9          They never asked MarkMonitor or Audible Magic in a

10  deposition what 0 or negative 1 in the column meant.  So that

11  assumption is entirely of the lawyer's fabrication.

12          Now, if they had asked, what they would have learned

13  is that in 2015 when they started to try to populate these

14  fields, they were trying different ways to populate them.  And

15  sometimes the data returned a Null, and some -- and sometimes

16  the data returned a negative 1.

17          Obviously, you can't have a match duration of

18  negative 1, it wouldn't mean -- what would that mean?  But they

19  never asked a witness.

20          So they're asking you to go along on this journey

21  that there is some known matches based on the presence of data

22  that they never asked the witness about, they're making

23  assumptions about, and they're wrong on it.

24          The Audible Magic spreadsheet is even more

25  infuriating because they subpoenaed Audible Magic.  And they

42

1    had apparently some dispute back and forth on the scope of what

2    they were going to get from Audible Magic.

3              Audible Magic provided files for 2012 to 2014, as I

4    understand it.  Right?  No, Audible Magic.

5              As Your Honor observed, they started doing matches in

6    2008.  So if matches were done from 2008 through 2011, it

7    wouldn't appear in the results that Audible Magic gave them.

8              So they say, oh, well, we don't have these results,

9    so 75 percent of the files were never even checked.  But it

10   goes further than that.  Not only do they have a restricted

11   time period, the witness also testified --

12             THE COURT:  Well, the time period that Audible Magic

13   produced documents is -- is larger than the time period in

14   which you are claiming the notices in this case.

15             So why -- why wouldn't the Audible Magic

16   spreadsheets, if these are transaction reports of every time

17   that I had some contact with MarkMonitor and prompted them to

18   then send a notice to Cox, why doesn't that show up in the

19   Audible Magic transaction log?

20             MR. OPPENHEIM:  So Audible Magic, if it does a

21   look-up on a hash in 2008, it does the match there.  And so,

22   the log will show a 2008 match.

23             THE COURT:  But you don't send a notice out in 2014

24   for a 2008 match.

25             MR. OPPENHEIM:  No, no, no.  But once -- so Audible

1  Magic is the fingerprint company.

2          THE COURT:  Right.

3          MR. OPPENHEIM:  When MarkMonitor down -- so let's say

4  in 2008 MarkMonitor downloads a file from Mr. Buchanan's

5  computer and there is a hash associated with it.  They send it

6  to Audible Magic, and it returns -- what were we talking --

7  Bruce Springsteen's Born to Run, great Sony track.  That -- so

8  Audible Magic returns a result in 2008.

9          MarkMonitor now knows that any file with this hash

10  has Bruce Springsteen's Born to Run.  They don't have to check

11  it again ever because, as all the experts agree, the hash is

12  unique.  Any time you find that hash, it's going to be the same

13  thing.

14          THE COURT:  So they don't have Audible Magic confirm

15  anything once they get a report from Audible Magic as to a

16  particular hash value?

17          MR. OPPENHEIM:  They don't need to.  There are from

18  time to time, as it turns out, they did run some things.  So

19  there were some later identifications of files that had been

20  downloaded earlier.  Why they did that, I don't know.  But they

21  didn't need to.  And for many they didn't.

22          So the Audible Magic transaction logs, if they're

23  from 2012 to 2014, wouldn't cover the first -- what is that?

24          THE COURT:  Four years.

25          MR. OPPENHEIM:  Five years, four or five years --

44

1          THE COURT:  Right.

2          MR. OPPENHEIM:  -- of identification.  But -- but Mr.

3     Ikezoye also said that when they were producing the documents,

4     they had to pull the transaction logs off backup tapes and they

5     couldn't find everything.  And that's in his deposition

6     testimony.

7          Now, they never -- Cox never put that spreadsheet,

8     the Audible Magic spreadsheet, in front of Mr. Ikezoye to ask

9     him about it.  So they asked questions about transaction logs.

10    They never asked him about specific columns.  They never asked

11    him about that particular document.

12         They -- Audible Magic produced, I believe it's

13    something in the range of 15,000 documents.  So they ask him

14    generically about transaction logs.  And then they say, well,

15    we got almost everything, and so, now based on that comparison

16    of the Audible Magic spreadsheet to the MarkMonitor

17    spreadsheet, 75 percent of the works didn't match.

18         It just -- it doesn't, it doesn't hold water, Your

19    Honor.  Doesn't hold water.

20         So that's -- that's the background.  You started by

21    asking about duty, so maybe I should turn to that, Your Honor.

22         THE COURT:  Okay.

23         MR. OPPENHEIM:  So the legal standard here is -- is

24    not that there is some theoretical possibility of litigation.

25    They need to show that litigation was reasonably foreseeable.

45

1          And the mere existence of a dispute does not
2   necessarily mean that the parties should reasonably anticipate
3   litigation.  And here, when Mr. Buchanan is citing to all of
4   this testimony, it's all about a theoretical possibility of
5   litigation.
6          The first time a demand letter went out from the
7   plaintiffs to Cox was I believe in 2016, Your Honor.  It was
8   after the BMG verdict.  That's the first time there was a
9   demand letter.
10         So they're complaining about data that they think
11  wasn't collected and preserved in 2008 to 2014.  The demand
12  letter didn't even go until 2016.
13         THE COURT:  Well, that doesn't -- there is the time
14  period before you're anticipating, before you actually send a
15  demand letter as well.  So, I mean --
16         MR. OPPENHEIM:  That's absolutely right, Your Honor.
17  And in this respect, I think that what Mr. Marks, the general
18  counsel of the RIAA, said in his declaration is -- really hits
19  the nail on the head.
20         The recording industry instituted this program of
21  sending notices because they wanted to avoid litigation.  As
22  you may well know, Your Honor, the recording industry had sued
23  peer-to-peer infringers individually for many years.  It was a
24  somewhat controversial program.
25         The RAII -- the recording industry stopped doing that

46

1    and they instituted this program.  And the whole point of this

2    program, of giving notice, was to send notices to ISPs in the

3    anticipation that they would take care of the infringement on

4    their networks.  It was to avoid litigation.  Had Cox actually

5    done what they were supposed to do, there would never have been

6    a litigation.

