# Exhibit A

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP,<br><br>        Plaintiff,<br><br>      v.<br><br>COX ENTERPRISES, INC., COX COMMUNICATIONS, INC., and COXCOM, LLC,<br><br>        Defendants. | ) ) ) ) Case No. 1:14-cv-1611 (LOG/JFA) ) ) ) ) ) ) ) ) |

## MEMORANDUM IN SUPPORT OF COX'S MOTION TO EXCLUDE
## THE TESTIMONY OF PUTATIVE EXPERT TERRENCE P. McGARTY, Ph.D.


## NON-CONFIDENTIAL PUBLIC VERSION

## INTRODUCTION

Pursuant to Federal Rules of Evidence 702, 402, and 403, Cox respectfully requests that this Court exclude, in their entirety and for any purpose, the opinions and testimony of Plaintiffs' putative expert Terrence P. McGarty, Ph.D. because his opinions are not relevant to any issue in this case and thus would be highly misleading and confusing to the jury.

Prior to his current position as a venture capitalist, Dr. McGarty had a long career in the telecommunications industry.  But he has no experience with either the Digital Millennium Copyright Act ("DMCA") or copyright more broadly.  In fact, despite rendering extensive opinions about the reasonableness of Cox's graduated response procedures for handling allegations of copyright infringement, Dr. McGarty *admits that he did not even read the DMCA*. Rather, his opinions largely rest on assumptions that Plaintiffs' counsel supplied to him and that he did not bother to investigate.  His putative expert testimony has no basis in the law, fails to consider the operational details of Cox's systems and processes, and does not take into account obvious industry standards such as the Copyright Alert System, the only publicly available industry benchmark relevant to this case (described further below).

In offering Dr. McGarty as their putative industry expert, Plaintiffs' apparent objective is to provide the jury with an uninformed opinion divorced from the facts of this case but backed by an impressive resumé.  Such testimony will not help the jury resolve any material factual dispute and can only serve to confuse the issues.  Pursuant to its "gate-keeping" function under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), this Court should exclude Dr. McGarty's opinions and testimony in their entirety.

## BACKGROUND

Dr. McGarty issued his opening report on June 19, 2015.  *See* Ex. A.  On July 10, 2015, Dr. McGarty issued a rebuttal report, which responded to the opening report of Cox's affirmative expert, William Rosenblatt.  *See* Ex. B.  (Mr. Rosenblatt also submitted a rebuttal report on July 10, 2015, critiquing the opinions in Dr. McGarty's opening report.)  Dr. McGarty issued his reply report on July 24, 2015.  *See* Ex. C.  Cox deposed Dr. McGarty on August 7, 2015.  *See* Ex. D (relevant excerpts from the McGarty transcript).

Currently the Managing Partner of Telmarc, a technology investment and management company, Dr. McGarty has extensive prior experience in the telecommunications industry.  None of this experience, however, relates to copyright.  Dr. McGarty has no familiarity with the DMCA, and he did not consult the DMCA in rendering his opinions.  Ex. D at 43:14-24, 44:3-45:4, 51:21-24, 81:21-82:10.  His only apparent experience with the Copyright Alert System occurred after he read about it in Mr. Rosenblatt's opening report.  *Id.* at 156:24-157:4.  As such, Dr. McGarty lacks the proper qualifications and factual foundation to deliver any opinion about the reasonableness of Cox's regime for handling complaints of alleged copyright infringement.

In his opening report, Dr. McGarty summarized his "conclusions" as follows (substituting numbers for Dr. McGarty's bullets):



(1)

(2)

(3)



Ex. A at ¶ 15.  Some of these "conclusions" (for instance, (2), (4), and (5)) are merely recitations

of fact that do not appear to contain any analysis at all.  In his rebuttal and reply reports,

Dr. McGarty largely dismissed Mr. Rosenblatt's opinions as "irrelevant," "unhelpful,"

"unfounded," etc., often without explanation.  *See* Ex. B at ¶ 4, Ex. C at ¶ 4.  As discussed

further below, at his deposition, it became clear that Dr. McGarty had no understanding of the

legal framework at issue in this case.

