# Exhibit B

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **ARISTA RECORDS, INC., et al.,** | ) | **CIVIL ACTION** |
| | ) | |
| **Plaintiffs,** | ) | **Case No.:  03 CV 2670 (JBS)** |
| **v.** | ) | |
| | ) | **DOCUMENT FILED** |
| **FLEA WORLD, INC., a** | ) | **ELECTRONICALLY** |
| **Pennsylvania Corporation, d/b/a** | ) | |
| **Columbus Farmers Market; et al.,** | ) | <u>**RETURN DATE:**</u> |
| | ) | |
| **Defendants.** | ) | **NOVEMBER 18, 2005** |

## MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' EXPERT, DR.  STEPHEN M. NOWLIS

| | |
|---|---|
| **WHITE AND WILLIAMS LLP** | Counsel for Columbus Flea |
| Michael N. Onufrak (MO 3693) | World, LLC |
| Thomas A. Warnock (TW 4396) | |
| LibertyView | |
| 457 Haddonfield Road, Suite 400 | |
| Cherry Hill, NJ  08002-2220 | |
| Telephone (856) 317-3600 | |
| Facsimile (856) 317-1342 | |
| | |
| **VOLPE AND KOENIG** | Counsel for Columbus Farmers |
| Ryan W. O'Donnell (RO 2904) | Market LLC |
| Randolph J. Huis (admitted *pro hac vice*) | |
| John J. O'Malley (admitted *pro hac vice*) | |
| United Plaza, Suite 1600 | |
| 30 S. 17th Street | |
| Philadelphia, PA 19103 | |
| | |
| **McCRINK, NELSON & KEHLER** | |
| Matthew R. McCrink (MM 8864) | |
| 475 Route 73 North | Counsel for John C. Ackerman, Jr. |
| West Berlin, NJ 08091 | and Charles F. Pratt |

# TABLE OF CONTENTS

**I.    BACKGROUND** ............................................................1

**II.   THE DAUBERT STANDARD AND FED.R.EV. 702**.................3

**III.  LEGAL ARGUMENT** .....................................................7

  **A.    The Nowlis Report Does Not Follow Any Accepted Methodology** .......8

  **B.    Dr. Nowlis Does Not Have Specialized Knowledge Necessary To Render An Expert Opinion On The Draw Of Infringing Recorded Music To A Flea Market** .........................................................13

  **C.    The Nowlis Report Is Fatally Unreliable, And Is Inadmissible** ..........15

    **1.    The Nowlis Report Does Not Establish That Research Directed To Multiple Retail Outlets Applies To Any Relevant Issue In This Case**. ...............................................................................15

    **2.    Whether Retail Shoppers Favor "Variety" Is Irrelevant To Any Issue In This Case** ..................................................19

    **3.    The Nowlis Report's Analysis And Conclusions Regarding The Importance Of Music Outlets To Draw Consumers Are Contradicted By The Materials Upon Which He Relied** .................20

    **4.    The Nowlis Report's Analysis And Conclusions Regarding The Availability And Draw of "Unique Compilations" Of Recorded Music Have No Support** ...............................................25

    **5.    The Nowlis Report's Analysis And Conclusions Regarding Infringing Recorded Music Being Offered At Below Market Prices Are Unreliable And Ignore Relevant Facts** .......................30

    **6.    The Nowlis Report's Analysis And Conclusions Regarding The Behavior Of Flea Market Buyers Are Unreliable And Ignore Relevant Facts** ...............................................................31

    **7.    The Nowlis Report's Analysis And Conclusions Regarding The Benefit Of The Sale Of Infringing Music To Columbus Farmers Market Has No Basis In Fact** ...........................................36

  **D.    The Conclusions In The Nowlis Report Do Not Flow From The "Research" Conducted By Nowlis** ......................................38

**III.  CONCLUSION** .............................................................39

# TABLE OF AUTHORITIES

Adobe System Inc. v. Canus Products, Inc.,
    173 F. Supp. 2d 1044 (C.D. Cal. 2001) ...................................................... 1

Boucher v. Suzuki Motor Corp.,
    73 F.3d 18 (2d Cir. 1996) ........................................................................ 36

Bourjaily v. United States,
    483 U.S. 171 (1987) .................................................................................. 7

Calhoun v. Yamaha Motor Corp., U.S.A.,
    350 F.3d 316 (3d Cir. 2003) ............................................................... 3, 4,
                                                             30, 36

Callaway Golf Company v. Dunlop Slazenger Group Americas, Inc.,
    2003 U.S. Dist. LEXIS 25625 (D. Del. May 21, 2003) ........................... 12

Chapman v. Maytag Corp.(In re Chapman),
    297 F.3d 682 (7th Cir. 2002) ................................................................... 27

Claar v. Burlington N. R.R.,
    29 F.3d 499 (9th Cir. 1994) ..................................................................... 19

Cloud ex rel. Cloud v. Pfizer, Inc.,
    198 F. Supp. 2d 1118 (D. Ariz. 2001) ..................................................... 13

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    43 F.3d 1311 (9th Cir. 1995) .................................... 2, 3, 5, 6, 7, 8, 10, 12,
                                                      13, 14, 20, 24

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993) ..................................................... 1, 3, 4, 5, 11, 37, 40

El Aguila Food Products v. Gruma Corp.,
    301 F. Supp. 2d 612 (S.D. Tex. 2003) ...................................................... 9

Elcock v. Kmart Corp.,
    233 F.3d 734 (3d Cir. 2000) ................................................................. 4, 5

General Electric Co. v. Joiner,
    522 U.S. 136 (1997) ............................................................4, 6,
                                                                          7, 29

Heller v. Shaw,
    167 F.3d 146 (3d Cir. 1999) ...........................................5, 20,
                                                                            21

Holden Metal & Aluminum Works v. Wismarq Corp.,,
    2003 U.S. Dist. LEXIS 5247 (N.D. Ill. April 02, 2003) ...................13, 14

JMJ Enterprises, Inc. v. VIA Veneto Italian Ice, Inc.,
    1998 U.S. Dist. LEXIS 5098 (E.D. Pa. April 15, 1998) .............10, 37, 38

Kumho Tire Co., Ltd. v. Carmichael,
    526 U.S. 137 (1999) ..........................................................1, 3,
                                                                          5, 6

LinkCo., Inc., v. Fujitsu Ltd.,
    2002 U.S. Dist. LEXIS  (S.D.N.Y. July 16, 2002)...................................12

Magistrini v. One Hour Martinizing Dry Cleaning,
    180 F. Supp. 2d 584 (D.N.J. 2002).......................................6, 29,
                                                                            39

Mitchell v. Gencorp, Inc.,
    165 F.3d 778 (10th Cir. 1999)...................................................11

Norris v. Baxter Healthcare Corp.,
    397 F.3d 878 (10th Cir. 2005)...........................................31, 33

Oddi v. Ford Motor Co.,
    234 F.3d 136 (3d Cir. 2000) .............................................5, 20,
                                                                          29, 39

In re Paoli Railroad Yard PCB Litigation,
    35 F.3d 717 (3d Cir. 1994), cert. denied, 115 S. Ct. 1253 (1995) ........4, 5,
                                                                            7, 20,
                                                                          27, 29

Raskin v. The Wyatt Co.,
    125 F.3d 55 (2d Cir. 1997) ......................................................17

Rutigliano v. Valley Bus. Forms,
    929 F. Supp. 779 (D.N.J. 1996)................................................3

Schneider v. Fried,
  320 F.3d 396 (3d Cir. 2003) ........................................................................25

Surace v. Caterpillar, Inc.,
  111 F.3d 1039 (3d Cir. 1997) ....................................................................25

In re TMI Litigation,
  193 F.3d 613 (3d Cir. 1999) ...................................................................9, 12

Total Containment, Inc. v. Dayco Products, Inc.,
  2001 U.S. Dist. LEXIS 15838 ...............................................................10, 31

Waldorf v. Shuta,
  142 F.3d 601 (3d Cir. 1998) .........................................................................4

Wartsila NSD N. America, Inc. v. Hill International, Inc.,
  299 F. Supp. 2d 400 (D.N.J. 2003) ...............................................................3

Wilkinson v. Rosenthal & Co.,
  712 F. Supp. 474 (E.D. Pa. 1989) ...............................................................17

Defendants Columbus Flea World, LLC, Columbus Farmers Market LLC, John Ackerman, and Charles Pratt (referred to collectively hereinafter as "Columbus Farmers Market"), by and through their attorneys, hereby move this Honorable Court pursuant to Federal Rules of Evidence 102 and 702, to exclude the expert report and testimony of Plaintiffs' ("The Record Companies") expert, Dr. Stephen M. Nowlis ("Nowlis).

