**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

SONY MUSIC ENTERTAINMENT, *et al.*,

        *Plaintiffs*,

        v.

COX COMMUNICATIONS, INC., *et al.*,

        *Defendants*.

Case No. 1:18-cv-00950-LO-JFA

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF
<u>THEIR MOTION FOR SUMMARY JUDGMENT</u>**

## <u>**TABLE OF CONTENTS**</u>

INTRODUCTION ................................................................................................................ 1

ARGUMENT .................................................................................................................... 5

I.     PLAINTIFFS LACK SUFFICIENT EVIDENCE TO PROVE DIRECT
INFRINGEMENT............................................................................................... 5

     A.     Plaintiffs cannot show infringement of the reproduction right. ............................ 6

     B.     Plaintiffs cannot show infringement of the distribution right. ............................... 7

     C.     Plaintiffs cannot prove that their works were available from Cox subscribers. ... 10

          1.     Preclusion of the MarkMonitor Spreadsheet is case dispositive. ............ 10

          2.     The MarkMonitor Spreadsheet is an inadmissible summary.................... 11

II.     PLAINTIFFS' CONTRIBUTORY CLAIMS FAIL WHERE THEIR NOTICES FAILED
TO IDENTIFY WORKS-IN-SUIT....................................................................... 14

     A.     Plaintiffs' notices failed to give Cox actual knowledge of infringement of works
they did not identify. ............................................................................................ 15

     B.     Plaintiffs cannot show Cox was willfully blind to infringements of sound
recordings and musical compositions that Plaintiffs never identified .................. 18

     C.     Plaintiffs concede that Cox lacked actual knowledge of alleged infringements of
musical compositions............................................................................................ 19

     D.     Plaintiffs concede that Cox cannot be vicariously liable for infringements it was
unaware of............................................................................................................. 20

     E.     Plaintiffs cannot show that Cox had actual knowledge of infringement by end
users of Cox Business subscribers ........................................................................ 20

III.     PLAINTIFFS LACK EVIDENCE TO SUPPORT VICARIOUS LIABILITY. .............. 22

     A.     Plaintiffs have no evidence that Cox had an obvious and direct financial interest
in infringement of works in suit............................................................................ 22

          1.     Plaintiffs cannot show that Cox's service was a draw to infringers. ........ 22

          2.     Plaintiffs cannot show Cox had a direct financial interest in infringement
of works-in-suit...................................................................................... 24

     B.     Plaintiffs cannot show that Cox had the right and ability to supervise alleged
infringing activity................................................................................................. 25

IV.     COX IS ENTITLED TO SUMMARY JUDGMENT LIMITING CERTAIN OF
PLAINTIFFS' STATUTORY DAMAGES CLAIMS TO ONE AWARD PER WORK. 26

     A.     Each compilation or work made for hire is limited to one statutory award.......... 26

     B.     A sound recording and the music composition from which it derives are limited to
a single award. ..................................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
   2017 U.S. Dist. LEXIS 14623 (D.D.C. Feb. 2, 2017), *rev'd in part on other
   grounds and remanded*, 896 F.3d 437 (D.C. Cir. 2018)..........................................................6

*Arista Records, Inc. v. MP3Board, Inc.*,
   2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002).......................................................................10

*Atlantic Recording Corp. v. Howell*,
   554 F. Supp. 2d 976 (D. Ariz. 2008) ....................................................................................9

*BMG Rights Mgt. (US) LLC v. Cox Comm's, Inc.*,
   149 F. Supp. 3d 634 (E.D. Va. 2015) [*BMG I*].............................................................. *passim*

*BMG Rights Mgt. (US) LLC v. Cox Comm's, Inc.*,
   881 F.3d 293 (4th Cir. 2018) [*BMG II*] ...................................................................14, 16, 22

*Branch v. Gov't Employees Ins. Co.*,
   286 F. Supp. 3d 771 (E.D. Va. 2017) ...................................................................................12

*Bryant v. Media Right Prods., Inc.*,
   603 F.3d 135 (2d Cir. 2010)...................................................................................................27

*Capitol Records, Inc. v. MP3Tunes, LLC*,
   28 F. Supp. 3d 190 (S.D.N.Y. 2014)......................................................................................29

*Capitol Records, Inc. v. Thomas*,
   579 F. Supp. 2d 1210 (D. Minn. 2008)...............................................................................7, 9

*Cobbler Nevada v. Gonzalez*,
   901 F.3d 1142,1145 (9th Cir. 2018) ................................................................................20, 21

*Corbis Corp. v. Amazon.com, Inc.*,
   351 F. Supp. 2d 1090 (W.D. Wash. 2004).............................................................................15

*Dobbs v. Wyeth Pharmaceuticals*,
   2007 WL 7660186 ..................................................................................................................12

*Ellison v. Robertson*,
   357 F.3 1072, 1079 (9th Cir. 2004) .................................................................................23, 24

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
   844 F.3d 79 (2d Cir. 2016)........................................................................................27, 29, 30

*Folio v. City of Clarksburg W. Va.*,
  134 F.3d 1211 (4th Cir. 1998) .................................................................11

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*,
  118 F.3d 199 (4th Cir. 1997) ................................................................8, 9

*Lowery v. Stovall*,
  92 F.3d 219 (4th Cir. 1996), *cert. den.* 117 S.Ct. 954 (1997).................11

*In re Microsoft Corp. Antitrust Litig.*,
  355 F.3d 322 (4th Cir. 2004) .................................................................27

*Nelson–Salabes, Inc. v. Morningside Dev., LLC*,
  284 F.3d 505 (4th Cir.2002) ............................................................22, 25

*Payne v. Wyeth Pharmaceuticals, Inc.*,
  606 F. Supp. 2d 613 (E.D. Va. 2008) .....................................................11

*Pegram v. Herdrich*,
  530 U.S. 211 ..........................................................................................11

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ...............................................................14

*Perfect 10, Inc. v. Visa Intern. Svc. Assn.*,
  494 F.3d 788 (9th Cir. 2007) .................................................................25

*Ragan v. Vosburgh*,
  110 F.3d 60, 1997 WL 168292 (4th Cir. 1997) ......................................11

*Spooner v. EEN, Inc.*,
  No. 08 Civ. 262, 2010 WL 1930239 (D. Me. May 11, 2010) .................29

*Sprint Nextel Corporation v. Simple Cell Inc.*,
  248 F. Supp. 3d 663 (D. Md. 2017).................................................13, 14

*Tenneco Chemicals, Inc. v. William Burnett & Co., Inc.*,
  691 F2d 658 (4th Cir. 1982) (2000).......................................................11

*TufAmerica, Inc. v. Codigo Music LLC*,
  162 F. Supp. 3d 295 (S.D.N.Y. 2016).....................................................28

*U.S. ex rel. Bunk v. Birkart Globistics GmbH & Co.*,
  2011 WL 5005313 (E.D. Va. Oct. 19, 2011)...........................................14

*U.S. v. Janati*,
  374 F.3d 263 (4th Cir. 2004) .................................................................14

*U.S. v. Meremelstein,*
　487 F. Supp. 2d 242 (E.D.N.Y. 2007) ....................................................................12

*U.S. v. Thomas,*
　631 Fed. Appx. 847 (11th Cir. 2015) .....................................................................12

*UMG Recordings, Inc. v. Grande Comm's Networks, LLC,*
　No. A-17-CA-365-LY, 2018 WL 1096871 (W.D. Tex. Feb. 28, 2018)..........................23, 24

*Vanderheyden v. Peninsula Airport Com'n,*
　2013 WL 30065 (E.D. Va. 2013) ...........................................................................11

*VHT, Inc. v. Zillow Grp., Inc.,*
　918 F.3d 723 (9th Cir. 2019) ...............................................................................28

*Xoom, Inc. v. Imageline, Inc.,*
　323 F.3d 279 (4th Cir. 2003) ...............................................................................28

*Yellow Pages Photos, Inc. v. Ziplocal, LP,*
　795 F.3d 1255 (11th Cir. 2015) ............................................................................27

**Statutes**

1 U.S.C. § 1 ........................................................................................................29

17 U.S.C. § 101 ...................................................................................................28

17 U.S.C. § 106 .....................................................................................................6

17 U.S.C. § 504(c) ...............................................................................................29

17 U.S.C. § 504(c)(1)......................................................................................27, 28

17 U.S.C. § 512(c) ...............................................................................................17

17 U.S.C. § 512(c)(3)(A)(ii) ...................................................................................17

17 U.S.C. § 512(*l*), (n) ..........................................................................................17

Copyright Act....................................................................................... *passim*

DMCA...................................................................................................3, 17, 25

**Other Authorities**

F.R.Civ.P. 37.......................................................................................................10

F.R.Cv.P. 37(e)(2)...........................................................................................10, 11

F.R.Ev. 1006 .................................................................................................... *passim*

*Goldstein on Copyright* § 7.5.1 (3d ed. 2012 Supp.) ....................................................9

H.R. Rep. No. 94-1476 (1976)...............................................................................29

*Nimmer on Copyright* § 2.10[A] n.8 ......................................................................28

*Patry on Copyright* § 22:186 .................................................................................28

S. Rep. 105-90...........................................................................................................23

S. Rep. No. 94-473 (1975).......................................................................................29

## INTRODUCTION

Plaintiffs' Opposition to Cox's Motion for Summary Judgment acknowledges the absence of evidence for key parts of their case. Plaintiffs attempt to traverse this failure by stretching settled copyright jurisprudence to fit their facts. They fail.

