**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT, *et al.*, | |
| Plaintiffs, | Case No. 1:18-cv-00950-LO-JFA |
| v. | |
| COX COMMUNICATIONS, INC., *et al.*, | |
| Defendants. | |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

I.   THE UNDISPUTED FACTS SUPPORT SUMMARY JUDGMENT FOR
PLAINTIFFS ............................................................................................. 2

     A.   Cox's Objections Are Improper and Fail to Carry Its Burden of
Identifying Citations to the Record Demonstrating A Genuine Factual
Dispute ........................................................................................ 2

     B.   Analysis and Argument in Declarations from Cox's Counsel of Record
Are Inadmissible and Do Not Constitute Citations to the Record ............. 4

     C.   Cox Disputes Facts That Are Indisputable and For Which Collateral
Estoppel Applies ............................................................................ 4

     D.   Cox Portrays Facts As "Disputed" While Conceding the Core
Proposition .................................................................................. 6

II.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON
OWNERSHIP ........................................................................................... 8

     A.   Cox Does Not Dispute That Plaintiffs Own or Control Exclusive Rights
to the Vast Majority of the 10,100 Works in Suit .................................. 8

     B.   Plaintiffs Properly Rely on Copyright Office Catalog Records ................... 8

     C.   Plaintiffs Own the 1,571 Works in Suit for Which Cox "Disputes"
Ownership .................................................................................... 9

         1.   Plaintiffs Own the 129 Works Cox Contends Were Registered More Than
Five Years After First Publication .............................................. 9

         2.   Plaintiffs Own the 1,209 Works For Which Cox Contends There Is a
"Missing" Chain of Title Document ........................................... 10

             a.   Cox's Complaint of Facially Deficient Certificates Is Unfounded 10

             b.   Testimony Can Supplement Chain of Title Documentation ......... 10

             c.   Chain of Title Can Be Proven Through Agreements with Authors
.......................................................................... 12

             d.   Speculation That Certain Agreements Are No Longer in Force
Does Not Create a Factual Dispute ............................... 13

             e.   Cox's Argument As To Post-Claim Period Agreements Is Faulty 13

             f.   There Are Copyright Registrations For Each Work ................... 14

             g.   Cox Was Not Prejudiced By a Few Late-Produced Documents... 14

i

3.   Plaintiffs Own the 238 Works that Cox Contends Should Not Have Been Registered As "Works Made For Hire" ................................................................ 15

4.   Plaintiffs Own The 78 Works that Cox Contends Were Registered Late .... 17

III.   PLAINTIFFS HAVE PROVEN THE EXISTENCE OF DIRECT INFRINGEMENT, EVEN THOUGH ITS FULL EXTENT IS UNKNOWN ............. 17

A.   Plaintiffs Have Shown That the Infringing Files Contained Plaintiffs' Works ................................................................................................................ 17

1.   Admissible Evidence Demonstrates that Cox's Subscribers Were "Sharing" Unauthorized Copies of All Works In Suit ................................................ 17

2.   Dr. Feamster's Analysis Does Not Create a Genuine Issue of Material Fact20

3.   Cox's Brand New Theory, That the Audible Magic Match May Be to a Cover Recording or Live Performance, Does Not Raise a Factual Dispute ................................................................................................................ 21

B.   Plaintiffs Do Not Need to Provide Cox with the Names of the Individuals Who Infringed Via Cox's Business Subscribers' Accounts ...... 21

C.   Plaintiffs Proved Violations of the Reproduction and Distribution Rights ............................................................................................................... 22

IV.   COX IS LIABLE FOR CONTRIBUTORY INFRINGEMENT ................................. 25

A.   Plaintiffs Have Shown that Cox Had Sufficient Knowledge of the Infringement ................................................................................................... 25

B.   Plaintiffs Have Shown That Cox Materially Contributed to the Infringement ................................................................................................... 27

V.   COX IS VICARIOUSLY LIABLE FOR THE DIRECT INFRINGEMENT .............. 28

A.   Plaintiffs Have Shown That Cox Obtained A Direct Financial Benefit ....... 28

B.   Plaintiffs Have Shown That Cox Had the Right And Ability to Control ..... 29

VI.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON COX'S AFFIRMATIVE DEFENSES ....................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*A&M Records, Inc. v. Napster, Inc.,*
   239 F.3d 1004 (9th Cir. 2001) (same) ........................................................................ 27, 29, 30

*Am. Soc'y for Testing & Materials v. Public Resource.org, Inc.,*
   2017 WL 473822 (D.D.C. Feb. 2, 2017) .............................................................................. 15

*Arista Records LLC v. Lime Grp.*, LLC,
   2011 WL 1641978 (S.D.N.Y. Apr. 29, 2011) ........................................................................ 9

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.,*
   149 F. Supp. 3d 634 (E.D. Va. 2015) ("BMG I"), rev'd in part on other grounds, 881 F.3d 293
   (4th Cir. 2018) .............................................................................................................. passim

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.,*
   199 F. Supp. 3d 958 (E.D. Va. 2016) ................................................................................... 27

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.,*
   881 F.3d 293 (4th Cir. 2018) ............................................................................................... 25

*Bouchat v. Baltimore Ravens Football Club,*
   346 F.3d 514 (4th Cir. 2003) ................................................................................................. 3

*Bouchat v. Bon-Ton Dep't Stores,*
   506 F.3d 315 (4th Cir. 2007) ................................................................................................. 6

*Bouchat v. Champion Prods.,*
   327 F. Supp. 2d 537 (D. Md. 2003) ....................................................................................... 5

*Capitol Records, Inc. v. Thomas,*
   579 F. Supp. 2d 1210 (D. Minn. 2008) ................................................................................ 22

*Capitol Records, LLC v. Escape Media Grp., Inc.,*
   No. 12-CV-6646 AJN, 2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015) .................................... 27

*Clegg v. West,*
   No. 97-cv-986, 1997 WL 1168697 (E.D. Va. Oct. 20, 1997),
   *aff'd,* 199 F.3d 1326 (4th Cir. 1999) ..................................................................................... 6

*Cleveland v. Policy Mgmt. Sys. Corp.,*
   526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) .................................................. 7

*Cobbler Nevada, LLC v. Gonzalez,*
   901 F.3d 1142 (9th Cir. 2018) ......................................................................................... 22, 26

*Complex Systems v. ABN Ambro Bank,*
 979 F. Supp. 2d 456 (S.D.N.Y. 2013) .................................................................... 15

*DeliverMed Holdings, LLC v. Schaltenbrand,*
 734 F.3d 616 (7th Cir. 2013) .................................................................................. 16

*Dtech Commc'ns, LLC v. OSC Eng'g, Inc.,*
 No. 11-cv-1425-MMA-BLM, 2013 WL 12094839, (S.D. Cal. Jan. 11, 2013) ...................... 16

*EMI Christian Music Grp., Inc. v. MP3tunes*, LLC,
 844 F.3d 79 (2d Cir. 2016) ..................................................................................... 15

*Fonovisa, Inc. v. Napster, Inc.,*
 2002 WL 398676 (N.D. Cal. Jan. 28, 2002) ............................................................ 26

*Genesis Office Sys., Inc. v. PNC Bank, N.A.,*
 639 F. App'x 939, 940 (4th Cir. 2016) ...................................................................... 7

*Golden Nugget, Inc. v. Chesapeake Bay Fishing Co. LCC,*
 93 F. App'x 530 (4th Cir. 2004) ............................................................................... 7

*Hotaling v. Church of Jesus Christ of Latter-Day Saints,*
 118 F.3d 19 (4th Cir. 1997) .................................................................................... 24

*In re Microsoft Corp. Antitrust Litig.,*
 355 F.3d 322 (4th Cir. 2004) .................................................................................... 5

*Iris Arc v. S.S. Sarna, Inc.,*
 621 F. Supp. 916 (E.D.N.Y. 1985) .......................................................................... 12

*Island Software & Comp. Serv., Inc. v. Microsoft* Corp.,
 413 F.3d 257 (2d Cir. 2005) ..................................................................................... 8

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.,*
 No. C 07-03952, 2010 WL 5598337 (N.D. Cal. Mar. 19, 2010) ............................... 27

*Manganella v. Evanston Ins. Co.,*
 700 F.3d 585 (1st Cir. 2012) .................................................................................... 5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
 475 U.S. 574, 106 S.Ct. 1348 (1986) ........................................................................ 6

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
 545 U.S. 913, 125 S.Ct. 2764 (U.S.,2005) .............................................................. 28

