## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>COX COMMUNICATIONS, INC., *et al.*,<br><br>    Defendants. | Case No. 1:18-cv-00950-LO-JFA |

### PLAINTIFFS' SECOND AMENDED NOTICE OF 30(b)(6) DEPOSITION TO DEFENDANT COX COMMUNICATIONS, INC. AND COXCOM, LLC

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 30(b)(6), Plaintiffs shall take the deposition upon oral examination of Defendants Cox Communications, Inc. and CoxCom, LLC ("Cox") before an officer authorized to administer oaths, on April 5, 2019, at 101 Marietta St., 2700 Centennial Tower, Atlanta, GA 30303, beginning at 9:30 am EST. Cox is requested to designate the person or persons most knowledgeable and prepared to testify on behalf of Cox concerning the subject matters described in Attachment A hereto. Said deposition shall be recorded by stenographic and/or audiovisual means and shall continue from time to time and place to place until completed.

Dated: April 23, 2019

*/s/ Jeffrey M. Gould*
Scott A. Zebrak (38729)
Matthew J. Oppenheim
Jeffrey M. Gould
Kerry M. Mustico
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW
Washington, DC 20016
Tel:  202-480-2999
scott@oandzlaw.com
matt@oandzlaw.com
jeff@oandzlaw.com
kerry@oandzlaw.com

*Counsel for Plaintiffs*

3

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 23, 2019, I caused a copy of the foregoing PLAINTIFFS' AMENDED NOTICE OF 30(b)(6) DEPOSITION TO DEFENDANT COX COMMUNICATIONS, INC. AND COXCOM, LLC to be served via e-mail on counsel for Defendants, Jennifer A. Golinveaux, at jgolinveaux@winston.com.

/s/ *Jeffrey M. Gould*
Jeffrey M. Gould

# ATTACHMENT A

# DEFINITIONS

Unless otherwise indicated, the following definitions apply to these requests:

1.  The term "Plaintiffs" refers collectively to Plaintiffs Sony Music Entertainment, Arista Music, Arista Records LLC, LaFace Records LLC, Provident Label Group, LLC, Sony Music Entertainment US Latin, Volcano Entertainment III, LLC, Zomba Recordings LLC, Sony/ATV Music Publishing LLC, EMI Al Gallico Music Corp., EMI Algee Music Corp., EMI April Music Inc., EMI Blackwood Music Inc., Colgems-EMI Music Inc., EMI Consortium Music Publishing Inc. d/b/a EMI Full Keel Music, EMI Consortium Songs, Inc., individually and d/b/a EMI Longitude Music, EMI Feist Catalog Inc., EMI Miller Catalog Inc., EMI Mills Music, Inc., EMI Unart Catalog Inc., EMI U Catalog Inc., Jobete Music Co. Inc., Stone Agate Music, Screen Gems-EMI Music Inc., Stone Diamond Music Corp., Atlantic Recording Corporation, Bad Boy Records LLC, Elektra Entertainment Group Inc., Fueled By Ramen LLC, Nonesuch Records Inc., Roadrunner Records, Inc., Warner Bros. Records Inc., Warner/Chappell Music, Inc., Warner-Tamerlane Publishing Corp., WB Music Corp., W.B.M. Music Corp., Unichappell Music Inc., Rightsong Music Inc., Cotillion Music, Inc., Intersong U.S.A., Inc., UMG Recordings, Inc., Capitol Records, LLC, Universal Music Corp., Universal Music – MGB NA LLC, Universal Music Publishing Inc., Universal Music Publishing AB, Universal Music Publishing Limited, Universal Music Publishing MGB Limited, Universal Music – Z Tunes LLC, Universal/Island Music Limited, Universal/MCA Music Publishing Pty. Limited, Universal – Polygram International Tunes, Inc., Universal – Songs of Polygram International, Inc., Universal Polygram International Publishing, Inc., Music Corporation of America, Inc. d/b/a Universal Music Corp., Polygram Publishing, Inc., Rondor Music International, Inc., and Songs of Universal, Inc.

