# Exhibit 3

95

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
--------------------------------:
                                :
BMG RIGHTS MANAGEMENT (US) LLC,  :
et al.,                         :
                 Plaintiffs,     :
                                : Case No. 1:14-cv-1611
      vs.                        :
                                :
                                :
COX ENTERPRISES, INC., et al.,   :
                 Defendants.     :
--------------------------------:
```


VOLUME 1 (p.m. portion)



TRIAL TRANSCRIPT


December 2, 2015


Before:   Liam O'Grady, USDC Judge


And a Jury

Case 1:14-cv-00250-PTG-JFA   Document 404-3   Filed 10/21/19   Page 3 of 151 PageID# 22804
Case 1:14-cv-01611-LO-JFA   Document 709   Filed 12/03/15   Page 2 of 150 PageID# 19102

96

<u>APPEARANCES:</u>

COUNSEL FOR THE PLAINTIFFS:

Michael J. Allan
John M. Caracappa
Jeremy D. Engle
Paul Gennari
Margaret P. Kammerud
William G. Pecau
Stephanie L. Roberts
Jeffrey M. Theodore
Roger E. Warin
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.   20036


Walter D. Kelley, Jr.,
HAUSFELD LLP
Suite 650
1700 K Street N.W.
Washington, D.C.   20006


COUNSEL FOR THE DEFENDANTS:

Andrew P. Bridges
Guinevere L. Jobson
Jedediah Wakefield
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94194

Brian D. Buckley
FENWICK & WEST LLP
1191 2nd Avenue, 10th Floor
Seattle, WA  98101

Craig C. Reilly
CRAIG C. REILLY, ESQ.
111 Oronoco Street
Alexandria, VA 22314

Case 1:14-cv-00250-PTG-JFA Document 494-3 Filed 10/21/19 Page 4 of 151 PageID# 22905
Case 1:14-cv-01611-LO-JFA Document 709 Filed 12/03/15 Page 3 of 150 PageID# 19108

97

<u>INDEX</u>

OPENING STATEMENTS BY:

| | |
|---|---|
| MR. WARIN | 98 |
| MR. WAKEFIELD | 135 |

| <u>WITNESS</u> | <u>EXAMINATION</u> | <u>PAGE</u> |
|---|---|---|
| MR. LAURENT HUBERT | | |
| | DIRECT EXAMINATION | 162 |
| | CROSS | 179 |
| | REDIRECT | 200 |
| BARBARA ANN FREDERIKSEN-CROSS | | |
| | DIRECT | 211 |

1          NOTE:  The afternoon portion of the case on

2     December 2, 2015 begins in the absence of the jury as follows:

3     JURY OUT

4          THE COURT:  All right.  Are we ready for our jury?

5          All right.  Joe, let's get our jury.

6          NOTE:  At this point the jury returns to the

7     courtroom; whereupon the case continues as follows:

8     JURY IN

9          THE COURT:  All right.  Please be seated.

10          As I said, we will have opening statements at this

11     time.

12          Mr. Warin, whenever you are ready, sir.

13          MR. WARIN:  If I please the Court.  Thank you, Your

14     Honor.

15          Good afternoon.  I was introduced this morning, but

16     let me introduce myself again.  My name is Roger Warin.  And

17     along with my colleagues, I represent BMG Rights Management.

18          This is my chance to tell you about BMG's case and to

19     give you a preview of what we think the evidence will show.

20     And from our perspective, the evidence is largely undisputed

21     and comes substantially from Cox's own files, its internal

22     documents, and the admissions of its own employees.

23          The evidence will show that Cox Communications, Inc.

24     and CoxCom, LLC are liable to BMG because of Cox's decision to

25     block, delete, and ignore millions of notices from BMG of

Case 1:14-cv-00250-PTG-JFA   Document 404-3   Filed 10/21/19   Page 6 of 15   PageID# 22357
Case 1:14-cv-01611-LO-JFA   Document 709   Filed 12/03/15   Page 6 of 150 PageID# 19103

99

1    illegal copyright infringement taking place on its high-speed

2    Internet network and for its decision to permit and to profit

3    from its subscriber's rampant use of the Internet to steal

4    BMG's copyrighted music through the online file sharing

5    protocol known as BitTorrent.

6            One in ten of Cox's customers admit that the

7    opportunity to get music for free via BitTorrent is one reason

8    they subscribe to Cox.  Because it didn't want to lose the

9    revenue, even though it knew of widespread illegal infringement

10   taking place on its network, Cox turned a blind eye and enabled

11   its subscribers to repeated use of the BitTorrent protocol to

12   infringe and steal BMG's copyrighted songs.

13           Complying precisely, precisely with Cox's own

14   published detailed requirements on how someone who thought

15   their music was being infringed should notify Cox, BMG sent

16   numerous infringement notices to Cox with respect to illegal

17   copying of its songs.  BMG's notices provided detailed

18   information on the infringement taking place on the Cox

19   network.

20           But Cox did nothing with those BMG notices, those

21   infringement notices.  Instead, Cox deleted millions of the BMG

22   notices and knowingly continued to allow its subscribers to

23   illegally copy BMG songs over its network.  And most

24   surprisingly, it kept absolutely no record, no record at all of

25   the BMG notices.  It just threw them out.

1          There is no question that Cox had the power to act on

2     the BMG notices.  Cox could have forwarded them to their

3     subscribers that were engaged in the illegal copyright

4     infringement.  It could have sent its own notices to its

5     subscribers with respect to the conduct that was going on on

6     their network.  And it could have either suspended or

7     terminated those customers because they were engaged in illegal

8     conduct on the Cox network.

9          But instead of doing any of those things, Cox simply

10    threw away the BMG notices, kept no record of them and, as the

11    evidence will show, went to great lengths to keep its

12    subscribers who were repeatedly infringing and taking BMG's

13    copyrighted songs.

14         Why did they do it?  So they would continue to get

15    the revenue, the subscription money from those subscribers who

16    were engaged in illegal conduct.  That makes Cox both

17    contributorily and vicariously liable for the conduct of its

18    subscribers on its network, and willfully so.

19         Let me introduce the parties.  You had just a brief

20    introduction to them so far, but let me give you a little more

21    details.  Who is BMG Rights Management?  Well, BMG Rights

22    Management is a music publisher for songwriters.

23         You will hear -- it's the next witness -- from

24    Laurent Hubert, who is the president of BMG, and later you will

25    hear from Keith Hauprich, BMG's deputy general counsel, and

Case 1:14-cv-00950-PTG-JFA   Document 404-3   Filed 10/21/19   Page 8 of 151 PageID# 22809
Case 1:14-cv-01611-LO-JFA   Document 709-3   Filed 12/03/15   Page 8 of 151 PageID# 19409

101

1    they will tell you about BMG's business and how it operates.

2            BMG represents 15,000 songwriters, the people who

3    write the music and the lyrics.  The composers.  Not the

4    performers, but the people who dream up the words and the music

5    that goes with them.  BMG controls copyrights to over 2 million

6    works.  BMG also holds the copyrights on the 1,397 music

7    compositions at issue in this case.

8            Now, let me take a moment and tell you a little bit

9    about what a copyright is.  I think most of you probably know,

10   but in case you need a refresher, let me just run through that.

11           As provided by federal law, a copyright is a

12   protection provided by law to an owner of a copyright allowing

13   that individual or entity the exclusive right to reproduce,

14   distribute, perform, and display the copyrighted works.

15           There is no issue in this case as to whether BMG has

16   the legal authority to the exclusive rights to the 1,397 songs

17   at issue.

18           The goal of both copyright law and BMG's goal is the

19   same, to make sure that songwriters are able to make a living

20   from the sale and distribution of their songs.  Like all of us,

21   they are entitled to be paid for their work.  Their work is

22   writing words and music to their songs.

23           Who gets the money?  BMG acts as their agent, and

24   $0.70 to $0.90 out of every dollar BMG collects goes to the

25   songwriters.

1        Songwriters earn money in a variety of ways.  They

2  earn money on the distribution of their songs.  They are paid

3  royalties, and those royalties are paid from sales of CDs.  I

4  am an old guy, so I still have CDs and listen to them in the

5  car.  Sales to people who stream.  Sales to people who legally

6  download from iTunes.  They get paid money from Pandora when

7  Pandora is playing a song that they wrote.  They get paid a

8  royalty when their song is played on the radio or used in a

9  movie.  That's how they get paid.

10        But songwriters earn no money, no money when their

11  songs are stolen and made and shared for free over the

12  Internet, over the Cox network, using BitTorrent.

13        When a song is shared illegally over the Cox network

14  using BitTorrent, the songwriter loses control over his work.

15  That song very quickly is now in the hands of dozens, hundreds,

16  or thousands of people who paid nothing for it.

17        Let me give you a big description of Cox.  Cox is the

18  fourth largest cable broadband company in the United States.

19  Its projected 2015 revenue from high-speed Internet is

20  approximately $3 billion.  That's not their overall revenue,

21  that's their revenue from high-speed Internet.

22        In 2014 Cox had 4.5 million subscribers.  Cox, like

23  many Internet service providers, ISPs, provides bundled

24  services.  You may have heard some of it when the judge was

25  asking the jury questions this morning.  So they provide

1    telephone, they provide Internet, and they provide TV.  What we

2    are here about today is the Internet service.

3           The relationship between Cox Communications, Inc.,

4    and CoxCom, LLC.  Cox Communication, Inc. is the parent.  And

5    CoxCom, LLC is the subsidiary.  CoxCom employs the group of

6    individuals that are responsible.  They have a group within Cox

7    Communications that are responsible for preventing copyright

8    infringement and other abuses of Cox's Internet network.

9           Most of the evidence you are going to hear from us

10   are going to be e-mails and testimony that those people whose

11   job it was to root out Internet copyright infringement, the

12   exact opposite was happening.  They were aware of it and

13   allowed it to continue to happen and continued to reinstate

14   their customers who they knew were engaged in this kind of

15   illegal activity.

16          CoxCom is the subsidiary that actually provides the

17   Internet services and promulgates something called the Cox

18   Acceptable Use Policy, and I am going to show you portions of

19   that in just a minute.  That is part of the agreement that

20   every single Cox subscriber, the contract that every single Cox

21   subscriber signs when they sign up to be a Cox subscriber.

22          Let's talk a little about what we think the evidence

23   will show.  We believe the evidence will show that Cox is

24   legally responsible for the infringement of BMG's copyrights.

25   The law makes Cox liable for copyright infringement by its

Case 1:18-cv-00950-PTG-JFA   Document 704-3   Filed 10/21/19   Page 11 of 151 PageID#
22312
Case 1:14-cv-01611-LO-JFA   Document 709   Filed 12/03/15   Page 106 of 150 PageID# 19410

104

1   subscribers of its Internet service when the following is true:

2   Number one, it knew or had constructive knowledge about the

3   infringement taking place on its network.

4            Number two, it profited from that infringement.

5            Number three, it had the right and the ability to

6   stop that infringing illegal activity on its network.

7            And number four, did virtually nothing to stop it.

8            The evidence will show infringement on the Cox

9   network of BMG's copyright works on a massive scale.  The

10  uploading and downloading literally millions of times on Cox's

11  network.

12           There is no serious dispute that there was widespread

13  rampant illegal copying of BMG's songs on the Cox network.  One

14  of the witnesses you will hear from is a man named Robert

15  Bardwell, one of BMG's experts.  And he will explain both the

16  scope and the intensity of the infringement on the Cox network.

17           Under law, once it has been established that

18  infringement of BMG's songs have taken place on the Cox

19  network, even if Cox itself wasn't the one doing it, under the

20  law Cox will be liable for damages if BMG can show that Cox was

21  either contributorily -- guilty of contributory infringement or

22  is liable for vicarious infringement.  And I am going to walk

23  through those to explain why it is that under the law Cox is

24  liable for the activities, the repeat activities of its

25  subscribers.

Case 1:18-cv-00950-PTG-JFA   Document 704-3   Filed 10/21/19   Page 12 of 151 PageID#
22313
Case 1:14-cv-01611-LO-JFA   Document 704   Filed 12/03/15   Page 139 of 150 PageID# 19411

105

1          The evidence we believe will clearly establish that

2     Cox is liable for both, both contributory infringement and

3     vicarious infringement.  Let's talk first about contributory

4     infringement.  We believe the evidence will show that Cox was

5     aware of widespread copyright infringement on its network

6     because it was receiving infringement notices not just from

7     BMG, but from hundreds of copyright owners complaining about

8     the infringement of their copyrights on the Cox network.

9          But apart from Cox's general knowledge of massive

10    copyright infringement on its network, Cox had actual or

11    constructive knowledge of the fact that its subscribers

12    illegally copied BMG's songs without paying for them.

13         BMG sent millions of notices, and Cox threw away

14    every one of them, like ripping up the mail when it comes

15    without looking at it.

16         Why did -- you may ask the question, well, why did

17    BMG send so many notices?  That sounds like a lot of notices.

18    They sent so many notices because of the rampant, widespread,

19    pervasive copyright infringement on the Cox network.  Every one

20    of those notices, ever single one of them, identified a

21    specific date and time when the infringement took place, the

22    address of the Cox subscriber, and the BMG song that was

23    copied.  That's what's in the notices, and I'll show you those

24    in a minute.

25         If Cox had sent its subscribers the notices telling

Case 1:18-cv-00950-PTG-JFA   Document 494-3   Filed 10/21/19   Page 13 of 151 PageID#
Case 1:14-cv-01611-LO-JFA   Document 704   Filed 12/03/15   Page 12 of 130 PageID# 19412
22314

106

1    them that their infringing active had been observed and they

2    were engaged in illegal copying, telling them that it was

3    illegal and contrary to Cox's own Acceptable Use Policy, or if

4    Cox had sent on the notices that we were sending them, they

5    would have had far fewer notices to send on because Cox would

6    have then been assisting BMG in addressing the copyright

7    epidemic on its network.  But Cox did none of those things.

8    And instead it continued to facilitate and ignore the ongoing

9    infringement on its network.

10          Now, Cox has criticized BMG and Rightscorp for

11   sending too many notices.  I suspect during the course of this

12   trial you're going to hear that from Cox.  Oh, there were just

13   so many.  And Cox's proposed solution is simple, BMG should

14   just have sent fewer notices and just ignored all of the other

15   infringements of BMG's songs that were taking place in the

16   network.

17          So if I have four children, they're all copyright

18   artists, and Cox says we can't send notices from all four, you

19   can only send it from one, am I just supposed to tell my other

20   three kid that have that copyright entitlement, oh, we're not

21   going to bother with yours?

22          That was Cox's approach.  You're sending too many

23   notices, you can't send that many.

24          Well, we sent that many because we represent

25   songwriters whose songs were being infringed on the network.

Case 1:18-cv-00950-PTG-JFA Document 704-3 Filed 10/21/19 Page 14 of 151 PageID# 22315
Case 1:14-cv-01611-LO-JFA Document 049 Filed 12/03/15 Page 130 of 150 PageID#19113

107

1   And we didn't have an obligation to favor some over the others,

2   we had an obligation to protect the rights of all of them, to

3   advise Cox that we were aware of the infringement on their

4   network for all of the 1,397 songs that we were protecting.

5          The evidence is undisputed that Cox deliberately

6   chose, though, to ignore the detailed notices of specific

7   infringement.  And as a result, Cox chose to be willfully

8   blind, willfully blind to the illegal copyright infringement

9   taking place on it network.  It also chose to be willfully

10  blind to its subscribers using its network to steal BMG songs

11  without paying for them.

12         The evidence will also show that Cox provided

13  material contribution to the infringement.  It facilitated the

14  infringement.  Without Cox, the infringement could not take

15  place on its network.  By actively running interference for the

16  infringing subscribers, Cox aided and abetted the continuing of

17  their illegal activities.  Cox's network and facilities --

18  network and facilities provided the access and the site and

19  facilities where the infringement took place.

20         By flaunting its own rules and reactivating known

21  infringers, Cox also provided material infringement -- material

22  contribution to that infringement.

23         And worse -- and you're going to hear about this and

24  I'm going to show some e-mails, internal Cox e-mails -- in a

25  deliberate effort to try to avoid legal liability, Cox

 1    pretended to terminate those real infringers when it really

 2    didn't.  And you're not only going to see the e-mails, but

 3    you're actually going to see video of some Cox witnesses when

 4    they were asked about that under oath.

 5            The evidence is also going to show that Cox is liable

 6    not just for contributory infringement, but for vicarious

 7    infringement.  As we go forward, I want you to understand that

 8    BMG doesn't have to prove that Cox is guilty of both.  Cox is

 9    liable if we prove either one or the other.  But we believe

10    that the evidence will show that Cox is guilty of both

11    contributory infringement and of vicarious infringement.

12            Let me talk about vicarious infringement.  And it's

13    importance when you consider vicarious infringement to realize

14    that we don't have to prove for vicarious infringement

15    liability that Cox either knew about the activity going on on

16    its network or that it intended.  There's a different set of

17    standards for vicarious liability.

18            The first standard is that Cox had the right and

19    ability to control the infringing activity.  Well, there's no

20    question about that.  Cox is the gatekeeper.  Cox's contract

21    with its subscribers contained the Acceptable Use Policy.  That

22    Acceptable Use Policy that every one of Cox's subscribes signed

23    on to prohibits copyright infringement.  Cox admits that it had

24    the right and ability to suspend and to terminate its

25    subscribers who engaged in copyright infringement on its

Case 1:18-cv-00950-PTG-JFA  Document 694-3  Filed 12/03/19  Page 16 of 151 PageID#
22317
Case 1:14-cv-01611-LO-JFA  Document 909  Filed 12/02/15  Page 199 of 150  PageID# 19115

109

1    network.

2            It stands to reason.  You know, Cox doesn't have to

3    sit by and let its network be used for illegal activity.  And

4    that's what the agreement said with each of their subscribers.

5            Cox knew that the copyright infringement was going on

6    its network and it was pervasive.  And it ignored its own

7    stated policy.  Rather than terminate repeat infringers, Cox

8    did everything to keep repeat infringers as subscribers, even

9    going so far -- even going so far as to create termination

10   records for -- fake termination records for repeat infringers

11   and then reinstating them immediately.

12           Click a button, oh, you're terminated.  Click another

13   button, you're reinstated.  And then they would create a record

14   that says that they terminated that repeat infringer.

15           Why didn't Cox just go to the trouble of terminating

16   repeat infringers when it got all of these notices, not just

17   from BMG, but from others.  Well, the evidence -- the evidence

18   is Cox's own documents, will show that Cox didn't stop habitual

19   repeat offenders because it didn't want to lose the revenue.

20           BMG's expert witness, Dr. Stephen Nowlis, will

21   testify that based on his survey of Cox subscribers,

22   approximately 10 percent of Cox subscribers admit that they

23   described to Cox in order to engage in this activity, to steal

24   music.

25           Mr. Hubert, who you will hear as the first witness

1   this afternoon, will tell you that BMG is suing Cox because Cox

2   is the gatekeeper of the Internet for its subscribers.  He will

3   explain that it is virtually impossible to address wide scale,

4   pervasive infringement on the Cox network in a meaningful way

5   by suing the individual subscribers.  First, BMG doesn't know

6   the identities of the individual subscribers, only Cox knows

7   it.  So in order to bring a suit against the individual

8   subscribers, they would have to bring some suit to try to get

9   the identity of them, which Cox wouldn't give them without

10  bringing a suit.

11          If they had to sue the individual subscribers, how

12  many would that be?  Thousands, tens of thousands of suits

13  throughout the entire Cox network?  The subscribers often have

14  limited resources to pay lawyers and to pay damages for the

15  infringement.

16          And finally, unlike Cox, unlike Cox, I'm confident

17  that some of the subscribers that were engaging in this

18  activity didn't know it was illegal.  But Cox did.

19          So it's not a solution to say, go out and bring tens

20  of thousands or hundreds of thousands of lawsuits against these

21  people that are infringing.  That's a teaspoon solution to an

22  ocean problem.  Suing Cox is BMG and its songwriter clients'

23  best hope to stem the rampant stealing of their work on the Cox

24  network.

25          Now, let me talk to you a little bit about how it

1    happens and how it works.  And believe me, as a history major,

2    I'm not going to get into any great detail about BitTorrent,

3    but I'm going to give you kind of a broad overview as I

4    understand it.

5          Number 1, it's clear that there has been a massive

6    amount of infringement on the Cox network using BitTorrent.

7    And Cox knows that BitTorrent is used to extensively by its

8    customers.  So Cox knows that one of the things its customers

9    are doing is using BitTorrent.

10         Cox also knows that BitTorrent is widely used by its

11   customers for peer-to-peer illegal downloading and uploading of

12   copyrighted songs and movies.  The evidence will show that

13   virtually every musical composition being shared on BitTorrent

14   is infringing.  It's not a legal copy, and the way it's

15   distributed is not legal.  It's illegal copyright infringement.

16         Let's talk about what Cox knew and what it didn't

17   know.  And you're going to hear about an individual named

18   Jason Zabek.  Jason Zabek -- here is his picture here.  You'll

19   hear his deposition later.  He was the guy that was largely in

20   charge of the Cox Abuse network.  It was part of Cox that is

21   supposed to be monitoring and rooting out the improper use of

22   its network.  And I'm talking about BitTorrent.

23         Well, Jason Zabek knew exactly what BitTorrent was

24   and here's his e-mail.  "BitTorrent is used for only one thing,

25   and I would know," smiley face.

112

1          Let's go on, how did they know?  Well, Cox not

2   surprisingly keeps track of what its subscribers are doing.

3   They keep track of how they're using their Internet resources.

4   And this is a page from one of the summaries Cox keeps track

5   of.  So they have the data to determine what their subscribers

6   are doing on their network.

7          And if you look at the part that I have highlighted

8   in yellow, P2P, that is peer-to-peer.  That means the copying

9   is not going on like in the old days of Napster where everybody

10  goes to Napster and tries get it there.  The copying is going

11  back and forth between various subscribers.  And I'll show you

12  how that works in just a minute on BitTorrent.

13         Now, look at the number next to that?  An average Cox

14  subscriber is spending 21 hours a month using the BitTorrent

15  protocol.  And they know that the BitTorrent protocol is used

16  primarily for illegal copyright infringement.  This is their

17  own record, they know that.

18         Let's go a little further.  Let's talk a little bit

19  about how BitTorrent works.  Please excuse the graphic, but

20  maybe it will help you explain it.  We've got a whole bunch of

21  individuals that are on their individual either desktop or

22  laptop.  And the way that BitTorrent works is I go load that

23  protocol on my computer, and other people do the same thing,

24  and then I have some of my songs, and so I put my songs in

25  there, I go to a site -- and I'll show you the site in a

113

1    minute.  PirateBay is one of them.  And PirateBay keeps track

2    of what everybody has got.

3          And so, once we're all there, my songs start going

4    out and coming back.  And the same thing happens with all these

5    other people.  It doesn't go to one central location and stay

6    there.  It's simultaneously slicing and dicing that song, like

7    a piece of pie sliced into 100 or 200 different slices, and

8    then reconfigured back when somebody wants a copy of it.

9    That's how BitTorrent works, that's how it avoids or tries to

10   avoid the Napster problem.

11         Now, I mentioned PirateBay.  PirateBay is a one of a

12   number of these sites where -- that using BitTorrent they

13   facilitate the illegal peer-to-peer copying of copyrighted

14   music without anybody paying for it.  I find it interesting

15   that they would use the symbol pirate with the skull and

16   crossbones, and I would like to point out to you that the two

17   people that founded it were criminally convicted four or five

18   years ago outside the United States.

19         Let's go a little further to show how this would

20   work.  So I've got ThePirateBay, which I access on the

21   Internet.  I've already got the BitTorrent program on my

22   individual computer.  So what's happening is everybody who is

23   hooked in in this maze -- and you're going to hear about

24   swarms, and you're going to hear about peers, and you're going

25   to hear about torrents.

Case 1:18-cv-00950-PTG-JFA   Document 494-3   Filed 10/21/19   Page 21 of 151 PageID#
22322
Case 1:14-cv-01611-LO-JFA   Document 709   Filed 12/03/15   Page 20 of 150 PageID# 19420

1        The simple version is, is that everybody who chooses

2   to participate in there is sharing everything simultaneously.

3   And it's like a virus, it just keeps spreading and spreading

4   and spreading because while it's going out, it's coming back

5   in.  While it's a source, it is also a recipient.

6        And you're going to hear one of our witnesses,

7   probably tomorrow, Barbara Frederiksen-Cross, will give you a

8   more detailed, a more technical explanation of it.  But for the

9   purposes of an overview, I think that that will help you

10  understand a little bit how this infringement takes place.

11       Now, ISPs.  BMG knew that their songs were being

12  illegally copied.  They had to try to find a commercial

13  solution to that.  Are we just going to sit back and ignore the

14  fact that this is taking place through BitTorrent and through

15  ThePirateBay and Kickass Torrents and some of these other

16  sites, or are we going to try to protect the rights of our

17  songwriters and try to put an end to it?

18       So they reached a contract with Rightscorp.  Now,

19  when you hear Cox's presentation, you'll think this whole case

20  is about Rightscorp, but actually it's about BMG retaining

21  Rightscorp to help them solve a problem.  And here's how

22  Rightscorp did it.  Rightscorp was able through some software

23  that it had developed to identify the infringement that was

24  taking place.  And I'll show you an example of that.

25       This is a diagram that shows.  So the first step is a

Case 1:18-cv-00950-PTG-JFA Document 649-3 Filed 12/21/19 Page 22 of 151 PageID#
22323
Case 1:14-cv-01611-LO-JFA Document 649-3 Filed 12/03/15 Page 23 of 130 PageID# 19421

115

1    Cox subscriber installs BitTorrent on its own computer.

2    Rightscorp then sends out these notices.  It asks the

3    subscriber for a file.  And you'll explain later what the file

4    is and how it's a BMG and how it came from certain of these

5    other sites.  And then the computer sends back, hey, I got that

6    file.  But we didn't have it legally.

7         Rightscorp then captures the IP port, the file name,

8    the peer-to-peer software client, and generates a notice.  And

9    these are the notices you're going to hear about that they send

10   to the ISP, to Cox.

11        And then Cox can be the one who can look up, who is

12   that?  That particular IP address, whose e-mail account is

13   that?  Because Rightscorp doesn't know that.  BMG doesn't know

14   that.  Only Cox knows it.  And Rightscorp has the ability then

15   to send the notices to Cox and asks Cox to go ahead and send it

16   on to your subscriber saying, hey, we observed what you're

17   doing, it's illegal, you need to stop it, and we want to reach

18   a settlement with you.

19        And that's what Cox was supposed to do.  But Cox

20   didn't do that.  Because Cox blocked -- it set up a protocol on

21   the Web site, coxabuse.com, which is supposed to receive all

22   these complaints, so it was like a brick wall.  When the

23   Rightscorp notices came in, they bounced back.  Cox didn't open

24   them, didn't look at them, didn't pay any attention to them,

