1

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
                    Alexandria Division




-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,        :
                               :
     -vs-                       :    Case No. 1:18-cv-950
                               :
                               :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                               :
-------------------------------:
```

HEARING ON MOTIONS


October 24, 2019


Before:  Liam O'Grady, USDC Judge




APPEARANCES:


Matthew J. Oppenheim, Scott A. Zebrak, Jeffrey M. Gould,
and Andrew Guerra, Counsel for the Plaintiffs

Thomas M. Buchanan, Michael S. Elkin, Jennifer A. Golinveaux,
Thomas Patrick Lane, and Diana Hughes Leiden,
Counsel for the Defendants

1          THE CLERK:  The Court calls case 1:18-cv-950, Sony

2   Music Entertainment, et al. versus Cox Communications, Inc., et

3   al. for a motion hearing.

4          May I have the appearances, please, first for the

5   plaintiffs.

6          MR. ZEBRAK:  Good afternoon, Your Honor.

7   Scott Zebrak with the law firm of Oppenheim + Zebrak.  With me

8   today at counsel table are my colleagues Matthew Oppenheim and

9   Jeffrey Gould.

10          Also in the courtroom today are a number of

11   colleagues from our firm on the far right, and a number of

12   client representatives behind me.  We have Nathan Osher from

13   Warner Chappell.  Sitting next to him, Carla Miller from the

14   UMG plaintiffs.  And sitting next to Carla is Brad Cohen from

15   Warner Music Group.  And then last, but certainly not least, is

16   David Jacoby from Sony Music.

17          THE COURT:  All right.  Well, good afternoon to all

18   of you.  And your -- your IT person who is going to help you

19   out today, what's his --

20          MR. ZEBRAK:  I apologize, Your Honor.

21          THE COURT:  Yeah.

22          MR. ZEBRAK:  Though he is facile with IT as well,

23   he's a lawyer with our firm as well, his name is Andrew Guerra.

24          THE COURT:  All right.

25          MR. ZEBRAK:  And with the Court's permission, we're

3

1   going to split up the arguments today where my colleague,

2   Matthew Oppenheim, will argue the summary judgment issues, with

3   the exception of ownership and Cox's pair of issues on

4   statutory damages, I'll argue those.  And on the Daubert

5   motions, Jeffrey Gould will argue our defensive motion on

6   Mr. Lehr, and I'll argue the other two.

7           THE COURT:  All right, that's fine.  Thank you.  All

8   right.  Again, good afternoon to all of you.

9           Mr. Buchanan.

10          MR. BUCHANAN:  Good afternoon, Your Honor.

11   Thomas Buchanan from the firm of Winston & Strawn on behalf of

12   the defendants.

13          With me at counsel table is Michael Elkin and Diana

14   Hughes Leiden.  Also here is Thomas Lane and

15   Jennifer Golinveaux.  And we are the ones that requested the

16   tech individual, who is here with us.

17          THE COURT:  All right.

18          MR. BUCHANAN:  And then we have two representatives

19   of Cox, Marcus Delgado and Kristen Weathersby from -- both

20   counsel with Cox.  Thank you, Your Honor.

21          THE COURT:  All right.  Good afternoon to all of you.

22          All right.  Well, by my count we're here to talk this

23   afternoon about the Tregillis, Lehr, and Feamster Daubert

24   motions, and then summary judgment motions as well.  And

25   included in that, of course, is I think affirmative defenses,

4

1   but more part of the summary judgment motions.

2          And what I would like to do is start with the Daubert

3   motions first.  I've read the pleadings.  Obviously the BMG

4   case was tried a couple years ago and, you know, rulings were

5   made in that case that are relevant here.

6          So I've read the reports and the pleadings, and I

7   have some questions.  I don't want you to go back through each

8   of your arguments, we'd be here until next week.

9          So I'm looking at, you know, 10 or 15 minutes of

10   argument, a response, we'll give the moving party the reply.

11   And keep moving that way.  And then summary judgments after the

12   Daubert motions.

13          So why don't we start with Feamster, does that work?

14          MR. ZEBRAK:  Yes, Your Honor.

15          THE COURT:  All right, Mr. Zebrak.

16          So the $64,000 question is, where did the spreadsheet

17   come from, right?  The REV 00003444.  So I know -- you know,

18   what's your position at this time?

19          MR. ZEBRAK:  Sure.  Sure.  Well, vis-a-vis

20   Dr. Feamster's expert report, I'll answer that right now.  And

21   I would also like to just bring to the Court's attention that

22   this is also the subject of a separate motion in limine outside

23   of the Daubert matter.

24          THE COURT:  Okay.

25          MR. ZEBRAK:  So the -- I mean, the REV '3434

5

1   spreadsheet is a spreadsheet that Audible Magic produced within

2   about 14 or 15,000 documents that it provided in response to a

3   very broad subpoena from Cox.  And Cox took Audible Magic's

4   deposition -- I was attending that deposition.  And at the

5   deposition Cox asked some general questions about Audible Magic

6   transaction logs which reflect MarkMonitor's use of Audible

7   Magic, but Cox did not show Audible Magic what Cox and

8   Dr. Feamster now claims is a log of these Audible Magic

9   transactions.

10          So, in effect, Cox in its summary judgment motion and

11  now Dr. Feamster here are relying on an in-authenticated

12  document that Cox really never asked the witness direct

13  questions about.

14          To the extent Cox did ask questions about transaction

15  logs generally, Audible Magic testified that it had to pull

16  transaction logs off of backup tapes, and that they were

17  incomplete, but that what it pulled off backup tapes covered

18  only the period of 2012 to 2014.

19          So in effect, what you have here is Dr. Feamster

20  using -- assuming it is what he believes it to be, being a

21  transaction log of MarkMonitor's usage of Audible Magic, his

22  use of it would be like saying, I am going to see how

23  productive or what work my employee did in the course of the

24  workday, which consisted of an eight-hour day from 9 to 5,

25  but I'm only going to look at the activity from 3 to 5 o'clock.

6

1          It's undisputed here that what occurred was that

2    MarkMonitor used Audible Magic for these audio identifications

3    over the course of years beginning as early as 2008 and

4    continuing through the end of the claim period in this case.

5          So if Dr. Feamster's goal, as he very clearly says in

6    his report and at deposition, and Cox has asserted again and

7    again in its pleadings, is to have him tell the jury that

8    75 percent or so of the works in suit were never matched to

9    Audible Magic's database, it's just flat out inaccurate.  It's

10   Dr. Feamster, in effect, providing testimony that doesn't fit

11   the facts of the case.  It's just patently unreliable.

12          It is not an issue of weight.  This is exactly the

13   sort of thing that the Fourth Circuit cases say goes to, you

14   know, the expert's testimony needs to fit the facts of the

15   case.  It's unequivocal that the logs go back to '08, but yet

16   his data set is only for that three-year period.

17          So our view is that both for reliability reasons and

18   just for reasons of confusion and prejudice, you know, that

19   that testimony has no place going before a jury.

20          I gave you a longer answer to what is that log, but I

21   think that covers it.

22          THE COURT:  No, I was looking for that.  All right,

23   go ahead then.

24          MR. ZEBRAK:  Sure.  So let me, let me take a step

25   back and explain who Dr. Feamster is and why we've brought this

1    Daubert motion.

2             As Your Honor has seen, we filed a number of these

3    motions.  And as Your Honor will also have seen, we didn't move

4    to strike these experts entirely.  We were very focused on just

5    those areas that we thought were not acceptable under the

6    Rules.  And Dr. Feamster is perhaps the expert that pretty much

7    his entire testimony is problematic for the reasons I'm about

8    to cover.

9             Your Honor is well familiar with the law, so I'm not

10   going to cover the law on Daubert and confusion, I'll just jump

11   right into it.  But Dr. Feamster in his report addressed four

12   separate categories, and I'm now in today's hearing going to

13   address a fifth one, which are undisclosed opinions he's

14   provided for the first time in opposition to our summary

15   judgment motion.

16            So that's what we have before us here today.  And to

17   be clear, we're not bringing this simply because we disagree

18   with his conclusions.  We disagree with his methodologies and

19   what we think is really just deceptive testimony that is not

20   going to assist the jury at all.

21            So Dr. Feamster has an extensive resumé, we're not

22   arguing that.  But that doesn't give him license to confuse and

23   mislead a jury and proceed with a lack of intellectual rigor,

24   and that's exactly what we think he's done.  And to the extent

25   he is testifying, he's testifying in ways that aren't tethered

8

1    to the evidence in this case.  And that also has no place

2    before the jury.

3            So let me address each of the areas quickly, and I'm

4    happy to answer whatever questions Your Honor has.  And if some

5    of this is redundant, just move me on, please.

6            So his first area is area one where Dr. Feamster

7    testifies that Mark -- he testifies about MarkMonitor's

8    downloads of these files.  And he says, and I quote, "for

9    nearly all of the works at issue, MarkMonitor did not download

10   any portion of the work."

11           Now, Cox, in its briefs, accuses us of latching onto

12   just one small part of his report in this area.  But this is

13   his executive summary.  This is exactly what Cox wants to do

14   with Dr. Feamster, is confuse the jury about whether the works

15   in suit have been downloaded.  It's not an issue in this case

16   about what happened on the downloads.

17           The testimony is unequivocal.  MarkMonitor did an

18   initial download of these files, and then the files were run

19   through Audible Magic in order to understand what's in the

20   files.  And thereafter, MarkMonitor relied on hash values,

21   which, until Cox and Dr. Feamster realized how many compelling

22   they were in proving the infringement, Dr. Feamster endorsed

23   the reliability of hash values to identify a file.  And

24   thereby, once you already know what's in a file, when you see a

25   file with a matching hash, you know it has the same contents.

9

1          Dr. Feamster first ran back on that in opposition to

2   summary judgment, contradicting his earlier testimony.  But in

3   this case, whatever testimony Dr. Feamster has on MarkMonitor

4   downloads, it's undisputed.  There's no need for expert

5   testimony on that from him.

6          Cox, in its opposition, justifies his testimony by

7   arguing that somehow the MarkMonitor contract with the RIAA

8   called for a process more rigorous than the one that

9   MarkMonitor applied.  There's no merit to that, Your Honor.

10          This is not something that Cox adduced in discovery

11   from MarkMonitor or the RIAA.  Cox is confusing separate

12   systems and separate methodologies from the Copyright Alert

13   System.

14          And in any event, it doesn't show -- I mean, whatever

15   downloads MarkMonitor did or didn't do, it doesn't require Dr.

16   Feamster to confuse the jury about that.  It's undisputed.

17          So let me move on to the second area, which we've

18   already largely covered, which is Dr. Feamster's testimony that

19   most of the tracks in the notices sent to Cox were not matched

20   by Audible Magic, and that fewer than 25 percent of the works

21   at issue were ever matched to the Audible Magic database.

22          Well, those statements, which are not qualified by,

23   well, just for the period of time I reviewed -- that's exactly

24   what Cox wants to mislead the jury about.  Dr. Feamster's

25   testimony is not about just a limited period, it's about in

1    totality.

2            We see these, for the reasons I said, as just

3    baseless deceptive statements that, you know, are contrary to

4    the evidence.

5            So, you know, I think, you know, beyond that, there's

6    just no support for this testimony, and we could have a shorter

7    clearer trial without this confusion.

8            His third area is an area that the other side has

9    since withdrawn in light of our motions in limine.  But I'd

10   like to spend just a brief minute on it, Your Honor, because I

11   think it's emblematic of the lack of rigor that, though he has

12   an extensive resume, Dr. Feamster brought to this case.

13           Dr. Feamster tried to contest the accuracy of Audible

14   Magic initially, even though it's the leading technology in the

15   industry, used by everyone, and courts have relied on it for a

16   decade plus.  His analysis here was ginned up before the

17   litigation began.  Dr. Feamster was paid to write an article --

18           THE COURT:  Right, I recall the document.

19           MR. ZEBRAK:  Yeah.  And so, there's an undisclosed

20   article that he had no basis to question Audible Magic in that

21   article, let alone repeat it in his report here without even

22   disclosing the opinion.  Now, now they've smartly withdrawn it,

23   as well as him making arguments about fair use and what

24   constitutes true infringement.  But that -- it's reflective of

25   the approach he's taken to this analysis.

1          So the fourth of the five areas are what I refer to

2     as the pretextual reasons for Dr. Feamster saying

3     contemporaneous downloads are required at the time of each

4     notice, rather than one initially, and thereafter relying on

5     hash values.

6          None of his rationales, which I'll explain in a

7     moment, has a factual basis in this case.  It's just irrelevant

8     academic theory.  And the underlying presumption that

9     undergirds his testimony in this area conflicts with the law.

10    It doesn't matter whether these peers that we sent notices

11    about had 100 percent of the infringing file or somewhere

12    between 90 and 100 percent.  It's an infringement.

13         Him implying that you must have full downloads or you

14    need to do a full download, otherwise you won't know if they

15    have the full file, it's just going to breed jury confusion and

16    it's irrelevant.

17         His justification for why -- his second justification

18    is that peers -- Your Honor is well familiar with this concept

19    of bitfield, which is how the whole BitTorrent system, in part,

20    is structured on.  And it works, it's efficient, there's a

21    reason why BitTorrent is such a prolific tool for piracy.  It

22    relies on peers indicating what they have that they're

23    distributing, and you can see the amounts that these folks have

24    on their systems.

25         Nowhere in his expert report did Dr. Feamster

12

1    criticize the accuracy or reliability of bitfield information.

2    Again, it was only in his deposition and then in their summary

3    judgment papers that he now brings up this theory that peers

4    sometimes lie about their bitfields.

5           Your Honor, there's no reason to think that happened

6    here.  There's no reason to think that it happens at any sort

7    of a frequent basis.  In fact, when pushed at deposition, and I

8    deposed Dr. Feamster, I wanted to know, how often does it

9    happen?  What's your basis for raising this here?  He

10   eventually said, well, to the extent it happens, maybe it

11   happens 1, 2 percent of the time.  I'm paraphrasing.

12          So testimony like that, not based in the evidence, is

13   not appropriate.

14          And then the fifth and final issue that I'd like to

15   mention is that, again, not in his expert report, which cabins

16   the scope of his testimony, but in Cox's attempt to stave off

17   summary judgment, Dr. Feamster has done an about-face.  Though

18   he understands, as he must, that hash values are reliable and

19   the world uses them for file identification, he now brings up

20   various issues that he wants the Court to see as somehow

21   casting doubt on our motion for summary judgment.  Again, it's

22   improper testimony.  It shouldn't be there.

23          But to address it very quickly, number one, he talks

24   about a concept called a "hash collision," which involves

25   essentially independent creation of two files with different

13

1    content that have the same hashes.  Again, it's deception.  It

2    happens when you look at the numbers and the frequency.  It's

3    something like less than a trillion of a -- I can't even say

4    it, lacking a capacity for some of this math, which I know

5    lawyers are famous for.

6            And the second piece of this is on summary judgment

7    there was another undisclosed issue on hash values, but I

8    don't, unless the Court wants to, need to extrapolate on that.

9            And I think that's an overview.  Any questions you'd

10   like me to answer?

11           THE COURT:  I don't have any right now -- well, so in

12   the Rightscorp -- in the BMG case, there was an issue as to

13   whether Rightscorp had reduced the hash values it was looking

14   at down to 10 percent versus the 100 percent, and it turned out

15   that none of that was occurring during the infringed -- alleged

16   infringing period.

17           Is that an issue in this case or not?

18           MR. ZEBRAK:  It is not an issue in this case, but I'd

19   like to give you one caveat to that, and it's a teeny, teeny

20   caveat.  So in this case MarkMonitor, underlying each of these

21   notices, recorded what are called "evidence packages," and

22   those packages record the amount of the bitfield.

23           So for all these notices, we, and Cox, and everyone's

24   respective efforts -- experts can see the amount in the

25   bitfield.  And I think there was a day or two, for testing or

1   some other reasons, where a small number of notices, I think

2   it -- it's in, I think, the parties' respective papers, I think

3   it was something like maybe 143 out of the 264,000 notices.  It

4   was -- again, I may be wrong on the numbers, but there's no

5   issue about a change in bitfield level.

6           The RIAA had a very -- through MarkMonitor, a very

7   conservative approach to notices here.  They wanted the peer to

8   have at least 90 percent of the file, and it's seen throughout,

9   and that's what the documents show.

10          THE COURT:  All right.  Thank you.

11          MR. ZEBRAK:  Thank you.

12          THE COURT:  All right.  Mr. Buchanan.

13          MR. BUCHANAN:  Yes, Your Honor.

14          So with regard to the first point made by counsel for

15  the plaintiffs about the MarkMonitor downloads and whether

16  Mr. Feamster testified that there were no downloads.  If you

17  consider the first and second points Mr. Zebrak discussed, it

18  indicates that, in fact, Mr. Feamster did recognize that there

19  was downloading by MarkMonitor as part of the verification

20  stage of their investigation process.

21          So the first thing that MarkMonitor did was download

22  from the Internet music, musical compositions, sound recordings

23  from an Excel spreadsheet or a list that had been provided by

24  the plaintiffs, and then they would attempt to match that to

25  the Audible Magic database.  Audible Magic had apparently

1    provided MarkMonitor with software that allowed them to create

2    a fingerprint.  They would match the fingerprint to the

3    fingerprint that already existed in the Audible Magic database

4    that had come from the plaintiffs at sometime before then.

5              So when Dr. Feamster testifies about the Audible

6    Magic spreadsheet, REV '0344, within that is an analysis of the

7    downloaded files, allegedly downloaded files of MarkMonitor,

8    being compared against the Audible Magic database.  So he's

9    acknowledging, by his testimony and his report, that that

10   happened.

11             So just to be -- make it simple, what he's not going

12   to testify, nor is anyone else going to testify in this case on

13   behalf of the defendants, that there wasn't downloading by

14   MarkMonitor of files supposedly to be the files that are the

15   works in suit.

16             Now, with regard to -- with regard to the dispute

17   over whether there needed to be downloading versus just a match

18   by way of a hash through some metadata, Dr. Feamster will

19   testify two points there.  One goes to your last question or

20   your question to the plaintiffs' counsel, which was about the

21   90 to 100 percent downloading.

22             So here we do not have any downloading by MarkMonitor

23   at the detection phase.  That's where they got the hash and

24   then they went out and tried to match it to a file on a

25   computer, say a Cox subscriber, and they would try to match it

16

1    with the metadata.  And they'd use the hash to do that.

2          And their view is that if you have a hash for a file,

3    that that is irrefutable proof that the two match.  They're

4    unique, they're a fingerprint.

5          So two points on that.  And that goes to your 90 to

6    100 percent.  They didn't download anything at that phase.  So

7    this is important on the issue of direct infringement, because,

8    as you pointed out in the BMG case, just making the file

9    available does not constitute infringement.  You have to have a

10   downloading.

11         And the Court went on to say that because Rightscorp

12   downloaded the file, that was evidence that there was

13   distribution or dissemination of that file.  Here, we have no

14   such evidence.

15         THE COURT:  Well, we've got sampling, right?  There's

16   sampling that occurred during MarkMonitor's identification

17   process of the hash marks versus the music?  Is that -- am I

18   right about that?

19         MR. BUCHANAN:  No.  So there was no sampling that I'm

20   aware of.  What we have is the downloading of the files at one

21   phase and matching it to the database remotely of Audible Magic

22   by way of the two fingerprints.

