**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

SONY MUSIC ENTERTAINMENT, *et al.*,

      Plaintiffs,

v.

COX COMMUNICATIONS, INC., *et al.*,

      Defendants.

Case No. 1:18-cv-00950-LO-JFA

<u>**PLAINTIFFS' OMNIBUS MEMORANDUM IN OPPOSITION TO**</u>
<u>**COX'S MOTIONS IN LIMINE NUMBERS 1–10**</u>

# TABLE OF CONTENTS

**I.     THERE IS NO MERIT TO COX'S MIL NO. 1 (ECF NO. 471)** ................................. 1

   A.   Plaintiffs Do Not Seek To Introduce Evidence Of The Court's Findings Or
        Judgments In *BMG* ............................................................................................... 1

   B.   Cox's Deposition And Trial Testimony In *BMG* Are Admissible ....................... 1

        1.   The *BMG* Testimony Of Beck, Cadenhead, Carothers, Negretti, Sikes, Trickey,
             Vredenburg, And Zabek Are Party Admissions Under Fed. R. Evid. 801(D)(2) .......... 2

        2.   The *BMG* Testimony Of Basquin, Beck, Cadenhead, Carothers, Negretti,
             Sikes, Trickey, And Zabek Are Admissible As Former Testimony Under
             Fed. R. Evid. 804 ................................................................................................ 3

**II.    THERE IS NO MERIT TO COX'S MIL NO. 2 (ECF NO. 474)** ................................. 4

   A.   The Third-Party Infringement Notices Cox Seeks To Preclude Are Relevant ................... 5

   B.   None Of Cox's Other Reasons For Preclusion Hold Water ................................. 8

**III.   THERE IS NO MERIT TO COX'S MIL NO. 3 (ECF NO. 478)** ................................. 9

   A.   Cox's Internal Emails Are Highly Relevant. ...................................................... 10

   B.   Cox's Emails Are Not Improper Propensity Evidence Nor Unfairly Prejudicial. ............ 12

**IV.    THERE IS NO MERIT TO COX'S MIL NO. 4 (ECF NO. 482)** ............................... 13

   A.   All Revenue And Profit That Cox Earned From The Infringing Subscribers At Issue
        Is Relevant. ........................................................................................................ 14

        1.   Relevance To Cox's Economic Incentive To Tolerate The Infringement At Issue ..... 14

        2.   Relevance To Statutory Damages, Including Cox's Profits And The Need For
             Deterrence ........................................................................................................ 16

   B.   Cox's Business Strategy Depends ██████████████████████████████
        ███████████████████████████████████████████████████████████
        █████████ .......................................................................................... 17

   C.   Evidence Relating To Plaintiffs' Harm From Infringement, Including That Such Harm
        Cannot Be Quantified, Is Critically Relevant To Statutory Damages. ............................ 18

   D.   No Discovery Misconduct Took Place To Justify Precluding Testimony On
        MarkMonitor's Pulse Checks .............................................................................. 21

**V.     THERE IS NO MERIT TO COX'S MIL NO. 5 (ECF NO. 487)** ............................... 22

   A.   Plaintiffs Can Lay A Foundation For The Hard Drive ....................................... 22

B. Cox's Attorney Argument About The Hard Drive Is Hollow ........................................... 22

**VI.     THERE IS NO MERIT TO COX'S MIL NO. 6 (ECF NO. 490) ............................. 24**

A. The MarkMonitor Spreadsheet Is Admissible ................................................... 24

   1. General Background ........................................................................................ 24

   2. The MarkMonitor Spreadsheet Is A Business Record, Not A Rule 1006
      Summary ........................................................................................................ 25

B. Plaintiffs Should Be Allowed To Offer Testimony From MarkMonitor Witness
Sam Bahun That Is Relevant And Within His Personal Knowledge ............................... 28

**VII.    THERE IS NO MERIT TO COX'S MIL NO. 7 (ECF NO. 493) ............................. 30**

**VIII.   THERE IS NO MERIT TO COX'S MIL NO. 8 (ECF NO. 496) ............................. 30**

A. Cox Is Not The Arbiter Of What Is A "Live Issue" In The Case ...................................... 31

B. Cox's MIL No. 8 Is Not An Appropriate Means To Streamline Trial ............................. 32

**IX.     THERE IS NO MERIT TO COX'S MIL NO. 9 (ECF NO. 499) ............................. 34**

A. Cox's Terminations For Non-Payment Are Relevant On Several Fronts......................... 34

B. Cox Has Not Shown Unfair Prejudice Or Confusion ....................................................... 35

**X.      THERE IS NO MERIT TO COX'S MIL NO. 10 (ECF NO. 502) ........................... 36**

A. The Performance Evaluations And Separation Agreements Are Relevant ...................... 36

B. Cox Has Not Shown Unfair Prejudice Or Jury Confusion ............................................... 38

# TABLE OF AUTHORITIES

## CASES

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ........................................................................... 20

*Aldridge v. Lake Cty. Sheriff's Office*,
No. 11-CV-3041, 2012 WL 3023340 (N.D. Ill. July 24, 2012)................................. 29

*Arista Records, Inc. v. Usenet.com, Inc.*,
633 F. Supp.2d 124 (S.D.N.Y. 2009) ...................................................................... 35

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
758 F. Supp. 1522 (S.D.N.Y. 1991) ....................................................................... 17

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
199 F. Supp. 3d 958 (E.D. Va. 2016),
*aff'd in part, rev'd in part,* 881 F.3d 293 (4th Cir. 2018)...................................... 32, 35

*Branch v. Government Employees Insurance Company*,
286 F. Supp. 3d 771 (E.D. Va. 2017) ...................................................................... 26

*Cox Communications, Inc., et al v. MarkMonitor, Inc.*,
Case No. 3:19-mc-80050-SK, ECF No. 28 (N.D. Cal. April 25, 2019) ...................... 29

*Health Alliance Network, Inc. v. Cont'l Cas. Co.*,
245 F.R.D. 121 (S.D.N.Y. 2007) ........................................................................... 27

*James River Mgmt. Co. v. Kehoe*,
No. 3:09-CV-387, 2010 WL 431477 (E.D. Va. Feb 5, 2010) ................................... 15

*Lowry's Reports, Inc. v. Legg Mason, Inc.*,
302 F. Supp. 2d 455 (D. Md. 2004) ....................................................................... 17

*Midfirst Bank, SSB v. C.W. Haynes & Co.*,
893 F. Supp. 1304 (D.S.C. 1994) *aff'd,* 87 F.3d 1308 (4th Cir. 1996) ...................... 27

*Mullen v. Princess Anne Volunteer Fire Co.*,
853 F.2d 1130 (4th Cir. 1988) ............................................................................... 13

*Pinkney v. Winn-Dixie Stores, Inc.*,
No. 14-CV-075, 2014 WL 7272551 (S.D. Ga. Dec. 17, 2014) ................................ 2, 3

*Psihoyos v. John Wiley & Sons, Inc.*,
Civ. No. 11-CV-1416 JPO, 2012 WL 5506121 (S.D.N.Y. Nov. 7, 2012),
*aff'd,* 748 F.3d 120 (2d Cir. 2014) ......................................................................... 17

*QBE Ins. Corp. v. Jorda Enterprises, Inc.*,
277 F.R.D. 676 (S.D. Fla. 2012) ............................................................................... 29

*Rao v. Rodriguez*,
No. 14-CV-1936(NGG)(ST), 2017 WL 1753489 (E.D.N.Y. May 1, 2017) .................................. 2

*Sony BMG Music Entm't v. Tenenbaum*,
660 F.3d 487 (1st Cir. 2011) ................................................................................... 19

*Sprint Nextel Corporation v. Simple Cell Inc.*,
248 F. Supp. 3d 663 (D. Md. 2017) .......................................................................... 28

*U– Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*,
576 F.3d 1040 (9th Cir. 2009) ................................................................................. 26

*United States v. Channon*,
881 F.3d 806 (10th Cir. 2018),
*cert. denied*, 139 S. Ct. 137, 202 L. Ed. 2d 85 (2018) ...................................................... 26

*United States v. Fujii*,
301 F.3d 535 (7th Cir. 2002) .................................................................................. 26

*United States v. Morley*,
199 F.3d 129 (3d Cir.1999) .................................................................................... 12

*United States v. Queen*,
132 F.3d 991 (4th Cir. 1997) .................................................................................. 12

*United States v. Williams*,
445 F.3d 724 (4th Cir. 2006) .................................................................................. 13

*Witcher v. Bayer Cropscience USA LP*,
No. 2:06-CV-947, 2008 WL 7137185 (S.D. W.Va Apr. 14, 2008) ............................................ 2

**RULES**

Fed. R. Civ. P. 32 ............................................................................................. 1, 2

Fed. R. Civ. P. 45 ............................................................................................... 3

Fed. R. Evid. 1001 ............................................................................................. 25

Fed. R. Evid. 1006 ..................................................................................... 24, 25, 26

Fed. R. Evid. 403 .............................................................................................. 1, 2

Fed. R. Evid. 702 ............................................................................................... 16

Fed. R. Evid. 801 ............................................................................................. 1, 2, 3

Fed. R. Evid. 803 ................................................................................................................. 24, 26

Fed. R. Evid. 804 ................................................................................................................. 1, 2, 3

Cox raises one baseless argument after another in its ten motions in limine. Cox's memoranda alone span 85 pages of briefing and address well more than ten separate categories of evidence. Cox's strategy is apparently to throw in the kitchen sink, in the hopes that the Court will be inclined to grant at least something. Its arguments are meritless and should all be rejected.

