# Exhibit 5

771

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
---------------------------------:
                                 :
                                 :
BMG RIGHTS MANAGEMENT (US) LLC,  :
et al.,                          :
            Plaintiffs,          :
                                 : Case No. 1:14-cv-1611
     vs.                         :
                                 :
                                 :
COX ENTERPRISES, INC., et al.,   :
            Defendants.          :
---------------------------------:
```

VOLUME  4   (P.M. portion)

TRIAL TRANSCRIPT

December 7, 2015

Before:  Liam O'Grady, USDC Judge

And a Jury

Anneliese J. Thomson   OCR-USDC/EDVA  (703)299-8595

1    SampleIt2 is not run throughout the entire relevant time
2    period?
3    A.   It's a -- it would be very expensive to do this.  It would
4    consume a lot of bandwidth and a lot of resources.
5    Q.   And how did you determine the number of full file samples
6    or samples that were downloaded?
7    A.   How did I determine?  By looking at the value of the
8    output.
9    Q.   Thank you.  Mr. Boswell, can you turn to your exhibit
10   binder PX 2564.sample?
11   A.   PX 2564.sample.  Okay.  2564.  We had already reached that
12   one, right?
13   Q.   Sorry.  You're right.  So is my associate, who told me
14   that I had already gone over that.
15         So if you can look at PX 2538.sample?
16   A.   All right.  We can do that.  Yes.
17   Q.   Are you familiar with this document?
18   A.   Very much.
19   Q.   And what is this document?
20   A.   This document is a sampling of Cox infringements that are
21   stored in the infringement table.
22   Q.   Can you explain how that table is created, please?
23   A.   Sure.  This table is created from the information that is
24   brought back from the infringement bot when it processes it
25   through and brings it into the table.

1  Q. Infringement --

2  A. Well, the infringement process.

3  Q. How, if at all, is the infringement bot related to

4  Infringement Finder?

5  A. Infringement Finder and bot are synonymous.

6  Q. And as we talked about before, who wrote the Infringement

7  Finder?

8  A. I did.

9          MR. CARACAPPA: Your Honor, at this time, I'd like to

10 move into evidence PX 2538.sample.

11         THE COURT: Any objection?

12         MR. BUCKLEY: No, Your Honor.

13         MR. CARACAPPA: I'd also like to move into evidence

14 2538.WAV, which is the CD which contains the entire --

15         THE COURT: All right. Received.

16 BY MR. CARACAPPA:

17 Q. Okay. Mr. Boswell, can you explain to the jury what's

18 depicted in PX 2538?

19 A. I'll look at the screen here. Yes. So right off the bat,

20 we have a standard ID number, which is an ID entry field into a

21 database table. It's just relevant for that. We have the

22 infraction GUID that we're talking about, which spans the

23 whole -- once the record is generated, that GUID is the unique

24 identifier for it.

25         We have a password field, not used. We have an IP

1  address of the computer who we connected with and shared the
2  information on the Cox network. We have paid date, paid
3  amount, first name, last name, all nulls in this case.
4         Onto the next page. Credit card information, account
5  transaction ID. We have the ISP that was the -- who was the
6  owner of the IP address. We have the title of the -- the
7  copyrighted title of the work. If you look at the first one,
8  it says, "Family Tree." We have the size of that work. It's
9  8.86 megabytes, or 9,299,439 bytes, megabytes.
10        Onto the next. We have the artist who owned that
11 work. In this case, it's Kings of Leon. We have the owner of
12 that work, which is BMG Rights Management. We have the billing
13 amount, the date that this work was generated, the port, and
14 the e-mail address who we -- who the ISP is sent to.
15 Q.   Do you know approximately how many infringement notices
16 were sent to Cox during the relevant time period?
17 A.   Yeah, 1.8 million approximately.
18 Q.   That relate to the works at issue?
19 A.   That relate, yeah.
20 Q.   Okay. Thank you.
21        Mr. Boswell -- hold that question.
22        Your Honor, can we have a brief sidebar?
23        THE COURT: Yes, sir.
24        MR. CARACAPPA: Thank you.
25        (Sidebar on the record.)

2117

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
                     Alexandria Division




---------------------------------:
                                 :
                                 :
BMG RIGHTS MANAGEMENT (US) LLC,  :
et al.,                          :
            Plaintiffs,          :
                                 : Case No. 1:14-cv-1611
    vs.                          :
                                 :
                                 :
COX ENTERPRISES, INC., et al.,   :
            Defendants.          :
---------------------------------:
```

