# Exhibit 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

----------------------------------:

BMG RIGHTS MANAGEMENT (US) LLC, et al.,
Plaintiffs,

vs. : Case No. 1:14-cv-1611

COX ENTERPRISES, INC., et al.,
Defendants.
----------------------------------:

MOTIONS HEARING

December 1, 2015

Before: Liam O'Grady, USDC Judge

tied into the DMCA and their CATS program, showed they had the right, they had the contractual right to do it.

But even more than that, with respect to the ability to control, the CATS program showed that they had lots of control and that they were exercising control.

So we think that it's completely relevant with respect to that first element of it.

Then with respect to financial benefit. As you know, Your Honor, there are a couple of reasons why we think that there is financial benefit. One, of course, is what Dr. Nowlis will show, it that it is an attraction to use Cox, it enhances the value of Cox.

But an important element of it also, Your Honor, with respect to the financial benefit, are all these e-mails in which their employee said, well, we know these guys are infringing like mad, but, you know, they pay us 400 bucks a month, we have got to keep them.

Now, Your Honor, I think that is an admission of their knowledge of financial benefit and is tied completely into this overall scheme.

Now, Your Honor, I understand the concern about going through the 13 or 14 steps of the graduated response program. And it isn't our intention to go into that in huge detail, it isn't as relevant anymore. But on the type of level that we're talking about and the specific testimony and the e-mails

concerning these various elements, Your Honor, we think that it's absolutely necessary that we present this to the jury so that they see the big picture.

You just can't see this thing as, oh, they're getting some notices coming in that has this language in it and why Cox did what they did, unless you saw what Cox was doing with respect to everything. Because this is only one element in an entire scheme basically not to take any responsible action, Your Honor.

THE COURT: So you would want to put in evidence what they did with spam and other stuff, that they followed a different policy with regard to them versus DMCA notices? Are you going to anticipate going that far?

MR. PECAU: Well, you know, Your Honor, I mean, if we had something on a comparison between what they did with respect to, you know, a broadband violation and compared that to what they did with CATS -- I mean, the amount of testimony that would be involved in that, based on what I have seen, would be a matter of 20 minutes. I mean, it's not a central part of our case.

And we really don't want to go into that level because we don't think it's that relevant anymore that the DMCA defense is out.

What we're going to focus on really is the element of knowledge. Which we think is extraordinarily important in this

case for damages, for contributory infringement, and for vicarious liability.

Thank you, Your Honor.

THE COURT: Okay. All right. So that gives you a little clearer picture of what BMG would like to present.

MR. BRIDGES: Yes, Your Honor. And it goes to -- he has articulated something very close to what I thought their theory of the case was all along. And their theory of the case was, if you don't have a DMCA safe harbor, you are liable.

There is an intervening step that they have missed. Which is, they have to prove liability because section 512 is simply a damages limitation if there is liability. If there is no liability, one doesn't reach the safe harbor to begin with because it's just about remedies.

There are a couple of points that are very, very important here, Your Honor. I think the Court asked a question as to whether -- and there may have been statements -- or the Court may have asked Mr. Pecau, well, are you going to argue that the DMCA requires notices to be forwarded?

The DMCA is nothing but a safe harbor. It has no substantive obligation for a defendant whatsoever. There is no affirmative obligation. It is optional.

So, for example, if there is -- for people paying quarterly estimated taxes, there is a safe harbor against underpayment if you pay more than a certain amount of your

previous year's taxes.

Well, if you pay that amount, you've got your safe harbor against penalties. But if you don't owe that much tax, you didn't have to opt for that safe harbor.

So the point is, the safe harbor is purely optional and it is just not an affirmative obligation.

And the section 512, I'm sorry, I don't have the statute with me, but there is a section, if the Court reads it, it says there, it does not affect any of the substantive standards of copyright law. It doesn't change what contributory and vicarious standards are.

And so -- but they've always wanted to blow up this controversy about, well, you didn't handle the DMCA well, and because of that, you must be liable. But the statute, Your Honor, section 512 precludes that type of argument.

THE COURT: So if I understand your argument, you're not arguing that BMG doesn't have the right to introduce actual infringement testimony or evidence in Cox's files, whatever they have done. Your argument is that they don't have to reference the DMCA to prove contributory infringement or the actual knowledge necessary for infringement and then contrib?

