# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

SONY MUSIC ENTERTAINMENT, *et al.*,

        Plaintiffs,

    v.

COX COMMUNICATIONS, INC. and
COXCOM, LLC.

        Defendants.

Case No. 1:18-cv-00950-LO-JFA

## COX'S MEMORANDUM OF LAW IN SUPPORT OF ITS OPPOSITION TO PLAINTIFFS' OMNIBUS MOTION *IN LIMINE*

████████████████

# TABLE OF CONTENTS

Page

I.    PLAINTIFFS ARE NOT ENTITLED TO NON-MUTUAL OFFENSIVE
      COLLATERAL ESTOPPEL. ........................................................................... 1

      A.    Much of the material designated by Plaintiffs is not eligible for estoppel. ............ 1

      B.    The BMG findings for which Plaintiffs seek estoppel relate specifically to the
            availability of a DMCA safe-harbor defense, which is not presented here. ........... 2

      C.    To the extent Plaintiffs seek to use the BMG findings as evidence of Cox's
            knowledge of direct infringement, estoppel is unavailable. ................................... 4

II.   EVIDENCE THAT 96% OF SUBSCRIBERS STOP RECEIVING NOTICES
      AFTER #5 IS ADMISSIBLE. .......................................................................... 4

      A.    A foundation has been laid for DX-74............................................................. 4

      B.    DX-74 is not hearsay. ................................................................................. 6

      C.    Pre-trial preclusion is not warranted under Rule 403. ......................................... 7

III.  COX SHOULD BE PERMITTED TO INTRODUCE EVIDENCE RELATING
      TO CAS. ...................................................................................................... 8

      A.    The CAS evidence is relevant......................................................................... 9

      B.    Cox has adduced competent evidence relating to CAS. ..................................... 11

      C.    The BMG in limine ruling on CAS does not govern here. .................................. 13

      D.    Excluding this evidence will not significantly streamline the trial....................... 14

IV.   COX IS ENTITLED TO PRESENT EVIDENCE THAT IT IS NOT LIABLE
      FOR INFRINGEMENT BY CERTAIN THIRD-PARTY USERS OTHER THAN
      NAMED ACCOUNT HOLDERS. .................................................................. 15

V.    THE '236 SPREADSHEET IS RELEVANT AND ADMISSIBLE EVIDENCE. .......... 17

VI.   THE AUDIBLE MAGIC SPREADSHEET IS RELEVANT AND ADMISSIBLE
      EVIDENCE.................................................................................................. 19

      A.    The AM Spreadsheet is sufficiently authenticated. ........................................... 20

      B.    The AM Spreadsheet is neither "confusing" nor "misleading," and in any event is
            admissible. ............................................................................................... 21

      C.    Even if the AM Spreadsheet were inadmissible, Cox's expert could rely on it
            under Rule 703. ......................................................................................... 22

VII.  COX'S CUSTOMER EMAILS DISPUTING INFRINGEMENT NOTICES ARE
      ADMISSIBLE............................................................................................... 22

      A.    Cox's customer emails are not hearsay............................................................ 22

      B.    The customer emails are not unfairly prejudicial to Plaintiffs.............................. 23

VIII.   COX SHOULD BE PERMITTED TO PRESENT EVIDENCE AND
ARGUMENT RELATING TO PLAINTIFFS' PER-WORK REVENUES. ................... 24

IX.   THE WITNESSES FROM WHOM PLAINTIFFS SEEK LIVE TESTIMONY
ARE UNAVAILABLE FOR PURPOSES OF RULE 32(A)(4), MAKING THEIR
DEPOSITIONS ADMISSIBLE. ...................................................................................... 26

X.   COX SHOULD NOT BE FORCED TO MAKE KEY WITNESSES
AVAILABLE IN PLAINTIFFS' CASE. ........................................................................... 28

XI.   THERE ARE NO GROUNDS TO EXCLUDE THE TESTIMONY OF
VICTORIA SHECKLER. ................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Zurich Ins. Co.*,
   667 F.2d 1162 (4th Cir. 1982) ..................................................................................2

*Blevins v. New Holland N. Am., Inc.*,
   128 F. Supp. 2d 952 (W.D. Va. 2001) ....................................................................18

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634 (E.D.
   Va. 2015), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018)................15, 17

*Bouchat v. Champion Prods., Inc.*,
   327 F. Supp. 2d 537 (D. Md. 2003) ..........................................................................3

*Branch v. Gov't Employees Ins. Co.*,
   286 F. Supp. 3d 771 (E.D. Va. 2017) ........................................................................6

*Reddick v. Dillard Store Servs.*,
   2010 WL 3025205 (S.D. Ill. Aug. 2, 2010) ............................................................30

*Carey v. Bahama Cruise Lines*,
   864 F.2d 201 (1st Cir. 1988)..............................................................................26, 27

*Culebra II, LLC v. River Cruises and Anticipation Yachts, LLC*,
   564 F. Supp. 2d 70 (D. Me. 2008) ..........................................................................27

*In re Denslow*,
   104 B.R. 761 (E.D. Va. 1989)....................................................................................5

*DNT, LLC v. Sprint Spectrum, LP*,
   2010 WL 582164 (E.D. Va. Feb. 12, 2010)............................................................18

*Dynamic Aviation Grp., Inc. v. Dynamic Int'l Airways, LLC*,
   2016 WL 10677907 (W.D. Va. July 5, 2016)..............................................18, 19, 21

*Fairfield 274-278 Clarendon Tr. v. Dwek*,
   970 F.2d 990 (1st Cir. 1992)....................................................................................27

*Fitzgerald Pub. Co. v. Baylor Pub. Co.*,
   807 F.2d 1110 (2d Cir. 1986)...................................................................................24

*Forrester Envtl. Servs., Inc. v. Wheelabrator Techs., Inc.*,
   2012 WL 1161125 (D.N.H. Apr. 6, 2012) ..............................................................27

*A.H. ex rel Hadjih v. Evenflo Co.*,
   579 F. App'x 649 (10th Cir. 2014) ...................................................................27, 28

*Houser v. Snap-On Tools Corp.*,
   202 F. Supp. 181 (D. Md. 1962) ...............................................................................26

*Intelligent Verification Sys., LLC v. Microsoft Corp.*,
   2015 WL 1518099 (E.D. Va. Mar. 31, 2015) ...........................................................1

*Manganella v. Evanston Ins. Co.*,
   700 F.3d 585 (1st Cir. 2012) (cited at Mem. 2) .........................................................3

*In re Microsoft Corp. Antitrust Litigation*,
   355 F.3d 322 (4th Cir. 2004) ...............................................................................1, 4

*Milbourne v. JRK Residential America, LLC*,
   2016 WL 1070818 (E.D. Va. March 15, 2006) .......................................................20

*Old Chief v. United States*,
   519 U.S. 172 (1997)...........................................................................................19, 23

*One Source Environmental, LLC v. M+W Zander, Inc.*,
   2015 WL 13505360 (D. Vt. Dec. 8, 2015) ...............................................................27

*R.B. Matthews, Inc. v. Transamerica Transp. Serv., Inc.*,
   945 F.2d 269 (9th Cir. 1991) ...................................................................................28

*Redman v. John D. Brush & Co.*,
   111 F.3d 1174 (4th Cir. 1997) .................................................................................22

*Smith v. Beck*,
   2011 WL 65962 (M.D.N.C. Jan. 10, 2011) ...............................................................6

*Sony BMG Music Entm't v. Tenenbaum*,
   721 F. Supp. 2d 85 (D. Mass. 2010), *aff'd in part, vacated in part, rev'd in
   part*, 660 F.3d 487 (1st Cir. 2011) ..........................................................................24

*UMG Recordings, Inc. v. Escape Media Grp., Inc.*,
   2015 WL 1873098 (S.D.N.Y. Apr. 23, 2015)...........................................................24

*United Features Syndicate, Inc. v. Spree, Inc.*,
   600 F. Supp. 1242 (E.D. Mich. 1984)......................................................................24

*United States v. Lightly*,
   677 F.2d 1027 (4th Cir. 1982) .................................................................................12

*United States v. Masiarczyk*,
   1 F. App'x 199, 209 (4th Cir. 2001) ...........................................................................5

iv

*United States v. Tse*,
   375 F.3d 148 (1st Cir. 2004) ..................................................................23

*Univeral Elecs., Inc. v. Universal Remote Control, Inc.*,
   2014 WL 8096334 (April 21, 2014) ........................................................27

*Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*,
   2017 WL 1312968 ....................................................................................27

