# Exhibit A

Case 1:19-cv-00950-PTG-JFA   Document 542-1 Filed 10/2/19   Page 2 of 23 PageID# 23963
Case 1:14-cv-01611-LO-JFA   Document 574-1 Filed 12/2/16   Page 2 of 22 PageID# 25564
PUBLIC VERSION

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC and ROUND HILL MUSIC LP | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.  1:14-cv-1611(LO/JFA) |
| COX COMMUNICATIONS, INC. and COXCOM, LLC | ) ) ) | |
| Defendants. | ) ) ) | |

### BMG'S OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO PRECLUDE EVIDENCE AND TESTIMONY AS TO CERTAIN INTERNAL COX EMAILS AND COMMUNICATIONS CONCERNING COX'S TERMINATION POLICIES AND TREATMENT OF ALLEGED INFRINGERS

Cox moves to exclude its own key emails regarding its system for handling copyright infringement – the same system that it applied to the BMG notices on which this suit is based – on the ground that those emails do not specifically address individual infringements of BMG works.  Cox makes this request at the same time that it seeks to introduce hearsay "evidence" of the practices that other ISPs applied to infringements of non-BMG works that are not at issue in this case.

The Court has already rejected the exact argument Cox makes now when it held that Cox's internal emails are highly relevant to Cox's willful blindness and willfulness because they reveal the intentions underlying the Cox practices for handling infringement on its network that were applied to Rightscorp and thereby deployed to block all of the BMG notices at issue in this case.  That is because there is no way to understand the intention behind Cox's decision to block Rightscorp's notices of infringement of BMG works at issue divorced from the context of Cox's

Case 1:18-cv-00950-PTG-JFA   Document 542-1   Filed 10/7/19   Page 3 of 23 PageID# 23964
Case 1:14-cv-01611-LO-JFA   Document 541-1   Filed 12/7/18   Page 2 of 22 PageID# 25585
PUBLIC VERSION

actions as a whole. The Court's reasoning was correct. There is no reason to reconsider this ruling, which Cox did not challenge on appeal.

Specifically, Cox seeks to exclude its own internal emails regarding almost every aspect of its system for responding to notices of infringement and handling repeat infringers on its network. Cox seeks to exclude emails demonstrating its knowledge that users identified in copyright infringement notices were almost invariably infringers, its indifference to copyright infringement on its network and its preference to ignore notices of infringement, its desire to keep repeat infringers online with a clean slate in order to preserve the revenue from their accounts, and the sham termination scheme by which it sought to immunize itself against liability for infringement on its network.

All of this evidence is highly probative, notwithstanding that it is not specific to infringements of BMG works. At the outset, it is impossible to understand Cox's decision to block Rightscorp's notices, which it knew identified specific instances of infringement, including of BMG works, apart from the context of Cox's overall system for addressing infringement. As Cox's abuse chief explained in one of the emails Cox now seeks to exclude, Cox's confidence in its sham termination scheme gave Cox comfort in ignoring Rightscorp's notices. PX-1392. Similarly, the emails Cox now seeks to exclude contradict Cox's claims that its intention was to protect its innocent subscribers from settlement demands and that its system as a whole was designed to be highly effective at preventing infringement. In fact, Cox's deliberate decision to block Rightscorp's notices was intended to avoid learning of repeat infringement by subscribers from whom it wanted to continue earning substantial revenue.

While Cox may not want the jury to see this evidence, it is highly probative regarding willfulness and willful blindness. The emails show that Cox knew of a high probability that

Case 1:18-cv-00950-PTG-JFA   Document 542-1   Filed 10/28/19   Page 4 of 23 PageID# 23965
Case 1:14-cv-01611-LO-JFA   Document 571-1   Filed 12/7/18   Page 3 of 22 PageID# 25586
PUBLIC VERSION

subscribers identified in infringement notices were in fact infringers, that Cox was happy to facilitate continued infringement by profitable subscribers, and that Cox did not want to see infringement notices because it did not want to take action against its infringing subscribers or to face a choice between terminating subscribers and calling into question its DMCA safe harbor. All of that bears on Cox's motivations in choosing to block BMG's notices.

## LEGAL STANDARD

"To be admissible, evidence must be relevant—a low barrier requiring only that evidence be worth consideration by the jury." *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 349 (4th Cir. 2014) (internal quotations and citations omitted); *see* Fed R. Evid. 401. "To be relevant, evidence need only to have 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996) (quoting Fed.R.Evid. 401).

Rule 403 permits the exclusion only of evidence that creates a danger of "*unfair* prejudice." Fed. R. Evid. 403 (emphasis added); *United States v. Mohr*, 318 F.3d 613, 618 (4th Cir. 2003) ("Rule 403 requires exclusion of evidence only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence.") (internal quotation marks omitted). "In reviewing a decision under Rule 403, the court must look at the evidence in a light most favorable to its proponent" and is "obligated to use the power conferred by Rule 403 sparingly." *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130 (4th Cir. 1988).

