**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT, *et al.*, | |
| Plaintiffs, | Case No. 1:18-CV-00950-LO-JFA |
| v. | |
| COX COMMUNICATIONS, INC., *et al.*, | |
| Defendants. | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR
OMNIBUS MOTION IN LIMINE**

## TABLE OF CONTENTS

I.   COX IS COLLATERALLY ESTOPPED FROM OFFERING EVIDENCE OR
     ARGUMENT INCONSISTENT WITH THIS COURT'S FACTUAL FINDINGS
     IN BMG ................................................................................................................ 1

     A.   Collateral Estoppel Applies To Fact Findings Even If The Ultimate Issue Differs ......... 1

     B.   There Is No Merit To Cox's Argument That Only Some Of The Material Designated By
          Plaintiffs Is Eligible For Collateral Estoppel .................................................................. 2

II.  THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENT
     CONCERNING COX'S MISLEADING AND UNSUPPORTED CONTENTION
     THAT ███████████████████ ................................................................... 2

III. THE COURT SHOULD PRECLUDE ANY EVIDENCE OR ARGUMENT
     RELATING TO THE POLICIES OR PRACTICES OF OTHER ISPS
     (INCLUDING THE COPYRIGHT ALERT SYSTEM) ...................................................... 7

     A.   The Policies And Practices Of Other ISPs (Including CAS) Are Irrelevant ................... 7

     B.   There Is No Competent Evidence On The Extent To Which Other ISPs Terminate (Or
          Do Not Terminate) For Repeat Infringement .................................................................. 8

     C.   References To CAS Should Be Precluded Under Rules 401 and 403 ............................. 8

IV.  THE COURT SHOULD PRECLUDE ANY ARGUMENT THAT COX IS
     NOT LIABLE FOR INFRINGEMENT OVER ITS NETWORK BY USERS
     OTHER THAN NAMED ACCOUNT HOLDERS ............................................................. 9

V.   THE COURT SHOULD PRECLUDE ANY EVIDENCE OR ARGUMENT
     CONCERNING THE MARKMONITOR '236 SPREADSHEET .................................... 10

VI.  THE COURT SHOULD EXCLUDE THE REV0003444 SPREADSHEET AND
     ANY RELATED TESTIMONY OR ARGUMENT ........................................................... 11

     A.   The REV0003444 Spreadsheet Is Not Authenticated ................................................... 11

     B.   Rule 403 Warrants Exclusion ....................................................................................... 12

     C.   Dr. Feamster Cannot Testify About REV0003444 ...................................................... 13

VII. THE COURT SHOULD PRECLUDE EMAILS COX RECEIVED FROM
     CUSTOMERS PURPORTING TO RESPOND TO PLAINTIFFS'
     INFRINGEMENT NOTICES ......................................................................................... 13

VIII.   COX SHOULD BE PRECLUDED FROM PRESENTING EVIDENCE AND
        ARGUMENT CONCERNING PLAINTIFFS' TRACK-LEVEL REVENUES
        FROM THE WORKS IN SUIT ......................................................................... 15

IX.     THE COURT SHOULD EXERCISE ITS DISCRETION TO PRECLUDE COX
        FROM OFFERING DEPOSITION TESTIMONY FROM WITNESSES IT
        CONTROLS AND COULD BRING TO TRIAL ................................................ 16

X.      COX SHOULD BE PRECLUDED FROM OFFERING LIVE TESTIMONY
        FROM KEY WITNESSES IT REFUSES TO MAKE AVAILABLE FOR LIVE
        EXAMINATION IN PLAINTIFFS' CASE IN CHIEF ...................................... 17

XI.     THE COURT SHOULD PRECLUDE TESTIMONY FROM
        VICTORIA SHECKLER ................................................................................. 19

CONCLUSION ........................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on Nov. 15, 1987,*
  720 F. Supp. 1493 (D. Colo. 1989) ......................................................................... 17

*Bifolck v. Philip Morris USA Inc.,*
  936 F.3d 74 (2d Cir. 2019) .......................................................................................... 2

*BMG v. Cox,*
  149 F. Supp. 3d 634 (E.D. Va. 2015) ..................................................................... 10

*Bouchat v. Bon-Ton Dep't Stores,*
  506 F.3d 315 (4th Cir. 2007) ...................................................................................... 1

*Bouchat v. Champion Prods., Inc.,*
  327 F. Supp. 2d 537 (D. Md. 2003) ........................................................................... 1

*Branch v. Gov't Employees Ins. Co.,*
  286 F. Supp. 3d 771 (E.D. Va. 2017) ........................................................................ 4

*Briggs v. Zotos Int'l., Inc.,*
  357 F. Supp. 89 (E.D.Va. 1973) ................................................................................ 4

*Collins v. Pond Creek Mining Co.,*
  468 F.3d 213 (4th Cir. 2006) ...................................................................................... 1

*Dun & Bradstreet Software Servs., Inc, v. Grace Consulting, Inc.,*
  307 F.3d 197 (3d Cir. 2002) ....................................................................................... 8

*Lehman Bros. Holdings, Inc. v. Nat'l Bank of Ark.,*
  875 F. Supp. 2d 911 (E.D. Ark. 2012) ................................................................... 17

*Matusick v. Erie Cty. Water Auth.,*
  757 F.3d 31 (2d Cir. 2014) .......................................................................................... 2

*Microsoft Corp. Antitrust Litig.,*
  355 F.3d 322 (4th Cir. 2004) ...................................................................................... 1

*Napier v. Bossard,*
  102 F.2d 467 (2d Cir.1939) ...................................................................................... 17

