1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                        Alexandria Division




-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,        :
                               :
    -vs-                        :     Case No. 1:18-cv-950
                               :
                               :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                               :
-------------------------------:
```

HEARING ON MOTIONS

November 12, 2019

Before:  Liam O'Grady, USDC Judge

APPEARANCES:

Matthew J. Oppenheim, Scott A. Zebrak, Jeffrey M. Gould,
and Michael J. Druckman, Counsel for the Plaintiffs

Thomas M. Buchanan, Michael S. Elkin, Jennifer A. Golinveaux,
and Thomas P. Lane, Counsel for the Defendants

2

```
 1              THE CLERK:  The Court calls case 1:18-cv-950, Sony
 2   Music Entertainment, et al. versus Cox Communications, Inc., et
 3   al. for a motion hearing.
 4              May I have the appearances, please, first for the
 5   plaintiff.
 6              MR. ZEBRAK:  Good morning, Your Honor.  Scott Zebrak
 7   for the plaintiffs with the law firm of Oppenheim + Zebrak.
 8   With me are my colleagues at counsel table Matthew Oppenheim
 9   and Jeffrey Gould.
10              MR. OPPENHEIM:  Good morning, Your Honor.
11              MR. ZEBRAK:  Sitting behind us are a legal assistant
12   from our office, Geoffrey Israel; and an associate, Michael
13   Druckman.
14              THE COURT:  All right.  Good morning to each of you.
15              MR. BUCHANAN:  Good morning, Your Honor.  Thomas
16   Buchanan from the firm Winston & Strawn on behalf of the
17   defendant Cox.
18              With me at counsel table is Michael Elkin and
19   Jennifer Golinveaux.  Also in the courtroom is Tom Lane,
20   another partner.
21              And Allie Regan, a paralegal, who will be assisting
22   me with some technology.
23              THE COURT:  All right.  Good morning to each of you.
24              All right.  I hope that you got a little time this
25   weekend to spend on something other than our hearing this
```

3

1    morning.

2            So I sent out, you know, a notice that I thought we

3    should focus on a couple of each side's motions.  And I would

4    propose we just go back and forth the way we did in our <u>Daubert</u>

5    motions.

6            I will hear Sony's motions first, and we will respond

7    and reply.  And then when we are done with Sony's, we will hear

8    from Cox the same way.  And if there are matters you want to

9    raise beyond that, I am happy to consider those after we're

10   done.

11           So, Mr. Oppenheim.

12           MR. OPPENHEIM:  Good morning, Your Honor.  If it

13   pleases the Court, I think it might make sense to address

14   Sony's motion in limines 5 and 6 together.

15           THE COURT:  Together?  That's fine.

16           MR. OPPENHEIM:  Some of the issues, I think, run

17   similarly and we don't want to be repetitive.

18           THE COURT:  No, that's fine.

19           MR. OPPENHEIM:  So, Your Honor, this is Cox's third

20   bite at the apple on this issue, first with the motion for

21   preclusion or spoliation that they brought before Judge

22   Anderson, then in the summary judgment motion, and now in the

23   motion in limine.

24           And the reason that Cox is pushing so hard to get

25   these two spreadsheets into evidence, Your Honor, is that Cox

4

1    wants to get up and tell the jury that MarkMonitor purged

2    information from its database; that plaintiffs have not

3    produced evidence of Audible Magic verifications because they

4    destroyed it, that's a quote from their brief; that 75 percent

5    of the works in this case were not confirmed by Audible Magic,

6    again a quote.

7          Not a single one of these statements, Your Honor, is

8    true.  They are palpably false statements.  Cox has zero

9    evidence to support them, yet continues to make these

10   arguments.  They have made them to Judge Anderson, they have

11   made them to this Court, and now they want to put them before

12   the jury.

13         In the argument on Cox's motion for spoliation, Your

14   Honor, Cox presented these same arguments to Judge Anderson.

15   Now, I think by anybody's measure, Judge Anderson is a smart

16   guy.  It took him about an hour of argument, Your Honor, to

17   recognize that the information upon which Cox was relying to

18   make these arguments made no sense.  And it wasn't until the

19   rebuttal that Judge Anderson pointed this out to the

20   defendants.

21         The jury will not have the benefit of an hour of back

22   and forth and a hundred pages of briefing before they address

23   this issue.  Cox should not be able to put this before the jury

24   in order to confuse the jury, which is what they seek to do.

25         With respect to the '236 spreadsheet, Your Honor,

5

1    which is addressed in the motion in limine No. 5, it comes from

2    the exact same source as the '431 spreadsheet.  They are both

3    downloads of data from the same MarkMonitor database.

4            It simply contains additional data fields.  The vast

5    majority -- the four additional data fields at issue are

6    entirely irrelevant to this case.  First of all, all of that

7    information contained within those four data fields were added

8    after 2015, after the claim period in this case.

9            Cox wants to use these spreadsheets to argue that the

10   information contained within one of the fields where it says

11   null, -1, or 0, indicates that Audible Magic did not make a

12   confirmation.

13           There are now declarations before the Court which

14   makes clear that that's not at all what those data fields mean.

15   Those are data fields and data that was provided by engineers

16   when they were setting up and trying to implement a brand-new

17   spreadsheet function for MarkMonitor.

18           THE COURT:  Is there any evidence that they were

19   going back instead to look at the relevant period of time, make

20   sure the data in the information that's in the '431 spreadsheet

21   was accurate, that that was the purpose?

22           MR. OPPENHEIM:  Your Honor, if you -- if you

23   eliminate those four columns and you just compare the two

24   spreadsheets and the additional -- and the information, it's

25   exactly the same on every other --

6

1          THE COURT:  Right, I understand that.  My question
2     was, you know, the purpose that the affidavits have --
3     declarations have described as the reason for generating the
4     additional information were that they were building on the
5     platform they had.
6          And my question was, was it -- is there any evidence
7     in the case that the purpose was to go back and look at the
8     accuracy of the Magic Mark documents or information?
9          MR. OPPENHEIM:  No, Your Honor.  There is no
10     indication that that's the case at all.  In fact, one of the
11     witnesses in -- I believe in the declaration indicated that
12     they were trying to build out that information for other
13     clients down the road, they saw a future use for it.
14          I know, you know, now in November 2019 we all think
15     of storage as ubiquitously infinite.  Back then, it was not the
16     case.  And so, companies were still somewhat cautious in how
17     much information they gathered and kept.
18          This was a process, as all technology companies went
19     through, where they were expanding what they were keeping
20     because they thought, you know, more data might be useful in
21     the future for purposes.
22          There is zero indication that it creates any doubt
23     about the Audible Magic verifications.  In fact, the CEO of
24     Audible Magic testified under oath that with 20 seconds they
25     could have a zero error rate confirmation.  And that every data

7

1    field that is in there where there is actual data, that is,

2    other than null, -1, and 0, it's over 20 seconds.

3            And so, according to the CEO of the company -- and

4    again, this is not some fly-by-night company.  This is a

5    company that's -- whose work has been used in courts over and

6    over again and used throughout the industry.  He said zero

7    error rate for all of those.

8            So, Your Honor, this should not be put before the

9    jury so that we have to do a whole sideshow explaining this.

10   They should not put it up on a screen and say, see, there is a

11   0 there, or there is a null there so that the jury takes an

12   implication.

13           Your Honor, with respect to motion in limine No. 6,

14   this deals with the Audible Magic '3444 spreadsheet.  As an

15   initial matter, there is just no foundation to admit this

16   document.  I have read through that deposition transcript, the

17   portions related to this examination, over and over again.

18           THE COURT:  Whether it is a transaction log or not --

19           MR. OPPENHEIM:  There were thousands and thousands of

20   documents produced and many spreadsheets.  And they are asking

21   questions about transaction logs.

22           The reason you want to have a set process is so that

23   if a document is put in front of a witness, the other side on

24   cross-examination can ask whatever questions they need to ask

25   so that you have a clear understanding of it.  That did not

8

1    happen here.

2              So there is a discussion generically about

3    transaction logs.  And that's all there is.

4              So recognizing this, Cox then turns to the argument

5    and says, well, our expert attended the deposition and he heard

6    what Mr. Ikezoye said about transaction logs, so he can lay a

7    foundation for the document.

8              Well, if it is not enough based on what Mr. Ikezoye

9    said in his deposition, then certainly the expert can't lay a

10   foundation for that document.  That makes no sense to me, Your

11   Honor.

12             But, I mean, more importantly, leave aside the

13   foundation issue, it just doesn't -- what Mr. Ikezoye said

14   about those transaction logs wouldn't give you the basis to say

15   that this document should be admitted.

16             What he said was, first of all, in response to a

17   subpoena, they provided information for 2012 to 2014, but yet

18   he said that the identifications went back to 2008.  So there

19   is four years of identifications that they never even attempted

20   to put into those transaction logs.  That's number one.

21             Two, he said that he tried to pull from backup tapes,

22   but he didn't get everything.

23             Three, when asked whether or not -- and he was asked

24   this repeatedly by Cox's counsel, whether or not the entirety

25   of the information should be contained within MarkMonitor's

9

1    database, he said, yes, and it should be the exact same data.

2    That data has been provided.  And that's in '431.

3             Again, the defendants want to use '3444 to confuse

4    the jury, to make this silly 75 percent argument for which they

5    have zero basis.

6             Now, if the defendants really believed that Audible

7    Magic's data would have -- if it had been produced in its

8    entirety, was different than what MarkMonitor had, then they

9    should have gone back on a motion to compel to get -- to tell

10   Audible Magic, you need to get all of the information, you need

11   to go back to 2008, you need to give us everything so we have a

12   comprehensive set of information that we can compare as against

13   the MarkMonitor data.

14            They didn't make that effort.  And the reason they

15   didn't is they were happy to have something that was incomplete

16   so they could make these arguments.

17            So, Your Honor, neither of these documents should

18   come in.  It really is just a sideshow for purposes of this

19   case.

20            THE COURT:  All right.  Thank you.

21            MR. BUCHANAN:  Are we on --

22            THE COURT:  Amanda, are we --

23            THE CLERK:  It's on.  I don't know what --

24            THE COURT:  We think it's on, but I don't see

25   anything on the monitors.

1          There we go.  It takes the youngest guy in the room

2    to make sure that --

3          MR. BUCHANAN:  Actually, he told me how to push that

4    button earlier.

5          So, Your Honor, with regard to the '236 spreadsheet,

6    just for your information, that was created in 2018, December,

7    revised several times.  It was also produced by MarkMonitor,

8    but only after we filed motions to compel asking for all their

9    data.  They fought that.  They fought it vigorously.  We spent

10   a lot of money to get it.  This spreadsheet happened to be in

11   there.

12         This notwithstanding that the plaintiffs had total

13   control over MarkMonitor pursuant to a contract and memorandum

14   of understanding.  So the fact is, they forced us to go through

15   to get this evidence.

16         So the idea that we could have easily obtained it by

17   asking for it, they had it all, they didn't share it.  They

18   made us go through and spend tremendous amounts of money to get

19   it.

20         So Exhibit 23 is the testimony of the 30(b)(6)

21   witness for MarkMonitor, Mr. Paszkowski.  I am looking at it

22   over here.  So this is -- we will come back to that.  That's

23   Mr. Ikezoye.

24         So Mr. Paszkowski is the 30(b)(6) on technical

25   issues.  He's a -- he's the director of engineering for

11

1    MarkMonitor.  He's actually an owner of some of their product.

2              The testimony that was just referenced to you, these

3    declarations by Mr. Bahun, are not admissible.  Mr. Bahun is a

4    sales rep, a sales agent that deals with their strategic

