**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| SONY MUSIC ENTERTAINMENT, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-950-LO-IDD |
| | ) | Hon. Liam O'Grady |
| COX COMMUNICATIONS, INC., *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Fifty-three members of the recording industry ("Plaintiffs" or "Sony") bring this action for copyright infringement. They seek relief from Cox Communications, Inc. and CoxCom, LLC ("Defendants" or "Cox") for infringement of Plaintiffs' works that allegedly occurred by unauthorized download and distribution of files using Cox's network. Plaintiffs allege both contributory infringement and vicarious liability for infringement by Cox's internet subscribers. Specifically, Plaintiffs claim that Defendants are liable for infringement of 7,068 copyrighted sound recordings and 3,452 copyrighted musical compositions from February 1, 2013 until November 26, 2014 ("Claim Period"). Dkts. 172-1, 172-2.[1]

## I.    BACKGROUND

The undisputed facts in this case are few, but certain of them will provide a framework for discussion. Plaintiffs are record companies that generally produce, manage, acquire, sell, and

---

[1] This refers to the Amended Exhibits to First Amended Complaint which are considered, collectively, as the 10,478 works in suit.

license sound recordings and musical compositions and their copyrights. Plaintiffs are part of a trade association, the Recording Industry Association of America ("RIAA"). As Plaintiffs' agent, RIAA hired an anti-piracy company, MarkMonitor, to scan the internet for potentially infringing file-sharing on peer-to-peer ("P2P") networks. MarkMonitor acted as a participant in the P2P networks to engage with potentially infringing users, gather data from those users, and use that data to generate infringement notices. These are the notices that MarkMonitor sent to Cox on behalf of Plaintiffs.

Defendants operate a broadband communications network and act as an internet service provider ("ISP") to residential and commercial customers throughout the United States. To monitor and address internet security issues, including copyright infringement, Cox has a department aimed at abuse of its services and has adopted a policy to respond to alleged abuse of its network. During the Claim Period, Cox offered a tiered pricing plan, charging different flat fees for different download speeds. Also during the Claim Period, Cox received and processed notices of infringement from MarkMonitor using the Cox Abuse Tracking System ("CATS"). Cox programmed CATS to automate tickets to send to the subscribers identified in the notices. The CATS system responded in different ways to different numbers of infringement notices, essentially resulting in a thirteen-strike policy. Cox's conduct throughout the thirteen strikes and the management of these accounts is not a subject for summary judgment.

Plaintiffs identified individual Cox accounts that received three or more infringement notices, and have established those subscribers as the basis for Defendants' liability here. This parameter helped determine the 10,478 works in suit, and the four P2P networks involved: BitTorrent, Gnutella, eDonkey, and Ares. This set of subscriber activity is the subject of the suit, and Cox's alleged contributory infringement and vicarious liability.

2

The Parties filed cross Motions for Summary Judgment on August 30, 2019. Dkt. 312

(Pls.' Mot.), Dkt. 328 (Defs.' Mot.). In addition, the Parties have filed, collectively, nine

*Daubert* motions and 21 motions *in limine* that bear on many of the issues raised in the instant

summary judgment motions. As such, the Court only addresses the following, and will resolve

the remaining issues either in pending pre-trial motions or at trial as necessary. The two main

issues the Court addresses here are (1) ownership of the copyrights, and (2) the knowledge

element of contributory infringement.

## II.   SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 states that "[t]he court shall grant summary judgment

if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law. The court should state on the record the reasons for

granting or denying the motion." Fed. R. Civ. P. 56(a). The trial judge is not required to make

findings of fact at the summary judgment stage. "The inquiry performed is the threshold inquiry

of determining whether there is the need for a trial—whether, in other words, there are any

genuine factual issues that properly can be resolved only by a finder of fact." *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). While the burden is on the moving party to

demonstrate entitlement as a matter of law, the opposing party "must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Dash v. Mayweather*, 731 F.3d 303, 311 (4th

Cir. 2013) (quoting *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir.

2003)).

## A.   Ownership of Copyrights in Suit

Before the Court is Plaintiffs' Motion for Summary Judgment (Dkt. 312) as it pertains to

Plaintiffs' claim that they "Own or Control Exclusive Rights Under Copyright for Each of

Plaintiffs' Works." Pls.' Br. 17-19. The matter is fully briefed, and the Court heard oral argument on October 24, 2019.

The Court granted Plaintiffs' Motion to Strike (Mot. Dkt. 420, Order Dkt. 521) on October 23, 2019, which removed from consideration the Declaration of Thomas Patrick Lane on the issue of copyright validity and ownership. As the Court struck it from the record, the Lane Declaration cannot support Defendants' claims on the ownership issue. Many of Defendants' arguments are thus precluded, and, accordingly, the Court addresses the remaining issues here.

Plaintiffs assert exclusive control of the copyrights to all works in suit, offering ownership evidence including certificates of registration, registration entries from the online Copyright Catalog,[2] declarations from executives representing all six plaintiff groups, merger and acquisition agreements, and other business agreements bearing on ownership. These are discussed more specifically below in relation to Defendants' arguments.

