1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
               Plaintiffs,     :
                               :
     -vs-                      :    Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
               Defendants.     :
                               :
-------------------------------:
```




STATUS CONFERENCE


November 26, 2019


Before:  Liam O'Grady, USDC Judge




<u>APPEARANCES</u>:


Matthew J. Oppenheim, Scott A. Zebrak, Jeffrey M. Gould, and
Jia Ryu, Counsel for the Plaintiffs

Thomas M. Buchanan, Michael S. Elkin, Jennifer A. Golinveaux,
Thomas P. Lane, Sean R. Anderson, and Cesie C. Alvarez,
Counsel for the Defendants

2

```
1              THE CLERK:  The Court calls case 1:18-cv-950, Sony

2    Music Entertainment, et al., versus Cox Communications, Inc.,

3    et al., for a status conference.

4              May I have the appearances, please, first for the

5    plaintiffs.

6              MR. ZEBRAK:  Good morning, Your Honor.  Scott Zebrak

7    for the plaintiffs of the law firm of Oppenheim + Zebrak, LLP.

8    With me are my colleagues Matthew Oppenheim, Jeffrey Gould, and

9    sitting at the table behind us is Jia Ryu.

10             MR. OPPENHEIM:  Good morning.

11             THE COURT:  All right.  Good morning to each one of

12   you.

13             MR. BUCHANAN:  Good morning, Your Honor.

14   Thomas Buchanan on behalf of the defendant, Cox.  And with me

15   at counsel table are my partners Jennifer Golinveaux,

16   Michael Elkin.

17             And behind me is Tom Lane, Cesie Alvarez, and

18   Sean Anderson.

19             THE COURT:  All right.  Good morning to each one of

20   you.

21             MR. BUCHANAN:  Thank you, Your Honor.

22             THE COURT:  All right.  Well, we've gotten together

23   to discuss final issues before trial next Monday.  I don't have

24   any good news for your Sony executives, there will be no cell

25   phones coming in.  I know that was going to be your first
```

1    question today.

2            You know, I have some questions that -- and I'll be

3    happy to answer any ones that you all have.  But one of my

4    questions is, there's -- I took a quick look at the jury

5    instructions, and there is some dispute as to where the DMCA

6    comes in.  And, obviously, the safe harbor is not a defense.

7    But certainly the Act has application.  And I don't know where

8    -- when Cox says it has no application here, I'm just not sure

9    what that means.

10           So maybe help me out there.

11           MS. GOLINVEAUX:  Good morning, Your Honor.

12           Your Honor, in the first BMG trial you gave an

13   instruction with respect to DMCA at the end of the case.  And

14   then when we were coming to try the second trial, you indicated

15   you would give a similar instruction, but at the beginning of

16   the case and it would be forward looking.

17           And in that -- in that instruction you explained, in

18   a more neutral way than plaintiffs propose, what the DMCA

19   defense is.  And you indicated, but it's not a defense in this

20   case.

21           And what we did is we proposed something slightly

22   different because the DMCA was not asserted as a defense in

23   this case.  It was not litigated.  There are different facts

24   here.  We didn't think that that language was appropriate.  It

25   would be misleading to the jury because it would indicate

4

1    somehow that there had been a determination about DMCA safe

2    harbor.

3            So that's why we worded our proposed instruction the

4    way we did.

5            THE COURT:  Okay.  All right, that helps.  Thank you.

6            MR. OPPENHEIM:  May I speak to the issue?

7            THE COURT:  Yes, sir.

8            MR. OPPENHEIM:  Good morning, Your Honor.

9            THE COURT:  Good morning.

10           MR. OPPENHEIM:  Your Honor, I think this is a fairly

11   critical and fundamental issue.  Cox will likely argue either

12   explicitly or implicitly that ISPs should not be held liable

13   for infringement on their network.  And that even if they don't

14   argue that, the jury may well wonder about that based on the

15   arguments that are put before them.

16           You know, what are we doing here if we're holding an

17   ISP liable for damages?  And in that sense, the jury needs to

18   know that there is a whole statutory regime that is set up that

19   provides ISPs with total protection from liability for damages,

20   money damages.  And that that is not an issue in this case.

21           So that has to be explained to the jury so that they

22   understand they are not deciding the fundamental question of,

23   well, boy, should ISPs be subject to monetary damages for what

24   happens on their network?  They need to understand that the law

25   has a provision for this, but it doesn't apply here.  So that's

1    number one.

2           Two, the instruction that Cox has proffered doesn't

3    even make any sense because the term "DMCA" appears throughout

4    the defendants' documents.  And, frankly, even some of the

5    plaintiffs' documents.  And by saying, basically, that the jury

6    should ignore it, is to tell the jury to ignore important

7    information within those documents.

8           The Cox witnesses testified, you know, that the DMCA

9    is a shorthand reference to the copyright laws.  And the jury

10   is going to need to understand that so that they can understand

11   those documents.

12          THE COURT:  What witness would you be proposing to

13   introduce any evidence about the Act and its parameters?

14          MR. OPPENHEIM:  So there is no question, Your Honor,

15   that the plaintiffs sent their notices based on their

16   understanding of the law.  I mean, it motivated the sending of

17   the notices, both the DMCA law and the underlying contributory

18   law.

19          And so, I expect that there will be potentially

20   multiple witnesses who would speak to that as to why the

21   plaintiffs sent their notices.

22          Now, we don't presume to put somebody up who we're

23   going to ask the Court to opine as an expert on what the law is

24   because that's -- that would be an improper use of an expert,

25   in my opinion.

6

1        So we're not trying, Your Honor, to put a thumb on

2   the scale in our proposed instruction by saying, look, their

3   conduct was so bad that they don't get the benefit of this

4   provision.

5        We haven't suggested anything like that.  We're just

6   trying to explain to the jury what the statutory provision is

7   and it's not available in this case for Cox.

8        THE COURT:  Okay, understood.

9        You may reply if you would.  And, you know, I've

10  allowed the information regarding the CAS because I believe it

