1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  1

TRIAL TRANSCRIPT

December 2, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:

FOR THE PLAINTIFFS:            MATTHEW J. OPPENHEIM, ESQ.
                              SCOTT A. ZEBRAK, ESQ.
                              JEFFREY M. GOULD, ESQ.
                              MICHAEL J. DRUCKMAN, ESQ.
                              ANDREW L. GUERRA, ESQ.
                              LUCY G. NOYOLA, ESQ.
                              JIA RYU, ESQ.
                              Oppenheim + Zebrak, LLP
                              4530 Wisconsin Avenue, N.W.
                              5th Floor
                              Washington, D.C. 20015


FOR THE DEFENDANTS:           THOMAS M. BUCHANAN, ESQ.
                              Winston & Strawn LLP
                              1700 K Street, N.W.
                              Washington, D.C. 20006-3817
                                and
                              SEAN R. ANDERSON, ESQ.
                              MICHAEL S. ELKIN, ESQ.
                              THOMAS P. LANE, ESQ.
                              CESIE C. ALVAREZ, ESQ.
                              Winston & Strawn LLP
                              200 Park Avenue
                              New York, NY 10166-4193
                                and
                              JENNIFER A. GOLINVEAUX, ESQ.
                              THOMAS J. KEARNEY, ESQ.
                              Winston & Strawn LLP
                              101 California Street, 35th Floor
                              San Francisco, CA 94111-5840
                                and
                              MICHAEL L. BRODY, ESQ.
                              Winston & Strawn LLP
                              35 West Wacker Drive
                              Chicago, IL 60601
                                and
                              DIANA HUGHES LEIDEN, ESQ.
                              Winston & Strawn LLP
                              333 South Grand Avenue
                              Suite 3800
                              Los Angeles, CA 90071

3

INDEX

OPENING STATEMENTS BY:


   MR. OPPENHEIM                                        27
   MR. ELKIN                                           62



WITNESS                          EXAMINATION      PAGE


 DENNIS KOOKER


                        DIRECT         95
                        CROSS          120



CLOSING ARGUMENTS BY:




COURT'S JURY INSTRUCTIONS

   THE COURT                                           18

4

1              NOTE:  The case begins in the absence of the jury

2    panel as follows:

3    JURY PANEL OUT

4              THE CLERK:  The Court calls case 1:18-cv-950, Sony

5    Music Entertainment, et al., versus Cox Communications, Inc.,

6    et al., for a jury trial.

7              May I have the appearances, please, first for the

8    plaintiffs.

9              MR. ZEBRAK:  Good morning, Your Honor.  Scott Zebrak,

10   counsel for the plaintiffs.  Would Your Honor like me to

11   introduce who's in the courtroom?

12             THE COURT:  Yeah, please.  Go ahead.

13             MR. ZEBRAK:  Sure.  At counsel table to my left is

14   Matthew Oppenheim.

15             THE COURT:  Yes.

16             MR. ZEBRAK:  As well as my colleague, Lucy Noyola.

17   At the table behind us is Geoffrey Israel.  Laurie Kuslansky,

18   part of our trial team as well.  Jeffery Gould.  And Andrew

19   Guerra.

20             And then sitting back there, we have a number of

21   clients as well as other colleagues of mine from Oppenheim +

22   Zebrak.  We have Michael Druckman.  Jia Ryu.  Nathan Osher.

23   David Jacoby.  Wade Leak.  Nathan Osher is with

24   Warner/Chappell.  But behind -- Mr. Leak and Mr. Jacoby,

25   they're with Sony Music.

5

1              And Carla Miller is here today as well.  I'm not sure

2   where she -- oh, there she is, and next to her -- she's with

3   Universal.  And Brad Cohen from Warner Music.

4              THE COURT:  All right.  Good morning to each of you.

5   Thank you.

6              Mr. Buchanan, good morning.

7              MR. BUCHANAN:  Good morning, Your Honor.  I'm Thomas

8   Buchanan with the firm Winston & Strawn on behalf of the

9   defendant, Cox Communications.

10             With me at counsel table is Michael Elkin and Thomas

11  Lane.  Ellen Brickman, advisor.  Also with us is Jennifer

12  Golinveaux.  Sean Anderson.  Michael Brody.  Cesie Alvarez.

13  Geoff Eaton.  Rachel Benjamin.

14             And from Cox is Marcus Delgado and Kristen

15  Weathersby.

16             THE COURT:  All right.  And good morning to each of

17  you.

18             You had some preliminary matters.  Let me just say

19  first, when we get our jury pool up here, I'm going to ask

20  counsel for each side to identify who is at counsel table.  And

21  also I'll ask you individually to identify the witnesses that

22  you expect to testify instead of my doing it and mispronouncing

23  all the names.

24             So that -- we'll do that early on in our voir dire.

25  Is that all right?  Okay.  Good.  Thank you.

6

1          All right.  The preliminary motions then.  I

2    understood there were -- that we had a couple of preliminary

3    matters.

4          MR. OPPENHEIM:  Yeah, I think, Your Honor, just a

5    couple of housekeeping matters.

6          I think still outstanding is the question of what the

7    preliminary instruction will say with respect to the safe

8    harbor and with respect to the infringement notices.

9          Also, I think one of the other issues that was --

10   substantive issues that was outstanding was the question of

11   what to do with the employee reviews for Messrs. Zabek and

12   Sikes.  And I believe that the Court indicated that to the

13   extent that Cox intends to throw them under the bus, for lack

14   of a better expression, that we then should be allowed to use

15   the employee reviews.  But, obviously, we need to know that in

16   advance.

17         THE COURT:  Yeah, that's the way I thought I wrote it

18   up.  And if it becomes relevant, then you can use them.  And

19   don't refer to them in your opening statements, but wait and

20   see -- and I understand you're in a position where you're not

21   going to know, perhaps, until later in the case and you're

22   unsure how that's all going to work out.

23         MR. OPPENHEIM:  Yeah, I'm not sure how I'm going to

24   use them if they --

25         THE COURT:  Yeah.

7

1          MR. OPPENHEIM:  If they use them at the end of their

2  case, if they do that -- excuse me -- not use the documents --

3          THE COURT:  Right.

4          MR. OPPENHEIM:  -- but if they throw them under the

5  bus at the end of the case, and I don't have the witnesses

6  available to put forward those reviews, I'm foreclosed.

7          THE COURT:  Yeah, I understand that.  And it's a

8  valid point that we really didn't close the loop on.  So I

9  understand.  All right.

10          Well, I guess the time is now then, Mr. Elkin, and

11  what is your intent with the Cox witnesses?  Is the company

12  going to take the same position as it did in BMG with regard to

13  trying to minimize fault just in the -- within that small

14  circle of people?

15          MR. ELKIN:  Thank you, Your Honor.  No, we're going

16  to stand shoulder to shoulder, Mr. Zabek and Mr. Sikes.  There

17  will be no throwing them under the bus.

18          THE COURT:  Okay.  All right.

19          MR. ELKIN:  One thing that I think we discussed when

20  we were before Your Honor last week was the verdict sheets.  We

21  exchanged as Your Honor ordered.

22          THE COURT:  Yeah, thank you.

23          MR. ELKIN:  We could not reach an agreement.  We're

24  still going to meet and confer with the other side to see

25  whether we can narrow the issues.  I don't think it's something

8

1   that Your Honor necessarily said the Court would take up now,

2   but I just wanted to highlight that.

3          There are some issues that we might have that would

4   inevitably key off of Your Honor's decisions with respect to

5   the opening instructions.  But I think rather than to belabor

6   that, we should just wait for that.

7          THE COURT:  Well, I'm going to give a little fuller

8   explanation to the jury in preliminary instructions.  I'm going

9   to describe -- I'm going to give a shortened version of the

10  fact that the safe harbor provision is not a defense in this

11  case.  I'm not going to talk substantively about the laws.

12         I am going to give a version of the infringement,

13  both contributory and vicarious liability.  I think that the

14  plaintiffs' instructions that they proposed, especially for

15  contributory infringement, track the Fourth Circuit's decision,

16  you know, word for word, and I'm going to give that.

17         I'll tell them that they'll have a more fulsome body

18  of instructions at the end of the case, but I wanted to give

19  them just a brief overview and leave it at that.

20         MR. ELKIN:  Thank you, Your Honor.  I think the only

21  thing that -- without seeing the instruction on the DMCA that I

22  think was made last week, and I'm sure will be observed, is

23  this notion under Section 512(l) that even if we litigated and

24  presented and lost the DMCA defense here, as we did in BMG, it

25  doesn't have a bearing on underlying liability.

```
 1              I think the Fourth Circuit's case in CoStar versus

 2   LoopNet also sort of confirms that basic principle.  I know

 3   Your Honor knows that, but I wanted to mention it.

 4              THE COURT:  Yeah.  All right.  Understood.

 5              I still think it's -- because of the other rulings I

 6   made in the case, as we discussed last Tuesday, that you're --

 7   you know, at least I believe, having let the CAS system

 8   evidence in and the evidence from the polling done regarding

 9   the other ISPs, that it's just going to be a hole in the --

10   confusing to the jury.  So I want to introduce the fact that

11   there is this DMCA and that there is a safe harbor provision,

12   but it's not an issue in this case.

13              MR. ELKIN:  Okay.  Thank you, Your Honor.

14              THE COURT:  Yes, sir.

15              MR. OPPENHEIM:  Thank you, Your Honor.  Just a

16   clarification on that.

17              THE COURT:  Yes.

18              MR. OPPENHEIM:  In reviewing exhibits that will

19   inevitably be used in the case, there are references to a

20   repeat infringer provision.

21              So when you give the instruction, will you give

22   reference to the fact that the safe harbor is triggered off of

23   the repeat infringer provision?  Because otherwise the

24   documents may not make sense.

25              THE COURT:  I'm not going to do that.  I just --
```

10

1   let's develop the evidence.  We'll see what instructions I give

2   at the end of the case.  But I want to give them a brief

3   outline without overstating the importance of the -- or

4   understating.  I don't know how -- I don't know how the

5   evidence is going to come in.  You folks know the evidence for

6   this case a whole lot better than I do, and I want to wait and

7   see how the evidence comes in.  All right?

8           MR. OPPENHEIM:  Very good.

9           THE COURT:  Your exception is noted.

10          All right.  So I've given the jury pool a list of the

11  parties and other -- a couple of other witnesses or company

12  references.  You know, MarkMonitor and RIAA.  And so, they've

13  had that and they've looked at it downstairs.  So when they

14  come up here, I won't be -- it won't be necessary to spend ten

15  minutes reading everybody's names.  They'll have that

16  information.

17          I've looked at your voir dire questions.  I'm going

18  to ask most of those questions.  I think that going beyond the

19  standard voir dire is important in this case so we understand,

20  you know, whether there's any particular bias for or against

21  either of the parties.  And ISPs are such big part of our

22  culture today, as well as the music industry, we ought to get

23  that out.  So I'll do my best.

24          I'll bring you up to sidebar afterwards.  If there's

25  additional questions you want me to ask, then let me know and

1    we'll consider that.  We'll do strikes for cause at sidebar at

2    that time.

3            And, you know, I'm going to tell them that we're

4    going to be -- you know, it'll be two weeks of evidence and

5    several -- perhaps a couple of days the following week so that

6    I don't scare them all into finding reasons not to be here.

7    And we'll see how it goes.  All right?

8            All right.  Anything else before we get our jury

9    pool?

10           MR. ELKIN:  No, Your Honor.

11           THE COURT:  Okay.

12           MR. OPPENHEIM:  Not from the plaintiff.

13           THE COURT:  All right.  Then let's take a brief

14   recess and we'll get our jury pool up here.

15           All right.  We're in recess.

16           NOTE:  At this point a recess is taken; at the

17   conclusion of which the case continues with the selection of

18   the jury for the case, which portion of the proceedings is

19   contained in a separate transcript; at the conclusion of which

20   the case continues in the presence of the newly selected and

21   sworn jury as follows:

22   JURY IN

23           THE COURT:  All right, please have a seat.

24           We're going to break now for an hour, and we will

25   come back at 2 o'clock, and I will have some preliminary

12

1   instructions for you.  And then we'll have opening statements

2   by counsel.  We will go until 5:30 or so.  So we will begin

3   testimony in the case.

4           We will talk about it at the end of the day, but I

5   usually start at 9 o'clock.  And we'll take a mid-morning break

6   and a mid-afternoon break, and an hour for lunch, and go until

7   5:30 or 6 each day depending upon if we are finishing up

8   witnesses.

9           So I hope that is not a problem, but we can talk

10  about it later.

11          So you are now sworn jurors, and from this point

12  moving on it is so important that you not do any research, or

13  investigation, or talk to anybody about this case as you begin

14  hearing the evidence, or even now at lunch break, because the

15  case needs to be decided based on what happens here in the

16  courtroom and nowhere else.

17          You hear and read occasionally that some juror --

18  usually in Los Angeles for some reason -- decides they're going

19  to write a book, or they're going to do something else to, you

20  know, use the evidence that they're hearing for some other

21  reason.  So they do some research, or they talk to other people

22  about the case, or they investigate what happened at a street

23  corner.  And it causes mistrials.  It subjects the jurors to

24  contempt, you can go to jail for violating my orders.

25          But mostly, most importantly, it interferes with the

13

1    administration of justice.  And it's so important that we

2    decide our cases based on what happens in the courtroom and not

3    outside the courtroom.

4              I'm going to order a rule on witnesses that the

5    parties -- we've discussed already.  So the fact witnesses will

6    remain outside of the courtroom during the trial of the case so

7    that they are not listening to other fact witnesses and

8    changing what they otherwise would say because they've heard

9    something here in the courtroom.

10             Expert witnesses are allowed to remain in the

11   courtroom and hear the facts as they're coming in and the

12   rulings that I am making so that they are prepared to testify

13   as experts.  So they are an exception to the rule.

14             And representatives of the companies are allowed to

15   remain as well.

16             So Mr. Ruelas is in charge of you all for the next

17   couple of weeks.  He'll do everything that he can to make your

18   time here comfortable, and he will bring to me any issues or

19   concerns that may arise.  And as I said, we will make it as

20   comfortable as we can for you.

21             We'll sit through Friday of this week.  We may start

22   a little later in the morning on Friday, but we will sit all

23   week this week.

24             Okay.  Then I'll let you go now and we'll come back

25   at 2 o'clock.  All right.

14

1          Thank you, you are excused.

2          NOTE:  At this point the jury leaves the courtroom;

3   whereupon the case continues as follows:

4   JURY OUT

5          THE COURT:  I just have one matter before we break.

6   I got an e-mail from Chief Judge Gilstrap from the Eastern

7   District of Texas who tells me he has trials set on the 9th of

8   December, and the 16th of December, and I am sure every week

9   from now until 2023, which I understand.  He in each of his

10  trials beginning on the 9th and the 16th has Mr. Almeroth as a

11  witness, as an expert witness.  And I think he tried to chide

12  the parties into contacting me.  And when they didn't, he

13  contacted me directly.

14         He is very interested in us calling Mr. Almeroth

15  either on the 9th if possible, but on the 10th at the latest,

16  perhaps in the morning.  And it may be that we call him out of

17  order, but I'm going to work with Judge Gilstrap and free Mr.

18  Almeroth to either testify -- one, I don't know whether he is

19  still a witness, but I believe he is.

20         And how much time do you think you need for his

21  testimony?

22         MR. ELKIN:  One hour, Your Honor.

23         THE COURT:  All right.  Then let's put him on on

24  Monday.  And we may have to interrupt your case.  And that

25  happens.

15

1          MR. OPPENHEIM:  So, many of our witnesses are,

2     unfortunately, busy executives, and we have choreographed as

3     best we can to accommodate their schedules.

4          THE COURT:  Yeah.

5          MR. OPPENHEIM:  We have, I believe, two witnesses who

6     our expectation is will be testifying on that Monday because

7     that is the only day that we can get them.

8          THE COURT:  Okay.

9          MR. OPPENHEIM:  So, obviously, I'm not thrilled about

10    the idea of putting Mr. Almeroth on in our case in chief.  But

11    more importantly, I have got to make sure that our witnesses

12    who are scheduled for that Monday get to go.

13         THE COURT:  Okay.  Then if you've got two witnesses

14    and they're going to take up seven hours of trial testimony,

15    then we have a problem.

16         But let's try and put him on at the end of the day on

17    Monday and get him on his way.  So we will call him by 3:30 or

18    something like that on Monday.  And if there is some emergency

19    reason when we get to the end of the week why that can't

20    happen, but let's plan on that.

21         I think, obviously, the Eastern District of Texas is

22    the busiest jurisdiction in the -- well, they used to be the

23    busiest jurisdiction, maybe Delaware has overtaken them now,

24    but I would like to accommodate Judge Gilstrap.

25         All right.  Anything else we need to discuss before

16

1    we break?

2         MR. ELKIN:  Your Honor, we, pursuant to Your Honor's

3    directive, counsel exchanged exhibits that are --

4    demonstratives that are going to be exhibited through the

5    openings.  And there are just a couple of ones that we're still

6    talking about.  I'm hopeful that we will be able to get them

7    resolved.

8         So I think it's premature for us to raise them now,

9    but we'll try to get it addressed.

10        THE COURT:  Okay.  Let's try and work it out.  And we

11   will address it briefly when we come back at 2 o'clock.

12        MR. OPPENHEIM:  Your Honor, I'm sorry, we exchanged.

13   I gave them comments within 15 minutes and we resolved their

14   two issues, I think.

15        We're about to give our opening.  If they don't -- if

16   we don't get it resolved, then I'm back here at 2, what do I do

17   with my slides?  It puts me in an unbearable position.

18        THE COURT:  Well, then sit down here and see if you

19   can work it out now.  And if you need to talk to me, I am right

20   behind the door.

21        MR. ELKIN:  Just so it's clear, the one reason, the

22   reason why we could not address one slide is because we hadn't

23   yet heard before Your Honor took the bench what the opening

24   instruction was going to be.  So there was no way for us to get

25   that resolved.

1          THE COURT:  Okay.  All right, then discuss it here.

2    And if you need a ruling from me, I'll come back out and give

3    you it to you immediately.  All right?

4          MR. OPPENHEIM:  Thank you, Your Honor.

5          MR. ELKIN:  Thank you.

6          THE COURT:  All right.  Remember that before

7    witnesses testify, if we have issues that you believe are going

8    to be important for that witness, instead of a sidebar, let's

9    try and get it resolved without the jury sitting in the box.

10   Okay?

11         All right, thank you.  We're in recess.

12         NOTE:  At this point a lunch recess is taken; at the

13   conclusion of which the case continues in the absence of the

14   jury as follows:

15   JURY OUT

16         THE COURT:  All right.  Are we ready for our jury?

17   All right.  We'll take a break after plaintiffs' opening, I

18   think, and if it lasts an hour, then we'll be an hour and

19   15 minutes in instead of trying to stretch it out.  Is that all

20   right with everybody?

21         MR. ELKIN:  Yes, Your Honor.

22         THE COURT:  Okay.

23         MR. OPPENHEIM:  Of course, Your Honor.

24         THE COURT:  All right.  All right.  Then, Joe, let's

25   get our jury, please.

18

1          NOTE:  At this point, the jury returns to the

2    courtroom; whereupon, the case continues as follows:

3    JURY IN

4          THE COURT:  All right.  Please, have a seat.

5          A JUROR:  Thank you.

6          THE COURT:  Everyone have a seat, please.

7          So we will be using the monitors, so wherever you

8    wish to sit that makes your view most comfortable, including on

9    the third row, you just sit wherever you want.

10          Let me give you some preliminary instructions.  The

11   first order of business is opening statements, and I understand

12   that opening statements will be made by both sides.  It's not

13   necessary that opening statements be made, but they will be

14   here.  They'll tell you what they expect the evidence to be,

15   and it should help you understand the evidence as it's

16   presented through the witnesses and documents and other

17   exhibits.  It will also make you aware of conflicts and

18   differences the attorneys foresee in the evidence you'll hear.

19   It's important for you to keep in mind that what the lawyers

20   say in their opening statements is not evidence, and you must

21   not consider it as evidence.

22          After opening statements, plaintiff will introduce

23   its evidence, and once it's concluded, the defendant then has a

24   right to introduce evidence if they desire.  If the defendant

25   then produces evidence, the plaintiff may introduce rebuttal

19

1    evidence to address the issues raised by the defendant.

