UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
              Plaintiffs,      :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
              Defendants.      :
                               :
-------------------------------:
```


<u>VOLUME  2   (A.M. Portion)</u>




TRIAL TRANSCRIPT

December 3, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:

FOR THE PLAINTIFFS:              MATTHEW J. OPPENHEIM, ESQ.
                                 SCOTT A. ZEBRAK, ESQ.
                                 JEFFREY M. GOULD, ESQ.
                                 MICHAEL J. DRUCKMAN, ESQ.
                                 ANDREW L. GUERRA, ESQ.
                                 LUCY G. NOYOLA, ESQ.
                                 JIA RYU, ESQ.
                                 Oppenheim + Zebrak, LLP
                                 4530 Wisconsin Avenue, N.W.
                                 5th Floor
                                 Washington, D.C. 20015


FOR THE DEFENDANTS:              THOMAS M. BUCHANAN, ESQ.
                                 Winston & Strawn LLP
                                 1700 K Street, N.W.
                                 Washington, D.C. 20006-3817
                                   and
                                 SEAN R. ANDERSON, ESQ.
                                 MICHAEL S. ELKIN, ESQ.
                                 THOMAS P. LANE, ESQ.
                                 CESIE C. ALVAREZ, ESQ.
                                 Winston & Strawn LLP
                                 200 Park Avenue
                                 New York, NY 10166-4193
                                   and
                                 JENNIFER A. GOLINVEAUX, ESQ.
                                 THOMAS J. KEARNEY, ESQ.
                                 Winston & Strawn LLP
                                 101 California Street, 35th Floor
                                 San Francisco, CA 94111-5840
                                   and
                                 MICHAEL L. BRODY, ESQ.
                                 Winston & Strawn LLP
                                 35 West Wacker Drive
                                 Chicago, IL 60601
                                   and
                                 DIANA HUGHES LEIDEN, ESQ.
                                 Winston & Strawn LLP
                                 333 South Grand Avenue
                                 Suite 3800
                                 Los Angeles, CA 90071

141

INDEX

OPENING STATEMENTS BY:


| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| DAVID KOKAKIS | | |
| | DIRECT | 144 |
| | CROSS | 164 |
| | REDIRECT | 203 |
| ALASDAIR McMULLAN | | |
| | DIRECT | 218 |
| | CROSS | 243 |
| STEVEN MARKS | | |
| | DIRECT | 268 |


COURT'S RULINGS

142

```
            1           NOTE:  The December 3, 2019, portion of the case
            2   begins in the absence of the jury as follows:
            3   JURY OUT
            4           THE COURT:  All right.  Good morning.  I see all
            5   counsel and the parties are here.  Good morning to all of you.
            6   And we have our jury now.
            7           Are there any preliminary matters?
            8           MR. OPPENHEIM:  Just to report, Your Honor, we are
            9   trying to move witnesses around so that we can accommodate
09:16:35  10   Mr. Almeroth on Monday.  One of the ones who we were fixed on
           11   Monday for, we have now pushed to Tuesday.  We think we will be
           12   able to do it.
           13           THE COURT:  The other option would be to push him to
           14   Friday and move the case along more quickly.  And keep that in
           15   mind.  All right?
           16           MR. OPPENHEIM:  Absolutely, Your Honor.  I agree.
           17           THE COURT:  Okay.  All right.  You know, the rule
           18   around here obviously is that you have got to have witnesses
           19   that run through the day so that we're not sending the jury
09:17:03  20   home at 4:30.  You will get assessed that time.  But more
           21   importantly, you will draw the wrath of the Court.  You have
           22   got Judge Bryan up there, he would tell you your case was over
           23   if you didn't have a witness.  And he would mean it.
           24           And I haven't adopted that, but let's make sure we
           25   have enough witnesses and anticipate that defendants may not
```

143

1 have as much cross-examination as you think they may have.

2 Okay?

3          MR. OPPENHEIM:  Absolutely, Your Honor.  We

4 understand that, and we are doing our best to finish it

5 quickly, move it along and have witnesses ready to go.

6          THE COURT:  Good.  Thank you.

7          All right, Joe.  Let's get our jury, please.

8          NOTE:  At this point the jury returns to the

9 courtroom; whereupon the case continues as follows:

09:18:27 10 JURY IN

11          THE COURT:  All right.  Please have a seat.

12          Good morning, ladies and gentlemen.  Thank you for

13 making your way back into court today.  And let me begin by

14 asking you whether you heeded my request that you not do any

15 research or investigation or speak to anybody?  Can I have a

16 nod of heads from everyone?  Thank you very much.  It is

17 really, really important.

18          All right, Mr. Oppenheim.  Next witness, sir.

19          MS. NOYOLA:  Good morning.  Plaintiffs call David

09:19:01 20 Kokakis to the stand.

21          THE COURT:  All right.

22          NOTE:  The witness is sworn.

23          THE COURT:  Good morning, sir.

24          THE WITNESS:  Good morning.

25          THE COURT:  Please proceed.

D. Kokakis - Direct

144

1          DAVID KOKAKIS, called by counsel for the plaintiffs,

2     first being duly sworn, testifies and states:

3          DIRECT EXAMINATION

4     BY MS. NOYOLA:

5     Q.   Good morning.  Sir, please state your full name for the

6     jury.

7     A.   David Kokakis.

8     Q.   Mr. Kokakis, where do you work?

9     A.   Universal Music Publishing Group.

09:19:56 10   Q.   Is Universal Music Publishing Group one of the plaintiffs

11    in the case?

12    A.   Yes, it is.

13    Q.   Would it be all right if I sometimes refer to Universal

14    Music Publishing Group as UMPG?

15    A.   Yes, that would be fine.

16    Q.   What is your current position at UMPG?

17    A.   I'm chief counsel for the company.

18    Q.   Tell us what you generally do or at high level as chief

19    counsel.

09:20:18 20   A.   I'm the lead lawyer for the company.  I handle the

21    contract negotiations.  I oversee litigation matters.  I handle

22    digital negotiations for the company.  And policy matters as

23    well.

24    Q.   Who do you report to?

25    A.   I report to the chief operating officer of the company, a

D. Kokakis - Direct

145

1    gentleman named Marc Cimino.

2    Q.   What is your educational background?

3    A.   I received a JD, a juris doctorate law degree, from Seton

4    Hall University.  And a Bachelor of Arts degree from Madison --

5    excuse me -- Drew University in Madison, New Jersey.

6    Q.   How long have you worked at Universal Music Publishing

7    Group?

8    A.   Just over ten years now.

9    Q.   And how much of that time were you chief counsel?

09:21:03 10    A.   The past few years.  And prior to that -- thank you,

11    sir -- prior to that I was also in business and legal affairs

12    in different capacities.

13    Q.   How long have you worked in the music industry?

14    A.   As an attorney for just over 20 years.  But I had a prior

15    life as a musician and songwriter and recording artist,

16    producer and engineer.  A lot of different hats.  And in total,

17    just about 35 years.  I started when I was young.

18    Q.   You mentioned you were a musician.  What instrument did

19    you play?

09:21:32 20    A.   I was a drummer, which some would question as to whether

21    that's qualifying as a musician, but it does.  I also played

22    keyboard, and produced a bit, and dabbled with guitar.

23    Q.   What type of music?

24    A.   Primarily rock music, with a little bit of pop influence.

25    Q.   And what about your -- you mentioned you were a songwriter

D. Kokakis - Direct

146

1    as part of a band as well?

2    A.    Yes, that's correct.

3    Q.    And tell us a little bit about that experience.

4    A.    Well, it's a challenging art.  It's a bit of magic

5    involved in songwriting.  It's a painful, creative expression

6    at times.  And as painful as it was sometimes, it was also some

7    of the best memories I have had during that moment in time when

8    I was creating work with my colleagues.

9    Q.    So based on your own experience as a songwriter and your

09:22:24 10   work at UMPG, can you tell us a little bit about the

11   songwriting process in general.

12   A.    Sure.  As I said, it's a little bit of magic.  It's kind

13   of this magical combination of notes and rhythm and melody and

14   lyric that comes together in a way that creates art.  It's

15   audible art.

16   Q.    And how many songs does a songwriter typically write in a

17   year?

18   A.    Oh, it depends on the songwriter concerned.  Some are

19   quite prolific.  Some could write hundreds of songs a year.

09:22:58 20   Some go through a painstaking process of perhaps producing just

21   a few noteworthy songs a year.  It depends on the writer

22   concerned.

23   Q.    So the songwriter writes the song.  Who typically performs

24   the song?

25   A.    At times the songwriter will also be the recording artist,

D. Kokakis - Direct

147

1    but much of the time the artist is different from the

2    songwriter.  So there are two distinct professions and two

3    distinct creative works.  You have the song and then the sound

4    recording of the song.

5    Q.   Can you provide an example where the songwriter is

6    different than the recording artist?

7    A.   Certainly.  There is a popular song "R-e-s-p-e-c-t"

8    performed by Aretha Franklin, which happened to be written by

9    Otis Redding.

09:23:47 10          There are some songs in the case here, such as by

11    Aerosmith like "Livin' on the Edge," which was written by a

12    gentleman named Mark Hudson.

13          Also, Aerosmith "Rag Doll" was written by a gentleman

14    named Jim Vallance.

15          There is also another song subject to this case,

16    "Life is a Highway," which was performed by Rascal Flatts,

17    which was written by a gentleman named Tom Cochrane.

18          So there are lots of examples where -- including

19    songs subject to this case, where the songwriter is a distinct

09:24:23 20    entity or person from who is performing the song.

21    Q.   And "Life is a Highway," there are actually two recording

22    artists for that song; is that right?

23    A.   Well, multiple, actually, because it was covered several

24    times.  It was originally written and performed by Tom Cochrane

25    back in the maybe late '80s, early '90s, and then was covered

D. Kokakis - Direct

148

1  multiple times by different artists, including Rascal Flatts

2  more recently for the movie "Cars."

3  Q.   Can you provide an example where the songwriter is also

4  the recording artist?

5  A.   Certainly.  We have many, as I said, writers who are also

6  the artists.  Billy Joel tends to write his own material.  One

7  of the songs subject to this case is "I Go to Extremes" by

8  Billy Joel both as the performer and the songwriter.

9       "Lose Yourself" by Eminem is also subject to this

09:25:19 10  case.  He co-wrote that song and performed it.

11       I could go on if you would like.

12  Q.   All right.  Well, thank you.  Let's turn now to music

13  publishers and their role in the creation and development of

14  songs and songwriters.

15       Mr. Kokakis, what does a music publisher do?

16  A.   We help to manage the careers of the songwriters.  We give

17  them guidance in terms of their career paths.  We help manage

18  the creative works that they create by finding opportunities to

19  exploit them, by going out and collecting money generated from

09:25:54 20  those works, and by protecting the rights of the songwriters.

21  Q.   Can you tell us a little bit more about the creative

22  support that music publishers provide to songwriters?

23  A.   Certainly.  Well, I'll speak to Universal and what we've

24  created.  We have hundreds of employees who work in the

25  creative department who do nothing but liaise on a daily basis

D. Kokakis - Direct

149

1    with the songwriters who we represent.  Again, giving them

2    creative support, setting up studio sessions for them,

3    co-writing opportunities with other writers, discussing career

4    path, discussing opportunities to place their songs in film and

5    TV projects and commercial advertisements, things of that

6    nature.  Anything that a songwriter needs to help create the

7    art that winds up being brought to the public.

8    Q.   And where do the record companies fit into this process?

9    A.   Well, the record companies play a critical role in the

09:26:51 10   ecosystem, but a very different role.  The record companies

11   record the songs.  They record the music that winds up being

12   publicly distributed.  They represent the records and the

13   artists.  Publishers represent the songwriters and the songs.

14   Q.   How do music publishers help songwriters make a living

15   from their songs?

16   A.   Well, as I mentioned, we look for opportunities to help

17   commercially exploit the songs that are delivered to us by

18   looking for licensing opportunities, by looking for artists to

19   record the songs.  Licensing opportunities could take the form

09:27:28 20   of placement in a film, placement in a TV project, in a

21   commercial, embodiment on a record, use in merchandise like

22   lyric t-shirts, karaoke products, things like that.

23   Q.   Does that mean that a songwriter gets paid every time a

24   song is played in a bar?

25   A.   Yes.  That is known as public performance.  There are very

150

few exceptions for that for small, small venues.  But when you

hear a song in a shopping mall, in a concert venue, in a bar or

a restaurant, that generates a royalty payment to the

songwriter.

Q.    I would now like to talk a little bit about more about

UMPG specifically.  Tell us about UMPG and its business.

A.    Certainly.  We're one of the largest music publishers in

the world.  We have offices in dozens of countries throughout

the world.  We have a roster of tens of thousands of

songwriters, and several millions of copyrights that we

represent, millions of songs.

Q.    What are the different music genres in UMPG's catalog?

A.    A varied genre, based -- really we touch every genre from

pop, to R&B, to rock, to hip hop, to classical music, country,

everything in between, and probably sub-genres that I'm not

even aware of that we represent.

Q.    Can you name a few songwriters that Universal Music

Publishing Group has signed that we might recognize?

A.    Sure.  The more recognizable ones would be Barry Manilow,

and Billy Joel, and Bruce Springsteen, and Otis Redding,

Brittany Spears, Christina Aguilera, Justin Bieber, Justin

Timberlake, Steppenwolf.

        I mean, I could spend the entire day naming the list,

if I could recall all of them.  But it's a renowned roster of

clients.

D. Kokakis - Direct

151

1  Q.   Who are some songwriters who have been prolific in their

2  career but we may not recognize?

3  A.   Well, as I mentioned, they are distinct professions, the

4  songwriter and the recording artist.  So much of the time the

5  songwriter is the unsung hero of the music business because

6  they are the ones behind the scenes creating the music, and

7  they don't often get the notoriety because they are not out in

8  front of the camera or behind the microphone.

9            So there is a woman named Diane Warren, who you

09:30:06 10  probably haven't heard of, but who is one of the most prolific

11  songwriters in the world.  She has written songs for decades

12  now, very popular songs.  Such as a song by Aerosmith, "Don't

13  Want to Miss a Thing," which was written for the movie

14  "Armageddon."  Or "Nothing is Going to Stop Us Now" by

15  Starship, which was written for the movie "Mannequin."  Or

16  "Rhythm of the Night" by DeBarge.

17            I mean, she's contributed so much to the music

18  business and to the songs that many of us recognize, but no one

19  will probably ever know who she is.

09:30:44 20  Q.   Are there other entities that are related that are within

21  the Universal Music Publishing Group that are plaintiffs in

22  this case?

23  A.   Yes, I believe there are a dozen of them.

24  Q.   Did you assist in preparing a demonstrative for your

25  testimony today?

D. Kokakis - Direct

152

1    A.    I did, yes.

2         MS. NOYOLA:  I have a copy of the demonstrative I

3    would like to hand up to Your Honor.  And opposing counsel

4    should have a copy as well.

5         THE COURT:  Any objection to publishing the

6    demonstrative?

7         MS. NOYOLA:  I would like to pass a copy up to Your

8    Honor.

9         MR. BUCHANAN:  No, Your Honor.

09:31:19 10   THE COURT:  All right, thank you.

11   BY MS. NOYOLA: (Continuing)

12   Q.    Mr. Kokakis, is this the demonstrative that you helped

13   prepare?

14   A.    Yes, it is.

15   Q.    What does this slide show?

16   A.    This slide shows the 12 corporate entities under the

17   Universal Music Publishing Group that are the plaintiffs in

18   this case.

19   Q.    And why are there so many different UMPG entities?

09:31:45 20   A.    We have dozens of different corporate entities that

21   collectively compromise Universal Music Publishing Group.  And

22   the point of having these different entities is because some of

23   them are affiliated with different territories, different

24   genres.  Some were acquired over time and we kept those

25   corporate entities intact.

D. Kokakis - Direct

153

1     So that's why we have so many different companies

2 under the single umbrella.

3 Q.   Thank you.

4     Mr. Duval, you can take that down.

5     I'd like to talk about UMPG's licensing activities.

6 What are the different types of licenses that Universal Music

7 Publishing Group negotiates on behalf of its songwriters?

8 A.   Certainly.  Well, I already mentioned licenses for film

9 and TV projects.  Those are commonly known as synchronization

09:32:36 10 licenses.  We issue licenses for the use of lyrics, as I

11 mentioned, in merchandise or in karaoke-based product, in sheet

12 music.  We issue licenses for the performance of songs in, as I

13 mentioned, bars, restaurants, concert venues, dance studios.

14     And more commonly, we issue what's known as a

15 mechanical license, which is for the use of a song in a sound

16 recording.

17 Q.   And what are the different types of sound recordings that

18 may fall under mechanical licensing?

19 A.   Well, there are different media types that sound

09:33:11 20 recordings can be exploited through.  You could have vinyl.

21 You could have -- I remember vinyl back in the day.  I remember

22 cassettes.  I remember 8-tracks.  Those were kind of clunky.

23     More recently, we see digital downloads.  And we see

24 streaming now, which is the preferred or more common method of

25 distribution of sound recordings on services like Spotify and

D. Kokakis - Direct

154

1    Apple and Pandora and Amazon.

2    Q.   Why is that license called a mechanical license?

3    A.   It's called a mechanical license because it refers to the

4    physical or mechanical embodiment of a song on a sound

5    recording.  And it dates back to many decades ago where you had

6    mechanical piano rolls, right, the scrolls with the -- you

7    know, with the grooves in them.  And those would sit inside of

8    a piano and turn and actually play the song.  They would click

9    the keys.

09:34:11 10         So that's how the phrase or name "mechanical royalty"

11    came about.

12    Q.   Are the licensing opportunities generated from -- like --

13    for -- by licensings for musical compositions the same as those

14    generated for sound recordings?

15    A.   Sometimes they're the same and oftentimes they're

16    different because they're unique rights types that are

17    attributable to songs that aren't attributable to sound

18    recordings.

19         For instance, the public performance of a song

09:34:46 20    generates a royalty for the songwriter.  Lyrics are unique to

21    songs.  Those licenses would bear a royalty for the songwriter,

22    but not for the recording artist.

23         So there are some distinct areas for song royalties

24    that don't overlap with sound recording royalties.

25    Q.   We've been talking about royalties.  Can you give us a

D. Kokakis - Direct

155

1   sense of a royalty rate for, say, downloading a song?

2   A.   Certainly.  It's prescribed by law under the Copyright

3   Act.  And it's something that fluctuates over time.  But at the

4   moment, the prevailing rate is 9.1 cents per song per download.

5   Q.   And what portion of the royalties does a songwriter get

6   from that royalty?

7   A.   It depends on the underlying contract between the music

8   publisher and the songwriter.  But generally the songwriter

9   will get the bulk of that money, anywhere from 90 percent down

09:35:47 10   to perhaps 50 percent.  More commonly in the 75 percent to

11   90 percent range goes to the songwriter.

12   Q.   So a dime per download.  How is a songwriter supposed to

13   make a living off of a dime per download?

14   A.   Well, it's a numbers game.  It's a volume game.  So it's a

15   very low margin, low cost transaction that over time adds up.

16   It's a pennies business, even a micro pennies business these

17   days.

18        So one of the responsibilities that we're charged

19   with as the music publisher in representing a songwriter is to

09:36:23 20   go out and collect all the micro pennies.  And, you know, if

21   all goes well, that adds up to something that a songwriter can

22   make a living from.

23   Q.   I'd now like to -- now that we have this background, I'd

24   now like to turn to the UMPG musical compositions that are at

25   issue in this case.  Are you familiar with them?

D. Kokakis - Direct

156

1    A.   Yes, I am.

2          MS. NOYOLA:  I would like to hand up to the witness a

3    document that's been previously marked as PX 2.  And I also

4    have a copy for Your Honor as well.  And I'm hoping counsel

5    also has a copy.

6          THE COURT:  All right.  Thank you.

7          THE WITNESS:  Thank you, sir.

8    BY MS. NOYOLA: (Continuing)

9    Q.   Mr. Kokakis, do you recognize this document?

09:37:11 10   A.   Yes, I do.

11   Q.   And what is PX 2 at a high level?

12   A.   It's a list of compositions that are subject to this

13   litigation.

14   Q.   And are you familiar with how this document was prepared?

15   A.   I am, yes.

16         MS. NOYOLA:  Your Honor, I'd like to move PX 2 into

17   evidence.

18         THE COURT:  Any objection?

19         MR. BUCHANAN:  No, Your Honor.

09:37:34 20        THE COURT:  It's received.

21         MS. NOYOLA:  Mr. Duval, thank you.  Can you please

22   pull up page 22.

23   BY MS. NOYOLA: (Continuing)

24   Q.   And, Mr. Kokakis, I'd like to direct your attention to

25   page 22, starting at line 903.  And if you could, just peruse

D. Kokakis - Direct

157

1    through page 47, Mr. Kokakis, through line 1969.

2    A.    Yep, I recall this.

3    Q.    What do these entries show?

4    A.    These entries show those compositions subject to this suit

5    that are owned or controlled by Universal Music Publishing

6    Group.

7    Q.    Can you identify a couple tracks that -- and the different

8    columns that are shown here, can you go through them very

9    quickly.

09:38:20 10   A.    Certainly.  It shows the song title, which is listed under

11   Track.  It shows the corporate entity that owns or controls

12   that composition.  And it shows the copyright registration

13   number in the third right-hand column.

14   Q.    Can you identify a couple tracks here that we might

15   recognize or that strike out to you.

16   A.    Sure.  Rather than flip pages, if I may, I'll go a bit

17   from memory.  Some of them, I -- some of them I already named.

18   But "Lose Yourself," written and performed by Eminem, "Insane

19   In The Brain," by Cypress Hill.  "I Go To Extremes," by Billy

09:39:05 20   Joel.  "Bonnie and Clyde," by Jay-Z and Beyoncé.  Our writer on

21   that track happens to be Tupac Shakur because one of his

22   pre-existing works was sampled into that song.  "She Will Be

23   Loved," by Maroon 5.

24          There were a few Aerosmith songs that I mentioned

25   before that are subject to the case, like "Rag Doll" and

158

1    "Livin' on The Edge."  "Stronger," by Kelly Clarkson.

2              I could look for more if you'd like, but I think that

3    gives a sampling.

4    Q.   That's fine, thank you.  How many total UMPG works are at

5    issue in this case?

6    A.   I believe just over a thousand songs are at issue in this

7    case by Universal, meaning owned or controlled by Universal.

8    Many more when you take into account the other plaintiffs.

9    Q.   Okay.  And if you could turn to the last page.  Can you

09:39:59 10   tell me -- tell us how many total musical compositions are at

11   issue in this case?

12   A.   Universal owned or --

13   Q.   Total.

14   A.   Total, total.  Okay.

15   Q.   If you just turn to the very last page.

16   A.   I see a count of 3,283 compositions.

17   Q.   Thank you.  You can put that document to the side.

18   A.   Thank you.

19   Q.   Mr. Kokakis, as chief counsel, are you involved with

09:40:29 20   UMPG's antipiracy work?

21   A.   Yes, I am.

22   Q.   In what capacity?

23   A.   I oversee the process of managing a team of people who

24   help to identify where our songs are being stolen, infringed

25   upon, used without authorization.  And we come up with

D. Kokakis - Direct

159

1    strategies for how to enforce the rights of our songwriters and

2    to reach out to people in those instances to try to put

3    licenses in place or find commercial solutions or, as a last

4    resort, to litigate when we're essentially ignored or can't

5    come to terms with the party who has infringed.

6    Q.   And from that work, do you think that peer-to-peer piracy

7    was a problem for Universal Music Publishing Group in the years

8    2013 and 2014?

9    A.   Undoubtedly.  It was a problem for the entire music

09:41:23 10  industry.  And, yes, Universal felt pain during that time, as

11   did all of our clients.

12   Q.   Why was it a problem?

13   A.   It was a problem because you, essentially, had platforms

14   that allowed for the consumption of music without there being

15   any payment for that.  It's like I just had the lovely

16   experience of going to WalMart on Black Friday, and if people

17   can envision what that experience is like, imagine if

18   everything was actually free and you could just run through the

19   store, you know, and take whatever you want.

09:41:58 20       That's what a peer-to-peer file sharing environment

21   is like.  It's the Wild West.  It's a complete free-for-all

22   where people's property is just stolen at will.

23   Q.   And are there particular challenges associated with

24   peer-to-peer piracy versus other types of piracy?

25   A.   Well, yes, there's some unique aspects to it in that you

D. Kokakis - Direct

160

1    can't identify much of the time, most of the time who is

2    actually engaging in the activity, meaning who's stealing the

3    property.  There are millions of those individuals involved or

4    entities involved.  So it's untenable to go after everybody.

5    You just can't enforce your rights that way.

6         So the anonymity of it and the just sheer volume of

7    it makes it very difficult to manage our rights, to enforce our

8    rights.

9    Q.   Has Universal Music Publishing Group ever tried to

09:42:59 10   calculate its harm or losses from peer-to-peer piracy?

11   A.   You know, I've been asked that in different contexts.

12   And, you know, the example I give is that if the house is on

13   fire, you don't stop to measure the temperature that the flame

14   is burning at.  You put the fire out, and you know it's doing

15   damage.

16        And that's kind of what this is.  It's very difficult

17   to quantify because, again, there's anonymity.  You don't know

18   what the volume of activity is going on behind the scenes.  But

19   some things are self-evident.  And this is one of those things.

09:43:34 20   If you have property available for free or goods available for

21   free, you know people are stealing them, you can't quite tell

22   how many, but it's clearly doing damage.

23        So in direct response, no, we haven't run specific

24   analyses of this, but we don't have to to know that there's

25   damage being done.

D. Kokakis - Direct

161

1   Q.   And how did you learn about the alleged infringement in

2   this case?

3   A.   There was a company named MarkMonitor that was engaged by

4   the record labels via the RIAA, which is a trade organization,

5   the Recording Industry Association of America, which represents

6   many record labels.  And this company, MarkMonitor, was hired

7   to monitor different platforms to see where there was

8   infringing activity taking place.

9         And because much of our repertoire overlaps with the

09:44:34 10   sound recordings that were being detected by MarkMonitor, we

11   knew that our songs were being infringed upon as well.

12   Q.   Did UMPG hire MarkMonitor to monitor the --

13   A.   No, we did not directly hire MarkMonitor, no.

14   Q.   How were they hired and how did you learn?

15   A.   Well, they were hired through --

16         MR. BUCHANAN:  Objection, Your Honor.  We're getting

17   into hearsay now.

18         MS. NOYOLA:  I'm sorry.

19         THE COURT:  Lay a foundation if you'd like him to

09:44:56 20   discuss this.  Was he involved in the hiring decision?  You may

21   ask him if you'd like.

22   BY MS. NOYOLA: (Continuing)

23   Q.   How did Universal Music Publishing Group associate with

24   MarkMonitor?

25   A.   We did not --

D. Kokakis - Direct

162

1            MR. BUCHANAN:  I'm going to object.

2            THE COURT:  Overruled.

3            THE WITNESS:  Yes, Your Honor.

4            THE COURT:  Were you involved in the negotiations or

5    the contracts or the licensing with RIAA or MarkMonitor to

6    enlist their help in this endeavor?

7            THE WITNESS:  No, Your Honor, I was not.

8            THE COURT:  Okay.

9            THE WITNESS:  Not directly.

09:45:38 10            THE COURT:  How did you learn of it?

11            THE WITNESS:  I learned about it through our sister

12    label, Universal Records, or Universal Music Group, because I

13    communicate with them on a regular basis.  I have an

14    overlapping role with UMG --

15            THE COURT:  Okay.

16            THE WITNESS:  -- on the sound recording side.  So I

17    have personal knowledge of what took place.

18            THE COURT:  Well, you had -- you have secondary

19    knowledge through Universal?

09:46:00 20            THE WITNESS:  Yes, sir.

21            THE COURT:  So let's move forward.

22    BY MS. NOYOLA: (Continuing)

23    Q.   Did Universal Music Publishing Group send infringement

24    notices to Cox with respect to its musical compositions?

25    A.   No, we did not directly, but we didn't have to because we

D. Kokakis - Direct

163

1    knew that our songs were being infringed upon because they

2    overlapped with the sound recordings that were subject to the

3    notices that were delivered to Cox.

4    Q.   Can you explain more by what you mean by "overlap"?

5    A.   Every time you have a sound recording of a song, you have

6    a song involved.  Again, two distinct rights, two distinct

7    creative works, but you can't have a sound recording of a song

8    without the song itself being implicated.

9              So when I say they overlap, I mean that if Cox is

09:46:53 10   receiving notices on behalf of a sound recording, then that

11   sound recording naturally contains a composition or a song,

12   many of which were ours that are listed here in this list that

13   we just went through.

14   Q.   Are you familiar with the allegedly infringing files in

15   this case?

16   A.   Yes, I am.

17   Q.   Have you listened to any of those files?

18   A.   I did to spot check the song titles that are on this list.

19   Q.   And what did you determine after listening to those files?

09:47:25 20   A.   That the songs indicated on this list, at least the ones

21   that I spot checked, were accurately reflected here.  And that

22   Universal Music Publishing Group did indeed own or control

23   those songs.

24   Q.   Mr. Kokakis, why did Universal Music Publishing Group file

25   this lawsuit against Cox?

D. Kokakis - Cross

164

1   A.   Well, because when somebody is engaged in illegal

2   activity, you enforce your rights.  And we have an obligation

3   to do so contractually because it's called for to some extent

4   in the contracts we have with our songwriters.  But also we

5   have an ethical obligation to enforce our rights.

6        You don't let somebody get away with breaking the law

7   without there being consequences.  And, you know, fortunately

8   we have the means and the resources and the wherewithal to

9   enforce those rights on behalf of our songwriters who

09:48:22 10   individually don't have the means or the resources to protect

11   themselves.

12        MS. NOYOLA:  Thank you.  Pass the witness.

13        THE COURT:  All right, thank you.

14        All right.  Cross-examination, Mr. Buchanan.

15        MR. BUCHANAN:  Yes, Your Honor.  We have a binder.

16        CROSS-EXAMINATION

17   BY MR. BUCHANAN:

18   Q.   Good morning, Mr. Kokakis.  My name is Tom Buchanan.  I

19   have a few questions for you.

09:49:28 20   A.   Good morning.

21   Q.   I think you testified that you are responsible for

22   coordinating litigation on behalf of UMPG; is that correct?

23   A.   That's accurate, sir.

24   Q.   Okay.  And you -- I believe you have previously testified

25   in other venues or forums that part of your responsibilities is

1   to enforce the rights of the artists and clients of UMPG; is

2   that correct?

3   A.   That is correct, yes.

4   Q.   And one of the ways you do that is to send cease and

5   desist letters; is that correct?

6   A.   That is accurate, yes.

7   Q.   Did you send a cease and desist letter to Cox

8   Communications in this case?

9   A.   No, because it wasn't necessary to do so, sir.

09:50:00 10   Q.   It's a yes or no.

11   A.   The answer is no, because it wasn't necessary.

12   Q.   Okay.  It wasn't necessary.

13         So the fact is that UMPG sends out like 2,000

14   copyright notices a day, does it not?

15   A.   I don't know the exact amount.  I would have to look into

16   that to get you an accurate number.

17   Q.   Okay.  You testified in the Phonerecords case that it was

18   about 2,000 a day.  Do you recall that?

19   A.   In -- I don't recall that, but I could tell you that we do

09:50:32 20   send thousands out a week, a month.  I don't recall saying

21   that, but if you would like to refresh my recollection, I could

22   look through this.

23   Q.   Sure.  It's 3197, Tab 2.

24   A.   Okay.  It might take me a moment.

25   Q.   You testified in that proceeding --

D. Kokakis - Cross

166

1           THE COURT:  Well, direct him to a paragraph and ask

2    him if that refreshes his recollection.

3    Q.   3197 is the page number, it is the Phonerecords II

4    litigation?

5    A.   That's right.  I do see it.

6    Q.   You said -- there you said:  Yes, we have a robust

7    antipiracy program.  We engage in takedowns of our content

8    online.  Quite often we send DMC takedown notices for that

9    purpose.

10           And then the next sentence --

11           MS. NOYOLA:  Objection, Your Honor.

12           THE COURT:  Well, sustained.  If you're trying to

13   refresh his recollection, ask him whether it refreshes his

14   recollection.  You don't need to read the prior testimony.

15   BY MR. BUCHANAN: (Continuing)

16   Q.   Does that refresh your recollection?

17   A.   It does, yes.

18   Q.   It was 2,000?

19   A.   Well, what I was referring to is a particular campaign

09:51:53 20   that we had against a company named Facebook, which was hiding

21   behind certain safe harbor protections.  And what we did was we

22   scaled up our takedowns during that period to send a message to

23   them to get our content down from that platform.

24           So at that time, we were sending about 2,000 notices

25   a day, yes.

D. Kokakis - Cross

167