7         The testimony of Mr. McMullan and Mr. Leak, they

8    never asked them:  When did you contemplate bringing a case

9    against Cox?  When did you contemplate bringing a case against

10   an ISP?  That's not the kind of testimony that they asked for

11   because they didn't want those answers.

12        The -- so the notices were take-downs.  And unlike

13   the BMG case where there were explicit threats to sue, these

14   were simple take-down notices.  They were notices of

15   infringement to an ISP.  They never threatened litigation in

16   those notices.

17        And the Comments to Rule 37 actually speak to the

18   idea that there -- that you have to be careful when looking to

19   outside sources to create a duty.

20        So, you were -- Mr. Buchanan -- the only evidence, by

21   the way, that they have that there was a duty is they look at

22   the MarkMonitor agreements.

23        But if you read the Comments, excuse me, to Rule 37,

24   while a party may have -- this is paragraph 7 of the Comments,

25   Your Honor:  While a party may have an independent obligation

47

1    to preserve evidence, such a document retention policy, it does

2    necessarily mean that the party had a duty with respect to a

3    litigation.

4            And the fact that a party failed to observe some

5    other preservation obligation does not itself prove that its

6    efforts to preserve were not reasonable with respect to a

7    particular case.  So that's paragraph 7 of the 2015 Comments.

8            And so, that's exactly what the MarkMonitor agreement

9    is.  Even if you assume that the MarkMonitor agreement raised

10   some prospect that they had some -- that MarkMonitor had some

11   obligation to preserve this, which we disagree with because --

12           THE COURT:  Well, let's go back to that.  Because you

13   say, the agreement specifies what they need to keep.  And

14   again, I want to make sure I didn't misunderstand this because

15   I need to hear from Mr. Buchanan if this isn't -- the

16   information that this agreement that says, this is what you

17   need to keep, MarkMonitor did keep and has been produced to the

18   defendant for the time period 2013 and 2014?

19           MR. OPPENHEIM:  Yes, Your Honor.

20           THE COURT:  Is that right?

21           MR. OPPENHEIM:  Yes, Your Honor.

22           THE COURT:  Well, I want -- this has some --

23           MR. OPPENHEIM:  I want to make sure I get this right.

24           THE COURT:  -- real significance to it, so I don't

25   want to --

48

1           MR. OPPENHEIM:  Okay.  I'm told that there -- one of

2    the categories, town, county, and country of the ISP address,

3    may not have been produced.  It's obviously not relevant to

4    this dispute.

5           And -- well, the asset rights holder was produced

6    because it says who owned it.  All the relevant fields were

7    produced, Your Honor.

8           What -- what Cox wants to do is take generic language

9    in a private agreement and say, because of that generic

10   language it created an obligation to retain the specific

11   information.  And because of that, there is, therefore, a legal

12   duty in this case that was breached.

13          So there are two jumps that they have to make to get

14   there.  One is that this agreement required the preservation of

15   the three columns they're complaining about.  Nothing in the

16   agreement could suggest that.

17          And if you look at what the agreement is about, what

18   those columns are about, there is no reason to preserve them.

19   That's number one.

20          Two.  Even if you assume that that's right, just

21   because there's an independent obligation, as the Comments to

22   the rules say, doesn't mean there was a duty here.  And that's

23   a duty on MarkMonitor --

24          THE COURT:  Well, I mean, I think a reasonable

25   interpretation of the Comments are, if you have to keep your

49

1  tax returns for five years and, you know, you don't keep your

2  tax returns for five years, that's an independent obligation.

3          If there is an obligation that you've entered into a

4  contract to do something for litigation purposes, that's a

5  little bit different.  I mean, that's dancing around the edges

6  with that.

7          But, I mean, I think I understand your position on

8  this.  Is that there was -- even reading the Master Agreement,

9  taking into consideration what is said in the Statement of

10  Work, MarkMonitor had a duty to preserve specific information

11  that was actually preserved and has been produced.

12          MR. OPPENHEIM:  Yes, Your Honor.  Yes, Your Honor.  I

13  think that the Comments go further than what you just

14  described, but we need not debate that.

15          So there is another Comment that I think is useful.

16  I've spent a lot of time on the Comments.  I really like this

17  2015 amendment.

18          THE COURT:  They are helpful.

19          MR. OPPENHEIM:  And that's paragraph 9, Your Honor.

20  And it says that the Rule 37(e):  Applies only if the

21  information was lost because the party failed to take

22  reasonable steps to preserve the information.  Due to the

23  ever-increasing of electronically-stored information and the

24  multitude of devices that generate such information, the

25  perfection in preserving all relevant electronically-stored

50

1    information is often impossible.

2           And then it says:  The routine good faith operation

3    of an electronic information system would be a relevant factor

4    for the Court to consider in evaluating whether a party failed

5    to take reasonable steps to preserve lost information.

6           Here, Mr. Bahun on behalf of MarkMonitor made very

7    clear, they didn't preserve this information up to 2015 because

8    they didn't feel like they needed it.  Starting in 2015, they

9    began to preserve it for entirely different reasons.

10          And Mr. Ikezoye, to respond to your earlier question,

11   gave some sense of why those other columns -- Mr. Ikezoye, I

12   apologize, is the CEO of Audible Magic -- explained why those

13   other columns are useful for other purposes.  And he does that

14   in paragraph 18 of his declaration, which is -- I don't have

15   the -- oh, it's Document 352-2.