**ARGUMENT**

Federal Rule of Evidence 702 assigns trial courts a "gatekeeping role" in evaluating expert testimony and determining whether it is properly grounded in relevant expertise and will assist the trier-of-fact. *Daubert*, 509 U.S. at 596-97; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (applying the requirements of *Daubert* to all expert testimony). "*Daubert* requires a two-part analysis to determine whether proposed expert testimony is admissible. First, the court must determine whether the expert's testimony is grounded in the scientific method and reflects scientific knowledge. Second, the court must determine whether the evidence proffered is relevant." *Miller v. Mandrin Homes, Ltd.*, 305 F. App'x 976, 979 n.2 (4th Cir. 2009). Plaintiffs bear the burden of establishing the admissibility of Dr. McGarty's testimony by a preponderance of the evidence. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

Expert testimony is not admissible unless it "…will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Rather, the proffered testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591. In other words, the expert opinion must "fit" the facts of the case. *See James River Mgmt. Co. v. Kehoe*, No. 3:09-CV-00387, 2010 WL 431477, at *4 (E.D. Va. Feb. 5, 2010) (excluding expert testimony that failed to meet the "fit" requirement, where the theory posited was not tethered to the facts of the case); *accord ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 812 (E.D.

Va. 2011). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591.

The flip-side of the Court's gatekeeping role is the duty to exclude expert testimony that threatens to confuse the fact-finder. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595. For instance, due to an expert's status or experience alone, the jury may attach more significance to the expert's testimony than is reasonably warranted. *United States v. Lester*, 254 F. Supp. 2d 602, 607 (E.D. Va. 2003). "Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert,* 509 U.S. at 595 (citations omitted); *see also* FED. R. EVID. 403. "[G]iven the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (citing *United States v. Dorsey*, 45 F.3d 809, 815-16 (4th Cir. 1995)).

As addressed in the following subsections, Dr. McGarty made no effort to tailor his analysis to the facts of this case. Therefore, Dr. McGarty's opinions are all inadmissible under Rules 402, 403, and 702, of the Federal Rules of Evidence.

## I. DR. MCGARTY'S OPINIONS DO NOT "FIT" THE FACTS OF THIS CASE.

In his deposition, Dr. McGarty detailed the three steps he would go through when evaluating a company's policy for complying with a legal mandate:

(1) **Understand the Law:** According to Dr. McGarty's testimony, he would first try to "understand the law" by consulting internal and outside counsel. Ex. D at 46:3-48:1. Ideally, that would mean getting "an opinion letter," which Dr. McGarty described as the "sine qua non that [he] would start with." *Id.*

5

(2)   **Understand the Operations of the Company:** Next, Dr. McGarty would "try to understand how [the policy] would fit into the operations of the company." Ex. D at 46:3-48:1. From his experience developing legal compliance regimes in the past, Dr. McGarty testified that this step would require getting information "from sales and marketing, operations, engineering" and other units in order to develop "a system that complies as best as [it] can with the opinion of outside counsel, that meets [the] customers' needs, and that provides ongoing data and information, printouts, as to how well it's performing." *Id.*

(3)   **Understand the Regimes of Competitors:** Finally, Dr. McGarty stated that he "would try to observe what was publicly available" about the practices of other organizations under the same legal compliance standards. Ex. D at 48:10-49:8. But Dr. McGarty described this issue as a "sticky wicket"; given antitrust concerns, a company "had to be very careful what [it] said to people who were perceived as competitors" and instead "would reasonably consider what was [publicly] available." *Id.*

In rendering his opinions in this case, however, Dr. McGarty did not adhere to the very rubric that he discussed in deposition. By his own admission, Dr. McGarty failed to consider the relevant law (much less an "opinion letter" concerning the law's requirements), *see* Ex. D at 43:14-24, 44:3-45:4, 51:21-24, 81:21-82:10; he failed to consider Cox's operations, *see id.* at 59:3-60:8, 86:4-16, 108:5-15, 132:25-134:13, 135:18-136:1; and he failed to consider (and in fact, dismissed) the only publicly available industry benchmark relevant to this case, the Copyright Alert System, *see id.* at 92:17-94:1, 95:15-21, 156:24-159:1.