The report submitted by Nowlis ("Nowlis Report", attached to the Declaration of Joshua Ryan ("Ryan Decl.")  as Exhibit C) is unreliable under the standards established in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  To that extent that <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1999) is applicable, the Nowlis Report fails to meet those standards as well.

## I.     BACKGROUND

In order to prove that Columbus Farmers Market are vicariously liable for copyright infringement, The Record Companies must establish two elements: (1) that the defendant has the right and ability to supervise the infringing activity, and (2) that the defendant has an obvious and direct financial interest in the infringement.  <u>Adobe Sys. Inc. v. Canus Prods., Inc.</u>, 173 F. Supp. 2d. 1044, 1048 (C.D. Cal. 2001).  As the incontrovertible evidence in this case demonstrates, the owners and operators of the Columbus Farmers Market flea market receive no direct financial benefit from the sale of the CDs alleged to be infringing in this

case.   Thus, the Record Companies are forced to manufacture such evidence. Accordingly, The Record Companies have submitted the Nowlis Report, Ryan Decl. Exhibit C, as well as the Supplemental Expert Report of Dr. Stephen M. Nowlis ("Supplemental Nowlis Report"), attached to the Ryan Decl. as Exhibit D.

In the Nowlis Report, without performing any independent research, study or analysis, and without any background as an expert in infringing recorded music or flea market consumers, Nowlis comes to various very specific conclusions regarding the draw of customers to the Columbus Farmers Market flea market created by the infringing recorded music and the direct financial benefit to Columbus Farmers Market.  (Nowlis Report at 2-3).

As demonstrated herein, each of Nowlis' conclusions is unsupported by the materials relied upon in his Report.   Nowlis did not perform any independent scientific research, study or survey.   His Report is merely an exercise in *ad hoc* article collecting.   Nowlis demonstrated no methodology at all in formulating his Report.   Nowlis' conclusions show no relationship to any of the materials upon which he based his Report.   Moreover, Nowlis' ignored the facts of this case, as well as facts from his own supporting materials that contradicted his conclusions. Accordingly, the Nowlis Report is so fatally flawed, it must be completely excluded under Daubert and its progeny.

## II.     THE DAUBERT STANDARD AND FED.R.EV. 702

The admission of expert testimony is governed by Fed.R.Ev. 702, which

provides that:

> If scientific, technical or other specialized knowledge
> will assist the trier of fact to understand the evidence or
> to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts in the
> case.

Fed.R.Ev. 702.  Rule 702 embodies three distinct substantive restrictions on the

admission of expert testimony: qualifications, reliability, and fit.  Calhoun v.

Yamaha Motor Corp., U.S.A., 350 F.3d 316, 320 (3d Cir. 2003); Wartsila NSD N.

Am., Inc. v. Hill Int'l, Inc., 299 F. Supp. 2d 400, 404 (D.N.J. 2003); Rutigliano v.

Valley Bus. Forms, 929 F. Supp. 779, 784 (D.N.J. 1996).  The Supreme Court in

Daubert clarified the operation and scope of Rule 702 with regard to expert

testimony.  In that case, the Supreme Court held that an "expert's opinion must be

based on the 'methods and procedures of science' rather than on 'subjective belief

or unsupported speculation;' the expert must have 'good grounds' for his or her

belief."  Daubert, 509 U.S. at 590; see also Calhoun, 350 F.3d at 321. The

standards set forth in Daubert operate as a framework to ensure the relevance and

reliability of expert testimony. Kumho Tire, 526 U.S. at 151.  It is the trial judge's

role to serve as the gate-keeper in scrutinizing the evidentiary relevance and reliability of the proposed expert submission. See Daubert, 509 U.S. at 588-89, 595-97.

The first step of the Rule 702 inquiry is to determine whether the expert is properly qualified. Before an expert witness may offer an opinion pursuant to Rule 702 he must first be qualified by virtue of specialized expertise. Calhoun, 350 F.3d at 321. Rule 702 requires the expert to have "specialized knowledge" with regard to the area he is testifying about. The Third Circuit has interpreted the specialized knowledge requirement liberally, and has stated that this policy of liberal admissibility of expert testimony extends to the substantive as well as the formal qualifications of experts. Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000) (citing Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998). However, "at a minimum, a proffered expert witness ... must possess skill or knowledge greater than the average layman ...." Id.; see also In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 741 (3d Cir. 1994), cert. denied, 115 S. Ct. 1253 (1995).

The Court's inquiry "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. However, "conclusions and methodology are not entirely distinct from one another." General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). Thus, the court must also "examine the expert's conclusions in order to determine whether they could

4

reliably flow from the facts known to the expert and the methodology used." <u>Heller v. Shaw</u>, 167 F.3d 146, 153 (3d Cir. 1999). It is the trial court's responsibility to evaluate not only the principles and methodologies of the expert, but also whether the expert has properly applied those principles and methods to the facts of the case. <u>Daubert</u>, 509 U.S. at 592-593.

The Supreme Court and the Third Circuit have recognized certain factors to guide a trial court's assessment of the reliability of proffered scientific expert testimony. These factors include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the nonjudicial uses to which the method has been put.

<u>See</u> <u>Daubert</u>, 509 U.S. at 593-94; <u>Oddi v. Ford Motor Co.</u>, 234 F.3d 136, 145 (3d Cir. 2000); <u>Paoli</u>, 35 F.3d at 742 n.8. As the Supreme Court noted in <u>Daubert</u>, this inquiry is a flexible one, and in this Circuit, it has been held that this list of factors is "nonexclusive" and that "each factor need not be applied in every case." <u>Elcock</u>, 233 F.3d at 746. Rather, the court must tailor its inquiry to the facts of each case and "should consider the specific factors identified in <u>Daubert</u> where [such factors] are reasonable measures of the reliability of the expert testimony." <u>Kumho Tire</u>,

526 U.S. at 150, 152 (noting that Daubert factors may or may not be useful depending on "nature of the issue, the expert's particular expertise, and the subject of his testimony") (citations omitted)).

The Supreme Court has also noted that Daubert's general holding applies not only to scientific knowledge, but also to technical and other specialized knowledge. Kumho Tire, 526 U.S. at 150. Moreover, some courts consider additional factors when determining reliability, such as: (i) whether the expert's proposed testimony grows naturally and directly out of the research the expert has conducted independent of the litigation, see Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir. 1995), (ii) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, see Joiner, 522 U.S. at 146), and (iii) whether the field of expertise asserted by the expert is known to reach reliable results for the type of opinion proffered by the expert, see Kumho Tire, 526 U.S. at 149-150. See also Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 594-95 (D.N.J. 2002), aff'd 68 Fed. Appx. 356, 2003 U.S. App. LEXIS 12972 (3d Cir. 2003); Fed.R.Ev. 702 advisory committee's notes.