First, Plaintiffs do not dispute that they lack any direct evidence to meet their threshold burden to prove direct infringement. They instead urge the Court to presume violation of the reproduction right based merely on the fact that files or portions thereof resided on devices using a subscriber's IP address, without any evidence whatsoever of the provenance of those files. Similarly, while conceding that they lack any evidence of actual distribution, Plaintiffs urge the Court to allow them to proceed on a theory of "deemed distribution" that this Court has already soundly rejected. These defects are fatal to Plaintiffs' ability to establish direct infringement. Moreover, their core evidence of direct infringement—the MarkMonitor '431 Spreadsheet—is inadmissible.

Second, Plaintiffs' argument that Cox should be held contributorily liable (up to $150k *per work*) for its subscribers' alleged infringement of works that Plaintiffs never provided notice about (and it is undisputed that Cox had no knowledge of) is fatally flawed. No reasonable jury could find Plaintiffs' notices gave Cox *actual knowledge* of infringement of unidentified works. Plaintiffs' argument that Cox was willfully blind to such infringements borders on the frivolous.

Third, Plaintiffs' effort to forge a new standard for vicarious liability, one that would make a service provider liable if it merely charges for its service and has the ability to terminate customers, would expose every ISP to catastrophic liability and should be rejected out of hand.

Fourth, Plaintiffs fail to respond to Cox's argument that each of work registered as a work-for-hire must be treated as a compilation for purposes of statutory damages: they thus concede it. And their sole effort to distinguish the overwhelming weight of authority that holds that a sound recording and the music composition from which it derives are limited to a single award of

statutory damages flies in the face of the plain language of the Copyright Act.

Plaintiffs' argument on each of these issues fails. Cox asks the Court to grant its motion.

## RESPONSES TO PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS

**SOAF Nos. 1-5** are immaterial to Cox's Motion, except that **SOAF 3** concedes certain sound recordings were registered as "a compilation or collective work (album)." SOAF 1, 2 & 4 are undisputed; #3 is disputed: 71 sound recordings in suit were registered on Form PA. ECF No. 325-3 ¶¶ 12-13, 15, 18-19, 27-29, 31. SOAF 5 states a disputed legal conclusion.

**SOAF Nos. 6-17**: disputed, but immaterial. MarkMonitor's processes used to generate the RIAA Notices (the only information Cox received concerning Plaintiffs' infringement allegations) are immaterial to whether Cox had actual knowledge of specific acts of infringement. In addition:

**SOAF 8-10**: Unsupported by the cited evidence ("Unsupported"). No evidence that files were verified. *See* ECF No. 404 ("Cox Opp'n.") at 12-18; ECF No. 238 ("Preclusion Mot.") at 13-15.

**SOAF 11**: Unsupported. There is no dispute that ███████████████████████████████
████████████████████████████████████████████████████. *See* ECF No. 352-2; Kearney Dec. Ex. 56 (ECF No. 433), Sept. 27, 2019 Hr'g Tr. at 42:15-19 (referring to ████████████ ████████████████).

**SOAF 12**: Unsupported. A hash value does not "represent[] … the contents of a file," and it is impossible to determine anything about a file's contents from. *See* concurrently filed Declaration of Dr. Nick Feamster ("Feamster Dec.") ¶¶ 2-4; ECF No. 395 (Feamster Opp'n. Dec.) at ¶¶ 3-8.

**SOAF 13**: Unsupported. Plaintiffs' agent MarkMonitor only obtained metadata, and failed to confirm activity. No accused subscriber "reported" *any* activity. *See* Cox Opp'n. at 21-23.

**SOAF 14**: misrepresents the evidence: independent consultants raised concerns about the accuracy of the MarkMonitor system. *See, e.g.,* ECF 400 ("Kearney Opp'n. Dec.") Ex. K6.

**SOAF 15**: Unsupported. Locating a peer on a peer-to-peer ("P2P") network does not mean that it is uploading and/or downloading content. *See* Feamster Dec. ¶¶ 21-27. In multiple cases, Plaintiffs' "evidence" of infringement was demonstrably inaccurate. *See* Kearney Reply Dec. ¶¶ 2-10.

**SOAF 16**: Unsupported. No evidence MarkMonitor downloaded or verified works, and Plaintiffs' hash data is materially flawed. Cox Opp'n. 16-18; Kearney Opp'n. Dec. ¶¶ 28, 36; *see also* ECF 237, 364. Hash values do not "identify" a file. Feamster Dec. ¶4; Feamster Opp'n. Dec. ¶3-4, 8.

**<u>SOAF 17-19</u>:** disputed, but immaterial; Unsupported and mischaracterize evidence: (1) locating a peer on a P2P network does not mean that it is uploading or downloading content; (2) it is easy to share lawfully acquired files on P2P networks; (3) copies of files are likely to have identical metadata even if they are copied from different sources, so MarkMonitor's system cannot distinguish them; (4) there are many reasons why peers would neither upload nor download content. Feamster Dec. ¶¶ 21-27. In addition:

**SOAF 18**: the "number of times" infringement occurred is immaterial to Cox's Motion. Plaintiffs indisputably could have (but failed to) obtain evidence of sharing, if any, and there is no evidence that P2P networks were "designed" to make sharing unobservable. *See* Cox SUF 21; BMG Opp'n. SOAF 16; Cox Opp'n. ¶ 13 (response to Plaintiffs' SUF 13).

**SOAF 19**: Unsupported, and illogical, speculation. *See* Feamster Dec. ¶¶ 21-27.

**<u>SOAF 20-27</u>:** disputed, but immaterial. Notice volume is immaterial ███████████████████ ███████████████████████████████. Third-party notices are immaterial to infringements of Plaintiffs' alleged works. SOAF 21 & 24 mischaracterize Cox's procedures. In addition:

**SOAF 20**: Unsupported that notices contained a "representative sample" of any works. The only "penalty of perjury" statement was irrelevant to infringement, and DMCA is irrelevant to this case.

**SOAF 22**: relevant only as an admission that the notices did not contain the names of all works in

suit. ECF 314-1 (Gould SJ Dec. Exhibits) Ex. 70; Kearney Opp'n. Dec. ¶¶ 13-15, Ex. K7, K8; ¶¶ 21-22, Ex. 13_A, 13_B. The Tregillis Report is immaterial, as it analyzes evidence first produced in discovery, not the RIAA Notices.

**SOAF 23**: Unsupported. Cox Opp'n ¶ 17.

**SOAF 24**: Unsupported. Numerous Cox subscribers contacted the RIAA to dispute infringement allegations. *See* Kearney Opp'n. Dec. ¶¶ 19-20, Ex. K11, K12.

**SOAF 25**: mischaracterizes evidence concerning conduct immaterial to Cox's Motion. Does not concern works-in-suit or relevant accounts, and generalized knowledge of infringement is insufficient as a matter of law. *See* Kearney Opp'n. Dec. ¶¶47-48, Ex. K37, K38.

**SOAF 26**: Unsupported. *Id.* ¶ 35, Ex. K25 (at ¶57); Cox Opp'n. 12-18; Preclusion Mot. 13-15.

**SOAF 27**: Unsupported: no foundation for notices, or identification of subscribers. Cox Opp'n. ¶ 32.

**SOAF 28-31:** disputed, but immaterial, and there is no nexus between subscriber's contractual obligations to Cox and Plaintiffs' claims. **SOAF 31** mischaracterizes evidence: the record contradicts Plaintiffs' speculations about Cox's policy. Cox Opp'n. ¶ 24.

**SOAF 32-39:** disputed, but immaterial. Collateral estoppel is inapplicable, *see* Cox Opp'n. at 39 (collateral estoppel inapplicable, as facts and issues central to *BMG* are not present). In addition:

**SOAF 34**: Unsupported. Termination was always an option; Graduated Response stopped infringement before termination stage was reached. Kearney Opp'n. Dec. at ¶34 Ex. K24; ¶41 Ex. K31.

**SOAF 38**: Unsupported. RIAA Notices were allegations, not themselves evidence of infringement. Graduated Response was effective even without termination. Kearney Opp'n. Dec. at ¶41 Ex. K31.

**SOAF 40-44:** disputed, but immaterial under legal standard for vicarious liability. In addition:

4

**SOAF 40**: Unsupported. Cox did not charge for excess data usage during the Claims Period, nor use information about data usage to "market" services. Cox SUF 3; Cox Op. ¶ 40(d).

**SOAF 41**: admits Cox charged a flat fee for Internet service; analysis is Unsupported and disputed, but immaterial. Cox SUF 2; *see infra* §§ II.D, III.A.1.

**SOAF 43**: Unsupported. No evidence that subscribers elected higher-tiered plans to infringe, and general statistics about "U.S. households" are immaterial. S*ee* Cox Opp'n. at 32; Kearney Opp'n. Dec. at ¶ 25, Ex. K16; ¶¶ 30-31, Ex. K20, K21; ¶ 45, Ex. K35.