*MOB Music Pub. v. Zanzibar on the Waterfront, LLC,*
 698 F. Supp. 2d 197 (D.D.C. 2010) ........................................................................ 15

*Paradox Sec. Sys., Ltd. v. ADT Sec. Servs., Inc.*,
   388 F. App'x 976 (Fed. Cir. 2010) ........................................................ 7

*Ramsay v. U.S.I.N.S.*,
   14 F.3d 206 (4th Cir. 1994) .................................................................. 5

*Roberts v. Gordy*,
   877 F.3d 1024 (11th Cir. 2017) ........................................................... 12

*Shapiro, Bernstein & Co. v. H. L. Green Co.*,
   316 F.2d 304, 307 (2d Cir. 1963) ......................................................... 28

*Teevee Toons, Inc. v. MP3.com, Inc.*
   134 F. Supp. 2d 546 (S.D.N.Y. 2001) .................................................. 16

*Trans-radial Solutions, LLC v. Burlington Med., LLC*,
   2019 WL 3557879 (E.D. Va. Aug. 5, 2019)........................................... 8

*UMG Recording, Inc. v. Escape Media Grp., Inc.*,
   No. 11-cv-8407, 2014 WL 5089743 (S.D.N.Y. Sept. 29, 2014) ............. 18

*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*,
   618 F.3d 417 (4th Cir. 2010) ............................................................... 13

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*,
   No. 13-cv-831, 2017 WL 745594 (N.D.N.Y. Feb. 24, 2017)................... 12

*Uribe v. McKesson*,
   No. 08-cv-01285 DMS NLS, 2011 WL 9640 (E.D. Cal. Jan. 3, 2011)..... 3

*Waag v. Sotera Def. Sols., Inc.*,
   No. 1:14-cv-1715, 2015 WL 13544756 (E.D. Va. Nov. 5, 2015),
   *aff'd*, 857 F.3d 179 (4th Cir. 2017) ...................................................... 3

*Zinner v. Olenych*,
   108 F. Supp. 3d 369 (E.D. Va. 2015) ................................................... 8

## **Statutes**

17 U.S.C. § 410.................................................................................. 9, 15

## **Rules**

Fed. R. Civ. P. 26............................................................................... 7

FED. R. CIV. P. 56 .............................................................................. 2

Fed. R. Civ. P. Rule 30 ...................................................................... 14

FED. R. EVID. 201 ................................................................................................................. 8

L. CIV. R. 56 ....................................................................................................................... 3

# INTRODUCTION

The undisputed facts establish that Cox is liable for both contributory and vicarious copyright infringement.  The Court should grant summary judgment for Plaintiffs.

First, the only reasonable inference from the evidence is that Cox's subscribers directly infringed Plaintiffs' copyrights.  MarkMonitor is a well-respected anti-piracy company whose system has been validated by multiple independent experts, and Cox has not identified a legitimate basis to question its reliability.  Cox has not identified any inaccurate infringement notices.  The record is unequivocal that MarkMonitor caught Cox's subscribers on P2P *file sharing* networks with confirmed infringing files.  There is no credible dispute that these files, identified by unique hash value, contained Plaintiffs' works.

Second, the evidence shows that Cox had more than sufficient knowledge to take action against the massive infringement on its network.  Cox knew of the specific repeat infringer subscribers who were the subject of multiple (often dozens or more) infringement notices.  Cox also knew precisely which infringing files they were "sharing" (containing Plaintiffs' works in suit).  When Cox knew a subscriber was a repeat infringer, it had an obligation to act.

Third, there is no merit to Cox's argument about the alleged "effectiveness" of its graduated response policy.  The proposition itself is absurd, as Cox allowed thousands of known repeat infringers to continue their infringement indefinitely.  Moreover, nothing about the alleged "effectiveness" of Cox's policy prevents Plaintiffs from proving their claims.  Cox is liable for assisting and profiting from the illegal activity of specific known repeat infringers.  Whether some

*other* subscribers *may* have stopped infringing because of Cox's graduated response process (or otherwise) is irrelevant. Copyright infringement is unlawful, period.[1]

Finally, Cox argues that Plaintiffs have not proven that they own or have exclusive rights to some of the 10,100 works at issue. Yet Cox's arguments fall flat. Plaintiffs filed six comprehensive declarations on ownership, accompanied by 468 appendices, and 5,951 documents spanning 29,943 pages. Each appendix lists the works at issue for a unique chain of title, and the corresponding exhibits include copyright registrations and the related chain of title documentation. Cox does not and cannot seriously dispute that Plaintiffs own their music catalogs. Instead, Cox nit-picks at the margins, primarily through an improper attorney declaration in which Cox's counsel of record "testifies" that Plaintiffs have not done enough to prove ownership.

## ARGUMENT

### I. THE UNDISPUTED FACTS SUPPORT SUMMARY JUDGMENT FOR PLAINTIFFS

Cox has tried to create the appearance of a factual dispute where none exists. Cox "disputed" 45 of the 47 uncontroverted facts, but a closer look shows that the facts entitling Plaintiffs to summary judgment are not in dispute.

#### A. Cox's Objections Are Improper and Fail to Carry Its Burden of Identifying Citations to the Record Demonstrating A Genuine Factual Dispute

On a motion for summary judgment, the non-moving party must cite to evidence in the record that demonstrates material facts in dispute. *See* FED. R. CIV. P. 56(c)(1)(A) ("A party

---

[1] Cox misleadingly informs the Court that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ (Opp. at 2.) Far from a neutral study, it was a self-serving Cox PowerPoint and is hearsay. Moreover, Cox did not produce the underlying data and knows little to nothing about the methodology for selecting it. Gould Decl. ¶ 3, Exs. 1(a)-(b). The document is inadmissible, is the subject of Plaintiffs' Motion to Strike Portions of the Kearney Declaration (ECF No. 420), and will be the subject of a forthcoming motion in limine.

asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record"); L. CIV. R. 56(B) (same).  Cox, however, disputes almost every uncontroverted fact as if it were a discovery request, raising conclusory objections such as "argumentative," "immaterial," "incomplete," "misleading," "no evidentiary basis," and/or "states a legal conclusion."  For some SUFs (Nos. 1, 2, 5, 6, 21, 29, 30, 41, 45, and 47), Cox provides *only* objections, which clearly falls short of the requirements set by the Federal and Local Rules.[2]

For instance, Plaintiffs provided declarations in which a declarant from each Plaintiff company testified that, as a matter of corporate practice and policy, they protect their copyrights through registration with the U.S. Copyright Office and by entering into agreements through which they own or control exclusive rights under copyright.  Cox disputed this fact as "Argumentative. No evidentiary basis; states a legal conclusion."  (*See* SUF No. 2 and Cox's response thereto.) Plaintiffs also provided declarations in which a declarant from each Plaintiff company testified that they did not authorize Cox or Cox's subscribers to copy or distribute any of Plaintiffs' Works. Cox disputed this fact as "argumentative," a "legal conclusion," and on the basis that Plaintiffs did not obtain discovery from Cox's subscribers or show that Plaintiffs were the "sole licensing agents for the works in suit."  (*See* SUF No. 7 and Cox's response thereto.)  Plaintiffs' facts are supported by evidence and Cox's attorney's objections do not create a genuine issue of material fact.

---

[2] *See*, *e.g.*, *Bouchat v. Baltimore Ravens Football Club*, 346 F.3d 514, 522, 525 (4th Cir. 2003) (nonmoving party must "set forth specific facts" – "[n]either unsupported speculation, nor evidence that is merely colorable … will suffice to defeat a motion for summary judgment") (citations omitted); *Waag v. Sotera Def. Sols., Inc.*, No. 1:14-cv-1715, 2015 WL 13544756, at *1 n.2 (E.D. Va. Nov. 5, 2015), *aff'd*, 857 F.3d 179 (4th Cir. 2017) (plaintiff's claim that defendant's proposed fact was "incomplete or misleading without citing any record evidence contrary … does not suffice to raise a dispute of material fact."); *Uribe v. McKesson*, No. 08-cv-01285 DMS NLS, 2011 WL 9640, at *10 (E.D. Cal. Jan. 3, 2011) (objection that a proposed undisputed fact is irrelevant is "not sufficient support" to exclude the fact).