"Plaintiff" means any one or more of the Plaintiffs, as defined herein.

2. The terms "you," "your," "Cox," "Defendant," or "Defendants" refer to Cox Communications, Inc. and CoxCom, LLC, their parents, subsidiaries, affiliates, officers, directors, agents, employees, and/or any other person or entity currently or previously acting or purporting to act on behalf of either defendant.

3. The term "MarkMonitor" refers to MarkMonitor Inc., its parents, subsidiaries, affiliates, officers, directors, agents, consultants, employees, attorneys and accountants, and/or any other person or entity currently or previously acting or purporting to act on its behalf. The term MarkMonitor also specifically includes DtecNet Inc. and Clarivate Analytics.

4. The term "Complaint" refers to the Complaint filed by Plaintiffs on July 31, 2018, in this lawsuit.

5. The term "ISP" means any business or organization that is an internet service provider.

6. The term "Subscriber" refers to any account holder or subscriber of your internet services.

7. The term "User" refers to any person that uses your internet services.

8. The term "DMCA" refers to the Digital Millennium Copyright Act.

9. The term "Infringement Notice" refers to a notice that one or more Subscriber or User allegedly infringed a copyright. This includes notices sent on behalf of any copyright owner, regardless of whether or not Cox processed or retained the notice. This term includes but is not limited to a notification of claimed copyright infringement pursuant to the DMCA, 17 U.S.C. § 512.

10. The term "CATS" refers to the Cox Abuse Tracking System.

11. The term "Cox Graduated Response" or "Graduated Response" refers to your system for responding to notices of copyright infringement or other violations of Cox's terms of service or AUP.

12. The term "Acceptable Use Policy" or "AUP" refers to any policy concerning obligations, rules, or limitations of Subscribers' or Users' use of internet services offered by Cox.

13. The term "BitTorrent" refers to the BitTorrent protocol for Peer-to-Peer file sharing used to distribute data and electronic files over the internet.

14. The term "Peer-to-Peer" or "P2P" refers to computer networks in which each computer can act as a server for the others, allowing shared access to files and peripherals without the need for a central server.

15. The term "RIAA" refers to the Recording Industry Association of America.

16. The terms "person" or "persons" is defined as any natural person or business, legal or governmental entity or association. Unless otherwise stated, "person" or "persons" shall also include any individuals and entities which are separately defined in these Definitions. Any reference to a person shall also include that person's successors, assigns, personal representatives, and heirs, by operation of law or otherwise.

17. The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a). A draft of a nonidentical copy is a separate document within the meaning of this term. "Document" specifically includes electronically stored information as defined in Rule 34(a).

18. The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) by any means, written, oral, or otherwise, at any time or place

under any circumstances. The definition is not limited to transfers between persons, but also includes other transfers, such as records and memoranda to file; any written letter, memorandum, or other document that was sent by one or more individuals to another or others; any telephone call between one or more individuals and another or others, whether such call was by chance or prearranged or not, formal or informal; and any conversation or meeting between one or more individuals and another, whether such contact was by chance or prearranged or not, formal or informal.

19. The term "concerning" means relating to, referring to, describing, evidencing or constituting.

20. "Any" should be understood to include and encompass "all," "all" should be understood to include and encompass "any," "or" should be understood to include and encompass "and," and "and" shall be understood to include and encompass "or."

21. The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

22. The use of the singular form of any word shall include the plural and vice versa.

## RULE 30(B)(6) DEPOSITION TOPICS

1. Cox's revenues, expenses and profits. This topic includes revenues, expenses and profits from all of Cox's services and is not limited to financials solely from Cox's residential data, telephone and video service.

2. Cox's revenue from and billings to the Subscribers identified in Plaintiffs' infringement notices. This topic includes the financial information the Court ordered Cox to produce on February 15, 2019.

3. Cox's realization rates on revenues collected against billings.

4. The average length of time that Cox retains Subscribers.

5. The various levels and tiers of internet services offered by Cox, data use limits associated with those tiers, the cost of such different levels or tiers of service, and Cox's efforts to move Subscribers into higher data use plans.