25   threw them away, didn't keep any record of it.  This was the

Case 1:18-cv-00950-PTG-JFA   Document 704-3   Filed 10/21/19   Page 23 of 151 PageID#
22324
Case 1:14-cv-01611-LO-JFA   Document 704   Filed 12/03/15   Page 23 of 130 PageID# 19472

116

1    way it was supposed to work, but this wasn't the way it worked

2    with Cox.

3           Now, let's talk about how the Rightscorp technology

4    works, and you're going to hear more about this from both the

5    Rightscorp witnesses, from Mr. Hubert, and also from

6    Ms. Frederiksen-Cross.

7           If you noticed down at the bottom it says SHA-1

8    hashtag, designed by United States National Security Agency.

9    NSA has created hashtags, and they use this kind of technology

10   to trace a lot of other stuff, but a unique fingerprint is on

11   each torrent.  So when there is this illegal copying going on,

12   it leaves a trail.  And that trail is the one that Rightscorp

13   was able to follow and get the information that it did about

14   the infringement that was taking place on Cox's network.

15          And the principal reason it was able to follow that

16   trail is this unique hashtag.  Look at that number -- I didn't

17   even bother to count them.  It looks like it is about 40

18   numbers and letters down at the bottom, that's the hashtag I'm

19   talking about.  So that's the way the Rightscorp technology

20   worked.

21          And the idea between BMG and Rightscorp was, look, we

22   could go out and try to find out who these people were, we

23   could sue Cox to try to get their identity, and then we could

24   seal all the individuals and the subscribers, or we could

25   basically send Cox a notice, these are the people that are

Case 1:18-cv-00950-PTG-JFA   Document 494-3   Filed 10/21/19   Page 24 of 151 PageID#
22325
Case 1:14-cv-01611-LO-JFA   Document 709   Filed 12/03/15   Page 24 of 150 PageID# 19423

117

 1    infringing, these are the songs they're taking, here's when

 2    they did it.  We want you to send our notice to them telling

 3    them what they're doing is wrong and asking if they'll pay a

 4    settlement amount to us and we'll give them a release.  A much

 5    cleaner, easier resolution than bringing thousands of lawsuits

 6    throughout the United States.

 7            Now, let's look -- because I mentioned this

 8    earlier -- at the Acceptable Use Policy.  This goes to our

 9    proving that Cox knew that what their subscribers were doing

10    was illegal.  Read what Cox wrote under the caption

11    Infringement.  "Pursuant to the Digital Millennium Copyright

12    Act, you may file a notification of the claimed infringement

13    with the designated agent on the service provider if you

14    believe that a Web page hosted by the service provider is

15    violating your rights under the U.S. Copyright Law."

16            So they're telling the people like the songwriters,

17    like BMG, if you think your songs have been infringed, you can

18    send a notice to us and the designated e-mail address is

19    abuse@cox.net.  That's exactly -- that's exactly what BMG and

20    Rightscorp did.

21            Cox also had requirements, oh, you just can't send

22    whatever kind of notice you want.  They had a very detailed

23    list of what has to be in that notice.  Signed under pain of

24    perjury and all this stuff.  BMG and Rightscorp complied

25    completely.  Every one of the million notices that they sent

Case 1:14-cv-01611-LO-JFA Document 704-3 Filed 12/03/15 Page 24 of 150 PageID# 19424

1  complied with Cox's own policy as to what they were supposed to

2  do if they had evidence that subscribers were infringing their

3  copyrighted works on the Cox network.

4         Now, this is an example of a Rightscorp notice parsed

5  down.  So this is the notice that after they found out about

6  the infringement, after they've identified it, that they send

7  to Cox.  And this then is a sample of a notice that they sent.

8  And it is true they sent more than a million of them.

9         And let's look what it says.  Number 1, it says the

10 copyright owner, BMG Rights.

11        It says the ISP address -- excuse me, the Internet

12 service provider, Cox.  So it says who owns the copyright and

13 whose network it was on.

14        It says the date and time of the infringement.  When

15 did it take place?  When was the illegal copying taking place?

16        It gives the IP address.  Cox only really -- is the

17 only one who knows who are the subscribers associated with that

18 IP address.  But when Rightscorp gives them that address, Cox

19 can go look at it, who is that, who's got that box.

20        It also gives them the port number.

21        It gives them the song infringed.  It identifies the

22 actual song that was illegally copyrighted.

23        It gives the hash value.  This is the unique

24 fingerprint that I told you about a minute ago.

25        So this is the detailed notice from Rightscorp and

Case 1:18-cv-00950-PTG-JFA   Document 594-3   Filed 10/21/19   Page 26 of 151 PageID#
22327
Case 1:14-cv-01611-LO-JFA   Document 709   Filed 12/03/15   Page 26 of 150 PageID# 19425

119

1    BMG to Cox to allow Cox to know this is exactly who did it,

2    this is exactly when they did it, this is exactly what they

3    did.  They copied this particular song.

4           Now, in addition to sending all of these notices,

5    rather than just focusing on sending a whole bunch of notices,

6    Rightscorp said, look, let's pick the really bad apples.  Let's

7    let Cox know about those people on its network that are doing

8    this virtually all the time.  The repeat infringers that are

9    copying song after song after song, and they're probably

10   copying movies and other things as well.

11          So this is an example -- let's see, this is what --

12   I'll get to this in a minute.  But we also sent a summary on a

13   fairly regular basis.  These people have more than 250 notices.

14   These people have more than 150 notices.  That same kind of

15   detailed information.

16          So if Cox wanted to address not all the copyright

17   infringement, but the really bad apples, Rightscorp gave them

18   the list of the really bad apples.  They could see how much

19   activity had gone on.  They could see who was doing it and they

20   could take action if they chose to, if they chose to, but they

21   chose not to.

22          Now, that's -- the first thing is the actual notice.

23   The second one is the summaries.  The third is the Dashboard,

24   and that's what you see on the screen now.

25          Rightscorp said, we're going to make you be able to

1   look at what we've got, our data, a Dashboard that comes in

2   that you can click on and get all the information you want.  So

3   if you look at this particular data, you can go with your mouse

4   and click on that particular IP address, the port.  The number

5   of infringements, that first one, 54,489.

6          So Cox can go on the Dashboard and look at that

7   number and just go down, it's the most egregious offenders,

8   click on them.  They can get the information with respect to

9   every single one of those infringements.  Every single one of

10  the songs infringed, the date it took place, the time it took

11  place, and in some instances they can even play the song that

12  was illegally infringed.

13         Did Cox pay any attention to the regular summaries we

14  sent?  No.  Cox's witnesses said, we paid no attention to them.

15  We not only canned the notices, threw them in the trash can,

16  didn't open them.  We didn't pay any notice -- attention to the

17  summaries.  And we never -- not one individual in Cox ever

18  accessed the Dashboard.  We weren't the least bit curious to go

19  in and find out who are the really bad apples on our system.

20  Who are the ones that are causing all these notices to come in

21  of infringement?  Not once did they think it was worth their

22  time and effort to go look at the Dashboard.

23         Now, I mentioned to you that Digital Rights

24  Corporation, which is Rightscorp, got blacklisted.  Their

25  notices got bounced.  And here's an e-mail from people that are

1   in that Abuse Cox network.  They're the ones that are supposed

2   to be enforcing the -- rooting out copyright on their network.

3   Here's what they said.  This was in February 2014.  "Sources

4   like Digital Rights Corporation are blacklisted with us, so we

5   silently delete e-mail messages without any parsing, ticketing,

6   et cetera.  As soon as our POP3 client recognizes the From

7   address in the headers as blacklisted, we delete the message

8   without retrieving the body of the message."

9           So you don't have to take my word that that's what

10  Cox was doing.  Cox's own e-mails say that that's what they

11  were doing.  They never bothered to open them up.  They never

12  bothered to see who it was that was supposedly infringing, when

13  the infringement took place, or what songs were being

14  infringed.

15          Let's keep walking down this line because I think it

16  will be helpful.

17          In addition to not paying attention to our notices,

18  you're going to hear some suggestions from Cox that, well, the

19  reason that we didn't pay attention to the notices is because

20  they had settlement language in them.  And it's true, I just

21  mentioned to you, the Rightscorp notices did have settlement

22  language in them.

23          And Cox will say that if we had removed the

24  settlement language, we would have "accepted them."  But one of

25  the things I'm going to talk about in a minute is what

122

1   "accepted them" means, because it didn't mean that they were

2   going to notify the infringer.  It means that they are going to

3   put them in the process.  But we'll walk through that in a

4   minute.

5           But you've got to realize that the Rightscorp notice

6   does ask for a settlement amount.  In the beginning, it was

7   $10, then it got up to $20.  And it does say that if you don't

8   settle, you could be liable for up to $150,000.  Well, that's

9   because the statute -- the Copyright Act says that statutory

10  damages of up to $150,000 are available for people who

11  willfully infringe copyrights.

12          So although Cox criticizes Rightscorp and BMG for

13  including that language in their notices, all they're doing is

14  quoting federal law, which says that people that are repeat

15  infringers -- willful repeat infringers could be subject to

16  liability of that sort.

17          And so, rather than being a threat, which is the way

18  Cox tries to portray it, it's simply reciting what that

19  individual's potential liability would be if we did what Cox

20  says we should have done, which is go sue the individual

21  subscriber.

22          But Rightscorp and BMG didn't want to sue the

23  subscriber.  They wanted to handle it this way with an e-mail

24  notice that allowed the subscriber to see that they'd caught

25  them.  It's an effect like the traffic camera.  Here's the

 1    snapshot of when you were infringing on BMG's copyright.  We'd

 2    like to settle with you, ten bucks, 20 bucks, 30 bucks, click

 3    clear and we'll give you a release so you are done with your

 4    liability with respect to that particular infringement.

 5            And yet that's being criticized, too many notices and

 6    threatening litigation.  Well, the fact of the matter is -- and

 7    if Rightscorp had ever -- BMG had ever sued anybody, you'd hear

 8    about it, but the only people they sued was Cox because they

 9    didn't think it was both appropriate and a reasonable business

10    response to go out and sue 10, 20, 30,000 individual

11    subscribers.

12            Here is another one of the e-mails from the Cox

13    people internally.  You heard me say it, and now I'll show it

14    to you, that one of the things that Cox engaged in was fake

15    terminations, reactivation.  And you're going to see a lot of

16    e-mails, and I'm not going to be able to go through all of them

17    with you right you, but I'm going to show you a few of them

18    that demonstrates how Cox was responding when they got notices

19    of repeat infringers.

20            Now, one of the things that I should point out is

21    that we weren't the only ones that were sending notices of

22    infringement.  So some of the data with respect to the notices

23    and how they were handled were from other people that Cox

24    decided they were going "accept" because they didn't have the

25    settlement language in it.  And they said to Rightscorp and

Case 1:18-cv-00950-PTG-JFA   Document 694-3   Filed 12/03/19   Page 31 of 51 PageID#
22332
Case 1:14-cv-01611-LO-JFA   Document 709   Filed 11/20/15   Page 30 of 150 PageID# 19430

124

 1    BMG, if you'd only taken the settlement language out, we would

 2    have accepted them.

 3            We can see what "accepted" means because they largely

 4    ignore all those violations.  They can correct hurdle and

 5    hurdle after obstacle after obstacle before they will even

 6    process them.  And in the end, the repeat infringer clicks a

 7    button and is "terminated" and then reactivated.

 8            Let's look at some of the slides here.  This is one

 9    that they say, we want to hold on to every subscriber we can.

10    That's the reason they didn't terminate them even though they

11    knew they were engaged in this activity.

12            It goes on further.  "If a customer is terminated for

13    DMCA" -- that will be shorthand for these purposes for

14    copyright infringement -- "You are able to reactivate them

15    after you give them a stern warning about violating the AUP and

16    the DMCA.  After you reactivate the DMCA, counter restarts.

17    The procedure restarts with sending warning notices just like

18    the first offense."

19            You're going to hear that what happens is Cox imposed

20    all sorts of hurdles, even for those notices that they

21    "accepted."  We're only going to take so many a day.  We're

22    only going to take so many from a particular complainant.

23    We're only going to take so many about a particular infringer.

24    We're not going to have the first one count.

25            Only after you get through hurdle after hurdle after

Case 1:18-cv-00950-PTG-JFA Document 649-3 Filed 10/21/19 Page 32 of 151 PageID#
22333
Case 1:14-cv-01611-LO-JFA Document 669 Filed 12/03/15 Page 31 of 160 PageID# 19431

125

1    hurdle do you go through their graduated response method.

2    Graduated response method is, well, the first one doesn't

3    count, and then probably the next three or four or five don't

4    count.  Or if they do, you can say, click here, and you're

5    reactivated.  And once you get to 12, 13, or 14, maybe we'll

6    have a telephone call with you, and those people are

7    reactivated.

8            So after you get through all of these hurdles, where

9    very few drop down to the bottom, they still have to go through

10   more hurdles with infringement notice after infringement notice

11   after infringement notice where they finally say, well, we're

12   going to terminate you, and then it turns out that they

13   immediately reactivate them.

14           These are people who in many instances admitted when

15   a Cox representative talked to them that they were engaging in

16   illegal copyright infringement over their network.

17           And this procedure I just described, look at the last

18   line.  "This only pertains to DMCA violations."  So other

19   violations of network policy, spam abuse, excess bandwidth,

20   they don't go through this fake termination/reactivate process.

21   It's only when somebody else's property is being stolen.  It's

22   only when copyright infringement is taking place that they go

23   through this obstacle after obstacle and then charade at the

24   end about terminate and reactivate.

25           Now, this is the policy.  "Violation of the AUP may

 1    result in immediate suspension or termination of either your

 2    access to the service or" -- and this says that you the

 3    subscriber, "You may not use the service to copy, post,

 4    transmit, or disseminate any content that infringes the

 5    patents, copyrights, trade secrets, trademark, moral rights, or

 6    proprietary rights of any party."

 7            When I sign up for Cox, that's the rules, and I am

 8    told that violation of this term could result in my

 9    termination.  So one of the elements we have to prove is that

10    Cox had the ability, the right, the power to terminate the

11    activity on the network.  The Cox policy that they signed with

12    their subscribers makes it clear as day that they had that

13    procedure, that right, and that authority from the day that the

14    subscriber signed up.

15            But what did they do?  They wanted to keep the

16    revenue.  And that's the profit motive that I talked about

17    earlier.  One of the benefits of being able to see these

18    e-mails is you not only get to see what Cox did, but you get to

19    see why they did it.

20            So why would they not take what seems like the right

21    course, the legal course, the appropriate course, the course

22    that they told their subscribers that they were going to take,

23    which is to terminate people that engage in illegal conduct?

24    Why wouldn't they do that?

25            Well, you see it in their own e-mails.  You're going

Case 1:18-cv-00950-PTG-JFA   Document 494-3   Filed 10/21/19   Page 34 of 151 PageID#
22335
Case 1:14-cv-01611-LO-JFA   Document 749   Filed 12/03/15   Page 33 of 150 PageID# 19433

1    to hear a term and you're going to see a video about the "soft

2    term."  Term doesn't mean like term paper.  It means like

3    termination.  It's a suspension that is called a termination on

4    the likelihood of reactivation.  For DMCA, we don't want to

5    lose the revenue.  So for copyright infringement, translation,

6    we don't really terminate these people because we don't want to

7    lose the revenue.

8         And look at the next one.  It's kind of like an

9    under-the-table procedure.  So not only is it a false

10   procedure, but it's a stealth procedure.  It's an

11   under-the-table procedure.

12        Here's another one.  "We have been soft terminating

13   for DMCA, copyright infringement, because we didn't want to

14   lose the revenue, but if the gross bandwidth of users are

15   costing us way more than we're making from them, it makes sense

16   to terminate them."

17        So who does Cox terminate?  It terminates the gross

18   bandwidth abusers that Cox loses money on.

19        And who does it keep?  The repeat infringers --

20   repeat copyright infringers because Cox wants to keep the

21   revenue because they're not losing money on them.  And why

22   aren't they losing money on them?  How much does Cox pay for

23   the content of the illegal copyright infringement?  If you go

24   to see a movie on the Cox cable channel, they're paying some of

25   their biggest people they do business with, HBO and whatever,

Case 1:18-cv-00950-PTG-JFA   Document 649-3   Filed 12/03/19   Page 35 of 151 PageID#
22336
Case 1:14-cv-01611-LO-JFA   Document 649-3   Filed 12/03/15   Page 35 of 150 PageID# 19134

128

 1   they have a business relationship with them, and Cox has to pay

 2   for that content.

 3          But Cox is selling Internet access where the profit

 4   margins go as high as 94 percent, where their gross revenues

 5   are $3 billion, and how much are they paying for that content?

 6   The songs that they are stealing from the artists, they're

 7   paying nothing for.  That's why the profit margins are so high,

 8   because they're making available content that they're not

 9   having to pay for.  And you know the content they are making

10   available is stolen content.

11          Here's another one.  This is an example of a customer

12   that I consider to be a habitual abuser.  So this is, again,

13   people in the Abuse Group at Cox.  In a year was terminated

14   twice and turned back on.  This is a miraculous situation

15   because they terminated somebody twice, but the first time

16   they're terminated -- you just saw the earlier e-mail -- click,

17   starts all over again.  The blackboard is wiped clean.  It's as

18   those they never infringed in the past.

19          So to get terminated twice in one year, means you

20   must be out there all 23 hours a month illegally copying music

21   on the Cox network.  But this is somebody that Cox looked at,

22   they terminated twice and turned back on.

23          And Mr. Zabek, who's the head of this unit said, "It

24   is fine.  We need the customers."

25          So somebody that's clearly known by Cox to be

Case 1:18-cv-00950-PTG-JFA   Document 694-3   Filed 10/21/19   Page 36 of 151 PageID#
22337
Case 1:14-cv-01611-LO-JFA   Document 649   Filed 12/03/15   Page 35 of 150 PageID#19135

129

1    repeatedly infringing, they don't terminate them.  And why?

2    The revenue.  They need the customers.

3         Here's another one.  This is again, Mr. Sikes, who's

4    in that same unit with Mr. Zabek.  Again, internal Cox e-mails.

5    It's Abuse corporate.  "I suggest you also cover the

6    possibility that it could be a BitTorrent client running on one

7    of their other computers."  So this has to do with a client

8    that was suspected of illegal copyright infringement.  They're

9    exchanging e-mails about that.

10        And he goes further to say, "The BitTorrent client is

11   running on one of their computers.  They need to uninstall it.

12   This customer pays us over $400 a month, and if we terminate

13   their Internet service, they will likely cancel the rest of

14   their services.  Every terminated customer means lost revenue

15   and a potential detractor to our net promoter score.  We should

16   make absolutely certain that we have covered each and every

17   possibility with them to the bitter end before we terminate."

18        Turning a blind eye, willful blindness, not taking

19   the steps, facilitating, providing material support, aiding and

20   abetting the copyright infringers by not terminating them.  And

21   why?  We want to keep the revenue.  We don't want to lose the

22   customers.  They are paying us $400 a month.

23        The profit motive for not doing what was right was

24   the reason Cox violated its own policy by continuing to

25   tolerate what it knew was illegal conduct going on by its

Case 1:18-cv-00950-PTG-JFA Document 494-3 Filed 12/03/19 Page 37 of 151 PageID#
22338
Case 1:14-cv-01611-LO-JFA Document 649 Filed 12/03/15 Page 38 of 150 PageID# 19436

130

1    subscribers on its network.  And in those circumstances, Cox

2    just can't wash their hands and say, it wasn't us.  It was our

3    subscribers.  Go sue them.  Because it was them.  They were the

4    ones that made the decision not to terminate.  They were the

5    ones that provided the facility to keep the infringement going.

6    They decided not to process the Rightscorp notices.

7             So it wasn't just passive activity on Cox's part.  It

8    was active activity which continued to facilitate, to feed, to

9    allow the infringement going on in their network.

10            Now, I've already shown you some of the money slides.

11   I'm going to show you a few more.  This shows, again, the

12   financial benefit as being the motivation for Cox not

13   terminating repeat infringers.  Again, the same cast of

14   characters.

15            You see Mr. Zabek, "Hey, all.  Internal info only.

16   Do not forward."  It goes on.  "If the customer has a Cox.net

17   e-mail, we would like to start the warning cycle over.  Hold

18   for more.  A clean slate, if you will.  This way, we can

19   collect a few more weeks of payments on their account."  Smiley

20   face.

21            Another example of the reason Cox -- this is somebody

22   again who Cox knew was a repeat infringer.  Another example of

23   why they didn't terminate them, "because we can collect a few

24   more weeks of payment from their account," smiley face.

25            "Once the customer has been terminated for DMCA, we

1   have fulfilled the objection of the DMCA safe harbor and can

2   start over."  So after we terminate, we start over again.

3   When?  A year from now?  No, right away.  Next day.  Next week.

4        It goes on further.  "But know that once termination

5   happens, we have fulfilled safe harbor."

6        So you may wonder why Cox -- why is Cox bothering to

7   go through this charade where they pretend to terminate?  Why

8   did they have to do that?  Well, the reason they would have to

9   do it is because there is a federal statute that says that if

10  they actually have a reasonable policy for terminating repeat

11  infringers, they have a safe harbor, they're immune from

12  liability.

13       Well, that is not an issue in this case.  Cox is not

14  immune from liability because it did not engage in what was

15  required in order to have that safe harbor protection.  If it

16  had, we wouldn't be here today.

17       Last line, "we do not make this information publicly

18  known."  Again, stealth, secret, fake terminations so that they

19  can pretend if ever challenged, that they were entitled to safe

20  harbor protections of the DMCA.

21       Here is another one.  Again, folks in that same Abuse

22  unit at Cox.  "I was chatting with Daryl and it seems to me no

23  one let them know in SAN that DMCA terms -- look at this -- are

24  not really terminations any longer."

25       So if I am terminated for copyright infringement,

Case 1:18-cv-00950-PTG-JFA Document 494-3 Filed 10/21/19 Page 39 of 151 PageID#
22340
Case 1:14-cv-01611-LO-JFA Document 409 Filed 12/03/15 Page 38 of 150 PageID# 19138

132

 1    DMCA terms, they aren't really terminations any longer.

 2              Their response to that, "this is not an official

 3    thing or part of the M and P.  We do not tell customers this."

 4              And then another e-mail of the same line showing why

 5    they engage in the charade, "remember that we must terminate to

 6    receive protection under safe harbor amendments."  I already

 7    told you that they aren't entitled to protection under the Safe

 8    Harbor Amendment.

 9              And then underneath that, I don't believe the TOC is

10    terminating the service completely, removing it from ICOMS,

11    they were just clicking terminate and the update ticket, which

12    shows a termination in the customer's ticket history.

13              So they weren't really clicking termination, they are

14    creating a false document by clicking it as though they

15    terminated it.

16              All right.  So I think I have given you a decent

17    preview of what are Cox's liabilities.  Even though they

18    weren't the ones that were directly copyright infringing

19    themselves, the law makes it clear if you are guilty of

20    contributory infringement or vicarious infringement, you are

21    liable to the same extent as the people that are actually doing

22    the illegal copying.  And I have gone through the requirements

23    of each of those and I have gone through a preview of some of

24    the documents we think will show overwhelmingly that Cox is

25    guilty of both contributory infringement and vicarious

1   infringement.

2           So what are the consequences of that?  Well, the

3   copyright law provides penalties.  They provide amounts that

4   are to be paid, that are to be assessed against people that

5   violate the copyright law when they violate that law.  These

6   are statutory penalties.  And I have put them on the slide here

7   in front of you.

8           And those statutory penalties are up to $30,000 per

9   copyright infringed for an innocent infringement.  We have got

10  1,397 copyrights.  1,397.  Up to $30,000 per copyright

11  infringed for innocent infringement.  Up to $150,000 for

12  willful infringement.  And we believe that you should make a

13  judgment as to the amount of the penalty that Cox should pay

14  within this framework.

15          We believe that the evidence shows that Cox was not

16  guilty of innocent infringement, but it was guilty of willful

17  infringement, which would put it in line for the higher

18  statutory damages.

19          What are the factors that you should consider?  Well,

20  there are a lot of factors.  Probably the most important one is

21  deterrence.  Because unlike some cases, the automobile accident

22  case where you compensate them for what their hospital bills

23  were or what their lost wages were, this is a statutory

24  penalty.  And so, we are not required to show how much revenue

25  the artist lost as a result of this illegal conduct.  It would

Case 1:18-cv-00950-PTG-JFA   Document 704-3   Filed 10/21/19   Page 41 of 151 PageID#
22342
Case 1:14-cv-01611-LO-JFA   Document 709   Filed 12/03/15   Page 40 of 150 PageID#19740

134

1  be virtually impossible.  Because once that BitTorrent file

2  goes out there, it goes out to the world.  And so there may

3  have been millions of copies of a single artist's recording.

4  And if that were sold, each one of those sales would have

5  generated revenue.

6          But we don't know how many people copied all those.

7  All we know is a whole bunch of them did.  And all we know is

8  that it was made available to all the other people on the

9  BitTorrent protocol.  So that's why statutory damages are the

10  method for calculating damages in a case like this.

11          And so, the principal starting point is deterrent.

12  How much of an award must you make to a $3 billion a year

13  company just from high-speed Internet to get them to pay

14  attention to their responsibilities under the copyright law?

15  That's deterrent.

16          The other factor you may consider is the size of the

17  activity, the willfulness of the activity.  These are all

18  factors that the judge will instruct you on at the end of the

19  day.  But I wanted to give you a little preview of the amounts

20  we are going to be asking you to consider.  Your judgment, not

21  ours, at the end of the case, if you believe that we've carried

22  our burden of showing that Cox is guilty of both contributory

23  infringement and it's also guilty of vicarious infringement.

24          I found it interesting this morning one of the people

25  that didn't make it on the jury, and I think you heard it, was

135