23         THE COURT:  Right.  Correct.

24         MR. BUCHANAN:  And then simultaneously, they proceed

25   and take the hash value and can search, say, for -- look for a

1   Cox subscriber or any subscriber out there on one of the

2   so-called pirate networks, BitTorrent, eDonkey, Gnutella, and

3   Ares, and they search and they say, okay, here, that hash

4   matches.

5          So the reference to the MarkMonitor contract that

6   they say is irrelevant, the relevance of that is that

7   MarkMonitor suggests that we download just like Rightscorp,

8   because that way you know the full content of the file, you

9   know for sure, it's not just metadata.

10          So if you're creating 174,000 evidence packages for

11   purposes of copyright enforcement and litigation, you want to

12   have the full download.  So there's two points.  Dr. Feamster

13   will say, in his expert opinion, you needed to have the content

14   downloaded so you could match, because it could be situations

15   where what purports to be in this file by way of the hash is

16   not actually that content.

17          And that's a dispute between two experts.  It's not

18   deception.  It's not untethered to the facts, misleading, as

19   Mr. Zebrak says.  It's his expert opinion.

20          And clearly whether they downloaded the music or the

21   musical composition, the file, their sound recording that's on

22   this file during the detection phase, is very relevant to the

23   issue of whether there is contributory or vicarious liability

24   in terms of whether there was disseminate -- contributory

25   liability because whether there was dissemination or

18

1    distribution of that file.

2           As the Court pointed out, BMG making it available,

3    letting it sit there on the file, is not enough.  And there's

4    no evidence in this case not only that it was disseminated, but

5    any downloading.

6           And in that case, again, the Court pointed out that

7    there was circumstantial evidence of dissemination and

8    distribution of the files in the BMG case because Rightscorp

9    itself did it.

10          So that is important evidence for us, and we should

11   be able to put that forward.  They can attack him all they

12   want, but his credibility and whether he's misleading, that

13   goes to weight.  The issue is, those are real issues and he is

14   an expert in that field and should be able to testify about

15   that.

16          Now, in terms of the Audible Magic spreadsheet, so

17   it's -- it is true that that particular spreadsheet, REV '344,

18   was never shown, handed to Vance Ikezoye, the CEO of Audible

19   Magic.  However, that individual testified at length that we

20   produce transaction logs, which have basically 17 columns of

21   information, including match offset, verification ID number,

22   the artist, the track, the album, when it was -- when it was

23   matched, the match offset, which is the point when they were

24   comparing them, and, you know, all this data, and he testified

25   about that, what was in there.

1          And he said, when MarkMonitor or another vendor
2     remotely accesses our database, it creates -- there's a query
3     that comes in and there's information that's matched up, like
4     Shazam, you match the two files, you go for 30 seconds, and
5     then if it's a match, Audible Magic has a record as does
6     MarkMonitor.  So the two should have a database that matches.
7          So what we have is an Audible Magic spreadsheet,
8     which was created at the time and simultaneous with the queries
9     for MarkMonitor.  So that's what we have, that's what they
10    produced.  They don't want it in evidence because it only shows
11    that there was matches for 25 percent of the works in suit.
12    And they say it lacks credibility because that 25 percent only
13    goes to a certain portion of attempted queries or matches that
14    took place during the period 2012 to 2014.
15         That's not quite correct.  25 percent of the
16    100 percent of the works in suit were queried before the period
17    in question.  75 percent, according to the testimony, were
18    queried at the -- within the time period and, therefore, on
19    that spreadsheet.
20         So what we have is of the 75 percent of the works in
21    suit, according to Audible Magic database and their
22    spreadsheet, which is only spreadsheet that was created and
23    retained as of the time that the queries were made, shows that
24    the matches were limited to 25 percent of the works in suit.
25         So where does this other spreadsheet come from?  So

20

1   we have MarkMonitor, which refused to produce anything in

2   response to a subpoena, even though they were totally

3   controlled by the plaintiffs and had a contract with the

4   plaintiffs that required them to produce documents, to keep

5   records, to come to court and testify, they refused to produce

6   anything.  We spent a fortune getting the documents from them,

7   the data that -- the spreadsheet and other information that we

8   requested.

9        So one of the things that MarkMonitor produced was a

10  spreadsheet called the '236 spreadsheet, which basically is the

11  same as the Audible Magic spreadsheet, except it was created in

12  2018 and it relies on data that existed after 2015.  And as the

13  witnesses have said, you cannot tell when those queries were

14  made.

15       So then we have a '431 spreadsheet which was produced

16  by the plaintiffs and counsel, which they took the '236

17  spreadsheet and they removed certain data on that spreadsheet

18  that indicated there weren't matches.  There was for about

19  9 percent of the files for which there was data.

20       So on the '236 spreadsheet there is various columns

21  that are not on the '431 spreadsheet.  What those columns show

22  is things such as the duration of the song, the match offset,

23  when it took place, and the duration of the known and unknown

24  files, and also the match percentage.  And the match percentage

25  is a column that was created by MarkMonitor to compare the

21

1    length of the two songs and the amount of the actual match.

2             And so, if you look at these columns -- and I can

3    hand the Court an example which was created by the plaintiffs

4    at the last hearing, if you want to look at them.  You can see

5    in yellow -- they already have them -- those are the columns on

6    the '236 spreadsheet which are not -- not on the '431

7    spreadsheet.  And you can see there is 0s and -1s when it

8    says -- in the column regarding the match.

9             So what we -- what they are submitting is that

10   spreadsheet should not be admitted in evidence, the Audible

11   Magic spreadsheet should not be admitted into evidence, but the

12   '431 spreadsheet, which takes those four columns out, which

13   they did that during discovery in 2018, 2019, that should come

14   in.

15            So what we're saying is, if the spreadsheets have to

16   come in, put them all in and we can have testimony about them.

17   But the Audible Magic spreadsheet is the only spreadsheet that

18   is based on data created at the time in question and which

19   reflects queries and responses simultaneously made as they came

20   in.

21            So the issue that somehow it is not authentic,

22   Vance Ikezoye, the CEO of Audible Magic, testified at length

23   about transaction logs.  He goes, we produced to you a

24   transaction log that has this information.

25            MarkMonitor testified that, yes, Audible Magic had

22

1   their own data, we had ours, and we have our own spreadsheets

2   that have this information.  Audible Magic produced all the

3   data that we have.  We retained some of it at different points

4   in time, but this is what we have today.  And it says, of 2015,

5   we created it in 2018.

6          So if you compare these spreadsheets, you'll see that

7   they are very similar.  But all the data in the '236 and '431

8   spreadsheets, except for maybe the column, the so-called yes

9   column that was created by MarkMonitor, the verification ID

10  column which says "Real" on it, that was created by MarkMonitor

11  to indicate there was a match.  Basically all the other

12  information is the same.

13         And even during the deposition of the plaintiffs'

14  expert, Barbara Frederiksen-Cross, she compared all these

15  spreadsheets repeatedly.  She criticized Dr. Feamster, but she

16  said, he relies on the Audible Magic spreadsheet, the

17  transaction logs.  He should rely on this one.

18         And we say, why?  Why should he rely on that one?

19         It's a dispute, it's a legitimate factual dispute,

20  and it should go to the jury.

21         In addition, there was no affidavit or declaration in

22  this case by Mr. Ikezoye or anyone else from Audible Magic to

23  suggest that that spreadsheet is not what it purports to be.

24         Even during the deposition of Barbara

25  Frederiksen-Cross, the plaintiffs' expert, there was some point

23

1   where there was some confusion over which spreadsheet was being

2   referenced, the '431 or the REV '344.  And Mr. Gould spoke up

3   and said, let's make sure we're talking about the Audible Magic

4   transaction logs and not the '431.

5          I mean, he acknowledges right in the deposition that

6   this REV '34 is the transaction logs from Audible Magic created

7   in time.  I can show you the deposition, the quote, it's all

8   there.

9          So I don't know if the Court has any questions --

10          THE COURT:  No, that's all.  Go ahead.

11          MR. BUCHANAN:  Thank you, Your Honor.

12          THE COURT:  All right.  Mr. Zebrak.

13          MR. ZEBRAK:  Your Honor, very briefly, and, quite

14   frankly, it's difficult to even to know where to begin.  There

15   is just a tremendous amount of vague statements and inaccuracy

16   in that.

17          THE COURT:  Well, begin by -- I mean, Mr. Buchanan's

18   point is they received this information from MarkMonitor.  They

19   looked through a lot of exhibits.  They culled out '344.  They

20   were interested in it.  They studied it.  They found that based

21   on that document, that there was far less confirmation of

22   matches.

23          And that they then looked at the '236 and the '431

24   spreadsheets that were produced, and that they should be

25   allowed to rely on all of them.  They were all produced by

24

1    MarkMonitor, and they find the REV '344 to be interesting.

2            MR. ZEBRAK:  Yeah.  Well --

3            THE COURT:  So where -- that's the bottom line, is

4    that there is no -- well, I haven't seen the motions in limine.

5            MR. ZEBRAK:  Sure.

6            THE COURT:  I don't know whether there, you know, is

7    authentication issues.  There is -- whether there were

8    different uses involved in one spreadsheet versus another

9    spreadsheet.  It appears that the REV '344 was

10   contemporaneously generated.  And I don't know the background

11   of that.

12           So go ahead.

13           MR. ZEBRAK:  Yeah.  Sure.  So, first of all, there

14   are declarations submitted in this record, both on summary

15   judgment and I believe for the motion in limine, that will make

16   this incredibly clear for Your Honor.  This is an example of

17   the kind of confusion that Cox hopes to bring about at trial

18   where they want to present dizzying arguments about data from

19   different spreadsheets.  And, quite frankly, none of it has an

20   evidentiary foundation.  And it -- let me break it down one by

21   one though, Your Honor.

22           The Audible Magic spreadsheet, that is REV '3434,

23   that is a spreadsheet that Audible Magic produced in discovery

24   that contains -- if it actually is what Cox and Dr. Feamster

25   say it is -- and I say it that way because it's their

25

1    obligation to lay a foundation for it.  It's never

2    authenticated.  So it is a leap on their part that they have

3    identified the right document.  So that's the spreadsheet upon

4    which he uses to opine that less than 25 percent of the works

5    were matched to Audible Magic.  Okay.  So unauthenticated, no

6    foundation.

7            That spreadsheet, assuming that it is what they say

8    it is, covers just the years 2012 to 2014.  Whereas the initial

9    lookups go all the way back to 2008.

10           Now, I'm not sure where Mr. Buchanan came up with

11   this figure that 75 percent of the works in suit indicate that

12   they were only matched in the -- in those three years.  I don't

13   believe that to be accurate.

14           There is unequivocal testimony from MarkMonitor about

15   its process.  And the '431 spreadsheet, which has been produced

16   by plaintiffs, it's MarkMonitor data they gave to plaintiffs.

17   And MarkMonitor then produced its own spreadsheet called the

18   '236 spreadsheet.  But all of this has been authenticated by

19   MarkMonitor in declarations and in deposition testimony.

20           The MarkMonitor '431 spreadsheet, their process is

21   unequivocal.  MarkMonitor isn't making up what these files are.

22   There is no basis to presume that.  It's a preposterous

23   assertion.

24           MarkMonitor's process was, the first time it saw a

25   file that it suspected to be infringing, it downloaded it, and

1    it ran it through Audible Magic.  And Audible Magic provided

2    data indicating what the file contained.  And that data

3    MarkMonitor stored in its database and produced it in discovery

4    here.

5          So Mr. Buchanan and Cox have no basis to say that

6    there is a lack of contemporaneous data about what these files

7    contain.  And, quite frankly, the whole contemporaneous issue

8    is a red herring because it doesn't matter whether I look at a

9    file with a unique hash in 2012 or 2014, it should have the

10   same contents.  Dr. Feamster testified about it until he didn't

11   testify about it because it was inconvenient to Cox.

12         So, you know, Your Honor, there is a constant

13   narrative going that MarkMonitor refused to cooperate in

14   production, in discovery, and there is some insinuation that,

15   quite frankly, we take offense to, that plaintiffs had

16   something to do with that.  It's not accurate.  And the record

17   of how Cox approached discovery from MarkMonitor speaks for

18   itself, and it has been criticized in that.

19         MarkMonitor had some issues about protecting source

20   code, and those were dealt with --

21         THE COURT:  I don't need to hear that.

22         MR. ZEBRAK:  Yeah.  Okay.  Well, then to keep moving

23   on, Your Honor.

24         THE COURT:  The downloads.

25         MR. ZEBRAK.  Yeah.  So the downloads -- look, it's

1    undisputed.  You've heard from both Mr. Buchanan and myself

2    today that the files were downloaded the first time that we ran

3    across them.  And then, thereafter, it was hash values we

4    relied on.  To the extent -- you don't need testimony from

5    Dr. Feamster confusing people about that.  That's in the

6    record.  If they want to cross-examine plaintiffs --

7    MarkMonitor about that, they can.

8            But, you know, they accuse -- I mean, one of the

9    other issues here, Your Honor, is that Mr. Buchanan is telling

10   you what Dr. Feamster ought to be able to testify to.  Notably,

11   he's not testifying -- well, Mr. Buchanan is not referring to

12   what Dr. Feamster said in his report.  And that cabins his

13   testimony here.

14           The very first bullet point in his summary is that

15   nearly all the works in suit were not downloaded.  That is

16   exactly what they want to do with this deceptive testimony.

17   Rightscorp relied on hash values as well when it sent its

18   notices.  And our view, just to come back to the initial

19   analogy I had, if you're trying to measure what an employee did

20   in the course of the day, you don't just look at the last two

21   years and say, it all goes to weight, because it needs to fit

22   the facts of this case.  This doesn't.  It's confusing, and it

23   is unreliable under the Fourth Circuit case law.

24           Thank you.

25           THE COURT:  Thank you.  All right.

28

1              Let's move on to Tregillis.

2              MR. ZEBRAK:  Thank you, Your Honor.

3              So Christian Tregillis is one of five experts that

4    Cox puts forward in this case.  The portion of his testimony

5    that is the subject of our Daubert motion is the portion that

6    concerns his purported attempt to do an actual damages

7    analysis.  The other part of his testimony concerns a similar

8    analysis to what plaintiffs' expert, Dr. McCabe, did in

9    verifying that the works in suit are supported by the

10   infringement data.  The two experts are largely in agreement on

11   that.  It's this actual damages analysis where really the

12   Fourth Circuit case of Tyger, T-y-g-e-r, and Dash that we talk

13   about, we think, quite frankly, render this aspect of Dr. --

14   excuse me -- of Mr. Tregillis' testimony a non-starter.

15             You know, Mr. Tregillis, just to sort of set the

16   table, what he did was he did a lost licensing analysis where

17   he attempted to measure what Cox would have paid to plaintiffs

18   to -- you know, for what plaintiffs would have charged for this

19   activity.

20             THE COURT:  I know.  He just used a dollar a piece

21   and counted one --

22             MR. ZEBRAK:  Yeah.  Right, right.

23             THE COURT:  -- and equated it to YouTube and didn't

24   look at peer-to-peer information.  So I understand the basic

25   premise.

1          MR. ZEBRAK:  Yes, Your Honor.

2          THE COURT:  And so, go ahead.

3          MR. ZEBRAK:  Yeah.  Well, so the Tyger and Dash cases

4   require an expert who is going to do an actual damages analysis

5   to justify the benchmark they use for the comparable royalty

6   rate.

7          Mr. Tregillis made no effort to do that.  His

8   testimony that we lay out in his expert -- in our Daubert

9   motion -- you know, we provide the details.  He made no

10  analysis for that.  He can't justify the benchmark.  And, in

11  fact, it's not -- it's clearly an inapplicable benchmark.

12         You know, the premise for a benchmark is it needs to

13  reflect the underlying economic realities of the situation.

14  His benchmark reflects what a user who goes to iTunes downloads

15  for their own personal use.  That's priced for that.  It's not

16  priced to allow the user to have it in their share folder on

17  peer-to-peer, which is the economic reality of this situation.

18         And so, you know, Cox attacks us in our motion to say

19  our whole premise in attacking his benchmark is based on the

20  faulty proposition that he did something he didn't do.  Either

21  way, what he did is improper.  He either did a lost licensing

22  analysis that is not based on the underlying economic realities

23  because he only considered the cost of download, not the rights

24  that plaintiffs would have to transfer to authorize

25  distribution.  Right.

```
 1            So he either did that without looking at the
 2   realities.  Or, had he done it, he didn't ascribe any value to
 3   it.  And, of course, there is value to it.
 4            And so, it's just a palpably inappropriate benchmark.
 5   He indicated --
 6            THE COURT:  Well, so he says -- I misspoke.  I meant
 7   iTunes.  He says, there is no evidence of how many uses were
 8   made once the download -- or once the song got to the customer,
 9   and that's peer-to-peer, but I don't know whether it was
10   shared, whether it wasn't shared, there is no data on that,
11   it's impossible to estimate that and, therefore, I'm not going
12   to consider it because it's Sony's burden to prove damages.
13            MR. ZEBRAK:  Sure.
14            THE COURT:  So I'm going to fall back on iTunes.  So
15   what's your response to that?
16            MR. ZEBRAK:  Sure.  So there's several things in
17   response to that, Your Honor.  First of all, in a case where we
18   elect statutory damages, we have absolutely no burden to prove
19   actual damages.  Statutory damages, as Your Honor is aware, was
20   created precisely for situations like this where actual damages
21   evidence is hard to obtain, among other reasons.
22            So -- and that's exactly what Cox wants to do.  They
23   want to flip this around and have Mr. Tregillis say, this is
24   the sum total of the actual damages, and I didn't calculate any
25   distributions because there is no proof of distributions.
```

1          But, Your Honor, a couple things there.  Number one,

2     the inability to quantify something doesn't mean that there is

3     an absence of that activity.  Obviously, among the hundreds of

4     thousands of notices, which represent just a small snapshot of

5     the infringing activity by Cox users, obviously there were

6     distributions.  You know, we can disagree about the scope, but

7     it -- you know, the argument -- I mean, clearly there were

8     distributions.

9          And, you know, Dr. -- excuse me.  Mr. Tregillis

10    indicated that there are things that he could have done to

11    attempt to go -- at least come up with an estimate for those

12    distributions.

13         Now, that plaintiffs didn't do it because plaintiffs

14    chose not to build their case by proving actual damages, is not

15    a justification for him to use an improper comparable benchmark

16    because it's not comparable.  You know, he said -- I asked

17    him -- and again, this is in our motion.  I said, what would

18    you do if you were trying to measure distributions?  Well, what

19    should the plaintiffs have done?  Because he faulted us for not

20    obtaining that evidence.

21         He said, well, I'd talk with the labels.  I'd look to

22    see if estimates can be made from the technology.

23         The point here is, Your Honor, is that he has the

24    obligation to justify the comparable he chose.  He made no

25    effort to ascribe any value for distributions.  That's the

1    reality of the situation, is that -- and, obviously, there are

2    many, there are many distributions, but the mere fact that the

3    right we transferred, according to him that he is pricing, our

4    actual damage here, that right was conveyed.  Someone had it

5    there.  Whether there were a million unauthorized distributions

6    or a thousand or a trillion, the point is that right was

7    transferred.  When you grant a license, you know, you look at

8    the realities of the rights that are granted, and he is only

9    looking at the right granted for the Cox user to download.  But

10   they took the right to distribute.  And that can't be debated,

11   that they took the right to distribute.