## I.   There Is No Merit To Cox's MIL No. 1 (ECF No. 471)

### A. Plaintiffs Do Not Seek To Introduce Evidence Of The Court's Findings Or Judgments In *BMG*

In MIL No. 1, Cox unnecessarily seeks to preclude Plaintiffs from offering this Court's findings and judgments in *BMG* into evidence at trial. (ECF No. 472 at 2–3, 6–8.) Plaintiffs have no intention of offering as evidence the fact that the Court already determined x, y, or z. However, for the reasons explained in Plaintiffs' omnibus motion in limine, the factual findings that underlay the Court's summary judgment ruling are established as a matter of law. (ECF No. 476, at Section I.) Collateral estoppel precludes Cox from attempting to contradict or relitigate those undisputed facts. *Id.* Plaintiffs, of course, reserve the right to introduce evidence and argument concerning the Court's findings and judgments in the *BMG* case if Cox somehow opens the door to it at trial. Plaintiffs likewise reserve the right to seek a preliminary jury instruction detailing certain undisputed facts that the jury must accept as true. Though many such facts come from judicial rulings, a preliminary instruction on this point need not state that.

### B. Cox's Deposition And Trial Testimony In *BMG* Are Admissible

Cox also seeks to exclude, under Fed. R. Civ. P. 32(a)(8) and Fed. R. Evid. 403, deposition testimony of Cox's witnesses taken in the *BMG* action that Plaintiffs designated in their opening designations. (ECF No. 358.) Neither argument has merit. Cox ignores that all of the *BMG* designations it seeks to exclude are admissible under the Federal Rules of Evidence as party admissions under Fed. R. Evid. 801(d)(2), former testimony under Fed. R. Evid. 804(b)(1), or

both.   And Cox's speculative concern that Plaintiffs will introduce duplicative or cumulative testimony is a red herring; Plaintiffs have no intention of doing so.[1]

To reach the result it desires, Cox misleadingly relies on excerpted portions of Fed. R. Civ. P. 32(a)(8).  In full, Rule 32(a)(8) provides:

> A deposition lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action.  *A deposition previously taken may also be used as allowed by the Federal Rules of Evidence.*

Fed. R. Civ. P. 32(a)(8) (emphasis added).  Cox self-servingly omits the critical last sentence that dooms its motion.[2]

### 1.   The *BMG* Testimony Of Beck, Cadenhead, Carothers, Negretti, Sikes, Trickey, Vredenburg, And Zabek Are Party Admissions Under Fed. R. Evid. 801(d)(2)

The *BMG* testimony of Brent Beck, Matthew Carothers, Sidd Negretti, Joseph Sikes, Roger Vredenburg, Jason Zabek and Linda Trickey are all admissible as party admissions under Fed. R. Evid. 801(d)(2)(D).  A statement is not hearsay if it is "offered against an opposing party" and the statement "was made by the party's agent or employee on a matter within the scope of that

---

[1] Cox has had the opportunity to object to specific designations.  Given the volume of Cox's objections, it has well taken advantage of this opportunity.  *See* ECF No. 429.  Plaintiffs have no intention of wasting the Court or the jury's time with duplicative designations at trial.

[2] A case that Cox cites, *Witcher v. Bayer Cropscience USA LP*, makes clear that prior deposition testimony is admissible if it complies with the requirements of Fed. R. Civ. P. 32 *or* if it complies with the Federal Rules of Evidence.  No. 2:06-CV-947, 2008 WL 7137185, at *9-10 (S.D. W.Va. Apr. 14, 2008).  *Witcher* does not support Cox's request.  The objecting party there "had no opportunity to develop his testimony by cross examination or otherwise," whereas Cox had ample opportunity to do so in the *BMG* case.  *Id.; see also Pinkney v. Winn-Dixie Stores, Inc.*, No. 14-CV-075, 2014 WL 7272551, at *2 (S.D. Ga. Dec. 17, 2014) (denying motion to strike deposition testimony taken in prior matter because deponent's testimony was party admission under Fed. R. Evid. 801(d)(2)); *Rao v. Rodriguez*, No. 14-CV-1936 (NGG)(ST), 2017 WL 1753489, at *3 (E.D.N.Y. May 1, 2017) (admitting deposition testimony taken in prior matter as former testimony under Fed. R. Evid. 804(b)(1)).

relationship and while it existed." Fed. R. Evid. 801(d)(2)(D).  All of these witnesses were Cox employees when they testified in *BMG*.  There can also be no question that their testimony related to matters within the scope of their employment.  *See Pinkney*, 2014 WL 7272551, at *2.

The *BMG* deposition testimony of Messrs. Beck, Randall Cadenhead, Carothers, and Negretti, and Ms. Trickey, are also admissible as party admissions under Fed. R. Evid. 801(d)(2)(C).  A statement is not hearsay if "offered against an opposing party" and the statement "was made by a person whom the party authorized to make a statement on the subject."  Fed. R. Evid. 801(d)(2)(C).  Cox designated these witnesses as Rule 30(b)(6) corporate designees and their statements on designated topics are admissible as party admissions.

## 2. The *BMG* Testimony Of Basquin, Beck, Cadenhead, Carothers, Negretti, Sikes, Trickey, And Zabek Are Admissible As Former Testimony Under Fed. R. Evid. 804

All of the *BMG* deposition testimony designated by Plaintiffs (except for that of Mr. Vredenburg) is also admissible as former testimony under Fed. R. Evid. 804(b)(1).

First, to be admissible under that provision, the declarant first must be shown to be unavailable under the meaning of Rule 804(a).  Messrs. Beck, Cadenhead, Carothers, Negretti, Sikes, Zabek, and Ms. Trickey are all unavailable because each is located in the Atlanta area and Plaintiffs cannot compel their presence due to their distance from the Court.  *See* Fed. R. Evid. 804(a)(5); Fed. R. Civ. P. 45(c).  The same is true for William Basquin, who lives in Illinois.

Second, the testimony must have been "given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one."  Fed. R. Evid. 804(b)(1)(A).  All the designated testimony was given during lawful depositions in the *BMG* case.

Third, the testimony must be "offered against a party who had … an opportunity and similar motive to develop it by direct, cross, or redirect examination."  Fed. R. Evid. 804(b)(1)(B).  During

Mr. Basquin's deposition, Cox expressly declined to ask questions.  *See* Gould Ex. 1 at 400:1-2

(Basquin BMG Tr.)  The remainder of the deponents were either Cox employees at the time of

their depositions or, in the case of Mr. Cadenhead, a Cox 30(b)(6) designee, and represented by

Cox's attorneys.  Cox also had a "similar motive to develop" the deponents' testimony in all these

depositions.  The deposition testimony Plaintiffs seek to admit involves identical legal claims

against Cox as were made in the *BMG* case, and involves the same copyright notice handling

system and Procera tools used by Cox during the same time period.

## II.    There Is No Merit To Cox's MIL No. 2 (ECF No. 474)

In MIL No. 2, Cox attempts to rewrite history.  Cox asks this Court to preclude evidence

of third-party infringement notices that provided Cox with knowledge of the infringing activity on

its network and awareness of particular subscribers who were using its service to infringe.  (ECF

No. 477.)  Cox focuses on "two kinds of evidence of third-party infringement notices"—the

"Rightscorp Notices" and "data from Cox's own copyright-management system identifying

alleged infringements involving other non-party rights holders." (MIL No. 2 at 3.)   Cox's request

is meritless.  The fact that MarkMonitor provided Cox with infringement notices for a particular

subscriber while other rights owners were simultaneously informing Cox during the same

timeframe that the *same subscriber* was also infringing their copyrights is unquestionably relevant

to establish Cox's knowledge of that subscriber's infringing activities.[3]

---

[3]  Cox makes the sweeping demand that Plaintiffs be precluded from introducing any evidence or
testimony relating to third-party infringement notices, "including but not limited to" 12 specifically
identified exhibits.  Cox did not provide the Court with any of these documents and fails to
describe, or misdescribes, several of them: (a) PX 34, not PX 300, is the Rightscorp Spreadsheet,
(b) PX 35 and 36 are exhibits related to the Rightscorp Spreadsheet (PX 34); (c) PX 38 relates to
Exhibits A and B to this Action (presumably included by error); (d) PX 279, 285, 299 and 300 are
Jason Zabek emails relating to Rightscorp; and (e) PX 19–22 are Cox's ticket data (and excerpts
of the same) containing ticket information for the Cox subscribers who were the subject of

### A.  The Third-Party Infringement Notices Cox Seeks To Preclude Are Relevant

Cox's overly stringent, unrealistic view of relevance is without basis.  Cox did not receive MarkMonitor's infringement notices on behalf of Plaintiffs in a vacuum.  The jury should know that Cox also received millions of infringement notices from third parties, including notices concerning thousands of the very same subscribers who were the subject of MarkMonitor's infringement notices.  This evidence is relevant and highly probative, including with respect to liability, willfulness, and statutory damages.

When Cox received MarkMonitor's infringement notices, Cox matched them to the Cox subscribers who were the subject of those notices.  PX 19–22 consist of information Cox produced from its CATS database concerning tickets Cox opened after receiving an infringement notice—from MarkMonitor or anyone else—for the subscribers who were the subject of MarkMonitor's infringement notices.[4]  Plaintiffs' expert Dr. George McCabe analyzed that ticket data.  His testimony, unrebutted by Cox, is that ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Cox's expert Dr. Lynne Weber also analyzed that ticket data.