VOLUME   10


TRIAL TRANSCRIPT


December 16, 2015


Before:  Liam O'Grady, USDC Judge


And a Jury

Norman B. Linnell/Anneliese J. Thomson  OCR-USDC/EDVA  (703)549-4626

2149

1  favor of the plaintiff from a preponderance of the evidence in
2  the case in accordance with the other instructions.
3         If you find that Cox is liable for contributory
4  infringement, or if you find Cox is liable for vicarious
5  infringement, then you should consider the amount of money to
6  award BMG.
7         If you find that Cox is neither liable for
8  contributory or vicarious infringement, you should not consider
9  this issue.
10         BMG seeks an award of statutory damages under the
11 Copyright Act.  Statutory damages are damages that are
12 established by Congress in the Copyright Act because actual
13 damages in copyright cases are often difficult to establish
14 with precision.  The purposes are to compensate the copyright
15 owner, penalize the infringer, and deter future copyright law
16 violations.
17         The amount awarded must be between 750 and $30,000
18 for each copyrighted work that you found to be infringed.  If
19 BMG proves that Cox acted willfully in contributorily or
20 vicariously infringing BMG's copyrights, you may, but are not
21 required to, increase the statutory damage award to a sum as
22 high as $150,000 per copyrighted work.
23         You should award as statutory damages an amount that
24 you find to be fair under the circumstances.  In determining
25 the appropriate amount to award, you may consider the following

2150

1  factors: The profits that Cox earned because of the
2  infringement; the expenses Cox saved because of the
3  infringement; the revenues that BMG lost because of the
4  infringement; the difficulty of proving BMG's damages; the
5  circumstances of the infringement; whether Cox acted willfully
6  or intentionally in contributorily or vicariously infringing
7  BMG's copyrights; deterrence of future infringement; and the
8  amount of harm, in the form of monetary loss, that BMG could
9  reasonably have avoided but for the failure to mitigate
10 damages, if you find that BMG did fail to mitigate.
11         You should award statutory damages whether or not
12 there is evidence of the actual damage suffered by BMG, and
13 your statutory damage award need not be based on the actual
14 damages suffered by BMG.
15         Cox's contributory or vicarious infringement is
16 considered willful if BMG proves by a preponderance of the
17 evidence that Cox had knowledge that its subscribers' actions
18 constituted infringement of BMG's copyrights, acted with
19 reckless disregard for the infringement of BMG's copyrights, or
20 was willfully blind to the infringement of BMG's copyrights.
21         In this case, Cox asserts the affirmative defense of
22 failure to mitigate damages. Cox must prove each element of
23 this defense by a preponderance of the evidence.
24         Plaintiff has a duty to use reasonable efforts to
25 mitigate damages. To "mitigate" means to avoid or reduce

2213

1  of Homeland Security, and it tries to balance all of these
2  issues.
3       Now, there are those cases when somebody goes through
4  the process and it's time to terminate, and there have been
5  some e-mails and some chats between employees, mostly Mr. Zabek
6  and his colleagues, about termination, reactivation, and
7  connecting those things to revenue.  People have said, we need
8  the revenue.  We need the customers.  We've all seen those
9  e-mails.
10      Those e-mails reflect bad judgment.  They reflect bad
11 decisions.  I think they're offensive, but they're not Cox's
12 policy, and they are not about this case.  Not one of those
13 e-mails was about a BMG notice, not about a situation with
14 Rightscorp at all.  They're not about the response to
15 Rightscorp or BMG.
16      Cox's response to Rightscorp, which is what the issue
17 here is in this case, was not about revenue.  It was about the
18 unfairness of demanding payment based on unproven accusations.
19      And Cox has worked to improve its process, as you
20 heard from Mr. Vredenburg:  "When we terminate somebody, we
21 don't turn them back on.  What we do now is we go through the
22 final suspensions, we tell the customer, 'All right, we're
23 going to talk to you twice, and on the next -- third
24 suspension, you're done.'  We terminate them.  We don't even
25 talk to them."