MR. BRIDGES: That's it, Your Honor. And the context here started out with Mr. Vredenburg. And what I would like to point out, the evidence that they want to make about what Cox did, none of it, none of the graduated response process has

anything to do with any BMG or any Rightscorp notices at all because Cox merely blocked them. What Cox did in escalating people up through its various steps, Cox did that only for the notices that it got from Warner Music, from Sony, from HBO. And so, these steps are completely irrelevant to this.

Whether Cox forwarded notices or not, we think that's fair game. If they want to say, did Cox terminate or not -- because I think they're arguing that the right and ability to control -- sorry, it's not right and ability to control. The standard in the Fourth Circuit Court under Nelson-Salabes and Humphreys is the right and ability to supervise infringing conduct, coupled with an obvious and direct financial interest in the infringing activity.

What the graduated response program is, they're arguing you can terminate, and that's your supervision. Well, then they can argue termination, they can argue numbers of terminations, but we don't have to go through any reference to the DMCA, and we don't have to go through all these steps.

THE COURT: Well, the problem in limiting it the way you would prefer is that the jury is not going to understand the context of the e-mails exchanged by Cox's employees. And they're the ones that talk about, this is our third warning. This customer has been at level 14 or 12, 13, and 14, and now I counseled him. The response is, counsel him again instead of terminating him.

The guy comes back and says, well, I counseled him actually last week. And so, I have done what you told me to do. Should I terminate him this time? And the answer is, no, give him another chance.

So the jury, in proving actual knowledge, the jury is going to need some context as to what this all means.

MR. BRIDGES: I understand that, Your Honor, but that context has nothing to do with these notices. It has nothing to do with this plaintiff. That context is entirely separate, a completely separate question from the question that should be here, is did Cox wrongly refuse to forward those notices? And should Cox be liable because it didn't terminate the people whom the plaintiffs want -- whom these plaintiffs wanted to terminate?

And why did Cox not terminate them? Well, among other reasons, it didn't even take the notices into the system.

What lower level Cox personnel in Hampton Roads were doing about somebody who is accused of having infringed upon Avatar five years ago in some of these e-mails and the like, Your Honor, they are a long time ago, that's the wrong -- that's precisely the wrong context for the jury.

The context that is appropriate for this jury is what did Cox do with these notices? And why? And what was the consequence of Cox's failure to deal with these notices? That's all this case is about.

And the Court said last time, this is a copyright infringement case. Absolutely. And we can apply the standards from the Supreme Court in Grokster, from the Fourth Circuit in CoStar, from the Fourth Circuit in Nelson-Salabes, and address all of these issues entirely in the context of what Cox did with these notices.

And if they want to argue the failure to terminate based on these notices -- because what they are arguing is that they also sent Cox demands for termination and Cox didn't. Cox had no affirmative obligation to terminate anybody under the DMCA because that's just a remedies limitation at its option.

If it had an obligation to terminate, the law of contributory or vicarious liability would create that obligation, not the DMCA.

So they can make a case of you didn't forward our notices and you should have terminated 138,000 people, or 500,000 people, or 78,000 people, and that's what the jury should be discussing, Your Honor.

Thank you.

MR. PECAU: Your Honor, could I respond briefly?

THE COURT: Yes, please, go ahead.

MR. PECAU: Well, not surprisingly, the defendants have described the case -- our plaintiffs' case the way the defendants would like the case to be. Well, that's fine.

But, Your Honor, really what this case is really

about is about Cox's behavior and its willfulness. And the only reason that we are looking at these issues is because it reflects what Cox's behavior is and what its willfulness is.

Now, with respect to --

THE COURT: Is it your position that the motive behind refusing to send out these notices was, it didn't want to lose customers so it wasn't even going to allow BMG's copyright notices to get to the customers and precluded it?

Because Mr. Bridges' point is, none of this e-mail traffic concerns Rightscorp's notices because none of them went to their customers.

MR. PECAU: Your Honor, I am glad you raised that because the thing is -- we are continuing to look at this from a DMCA perspective as a defense. You know, this idea of having to forward on notices and whether you're creating a safe harbor.

The real -- what we should really be looking at, Your Honor, is what do we have to show for contributory infringement and vicarious liability. Those two doctrines, they have been around for a long time, what they do is define when a person is liable for acts that are basically under its control.