*Wells v. Liddy*,
   37 F. App'x 53 (4th Cir. 2002) ...........................................................4, 20

**Other Authorities**

Fed R. Civ. P. 32(a) ........................................................................................26

Fed R. Civ. P. 32(a)(4) .........................................................................26, 27, 28

Fed R. Civ. P. 45(d)(3)(A) ..............................................................................30

Fed R. Civ. P. 403 .........................................................................7, 8, 19, 23

Fed R. Civ. P. 703 ..........................................................................................22

Fed. R. Evid. 611(a) .................................................................................28, 29

Fed. R. Evid. 801(c) ........................................................................................23

Fed. R. Evid. 803(3) ........................................................................................23

Fed. R. Evid. 803(6) ..........................................................................................6

Fed. R. Evid. 804 .............................................................................................26

Fed. R. Evid. 804(a)(5)(A) ..............................................................................26

Fed. R. Evid. 901(b) ........................................................................................20

Fed. R. Evid. 901 .........................................................................................4, 20

Fed. R. Evid. 901(b)(1) ..................................................................................4, 5

Fed. R. Evid. 1006 .............................................................................................6

# INTRODUCTION

The purpose of a motion *in limine* is to "allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider." *Intelligent Verification Sys., LLC v. Microsoft Corp.*, No. 2:12-CV-525, 2015 WL 1518099, at *9 (E.D. Va. Mar. 31, 2015). It is not a vehicle for excluding relevant, admissible evidence that happens to be unfavorable to a party's case. Plaintiffs' "omnibus" motion throws nearly a dozen ill-founded evidentiary arguments against the wall, hoping that a few might stick and open a path to a $1.6 billion judgment undeserved on the merits. Plaintiffs' efforts to handicap Cox's defense should be rejected and their motion denied.

# ARGUMENT

## I.      Plaintiffs Are Not Entitled to Non-Mutual Offensive Collateral Estoppel.

Plaintiffs seek to preclude Cox from "re-litigating" aspects of its defense that they claim were decided in *BMG*. Issue preclusion is discretionary; to apply it, "the proponent must demonstrate" that the issue or fact is identical to one previously litigated, actually resolved, "critical and necessary" to a prior judgment, and that the prior judgment is final and valid. *In re Microsoft Corp. Antitrust Litigation*, 355 F.3d 322, 326 (4th Cir. 2004). Here, *none* of the issues presented were litigated or decided in *BMG*, rendering collateral estoppel unavailable.

### A.      Much of the material designated by Plaintiffs is not eligible for estoppel.

Much of the *BMG* material for which Plaintiffs seek estoppel is not properly subject to estoppel at all. Large portions of the passages highlighted in Gould Declaration Ex. 1 consist of direct quotes from documents introduced into the *BMG* summary judgment record.[1] To the extent those documents are relevant and otherwise admissible in this litigation (and Cox has explained

---

[1] *See, e.g.*, ECF No. 473-3 (Declaration of Jeffrey Gould ("Gould Dec.") Ex. 1 at 656-658 and 659-60).

elsewhere why they are not),[2] they are not "fact-*findings*" subject to estoppel. There is no sense, for example, in which the contents of a particular email were "litigated" or "decided" in *BMG*. If Plaintiffs can admit these documents into evidence at trial, they may rely on the documents for their contents, just like any other documentary evidence. Issue preclusion has no role here.

### B.    The *BMG* findings for which Plaintiffs seek estoppel relate specifically to the availability of a DMCA safe-harbor defense, which is not presented here.

As to any *BMG* findings that are potentially eligible for estoppel, Plaintiffs fail to carry their substantial burden on the threshold requirement that the second litigation involve an issue "identical" to one previously litigated and decided. *See Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982). The key findings on which Plaintiffs seek estoppel include the Court's findings that 1) "the record conclusively establishes that before the fall of 2012 Cox did not implement its repeat infringement policy;"[3] 2) "[t]he emails in the record strip Cox of any innocence," because they "make clear that it was Cox's policy to intentionally circumvent the DMCA," rendering Cox's repeat-infringer policy "an absolute mirage;"[4] 3) "no reasonable juror could find that Cox implemented a repeat infringer policy before the fall of 2012;"[5] 4) "Cox was able to tell from … account holders' statements and conduct that infringement was occurring, [but] continued to provide service;"[6] 5) "[b]y the time an account holder reaches the end of Cox's graduated response procedure, the chance that the account holder is not a willful infringer is substantially lessened;"[7] and 6) "the emails in the record reveal that Cox had knowledge that at least some of its account holders were intentionally and repeatedly infringing."[8]

---

[2] *See* Cox Motion *in Limine* No. 3 (ECF No. 478)
[3] Gould Dec. Ex. 1 at 655.
[4] *Id.* at 658
[5] *Id.*
[6] *Id*. at 662.
[7] *Id.*
[8] *Id.*

But *all* those findings (indeed all the findings for which Plaintiffs seek estoppel), relate specifically to Cox's attempt in *BMG* to invoke the DMCA safe-harbor—a defense that Cox has not asserted in this action. That defense required the Court to determine whether Cox "reasonably implemented its repeat infringer policy." As Plaintiffs concede (Mem. 2), that DMCA-specific issue will not be litigated here.[9]  Nor have Plaintiffs made any attempt to explain what *other* issue in this litigation is "identical" to that inquiry that makes the Court's DMCA-related fact-findings appropriate for estoppel. Nor could they: as Cox has explained, the emails on which the *BMG* plaintiffs largely relied to attack Cox's DMCA defense are not relevant to any issue in this case.[10] Because Plaintiffs have not attempted to identify an identical issue for estoppel, and because the only issues for which the findings were used in *BMG* are not presented here, estoppel is improper.[11]

Conscious of this flaw, Plaintiffs claim that identity of the "ultimate issue" is not necessary so long as there is identity of "necessary intermediary findings," and that "*[a]ny* related facts already addressed and resolved are precluded from relitigation."  Mem. 2 (emphasis added). But that is not the law. As Plaintiffs' authority explains, the key is that the previous case "must have effectively resolved *the issue presented here*."  *Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 591 (1st Cir. 2012) (cited at Mem. 2). If Plaintiffs were correct that subsidiary findings are eligible for estoppel whether they relate to an issue presented here or not, the identity-of-issue requirement would be meaningless.[12] Plaintiffs have not explained what "the issue presented here" is, never mind demonstrated that it was resolved in or necessary to the judgment in *BMG*.

---

[9] ECF No. 473 ("Mem." refers to Plaintiffs' Memorandum in Support of Their Omnibus MIL).

[10] *See* ECF No. 3 (Cox Motion *in Limine* No. 3).

[11] In opposing Cox's motion to exclude the same emails in *BMG*, the *BMG* plaintiffs' argument for relevance was specific to the Rightscorp issue. *See* Ex. A (*BMG* Dkt. 974 at 4).

[12] *Bouchat v. Champion Prods., Inc.*, 327 F. Supp. 2d 537 (D. Md. 2003), cited at Mem. 3, is not contrary. It merely expresses the basic principle that collateral estoppel requires identify of issues, not identity of claims; it is irrelevant here, as Plaintiffs have not demonstrated identity of issues.

C.     **To the extent Plaintiffs seek to use the *BMG* findings as evidence of Cox's knowledge of direct infringement, estoppel is unavailable.**

If it is Plaintiffs' intention to rely on *BMG* to support the ultimate issue in this case—Cox's alleged knowledge of, or willful blindness to, alleged direct infringement that was the subject of Plaintiffs' notices, the Court's findings made in resolving Cox's DMCA defense cannot be the subject of estoppel on the issue of Cox's knowledge of the alleged infringement identified by *these* notices, because that issue was neither pled, litigated, nor decided in the *BMG* summary judgment proceedings, and is not the subject of a valid and final judgment. *In re Microsoft*, 355 F.3d at 326.

## II.     Evidence That 96% of Subscribers Stop Receiving Notices After #5 is Admissible.

Cox's former privacy counsel, Randall Cadenhead, created DX-74 in or around 2010 with the assistance of Cox employee Brent Beck in connection with negotiations around CAS. Plaintiffs' motion focuses on a single page of DX-74, Bates No. COX_SONY_00519178 at 9198. They concede this page is relevant but claim it lacks foundation, is hearsay, and would be prejudicial. They are wrong.