Case 1:18-cv-00950-PTG-JFA   Document 542-1   Filed 10/2018/19   Page 5 of 23 PageID# 23966
Case 1:14-cv-01611-LO-JFA   Document 574-1   Filed 12/7/18   Page 4 of 22 PageID# 25587
PUBLIC VERSION

# ARGUMENT

## I.   AS THE COURT HAS ALREADY RULED, COX'S INTERNAL EMAILS ARE HIGHLY RELEVANT TO ITS WILLFUL BLINDNESS AND WILLFULNESS

### A.   Cox Seeks to Exclude Key Emails Demonstrating the Intent Underlying Its Abuse Procedures

Cox seeks to exclude emails that are not only highly relevant but constitute some of the most important evidence concerning the key issue on remand – Cox's willful blindness and willfulness in blocking notices of infringement while allowing subscribers to continue to infringe.  The Fourth Circuit held that the re-trial should focus on "the intent necessary to prove contributory infringement," specifically whether Cox is willfully blind because it "consciously avoided learning about specific instances of infringement."  *BMG Rights Mgmt. (US) LLC v. Cox Communications*, 881 F.3d 293, 307, 312 (4th Cir. 2018).  The emails Cox wants to keep from the jury are highly probative on this point.  They reflect Cox abuse staff's subjective knowledge that subscribers who have been identified in infringement notices are almost certain to be infringers.  And the emails demonstrate that Cox wanted to avoid learning of infringement because it did not want to face a choice between terminating repeat infringers and losing the revenue associated with their accounts or losing its DMCA safe harbor.  That explains why Cox was deliberately avoiding knowledge of its subscribers' infringement when it blacklisted Rightscorp – exactly what is at issue for willful blindness.

Moreover, as the evidence at the first trial showed, the blocking of Rightscorp's notices was part of Cox's integrated scheme to avoid acting on notices of infringement.  It is simply impossible to understand the intention behind Cox's decision to block Rightscorp's notices divorced from the context of Cox's actions as a whole.  Cox intends to claim at trial that its blacklisting of Rightscorp was part of a good faith and highly effective program to address copyright infringement on its network while protecting innocent subscribers from improper

Case 1:18-cv-00950-PTG-JFA  Document 542-1  Filed 10/2/2019  Page 6 of 23 PageID# 23967
Case 1:14-cv-01611-LO-JFA  Document 574-1  Filed 12/7/18  Page 6 of 22 PageID# 23568
PUBLIC VERSION

payment demands.  Meanwhile, Cox seeks to exclude its own internal documents that contradict this position and demonstrate that it was unconcerned about infringement or protecting its subscribers.  Cox should not be able to claim good faith while preventing the jury from hearing evidence that it sought to retain repeat infringers because they are revenue generating units, while avoiding liability for contributing to their infringement by erecting a sham DMCA safe harbor defense.

All of the emails at issue are highly probative on these points.  In PX-1340 and PX-1427, Cox abuse leaders Jason Zabek and Joseph Sikes explain Cox's decision to block Rightscorp's notices.  Without mentioning any desire to protect innocent Cox subscribers, Messrs. Zabek and Sikes explain their attitude as "F the dmca!!!" and "F the DRC!"  This is highly relevant, direct evidence as to Cox's intent and willfulness in blacklisting Rightscorp.

The emails also reflect Cox's overarching motivation to avoid terminating repeat infringers so as to preserve the revenue associated with their accounts – a motivation that explains why Cox deliberately sought to avoid learning about infringements identified by Rightscorp.  Mr. Zabek wanted repeat infringers to have a "clean slate" of infringement notices so that Cox "could collect a few extra weeks of payments for their account ;-)."  PX-2068. Indeed, Mr. Zabek instructed his team "to hold on to every subscriber we can," to "keep customers and gain more RGU's" (i.e., revenue generating units, otherwise known as subscribers), and to reactivate a "habitual abuser" because "we need the customers."  PX-1378; PX-1381; PX-1984.  As Mr. Sikes explained, "Every terminated Customer becomes lost revenue and a potential Detractor to our Net Promoter Score."  PX-1354 & PX-1446 ("This Customer pays us over $400/month and if we terminate their internet service, they will likely cancel the rest of their services.  . . . We should make absolutely certain that we have covered each and

Case 1:18-cv-00950-PTG-JFA   Document 542-1   Filed 10/2/2019   Page 7 of 23 PageID# 23968
Case 1:14-cv-01611-LO-JFA   Document 571   Filed 12/7/18   Page 6 of 22 PageID# 25589
PUBLIC VERSION

every possibility with them ('to the bitter end') before we terminate them."); *see also* PX-1453 ("This customer will likely fail again, but let's give him one more chan[c]e. he pays 317.63 a month."). In PX-1358, Mr. Sikes explained that abuse decisions are made based on Cox's bottom line: "we have been 'soft terminating' for DMCA because we didn't want to loose (sic) the revenue but if the gross bandwidth abusers are costing us way more than we are making from them, it makes sense to terminate. That's 'supposed' to be the driver, that they cost more than we make from them."