*Polys v. Trans-Colorado Airlines Inc.,*
  941 F.2d 1404 (10th Cir. 1991) ............................................................................... 17

*Proctor v. LeClaire,*
  715 F.3d 402 (2d Cir. 2013) ....................................................................................... 2

*R.B. Matthews, Inc. v. Transamerica Transp. Servs., Inc.*,
    945 F.2d 269 (9th Cir. 1991) ................................................................................................. 19

*United States v. Oldbear*,
    568 F.3d 814 (10th Cir. 2009) ................................................................................................. 8

*Universal Furniture Int'l., Inc. v. Collezione Europa, USA, Inc.*,
    599 F. Supp. 2d 648 (M.D.N.C. 2009) .................................................................................. 6

*VIIV Healthcare Co. v. Mylan Inc.*,
    No. 12-CV-1065-RGA, 2014 WL 2195082 (D. Del. May 23, 2014)..................................... 17

*Weinstein Co. v. Smokewood Entm't Grp., LLC*,
    664 F. Supp. 2d 332 (S.D.N.Y. 2009) ..................................................................................... 8

**Rules**

Fed. R. Civ. P. 32 ........................................................................................................... 15, 16

Fed. R. Evid. 1006 ............................................................................................................ 3, 5

Fed. R. Evid. 26 .................................................................................................................. 16

Fed. R. Evid. 30 .................................................................................................................. 16

Fed. R. Evid. 401 .................................................................................................................. 8

Fed. R. Evid. 403 .................................................................................................... 3, 5, 11, 12

Fed. R. Evid. 803 .................................................................................................................. 4

Fed. R. Evid. 804 .......................................................................................................... 15, 16

## I.    Cox Is Collaterally Estopped From Offering Evidence Or Argument Inconsistent With This Court's Factual Findings In BMG

### A.  Collateral Estoppel Applies To Fact Findings Even If The Ultimate Issue Differs

Cox concedes that all the elements of collateral estoppel are met, save one: the "identity-of-issue" requirement, as Cox calls it.  (Opp. at 3.)  It contends that Plaintiffs have failed to identify "an identical issue for estoppel" because the *BMG* factual findings underlay an adjudication of Cox's DMCA safe harbor defense, which is not at issue here.  *Id.* at 3.  Cox is wrong because it ignores the Fourth Circuit standard for determining what is an "identical issue."

Collateral estoppel concerns whether "the issue or fact is identical to the one previously litigated," not whether the ultimate claim for which the fact was resolved is identical.  *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004); *see also Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 219 (4th Cir. 2006) (collateral estoppel applied where issue of decedent's suffering from pneumoconiosis as a result of his work in the mines was identical issue in claim for survivor's benefits and prior benefits claim under Black Lung Benefits Act).

Cox has no response for that governing Fourth Circuit law.  Its attempt to distinguish *Bouchat v. Champion Prods*., *Inc.,* 327 F. Supp. 2d 537, 546 (D. Md. 2003), *aff'd on other grounds sub nom. Bouchat v. Bon-Ton Dep't Stores*, 506 F.3d 315 (4th Cir. 2007), highlights the flaw in Cox's position.  *Bouchat* explains that "[t]he claim presented need not be the same for collateral estoppel to preclude relitigation of an issue."  327 F. Supp. 2d at 546.  Cox even concedes that *Bouchat* stands for "the basic principle that collateral estoppel requires identify [sic] of issues, not identity of claims," yet it argues for a different result.  (Opp. at 3.)

Cox tries to conflate the preclusive effect of a factual finding and the ultimate legal claim, but the two are not the same.  As the Second Circuit clearly explained, preclusive effect is given to *factual issues* previously resolved, even if on a different claim, because collateral estoppel

1

is concerned not with "claims or ... causes of action as a whole," *id.*, but with *issues*— "single, certain and material point[s] arising out of the allegations and contentions of the parties," *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 48 (2d Cir. 2014) (citation omitted). Where, as here, the issue to which the plaintiff seeks to give preclusive effect concerns "only the existence or non-existence of certain facts," and not "the legal significance of those facts ..., [it] need only deal with the same past events to be considered identical." *Id.* (citation omitted). In such cases, the "legal standards to be applied" need not be identical.

*Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 80–81 (2d Cir. 2019) (emphasis in original).

Plaintiffs' motion concerns the preclusive effect of facts resolved in a prior proceeding, not their legal significance. That Cox did not assert a DMCA defense here is immaterial.

### B. There Is No Merit To Cox's Argument That Only Some Of The Material Designated By Plaintiffs Is Eligible For Collateral Estoppel

Citing no case law, Cox tries to draw a distinction between the Court's factual determinations and the underlying evidence that the Court relied on to support its determinations. Cox contends that only the former is eligible for collateral estoppel. Plaintiffs believe that both are subsumed. But even if the Court accepts Cox's position, it does not dispense with the issue. As set forth in the attached copy of the Court's summary judgment decision from *BMG*, there remain numerous factual findings (highlighted in green) that are distinct from the evidence the Court relied upon. Gould Declaration ("Gould Decl.") Ex. 1.

## II. The Court Should Preclude Evidence And Argument Concerning Cox's Misleading And Unsupported Contention That ███████████████

The facts and figures in DX 74 are a confusing mess of internal inconsistency, misleading calculations that *literally* ███████████ and devoid of data to support them. And yet, Cox's claim that ███████████████ is the headline of its defense. Cross examination to undermine the claim cannot solve the problem. The mere utterance of the so-called "study" and its misleading and unsupported conclusion will lend it an air of credibility in the jury's mind. The proverbial bell cannot be un-rung. The *only* adequate solution is exclusion.