5    clients.  We were specifically advised by correspondence and

6    during the depositions of Mr. Bahun that he was not a technical

7    person.  We were not to ask him technical questions.  We were

8    to reserve them all for Mr. Paszkowski.

9              The response to that is to essentially violate the

10   rules of this court and the rules of professional ethics, for

11   us to forge ahead and force him to answer questions of a

12   technical nature.  That's what they say in their brief,

13   basically saying we were suckers, we should have gone forward

14   and demanded it.  We did actually ask a lot of questions that

15   sort of borderlined both ways on background, and he had no

16   answers.

17             This is an admission by Mr. Paszkowski on behalf of

18   MarkMonitor as to the four columns of data that they say, and

19   they just told this Court, have no meaning.  That they didn't

20   go back, that is, MarkMonitor, and restore their database to

21   capture this evidence.  They said they never did that for the

22   reason the Court just asked, to try to determine whether they

23   had all the data or their data was complete.

24             This is an admission.  Bahun's testimony is not

25   admissible.  And this establishes beyond a scintilla of doubt

12

1    as to why they started to restore their database to capture

2    these four columns of data.  There was match duration, track

3    duration, the verification ID, and the percentage match.

4              I assume the Court has read that.

5              THE COURT:  I have.

6              MR. BUCHANAN:  So I don't know if the Court has any

7    questions, but just to make the point, preceding this answer

8    was a whole dialog over AM verification ID, which he said,

9    basically confirming what Ikezoye said, is the driver's license

10   number that leads you to the artist, album, and the track.

11             And then he went on to discuss these other items,

12   match duration, match offset, and track duration.  And he says:

13   The database has evolved over the years.  We were not capturing

14   the full richness of the metadata that Audible Magic was

15   returning to us.  Initially we were capturing artist, track,

16   and album.

17             What they say is everything, that's all you needed.

18   He is saying that's wrong, that's false.  This is an admission

19   by MarkMonitor.

20             THE COURT:  Well, he is saying there is more data

21   that exists in the metadata.  He's not saying that the

22   fingerprint analysis that MarkMonitor does is not sufficient to

23   satisfactorily identify a work between Audible Magic and

24   MarkMonitor's meeting, right?

25             MR. BUCHANAN:  What he is saying is, he's saying

13

1    that, yeah, we had this other information, but it was

2    incomplete.  So this goes to the Audible Magic spreadsheet in

3    the '236 and the '431.  The '431 only has three columns of the

4    17 columns of the Audible Magic data.  This has six.

5              But these three columns he is talking about, he is

6    saying, we are going from evolving, which means you are going

7    from the simple to the complex.  We didn't have the full

8    richness of the data.  All we had were these four columns that

9    they say are everything.

10             So why are they adding these other columns if counsel

11   just said they were meaningless?  They are adding the data.

12   And look --

13             THE COURT:  Well, he didn't say they were

14   meaningless.  He said that they were moving forward, they are

15   experimenting with what they had and what their capabilities

16   were so that they, moving into the future, they would have more

17   information.  Right?

18             MR. BUCHANAN:  Well, actually, no, the Audible Magic

19   spreadsheet is the only spreadsheet that captures the data at

20   the exact time of the query.

21             THE COURT:  Right.

22             MR. BUCHANAN:  So it has all 17 columns.  They -- as

23   counsel just said, as Mr. Ikezoye said, and so does

24   Mr. Paszkowski, the two spreadsheets should match if they

25   wanted them to, because all the data that was being registered

14

1    on the Audible Magic database in the spreadsheet was also being

2    captured by MarkMonitor.  They are not experimenting, they have

3    got it.

4              THE COURT:  What does "null" mean?

5              MR. BUCHANAN:  "Null" means -- well, he explains

6    that.  He says -- go back up -- go to the question.

7              Okay, there:  Now, a number of these rows have a null

8    as the entry, the columns we have just been talking about.

9    Does that mean that Audible Magic returned no information for

10   that field in respect to the list of works?  That's actually

11   not how it works because the database evolved over the years.

12             THE COURT:  Yeah, but he doesn't explain what it

13   means.  He just says it is more data.  The 0s and 1s, it's more

14   data.  Right?  That's my disconnect.

15             MR. BUCHANAN:  Okay.  Well, that's correct.  So you

16   have more data.  But what are the fields?  The fields are

17   existing and the data is existing.  MarkMonitor is not doing

18   anything to create this data.  Okay.  It's coming from Audible

19   Magic into their system.  They're just not keeping it.  Now

20   they are starting to keep it because he thinks they need it.

21             And what are we talking about?  So if you have -- you

22   start out, okay, the plaintiffs provide to MarkMonitor the

23   artist, the album, and the track to go onto the network to

24   download a file that matches those names.  They have that.

25             Then when they get that file, they create this

15

1    fingerprint and they try to run it against their database

2    remotely of Audible Magic.  And what does it do?  What is the

3    calculation that is taking place?

4           You are taking their duration of the song, the

5    unknown song, and you are matching it against the duration of

6    the song that is known.  And once they match, there is a match

7    offset that comes up that says at this point in the song we now

8    know it matches.

9           THE COURT:  Right.

10          MR. BUCHANAN:  And then -- you know, so then

11   MarkMonitor had previously created the percentage column.  Why

12   would MarkMonitor create a match percentage column if the

13   columns of track duration and match duration were irrelevant?

14   Why would they create this second column, this separate column,

15   which compares the two?  So all that data is relevant.

16          The only reason this spreadsheet isn't complete, in

17   other words, that we don't have these columns of information as

18   to all 50,000 files, is because they didn't keep it.  And so,

19   it's incomplete as Mr. Paszkowski admits.

20          Now, could we pull up the exhibit so -- so here this

21   goes to the issue of -1 versus 0 and whether it's relevant.

22          So what we have got here is we have highlighted some

23   musical compositions or recordings that have -1 or 0.  So we

24   have Kanye West, we have Jack Johnson, and then we have Lady

25   Antebellum, which is a match.  So that shows under those

16

1    columns the match.  The other two show a 0 and a 1.

2          Now, let's go to the next exhibit.  And this is

3    exhibit -- it's an index that the plaintiffs provided us to the

4    downloaded audio file, the 52,000 files they claim they

5    actually downloaded all the files.  And they say there is a

6    hash for every work in suit every time there was a match.

7          So we went and searched this database, okay, which

8    supposedly is tied to all the downloaded files.  And what it

9    shows is for the ones that are 0 and -1, they are not on that

10   index, which means there was no match because they are not in

11   the downloaded file.  However, the ones relating to Lady

12   Antebellum is in there.  So that proves that the -1s and the 0s

13   reflect no match by their own data.

14         So again, Your Honor, the only reason we're having

15   this so-called confusion is because they did not keep all the

16   data that Audible Magic sent to them.  The closest thing to an

17   actual database that reflects contemporaneous queries and

18   matches is the REV '03444 Audible Magic spreadsheet.  They say

19   that shouldn't come in because, you know, there is gaps, it's

20   not complete.  But there is no testimony to that effect.  The

21   testimony of Mr. Ikezoye was that it captured substantially all

22   of the attempted matches for the period of the claim period,

23   2012 to 2014.  If you look up "substantially all," it says

24   90 percent.

25         THE COURT:  They had to go back to some backup tapes

17

1    for some of it, right?  Isn't that what I read?

2              MR. BUCHANAN:  That's correct.

3              THE COURT:  Yeah.

4              MR. BUCHANAN:  But he said, I got substantially all.

5    I'm not sure how much is not there, I got substantially all.

6              Our expert -- so they claim that we did not show it

7    to a witness.  You don't need to show it to Mr. Ikezoye.  We

8    don't need to show it to him.  It can be committed based on its

9    characteristics, the nature of the document, other witnesses in

10   terms of authentication.  It's a prima facie case, it's a low

11   threshold.

12             So they say, you didn't show it to Mr. Ikezoye.

13   Well, they produced to us 48,336 documents a week before Mr.

14   Ikezoye's deposition.  They were in various types files, ESP,

15   Linux, there were certain spreadsheets, and we had to go

16   through it all.  And Mr. Feamster, Dr. Feamster helped us go

17   through it because he's familiar with the technology.  And he

18   found this spreadsheet, this transaction log, which Mr. Ikezoye

19   described to a T, and that was the path by which Mr. Feamster

20   found the document.

21             And we showed this, and it was opined on by

22   Barbara Frederiksen-Cross, the expert witness.  She actually

23   says several times, we've got two Audible Magic spreadsheets

24   here.  So could you call the one from Audible Magic the

25   transaction logs?  The other one is the '431 spreadsheet.

18

1          She treated them as coming from, both from Audible
2    Magic ultimately.  She opined on them, as did Dr. Feamster.
3          And Mr. Paszkowski also described what would be in
4    that transaction log.  He looked at it.  And so, he described
5    it the exact way Mr. Ikezoye did.
6          So the mere fact we didn't show it to Mr. Ikezoye,
7    who we had one crack at because we couldn't find it in 48,000
8    documents, doesn't mean it is not authentic.
9          The rule is pretty clear, Judge.  You know it.  It
10   says:  Testimony of a witness with knowledge.  That's
11   901(b)(1).
12          (b)(4):  Distinctive characteristics and the like.
13   The appearance, contents, substance, internal patterns, or
14   other distinctive characteristics of the item taken together
15   with all the circumstances.
16          And then 703 allows an expert to rely on evidence
17   that is not otherwise inadmissible.
18          They do not discuss 901 or the cases we cite.  They
19   say 703 is a backdoor.  It's just not true.
20          So it's admissible on its face.  It has been properly
21   authenticated.  It is relevant.  And it is certainly -- it does
22   not create some level of confusion that substantially outweighs
23   its relevance.
24          THE COURT:  All right.  Thank you.
25          MR. OPPENHEIM:  You can take that down.  Thank you.

19

1            Your Honor, start with a little background here.

2       Mr. Bahun from MarkMonitor, he's worked in the antipiracy

3       industry doing what he does for over 15 years.  The notion that

4       he's a sales guy is just not an accurate description of what he

5       does.  There are sales guys at that company, he is not one of

6       them.  He's actually directly responsible for this program that

7       was involved here, and this guy is incredibly technical.

8            The fact that MarkMonitor decided on its own -- by

9       the way, a third party from whom they sought discovery directly

10      and we were not involved at all.  And the scorched earth

11      litigation there, the District Court judge in that matter spoke

12      to what happened in that scorched earth litigation.  I hope the

13      Court has read what the Court said about that.

14           The fact that MarkMonitor decided to put up a coding

15      engineer, Mr. Paszkowski, doesn't speak to the fact that

16      Mr. Bahun doesn't have a technical background.  It just means

17      that they put somebody -- MarkMonitor decided to put somebody

18      else up on the technical issues.

19           Mr. Bahun, while he -- Mr. Bahun's technical

20      background is evident by his testimony.

21           Mr. Paszkowski made no such -- no admissions.  I

22      don't know what this testimony is that there were admissions,

23      admissions, admissions that Mr. Buchanan is referring to.

24      MarkMonitor is not a party.  They can't admit anything, and

25      that's just deposition testimony.  And I can read that

1    deposition testimony all day long, I don't see in it what

2    Mr. Buchanan says he sees in it.  So the MarkMonitor -- so

3    that's number two.

4           Three.  The MarkMonitor records -- Mr. Buchanan said

5    that the MarkMonitor records are not contemporaneous and that

6    the Audible Magic records are.  That -- he's just looking at

7    the metadata of when a spreadsheet was created.  That has

8    nothing to do whether the data -- when the data was recorded.

9    He is just looking at when there was an export of data.  That

10   doesn't mean that the data is not contemporaneous.  It is