## 1. Legal Standard

To establish a claim for copyright infringement, a plaintiff must show two things: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991) (citing *Harper & Row, Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539, 548 (1985)). The matters in dispute concern the first element, determining if Plaintiffs have standing to bring these claims as owners of the claimed copyrights.

A copyright owner controls the exclusive rights enumerated in Section 106 of Title 17 of the United States Code, including "(1) to reproduce the copyrighted work in copies or

---

[2] UNITED STATES COPYRIGHT OFFICE, Public Catalog, cocatalog.loc.gov (last visited November 13, 2019).

4

phonorecords; . . . [and] (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106. Ownership "initially vests in the author of a copyrighted work," then the author "may transfer all or a subset of these rights 'by any means of conveyance or by operation of law.'" *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 410 (2d Cir. 2018) (quoting 17 U.S.C. § 201)). While ownership naturally lies with the author of an original work, "the presumption of authorial ownership fails . . . if the work is made 'for hire,' such as 'one prepared by an employee within the scope of his or her employment.'" *Avtec Sys. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994) (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737-38 (1989)).

Although a copyright "owner's rights exist apart from registration, *see* § 408(a), a registration is akin to an administrative exhaustion requirement that the owner must satisfy before suing to enforce ownership rights." *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S.Ct. 881, 887 (2019) (internal citation omitted). Once a copyright is registered, "[a] certificate of registration issued by the Copyright Office is 'prima facie evidence of the validity of the copyright and of the facts stated in the certificate, such as ownership.'" *Univers. Furniture Intn'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 428 (4th Cir. 2010) (quoting 17 U.S.C. § 410(c)).[3]

In addition to evidence of the copyright registrations, courts consider other indicia of ownership. These other indicia include "the parties' intent and the terms of transfer agreements and other documents establishing a chain of title." *Univers. Furniture*, 618 F.3d at 428 (citing *SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1209 (10th Cir. 2009); *AccuSoft Corp. v. Palo*,

---

[3] On October 18, 2019, the Court issued an Order (Dkt. 467) granting Plaintiff's Motion for Judicial Notice (Dkt. 283) of copyright ownership information from the United States Copyright Office Database online as valid ownership evidence.

237 F.3d 31, 58 (1st Cir. 2001)).  Such "chain[s] of title" include acquisitions of ownership as well as exclusive licenses to exercise ownership rights.  *See Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016) ("The Copyright Act recognizes that an exclusive license is effectively a transfer of ownership over the rights licensed . . . and exclusive licensees stand in the shoes of creators for enforcement purposes, 17 U.S.C. § 201(d).).  Thus, demonstrating either actual ownership or exclusive license rights is sufficient to bring an infringement claim.

While the burden is on the Plaintiff to establish ownership as a matter of law, "mere denial of these facts is not sufficient to rebut the presumption of ownership or to create a genuine issue of material fact."  *BMG Rights Mgmt. (US) v. Cox Commc'ns* ("*BMG I*"), 149 F. Supp. 3d 634, 648 (E.D. Va. 2015) (citing *Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936, 2011 WL 1641978, at *4 (S.D.N.Y. Apr. 29, 2011) ("A non-movant may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon mere allegations or denials of the nonmoving party's pleading.") (citing *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532-33 (2d Cir. 1993)).  A reasonable jury must be able to find in favor of the nonmoving party based on the facts in the record at summary judgment.  *See Dash v. Mayweather*, 731 F.3d at 311 ("If the adverse party fails to provide evidence establishing that the factfinder could reasonably decide in his favor, the summary judgment shall be entered 'regardless of any proof or evidentiary requirements imposed by law.'") (quoting *Bouchat v. Balt. Ravens*, 346 F.3d at 522)).

## 2. Discussion

Defendants faced similar infringement allegations in *BMG I*.  In that case, the Court recognized four categories of ownership evidence with varying combinations of copyright certificates of registration showing the plaintiffs and predecessors, and business agreements

6

showing purchase or exclusive licensing rights. *BMG*, 149 F. Supp. 3d at 643-44. The Court finds no reason to alter its positions on its various findings in *BMG* — as ownership was not a discrete issue on appeal in *BMG*, the Fourth Circuit did not disturb these findings.[4] The parties in this case aptly present new arguments.

### a) Plaintiffs' Assertion of Ownership, and Evidence in Support

There are fifty-three plaintiffs remaining in this case, broken into six sub-groups. Plaintiffs present ownership evidence through declarations for each of those six sub-groups.[5] As a general matter, Plaintiffs assert that they "protect their copyrights, including through registration with the U.S. Copyright Office and by entering into written agreements through which they own or control exclusive rights under copyright." Pls.' Br. 4 (citing Blietz Decl. ¶ 51 Kokakis Decl. ¶ 5; Leak Decl. ¶ 4; McMullan Decl. ¶ 4; Patel Decl. ¶ 4; Poltorak Decl. ¶ 4). Specifically, the declarations are supported by certificates of registration, excerpts from the U.S. Copyright Catalog showing registration, merger and acquisition agreements and related contracts that bear on copyright ownership.[6]

As such, Plaintiffs claim to have demonstrated enough ownership evidence to shift the burden to Defendants to produce evidence to the contrary. For the vast majority of the works in dispute, discussed below, the Court agrees that Plaintiffs have established a presumption of

---

[4] Some findings related to ownership evidence include: (1) merger and acquisition agreements are admissible to show ownership; (2) the chain of title need not trace back to the author instead of the original claimant; and (3) the agreements are not required to list the specific copyrights acquired if the agreement otherwise conveys ownership rights by operation of law. *See BMG*, 149 F. Supp. 3d at 645-46.