11  was relevant because Sony and other plaintiffs signed onto

12  that -- well, MOU or whatever it was.  And also that the study,

13  Friedberg study, was done.

14       But doesn't it all involve the notices, the notices

15  are coming out because of the DMCA, and what Cox did in

16  response to -- even though they are not a signer of the CAS

17  agreement, the whole graduated program, it's all around the

18  DMCA, right?  How do you excise one portion of it and give the

19  jury an understanding of what's going on?

20       MS. GOLINVEAUX:  Well, Your Honor, I think what the

21  plaintiffs are doing is exactly trying to put the thumb on the

22  scale with respect to DMCA.  It was not litigated in this case.

23  Cox responded to notices with its graduated response as it

24  found appropriate.  The DMCA statute explicitly states that

25  qualification for safe harbor does not have any determination

1    on any underlying liability under the common law.

2         So for them to come in with an instruction at the

3    beginning of the case and say, here is what the safe harbor was

4    out there and here is what it required and, by the way, Cox

5    does not qualify for it, is inappropriate when the defense has

6    not been litigated in this case.

7         And it's a separate issue from CAS, Your Honor.  CAS

8    was an agreement where the plaintiffs worked out what they felt

9    was important with the other major ISPs in an agreement they

10   reached and is separate and apart from the DMCA.

11        THE COURT:  Well, the safe harbor provision has been

12   litigated and it was litigated in BMG.  And Cox was found not

13   to have the ability to use it.  And I realize that, you know,

14   the Rightscorp/Cox negotiations, which ended with them not

15   receiving notices, is factually different, and that's why I

16   made some rulings that I made pretrial.  It's a different case.

17        But as far as Cox and the safe harbor provisions, I

18   am not so sure that's not an estoppel issue.

19        MS. GOLINVEAUX:  Well, Your Honor, it really is a

20   different set of facts, as you have indicated.  Here there is

21   going to be no dispute under the evidence that Cox processed

22   all of plaintiffs' notices under its graduated response.

23        Defendants will also put on evidence that it

24   terminated more than 30 subscribers during the claims period,

25   and 13 of those subscribers specifically who had received the

8

1    plaintiffs' notices.

2           So you really have a different set of facts even with

3    respect to the safe harbor qualifications in this case.

4           THE COURT:  All right.  Mr. Oppenheim.

5           MR. OPPENHEIM:  I am madly leafing through your

6    summary judgment opinion in the BMG case, and I'm having

7    trouble finding precisely what I was looking for.  But you

8    wrote, in finding that Cox didn't get the benefit of the safe

9    harbor, that that wasn't just limited to Rightscorp notices.

10          And that's the point, Your Honor.  To get up and say,

11   well, we didn't litigate it, you know, we didn't assert the

12   defense, because they knew as a legal matter that had they, it

13   would have been frivolous.  The Court had already opined on it.

14   And as a matter of law of collateral estoppel, they can't

15   assert that defense.

16          So for them to make that argument is disingenuous,

17   Your Honor.

18          Your Honor, we're not attempting to use DMCA to

19   bootstrap our way to liability in any way.  And our

20   instruction, if you read it, doesn't try to do that at all.  We

21   really did try to articulate exactly what the law is.  Why

22   would we blind the jury into understanding the legal regime

23   that they're deciding this case within?  And that's the

24   question.

25          And there is no doubt that when Cox argues their

1    case, they're going to say over and over and over again,

2    they're going to ask witnesses questions and make arguments

3    about, you know, an ISP cutting off their users and, you know,

4    what an ISP should do and what they should be held liable for

5    doing.

6         And this jury needs to know, they can escape all of

7    that liability if they just -- all they have to do is fulfill a

8    relatively easy provision with the DMCA that they didn't

9    fulfill.

10        And so, the jury really should understand the

11   permutation of what they're dealing with.

12        THE COURT:  Okay.  All right.  Well, I will look at

13   the instructions further.  I think that Cox is estopped from

14   asserting the safe harbor provision and some instruction is

15   appropriate, but I'll look a little further at it.

16        So the next issue I would like to address is that the

17   District of Columbia did something timely and transferred the

18   RIAA subpoena duces tecum to the EDVA.  And I don't know

19   whether there is -- that you want to pursue this before Judge

20   Anderson, but I wanted to bring up the fact that it had been

21   transferred and that it's before the Court.

22        Mr. Buchanan.

23        MR. BUCHANAN:  Yes, Your Honor.  I think you are

24   being generous on suggesting that the District of Columbia

25   acted quickly.  That has been there for sometime.

1          We actually finally sent a letter -- I believe the
2    plaintiffs indicated that they were willing to transfer it.  We
3    filed it there because we thought there was jurisdiction just
4    there.  But then there was a provision that allows the opposing
5    party to say, look, we'll transfer it.  So they did it here.

6          And so, we've subpoenaed these records, and we think
7    they're relevant to our case.  These are reports that were
8    going to the RIAA with regard, I believe, to CAS and notice of
9    infringement and responses.  And we never really got a response
10   from the RIAA whether they have these documents.  They have
11   just opposed producing them.

12         And so, we think they are relevant.  CAS is relevant.
13   Responses to e-mails both by Cox subscribers -- there is a
14   whole system set up whereby the ISPs that were part of CAS
15   would send information to the copyright information center that
16   was sort of managing the process.  There were notices that were
17   supposed to go to MarkMonitor and the information that was
18   supposed to go to the RIAA.  And that is all relevant as to
19   what subscribers were saying and responding to notices to
20   indicate, you know, hey, I got one notice, two or three.

21         Well, they're saying, look, my grandkids did this, I
22   just came up.  How do I deal with it?  I have got open Wi-Fi.
23   You know, I've got problems with the router.  And we have like
24   1,700 e-mails along those lines.

25         But a lot of this information was supposed to be sent

11