2            At the conclusion of all the evidence, the attorneys

3    again will present their closing arguments to summarize and

4    interpret the evidence for you.  In their closing arguments,

5    they'll refer to testimony that has been presented and that you

6    have heard, but what the lawyers say in their closings is not

7    evidence.  The arguments are based on their own personal

8    recollections of the evidence.  It's your collective

9    recollection as jurors that governs the outcome of the case.

10           I will instruct you before closing arguments on what

11   the law is, as I'm doing preliminarily here, and these are the

12   instructions of law that it's your duty to follow in

13   interpreting the evidence.  Once you've heard the instructions

14   of law and the closing arguments, then you'll retire, select a

15   foreperson, and deliberate and arrive at your verdict.

16           It's important to keep in mind during your jury

17   service, you must not be influenced to any degree by any

18   personal feelings of sympathy for or prejudice against any

19   party in this suit.  Each party is entitled to the same fair

20   and impartial consideration.

21           It's your duty to follow the law as I give it to you

22   now and also in my closing instructions, whether you agree with

23   it or not, and it's also your duty to determine the facts from

24   the evidence and the reasonable inferences arising from such

25   evidence, and in doing so, you must not engage in guesswork or

20

1    speculation.

2         The evidence from which you will find the facts

3    consists of the testimony of the witnesses, documents, and

4    other exhibits entered into evidence, any facts that the

5    lawyers agree on or stipulate to or that I instruct you to

6    find.  The admission of evidence in court is governed by rules

7    of law and evidence that have been developed over many years.

8    The purpose of these rules of evidence is to protect the

9    fairness and the accuracy of the fact-finding process in which

10   you as jurors are engaged.

11        From time to time, it may be the duty of the lawyers

12   to make objections.  It's my duty as the trial judge to rule on

13   these objections and determine whether you can consider certain

14   evidence.  You must not concern yourself with any objection or

15   hold it against either attorney for making an objection.  It's

16   their duty to fully represent their clients' interest.  You

17   must not consider testimony or exhibits to which an objection

18   was sustained or which the Court has ordered stricken.

19        If an objection is overruled, treat the answer like

20   any other.  If you're instructed that some item of evidence is

21   received for a limited purpose only, you must follow that

22   instruction.  Statements, arguments, and questions by counsel

23   are not evidence.

24        It's also important for you to keep in mind that no

25   statement, ruling, gesture, or remark that I make during the

1    course of this trial is intended in any way to indicate my

2    opinion of the facts.  You're to determine the facts of this

3    case.  You alone decide upon the believability of the evidence

4    and its weight and its value.  You must not consider anything

5    you may have seen or heard outside of the courtroom.  You are

6    to decide this case solely on the evidence presented here in

7    the courtroom.

8          We have a rule here that we're not to make any

9    contact with our jurors during the course of the trial.  So you

10   may see counsel from one side or the other or members of the

11   court or my law clerks or me, and we may nod at you, but we're

12   not going to speak to you, and that's out of respect for your

13   privacy and so that there's just absolutely no question that

14   you are, you know, absolutely deserving of total privacy, and

15   so it's not lawyers or all of us don't want to say hi and ask

16   you how your day is going.  It's just that we will not.  If

17   anybody does attempt to speak to you, then I want you to bring

18   it to my attention right away.

19         There are two kinds of evidence:  direct and

20   circumstantial.  Direct evidence is direct proof of a fact such

21   as testimony of an eyewitness.  Circumstantial evidence is

22   proof of facts from which you may infer or conclude that other

23   facts exist.  I'll give you further instructions on these

24   later, but you may consider both kinds of evidence.

25         In considering the weight and value of the testimony

22

1    of any witness, you may take into consideration the appearance,

2    attitude, and behavior of the witness; the interest of the

3    witness in the outcome of the trial; the relation of the

4    witness to any party in the case; the inclination of the

5    witness to speak truthfully or not; the probability or

6    improbability of the witness's statement, and all other facts

7    and circumstances in evidence.  Thus, you may give the

8    testimony of any witness the weight and value that you

9    determine that testimony is entitled to receive.

10           Please pay careful attention to the testimony of the

11   witnesses because contrary to what you've seen on television,

12   it's not possible to call a witness back or to read their

13   testimony back to you after you have begun deliberating.

14           This is a civil case.  As I've stated, the plaintiff

15   has the burden of proving this case by what's called a

16   preponderance of the evidence.  That means the plaintiff has to

17   produce evidence which considered in light of all the facts,

18   leads you to believe that what the plaintiff claims is more

19   likely true than not.  To put it differently, if you were to

20   put the plaintiffs' and defendants' evidence on opposite sides

21   of the scales, plaintiff would have to make the scales tip

22   somewhat on her side.  If the plaintiff fails to meet this

23   burden, the verdict must be for the defendant.

24           Those of you who have sat on criminal cases will have

25   heard "proof beyond a reasonable doubt."  That requirement does

23

1    not apply to civil cases; and therefore, you should not be

2    concerned with it.

3           You'll be hearing some different terms, and let me

4    give you a brief sketch of what you'll be hearing about with a

5    little more particularity than you've heard so far in the

6    introductions.

7           A copyright is a set of rights granted by federal law

8    to the owner of an original work of authorship.  The owner of a

9    copyright has the exclusive right, among other things, to

10   reproduce the copyrighted work, to prepare derivative works

11   based on the copyrighted work, to distribute copies or phone

12   records of the copyrighted work to the public by sale or other

13   transfer of ownership by rental, lease, or lending.

14          The term "owner" includes the author of the work, the

15   assignee, and any exclusive licensee.  In this case, we are

16   focused on two kinds of copyrighted works:  sound recordings,

17   which are recorded music; and musical compositions, which

18   include music and lyrics.

19          In this case, plaintiffs claim that Cox is

20   contributorily and vicariously liable for the infringement of

21   10,017 copyrighted works by users of Cox internet service.  As

22   I said to you previously, Cox denies that is the case and has

23   asked you to fully consider the defenses that they have.

24          We -- prior to your beginning your service, certain

25   decisions were made by me that plaintiffs have established that

24

1    they are the owners of the 10,017 copyrighted works in issue --

2    at issue in the case and that the copyright and registration in

3    each of those is valid.  They have also -- plaintiffs have also

4    established the knowledge element of contributory infringement;

5    that is, plaintiffs have established that Cox had specific

6    enough knowledge of the infringement occurring on its network

7    that Cox could have done something about it.

8            Direct infringement is -- well, in order to prove

9    contributory or vicarious copyright infringement, plaintiffs

10   must first establish by preponderance of the evidence that the

11   users of Cox's internet service used that service to infringe

12   plaintiffs' copyrighted works.

13           "Contributory infringement" means that a copyright

14   may be infringed by contributory infringing, and with certain

15   exceptions, a person is liable for copyright infringement by

16   another if the person knows or was willfully blind to specific

17   instances of the infringing activity and induces, causes, or

18   materially contributes to that activity.

19           "Vicarious infringement" means that a copyright may

20   be infringed by vicariously infringing.  A person is liable for

21   copyright infringement by another person if that person has a

22   financial interest and a right in the ability to supervise the

23   infringing activity, whether or not the person knew of the

24   infringement.

25           You may hear testimony or see documents referring to

1    infringement and infringement notices.  As I've just gone over

2    briefly in the description of the contributory and vicarious

3    liability instructions, infringement is an issue of fact that

4    you will ultimately decide based on the facts that you hear,

5    but the word "infringement" and "infringement notices" are

6    words that you'll hear often during the case.

7            Infringement notices are notices sent to Cox that are

8    evidence that you may consider.  It's evidence of infringement,

9    but just the fact that there are infringement notices

10   themselves is not alone -- standing alone ultimate proof of

11   infringement without any other evidence.  So it's evidence you

12   may consider and give it the weight that you believe that it

13   deserves, but as a matter of law, it does not prove

14   infringement.

15           You'll also hear testimony and see documents that

16   refer to the Digital Millennium Copyright Act, known as the

17   DMCA.  The DMCA provides that an internet service provider,

18   like Cox, may have a defense to liability arising from

19   infringement on its network and that there is a defense called

20   a safe harbor defense, which is included in the DMCA in part of

21   the statute.  It's not a defense for Cox in this case.

22   However, the failure or the fact that the safe harbor provision

23   does not apply does not bear adversely on the consideration of

24   a defense by the service provider that the service provider's

25   conduct is not infringing under the remainder of the title or

26

1    for any other defense.

2           As I indicated before you broke, you must not discuss

3    the case with -- among yourselves or with anyone else, and you

4    must not remain within the hearing of anyone who is discussing

5    the case, and to avoid the appearance of -- any possible

6    appearance of impropriety, I urge that until the case is

7    concluded, you should not talk with anyone at all, including

8    me.  Do not read or listen to anything touching on the case.

9    If someone should try to speak to you, please bring it to my

10   attention.

11          As I indicated, please do not do any research or

12   investigate the case on your own, and after the case has been

13   submitted to you, you must discuss the case only in the jury

14   room when all members of the jury are present.

15          You are to keep an open mind.  You should not decide

16   any issue in this case until the case is submitted to you for

17   deliberation under the instructions of the Court.   Remember

18   there are two sides to every story.

19          I see some of you have notebooks.  You may take notes

20   if you wish.  The case is going to go on for the next two

21   weeks, and certainly they may be helpful, but remember that

22   they are only for your own personal use and they are not to be

23   given or read to anyone else either during the course of the

24   case or during your deliberations.

25          You've discovered that there are restrooms and

27

1    telephones in the back, and that Mr. Ruelas will do whatever he

2    can to make your time here as comfortable as possible.  If

3    there are issues which arise about lunch, we used to have a

4    cafeteria here in the courthouse, and it's been temporarily

5    closed, so there's no place to eat in the building, but speak

6    to Mr. Ruelas if there are specific issues which you think you

7    would like us to address for you on your behalf.

8              All right.  Counsel, Mr. Oppenheim?

9                        OPENING STATEMENT

10                       BY MR. OPPENHEIM:

11             Thank you, Your Honor.

12             Good afternoon.  This is a case about an internet

13   provider swarming with piracy that said one thing but did

14   another and that put its profits above the law.  This is a

15   case, ladies and gentlemen, about Cox Communications.  Cox, the

16   defendant, provided a safe haven for massive infringement

17   because it didn't care much for the copyright law or copyright

18   owners, and as such, Cox has been sued for copyright

19   infringement by a group of record companies and music

20   publishers.

21             To Cox, it was more important to keep customers than

22   abide by the law, and the reason was simple:  money.  For

23   years, Cox continued to provide internet service to customers

24   that Cox knew were using its network to infringe, and Cox

25   collected hundreds of millions of dollars because of it.

1          My name is Matt Oppenheim.  With me representing the

2   plaintiffs at trial in this case, my partner, Scott Zebrak;

3   Lucy Noyola; Jeff Gould; I'm sorry, Andrew Guerra; and among

4   others who you will see in and out of the courtroom from time

5   to time during the case.

6          Also present here, we have representatives from the

7   music industry.  Here today, I believe we have Nathan Osher

8   from Warner/Chappell, Brad Cohen from Warner Music,

9   Carla Miller from Universal Music Group, and I think I missed

10   one -- oh, David Jacoby, excuse me, from Sony Music

11   Entertainment.  But there will be others in and out of the

12   courtroom during the course of this trial because this is a

13   critical and vital case for the music industry.

14          Now, before I go any further, let me just recognize

15   what the judge has said already.  This is a very special and

16   busy time of the year for everyone, and this may not be the

17   first choice of how you spend the next several weeks, but it is

18   a critical case for our industry, and so we ask you in advance

19   for your time and attention, and we thank you for your service.

20          Now, what I'd like to do is give you a brief road map

21   of what I'm going to cover during this opening statement.  I'm

22   going to try to divide up my thoughts, pardon me, in five

23   sections, give you a little background, go through the detailed

24   infringement evidence, discuss Cox's sham policies and

25   procedures, review Cox's motive, and finally at the end just

1    touch on for a moment the issue of statutory damages.

2           Background.  So Cox is an enormous company.  It owns

3    and operates a high-speed internet service.  And Cox knew that

4    its network was a hotbed for copyright infringement and that a

5    substantial portion of the traffic on its network was a type of

6    piracy called peer-to-peer piracy or P2P for short, and it was

7    no secret that peer-to-peer activity was infringement.

8    Copyright owners told Cox over and over and over again about

9    specific Cox customers, also called subscribers, who were using

10   Cox's high-speed network to illegally distribute copyrighted

11   music.

12          Make no mistake, as the judge said earlier this

13   morning, uploading and downloading copyrighted music on the

14   internet without authorization is illegal.  It's copyright

15   infringement and it's piracy.

16          Now, Cox didn't address the mass piracy on its

17   network.  In fact, it welcomed it.  Cox didn't stop the repeat

18   infringers on its network.  It gave them a free pass.

19          Unfortunately, piracy is not a victimless crime, and

20   Cox's facilitation of it has had serious consequences.

21   Artists, composers, and everyone else connected to the music

22   economy were losing money hand over fist from the piracy that

23   Cox was sheltering.

24          During this case, you will hear quite a bit about

25   peer-to-peer networks and Cox's failed policies, but

1    ultimately, this is really a case about protecting the music

2    that we all love and protecting copyrights.  So with that,

3    let's talk about what a copyright is.

4            So copyrights are intellectual property rights

5    established by federal law.  The notion of copyrights actually

6    dates back to our Constitution, where they're enshrined.

7    Copyrights are an exclusive right, as the judge explained to

8    you, of something somebody owns in something like a photograph

9    or a book, a piece of art, a piece of software or music; and

10   you can own that piece of property much like you would own a

11   piece of real estate; and when you own that copyright, that

12   gives you the right to protect that property and earn money

13   from it.

14           In this case, there are two types of copyrights at

15   issue.  One is a musical composition.  Now, a musical

16   composition is the rights one owns in a song that somebody

17   writes in terms of notes and lyrics.  The simplest way to think

18   about a composition is the sheet music where you can actually

19   see the notes and you can see the lyrics written down.  Musical

20   compositions typically are owned by music publishers on behalf

21   of the songwriters whom they serve and compensate.  Many

22   plaintiffs in this case are music publishers.

23           The second type of copyright at issue in this case

24   are sound recordings, and those are the rights owned in a

25   recorded performance of a composition.  So typically, these are

31

1   owned by record companies who work closely with artists and pay

2   the artists to perform the song.  Many of the plaintiffs in

3   this case are record companies.

4          Let me give you an example.  If I were to sit down

5   and write a song with notes and lyrics, that would be a

6   composition.  If I then gave it to my partner, Scott, and asked

7   him to sing it and record it, that would be a sound recording,

8   and the fact that nobody in the world would want to listen to

9   what I wrote or what Scott sang is irrelevant.  It still gets

10  the benefit of copyright protection.

11         So let me tell you a little bit about the plaintiffs.

12  The plaintiffs include some of the most iconic record labels

13  and music publishers in the world.  The music publishers in

14  this case are ultimately owned by three groups:  Sony/ATV,

15  Warner/Chappell, and Universal Music Publishing Group.  They

16  are storied companies.  Warner/Chappell's history goes back

17  200 years.

18         The record label plaintiffs in this case are

19  ultimately owned by three record groups:  Sony Music

20  Entertainment, Warner Music Group, and Universal Music Group.

21  These companies are the forces behind legendary recording

22  artists and songwriters whom we all know and love.  And the

23  plaintiffs in this case collectively have asserted claims on

24  10,017 copyrights that were infringed on the Cox network by Cox

25  subscribers.  These 10,017 copyrights are not the entire world

1  of what was infringed on the Cox network.  These are the

2  copyrights that were infringed by Cox subscribers who were

3  caught and reported at least three times.

4          The record labels in this case have been the

5  birthplace of many of the most successful artists of our

6  generation, many of whom are in this case, including

7  Bruce Springsteen, Etta James, James Taylor, Eminem,

8  Justin Timberlake, Journey, Keith Urban, Eric Clapton, Lady

9  Gaga, The Rolling Stones, Led Zeppelin.  I could go on and on

10  and on.  Oh, I forgot Dave Matthews.  They're kind of from this

11  neighborhood in Virginia.

12          These artists have recorded music that are often part

13  of our lives and part of our history, but all too often, we

14  focus on the big names, as I just did.  For every

15  Justin Timberlake, there are 20 or 100 other recording artists

16  who have recordings that people listen to without the fame,

17  without the success, and without the compensation.

18          And all too often, we forget that behind every

19  successful recording artist, like, say, The Rolling Stones, is

20  a team of creatives, from union physicians to digital

21  production engineers, who rely on the revenues that comes from

22  selling music.

23          Songwriters -- excuse me, music publishers

24  essentially handle the business side of songwriting.  Most

25  songwriters earn a living by writing music.  That's what they

1    do.  Some of them you might recognize, but frankly, many of

2    them you wouldn't, because what songwriters do is often behind

3    the scenes.  They work very hard to perfect something that will

4    resonate with people and have lasting meaning in their lives.

5    They put their creative talents into writing music for which

6    they need to be paid.  It is their livelihood and often their

7    only livelihood.  And the incentive to create new music depends

8    on the plaintiffs' ability to protect copyrights and to make

9    money from copyrighted works.

10           On the other side of this case is Cox Communications.

11   Now, Cox is the largest private telecommunications company in

12   the United States.  In fact, it's the third largest cable

13   company and the eighth largest internet service provider across

14   the country.  Cox, among other things, sells access to

15   high-speed internet, and they have over 6 million residences

16   and businesses that they refer to as their subscribers.

17           Now, while most subscribers use the internet for

18   legitimate activities, there are some, unfortunately, who use

19   technology for illegal purposes, and this case is about what

20   Cox did to address those users, those that were using Cox's

21   network for illegal purposes.

22           Cox likes to refer to itself as a mom-and-pop

23   operation.  Make no mistake, Cox is nothing like a mom-and-pop

24   operation.  It has over 20,000 employees.  It has over

25   $10 billion a year in revenues, billion with a "B."

34

1          To put how big Cox is in context on its own, Cox is

2     bigger than all of the record companies in this case or all of

3     the music publishers in this case.  In fact, Cox's net

4     operating cash, another was of -- fancy way of saying profit,

5     is larger than all of the plaintiffs in this case put together.

6     So when defendants tell you that plaintiffs are large

7     conglomerates, that -- they pale in comparison to Cox.

8          Let's talk for a moment about the legal standards.

9     The plaintiffs have asserted two legal claims in this case

10    against Cox, one for contributory copyright infringement and

11    one for vicarious liability.  At the end of the case,

12    Judge O'Grady will instruct you in detail about those claims

13    and the law surrounding them, but let me tell you what those

14    claims mean at a high level, so as you hear the evidence, you

15    will be able to understand how it applies, and at the end of

16    the trial, you will be able to decide whether Cox should be

17    held liable or not.

18         Under the law, a company like Cox cannot knowingly

19    contribute to infringement.  That is contributory infringement.

20    Under the law, a company like Cox cannot profit directly from

21    infringement it can control.  That's vicarious liability.  And

22    under the law, if you find Cox liable, you will be asked to

23    determine if the infringement was committed willfully.

24         For purposes of listening to the evidence as it is

25    presented, keep in mind whether you think Cox acted recklessly

1    or intentionally, because if they did, that means that their

2    infringement was willful.

3            As the judge told you a moment ago, this is a civil

4    case, and the standard "beyond a reasonable doubt" does not

5    apply.  Many of you may have heard that standard in movies and

6    in television or on the news.  It applies in criminal cases.

7    This is a civil case, and so "beyond a reasonable doubt" should

8    be put out of your mind.  It's not relevant.

9            What is relevant, as the judge already explained to

10   you, is the standard called "preponderance of the evidence."  I

11   will tell you the first time I heard that in law school, I had

12   no idea what it meant, and what it means is what is more

13   likely, what is more likely.

14           You can -- as the judge explained to you, you can be

15   51 -- you have 51 percent of the evidence, that means it's more

16   likely, and you've met your burden of the preponderance of the

17   evidence.