```
 1    Q.   So --
 2              THE COURT:  All right.  So -- hold on.  So if counsel
 3    asks you a question which has a yes or no answer, then please
 4    answer it yes or no.  Or say, I can't answer it.  I know you're
 5    experienced in this.
 6              Your counsel, if she chooses, will on redirect ask
 7    you further questions if she wants to amplify your answer.
 8              THE WITNESS:  Yes, Your Honor.  Certainly.
 9              THE COURT:  So let's do it that way.
10              THE WITNESS:  Okay.
11              THE COURT:  All right.
12    BY MR. BUCHANAN:  (Continuing)
13    Q.   In your answer to that question under oath in that
14    proceeding, you didn't mention that this was a new campaign
15    that was focused on Facebook, did you?
16    A.   I did not.
17    Q.   All right.  And I believe you testified that you did not,
18    that is UMPG, did not send a single notice for any of the
19    thousand works in suit relating to UMPG in this case to Cox.
20    That's correct?
21    A.   We knew that notices were being sent by our sister company
22    that incorporated our work.  So that's correct, it wasn't
23    necessary to.  So we did not do so.
24    Q.   So the Court just instructed you if it was yes or no, to
25    try to answer it that way.  Did you hear that?
```

09:52:42 (line 10)
09:53:12 (line 20)

D. Kokakis - Cross

168

1    A.   I did, sir.  But these are complex questions that go

2    beyond just a yes or no answer.  And if I may give context for

3    them, I think the jury would better understand what took place.

4              So when I say, for instance, 2,000 --

5              THE COURT:  Okay.  Stop, stop, stop.

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  Ask your next question.

8    BY MR. BUCHANAN: (Continuing)

9    Q.   Okay.  Mr. Kokakis, you've testified a number of times in

09:53:50 10   courts and depositions, haven't you?

11   A.   In depositions, but not many times in court.

12   Q.   Okay.  You testified in the phone records case, right?

13   A.   I believe so, yes.

14   Q.   And there was another case you testified on behalf of

15   UMPG?

16             THE COURT:  I am sorry, what's the relevance of this?

17   Let's move on to the subject matter regarding this case,

18   please.

19   BY MR. BUCHANAN: (Continuing)

09:54:11 20   Q.   So again, the answer is that not a single notice was sent

21   of copyright infringement by UMPG to Cox regarding the works in

22   suit, correct?

23   A.   Notices were sent to Cox that incorporated our works.  I

24   did not sign those notices.  They were sent by our sister

25   company.

D. Kokakis - Cross

169

1    Q.    All right.  And your sister company is UMG?

2    A.    That's correct, yes.

3    Q.    Okay.  So did you coordinate with UMG to have them send

4    those notices on your behalf before they sent them?

5    A.    I did not coordinate with them, but I was aware of that

6    activity taking place.

7    Q.    But after the fact?

8    A.    During the fact and after the fact.

9    Q.    Okay.  You did -- your company never hired MarkMonitor,

09:54:59 10   did it?

11   A.    It did not, sir.

12   Q.    Okay.  And you have your own public affairs arm, do you

13   not?

14          Like the RIAA, they don't represent you, do they?

15   A.    The RIAA does not represent Universal Publishing Group.

16   That's correct.  We have our own trade organization known as

17   the National Music Publishers Association.

18   Q.    And you didn't retain them to retain a vendor to detect

19   any sort of infringement by Cox subscribers or any other

09:55:28 20   subscribers, did you?

21   A.    We try not to duplicate work and waste money and

22   resources.  So, no, it wasn't necessary to do so, and we did

23   not.

24   Q.    So you rely on your artists and your clients often to

25   learn about infringement, do you not?

D. Kokakis - Cross

170

1    A.   At times, yes.  At times we have independent campaigns

2    that don't involve the record labels at all.

3    Q.   And isn't it true that when you do learn about

4    infringement, you, that is, UMPG, takes the lead in that case;

5    isn't that true?

6    A.   Not always, no.  Sometimes we do, sometimes we don't.

7    Again, it depends on whether we believe that our interests will

8    be properly protected through somebody else taking the lead.

9    Q.   I would like to direct you to your deposition testimony.

09:56:44 10  Do you have a copy of it?

11            MR. OPPENHEIM:  It's in the binder, I thought you

12   said.

13            MR. BUCHANAN:  We just handed it to him.

14   BY MR. BUCHANAN: (Continuing)

15   Q.   So do you recall testifying in this case, Mr. Kokakis?

16   A.   I am sorry, sir, the question is, do I recall my

17   deposition?

18   Q.   You testifying in this case in a deposition.

19   A.   Yes, sir, I do.

09:57:05 20  Q.   All right.  And you were the corporate representative of

21   UMPG in that case, right?

22   A.   Yes, I was.

23   Q.   Okay.  So you had to answer questions about various topics

24   and subjects that were relevant to this case?

25   A.   Yes.

D. Kokakis - Cross

171

1    Q.   And you were under oath?

2    A.   Yes.

3    Q.   Okay.  So why don't you take a look at page 15, line 14.

4    The question:  As a general matter, does the NMPA inform

5    Universal Music Publishing of potential claims that it might

6    have?

7              Answer:  Typically, no.  We at Universal are well

8    aware of how our catalog is being infringed upon, and we tend

9    to take the lead on our litigation matters.

09:57:45 10  A.   Yes, as between us and the NMPA.  That's correct.

11   Q.   So what about between you and the RIAA, do they take the

12   lead, or do you guys take the lead to protect your artists,

13   since they don't represent them?

14   A.   Well, as I said, it depends.  In cases when their

15   initiatives clearly overlap with our rights and protect our

16   interests, why would we duplicate efforts and spend the money

17   on it when we have somebody else picking up the tab?

18             So in this instance, it made sense to do that.  In

19   many instances, it makes sense for us to take the lead.  So as

09:58:14 20  between us and the NMPA, we are usually the one who takes the

21   lead.

22             In instances when somebody else, again, is picking up

23   the tab and doing a fine job of it, we let them go and we, you

24   know, take a back seat to that.

25             THE COURT:  What's the MPA?

```
 1                THE WITNESS:  I'm sorry, sir?

 2                THE COURT:  You're using initials, and the jury may

 3   not be familiar with the --

 4                THE WITNESS:  A lot of acronyms in this business, and

 5   they're very confusing.  The NMPA is the National Music

 6   Publishers Association.  It's a trade organization that

 7   represents the interests of publishers and songwriters.

 8                THE COURT:  Thank you.  Go ahead.

 9   BY MR. BUCHANAN:  (Continuing)

10   Q.   So did you tell your artists in this case that you were

11   using the RIAA to protect their interests?

12   A.   We often don't tell our clients what we're doing behind

13   the scenes until there is a positive outcome.  We like to share

14   good news.

15   Q.   So the answer is no?

16   A.   We don't in the normal course.  So, no, we didn't in this

17   case.

18   Q.   Okay.  So is part of your efforts, your antipiracy

19   efforts, you also sue individual subscribers, file sharers, do

20   you not?

21   A.   We try not to.  These are --

22   Q.   Do you sue them?

23                THE COURT:  Well, put a time frame on it if you

24   would, please.