16          And what Mr. Ikezoye says is:  The additional

17   information, those three columns, may be useful for certain

18   customers for other reasons.  For example, it can assist Web

19   sites or companies hosting content, i.e. a video game streaming

20   company, to readily identify the location, scope, and duration

21   of infringing content on its platform for removal or muting of

22   the audio.  In particular, the combination of the match offset,

23   match duration, and track duration enables the customer to skip

24   ahead to examine different parts of the file or skip to the end

25   of the file.

1          He's explaining -- Mr. Ikezoye is explaining why

2    Audible Magic uses that -- has that data for other purposes.

3          In this case, again, Your Honor, there is no

4    question, there was a match of every one of the works in suit.

5    There was a match of every one of the works in suit.

6          So let me turn, Your Honor, to whether or not this

7    information was material.  And here, I've already gone through

8    the -- what the three different columns are.  So let me just --

9    let me go through each of MarkMonitor's -- excuse me, Cox's

10   arguments here.

11         First off, Cox claims that the MarkMonitor designee

12   testified, this is at page 10 of their brief, that MarkMonitor

13   routinely destroyed data that was provided by Audible Magic

14   prior to 2015.  That kind of language from a lawyer is

15   inappropriate.  Because if you look at the testimony of the

16   MarkMonitor witnesses, it doesn't support that point at all.

17   Nothing in what the witness said could be used to support that.

18         The MarkMonitor witnesses said:  From our

19   perspective, we didn't have a need for that data, so we didn't

20   capture it.

21         There was no destruction, Your Honor, a word that

22   permeates their briefing.  A failure to retain data that was

23   returned as a result of a look-up is not a destruction of

24   evidence.

25         It's akin, Your Honor, if you ask a clerk to do a

52

1    Westlaw search for a set of cases, they get a bunch of cases,

2    and each of those cases has a cover sheet.  They may have saved

3    the cases, but they didn't save the cover sheet.  They didn't

4    need to because they have the cases.

5          Here, Cox has all of the data that was retained and

6    all the underlying files.

7          Cox argues that -- that the spreadsheets

8    demonstrate -- the Audible Magic spreadsheets demonstrate that

9    the MarkMonitor spreadsheets are inaccurate and incomplete.

10   I've gone through this.  The 75 percent number, Your Honor,

11   it's hogwash.  They never asked the Audible Magic witness about

12   the spreadsheet.  They have no foundation to put it forward,

13   Your Honor.

14         And I'm not talking about whether they put it forward

15   in trial.  To put it forward to Your Honor.  If they're going

16   to base a spoliation motion on the Audible Magic spreadsheet,

17   they should have at least asked the witness about it so that

18   they would have some credible basis to tell Your Honor what the

19   spreadsheet means.  But they don't.

20         Cox argues that the MarkMonitor spreadsheets are

21   summaries.  I get it.  I agree with you, Your Honor, that's a

22   1006 issue for Judge O'Grady.

23         Having said that, a download of data from a server is

24   not a summary.  It's a download of data from a server.  If

25   there were a summary, it would be way shorter, Your Honor.  I

1    have given you a tiny little excerpt.  Nobody would call that a

2    summary.

3           Cox argues that because MarkMonitor subsequently

4    retained Audible Magic data fields, it shows that those data

5    fields are material.

6           THE COURT:  You've addressed that.

7           MR. OPPENHEIM:  I've addressed that, Your Honor.

8           Cox argues that the discarded data and the retained

9    data are inconsistent.  This is this point, Your Honor, that

10   some of the columns say Null, 0, or negative 1.  I've addressed

11   this, Your Honor.  Those columns, that's 2015 data that

12   MarkMonitor was trying to import.  They never asked a question.

13          Again, they should not be permitted to come forward

14   and seek a sanction based on a spreadsheet, the data in a

15   spreadsheet they never asked a witness about.

16          On the issue of culpability, Your Honor.  Under

17   (e)(2), they have to show that there was something more, that

18   there was a bad faith intent.

19          I think Your Honor has, prior to the Rule 37(e)

20   amendment, Your Honor wrote some very interesting opinions

21   trying to understand in a spoliation motion whether negligence

22   was enough.

23          THE COURT:  Under Fourth Circuit law.

24          MR. OPPENHEIM:  Under Fourth Circuit law.

25   Unfortunately, all of that great legal analysis doesn't apply

54

1    to the new paradigm.  Because the new paradigm really -- what

2    the Federal Rules Committee was trying to do was say, there

3    should be consistency across the courts.  And they said, Rule

4    37 takes the place of the Court's inherent authority on issues

5    of ESI.  So Rule 37(e) controls on this.  And that's -- that's

6    from the Committee notes.

7          And under 37(e)(2), for them to get a significant

8    sanction, which is what they are seeking, they would need to

9    show bad faith intent.  And their -- if you look at their

10   briefs, in their reply brief what they do is they say, we

11   haven't shown that we had a reasonable reason not to keep the

12   information.  That's their argument.  That doesn't get even

13   close to bad faith intent.

14         Now, under (e)(1), Your Honor, Your Honor does have

15   great discretion.  But here, A, Cox has had this for a very

16   long time and waited to the last minute to bring this.  And the

17   notion that they waited because of the Slawomir deposition in

18   Lithuania is not true.  It's not accurate.

19         They could have -- A, they could have brought it two

20   days after the Slawomir deposition.  They didn't.  They waited

21   until the midst of summary judgment briefing.