At bottom, Dr. McGarty's opinion boils down to a single sentiment: had Cox acted more reasonably, it would not have gotten sued.  *See* Ex. D at 103:24-107:25.  As Dr. McGarty himself admitted, all he considered was the "uncertain cost associated with failure to comply" with Rightscorp's demands:

> All I could consider, since there's no benchmark as to what the – what the established damages could have been, was to say that they could be substantial. There could be a lot of legal costs.  Here are the costs.  There could be a lot of legal costs, there could be a lot of other things associated with it that Cox probably would not want to – well, if I were in Cox's position, I would not want to incur. I would try to avoid those costs.

Ex. D at 103:24-105:10.  That kind of shallow analysis, devoid of any appreciation of the facts at play in this case and based solely on a vague notion of legal costs the Dr. McGarty did not even try to quantify, is unworthy of "the mantle of reliability that accompanies the appellation 'expert testimony.'"  *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).

## A.    Dr. McGarty Has No Understanding of the DMCA or Its Requirements.

Dr. McGarty's expert reports contain extensive opinions about Cox's graduated response procedures for handling complaints of alleged copyright infringement.  Most notably, in his rebuttal report, Dr. McGarty opines that ███████████████████████████████ ████████████████████████████████████ Ex. B at ¶¶ 19-33.  But Dr. McGarty's reports also contain a number of opinions about the reasonableness of specific aspects of Cox's graduated response procedures, including its ███████████████ *see* Ex. A at ¶ 50, Ex. B at ¶ 12, Ex. C at ¶¶ 17-20; ██████████████████████████████████ █████████████████████████ *see* Ex. A at ¶ 41, Ex. B at ¶¶ 14-16; and Cox's decision not to announce all the details of its graduated response procedures to account holders, to name a few, *see* Ex. A at ¶ 48, Ex. C at ¶¶ 21-23.

While criticizing Cox's graduated response procedures, however, Dr. McGarty revealed at his deposition that he had never developed, or advised anyone in the development of, a system for compliance with the DMCA.  Ex. D at 108:16-19.  Despite his long experience in the telecommunications industry, he never before dealt with systems for handling allegations of copyright infringement.[1]  *Id.* at 128:5-129:23.  In fact, Dr. McGarty admitted that *he had not even reviewed the text of the DMCA when rendering his primary opinions.  Id.* at 51:21-24.  And, when questioned about whether the DMCA requires a service provider to take any affirmative steps to corroborate infringing activity (it does not, *see* 17 U.S.C. § 512(m)), Dr. McGarty answered: "as I indicated before, I've not got into the DMCA to any degree."  *See* Ex. D at 81:21-82:10.  Therefore, he has no grasp of the relevant legal framework for evaluating Cox's graduated response procedures.

To be eligible for safe harbor protection under the DMCA, a service provider must have "a policy that provides for the termination *in appropriate circumstances* of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i)(1)(A) (emphasis added).  But Dr. McGarty had no awareness that the DMCA contains this standard.  Ex. D at 44:3-6.  And he had no notion of what "appropriate circumstances" could mean: "I have no idea what appropriate – you're dealing with people and systems that have to make decisions, and if you give them such a vague statement as, appropriate circumstances, I have no idea what that means." *Id.* at 43:14-24; *cf. Lee v. City of Richmond, Va.*, No. 3:12-cv-00471, 2014 WL 5092715, at *7 (E.D. Va. Sept. 30, 2014) (excluding expert testimony about compliance with a law enforcement standard where putative expert testified "I

---

[1]  Relatedly, Dr. McGarty assumes that habitual abusers are common among users of telecommunications systems, but he did not analyze any data regarding Cox account holders to verify whether abusive conduct ever became habitual.  Ex. D at 128:5-129:23.

don't know what that standard is and you don't know what that standard is and nobody is really going to be able to nail that standard down") ("[Putative expert] reduced his opinions on compliance with the unidentified standards to *ipse dixit* entirely devoid of meaningful principles."). Tellingly, Dr. McGarty even confessed that one would have to "*wait until the five legal cases to determine what appropriate circumstances meant and try to figure out what's going on. . . . It leaves the person implementing it to the – to wander in the desert. I have no idea what it means . . . .*" Ex. D at 44:10-45:4 (emphasis added).