Significantly, there is nothing in the Federal Rules of Evidence, Daubert, or its progeny, that "requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may

6

conclude that there is simply too great an analytical gap between the data and the opinion proffered." Joiner, 522 U.S. at 145-46, citing Turpin v. Merrell Dow Pharmaceuticals, Inc., 959 F.2d 1349, 1360 (6th Cir. 1992), cert. denied, 506 U.S. 826, (1992).

The last step of a Rule 702 inquiry is to determine "fit" - whether there is a relevant "connection between the scientific research or test result to be presented and particular disputed factual issues in the case." Paoli, 35 F.3d at 741-43. "Fit" requires that the expert's testimony not only be reliable, but that it assist the jury by providing it with relevant information for the purpose of the case. Id., at 743.

The proponent of expert testimony must establish the admissibility of the expert's opinion by a preponderance of the evidence. See Bourjaily v. United States, 483 U.S. 171, 175 (1987); Paoli, 35 F.3d at 744.

## III. LEGAL ARGUMENT

Columbus Farmers Market submit that the Nowlis Report does not meet the requirements of reliability as outlined in Daubert, and is therefore inadmissible. The conclusions drawn by Nowlis are not supported by any independent research, or any of the materials he relied upon in preparing the Nowlis Report. Rather, the Nowlis Report makes unsupported analytical leaps without any scientific basis. In addition, Nowlis ignored relevant facts directly contradicting his conclusions.

Defendants' expert witness, Dr. Michael Rappeport, a marketing and survey research expert, has conducted an in depth critique of the Nowlis Report, provided in the Rappeport Report attached to the Ryan Decl. as Exhibit E, specifically at pages 12-20. As the Court can ascertain from Dr. Rappeport's Report, the Nowlis Report is replete with errors, and Nowlis' conclusions are not supported by the materials upon which he relies. The Nowlis Report espouses conclusions without substantiation.

In view of this, the Nowlis Report is fatally flawed due to the expert's lack of experience in the pertinent field, faulty methodology, and illogical leaps in reaching it conclusions.

## A. The Nowlis Report Does Not Follow Any Accepted Methodology

Research performed by an expert must be described "in sufficient detail that the district court [can] determine if the research was scientifically valid." Daubert, 43 F.3d at 1319, quoting United States v. Rincon, 28 F.3d 921, 924 (9th Cir. 1994). Here, Nowlis performed no independent research in support of *any* conclusion found his Report. (Deposition of Dr. Stephen Nowlis ("Nowlis Dep.", pertinent referenced pages attached to the Ryan Decl. as Exhibit F) at 15:15-16:3; 18:13-20; 19:9-20:1; 21:14-17; 40:9-21; 45:19-46:2; 49:13-24; 52:19-24; 58:16-23; 178:17-179:2; 179:8-18; 191:14-18; 203:23-204:4; 225:7-12). Nowlis' "methodology," if it can be called that, consisted of adopting conclusions, and cobbling together

articles from his collection, regardless of whether such articles supported his conclusions. This prefabricated, piecemeal approach falls far short of the standards for a reliable expert report. The Court of Appeals for the Third Circuit has cautioned against reliance upon information that is "purely anecdotal." In re TMI Litig., 193 F.3d 613, 673 (3d Cir. 1999) (affirming exclusion of expert testimony based on information that was "purely anecdotal").

Even worse than formulating conclusions prior to performing any research in this case, Nowlis formed and is apparently parroting the identical conclusions from *a previous case* where he was hired by The Record Companies. In UMG Recordings, Inc., et al. v. Sinnot, Case No. CIV S-02-2153, Eastern District of California, Nowlis submitted an expert report ("Nowlis Sinnot Report")[1] on behalf of The Record Companies *virtually identical* to the Nowlis Report in this case. A comparison of the two reports shows that Nowlis reached the same exact conclusions in each case, underwent the same exact analysis in each case, and cited the same articles in each case. (Ryan Decl. Ex. B). The present Nowlis Report is little more than a "find-and-replace" version of the Nowlis Sinnot Report. Id. Preformed conclusions such as these inadmissible. See El Aguila Food Prods. v.

---

[1]  Nowlis Sinnot Report attached to the Declaration of Michael F. Snyder ("Snyder Decl.") as Exhibit A, and attached to the Declaration of Joshua Ryan ("Ryan Decl.") as Exhibit A.

Gruma Corp., 301 F. Supp. 2d 612, 626 (S.D. Tex. 2003), aff'd 2005 U.S. App.
LEXIS 8944 (5th Cir. Tex., May 17, 2005).

Prior to working for The Record Companies, Nowlis had no expert
experience with either infringing recorded music or flea markets, and has never
performed independent research related to either. (Nowlis Dep. 19:9-20:1; 50:1-
51:10). Here, Nowlis prepared his analysis solely for his report and testimony in
this case (and in a previous case where he was tapped by The Record Companies)
and has not conducted any study on this topic independently. (Nowlis Dep. 15:15-
16:3; 18:13-20; 19:9-20:1; 21:14-17; 40:9-21; 45:19-46:2; 49:13-24; 52:19-24;
58:16-23; 178:17-179:2; 179:8-18; 191:14-18; 203:23-204:4; 225:7-12). This
Court's sister courts have excluded expert opinions where the expert failed to
conduct any independent research to determine the reliability of his assumptions.
See, e.g., Total Containment, Inc. v. Dayco Products, Inc., 2001 U.S. Dist. LEXIS
15838; JMJ Enterprises, Inc. v. VIA Veneto Italian Ice, Inc., CIVIL ACTION No.
97-CV-0652, 1998 U.S. Dist. LEXIS 5098 (E.D. Pa. April 15, 1998). Nowlis is
one of a class of experts who are not "proposing to testify about matters growing
naturally and directly out of research they have conducted independent of the
litigation,... [but] have developed their opinions expressly for the purposes of
testifying." Daubert, 43 F.3d at 1317. As such, the reliability of Nowlis'
"methods" and the value of his testimony should be completely dismissed.

Nowlis was unable to testify that his theory regarding the draw of infringing recorded music to flea markets had been subjected to peer review and publication, because he declined to expose it to the rigors of those processes by actually performing a study or conducting any independent research. See Mitchell v. Gencorp, Inc., 165 F.3d 778, 783 (10th Cir. 1999) ("By failing to subject their opinions to peer review, the experts missed the opportunity to have other scientists review their work and warn them of possible flaws in their methodology."). Similarly, Nowlis did not test the conclusions of his report to determine a "known or potential rate of error," Daubert, 509 U.S. at 594.  Because he did not do so, it is impossible to know whether his conclusions can be verified in the real world, and indeed, the facts surrounding the sale of recorded music at the flea market are clearly contrary to his conclusions.  (See Rappeport Report 12-19).

Nowlis' conclusions here are unmistakably copied from his prior Sinnot Report, where his "methodology" also consisted of selecting articles from his library, rather than any independent research, analysis, or study relevant to this case.  (Ryan Decl. Ex. B).  His only basis for his conclusions drawn from those articles is his "experience," which experience is unrelated to the issues upon which

he opines, as explained in further detail below.[2]   As Nowlis' relies upon a collection of articles where he has never done any additional probing or research, under Daubert, such evidence is not reliable. See, Callaway Golf Company v. Dunlop Slazenger Group Americas, Inc., Civil Action No. 01-669-KAJ, 2003 U.S. Dist. LEXIS 25625 (D. Del. May 21, 2003), citing Primavera Familienstifung v. Askin, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001) (An expert "must do more than aver conclusorily that his experience led to his opinion"); LinkCo., Inc., v. Fujitsu Ltd., No. 00 Civ. 7242(SAS), 2002 U.S. Dist. LEXIS 12975at *13, (S.D.N.Y. July 16, 2002)   ("[A] court cannot permit experts to 'offer credentials rather than analysis'") (citation omitted).