**SOAF 44**: Unsupported. No evidence that Cox had such a "goal" or that it "drove Cox's decisions." *See* Cox Opp'n. at ¶ 39; p. 32

**<u>SOAF 45</u>**: immaterial for the reasons given above, because the RIAA Notices concededly failed to name works in suit, and because contractual agreements between Cox and its subscribers have no bearing on the legal standard governing Plaintiffs' claims.

## ARGUMENT

### I.   Plaintiffs lack sufficient evidence to prove direct infringement.

Plaintiffs seek windfall statutory damages of up to $1.6 *billion* from Cox, yet concede that they have no direct evidence to establish the threshold issue of direct infringement of their reproduction and distribution rights. Opp. 17-18. Devoting barely a paragraph to the issue of reproduction, Plaintiffs argue that merely because the MarkMonitor system purportedly detected certain files or portions thereof on a device associated with a subscriber's IP address, this Court should presume that those files were unlawfully copied. But Plaintiffs do not dispute that lawfully acquired files are frequently made available on P2P networks and the mere availability of a file on a device is insufficient to establish unlawful reproduction. Similarly, Plaintiffs attempt to overcome their failure of evidence of actual distribution by relying on a theory of "deemed distribution" that

was soundly rejected by this Court in *BMG*. Even aside from these fatal legal flaws, the core Mark-Monitor evidence upon which Plaintiffs attempt to rely is inadmissible.

## A.      Plaintiffs cannot show infringement of the reproduction right.

Plaintiffs lack any evidence that the online files MarkMonitor supposedly "detected[1]" (but did not download) had been obtained unlawfully, so they attempt to shift the burden to Cox to show that the copies were lawful. That is not the way copyright law works: even if "acquiring evidence of downloads may be difficult … this does not relieve Plaintiffs of the burden of estab-lishing some evidence demonstrating direct infringement by third parties." *See Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 2017 U.S. Dist. LEXIS 14623, *66 n.10 (D.D.C. Feb. 2, 2017), *rev'd in part on other grounds and remanded*, 896 F.3d 437 (D.C. Cir. 2018) (evidence that works in suit were "accessed" on websites at least 5,454 times provided "no basis for the court to determine that accessing a website is equivalent to copying or violating any of the exclusive rights under § 106."). Plaintiffs do not dispute that lawfully acquired files are frequently made available on P2P networks. Nor could they plausibly do so: plainly, such files must have come from a lawful source at some point; logically, the more popular a file, the more likely that multiple copies will be made available online; and it is easy for users to share lawfully acquired files on P2P networks. Feamster Dec. ¶¶ 5-20.[2] File metadata—██████████████ ████████████—merely identifies a file, not its contents or origin. It cannot distinguish between lawful and unlawful copies of files, and Plaintiffs failed to seek

---

[1] Plaintiffs' attempts to puff the accuracy of the MarkMonitor system are based on patently false claims which we have addressed in opposing Plaintiffs' Motion for Summary Judgment. For the purposes of this claim, it does not matter how good the MarkMonitor detection system is. If it is not used to detect actual distribution of a copyrighted work, it is not detecting infringing conduct.

[2] Indeed, there are well documented instances of widespread *inadvertent* sharing of legitimately acquired files using the Gnutella P2P network and BitTorrent protocol. Feamster Dec. ¶ 14.

discovery from any of the accused peers.[3] Plaintiffs concede that they lack any evidence whatsoever of the source of the files at issue, and the Court should grant Cox summary judgment on this issue.[4]

**B.** **Plaintiffs cannot show infringement of the distribution right.**

A finding of direct infringement of the distribution right requires evidence that the work was actually disseminated, not merely "made available" for dissemination. *BMG v. Cox*, 149 F. Supp. 3d 634, 670 (E.D. Va. 2015) ("*BMG I*"). Indeed, the key take-away from this Court's *BMG* decision (and the other cases Plaintiffs cite) is that a plaintiff who brings secondary infringement claims based on a distribution theory must have at least *some* evidence that direct infringement actually occurred, in the form of actual transmissions of works-in-suit. In *BMG I*, the plaintiff survived summary judgment on this issue because the Court found that its agent, Rightscorp, had *actually* downloaded 100,000 copies of the approximately 1,400 works at issue "from Cox subscribers using Cox's internet service[.]" *Id.* at 670.[5] Similarly, in *Capitol Records Inc. v. Thomas*, cited at Opp. 19, the court found that "distribution to [plaintiff's investigator] MediaSentry" could "form the basis of an infringement claim." 579 F. Supp. 2d 121 (D. Minn. 2008);[6] *and see BMG I*

---

[3] Plaintiffs' labored "term paper" analogy, Opp. n.8, is irrelevant, *see* Feamster Dec. ¶ 12-13.

[4] Plaintiffs claim they caught two Cox subscribers in the act of downloading a file, because they found the percentage of a file on their computers increased (by 2%) over time. First, this only purports to relate to 2 of 57,000 accused subscribers (and 5 of 260,000 notices). At most, it creates a question of fact as to two acts of direct infringement. Summary judgment is appropriate as to the rest. But the evidence begs the question of where the file was downloaded from. Either the initial portion of the download or the incremental portion could have come from any source, and could have been made over any network (not just Cox's). There is no evidence that tens of thousands of Cox subscribers used Cox's network to copy hundreds of thousands of files unlawfully.

[5] Although downloads performed by the plaintiff's authorized agent are not "unauthorized" and are thus only circumstantial evidence of infringement, they may still prove sufficient to survive summary judgment. Plaintiffs point to no cases where such claims survived summary judgment in the absence of at least that much evidence.

[6] Plaintiffs in the *Thomas* case had also "presented evidence that [the defendant], herself, provided the copyrighted works for copying and placed them on [the] network[.]" *Id.*

7

at 664 (collecting cases where direct infringement claims were permitted to proceed because a plaintiff's investigator had "downloaded actual copies" of works in suit).

Plaintiffs, sophisticated copyright litigants, chose to ignore the road map set out by this Court and others and subscribe to a ████████████ of the MarkMonitor system, ████████████ ████████████████████████████████████████. Since Plaintiffs concede they lack any evidence (even circumstantial evidence) of an actual dissemination from a Cox sub-scriber to anyone, they argue instead that the "nature" of P2P protocols somehow proves their case for them. It does not. Plaintiffs pluck quotes out of context to misrepresent how BitTorrent func-tions. *See* Opp. 19-20. As a preliminary matter, this ignores ████████████████ that used a different P2P protocol.[7] Thus, no question of fact is framed as to ████████████ ████████████████████████. Moreover, even as to BitTorrent, Plaintiffs are simply wrong when they argue that the mere presence of a peer on a BitTorrent network means that the peer is actively downloading and uploading content, or both. Feamster Dec. ¶¶ 19-20. The so-called "tit for tat" model that Dr. Feamster was discussing in Plaintiffs' cherry-picked quotations from his deposition is just that: a model, designed to provide incentives to peers to make pieces of files available. Feamster Dec. ¶ 21. Nothing about the "nature" of P2P protocols *requires* one peer to actually download (or upload) available pieces from (or to) any other peer. *Id.* There are many reasons why a peer would not exchange data with another peer, *see* Feamster Dec. ¶¶ 22-25, and Plaintiffs' evidence cannot show that any exchange ever took place.[8]

Having failed to adduce any evidence of distribution, Plaintiffs attempt to proceed on a theory of "deemed distribution" based on *Hotaling v. Church of Jesus Christ of Latter-Day Saints*,

---

[7] Plaintiffs use the general term "P2P networks," but address only the BitTorrent protocol.
[8] The MarkMonitor system is itself an example of a peer that routinely neither downloads, nor uploads, any content. Feamster Dec. ¶ 19, 22.

118 F.3d 199 (4ᵗʰ Cir. 1997). But Plaintiffs' claim that "this case is exactly the type where *Hotaling* is intended to apply," Opp. 21, ignores the host of recent decisions—including this Court's *BMG* decision—that have rejected applying *Hotaling* to allegations of P2P infringement virtually indistinguishable from Plaintiffs' here. *See BMG I* at 665, 668; *and see, e.g.*, *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1224 (D. Minn. 2008); *Atlantic Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 981 (D. Ariz. 2008). As the *Howell* court explained, and this Court agreed, "[t]he majority of district courts have rejected the recording companies' 'making available' theory because *Hotaling* is inconsistent with the Copyright Act." *Id.* at 982-83.

Plaintiffs attempt to distinguish this case from *BMG* and align it with *Hotaling* on the ground that P2P protocols are "designed to make it impossible for anyone to collect records depicting how many times a peer distributes an infringing files," and that that it is "impossible" to "track a peer's activity with other peers." Opp. 20, 21.[9] But courts (including this one) routinely refuse to apply *Hotaling* in exactly this peer-to-peer context, see *supra*, and Plaintiffs here had *exactly* the same ability to collect evidence of dissemination as the Plaintiff in *BMG*—by having its agent download files from subscribers' computers.[10] Plaintiffs lack any direct or circumstantial evidence of "actual dissemination" simply because they chose not to collect it, not because it was "impossible" to do so. In addition, "deemed distribution" applies only "when the proof is impossible to produce because *the infringing [defendant]* has not kept records of public use." *BMG I* at 666 (emphasis added, quoting Goldstein on Copyright § 7.5.1 (3d ed. 2012 Supp.)); *see Arista*

---

[9] This argument is not only false, but irrelevant: a direct infringement claim does not depend on "how many times" infringement occurred, but whether infringement occurred at all.