**B.  Analysis and Argument in Declarations from Cox's Counsel of Record Are Inadmissible and Do Not Constitute Citations to the Record**

Although the Court may only consider admissible evidence in deciding a motion for summary judgment, Cox relies heavily on inadmissible testimony and documents offered in declarations from two outside counsel of record, Thomas Patrick Lane and Thomas Kearney.  *See* Cox's response to SUF No. 3 (Lane Declaration ¶¶ 9-166).  *See also* Cox's response to SUF Nos. 7, 9-11, 14, 17-19 (Kearney Declaration ¶¶ 5, 7–11, 13–15, 18–20, 24–29, 36, 40).  For the reasons set forth in a separate motion to strike, *see* ECF No. 420, which Plaintiffs adopt herein, the entirety of the Lane Declaration and substantial portions of the Kearney Declaration, including documents cited therein, should be stricken from the record that the Court considers on Plaintiffs' motion for summary judgment.  Sworn testimony must be limited to evidence, not attorney argument.

**C.  Cox Disputes Facts That Are Indisputable and For Which Collateral Estoppel Applies**

A number of uncontroverted facts, including SUF Nos. 21, 22, 24-28, and 34, are established not only by the record evidence in this case, but also by this Court's specific factual findings that underlay its summary judgment decision in *BMG*.  Ignoring that, Cox disputes here that: (a) Internet access was required for its subscribers to upload or download on P2P networks; (b) Cox's Acceptable Use Policy provided Cox with the right to terminate subscribers for using its Internet service to infringe; (c) Cox took a multitude of steps to render its repeat infringer policy a mirage; and (d) Cox refused to accept infringement notices from Rightscorp.

There obviously cannot be any real dispute as to these facts.  Plaintiffs cited, *inter alia*, Cox's own documents, deposition testimony, and interrogatory responses.  Cox merely "disputes" these facts with objections and citations to the record that are either non-responsive or minor clarifications.  Cox does not dispute the core factual propositions asserted in these SUFs.  For instance, Plaintiffs' SUF No. 26 states that "[a]fter the fall of 2012, Cox essentially stopped

4

terminating repeat infringer subscribers altogether despite receiving an increasing number of infringement notices every year and continuing to receive infringement notices informing it of specific repeat infringing subscribers." Cox "disputed" SUF No. 26 as "[m]isleading" and by stating that Cox's Customer Safety personnel had discretion and could consider terminating (and actually terminated) a subscriber at any time. Cox's response thus does not really dispute the SUF.

In any event, the doctrine of collateral estoppel bars Cox from litigating the facts that Cox attempts to refute here. Cox recognizes that collateral estoppel precludes it from asserting a DMCA defense in this case given the Court's prior holding in *BMG*. However, Cox overlooks the fact that the same collateral estoppel doctrine applies to the Court's factual findings underlying its summary judgment decision in *BMG*. The facts concerning Cox's process for responding to infringement notices and addressing repeat infringers were identical; actually resolved; critical and necessary to the final and valid judgment; and Cox had a full and fair opportunity to litigate them. No more is required for collateral estoppel. *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004); *Ramsay v. U.S.I.N.S.*, 14 F.3d 206, 210 (4th Cir. 1994).[3]

Collateral estoppel applies even though, unlike in *BMG*, Cox did not plead the DMCA as an affirmative defense in this case. Application of collateral estoppel merely requires an "issue or fact," not the ultimate issue, to be identical. *See Microsoft*, 355 F.3d at 326; *Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 591 (1st Cir. 2012) ("[T]he issue need not have been the ultimate issue decided by the [prior proceeding]; issue preclusion can extend to necessary intermediate findings . . . ."); *Bouchat v. Champion Prods.*, 327 F. Supp. 2d 537, 546 (D. Md. 2003) ("The

---

[3] Plaintiffs have attached a copy of this Court's summary judgment decision in *BMG v. Cox*, 149 F.Supp.3d 634 (E.D. Va. 2015), and highlighted facts that Cox is collaterally estopped from disputing in this proceeding. Gould Ex. 12.

claim presented need not be the same for collateral estoppel to preclude relitigation of an issue"), *aff'd sub nom on other grounds*, *Bouchat v. Bon-Ton Dep't Stores*, 506 F.3d 315 (4th Cir. 2007).

### D.  Cox Portrays Facts As "Disputed" While Conceding the Core Proposition

Finally, for virtually every SUF, Cox indicates that facts are "disputed" even though it concedes much or all of the factual proposition.  Cox even goes so far as to dispute an SUF that sets forth data from Cox's own interrogatory answers, *see* SUF No. 23, and another that puts forward figures from Cox's own pricing advertisement, *see* SUF No. 36.  Disputing facts based on "immaterial factual disputes are not sufficient to avoid summary judgment." *Clegg v. West*, No. 97-cv-986, 1997 WL 1168697, at *3 (E.D. Va. Oct. 20, 1997), *aff'd*, 199 F.3d 1326 (4th Cir. 1999).

For instance, in support of SUF No. 13, Plaintiffs cited declarations and deposition testimony showing that it was impossible for MarkMonitor to observe the number of times Cox subscribers downloaded and distributed confirmed infringing files.  Plaintiffs' evidence shows that instances of copying between two peers on a P2P network are unobservable to anyone other than those two peers.  Cox's objections and citations to the record do not actually dispute that core factual proposition.  Instead, Cox focuses on how P2P networks were "designed," without contesting that they "operate" in the manner described.  *See* Cox's response to SUF No. 13.

By way of another example, it is well-established that files with the same cryptographic hash values are identical and will have the same contents.  *See* SUF No. 9.  As described in Plaintiffs' opening brief, Cox's expert, Dr. Feamster, agreed in his deposition that two files that are identical will have the same hash value.  In now "disputing" this basic proposition, Cox relies upon a conflicting declaration from Dr. Feamster prepared for Cox's opposition.  *See* Cox Response to SUF Nos. 9 and 17.  Dr. Feamster now states that it is "possible" for two different files to have the same hash, known as a "collision."  (Feamster Decl. ¶ 4.)

6

Dr. Feamster's summary judgment declaration contradicts his deposition testimony and should be disregarded. *See Genesis Office Sys., Inc. v. PNC Bank, N.A.*, 639 F. App'x 939, 940 (4th Cir. 2016) (finding that subsequent statements contrary to prior sworn deposition testimony "are insufficient to create a material issue of fact"), citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting [its] previous sworn [deposition] statement"). Dr. Feamster's declaration is also improper because the opinions therein were not included in his expert report. *See* Fed. R. Civ. P. 26(a)(2)(B) (expert report must contain a "complete statement of all opinions the witness will express and the basis and reasons for them" to provide notice of expert testimony); *Golden Nugget, Inc. v. Chesapeake Bay Fishing Co., L.C.*, 93 F. App'x 530, 535 (4th Cir. 2004) (expert's testimony is limited to what was disclosed in the expert report).

Even if Dr. Feamster (or Cox) could offer this testimony, the odds of a "hash collision" are infinitesimally small—for all intents and purposes, zero. The very paper that Dr. Feamster cites in support indicates: "[i]f you hashed $2^{80}$ random messages, you'd find one pair that hashed to the same value."[4] In other words, one has to perform over a *trillion* trillion hash generations ($2^{80}$ = 1,208,925,819,614,629,174,706,176) before finding a single instance of two different files producing the same hash. That does not create a genuine factual dispute about whether MarkMonitor found Cox's subscribers with files previously confirmed as infringing.

---

[4] Feamster Decl. para 4 (citing Bruce Schneier, "Cryptanalysis of SHA-1," Schneier on Security (Feb. 18, 2005), https://www.schneier.com/blog/archives/2005/02/cryptanalysis_o.html). Dr. Feamster's reliance upon the NIST policy statement—which concerns digital signatures, not file hash values as relied upon herein, is equally unavailing.

## II.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON OWNERSHIP

### A.  Cox Does Not Dispute That Plaintiffs Own or Control Exclusive Rights to the Vast Majority of the 10,100 Works in Suit

Plaintiffs moved for summary judgment on ownership for 10,100 works.  Cox does not dispute that Plaintiffs own or control exclusive rights to the vast majority of these works.  In fact, assuming the Court grants Plaintiffs' Motion for Judicial Notice (ECF No. 283), Cox's opposition addresses just 1,571 works.[5]  For these, Cox primarily argues that Plaintiffs have failed to meet their burden.  Summary judgment for Plaintiffs on ownership for all 10,100 works is appropriate.

### B.  Plaintiffs Properly Rely on Copyright Office Catalog Records

Cox argues that Plaintiffs did not prove ownership for 1,715 works because Plaintiffs supported their claims with copyright registration records from the U.S. Copyright Office's Online Catalog, instead of copies of registration certificates.  (Opp. at 23-24.)  As discussed in Plaintiffs' fully briefed Motion for Judicial Notice (ECF No. 283), courts regularly take judicial notice of registration records from the Copyright Office's Catalog.[6]  Indeed, the requirements of FED. R. EVID. 201(b) are satisfied and Cox does not even try to contest them.  Plaintiffs have provided the necessary information and so judicial notice is required under Rule 201(c)(2).