6. The effects or potential effects of Cox terminating Subscribers' internet service in connection with copyright infringement, including loss of revenue, reputational harm and/or ability to attract new customers and any research, reports, or analysis of any such costs. This Topic includes the effects or potential effects of terminating or suspending residential or commercial business Subscribers' internet service on their ability to receive or continue receiving from Cox other services that rely on Internet, such as home security or voice over IP (VOIP).

7. The number of Subscribers of Cox's high-speed internet service and the tiers or levels of service, including data plans.

8. Cox's CATS system, including its purpose, functionalities, capabilities, and ability to identify subscribers by IP address or other information.

9. Cox's Graduated Response program for responding to copyright infringement notices, including what each step in the process is, Cox's rationale for those steps, whether such steps are automated or manual, and implementation of the program.

10. The application of CATS or the Graduated Response program to different categories of subscribers (i.e. residential vs. commercial business) and different abuse types.

11. The level of resources and staffing Cox dedicated to CATS and the Graduated Response program from 2010-2014 and the impact such levels had on Cox's ability to process copyright infringement notices.

12. Cox's network management and monitoring capabilities, including the mechanisms by which Cox monitors and/or controls its Customers' internet usage and/or access.

13. Cox's right and ability to terminate subscribers.

8

14. Cox's right and ability to limit subscribers access to BitTorrent or other P2P file-sharing protocols, including the instances in which Cox has done so.

15. Cox's right and ability to limit subscriber access to particular domains and IP addresses (e.g. the Pirate Bay), including the instances in which Cox has done so.

16. Cox's right and ability to throttle bandwidth for particular subscribers, activities or protocols, including the instances in which Cox has done so.

17. Cox's relationship with Procera and the goods, services, reports (including Procera Network Activity reports), data or information provided by or to Procera.

18. Market research, studies, surveys, reports and/or analysis concerning how Cox subscribers' use the internet, Cox's internet service, and what attracts them to Cox's service, including the identity of each third-party that provided such analysis or information. This topic includes the following documents: Cox High-Speed Internet Service, Residential Subscriber Tracking Surveys (e.g., COX_SONY_00527729) and Music Listening Habits of Current HSI Customers (COX_SONY_00002678).

19. Cox's relationships with inCode Telecom and Nielsen Consumer Insights, including the services, reports, data or information provided by or to inCode or Nielsen Consumer Insights. This topic includes the following documents: (a) Cox High Speed Internet Broadband Usage Product (Statement of Work) (COX_SONY_00000563); (b) Cox High Speed Internet Data Usage Assessment Mid-term Readout, April 2, 2011 (COX_SONY_00002827); and (c) Attitude and Usage Tracking, June 2015 (COX_SONY_00002316).

20. Cox's efforts to market, promote and/or advertise Cox's internet services, including faster download and upload speeds to subscribers (including for music).

21. Use of BitTorrent and other P2P file-sharing protocols by Cox subscribers, including percentage of subscribers that use such protocols, the volume of such use, bandwidth associated with such uses, as well as use of such protocols for the uploading and downloading of music.

22. Communications, studies, investigations, memoranda, and reports concerning use of BitTorrent or other P2P file-sharing networks for illegal uploading and downloading, including of music.

23. Infringement notices Cox received from the RIAA on behalf of Plaintiffs, and Cox's responses to and handling of such notices.

24. Infringement notices Cox received from third parties concerning subscribers identified in infringement notices from the RIAA on behalf of Plaintiffs, and Cox's responses to and handling of such notices.

25. COX_SONY_00515539 (actions-history.csv), including the processes, systems, and persons involved in creating that document.

26. The origin, meaning, and formatting of each of the nine variables in COX_SONY_00515539 (actions-history.csv), including but not limited to:

    a. Whether each unique ticket corresponds to a copyright infringement notice;

    b. The time zone reflected in the data and whether daylight savings time was implemented;

    c. Gaps in certain entries for ticket_id, src_port, action_date, action, and action_content_form variables;

    d. ICOMS IDs listed in COX_SONY_00515540 (riaa_subjects_to_accounts.txt) that do not appear in COX_SONY_00515539 (actions-history.csv);

    e. The meaning of the 10 different types of entries for the action variable; and

    f. The meaning of the 16 different types of entries for the action_content_form variable.