```
 1    a songwriter.  And he indicated how difficult it was for a

 2    songwriter to make money.  That's the problem we have got.

 3              THE COURT:  Mr. Warin, let's confine ourselves to the

 4    evidence in the case here today and not anecdotal comments

 5    about potential jurors.

 6              MR. WARIN:  That's fine, Your Honor.

 7              One of the things that you are going to hear is the

 8    difficulty of the songwriter making money.  And we're trying

 9    to -- representing song writers to address that by having this

10    case against somebody who can put a stop to the illegal

11    infringement on its network.  And the way it puts a stop to it

12    is by this jury awarding an award against Cox in a significant

13    amount of money so that in the future Cox will pay attention to

14    the notices so that they will try to root out the repeat

15    infringers on their network, and so that the people that make

16    money from the royalties of the legal sale of their music will

17    have an opportunity to make the money they are entitled to for

18    their work.

19              Thank you very much for your attention.  We look

20    forward to talking to you later as we go along.

21              THE COURT:  Thank you, Mr. Warin.

22              All right.  Mr. Wakefield.

23              MR. WAKEFIELD:  Thank you, Your Honor.

24              Ladies and gentlemen, I introduced myself at the

25    beginning of the day today.  But again, my name is Jed
```

Case 1:18-cv-00950-PTG-JFA Document 694-3 Filed 10/21/19 Page 43 of 151 PageID# 22344
Case 1:14-cv-01611-LO-JFA Document 694 Filed 12/03/15 Page 42 of 150 PageID# 19142

136

  1   Wakefield, and I represent Cox Communications.  Thank you all

  2   for your service and for your attention.

  3           The judge said something this morning.  He said there

  4   are two sides to every story.  And that is definitely true.

  5   And you just heard one.  And I thank you for keeping an open

  6   mind while you hear both sides of the story.

  7           You heard about BMG and you heard a little bit about

  8   notices sent by Rightscorp.  But there is a big piece of the

  9   story that you didn't hear about Rightscorp.

 10           Rightscorp was BMG's copyright enforcement agent.

 11   And you heard from counsel that most of the evidence in this

 12   case will come from Cox's own files.  But Cox doesn't have any

 13   evidence of the key thing that the plaintiffs have to prove in

 14   this case, and that's that there was actual infringement,

 15   first, before they get to whether there was contributory

 16   infringement or vicarious infringement.

 17           And all the evidence in this case, every bit of it

 18   about alleged infringement, comes from this company,

 19   Rightscorp.  A company out in L.A. that has made its business

 20   about monetizing copyrights.

 21           And the key fact in this case you didn't hear about

 22   is why Cox refused to forward those notices.  The key fact is

 23   that Cox refused to join in Rightscorp's business.  Rightscorp

 24   had a proposal for Cox.  And that proposal was, we want you,

 25   Cox, to send e-mails accusing customers of infringement and

1    demanding money from them.  And if we say that they are a

2    repeat infringer -- and we will get to what that means -- it's

3    not what it sounds like.  But if we, Rightscorp, say they are a

4    repeat infringer, then you shut off their Internet access until

5    we tell you that we have been paid.  And if you cooperate, we

6    will share that money with you, Cox.

7            Cox refused to be a part of this.  It refused to

8    demand payments from people, from its customers, based on

9    unproven accusations.  It knew then that Rightscorp didn't know

10   key information when it sent out those notices.  And the

11   evidence in this case will show that today Rightscorp will not

12   be able to prove key facts about those e-mails, those millions

13   of e-mails that it sent.

14           It can't tell what really happened on a computer.  It

15   can't detect somebody copying anything.  It can't detect

16   someone transmitting anything.  It can't tell that anyone

17   uploaded or downloaded.  And the system is riddled with

18   problems.  It makes big mistakes.  The Rightscorp system also

19   dramatically over-counts alleged infringements, generating

20   extra notices, each one asking for money.

21           And the Rightscorp system can't tell you who did

22   anything.  It can't tell you that the person who is identified

23   in Cox's record as its subscriber actually did anything.  So it

24   can't tell you the who, the what, or the how many.

25           But Cox didn't refuse to deal at all with Rightscorp.

1    It offered to forward notices to its customers without those

2    settlement offers, those settlement demands, and without

3    shutting off their access.  It does this, and it was doing this

4    at the time, with many other rights owners and rights owner

5    agents.  It works with HBO and movie studios and TV channels,

6    and it cooperates with them, and it has worked out systems with

7    them, and it forwards their notices.  And it works with its

8    subscribers to address issues about purported infringement.

9           And in one of the e-mails you saw that was held up as

10   evidence of this bad intent by Cox, an e-mail from Mr. Sikes

11   from 2014, there were highlighted parts.  But at the end of it

12   all, it says -- I mean, first of all, it notes that they are

13   addressing concerns.  It could be a kid using a wireless

14   network.  It might not be the subscriber.  But if you all think

15   this has been covered in detail, go ahead and terminate.  Cox

16   wasn't playing games.  It was looking out for customers,

17   addressing the problem, figuring out what happened, and not

18   relying on a bunch of hearsay from some company out in L.A.

19   that was dumping millions of e-mails on it.

20          Now, Cox works with copyright owners, but it doesn't

21   put itself in the position of the judge or the jury and decide

22   if there has been an infringement.  It can't tell that from an

23   e-mail.  It can't tell that just because an e-mail says there

24   is an IP address and there's a song title.  Those things can be

25   mistakes.

Case 1:18-cv-00950-PTG-JFA   Document 494-3   Filed 10/21/19   Page 46 of 151 PageID#
22347
Case 1:14-cv-01611-LO-JFA   Document 409   Filed 12/03/15   Page 48 of 150 PageID# 19145

139

1              If somebody wants to take money from somebody, from a

2    Cox subscriber, there is a process for that, and Cox cooperates

3    in that.  Companies can file John Doe lawsuits.  They can file

4    them against one subscriber or lots of them.  And it can serve

5    subpoenas on Internet service companies like Cox to get

6    subscriber information.  And Cox cooperates with those.  And

7    then the rights owner can reach out to that subscriber and say,

8    we think you owe us money.  And if they got the right guy, say,

9    you got me, I'll settle.  And if they got the wrong person,

10   that wrong person can make them prove their case.

11             But Rightscorp -- or as it was called at the time,

12   Digital Rightscorp, did not want that process used.  As they

13   said, "we do not want our clients to use this information to

14   subpoena or sue."  We don't want to test our case against these

15   individuals that we're accusing.  Instead, we want you to shut

16   off the Internet to them until they pay us.

17             And shutting off the Internet in 2015 and back in

18   2012 is a big deal.  The Internet isn't a novelty like it was

19   in 1995 when you could see if you have got mail on AOL.  The

20   Internet is a daily part and a vital part of our lives.  People

21   use it for work.  They run businesses on the Internet from home

22   businesses.  Or if they work in an office and they need to go

23   home because a kid is sick, they can work from home with an

24   Internet connection.  They keep in touch with family near and

25   far, including our troops abroad.  They use it to manage their

1   money, to pay their bills, to get alerts about credit card

2   fraud.  They use it -- if they are out of work, they use it to

3   look for work.  And they use it to deal with health issues, to

4   get health information, to fill prescriptions if they are not

5   able to go to the pharmacy themselves.

6         Now, Cox doesn't provide the Internet.  It doesn't

7   provide any of these websites, and it certainly doesn't provide

8   BitTorrent sites.  It provides a connection, a pipe to the

9   Internet.  Literally, it's a cable company.  That's how it got

10  started.  It physically put cables into buildings, people's

11  homes, people's businesses.

12        And today it does provide television, cable TV.  And

13  it does provide phone and Internet access, and now home

14  security.  And when it provides television service, it doesn't

15  supervise and it doesn't control what people watch.  It's not

16  in charge of people's television viewing.

17        And when it provides phone service, it doesn't tell

18  people who to call or what to say.  It does not supervise or

19  control the phone.

20        And the same is true with the Internet.  It provides

21  a connection, but it does not control and it does not supervise

22  what people do on the Internet.

23        Cox's customers decide how they will lead their lives

24  and how they will use the Internet, and Cox only provides an

25  onramp to the information highway.  Where people go, what they

Case 1:18-cv-00950-PTG-JFA   Document 694-3   Filed 10/21/19   Page 48 of 151 PageID#
22349
Case 1:14-cv-01611-LO-JFA   Document 749   Filed 12/03/15   Page 47 of 130 PageID# 19747

141

1    do, where they drive is up to them.

2              But Cox does not encourage or promote or induce in

3    any way any infringement, and it doesn't profit from it.

4              Cox has an Acceptable Use Policy.  Counsel pointed it

5    out.  It tells its customers that there are certain behaviors

6    that they want them to abide buy.  It tells its customers that

7    it has an intellectual property policy and that they should not

8    transmit or disseminate material that infringes any

9    intellectual property rights, patents, trademarks, copyrights.

10   It doesn't encourage anything.

11             Now, more about this company, Rightscorp.  As I

12   mentioned earlier, it is a company out in L.A.  It calls itself

13   a copyright monetization business.  And it claims that it has

14   developed this software that can detect alleged infringements

15   using BitTorrent technology, and it has a business proposal for

16   rights owners.  Let us force ISPs to threaten their customers

17   and shut off their Internet access until they pay, and we will

18   share that money with you.

19             And from the beginning of this case, for years,

20   Rightscorp -- years before this case, Rightscorp was behind

21   this case.  It helped plan this case.  And when this lawsuit

22   was filed, Rightscorp announced, this is our lawsuit.

23             And what did Rightscorp want Cox to do?  Let's look

24   at the notices you heard about.  First they asked Cox, don't

25   change these notices, send the entire notice.

Case 1:18-cv-00950-PTG-JFA Document 494-3 Filed 10/21/19 Page 49 of 151 PageID# 22350
Case 1:14-cv-01611-LO-JFA Document 09 Filed 12/03/15 Page 48 of 150 PageID# 19148

142

1          And at the beginning they wanted us to tell -- they

2   wanted Cox to tell its subscribers, your ISP, that's Cox, has

3   forwarded you this notice.  It is not spam.  So they wanted Cox

4   to vouch for the e-mail.  And that's important because

5   Rightscorp was going to send a lot of them.  And each one had a

6   link for people to give up their personal information, their

7   name, their address, their e-mail address, their phone number,

8   and their credit card information to pay.

9          They threaten them with $150,000 per infringement.

10  You heard from counsel that's the maximum statutory damages,

11  except that is not the law.  $150,000 per work is the law.  If

12  someone has ten copies, a thousand copies of the same song,

13  that's one statutory damages award.  But they were threatening

14  them and including these in each infringement notices.  And we

15  will show you that they sent a lot of these notices for the

16  same work to the same person.

17         And they then threatened the loss of Internet access,

18  your ISP service.  Again, ISP is Internet service provider.

19  Your service could be suspended if this matter is not resolved.

20        And then there was the link.  "If you click on the

21  link below and log into Rightscorp's automated settlement

22  system for $10, you will receive a legal release from the

23  copyright owner."  That was only for that one e-mail and that

24  one observation of an alleged infringement.  If there were

25  others, even some taken on the same day for the same alleged

1   song, Rightscorp would then ask for money for each one of

2   those.  And that amount later went up -- as counsel said, up to

3   $20, and later to $30.

4           And when Rightscorp said that there was more than one

5   of these e-mails that it was alleged to be now a repeat

6   infringer, they said, we want you, Cox, to suspend that

7   person's Internet account.  Not until you warn them and talk to

8   them and figure out what happened.  No, we want you to suspend

9   their Internet until they pay.

10          Cox refused.  It said, "as a matter of policy, it

11  does not accept or forward notices such as yours, which make

12  settlement demands."  But it agreed to forward those notices if

13  Rightscorp would remove the settlement demands.  And Rightscorp

14  refused to ever do that.

15          Rightscorp sweetened the deal.  It said, "after some

16  reasonable initial compliance, we are willing to discuss a

17  revenue share with Cox to offset legitimate costs."  In other

18  words, you should do this, there is money in it for you.

19          Again, that's not Cox's business.  It gets paid from

20  its subscribers for its services.  It doesn't go to them and

21  demand money based on unproven accusations.

22          Again, Rightscorp tried to convince Cox saying, "we

23  can add an item to an income statement."  This was from a list

24  of talking points that Rightscorp prepared to get ready for a

25  phone call to try to convince Cox to join in this program.

Case 1:18-cv-00950-PTG-JFA Document 704-3 Filed 10/21/19 Page 51 of 151 PageID#
22352
Case 1:14-cv-01611-LO-JFA Document 704 Filed 12/03/15 Page 50 of 150 PageID#19150

144

1          Now, you may hear some evidence that it could have

2     been possible for Cox to remove the settlement demands, to go

3     into each of these millions of notices and change them and

4     forward them.  But Rightscorp did not want that to happen.

5     Rightscorp made clear, this was their program, and you'll hear

6     testimony from Mr. Steele, Rightscorp's president and chief

7     operating officer, that he did not want anyone -- he never

8     communicated to Cox that they should forward these notices

9     without settlement offers.

10         And Rightscorp's position did not change.  Here is

11    another letter communication to Cox saying, forward -- in this

12    case it was 452,000 e-mails, forward those hundreds of

13    thousands of e-mails, each one asking for money.  "Suspend the

14    infringer's service," this is an accused person, not someone

15    who has been determined to be an infringer, but suspend their

16    service until we've been paid and then reconnect them when we

17    tell you you can do that.

18         Cox refused to do this, as I said, because it could

19    not rely on these notices as proof of infringement.  Because it

20    knew then that you can't tell based on Internet protocol

21    addresses, these IP addresses, who is actually involved in

22    things.  And the evidence has shown as we've gotten into this

23    case that the Rightscorp system was flawed.  It did not tell us

24    who did anything, it did not tell us the what, and it did not

25    tell us the how many.

1          Let's start with the who.  To understand that, it's

2    helpful to understand how people use the Internet in their

3    homes and businesses.  Cox, as I mentioned, it provides a

4    cable, a connection to the home.  And if it's providing

5    Internet service, it provides a connection to a cable modem.

6          And that modem is assigned temporarily an IP address.

7    Sometimes that IP address is there for a long time if the modem

8    is left on and nothing changes.  Sometimes that IP address

9    turns over and changes if the modem is shut off or for other

10   technical reasons.

11         But many, many people connect that modem to a WiFi

12   router, a wireless antenna that lets any Internet-enabled

13   device connect to the Internet.  Many people have this in their

14   homes.  Many businesses like Starbucks have WiFi networks

15   people can get on.  And anyone in range of a WiFi router can

16   connect.  If it's password protected, unless someone has stolen

17   a password, they need the password.  But if it's not -- and

18   many of these are unsecured -- then anyone can get on.  Anyone

19   in range of that WiFi router antenna can connect.

20         Cox, as the cable company, it knows the subscriber

21   name of who has that account.  But it doesn't know what people

22   are using the Internet that's connected to that account.  It

23   could be a person upstairs in this picture.  Maybe that's a

24   subscriber, maybe it's not.  I could be a guest.  A kid who is

25   home visiting from college.  It could be a neighbor who is

146

1    within access of the WiFi antenna.

2              And many people, upwards of 65 percent and growing,

3    use WiFi routers in their homes with high-speed Internet.  So

4    the Rightscorp software can't identify who.  And you will hear

5    that not from me, you will hear it from their own witnesses.

6              And by the way, I mentioned Starbucks as an example.

7    But there are coffee shops, hotels, businesses that use

8    wireless networks as well, that are open, and Cox customers

9    include these small businesses.

10             Christopher Sabec, Rightscorp's founder, was asked

11   about this in his deposition.  Admitted, we don't know who did

12   it.

13             Greg Boswell, a Rightscorp programmer, acknowledges

14   that anyone within range of a WiFi antenna and WiFi router can

15   connect.  It could be a neighbor, it could be someone in a car.

16   I could be a guest at a hotel.  Rightscorp admits all of this.

17   So they don't know who did it.

18             They also send notices in error.  And to understand

19   this, it's helpful to understand a bit more about BitTorrent

20   technology.  There was a suggestion that BitTorrent is somehow

21   a criminal piece of technology, that it's just used for music

22   stealing.  It is used by NASA.  It's used by major software

23   companies to distribute -- I mean, to transmit updates to their

24   software.  It's used for countless legal and legitimate

25   purposes.

1          A torrent payload describes the contents that someone

2   can find.  And that can be authorized or unauthorized content.

3   It's like a box that you can put anything in.  It could be not

4   just music or movies or software.  It could be posters,

5   photographs, anything that can be digitized.  It contain

6   articles -- it could contain articles, it could contain music.

7   In this example we see some articles, some posters, and a CD of

8   a Bruno Mars record.

9          BitTorrent users can download the whole torrent or

10  they can choose to download a part.  So if someone is looking

11  for something specifically, they can download just that,

12  including the authorized or legal content.  And the authorized

13  or legal content isn't just documents and so forth.  There are

14  artists who authorized their music to be released on

15  BitTorrent, including BMG artists, including well-known

16  musicians.

17          So the notion that BitTorrent equals infringement is

18  just not going to be supported in this case.

19          But a BitTorrent user can choose part of it.  And

20  this system has identified legitimate non-music files and

21  called them music.  In this case, Rightscorp identified for one

22  example this article about the Grateful Dead performing at

23  Wembley in 1972.  And they said it was a song.  And they sent

24  somebody an infringement notice asking them to pay for

25  infringing the song.  That person, who had that document, did

Case 1:18-cv-00950-PTG-JFA Document 704-3 Filed 10/21/19 Page 55 of 151 PageID#
22356
Case 1:14-cv-01611-LO-JFA Document 1049 Filed 12/03/15 Page 54 of 150 PageID# 19154

148

1    not infringe that song.  That's not a song, it's a piece of

2    paper.

3              And there are other problems with the system.  The

4    Rightscorp system sends notices after detecting not the whole

5    payload, not the whole box, but just 10 percent.  It's not

6    actually looking for what's on someone's computer.  It's

7    looking for metadata, it's looking for signals about what is

8    available.  And if it sees a 10 percent match, it assumes that

9    everything in the box is there and is being made available to

10   download.  That 10 percent could be authorized, could be legal,

11   could be something that Rightscorp is not authorized to try to

12   settle anything for.

13             And the third big problem is that Rightscorp counts

14   the same thing over and over again and it calls each one a

15   different infringement.

16             So I mentioned Rightscorp just observes metadata, it

17   observes information about a BitTorrent without seeing that

18   anything is on a computer.  But if it sees information and it

19   concludes that it means that there is, for example, one CD with

20   12 songs on it, it will send 12 notices to the IP address that

21   it detected.  So that one person with one CD, assuming they

22   have it -- and we don't know -- would get 12 notices.

23             If that computer is just left running for a month,

24   Rightscorp will go back every day and keep looking at it, and

25   each time it sees that same alleged CD, it says, aha, 12 more.

1   I looked again, 12 more.  I looked again, 12 more.  And so for

2   one month there would be 360 separate infringements according

3   to Rightscorp, but with one CD, one time.

4       And that could range in into settlement demands

5   between $3,600 to $10,800 in demands.  And that person with

6   that IP address would be called a repeat infringer and they

7   would have their Internet access shut off.

8       And again, you'll hear from Mr. Boswell, Rightscorp's

9   own programmer, that if they saw one work for ten days, that

10  would be called ten infringements, even though it was one

11  thing.

12      But it's worse than that because Rightscorp would

13  count the same thing multiple times in one day and call it

14  repeated.

15      On March 9, 2012, Rightscorp sent six notices to Cox,

16  according to Rightscorp's own records, for a single IP address

17  with one song by ZZ Top.  It sent notices at -- on the same

18  day, 4:43, it said, aha, an infringement.  5:22, aha, an

19  infringement.  5:47, 6:13, 6:51, and 7:30, all the same day.

20  And it did this again and again.

21      You heard about how BMG sent somewhere around a

22  million notices.  It actually sent 7,620,000 notices according

23  to Rightscorp's records.  7 million notices.  You heard from

24  counsel that Cox has about four-and-a-half million subscribers.

25  That's more notices of alleged infringement than there are

1    subscribers on the Internet.

2            You also heard that something like on Cox's Internet

3    service.  Cox doesn't have 7.6 million customers.

4            You also heard that there's going to be a study

5    introduced in this case that shows that 10 percent of Cox

6    customers say they use BitTorrent to download music.  It's not

7    true.  That survey will come in, and you will get a chance to

8    view it yourself, but it doesn't ask people if they use

9    BitTorrent and it doesn't ask people if they download files

10   that they don't have authorization to download.  It does not

11   show it.  And it also doesn't make sense that one out of ten,

12   that if you take ten subscribers, that one out of ten of them

13   were using BitTorrent to download music.

14           So the system is not accurate.  It can't tell you

15   who, it can't tell you what, it can't tell you how many.  What

16   does BMG have to say about this?  They hired this company to

17   send out these notices.  What did they do?  There won't be

18   evidence that they verified that this system works.

19           Mr. Hauprich, the vice-president, will testify,

20   testified in his deposition, that the accuracy of the system

21   for him is measured in receiving some payments.  If people who

22   have been threatened or who have had their Internet access cut

23   off, pay some money, it means they must be guilty.

24           And there's another key problem with the Rightscorp,

25   software.  And that is, for the whole period of time when the

Case 1:14-cv-01611-LO-JFA Document 494-3 Filed 12/03/15 Page 57 of 150 PageID# 19157
Case 1:18-cv-00950-PTG-JFA Document 649-3 Filed 10/21/19 Page 58 of 151 PageID# 22359

151

1    evidence that's going to be presented in this case of alleged

2    infringement Rightscorp was generated, that whole period of

3    time they were changing that software and they were erasing

4    parts of that software and writing over pieces of that

5    software.  And they didn't keep any logs, they didn't use a

6    revision control system.  And so that software, that whiz-bang

7    system that tells us it can prove infringement, is gone.  We

8    only have software that came later.

9            And the timeline on this is important.  On March 7,

10   2012, BMG and its in-house attorneys were discussing bringing

11   this lawsuit.  A year later, Rightscorp -- this is March 20,

12   2013, Rightscorp and its attorneys retain an expert to get

13   their software ready for litigation.  You're going to hear from

14   that expert.  Her name is Barbara Frederiksen-Cross.  If she

15   had been asked at the time, should we be saving this stuff as

16   we keep changing it, she would have said, yes, absolutely.  But

17   they didn't ask her and they kept changing it and they kept

18   erasing parts of it.

19           They filed their lawsuit November 2014.  Did they

20   stop erasing their code?  Nope.  They kept changing things.

21   They finally had to produce it in this case July 2015.  They

22   finally produced that new software.  Everything up until then

23   we can't see because it wasn't saved.  They wrote over that

24   earlier software.

25           There's another key piece of the timing in this case.

Case 1:18-cv-00950-PTG-JFA   Document 704-3   Filed 10/21/19   Page 59 of 151 PageID#
22360
Case 1:14-cv-01611-LO-JFA   Document 409   Filed 12/03/15   Page 58 of 130   PageID# 19458

152

1   As I mentioned before, Cox told Rightscorp again and again, it

2   told them before September 2011, but it told them again on

3   September 2011, we will not accept notices asking for money.

4   We won't do it.

5          Now, Rightscorp and BMG sound surprised that their

6   e-mails were going to this brick wall.  But Cox told them, we

7   will not accept them.  December 2011 after being told

8   unequivocally, we will not accept these notices, Rightscorp and

9   BMG entered into their representation agreement.  And after

10  that, Rightscorp began sending these notices, knowing full well

11  that every one of them was not going to be accepted.

12         When Rightscorp and Cox were in these discussions and

13  Rightscorp was trying to continue to get -- was continuing to

14  try to get Cox to join its program, they began to threaten Cox.

15  They said, we've been taking a baby step approach with these

16  numbers, but if we wanted to, we could have sent more.  We

17  could have sent 27,000.  You would have had to terminate people

18  because, again, they were asking us to shut off people's

19  Internet access until they paid.

20         Cox would not be pressured by this e-mail and it said

21  no.  And sure enough, Rightscorp followed through on its

22  threat.  It went from sending a few hundred to up to about a

23  thousand notices in a month to sending 74,000 e-mails in one

24  month.  In fact, on two days in October 2011 it sent over

25  40,000 e-mails just to Cox.

Case 1:18-cv-00950-PTG-JFA   Document 649-3   Filed 12/03/24   Page 60 of 151 PageID# 22361
Case 1:14-cv-01611-LO-JFA   Document 709   Filed 12/03/15   Page 59 of 150 PageID# 19459

153

 1          So why did Cox blacklist and refuse to accept these
 2   e-mails?  Was it because it needed to profit from one or two
 3   subscribers that you saw e-mails about?  No.  It was because it
 4   was being threatened with a deluge of e-mails, of millions of
 5   e-mails, and because Rightscorp refused to take out these
 6   settlement demands.  It refused to accept payment -- to accept
 7   and send payment demands because they were based on unproven
 8   allegations.  And sure enough, it went on to receive
 9   7.6 million e-mails.  And overall, 22-and-a-half million
10   e-mails, 22-and-a-half million e-mails were sent by Rightscorp
11   to Cox.
12          Cox doesn't promote and it doesn't help and it
13   doesn't encourage copying by anyone.  You heard about sites
14   like ThePirateBay and the old sites like Napster.  Cox doesn't
15   operate any sites like that.  It just provides a connection to
16   the Internet, and it doesn't try to convince people to do it,
17   it discourages them from doing it, it has policies against it.
18          And it can't go out and block P2P technology,
19   peer-to-peer technology, like BitTorrent.  There was a
20   suggestion in one of those slides that Cox knew that BitTorrent
21   was being used, it must know that it's bad.  Well, A,
22   BitTorrent is not criminal.  BitTorrent can be used for
23   legitimate purposes.  But B, because of that, Cox isn't allowed
24   to slow it down or stop it.  It can't do that.
25          And by the way, Rightscorp says that.  Rightscorp in

Case 1:18-cv-00950-PTG-JFA   Document 494-3   Filed 10/21/19   Page 61 of 151 PageID#
22362
Case 1:14-cv-01611-LO-JFA   Document 709   Filed 12/03/15   Page 60 of 150 PageID# 19460

154

1   its presentation to Cox said, ISPs, Internet companies like

2   Cox, may want to block P2P, but it is not legal to do so.

3          Cox does not have the right and ability to supervise

4   its customers.  It does not control what Web sites they visit.

5   It can't stop peer-to-peer technology, it's not allowed to do

6   that.  And Cox does not have a direct financial interest in

7   user copying.

8          You heard from counsel that Cox spends a lot of money

9   on content.  That's because Cox provides TV services and it

10  gets paid for that.  It gets paid when people watch video on

11  demand.  It has -- you heard about Pandora, a streaming service

12  that people can subscribe to.  Cox has an arrangement with

13  Pandora where people can get Pandora through the Cox TV

14  Internet service.  So when people get music without

15  authorization, without any payment, that is in competition with

16  Cox.  It doesn't make money from that, it loses money from

17  that.  It's not in its interest.

18         But it's also not in its control to stop it.  It does

19  work with rights owners.  And it does try to -- it does forward

20  notices and it does work with customers to figure out what's

21  going on.  And if someone else is using their WiFi, to help

22  them secure it.  But it's not profiting from that.

23         It does not have a direct financial interest, which

24  is what the law requires to find vicarious liability.  It does

25  not have any financial interest in infringement.  In fact,

Case 1:18-cv-00950-PTG-JFA   Document 704-3   Filed 10/21/19   Page 62 of 151 PageID#
22363
Case 1:14-cv-01611-LO-JFA   Document 709   Filed 12/03/15   Page 61 of 150 PageID# 19161

155

1    Rightscorp itself said, you can reduce the cost per subscriber

2    by getting rid of these high bandwidth consumers, people

3    watching movies and downloading music.

4              So what is the evidence in this case going to show?

5    It's going to show that Cox cooperates and it works with rights

6    owners.  It responds to subpoenas when there's a dispute and

7    someone wants to get paid.  But it did not induce, it did not

8    cause, it didn't encourage, it didn't contribute to music

9    sharing.  It didn't supervise and it didn't control and it does

10   not do so now any music sharing.  And it didn't have any

11   financial interest or benefit from this alleged copyright

12   infringement.

13             So why are we here and what did Cox do?  It stood up

14   for its customers.  It stood up for customers to prevent them

15   from getting their Internet access shut off until they paid

16   money based on unproven allegations.  And at the end of this

17   trial, those allegations will remain unproven because plaintiff

18   will not meet its burden of proof.

19             I want to thank you all very much.  I know it's been

20   a long day already and we've been talking a lot, but on behalf

21   of Cox and our team here, I want to thank you for your service

22   and for your attention and for the hard work I know you're

23   going to do.

24             Thank you all very much.

25             THE COURT:  Thank you, Mr. Wakefield.

1           All right.  Let's take our mid-afternoon break now.

2    And take 15 minutes, we'll come back at ten minutes to 4:00 and

3    we'll begin the testimony in the case.

4           All right.  Thank you.  You are excused.

5           NOTE:  At this point the jury leaves the courtroom;

6    whereupon the case continues as follows:

7    JURY OUT

8           THE COURT:  All right.  Do we need to discuss

9    anything before this first witness testifies?  Have we got it

10   all straight?

11          MR. BUCKLEY:  Your Honor, we are going to have issues

12   with respect to the second witness, Ms. Frederiksen-Cross, but

13   I don't know whether we are going to get to her today.

14          THE COURT:  Yeah, I would --

15          MR. BUCKLEY:  But -- so we can wait.

16          THE COURT:  Okay.  Yeah.  Let's wait until his

17   testimony is over and then I'll hear anything you'd like to

18   say.

19          MR. WARIN:  Your Honor, I didn't want to interrupt

20   opposing counsel during their opening, but the word "threaten"

21   was used four times.  And I think that's not consistent with

22   this Court's ruling with respect to derogatory terms with

23   respect to Rightscorp.  I just didn't want to interrupt, but it

24   was mentioned four times.

25          THE COURT:  Okay.  You know, it's opening statement.

 1   You referenced how they were stealing everything in sight, and

 2   your opposing counsel --

 3        MR. WARIN:  I might have done that.

 4        THE COURT:  Yeah, and your opposing counsel kind of

 5   looked at me like, you know, we're going to let it go.  So

 6   let's stay within the orders that we have issued, but I

 7   understand opening statement things --

 8        MR. WARIN:  Thank you, Your Honor.

 9        THE COURT:  -- trying to send a message.

10        All right.  So we're in recess.  We will come back

11   at -- what'd I say -- ten minutes to 4:00.

12        All right.  Thank you.

13        NOTE:  At this point a recess is taken; at the

14   conclusion of which the case continues in the absence of the

15   jury as follows:

16   JURY OUT

17        THE COURT:  All right.  One matter you wanted to

18   discuss, Mr. Bridges?

19        MR. BRIDGES:  Yes, Your Honor.  Thank you.

20        During Mr. Warin's opening, he alluded to testimony

21   that would be coming in from the first witness, Mr. Hubert, who

22   is, I believe, CEO of BMG, and he was talking about that some

23   of the testimony would extend to discussions about harms to

24   songwriters and the like.  And that's really verging on -- that

25   is opinion testimony.  That's 701, 702.

Case 1:18-cv-09050-RJC-JFA Document 494-3 Filed 10-21-19 Page 65 of 151 PageID #:
Case 1:14-cv-01611-LO-JFA Document 709 Filed 12/03/15 Page 64 of 150 PageID# 19164
22366

158