12         And so, under the Tyger case, you know, fundamentally

13   it's the wrong, unjustified benchmark.  And it's his burden to

14   show and Cox's burden to show that they had the right one.  And

15   it was either Tyger or Dash said, when your analysis is solely

16   based on an incomparable benchmark, which clearly this is, that

17   renders it unreliable, and we could stop there.

18         But it goes a lot further, Your Honor, because just

19   as in Tyger where they were trying to come up with a

20   quantification of cost overruns, here Mr. Tregillis

21   acknowledges the data doesn't exist.  He doesn't dispute that

22   there are distributions, because it would be absurd to do so.

23   He says, I can't quantify them because, he agreed, there aren't

24   logs kept of that activity.

25         So what does he do?  Instead, he proceeds with an

1    analysis saying, the plaintiffs' actual damages are the

2    following because Cox wants this deceptively low number based

3    on a sliver of the activity with a professional testifying

4    expert who is going to talk about what the evidence of the case

5    is or isn't and use a palpably improper benchmark on this.

6           And, you know, so for those reasons, the damages

7    portion are out.  And just so we don't lose track of it, I'm

8    happy to speak now or at the end, but he does two other things

9    in his expert report ranging from testifying to the law and

10   making arguments about what the jury should award on statutory

11   damages, to talking about the efficacy and effectiveness and

12   how Cox's anti-piracy procedures worked well work where he did

13   no analysis for that.  He is not qualified to do that.  It's

14   part of the narrative from Cox's experts of telling the jury

15   what to think.

16          Thank you.

17          THE COURT:  All right.  Thank you.

18          MR. BUCHANAN:  Thank you, Your Honor.

19          I think, once again, we have a straw man argument

20   that the plaintiffs have put forward to try to preclude

21   Dr. Tregillis.  They keep using the term "lost license

22   analysis."  That's not a term that Dr. Tregillis used in his

23   expert report.  It's not what he did.  He merely took evidence

24   provided by the plaintiffs regarding the legal download of a

25   file, you know.  And he used their numbers that they produced

34

1  in the form of a proffer, both as to musical compositions and

2  to sound recordings, like 10 cents and 90 cents when you

3  average it out.

4          They don't dispute any of that.  They don't dispute

5  that that evidence was provided by them through a proffer.  And

6  they don't dispute any of his mathematical calculations where

7  he comes up with $675,000 in actual damages.

8          THE COURT:  Well, they talk about his not identifying

9  actual infringements, just notice data in the data that he

10  used, right?  So they took issue with that.

11          MR. BUCHANAN:  So that's what Dr. Sullivan did in

12  BMG.

13          THE COURT:  Yeah.

14          MR. BUCHANAN:  He basically said, I have notices, I

15  will give them on a conservative basis, and this is what

16  Dr. Tregillis did, I will, you know, basically treat every

17  notice as an infringement.  If it's an album, I'll give them

18  credit for every song in the album.  If there's ten songs on

19  the album, every one of those will constitute infringement.

20          He didn't try to dedupe any of the notices because,

21  obviously, notices relate to the same song.  Maybe on Tuesday,

22  Wednesday, and Thursday Billy left on his file Born Run, and it

23  got hit every time by MarkMonitor and they fired out a notice.

24  He didn't dedupe those.  He counted them all.

25          Unlike Dr. Sullivan, he didn't take out streaming

1    downloads.  He counted those.

2           So he attributed all possible, you know, royalties as

3    they use to the notices, which are the -- really the evidence

4    that they have of downloading because that's what they're

5    saying.  They're saying there's 57,000 Cox subscribers, 54,000

6    residential subscribers, 3,000 business subscribers that

7    received one notice after receiving two other notices, either

8    from them or someone else.  That's their theory of damages in

9    the period January 2012 to November of 2013.

10          So we're basically saying, we take all that time

11   period, we take every notice you sent to us about every work in

12   suit.  We won't dedupe anything and we'll count that.  And

13   we'll use the information you to gave us in which you utilized

14   to determine the value of each song for purposes of just a

15   single legal download.

16          And they've answered their own question.  They say,

17   well, he doesn't consider the value of a royalty.  Well, he

18   admits, you know, that is not something you can determine.

19   That's something you argue to the jury.

20          They don't do that.  And they say, we don't have to

21   do it.  They don't do it because they can't do it.  That

22   doesn't -- that means he can't do it.

23          But -- so they say, we go to statutory damages, we

24   don't need to do actual damages.  So the law is absolutely

25   clear that in a case like this where someone elects statutory

1    damages, that the defendants can use actual damages to counter

2    that, to show what in fact their real losses were.

3          And so, he doesn't dispute that his analysis does not

4    count every single download, whether some Cox subscriber

5    downloaded Born to Run, and somebody from Comcast, you know,

6    using their system, or Time Warner, or Verizon came along and

7    also downloaded it, which would go to an infringement by those

8    networks and their subscribers.  So that's a different analysis

9    altogether that he doesn't get into.

10          But it was allowed in BMG.  This is a more

11   conservative analysis.  And we think we have an absolute right

12   to put on an alternate damages model related to actual damages.

13   This was allowed in that case.  The identical motion was filed

14   in that case, making the identical argument, and the Court

15   ruled in favor of Cox in that case.

16          Thank you, Your Honor.

17          THE COURT:  How about the fact that he's -- whether

18   he's qualified to talk about statutory damages.  And, of

19   course, I'm sure you're not going to argue -- and I think you

20   had referenced the fact that he's not going to be citing law to

21   the jury.

22          MR. BUCHANAN:  That was just like a reference.  He

23   cites the Copyright Act and some case law and he says, you

24   know, I understand based on this from counsel that, you know,

25   statutory damages are allowed and you can do this.  He's not

37

1  going to testify about any of that.  And the Court wouldn't let

2  him do that.  We wouldn't try to do that.

3          This bit about the efficacy of the system.  He's

4  basically saying that because based on Dr. Weber's analysis and

5  some of his, that based on an analysis of the notices that came

6  in from the plaintiffs during the period in question, 2012 to

7  2013 -- I'm sorry, 2013 to 2014, that based on their notices

8  alone, after the first notice, 50 percent of the people who

9  received one notice didn't get a second one.

10          THE COURT:  How is that relevant?

11          MR. BUCHANAN:  So that -- you mean in terms of this

12  argument?

13          THE COURT:  You know, even the broader argument with

14  Weber and --

15          MR. BUCHANAN:  Well --

16          THE COURT:  How is their reconstruction of what Cox

17  did and whether it was reasonable or not relevant here?

18          MR. BUCHANAN:  So in this particular case?

19          THE COURT:  Yes.

20          MR. BUCHANAN:  I think -- here's why it's relevant.

21  Because their argument is that the Cox system was not

22  reasonable, basically, it wasn't efficient.  Essentially, we

23  didn't do anything to stop infringement.

24          So there's two ways you can stop infringement.  There

25  is sending them the notice, forwarding the notice that comes in

1    from the plaintiffs, which we did.  Attaching an e-mail which

2    says, if you continue to do this, you could be terminated.

3    Having a contract which says, this is unlawful, and following

4    up on it when we did.

5         We had no caps in this case in terms of, you know,

6    not forwarding the notices.  The cap was 600.  They never came

7    close to that except for six times over the two-year period.

8    There's no issue with the caps with regard to the -- a notice

9    per day because that only happened on a handful of times.

10        So what this run-off shows is that notices of

11   infringement that people were receiving was working, it was

12   getting people to stop.

13        So when you get to six notices, you've got 85 percent

14   of the people that never got another notice.

15        THE COURT:  Yeah, but where does that fit into your

16   defense?  Is it -- does it go to willfulness?  Does it go -- I

17   allowed in, in the BMG case, Cadenhead to talk about that

18   96 percent and the --

19        MR. BUCHANAN:  Right.

20        THE COURT:  But that was all factual information that

21   Cox had at the time it was using this system.  And what

22   relevance is it of some expert to get up and say, this is

23   perfectly reasonable to me, I've run the data now in hindsight,

24   and I think that what Cox did was perfectly reasonable?

25        MR. BUCHANAN:  Because the plaintiffs are arguing

39

1   that we really did nothing.  Okay?  We had a 13-strike policy.

2   So their whole case goes on termination.  Okay?  But it's

3   unclear when, under the law, or this case, when we should have

4   terminated.

5          So in their complaint, in paragraph 10 they say, for

6   the period in question, we are seeking damages for the notices

7   that we sent to those Cox subscribers that had received three

8   notices from us or some other person.

9          So what we're saying is, well, if that's the

10  analysis, these people by three, most everyone had stopped.

11  They didn't get another notice.

12         So again, in every case you have a liability at a

13  point in time and you have damages that feed off that point in

14  time.  So what is the point in time in which liability

15  attaches?  Not direct infringement, but contributory or

16  vicarious.  And in their case, it's termination.

17         So if we're going to show 57,000 people that are

18  going to say after one notice, and this gets to Lehr, all

19  57,000 people should have been terminated, 3,000 businesses,

20  hospitals, universities, dorms, apartment complexes, one

21  notice, shut the whole city down.

22         So what we're showing is that, look, we had a system

23  in place.  And we have a right to argue to the jury that the

24  system was set up.  That termination wasn't the beginning and

25  end-all.  There's no law that says we have to have termination

40

1    at some point.  And they're saying we should have terminated at

2    one, three or five.  How can that go to the jury?

3            The notices in question, first of all, were going to

4    a Cox e-mail address, which I would say nobody ever looks at

5    that.  And we have data from our own subscribers who wrote back

6    saying, what is this about?  Often it's a neighbor.  It's the

7    kids doing it.  You shut them down?

8            And so, it goes to, did we materially contribute?

9    Did we enhance the ability for people to infringe?  And if --

10   our system is two parts.  We send them notices with the e-mail.

11   And then, of course, there's the suspension, and the Court is

12   aware of that, and the termination.

13           And they'll get up and say, well, you only terminated

14   13 people over this period of time.  Well, by time we got to

15   ten, there was -- 98 percent had stopped.

16           So that's where the whole CAS thing comes in where

17   they negotiated with the other ISPs.  There they gave one

18   notice a week and they didn't require them to suspend anyone

19   because all the deposition testimony evidence there shows that

20   they, you know, the copyright center, the RIAA, the ISPs,

21   content owners, had got together, studied it and found what

22   works is to educate them, send the MAT, alert them, refer them

23   to Websites, to information, and they will stop.

24           So that is how they approached it.  They called it an

25   educational program, which is not relevant here.  Well, that's

41

1   what ours was.  We're doing the same thing.  We're -- we've got

2   references in the notices and e-mails to literature.

3           So I think it -- if that weren't to be admitted, they

4   would just say that no one was ever terminated and everybody

5   continued to infringe.  So in other words, you have 57,000

6   people, the jury would have no idea what happened.  What

7   happened with the notices?  Did they work?

8           THE COURT:  Well, okay.  Thank you.

9           MR. ZEBRAK:  Very briefly, Your Honor.

10          THE COURT:  Yes, sir.

11          MR. ZEBRAK:  So Cox's opposition just now went pretty

12  far afield and --

13          THE COURT:  Well, I asked the question, so --

14          MR. ZEBRAK:  Well, no, I understand.  But literally

15  it touches upon a number of other motions in limine, and what

16  I'd like to do is --

17          THE COURT:  You don't have to respond to that at all

18  if you don't want to.

19          MR. ZEBRAK:  No.  Well --

20          THE COURT:  It was a question I wanted to --

21          MR. ZEBRAK:  Sure.  What I'd like to do, Your

22  Honor --

23          THE COURT:  Because it is -- you know, you mentioned

24  it with Feamster --

25          MR. ZEBRAK:  Sure.

42

```
 1          THE COURT:  -- and that he wanted to talk about the
 2   damages --
 3          MR. ZEBRAK:  Sure.
 4          THE COURT:  -- and whether the number of
 5   infringements went down after notices.  So go ahead.
 6          MR. ZEBRAK:  So -- yeah, so with respect to Mr.
 7   Tregillis' Daubert motion that we have before us, I'd like to
 8   address that and just briefly respond to a couple of other
 9   points.
10          So, look, at its core what Mr. Tregillis has done is
11   purport to come up with an actual damages analysis that looks
12   at the cost of buying one newspaper from a newspaper bin,
13   rather than the cost of a bin that has an unlimited number of
14   newspapers for whoever wants them.
15          Now, he's saying, that's okay, because there's no
16   proof that someone took more than one, even though I
17   acknowledge -- well, actually what he says is -- he doesn't
18   dispute that people took more.  He says, no one can quantify
19   how much more was taken.
20          So I understand you conveyed the right for an
21   unlimited number of newspapers.  But I'm just -- since we only
22   have evidence of the one that was taken, I'll calculate that.
23          There's no value to that.  It's confusing to a jury.
24   It flouts the Fourth Circuit cases which stand for the
25   proposition that when you're using a comparable royalty rate,
```

43

1    whether you denominate it as a loss licensing analysis or

2    something else, that's a distinction without a difference, Your

3    Honor.

4            The point is, when you come up with a royalty rate as

5    a comparable, the expert is obligated to come up with one and

6    justify it.  He made no effort to do it here.  In our papers we

7    use the example of the street light effect, which we thought

8    was illustrative of this.  He took this information, he said,

9    because it was the only thing available.

10           Now, as a sign for what we think shows you sort of

11   the wafer thin substance of Cox's arguments here, you know,

12   they make arguments about some back-and-forth at a deposition

13   to make some estoppel point.  Or we produced a royalty rate

14   because they were pressing for it in discovery, and we gave the

15   rate trying to avoid some other more voluminous discovery,

16   which we ended up having to provide after we were ordered to do

17   so.  And then they made no use of it.

18           Because, quite frankly, our historic revenue from

19   these activities doesn't show the actual damages.  And so, this

20   actual damages analysis is a house of cards.  We think it falls

21   apart for those reasons.

22           In the BMG case -- we're different lawyers, arguing a

23   different case.  And in this instance, we've attacked his

24   indefensible choice of an incomparable royalty rate that

25   doesn't reflect the realities of the situation.

1          I don't recollect for certain, I did look at the

2     briefing there, I thought that briefing focused on him doing an

3     analysis without a competent universe of infringements to

4     multiple a rate by.  I don't remember a challenge to the rate.

5     But fundamentally that's the issue, and the lack of a proper

6     universe makes it even worse here.

7          With respect to -- Your Honor asked the question,

8     what's the relevance of this.  Of his imprimatur of Cox's

9     procedures worked well, they were effective.  Mr. Buchanan gave

10    away the game when he said, we're allowed to argue this.  It's

11    argument.  It belongs, whether it's Mr. Buchanan or someone

12    else, in a closing argument, if anywhere.

13         And quite frankly, we think those arguments have no

14    place in the courtroom because it's not a defense that others

15    may have infringed or that others may have stopped.  This case

16    is about the subscribers that they knew were engaging in

17    infringement and continued to provide service to.

18         What they want -- and he said, well, it's relevant

19    for us to talk about our policies and procedures.  Well, of

20    course, it's going to come out at trial the different steps

21    they had in their process.  But what's not okay is for them to

22    have experts there to tell the jury what to think about those

23    steps by dubbing them reasonable, effective, windfall.  These

24    are standardless, subjective ipse dixit from these folks.

25         And we have a separate motion in limine about this

1    96 percent analysis.  Which, again, we've approached

2    differently.  Cox has this internal study that they prepared.

3    It's been labeled a study in Cox's summary judgment briefing.

4    Before that, it was a PowerPoint presentation prepared for

5    advocacy.  And we have a motion in limine on this, Your Honor.

6    I think you'll see, there's no foundation to it.  It's

7    deceptive.  They don't even understand the data that they're

8    proposing -- relying on for it.  And they want these experts to

9    parade it out in front of a jury.

10           Thank you.

11           THE COURT:  All right.  We'll look at that in limine

12   motion down the road.

13           All right.  Mr. Lehr -- Dr. Lehr.

14           MR. BUCHANAN:  Thank you, Your Honor.

15           You know, we move to strike most of Dr. Lehr's expert

16   report and potential testimony because his theory of damages,

17   which can be broken up in sort of three groups, one is an

18   amorphous impact and speculative of injury to artists and music

19   companies, label companies over a 15-year period due to people

20   downloading music on BitTorrent or Napster or Grokster at any

21   period in time and there was just some injury there.  And he --

22   when asked to quantify it, he said, I didn't attempt to, it

23   can't be.

24           We asked, did you talk to any of the plaintiffs to

25   ask them, hey, do they have any financial data to indicate lost

1    sales or injuries or impact, board discussions, meetings among

2    people.  And he said, no, I didn't even ask for any of that.

3            He cites to one document with regard to this sort of

4    generic commentary on the impact of piracy over the

5    centuries -- or decades, I should say, and that is a Warner

6    Music 10-K that just talks about, generically about the impact

7    of piracy.  So it's never quantified.

8            He also -- then he says that Cox saved certain money

9    and there's certain benefit here.  And this is -- I guess all

10   of this is somehow tied to the second prong of the vicarious

11   liability, this direct and obvious financial interests that

12   somehow, if you analyze it, was a draw to subscribers to come

13   to Cox because they -- all this infringement was taking place

14   and they knew they could get on there and get away with it.

15           There's no evidence or testimony about any of that.

16   I know Mr. Elkin is going to deal with that on summary

17   judgment.  I know that issue barely passed muster in the BMG

18   case.  And I know one of the issues there was that Dr. Nowlis,

19   I believe, had some market studies and surveys that the Court

20   said that will allow you to proceed.

21           There's no market survey here.  There's no such

22   testimony that Dr. Nowlis offered in that case.  And as I said,

23   Dr. Lehr here doesn't even attempt to quantify anything, any of

24   these damages.  For example, he says that had Cox done certain

25   things, it could have cost them money.  Such as if they

47

1    terminated more people, there could have been a cost in sending

2    the letter of termination.  If they accepted more notices, that

3    had we mailed them, that could have cost money.  We e-mailed

4    them.  He said, you'd have to go pick up more modems when you

5    terminated people, on and on.

6          So I said, did you quantify any of this in any way?

7    He said, no, it couldn't be done.  And he goes, I didn't -- a

8    quote, "I didn't try to specifically quantify those because,

9    you know, to come up with specific estimates of what Cox's

10   costs would be or to try to, you know, do something other than

11   what it did, I would have to have an opinion about what --

12   specifically, what they would do.  I'm not offering opinion

13   about specifically what Cox should have done, but

14   specifically -- I'm not offering an opinion about what they

15   should have done, what they shouldn't have done, it's not part

16   of my testimony."

17         So he can't quantify it and he doesn't say we had to

18   do it, so I really don't see how he adds anything when he

19   testifies about that.

20         And more substantively, and this goes to the Court's

21   question about why is Dr. Weber's post hoc analysis on

22   statistics of impact of notices, he comes up with a theory

23   which he says the plaintiffs lawyers asked him to do -- and I

24   am not disparaging them on that.  They asked him to do it.  He

25   didn't come up with it.  He said, they asked me to go look at

1    what would happen if you analyzed the revenue that came in over

2    a five-year period based on an average business customer and a

3    residential customer of Cox and if they had got one, three, or

4    five notices and they got terminated after one, three, or five.

5    So it's $5,200 per residential subscriber, 20,000 per business

6    subscriber.