In *BMG*, Cox's practice of systematically discarding Rightscorp's notices meant that the identities of Cox's subscribers who were the subject of Rightscorp's notices was unknown.  However, Plaintiffs' expert Dr. Terrence McGarty compared a dataset (PX 34) containing records

---

MarkMonitor infringement notices.  *See* Gould Ex. 13 (attaching exhibits identified in Cox's MIL No. 2).  Cox does not address PX 38, PX 279, PX 285, PX 299 or PX 300 in its motion.

[4] Plaintiffs sought discovery on the nature and extent of Cox's knowledge of the infringing use of its service by the particular Cox subscribers who were the subject of MarkMonitor's infringement notices.  Cox baselessly obstructed but lost a motion to compel and then produced the information.  (ECF No. 68 (Dec. 21, 2018 Hearing Tr.).)

of ███████████████████████████████████████████████████████

███████████████████████████████. He was able to associate a subset of those

notices with the Cox subscribers who were the subject of MarkMonitor's infringement notices.

Gould Ex. 2 at ¶ 26 (McGarty Reply Rept.)  Dr. McGarty determined that Rightscorp sent

████████ infringement notices to Cox for ████████ of the 57,600 subscribers who were the subject

of MarkMonitor's infringement notices.  *Id.*

It is understandable that Cox desperately wants to keep this evidence from the jury because

it is so devastating to its case; but it is plainly relevant to a multitude of issues.

*First*, the infringement notices from other rightsholders help show that Cox knew about

and willfully blinded itself to vast infringing activity on its network.  This will be important context

as the jury (i) hears evidence of Cox's policies and procedures, as well as Cox's response to

MarkMonitor's notices, and (ii) assesses the credibility (or lack thereof) of Cox's witnesses.

*Second*, the infringement notices from others about the same subscribers who were the

subject of MarkMonitor's notices further establishes that Cox had specific knowledge that these

particular Cox subscribers were using its service to infringe.  That is directly relevant to Cox's

contributory infringement liability.  The Fourth Circuit did not hold that contributory infringement

requires "actual knowledge of, or willful blindness to, specific infringements of *identified*

*copyrighted works*," as Cox has argued in this case. (ECF No. 394 at 27 (emphasis added).)  Nor

did the Fourth Circuit indicate that Cox's knowledge that a specific subscriber is engaged in

infringement is somehow cabined to the rightsowner's infringement notice to Cox concerning the

infringing subscriber.  Rather, the Fourth Circuit held that the knowledge standard for contributory

infringement "requires a defendant to have specific enough knowledge of infringement that the

defendant could *do* something about it."  Gould Ex. 3 at 32 (*BMG* Feb. 1, 2018 Order ("*BMG III*"))

(emphasis in original). Regardless of the source of its knowledge, Cox need only know "which [subscribers] were infringing" so that it has "knowledge that infringement is substantially certain to result from Cox's continued provision of Internet access to *particular subscribers*." *Id.* (emphasis added). The evidence that Cox is attempting to exclude clearly establishes Cox's knowledge in accordance with the Fourth Circuit's standards.

*Third*, the volume of these infringement notices from others also shows Cox's financial incentive to tolerate infringement. Cox knew that many of its subscribers valued using Cox's service to infringe, as evidenced by their use of Cox's network for that purpose, so Cox chose not to enforce its own policies. This is relevant for the financial benefit element necessary to establish Cox's vicarious liability: an obvious and direct financial interest in the infringing activity.

*Fourth*, third-party infringement notices are relevant to willfulness. Cox's reckless disregard for Plaintiffs' copyrights is based, in part, on Cox's lax response to the severity of the overall infringing activity on its network. Cox's disregard for Plaintiffs' copyrights was even more reprehensible given that Cox was receiving notices not just from MarkMonitor, but also from third parties, concerning thousands of the same specific Cox subscribers using Cox's service to infringe.

*Fifth*, and finally, all the issues covered above fall squarely within the broad considerations for a jury when assessing statutory damages, especially the need for deterrence.

Rather than address the foregoing, Cox argues against relevance solely with regard to what suffices for the knowledge element of a contributory infringement claim. Even there, Cox again resorted to misrepresenting the Fourth Circuit's *BMG* opinion. The Fourth Circuit expects a service provider that knows of a particular subscriber who is using its service to infringe to do something about it—period. *Id.* at 32.

### B.  None Of Cox's Other Reasons For Preclusion Hold Water

*First*, Cox contends it would be unfairly prejudicial for Plaintiffs to introduce the Court's findings relating to Rightscorp in *BMG*.  (MIL No. 2 at 6, 8.)  But Cox's argument is untethered to the evidence it seeks to preclude.  MIL No. 2 concerns Rightscorp and other third-party notices, not *BMG* findings.  Cox argues that allowing the notices in evidence will be prejudicial; however, the proper inquiry is whether the evidence will be *unfairly* prejudicial.  Gould Ex. 3 at 36 (*BMG III*, affirming admissibility because "[t]he mere fact that the evidence will damage the defendant's case is not enough to establish unfair prejudice" under Rule 403 (internal quotations omitted)).

*Second*, Cox argues that the Rightscorp Spreadsheet should be precluded because it would be unfair if the jury knew that Cox diverted millions of Rightscorp notices to the garbage bin.  Cox gets its backward:  concealing from the jury the fact that Cox discarded millions of notices would give the jury an incomplete and inaccurate view of the full, reprehensible nature of Cox's disregard for its obligations to copyright owners, which is directly relevant to Cox's willfulness.  *See* Gould Ex. 4 at 2 (*BMG* Aug. 21, 2018 Order ("*BMG II*"), holding that "Cox should not be able to characterize its response to infringement notices as made in good faith while preventing the jury from seeing evidence to the contrary.")  The probative value of that fact is high.

In a similar vein, Cox argues that its own business records, in the form of its CATS ticket data, should be precluded. Cox asserts it would be unfair if the jury knew that third parties sent Cox infringement notices about the same at-issue infringing subscribers.  (MIL No. 2 at 6–7.)  Once again, Cox mistakes evidence that is harmful to its cause with unfair prejudice.  The two are not the same.  Nor are either of these datasets—Cox's own CATS records or Rightscorp Notices— "fraught with factual disputes, such that their use would necessitate a full-blown trial within the trial to determine their provenance, authenticity, and reliability."  It is hollow rhetoric.  Cox's

CATS records are obviously not "fraught with factual disputes." They are highly probative business records, maintained by Cox in the ordinary course, that demonstrate it received additional notices from others about the same subscribers. And Cox has failed to identify any factual dispute concerning the Rightscorp data that Dr. McGarty utilizes within one aspect of his expert testimony.

Third, Cox contends that PX 34 (Rightscorp data) cannot be authenticated, is hearsay, and is an improper Rule 1006 Summary. (MIL No. 2 at 8.) Cox is wrong. There is no question about the genuineness of the records. They were produced to Cox in the *BMG* case, the subject of rigorous examination, and then admitted at trial. Gould Ex. 5 at 891:15–893:20 (*BMG* Trial Tr.) As for Dr. McGarty's consideration of the Rightscorp data, he is an expert witness, so Cox's objections regarding hearsay and Rule 1006 are misplaced. Plaintiffs do not need to offer the Rightscorp data into evidence. Instead, Dr. McGarty will testify to his *analysis* of those records, which show that Rightscorp sent 1,445,577 notices to Cox for 12,402 of the 57,600 subscribers who were the subject of MarkMonitor's notices.

## III.   **There Is No Merit To Cox's MIL No. 3 (ECF No. 478)**

In MIL No. 3, Cox seeks to exclude the incriminating emails and communications that this Court twice found admissible in the *BMG* case and relied on in key rulings in that case. (ECF No. 480.)[5] As in *BMG*, Cox moves to exclude key emails by its employees regarding its system for handling copyright infringement—the same system that it applied to MarkMonitor's infringement notices. Cox's goal in excluding these 31 emails and chat logs is consistent with its larger desire to tell the jury a story about Cox's "reasonable" behavior that is detached from reality. This Court

---

[5] Plaintiffs have provided copies of these "smoking gun" Cox emails and chat logs (which Cox did not), so the Court can see the subject of Cox's motion. See Gould Ex. 14. Of the 31 emails identified in Cox's MIL No. 3, all but four emails (PX 263, 303, 337, 341) were also the subject of Cox's Motion in Limine in *BMG*, which the Court rejected. *BMG* ECF No. 927 at 12–13.

has rejected Cox's repeated protests that these emails are irrelevant, unduly prejudicial or inadmissible as improper propensity evidence.  Gould Ex. 4 at 1–2 (*BMG II*), Gould Ex. 6 at 30:5–13 (BMG Dec. 1, 2015 Hearing Tr.).  The Court found the evidence to be highly relevant because it reveals Cox's policies and procedures for handling infringement notices, as well as the intentions underlying Cox's practices for handling infringement on its network.  Gould Ex. 4 at 2 (*BMG II*).  The Court found that the emails are not improper "propensity" character evidence, whether or not they pre-date the claims period.  There is no reason the Court should reach a different conclusion.

### A. Cox's Internal Emails are Highly Relevant.

Cox seeks to exclude emails that constitute critical evidence of Cox's sham graduated response policy and termination procedures for copyright infringement.  This Court has already examined almost all of these *very same emails* in *BMG*, and found that they are "highly probative on the issue of willfulness and willful blindness" and "relevant to whether Cox consciously avoided learning about specific instances of infringement."   Gould Ex. 4 at 1–2 (*BMG II*).  Accordingly, the Court denied Cox's motion to exclude as irrelevant Cox's emails from prior to the claim period, concerning works not in suit, regarding notices from other copyright holders.  The emails are just as relevant here as they were in *BMG*.