THE COURT: And the opinion that I apologize for not getting you sooner, I say exactly that. You have to prove infringement. I identify half a dozen of the e-mails that show actual knowledge. You know, I find that not only actual

knowledge, but constructive knowledge, or willful blindness can be used to prove contributory infringement in the Fourth Circuit. And then you have the vicarious liability issue where we'll talk in a minute about the financial incentives that I may have misstated my limitation on Lehr's testimony as well and said that he couldn't talk about economic incentives. And I want to revisit that.

So I agree with you completely. How far do you need to go? And how are you going to use it? Because it does go to contributory infringement.

MR. PECAU: Right.

THE COURT: And you have to prove infringement. And we may have to fashion some kind of limiting instruction as to what that actual knowledge goes to.

MR. PECAU: Well, Your Honor, I think we have to look at it in terms of -- you know, the elements in contributory infringement and vicarious liability, we have to prove those things to show that they're responsible.

And if you look at the cases, Your Honor, they're not limited to the specific works at issue. They're basically looking -- they're looking at, well, for contributory infringement, they've got to know what's going on. And two, they have to materially contribute. I mean, that isn't specific to the particular, the particular works at issue.

The same thing for vicarious liability. Do you have

the right and ability to control, and are you getting a direct financial benefit? That's what all the cases are looking at.

So what we're arguing, Your Honor, and what our whole focus on in our case is not on the DMCA anymore per se. Our focus is on, what was their behavior? Right. What were they doing? Were they violating the law of contributory infringement and vicarious liability? That's our entire focus.

THE COURT: And they use the response to the settlement offers as a reason not to follow through with their customers, and they had an economic benefit as a result of not terminating any customers, is that your argument?

MR. PECAU: That's part of it, Your Honor. You know, as we've indicated -- we've indicated many times before, we think it's part of a whole scheme to avoid their responsibility under contributory infringement and vicarious liability principles. That's our whole thing.

Now, it isn't a matter of whether they forwarded it on to something. It's a matter of whether once they got notice, did they do what was required under the law?

And our argument is, Your Honor, all of these e-mails and all of these actions are directly on point. That's basically it.

THE COURT: But they did follow through in sending notices to some customers, right? Where does that fit into your theory?

MR. PECAU: Well, Your Honor -- well, it doesn't fit into our theory at all because we --

THE COURT: Well, how do you deal with that?

MR. PECAU: Are we going to deal with that? Well, Your Honor, the way we're going to deal with it is we're going to say that under principles of vicarious infringement and contributory infringement, is that when they got notices of these things, they had to act upon it. They had to act responsibly.

And they had all kinds of choices. They could have sent out their own notice. They could have ripped out whatever they didn't like in our notice. They could have forwarded our own notices. But they didn't choose any of the responsible actions. What they said is, our way or the highway.

And, Your Honor, we don't think that that's -- that there is any basis that they can take that position.

Now, you know, they can argue willfulness, and we don't know how they are going to argue --

THE COURT: Mr. Bridges' statement is that the safe harbor is just a damages issue. They don't have to opt into the safe harbor. And they don't need to issue notices to customers if they choose not to.

MR. PECAU: I agree, Your Honor.

THE COURT: And it's still your burden.

MR. PECAU: I agree, Your Honor. Safe harbor is a

defense that is out of the case. But it is still part of the case of whether they are contributorily infringing or they are in vicarious liability. And their behavior, their conduct and their willfulness, is all part of the fabric of the case and it all fits together. You just can't -- you can't take reality out of this case and then try to put something to the jury. They will have no clue as to what's going on. And it doesn't really reflect the reality of what has happened or why we believe that they are liable.

THE COURT: Okay.

MR. BRIDGES: Your Honor, the irony is not lost on me that they asked for the DMCA to be out of this case. And they got what they asked for. And now they're saying, oh, but we want it to be out of the case for any purpose that benefits them, but we still want to use it as a sword, and they don't get a shield.

Your Honor, that makes no sense as an approach. It's not an intellectually honest approach. If they wanted it in, it should have been in. And if they wanted it out, it should be out. And we believe Your Honor's ruling is that it is out.

They are trying to say, essentially, they did us wrong, they did us wrong, because they did other copyright holders wrong. And they did us wrong in a different way because they wouldn't even accept our notices. And so, we want to show how they did every other copyright holder wrong by not

implementing their graduated process correctly.