A.     **A foundation has been laid for DX-74.**

Cox has laid a foundation for DX-74 and could further do so at trial if required. The burden to authenticate evidence "is not a high one." *Wells v. Liddy*, 37 F. App'x 53, 63 (4th Cir. 2002). Under FRE 901, a document's proponent need only "make a prima facie showing that the exhibit is what the proponent claims it to be." *Wells,* 37 F. App'x at 63 (quoting Weinstein's Federal Evidence, § 901.02[3] (2d. ed. 2001)). A primary way to lay foundation is through "testimony of a witness with knowledge." Fed. R. Evid. 901(b)(1). Cox has provided that witness in Cadenhead. At his deposition, which Cox designated for trial, Cadenhead testified that ██████████████

███████████████████████████████████████████████████████████

████████████████████████████████████ [15] This satisfies FRE 901(b)(1).[16]

Plaintiffs claim that because neither Cadenhead nor Beck recalls precisely how the document was created, it lacks foundation. But such concerns about the details of the document go to weight, not admissibility. *See United States v. Masiarczyk*, 1 F. App'x 199, 209 (4th Cir. 2001) ("Generally, objections that an exhibit may contain inaccuracies, ambiguities, or omissions go to the weight and not the admissibility of the evidence.") (quotation omitted); *In re Denslow*, 104 B.R. 761, 766 (E.D. Va. 1989). Plaintiffs cite no case law to the contrary.

Moreover, contrary to Plaintiffs' claim that the underlying data Cox produced is unrelated to the chart, the underlying email and attached data demonstrate that the data was pulled from ██

███████████████████████████████████████████████████████████

██████████████████████████.[17] Plaintiffs additionally claim that there is no foundation for the statement within the document regarding "*Notices*" sent to customers because the email concerns "infringement *tickets.*" Mem. 5. They say this is an important distinction because Cox rolled up multiple notices received within a 24-hour period in a single ticket. *Id.* But Beck explained at deposition that ███████████████████████████████████████████

---

[13] *See* Ex. B (Cadenhead Dep., 285:2-285:9).

[14] *Id.* at 285:18-286:2, 291:13-292:1.

[15] *See* Gould Decl. Ex. 8 (Beck Dep., 29:21-35:2).

[16] It was admitted in *BMG* on the same foundation. Ex. C (*BMG* Trial Tr. 1343:21-1344:10).

[17] *See* Gould Decl. Ex. 5 (COX_SONY_00974461). Plaintiffs' claim that Cox withheld this document until late into discovery is false. A version of this document, including the page at issue, was admitted in *BMG* and produced to Plaintiffs in January (*BMG* DX0141). Despite having this document for many months and asking about it at *three* depositions in early June, Plaintiffs did not move to compel this document until June 17, the last day for motions.

████████████████████████████████████████ [18] His underlying email to Cadenhead thus

supports the assertion in DX-74 that it is ████████████████████████████████ Any

clarification that is needed outside of the referenced testimony can be elicited at trial.

### B.    DX-74 is not hearsay.

DX-74 is not hearsay for multiple reasons. First, it is admissible as a business record. Data

from Cox's CATS is recorded in the normal course of business and there is no argument to the

contrary. *Branch v. Gov't Employees Ins. Co.*, 286 F. Supp. 3d 771, 777 (E.D. Va. 2017)

("evidence that has been compiled from a computer database is … admissible as a business

record"). Indeed, Plaintiffs intend to rely on this same data in their case. The presentation qualifies

as a business record because it was prepared in the normal course of Cadenhead's and Beck's job

responsibilities.[19]  Cadenhead  testified  that  he  ████████████████████████████████

████████████████████████████████████████████████████, including DX-

74.[20] Beck testified that when data was needed to prepare such analyses, he could and would pull

data from CATS.[21]  A foundation has, or can be laid, to qualify DX-74 as a business record, rending

it admissible under FRE 803(6).

At trial, DX-74 can also be admitted for purposes other than proving the truth of the matter

asserted. First, contrary to Plaintiffs' claim, the document is not "the primary basis for Dr. Lynne

---

[18] *See* Gould Decl., Ex. 8 (Beck Dep. 27:4-28:1). Cox's 30(b)(6) designee on this topic, Matthew
Carothers, similarly explained that ████████████████████████████████████████████
████████ *See* Ex. D (Carothers Dep. 185:2-13).
[19] *Smith v. Beck*, 2011 WL 65962, at *4 (M.D.N.C. Jan. 10, 2011), *report and recommendation
adopted*, 2012 WL 1340766 (M.D.N.C. Apr. 18, 2012) (admitting internal investigation report as
a business record because it was created pursuant to routine job responsibilities).
[20] Cadenhead Dep. 284:2-13, 285:18-286:2, 291:13-292:1.
[21] Gould Decl., Ex. 8 (Beck Dep. 32:2-9, 35:3-37:9).  DX-74 also qualifies as an admissible
summary under FRE 1006. Cox produced the ticket and customer data upon which the
presentation is based. Cox can authenticate this data at trial, which provides a sufficient basis for
the admission of DX-74 as a summary exhibit.



Weber's … opinion that Cox's response to infringement notices as 'effective.'"  Mem. 6. Rather, Dr. Weber relied on her ███████████████████████████████████████████, none of which is the subject of DX-74. Weber did reference DX-74 to note that █████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████[22] Weber's analyses do not rely on the truth of the document's assertions.

Moreover, Cox does not need to admit this document at trial to support an argument that ████████████████████████████████████████████████████████ ████████████████████████████████ DX-74 demonstrates that Cox had a good faith basis for believing in the effectiveness of its graduated response system as early as 2010. Thus, when Cox utilized that system in responding to the notices sent by plaintiffs during the damages period (2012-2014), it had a good faith basis that it was not "contributing to" the infringement of which Plaintiffs have complained nor was it "willfully blinding" itself to that infringement. Rather, Cox believed that its CATS system was an effective response to infringement notices. The document also demonstrates that Plaintiffs, through CAS negotiations, were aware of Cox's graduated response and Cox's decision not to join CAS because it believed CATS was an effective approach. The document has relevance separate and apart from the truth of the matter asserted.

### C.   Pre-trial preclusion is not warranted under Rule 403.

Plaintiffs also claim the exhibit should be precluded under Rule 403 because it is "misleading, deceptive, and unfairly prejudicial." Mem. 7. First, as discussed above, Plaintiffs are incorrect that the exhibit is misleading because it references "Notices" but the underlying data pertains to "tickets."  Mem. 7. Beck, Carothers, and Cadenhead each explained that the document

---

[22] *See* Ex. E (Rebuttal Expert Report of Cox's Expert Dr. Lynne Weber ¶ 95, n.82).

██████████████████████████████. *See supra* at 4-6. Plaintiffs also claim that "Cox has no proof that these subscribers actually *stopped* infringing …." *Id.* (emphasis added). The jury is free to adopt any reasonable inference that can be drawn from this document, including the inference that subscribers who were not the subject of any further customer facing actions were not the subject of any further notices because they did in fact stop infringing. Plaintiffs may dispute the inference that Beck and Cadenhead drew, but that is no basis for invoking Rule 403.

## III. Cox Should Be Permitted to Introduce Evidence Relating to CAS.

During Plaintiffs' claim period, the RIAA and several Plaintiffs signed a "memorandum of understanding" ("MOU") committing to the Copyright Alert System ("CAS"), as the standard by which participating rights holders and major ISPs would abide for detecting copyright infringements, for sending infringement notices to ISPs, and for how ISPs were to interact with their subscribers in response to those notices.[23] CAS was a graduated response system that placed caps on the number of notices that would be sent to ISPs. Cox's CATS system implemented a similar progressive response policy, and it also capped notices. But Cox did not sign onto CAS because it believed that CATS was more effective at combating alleged copyright infringement than CAS. For one thing, CATS provided for the possibility that certain "repeat infringers" would have their internet service terminated, ████████████████████████████.

Plaintiffs now seek to preclude Cox from presenting evidence "relating to the policies or practices of other ISPs," including evidence relating to the CAS procedures the Plaintiffs themselves endorsed, while simultaneously contending that Cox's implementation of a stricter and more extensive progressive responsive system constituted turning a blind eye to notices of infringement. *See* Mem. 7-1. Plaintiffs' reliance on this Court's ruling on a motion *in limine* in

---

[23] Ex. F (*FAQ's on The Center for Copyright Information and Copyright Alert System*, Bates No. COX_SONY_00006140).

*BMG* should be rejected given the very different facts here—not only was BMG not a signatory to CAS, but unlike here, the *BMG* evidentiary record on CAS was undeveloped.