The emails at issue demonstrate that Cox did not care about whether subscribers used its network to infringe, so long as it was not forced to terminate them in order to preserve a safe harbor defense. As Mr. Zabek explained, "DMCA does not hurt the network like DOS attack, spam or hacking." PX-1381; *see also* PX-1391 ("I am not that concerned about DMCA."). Cox's emails also show that its abuse staff knew that subscribers identified in multiple infringement notices were highly likely to be infringers, an important aspect of the willful blindness analysis. *See* PX-1391 ("just want to steal stuff"); PX-1453 ("likely fail again"); PX-1984 ("habitual abuser"); PX-2589 ("years of doing this"). These attitudes explain Cox's deliberate decision to blind itself to Rightscorp's notices – so that it could avoid learning of infringement and needing to terminate.

Cox's sham termination procedure is further evidence that its copyright infringement policies, including its decision to blacklist Rightscorp, were designed not to combat infringement but to protect itself and keep revenue. Cox seeks to exclude a host of emails that detail its policy of reactivating repeat infringers after pretending to terminate them – a policy that those emails show applies to copyright infringement only and not to other forms of abuse. *See, e.g.*, PX-1378; PX-1382; PX-1388; PX-1389; PX-2060. The fraudulence of this procedure, by which Cox

Case 1:18-cv-00950-PTG-JFA   Document 542-1   Filed 10/2/18   Page 8 of 23 PageID# 23969
Case 1:14-cv-01611-LO-JFA   Document 574-1   Filed 12/7/18   Page 7 of 22 PageID# 25570
PUBLIC VERSION

would not even "actually terminat[e] the service" but "just click[] Terminate and Update Ticket, which shows a Termination in the Customers Ticket History," reflects the intent behind its overall abuse procedures.  PX-2029.  Based on these sham terminations, Cox intended to claim that it "fulfilled the obligation of the DMCA safe harbor."  PX-1378.

Evidence of Cox's sham termination policy is critical because it explains why Cox decided to blacklist Rightscorp:  not to protect its subscribers, as Cox has claimed throughout this litigation, but because it thought a safe harbor defense allowed it to get away with facilitating infringement while looking the other way.  As Mr. Zabek explained while forwarding an email exchange in which he had informed Rightscorp's Robert Steele that Cox would not accept its notices, "I really hope they push this and threaten to sue us. We have all our ducks in a row on DMCA and I would dig going to court and either shoving it in there face or destroying the DMCA."  PX-1392.

It is simply impossible to understand Cox's decision to blacklist Rightscorp outside the context of Cox's scheme to "ignore the bulk of DMCA notices," PX-2022, and then avoid liability by pretending to terminate a small number of subscribers who received many notices despite Cox's rigorous infringement notice filtration process.  Isolating the decision to blacklist Righstcorp and excluding all evidence regarding the remaining parts of Cox's system would give the jury a highly unrealistic perspective on Cox's decision-making and intentions in formulating its abuse policies.

Indeed, Cox plans to put on testimony that its handling of infringement notices was governed by a well-intentioned set of policies.  At the first trial, Cox elicited testimony from its in-house counsel – which it plans to read into the record – that Cox's system for responding to infringement was designed to not interfere with the customer's "sacrosanct" use of the Internet,

Case 1:18-cv-00950-PTG-JFA Document 542-1 Filed 10/2/19 Page 8 of 23 PageID# 23970
Case 1:14-cv-01611-LO-JFA Document 974-1 Filed 12/7/18 Page 9 of 22 PageID# 25571
PUBLIC VERSION

that Cox openly accommodated each copyright holder's situation, and that its system was extremely effective at stopping infringement.  Trial Tr. at 1341-43, 1352-54, 1383.  Cox's motion to reconsider the Court's prior orders barring testimony about the Copyright Alert System and the practices of other ISPs ("CAS Motion") similarly indicates that Cox plans to offer testimony about the supposed superiority, good faith, and effectiveness of Cox's system for handling infringement notices (even apart from any testimony regarding Cox's supposed reliance on the practices of other ISPs).  *See* Dkt. No. 933, Def's Mot. to Recons. Order Granting Pls' Mot. in Lim. No. 3 at 3-4, 8.

Cox should not be able to have its witnesses tell the jury fairy tales about the effectiveness of its system while excluding evidence that shows just the opposite.  The jury should have a full picture of Cox's system and the context for its blocking of Rightscorp's notices.

### B. Cox's Motion Runs Afoul of Rulings of both this Court and the Fourth Circuit

The Court recognized the critical importance of this evidence when it rejected the exact same arguments for exclusion prior to the first trial.  As the Court explained, "I'm going to allow BMG to put on its theory of the case. . . . I think that for purposes of contributory infringement, actual knowledge is BMG's burden.  All of the e-mails, even though they are not of BMG clients, go to the actual knowledge of the program and the fact that Cox was not going to follow it.  And they weren't going to follow it because they didn't want to lose customers."  12.1.15 Hearing Tr. at 30:5-13.