2

The sole basis for Cox's claim that ███████████████ is a single slide in DX 74, which was used as a piece of advocacy.  That slide purports to ████████████ ███████████████  But Cox never produced the data.  All Cox produced was an email from Beck, ███████████████████████; it is not the actual underlying data.  As the Court knows, there is a wide gulf between tickets and notices.  Without the underlying data, Cox's ████████ lacks adequate foundation to establish its relevance.  Indeed, the notion that ████████████████████████████████████ contradicts all other data and information in the record.  If Plaintiffs are not permitted an opportunity to examine the underlying data, Plaintiffs (and the jury) are unfairly prejudiced by its use in court.

Cox wants to summarize data it has not provided and misleadingly argue its meaning to the jury.  Cox cannot lay a foundation for that merely by describing what DX 74 purports to be and who prepared it.[1]  Whether Cox calls DX 74 a business record or a Rule 1006 summary, the fundamental problems are the same.  The slide itself is internally inconsistent, deceptive and utterly confusing.  The Court should exclude it on any of multiple grounds, including foundation, relevance, hearsay, FRE 1006, or FRE 403:

*Foundation & Relevance*.  Plaintiffs do not concede the relevance of ████████ or any "effective" analysis, as Cox contends.  Cox either met its legal obligations or did not.  Those obligations do not turn on "effectiveness."  ████████████, in particular, is irrelevant because it contains misleading and unsupported conclusions and calculations that lack evidentiary or foundational support.  Without a proper foundation supporting it, ████████████ is unreliable and

---

[1] Cox conflates establishing authenticity with laying foundation.  (Opp. at 4-5.)  The two are not the same; both are required to establish admissibility.  And while the Court allowed Cadenhead to sponsor DX 74 in *BMG*, the record here is very different and confirms its inadmissibility.

irrelevant.  *See Briggs v. Zotos Int'l., Inc.,* 357 F. Supp. 89, 92 (E.D.Va. 1973) (affirming

exclusion of evidence at trial based on "the lack of proper foundation so as to prove relevance.").

    *Hearsay*.  ███████ is hearsay that cannot satisfy the business records exception, as

Cox contends.  Even if the never-produced underlying data actually came from CATS, ████

████ is a conclusion based on an analysis.  Unlike the business records at issue in *Branch*,

Cadenhead did more than "simply copied and pasted information from [Beck's] report" into the

slide.  *Branch v. Gov't Employees Ins. Co.*, 286 F. Supp. 3d 771, 778 (E.D. Va. 2017).

Cadenhead ████████████████████████████████████

████████████████████████████████ Not only do they

speak to different issues in tickets and notices, but Cadenhead ███████████████

████████████████.  That is not a business record.

    DX 74 also fails the business records test because Plaintiffs have "show[n] that the source

of information or the method or circumstances of preparation indicate a lack of trustworthiness."

Fed. R. Evid. 803(6)(E).  First, Beck summarized ███████████████, while

Cadenhead's slide describes ████████████ The number of CATS tickets is not

the same as the number of email warnings Cox sent to customers.  Second, Cox concedes the

actual source data is missing.  Gould I, Ex. 9.[2]  Third, the method of preparation lacks

trustworthiness because DX 74 changes the meaning of the information it purports to summarize

and is itself internally inconsistent.  The bar graph says █████████████████;

but the table on the same page says that █████████████.  Carothers

agreed this was confounding: ████████████████████████

---

[2] "Gould I" refers to the Gould Declaration filed with Plaintiffs' Omibus Motion in Limine.

████████████████████████████████████████████  Gould Ex. 5 at 185:2–186:19

(Carothers Tr.).  Every other step of the graph and table are likewise at odds.

Cox also contends that ███████████ is not hearsay because it can be offered to show

Cox believed that its graduated response system was effective.  In Cox's view, Cox can write

down what it wants to believe and then rely on that to prove its state of mind.  That is called

delusion, not a hearsay exception.  There is also no basis for Cox's creative position that the

document demonstrates that Plaintiffs were aware of Cox's state of mind.  And, of course, Cox

should not be able to backdoor its unsupportable "study" by presenting it through an expert, Dr.

Weber, who has not seen or analyzed the data.

*FRE 1006*.  Recognizing these flaws, Cox argues that "DX 74 also qualifies as an

admissible summary under FRE 1006."  (Opp. at 6 n.21.)  It does not.  To satisfy FRE 1006, "the

underlying evidence [must] be admissible and available to the opponent so that a proper cross-

examination may be had."  *United States v. Strissel*, 920 F.2d 1162, 1164 (4th Cir. 1990).

Despite Plaintiffs' repeated requests for the underlying data, Cox produced just the Beck email,

containing yet another summary, on the last day of discovery.  Plaintiffs obviously could not

cross-examine on it.  And Cadenhead admitted that ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████  Gould I, Ex. 3 at

292.  Moreover, the summary contains analysis and conclusions, not an objective summary of

the data as Rule 1006 requires.  *See Universal Furniture Int'l., Inc. v. Collezione Europa, USA,*

*Inc.*, 599 F. Supp. 2d 648, 656 (M.D.N.C. 2009).  Beck's summary email is also hearsay that is

not itself admissible, as required under FRE 1006.