11   contemporaneous.  All of the testimony from MarkMonitor

12   indicates that that's the information, the information in '431

13   is the information that was obtained from Audible Magic.

14          Mr. Buchanan suggested that what Audible Magic does

15   is they compare the lengths of the recordings.  Boy, that's an

16   understatement of what Audible Magic does.  This is a company

17   that looks at the audio characteristics of a file and compares

18   the audio characteristics in a way that is highly, highly

19   complex.  And that's why they can say that one recording

20   matches another when they have a 20-second match.

21          So in response to the question of why the match

22   duration column is relevant, Mr. Buchanan argued, well, it's

23   there, it must be relevant, but that doesn't answer the

24   question.  Why would information that was recorded years after

25   the relevant -- a year after the relevant claim period be

21

1   relevant when all of the testimony is that if it's contained in

2   there with a name, an artist, and a title -- excuse me -- an

3   artist name, a track name, and an album name, it's a

4   confirmation.  It doesn't speak to the relevancy issue, Your

5   Honor.

6           Mr. Buchanan also argued that Barbara

7   Frederiksen-Cross, our expert, authenticated the spreadsheets.

8   Not true.  She was asked questions about the spreadsheets.  All

9   she did was arithmetic based on the numbers contained within

10  the spreadsheets.  She didn't testify or authentic them about

11  the substance of them or authenticate them in any way, Your

12  Honor.

13          So this argument about null that Mr. Buchanan put

14  forward -- and this is really the most important point -- this

15  is attorney conjecture.  They didn't ask the witnesses this

16  during the depositions.  They asked what null meant.  They

17  didn't get an answer, they didn't pursue it.  This is a theory

18  that the lawyers have dreamed up, but it doesn't have any

19  factual support.  That's what shouldn't go before the jury.

20          Thank you, Your Honor.

21          THE COURT:  All right.  All right.  Go ahead,

22  Mr. Gould.

23          MR. GOULD:  Good morning, Your Honor.  Thank you.

24          THE COURT:  Good morning.

25          MR. GOULD:  I am going to address Sony's motions in

1  limine 9 and 10 together.  This is the two motions relating to

2  the presentation of witnesses and depositions.  And really it

3  goes to the heart of how this trial will unfold before the

4  jury.

5          THE COURT:  Either witnesses are going to testify

6  live or they are going to testify by deposition.  There isn't

7  going to be -- I am not going to allow Cox to put on a witness

8  live that they refused to put up in Sony's case in chief if

9  Sony wants to put them on.  You can have it one way or the

10 other, but we're not going to have a deposition of a Cox

11 witness in Sony's case and then have that person testify live.

12 I can't think of anything that is more confusing to a jury.  I

13 think it's improper.

14          And the jury should have the opportunity to judge the

15 credibility of a witness in total.  And I am going to put you

16 on a clock, so that there may -- you know, often times I will

17 want witnesses to testify to everything they have to say at --

18 when they are first presented.  And I am not going to do that

19 in this case because I want to make sure that each side's time

20 is preserved.  But, absolutely, the jury has a right to judge

21 the credibility of a witness in total in deposition testimony

22 for one side -- and then live on another is confusing.  I think

23 it's improper.

24          So beyond that, go ahead.

25          MR. GOULD:  Thank you, Your Honor.  I think that

23

1   essentially resolves motion in limine number 10.  The one small

2   clarification that I would like is the defendants have said

3   they don't intend to call live Mr. Zabek or Mr. Sikes, and it's

4   unclear from that representation what that intent is.  And I

5   think there is at least enough wiggle room in that assertion to

6   be trying to preserve some right to call them in rebuttal, and

7   we just ask that Your Honor foreclose that possibility.

8           THE COURT:  I think my ruling does foreclose that,

9   right?  I mean, they have got to tell you whether they are

10  going to call them or not before you put the testimony in by

11  deposition.

12          MR. GOULD:  Thank you, Your Honor.  I will turn to

13  motion in limine number 9.

14          THE COURT:  All right.

15          MR. GOULD:  In motion in limine number 9 we have

16  sought to preclude the defendants from calling witnesses by

17  deposition who they control and could bring to trial.

18          The principle here is a clear one.  There is a strong

19  preference for live testimony.  Deposition, as we all know, is

20  a distant second to be used if and only if necessary.

21  Available witnesses, like you said, should appear live once for

22  the full scope of their presentation.

23          Now --

24          THE COURT:  Yeah, but does your case law really

25  support the proposition that just because somebody has a

24

1    separation agreement with their company and the company

2    reserves the right to require them to cooperate with them and

3    appearing if necessary, is that enough to compel their

4    appearance?

5            MR. GOULD:  So we think it is in this instance, Your

6    Honor.  First of all, Your Honor has a tremendous amount of

7    discretion here and we recognize that.

8            Number two, we have cited cases in our papers that

9    show that both Rule 32(a)(4) and Federal Rule of Evidence 804

10   must be satisfied in order for them to use their own

11   depositions in this case.

12           And they ignore entirely 804 and say, 804 doesn't

13   matter because 32, Rule 32 under the Rules of Civil Procedure

14   provides an independent exception that is more permissive.

15           We've cited cases directly to the contrary of that.

16   They haven't even touched on 804.  So let's look at briefly

17   both of those rules.

18           So 804, they haven't argued it, and there is a reason

19   why.  They can't satisfy it.  Under 804(a)(5)(A), a declarant

20   is deemed unavailable if he or she is absent from the trial or

21   hearing and the statement's proponent has not been able by

22   process or other reasonable means to procure the declarant's

23   attendance.

24           Now, "or reasonable means" is important.  It has

25   meaning.  It's there for a purpose.

25

1              There is no question that Cox could procure the

2    attendance of these witnesses by reasonable means.  What are

3    those reasonable means here?  Simply asking them or telling

4    them and paying $200 for a flight.  It's very simple.  They

5    control each, they could ask them to come.

6              Now, turning to Rule 32(a)(4).  Even if they are

7    right -- and we disagree -- but even if they are right that

8    satisfying 32(a)(4) is enough, their arguments still fail.

9    Under 32(a)(4), they may use a deposition subject to Your

10   Honor's discretion.  And this is the quote:  If the Court finds

11   that the witness is more than 100 miles away -- I botched the

12   quote, so pardon me, Mr. Linnell:  They may use the deposition

13   if the Court finds the witness is more than 100 miles away

14   unless it appears that the witness' absence was procured by the

15   party offering the deposition.

16             Cox has the burden to show that they have not

17   procured the absence, and we don't think they have done so

18   here.  They haven't cited a single -- excuse me.  They have

19   cited cases saying that not bringing your own witnesses does

20   not automatically equate to procuring their absence.

21             I read those cases.  Some of them say that.  Again,

22   this is a discretionary question that really turns on the

23   facts.  So let's look at the facts that are at issue here.

24             There is no explanation for their unavailability.

25   And they don't deny that they could bring them if they wanted

26

1    to.

2         So Your Honor asked about Mr. Zabek and Sikes, so I

3    will start there.  I would like to after that get to the four

4    30(b)(6) witnesses that currently are employed.  But with Mr.

5    Zabek and Mr. Sikes, I assume that Your Honor has read this

6    separation agreement.  It was submitted as an exhibit.  And the

7    language in there is quite clear that if Cox asks them to, they

8    must come to trial to testify.  That's a contractual

9    obligation.  All they have to do is say, come, and they will

10   come.

11        We asked Mr. Zabek if he would come.  He said yes.

12        THE COURT:  Yeah.

13        MR. GOULD:  They said no.  They have procured his

14   absence.  So I don't have a case that says under these precise

15   facts, but I have principles, I have your discretion, and I

16   have hundreds of years of fairness jurisprudence that really

17   demand that outcome here.

18        Now, Mr. Zabek is a particularly unique witness here

19   for a lot of reasons.  One is, he's the face of Cox's

20   anti-infringement program.  They want to say it is someone

21   else, but we all know that during the relevant time period and

22   based on the documents and what was occurring at the time,

23   Mr. Zabek was the guy.  He set the policies.  He led the team.

24        And this game about bringing or not bringing or

25   making Mr. Zabek available has started long ago, and it started

27

1   with our notice to depose Mr. Zabek.  And what Cox did at the

2   tail-end of that deposition is fluffed a very faux, like

3   artificial, friendly direct examination.

4           So we don't dispute that Cox can counter-designate

5   relative portions of our designations.  So with Mr. Zabek it

6   really comes down to this self-serving direct that is so

7   totally canned, and it's really a manufactured effort from long

8   ago to avoid us being able to call him live but still be able

9   to put him on by direct.

10          And we think, Your Honor, under those facts and in

11  that scenario, that tail-end should really not be presented to

12  the jury.

13          THE COURT:  Why couldn't he do the same thing live?

14          MR. GOULD:  He could do the same thing live.  Bring

15  him.  We are happy to take him live.  We would like nothing

16  more than to put Mr. Zabek live on in our case.  They won't

17  show him.

18          THE COURT:  Well, I guess my point was, they can ask

19  him the same questions when he is sitting in the witness box

20  and get the same answers that they get in the deposition,

21  right?

22          MR. GOULD:  Maybe.  Many of those questions were

23  objectionable.  There is a lengthy -- I mean, there is plenty

24  of objections on that.  So Your Honor may be asked to rule upon

25  some of those for sure.

1        But, I mean, it's a fair point.  It goes back to the

2   preference for live testimony.  The jury will have the

3   opportunity to observe his demeanor, how he answers questions.

4   And that is different than sitting in a friendly conference

5   room moments after Cox has prepared him and told him what they

6   are going to ask him.  I guess somehow it will end in the same

7   on direct here.  But I think you understand my position, Your

8   Honor.

9        THE COURT:  I do.

10        MR. GOULD:  Mr. Sikes is the same, indistinguishable,

11   there wasn't the same faux direct at the tail-end of his

12   deposition, but the principle is the same.

13        Now, the four other witnesses, Mr. Summers, Stifel,

14   Jarchow, and Delgado.  So Mr. Delgado I will take first and

15   foremost.  He shouldn't be testifying in any manner.  Cox

16   didn't identify Mr. Delgado on either their initial disclosures

17   or their witness list.  He can't testify.  They designated him.

18   I don't know what the thinking was.  He was their 30(b)(6) on

19   factual bases for affirmative defenses.  We are hopeful, Your

20   Honor, that we will get a favorable ruling on summary judgment.

21   That may moot the point in any event.

22        But they missed the boat on that one and Mr. Delgado

23   can't testify.  And even if he could -- I recognize he is not

24   here today, but Mr. Delgado is there in-house, I believe,

25   associate general counsel managing this litigation.  He has

29

1    attended many, many, many of the depositions, including those

2    in Washington.  He has been here at hearings.

3            I suspect -- I don't know.  I suspect he will be here

4    at trial.  To the extent they want to put him on at all and

5    Your Honor permits that given their failure to disclose him in

6    a timely manner, that shouldn't be by deposition.

7            The others, similar, Mr. Jarchow is -- runs the ICOMS

8    database, their billing database.  He is in California.  When

9    they wanted to put him up as a witness, they flew him to

10   Atlanta.  To the extent they need him at this trial, they can

11   fly him to Washington.

12           Mr. Summers and Mr. Stifel, 30(b)(6) witnesses as

13   well.  Cox identified these people to speak for it in this

14   case.

15           I think you understand our position.  There is a

16   fairness element here.  The facts are what they are.  We would

17   ask Your Honor to grant both motions in full.

18           THE COURT:  All right.  Thank you, Mr. Gould.

19           MR. BUCHANAN:  Do you want to hear any additional

20   argument, Your Honor?

21           THE COURT:  If you want to highlight anything that

22   you -- I think I -- Mr. Gould --

23           MR. GOULD:  Sorry, Tom.  One clarification, I

24   misspoke.  I believe Mr. Stifel was not a 30(b)(6) witness.  He

25   was a fact witness.

30