[5] The Sony Music Plaintiffs account for 3,231 sound recordings through the Leak Declaration, Pls.' Br. Ex. 3; the SATV-EMI Plaintiffs account for 1,139 musical compositions through the Patel Declaration, Pls.' Br. Ex. 4; the Warner Music Plaintiffs account for 1,307 sound recordings through the Poltorak Declaration, Pls.' Br. Ex. 5; the Warner Chappell Plaintiffs account for 1,330 musical compositions through the Blietz Declaration, Pls.' Br. Ex. 10; UMPG Plaintiffs account for 1,087 musical compositions through the Kolkakis Declaration, Pls.' Br. Ex. 8; and the UMG Plaintiffs account for 2,230 sound recordings through the McMullan Declaration, Pls.' Br. Ex. 9.

[6] Plaintiff has submitted by hard drive 15,313 files in 1,620 folders in support of the ownership claim. Due to this volume, it is unreasonable for the Court to review each one. The Court will focus on those that the parties have identified in their briefs as in dispute.

7

ownership. The main question at bar is thus whether Defendants have shown genuine issues of

material fact to survive summary judgment. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 585-86 (1986) (noting that to survive summary judgment, "the issue

of fact must be genuine.") (internal citation omitted).

### b) Analysis of Defendants' Challenges

Defendants do not object to the evidence as broadly as they did in *BMG I*. Rather,

though Plaintiffs moved for summary judgment on 10,100 works,[7] the ownership evidence in

dispute is limited to the following: [8]

1. 1,715 works where the evidence is limited to the online Copyright Catalog;
2. 129 works registered more than five years after the first publication;
3. "Hundreds" of works where Plaintiffs rely on declarations and are missing documentary proof of an ownership transaction;
4. 238 individual sound recordings ("singles") registered as works made for hire;
5. 78 works registered after the Claim Period, precluding statutory damage recovery.

Defs.' Opp'n at 24-26.

The Court will address each of Defendants' objections in turn.

### (1)   Copyright Catalog Alleged to be the Only Ownership Evidence

To begin, the Court granted Plaintiffs' Motion for Judicial Notice, which moots most of

this first argument.[9] The registration information from the Copyright Catalog shores up well

over one thousand of Plaintiffs' ownership claims. Further, while Defendants claim that the

online Copyright Catalog print-outs are the "*only* evidence of ownership" for approximately

---

[7] Defendants' say Plaintiffs claim 10,478 works in the case, but that they move for Summary Judgment on hundreds fewer (Defs.' Opp'n 23 n.14), citing the Amended Exhibits to First Amended Complaint (Dkts. 136, 172-1, 172-2). Plaintiffs' Reply then refers to 10,100 works in suit. Pls.' Reply 8. The Court adopts the 10,100 total.

[8] Some of the works in suit are subject to multiple of Defendants' objections such that the categories of works listed in Plaintiffs' Reply brief exceed the total number of works in dispute: 129 noted as registered more than five years after publication; 1,209 works with missing chain of title documents; 122 agreements with potentially invalid terms; 54 supporting documents produced to Cox after discovery period closed; 238 works registered as "made for hire;" 78 works registered after the claim period.

[9] *See supra* note 3.

8

1,715 works, this is based on the allegation that the print-outs are the only documentary evidence. Whether or not that is true, this assertion necessarily assumes that the Plaintiffs' declarations are inadmissible as ownership evidence. The Court finds this assumption to be mistaken.

Written documentation is not the only acceptable form of ownership evidence. *Armento v. Laser Image, Inc.*, 950 F. Supp. 719, 734 (W.D.N.C. 1996) (considering parties' actions to support ownership claim, and citing the plaintiff's affidavit in so doing). Uncontroverted testimony is valid ownership evidence, and can supplement the registration information to establish a presumption of ownership. *See X-It Prods., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 155 F. Supp. 2d 577, 604 (E.D. Va. 2001) (regarding oral assignment of copyrights, finding standing according to "unchallenged affidavits" and associated assignment agreements); *Donald A. Gardner Architects, Inc. v. Cambridge Builders, Inc.*, 803 F. Supp. 2d 373, 378 (E.D.N.C. 2011) ("Plaintiffs have also submitted deposition testimony and sworn declarations of the architects who created the home designs, averring that the designs are their original creations.").[10]

Cox points to a lack of supplemental evidence, but, as stated before, "mere denial of these facts" is not enough at this point in the litigation. *BMG*, 149 F. Supp. 3d at 648. Accordingly, the registration print-outs are not the "*only* evidence of ownership" before the Court, and Defendants' arguments targeting the sufficiency of Copyright Catalog registrations are effectively moot.[11]

---

[10] The Court recognizes that case law here may be referring to certificates of registration rather than the Copyright Catalog, but does not find that there is a material difference given the evidence at issue.