```
1    to the RIAA as part of their agreements through CAS.  And so,

2    we think that is very relevant.  Because their idea is to

3    terminate at one, two, three, four, or five.  Well, that means

4    these people knew exactly what they were doing when it happened

5    and they should be cut off, their lifeline.

6              And what this shows is, hey, the idea of educating

7    them and finding out what's going on and acting on a gradual

8    response way is very relevant.  And that's what CAS was.  They

9    had one a week and then they had -- that's a notice, one per

10   week, and they had caps, and they had six notices.  So that

11   would be six weeks of notices and still no requirement to

12   terminate.

13             But within that there was information that was

14   supposed to be sent back to the RIAA about what was happening.

15             THE COURT:  Well, Cox wasn't a signatory of CAS,

16   right?

17             MR. BUCHANAN:  No, we were not.  We considered it and

18   we did not pursue it.  And because of the fact we thought our

19   system was, instead of less tolerant, as their experts seem to

20   suggest without considering CAS, it was more restrictive.

21             And as the evidence will show, by the third or fourth

22   notice 80 percent of the people that received an RIAA notice

23   never got another one.

24             THE COURT:  And was this not litigated before

25   Judge Anderson when he --
```

12

1          MR. BUCHANAN:  It was not.  As I said, Your Honor, we

2   filed it in D.C. because that's where the RIAA is.  And this is

3   a third-party issue.  So we did not believe that Judge

4   Anderson --

5          THE COURT:  I know the subpoena wasn't litigated in

6   front of him, but was the issue of the discovery, whether it

7   was relevant and should be produced separately --

8          MR. BUCHANAN:  There were some decisions, but we

9   don't believe that this specific group of documents was covered

10  by any prior ruling.

11         THE COURT:  Okay.

12         MR. BUCHANAN:  I know they're suggesting it was, but

13  we think it was separate and distinct.

14         THE COURT:  Do you want to respond, Mr. Gould?

15         MR. GOULD:  Thank you, Your Honor.

16         We really need to level set the history here to talk

17  about how this lands on your desk on the eve of trial.  And it

18  goes back to January 2018 when Cox served a subpoena on RIAA.

19  RIAA responded in writing, produced documents, exchanged

20  letters and phone calls on conferrals.  Nine months passed and

21  ten months passed, and here we are today.

22         The RIAA sat for a deposition in June.  More time

23  passed.

24         In January Cox filed a very large omnibus motion to

25  compel before Judge Anderson seeking all things under the sun

13

1   related to CAS.  And Judge Anderson reviewed that in great

2   detail and sliced very thinly what he believed was appropriate

3   and relevant for production under CAS.  And we produced that.

4   And Cox took discovery on that.

5          More months passed, more silence as to this category

6   of documents they want from the RIAA.

7          Discovery closed on July 2 after seven months, which,

8   as you know, is considerably longer than the norm in this

9   court.  During that time the parties sought an additional

10  enlargement from the prior enlargement.  And Judge Anderson

11  made very clear that no further enlargements of discovery shall

12  be had -- shall be had.

13         Discovery closed on July 2.  Still no word or mention

14  of this issue from Cox.  Six more weeks passed.  The pretrial,

15  final pretrial conference passed.  And six weeks after the

16  close of discovery in late August Cox filed a motion to compel

17  RIAA in the District of Columbia with no mention of this to

18  plaintiffs.  This was surprising to us to say the least.

19         We then asked Cox if they would consent to transfer

20  to this Court for quick resolution before Judge Anderson who,

21  we explained to them, had already addressed this issue.

22         Cox declined that transfer.  And the reason was

23  clear, they were forum shopping for a different ruling from a

24  different court without the benefit of context of the entire

25  case and the closely related case that had preceded here four

14

1    years before that.

2            What happens?  We filed an opposition explaining that

3    the motion should be denied on multiple grounds, it was

4    untimely, Judge Anderson had already ruled on it, and on the

5    merits.  And we moved in the alternative for transfer to this

6    venue because we believed Judge Anderson or yourself would be

7    best equipped to unpack this lengthy and detailed history,

8    including the prior rulings and the impact of those.

9            Then the papers sat quietly at the District of

10   Columbia for sometime and have recently found their way back to

11   this Court.  We believe, Your Honor, that this is completely

12   out of bounds and improper to be pursuing at this point.  We

13   explained in the papers why it's untimely, why it's been ruled

14   on already, and why, even if that's not the case, the motion is

15   improper on its merits.

16           We're happy to argue further.  I think you understand

17   the position.  If you have any questions -- I'm sorry, the

18   subpoena was January 2019, my colleague corrected me.  I

19   misspoke 2018.

20           THE COURT:  Thank you.

21           MR. GOULD:  If there are any further questions --

22           THE COURT:  All right.  Thank you, sir.

23           Mr. Buchanan.

24           MR. BUCHANAN:  Your Honor, so with regard to

25   Judge Anderson's ruling on CAS, we did have a lengthy request.

15

1    And what he ruled was that we could get the memorandum of

2    understandings and the implementation agreements.  And he did

3    not -- we did not know until we got these other documents that

4    there was actually this internal policy and process by which

5    notices would be received and responses from subscribers once

6    those notices had been forwarded by e-mail by the members of

7    CAS, that they were supposed to respond and data would be

8    collected.  So there was no way we could anticipate that that

9    evidence would be there.

10          And so, the RIAA is in D.C.  We went there and we

11   pursued it there.  And the judge just didn't move on it until

12   we wrote a letter recently asking him, saying there is a trial

13   coming up, could we get a ruling.  And then, and then he sent

14   it.  Otherwise it would have never been ruled on.

15          So, you know, it was after the end of discovery, but

16   that was because we were still negotiating and talking with

17   them about getting these documents.

18          And so, when they finally said that was it -- because

19   they did produce some things -- then we filed the motion --

20   rather the -- yes, the motion in D.C.

21          So it's clearly, I think, relevant to this case.  It

22   wouldn't be that hard for them to produce it.  And it is

23   consistent with what they were doing with CAS.

24          THE COURT:  All right.  Well, you know, with the

25   marginal relevance given the fact that you are not a signatory,

16

1   but more importantly it is way outside of discovery and the

2   close of discovery, and I understand it is a subpoena duces

3   tecum to a party at the location of a party, which is proper,

4   but this needed to go through Judge Anderson.

5          And if Cox was going to attempt to get this

6   additional discovery and -- it's unfortunate it wasn't timely

7   supplied so that it could have been presented to Judge Anderson

8   and that you could have had the opportunity -- but discovery

9   closed in July.  The parties have been working towards

10  resolution and trial in this case for months with all the

11  motions that have been filed.  And it's clearly too late and

12  prejudicial.

13         And I am going to not allow the -- I am going to

14  quash the subpoena at this time.

15         All right.  From Cox, I'm interested in whether you

16  have evidence of the knowledge by your -- the group at Cox

17  about the graduated response program and its effectiveness,

18  which is timely and makes relevant the testimony of Weber at

19  least.  And I -- because, you know, BMG didn't really deal with

20  Sony.

21         What witnesses do you expect to have?  I'm looking

22  for just an overview that there is relevance to putting an

23  expert on to say, I've gone through every one of these notices

24  and this is what they say, and it's relevant because Cox

25  employees were following and tracking that data

1   contemporaneously.

2           MR. ELKIN:  Sure.  Good morning, Your Honor.

3           THE COURT:  Good morning.

4           MR. ELKIN:  I want to just comment, if I can, when I

5   sort of finish responding to Your Honor's question, about

6   something I think that Your Honor mentioned a few minutes ago

7   so that there is no surprise with regard to certain evidence as

8   it relates to the MOU.

9           But in response to your question, we will have the

10  testimony of a number of Cox witnesses, including

11  Matt Carothers and Brent Beck.  I believe both of them are

12  expected to be called as hostile witnesses to support