18           If you imagine the scales of justice, as

19   Judge O'Grady -- and I promise you, I had no idea he was going

20   to say that.  I've never heard him deliver instructions.  So

21   I'm not just stealing his bit -- I apologize, Your Honor -- but

22   if you imagine the scales of justice and you put all of the

23   plaintiffs' evidence on one side and all of the defendants'

24   evidence on the other side and it's fifty-fifty, and the

25   plaintiffs then have a feather more than the defendants, that

36

1    means that the plaintiffs have met their burden and Cox should

2    be held liable.

3           Now, the plaintiffs' evidence, as you will see, will

4    be overwhelming, but the point is it doesn't even need to be.

5    We only need 50.1 percent compared to Cox.

6           Let me touch on one more critical legal issue for you

7    to understand.  And Judge O'Grady already spoke to this briefly

8    already.  There is a provision in the copyright laws -- in a

9    part of the copyright laws called the Digital Millennium

10   Copyright Act, and that provision provides that internet

11   providers like Cox can get protection from liability with

12   something called a safe harbor.  Again, it may not need

13   anything to you, but it means that they can't be sued for

14   money.

15          They -- ISPs can avoid being sued for money, kind of

16   a free pass for lawsuits, if among other things, the ISP has a

17   policy to terminate repeat infringers.  If they do that, they

18   can't be sued by copyright owners.

19          Now, in this case, Cox does not get any safe harbor.

20   Cox does not get any protection under that law that I just

21   described to you.  And this is important for you to realize

22   because there is a way that ISPs can avoid these types of

23   lawsuits.

24          So when Cox suggests to you that an ISP is really

25   just a set of pipes, like a utility company, and should not be

1    held liable for the actions of its users, remember there is a

2    legal way for companies like Cox to avoid these lawsuits, but

3    Cox can't take advantage of that here.

4              Let me turn to the infringement evidence in this

5    case.  At the heart of this case is Cox's continued provision

6    of service to subscribers that were illegally distributing

7    music using peer-to-peer networks.  So what is a peer-to-peer

8    network?  It's basically an online network that enables

9    strangers to distribute an endless number of digital copies of

10   anything from books to software to music to movies, anything

11   you want, across the internet.

12             Now, in this case, a large number of Cox customers

13   were using peer-to-peer networks to illegally copy and

14   distribute plaintiffs' music.  Now, we have no idea how many

15   Cox customers were using peer-to-peer because peer-to-peer

16   activity is done privately, and Cox didn't track what its user

17   were doing and didn't maintain records, so there's no idea how

18   many Cox subscribers were actually infringing.

19             When a Cox customer is distributing on a peer-to-peer

20   network, they are essentially running the equivalent of a

21   digital record store.  I know there are very few record stores

22   anymore, but if you remember, there used to be record stores.

23   And so when a Cox subscriber is using a peer-to-peer network to

24   distribute music, they're essentially a digital record store

25   where they're providing an unlimited number of perfect digital

38

1    copies of recordings, and they keep no records of how many

2    copies they give out, and you can't possibly see how many

3    people go in the store to get them.

4            So while we do not know the exact numbers, you will

5    hear evidence of over 57,000 Cox subscribers who were

6    infringing on plaintiffs' copyrights during the period at issue

7    in this case, 2013 to 2014.  That is over 57,000 private

8    digital record stores on Cox's network distributing plaintiffs'

9    music for free without permission.

10           Now, Cox knew that its network was being used for

11   piracy.  For years, Cox had been measuring what its subscribers

12   were doing on the network.  Cox had detailed data that

13   demonstrated that peer-to-peer piracy was one of the primary

14   uses of its network and that it was a -- that peer-to-peer

15   activity was, in fact, driving increased bandwidth demand at

16   Cox.  Now, Cox liked this because they could sell their

17   customers who needed more bandwidth a higher tier of service

18   and make more money from those customers.

19           So while Cox liked peer-to-peer piracy, it didn't

20   fare well for the record industry.  In fact, peer-to-peer

21   piracy had a devastating effect on the music industry.  Between

22   2004 and 2012 -- excuse me, 2004 and 2014, the use and

23   enjoyment of music went through the roof.  People were

24   discovering things, new devices and iPads and iPods to listen

25   to music in ways they never had before.  You could listen to

1   music on your phone.  You could listen to music in -- on your

2   computer.  There were lots and lots of ways to listen to music,

3   and so consumption was going up and up and up, and so you would

4   have expected that's great for the music industry.

5         No, it wasn't.  And, in fact, what you see is that

6   between 2004 and 2014, because of peer-to-peer piracy, annual

7   revenues went down year after year and were cut in half, cut in

8   half.

9         You can imagine that if you go to work every day and

10  you do the same thing and you get paid a little less and a

11  little less and a little less, so ten years later you're making

12  half of what you were before, ten years before, that's what was

13  happening to the record industry.  And yet everybody was

14  listening to their product.

15        So in 2008, the record industry began sending

16  infringement notices to Cox.  These infringement notices

17  informed Cox about specific Cox subscribers who were infringing

18  on music copyrights.  These were the people running the digital

19  music record stores.

20        And as you will hear, there were many other content

21  companies that were also sending infringement notices to Cox.

22  It wasn't just the record industry.  It was movie studios, game

23  companies, lots and lots of others.

24        Well, the record industry used a company, a very

25  well-known and well-respected company, antipiracy vendor called

1   MarkMonitor to send the notices.  Now, MarkMonitor, and you're

2   going to hear a lot about them, is the industry leading

3   antipiracy and brand protection company in the world.

4   MarkMonitor serves half of the Fortune 100 companies.

5   MarkMonitor provides similar antipiracy protection services to

6   movie studios, game companies, book publishers, and numerous

7   others.  And there's a reason that everybody hires MarkMonitor

8   to do this:  because they are the gold standard in antipiracy

9   work.

10          So here's what MarkMonitor did.  MarkMonitor has a

11   proprietary system that goes on to peer-to-peer networks and

12   searches for potentially infringing files.  MarkMonitor would

13   then download and confirm that a file was infringing.  Once

14   MarkMonitor had verified that the file was infringing, it kept

15   a log of that file and that file's hash value.

16          Now, what's a hash value?  So every file has a unique

17   thing called a hash, and that hash is essentially a fingerprint

18   of the file, and every, every file has a unique hash.  That

19   means that if you see two files, they can even have different

20   names of the files, you can have one file A, one file B.  If

21   the same thing is inside of them, they'll have the same hash.

22   But if they are even slightly different, they'll have a

23   different hash.  And you're going to hear a lot about hashes.

24          So MarkMonitor kept a library of all of the

25   infringing hashes that they found on peer-to-peer networks.

41

1   Then MarkMonitor would go onto the peer-to-peer networks and

2   search for people who were distributing those infringing hashes

3   because they knew if that person was distributing a file with

4   that hash, it was infringing.  No matter what the file was

5   called, they knew it was infringing.

6          At that point, MarkMonitor would connect to the user

7   and begin the download process and collect detailed evidence

8   about the user, the user who was distributing the file.

9   MarkMonitor would capture the evidence and use that evidence to

10  generate the infringement notice, and then that infringement

11  notice was sent.

12         Now, MarkMonitor sent that notice through a group

13  called the RIAA, or the Recording Industry Association of

14  America.  This association provided antipiracy services to the

15  record industry, among other things.

16         And so the RIAA would send these infringement notices

17  to Cox, and the infringement notices contained all the detailed

18  information that Cox needed to know which of its subscribers

19  was infringing and how.  Cox was receiving infringement notices

20  from a variety of industries, not just music.

21         So what did Cox do when it received infringement

22  notices?  Well, let's turn to that.  They sent an automatic

23  reply in response to infringement notices, and that reply was

24  what Cox told the copyright owners in response to the

25  infringing activity that they were seeing on the network, and

42

1    you'll see here Cox assured the sender that it took what they

2    called abuse complaints seriously.  Copyright infringement was

3    considered one of Cox's abuses, so they took copyright

4    infringement seriously, they said.

5           And then they went on and they said if Cox found that

6    the customer was in violation of Cox's policy, Cox would take

7    the necessary action to stop the infringement.  So every single

8    notice that Cox received, it sent a reply and it said:  We're

9    going to stop the infringement.

10          As you will see as the evidence is presented, this

11   reply could not have been further from the truth.  What Cox was

12   really doing internally with these notices was something

13   entirely different, and we'll get to that shortly.

14          Between 2012 and 2014, Cox accepted over 270,000

15   infringement notices from the RIAA.  At the time that the RIAA

16   sent the notices, it did not and could not know who Cox's

17   subscribers were who were infringing.  Only Cox could know

18   that.  Based on the information that was provided during the

19   course of this lawsuit, we now know that the 270,000

20   infringement notices identified 57,600 Cox subscribers.

21          But Cox did little to stop the infringement by these

22   57,600 subscribers.  In fact, the Cox data shows that more than

23   half of these subscribers were caught and reported in three or

24   more notices by copyright owners who had sent notices to Cox.

25          These were subscribers who were caught again and

43

1    again and again.  And during this trial, you will hear that

2    there were subscribers who reported dozens, hundreds, and even

3    some thousands of times in the very short period of 2012 to

4    2014.

5              So even though Cox was up to its neck, its eyes,

6    whatever expression you like, in infringement notices, and even

7    though, as you're going to see later, Cox had an endless number

8    of internal e-mails about the infringement on its network, Cox

9    is going to try to convince you that the infringement didn't

10   really happen.  Cox will likely claim there's no proof that Cox

11   subscribers were infringing, but the evidence that you will see

12   will be overwhelming.

13             I already described that MarkMonitor was the gold

14   standard when it comes to brand protection and antipiracy, and

15   there's a reason that they're hired not only by the music and

16   movie industries, but they're also hired by banks, professional

17   sports leagues, and major brands like Apple and Google.  You

18   will see and hear from a MarkMonitor witness who was deeply

19   involved in the process of sending these notices, and he will

20   describe and show you that process, and you will see the

21   270,000 notices that were sent.

22             No, we're not going to go through 270,000 notices,

23   but you'll see an example, and you'll see all of them if you

24   want to.  And you will see that MarkMonitor has copies of the

25   infringing files, and you will hear from a technical expert who

44

1    came in afterwards and said:  Did Cox -- did MarkMonitor's

2    system work to capture evidence and capture evidence

3    accurately?  And that expert will tell you that she reviewed

4    the system and it did and the evidence is reliable.

5         You will also see that it wasn't just the RIAA and

6    MarkMonitor sending infringement notices to Cox, but many

7    others were as well.

8         So Cox's -- so let me turn to Cox's policies and

9    procedures.  Cox's public-facing policy was called its

10   Acceptable Use Policy, or AUP, and it strictly prohibited Cox

11   users from using its network to infringe and warned users that

12   they could have their account terminated if they violated the

13   policy.  In fact, in order to sign up for Cox's service, a

14   subscriber had to agree to these terms, and under these terms,

15   Cox had the express right to suspend or terminate anybody who

16   infringed on its network.  This is what Cox was telling the

17   public about its view on copyright.

18        Cox's internal policies, however, were entirely

19   different than what they were telling the public.  The

20   nonpublic internal policy was referred to as its graduated

21   response policy.  The first version of Cox's graduated response

22   policy was a three-strike rule applied to both residential and

23   business customers alike.  Pretty simple policy.

24        The first time a subscriber was the subject -- was

25   reported in a notice, Cox would notify the subscriber that they

1  had violated the law.  The second time that subscriber was

2  reported in an infringement notice, Cox would temporarily

3  suspend the account until they spoke on the telephone with that

4  subscriber to get the infringement to stop.  On the third

5  notice, Cox would terminate the subscriber's account.  It was a

6  simple and sensible policy, but it did not last long.

7        Over the course of the next several years, as the

8  number of infringement notices Cox had to deal with was

9  growing, Cox changed its policy.  So the question is as they

10  got more notices, did the policy become stricter to address the

11  increased infringement?  The answer is no.

12        For residential customers, Cox extended the

13  three-strike policy to ten strikes; that is, ten strikes before

14  Cox would enforce its policy of no infringement on the network.

15  Put another way, a subscriber would have to be caught and

16  reported ten times before Cox would stop the infringement.

17        But ten strikes didn't work because the peer-to-peer

18  activity on Cox's network continued to grow.  So what did Cox

19  do?  They extended it to 12 strikes, but then 12 didn't work

20  because peer-to-peer activity continued to grow.  So what did

21  Cox do?  They extended it to 14 strikes.

22        For the claim period in this case, which is 2013 to

23  '14, it's that 14-strike policy that was in effect.  That meant

24  subscribers had to be caught and reported 14 times that they

25  were violating the law before Cox would stop the infringement.

1        But continually increasing the number of steps in its

2    policy before it had to suspend or terminate a customer was not

3    all Cox did to facilitate the piracy, though that would have

4    been enough.  Cox came up with five different ways to game its

5    own system that made the 14-strike policy even more of a sham

6    than it already was.

7        The three-strike policy had provided that upon the

8    third notice, there was a mandatory termination provision.

9    Under its 10-, 12-, and 14-step policies, Cox decided that

10   termination should not be automatic, but discretionary instead.

11       Now, I'm going to come back to this point of

12   discretion later because the manner in which Cox chose to

13   exercise its discretion is indisputable evidence of

14   willfulness.

15       The second way that Cox decided to game its own

16   14-step graduated response policy was it decided that it was

17   going to ignore the first notice it received about any

18   particular user.  That means that the first time that Cox

19   received an infringement notice about an infringing subscriber,

20   Cox would basically put it in the trash.  Cox kept the

21   customer's name, kept the customer's money, but ignored the

22   notice.

23       As Cox witnesses take the stand and try to weave a

24   justification for this policy decision to ignore the first

25   notice, consider how their explanation squares with Cox's

1    statement about how it takes the complaint seriously, and

2    consider that its users are prohibited from infringing on the

3    network, and so you can ask the question of why they were

4    throwing the first notice away.

5              The third way that Cox decided to game the system was

6    to institute a ceiling on the number of customers that Cox was

7    willing to suspend each day.  What this means is that Cox set a

8    daily limit at 300 as to the number of subscribers it was

9    willing to suspend.  So even under its 14-step policy, if it

10   called for, say, a thousand customers to be suspended, Cox

11   would say:  No, no, no, no, no.  The most we're going to do in

12   any given day is 300.

13             And as you'll see, the internal e-mails show that

14   they hit this 300 limit at usually nine or ten in the morning.

15             The fourth thing that Cox did to game the system was

16   it decided that it would only allow copyright owners to report

17   a certain amount of infringement.  Cox didn't want to know

18   about all of the infringement, so Cox said:  No, you're only

19   allowed to report 200 infringements a day.

20             Now, this is a different type of cap than the

21   suspension cap.  This is how much they will hear.  Anything

22   that a copyright owner sent over the limit was rejected with

23   Cox taking no action.  They wouldn't even tell the customer

24   that they had been caught and reported.

25             That was a choice that Cox made, and it shows that

48

1    Cox knew its subscribers were infringing but it didn't want to

2    know -- it didn't want to hear it.  It didn't want to have to

3    deal with it.  That's more evidence of willfulness.

4              Over time, the RIAA, the Recording Industry

5    Association, asked to increase the cap, and eventually and

6    begrudgingly, Cox did agree to increase the cap to 600 per day.

7    This is from a multi-billion-dollar company with all the

8    resources in the world behind it if it wanted to actually deal

9    with this issue.

10             Earlier I mentioned that the RIAA or MarkMonitor sent

11   270,000 notices.  That's 270,000 with the cap in place.

12             Now, Cox will try to characterize the caps as there

13   was -- try to say there was an agreement to the cap, but as you

14   hear the evidence, you'll see there was no agreement.  There

15   was an e-mail that the RIAA sent back that said:  Thanks.

16             They were being polite.  Last time I checked, being

17   polite doesn't mean you've entered into an agreement.

18             Cox will also try to distract from its own misconduct

19   by pointing out that after Cox begrudgingly increased the cap

20   to 600, the RIAA didn't send all the way up to the cap all the

21   time.  And while it is true that they did not hit the cap all

22   the time, it is a classic example of blaming the victim.  The

23   evidence speaks for itself, and you should listen to what it

24   says.

25             The fifth way that Cox gamed the system was

1   blacklisting.  In some instances, Cox simply refused to accept

2   any notices from a rights owner.  In the case of a company

3   called BMG Music, who is not a plaintiff in this case, Cox

4   blacklisted their antipiracy company called Digital Rightscorp,

5   or DRC, and you'll see some e-mails about that.  The records

6   show that Rightscorp sent Cox over a million notices.  Cox

7   simply refused to accept any of them.  It's hard to imagine

8   greater willfulness than that.

9          As the number of infringement notices increased, Cox

10  made change after change to be more lenient towards the

11  infringement, and the effect of the five cheats, or the five

12  ways that Cox was gaming the system, had a dramatic impact.

13  What Cox was telling the public was:  We take it seriously.

14  What Cox was doing internally was not taking it seriously.

15         As part of the charade internally at Cox -- as part

16  of its charade internally at Cox, the department charged with

17  implementing graduated response was called the abuse group.

18  The group is later renamed the safety department, but as you

19  will see, it really was an abuse group.

20         The abuse group was at the heart of Cox's effort to

21  avoid implementing its so-called no infringement policy.

22  Rather than stopping the infringement on Cox's network and

23  protecting the law and the rights of artists, the abuse group

24  dedicated itself to protecting Cox's customers by not

25  terminating those who were caught over and over again.

1          For many years, the abuse group was run by an

2     individual by the name of Jason Zabek, and his lieutenant was

3     Joseph Sikes.  Mr. Zabek and Mr. Sikes were long-time valued

4     employees at Cox.  Unfortunately for the music industry,

5     Mr. Zabek and Mr. Sikes were the proverbial foxes guarding the

6     henhouse.  They were responsible for overseeing the department

7     that handled the infringement notices.

8          Mr. Zabek and Mr. Sikes saw little value in

9     copyrights or in copyright owners, but don't take my word for

10    it.  Here's an e-mail that demonstrates the point.  In response

11    to a question from another ISP, Mr. Zabek made his views of the

12    copyright law clear:  F the DMCA.

13         In this e-mail chain, they are discussing

14    infringement notices from Digital Rightscorp, who I mentioned a

15    moment ago, who had been blacklisted.  So in response to

16    Mr. Zabek, Mr. Sikes added his two cents:  So, yeah, F the DRC.

17         Matt Carothers, who is Cox's principal security

18    architect, responded to this e-mail.  Now, his response was

19    not:  Hey, Cox needs to respect the copyright law and the

20    copyright owners.

21         What did he say?  He says:  Sorry to be Paranoid

22    Panda here, but please stop sending out e-mails saying F the

23    law or F some company.  If we get sued, those e-mails are

24    discoverable and would not look good in court.

25         Mr. Carothers was right.  Incredibly, those few words

51

1    say it all, and that's why we are here.  Cox was breaking the

2    law, and they knew it but did it anyway.

3         Now, unfortunately, Cox is not going to bring

4    Mr. Sikes or Mr. Zabek to this trial.  They were the two

5    individuals at the heart of what happened.  You can reach your

6    own conclusions about why those witnesses will be missing.

7    However, we will have an opportunity to see them -- see many of

8    their e-mails and see them responding to questions under oath

9    by video.

10        So just to recap where we are, Cox extended its

11   graduated response from 3 ultimately to 14 and then added

12   5 cheats on top of it, but in August of 2009, Cox decided to

13   make a mockery of the law.  Mr. Zabek sends an e-mail to the --

14   his abuse group, and it starts by saying:  Proprietary info.

15   This is not to be shared outside of Cox.

16        Already now I'm interested.

17        Then it goes on and says:  We want to hold on to

18   every subscriber we can.

19        Okay.  Next he says:  If a customer is terminated for

20   DMCA, you are able to activate them after you give them a stern

21   warning.  In other words, if they hit that 14th step and you

22   have to terminate them, you just reactivate them next.

23        And he explains:  We still must terminate in order

24   for us to be in compliance with the safe harbor.

25        Remember we discussed the safe harbor protection

52

1    earlier?  He says:  We still must terminate in order for us to

2    be in compliance with safe harbor, but once the termination is

3    complete, we have fulfilled our obligation.

4           After you reactivate them, the DMCA counter restarts.

5    In other words, you get to that 14th step.  You've been caught

6    14 times.  What happens next?  You're terminated, reactivated,

7    you go back to step 1.  They throw the next notice away.

8           And he was very clear that this was not something he

9    wanted to be public:  This is to be an unwritten semi-policy.