25   Q.   Okay.  In the time frame of 2010 to 2015, did you sue any
```

D. Kokakis - Cross

173

1   individual subscribers?

2   A.    Did you Universal Publishing Group?

3   Q.    Yes.

4   A.    Not to my recollection, no.

5   Q.    So do you recall ever suing individual subscribers?

6   A.    When you say "individual subscribers," I need that

7   clarified, if you don't mind.  I don't know if you mean to Cox

8   or to --

9           MS. NOYOLA:  Objection, Your Honor.

10          THE COURT:  I am sorry, the objection?  What's the

11   objection?

12          MS. NOYOLA:  Who are the individual subscribers?

13          MR. OPPENHEIM:  Subscribers to what?

14          MS. NOYOLA:  To what?

15   BY MR. BUCHANAN: (Continuing)

16   Q.    Subscribers to Internet service providers, the people who

17   download the music illegally.  File sharers.

18          THE COURT:  Go ahead.

19   A.    Within the Cox echosystem or outside of it?  Because there

20   are individuals who we take issue with who we send claim

21   letters to.  Many of them operate on YouTube, on Facebook, on

22   Twitter.

23          Specific to Cox?  I can't recall any.

24   Q.    So I direct you to page 14 of your deposition.  Why don't

25   you start at line 10.  It says:  Were any of these lawsuits

D. Kokakis - Cross

174

1   directed at entities that provide file sharing services, such

2   as BitTorrent, or PirateBay, or entities such as that?  Not

3   directly, no.  Were any directed at individual users of the

4   Internet, people?  Some, yes.

5           So how many?

6   A.   I don't know how many.  And I can tell you that, as I

7   mentioned, in the normal course we try not to go after

8   individuals when there is a large multibillion dollar

9   corporation behind the scenes driving the getaway car.  And

10  that's what's at case here.

11          I mean, yeah, we could go after tens of millions of

12  individuals, students, and children, and grandmothers.  That's

13  not a prudent use of our resources or something that we want to

14  do.

15  Q.   Okay.  So the people that are actually doing the

16  downloading, as you just described, are students, grandmothers,

17  and children.  So they are the ones that do it.

18          And so what you're saying is that Cox, on behalf of a

19  notice that you didn't send, should terminate --

20          MS. NOYOLA:  Objection, Your Honor.

21  Q.   --grandmothers, children, and students.

22          THE COURT:  Hold on.  Stop.  Hold on.

23          If there is an objection, make it louder so that Mr.

24  Buchanan can hear it over his asking his own question.

25          And it's overruled.

D. Kokakis - Cross

175

1          Can you answer the question?

2          THE WITNESS:  If you could repeat the question, I

3     would appreciate it.

4     BY MR. BUCHANAN: (Continuing)

5     Q.   So you just said that UMPG, which is part of a $30 billion

6     conglomerate, makes a decision --

7          MS. NOYOLA:  Objection, Your Honor.

8     Q.   -- not to sue --

9          MS. NOYOLA:  Objection, foundation.

10         THE COURT:  The fact is not in evidence.  Just ask

11    the specific question in response to his last answer.

12    BY MR. BUCHANAN: (Continuing)

13    Q.   The question is, you just testified that you did not

14    pursue children, grandmothers, and students because you wanted

15    to pursue the one that was driving the getaway car.

16         So, however, you're saying that when they get a

17    notice, a single notice of a copyright from UMPG or anybody

18    else, that Cox should then terminate the student, the child, or

19    the grandmother; is that right?

20    A.   No, I didn't say any of that.  But I will explain if you'd

21    like because I see where you're going with it.

22    Q.   I just --

23    A.   Well, no, I didn't -- you're putting words in my mouth.  I

24    did not say that they get one notice and they should be

25    terminated.

D. Kokakis - Cross

176

1              THE COURT:  Okay, next question.

2     Q.   Okay.  So two notices and you cut off the child and the

3     family?

4     A.   I didn't say that either.

5     Q.   Three notices?

6     A.   I didn't say that either.  However, I will say --

7     Q.   How about for a military base or a hospital, how many

8     notices should we send them and then terminate them?  After how

9     many notices?

10    A.   Sir, the law is quite clear on this.  Cox had an

11    obligation to enforce the law, and it failed to do so.  And we

12    have recourse because of that, irrespective of who may have

13    actually been file sharing, Cox still had an obligation legally

14    and it did nothing.  And that's what's at issue here.

15             THE COURT:  Next question.

16    A.   Not the grandmother or the child who might be engaging --

17             THE COURT:  Next question.

18             THE WITNESS:  Sorry, sir.

19    BY MR. BUCHANAN: (Continuing)

20    Q.   So the children and the grandmother and the student, these

21    people when they're copying your works, they're not doing

22    anything illegal?

23    A.   I didn't say that, no.

24    Q.   Okay.

25    A.   No, not at all.  They are doing something illegal.

D. Kokakis - Cross

177

1    Q.    Okay.

2    A.    The party against whom we choose to enforce our rights is

3    our choice to make.  That's --

4    Q.    Oh, really?

5    A.    Yes, absolutely.

6    Q.    Selectively, you can just select who you want to sue?

7    A.    Well, if somebody is breaking the law, we have the right

8    to go after that party.

9    Q.    Right.  And you had the right --

10   A.    And in this case we're talking about Cox breaking the law,

11   so we decided to go after Cox --

12   Q.    But you talk about --

13   A.    -- to facilitate the --

14            THE COURT:  Yeah, all right.

15            THE WITNESS:  Sorry, sir.

16            THE COURT:  All right.  Only one person can speak at

17   a time or we don't get the recording.  And now you're just --

18   you've completely lost the jury.  You're just arguing the law.

19   It's not your job to argue what the law is or what it's not.

20            Mr. Buchanan, ask questions that are factual in

21   nature that you want to get the answer to, and let's move on.

22   BY MR. BUCHANAN: (Continuing)

23   Q.   So you would agree that in residential households where

24   grandmothers, or children, or kids are downloading music

25   illegally, they are the ones that are actually doing the

D. Kokakis - Cross

178

1    illegal act; is that not true?

2    A.   I would agree that they are engaged in illegal activity.

3    And just to clarify, because this sounds quite inflammatory,

4    grandmothers, and children, and the like, there are

5    professional thieves that exist on these torrent sites.  It's

6    not just the innocent and weak that we're talking about here.

7    There are people who make a living stealing on these types of

8    platforms.

9             So we --

10            THE COURT:  Okay, that's your answer.

11            THE WITNESS:  Yes, sir.

12            THE COURT:  Next question.

13   BY MR. BUCHANAN: (Continuing)

14   Q.   But in your example, you didn't mention thieves, you

15   mentioned children, grandmothers, and students because you

16   wanted to mention them to justify to the Court and the jury why

17   you didn't go after individual subscribers?

18            MS. NOYOLA:  Objection.

19            THE COURT:  Overruled.

20   BY MR. BUCHANAN: (Continuing)

21   Q.   Isn't that true?

22   A.   And I just gave an example of there being thieves on these

23   platforms as well.

24   Q.   And how many thieves who are on the platform that they are

25   so rampant, how many of them did you go after, your company go

D. Kokakis - Cross

179

1  after?  Name me one that you went after.

2  A.    On the Cox --

3  Q.    An individual thief.

4  A.    On the Cox platform during this --

5  Q.    No, just any platform, Verizon, Comcast, Time Warner.  Who

6  were thieves out there that you just identified and did you sue

7  them?

8  A.    I can give you a list, if the Court would please, of

9  everyone we've sued during this period and beyond if you would

10  like.  I can't recall specific names.  There are a lot of them.

11  So excuse me for not being able to name names.

12       But I could tell you that in most instances when

13  there is an individual involved, and we go and issue a

14  take-down notice, or we issue a cease and desist letter,

15  they're responsive and they comply.  Okay.  In instances when

16  they refuse to engage with us, then we have to escalate

17  matters.

18       The reason that we choose not to typically go after

19  individuals is because there are millions of them and it's

20  untenable.  So why not go to the source of the problem, which

21  is the platform facilitating rampant and blatant theft?  That's

22  what makes sense to us.  And that's why we chose to name Cox as

23  the defendant to sue in this case.

24  Q.    What about the platforms, the piracy networks?

25  BitTorrent, have you sued them?

D. Kokakis - Cross

180

1   A.   There have been instances when companies like Megaupload

2   were sued, yes.  And that is a direct BitTorrent site that was

3   the subject of protracted litigation.

4   Q.   So in fact, you testified in another proceeding that when

5   platforms like LimeWire, or Megaupload, or PirateBay are taken

6   out, that dramatically reduces piracy and drives up sales;

7   isn't that true?

8   A.   That's accurate, yes.

9   Q.   Okay.  So in this case we have Ares, we have eDonkey, we

10  have Gnutella, and BitTorrent.  Which one of those entities,

11  the platforms that were providing the access to do the

12  downloading by the grandmothers, and the children, and the

13  students --

14  A.   And the thieves.

15  Q.   And how many of those entities have you suited?

16          MS. NOYOLA:  Objection, Your Honor.

17          THE COURT:  Overruled.

18  A.   Universal Music Publishing Group has not sued any of those

19  specific platforms.  LimeWire was the subject of litigation.

20  PirateBay was the subject of litigation.  Megaupload was the

21  subject of litigation.  The record labels, as in this case,

22  took the lead on those litigations and we didn't have to take a

23  proactive role because we knew that our rights were being

24  implicated as well and our copyrights were involved in those

25  cases.

D. Kokakis - Cross

181

1    Q.    So what record label companies have sued the platforms

2    that provide the access to do the unlawful downloading, the

3    peer-to-peer sharing that we're talking about here, eDonkey,

4    Ares, Gnutella, and BitTorrent?  Which of the --

5    A.    Of those specific companies?

6    Q.    Have sued them.  Tell me -- tell me who else has sued them

7    that that is a plaintiff in this case?

8    A.    Those specific companies?

9    Q.    Yes.

10   A.    I'm not aware of any.  I don't have personal knowledge of

11   that.

12   Q.    But you just said you piggybacked on lawsuits, suggesting

13   that the record label companies had gone after them.  So what

14   you're saying is they have not?

15   A.    No, that's not what I'm saying.  I said that they went

16   after LimeWire, Megaupload, and PirateBay.

17   Q.    Okay.  When did they go after PirateBay?

18   A.    Those are the three biggest -- I don't recall the year.  I

19   don't recall --

20   Q.    When did they go after LimeWire?

21            THE COURT:  Stop.

22   A.    Sir, I'm not an encyclopedia.

23            THE COURT:  Let me answer the question and ask your

24   next question, or we can't get this down on --

25   BY MR. BUCHANAN:  (Continuing)

D. Kokakis - Cross

182

1    Q.    When did they sue LimeWire?

2    A.    I'm not aware of the specific date or venue.

3    Q.    So what was your position at UMPG or your prior company

4    when LimeWire was sued, PirateBay was sued, Megaupload was

5    sued?

6    A.    If I don't know the specific date or venue, it's difficult

7    for me to pinpoint where I was at the time.  So I cannot answer

8    that question.

9    Q.    Okay.  So are you familiar with the Copyright Alert

10   System, CAS, at all?

11   A.    I am familiar with it, yes.

12   Q.    And do you know that Verizon and Comcast and Time Warner

13   were all part of that group?

14   A.    I don't have --

15   Q.    Cablevision.

16   A.    I'm not aware of who is specifically party to that.

17   Q.    So how many notices -- well, you know the size of those

18   companies, right.  Comcast is way bigger than Cox?

19   A.    I'm not aware of the relative size, but I know Comcast, I

20   have heard of Comcast, of course.

21   Q.    This is your business.  I mean, you're saying you don't

22   know how big these ISPs are vis-à-vis Cox?

23   A.    I know that Cox has almost a market cap of $5 billion, but

24   I don't know what it's competitors' market caps are.

25   Q.    Did I ask you what the market cap was for Cox?

D. Kokakis - Cross

183

```
 1              THE COURT:  Ask your next question.
 2   A.    No, but you asked size.
 3              THE COURT:  Ask your next question.  Ask your next --
 4              MR. BUCHANAN:  Well, Judge, I don't have a right for
 5   him to be responsive?
 6              THE COURT:  He responded, and now you're just arguing
 7   with him.
 8              MR. BUCHANAN:  I am sorry, Your Honor.
 9              THE COURT:  Ask your next question.
10   BY MR. BUCHANAN: (Continuing)
11   Q.    Okay.  What's the market cap of UMG?
12   A.    I'm not certain.
13   Q.    You do not know the market cap of your parent company?
14   A.    That's correct.  I represent Universal Music Publishing
15   Group, which is a division of a much larger umbrella
16   organization known as Vivendi.  I do not know the market cap of
17   Vivendi at this time.
18   Q.    So you're telling the jury that you know the market cap of
19   Cox, but you don't know the market cap of your parent company?
20   A.    I looked it up this morning.  I was curious about Cox.
21   Q.    Oh.
22   A.    Yeah.  I am sitting here today.  I Googled it this morning
23   out of curiosity.
24   Q.    Really?
25   A.    Yeah.
```

10:11:35

D. Kokakis - Cross

184

1   Q.   So you've never Googled to see what the market cap of your

2   own company is?

3   A.   Not that interested.

4   Q.   Do you have stock in your company?

5   A.   None that I've purchased outright.  This was an employee

6   incentive stock that was given to multiple employees.

7   Q.   Okay.  And the value of the parent company has no

8   connection whatsoever to your pay, or your stock, or your

9   position?

10:12:07   10   A.   I'm a salaried employee.  I'm not that interested in what

11   the market cap of Vivendi is.

12          THE COURT:  Okay.  Let's -- he's answered.  He

13   doesn't know.

14   Q.   Now, how many take-down notices did -- or I'll call them

15   copyright notices.  How many copyright notices for the works in

16   suit did your company send to Verizon?

17   A.   None.

18   Q.   How many did you send to Time Warner?

19   A.   None, to my knowledge.

10:12:41   20   Q.   Okay.  What about to Comcast?

21   A.   None, to my knowledge.

22   Q.   Cablevision?

23   A.   None, to my knowledge.

24   Q.   Okay.  So we're talking about 80 percent of the service

25   providers, Internet service providers that provide the

D. Kokakis - Cross

185

1   platforms, as you testified, that allow people to infringe, and

2   you've not sent any of them a single notice of infringement; is

3   that right?

4   A.   It could very well be the case that they were complying

5   with the law, unlike Cox, and maybe that's why we didn't send

6   the notices.

7   Q.   Do you know that for a fact?

8   A.   I don't.  But that could be a very good reason why we

9   didn't target them, and instead we focused on Cox.

10:13:21 10          THE COURT:  Stop, stop, stop.

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Answer the question.  And don't just

13   speculate about reasons for it.  If your counsel wants to get

14   back into a subject matter, she can do so.

15          THE WITNESS:  Yes, Your Honor.

16          THE COURT:  But listen to the question and answer the

17   question.

18          THE WITNESS:  Yes, Your Honor.

19   BY MR. BUCHANAN: (Continuing)

10:13:40 20   Q.   So do you know under CAS, this Copyright Alert System,

21   this gradual response system, that your sister company was

22   sending tens of thousands of notices a month to all those

23   different ISPs, Verizon, Cablevision, Time Warner?

24   A.   I don't have specific knowledge of how CAS operated

25   because it was record label initiative, not a publishing

D. Kokakis - Cross

186

1    initiative.  It didn't involve the company that I worked for.

2    Q.   All right.  But you testified earlier that your sister

3    company, when it comes to copyright infringement and giving

4    notices, they go out and take the lead and you tag along?

5    A.   I did not say that that happens all the time, sir.  I said

6    sometimes it makes sense for us to take a back seat --

7    Q.   All right.

8    A.   -- to their initiative, as in this case.

9    Q.   Okay.  So did you take a back seat to your sister company

10:14:26 10   in terms of their agreement with 80 percent of the ISP market

11   in terms of how many notices they would accept a month, how

12   many they would accept a week, how many terminations they would

13   make?  You're not aware of any of that?

14   A.   We did not take a back seat.  And, no, I wasn't aware of

15   the specifics of that because it didn't directly involve

16   Universal Publishing Group.  It was a record label initiative

17   in which I was not directly involved.

18            So whatever agreement they reached with the ISPs in

19   that regard had no bearing or enforceability against the

10:14:58 20   publishing interests that I represent through my company.

21   Q.   But how are you protecting your artists' interests if

22   80 percent of the Internet service providers are getting no

23   notices from you and you -- you're not even attempting to

24   piggy-back like you did with Cox with those Internet service

25   providers in terms of notices?

D. Kokakis - Cross

187

1    A.    We do what we can.  We have limited resources and we do

2    our best with those resources.  The fact of the matter is --

3    Q.    You're a multibillion-dollar company, are you not?

4    A.    Yes, we are.  Yeah.  And we do a lot to protect the

5    interests of our songwriters.

6    Q.    But not -- you don't -- you do a lot, but nothing with

7    regard to 80 percent of the Internet service providers that are

8    providing the platform for the women and children and students

9    that are doing all this infringing, that's right?

10:15:44  10    A.    We didn't have evidence of there being any wrongdoing that

11    would be the subject of litigation like there is here.  When we

12    become aware of something and we have evidence of it, then we

13    take action.  I don't recall seeing any evidence regarding

14    those other ISPs that you mentioned.

15    Q.    Okay.  But what you're saying then is that -- I didn't ask

16    you if you were taking any action.  I asked you about whether

17    you're sending notices or at least relying on your sister

18    company to send notices to protect your artists and all this

19    music you've talked about.

10:16:17  20          So what I'm asking you now is, are you saying that

21    those ISPs, Verizon, Comcast, Cablevision, and Time Warner,

22    AT&T, that their subscribers never illegally downloaded a

23    single musical composition that's owned by your artists?

24    A.    Are you asking me if I said that?

25    Q.    I'm asking you if that's true?

D. Kokakis - Cross

188

1  A.   Well, I would venture to say, no, that's not true at all.

2  I would venture to say that there's probably illegal activity

3  taking place on lots of different platforms throughout the

4  world.

5  Q.   Okay.

6  A.   And we do what we can to enforce our rights when there is

7  something that's as blatant and rampant as it is with Cox.

8  Q.   Okay.

9  A.   A complete disregard for its legal obligations.  So we

10:17:10 10  don't know if we're going to go after the other ISPs at some

11  point.  But this is one instance where it felt like it was

12  absolutely necessary.

13  Q.   So how can you possibly go after them if you've never sent

14  them any infringement notices?

15  A.   As I said, we can't blanket the entire world's worth of

16  infringing activity.  It's impossible for us to manage that.

17  We don't have the resources to do that.

18  Q.   So --

19  A.   So we go after specific instances when we're certain that

10:17:38 20  our rights have been infringed upon, where we have the

21  resources to devote to it.

22  Q.   So your counsel, in opening, said Cox was the eighth

23  largest Internet service provider.  He said this piracy was

24  rampant.  So there's seven above us.

25  A.   Uh-hmm.

D. Kokakis - Cross

189

1    Q.   Okay?  And the top I just named for you several times.  So

2    you've carved them out because you say we can't go after them.

3    They're way bigger than us, so there's way more infringement,

4    you can't go after them, but you can go after the eighth

5    company?

6    A.   I didn't -- sir, I didn't say we can't go after them.

7              MS. NOYOLA:  Objection, Your Honor.

8              THE COURT:  If he can answer, he can answer.

9    Overruled.

10:18:16 10   A.   Sir, I didn't say we can't go after them.  I said we

11   decided not to yet.

12   BY MR. BUCHANAN: (Continuing)

13   Q.   Oh, so -- okay.  So now you're saying you have a basis to

14   go after them, they've committed infringement, but you haven't

15   made a decision to sue them?  So you're contemplating suing

16   them?

17   A.   Let me be perfectly clear because I see that you keep

18   trying to put words in my mouth.  We have limited resources.

19   We have evidence of Cox engaging in rampant and blatant illegal

10:18:47 20   activity.

21             So, yes, we decided to enforce our rights against

22   Cox.  What's happening with the other ISPs, I'm not certain of.

23   Q.   Okay.

24   A.   I just can't say with certainty whether they're

25   infringing, whether they're not, whether they're complying with

D. Kokakis - Cross

190

1    disconnecting accounts after a certain number of strikes and

2    receiving a certain number of notices.

3         THE COURT:  Okay.  Let's move on.

4         THE WITNESS:  I just don't have knowledge of that.

5    BY MR. BUCHANAN:  (Continuing)

6    Q.   So do you understand that your sister company used

7    MarkMonitor to detect infringement pursuant to a memorandum of

8    understanding with all those enormous ISPs and sent them

9    hundreds of thousands of notices a year, and they had an

10:19:26 10  agreement that even though they sent all those notices, they

11   didn't have to terminate anyone?

12        Are you aware of that?

13   A.   I don't know the specifics of the arrangement.  I just

14   don't know.  I cannot answer that question.

15   Q.   You're the chief --

16        THE COURT:  Okay.  Let's move on.  He said he can't

17   answer the question.

18   Q.   So you mentioned streaming revenue.  Oh, by the way, you

19   said that there's a thousand works in suit in this case that

10:20:03 20  your company owns?

21   A.   I believe just over a thousand.

22   Q.   And you -- and your company owns close to 4 million

23   copyrighted works?

24   A.   Many of them songs that you might not have heard of that

25   aren't quite popular.  So, yes, we -- I think, in total, we

D. Kokakis - Cross

191

1    probably control or own three-and-a-half to four million.  It

2    fluctuates.

3    Q.    So does it mean that they're not that popular, we haven't

4    heard of them, that you don't protect them and send notices?

5    A.    No, of course, we do.  When we're aware of infringing

6    activity, we do.

7    Q.    Okay.  So there's four million copyrighted works.  How

8    many notices for those four million copyrighted works did you

9    send to the major ISPs, Verizon, Time Warner, Cablevision,

10:20:51 10   AT&T?

11   A.    None.  Because as I said, we were taking a back seat to

12   the label initiatives.

13   Q.    Okay.  And how many did they send?

14   A.    I'm not certain how many they sent.

15   Q.    So if you're taking a back seat to your sister company and

16   the record companies, but they're not telling you what they're

17   doing, then how are you protecting your artists' rights?

18   A.    I am certain that they are quite aggressive in their

19   tactics and their ability.

20   Q.    Okay.

21   A.    And I think they're competent.  So I trust that they're

22   doing --

23   Q.    Okay.

24   A.    -- all that they can do and that we are benefiting from

25   those efforts.

D. Kokakis - Cross

192

1    Q.   All right.  So what exactly are they doing?

2    A.   My understanding is that they've been sending out notices

3    and engaging services like MarkMonitor to make sure that the

4    ISPs are complying with their legal obligation to disconnect

5    accounts or to send warnings to accounts, things of that

6    nature.

7    Q.   Okay.  So earlier I asked you about that, you said you

8    didn't know.  Now you seem to know.  So is that pursuant to the

9    CAS agreement?

10:21:55 10   A.   Seem to know what?  And what did I say earlier that you're

11   referring to?

12   Q.   So you just described what you think they're doing.  Do

13   you know that for a fact, that they're sending a certain amount

14   of notices every month?

15   A.   Oh, I do because you just told me.

16   Q.   Okay.

17   A.   You said 200,000 or so.

18   Q.   Okay.  So before I told you, you didn't know?

19   A.   I did not know before you mentioned.

10:22:16 20   Q.   You hadn't Googled that information to check it out so

21   that you could cover the interests of your artist clients --

22   A.   No, I wasn't --

23   Q.   -- by either Googling it or talk to anybody?

24        THE COURT:  Start over.  Just ask your questions and

25   don't testify in your questions.

D. Kokakis - Cross

193

1    Q.    So you learned it when I told you?

2    A.    That's accurate, yes.

3    Q.    Okay.  You never Googled that information to try to find

4    out, hey, let me see what the record label companies are doing

5    on behalf of my clients, I'll Google it and try to find that

6    out?  Did you do that?

7    A.    You asked about the specific number of notices that were

8    sent.  No, I never Googled how many specific notices were sent.

9    Q.    All right.  Okay.  So I know you made reference to --

10:22:53 10  several times about Cox and rampant, you know, copyright

11   infringement.

12          So do you know that the agreement between your sister

13   company and all the other music companies with these five major

14   ISPs is that no matter how many notices they sent, whether it

15   was 10 million a month or 500,000 a month, whatever the cap

16   was, they only had to forward one every seven days to the

17   alleged infringer?

18   A.    I'm not aware of the details of that agreement.

19   Q.    Yeah.

10:23:30 20  A.    I've answered that question many times.

21   Q.    Are you aware that the agreement was that the five major

22   ISPs that controlled the entire pipe that allowed this

23   infringement, that they didn't have to terminate anyone no

24   matter how many notices they got from your sister company and

25   all these other companies?

D. Kokakis - Cross

194

1    A.    Sir, you could ask me questions --

2              MS. NOYOLA:  Objection, Your Honor.

3              THE COURT:  Sustained.  Please, stop testifying in

4    your questions.  None of that initial information is in

5    evidence and -- so ask your direct questions, please.

6    BY MR. BUCHANAN: (Continuing)

7    Q.    Do you know that there was an agreement as part of the MOU

8    between your company -- you sister company and all the other

9    music companies and the ISPs, that they did not have to

10:24:14 10   terminate?  Do you know that?

11   A.    I am aware of the existence of an agreement, but I don't

12   know the specifics of it.  And I understand that you keep

13   asking me questions about the agreement, but the answer is

14   always going to be the same.  I don't know.  I was not privy to

15   the agreement.  The company that I work for was not a party to

16   that agreement.  I never saw the agreement.  I never had an

17   outline of the terms of the agreement.  I just don't know.

18   Q.    Okay.  But you do agree that that agreement implicates

19   your artist clients' rights if --

10:24:44 20   A.    Actually -- well, no, if we're not a party to the

21   agreement and our clients aren't a party to the agreement,

22   we're not subject to the agreement.

23   Q.    That's right.  But if your sister company, the record

24   label company, and the other record label companies are

25   protecting your clients' interests in many cases and taken the

D. Kokakis - Cross

195

1    lead, as you have testified, and they're cutting this

2    agreement, that is going to impact the rights of your clients

3    if you're relying on them, isn't it?

4    A.   If they are relying on them, yes.  And perhaps it was just

5    a bad agreement.  I don't know the specifics.  And just because

6    they may have agreed to something, doesn't mean that we have

7    waived our right to go after these ISPs if we feel that that

8    arrangement isn't making sense.

9    Q.   All right.  So now it's a bad agreement -- are you just

10:25:28 10  learning that it's a bad agreement?

11            MR. OPPENHEIM:  Objection.

12            THE COURT:  Yeah, sustained.  Let's move on.  He said

13   he doesn't know anything about the agreement.  He hasn't signed

14   onto it.  He's not the proper party to further this line of

15   questioning.

16   BY MR. BUCHANAN: (Continuing)

17   Q.   So I want to ask you a couple questions about --

18            THE COURT:  Questions about what, I am sorry?

19            MR. BUCHANAN:  He talked about -- I have some

10:26:06 20  financials of his company in 2013, 2014.

21            THE COURT:  All right.

22   BY MR. BUCHANAN: (Continuing)

23   Q.   Could you look at Tab 3, please.  It's the audited

24   financials for Vivendi, your parent company.

25            MS. NOYOLA:  Objection, Your Honor, outside the

D. Kokakis - Cross

196

1    scope.

2          THE COURT:  Overruled.

3          MR. BUCHANAN:  I just have a few questions on these,

4    Your Honor.

5    BY MR. BUCHANAN: (Continuing)

6    Q.   So if you look at page 21, it's down in the right-hand

7    corner.

8    A.   I am on 21.

9    Q.   Okay.  And it says revenues in EBITDA and under that, is

10:27:05 10   this correct, Universal Music Group's revenues were 4.8 billion

11   for this period?

12         MS. NOYOLA:  Objection, Your Honor.

13         THE COURT:  What's your objection?

14         MS. NOYOLA:  Foundation.  He is reading from a

15   document that is not in evidence.

16         THE COURT:  Lay a foundation.

17   BY MR. BUCHANAN: (Continuing)

18   Q.   You were shown this document in your 30(b)(6) deposition,

19   were you not?

10:27:24 20   A.   I believe that's accurate, yes.

21   Q.   And do you believe that information is accurate?

22   A.   If it is in an official Vivendi report.  Then, yes, it

23   would be accurate.

24         THE COURT:  Go ahead.

25   Q.   I want to know if this is also true.  It says:  As the

1    decline in physical --

2                MS. NOYOLA:  Objection, Your Honor.

3                THE COURT:  Overruled.

4    BY MR. BUCHANAN: (Continuing)

5    Q.   It says:  As the decline in physical sales was offset by

6    the growth in digital and other revenues with subscription and

7    streaming revenues increasing by approximately 75 percent over

8    the prior year, for the first time in 2013 yearly digital sales

9    exceeded physical sales.

10:28:01 10          That's true, is it not?

11   A.   I believe that's accurate, yes.

12                THE COURT:  What year are you referring to?

13                MR. BUCHANAN:  2013, 2013.

14                THE COURT:  Thank you.

15   BY MR. BUCHANAN: (Continuing)

16   Q.   I would like you to turn to the next tab.

17   A.   Tab 4?

18   Q.   Yes.  And page 24.  Do you see that?

19          And it has columns 2014, 2013.  It has revenue.  Do

10:28:35 20  you see that?

21   A.   Yes, I see that.

22   Q.   Okay.  And is it correct that for the year 2014 from music

23   publishing, the revenue went from 655 million for the prior

24   year to 673 million just for the UMPG?

25   A.   Yes, I see that.

D. Kokakis - Cross

198

1    Q.    And that was an increase of 4 percent?

2    A.    Yes.

3    Q.    Okay.  And this had to do with streaming, a lot of

4    streaming happening, replacing the old type of digital sales or

5    CD sales?

6    A.    That's accurate, yes.

7    Q.    Now, you said you weren't sure of the worth of Universal

8    Music Group.  Could you turn to tab 5.

9          Are you familiar with "Rolling Stone Magazine"?

10:29:25 10  A.    I am, yes.

11   Q.    Okay.  I assume you read that.  I know you have a great

12   interest in music.

13   A.    No, I don't.

14   Q.    Okay.  So it reports here, and tell me if this is wrong,

15   maybe it refreshes your recollection, that UMG is worth 33.25

16   billion?

17   A.    "Rolling Stone" is not an authority on the valuation of

18   corporations.

19   Q.    So if you read that, it says:  On Monday Deutsche Bank

10:29:59 20  said in a report that it believes UMG is worth --

21          THE COURT:  Stop.  Sustained.  The objection is

22   sustained.  You can ask him whether his recollection is

23   refreshed by the number, but you're, again, testifying into the

24   record on an exhibit which is not in evidence and hasn't been a

25   foundation laid.

199