22         They could have brought it after the Sam Bahun

23   deposition.  They could have brought it when they received the

24   spreadsheets.  They didn't ask any questions in discovery of

25   any of the witnesses about any of this.  They never came to the

1   Court and complained about any of it.

2          So now they come to you and they want sanctions.

3   Your Honor, they have what they have.  Those two other

4   spreadsheets that they got on their own, that's their own mess.

5   They can deal with that.

6          At the end of the day, they have the underlying

7   files, and this is my last point and I will sit down, Your

8   Honor.  They say, well, we don't have all the files.  That's

9   not true.  For every work in suit, they have the underlying

10  file.

11         THE COURT:  And what does that mean, they have the

12  underlying file?

13         MR. OPPENHEIM:  So when MarkMonitor did the initial

14  -- did the download, right, they got the hash, there is a file.

15         THE COURT:  Okay.  And that --

16         MR. OPPENHEIM:  That hash file, the file, a file with

17  that hash with the works in suit has been produced to the

18  defendants.

19         THE COURT:  No matter when that hash -- that file was

20  downloaded, it had been done --

21         MR. OPPENHEIM:  A hash is the hash.

22         THE COURT:  It could have been done in 2008, 2009,

23  2010?

24         MR. OPPENHEIM:  Right.  It could have been done any

25  time.

1          There is one, one thing to be clear here, Your Honor.

2     There were a lot of infringement notices for works that the

3     plaintiffs have not filed suit -- have not asserted claims on.

4          We -- we've -- we have only asserted claims on

5     certain works that we know Cox's subscribers -- I'm going to

6     get -- I didn't articulate that well.  Let me try that again.

7          We've only asserted works when we've identified a Cox

8     subscriber who is the subject of three or more notices.  And

9     even then, we haven't asserted claims on every work.

10         So while there may be 10,000 works in this case, the

11    notices probably cover far more.

12         But as -- so to the extent that they say, well, it's

13    only a portion, they have everything that is a work in suit,

14    Your Honor.

15         So, Your Honor, just in closing, they haven't met any

16    of the elements, yet alone all of them, by clear and convincing

17    evidence, as is their obligation.

18         THE COURT:  Okay.

19         MR. OPPENHEIM:  I'm sorry, I'm --

20         THE COURT:  Okay.  Well, let -- you have got a

21    footnote coming here it sounds like.

22         MR. GOULD:  A big footnote.

23         MR. OPPENHEIM:  My colleague really thinks I should

24    show you the spreadsheet that has the 0s and negative 1s that

25    Mr. Buchanan made such a point about.  If Your Honor will allow

1    me, I'll hand it up.

2              THE COURT:  All right, I'll take it.  And then Mr.

3    Buchanan can help me understand it if he needs to.

4              MR. OPPENHEIM:  So Mr. Gould is correct that Mr.

5    Buchanan spent a significant portion of his argument on this

6    notion that there were certain columns in the MarkMonitor

7    spreadsheet that said Null, 0, or negative 1.

8              And what you have in front of you, Your Honor, is an

9    excerpt from the spreadsheet, but this is for all of the tens

10   of thousands of entries on the spreadsheet, this is the

11   totality of all of them that have Null --

12             THE COURT:  This is just for the eDonkey, Gnutella,

13   and Ares?  It's not --

14             MR. OPPENHEIM:  BitTorrent doesn't have any it, Your

15   Honor.

16             THE COURT:  Okay.

17             MR. OPPENHEIM:  And BitTorrent -- and that's why the

18   percentage numbers that get thrown around are so -- so high or

19   low depending upon what they were aiming for.  And that's

20   because BitTorrent, which is the overwhelming peer-to-peer

21   network at issue here, didn't have any of these Nulls, negative

22   1s, or 0s.

23             THE COURT:  Okay.

24             MR. OPPENHEIM:  But you'll see here, Your Honor, on

25   page 1, that the match duration is negative 1, Your Honor.  It

58

1    doesn't make any sense, Your Honor.

2            Right.  So, yes, so Cox said -- Mr. Buchanan said,

3    this is 10 percent of the 2 percent.  So this goes to that.

4            But -- but you'll see here, this match duration of

5    negative 1, they're saying based on that there was no match.

6    But all of the other witnesses, Your Honor, have said that if

7    Audible Magic returned a -- returned an artist name, a track,

8    and an album, that that was a positive identification.

9            And you'll see that that exists for all of these.

10   You see artist, track, and album, right there on the

11   spreadsheet, Your Honor.

12           THE COURT:  Well, how -- how was this information,

13   Null, negative 1, populated and then placed into the

14   spreadsheet?  I mean, what's the explanation for that?

15           MR. OPPENHEIM:  So as I understand it, had they asked

16   the MarkMonitor -- either of the two MarkMonitor witnesses --

17   and I think they did touch on this just slightly with Slawomir.

18   That in 2015 they started -- MarkMonitor started to try to

19   retain additional information because they thought it might be

20   useful in the future for some purpose.  And they were trying to

21   figure out how to translate information from the Audible Magic

22   download into their servers.

23           And while you're experimenting on figuring out how to

24   do that, sometimes it wouldn't work and you would get a Null,

25   0, or negative 1.  As you will see, Your Honor, it's a tiny

1    number of entries.

2            THE COURT:  All right.  Okay.

3            Okay, Mr. Buchanan.

4            MR. BUCHANAN:  So I'll just start from the last

5    point.

6            The reason there is no negative 1s or 0s for

7    BitTorrent, and there is -- why there is only 2 percent of the

8    data and 10 percent that shows 0 or 1 of the 2 percent, is

9    because that's all they produced.  There is no -- there is no

10   declaration in this case from any witness for the plaintiffs to

11   support those last comments by counsel.

12           There is no declaration that says that what we say

13   those columns mean, that the negative 1 and the 0s mean there

14   wasn't a match, there is no one that counters that.