Nor did Dr. McGarty make any apparent effort to try to "understand the law," though he testified that was usually his first step in evaluating a legal compliance regime. *See* Ex. D at 46:3-48:1. Contrary to his stated practice, Dr. McGarty did not get an opinion letter about what the DMCA required. *Id.* at 49:17-50:10. Rather, Dr. McGarty based his opinions on three starting assumptions: "That there is a law out there that requires a certain level of compliance, *that Cox's system does not appear to comply with that appropriately*, and that it has – should or does have the capability of exercising such control." *Id.* at 94:2-95:14 (emphasis added). Those assumptions came from Plaintiffs' counsel. *Id.* And Dr. McGarty did not try to validate those assumptions, *i.e.*, by comparing Cox's procedures to any industry standard. *See id.* at 95:15-21. Instead, Dr. McGarty simply assumed Cox's liability at the outset of his analysis.

Without any legal framework to measure his analysis against, Dr. McGarty's opinions lack foundation. His lack of understanding about the DMCA and copyright law more broadly is itself a sufficient ground to exclude the entirety of his opinions.

### B.     Dr. McGarty Failed to Consider the Details of Cox's Operations.

Dr. McGarty's expert reports also contain several opinions about measures he contends Cox can and should take to deal with instances of alleged infringement on the Cox network. For

instance, Dr. McGarty opines that, 

Ex. A at ¶ 15; *see also id.* at ¶¶ 52-61

Further, Dr. McGarty states that

*Id.* at ¶ 15, 63. But Dr. McGarty bases these opinions on generalized understandings of the Cox Abuse Tracking System ("CATS") and Cox's internal processes, rather than actual analysis of Cox's operations.

By his own admission, Dr. McGarty does not "know the details of the Cox system. . ." Ex. D at 86:4-16. In rendering his opinions, Dr. McGarty did not review the source code for the CATS system. *Id.* at 51:25-53:4. Nor did he ask Plaintiffs' counsel to review any source code for CATS; he "didn't believe it was germane" to his opinions, because in his "experience having been the COO and CEO, [he would] have people that [he would] hire to do those things." *Id.* Dr. McGarty did not examine any engineering budgets, and he has "no idea how [Cox] implemented [CATS] and what their costs were." *Id.* at 55:8-18. Dr. McGarty opines that, "[i]f Cox can parse out those elements that are required for an infringement notice, then Cox can forward an infringement notice, not including those elements [that Cox found offensive to its customers] that could be extraneous to that notice."[2] *Id.* at 63:22-64:7. But when asked about

---

[2] Dr. McGarty provides no answers of how Cox could actually eliminate those offensive elements from Rightscorp's notice, particularly if Rightscorp subsequently modified the syntax of its settlement demands. *See* Ex. D at 143:23-144:17 ("I'd probably go up and get a couple of

the functionality of the parsers CATS uses, Dr. McGarty answered: "I haven't done this in 20

years, so I don't want to go down that path." *Id.* at 143:23-144:17.  Similarly, when questioned

about the reasonableness of Cox's decision to blacklist Rightscorp at the mail server level, Dr.

McGarty responded:

> I don't know the capacity of the CATS system, and I don't know the details of
> this volume of complaints, but the complaints, to some degree as text, seem to be
> fairly simple, and, as processing issues, not terribly complex. So it's not clear to
> me that even a large volume of complaints would bring the system crashing down.
> *I just don't know enough about the system to give you an opinion.*

Ex. D at 132:25-134:13 (emphasis added); *see also id.* at 135:18-136:1 ("[A]s we discussed

before, not being fully conversant in the architecture of the CATS system, I couldn't comment

on that.").

All Dr. McGarty knows about the CATS system is the little he gleaned from "functional

specifications" and comments in depositions.[3]  *See* Ex. D at 53:12-55:6.  "An expert's subjective

beliefs, his speculation, and his hunches are not admissible expert testimony." *Rembrandt Soc.*

*Media, LP v. Facebook, Inc.*, 22 F. Supp. 3d 585, 593 (E.D. Va. 2013).  And yet Dr. McGarty

hides behind his ignorance, using his lack of knowledge about the operational details of CATS as

a license to speculate about the hypothetical system that Cox *could* theoretically implement.  In

his view, "Cox always has the ability to change the capacity and configuration of its systems.