In this matter, the articles relied upon by Nowlis are unreliable, as outlined in detail below.  Nowlis did nothing to confirm whether any of the articles he relied upon provides support for his conclusions here.  (Nowlis Dep. 15:15-16:3; 18:13-20; 19:9-20:1; 21:14-17; 40:9-21; 45:19-46:2; 49:13-24; 52:19-24; 58:16-23; 178:17-179:2; 179:8-18; 191:14-18; 203:23-204:4; 225:7-12).   In such cases, the expert should be excluded.   See TMI, 193 F.3d at 698 (report unreliable and inadmissible because expert did not probe the underlying materials relied upon or

---

[2]     Nowlis has no background in accounting, statistics, or the identification of infringing recorded music.  (Nowlis Dep., 13:23-14:5; 53:13-24; 171:3-7, 261:19-22).  Therefore, his "experience" cannot provide the basis for his analysis.

perform additional research); <u>Cloud ex rel. Cloud v. Pfizer, Inc.</u>, 198 F. Supp. 2d 1118, 1135 (D. Ariz. 2001) (same).

At his deposition, Nowlis could not point to any direct research he performed that supported his conclusions regarding infringing recorded music and the Columbus Farmers Market flea market. (Nowlis Dep. 15:15-16:3; 18:13-20; 19:9-20:1; 21:14-17; 40:9-21; 45:19-46:2; 49:13-24; 52:19-24; 58:16-23; 178:17-179:2; 179:8-18; 191:14-18; 203:23-204:4; 225:7-12). Because Nowlis provided no explanation for his methodology in coming to the conclusions in this case (which are the same conclusions as in the <u>Sinnot</u> case), his report and testimony must be excluded. <u>See</u>, <u>Daubert</u>, 43 F.3d at 1319 ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under <u>Daubert</u>, that's not enough."); <u>Holden Metal & Aluminum Works v. Wismarq Corp.</u>, No. 00 C 0191, 2003 U.S. Dist. LEXIS 5247 (N.D. Ill. April 02, 2003) (expert report barred due to "failure to conduct actual tests, to employ any identifiable methodology, and to sufficiently take into account existing data and research...").

**B. Dr. Nowlis Does Not Have Specialized Knowledge Necessary To Render An Expert Opinion On The Draw Of Infringing Recorded Music To A Flea Market**

Nowlis presents a Report where he opines on (a) the draw of infringing recorded music, and (b) the benefit of selling infringing recorded music at flea

markets.   However, Nowlis does not have experience in either area, and has performed no independent survey or study to support his conclusions.   His experience with infringing recorded music and flea markets is no greater than any lay person.

Dr. Nowlis has no experience with infringing recorded music, and has no basis for identifying infringing recorded music or noninfringing recorded music. (Nowlis Dep., 53:13-24; 171:3-7).   He has never performed any independent survey or study regarding infringing recorded music.  (Nowlis Dep. 18:9-20:1). Thus, Nowlis' opinions regarding the draw of infringing recorded music have no basis.

Other than as a tool of The Record Companies, Nowlis does not have any prior experience with studying flea markets in particular.  (Nowlis Dep., 18:13-20). He has visited flea markets only a handful of times, and has never visited flea markets to perform a survey or study.  (Nowlis Dep., 49:9-51:10).   His only "research" experience with flea markets at all is an expert hired by The Record Companies in this and two other case.   (Nowlis Dep., 15:18-16:5).   Nowlis admitted that he is not aware of any studies or research discussing which products draw consumers to flea markets.  Id.  Thus, his conclusions do not flow from any of his experience or studies, and are unacceptable under Daubert.

14

### C. The Nowlis Report Is Fatally Unreliable, And Is Inadmissible

Each section of the Nowlis Report is an exercise in inapposite generalizations, followed by conclusions that are a wild leap from those generalizations. Applying the tests accepted by the Supreme Court, the Third Circuit, and this Court, the Nowlis Report must be excluded under the Court's gate-keeper function.

### 1. The Nowlis Report Does Not Establish That Research Directed To Multiple Retail Outlets Applies To Any Relevant Issue In This Case

At pages 3-8 of the Nowlis Report, Nowlis attempts to establish that Columbus Farmers Market benefit from, in particular, the sale of recorded music. As a threshold and core premise, since Nowlis has no true basis for providing an expert report directed to flea markets, Nowlis first attempts to establish that "flea markets" are "multiple retail outlets." (Nowlis Report, at 3). The purpose of this is to allow Nowlis to rely upon articles from his library that relate to "multiple retail outlets," such as shopping malls, shopping centers and department stores. Next, Nowlis seeks to make a logical leap that articles discussing offering a variety of products at multiple retail outlets somehow shows that Columbus Farmers Market benefits from the sale of recorded music. (Nowlis Report, at 5-8). Nowlis' conclusion that articles discussing multiple retail outlets, or studies performed relating to multiple retail outlets, "in general also apply to the Columbus Farmers

15

Market" (Nowlis Report at 3), are completely unsubstantiated. (<u>See</u> Rappeport Report at 12).

Since there are no studies or articles that substantiate his conclusion regarding the draw of infringing recorded music at flea markets, as part of Nowlis' mix-and-match approach, he is forced to rely on articles from his library discussing "multiple retail outlets" for support regarding infringing recorded music and flea markets. However, Nowlis provides no substantiation that the research discussing multiple retail outlets translates to flea markets. (<u>See</u> Ryan Decl. Ex. E, Rappeport Report, at 12). Thus, a core assumption of Nowlis' Report remains unproven.

Even a cursory examination of the articles cited by Nowlis in his report show that they do not support his conclusions regarding consumer behavior ***at flea markets***. To say that his conclusions are a "stretch" would be an understatement. For example:

- Nowlis cites to an article he lists as "Modeling the Effects of ***Multiple Retail Outlet*** Size and Store Variety on Consumer Choice Behavior." (Nowlis Report, at 6, n. 10; 17). The <u>actual title</u> of the article cited by Nowlis is, "Modeling the Effects of ***Shopping Center*** Size and Store Variety on Consumer Choice Behavior." (Snyder Decl. Ex. B).

- Nowlis provides a cite to "***Multiple Retail Outlet*** Rentals: An Empirical Analysis of the Retail Tenant Mix." (Nowlis Report, at 8,

n. 21).  The <u>actual title</u> of the article cited by Nowlis is, "**Shopping Center** Rentals:  An Empirical Analysis of the Retail Tenant Mix." (Snyder Decl. Ex. C).

- Nowlis provides a cite to "Solving the Ideal Tenant Mix Puzzle for a proposed **Multiple retail outlet**:  A practical Research Methodology." (Nowlis Report at 8, n. 19).  The <u>actual title</u> of the article cited by Nowlis is, "Solving the Ideal Tenant Mix Puzzle for a proposed **shopping centre**:  A practical Research Methodology." (Snyder Decl. Ex. D).

- Nowlis provides a cite to "Optimal Competition and Allocation of Space in **Multiple retail outlets**."  Nowlis Report at 17, n. 54) The <u>actual title</u> of the article cited by Nowlis is, "Optimal Competition and Allocation of Space in **Shopping Centers**." (Snyder Decl. Ex. E).

Clearly, in an effort to have the articles upon which he relies fit even his flawed premise, Nowlis has misrepresented the articles.  These types of errors clearly render Nowlis Report suspect and unreliable.  <u>See</u> <u>Raskin v. The Wyatt Co.</u>, 125 F.3d 55, 67 (2d Cir. 1997) (expert testimony that contains "elementary" error is not helpful); <u>Wilkinson v. Rosenthal & Co.</u>, 712 F. Supp. 474, 479 (E.D. Pa. 1989) (same).