[10] Notably, the Fourth Circuit rejected BMG's similar arguments on appeal, declining to hold Cox categorically liable for contributory infringement and instead holding that the issue was properly one for the jury. *See BMG I.*

*Records, Inc. v. MP3Board, Inc.*, 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002). Here, Plaintiffs had access to data that could have supported (or refuted) their direct infringement claims, but they failed to collect, preserve, or produce it.[11] Nor did Plaintiffs make any effort to obtain discovery from alleged direct infringers, either before or during this litigation. There is no basis for Plaintiffs to proceed on a "deemed distribution" theory here.

### C.   Plaintiffs cannot prove that their works were available from Cox subscribers.

Cox's opening brief asked for summary judgment in the event that Magistrate Judge Anderson granted Cox's motion under Fed. R. Civ. P. 37 and Fed. R. Evid. 1006 to preclude a spreadsheet prepared by MarkMonitor.[12] Cox explained that without the spreadsheet, Plaintiffs could not prove direct infringement. On September 27, Judge Anderson denied Cox's Rule 37 motion and determined that the Rule 1006 question was for this Court,[13] and Plaintiffs agreed.[14] Cox now asks the Court to address the Rule 1006 issue Judge Anderson reserved.

### 1.   Preclusion of the MarkMonitor Spreadsheet is case dispositive.

Before Judge Anderson, Plaintiffs argued that, because the Spreadsheet was "the crucial link" in their case,[15] preclusion would be tantamount to a dispositive sanction requiring consideration under the higher standard of Rule 37(e)(2).[16] Judge Anderson agreed.[17] Plaintiffs cannot now

---

[11] Any effort by Plaintiffs to argue that Cox should have kept such records fails because Cox could not have proactively monitored all the communications of its millions of Internet subscribers, *and* retained such records indefinitely, in case a particular subscriber might someday infringe.

[12] *See* Declaration of Thomas Kearney in Support of Cox's Summary Judgment Motion ("Kearney SJ Dec.") Ex. 37 (MM000236) (the "'236 Spreadsheet"); Ex. 39 (Plaintiffs_0286431, originally produced without metadata as Plaintiffs_00286281) (the "'431 Spreadsheet"). Collectively, the "MarkMonitor Spreadsheet."

[13] Kearney Dec. Ex. 56 (ECF No. 433), Sept. 27, 2019 Hr'g Tr. at 3:9-13.

[14] *Id.*, 52:20-22.

[15] ECF No. 352 at 26, "The MarkMonitor Spreadsheet containing Audible Magic verifications is the crucial link between the files 'shared' by Cox subscribers and Plaintiffs' copyrighted works. Plaintiffs' experts … rely upon that evidence and the case is organized around it."

[16] Kearney Dec. Ex. 56 (ECF No. 433), Sept. 27, 2019 Hr'g Tr. at 28:8-30:8, 53:16-54.

[17] *Id.* at 75:22-76:5.

avoid summary judgment by reversing field. The doctrine of judicial estoppel, "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8; *see also Tenneco Chemicals, Inc. v. William Burnett & Co., Inc.*, 691 F2d 658, 664 (4th Cir. 1982) (2000).

Judicial estoppel applies here because: *First*, Plaintiffs' position on this motion—that preclusion of the MarkMonitor Spreadsheet *is not* case dispositive—is clearly "inconsistent with [their] position" before Judge Anderson—that it *is* case dispositive. *Folio v. City of Clarksburg W. Va.*, 134 F.3d 1211, 1217-1218 (4th Cir. 1998). *Second*, Judge Anderson explicitly "accepted" Plaintiffs' "position" on this point.[18] *Third*, Plaintiffs' representation that the MarkMonitor Spreadsheet was the "crucial link" in their case is one of fact, not law.[19] And, *finally*, Plaintiffs did not "act[ ] … inadvertently" in arguing that preclusion of the MarkMonitor Spreadsheet would be dispositive. *Folio*, 134 F.3d at 1217-1218. They did so intentionally to induce Judge Anderson to adopt the more stringent standard required for sanctions under Rule 37(e)(2). This is "the determinative factor in the application of judicial estoppel to a case." *Lowery v. Stovall*, 92 F.3d 219, 223 (4th Cir. 1996), *cert. den.* 117 S.Ct. 954 (1997).

### 2.     The MarkMonitor Spreadsheet is an inadmissible summary.[20]

Under Federal Rule of Evidence 1006 a party "may use a summary … to prove the content

---

[18] *Id.* at 75:22-76:5.

[19] This *Folio* factor, *id.*, estops a plaintiff from taking opposing positions on the ultimate question of whether a claim can be made. *E.g., Ragan v. Vosburgh*, 110 F.3d 60 (Table), 1997 WL 168292, *6 (4th Cir. 1997) (Plaintiffs prior successful argument estopped them from subsequently asserting contrary position); *Vanderheyden v. Peninsula Airport Com'n,* 2013 WL 30065, *11 (E.D. Va. 2013). *See also Payne v. Wyeth Pharmaceuticals, Inc.*, 606 F. Supp. 2d 613, 616 (E.D. Va. 2008) (representation on an issue ultimately to be submitted to the jury is a representation of fact).

[20] The arguments in this section were, for the most part, presented to Judge Anderson, *see* ECF No. 237, Cox's Motion for Discovery Sanctions and to Preclude Plaintiffs' Use of MarkMonitor Evidence ("MarkMonitor Motion") at 18-20; *see also* ECF No. 364, Cox's Reply MarkMonitor

of voluminous writings" only if "[t]he proponent … makes the originals … available for examination or copying." The MarkMonitor Spreadsheet is a "summary," but the "originals" from which it was compiled were not "ma[d]e available for examination".

First, the MarkMonitor Spreadsheet is a selective extract from the Audible Magic data, not a simple reproduction of it. Plaintiffs acknowledge that Audible Magic sent 17 types of data when a file matched a work in suit.[21] Only 3 of the 17 data types were captured in the '236 Spreadsheet for files downloaded from the BitTorrent network,[22] and only 7 for files downloaded from eDonkey, Gnutella, and Ares.[23] The '431 Spreadsheet selected only 3 Audible Magic data types for all networks.[24] A spreadsheet comprising such selective extracts from a database is a Rule 1006 summary of the database.[25] Further, the MarkMonitor Spreadsheet also contains data from sources other than Audible Magic,[26] as well as data representing MarkMonitor's interpretation of the

---

Motion at 17-18. We summarize them here for the Court's convenience, and we supplement them to address issues raised at the September 27, 2019 hearing.

[21] Kearney Dec. Ex. 56 (ECF No. 433), Sept. 27, 2019 Hr'g Tr. at 35:18-21.

[22] *See* Kearney SJ Dec. Ex. 37A ('236 Spreadsheet), BitTorrent tab, columns N through P titled respectively "artist," "track," and "album." *See* ECF 352-1 (Declaration of Sam Bahun) ¶¶ 17-19 (regarding origin "artist," "title," and "album").

[23] *See* Kearney SJ Dec., Ex. 37A, eDonkey, Gnutella, and Ares tabs, Columns L through R, titled respectively "artist," "track," "album," "am_item_id," "match_offset," "match_duration," and "am_track_duration." *See also id.* Ex. 7 at 80:6-81:11 (regarding origin of Columns O through R); ECF 352-2 (Declaration of Vance Ikezoye) ¶¶ 11, 14, 15 (regarding origin of all seven data types).

[24] *See* Kearney SJ Dec. Ex. 39 ('431 Spreadsheet), Columns L-N of the BitTorrent tab, J-L of the eDonkey and Gnutella tabs, and Columns I-K of the Ares tab.

[25] *E.g., Branch v. Gov't Employees Ins. Co.*, 286 F. Supp. 3d 771, 779 (E.D. Va. 2017) (spreadsheet selectively compiled from database was a Rule 1006 summary); *see also Dobbs v. Wyeth Pharmaceuticals,* 2007 WL 7660186, *3-*4 (applying Rule 1006 to "a summary of the factual information … extracted from those databases."); *U.S. v. Meremelstein*, 487 F. Supp. 2d 242, 266 (E.D.N.Y. 2007) (applying Rule 1006 where witness proposed to summarize records by "extract[ing] data" from them.); *U.S. v. Thomas*, 631 Fed. Appx. 847, 849 (11th Cir. 2015) (approving district court's application of Rule 1006 to exhibit that was "an extract of a larger report.")

[26] *See* Kearney Dec. Ex. 52 (Deposition of Slawomir Paszkowski at 80:6-81:18, 87:23-91:22) (differentiating between data types provided by Audible Magic, MarkMonitor, the p2p networks, and calculations performed by MarkMonitor).

Audible Magic data.[27] These facts further confirm that it is a Rule 1006 summary.[28]

Plaintiffs have nonetheless argued (without authority) that Rule 1006 is inapplicable because the MarkMonitor Spreadsheet is merely an "extract" from the Audible Magic data.[29] But the case law is clear that "extracting" data from a database is exactly a way of summarizing it. And for good reason: all summaries are, by definition, extracts. The fact that some of the underlying data is "extracted," and some is not, is what differentiates a summary of the data from the original.