Cox also mistakenly argues that, for these works, "the only evidence of ownership" is the registration records from the Online Catalog.  In actuality, Plaintiffs further supplied detailed declarations explaining their reliance on printouts of supporting registrations from the U.S.

---

[5] Cox raises more than one argument for certain works, and therefore a sum of the issues in Cox's opposition and exhibits is much higher than the number of works that Cox challenges.

[6] *See, e.g., BMG I*, 149 F. Supp. 3d 634, 646 n.5, citing *Island Software & Comp. Serv., Inc. v. Microsoft* Corp., 413 F.3d 257, 261 (2d Cir. 2005) ("judicial notice of Microsoft's federal copyright registrations, as published in the Copyright Office's registry."); *see also Trans-radial Solutions, LLC v. Burlington Med., LLC*, 2019 WL 3557879, at *2 (E.D. Va. Aug. 5, 2019) (judicial notice of copyright registrations); *Zinner v. Olenych,* 108 F. Supp. 3d 369, 377 n.2 (E.D. Va. 2015) (same).

Copyright Office Online Catalog and their chain of title to ownership or control of the exclusive rights to all these works.  Plaintiffs explained that each work is registered with the U.S. Copyright Office and cited the registration numbers.  Cox has not offered any contrary facts or evidence.

The works are registered and Plaintiffs' uncontradicted testimony is sufficient proof of ownership.  *See Arista Records LLC v. Lime Grp. LLC*, No. 06-cv-5936, 2011 WL 1641978, at *4 (S.D.N.Y. Apr. 29, 2011) ("Plaintiff has submitted competent evidence, in the form of unrefuted affidavit testimony, establishing chain of title to these sound recordings"); *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.,* 149 F. Supp. 3d 634, 648 (E.D. Va. 2015) ("*BMG I*"), rev'd in part on other grounds, 881 F.3d 293 (4th Cir. 2018) (holding that Cox could not rebut presumption of ownership established in part by witness testimony).

### C.  Plaintiffs Own the 1,571 Works in Suit for Which Cox "Disputes" Ownership

#### 1.   Plaintiffs Own the 129 Works Cox Contends Were Registered More Than Five Years After First Publication

Cox argues that Plaintiffs do not have a presumption of ownership under 17 U.S.C. § 410(c) for 129 works that were registered more than five years after publication.  (Opp. at 24.)[7] Cox overlooks, however, that Plaintiffs provided detailed declarations and exhibits demonstrating that the works are registered and that they own or control exclusive rights to them.  Cox fails to dispute that evidence.  Cox's mere reliance on the Copyright Act's section on presumptions fails to meet its burden to come forward with *actual evidence* to refute Plaintiffs' proof of ownership.

---

[7] For a number of the works that Mr. Lane claims were registered more than five years after publication, the documents plainly show that registration took place within five years of publication.  Gould Decl. ¶ 4, Ex. 2.

### 2.   Plaintiffs Own the 1,209 Works For Which Cox Contends There Is a "Missing" Chain of Title Document

#### a.   Cox's Complaint of Facially Deficient Certificates Is Unfounded

The improper Lane Declaration complains of 13 registration certificates that allegedly "contain facial deficiencies, such as missing or illegible pages." (Opp. at 24 n.16.) Cox never once asked for a cleaner or more complete copy of any of these documents in discovery and there is no real dispute here. Regardless, Plaintiffs also produced registration records from the U.S. Copyright Office's Online Catalog for each of these works, which is more than sufficient to resolve any question about any allegedly missing or illegible pages. Gould Decl. ¶ 5, Ex. 3. *See BMG I*, 149 F. Supp. 3d at 646 (granting partial summary judgment on ownership based in part on "the unofficial copyright registration available on the public catalog, of which the Court may take judicial notice").

#### b.   Testimony Can Supplement Chain of Title Documentation

Cox contends that, for 818 works (468 sound recordings and 350 musical compositions), Plaintiffs' chain of title evidence is insufficient because the declarants did not substantiate every single assertion with a document. (Opp. at 24-25, relying on improper Lane Decl. ¶¶ 13-165.) Cox ignores that evidence includes both documents *and* testimony. As this Court recognized, testimony can be part of the evidence establishing chain of title. *BMG I*, 149 F. Supp. 3d at 648 ("[e]ven assuming that to satisfy the chain-of-title requirement Plaintiffs must submit evidence of the specific copyrights covered by each agreement, they have done so via declaration testimony"). *See also Arista Records*, 2011 WL 1641978, at * 4 (finding declaration testimony sufficient to explain a corporate name change).

For certain chains of title, Plaintiffs explained one or more steps in the chain via declaration testimony. For instance, Plaintiffs' ownership witnesses testified to certain corporate mergers or

acquisitions, which moots Cox's complaint concerning 430 works.[8]   Similarly, Plaintiffs'

ownership witnesses explained that some of the discrepancies were due to certain name changes,

which moots Cox's complaint concerning 69 works.[9]   While Plaintiffs have limited space in this

brief, Cox's complaints concerning another 159 works are resolved as noted below.[10]   Cox cites

no authority for the proposition that it is impermissible for Plaintiffs to testify to such facts, or that

a document is the only permissible proof required to establish any given fact.   On the contrary, this

Court and many others accept testimony as evidence of ownership.   The witnesses who provided

these declarations have personal knowledge of the facts in connection with their job

responsibilities.   Not every fact needs a document.   Cox has no contrary evidence, nor does it claim

that the testimony of Plaintiffs' declarants is false, inaccurate, or not credible.

---

[8] *See* McMullan Decl. ¶ 26 (88 works), ¶ 29 (67 works), ¶ 42 (5 works); Blietz Decl. ¶ 24 (acquisition, 3 works), ¶ 37 (acquisition, 1 work), ¶ 84 (acquisition, 1 work); and Kokakis Decl. ¶ 27 (merger, 59 works), ¶ 28 (merger, 33 works), ¶ 29 (acquisition, 3 works), ¶ 30 (acquisition, 1 work), ¶ 32 (acquisition, 104 works), ¶ 33 (acquisition, 3 works), ¶ 34 (acquisition, 2 works), ¶ 35 (acquisition, 1 work) , ¶ 36 (acquisition, 1 work), ¶ 37 (acquisition, 12 works), ¶ 42 (acquisition, 1 work), ¶ 61 (merger, 1 work), ¶ 65 (merger, 6 works), ¶ 69 (merger, 1 work), ¶ 71 (acquisition, 9 works), ¶ 84 (acquisition, 9 works), ¶ 86 (acquisition, 19 works).

[9] *See* Leak Decl. ¶ 57 (name change, 5 works), ¶ 58 (name change, 11 works); Blietz Decl. ¶¶ 18-19 (acquisition and name change, 6 works), ¶ 21 (acquisition and name change, 1 work), ¶ 65 (acquisition and name change, 14 works); Kokakis Decl. ¶ 25 (merger and name change, 11 works), ¶ 26 (name change, 1 work); McMullan Decl. ¶ 16 (merger and name change, 1 work), ¶ 21 (name change, 14 works), ¶ 33 (name change and acquisition, 4 works); Patel Decl. ¶ 176 (acquisition and name change, 1 work).

[10] The Leak Declaration addresses 130 sound recordings that Plaintiff Sony Music Entertainment ("SME") exclusively licensed from a foreign affiliate.   *Compare* Lane ¶ 18 with Leak ¶ 48.   The Leak Declaration addresses another six sound recordings by describing ownership rights acquired at an IRS foreclosure sale.   *Compare* Lane Decl. ¶ 16 with Leak Decl. ¶ 45.   The Poltorak and Leak declarations address another 23 sound recordings by describing instances where chain of title is via agreement with the artist, the registration lists the artist's company as the claimant, and there is no issue about the artist's authority to grant those rights.   *Compare* Lane ¶ 28 with Poltorak ¶ 34, and Lane ¶ 17 with Leak ¶ 46.

### c.   Chain of Title Can Be Proven Through Agreements with Authors

Cox argues (in the improper Lane declaration but not in its brief) that summary judgment is inappropriate for 216 works because the Music Publisher Plaintiffs trace their ownership through an agreement with an author/songwriter on the copyright registration, rather than through the named copyright claimant.[11]   (Lane Decl. ¶ 13.)   But rather than demonstrating a defect in any chain of title, this simply reflects songs with multiple co-authors/writers and music publishers.