27. COX_SONY_00515540 (riaa_subjects_to_accounts.txt), including the processes, systems, and persons involved in creating it.

28. Entries in COX_SONY_00515540 with no ICOMS ID and what Cox has done to try to identify those missing ICOMS IDs.

29. Cox's process for assigning and/or re-assigning IP addresses to Subscribers and Cox's process for tracking the identity of the Subscriber associated with each IP address.

30. Cox's policies and/or procedures, and implementation of such policies or procedures, for responding to or handling copyright infringement notices, including notifying Subscribers of infringement notices.

31. Actions that Cox has taken or considered taking against its Subscribers who have been the subject of infringement notices, the bases and requirements for taking any such actions, whether such actions have changed over time, and the frequency with which such actions are taken.

32. Actions that Cox has taken or considered taking against its Subscribers who have been the subject of infringement notices sent by the RIAA, the basis and requirements for taking any such actions, whether such actions have changed over time, and the frequency with which such actions are taken.

33. Cox's policies, procedures and actions for limiting or restricting infringement notices Cox accepted or processed from any rights holder (or agent of a rights holder), including

    a. why and how Cox blacklisted rights holders (or agents of rights holders) by declining to accept or process infringement notices from them;

    b. limits or caps on the number of infringement notices;

      c. the individuals involved in creating such policies and procedures;

      d. the rationale or basis for such policies and procedures; and

      e. exceptions to such policies and procedures, whether to increase or decrease the number of infringement notices accepted, including the rationale or basis for such exception.

34. Limits or caps on the number of infringement notices Cox would receive from the RIAA, including why Cox imposed such limits and how it handled notices in excess of such limits.

35. Limits or caps on the number of infringement notices Cox imposed on copyright holders or agents other than the RIAA, including why Cox imposed such limits and how it handled notices in excess of such limits.

36. COX_SONY_00003682 ("DMCA rules for reporting to Cox"), including the persons involved in creating it, the date it was created, any prior or subsequent versions, and the content of such prior or subsequent versions.

37. Cox's requirements for accepting copyright infringement notices and, for the years 2012-2014, the number of notices Cox rejected or ignored or took no action on based on those requirements.

38. Cox's termination of subscribers for violations of its AUP, including the information in Cox's First Supplemental Response To Interrogatory No. 6.

39. Cox's termination of subscribers for non-payment, including the information in Cox's First Supplemental Response To Interrogatory No. 11 and COX_SONY_00515534.

40. Cox's responses to and handling of subscribers' AUP violations other than copyright infringement.

41. Cox's suspension and termination rates for copyright infringement violations of Cox's AUP compared to other violations.

42. Cox's knowledge of copyright infringement of music by its Subscribers using BitTorrent.

43. Cox's terms of use or service and AUP, including any differences between Cox's policies and procedures and/or actions taken in response to copyright infringement and other violations. This Topic includes both residential and Cox Business terms of use or service and AUP in effect during Plaintiffs' claim period.

44. Counternotices or other objections that Cox received from Subscribers concerning copyright infringement notices from the RIAA from 2012-2014. This Topic includes the specific number of counter notifications (as defined in 17 U.S.C. 512) Cox received from residential and Cox Business Subscribers in response to copyright infringement notices from the RIAA from 2012-2014.

45. Communications between Cox and MarkMonitor concerning copyright infringement.

46. Communications between Cox and Plaintiffs or any Plaintiff concerning copyright infringement.

47. The factual basis for each affirmative defense that Cox has asserted in this litigation.

48. The process by which Cox's documents were collected, reviewed and produced in response to Plaintiffs' document requests.

49. Cox's responses to Plaintiffs' interrogatories and BMG's interrogatories that Cox has produced in this case.

50. Reactivation fees charged following suspensions, disconnects, terminations or other limitations on Subscribers' Internet service as a result of copyright infringement abuse or notices or allegations.