```
 1          We had a Daubert motion over an expert on those

 2   issues, and we don't believe that this testimony should go in

 3   that direction.  I'd rather resolve that now rather than have

 4   to pop up as questions arise.

 5          THE COURT:  Okay.  Well, I think it's fair game for

 6   them to talk about revenues and where those revenues go and

 7   they go to the copyright owners.  The added comments in the

 8   opening statement, that's a legitimate concern.

 9          So we're -- Mr. Allan, you've popped -- you've

10   jumped -- you got up.  Where are the boundaries?

11          MR. ALLAN:  Yes, Your Honor.

12          So, look, Mr. Hubert is the head of the company.

13   He's certainly not going to give overall opinion testimony, but

14   we do have the burden of proof here.  We do have the burden of

15   proof on damages.  They've just made that very clear to the

16   Court and the jury.

17          Mr. Hubert is simply just going to say that this

18   problem, piracy and the issue of online piracy, BitTorrent is a

19   problem for the business and a problem for their songwriters,

20   and it's not going to really go much beyond that to be honest

21   with you.  Not going to get into any detailed macroeconomic

22   analysis of any of this stuff.  It's just going to say, yeah,

23   it's a problem and it causes a problem to our business.

24          THE COURT:  Okay.  Reduction in our profitability,

25   our profits, our bottom line, right, and --
```

Case 1:18-cv-00950-PTG-JFA   Document 694-3   Filed 10/21/19   Page 66 of 151 PageID#
22367
Case 1:14-cv-01611-LO-JFA   Document 709   Filed 12/03/15   Page 65 of 150 PageID# 19465

159

1          MR. ALLAN:  Correct.

2          THE COURT:  -- for the copyright owners?

3          MR. ALLAN:  Right.

4          THE COURT:  All right.  Mr. Bridges, what's the -- or

5    Mr. Buckley, what's the problem with that?

6          MR. BRIDGES:  Your Honor, if he's going to give

7    accounting information about loss of sales that's based on

8    personal knowledge, fine.  If he wants to say, "It's just

9    tough," that's over the line, Your Honor.  I think if he wants

10   to say this case is about these issues and these harms

11   experienced in these circumstances, based on his personal

12   observation, that would be fine.  But I don't -- if we look at

13   the pattern of other witnesses they have, the CEO of BMG is not

14   the person with that personal knowledge.  This is -- this is

15   the person that paints a canvas of a broad worry and concern,

16   and we believe that's form of opinion, Your Honor.

17         THE COURT:  Okay.  I think you're cutting that --

18   cutting the edges a little too sharply.  I think he's -- he's

19   the CEO of the company.  He's looking presumably at profits and

20   losses and revenues and whether they're going up and whether

21   they're going down or where they're -- where they are or they

22   aren't consistent and where the problems are.  So identifying

23   the fact that BitTorrent -- that loss of revenue from copyright

24   infringement I don't think is going too far, but --

25         MR. BRIDGES:  Your Honor, it wouldn't be if he's

Case 1:18-cv-00950-PTG-JFA   Document 494-3   Filed 10/21/19   Page 67 of 151 PageID#
22368
Case 1:14-cv-01611-LO-JFA   Document 049   Filed 12/03/15   Page 68 of 150 PageID# 19466

160

1   going to be precise about lost revenue.  I do notice that in

2   the discussion of statutory damages, the only factor Mr. Warin

3   referred to was deterrence, which he I believe improperly

4   referred to as a penalty.

5           THE COURT:  Yeah.

6           MR. BRIDGES:  And that's a separate discussion for

7   another day.

8           THE COURT:  It is.

9           MR. BRIDGES:  But I think that there's a mood that is

10  being intended here by this intended opinion testimony, not

11  facts, and we would ask that the testimony be -- contain the

12  facts.

13          THE COURT:  Let's limit it to the facts.  But I think

14  he can reach some conclusions based on the facts, based on

15  what's going on in his business and that's -- that I think is

16  permissible and that's what I was trying to say.

17          MR. BRIDGES:  Thank you, Your Honor.

18          MR. ALLAN:  Thank you, Your Honor.  And I'll just

19  note that obviously, you know, the fact that we -- we've taken

20  clearly the position that we cannot prove actual damages.  It's

21  impossible.  So trying to pigeon hole us into a testimony where

22  he has -- he can only opine on this specific harm to these

23  specific copyrights is not realistic.

24          One other housekeeping matter, Your Honor.  In terms

25  of the exhibits, we've got one exhibit that we'll introduce

1   with Mr. Hubert that has no objection, so if it pleases the

2   Court, I'll move it into evidence now or we can do it through

3   his testimony.

4           THE COURT:  You want to have him identify it and

5   demonstrate it that you understand -- that he recognizes it and

6   can testify about it?

7           MR. ALLAN:  Be happy to do that, Your Honor.

8           THE COURT:  All right.  Let's do it that way.

9           MR. BRIDGES:  One last thing, based on what Mr. Allan

10  said, I would like for the testimony to be about BMG, the

11  plaintiff, rather than nonparties in the industry.

12          THE COURT:  Carly Simon lost revenues and she's in

13  terrible straits as a songwriter and singer, is that what you

14  mean?

15          MR. BRIDGES:  Anyone other than the plaintiff, Your

16  Honor.

17          THE COURT:  Okay.  All right.  Well, I don't know why

18  there would be testimony about anybody other than the

19  plaintiff, but make your objection if and when.

20          And only one of you is handling each witness.  Right?

21  And so we're not going to have multiple people popping up.

22  Good.  All right.  I know that can be hard sometimes, but sit

23  on your hands.

24          All right, Joe.  Let's get our jury.

25  (JURY IN AT 4:01 P.M.)

Case 1:18-cv-10050-DTG-JFA   Document 494-3   Filed 10/21/19   Page 69 of 151 PageID#
22370
Case 1:14-cv-01611-LO-JFA   Document 1049   Filed 12/03/15   Page 68 of 150   PageID# 19168
L. Hubert - Direct

162

1          THE COURT:  All right.  Please be seated.  First

2   witness, is it you, Mr. Allan?

3          MR. ALLAN:  Yes.  Thank you, Your Honor.

4          THE COURT:  All right.

5          MR. ALLAN:  Your Honor, we call -- plaintiffs call

6   Laurent Hubert.

7   (THE OATH WAS ADMINISTERED.)

8          THE COURT:  Please proceed.

9          MR. ALLAN:  Thank you.

10              **MR. LAURENT HUBERT,**

11      having been first duly sworn, testified as follows:

12              DIRECT EXAMINATION

13   BY MR. ALLAN:

14   Q.   Good morning -- or good afternoon, Mr. Hubert.  How are

15   you?

16   A.   Good.  Thank you.

17   Q.   Could you state your name for the record, please?

18   A.   Laurent Hubert.

19   Q.   And where do you work?

20   A.   I work at BMG.

21   Q.   And what do you do there?

22   A.   I am the president of creative and marketing.

23   Q.   And I'm from Fairfax County.  You sound like you're not

24   quite from around here.  Where are you from?

25   A.   Originally from France, and I came to this country about

1    27 years ago, and I became an American citizen about eight

2    years ago.

3    Q.   Very good.

4              What do you do at BMG?  What's your job

5    responsibility?

6    A.   I oversee marketing and credit functions as well as some

7    other business functions.

8    Q.   Very good.

9              Could you briefly describe for us the business of

10   BMG?

11   A.   We are a music right company involved in different aspects

12   of the music business from recording music to music publishing.

13   And music publishing is the majority of our business, the

14   lion's share.

15   Q.   Thank you.

16              Music publishing.  What is that?

17   A.   We are the partner of a songwriter.  We make sure that we

18   provide them with creative and marketing support, as well as

19   handle all the administrative functions related to that

20   activity and we enforce their rights.

21   Q.   You said songwriter.  What's a songwriter?

22   A.   A songwriter is somebody who writes the music and the

23   lyrics of a song.

24   Q.   So is the songwriter when I flip on the radio and people

25   are singing the tunes, is that the songwriter?

1   A.   Sometimes, but most often the case, it's not.   It is

2   somebody who will write a song for an artist to record.

3   Q.   Does BMG have a role with helping songwriters earn a

4   living?

5   A.   Absolutely.   That's our primary goal is to enforce the

6   copyrights and making sure those copyrights become valuable.

7   Q.   When you say the primary role is to enforce the

8   copyrights, what do you mean by that?

9   A.   Well, for us, we have to license those rights and making

10   sure that we provide them with a number of opportunity so they

11   can further their craft and exploit these copyrights.

12   Q.   So we'll talk about the licensing in a moment, but how is

13   it that BMG has the ability to license?

14   A.   We own or control the copyrights, and the copyright is the

15   protection for us and the protection needed for us for the

16   songwriter to earn a living.

17   Q.   Is there some sort of contractual relationship that the

18   company has with the songwriters?

19   A.   There is.

20   Q.   And how does that work?

21   A.   Typically, there's two type of contract.   One where we are

22   the corner of the copyright with the songwriter, and we have

23   obviously an exclusive license to administer those rights, and

24   we will make anywhere between -- typically north of 75 percent

25   of those royalties.

Case 1:18-cv-00950-PTG-JFA Document 494-3 Filed 10/21/19 Page 73 of 151 PageID# 22373
Case 1:14-cv-01611-LO-JFA Document 909 Filed 12/03/15 Page 73 of 150 PageID# 19471
L. Hubert - Direct
165

1          The other scenario is where we do not own a

2    copyright.  The ownership rests with the writer, but we do have

3    exclusive rights to administer the copyright and we remit

4    anywhere between 75 and 95 percent of those royalties to the

5    writer.

6    Q.   So on the co-publishing side, what do you mean you remit

7    75 percent to the songwriter?  What does that mean?

8    A.   For every dollar that we collect, we would pay out 75

9    cents to the writer and we would keep the difference, 25 cents.

10   Q.   And that's generally with respect to co-publishing

11   arrangements that the company has with songwriters?

12   A.   That is generally the case.

13   Q.   And then explain to me the administration revenue

14   breakdown again.

15   A.   On the administration side, essentially we pay a higher

16   royalty payout.  Typically, it can be 80 percent, as high as 95

17   percent.  So we would keep five to 20 percent of that royalty.

18   Q.   So BMG would keep five to 20 percent?

19   A.   Yeah.

20   Q.   The rest would go to the songwriter?

21   A.   Yes.

22   Q.   Why is it that you think BMG is an attractive partner for

23   songwriters?

24   A.   Well, first and foremost, we get to enforce the copyrights

25   of our songwriter, but also we make at their disposal a global

1   infrastructure.  We have deep resources in the creative

2   community.  We have large teams both on the marketing side, on

3   the creative side, also on the administration side to ensure

4   that we collect those royalties and remit those royalties

5   properly.

6   Q.   So the royalties, is that part of the licensing

7   arrangement?

8   A.   It is.

9   Q.   Can you explain a little bit about how the songwriters

10   actually earn a living?  How they get paid?

11   A.   Every time a song is downloaded or streamed or heard on

12   the radio or placed in a movie, a commercial, or a TV series,

13   it leads to a royalty and there's a royalty payout.

14   Q.   Even songs that you hear on the radio --

15   A.   Yes --

16   Q.   -- receives a royalty?

17   A.   -- absolutely.

18   Q.   You mentioned a few moments ago copyrights.  Are

19   copyrights an important part of your business?

20   A.   They are our business.  Without copyrights, we would not

21   have, again, the ability to collect royalties on behalf of our

22   songwriters.

23   Q.   Why is that?

24   A.   Because they are there for our protection to -- to make

25   sure that we license and those copyrights are not used without

1    permission and compensation.

2    Q.   Are -- would you consider copyrights to be an asset of

3    BMG?

4    A.   Absolutely.  A copyright is very much like property

5    rights, like a house title or a car title.

6    Q.   Are you familiar with the copyrights that are at issue in

7    this case?

8    A.   Yes, I am.

9    Q.   Do you have any understanding of roughly how many

10   copyrights there are?

11   A.   Approximately, 1400.

12   Q.   I'd like to hand the witness an exhibit, if I may.

13           Mr. Hubert, I've handed you an exhibit here that's

14   been labeled PXS 001.  Could you take a look at it and tell me

15   if you recognize it?

16   A.   Yes, I do.

17   Q.   And what is it?  Do you know what it is?

18   A.   Yes.  Those are the copyrights asserted in this case.

19   Q.   And do you know how this document was put together?  Do

20   you know what it consists of?

21   A.   Consists of -- this is information from copyright

22   registration.  I can see a copyright registration number, a

23   song title, songwriters, as well as recording artists.

24   Q.   Is it a summary of the copyrights that are at issue in

25   this case?

1    A.    I believe it is.

2           MR. ALLAN:  Your Honor, I'd move the admission of

3    PXS 001.

4           THE COURT:  All right.  Any objection?

5           MR. BRIDGES:  No, Your Honor.

6           THE COURT:  All right.  Proceed.

7    BY MR. ALLAN:

8    Q.    And, again, just looking at this first page -- and I

9    recognize that there are a number of pages in this document,

10   Mr. Hubert.  Just -- is the -- the copyright registration

11   number, what does that mean to you?

12   A.    Well, that's a -- there is -- it's a -- the registration

13   of the copy -- the protection of the copyright, registration of

14   copyright.  It's under which a right is protected, a

15   registration number.

16   Q.    And what is the importance of the song title?  What does

17   the song title identify?

18   A.    Well, the song titles -- can you repeat your question?

19   What do you mean?

20   Q.    Yeah, what -- I mean, what -- is there a way to refer to

21   your works other than a song title?

22   A.    We typically refer that as a composition.

23   Q.    And do you refer to the composition if you want to talk

24   about a specific composition by the title of the song?

25   A.    Yes.

Case 1:18-cv-00950-PTG-JFA Document 704-3 Filed 10/21/19 Page 76 of 151 PageID# 22377
Case 1:14-cv-01611-LO-JFA Document 704 Filed 12/03/15 Page 76 of 150 PageID# 19175
L. Hubert - Direct

169

1    Q.    And the next column references songwriters.  Are these the

2    folks that we talked about that actually write the music and

3    the lyrics?

4    A.    That is correct.

5    Q.    What is the recording artist?

6    A.    It's the artist will record that composition or that song.

7    Q.    Okay.  And so does the -- is it -- does the -- BMG refer

8    to the composition by the song recorded by the recording

9    artist?

10   A.    Yes.  The song title is essentially the common element

11   that will include the song composition.

12   Q.    And flip through the exhibit, if you would, please,

13   Mr. Hubert.  Does BMG have relationships with various of the

14   songwriters listed here on this summary exhibit?

15   A.    We do.

16   Q.    Very good.

17         How many songwriters does BMG represent?

18   A.    Approximately 15,000.

19   Q.    Tell us a little bit about the types of songwriters that

20   the company represents.  Is it, for example, one particular

21   genre, musical genre?

22   A.    We have all type of songwriters writing in all musical

23   genre.  We have songwriters who have enjoyed extraordinary

24   success with very popular songs, and we have some other

25   songwriters who write beautiful songs but may not have the

1  benefit of enjoying the same success.  And the reality is it is

2  a rarity to have a songwriter that has a continual success.

3  It's a very competitive business.

4  Q.   Thank you.

5       I think earlier you testified that BMG is a --

6  considers itself a partner with these songwriters?

7  A.   We are.

8  Q.   How so?

9  A.   Well, we co-own the copyrights in many cases, obviously.

10  But most importantly, if they don't earn royalties, we don't

11  earn any royalties, so our economic interest is absolutely

12  aligned.

13  Q.   Is there a creative aspect that the company partners with

14  its songwriters on?

15  A.   Absolutely.  The --

16  Q.   How does that work?

17  A.   The creative side of our business is very important, if

18  not a critical part of our business.  And our job is to make

19  sure that we foster an environment for them to develop their

20  creative abilities, and we do this in many different ways.

21  Q.   Can you give us some examples of ways in which the company

22  assists songwriters on the creative side?

23  A.   Yes, we have a creative team.  We try to understand the

24  strength of each songwriter.  We try to find ways to sometimes

25  pair them with another songwriter, perhaps a producer, perhaps

1  an artist.  So our job is on some occasion to also give them

2  some guidance and insight on the songs.  We don't write the

3  music obviously, but we try to be as supportive and give them

4  as much service with respect to the creative process.

5  Q.   Are there other ways other than sort of the creative

6  process that the company helps songwriters?

7  A.   Yes, on the marketing side and the exploitation side, we

8  have a team here too that has deep relationships with movie

9  studios or as licensees, and our job is to find ways for them

10  to find opportunity to place those songs in any sort of

11  opportunities.  I mentioned movie earlier or an advertisement,

12  and that's what the team does.

13  Q.   So the marketing helps songs get placed in different

14  potential revenue channels?

15  A.   That's correct.

16  Q.   Is there just sort of a business component to what BMG

17  does for songwriters as well?

18  A.   Yes.  We handle all the administrative part of the

19  business from the copyright registration which we've seen there

20  from licensing and negotiating the licensing agreements with

21  various parties, sometimes auditing licensees, collecting those

22  funds, producing statements that would then be sent to

23  songwriters, and as I mentioned earlier, also enforcement.

24  Q.   Can you give us some of the examples of ways in which

25  people can access BMG's work legally on the Internet?

1   A.    Through most of the large and small digital platform that

2   have been licensed, anywhere from Apple to Amazon to Spotify or

3   Pandora.  So we have licensed most geo platform in the market.

4   Q.    And those you can download BMG's songs or songwriters'

5   songs from those platforms legally?

6   A.    That's correct.  You can download or stream and -- those

7   songs legally.

8   Q.    Speaking of downloading, is all music that people download

9   on the Internet licensed?

10  A.    I wish.  Unfortunately, that's not the case.

11  Q.    Are you familiar with the term -- I mean, is piracy

12  considered to be a term for the unauthorized use of music

13  online?

14  A.    Yes, I'm familiar with the term.  Essentially, piracy is

15  theft for us.

16  Q.    I'm sorry?

17  A.    It's theft.  It's stealing.

18  Q.    Why is that?

19  A.    It's the use of a song or composition without proper

20  permission and without compensation.

21  Q.    Hasn't piracy always been a problem for the music

22  industry?  I mean, isn't it -- hasn't the music industry always

23  faced piracy in one shape or form?

24  A.    It has always been a problem, but the reality is with the

25  explosion of digital activity, especially on BitTorrent or

Case 1:18-cv-00950-PTG-JFA Document 494-3 Filed 10/21/19 Page 80 of 151 PageID# 22381
Case 1:14-cv-01611-LO-JFA Document 1049-3 Filed 12/03/15 Page 730 of 1501 PageID# 19479

L. Hubert - Direct

173

1    peer-to-peer, it has escalated to a very significant magnitude.

2    Q.   Speaking of BitTorrent, what is your involvement with

3    BitTorrent?  I mean, have you had experience with it -- with

4    the BitTorrent platform?

5    A.   Well, I never authorize BitTorrent platform to use the

6    copyrights, but we've had some issues with BitTorrent

7    platforms.  And I'm a board member of the National Music

8    Publishing Association, and we've had to deal as best as we

9    could with enforcement with BitTorrent websites.  But

10   unfortunately in most cases those sites are outside the U.S.,

11   and litigation is quite challenging.

12   Q.   You mentioned the National Music Publishers Association.

13   What is that?

14   A.   It's our trade association, and their mission is to

15   advance the cause of our songwriters and the publishers to the

16   marketplace through the Congress, and in some cases also to

17   initiate litigations to protect our interest.

18   Q.   And did you have -- and you said you're a board member of

19   this organization, the National Music Publishers Association?

20   A.   Yes, I am.

21   Q.   And in your capacity as a board member of the National

22   Music Publishers Association, have you had opportunity to deal

23   with or consider the issue of BitTorrent?

24   A.   Yes, peer-to-peer and BitTorrent issues are a subject that