7           And they're saying, look, had they terminated after

8    one, all 57,000 subscribers, they -- it would have cost them

9    like $300 billion in revenue over a five-year period.  It goes

10   down to like 180, and then 90, and he does it in terms of

11   overall revenue.  But the problem is, it's untethered to any

12   theory of liability in the case.  It's just speculation.

13          And if you look at what the complaint says, it says,

14   we are seeking damages relating to notices that we sent to Cox

15   subscribers where those subscribers had received a notice from

16   us and received two others during the period January 2013 to

17   November 2014.

18          So the period of time that Dr. Lehr uses is 2012 to

19   2016.  So he's saying, basically, here is an actual damage

20   model based on some theory of liability that occurred at some

21   point in time, which he doesn't really consider, and he goes

22   outside the claims period.  He goes outside the fact that it's

23   three notices they're talking about and he uses one, and then

24   he does three and five.  And so, he comes up with this huge

25   number.

49

1          And I asked him, I said, what about the person that

2     got one notice?  Should that person be terminated?  I have no

3     opinion.  Two, three, four, five?  I have no opinion about

4     that.

5          Dr. McCabe was the same way.  And I just bring that

6     up because he is their liability expert on our process.  I

7     asked him about all the processes, the caps, the limits, and,

8     you know, when we should terminate.  He goes, I have no opinion

9     about any of those things.  All I'm here to testify is that at

10    13 they should have done something.  That's all.  So that's the

11    liability expert.

12         Then you have got the damage expert who is totally

13    disconnected from the liability expert and the facts because

14    now he's saying, terminate at one, three, and five even though

15    he has no opinion about that.

16         So let's assume someone got a notice at the end of

17    the claims period, 2014, one notice.  Some kid downloads a

18    song.  The parents catch him.  They call up, won't happen

19    again.  They say they should be terminated and all the revenue

20    prior to that back to 2012 that they paid should be disgorged,

21    basically, that Cox received because Cox is guilty as of that

22    point in time of contributory infringement.  And that is their

23    damages theory.

24         And that is just -- that is not connected to

25    anything.  There is no connection to vicarious liability there.

1    In terms of that revenue has nothing to do with incentivizing

2    some unknown individual to come to Cox because there is

3    infringement on the network.  That is just coming up with a

4    theory to drive up this huge number when he doesn't even defend

5    it.  He just says, they told me to do it, I calculated it.

6           And the last point he makes is that he tries to

7    create this incentive to attract people.  Because if you look

8    at those people that got over 20 notices, they paid $4 more a

9    month than people who got one or two.  So he's taking the

10   outlier of whom there's probably one one-tenth of 1 percent of

11   their residential subscribers that got over 20.  And he's

12   saying that that is a measure somehow that people are

13   attracted.

14          But there is no evidence that those people who got 20

15   came to Cox because they could infringe.  Cox didn't charge

16   people extra money if they exceeded their data allowance on a

17   monthly basis.  It's a flat monthly rate.

18          Cox did not discriminate between people who got one,

19   three, five, or ten in terms of sending them infringement

20   notices or suspending them.  There is no distinction between

21   them.

22          And in fact, there is no analysis of the demographics

23   behind this particular part of this report because Cox has --

24   is all over the country, and in different places there is

25   different rates per month for different tiers of packages.  And

1  he never takes that into consideration to see if that makes a

2  difference between the $4.

3        So that is totally disconnected from any theory of

4  damages.  And certainly the notion that somehow that those

5  people that got over 20 notices, they paid $4 more a month

6  because of their service, that somehow attracted people to Cox

7  with the draw, there is no testimony or evidence of that at

8  all.

9        THE COURT:  All right.  Thank you.

10        Good afternoon.

11        MR. GOULD:  Good afternoon, Your Honor.  Jeff Gould

12  for the plaintiffs.

13        I want to back up a little bit to begin, Your Honor.

14  I think you are familiar with Dr. Lehr.  He testified in the

15  BMG case, but if I could just back up and remind you of --

16        THE COURT:  He has been testifying for 20 years all

17  over the country, and his testimony has been largely accepted,

18  as far as I can tell, and even the broader testimony regarding

19  general impact on injury to the industry from piracy, it

20  appears.

21        Go ahead.

22        MR. GOULD:  Then I won't belabor those points.  I'll

23  just follow up on one thing on the general --

24        THE COURT:  Well, you know, every case is different.

25  And Mr. Buchanan's point is, there is no tie-in to what

52

1    happened between plaintiffs and Cox.

2            MR. GOULD:  So let me back up and start with the

3    broader point because I think Mr. Buchanan has not given a fair

4    characterization of the plaintiffs' theory of the case, which

5    is the defendants' continued provision of service to known

6    infringers.  And he continues in each of these exercises to

7    focus strictly on actual damages in trying to find and pinpoint

8    the precise point at which something should have happened, the

9    precise point of termination, the precise point at which

10   infringement becomes attributable -- excuse me -- the precise

11   point at which culpability is attributable to Cox, the precise

12   point at which damages are attributable to infringement.

13           What he is missing in that, fundamentally, is that

14   this is a statutory damages case.  And as you well know, there

15   are many factors that go into that analysis.  I'll address some

16   of his actual damages points, but they are really an effort to

17   distract, I think, from much of what is relevant in this case.

18           So let's talk about his general opinion that

19   copyright infringement harms -- harms copyright holders.  All

20   right.  So what does he do?  He explains why we don't have data

21   that allows him or you or the jury to quantify what that harm

22   is.  And he does that through the lens of the economic and

23   economic literature.

24           He explains through that literature that piracy

25   causes substantial harm.  And what these articles that

1    Mr. Buchanan gives short shift to do is they compile data from

2    numerous sources, including academic surveys of how many people

3    infringe and by what quantum, they use market data to assess

4    consumer behavior, and then these studies run economics --

5    regression analysis, statistical analysis, econometrics, and

6    they try to use those principles to understand the relationship

7    between infringing behavior and purchases.  Okay.

8              I don't know about you, but that's not something that

9    I would understand.  And it would be helpful to me, and I

10   believe to the jury, to have an expert with Mr. Lehr's -- with

11   Dr. Lehr's qualifications to be able to explain those things.

12             And, frankly, those are common uses and efforts by

13   testifying experts in these kinds of cases.  He talks about

14   dozens of complicated economic articles, not a single one like

15   Mr. Buchanan says, and these articles require expert

16   interpretation.  And Your Honor understood this in BMG when one

17   of these issues came up at trial.

18             And here is what Your Honor said during the BMG trial

19   at page 1099:  This is right in Dr. Lehr's wheelhouse.  This is

20   what he does on a regular basis as a professor in studying

21   economic effects of influences on the Internet, and he deals in

22   the economic world.  So he's the first one I thought had a

23   right to come in and say, yes, this is used in the industry,

24   I'm familiar with it, and the rest of the testimony talks about

25   reliability.

54

1          That's what we have here.  Now, there is no question

2     that the impossibility of quantifying the harm is relevant to

3     statutory damages, and I don't think even Mr. Buchanan makes

4     that argument.

5          THE COURT:  Well, he says that actual damages are

6     relevant to a statutory damages analysis.  What do you say to

7     that?

8          MR. GOULD:  I think that if there is a reliable

9     methodology by which the jury can be presented with information

10    that would be helpful to it to understand the scope of that

11    harm, I think that's fair information for them to present and

12    we can attack it.

13         THE COURT:  Okay.  Go ahead.

14         MR. GOULD:  I don't think that exists here for the

15    reasons that we have explained in our papers.

16         THE COURT:  I understand.

17         MR. GOULD:  The other thing that Cox says in its

18    papers but Mr. Buchanan didn't mention is that Dr. Lehr's

19    testimony on the nature of harm and un-quantifiability of harm

20    is unnecessary because fact witnesses for the plaintiffs will

21    testify about the harm.  But that completely misses the point,

22    in my opinion.  It is precisely because of the difficulty of

23    quantifying that this expert testimony is needed.

24         The fact witnesses can testify about the types of

25    harm, and they will tell you that it's hard to know by what

55

1    measure.  And without Dr. Lehr, there is too high a risk of

2    misleading the jury.  That inability by individual plaintiff

3    fact witnesses to quantify it means that there is no harm.

4    That is not appropriate here.

5         The second thing Mr. Buchanan talked about was the

6    costs saved.  I want to address that specifically.  Mr.

7    Buchanan says that Dr. Lehr provided an opinion that Cox saved

8    direct incremental costs -- let me back up.  I apologize.

9         Dr. Lehr describes certain direct incremental costs

10   that he says Cox avoided by its handling or non-handling of a

11   proper Copyright Abuse System.

12        THE COURT:  Save money.

13        MR. GOULD:  Save money.  He includes operating

14   expenses by running a better system.  He talks about how if you

15   didn't blacklist certain senders, you would have to process

16   more notices.  If you didn't cap notices, you would have to

17   process more notices.  You would have to take more phone calls

18   by customer service.  You would have to commission or

19   decommission more modems and the like.

20        There is reams of evidence in this case, you've

21   probably seen it, of Cox trying to stem the flow of customer

22   calls to its abuse representatives.  Right.

23        So I don't hear Mr. Buchanan or Cox to argue that

24   those costs saved are irrelevant.  In fact, those are factors,

25   again, that the jury can consider on statutory damages.

1              Instead, what Cox claims is that Dr. Lehr's opinion

2     is just his say so.  That his opinion is Cox would have spent

3     more money if it spent more money.

4              What they're missing is what underlies those

5     opinions.  Right?  And he says, well, Lehr, Dr. Lehr had to

6     testify about what they should have done.  And he criticizes

7     them for not calculating the actual costs.  But there is three

8     problems with this, Your Honor.

9              First, Dr. Lehr's opinion is based on an assumption,

10    and that is perfectly common territory for an expert to rely on

11    an assumption to provide an opinion.  And that is what he does

12    here.  Which is that, assuming that these additional steps were

13    needed, which he doesn't provide an opinion that they are, they

14    would have included additional incremental costs to Cox.

15             And that's helpful to the jury because, again, there

16    may be basic macro and microeconomic principles, but it's not a

17    given that a jury understands that direct incremental costs

18    saved by an ISP by not operating a more robust infringement

19    protection system is something that comes off their bottom

20    line.  That's why it's helpful.

21             Number two.  As to actual costs, Cox's 30(b)(6)

22    witnesses were asked about the costs of operating this system,

23    and they didn't know.  So how is Dr. Lehr supposed to do so,

24    right?

25             Matt Carothers was Cox's 30(b)(6) witness on the

1   following topic:  The level of resources and staffing Cox

2   dedicated to CATS and the graduated response program, among

3   other things.  The level of resources to operate this system.

4   And he was asked the following questions and gave the following

5   answers in his deposition:  Have you ever done a study or seen

6   -- excuse me, on page 38 of his deposition he was asked the

7   following questions:  Have you ever done a study or seen a

8   study indicating what the costs is -- what the cost is to

9   handle each abuse ticket?  Answer:  No.

10          Question:  Have you ever done a study or seen a study

11   indicating what the time is that it takes Cox to deal with each

12   ticket?  Answer:  No, I haven't.

13          Then let's turn to Sanford Mencher, that is Cox's

14   30(b)(6) witness on topic 1, Cox's revenues, expenses and

15   profits.  And during that deposition we were looking at Cox's

16   profit and loss statement identifying the specific breakdown of

17   costs, revenues, and the like for its data, its phone, and its

18   video services.  It's an exhibit you saw at length in the BMG

19   trial.  You may see it again here.

20          And here is what I asked Mr. Mencher.  Question:  Is

21   there an expense item on Exhibit 3 showing the Safety and Abuse

22   Team?  That's the team that handles these things.  Answer:  No.

23          Question:  What report could we look at to identify

24   the costs associated with the Abuse Team?  Answer:  I don't

25   know.  I don't know if the safety -- what did you call it?

1    Safety and Abuse Team?  I'm sorry, what did you refer to it as?

2           He then goes on in the next pages to talk about the

3    many steps that he would need to take internally, the layers of

4    expense and finance folks in his operation that he would need

5    to explore, try to unpack, try to identify if the Safety and

6    Abuse Team has an expense line item, was it part of the general

7    corporate expenses?  Could it be broken down?

8           So for Cox to come in and say that -- criticize Dr.

9    Lehr for not quantifying it or calculating it when Cox itself

10   couldn't do so, is, frankly, not a helpful criticism.

11          Lastly, Dr. Lehr did consider the information that

12   was available to him, but it still doesn't quantify the issue.

13   He looked at an exhibit from the Matt Carothers' deposition

14   that discusses the costs of handling an abuse ticket as $4.98.

15   That is part of his testimony by reference to the exhibits and

16   information that he considered.  Although, he didn't call it

17   out specifically, that underlies his opinion.

18          Even if you assume that's the quantum of costs saved,

19   $4.98 per ticket not processed because of their rigged system,

20   it still doesn't answer the question or allow you to calculate

21   the overall costs saved.  And that's because, like many of the

22   things here, we just don't know how many tickets went

23   unprocessed because of the millions blocked by Rightscorp for

24   blacklisting because of the who knows how many others that

25   exceeded the caps, hard limits, the way that they bundled

59

1    tickets, bundled notices and individual tickets and the like.

2         I want to turn now to the next opinion that

3    Mr. Buchanan discussed, and that's the lifetime value

4    calculation.

5         So backing up a little bit, Your Honor, Mr. Lehr --

6    excuse me, Dr. Lehr provides an opinion that -- let me back up.

7         He considered the economic incentive to tolerate

8    infringement, including by repeat infringers, and he did that

9    in several ways.  Mr. Buchanan talked about a couple of them,

10   but I want to list them for you.

11        So he looked at the revenue from the customers that

12   infringe plaintiffs' copyrights, including after their

13   infringements -- their notices of infringement to those

14   customers.  He looked at the average lifetime value of a high

15   speed Internet customer and did a profit calculation from the

16   time frame at issue.  He looked at the costs saved, which I

17   just discussed.  And he also demonstrated that infringing

18   subscribers are more profitable on average.

19        And I want to remind Your Honor that in the BMG case

20   you permitted Dr. Lehr to testify about the economic incentives

21   to tolerate infringement.  And he did provide a lifetime value

22   calculation, and he did multiple it by the number of alleged

23   infringers in that case based on a calculation that one of the

24   other experts had provided.  So Cox made similar arguments on

25   their Daubert motion there.  Those were overruled and Dr. Lehr

60

1    testified.

2           Now, as for the opinion on economic incentive, he

3    provides two calculations of what Cox earned from those

4    subscribers.  One is based on actual billing data from those

5    particular infringing subscribers.  And two is based on his

6    calculation of an average lifetime value of a Cox subscriber.

7    Both of those are important to the statutory damages, and both

8    of those are important for vicarious liability.

9           So let's touch on damages.  Again, Cox has asked you

10   to limit the information that Dr. Lehr can present to that

11   strictly, solely, and only attributable to infringement.  I

12   don't need to belabor it, but that's too narrow.  The jury can

13   consider many other things on statutory damages, deterrence in

14   particular, and even penalty.  They're related, but the

15   deterrent effect is important.

16          And in order for a jury to come up with an adequate

17   deterrent, it certainly needs the context of what's going on

18   here?  What is the level of activity?  How much is Cox earning

19   by providing service to all of these subscribers, whether they

20   have one or 20 or 2,000?  It's -- the opinion is that they have

21   economic incentive to tolerate infringement.  And so, the jury

22   should know the value of those subscribers to Cox in total.

23          THE COURT:  Is he going to break out the -- you know,

24   the infringement claim period versus his other financial

25   information?  It was a little confusing in his expert report.

61

1          MR. GOULD:  So we're still refining what that'll look

2     like.  The opinions that we -- that I anticipate that he will

3     give are, one, big picture, who is Cox?  In terms of the

4     financial picture, what does Cox make?  He will talk about the

5     average, we believe, we're still puzzling over it, but we

6     believe the average value of a customer at this time.  And he

7     will give the jury, he'll equip the jury with several ways to

8     examine that.  One as an -- the value of an individual

9     subscriber.  What does Cox think of as a valuable subscriber

10    when it implements a policy to keep or not keep or enforce or

11    not enforce?  And then he's going to, I believe, calculate that

12    against several bodies -- several subsets of groupings.

13          And what we've put forth -- what he's put forth in

14    his reports is the value of subscribers who infringe once, the

15    value of subscribers that infringe three times, and the value

16    of subscribers that infringe five times.  And I don't know, as

17    I sit here today, whether his testimony will be limited to --

18    well, it will be limited by the data that Cox has produced

19    about its infringing subscribers.

20          What Cox has produced is data for infringement from

21    2012 to 2014 for 57,000 subscribers.  So that's the body that

22    we'll look at.  So the average lifetime calculation isn't

23    really a time-based analysis.

24          THE COURT:  Right.

25          MR. GOULD:  Other than the fact that he's looking at

62

1    the average value of a subscriber in 2014.

2            THE COURT:  Yeah, I just don't want it to be blurred.

3    I want a jury to be able to understand what he's talking about,

4    right?

5            MR. GOULD:  Yes.  Yes, Your Honor, I agree.

6            THE COURT:  All right.

7            MR. GOULD:  And then the second calculation he does

8    is based on Cox's actual billing data.  That can be more

9    precisely tailored by time.  And the parties have a dispute

10   about what's relevant and how much weight to give it.  The data

11   that they've produced for billings runs from, I believe, 2012

12   to 2016.

13           So Magistrate Judge Anderson gave us a little bit of

14   runway before the claim period to get a look at what the

15   billings and revenue history were for these at-issue

16   subscribers leading up to the claim period.  And what we've

17   done, what Dr. Lehr has done is looked at how much Cox

18   collected from those.

19           Now, I believe that his testimony on that front will

20   begin with the claim period.  And so, he'll look at it from the

21   claim period forward.  And there's the question of -- I think

22   the parties, again, have a dispute about whether that period

23   should end with the claim period or thereafter.  And, you know,

24   I think --

25           THE COURT:  We'll get to that in a couple of weeks.

1           MR. GOULD:  We'll get to that in a couple of weeks.

2     Thank you.  But certainly, we will, mindful of this discussion,

3     be certainly clear that Dr. Lehr's testimony is clear as to

4     time and what it's purporting to characterize.

5           Now -- so damages, I think I explained why that

6     calculation is relevant to damages.  And then, you know, Cox is

7     also wrong, in our opinion, on his opinions on both average

8     lifetime value and actual billings.  Those are also relevant to

9     vicarious.  They go to the financial benefit prong.

10          And my colleague, Mr. Oppenheim, is going to speak at

11    greater length about the standard under vicarious, so I won't

12    belabor it.  But Cox was collecting money hand over fist from

13    subscribers that it knew -- well, had reason to believe, knew

14    were infringing.

15          And Mr. Buchanan wants to ascribe to the plaintiffs

16    the legal position that the case turns on the moment at which

17    they should have terminated.  You know, I think it's for the

18    jury to decide what Cox should have done with the information.

19    And that's why the one, three and five counts are relevant,

20    because the jury would be perfectly within its right,

21    regardless of our theory of the case, as to say, you know what,

22    they knew so much, that the minute they got a first one, they

23    should have done something.  You know, okay, we'll give them a

24    break.  After three, they should have done something.  Okay.