*First*, they show that Cox was clearly aware that its subscribers were infringing and that they were doing so intentionally.  *See* PX 277 ███████████████████████████ ████████████████████; PX 345 ████████████████████████; PX 346 ████████████████████████████████████████████ ████████████

*Second*, the emails provide necessary context for Cox's failure to address specific instances of infringement brought to its attention.  The Fourth Circuit found that Cox's internal emails show

that Cox "made every effort to avoid reasonably implementing" its own written policies; rather, "Cox very clearly determined *not* to terminate subscribers who in fact repeatedly violated the policy." Gould Ex. 3 at 16 (*BMG III*) (emphasis in original).  For example, Mr. Zabek explained to his team an ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ PX 253.  *See also* PX 245 ██████████████████████████████████████ ████████████████████████████████████████████████████.  The emails also demonstrate Cox's dismissive attitude behind its infringement policies, as reflected in emails from senior members of Cox's abuse team stating, ████████████████████ PX 336.  Such documents are highly relevant, direct evidence of Cox's intent, willful blindness to its subscribers' infringement, willfulness and disregard for copyright.

*Third*, the emails demonstrate Cox's key motivation for refusing to terminate repeat infringers:  money.  Cox's strong and direct financial interest in the infringing activity is starkly revealed in numerous emails from its abuse team, reflecting Cox's decision not to terminate known repeat infringers.  For example, ████████████████████████████████████████ ████████████████████████████ PX 347.  Joseph Sikes, the second in command of the abuse group, similarly declined to terminate a subscriber because ██████████████████ ██████████████████████████████████████████████████████████ ████████ PX 341.  And in yet another email, a top-level abuse engineer informed Mr. Zabek of ██████████████████████████ and Mr. Zabek responded that ██████████████████ ████████ PX 277.  These emails, among many others that Cox wants to hide, clearly demonstrate Cox's financial incentives for failing to act upon known infringing activity of specific subscribers identified to Cox in infringement notices.

11

Cox repeats its unavailing argument from *BMG,* that the emails are not relevant because they relate to Cox's general policies rather than specific instances of infringement of the works at issue.  In rejecting this claim, the Court correctly held that such evidence of "Cox's overall system for addressing infringement (including evidence showing that Cox knew of a high probability that users identified in infringement notices were in fact infringers and evidence showing that Cox did not want to see infringement notices because it did not want to take action against subscribers) is relevant to whether Cox consciously avoided learning about specific instances of infringement." Gould Ex. 4 at 2 (*BMG II*).  The Court further noted that "Cox's internal policies and procedures related to infringement were of course established prior to [the claim period], and it is those policies and procedures that Cox applied when it received notices of infringement for BMG's works at issue." *Id.*  The same reasoning applies here.

**B. Cox's Emails Are Not Improper Propensity Evidence Nor Unfairly Prejudicial.**

Cox repeats its claim that the emails are improper "propensity evidence" under Rule 404(b), which the Court should again reject.  *See* Gould Ex. 4 at 3 (*BMG II*).  Propensity evidence requires an inference that "because the defendant committed . . . the offenses before, he therefore is more likely to have committed this one." *United States v. Morley*, 199 F.3d 129, 137 (3d Cir.1999).  But as explained above, Plaintiffs offer the emails to show Cox's intent in forming and implementing the system and policies it applied to handle specific infringement notices regarding Plaintiffs' works.  *See* Gould Ex. 4 at 3 (*BMG II*) ("the Court finds that the emails would demonstrate not that Cox is liable for infringing BMG's copyrights because it infringed other works, but rather would go to show whether Cox consciously avoided learning about specific instances of infringement."); *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997) (Rule

404(b) "recognizes the probative value of willful states of mind" and "does not disqualify evidence of earlier specific states of mind from proving a later similar state of mind …").

The Court should also reject Cox's argument that the emails should be excluded as unfairly prejudicial under Rule 403.  Regardless of any purported "inflammatory" content, the emails are not *unfairly* prejudicial where, as here, their probative value significantly outweighs any prejudice. *See Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1131 (4th Cir. 1988) (finding error in excluding racial epithets from the jury, as "all relevant material should be laid before the jury as it engages in the truth-finding process").  "The 'mere fact that the evidence will damage the defendant's case is not enough' to establish unfair prejudice."  Gould Ex. 3 at 36 (*BMG III*, quoting *United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006)).

Cox points to the email chain wherein Messrs. Sikes and Zabek declare █████████████ ███████████, claiming that such statements have minimal relevance and are therefore unfairly prejudicial.  PX 336.  But this is highly probative evidence of Cox's indifference to its legal obligations and contempt for the law and copyright holders, while strategizing to evade future liability, and is thus relevant to and strongly supports a finding of willfulness.  "[A]ny prejudicial impact of the emails is insufficient to outweigh their probative value."  Gould Ex. 4 at 3 (*BMG II*).

## IV.    <u>There Is No Merit To Cox's MIL No. 4 (ECF No. 482)</u>

In its sprawling MIL No. 4, Cox largely rehashes its Daubert motion regarding Dr. William Lehr.  (ECF No. 486.)  The arguments have no more merit as a motion in limine than as a Daubert motion.  For the reasons explained in Plaintiffs' opposition to Cox's motion to exclude Dr. Lehr (ECF No. 376), at oral argument on that motion (ECF No. 535), and further below, Cox's MIL No. 4 should be denied in its entirety.  The evidence that Cox seeks to exclude "fits" the case.

### A. All revenue and profit that Cox earned from the infringing subscribers at issue is relevant.

Dr. Lehr calculated Cox's revenues and profits from subscribers about whom Cox reported processing one, three and five infringement tickets from 2012-2014. All of those subscribers were the subject of infringement notices from MarkMonitor during the claim period; some received additional notices outside the claim period. Cox wants to handicap the jury's consideration of relevant facts. It moves to exclude evidence about the profits and revenues Cox earned from: (1) subscribers who were the subject of just one infringement ticket processed under Cox's rigged system, MIL No. 4 at 2–5; and (2) subscribers who received notices outside the claim period. *Id.* at 5–6. Cox claims those financial benefits are irrelevant because Plaintiffs seek to hold Cox liable only for its subscribers' third or later notice during the claim period. Cox's arguments do not raise a serious challenge to the relevance of this evidence and should be rejected for several reasons.[6]

#### 1. Relevance to Cox's economic incentive to tolerate the infringement at issue

*First*, Dr. Lehr opines that *all* of the revenue and profit Cox earned from the at-issue subscribers was relevant to Cox's incentive to tolerate the infringement. Specifically, Dr. Lehr explained that by avoiding addressing its subscribers' infringement of Plaintiffs' works, ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[6] By limiting its motion to subscribers who were the subject of one notice, Cox concedes that revenues and profits it generated from subscribers who were the subject of three or more notices are relevant to Plaintiffs' vicarious liability claim.

██████████ Buchanan Decl. Exs. 2 ¶ 13 ("Lehr Rep."); 3 ¶ 14 ("Lehr Reply").  Dr. Lehr then calculated those considerable contributions.  He explained that his profit analysis



Lehr Reply ¶ 15 (emphasis added).  This opinion applies equally to Dr. Lehr's average lifetime value analysis and his calculations of Cox's revenue from the infringing subscribers.

*Second*, Plaintiffs' claims are based on repeat infringement by Cox's subscribers, where a subscriber's third or later infringement notice occurred during the claim period.  But that does not mean that all the relevant infringements must have occurred during the claim period—just the third or later.  Cox nevertheless wants to blind the jury to its subscribers' repeat infringements by presenting a false picture of what Cox knew about its subscribers and when—and Cox's related financial benefit.  The jury cannot understand when a subscriber received his or her third or later infringement notices without information on the notices that came before.  And, as noted above, Cox's economic incentive to tolerate its subscribers' infringement includes the entire value of its infringing subscribers, not just the portion attributable to copyright infringement during the claim period.  Lehr Reply ¶ 15 (emphasis added).[7]

*Third*, Cox's reliance on *James River Mgmt. Co. v. Kehoe*, (MIL No. 4 at 4) is misplaced. Civ. No. 3:09-CV-387, 2010 WL 431477, at *4 (E.D. Va. Feb. 5, 2010).  *Kehoe* was a Daubert

---

[7] There are additional reasons for reviewing the entirety of Cox's revenues for an infringing subscriber when considering Cox's economic incentives.  For instance, because Cox rigged its copyright abuse handling system to ignore, delete and discourage millions of infringement notices from copyright holders, the number of infringement tickets Cox generated understates the entirety of these subscribers' infringing activity.

motion to exclude proposed expert *damages* testimony under Fed. R. Evid. 702, not one to exclude evidence of *liability* under Rule 402 and 403, as here.   The *Kehoe* court excluded the proposed damages opinion under Rule 702 because the putative expert applied a "facially defective damages model" that failed to demonstrate sufficient intellectual rigor, relied on improper assumptions, and ignored critical facts.   *Id.* at *4–5.   Cox has not argued that here, nor could it.   Regardless, Dr. Lehr's calculations of revenue and profits from subscribers that Cox reported were the subject of one infringement ticket from 2012–2014 fit the facts for all the reasons described above—namely, that Cox would have considered the full value of those subscribers as economic incentive to tolerate their infringement and the unknown (but certainly understated) scope of that infringement.