And, Your Honor, that's evidence of unrelated conduct that is irrelevant to this. The question is, were they harmed by this failure?

I need to say one thing, Your Honor. I'm sure that the water may be under the bridge on this, but I have been talking about knowledge a little bit, and I have talked about it in the past. When time comes to discuss the jury instructions, we believe that there is a sharp divide here in terms of what the appropriate standard is for contributory infringement.

And I will just zoom back for a bit. Vicarious liability is about a particular relationship. Contributory infringement is about culpable behavior. And I don't believe they mentioned in their jury instructions, they may have, but I don't think so, the Grokster decision is the latest decision on contributory. And it distinguished the Sony decision of the Supreme Court. Those are the two landmarks of contributory which establish the two essential branches of contributory.

And the Sony case, as Justice Ginsberg explained in the Grokster concurrence where she sort of set out the whole framework, she said, you're liable because you're providing a product that is devoted to infringement. That's one path. The other path is, you're liable for intentionally -- for intentionally inducing infringement.

And in the majority opinion, I think it was unanimous on this part in Grokster, the Court said, mere knowledge of actual infringing uses is not enough. Mere knowledge of actual infringing uses is not enough. Those words are in the statute.

So this is a little bit of a detour. We knew that they were going to avoid Grokster on the summary judgment motion. We knew they were going to avoid it. So we did some argument about the argument we thought that they were going to resort to. But I just want to emphasize to the Court that the correct standard is the Supreme Court standard.

And you will discover in their jury instructions that they tend to resort to Ninth Circuit law a lot. Now, we're from California, we would have been happy to have tried this case in California, Your Honor, under the Ninth Circuit, but this case got filed here. And we think the Supreme Court and the Fourth Circuit in CoStar and Nelson-Salabes should apply.

So I just want to make those cases.

One thing I noticed, the Court seems to be revisiting a couple of the decisions on this. We think the DMCA should be out. But if the DMCA in any respect comes in, then I think we absolutely need to show that Cox's response to Rightscorp was echoed by Charter, by Suddenlink, by Clearwire, by AT&T, by Verizon.

The Court had a question at one of the earlier hearings, what do other ISPs do? So to me, Your Honor, if they

want to use DMCA processes for other copyright complainants, then it would be equally fair game to bring in other ISP responses to these notices.

So there just needs to be a basic balance here. And what they're asking for is a completely imbalanced outcome, Your Honor.

Thank you.

THE COURT: Well --

MR. PECAU: Your Honor, I don't want to reargue the motion for summary judgment. I just want to make a point on what I think we're talking about.

THE COURT: Go ahead, one point.

MR. PECAU: And it's going to be very quick.

Your Honor, what they're trying to do is use this whole thing, the DMCA, as a sword and a shield. So basically what they want to do is --

THE COURT: You're in agreement then.

MR. PECAU: I am in agreement with that, Your Honor. Basically what they want to do is to be able to say that, you know, we acted responsibly. But the fact is that we should be able to show that they irresponsibly.

And the thing is that then they say, well, you know, we want to show that they were treated like everyone else. If they want to show that they were treated -- that we would be treated like everyone else if we went into their program, well,

the result of going into their program is that you're not being treated responsibly, Your Honor.

It all goes to this entire scheme that they've put together and to their willfulness.

THE COURT: Okay. All right. Well, I'm going to allow BMG to put on its theory of the case. And as promised, we're not going to harp on the 14 steps to termination. But I think that for purposes of contributory infringement, actual knowledge is BMG's burden. All of the e-mails, even though they are not of BMG clients, go to the actual knowledge of the program and the fact that Cox was not going to follow it. And they weren't going to follow it because they didn't want to lose customers. And it also clearly goes to the financial incentive to keep the customers and, therefore, is highly relevant to vicarious liability.

Whether the safe harbor defense exists or doesn't exist doesn't change plaintiffs' burden to prove direct infringement and then contributory or vicarious liability or both. And that's why there is 40 cases to read on every one of these issues. It's because the courts have allowed plaintiffs to put in the evidence of what the defendant did with regard to the DMCA and its obligation under the DMCA to or not to avoid the liability issue. And so, I think it is relevant.

As to what other ISPs did, I will continue to think about that now that you've brought it up and we've talked here