### A.      The CAS evidence is relevant.

During Plaintiffs' claim period, five major ISPs (███████████████████ ████████████████████████████████████████████████████ ████████████), content owners (███████████████████████████████████ ███████████████████), the RIAA, and the Motion Picture Association of America entered into the MOU to address and deter online copyright infringement.[24] In the MOU, the RIAA and the signatory Plaintiffs ██████████████████████████████████████



[25]

Cox was not a signatory to the MOU. It had already implemented its own graduated response system—CATS—for addressing copyright infringement notices years before CAS was implemented. In fact, Cox's graduated response was tougher than CAS in several respects. Most notably, unlike CAS, Cox's process resulted in the termination of service for certain "repeat infringers."[26] By contrast, █████████████████████████████████████████ ██████████████████████████████████████[27] And unlike CAS, CATS did not ████

---

[24]   *See* Ex. G (Memorandum of Understanding or "MOU," Plaintiffs_00286200 at Plaintiffs_00286220-36).
[25] *Id.* at 8-15.
[26]*See* Ex. H, (Bates No. COX_SONY_00001240).
[27] *See* Ex. I (Marks Dep., 139:12-24); *see also* Ex. J (Lesser Dep., 116:13-21, 205:16-22).

███████████████████████ Cox continued to engage through additional rounds of increasingly aggressive responses, which continued to diminish infringement.[28]

In this case, Plaintiffs have argued that Cox refused to take reasonable measures to curb infringement.[29] Indeed, their theory of liability is that Cox "continued [its] provision of service to known infringers."[30] The fact that the RIAA and signatory Plaintiffs negotiated CAS—████████████████████████████████████████████—is *highly relevant* to Plaintiffs' theory that Cox's more stringent system was unreasonable.

The parties to CAS also ███████████████████████████████████████████████████████████████████[31] Despite their approval of such caps for CAS, Plaintiffs claim that—during the same time period—Cox's "caps" on notices demonstrates Cox's "willful blindness" to infringement.[32] The evidence in the record demonstrates that the ███████████████████████ Coupled with Plaintiffs' ███████████, a reasonable juror might well conclude that Cox's caps were reasonable.

Further, the CAS-related evidence is also relevant to statutory damages and any harm to the Plaintiffs caused by the alleged infringements. As Plaintiffs argued at the summary judgment hearing, they plan to introduce evidence that piracy *generally* harms copyright holders, and that this harm will continue if so-called "repeat infringers" are not terminated by ISPs like Cox.[34] If Plaintiffs are permitted to introduce this testimony through their putative expert Dr. Lehr or fact

---

[28] *See* Ex. H (Cox Abuse Ticket Handling Procedures, Bates No. COX_SONY_00001240); *see also* Ex. E (Weber Rpt., ¶ 92).
[29] ECF No. 136, Amended Complaint, ¶ 2.
[30] Ex. K (Oct. 24, 2019 Summary Judgment Hr'g Tr. at 52:4-6).
[31] *See* Ex. G (MOU 5(C), Plaintiffs_00286200 at 215).
[32] *See, e.g.*, ECF No. 313 (Pls.' Mot. for Summary Judgment at 27-28).
[33] *See* Ex. E (Weber Rpt., ¶139).
[34] Ex. K (Oct. 24, 2019 Summary Judgment Hr'g Tr. at 52:18-53:11).

witnesses, Cox should be able to rebut it with evidence that Plaintiffs and their agent entered an agreement that did not require termination and endorsed responses to infringement notices that were a pale imitation of Cox's—which challenges the credibility of this testimony.

Plaintiffs claim that this evidence is irrelevant because they do not consider CAS an "industry standard," ignoring the fact that nearly the entire music and motion picture industry as well as the leading ISPs agreed to it. The fact that Plaintiffs (uniformly) testified at deposition that

██████████████████████████████████████████████████████████████████

████████████████████████. At most, it frames a factual issue.[35]

### B.   Cox has adduced competent evidence relating to CAS.

Plaintiffs initially refused to produce discovery on CAS, but were ordered to produce the MOU, the "implementation agreements" showing what measures each ISP agreed to take, and documents sufficient to show whether each Plaintiff was a signatory during the claim period.[36] Cox subsequently subpoenaed Jill Lesser, the former executive director of the Center for Copyright Information, the entity that administered CAS. Lesser authenticated the MOU and other CAS-related documents and testified on several topics, including █████████████████████

████████████████████████████████████████████████████████[37] Cox also questioned the RIAA and the CAS-signatory Plaintiffs about their involvement in CAS. Indeed, RIAA witness Steven Marks testified that ███████████████████████████████████

██████████████████████████████████████████████████████████████████

---

[35] Plaintiffs' implication that ████████████████████████████████████████████
████████████

[36] *See* Ex. L (Jan. 25, 2019 Hr'g Tr. at 61:22-62:9; *see also id.* at 62:17-19 ("each plaintiff needs to get on the record as to whether they were or weren't part of this.").

[37] *See* Ex. J (Deposition of Jill Lesser, 88:16-17, 92:12-93:22, 106:16-18, 111:4-22, 115:19-116:2. 205:21-22).

███████████████████████.[38] Cox also subpoenaed Stroz Friedberg ("Stroz"), an independent

consultant. While Stroz is independently relevant to this case because it assessed the MarkMonitor

system (discussed below in Section D), it also assessed the various ISPs' implementations of CAS,

and Cox received and took testimony on those assessments.[39]

Much of Plaintiffs' motion focuses on the fact that Cox did not subpoena individual ISPs

about their policies. *See* Mem. 9. As a result, Plaintiffs claim that "Cox has no competent evidence

to offer." *Id*. But this is patently false; as detailed above, there are at least six witnesses with

personal knowledge of CAS, documents detailing ISPs' obligations under it, and independent

assessments of how the obligations were implemented. This is very different from *BMG,* where

the *only* witness proposed to testify about CAS and other ISP practices was Cox's witness Matt

Carothers.[40]

Indeed, there is competent evidence regarding the practices of the other ISPs. Stroz

assessed each of the five ISPs' implementation of CAS and found that they ██████████████

████████████████████████████████████. Both the Stroz witness and the

RIAA witness authenticated these reports in their depositions.[41] There is therefore no need for Cox

to call the ISPs themselves to testify that they did what Stroz Friedberg found that they did,

████████████████████████████ Plaintiffs' apparent argument that the *only*

competent evidence as to other ISPs' practices is first-hand testimony from the ISPs themselves

contradicts well-established evidentiary rules. *See United States v. Lightly*, 677 F.2d 1027, 1028

---

[38] *See* Ex. I (Deposition of Steven Marks, 100:12-102:10, 129:4-132:9).

[39] *See e.g.,* Ex. I (Marks Dep., 200:2-10, 201:7-12)*.*

[40] Gould Dec., Ex. 13 at 4 (denying Cox's motion in part because "the jury would be presented only with Mr. Carothers's impressions of other ISPs' practices based on his conversations with their abuse teams. But Mr. Carothers has no personal knowledge of these issues.").

[41] Ex. M (Deposition of Samuel Rubin, 200:20-202:24, 205:17-207:9); Ex. I (Marks Dep., 194:11-23, 200: 2-10, 207:16-24, 212:5-13, 216:14-21).

(4th Cir. 1982) (a witness must simply have "personal knowledge of the matters about which he is to testify").

In any event, Plaintiffs' argument wrongly assumes that the *only* relevant takeaway from CAS is that other ISPs ███████████████████████████████████████. *See* Mem. 8 (arguing that Cox should be precluded from arguing that █████████████████████████ ███████████████████. But, as set forth above and below, CAS's relevance is far broader than that because the RIAA and Plaintiffs themselves negotiated and signed onto the agreement. This evidence is also relevant to Plaintiffs' primary theory of the case—that Cox's graduated response was an unreasonable response to infringement notices, and that ███████████████ ████████████████████████ CAS is relevant because it shows that Cox's similar but tougher graduated response was a reasonable approach. Plaintiffs cannot dispute that there is competent evidence of CAS's terms and that Plaintiffs and the RIAA voluntarily participated in it.

### C.     The *BMG in limine* ruling on CAS does not govern here.

Plaintiffs emphasize that the *BMG* Court granted BMG's motion to prohibit Cox from referencing CAS.[42] Then, prior to the *BMG* retrial, Cox moved for reconsideration, which the Court denied for several reasons, none of which apply here.[43]

*First*, unlike BMG, the RIAA and several Plaintiffs themselves negotiated and signed onto CAS. This is not simply an issue of comparing Cox's policies to those of other ISPs—this evidence shows what Plaintiffs themselves considered to be an acceptable response from ISPs to infringement notices and is therefore highly relevant to whether Cox's response was unreasonable.