The Fourth Circuit agreed.  On appeal and without making any claim of error, Cox told the Fourth Circuit that "those emails do not establish knowledge of infringement, much less willfulness" and that there had been "irrelevant DMCA testimony" at the trial.  Appeal Dkt. 108

at 25; Appeal Dkt. 25 at 16. Yet, the Fourth Circuit recited much of the evidence in its opinion while holding that the Court's rulings were a "model of fair administration of justice" and that BMG had presented "powerful evidence from which a reasonable jury could find that Cox willfully blinded itself to specific instances of infringement by its subscribers." *BMG*, 881 F.3d at 312.

Even apart from the Fourth Circuit's endorsement of this Court's prior ruling, Cox has identified no grounds for reconsidering the decision other than to re-hash the same points it made before. "A motion to reconsider cannot be based on issues previously before the court simply because the losing party dislikes the outcome." *See Smith v. Loudoun County Public Schools*, No. 1:15cv956, 2016 WL 659786 at *16 (E.D. Va. Feb. 18, 2016), *aff'd*, 723 F. App'x 194 (4th Cir. 2018). The existing "decision should continue to govern the same issues in subsequent stages in the same case." *TFWS v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009) (citation omitted).

Cox's motion would work a massive change in the trial and in BMG's willful blindness case that is not contemplated by the Fourth Circuit's opinion. In addition to excluding internal emails from the leadership of its abuse team that are integral parts of the story of Cox's willful blindness, Cox's motion would also have the effect of removing substantial portions of the video tape depositions of Zabek and Sikes that were played for the jury at the last trial as a result of Cox's decision to keep them from trial despite their having been listed on the Cox witness list.

There is no change since the first trial that would justify reversing the Court's prior ruling on this issue. On the contrary, there will be an even greater focus on the questions of willful blindness and willfulness that justified the inclusion of the emails in the first place. And Cox's failure to raise admission of these emails as a formal claim of error in the Fourth Circuit has

waived the issue.  Cox cannot "use the accident of a remand to raise an issue that it could just as well have raised in the first appeal." *United States v. Pileggi*, 703 F.3d 675, 680 (4th Cir. 2013) (alteration marks and citation omitted).

## II.    Cox's Arguments for Exclusion Do Not Hold Water

### A.    The Emails Are Relevant Notwithstanding that They Are Not Specific to BMG Works

Cox argues that the emails it wishes to exclude are irrelevant because they do not relate specifically to BMG works at issue.  Cox Br. at 3-4.  But the Court explicitly rejected this argument when it allowed in the very documents at issue on this motion "even though they are not of BMG clients."  12.1.15 Hearing Tr. at 30:5-13.

The emails reflect the full architecture of and purposes behind Cox's policies for tolerating infringement on its network, of which the blacklisting of Rightscorp was only one piece.  It is not appropriate to separate out the blacklisting of Rightscorp and assume as a matter of law that it was motivated by intentions different from those underlying the rest of Cox's system for ignoring infringement.  The jury is more than entitled to conclude that the emails disclosing the purposes and intentions of Cox's abuse staff in addressing infringement on its network are relevant to the decision to blacklist Rightscorp.

Moreover, Cox's policies other than blacklisting applied to Rightscorp's notices regarding the BMG works at issue.  Blacklisting Rightscorp was only the first of Cox's many filters by which it avoided acting on infringement notices.  Had Rightscorp not been blacklisted, Cox would still have ignored more than 99% of its notices based on its 200 notice/day rule and then failed to take any action against infringers identified in the remaining one percent of notices based on its sham termination procedures – a fact that completely undermines Cox's core defense that it was only trying to protect its innocent subscribers from settlement offers.  Cox's

abuse staff built a castle with many layers of defense against notifications of infringement, including those sent on behalf of BMG. And even the inner keep is relevant to understanding Cox's defensive scheme, notwithstanding that the BMG notices never made it past the outer curtain wall.

Nor does it matter that many (though not all) of the emails that Cox wants to exclude do not relate specifically to Rightscorp or to BMG. The emails are highly relevant evidence of the policies, practices, and purposes that fully applied to the notices of infringement of the BMG works at issue. Far more remote pieces of evidence have been deemed relevant to intent in intellectual property cases. *See Design Basics, LLC v. Drexel Building Supply, Inc.*, No. 13-C-560, 2016 WL 5794746, at *6 (E.D. Wis. Oct. 4, 2016) (mere allegations of separate infringements were relevant to defendants' intent as to instant infringement).

Cox argues that there can be no willful blindness as to BMG works because it blocked Rightscorp's notices well before Rightscorp began representing BMG, thereby depriving Cox of any subjective belief that BMG works were being infringed. Cox Br. at 3-4. Setting aside the absurdity of the claim that Cox can blind itself to infringement notices en masse but avoid being blind to any specific infringements, the Fourth Circuit recognized that Cox never received any BMG notices and still held that there was "powerful evidence from which a reasonable jury could find that Cox willfully blinded itself to specific instances of infringement by its subscribers." *BMG*, 881 F.3d at 300, 304, 312. Moreover, Cox did know that Rightscorp was sending notices on behalf of BMG based on subsequent correspondence. And the very emails that Cox seeks to exclude demonstrate its awareness of the high probability that subscribers named in infringement notices are actually infringers. *See, e.g.*, PX-1391; PX-1453; PX-1984; PX-2589.