_FRE 403_.  DX 74 is misleading, deceptive, and unfairly prejudicial.  Cox claims otherwise based, in part, on testimony from Matt Carothers.  But Carothers ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ and what could be divined from the confusing slide:



- Carothers confirmed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- Carothers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- Carothers agreed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The percentages and calculations are also incomprehensible.  The table percentages add up to ▮▮▮▮▮▮▮▮▮▮▮.  It says ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  And critically, the percentage of customers with five notices ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

DX 74 is a confusing mess, even to Cox's own witnesses.  There is also no evidence that Cox's subscribers stopped infringing, though that is the punchline of DX 74.  Allowing Cox to present this so-called "study" would knowingly infect the jury with misimpressions unsupported by Beck's summary email of never-produced data.  The number of tickets processed under Cox's rigged system is not the same as the number of notices received per customer or sent to customers and—contrary to DX 74—Cox has no idea whether a subscriber stopped infringing.[3]

---

[3] Cox also misleads the Court on the discovery record concerning DX 74.  Plaintiffs' motion explained that Cox withheld Beck's email until the last day of discovery, after Plaintiffs moved to compel.  Cox purports to dispute that by noting a second instance in which it produced DX 74.  (_See_ Opp. at 5 n.17.)  Cox has no answer for delaying production of Beck's email until the last day of discovery, when Plaintiffs obviously could not cross examine anyone on it.

### III.   The Court Should Preclude Any Evidence Or Argument Relating To The Policies Or Practices Of Other ISPs (Including The Copyright Alert System)

In *BMG*, this Court correctly concluded "that a comparison of Cox's policies to the policies of other ISPs would be irrelevant, prejudicial, and likely to mislead the jury."  Gould I, Ex. 13 at *2.  The issue has not changed and the same result should apply here.

### A.   The Policies And Practices Of Other ISPs (Including CAS) Are Irrelevant

Cox argues that the actions of other ISPs (under CAS) and a comparison of Cox's misconduct to them are relevant to rebut "Plaintiffs' theory that Cox's more stringent system was unreasonable."  (Opp. at 10.)  Cox's argument has no merit.

First, Cox fails to cite even a single case for its theory of relevance.  It does not even attempt to distinguish the vast authority Plaintiffs cite against its argument.  *See*, *e.g.*, *Dun & Bradstreet Software Servs., Inc, v. Grace Consulting, Inc.*, 307 F.3d 197, 211 (3d Cir. 2002) ("A defense of industry custom and practice in the face of the protective provisions of the Copyright Act could undermine the purposes and objectives of the statute and reduce it to rubble."); *United States v. Oldbear*, 568 F.3d 814, 821 (10th Cir. 2009) ("An 'everybody-is-doing-it defense' . . . [i]s a sideshow from which the jury c[an] [] glean[] little valuable information." *Weinstein Co. v. Smokewood Entm't Grp., LLC*, 664 F. Supp. 2d 332, 348 (S.D.N.Y. 2009) ("[N]otwithstanding plaintiff's claims about 'custom and practice' in the entertainment industry, federal copyright law dictates the terms by which an exclusive license can be granted.").

Second, Cox's argument is based on its misrepresentation of Plaintiffs' claims.  This case is about Cox's violation of its legal obligations by continuing to provide service to specific known infringers—not whether it acted better, worse, or the same as another ISP.  Plaintiffs' claims do not depend on whether Cox's graduated response process was "reasonable" or "effective" in comparison with other ISPs.  Cox raised those contrived concepts of

7

"reasonableness" and "effectiveness" to deflect from its obvious misconduct in assisting and profiting from the illegal activity of particular known infringers.  Nor is there any merit to Cox's claim that CAS is somehow relevant because Plaintiffs' expert, Dr. Lehr, may testify about the economic harms of piracy.  Cox's attempt to link the two is a non sequitur.

### B.    There Is No Competent Evidence On The Extent To Which Other ISPs Terminate (Or Do Not Terminate) For Repeat Infringement

Cox lacks competent evidence to show that other ISPs did not terminate repeat infringers.  While Cox tries to sidestep the issue, whether and the extent to which other ISPs terminated repeat infringers is a *complete unknown* in the record.  Cox wants to mislead the jury otherwise.

Cox argues that "there are at least six witnesses with personal knowledge of CAS, documents detailing ISPs' obligations under it, and independent assessments of how the obligations were implemented."  (Opp. at 12.)  That is beside the point.  Nothing about CAS is relevant to those ISPs' legal obligations, including what steps, if any, they may have taken to terminate the accounts of known infringers.  It is undisputed that CAS did not address termination.  CAS left that issue to each ISP to address on its own, in light of the law's requirements.  Cox wants to talk about what those ISPs did within the confines a private agreement that explicitly did not address an ISP's legal obligations.  That is irrelevant.

Granting Plaintiffs' motion is neither harsh nor unfair.  Cox's lack of competent evidence is a problem of its own making.  This Court told Cox it needs discovery from third-party ISPs if it wanted to present trial evidence on their copyright abuse handling.  Cox ignored that and chose not to take discovery from other ISPs, whether or not they participated in CAS.

### C.    References To CAS Should Be Precluded Under Rules 401 and 403

CAS was a temporary educational experiment, not an "industry standard."  It did not define what any Plaintiff deemed acceptable on whether termination of repeat infringers was

required. ████████████████████████████████████████████

███████████████████████   Gould Ex. 2 at 140:5-142:2 (Marks Tr.).  How to handle

termination was left to each ISP and the law—CAS simply did not address it.  Nonetheless,

ignoring the *entire record*, Cox contends that the terms of CAS raise some "factual issue" for the

jury.  Not so.  Cox has no evidence, only attorney argument and speculation, about how any

other ISP handles the issue of termination under the law.  It is thus deceptive, unfairly

prejudicial, and irrelevant to compare Cox's handling of repeat infringers under the law with the

terms of a private agreement that expressly did not address that.[4]

## IV.   The Court Should Preclude Any Argument that Cox is Not Liable for Infringement Over Its Network by Users Other Than Named Account Holders

Cox should be precluded from arguing against liability on the grounds that an authorized

user of an account, rather than the named account holder, infringed.  In the same vein, Cox

should be precluded from *speculating* that the infringement was by unauthorized users.