```
1              THE COURT:  Okay.

2              MR. BUCHANAN:  So, essentially, the position of the

3   plaintiff is that in any case where there is a corporate

4   defendant, they -- the plaintiff can force the corporate

5   defendant to bring every employee, officer, and director to

6   trial.  And that defeats the entire purpose of streamlining

7   discovery.

8              These particular witnesses they are referring to, a

9   lot of them are background witnesses, technical witnesses, and

10  30(b)(6) focusing on collecting of documents, authenticating,

11  you know, databases, ICOMS, that type of thing, Jarchow,

12  Stifel, and Summers.

13             So the notion that Rule 804 trumps Rule 32 and

14  basically eviscerates it, makes it superfluous, as the Court

15  said, we cited a number of cases that say whether it is an

16  agency relationship, an employee relationship, separation

17  agreement, we have had cases that we cited for that, and that

18  does not constitute taking affirmative steps to procure their

19  absence.

20             THE COURT:  Thank you.  All right, does that complete

21  the Sony --

22             MR. OPPENHEIM:  I believe so, Your Honor.

23             THE COURT:  Yeah.

24             MR. OPPENHEIM:  Of the issues that you listed, Your

25  Honor --
```

1          THE COURT:  That I listed, right.

2          MR. OPPENHEIM:  -- we noted, Your Honor, that you

3    didn't want to hear argument on the 96 percent study.  We are,

4    if Your Honor wants to, prepared to address that.

5          THE COURT:  Okay.  Let's move on to Cox's motions.

6          MR. BUCHANAN:  So our first motion -- I'm arguing the

7    first one, Your Honor, relating to Dr. Lehr's damages.  And

8    Ms. Golinveaux will argue the next three.

9          In their complaint, the plaintiffs identified a

10   specific claims period.  That was February 2013 to November 26,

11   2014.  And they identified a specific threshold of notices of

12   infringement by which they claim some sort of liability should

13   attach, at least that's the way it reads, three or more.

14         All the subscribers identified, 57,000, received at

15   least three or more, and at least, you know, two prior to

16   receiving one from the plaintiff.  So that's how they defined

17   their theory of liability and damages.  And all we're asking is

18   that they comply with that defined period of time and defined

19   level of notices.

20         Dr. Lehr goes back to 2012, he goes to 2016, he

21   counts notices through that whole time period, corresponding

22   revenue and invoices.  Does it various different ways, one,

23   three, and five.

24         So, clearly, Dr. -- and I would add that Dr. McGarty,

25   who is their liability expert, and Dr. Lehr, their damages

32

1   expert, both say they have no opinion on when and if Cox should

2   have terminated, zero.  So McGarty talks about 13, you have 13,

3   if you have 13, you should work with that.  But before that,

4   their policies and procedures, no opinion.

5          So what we have is a damages claim that is really

6   untethered to their liability case and the testimony of their

7   liability expert and their damages expert.

8          So what we are saying is, let's keep the notice

9   period to those notices from the plaintiffs, I think 163,000

10  for that time period, and that he can calculate, you know,

11  revenue based on that, just from those notices in that time

12  period.

13         We also submit that he should limit his damages

14  theory to the infringement as it relates to the service that

15  was provided, and that is Internet service.  We have, you know,

16  the TV and we have phone, and he can -- the ICOMS data and the

17  data he has, he can break that out.  He compiles it and says,

18  you know, you're paying for it all, you lose it all.  So we

19  submit that that is not reasonable.

20         Then he testifies about piracy across the world from

21  1995 to 2010 involving pornography, obviously, involving film

22  and TV and music.  And he has no numbers or calculations, nor

23  do any of the plaintiffs' representatives because they say they

24  can't quantify.  And I understand their theory there.  It is

25  not totally unreasonable.

33

1          But when he goes through this whole time frame, and

2     we're talking about a period of time, a narrow period of time,

3     and he doesn't talk about or try to quantify or distinguish

4     between music and all these other types of content, or between

5     Cox and all the various other ISPs, like Verizon, Time Warner,

6     AT&T, Comcast, who dominate the -- and -- you know, and doesn't

7     consider any notices that were sent to them by the plaintiffs,

8     or their system of retrieving and handling those notices, and

9     whether they terminated anyone, which they didn't pursuant to

10    the agreement under CAS, or the plaintiffs, how can he come in

11    and try to attribute this massive piracy through all these

12    networks for this entire period of time and try to suggest to

13    the jury that Cox is to blame for it?  And we say it is so

14    untethered to any of their notions of liability.

15          And I realize they can talk about the profits of Cox

16    and how much they made during this time period, a multibillion

17    dollar company, but none of that --

18          THE COURT:  And that they were aware of piracy --

19    ongoing piracy long before the period of infringement alleged

20    and --

21          MR. BUCHANAN:  His is -- so that would be a liability

22    issue, the awareness and when it occurred.  And that's where

23    you get into the notices.  Okay, we have notices.  So they are

24    going to argue they got the notices.  They processed them.

25    They sent them along with an e-mail.  So they are aware of a

1    potential infringement.

2            That has nothing to do with damages and what is going

3    on in the world involving all sorts of different types of

4    content and that we were focused on that.  You know, we met

5    with, you know, the plaintiffs and we had our own system to

6    deal with notices.

7            So, I mean, obviously, there is testimony by fact

8    witnesses that say, yeah, we were aware of BitTorrent, we were

9    aware that there is piracy out there and we set up a system to

10   deal with it.  It was a graduated response system and it -- as

11   with every notice, people dropped off, by three or four, you

12   have 75 percent did not get another notice.

13           So that goes to liability.  And I am just saying that

14   he is up there as a damages expert.  And the jury says, wow,

15   you know, where does Cox fit in this?  What were the other ISPs

16   doing?  Which they are trying to keep all that out.

17           So that -- if can he testify about this wide-ranging

18   world of piracy and what Cox knew, then all the -- what the

19   other ISPs were doing should come in for sure so we can all put

20   them in the chart and show who had what customers, what

21   subscribers, how many notices everyone got, what everybody did.

22   I just think that would be fair.

23           Then there is this testimony about the pulse check.

24   So this is, again, the sales representative, by the way -- if I

25   can find that testimony.  Mr. Bahun, who he said is a technical

35

1    guy, you can go and look at the deposition testimony we

2    designated to show how every question he said he didn't know.

3          So he -- this goes to his testimony on the pulse

4    checks.  By the way, he was asked, what are your job duties as

5    the director of strategic accounts?  It's actually a sales

6    role.  That's his testimony under oath.

7          So this salesperson is now testifying about pulse

8    checks, which apparently what happened is MarkMonitor would

9    send out and do this detection, and it would show some sort of

10   pulse, but it didn't reach a threshold that would constitute

11   enough evidence to create a evidence package to send a notice.

12         It has nothing to do with the plaintiffs.  It has

13   nothing to do with the content in this case.  It has to do

14   so-called with Cox subscribers that he saw this.  And so, we

15   had asked for this evidence and they didn't produce it, so they

16   shouldn't be allowed to testify about it.

17         And when I asked -- when I asked their expert on

18   damages about this -- let me just -- it will just take a

19   second, Your Honor.  Mr. Lehr -- Dr. Lehr -- sorry, Your Honor.

20         THE COURT:  That's all right.

21         MR. BUCHANAN:  So I asked him:  Okay.  The term

22   "event," which is relating to this pulse check, what do you

23   mean by that?  You use the term "event"?  I'm talking about the

24   RIAA notice, presumably when MarkMonitor told them about, you

25   know, the sort of observations and generated the RIAA notices,

36

1   I don't know exactly how RIAA was generating those notices --

2   it's possible, for example, that there was some subset of

3   songs.  I just don't know.  I'm making this up because I don't

4   know.  I'm saying I'm making up the fact that the details -- I

5   have told you, I don't know specifically.

6           Okay.  So this is their damages expert on the

7   so-called pulse checks.

8           So we would submit, Your Honor, that the damages

9   claims they have have to be tied into some notion.  Vicarious

10  liability, they are not tied to that in any way because they

11  have no evidence that there was this draw, that the infringing

12  activity drew people in.  And this is an obvious and specific

13  financial interest related to that.  They hardly argue that.

14  And that's really what he's trying to do, to get all this

15  evidence in.

16          The other is statutory damages, that has been tied to

17  the infringement in some way.  It is not.  It has nothing to do

18  with infringement in this case.

19          Thank you, Your Honor.

20          THE COURT:  Thank you, Mr. Buchanan.

21          Go ahead.

22          MR. GOULD:  Thank you, Your Honor.  So Cox's motion

23  in limine 4 is largely a rehash of many of the arguments you

24  have read in the briefs and you have heard argument on on their

25  Daubert motion to exclude portions of Dr. Lehr's testimony.

1    And the goal of that motion, all of those motions, is really to

2    limit the jury to a -- really a false picture of what occurred

3    here, what Cox knew, how Cox benefited, and what the jury can

4    consider on statutory damages.

5            Virtually all of the pieces of this fourth motion in

6    limine seek to limit evidence to actual damages.  Their theme

7    throughout the case has been, if you can't show that the

8    revenue or the profit are directly attributable to

9    infringement, then they have no place here at trial.

10           That is simply not right.  That's not right as a

11   matter of the broad considerations the jury may consider on

12   statutory damages, and it's also not right on the vicarious

13   prong.  And it's also not right in trying to limit the types of

14   things that go into Cox's specific knowledge here.

15           So I'll try to keep it brief, Your Honor, because I

16   know you have heard these arguments before.  But to their

17   argument about Dr. Lehr should not be permitted to testify as

18   to revenue or profits from subscribers with one or more notice

19   or the same for notices outside the claim period.

20           So with the one or more notice, Cox was running a

21   rigged system here.  They set up their system to blacklist

22   millions of notices, to cap complainants from sending notices,

23   to roll up who knows how many notices into a single ticket.

24   Ones could have been threes, ones could have been tens, ones

25   could have been twenties.  Nobody knows.  We are certainly free

38

1    to put that argument forward and the jury will decide what it

2    wants to.  But Dr. Lehr's testimony about the revenue from

3    those subscribers is certainly part of the equation and part of

4    what the jury should consider.

5            Cox's papers also mislead, I think, in terms of

6    Dr. Lehr's opinion on economic incentive.  Dr. Lehr opined that

7    because Cox acted in such a way as to avoid addressing the

8    copyright infringement by subscribers, it benefitted from

9    having a larger subscriber base, higher total revenue, and

10   higher profits.  And he specifically said that when Cox was

11   deciding whether to implement a more appropriate response to

12   copyright infringement, here is the critical part, Cox would

13   have considered the potential loss of the entire subscriber as

14   a source of revenue and contribution margin, not just the

15   portion attributable to infringement.

16           So, Cox ignores this and, again, focuses only on

17   this -- what they call nexus and the revenue collected after

18   Cox should have terminated.  The jury should know the full

19   value of those subscribers.

20           Cox also I think has misrepresented the plaintiffs'

21   theory of the case or misunderstands the liability case.  It's

22   up to the jury to decide if Cox acted properly under the law.

23   And this three-notice comment, they really have mis-described

24   it.  The three strikes was a limiting factor that the

25   plaintiffs used to identify the works in suit to include in

39

1    this case.  It's not a limiting factor on the infringements

2    that are relevant for the jury to consider.

3            The plaintiffs included works in suit in their case

4    when those works were infringed by a subscriber on their third

5    or later notice.  That is different than saying anything that

6    happened on the first or second is irrelevant.  That is not at

7    all the theory of the case, nor is it what the jury will

8    decide.

9            I want to move to the general harm argument that

10   Mr. Buchanan discussed.  This is, again, largely another repeat

11   of the Lehr Daubert motion.  And in their papers they say it is

12   all about all the other fact witnesses, not Dr. Lehr.  Of

13   course you heard the argument as I did, today it was only about

14   Dr. Lehr.

15           So Dr. Lehr and, I believe, others were permitted to

16   testify in the BMG case about harm to the industry, and there

17   is a reason.  That's important, relevant information and

18   certainly within the wide birth of relevant facts that a jury

19   can consider on statutory damages.

20           And the argument that they put forward really is one

21   more under 403 than relevance.  I mean, the relevance really

22   can't be questioned.  It's not seriously disputed.

23           So the jury needs to know from an economic and

24   historical perspective that this activity is harmful.  What is

25   the history of that harm?  How do we know that?  How do we get

40

1   to where we are today?  How did that history lead to a

2   decimation of the music industry for years?  How sales fell off

3   a cliff?  How revenue was slashed?  How these companies were

4   forced to lay off in great numbers just to keep the ship

5   afloat?  How the industry climbed back from that?  How they

6   shifted their distribution and delivery models?  And how we are

7   still playing whack-a-mole after the Napsters, and the

8   Groksters, and LimeWires, and yet a different target through a

9   different distribution model?  And really critically, why we

10  were sending notices at this time to Cox?

11          That history is vital to that story.  And without it,

12  the jury won't have the context to understand this case at all.

13  You simply can't tell the story without it.

14          Now, we're not telling the jury that Cox is

15  responsible for every dollar lost in the industry in 2004 or

16  2010, but that's vital context for the story.  And I have no

17  doubt Your Honor will properly instruct the jury on damages and

18  what it could consider and how it should do so.

19          I want to move to this notion of the pulse checks,

20  and let's level set once again about Mr. Bahun.  Mr. Bahun is a

21  director of strategic accounts who has some sales

22  responsibilities.  We don't dispute that.  But it's -- it is

23  inaccurate and a disservice to describe him as a sales rep.  He

24  is one of the core faces of the MarkMonitor business and

25  process, was materially involved in setting up, executing, and

41

1    working through and with the RIAA program.  He routinely

2    advises and works with the engineers who put the technical

3    pieces in place to make sure that they are properly executing

4    and managing the program as configured by the particular

5    client.

6         So what did he testify about?  Mr. Bahun testified

7    about a part of a global canvassing process and project that

8    MarkMonitor does, what he called these pulse checks.  And in

9    that MarkMonitor observed Cox subscribers engaging in

10   peer-to-peer sharing far beyond the number of notices that

11   plaintiffs through the RIAA sent to Cox.

12        If you read Cox's papers, they seek to exclude this

13   testimony based only on some alleged discovery misconduct.

14   That's the sole basis of their motion.  They had a new argument

15   in reply, and I will address it, but the sole basis of their

16   motion was one for discovery.

17        They haven't remotely satisfied their burden under

18   Rule 37.  They don't even mention Rule 37.  They haven't

19   identified an order that MarkMonitor allegedly failed to obey.

20   And while they have cherry-picked a couple of document requests

21   here and there, none of them really call for the evidence that

22   they are asking for, nor have they provided for Your Honor the

23   responses and objections to those document requests.

24        So it's very easy to cite an overbroad document

25   request in the abstract without any more history.  It's only a

42

1    part of the story, and I think Your Honor is aware of that.

2            And as to the particular document requests they did

3    identify, none of them fairly call for this information.

4            But even setting aside that MarkMonitor objected and

5    provided whatever responses it did, Cox sat on its hands here.

6    Cox has been vigorous and aggressive in their discovery of both

7    the plaintiffs and MarkMonitor, of the RIAA, of Audible Magic