[11] Plaintiffs' Reply responds to Defendants' contention that there are 54 documents that were produced after the discovery period closed, 52 of which seem to be registrations. Pls.' Reply 14. Defendants do not raise these documents in their Opposition, and they likely originate from the Lane Declaration now stricken from the record. Furthermore, a discovery dispute of this nature is properly brought to Magistrate Judge Anderson. The parties fully briefed and argued before Judge Anderson a Motion for Discovery Sanctions and to Preclude Plaintiffs' Use of

(2)    Registrations Dated More than Five Years After Publication.

Second, the fact that there are copyrights for which the registration is dated more than

five years after publication of the work does not preclude Plaintiffs from supplementing that

ownership evidence with "other relevant indicia of ownership." *Univers. Furniture*, 618 F.3d at

428. Indeed, regarding judicial proceedings, "the certificate of a registration made before or

within five years after first publication of the work shall constitute prima facie evidence of the

validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). But the

statutory provision allowing Courts to recognize certain evidence does not, *ipso facto*, preclude

later registrations as irrelevant. The registrations are relevant. The six plaintiff groups also

submit uncontroverted testimony in support of these copyrights. Defendants' claim that

Plaintiffs failed to further substantiate ownership for 129 works thus fails for the same reasons

stated above.

(3)    Allegedly Insufficient Chain of Title Evidence.

Third, Cox argues that there are missing chain of title documents for what Plaintiff

characterizes as 1,209 works. The Parties break these down into several categories, including

those with alleged facial deficiencies and lack of documentation for certain name changes,

mergers, and acquisitions.[12]

The writing requirement to execute a transfer of copyright ownership is not absolute. *See*

17 U.S.C. § 204(a) ("A transfer of copyright ownership, *other than by operation of law*, is not

---

MarkMonitor Evidence (Dkt. 237) while this ownership argument was relevant. As far as the Court is aware,
Defendant did not raise it. The Court will not at this time disturb ownership discovery that has been included in the
record thus far on the basis of late production.

[12] Cox's also points to 49 instances where Plaintiffs erroneously cited to the wrong certificate for the works in its
briefing. Similar to the 54 documents allegedly produced after discovery, discussed *supra* note 11, the Court notes
that Defendants did not argue this in Opposition. To the extent that these copyrights are in dispute because of the
now stricken Lane Declaration, the Court need not address an objection. Even if the works were under scrutiny, the
Court understands Defendants' arguments to be that the claimed copyrights are improperly supported, not that they
are unregistered or otherwise invalid.

valid unless an instrument of conveyance . . . is in writing and signed.") (emphasis added). As

Plaintiffs state, "[n]ot every fact needs a document." Pls.' Reply 11. To hold otherwise when

considering thousands of copyrights subject to corporate agreements would be unreasonable and

contrary to governing law. *See Univers. Furniture*, 618 F.3d at 429 (citing § 204(a)); *BMG*, 149

F. Supp. 3d at 646 (collecting cases). Furthermore, "when there is no dispute between the

original copyright owner and his licensee or assignee, 'it would be anomalous to permit a third-

party infringer to invoke this [writing] provision against the licensee.'" *X-It Prods.*, 155 F. Supp.

2d at 604 (quoting *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 37 (2d Cir.

1982)).

Once again, Cox demands documentation and ignores fact testimony from business

representatives with extensive personal knowledge of the relevant business agreements and

associated copyright ownership status. Further, any disputes related to the quality of reproduced

documents are insignificant at this stage, and that evidence will be admitted.

Cox has not shown, affirmatively, a likelihood that the substance of proffered ownership

evidence is incorrect, or that it cannot plausibly connect Plaintiffs to the works. The Court

believes that Cox has had ample opportunity to do so.

(4)     Sound Recordings Registered as "Works for Hire"

Cox contends there are 238 individual sound recordings in suit improperly registered as

"works for hire." Cox summarily states that "these registrations must be deemed invalid and

insufficient to sustain Plaintiffs' burden of proof." Defs.' Opp'n 25. Plaintiffs counter that the

"work for hire" notation does not render the registration evidence invalid. Rather, Plaintiffs note

once more that a certificate of registration is prima facie evidence of the validity of the facts

therein, and that Cox "has not offered evidence that any alleged error was made knowingly or with an intent to defraud the Copyright Office." Pls.' Reply 16.

As the nonmovant in this instance, Cox does not offer the evidence required to rebut the presumption of validity of the registration certificate. Regardless of whether Plaintiffs offer evidence that the works were created by employees of the record company, the Court cannot ignore that Cox fails to offer any evidence to combat the substance of the certificates. *Cf. MOB Music Publ'g v. Zanzibar on the Waterfront, LLC*, 698 F. Supp. 2d 197, 204 (D.D.C. 2010) ("Defendants' idle assertions regarding the possibility that these Bob Marley songs were improperly registered as 'works for hire' – as well as defendants other unsupported evidentiary complaints – are simply insufficient to create a genuine issue of material fact as to plaintiffs' ownership of the songs.").