13  plaintiffs' case in chief.

14          There are other witnesses that have -- that will

15  testify with regard to, for Cox, Linda Trickey, which is a

16  subject of discussion that I think plaintiffs will want to

17  bring up as they wish to now call her in support of their case

18  in chief, something that we have an issue about in terms of

19  logistics.

20          And there may be -- and there is some testimony --

21  although Your Honor did strike Mr. Cadenhead's PowerPoint

22  slide, there is testimony in his videotape deposition that we

23  also believe would provide a predicate for Weber's opinions.

24          One thing I did want to mention, Your Honor, just

25  because I don't want there to be any surprises, in the MOU

18

1    itself it is very clear, and the witness testimony in the case

2    that we've taken, the third-party witness testimony bears this

3    out, there were indeed specific explicit references in the MOU

4    to the DMCA.  And, specifically, that the DMCA, in terms of the

5    repeat infringer policies and the parties' respective rights,

6    were unaffected, explicitly unaffected.  And this is borne out

7    in the testimony itself.

8            So our position, not to say that it's going to have

9    any bearing on Your Honor's decision on the opening

10   instruction, but to the extent that Your Honor's decision

11   hinges on the extent to which the MOU encompasses or envisages

12   this notion to DMCA, it explicitly says it doesn't apply.

13           THE COURT:  Okay.

14           MR. ELKIN:  Thank you, Your Honor.

15           THE COURT:  Thank you.  Mr. Oppenheim.

16           MR. OPPENHEIM:  So the issue you have raised, Your

17   Honor, with respect to Weber is actually an issue we wanted to

18   raise.  Actually, it -- there are a couple of different pieces

19   to it, if I may.

20           So, first off, the Court ruled on the 96 percent

21   study after thorough briefing and argument.  And I want to make

22   sure we understand that Dr. Weber can't get up and testify as

23   to the 96 percent study.  I assume that's the case.

24           THE COURT:  He can't use that document as his

25   evidence.  If Weber has gone through every notice and

1    separately looked at the numbers of notices or tickets and gone

2    through that, then, you know, that was not precluded by my

3    ruling.

4         MR. OPPENHEIM:  Right.  She, she can testify, that we

5    understand from your ruling, on any analysis she has done.

6         THE COURT:  Correct.

7         MR. OPPENHEIM:  But she can't corroborate her

8    conclusions by pointing to the 96 percent study, which is what

9    she does in her opinion.

10        THE COURT:  She cannot.

11        MR. OPPENHEIM:  The second thing that Dr. Weber does

12   is she relies on 20 hand-picked e-mails from Cox subscribers.

13   So there was a motion in limine -- this is the intersection of

14   the Daubert motion and the motion in limine.

15        There was a motion in limine on the Cox subscribers'

16   e-mails.  And if I understand the Court's ruling, the Court

17   said, to the extent that Cox can lay a foundation on those

18   e-mails, they can admit them for the very limited purpose of

19   speaking to what Cox's state of mind was at the time based on

20   those e-mails.

21        But they certainly can't admit them, as I

22   understand -- and you didn't say this, Your Honor, but this is

23   how I read your opinion -- for purposes of saying, this Cox

24   subscriber said they were -- they hadn't done it, so they

25   didn't do it.  And so, here, jury, you should see, this

20

1    infringement didn't occur.

2          That's how I --

3          THE COURT:  Well, they were not admitted for the

4    truth of them.  They are admitted as notice that Cox had

5    information from customers saying, hey, you know, the system is

6    obviously not perfect.  So I think it was permissible for the

7    notice to Cox.

8          MR. OPPENHEIM:  To the extent that Cox has anybody

9    who can testify that they read them at the time, we understand

10   they can come in for that very limited purpose.

11          Dr. Weber relies on a hand-picked 20 of those e-mails

12   to opine that many of Cox's subscribers are innocent or

13   well-intentioned.  And she says she has a background in doing

14   consumer behavior studies.  And so, based on that background,

15   she can read these e-mails and determine that, in fact, some of

16   these subscribers are innocent and well-intentioned.  And,

17   therefore, it would be punitive, and these are her words,

18   punitive to terminate Cox subscribers with only a handful of

19   notices.

20          And as -- she is relying on the very thing I

21   understand as a matter of hearsay Your Honor has said is not

22   admissible.  So, I guess I'm looking for a little clarification

23   that she can't opine on that.

24          THE COURT:  Understood.

25          MR. OPPENHEIM:  Okay.  So I know I have not gotten to

21

1    your issue yet, which I will get to next.

2              And so, then I believe that the question you asked,

3    Your Honor, was what evidence of knowledge of the effectiveness

4    of graduated response will be coming in and through whom.

5    Well, this is a little troubling.  I mean, in discovery we very

6    clearly asked for all studies.  The only --

7              THE COURT:  I wasn't asking for studies.  I was

8    asking for evidence that Cox was intending to put on that

9    somebody contemporaneously understood from the responses to the

10   graduated response program that their customers were being

11   educated and that after three or five notices, that they

12   stopped coming up in their database.  Right?

13             MR. OPPENHEIM:  We're concerned, Your Honor, that Cox

14   is going to put its witnesses up to testify to something for

15   which they have zero foundation.  Because the only foundation

16   they could have had was this 96 percent study.

17             So Mr. Carothers was asked in his deposition -- I

18   don't have it in front of me at the moment, but we can provide

19   it, Your Honor -- but Mr. Carothers was asked in his deposition

20   the basis for his conclusion that the program -- that graduated

21   response was effective at stopping infringement.  And he

22   pointed to the 96 percent study.

23             Now, he indicated that he had only seen that in his

24   deposition preparation.  So he certainly didn't know it at the

25   time.

1    So the idea that Mr. Carothers is going to take the

2  stand and say, well, he believed that graduated response was

3  effective, there is no foundation for it.  They would have had

4  to have produced something in discovery to show it.

5    Now, the problem is, if I ask the question, well,

6  Mr. Carothers, you're not aware of any studies, he'll then

7  refer to the very study that the Court has excluded, I presume.

8  And I don't want to open that door.

9    THE COURT:  Well, he should be educated not to do

10  that before.  But -- so, you know, on the last day of discovery

11  you got the e-mail from Beck that listed numbers of

12  infringement notices, and the fact that they are going down.

13  And that came from somewhere.

14    And really my question is, was somebody paying

15  attention to those numbers in trying to determine whether their

16  program was effective in a timely fashion?  And that was what I

17  was trying to get at.

18    Because Weber's testimony is not relevant if Cox had

19  no idea whether their graduated response program was effective

20  or not.  And so, that's what I'm trying to get at.

21    MR. OPPENHEIM:  Your Honor, I completely agree.

22  Weber can analyze today what happened then all she wants, but

23  they did no analysis then.  And they can have their witnesses

24  get up and say, without any support whatsoever, oh, we thought

25  it was effective, but they have no basis for saying that.

23

1           And so, Weber shouldn't come in to retroactively try

2     to give credibility to that testimony.  Which, frankly,

3     shouldn't be permitted because there is no foundation for it.

4           THE COURT:  Well, that's why we have trials is -- and

5     that's why there is cross-examination.  And I understand.  And

6     that's why I'm asking the question.  And I am getting two

7     different answers.

8           And, clearly, if there is no foundation for Weber's

9     testimony, it doesn't come in.  But I don't have -- the genie

10    is in the bottle.  You know, I have got to -- we have to wait

11    to hear the evidence.  So if somebody testifies and they have

12    no basis, you move the strike the testimony, and I will rule on

13    it when that occurs.

14          MR. OPPENHEIM:  And just so I'm clear here, and I

15    apologize if --

16          THE COURT:  No, I understand.

17          MR. OPPENHEIM:  -- I am being a little slow on this.

18          THE COURT:  Yes.

19          MR. OPPENHEIM:  I am allowed to ask the witness, you

20    have no studies, you conducted no studies to confirm this at

21    the time, and they are not allowed to refer to the 96 percent

22    study?

23          THE COURT:  The 96 has been struck.  Well, you know,

24    is it Carothers?  Is Carothers -- you expect him to say,

25    whether its accurate or not, I relied on the 96 percent study?

24