10          And the motive behind it was clear:  Remember to do

11   what is right for our company and our subscribers.

12          Noticeably absent was remember to do what is right

13   for the copyright owners who are sending the infringement

14   notices.

15          The effect of this new reactivation policy was

16   explained by another employee in May 2012, when he sent an

17   e-mail in which he said:  This gives the customer ten chances

18   to shares files before they even have to talk to us again.

19          The import was clear.  Cox would allow its customers

20   to keep breaking the law without even having to speak to Cox.

21   The terminations were not terminations at all.

22          In 2012, Cox changed its policy again.  At this

23   point, even Cox recognized the absurdity of its policy, and

24   Mr. Sikes sends out an e-mail, and he says:  Now, when we

25   terminate customers, we really terminate the customer for six

1    months.

2           Critically, however, this policy came with another

3    change.  Cox simply stopped terminating.  Remember earlier I

4    said we're going to talk about how Cox exercised its

5    discretion?  Well, this is how they exercised its discretion.

6           So did Cox start terminating for real?  Not really.

7    What happened under this new policy was, and the evidence will

8    show, that during the claim period of this case, Cox terminated

9    the sum total of 13 infringing subscribers.  Remember, the

10   record company sent notices on 57,600 infringers.  Cox

11   terminated 13.  This slide would probably better read:  Does

12   Cox start terminating for real?  And the answer really should

13   be no.

14          Cox has claimed in this case that it was trying to

15   stop the infringement.  The witnesses may testify that its

16   policies were developed to stop the infringement and how hard

17   they were trying or that their system worked, but just saying

18   something doesn't make it true.  You'll get to see the internal

19   e-mails, and you'll be able to decide whether they're just

20   saying that on the stand now, and you'll be able to decide

21   whether the internal e-mails indicate that's not accurate.

22          Cox will also claim that it stopped the majority of

23   the infringement because so much subscribers were only the

24   subject of one infringement notice.  When Cox makes this

25   argument, keep two things in mind.  First, Cox has absolutely

54

1   no idea whether its subscribers stopped infringing or not

2   because Cox wasn't watching.  All Cox was doing was looking at

3   the notices that were coming in, right?

4           And we know they blacklisted so they wouldn't get

5   some notices, they capped so they wouldn't take others, right?

6   And there's a limit to the number of notices that the content

7   companies can send.  So when they say that these subscribers

8   stopped, think about whether that's accurate.

9           And the second thing to think about when Cox claims

10  that they stopped the majority of the infringement is that this

11  case is not about the infringers who stopped after one notice

12  or two.  This is a case about the subscribers who infringed

13  after they were caught and reported over and over and over

14  again.

15          Though it may not seem possible, Cox's handling of

16  infringement by its business customers was even more

17  problematic.  The classic rule of follow the money applies

18  here.  These are the customers that were paying Cox the most,

19  sometimes between 15 and 20,000 dollars a month.

20          In 2012, Cox implemented the following policy.  Cox

21  would ignore the first notice that it received, again, put it

22  in the trash, but for every notice after the first, Cox was

23  supposed to call or e-mail its customer to discuss

24  infringement.

25          This was a toothless, never terminate policy, giving

55

1    infringers unlimited access to Cox's network to engage in

2    infringement.  The policy itself recognized that there well may

3    be excessive violations.  Yet the policy goes on to say that it

4    is not likely that they would ever terminate a business

5    customer, and in fact, the evidence will show they didn't.

6    They didn't terminate a single business customer.  Again, let

7    me say that again:  They did not terminate a single business

8    customer.

9         Now, under this policy, since there were never any

10   consequences to a subscriber for infringing, you can well

11   imagine what happened.  The infringement notices just piled up

12   and piled up and piled up, so while Cox was telling the

13   copyright owners that they prohibited infringement and they

14   were going to stop it, they, in fact, were doing nothing.

15        Now, remember we talked about Joseph Sikes, who was

16   in the abuse group, earlier?  Here's what he had to say about

17   the business customers in his deposition.

18        (Video excerpt played as follows:)

19        "Question:  It would indicate a serious problem to

20   you if a Cox business customer received 50 take-down notices,

21   correct?

22        "Answer:  Yes.  It would indicate a serious problem

23   to the customer as well.  I don't think any business would want

24   to have thousands of complaints caused by activity on their,

25   their network.

1          "Question:  Would it concern you if you learned that

2     a Cox business customer was the subject of hundreds or

3     thousands of copyright infringement notices?

4          "Answer:  Yes.

5          Question:  Do you think Cox should be doing something

6     about that?

7          Answer:  Absolutely."

8          (End of video excerpt.)

9          MR. OPPENHEIM:  So even Mr. Sikes said that if a

10    customer had 50 complaints, that would be a serious problem.

11    Well, apparently Mr. Sikes didn't know that for the short

12    period of 2012 to 2014, there were well over a hundred business

13    customers who were reported more than 50 times.  In fact, two

14    of them had over 4,000 notices.  Mr. Sikes testified under oath

15    that Cox should absolutely do something about that, and yet Cox

16    did nothing.

17         Cox will try to convince you that these business

18    subscribers were essential businesses like hospitals and

19    nursing homes and military bases, but in reality, they were

20    public WiFi systems, hotels, and fraternities.

21         I have now reviewed with you at length, maybe too

22    much length, Cox's sham policies, but Cox is going to likely

23    come up and say that its policies were consistent or better

24    than what other ISPs were doing, like the "everybody was doing

25    it" defense.  For those of you who are parents, you know it

57

1    well.

2         Cox is going to present evidence regarding an

3    experimental educational program that was called the copyright

4    alert system, CAS.  Now, CAS was developed by the record

5    companies and the movie studios with a group of other ISPs to

6    see if they could educate internet users who had been caught

7    infringing.  The educational program was created to stand

8    outside of the copyright laws.  In fact, the agreement creating

9    this says that explicitly.

10        Now, this is very important.  CAS, which Cox is going

11   to tell you about, says nothing about what an ISP needs to do

12   to comply with the copyright laws.  CAS stood outside of the

13   copyright laws.

14        Here's the punch line:  While Cox is going to point

15   to CAS over and over again in this case, I think, Cox refused

16   to participate in CAS.  They began the initial discussions and

17   then dropped out because they didn't want to do it.

18        As the infringement problem on Cox's network was

19   exploding, Jason Zabek, who was running the abuse group, knew

20   he had a problem, and he knew he needed more resources to

21   respond to the increasing problem, and he knew that his

22   department could not handle the influx.  So twice he went to

23   management at Cox to seek increased staffing, but those

24   requests were denied.  Instead, Cox actually did exactly the

25   opposite.

1          At the time when they needed more resources to

2    address the increasing peer-to-peer piracy problem on their

3    network, Cox opened the door wider.  In April 2011, Cox reduced

4    its abuse group staff from nine down to four and then piled

5    other abuse group -- abuse issues on them to handle.

6          Remember I told you that Cox had 20,000 employees?

7    They couldn't even afford nine to handle the infringement

8    issue?  This is yet more evidence of willfulness.

9          Let me turn to Cox's motive.  Sorry, I -- there we

10   go.

11         When I began my opening, I said that this was a case

12   about piracy by a company that put its profits ahead of the

13   law, and that's right.  Cox's actions were all about money.  In

14   e-mail after e-mail, Cox will show it prioritized collecting

15   monthly payments from infringers over addressing their

16   infringement.  Here are just two examples of many.

17         The first e-mail is from a member of the abuse group

18   during what's called a termination review, so this would have

19   been a subscriber who had hit the 14 steps.  And the quote is:

20   This customer will likely fail again, but let's give him one

21   more chance -- change -- chance.  He pays $317.63 a month.

22         Or the next one from Mr. Sikes:  This customer pays

23   us over $400 a month, and if we terminate their internet

24   service, they will likely cancel the rest of their services.

25         The motivation by Cox was unmistakable.  Terminate a

59

1    customer's service and lose the incoming payments from them.

2    Look the other way and collect hundreds of millions of dollars.

3           I will discuss damages in more length at my closing,

4    but I just want to touch on it quickly here.  In this case, the

5    plaintiffs have elected to seek what's called statutory

6    damages.  This is part of the Copyright Act, and Judge O'Grady

7    will ultimately provide you with a detailed instruction about

8    how to assess statutory damages, but let me give you a

9    high-level overview.

10          If you find Cox liable, you will be asked to

11   determine the appropriate amount of statutory damages.  The

12   damage range for non-willful infringement is 750 to 30,000, and

13   if you find that the infringement is willful, the ceiling of

14   that range goes up to 150,000.

15          There is a lot at stake here for both parties.  If

16   you, the jury, decides that Cox's conduct was as outrageous as

17   the plaintiffs believe it was, you will have the ability to

18   award up to $1.5 billion.

19          In addition to looking at Cox's conduct, you will

20   also be able to consider Cox's profits.  You will hear evidence

21   during the trial that while the record industry was losing

22   money, laying off employees, cutting artist rosters, and

23   signing less acts, Cox was making a billion dollars a year in

24   profit.

25          Cox will try to distract and minimize the damages

60

1    award by putting forward a flawed calculation.  The calculation

2    will try to determine what the actual harm to the record

3    companies and music publishers was from the infringement.

4            Of course, we discussed earlier there were no

5    records.  Nobody knows how many copies were made.  Nobody knows

6    how many people were going into the digital -- the free digital

7    music store on the internet.  And so when you hear these

8    analyses from these experts, think about whether or not they've

9    explained that.  Given everything that you will hear about

10   Cox's conduct, we believe that a large award will be warranted,

11   but ultimately, it will be entirely up to you, the jury, to

12   decide what that should be.

13           Before I close, one last time, let me thank you for

14   your service.  We know this is a busy time, but this is a vital

15   case for our industry, and we appreciate your attention.

16           THE COURT:  All right.  Thank you.

17           I'm going to give you a break in a second.  There was

18   a reference to persons appearing in person versus appearing by

19   deposition.  Potential witnesses who live outside of 100 miles

20   with certain other reservations can testify by deposition, and

21   a deposition given under oath is the same effect of a testimony

22   given here live, and you'll have, I think, several occasions

23   where you'll be listening to deposition testimony of witnesses

24   versus live testimony, whether -- and so I just need to make

25   sure you understand that both types of testimony are

61

1    admissible, and just because someone is not here in person

2    doesn't mean that their deposition testimony doesn't count.

3    There may be some other factors which go into that, but I

4    wanted to give you that little bit of information.

5            All right.  Then we'll take a 15-minute break, and

6    we'll come back and we'll hear opening statement by Cox.  All

7    right.  Thank you.  You're excused.

8            NOTE:  At this point, the jury leaves the courtroom;

9    whereupon, the case continues as follows:

10   JURY OUT

11           THE COURT:  All right.  Anything before we break?

12           MR. OPPENHEIM:  Not from plaintiffs, Your Honor.

13           MR. ELKIN:  No, Your Honor.

14           THE COURT:  All right.  Then let's take 15 minutes.

15   We're in recess.

16           NOTE:  At this point, a recess is taken, at the

17   conclusion of which the case continues in the absence of the

18   jury as follows:

19   JURY OUT

20           THE COURT:  All right.  Ready for our jury?

21           MR. OPPENHEIM:  Yes.

22           THE COURT:  All right, Joe, let's get the jury,

23   please.

24           NOTE:  At this point the jury returns to the

25   courtroom; whereupon the case continues as follows:

1    JURY IN

2          THE COURT:  All right, let's have a seat everyone.

3          All right.  Opening statement, Mr. Elkin.

4          MR. ELKIN:  May it please the Court, counsel, members

5    of the jury.

6          No reliable proof of infringement.  No material

7    contribution to infringements.  No control over infringements.

8    Three missing elements from this case.  And without these three

9    elements, this case lacks any basis.

10         Good afternoon.  My name is Michael Elkin, and I'm

11   pleased to be able to present the defense of Cox.  I wish I

12   could sometimes claim credit for all of what I'm about to say,

13   but I'm assisted by one of the best teams of lawyers I've ever

14   worked with.  I'm blessed to be able to work with them and be

15   in their company.

16         Let me just announce who the people are at these

17   first two tables.  They include Thomas Buchanan, Thomas Lane,

18   and Jennifer Golinveaux, all of whom will have an opportunity

19   to be able to present evidence in this case.  And there will be

20   others as well.

21         We also have with us senior representatives from Cox,

22   including Kristen Weathersby, who has been with the company

23   some 20 years, and Marcus Delgado, who has been with the

24   company for 16 years.

25         As you were told earlier, there's a whole lot of work

63

1   that gets done before you all have assembled here.  And we all

2   thank the Court, the Court's clerks, and staff who have done a

3   wonderful job of narrowing the issues and to be able to --

4   enable us to be able to present the proofs here today.

5          As you can probably tell already, this is an

6   adversarial process.  And while we'll be arguing against the

7   lawyers for the plaintiffs, we've had occasion to work with

8   them, they're fine lawyers, they're excellent lawyers, and we

9   will be pleased to be able to work together, and even on

10  opposite sides to be able to present the evidence to you all.

11         One of the things that we actually do agree upon is

12  the fact that we both thank you for your service.  This is an

13  important case for everyone, and we realize it not only is a

14  busy time, it's a huge investment of your time and energy, and

15  we thank you very much for that.

16         Now, getting to the case.  This is an action to make

17  Cox, an Internet service provider which merely provides access

18  to the Internet and does not spy on its customers, responsible

19  for its customers' alleged copying of music.

20         This is a misplaced lawsuit.  Plaintiffs haven't even

21  come to court with adequate proof of infringements that Cox's

22  customers allegedly committed.  The evidence doesn't hold

23  together.  And they shouldn't be coming after Cox, which merely

24  provides access to the Internet, unless they can show -- and

25  they cannot show -- that Cox materially contributed to

64

1    infringements or marketed its Internet service to infringers so

2    that they could and did receive money directly for this

3    infringing activity.

4            Cox is an extremely responsible company, unlike what

5    you've heard so far, 120-year-old -- a 120-year history founded

6    on the principle of doing the right thing, which I hope you

7    will agree, after listening to all of the evidence in this

8    case, that they did so here in addressing plaintiffs' notices

9    of infringement.

10           Cox, by the way, is also a content owner and has

11   great respect for content creation and ownership.  It has its

12   own copyrights, owns its own works, and respects authors and

13   creators.  It took painstaking efforts to ensure that both its

14   Internet customers and the Internet community as a whole were

15   acting in a safe and lawful manner.

16           When Cox could readily confirm alleged wrongdoing of

17   its customers, such as hacking or spamming or stealing or

18   breaching security, Cox would take decisive actions against

19   those perpetrators.  When it came to certain violations of its

20   rules, like copyright infringement, Cox did not have the same

21   visibility, as you will hear.  It simply was not possible for

22   Cox to confirm any wrongdoing.  It lacked both the ability to

23   inspect its customers' uploads.  And in any event, it would

24   never spy on its customers as that will -- would be, as you

25   will hear, against its core values.

65

1              But Cox did notify its customers of the alleged

2    infringement and took actions to remedy further potential

3    claims against those customers.  This including -- this

4    included warning customers that they could lose their Internet

5    service, that their service could and would be suspended, and

6    in extreme situations they could have their service terminated.

7              In fact, as you will hear, Cox was a leader in its

8    industry in responding to claims of copyright infringements.

9    Cox was successful in greatly reducing the amount of claimed

10   infringements by suspected infringing customers.  At no time

11   here did Cox assist them in committing these infringements.

12             Cox also did not have the practical ability to

13   control what its customers do on the Internet.  It simply

14   provided them with a gateway to the Internet.  It would not and

15   it will not spy on its customers.

16             And Cox did not market its service for infringement

17   or receive any direct financial benefit from any of these

18   so-called infringements brought about by any notion that Cox

19   failed to supervise its customers' alleged infringing

20   activities.

21             Furthermore, as you will hear, Cox did not charge its

22   customers for its alleged infringing activities, nor did Cox

23   customers sign up for the service because Cox promoted its

24   network as some sort of a digital safe haven.  Any such notion,

25   as you will see from the evidence, is simply preposterous.

66

1            And regarding the specific infringements that the

2     plaintiffs are complaining about here, plaintiffs cannot

3     show -- they cannot even show copying.  Unless the plaintiffs

4     can show the underlying infringements of Cox's customers to

5     begin with, there is no liability that can attach to Cox even

6     if plaintiffs could otherwise show that Cox was responsible for

7     contributing or supervising the infringements.

8            Plaintiffs cannot show underlying uploads or

9     downloads or side load or right loads or left loads.  Their

10    proof of tiny bits of data associated with the music files on

11    the computers associated with Cox customers have not been

12    verified in any way, shape, or form that we will show in this

13    case was necessary to make out any such claims.

14            Please, as you listen to the evidence, be aware of

15    the bluster and focus on the proof.

16            Let me address for a moment who Cox is.  Cox is a

17    family-owned company based in Atlanta, Georgia.  Started in

18    1898, older than any of us, even our grandparents.  And today

19    it has tens of thousands of employees and owns television and

20    radio stations, newspapers, cable, security, and automotive

21    businesses throughout the United States.

22            And there's a reason why it's been around.  It's

23    stuck to its core values.  Those core values demonstrate

24    unparalleled commitment to its customers, its employees, and

25    its community.  As you will hear, a dedication of privacy,

67

1     service and, yes, doing what's right.

2            Now, Cox provides services to its customers in a

3     variety of communities, urban, suburban, rural.  Those services

4     include television, cable and, yes, Internet service.  In this

5     case, as you've heard, relates to its Internet service.

6            So what does Cox do and what does Cox not do with its

7     Internet service?  Let's start first with what Cox does not do.

8     It does not create nor edit content.  It doesn't post anything.

9     It doesn't store anything.  It doesn't assist in the uploading,

10    streaming, or downloading of any content.  It can't see any

11    content that is being uploaded or downloaded, it can't find it,

12    it can't access it, can't take it down.  It simply provides a

13    connection.

14           Now, what does Cox do with respect to the Internet?

15    All it does relative to content is to provide a mechanism, a

16    pipe, a gateway, or a bridge for its customers to gain access

17    to the Internet.  In this respect, it's like a telephone

18    service with no ability to monitor the communications initiated

19    or received by its customers.

20           Now, the Internet and the decision as to why cutting

21    off access is never an easy one, is because, as we all know, it

22    is essential in living in the world today.  It involves and

23    affects our health care, work, school, banking, shopping,

24    access to news, entertainment, social media.  Frankly, whether

25    it's finding a doctor, getting medication filled, searching for

68

1    a job, or connecting with family and friends.  Without it, life

2    would be quite different and today quite challenging.

3         And the only way to gain access to the Internet is

4    through an Internet service provider, or what you'll hear in

5    this case, ISP, standing for Internet service provider.  Cox

6    provides that to millions of their customers in their homes and

7    in their businesses.

8         Now, while the Internet is an essential part of

9    everyday life, to be sure, it can also be dangerous in so many

10   ways.  ISPs like Cox have to address problems that fall into

11   three major categories.  Those that threaten the security and

12   integrity of Cox's network.  Those that protect Cox's

13   customers.  And those that protect the interests of third

14   parties who may be affected by the use of the Internet by Cox's

15   customers.

16        If Cox's network is attacked, such as a security

17   breach, there's no Internet service at all.  And in terms of

18   customer safety, there are many perils that Cox needs to guard

19   against, including malware, viruses, and hacking, and scams,

20   and spamming, and other invasions of privacy.  And as you will

21   hear, preserving privacy, yes, is important, it is paramount to

22   Cox for Cox's customers, especially in this day and age.

23        And as to copyright claims where there is lack of

24   ability of Cox to detect file sharing, as you will learn, Cox

25   introduced progressive measures to combat this problem.  As you

1    will hear, Cox was an industry leader in innovations, as I'll

2    describe in a moment.

3           Now, dealing with the sheer volume of abuses visited

4    upon ISPs like Cox, its customers, and the interests of third

5    parties, is an extraordinary undertaking.  There are simply not

6    enough resources or technology available to deal with the

7    volume of issues.  It is simply impossible to deal with all of

8    the matters that may crop up, like malware and privacy attacks,

9    and hacking, and copyright infringement, without imposing

10   certain conditions and limitations in Cox's network security.