```
       1            So ask him his question.

       2   BY MR. BUCHANAN: (Continuing)

       3   Q.   So you are familiar with Deutsche Bank?

       4   A.   I know of Deutsche Bank.

       5            THE COURT:  No.  Ask him whether he believes that the

       6   information coming from Deutsche Bank is accurate or not.

       7   Q.   Okay.  So do you --

       8            I was just laying a foundation if he thought Deutsche

       9   Bank was reliable.

10:30:42 10            THE COURT:  You are right.  I apologize.  Can you

      11   answer that question?

      12            THE WITNESS:  If Deutsche Bank is a reliable

      13   resource?

      14   BY MR. BUCHANAN: (Continuing)

      15   Q.   Yes.

      16   A.   Yes, I believe it would be.

      17   Q.   So if they reported that the company was worth

      18   33.25 billion, you would you rely on that?

      19   A.   If it was a valuation commissioned by Universal and

10:31:05 20   reflected accurate and independent information, then I would

      21   likely say it's reliable.

      22   Q.   Streaming revenue has increased dramatically, has it not,

      23   over the years?

      24   A.   Yes, it has.

      25   Q.   And that has benefited UMPG and all the other music
```

D. Kokakis - Cross

200

1  companies?

2  A.   Yes, it has.

3  Q.   But you have a view that Spotify and Amazon and Apple,

4  that they're not being fair because they're not sharing more

5  with your company and other music companies; is that right?

6  A.   I believe that we could achieve better rates than what

7  they're currently paying.  And that in the earlier years, when

8  these services first emerged, we were -- I want to be clear

9  about what the strategy was.

10:32:00 10       We wanted to make it easier for them to get to

11  market.  So we perhaps compromised on things that in retrospect

12  we shouldn't have compromised on.  So now that they have market

13  power, now that they have traction in the market, we can go

14  back and renegotiate those rates and those deals.

15  Q.   But you believe that those companies are more focused on

16  drawing in customers by charging lower rates and building up

17  their market value; isn't that true?

18  A.   I don't know exactly what motivates them or what their

19  business strategies are.  I would venture to say that sometimes

10:32:38 20  our interests are different.

21       And to the point I believe you made, I believe that

22  we deserve higher rates, that our songwriters should be paid

23  higher rates.

24  Q.   So could you turn to tab 6?  This is your witness

25  statement in the matter of the determination of rates and terms

D. Kokakis - Cross

201

1    for making and distributing phone records.  Paragraph 61,

2    page 20.

3    A.    Yes, I see that.

4    Q.    So there you're talking about Spotify, and it says it has

5    a similar strategy.  I assume you're referring to the other

6    digital service companies?

7    A.    I would have to look back at what the prior strategies

8    refer to to see if that's correct.

9    Q.    All right.  Why don't we just focus on Spotify, then.

10:33:46 10    A.    Sure.

11    Q.    So you state there --

12              MS. NOYOLA:  Objection, Your Honor.  He is about to

13    read from a document that is not in evidence yet.

14              MR. BUCHANAN:  I am only refreshing his recollection.

15              THE COURT:  Well, I didn't think there was a question

16    to refresh his recollection.  So --

17              MR. BUCHANAN:  I asked him about the IPO and whether

18    they were driven actually by their market cap and by, you know,

19    just enhancing their base.  And he said he wasn't sure about

10:34:10 20    that.

21              THE COURT:  Okay.  Go ahead.  Focus him on the area

22    in particular and ask him if that refreshes his recollection,

23    if that's your goal.

24    BY MR. BUCHANAN:  (Continuing)

25    Q.    The third sentence begins:  A larger user base will

D. Kokakis - Cross

202

```
          1    increase Spotify's already quite large 8-plus billion

          2    enterprise value, which will inure to the benefit of Spotify

          3    and its owners/investors when it completes its highly

          4    publicized initial public offering.  While Spotify's IPO will

          5    likely make its owners very wealthy, the songwriters and

          6    publishers who have fueled Spotify's rise will not receive

          7    payment from the IPO; is that right?

          8    A.   That's my personal opinion of what the strategy is.  I

          9    don't have knowledge what their actual strategy may be.  But

10:34:53 10    this is what I believe to be the case.

         11    Q.   Okay.  And your company, UMG, owned stock in Spotify and

         12    benefited greatly from the IPO, did it not?

         13    A.   Universal has not sold its stock in Spotify.  So I don't

         14    know if it stands to benefit greatly from it.

         15    Q.   Okay.  Well, the IPO was enormous, was it not?

         16    A.   That's a relative term.

         17    Q.   Okay.  It was successful?

         18    A.   It was successful, to my knowledge.

         19    Q.   And your company invested in that IPO?

10:35:25 20    A.   Universal Music Group has stock in Spotify, as do many

         21    other music companies and individuals and private equity firms.

         22    Yes, we have lots of investments.

         23    Q.   And Sony owned 5 percent of Spotify, did it not?

         24    A.   I don't know what Sony's ownership interest was in

         25    Spotify.
```

D. Kokakis - Redirect

203

1    Q.   You don't follow that?  If you own 5 percent, you have got

2    to report it to the SEC?

3    A.   I don't Google things nearly as much as you think I do.

4    No, I don't know.

5            THE COURT:  Just answer.  If you don't know, you

6    don't know.

7            THE WITNESS:  I don't know, sir.

8            MR. BUCHANAN:  Okay.  I have no further questions.

9            THE COURT:  All right.  Thank you.

10:35:59 10            All right, redirect.

11            MS. NOYOLA:  Yes, Your Honor.

12        REDIRECT EXAMINATION

13   BY MS. NOYOLA:

14   Q.   Just a few questions, Mr. Kokakis.  Are you familiar with

15   the difference between a platform and a protocol?

16   A.   A platform and a protocol?  No, I am not sure I do.

17   Q.   Mr. Buchanan earlier referred to a BitTorrent platform.

18   A.   Yes.

19   Q.   Is BitTorrent a platform --

10:36:32 20   A.   Well, it's --

21   Q.   -- or a --

22   A.   It's actually a -- torrent refers to a type of

23   file-sharing platform, typically peer-to-peer.

24   Q.   Sorry.  Is BitTorrent a platform or a protocol?

25   A.   It's a protocol.

D. Kokakis - Redirect

204

1    Q.   And would you send -- are takedown notices sent to

2    protocols?

3    A.   No.  They are sent to service providers and platforms.

4    Q.   Are infringement notices sent to platforms -- or sorry --

5    protocols?

6    A.   No, they are not.

7    Q.   And is BitTorrent similar to an entity like Cox?

8    A.   No, very different.

9              MR. BUCHANAN:  I am going to object to the leading

10:37:08 10   questions.  And it is way beyond -- I didn't ask anything about

11   protocols, and I didn't say anything about sending notices --

12             THE COURT:  You have asked him to specific companies

13   and --

14             MR. BUCHANAN:  Right --

15             THE COURT:  -- whether they were sent notices.  So

16   I'm going to allow the line of questioning.

17             It was leading, and so that objection is sustained on

18   leading grounds.  You may reask the question.

19   BY MS. NOYOLA: (Continuing)

10:37:32 20   Q.   How is BitForm -- BitTorrent similar to Cox?

21   A.   I'm not certain that it is.

22   Q.   And do you remember your testimony about LimeWire?

23   A.   Yes.

24   Q.   And is -- how is BitTorrent similar or different to

25   LimeWire?

A.    LimeWire provided a forum on which free file sharing could

take place without any monetization or payments going to the

rights holders.  So songwriters and artists were deprived of

any compensation whatever on that service, similar to what

we're seeing with Cox allowing torrent sites to operate and

torrent services to operate within its platform without

controls in place, without complying with its legal

obligations.

            So in that regard, I think Cox's activities are

similar to what we saw with LimeWire.

            MS. NOYOLA:  No further questions, Your Honor.

            THE COURT:  All right.  May Mr. Kokakis be excused?

            MS. NOYOLA:  Yes.

            MR. BUCHANAN:  Your Honor --

            THE COURT:  No.

            MR. BUCHANAN:  Okay.

            THE COURT:  All right.  Mr. Kokakis, you're excused

with our thanks, sir.  Please don't discuss the testimony

you've given with anyone until our trial is over.  All right?

            THE WITNESS:  Yes, sir.

            THE COURT:  All right.  Have a good day.

            THE WITNESS:  Thank you.  Thank you, Your Honor.

            NOTE:  The witness stood down.

            THE COURT:  All right.  Let's take our mid-morning

break.  We'll come back at 11 o'clock and we'll continue with

206

1       our testimony.  Thank you.  You're excused.

2                NOTE:  At this point the jury leaves the courtroom;

3       whereupon the case continues as follows:

4       JURY OUT

5                THE COURT:  All right.  Anything before we break?

6                MR. ZEBRAK:  Yes, Your Honor.  We have four issues

7       we'd like to raise with Your Honor.  They'll hopefully go

8       quickly.  I think they're fairly straightforward, that we want

9       to bring --

10:40:03 10              MR. OPPENHEIM:  Your Honor, I think -- we want to

11      avoid so many objections during crosses.  And so, maybe we can

12      clean some issues up and make this more efficient.

13               So, you know, a lot of these executives are -- they

14      may have knowledge about what forward-looking enforcement plans

15      are for their company that they have by virtue of the fact that

16      they are counsel or they're having discussions with counsel.

17      Asking questions about forward-looking enforcement issues

18      impinges on the attorney/client privilege and are improper.

19               I didn't want to interrupt and have that discussion

10:40:43 20     at sidebar, because I do want this to move forward, but it

21      really is improper going forward and shouldn't happen.

22               Witnesses shouldn't be put in the position where they

23      have to reveal what their company may or may not do with

24      respect to other ISPs, other companies in terms of enforcement.

25               THE COURT:  Understood.  What's your second one?

207

1          MR. OPPENHEIM:  Secondly, the -- there are three

2    major publishing entities here, and Mr. Kokakis was one witness

3    for one of them.  We're going to have two more coming.  The

4    publishers were not parties to CAS.

5          So once that -- asking a question on

6    cross-examination, were you a party to CAS, fine.  When they

7    say no, there shouldn't be any further -- I mean, you could

8    ask, well, why weren't you?  That's fine.  But asking question

9    after question after question about the contents of CAS seems,

10:41:36 10   to me, to be improper and unnecessary.

11          THE COURT:  Okay.  Third issue?

12          MR. ZEBRAK:  Yes, Your Honor, two other issues.  The

13   third issue is that to show Mr. Elkin's slide from opening, and

14   I quote, "this case has nothing to do with streaming music,"

15   and yet question after question after question gets into this

16   irrelevant issue.

17          And we didn't want to object.  It was clear Your

18   Honor didn't want more objections from us.  But, you know, I

19   ask that they be held to their own statements.

10:42:06 20          And the fourth issue is that we would ask that the

21   jury be specifically told to disregard Mr. Buchanan's

22   testifying within questions.  There were a number of factual

23   inaccuracies.  And Your Honor already encouraged the witness

24   not to argue with Mr. Buchanan.  And the witness is put in a

25   difficult position when Mr. Buchanan is referring to things as

208

1    platforms when they're protocols.

2            And the jury -- this is technical stuff to begin

3    with.  And when they see counsel testifying in the record

4    inaccurately, it leads to a host of problems.

5            THE COURT:  All right.

6            MR. OPPENHEIM:  May I put a point on that, Your

7    Honor?  Because there is a lot of confusion here.

8            Platform, I -- platform can be used a lot of

9    different ways.  So Mr. Buchanan asked questions, and I won't

10:42:51 10   get the exact wording right, but he asked, well, you know,

11   you -- the record companies sued LimeWire, right?  So LimeWire

12   was a company.  You call it a platform, but it was a juridical

13   entity.

14           eDonkey, Gnutella, Ares, and BitTorrent are not

15   companies, but he's using this generic term "platform," and

16   he's asking these questions.  It confused the witness.  Now I

17   bet the jury is going, well, why haven't they sued BitTorrent,

18   eDonkey?

19           Now, the -- I'm going to make it even a little more

10:43:29 20   confusing.  There is a company called BitTorrent, but it has

21   nothing to do with the BitTorrent protocol.

22           So anyway, it's a huge mess.

23           THE COURT:  Well, go ahead.  Do you want to respond,

24   Mr. Buchanan?

25           MR. BUCHANAN:  Your Honor, this notion that I was

209

1    violating the attorney/client privilege by asking him questions

2    about forward-looking --

3            THE COURT:  What's the relevance of what their plan

4    is in the future about whether they're going to sue Verizon or

5    not?

6            MR. BUCHANAN:  I never asked that question.  He

7    answered that, Your Honor.  I was asking, have you done it?

8    And he raised all those issues.

9            As you recall, he kept avoiding the question.  He

10   goes, who knows what we're going to do, we might sue them, I

11   don't know.  That's why I followed up.  I didn't ask him what

12   he was going to do in the future.  I asked him what they had

13   done.

14           THE COURT:  Okay.  Well --

15           MR. BUCHANAN:  In terms of these platforms --

16           THE COURT:  If he answers that way, I think you're

17   allowed to follow up.  Go ahead.

18           MR. BUCHANAN:  Okay.  I'm not invading the

19   attorney/client -- I mean -- and this --

20           THE COURT:  Well, it may be.  But he needs to -- the

21   witnesses needs to --

22           MR. BUCHANAN:  Right.  He -- this is -- he testifies

23   all the time.

24           THE COURT:  General counsel, I understand.

25           MR. BUCHANAN:  He's a smart guy.

10:44:09 (line 10)

10:44:27 (line 20)

210

```
 1              THE COURT:  I understand.

 2              MR. BUCHANAN:  This bit about CAS and asking him

 3    that.  He brought up MarkMonitor.  He said we deferred to the

 4    sister company, they had this deal with MarkMonitor, they were

 5    doing it, they were taking care of it, Cox is this horrible

 6    company.

 7              So I said, okay, what were they -- what notices were

 8    you sending to Verizon and these other companies?  MarkMonitor

 9    was hired --

10:44:57 10          THE COURT:  CAS came in as a separate issue that you

11    raised.

12              MR. BUCHANAN:  Right.

13              THE COURT:  And he said, I'm not familiar with it.  I

14    think you can explore that.

15              MR. BUCHANAN:  Right.

16              THE COURT:  But I think that after you explore what

17    he knows, what he doesn't know, you need to move on, especially

18    if they're not signatories to it.  I don't think you're barred

19    from asking follow-up --

20              MR. BUCHANAN:  Right.

21              THE COURT:  -- questions if they're -- just because

22    they're not a signature -- a signatory.  But let's not --

23              MR. BUCHANAN:  Right.

24              THE COURT:  -- beat a dead horse at that stage.

25              MR. BUCHANAN:  Yes, Your Honor.  I just -- I guess
```

211

1    the only reason -- he kept falling back as, I don't know what

2    those other companies are doing.  I'm not bound by them.  It's

3    a bad agreement.

4            Or then he started to, well, I think they're going

5    after them, they're being aggressive, I can rely on them.  And

6    so then it has to be a balance, okay, if you're relying on

7    them, you're the chief counsel --

8            THE COURT:  I --

9            MR. BUCHANAN:  Okay.  Your Honor, I got it.

10:45:48 10            THE COURT:  We're not going to go down that road.

11            MR. BUCHANAN:  Okay.

12            THE COURT:  When he starts saying, I don't know, and

13    I don't know what their protocol is, and we're not going to

14    beat it to death.

15            MR. BUCHANAN:  And --

16            THE COURT:  He's got no information on it.

17            MR. BUCHANAN:  Right.  And the streaming, he brought

18    up streaming.  He talked about streaming on direct.

19            THE COURT:  What is the relevance of the streaming?

10:46:04 20    In '13, '14, I think it's relevant, and then your questions

21    went on beyond that.

22            MR. BUCHANAN:  That's it.

23            THE COURT:  So --

24            MR. BUCHANAN:  I just asked one question.  It was --

25    it went forward and --

212

```
 1              THE COURT:  Okay.

 2              MR. BUCHANAN:  -- it was beneficial.  That's all.

 3    Because it goes to -- I think you talked about deterrence and

 4    things like that where the market is changing, and not any

 5    fault of Cox, and the revenue is going in a different

 6    direction.

 7              THE COURT:  Yeah.

 8              MR. BUCHANAN:  And you want to say something?

 9              MR. ELKIN:  Yeah, just very briefly.  They -- part of

10:46:34 10    the case is that during this period of time, 2013 and '14, you

11    know, where the action was was in digital downloads.  And it

12    doesn't matter what is happening today.

13              Well, that's not true, as we -- as I showed Mr.

14    Kooker yesterday, he provided testimony to the Copyright

15    Royalty Board where he testified that the revenues were

16    staggering during this period of time.