15           THE COURT:  Well, that's just your statement.

16           MR. BUCHANAN:  No.

17           THE COURT:  It's their statement.

18           MR. BUCHANAN:  No, but --

19           THE COURT:  I mean, you know, I don't have the

20   testimony of anybody as to -- who really knows what that means

21   before me.  Right?

22           MR. BUCHANAN:  Well, the -- the exhibit itself has

23   all these, these columns.  And we did produce Exhibit J to our

24   initial brief, the Exhibit J to Ms. Diana Leiden, Diana Hughes

25   Leiden's affidavit or declaration.

60

1              THE COURT:  All right.

2              MR. BUCHANAN:  The testimony of Paszkowski, and he

3    talks about these various columns.

4              THE COURT:  But how did -- I mean --

5              MR. BUCHANAN:  And he says, after we went over each

6    of those fields with him, he never said anything to the effect

7    that we just started putting those in in 2015, they didn't have

8    any relevance to anything.

9              He says:  We just started collecting them in 2015,

10   but we were getting them, that information from Audible Magic

11   before that, we just didn't retain it, we basically destroyed

12   it.

13             Now, they didn't retain it.  And so, what he says

14   here --

15             MR. OPPENHEIM:  Could you read the testimony to the

16   Court?  You forget how they then --

17             THE COURT:  Yeah, just tell me what page you're

18   talking about.  I've got Exhibit J in front of me.

19             MR. BUCHANAN:  So I will get to that in -- let's see.

20   He testifies -- let's see.  I'll find it, Your Honor.

21             What he says is -- he says they did not keep that

22   data until 2015.  That's undisputed, no one disputes that.  So

23   that means they didn't retain it.

24             So whether you say destroyed or not, he doesn't use

25   that word, but they didn't keep it.  So it was technically

1    destroyed electronically.

2          I'm not saying that the guy sat down and said, I'm

3    going to destroy all this evidence so it can't be used in

4    litigation.

5          But after we go through AM track duration and match

6    percentage and the verification type, and we go through all

7    those columns -- he talks about how they kept them and what

8    they mean.  And then he says on page 99 of his deposition:  So

9    the spreadsheet we are looking at now contains data from the

10   verification process.  It's used to determine what

11   infringements were captured in our collection process can be

12   used for noticing and which ones can be used -- cannot be used

13   for noticing.  Basically, whether there is a match.

14         So he goes through those columns specifically.  He is

15   shown the '236 spreadsheet.  He talks about the data.

16         Now, we have testimony also in a statement from

17   their -- in their -- in our brief, our reply brief we quote

18   from Barbara Frederiksen-Cross who says -- we asserted:

19   Barbara Frederiksen-Cross has acknowledged that in response to

20   a matching inquiry from MarkMonitor, quote, Audible Magic

21   returned an XML formatted file that contained an indicator

22   indicating whether the match was successful.  And that's that

23   AM ID verification column.  And it -- basically that's where

24   you get that alphanumeric number.

25         Now, with regard, Your Honor, I wanted to point out

62

1   that in terms of this -- right.  Okay.

2          THE COURT:  I mean, Frederiksen-Cross is your expert,

3   she is the director of litigation services at JurisLogic.  She

4   isn't somebody at MarkMonitor or Audible Magic who actually

5   knows what those columns were, and what they meant, and whether

6   it was or wasn't a match if it presented the artist's name and

7   number in the spreadsheet, right?

8          MR. BUCHANAN:  No, he's their -- he's their technical

9   expert --

10          THE COURT:  No, you just mentioned --

11          MR. BUCHANAN:  Hoskowski?

12          THE COURT:  Frederiksen-Cross, right?  Didn't you

13   mention what she just said in her declaration.

14          MR. BUCHANAN:  So yeah, initial -- the first

15   testimony we read --

16          THE COURT:  Yeah, the deposition testimony doesn't

17   address any of this that you talked about.  I mean, it doesn't

18   talk about anything having to do with null values.  I just read

19   it, pages 99, 98 and 99.

20          MR. BUCHANAN:  No, that addressed the point that

21   counsel made that said that we didn't ask anyone about those

22   four columns of information and what they meant.  And he

23   described and his testimony says --

24          THE COURT:  Well, you asked what the spreadsheets

25   meant.

63

1           MR. BUCHANAN:  Right.  But those four columns of

2     information, if you look at 81, we go through all of that

3     information, the match offset, the match duration, the AM item

4     ID, and the match percentage, and the AM verification type.

5     All five --

6           THE COURT:  I see 81, but I don't see anything after

7     81 until 97.

8           MR. BUCHANAN:  That's right.  But if you look at 81,

9     he talks about those four columns.  And he says, this is --

10    it's whether it's MarkMonitor's data or whether it's Audible

11    Magic's data.

12          THE COURT:  All right.

13          MR. BUCHANAN:  So, again, I mean -- I would like to,

14    you know, go back to the spreadsheet itself.

15          THE COURT:  Which one?

16          MR. BUCHANAN:  The '236 spreadsheet.

17          THE COURT:  All right.

18          MR. BUCHANAN:  And I guess it was the last document

19    passed up that said, look, it's only a tiny bit of data.  Well,

20    it's -- it's a sample that is indicative of what the whole

21    spreadsheet would look like if we had all the data.

22          To sit here and say, they don't have any data for

23    anything beyond 2 percent, they don't have anything on

24    BitTorrent, which is the major protocol which the alleged music

25    was downloaded, they don't have any of that.  Of course we

64

1   don't because they didn't give it to us.  That information was

2   retained -- it was part of the MarkMonitor process.  And they

3   queried Audible Magic and it produced that information.