---

my former students at MIT and we would sit down and figure out how do we play spy versus spy
with the message, all right?").  Moreover, Dr. McGarty admits he does not know and has not
even considered how Cox could indicate to an account holder that Cox had modified the
communication.  Ex. D at 67:22-68:6.

[3]  Similarly, all Dr. McGarty knows about Cox's use of DPI is "various statements that have
been in the depositions that tends to indicate that [Procera is] used currently." Ex. D at 70:20-
72:15.  And even he admits that those statements tend to show Cox uses DPI "in a more limited
fashion" than would be necessary to accomplish what he proposes. *Id.*  And, while delivering
the opinion that Cox *could* use DPI to potentially investigate alleged infringements, Dr. McGarty
admits he never examined the issue of whether Cox *should* do so. *Id.* at 81:21-82:10.  Why not?
Because he "wasn't asked to do that." *Id.*

Companies are doing that all the time." *Id.* at 134:24-135:8. While admitting he did not even examine the functionality of the parsers that CATS uses to process incoming communications, Dr. McGarty nevertheless maintains that "CATS can be modified or redesigned to be able to" process Rightscorp notices; "it could be redesigned, it could be upgraded or it could be replaced." *Id.* at 59:3-60:8. He concedes that modifying CATS "depends upon the capacity of the processes involved," about which he confesses he knows nothing. *Id.* at 59:3-61:15. But, in delivering his opinions, he dismisses capacity considerations entirely: "Then build a bigger system. It's just software and servers." *Id.* at 167:6-18.

To be sure, when Dr. McGarty has actually attempted to modify systems in the past, he has seen things very differently. He admitted that changing any system requires working within resource constraints: "That was my job. . . . I had a budget I had to live within, I had a staffing I had to live within, and I had a time frame to live within, and a vendor contract to live with." Ex. D at 59:3-61:15. In fact, when describing his past experience in the telecommunications industry, he recounted one instance where he implemented a change simply because it increased "customer satisfaction," "it made the bills shorter, made them simpler, and, *particularly, it reduced the load on the customer service system.*" *Id.* at 98:11-99:22, 103:8-11 (emphasis added). But, when rendering his opinion in this case, none of these considerations came into play at all. Indeed, Dr. McGarty even failed to consider how his proposals would fit into the larger CATS ecosystem, as he had not examined how CATS dealt with other types of alleged abuse: "I've not seen the other data specifically. I don't recall that I did." *See id.* at 57:13-59:1.

At root, Dr. McGarty's opinions are just a trumped-up cost-benefit analysis, *where Dr. McGarty admits he has no information about the costs on either side of the balance.* On one end, he purports to consider the cost of greater compliance by Cox, though he has "no idea" of

the costs Cox has already incurred in implementing its graduated response procedure or how much his proposed level of compliance would cost. Ex. D at 105:11-107:3; *see also id.* at 108:5-15 ("I did not perform any detailed financial analysis because I wasn't asked to do that."). On the other end, he purports to considers the "downside costs of substantial litigation" and potential loss of the DMCA safe harbor, which he admits are indeterminate. *Id.* at 107:16-25. As Dr. McGarty explained in the following analogy, the fact that Cox got sued is essentially all the proof Dr. McGarty needs to show that Cox was acting unreasonably:

> But it's the issue of – it's comparable to a railroad and the farmers. The railroad goes down, knocks off sparks, the farmer's field burns down. The railroad has two options: It could get sued in court with undetermined damages, or it could pay the farmer, okay? So that is – in this particular case, Cox could take the position of saying, well, let's see what happens and not deal with every one of these and, you know, play the game and see what happens in court, or it could pay the farmer, which means process these complaints as received, in a form that is consistent with their safe harbor requirements. . . . What I'm saying is that there is – the costs associated with executing this, all right, in the fullest degree, is, most likely, not unreasonable compared to the downside costs of substantial litigation.

*Id.* at 105:11-107:25. Because Dr. McGarty's opinions have no connection or "fit" to Cox's actual systems and operations, the Court should exclude them in their entirety.