Other articles relied upon by Nowlis are just as immaterial, and provide no connection to consumer behavior toward infringing recorded music at flea markets. The following articles were relied upon by Nowlis as supporting his conclusions:

- An article discussing a survey of 405 shoppers *in Edmonton, Canada* in 1996, examining shopping strategies. (Nowlis Report at 6, n. 11); (Snyder Decl. Ex. F). The article does not mention infringing recorded music or flea markets.

- An article discussing retail tenant mixture in shopping centers reviewing 293 shopping center leases *at seven New Zealand community shopping centers* from 1998. (Nowlis Report at 9, n. 21); (Snyder Decl. Ex. C). The article does not mention infringing recorded music or flea markets.

- An article examining how consumers *in Singapore* react to counterfeit goods. (Nowlis Report at 15, n. 45); (Snyder Decl. Ex. G).

- An article discussing retail tenant mix at a proposed shopping centre *in Cape Town, South Africa*. (Nowlis Report at 8, n. 19); (Snyder Decl., Ex. D).

Nowlis did not provide any scientific basis for determining that such divergent sources apply specifically to any relevant issue in this case. From the above list, the Court is likely wondering how such articles apply to the alleged draw of

infringing recorded music to the Columbus Farmers Market flea market at all.[3]
The Nowlis Report provides no answer.

Where the materials upon which an expert relies fail to discuss relevant
information, such as whether consumers are drawn to flea markets directly due to
the sale of infringing music, an expert's conclusions are based on nothing more
than subjective belief and unsupported speculation, rendering the expert's report
inadmissible. Claar v. Burlington N. R.R., 29 F.3d 499, 502 (9th Cir. 1994).

### 2. Whether Retail Shoppers Favor "Variety" Is Irrelevant To Any Issue In This Case

One of Nowlis' purported conclusions is that "recorded music adds variety
to the available product mix, which is an important benefit to the Columbus
Farmers Market." (Nowlis Report at 2). Nowlis then goes on to review literature
directed to department stores, shopping centers, and shopping malls, concluding
that "a greater variety of merchandise serves as a powerful draw for customers at
the Columbus Farmers Market." (Nowlis Report at 8).

As detailed in the Rappeport Report at 12-13, Nowlis' "expert" conclusions
that shoppers like variety is an exercise in platitudes. As Rappeport asks, *so what*?

---

[3]     The Nowlis Report, and the materials upon which it relies, must be
contrasted with the Rappeport Report, attached as Ryan Decl. Exhibit E. The
Rappeport Report surveyed flea market customers (the relevant universe in this
case), of the Columbus Farmers Market flea market (the flea market at issue in this
case), regarding the types of products that draw customers to the Columbus
Farmers Market flea market (an ultimate issue in this case).

(Rappeport Report at 13). Nowlis provides no causal connection between shoppers liking "variety," and infringing recorded music acting as a draw to a flea market. Under the <u>Daubert</u> "fit" requirement, an expert's testimony must assist the jury by providing it with relevant information for the purpose of the case. <u>Paoli</u>, 35 F.3d at 743. Admissibility of expert opinion depends in part upon the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case. <u>Oddi</u>, 234 F.3d at 145. Obviously, neither the Court nor a jury need expert assistance in this area.

### 3. The Nowlis Report's Analysis And Conclusions Regarding The Importance Of Music Outlets To Draw Consumers Are Contradicted By The Materials Upon Which He Relied

In the Nowlis Report, at 8-9, Nowlis attempts to demonstrate that "[r]ecorded music ranks high in importance in terms of products preferred by customers in multiple retail outlets." Ignoring the fact that, as discussed *supra*, Nowlis has never established that articles directed to shopping centers, shopping malls, or departments stores apply to flea markets, Nowlis' analysis still does not meet the <u>Daubert</u> test. The Court must "examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." <u>Heller v. Shaw</u>, 167 F.3d 146, 153 (3d Cir. 1999).

In support of Nowlis' claim regarding the importance of music, he cites to two studies regarding the types of stores consumers said they preferred in retail

outlets. (Nowlis Report at 8). After citing the two articles, Nowlis concludes that they "clearly show that consumers strongly prefer music outlets in multiple retail outlets, and thus these types of stores act as powerful draws." Id. However, an examination of the cited articles does not support the conclusion that music outlets are "powerful draws."

The first article examined patronage motives and purchase patterns within the context of a mall. (Nowlis Report at 8, n. 18; Snyder Decl. Ex. H). Nowlis relies on the article to support his conclusion that music outlets are a powerful draw to flea markets. The article states no such thing. Respondents were asked whether they preferred to purchase certain items from a set list of 21 items at a mall. (Snyder Decl. Ex. H, at 98). Thus, as the authors noted, the results of the questioning showed whether "people prefer to buy certain products services in a mall but not others." Id. This survey has no relation to whether consumers are drawn to flea markets to purchase infringing recorded music. The category "Records/tapes/CDs" ranked 7th out of 21 categories. That ranking does not support a conclusion that music is a "powerful draw," with the music category not even in the top quarter of the results. (Rappeport Report at 13-14).

The second article, entitled, "Solving the Ideal Tenant Mix Puzzle for a proposed *shopping centre*: A practical Research Methodology," (Nowlis Report at 8, n. 19), researched the "ideal" tenant mix for a proposed shopping centre in Cape

21

Town, South Africa. (Snyder Decl. Ex. D, at 163). Of course, this article is completely irrelevant to the issue of whether infringing recorded music is a draw to the Columbus Farmers Market flea market, in the United States.

Notwithstanding, Nowlis stated that the cited article showed that out of 307 households surveyed, 'Music/CD shop" were the "fourteenth most preferred store in a multiple retail outlet." (Nowlis Report at 8). Again, ignoring for the moment that Nowlis performed no research of his own on the issue, an examination of the article shows that it does not indicate that music is a "powerful draw" to any shopping center, let alone the Columbus Farmers Market flea market. (See, e.g., Rappeport Report at 13-14).

In the cited article, a list of possible tenants at a shopping center were set. (Snyder Decl., Ex. D, at 165). Respondents were then asked to identify whether they preferred such tenants at all-- not how much they preferred such tenants. (Id., at 165-66, Table III.) It is that Table to which Nowlis refers. All that Table III showed was a list of tenants that the respondents would like in a shopping center.

However, when asked to actually rank those same tenants by order of preference, the category "Music/CD shop" *ranked only 29th*. (Id., at 165-66, Table IV.) The authors of the article went out of their way to point out that the category "Music/CD store" "**ranked low in order of preference (no. 29)**." (Id., at 165) (emphasis added).

Thus, not only does Nowlis provide a purposefully misleading analysis of the article on which he relies, he ignores the authors' contrary conclusions on that very point. This is not a small mistake-- it is the basis for one of his main conclusions, and a conclusion upon which the rest of his Report is grounded.

Another article relied upon by Nowlis in this section of this report is entitled, "**Shopping Center** Rentals: An Empirical Analysis of the Retail Tenant Mix." (Nowlis Report at 9; Snyder Decl. Ex. C ("*Gerbich* article")). As discussed, the *Gerbich* article addressed retail tenant mixture in shopping centers reviewing 293 shopping center <u>leases</u> (note "centers" as Nowlis claims) at <u>seven</u> New Zealand community shopping centers from 1998. This is one of the articles where Nowlis changed the title to have it appear more relevant, and falsely increased the number of shopping centers to 293, not the <u>seven</u> reported. Regardless, this has no relation to the purchase of infringing recorded music at flea markets.