The summary embodied by the MarkMonitor Spreadsheet is inadmissible because Cox asked for and was supposed to receive all the Audible Magic data, but most was not produced.[30] Plaintiffs admit they received all Audible Magic data beginning in 2008, but that, prior to February 2015, they chose not to keep most of it. ECF 352 at 12. And they did not even produce all of the post-February 2015 data in their possession.[31] Specifically, MarkMonitor has not produced:

- For files downloaded using the BitTorrent protocol, none of the original Audible Magic data other than "artist," "title," and "album" has been produced. The unproduced data was retained by MarkMonitor for at least the period after February

---

[27] An example of interpretive data supplied by MarkMonitor (one relied on by Plaintiffs' experts) is the "verified_type_name" column, in which MarkMonitor entered the value "REAL" when it concluded that the entirety of the Audible Magic data showed a file had been matched to a work in suit. Kearney Dec. Ex. 52 (Paszkowski Dep. at 81:13-18); Ex. 25 at RIAA_00127775; Ex. 13 (Frederiksen-Cross Rpt. at ¶ 153).

[28] *Sprint Nextel Corporation v. Simple Cell Inc.*, 248 F. Supp. 3d 663, 672-674 (D. Md. 2017) ("spreadsheets [that] combine data from at least three different … and also contain 'analysis' based on certain assumptions provided by [their sponsor]" are summaries which must satisfy Rule 1006 to be admissible).

[29] ECF No. 352 at 17; *see also* Kearney Dec. Ex. 56 (ECF No. 433), Sept. 27, 2019 Hr'g Tr. at 52:23-24.

[30] Cox subpoenaed this data from MarkMonitor, Kearney Dec. Ex. 53 (MarkMonitor Subpoena ¶¶ 8, 11), which was ordered to comply. *See* Kearney Dec. Ex. 54 (March 7, 2019 Order on Cox's Motion to Compel from *Cox Comm's, Inc., et al v. MarkMonitor, Inc.,* Case No. 3:19-mc-80050-SK (N.D. Cal.)). When it became clear at deposition that portions of the requested data had not been produced, counsel requested it. Kearney Dec. Ex. 52 (Paszkowski Dep. at 86:14-87:22). Later, when the data still was not produced, counsel for Cox reiterated the request. *See* Kearney Dec. Ex. 55 (July 12, 2019 email).

[31] Kearney Dec. Ex. 52 (Paszkowski Dep. Tr. at 86:14-87:22).

2015.[32] *No excuse has been given for the failure to produce it.*

- For files downloaded from the eDonkey, Gnutella, and Ares networks, none of the original Audible Magic data has been produced, other than the data for "artist," "title," and "album," for any period prior to February 2015. This data was not produced because it was not retained by MarkMonitor. Kearney Dec. Ex. 52.

Plaintiffs justify these omissions by arguing that the missing data is immaterial.[33] But materiality is irrelevant under Rule 1006. The sponsor of the summary does not get to unilaterally decide whether the summary is accurate and complete. The opposing party must be provided with the data needed to test, and, if appropriate, challenge it.[34] Because the original Audible Magic data has not been produced, the MarkMonitor Spreadsheet summarizing it is inadmissible under Rule 1006,[35] and summary judgment is warranted.

## II.    Plaintiffs' contributory claims fail where their notices failed to identify works-in-suit.

The Fourth Circuit's standard for contributory infringement could hardly be clearer: contributory infringement requires "a **material contribution** to copyright infringement" in combination with "**actual knowledge** of **specific acts** of infringement'" or, at a minimum "[w]illful blindness of **specific facts**." *BMG II* at 306, 310 (quoting *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072–73 (9th Cir. 2013)) (emphases added); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1176 (9th Cir. 2007) (contributory infringement requires "*actual* knowledge that *specific* infringing material is available using its system") (emphases in original, citation omitted).

Plaintiffs radically misstate the law by impermissibly conflating *knowledge* with *material*

---

[32] Kearney Dec. Ex. 52 (Deposition of Slawomir Paszkowski at 86:14-87:22).

[33] They are wrong. *See, e.g.,* ECF 364 (MarkMonitor Motion Reply at 3-11).

[34] *U.S. v. Janati,* 374 F.3d 263, 273 (4th Cir. 2004) ("The obvious import of these provisions is to afford a process to test the accuracy of the chart's summarization."); *U.S. ex rel. Bunk v. Birkart Globalistics GmbH & Co.,* 2011 WL 5005313, at *8 (E.D. Va. Oct. 19, 2011) ("The rule requires that the opposing party be given a fair opportunity to evaluate the accuracy and reliability of the summary exhibit against the source documents supposedly summarized in the summary exhibit.").

[35] *See, e.g.*, *Sprint,* 248 F. Supp. 3d at 672 (spreadsheet summarizing database was not admissible where plaintiff "has not made the underlying data on which its spreadsheets are based available.")

14

*contribution*, and then writing the Fourth Circuit's "actual knowledge" requirement out of the law entirely. They ask the Court to allow their contributory claims to proceed on the unprecedented theory that if Cox has actual knowledge of *one* specific act of infringement by a subscriber, then Cox can be held liable for materially contributing to *every other* act of infringement by that subscriber, *even if Cox has no knowledge of them*. That is not the law in this or any jurisdiction.

Plaintiffs concede that they failed to identify thousands of the works-in-suit in any notices, so there is no way that Cox could have had actual knowledge that those works were being infringed and no evidence that it did.[36] And there is no evidence whatsoever that Cox was somehow willfully blind to such infringements. Cox is entitled to summary judgment on Plaintiffs' contributory infringement claims as to those works. Because Plaintiffs do not even attempt to explain how Cox could possibly supervise acts of infringement of which it was unaware, Cox is also entitled to summary judgment on Plaintiffs' vicarious liability claims for those works.

### A.    Plaintiffs' notices failed to give Cox actual knowledge of infringement of works they did not identify.

Plaintiffs have *no* evidence, and *no* plausible argument, that Cox had actual knowledge of infringement for the works-in-suit that Plaintiffs failed to identify in *any* infringement notices. Plaintiffs do not dispute that their notices during the Claims Period identified only 1,998 works, yet ask the Court to find that those notices somehow gave Cox actual knowledge that more than *eight thousand* other, unnamed works were also being infringed. Unsurprisingly, Plaintiffs provide

---

[36] Even for the 1,998 works that Plaintiffs arguably identified by Title and Artist in notices, those notices were insufficient to confer actual knowledge of infringement under the relevant standard. As this Court has recognized, "notices alone do not … conclusively determine that the user is an infringer." *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1105 n.9 (W.D. Wash. 2004); *see* BMG ECF 709 at 230 (*BMG* Trial Tr.) ("The evidence of the infringement is not going to be the notice itself."). More is required—but because Plaintiffs have *no* foundational evidence linking the RIAA Notices to works in suit, nothing more is available.

no authority to support this remarkable theory.

Plaintiffs do not dispute that each of their notices identified, by Title and Artist, a *single* allegedly infringed work. Nor do they contest that only 1,998 works were so identified.[37] Yet they contend that their notices in some unspecified way "informed" Cox of "specific infringing files" which "often" included other works that were *not* named.[38] Their theory appears to be that each such notice gave Cox actual knowledge of infringement of *additional* works, because Plaintiffs' notices also contained a filename and a hash value that (unknown to Cox) had been derived from a file somewhere online that *might* have contained additional works, *some* of which Plaintiffs *may* have owned. The Court should reject this attempt to revive (and vastly expand) the "should have known" knowledge standard explicitly rejected by the Fourth Circuit in *BMG*. *BMG II*, at 308-310 (rejecting "had reason to know" and "should have known" as an improper negligence standard).

Plaintiffs' argument in favor of their theory is, to put it mildly, unpersuasive. The evidence shows that none of the RIAA Notices alleged infringement of multiple works, or informed Cox that they were intended to do so. Each of the Notices alleged infringement of "*an* unauthorized copy" of "*a* copyrighted sound recording." Kearney SJ Dec. Ex. 29-32. Plaintiffs argue that the Notices *claimed* to have "attached … a sampling of the music shared," Opp. 26, but nothing in them indicated what the vague term "sampling" was supposed to refer to, and in any event, neither a song name, a title-and-artist designation, a filename, or a hash value is a "sampling of … music." Plaintiffs' alternative argument, that the Notices identified a "representative list" of works in-fringed, is even less plausible: the Notices did not provide, or even mention, any such "list,"

---

[37] Inexplicably, Plaintiffs claim that Cox would require works to be "identified by title and copy-right owner." Opp. 25. Cox makes no such argument.

[38] Plaintiffs apparently refer to the <FileName> and <Hash> fields that appear in the RIAA No-tices. *See* Opp. 25-26; BMG SOAF 20; Cox SUF 42 (admitted by Plaintiffs). Like the hash value, *see infra*, the <FileName> does not identify a work. *See, e.g.*, Kearney SJ Dec. Ex. 30, 31.

representative or otherwise. Plaintiffs' circular argument that "DMCA-compliant notices are evidence of actual knowledge," Opp. 26, is also irrelevant: because the DMCA requires identification of allegedly infringing works, notices that *omit* such identification are patently not DMCA-compliant. 17 U.S.C. § 512(c)(3)(A)(ii).[39] DMCA issues, including § 512(c) notice provisions, are inapplicable here, *see id.* § 512(*l*), (n), and in any event Plaintiffs cite *no* cases holding a defendant liable for contributory infringement based on an *undisclosed* list of works.