It is common in the music publishing industry that each publisher may independently register a work, resulting in multiple registrations.   Gould Decl. ¶ 6, Ex. 4 (attaching examples). *See, e.g., Roberts v. Gordy,* 877 F.3d 1024, 1031 (11th Cir. 2017) (recognizing the existence of multiple "good faith, redundant registration(s)" by separate publishers for the same song); *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc*., No. 13-cv-831 (GLS/DEP), 2017 WL 745594, at *4 (N.D.N.Y. Feb. 24, 2017) ("as Universal correctly notes, multiple registrations of the same work do not render a copyright invalid.").   Or, as is the case here, sometimes an author (or her publisher) may rely upon the registration of the work by her co-author (or the co-author's publisher) rather than independently registering the same work a second time.   For these works, valid registrations and chain of title have been produced.   All of the works in suit are registered and Cox offers no evidence that the authors lacked the rights that they granted therein to the parties asserting them herein.   The unrebutted declaration testimony provides further confirmation.

---

[11] Mr. Lane's declaration is facially inaccurate.   For many of the works cited in this category, the chain of title traces to a claimant on the registration.   Gould Decl. ¶ 7, Ex. 5.   For other works in this set, a different Plaintiff claims co-ownership of the work and is either listed as the claimant or has chain of title to the claimant.   *Id.* ¶ 8, Ex. 6.

### d.  Speculation That Certain Agreements Are No Longer in Force Does Not Create a Factual Dispute

Cox argues (again, in the improper Lane declaration but not in its brief) that summary judgment is inappropriate for 122 works because the agreements through which the Music Publisher Plaintiffs hold their rights "are often decades old" and have terms that "may have passed." (Lane Decl. ¶ 14.)  This type of speculation—whether in a brief or attorney declaration—is not evidence.  Plaintiffs explained in sworn declarations that they hold their ownership or exclusive rights through those agreements.  Cox did not pursue this issue in depositions, has offered no contrary evidence, and does not refute a single, specific term period or extension provision in an agreement.

### e.  Cox's Argument As To Post-Claim Period Agreements Is Faulty

Cox alleges that Plaintiffs cannot recover for seven works because their ownership "post-dates the claim period in this case." (Opp. at 26.)  This argument lacks merit.  First, three of the works were acquired pursuant to corporate mergers, as evidenced in each instance by declaration testimony.[12]  Because "mergers transfer copyrights 'by operation of law' and obviate the writing requirement[,]" nothing more is required.  *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 428–29 (4th Cir. 2010) (affirming that Universal established ownership of copyrights via merger, and Universal was not required to present evidence of the specific assets acquired in the merger); *BMG I,* 149 F. Supp. 3d at 646; 17 U.S.C. § 204(a).  For others, the relevant agreements expressly transferred the copyrights as well as any copyright infringement claims, whether known or unknown, that had accrued with regard to those works.[13]

---

[12] *See* Blietz Decl. ¶¶ 18-24; Leak Decl. ¶¶ 19-24; Patel Decl. ¶¶ 33-39; Poltorak Decl. ¶¶ 20-39; Kokakis Decl. ¶¶ 20-41; McMullan Decl. ¶¶ 24-40.

[13] *See* Patel Decl. Ex. 113B (SATV-EMI_00006969, §1.02(a)), 137B (SATV-EMI_00007144, §8.01), 165B (SATV-EMI_00009956, § 6.01).

### f.   There Are Copyright Registrations For Each Work

For 49 works, Cox contends the registration cited in Plaintiffs' opening brief and declarations is the wrong certificate.  *See* Lane Decl. ¶¶ 22, 26, 33-60, 69-70, 82, 90-91, 104, 117, 126, 130, 160.  These works are all registered.  Indeed, there are other copyright registration certificates or records produced in discovery for the vast majority.  Gould Decl. ¶ 9, Ex. 7.

### g.   Cox Was Not Prejudiced By a Few Late-Produced Documents

Cox argues that summary judgment is inappropriate for 54 works because Plaintiffs' proof includes a small number of documents provided shortly after discovery.  Cox's complaint pertains to two chain of title documents and some copyright registration records.  Cox has long been on notice of these works and cannot claim prejudice based on the timing of Plaintiffs' production of publicly available registration information.  In any event, the Court can take judicial notice of the Copyright Office's public catalogue of records, as it did in the *BMG* case.  The two chain of title documents that Cox complains of are no different in kind than the mass of other chain of title documents produced during discovery and that Cox barely addressed in depositions.  For example, although UMG had produced approximately 800 ownership-related documents (in addition to Plaintiffs' collective production of thousands of additional records from the Copyright Office) before its Rule 30(b)(6) deposition on ownership topics, Cox asked UMG's ownership witness about *nine* documents concerning registration, validity or ownership.  Gould Decl. ¶ 10, Ex. 8.

### 3. Plaintiffs Own the 238 Works that Cox Contends Should Not Have Been Registered As "Works Made For Hire"

For 238 sound recordings, Cox contends that the registrations are invalid and insufficient to sustain Plaintiffs' burden of proof because they were inaccurately registered as "works made for hire." (Opp. at 25.) Cox's argument fails on multiple levels.[14]

First, Cox has not shown any inaccuracy. The facts in the registration are presumed true. A registration constitutes "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Cox did not ask about these registrations during depositions and cites no evidence that any work for hire claims were inaccurate. Legal argument and speculation from Cox's attorneys are not evidence.[15] *See EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 97 (2d Cir. 2016) (rejecting claim of invalidity where "[t]here is no evidence on this record that the certificates of registration at issue here were inaccurate"); *Am. Soc'y for Testing & Materials v. Public Resource.org, Inc*., 2017 WL 473822, at *6 (D.D.C. Feb. 2, 2017) ("Parties challenging the validity of copyright registrations must . . . do more than simply point out potential errors in the certificate.").

---

[14] Mr. Lane's declaration is factually incorrect. Many of the registrations are not for works made for hire. Others were not registered for individual recordings as Mr. Lane contends. Gould Decl. ¶¶ 11-12, Exs. 9-10.

[15] A party seeking to contest ownership must put forward "specific evidence that rebuts the presumption of validity which attaches to a duly issue[d] registration." *BMG I*, 149 F. Supp. 3d at 645, quoting *Complex Systems v. ABN Ambro Bank*, 979 F. Supp. 2d 456, 470 (S.D.N.Y. 2013). Infringers should not "be able to dispute copyright ownership based on valid registration certificates with baseless speculation, unsupported by any evidence, and thereby eviscerate the statutory command that a copyright registration certificate 'shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.'" *MOB Music Pub. v. Zanzibar on the Waterfront, LLC,* 698 F. Supp. 2d 197, 205 n.4 (D.D.C. 2010) (citation omitted).

Second, Cox has not shown that any alleged error in the registration was material.  Cox merely asserts that "these misrepresentations . . . are plainly material."  (Mot at 26. n.19.)  But Cox's *ipse dixit* is no substitute for proof.  Cox presents no evidence, nor specific claim, that any statement in any Plaintiff's certificate would constitute "a material error which would have caused the Register of Copyrights to refuse registration."  *Dtech Commc'ns, LLC v. OSC Eng'g, Inc.*, No. 11-cv-1425 (MMA/BLM), 2013 WL 12094839, at *4 (S.D. Cal. Jan. 11, 2013).[16]

Third, Cox has not offered evidence that any alleged error was made knowingly or with an intent to defraud the Copyright Office.  Cox baldly contends that because record companies tried more than ten years ago to amend legislation to explicitly permit any sound recording to be deemed a "work made for hire," any alleged inaccuracy on a registration concerning work for hire status is necessarily a "knowing and intentional" misrepresentation.  (Mot at 26. n.19.)  Yet that leap is pure conjecture; Cox cites no evidence.  *See Teevee Toons, Inc. v. MP3.com, Inc.*, 134 F. Supp. 2d 546, 549 (S.D.N.Y. 2001) (even inaccurate registration of "work made for hire" is not subject to invalidation "unless, at a minimum, the infringing party can show that the inaccuracy was both material and made in bad faith"); *Gold Value Int'l Textile, Inc. v. Dress Barn, Inc.*, No. 16-cv-7360, 2017 WL 8236287, at *3 (C.D. Cal. Dec. 20, 2017) (to rebut presumption, defendants must show evidence of inaccurate information that "was included with knowledge that it was inaccurate").