25   we've discussed a number of times with the board.

Case 1:18-cv-00950-PTG-JFA Document 494-3 Filed 12/03/21 Page 81 of 151 PageID#
22382
Case 1:14-cv-01611-LO-JFA Document 1049-1 Filed 11/03/15 Page 80 of 150 PageID# 19130
L. Hubert - Direct

174

1    Q.   And is it something that you deal with in your business at

2    BMG as well?

3    A.   I do.  This is an issue that comes up in a number of

4    times, yes.

5    Q.   Why does it come up at BMG and -- and in your role at the

6    National Music Publisher Association?

7    A.   Well, it's an industry issue.  It comes up at BMG.  It

8    comes up everywhere else because it has had a massive impact on

9    our business.

10   Q.   Why is that?

11   A.   Because every time a song is uploaded and available in an

12   infinite and put into a BitTorrent website, essentially our

13   songwriters are not getting paid for that and there's a loss of

14   royalties.

15   Q.   In terms of the -- in terms of BitTorrent, I think -- I

16   can't remember if you testified -- did you indicate whether you

17   had ever authorized a BMG work to be licensed on BitTorrent or

18   used on BitTorrent?

19   A.   I never did.  And if BMG had ever authorized, it would

20   have been extraordinary in nature.  We would never do that.

21   Q.   And why is that?

22   A.   Again, the minute a song file is uploaded into BitTorrent

23   environment, it is the equivalent of a perpetual giving away of

24   our music, and we have no way of earning any royalties for our

25   songwriters.

1   Q.    And the perpetual giving away of music, that -- can you

2   explain that a bit more?

3   A.    Well, it -- essentially it is in an environment that is

4   totally uncontrolled, and millions of people globally can

5   access those files.

6   Q.    Has BMG done anything to try to address the issue of

7   piracy?

8   A.    As best as we can.  It's part of our mission, as I said

9   earlier, to enforce the rights of our songwriters, so we do the

10  best we can to try to contain and curb piracy.

11  Q.    And how is it that the company's taken action specifically

12  to address piracy on BitTorrent platforms?

13  A.    It's -- because of its massive magnitude, we often rely on

14  third-party suppliers to help us do the work.

15  Q.    And have you used a third party to assist BMG in

16  connection with BitTorrent recently?

17  A.    Yes, we have.

18  Q.    And who is that?

19  A.    Rightscorp.

20  Q.    Okay.  Is -- in your role with the NMPA, have you seen

21  piracy as a problem for the National Music Publishers

22  Association?

23  A.    Yes.  It's a -- it's a constant issue, and it's a fact of

24  life that we have to live with and we have to manage.

25  Q.    Do you see it, as the head of BMG, having an impact on

Case 1:18-cv-00950-PTG-JFA Document 494-3 Filed 10/21/19 Page 83 of 151 PageID#
22384
Case 1:14-cv-01611-LO-JFA Document 704 Filed 12/03/15 Page 82 of 130 PageID# 19132
L. Hubert - Direct
176

1    BMG's business?

2    A.    It does.  It has an impact every day.  Every time you have

3    to compete with free, you devalue music and that has

4    significant implication on our business and our songwriters.

5    Q.    How so?

6    A.    You know, all the millions of royalties that would not

7    have been earned and should have been earned is affecting the

8    livelihood of our songwriters, and in some aspect, affecting

9    their creativity and their ability to create.

10   Q.    Were you involved, Mr. Hubert, in the decision to hire

11   Rightscorp?

12   A.    Yes, I was.

13   Q.    Did you make that decision?

14   A.    Yes, I did.

15   Q.    Why?

16   A.    I thought Rightscorp came with an interesting and

17   compelling solution, or at least the beginning of a solution

18   with respect to curb piracy.

19   Q.    What was the solution that Rightscorp brought to you?

20   A.    They have a technology that detects infringements on ISP

21   networks.

22   Q.    And why was that solution attractive?

23   A.    Well, it was attractive to us because, one, we would be

24   aware of those infringements, then we would have the ability to

25   notify the ISPs, in this case, Cox, in the hope that Cox or

Case 1:18-cv-00950-PTG-JFA   Document 494-3   Filed 10/21/19   Page 84 of 151 PageID#
22385
Case 1:14-cv-01611-LO-JFA   Document 049   Filed 12/03/15   Page 83 of 150 PageID# 19183

177

1    other ISP would take action.

2    Q.   And why was that important to BMG?

3    A.   Because we want to find a way again to curb piracy as best

4    as we can and also educate infringers about what they're doing

5    and that they should stop.

6    Q.   Is education of the infringers something that's of import

7    to the company?

8    A.   It is important.

9    Q.   Why?

10   A.   It is important to help people understand that what they

11   do, infringing on copyrights in this case, our copyrights, is

12   something that they should not do and hopefully to convert them

13   into accessing music in a legal fashion.

14   Q.   And why did you think that what -- well, did you think

15   that what Rightscorp brought to the table was constructive?

16   A.   I thought it was a pragmatic and constructive approach to

17   the issue of piracy, yes.

18   Q.   And what were the key factors of its system that led you

19   to conclude that?

20   A.   I'm sorry.  Can you repeat?

21   Q.   What were the reasons why you thought it was a pragmatic

22   and constructive solution?

23   A.   You know, I thought it really helps everyone, all the

24   parties involved.  It's an opportunity for the ISP to clean up

25   its network and be aware of the infringement of its -- on its

1    network.  It's an opportunity to speak and contact the

2    subscriber and make the subscriber and infringer aware of that

3    activity.  And also in this particular case, we wanted to

4    settle the matter with a modest amount of money which enable to

5    shift some of the costs of infringement from the songwriter to

6    the user and infringer.

7    Q.    So there was a settlement angle and component to your

8    partnership with Rightscorp?

9    A.    Yes.

10   Q.    And what was that?  Do you know how that worked?

11   A.    I don't know all the details, but the idea was for a

12   modest amount of money we would offer a release to the user.

13   That's what we would do.

14   Q.    And why was that important to BMG?

15   A.    As I said earlier, I think it is important to educate

16   users about what they're doing and for them to understand it's

17   a serious matter and that they have to stop.  And as I said

18   also earlier, I wanted to make sure that all songwriters would

19   derive some of those royalties in their pocket.

20   Q.    So the revenues that BMG would earn from settlement in

21   this program, would that have gone -- using the same revenue

22   percentages that we talked about earlier, the songwriters would

23   have gotten a piece of that money?

24   A.    Yes.  What we would have collected and what we have

25   collected would be paid to the songwriter, the vast majority

Case 1:18-cv-00950-PTG-JFA Document 494-3 Filed 10/21/19 Page 86 of 151 PageID#
22387
Case 1:14-cv-01611-LO-JFA Document 704 Filed 12/03/15 Page 86 of 150 PageID# 19185
L. Hubert - Direct

179

1    would be, anywhere between 75 and 90 percent.

2    Q.   Mr. Hubert, I want to talk to you a little bit about Cox

3    Communications.

4    A.   Yes.

5    Q.   Cox Com.

6            Is it your understanding that BMG notified Cox of

7    infringements on its network?

8    A.   Yes.

9    Q.   And what is your understanding of what Cox did with that

10   information?

11   A.   My understanding is that they've done nothing.

12   Q.   And what did you except Cox to do with that information?

13   A.   I expected Cox to work with us, frankly, and to find a way

14   to at the very least inform the subscribers.

15   Q.   I'm sorry.  Say that again.

16   A.   At the very least to inform the subscribers about the

17   infringement.

18   Q.   And are you -- and did that surprise you that nothing was

19   done?

20   A.   Yes, surprising and disappointing.

21           MR. ALLAN:  Pass the witness.

22                       CROSS-EXAMINATION

23   BY MR. BRIDGES:

24   Q.   Good afternoon, Mr. Hubert.

25   A.   Good afternoon.

1    Q.   Did I pronounce the name correctly?

2    A.   I can't hear very well, so I --

3    Q.   I'm sorry.  Did I pronounce your name correctly?

4    A.   You did.  You did.  Thank you very much.

5    Q.   What effort have you personally made to reach out directly

6    to somebody at Cox Communications?

7    A.   None.

8    Q.   In fact, the only communications from BMG to Cox were

9    through Rightscorp.  Correct?

10   A.   It is my understanding, although I believed it was a

11   communication between someone in our legal department to

12   somebody at Cox, I believe.

13   Q.   It was -- Rightscorp, in fact, used an e-mail from the Cox

14   legal department to communicate to Cox.  Correct?

15   A.   I don't know.

16   Q.   You don't know?

17   A.   No.

18   Q.   I want to ask you just generally --

19   A.   Of course.

20   Q.   -- about BMG Rights Management.

21        The only songs at issue in this case are songs where

22   BMG itself owns the copyrights.  Correct?

23   A.   That is correct.

24   Q.   And you discussed earlier a type of copyright called a

25   musical composition.  Is that correct?

1    A.    Yes.

2    Q.    Help me understand, please -- please explain the different

3    types of copyrights and different types of music.  Could you do

4    that, please?

5    A.    In the music industry or different type of copyrights?

6    Q.    Different types of copyrights in a song.

7    A.    I could not explain that to you.  For me, a song is a

8    copyright.

9    Q.    A song is a copyright?

10   A.    Uh-huh.

11   Q.    A song that a songwriter composes is a musical

12   composition?

13   A.    That's correct.

14   Q.    And the only types of songs at issue in this case are

15   musical compositions, in other words, what songwriters compose.

16   Correct?

17   A.    That's correct.

18   Q.    Songwriters who write the music or write the lyrics.

19   Correct?

20   A.    Uh-huh.

21   Q.    And there is a copyright in what those writers produce.

22   Correct?

23   A.    Yes.  Again, I'm not a copyright expert, but --

24   Q.    I'm sorry?

25   A.    I'm not a copyright expert, but --

Case 1:18-cv-00950-PTG-JFA Document 704-3 Filed 10/21/19 Page 89 of 151 PageID#
22390
Case 1:14-cv-01611-LO-JFA Document 709 Filed 11/03/15 Page 89 of 150 PageID# 19188
L. Hubert - Direct

182

1   Q.   And then other people sometimes record those songs that

2   the songwriters have written.  Correct?

3   A.   That's correct.

4   Q.   And -- or people perform the music that songwriters write.

5   Correct?

6   A.   Yes.

7   Q.   And then other people may record those performances that

8   other people perform of songs that the songwriters --

9   A.   Uh-huh.

10          THE COURT:  You need to answer yes or no.

11          THE WITNESS:  Oh, yes.  I'm sorry.

12          THE COURT:  The record will reflect your answer.

13  BY MR. BRIDGES:

14  Q.   And there is a separate, different copyright in the sound

15  recording of that performance.  Correct?

16  A.   That's correct.  There's a song recording copyright.

17  That's correct.

18  Q.   And this case is not about any sound recording copyrights.

19  Correct?

20  A.   That is my understanding.

21  Q.   Okay.  I'd like to look at exhibit -- the exhibit you've

22  provided.  Mr. Allan took you through it, and I'll ask you to

23  do a couple of things.

24          So what's -- what -- how did BMG determine what songs

25  to include in this list?

Case 1:18-cv-00950-PTG-JFA  Document 494-3  Filed 10/21/19  Page 90 of 151 PageID#
22391
Case 1:14-cv-01611-LO-JFA  Document 704  Filed 12/03/15  Page 89 of 150  PageID# 19189
L. Hubert - Direct
183

1    A.    I'm sure our copyright department provided that

2    information.

3    Q.    Do you know on what basis?

4    A.    Ownership and its every agreement that we have with our

5    songwriter leads to a copyright registration.

6    Q.    But do you know why these songs and not other songs?

7    A.    Those are the copyrights that matter in this particular

8    situation.

9    Q.    Do you know why these songs matter in this situation and

10   not others?

11   A.    Because notices have been sent with respect to

12   infringement about those songs on the Cox network.  That's my

13   understanding.

14   Q.    Do you understand also that there were many millions of

15   notices sent about many more songs than are on this list?

16   A.    I do.

17   Q.    But this suit is only about these songs.  Correct?

18   A.    That's my understanding.

19   Q.    And you understand that over the course of this case, over

20   a hundred songs have dropped off the list?

21   A.    That's my understanding also.

22   Q.    Why?

23        MR. ALLAN:  Objection, Your Honor.  What's the

24   relevance of this?

25        THE COURT:  Sustained.

Case 1:18-cv-09050-BTG-JFA Document 94-3 Filed 12/03/15 Page 91 of 151 PageID#: 19490
Case 1:14-cv-01611-LO-JFA Document 09-7 Filed 12/03/15 Page 300 of 150 PageID#: 22392
L. Hubert - Direct

184

BY MR. BRIDGES:

Q.   Mr. Hubert, let me ask you to look again at the headings of this document.

What do you understand the type of copyright to be in the numbers of the U.S. copyright registration numbers on the left?

A.   Again, as I said, I'm not a copyright expert.

Q.   Do you know whether that is a copyright in the musical composition or in the sound recording or in -- excuse me -- that's right -- or in the sound recording?

A.   I do not know.

Q.   You don't know.

And the song title here would be both the title of a musical composition and the title of a different copyrighted work, mainly the sound recording of a performance of that musical composition.  Correct?

A.   To my understanding, it would be a musical composition, a song.  That's my understanding.

Q.   Well, when somebody records the song, they usually release the song under the same title as the musical composition.

A.   That's correct, but that's a song recording copyright.

Q.   Okay.  Do you happen to know whether the PA numbers refer to musical compositions whereas SR numbers refer to sound recordings and copyright registrations?

A.   I believe it is to the composition, but I'm not entirely

Case 1:18-cv-09050-RJS-JFA Document 494-3 Filed 10/21/19 Page 92 of 151 PageID#:
Case 1:14-cv-01611-LO-JFA Document 1049 Filed 12/03/15 Page 91 of 150 PageID# 19191
22393

L. Hubert - Direct

185

1    sure.

2    Q.   And then on the next -- on the column over towards the

3    right under recording artist, those are people who happen to

4    sing or otherwise perform the compositions for some other

5    recording -- excuse me -- for some recorded performance.

6    Correct?

7    A.   Yes.

8    Q.   And that -- when the recording artist performs a song and

9    that song -- that performance is recorded, that's a separate

10   copyright in that sound performance -- in that sound recording

11   you mentioned.  Correct?

12   A.   Could be, yes.

13   Q.   And that would have a separate copyright registration.

14   Correct?

15   A.   As I said, I'm not a copyright expert.

16   Q.   Okay.  Well, let me ask you to look -- if we could go down

17   to line 34, please.

18   A.   Should I do it myself or should --

19   Q.   Oh, I think we'll get it blown up.  Just want to give an

20   example.  This is a -- sorry -- are you familiar with this

21   song, Mr. Hubert?

22   A.   I know this song.  I could not sing it, but I know this

23   song.

24        (LAUGHTER.)

25   Q.   So this was a musical composition called You Don't Love Me

1    Anymore, which the songwriters of the musical composition are

2    Gregory Barnhill and Kim Carnes.  Correct?

3    A.    That is correct.

4    Q.    And Tim McGraw wasn't a songwriter of that song.  Correct?

5    A.    Can you repeat your question, please?

6    Q.    You see the name Tim McGraw over towards the right?

7    A.    It doesn't look like he has any writer credit.

8          It doesn't look like he has any writer credit on that

9    song, that's correct.

10   Q.    No writer credit.

11   A.    Yes, I'm sorry.  No writer credit.

12   Q.    Okay.

13         So he's simply a performer on a different copyright

14   for the sound recording.  Correct?

15   A.    That is correct.

16   Q.    I've got a few other questions just to help me understand

17   these.

18   A.    Sure.

19   Q.    If we could look down to lines 490 to 499 -- sorry -- yes,

20   490 to 499.

21         Can you see that blown up?

22   A.    Yes.

23   Q.    I notice that all of these songs have the same copyright

24   registration number.

25   A.    Yes.

1    Q.    Do you know why that's the case?

2    A.    They are part of the same album.

3    Q.    Part of the same album?

4    A.    I suspect it is the case, yes.

5    Q.    In other words, these are all musical compositions that

6    are gathered together in a group --

7    A.    That is correct.

8    Q.    -- published together as a group.  Correct?

9    A.    That is correct.

10    Q.    Is there another technical term in the industry for a

11    group of songs together like that?

12    A.    Not particularly.

13    Q.    Have you heard the term "compilation"?

14    A.    Oh.

15            MR. ALLAN:  It's an album.

16            THE WITNESS:  Yes, it's an album.

17    BY MR. BRIDGES:

18    Q.    It's an album, but it's also what you know in the industry

19    as a compilation.  Is that correct?

20    A.    Again, I'm not -- personally, I haven't heard compilations

21    in many other context, but I'm not a copyright expert.

22    Q.    But these are musical compositions that were published

23    together and registered together as a single unit.  Correct?

24    A.    That is correct.

25    Q.    And let's look down at -- or look up, please, at line 454.

Case 1:18-cv-00950-PTG-JFA   Document 494-3   Filed 10/21/19   Page 95 of 151 PageID#
22396
Case 1:14-cv-01611-LO-JFA   Document 1049   Filed 12/03/15   Page 95 of 150 PageID# 19194

L. Hubert - Direct

188

1    There is an entry for American Honey.  What can you tell me

2    about that song?

3    A.    I'm not sure I understand your question.

4    Q.    What do you know about the song, American Honey?

5    A.    I know the title.

6    Q.    Do you know who performed it?

7    A.    I do know the band, Lady -- Lady Antebellum.

8    Q.    And do you know who -- and so when Lady Antebellum

9    performed the song and that was recorded, that's a separate

10   copyright not here for sound recording.  Correct?

11   A.    The sound recording is a separate copyright, yes.

12         MR. ALLAN:  Your Honor, I object.  There are no sound

13   recording copyrights in the case.  We're getting outside --

14         MR. BRIDGES:  I'll be able to tie this together

15   later, Your Honor.

16         THE COURT:  Well, you -- this is multiple examples

17   of -- we're asking the same questions over and over again, so

18   let's keep it to a few versus a lot, please.

19         MR. BRIDGES:  I'm sorry I didn't make the difference

20   clear over that.

21   BY MR BRIDGES:

22   Q.    What I'm -- and so if we look at this song, do you know

23   how many copyright registrations there are for the song,

24   American Honey?

25   A.    I do not know.

Case 1:18-cv-09050-DLC-JLC Document 49-13 Filed 10/21/19 Page 96 of 151 PageID#: 195
Case 1:14-cv-01611-LO-JFA Document 704-3 Filed 12/03/15 Page 96 of 150 PageID# 19795
L. Hubert - Direct

189

1  Q.   Do you know that there are two different registrations for

2  the musical recording?

3  A.   I know there's a registration for the composition on the

4  publishing side, and I suspect there's a registration on the

5  sound recording as well.

6  Q.   Do you know there are two registrations for the sound

7  recording?

8  A.   I do not know.  As I said, I'm not a copyright expert.

9  Q.   Do you know what names are credited on the copyright

10 registration for American Honey as shown in this number,

11 registration number?

12 A.   I do not know.

13 Q.   Do you know that that registration doesn't show any

14 reference to Lady Antebellum on it?

15 A.   I do not know.

16 Q.   And do you know that there are two registrations for sound

17 recordings, one of which the owner is Capitol Records

18 identifying Lady Antebellum with a song, American Honey?

19 A.   I suspect that's the case, yes.

20      MR. ALLAN:  Your Honor, I object again.  He's trying

21 to make a point about the sound recording copyright.

22      MR. BRIDGES:  Your Honor --

23      THE COURT:  And I'm going to let him attempt to tie

24 it up.  I don't understand the relevance either, Mr. Allan, but

25 we'll give him the opportunity to demonstrate its relevance.

Case 1:18-cv-00950-PTG-JFA Document 494-3 Filed 10/21/19 Page 97 of 151 PageID#
22398
Case 1:14-cv-01611-LO-JFA Document 809 Filed 12/03/15 Page 98 of 150 PageID# 19496
L. Hubert - Direct

190

BY MR. BRIDGES:

Q.   Lady Antebellum's American Honey is a sound recording.
Correct?

A.   Yes, I believe it is.

Q.   Thank you.

     I'd like to ask you a little about the Rightscorp
relationship that you discussed earlier.  Do you recall when
you signed the representation agreement with Rightscorp?

A.   I believe it was in 2011.

     MR. BRIDGES:  Your Honor, may I offer the witness a
copy of the Rightscorp agreement?

     THE COURT:  Yes.  Go ahead.

BY MR. BRIDGES:

Q.   Mr. Hubert, do you recognize this document, which is
marked as Defendant's Exhibit 0248?

A.   Yes.

Q.   It appears to be an e-mail from Keith Hauprich of BMG to
Rightscorp, then with a reply from Christopher Zabek at