25    Well, after five, they certainly should have.

64

1          So, you know, it -- I think it's -- it doesn't

2     accurately characterize the position.  But that's why those

3     one, three, and five quantifications are relevant.

4          There's a lot of talk in the papers about a failure

5     to show a nexus.  Again, I think the problem there is that it's

6     really relying strictly on an actual damages analysis, which is

7     too narrow a lens for this.  I won't belabor it, but Dr. Lehr

8     opines that there is a direct relationship, attributable

9     relationship between the infringement particularly at this

10    level with the benefits of having a larger subscriber base,

11    higher total revenues, and higher profits.  And those are all

12    things that he opines on and calculates.

13         Now, the last thing Mr. Buchanan talked about is

14    another economic incentive argument where Mr. Lehr -- Dr. Lehr

15    calculates a statistically significant difference in billings

16    and payments between infringers with 20 or more -- 20 or more

17    tickets on one hand and one to two infringement tickets on the

18    other, and wants the jury to be without that really helpful,

19    relevant information.

20         And I want -- so I just want to explain what that

21    opinion is and what went into it, because I think it's helpful

22    in understanding it.

23         THE COURT:  Go ahead.

24         MR. GOULD:  So Dr. Lehr looks at a body of evidence

25    that leads him to conclude that on balance infringing

65

1    subscribers pay Cox for higher bandwidth.  He bases that on

2    several factors, including the undisputed fact that

3    peer-to-peer use generally consumes higher bandwidth, Cox

4    documents and internal analysis showing that peer-to-peer use

5    was a key driver of bandwidth by its customers during this

6    exact time frame, and the scope of prices that Cox charged to

7    its customers for different levels of service.

8            And to test that theory, what he does is he went to

9    the actual billing data.  You're going to hear all about ICOMS

10   data.  ICOMS is their billing database.  So he looks at the

11   ICOMS billing data, the same billing customer information that

12   I've been discussing, and he says, okay, let's test this.

13   Let's look at the relative payments for data by these customers

14   who infringed a lot versus these customers who infringed a

15   little bit.

16           And I want to qualify that a little bit.  So all we

17   have is a glimpse in time of 2012 to 2014.  For all the reasons

18   we've described in a million places, we think the scope of

19   infringement was much higher.  When I talk about this, I'm

20   looking at the limited snapshot.

21           So he looks at the data they've produced for

22   customers for whom we have billing data and infringement ticket

23   data.  And he says those with 20 or more were billed, on

24   average, 8.4 percent higher than those with just a few notices.

25   That's a statistically significant difference, number one.  And

1   number two, it's a -- it supports the inference that higher

2   level -- higher infringers were paying for higher bandwidth.

3   And that, again, touches on the direct financial benefit.

4         The rest of Cox's criticism on that in the papers,

5   Mr. Buchanan didn't talk about them, but as we explained in our

6   opposition, we think those go just to weight.

7         THE COURT:  Let's finish up.

8         MR. GOULD:  Thank you, Your Honor.

9         THE COURT:  All right.  Thank you, Mr. Gould.

10        Mr. Buchanan.

11        MR. BUCHANAN:  I'll be quick, Your Honor.

12        As to the last point about the difference between the

13  monthly rate, someone that has one or two versus 20, I meant --

14  they basically say it's just being helpful, there's good

15  inferences there.  Everything that Mr. Gould just said is that

16  it could be helpful to the jury.  Well, it would be helpful to

17  their case to put everything in the world there, but is it tied

18  to some theory of liability.

19        They keep talking about damages and statutory

20  damages.  Before you get to damages, you've got to get by

21  liability.

22        So how does this notion that some people paid -- that

23  got 20 or more notices paid, in some parts of the country, $4

24  more a month than someone that got one or two, have to do with

25  whether there was a draw, a draw to subscribers to join the

1    network at Cox because they knew there was infringement?

2    There's zero.

3           It's the same with their argument about one, two, and

4    three.  They say it's relevant to vicarious liability and

5    statutory damages, but it's not related to -- relevant to

6    vicarious liability.  There's nothing to do with drawing people

7    there.  It's just -- they're just saying that everyone who got

8    one notice of infringement should be terminated.  And that's a

9    problem.  That goes back to what we were talking about,

10   whether, you know, Dr. Weber's data is relevant that there was

11   a runoff.  Because they would love not to have anyone see that.

12   So they can say these people, these 57,000 customers, they each

13   got at least three notices of infringement from the plaintiffs

14   or some other content owner.  And they were never terminated,

15   they just did it forever.  We have no idea what happened to

16   them.  They equate notices with infringement.

17          And then you heard Mr. Gould say, we're going to

18   argue to the jury that even at one, at one notice to some

19   university -- or actually, we'll just take a real example.  An

20   ISP in rural Oklahoma created by the Department of Agriculture

21   with tens of millions of dollars to bring broadband to rural

22   Oklahoma people, and they had -- they're the ones -- they're

23   one of the ones that they've identified in their complaint as a

24   serious infringement that should have been terminated.

25          So they're saying that entire rural community should

68

1    have been one notice.  We should have shut down the whole

2    community.  The hospital, the police station, everything.

3    There's 3,000 business customers.

4            So how -- I don't see any articulation by the

5    plaintiffs that there's any theory whatsoever, any case law,

6    any statute that would support that you could argue to a jury

7    that after one notice, that that constitutes an infringement

8    and you should shut those people down.

9            And again, he says, we're going to be refining it,

10   we're working on it, we're crystalizing it.  That's not -- that

11   is a sign that they -- of weakness.  I mean, that is a sign

12   that there's problems with this theory.  They have stated what

13   they're going to do.  How are we going to find out what their

14   theory of damages is at trial?

15           So I think that -- and one final point is, again, you

16   need to establish liability first.  So when they talk about all

17   these incremental costs of Cox, which, you know, I meant, they

18   need to show that in fact we should have had to do those.

19   Right?  You can't say, I don't care if they did or didn't do

20   them.  But if they did do them, it would have cost some money,

21   which I didn't quantify because I'm not giving an opinion.

22           And McCabe is the same, no opinion about any of these

23   aspects of the process of our system to try to stop

24   infringement.

25           THE COURT:  All right, thank you.

69

1          Let's take a brief recess.

2          MR. OPPENHEIM:  May I make one very quick comment?

3          THE COURT:  Yes, sir.

4          MR. OPPENHEIM:  Mr. Buchanan's characterization of

5    the plaintiffs' position of shutting down Internet in the State

6    of Oklahoma is not our position.  We've never said anything

7    remotely like that.  And I want the record to be clear that

8    that's not where we stand.

9          Thank you, Your Honor.

10         THE COURT:  Okay.  Yeah, thank you.

11         All right.  Let's take ten minutes.  We're in recess.

12         NOTE:  At this point a recess is taken; at the

13   conclusion of which the case continues as follows:

14         THE COURT:  All right.  Let's hear Sony's motion for

15   summary judgment first, please.

16         MR. OPPENHEIM:  Thank you, Your Honor.  Cox's

17   wholesale indifference to copyright infringement on its network

18   has been well storied by this Court already.  And as we dig

19   into the detailed elements of the plaintiffs' claims and Cox's

20   defenses, Cox will no doubt want to avoid any discussion about

21   many of the facts that it does not like.

22         Indeed, what we've seen already is Cox seeks to

23   rewrite the story of what it did, what the music industry did,

24   and what the copyright laws are.

25         THE COURT:  So I read your pleadings.  I understand

1   we're focusing on ownership.  And it took up a big part of our

2   case with BMG.  And I made the rulings that I made in that

3   case.

4            So I think I understand.  And if you want to point

5   out what you think are new issues that I need to look at

6   carefully and/or why some of my prior rulings as to the manner

7   in which Sony and the other plaintiffs have shown ownership,

8   that would be helpful.

9            MR. OPPENHEIM:  So, Your Honor, I'll leave to

10  Mr. Zebrak at the end, the ownership issue, if that's all

11  right.  And I would like to turn to the issues of the

12  underlying direct infringement and the knowledge and financial

13  benefit.

14           THE COURT:  Okay.

15           MR. OPPENHEIM:  So, Your Honor, on those issues, I

16  know we -- we kind of hit in pieces in the Daubert motions what

17  it is MarkMonitor and Audible Magic did.  I would like to kind

18  of just -- let's have a very clear understanding of what

19  happened here because I don't think it's come out quite right

20  yet.

21           THE COURT:  Well, it depends on how long that is

22  going to take.

23           MR. OPPENHEIM:  I will try to do it very quickly,

24  Your Honor.

25           So, MarkMonitor used a process that was very similar

71

 1   to other vendors, including in some ways what Rightscorp did.

 2   Beginning as early as 2008, MarkMonitor went on to peer-to-peer

 3   networks to identify files that were being infringed.  And they

 4   would download those files and submit those files to Audible

 5   Magic to determine what was in those files and whether they

 6   were infringing.

 7        Audible Magic would return data to MarkMonitor.

 8   MarkMonitor would record in its database the artist, track, and

 9   album.

10        Now, starting in 2015, after the claim period for

11   this case, MarkMonitor started recording other data as well,

12   not for purposes of what it was doing for the music industry,

13   but for other potential clients.  And that has been explained

14   in the affidavits of Sam Bahun.

15        If that information was recorded in the MarkMonitor

16   database, that is the artist, the album, and the track, that

17   was deemed to be an accurate identification because otherwise

18   they wouldn't have the information.  And that information was

19   stored in the MarkMonitor database.

20        All of that information associated with each of the

21   claims in this case has been produced in a spreadsheet that the

22   plaintiffs produced that was obtained from MarkMonitor.  Okay.

23   That, Your Honor, is -- I want to make sure I get my numbers

24   right here.  It's the --

25        THE COURT:  '431.

72

1          MR. OPPENHEIM:  '431, right.  Now, that is the --

2    that evidence -- the evidence from that spreadsheet is before

3    the Court, there is a foundation for it, witnesses have

4    testified to it, and I can explain to you exactly what's in

5    there.

6          The other two spreadsheets that we've been talking

7    about today do not play a role and do not create an issue of

8    fact for purposes of summary judgment for this Court.  So the

9    REV '3444, the Audible Magic spreadsheet, is not before the

10   Court for purposes of summary judgment.  The defendant has laid

11   zero foundation, nor could they lay a foundation for it.

12         The reason you put a document in front of a witness

13   in a deposition to get it authenticated is so that both sides

14   can ask questions about it and create a record.  Cox did not do

15   that.  And had they, they would have gotten a clear explanation

16   about what REV '3444 was and why it can't be the basis to

17   dispute MarkMonitor's data.

18         So they have no foundation for it.  The Court struck

19   the declaration of Mr. Kearney which tried to put it forward.

20   It's not before the Court for purposes of summary judgment.

21         The other document, '236, I believe, the MarkMonitor

22   spreadsheet, has all the exact same information that is in

23   '231, plus additional information.

24         Now, that additional information does not create an

25   issue of fact.  That additional information was information

73

1   that was collected later in time and has -- and if you look at

2   the spreadsheets that Mr. Buchanan gave you -- and, by the way,

3   we went through this with Judge Anderson at great length a

4   week-and-a-half ago, almost two weeks ago.  That information is

5   information that was -- does not in any way reflect that the

6   other information in '431 is inaccurate.

7           So, for example, where it says, match duration, -1,

8   obviously there is not a -1 second match duration.  That would

9   be an impossibility.

10          Now, Cox has put forward attorney argument that says,

11  well, if it says -1 or 0, it must mean that there was no match.

12  They have no foundation for that.  They have no testimony for

13  it.  They didn't ask the witnesses about it.  All they have is

14  the attorney argument on it.  That's all they have.

15          Now, in the motion in limine that is before your

16  court, Sam Bahun, the MarkMonitor rep, who, if he had been

17  asked in deposition, would have said this, but he now says it

18  in a declaration, he said that MarkMonitor was in the process

19  of refining its databases and the engineers had 0s and -1s put

20  in those places because the data wasn't transferring and it was

21  obviously a void for the data.

22          So the only evidence that is before the Court for

23  purposes of plaintiffs' motion on summary judgement of direct

24  infringement in terms of the Audible Magic confirmations is the

25  one spreadsheet, and that one spreadsheet is unambiguous as to

74

1   the works in suit.  Now -- so that speaks to the issue of the

2   Audible Magic data.

3           But the Court has before it lots of other evidence of

4   the infringements.  And it is not a making available issue,

5   Your Honor.

6           So the evidence that is before the Court on

7   distribution includes MarkMonitor's detailed log files, the

8   evidence captures, the Audible Magic confirmations which we

9   just spoke about, testimony describing the process of

10  collecting this evidence, evidence describing the process of

11  sending the notices, and testimony of Barbara Frederiksen-Cross

12  who reviewed the MarkMonitor system and confirmed that it does

13  exactly what it says it does.

14          Now, what does that system do?  It is not simply

15  going onto a network and looking to see if there is somebody on

16  that network with a file.  It is doing well more than that,

17  Your Honor.

18          When MarkMonitor goes onto a peer-to-peer network, it

19  is connecting to a user who has the infringing file on the

20  network.  It connects to that user and it initiates the process

21  under the peer-to-peer protocol to obtain the file.  It

22  collects the IP address, it collects the hash of the file.

23          THE COURT:  That's the handshake, you know.

24          MR. OPPENHEIM:  The handshake.  You've got it.  All

25  of that.

75

1          THE COURT:  Yeah.

2          MR. OPPENHEIM:  Now, Your Honor, that is enough to

3   show distribution under Hotaling.  And I am going to get to

4   that in a minute.

5          But it's important to understand that this process of

6   connecting with this person is not simply observing as though

7   somebody may theoretically be out there distributing.  They

8   actually connect to them and begin the process.  It is akin,

9   Your Honor, and I can't help, given the fever in the city right

10  now, to say it's akin to saying, I had a World Series ticket.

11  I went into the ballpark.  And Cox saying, yeah, but we don't

12  have proof you watched the game.

13         Now, I read at great length the argument on Hotaling

14  before this Court in the BMG case.  And having spent the better

15  part of my career as a copyright lawyer, I found it very

16  interesting that the entire discussion was about whether or not

17  there was a making available right or not.

18         Hotaling, as you read it, not once in Hotaling do the

19  terms "making available" appear.  It is not a case about making

20  available.  It is a case about what is the quantum of proof

21  that is necessary to show distribution.  That is entirely

22  different than a making available right under WIPO.

23         Now, we could talk about making available, but we

24  don't need to because Hotaling is the law, and it is the law of

25  this circuit and it's the right law.  And under Hotaling, what

1    the Fourth Circuit said is, when you can't have sufficient

2    proof of distribution, if you see everything up to the point of

3    distribution, that can be deemed distribution.

4            That's good law in this circuit.  And you couldn't be

5    closer to that circumstance than what we have here in this

6    case.

7            Peer-to-peer networks have been created so that the

8    only people who can see what's happening as between peers are

9    the peers.  And so, there is no way that MarkMonitor could go

10   onto a network and see Cox's subscribers distributing the files

11   to others.

12           Now, Cox complains, well, MarkMonitor should have

13   downloaded the files themselves.  And then they say, yeah, but

14   that -- even that wouldn't have been enough.

15           So under Cox's view of the world, you could never

16   have enough evidence to show that a Cox subscriber was engaging

17   in infringement.  That, of course, can't be the law.

18           So MarkMonitor goes on the network, finds the Cox

19   subscriber actively providing this file to others, that is

20   under Hotaling enough.

21           If the P2P networks had created and maintained log

22   files, then we would have them and we would put them before the

23   Court.

24           If Cox, once it had received a first notice that a

25   subscriber was infringing, decided to observe whether or not

1    that subscriber was continuing to use a P2P network, which they

2    have the technology to do, then we would have those records.

3    They didn't do that.

4           The plaintiffs collected the evidence they could

5    collect.  Now, the defendants say, well, you could have paid

6    more and had MarkMonitor do more.  There are limits to what you

7    can do in terms of collecting evidence.  There are limits to

8    what you can collect.  What was collected is enough and has

9    been enough in other courts.

10          So I've discussed the distribution aspect, but I

11   really want to focus for a minute on a reproduction piece.  The

12   defendants want to characterize that the evidence that the

13   plaintiffs have shows merely that the Cox subscriber had a

14   recording in a share directory and nothing more.

15          This is a speculative argument.  They don't have a

16   basis for this, and there are two reasons that the argument has

17   no legs.  So plaintiffs have put forward evidence that over

18   57,000 Cox subscribers on peer-to-peer networks had a file that

19   MarkMonitor had previously identified as infringing that had

20   the same hash as a file that MarkMonitor had previously found.

21          As the expert -- as Barbara Frederiksen-Cross

22   explained in her expert report, when confronted with identical

23   content items being shared by multiple users on a peer-to-peer

24   file-sharing network, it is overwhelmingly likely that the

25   users have copied the files from each other.

78

1           And the reason this is is because hashes are unique.
2    Dr. Feamster testified to that in his deposition.  Yes, in a
3    footnote in their brief they now say there's a theoretical
4    possibility that it didn't happen -- doesn't happen.  We can
5    ignore that.
6           This is akin to a teacher walking into a classroom
7    and collecting essays from students, and all of the essays are
8    exactly the same.  And the teacher being told, no, no, no, they
9    were all independently created.
10          It's not a possibility, Your Honor.  In considering
11   summary judgment, don't leave reasonableness at the door.
12   These arguments are just speculation.
13          Secondly, many of the subscribers who were caught
14   didn't have the complete file.  And there's some confusion over
15   this argument in plaintiffs' brief, so I want to clarify it.
16          Plaintiffs' expert pointed to two examples of a -- of
17   two Cox subscribers who were caught in two different instances
18   with the exact same hash file, but different quantums of the
19   bitfield.
20          So imagine -- and I don't have the exact numbers in
21   front of me.  But on day 1, 90 percent; on day 5, 95 percent.
22   That shows that that user is in the process of reproducing the
23   file.  That's clear and unequivocal evidence of that.
24          Now, any user who is -- and that's just two examples.
25   But any user who has less than 100 percent of the file, and has

79

1    it in their share directory, and is on the network, is in the

2    process of reproducing it.  And roughly 15 percent of the users

3    who were caught had less than 100 percent of the file and were

4    caught reproducing it.  This is unequivocal, unrefuted evidence

5    of reproductions occurring by Cox subscribers.

6           Your Honor, before I go on to the knowledge issue, I

7    want to speak to Cox's argument about direct infringement by

8    Cox business subscribers can't count as an underlying direct

9    infringement.

10          First, we've got to understand the context of this,

11   Your Honor.  Cox is desperate to get the infringement by its

12   business subscribers out of this case.  Cox's original policy

13   with respect to business subscribers was that it would

14   terminate after three -- four notices, excuse me,

15   automatically, every business subscriber, as it would

16   residential.

17          Cox changed its policy to say it would never

18   terminate a business subscriber, period, under any

19   circumstances.  And what that led to is situations like we have

20   in this case.  There were business customers who, in a very

21   short period of time, were the subject of over 4,000

22   infringement notices.

23          Cox's argument is that their business subscribers

24   should have a license to infringe as much as they want and Cox

25   shouldn't have to do anything about it.  And these subscribers

80

1    were making Cox the most money.  They were paying between 30

2    and $120,000 a month, Your Honor.  So they're desperate to get

3    these subscribers out of the case.  And so, they point to this

4    Cobbler, case.

5           And this Cobbler case, Your Honor, is largely a

6    direct infringement case.  That part of the case has nothing to

7    do with this case.