### 2.   Relevance to statutory damages, including Cox's profits and the need for deterrence

All revenues and profits from the at-issue infringing subscribers is relevant to statutory damages because it shows how profitable Cox's tolerance of infringing subscribers was and the need for deterrence.   The jury should understand the full scope of those revenues and profits in assessing statutory damages, not just what Cox earned from infringement during the claim period.   Cox cites no precedent that it would be misleading for a jury to hear these figures.

Cox has not moved to exclude evidence of its total profits or revenues during the claim period.   Given that conceded relevance, it is no stretch to conclude that the total profit Cox derives from each infringing subscriber at issue is likewise a relevant consideration.   It provides important context for the jury when determining statutory damages; that those subscribers also received infringement notices outside the claim period does nothing to change that.[8]

---

[8] Nor has Cox articulated any justifiable basis to preclude evidence of the upward trend in Cox's profits, or its total profits, between 2011 and 2014.   *See* MIL No. 4 at 7.   Instead Cox contends simply that anything outside the claim period is irrelevant.   *Id.*   Of course, Cox produced

A statutory damages analysis can encompass a wide range of factors, including "deterrence of future infringement." MIL No. 4, Ex. 4 (*BMG* Trial Tr. 2150:1-10). "The wealth of the defendant has been widely recognized as relevant to the deterrent effect of a damages award." *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455, 461 (D. Md. 2004) (citing cases). Thus, in analyzing deterrence, factfinders regularly consider a defendant's total profits, and not just the defendants' profits directly linked to the infringement. *See, e.g., Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1545 (S.D.N.Y. 1991) (considering defendant's total income and assets in determining statutory damages award); *Psihoyos v. John Wiley & Sons, Inc.*, Civ. No. 11-CV-1416 JPO, 2012 WL 5506121, at *4 (S.D.N.Y. Nov. 7, 2012), *aff'd*, 748 F.3d 120 (2d Cir. 2014) (upholding statutory damages award in part based on "the fact that Defendant is a $300 million a year division of a $1.7 billion company . . .").

**B.** ████████████████████████████████████████
████████████████████

Cox again attempts to expand on its unpersuasive motion to exclude Dr. Lehr with a new shot at his calculations that Cox did not include in its Daubert motion. Echoing Cox's putative expert hired to rebut Dr. Lehr, Cox claims Dr. Lehr should not have included revenue from voice and video service, or revenue from outside the claim period, in calculating Cox's profits and revenue from infringing subscribers. MIL No. 4 at 7–8. Cox is wrong.

As explained above, ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████ Lehr Reply ¶ 15 (emphasis

---

evidence of its 2011 – 2014 revenues precisely because it is relevant, and both the totals and upward trend are important deterrence factors for the jury to consider.

added).  For Cox, the value of its subscribers depends ███████████████████████

██████████████████████████ Sanford Mencher, Cox's VP of Finance and Accounting,

testified that ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████ Gould Ex. 7 at 142:18-25 (Mencher Tr.); *see also* Gould

Ex. 8 at ¶¶ 25-26 (Lehr Reply Rept.).  He further explained that ████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████ *Id.* at 144.

Even Cox's abuse engineers handling infringement notices recognized that a subscriber's

value is tied up in their entire bundle of services, not just Internet service.  In a 2014 email

conversation, for example, one of Cox's head abuse engineers, Joseph Sikes wrote that a certain

customer ██████████████████████████████████████████████████████████████████

█████████████████████████ (PX 341) (emphasis added).  The value of an infringing

subscriber includes the value of all of their Cox subscriptions, not just the Internet service.  The

jury must know that to properly assess Cox's economic incentive to tolerate infringement and to

assess damages.  In any event, Cox's arguments go only to weight, not admissibility.

### C.  Evidence relating to Plaintiffs' harm from infringement, including that such harm cannot be quantified, is critically relevant to statutory damages.

Recycling another portion of its Daubert motion to exclude Dr. Lehr, Cox asks the Court

to preclude evidence concerning the evolution of the music industry, including the harm to

copyright holders (including Plaintiffs) from piracy.  MIL No. 4 at 8–11.  In doing so, Cox

misconstrues the record evidence and its import and asks the Court, once again, to limit the jury's

consideration to actual damages.  But that is improper.

Plaintiffs' testimony is unequivocal that piracy, including the P2P piracy by Cox and its subscribers at issue here, has devastated their businesses, but that quantifying that harm is not possible. Gould Ex. 9 at 145:14–146:16 (Abitbol Tr.), Ex. 10 at 67:15–70:10 (Kokakis Tr.). Part of the reason the harm cannot be quantified is that no one knows the scope of infringement— including the scope of infringement by Cox and its subscribers. *See* Gould Ex. 10 at 71:15–72:16 (Kokakis Tr.). In order for the jury to understand why the scope of and harm from infringement cannot be quantified, it must also understand the evolution of the music industry. In particular, the jury must understand the historic shift from sale of physical media (such as records, tapes and CDs) to online digital distribution, viral music sharing through peer-to-peer networks, and the history that undergirds Plaintiffs' antipiracy efforts that resulted in this lawsuit.

Dr. Lehr will further explain, through the lens of academic and economic literature, the unquantifiable phenomenon and harm of digital piracy. Indeed, it is precisely *because* of the difficulty quantifying harm from Cox's infringement that fact and expert testimony on the nature of harm caused by piracy are needed. The loss of revenue to the industry in and around the years at issue is on point and is as close to quantifying harm as possible. The jury needs to hear that.

As for Dr. Lehr, he does more than just describe the evolution of the industry or opine that infringement is harmful: he explains *why* economists have concluded that infringement is harmful. A statutory damages analysis permits consideration of all the harms a defendant's infringement causes, not merely those that can be quantified in a traditional actual damages analysis. *See Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 502–03 (1st Cir. 2011) (affirming statutory damages award in part based on record evidence of "extensive testimony regarding the loss in value of the copyrights at issue that resulted from [the defendant's] conduct, and the harm of [the defendant's] actions to [the plaintiff] and the recording industry, including reduced income and

profit"). In order to properly award statutory damages, the jury should be aware of the academic consensus that piracy harms rights holders and how the harms piracy causes affect the marketplace for creative content. Indeed, it was not so long ago that infringers were arguing that the P2P piracy they encouraged was actually beneficial to rights holders. *See, e.g. A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1017 (9th Cir. 2001), *as amended* (Apr. 3, 2001) (noting that Napster offered an expert report that "concluded that Napster is beneficial to the music industry because MP3 music file-sharing stimulates more audio CD sales than it displaces").

Cox engages in sophistry when it asserts that Plaintiffs "failed to respond to discovery requests and prepare corporate designees for depositions." MIL No. 4 at 9. Cox merely cites deposition testimony from several witnesses who acknowledged that they do not know the scope of harm and had not quantified the harm caused by Cox's infringement. *Id.* at 9–11. But that does not represent a discovery failure. Rather, it illustrates the basic point, and the need for Dr. Lehr's testimony, that nobody has figures for the unquantifiable. That is exactly why more generalized evidence on the types and history of harm are vital here. The fact that the harm may be difficult to quantify does not mean that there is none. However, Cox wants to mislead the jury to believe that the inability to prove actual damages means no damage occurred. That is directly at odds with a key purpose of statutory damages. As the Court explained in instructing the *BMG* jury: "Statutory damages are damages that are established by Congress in the Copyright Act because actual damages in copyright cases are often difficult to establish with precision." MIL No. 4, Ex. 4 at 2149:10-16 (BMG Trial Tr.) Cox is free to cross examine and present appropriate argument but there is no reason to keep those critical facts from the jury.

**D.  No Discovery Misconduct Took Place To Justify Precluding Testimony On MarkMonitor's Pulse checks**

Cox asks the Court to preclude Plaintiffs from presenting evidence that MarkMonitor observed Cox's subscribers "sharing" at much greater levels than Cox's caps allowed MarkMonitor to report in infringement notices.  (MIL No. 4 at 11–12.)  MarkMonitor's designee, Sam Bahun, explained in his deposition that MarkMonitor observed █████████████████████

████████████████████████████████████████████████████████████████████████████

Though this process was not for purposes of sending notices, it was a ██████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████  MIL No. 4, Ex. 12 at 293:7-17 (Bahun Tr.)

Cox does not argue the information concerning these so-called "pulse checks" by MarkMonitor is irrelevant, nor could it.  Instead, Cox claims that Plaintiffs and third parties somehow obstructed discovery and should therefore be precluded from offering the above evidence.  Cox's argument is revisionist history and its request should be denied.

The document requests Cox cites simply do not seek what Cox claims.  *See* MIL No. 4 Exs. 15 at Request No. 78 (RFPs to Plaintiffs); 16 at Request Nos. 8-11 (RFPs to MarkMonitor); 17 at Request No. 17 (RFPs to RIAA).  Nor, unsurprisingly, does Cox explain how *MarkMonitor*'s observation of P2P swarm activity outside of its work for RIAA or Plaintiffs would be information in *RIAA* or *Plaintiffs*' possession in any event.  Mr. Bahun testified at his June 13, 2019 deposition that ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████  Gould Ex. 11 at 308:14–309:13 (Bahun Tr.)  Cox did not follow-up with Plaintiffs, RIAA or MarkMonitor after Mr. Bahun's deposition requesting documents relating to Mr. Bahun's

testimony on this point.  Cox certainly could have, as it did with the numerous other issues raised in Cox's lengthy July 12, 2019 email to MarkMonitor's counsel and motions to compel both during and *after* the discovery period.  MIL No. 6, Ex. 16.  In any event, Cox's post hoc motion to preclude on this basis has no support in the record and should be denied.