*Second*, the Court excluded CAS-related evidence in *BMG* in part because it would have been introduced solely through a Cox witness who it found lacked personal knowledge. But here

---

[42] Gould Dec., Ex. 6 (Nov. 25, 2015 Order on Motions *in Limine* and *Daubert* Motions).
[43] Gould Dec., Ex. 13 (Aug. 9, 2018 Order to Cox's Motion to Reconsider).

there is extensive documentary evidence and the testimony of a number of witnesses with personal

knowledge of CAS, including Steven Marks, who, for the RIAA, ███████ and signed onto CAS

on behalf of ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████.

     *Third*, the Court's final reason for excluding CAS-related evidence in *BMG* was that it

found Cox had not adequately disclosed this theory during discovery.[44] Plaintiffs cannot argue that

is the case here: Cox has aggressively sought CAS discovery since the beginning of discovery.

     **D.**     **Excluding this evidence will not significantly streamline the trial.**

     Plaintiffs ask the Court to exclude not only documentary evidence relating to CAS and the

testimony of Lesser, but also the testimony of Stroz and former employees of Harbor Labs,

claiming that "[e]ach witness was deposed only on matters pertaining to CAS." *See* Mem. at 11.

This is a misrepresentation. Stroz and Harbor Labs were subpoenaed because they conducted

independent assessments of the MarkMonitor system used to purportedly detect and verify the

alleged infringements. The RIAA and CAS-signatory Plaintiffs used MarkMonitor both for CAS

*and* to send notices to Cox. These witnesses were questioned at length about their critiques of

MarkMonitor and recommendations for improvement; this had nothing to do specifically with

CAS or the practices of other ISPs. Indeed, the Harbor Labs witnesses did not testify about CAS

at all, except vis-à-vis which version of the MarkMonitor system was used for it. And while the

Stroz witness testified about its assessment of ISPs' implementation of CAS, the majority of his

testimony addressed Stroz's recommendations for improvements to MarkMonitor that had nothing

to do with CAS. Granting Plaintiffs' motion would not obviate the need to call these witnesses.

---

[44] Gould Dec., Ex. 13 at 4-5.

IV.     **Cox Is Entitled to Present Evidence That It Is Not Liable for Infringement by
        Certain Third-Party Users Other than Named Account Holders.**

Plaintiffs ask the Court to "preclude Cox from arguing that it is not liable for infringement

over its network by users other than named account holders," claiming that the Court precluded

such arguments in *BMG*. Mem. 11-12. Plaintiffs are wrong. Contrary to Plaintiffs' misleading

paraphrase, the Court did not hold that an ISP was categorically liable for the acts of "those users

[with access to Cox's service]." Mem. 12.[45] Nor did the Court "reject" Cox's argument that it

should not be liable for infringement by certain categories of non-subscribers. Rather, the Court

recognized that "Cox's liability for infringement over its network is not boundless," and expressly

held that Cox was "free to present evidence at trial that might weaken any inference raised by [the

plaintiffs'] evidence of infringement." *BMG*, 149 F. Supp. 3d at 664. Similarly, the Court's ruling

on BMG's concurrent motion *in limine* expressly permitted Cox to present evidence that it was *not*

liable for unauthorized users of a residential Internet account.[46]

Taken together, the Court's *BMG* rulings recognized at least three categories of users of a

residential Internet account: the user whose "name … appear[s] on the bill;"[47] other "member[s]

of a multimember household" who were "authorized users;"[48] and unauthorized users.[49] Contrary

to Plaintiffs' mischaracterization, the *BMG* Court plainly recognized that Cox might *not* be liable

---

[45] The phrase "users [with access to Cox's service]" is Plaintiffs' language, not the Court's, and is misleading. What the Court actually said was that "it is typical for **each member of a multimember household** to access the internet via an agreement between Cox and one individual in the household," and that "evidence that any **one of those users** infringed would be sufficient," even if the user's "name does not appear on the bill." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 664 (E.D. Va. 2015) (emphases added).

[46] *See* Gould Decl. Ex. 6 (*BMG* Dkt., ECF 691 at ¶ 17 (Order on BMG's Motion *in Limine* No. 6)).

[47] *BMG*, 149 F. Supp. 3d at 664.

[48] *See* Gould Decl. Ex. 6 (*BMG* Dkt. 691 at ¶ 17).

[49] *See id.*

for infringement by *unauthorized* users. Accordingly, Cox was permitted to offer evidence to that effect. The Court should not depart from that rule here.[50]

Finally, to the extent Plaintiffs seek to preclude Cox from arguing that it is not liable for infringement by end users of Cox Business accounts, that argument should be rejected. The Court's *BMG* ruling addressed only residential accounts, and is inapplicable to issues of Cox's liability for infringement by Cox Business end users. Unlike alleged infringement by residential subscribers—where the sole question was whether the accused *direct* infringer was an authorized or unauthorized user of the account—accused Cox Business account holders are not, and cannot be, direct infringers. At most they are secondary infringers, based on the activities of *their own* end users. If Cox is to be held liable, it must be for the direct infringements of those end users. Accordingly, argument and evidence concerning Cox's liability for end users of Cox Business subscribers is directly relevant to core issues that the jury must decide in this case, including at least (1) whether Plaintiffs' notices identifying Cox Business account holders were sufficient to give Cox the requisite knowledge of direct infringement by Cox Business end users; (2) whether Cox had the requisite ability to "do something" about direct infringement by Cox Business end users; (3) whether Cox had the right and practical ability to supervise direct infringement by Cox Business end users; and (4) whether Cox derived a direct financial benefit from infringing activities of Cox Business end users. Thus, even if the Court were inclined to grant Plaintiffs' motion as to Cox's residential subscribers—which it should not—there is no basis for granting it as to Cox Business subscribers. The Court should reject Plaintiffs' baseless motion as to both kinds

---

[50] Plaintiffs' pretense that Cox's Authorized Use Policy ("AUP") is a new factor, or a relevant one, is specious. Just as in *BMG*, where the very same argument was made and rejected, the AUP is a red herring: a private agreement between Cox and its subscribers cannot create liability where none exists. *See* Ex. N (*BMG* Dkt. 560 at 4).

of subscribers and hold, as it did in *BMG*, that "Cox is free to present evidence at trial that might weaken any inference raised by … evidence of infringement." 149 F. Supp. 3d at 664.

## V.      The '236 Spreadsheet Is Relevant and Admissible Evidence.

Plaintiffs seek to preclude evidence concerning the '236 Spreadsheet, arguing that it is irrelevant and misleading. Mem. 14. Plaintiffs' motion ignores the broad standard of relevance and merely frames a factual dispute for resolution by the jury.

In order to prove that Cox subscribers directly infringed Plaintiffs' works, Plaintiffs intend to rely on a later version of the '236 spreadsheet; namely, the '431 Spreadsheet.[51] The '431 Spreadsheet is alleged to be a ████████████████████████████████████

████████████████████████████████████████████████[52] In Plaintiffs' words, "The ['431] Spreadsheet containing Audible Magic verifications is the crucial link between the files 'shared' by Cox subscribers and Plaintiffs' copyrighted works. Plaintiffs' experts … rely upon that evidence and the case is organized around it."[53] The difference between the two Spreadsheets is that the '236 Spreadsheet contains information ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ The relevance of the '236 Spreadsheet is uncontestable: if the '431 Spreadsheet is a "crucial link" for Plaintiffs' claims, the '236 Spreadsheet, as an earlier

---

[51] *See* Ex. O (Screenshot of '236 and '431 metadata). Both spreadsheets ████████████████

████████████████████████████████████████████████████████████

[52] Frederiksen-Cross opined that the '431 Spreadsheet showed ████████████████

████████████████████████████ *See* Ex. P, Frederiksen-Cross Reply Report, ¶11; *see also* Ex. Q (P2P Enforcement Process, 10) ████████████████████████████████

████████████████████████████████████████████████████████████

[53] *See* ECF No. 352 at 20 (Plaintiffs' Opposition to Cox's Motion for Discovery Sanctions and to Preclude Plaintiffs' Use of MarkMonitor Evidence).

and more complete version of that document, is relevant to rebut those claims and to cross-examine those of Plaintiffs' witnesses who will testify regarding them.