Case 1:14-cv-00950-PTG-JFA   Document 542-1   Filed 10/20/19   Page 13 of 23 PageID# 33974
Case 1:14-cv-01611-LO-JFA   Document 974-1   Filed 07/27/18   Page 12 of 22 PageID# 25575
PUBLIC VERSION

Indeed, Cox's argument reads more like a summary judgment motion than a motion in limine. But the Fourth Circuit has already foreclosed this line of argument. The evidence – including much of the evidence that Cox seeks to exclude – shows that Cox was aware of the high probability that subscribers named in infringement notices were infringing and chose to block the BMG notices so that it would not obtain knowledge of specific instances of infringement and incur an obligation to terminate subscribers and suffer the concomitant loss of revenue.

### B. Emails Are Relevant Whether or Not They Copy Randall Cadenhead

Next Cox argues that the emails should be excluded unless they were sent by or to Randall Cadenhead, Cox's privacy counsel, on the theory that he had sole responsibility for the decision to blacklist Rightscorp. Cox Br. at 5-7. This argument is flawed as a matter of both fact and law.

At the outset, the evidence contradicts the assertion that Mr. Cadenhead was solely or even primarily responsible for the decision to blacklist Rightscorp. Cox not only fails to support this claim with citations or evidence, but contradicts it in its CAS Motion, where Cox identifies the key person as Matthew Carothers, who Cox now contends "would often trade information about specific complainants, including Rightscorp" with "other ISPs" that "took issue with the volume and content of Rightscorp's notices," and asserts that "these critical conversations informed Cox's . . . conclusion that blocking Rightscorp was necessary and prudent given the volume of improper notices containing settlement demands." CAS Motion at 3-4.

In fact, it was Cox's abuse leadership, specifically Mr. Zabek, that made the decision to delete Rightscorp's notices. His deputy, Mr. Sikes, upon receiving a sample Rightscorp notice from Brent Beck, responded "Jason [Zabek], can you respond to them with your magic form letter and let Brent [Beck] know *if* he should go ahead & blacklist them?" PX-1993 (emphasis

Case 1:19-cv-00950-PTG-JFA   Document 542-1   Filed 10/30/19   Page 14 of 23 PageID# 23975
Case 1:14-cv-01611-LO-JFA   Document 542-1   Filed 07/27/18   Page 13 of 22 PageID# 23576
PUBLIC VERSION

added).  Mr. Zabek replied, "I already sent them a response . . . Brent . .. Auto Delete their

emails. Do not even create a ticket for them."  PX-2013.  And it was Mr. Zabek who, in an email

Cox now seeks to exclude, wrote to Robert Steele to inform him that Cox would not accept

Rightscorp's notices unless they removed the settlement offers.  PX-1392.  More generally,

Cox's documents are clear that Mr. Zabek had the authority to block notice senders.  *See* DTX-

1895 (email in which Zabek instructs Beck:  "Block them if you need to prevent any mail loops.

Or if you just want to. :-)").  Mr. Carothers testified that ████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████."  Dkt. 833-2 (Carothers 2015.06.03 Dep. Tr.) at

206:15-207:1.

While Mr. Cadenhead gave the legal signoff for Cox's policy of rejecting notices

containing settlement offers and came up with Cox's putative "spirit of the DMCA" legal

justification, he made clear at his deposition that his role was to offer legal *advice*, not to be the

ultimate decision-maker.  He repeatedly ████████████████████████████████████

████████████████████  Roberts Decl. Ex. A (Cadenhead Dep. Tr.) at 85:5-16, 89:8-15,

96:3-18.  And he testified that ████████████████████████████████████████████

██████████████████████████████████████  Cadenhead Dep. Tr.

at 47:4-17.

Mr. Cadenhead also testified that, ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████  *Id*. at 96:13-18.  As Mr. Cadenhead

explained, ████████████████████████████████████████████████████████████

████████████████████████  *Id*. at 200:6-22.  Critically for purposes of willful blindness, only

the latter two options avoided knowledge of the infringements, and the decision to go that direction was not Mr. Cadenhead's.  Cadenhead was careful to say that ███████████████████ ████████████████████  *Id.* at 201:7-8 (emphasis added).  That dooms Cox's attempt to limit the scope of relevant willful blindness evidence to Mr. Cadenhead.

Ultimately, blacklisting settlement offerors was an abuse team decision arising out of a team discussion of ways to "ignore" notices and "stem the flow."  PX-2022; PX-1322.  Zabek was a key force supporting it, spoke to senior management about it, and had tremendous enthusiasm for blacklisting, including Rightscorp in particular.  *See* PX-1340; PX-1392; Dkt. 833-1 (Zabek Dep. Tr.) at 305:6-11.  Thus, emails reflecting the views of Messrs. Zabek, Sikes, and the rest of Cox's abuse team are highly relevant to Cox's deliberate decision to ignore the Rightscorp notices, whether or not the emails in question may not have copied Mr. Cadenhead.