In *BMG*, this Court held that "[w]hile identity is a key issue in many individual

infringement suits, it has little relevance in a large-scale secondary liability suit."  *BMG v. Cox*,

149 F. Supp. 3d 634, 664 (E.D. Va. 2015).  The Court correctly recognized it does not matter

that the infringer happens to be a household member rather than the named account holder.  *Id.*

---

[4] The parties agree that granting Plaintiffs' motion will streamline trial, notwithstanding some disagreement on the extent.  Cox concedes Jill Lesser would not need to testify, and it would streamline testimony from Dr. Almeroth (who proposes to testify about CAS) and several of Plaintiffs' witnesses (who Cox plans to cross-examine about CAS).  Cox claims that testimony from Christopher Monson, Seth Nielson and Samuel Rubin would still be needed.  Plaintiffs disagree.  Each was involved in evaluating MarkMonitor *pursuant to CAS*, which had its own goals, requirements, and procedures.  It would confuse the record and jury to permit their testimony concerning the MarkMonitor systems used in CAS.  Cox had a full opportunity to inspect the MarkMonitor system used to generate the notices to Cox at issue here.  Cox also inspected MarkMonitor's source code, received an extensive document production from MarkMonitor, and conducted a lengthy 30(b)(6) deposition of two MarkMonitor witnesses.

Cox appears to agree.  (Opp. at 15 n.45.)  Cox should thus be precluded from deflecting liability

on the grounds that an authorized user, rather than the named account holder, infringed.

Cox next notes that this Court indicated in *BMG* that Cox may present evidence that

"might weaken" the evidence presented against it.  The Court mentioned the theoretical example

of stolen access to wireless networks.  Here, there is no evidence that the infringement at issue

stems from stolen access to wireless networks.  Cox's counsel, fact witnesses, and experts should

be precluded from *speculating* otherwise (on this or other theoretical bases).

Cox also argues that its liability for infringement by users of Cox's business accounts

ought to be treated differently.  But this Court's reasoning for residential accounts in *BMG*

discussed above holds true for business accounts.  The case is not about *who* is the direct

infringer.  Secondary liability merely requires the *existence* of direct infringement, not an

identification of the infringer's precise identity.  Accordingly, Cox should be precluded from

arguing that Plaintiffs had to inform Cox of the identity of the specific direct infringers.

## V.      The Court Should Preclude Any Evidence Or Argument Concerning The MarkMonitor '236 Spreadsheet

Cox misleadingly argues that the '236 Spreadsheet must be relevant because the '431

Spreadsheet is relevant.  (Opp. at 17-19.)  This misses the point.  The portions of the '236

Spreadsheet that are cumulative of the '431 Spreadsheet are relevant but they are, by definition,

cumulative.  The mish-mosh of confusing and irrelevant formulations in four extraneous fields

collected <u>after</u> the claim period are completely irrelevant.  Corporate designees from both

Audible Magic and MarkMonitor confirmed exactly that.  As they explained, ███████████

██████████████████████████████████████████████████████████

████████████████████████████████████████    Cox wants to mislead the jury by

ignoring this unrebutted evidence and telling the jury the data means something else.

10

As Magistrate Judge Anderson understood, ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████

Cox should not be permitted to infect the jury with its palpably false theories about the

additional data fields under the guise that "it goes to weight."

## VI.   The Court Should Exclude The REV0003444 Spreadsheet And Any Related Testimony Or Argument.

### A.  The REV0003444 Spreadsheet Is Not Authenticated

One of the most basic purposes of a deposition is to have witnesses authenticate

documents and answer questions about them.  That allows parties to build a record without

speculation about documents and their meaning.  For whatever reason, Cox chose not to do so

with REV0003444 at Audible Magic's deposition.

Cox's response is that REV0003444 is authenticated because Audible Magic produced

the document in discovery (among ████ others) and it contains records similar to records

MarkMonitor received from Audible Magic.  Recognizing that does not cut it, Cox rolls the dice

with other creative but inadequate ideas.  Cox suggests that its own expert, Dr. Feamster, can

authenticate the document, though he knows nothing about it.  Cox misrepresents that Plaintiffs'

expert authenticated the document—not true.[5]  Cox claims REV0003444 was produced in response to a specific document request, but admitted that "Audible Magic did not specifically identify which request each document related to" and concedes it "was arguably responsive" to at least two other requests.  ECF No. 462 at n.4.  Cox even contends the document must be authentic because neither Plaintiffs nor Audible Magic have denied that it is the transaction log Cox wants it to be.  That flips the burden and is not how authentication works.

### B.  Rule 403 Warrants Exclusion

Cox's contention that REV0003444 is not confusing or misleading is simply wrong.  Cox should not be allowed to use this inadmissible document as a tool to deceive the jury.

First, Cox claims that "Plaintiffs have not produced any evidence of Audible Magic's pre-2012 verifications because they destroyed it."  (Opp. at 21.)  This is obviously false.
MarkMonitor used Audible Magic from 2008-2014, ███████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████
████████████████████████  There is zero merit to Cox's rhetoric that the '431 Spreadsheet "has been cleansed of conflicting data points that Plaintiffs destroyed or refused to produce."  It defies credulity—and evidentiary foundation—for Cox to imply that MarkMonitor would make up the Audible Magic verifications.  Cox may not like the evidence, but it exists.