8    and everybody else.  They moved to compel source code and

9    deposition testimony from MarkMonitor, and yet, curiously,

10   after Mr. Bahun's deposition, with weeks remaining in

11   discovery, with the knowledge of this testimony and this

12   information, they did nothing.  They did nothing.

13           What else did they do after Mr. Bahun's deposition?

14   They continued to hound MarkMonitor for more and more and more

15   and more documents.  They asked for more information for the

16   '236 spreadsheet.  They sent a long e-mail complaining about

17   discovery deficiencies, alleged deficiencies on July 12, weeks

18   after discovery.  Never once mentioned the pulse check issue.

19           They filed a motion to compel the plaintiffs on the

20   very last day of discovery, later withdrawn after we opposed.

21   They filed a motion to compel the RIAA weeks after discovery in

22   the District of Columbia and refused to consent to a transfer

23   to this court.  That motion still sits collecting dust at the

24   DDC.

25           So the notion that MarkMonitor did something awry

43

1    here is just -- there is just no support for it.  And even if

2    they are right, they still haven't explained how the plaintiffs

3    somehow should be prejudiced by something that MarkMonitor did

4    here.

5            In reply they add new arguments on relevance.  Again,

6    this is not a serious argument here.  There is lots of evidence

7    in the record that it's impossible to quantify the scope of

8    infringement or harm.  This directly supports the notion that

9    there is more out there.  It supports the notion that there is

10   more infringements than the caps allowed.  It supports the

11   notion that there is more infringement activity than notices we

12   sent.

13           And even if those weren't about plaintiffs' work or

14   for the RIAA, it shows what MarkMonitor knew about Cox's

15   peer-to-peer activity.  And Cox can certainly cross-examine on

16   it and show that they never led to notices, they weren't about

17   the plaintiffs' works.  They have their chance to take their

18   shot at that.

19           If there is any questions, Your Honor, I am happy to

20   answer them.  Otherwise, that's all.

21           THE COURT:  Thank you.

22           MR. BUCHANAN:  Your Honor, I guess I am going to

23   start with the pulse checks.  We specifically asked for data,

24   communications relating to Cox subscribers involving copyright

25   infringement, any sort of notices.  And the idea that somehow

44

1    Mr. Bahun could spew out that we had pulse checks and so it's

2    not limited to just the notices -- and the pulse checks may or

3    may not relate to Cox subscribers.  There is no technology, no

4    testimony about how they discovered this, the meaning of it.

5    It's just a throwaway point, and they are trying to get their

6    expert, Mr. Lehr, Dr. Lehr, to talk about it.  But it doesn't

7    involve the RIAA or the notices in this case.  It doesn't

8    involve the plaintiffs or the works in suit.

9          It involves, you know, music also, but TV and film.

10   It has no relevance whatsoever, and it's just a way of them

11   trying to add to the theory that Cox just didn't infringe by

12   way of the notices, there is a lot of other stuff out there

13   that could have been developed that we didn't, it could have

14   been produced but we didn't, but we are just going to have this

15   one witness, who is a sales rep by his own testimony, come in

16   and testify about it.

17         In terms of -- Mr. Gould talked about vicarious and

18   statutory damages.  He doesn't ever address, and the Court is

19   going to get to this, vicarious liability and what needs to be

20   proved, I already talked about that.  There's no draw.  This is

21   not related to any draw or attraction to subscribers.  And it

22   is not relevant to statutory damages.

23         I think the judge in BMG talked about the type of

24   evidence.  And I read from your instructions:  The profits that

25   Cox earned because of the infringement, expenses Cox saved

45

1  because of the infringement, the revenues BMG lost because of

2  the infringement, the difficulty of proving BMG's damages --

3  that has nothing to do with this -- when they've defined the

4  time period and the notice period.  They could go out five

5  years.

6          And just one final point.  They say, you know, we had

7  caps and we blacklisted.  There is no blacklisting or blocking

8  in this case.  The caps was 600.  They never met it but twice

9  by accident.  It was 450.  The one day per complainant that we

10 had, they rarely, if ever, exceeded that.  And their expert,

11 McGarty, says, I don't have an opinion on any of those things.

12         So this is way different than the BMG case.

13         And so, the point I was getting to is, you have this

14 notion of a subscriber's lifetime value of five years and

15 that's what we knew about when we allowed people to infringe

16 one time and didn't terminate them.

17         So assuming this person infringed at the end of 2014,

18 how do they capture all of the revenue in 2012, 2013, through

19 2014?  They had the data.  And this is a suggestion where I

20 think this would be what they should have to do.  If they are

21 going to go with one, three, and five notices, it should be at

22 that point in time when that three notices came in or five

23 notices came in, they should be limited to then putting forward

24 what revenue came in at that point because that's what they are

25 suggesting is potentially a time to terminate, although none of

46

1    their experts say that, and they have told the Court they are

2    going to argue to the jury, we are leaving it up to the jury.

3              And so, one final point about this.  The wide-ranging

4    piracy.  Again, it goes so far in time.  And if they are going

5    to go that route and say, we're the player and this is all

6    about us and we knew all this, then we should be able to put on

7    testimony about what was going on with all the other ISPs with

8    the cooperation and approval of the plaintiffs.  If they have

9    an agreement that says one a week, and we're one a day, and you

10   have this cap and that cap, and you don't have to terminate,

11   and to suggest this massive conspiracy of piracy and we are

12   somehow a part of it, a leg to it, then what is going on with

13   all these others?  How can they bless what they're doing and

14   not sue them and not require them to infringe and then put us

15   right in that wheelhouse?

16             Thank you, Your Honor.

17             THE COURT:  All right.  Thank you.  All right.

18             MS. GOLINVEAUX:  Good morning, Your Honor.

19             THE COURT:  Good morning.

20             MS. GOLINVEAUX:  Your Honor, Cox's motion in limine

21   number 7 addresses the notices that MarkMonitor and the RIAA

22   sent to Cox claiming infringement by Cox subscribers.  Cox

23   seeks to preclude plaintiffs from relying on the notices as

24   themselves proof of the direct infringement.

25             So we're asking for two things with this motion, Your

1    Honor.  First, that the Court preclude plaintiffs from offering

2    testimony that the notices themselves establish infringement or

3    referring to them in a way that implies that they do.

4         And second, a limiting instruction when the notices

5    are introduced similar to the one that the Court ended up

6    giving during the testimony of Barbara Frederiksen-Cross during

7    the BMG trial, Your Honor, that clarifies this for the jury

8    because we think otherwise it is very misleading.

9         And during the BMG trial, and this is in the trial

10   transcript at 338, Your Honor, Your Honor stopped during Ms.

11   Frederiksen-Cross' testimony when there was reference to

12   infringement records and infringement notices and reminded or

13   instructed the jury that infringement is one of the issues that

14   they are going to need to determine on the basis of all the

15   testimony and the facts and the law that you would instruct.

16        So when they hear the word "infringement" in

17   connection with notices or records, they need to keep that in

18   mind, that that is an ultimate determination.

19        THE COURT:  I don't hear Sony objecting to that.  And

20   it wasn't -- it kind of evolved in the BMG case because

21   everybody is just using infringement and infringement notices.

22        And so, this time we're, I think, better aware of the

23   way the experts are likely to testify, and that giving an

24   instruction right at the beginning of the case is probably the

25   appropriate time.  And I will hear from Sony, but I didn't hear

48

1    any objection to that in their response.

2              MS. GOLINVEAUX:  All right.  Thank you, Your Honor.

3              MR. OPPENHEIM:  Your Honor, to your point that you

4    just made, your instruction in the course of the BMG case that

5    the use of the term "infringement" doesn't necessarily mean

6    that the infringement had necessarily occurred and that it is

7    ultimately an issue for the jury to determine, that was fine,

8    that was fine.

9              But the idea here that there would be some

10   instruction up front that the notices are not proof of

11   infringement is -- makes no sense, it makes no sense.

12             MarkMonitor was retained in -- for purposes of a P2P

13   notice program, and fundamental to that program was MarkMonitor

14   went onto these networks and they identified individuals who

15   were infringing on plaintiffs' rights, including individuals on

16   Cox's network.  And when MarkMonitor found somebody infringing,

17   it would gather evidence of that infringement and then would

18   generate a notice that contained information about that

19   infringement that was ultimately sent to Cox.

20             So those notices, which are not technical, unlike a

21   lot of the other evidence packages, which are highly technical,

22   reflect what is in the MarkMonitor data sets.  They are

23   absolutely evidence relating to infringement.

24             So the idea that there would be some instruction up

25   front that they are not would be contrary to the evidence, Your

49

1   Honor.

2        I'll just leave -- I am sure we will have a

3   full-throated discussion on jury instructions and probably some

4   of this will get addressed at that point as opposed to up

5   front.  I would hate for the jury to be told up front, a jury

6   instruction along those lines when no proof has come in.

7        THE COURT:  Understood.

8        MS. GOLINVEAUX:  Your Honor, in plaintiffs'

9   opposition it seemed like we were in agreement that the notices

10  themselves are not proof of infringement.

11       THE COURT:  No, they are not -- you know, they are

12  not absolute proof.  You know, the distinction that I drew in

13  the BMG case, and I think Mr. Oppenheim is trying to draw, is

14  that they are evidence of infringement.

15       There has been an analysis done by these two

16  companies and you have got a fingerprint.  There is going to be

17  testimony about the fact that the notice is a reflection of

18  that examination.  So, of course, it's evidence of

19  infringement.  It's not the ultimate determination of

20  infringement.

21       MS. GOLINVEAUX:  And, Your Honor, I think where we

22  differ with the plaintiffs is that we think it's important for

23  a limiting instruction up front saying exactly that, to clarify

24  that for the jury.  So when they hear things like "infringement

25  records" or "infringement notices," that that is clear up

50

1  front.  And it doesn't make sense to wait and only do it at the

2  jury instruction stage.

3        THE COURT:  I think the evidence that Sony is going

4  to put in is that the notice contains sufficient information

5  that on that basis alone infringement has been proven for those

6  works, at least that's what I expect.

7        I mean, the -- MarkMonitor, you know, has evolved

8  since the BMG case in the way they have identified their

9  infringement and with Audible Magic.  But that's what I -- so

10 we will need to work on something which doesn't identify the

11 notice itself as being proof positive and leaving Cox with only

12 some rebuttable presumption that a notice itself is sufficient.

13       So I understand your argument on that.

14       MS. GOLINVEAUX:  Okay.  Thank you, Your Honor.

15       THE COURT:  Okay.  Go ahead.

16       MS. GOLINVEAUX:  Your Honor, Cox's motion in limine

17 number 8 addresses certain evidence relating to the

18 peer-to-peer traffic on Cox's network.  And we are asking that

19 the Court exclude three categories of evidence that we laid out

20 in our motion because there is a complete lack of support in

21 the record, and doing so would significantly streamline this

22 trial.

23       First, the first category is evidence that Cox has

24 the ability to determine the content of any files that are

25 uploaded or downloaded on P2P traffic on its network.  And

1    plaintiffs didn't oppose this portion of motion -- of Cox's

2    motion in their opposition, so we think that is appropriate.

3            The second category is evidence that Cox could

4    somehow block, shape, or otherwise manipulate the peer-to-peer

5    traffic.

6            Now, plaintiffs' expert, Dr. McGarty, initially

7    opined about various kind of general network management

8    procedures that could be applied and allow ISPs generally to

9    monitor and control traffic.

10           Your Honor, Dr. Almeroth, Cox's witness, came in in

11   his rebuttal report and opined that Cox could not have used the

12   Procera tool that the plaintiffs have referred to to manipulate

13   traffic on the network for a variety of reasons.  And he lists

14   out a whole bunch of reasons on that.

15           When Mr. McGarty came back with his reply report, he

16   didn't address that portion of Dr. Almeroth's report at all.

17   And in fact, during his deposition he testified specifically

18   and unequivocally that Cox had no duty to use Procera or any

19   other deep packet inspection tool.

20           THE COURT:  Right.  And the question is, you know,

21   duty versus is it something that -- is it a technology that is

22   available that they could have used if they had chosen to.

23           MS. GOLINVEAUX:  That's exactly right, Your Honor.

24   He went even further in his deposition and he testified that

25   using Procera would probably not be enough to say a subscriber

52

1    infringed.  And that's in his deposition.

2          All of the fact witnesses -- and this goes to Clint

3    Summers, the Cox 30(b)(6) witness on network management, the

4    Sandvine 30(b)(6) witness, the third party who now who bought

5    Procera basically, and also inCode, all the testimony is

6    consistent that during the period, during the claims period,

7    there was no way that Cox could do the type of network

8    management and manipulation that Dr. McGarty initially referred

9    to in very general terms.

10         So we think there is no basis in the record to make

11   those arguments anymore.  And granting Cox's motion will very

12   significantly streamline this trial because that's the thrust

13   of Mr. Summers' testimony, the Sandvine testimony, the inCode

14   testimony, and significant portions of Dr. Almeroth's report,

15   Your Honor.

16         THE COURT:  All right.  Thank you.

17         MR. ZEBRAK:  Your Honor, I know there has been a lot

18   of motions in limine.  This one is particularly confounding.

19         So first of all, their motion, counsel just stood up

20   and said there were three areas in the motion, really it

21   identifies two.  And apparently throughout the brief there

22   seems to be mission creep where it involves a third, and that

23   became clear in its reply brief.

24         The whole presentation, Your Honor, is -- it's really

25   deceptive.  First of all, Dr. McGarty hasn't abandoned

53

1    anything.  They misrepresent his opinion in order to couch it

2    as abandoning.  You know, there is just a flare for the

3    dramatic that doesn't apply here.  And nothing they have raised

4    really speaks to exclusion.

5         What they do is they attack two very narrow areas,

6    and then in their brief they say everything about Procera and

7    network management tools ought to be out.  Everything about

8    Cox's general knowledge about the massive use of peer-to-peer,

9    which indisputably, you know, is overwhelmingly illegal, is

10   out.

11        And then they ask for exclusion of several witnesses.

12   And have the audacity to couch inCode as being nothing about

13   network management -- of being solely about network management

14   in these areas when inCode.  Your Honor, I would like to hand

15   this up, because I know there has been a sea of papers.  This

16   was Exhibit 16 to Jeffrey Gould's declaration in opposition to

17   Cox's motion.  This is one of a whole set of documents that

18   inCode prepared for Cox.

19        inCode is a strategic business consultant for Cox and

20   others.  And inCode is not like Procera, which is a network

21   management deep packet inspection company.  inCode are

22   consultants.  And inCode notably did demand forecasts for Cox.

23   They did one in 2009 looking forward five years and then one in

24   2012 looking forward three years.

25        And they told Cox, here is what you should anticipate

54

1    about the volume of peer-to-peer usage, and here is what an

2    average household uses in peer-to-peer.  And they explained to

3    Cox in this presentation in 2012 that peer-to-peer is the most

4    bandwidth intensive category, and that P2P households represent

5    13 percent of your Internet service households.  And on

6    average, they use 82 gigabytes a month, that's the national

7    average.

8         And then if Your Honor looks to -- there is a later

9    line graph on page 10, which shows the Cox service tiers.  This

10   is -- quite frankly, when they say -- you know, they stand up

11   and say that, you know, his testimony is irrelevant and only

12   goes to network management tools, this is, in our view,

13   dispositive proof of financial benefit for vicarious

14   infringement.