Further, settled law across circuits states that inaccurate registrations are not invalidated without evidence that the inaccuracy was both material and made in bad faith. In other words, "the inaccurate information must have been included in the application . . . 'with knowledge that it was inaccurate' and 'the inaccuracy of the information, if known, would have caused the Register of copyrights to refuse registration.'" *Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*, 925 F.3d 1140, 1146 (9th Cir. 2019) (quoting 17 U.S.C. § 411(b)(1)); *see also Jedson Eng'g, Inc. v. Spirit Const. Svs., Inc.*, 720 F. Supp. 2d 904, 914 (S.D. Oh. 2010) ("Neither innocent misstatements, nor deliberate, but nonmaterial misstatements, will overcome the presumption of validity.") (quoting *Tacori Enters. v. Rego Mfg*, No. 1:05cv2241, 2008 WL 4426343, at *14 (N.D. Oh. Sept. 25, 2008) and *Shady Records, Inc. v. Source Enters., Inc.*, No. 03 Civ. 9944(GEL), 2005 WL 14920, at *8 (S.D.N.Y. Jan. 3, 2005)).

Defendants in their Opposition maintain that "Plaintiffs' misrepresentations were knowing and intentional." Defs.' Opp'n 25 n.19. To shore up this claim, Defendants submit just one argument, in a footnote: that the "work made for hire" notations on the registrations must invalidate the registrations because of certain knowledge of legislative history. [13]  In short, Defendants claim that a legislative controversy twenty years ago is automatically and comprehensively imputed to Plaintiffs' state of mind, and that it is dispositive here.

The Court disagrees. When the record can only support a finding that technical errors in registrations are inadvertent and immaterial, they are "of the type that does not render a registration invalid for the purpose of § 411(a)." *Huthwaite, Inc. v. Sunrise Assisted Living, Inc.*, 261 F. Supp. 2d 502, 510 (E.D. Va. 2003) (citing *Bouchat*, 241 F.3d at 357). A reference to past legislation and repeal, without facts specific to Plaintiffs, falls well short of raising a genuine issue of material fact.

(5)     Registrations Dated After Alleged Infringement

Finally, Defendants claim there are 78 works in suit that were registered after the alleged infringement, precluding Plaintiffs from recovery pursuant to Section 412 of the Copyright Act. Section 412 reads:

> In any action under this title . . . an action for the infringement of the copyright of a work that has been preregistered under section 408(f) before the commencement of the infringement and that has an effective date of registration not later than the earlier of 3 months after the first publication of the work or 1 month after the copyright owner has learned of the infringement . . . no award of statutory damages or attorney's fees . . . shall be made.

---

[13] Specifically, the repeal of "sound recording" as it relates to "work made for hire" in § 101 of the Copyright Act. Work Made for Hire and Copyright Corrections Act of 2000, Pub. L. No. 106–379, § 1, 114 Stat. 1444 (2000). The Court does not hesitate to consider the importance of legislative changes when they are material to the litigation and fully briefed; here we have neither.

17 U.S.C. § 412. It is true that "[u]pon registration of a copyright . . . a copyright owner can recover for infringement that occurred both before and after registration," but infringement before registration can only support a claim for statutory damages if the owner has preregistered the copyright and the registration takes effect within three months of the first publication.[14] *Fourth Estate*, 139 S.Ct. at 886-87.

Plaintiffs do not dispute that these 78 registrations were issued outside of the statutory time frame and they make no legal argument for statutory damages related to these works. Therefore, these 78 works are improper as a basis for statutory damages, and Plaintiffs will not be permitted to present evidence at trial that is unique to these works.

Plaintiff has shown sufficient ownership evidence, and Defendants have failed, in most instances, to rebut Plaintiffs' claims with evidence to create a genuine issue of material fact. The Court intends for this holding to apply to 10,022 works; specifically, the Court grants summary judgment on all 10,100 works referenced in Plaintiffs' Reply brief, except for the 78 works discussed above as ineligible for suit because of late registration. For the reasons stated herein, Plaintiffs' motion for summary judgment on copyright ownership is hereby **GRANTED** with the exclusion of those works registered late. Copyright ownership for the works in suit is not an issue for trial.[15]

## B.   Knowledge, as Applied to Contributory Infringement

Plaintiffs also submit their Motion for Summary Judgment (Dkt. 312) to establish, in part, that Defendant Cox is liable for contributory infringement because Cox had knowledge of infringement. Pls.' Br. IV.A. Defendants, in their cross Motion for Summary Judgment (Dkt.

---

[14] Or, per Section 412, registration may have to take effect sooner if the owner learns of the infringement.
[15] It is unclear from the record which 378 works are excluded from Plaintiffs' motion. Should this discrepancy become material at trial, specifically for purposes of statutory damages, Plaintiffs will be required to provide evidence to support each work that does not fall into a category discussed above.

328), ask the Court to find (1) there can be no liability for claims where Plaintiffs' notices failed to identify certain works in suit, and (2) there can be no liability arising from Cox Business subscribers due to insufficient notice. Defs.` Br. II., III.

The question to address is what constitutes knowledge of infringement in the context of contributory infringement of a copyright, and whether the infringement notices Cox received from RIAA, through its agent MarkMonitor, were sufficient in conveying that requisite knowledge.

### 1. Legal Standard

A claim for contributory infringement can be summarized as follows: "[o]ne contributorily infringes when he (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007); *see also Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) ("[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a contributory infringer.") (internal quotations omitted).