```
1    Is that what you think he's going to say?

2              MR. OPPENHEIM:  I don't know what he's going to say,

3    Your Honor.  In his deposition he said he wasn't aware of it

4    until he prepared for his deposition.

5              So he certainly at the time didn't know.  So it

6    should be out on that basis alone.

7              THE COURT:  Certainly, he can't testify -- that's

8    not -- that's hindsight, and it's completely irrelevant what he

9    learned at the time of his deposition.  And if there is an

10   objection to the question, it will be sustained.

11             MR. OPPENHEIM:  Very well, Your Honor.

12             Would you like me -- the issue of Ms. Trickey was

13   raised.  I'll put a pin in that and come back to it if

14   Mr. Elkin wants to respond.

15             THE COURT:  Yeah, why don't we hear about the -- the

16   hand-selected customer responses, I guess, that Ms. Weber would

17   testify to.

18             MR. BUCHANAN:  So, Your Honor, in every notice of

19   copyright infringement that came into Cox that was forwarded to

20   a subscriber, there is a reference there to -- not to contact

21   necessarily Cox, but to go to the RIAA or to MarkMonitor, and

22   there is a phone number.

23             And tried to -- we got some of that data from

24   MarkMonitor, but it was very limited, they didn't keep a lot of

25   it.  But we did get a lot of e-mails back from Cox subscribers
```

1    because they, I guess, were hesitant to go outside the system.

2            And then Weber looked at those.  And she is a

3    behavioral expert.  And she looked at those in consideration

4    with her other data to determine, you know, okay, what are the

5    reasons that people are stopping?  And what this reflects is

6    those people's state of mind, the reasons they're giving.  And

7    she did not just pick the best 20.  She has reviewed all 1,700,

8    and she has a chart in terms of what they all reflect.

9            For her deposition at that time, she randomly picked

10   20, I think she testified to that.  And those 20 indicated

11   various things.

12           But I should point out that the CCI did something

13   similar before they established CAS.  They did a study, and I

14   think this will come into evidence, where they went out on

15   behalf of the plaintiffs and others to try to determine, you

16   know, what is a good way to stop copyright infringement.

17           And several of their witnesses, their corporate

18   representatives, all say gradual response systems.  That's what

19   we were trying to push, because that's what we believed from

20   our internal study, and CCI did a thorough study, that people

21   that get five or six are innocent infringers.

22           So that -- there is a whole industry thinking going

23   on that Cox was a part of about, you know, what was a good

24   gradual response?  What's the point?  Why do you not send the

25   first one?

26

1          Because we have anecdotal evidence that people are

2    dropping off based on e-mails.  Mr. Beck will testify about

3    that, and others will testify about these e-mails that they got

4    at their desk in response, and they reviewed them and they

5    talked to people.

6          And that's the whole part of the gradual response

7    system, so they can authenticate those as something that were

8    coming in at the time.  And the phone calls were similar.

9          And all this reflects is -- so they can be

10   authenticated, there is a foundation.  And they are relevant

11   because they show, you know, what Cox believes is happening and

12   why Cox believes a gradual response is working.  And that all

13   these people aren't just out there intentionally infringing.

14   Which is the same thing that the plaintiffs found through the

15   CCI and their study.

16          And that's why there is the run-off.

17          THE COURT:  Okay.  Thank you.

18          MR. OPPENHEIM:  Your Honor, that raised so many

19   issues for me, it's hard to even know where to start.

20          First off, the idea that Dr. Weber -- now she is a

21   behavioral expert.  Before she was a statistician.  Then she

22   was a consumer survey person.  And she did this -- she has

23   apparently expertise in anything you need.

24          Putting that aside for the moment.  The fact that

25   she -- the idea that she has now done a complete review of

1    1,700 e-mails, has some chart, is going to testify on that,

2    when that wasn't in her report, she hadn't done it at the time

3    of her deposition, to me that shouldn't be permitted.  That's

4    all new.

5            I don't know why Dr. Weber is allowed to appear in

6    the first instance, but the idea that she gets to come on new

7    studies is totally out of bounds.  That's number one.

8            Two, what Mr. Buchanan just described is exactly why

9    we think CAS and these e-mails need to be out.  I mean, we're

10   just exploding the contours of this case.  The idea that

11   they're going to bring in a study done in relation to CAS,

12   which is an entirely different program, and they are going to

13   use that to bootstrap what they were doing, right, and suggest

14   that there were innocent infringers at Cox -- the very -- you

15   already ruled that the e-mails shouldn't come in for that

16   purpose, but that's exactly what they are trying to do.

17           That kind of testimony should not be permissible,

18   Your Honor.  This trial -- you know, let's go through

19   mid-January then, because we're going to explode this thing

20   beyond any ability to have any structure on it.

21           THE COURT:  Well, I ruled the way I did because I

22   thought that the jury was entitled to know that the ISPs and

23   the music industry were working -- in an attempt to work

24   together to stop infringing.

25           And although Cox didn't sign onto it, that some of

28

1    the plaintiffs signed onto it.  That it doesn't talk about

2    termination.  And because I'm sure you have witnesses who are

3    going to identify the fact that ISPs weren't interested in

4    talking about termination, or at least I assume that's the

5    case.

6            But it has some -- it has some relevance.  You know,

7    there -- you have talked about the context and the DMCA, the

8    jury needing context, and I think that this is fair context as

9    well.

10           MR. OPPENHEIM:  Just by way of background.  So CAS

11   did not relieve those ISPs of their legal obligations under the

12   copyright laws.

13           THE COURT:  Correct.

14           MR. OPPENHEIM:  And that's what the witnesses will

15   testify to.  And so, notion that you're going to compare what

16   was in an educational program in CAS to what the legal

17   obligations of Cox were is apples and oranges and is intended

18   to confuse the jury.  It is intended to try to get the jury to

19   say, well, in this educational program, six notices was okay.

20   So obviously the graduated response process that Cox had was

21   okay because graduated response was good here, it should be

22   good here.

23           But it's apples and oranges.  And it will confuse the

24   jury, there is no doubt it will confuse the jury.  And now when

25   we bring it to the level of now we're going to admit studies

29

1    that talk about innocent infringers that they're going to use

2    to bootstrap e-mails that are coming in that their witnesses

3    are going to testify, our subscribers weren't infringing --

4    what I would like to go back to, Your Honor, is your opinion in

5    the BMG case on the safe harbor.

6            And this goes to the collateral estoppel issue that

7    Your Honor reserved on.  They intend to put forward evidence

8    that is entirely contrary to this Court's findings in that

9    litigated case.  Their witnesses exchanged e-mails that said

10   99 percent of this activity is purposeful.  And now they want

11   to put on evidence that says just to the contrary.  So --

12           THE COURT:  Well, isn't that what -- to the extent

13   they have evidence that the opposite was true, that other

14   people were getting other information, that's also relevant.

15   And I don't know what that evidence is going to be.  I don't

16   know the evidence as well as you all do.

17           But certainly they can be cross-examined on it.  But,

18   you know, to the extent they have that kind of evidence -- now,

19   Dr. Weber, I'm not sure she is a doctor, whatever, but she is

20   not going to testify about anything that wasn't in her report

21   and was generated after her report and deposition.  That is not

22   going to be permitted.  That will be excluded.

23           So I don't know what -- anything about where the line

24   should be drawn.  But certainly Cox needs to be on notice

25   that -- and so are you, that your experts are limited to the

1    reports that they provided.  And to the extent that there is a

2    demonstrative that covers testimony, those will be permitted.

3    But not newly-generated evidence outside of that time frame.

4            And, you know, the customers' responses that have

5    been selected, that will be something that we'll address as the

6    trial goes on.

7            MR. OPPENHEIM:  The 20 that she relied on --

8            THE COURT:  The 20 that she relied on.

9            MR. OPPENHEIM:  -- to conclude --

10           THE COURT:  I'll need to understand the context, and

11   we'll need to do that before she takes the stand.

12           MR. OPPENHEIM:  Okay, Your Honor.  Very well.

13           Oh, the issue of Ms. Trickey --

14           MR. ELKIN:  Can I --

15           THE COURT:  Yeah, go ahead, Mr. Elkin.  Why don't we

16   let Mr. Elkin respond.

17           MR. ELKIN:  We all may have lost the thread because

18   it had to do with 15 minutes ago, but I just wanted to comment

19   with regard to the -- to the witnesses.

20           First of all, of course we read Your Honor's

21   decision.  We are not going to elicit testimony related to that

22   Cadenhead slide.

23           But the question -- there were questions in their

24   depositions that went outside of studies.  The witnesses all

25   testified -- in fact, Mr. Zabek and Mr. Sikes were questioned

31

1    for seven hours about these very issues.  And that testimony is

2    going to come in by video as well.

3            So there is ample testimony from Mr. Vredenburg, who

4    will be here, on all the safety -- these folks lived --

5    whatever you want to think about these gentlemen and whatever

6    intemperate remarks they made in their e-mails, they lived and

7    breathed this customer notification set of issues.

8            So I just wanted to say, while there is no specific