11          So, in order to manage the process as best it can,

12   Cox developed an automated process called CATS, C-A-T-S, to

13   receive and process abuse complaints.  CATS stands for the Cox

14   Abuse Tracking System.

15          Anyone can notify Cox of an abuse by sending an

16   e-mail to Cox -- to a Cox e-mail address.  CATS, this system,

17   then automates their response, including taking actions to

18   respond to the complaint.  This system, as you will hear, as it

19   relates to ISPs was first in time and best in class.  It has

20   been recognized and adopted by other major ISPs.

21          As relates to claims of infringement, copyright

22   owners can e-mail Cox.  And assuming the notifications of

23   claimed infringement comply with Cox's privacy policies --

24   which, by the way, are designed to protect its customers

25   against various abuses -- Cox will process these notices,

1    create tickets, which is like a registration of the complaint,

2    and addresses all of this in an organized manner designed both

3    to educate its customers and to create impediments to further

4    claimed infringing activities.

5           And these range from providing notices, sending

6    warnings, placing restrictions on usage, requiring realtime

7    discussions with Cox personnel, imposing suspensions, and on

8    occasion in extreme situations termination of access to the

9    Internet service.  This system of escalation is entirely

10   voluntary on Cox's part.

11          Now, at the time Cox introduced graduated response in

12   the mid-2000s, as you'll hear from Cox's witnesses, you will

13   hear evidence that not a single other major ISP had any such

14   program for dealing with claims of copyright infringement.

15          So as I'll discuss in a few moments, there's this

16   interindustry initiative known as the Copyright Alert System,

17   CAS -- Mr. Oppenheim mentioned that in his opening -- in which

18   the plaintiffs and the other major ISPs participated, such as

19   Comcast and Verizon.  You will hear that that system was

20   actually modeled on Cox's system.  It was -- more importantly,

21   Cox's system was actually more aggressive in addressing

22   complaints vis-a-via its customers.

23          Now, there are two terms used in this case that sound

24   very close to each other and they may be confusing, "CATS" and

25   "CAS."  CATS, C-A-T-S, is the Cox Automated Tracking System,

1    the automated system that is used by Cox to permit anyone to

2    report any claimed violations of Cox's Acceptable Use Policy,

3    AUP, Acceptable Use Policy.

4           CAS, C-A-S, is the Copyright Alert System, the

5    interindustry agreement between some of the largest ISPs and

6    the RIAA, including the plaintiffs -- the RIAA is the Recording

7    Industry Association of America, which we'll get to in a few

8    moments, as well as the motion picture industry -- which

9    provided an agreed-upon arrangement with those -- all of

10   those -- the motion picture studios and the record labels, for

11   the ISPs to process and address copyright owners' notices of

12   infringement.  And I'll get back to that in a few minutes.

13          But turning back to CATS.  In order not to overload

14   the system that could result in crashing the system, Cox had a

15   self-regulating mechanism built into it.  It was a way, as you

16   will hear from the witnesses, to ensure a manageable number of

17   abuse complaints that may be received through the system at a

18   given time without overloading the system.

19          Now, this control mechanism takes various forms.

20   Such as how many notices CATS may process in a given day.  How

21   many individual notices of infringement may be received on a

22   given day from the same complainant.  This has to do with

23   ensuring fairness to the entire pool of complainants so that no

24   one could take for themselves all of the resources of the

25   system, leaving others not to gain access to the needed help.

72

1          Other abuse complaints will not be processed through

2     CATS if they violate Cox's privacy policies which are designed

3     to protect its customers.  So one of the control mechanisms

4     here was to cap the number of infringement notices that Cox

5     would receive on a given day.  And, yes, that default was 200 a

6     day per complainant.  Copyright owners and their

7     representatives would be notified of the limits so that they

8     could send and stagger their notices appropriately.

9          In certain circumstances, as was the case here, when

10    Cox was asked by a copyright owner to increase the limit, Cox

11    would do so.  We will show you evidence that the plaintiffs

12    asked for Cox to increase the numbers it would receive on a

13    given day to 600.  That's three times the number it normally

14    provided.

15         And by the way, it wasn't simply what Cox told them,

16    it's what the plaintiffs actually asked, would you process 5 to

17    600.  We said, we will do 600.  It was their request.

18         As it turns out, these plaintiffs actually sent far

19    less than this amount during the claims period 2013 and '14.

20    And Cox processed each and every one of these notices, every

21    single one.

22         Now, the only exception to Cox processing notices is

23    where the notice impinged on network security or customer

24    safety.  Some examples of that would be if a notice required a

25    customer to click on a link that is suspicious or may subject

1   them to potential harassment or harm.  And when this happens,

2   Cox is vigilant.

3          Cox witnesses will share with you that a primary

4   concern is raised when one of its customers receives an

5   unsolicited e-mail from a party posing as a legitimate source.

6   An example of that, as you will hear, is when a sender is an

7   imposter pretending to be a legitimate company contacting one

8   of Cox's customers inviting her to hit a link.  And when that

9   happens, when a Cox customers clicks on an unknown link, you

10  will hear anything could happen, virus, malware, spyware may be

11  installed, the computer may be hijacked for ransom, and

12  personal information, credit card information, or banking

13  information may be stolen.

14         And that is one of the many reasons why Cox rejected

15  the notices sent by a company by the name of Rightscorp, or as

16  you heard earlier, Digital RightsCorp.  This is a different

17  entity than MarkMonitor, who was the party that sent notices

18  for the plaintiffs.  Rightscorp directed Cox customers to click

19  on a link inviting them to make a settlement payment based on

20  Rightscorp's assertion of a claim of infringement.

21         As you will hear, Cox actually blocked the notices of

22  Rightscorp, which, again, did not send the relevant notices for

23  the plaintiffs here.  And the reason for that had to do with

24  what Cox believed -- and frankly, it's not just Cox.  Some of

25  the plaintiffs' representatives will also share with you the

1    questionable practices of that company by extracting

2    settlements based on unverified claims of infringement, and

3    where that company sent tens of thousands of notices on a daily

4    basis to Cox that was calculated to overload and shut down

5    Cox's system.

6            To be clear, the primary role of the safety team was

7    customer care, not policing copyright infringement.  Part of

8    the safety team's responsibilities, to be sure, was enforcing

9    Cox's acceptable use policy, which included responding to

10   claims of copyright infringement.  The individuals, including

11   Brent Beck, Joe Sikes, and Jason Zabek, you'll hear from all of

12   them, who were primarily responsible for the CATS safety team

13   at the time, and those that supervised them, Matt Carothers,

14   Linda Trickey, and Randy Cadenhead, you'll hear from all of

15   them as well, responded to notices of an infringement

16   consistent with these broad guidelines and discretion of the

17   staff.

18           But they were not hired to or required to act as the

19   copyright police.  They were not the handmaiden to the record

20   industry.  That was never supposed to be the case.

21           Now, Cox's graduated response system was designed to

22   be educational and informative in nature.  The thought being

23   that as Internet users were notified that they were the subject

24   of copyright infringement allegations, they would take steps to

25   ensure that their WiFi was secure or otherwise wasn't being

1   used by others to share music files.  Or they would cease to

2   engage in those activities as they might suffer some

3   repercussions, whether by receiving further notifications,

4   having suspensions, or potentially even losing their Internet

5   service.

6         The evidence you will see in this case will show that

7   the system was highly effective.  As you will hear from the

8   evidence, by the time that Cox ran accused customers through

9   the completion of Cox's graduated response program, the

10  overwhelming vast majority of those customers were never the

11  subject of claimed copyright complaints.

12        Also, Matt Carothers, who you see on your screen to

13  the left, the principal security architect at Cox, who will

14  testify here, will explain to you that Cox processed the first

15  notice, but didn't send it to the customer because it found it

16  did not create a significant difference in repeat offense rates

17  between subscribers.  And the majority of Cox subscribers only

18  received one notice.  They were processed, they weren't thrown

19  away or ignored, they were processed.  Cox didn't send notices

20  because most of the times that people were the subject of a

21  notice, they never received a second one.

22        Now, at the time that Cox -- at the time that CATS

23  was rolled out in 2003, no other automated abuse system was in

24  place, much less a graduated response system, addressing claims

25  of copyright infringement.  Other major ISPs even licensed the

1      system from Cox, including the company now known as Spectrum.

2            The program was so successful and heralded by the

3      Internet community that when, at the Government's urging, the

4      content community, including these plaintiffs, and the Internet

5      service providers gathered together on an interindustry

6      initiative to figure out how to deal with online piracy, Cox

7      was at the center in terms of all of the key players trying to

8      learn how effective Cox was in curbing copyright infringement

9      on its system.

10           You will hear video testimony from Cox's privacy

11     counsel, Randy Cadenhead, who showcased Cox's system to the

12     music, motion picture, and ISP industry groups, including

13     representatives of the plaintiffs.

14           And you will hear from Cox's witnesses that Cox

15     elected not to participate in this interindustry effort.  It

16     had its own superior system, one that was more effective and

17     more successful than what even they proposed.

18           Now, the claims here arose between February 2013 and

19     November 2014, but back around 2009 and '11 timeframes I just

20     alluded to, the music industry plaintiffs and the motion

21     picture industry on one hand and the major ISP providers on the

22     other held a lengthy and drawn out series of discussions and

23     negotiations to develop a cooperative effort to work together

24     to develop a working relationship where the Internet providers

25     would agree to process a limited, a limited number of their

1   copyright infringement notices on a daily basis.

2          The steps laid out in this agreement, known as the

3   Copyright Alert System, or CAS, C-A-S, or sometimes it is

4   referred, and you will see it in the evidence, as MOU, or

5   memorandum of understanding, were simply to provide notices and

6   then to escalate if the notices as the suspected infringers

7   persisted by engaging in a number of what you will hear as

8   mitigation steps, which ranged from warnings to suspensions,

9   whatever was acceptable to an ISP.  There was no termination

10  required, none.

11         This agreement was in existence during the entire

12  claims period.  I think I heard in the opening statement just

13  now that it was referred to as some sort of an experiment.  The

14  record industry was represented -- 85 percent of the record

15  industry was involved in this, and two-thirds of the cable

16  industry was involved.  The agreement took about a couple of

17  years to negotiate.  Then there were individual agreements that

18  were negotiated for a couple of years.  This process went on

19  for -- all told for many years and was extended six times.

20  It's hard to imagine anything that was less experimental.

21         But the program was designed to deal expressly with

22  the notion of repeat infringers, repeat infringers.  And the

23  thrust of this initiative, the thrust of it was thought to be

24  educational in nature, and not some mechanism designed to

25  deprive suspected infringers of their needed online connection.

78

1          Now, the RIAA, their lobbyists, represented all the
2     major record labels, and these companies are all related under
3     common ownership with the music publishers here.  Each of the
4     major record labels not only signed off on this agreement, they
5     also separately entered into what you will see as
6     implementation agreements with each ISP.  These are separate
7     agreements with each ISP spelling out particular requirements
8     for processing notices.
9          Each of these ISPs were specifically -- was
10    specifically permitted to cap the number of notices to be
11    processed, and there was no requirement, none, to terminate any
12    ISP user, even if they were the subject of repeat notices.  No
13    requirement to terminate, none.
14         Now, certain of these agreements simply provided for
15    sending notices with no escalation at all for certain ISPs.
16    And others went so far as to create limited suspensions, but
17    nothing anywhere close to the scale of what this Cox system
18    provided.
19         In fact, while plaintiffs complain that Cox had some
20    13, I think I heard today, 14 steps to its graduated response
21    program, that only shows as you listen to the evidence that Cox
22    was willing to continue to engage with its customers to address
23    the problem.  Under the CAS, plaintiffs and the ISPs gave up on
24    the customers.  As you'll learn, after six steps with no
25    termination.

1        But in this case, the plaintiffs seek to hold Cox to

2   a much higher standard, and are actually saying that they had

3   an obligation to throw their customers off of the Internet

4   despite the fact that to do so not only would be useless, but

5   contrary to what they had agreed with the other ISPs.

6        Now, how does Cox compare to the two systems?  We

7   will hear Cox's system was not only effective, it was far more

8   advanced than the CAS prescribed.  And of course, when extreme

9   circumstances warranted it, Cox actually terminated customers

10  under the graduated response program.  There is no such

11  requirement for the ISPs under CAS.

12       And as you will hear from the testimony, Cox listened

13  to what the participants were proposing, and Cox made the

14  decision that the procedures it had put in place for itself at

15  great expense to Cox was far more advanced and thought to be

16  far more effective than what was being proposed.  Therefore,

17  Cox elected to continue with what it believed to be a more

18  aggressive and effective process, and did not participate in

19  the CAS.

20       Talk for a moment about the plaintiffs.  There are

21  two groups of plaintiffs here, the record labels and the music

22  publishers.  You will hear there is common ownership between

23  Universal, Sony, and the Warner entities, that is to say on the

24  publishing and sound recording side.  They own the sound

25  recordings and the music compositions, there is no question

80

1   about that, but they do not create anything.  They are not the

2   collection agent for their artist.  They collect money, to be

3   clear, for themselves and for their own accounts.

4           The plaintiffs are billion-dollar companies.  They

5   have one of the most powerful lobbyists in Washington, the

6   RIAA, who fronted the plaintiffs' activities here.  They have

7   their own PAC and their own political connections that was

8   involved in this CAS.  This case has nothing to do with the

9   streaming music services that you hear about today, like

10  Spotify and Apple and Pandora.

11          And, by the way, there was a reference in the opening

12  statement where you will see the evidence impinge on this about

13  whether or not -- you know, how downloads were sort of killing

14  the music industry.  During this period of time, as you will

15  hear from the evidence, 2013 and 2014, there began to be a

16  proliferation of streaming services that dwarfed the growth of

17  the so-called digital downloads.  We ask you to keep that in

18  mind as you listen to the evidence.

19          And by the way, nothing -- none of the plaintiffs

20  here have any knowledge as to whether any Cox subscriber

21  allegedly copied its music that was on this peer-to-peer

22  network by downloading a legitimate iTunes track, uploading it

23  from her purchased CD, or otherwise by any lawful means.

24          Now, the record label plaintiffs that you will hear

25  about, and you will hear from them directly, are in a position

81

1     to sue and stop infringing infringers, individual infringers

2     who download music over the Internet.  They have done it

3     repeatedly.  In fact, they have literally brought tens of

4     thousands of lawsuits against individual defendants for

5     Internet music infringement.  They could have done this here

6     for the most egregious examples, they could have done this, but

7     they chose not to do so.  They are the ones that actually knew

8     through their system who they believed were infringing.

9            They have admitted that they don't want to do it, and

10    you will hear in this case, because it was bad PR.  They didn't

11    want to sue customers.

12           Now, the record labels were signatories to the CAS,

13    and at all times during the existence of these agreements,

14    including the claims period, 2013 and '14, they did not require

15    ISPs to terminate.

16           And while Cox did not participate in the CAS, given

17    its more robust system, Cox did work with plaintiffs to process

18    copyright infringement notices in an extremely cooperative

19    manner.

20           Now, you will hear from the witnesses, the RIAA,

21    plaintiffs' agent, and Cox, believe it or not, had an excellent

22    relationship at the time.  When the RIAA asked Cox to increase

23    the number of notices it would process on a given day, Cox

24    readily and cooperatively agreed to do that by three times, to

25    600 notices a day for the claims period.

82

1          And notwithstanding that during nearly the entirety

2     of the 2014 period when Cox agreed to accept some 600 notices

3     per day from the plaintiffs, plaintiffs didn't even send to Cox

4     on average even 500 notices a day during this very period.

5          There cannot be any serious claim about Cox turning

6     some sort of a blind eye to any notice of infringement by the

7     plaintiffs.

8          And with respect to these notices, as it turns out,

9     plaintiffs themselves don't even know what they're alleging.

10    There isn't even proof that they, themselves, verified through

11    actual downloaded copies.

12         As I just mentioned, the RIAA provided notices in an

13    amount that averaged less than 500 notices a day during the

14    claim period.  And Cox processed each of these notices in

15    accordance with its graduated response program.

16         Now, Cox had no idea whether the claimed

17    infringements were accurate.  If the notice was in the proper

18    form, as you will learn, and sent from a safe source, the

19    notices were processed.  And further notices involving the same

20    accused subscriber were escalated through the system.  Which,

21    in turn, reduced, as you will hear from the evidence from Cox

22    witnesses, the extent to which they would be the subject of

23    further notices.

24         Now, Cox simply does not have the ability to locate,

25    verify, disable access, or remove any claimed infringing file.

1    It doesn't have the ability to detect the actual contents of

2    the packets uploaded or distributed by their customers.  And

3    Cox would not, as I mentioned, in any event try to do that

4    because that would amount to spying on their customers.  Which,

5    as you will hear, is contrary to the policies and values of the

6    company.

7              Contrary to what plaintiffs would have you believe,

8    Cox never turned a blind to any of plaintiffs' notices.  To the

9    contrary, at all times Cox respected and treated plaintiffs'

10   concerns in a professional manner.  And you will hear that.

11             This is not a situation where plaintiffs can show

12   that any of Cox's subscribers actually unlawfully reproduced or

13   distributed any of their music that was even identified in the

14   notices that were provided.  There are no e-mails, there are no

15   screen shots, there are no actual downloads of the music in

16   question.

17             Plaintiffs' efforts to take you through their

18   evidence, trying to match bits of data here and tiny bits of

19   data there, to demonstrate that somehow it must be that Cox

20   customers copied plaintiffs' music files.  But as the evidence

21   makes clear, this will be an ineffective attempt to try to

22   piece together copying where we will show none can be shown.

23             Plaintiffs could have attempted to come to court with

24   actual downloads by the RIAA's agent, MarkMonitor as they had

25   the capabilities, as you will learn, to enter a so-called

84

1    peer-to-peer swarm and request from a Cox subscriber a

2    recording.

3           Now, if they did that, if they did that, they would

4    have actual evidence.  But you will see the evidence here, that

5    MarkMonitor didn't even try to do that, even though they offer

6    the service, because the plaintiffs didn't want to pay for it.

7    There are no downloads at all.

8           All they have is this theory advanced by their

9    expert, Barbara Frederiksen-Cross, who will testify for them

10   that the accused Cox subscribers had uploaded infringing files

11   because Cox subscribers claimed to have files with so-called

12   hashes that match the hashes of files allegedly -- that

13   allegedly are copies of plaintiffs' works.

14          As our expert, Dr. Nick Feamster, who you will hear

15   from, make abundantly clear in his testimony, this is

16   fundamentally wrong.  First, the so-called hash values simply

17   don't tell you what's inside the files.  He'll explain to you

18   that there are lots of reasons why a hash value may actually be

19   misleading about what the file contains.  That is, whether the

20   file contains any of their music.  And there will be zero

21   evidence that the presence of a hash value says anything about

22   whether the Cox subscriber acquired the recordings lawfully,

23   such as from an iTunes download.

24          Now, despite plaintiffs' efforts to demonstrate

25   copying through this metadata matching theory, they cannot show

85

1    that Cox's customers actually possessed copies of plaintiffs'

2    music.  And even assuming that some Cox customers did possess

3    copies of music files, there is no evidence that you will see

4    that these files contained copies of the works here.  There is

5    no evidence that any online files that may have existed were

6    unlawful copies of works that are at issue in this case.

7             So there is no evidence of reproducing any of the

8    claimed music files.  And plaintiffs admit that they have zero

9    evidence that Cox's customers actually distributed any of the

10   music files.

11            And our network security expert, Dr. Kevin Almeroth,

12   who will testify here, will explain that peer-to-peer networks

13   are used for many legitimate uses.  There is no proof that the

14   alleged actual infringer was a Cox customer, by the way.

15            The problem is worsened by virtue of the business

16   customers involved.  It's not simply residential customers in

17   this case, but also commercial customers.

18            Plaintiffs gloss over the fact that the claimed more

19   notorious Cox customers include hospitals, military bases,

20   universities, where it's impossible to control what's going on

21   or to discern who is doing what.  The notion that somehow

22   hotels and hospitals and big and small commercial

23   establishments are some sort of a digital record store, is not

24   something that will be borne out by the evidence here.

25            And even if there were infringements that could be

1   shown, there was no proof that the Cox customer had anything to

2   do with it.

3   　　　When it comes to Cox's business customers, be they

4   universities or hospitals, ISP resellers who have their own

5   ISPs who may be customers at Cox, who have their own

6   relationships to their own customers, or virtually any entity

7   where there is WiFi made available to the public, there is no

8   way that the claimed infringing activity can properly be

9   assessed against the Cox customer in question.  Who knows who

10  is accessing the Cox customers' WiFi?  As the evidence will

11  show, it is simply not possible to know this.