17              And I think it helps, from our point of view, to put

18    in proper context how much damage there was in the aggregate of

19    the overall music distribution gestalt.  That's the --

20              THE COURT:  Yeah.

21              MR. ELKIN:  -- additional point I wanted to raise.

22              THE COURT:  Yeah.

23              MR. ZEBRAK:  Your Honor, just very briefly.

24              THE COURT:  Yes, Mr. Zebrak.

25              MR. ZEBRAK:  And I know Mr. Buchanan doesn't have a
```

1  transcript of his questioning in front of him when he stands up

2  and says, I only asked one question about streaming.  It's just

3  flat out not true.  He has an exhibit that he's reading into

4  the record from "Rolling Stone Magazine" that the witness said

5  he hadn't read.  And I think the jury is hopelessly confused

6  from something like that.

7          THE COURT:  Okay.

8          MR. ZEBRAK:  And they should be told to ignore that

9  testimony.

10:47:40 10          THE COURT:  All right.  That goes to your final

11  point, which is Mr. Buchanan is putting a significant amount of

12  new information that's not in the record and not laying a

13  foundation for it.

14          And you need to tone -- you need to restrict your

15  questions to the evidence in the case.  You can ask other

16  open-ended questions about, do you know about this or do you

17  know about that, but to just front load the questions with

18  evidence, which isn't in the record, and as far as I can tell

19  is not going to get into the record, is improper.  It's just --

10:48:17 20  there's far too much substance in your questions.

21          MR. BUCHANAN:  Yes, Your Honor.

22          THE COURT:  So I let you do it for a little while,

23  but let's focus on cross-examination to the subject matter

24  that's on direct and -- I mean, a couple of the questions

25  contained a lot of information which was outside the direct

214

1    examination and also, frankly, the case.

2              So let's work on that.  All right?

3              MR. BUCHANAN:  Yes, Your Honor.  I'd like to move

4    those financial statements in, DX 41 and DX 39.

5              THE COURT:  Any objection?

6              MR. OPPENHEIM:  They're obviously accurate

7    statements.  The problem is Vivendi is a large company and the

8    two plaintiffs are a small part of that.  So I think moved into

9    evidence, so long as the jury is informed as to that effect,

10:49:25 10  that's fine.

11             THE COURT:  Well, that's your job.  That's not my

12   job.

13             MR. OPPENHEIM:  That's fine.

14             THE COURT:  And, you know, the same with a lot of the

15   platform versus protocols.  And if Mr. Buchanan is mixing

16   oranges and apples in asking these questions, then that's

17   something that you straighten out and make clear that he was

18   doing that.  And, you know, the jury will look at them and say,

19   well, why was he doing that?

10:49:54 20            MR. OPPENHEIM:  Yes, Your Honor.

21             THE COURT:  So that's up to you to change -- to clear

22   that up.

23             MR. OPPENHEIM:  Yes, Your Honor.

24             THE COURT:  All right?  All right, we're in recess.

25             NOTE:  At this point a recess is taken; at the

215

1  conclusion of which the case continues in the absence of the

2  jury as follow:

3  JURY OUT

4       THE COURT:  Ready to proceed?

5       MR. OPPENHEIM:  I think there is one issue we have

6  identified might come up on the cross of this witness.  Or if

7  not this witness, the next witness.  And we want the Court to

8  try to resolve it first before the jury comes out.

9       THE COURT:  Yes, sir.

11:12:11 10      MR. OPPENHEIM:  So you have heard a lot about CAS,

11  Your Honor.  CAS was created through -- initially through a

12  memorandum of understanding, which is public, and not a

13  problem.

14      There were then individual implementation agreements

15  with each of the CAS ISPs, which have very strict

16  confidentiality provisions.

17      For purposes of discovery, we gave notice pursuant to

18  those confidentiality provisions and indicated that the

19  documents would be produced pursuant to the protective order.

11:12:43 20  And that happened.

21      It's not our intent to actually use the -- the

22  plaintiffs' intent to use the documents, though we will be

23  referencing some -- the way in which the actions in CAS

24  occurred.  But I think the defendants do intend to use them.

25      And before they become public, I think we just need

216

1  to deal with that confidentiality provision.  I have asked that

2  one of them just be teed up for Your Honor on a monitor, if you

3  would like to see it.

4        This is from DX 75.  And it's paragraph 2.  And I

5  don't believe we've given notice to the CAS participant -- the

6  ISPs in CAS that we intend to use these in court.  We haven't,

7  and I don't think the defendants have either.

8        So I just wanted to raise that before they come up.

9        THE COURT:  Okay.

11:13:37  10        MR. ELKIN:  Your Honor, I don't think this -- the

11  next witness will be implicated by any of this.  Probably in

12  the afternoon with Mr. Marks.

13        My understanding is that pursuant to Your Honor's

14  confidentiality order, this material that was produced pursuant

15  to the confidentiality order can be designated within 15 days

16  of trial.  And I believe, I can't -- I don't know who everyone

17  is in the courtroom, but it covers, obviously, the Court and

18  the staff and the client representatives, at least that I can

19  identify that are in the Court.

11:14:17  20        But I just wanted to make Your Honor aware that is

21  applicable to the confidentiality order entered in the case.

22        THE COURT:  All right.  Thank you, Mr. Elkin.

23        All right.  So I will look at it.  And, you know,

24  I -- confidentiality I think is appropriate during the

25  discovery process.  And when we get to trial, the

217

1    confidentiality agreements no longer apply.

2            And if you want to redact certain portions that are

3    not relevant in the agreement -- but otherwise the documents

4    themselves are going to be entered into the public record.

5            MR. OPPENHEIM:  Your Honor, to be clear, I'm not

6    trying to avoid that.  I just don't want to be called by those

7    ISPs with complaints later.

8            THE COURT:  Okay.  No.  And I appreciate that, and

9    that's my ruling.

11:15:14 10          MR. OPPENHEIM:  Very well.  Thank you, Your Honor.

11           THE COURT:  All right, Joe.  Let's get our jury,

12   please.

13           I think I have all of the plaintiffs' exhibits, at

14   least most of them.  So I don't need to have another copy.  I

15   can get them out of the binder.

16           MR. OPPENHEIM:  It will save some trees.

17           NOTE:  At this point the jury returns to the

18   courtroom; whereupon the case continues as follows:

19   JURY IN

11:16:09 20          THE COURT:  All right, please have a seat.

21           Sorry for the delay.  We were working out here and

22   didn't want to do it at sidebar.  Thank you.

23           All right.  Next witness, Mr. Oppenheim.

24           MR. OPPENHEIM:  Your Honor, the plaintiffs would call

25   Alasdair McMullan.

A. McMullan - Direct

218

1          NOTE:  The witness is sworn.

2          THE COURT:  All right.  Good morning, Mr. McMullan.

3          THE WITNESS:  Good morning.

4          THE COURT:  Please proceed, Mr. Oppenheim.

5          ALASDAIR McMULLAN, called by counsel for the

6     plaintiff, first being duly sworn, testifies and states:

7          DIRECT EXAMINATION

8     BY MR. OPPENHEIM

9     Q.   Good morning, Mr. McMullan.  Where do you work?

11:17:07 10  A.   I work at Universal Music Group.

11    Q.   And what is your position?

12    A.   Senior vice president of legal and business affairs.

13    Q.   How long have you had that role?

14    A.   Since late 2012.

15    Q.   How long have you worked in the music industry?

16    A.   Since December 1995.

17    Q.   I'm going to ask you to speak up a little.  It's a big

18    courtroom.

19    A.   I'm a little hoarse, so I am going to lean in.

11:17:35 20  Q.   Okay.  I will as well, apparently.

21          Why did you get into the music industry?

22    A.   I think like a lot of people in the music industry, music

23    was always my passion.  I grew up in a musical household.  We

24    listened to music.  I played music.  I played music in

25    symphonic bands and marching bands and rock bands.  And it was

A. McMullan - Direct

219

1    just a natural place for me to go as a lawyer.

2    Q.   Do you still play?

3    A.   Mostly now just teaching my seven-year-old twins how to

4    play the piano.

5    Q.   Other than working at Universal Music Group, have you had

6    other positions within the music industry?

7    A.   Prior to being at a music company, I worked at a law firm

8    that we did a good amount of music work, we represented

9    artists, we represented companies in different aspects of music

11:18:31 10   law.

11   Q.   When was that?

12   A.   From graduating from law school in 1988 through the end of

13   1995.

14   Q.   And what did you do after that?

15   A.    I went into a music company called EMI Music, which was

16   the smallest of the large record companies at the time.  It was

17   the home of the Beatles, and the Beach Boys, and Frank Sinatra,

18   and Nat King Cole.  Really a lot of the music I grew up with, a

19   lot of the music my parents grew up with, and it was just an

11:19:08 20   ideal job for me, really.

21   Q.   And at some point did you leave EMI?

22   A.   It was acquired by Universal in late 2012.

23   Q.   Sorry, when was that?

24   A.   Late 2012.

25   Q.   And was that when you transitioned?

A. McMullan - Direct

220

1    A.    That's when I transitioned.

2    Q.    Are there UMG companies that are plaintiffs in this case?

3    A.    There are two.  UMG Recordings, Inc., and Capital Records,

4    LLC.

5    Q.    And what kind of companies are those?

6    A.    Those are what we traditionally call record companies that

7    make, market, sell, get to consumers records, recorded music.

8    Q.    And what is the distinction -- or can you explain the

9    distinction between UMG Recordings and UMPG, or Universal Music

11:20:04 10   Publishing Group?

11   A.    So the Publishing Group owns, markets musical

12   compositions, the songs themselves that are written by

13   songwriters.

14        The record company side, UMG Recordings, Inc.,

15   Capital Records, LLC, owns, markets the recorded music, the

16   music you hear on the radio.

17        So Lennon and McCartney wrote the Beatles songs.

18   Their compositions might be owned and controlled by a

19   publishing company, which is actually not a Universal company,

11:20:38 20   it's a Sony company.  We own and control the Beatles

21   recordings, the performances you hear that are embodied on

22   records.

23   Q.    Are UMG Recordings and UMPG ultimately owned by the same

24   entity?

25   A.    Ultimately they are owned by a parent company.

A. McMullan - Direct

221

1    Q.    And what is that parent company?

2    A.    The ultimate parent is called Vivendi SA.

3    Q.    And does that parent company own -- strike that.

4          What entities does Vivendi SA own, that you know?

5    A.    They operate a number of businesses.  They operate a -- or

6    they own a large advertising agency called Havas.  A movie

7    studio called Canal+.  I think they have some video game

8    companies.  I'm not familiar with their full portfolio.

9    Q.    As between UMG Recordings and UMPG, can you describe how

11:21:50 10   they are structured in terms of employees and operations?

11   A.    They operate separate businesses.  There is a CEO of the

12   publishing company, and it has its own legal department and

13   artists, A&R department, or artists and repertoire department.

14   It has its own facilities.

15         The record company side of the business operates

16   quite a number of different record labels that each have their

17   own CEO and marketing people and promotion people and

18   salespeople.  And that rolls up into a parent recorded music

19   company.

11:22:27 20   Q.    I am sorry, I didn't mean to interrupt you.

21         Can you describe several of the record labels that

22   UMG owns.

23   A.    Well, it now owns EMI, which is Capital Records.  It owns

24   Interscope, Decca, Verve, Republic.  I mean, it owns many, many

25   record companies.

A. McMullan - Direct

222

1    Q.   And what kind of genres of music does UMG have within its

2    catalog?

3    A.   Oh, it spans all genres of music.  It obviously has some

4    of the most popular music of today, pop music.  It has a large

5    rap/hip hop catalog.  It has a classical catalog.  It has a

6    phenomenal jazz catalog, Blue Note, Verve, Decca.  Country

7    music, we have a business in Nashville.  Latin music, we have a

8    business in Miami.

9    Q.   I'm sorry, did you say Blue Note?

11:23:30 10    A.   Blue Note.

11    Q.   Can you just describe for the jury what Blue Note is?

12    A.   Blue Note was -- is a historic jazz label that dates back

13    to 1939.  Some of the most iconic and famous jazz recording

14    artists recorded for Blue Note.  And it's a label that, you

15    know, we are pretty proud that it still operates today, still

16    puts out music today.

17    Q.   Do you recall some of the artists in the Blue Note

18    catalog?

19    A.   Herbie Hancock, John Coltrane.  I mean, Norah Jones.  I

11:24:00 20    mean, again, it spans decades of musical history.

21    Q.   Are you familiar with some of the works that are asserted

22    were infringed in this case?

23    A.   I am.

24         MR. OPPENHEIM:  Your Honor, we would like to publish

25    PX 1, which has already been admitted.

A. McMullan - Direct

223

1           THE COURT:  Right.  Go ahead.

2    BY MR. OPPENHEIM: (Continuing)

3    Q.   Mr. McMullan, have you seen this document before?

4    A.   I have.

5    Q.   And can you describe what it is for the jury, please.

6    A.   It's a list of the recordings that the plaintiffs in this

7    case contend were infringed by defendant in this case.

8    Q.   And I have asked that we flip to the pages of the UMG

9    recordings.  And are these some of the UMG recordings that are

11:24:55 10  in this case?

11   A.   Those are, yes.

12   Q.   And are you familiar with some of these recordings?

13   A.   I am familiar with many of them.

14   Q.   And why?

15   A.   These -- many of these are very popular recordings that I

16   am familiar with either through working in the business or just

17   familiar with through being a fan of music.

18   Q.   Were you involved in the preparation of a medley of some

19   of these recordings for purposes of the jury?

11:25:21 20  A.   I was.

21           MR. OPPENHEIM:  Your Honor, permission to play a

22   short medley.

23           THE COURT:  Any objection?

24           MR. BUCHANAN:  No, Your Honor.  I will have to listen

25   to the music first, and then I may have an objection.

A. McMullan - Direct

224

1           MR. OPPENHEIM:  I think --

2           THE COURT:  All right.  Let's go ahead.

3           MR. OPPENHEIM:  I think he's going to like it, Your

4    Honor.

5           NOTE:  A music excerpt is played.

6    BY MR. OPPENHEIM: (Continuing)

7    Q.   Mr. McMullan, can you describe the importance of

8    recordings like the ones we just heard to UMG?

9    A.   That's some very key hit music that UMG has helped bring

11:27:55 10  to the world.  I mean, some of those are iconic pieces of our

11   culture.  I heard music that I used to play in a bar band when

12   we did covers.  I heard my prom song in there, "Wonderful

13   Night."

14          I mean, it's just very important music from very

15   important recording artists.

16   Q.   So let me turn now away from the legitimate recordings

17   that we just listened to and turn to the infringing ones.

18          Have you had occasion to listen to any of the

19   infringing recordings in this case?

11:28:29 20  A.   I did.

21   Q.   How many?

22   A.   I listened to 100 of them.

23   Q.   And do you recall how the 100 recordings were selected?

24   A.   They were picked randomly by a computer.

25   Q.   And why did you listen to them?

A. McMullan - Direct

225

1  A.   I understood that during the course of this case there was

2  some issue raised about whether the recordings were in fact

3  copies of our recordings.  We believe that the technology used

4  to find and select them is essentially infallible, but, you

5  know, I wanted to listen for myself and put aside any possible

6  doubt.  And I listened to 100 of them.

7  Q.   And when you say the issue was raised, do you know -- who

8  do you understand raised the issue?

9  A.   Oh, I understand it was raised by Cox.

11:29:27 10  Q.   And was there a reason you didn't listen to all of the UMG

11  recordings in this case?

12  A.   Well, it's thousands of recordings, I think.  So --

13  Q.   And after you listened to them, what conclusion did you

14  come to?

15  A.   They were exact copies of our copyrighted sound

16  recordings.

17  Q.   How did they sound?

18  A.   They sounded great.  They sounded like exact copies of our

19  sound recordings.

11:29:52 20  Q.   In your position at Universal Music Group, do you deal

21  with piracy issues?

22  A.   Unfortunately, I do.

23  Q.   So at a high level, can you describe for the jury what

24  piracy is.

25  A.   Piracy is essentially the theft of our content.  It's the

A. McMullan - Direct

226

1    unauthorized copying, distribution, exploitation of the

2    recordings that we own and what we market and what our business

3    is founded on.

4    Q.   And are there different types of piracy?

5    A.   There are different types.  There have historically been

6    different types.  There was a time where piracy consisted of

7    vinyl bootlegs of recordings.  There was a time where cassette

8    piracy, people copying albums on cassettes and selling them was

9    the problem.

11:30:39 10          And then as with the development of the Internet,

11   Internet piracy grew as a huge problem.

12   Q.   And are you familiar with -- when you say "Internet

13   piracy," can you describe several of the types of Internet

14   piracy you're familiar with.

15   A.   Well, there's Internet piracy where someone might just put

16   up a website and be offering copies to directly download.  And

17   there's Internet piracy like we're talking about in this case,

18   where there are peer-to-peer systems.

19   Q.   And are peer-to-peer systems -- how do peer-to -- how does

11:31:14 20  peer-to-peer piracy differ from the older types of piracy that

21   you use to deal with, say, for instance, vinyl or cassettes

22   that you were describing?

23   A.   Well, in those cases someone needed to make copies of our

24   recordings and get them one-to-one out to somebody who wanted

25   to acquire a pirated copy.

A. McMullan - Direct

227

1    Q.   Let me interrupt you.  When you say "one-to-one," what do

2    you mean by that?

3    A.   Well, like a copy would be made in a factory or somewhere

4    and it had to get into someone's hand.  With Internet piracy,

5    peer-to-peer piracy, unlimited copies can be generated and

6    distributed across the Internet.

7    Q.   Can you describe, at a consumer level, how peer-to-peer

8    piracy works?

9    A.   So if -- well, at a user level, someone might have a copy

11:32:07 10   of the recording on their computer, on their hard drive, as

11   well as software that allows them to connect into a

12   peer-to-peer system.  And it allows them to distribute a copy

13   of that recording to anyone else who has that peer-to-peer

14   software client installed and connected to that system.

15           So that user can upload it into a system where

16   millions of people can have illegal access to the recording.

17   Q.   When -- strike that.

18           I think you said earlier that the business of UMG is

19   to sell recordings; is that right?

11:32:52 20   A.   Yeah, to sell, distribute, license, market recordings.

21   Q.   When UMG sells recordings through a service like iTunes or

22   Amazon, what rights does UMG give the consumer to distribute

23   the recordings on a peer-to-peer service?

24   A.   The consumer gets no rights to do that.

25   Q.   Why not?

A. McMullan - Direct

228

1    A.    Because that would allow a consumer to be in direct

2    competition with our legitimate sales of that music.

3    Q.    In the course of your personal work and time within the

4    music industry, how has peer-to-peer piracy impacted the

5    companies you've worked at?

6    A.    It had a very severe impact.  I was at a record company at

7    the time that the first peer-to-peer service launched, it was

8    called Napster, and then multiple other large services allowing

9    millions and millions of people to illegally distribute our

11:33:56 10   recordings developed.

11            And it had a devastating impact on our business, on

12   the finances of our business, on our ability to invest in new

13   content.  And it was all happening at a time when we were

14   trying to figure out what's the best and safest way to sell,

15   market, distribute music through the Internet.  And here we

16   were doing it in competition with millions of folks who were

17   giving it away and taking it for free.

18   Q.    When these peer-to-peer networks were first launched, how

19   did the record industry deal with it?

11:34:32 20   A.    We sued Napster.  And then we sued another set of

21   services, Kazaa and Grokster.  That case actually went to the

22   Supreme Court.  And then we sued another company called

23   LimeWire.

24            We engaged in educational programs to try to educate

25   consumers that they shouldn't be doing this.  And we worked

A. McMullan - Direct

229

1   hard to develop a legitimate business to try to compete with

2   this distribution of free music illegally.

3   Q.   You mentioned a moment ago that Grokster and Kazaa went to

4   the Supreme Court.  What happened there?

5   A.   We won that case unanimously.  And, you know, each of

6   those companies and businesses, Napster, Grokster, Kazaa,

7   LimeWire, they were all eventually shut down through an

8   expensive legal process.

9   Q.   Are you familiar with the peer-to-peer networks at issue

11:35:27 10   in this case?

11   A.   I am.

12   Q.   Can you list them?

13   A.   I think there is BitTorrent, Ares, eDonkey -- BitTorrent,

14   Ares, eDonkey -- there might be others.  Those are the ones I

15   remember.

16   Q.   With respect to those --

17   A.   Gnutella, I think, is one.

18   Q.   So eDonkey, Ares, Gnutella, and BitTorrent.  With respect

19   to those four peer-to-peer networks at issue in this case, why

11:35:56 20   hasn't the music industry just sued those entities?

21   A.   There's no company to sue.  There's no entity.  This is

22   now -- peer-to-peer moved to a decentralized model where,

23   again, consumers have software on their computers and simply

24   communicate with each other.  Nothing goes through a central

25   server.  There's no central company to sue.

A. McMullan - Direct

230

1          MR. BUCHANAN:  Your Honor, can we approach?

2          THE COURT:  Yes, sir.

3          NOTE:  A sidebar discussion is had between the Court

4   and counsel out of the hearing of the jury as follows:

5   AT SIDEBAR

6          MR. BUCHANAN:  So I just wanted to make sure that

7   this witness -- none of the testimony of the prior witness was

8   revealed to this witness before he testified.

9          MR. OPPENHEIM:  No.  If you think that we haven't

11:36:54 10   discussed this issue for ten years with these witnesses, you'd

11   be kidding yourself.

12          MR. BUCHANAN:  It just seemed to me --

13          THE COURT:  Well, what do you want me -- you want me

14   to have Mr. Oppenheim ask whether he spoke to Mr. --

15          MR. BUCHANAN:  Well, if he represents that he didn't

16   talk to him before he -- just now and testifying and discussed

17   with him Mr. Kokakis' testimony, then I accept that.

18          MR. OPPENHEIM:  Okay.  I did not disclose any of

19   Mr. Kokakis' testimony to Mr. McMullan.

11:37:23 20          MR. BUCHANAN:  All right.

21          THE COURT:  Okay.  Thank you.

22          NOTE:  The sidebar discussion is concluded; whereupon

23   the case continues before the jury as follows:

24   BEFORE THE JURY

25          THE COURT:  Please proceed.

A. McMullan - Direct

231

1   BY MR. OPPENHEIM: (Continuing)

2   Q.   A moment ago, Mr. McMullan, you described a variety of

3   different things that the industry has done in response to

4   peer-to-peer piracy.  Did the industry also sue individual

5   peer-to-peer users?

6   A.   There was a time where we did do that.

7   Q.   Can you explain why the industry did that.

8   A.   At that time, I think there were a couple -- there were a

9   couple of reasons for it.  One, we needed to establish in this

11:38:25 10   sort of new form of piracy that this was illegal and that you

11   should not do it.  So we needed the legal precedent to do that.

12            And secondly, peer-to-peer piracy became such a

13   phenomenon that we were in danger of a generation of people

14   believing that music is free, does not have to be paid for.

15   And we wanted to send that -- a message that that is not the

16   case.  And we wanted to change behavior and perception on that

17   point.

18   Q.   And did there come a point in time where the industry

19   stopped filing those types of suits on a regular basis?

11:39:09 20   A.   There did.

21   Q.   And why?

22   A.   I think we found other ways.  You know, we don't sue

23   anyone lightly.  We're a music business, we're not a

24   litigation/lawsuit business.  And we believed that there were

25   -- the precedence were sufficiently established and that there

A. McMullan - Direct

232

1    were other means by which we could deal with this type of

2    piracy without having to clog the courts with hundreds of

3    lawsuits.

4    Q.   And what were those other means?

5    A.   Well, we -- again, we engaged in educational means.  But

6    one of the means was sending notices to Internet service

7    providers notifying them of repeat infringers on their systems.

8    Q.   Well, you said notifying them of repeat infringers.

9    A.   Well, notifying them of infringers on their systems and,

11:40:10 10  by nature, infringers who would continue to do it repeatedly.

11   Despite the fact that we had already engaged in a large

12   litigation program against consumers and had established

13   precedence against peer-to-peer networks, there were people

14   that continued to do this.

15   Q.   Were you able to identify who was a repeat infringer and

16   who was not when you were sending notices?

17   A.   No.  I think our notices were just -- were just

18   identifying there is someone infringing this content on an ISP,

19   and the ISPs can identify who's a repeat infringer.

11:40:47 20  Q.   So what role do the ISPs play in peer-to-peer piracy?

21   A.   Well, the ISPs provide the network by which the piracy

22   occurs and have the ability to -- when notified about it, to

23   stop it.

24   Q.   And so what does -- what did the record industry expect an

25   ISP, like Cox, to do to address peer-to-peer piracy?

A. McMullan - Direct

233

1  A.   Well, we expected them to do something.  We expected them

2  to work with their customers that were infringing to stop the

3  infringement.  And if a customer continued to do it, ultimately

4  they might have to lose their service and be terminated.

5  Q.   All right.  Are you familiar with the term "infringement

6  notice"?

7  A.   I am.

8  Q.   Can you describe for the jury, at a high level, what an

9  infringement notice is.

11:41:41 10  A.   It's a notice to a company or to someone that on their

11  system there is infringement occurring of a particular work.

12  Q.   Have you ever heard the term "take-down notice"?

13  A.   Take-down notice, yes.

14  Q.   And is an infringement notice and a take-down notice the

15  same thing, or are they different?

16  A.   Well, I mean, a take-down notice might also notify you of

17  infringement.  But a take -- the purpose of a take-down notice

18  really has to do with the DMCA.  And it's a -- you know, a

19  notice to a company like YouTube, saying, we found this content

11:42:20 20  on your system, take it down.

21       And if they do comply with taking it down within the

22  parameters of the law, then, you know, YouTube can avoid a

23  liability for that infringement that it has been notified of.

24  Q.   Are infringement notices, in your experience, typically

25  successful?

A. McMullan - Direct

234

1    A.    Infringement notices are successful if the company that's

2    receiving them takes them seriously and acts upon them.

3    Q.    And what is -- what does the record industry expect an ISP

4    to do in response to an infringement notice?

5    A.    Again, we -- what we expect them to do is take them

6    seriously, notify their customer, and work with that customer

7    to make the infringement stop.

8    Q.    Are you familiar with the Copyright Alert System?

9    A.    I am.

11:43:24 10    Q.    And what was -- let me ask you this.  Is the Copyright

11    Alert System still in effect?

12    A.    No.

13    Q.    Okay.  So what was the Copyright Alert System?

14    A.    The Copyright Alert System was an attempt by some content

15    owners and some ISPs to work together to see if they could

16    educate and inform consumers within the parameters of a

17    program, to see what impact it might have on infringement

18    across those particular ISPs' networks.

19         And to provide some learnings back that might help in

11:44:04 20    understanding this consumer behavior and how to curb

21    infringement through this consumer behavior.

22    Q.    From a time frame perspective, do you know when CAS began

23    roughly and ended roughly?

24    A.    I'm thinking 2013 to very early 2017.

25    Q.    And were you involved -- I am sorry.

A. McMullan - Direct

235

1          How long did it take to -- do you know how long it

2     took to negotiate the agreement to start CAS?

3     A.   I believe it took a number of years to put that in place.

4     Q.   And were you involved in any way in those negotiations?

5     A.   I didn't -- I certainly didn't negotiate anything

6     directly.  I was informed of them from time to time.

7     Q.   And at the time those negotiations were going on, where

8     were you working?

9     A.   At the time of the negotiations, the bulk of them, I would

11:45:02 10   have been working at EMI.

11    Q.   And then when you moved to Universal Music Group, were you

12    involved at all?

13    A.   I think when I moved to Universal Music Group, by that

14    time CAS had just -- would have just launched.  You know, our

15    company was acquired in late 2012, and I think maybe it

16    launched in 2013, shortly thereafter.

17    Q.   And was UMG a participant in CAS?

18    A.   It was.

19    Q.   Who else do you recall was a participant in CAS?

11:45:35 20   A.   Other record companies, Sony and Warner.  The movie

21    companies were involved.  And then a number of ISPs were

22    involved.

23    Q.   When you say "movie companies," what do you mean by that?

24    A.   Film, the film industry, movie studios.

25    Q.   Like Sony Pictures?

A. McMullan - Direct

236

1    A.    Disney, Sony, Warner Brothers.

2    Q.    And you said several ISPs?

3    A.    And several ISPs.  I know -- I think Verizon --

4    Q.    Do you recall --

5    A.    -- Time Warner, Comcast.

6    Q.    Did Cox participate?

7    A.    No, Cox did not participate.

8    Q.    Do you know whether there were any music publishers who

9    participated in the CAS?

11:46:23 10    A.    No, music publishers were not involved in CAS.

11    Q.    Can you explain how CAS sought to address peer-to-peer

12    infringement.

13    A.    You know, CAS established a board.  It established an

14    executive committee.  It created a full educational program.

15    And then it prescribed some parameters that the ISPs could use

16    to deal with notices that were given to them by the content

17    owners of infringements occurring on their system.

18    Q.    Do you recall whether there was a -- what's called a

19    graduated response within CAS?

11:47:16 20    A.    I guess it was a graduated response.  There were

21    educational steps where they would tell a consumer or one of

22    their customers, hey, we have -- this infringement has occurred

23    on your system.

24          There were -- there was an increased step where they

25    would force the consumer to interact with them and acknowledge

A. McMullan - Direct

237

1    they got these notices.

2    Q.    What do you mean by "interact with them"?

3    A.    I guess it might put up -- if you tried to use your

4    Internet, it might put up a page saying, you've gotten this

5    infringement notice and, you know, click here and acknowledge

6    it.

7          They had a call center where they might require

8    people to call in.  Part of what CAS was was operating a, you

9    know, a call center to field questions.

11:48:04 10        And then there were, I guess, what you call

11   mitigation measures if it escalated further that might throttle

12   down your bandwidth of your Internet connectivity or slow it

13   down, something to get a user's attention even more.

14   Q.    And do you recall how many steps there were within the CAS

15   graduated response?

16   A.    I think there were these sort of three areas of education,

17   acknowledgement, mitigation.  But I think it took you

18   through -- it could be either five or six steps.  The

19   parameters were given, but each ISP could implement them in a

11:48:45 20   slightly different way based upon what they were interested in,

21   and that would give different learnings on how consumers might

22   react to different methods of communications to them.

23   Q.    When the record industry was sending notices in CAS, did

24   you know how many steps the infringer in the notice had already

25   gone through?

A. McMullan - Direct

238