4              And to -- I would jump to the point about Audible

5   Magic and our expert saying 75 percent didn't match.  Their

6   expert said the same thing.  She said, qualified it, saying,

7   well, the 30(b)(6) witness of Audible Magic said, right, he

8   said that we produced substantially all of the data, but there

9   was some period of time where we might not have everything, but

10  substantially all.

11             So we have that.  And we know that based on our

12  expert, there wasn't a match for 75 percent.  Their expert --

13             THE COURT:  During that time period?

14             MR. BUCHANAN:  Yes, for the time period in question.

15             THE COURT:  During the -- that's right.  And that's

16  the part that I'm still confused about.  And I don't know

17  whether I'm missing it or not.

18             But you keep talking about the Audible Magic -- the

19  information that was presented by Audible Magic for a limited

20  period of time and the matches that those records show.

21             My understanding is that, you know, matches could

22  have occurred prior to that limited period of time.  And what

23  is the significance -- and just let me finish so he understands

24  the question before you talk to him.  Okay?

25             MR. BRODY:  All right.

1              THE COURT:  I want to make sure that he can

2    understand the question and you understand the question that I

3    want the answer to.

4              So my understanding of the Audible Magic transaction

5    log is that it is related to a period of time of, let's just

6    say two years.  That matches were done long before that

7    two-year period.  And the idea that that transaction log only

8    covers a certain percentage of works doesn't mean there wasn't

9    ever a match to a work prior to that.

10             MR. BUCHANAN:  And the testimony of their expert,

11   Barbara Frederiksen-Cross --

12             THE COURT:  Well, make sure you --

13             MR. BUCHANAN:  I've got it.

14             THE COURT:  All right.

15             MR. BUCHANAN:  I have an answer.

16             THE COURT:  Okay.

17             MR. BUCHANAN:  This time at least.

18             MALE VOICE:  I should know better than to doubt him.

19             MR. BUCHANAN:  So Barbara Frederiksen-Cross testified

20   about this.  And she said that only 25 percent of the matches

21   related to the works in suit occurred before 2012.  Did I get

22   that right?

23             Okay.  So it was 25 percent of downloads occurred

24   before the 2012 period.  So, obviously, you can't have a match

25   without a download.

1          So when we used the 75 percent figure on what we

2     have, that's correct.  And plaintiffs' counsel made a point,

3     oh, you can't count that because you have got to go back in

4     time.  He didn't tell you what we put in our briefs and what

5     the testimony is, is that she carved out 25 percent only.

6          So we have 75 percent of the works in suit were

7     downloaded and allegedly matched in that time period.  And

8     that's what that Audible Magic spreadsheet shows.

9          So it's not -- they poo poo all this evidence and

10    they say we didn't ask all these questions.  But we did ask the

11    questions.  They described the transaction log.  They described

12    how every time there was a query, they said the MarkMonitor

13    '236 spreadsheet should be identical to theirs.  It should have

14    all that information if they want it.  We retained it, they

15    didn't.

16         Now, I would like to address this issue of the -- the

17    Statement of Work.  First of all, the Master Agreement they

18    never talked about.  They never talked about the testimony of

19    the general counsels from the two, UMG and Sony, who testified

20    when asked that they believed there was going to be litigation.

21    They were asked about that.  Why you were retaining

22    MarkMonitor?  Did you -- were they required to retain the

23    evidence for litigation?  Yes.

24         THE COURT:  And the evidence that they were required

25    to retain is specified particularly in T on pages 27 and 28.

1          MR. BUCHANAN:  That's the Statement of Work.  That's

2    not the Master Agreement.

3          THE COURT:  Well, the Statement of Work refers to, it

4    says at the very beginning of it:  This Statement of Work

5    dated -- is made in reference to the Master Agreement

6    so-and-so.  The Statement of Work to describe the technical

7    obligations regarding their agreement to scan and do so and so.

8          So, you know, this is a Statement of Work directly

9    related to the February 15, 2012 Master Agreement that explains

10   in detail what -- what are the data capture and storage

11   requirements under the Master Agreement.

12         MR. BUCHANAN:  That's correct.  And I would make two

13   points.  First of all, this was never put forward in their

14   briefs or by any declaration, that particular passage.

15   However --

16         THE COURT:  Well --

17         MR. BUCHANAN:  -- if you go the page before that,

18   under hash-based verification, if you recall, plaintiffs'

19   counsel said, now there is a hash that is created right away,

20   it is key, you download the music, it's unique, the file has a

21   hash.  And this talks about hash-based verification.  And it

22   says:  And describe in the section below captioned Data Capture

23   and Storage all evidence will be saved, including without

24   limitation, packets of data that are received and exchanged

25   during the process.

1        So this is talking about hash space verification,

2   which is we're talking about, the match.

3        THE COURT:  Well --

4        MR. BUCHANAN:  The other has to be with the

5   notification.

6        THE COURT:  All right.  So before I forget, let me

7   ask this question.  They have indicated that you have all of

8   the files relating to the hash values.  Is that right or not?

9        MR. BUCHANAN:  So what they are referring to is PX

10  39, which is 57,000 audio files.

11       THE COURT:  Right.

12       MR. BUCHANAN:  Which Mr. Bahun talks and references.

13  Which no expert listened to.  Which no witness ever listened

14  to.  For which there is no evidence of when they were

15  downloaded, when they were matched.  It's just a file.

16       In addition --

17       THE COURT:  It's a file with a hash value.  So if --

18       MR. BUCHANAN:  But it hasn't --

19       THE COURT:  If you thought this hash value -- if, you

20  know, you have some concerns about the veracity of this hash

21  value being directly related to or consistent with a work, an

22  original work part of this lawsuit -- I mean, you have that raw

23  data.  You keep saying, I don't want -- now you're saying, I

24  don't want raw data.  Sometimes you say you want raw data.