## C.  Dr. McGarty Failed to Consider Relevant Industry Benchmarks.

Dr. McGarty testified, when evaluating a company's legal compliance regime, he would generally "try to observe what was publicly available" about the practices of other organizations under the same legal compliance standards. Ex. D at 48:10-49:8. But, in rendering his opinions for the purpose of this lawsuit, Dr. McGarty admitted that he did not consider the DMCA procedures and policies of any Internet service provider other than Cox. *Id.* at 92:17-94:1. In fact, he went so far as to criticize Cox's expert, Mr. Rosenblatt, for considering the Copyright Alert System. In his rebuttal report, Dr. McGarty opined that ███████████████████

███████████████████████████████████████████



Ex. B at ¶ 4.  He continued:

*Id.*

The Copyright Alert System is the single most publicized system for handling allegations of copyright infringement.  And even Dr. McGarty admits that roughly a half dozen major record labels, the major movie studios, and five of the top ISPs in the United States participated in its development.  Ex. D at 156:24-157:18.  Yet Dr. McGarty's opinion dismisses the Copyright Alert System entirely, without making any serious effort to address it.  *See McEwen v. Baltimore Washington Med. Ctr. Inc.*, 404 F. App'x 789, 791 (4th Cir. 2010) (affirming district court's exclusion of expert testimony where experts "failed to meaningfully account for medical literature at odds with their testimony, declaring without explanation that the studies cited [d]id not apply").  Dr. McGarty's disregard of the Copyright Alert System only re-enforces his lack of familiarity with the copyright space, and Dr. McGarty's deposition testimony illuminates how limited his awareness of the Copyright Alert System truly is: "I read about it in Mr. Rosenblatt's reports.  I've looked at his website.  I've scanned through sections of the memo of understanding."  Ex. D at 156:24-157:4.  As Dr. McGarty readily admits: "It's not clear to me what the Copyright Alert System, as an entity, is."  *Id.* at 157:19-159:1.  Tellingly, while dismissing the Copyright Alert System because                               Dr. McGarty

---

4

*Cf.* Ex. D at 48:10-49:8.

14

is unaware of any evidence of any ISP terminating its customers based on mere allegations of

copyright infringement.  *Id.* at 165:1-21.

   As his deposition revealed, Dr. McGarty considered Cox's graduated response

procedures, and its response to Rightscorp, in a total vacuum.  *See* Ex. D at 92:17-94:1.

Dr. McGarty did not ask to review materials about how other ISPs dealt with Rightscorp notices,

and he did not try to find out whether such materials existed.  *Id.* at 92:17-94:1.  (Plaintiffs

produced several communications from other ISPs reflecting their refusal to accept Rightscorp's

notices.  *See, e.g.*, Dkt. 311 [Declaration of A. Bridges in support of motion for summary

judgment] at ¶ 4(m)-(r), (u)-(w), Exs. 2, 5-13.)  As this Court is well aware, Rightscorp plays a

central role in this lawsuit, as it does in Dr. McGarty's opinions.  But, once again, Dr. McGarty

has only a shallow understanding of how Rightscorp operates.  He has "never spoken to

Rightscorp."  Ex. D at 72:22-73:15, 76:9-14.  In rendering his opinion, he did not consider any

proprietary or internal information of Rightscorp; he was not aware that Plaintiffs' counsel

possessed such information, and he did not request it.  *Id.* at 73:17-74:9.  Nor did he review any

deposition testimony of Rightscorp personnel.  *Id.* at 74:10-75:6.  He was not even aware that

such depositions took place before he rendered his opinions.  *Id.*  It is unthinkable that

Dr. McGarty could deliver an opinion about the purported reasonableness of Cox's actions and

processes without considering Rightscorp's conduct and whether the notices of alleged

infringement it purportedly sent to Cox were even accurate or reliable.[5]

   Because Dr. McGarty's opinions do not measure Cox's procedures against the facts or

any relevant standard, the Court should exclude Dr. McGarty's opinions in their entirety.

_____

[5]  Dr. McGarty's understanding of BitTorrent is similarly uninformed, as he is unable to
distinguish between .torrent files and their associated torrent payloads. Ex. D at 151:6-155:11.
When asked whether he had ever used a BitTorrent client application, he responded: "I don't use
pay toilets.  No.  I wouldn't go near that, okay?"  Id. at 153:25-154:3.