The *Gerbich* article focused on the impact of anchor store tenants in shopping centers. As detailed in the Rappeport Report at 14-15, Nowlis has radically inverted the point of the *Gerbich* article. The *Gerbich* article does not discuss how music stores might generate added customer traffic so as to raise the rent for other stores in a shopping center. The *Gerbich* article instead shows that in seven New Zealand shopping centers in 1992, shopping center owners were charging stores in the category "books/music/photography," as well as several

23

other stores, more per square meter than they were charging some stores in other categories, notably, the anchor stores.  (Rappeport Report at 15).

Of course, Nowlis supplied no basis for applying the *Gerbich* article to a flea market in New Jersey.  In fact, the author of the *Gerbich* article specifically warns against applying the articles findings to other locations and situations:

> The results should be qualified on two counts.  As location differences are mostly unquantifiable and highly visible, they provide fertile ground for discord.  Location differences could eclipse the importance of retailer type, occupancy cost, size and center turnover, in specific cases. Second, this is a cross-sectional study, based on 1992 data only.  Therefore no evidence is available of the stability of relationships over time in New Zealand.  It would be surprising in such a dynamic market as retailing (and New Zealand could be described as an emerging market in this industry) for covariances between the various retail types and base rents to be constant in the long run.

(Snyder Decl. Ex. C, at 293-94).  Thus, while the author of the article would insist that the *Gerbich* article *not* be relied upon in studying U.S. flea markets, Nowlis blatantly ignores these admonishments.

The above analysis begs the question of whether Nowlis did, in fact, even read the articles that he purports to rely upon.  Under <u>Daubert</u>, this slapdash-style analysis renders the Nowlis Report inadmissible.

**4.     The Nowlis Report's Analysis And Conclusions Regarding The Availability And Draw of "Unique Compilations" Of Recorded Music Have No Support**

In the Nowlis Report at 9-11, Nowlis attempts to show that "when the Columbus Farmers Market offers infringing recorded music that is composed of a unique mix of songs and artists, this is a particularly strong draw for consumers, as the uniqueness and rarity of the music is a very important benefit." (Nowlis Report at 11). The Nowlis Report, however, provides no basis for this conclusion.

Nowlis' conclusions regarding "unique compilations of infringing music" are illustrative of the disconnect between the articles upon which he relies, and his unsupported analysis. As a threshold matter, Nowlis has no experience based upon which he can render an expert opinion regarding "unique compilations of infringing music." (Nowlis Dep. 189:23-190:4; 191:14-18; 191:24-192:4; 209:5-8). He was forced to admit at his deposition that he had no basis for concluding that any of the tracks at issue in this case were "rare," as he suggested in his report. (Nowlis Dep. 206:6-207:7).

A witness must be qualified to testify as an expert. Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003). Qualification requires "that the witness possess specialized expertise." Id. An expert may be excluded when his training and experience is lacking in the particular area in which his testimony is offered. Surace v. Caterpillar, Inc., 111 F.3d 1039, 1055 (3d Cir. 1997) (affirming

exclusion of electrical and mechanical engineering expert because he had no training in "habituation" and no experience in designing equipment from a human safety standpoint.)   Nowlis is entirely unqualified to testify regarding "unique compilations of infringing music."

After considering articles that make no mention of any "unique compilations of infringing music" offered at flea markets, Nowlis concludes that these phantom unique compilations are a "particularly strong draw."   (Nowlis Report, at 11). However, Nowlis did not find a single "unique compilation" at the Columbus Farmers Market flea market when he personally visited the Columbus Farmers Market flea market.[4]   (Nowlis Dep., 182:6-19; 187:5-188:3).   Nowlis basis for concluding that the CDs in this case include "unique compilations" was that he was "told that,"  apparently by counsel for The Record Companies.   (Nowlis Dep. 193:17-23).  He never conducted, nor is he aware, of any study, research or survey showing that "unique compilations" of infringing music draw consumers to any flea market.  (Nowlis Dep. 188:4-8).  Thus, his "expert" opinion in this area is unreliable on its face.

---

[4]    Tellingly, Nowlis did, in fact, purchase several CDs at the Columbus Farmers Market flea market, and turned such CDs over to counsel.  He did not mention these CDs in his Report.  Although requested from counsel at the Nowlis deposition, the CDs purchased by Nowlis have not been provided.

Nowlis' unverified statements unsupported by scientific methodology render his Report inadmissible. Chapman v. Maytag Corp.(In re Chapman), 297 F.3d 682, 688 (7th Cir. 2002) (holding district court erred when it did not exclude expert). An expert must have "good grounds" for his or her belief. Paoli, 35 F.3d at 742. At page 10 of the Nowlis Report, Nowlis makes several pronouncements that are unsupported even by his usual collection of inapt articles. Nowlis claims in his Report that he "noticed [unique compilations] when I was examining the CDs that had come from the Market." (Nowlis Report at 10). However, Nowlis basis for that statement is that he was "told" that some of the CDs he reviewed in this case were unique compilations. (Nowlis Dep. 193:17-194:23). His total "scientific method" for confirming that he "noticed" "unique compilations" involved being "told," "looking around, shopping, noticing," which he was not even sure, but he "guessed" he did. (Nowlis Dep. 194:2-195:21). That was the extent of his "independent research." Id. Again, his analysis is marred by a complete lack of quantitative analysis or data. (Rappeport Report at 16). So much for the scientific method.

As in the other sections of his Report, Nowlis again relies upon materials that do not provide a basis for his conclusions. Thus, Nowlis begins by positing as a general premise that the sales of unique merchandise is a "major competitive advantage for retailers and multiple retail outlets." (Nowlis Report at 10.) The

text that he cites as his basis for that conclusion "Retailing Management 5th ed.," states only that "many retailers realize a sustainable competitive advantage by developing private-label brands (also called store brands), which are products developed and marketed by a retailer and available only from that retailer." (Nowlis Report at 10, n. 24; Snyder Decl. Ex. I, at 156). There is no question that the Columbus Farmers Market does not "private label" any products, and there is no "private label" issue in this case.

Based on the foregoing, Nowlis comes to the conclusion that "[t]his means that the Columbus Farmers Market has a competitive advantage since unique compilations of music are sold there which cannot be found at other retail stores, and thus consumers must shop at the Columbus Farmers Market to acquire this merchandise." (Nowlis report at 11). Unless viewed as Nowlis taking orders directly from The Record Companies to reach a predetermined conclusion, it is difficult to see how a true expert would jump to such a definitive and unwarranted conclusion, taking into consideration these weak supporting articles that do not even *discuss* the sale of unique compilations of infringing music at flea markets, and without any knowledge of whether even a single Columbus Farmers Market customer seeks "unique compilations" of music. (Rappeport Report at 17).[5]

---

[5]    Similarly, the Supplemental Nowlis Report stands for the premise that customers of the outdoor portion of the Columbus Farmers Market flea market

Nowlis' analysis includes nothing more than "leaps of faith" to the positions espoused by The Record Companies, and is no more than a hypothesis not adequately supported by the scientific method. Paoli, 35 F.3d at 745 ("Daubert's requirement that the expert testify to scientific knowledge -- conclusions supported for good grounds for each step of the analysis -- means that any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony unreliable.") (emphasis in original). A court may conclude that there is simply "too great an analytical gap between the data and the opinion proffered." Oddi, 234 F.3d at 158; See also Magistrini, 180 F. Supp. 2d at 595 (citing Joiner, 522 U.S. at 145-46). Following Joiner, the Third Circuit has held that "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony."