Moreover, the underlying files referenced only by file hash in Plaintiffs' notices only *sometimes* (Plaintiffs say "often," Opp. 26) contained more than one work.[40] For those that did, Plaintiffs might only own *some* of the works.[41] So even if Cox had managed to: (1) guess that the RIAA intended to give notice about works other than the one actually identified; (2) guess that the filename in the notice referred to a file containing those additional works; (3) go online and somehow locate a copy of the file; (4) download a copy of the file (infringing Plaintiff's copyright in the process); and (5) identify each of the additional songs (if any) on the file—Cox would *still* have been in the dark as to *which*, if any, of the file's additional contents were infringing or whether any of the Plaintiffs owned the work and was complaining of the infringement.

Plaintiffs ignore the representative example Cox provided in its opening brief

---

[39] Plaintiffs' repeated claim that notices were submitted "under penalty of perjury," Opp. 17 & SOAF 20, is also misleading and irrelevant: the only statement so made was "that the RIAA is authorized to act on behalf of its member companies[.]" Kearney SJ Dec. Ex. 29-32.

[40] In addition, because Plaintiffs sent infringement notices based on four different P2P protocols, each of which uses different hash functions for different purposes, it is unclear what the hash value even refers to—in the case of BitTorrent, at least, it does not refer to the file named in the notice. Kearney SJ Dec. Ex. 13 (Frederiksen-Cross Rpt. at ¶ 19).

[41] For example, Plaintiffs sent notices concerning only *one* sound recording by the artist Weird Al Yankovic. *See* Mot. 23 n.15; Kearney SJ Dec. ¶¶ 38-41 & Ex. 34, 35. Although Plaintiffs' hard drive indicates that a torrent file named "Weird Al Yankovic" contained 146 separate Weird Al sound recordings, Plaintiffs allege infringement of only 117 of them, and only 7 underlying musical compositions. *Id.*; Gould Opp. Dec. Ex. 67 (Plaintiffs' hard drive).

demonstrating that Plaintiffs seek to recover a staggering *$18.6 million* in damages for alleged infringement of *117* sound recordings and *7* musical compositions by Weird Al Yankovic, based on notices that identified a *single* sound recording. In all, Plaintiffs seek nearly *$1.6 billion* in total statutory damages for alleged infringement of approximately 10,500 works—almost 8,500 un-named—based solely on notices that, in the aggregate, identified fewer than 2,000 works.

No reasonable jury could find Plaintiffs' notices sufficient to give Cox actual knowledge of infringement of unnamed and unidentified works. Plaintiffs' theory of knowledge ignores and contradicts the law, and offends both common sense and basic notions of fairness.[42] The Court should grant summary judgment to Cox as to all of the works in suit for which Plaintiffs failed to give Cox notice by identifying them in at least one copyright infringement notice.

### B.   Plaintiffs cannot show Cox was willfully blind to infringements of sound recordings and musical compositions that Plaintiffs never identified

Nor can Plaintiffs avoid the lack of notice provided to Cox by invoking the "willful blindness" doctrine. Plaintiffs' primary argument—that Cox "believe[d] infringement was occurring" and had "actual knowledge of repeat infringers," but "did not dispute" infringement—is irrelevant to willful blindness, because there is no evidence that Cox consciously avoided learning about *specific instances* of infringement.

Their alternative argument, that Cox willfully blinded itself because there was a cap on the number of notices that Plaintiffs agent RIAA could send, borders on frivolous; Plaintiffs' agent RIAA *voluntarily* agreed to limit the number of notices it would send to Cox; Cox agreed to accept more notices from RIAA than other copyright owners; and, day in, day out, RIAA sent *fewer* notices than Cox had agreed to accept. Moreover, Plaintiffs make no attempt to explain how this

---

[42] It is also almost certainly unconstitutional, which is yet another reason that the Court should not strike Cox's affirmative defenses. *See* Cox Opp. at 36-38.

voluntary limit on notice volume could possibly have had had any effect on the 80% of works that Plaintiffs did not identify in *any* notices. As to Plaintiffs' claim that Cox willfully blinded itself when it blocked Rightscorp's improper notices (which at least purported to *identify* works owned by BMG), that is patently irrelevant to whether Cox willfully blinded itself to infringements of *Plaintiffs'* alleged works, for which no notices were ever sent.

Plaintiffs have no evidence that Cox willfully blinded itself to infringement of *any* of the works. For the 1,998 works that were identified, Cox accepted and processed the notices. For the approximately 8,500 works that were not identified, Cox was not in a position to turn a blind eye, because there was nothing to see. The Court should grant Cox summary judgment on this issue.

### C.   Plaintiffs concede that Cox lacked actual knowledge of alleged infringements of musical compositions.

Plaintiffs do not dispute that the Publisher Plaintiffs never sent a single notice alleging infringement of any of the 4,231 musical compositions in suit, nor that the notices sent on behalf of Label Plaintiffs were limited to sound recordings. Nor do Plaintiffs dispute that the Title-and-Artist of a sound recording does not reliably identify a unique underlying musical composition (or compositions), or indicate whether the composition(s) are alleged to have been actually infringed (or are subject to copyright protection at all). Plaintiffs also fail to offer any alternative theory of how Cox could have possibly obtained actual knowledge of infringement, absent such information. The Court should dismiss the Publisher Plaintiffs' claims in their entirety, and dismiss their vicarious liability claims for the same reason. Plaintiffs do not address Cox's arguments on these claims, and fail to explain how Cox could possibly have supervised infringements of musical compositions when it had no idea that they even existed, let alone that they were allegedly being infringed. Summary judgment is warranted on this issue by default.

### D.      Plaintiffs concede that Cox cannot be vicariously liable for infringements it was unaware of.

Plaintiffs misconstrue Cox's vicarious liability argument: Cox is not "attempt[ing] to merge" the "right and ability to supervise" prong into the contributory infringement analysis. Rather, Cox seeks summary judgment of no vicarious liability for the works-in-suit that Plaintiffs failed to identify, and provided no notice that infringement was even occurring. *See* Mot. at 25 ("… Plaintiffs cannot show that Cox had the practical ability to supervise infringing acts of which it was unaware.") Plaintiffs fail to address this issue or Cox's argument in their opposition. Their conclusory statements that Cox had "control," simply because it could shut down a subscriber's Internet service entirely, are unavailing: they fail to address the issue of Cox's lack of awareness, and focus exclusively on a "right to *control*" requirement that does not appear in the case law, while ignoring the actual "ability to *supervise*" standard that does. Since no reasonable jury could find that Cox had the practical ability to supervise conduct of which it was unaware—and separately, because Plaintiffs have conceded this issues by failing to dispute it—the Court should also grant Cox summary judgment of no vicarious liability for the non-noticed works.

### E.      Plaintiffs cannot show that Cox had actual knowledge of infringement by end users of Cox Business subscribers

The application of *Cobbler Nevada v. Gonzalez* to this case is straightforward, and contrary to Plaintiffs' argument, the issue is one of knowledge, not "identity."[43] In *Cobbler*, the Ninth Circuit held, in keeping with well-established principles of secondary liability, that merely sending copyright infringement notices alleging that a business's IP address was used for infringement does not state a claim for either direct *or* secondary infringement against the business. 901 F.3d

---

[43] Plaintiffs' citation to *BMG I* is confusing: the *BMG* court was discussing the unrelated issue of whether a *residential* subscriber could be held liable for direct infringement if someone other than the named subscriber (such as a family member) was actually infringing. That is utterly irrelevant to this issue, and Plaintiffs' collateral estoppel argument is meritless (and irrelevant) as well.

1142, 1145 (9th Cir. 2018). Plaintiffs' notices, having the same limitations, are likewise insufficient to establish that a targeted Cox Business subscriber was a direct or contributory infringer.

To hold Cox contributorily liable for infringement, Plaintiffs must prove that Cox had actual knowledge of specific acts of underlying infringement. But their notices, like the notices in *Cobbler*, are insufficient to show that the Cox Business subscribers—as opposed to users of their networks—were infringing. It follows that the actions of those Cox Business subscribers cannot be a source of actual knowledge for Cox. Plaintiffs must therefore show that Cox had actual knowledge of specific infringing acts by end users of the accused Cox Business subscribers. But because notices such as Plaintiffs' are insufficient to state a claim of contributory infringement against a business user, that means that they are insufficient to give the *business* actual knowledge of infringement by its end users. That being the case, they are plainly insufficient to give a business's ISP—which merely supplies an IP address and an Internet connection to business customers—a higher degree of knowledge.