---

[16] Cox also overlooks that if a court finds that all the other preconditions to materiality are satisfied, it is supposed to ask the Copyright Office if a given inaccuracy would have led to refusal to register.  *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 623–24 (7th Cir. 2013).

**4.**     **Plaintiffs Own The 78 Works that Cox Contends Were Registered Late**

For 78 works, Cox concedes Plaintiffs' proof of ownership, but asserts that untimely copyright registration prevents statutory damages for these works. (Opp. at 26.)[17]  Because there is no dispute that Plaintiffs own these works, summary judgment should be granted in favor of Plaintiffs on ownership.  If statutory damages are not available for those works in this particular case, the jury should still be informed that the works were infringed.  It is part of the overall case.

## III.     PLAINTIFFS HAVE PROVEN THE EXISTENCE OF DIRECT INFRINGEMENT, EVEN THOUGH ITS FULL EXTENT IS UNKNOWN

The uncontroverted evidence establishes direct infringement.  The jury should decide its scope and the damages to award.

### A.  Plaintiffs Have Shown That the Infringing Files Contained Plaintiffs' Works

**1.**     **Admissible Evidence Demonstrates that Cox's Subscribers Were "Sharing" Unauthorized Copies of All Works In Suit**

Plaintiffs have proven that the files at issue, identified by their unique hash values, contain copies of Plaintiffs' works. ███ ████████████████████████████ ██

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

---

[17] Mr. Lane's declaration is inaccurate.  For some of these works the registration clearly pre-dates the infringement.  Gould Decl. ¶ 13, Ex. 11 (attaching examples).  For another eight works, Mr. Lane attaches to his declaration an exhibit, L14, with a column entitled "Registered Three Months After First Publication and Last Notice During Infringement Period Received Before Registration."  Mr. Lane does not explain what this means or what data Cox relies on as the basis for the assertions.  These flaws, among others, highlight why the Lane Declaration and its exhibits should be stricken.

For over a decade, courts have recognized the use of Audible Magic as a proper method to identify the content of an audio file as a specific copyrighted work.[18] ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████   *See* Declaration of Sam Bahun of MarkMonitor ("Bahun Decl.") ¶¶ 15, 20, 22-23 (ECF No. 352-6).  There is no material issue of fact as to this.  Cox has not pointed to even a single inaccurate infringement notice or verification of the contents of the files Cox's subscribers were caught "sharing" on P2P networks.

In addition to the foregoing, Plaintiffs produced in discovery the digital files that were the basis of MarkMonitor's infringement notices to Cox, and again Mr. Bahun authenticated and explained them in his declaration.  *Id.* ¶¶ 15, 24-25.  If Cox had a genuine concern about any specific Audible Magic identifications, it could have listened to the infringing audio files to personally confirm the accuracy of the Audible Magic confirmations, but it did not.  Instead, Cox throws the proverbial spaghetti against the wall, in no fewer than six misguided arguments about the hard drive that contains the infringing files at issue.  (Opp. at 16-17.)  None has merit.

---

[18] *See UMG Recordings, Inc. v. Escape Media Grp., Inc.*, No. 11-cv-8407, 2014 WL 5089743, at *17 (S.D.N.Y. Sept. 29, 2014) (finding Audible Magic's report admissible for summary judgment purposes, noting that "Audible Magic is a vendor that has been repeatedly used in entertainment copyright cases" and its "methods of analysis … have been relied upon in various similar copyright litigations.") (collecting cases).

First, Plaintiffs laid a foundation for the hard drive.  Bahun Decl. ¶¶ 15, 24-25.  If Cox believes otherwise, it is because it did not ask about the hard drive in depositions.

Second, Cox's argument about the need to distinguish between studio recordings versus cover versions versus live performances is nothing more than attorney argument.  Cox has not pointed to a single piece of evidence to support this speculation.  Cox did not ask questions in deposition about what versions of Plaintiffs' works are used to create Audible Magic fingerprints.

Third, Cox's argument about requesting in discovery, but not receiving, a reference set of recordings of the works is misleading.  Following discussions between counsel, Plaintiffs produced a representative sample set of recordings.  Cox never followed up to complain about the sample it received, never asked for more recordings and never moved to compel production of a full reference set.  Cox never indicated that it needed a full set in order to do a comparison to the recordings on the hard drive.  And, of course, Cox could have gone to any number of publicly available sources (including YouTube, Apple Music or Spotify) to listen to the recordings.

Fourth, Cox's argument about the date contained in the metadata of the music files is meaningless.  As described previously, files with the same hash value are identical and have the same contents, regardless of when downloaded and reviewed.[19]

Fifth, the hard drive is comprehensive as to the files that are the basis for the infringements in suit.  Cox's subscribers were caught downloading or uploading those files, identified by their unique hash value, on their third or later infringement notice.  The fact that the MarkMonitor

---

[19] Magistrate Judge Anderson understood this point at the recent discovery sanctions hearing. He described it this way:  "You have the Born to Run work that you've mentioned. Audible Magic, through its expertise, then finds that, you know, this file with this hash valve is actually the Born to Run song. . . . So whenever that hash value, a file with that hash value is recognized, why -- why would they -- if the hash value never changes, and you verify that that hash value is what is being distributed, why do you have to go back and reverify the hash, that actual file? . . . If the hash value has already been verified."  Gould Ex. 13 at 12 (Sept. 27, 2019 Hr'g Tr.).

Spreadsheet may identify additional recordings that Cox's subscribers infringed, but which Plaintiffs have not included in the case, does not render the hard drive deficient.

Sixth, the hash values of the files can be used to match files to notices.  Bahun Decl. ¶¶ 15, 20-25.  If Cox believes otherwise, it is only because it did not ask questions about the hard drive in deposition and has not examined the hard drive carefully.

### 2. Dr. Feamster's Analysis Does Not Create a Genuine Issue of Material Fact

Cox dooms its argument against direct infringement from the start by relying on an unauthenticated, inadmissible spreadsheet.  Cox contends that a document Audible Magic produced in discovery (REV0003444 or the "Audible Magic Spreadsheet") ████████████ ████████████████████████████████████████████████████████████████████████ At Audible Magic's deposition, Cox failed to authenticate the document or ask a single question about it to understand what it purported to be or what it included.  Cox asked questions about a "transaction log" in the abstract but did not present the witness with a purported "transaction log" or confirm what document the witness had in mind.  Audible Magic's designee testified that ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████  Thus, even assuming the Audible Magic Spreadsheet is what Cox believes, it is partially complete for 2012-2014 and, by definition, would not include the Audible Magic verifications done for MarkMonitor during 2008-2011.[20]

Ignoring all of this, Dr. Feamster opines that the unauthenticated, time-limited document somehow means that more than 75% of the works that were the subject of infringement notices to

---

[20] The Audible Magic Spreadsheet is the subject of Plaintiffs' Motion to Strike (ECF No. 388) and Plaintiffs intend to file a motion in limine to exclude it at trial as unauthenticated hearsay, lacking foundation, and unduly confusing and unfairly prejudicial.

Cox were never matched to the Audible Magic fingerprint database.  Cox then argues that "the Audible Magic records show that when putative copies of 75% of the works in suit were compared to the Audible Magic fingerprint database, they did not match."  (Opp. at 13.)  This is pure junk science, totally lacking in foundation or credibility and certainly insufficient to create a material factual dispute.  With Audible Magic lookups occurring back to 2008, it is neither surprising nor meaningful that a transaction log for 2012-2014 would not contain matches for all the works in suit.  Indeed, Magistrate Judge Anderson saw right through Cox's confounding argument on this point in rejecting Cox's discovery sanctions motion to preclude the MarkMonitor Spreadsheet.[21]

### 3. Cox's Brand New Theory, That the Audible Magic Match May Be to a Cover Recording or Live Performance, Does Not Raise a Factual Dispute

In its reply brief, Cox raises newly minted speculation that it neither explored during discovery nor offers any evidence to support.  (Opp. at 15.)  Without factual support, Cox argues that, because songs can be recorded multiple times, there is no foundation to establish that the reference files in the Audible Magic database are copies of the works in suit, *i.e.*, the same as the work covered by the copyright registration.  Cox did not explore with Plaintiffs or Audible Magic how they select reference files or how they go about the fingerprinting process.  Cox's layers of attorney argument and speculation are not evidence that creates a genuine issue of material fact.