Rightscorp back to Mr. Hauprich attaching a fully executed
representation agreement.  Is that correct?

A.   Do you want me to look at the first e-mail that I have?

Q.   Take your time.

A.   Yes.

Q.   And Rightscorp returned this executed agreement to BMG
apparently on June 27th, 2013.  Is that your understanding?

Case 1:18-cv-00950-PTG-JFA   Document 704-3   Filed 10/21/19   Page 98 of 151 PageID#
22399
Case 1:14-cv-01611-LO-JFA   Document 704   Filed 12/03/15   Page 97 of 150 PageID# 19197
L. Hubert - Direct
191

1 A. That's what I can see here.

2 Q. Did you read the agreement when BMG entered into it?

3 A. No.

4 Q. You did not?

5 A. I did not.

6 Q. How did you know to sign it?

7 A. Excuse me?

8 Q. How did you know to sign it?

9 A. I sign agreements every day.  You know, I'm involved in a
10 lot of activities for business.

11 Q. What -- who asked you to sign it?

12 A. I don't recall exactly, but typically I have my assistant
13 that provides me with a binder at the end of the day with a
14 number of documents to sign.  That's when I signed those
15 documents.

16 Q. But you sign legal agreements like this without reading
17 them?

18    THE COURT:  That's not his testimony, Mr. Bridges.
19 Rephrase the question.

20 BY MR. BRIDGES:

21 Q. Were you aware that this agreement contemplated in
22 paragraph 5 settlement collection for license infringements of
23 BMG's rights of $20 for each alleged infringement?

24 A. At what time?

25 Q. At the time of the agreement.

Case 1:18-cv-00950-PTG-JFA  Document 494-3  Filed 10/21/19  Page 99 of 151 PageID#
22400
Case 1:14-cv-01611-LO-JFA  Document 749  Filed 12/03/15  Page 380 of 150  PageID# 19198
L. Hubert - Direct
192

1  A.   At the time of signing the agreement?

2  Q.   Yes.

3  A.   No, I wasn't.

4  Q.   I direct your attention to -- did you have some other

5  understanding?

6  A.   No, I signed the agreement and that's all.

7  Q.   Did you know what the settlement price structure was that

8  Rightscorp was going to use on BMG's behalf?

9  A.   At what point in time?

10  Q.   At the time that this agreement went into effect.

11  A.   No.

12  Q.   Did you ever?

13  A.   Only recently in the context of preparing for the trial.

14       MR. BRIDGES:  Your Honor, I would like to offer that

15  into evidence, please.

16       THE COURT:  Any objection?

17       MR. ALLAN:  No, Your Honor.

18       THE COURT:  All right.  It's received.

19       For the record, it's Defense Exhibit 248.

20  BY MR. BRIDGES:

21  Q.   Mr. Hubert, you mentioned that BMG does not authorize

22  songs on BitTorrent.  Correct?

23  A.   That is correct, to my knowledge.

24  Q.   Are you familiar with a band called Gramatik?

25  A.   I became familiar with the band, yes.

1   Q.   How did you become familiar with it?

2   A.   Again, in the context of preparing for this trial.

3   Q.   And is it because you became aware that -- and what is

4   BMG's relationship with Gramatik?

5   A.   To my knowledge, none.

6   Q.   None?

7   A.   No relationship.

8   Q.   All right.  Does BMG have a relationship with songwriters

9   who have written songs that Gramatik has performed?

10  A.   My understanding is that this sampled a work that we

11  control and Muddy Waters work that we control.  That's my

12  understanding.

13  Q.   I'm sorry.  I didn't hear the last --

14  A.   I'm sorry.  My understanding is that they sampled a work

15  that we control by Muddy Waters.

16  Q.   Okay.  Do you understand that Gramatik put its music out

17  on BitTorrent for its fans?

18  A.   I recently understood that.

19  Q.   Did you understand that that was a -- that was a song that

20  Rightscorp enforced on BMG's behalf until Rightscorp learned

21  that Gramatik had itself put its own performance of that song

22  out on BitTorrent?

23  A.   That is my understanding.

24  Q.   Were you aware of the full authority that BMG gave

25  Rightscorp?

Case 1:14-cv-00950-BTC-JFA Document 709-3 Filed 12/03/15 Page 100 of 150 PageID# 19200
Case 1:14-cv-01611-LO-JFA Document 709 Filed 12/03/15 Page 101 of 151 PageID# 22402

1    A.    Not in great details.

2    Q.    Who knows most of the details at BMG?

3    A.    Well, this was an initiative within our legal business

4    affair department and/or staff within that department.  And

5    Keith Hauprich specifically knew the details.

6    Q.    Keith Hauprich, the deputy general counsel?

7    A.    That is correct.

8    Q.    What actions on BMG's behalf did you understand Rightscorp

9    to be authorized to take?

10   A.    My understanding is that they could detect infringement on

11   an ISP network and they would send those notices to the various

12   ISPs.

13   Q.    And what else?

14   A.    That was my understanding, that they would try to settle

15   the matter and resolve the matter as best as we can with the

16   user.

17   Q.    Did you understand that Rightscorp had authority to

18   negotiate settlements and collect money on BMG's behalf?

19   A.    Not in great details, but I -- there was -- that was what

20   was implied.

21   Q.    Did you understand that Rightscorp had the authority to

22   demand termination of Internet service to subscribers by ISPs

23   on BMG's behalf?

24   A.    I don't believe they were demanding to the subscribers.  I

25   believe those were directed to Cox, but not to the subscriber.

Case 1:14-cv-00950-BTG-JFA Document 709-2 Filed 12/03/15 Page 101 of 150 PageID# 19201
Case 1:14-cv-01611-LO-JFA Document 709-2 Filed 12/03/15 Page 102 of 151 PageID# 22403
L. Hubert - Direct

195

1  Q.    Perhaps I misspoke.  I'm sorry.

2        Are you aware that -- strike that.

3        To your knowledge, did BMG authorize Rightscorp to

4  ask ISPs to terminate Internet service to subscribers based on

5  alleged violations of BMG's copyrights?

6  A.    I was aware that this could be one of the options in one

7  of the ISPs.  That's correct.

8  Q.    Did you understand BMG to authorize Rightscorp to collect

9  evidence of infringements against subscribers?

10 A.    Yes.

11 Q.    Did you understand that BMG authorized Rightscorp, among

12 other things, to at any point download songs from Cox

13 subscribers in order to collect evidence?

14 A.    I -- you know, Rightscorp is a third-party supplier for

15 us.  I did not understand all the details of those processes.

16 So the answer is no.

17 Q.    What investigations did, to your knowledge, BMG do into

18 write the details of Rightscorp's processes?

19 A.    We haven't, to my knowledge.

20 Q.    Do you know when Rightscorp started looking for

21 infringements of BMG's songs?

22 A.    I don't have an exact timeline other than to know that we

23 signed the agreement in December 2011.  And I suspect that they

24 have started to work on the infringements of the songs.

25 Q.    In fact, Keith Hauprich, the deputy general counsel,

1    negotiated the deal with Rightscorp.  Correct?

2    A.    Yes, he did.

3    Q.    And he recommended to you that BMG enter into the contract

4    with Rightscorp?

5    A.    Yes, he did.

6    Q.    And he supervised the relationship with Rightscorp?

7    A.    Yes, he did.

8    Q.    And he reviewed documents that Rightscorp sent on BMG's

9    behalf?

10   A.    I believe he did.

11   Q.    Did you ever see the notices that Rightscorp sent out on

12   BMG's behalf?

13   A.    I have seen some notices recently as part of the

14   preparation for this trial.

15   Q.    But beforehand you had not?

16   A.    I don't recall.

17   Q.    Do you recall -- strike that.

18          Did BMG know that before Rightscorp entered into the

19   agreement with BMG that Cox had told Rightscorp that it would

20   not accept or process Rightscorp's notices that had monetary

21   demands?

22   A.    Can you repeat your question, please?

23   Q.    Did you know -- strike that.

24   A.    Did you know -- yeah.

25   Q.    Did you know before entering into the relationship with

Rightscorp --

A.    Uh-huh.

Q.    -- that Cox had told Rightscorp previously that it would
not accept notices from Rightscorp that had demands for payment
of money?

A.    No.

Q.    When did you find out?

A.    I don't recall exactly.

Q.    Do you know when BMG found out?  Have you heard?

A.    I don't know.

Q.    Did you ever know that Cox had said to Rightscorp that if
you take the monetary demands out of notices we will forward
them?

A.    I became aware of this recently again in preparing for
this trial, but it was very unclear as to what right Cox would
do, not as other than to say they would process those notices.
I have no question what that means.

Q.    What did you do to find out what that meant?

A.    Personally, I haven't done anything.  As I said, I just
learned this in the context of this trial.

Q.    Now, you referred earlier to a BitTorrent website.  Are
you familiar with BitTorrent websites?

A.    There are a number of BitTorrent websites, yes.

Q.    Are you aware that no Rightscorp notice to Cox ever
identified any website hosted by Cox?

1    A.   I believe they identify a file as being uploaded on a

2    BitTorrent protocol, data protocol.

3    Q.   But not a BitTorrent website like The Pirate Bay or

4    Kickass Torrents or something like that.  Correct?

5    A.   I would not know the details, to be honest with you.

6    Q.   Do you know how many notices BMG sent out through

7    Rightscorp?

8    A.   I believe it is in the millions.

9    Q.   Do you know how many millions?

10   A.   I believe it's -- I don't have an exact number, but I

11   believe it's north of five million.  That's what I understand.

12   Q.   Are you talking about just to Cox or to all ISP

13   subscribers?

14   A.   I don't recall.

15   Q.   Let me ask you, just to make the record clear.  Do you

16   know how many notices Rightscorp has sent out to all ISP

17   subscribers?

18   A.   I don't have an exact number, but I do believe it's in the

19   millions.

20   Q.   Do you know how many IP addresses BMG has targeted through

21   Rightscorp?

22   A.   I do not know.

23   Q.   Do you know how many subscribers of ISP services broadly

24   BMG has asked Internet providers to terminate?

25              MR. ALLAN:  Objection --

1          THE WITNESS:  I don't --

2          MR. ALLAN:  -- Your Honor.  It's outside the scope of

3     some of our rulings.

4          THE COURT:  What was the question again?

5          MR. BRIDGES:  I asked, does he know how many requests

6     for termination of subscribers broadly BMG sent out through

7     Rightscorp.

8          THE COURT:  I'll allow that.  And he said he doesn't

9     know, so --

10          MR. ALLAN:  Your Honor, it was to other ISPs.

11          MR. BRIDGES:  To all ISPs.

12          THE COURT:  All ISPs.  All right.  That's sustained.

13     He's already said "I don't know" to all of your questions, so

14     he clearly does not know how many notices were sent out to

15     anybody.  So let's -- you've proven your point, if there was a

16     point to prove, and let's move on.

17          THE WITNESS:  I'm not involved in --

18          MR. ALLAN:  There's no question pending.

19     BY MR. BRIDGES:

20     Q.   BMG Rights Management -- the plaintiff is BMG Rights

21     Management U.S., LLC.  Correct?

22     A.   That is correct.

23     Q.   But BMG Rights Management operates as a sort of U.S. and

24     German company.  Correct?

25     A.   It's a U.S. operation.

200

1    Q.    All right.  Does it work with a German parallel company?

2    A.    We have a parent company.

3    Q.    But is there a sister company in Germany?

4    A.    It's a parent company.

5    Q.    And are some of the BitTorrent websites that cause BMG

6    concern located in Europe?

7    A.    Some are.

8              MR. BRIDGES:  No further questions.  Thank you.

9              THE COURT:  Redirect, Mr. Allan.

10             MR. ALLAN:  Thank you, Your Honor.  Couple of quick

11   questions.

12             THE COURT:  Sure.

13                        REDIRECT EXAMINATION

14   BY MR. ALLAN:

15   Q.   Mr. Hubert, first of all, in terms of the copyrights that

16   BMG owns that Mr. Bridges talked to you about, does the

17   songwriter still receive a significant share of the revenue

18   that is generated based on the copyrights that BMG owns?

19   A.   The vast --

20             MR. BRIDGES:  Objection.

21             THE COURT:  Overruled.

22             THE WITNESS:  The vast majority, yes.

23   BY MR. ALLAN:

24   Q.   And on what percentage basis?  The same percentage you

25   talked about earlier?

1    A.    Anywhere between 75 and 95 percent.

2    Q.    We have heard a lot about --

3            THE COURT:  Let's try not to lead.

4            MR. ALLAN:  Thank you, Your Honor.  I will.

5    BY MR. ALLAN:

6    Q.    In terms of musical compositions and recorded songs, what

7    is the relationship between musical composition and sound

8    recordings?

9    A.    Well, a song -- when a song is written, it leads to a

10   music composition.  When that music composition is recorded, it

11   leads to a recorded music master.

12   Q.    So there may be a separate copyright for it?

13   A.    It is a separate copyright.

14   Q.    And if the musical composition copyright is infringed,

15   does that also mean the sound recording is also infringed?

16   A.    Yes.

17   Q.    So if there's an infringement taking place on the Cox

18   network, would that encompass infringement of more than the

19   sound of the composition copyright?

20   A.    Absolutely.

21   Q.    I think Mr. Bridges showed you an example of a Kings of

22   Leon album?

23   A.    Yes.

24   Q.    Do you recall that?

25            And there were a number of works that were shown of

Case 1:14-cv-00950-PTG-JFA Document 704-3 Filed 12/03/15 Page 108 of 150 PageID# 19208
L. Hubert - Redirect
Case 1:14-cv-01611-LO-JFA Document 709 Filed 10/21/19 Page 109 of 151 PageID# 22410

202

1    one copyright registration.

2    A.    Uh-huh.

3    Q.    Do you consider those to be each individual copyrighted

4    works?

5    A.    I do.

6          THE COURT:  You're leading again.  Ask him whether or

7    not he --

8          MR. ALLAN:  Okay.  I apologize, Your Honor.

9          THE COURT:  All right.

10         MR. ALLAN:  Can I show DTX 0248?  Can you bring that

11   up?

12         THE COURT:  You may still have it in hard copies, the

13   contract with the e-mails in front, if you want to look at it

14   in hard copy.

15         MR. ALLAN:  Thank you, Your Honor.

16   BY MR. ALLAN:

17   Q.    This is the representation agreement you were showed --

18   A.    Oh, okay.

19   Q.    -- earlier.

20   A.    The agreement?

21   Q.    Yes.  Just to make sure I understand, what was your

22   understanding of the settlement component of the Rightscorp

23   arrangement with BMG?

24   A.    The understanding of the settlement itself, the language

25   of the settlement or --

1  Q.   Just the -- did you have a broad understanding of the
2  settlement language?  And if so, what was it?
3  A.   I had an understanding that the goal was to, again,
4  educate the infringer and find a reasonable solution to resolve
5  the claim and infringement by asking a modest amount of money,
6  anywhere between 20 and $30.  That was my understanding.
7  Q.   And was that your understanding when the relationship
8  began with Rightscorp?
9  A.   Generally speaking, yes.  High level.
10  Q.   Mr. Bridges talked to you about Gramatik.  Could you
11  explain, again, the relationship between BMG and Gramatik?
12  A.   Gramatik, again, sampled a work that we control, but we
13  don't control Gramatik.  We do control the work that is sampled
14  in the composition.
15  Q.   And what is your understanding of what BMG did with
16  respect to enforcement of that work when it learned Gramatik
17  wanted that particular work on BitTorrent?
18  A.   Well, I understand that Gramatik contacted us and then we
19  communicated to Rightscorp that that could be removed from the
20  system at their request.
21  Q.   Are you aware of any other examples where songwriters of
22  BMG have asked to have their music put on BitTorrent?
23  A.   I personally don't.
24  Q.   And finally, Mr. Bridges asked you about the concept that
25  communication with Cox and Rightscorp about the settlement

1    language.  Do you recall that?

2    A.    Yes.

3    Q.    Do you know what Cox would have done in terms of

4    processing the notices in Cox speak?

5            THE COURT:  That calls for speculation, I believe,

6    unless you lay a foundation.

7            MR. ALLAN:  Well, he was asked, Your Honor, about the

8    question.  I just want to know if he knows what Cox would have

9    done in terms of what processing meant.

10            THE COURT:  Based on what?  Based on conversation

11    with Cox or --

12            MR. ALLAN:  Well, based on any communications with

13    Rightscorp or their agent.

14            THE COURT:  What Cox -- what was his answer to the

15    question that was asked in cross-examination, was I don't know.

16    Right?

17            MR. ALLAN:  And I'm just -- I'm wondering if he knew

18    what process meant.  That was my only question, Your Honor.

19            THE COURT:  What is his understanding --

20            MR. ALLAN:  Yes.

21            THE COURT:  -- of what process means.

22            You may answer that question, sir.

23            THE WITNESS:  I don't.  I don't know what process

24    means.

25            MR. ALLAN:  Thank you.  Nothing further.

205

1          THE COURT:  All right.  May this witness be excused
2     or do you want him subject to recall?
3          MR. ALLAN:  We will have him subject to recall.
4          THE COURT:  All right.
5          Mr. Hubert, thank you.  Your testimony is complete
6     for tonight, but you may be subject to recall.  Please don't
7     discuss the testimony you've given here today with anyone else
8     except your counsel.  And you're going to have to remain
9     available for further testimony perhaps in a later stage of the
10    case.  All right, sir?
11         THE WITNESS:  Thank you, Your Honor.
12         THE COURT:  All right.  Thank you.
13         MR. ALLAN:  Thank you, Your Honor.
14         MR. BRIDGES:  Thank you.
15         THE COURT:  Next witness.
16         MR. ALLAN:  Your Honor, we call -- plaintiffs call
17    Barbara Frederiksen-Cross.
18         MR. BUCKLEY:  Your Honor --
19         THE COURT:  And this is where you had an issue.
20    Let's go to the side-bar.
21         I apologize in advance for this horrible sound.  And
22    we'll keep sidebars to a minimum.  And I've asked them to play
23    music or do something else, but they refuse.  And instead
24    you'll be assaulted in a moment here, and I apologize.
25    (ON-THE-RECORD BENCH CONFERENCE, TO WIT:

Case 1:18-cv-00950-PTG-JFA Document 494-3 Filed 10/21/19 Page 113 of 151 PageID#
22414
Case 1:14-cv-01611-LO-JFA Document 709 Filed 12/03/15 Page 112 of 130 PageID# 19212

206

1          THE COURT:  Okay.  So let me first start with

2     Mr. Bridges.  You have asked about the hundred copyrights that

3     were no longer part of the case.  And that was Round Hill?

4          MR. BRIDGES:  No, no, BMG.

5          THE COURT:  It was BMG.

6          MR. BRIDGES:  It was off BMG's list.

7          THE COURT:  All right.  I didn't think it was

8     relevant, but it doesn't violate my -- our ruling that Mr.

9     Buckley asked for yesterday.

10          Okay.  So what's the -- what's at issue?

11          MR. BUCKLEY:  So, Your Honor, the next witness

12     they're going to call is the code expert, Ms.

13     Frederiksen-Cross.

14          THE COURT:  Yes.

15          MR. BUCKLEY:  And they've got hundreds of slides that

16     they're going to use with her, 50 of which we've objected to on

17     the grounds that they're related to documents that she can't

18     authenticate.  She has no foundation to talk about; they're

19     hearsay.  There are all sorts of problems with them.  And so we

20     can go slide by slide or we can do it during her direct, but

21     the overarching issue, Your Honor, is they're trying to use

22     their expert to basically tell their story and to put on their

23     case and to authenticate documents that other witnesses are in

24     a position to authenticate.  So we either do that now with the

25     jury out and go slide by slide and exhibit by exhibit or we can

1    do it on the fly.

2           MR. BRIDGES:  I think it's beyond her -- possibly way

3    beyond her --

4           MR. BUCKLEY:  Well, outside the scope.

5           THE COURT:  And are these going to be authenticated

6    by other witnesses during the trial?

7           MR. BUCKLEY:  They should be.  They're all documents

8    that somebody else in theory could authenticate if somebody

9    offers them properly.

10          THE COURT:  Your response?

11          MR. CARACAPPA:  Well, I don't think there's a problem

12   with using our expert to put on our case.  That's the first

13   point.

14          Second point is all of those documents that she's

15   talking about will be authenticated by other BMG witnesses

16   during the trial.  There's three main categories of documents.

17   There's the notices, there's the code, and then there's the

18   CATS system, which is the system that Cox uses to deal with the

19   notices.

20          THE COURT:  Right.

21          MR. CARACAPPA:  She dealt with all three of those

22   things in her report.  She is in a position, we believe, to lay

23   the foundation for these things.  She analyzed the code.  She

24   can say what it does.  She can say as a result of the code it

25   generates notice X.

Case 1:18-cv-00950-PTG-JFA Document 704-2 Filed 12/03/15 Page 115 of 151 PageID# 22416
Case 1:14-cv-01611-LO-JFA Document 709 Filed 12/07/15 Page 114 of 150 PageID# 19214

208