8           But with respect to the secondary liability part of

9    the case, the Ninth Circuit looked at it and said that the sole

10   allegation was that the nursing home had failed to police its

11   WiFi service.  One sentence.  That was the sole allegation for

12   its secondary liability complaint.  And the Ninth Circuit said,

13   you know what, that's not enough to sustain a secondary

14   liability claim.

15          I agree with that.  I think we should all agree with

16   that.  But the ISP -- the nursing home was not an ISP.  And Cox

17   here, we -- way more than one sentence in our complaint about

18   their failures here, Your Honor.

19          The Cox business subscribers infringed, Cox doesn't

20   dispute that.  What they're asking this Court to do is create

21   an immunity for them and the business subscribers to infringe

22   all they want.

23          Now, the reality is that those business subscribers

24   are subject to terms of use.  They have a contract with Cox.

25   That contract requires them to abide by the Acceptable Use

81

1   Policy.  And to the extent that they have their own

2   subscribers, like the situation Mr. Buchanan was just

3   describing where it was another ISP, Cox requires that other

4   ISP to impose the same obligations on its users.  They have a

5   contractual way to deal with this, and they should enforce

6   their contract.  They should not be allowed to not enforce

7   their contract.

8          Your Honor, I would put forward that the Cobbler

9   argument here can be ignored.

10         Let me turn to the knowledge issue on contributory

11  infringement.  Even with the caps that Cox put into place, the

12  plaintiffs sent Cox over 200,000 notices.  Cox was put on

13  notice of specific instances of infringement.  Those notices

14  provided the specific user, by virtue of an IP address, that

15  was infringing, the specific date and time of the infringement,

16  the network that the user was using to infringe, the name of

17  the file that was infringing, and a representative copyrighted

18  work from that file.

19         Now, the reason I ticked through those elements is

20  because those are the elements that Cox requires in a notice,

21  and that's what the music industry did.

22         So the defendants say, well, that's insufficient

23  under the Fourth Circuit standard that comes from the BMG case.

24  But that Fourth Circuit standard, they read into it way more

25  than is there.  There are only two relevant sentences from that

1  decision for the purposes of notice.  The first is whether or

2  not the defendant was put on notice of specific instances of

3  infringement.  Well, that absolutely happened here, couldn't be

4  any closer.

5         And then the Fourth Circuit said that the defendant

6  must have specific enough knowledge of infringement that the

7  defendant could do something about it.  Again, check that box,

8  Your Honor.  The plaintiffs did that.

9         Cox says, well, you didn't list every work that was

10  infringed in the notices.  Cox didn't require it by its own

11  policies.  And even if they had, the Fourth Circuit doesn't

12  require it.

13        Cox, when it received a notice of infringement,

14  didn't care whether what was being infringed was Bruce

15  Springsteen's Born to Run or The Lion King.  They didn't care.

16  The underlying work that was infringing was irrelevant to them.

17        So they now want to use that as a basis to try to

18  escape liability because they say not every work was listed.

19  The Fourth Circuit doesn't require it, and their own policies

20  don't require it, and their own procedures don't require it.

21        Your Honor, on the issue of material contribution,

22  all I can say is I think the Court's well familiar with that.

23  I'm happy to address it in greater detail, if you'd like, but

24  I'll move on to financial benefit.

25        THE COURT:  Yeah, go ahead to financial benefit.

1           MR. OPPENHEIM:  So I originally contemplated starting

2    with the facts here, but I think it's important to actually

3    start with the law, because I think the law has been turned on

4    its head in this area of the law, and in particular in the

5    briefing here.

6           So the roots of vicarious liability derive from

7    respondeat superior, Your Honor.  Obviously, you know, in a

8    respondeat superior case, you don't need to prove draw.  And

9    similarly, you don't need to prove draw in the early vicarious

10   liability cases.

11          So the touchstone, cornerstone case on vicarious

12   liability is Shapiro, Bernstein versus Green.  This is the case

13   that the Supreme Court cited to in Grokster roughly ten years

14   ago.  And what happened in that case, right, is that a store,

15   the H.L. Green store, had a concessionaire within it that was

16   selling records that included some bootlegged pirate records

17   and some not bootlegged records.  And what the Second Circuit

18   held was that that concessionaire could be held liable --

19   excuse me, that store could be held liable for the sale of the

20   records by the concessionaire.  And the reason they could be

21   held liable is because they got a percentage of the gross

22   revenues.

23          Now, they got a percentage of the gross revenues from

24   all of the records, infringing or not.  And the Court still

25   held that they could be held liable.  And that's the case that

84

1    the Supreme Court just cited to in the Grokster case.

2              Now, the first time the issue of draw comes up in any

3    cases, as far as I know, is in the Fonovisa versus Cherry

4    Auction case.  And in that case, it was a swap meet.  And

5    Fonovisa, a Latin record company, sued the swap meet operator

6    because there were so many booths within the swap meet that

7    were selling pirate copies of their Latin music.

8              And initially the District Court said, no, you cannot

9    hold the swap meet operator liable because all they're doing is

10   taking money at the entrance when people come in, booth fees,

11   parking fees, and concession fees.  And they said that -- you

12   can't show that it's direct enough.

13             And what the Ninth Circuit said is -- it said, no,

14   it's not just looking at whether you can tie money to the

15   infringement.  If the infringing behavior was a draw to

16   customers generally, that also shows financial benefit.

17             So it was an alternative way of showing financial

18   benefit, and that's what happened in the Cherry Auction case.

19             Now, Ellison, which this Court has discussed --

20   Ellison was a case which is 100 light-years away from what we

21   have here.  In Ellison there was a science fiction author who

22   sued AOL because AOL subscribers could go onto AOL, and among

23   the many, many things they could do, they could go onto Usenet

24   and then onto a Usenet channel where they could theoretically

25   get an infringing copy of his book.  And he said, that's enough

1    because the subscribers are paying for the totality of the

2    service, and AOL is making money off that, and the subscriber

3    could go and get infringing material.

4          And the Ninth Circuit said, no, that's not enough.

5    And obviously what the Ninth Circuit is saying there is that

6    the tie between the infringement and the money is not direct

7    enough.  That's what Ellison stands for.

8          Now, in our case, what we've put forward in our

9    papers is that there are 57,000 or 33,000, count however many

10   subscribers you want who were infringing, which at some point

11   in time Cox should have done something about.  And we don't

12   need to articulate when.  That'll be up to the jury to decide.

13   We believe Cox knew about infringement, they had an obligation

14   to stop it at some point in time.

15         Instead of terminating those infringers -- and the

16   e-mails internally are clear as day on this -- they chose to

17   keep them up or reactivate them and collect the money.  And

18   their own internal people say this is why they did it.

19         So our theory of financial tie here is not a long

20   stretch as in Ellison.  Our financial tie here is the monies

21   that Cox collected, not from all of their subscribers who

22   theoretically could have infringed, but from identified, known,

23   specific infringers who they should have done something about.

24   And it's hard to imagine a closer tie than that, Your Honor.

25         And so, I believe that the facts that we've set

1   forth, they can't refute.  And it does establish as a matter

2   for summary judgment purposes liability.

3           Now, I'm going to close on this note, Your Honor.

4   There are lots -- there's lots of evidence before the Court.

5   Some of that evidence is direct and some is circumstantial.

6   But those two types of evidence are viewed equally by the

7   Court.  And you can succeed on a motion for summary judgment on

8   circumstantial evidence as much as direct evidence.

9           The only question is whether defendants have contrary

10  evidence, not arguments, but contrary evidence.  And I put

11  forward, Your Honor, that they don't.  Thank you, Your Honor.

12          THE COURT:  All right.  Thank you.

13          Do you want to do the ownership issue?

14          MR. ZEBRAK:  Yes, Your Honor.  I'll be very brief

15  with this, unless the Court has any questions.

16          Our position is that the defendant has not created a

17  genuine issue of material fact for trial.  This is our

18  business.  We work with these artists and songwriters to

19  create, promote, and distribute these works.  It's our regular

20  corporate policy and practice to acquire ownership or exclusive

21  rights.  We submitted very detailed declarations and a mountain

22  of documentary evidence.

23          For the high majority, Cox made no attempt to even

24  contest them in light of Your Honor's judicial notice ruling.

25  I believe they have argument in their brief for about 1,500.

1   And with the Court's permission, I'll just very quickly tick

2   through those by category.

3           THE COURT:  You know, why don't you -- why don't I

4   just let you respond to Cox's arguments that your documentation

5   is insufficient.  All right?

6           MR. ZEBRAK:  Yes, Your Honor.  That's one of the four

7   areas in their brief that they raise.

8           THE COURT:  Okay.  Go ahead.  Go ahead.

9           MR. ZEBRAK:  And in -- and on that front, first of

10  all, their brief is conclusory that -- you know, they haven't

11  cited to any documents.  They've cited to the stricken Lane

12  declaration by referencing 150 some-odd paragraphs.

13          So, you know, I put forward that they haven't, you

14  know, actually created a genuine issue.

15          But taking a step backward, even had they approached

16  this properly, there's no rule that every fact needs to be

17  substantiated with a document.  Evidence comes in in many

18  forms.  And you know, if one takes it to its extreme, you know,

19  there's no limit to what you then have to provide documentation

20  for.

21          In the BMG case, in fact, Your Honor recognized that

22  testimony can be used for aspects of chain of title, and it's

23  not a lawful proposition.  Other courts, including the LimeWire

24  court, have done the same.  These are not facts, by the way,

25  for which there is any dispute.  There is no issue about

1  whether a certain acquisition occurred or whether a certain

2  name change occurred.  This is minutia that, you know, Cox is

3  just attempting to quibble with whether in a multistep chain of

4  title we have put forward a document to prove every step of the

5  way.  But the point is, there is un-rebutted declaration

6  testimony establishing these facts.

7        And on top of that, had Cox actually had a genuine

8  concern about this, they could have come forward with proof by

9  asking questions at deposition.  They -- you know, we had to

10  prepare and put up these ownership deponents after producing

11  all this evidence, and they largely didn't touch these issues.

12        And so, you know, given that the law allows us to use

13  the combination of documentary and testimonial, we think it's

14  fine and well supported by case law.

15        THE COURT:  All right.  Thank you.

16        MR. ZEBRAK:  Thank you.

17        THE COURT:  All right.  Mr. Elkin.

18        MR. ELKIN:  Good afternoon, Your Honor.

19        THE COURT:  Good afternoon.

20        MR. ELKIN:  I guess you figured out so far that Cox

21  and the plaintiffs have quite a number of disputes, but I think

22  one of the things we could probably agree upon is the fact that

23  we both appreciate all of the time that you and your clerks

24  have put into preparing.  We know that we've put a lot of paper

25  before you, and thank you for all of the work and giving us as

1    much time as you have today.

2              THE COURT:  All right.

3              MR. ELKIN:  There are four, four discrete areas that

4    I would like to address, and then I'll comment on various

5    points that have been raised by counsel in connection with

6    their summary judgment argument.  The first is the plaintiffs'

7    proof of direct infringement.

8              Secondly, the direct financial benefit of the

9    vicarious infringement claim.

10             The third, contributory infringement issues

11   pertaining to the non-specifically noticed works and the

12   business subscribers that Mr. Oppenheim touched upon.

13             And then finally, Your Honor, the plaintiffs' -- the

14   separate statutory damages works that are part of the

15   compilations as defined by the Copyright Act.

16             On the plaintiffs' proof of direct infringement, as

17   Your Honor well knows, based both on this, the BMG case and

18   other cases before you, the plaintiffs have to prove, and they

19   don't dispute this, the underlying reproduction or distribution

20   of the works in issue.

21             Unlike in BMG where Rightscorp actually downloaded

22   the full copies of the works from Cox subscribers, here we have

23   no evidence of distribution.

24             Now, the Court, I believe, in BMG didn't need to

25   analyze the reproduction issues since -- given the distribution

90

1    evidence.

2            Because the record labels chose not to direct

3    MarkMonitor to download copies of the allegedly infringing

4    files -- and they had a contract, they decided advertently not

5    to do that.  I'm not blaming them for that, it's their right,

6    but they advertently decided not to do that.

7            As a result of that, Your Honor, the only link, the

8    only link between those files and plaintiffs' works is what

9    plaintiffs have referred to as the so-called cryptographic hash

10   match between the two.  And we've talked a little bit about

11   that today.

12           At first blush -- and I must say, when I read this,

13   it seems awfully seductive because it -- if you -- but when you

14   take a step back, as I'm going to ask Your Honor to do for a

15   moment, let me suggest in these circumstances it can be

16   misleading as it relates to the facts before you.

17           The issue for that, and the -- what I would ask Your

18   Honor to talk about -- to listen, is what these hash values --

19   I'm just going to shorten it by referring to it as hash

20   values -- what they represent and what they don't.

21           What they do represent -- and we do not dispute this.

22   Let me just be clear, we do not dispute this.  It identifies

23   the files.  The files, they can match up one file with another

24   file.  Yes, it identifies the files.

25           But what it doesn't do, what it doesn't do, it

1    doesn't indicate a file's file type.  It doesn't indicate the

2    contents of the file.  It doesn't indicate where the file is

3    originated, whether it was lawful or not.  And, fourth, it

4    doesn't -- it doesn't include or say anything about the

5    particular -- whether the particular copy of the file was

6    acquired lawfully.

7            In short, you don't know what is in the files.  And

8    let me just -- before I take you through the evidence here, let

9    me explain why it's important.  And each of the four protocols,

10   as Your Honor I am sure is aware from reading the papers, have

11   different hash values, whether it's Gnutella or eDonkey or any

12   of those.

13           I would ask Your Honor to just consider the following

14   analogy.  The FBI, as we know, has a rich database of

15   fingerprints.  And when a crime is being investigated and the

16   FBI is able to dust for fingerprints, they have the ability to

17   go back into their database and to match up the fingerprints.

18   And we know that is powerful evidence because fingerprints

19   match up with fingerprints.

20           What it doesn't do is to say anything about the

21   underlying fingerprints that were actually taken of the person

22   whose fingerprints it is.  It says nothing about the underlying

23   foundation.  In most instances it doesn't matter because you

24   can find the suspect and make that verification.

25           The reason why I raise this here is because

92

1    plaintiffs' hash match evidence, we submit, is severely flawed

2    in material respects because there is an insufficient -- I want

3    to take the Court through this -- an insufficient foundation in

4    the record evidence as a matter of law.  Foundation is key

5    here, and that's what I'm going to focus on purely in my

6    argument.

7            To illustrate our argument, I would like to take Your

8    Honor through the various steps that plaintiffs outlined -- and

9    we don't dispute these steps by the way -- as the basis for

10   their assertion that the direct infringements have taken place

11   and what we believe to be the uncontroverted evidence showing

12   that plaintiffs' proof of direct infringements is riddled with

13   fault as a matter of law.

14           And I would like to hand up, if I may, a document

15   which I have given to counsel before the argument, which is of

16   the PowerPoint that we're going to exhibit on the screen, to

17   help illustrate this, if I can.

18           THE COURT:  Yes, sir.  Got it.

19           MR. ELKIN:  So there are four steps.  And again, we

20   don't disagree what they are.

21           Just to summarize it, if you go to the first slide,

22   this is the step where the -- MarkMonitor trolls the Internet

23   to look for suspecting infringing files.  Right?

24           By the way, I am sure, as Your Honor well knows, this

25   has nothing to do in particular with Cox's customers.  This is

1   something that they do in trolling peer-to-peer sites to

2   develop an inventory of potentially suspect files.

3         Then what you do is you go to the second step, this

4   is their so-called verification step.  This is the step where

5   MarkMonitor goes to Audible Magic and they confirm, hey, this

6   is the suspecting file, it's something you guys have in your

7   database, because if you do we know it belongs to the

8   plaintiffs.  Right?

9         The third step, this is the logging step.  Once

10  MarkMonitor has gotten the verification, it then logs the data,

11  whatever -- that's, obviously, a subject of debate here.  They

12  log that into the MarkMonitor database.

13        And then you go to the fourth step where MarkMonitor

14  actually connects a Cox subscriber.  It confirms that the

15  subscriber is infringing.  The so-called handshake that

16  everybody is talking about.

17        And those are the steps.  And there is a fifth step,

18  of course, the notice step where they actually send the notice.

19  That relates to contributory liability, which I will get to

20  when I get to that argument.

21        So what I would like to focus on in each of these

22  four steps is why there is an insufficient foundation for Your

23  Honor to conclude at this stage that there is direct

24  infringement.  If you take a look at the first step, you have

25  to ask yourself, or I would hope the Court would ask itself,

1    where is the proof in the record, beyond conclusory statements,

2    that MarkMonitor has actually done what it says it did rather

3    than just to assume that it did?

4            What do they have?  They have pointed to a hard

5    drive, the hard drive of 57,000 some-odd recordings.  But the

6    problem is that it lacks foundation because, number one, nobody

7    bothered to even listen to the files.

8            Secondly, plaintiffs didn't produce any reference

9    files of their works in this case.  So nothing could be done to

10   actually match this -- the contents of the hard drive to what

11   it is plaintiffs actually claim were infringing.  But what we

12   do know, Your Honor, what we do know is that the files on the

13   hard drive were dated 2016 and later.

14           We can conclude on that basis, and there is another

15   point I want to make, but there is no reliable basis to infer

16   that MarkMonitor searched for and downloaded reference copies

17   of the plaintiffs' works in suit, nor were they downloaded in

18   advance of the notices being sent.

19           Now, if we go to step two, this is the verification

20   stage.  And we have a number of issues with this particular --

21   with the foundation of this.  The first is that there is no

22   evidence in the record that plaintiffs actually lodged original

23   works with Audible Magic to create the referenced library.

24   They say that, but there is no witness that testified, there is

25   no declaration that lays out from the record labels, we are

1   giving to you MarkMonitor, MarkMonitor -- I mean, Audible

2   Magic, I apologize -- Audible Magic has actually received these

3   sound recordings and they have ingested them or any of that.

4   There is just no foundation for it.

5         And we believe that to be -- on that basis there is

6   no reliable mechanism to infer that the files located by

7   MarkMonitor later were matched against plaintiffs' works in

8   suit.

9         Secondly, with regard to this second step here, the

10  only evidence of this match is metadata recorded in the

11  spreadsheets.  But as Your Honor knows from reading the papers,

12  the spreadsheet on which plaintiff intends to rely is missing

13  Audible Magic data from before 2015 because they didn't bother

14  to include for the BitTorrent files some 14 out of the 17

15  fields.  We don't know what was recorded there.

16        Two, it is an inadmissible summary of the missing

17  Audible Magic data.  And I want to pause here and just go over

18  this argument because it's important.  It did crop up.

19  Recently Judge Anderson asked you to ultimately deal with this,

20  and it will be part of an in limine motion.  But I just want to

21  take Your Honor through it very quickly because it does relate

22  to the foundation issue.

23        As Your Honor well knows, under Federal Rule of

24  Evidence 1006, a summary is admissible to prove the content of

25  voluminous evidence only if the proponent makes the originals

1    available to the other side.