## V.  There Is No Merit To Cox's MIL No. 5 (ECF No. 487)

In MIL No. 5, Cox asks this Court to exclude PX 39, a hard drive of copies of the works in suit.  Those are infringing files, as identified by their unique hash value, that were the subject of MarkMonitor's infringement notices.  Cox contends that Plaintiffs will be unable to lay an adequate foundation that the files on the hard drive are copies of the works in suit.  (ECF No. 489.) Cox's request is baseless.

### A.  Plaintiffs Can Lay A Foundation For The Hard Drive

Cox's brief is inadequate and deceptive.  Cox makes no mention that MarkMonitor has *already authenticated and explained* that the hard drive contains digital files that were the basis of MarkMonitor's infringement notices to Cox.  Declaration of Sam Bahun, Appx. A at ¶ 15, 24-25 ("Bahun Decl.").  Mr. Bahun further explained that Audible Magic has identified the contents of those files as containing Plaintiffs' works in suit.  *Id.* at ¶ 16-17.  Cox briefed MIL No. 5 without informing the Court of Mr. Bahun's testimony that clearly laid the foundation for the hard drive.

### B.  Cox's Attorney Argument About The Hard Drive Is Hollow

Cox essentially recycles its attorney argument from summary judgment as to the hard drive. Cox is still wrong.

First, Cox provides attorney argument to the effect that there is no fact or expert witness who claims to have listened to all the recordings on the hard drive and confirmed that they are actually copies of the works in suit.  But this completely ignores Mr. Bahun's testimony; Audible

Magic examined them and verified they match Plaintiffs' copyrighted works.  Cox also never asked any witnesses in deposition about whether they listened to the recordings on the hard drive.  Cox has no basis to claim that the recordings were never listened to or examined.

Second, Cox's argument about the need to distinguish between studio recordings versus cover versions versus live performances is mere conjecture and attorney argument.  Cox has not pointed to a single piece of evidence to support this speculation.  Cox did not ask questions in deposition about what versions of Plaintiffs' works are used to create Audible Magic fingerprints.

Third, Cox's argument about the date contained in the metadata of the music files is meaningless, and again, is simply attorney conjecture.  Files with the same hash value are identical and have the same contents, regardless of when downloaded and reviewed.

Fourth, Cox's argument about requesting in discovery, but not receiving, a reference set of recordings is an incomplete telling of the story.  Following repeated meet-and-confers between counsel, Plaintiffs agreed to produce and did produce a representative sample set of recordings that included more than 150 sound recordings.  Cox never followed up, never asked for more, and never moved to compel anything more on this.  Cox never indicated that it needed a full set to do a comparison to the recordings on the hard drive, though Plaintiffs asked if that was its intent many times.  And, of course, Cox could have gone to any number of publicly available sources (including YouTube, Apple Music or Spotify) to listen to the recordings.

Fifth, the hard drive is comprehensive as to the files that are the basis for the infringements in suit.  Cox's subscribers were caught downloading or uploading those files, identified by their unique hash value, on their third or later infringement notice.  The fact that a separate MarkMonitor Spreadsheet (PX 11, Plaintiffs_00286431) may identify additional recordings that Cox's subscribers also infringed, but which Plaintiffs have not included in the case, does not render the

hard drive deficient.  If anything, it demonstrates Plaintiffs' conservative approach to this case.

Moreover, the hash values of the files can be used to connect them to MarkMonitor's notices.

Bahun Decl. Appx. 1 at ¶ 17.  There is no reason to exclude PX 39 or any related testimony.

**VI.    There Is No Merit To Cox's MIL No. 6 (ECF No. 490)**

    **A.    The MarkMonitor Spreadsheet Is Admissible**

Cox has been on an unending crusade to concoct a basis to exclude the MarkMonitor

Spreadsheet (the "'431 Spreadsheet").  *See* Gould Decl. ¶ 14, Ex. 12.  Cox's efforts to exclude this

important evidence from trial are misplaced.  The MarkMonitor Spreadsheet is a business record

that MarkMonitor amassed in the normal course of its anti-piracy operations, contemporaneously

and electronically stored in its internal database of known infringing files, and then extracted from

the database for production in discovery.  It is admissible under Fed. R. Evid. 803(6).  Fed. R.

Evid. 1006 and its requirements do not apply to the MarkMonitor Spreadsheet, which is simply a

download of data from a computer database.

        **1.  General Background**





Bahun Decl. Appx. 1 at ¶ 18.  This is the '431 Spreadsheet that Cox seeks to exclude;

Gould Decl. ¶ 14, Ex. 12.  Two of Plaintiffs' experts (Dr. George McCabe and Barbara Frederiksen-Cross), along with one of Cox's experts (Christian Tregillis), considered and utilized the '431 Spreadsheet.  Plaintiffs and Cox both included the '431 Spreadsheet on their proposed exhibits lists.  ECF Nos. 278-1 (DX 141), 280-1 (PX 11).

### 2. The MarkMonitor Spreadsheet Is A Business Record, Not A Rule 1006 Summary

The '431 Spreadsheet is not a summary for purposes of Fed. R. Evid. 1006 and so that rule's requirements are inapplicable.  Rule 1006 applies only where a "summary" is used to prove the contents of other voluminous original documents.  Rule 1006 only applies where the summary being offered as evidence is not itself the original document.

Fed. R. Evid. 1001(d) defines "original" as: "[f]or electronically stored information, 'original' means any printout — or other output readable by sight — if it accurately reflects the information."  Mr. Bahun has laid a sufficient foundation to establish that the '431 Spreadsheet accurately reflects the data in MarkMonitor's database.  Bahun Decl. Appx. A at ¶¶ 15, 23. Accordingly, the '431 Spreadsheet is an "original" document under Rule 1001(d) and its admission

is not subject to Rule 1006's requirement that the "proponent must make the originals or duplicates available for examination." *See* Fed. R. Evid. 1006.

Several Courts of Appeal have held as much.  For example, the Tenth Circuit recently rejected a nearly identical argument to the one Cox makes here, holding that, because spreadsheets reflecting accurate database extracts are "originals," Rule 1006 does not require providing the opposing party further access to the database from which the data in the spreadsheets was extracted.  *United States v. Channon*, 881 F.3d 806, 810–11 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 137, 202 L. Ed. 2d 85 (2018).  The Ninth Circuit reached the same conclusion, holding that computer-generated summaries of electronically stored data "themselves constituted the business records.  They were the writings at issue, not summaries of other evidence.  Thus, Rule 1006 does not apply."  *U– Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1043 (9th Cir. 2009); *see also United States v. Fujii*, 301 F.3d 535, 539 (7th Cir. 2002) (admitting printouts of computer data without conducting Rule 1006 analysis).

Cox relies on *Branch v. Government Employees Insurance Company*, 286 F. Supp. 3d 771, 779 (E.D. Va. 2017), but *Branch* actually undercuts Cox's argument.  *Branch* held that the "relevant question" for admission of a spreadsheet reflecting data stored electronically in a database "is whether the spreadsheet could be admitted under *either* provision" of Fed. R. Evid. 803(6) or Fed. R. Evid. 1006.  *Id.* at 776–77 (emphasis added).  *Branch* thus recognized that a spreadsheet reflecting data extracted from a database maintained in the ordinary course of business need not satisfy Rule 1006 to be admissible.

As the cases thoroughly reviewed in *Branch* make clear, producing limited data from a large database is akin to reviewing a set of documents in response to a discovery request and producing the responsive documents.  *Id.* at 778 (*citing Health Alliance Network, Inc. v. Cont'l*

*Cas. Co.*, 245 F.R.D. 121, 129 (S.D.N.Y. 2007)).  While *Branch* concluded a spreadsheet reflecting electronically stored data could be admitted under Rule 1006, it reached that conclusion in the alternative; *Branch* did *not* hold that such a spreadsheet must satisfy Rule 1006's requirements. To the contrary, "computer records are admissible so long as the requirements of Rule 803(6) are met, and no more is required."  *Midfirst Bank, SSB v. C.W. Haynes & Co.*, 893 F. Supp. 1304, 1311 (D.S.C. 1994) (observing that "[d]ecisions are legion admitting computer records as Rule 803(6) business records") (internal quotations and citations omitted), *aff'd*, 87 F.3d 1308 (4th Cir. 1996).

As shown above, the MarkMonitor Spreadsheet is a business record that easily satisfies Rule 803(6)'s requirements.  Mr. Bahun testified in his declaration that the records in the spreadsheet were recorded at or near the time ██████████████████████████████ ████████████ that they were kept in the ordinary course of business, and that making those records was a regular practice of MarkMonitor.  *See supra*, Section VI.A.1.  While Cox turns cartwheels attempting to challenge the reliability of the MarkMonitor spreadsheet, none of its complaints meet its burden of undermining the unrebutted testimony showing that the data in the '431 Spreadsheet was the product of a reliable, trustworthy, regularly conducted business activity.