Plaintiffs complain that Cox's interpretation of the data within the '236 Spreadsheet, characterizing it as "misleading," but that goes to the weight of the evidence—not its admissibility. *See, e.g., DNT, LLC v. Sprint Spectrum, LP*, No. CIV.A. 3:09CV21, 2010 WL 582164, at *3 (E.D. Va. Feb. 12, 2010); *Blevins v. New Holland N. Am., Inc.*, 128 F. Supp. 2d 952, 957 (W.D. Va. 2001). Likewise, Plaintiffs argue that the data within the '236 Spreadsheet would confuse the jury, but this too goes to its weight and is not a basis for excluding the evidence. *Dynamic Aviation Grp., Inc. v. Dynamic Int'l Airways, LLC*, No. 5:15-CV-00058, 2016 WL 10677907, at *2 (W.D. Va. July 5, 2016) (denying plaintiffs' motion *in limine* because "[t]he jury must ultimately decide the confusion issue, and plaintiffs' evidence is both relevant and highly probative to that inquiry").

Moreover, Plaintiffs' arguments concerning the supposed irrelevance of the data that is included in the '236 Spreadsheet ███████████ '431 Spreadsheet are simply wrong. It is undisputed that MarkMonitor routinely received ██████████████████████████████ ████████████████████████████████████[54] Prior to February 2015, MarkMonitor ████████████████████████ Subsequent to February 2015, MarkMonitor ███████████████████[55] ██████████████████████ ████████████████████████████████ ████████████████████ The data fields ████████████████ ████████████████ are material for the following reasons:



- ████████████████████████████████████

---

[54] Ex. R (Sept. 27, 2019 Hearing Tr. at 35:20-21).
[55] Gould Dec., ¶19 and Ex. 17.
[56] Gould Dec., ¶20.

18



Plaintiffs ultimately want the '236 excluded because it undermines their claims. But "unfair prejudice" under Rule 403 does permit excluding evidence simply because it may hurt a litigant's case. *Old Chief v. United States,* 519 U.S. 172, 193 (1997). The '236 spreadsheet is admissible.

## VI.    The Audible Magic Spreadsheet Is Relevant and Admissible Evidence.

Plaintiffs claim the Audible Magic Spreadsheet, REV0003444 (the "AM Spreadsheet"), is inadmissible because it "has not been authenticated" and therefore "lacks foundation." Mem. 18. They are wrong.

---

[57] Ex. S (Paszkowski Dep. Tr. at 81:6-11).
[58] Gould Dec. ¶¶19-20.
[59] *Id.*
[60] This is corroborated by the fact that ████████████████████████████████████
████████████   *See* Ex. T (Feamster Rebuttal Report at ¶¶ 35, 156-159); *see also* Ex. U (Frederiksen-Cross Dep., 87:5-90:12).
[61] *See* ECF. No 473-2 (Declaration of Vance Ikezoye, ¶¶15 a & b); ECF No. 373-1 (Declaration of Sam Bahun ¶26).
[62] *See* ECF No. 238-1, Declaration of Diana Hughes Leiden at ¶12.
[63] *Id.*; *see also* Ex. V (Frederiksen-Cross Rpt., ¶81).

### A.     The AM Spreadsheet is sufficiently authenticated.

Plaintiffs' argument that the AM Spreadsheet has not been authenticated ignores the standard set by FRE 901, which requires only a "prima facie showing that the exhibit is what the proponent claims it to be." *Wells,* 37 F. App'x at 63 (quoting Weinstein's Federal Evidence, § 901.02[3] (2d. ed. 2001)). The Rule identifies several exemplary ways to authenticate or identify the evidence, including through the testimony of witnesses and the "distinctive characteristics" of the evidence, such as "the appearance, contents, substance, [or] internal patterns" of the evidence in light of "all the circumstances." Fed. R. Evid. 901(b). "Authentication may be accomplished entirely through circumstantial evidence, and any and all manner of circumstantial evidence may be used to establish that the document is genuine." *Milbourne v. JRK Residential America, LLC*, 2016 WL 1070818, at *3 (E.D. Va. March 15, 2006) (quotation omitted).

Here, Audible Magic produced the Spreadsheet in response to requests for production of "databases … or other repositories of information concerning the fingerprinting."[64] Audible Magic's 30(b)(6) witness, Ikezoye, █████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████.[65] Other evidence confirms that the AM Spreadsheet data corresponds precisely with the specific data-types provided by Audible Magic to MarkMonitor as part of the matching process.[66] Moreover, Cox's expert Dr. Feamster, who

---

[64] *See* Ex. W (Audible Magic Subpoena, ¶6).
[65] Ex. X (Ikezoye Dep. 138:10-141:4); *see also id.* at 173:21-174:8; 175:8-178:10
[66] Ex. S (Paszkowski Dep. at 80:9-83:13)



*See also* Ex. X (Ikezoye Dep., 120:9-121:2)

attended Ikezoye's deposition and reviewed the AM Spreadsheet, opined that "[b]ased on Mr. Ikezoye's testimony, and my past experience with data recording methods, ███████████████ ████████████████████████████████████████████████████████████████████ ECF 364-11 (Feamster Dec. (9-20-19), ¶¶ 5-6). Plaintiffs' expert Frederickson-Cross also referred to the AM Spreadsheet as ████████████████████████████████ in her deposition.[67]

Notably, Plaintiffs do not dispute that the AM Spreadsheet is, in fact, ████████████████ referred to by Ikezoye. Plaintiffs have had ample opportunities to deny that the AM Spreadsheet is what it purports to be, both in numerous motions and, most obviously, in the declaration Ikezoye solicited by Plaintiffs in opposition to Cox's Preclusion Motion. Neither Plaintiffs nor Ikezoye did.

**B.    The AM Spreadsheet is neither "confusing" nor "misleading," and in any event is admissible.**

Plaintiffs also argue that the AM Spreadsheet should be precluded as "misleading" because it is missing data concerning verifications completed for MarkMonitor from 2008-2011. That argument is unfounded for multiple reasons.

First, this is the wrong standard for admissibility: arguments that evidence would confuse the jury go to its weight, not admissibility. *See Dynamic Aviation Grp.,* 2016 WL 10677907, at *2. Second, Plaintiffs have not produced any evidence of Audible Magic's pre-2012 verifications, because they destroyed it.[68] What will mislead and confuse the jury is the presentation of evidence that has been cleansed of conflicting data points that Plaintiffs destroyed or refused to produce. The only reason a dispute exists about the spreadsheets is that Plaintiffs' recordkeeping practices

_____

███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████

[67] Ex. U (Frederiksen-Cross Dep., 90:15-91:10).
[68] ECF No. 352 at 11.

created one, but that is no justification for telling the jury only half of the story. Third, the AM

Spreadsheet ███████████████████████████████████████████████████████████████

████ [69] Indeed, ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████. [70] Thus, at a

minimum, the AM Spreadsheet bears on the bulk of the alleged infringement at issue.

### C. Even if the AM Spreadsheet were inadmissible, Cox's expert could rely on it under Rule 703.

Finally, regardless of the spreadsheet's admissibility, Cox's expert Dr. Feamster can offer

opinions reliant on it by Fed. R. Evid. 703, which "permits the admission of expert opinion

testimony even though the expert has relied on evidence that is inadmissible," so long as the

evidence is "of a type reasonably relied upon by experts in the particular field in forming opinions

or inferences upon the subject." *See Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th

Cir. 1997). Feamster has explained his basis for relying on the AM Spreadsheet at length. [71]

## VII. Cox's Customer Emails Disputing Infringement Notices Are Admissible.

Plaintiffs seeks to exclude from evidence more than 1,800 emails Cox received from

subscribers in response to infringement notices, arguing that the emails are hearsay and that their

admission would unfairly prejudice Plaintiffs. Plaintiffs are wrong on both counts.

### A. Cox's customer emails are not hearsay.

Plaintiffs argue that Cox's customers' responses objecting to infringement notices are

hearsay that cannot be used "to cast doubt on whether Plaintiffs have proven direct infringement."

Mem. 20. But an out-of-court statement is hearsay only if "offer[ed] in evidence to prove the truth

---

[69] *See* Ex. X (Ikezoye Dep. at 175:25-177:22, confirming that the transaction logs contain

████████████

[70] *See* Ex. U (Frederiksen-Cross Dep., 162:9-163:4).