Cox itself acknowledges that Mr. Cadenhead "engaged in internal discussions concerning how Cox should handle the notices" with "various Cox employees" and that those discussions "informed" his "decision to blacklist Rightscorp's notices."  Mot at 6.  Even accepting Cox's assertion in this motion for reconsideration that the decision was Mr. Cadenhead's and ignoring Cox's focus on Mr. Carothers in its CAS Motion, the views of those other "Cox employees" – and the emails in which they are expressed and which Cox now seeks to exclude – are highly relevant to Cox's decision-making.  Notwithstanding that Mr. Cadenhead himself may never have seen the Sikes, Zabek, and Carothers emails at issue, the views and facts which those emails reflect would have been incorporated into his decision-making through his discussions with Messrs. Sikes, Zabek, and Carothers.

Cox is also wrong on the law when it argues that only a final decision-maker's documents are relevant.  Cox cites a single employment discrimination case holding that the

focus must be on motivations of those decision-makers who made the challenged employment decision.  Cox Br. at 7 (citing *Worldwide Network Services v. Dyncorp International*, 365 F. App'x 432, 455-56 (4th Cir. 2010)).[1]  Putting aside the fact that a concrete employment decision is very different from a corporate policy decision arising out of discussions among various stakeholders and reflecting various corporate priorities, Cox's invocation of *Worldwide Network Services* confuses the question of ultimate liability with the question of relevant evidence.  Even in employment cases, the intent of an employee who is not the decision-maker can be relevant to the analysis of the decision-maker's motivations.  *See Merritt v. Old Dominion Freight Line*, 601 F.3d 289, 301 (4th Cir. 2010) ("While the views of others are no proof of the views of [the decision-maker], at some point the corporate environment in which he worked places [the decision-maker's decision] . . . in a less neutral context.").

Thus, courts have consistently found that evidence as to non-decision-maker's views can be relevant though the decision-maker's motivations that are actually at stake.  *See Sampson v. City of Cambridge*, 251 F.R.D. 172, 175 n.4 (D. Md. 2008) ("The Court is of the view, however, that regardless of whether Pritchett or Mayor Rippons was the actual decisionmaker under the *Hill* standard, Pritchett's emails and other documents could be relevant.").  And *Worldwide Network Services*, which did not call for the exclusion of any such evidence, is not to the contrary.  There is no basis for holding that emails from Cox's abuse leadership who played a major role in the decision to blacklist Rightscorp are irrelevant simply because they did not go to Mr. Cadenhead.

---

[1] Cox's other two cases do not address the question of which employees' motivations are are relevant.

Case 1:19-cv-00950-PTG-JFA   Document 542-1   Filed 10/30/19   Page 17 of 23 PageID# 33978
Case 1:14-cv-01611-LO-JFA   Document 574-1   Filed 10/27/15   Page 16 of 22 PageID# 25573
PUBLIC VERSION

**C.    Emails From Before February 5, 2012 Are Relevant Because They Evidence the Development of the Cox Policies at Issue**

More narrowly, Cox seeks to exclude all emails from before February 5, 2012 on the grounds that Rightscorp did not begin sending BMG notices until that date.  Cox Br. at 7-9.  Once again, this is an impossibly cramped view of relevance that would exclude a wealth of probative evidence.

The great majority of the policies and procedures by which Cox blocked BMG's notices were established well before February 2012.  As a result, the emails evidencing their specifics and the underlying purpose predate February 2012.  That Cox's intentions in establishing its sham termination scheme, which later made it feel comfortable in blacklisting Rightscorp, PX-1392, are reflected in pre-February 2012 emails does not make those intentions and the emails that evidence them irrelevant when Cox applied the same policies to BMG beginning in February 2012.  Indeed, the pre-February 2012 emails relate to the putting in place of the very scheme by which Cox blocked BMG's notices and reflect Cox's underlying intentions as to how to handle infringement carried out via its internet service.  Significantly, Cox's proposed exclusion of pre-February 5, 2012 emails would also exclude several critical documents showing that Cox's scheme was intended to relax its handing of infringement in favor of maintaining customers and revenue, PX-1378; PX-1381; PX-1388; PX-1391; PX-1984; PX-2029; PX-2068, including the email exchange between Cox and Rightscorp in which Mr. Zabek explained why he felt comfortable ignoring Rightscorp's notices.  PX-1392.

Cox asserts that the pre-February 2012 emails "cannot meet the *Global-Tech* standard" because they do not show that Cox blinded itself to infringement of specific BMG works.  Cox Br. at 7-8.  This analysis confuses the question of whether an email alone proves willful blindness with whether it is *relevant* to that inquiry – or to any of the other issues in the case.