Second, the REV0003444 Spreadsheet does not cover the relevant time period.
Assuming REV0003444 is the transaction log that Cox contends, it covers only ███████████

---

[5] Barbara Frederiksen-Cross merely responded to Cox's counsel's questions about REV0003444. It is an internal Audible Magic document that Ms. Frederiksen-Cross obviously was not in a position to authenticate.

███████████████ and, by definition, would not include verifications done for MarkMonitor during 2008-2011.[6]  Cox falls back on the old "weight, not admissibility" adage. Of course, Rule 403 confirms otherwise where, as here, the document does not cover the relevant time period and is incomplete.  It is difficult to imagine a more wasteful detour of the jury's time.

### C.  Dr. Feamster Cannot Testify About REV0003444

Cox also argues that, even if the spreadsheet is inadmissible, Dr. Feamster can offer opinions on it.  But for all the reasons explained, the document is unreliable and no one knows what it means.  Cox should not be permitted to backdoor the inadmissible spreadsheet and use it as the foundation for Dr. Feamster's opinion.  As explained in Plaintiffs' Daubert motion, Dr. Feamster has not approached his assignment with the intellectual rigor expected of an expert. His reliance on REV0003444 demonstrates that further as his opinions are based on speculation and hope that the document is what he thinks.  Cox is desperate to squeak in this problematic document so it can argue unreasonable inferences from it.  The Court should not allow it.

### VII.   The Court Should Preclude Emails Cox Received From Customers Purporting To Respond to Plaintiffs' Infringement Notices

First, Cox claims that the customer emails provide evidence of Cox's state of mind.  In the same breath, Cox explains those emails "undermine[] Plaintiffs' claim that infringement notices are sufficient to prove actual knowledge of, or willful blindness to, infringement." (Opp. at 23.)  The implication Cox wants the jury to draw is that the statements are true.  Further, these customer emails could not provide evidence of Cox's state of mind because they went to the same address as MarkMonitor's infringement notices.  Cox's counsel told the Court at a recent

---

[6] Cox claims 75% of the records in the '431 Spreadsheet concern infringing files first downloaded during the 2012-2014 period covered by REV0003444.  Cox's sole support for this is the testimony of Plaintiffs' expert Barbara Frederiksen-Cross, who merely acknowledged the arithmetic on a demonstrative presented to her by Cox's counsel.  (Opp. at 22 n. 70.)

hearing: "The notices in question, first of all, were going to a Cox e-mail address, which I would say *nobody ever looks at that*." ECF No. 535 (Oct. 24, 2019 Hr'g Tr. at 40:03-05.)   Unread emails cannot possibly influence Cox's state of mind.  Moreover, Cox's internal emails among the abuse team make clear that they believed that ████████████████████████████ ██████████████████   Gould Ex. 3 (PX 264).

Second, Cox claims it will offer the emails to rebut Plaintiffs' claim that no Cox subscriber ever disputed an allegation of infringement.  That is a tenuous reed, premature at best.  Cox's records indicate nearly 58,000 Cox subscribers were the subject of hundreds of thousands of MarkMonitor notices.  Cox's trial exhibits include 1,800 emails Cox received from some unknown number of unidentified subscribers.  That amounts to just 3% of the infringing subscribers.  But the figure is likely lower.  Cox's redactions hide from view who the subscriber are and how many sent those emails, though certainly some emails are repeat senders.[7]

Third, Cox argues that its expert, Dr. Weber, can use these emails to support her testimony that it was reasonable for Cox not to automatically terminate repeat infringers or to respond to first notices.  This makes no sense.  It is a non sequitur aimed merely at interjecting these emails into the trial.  A Cox subscriber was not even eligible for termination under Cox's policy until over 13 infringement notices.  Nor is anything about these emails plausibly connected to Cox's across-the-board policy to do nothing in response to the first notice.

Finally, the emails also have a strong potential to mislead and cause unfair prejudice that outweighs any probative value.  Cox's redactions conceal not just the names of the subscribers but also how many unique accounts were involved.  And the record does not indicate whether the

---

[7] Many of these emails do not dispute that either the subscriber or an authorized user engaged in the conduct at issue.  Yet walking through this body of emails at trial is not practicable.

named subscribers even authored the emails.  Nobody knows what these unidentified customers understood, what they meant, or if they were being truthful.  These authors cannot be cross-examined, nor their assertions tested.  The situation is ripe for speculation, confusion, and abuse.

### VIII.   Cox Should Be Precluded From Presenting Evidence and Argument Concerning Plaintiffs' Track-Level Revenues From the Works In Suit

Cox's *de minimis* use of Plaintiffs' track-level revenue by its damages expert is telling—it is simply not relevant and would be confusing and unhelpful to the jury.  It should be excluded.

Cox misses the point in arguing that a jury awarding statutory damages can consider a plaintiff's actual damages and a copyright's value.  Plaintiffs' concern is that their historic track-level revenue data, standing alone, cannot possibly serve as a reliable indicator of either.  Cox did not use Plaintiffs' track level revenue to determine anything about Plaintiffs' actual damages or a valuation of their works.  Nor could it—a Plaintiff's historic revenue from a work obviously does not indicate the revenue lost to infringement.  This is precisely why Cox did not do *any* analysis to connect historic revenues to a measure of actual damages.  This highly confidential, competitively sensitive information is irrelevant and would only mislead and confuse the jury.

Nor does a Plaintiff's past revenue, standing alone, measure the value of that work's copyright.  Once again, Cox failed to analyze or appraise the value of any of the works.  There are experts who specialize in that sort of work.  Cox decided not to engage them.