15        This shows that the average household using

16   peer-to-peer is already above -- they are in Cox's third tier.

17   If Your Honor looks at where 82 gigabytes would fall in this

18   time period, it is above both the starter and essential tiers.

19        Now, it's undisputed that peer-to-peer is

20   overwhelmingly infringing.  And we concede that there are

21   potentially some legal uses, but it is overwhelmingly

22   infringing.  We have Lord knows how many subscribers

23   infringing.

24        And, you know, inCode testifies right here -- and

25   their model was verified by looking at Procera data, actual

55

1    usage data.   In this model, at the end of it, inCode did this

2    analysis and then Cox gave inCode Procera data.

3            This is a small -- these are excerpts from a much

4    larger document.  But the point is that and what I would like

5    to do -- I jumped right into who the witnesses are a little bit

6    because I don't think it justifies exclusion, and I took

7    particular issue with inCode, which is a very substantial

8    witness in this case on a number of issues.

9            But taking a step back, plaintiffs -- you know, this

10   case is not about whether Cox could determine the content of

11   files and could do deep packet inspection.  It's not about

12   saying, Cox should have blocked all peer-to-peer traffic or

13   BitTorrent traffic.  That's not our theory of the case.

14           And what Cox does, is it tries to use exclusion of

15   those two narrow issues to then take out a whole bunch of very

16   relevant testimony.

17           And, first of all, to the extent we put in some --

18   whether it's live testimony or deposition designation testimony

19   from Mr. Summers, it will be brief.  It will be actually much

20   narrower than we designated.

21           Mr. Summers is in charge of network intelligence for

22   Cox.  He will acknowledge that through their Procera tool they

23   had knowledge about the percentage of their network that was

24   being used for peer-to-peer.

25           Now, we don't contend that because they knew of

56

1    massive peer-to-peer piracy that means they are liable for

2    contributory infringement.  We understand what the Fourth

3    Circuit said.

4          But their knowledge about this massive use is

5    relevant to a host of issues ranging from damages to Cox's

6    willfulness.  And I could drill down further, but I think the

7    point is made.

8          And in addition to that, Mr. Summers will testify

9    that through Procera they had use of something called a live

10   view tool.  And nothing in Cox's papers disputes this, and they

11   can't dispute this.

12         In this live view tool, had Cox wished to look at

13   subscriber activity for those subscribers repeatedly in our

14   notices, it could look at those subscribers and see are they

15   continuing to go to BitTorrent or other peer-to-peer

16   applications.  And I don't have the testimony in front of me.

17   If I remember it correctly, I believe they could also determine

18   if it's audio content.

19         Now, again, is that dispositive that the person

20   continued to infringe?  No.  Is that relevant that they could

21   have done that and didn't do it or didn't even consider doing

22   it?  I think so.

23         So, again, Mr. Buchanan referred to Dr. McGarty as

24   our liability expert.  He does no such thing, Your Honor.  I

25   don't know if this is a way to reinforce their Daubert motion,

1    but Dr. McGarty looks at the technical capabilities Cox had

2    with its CATS system and then it looks about what it did in

3    practice to see if it utilized those technical capabilities.

4             And, you know, we observed how the Court handled his

5    testimony in the BMG case, and we deliberately took a different

6    approach here.  But he's not testifying to liability.  And he

7    didn't testify they had a legal obligation to use these things.

8    He is merely noting that Cox, had it wished to exercise some

9    control and gain more insights, it could have.

10            And, you know, this notion that Cox couldn't use

11   these things, first of all, it was Cox's choice to deploy its

12   network infrastructure to do more with these tools or not.  You

13   know, it's like saying, I choose not to put an alarm in my

14   house; therefore, I can't alarm my house.  You know, I mean,

15   it's silly.

16            And factually, again, it's not our case, the two

17   areas they have moved to exclude, but factually it's

18   inaccurate.  You know, there are points when they say there are

19   no facts in the record to show those things.  They are just

20   wrong.  Yes, some or perhaps much of the network traffic is

21   encrypted, but that doesn't mean all of it is if they wish to

22   do deep packet inspection.

23            And in terms of blocking, shaping, or manipulating

24   peer-to-peer traffic, it was their choice not to put Procera in

25   line but to keep it in a passive environment.

58

1           And beyond that, years earlier they used a different

2    deep packet inspection tool where they actually did manipulate

3    traffic by limiting the number of peer-to-peer connections.

4           So it's really a very, you know, I think, confusing

5    approach they have taken.  But in the area that I think matters

6    most to us here is that inCode is a much broader witness than

7    these issues, Summers and Procera, if they are called at all,

8    will be narrow.  And this issue about Cox's general knowledge

9    of infringement we just think is critical to the issues we've

10   discussed.

11          Thank you.

12          THE COURT:  Thank you.

13          MS. GOLINVEAUX:  Your Honor, there is no evidence in

14   the record that Cox could have used Procera to control the

15   infringing activity alleged in this case.  None.  Plaintiffs

16   haven't pointed to any in their opposition.  Mr. Zebrak hasn't

17   mentioned any just now.

18          Their expert, Dr. McGarty, has said both that Cox

19   didn't have a duty to do it, and it probably wouldn't have been

20   enough to determine infringement even if it could have figured

21   out if someone was using peer-to-peer.

22          Now, Mr. Zebrak's argument focuses entirely on this

23   generalized knowledge that there was peer-to-peer traffic on

24   the network.  That's what he wants to focus on.  That's the

25   focus of their inCode testimony.  But, Your Honor, that's not

59

1      the standard.  Evidence that Cox has generalized knowledge

2      about peer-to-peer traffic on the network is not the standard

3      for any of the claims in the case.  Actual knowledge of

4      specific acts of infringement is the standard for contributory

5      liability.

6              So Mr. Zebrak's focus, and, you know, he talks about

7      how important it is for them to show this generalized

8      knowledge, is just not relevant to the case, Your Honor, and

9      that's the thrust of the inCode testimony.

10             THE COURT:  All right.  Thank you.

11             MS. GOLINVEAUX:  So, Your Honor, finally there is

12     Cox's motion in limine number 10 addressed at the performance

13     evaluations for --

14             MR. ZEBRAK:  Just one last point, if I could, before

15     you move on to the next motion.

16             THE COURT:  Well, it's their motion, so you are done.

17             MR. ZEBRAK:  Thank you, Your Honor.

18             THE COURT:  Thank you.

19             MS. GOLINVEAUX:  So, Your Honor, Cox's motion in

20     limine number 10 is to exclude the performance evaluations and

21     the separation agreements for Mr. Sikes and Zabek.  We think

22     they should -- there is both performance evaluations and

23     self-evaluations that they have identified as exhibits.

24             This material is simply not relevant to plaintiffs'

25     claims, Your Honor.  And any marginal relevance --

60

1          THE COURT:  So the argument is, as I am reading this,

2   how do you prevent Cox from doing the same thing that it did in

3   the BMG case?  Which is try and throw these couple witnesses

4   under the bus, say they don't represent Cox, and it is

5   unfortunate, but don't consider this is our corporate culture.

6          So how do you -- do you get an agreement that you are

7   not going to throw these witnesses, try and run from them?  Or

8   do you -- you know, because, obviously, if Cox waits until

9   closing argument to make that statement, it's a little too late

10  for the jury to get evidence of approval ratings by their

11  supervisors.

12         MS. GOLINVEAUX:  Well, Your Honor, I think two

13  things.  Number one, I think what plaintiffs are saying is that

14  they want to use this evidence of positive reviews over the

15  years as somehow proof that Cox sanctioned certain e-mail

16  language or the like.  And, Your Honor, there is just nothing

17  about the reviews that indicates that that's the case or makes

18  that point for the plaintiffs.

19         THE COURT:  So I didn't -- and maybe the information

20  was there, but I didn't have the timing of when reviews were

21  taking place versus, you know, comments that were being made

22  about the DMCA and the plan and the infringing customers.  So I

23  don't completely understand that.

24         But to the extent those witnesses testify and there

25  is testimony, one, that, you know, Cox -- or you have another

61

1    witness that testifies that Cox didn't know about what these

2    marketing folks were doing and didn't approve of it, and they

3    of course thought that the DMCA was proper, and you have got

4    the testimony regarding CAS and the industry, you know, it may

5    become relevant at some stage, right?  That's what I am trying

6    to figure out.

7            MS. GOLINVEAUX:  Well, Your Honor, and it's possible

8    that the parties could work together on some form of

9    stipulation in that regard.  But going back to the actual

10   evaluations -- and they do cover a period of years leading all

11   the way up, I think the last one is for the year 2015.  But

12   there is nothing in the reviews themselves, and particularly

13   the language that the plaintiffs point to in their opposition,

14   that indicated Cox somehow had knowledge of the e-mails that

15   they like to bring to the Court and show around, that they were

16   being held out as valued employees despite that type of

17   language or that Cox condoned that type of language.  They

18   don't get you there.

19           With respect to the separation agreements.  The

20   plaintiffs seem to think that they are relevant to show bias

21   because they have these non-disparagement clauses, but both

22   witnesses testified under oath and explained that they had

23   nothing disparaging to say about Cox.  It's really not

24   relevant.  That's a stretch, Your Honor.

25           They argue that the $50,000 payment that I think

62

1    Mr. Zabek received when he left should be relevant somehow that

2    he was rewarded or the like.  But, Your Honor, he testified at

3    his deposition that was a general severance package that was

4    being offered to some of the older employees at Cox, and he

5    decided to take advantage of it and go.

6            So there is just nothing there.  And to allow them to

7    come in, it's prejudicial, and the relevance is not there, Your

8    Honor.

9            THE COURT:  All right.  Thank you.

10           MS. GOLINVEAUX:  Thank you.

11           MR. GOULD:  Thank you, Your Honor.  Unsurprisingly,

12   we disagree with Ms. Golinveaux's position.  These performance

13   evaluations are relevant out of the gate.  We don't need to

14   wait for Cox to roll these gentlemen under the bus.  It is

15   critically important for the jury to know what Cox thought

16   about these leaders of the abuse department at the time that

17   they were acting reprehensibly.

18           We haven't sought to tie that to individual e-mails.

19   The jury is going to be intelligent peers who can connect the

20   dots themselves.  It is not about Zabek said this in his e-mail

21   and Cox said that e-mail was their corporate values.  But here

22   is what they did say.  They said, Zabek clearly lives Cox's

23   values in his interactions with big C customers.  They said he

24   leads by example.

25           And on Mr. Sikes, they said, he is a good reflection

63

1    of Cox's ethics and business values.

2            That is not about a single e-mail.  In these jury

3    trials, we put on pieces of evidence, we build blocks with

4    these relevant pieces, and the jury connects the dots.  That's

5    what we are doing here.  And that's directly relevant to these

6    gentlemen's credibility, and it's directly relevant to what Cox

7    said, thought, and did about them.  Not just about one e-mail,

8    but patting them on the back for the good job they were doing,

9    creating a system that lined its pockets with gold while our

10   clients were taking it on the chin.

11           As to separation agreements, it really goes to the

12   credibility of the witnesses.  Ms. Golinveaux is free to make

13   those same arguments to the jury later, but there is no real --

14   there can't be any real argument that their payment to an

15   agreement not -- their $50,000 payment and the promise of

16   future benefits in retirement in consideration for a

17   non-disparagement promise, that's relevant to their

18   credibility.  The jury will listen to what they have to say,

19   how they said it, what they looked like when they said it, and

20   they will decide for themselves whether they said it because

21   they promised not to so they could get paid or whether they

22   said it because they meant it.

23           Another point on the separation agreements.  There

24   has been a lot of talk about whether Mr. Sikes and Zabek will

25   come to trial.  They are obligated to if Cox wants them to.  We

64

1    may seek a jury instruction asking for an adverse inference if

2    they don't bring witnesses they control.  We are still puzzling

3    over that, but it's relevant.

4           And then on the prejudice, the standard is whether it

5    substantially outweighs the probative value.  And we'd submit,

6    Your Honor, based on the arguments we made in our papers here

7    today that it is not even a close call.

8           Thank you, Your Honor.

9           THE COURT:  All right.  Thank you.

10          MS. GOLINVEAUX:  Just very briefly, Your Honor.

11          Your Honor pointed out that if there was an effort in

12   closing, for example, along the lines of BMG for Cox to throw

13   these employees under the bus, so to speak, that the Court

14   could see some relevance to the performance evaluations.

15          I think what Mr. Gould has articulated is a much

16   different purpose for the evaluations.  And again, the reviews

17   themselves, when you look at them, they in no way provide

18   evidence that Cox was some condoning specific activity, that

19   they want to try to leave that impression with the jury.

20   That's an improper purpose for putting those reviews in.  It's

21   going to be misleading to the jury.  And we ask you to grant

22   the motion.

23          Thank you, Your Honor.

24          THE COURT:  Thank you.  All right.  Let's take ten

25   minutes and let you think about whether there is a couple other

65

1    issues you want to bring forward.  I mean, I didn't necessarily

2    need argument on the remaining issues, but if there is

3    something that you want to bring up after we come back, I will

4    permit you to do that then.  Okay.  All right.

5            All right.  Let's take ten minutes.  We're in recess.

6            NOTE:  At this point a recess is taken; at the

7    conclusion of which the case continues as follows:

8            THE COURT:  I didn't mean to just keep you here for

9    ten additional minutes, but I wanted you to take stock and see

10   if there is anything else we needed to talk about.

11           Mr. Oppenheim.

12           MR. OPPENHEIM:  Thank you, Your Honor.  I would like

13   to briefly discuss one of the other motions in limine, and then

14   just some housekeeping matters, if I may.

15           THE COURT:  Go ahead.

16           MR. OPPENHEIM:  And that concerns plaintiffs' motion

17   in limine number 2 with respect to the 96 percent study.

18           THE COURT:  Right.

19           MR. OPPENHEIM:  To plaintiffs, this is a

20   supercritical motion in limine.  And that's apparent based off

21   of Cox's briefing of summary judgment.  They intend to put this

22   front and center as the thematic of their case, and that's why

23   we think it's so important.  And happy to answer any questions

24   the Court has, but the situation with this 96 percent study in

25   this case is so different than what was presented in BMG.

66

1          THE COURT:  Right.

2          MR. OPPENHEIM:  We just want to make sure that those

3    distinctions are drawn to the Court's attention because we were

4    aware of what happened with respect to that study in BMG, and

5    so we pursued diligently trying to understand what was behind

6    the study and try to understand the study and were thwarted at

7    every turn.  None of the witnesses knew anything about the

8    study other than they were told the conclusions by their

9    lawyers.

10         And when you look at those two slides, they make no

11   sense.  And I am happy to pull it up on a screen and talk about

12   it for a second, but you can't even add the numbers up to get

13   to 96 percent.  They just don't even get to 96 percent.

14         And then the bar graph and the chart are two

15   different data sets.  And none of that is supported by the

16   single e-mail they provided which they say is the data

17   underlying it.  But that's not raw data.

18         The testimony from Mr. Cadenhead was that there was

19   one month of raw data provided by Brent Beck.  They provided a

20   single e-mail that had six months of ticket data, not notice

21   data.

22         It's just -- so, Your Honor, I don't want to argue

23   what you don't want to hear, but I do want to make us available

24   to answer any questions on this.  We think that there is no way

25   this should come in, whether it be direct as evidence or

67