Within this claim, the Fourth Circuit held that "contributory liability can be based on willful blindness but not on recklessness or negligence," as this standard "appropriately targets culpable conduct without unduly burdening technological development." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 309 (4th Cir. 2018) ("*BMG II*"). The *BMG II* case clarified:

> Selling a product with both lawful and unlawful uses suggests an intent to cause infringement only if the seller know of specific instances of infringement, but not if the seller only generally knows of infringement. *See [Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013)] (holding that contributory copyright infringement "requires more than a

15

generalized knowledge ... of the possibility of infringement"; it requires "specific knowledge of infringement.").

*Id.* at 311. In essence, "generalized knowledge" of infringement somewhere on an ISP's network is insufficient to establish contributory infringement liability, and "the proper standard requires a defendant to have specific enough knowledge of infringement that the defendant could *do* something about it." *Id.* at 311-12 (emphasis original). Similarly, the Ninth Circuit in *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) ("*Amazon.com*") held that "a computer system operator can be held contributorily liable if it has *actual* knowledge that *specific* infringing material is available using its system . . . and can take simple measures to prevent further damage to copyrighted works . . . yet continues to provide access to infringing works." (emphasis original, internal citations omitted).[16]

### 2. Discussion

#### a) Specificity of the RIAA Notices

Knowledge of infringement is not often adjudicated, but the case law agrees that "a service provider's knowing failure to prevent infringing actions could be the basis for imposing contributory liability." *Amazon.com*, 508 F.3d at 1172 (citing *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001); *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005)). The question is whether the notices that Cox received during the Claim Period amount to the requisite knowledge for Plaintiffs' contributory infringement claim.

The Fourth Circuit in *BMG II* cites to *Ludvarts*, where the plaintiffs held copyrights in multi-media messaging content that was allegedly infringed upon when recipients of that content

---

[16] In *Amazon.com*, "[t]he district court did not resolve the factual disputes over the adequacy of Perfect 10's notices to Google and Google's responses to these notices." 508 F.3d at 1172.

forwarded it to additional consumers in violation of a single-use restriction. The *Ludvarts* plaintiffs sued AT&T and other mobile wireless carriers, alleging, *inter alia*, that the defendants had knowledge of the infringement because of notices sent to the carriers. The Ninth Circuit held that these notices were insufficient to establish the specific knowledge of infringement because they "failed to notify the Carriers of any meaningful fact." *Ludvarts*, 710 F.3d at 1072. The notices at issue were "150-page-long lists of titles, apparently just a transcription of every title copyrighted by Ludvarts . . . These notices do not identify which of these titles were infringed, who infringed them, or when the infringement occurred." *Id.* at 1073.

Furthermore, ongoing litigation in the United States District Court for the District of Colorado, *Warner Bros. Records, Inc. v. Charter Commc'ns, Inc.*,[17] deals with issues—and infringement notices—very similar to those before the Court. In that case, Magistrate Judge Hegarty recommends the District Court deny the defendant's motion to dismiss for vicarious liability in part because Defendant failed to stop or limit infringement after receiving "hundreds of thousands of notices of infringement . . . identifying the infringing users and the Defendant's policy." *Id.* at *7. While applied to vicarious liability rather than contributory liability, Judge Hegarty's relevant finding is that the notices in question, very similar to RIAA's in this case, provided actionable information. Per the Fourth Circuit's standard, the provider could *do* something in response.

In the instant case, MarkMonitor gathered data and generated infringement notices to send to Cox on behalf of RIAA; the notices included the information required under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(c). Bahun Decl. ¶ 18. This included "variables such as the timestamp of the infringement detection, the date the notice was sent, the

---

[17] No. 19-cv-874, 2019 WL 5387099 (D. Co. Oct. 21, 2019).

NoticeID, the Cox user (identified by IP address and Port), and a hash value pertaining to the file." *Id.* ¶ 22. To evidence the level of detail, proposed exhibit PX 14 (Bates Plaintiffs_00286280) is an excel file of notice data showing the data extracted from MarkMonitor's internal database contemporaneously with the detection of the infringement, and proposed exhibit PX 538 (Bates Plaintiffs_00100723) is a representative infringement notice sent to Cox. *Id.* ¶¶ 21-22. Further, the notices drew attention to the data enclosed by informing subscribers, "[i]f you disagree with the claims in the notice, you should contact the sender, and not Cox, to resolve the matter." Pls.' Br., Gould Decl. ¶ 7, Ex. 14 (COX_SONY_00717187).

Based on the level of detail included in the notices directed at Cox and its subscribers, there is no doubt that Defendants had more than just "generalized knowledge" of infringement. A far cry from the comprehensive list of copyrighted works at issue in *Ludvarts* with no indication of specific activity, the notices in this case are specific to the time, subscriber, work, and all additional data as dictated by § 512(c)(3) of the DMCA. Further, because Cox maintained the ability to suspend or terminate these infringing accounts, this was "specific enough knowledge of infringement that the defendant could *do* something about it." *BMG II*, 881 F.3d at 311-12 (emphasis original).