9    study, and Your Honor ruled the way it ruled, there will be a

10   lot of customer information evidence that will be put forth

11   here.

12           THE COURT:  Okay.

13           MR. ELKIN:  Thank you, Your Honor.

14           THE COURT:  All right, thank you.

15           MR. BUCHANAN:  Your Honor, could I just spend one

16   second on the -- just so the Court is aware of the 1,700

17   e-mails.  We produced those.  She referenced those in her

18   report.  She just took 20, okay, and just -- and they

19   cross-examined her about those.

20           THE COURT:  Twenty.

21           MR. BUCHANAN:  So those were -- those were reflective

22   of the total.  She randomly -- and so, the idea that somehow

23   they are being surprised, they had all those.  They could have

24   showed them all to her.

25           And so, the fact that she might now, you know, is

32

1  going to have a chart that says, here is what they sort of

2  reflect, it reflects the 20 as well, but it goes for the entire

3  amount.  So it's not -- I just want to emphasize, there is no

4  surprise here.

5          THE COURT:  Okay.  Thank you.

6          MR. OPPENHEIM:  Just for the record, Your Honor, that

7  couldn't be further from the truth.  I mean, she came to

8  certain conclusions and opinions in her report.  I asked her

9  about them in her deposition.  She relied on 20 e-mails that

10  she attached to her report.  She made no reference to the other

11  ones.

12          If she has now bucketized 1,700 e-mails in some

13  analysis that she has done, we've never seen it.

14          THE COURT:  All right.  Well, then prepare something

15  in writing before she is going to take the stand and let's not

16  reference the specific study until I make a ruling on it after

17  I've gotten that information.

18          All right.  Other than pedestrian matters like how

19  much time do you want for opening statements, that's pretty

20  much all I had this morning.

21          MR. OPPENHEIM:  Maybe I could start by addressing the

22  Trickey, Linda Trickey issue that was foreshadowed.

23          THE COURT:  And Delgado, if you haven't resolved

24  Delgado.

25          MR. OPPENHEIM:  Well, with respect to Ms. Trickey --

33

1            THE COURT:  Trickey, go ahead.

2            MR. OPPENHEIM:  We would like to call her in our case

3   in chief.  She was a 30(b)(6) designee by Cox on various topics

4   associated with the graduated response program, Cox's policies

5   and procedures.  And we have asked Cox to produce her and are

6   prepared to, of course, honor the Court's indication that Cox

7   should then be permitted to either examine her then in our case

8   or wait until later.  That's fine with us.

9            Cox has indicated that because we only moved with

10  respect to Messrs. Carothers and Beck, that we can't ask for

11  Ms. Trickey now.  And it is true, we did not include her in the

12  motion, but, you know, preparing for a trial is a dynamic thing

13  and we now realize that our presentation to the case to the

14  jury will make a lot more sense if her testimony is presented

15  up front.

16            And so, we would ask that since she's going to

17  testify anyway, that she be permitted -- we be permitted to

18  call her in our case in chief.

19            THE COURT:  All right.  Mr. Buchanan.

20            MR. BUCHANAN:  There is a little more to that, Your

21  Honor.  Is that we gave them a reason why she wasn't available

22  that first week for their case.  And that's because she's the

23  expert in security matters for Cox from a legal perspective.

24  There was a recent statute, law passed in California, consumer

25  law that is very substantive and significant.  And she has been

34

1    assigned to analyze this company wide and make presentations.

2            So they did not list her as a will call witness.

3    They listed her as may call.  They didn't make her part of

4    their motion.  We understand the Court's order, but she now has

5    taken on these assignments for that first week at least.

6    However, she will be here.  And we've told them that we'll let

7    you leave your case open and then you can do your examination

8    of her outside the scope of direct, if you need be, and in our

9    case.

10           But this particular witness has now taken on work

11   that is very important to the company, and her schedule doesn't

12   allow her to come up in their case.

13           Now, if the Court orders her, then obviously that's

14   that, but I think there should be an accommodation.  We are

15   bringing Carothers and Beck.  We are basically having to shift

16   like all of our witnesses into their case.  We only have like

17   two fact witnesses now in our case.  It's going to be very

18   awkward to the jury, I think.

19           And so, this particular witness is not crucial to

20   their case.  She is a lawyer.  But we've had said, look, we'll

21   bring her up, and you just do her in our case so that she can

22   cover the work that the company has asked her to do and that

23   she signed up to do some time ago.

24           THE COURT:  All right.  Thank you.

25           Mr. Oppenheim.

1          MR. OPPENHEIM:  Mr. Buchanan is correct.  They did

2     tell us that she had some work obligations.  They didn't

3     describe what he just described, which I've been involved in

4     briefing companies on pending legislation, there is rarely a

5     burning moment in that.  That's the way legislatures tend to

6     act these days.

7          And what they did say is that if the Court ordered

8     her, she would be here.  And we believe that it will allow for

9     a much cleaner presentation to the jury of the issues.

10         THE COURT:  Well, is her testimony cumulative?  What

11    is -- how many witnesses are you going to have talking about

12    Cox's graduated response program?

13         MR. OPPENHEIM:  We're trying -- well, that's one of

14    the reasons we wanted to call her in our case, is to be able to

15    get through with her an issue that we then won't have to deal

16    with with other issues, that she was the designee in the

17    30(b)(6).

18         And so, we are trying -- if we can't call her in our

19    case and we haven't set a framework for the jury on some of the

20    background issues that she was the witness on, then we have to

21    try to do that with another witness where they weren't the

22    witness who necessarily provided the testimony in the 30(b)(6)

23    deposition.  And then we do have a cumulative issue.

24         THE COURT:  Well, do these other witnesses have

25    personal knowledge of what Ms. Trickey testified to?

36

1          MR. OPPENHEIM:  I hope so, but we don't know for a

2   certainty and don't know how resistant they will be to

3   providing that testimony.

4          So what we are trying to do, Your Honor, is in light

5   of all your rulings is to hone our case and put a presentation

6   together that isn't repetitive with the witnesses.  And our

7   presentation would have Ms. Trickey as the first of the Cox

8   witnesses we would call to lay the background on the things she

9   testified to.

10          THE COURT:  All right.  Then she will be required to

11   appear for the plaintiffs' case in chief.  And hopefully she

12   can work from the East Coast when she is not in the interim

13   period of time.

14          All right.  Is Delgado still a witness?  And if so,

15   is there --

16          MR. BUCHANAN:  That's not an issue, Your Honor.

17          THE COURT:  Okay.

18          MR. GOULD:  Just for clarification, ask for a

19   clarification.  I take that to mean you're not planning to

20   present him at trial?

21          MR. BUCHANAN:  No, Your Honor.

22          THE COURT:  Okay.

23          MR. GOULD:  Thank you.

24          THE COURT:  All right.  Then what else do we have

25   this morning?

37

1          MR. OPPENHEIM:  I believe the remaining issues, Your

2   Honor, are pedestrian, as you said, but important.

3          THE COURT:  Yes.

4          MR. OPPENHEIM:  So the first being the -- obviously

5   and critical, is the length of the trial.

6          On that issue, Your Honor, the BMG case went for ten

7   days.  They had just one plaintiff.  And for them, their

8   notices were thrown away, essentially.

9          We have six plaintiffs, plaintiff groups.  And we

10  have to -- we need to have at least one witness from each of

11  the plaintiff groups, and we have to explain what happened to

12  the notices.

13         We are cutting to the core.  We believe that we can

14  do it within six days.  We were at seven, we are now at six.  I

15  know Your Honor wanted four.  And, believe me, with the

16  holidays upon us, we would love to do that and we're trying,

17  but I just don't see how we can get below six.

18         We did discuss this with the Cox folks.  They said

19  that they were prepared to live with four.  And we've tried, we

20  just don't see how we can do that, Your Honor.

21         So with that -- I mean, we will cut as the trial goes

22  as much as possible.  But from what I'm hearing today, it's

23  actually making me worry that even six will be worrisome just

24  because if we're going to be getting into things like CCI

25  studies and we're to go through 1,700 user e-mails -- I just

38

1    don't know where this trial is going to go.

2              And I don't want to be in a position where we use

3    most of our time putting our direct case on and we can't cross

4    on all of this other stuff that goes forward.

5              THE COURT:  Okay.  Mr. Buchanan.

6              MR. BUCHANAN:  We are happy to go with four.  We can

7    put our case on in four.  The plaintiffs elected to come here,

8    not to go to Atlanta, so they knew that in a case of this size,

9    that's typically -- it's four days of trial.  They decided to

10   front-load their case with all of our witnesses.  That's their

11   choice, the Court has allowed them.

12             And so, we don't think the case should go longer than

13   that.  The jury would get lost along the way.

14             This notion of 1,700 e-mails, whether the Court

15   allows that or not, that's like five minutes of testimony.

16   There were 1,700 e-mails, and I have done a chart, assuming the

17   Court allows that, that is not delaying the case.

18             The CCI study is like five minutes of a reference to

19   this study that talks about innocent infringement.  Those are

20   red herrings.

21             So we believe the case can be done in four days, and

22   it should be.  They elected to come here.  They elected not to

23   go to Atlanta.  They elected to put their case on through --

24   all our witnesses through their case.  So I think that's how it

25   should work.

39