12  　　　Cox's business subscribers accounted for some

13  25 percent of the notices here.  25 percent.  And as you listen

14  to the evidence in this case, you will observe that during the

15  2013 and 2014 claims period, and before, to be sure,

16  peer-to-peer online infringement was an epidemic.  We

17  acknowledge that.

18  　　　You need to ask yourself in listening to all of this,

19  who is responsible for dealing with this?  The P2P software

20  creators?  The subscribers?  The web sites offering illegal

21  downloads?  The copyright owners?  The ISPs?

22  　　　As you will hear from both the experts and

23  representatives of the Cox safety team, the magnitude of this

24  problem was such that no one single party could handle this by

25  themselves.  You will learn that this was a shared

1  responsibility.

2        And for Cox's part, for Cox's part, it did what it

3  thought was helpful.  It developed and implemented a graduated

4  response system, which we will show was highly effective in

5  reducing repeat instances of copyright infringements of its

6  customers.  The thrust of the program was not intended to

7  terminate subscribers, but to educate them and to interact with

8  them at a fairly intensive level in an effort either to

9  determine the problem, be it getting their kids off the file

10  sharing sites, fixing their WiFi, to warn them, suspend them

11  and their service in order to get them to stop.

12        These actions, as you will learn from our witnesses,

13  had the result in stopping the overwhelming, vast majority of

14  customers accused of infringement after receiving ten or more

15  notices.  Sure, they could have terminated the relatively

16  insignificant number of accused infringers, but, as the experts

17  will opine, what would that have accomplished?

18        You will hear from the experts that the worst of the

19  worst would have simply gone across the street and signed up

20  for Verizon.  You will hear the record industry themselves had

21  the ability to go after the relatively small number of accused

22  infringers had they wished to do so, but they elected not to do

23  so even though they did it many years earlier.

24        You will hear them admit that they have a history of

25  filing claims against the worst of the worst.  We will ask them

88

1   why they didn't step up themselves and instead elect to

2   shoulder all of this on Cox, especially given their failure to

3   go after the real culprits, the peer-to-peer protocols and the

4   web sites offering these unauthorized recordings.

5           This is noteworthy, as you will learn from Cox's

6   witnesses, that during this period of time, 2013 and 2014, ISPs

7   were generally not permitted to block subscribers from

8   accessing sites or throttle bandwidths.

9           Here, plaintiffs seek to hold Cox for, as you heard,

10  contributory copyright infringement as to more than 10,000

11  music files.  By the way, music files is not the same as

12  notices.  Please don't confuse the two.  The notices may

13  actually relate to, as you listen to the evidence, the same

14  actual music files.

15          In order to do this, plaintiffs must prove direct

16  infringements by Cox customers of specific plaintiffs' music

17  files, that Cox had notice of each of these infringements, and

18  that it materially contributed to these infringements.

19          And listening to the evidence relevant to

20  contributory infringement, consider the testimony, as you hear

21  it, regarding what Cox actually did, provide an essential

22  service to its customers, access to the Internet, and the

23  efforts that it went through in order to respond to plaintiffs'

24  notices.

25          Against this backdrop, listen to the evidence as to

89

1    whether Cox had the ability to discern what was in those files.

2    They did not.  Cox processed the notices under its graduated

3    response program despite not being actually aware as to whether

4    the music was being copied.  It doesn't monitor the actual

5    files.  It cannot verify the existence of any such allegation.

6            You will hear in this case that it did at least as

7    much, if not more, in response to the notices it did receive

8    than what the plaintiff record labels required of other ISPs

9    under the CAS.

10           Cox was never shown any of the hard evidence of any

11   downloaded music because there wasn't any.

12           Further, our experts will testify that the underlying

13   data in the plaintiffs' notices were all questionable.  As I

14   said, you will hear that Cox simply can't locate, disable

15   access to, or remove any infringing files.  It has no ability

16   to do that.  It did not subscribe to the technology that would

17   have enabled this kind of monitoring.  And even if it could, as

18   you will hear from Cox, it would never spy on its customers.

19           And while the plaintiffs now believe that Cox should

20   have terminated Cox customers accused of infringement, the

21   truth is, as you will learn, plaintiffs didn't require that of

22   65 percent of the ISP community.  In extreme, extreme and

23   appropriate circumstances, as you will hear, Cox actually did

24   terminate customers accused of copyright infringement.  But the

25   evidence will show that termination should be the last resort.

90

1   As we all know, losing access to the Internet has grave

2   consequences.

3          And while Cox did on occasion terminate customers in

4   extreme cases, you will hear Cox witnesses testify that they

5   were right to pause before taking any such action given the

6   gravity of the situation.  There was no obligation to

7   terminate, and for good reason.

8          Now, plaintiffs also seek to hold Cox liable for

9   something called vicarious infringement, that Cox specifically

10  sought to make money from its customers' infringement, which

11  infringements Cox could control.

12         This claim, based on the evidence that you will be

13  presented with, is equally defective.  You will hear evidence

14  that Cox did not attempt to profit from any infringers and did

15  not market its service to commit infringement.

16         Cox provided an essential service to its customers,

17  the Internet.  In our daily lives, it has become a necessity.

18  And in terms of control, Cox doesn't monitor what its customers

19  upload and download.

20         And in terms of advertising, all ISPs, as you will

21  learn, market the notion of speed in their high-speed Internet

22  as speed is where the action is, when to watch movies or

23  sports, play games, engage in social media, or do almost

24  anything quickly on the Internet involving larger files.

25         The notion that Cox advertised or sold high-speed

91

1   Internet to profit from customer music infringing behavior has

2   no foundation here.

3         Cox is a media company and develops its own

4   intellectual property that it protects.  In any event, as you

5   will hear from Cox's witnesses, it would never profit directly

6   from any such unlawful conduct, and it didn't do so here at

7   all.

8         Now, plaintiffs cannot prove actual infringement

9   based on the evidence.  But even if they could, they cannot

10  show that Cox materially contributed to the actual instances of

11  specific infringements or received any direct financial benefit

12  from any of the infringements of their customers for whom they

13  had both the right and the ability to control such specific

14  infringing activities.

15        But even if all this occurred, even if it all

16  occurred, which it did not, as we will show, plaintiffs' notion

17  of compensation is absurd.  You will hear plaintiffs seeking --

18  and you saw some inkling of it earlier today -- more than

19  $1.5 billion plus in statutory damages for alleged secondary

20  copyright infringement in this case.  This request bears no

21  responsibility of any notion of loss.

22        And according to the opinion of our financial expert

23  that you'll hear from this case, Christian Tregillis, he will

24  provide testimony here, the most that plaintiffs could show,

25  even if they could prove infringement, amounts to more than

92

1    $700,000, which he calculates by multiplying the number of

2    notices for the works in suit by $1.

3           This assumes every notice represents a displaced,

4    legitimate, digital download, such as a purchase on iTunes, for

5    example.  Multiplied by what that customer would have paid for

6    it had it done so.

7           So if you were to find Cox liable for secondary

8    infringement, despite all of the evidence we're going to show

9    you to the contrary, this is the proper amount that we would

10   ask you to consider as you listen to the evidence.

11          Now, if you were to find Cox liable in this case, and

12   we believe the evidence, again, will not support that, the

13   Court will instruct you, as you heard, on something referred to

14   as statutory damages, and the ranges you may consider for this

15   award, and the factors you should consider in deciding how much

16   to award.

17          In listening to the testimony in this case as to how

18   you should approach how much in the way of statutory damages to

19   award, if you decide to find Cox liable, and we would urge you

20   not to do that, you should pay attention, please, to the

21   evidence bearing on how much plaintiffs can demonstrate they

22   lost.  They actually haven't come forward with any figure as to

23   loss.  But our financial expert has, and he reveals, based on a

24   thoughtful analysis that will be presented to you, that the

25   most they can show is $700,000.

93

1          Therefore, should you find Cox liable -- we hope that

2    you would not -- we would ask you to limit the statutory

3    damages to an amount that is closest, closest to that figure.

4    That will be many multiples of the amount of any claimed loss

5    according to the only evidence that will be presented in this

6    case.

7          Now, you've heard counsel talk about plaintiffs' --

8    that Cox's profits -- there's no basis to any notion that these

9    customers went on the Internet so that they could infringe.

10   The Internet is used for many things.  This theory -- there's

11   no support -- factual support for the theory.  And we would

12   submit that you'll determine based on the evidence that it's

13   nonsensical.

14         Now, lastly, plaintiffs' counsel made reference to

15   some former Cox employees working in the Customer Safety

16   department.  These individuals, Jason Zabek and Joseph Sikes,

17   plaintiffs seek to demonize these folks by cherry-picking

18   certain e-mails.  We've all sent e-mails that sometimes we

19   would rather not having sent if you send them every day.  But

20   you will learn from their testimony, these folks will provide

21   testimony by video as to the efforts that they made to address

22   infringement complaints.

23         Whatever intemperate statements are shown through the

24   various e-mails opposing counsel has highlighted, is nothing

25   more than sheer frustration in dealing with companies like the

94

1  labels and their lobbyist agent who overstepped their

2  boundaries in asserting claims.  These individuals, Zabek and

3  Sikes, were completely committed, as you will learn, to

4  addressing abuses of the customers and were sensitive to the

5  needs of the customers and the responsibilities to Cox.  The

6  truth is, they did an effective job at dealing with copyright

7  infringement claims.

8          So the e-mails that plaintiffs wave around are all

9  completely irrelevant to this case.  They're just trying to

10  distract you.

11          As you will hear about these -- as you hear about

12  these e-mails, please bear in mind that none of these e-mails

13  relate in any way to the plaintiffs here, to the plaintiffs'

14  works in this chase, and most of this is not even applicable to

15  the relevant time frame, 2013 and '14.

16          Bottom line, the evidence you will see here reflects

17  that Cox was absolutely a model citizen when it came to dealing

18  with claims of customer infringement.  It processed all of

19  plaintiffs' notices despite the fact that it could not verify

20  the allegations.  The system that it employed was highly

21  effective in reducing copyright infringement.  And it

22  provided -- the system itself provided notices, warnings,

23  suspended its customers, and on occasion in extreme situations

24  terminated customers where there was no other choice.  It was

25  more stringent than any other ISP and more than what the

D. Kooker - Direct

95

1  plaintiffs required of the other major ISPs.

2          For the plaintiffs' part, they have not bothered

3  providing reliable proof of the infringements.  There was no

4  contribution, no attempt to advertise nor profit from these

5  infringements.

6          Again, as I said at the beginning, three missing

7  elements in this case.  No reliable proof of infringements, no

8  material contribution to infringements, no control over

9  infringements.  These elements are key to finding Cox liable,

10  and they are missing from this case.

11          Thank you.

12          THE COURT:  All right.  Thank you, Mr. Elkin.

13          All right, let's call our first witness.

14          MR. ZABEK:  Plaintiffs call Dennis Kooker to the

15  stand.

16          THE COURT:  All right.  Our witness room is around

17  the corner, so it takes a minute to locate our witnesses

18  sometimes.

19          NOTE:  The witness is sworn.

20          THE COURT:  All right.  Good afternoon, Mr. Kooker.

21          Please, Mr. Zebrak, go ahead.

22          MR. ZEBRAK:  Thank you, Your Honor.

23          DENNIS KOOKER, called by counsel for the plaintiffs,

24  first being duly sworn, testifies and states:

25      DIRECT EXAMINATION

D. Kooker - Direct

96

1    BY MR. ZEBRAK:

2    Q.   Good afternoon, sir.  Would you please state your name for

3    the record.

4    A.   Yes.  My name is Dennis Kooker.

5    Q.   And, Mr. Kooker, where do you work?

6    A.   I work at Sony Music Entertainment.

7    Q.   And what is your position with Sony Music?

8    A.   I am the head of the global digital business and U.S.

9    sales group.

10   Q.   And how long have you worked within the music industry?

11   A.   A little over 24 years in the music industry.

12   Q.   And what is your educational history, sir?

13   A.   I have a Bachelor's in accounting and an MBA.

14   Q.   And did you go right into the music industry after you

15   obtained your MBA?

16   A.   I did not.  I worked in an unrelated industry with my

17   accounting background first.

18   Q.   And when was it that you moved into the music industry?

19   A.   After I finished my MBA, I was looking for an opportunity

20   to work in a company that would be global in nature where I

21   would have potential of traveling abroad, potentially working

22   abroad.  And assessing those opportunities, one of those

23   opportunities was music, which I always had a passion for, and

24   it seemed like a no-brainer to be able to work in an industry

25   that was kind of satisfying my career direction, but at the

D. Kooker - Direct

97

1    same time is a product that I'm incredibly passionate about.

2    Q.   And what was it that was your first job upon entering the

3    music industry?

4    A.   My first job, which was really important for me, was in

5    international royalties.  You know, my background, again, is

6    not creative.  So I knew that I was coming into the industry

7    from the business side of things.

8              And so, when I think about music and what's important

9    ultimately, I know the relationship with the artists is

10   incredibly important.  And the two most important aspects to

11   that are the creative side, and then on the business side is

12   royalties.

13             So I wanted to work in international royalties so

14   that I could understand that second-most important component

15   with the artists, which is ultimately how the royalty payments,

16   which is really the paycheck for the artist, gets paid through

17   to the artist.

18   Q.   And what company was it that you joined for that first job

19   in the music industry?

20   A.   That first job was actually BMG before Sony Music and BMG

21   merged into -- into one company.

22   Q.   And have you been with Sony Music your entire career?

23   A.   I have, yes.  My entire music career, yes.

24   Q.   Okay.  And when was it that you assumed your current

25   position with Sony Music as president of the global digital

D. Kooker - Direct

98

1  business and U.S. sales?

2  A.   About seven years ago, 2012.

3  Q.   And really just at a high level, could you tell the jury

4  what your responsibilities are in your current position.

5  A.   Yes.  I think at the highest level, ultimately I'm

6  responsible for generating the revenue and the commercial

7  strategy for the company overall.  So all of the relationships

8  that we have with our retail partners, both physical and

9  digital, operates through my team.

10  Q.   And who is it that you report to?

11  A.   I report to the chief executive officer and our chief

12  operating officer jointly.

13  Q.   And are you -- are you familiar with what an executive

14  leadership team is?

15  A.   Yes, I am.

16  Q.   And could you explain what that is.

17  A.   Yes.  So our leadership team is really made up of, you

18  know, obviously our CEO and COO, me as the head of our

19  commercial strategy, our general counsel, CFO, head of Human

20  Resources.

21        So that leadership team ultimately is the team that

22  drives the majority of decisions and direction for the company.

23  Q.   Thank you.  Today I'm going to ask you some questions

24  about the record industry and Sony Music's role in that, but

25  first I want to ask you just a very basic question.

1               Why is music important?

2     A.   Well, music is important because I think at first, the

3     emotion and passion that is so critically important when you

4     listen and experience music.  It's a connection that ultimately

5     bonds human beings together.  The passion and connection with

6     that music from times -- it comforts us in sadness.  It is

7     there for the happiest of moments.  It's the soundtrack for

8     when we work out.

9               It is -- you know, it is an essential connection to

10    us as human beings in thinking about what we do in our

11    day-to-day lives.

12    Q.   Is there anything beyond that emotional or passion

13    connection that --

14    A.   Well, I think the other part that's extremely important

15    for people to understand is ultimately -- you know, back to my

16    side of it, it is a business.  And ultimately, you know, there

17    are hundreds of thousands of livelihoods that are at least

18    somewhat dependent on what happens within -- within the music

19    industry.

20    Q.   So you mentioned this concept of an emotional connection

21    to music.  Could you relate it to an example.

22    A.   Yeah.  I can give some personal examples.  You know, when

23    I think about one of my happiest times in my life, I think to

24    my wedding and the song that my wife and I chose, Louis

25    Armstrong, "What a Wonderful World," you know.  Yeah, and it

D. Kooker - Direct

100

1   gets -- gives you goosebumps.

2           I think about my daughter, who is away at college,

3   and we've connected with Adele's cover of "Love Song."  And

4   whenever we need that kind of virtual hug, when one of us is

5   down, you put that song on and it immediately makes us think of

6   each other.

7           I also think about how music is just the soundtrack

8   of our lives.  And, you know, as I'm going through the material

9   for this case and I see The Clash, it immediately invokes

10  "Train in Vain."  I'm thinking about, you know, in the car with

11  my friends in high school when that song was really breaking,

12  hadn't heard it before, how amazing it was on our way to the

13  gym, you know, every weak.

14  Q.   Have you had the opportunity to become familiar with

15  Sony's music that's part of this case?

16  A.   I have.  And actually, I prepared a short medley to give

17  some examples.

18           MR. ZEBRAK:  Your Honor, with the Court's permission,

19  we would like to play a very short medley of some of the music

20  in the case.

21           THE COURT:  Do you have any objection?

22           MR. ELKIN:  No objection, Your Honor.

23           THE COURT:  All right, go ahead.

24           MR. ZEBRAK:  Mr. Duval.

25           NOTE:  A music clip is played.

D. Kooker - Direct

101

1   BY MR. ZEBRAK: (Continuing)

2   Q.   Mr. Cooker, why was it that you wanted the jury to hear

3   some of that music today?

4   A.   Well, I think it just is a good example of, you know,

5   exactly what I was talking about, that emotion, passion, that

6   connection.  You know, hopefully at least one of those songs

7   brought you back or reminded you of something that was

8   important or made you feel better.

9          Again, it's that emotional connection.  And,

10  obviously, these are some of the most important recordings

11  in -- in our company.

12  Q.   So I would like to explore some basic music industry

13  terms.  Could you start by explaining what is the record

14  industry?

15  A.   Sure.  The record industry is primarily focused on working

16  with artists to create, market, and distribute their

17  recordings.  And, you know, to give you an example or explain

18  that more clearly, you know, when you think of the biggest

19  single of the year, "Old Town Road" with Lil Nas X, or you

20  think about the two recent number one albums we had with Celine

21  Dion, or with country star Luke Combs, or you think of Elvis

22  Presley, it's the artists who you're thinking about, those are

23  the people that we work with to market, distribute, and sell in

24  the recording -- in the recording industry.

25  Q.   And where is it within the overall music industry that the

D. Kooker - Direct

102

1    record industry fits?

2    A.   So again, that part is, you know, the exploitation of

3    working with the performing artists.  There is also the music

4    composition, which is the songwriter actually writing the song.

5    Sometimes that is the same as the artist performing, often it

6    is not, there's a separate songwriter that contributes to it.

7         But beyond that, you know, there are retail partners,

8    there are digital service providers, there are live

9    performances in live venues, and an entire live industry, live

10   music industry around that.

11        In addition to, you know, thinking about studios and

12   recording studios and studio musicians and union employees, et

13   cetera, that make up the overall music industry.

14   Q.   So you mentioned -- I think you said digital service

15   provider.  But could you explain what you meant by that.

16   A.   Yeah, sorry.  I fall into that habit of using acronyms.

17   So a digital service provider is really services that most

18   people think about going and either listening to music or

19   watching a movie or a film.

20        So, for example, Apple Music, Amazon, Spotify are

21   examples of digital service providers.

22   Q.   And what is a music publisher?

23   A.   A music publisher is a company that works with the

24   songwriter.

25   Q.   And just to be clear, is there -- is a digital service

D. Kooker - Direct

103

1  provider, or DSP, the same thing as Cox?

2  A.   No.  A digital service provider is a retail -- or a

3  platform that ultimately is either selling or streaming music

4  to consumers.

5  Q.   So a DSP is different than an ISP?

6  A.   DSP is different than an ISP, exactly.

7  Q.   This is the Washington area where we're famous for our

8  acronyms.

9  A.   Sorry.  So is the music industry.  Sorry.

10  Q.   And just so we have some clear terminology, what is a

11  music download?

12  A.   A music download is a track or an album that has been

13  downloaded for purchase from a digital store, one of those

14  DSPs.

15  Q.   And what does music streaming refer to?

16  A.   Music streaming is when a consumer is listening to music

17  via a streaming service, like Spotify or Apple Music, where

18  ultimately the music is -- is typically not downloaded or

19  purchased by the consumer, but is experienced either through

20  add supported or a subscription type of payment method.