```
 1    A.    No.

 2    Q.    Can you explain that?

 3    A.    Well, we were identifying that an infringement occurred

 4    and sending that notice to the ISP.  But it is the ISP that

 5    knows, well, who that infringer is and how many times they have

 6    been caught doing this before.

 7    Q.    Well, if you didn't know, was it possible -- do you

 8    understand it was possible that an ISP may have received a

 9    notice for a subscriber which would have been past the sixth
```
11:49:53 10    step?
```
11    A.    They could easily have gotten notices past the sixth step.

12    Q.    And what did you understand that CAS obligated the ISPs --

13    excuse me.  What did you understand that the ISPs had to do

14    with notices that were past the sixth step?

15    A.    Past the sixth step, CAS didn't deal with it.  CAS was

16    looking at with these six steps, what has occurred and what can

17    we learn from that.  Past the sixth step, the ISPs had to

18    comply with the law.

19           Just like they had to comply with the law for notices
```
11:50:31 20    they might be getting from other copyright holders like the
```
21    publishers outside of CAS.

22    Q.    What obligations did an ISP participating in CAS have to

23    terminate repeat infringers?

24    A.    Well, CAS' six steps didn't have anything to do with

25    terminating infringers.  That's not what it was looking at.
```

A. McMullan - Direct

239

1    But all of these companies had policies that noted that users

2    could be terminated if they engaged in repeat infringement.

3    Q.    In the course of the discussions to create CAS, do you

4    recall there ever being a discussion about having a 14-step

5    graduated response policy?

6    A.    That I don't recall.

7    Q.    Do you -- do you recall how many steps the record industry

8    wanted CAS to have?

9    A.    I believe we wanted three steps.  We believed three steps

11:51:36 10    was something that we had seen in graduated response programs

11    in other countries that had been effective.

12    Q.    Can you describe that a little more.

13    A.    There were certain countries, in France there was a

14    program called HADOPI that mandated three steps before

15    termination.  And the learnings we received from that was that

16    greatly reduced peer-to-peer piracy across networks that were

17    participants in HADOPI.

18          I think there were similar programs in New Zealand

19    and some other countries.

11:52:15 20    Q.    Sorry, I didn't mean to interrupt you.

21    A.    That's okay.

22    Q.    Do you think CAS was effective?

23    A.    I don't think CAS proved to be a solution to anything.

24    Some learnings may have come out of it that were useful.  If it

25    were -- if it were highly effective, we would still be

A. McMullan - Direct

240

1    operating it today.  Certainly as compared with an ISP's

2    obligation at law to deal with notices, I don't think the CAS

3    construct added anything to it that was particularly useful.

4    Q.   Can you explain a little -- maybe a little more clearly

5    for us what you mean by obligations within CAS and obligations

6    within the law.

7    A.   Well, CAS, again, was looking at --

8           MR. BUCHANAN:  I am going to object, Your Honor.  He

9    is giving legal opinions now.

11:53:15 10        THE COURT:  Well, let's see where he goes.

11   Overruled.  His understanding of what obligations are, he can

12   testify to that.

13   A.   CAS was looking at this set of notices within this

14   graduated response, seeing what the consumer behavior was when

15   different mitigation measures were -- and educational measures

16   were employed.

17          At law, my understanding is if someone is notified

18   that their system is being used to infringe and they are

19   notified that that is happening repeatedly, they need to act to

11:53:54 20   stop that.  That's certainly what we expect of the company.

21   BY MR. OPPENHEIM: (Continuing)

22   Q.   I believe you testified earlier that CAS was terminated.

23   Were you involved in that decision?

24   A.   I was.

25   Q.   And can you describe why CAS was terminated?

A. McMullan - Direct

241

1    A.   Well, again, I just think the experiment had concluded.

2    We had developed whatever information we could out of it.  And

3    I just don't -- it was not viewed as a solution to this type of

4    piracy.

5    Q.   And did the record industry send notices to Cox?

6    A.   It did.

7    Q.   And were those notices within CAS?

8    A.   No.

9    Q.   Why not?

11:54:48 10  A.   Because Cox didn't participate in CAS.

11   Q.   Do you know who actually physically sent the notices to

12   Cox in this case?

13   A.    I believe our trade association, RIAA, the Recording

14   Industry Association of America.

15   Q.   Keep your voice up.

16   A.    I know.  I am just getting a little hoarse.  Sorry.

17   Q.   What is UMG's relationship with RIAA?

18   A.   We are a member of RIAA.

19   Q.   And is UMG involved in operating the RIAA?

11:55:30 20  A.   Well, no, the RIAA has its own president and officers,

21   et cetera, but we are on the Board of the RIAA.  We fund the

22   RIAA.

23   Q.   So what was the goal of sending notices to Cox,

24   infringement notices to Cox?

25   A.   To inform them that infringement was happening on their

242

1   system and to get them to act to stop it.

2   Q.   And why did UMG bring this lawsuit?

3   A.   Because in response to those notices, our understanding is

4   Cox did essentially nothing to stop or curb the infringement of

5   these users across its system.

6   Q.   Why not sue the individual infringers instead?

7   A.   One, we don't know who they are.  They are Cox customers.

8   Again, we were trying to avoid having multiple lawsuits against

9   multiple unknown people when we believed we had another

11:56:30  10   alternative that would avoid litigation.  Which is notifying

11   Cox and having Cox deal with their infringing customers to stop

12   the infringement.

13   Q.   Why does Universal Music Group enforce its copyrights?

14   A.   They are our sole assets, essentially.  They are the

15   engine of our business.  If we don't enforce our copyrights and

16   allow anyone to simply copy our recordings and use them, then

17   we don't have a business because we are competing with someone

18   giving away our product for free.

19   Q.   Is this case important to the music industry?

11:57:09  20   A.   This case is very important to the music industry.

21   Q.   Why?

22   A.   Again, this is about a big company that did not take steps

23   to stop the wholesale theft of our copyrights on its system.

24   And we need to do this to protect our business, our employees,

25   our artists, all of whom rely on the revenue generated by our

A. McMullan - Cross

243

1    sale of, marketing, distribution of recordings.

2             MR. OPPENHEIM:  I pass the witness, Your Honor.

3             THE COURT:  All right.

4             All right.  Mr. Buchanan, cross-examination.

5             MR. BUCHANAN:  Yes, Your Honor.

6         CROSS-EXAMINATION

7    BY MR. BUCHANAN:

8    Q.    We have a couple of binders here.

9             Good afternoon, Mr. McMullan.

11:58:14 10   A.    Good afternoon.

11   Q.    I just have a few questions for you.  I would appreciate

12   it, if possible, if you could give yes or no answers.  If it

13   calls for a yes or no answer, could you do that for me?

14   A.    Sure.

15   Q.    Okay.  So how many sound recordings are involved in this

16   case that are owned by UMG?

17   A.    I would have to look at the list --

18   Q.    I just need a no or --

19   A.    To get a number.  I don't know the number off the top of

11:58:50 20   my head.

21             MR. OPPENHEIM:  Mr. Buchanan, if you could let him

22   finish answering, that would be great.

23   Q.    You don't know?

24   A.    Off the top of my head, I don't know.  I mean, they just

25   showed a chart that has them all listed.  So you could -- we

A. McMullan - Cross

244

1    could figure out the number.  I think it was thousands.

2    Q.   Okay.  And how many -- so that exhibit that you looked at,

3    those sound recordings are attached to the lawsuit, are they

4    not?

5    A.   Attached to the complaint in the lawsuit?

6    Q.   Yes.

7    A.   Yes.

8    Q.   And you reviewed that before it was filed?

9    A.   I did.

11:59:24 10    Q.   So did you not look and determine how many sound

11    recordings were on there that were --

12    A.   I just don't remember the count.  Again, we could look at

13    it and count.

14         THE COURT:  All right.  Let's move on.  He's answered

15    your question.

16    Q.   So you think it is thousands.  So how many sound

17    recordings does UMG own total?

18    A.   I don't know.  Hundreds of thousands.  Possibly millions.

19    Q.   Are you the legal counsel for the company, right?

11:59:49 20    A.   I am one of the legal counsels for the company.

21    Q.   So you don't know whether it is hundreds of thousands or

22    millions?

23         THE COURT:  He's answered the question.  Let's not --

24    BY MR. BUCHANAN:  (Continuing)

25    Q.   Okay.  So you talked about lawsuits against individual --

245

1   what I call subscribers or file sharers, that they -- there was

2   a lot of lawsuits filed during a period of time against

3   individuals; is that right?

4   A.   There were a number of lawsuits filed at -- during a

5   period of time against individuals, yes.

6   Q.   Do you know how many?  Was it thousands?

7   A.   Hundreds, could have been thousands.

8   Q.   And these were -- involved not only your company, but

9   other sound recording companies?

12:00:36 10   A.   Yes.

11   Q.   Okay.  And did you assist in this litigation when you were

12   at EMI or --

13   A.   Which litigation?

14   Q.   The litigation against the individual subscribers.

15   A.   I testified in a couple of those cases, in one, yeah.

16   Q.   Okay.  So you're familiar that there were thousands of

17   them?

18   A.   There were many cases filed.

19   Q.   Okay.  So you -- a minute ago, you testified that you

12:01:02 20   weren't bringing these types of lawsuits presently because you

21   couldn't find who they were.

22   A.   Well, no, that's not the only reason.  We --

23   Q.   But did you testify to that just a minute ago?

24   A.   I said we don't know who they are.

25   Q.   Okay.  And so -- but you can find out who they are, can't

A. McMullan - Cross

246

1    you, by suing and then asking the Internet service provider to

2    give you the name because you have the IP address?

3    A.   I believe we could do that and file what are known as John

4    Doe lawsuits.

5    Q.   Right.  That's what you did in those 5,000 lawsuits?

6    A.   Yeah.  And when we were doing that, the ISPs complained

7    mightily that they didn't like us --

8    Q.   But you got the information --

9    A.   -- pursuing their subscribers.

12:01:48 10    Q.   So you got -- you were able to get the information

11    ultimately through the courts, who they were?

12    A.   Ultimately through a cumbersome process --

13    Q.   Okay.

14    A.   -- of having to file many, many litigations, we were able

15    to -- we were able to do that.

16    Q.   Okay.  So -- and in -- for instance, in this case, you and

17    the other sound recording companies utilized MarkMonitor,

18    right?

19    A.   Yes.

12:02:15 20    Q.   And MarkMonitor is able, through its detection

21    capabilities, to find out the IP address for anybody that's

22    infringing on one of these peer-to-peer networks, is it not?

23    A.   I think that's right.

24    Q.   Right.  And that goes into the notice, does it not?

25    A.   I think that's right.

A. McMullan - Cross

247

1    Q.   And then Cox can tell from the IP address who the

2    infringer is?

3    A.   Cox can tell.

4    Q.   Right.  So -- and is that the process you used with these

5    5,000 lawsuits to find out who these individual subscribers

6    were?

7            THE COURT:  Mr. Buchanan, I didn't hear the number

8    5,000.  He said hundreds, maybe thousands.  So let's not put

9    information in the record, please, in your question which is

10   not in evidence.

11           MR. BUCHANAN:  Okay.

12   BY MR. BUCHANAN: (Continuing)

13   Q.   For all those lawsuits that were filed, whether it was

14   hundreds or thousands, is that how you determined who the

15   subscriber was?

16   A.   I don't recall.

17   Q.   Okay.  Now, you testified that you wanted Cox to do

18   something about this infringement, right?

19   A.   I did.

20   Q.   Okay.  And Cox is, according your counsel's opening, the

21   eighth largest Internet service provider?

22   A.   I did not hear his opening.

23   Q.   I know.  But do you agree that it's eighth, or do you not

24   know?

25   A.   I have no idea.

A. McMullan - Cross

248

1   Q.   Okay.  Do you know if Verizon is bigger?

2   A.   Do you want me to guess on the size of different

3   companies?  Verizon might be bigger.  I don't know.

4   Q.   Well, you testified that you were familiar with the

5   Copyright Alert System that involved Verizon and a bunch of

6   other ISPs, right?

7   A.   I did.

8   Q.   Okay.  And so, do you know who those other ISPs were,

9   other than Verizon and Comcast?

12:03:55 10   A.   There was -- Time Warner was in there.

11   Q.   AT&T?

12   A.   I think so.

13   Q.   Cablevision?

14   A.   I don't recall, but maybe.

15   Q.   Basically the five largest ISPs, right?

16   A.   If you say so.

17   Q.   No, I -- do you know?

18   A.   There were five large ISPs.

19   Q.   Okay.  And the other participants in this Copyright Alert

12:04:12 20   System were all the plaintiffs in this case, correct?

21   A.   No.

22   Q.   The recording companies?

23   A.   The recording plaintiffs in this case, yes.

24   Q.   Okay.  And how much of the sound recordings in the United

25   States do those plaintiffs own?  85 percent?

A. McMullan - Cross

249

1   A.   I've heard that number.  I don't know, today, how much

2   the --

3   Q.   And you --

4   A.   -- three majors own.

5   Q.   -- said Disney was involved?

6   A.   I think that the large movie companies were involved, like

7   Disney and Warner and --

8   Q.   Right.

9   A.   -- Sony Pictures.

12:04:49 10  Q.   Okay.  And so, essentially, all the large entertainment

11  companies were Disney, Sony, that not only music, but film and

12  other rights, copyrights regarding entertainment?

13  A.   I think only recording companies and audio/visual film

14  were involved.

15  Q.   So essentially it covered a vast majority of the

16  entertainment companies and a vast majority of the Internet

17  service providers, correct?

18  A.   It included who it included, which were --

19  Q.   Okay.

12:05:22 20  A.   -- large movie companies, large record companies, and

21  large ISPs, and some consumer groups.

22  Q.   And you said that negotiations went on for two years?

23  A.   It went on for years.  I don't remember how many years.

24  Q.   So lots of lawyers and lots of business people were

25  involved?

1    A.   I think there were lawyers involved at the trade

2    associations.  I think they kept lawyers informed at their

3    trade association members, and I assume the ISPs had lawyers

4    involved.

5    Q.   Right.  And the Recording Industry Association of America,

6    who represents the sound recording companies, they were

7    involved?

8    A.   They were involved.

9    Q.   Okay.  And then actually, ultimately, a new entity was

12:06:11 10   created, right?  The Center for Copyright Infringement?

11   A.   That was --

12        MR. OPPENHEIM:  Objection.  If I heard that right,

13   that's certainly not the name of it.  And it's an inappropriate

14   question.  It wasn't the Center for Copyright Infringement,

15   which is what I heard.  Maybe I misheard it.

16        THE COURT:  Okay.

17        THE WITNESS:  It would be a terrible name for any

18   kind of business.

19   BY MR. BUCHANAN:  (Continuing)

12:06:32 20   Q.   Center for Copyright Information?

21   A.   Okay.

22   Q.   Was that -- you're familiar with that?

23   A.   Yes, something was created that had a --

24   Q.   And they were located in Washington, D.C.?

25   A.   I assume that's where they were located.

A. McMullan - Cross

251

1    Q.    Do you know who was the head of it?

2    A.    I don't off the top of my head, no.

3    Q.    But it was funded by all these entities that were part of

4    CAS?

5    A.    I think it was funded half by the content owners and half

6    by the --

7    Q.    Right.

8    A.    -- Internet service providers.

9    Q.    And so, you said that you wanted them to do three, at

12:06:59 10    least do -- take three notices and then terminate; is that

11    right?

12    A.    We think a three-notice graduated response would be very

13    effective in curbing infringement of this nature.

14    Q.    Okay.  So three notices and then what?  That's what I

15    don't get.  What happens after three?

16    A.    Well, after three, if a subscriber simply will not stop

17    using these peer-to-peer systems to infringe our content, we

18    think that the Internet service provider should terminate them.

19    Q.    So you said three.  And if they continued, how many more

12:07:41 20    infringement notices before you really think they should shut

21    down the family, or the hospital, or the military base,

22    whatever might --

23              MR. OPPENHEIM:  Objection.

24              THE COURT:  Sustained.  Ask the question,

25    Mr. Buchanan.

A. McMullan - Cross

252

1          MR. BUCHANAN:  Okay.

2     BY MR. BUCHANAN: (Continuing)

3     Q.    So we're talking about a residential home, okay?  At what

4     point should they cut off their Internet service?

5     A.    I think that if the ISP takes appropriate action to notify

6     and inform its customer what's happening on the system that

7     through their household is illegal and shouldn't happen, we

8     think that if that continues to occur and it occurs three

9     times, I do think it might be appropriate to terminate that

12:08:34 10    customer.

11          But we would hope it doesn't get to that.  We're not

12    here to require terminations.  We want responsible companies to

13    do responsible things, to work with their customers to stop

14    infringements.

15          And certainly in the -- as to what Cox did, they fell

16    down on that responsibility entirely.

17    Q.    Okay.  So I want to get back to the three.  What you

18    negotiated under CAS was six steps, or alerts rather, right?

19    A.    I think --

12:09:15 20    Q.    Each step had an alert with it that got a little bit

21    different, depending on the content owner?

22    A.    The alert was what the ISP sent to its customer.

23    Q.    Right.  That was a notice, right?

24    A.    No, the notice was what we sent to the ISP.

25    Q.    Yeah.  So do you know, did the alert attach the notice?

A. McMullan - Cross

253

1   A.   I believe the first -- I believe in -- however CAS was

2   implemented by an ISP, the first alert probably attached the

3   notice.

4   Q.   So didn't -- and so with Cox -- are you familiar with Cox?

5   We would take the notice that, say, your company sent, and we

6   would attach an e-mail with that and then send it by e-mail.

7   Did that --

8           MR. OPPENHEIM:   Objection.

9   A.   My understanding is Cox --

12:10:03 10          THE COURT:   He just asked whether it's his

11  understanding.   Overruled.

12  BY MR. BUCHANAN: (Continuing)

13  Q.   I just said, did your -- did you ever see the e-mail that

14  Cox forwarded along with the notice?

15  A.   My understanding is the first notice that Cox received of

16  infringement of a subscriber, it did not forward.

17  Q.   Okay.  Let's go to the next one.  Do you know why they

18  didn't forward them?  Do you know why?  Do you know why

19  because --

12:10:25 20  A.   I can't fathom why they wouldn't forward the first notice.

21  Q.   Do you know that in fact, that because 50 percent --

22          THE COURT:   He said he didn't know.

23          MR. BUCHANAN:   Okay.

24          THE COURT:   Now you're testifying again.  We're going

25  to get into trouble here, Mr. Buchanan.

254

1                MR. BUCHANAN:  Okay.

2                THE COURT:  Ask questions, please.

3    BY MR. BUCHANAN: (Continuing)

4    Q.   So the second notice, we'll just talk about the second

5    notice.

6    A.   Okay.

7    Q.   There's an e-mail, it goes along and it accompanies the

8    notice, an e-mail from Cox accompanying the copyright notice

9    from the content owner.  Are you aware of that?

12:10:55 10   A.   Not really, but okay.

11   Q.   So -- okay.  Did you ever see the e-mail warning that Cox

12   would send that -- did you ever see that?

13   A.   I don't recall seeing it.  I may have seen it.

14   Q.   Okay.  So I'm just wondering, did you see the alert or

15   e-mail that the ISPs that are a part of CAS, that they sent

16   along with their notice?

17   A.   Well, I think those were negotiated as part of the

18   program.

19   Q.   Right.  But did you actually see the -- what the alert

12:11:25 20   said?  You know, in other words, the information in the e-mail

21   that was sent by the ISP along with the notice from MarkMonitor

22   or whoever sent it?

23   A.   Did I see it?  No.

24   Q.   No.  Okay.  So you couldn't compare the two, you don't

25   know either one?

A. McMullan - Cross

255

1    A.   Without looking at something, I could not compare the two.

2    Q.   Okay.  I was just wondering if you looked at it at the

3    time.  So you've said three and do something.

4         But what was negotiated with the ISPs that -- you

5    know, that -- I think you admitted that controlled a large

6    percentage of the Internet service provider market, they said

7    six --

8         MR. OPPENHEIM:  Objection.  That misstates

9    Mr. McMullan's testimony.

10         THE COURT:  Yeah, sustained.

11         MR. OPPENHEIM:  Can we stop this?

12         THE COURT:  Sustained.

13         MR. BUCHANAN:  Okay.

14   BY MR. BUCHANAN:  (Continuing)

15   Q.   All right.  So the five large Internet service providers

16   that were part of CAS, okay, they negotiated with all these

17   music companies, entertainment companies, six, six alerts or

18   notices, correct?

19   A.   They negotiated a program --

20   Q.   Right.

21   A.   -- that included a lot of things.  It included funding a

22   CCI.  It included creating an educational program.  And it

23   included -- and it included a graduated response type program

24   where we would look at what happened when they engaged in this

25   process, which could have been five or six notices across these

1    sort of three areas of escalation.

2    Q.   Okay.  Right.  And so, they would send -- it was one a

3    week per subscriber, right, every seven days?