25       MR. BUCHANAN:  But this -- wait, this raw data is

69

1    57,000 music files.  They're saying for us to listen to the

2    songs.  And what do we match it to?  How do we know what's on

3    those files, it matches with anything?

4                    THE COURT:  Well, all the notices --

5                    MR. BUCHANAN:  We don't have access --

6                    THE COURT:  -- indicate the hash value, right?  I

7    mean, all of these notices that were sent out said a specific

8    hash value that they said was being infringed, right?

9                    MR. BUCHANAN:  Right.

10                   THE COURT:  And so, you could -- you have been given

11   the raw data to correlate, you know, what they say that hash

12   value was with a -- you know, what they say that hash value is,

13   and you could verify whether that was in fact a work that is

14   owned by the plaintiffs and being infringed.

15                   MR. BUCHANAN:  There is only -- there is -- two

16   points.  None of their experts or any witness have listened to

17   those files and said they are what they are or when they were

18   created.

19                   Second, the one expert, George McCabe, said he asked

20   the plaintiffs to give him a list, an index of everything that

21   is on there.

22                   THE COURT:  Who is George McCabe?

23                   MR. BUCHANAN:  He is an expert witness for the

24   plaintiffs.

25                   THE COURT:  Okay.  He asked --

1            MR. BUCHANAN:  So right before he filed his report,

2     they gave him, I think it's spreadsheet 432.  So we analyzed

3     432 to see if just looking at what was on there matched with

4     what PX 39, the audio files.  22 percent of the files listed on

5     the index relied by their expert were not on the audio files.

6     And there is no way we could listen to those audio files unless

7     we have access to the Audible Magic library.  How could we

8     match?

9            We can't do -- just because it has -- has a hash,

10    doesn't mean what's on there actually ever matched.  That goes

11    back to the '236 spreadsheet.

12           THE COURT:  All right.

13           MR. BUCHANAN:  If you recall, those -- the

14    negative -- what does negative 1 and 0 mean?  Does anyone doubt

15    that means that that's not a match?  I mean, they --

16           THE COURT:  Yeah, I mean, they just said it doesn't

17    mean -- it's garbage, is what they're saying.

18           MR. BUCHANAN:  Okay.  Where is the --

19           THE COURT:  Maybe it is, maybe it isn't.  You know,

20    but I don't know.

21           MR. BUCHANAN:  Where is the -- where is the

22    declaration from MarkMonitor or Audible Magic that says that?

23           THE COURT:  Well, where is the declaration that says

24    that means it isn't a match?  I mean, you know --

25           MR. BUCHANAN:  Well, if -- if the testimony of

1   Paszkowski -- if I got his name right -- he describes what

2   happens.  If you're taking two songs that are five minutes and

3   you're running them for 20 seconds, and the match duration,

4   which is the amount of time, it's described in his deposition,

5   that there is a match, and the match offset shows at what point

6   in time, and you look at the Audible Magic, that does -- it has

7   44 seconds, it has 44 in there.  It is measured in seconds.

8          That column, the testimony of Paszkowski is it's

9   measured in seconds.  The track duration is measured in

10  seconds.  The match duration is measured in seconds.  And

11  MarkMonitor added their own column, which they described in the

12  testimony, that matches the duration versus the track.

13         THE COURT:  Mr. Buchanan, you're looking at something

14  that says the track duration.  That is that the work that I am

15  examining is minus one second or minute long.  Doesn't that --

16  just a red flag that something doesn't make sense here?  That

17  it's less than 0 time?

18         To give you the impression that, you know, this

19  information really isn't valid information?  So, I mean, the

20  idea --

21         MR. BUCHANAN:  How --

22         THE COURT:  -- that you're now going to make the

23  argument that, you know, the Bruno Mars Marry You track is, you

24  know, somehow or another in space and time, you know, less than

25  a 0 length in -- you know, this AM track duration column, do

72

1    you see that?  Where all the other ones that have AM track

2    duration of like, 536, 450, 404, 352, this column shows AM

3    track duration of minus 1.

4            And I think every -- well, maybe one as 0, a couple

5    have 0, but they are all minus 1 or 0.  So there is nothing

6    there.  Or there is less than nothing.

7            Doesn't that -- just a red flag that that doesn't

8    make sense?

9            MR. BUCHANAN:  Well, that --

10           THE COURT:  That entry.

11           MR. BUCHANAN:  In the columns where there is over

12   90 percent match, are those meaningless as well?  I mean --

13           THE COURT:  Well, those are not in the -- never mind.

14   Go ahead.

15           MR. BUCHANAN:  So, Your Honor, if you are correct,

16   wouldn't we have a declaration from Audible Magic to say that

17   that negative 1 does not mean that there was a match or not?

18           There is no testimony from their -- I mean, on its

19   face I think -- you know, first of all, on its face it says

20   negative 1, and I believe that says no match.  All they had to

21   do was come in with Mr. Ikezoye or someone from MarkMonitor and

22   say, we reviewed that.  And they just give an explanation, but

23   there is no declaration.