## II. AT LEAST ONE OTHER COURT HAS CRITICIZED DR. MCGARTY FOR SUBMITTING IRRELEVANT EXPERT TESTIMONY.

This is not the first time that Dr. McGarty has attempted to deliver an irrelevant expert opinion. In *Arzoomanian v. British Telecomms, PLC*, No. 2:03-00374, 2007 WL 132983, at *1, 16 (D.N.J. Jan. 12, 2007), Dr. McGarty offered an expert report in support of a plaintiff alleging claims for tortious interference with contractual relations, tortious interference with prospective economic advantage, and quantum meruit. Dr. McGarty's report described "the role of an Intermediary" and the usual compensation due to someone in that role. *Id.* at *16. The problem, however, was that the plaintiff in that case *was not an Intermediary*, and Dr. McGarty's report contained "no explanation of what constitute[d] ordinary or customary compensation in the alleged deal with" the plaintiff.[6] *Id.* Accordingly, the court held that "Mr. McGarty's statements [were] beyond the facts in this case," noting that "the report, if carefully scrutinized, may actually support the defendants." *Id.*

While this case is contextually different than the *Arzoomanian* case, the problems with Dr. McGarty's purported expert testimony are much the same. As described in the sections above, his opinions just do not "fit" the facts of this case. *See ePlus*, 764 F. Supp. 2d at 813. "[T]here is simply too great an analytical gap between the data and the opinion proffered." *See Joiner*, 522 U.S. at 146. Because it fails to consider any relevant legal, operational, or industry framework, Dr. McGarty's testimony "is the quintessential *ipse dixit*. It is so because I, the expert, say it is so." *See ePlus*, 764 F. Supp. 2d at 815. Therefore, this Court must exclude all of Dr. McGarty's opinions.

---

[6] In fact, at his deposition, Dr. McGarty revealed that he had warned the plaintiff's counsel in *Arzoomanian* "that, you know, I don't think this works." Ex. D at 194:22-196:22.

# CONCLUSION

Expert testimony poses unique risks in litigation. While a well-informed, qualified expert can significantly assist a jury, an expert delivering irrelevant testimony can confuse the fact-finder and irreversibly taint the process. Because Dr. McGarty failed to tailor his opinions to the facts of this case, Cox respectfully requests that the Court exclude his reports and all putative expert testimony and opinions offered by Dr. McGarty. Cox submits a form of proposed order with this motion.

Dated: October 23, 2015                                  Respectfully submitted,


                                                         /s/ Craig C. Reilly
                                                         Craig C. Reilly VSB # 20942
                                                         111 Oronoco Street
                                                         Alexandria, Virginia 22314
                                                         TEL:    (703) 549-5354
                                                         FAX:    (703) 549-5355
                                                         E-MAIL: craig.reilly@ccreillylaw.com

                                                         *Counsel for Defendants*

17

*Of Counsel for Defendants*

Andrew P. Bridges (*pro hac vice*)
David L. Hayes (*pro hac vice*)
Jedediah Wakefield (*pro hac vice*)
Guinevere L. Jobson (*pro hac vice*)
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Tel:  (415) 875-2300
Fax:  (415) 281-1350
Email:  abridges@fenwick.com
        gjobson@fenwick.com

Brian D. Buckley (*pro hac vice*)
Fenwick & West LLP
1191 2nd Avenue, 10th Floor
Seattle, WA  98101
Tel:  (206) 389-4510
Fax:  (206) 389-4511
Email:  bbuckley@fenwick.com

Armen N. Nercessian (*pro hac vice*)
Ronnie Solomon (*pro hac vice*)
Ciara Mittan (*pro hac vice*)
Fenwick & West LLP
801 California Street
Mountain View, CA  94041
Tel:  (650) 988-8500
Fax:  (650) 938-5200
Email:  anercessian@fenwick.com
        rsolomon@fenwick.com
        cmittan@fenwick.com

### CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2015, the foregoing was filed and served

electronically by the Court's CM/ECF system upon all registered users:

/s/ Craig C. Reilly
Craig C. Reilly, Esq. (VSB # 20942)
111 Oronoco Street
Alexandria, Virginia 22314
TEL (703) 549-5354
FAX (703) 549-5355
craig.reilly@ccreillylaw.com

*Counsel for Defendants*