Nowlis conclusions regarding "CDs that had come from the Market" and the alleged draw of "unique compilations" are based purely on speculation, and are unreliable. The Third Circuit has held that an expert's opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or

---

may use the ATM machines or bathrooms located in the indoor section. (Ryan Decl. Ex. D at 3-4). Nowlis then uses this innocuous "finding" to somehow offer a conclusion regarding the sale of infringing recorded music, for which he has no independent basis, and where he performed no research. (Id.).

unsupported speculation.'" <u>Calhoun</u>, 350 F.3d at 321 (<u>quoting</u> <u>Daubert</u>, 509 U.S. at 590).

> **5.** **The Nowlis Report's Analysis And Conclusions Regarding Infringing Recorded Music Being Offered At Below Market Prices Are Unreliable And Ignore Relevant Facts**

As in the other sections of his Report, at pages 11-14, Nowlis makes much of the general premise that people like to save money. Nowlis then seeks to create a causal link between low prices and the sale of infringing CDs. However, Nowlis can point to no research pinpointing low prices for infringing CDs as a significant draw to a flea market, since customers seek bargain prices on all items, not just CDs. (Rappeport Report at 17). Instead, the materials relied upon by Nowlis demonstrate only that shoppers, in general, seek bargains on <u>all</u> products. (Nowlis report at 11-14). Thus, as Rappeport points out, Nowlis' analysis actually supports a conclusion that since flea markets attract customers seeking low prices on <u>all</u> goods (which is supported by Rappeport's survey data), if one category of products (CDs) also has low prices, it could be a serious draw for only an insignificantly small proportion of Columbus Farmers Market flea market shoppers. <u>Id</u>.

Nowlis' premise is that infringing CDs at Columbus Farmers Market (of which he has no independent knowledge or research) are appealing to consumers because they are offered at low prices, such as $5.00. (Nowlis Report at 12). However, Nowlis actual experience with CD pricing is remarkably weak. He has

never performed a study to determine whether the infringing CDs that are alleged to be offered at Columbus Farmers Market are offered below prices charged for legitimate CDs. (Nowlis Dep. 214:16-215:4). Even when considering other retailers, including online retailers, offering CDs at very low prices, he would not take that into account in his opinion. (Nowlis Report 215:5-216:23). Nowlis' ignorance of, and perhaps willful blindness to, real world pricing renders his "expert" opinion on the impact of price on infringing CD purchases wholly unreliable and inadmissible. Total Containment, 2001 U.S. Dist. LEXIS 15838 (ignoring facts that should impact expert's analysis renders opinion inadmissible under Daubert); Norris v. Baxter Healthcare Corp., 397 F.3d 878, 884 (10th Cir. 2005) (experts cannot ignore or discount relevant known facts without explanation). Even the most cursory review of, for example, Amazon.com, shows pages of CDs offered for $5.99. (Snyder Decl. Ex. J). For Nowlis, a purported expert in marketing, to ignore the *market* is inexcusable.

> **6.    The Nowlis Report's Analysis And Conclusions Regarding The Behavior Of Flea Market Buyers Are Unreliable And Ignore Relevant Facts**

At pages 14-16 of his Report, Nowlis attempts to show that consumers looking for infringing merchandise are "particularly likely" to consider shopping at the Columbus Farmers Market. However, this conclusion was never scientifically tested. Although Nowlis visited the Columbus Farmers Market flea market, he

performed no independent study, research or survey to test his conclusions. (Nowlis Dep. 58:16-23). Instead, he went out of his way to ensure that his conclusions never crossed paths with the reality of the Columbus Farmers Market flea market: he did not note finding (or even looking for) any infringing CDs, he did not discuss the sale of music at the flea market with any vendor or customers, he did not ask any customer whether they were attracted to the Columbus Farmers Market flea by the sale of infringing music. (Nowlis Dep., 58:16-23; 84:16-22; 181:8-13; 182:6-19; 187:14-188:3). Accordingly, Nowlis again ensured that he discovered no information that could change the opinions he formed in the <u>Sinnot</u> case.

Significantly, Nowlis misrepresents the results of the main article upon which he relies in this section of his Report, "Consumer Demand for Counterfeit Goods" ("Consumer Demand") (Nowlis Report at 14; Snyder Decl. Ex. K). Nowlis claims that the *Consumer Demand* study showed that a survey of 268 customers at a mall and at a flea market found that consumers at a flea market "are significantly more likely to admit to having purchased infringing **products** in the past (46%) than consumers at malls (31%)." (Nowlis Report at 14). Nowlis then goes on to state that "***overall***, 20% ***of those surveyed*** admitted to specifically buying infringing CDs, while 30% admitted to having bought infringing tape

recordings." <u>Id</u> (emphasis added). Both of these statements that Nowlis' relies upon as supporting his conclusions are erroneous.

A review of the *Consumer Demand* study shows that Nowlis misrepresented the results. While the *Consumer Demand* survey showed that, overall, based on the sample, more of the flea market consumers surveyed admitted to purchasing infringing products, that is *not* the case for CDs. As the *Consumer Demand* article states in the same paragraph upon which Nowlis relies, the only categories of infringing goods that flea market consumers were more likely to own than mall shoppers, were designer clothes, perfume, purses and watches. (Rappeport Report at 18); (Snyder Decl. Ex. K at 417). Thus, the *Consumer Demand* study did not show that "overall" flea market shoppers admitted to buying more infringing CDs than mall shoppers.

Moreover, one would gather from Nowlis' presentation of the *Consumer Demand* study that CDs were a major draw for consumers. The *Consumer Demand* study examined the incidence of ownership of counterfeit goods in eight product categories (CDs, designer clothing, perfumes, purses, software, tape recordings, videos, watches). (Snyder Decl. Ex. K, at 417).

Most significantly, Nowlis claim that the *Consumer Demand* study showed that "***overall***, 20% ***of those surveyed*** admitted to specifically buying infringing CDs, while 30% admitted to having bought infringing tape recordings." (Nowlis

Report at 14). This is a blatant misrepresentation. The truth is that the *Consumer Demand* study reported that, *of the 38% of the sample that indicated they had knowingly purchased one or more counterfeit products*, 20% admitted to owning counterfeit CDs, while 30% admitted to owning tape recordings. Thus, the true percentage of the sample of people surveyed that admitted to owning a counterfeit CD was approximately 7.6% (38% x 20%), while the percentage of the sample that admitted to owning a counterfeit tape recording was approximately 11.4% (38% x 30%). (Snyder Decl. Ex. K, at 417).

Notably, even those percentages do not apply directly to flea market consumers. Considering only flea market consumers surveyed in the *Consumer Demand* study, only 3.5% of the flea market consumers admitted to owning counterfeit CDs (38% x 20% x 46%), while only 5.2% of the flea market consumers admitted to owning counterfeit tape recordings (30% x 30% x 46%). The accurate calculation, which is readily apparent from the *Consumer Demand* article and should have been recognized by a marketing expert, radically alters the figures reported by Nowlis, and invalidates any possible claim by Nowlis regarding the drawing of CDs to flea markets. (Rappeport Report at 18).

As shown above, in order to make the connection between "infringing products" (which in the *Consumer Demand* study could have been anything from t-shirts, to designer clothes, to perfume, to watches, to purses, to videos), Nowlis

34

misrepresents the figures specifically directed to CDs and flea market consumers. Nowlis conclusion that "[i]nfringing recorded music, compared to other types of merchandise, is a ***particularly attractive*** product category to the Columbus Farmers Market visitors," (Nowlis Report at 2, emphasis added), which he reiterated at his deposition was supported by the *Consumer Demand* study (Nowlis Dep. 115:3-24), is rendered wholly unreliable.