Plaintiffs have no counter-argument. They simply say that their claims are "based on much more" than the *Cobbler* claims. Plaintiffs are mistaken: their *only* evidence of infringement is *exactly* the same as in *Cobbler*, namely infringement notices directed at a business's IP address. Their evidence is insufficient here for exactly the same reasons as in *Cobbler*. Because Plaintiffs cannot show that the Cox Business subscribers were infringers, and cannot identify the actual infringers, their argument that "Cox knew exactly which repeat infringer subscribers to terminate" is nonsense. Finally, Plaintiffs' fact-free policy argument—that *Cox* should be held liable because it is "technologically savvy" and "differently situated" from the *Cobbler* defendant—fails to address these fundamental flaws in their claims. Plaintiffs' notices directed at Cox Business IP addresses were thus, at best, allegations that an unidentified end user, somewhere on a subscriber's

21

network,[44] had infringed one of Plaintiffs' works. This sort of vague, generalized knowledge of infringement is "exactly what falls short under *Sony*." *BMG II* at 311. Plaintiffs made no attempt to seek discovery and lack any additional evidence that could save their claims against the Cox Business subscribers. Cox is entitled to summary judgment on these claims.

### III.    Plaintiffs Lack Evidence to Support Vicarious Liability.

Plaintiffs cannot show that Cox possessed "an obvious and direct financial interest in the exploited copyrighted materials," cannot show a "causal relationship" between "the infringing activities *at issue in th[e] case*," and cannot demonstrate that Cox had "the right *and ability to supervise* the infringing activity." *BMG I* at 673 (quoting *Nelson–Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir.2002)) (emphasis added).

#### A.    Plaintiffs have no evidence that Cox had an obvious and direct financial interest in infringement of works in suit.

##### 1.    Plaintiffs cannot show that Cox's service was a draw to infringers.

As this Court explained in *BMG I*, because "Cox provides a content-neutral commercial service that makes a wide selection of services and activities available to its subscribers … [and] charges the same flat monthly fees to its users whether they use Cox's service for infringing or non-infringing purposes … the relevant inquiry … is whether the infringing activity constitutes *a draw for [Cox's] subscribers*, not just an added benefit." *BMG I* at 676 (emphasis added) (citations omitted). Without evidence that "some portion of [Cox's] fees is generated from subscribers that are drawn to Cox's service at least in part *because* of the infringing activity alleged *in this case* … the requisite causal connection between the benefit and the infringing activity is not established." *Id*. (emphasis added). Plaintiffs urge the Court to find that Cox's receipt of infringement allegations from third-party copyright owners somehow provides the evidence of this required element,

---

[44] Plaintiffs have no evidence that Cox controlled its subscriber's networks.

but offer no evidence to support this circular, entirely speculative argument. And unlike the plaintiff in *BMG*, they fail to adduce any other evidence.[45] Plaintiffs have no evidence that Cox's supposed failure to terminate alleged infringers acted as a draw to its service. To the contrary, the only available evidence is that Cox, virtually alone among major ISPs, *did* terminate repeat infringers. Kearney Opp. Dec. ¶ 42, Ex. K32; ¶ 34, Ex. K24 (at ¶¶ 30, 146, 149).

Lacking any evidence that Cox's service acted as a "draw," Plaintiffs attempt to avoid summary judgment by simply asking the Court to ignore settled law and hold that no such evidence is required. Their attempt to rewrite this basic rule of vicarious liability relies on misrepresentations of both Congressional legislative history and the *Ellison* decision. Plaintiffs claim incorrectly that because "*Ellison* and the legislative history it quotes expressly use the word 'ordinarily,'" that "demonstrate[s] an understanding that fixed payments can satisfy this element in appropriate circumstances." Mot. 34. But the word "ordinarily" appears nowhere in the relevant legislative history, and *Ellison* (along with this Court and Congress) explicitly stated the *only* "exception" to the general rule that a flat fee-for-service is insufficient: namely, where "the value of the service lies in providing access to infringing material"—*i.e.*, a "draw." *Ellison* at 1079; *BMG I* at 675-76; S. Rep. 105-90 at 44-45. Plaintiffs' proposed rule, that a defendant is vicariously liable if it receives multiple emails from a copyright owner, would swallow the rule, applying to *any* situation where a defendant who receives flat-fee revenues for providing a service is sued for infringement. *See UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, No. A-17-CA-365-LY, 2018 WL

---

[45] In *BMG I*, the plaintiff offered a "hardly overwhelming" customer survey purporting to show that for some fraction of Cox subscribers, the ability to obtain free music from certain websites was one reason (among many) they subscribed to Cox's service. The Court recognized that this was "hardly overwhelming" evidence, but found it sufficient to present a fact question for the jury.[45] *Id*. Because Plaintiffs here lack any comparable evidence—or any evidence at all—to support their essentially identical claim, vicarious liability is not a "close question." *See id.*

23

1096871, at *10 (W.D. Tex. Feb. 28, 2018), *report and recommendation adopted,* No. 1:17-CV-365-LY, 2018 WL 2182282 (W.D. Tex. Mar. 26, 2018), *and report and recommendation adopted,* No. 1:17-CV-365-LY, 2018 WL 1905124 (W.D. Tex. Mar. 28, 2018) ("UMG only alleges that the existence of music and the BitTorrent protocol is the draw. But that would impose liability on every ISP, as the music at issue is available on the Internet generally, as is the BitTorrent protocol, and is not something exclusively available through Grande's services."). It is unsurprising that Plaintiffs cite no authority to support their expansive rewriting of the standard.

### 2. Plaintiffs cannot show Cox had a direct financial interest in infringement of works-in-suit.

Even if the Court were inclined to ignore settled law and hold that evidence of a "draw" is not required, Plaintiffs' evidence is insufficient to survive summary judgment, because they cannot show that: (a) Cox possessed "an obvious and direct financial interest in the exploited copyrighted materials," *and* (b) there was a "causal relationship" between "the infringing activities *at issue in th[e] case* and a direct financial benefit to the defendant." *BMG I* at 675-76 (emphasis in original) (quotation omitted). Plaintiffs must show both; they have evidence of neither.

Plaintiffs do not dispute that the only revenue Cox received from its subscribers was a monthly subscription fee that did not depend on the manner or purpose for which subscribers used the service. Plaintiffs' argument that some accused infringers may have had a slight tendency to subscribe to more expensive tiers of service, even if it were true, lacks any hint of a causal relationship to infringements of Plaintiffs' works, which are the only infringing activities at issue here. And Plaintiffs' argument that Cox obtained revenues "by not terminating known infringers," Opp. 33, 36, is precisely what, according to both the seminal opinion in *Ellison v. Robertson*, 357 F.3 1072, 1079 (9th Cir. 2004) and this Court's *BMG* decision, is *insufficient*.

Plaintiffs fail to provide any evidence showing that Cox derived an obvious and direct

financial benefit from infringement of Plaintiffs' works, or for that matter any infringing works, and cannot show that any subscribers were drawn to Cox's service by the availability of unauthorized copies of Plaintiffs' works. Nor is there evidence that the availability of Plaintiffs' music on Cox's network enhances the value of Cox's services to subscribers, that anyone subscribed to Cox's ISP service to obtain unauthorized copies of Plaintiffs' works, or that anyone chose Cox's service over another because of a perceived ability to obtain Plaintiffs' works over Cox's network. Notably, too, Plaintiffs' expert bases his analysis and findings on the number of "DMCA tickets" that a subscriber received, Gould Opp. Dec. 15 (Lehr Dec.), but fails to link that number to alleged infringement of Plaintiffs' works, so the required "causal relationship" simply cannot be shown.

### B. Plaintiffs cannot show that Cox had the right and ability to supervise alleged infringing activity.

Plaintiffs misrepresent the Court's holding in *BMG*, and ignore the Fourth Circuit's *Nelson-Salabes* "right and ability to *supervise*" standard. *BMG I* at 673 (quoting *Nelson–Salabes*, 284 F.3d at 513 (emphasis added). They argue that Cox had "control" simply because it had the legal right to terminate subscriber's accounts. But so too does the electric company that supplies power to an infringer's computer; that does not make the electric company (which cannot supervise its account holders' activities either) vicariously liable for infringement. *See Perfect 10, Inc. v. Visa Intern. Svc. Assn.*, 494 F.3d 788 (9th Cir. 2007). The mere right to terminate a subscriber's account does not give Cox the right and ability to *supervise* acts of allege infringement: it is undisputed that Cox does not, and *cannot*, control the contents on its subscriber's devices, nor remove material from the Internet. And Plaintiffs fail to explain how Plaintiffs' notices—which contained unsworn allegations of *past* acts of infringement that Cox had no way to verify—could have enabled Cox to supervise those acts, or any others.

Contrary to Plaintiffs' claim, the Court did not "determine[]" this issue in *BMG*—and the

*BMG* jury, which *did* determine the issue, found Cox *not* vicariously liable, on similar facts. Not only *could* a reasonable jury find Cox lacked the practical right and ability to supervise infringement, but a reasonable jury has *already done so*. More to the point of this Motion, Plaintiffs lack evidence in *this* case sufficient for a reasonable jury to find otherwise, so the Court should enter summary judgment of no vicarious liability on this basis as well.

## IV.   Cox Is Entitled to Summary Judgment Limiting Certain of Plaintiffs' Statutory Damages Claims to One Award Per Work.