### B. Plaintiffs Do Not Need to Provide Cox with the Names of the Individuals Who Infringed Via Cox's Business Subscribers' Accounts

Cox contorts the meaning of a Ninth Circuit case to argue that Plaintiffs must identify the actual infringer who infringed using a Cox Business account.  (Opp. at 18-19.)  The law requires

---

[21] Magistrate Judge Anderson correctly explained:  "So my understanding of the Audible Magic transaction log is that it is related to a period of time of, let's just say two years.  That matches were done long before that two-year period.  And the idea that that transaction log only covers a certain percentage of works doesn't mean there wasn't ever a match to a work prior to that."  Gould Ex. 13 at 65 (Sept. 27, 2019 Hr'g Tr.).

no such thing.  Indeed, this Court already recognized that, "[w]hile identity is a key issue in many individual infringement suits, it has little relevance in a large-scale secondary liability suit." *BMG I*, 149 F. Supp. 3d at 664.

The case that Cox relies upon, *Cobbler Nevada, LLC v. Gonzalez*, 901 F.3d 1142 (9th Cir. 2018), is not to the contrary.  There, the Ninth Circuit held that bringing a claim of direct infringement against an adult foster care home required something more than a mere allegation that the direct infringement occurred through an IP address assigned to the defendant.  901 F.3d at 1146–47.  *Cobbler* spoke only to who could be named as the direct infringer, not whether there was infringement by someone.  Cox's records indicate that MarkMonitor's notices in this case pertained to 57,679 Cox subscribers:  54,886 (95%) were residential customers and 2,793 (5%) were business customers.  For Cox's secondary liability, what matters is the existence of a direct infringement, not the precise identity of the direct infringer.   Cox's argument also ignores the fact that under Cox's AUP, every Cox subscriber is responsible for the activities on his or her account.

### C.  Plaintiffs Proved Violations of the Reproduction and Distribution Rights

A finding of direct infringement is the only reasonable inference from the evidence.  In arguing no direct infringement, Cox speculates, overlooks the record, and—once again—"ignores the fact that [Plaintiffs] may establish direct infringement using circumstantial evidence that gives rise to an inference that Cox account holders or other authorized users accessed its service to directly infringe." *BMG I,* 149 F. Supp. 3d at 663; *see also Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1225 (D. Minn. 2008) ("[D]irect proof of actual dissemination is not required by the Copyright Act.  Plaintiffs are free to employ circumstantial evidence to attempt to prove actual dissemination.").  The circumstantial evidence is overwhelming.

Cox has not put forward any evidence that could reasonably dispute Plaintiffs' evidence that each of the 57,679 specific Cox subscribers identified in MarkMonitor's 163,148 infringement

notices to Cox in the Claim Period were infringing. Cox relies on attorney argument and speculation that files identified by hash value in MarkMonitor's infringement notices "were initially purchased from iTunes, legally uploaded from a purchased CD, or obtained from another legal source." (Opp. at 19.) Nothing in the record supports that unfounded speculation. Each Cox subscriber who was the subject of a notice in the Claim Period was caught on a P2P *file sharing* network notorious for infringement with a file previously confirmed to be infringing. There is a notable absence of Cox subscribers disputing the infringement notices.[22]

Indeed, the point of file sharing networks is to upload and download files, often consisting of popular copyrighted content. MarkMonitor caught Cox's subscribers on these P2P file sharing networks at various stages of downloading—with the infringing file on their computer (BitTorrent) or even in their "shared folder" (Ares, Gnutella and eDonkey). These Cox subscribers were "sharing" files previously confirmed as infringing and it is pure speculation that every one of them may have downloaded the infringing files using someone else's Internet service. Reflective of the overall activity, Cox's subscribers were caught with less than 100% of a confirmed infringing file but in the process of downloading the remainder, and ultimately amassed 100% of the file.

Cox asks this Court to ignore the fundamental and undisputed nature of P2P protocols and the overwhelming (and uncontroverted) circumstantial evidence of distribution. Cox's own expert, Dr. Nick Feamster, confirmed that "[a] client cannot retrieve pieces without providing pieces to

---

[22] Cox purports to dispute this by citing to a small number of emails (16 amongst the sea of 284,444 MarkMonitor notices) that it received from its subscribers, with a copy to MarkMonitor, and a few MarkMonitor call center reports. Cox's response to SUF No. 19 (Kearney Declaration ¶¶ 19, 20). Cox relies on these emails for their truth, but these are obviously hearsay and should not be considered. Moreover, numerous of these customers seem to *acknowledge the infringing activity*, either by them or other members of the household. The call center reports demonstrate nothing more than that a call or email was placed; none demonstrates a disputed claim of infringement. In any event, the dearth of such emails and calls in response to hundreds of thousands of notices corroborates the existence of infringement.

others—this is the so-called 'tit for tat' incentive model of BitTorrent."  He further acknowledged that "[i]n the BitTorrent protocol, any participating peer will generally be downloading or retrieving pieces of the file as well as providing—if you want to use the term uploading, that's fine."  Thus, when MarkMonitor detected 57,679 Cox subscribers online, running P2P software on their computers, and "sharing" an unauthorized copy of Plaintiffs' works, there can be no reasonable question that unauthorized distributions occurred.

The Fourth Circuit has held that a distribution occurs where the defendant "makes the work available" and "has completed all the steps necessary for distribution to the public[,]" without the need to show more—otherwise "a copyright holder would be prejudiced by a [defendant] that does not keep records of public use, and the [defendant] would unjustly profit."  *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997).  This Court found that *Hotaling* is intended to apply "where it is impossible for a copyright owner to produce proof of actual distribution," which is the exact circumstance presented here.  *See BMG I*, 149 F. Supp. 3d at 666.  P2P networks operate in a manner to make it impossible for anyone to collect records depicting a peer's distributions to other peers.  Interactions between two peers on a P2P network are unobservable to, and hidden from, anyone other than those two peers.

Cox claims that proof of actual dissemination is not impossible to produce because Plaintiffs could have downloaded the files from, or taken discovery of, the Cox subscribers.  (Opp. at 22-23.)  This misses the point, and ignores the teaching of *Hotaling*, as it is undisputed that P2P software does not maintain logs of the infringing files distributed.  The idea of MarkMonitor performing downloads from Cox's subscribers is form over substance.  Indeed, in *Hotaling*, the Plaintiffs could have gone to check out every book at issue but were not required to.  MarkMonitor already downloaded the infringing files and recorded their unique hash values.  When later running

across Cox's subscribers with those confirmed infringing files, there was no need to download the file again. The contents were already identified. With BitTorrent, the download would typically come in pieces distributed by multiple users anyway. Moreover, such download would not indicate how many times the Cox subscriber distributed the infringing file to other peers, as opposed to MarkMonitor.

## IV.   COX IS LIABLE FOR CONTRIBUTORY INFRINGEMENT

### A.  Plaintiffs Have Shown that Cox Had Sufficient Knowledge of the Infringement

Cox misrepresents the Fourth Circuit's decision in *BMG*. The Fourth Circuit did not hold that contributory infringement requires "actual knowledge of, or willful blindness to, specific infringements of *identified copyrighted works*," as Cox argues. (Opp. at 27 (emphasis added).)

Instead, the Fourth Circuit held that the knowledge standard for contributory infringement "requires a defendant to have specific enough knowledge of infringement that the defendant could *do* something about it." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 311-12 (4th Cir. 2018) ("BMG III") (emphasis in original). Cox need only know "which [subscribers] were infringing" so that it has "knowledge that infringement is substantially certain to result from Cox's continued provision of Internet access to *particular subscribers*." *Id.* On this basis, the Fourth Circuit directed that, on remand, "the contributory infringement instruction should require that Cox knew of specific instances of infringement or was willfully blind to such instances." *Id.*

MarkMonitor's infringement notices to Cox identified *particular subscribers* (by IP address and timestamp) using Cox's Internet service to infringe. The notices further informed Cox of the *specific infringing files* that those particular subscribers downloaded or distributed. The infringing files identified in the infringement notices often included multiple copyrighted works,

and the notices made clear that the work listed in the notice was a "sampling of the music shared." This was more than enough for Cox to *do something* about the infringement.[23]

Cox invents from whole cloth the notion that it lacked knowledge for contributory infringement of the works that were contained in those infringing files but not listed in the notice as representative sample works infringed. Under Cox's extreme and unprecedented position, contributory liability can only attach when the direct infringer steals the same exact copyrighted work time and time again. As explained above, however, Cox is wrong. Cox should not have continued to provide Internet service to particular infringing subscribers repeatedly brought to its attention in infringement notices.