```
 1              She's not going to go into a tremendous amount of

 2      detail.  There are a couple of notices that we're going to go

 3      into to show the jury it says Cox, it says the IP address, it

 4      says the song work.

 5              She also looked at the CATS code.  She analyzed it.

 6      She knows what it does.  So she's going to talk about what

 7      happens when a notice comes in from Rightscorp and somebody

 8      else, how it goes through this graduated response.

 9              I'm going to move through it quickly.  We are aware

10      that --

11              THE COURT:  Put the case on the way you want to put

12      the case on.  Hopefully not so that you kill the jury with the

13      information.

14              MR. CARACAPPA:  That's our hope, yes, Your Honor.

15              THE COURT:  All right.

16              And why isn't that admissible?

17              MR. BUCKLEY:  Well, she can't authenticate any of the

18      documents.  Just the fact --

19              THE COURT:  The representation is they're going to be

20      authenticated, and every day in a courtroom judges say, okay,

21      you know, I'll provisionally let them in.  We won't formally

22      admit them.  We'll wait and see what happens, and if there's a

23      problem down the road, we'll cure it.

24              MR. BUCKLEY:  So if we can understand their

25      objection, she -- if those documents are authenticated later
```

```
 1    or --

 2              THE COURT:  If they're not otherwise admissible,

 3    absolutely, I'll give you that standing.

 4              MR. BUCKLEY:  Okay.  And some of the slides go well

 5    beyond what we believe she has put in her report, and she's got

 6    slides that she made up about how CATS works and that sort of

 7    thing.  So I'm going to have to object on a slide-by-slide

 8    basis to those, so I don't know how you want to handle that.

 9    It's about to come up.  Do I pop up?

10              THE COURT:  So you've seen the slides.

11              MR. BUCKLEY:  We've seen these slides.

12              THE COURT:  You've looked at them.  And were they

13    subject to her report?  You say -- Mr. Buckley says they're

14    outside of the report.  And if they're summaries, that's one

15    thing.  If they contain new information that she did not make

16    available so that it could be subject to questions, then I

17    think it's inadmissible.

18              MR. CARACAPPA:  We believe they were set forth either

19    in her report or at her deposition.  So we believe everything

20    in the slides is within the scope of her --

21              THE COURT:  When you say in the deposition --

22              MR. CARACAPPA:  It could have been --

23              THE COURT:  -- the physical exhibit was shown or the

24    information in the exhibit was the subject of the deposition?

25              MR. CARACAPPA:  The information in the exhibit was
```

210

1    discussed in the deposition.  I think it's all in the report.

2    There may be one slide that was discussed in her deposition,

3    so --

4              THE COURT:  So did you supplement the report to -- to

5    reflect the additional testimony she gave in the deposition?

6              MR. CARACAPPA:  She did submit a supplemental report,

7    so there are two reports.  There's a declaration that she

8    submitted as well.

9              MR. BUCKLEY:  She was --

10             MR. CARACAPPA:  If there's a -- maybe tonight we can

11   talk about a particular document, because we're not going to be

12   able to get through Ms. Cross today.  So maybe tonight.  And I

13   think most of this stuff is at the end, so maybe tonight we can

14   talk about what we think is within or without the scope of the

15   report.

16             THE COURT:  All right.  Let's try that way.  And if

17   we need to start the morning talking about that, that's what

18   we'll do.

19             All right.  Thank you.

20             MR. CARACAPPA:  Thank you, Your Honor.

21             VOICES:  Thank you, Your Honor.

22   (END OF BENCH CONFERENCE.)

23             THE COURT:  Is our witness in the courtroom or is she

24   still outside?

25             MR. CARACAPPA:  She is, Your Honor.

| | |
|---|---|
| 1 | THE COURT: Oh, please come forward. |
| 2 | COURT SECURITY OFFICER: Face the clerk, please. |
| 3 | (THE OATH WAS ADMINISTERED.) |
| 4 | THE COURT: Go ahead. |
| 5 | MR. CARACAPPA: Good afternoon, Your Honor. John |
| 6 | Caracappa on behalf of plaintiff, BMG. |
| 7 | BARBARA ANN FREDERIKSEN-CROSS |
| 8 | having been first duly sworn, testified as follows: |
| 9 | DIRECT EXAMINATION |
| 10 | BY MR. CARACAPPA: |
| 11 | Q. Good afternoon. |
| 12 | A. Good afternoon, counsel. |
| 13 | Q. Can you please state your full name for the record? |
| 14 | A. My name is Barbara Ann Frederiksen-Cross. And that is |
| 15 | Barbara spelled B-A-R-B-A-R-A, Frederiksen, |
| 16 | F-R-E-D-E-R-I-K-S-E-N, and then hyphen, C-R-O-S-S. |
| 17 | Q. And could you please tell the Court a little bit about |
| 18 | your educational background? |
| 19 | A. Yeah. I was one of those classic kids who got interested |
| 20 | in computers about the age of 13 in a math class - it would |
| 21 | have been called a stem class today - where I got exposure to |
| 22 | programming. And after getting my first taste of programming, |
| 23 | I got very excited about becoming a programmer when I grew up. |
| 24 | And I went to a local community college where I finished my |
| 25 | high school degree and entered into a program to learn computer |

1    programming.

2         So I got my first job in computer programming at

3    about 18 after completing a two-year degree in programming, and

4    that was in 1974.  Since then I've been continuously employed

5    in the computing industry, and I received a lot of training

6    from companies within that industry like IBM and the SASS

7    Institute, the Merrell Institute, Verhoef, Microsoft,

8    DevelopMentor, and other companies that specialize either in

9    computer technology and they offer training about that

10   technology or they have specific services to provide training

11   about technology.  And that would be companies, like

12   DevelopMentor, that teach languages, computer languages.

13   Q.   Thank you, Ms. Frederiksen-Cross.

14        Could you please describe your experience in computer

15   programming?

16   A.   As I said, it started when I was about 13 or 14.  I have

17   been writing computer programs continuously since then, so

18   about 42 years.  42 years for pay and a couple of years before

19   that before I was old enough to do it for pay.

20        THE REPORTER:  Can I ask you to slow down just a

21   little bit?

22        THE WITNESS:  Sure, sure.  Thank you.

23        I started out in the early days working for big

24   companies because in the 1970s that's who had computers.  So I

25   worked for government agencies, I worked for banks, I worked

1    for telephone companies, I worked for insurance companies, and

2    I worked for a few large manufacturing companies that were big

3    enough to have sophisticated computer systems.  And, again,

4    during that time I was getting training from IBM and others who

5    provided those systems.

6            When I was about 21, I started a business on my own

7    specializing in high-performance systems and in fixing problems

8    with those systems that were related to their performance or

9    scalability.  So a bank might have a system and it was starting

10   to bog down because now there were more checking accounts and

11   they couldn't keep up.  My specialty was to go in and to figure

12   out what could be done to improve that performance and to make

13   it right.

14   BY MR. CARACAPPA:

15   Q.   Did you ever do any work for any police departments?

16   A.   I did.  For about nine years, I was a police reserve

17   recruit, and basically I functioned in a capacity where I was a

18   volunteer advisor to the Hillsboro High-Tech Crime Team.  My

19   role when I worked for them was to assist in policies and

20   procedures involving the handling of electronic data or

21   computer-based investigations.  I assisted in things like

22   fraud, investigations, and missing persons where they needed

23   someone who could look at evidence to find out what had gone on

24   and was there evidence on a computer that related to some kind

25   of criminal activity.

1    Q.    And what would you say is your profession?

2    A.    Since 1997, the focus of my profession has been forensic

3    software analysis, and that is the analysis of computer

4    programs and computer controlled devices and generally computer

5    data.  So that can run the gamut from cases like this that

6    might involve some aspect of how computer programs operate, to

7    cases that might involve something like computer fraud on the

8    Internet or intrusion into protected systems.

9    Q.    And how many matters involving forensic software analysis

10   would you say you've done since 1997?

11   A.    If I could answer that question slightly differently

12   because I started doing forensics in 1986, approximately '86,

13   '85, '86.  And the counts I've got in my head are really for

14   the total of the period of time I've been doing forensics.  And

15   that's between 225 and 250 cases.

16   Q.    And have you published any articles in your field?

17   A.    I have published articles both in technical forum and also

18   in legal symposia relating to computer forensics and the

19   handling of digital evidence.

20   Q.    Are you a member of any professional organizations?

21   A.    I am a member of ACM, which used to be the Association of

22   Computing Machinery.  It's an educational, nonprofit

23   organization, one of the world's largest educators and

24   publishers of information related specifically to the computer

25   industry.  And I'm also a member of the IEEE.

Case 1:14-cv-09050-RTG-JFA Document 494-3 Filed 12/03/15 Page 121 of 150 PageID# 19221
B.A. Frederiksen-Cross - Direct
22423

215

1    Q.    Ms. Frederiksen-Cross, what is source code?

2    A.    Source code is the human readable form of a computer

3    program.  So it's what a programmer would write in order to set

4    down the instructions to tell a computer how to solve some

5    particular problem.  And that term is used in contrast to

6    binary code or executable code, which is the form of that

7    program the human wrote when translated that's run on a

8    computer.  So the binary form is what the computer reads; the

9    source code is what I would read typically.

10   Q.    And what language is the source code at issue in this case

11   written in?

12   A.    Most of the source code with respect to the Rightscorp

13   code is written in the Java language, and then there's some

14   components that are written in what's called JSP, which is a

15   language used for a web-based systems.

16   Q.    And can you please describe for the jury the experience

17   you have in Java code and script languages?

18   A.    Sure.  I've been writing Java code almost since the

19   language came into being in the marketplace.  I received my

20   formal training in Java from a company called DevelopMentor.

21   DevelopMentor is the same company that Microsoft uses for a lot

22   of its internal trainings.  I have done pretty extensive Java

23   development myself, much of it in the context of robotics,

24   which is one of my hobbies in an area that I'm sort of pursuing

25   as I move towards retirement.

1          I'm working on some inventions in that area that

2     relate to robots to be used in agricultural applications.  And

3     I've also done extensive analysis of Java code in the context

4     of various litigation matters including copyright matters,

5     patent matters, and trade secret matters.

6     Q.   How many lines of Java code would you say you've analyzed

7     in your career as a computer forensic specialist?

8     A.   Somewhere between very high hundreds of millions and very

9     low billions probably.

10    Q.   And how many lines of code have you written in those

11    languages?

12    A.   Boy.  Hundreds of thousands at least, if not more.

13    Q.   Ms. Frederiksen-Cross, who do you currently work for?

14    A.   I have my own company, Frederiksen Software, Incorporated.

15    And I also work as the senior managing consultant and I'm on

16    the board of directors for a company called Johnson-Laird

17    Incorporated, or JLI.  JLI was one of the early pioneers in

18    digital forensics.

19    Q.   And what do you do at JLI?

20    A.   Primarily forensic analysis in the context of cases like

21    this.  But I'm also involved in some of our staffing,

22    recruiting, training, and some of our decisions about our own

23    internal technologies that we want to use within -- within our

24    business.

25          MR. CARACAPPA:  Your Honor, I have a witness binder

```
 1    for Ms. Frederiksen-Cross.

 2            THE COURT:  Sure.

 3            MR. CARACAPPA:  We have one for the Court as well,

 4    Your Honor.

 5            THE COURT:  All right.  Thank you.

 6    BY MR. CARACAPPA:

 7    Q.   Ms. Frederiksen-Cross, can you turn to Exhibits PX 1669.

 8    A.   Okay.  I'm there with you.

 9    Q.   And what is that document?

10    A.   This was Exhibit A to a report that I prepared in this

11    matter, and that would be my resume or curriculum vitae as it's

12    called in the legal circles.

13    Q.   I'm sorry.  And to the best of your knowledge, is it fair

14    and accurate?

15    A.   Give me just a half a sec.  Just checking to see if it's

16    current.

17            It's accurate, though it appears to be missing a

18    couple of my most recent deposition testimony.

19            MR. CARACAPPA:  Your Honor, at this time we would

20    like to move into evidence PX 1669.