2            What we have here is an extract.  We have data from a

3    database.  We requested -- we were -- we asked the Court, we

4    asked the other side for it, MarkMonitor for it.  We went to

5    court.  We got a Court order.  It wasn't turned over.  We

6    complained about it.  And what we have is the so-called '431

7    spreadsheet.

8            And we believe that is a summary in the

9    circumstances.  And we believe that the case law is clear that

10   these selective extracts were from a database, and we believe

11   it's a summary.

12           If you take a look at the Branch case, which we have

13   cited, it is a Judge Payne decision from two years ago where

14   there was a spreadsheet selectively compiled from a database.

15   The Court held there that it clearly was a summary that would

16   need to have the underlying database be provided to counsel.

17           Similarly, the District Court in Maryland in the

18   Sprint Nextel case, another case that we cited in our reply

19   brief, indicated that spreadsheets combining data and analysis

20   from different sources were Rule 1006 summaries.

21           And, of course, we know here that the MarkMonitor

22   database -- and this is not really disputed, Your Honor --

23   contained both Audible Magic data as well as whatever

24   MarkMonitor has that we have never been in position to actually

25   inspect.  So we think that's a separate problem with respect to

1    this foundation.

2             And then finally here, this '431 spreadsheet was

3    created after the claims period.  It was done in 2018 when this

4    case was pending.

5             So we believe on that basis, Your Honor, that there

6    is no reliable basis to infer that the works in suit were

7    matched to the files being shared by Cox subscribers on the

8    peer-to-peer networks.

9             And then finally on the verification step related to

10   this foundation, we know that the evidence packages were

11   assembled without waiting for the verification step.  And they

12   say that somehow it existed anyway.  But if you look at

13   Barbara Frederiksen-Cross' report, she specifically even admits

14   that.

15            So my -- our conclusion with respect to that is that

16   creates the potential of sending notices on non-infringing

17   works.  I know that the plaintiffs probably won't want me to

18   say this, but the truth of the matter is, they had an

19   operational audit.  It was done by an independent company, the

20   Stroz Friedberg.  They were required to do all of this

21   verification, an audit under the implementation agreements that

22   the record labels had with MarkMonitor and the ISPs that

23   were not -- did not implicate Cox, but were a part of this

24   program.  And they said, look, there is a problem.  Unless you

25   get this stuff verified before sending notices, there is a

1   potential for notices going out that are faulty.

2           Going to the third step, Your Honor, the so-called

3   logging step.  This is the same point I mentioned earlier, the

4   internal database was simply never produced.  We believe on

5   that basis there is no reliable basis to infer that this step

6   occurred either.

7           And then finally, the fourth step, the handshake,

8   there are two points here.  One is that there is no evidence

9   that any particular peer was actually downloading or

10  distributing the works in suit, at most making available.

11          I know that the plaintiffs aren't happy with the

12  ruling in BMG with respect to Hotaling.  We believe it was the

13  right decision.  Obviously, we are relying on that.  But I have

14  to say that it's disconcerting to suggest that somehow they

15  could not have done more because they could have done more.

16  MarkMonitor actually had a program, and it's in evidence, where

17  they could have, you know, downloaded the works.  It would have

18  cost them a little extra money.  I don't blame them for not

19  doing it, but they decided not to do it.

20          But they can't somehow, we would suggest, circumvent

21  the law here on the right of distribution simply because of a

22  step that they decided not to take.  So on that basis, we

23  believe there is no, again, reliable basis to infer this step

24  occurred.

25          And then finally on this, the accuracy of this match

99

1    depends on the accuracy of the match in the step two where

2    there was no evidence of the works being lodged in the Audible

3    Magic library.  There's an inadmissible summary.  There's a --

4    it was done after the fact.  There's missing data from before

5    2015.  And the evidence packages were asserted without waiting

6    for the verification.

7           So we believe, Your Honor, that the plaintiffs, in

8    essence, would like the Court to take their word for the

9    underlying foundation.  But given what's at stake here,

10   Your Honor, I would -- we would urge you not to do that.

11          I do want to turn now to the vicarious infringement

12   argument on direct financial benefit.  As to the vicarious

13   infringement claim, our brief addresses so much of the issues

14   that I will not repeat here as to the right and the ability to

15   control the infringing activity.

16          What we think the Court can determine as a matter of

17   law on summary judgment, and what we think is -- we submit is

18   dispositive is that there is no direct financial benefit.

19          The main issue here, as has been articulated, is

20   whether plaintiffs have proved that Cox subscribers were drawn

21   to its service because of the infringing activity alleged in

22   the case.  There is no evidence, Your Honor -- we would submit

23   that there's no evidence in the record of this.

24          Plaintiffs have not produced -- they have not

25   produced evidence of a link between the specific infringements

100

1    at issue, the specific infringements at issue and a financial

2    benefit conferred on Cox.

3            Ellison, despite the argument that you just heard, we

4    would submit, is highly instructive here.  This is not some

5    outlier AOL single infringer case.  This case, Ellison has been

6    relied on by some 600 federal district courts and circuit

7    courts from and after the time that it -- that holding was

8    announced.  It is instructive here and it holds that fixed

9    payments do not satisfy this requirement.

10           And the only exception, the only exception to this

11   general rule is where providing access to the infringing

12   material is a draw to the customers.

13           Plaintiffs have not come forward with any evidence

14   that subscribers were drawn to Cox's service so that they could

15   infringe plaintiffs' works.

16           The plaintiffs argue, and I won't belabor the

17   argument regarding Dr. Lehr, but they argue that Dr. Lehr has

18   shown that Cox's service was a draw because Cox subscribers who

19   received a number of notice -- a larger number of notices on

20   average, paid Cox a few dollars more a month than subscribers

21   who received only a few notices.

22           We would submit for purposes of summary judgment,

23   Your Honor, that this analysis is both irrelevant and wrong for

24   two reasons.  First, Lehr did not limit his analysis to

25   subscribers who received notices regarding plaintiffs' works.

1  It went far beyond that.

2         And then secondly, it is undisputed that Cox did not

3  charge any overage fees during the claims period.  There is no

4  evidence that higher-paying subscribers chose Cox or chose more

5  expensive data plans in order to illegally access the

6  plaintiffs' work.

7         Plaintiffs' failure, we submit, Your Honor, to come

8  forward with this evidence is really the end of the inquiry

9  under Ellison.  Their only response is to urge this Court to

10  disregard Ellison and all of the courts adopting its reasoning,

11  and to hold that a defendant is vicariously liable if it

12  receives multiple e-mails from a copyright owner.  That would

13  swallow the rule.

14         And we heard something else just a little while ago

15  having to do with these e-mails, which will be the subject of a

16  motion in limine and potentially at trial.  These e-mails have

17  nothing to do with the specific works at issue.  To the extent

18  they come into the case, and for whatever reasons they want to

19  tag Cox with, they don't relate to the works in this particular

20  case.

21         I would also note, and I think Mr. Buchanan may have

22  made reference to this, that BMG had even more evidence than

23  plaintiffs do here because they presented an expert survey

24  showing that at least some small portion of Cox subscribers

25  were attracted to the service for the supposed ability to

102

1    obtain free music.  And I think Your Honor permitted them to go

2    to trial on that, and we know what happened there.

3            But plaintiffs didn't even attempt to adduce that

4    evidence here.  We don't believe that -- we believe that

5    because plaintiffs cannot prove that Cox derived a direct

6    financial benefit due to the infringements in this case, the

7    Court should reject the plaintiffs' vicarious infringement

8    claim.

9            On contributory liability, I'm going to focus on the

10   actual knowledge element.  As both the publisher plaintiffs and

11   so much of the sound recording works in issue that were not the

12   subject of any MarkMonitor notice, we submit that those claims

13   should be decided in Cox's favor as a matter of law with

14   respect to contributory liability.

15           It is undisputed, Your Honor, that all of the notices

16   at issue sent by the RIAA or MarkMonitor on behalf of the

17   record label plaintiffs were sent only on their behalf and did

18   not refer to any music composition.  In fact, the RIAA was not

19   even authorized to send notices on behalf of the publishers,

20   and we have their testimony with regard to that.

21           And it is further undisputed, Your Honor, that

22   MarkMonitor notices identified only a portion, a relatively

23   small portion of the sound recordings at use -- at issue.  Yet

24   they attempt to hold Cox liable, would like to have the case go

25   to trial on some 10,000-plus works.

103

1            Here's how they attempt to get around the notice

2      issue.  They submit because the actual notice provides a

3      so-called -- let me get this right, "SHA-1 hash number," Cox

4      had the ability to divine that other works must have been in

5      the notice.

6            Respectfully, Your Honor, the convoluted way in which

7      one could figure out from this SHA-1 hash number defies

8      credulity.

9            Let's talk about how plaintiffs believe Cox could

10     have figured this out.  The first step, of course, is that Cox

11     receives a notice from MarkMonitor.  It has the title, it's got

12     the artist, it's got the file name, and it's got the hash type.

13     And despite the language in the notice that it identifies an

14     authorized copy of a copyrighted sound recording, and those --

15     that's a direct quote, and no other indication that the notice

16     merely identifies a representative work as they now claim, Cox

17     would have to assume that the notice actually gives notice of

18     the alleged additional works.

19            Cox would have to know the hash type information that

20     identified a torrent payload that may or may not contain other

21     of plaintiffs' works.  Cox would also have to know that you can

22     search for these torrent payloads by the hash type information.

23            And then after you do that, Your Honor, Cox would

24     then have to download a peer-to-peer file sharing program and

25     search for the hash type information to find the torrent

104

1    payload.

2            Then they would have to download the torrent payload

3    and then determine whether any of the sound recordings on the

4    payload belonged to the labeled plaintiffs.

5            And then, finally, Cox would have to -- separately

6    have to determine whether any of the music compositions

7    belonged to the publisher plaintiffs.

8            Respectfully, Your Honor, this is an

9    after-the-fact -- at least in our view, an after-the-fact

10   justification that should be seen really for what it is.

11   Which, I would submit, is a last-ditch effort by the plaintiffs

12   to avoid dismissal of contributory claims for the non-noticed

13   works.

14           Briefly on the business subscribers.  We submit that

15   the notices to the Cox business subscribers -- which, by the

16   way, Your Honor, it's about 25 percent of all of the notices in

17   this case.  So it's not an insignificant number of notices.  We

18   believe that they're insufficient as a matter of law to put Cox

19   on notice for contributory liability purposes.

20           Now, as Your Honor well knows, and I think we

21   discussed this in a different context, in the Fourth Circuit

22   BMG opinion, the Court held, "put another way, the proper

23   standard requires a defendant to have specific enough knowledge

24   of infringement that the defendant could do something about

25   it."

1          We would submit, in the case of business subscribers,

2    that Cox is simply not in a position or not situated to do

3    anything about a business subscriber as the relationship

4    between the actual commercial entity and actual infringer may

5    be attenuated at best.

6          We talked -- Mr. Oppenheim referenced the Cobbler

7    case.  Frankly, he agrees with the Cobbler case.  The problem

8    is that we believe it to be dispositive of the Cox business

9    customers.

10          And by the way, the Cox business customers, the vast

11    majority of those Cox business customers only received a

12    handful of notices, not the tens of thousands of notices that

13    were referenced earlier.

14          We believe the plaintiffs can, at most, show that the

15    alleged infringer signed onto a business network.  That they

16    are unable to pinpoint who accessed the potentially public

17    WiFi.  And is inconceivable how an ISP would be in a position

18    to do that.  We think that the claims for contributory

19    liability as it relates to the Cox business subscriber notices

20    should be dismissed.

21          Lastly, lastly, I realize we're getting on with the

22    day, and I'll be short on this, we're commenting on a couple of

23    points that were raised earlier, if I may.

24          Statutory damages 504(c)(1).  I think the statutory

25    damages argument that we're advancing for summary judgment is

106

1    fairly straightforward.  It's based completely, 100 percent on

2    the Copyright Act's language under Section 504(c)(1) and the

3    cases.  The MP3 Tunes case and the Capitol Records case.  And I

4    understand that they may want to try to get around them, but

5    it's based on established case precedent.

6          We believe that these authorities hold that if you

7    elect to recover statutory damages -- by the way, they weren't

8    forced to seek statutory damages, but they decided to do it.

9    Any parts of a compilation are merged into one work for

10   statutory damages purposes.

11         Now, the plaintiff labels here, Your Honor, chose to

12   register some 6,777 of the works in suit as albums, which falls

13   into the Copyright Act's definition of a compilation, which --

14   for which one statutory damage award is allowed.

15         Even more, Your Honor, as we argue, these albums were

16   registered as a works -- as works for hire.  Which is only

17   available when all of the sound recordings covered by the

18   registration are part of the compilation.  And the copyright

19   statute, as Your Honor knows, there are specifically delineated

20   areas where you can even claim work for hire.  It would have to

21   be either, in this case, for a sound recording, either a

22   collective or a compilation.  Collective is considered to be a

23   compilation under the definitional section.

24         There's no dispute here that the 6,777 works were

25   registered as works for hire on 1,158 registrations.

107

1  Therefore, only predictable as compilations.

2        We believe a straightforward reading of 504(c)

3  mandates that plaintiffs -- if they're successful here, would

4  be entitled to, at most, 1,158 awards.

5        As it relates to the argument the plaintiffs should

6  recover twice, two times for the 2,556 of the music

7  compositions in suit that are also embodied in the sound

8  recordings, again, 504(c)(1) plainly precludes multiple damages

9  awards.  That's MP3 Tunes.  That's Capitol Records.  Their

10 novel and tortured reading of Section 504(c) should be

11 rejected.  There's no support for plaintiffs' claim that there

12 is a distinction between single and plural copyright owners.

13       And before I conclude, I just want to make sure that

14 I address some of the comments for efficiency purposes that

15 have been made, and I'll do it very briefly before I sum up.

16       Mr. Oppenheim made a reference to Section -- to '431,

17 that there's a foundation for it.  We don't think there's a

18 foundation for it based on 1006 issue.

19       He talks about the Audible Magic sheet as no longer

20 being in the case based on the struck affidavit.  Your Honor,

21 we certainly intend to -- if this goes to trial, to discredit

22 that the '431 spreadsheet, by using that.

23       The handshake issue we've addressed.  On the analogy

24 that was raised, the teacher analogy about the term paper, I

25 think a better analogy with respect to whether the term paper

1    should be considered to be the same is not whether the --

2    everything was plagiarized, but whether or not the font and the

3    style and the number of pages and the attributes as opposed to

4    the actual content itself, because you can't tell that from the

5    hash evidence.

6            Finally, Your Honor, with regard to the ownership

7    issues on the testimony.  There is this concept of best

8    evidence.  And I'm not suggesting that there can't be

9    testimony, but where they have actual evidence and they don't

10   turn it over, I question whether or not they've actually met

11   that standard.

12           So, finally, Your Honor, we submit that the case

13   should be disposed of at this stage as the plaintiffs cannot

14   show any of the underlying infringement for the foundational

15   reasons that I attempted to argue.

16           The worst case, it should be stripped down at

17   trial -- for trial to -- simply for the sound recordings that

18   were the subject of actual notices by the relevant label

19   plaintiffs on a contributory liability claim for residential

20   customers where the statutory damages awards per work include

21   all of their constituent and derivative parts.

22           Thank you.

23           THE COURT:  All right.  Thank you, Mr. Elkin.

24           Yes, sir.

25           MR. OPPENHEIM:  Thank you, Your Honor.

109

1            I often find these arguments sometimes aren't useful,

2    but actually I find -- I found Mr. Elkin's argument to be very

3    useful because as I tick through the issues that he went

4    through, I think it makes clear that the plaintiffs' evidence

5    here is a clear basis for the grant of summary judgment on

6    liability.

7            His -- the PowerPoint presentation he put forward is

8    fundamentally, as he described it, a presentation that

9    plaintiffs have not put forward foundational evidence to

10   support their claims.

11           Your Honor, I don't have an extra copy of it, but it

12   was submitted as part of our summary judgment papers, it's

13   Document 325-6, the declaration of Sam Bahun.  I used to say

14   Bahun, I've been corrected.  For purposes of the court

15   reporter, it's Bahun.  And this declaration, Your Honor,

16   couldn't lay a clearer foundation.

17           Mr. Bahun, who is a senior representative at

18   MarkMonitor, he's been there for years, describes the

19   MarkMonitor process that was used to gather evidence and to

20   send notices.  And after he goes through describing it, he then

21   has -- starting on page 7, he goes through the evidence to

22   support or that was generated as a result of the process.

23           So he has a section, infringement notice, and he

24   describes PX 538 and the plaintiffs' number, and what it is,

25   and the foundation for it.  He provides a section on notice

1    data, PX 13, PX 14, and he describes the basis for it.

2           Now, Mr. Elkin focused in particular on the spread --

3    the famous '431 spreadsheet, PX 11.  Well, Mr. Bahun describes

4    it.  He explains exactly what it is.  It's an Excel file with

5    47,445 records of digital audio files that, as per the process,

6    described ...  And he explains what it is.  And he explains

7    that the data was extracted from the MarkMonitor database and

8    produced.

9           There's a section on audio files, PX 39, and he

10   describes that.

11          There's a section on download data, PX 16, and he

12   describes that.

13          And last but not least, a section on case packages.

14   Individual cases, 175,968 different evidence packages collected

15   from the infringement by Cox's subscribers between January 2013

16   and March 31, 2015, and he describes that.

17          There is clearly a foundation for all of the evidence

18   we've put forward in support of our motion for summary

19   judgment.  So to the extent that we take Mr. Elkin at his word

20   that their issue with respect to direct infringement is a lack

21   of foundation, we've addressed that.

22          Now, the other issue that Mr. Elkin raised is he

23   claimed that the MarkMonitor data is a 1006 summary.  This is

24   an argument that I find interesting because he cites the Branch

25   case.  I don't think Mr. Elkin has read the Branch case,

111

1   because what the <u>Branch</u> case says is, "courts have consistently

2   held that evidence that has been compiled from a computer

3   database is also admissible as a business record."

4          It goes on later citing another case and says,

5   "producing limited data from a larger database is more akin to

6   reviewing a set of documents in response to a discovery request

7   and production -- producing only responsive documents than it

8   is creating a new data compilation or documents for the

9   purposes of litigation."

10         When MarkMonitor produced that spreadsheet, Your

11  Honor, if I gave it to you in totality, and it really was a

12  summary, it would be the world's worst summary because it's

13  massive.  And it's -- you've got to have a Sam Bahun to explain

14  it to you, which we do.  If that's a summary, it's the world's

15  worst summary.  It's -- all it is is an extract of data from

16  the MarkMonitor database.

17         Now, Mr. Elkin complains, well, it was created during

18  the litigation.  Well, yeah, they asked for information in

19  discovery.  So we pulled the information out of the server.

20  Not a surprise that it's dated when it's dated.

21         So their issues on 1006, just -- it's not there.  If

22  we were going to create a summary, Your Honor, and we probably

23  will have to for some kind of demonstrative for trial, it will

24  be a true summary.

25         Mr. Elkin pointed to the fact that there was what he

112

1   called simultaneous evidence collection.  And he's right, but

2   he's wrong.  And this is just a detail of how the MarkMonitor

3   system worked.  So while it was -- when MarkMonitor found a

4   file that it thought was infringing, while it downloaded that

5   and it sent it off to Audible Magic, MarkMonitor continued to

6   collect evidence about everybody who was distributing that file

7   before it had the confirmation from Audible Magic.