Cox complains that some underlying data is missing, but there is no underlying data to produce: the '431 Spreadsheet *is* the data from the MarkMonitor internal database.  The '431 Spreadsheet is simply not a Rule 1006 summary.  Instead, the '431 Spreadsheet ███████████ ██████████████████████ placed into a spreadsheet for production in discovery. Nothing about the '431 Spreadsheet could be perceived as a "summary."  It contains no summarizing of data or added analysis for purposes of litigation, and does not attempt to compile,

abstract, abridge or digest the information about the infringing files.  Were it a summary, it would be a wholesale failure as nothing about it is abbreviated or condensed.

The other case on which Cox relies, *Sprint Nextel Corporation v. Simple Cell Inc.*, 248 F. Supp. 3d 663, 672-74 (D. Md. 2017), also does not help its cause.  The spreadsheets at issue in *Sprint* were drastically different than the MarkMonitor Spreadsheet.  In *Sprint*, the court viewed the spreadsheets at issue as Rule 1006 summaries, not business records, because: (1) the spreadsheets created for litigation extracted and combined records from *three separate internal databases*, were edited, and contained analysis based on certain presumptions; and (2) the declaration sponsoring the spreadsheets "provide[d] no explanation of how the information in these databases [was] amassed."  *Id.* at 673.  In stark contrast, the MarkMonitor Spreadsheet contains ███████████████████████████, maintained in the ordinary course of business, and there is detailed testimony from MarkMonitor on how the information therein was amassed.  *See supra* Sec. VI.A.1.

### B. Plaintiffs Should Be Allowed To Offer Testimony From MarkMonitor Witness Sam Bahun That Is Relevant And Within His Personal Knowledge

In MIL No. 6, Cox argues that Sam Bahun's trial testimony should be limited to the topics for which he was non-party MarkMonitor's corporate designee at deposition.  Cox's request misrepresents the record, is improper, and should be rejected.

Corporations routinely designate multiple witnesses to handle a 30(b)(6) deposition that covers a variety of topics.  Here, MarkMonitor designated two particular corporate designees (Sam Bahun and Slawomir Paszkowski) to handle the 30(b)(6) topics.  Mr. Paskowski lives in Lithuania and his designation was limited to computer source code and engineering on a few limited topics.  But that MarkMonitor designated a particular corporate designee other than Sam Bahun to handle certain topics does not mean that Mr. Bahun lacks personal knowledge on those topics.

Cox cites *QBE Ins. Corp. v. Jorda Enter., Inc.*, 277 F.R.D. 676, 698 (S.D. Fla. 2012) and *Aldridge v. Lake Cty. Sheriff's Office*, No. 11-CV-3041, 2012 WL 3023340, at *5 (N.D. Ill. July 24, 2012), for the basic proposition that a party cannot fail to provide a 30(b)(6) witness on topics but then take positions on those topics at trial. That is not the case here at all. There is no allegation that MarkMonitor failed to provide qualified 30(b)(6) witnesses.[9] Nor would such a shortfall (and there is not one here) be a basis to limit *Plaintiffs*' ability to question witnesses at trial.

Cox spent roughly eight hours deposing Mr. Bahun. MarkMonitor's counsel objected to certain questions as outside the scope of Mr. Bahun's designated topics, but he did not prohibit Mr. Bahun from answering. In its motion in limine, which cites zero testimony, Cox baldly complains of objections but, notably, does not contend that Mr. Bahun refused to answer any questions. If Cox is unaware of Mr. Bahun's personal knowledge on the issues, it has only itself to blame.

Though Cox's motion is not specific in this regard, Cox (as always) seems primarily focused on the '431 MarkMonitor Spreadsheet. Cox did not ask Mr. Bahun a single question about it or even use it as an exhibit with Mr. Bahun. That is Cox's own failing, not some unfairness caused by MarkMonitor's corporate designations. Mr. Bahun's Rule 30(b)(6) designations fairly cover the '431 Spreadsheet and he also has personal knowledge of it.[10]

---

[9] Cox has repeatedly cast aspersions on the sufficiency of MarkMonitor's responses to Cox's subpoenas and sought to tarnish Plaintiffs for that, as well. Cox's innuendo is irrelevant to these motions, and inaccurate. Cox also ignores its own conduct, which led the judge overseeing that non-party discovery to admonish it to practice civilly. *Cox Communications, Inc., et al v. MarkMonitor, Inc.*, Case No. 3:19-mc-80050-SK, ECF No. 28 (N.D. Cal. April 25, 2019).

[10] Subject to MarkMonitor's objections, Mr. Bahun was designated to testify, among other topics, about MarkMonitor's "anti-piracy services for the RIAA and/or any Plaintiff between 2010 and present, including without limitation the services that resulted in notices being sent to Cox, and including the specific Configurations utilized by the RIAA as related to any Peer-to-Peer Notice Program." MIL No. 6 Ex. 1 at Topic 6 (MarkMonitor Rule 30(b)(6) Responses and Objections).

### VII.    There Is No Merit To Cox's MIL No. 7 (ECF No. 493)

In MIL No. 7, Cox purports to argue that "Plaintiffs should be precluded from relying on these [MarkMonitor] notices as proof of direct infringement or referring to them in any way that implies that they prove that Cox's subscribers infringed the works in suit."  (ECF No. 495 at 1.) Cox's demand is both vague and premature.  It should be denied.

Infringement notices are a manifestation of the MarkMonitor system used to detect and verify infringement.  These notices are a shorthand reference to the output of MarkMonitor's infringement detection and verification system.  While witnesses may use the term infringement, or infringement notices, the ultimate decisions on the existence of direct infringement and secondary infringement are for the jury alone.  Throughout MIL No. 7, Cox makes clear that its true purpose is to push the Court to accelerate its process for considering jury instructions. Specifically, citing how the Court instructed the jury with respect to consideration of Rightscorp's infringement notices in *BMG*, Cox presses for a similar instruction here.  (MIL No. 7 at 4–7.)

The Court should reject Cox's attempt to use a motion in limine to obtain a jury instruction. The Court has separate processes for motions in limine and jury instructions.  It may be that Plaintiffs consent to a similar instruction, but Plaintiffs believe jury instructions are best addressed as a whole.  Addressing them piecemeal, and too early, is inefficient and potentially problematic.

### VIII.    There Is No Merit To Cox's MIL No. 8 (ECF No. 496)

In MIL No. 8, Cox asks this Court to preclude Plaintiffs from presenting evidence at trial that Cox has the ability to (1) determine the content of any files uploaded or downloaded on peer-to-peer traffic on its network, or (2) block, shape, or otherwise manipulate peer-to-peer traffic.  In seeking to preclude this testimony, Cox hopes to keep from the jury just how much control Cox could exercise if it chose to.  Without any analysis, Cox then summarily asserts that "[p]recluding

Plaintiffs from introducing this evidence will obviate the need to call Mr. Summers, InCode, or Sandvine (Procera) as trial witnesses because their deposition testimony was entirely limited to the topics described above." (ECF No. 498 at 8.). Cox's MIL No. 8 should be denied.

### A. Cox Is Not The Arbiter Of What Is A "Live Issue" In The Case

Cox makes several arguments for why its use of Procera and network management tools is supposedly not a "live issue" in this case. None has merit.

First, Cox points out that Procera and network management tools were not in Plaintiffs' summary judgment papers (MIL No. 8 at 7.) But that argument is hollow. It is not unusual for certain evidence to be more suitable for trial than summary judgment. The four corners of a motion for summary judgment does not determine what is permissible at trial.

Second, Cox argues that "Dr. McGarty abandoned his initial opinions and conceded at deposition that Cox had no duty whatsoever to use Procera." (MIL No. 8 at 6.) This too is nonsense. Dr. McGarty did not opine that Cox had a duty to use Procera. All along, Dr. McGarty opined on and testified about the ███████████████████████████████████

███████████████ Gould Ex. 2 at ¶¶ 24–25 (McGarty Rept.) (stating that ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████ ) Dr. McGarty has not "abandoned" any opinions, as Cox misleadingly argues.

Third, Cox argues that its knowledge of the percentage of traffic on its network that was categorized as P2P is irrelevant. (MIL No. 8 at 8.) Cox is wrong. P2P was notorious for infringing activity, as Cox's own witnesses acknowledge. *See, e.g.,* (PX 318 ███████████████████

██████ )).[11]  This substantial (and overwhelmingly illegal) P2P activity on its network by its subscribers is relevant to multiple issues.  For example, it makes it more probable that Cox subscribers who were the subject of MarkMonitor's infringement notices infringed.  It also speaks to Cox's financial interest in the infringing activity.  It shows Cox's customers wanted to engage in (and did engage in) massive P2P activity.  Because P2P indisputably consumes substantial bandwidth that pushes subscribers into higher priced service plans, it is thus relevant to Plaintiffs' vicarious liability claim.

Moreover, Cox's awareness and total disregard for the scope of P2P traffic on its network—in the face of millions of infringement claims based on P2P activity, including from MarkMonitor—shows Cox's reckless disregard for Plaintiffs' copyrights.  And, of course, Cox's decision to build a business around massive and infringing P2P activity is critically relevant to statutory damages and the need for a strong deterrent award.  In sum, it is quite relevant that, through Procera and other network management tools, Cox knew that a substantial portion of its network was being used for P2P and could determine whether specific subscribers cited in infringement notices were continuing to use P2P.