[71] *See* ECF No. 364-11, Declaration of Dr. Nick Feamster.

of the matter asserted in the statement." Fed. R. Evid. 801(c). The "matter asserted" in the nearly 2,000 customer emails is generally a subscriber's statement that he or she did not download the file identified in a MarkMonitor infringement notice. *See* Gould Dec. Ex. 24. Cox will not offer the emails to prove the truth of those assertions. Rather, Cox will offer the emails for other purposes. First, the emails provide evidence of Cox's state of mind with respect to infringement. Fed. R. Evid. 803(3). Whether the customers' assertions of innocence or mistake were true or not, Cox's receipt of several thousand emails making such assertions undermines Plaintiffs' claim that infringement notices are sufficient to prove actual knowledge of, or willful blindness to, infringement. Second, Cox will offer the emails to rebut Plaintiffs' claim that no Cox subscriber ever disputed an allegation of infringement. Third, Cox's expert Dr. Weber relies on these emails to support her opinion that it was reasonable for Cox not to automatically terminate repeat infringers (*see* Weber Rep., ¶¶ 78-79) or to respond to first notices (*id.*, ¶ 93). Offered for any of these purposes, Cox's customer emails are not hearsay, and are admissible.

### B.     The customer emails are not unfairly prejudicial to Plaintiffs.

Plaintiffs claim that the customer emails should be excluded under Rule 403 because they have "a strong potential to mislead and cause unfair prejudice," and would create "a situation … rife for [sic] speculation, confusion, or abuse." Mem. 20. But as the party opposing admission under Rule 403, it is Plaintiffs' burden to demonstrate *why* presenting Cox's customer emails to the jury would cause undue "speculation confusion or abuse." *See, e.g., United States v. Tse*, 375 F.3d 148, 164 (1st Cir. 2004). They have not done so. Their complaint that "[t]hese out of court declarants cannot be cross-examined, nor their assertions meaningfully tested" is merely a reiteration of their hearsay claim, not a source of prejudice. Evidence that is unfavorable to the Plaintiffs' case may cause "prejudice," but it does not constitute *unfair* prejudice under Rule 403. *See, e.g., Old Chief*, 519 U.S. at 193.

VIII.  **Cox Should Be Permitted to Present Evidence and Argument Relating to Plaintiffs' Per-Work Revenues.**

Plaintiffs claim that their historical per-work revenue numbers should be excluded as irrelevant and prejudicial. Mem. 20. On relevance, Plaintiffs are simply wrong: the jury may consider several factors in determining statutory damages, including the relative value of Plaintiffs' copyrights. As for prejudice, Plaintiffs' conclusory assertion that per-work revenues are "inherently misleading" and "unsupported by the evidence" is based entirely on a claim that its revenues are "cannibalized" by piracy—a claim for which, ironically, there is no evidence at all.

Ample authority supports the relevance of per-work value in determining statutory damages. If Plaintiffs establish liability at trial, the jury will be instructed to consider several factors when assessing statutory damages on thousands of works. Among those factors may be the relative value of each of Plaintiffs' copyrights. *See, e.g.*, *Sony BMG Music Entm't v. Tenenbaum*, 721 F. Supp. 2d 85, 93 (D. Mass. 2010), *aff'd in part, vacated in part, rev'd in part*, 660 F.3d 487 (1st Cir. 2011); *Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986); *United Features Syndicate, Inc. v. Spree, Inc.*, 600 F. Supp. 1242, 1245–46 (E.D. Mich. 1984).[72]  The jury has wide discretion in determining statutory damages. *UMG Recordings, Inc. v. Escape Media Grp., Inc.*, 2015 WL 1873098, at *8 (S.D.N.Y. Apr. 23, 2015). It could (for example) decide to award higher statutory damages for more frequently infringed works or those works from which Plaintiffs earn more revenue. Without Plaintiffs' per work revenue for the years at issue, the jury would be deprived of the information with which to make this type of valid assessment.[73]

---

[72] Judge Anderson recognized the relevance when he compelled Plaintiffs to produce it. *See* Ex. L (Jan. 25, 2019 Hr'g Tr. 20:22-24) ("THE COURT:…if there is a copyrighted work in which there has been no revenue for four years, don't you think that's going to be significant?").
[73] Plaintiffs' claim that this information is "highly confidential, competitively sensitive information that Plaintiffs do not share publicly" is unavailing. Plaintiffs brought this case seeking nearly $1.6 billion in statutory damages. Putting aside the merits of their claim, their concerns, if deemed legitimate, can be addressed in myriad ways. Preclusion is not warranted.

Plaintiffs' primary argument—which appears to be the basis for both their relevance objection and their prejudice objection—is that per work revenue cannot "provide a basis to understand the relative value of individual works for purposes of assessing statutory damages," because their "lawful sales were cannibalized by the massive piracy …." Mem. 21. But it is undisputed that many of Plaintiffs' works generated very little, if any, revenue during the Claim Period and were subject to equally few, if any, notices of alleged infringement. And there is *no evidence at all* that Plaintiffs' "lawful sales" of these low-value works were "cannibalized" by infringement. A conclusory allegation of "cannibalization" by counsel does not somehow render Cox's evidence irrelevant, and cannot be the basis for a finding of unfair prejudice.

Plaintiffs also seek to preclude this evidence because Cox's expert Tregillis only considered Plaintiffs' earnings from a handful of works when opining that ███████████ ████████████████████████████████████████████████████████████ Mem. 22 (citing Gould Ex. 12, ¶¶ 80-82). Plaintiffs argue that the evidence is irrelevant because Tregillis did not highlight how much Plaintiffs earned from each work in suit. *Id.* For one, the amount Plaintiffs earned from each work is demonstrated by the data they produced. Moreover, Plaintiffs ignore that Tregillis ████████████████████████████████████████████ With that calculation and Plaintiffs' revenue data, Tregillis can explain to the jury, as he did in his report, how much Plaintiffs earned for certain works as opposed to others.[74]

Plaintiffs will argue for maximum statutory damages for each of their 10,100 works in suit, entitling them to an award of nearly $1.6 billion. In so arguing, Plaintiffs will claim that their core asset is their copyrights, and that the value of their core asset has been decimated by piracy. But they will also argue that calculating how much they have been harmed by Cox's alleged piracy is

---

[74] Plaintiffs did not ask Tregillis any questions regarding this analysis at his deposition.

impossible. The evidence demonstrates that many of the Plaintiffs' assets were the subject of very few infringement notices and generated very little value in the first place. This is important context for the jury if they are charged with determining statutory damages in this case.

## IX. The Witnesses from Whom Plaintiffs Seek Live Testimony Are Unavailable for Purposes of Rule 32(a)(4), Making Their Depositions Admissible.

Plaintiffs argue that Cox should be precluded from offering deposition testimony from four Cox employees and two former Cox employees "because they are not unavailable" under FRE 804(a)(5)(A), making their testimony "inadmissible hearsay." Mem. 22. They are wrong.

FRCP 32(a)(4) permits a party to present at trial the deposition of a witness who is "more than 100 miles from the place of the hearing or trial ... unless it appears that the witness's absence was procured by the party offering the deposition."[75] It is undisputed that all six witnesses identified by Plaintiffs (Stifel, Summers, Jarchow, Delgado, Zabek, and Sikes) are located more than 100 miles from the courthouse. Because Plaintiffs successfully opposed a motion to change venue to Atlanta, which would have brought five of these witnesses within the 100-mile rule, their only argument for avoiding Rule 32(a)(4) is their claim that "Cox has procured the absence" of the witnesses "by failing to exercise its control over them and bring them to trial."  Mem. 23.

But the mere facts that the witnesses (1) are (or were) Cox employees or have contractual agreements with Cox and (2) will not attend the trial does not mean that Cox has somehow "procured" their absence. Courts overwhelmingly agree that the "procuring absence" exception to the Rule 32(a) unavailability rule applies only upon a showing that the party offering the deposition "*actively took steps* to keep the deponents from setting foot in the courtroom."  *Houser v. Snap-*

---

[75] Rule 32(a)(4) provides an independent exception to the hearsay rule that is "more permissive" than FRE 804. *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 204 (1st Cir. 1988).

*On Tools Corp.*, 202 F. Supp. 181, 189 (D. Md. 1962) (emphasis added). There is no evidence that Cox has "actively taken steps" to procure the absence of any witness here.