*See* Fed. R. Evid. 401.  Cox's definition of relevance would require that each email be sufficient to satisfy each element of *Global-Tech* before it is admitted.  But that is not the standard.  Rather, each email need only be relevant to some aspect of the proof.  The pre-February 2012 emails are relevant to show the overall architecture of Cox's abuse policies, which are the context in which Cox blacklisted Rightscorp, as well as the purposes underlying this system for ignoring infringement on its network.  That is highly relevant to the deliberateness of Cox's subsequent decision to blind itself to BMG's notices by continuing to blacklist Rightscorp as well as to the willfulness of Cox's contributions to infringement.

Acknowledging that pre-February 2012 emails are likely relevant, Cox argues that they should be excluded nonetheless.  Cox Br. at 8.  First, Cox argues that they are duplicative of subsequent emails.  But this is untrue – several of the pre-2012 emails, particularly the ones in which Mr. Zabek is establishing and instructing his troops on the new sham termination policy, have no later analog.  Because Cox's scheme was already in operation by February 2012, Cox's intentions in developing the system in the first place are not fully reflected in later emails.  Second, Cox argues that it would be confusing if BMG were permitted to argue pre-2012 infringement of non-BMG works.  But that is not what BMG seeks to do.  BMG seeks to use those emails to show Cox's intentions underlying the policies that it subsequently applied to BMG.  And the Court's jury instructions regarding infringement of BMG works were and will be clear.

Finally, Cox argues that pre-2012 evidence is improper propensity evidence.  Cox Br. at 9.  That is just incorrect.  Propensity evidence requires an inference that "because the defendant committed . . . the offenses before, he therefore is more likely to have committed this one." *United States v. Morley*, 199 F.3d 129, 137 (3d Cir.1999); *see also United States v. Queen*, 132

Case 1:19-cv-00950-PTG-JFA   Document 542-1   Filed 07/27/18   Page 19 of 23 PageID# 23980
Case 1:14-cv-01611-LO-JFA   Document 541-1   Filed 10/27/15   Page 19 of 22 PageID# 23591
PUBLIC VERSION

F.3d 991, 995 (4th Cir. 1997) ("Rule 404(b) prohibits proof of a defendant's character to show

conduct in conformity therewith because evidence of a person's character supplies an inadequate

causal link between it and the specific conduct sought to be established.").  BMG does not offer

the emails to evoke an inference that Cox is liable for infringing BMG's copyrights because it

infringed other works as well.  Rather, BMG offers the emails to show Cox's intent in forming

the very system that was used to block Rightscorp notices.  This is entirely proper.  "The fact that

totally different types of conduct may follow from a single type of character . . . does not

disqualify evidence of earlier specific states of mind from proving a later similar state of mind . .

. . Rule 404(b) recognizes the probative value of willful states of mind."  *Queen*, 132 F.3d at

995.[2]  There are no grounds to exclude the pre-February 2012 emails.

## III.     Court Should Not Exclude the "F the DMCA" Email Chain

Finally, Cox argues that the Court should exclude three email chains that are highly

probative of its abuse leadership's intentions regarding infringement notices and Rightscorp as

overly prejudicial.  But as the Fourth Circuit observed, all evidence is prejudicial.  *BMG*, 881

F.3d at 313.  Cox must demonstrate that they are "unfairly prejudicial," *id.*, and there is no unfair

---

[2] While BMG does not intend to prove that Cox is liable for other instances of
infringement, that would be admissible to prove willfulness and intent.  *See Guidance
Endodontics, LLC v. Dentsply International*, 705 F. Supp. 2d 1265, 1271 (D.N.M. 2010) (the
defendant's prior course of patent trolling was admissible under Fed. R. Evid. 404(b) because it
tended to establish willfulness and was therefore offered for the non-propensity purpose of
intent); *Johnson & Johnson v. Aini*, 540 F.Supp.2d 374, 392 n. 31 (E.D.N.Y.2008) (history of
trademark infringement actions against defendants was admissible as evidence of intent); *Gucci
Am., Inc. v. Guess?*, 858 F. Supp. 2d 250, 253-54 (S.D.N.Y. 2012) (evidence of prior trademark
disputes was "relevant and material" in trademark infringement action because the plaintiff's
claim "requires proof of bad faith"); *United States v. Kim*, 307 F. App'x 324, 326 (11th Cir.
2009) (holding that a prior trademark counterfeiting conviction was relevant to show
willfulness); *Delta Air Lines v. Wunder*, 1:13-CV-3388-MHC, 2015 WL 11242003, at *13 (N.D.
Ga. Dec. 15, 2015) ("[C]ourts frequently consider prior judicial resolutions of trademark disputes
when discussing the alleged infringer's intent or bad faith. Courts also consider the
alleged infringer's receipt of and response to cease-and-desist letters for the same purposes."
(internal quotation marks and citation omitted)).

Case 1:14-cv-00950-PTG-JFA   Document 542-1   Filed 10/30/19   Page 20 of 23 PageID# 23981
Case 1:14-cv-01611-LO-JFA   Document 972-1   Filed 07/27/18   Page 19 of 22 PageID# 25582
PUBLIC VERSION

prejudice in showing the jury Cox abuse leadership's own statement of its views and motivations.