Despite all this, Cox intends to cherry-pick from the hundreds of thousands of data points, without any analysis of whether that revenue data is representative or what it means.  This cannot possibly be meaningful for a jury.  Experts are supposed to analyze financial data like this to make it accessible and understandable, including in the context of accounting, economic and other financial principles.  What Cox proposes to do is not anywhere close to an expert analysis of actual damages or a work's valuation.  Cox's purported justification falls flat.

15

**IX.     The Court Should Exercise Its Discretion To Preclude Cox from Offering Deposition Testimony From Witnesses It Controls And Could Bring To Trial**

Plaintiffs' explained why Cox's proffered deposition testimony from six witnesses it controls is inadmissible under FRE 804 and Fed. R. Civ. P. 32.  (Mot. at 22-23.)  Cox's opposition ignores FRE 804 entirely, with just a passing footnote describing Rule 32(a)(4) as an allegedly "independent exception to the hearsay rule."  (Opp. at 26 n.75.)  But "[t]he party seeking to admit the deposition must prove that the requirements of both Rule 32(a)(3) and Rule 804(b)(1) have been met."  *Lehman Bros. Holdings, Inc. v. Nat'l Bank of Ark.*, 875 F. Supp. 2d 911, 922 (E.D. Ark. 2012); *see also In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on Nov. 15, 1987,* 720 F. Supp. 1493, 1502 (D. Colo. 1989).  Cox has not explained why it cannot exercise "reasonable means" to make witnesses it controls available, as FRE 804 requires.

But even if Cox could satisfy Rule 804 (and it cannot), the "court [is] not automatically required to admit the deposition testimonies under federal Rule of Civil Procedure 32(a)(3)(B) just because the witnesses were more than 100 miles away."  *Polys v. Trans-Colorado Airlines Inc.*, 941 F.2d 1404 (10th Cir. 1991); *accord VIIV Healthcare Co. v. Mylan Inc.*, No. 12-CV-1065-RGA, 2014 WL 2195082, at *1 (D. Del. May 23, 2014) ("[C]ourts retain significant discretion in determining whether to admit deposition testimony.").  That makes sense because "[t]he deposition has always been, and still is, treated as a substitute, a second-best, not to be used when the original is at hand."  *Napier v. Bossard,* 102 F.2d 467, 469 (2d Cir.1939).

Cox offers no explanation why the witnesses it controls cannot appear live or any reason to doubt that Cox has procured their absence.  Four of those witnesses are among Cox's Rule 30(b)(6) corporate designees (Stifel, Summers, Jarchow, Delgado).  Cox selected them to speak for the company in this case.  Jarchow lives in California and Cox flew him to Atlanta for his deposition.  Delgado is Cox's in-house counsel managing this litigation, has attended the

majority of Cox's defensive depositions (including in Washington, D.C.), attended the summary judgment hearing, and will no doubt attend trial.[8]  Zabek and Sikes are contractually bound to attend trial if Cox asks.  Zabek testified ████████████████████—well, Plaintiffs have asked and Cox refuses to bring him; same for Sikes.  Cox is a multi-billion-dollar company actively blocking Plaintiffs from examining these witnesses live and hiding behind a technicality. The Court should exercise its discretion to preclude Cox from offering their depositions absent a showing they are *actually* unavailable.

## X.  Cox Should Be Precluded From Offering Live Testimony From Key Witnesses It Refuses To Make Available For Live Examination in Plaintiffs' Case in Chief

Two days after Plaintiffs filed this motion, Cox offered a compromise to resolve this motion.  Cox said it would produce Matt Carothers and Brent Beck in Plaintiffs' case in chief, but could not commit to producing Jason Zabek or Joseph Sikes because it had not decided if it would call them.  Gould Ex. 4.  Before Plaintiffs responded, Cox withdrew the offer, said it "understand[s] that Sikes and Zabek do not intend to appear at trial," and then opposed the motion as to Carothers and Beck.  *Id.*  Cox is still playing games.

In its motion, Cox reiterates the vague statement that it "does not intend to call Sikes or Zabek . . . at trial, but will present their testimony by deposition."  (Opp. at 28.)  Given this representation and the reasons explained in Plaintiffs' briefing, Cox should be estopped and precluded from presenting either live at trial for *any purpose* (including affirmatively or in rebuttal) unless it agrees by a date certain to make them available in Plaintiffs' case.[9]

---

[8] Cox did not identify Mr. Delgado on its Rule 26(a)(3) Witness List and therefore cannot present him at trial in any format.  (Mot. at 24 n.9.)  Cox does not dispute this in its opposition.

[9] Though Plaintiffs' preference is to present both witnesses live, the Court should not permit Cox to announce on the eve of trial that Zabek and Sikes will suddenly appear.  The purpose of in limine motions is to resolve disputed issues in advance so that the parties can plan for an efficient trial, not play catch-up from games of "gotcha" at the last minute.

As for Carothers and Beck, Cox concedes the Court has authority to preclude their live testimony if it refuses to make them available in Plaintiffs' case in chief. *Id.* It also agrees that Carothers and Beck are "key witnesses." *Id.* Yet Cox ignores the wealth of cases in which courts throughout the country apply their discretion to grant the relief Plaintiffs' request. (Mot. at 24-27.) Cox has not cited a single case to the contrary. The *only* case Cox cites had identical facts and supports Plaintiffs' motion. (Opp. at 28) (citing *R.B. Matthews, Inc. v. Transamerica Transp. Servs., Inc.*, 945 F.2d 269, 273 (9th Cir. 1991)). There, the Ninth Circuit held that:

> By denying RBM's requests to produce Reed and White as live witnesses, TTS engaged in gamesmanship, forcing RBM to rely on depositions. The district court did not abuse its discretion when it forced TTS to rely on deposition testimony as well. If TTS had truly wished to present the live testimony of White and Reed, it could have done so by making those witnesses available when RBM requested that they be produced.