```
1    through an expert, because it's contrary to what actually

2    happened with Cox's system.  It's rewriting the narrative of

3    what Cox did.

4           Other than that, I will turn to some housekeeping

5    issues, but if Mr. Elkin, you want to respond to that, I don't

6    want to --

7           THE COURT:  Yeah, okay.  Mr. Elkin, go ahead.

8           MR. ELKIN:  Good afternoon, Your Honor.

9           THE COURT:  Good afternoon.

10          MR. ELKIN:  I will be brief.  Your Honor knows that

11   this Cadenhead page from a PowerPoint was admitted in the BMG

12   trial.

13          THE COURT:  Right.

14          MR. ELKIN:  And it did have some focus in this

15   particular case.  Mr. Cadenhead testified extensively at his

16   deposition that this was a presentation based on data that had

17   been provided by Brent Beck or Mr. Carothers, Matt Carothers,

18   and he had given this presentation over and over again, and he

19   provided testimony with respect to the background of that.

20          Mr. Beck testified at his deposition specifically

21   about providing this data to Mr. Cadenhead, and we provided the

22   data that was reflective of what Mr. Cadenhead took.

23          They are unhappy --

24          THE COURT:  Is that the e-mail or --

25          MR. ELKIN:  It was the e-mail.  They believe somehow
```

68

1    that the e-mail doesn't add up to the data, but that goes to

2    the weight as opposed to the admissibility.

3             And, frankly, I think they are conflating the expert

4    testimony of Lynn Weber with respect to the so-called 98

5    percent and how the columns add up with regard to the 96

6    percent.

7             I am happy to take the Court through more arguments,

8    but I just want to mention that the record here is very well

9    developed in many respects, much more fully developed than it

10   was in BMG.

11            Thank you.

12            THE COURT:  All right.  Understood.

13            MR. OPPENHEIM:  So I don't want to conflate issues,

14   and I want to be really clear about this because I didn't get

15   this the first time I looked at it.  So if I may, I have asked

16   it to be pulled up.

17            THE COURT:  Go ahead.

18            MR. OPPENHEIM:  So, Your Honor, the first data point

19   that I pointed to is that here you see that this -- the chart

20   says two notices.  There is -- by two notices, there is 50,000

21   customers.  Here it says one for 50,000.  Those are

22   inconsistent data sets.

23            So I -- and I don't understand that.  I asked them

24   about it.  They couldn't explain it.  Okay?

25            But here is the part about the 96 percent.  So they

69

1   talk about 96 percent.  We see it over and over and over again

2   in their papers.  So this is arithmetic, Your Honor.  61 plus

3   20 is 81.  Plus 8 1/2 is 89 1/2.  Plus 8 percent is 97 1/2.

4          So they keep saying 96.  How do you get to

5   96 percent?  I would love to look at the data, but we don't

6   have it.  That e-mail is not data.  And I will leave it at

7   that, Your Honor.

8          THE COURT:  Okay.  All right.  Other housekeeping

9   matters?

10         MR. OPPENHEIM:  Certainly, Your Honor.

11         THE COURT:  Well, let me start out.  You didn't have

12  a settlement conference.  I thought you were going to have a

13  settlement conference.

14         MR. OPPENHEIM:  Well, my clients were on planes on

15  their way here.

16         THE COURT:  And so is -- I don't know.  Talking to

17  Judge Anderson, he said it was that Mr. Buchanan called, said

18  we can't meet then, but then there was no follow-up?  There was

19  no other conference date chosen?  Is that -- so you all never

20  talked about it anymore?

21         MR. OPPENHEIM:  So, Your Honor, since even -- long

22  before we filed this case, we put a settlement offer on the

23  table.  We have tried repeatedly.  We've never gotten an offer

24  from the defendant.

25         If they don't -- I can't force them to want to engage

70

1   in a settlement dialog.  I wish they had just told Your Honor

2   up front when you first raised this that they weren't

3   interested in having a settlement conference, because we were

4   never going to get there, in which case it would have saved us

5   and our clients a whole lot of time and money.  But they did

6   what they did.

7            THE COURT:  Okay.

8            MR. OPPENHEIM:  I can't speak to it.  If they have

9   got a settlement offer, we are happy to hear it.

10           THE COURT:  Okay.  All right.  I just thought that

11  you all had agreed to have a settlement conference, although I

12  could see resistance from Cox.

13           But if you are not going to have the settlement

14  conference, you know, one, you need to tell the Court you

15  decided you are not going to engage in a settlement conference.

16  And that evidently never occurred because Judge Anderson

17  waited.  And so, in the future, if you're going to change your

18  mind and do that, then that needs to be clear.

19           Okay.  All right.  I don't need -- Mr. Buchanan.

20           MR. BUCHANAN:  Yeah.  So as I recall, and maybe we

21  should have contacted Judge Anderson, but when we didn't go

22  forward with the last -- or the only settlement conference --

23  and that was because we were so far apart, I think Judge

24  Anderson sort of agreed that the numbers were so far apart that

25  it wasn't worth everyone coming.