Cox argues that because each notice "specified only one particular work (Artist/Title pair), the opaque reference to an info hash in the notice did not on its face disclose that other works might have been on the subscriber's computer." Defs.' Br. 23-24. But Cox's argument is misplaced. The purpose of the notices was to alert Cox to the fact that specific infringement was occurring. Cox does not dispute that the RIAA notices identified individual subscriber accounts and specific copyrighted works. Peculiarly, conceding this, Cox continues, "a defendant is not required to do extensive research and analysis to determine whether infringement is occurring."

18

*Id.* at 24. The question of whether there was additional infringement beyond that on the face of the notice is irrelevant to the threshold question of knowledge for contributory liability. Questions related to what Cox did or did not do in response to the notices, and the reach of the infringement notice itself, will be for the trier of fact.

Thus, the Court finds as a matter of law that there is no genuine issue of fact regarding the sufficiency of the RIAA notices in this case, and that they can support the knowledge element of a contributory infringement claim. Defendants' motion therefore fails as to this issue.

*b) Establishing Knowledge with RIAA Notices*

Plaintiffs' motion seeks a ruling that the notices are not only able to support the knowledge element, but also dispositive of said knowledge on these facts.

Generalized knowledge is clearly established. Plaintiffs have shown that the parties are supremely aware of the infringement problem at issue and have each implemented large-scale policies and programs in anti-piracy to address it. The Parties produced thorough evidence of Cox's role as the middle man between Plaintiffs and the internet subscribers, processing the RIAA notices and forwarding certain information to its customers. It would be farcical to argue that Cox had no knowledge of the hundreds of thousands of notices it received indicating infringement for the works in suit. The notices were sent to an email address Cox created for the very purpose of receiving this information, and were processed by a corporate department dedicated to abuse and security for Cox.

The more specified knowledge required to satisfy this element in the Fourth Circuit is also established. As the Court finds the notices sufficient to support the knowledge element, it follows that knowledge of the notices constitutes knowledge as a matter of law on these facts. Because of this, Plaintiffs must prevail on this issue.

19

### c) *Cox Business Subscribers*

Defendants also move the Court to find as a matter of law that Defendants cannot be liable for potential infringement by any end users of Cox Business accounts. This is because there was allegedly insufficient information to notify Cox of the infringing activity. "Plaintiffs' evidence only identifies alleged infringers by the IP address of the Cox Business subscriber," Defendants explain, and the IP address alone cannot support a finding of secondary liability for the underlying conduct. Defs.' Br. 29. The Court disagrees.

### (1)    The Parties' Arguments

In *Cobbler Nevada, LLC v. Gonzalez*, 901 F.3d 1142 (9th Cir. 2018), copyright holders traced infringing activity to an IP address and named Jon Doe—at that IP address—as the defendant in its copyright suit alleging direct and contributory infringement. The plaintiffs in *Cobbler* went to great lengths to locate the subscriber on the account, Thomas Gonzales. Gonzales owned and ran an adult foster care home in Portland, Oregon, and the court allowed the plaintiffs to depose Gonzales about the allegedly infringing activity. *Id.* at 1145. The plaintiffs then doubted that he was the actual infringer. The Ninth Circuit held that there was not enough evidence to allege a secondary infringement claim against Gonzales, noting, "this situation hardly seems to be one of 'the circumstances in which it is just to hold one individual accountable for the actions of another.'" *Id.* at 1149 (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 (1984)).

Defendants note that *Cobbler* is "the only decision to have considered the issue," and go on to argue that its reasoning is dispositive here. Defs.' Br. 30. Specifically, Defendants contend that "Plaintiffs' inability to prove *which* user of a particular Cox Business subscriber's IP address purportedly infringed a particular copyright is fatal to their direct infringement

claims." *Id.* (emphasis original). Ever anthropomorphizing its argument, Cox insists on

identification of end users, and "proof of direct infringement by *someone*." *Id.* (emphasis

original). Defendants further argue that an IP address alone is what the Fourth Circuit would call

"generalized knowledge" that falls short of the knowledge needed to establish secondary

liability.

Plaintiffs counter that (1) Cox is collaterally estopped from making this argument, (2)

Cox's application of *Cobbler* is incorrect, and (3) Cox misapplies the Fourth Circuit's *BMG II*

decision. Pls.' Opp'n 29-31. Collateral estoppel applies here, Plaintiffs argue, because this

Court held that "[w]hile identity [of the infringer] is a key issue in many individual infringement

suits, it has little relevance in a large-scale secondary liability suit." *BMG I*, 149 F. Supp. 3d at

664. Since this is a large-scale suit against the ISP, Plaintiffs claim that Defendants cannot

revive this argument regarding the identity of the infringer.

Second, the identity and position of the defendant in *Cobbler* is a point of contention

between the parties when compared to Cox. Defendants maintain that without a particular

person to name for direct infringement, *Cobbler* says there can be no secondary infringement.

Plaintiffs find no such requirement; the only requirement should be a reasonable basis to allege

infringement. Further, Plaintiffs argue, the *Cobbler* opinion demonstrated concerns about

imposing duties and liability upon private internet subscribers. Plaintiffs maintain that

Defendants represent a major ISP, not a private account holder, thus *Cobbler* does not lend

Defendants any help.