```
 1              THE COURT:  All right, thank you.

 2              Well, you know, it's the plaintiffs' burden to prove

 3   their case, and it's not unusual for a plaintiffs' case to

 4   require more time than a defendants' case, but I'll have to see

 5   how this is going.

 6              You know, the -- rule number one is fair

 7   administration of justice and allowing parties to put on their

 8   case and not precluding it by some arbitrary number.  I looked

 9   at the BMG case, and as in this case, there was a lot of work

10   done preliminary so that the case could be tried.  Inevitably

11   there are delays where we're talking about issues before

12   witnesses testify that aren't counted against either side.

13              And in the -- at the end in the BMG/Cox case I didn't

14   keep a clock.  And there were witnesses who were put on and

15   allowed to testify one time for both purposes of both parties.

16              So we have time to allow five days and not scare the

17   jury in that -- getting into that third week.  So I don't --

18   but I am going to be really diligent in making sure that this

19   doesn't become a runaway train.

20              I mean, the -- you've got six groups of plaintiffs,

21   but, you know, after the first two testify about what their

22   jobs are and who they represent and what they're doing here, I

23   can't imagine that having the other four do the same has any

24   usefulness to the jury.

25              So let's really look at what you are doing.  And I
```

40

1  see a lot of witnesses, but the issues in the case I think are

2  fairly discrete.

3          And so, I understand your position, I'll work with

4  you and you work with the Court.  Okay?  All right.

5          MR. BUCHANAN:  Your Honor, I think one other issue,

6  administrative, and then there is a substantive issue I wanted

7  to raise.  I think we've agreed that one hour for opening?

8          THE COURT:  All right, that's fine.

9          MR. BUCHANAN:  And then the other issue I wanted to

10  raise, Your Honor, is in your November 15, 2009, summary

11  judgment order with regard to the notices and whether they put

12  Cox on notice of copyright infringement at a certain level, the

13  Court found that the RIAA sent notices on behalf of both the

14  record label plaintiffs and the music publishers.

15          It's undisputed in this case that the music

16  publishers sent no notices.  So those 3,000 works in suit that

17  are identified, I think, in Exhibit B of the complaint for the

18  music publishers, there were no notices sent by them.  They are

19  not part of the RIAA.  No notices were sent.

20          And so, basically, they are trying to bootstrap off

21  the notices that were sent on behalf of the record label

22  companies.

23          So, in fact, if you read your decision about why the

24  notices -- because of the information they contained put us on

25  notice, they did not put us on notice of music publishers.

41

1    There is no mention of any of them on those notices.  They

2    never sent any.

3            So that's another way to streamline this case, is

4    because those, as we moved, and based on your Court's ruling

5    applying the same logic, they should be out.

6            So we really should just be talking about the notices

7    that went on behalf of the record label companies and those

8    works in suit.  Which, actually, when you reduce them down,

9    there is like 2,000 because the notices with regard to those

10   contain references to songs in which they have Bruce

11   Springsteen, Born to Run, and embedded within that is somebody

12   that's gone out there and added all sorts of other works that

13   don't relate in like a zip and we're suppose to have notice of

14   that.  Those were two issues that we raised.

15           But the one right now is, clearly, under the Court's

16   logic and reasoning in the summary judgment decision, there is

17   no way we could be put on notice of the musical compositions of

18   the music publishers.

19           THE COURT:  Okay.  So this is a motion to reconsider?

20           Yes, sir.

21           MR. OPPENHEIM:  There is a little -- too cute by

22   halves in there, Your Honor.  I mean, I do agree with Mr.

23   Buchanan that the opinion does say, notices from record

24   companies and music publishers, that is certainly true.

25           It was clear that the Court rejected Cox's argument

42

1   that every notice had to specify every work that was being

2   infringed in it.  The Court followed what the Fourth Circuit

3   said.  Which is, was it sufficient notice for Cox to do

4   something about it?  And that's what those notices were.

5           So here, compositions are contained with sound

6   recordings.  Right?  And so, Mr. Buchanan saying, well, there

7   was no notice as to the compositions, well, of course there

8   was.  There was no need to send a separate notice, which would

9   be the exact same notice, only specify the composition.  It

10  would be the exact same infringer, the exact same date and

11  time, on the exact same network.  It would be exactly the same.

12          So the Court -- the Court has made a finding, which

13  was undisputed, that Cox had knowledge of the infringing acts

14  such that they could do something about it.  And nothing that

15  Mr. Buchanan has said should disturb that.  He's just pointing

16  to the one phrase within the opinion which, you know, he thinks

17  is a little inelegant.  But the point of the decision is very

18  clear and should be undisturbed.

19          THE COURT:  All right.  Yes, sir.

20          MR. BUCHANAN:  Just briefly, Your Honor.  I mean,

21  it's under Rule 54(b), and it is a timely motion.  We haven't

22  filed it.  We haven't it filed, but we are arguing it now.

23  There is no dispute that there is a mistake of fact.  The

24  plaintiffs just admitted that.

25          THE COURT:  I will look at it, Mr. Buchanan.

1          MR. BUCHANAN:  Okay.  Thank you.

2          THE COURT:  Yes, sir.

3          MR. BUCHANAN:  So when you said you will look at it,

4   you want us to file a formal motion?

5          THE COURT:  No, no.  I'll look at it.  We will go

6   back and we will take a look at what you've just said.  And if

7   we think we made an error, we will let you know.

8          MR. BUCHANAN:  Right.  And the only other point I'd

9   make is the general counsel of the RIAA, you know, testified

10  that they don't represent the music publishers, in admissions 6

11  through 12 they admitted that.

12          And in their statement of undisputed facts, they say

13  that the notices were by the RIAA, they only represented the