21  Q.   And what does the term "sound recording" refer to?

22  A.   Sound recording is the recording of a composition by an

23  artist or a band.  You know, in that medley I played, it ended

24  with Adele's "Rolling in the Deep."  "Rolling in the Deep" is a

25  sound recording.

D. Kooker - Direct

1   Q.   Thank you.  And you've referred to songwriters.  Would you

2   explain what a music composition is.

3   A.   Sure.  The music composition is the lyrics and the

4   composition of the song that is ultimately performed by the

5   artist.

6   Q.   And who generally owns music compositions?

7   A.   Typically the publishers own music compositions.

8   Q.   Do record companies generally own musical compositions?

9   A.   Generally they don't.

10  Q.   So besides the music publishers and the record companies

11  and the digital service providers, could you explain who some

12  of the other major participants are in the overall music

13  industry.

14  A.   Yeah.  I think, you know, back to some of the examples of,

15  you know, live venues, you know, there's a live business that

16  supports the music industry.  You know, recording studios,

17  engineers, studio musicians.

18  Q.   Okay.  And I promise one last term for you to define.

19  A.   Sure.

20  Q.   What does the term "A&R" refer to?

21  A.   A&R is artists and repertoire.  It's the area of our

22  company that focuses primarily on the creative side of the

23  artist relationship.

24  Q.   So could you expand on what you mean by A&R involves the

25  creative side.

D. Kooker - Direct

105

1    A.   Yes.  So A&R ultimately is the team that is working with

2    the artists in the studio.  First, often talent scouting,

3    finding the artist, signing and developing those artists,

4    working with them in the study to ultimately make the sound

5    recordings.

6    Q.   Thank you.

7         MR. ZEBRAK:  I would like to show the witness

8    plaintiffs binder one, specifically the first tab.

9         We would like to show PX 1 from plaintiffs' binder of

10   the exhibits to the witness.

11        THE COURT:  Mr. Elkin, do you need a moment to find

12   that binder?

13        MR. ZEBRAK:  It's the overall set of exhibits in the

14   case.  It is Plaintiff's Exhibit No. 1.  It's a straightforward

15   exhibit --

16        THE COURT:  It's an exhibit which identifies the

17   overall number of exhibits you have?  Is that what you're

18   saying?

19        MR. ZEBRAK:  No, Your Honor.  This -- if I could

20   identify what it is.  It's the list of the record companies'

21   list of sound recordings in the case.  It's the first exhibit

22   in the plaintiffs' exhibits.  We would like to show it to the

23   witness.  Cox has copies.

24        THE COURT:  All right.  Any objection?  Any

25   objection?

D. Kooker - Direct

106

```
 1              MR. ELKIN:  No objection, Your Honor, now that I know
 2    what it is.
 3              THE COURT:  All right.  Thank you, sir.
 4              Please go ahead.  It's received.
 5              MR. ZEBRAK:  Thank you.
 6    BY MR. ZEBRAK: (Continuing)
 7    Q.   Let's start again, Mr. Kooker.
 8    A.   Sure.
 9    Q.   So if you could turn your attention to the first tab in
10    that -- in that document.
11    A.   Yes.
12    Q.   And do you recognize what's there?
13    A.   Yes.  This is a list of the plaintiffs' copyrighted sound
14    recordings in this case.
15              MR. ZEBRAK:  Your Honor, with the Court's permission,
16    we would like to move PX 1 into evidence.
17              THE COURT:  It's received.
18              MR. ZEBRAK:  Thank you, Your Honor.
19    BY MR. ZEBRAK: (Continuing)
20    Q.   Mr. Kooker, how many record companies' sound recordings
21    are on that list that you have at Plaintiffs' PX 1 in front of
22    you?
23    A.   6,734.
24    Q.   Thank you.  And if you could also look at that document
25    and tell me, how many Sony Music sound recordings are on that
```

1  list of sound recordings in this case?

2  A.    3,225.

3  Q.    Thank you.  You can turn the binder closed for now.  Thank

4  you.

5           So let's -- let's explore a little more about the

6  background in the music industry.  Could you tell the jury

7  something about the different types of jobs that there are in

8  the record industry.

9  A.    Sure.  So I touched a little bit on the creative -- some

10  of the creative-oriented jobs from talent scouts to producers

11  and engineers.  But in addition to that, we have marketing and

12  promotion staff, sales teams, and then support functions like

13  Human Resources, legal and business affairs, finance.

14  Q.    And are these jobs all within record companies?

15  A.    These are jobs that are typical within record companies,

16  yes.

17  Q.    And could you describe the value that record companies add

18  to the creation of music.

19  A.    Yes, it's very significant.  You know, I think about --

20  you know, when I think about the value that we add, I think

21  about the 5,000 employees who literally wake up every day

22  focussed on our artists, our roster, to maximize what

23  ultimately -- you know, the creative works that they are

24  putting into the marketplace.

25  Q.    So you mentioned your roster.  What does it mean for an

108

1    artist to be signed by a record company?

2    A.    It's very significant.  I think it's, you know, a

3    recognition that they have achieved a very significant level in

4    the development of their career if they're serious about being

5    a musical artist for their career.

6    Q.    And what's the impact on the artist of being signed by a

7    record company?

8    A.    Especially when it's the first time for an artist, it's

9    pretty incredible.  And I can think of an example in the last

10   couple of months where we had a new and developing artist that

11   had been signed to one of our labels, they came into our

12   building, we have a giant billboard screen as you walk in the

13   building, and it said congratulations to the artist for signing

14   to the label.  And she immediately broke into tears, took a

15   picture, sent it to mom.  It's a really big deal.

16   Q.    And what happens with the artist, generally speaking,

17   after they have been signed to a deal?

18   A.    Really that's the beginning.  You know, from that

19   standpoint then we start focusing on making records, making

20   singles, making albums.  And at the point in time when the

21   creative process is completed, then a marketing plan will be

22   put together, a sales strategy.

23          So that signing is really just the beginning of all

24   of the hard work that is yet to come.

25   Q.    And then walk the jury, please, through what happens in

D. Kooker - Direct

109

1    terms of the recording process and then thereafter.

2    A.    Sure.  So, you know, the recording process will be, you

3    know, working with an artist, putting them in a studio,

4    matching them up with collaborators, potentially with

5    songwriters if necessary if they haven't written all of their

6    own music.  And also with talented engineers, with talented

7    studio musicians to ultimately make a recording.

8    Q.    And then what happens once the recording is made?

9    A.    Once the recording is made, then typically what would

10   happen is a marketing plan would be put together, which would

11   be really planning to release that new music into the

12   marketplace.  A sales strategy and sales plan working with all

13   of our retail partners would then accompany that marketing

14   plan.

15        And those two components would really lead the

16   release into the market when consumers like us hear it for the

17   first time.

18   Q.    Could you explain what are generally the core assets of

19   record companies?

20   A.    Yeah.  First and foremost, it's the music.  The music is

21   our asset.  It is how we generate our revenue.  It is the life

22   blood of the business.  But beyond that, you know, for me, and

23   especially coming from the business side of things, it was

24   important to understand that our business is built on artists.

25   Our most important stakeholder is the artists.

D. Kooker - Direct

110

1              But in addition to that, you know, we work with a

2    very unique product.  It is not a hard good.  You know, the

3    product that we are working with is ultimately a human being,

4    very talented human beings.

5              And because of that, you know, those 5,000 people at

6    Sony Music that wake up each day thinking about that have very

7    unique skill sets.  You know, so that is also a key asset to

8    ultimately running and being a successful company in a creative

9    industry.

10   Q.   So Cox has made the argument that record companies just

11   collect money for themselves and not their artists.  Did you

12   have a reaction to that?

13   A.   Yeah.  I could not disagree more.  Ultimately, you know,

14   my job is doing what I do on behalf of our artists.  And if I

15   don't do it well, then artists stop signing to me.  And in

16   today's world, an artist has many, many choices in the

17   marketplace.

18             And so, you know, ultimately I have to deliver for

19   that artist.  And that means that I have to look out for what's

20   best for them.  I have to protect their intellectual property,

21   their copyrights, and I have to maximize the commercial

22   opportunity for those copyrights in the marketplace.

23   Q.   Sure.  And you used the term "royalties" before.  Could

24   you explain what royalties are with respect to the record

25   company's relationship.

D. Kooker - Direct

111

1    A.   Yeah.  So royalties are the term that is used to designate

2    the payment that is made from the record company to the artist.

3    It's usually based on a contractual relationship between the

4    record company and the artists.  And it's usually paid as a

5    percentage of the revenues that are collected on behalf of that

6    artist.

7    Q.   Are copyrights among the core assets of record companies?

8    A.   Copyrights ultimately are absolutely the core asset of the

9    company.  They are the music.  They are the thing that protects

10   the music, that allows us to enforce that protection, and

11   ultimately it is what we are monetizing and commercially

12   delivering in the marketplace that generates revenue for the

13   company and for the artist.

14   Q.   What relationship, if any, is there between protection of

15   copyright and the royalties that artists obtain?

16   A.   I think they go hand in hand.  If there is no protection

17   of the copyright, then ultimately no one is -- there is no

18   remuneration, there is no payment being made, and ultimately

19   the artist is not able to get paid a royalty.

20   Q.   Sure.  Let's talk a little bit about how record companies

21   generally make money for themselves and the artists.

22   A.   Sure.

23   Q.   Could you explain how that has worked historically.

24   A.   Yes.  So historically, you know, all the way back to the

25   '50s and '60s, you know -- and the business has gone through a

D. Kooker - Direct

112

1   lot of change in how you actually generate revenue and make

2   money.  But it was a 45s business.  It was a singles business

3   on vinyl which eventually moved to LPs, eight-tracks, if any of

4   us remember that, to cassettes, to CDs, to digital downloads,

5   and now to streaming.

6          And so, you know, there has been a lot of different

7   ways to legally obtain music throughout the years.  And that

8   has changed dramatically from the way that consumers actually

9   listen to and experience music.

10         But all of those different components, even today,

11  other than maybe eight-tracks and cassettes, still make up, you

12  know, how we make money in the business, including vinyl.

13  Q.   And you referred to downloads.  How are sound recordings

14  available for sale as downloads in this era?

15  A.   So they would be available in a download store, it would

16  be a retail environment for purchase.  And they typically would

17  be available as individual tracks or also as albums.

18  Q.   And for what length of time has that been the case,

19  roughly speaking?

20  A.   Roughly, early 2000s.  I mean, the biggest, most prominent

21  store that everyone recognizes is the Apple iTunes store,

22  download store.

23  Q.   I would like to explore with you now some of the costs

24  that record companies typically incur.  Can you at a high level

25  list the more significant categories of those costs.

D. Kooker - Direct

113

1   A.   Yeah.  At a very high level, I will break them into three

2   categories.  There is the talent-related costs, which are the

3   costs, you know, in and around artists and signing artists and

4   making recordings.

5          There is marketing and promotion-related costs, which

6   is really about marketing the music as it enters the market

7   place.

8          And then there is overhead costs.  That is the

9   employees, the 5,000 employees that I mentioned earlier.  You

10  know, the costs of actually running the company and paying the

11  employees who ultimately are working to generate the revenue.

12  Q.   Sure.  Can you add a little bit more detail, walk us

13  through the nature of recording costs.

14  A.   Sure.  So typically there are advances that are paid for

15  recording.  There are advances paid to the artists for living

16  expenses.

17         And so, those type of expenses, including studio

18  time, paying for engineers, paying for studio musicians, and

19  also paying royalties make up the majority of talent-related

20  costs.

21  Q.   And what at a high level are artist advances?

22  A.   Artist advances are advances that we pay to the artist

23  typically at the time that we would sign a deal, sometimes at

24  delivery of certain materials within a contract, like when they

25  delivery a single or an album.  But they are typically payments

D. Kooker - Direct

114

1   made ahead of actually releasing music into the marketplace.

2   Q.   And what benefit, if any, does an artist receive from an

3   artist advance?

4   A.   A few things.  You know, most importantly they have the

5   surety of what they are going to earn out of an individual

6   project.  And most importantly, they have money in their pocket

7   to be able to cover some of the expenses and also to cover

8   living expenses.

9   Q.   And once the sound recording is made, what are some of the

10  costs involved in bringing that artist's work to a public

11  audience?

12  A.   So on the marketing and promotion side, you know,

13  everything from publicity to digital advertising and media,

14  radio, and actually getting the artist out in front of

15  consumers, be that on television through television shows, or

16  radio promotion tours, all of those are the types of costs that

17  go into marketing and promotion leading up to and after the

18  release of an album.

19  Q.   And given all these costs that you have been describing,

20  how would you characterize the investment risk that record

21  companies undertake?

22  A.   Well, it's substantial.  And the reason being that a lot

23  of those costs are actually incurred before any of the music is

24  actually in the public.  So the majority of the talent costs

25  happen before the release is actually made.  And a significant

D. Kooker - Direct

115

1    part of the initial marketing and promotion costs are actually

2    made before the music is in the marketplace.

3    Q.   And at that time does a record company know what will

4    achieve commercial success or not?

5    A.   Absolutely not.  And especially if it's a new and

6    developing artist that doesn't have a track record.

7    Q.   I would like to direct some questions to you about Sony

8    Music more specifically.  What is Sony Music's role in the

9    industry?

10   A.   We are one of the largest recorded music companies in the

11   industry.  We have operations in over 60 markets around the

12   world and a roster of tens of thousands of artists.

13   Q.   Could you name for the jury a handful of some of the more

14   well-known and famous Sony artists, Sony Music artists?

15   A.   Sure.  Some that were sampled earlier, Adele,

16   Bruce Springsteen, Elvis Presley, Aerosmith, to name a few.

17   Q.   And for every well-known, famous star like some of the

18   ones you have just mentioned, you know, how many more other

19   artists are there on Sony Music's roster?

20   A.   Many, many thousands.  You know, in fact, our -- one of

21   our primary goals is really breaking and developing new

22   artists, getting them to that established -- in that superstar

23   level.

24            And so, you know, at any given time the majority of

25   our active new signing roster will be artists that are yet

D. Kooker - Direct

116

1    undiscovered by most people.

2    Q.    And where is Sony Music headquartered?

3    A.    We are headquartered in New York.

4    Q.    And roughly how many people does Sony Music employ?

5    A.    About 5,000 people worldwide.

6    Q.    And roughly how many artists does Sony Music have a

7    relationship with in this business?

8    A.    It is tens of thousands.  And I would, I guess, explain a

9    little further that, you know, not all of those are active

10   roster putting out new releases today.  A significant portion

11   of those also are catalog artists, you know.  But those catalog

12   artists are equally important to us.  And ultimately, we have

13   to continue to maximize the revenues that we have for all the

14   artists, whether they're actively in cycle of making a record

15   or, you know, made a recording 30 years ago that is still

16   important and a key component to their livelihoods.

17   Q.    So is a catalog artist someone who is not currently making

18   music but whom you still have a relationship with?  Is that --

19   A.    That's correct.

20   Q.    Okay.  And are you familiar with the Sony Music entities

21   that are among the plaintiffs in this lawsuit?

22   A.    I am familiar with that, yes.

23   Q.    And do you know how many of them there are?

24   A.    There are eight of those, yes.

25            MR. ZEBRAK:  And, Your Honor, we would like to show

D. Kooker - Direct

117

1  the witness a slide that he is familiar with.

2          THE COURT:  That has those eight names on it?

3          MR. ZEBRAK:  Yes, sir.

4          THE COURT:  All right.  Go ahead.

5          MR. ZEBRAK:  Thank you.

6  BY MR. ZEBRAK:  (Continuing)

7  Q.  Are you familiar with these eight entities?  Arista Music,

8  Arista Records, LLC; LaFace Records, LLC; Provident Label

9  Group, LLC; Sony Music Entertainment; Sony Music Entertainment

10 U.S. Latin; Volcano Entertainment III, LLC; and Zomba

11 Recordings, LLC?

12 A.  Yes, these are all record companies under Sony Music.

13 Q.  And why does Sony Music have so many different entities?

14 A.  A couple of reasons.  One is historical.  You know,

15 through mergers and acquisitions there have been different

16 companies that have been put together with different legal

17 entities.

18          But also kind of the nature of music is that it's

19 very entrepreneurial.  So whether it be music companies or

20 actual labels, record labels, which a lot of people hear about,

21 ultimately we try to run our operations because it's creative

22 in nature in a very entrepreneurial way.  And as a result, we

23 have many different labels to represent the individual cultures

24 of those organizations or the creative vision and direction for

25 that area.

D. Kooker - Direct

118

1   Q.   And how long has Sony Music been in existence?

2   A.   Well, we have two of the oldest record labels in the

3   business, and both have been in business and existed for over

4   100 years.

5   Q.   Do you still have that binder in front of you that had the

6   list of Sony Music recordings?

7   A.   I do, yes.

8   Q.   And have you had a chance -- you said you've had a chance

9   to look through and you are aware of the Sony Music music?

10  A.   I have, yes.

11  Q.   Can you describe what types of music is included on that

12  list from Sony Music.

13  A.   Yeah.  It's a very healthy variety.  You know, across

14  different genres of music and different decades of music as

15  well.  So it is a really good sampling of our catalog and also

16  different types and styles of music.

17  Q.   And are any well-known, famous artists within those on

18  that list?

19  A.   Yes, absolutely, including some of the ones I played

20  today.

21  Q.   And is that list of Sony Music recordings that are the

22  subject of this lawsuit, does it only include music from famous

23  well-known stars?

24  A.   I think, as I have looked through the list, there are

25  probably quite a number of names that if I shared with the

D. Kooker - Direct

119

1  courtroom, people would not recognize.

2  Q.   Can you describe the importance of those artists and

3  recordings to Sony Music.

4  A.   Yes.  They are absolutely vitally important.  You know, at

5  the time that we sign an artist, we believe every one of them

6  are going to be enormously successful.  But based on business

7  experience, we also know that is not going to be true.

8           And, you know, but every single artist is equally

9  important and vitally important to the company because it is

10 what we do.

11 Q.   And did you have any reaction when you looked through the

12 list of the repertoire that is there?

13 A.   Just that it was incredibly expansive.  You know, I looked

14 at some artists that are near and dear to my heart, and I saw

15 complete, almost complete discographies, like their entire

16 life's work contained in this exhibit.

17 Q.   And what happens if the copyright protecting those

18 recordings is not enforced?

19 A.   Well, ultimately if it is not enforced, I am not even sure

20 the recordings ever get made because the investment can't be

21 made, and ultimately the business doesn't exist because the

22 copyright and enforcement of that copyright and monetization of

23 that copyright is the bedrock of our business.

24           MR. ZEBRAK:  Thank you.  No further questions.

25           THE COURT:  All right, thank you.  Let's break for

D. Kooker - Cross

120

1   tonight -- well, how much cross-examination do you have?

2           MR. ELKIN:  I think that's a good question, Your

3   Honor.  I think maybe 20 minutes.

4           THE COURT:  All right.  Can we do 20 minutes and

5   finish with this witness?  Does that work?  I'm sorry?

6           A JUROR:  Not 30.

7           THE COURT:  20.  All right.  We will see how it goes.

8   All right.  Then let's -- please, Mr. Elkin, your

9   cross-examination.

10      CROSS-EXAMINATION

11  BY MR. ELKIN:

12  Q.   Good afternoon, Mr. Kooker.  How are you?

13  A.   Good.  How are you?

14  Q.   Good, thank you.

15          On direct examination counsel took you through some

16  questions related to copyright enforcement.  I wanted to start

17  there in my examination, if I could.

18          Are you generally aware of the antipiracy efforts

19  that Sony Music has been engaged in from and after the time

20  that you assumed your executive positions with the company?

21  A.   I am generally aware.

22  Q.   And are you aware that from in or about, let's say, the

23  early 2000s to about 2008 or '9, that Sony brought a number of

24  lawsuits against individual file sharers with respect to

25  enforcing copyrights?

D. Kooker - Cross

121

1   A.   I am aware, yes.

2   Q.   And would you -- do you have an understanding as to

3   whether or not the number of those lawsuits, for example,

4   exceeded 5,000 complaints?

5   A.   I don't believe so.

6   Q.   Do you have any recollection at all as to how many

7   lawsuits were actually filed during that period of time?