4    A.   I don't recall that.

5    Q.   Okay.  Would you take my word for it, or do you want me to

6    show you the document?

7            THE COURT:  He said he doesn't know the answer.

8            MR. BUCHANAN:  Okay.

9            THE COURT:  You're testifying -- please, ask your

12:13:12 10  next question.

11           MR. BUCHANAN:  I just didn't want to waste the

12   Court's time with showing the document.

13   BY MR. BUCHANAN: (Continuing)

14   Q.   Okay.  So you don't know --

15           THE COURT:  Well, you know the way to do it.  If you

16   want to try and refresh his recollection, do so.

17   Q.   All right.  So do you know -- so you are not aware of

18   that.  Do you know that they did not terminate?  There was an

19   agreement not to terminate?

12:13:32 20  A.   There wasn't an agreement not to terminate.  For those six

21   notices, there was no termination required.  But, I mean, the

22   program itself didn't impact what they had to do under the law.

23   Q.   Okay.  But --

24   A.   They were presumably receiving notices other than the ISP

25   notices that the particular participants in CAS were receiving.

A. McMullan - Cross

257

1    They were probably receiving notices from book publishers and

2    gaming companies and music publishers.

3              THE COURT:  Okay.  All right.  You have answered the

4    question.  Wait for the next question, please.

5              THE WITNESS:  Sure.

6    BY MR. BUCHANAN:  (Continuing)

7    Q.   Okay.  So during the CAS program, what -- do you know

8    if -- whether it was pursuant to CAS or outside of that,

9    whether these five Internet service providers were terminating

12:14:24 10   anyone that was receiving notices from your client and the

11   other recording companies that were part of CAS?

12   A.   I'm sorry, I just didn't get the question.

13   Q.   Okay.  Do you know if Verizon and Comcast, Time Warner,

14   AT&T, or Cablevision, who were all part of the MOU that made up

15   CAS, whether they were terminating anybody in response to the

16   notices from the other members, the content owners who were

17   members of the CAS?

18   A.   I don't know.

19   Q.   Okay.  So MarkMonitor is the -- I think you might have

12:15:04 20   said this already -- was the investigative infringement company

21   used in this case, right?

22   A.   Right.  They provided technology for us.

23   Q.   And they were the same company that was used under CAS to

24   investigate infringement by the five large ISPs and to send

25   notices, correct?

A. McMullan - Cross

258

1   A.   MarkMonitor was used to generate notices as to Cox.

2   MarkMonitor was used to generate notices within the CAS

3   program.

4   Q.   Okay.  So -- and the RIAA was assisting you in both,

5   correct, by you meaning your company and the other copyright

6   owners?

7   A.   I think the notices actually came from RIAA after the

8   information was generated by --

9   Q.   So during this --

12:15:54 10          THE COURT:  Wait, let him answer the question.

11          MR. BUCHANAN:  Sorry.

12   BY MR. BUCHANAN: (Continuing)

13   Q.   So during this five-year period that CAS was in play, in

14   operation, how many notices were sent by MarkMonitor to the

15   five ISPs by the copyright owners like your company?

16   A.   I don't think it was a five-year period.  I think it might

17   have been a four-year period.  But I don't know how many

18   notices were sent.

19   Q.   So you don't know -- was it one notice or was it millions?

12:16:27 20   A.   It wasn't one notice.  That would have been horrific.

21   Q.   I'm thinking -- do you know how many?

22   A.   I don't, no.  I just said I don't know how many.

23   Q.   Okay.  I was just trying to see.  Do you -- did you get

24   any data from the ISPs that came through the RIAA or

25   MarkMonitor that would show you how many notices were sent out?

A. McMullan - Cross

259

1    A.   I am sure RIAA received data.  I don't recall the numbers

2    of notices that were sent during the course of this program.

3    Q.   And you haven't -- and I think you said you don't know if

4    they ever terminated anyone pursuant to the notices that you

5    sent, however many they were?

6    A.   I don't know.

7    Q.   Okay.  And you haven't sued -- that is, when I say "you,"

8    I apologize, I don't mean you personally, but your company and

9    the other recording companies or music publishing companies, if

12:17:16  10    you are aware of them -- none of them have sued Verizon,

11    Comcast, AT&T, Time Warner, or Cablevision with regard to any

12    of those notices that were sent to the works in suit in this

13    case during that five-year period?

14         MR. OPPENHEIM:  Objection, vague and ambiguous.  I

15    don't understand what he is talking about inside of CAS,

16    outside of CAS.

17         THE COURT:  Overruled.  I am going to allow it.  If

18    he knows who has been sued and who hasn't, he can answer that

19    question.

12:17:42  20         THE WITNESS:  I apologize, Your Honor.  That was a

21    long question.  We have not sued Verizon, Comcast, Cablevision.

22    What was the other company you mentioned?

23    BY MR. BUCHANAN:  (Continuing)

24    Q.   Time Warner.

25    A.   We have not sued those -- we have not sued those

1    companies.

2    Q.    I may have asked this.  I apologize if I did.  But I

3    thought you testified that as part of the CAS, information

4    would be gathered by the ISPs and shared, you know, with RIAA

5    and your company and the other companies that were copyright

6    owners that were part of CAS.

7    A.    I think -- I think some information was shared, yeah.

8    Q.    Like a lot of data would be gathered and shared?

9    A.    I think some data would be gathered and shared.

12:18:37 10    Q.    Did you review any of the data?

11    A.    I did not.

12    Q.    Do you know anyone in your company that reviewed it?

13    A.    I believe that it was looked at at the RIAA level.

14    Q.    Okay.  Do you know what the value -- I think you testified

15    about Vivendi, the parent company.

16    A.    What's the question?

17    Q.    Is Vivendi the parent company?

18    A.    Vivendi is the ultimate parent company.

19    Q.    And what is the value of Vivendi?

12:19:25 20    A.    I don't know.

21    Q.    Okay.  If I showed you a report by, say, JPMorgan with a

22    number, would that -- would you be able to look at that and

23    determine whether that was close to being accurate?

24    A.    No.

25    Q.    So you have no idea?

A. McMullan - Cross

261

1    A.    It's a publicly traded company.  I assume its value is

2    known.

3    Q.    Okay.  What about UMG, what is the value of your company?

4    A.    We are not a publicly traded company, so I don't know its

5    value.

6    Q.    Okay.  What are your -- what are your annual revenues?

7    A.    I don't know.

8    Q.    You have no idea?  Okay.

9    A.    I am not in the finance department.  I just don't know.

12:20:13 10   Q.    So you mentioned that you terminated CAS or CAS was

11   terminated.  But it was -- in your view, it was just an

12   educational program; is that right?

13   A.    I mean, it was a program -- it was a cooperative program

14   with a large educational component to evaluate consumer

15   behavior and to evaluate the methods that were employed in CAS.

16   Q.    So -- well, you said to evaluate the behavior.  How was

17   that evaluation documented?

18   A.    I think CCI, you know, generated some information about

19   behavior across the systems of the CAS participants.

12:21:07 20   Q.    Okay.  And what was -- what was the data or the

21   information that they generated?  Did you see it?

22   A.    Over the years, I think I did see it from time to time.

23   My takeaway was using those methods was not as effective as

24   just relying on ISPs to respond to our notices as they are

25   required to under the law.

A. McMullan - Cross

262

1  Q.   But that's -- with CAS you were sending notices, you know,

2  thousands of notices, you know, by all the companies, and they

3  were supposed to respond, right?

4  A.   They were supposed to do what the CAS program outlined for

5  them to do.

6  Q.   But they still had to comply with the DMCA, right?

7  A.   Well, if they wanted the safe harbor, they would need to

8  comply with the DMCA.  They also needed just to comply with the

9  obligation not to infringe our content.

12:21:56 10  Q.   Right.  Well, that in the first instance was their

11  subscribers, and that's why you would send them the notices,

12  right?

13  A.   Well, once the ISP like Cox is notified that its

14  subscribers are infringing, and since they have the ability to

15  control it, they make the money from it, they need to do

16  something.  That's the whole reason why we're here.

17  Q.   Okay.  On CAS, in terms of -- you had this system, CAS,

18  but I think you have even talked about that the DMCA was beyond

19  that.

12:22:27 20       And so, for all those ISPs, even if they complied

21  with CAS, you could still sue them if they weren't terminating

22  people for infringement?

23  A.   I'm not understanding the question.  If they complied --

24  Q.   CAS was --

25  A.   Okay.  CAS was CAS, and we wanted them to apply with CAS.

A. McMullan - Cross

263

1    And we wanted them to understand what was coming out of CAS.

2    And was there an effective way of dealing with consumers,

3    educating consumers, engaging in mitigation, engaging in

4    throttling, did that work, what did that do?

5    Q.   Okay.  I am asking you aside from CAS, okay -- and I think

6    you testified to this -- that these ISPs that were part of CAS

7    still had to comply with the law?  In other words, you could

8    still sue them for copyright infringement, correct?

9    A.   Well, those are two different things.  Do they still have

12:23:26 10   to comply with the law?  Of course they have to comply with the

11   law.

12   Q.   And that meant --

13   A.   You have the music publishers that might be noticing.  All

14   CAS was doing was saying, for these six notices, in some cases

15   they implemented it as five notices, this is what you have to

16   do so we can look at that.

17          But if a user is getting a hundred notices, well,

18   yeah, they are in a different bucket.

19   Q.   Okay.  How many got a hundred?

12:23:48 20   A.   I don't know.  How many where got a hundred?  In Cox, my

21   understanding --

22   Q.   Well -- excuse me, sir.

23          THE COURT:  Hold on.  Hold on.  Wait for the next

24   question.

25          He said, I don't know.  What is your next question?

A. McMullan - Cross

264

BY MR. BUCHANAN:  (Continuing)

Q.   All right.  But then he said, I don't know which -- who I am talking about.

A.   Yeah, I said I don't know who you are talking about.

Q.   Okay.  I'm talking about -- I thought I was clear, but maybe I wasn't.  I was talking not about Cox, but about those members of CAS, those ISPs that were members of CAS.

And you pointed out several times that Cox is not part of CAS, right?

A.   Cox is not part of CAS.

Q.   So what I want you to tell me is how many subscribers of the members of CAS received over a hundred infringement notices from the copyright owners that were part of CAS?

A.   I don't know.

Q.   How many received over 50?

A.   I don't know.

Q.   How many received just one?

A.   I don't -- I don't know.  I imagine there was some that received just one.

Q.   All right.  And in making determinations whether to terminate somebody, you would distinguish a business, say, like a hospital, from a residence, would you not?

A.   I have never thought about it.

Q.   Well, let me -- you know, since you -- well, let me ask you.  Say a hospital got three notices over three months.

A. McMullan - Cross

265

1   Would you terminate the hospital?

2   A.    I mean, is it the --

3          THE COURT:  I'm sorry, I'm sorry.  Lay a foundation

4   as to how he would know that a hospital got a notice in his

5   position before you ask that next question.

6   BY MR. BUCHANAN:   (Continuing)

7   Q.    Okay.  I mean, you -- do you know that there is both

8   residential subscribers and business subscribers?

9   A.    I imagine an ISP has different types of subscribers.

12:25:41 10   Q.    And what I'm asking you is:  Do you -- in terms of how

11   many notices to -- before you would terminate, if there is a

12   distinction from your standpoint between a residence and, say,

13   a business, like a hospital?

14   A.    Again, we don't want anybody terminated.  What we want is

15   Cox to work with its subscribers to stop the infringement.

16   Q.    Okay.

17   A.    When you say generically a hospital, is it the hospital's

18   public WiFi?  Is it the -- like, I don't know.  Cox should be

19   in the position, once they are notified, hey, there's a

12:26:15 20   business --

21          MR. BUCHANAN:  Your Honor, I would --

22          THE COURT:  No.

23          MR. BUCHANAN:  He's not --

24          THE COURT:  He does not know the answer.  You're

25   asking him what I -- what the -- Cox or an ISP knows and what

A. McMullan - Cross

266

1    they should do and he doesn't know.  And he has told you he

2    doesn't know.  So let's move on.

3              MR. BUCHANAN:  Okay.

4    BY MR. BUCHANAN: (Continuing)

5    Q.   So what about with regard to a residential?  I think

6    you've said three and maybe more.  I wasn't sure exactly what

7    you said.

8              But does it matter, for example, if they got three

9    notices in a week and it was for the same song and there was

12:26:52 10   some kid that was 12 years old that did it?

11   A.   I think --

12             MR. OPPENHEIM:  We --

13             THE COURT:  Yeah, I'm going to allow the question.

14   A.   I think in your hypothetical, if Cox knows that it's one

15   kid getting three notices over the period of one week, it

16   should be able to work with that subscriber to figure out how

17   to stop that.

18             MR. BUCHANAN:  All right.  No further questions,

19   Your Honor.

12:27:37 20            THE COURT:  All right, thank you.  Redirect.

21             MR. OPPENHEIM:  I think it's a good time for lunch,

22   Your Honor.  We have no further questions.

23             THE COURT:  Well, we're going to keep going for about

24   another --

25             MR. OPPENHEIM:  All right.

A. McMullan - Cross

267

1          THE COURT:  -- for a little while longer.  So we'll
2     break closer to 1:00.
3          MR. OPPENHEIM:  My apologies.
4          THE COURT:  You have no redirect?
5          MR. OPPENHEIM:  We'll pass the witness, Your Honor,
6     or the witness is excused.
7          THE COURT:  All right.  May Mr. McMullan be excused?
8          MR. OPPENHEIM:  Yes.
9          THE COURT:  All right.  Mr. McMullan, thank you, sir.
12:27:56 10   You're excused at this time.  Please do not discuss the
11    testimony you've given during the trial here with anyone until
12    our trial is over.  All right?
13         THE WITNESS:  Yes, Your Honor.
14         THE COURT:  All right.  Have a good day.
15         THE WITNESS:  You too.
16         NOTE:  The witness stood down.
17         MR. OPPENHEIM:  Apologies for assuming lunch was at
18    12:30, Your Honor.
19         THE COURT:  Next witness.
12:28:14 20   MR. OPPENHEIM:  We will call Steven Marks, Your
21    Honor.
22         NOTE:  The witness is sworn.
23         THE COURT:  All right.  Good afternoon, sir.
24         Mr. Gould, please proceed.
25         MR. GOULD:  Thank you, Your Honor.

268

1                    <u>STEVEN MARKS</u>, called by counsel for the plaintiff,

2         first being duly sworn, testifies and states:

3              DIRECT EXAMINATION

4         BY MR. GOULD:

5         Q.    Good afternoon, Mr. Marks.

6         A.    Good afternoon.

7         Q.    We've met before.  My name's Jeff Gould, I'm an attorney

8         with Oppenheim + Zebrak on behalf of the plaintiffs.  Thank you

9         for being here today.

12:29:48  10              Could you please state your full name for the record.

11        A.    Steven Marks.

12        Q.    Mr. Marks, are you familiar with the Recording Industry

13        Association of America, often referred to as the RIAA?

14        A.    Yes, very much so.

15        Q.    And how are you familiar with the RIAA?

16        A.    I worked there for 21 years until the end of last year.

17        Q.    And what was your role at the RIAA?

18        A.    For most of the time I was there, I was chief of digital

19        business and general counsel.

12:30:11  20        Q.    And the general counsel, that's the head lawyer at the

21        RIAA?

22        A.    Yes.

23        Q.    Do you still work there, Mr. Marks?

24        A.    No.  I was there until the end of 2018.

25        Q.    And why did you decide to leave the RIAA?

S. Marks - Direct

269

1    A.   I had started a company and decided that I was going to

2    run the company myself.  I had started it a few years earlier.

3    And the CEO who was running it had fallen ill, and I decided to

4    step in myself.

5    Q.   What's that company that you started?

6    A.   It's called RoadNation.

7    Q.   And what is RoadNation?

8    A.   It is an online platform where artists create tours with

9    their fans.

12:30:54 10   Q.   Why is that something that was important or interesting to

11   you?

12   A.   Well, touring is more important than ever for artists of

13   all kinds, whether you're a big artist or a small artist.  Most

14   of the revenue or a lot of revenue comes from touring for

15   artists.

16        And it was an area -- the touring market is just kind

17   of an old model, and I had an idea about how to make it better

18   so that more artists could get -- do more shows and more fans

19   could see shows from their favorite artists.

12:31:25 20   Q.   Turning back to the RIAA.  Could you tell me at a high

21   level, what is the RIAA?

22   A.   The RIAA is a trade association that represents recording

23   companies and the industry on some matters.

24   Q.   And who are the members of the RIAA?

25   A.   Hundreds of individual record labels.  They do include

1    the -- what are sometimes referred to as the major recording

2    companies, Universal, Warner, and Sony.

3    Q.   And if you could give me -- list some of the things that

4    the RIAA does as a trade association for the record companies.

5    A.   Sure.  RIAA does a number of different things.  Advocacy

6    work, legal work, enforcement, antipiracy.  It created and

7    still runs the gold and platinum program.  Puts together market

8    research for the industry.  And licensing work.

9             I may be forgetting one or two, but I think that

12:32:35 10  covers most of the ground.

11   Q.   Did you say antipiracy?

12   A.   Yes.

13   Q.   And can you give us a brief overview, Mr. Marks, of your

14   role as the general counsel in the years that you were at the

15   RIAA.

16   A.   Sure.  I was involved in most strategic and kind of

17   management decisions that were made for most of the time I was

18   there.  But I focused principally and day-to-day on all the

19   legal and technology and litigation matters.

12:33:10 20  Q.   Are you familiar, Mr. Marks, with the gold and platinum

21   program?

22   A.   Yes.

23   Q.   What is that?

24   A.   It's a program that RIAA created in 1958 to provide an

25   award for reaching certain sales levels to -- you know, for

S. Marks - Direct

271

1    achievement in sales of recorded music.

2    Q.   So what's a gold record or gold album?

3    A.   A gold album is one -- I mean, traditionally, it was one

4    that reached 500,000 in sales.

5    Q.   And what's a platinum album?

6    A.   That would be a million traditionally.

7    Q.   You said 1958.  Do you remember the first gold record or

8    the first gold record song?

9    A.   I do.  Perry Como, "Catch a Falling Star."

12:33:55 10   Q.   And as you sit here today, what are some of the other

11   artists that you think of who are prominent in the gold and

12   platinum categories?

13   A.   The Beatles, Elvis, Barbra Streisand.  Just a number of

14   names that most people, I think, in the room would recognize.

15   Q.   And you spent 21 years with the RIAA.  Did you ever have

16   the honor of giving out a gold or a platinum award?

17   A.   Yeah, on two different occasions.  The first was to -- so

18   Fats Domino, who lived in New Orleans, had his entire gold

19   record and platinum record collection destroyed in the

12:34:36 20   hurricane.

21   Q.   What hurricane was that?

22   A.   That was Katrina.  So we -- I went down as the

23   representative for RIAA and the industry to give him

24   replacement copies of all his gold records.  So that was quite

25   a unique and special presentation.

S. Marks - Direct

272

1    Q.    And I think you said twice.  What was the other time?

2    A.    The other was back stage at Madison Square Garden for one

3    of my favorite bands growing up, the band Rush.  So that was

4    special for me personally.

5    Q.    And you talked about gold and platinum.  Is there anything

6    higher?

7    A.    Yeah.  Beginning in the late '90s there was something

8    called the diamond award.

9    Q.    And what's the diamond award?

12:35:19  10    A.    The diamond award was for the level of 10 million in

11    sales.

12    Q.    And have the awards or number of awards being distributed

13    changed over the years or, in particular, during the digital

14    music era?

15    A.    Yeah.  I mean, in -- beginning in the early 2000's, there

16    was quite a steep decline in the number of gold and platinum

17    records that were issued as a result of the piracy that the

18    industry was facing.

19    Q.    I want to ask about some of the other things you said that

12:35:52  20    the RIAA does.  I think you mentioned advocacy.

21          What kind of advocacy does the RIAA do?

22    A.    Principally, it's to explain to the public, to policy

23    makers, to other industries, what record companies and artists

24    do in creating a recording.  What work goes into it.  The

25    investments that are made by record labels and others.  Just

S. Marks - Direct

273

1  kind of that whole process and the importance of -- the

2  importance that it remain vital in order for additional

3  investment to be made for artists to, you know, come from --

4  you know, start small and then become more popular.

5  Q.  Does the RIAA work on legislative issues?

6  A.  Yes.

7  Q.  What kind, or can you give a general sense?

8  A.  Issues that affect the industry principally.  So they

9  could be issues related to copyright law.  They could be issues

12:36:53 10  like one time we got involved to help musicians be able to

11  bring their instruments on planes without having to check them.

12  There are all kinds of things that Congress might be