24           I mean, I believe, and the case law supports this,

25   that once, you know, we -- the burden shifts --

```
 1              THE COURT:  What --

 2              MR. BUCHANAN:  Once the moving party shows that the

 3    spoliated material is likely to be relevant in the action, the

 4    burden to show otherwise falls on the party charged with

 5    spoliation.  That's from duPont versus Colon, Judge Payne's

 6    opinion in which he goes through all the cases on spoliation.

 7              THE COURT:  Back in early 1990.

 8              MR. BUCHANAN:  Yeah, it is -- but it hasn't been

 9    reversed.  I mean, I think -- I think there is nothing in the

10    notes that say the burden changed.

11              But the point is that on its face -- so we can sit

12    here, now we're debating in a vacuum.  Why don't we just have

13    all the information and all the data?  And they can laugh at it

14    and say it doesn't mean anything, it's hogwash --

15              THE COURT:  Or you can say there are too many files,

16    I am not going to look at it.

17              MR. BUCHANAN:  Wait, that's --

18              THE COURT:  Which would give you the hash value

19    information.  I mean --

20              MR. BUCHANAN:  They didn't look at the files.

21              THE COURT:  Well --

22              MR. BUCHANAN:  Those aren't admissible.  There is no

23    authentication of those.  There is no foundation for any of

24    that.

25              When you say, look at them, they are music files.  We
```

74

1    would have to listen to them and match them.  I couldn't just

2    start listening to 57,000 files and say, okay, that sounds like

3    Bruce Springsteen.  I need to -- how do I identify that and

4    match it up to a notice?  The burden is on them on direct

5    infringement.

6              THE COURT:  Right.

7              MR. BUCHANAN:  It's not on us.

8              THE COURT:  I understand the burden is going to be on

9    them when the trial of this case gets going.

10             MR. BUCHANAN:  So the idea, they say, we gave them a

11   bunch of files, 57,000, they are going to play them for the

12   jury.

13             Do you know how many of those files their expert

14   listened to?  Two.  And how she did it?  She listened to them

15   and then got on iTunes and matched them up.

16             So that's what we're supposed to do?  57,000 files,

17   put on iTunes and match them up?  I mean, the burden was on

18   them to have someone listen to at least a substantial

19   percentage.

20             And as we put forward an affidavit that says, the

21   index they gave us, which is shorthand, which their expert

22   relied on, 22 percent of the audio files listed on the index

23   that is supposed to match directly with the audio files, does

24   not match.  They have never filed an affidavit or countered

25   that evidence.  And we submitted an affidavit that did that

1    analysis.

2              So all I'm saying, Your Honor, is we can debate, you

3    know, this evidence, but the idea that they could say, well, we

4    decided to start collecting it in 2015, we didn't keep it

5    before then, Audible Magic collected it, it's not relevant, you

6    didn't ask them the right questions, I just -- I think that in

7    this case, that it would have been very easy for them to retain

8    that.

9              And as I just read from the Statement of Work, I

10   mean, it talks about keeping evidence files, case files.

11   That's what their experts relied on, these case files, evidence

12   files to prove their case, which includes this, the '431

13   spreadsheet.  The '236, they didn't rely on, and neither did

14   they rely on the Audible Magic spreadsheet.

15             So that's our position, Your Honor.

16             THE COURT:  All right.  Thank you.

17             I don't need to hear any more.

18             You know, I have read these materials.  I've heard

19   fairly lengthy argument from counsel.  And, you know, it's an

20   interesting issue.  It's one that has, obviously, some real

21   significance in the matter.

22             And I think given the relief that is requested, that

23   is striking an exhibit that is as central to the expert's

24   testimony as both sides seem to agree that it is, that this

25   would fall into the 37(e)(2) category as opposed to the

1    37(e)(1) category, the request to strike the exhibit, because

2    it could in fact result in the damages case being excluded

3    because they wouldn't have the testimony of that.

4              So I have to look at that, I think, through those --

5    through that pair of glasses.

6              Initially, you know, I'm -- you have to have a duty

7    to preserve the information in anticipation of the conduct of

8    the litigation.  You know, I do not find at this point in time

9    that in the 2013/2014 time frame, that there was necessarily an

10   anticipation of this litigation or this type of litigation that

11   would require one to keep every piece of information relating

12   to every examination, work, verification, or whatever of the

13   various notices that were sent out during that time period.

14             The argument having to do with the Master Agreement

15   and the Statement of Work, you know, provides certain

16   information that was to be retained.  My understanding, based

17   on what has been presented here today from the plaintiff -- the

18   plaintiffs, is that the information outlined in the Statement

19   of Work, which is Exhibit T on pages 27 and 28, which specify

20   what was to be data captured and stored for the relevant

21   information contained in that, that it was captured, stored,

22   and produced to the defendant in response to the discovery

23   requests for the time period relating to there.

24             So as an initial matter, I find at this point in time

25   that there really wasn't a duty to preserve any more of the

1    information than what was outlined in the Statement of Work,

2    and that has been produced.

3              I think, you know, the reasonableness of the party in

4    this, state they had an agreement, they expected MarkMonitor to

5    agree by it.  They did do it, it seems reasonable.  So I think

6    it has been reasonable.

7              I also find that there is no -- if we get to the

8    point of where we have to deal with whether it's (e)(2), with

9    the intent to deprive another party of information in the use

10   in the litigation, there is no evidence that, you know, this

11   was specifically not retained for the intent to deprive Cox for

12   the use of that information in this litigation.

13             You know, I understand the arguments, and I

14   appreciate the arguments that this spreadsheet, you know, may

15   be subject to some attack, either whether it gets excluded or

16   whether it gets -- the weight of it gets reduced at the trial

17   of the case when the experts and various people come in and

18   provide testimony as to what this column means, what this

19   column doesn't mean, or who did this, and what this information

20   is, you know, that's -- that will be information that the jury

21   can assess and make a determination as to what weight it should

22   give to that particular spreadsheet.

23             But at this point in time, I don't think sanctions

24   are appropriate.

25             So I am going to deny the motion to exclude the

78

1   exhibit based on a violation of a failure to comply with a

2   discovery obligation to preserve discoverable information.

3          Thank you very much.  I appreciate it.  You all have

4   a good weekend.

5          Court will be adjourned.

6          MR. OPPENHEIM:  Thank you, Your Honor.

7          MR. BUCHANAN:  Thank you, Your Honor.

8          NOTE:  The hearing concluded at 3:53 p.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25