The balance of this section of the Nowlis Report reveals the same analytical gaps and internal contradictions as the other sections previously discussed. Thus, Nowlis cites to articles discussing "swap meets," (Nowlis report at 14, n. 43, 44), without providing any showing that swap meets and flea markets are comparable. His own analysis shows that Columbus Farmers Market does not fit the profile of the "thieves market" swap meet described in the article upon which he relies-- in the very next page of his report, Nowlis goes on to stress that "the credibility of flea markets" is an important component of a flea market's appeal, and that the Columbus Farmers Market in particular is trustworthy. (Nowlis Report at 15).

Nowlis' disjointed analysis somehow finds no difficulty combining these concepts to conclude, "[t]hus, when certain flea markets, such as the Columbus Farmers Market, make infringing recorded music an accepted part of the merchandise sold, do nothing to discourage its sale, and implicitly condone it, consumers can then feel more comfortable in shopping for and purchasing

unlawful products in that environment." (Nowlis Report at 14). However, it is clear that Nowlis has no information, from his own work or otherwise, supporting this statement. Nowlis makes this statement pointing to no actual data, having performed no studies, having spoken to no vendors or customers at the Columbus Farmers Market flea market, and having seen no infringing CDs while at the Columbus Farmers Market flea market. (Nowlis Dep. 19:9-20:1; 58:16-20; 84:16-22; 195:22-196:4). This is the epitome of "subjective belief or unsupported speculation." <u>Calhoun</u>, 350 F.3d at 321. Expert testimony should be excluded if it is speculative or conjectural, "or if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison.'" <u>Boucher v. Suzuki Motor Corp.</u>, 73 F.3d 18, 21 (2d Cir. 1996) (citations omitted).

### 7. The Nowlis Report's Analysis And Conclusions Regarding The Benefit Of The Sale Of Infringing Music To Columbus Farmers Market Has No Basis In Fact

In this section of the Nowlis Report, at pages 16-17, Nowlis attempts to make a connection between increased foot traffic due to the sale of infringing CDs, and a direct financial benefit to the Columbus Farmers Market. This ultimate conclusion has no basis whatsoever. As in the other sections of his Report, Nowlis relies on unconnected articles discussing tenants of shopping centers. (Nowlis Report at 16, n. 52; Snyder Decl. Ex. D) (Nowlis Report at 17 n. 54; Snyder Decl.

Ex. E).  His conclusion here is that increased traffic "results in a greater value of the flea market generally."  (Nowlis report at 17).  This conclusion, in addition to being unsupported, does not "fit" with the relevant issue in this case-- namely, whether any Defendant *directly benefits from the sale of infringing music*.  As pointed out by Rappeport, the issue is the quantitative relationship between increasing the draw and benefiting the owners, an issue on which Nowlis, having performed no research, simply cannot opine.  (Rappeport Report at 19).

An expert's testimony must have some connection to existing facts. <u>JMJ Enterprises</u>, 1998 U.S. Dist. LEXIS 5098 at *16.  Expert testimony that ignores existing data and is based on speculation is inadmissible.  <u>Id</u>.  The expert's opinion must be "based on the methods or procedures of science" rather than on "subjective belief or unsupported speculation." <u>Daubert</u>, 509 U.S. at 590.

In concluding that Columbus Farmers Market directly benefits from the sale of infringing recorded music, Nowlis admittedly ignored the fact that flea market vendors paid a flat fee for renting space at the flea market, ignored the fact that Columbus Farmers Market, LLC received a fixed rent from Columbus Flea World, LLC, ignored that fact that none of the Defendants profit from the sale of any concessions, and ignored the fact that the Columbus Farmers Market flea market does not charge admission.  (Nowlis Dep., 14:17-15:7).  He never reviewed how payments were made to the owners or operating company of the Columbus

Farmers Market flea market, and never took a survey of the vendors to determine what kinds of fees were paid. (Nowlis Dep. 179:8-18; 181:8-13). He is unqualified, therefore, to opine on this issue. Ignoring these facts leads to uncorrectable methodological flaws. See JMJ Enterprises,, 1998 U.S. Dist. LEXIS 5098.

### D. The Conclusions In The Nowlis Report Do Not Flow From The "Research" Conducted By Nowlis

It is apparent that Nowlis does not provide any acceptable scientific basis for the opinions included in his report. Ignoring for the moment the fact that Nowlis' sole support for his conclusions are articles which may or may not be accurate, the materials upon which he does rely cannot lead to any of his conclusions. The following chart summarizes just a few of these leaps:

| Source | Nowlis' Analytical Leap/Conclusion | Nexus/Support for Conclusion |
|---|---|---|
| Shoppers enjoy variety (Nowlis Report, at 6-8) | Adding recorded music to the variety of products serves as a "powerful draw" for customers at the Columbus Farmers Market | None |
| Some unquantifiable number of consumers may like "records/tapes/CDs" as a product category (Nowlis Report, at 8-9) | Recorded music outlets act as "an important draw to a flea market such as Columbus Farmers Market, since music is a particularly important category to consumers." | None |
| Crate & Barrel quickly sold out of a Christmas album called "A Cool | Infringing recorded music containing a unique compilation of songs "can be particularly | None |

38

| Source | Nowlis' Analytical Leap/Conclusion | Nexus/Support for Conclusion |
|---|---|---|
| Christmas" (Nowlis Report, at 10) | successful" at flea markets | |
| Stores that consumers like, appeal to the consumers (Nowlis Report, at 11) | Infringing recorded music featuring unique compilations is a "particularly strong draw for consumers" | None |
| Consumers are attracted to low prices, and like bargains at flea markets (Nowlis Report, at 12) | Consumers are attracted to the Columbus Farmers Market due to the sale of infringing recorded music | None |
| Nowlis overheard a customer say to one of the vendors, "I was looking for videos you can't find in the video store" (Nowlis Report, at 15) | Columbus Farmers Market flea market draws consumers looking for infringing recorded music | None |

As shown in the above chart, the Nowlis Report has no scientific basis, "there is simply too great an analytical gap between the data and the opinion proffered." Oddi, 234 F.3d at 158; see also Magistrini, 180 F. Supp. 2d at 595 (citing Joiner, 522 U.S. at 145-46). The conclusions in the Report are drawn essentially from the ether.

## III. CONCLUSION

It would be insulting to the scientific arts to refer to the Nowlis Report or Supplemental Nowlis Report as any "science" other than "junk science." Rule 702 imposes a special obligation on the Court to "ensure that any and all scientific

testimony or evidence admitted is not only relevant, but reliable." <u>Daubert</u>, 509

U.S. at 589. In view of the demonstrated carelessness and falsities, the lack of

analysis, and the predetermined recycled conclusions presented in the Nowlis

Report, the Court should exercise its gate-keeping mandate and exclude the Nowlis

Report, and bar Nowlis from testifying at trial as an expert in this matter.

Respectfully submitted,

Date: <u>October 14, 2005</u>          By: <u>/s/ Ryan W. O'Donnell</u>
                                  Ryan W. O'Donnell (RO 2904)
                                  Randolph J. Huis
                                  Volpe and Koenig, P.C.
                                  United Plaza, Suite 1600
                                  30 S. 17th Street
                                  Philadelphia, PA 19103
                                  *Attorneys for Defendant*
                                  *Columbus Farmers Market, LLC*

Matthew R. McCrink                Michael N. Onufrak
McCrink, Nelson & Kehler          Thomas A. Warnock
475 Route 73 North                LibertyView
West Berlin, NJ  08091            457 Haddonfield Road, Suite 400
Phone: (856) 768-0033             Cherry Hill, NJ  08002-2220
Fax: (856) 768-7243               Telephone (856) 317-3600
*Attorneys for Individual Defendants*   *Attorneys for Defendants*
*John Ackerman, and Charles Pratt*      *Columbus Flea World, LLC*