### A.      Each compilation or work made for hire is limited to one statutory award.

Plaintiffs do not dispute that 6,777 of the Label Plaintiffs' 7,057 sound recording works-in-suit were registered as works "made for hire," as evidenced by the 1,158 "work made for hire" registration certificates Plaintiffs rely upon.[46] Nor do they dispute—or even address—Cox's statutory argument that because the vast majority of the Label Plaintiffs' works are registered as works "made for hire"—possible *only* if they are "compilations"—they are entitled as a matter of law to only one award of statutory damages per compilation under the plain language of the Copyright Act. *See* Cox Mot. at 36-38 (citing 17 U.S.C. § U.S.C. 504(c)(1)).[47] Plaintiffs do not (and could not) dispute that they elected this form of registration intentionally, in order to preclude the works' human creators from asserting any rights in the future. Mot. 38. By failing to respond to this argument, Plaintiffs have conceded it.

Plaintiffs' only arguments against summary judgment rely on the Court's ruling in *BMG* and the independent economic value rule. Neither is sufficient to prevent summary judgment for

---

[46] Plaintiffs also do not dispute that 6,777 of these works were registered and first issued on 1,158 albums. Opp. ¶ 3 (SOAF 3, conceding works were "registered in conjunction with a compilation or collective work (album)").

[47] Plaintiffs also do not dispute that they knowingly and intentionally registered these sound recordings as compilations that were made for hire, as it indisputably confers them more control over the works for a longer period of time. Mot. 37-39.

Cox. *First*, *BMG* is distinguishable. There, the Court was ruling not on a motion for summary judgment with an undisputed factual record, as exists here, but on Cox's motion for a new trial based on its claim the court erred in instructing the jury. *Second*, the works at issue in *BMG* were not, as here, sound recordings that were both registered as works "made for hire" *and* initially released on albums, but musical compositions, which the Copyright Act treats very differently.[48] For these same reasons, preclusion does not apply.[49] *Third*, Plaintiffs' reliance on the independent economic value theory is misplaced. The Copyright Act "specifically states that all parts of the compilation must be treated as one work for the purpose of calculating statutory damages … [it] provides no exception for a part of a compilation that has independent economic value[.]"*Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 142 (2d Cir. 2010); *see also Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1281 (11th Cir. 2015) ("[I]f the dispositive factor for whether a work has independent economic value is whether it can conceivably be sold on its own, Congress's express mandate in 17 U.S.C. § 504(c)(1) that 'all parts of a compilation [are to] constitute one work' would be meaningless.").[50] Plaintiffs entirely ignore this argument, and nevertheless urge the Court to adopt the independent "economic value" test because the works constituting what are

---

[48] The statutory "works made for hire" issue was not present in *BMG*.

[49] Because of these differences, the issue in this case is not identical to one previously litigated and resolved, making preclusion/estoppel inapplicable here. *See, e.g., In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004).

[50] Plaintiffs point to the Second Circuit's opinion in *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79 (2d Cir. 2016), in which it affirmed a district court's denial of a motion for a new trial based, in part, on the claim it erred in instructing the jury that it could award separate damages for each track on albums. Opp. 38, n.18. There, however, the district court found the plaintiffs had proven to the jury each track "was available for purchase as a single … on the date of infringement." *EMI Christian Music Grp., Inc.*, 844 F.3d at 101. Here, Plaintiffs' only evidence that any works in suit were available as singles "during the Claim Period" are conclusory declarations by record label witnesses, without documentary support. *See* Pl. SUF ¶3; Leak Dec. (Dkt. 392-5) §6; McMullen Dec. (Dkt. 392-6) §6;

concededly *collective* works[51] can be sold or licensed independently. Opp. 38. But the Copyright Act's definition of a "collective work" *presupposes* that each individual work in a collection has independent value. *See* 17 U.S.C. § 101 (definition of "collective work"). Thus, it is not the "independent value" of individual parts of a collective work that dictates the number of statutory damage awards, but rather *how* the work is protected. *See VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 747-48 (9th Cir. 2019); *see also Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 (4th Cir. 2003). Because there is no dispute that 6,777 of the Label Plaintiffs' 7,057 works-in-suit were registered as works "made for hire" on 1,158 registrations, and therefore *only* protectable as compilations, *see* 17 U.S.C. § 101, the Copyright Act mandates that Plaintiffs are only entitled 1,158 awards of statutory damages—not 7,057. *See* 17 U.S.C. § 504(c)(1).

### B.   A sound recording and the music composition from which it derives are limited to a single award.

Plaintiffs do not dispute that a sound recording is a "derivative work" of a music composition, so that the recording and the composition are a *single work* for purposes of statutory damages. *See* 17 U.S.C. §§ 101 ("a sound recording" is an example of a "derivative work … based upon one or more preexisting works[.]"), 504 ("**all the parts** of a … derivative work constitute one work") (emphasis added); *TufAmerica, Inc. v. Codigo Music LLC*, 162 F. Supp. 3d 295, 303 n.5 (S.D.N.Y. 2016) ("Generally, '[a] sound recording is a derivative work in relation to the musical work recorded therein, just as a motion picture is a derivative work in relation to the novel or screenplay upon which it is based.'") (quoting 1 Nimmer on Copyright § 2.10[A] n.8 (2015)).[52] Nor do Plaintiffs dispute that the only Court of Appeals to reach this issue squarely held—consistent with

---

[51] *See* Opp. SOAF 3 (works were "published as part of a compilation or collective work (album).")

[52] *See also* Patry on Copyright § 22:186 ("Sound recordings are defined in section 101 as a species of derivative work of the underlying musical composition, and, as such, both fall within the one work, one award rule for statutory damages … regardless of whether there are different owners.").

both leading copyright treatises—that "[a] plain reading of the Copyright Act's text supports" a finding "that the plaintiffs could recover only one statutory damages award for a music composition and its corresponding sound recording, even where the composition and the recording were owned by separate plaintiffs." *See EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 94-95 (2d Cir. 2016).[53] To evade this overwhelming weight of authority, Plaintiffs raise one textual argument and one policy argument. Neither has merit.

Plaintiffs' simplistic textual argument, based on the Copyright Act's use of "the copyright owner" (singular) in §504(c)(1), ignores that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise[,] words importing the singular include and apply to several persons, parties, or things[.]" 1 U.S.C. § 1. By statute, that is, the phrase "copyright owner" includes the plural "copyright owners." Plaintiffs make no attempt to explain how "the context indicates" an exclusively singular reading of "copyright owner" in §504(c), and could not do so: when Congress drafted §504(c)(1), it was well aware that "it is possible to have the rights of a number of owners of separate 'copyrights' in a single 'work' infringed by one act of a defendant," and it created the single-recovery rule with that knowledge. H.R. Rep. No. 94-1476, at 162 (1976); S. Rep. No. 94-473, at 144 (1975). The plain language of the Copyright Act, Congress' express statements in the legislative history, and the complete absence of anything to "indicate[] otherwise," entirely refutes Plaintiffs' statutory argument.

Plaintiffs' policy argument fares no better. Relying on a 2001 district court case that the Second Circuit expressly rejected in *EMI Christian,* they argue that it would be "absurd" "if suing

---

[53] *See also Capitol Records, Inc. v. MP3Tunes, LLC*, 28 F. Supp. 3d 190, 191-92 (S.D.N.Y. 2014) (when defendants "infringed the copyright covering a sound recording and music composition for the same song, they infringed only one work because the infringement was directed at the sound recording and music composition was not exploited separately."); *see also Spooner v. EEN, Inc.*, No. 08 Civ. 262, 2010 WL 1930239, at *5 (D. Me. May 11, 2010).

separately allowed rights holders to each recover their own statutory damages award, but if suing in the same action they are limited to a single award." Opp. 40 (citing *Teevee Toons, Inc. v. MP3.com, Inc.*, 134 F. Supp. 2d 546, 548 (S.D.N.Y. 2001), *disagreed with by EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 94-95 (2d Cir. 2016)). While it may be correct that the two groups of Plaintiffs could have sought separate and multiple awards if they had elected to sue separately, they chose to sue together—presumably to marshal resources and conserve expenses.[54] Plaintiffs also ignore that because the Label Plaintiffs and Publisher Plaintiffs are suing together, the jury may properly consider their separate harms, if any, when determining the amount of statutory damages it awards per work. It cannot be unfair or absurd to hold Plaintiffs to a single award of statutory damages when that result is due to Plaintiffs' own decisions—and more importantly, dictated by the plain language of the Copyright Act.

Plaintiffs do not dispute that 2,556 of the Label Plaintiffs' sound recordings are derivative of Publisher Plaintiffs' works in suit. Mot. 40. Thus, for each of these works, Plaintiffs should be restricted to a single award of statutory damages.

For these reasons, Cox respectfully requests that the Court grant Cox's motion.

Dated: October 11, 2019

Respectfully submitted,

*/s/ Thomas M. Buchanan*
Thomas M. Buchanan (VSB No. 21530)
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.
and CoxCom, LLC*

---

[54] The Label Plaintiffs may also have been motivated to join this suit because they failed to send any notices of their own. *See* Cox MSJ at § II.B.

30

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email: melkin@winston.com
Email: tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
Thomas Kearney (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
Email: jgolinveaux@winston.com
Email: tkearney@winston.com

Michael L. Brody (*pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
Email: mbrody@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750
Email: dhleiden@winston.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 11, 2019, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users.

<u>/s/ Thomas M. Buchanan</u>
Thomas M. Buchanan (VSB No. 21530)
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.*
*and CoxCom, LLC*