Cox's reference to the *Cobbler* case from the Ninth Circuit does not help its cause. *Cobbler* involved a "perfunctory allegation" that a foster care home "failed to police [its] Internet service." *Cobbler*, 901 F.3d at 1148-49. Unlike the defendant in *Cobbler*, who was apparently unaware of who to cut off to stop the infringement, Cox knew exactly which repeat infringer subscribers to terminate. In *Cobbler*, the court's concern was not to create "an affirmative duty for private internet subscribers to actively monitor their internet service for infringement [because] [i]mposing such a duty would put at risk any purchaser of internet service who shares access with a family member or roommate, or who is not technologically savvy enough to secure the connection to block access by a frugal neighbor." *Id.* at 1149. For Cox, none of those concerns apply. Cox is a sophisticated, technologically savvy company in the business of providing access to its network to

---

[23] Cox's claim that its knowledge was limited to the rights owner and works listed in the notice flies in the face of its actual conduct, which did not depend on the work allegedly infringed, the number of works listed in an infringement notice, or whose rights were infringed. In arguing that the Music Publisher Plaintiffs had to send their own notices, Cox finds itself in the company of Napster, which similarly argued (unsuccessfully) that notice can only be provided by plaintiffs. *Fonovisa, Inc. v. Napster, Inc.*, 2002 WL 398676, *9 n.10 (N.D. Cal. Jan. 28, 2002).

customers and it purported to have policies and procedures to receive infringement notices, work with subscribers to stop the infringement, and terminate accounts of repeat infringers.

Cox discusses *Corbis Corp v. Amazon.com, Inc.*, 351 F. Supp. 2d, 1090 (W.D. Wash. 2004), but relies on a portion of the decision concerning knowledge for purposes of the repeat infringer provision of the DMCA, not knowledge for contributory liability.   Defendants often obtain knowledge for purposes of contributory liability as a result of infringement notices, just as Cox did here.  *See, e.g., Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, No. C 07-03952 JW, 2010 WL 5598337, at *5 (N.D. Cal. Mar. 19, 2010), *aff'd in part, vacated in part, remanded*, 658 F.3d 936 (9th Cir. 2011); *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646 AJN, 2015 WL 1402049, at *43 (S.D.N.Y. Mar. 25, 2015)); and *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1020 n. 5 (9th Cir. 2001) ("Napster II") (same).

### B.  Plaintiffs Have Shown That Cox Materially Contributed to the Infringement

Cox's argument that it did not materially contribute to the infringement is plainly frivolous. This Court previously explained, "[t]here can be no question that the provision of high-speed internet service materially contributes to infringement via BitTorrent and that Cox had the means to withhold that assistance upon learning of specific infringing activity."  *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 979 (E.D. Va. 2016) ("BMG II") (emphasis added).  The Court determined, "[t]here cannot be any serious dispute that internet service is an essential component of the infringing activity."  *BMG I*, 149 F. Supp. 3d at 674 (explaining that "[f]ile-sharing programs are completely dependent on the internet to facilitate the download and upload of files").

Case 1:18-cv-00950-LO-JFA   Document 455   Filed 10/11/19   Page 35 of 38 PageID# 19625

## V.     COX IS VICARIOUSLY LIABLE FOR THE DIRECT INFRINGEMENT

### A.  Plaintiffs Have Shown That Cox Obtained A Direct Financial Benefit

Plaintiffs have different proof, in kind and quantity, than in *BMG*.  Cox rigidly focuses on whether the infringement acted as a draw to its service.  (Opp at 32-34.)  *BMG* argued draw to prove financial benefit.  Here, a jury could certainly find the existence of a draw.  The high volume of infringement shows that the infringement made Cox's Internet service more attractive to subscribers than it would be if the infringement were precluded.  Draw is also shown by the fact there were subscribers so bent on using Cox's service to infringe that they continued to do so despite repeated warnings, risk of liability, and potential loss of their Internet service.

However, draw is only one means of proving a defendant had a sufficient financial interest in the infringement.  Unlike in *BMG*, Plaintiffs in this case argue financial benefit beyond draw. Plaintiffs' evidence shows a direct causal link between the infringing activity and Cox's direct financial benefit.  The relevant question is whether the defendant has "an obvious and direct financial interest in the exploitation of copyrighted materials." *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963); *accord Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005).  As Plaintiffs explained in their opening brief, and in response to Cox's motion for summary judgment, Cox obtained a direct financial benefit from its subscribers' infringement in multiple ways:

- Cox affirmatively decided not to terminate the accounts of known repeat infringers in order to collect substantial additional subscription revenues it would not have otherwise obtained.  Cox made this clear both in internal emails and in deposition. In the process, it also avoided costs (e.g., staffing) it would have otherwise incurred.

- Plaintiffs' expert has quantified the amount of the fees that Cox collected as a result of Cox's decisions to allow known repeat infringers to continue to infringe.

- The infringing activity was profitable for Cox, whose business model is built on charging clients for data usage.  The uncontroverted proof is that P2P activity—

including infringing P2P activity—consumes significant bandwidth and creates the need for subscribers to be on more expensive plans.  The actual subscriber data is corroborative, with subscribers with greater numbers of infringement tickets paying Cox more than subscribers with fewer infringement tickets.

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) is inapposite.  The facts of *Ellison* (a single unheeded email) do not remotely resemble the facts here.  Cox had a corporate policy and systematic practice to continue delivering Internet service and accepting payments from specific known infringing subscribers—and Cox has admitted repeatedly that collecting monthly subscription payments from these repeat infringers drove decisions not to terminate their Internet access.  While knowledge is not an element of vicarious liability, Cox's behavior after being informed of specific repeat infringers speaks volumes about the symbiotic relationship between Cox's financial interests and the infringing activity.

Courts have found financial benefit in circumstances far less compelling than those present here.  For instance, the Ninth Circuit found that Napster had a financial benefit in the infringing activity merely because it increased the size of its user base.  *Napster II*, 239 F.3d at 1023.  In *Usenet*, the court rejected an argument that causation was not established "because [the defendants] are paid on a per-volume, not per-download, basis and because infringing music accounts for less than 1% of the newsgroups available on their service."  633 F.Supp.2d at 15 at 157.  Cox, on the other hand, directly obtained hundreds of millions of dollars from the infringement by not terminating the accounts of specific repeat infringers brought to its attention.  P2P activity—much of which is known to be infringing—constituted 12% of Cox's network traffic in one year, much more than the 1% in *Usenet*.

**B.  Plaintiffs Have Shown That Cox Had the Right And Ability to Control**

In addition, for purposes of vicarious liability, Cox had sufficient control over its subscribers.  As this Court expressly recognized:

> Cox has a contractual relationship with its users and that relationship gives Cox the legal right to withhold service in the face of infringing conduct.  Cox also provides a crucial service to the infringements alleged in this case, which gives Cox the practical ability to stop or limit infringement.

*BMG I*, 149 F. Supp. 3d at 675.  "The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise."  *Napster II*, 239 F.3d at 1023.  If subscribers listen when Cox exercises its authority, the infringement stops.  *BMG I*, 149 F. Supp. 3d at 674.  If subscribers do not and Cox terminates their service, the infringement either stops or at least is limited.  *Id.  Perfect 10 v. VISA* is not analogous.  It involved payment processing, not providing the tool used to infringe.  494 F.3d 788 (9th Cir. 2007).

## VI.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON COX'S AFFIRMATIVE DEFENSES

Cox invents the notion that affirmative defenses are immune to summary judgment and can be challenged only by a motion to strike filed within 21-days of Cox's Answer but never thereafter.  Cox has no support for that position.  For the reasons set forth previously, Plaintiffs are entitled to summary judgment on Cox's affirmative defenses 6-11, 16, and 18-20.

Summary judgment against Cox's innocent infringement defense is also appropriate.  Factually, Cox's outrageous conduct as detailed in *BMG* and Plaintiffs' Motion for Summary Judgment does not permit an innocent infringement defense.  Legally, Plaintiffs' practice of marking their works with copyright notices provides a separate basis for precluding the defense.

Finally, summary judgment is appropriate on Cox's failure to mitigate defense.  At trial, Cox will have its chance to present evidence and argument.  Assuming liability, the jury will consider statutory damages as the law commands.  There is no point to a separate failure to mitigate defense.  It does not pertain to liability and adds nothing to the jury's task.

Dated:  October 11, 2019

Respectfully submitted,

/s/ Scott A. Zebrak
Scott A. Zebrak (38729)
Matthew J. Oppenheim (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
Kerry M. Mustico (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
5225 Wisconsin Avenue, NW, Suite 503
Washington, DC 20015
Tel: 202-480-2999
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com
kerry@oandzlaw.com

*Attorneys for Plaintiffs*