21            THE COURT:  Objection?

22            MR. BUCKLEY:  No objection, Your Honor.

23            THE COURT:  All right.  It's received.

24            MR. CARACAPPA:  We would also like to credit

25    Ms. Frederiksen-Cross as an expert in computer programming and
```

1    computer forensics.

2              THE COURT:  All right.  Any objection?

3              MR. BUCKLEY:  No, Your Honor.

4              THE COURT:  All right.  She'll be received for those

5    purposes.

6              MR. CARACAPPA:  Okay.  Thank you.

7    BY MR. CARACAPPA:

8    Q.   Ms. Frediksen-Cross, what were you asked to do in this

9    case?

10   A.   My role in this case has been primarily focused on the

11   software at issue both for Rightscorp's software, the software

12   that's used to detect infringement and to report on that

13   infringement.  I was also asked to examine the software that

14   Cox uses for an automated system that they use to -- to handle

15   complaints about -- specifically the complaints about copyright

16   infringements.

17   Q.   And can you give the jury a brief summary of your

18   conclusions based on your assessment of the Rightscorp source

19   code, please?

20   A.   Yes.  I've had the opportunity to examine the source code

21   and to discuss the source code with Rightscorp people who

22   designed the code and wrote the code.  Based on the combination

23   of those two things, as well as some testing I have myself

24   performed related to that code, it's my conclusion that the

25   code is a sound approach to detecting infringement.  That the

Case 1:18-cv-00950-PTG-JFA Document 649-2 Filed 12/03/15 Page 125 of 150 PageID# 22427
Case 1:14-cv-01611-LO-JFA Document 709 Filed 12/07/15 Page 126 of 151 PageID# 19225
B.A. Frederiksen-Cross - Direct

219

1    code works and is capable of detecting individuals who are

2    trade -- or detecting specific IP addresses where computers are

3    trading files using the BitTorrent protocol.  It's capable of

4    collecting actual music samples related to that activity, and

5    it's capable of providing reports, including infringement

6    notices for the activity that it's detected.

7    Q.    Do you recall approximately how many asserted works there

8    are in this case?

9    A.    About 1,400.

10   Q.    And do you recall approximately when Rightscorp started

11   sending notices to Cox on behalf of BMG for the asserted

12   works -- strike that.

13          For the infringement of the asserted works?

14          MR. BUCKLEY:  Objection, Your Honor, foundation,

15   assumes facts.

16          THE COURT:  Ask her whether she's reviewed them and

17   when she understands they began.  So sustain that.  Lay the

18   foundation.

19          MR. CARACAPPA:  Thank you, Your Honor.

20   BY MR. CARACAPPA:

21   Q.    Have you reviewed the notices that Rightscorp sent to Cox?

22   A.    I have reviewed selections of them, yes, and I've also

23   done things like use a little program I wrote to pull the dates

24   out of notices and to pull the dates out of some of the data

25   that I was provided that's underlying those infringement

1   notices.  So it's actually the data that gets stored from which

2   the infringement notices are written.

3   Q.   And based on your review of those notices, do you have an

4   understanding as to when Rightscorp, on behalf of BMG, began

5   sending those notices to Cox?

6   A.   About --

7           MR. BUCKLEY:  Same objection.

8           THE COURT:  Overruled if she says yes.

9           THE WITNESS:  About February of 2012, first week of

10  February, Groundhog's Day or February 4th, right in that time

11  period.

12  BY MR. CARACAPPA:

13  Q.   Upon your review of the evidence and the code and the

14  notices, do you have an understanding as to approximately the

15  number of notices that have been sent to Cox between February

16  12th -- sorry, February 2nd, 2012, and November 26, 2014?

17  A.   Specifically just for the BMG works?

18  Q.   Yes, Ms. Frederiksen-Cross.

19  A.   About 1.8 million.

20  Q.   And what action, if any, has Cox taken with respect to

21  those notices?

22          MR. BUCKLEY:  Objection, Your Honor.  Foundation.

23          THE COURT:  Yeah, no foundation.

24          Sustained.

25  BY MR. CARACAPPA:

1    Q.   Do you have an understanding as to what Cox has done with

2    those notices?

3              MR. BUCKLEY:  Same objection, Your Honor.

4              THE COURT:  Lay a foundation.  That's not a

5    foundation.  Step -- take a step -- another step back.

6    BY MR. CARACAPPA:

7    Q.   Ms. Frederiksen-Cross, have you reviewed the Cox CATS

8    system?

9    A.   Yes, I have.

10   Q.   And what is the Cox CATS system?

11   A.   The Cox CATS system is an automated system that is to say

12   a series of programs that can receive or read from the mail

13   server Cox's facility, e-mails that were sent to Cox as

14   complaints.  And it can evaluate those complaints to see what

15   kind of complaint they are.  So some might be copyright

16   complaints, for instance, and some might be spam complaints.

17             And then based on the evaluation of what type of

18   complaint it is, and some other information that the programs

19   evaluate, it will parse those complaints, that is to say pull

20   relevant data out of them, and then determine what action is

21   appropriate to take for that complaint.  So for instance, in

22   the case of a copyright complaint, it might send an e-mail

23   notice to a subscriber or it might do nothing or it might

24   suspend the subscriber, just depending on, for instance, if

25   it's the first notice they ever received in the last six months

1  for this subscriber or if it's the tenth notice, things like

2  that.

3         So it makes decisions what an appropriate action is

4  to take, and to the extent possible, takes the warning or

5  suspension or ignore actions automatically without requiring a

6  human to read the e-mail.

7  Q.   And based on your review of the CATS system, do you have

8  an understanding as to what Cox does with the notices that

9  Rightscorp sends to Cox?

10        THE COURT:  Regarding BMG?

11        MR. CARACAPPA:  Yes, regarding the asserted works.

12        MR. BUCKLEY:  Your Honor?

13        THE COURT:  Yes.

14        MR. BUCKLEY:  Your Honor, there's no foundation for

15  any of this.  This is far outside this witness's knowledge, and

16  there are going to be lots of other witnesses that talk about

17  how CATS operates and also implicates their motions in limine.

18  I think this has gone --

19        THE COURT:  Well, number one, just make your

20  objection foundation.

21        Overrule.  I'm going to allow the testimony

22  provisionally and at this time.  I think she's indicated an

23  understanding of the system, and she's studied the system and

24  may answer the question, if you can.

25        THE WITNESS:  Thank you, Your Honor.

1          The code for the Cox system that was provided to me

2   includes both programs and some other configuration data those

3   programs use.  One piece of that information is called a black

4   list.  And it's a list of e-mail addresses that the system will

5   reject, and that is to say not process.  And what the Cox

6   system does for an address that's on the black list is it

7   deletes the e-mail and then takes no further action on it.

8          In the call that I reviewed in the files that I

9   reviewed, the right Rightscorp e-mail that's used when it sends

10  a copyright notice is on that black list.  And so what that

11  means is that the e-mail comes into Cox's server, but then the

12  program that goes to read the e-mail off the server reads the

13  header part, the to/from information on the e-mail.  It checks

14  it against the black list.  It sees that Rightscorp is on the

15  black list, so that e-mail is then just deleted and no further

16  processing occurs for it.

17  BY MR. CARACAPPA:

18  Q.   Ms. Frederiksen-Cross, we talked a little bit about this

19  when going over your background, but maybe you can go into a

20  little bit more detail about the materials you've considered in

21  preparing your opinions in this case?

22  A.   Oh, certainly.

23          When I was first involved in this case, I received

24  some of the source code for the Rightscorp system.  Subsequent

25  to that, I received also some documents related to this case,

1   things like -- there's an exchange of information called

2   interrogatories where each side asks the other questions and

3   then their technical people answer or their business people,

4   depending on the nature of the question, answer those questions

5   and sometimes they attach documents that give the answer.  And

6   so I was provided those kind of documents to review as well,

7   the questions that were asked of Cox and of Rightscorp by the

8   opposing parties and the answers that were given.

9          I reviewed the Cox CATS system, which I actually

10  traveled to a Cox facility to review.  And then -- or to a

11  facility where they were having the code hosted.  And then I

12  reviewed deposition testimony, which is the sworn testimony

13  given by people who are witnesses that you may or may not see

14  on the stand during the course of this trial, but they were

15  witnesses that the parties agreed could be interviewed in this

16  matter.  And those were the principal pieces of data.

17         In addition to that then, I also requested and

18  received at various times during my investigation some of the

19  data that the Rightscorp system collects or some of the notices

20  that it sends.  You know, I would ask can I see a sample of two

21  weeks' worth of data for a song or can I see a sample of

22  notices or -- you know, at various times I was given different

23  views into the data.

24         And then finally I did some of my own testing of

25  BitTorrent clients and of Rightscorp's ability to detect the

1 activity that I was conducting when I was using BitTorrent

2 to -- in this control test to do testing.

3        THE COURT:  Mr. Caracappa, let's end our questioning

4 for tonight.  It's 5:30.  I promised the jury I would let them

5 go home at 5:30, and I think this is a good time to break in

6 the testimony.

7        So, I'm going to excuse you for tonight.  Very, very

8 important that you go home and enjoy yourselves or listen to

9 the news where you'll receive some really horrible news on some

10 California shootings.  But don't do any investigation.  Don't

11 discuss the testimony or the case with anybody else tonight.

12 Don't do any research.

13        It causes -- it's a complete -- causes a complete

14 breakdown of the judicial system if you don't decide this case

15 based on what you hear in this courtroom and you instead do

16 things on your own to -- to make your decisions.  That defeats

17 our whole system.  So it's really important that you not do

18 that.

19        The first thing tomorrow I'm going to ask you whether

20 you had adhered to my order, and it's an order.  You know,

21 if -- I know you may have read about people who don't listen to

22 the judge -- because every judge gives the same speech I'm

23 giving you -- and have done something to pollute the entire

24 proceeding.  It causes mistrials; it costs lots of money,

25 inconveniences.  It subjects you to criminal penalties.  It's a

1   really serious matter.

2          So, please, go home, enjoy yourselves and your

3   families and some peace, and we'll see you at 9 o'clock

4   tomorrow morning.

5          All right.  Thank you.  You're excused at this time.

6   (JURY OUT AT 5:30 P.M.)

7          THE COURT:  So you're excused for this evening.  And

8   as I'm sure you're well aware, you're in the middle of your

9   testimony and you shouldn't discuss the testimony you've given

10  so far with anybody until you return tomorrow.  All right?

11         THE WITNESS:  (Nods head.)

12         THE COURT:  Thank you.  And you may step down if you

13  you'd like.  I think we have a couple of matters to discuss,

14  nothing I don't think that deals with your testimony.  But if

15  you don't want to sit up there versus -- you're released at

16  this time for the night.

17         THE WITNESS:  Could I just clarify one thing because

18  I'm not that familiar with local rules here.  Am I allowed to

19  talk to counsel about testimony or not?

20         THE COURT:  Moving forward, testimony you haven't

21  given.

22         THE WITNESS:  Okay.  I just wanted to be clear.

23  Thank you, sir.

24         THE COURT:  Yeah, absolutely.  All right.  Have a

25  good evening.  Thank you.

227

1          THE WITNESS:  Thank you.

2          THE COURT:  All right.  Couple -- so let's try and

3    avoid speaking objections.  As a judge reminded me, you know,

4    if you're not under oath, you shouldn't be testifying in the

5    courtroom.  So I may not get it, and if I don't get it, the

6    nature of the objection, then, you know, I'll ask for help.

7    And I'll ask for more substance, but foundation, hearsay,

8    authentication, you know, those -- that's where we ought to

9    start.  And I should have said something before we started

10   trial about that.

11         Mr. Bridges, I'm curious.  You asked Mr. Hubert about

12   whether they had a German entity with BMG and then also asked

13   whether BitTorrent wasn't a German company.  And I'm just

14   wondering where you're going with that.

15         MR. BRIDGES:  Your Honor, he was describing the

16   difficulty of going after overseas websites as part of the

17   rationale for their litigation strategy.  Actually have a

18   European parent and there's a lot of litigation in Europe about

19   those European websites.

20         THE COURT:  Are you going to have a witness who is

21   going to testify about what the laws are and --

22         MR. BRIDGES:  No, Your Honor.  That's what I plan to

23   do for now.

24         THE COURT:  Okay.  Well, that's a little -- that's

25   pretty far out there if you don't have some evidence that --

1    that BMG chose not to go after BitTorrent instead of Cox.  And

2    in a foreign -- in a foreign country's laws.

3           MR. BRIDGES:  Your Honor, he's said -- he said a

4    strong implication was they couldn't go after foreign websites.

5           THE COURT:  Well, he indicated he didn't really have

6    much information about it one way or the other.  But let's --

7    unless you're going to develop evidence that, you know, BMG had

8    a legal right to sue BitTorrent in another country and chose

9    not to, then I think we -- we need to forego questions of that

10   nature.  I don't think that's relevant to our suit here then.

11   Okay?

12          MR. BRIDGES:  Yes, Your Honor.

13          THE COURT:  Okay.  Now, tomorrow -- or tonight

14   you-all are going to discuss -- see whether you can resolve the

15   exhibits that you plan to use with Mr. --

16   Ms. Frederiksen-Cross, and I thank you for trying to do that.

17   If you can, why don't we, you know, get together at ten minutes

18   to 9:00 or something like that and I'll try give you an answer

19   at that time.  My preliminary answer was if they're going to be

20   authenticated down the road, I'm going to allow the testimony.

21   I don't really get in the middle of -- I think it's too

22   formalistic to require all the evidence to be admitted before

23   an expert can testify about it.  I just -- we'll rely on the

24   good faith of counsel making the representations, and that's

25   the way it will go for Cox and for BMG.

229

1        And to the extent you don't think those exhibits can

2   be -- the information in the exhibits can be authenticated or

3   you believe that they're outside of the Rule 26 report or the

4   supplement and you're prejudiced by not having had the ability

5   to depose her about those things, then, I mean, I don't think

6   they're admissible.  I think that everybody continues to work

7   with their experts and comes up with all kinds of new ideas

8   that they think, wow, this is -- you know, let's add this to

9   the trial and that's why you have limits and Rule 26

10  limitations, so we'll likely not let in any of that

11  information.

12        Mr. Buckley?

13        MR. BUCKLEY:  Your Honor, can I have two points of

14  clarification?

15        On the foundation objection, can I just have a

16  standing objection to that so that I don't have to do it on an

17  issue-by-issue basis?  There may be some where it's broader

18  than that and I need to do something on the spot.

19        THE COURT:  Foundation based on?

20        MR. BUCKLEY:  The authenticity for documents that are

21  going to be implicated later if they aren't, and she's

22  testified about that.

23        THE COURT:  Absolutely.  And I won't -- I won't

24  formally admit the exhibits until we've had an opportunity to

25  discuss that, whether they have or have not been authenticated.

1      MR. BUCKLEY:  And the second issue, Your Honor, we're

2  clearly going to get into that, and we're going to want

3  limiting instruction on the hearsay issues that they're not

4  being offered for the truth.  I don't believe they are, but as

5  soon as they start to come in and there's an expert talking

6  about them, I think the jury ought to hear that.

7      THE COURT:  All right.  Do you have any objection to

8  that from BMG's side of things?  It's what I talked about doing

9  from the very start.  The evidence of the infringement is not

10  going to be the notice itself.  It's going to be the

11  Rightscorp's software system identifying what -- you know, the

12  hits that are received based on its code.  Right?

13      MR. CARACAPPA:  That's correct.  She's going to talk

14  about the software.  She's going to say this is what it does,

15  this is how it works, and then it spits out a notice.

16      THE COURT:  So it's an accusation?

17      MR. CARACAPPA:  Exactly.

18      THE COURT:  Okay.  All right.  Then I'll give that

19  limiting instruction that it's an accusation only and that it's

20  not -- that portion of it is not offered for the truth of

21  the -- whether or not there was an infringement.

22      MR. CARACAPPA:  Yeah.  I mean, the notices themselves

23  are -- they're evidence of actual notice and we think -- we

24  think the software works and it is an accurate identification

25  of infringement.

Case 1:18-cv-00950-PTG-JFA Document 704-3 Filed 12/03/15 Page 138 of 151 PageID# 22439
Case 1:14-cv-01611-LO-JFA Document 709 Filed 12/03/15 Page 138 of 150 PageID# 19237

231

1    THE COURT:  Yes, it accurately identifies, you know,

2    infringements -- well, the jury doesn't know whether -- the

3    jury is going to have to make the decision as to whether it

4    accurately identifies infringements.  Clearly that's a center

5    foundation of the case.  For now, you're going to admit the

6    notices for -- for what purpose, to demonstrate that that

7    software system that Rightscorp used was able to identify what

8    it believed were infringing downloads by using the BitTorrent

9    system by Cox customers?

10   MR. CARACAPPA:  That's right, Your Honor.  So the

11   software goes out and it identifies an IP address and a song

12   and a port and the fact that it's a Cox customer.  And if the

13   jury --

14   THE COURT:  She's going to testify to that?

15   MR. CARACAPPA:  Yes.  And if the jury believes that

16   the code works, then those 1.8 million notices are accurate

17   records of infringement.  And if it doesn't, they may say,

18   well, only 1.7 of them or 1.6 or 1.5 or none of them are

19   accurate evidence of infringement.

20   THE COURT:  So you do want to use the notices and the

21   information in the notices as proof of infringement?

22   MR. CARACAPPA:  The notices are a manifestation of

23   the system.  So we're not taking the notice itself and saying,

24   here, it's accurate evidence of infringement.

25   THE COURT:  Right.

Case 1:18-cv-00950-PTG-JFA   Document 704-2   Filed 10/21/19   Page 139 of 151 PageID#
22440
Case 1:14-cv-01611-LO-JFA   Document 709   Filed 12/03/15   Page 138 of 150 PageID# 19238

232

1          MR. CARACAPPA:  But we have the code in conjunction

2     with the notice.  So it's the entire system that when looked at

3     in its entirety is accurate and accurately identified

4     infringement we think 1.8 million times.  Cox thinks it's some

5     number less than that.  And we think the jury should be able to

6     at least see that there was that number of notices and say,

7     okay, I think the system works and that those notices are

8     accurate, or it's accurate 90 percent of the time or it's not

9     accurate at all.

10          THE COURT:  Well, certainly is accurate for the fact

11     that there has been an accusation made in the notice of

12     infringement that's been sent by Rightscorp to Cox, but it's

13     actually the software system itself and whether the jury

14     believes that it accurately has captured those infringements,

15     which is the evidence of whether, in fact, there has been an

16     infringement, and the jury will decide that.  So, do -- that's

17     the distinction I'm drawing.  So tell me where you think I'm

18     wrong.

19          Mr. Allan, go ahead.

20          MR. CARACAPPA:  I'm not understanding, Your Honor.

21          MR. ALLAN:  I think the issue, Your Honor, is that

22     the notice is obviously part of a larger, right, piece of

23     evidence.  Right?  It's not -- standing alone, we can see.  If

24     we come in and we just give that one piece of paper that that's

25     not going to do it.  Okay?

233

1          THE COURT:  Correct.

2          MR. ALLAN:  We've got -- we've got copies of songs,

3   we've got the Dashboard, we've got roll-up notices, we've got

4   testimony from witnesses, we've got the source code discussion.

5   I think if you give a limiting instruction with respect to the

6   notices themselves, it's going to confuse the jury and they're

7   not going to look at all of the evidence in totality, which is

8   what you -- you've suggested or ordered that they need to do,

9   which is what they need to do.

10          So I don't think there's a need for a limiting

11   instruction.  We're not going to stand up and say, this piece

12   of paper proves it's infringement.  It's the total.  It's the

13   sum total.

14          THE COURT:  So --

15          MR. ALLAN:  I think if you want to have an

16   instruction to us -- and we'll certainly abide by it -- that

17   says you can't make that argument to the jury, that this piece

18   of paper alone is enough, I think that solves the issue.  I

19   don't think the jury needs to have a separate potentially

20   misleading instruction, given all the evidence that's going to

21   come in on this.

22          MR. BUCKLEY:  Yeah.

23          THE COURT:  Well, maybe Mr. Caracappa, what questions

24   are you going to ask this witness about, what she has done with

25   the notice that was generated by Rightscorp?

1        MR. CARACAPPA:  Well, let me take it a step back.

2    Let me tell you what she's going to start with.  She's going to

3    analyze all the source code that Rightscorp has going, and

4    she's going to talk about how the Rightscorp system works.

5    It's going to go through step by step about how the Rightscorp

6    system in -- just to torrent and then compares that torrent to

7    the BMG work, and then the lines of code that are used to see

8    whether or not there's a file on a peer, and how it extracts

9    that information.

10        Then she's going to talk about how in many instances

11    the Rightscorp software goes out and downloads an actual copy

12    in over 150,000 instances.  And then she's going to talk about

13    the document that is spit out by that source code is this

14    notice.  And then she's going to talk about how that notice is

15    sent to Cox and she looked at the CATS system at Cox and she

16    knows based on her analysis of the code exactly what's done

17    with that notice, with that information.

18        THE COURT:  Okay.  Now Mr. Buckley, why isn't that

19    permissible testimony without giving a limiting instruction

20    because ultimately -- go ahead.  Tell me.

21        MR. BUCKLEY:  So this is a very -- this is a very

22    specific hearsay issue, and it's a simple one.  The evidence of

23    infringement, if there is any -- and that's just what

24    Mr. Caracappa and Mr. Allan have been saying.  The evidence, if

25    there is any, is the Rightscorp system, it's the infractions

```
 1    tables that are created with the data that's collected.  These

 2    notices say, here's what that evidence is.  That is hearsay.

 3    The notice itself is not proof of what the notice talks about.

 4    Your Honor already ruled that.

 5             So all we're asking for -- and this is what Rule 105

 6    says -- is if they're going to wave the notices around, which

 7    they've already been doing, and they said in their opening the

 8    DMCA is shorthand for infringement.  They've already had their

 9    expert on the stand referring to infringements, which she

10    shouldn't be doing.  Those are legal conclusions.  If they're

11    going to use them in that way, we're entitled to an instruction

12    under Rule 105 that says the notice itself isn't evidence of

13    anything.  It's not proof of an infringement.  If they want to

14    go and prove that up, they should do that.

15             THE COURT:  Well, they certainly are relevant in

16    their totality to the decision a jury will be making, and they

17    should come in in their complete form so the jury understands

18    what the Rightscorp system does.  And at the end of her

19    testimony, she -- well, in her direct she clearly is going to

20    testify that the system works and is accurate, and as a result

21    her opinion is, as she's already given, that these copyrighted

22    materials were all downloaded through the Cox system and are

23    infringing.

24             MR. BUCKLEY:  Your Honor, she shouldn't be able to

25    say that.  She can talk about facts.  She can talk about what
```

1   the system does and the results of it.  She should not be able

2   to sit up here and tell the jury that's infringement.  She's

3   not a lawyer.  That's your job.  So she shouldn't be able to

4   say that.

5          THE COURT:  Well, that's a word of art that the jury

6   has been -- already been -- had spoken of and it's not --

7   certainly not -- I mean, infringement is the issue they're

8   going to have to ultimately decide.  But that's why you have

9   experts to guide them through the use of what they're -- you

10  know, what they should be looking at to make that determination

11  and --

12         MR. BUCKLEY:  Your Honor --

13         THE COURT:  Does she know whether it's infringing or

14  not?

15         MR. BUCKLEY:  No.

16         THE COURT:  I mean, does she know whether there

17  are -- did she discuss -- has she covered all the licensing

18  issues and is she aware, or has she just been told they've been

19  downloaded without permission?

20         MR. BUCKLEY:  She assumes that making available is

21  infringement, and that's the -- that's the assumption that her

22  opinions are based on.  So in the same way, Your Honor, if one

23  of our experts got up and said, my opinion is Cox has not -- is

24  not contributorily liable for infringement --

25         THE COURT:  All right.

1        MR. BUCKLEY:  -- Mr. Allan would go through the roof

2   and you would sustain his objection.  It's the same thing.  She

3   shouldn't be here telling the jury what you are tasked with

4   finding has already occurred.  That's one issue.

5        But there's still a separate issue of the notices.

6   They are hearsay.  If they're offered for the truth, they can't

7   be.

8        THE COURT:  Well, that's why I asked about them

9   yesterday or whenever the heck that was.  And the answer was,

10  we want to use the exhibits, too, Judge, and I thought that

11  ended the issue.

12       MR. BUCKLEY:  We all have to talk about the issues.

13  We all have to talk about the notices.  But if they're just --

14  as Mr. Kelley said, I'm going to stack them to the ceiling and

15  say, there are the infringements in boxes over there, that's

16  clearly improper.

17       THE COURT:  Well --

18       MR. ALLAN:  Your Honor --

19       THE COURT:  -- the answer yesterday should have been,

20  I still object on the basis of hearsay.  We want to use the

21  document too, then it would have, in my mind, preserved the

22  issue.  So what we're talking about tonight is a surprise given

23  what I understood you to say --

24       MR. BUCKLEY:  Your Honor --

25       THE COURT:  -- yesterday.

1            MR. BUCKLEY:  -- I apologize for cutting you off.

2            I certainly never meant to waive that argument, and

3    I'm happy to go back and look at the transcript.  This has all

4    been in the -- the only reason we're talking about the notices

5    was our motion in limine that they're hearsay.  That's been

6    the -- that's been the wrapper for this whole conversation, and

7    that's what Rule 105 is about.

8            THE COURT:  Maybe it's my fault.

9            MR. BUCKLEY:  No, it's probably mine.

10           THE COURT:  I asked yesterday --

11           MR. BUCKLEY:  But that's what --

12           THE COURT:  -- and Mr. Kelley --

13           THE REPORTER:  One at a time.

14           THE COURT:  Yeah, one at a time.

15           MR. BUCKLEY:  Sorry.

16           THE COURT:  I had Mr. Kelley up and I said, hey,

17   we -- you were going to file a brief if necessary.  Where are

18   we?  He ducked it, you know, like a curve ball from an all-star

19   claiming an illness and, you know, at the end of day then you

20   got up and I thought it resolved it.  So that -- maybe I should

21   have kept asking questions.

22           Are they business records?  Do they come in as

23   business records?  There were several other -- there were

24   several objections to your motion in limine raised, and we

25   never -- I never resolved them because I never had enough

1    information, so here we go.

2           Put it in a -- in a pleading tonight; give it to me

3    in the morning.  And both of you supplement your motion in

4    limine that you've filed already and tell me why the document

5    is independently admissible as a business record, if you

6    believe that it is; and if not, how it should be used.

7           If -- if we have not proven infringement yet, that's

8    a jury decision, then I believe Mr. Buckley is correct.  The

9    testimony of Ms. Frederiksen-Cross should be limited to her

10   talking about the accuracy of the system and the information it

11   generates and not going to the ultimate question of

12   infringement.  That's not her job.  She doesn't have firsthand

13   information.  She's not a lawyer.  It's a -- as Mr. Buckley

14   pointed out, it's an issue that the jury should decide that I

15   rarely ever give to an expert to make an ultimate

16   determination, and I did not mean by my questioning tonight to

17   suggest it should be.  I was merely asking about how far you

18   intended to go.

19          So there's two issues.  One is is it hearsay, should

20   we have a limiting instruction.  Is it independently -- are

21   they all independently admissible.  But at the end of the day

22   this is -- Ms. Frederiksen-Cross is not going to be testifying

23   about whether they're infringement or not.  It's just about

24   whether the information in the notices is accurate based on her

25   investigation.

1          Okay?

2          MR. BUCKLEY:  Thank you, Your Honor.

3          THE COURT:  Does that work?

4          MR. WAKEFIELD:  (Nods head.)

5          MR. ALLAN:  Your Honor, yes.  Two, I think, small

6    housekeeping matters on something else.

7          Your Honor asked to have the depositions -- the

8    transcripts that were in dispute.  I actually -- I think there

9    are other people on teams that aren't with us right now that

10   are coordinating on this, so I'm not sure we exactly know

11   what's in this binder, but there are some transcripts for you.

12         And I've looked through it and I'm happy to share it

13   with counsel here.  This is what I have.  And I note that what

14   you're going to get doesn't seem to be all that user-friendly,

15   and we'll certainly do our best to make it more user-friendly

16   the next time you see it.

17         THE COURT:  And I'm old-school, and I've spent a fair

18   amount of time outside the courtroom doing whatever other

19   people in this case are doing.  And it was drilled into me that

20   the way the judge wanted it was he wanted the deposition in its

21   totality so that he could see who the witness was, what they

22   were testifying about, and get a sense of why they were

23   testifying.

24         And then, you know, page 103, plaintiff wants, you

25   know, the deposition testimony either read in or by video of

Case 1:18-cv-00950-PTG-JFA   Document 704-3   Filed 12/03/15   Page 149 of 150 PageID# 21547
Case 1:14-cv-01611-LO-JFA   Document 709   Filed 12/03/15   Page 149 of 151 PageID# 22449

241

1    pages 103 through 108.  Cox wants counters 108 to 116 or 160 to

2    172.  The objections were embedded in the deposition transcript

3    itself, which depending on what jurisdiction you're trying the

4    case in may or may not be permissible anymore, frankly.  I know

5    I went to Texas and learned a real lesson on how they

6    interpreted the rules.

7             But tell me what you've got now.

8             MR. ALLAN:  I know we have a folder for you, Your

9    Honor.  Mr. Theodore will handle this exhibit.

10            MR. THEODORE:  So where we have -- we have three full

11   transcripts, Your Honor, that have -- on them they have

12   highlighting.  I believe the yellow is our initial

13   designations, the green is their -- is Cox's counter

14   designations, and the pink is our fairness designations.  So

15   the three transcripts are Sikes, Carothers 1, and Carothers 2.

16            THE COURT:  Okay.  And are the objections embedded

17   in --

18            MR. THEODORE:  Well, there are -- some objection -- I

19   mean, people object differently in the transcripts.  So you

20   have the full transcript, so you'll see the objections.

21            We also have two additional documents for you that

22   are designed to tell you the objections that people are

23   standing on currently after our meet and confer.

24            So first of all, we have a chart which has the

25   objection -- objection codes, and then we have a chart that has

1    the page and line numbers of each designations.  And then if

2    those objections -- or those page and line numbers are objected

3    to, we have the designations that the parties are standing on

4    in the chart.

5          THE COURT:  Okay.  I should be able to figure that

6    out.

7          MR. THEODORE:  Yeah.  And now that I look at it,

8    maybe the chart probably should be in bigger font, and we will

9    make the chart in bigger -- try to make a chart in bigger font

10   next time.

11         THE COURT:  Okay.  Are you going to call -- you

12   expect to use these tomorrow?

13         MR. THEODORE:  Maybe tomorrow or maybe Friday.  You

14   know, if -- they are -- they have been noticed for tomorrow.

15   We'll see how long the witnesses take.

16         THE COURT:  Okay.  All right.  Then I'll do the best

17   I can to get -- to get through those.

18         MR. ALLAN:  And, Your Honor, just one more small

19   thing on the -- the one exhibit we introduced with Mr. Hubert,

20   I have several copies here which signals to me that I perhaps

21   neglected to pass up the appropriate numbers.

22         THE COURT:  That was 248?

23         MR. ALLAN:  Let me double-check.

24         THE COURT:  248 made its way.

25         MR. ALLAN:  PXS 001.  No, I don't believe.

1           THE COURT:  Oh.

2           MR. ALLAN:  I know I gave you one for the witness,

3    but I may have given you three.

4           THE COURT:  Okay.

5           MR. BRIDGES:  May I ask, what -- today probably ran

6    longer than we expected and we're probably running behind.  May

7    I ask who you're going to be put on tomorrow?

8           MR. ALLAN:  Well --

9           MR. BRIDGES:  Designated people, but we're running

10   behind.  I would like to know if there's somebody you know who

11   you're going to anticipate getting on tomorrow.

12          MR. ALLAN:  Well, I believe the next live witness is

13   Mr. Hauprich.

14          MR. BRIDGES:  You're going to do him before the

15   video?

16          MR. ALLAN:  I don't know that we know the answer to

17   that right now.

18          THE COURT:  Okay.  Well, keep working and

19   communicating.  And I appreciate the work you did today.  And

20   I'll see you-all at 9 o'clock tomorrow morning.

21          All right?  Thank you.

22          I'm sorry?

23          MR. THEODORE:  May I hand this to your bailiff?

24          THE COURT:  Yes, please.

25          MR. WARIN:  Your Honor, did you mean 8:50?

Case 1:18-cv-00950-PTG-JFA   Document 494-3   Filed 10/21/19   Page 151 of 151 PageID#
22452
Case 1:14-cv-01611-LO-JFA   Document 709   Filed 12/03/15   Page 150 of 150 PageID# 19250

244

 1              THE COURT:  Yes.  If you can't work it out, then I'll

 2     be here in chambers and we'll get rolling at 8:50.  All right.

 3     Thank you, Mr. Warin.

 4              All right.  Thank you.  We're in recess.

 5              VOICES:  Thank you, Your Honor.

 6              NOTE:  The December 2, 2015 portion of the case is

 7     concluded.

 8          -------------------------------------------------

 9

10

11

12

13

14

15

16

17              We certify that the foregoing is a true and

18        accurate transcription of our stenographic notes.

19

20              /s/  Norman B. Linnell
                _____
21              Norman B. Linnell, RPR, CM, VCE, FCRR

22              /s/  Julie A. Goodwin
                _____
23              Julie A Goodwin, CSR, RPR

24

25