8           Now, it wouldn't do anything with any of that data

9   collection until there was a confirmation from MarkMonitor --

10  or, excuse me, from Audible Magic.  If there wasn't a

11  confirmation, it would discard it because it wasn't an

12  infringing file.

13          So the fact that the confirmation happened

14  simultaneously doesn't in some way make the evidence impure or

15  wrong.  It's just how the computers worked.

16          Mr. Elkin referred to the Stroz Friedberg audit.

17  It's an audit done in the context of CAS, which has no place in

18  this case and is the subject of a motion in limine.  But if it

19  is and we look at the Stroz Friedberg audit, it is an A-plus,

20  double-checked, smiley face report card of MarkMonitor.  It

21  couldn't have been a better report.  And I would ask that the

22  Court, if it is going to consider it, read it and not take

23  Mr. Elkin's word for what it says.

24          On the issue of vicarious infringement, Your Honor.

25  Mr. Elkin referred to Ellison and said, well, of course, it's

113

1    good law, it's been relied on by 600 courts.  I can't tell you

2    the number of times I've heard Mr. Elkin over the years talk

3    about the Sony Betamax case, including in the BMG appeal.  And

4    that was relied on by many, many courts, as he put it, for his

5    articulation of the Sony Betamax case for years until the

6    Supreme Court said, no, no, no, that articulation of Sony

7    Betamax is wrong in the Grokster case.

8              So just because other courts have cited to it doesn't

9    mean that its application in this case should be looked at

10   without regard to the facts.  The facts in this case are clear.

11             So we put forward three pieces of evidence in

12   support -- or three types of evidence in support of financial

13   benefit.  One I spoke about at length earlier, and that was the

14   fees that were collected from known infringers.  Right?  Which

15   is akin to saying, I'll let you keep infringing if you pay me.

16   That's a direct financial benefit.  And I think that it gets

17   past Ellison easily.

18             But there were two other types of evidence that we

19   put before the Court.  And that is, one, Dr. Lehr's study shows

20   that Cox was making more money from heavy infringers, and

21   that's a financial benefit.

22             And, three, we did put forward an argument for draw.

23   Now, Mr. Elkin and Mr. Buchanan said, well, we didn't put

24   forward a study like was done in the BMG case.  And that's

25   true, we did not put forward a study.  A study is not

114

1    necessary.

2           If you look at Fonovisa, which is the first draw

3    case, the Ninth Circuit concluded there was a draw based on its

4    review of the evidence and simply saying, of course people were

5    coming to the swap meet for the infringing recordings.

6           And here, of course these subscribers were staying

7    with Cox because they knew that they could continue to infringe

8    on the network without Cox doing anything because they had a

9    sham set of policies with respect to copyright infringement.

10          On the contributory infringement issue, Your Honor,

11   Mr. Elkin went in detail talking about how Cox -- how hard it

12   would have been for Cox to figure out all of the works that

13   were being addressed in each notice.  But Mr. Elkin didn't

14   answer the question of why Cox needed to know every work that

15   was the subject of the notice.  He didn't answer that because

16   Cox didn't care about that.

17          I mean, frankly, we all know that Cox really didn't

18   care about who was infringing either, but they had to facially

19   at least give the appearance that they did.  But certainly as

20   to the infringing files, whether it was a musical composition,

21   it was a movie, it was a sound recording, it was a book, Cox

22   didn't care.  Its processes didn't care.  It can't now come

23   forward and say, oh, this mattered to Cox.  There is no

24   evidence that it mattered to Cox.

25          And certainly the Fourth Circuit doesn't require it.

1   And Mr. Elkin can't point to anything in the Fourth Circuit

2   opinion that says it had to be there.

3          The only thing that Cox needed in order to do

4   something about the infringement was to know who the infringers

5   were.  That they got, they got it in spades.  They capped it

6   and they blacklisted folks, but the evidence in the summary

7   judgment motion is clear, they got that.  They have knowledge.

8          So, Mr. Elkin can say, well, SHA-1, what is that?  We

9   couldn't figure it out.  That's not the point.

10         And, in fact, what has been lost in the discussion is

11  the restraint that the music industry has exercised in this

12  case.  We could have sued on every single work we ever found.

13  We didn't.  We sued on only those recordings that were

14  infringed by Cox subscribers who had been the subject of two or

15  more notices after that second notice.  We exercised restraint.

16  We didn't simply sue on everything we could.

17         With respect to the business subscriber issue, Your

18  Honor, I think I addressed the Cobbler decision at some length.

19  To be clear, just so the record is clear, I agree with the

20  Ninth Circuit's finding on secondary liability in that case.

21  The direct infringement I don't think we need to speak to here.

22         But what Mr. Elkin raised was an issue outside of

23  Cobbler.  And that is to say that under the Fourth Circuit BMG

24  decision, the requirement that they get enough knowledge to do

25  something about it, that with respect to business subscribers,

1    that's not the case.  But that's not true.  Of course they

2    could do something about it.  They are their subscribers.  Some

3    of these subscribers -- I mean, they want to say, oh, yeah, it

4    was an ISP in Oklahoma.

5         Yeah, it was also a fraternity house.  It was also

6    the gas station that has two people working at it.  Right?  So

7    they can call them business subscribers and say that they

8    should have a license to infringe, but the law can't allow

9    that.

10         I'm going to allow my colleague, Mr. Zebrak, to

11   briefly address the copyright issues with respect to damages.

12   But one last issue which I didn't touch on in my initial

13   argument, and that is the one -- the affirmative defense of

14   mitigation.  And you asked earlier, Your Honor, for me to

15   address only those things that were somewhat different than

16   BMG, and I know I have violated that, but here I actually think

17   this is different.

18         Mitigation in the context of statutory damages is

19   a -- if anything, a factor that can be considered in statutory

20   damages.  It's not an affirmative defense.  It's not worthy --

21   I mean, we're not at jury instructions, we'll talk about it

22   later.  But it's not as though mitigation gets a separate,

23   special jury instruction or special defense.

24         In a statutory damages case, they can argue

25   mitigation as one of the many factors in statutory damages.

117

1    But it's not -- in a statutory damages case, it is not an

2    affirmative defense, Your Honor.

3              With that, I will leave it to Mr. Zebrak.

4              THE COURT:  All right.

5              MR. ZEBRAK:  Thank you, Your Honor.  Very briefly, I

6    would like to briefly address each of the pair of arguments

7    that Cox raised with respect to statutory damages.

8              THE COURT:  Go ahead.

9              MR. ZEBRAK:  The first argument is what by shorthand

10   we reference as the album/track argument that they make.  Which

11   is that if multiple tracks were ever on the same album and they

12   are in this case, that means there is only one award of

13   statutory damages.

14             Quite frankly, Your Honor, this is not a serious

15   argument.  And in a tell of how insubstantial the argument is,

16   Cox in its initial briefing and then again here today didn't

17   brief Your Honor on what the law or the facts are.

18             THE COURT:  Well, Mr. Elkin cited the MP3 case and a

19   second case, right?

20             MR. ZEBRAK:  Sure.  But by that let me explain what I

21   mean.  So, first of all, in the BMG case Your Honor recognized

22   correctly that nothing in the Copyright Act bars a plaintiff

23   from recovering a statutory damage award for a sound recording

24   issued as an individual track simply because that plaintiff at

25   some point in time also included that sound recording as part

118

1   of an album or other compilation.

2          THE COURT:  Right.  The duplication argument.  Go

3   ahead.

4          MR. ZEBRAK:  Right.  But that was not in Cox's

5   initial papers or its argument today.  And I wished to bring it

6   before the Court because Your Honor wasn't the first court to

7   reach that correct result, nor the last court since.

8          The very MP3 Tunes case they rely on from the Second

9   Circuit reaches the same result that Your Honor did, as did the

10  LimeWire case in New York as well.  And the reason for that is

11  that what constitutes a work is different than registration.

12  Registration, you know, there are all sorts of different ways

13  that works are protected by registrations.  And Cox tries to

14  conflate the two.

15         And Your Honor and other courts, including the Second

16  Circuit, have correctly recognized that where a work is

17  separately distributed as a track, not just as part of an

18  album, separate statutory damage awards are appropriate.

19         Now, rather than address that head on today or in its

20  briefing, Cox ignored it.  And instead focuses on what some

21  other courts look to, which is whether a work has independent

22  economic value.

23         Now, we pointed out that these works do have

24  independent economic value, but that's not the sole basis for

25  our argument.  It's the fact that these tracks and these

119

1    compositions -- well, their argument applies with respect to

2    sound recordings.  But the point, Your Honor, is that these

3    sound recordings have been commercialized individually.  Now,

4    that's the evidence of the case.  We put in detailed

5    declarations to that effect.

6           Now, if there wasn't deposition testimony about it,

7    it's because Cox didn't choose to focus on that.  Winston &

8    Strawn is well aware that in the digital age these tracks have

9    been commercialized individually.  And there is a number of

10   courts that have essentially said that a per-track award is

11   appropriate on this ground.

12          And it's not just our testimonial evidence, which is

13   not -- though they address this just in a footnote in their

14   reply brief, we have multiple paragraphs from our declarants in

15   our opposition to their summary judgment motion explaining that

16   these were commercialized individually.

17          So let me move to the second of the pair of

18   arguments.  I know time is tight.

19          Mr. Elkin referred to our arguments as tortured and

20   largely dismissed them, but notably without addressing them,

21   Your Honor.  And that I think is reflective of the fact that

22   our argument, we believe, is a plain reading of the statutory

23   text and actually one that, though Cox asks this Court to sort

24   of blindly follow the Second Circuit's non-dispositive

25   decision, the Second Circuit didn't address our argument

120

1    either.  Which is that the plain statutory text indicates in

2    the singular, the copyright owner makes an election.

3            And we think the plain reading of the statute is that

4    the all parts of a derivative work or one work limitation only

5    applies where it's a single owner that owns the derivative work

6    and the underlying work.  And I will explain why.

7            First of all, Congress obviously knows how to write

8    in the singular or the plural.  And five times in section 504

9    it uses the singular.

10           Now, it's not just that.  I noticed this earlier

11   today, but actually in 504(b) it's not just the singular or

12   referring to the infringer, but it refers to him or her.  Which

13   is further reenforcing that we're talking about a singular

14   here.  It's hard to pluralize him or her with just the addition

15   of an "s."

16           Now, when we made this argument, Cox has never cited

17   a court that rejects our argument.  Instead, it cites 1 U.S.C.

18   1, which says, unless the context indicates otherwise, words

19   can be pluralized or from pluralized made to the singular in

20   interpreting a statute.

21           Now, we submit, Your Honor, that the context clearly

22   indicates otherwise.  It's not -- you know, the context might

23   not indicate otherwise if there was an interchangeable use of

24   singular or not, but it used it five times.  So that's the

25   first thing.

1          The second point, Your Honor, is that to pluralize

2     "copyright owner" here gives it a very different meaning.  Now,

3     I understand pluralizing a word, if it just allows for various

4     permutations of the same meaning, but it is a clearly different

5     meaning if in a case like this, when two works are independent

6     -- two works have been infringed, we get one award, that's a

7     very different meaning and not one that we think should just be

8     shooed under the rug based on a statutory provision that says

9     that you have to pay attention to whether the context indicates

10    otherwise.

11          And the third reason why the context indicates

12    otherwise, Your Honor, is something that Judge Rakoff

13    recognized in the TV Tunes decision that we cite in our papers

14    that the MP3 Tunes case disagreed with.  Cox refers to our

15    argument in this regard as a policy argument.  It's not a

16    policy argument.  It's an argument for why the context

17    indicates otherwise.

18          And it's as follows.  The statutory damage provision

19    talks about this election being made and all parts of a

20    derivative work being one work for statutory damage purposes.

21    It talks about it in the context of a single action.  Cox

22    acknowledges that we could avoid the draconian anti-copyright

23    results that totally stifles the ability of a copyright owner's

24    incentive to create, and all the fundamental logic behind the

25    Copyright Act, that draconian result that they advocate for

122

1    here, we could avoid that result by bringing separate cases.

2    This is the absurdity that Judge Rakoff pointed out.

3            Now, if Congress intended for something like -- well,

4    first of all, Congress wouldn't -- why would Congress intend

5    for a result that you could separately obtain awards that you

6    couldn't obtain in a single case?  It's anti-judicial

7    efficiency.  It stifles peoples' ability to protect their

8    works.  There is a million reasons why.

9            So for those reasons, we argue that our plain text

10   reading is -- ought not to be dismissed as a tortured reading.

11   It is a correct one, notwithstanding that the Second Circuit

12   didn't address this issue.

13           And, quite frankly, the Second Circuit, what it did,

14   it laid out the statutory provisions.  Then what it did, it

15   proceeded to cite a treatise, Patry, which simply cited the

16   derivative work provision.  And then it cites legislative

17   history.

18           And Your Honor is well aware about the utility of

19   legislative history in a matter like this.  And the legislative

20   history is sparse, there is not much there.  And to the extent,

21   you know, one looks at the legislative history -- and we don't

22   think you need to because the plain text, as the rules of

23   construction command, we think is in our favor.  Especially in

24   our favor when you recognize that it is an obligation of

25   construction to give meaning to each of the disparate language,

1    and ours is the only one that does that.

2           But if you look at the legislative history, what we

3    think is much more likely is that what Congress had in mind was

4    some scenario where -- and I'm speculating, obviously -- is a

5    scenario where you have, you know, a software company that

6    maybe has three versions of a piece of software, and they own

7    the work and the various components in it.

8           There is no indication that Congress had in mind

9    owners of different types of works, let alone sound recordings

10   and musical works.  And we think, again, you don't even need to

11   look at that because the statute is clear.

12          Thank you.

13          THE COURT:  Thank you.

14          MR. ELKIN:  Your Honor, may I have 60 seconds?

15          THE COURT:  You may have three minutes.

16          MR. ELKIN:  All right, thank you.  I'll try to make

17   good use of it.

18          First of all, shockingly, I actually did read the

19   Branch case.

20          THE COURT:  Yeah, I --

21          MR. ELKIN:  And I can tell you that the Branch case

22   confirms that even if spreadsheets qualify as business records,

23   such business records are inadmissible if they are summaries

24   under FRE 1006 and the underlying data is not made available.

25          And the Sprint Nextel case also confirms, as it

124

1    relates to business records, that if spreadsheets are created

2    in anticipation of litigation, and obviously it was here, which

3    select and interpret data, they're not business records.

4           The Fonovisa case is a very important case, but it

5    doesn't focus on direct financial benefit.  It focuses on the

6    ability to supervise.  I would commend that to the Court's

7    attention.

8           The issue on failure to mitigate and not being a

9    defense.  Frankly, there's a lot of discussion and there's some

10   circuits that go one way, there are some circuits that go

11   another.  There's a Fifth Circuit case that just got argued,

12   we're waiting for a decision on that particular case.  But to

13   suggest that somehow it's part of the Petrella bar is a bridge

14   too far.

15          With regard to the TV Tunes case and Judge Rakoff,

16   happily or unhappily, I was the lead trial attorney in that

17   case in 2001.  I made that argument successfully.  The

18   MP3 Tunes case in the 2nd Circuit overruled that decision.  So

19   there was a lot of discussion about something that has been

20   overruled.

21          The last thing I'll mention before I sit down, and

22   thank you, Your Honor, for your time and indulgence, is the

23   notion that the BMG case before you was about music

24   compositions.  It wasn't about sound recordings that were part

25   of or derived out of the music compositions.  We're comparing

125

1    apples to pears.

2                Thank you very much.

3                THE COURT:  All right.  All right.  Well, thank you

4    for your argument today, and it's helped moved our education

5    along.  And I'm not going to be making any rulings tomorrow.

6                I see maybe more than I appreciated before today that

7    the motions in limine are intertwined in a lot of the issues

8    that remain outstanding.  You know, we'll start moving and

9    trying to make decisions on ones we think we can do safely.

10   We, obviously, have looked at it and saw a need to discuss some

11   of them and not a need to discuss others because the pleadings

12   were so complete.

13               So we'll continue to work on it.  We've got a hearing

14   on November 12 with the motions in limine.  Are they -- they're

15   not fully briefed yet?  Okay.  Then we'll -- they're on our

16   radar, but we're -- we'll wait until we get the -- well, we

17   won't wait until the brief -- when's the briefing complete?

18               MR. ZEBRAK:  I believe it's November 6, Your Honor.

19               THE COURT:  Good.  Well, then we have plenty of time

20   to -- well, how many of them are there total?

21               MR. ZEBRAK:  Well, the plaintiffs filed one omnibus

22   motion in limine that raises a number of separate issues in it

23   within 30 pages.  Cox has filed -- do you know the number?

24   Nine or 10.

25               THE COURT:  Okay.  All right.  Well, we'll get on it

1    sooner than later, and hopefully be prepared to hear argument

2    on that on the 12th.

3              Is there anything else we need to talk about tonight?

4              MR. OPPENHEIM:  Can I ask just a -- we're trying to

5    figure out logistics with witnesses for the trial.

6              THE COURT:  Yeah.

7              MR. OPPENHEIM:  Do you know, Your Honor, whether we

8    intend to sit on Fridays of -- or not at this point?

9              THE COURT:  So we've been talking about that a little

10   bit, and I'm probably going to put you all on the clock.  And I

11   think we talked about two weeks of trial testimony when we

12   were -- bless you.  When we -- or at least two weeks.  And I

13   think -- you know, I don't have anything else going on, except

14   for our holiday, which is about -- day four they'll be asking

15   about when are we going to be done because the holidays are

16   coming up.

17             So, you know, why don't you all see if you can work

18   together on how many days you think you each need.  I may do --

19   I may cut down my Friday dockets and start at 11:00 instead of

20   starting at 9:00.  But I think, given the holidays, we're going

21   to go on Fridays as well, unless something that really requires

22   my attention comes up.  So that's the plan.

23             MR. OPPENHEIM:  Very well.  And when you say put us

24   on the clock, you mean like a chess clock of time?

25             THE COURT:  Yeah.  You can each have four days, you

1    know, something like that.

2            MR. OPPENHEIM:  I thought we had actually said that

3    we --

4            THE COURT:  Yeah, gone farther than that?

5            MR. OPPENHEIM:  I thought we had concluded it was

6    going to take us three weeks total, but I'm not sure we had

7    settled on that.  But we'll discuss it, obviously, Your Honor.

8            THE COURT:  Yeah.

9            MR. OPPENHEIM:  And none of us want to be driving

10   into the holidays that far if we can avoid it.

11           THE COURT:  Yeah.  Well, keep -- you know, obviously,

12   a lot of repetition is not going to be permitted.  And you need

13   to -- and, you know, some of these rulings will help focus the

14   case.  And I realize you've got to wait for those before you

15   have your final trial strategy set.

16           So -- but keep looking at what you need versus what

17   you don't need.  All right.

18           MR. OPPENHEIM:  Very well.  Thank you, Your Honor.

19           THE COURT:  Okay.  All right.  Well, thank you all.

20           Have a good evening and we're in recess.

21   ------------------------------------------------

                          HEARING CONCLUDED

22

23           I certify that the foregoing is a true and
        accurate transcription of my stenographic notes.

24

25                  /s/  Norman B. Linnell
                Norman B. Linnell, RPR, CM, VCE, FCRR