### B.  Cox's MIL No. 8 Is Not An Appropriate Means To Streamline Trial

Proceeding on the false premise that Cox's ability to use Procera or other network management tools is no longer a "live issue," Cox then misleadingly tells the Court that granting

---

[11] This Court also recognized that BitTorrent "fosters a staggering amount of infringement" and cited studies to that effect.  *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 964 (E.D. Va. 2016) (citing NetNames, *Sizing the Piracy Universe* 18 (Sept. 2013) ("Of all unique visitors to bittorrent portals in January 2013, it is estimated that 96.28% sought infringing content during the month, a total of 204.9m users."); *id.* at 30 ("Thus out of all non-pornographic files located, 99.97% of content was infringing."); Envisional Ltd., *Technical Report: An Estimate of Infringing Use of the Internet* 4-5 (Jan. 2011) ("An in-depth analysis of the most popular 10,000 pieces of content managed by PublicBT found: ... 2.9% was music content—all of which was copyrighted and shared illegitimately."), *aff'd in part, rev'd in part,* 881 F.3d 293 (4th Cir. 2018).

its MIL No. 8 will eliminate any need for any testimony from Mr. Summers, inCode, or Procera (Sandvine) and limit Dr. McGarty's  and Dr. Almeroth's testimony.  This far overstates the impact of granting Cox's odd MIL No. 8.   While MIL No. 8 is limited to two discrete issues, Cox apparently asks the Court to exclude a host of other important evidence.  Without delving too far, Mr. Summers and inCode and Procera witnesses have valuable testimony concerning, *inter alia*, the technical tools available to Cox that it could have used to better understand and act on the P2P activity on its network.

*Clint Summers* is a longtime Cox employee in charge of network intelligence.  He explains the ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████

*William Basquin* is VP of Global Sales Engineering for Sandvine, Inc., a network intelligence company that acquired Procera several years ago.  Mr. Basquin explains the

████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████

*Jorge Fuenzalida* is an executive at inCode Consulting, which provides management consulting services for the telecommunications industry and has worked for Cox since 2005.  Mr. Fuenzalida explains ████████████████████████████████████████████████



All of these issues are important to the case.

## IX.     There Is No Merit To Cox's MIL No. 9 (ECF No. 499)

In its MIL No. 9, Cox argues the evidence of its terminations for non-payment is irrelevant, confusing, and unfairly prejudicial. (ECF No. 500). Cox is wrong. Across the entirety of 2013–2014, Cox terminated a total of ███ subscribers for copyright infringement. In that same period, Cox terminated approximately ██████ subscribers, or ██████ per month, for failing to pay their monthly bills. Such evidence is highly probative of both Cox's liability and willfulness, by demonstrating Cox's right and ability to terminate service and control violations of its AUP while turning a blind eye to infringement. This evidence starkly shows Cox's routine practice of placing its financial interests over its legal obligations.

### A.  Cox's Terminations For Non-Payment Are Relevant On Several Fronts

Cox's handling of subscribers violating its payment policies is relevant to Cox's right and ability to control infringement, as well as Cox's willfulness. Vicarious infringement requires a

showing that Cox had the right and ability to supervise the infringing activity.  *See BMG*, 199 F. Supp. 3d at 992.  In determining whether a defendant had the right and ability to control infringing activity, courts look to whether the defendant could and did take action against violations of its policies, *including those that are not related to infringement.  Arista Records, Inc. v. Usenet.com, Inc.*, 633 F. Supp.2d 124, 157 (S.D.N.Y. 2009) (the ability to block users for "any reason whatsoever" is "evidence of the right and ability to supervise" infringing activities) (internal quotes omitted).  Evidence that Cox could—and did—terminate subscribers for non-payment speaks volumes regarding Cox's attitude toward its legal obligations to copyright owners, and is directly relevant to this key element of vicarious liability.  Cox's concession that it could also terminate for infringement (though did not) does not undermine this.

In addition, Cox tries to justify its unwillingness to terminate subscribers who infringe by arguing that a loss of service is a drastic measure.  Yet its quick draw terminations for non-payment show that Cox's arguments for not terminating repeat infringers are pretextual.  If Cox regularly terminated the accounts of subscribers engaged in non-payment, then it could have done the same for subscribers it knew repeatedly infringed copyrights.  This is clearly relevant evidence that should be considered by a jury in determining whether Cox had the right and ability to suspend or terminate subscribers for violations of Cox's own stated (yet ignored) infringement policies.

### B.  Cox Has Not Shown Unfair Prejudice Or Confusion

Cox contends that a comparison of the number of Cox subscribers terminated for failing to pay their monthly bills as compared to the number terminated for receiving notices of alleged copyright infringement would be a confusing and prejudicial metric.  But Cox's argument is wholly conclusory.  There is no reason to believe that is the case.  A jury is more than capable of seeing these figures to illustrate the basic point that Cox terminates accounts when the subscriber

no longer benefits its financial interests (non-payment of subscription fees) but retains accounts when doing so benefits its financial interest (failure to terminate repeat infringers).

Cox asserts that it "had legitimate business reasons for terminating subscribers for non-payment the way that it did, which have no bearing on its separate legitimate business decisions regarding its termination policy for subscribers who receive notices of alleged copyright infringement." (MIL No. 9 at 7.) Cox can argue that to the jury. Just as Plaintiffs will argue Cox did not have "legitimate business reasons" for how it proceeded in failing to terminate repeat infringers. This Court, affirmed by the Fourth Circuit, already found that Cox's true approach for repeat infringers was either not to terminate their subscriptions or, previously, terminate but then immediately reactivate their subscriptions. There was nothing "legitimate" about such business decisions, let alone anything that makes it inappropriate for a jury to see how Cox acted in other circumstances with respect to termination.

## X.    There Is No Merit To Cox's MIL No. 10 (ECF No. 502)

In its MIL No. 10, Cox asks the Court to exclude employee performance evaluations and separation agreements of former Cox employees Joseph Sikes and Jason Zabek, as well as testimony relating to the circumstances of Messrs. Sikes' and Zabek's departure. (ECF No. 503.)[12] Cox baldly argues that this evidence is irrelevant and would cause Cox unfair prejudice or mislead the jury. Cox is wrong.

### A.  The Performance Evaluations And Separation Agreements Are Relevant

In *BMG*, Cox threw Jason Zabek and Joseph Sikes under the proverbial bus during its closing argument. Cox's counsel stated the following during closing argument to the jury:

---

[12] MIL No. 10 also seeks exclusion of performance evaluations of Roger Vredenburg. Plaintiffs do not intend to use his performance evaluations affirmatively at trial and so that portion of the motion is moot. Plaintiffs nevertheless reserve the right to use them for impeachment or rebuttal.

Now, there are those cases when somebody goes through the process and it's time to terminate, and there have been some e-mails and some chats between employees, mostly Mr. Zabek and his colleagues, about termination, reactivation, and connecting those things to revenue. People have said, we need the revenue. We need the customers. We've all seen those e-mails.

Those e-mails reflect bad judgment. They reflect bad decisions. I think they're offensive, but they're not Cox's policy, and they are not about this case.

*See* Gould Ex. 5 at 2213:3-12 (BMG Trial Tr.).

The performance evaluations, which Plaintiffs obtained only as a result of motion

practice, starkly contradict Cox's attempts to shift blame.  Cox 

as they helped Cox put its corporate

profits over its legal obligations.

To Cox, Messrs. Zabek and Sikes were shining beacons of Cox's corporate values.  By

way of limited example, Jason Zabek's manager states he ████████████ and ██████

████████████████████████████ (PX 375), █████████████████████

█████████████████████ (PX 381), and █████████████████████████

██████ (PX0382).  Similarly, Joseph Sikes' feedback from management states: ████████

████████████████████████████████████████████████████████

████████████████████ (PX 392), █████████████████████████████

█████████████████████ (PX 382), and █████████████████████████

████████████████████ (PX 417).[13]

Cox's conclusory statement that these evaluations are "irrelevant" and "immaterial" is

wishful thinking and unsupported.  Cox moves to exclude these documents only because they show

---

[13] The cited excerpts of these representative exhibits, which Cox seeks to exclude in Cox's MIL No. 10, are attached as Gould Ex. 15.  Exhibit 15 also includes the two separation agreements discussed below.

that Cox highly valued the very employees at the center of Cox's most outrageous conduct.  Even

after Cox's shameful conduct came to light through the BMG case, Cox further revealed its true

colors by referring to Mr. Zabek's DMCA-related conduct as ███████████████████

███████████  (PX 428).   These documents show what Cox thought about the key employees

involved in Cox's policies, procedures, and misconduct with respect to repeat infringers.   Among

other issues, it fits comfortably within the quilt of evidence a jury can consider in assessing

statutory damages including the need for deterrence.

Both Mr. Zabek and Mr. Sikes are also expected to testify, either live or through deposition

designations.   Their separation agreements bear directly on their credibility.  ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████  The jury is entitled to all of this information as it assesses what weight

to afford a witness's testimony.

### B.  Cox Has Not Shown Unfair Prejudice Or Jury Confusion

Cox has not shown that this highly probative evidence would cause unfair prejudice or

confuse the jury.   In fact, the opposite is true.   The performance evaluations show how Cox

███████████████████████████████████████████████████

███████████████████████████  It is important context for the jury, even if

that bodes poorly for Cox.

## **CONCLUSION**

For all of the foregoing reasons, the Court should deny all of the relief requested in Cox's

motions in limine 1 through 10.

Respectfully submitted,

Dated October 30, 2019

/s/ Scott A. Zebrak
Scott A. Zebrak (38729)
Matthew J. Oppenheim (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
Kerry Mustico (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20015
Tel:  202-480-2999
scott@oandzlaw.com
matt@oandzlaw.com
jeff@oandzlaw.com
kerry@oandzlaw.com

*Attorneys for Plaintiff*