Nor does it matter that the witnesses are current or former Cox employees: "because procuring absence and doing nothing to facilitate presence are quite different things,'" the "mere fact that the deponents are employed by the defendant … is not enough to trigger exclusion" of their depositions. *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 204 (1st Cir. 1988) (quoting *Houser*). As one court explained, the argument "that Defendants have procured" a witness's absence based "solely on the facts that [the witness] works for" defendant and that defendant "could require him to attend trial" failed under Rule 32(a)(4), where plaintiff "provided no evidence that Defendants have taken any steps to prevent" the witness from testifying. *One Source Environmental, LLC v. M+W Zander, Inc.*, 2015 WL 13505360, at *1 (D. Vt. Dec. 8, 2015).[76]

Plaintiffs have cited no authority reaching a different result. They identify only two cases to support their claim that Cox has "procured" the absence of the witnesses because it "controls" them by virtue of employment or contract, and neither is apposite here. Both *Fairfield 274-278 Clarendon Tr. v. Dwek*, 970 F.2d 990, 995 (1st Cir. 1992) and *Culebra II, LLC v. River Cruises and Anticipation Yachts, LLC*, 564 F. Supp. 2d 70, 80 (D. Me. 2008) involve the voluntary absence from trial of *a party to the litigation*. They say nothing to suggest that employment or contractual relationships of themselves are sufficient to demonstrate that an employer or former employer has "procured the absence" of a witness who chooses not to attend trial. Indeed, in a case involving a similar claim, a Court of Appeals rejected a litigant's reliance on *Dwek* and followed *Bahama*

---

[76] *See also, e.g., A.H. ex rel Hadjih v. Evenflo Co.*, 579 F. App'x 649, 656 (10th Cir. 2014) (quoting *Bahama Cruise Lines*); *Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*, 2017 WL 1312968, at *2 (W.D. Ark. April 5, 2017) (same); *Forrester Envtl. Servs., Inc. v. Wheelabrator Techs., Inc.*, 2012 WL 1161125, at *2 (D.N.H. Apr. 6, 2012) (same); *Univeral Elecs., Inc. v. Universal Remote Control, Inc.*, 2014 WL 8096334, at *5 (April 21, 2014) (same).

*Cruise Lines* instead. *See A.H. ex rel Hadjih v. Evenflo Co.*, 579 F. App'x at 656. In the absence of any evidence that Cox has "actively taken steps" to prevent the witnesses from attending, the hearsay exception in Rule 32(a)(4) applies and permits Cox to use their depositions at trial.

**X.      Cox Should Not Be Forced to Make Key Witnesses Available in Plaintiffs' Case.**

Plaintiffs seek to preclude Cox from calling four of its own witnesses (Carothers, Beck, Sikes, and Zabek) in its case-in-chief unless Cox first make those witnesses available for *Plaintiffs'* case. The Court should reject Plaintiffs' attempt to skew the order of proof.

Cox does not intend to call Sikes or Zabek (former Cox employees) at trial, but will present their testimony by deposition. *See* Section IX, *supra*. That leaves only current Cox employees Carothers and Beck. Carothers is Cox's Principal Security Architect and was its 30(b)(6) designee on Cox's infringement response procedures. Beck was the lead engineer on Cox's infringement-management system, CATS, and was Cox's 30(b)(6) designee on technical issues relating to Cox's infringement response. Both are important witnesses in support of Cox's defense.

There is no rule requiring Cox to make its witnesses available for use in Plaintiffs' case, and Carothers and Beck are outside the Court's subpoena power. In these circumstances, the decision to allow or exclude live testimony from them is a matter within the Court's discretion under Federal Rule of Evidence 611(a). *See, e.g., R.B. Matthews, Inc. v. Transamerica Transp. Serv., Inc.*, 945 F.2d 269, 272 (9th Cir. 1991). The Court should exercise that discretion to deny Plaintiffs' motion here. Plaintiffs have sued Cox for $1.6 billion, alleging that Cox's subscribers infringed their copyrights and that Cox knew of that infringement. Carothers and Beck are senior members of Cox's anti-infringement effort, and will represent in part the "face" of that effort at trial. To have key Cox witnesses introduced to the jury by Plaintiffs risks not only confusing the jury about who Carothers and Beck are and whose cause they support, but also prejudicing Cox by creating an initial, hostile impression of the witnesses that would be impossible for Cox to

repair when it calls them in support of its own case.  Moreover, Plaintiffs have made no attempt to explain why they cannot adequately elicit the testimony they seek on cross-examination during Cox's case. That solution would prevent the duplication that would result if the witnesses were called twice and would avoid unnecessarily inconveniencing the witnesses. *See* Rule 611(a). Cox acknowledges that some courts have exercised their discretion to grant the relief Plaintiffs seek. *See generally* Mem. 24-27 (citing cases). But no binding authority requires that result, and in this case, fairness to Cox's defense mandates that Plaintiffs' motion be denied.

## XI.    There are no Grounds to Exclude the Testimony of Victoria Sheckler.

Plaintiffs seek to exclude the testimony of former RIAA attorney Victoria Sheckler, arguing that it would be "duplicative" of the testimony of the RIAA's 30(b)(6) deponent, Steven Marks.   There is no basis for excluding Ms. Sheckler's testimony.

*First*, as the RIAA's Steven Marks admitted, ██████████████████████████ ████████████████████████████████████████████████████.[77] She ██████████████ ████████████████████████████████████████. Plaintiffs claim that these so-called "caps" (which Cox twice agreed to increase) demonstrate that Cox was willfully blind to specific instances of infringement on its network, while Cox will present evidence that Cox and the RIAA jointly agreed to these limitations and that the RIAA rarely if ever sent Cox the maximum number of notices. Plaintiffs deposed Cadenhead on this topic (among others) and intend to call him as a witness. Cox requested that Plaintiffs designate Sheckler as the RIAA's 30(b)(6) deposition witness given her direct dealings with Cox on this key issue, but they refused. While Plaintiffs argue that Cox could elicit the same testimony from Marks, they ignore the fact that Marks is no longer employed by the RIAA and refused to answer simple questions relating to Sheckler's

---

[77] *See* Ex. I (Marks Dep., 70:20-71:14).

statements in emails to Cox, such as confirming that the RIAA was the record label Plaintiffs' exclusive agent for sending copyright notices to Cox.[78] And because Cox does not intend to elicit duplicative testimony from Marks and Sheckler, Plaintiffs' fears of extending trial are unfounded.

*Second*, Sheckler resides in Northern Virginia and is unquestionably under the Court's subpoena power.[79] There would be no basis for Ms. Sheckler to quash Cox's trial subpoena, even if she had tried to do so.[80] Plaintiffs try to explain away their failure to move to quash the subpoena, but do not even attempt to argue that they would meet the standard for quashing a subpoena imposed by Rule 45(d)(3)(A).[81]

*Third*, Plaintiffs' detour into discussing Cox's attempts to depose Sheckler is a red herring. *See* Mem. at 28-29. After Plaintiffs' counsel refused to designate Sheckler as the RIAA's 30(b)(6) deposition witness, Cox sought leave of Court to increase the number of depositions permitted per side so that it could depose her in her individual capacity. Judge Anderson denied this request on the grounds that Cox's 30(b)(6) notice covered the topics within the scope of Sheckler's personal knowledge, but did not rule on the propriety of Sheckler as a trial witness.

## CONCLUSION

For all these reasons, Plaintiffs' Omnibus Motion *in Limine* should be DENIED.

---

[78] *See id.* at 88:18-93:7.

[79] *See id.* at 10:11-11:16.

[80] *See* Mem. at 28 n. 13.

[81] Plaintiffs argue briefly that as a non-party, Sheckler "should be spared being called away from work and hauled into court for days on end for no good purpose." Mem. 30. Even if Sheckler had properly moved to quash the subpoena, this conclusory sentence is insufficient to show undue burden. *C.f. Reddick v. Dillard Store Servs.*, 2010 WL 3025205, at *1 (S.D. Ill. Aug. 2, 2010) (requiring a witness to travel over 100 miles for trial, "particularly when his deposition was videotaped … imposes undue burden and expense"). Here, Sheckler does not live over 100 miles from the trial and Cox was not given the opportunity to depose her.

Dated: October 30, 2019                    Respectfully submitted,

*/s/ Thomas M. Buchanan*
Thomas M. Buchanan (VSB No. 21530)
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc. and CoxCom, LLC*

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone:  (212) 294-6700
Facsimile:  (212) 294-4700
Email:  melkin@winston.com
Email:  tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
Thomas J. Kearney (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA  94111-5840
Telephone:  (415) 591-1000
Facsimile:  (415) 591-1400
Email:  jgolinveaux@winston.com
Email: tkearney@winston.com

Michael L. Brody (*pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
Email: mbrody@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Telephone:  (213) 615-1700
Facsimile:  (213) 615-1750
Email:  dhleiden@winston.com

## CERTIFICATE OF SERVICE

I certify that on October 30, 2019, a copy of the foregoing was filed electronically with

the Clerk of Court using the ECF system, which will send notifications to ECF participants.


*/s/ Thomas M. Buchanan*
Thomas M. Buchanan (VSB No. 21530)
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.*
*and CoxCom, LLC*