In PX-1392, Mr. Zabek explains that he feels comfortable blacklisting Rightscorp because "We have all our ducks in a row on DMCA and I would dig going to court and either shoving it in there face or destroying the DMCA."  Read in the context of Cox's sham termination procedures, this is highly probative evidence that Cox deliberately sought to ignore notifications of specific instances of infringement while evading infringement liability through a fraudulent termination scheme.  That is extremely powerful evidence of Cox's willfulness and willfulness from the head of Cox's abuse department and there is no unfairness to Cox in allowing it to be admitted.

Next, Cox seeks to exclude two versions of the email string in which, responding to another ISP's expression of surprise at Cox's procedures to ignore infringement notices, Mr. Zabek explains Cox's 200/day notice limit by saying "F the DMCA!!!" and Mr. Sikes explains Cox's blacklisting policy by saying "F the DRC!"  PX-1340; PX-1427.  Cox claims that this "intemperate language" will have a prejudicial effect on the jury.  But this is highly probative evidence of the reasons why Cox chose to impose two of its key mechanisms for weeding out the vast bulk of infringement notices.  It is also highly probative evidence of Cox's indifference to its legal obligations and contempt for the law all while seeking to develop grounds to evade liability – which strongly supports a finding of willfulness.  Notably, Mr. Carothers responded not by contesting the substance of the views Messrs. Sikes and Zabek had expressed but by telling them that their emails would not look good in court.  PX-1340.

The "intemperate" nature of these emails is not grounds to exclude them.  "Jury trials are not antiseptic events, and . . . upsetting facts may well emerge. The general policy of the Federal

PUBLIC VERSION

Rules, however, is that all relevant material should be laid before the jury as it engages in the truth-finding process." *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130 (4th Cir. 1988) (internal quotation marks and citations omitted).  Thus, the Fourth Circuit has found error in excluding even racial epithets from the jury because "[t]he emotional reaction claimed to be unfairly prejudicial is … closely tied to the [requisite] inquiry into state of mind." *Id*.  "[C]ourts are obligated to use the power conferred by Rule 403 sparingly, and to remember that the Federal Rules favor placing even the nastier side of human nature before the jury if to do so would aid its search for truth." *Id*.

There is nothing unfair about admitting any of Cox's emails, and it would be tremendously unfair to exclude them.  Cox should not be able to give the jury a rose-tinted explanation of its abuse procedures while excluding the actual evidence of what Cox was doing and why Cox was doing it.[3]

## CONCLUSION

For the foregoing reasons, BMG respectfully requests that the Court deny Cox's motion.

---

[3] Cox's assertion that Mr. Zabek was "expressing frustration" about "complying with" the DMCA is dubious in light of its claim that the DMCA is optional.

July 27, 2018                                   Respectfully submitted,

                                               */s/ Scott Richey*
                                               Scott Richey (VSB No. 83313)
                                               SRichey@steptoe.com
                                               STEPTOE & JOHNSON, LLP
                                               1330 Connecticut Ave, NW
                                               Washington, DC 20036
                                               Tel.: (202) 429-3000
                                               Fax: (202) 429-3902

                                               Walter D. Kelley, Jr. (VSB No. 21622)
                                               HAUSFELD, LLP
                                               1700 K Street, NW
                                               Washington, DC 20006
                                               202-540-7200

                                               *Of Counsel*

                                               Roger E. Warin (admitted *pro hac vice)*
                                               Michael J. Allan (admitted *pro hac vice*)
                                               William G. Pecau (admitted *pro hac vice*)
                                               John M. Caracappa (admitted *pro hac vice*)
                                               Jeffrey M. Theodore (admitted *pro hac vice*)
                                               Stephanie L. Roberts (admitted *pro hac vice*)
                                               STEPTOE & JOHNSON, LLP
                                               1330 Connecticut Avenue, NW
                                               Washington, DC 20036
                                               Tel.: (202) 429-3000
                                               Fax: (202) 429-3902

                                               Michael O. Crain
                                               Crain Law Group, LLC
                                               The Bottleworks
                                               297 Prince Avenue, Suite 24
                                               Athens, Georgia 30601
                                               Tel. (706) 548-0970
                                               Fax: (706) 369-8869

                                               *Counsel for BMG Rights Management (US) LLC*

**PUBLIC VERSION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 27, 2018, I electronically filed a true and correct copy of the

foregoing using the Court's CM/ECF system, which then sent a notification of such filing (NEF)

to all counsel of record:

Thomas Buchanan (VSB No. 21530)
tbuchanan@winston.com

                                    */s/ Scott Richey*
                                    Scott Richey (VSB No. 83313)
                                    SRichey@steptoe.com
                                    STEPTOE & JOHNSON, LLP
                                    1330 Connecticut Ave, NW
                                    Washington, DC 20036
                                    Tel.: (202) 429-3000
                                    Fax: (202) 429-3902