*Transamerica*, 945 F.2d at 273. The Court should reach the same result here.

Instead, Cox claims that fairness warrants denying Plaintiffs' request because Carothers and Beck will represent the "face" of Cox's anti-infringement effort, and it would be confusing for the jury and bad for Cox if they appear in Plaintiffs' case. (Opp. at 28.) This is simply not credible or convincing, and "bad for Cox" is not the standard. Zabek and Sikes ran the abuse department during the claim period. *They* were the face of Cox's anti-infringement effort, yet Cox refuses to show their faces at trial. Cox did not even call Beck in the *BMG* trial, so its claim that he is their "face" is hollow. In any event, Cox has plenty of other faces it intends to call at trial, including on anti-infringement topics. *See* ECF No. 221 (Cox's witness list).

Cox's refusal to bring Zabek and Sikes to trial makes Carothers' and Beck's appearance in Plaintiffs' case in chief even more critical. Just one Cox witnesses (a former line-level abuse employee) is within the Court's subpoena reach. Cox witnesses are critical to Plaintiffs' case and Plaintiffs should not be blocked from presenting them by Cox's strategic games. Cox half-

18

heartedly suggests Plaintiffs should elicit their desired testimony from Carothers and Beck during Cox's case.  This is ironic.  Cox ignores that Plaintiffs' cross will certainly exceed the scope of Cox's self-serving direct exams and that Cox has refused to allow an expanded scope on cross.  Gould I, Exs. 37, 38.  In any event, Plaintiffs have conservatively limited their request for live attendance in their case to just four key witnesses (two of whom Cox says will not attend).

Plaintiffs bear the burden of proof and will put on their case first.  Absent this relief, Plaintiffs will be forced to play hours and hours of deposition videos for Carothers and Beck, which Cox has materially counter-designated.  *See* ECF 429-1.  Cox will then call the same witnesses live and get a second chance to rebut Plaintiffs' case through them.  This would be inefficient, disjointed and confusing; it makes no sense at all.  Granting the motion will promote a fair, efficient and sensible trial.

### XI.    The Court Should Preclude Testimony From Victoria Sheckler

Cox adds nothing to the record before the Court to support its demand to burden non-party Victoria Sheckler with a trial subpoena for cumulative testimony that Cox can present through RIAA's corporate designee.  Magistrate Judge Anderson already rejected Cox's effort to depose her.  He rightly concluded that her corporate and personal knowledge were one and the same, and RIAA's 30(b)(6) designee, Steve Marks—who supervised Ms. Sheckler and worked closely with her on all relevant matters—was sufficient.  Nothing has changed since that ruling and Cox offers no reason for a different result here.

Cox's sole proffer for why it needs Ms. Sheckler's testimony is that she emailed with Mr. Cadenhead about Cox's caps on the number of infringement notices it would accept.  (Opp. at 29.)  Ms. Sheckler was but one member of a team.  As Mr. Marks testified, when emailing with Mr. Cadenhead about those caps, Ms. Sheckler ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19

██████████████████████████████████████████████████

████████████████████████     Or, as Magistrate Judge Anderson put it, "anything that she did

she would have done as a corporate representative of RIAA," including emailing with Mr.

Cadenhead.  *See* Gould I, Ex. 34 at 16-17.

Cox also misleads the Court in arguing that Ms. Sheckler's testimony is needed because

Mr. Marks "refused to answer simple questions . . . confirming that the RIAA was the record

labels Plaintiffs' exclusive agent for sending copyright notices to Cox."  (Opp. at 29-30.)  While

Plaintiffs' counsel properly objected because the question calls for a legal conclusion concerning

"agency," Mr. Marks responded that ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████ █

Cox also misses the point on Plaintiffs' alternative request to quash the subpoena to Ms.

Sheckler as an undue burden.  Plaintiffs do not dispute that Ms. Sheckler lives nearby.  Rather,

Plaintiffs (and RIAA and Ms. Sheckler) argue that it would be an undue burden to call her away

from work and into court for up to three weeks under the circumstances—namely, to provide

cumulative testimony on things "done as a corporate representative of RIAA," when her direct

supervisor, who worked on those same things, has been deposed on the same topics and will

testify on those same topics as RIAA's corporate designee.

## CONCLUSION

For the reasons set forth herein, the Court should preclude the evidence and argument

discussed above at trial.

---

[10] Cox's opposition also relies on a flawed premise.  Cox says that "Cox requested that *Plaintiffs* designate Ms. Sheckler as the *RIAA*'s 30(b)(6)" witness on certain issues but Plaintiffs refused. (Opp. at 29-30 (emphasis added).)  Plaintiffs do not select RIAA's designees, RIAA does.

Dated November 6, 2019                                   Respectfully Submitted,

                                                         /s/ Scott A. Zebrak
                                                         Scott A. Zebrak (38729)
                                                         Matthew J. Oppenheim (*pro hac vice*)
                                                         Jeffrey M. Gould (*pro hac vice*)
                                                         Kerry M. Mustico (*pro hac vice*)
                                                         OPPENHEIM + ZEBRAK, LLP
                                                         4530 Wisconsin Avenue, NW, 5th Floor
                                                         Washington, DC 20015
                                                         Tel:  202-480-2999
                                                         scott@oandzlaw.com
                                                         matt@oandzlaw.com
                                                         jeff@oandzlaw.com
                                                         kerry@oandzlaw.com

                                                         *Attorneys for Plaintiffs*