```
 1              However, as I recall -- and plaintiffs' counsel can

 2    correct me -- I thought Judge Anderson said he was going to

 3    reach out to us and to have further discussion --

 4              THE COURT:  Yeah, that's not --

 5              MR. BUCHANAN:  -- at some point.  And that didn't

 6    happen.  So maybe -- my apologies to the Court.  Maybe we

 7    should have called him back.

 8              THE COURT:  Yeah, that wasn't his recollection.  I

 9    will let him know that was your --

10              MR. BUCHANAN:  Okay.  That's fine, Your Honor.  I

11    don't know if plaintiffs' counsel may have a different

12    recollection of that.  I thought that's what he said.

13              THE COURT:  Okay.  In the future, that's on the

14    parties to notify the Court one way or the other and make it

15    clear.

16              All right.  What else have we got?

17              MR. OPPENHEIM:  The only thing, just, Your Honor, I

18    don't know how they could know we were too far apart when we

19    never even had a discussion, but so be it.

20              THE COURT:  Okay.

21              MR. OPPENHEIM:  We are here.  We are available any

22    time they want to make an offer, Your Honor.

23              THE COURT:  Okay.

24              MR. OPPENHEIM:  Okay.  With respect to a number of

25    other housekeeping issues, Your Honor, I understand there is a
```

72

1  standing rule in the Court as to physical exhibits, copies for

2  the Court.

3          With respect to the issue of ownership, to the extent

4  the Court hasn't resolved it, that's an enormous volume of

5  physical documents, and I --

6          THE COURT:  That will be resolved shortly.

7          MR. OPPENHEIM:  Okay.  Okay.  So with respect to the

8  issue of witnesses.  Based on Your Honor's ruling today, we

9  would like to have some calendar so that we know who Cox is

10 going to bring and who they are not so we can know who we are

11 preparing for and not, especially since some of these witnesses

12 are significant witnesses.  It's not something we are going to

13 do on the fly.  And --

14         THE COURT:  So try and work out an agreement that

15 72 hours before the trial you are going to identify who is

16 going to testify live and who is going to testify by

17 deposition.  I realize we are starting over Thanksgiving --

18 after Thanksgiving break, but, you know, on the Friday before

19 the Monday trial identify who is coming, to the best of your

20 ability, unless there is some unexpected health issues.

21         And also on a daily basis, I mean, you, as the

22 plaintiff, need to identify the witnesses you expect to

23 testify, you know, by each day for the following -- you know,

24 6 o'clock.  At the end of the trial day, you notify Cox who you

25 expect.  And Cox will do the same thing with you.  So you know

73

1    who is coming in the next day.

2           MR. OPPENHEIM:  With respect to that latter issue, of

3    course, Your Honor, we would always do that.

4           THE COURT:  Yeah.

5           MR. OPPENHEIM:  With respect to Mr. Zabek and

6    Mr. Sikes, preparing cross-examination on those two witnesses

7    is a significant event.  72 hours, especially over Thanksgiving

8    weekend, really is not -- seems unnecessarily restrictive.

9    They will know certainly within several days, I am sure, of

10   discussing this hearing whether or not they are going to bring

11   them as witnesses.

12          Why shouldn't we have two weeks notice to prepare

13   that examination, especially given the holiday, Your Honor?  Is

14   that -- is that possible?

15          THE COURT:  Well, they may be waiting for rulings

16   from me as to other evidence that is important to their

17   decision.  So I think that that's a legitimate issue.

18          But, Mr. Buchanan, do you want to be heard?

19          MR. BUCHANAN:  We're not -- we don't intend to call

20   Mr. Zabek and Mr. Sikes.

21          THE COURT:  You do not?

22          MR. BUCHANAN:  We do not.

23          THE COURT:  Okay.

24          MR. BUCHANAN:  So they are not going to be called.

25   And then there is Mr. Beck and Carothers.  I think the Court's

74

1    ruling was if we want to use them in our case live, we have to

2    bring them up so they can call them in their case.

3            THE COURT:  Yes.

4            MR. BUCHANAN:  So then we need to know from them when

5    they want to put them on.  And we also represent Roger

6    Vredenburg.  So I think he wants to know in advance because he

7    is driving up from south Virginia, southeast Virginia, so it is

8    a four-hour drive.  So he wants to know when they will call

9    him.  So we can work that out with them.

10           THE COURT:  All right.  It sounds like you're pretty

11   far along then.

12           MR. OPPENHEIM:  Thank you, Mr. Buchanan.  That makes

13   it much easier.  And we will absolutely give them notice as to

14   when we want to call those witnesses.

15           I hesitate to even raise this, but my clients have

16   asked me to.  So I am putting on my flak vest now, Your Honor.

17   It's a long trial.  We have senior executives within our

18   companies who intend to come to the trial as representatives.

19           I know there is a -- without court order a no phone

20   rule, and wondering whether or not for purposes of the trial a

21   client can get -- we could seek leave from the Court for

22   clients to have access to their phones on silent mode.

23           THE COURT:  No.  You may -- you know, we might be

24   able to stash them someplace and they could go use them, but

25   they are not going to have them on their possession.  And I

1   have not cleared that with the resident senior active district

2   judge, who has great interest in that issue.

3              So if you want me to, I will raise it and it may be

4   that -- but the -- I don't know whether it helps you, if you

5   don't get notice that somebody needs to talk to you right away,

6   then how do you know to go use our phone over in the reception

7   area.

8              So I will ask our judge, but she has been pretty firm

9   in the "no" to that.  So -- but I will ask.

10             MR. OPPENHEIM:  Much appreciated.  And I didn't mean

11  to make it a one-sided request.  I am sure, no doubt, Cox would

12  ask for the same.

13             THE COURT:  I understand, yeah.

14             MR. OPPENHEIM:  Last but not least, Your Honor,

15  obviously there are a lot of rulings, I think, both sides are

16  waiting for.

17             THE COURT:  Waiting for.

18             MR. OPPENHEIM:  And I anticipate that there may be

19  housekeeping issues regarding the conduct of the trial that

20  arise after those rulings are issued.

21             Would it make sense for us to get on schedule a

22  status conference or a pretrial -- not to push Your Honor on

23  when you are going to issue those rulings, but in anticipation

24  that there may be issues that arise?

25             THE COURT:  So I hope to get rulings out by the end

1    of the week, so this Friday, on pretty much everything.  And

2    I'm in trial the following week on a criminal case, but that

3    doesn't mean we can't have a status hearing if you think it's

4    necessary.

5              So I don't -- you know, I can -- well, Tuesday, the

6    19th, we will start at 10 o'clock because we are bringing in a

7    jury.  But Wednesday and Thursday we will start at 9.  I have a

8    regular Friday calendar that I intend to keep for the 22nd.  Or

9    the following week I am not in court.  So the 25th, 26th, 27th,

10   which kind of makes sense where we might be closer to the

11   trial.

12             When are jury instructions due?

13             MR. OPPENHEIM:  The 22nd?  Monday, the 25th.

14             THE COURT:  Okay.  Then do you want to try and put

15   something together the 26th so we are not -- so people won't --

16   I will reserve the 26th.  You got -- you all decide whether you

17   think it's necessary to come in and have final -- any final

18   comments.

19             I mean, I am not going to -- traditionally, I don't

20   give a lot of jury instructions in the beginning of the case.

21   I give general instructions.  If it's -- we may be far better

22   served by being more specific in the opening instructions in

23   this case.  And so, if you want to take a shot at doing

24   something along those lines -- traditionally each side submits

25   jury instructions.  They kind of go -- they kind of stay in the

1    background until we're, you know, part of the way through a

2    case, and then I designate people to see which ones you can

3    agree on and which ones you can't agree on.  And then we have a

4    settle -- a jury instruction conference over the ones that are

5    contested.

6              But if you want to try and put together a few more

7    instructions that you can agree on and -- or if you can't agree

8    on them, but you think they are important, that would be the

9    time to hear those, would be the 26th, because I don't want to

10   do it -- well, we -- I don't want to wait until Monday, the

11   first day of trial to do that.

12             So that may be a good idea, talk about that, and see

13   whether that is something you want to do.

14             MR. OPPENHEIM:  Would that also be a good time to

15   discuss the clock Your Honor has suggested putting us on?

16             THE COURT:  Yeah.  I mean, I -- you are going to go

17   on a clock, and I think four days each is -- you know, we will

18   spend the first day picking a jury and having opening

19   statements and, you know, maybe getting going.  I don't know

20   how long you anticipate opening statements, but I am sure it's

21   not 20 minutes that most cases require.

22             So that -- and it may take us a little longer to pick

23   a jury given some of the issues.  And, you know, I am going to

24   bring in more jurors than I would normally.  And my preference

25   is to pick eight jurors and let all eight deliberate instead of

78

1   having alternates.

2         And, of course, you will be submitting voir dire

3   questions on the 25th, I guess, as well.  So what do you think,

4   do you want to get together on the 26th?

5         MR. OPPENHEIM:  So, Your Honor, I think that's a

6   great -- getting together on the 26th is a great idea.  Knowing

7   how much time we think we are going to need to present our case

8   is hard to put forward before we see the rulings you are going

9   to issue.  So, you know, the four days seems somewhat limited

10  to me right now, but I think I will know a lot more after your

11  rulings on Friday.

12        THE COURT:  Okay.

13        MR. OPPENHEIM:  So the 26th to me makes sense.

14        THE COURT:  Okay.  Mr. Elkin.

15        MR. ELKIN:  Yes, Your Honor, the 26th is fine, we

16  think it's a good idea to do that.

17        THE COURT:  Okay.

18        MR. ELKIN:  What I intended to do, and I thought

19  maybe getting the rulings from the Court would be a good

20  prelude, was to sit down with counsel to work out how we are

21  going to allocate the time in the interest of the Court and the

22  respective convenience of the parties.

23        I am assuming that in light of Your Honor's

24  admonition or ruling or indication as to how you are going to

25  rule with regard to the Cox witnesses who they wish to call in

79

1    support of their case in chief, we will cross-examine them or

2    examine them while they are on the stand so they will not be

3    called back when it comes to our turn.  So we will take that

4    into account in terms of the allocation.

5            THE COURT:  All right.  Obviously that is preferable.

6    But if I have got you on a clock, I don't -- there may be

7    strategic reasons not to do that, and I don't want to interfere

8    with that.  But obviously that would be the preference, both I

9    am sure for your witnesses as well as for the jury to put all

10   the testimony in and then allocate it between the parties

11   time-wise.

12           MR. ELKIN:  Would we be permitted to make that

13   allocation ourselves, or does the Court have any hard and fast

14   rules with regard to that?

15           THE COURT:  I don't.  You know, I expect you to --

16   somebody is going to be a time keeper on each side, and then

17   you can, you know, compare notes.  And if you have issues, we

18   will have somebody taking -- keeping time as well.

19           MR. ELKIN:  Thank you, Your Honor.

20           THE COURT:  Okay.  All right.  Anything else?

21           MR. BUCHANAN:  Not from the plaintiffs, Your Honor.

22           THE COURT:  I am sorry, does 10 o'clock work on the

23   26th?

24           MR. BUCHANAN:  Yes, Your Honor.  That works for Cox.

25           THE COURT:  Okay.

80

1            MR. OPPENHEIM:  Yes.  Very well, Your Honor.

2            THE COURT:  All right.  Good.  Thank you again for

3    coming in today, and we'll get you some rulings.  We will see

4    you on the 26th.

5            All right.  We're in recess.

6            MR. ELKIN:  Thank you, Your Honor.

7            MR. OPPENHEIM:  Thank you, Your Honor.

8    -------------------------------------------------
                        HEARING CONCLUDED

9

10

11

12

13

14

15

16

17

18

19            I certify that the foregoing is a true and

20       accurate transcription of my stenographic notes.

21

22

23            /s/  Norman B. Linnell
              Norman B. Linnell, RPR, CM, VCE, FCRR
24

25