Finally, Plaintiffs criticize Defendants' claim that the infringement notices in this case

only amounted to "generalized knowledge" insufficient to show infringement was happening on

its network. This is again because the notices, Plaintiffs say, provided plenty of information for Cox to take action in response to specific infringement activity. Pls.' Opp'n 31.

(2)   Analysis

As an initial—and important—distinction between the instant case and *Cobbler*, the fundamental conundrum in *Cobbler* was finding and naming the right defendant; here, there is no dispute or hesitation in naming Cox as the intended defendant. Additionally, contrary to Defendants' claims, the fact that Cox is an ISP is material when using *Cobbler* for legal comparison. The law recognizes and treats service providers differently from end users, and *Cobbler's* holdings and dicta are relevant to individual account holders, not the provider of said account. [18]   Cox's argument is largely inapposite to an ISP defendant. [19]

The reason there is no doubt as to the intended defendant in this suit is because it is a large-scale attempt to impose indirect liability where enforcement against direct infringers is both impractical and improbable. *See Grokster*, 545 U.S. at 929-930 ("[I]t may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor . . . for secondary liability.")). As the Supreme Court said in *Grokster*, "[t]he argument for imposing indirect liability in this case is, however, a powerful one, given the number of infringing downloads that occur every day" using the defendant's software. *Id.* at 929.

*Cobbler* involved an investigation into the subscriber connected to the infringing IP address, and a subsequent deposition of the account holder with permission from the court. Indeed, the search for the infringer's identity in *Cobbler* illustrates exactly the type of litigation

---

[18] The DMCA addresses this distinction in great detail, providing various limitations on liability for service providers that are not otherwise applicable to business subscribers.
[19] The Court notes here that the Ninth Circuit's holding in *Cobbler* is not binding; even if it were, it would not control the way Cox insists it does.

22

that is unreasonable for Plaintiffs to pursue. Enforcement against direct infringers in the instant case is impractical because of the sheer volume of alleged infringers and infringed works, and the frequency of infringement notices and tickets. The *Cobbler* case was about one movie; this case is about more than 10,000 works.

Further, enforcement against individual infringers is improbable. For one thing, individual subscribers can easily evade identification by third parties by editing and manipulating accounts and contact information. Plus, ISPs tend to refuse—and in some Circuits do legally refuse—to provide the contact information to target specific subscribers. *See, e.g.*, *Recording Industry Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1236 (D.C. Cir. 2003) ("*RIAA v. Verizon*") (holding there is no obligation under the DMCA to provide individual subscriber information, granting Verizon's motion to quash subpoena to do so); *but cf. Cobbler*, 901 F.3d at 1145 (involving records successfully subpoenaed from Comcast). Mr. Gonzales in *Cobbler* stood in the shoes of the subscriber whose identity the plaintiffs sought in cases like *RIAA v. Verizon*.

The natural analogy is that Cox has the information to identify its subscribers in this case, just as Comcast had the information to identify Mr. Gonzales in *Cobbler*. The fact that there was also a contributory liability claim against Mr. Gonzales does not transform him from the account holder into the service provider. Cox has the access and ability to use individual account information associated with the IP addresses at issue, not Plaintiffs. Yet Cox has not produced evidence of any organized endeavor to identify direct infringers beyond the Cox Business IP addresses.

Ultimately, the characterization of an IP address as a residence or a business does not affect either the level of specificity in the notice or Cox's ability to take action in response.

There is no indication from the Fourth Circuit that specific IP addresses and account numbers are insufficient to identify "particular subscribers," and consequently, the knowledge standard discussed herein applies to all subscribers that were the subject of a notice from Plaintiffs. As such, Defendants' motion to exclude business subscribers as a potential basis for liability cannot survive.

The idea that Cox is collaterally estopped from making this argument, or any argument, about the identification of end users is too restrictive, and the Court cannot say with certainty that there is no evidence to support a defense against it. The Court will wait until the evidence is concluded and consider this argument again.

To conclude, neither the existing body of law in the Fourth Circuit nor *Cobbler* in the Ninth Circuit preclude a jury from finding that Cox had actual knowledge of or was willfully blind to infringement by residential and business subscribers alike. As outlined above, relative to the stated issues of the knowledge element of contributory infringement, Plaintiffs' motion is **GRANTED**, and Defendants' motion is **DENIED**. This ruling is limited to the knowledge element and thus not dispositive of a contributory infringement claim.

## C.   **Issues of Material Fact**

Accordingly, the remaining claims in the Parties' motions not specifically addressed here are denied, to be resolved at trial. In sum, Defendants' Motion for Summary Judgment (Dkt. 328) is hereby **DENIED** in its entirety for the reasons stated herein or because issues of material fact remain, and Plaintiff's Motion for Summary Judgment (Dkt. 312) is hereby **GRANTED IN PART AND DENIED IN PART**. Plaintiffs' motion is granted as to ownership or control of exclusive rights, as qualified above, and as to knowledge of specific instances of copyright

infringement.  In all other instances, except for Cox's affirmative defenses which will be the subject of further order of the Court, genuine issues of material fact preclude summary judgment.

It is **SO ORDERED**.


November 15, 2019                                     _____
Alexandria, Virginia                                  Liam O'Grady
                                                      United States District Judge