14  record labels.

15          So there's no notices that reference at any time the

16  music publishing companies and their compositions.

17          THE COURT:  Okay.

18          MR. OPPENHEIM:  Yeah, it's undisputed that the RIAA

19  represents record companies.  Doesn't mean that the notices

20  didn't cover musical compositions.  It's just --

21          THE COURT:  Okay.

22          MR. OPPENHEIM:  So, Your Honor, unless you wanted to

23  hear more on this, I had two other pedestrian matters.

24          THE COURT:  No.  Go, please.

25          MR. OPPENHEIM:  I assume, based on what you said,

44

1    that we will be sitting on Fridays?

2              THE COURT:  Yeah, we will be sitting on Friday, next

3    Friday for sure.  The following Friday we will see how -- we

4    may be done by then.

5              MR. OPPENHEIM:  That would be great.  I said two

6    issues, I actually have a few more pedestrian.  Sorry.

7              On the sequestration of the witnesses, it's all right

8    for the witnesses to hear the opening statements, I presume,

9    just not witness testimony?  Or --

10             THE COURT:  No, I don't want them to hear opening

11   statements either.  Let's just have them removed so we don't

12   worry about them hearing that Mr. Jones is going to say A, B,

13   and C.  We don't need to be concerned about it.

14             MR. OPPENHEIM:  Okay.  As to experts, however, Your

15   Honor, I assume that the sequestration rule doesn't apply to

16   them?

17             THE COURT:  No, not unless there is something unique

18   that I haven't heard about, the experts will be allowed to

19   remain in the courtroom.

20             MR. OPPENHEIM:  I don't believe so, Your Honor.

21   There is nothing unique.

22             THE COURT:  All right.

23             MR. OPPENHEIM:  I believe we all submitted voir dire,

24   proposed voir dire and jury instructions last night.  I don't

25   believe that we have a deadline in place for submission of a

45

1    proposed verdict form.  We discussed it last night and decided

2    it was something we should raise with Your Honor when you would

3    like a proposed verdict form.

4              THE COURT:  Yeah, I would like one.  Obviously, if

5    you can agree on a proposed verdict form, that would be

6    helpful.  If you can't agree on it, it's something we will talk

7    about.  But I would like you all to generate the first versions

8    of it so that we can look at it.

9              MR. OPPENHEIM:  Do you want that before the trial

10   begins, Your Honor?

11             THE COURT:  Yeah, it would be preferable, but not --

12   it's not something I would read to the jury at the beginning of

13   the case and be involved in, but it's normally provided with

14   the jury instructions.

15             So if you all can get to work on that -- you know, I

16   don't need it until Monday.  Hopefully you are all going to

17   take a step back and be with your families over Thanksgiving,

18   but I'm sure you will be back in action by Sunday.  So maybe

19   Sunday you can get together and just have something to me on

20   Monday is fine.

21             MR. OPPENHEIM:  Okay.

22             THE COURT:  So you went over the jury selection.  You

23   think you have got that down?  As I had indicated, at some

24   stage I'm going to call eight jurors, they will all sit, and

25   they will remain to deliberate.  So that if we lose a couple,

1  we're still okay.

2         So we're going to pick eight, they are going to go

3  into the box.  Obviously, we will have weeded out those that

4  shouldn't be in the jury.  And then if you don't strike

5  somebody, they're in, as we go to the second round.

6         And I think we are trying to get you the pool today.

7  Is that -- if not, it will be available tomorrow.

8         The number of strikes has come up.  And do you

9  want -- have you talked about that?  Do you want to address

10 that?

11        MR. OPPENHEIM:  Your Honor, as I understand, it's

12 either three or four.  I guess my preference would be four, but

13 I don't feel hugely strongly about it.  Given the number of

14 issues here, my preference, where there is a potential bias, I

15 think four would be preferable.  But I will let the defendants

16 speak to that.

17        THE COURT:  I don't have any objection to that, four

18 is fine.

19        MR. BUCHANAN:  Four works, Your Honor.

20        THE COURT:  Yeah.  All right.  We will do four.

21        We don't have any push polls going out, right?  There

22 is nothing going to our jury pool?  I had a case with a

23 gentleman from Texas who had done a push poll, and I frankly

24 had to say I had never even heard of it.  I thought while I was

25 in private practice I had heard of most polls.  But that was

47

1    amazing.

2              MR. BUCHANAN:  I have a case with that lawyer right

3    now, Your Honor.

4              THE COURT:  You do.  Jeez, I was just stunned.

5              MR. BUCHANAN:  It's worse than you can imagine.

6              THE COURT:  That was stunning.  All right.

7              MR. OPPENHEIM:  With respect to the proposed verdict

8    form, do you want us to file those on ECF, or just submit them

9    to the Court by a --

10             THE COURT:  ECF is great.

11             MR. OPPENHEIM:  Very well.

12             THE COURT:  That way you can do it whenever you get a

13   chance.

14             MR. OPPENHEIM:  I don't believe I have any other

15   housekeeping matters.  We have some questions for your staff,

16   your clerks, we will deal with them directly.  Thank you, Your

17   Honor.

18             THE COURT:  Okay.  They are probably better qualified

19   to answer those questions.

20             All right.  Mr. Buchanan, anything else?

21             MR. BUCHANAN:  Nothing, Your Honor.

22             THE COURT:  All right.  I hope you all have a good

23   Thanksgiving.  And, you know, make that Sunday night call and

24   say, hey, you know, how about settling this case and --

25             MR. OPPENHEIM:  We are still waiting for it, Your

48

1    Honor.

2              THE COURT:  It's never too late.  All right.  Thank

3    you all.  We're in recess.

4              MR. ELKIN:  Thank you, Your Honor.

5         ------------------------------------------------
                        HEARING CONCLUDED

6

7

8

9

10

11

12

13

14

15

16

17

18

19              I certify that the foregoing is a true and

20       accurate transcription of my stenographic notes.

21

22

23
                     _____
24                   /s/  Norman B. Linnell
                     Norman B. Linnell, RPR, CM, VCE, FCRR

25