8   A.   Sorry, I don't.

9   Q.   Would it surprise you to learn that through public

10  database we were able to pull some 5,000 complaints that Sony

11  Music filed against individual file sharers at this point --

12  during this point in time?

13  A.   That's possible, yeah.

14  Q.   With respect to enforcement of copyright, have you ever

15  heard of the program called the Copyright Alert System?

16  A.   Yes, I've heard of it.

17  Q.   And Sony had signed on to the Copyright Alert System,

18  correct?

19  A.   We participated in that, yes.

20  Q.   You are not aware of any individual lawsuits that Sony

21  filed against any individual file sharers using the Cox

22  service, are you?

23  A.   I am not.  I am not aware, no.  I am not aware personally,

24  no.

25  Q.   Is it fair to say that Sony stopped suing individual file

D. Kooker - Cross

122

1    sharers in or around 2009 because it was not very good PR?

2    A.    I don't know if that was the motivation.  I am not sure.

3    Q.    You did participate -- I think you said in your direct

4    examination that you participated, part of a team, including

5    the general counsel, correct?

6    A.    Yes.  On the leadership team, yes.

7    Q.    Yes.  Was there any -- do you recall having any

8    discussions at an executive level with regard to why a decision

9    was made not to continue to pursue individual file sharer suits

10   after 2009?

11   A.    I remember that there were conversations.  And I remember

12   that there were multiple reasons ultimately that played into

13   that.

14   Q.    But Sony just stopped after that time; is that correct?

15   A.    Yes, we stopped after that time.

16   Q.    Let me take you back to the 2013 and 2014 timeframe, if

17   you can harken back to that.

18         Were digital revenues from Sony Music, including

19   revenues from streaming services, the primary revenues that you

20   depend on to continue in making substantial investments

21   required to operate a recorded music company?

22   A.    Sorry, could you ask the question again?

23   Q.    Sure.  During the timeframe 2013 and '14, did you form a

24   belief that digital revenues of -- are and would remain the

25   primary revenues that Sony would depend on to continue to make

D. Kooker - Cross

123

1    substantial investments required to operate a recorded music

2    company?

3    A.   Digital revenues were a major component, yes.

4    Q.   Okay.  And that included streaming services as well,

5    correct?

6    A.   That did, yes.

7    Q.   And part of it is because people just stopped buying CDs

8    around that time, right?

9    A.   Well, no, I don't think people stopped buying CDs around

10   that time.  I think CDs have been declining in sales since

11   around 2000.

12   Q.   And -- now, today the majority of the revenues for Sony

13   Music are through streaming, streaming activities, correct?

14   A.   In the U.S., that's correct.

15   Q.   And did you form a belief in and around 2014 that then in

16   the last several years you believed there was an explosion in

17   online streaming services?

18   A.   I honestly don't recall exactly where my head was at in

19   2014.

20   Q.   Okay.  Do you recall forming a view that the streaming

21   services represent the second largest component of digital

22   music business enabling users to access millions of songs from

23   their personal computers or mobile devices without actually --

24   without actually buying the music?

25   A.   Yeah, it was very clear that we were going through a

D. Kooker - Cross

124

1    transition, and that streaming was something that was very

2    popular with consumers and will be an important part of the

3    future for the industry.

4    Q.   And this was back in 2014, correct?

5    A.   I don't know if it was exactly 2014, but --

6    Q.   Well, would it refresh your recollection if I were to tell

7    you that you provided testimony to that effect before the

8    Copyright Royalty Board when you testified in 2014?

9    A.   That wouldn't surprise me.

10   Q.   Okay.  Did you also form a belief at or around that time,

11   2014, that the growth of streaming over the last several years,

12   leading up to 2014, was staggering?

13   A.   From a very low base, yeah, it was a big percentage, but a

14   very little number.

15   Q.   But you would agree that you characterized it as

16   staggering, right?

17   A.   I honestly don't remember that, but I guess you have that.

18   Q.   Does that --

19   A.   Staggering is not a word that I typically use, so --

20   but --

21   Q.   Okay.  Well, let's take -- let's take a look.

22            MR. ELKIN:  I am going to hand to you my binder for

23   cross exhibits for Mr. Kooker.

24            Your Honor, I'm handing -- I'm having handed to the

25   witness a binder of potential cross exhibits.

D. Kooker - Cross

125

1          THE COURT:  Okay.

2     BY MR. ELKIN: (Continuing)

3     Q.   If I've done this correctly, it would be the second tab.

4     The third tab in your binder.

5          Again, as you open it up, you can look at the first

6     page.  Tell me if this refreshes your memory as to the

7     testimony that you provided to the Copyright Royalty Board.

8     A.   Yes, this is apparently my testimony.

9     Q.   And take a look at the last page of this document.

10    A.   The very last page?

11    Q.   Yes, please.

12    A.   Yes.

13    Q.   Is that your signature?

14    A.   Yes, it is.

15    Q.   What is the date that you wrote there?

16    A.   October 6, 2014.

17    Q.   Okay.  And the testimony that you provided to the

18    Copyright Royalty Board was truthful and accurate, correct?

19    A.   It was, yes.

20    Q.   Okay.  Take a look at page 11 of your testimony.  I'm just

21    going to read the second sentence:  For those online services

22    that report at least some of the user information, the growth

23    numbers are staggering.

24          Do you see that?

25    A.   I see that.

D. Kooker - Cross

126

1   Q.   That's a statement that you wrote in your testimony,

2   correct?

3   A.   That is -- yes, that sentence is there, yes.

4   Q.   Did you also form the view as of that moment in time that

5   one of the factors that accounted for the increasing popularity

6   of streaming services was the widespread availability of

7   broadband Internet connections?

8   A.   Likely, yes.

9   Q.   Okay.  And would you agree with me that Sony's revenues

10  from streaming services relies on access to widespread

11  broadband Internet connections?

12  A.   A component of it, yes.

13  Q.   Are you familiar with the reporting of Sony's revenues

14  year over year?

15  A.   Somewhat familiar.

16  Q.   Do you know that in 2018 Sony had a 22.3 percent increase

17  over the prior year from streaming revenues?

18  A.   Okay.

19  Q.   Does that sound right?

20  A.   Makes sense.

21  Q.   And that reflects approximately $2 billion out of the

22  $3.9 billion in revenues that Sony made during that period of

23  time, right?

24  A.   That makes sense to me, yes.

25            MR. ELKIN:  No further questions, Your Honor.

127

 1              THE COURT:  All right, thank you.

 2              Any redirect?

 3              MR. ZEBRAK:  No, Your Honor.

 4              THE COURT:  All right.  May Mr. Kooker be excused?

 5              MR. ZEBRAK:  Yes, Your Honor.

 6              THE COURT:  All right.  Mr. Kooker, you're excused

 7    with our thanks, sir.  Please don't discuss the testimony

 8    you've given with anyone until our trial is over.  All right?

 9              THE WITNESS:  Okay.

10              THE COURT:  All right.  Have a good afternoon.

11              THE WITNESS:  Thank you.

12              THE COURT:  All right, thank you.

13              NOTE:  The witness stood down.

14              THE COURT:  All right.  We're going to break for

15    tonight and come back tomorrow at 9:00 a.m., continue the

16    testimony.

17              And I'll repeat one more time today, please, go home,

18    enjoy the evening, don't discuss the case with anyone and don't

19    do any research or investigation.  Have a wonderful evening.

20    We'll see you tomorrow.  Thank you.

21              You're excused at this time.

22              NOTE:  At this point the jury leaves the courtroom;

23    whereupon the case continues as follows:

24    JURY OUT

25              THE COURT:  All right.  Anything before we break for

1    tonight?  Mr. Elkin.

2              MR. ELKIN:  One thing, Your Honor.  We received your

3    indication over the weekend with regard to our request that

4    witness exhibit binders was something that was not a

5    requirement but, you know, suggested or recommended.

6    Plaintiffs have not elected to do that, which is fine.  They're

7    not required to do it.

8              But I would just note that when the witness is called

9    to testify, we should, I think, have an exhibit binder at that

10   moment in time to not slow things down.  I would just make that

11   request.

12             There was also a demonstrative, which was of no

13   moment, but we really didn't get that.

14             THE COURT:  All right.  Let's -- you know, my -- I

15   thought when I required exhibits be identified a

16   day-and-a-half, things break down every day, new exhibits that

17   weren't identified the night before were included because of

18   testimony that's occurred during the day, so it -- I do

19   encourage it.  This is a civil case.  This is not a criminal

20   case where discovery issues are different.

21             Most definitely the binders should be identified and

22   ready for -- to be used to follow along.

23             And to the extent you have exhibits, the main

24   exhibits that you know you're going to use, I mean, there's no

25   surprises here.  I mean, you each know what's going on in

129

1    the -- in the case.  And so, let's provide them.

2              I don't want it to be a rule because I don't want

3    that to become a volcano every day.  But I certainly think that

4    you've cooperated to get the case this far, and cooperation

5    should continue.  So let's do it to the extent we can do it.

6              Mr. Oppenheim.

7              MR. OPPENHEIM:  We hear you.  We understand you.

8              I will tell you until this morning I did not

9    understand that the document management system in here would

10   not allow us to show the documents to -- it would only allow us

11   to show it everybody.

12             THE COURT:  Right.

13             MR. OPPENHEIM:  I thought that we would be able to

14   restrict the publication.  And certainly, for instance, when

15   the only exhibit is going to be Exhibit 1, a list of the

16   recordings, we didn't prepare a binder, we didn't think it was

17   an issue.  It shouldn't have been an issue.

18             But we hear you, Your Honor, and we understand.

19             THE COURT:  Okay.  So can we -- Amanda?

20             MR. OPPENHEIM:  And by the way, Your Honor, just so

21   it's clear, we did provide that demonstrative with the list of

22   companies beforehand.  So they had it.

23             THE COURT:  Okay.

24             MR. ELKIN:  I apologize.  I didn't see it, but I'm

25   sure -- I accept their representation.

130

1          THE COURT:  All right.  But having access to it --

2          MR. OPPENHEIM:  Absolutely.

3          THE COURT:  Because, you know, if we have a two- or

4    three-minute delay every time an exhibit is identified, that

5    isn't going to turn out well, and the jury shouldn't be sitting

6    around.

7          I thought we had corrected that problem.  That makes

8    no sense.

9          I thought we had corrected the problem with being

10   able to show electronically a document on only the witness'

11   screen.  I'll continue to pursue that.  That doesn't -- that

12   shouldn't -- I thought we had corrected it, and I apologize if

13   we haven't.

14         MR. OPPENHEIM:  It's quite all right.  Your Honor,

15   may I raise one other issue?

16         THE COURT:  Yes, sir.

17         MR. OPPENHEIM:  I didn't want to interrupt the

18   cross-examination of Mr. Kooker.  I'm not sure what the

19   relevance of eliciting testimony on streaming revenues in 2018

20   could possibly have in this case.  And I know that we want to

21   keep this trial moving forward.  I think it's a distraction for

22   the jury.  And unless there's some indication of what the

23   relevance is, I think in the future we will object.

24         I don't know if there's something I just don't

25   understand about the case, but --

1          THE COURT:  All right.  Mr. Elkin.

2          MR. ELKIN:  I can give it a shot.  I think he opened

3     the door.  He was talking about the revenues and how much money

4     they lost.  As the Court well knows, when you instruct the jury

5     at the end of the case on statutory damages, you're going to

6     have to get into the issues of deterrence, general and

7     specific.

8          And, you know, assuming everything they say happened

9     here, the issue is whether or not it's capable of happening.

10    Digital downloads are antiquated and it should be something

11    that the jury should consider with respect to deterrence.

12         MR. OPPENHEIM:  I may not be the smartest guy in the

13    room, I don't get it.  I don't get how --

14         THE COURT:  There's no need to deter the ISPs any

15    longer because revenues -- because the infringements aren't

16    occurring in the same way now as they did back in '09 to '14.

17    So is it marginally relevant to the need to deter that type of

18    behavior?

19         MR. OPPENHEIM:  Under that theory then, you know,

20    anything could come in under deterrence.  It opens the door

21    pretty wide.

22         Any way, I'll note my objection going forward, Your

23    Honor.

24         THE COURT:  Absolutely.  Okay.

25         MR. OPPENHEIM:  One moment, if I may.

1          THE COURT:  Yes, sir.

2          MR. OPPENHEIM:  So, Your Honor, I was very cognizant

3  in my opening to not cross the line that you drew on your

4  ruling on the motion in limine about non-payment, terminations

5  for non-payment.

6          Mr. Elkin went on at some length about how serious

7  and important Internet connectivity is, and that he wouldn't

8  terminate except in the most serious of circumstances.

9          I think the door is open and we should be able to

10 tell the jury how many subscribers that they terminate

11 regularly when they don't get their check.  Because he's now

12 said, it's so grave, we wouldn't possibly terminate.

13         THE COURT:  Mr. Elkin.

14         MR. ELKIN:  Thank you, Your Honor.  So I -- so number

15 one, I think the issue with respect to termination, I thought

16 where he was going with this was the ruling on the motion in

17 limine with respect to whether Cox terminated all of these

18 people.  We try to stay within the confines of Your Honor's

19 order with regard to saying it's not, you know, coin of the

20 realm.  In fact, it happens in isolated cases.  They may end up

21 making a lot of that at some point, but that was where that

22 was.

23         I think the reality is that there's a lot of

24 testimony in this -- there will be testimony in the trial with

25 respect to the fact that all of the ISPs, including Cox, were

133

1    loath to terminate.  They actually agreed to not actually do

2    that.  And it's not just because of the fact that they wanted

3    to have piracy proliferate.  It had to do with this notion of

4    it was a very difficult thing.

5         And the fee issues with regard to what was at stake

6    on the motion in limine in terms of the revenues was far

7    different, far more prejudicial, and I -- we would have

8    developed an entirely different, you know, presentation had we

9    had not had the benefit of Your Honor's ruling, but I -- I

10   think that would be a bridge too far simply to look at that.

11        They knew from the very beginning that we were going

12   to take the position that the termination is -- you know, is

13   not an easy step.  So I -- I fail to see the significance of

14   it.

15        THE COURT:  Well, you know, you ran a truck through

16   the ruling that I thought I made, which was that we weren't --

17   I wasn't going to allow a broad assault on the fact that you

18   terminate subscribers for other reasons that weren't relevant

19   to the gradual response program.  But then you went a step

20   farther and you put up slides that talked about medical care,

21   education, and all the other reasons why your customers need to

22   keep their Internet connection.

23        And that puts us in a different place, doesn't it?

24   Isn't it relevant now that, you know, you -- Cox cares about

25   its customers, it's a last resort, we never are going to, you

134

1   know, leave our customers hanging just because they have

2   infringed a couple of notices, and now for non-payment after 30

3   days, you -- or 60 days or whatever it is, I don't know, you

4   terminate them, no questions asked.

5            MR. ELKIN:  Well, I have two responses.  One is --

6   not to belabor the point.  I think what I had taken away from

7   Your Honor's earlier opinion is that we -- we should not parade

8   all of the terminations that we undertook.

9            The purpose for why I chose that demonstrative and to

10  talk about the different things was to talk about sort of the

11  nature of the service itself.  They had Kooker talk about how

12  Sony brings all good things to life with regard to the music

13  industry and all of that stuff.  And that's fine, they can talk

14  about what they do, what their product is.

15           And I think, you know, the Internet service is not

16  necessarily ephemeral, but it needed some explanation to sort

17  of bring that to life.

18           So that was not certainly the intention, Your Honor,

19  to overstep the contours of your order.

20           THE COURT:  Well, that's the effect of that opening

21  statement.

22           I'm going to allow plaintiffs to -- if there's

23  testimony concerning the care of its customers that you've

24  represented Cox considers, then I think it's relevant for

25  cross-examination to identify the numbers of subscribers who

135

1   are terminated for other reasons.  And so, I'll allow that

2   window, I think that's open now, and that is proper.  And your

3   exception is noted.

4          MR. ELKIN:  Thank you, Your Honor.

5          THE COURT:  All right.  Anything else?

6          MR. OPPENHEIM:  One last issue.  And I apologize.  I

7   know it is late, Your Honor.

8          One of the other things Mr. Elkin said in his opening

9   was that other ISPs did not have graduated response programs.

10  I don't believe that they can present any evidence to that

11  effect.  They took no depositions of any other ISPs.  There

12  were no documents subpoenaed or produced.

13         The only thing they can point to is CAS, which is --

14  which is something unto itself.  But he explicitly said,

15  outside of CAS, that nobody else had graduated response.

16         And I don't believe that Cox is going to be able to

17  present any evidence to support that, and I believe that there

18  should be a corrective instruction given, Your Honor.

19         MR. ELKIN:  That's not --

20         THE COURT:  The Frederick report, didn't it identify

21  a study that they did about how ISPs were doing with the

22  program?  Did I not read that correctly?

23         MR. ELKIN:  Matt Carothers is going to testify, and

24  he testified at the BMG trial, and he was someone who created

25  the graduated response out of whole cloth, he did it himself,

1   there were no models.

2          A part of his job, as Your Honor will hear along with

3   the jury, is to interact with all of these ISPs.  He negotiated

4   with Suddenlink.  He negotiated with Charter.  He negotiated

5   with Bright House.  And he has been in the industry since the

6   early 2000s, has knowledge with regard to the state of the --

7   they elicited testimony from Mr. Kooker about the record

8   industry and all that stuff.

9          So I think it's -- if they want to cross-examine him,

10  they certainly can.  They had him for, you know, seven full

11  hours.

12         THE COURT:  Well, I think you can ask him whether he

13  was communicating about the program with other ISPs.  I don't

14  think he can testify about what any other ISPs told him, that's

15  hearsay.  And so, I think that's as far as we go.

16         MR. ELKIN:  Okay.

17         MR. OPPENHEIM:  And, Your Honor, I will remind you

18  that Mr. Carothers sought at the BMG trial to testify to this,

19  and Your Honor excluded it on the grounds of hearsay.

20         So now what we have is something that was explicitly

21  excluded.  Cox did nothing different during discovery in this

22  case.  And yet Mr. Elkin gets up and presents and says, we're

23  the cutting edge, nobody else does this, we're the only ones

24  that do this.  And there's just no evidence to support it, nor

25  will there be.

137

1          The Stroz report, which I believe is maybe what you

2     are referring to --

3          THE COURT:  It is.

4          MR. OPPENHEIM:  That is entirely within CAS, has

5     nothing to do with what those ISPs were doing outside of CAS.

6          And I will tell you, Your Honor, I don't want to ruin

7     the surprise, but what Mr. Elkin is saying about CAS and his

8     representations about how it functioned, is entirely wrong.

9     And there will be testimony on that.

10         But you can't point to the Stroz report as a basis to

11    say what other ISPs were doing under the copyright law.

12         THE COURT:  Okay.

13         MR. ELKIN:  One last thing, Your Honor.  I know it's

14    late and we've been going since early this morning.

15         THE COURT:  Yes, sir.

16         MR. ELKIN:  I believe that if we all look back to

17    what happened in the BMG trial with respect to Carothers, there

18    is an issue about the fact that BMG was not a signatory to the

19    CAS.  He wanted to talk about that.

20         It's far more nuanced than what was just represented.

21    I mean, he'll be here in a few days.  He can cross-examine him.

22    I understand Your Honor's admonition with respect to the

23    contours.

24         THE COURT:  Okay.  All right.  Renew your motion when

25    it's --

138

1          MR. OPPENHEIM:  Very well.

2          THE COURT:  When we get there, and I'll look at it

3   again.  Perhaps I didn't appreciate the Stroz report and what

4   it said.  I've looked at a fair amount of information over the

5   last couple of weeks.

6          So I'll continue to look at it, and you can renew

7   your motion at that time.

8          MR. OPPENHEIM:  Thank you, Your Honor.

9          MR. ELKIN:  Thank you, Your Honor.

10         THE COURT:  All right.  Thank you all.  We will see

11  you tomorrow at 9 o'clock.

12         NOTE:  The December 2, 2019, portion of the trial is

13  concluded.

14         ------------------------------------------------

15

16                  CERTIFICATE OF COURT REPORTERS

17

18         We certify that the foregoing is a true and
           accurate transcription of our stenographic notes.

19

20

21              /s/  Norman B. Linnell
           Norman B. Linnell, RPR, CM, VCE, FCRR

22

23

24              /s/  Anneliese J. Thomson
           Anneliese J. Thomson, RDR, CRR

25