13  considering or doing that affect the industry.

14  Q.  Does the RIAA work with the Copyright Office in any

15  manner?

16  A.  Yes.  The Copyright Office is, by its name, the expert

17  agency on copyright law and copyright issues.  And they will

18  hold -- at any given time they have a number of different

19  proceedings or what are called rule makings to develop rules

12:37:33 20  around the laws.  That they hold panels, and there are briefing

21  papers that are put in, and things like that.

22         So we would represent the major recording companies

23  in those proceedings.

24  Q.  Does the RIAA do any trade work?

25  A.  Yeah.  We have a full-time executive who works on

274

1    international trade issues, both with U.S. representatives,

2    like the U.S. trade representative, as well as organizations

3    around the world.

4    Q.   Did you mention industry relations?

5    A.   I mentioned -- yeah, I mentioned it earlier.  And that's a

6    combination of things like the gold and platinum program, as

7    well as working with other industries, whether they be other

8    copyright industries or, you know, other companies that deal

9    with record companies and the industry generally.

12:38:33 10   Q.   I want to talk about and ask you some questions about the

11   RIAA's antipiracy work and enforcement work.

12           At a general level, what does that mean?  What does

13   the RIAA do, just at a high level, in the antipiracy and

14   enforcement work?

15   A.   Well, recordings are protected by copyright law.  They are

16   intellectual property.  So a lot of companies might own a

17   building or hard assets, and the assets that record companies

18   and artists own are the recordings and the intellectual

19   property in that.

12:39:07 20           And so, that needs to be protected and, you know,

21   defended so that those continue to be owned by those -- you

22   know, by the labels and the artists, but as well that they can

23   be exploited after all of the investment and hard work that

24   goes into creating them.

25   Q.   Can you list for me some of the kinds of antipiracy

S. Marks - Direct

275

1    activities that the RIAA engages in.

2    A.    There are a number of different things.  One would be

3    litigation to bring cases when necessary.  There are also

4    contacting sites before litigation.  Or if it's offline in

5    the -- you know, previous to digital, it focused a lot on CD

6    plants that were manufacturing CDs without authorization,

7    counterfeit goods that would show up either in stores or in

8    flea markets and things like that.

9              So there's that kind of enforcement.  There is --

12:40:11 10  there are notice programs.  The litigation I mentioned.

11   Participating on panels and in important industry and

12   interindustry discussions about the threats facing the industry

13   at any given time.  Those are some of the things.

14   Q.   What about law enforcement, does the RIAA work with any

15   law enforcement efforts in the antipiracy realm?

16   A.    Yeah.  I should have mentioned that one.  The copyright

17   law has a provision for criminal copyright violations.

18   Somebody can be prosecuted under the criminal law for willfully

19   infringing copyrights for financial gain.

12:40:57 20            Sometimes in our investigations to -- with CD plants

21   or others that were involved in that kind of activity, we would

22   make referrals to law enforcement.  Other times law enforcement

23   would contact us based on things that they were working on for

24   victim impact statements and things like that.

25   Q.   What's a CD plant?  I think you just mentioned a CD plant.

S. Marks - Direct

276

1   What is that?

2   A.   Yeah.  That's a manufacturing facility for the bright,

3   shiny disks that everybody used to buy back in the '80s and

4   '90s.

5   Q.   Counterfeit?

6   A.   Right.  So the enforcement actions against those plants or

7   facilities was that they were manufacturing CDs without

8   authorization and trying to sell them as authorized CDs.

9   Q.   And you mentioned lawsuits or litigations.  I want to talk

12:41:52 10   about some of that history.

11        At a high level, what kinds of lawsuits does the RIAA

12   engage in with respect to copyrights?

13   A.   So it takes many different forms.  Principally the

14   litigations or the lawsuits are directed toward those that our

15   members feel are infringing upon their -- the intellectual

16   property that I was describing earlier.

17        So that did occur against manufacturing facilities

18   like CD plants over time, individual lawsuits, lawsuits against

19   individual sites online that were selling music without having

12:42:37 20   any authorization.  We had a number of lawsuits against

21   peer-to-peer companies as digital piracy grew.

22        So it's a variety of things depending on, you know,

23   what's happening at the moment.

24   Q.   Now, you talked about these CD plants or counterfeit CDs.

25   Have you seen in -- a change in the manner of piracy with the

S. Marks - Direct

277

1   evolution of digital distribution of music as people are

2   getting their music more and more online?

3   A.   Yeah, it changed pretty dramatically.  You know, when you

4   were dealing with a manufacturing facility and there were hard

5   goods, you could, you know, intercept those goods or halt the

6   manufacture of them and it was done.

7           With digital and online, what we saw was that any

8   individual could, in effect, be a worldwide publisher of all

9   the music that they had, owned, or didn't own, and distribute

12:43:40  10   it worldwide.

11          So it was vastly different.  And the other main

12   difference was that the copies that were being distributed

13   were, and are to the extent this still continues as it does,

14   perfect digital copies.

15          So unlike back in the day when people made, you know,

16   tapes for each other, or copied a tape from tape to tape, then

17   there was a loss of quality.

18          With digital, you can maintain that quality.  So

19   you're basically giving away or distributing or copying

12:44:20  20   recorded copies of the files that otherwise should be sold, you

21   know, on an -- in an iTunes store or other kinds of stores

22   online.

23   Q.   In what kind of networks did the RIAA start to see this

24   distribution of pirated music?

25   A.   It started with companies that were called peer-to-peer

S. Marks - Direct

278

1   networks.  They were -- there were technology protocols that

2   were developed, peer-to-peer networks, and then companies that

3   would use those to provide individual users the ability to copy

4   and distribute without authorization.

5   Q.   Is there a way, Mr. Marks, that you can analogize a

6   peer-to-peer distribution model to an old school record store

7   that you would walk into?

8   A.   Sure.  It would be as if an individual could walk into any

9   record store, choose every recording that they liked, and just

12:45:22 10   walked out with all of that.  Except they didn't actually have

11   to go to the store, they could just do it from home at their

12   computer.

13        So they could get access to every recording in the

14   history of U.S. recorded music from their desk at their

15   computer without paying anything, and then distributing it to

16   others.

17   Q.   Does that impact the RIAA?

18   A.   It impacted us in the industry very significantly.

19   Industry sales fell off a cliff within a couple of -- within a

12:46:01 20   few years.  The industry decline was down to 50 percent.

21        So you had what was a mature, healthy, growing

22   business over time suddenly, you know, go from that to falling

23   right off -- right off of a cliff.  And continued to fall for

24   many years.

25   Q.   What about RIAA?  You were there a long time.  Did you see

S. Marks - Direct

279

1    impact at the RIAA?

2    A.   Yeah.  We had to mobilize to address that infringement.

3    And that meant retooling in antipiracy to figure out new

4    strategies and new processes for dealing with it.

5         You know, sending investigators out to look for CDs

6    that were being manufactured paled in comparison to the breadth

7    and scope of the infringement that occurred on these networks.

8    Q.   Was there impact to the staff or the size of the RIAA?

9    A.   Yes.  Several years after this started, as the industry

12:47:03 10   was declining -- I mean, at our member companies, all of our

11   member companies had huge layoffs.  They slashed artist

12   rosters, meaning that they had to drop artists that were on the

13   roster.  They weren't really able to invest the same amount of

14   money in new and developing artists.

15        And RIAA went through the same kind of layoffs that

16   many of the record companies did.  RIAA was about 125 people

17   before this started or around that time, and went all the way

18   down to 50.

19   Q.   Now, you mentioned that the RIAA needed to -- I forget

12:47:41 20   your word -- retool or rethink enforcement methods because they

21   were no longer just looking for CD plants, correct?

22   A.   Correct.

23   Q.   How do you do that?

24   A.   Well --

25   Q.   Starting from scratch with this new delivery model.

S. Marks - Direct

280

1    A.   It was started from scratch.  I mean, we had to create an

2    entire online antipiracy department.  Bring in people who

3    understood that environment.  Determine strategies for

4    addressing the companies that were facilitating this and

5    inducing it and contributing to it, as well as, you know, the

6    individuals who were engaged in it.

7    Q.   When was the first time you heard or learned about

8    peer-to-peer piracy?

9    A.   It was in the late '90s.  I can't remember whether it was

12:48:36 10    '97 or '98 or '99, but when Napster -- that was the first

11    well-known and widely used P2P network.

12    Q.   And what did the music industry do in response to

13    Napster's launch?

14    A.   Well, we first contacted Napster and expressed our very

15    significant concern that they were enabling this very

16    widespread infringement of literally billions of music files

17    that were being copied and then distributed and made available

18    publicly.

19         And it was so easy to use.  And as I was saying

12:49:22 20    before, the digital copies were basically the same as you would

21    get from a store.  The entire industry was basically competing

22    with free.

23    Q.   Did Napster agree to fix the problem?

24    A.   No, they didn't.  And, unfortunately, we had to sue them.

25    Q.   What was the outcome of that effort?

S. Marks - Direct

281

1    A.    After several years of litigation, Napster was ordered to

2    keep all the copyrighted content off or shut down.  Which it

3    did.

4    Q.    You said it shut down?

5    A.    Yes.

6    Q.    And after Napster shut down, did the peer-to-peer

7    infringement stop?

8    A.    Unfortunately not.  There were other companies that came

9    on afterward.

12:50:00 10    Q.    Do you recall the names of some of those others that

11    popped up?

12    A.    Kazaa, Grokster, Morpheus, AudioGalaxy.  There's several

13    others.  Aimster.  Those are some of them, not all of them.

14    Q.    What was Grokster?

15    A.    So Grokster was a software that was made available on what

16    was called a decentralized P2P network.

17             So the way Napster had worked was Napster maintained

18    a central server or directory of all of the recordings that

19    were being traded or distributed, you know, between individual

12:50:42 20    peers, people on the network.

21             The decision to shut down Grokster, the court

22    decision talked a lot about having that central directory.

23             And so, what others did was, to get around that, they

24    developed what were called decentralized P2P protocols.  And

25    that meant there wasn't a central server, but they basically

S. Marks - Direct

282

1    worked the same way.  You would go on, you would use the

2    software, you would find the recording you want, you could copy

3    it, and then distribute to others.

4    Q.    I think you said Napster had the central?

5    A.    Yeah.

6    Q.    And then you were talking about Grokster after that?

7    A.    Yes.  Grokster was decentralized, right.

8    Q.    Was there litigation over Grokster?

9    A.    There was litigation over Grokster.  That litigation went

12:51:29 10   all the way to the U.S. Supreme Court, which decided

11   unanimously in 2005 that Grokster was, in fact, liable for

12   infringement.

13   Q.    Was the RIAA involved in that Grokster case?

14   A.    Yes.  We coordinated on behalf of the entire recording

15   industry.

16   Q.    Do you recall the music industry's response to a unanimous

17   Supreme Court decision shutting down Grokster in 2005?

18   A.    It was huge.  I mean, you know, we had been litigating

19   against them, not only for a long time, but there were all

12:52:06 20   these other companies that were based on this same principle of

21   it being decentralized.

22          And so, winning that lawsuit, especially in a

23   9/nothing decision from the U.S. Supreme Court, it set the

24   record pretty straight about what was legal and what was not.

25          And so, while it was a long, hard battle, we really

S. Marks - Direct

283

1    couldn't have asked for a better result.

2    Q.   So surely with that kind of decision from the Supreme

3    Court, the peer-to-peer infringement must have stopped?

4    A.   You would have thought so.  But, unfortunately, it didn't.

5    You know, the way I would describe a number of the companies

6    that were P2P companies is that they were essentially

7    short-term profiteers.  They knew that at some point they

8    wouldn't be able to continue it, but they were making a

9    tremendous amount of money.  And the way they made the money

12:53:03 10   was that they would sell advertising to be shown to everybody

11   using it.

12            Now, you're only able to sell advertising if you have

13   a lot of people.  And they had a lot of people and billions and

14   billions of files.  And so, advertisers flocked there because

15   there were, you know, a lot of people using that software, and

16   they would advertise, and the operators and owners of those

17   companies were earning a lot of money annually, millions and

18   millions of dollars every year.

19   Q.   At some point in this history of battling peer-to-peer

12:53:39 20   piracy, did the RIAA try to enforce copyrights against

21   individual peer-to-peer users?

22   A.   Yes.  In about 2004 we had made the decision that as part

23   of the strategy or effort to deal with this widespread

24   infringement, we felt it was necessary to sue the individuals

25   who were actually the ones copying and distributing the

284

1    recorded music using the P2P software.

2            So we felt that this was a very complex problem, and

3    it required a number of different strategies and kind of a

4    multifaceted approach.  So we clearly had to enforce against

5    those that were making the networks available, and they were

6    fully aware of what was going on.  Then there were the

7    individuals that were using it, needed to do that.  As well as,

8    you know, other things at the same time.

9    Q.   What was the time frame, generally, for the lawsuits

12:54:42 10   against individuals?

11   A.   It started in '04 and lasted about four years into '08.

12   Q.   And could you just tell us a little bit, what did those

13   individual enforcement efforts entail?

14   A.   Well, they weren't as straightforward as you might think

15   because we did not know who the -- the identity of the people

16   using the software.

17           So we could go on and see which computers were

18   involved because every computer has what is called an IP

19   address or Internet protocol address.  So it's, you know,

12:55:26 20   basically a long string of numbers.

21           We could -- we could see that.  And that related back

22   to a person, but we needed to get that information so that we

23   could move forward with the lawsuit.

24   Q.   And how could you find out who an individual was that was

25   associated with an IP address?

S. Marks - Direct

1    A.    Internet service providers had that information because

2    those individuals were the Internet service provider's

3    subscribers.  And each Internet service provider, or ISP, had

4    that information about which IP address related to which

5    account.

6    Q.    Was the RIAA -- were you able to figure out who some of

7    the folks were associated with those infringing activities?

8    A.    Eventually we were.  And then -- and we moved forward

9    with -- it was a lawsuit program, but it was premised around

12:56:17 10   actually trying to settle before filing the actual lawsuit

11   against the individual.  So, yeah.

12   Q.    Do you recall trying to figure out the identities of any

13   Cox subscribers in the time frame of this end user lawsuit

14   period?

15   A.    Yes.

16   Q.    And what was that like?  How did that go?

17   A.    When we went to Cox, we thought, okay, they have this

18   information, there's no reason for them not to give it.  We've

19   got proof that infringement is occurring.

12:56:52 20         But Cox told us that they wouldn't voluntarily give

21   up -- give the information over and needed us to get a court

22   order of some kind to force it to give that information.

23   Q.    Do you recall generally whether Cox was cooperative in

24   these efforts?

25         MR. ELKIN:  Objection.

S. Marks - Direct

286

1        THE COURT:  Yeah, sustained.  Ask him -- next

2   question.

3   BY MR. GOULD: (Continuing)

4   Q.   Do you recall generally how many of the end user suits

5   were filed?

6   A.   We contacted thousands of individuals.  Most of those

7   individuals settled without us having to actually file -- you

8   know, go through with a lawsuit against them.

9        So the numbers that went past that stage, my

10  recollection is, you know, probably in the hundreds from, you

11  know, a much larger group.

12  Q.   I think you said that that -- the end user lawsuits ended

13  around 2008?

14  A.   Correct.

15  Q.   Why did you stop that approach?

16  A.   We felt that the program had basically run its course.

17  You know, one of the main things that we wanted to get out of

18  it -- this wasn't about punishment so much.  It was about

19  awareness and education, for people to understand that that

20  activity, which had become very normal to a lot of people, was

21  actually not legal.

22       And when we -- before filing -- before starting that

23  program, you know, we had tried a number of different ways to

24  educate, and found that education really doesn't work with

25  something like this unless there's a consequence.  You have to

S. Marks - Direct

287

1    have something that's a consequence for somebody to really

2    understand and agree not to do it again.

3            Not unlike anybody who has kids.  In dealing with

4    your kids, you just -- you know, when they know that there is

5    something on the other end, they're, you know, more likely not

6    to do it again.

7    Q.   Did you find that the user lawsuits was able to address

8    the size of the problem?

9    A.   Well, it advanced the ball for us, you know, in the sense

12:59:28 10  that we -- if you polled people before those lawsuits and then

11   afterward about whether the P2P distribution was legal or not,

12   it -- that changed dramatically.  It was about 30 percent, 25

13   to 30 percent before we started, and then about 70 percent

14   afterward.

15   Q.   What about addressing the pervasiveness of the problem?

16   Was the end user lawsuit something that was viable there?

17   A.   No.  It was impossible for a program like that to actually

18   stop all of the infringement.  It was about making, you know,

19   some progress, but we were talking about millions of people

13:00:09 20  engaged in this activity.  You know, distributing the music

21   without, you know, paying for it or without any authorization.

22           And we would have had to -- we just couldn't -- no

23   industry can file that many lawsuits against individuals.  It's

24   just -- it's, frankly, impossible.

25           And so, we -- it didn't -- yeah, it didn't stop what

S. Marks - Direct

288

1   was happening.

2   Q.   I want to turn back to the P2P context.  And you described

3   this concept of the decentralized --

4           THE COURT:  Mr. Gould, is this all right, now that

5   you're finished with the individual suits, that we break for

6   lunch?

7           MR. GOULD:  Yes, sir.

8           THE COURT:  All right.  Then we're going to break for

9   lunch at this time and take an hour, and we'll come back at

13:00:54 10  2 o'clock.

11          All right.  Thank you.

12          NOTE:  At this point the jury leaves the courtroom;

13  whereupon the case continues as follows:

14  JURY OUT

15          THE COURT:  All right.  Nobody needs the Court

16  interrupting or criticizing or commenting on questions that

17  counsel are asking in their -- you know, every judge is a

18  little different.  And you all have practiced for a long time.

19  But here, in this courtroom, especially on both direct and

13:02:08 20  cross-examination, counsel needs to listen carefully to the

21  answers that they get, form their next question based on the

22  actual answers to the question, and not testify in the question

23  that they're following up with.

24          And you all know how to do it classically, but you

25  all have adjusted your styles to the Courts that you've been in

1    over the years.  But I run a much tighter show than evidently

2    some Courts do.  And I'll continue to yack up here, which is

3    not productive if necessary.  But I hope that this is enough

4    information for you to -- that you'll look at your outlines and

5    modify questions.

6              Anything else we need to talk about before break?

7              MR. OPPENHEIM:  Not from plaintiffs, Your Honor.

8              MR. ELKIN:  No, Your Honor.

9              THE COURT:  All right.  We're in recess.

13:14:41 10              NOTE:  The morning portion of the case on December 3,

11    2019, is concluded.

12              ---------------------------------------

13

14

15                    CERTIFICATE OF COURT REPORTERS

16

17

18              We certify that the foregoing is a true and
          accurate transcription of our stenographic notes.

19

20

21                    /s/  Norman B. Linnell
                 Norman B. Linnell, RPR, CM, VCE, FCRR

22

23

24                    /s/  Anneliese J. Thomson
                 Anneliese J. Thomson, RDR, CRR

25