UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,       :
                               :
     -vs-                      :    Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.       :
                               :
-------------------------------:
```

VOLUME 2 (P.M. Portion)

TRIAL TRANSCRIPT

December 3, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

291

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:           MATTHEW J. OPPENHEIM, ESQ.
                                   SCOTT A. ZEBRAK, ESQ.
 3                                 JEFFREY M. GOULD, ESQ.
                                   MICHAEL J. DRUCKMAN, ESQ.
 4                                 ANDREW L. GUERRA, ESQ.
                                   LUCY G. NOYOLA, ESQ.
 5                                 JIA RYU, ESQ.
                                   Oppenheim + Zebrak, LLP
 6                                 4530 Wisconsin Avenue, N.W.
                                   5th Floor
 7                                 Washington, D.C. 20015


 8
     FOR THE DEFENDANTS:           THOMAS M. BUCHANAN, ESQ.
 9                                 Winston & Strawn LLP
                                   1700 K Street, N.W.
10                                 Washington, D.C. 20006-3817
                                      and
11                                 SEAN R. ANDERSON, ESQ.
                                   MICHAEL S. ELKIN, ESQ.
12                                 THOMAS P. LANE, ESQ.
                                   CESIE C. ALVAREZ, ESQ.
13                                 Winston & Strawn LLP
                                   200 Park Avenue
14                                 New York, NY 10166-4193
                                      and
15                                 JENNIFER A. GOLINVEAUX, ESQ.
                                   THOMAS J. KEARNEY, ESQ.
16                                 Winston & Strawn LLP
                                   101 California Street, 35th Floor
17                                 San Francisco, CA 94111-5840
                                      and
18                                 MICHAEL L. BRODY, ESQ.
                                   Winston & Strawn LLP
19                                 35 West Wacker Drive
                                   Chicago, IL 60601
20                                    and
                                   DIANA HUGHES LEIDEN, ESQ.
21                                 Winston & Strawn LLP
                                   333 South Grand Avenue
22                                 Suite 3800
                                   Los Angeles, CA 90071
23

24

25
```

292

1
2                                          <u>INDEX</u>

3       <u>WITNESS</u>                          <u>EXAMINATION</u>          <u>PAGE</u>

4
        STEVEN MARKS  (Resumed)
5                                        DIRECT           294
                                         CROSS            349
6                                        REDIRECT         390
                                         RECROSS          395
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

293

<pre>
          1              A F T E R N O O N   S E S S I O N

          2              NOTE:  The afternoon portion of the proceedings on

          3     December 3, 2019, begins in the absence of the jury as

          4     follows:

          5     JURY OUT

          6              THE COURT:  All right.  Ready for the jury?  Okay.

          7              MR. OPPENHEIM:  Yes.

          8              THE COURT:  All right.  One of the jurors indicated

          9     they had an important event on Thursday and they needed to

02:07:45 10     leave closer to 5:00, so we're going to -- I've agreed to let

         11     the jury go at 5:00 on Thursday evening, just for your

         12     information.  Okay?

         13              MR. OPPENHEIM:  Are you -- I'm sorry.  Go ahead.

         14              MR. ELKIN:  Your Honor, I just wanted -- just because

         15     this may happen quickly when Mr. Gould passes the witness, I

         16     just wanted to remind the Court, as I mentioned a couple weeks

         17     ago and as counsel knows, as of three days ago, I intend to go

         18     beyond the scope of the cross to take Mr. Marks in support of

         19     our case since he's here.

02:08:22 20              THE COURT:  Right.  And that's agreed to.

         21              MR. OPPENHEIM:  Understood.

         22              THE COURT:  Yep.  All right.

         23              MR. OPPENHEIM:  Generally, is the Court going to try

         24     to go to 5:30?

         25              THE COURT:  Tonight?  Yeah, between 5:30 and 6:00.
</pre>

S. Marks - Direct

294

1    If I can push the jury to 6:00, I go to 6:00, but we got a

2    little push-back last night.

3              MR. OPPENHEIM:  A little?

4              THE COURT:  Yeah.  We'll see how that goes.  But on

5    Thursday, there's an occasion that one of the jurors has that I

6    want to honor.  Okay.

7              MR. BUCHANAN:  Thank you.

8              THE COURT:  They are giving us a bit of their time.

9              All right.  So, Joe, let's get our jury, please.

10             NOTE:  At this point, the jury returns to the

11   courtroom; whereupon, the case continues as follows:

12   JURY IN

13             THE COURT:  All right.  Please have a seat.

14             All right.  Mr. Gould, please continue, sir.

15             MR. GOULD:  Thank you, Your Honor.

16        STEVEN MARKS, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

17                  DIRECT EXAMINATION (Cont'd.)

18   BY MR. GOULD:

19   Q.   Mr. Marks, how was your lunch?

02:10:01  20   A.   Good.

21   Q.   Great.  Welcome back.

22   A.   Thank you.

23   Q.   You were asked some questions earlier about lawsuits

24   against Napster and Grokster.  Do you recall that?

25   A.   Yes.

S. Marks - Direct

295

1    Q.   What kind of lawsuit or legal claim was brought against

2    Napster?

3    A.   Contributory and vicarious -- contributory infringement

4    and vicarious infringement liability.

5    Q.   And what kind of lawsuit or legal claim was brought

6    against Grokster?

7    A.   Principally, the same.

8    Q.   And what were those?

9    A.   Contributory infringement and vicarious infringement.

02:10:37 10  Q.   You were also asked some questions about lawsuits against

11   end users.  Do you recall that?

12   A.   Yes.

13   Q.   Did RIAA try to find out some of the Cox subscribers?

14   A.   Correct.

15   Q.   How did Cox respond?

16   A.   They --

17           MR. ELKIN:  Objection.

18           THE COURT:  Yeah, it was already asked and answered.

19   You're retreading old ground now.  Let's move forward.

02:11:05 20          MR. GOULD:  Understood.

21           THE COURT:  Okay.  Thank you.

22   BY MR. GOULD:

23   Q.   Has the RIAA ever sued BitTorrent?

24   A.   No.  It's not really possible to sue BitTorrent because

25   BitTorrent is a protocol, not an actual company or service.

S. Marks - Direct

296

1    Q.    What about eDonkey?

2    A.    Same thing.

3    Q.    What about Ares?

4    A.    Same.

5    Q.    And Gnutella?

6    A.    The same.

7    Q.    Has the record industry ever sued ISPs, other ISPs for

8    contributory infringement, copyright infringement?

9    A.    Yes.  There are a number of additional suits against other

02:11:45   10    ISPs that I think are either currently pending.  I'm not in the

11    role anymore, so I don't know the exact stage, but they include

12    Grande, Charter, RCN, Bright House, and maybe one or two

13    others.

14    Q.    I want to turn to the period starting around 2008, when

15    you said the end user lawsuits ended.  Did the RIAA shift its

16    approach to battling peer-to-peer infringement at that time?

17    A.    Yeah.  As I explained earlier, suing individuals was not

18    something that could stop all of the infringement because there

19    were just too many people engaged in it, and so as part of, you

02:12:36   20    know, our effort to deal with the problem, we decided to create

21    what we called a notice program where we would send notices to

22    ISPs with information about specific instances of infringement

23    by subscribers on their networks.

24    Q.    Why did you take that approach?

25    A.    Well, as -- one is that the ISPs have responsibility for

S. Marks - Direct

297

1  addressing infringement on their networks, and they knew that

2  there were a lot of infringement.  Everybody by this time knew

3  that P2P in particular was devastating our industry and

4  beginning to impact a lot of other industries, and so we, we

5  wanted to, you know, work mostly in partnership with them in

6  terms of, you know, giving them enough information so that they

7  can then act on that information that we were giving them by

8  taking appropriate action with respect to the subscribers, and

9  there were laws in place to, you know, deal with this and

02:13:44  10  address it.

11  Q.   What kind of laws?

12  A.   Copyright law, and in particular the Digital Millennium

13  Copyright Act, which was a law that was passed in 1998 and

14  contained provisions about how a notice program like this would

15  work, where a copyright owner could send notice to an ISP and

16  that ISP would have an obligation to address repeat

17  infringement if it wanted to take advantage of what was called

18  a safe harbor in that, in that law.

19  Q.   Do you have an understanding of what the safe harbor is?

02:14:25  20          MR. ELKIN:  Objection.

21          THE COURT:  Yeah, sustained.  Let's not go through

22  the law with this witness.

23          MR. GOULD:  Your Honor, it's foundational for why

24  the -- if I could approach?

25          THE COURT:  Yeah.  Come to the sidebar.

S. Marks - Direct

298

1          NOTE:  A sidebar discussion is had between the Court

2     and counsel out of the hearing of the jury as follows:

3     AT SIDEBAR

4          THE COURT:  Yes, sir.

5          MR. GOULD:  The intent is not to have Mr. Marks

6     testify about what the law is or means but his understanding of

7     it and why that was a foundational component of why the RIAA

8     got the notice program off the ground.  The DMCA and safe

9     harbor was the critical element for why they took the approach

02:15:19 10   they did.

11          THE COURT:  I think that's legitimate.  I think why

12    they started the notice program and why they believed it was

13    the way to move forward with the ISPs, I think, is relevant.

14    He's not commenting on the law itself but why he did what he

15    did in response to the, what he understood the law to be.

16          MR. GOULD:  Just to clarify so I understand the

17    parameters --

18          THE COURT:  Yeah.

19          MR. GOULD:  -- I do intend to ask him what his

02:15:43 20   understanding was of the law and why that was a motivating

21    factor, and he would say if they had a repeat infringer policy

22    that terminated, they would be insulated from liability.  We

23    thought they would do that.

24          MR. ELKIN:  The one thing I would say, Your Honor, is

25    that I think that the last question sort of does hinge on

1   giving the jury the instructions that Your Honor is going to

2   give at the end of the case, and I -- you know, at some point,

3   it does become blurred in terms of what his -- it's setting

4   forward his understanding of the law and the motivations and

5   basically starting to tell the jury, you know, what the law is

6   all about.  That's a concern I have.

7          THE COURT:  Yeah.  I'm going to allow it.  He's in a

8   position that he was in with RIAA, and I think he's qualified

9   to at least give his opinion and -- but the focus should be on

02:16:39 10  what he did in response to what he understood the law to

11  permit.

12         MR. GOULD:  Okay.

13         THE COURT:  But I'll allow you to ask those

14  questions.

15         Your exception is noted.

16         MR. ELKIN:  Thank you, Your Honor.

17         NOTE:  The sidebar discussion is concluded;

18  whereupon, the case continues before the jury as follows:

19  BEFORE THE JURY

02:17:19 20  BY MR. GOULD:

21  Q.   Mr. Marks, do you have an understanding of what the safe

22  harbor is under the DMCA?

23  A.   Yes.  It's -- safe harbor is a provision that gives --

24  it's a way for a party, in this case the ISP, to avoid being

25  sued, avoid liability if they take certain actions.

S. Marks - Direct

300

1    Q.   Was that part of your thinking or consideration -- I'll

2    ask a different question.

3         How did that factor into RIAA's thinking in starting

4    a notice program?

5    A.   Prominently, because the idea was that we would -- they

6    had an obligation if they wanted this immunity or wanted to

7    avoid being sued to implement a policy that was reasonable to

8    address repeat infringers through termination in appropriate

9    circumstances, and so it was kind of set up in the law for us

02:18:19 10   to be able to send notices that specified what those notices

11   had to contain.  It was a framework for what we were doing.

12        And we expected, just to finish the thought, I guess

13   we expected that Cox and other ISPs would want to avoid

14   liability and, therefore, address the infringement that was

15   occurring among their subscribers on their networks.

16   Q.   Did the RIAA use a vendor to send notices?

17   A.   Yes.

18   Q.   And who was that?

19   A.   The vendor's name was MarkMonitor.

02:19:03 20   Q.   What did MarkMonitor do in the notice program?

21   A.   MarkMonitor served kind of an investigatory role.  They

22   basically went onto the P2P networks, found specific instances

23   of infringement, documented those, made sure that the files

24   that were said to be distributed were actually the files that

25   our companies owned, and then that information could be put

S. Marks - Direct

301

1    into a notice that we could send to the ISP.

2    Q.   I want to back up just two questions just to clarify what

3    you meant by "immunity" before.

4    A.   Yeah.  Immunity is just, sorry, a way of saying no

5    liability or not being sued.

6    Q.   Is that -- you're referring to the safe harbor?

7    A.   Yes.

8    Q.   Why did RIAA select MarkMonitor?

9    A.   MarkMonitor was known to be a very sophisticated and

02:20:03 10   reputable vendor for these kinds of services.  There weren't a

11   lot of these services that existed, and MarkMonitor had the

12   best reputation as far as we knew and could tell.

13   Q.   When did RIAA start sending infringement notices to Cox?

14   A.   2008, I believe.

15   Q.   Were there any discussions with Cox about getting that off

16   the ground?

17   A.   Yes.  We wanted to make sure, for example, that the

18   notices we were sending were going to be accepted, because

19   they -- you know, just to make sure that they were in the right

02:20:37 20   form and we were sending them according to a certain file

21   format and things, and we wanted that to go smoothly.

22   Q.   Were you able to figure that out?

23           MR. ELKIN:  Objection.

24           THE COURT:  Well, it's a pretty broad, general

25   question.  Why don't you ask a more specific question, please.

S. Marks - Direct

302

1  BY MR. GOULD:

2  Q.   Did you come to a point where you were able to send

3  notices to Cox?

4  A.   Eventually, yes.

5  Q.   Did you understand Cox would accept the format of those

6  notices?

7  A.   Yes, yes.

8  Q.   Do you recall what information was included in the

9  notices?

02:21:15 10  A.   Well, the notice identified -- it had the IP address,

11  which, as I was saying earlier, is the way to identify the

12  computer, the device being used.  It had the name of the

13  recording, for example, that was one of our members' recording

14  that was being infringed.

15         It, it had, you know, a certain format.  We were

16  required, for example, to state everything under penalty of

17  perjury, and so all of that information was there.  I mean, in

18  short, it was all the information that Cox needed to be able to

19  address the infringement that we were giving them notice about.

02:21:59 20         MR. GOULD:  Your Honor, if I may approach to hand the

21  witness a binder?

22         THE COURT:  No, Mr. Ruelas will be happy to do that

23  for you.

24         MR. GOULD:  Thank you, sir.

25  BY MR. GOULD:

S. Marks - Direct

303

1    Q.   Mr. Marks, if you could turn to tab 5 in your binder,

2    please.  Do you recognize this document?

3    A.   Yes.

4         THE COURT:  Is it one of plaintiff's exhibits

5    separately?

6         MR. GOULD:  Yes.  Thank you, Your Honor.  For the

7    record, this -- I'm directing the witness to PX 537.

8         THE WITNESS:  Yes, I recognize it.

9         MR. GOULD:  I would move to admit 537, plaintiff's.

02:22:39 10       MR. ELKIN:  No objection.

11        THE COURT:  It's received.

12        MR. GOULD:  Could we please publish 537 for the

13   Court?

14   BY MR. GOULD:

15   Q.   Mr. Marks, what did you say this exhibit is?

16   A.   This is a notice that Jeremy Landis in the RIAA antipiracy

17   department sent to Cox identifying a specific act of

18   infringement.

19   Q.   And I just want to take a look visually at an overview

02:23:12 20   here first.  What's the format of this?

21   A.   The format is -- I'm sorry?

22   Q.   It looks like an e-mail.

23   A.   Oh, yeah.  Sorry.  Yeah, it's an e-mail that was sent from

24   a dedicated antipiracy account at RIAA to the dedicated account

25   that Cox had.  This would have been part of the discussion that

S. Marks - Direct

304

1    you referred to earlier between RIAA and Fox (sic) to let them

2    know, hey, these were coming, here's who it's coming from, and

3    who to send it to.

4            MR. GOULD:  Mr. Duval, if you could zoom in on the

5    top half, please?  Above that.  The To and From.  Further,

6    please.  A little bit further.  There you go.

7    BY MR. GOULD:

8    Q.   Do you see there's a To address?

9    A.   Yes.

02:24:09 10   Q.   Who is the e-mail addressed to?

11   A.   That's the designated Cox e-mail address.  It's

12   abuse@cox.net.

13   Q.   Thank you.

14           And if we could scroll down to the very bottom of the

15   PX 37?  Actually above that.  Right there.

16           And could you tell us, sir, whose signature is on

17   this notice?

18   A.   Yeah.  Jeremy Landis, who works in the RIAA antipiracy

19   department.

02:24:36 20          MR. GOULD:  Now, if we could call up the first two

21   paragraphs of text, please?

22   BY MR. GOULD:

23   Q.   Mr. Marks, could you read those paragraphs, please?

24   A.   I am contacting you on behalf of the Recording Industry

25   Association of America -- the trade association whose member

S. Marks - Direct

305

1   music companies create, manufacture, and distribute

2   approximately 85% of all legitimate music sold in the United

3   States.

4           If you are an internet service provider (ISP), you

5   have received this letter because we have identified a user on

6   your network reproducing or distributing an unauthorized copy

7   of a copyrighted sound recording.  This letter constitutes

8   notice to you that this user may be liable for infringing

9   activity occurring on your network.

02:25:34  10   Q.   What was the purpose of this -- these paragraphs?

11   A.   The purpose of the first one is to identify who RIAA is

12   and who we're sending this on behalf of, which, you know, the

13   RIAA members represent approximately 85 percent of the music

14   that's sold in the U.S., and then the second paragraph is to

15   make clear that we were providing Cox notice of infringement

16   that was occurring on their network by one of their subscribers

17   of a, a specific instance of that infringement, as is detailed

18   later.

19           MR. GOULD:  If we could scroll down, Mr. Duval, to

02:26:23  20   the paragraph beginning:  We have attached below.  If you could

21   blow that up, please.

22   BY MR. GOULD:

23   Q.   I apologize for asking, it's a bit of a long paragraph,

24   could you read up to the last sentence, please?

25   A.   Sure.  We have attached below the details of the illegal

1    file-sharing, including the time, date, and a sampling of the

2    music shared.  We assert that the information in this notice is

3    accurate, based upon the data available to us.  We have a good

4    faith belief that this activity is not authorized by the

5    copyright owner, its agent, or the law.  Under penalty of

6    perjury, we submit that the RIAA is authorized to act on behalf

7    of its member companies in matters involving the infringement

8    of their sound recordings, including enforcing their copyrights

9    and common law rights on the internet.

02:27:30  10   Q.   What does "shared" mean in the first sentence of that

11   paragraph?

12   A.   P2P networks were -- sometimes the activity was

13   colloquially referred to as file sharing, which was misleading

14   because it made it sound as though I'm sharing, that's fine,

15   there's nothing wrong with sharing, when, in fact, the sharing

16   was actually an illegal distribution of, of the works and

17   therefore copyright infringement.

18   Q.   The categories of information in this paragraph, why did

19   the RIAA include that information in the notice?

02:28:11  20   A.   The information in this paragraph?

21   Q.   Yeah.

22   A.   We were -- first of all, it complied with the law and what

23   was required under the DMCA for us to send it, and to emphasize

24   that, you know, we had information that was very specific:  the

25   time, the date.  We had verified that the, that the music

S. Marks - Direct

307

1    listed had actually been shared, and that, as I was saying

2    before, there -- we had to under penalty of perjury -- this was

3    not a letter that you could just send off with a thought about

4    it.  You had to be pretty certain that -- very certain that the

5    information in it was accurate and true.

6    Q.   Now, between the highlights on that second line, there's a

7    phrase, "sampling of the music shared."  What does that mean

8    here, "a sampling of the music shared"?

9    A.   So the way that MarkMonitor determined whether the music

02:29:16 10   file actually contained the music that belonged to one of our

11   members was that they would first make a download of the whole

12   file the first time they found it, and then they would check

13   that against a database, which had something called a hash

14   value, which is kind of a way of -- it's kind of like the DNA

15   of the file.  It's the -- it's a way of identifying the file

16   precisely, knowing that that's, that's actually that file.

17        And so in, in the future, after you'd looked at it

18   once and verified it, you could then match this file DNA, or

19   hash, to verify that another person was using that same file.

02:30:06 20   Q.   And the word "sampling," what does that mean?

21   A.   That, that they had, they had listened to a part of it or

22   there was a part of it but not the whole thing.

23        Oh, the sampling of the music shared, I'm sorry.

24   That would refer -- you know, later on refers to the fact that

25   in any -- the way peer-to-peer worked was that files could

S. Marks - Direct

308

1    contain more than one recording.  We were only in the notice

2    listing the one recording, but there could -- there were

3    additional ones in there as well.  So we were, we were saying

4    the details here are for a sampling of the music shared,

5    meaning that one that we were, you know, featuring in the, in

6    the details below.  Sorry.

7            MR. GOULD:  If we could scroll down to the portion

8    that begins with "list of infringing content."  And blow up

9    that, please, sir.

10   BY MR. GOULD:

11   Q.   What does this section of the notice show?

12   A.   So this, this identifies the work that was being infringed

13   by name, artist, when it was found, how big the file was,

14   importantly what the IP address was, and what the network and

15   protocol was.  So BitTorrent, as we were discussing earlier,

16   was the P2P protocol that was being used for this particular

17   one.

18   Q.   Do you know how many infringement notices RIAA sent to

19   Cox?

02:32:04  20   A.   I don't know specifically, but it was a lot.

21   Q.   What do you mean by "a lot"?

22   A.   I think millions.

23   Q.   Are you sure about that?

24           MR. ELKIN:  Objection.

25           THE COURT:  Don't, don't guess.

S. Marks - Direct

309

1          THE WITNESS:  Yeah, sorry.  I don't, I don't

2     remember.

3     BY MR. GOULD:

4     Q.   Okay.  You said it was a lot in your mind.

5          Was RIAA --

6          THE COURT:  We don't testify.  We testify when we're

7     under oath on the witness stand, okay?

8          MR. GOULD:  Thank you, Your Honor, for the reminder.

9     BY MR. GOULD:

02:32:39  10     Q.   Did the RIAA send notices to Cox for all the infringement

11    it detected?

12    A.   No.

13    Q.   Why not?

14    A.   The --

15          MR. ELKIN:  Objection.  Lack of foundation.

16          THE COURT:  All right.  Yeah, lay a foundation.

17          MR. GOULD:  I'll move ahead and come back to it.

18          THE COURT:  Okay.

19    BY MR. GOULD:

02:33:02  20    Q.   Do you recall discussions with Cox about the number of

21    notices RIAA would send?

22    A.   Yes.

23    Q.   What, what are those discussions?

24    A.   I mean, the main thing I remember from that is that Cox

25    was really the first ISP to tell us:  Hey, we're not going to

S. Marks - Direct

310

1    accept more than this many notices; in other words, they put a

2    cap.  So after we had gone through the discussion of the form

3    of the notice and that we were going to be sending them, Cox

4    told us:  And we'll only accept up to 200 notices per day.

5    Q.   And that was for who?

6    A.   That was 200 notices for -- I mean, we were representing

7    85 percent of the entire recording music industry, so the, the

8    hundreds and hundreds of record labels that existed and owned

9    all that music combined would get 200 notices.

02:34:08  10    Q.   What was RIAA's perspective on that?

11    A.   We were surprised by it and felt it was not really in the

12    spirit of trying to address what was a very serious problem for

13    our industry.  I mean, there's just no way that you could

14    counter all of the infringement by only sending 200 notices.

15    Q.   So what did you do?

16    A.   We asked if they would take more, and unfortunately, we

17    were shut down.  And then we asked again later, and we got a

18    little bit of a bump from 200 to 400, and then later on again

19    from 400 to 600.  So -- but over many years.

02:34:59  20    Q.   I direct you, Mr. Marks, to tab 2 in your binder.  It's

21    PX 234.

22    A.   Yes.

23    Q.   Do you recognize this document?

24    A.   Yes.

25           MR. GOULD:  I move to admit PX 234.

S. Marks - Direct

311

                    THE COURT:  Any objection?

1                   MR. ELKIN:  No objection, Your Honor.

2                   THE COURT:  It's received.

3   BY MR. GOULD:

4   Q.   Mr. Marks, what is Exhibit 234?

5   A.   It's an e-mail exchange between Victoria Sheckler, who was

6   a lawyer in my department, and Randy Cadenhead of Cox, and --

7   yeah.

8   Q.   I draw your attention to the middle e-mail on the first

02:35:53  10   page from July 9, 2009.

11  A.   Yes.

12  Q.   Who is listed as -- are you among the recipients of this

13  e-mail?

14  A.   Yes.  I was copied along with three of my colleagues at

15  RIAA.

16  Q.   And could you read this e-mail for the jury, please?

17  A.   Yes.

18           Thanks again.  We wanted to check in with you about

19  the possibility of raising the number of daily notices we send

02:36:23  20  to you to 800 or 1,000 per day.  Please let us know if this is

21  acceptable.  Also, we recently noticed that in the month of

22  June, we sent ten notices each to two different IP addresses --

23  I don't know if this is the same two users or multiple users.

24  Would it be possible to find out?  If yes, we'll send you the

25  data on these 20 notices.  I look forward to hearing from you.

312

1          Regards, Vicky Sheckler.

2     Q.    Do you recall receiving a response from Cox?

3     A.    Yes.  Mr. Cadenhead sent a response and said that they

4     were, as the e-mail says, currently at the maximum number that

5     they could process measured against the staff we have to

6     process calls from customers.

7     Q.    And the next sentence?

8     A.    You might want to consider not sending us multiple notices

9     for the same IP on the same day as one way to make better use

02:37:29  10     of the resources we have to apply.

11     Q.    And the next sentence?

12     A.    In terms of the two you mentioned, we can't give you

13     information about them.

14     Q.    What did you think of this response?

15     A.    We were not happy about it.  This was part of what I

16     referred to earlier about the lack of cooperation that we had

17     with Cox on these matters.  You know, Vicky had sent notes

18     asking what we thought was a reasonable request, and

19     Randy Cadenhead sent this note back, I don't know, three hours

02:38:06  20     later, basically saying no.  So it didn't strike us that very

21     much discussion or internal consideration was done at Cox

22     before he just kind of, you know, replied, saying, no, we won't

23     take any more.

24          And then the sentence about you might want to

25     consider not sending us multiple notices for the same IP on the

S. Marks - Direct

313

1    same day was kind of like saying don't send us information

2    where you -- where there's evidence of repeat infringement,

3    which is exactly the kind of behavior that is supposed to be

4    addressed under the DMCA safe harbor.

5    Q.   I want to -- you can pull that one down, please, sir.

6         If you could direct your attention to tab 3 in your

7    binder, PX 257.  I'll ask if you recognize it.

8    A.   Yes.

9    Q.   Do you see you're a recipient on the initial e-mail?

02:39:10 10   A.   Yes.  Yeah, the initial e-mail is from Ms. Sheckler, and

11   I'm again copied with one of my colleagues at RIAA and two

12   colleagues at -- or two, two people we worked with at the

13   Motion Picture Association.

14            MR. GOULD:  I move to admit PX 257.

15            THE COURT:  Any objection?

16            MR. ELKIN:  No objection.

17            THE COURT:  Received.

18            MR. GOULD:  If you could call up the bottom e-mail,

19   please, Mr. Duval.

02:39:43 20   BY MR. GOULD:

21   Q.   Do you see the date of this e-mail, sir?

22   A.   April 26, 2010.

23   Q.   And again, you're a recipient on the copy line?

24   A.   Yes.

25   Q.   Could you read the first sentence, please?

S. Marks - Direct

314

1    A.    Randy, per our discussion, attached please find the data

2    on "infringements found" (labeled "1"), and "notices sent"

3    (labeled "2") for Cox subscribers that was used in the

4    analysis, along with the annotated version of the code used for

5    the model and an associated flow diagram.

6    Q.    Are you familiar with the information she referenced that

7    she attached?

8    A.    Yes.

9    Q.    And what is that?

02:40:39 10   A.    She -- Vicky was sending a list of, hey, here are all the

11   infringements we found, which were a lot, and here are the

12   notices we've sent, which were just a tiny -- a small fraction

13   of that amount.   So it was meant to demonstrate with the, the

14   volume that we're capped at, we're not really able to

15   meaningfully address the infringement through these notices,

16   because you're not accepting any, any notices above the 200 or

17   the 400 at the time, and there's all this infringement going on

18   on your network.   We really need to be able to send you more

19   notices so that you can effectively address it.

02:41:27 20   Q.    Did you prepare a slide to assist the jury in

21   understanding the information in this spreadsheet?

22   A.    Yes.

23          MR. GOULD:   Permission to publish, Your Honor?

24          THE COURT:   Any objection?

25          MR. ELKIN:   No objection.

S. Marks - Direct

315

1      THE COURT:  It's received.  Go ahead.

2      MR. GOULD:  We can call this Plaintiff's

3  Demonstrative Exhibit -- what are we up to?  Why don't we say 5

4  to be safe.

5      THE COURT:  Okay.

6      MR. GOULD:  We'll try to backfill when we figure it

7  out.

8      THE COURT:  Okay.

9  BY MR. GOULD:

02:42:00  10  Q.   And, Mr. Marks, can you explain what this -- what you've

11  summarized in this slide?

12  A.   Yeah.  It's a pie chart showing the total number of

13  infringements that we found on February 23, 2010, which was,

14  you know, shortly before this e-mail, and how many of those --

15  so there were 4,051 total infringements that we found on that

16  day, and we had sent notices to Cox totaling 445, so roughly,

17  you know, a little more than 10 percent, 11-12 percent of the

18  total.

19      So 3,606 infringements we were not able to send a

02:42:46  20  notice to Cox because they had instituted this unilateral cap.

21  Q.   Was every day this big a difference?

22  A.   Yes, pretty much.  I mean, it may have varied from day to

23  day, but it was generally a small fraction of what the total

24  was.

25  Q.   Some days more, some days less?

S. Marks - Direct

316

1          MR. ELKIN:  Objection.

2          MR. GOULD:  Withdrawn.

3          THE COURT:  If he knows.

4          MR. GOULD:  Yeah, withdrawn.

5          THE COURT:  Ask your next question.

6          MR. GOULD:  Turn to the next slide, please.  Thank

7   you.

8   BY MR. GOULD:

9   Q.   And what does the second slide show?

02:43:23  10   A.   It's the same -- it's showing basically the same thing

11   except instead of looking just at the one day, it's looking at

12   a complete year.  So we had found more than 366,000

13   infringements on the Cox network, and we were only able to send

14   84,000 notices during that year period.  So, you know, it's

15   roughly -- well, it's less than a quarter, 20 to 22 percent or

16   23.  I'm not sure of the exact amount, but, again, a small

17   fraction.

18   Q.   Do you know if the RIAA always sent up to the full amount

19   of the cap?

02:44:07  20          MR. ELKIN:  Objection.  Foundation.

21          THE COURT:  Yeah, lay a foundation.

22   BY MR. GOULD:

23   Q.   You were involved to some degree with the RIAA notice

24   program?

25   A.   Yes.

S. Marks - Direct

317

1    Q.   And had some involvement in understanding the nature of

2    that program and the number of notices sent?

3    A.   Yes.

4    Q.   Did you have an understanding of -- do you know as you sit

5    here today whether Cox was sending the full amount under the

6    caps?  I'm sorry, strike that.

7         Do you know as you sit here today if RIAA was sending

8    the full amount Cox permitted under the cap?

9    A.   I think there were times during that -- the period over

02:44:54 10   those years that we were and some times where we were not.

11   Q.   Do you know why?

12   A.   Yeah.  We, we had a mistake on our end.  When Cox did

13   agree to go from 400 to 600, internally it was not communicated

14   to our vendor that it could be increased all the way up to that

15   level.  I didn't know that at the time and found out about it

16   much later.

17   Q.   I want to turn back to 234, please.

18        Excuse me, I apologize.  I'd like to call up PX --

19   excuse me.

02:46:02 20   Mr. Marks, could you turn to tab 4 in your binder?

21   A.   Sure.

22   Q.   Do you recognize this PX 327?

23   A.   Yes.

24        MR. GOULD:  I move to admit PX 327.

25        THE COURT:  Any objection?

S. Marks - Direct

318

1           MR. ELKIN:  No objection.

2           THE COURT:  Received.

3  BY MR. GOULD:

4  Q.   And what is PX 327?

5  A.   So it's a request some years later than the previous

6  e-mails we were looking at, about three years later, asking for

7  an increase from the 400 per day limit to something higher, and

8  it was, it was requested again directly from Ms. Sheckler on my

9  team to Mr. Cadenhead.

02:47:02 10  Q.   And remind the jury, who's Ms. Sheckler?

11  A.   She's -- her title is deputy general counsel at RIAA.  So

12  she, she was on the legal team and reported directly to me.

13           MR. GOULD:  And if you could scroll up to -- all

14  right.  Pull up the bottom e-mail, please.

15  BY MR. GOULD:

16  Q.   And what does Ms. Sheckler ask here?

17  A.   She's asking for that increase from 400.  So we'd like to

18  increase the number of P2P notices that we send to Cox.  The

19  current limit is 400 per day, and we'd like to increase it.

02:48:03 20           MR. GOULD:  And can we scroll up to Mr. Cadenhead's

21  response?

22  BY MR. GOULD:

23  Q.   Could read that for the jury, please?

24  A.   We have a fairly hard limit on the number of calls from

25  customers that our team can handle in a day, but within those

S. Marks - Direct

319

1    parameters, we would be happy to discuss the number of notices

2    that we accept from you.  Can you give me some sense of what

3    you are thinking?

4    Q.   And Ms. Sheckler replies?

5    A.   She, she said:  How about 500 or 600 per weekday?

6    Q.   Was this before or after the pie charts we just looked at?

7    A.   It was after.

8           MR. GOULD:  And if you scroll up to Mr. Cadenhead's

9    response?

10   BY MR. GOULD:

11   Q.   And could you read what he says?

12   A.   I've checked with our technical team.  We do want to be as

13   helpful as we can, but we have to be mindful of the call volume

14   that notices generate.  They think that we can try accepting

15   600 per day, subject to unexpected call concerns that might

16   arise.  Does that sound okay?

17   Q.   And do you see how Ms. Sheckler responds?

18   A.   Yes.  She said:  Thanks.

19   Q.   Was this an agreement in your mind, sir?

02:49:34 20          MR. ELKIN:  Objection.

21          THE COURT:  Yeah.  What's his understanding of this

22   negotiation?  Sustained.

23   BY MR. GOULD:

24   Q.   Mr. Marks, what was your understanding of this discussion?

25   A.   Well, again, we're operating in a world where Cox was

1    giving us crumbs to address, you know, not to use the pie chart

2    again, but a lot of -- a big pie of infringement, and, you

3    know, we had made a request to bump that up modestly.

4           I mean, I've gotta say when we get this e-mail back

5    from Mr. Cadenhead saying we want to be helpful, but we have to

6    be mindful of call volume, so basically, this is a

7    multi-billion-dollar company with huge profits from -- and a

8    huge amount of infringement on its network, and they're

9    basically saying, well, we can try to go up to 600 if there

02:50:48 10   aren't too many phone calls that come in from customers,

11   because that might, you know, increase our costs.

12          I mean, I didn't know why they just couldn't, you

13   know, I mean, there are call centers, you could hire one or two

14   more people on a part-time basis.  There are all kinds of ways

15   to address this, and in light of the amount of infringement

16   that was going on and the fact that, you know, Cox itself could

17   be sued if they didn't take appropriate action with respect to

18   that infringement, it just -- again, it just didn't seem like a

19   very cooperative way to work together.

02:51:19 20   Q.   Do you have an under- -- did you understand whether this

21   was an agreement in your mind?

22          MR. ELKIN:  Objection.

23          THE COURT:  I think he's just explained what it was.

24   I'll sustain that.

25          MR. OPPENHEIM:  Sustained or overruled?

S. Marks - Direct

321

```
           1              THE COURT:  I sustained it, yeah.

           2    BY MR. GOULD:

           3    Q.   I want to turn to tab 1 in your binder, please.  This is

           4    PX 7.

           5    A.   Yes.

           6    Q.   Do you recognize this, Mr. Marks?

           7    A.   Yes.

           8              MR. GOULD:  I move to admit PX 7.

           9              MR. ELKIN:  No objection, Your Honor.

02:52:09  10              THE COURT:  It's received.

          11              MR. GOULD:  You can publish, please.

          12    BY MR. GOULD:

          13    Q.   Mr. Marks, could you identify the to and from on this

          14    e-mail?

          15    A.   This was an automatic response from that abuse@cox.net

          16    e-mail address, which is titled "Cox Customer Safety," and it

          17    was sent to the RIAA antipiracy address.

          18    Q.   I want to call up a sentence in the second paragraph,

          19    starting with:  Cox Communications takes all reports of abuse

02:52:51  20    seriously.

          21    A.   Yes.

          22    Q.   Do you agree with that based on what you knew about the

          23    Cox system?

          24    A.   Well, no.  I mean, first of all, they were limiting our

          25    ability to report complaints, knowing that there was a lot more
```

S. Marks - Direct

322

1    infringement on their network.  I mean, that was clear.

2            And, second, given that we were seeing notices being

3    sent to the same IP address over and over, it wasn't clear to

4    us that they were really actually addressing it even for those

5    that they received it on, those subscribers that, you know,

6    were engaging in repeated acts of infringement.

7    Q.   If we could look at the last sentence of the next

8    paragraph, starting with:  Please.

9            Please be assured that if we find that a customer is

02:53:51 10  in violation of the above policies, we will take the necessary

11   action to stop the activity in question.

12           Did you form any views about that?

13   A.   Yeah.  It was not our understanding that they were really

14   taking action to stop the activity in question.

15   Q.   I want to shift gears and talk about the Copyright Alert

16   System.  Do you have some familiarity with that?

17   A.   Yes.

18   Q.   What's the basis for your familiarity?

19   A.   I was directly involved in the discussions of that program

02:54:21 20  from the very beginning.

21   Q.   And what is or what was the Copyright Alert System?

22   A.   The Copyright Alert System was part of an agreement, a

23   voluntary agreement between the record -- recorded music

24   industry, the Motion Picture Industry on the one hand as

25   copyright owners, and five internet service providers, and the

1    purpose of it was to deter -- find a way to deter infringement

2    and try to direct consumers or subscribers to lawful

3    alternatives, in other words, to help promote or highlight

4    places where you could buy music legally.

5    Q.    When was -- when did CAS start, C-A-S?

6    A.    The -- well, the agreement was signed in July of 2011.

7    Q.    And was there any lead-up to that?

8    A.    There were discussions that took place over a number of

9    years before we got to that point.

02:55:29  10    Q.    When did the program get off the ground, so to speak?

11    A.    Well, there was a -- after the documents were signed,

12    there were additional things that needed to be done in order to

13    get it up and running.  So it wasn't really fully up and

14    running until a couple years after that.

15    Q.    What was the RIAA's involvement?

16    A.    So, we were there as a representative of our member

17    companies and, you know, the recording industry generally, even

18    some of the independents who were not part of the discussion

19    were relying on us in this way to complete the agreement,

02:56:07  20    and -- yeah, I'm sorry, what -- just refresh me what the

21    question was because I lost --

22    Q.    I think you answered it.

23    A.    Okay.  I just want to make sure I got all of it.

24    Q.    Were you personally involved?

25    A.    Yes, I was.

S. Marks - Direct

324

1    Q.    In what manner?

2    A.    I was at virtually every meeting about it, and I was

3    directly involved in the discussions and the negotiations that

4    occurred to get the agreement in place.

5    Q.    What was the RIAA hoping to achieve with this program?

6    A.    Well, we were hoping to find a meaningful way of

7    addressing the infringement that continued to occur, so, you

8    know, just stepping back, we had, you know, sued Napster,

9    Grokster, and other companies.  We were trying to get those

02:56:58 10  shut down, but the activity was kind of morphing away from

11   companies that could be sued to using the, the underlying

12   protocol without -- you know, under a company umbrella, and so

13   there was still this pervasive infringement going on, and we

14   thought notice programs, in particular notice programs that had

15   some kind of consequence or teeth to them would help deter that

16   infringement and educate people in a way that got their

17   attention that what they were doing was, was illegal.

18   Q.    What did you need the ISPs for?

19   A.    Again, they, they had the information on who the

02:57:47 20  subscribers were.  We could only identify the IP address, which

21   was the -- you know, the address for the device.  They knew who

22   that device was connected to, you know, which subscriber of

23   theirs it was connected to.  So we had no way of getting the

24   notice to the individual without the help of the internet

25   service providers.

S. Marks - Direct

325

1    Q.    Any other reasons to work with the ISPs on this?

2    A.    Well, you know, there was a broader purpose to it, which

3    is to say, you have to realize that all this happened very

4    fast, the piracy that occurred, and the music industry in

5    particular was the first one that was really affected by it.

6    When it started, the files for movies were still too big to

7    really distribute on these networks, although that changed, you

8    know, over time, and we were often really the only ones

9    speaking out about this and how it was affecting our business,

02:58:54  10   which, you know, we were -- that was part of what we did, but

11   by having the ISPs enter into an agreement with us where the

12   purpose of the agreement was to address this infringement was

13   extraordinarily meaningful to us, because it wasn't just that

14   they were going to implement what we agreed to, but they were

15   standing next to us basically shoulder to shoulder, validating

16   and saying yes, there's a lot of infringement happening, and it

17   needs to be addressed.

18          And, you know, that was something that they did not

19   only by signing the agreement, but that agreement included

02:59:40  20   creating an organization called the Center for Copyright

21   Information, CCI -- sorry for all the acronyms -- but -- and

22   that was an organization that was half content owners, so the

23   movie and music industry, and then half ISPs.

24          And the purpose of CCI was to put, put in place this

25   notice system that worked well, safeguarded, you know, consumer

S. Marks - Direct

326

1    rights, privacy issues, had appeals and things like that to

2    make sure it was fair, but it also, an important part of the --

3    of that organization's purpose was to create educational

4    programs and to generally be -- you know, there was an

5    executive director that was hired, somebody who was formerly

6    from a technology company, and she would, you know, go on

7    panels, develop talking papers, things that would help explain

8    what was going on and what the impact was and that there were

9    lawful alternatives to get this.

03:00:58 10          You know, we can do that, but when we're doing it,

11   it's kind of self-serving or could be viewed as self-serving

12   because it's our business that was being impacted.  Having the

13   largest or some of the largest ISPs, some of the largest

14   companies in the entire country for that matter standing with

15   us and saying, hey, this is a problem, it needs to be

16   addressed, and we're going to address it in this way, was very,

17   very valuable.

18   Q.   Was Cox involved?

19   A.   Cox was not involved.

03:01:24 20   Q.   What do you mean?

21   A.   Well, I should, I should rephrase that.  They, they, they

22   were part of the discussions initially, and then they withdrew

23   from the discussions before an agreement was reached.  So they

24   kind of walked away, in essence, from the, from the

25   discussions.

S. Marks - Direct

327

1    Q.    I want to turn to tab 6 in your binder, please.

2          This is PX -- excuse me, this is DX 63.

3          THE COURT:  DX 63?

4          MR. GOULD:  I move to admit.

5          THE COURT:  Any objection?

6          MR. ELKIN:  No objection, Your Honor.

7          THE COURT:  It's received.

8    BY MR. GOULD:

9    Q.    Mr. Marks, what is DX 63?

03:02:08 10   A.    This is the document that is the agreement that I was just

11   talking about.  It's titled "Memorandum of Understanding,"

12   instead of agreement, but it's essentially the agreement.  So

13   it contains all the details of it.

14         MR. GOULD:  And could we blow up that first

15   paragraph, please?

16   BY MR. GOULD:

17   Q.    The agreement to do what?

18   A.    To create the Copyright Alert System, to create CCI and

19   all the pieces around those two things.

03:02:42 20   Q.    Could we highlight, and, Mr. Marks, could you read the

21   first sentence?  It's a long one.

22   A.    Sure.  "Copyright infringement (under Title 17 of the

23   United States Code) on the internet ("Online Infringement") --

24   including the illegal distribution of copyrighted works such as

25   music, movies, computer software, gaming software, e-books and

S. Marks - Direct

328

1   the like via Peer-to-Peer ("P2P") file exchanges and other

2   illegal distribution via internet file hosting, streaming or

3   other technologies -- imposes substantial costs on copyright

4   holders and the economy each year.

5   Q.   And then skipping down one sentence, starting with:  The

6   availability of, could you read that one for us?

7   A.   The availability of copyrighted content, including live

8   and recorded programming, from pirated sources harms legitimate

9   content creation and distribution.

03:03:48  10   Q.   Was this an important aspect of the program for the record

11   business?

12   A.   Yes.  This, this highlights what I was just saying,

13   because this document is signed by all of the parties to the

14   agreement, including the ISPs, so the ISPs were -- you know,

15   this stated in a very straightforward way that all of this

16   infringement is a big problem for copyright owners.  It

17   interferes with the ability to invest in new artists.

18         As, you know, I was talking about earlier, our member

19   companies had not only laid off a number of people that worked

03:04:25  20   at the companies, but they had cut artist rosters, they had

21   limited their investment, and so this was -- this was

22   recognizing, you know, all of those, all of those issues and

23   problems and challenges that we were faced with.

24   Q.   In terms of the actual program, at a high level, can you

25   describe the framework for how it functioned?

S. Marks - Direct

329

1  A.   Yeah.  The Copyright Alert System refers to what was

2  called a graduated response program, meaning you sent notices,

3  and with each notice, it got a little more serious for the

4  user.  So in this particular program, there were three stages:

5  an education stage, an acknowledgement stage, and a mitigation

6  stage.

7  Q.   What was the education stage?  What's the concept?

8  A.   The concept of the education stage was to have kind of a

9  soft, hey, you're -- we noticed you're engaging in this.  Here

03:05:28 10  are the works that we found.  This, this is infringement, and

11  there are a lot of other alternatives to get music and movies

12  legally, so kind of please stop doing it.

13  Q.   And what's the acknowledgement stage?

14  A.   At the acknowledgement stage, the subscriber -- so again,

15  the acknowledgement stage would mean that they had received at

16  least one, if not two, previous notices, and the

17  acknowledgement stage was meant to make the subscriber

18  acknowledge that they had, they had received the notice and,

19  you know, read it, in essence, and understood, you know, what

03:06:12 20  was there.

21       So it was a way to ensure that it was actually read,

22  and it required the subscriber to essentially admit that they

23  had read it and were -- and knew of the infringement that they

24  were being notified about.

25  Q.   And the third stage?  What was that?

S. Marks - Direct

330

1    A.   The mitigation measure was a penalty that was imposed if

2    there were additional notices that were sent.  So if somebody

3    ignored the education, didn't act upon the acknowledgement, and

4    continued to infringe, when they got to that next stage, the

5    ISP according to the agreement would impose a penalty on the

6    subscriber.

7         So again, it was -- as I was describing earlier,

8    education programs alone tend not to work, at least in this

9    particular circumstance for us, and the mitigation measure at

03:07:12  10  the end was meant to have some teeth in it so that, you know,

11   it was more than just letting somebody know that the

12   infringement was going with no consequences.

13   Q.   What were some of the mitigation steps that were part of

14   CAS?

15   A.   So in the agreement, it mentions a few, and the idea was

16   that individual ISPs, because of their systems or technical

17   limitations or just the way they wanted to -- which one they

18   wanted to choose, we gave them some flexibility.  That was the

19   agreement.  So there were a number that were listed in the

03:07:47  20  agreement, and they included things like, you know, a temporary

21   suspension, where the person would have to -- would not be

22   able -- they'd go online, they wouldn't be able to access the

23   internet and would need to watch a video, take a test

24   afterward.  That was one thing.

25        Another was what was called throttling the speeds for

S. Marks - Direct

331

1    the user uploading and downloading.

2    Q.    What is throttling?

3    A.    Yeah.  So throttling is basically decreasing the speed, so

4    when you go on the internet, you're moving -- it takes a long

5    time for each page to load, you may not be able to upload

6    things if you want to send something to a friend, those kind of

7    things.

8          Think of it like if you're driving -- if a penalty

9    for an infraction when you're driving were, okay, your car only

03:08:47 10  goes 20 miles an hour now.  So it had a -- it was meant to have

11   a meaningful impact beyond an annoyance because people wouldn't

12   be able to do the things that they wanted to do online.

13         Some -- another measure taken by one of the ISPs was

14   to limit access to the top 500 sites online, the most popular

15   sites, so that you couldn't access those.  Those are some

16   examples.

17   Q.    Anything that would stop any use of internet?

18   A.    No.  We -- I mean, we very much wanted the mitigation

19   measure to be termination, which would have stopped, you know,

03:09:29 20  use, but those fell short of that.  And even in those

21   instances, there was a way -- if there was, for example, a

22   medical emergency and somebody was relying on their internet

23   because they had -- their telephone ran through their internet

24   line, voice over IP it's called, we wouldn't want to as a

25   result of copyright infringement interfere with somebody

S. Marks - Direct

332

1    getting an ambulance for a life-threatening, you know,

2    situation.  So that was still allowed.

3    Q.    Just to be clear, was termination required under CAS?

4    A.    Termination was not required under CAS.

5    Q.    Why not?

6    A.    Well, we very much wanted it, but it was just not possible

7    to get that in the negotiation.  The ISPs that we were

8    negotiating with wouldn't agree to that as part of the system.

9    Q.    Why would you agree to a graduated response program that

03:10:29  10  didn't include termination?

11   A.    We didn't have a lot of alternatives is the truth.  That's

12   one thing.  You know, we, we needed the cooperation of the ISPs

13   to try to address the problem.  But second and, you know, maybe

14   really more importantly is that the agreement itself, we were

15   getting a lot of other things in the agreement.  So, of course,

16   the specifics of the notice program were important, but things

17   like the creation of CCI that I mentioned earlier, where we

18   were -- you know, that organization on behalf of both the music

19   industry and the ISPs were talking about the seriousness of the

03:11:16  20  problem, how people could avoid infringing by securing their

21   wireless, so it was educating people in that way, and putting

22   together programs.

23         I mean, CCI, for example, put together a curriculum

24   for elementary and middle schoolers, which was something that

25   was really important, because a lot of the people who were

S. Marks - Direct

333

1    engaged in this were, were young and were learning that at very

2    young ages.  And so the earlier we could -- in a school

3    curriculum, so again, not our industry just saying, hey, you

4    should stop this, but having this be part of a school

5    curriculum adopted by, you know, a countywide school system,

6    where those elementary or middle school students were being

7    taught what was right, what was wrong, what was legal, what was

8    not, was -- you know, that was a win for us.

9    Q.   How did the, the copyright laws factor into your thinking,

03:12:19 10  RIAA's thinking in putting CAS together?

11   A.   Well, the -- this agreement didn't replace the law in a

12   sense.  So the obligations that existed under the law remained

13   there, and so, for example, we were talking earlier about if an

14   ISP wanted to avoid being sued, that they had to implement or

15   put together a policy to address this repeat infringer, you

16   know, individuals who were engaged in repeat infringement.

17          That still existed, and we basically just said, hey,

18   that still exists.  We're not going to argue over what the law

19   is or what the law isn't.  We're going to just park it here and

03:13:06 20  acknowledge that, yes, the law still governs, but we're going

21   to try and put this notice program, this graduated response

22   program together as a way -- another attempt for us to address

23   the problem.

24          MR. GOULD:  Could we call up DX 63?  Go down to

25   page 9, please.  Oh, you're way ahead of me.  Impressive.

S. Marks - Direct

334

1           Mr. Mark -- could you just show the page, please,

2   Mr. Duval.

3   BY MR. GOULD:

4   Q.   Do you see there's a large footnote at the bottom of

5   page 9?

6   A.   Yes.

7   Q.   Can we look at that a little closer?

8           Are you familiar with this part of the MOU,

9   Mr. Marks?

03:13:50 10  A.   Yes.  Yes, I am.

11  Q.   What do you understand -- maybe we should read some of it.

12  At the risk of some legal jargon, I think it's important.

13          Could we read the first sentence, please, and

14  highlight it?

15  A.   Sure.  So, yeah, let's take this in pieces because there's

16  a few different things contained in here.  The first sentence

17  says:  The parties acknowledge and agree that the limitations

18  on ISP liability under the DMCA are conditioned on an ISP's

19  adoption and reasonable implementation of a policy that

03:14:28 20  provides for the termination in appropriate circumstances of

21  subscribers and accountholders who are repeat infringers.

22          So this sentence was essentially saying, hey, there's

23  still this obligation to address repeat infringement if you

24  want to operate under the safe harbor and not be sued, and all

25  the parties are acknowledging and agree that that's there and

S. Marks - Direct

335

1    were kind of, you know, just putting that to the side for

2    purposes of the agreement.  It still -- in other words, the law

3    still governs.

4    Q.   And the next lengthy sentence, if you would, sir.

5    A.   Notwithstanding the foregoing, (1) this agreement does not

6    and is not intended to create any obligation on a participating

7    ISP to adopt, implement, enforce, or otherwise take any action

8    in furtherance of a DMCA termination policy; (2) the adoption,

9    implementation, enforcement, or other action in furtherance of

03:15:39 10  a DMCA termination policy is not part of any step of the

11   Copyright Alert Program or enforceable under this agreement;

12   and (3) entering into this agreement is not, by itself,

13   intended to address whether a participating ISP has adopted and

14   reasonably implemented a DMCA termination policy.

15   Q.   What do you understand that to mean?

16   A.   This was basically a way for the ISPs to say, look, we're

17   going to help you with this.  We want to help.  This is -- you

18   know, we're coming together to create this system, but we don't

19   want our cooperation to be used against us in some way if, if

03:16:27 20  it doesn't work out or, you know, if we agree that this program

21   has these three stages that you come in later and say, sorry,

22   you only were -- you know, could have two stages or something

23   like that.

24        So it was, it was another way of saying, hey, the law

25   still exists, and nothing that we're doing here can be used if

S. Marks - Direct

336

1    there were ever any lawsuit later on between the parties.

2    Q.   And I've got one more for you.  Could you read the next

3    sentence, please?

4    A.   Yeah.  The next sentence:  This agreement does not and is

5    not intended to establish any legal inference regarding any ISP

6    that does not participate in the Copyright Alert Program or to

7    address whether or not any ISP has adopted and reasonably

8    implemented a DMCA termination policy.

9    Q.   And what did you understand that to mean?

03:17:22   10   A.   This, this sentence was intended to say if you are an ISP

11   that's not part of it, you can't point to this -- if you

12   implement something along these lines, you can't point to it

13   and claim that you're not liable.

14        We didn't -- you know, again, this was a -- the

15   graduated response piece of this was a piece of a larger

16   agreement, and neither we nor the ISPs for that matter wanted

17   other ISPs basically picking individual pieces of it that they

18   liked and that -- but not signing the agreement because of

19   things that they didn't like, and then using that to shield

03:18:07   20   themselves from liability or make an argument that they, they

21   shouldn't be liable.

22   Q.   This paragraph we just reviewed, was that an important

23   part of the program for RIAA?

24   A.   I'm sorry, could you repeat that?

25   Q.   Was this paragraph that we've just reviewed, was that an

S. Marks - Direct

337

1    important part of the program for RIAA?

2    A.    Yes.  Yes.

3    Q.    Why?

4    A.    Because it sets forth, first, that there was still an

5    obligation from the ISPs that were part of the program to, you

6    know, implement a repeat infringer policy.  We weren't

7    replacing that obligation here.

8              And those that were not participating, those ISPs,

9    like Cox, for example, that were not participating couldn't

03:18:47  10    take -- couldn't use this in any litigation later on.  That

11    was -- that's what we were agreeing to with the other ISPs, and

12    we wanted to make that clear.

13    Q.    You described three stages, three steps within CAS.  Do

14    you know what ISP -- the CAS ISPs were doing outside of CAS?

15              MR. ELKIN:  Objection.  May --

16              THE COURT:  Yeah.  Come to the sidebar, please.

17              NOTE:  A sidebar discussion is had between the Court

18    and counsel out of the hearing of the jury as follows:

19    AT SIDEBAR

03:19:31  20              THE COURT:  So there's a foundation problem, but

21    where are you going here?

22              MR. GOULD:  I'm going to have him establish that he

23    does not know what the CAS ISPs were doing outside of CAS with

24    respect to the question of termination.

25              THE COURT:  Doesn't know what the CAS --

S. Marks - Direct

338

1           MR. GOULD:  -- ISPs --

2           THE COURT:  -- ISPs, those who were involved in it

were doing outside of the conversations that he was having with

them?  So he didn't know what they, what they went back to

their companies and said about it?

6           MR. GOULD:  What they did after the three stages of

CAS.

8           THE COURT:  Oh, about termination.

9           MR. GOULD:  Correct.

03:20:07 10      MR. OPPENHEIM:  Or with respect to notices from

11  non-RIAA, non-MPAA entities.

12          THE COURT:  Mr. Elkin?

13          MR. ELKIN:  Thank you, Your Honor.  The concern I

have with that question is that it by force of nature invites

speculation.  I don't know what's going to come out of his

mouth.  If it's as benign as they're suggesting, that's one

thing, but it's inviting speculation, and if the jury hears

that, I want to be in the position of trying to encourage the

curbing of that.

03:20:37 20      THE COURT:  I think if you can articulate the

question the way you just said it, you can ask it, but if he

says -- if he says he has, then we'll come back here.

23          MR. GOULD:  I'll ask him a yes-no question.

24          THE COURT:  Okay.  All right.  Thank you.

25          MR. ELKIN:  Thank you, Your Honor.

S. Marks - Direct

339

```
 1              THE COURT:  Thank you.

 2              NOTE:  The sidebar discussion is concluded;

 3    whereupon, the case continues before the jury as follows:

 4    BEFORE THE JURY

 5              THE WITNESS:  Could I just add something to my last

 6    answer, not answer the other one, something about one of the

 7    sentences we reviewed?

 8              THE COURT:  No.  Why don't we -- you'll perhaps have

 9    a further opportunity, but why don't we move forward?  Thank
```
03:21:28 10   you, sir.
```
11              THE WITNESS:  Okay.

12              THE COURT:  Go ahead.

13    BY MR. GOULD:

14    Q.  Mr. Marks, do you know -- this is a yes-no question:  Do

15    you know what the five CAS ISPs were doing outside of CAS on

16    the question of termination?

17    A.  No.

18    Q.  Any idea at all?

19    A.  No.
```
03:21:49 20   Q.  You mentioned three stages of CAS.  Can you describe what
```
21    the process was after those three stages?

22    A.  Sure.  The agreement among the parties was, hey, we're

23    going to try this three-stage process, and I think what's

24    important to understand about this is this truly was an

25    experiment.  There wasn't anything that had been done like this
```

1   before, and that's some of the reason why some of the language

2   is in here, because we were all taking a little bit of a leap

3   of faith to try something out in the hopes that, that it would

4   work, and -- I'm sorry, your question?  I talked too long

5   without getting to your question before it fleeing from my

6   mind.

7   Q.   Can you describe the process after?

8   A.   Oh, right.  Sorry.  So, right.  So we set up this, this

9   program, and the idea was, hey, we're going to try this.  If it

03:22:51 10   doesn't work, everybody kind of goes on their merry way as, as

11   though -- if it doesn't work as to subscribers that continue to

12   get notices, we're just going to kind of go as if -- move on as

13   if the law that existed continued to apply.  So, in other

14   words, there would continue to be a -- an obligation by the

15   ISPs to address repeat infringement through a policy.  We would

16   continue to send notices, you know, like the ones that we

17   reviewed, etc.

18        So we were -- we weren't trying to say what happens,

19   you know, if -- we didn't come up with a fourth or a fifth

03:23:34 20   stage, anything like that.

21   Q.   Did you have an understanding of what your options were

22   after those three steps?

23   A.   Yeah.  We could continue sending notices to the ISP and --

24   or we could file lawsuits against, you know, the individuals,

25   you know, again.

S. Marks - Direct

341

1   Q.    What about the ISPs?

2   A.    And -- well, the ISPs had an obligation if they wanted the

3   benefit of the safe harbor to -- and to avoid, you know,

4   copyright infringement, they needed to implement repeat

5   infringer policy.

6   Q.    Did you give up after six steps?

7            MR. ELKIN:  Objection.

8            THE COURT:  It's hard to understand the question:

9   Did you give up after six steps?  What -- so why don't you

03:24:20 10   rephrase the question.

11            MR. GOULD:  Respectfully, Your Honor, that's exactly

12   what Mr. Elkin said in his opening, they gave up after six

13   steps.

14            THE COURT:  Well, fine.  What counsel said in his

15   opening statement may or may not have been clear to the rest of

16   us as well.  If you want an answer to your question, ask it

17   more specifically.

18            MR. GOULD:  Thank you, Your Honor.

19   BY MR. GOULD:

03:24:46 20   Q.    Did RIAA do anything more on sending infringement notices

21   to ISPs after exceeding the six?

22   A.    Yeah.  We continued to send notices.

23   Q.    Is CAS still in existence?

24   A.    No.

25   Q.    Why did it end?

1    A.    I can speak only for our industry on the music side of

2    things.  So the term of the agreement was four years.  So that

3    took us to 2015, and we were in discussions to extend it for

4    another four years, for example, and we were reviewing some of

5    the early data that was coming in and analyzing that to

6    determine whether we thought it was working well enough to

7    continue.

8              Our members, after reviewing that, decided that the

9    money that we were spending on that program was better spent on

03:26:06 10   other antipiracy measures or enforcement measures, and so the

11   music industry withdrew.  I think the, the movie industry

12   continued for some period of time, but it wasn't very long, and

13   it fell apart.

14   Q.    Were there some extensions of any of the documents?

15   A.    Yeah.  There were some extensions as we were working

16   through -- you know, it took a little bit longer to get things

17   going in the first instance as we were ramping up and to get

18   fully operational.  The discussions to extend took longer than

19   we anticipated.  So we did some short extensions to enable us

03:26:47 20   to continue those discussions.

21   Q.    Who was the antipiracy vendor that the content owners used

22   in CAS?

23   A.    MarkMonitor.

24   Q.    Is that the same -- and who is the antipiracy vendor that

25   the RIAA used to send notices to Cox?

S. Marks - Direct

343

1    A.    MarkMonitor.

2    Q.    In the CAS program, was there ever an opportunity to

3    review MarkMonitor?

4    A.    Yes.

5    Q.    How did that arise?

6    A.    Well, the -- this agreement called for CCI, the

7    organization that we created, to ensure that the process on --

8    of sending notices was accurate and reliable, and so CCI hired

9    a third party to review that process, you know, in very kind of

03:27:41  10   detailed discussions, getting in under the hood of how

11   MarkMonitor's process worked and reviewing it, you know, in

12   depth, and they put a report out saying that after that review,

13   they could say that the, the MarkMonitor notice generation

14   process was reliable and accurate.

15   Q.    Was there -- who was the company that did that review?

16   A.    Stroz Friedberg.

17   Q.    If I could direct you to tab 11 in your binder, please,

18   DX 130, "D" as in dog.

19          Is this the report you just described, sir?

03:28:26  20   A.    Yes, it is.

21          MR. GOULD:  Move to admit DX 130.

22          MR. ELKIN:  No objection, Your Honor.

23          THE COURT:  It's received.

24   BY MR. GOULD:

25   Q.    Mr. Marks, do you see this label, "Independent Expert

344

1   Assessment of MarkMonitor AntiPiracy Methodologies," dated

2   October 31, 2012 --

3   A.   Yes.

4   Q.   -- by a company called Stroz Friedberg?

5   A.   Yes.

6        MR. GOULD:   For the record, Your Honor, this may be

7   one of the documents as well where we may have a

8   confidentiality issue that we can address down the road.

9        THE COURT:   Okay.

03:29:01 10   BY MR. GOULD:

11   Q.   Mr. Marks, do you see it says "Draft" on the top there?

12   A.   Yes.

13   Q.   Do you know if this was a draft?

14   A.   I know that CCI published publicly this report sometime

15   right around this date, so I don't think this was, you know, a

16   draft in the sense of they were still working on it.  I think

17   it was complete.

18   Q.   Do you understand this to be the final?

19   A.   Yes.  Based on the date, I would say so.

03:29:35 20   Q.   And if you could turn to page 1, please?  And pull up the

21   middle paragraph.

22        Starting with the second sentence:  Stroz Friedberg

23   conducted an assessment of the MarkMonitor Methodologies for

24   monitoring, verifying, and enforcing online copyright

25   infringement on P2P file sharing networks.  Stroz Friedberg

S. Marks - Direct

345

1   assessed the efficacy of MarkMonitor's Methodologies to

2   monitor, identify, collect evidence, and generate notices to

3   P2P infringers by conducting a series of in-person and remote

4   interviews, reviewing documentation, and conducting technical

5   analysis.

6           Is that an accurate description of CCI's -- excuse

7   me -- Stroz Friedberg's charge here?

8   A.   Yes.  That was, that was the purpose of retaining them was

9   to do that exact analysis.

03:30:36 10   Q.   Do you recall generally what Stroz Friedberg included?

11   A.   Yeah.  They found that MarkMonitor's methods and

12   operations in identifying the infringement and generating the

13   notices were, were sound, were, you know, reliable and

14   accurate.

15           MR. GOULD:  And if we could turn to sub-2 under

16   "Summary of Findings and Recommendations," and pull up those

17   six bullets?  Thank you.

18   BY MR. GOULD:

19   Q.   Mr. Marks, could you read the summary of findings and

03:31:16 20   recommendations FROM Stroz Friedberg?

21   A.   Sure.  Based on our analysis and review of MarkMonitor's

22   Methodologies, Stroz Friedberg found that:

23           First, MarkMonitor's Methodologies effectively

24   identify P2P online copyright infringers.

25           Second:  MarkMonitor Methodologies are well-developed

S. Marks - Direct

346

1    and matured.

2            Third:  MarkMonitor's evidence collection in

3    connection with P2P infringement is robust, defensible, and

4    will withstand adverse party scrutiny or evidentiary

5    challenges.

6            Fourth:  The Methodologies include appropriate checks

7    and balances at key points in the work flow to ensure accuracy.

8            Fifth:  The reporting and notice-generating abilities

9    allow MarkMonitor to accurately report on identified

03:32:07  10    infringers.

11           And last:  The Methodologies have a number of

12    inherent and added system redundancies designed to ensure that

13    MarkMonitor can provide continuous and consistent scanning.

14    Q.   Did Stroz Friedberg make any recommendations for

15    improvements?

16    A.   Yes.  They made a handful of small recommendations.

17    Q.   Did you have any reason to doubt Stroz Friedberg's

18    conclusions?

19    A.   No.

03:32:35  20    Q.   How -- did the Stroz Friedberg report factor into your

21    thinking about the reliability of MarkMonitor?

22    A.   Yeah, it just reinforced what -- I mean, we had done our

23    own due diligence.  We wanted this -- I mean, we had been using

24    MarkMonitor, so we had direct experience with them, and we

25    wanted to -- we had gone to a lot of effort to put this program

S. Marks - Direct

347

1    together.  We would not have wanted to pick a vendor that had

2    any questions about its ability to do the work that they were

3    doing given the -- given the seriousness of the work.

4    Q.   Was there ever another review and report of MarkMonitor?

5    A.   Yeah.  There was another one that followed by a company

6    called Harbor Labs, and the reason that report was done was

7    that one of the people who worked at Stroz Friedberg who had

8    worked on the Hill for Senator Leahy and then had done some

9    lobbying, including lobbying work for us on other issues, she's

03:33:57 10   now a federal judge in D.C.

11         When we -- when that came about, we didn't want --

12   CCI did not want there to be any appearance, even the optics --

13   there wasn't any questioning about what their findings were,

14   but we, we as a group of CCI took so seriously what we were

15   doing and wanted to ensure that everybody that was involved or

16   watching this program felt that it was fair and reliable, and

17   so out of kind of an abundance of caution, we got somebody else

18   to come in and review as well so that nobody could say, well,

19   that was the report -- or Stroz was the report where somebody

03:34:50 20   used to work for the RIAA lobbying.

21         We didn't -- it wasn't worth that, you know.  We

22   didn't want that to taint anything.

23   Q.   So you commissioned a second report?

24   A.   We commissioned a second report.

25   Q.   Is there anything in the second report that impacted your

S. Marks - Direct

348

1   views of the first report?

2   A.   No.

3            MR. GOULD:  Pass the witness, Your Honor.

4            THE COURT:  All right.  Why don't we take our

5   mid-afternoon break now.  We'll take 15 minutes, and we'll come

6   back with cross-examination.

7            Thank you.  You're excused.

8            NOTE:  At this point, a recess is taken; at the

9   conclusion of which the case continues in the absence of the

10  jury as follows:

11  JURY OUT

12           THE COURT:  All right.  Mr. Marks, you're in the

13  middle of your testimony.  Please don't discuss the testimony

14  you've given so far with anybody until we come back, all right?

15           THE WITNESS:  Yes.

16           THE COURT:  All right.  Anything before we break?

17           MR. ELKIN:  Not here, Your Honor.

18           THE COURT:  Okay.  All right.  Then we're in recess.

19           NOTE:  At this point, a recess is taken; at the

20  conclusion of which the case continues in the absence of the

21  jury as follows:

22  JURY OUT

23           THE COURT:  Ready for our jury?

24           MR. OPPENHEIM:  (Nodding head.)

25           THE COURT:  All right.  Joe, let's get the jury,

S. Marks - Cross

349

1    please.

2           NOTE:  At this point, the jury returns to the

3    courtroom; whereupon, the case continues as follows:

4    JURY IN

5           THE COURT:  All right.  Please have a seat.

6           Mr. Elkin, proceed with cross-examination, sir.

7           MR. ELKIN:  Thank you, Your Honor.

8                          CROSS-EXAMINATION

9    BY MR. ELKIN:

04:01:49 10   Q.   Good afternoon, Mr. Marks.

11   A.   Good afternoon.

12   Q.   Good to see you again.

13   A.   Same here.

14   Q.   I appreciate your time today.  And speaking of time, are

15   you getting paid for your time today?

16   A.   Yes.

17   Q.   The RIAA is paying for your time?

18   A.   The plaintiffs are.

19   Q.   Okay.  And how much are they paying you?

04:02:07 20   A.   $650 an hour.

21   Q.   I'm sorry, how much?

22   A.   650 an hour.

23   Q.   Okay.  And have you -- were you paid for other work that

24   you've done in this case so far?

25   A.   For the deposition testimony, yes.

S. Marks - Cross

350

1    Q.    And the preparation as well?

2    A.    Yes.

3    Q.    How much have you received so far from the plaintiffs for

4    your assistance in this case so far?

5    A.    I think that the work on the deposition was somewhere

6    around 20,000, maybe a little bit more.  I don't remember the

7    exact number.

8    Q.    Okay.  And you're getting paid for your preparation and

9    for your testimony here today; is that correct?

04:02:44  10    A.    Yes.

11    Q.    Now, you mentioned a number of activities of the RIAA on

12    direct.  RIAA also does lobbying, correct?

13    A.    Yes.

14    Q.    They're a lobbyist, right?

15    A.    Excuse me?

16    Q.    They -- they're a lobbyist?

17    A.    Yes.  They -- as I was saying earlier, part of advocacy

18    work is work with policymakers to explain importance of issues

19    to the industry, yeah.

04:03:16  20    Q.    Okay.  And you mentioned a number of networks or ISPs that

21    have been sued on direct.  If I made notes carefully, I have

22    Charter, Bright House, Grande, and RCN.

23          Did I get that right?

24    A.    Yes.

25    Q.    And it is true, is it not, that -- withdrawn.

S. Marks - Cross

351

1      You understand that this lawsuit has to do with the

2  claims period that is -- relates to the period -- most of the

3  period of 2013 to 2014; is that correct?

4  A.   Yes.

5  Q.   And to your knowledge, these lawsuits weren't filed

6  anywhere near that time frame, correct?

7  A.   Well, I mean, this lawsuit -- I don't know exactly when

8  this lawsuit was filed, what date specifically, but it was

9  within a couple of years ago, I think.

04:04:12 10  Q.   Okay.  Well, you left the RIAA at the end of 2018, right?

11  A.   Yes.

12  Q.   And you don't have any testimony that any of these

13  entities were actually sued by the RIAA with the exception of

14  Grande before you left, correct?

15  A.   I believe that's correct.

16  Q.   And -- now, as a general counsel of the company, you

17  worked closely with regard to the head of litigation to

18  supervise the litigations that were organized by the RIAA; is

19  that right?

04:04:50 20  A.   Yes.

21  Q.   And I think you've testified that individual lawsuits were

22  filed or organized on behalf of constituent record labels by

23  the RIAA from anywhere around 2004 to about 2008 or '9; is that

24  right?

25  A.   That's correct for the, the lawsuits against individual

S. Marks - Cross

352

1    users of the P2P networks.

2    Q.   Right.  And with regard to those, I think you testified on

3    direct, but correct me if I'm wrong, that they were in the

4    hundreds; is that right?

5    A.   So there were -- again, it depends on how -- what you,

6    what you count as a lawsuit.  We had to file in court to get

7    the names of the people.  Most of those after we received the

8    names and sent a letter to them did not go on in a full-blown,

9    you know, litigation because the overwhelming number of people

04:06:00   10   reached some kind of agreement or settlement.

11   Q.   But there was a lawsuit that was filed against a

12   peer-to-peer user in the form of a John Doe lawsuit, and

13   eventually there were settlements; is that what you're saying?

14   A.   Yeah.  The John Doe was only filed because Cox, for

15   example, as an ISP would not give us the information on who the

16   subscriber was.  If they had -- we had the IP information, as I

17   said, the IP address, so had they given that to us instead of

18   saying, hey, you've got to go file a -- what was called the

19   John Doe lawsuit, and then get a subpoena, we wouldn't have

04:06:39   20   needed to file those lawsuits.  We could have contacted them

21   directly.

22   Q.   Well, would it surprise you to learn that actually we

23   found some 5,000 of complaints that the RIAA filed during that

24   period of time with regard to claimed individual P2P file

25   sharers?

S. Marks - Cross

353

1    A.    Do you mean John Doe suits?

2    Q.    John Doe suits and regular suits against -- against

3    peer-to-peer file shares.

4    A.    No, that wouldn't surprise me.  What I was referring to

5    earlier was that the -- those were filed as John Doe suits, but

6    they didn't really move forward beyond that because they were

7    settled, and we only needed to do that because the ISPs were

8    not cooperating and giving us the names.

9    Q.    Right.  Now, I think you testified on direct that you

04:07:20 10   actually stopped the -- this campaign to file individual

11   lawsuits in part because of the fact that it had run its

12   course.  Is that right?

13   A.    Correct.

14   Q.    And has it ever been suggested to you that the reason --

15   another reason why it was done is because it ended up being bad

16   PR for the record labels?

17   A.    Not really, because we knew it wasn't going to -- it was

18   going to be bad PR when we started it.  I mean, you don't --

19   there are not many industries that have to take that step.  No,

04:07:52 20   no industry likes to sue their own customers, but we felt that

21   we didn't have any choice.

22        We knew that going in, that there was going to be a

23   tremendous amount of bad press, but we had also received bad

24   press when we sued Napster and Grokster, and, in fact, many of

25   the people who criticized RIAA for filing against those said

S. Marks - Cross

354

1    that we should actually sue the individuals instead of those

2    companies.

3    Q.    Well, do you deny looking at a fusillade of bad press

4    articles about the RIAA's actions in filing these cases?

5    A.    Would I deny?

6    Q.    Would you deny having looked at or received or somehow

7    been brought to your attention bad, bad publicity related to

8    the RIAA's decision to go after individuals?

9    A.    Again, we knew that going in, and frankly, the bad

04:08:45  10    publicity was the least of it.  We had the head of our

11    organization death threats and had to have full-on 24-hour

12    security.  So we undertook this knowing that there was going to

13    be a lot of backlash.

14            THE COURT:  Okay.  So listen to the question and

15    answer the question if you can, please.

16            THE WITNESS:  Will do.

17    BY MR. ELKIN:

18    Q.    You understand there was bad PR fall out, correct, from

19    having filed those suits?

04:09:07  20    A.    Yes, there was bad PR.

21    Q.    Now, piracy has -- if I understood your testimony

22    correctly, at least online piracy has existed at least going

23    back to 1999, right?

24    A.    Yes.

25    Q.    With the advent of Napster.  You mentioned Napster and

S. Marks - Cross

355

1    Grokster and LimeWire and other defendants that RIAA sued,

2    correct?

3    A.   Correct.

4    Q.   And you understand that Cox is not a -- it's not being

5    sued here as a website, correct?

6    A.   Yes, correct.

7    Q.   And it's not being sued here as a web hoster?

8    A.   Correct.

9    Q.   And the individual lawsuits actually began prior to the

04:10:11 10   actual Grokster decision, but it continued through the Grokster

11   decision for several years thereafter, right?

12   A.   Yes.

13   Q.   And then it had, as you say, run its course, and then that

14   experiment was over, right?

15   A.   Yes.  We felt that we had achieved what we could achieve

16   in terms of our goals from the program.

17   Q.   And then you entered a new experiment where you would send

18   notices to ISPs, if I understood your testimony; is that right?

19   A.   Yeah.  I mean, that was kind of pursuant to the framework

04:10:43 20   that was set up in the DMCA, so it was an alternative course.

21   I'm not sure I'd call that an experiment in the sense that it

22   was contemplated by law ten years earlier.

23   Q.   Okay.  Well, so 2009, around the time that you did that,

24   it took a couple years to negotiate the MOU that was signed in

25   2011, right?

356

```
         1   A.    I just want to be clear that I understand when you're

         2   talking about general notice program and the CAS program,

         3   because those were two different things.

         4   Q.    Right.  I understand that.  I referred to the notice

         5   program, and now I'm referring to the CAS program.

         6   A.    Okay.  So, I'm sorry, could you repeat your question about

         7   the CAS?

         8   Q.    Yeah, I'm getting to that right now actually.

         9   A.    Okay.

04:11:22 10   Q.    Thank you for that.

        11         So the CAS program, I think you described toward the

        12   end of your testimony as being experimental.  Do you remember

        13   that testimony?

        14   A.    Yes.

        15   Q.    And that's over, right?

        16   A.    Yes.

        17   Q.    And now you're suing -- now the RIAA is suing the ISPs,

        18   right?  What's going to be the next experiment?

        19   A.    I don't know.  I don't -- I don't work there anymore.  I

04:11:44 20   wouldn't have knowledge of that.

        21   Q.    Okay.  I think you testified to this:  Just to be clear,

        22   the RIAA represents record companies, right?

        23   A.    Correct.

        24   Q.    And it's authorized to enforce the copyright of its record

        25   company members, right?
```

S. Marks - Cross

357

```
            1    A.   Correct.

            2    Q.   And that would include the record labels that are part of

            3    this case, right?

            4    A.   Yes.

            5    Q.   The RIAA is not a trade association for the music

            6    publishers, right?

            7    A.   Correct.

            8    Q.   And it's not authorized -- or RIAA is not authorized to

            9    enforce the copyrights of the music publishers, right?

04:12:31   10    A.   That's generally correct, yes.

           11    Q.   And the RIAA, to your knowledge, hasn't filed any lawsuits

           12    seeking to enforce the copyrights of any music publishers,

           13    correct?

           14    A.   I don't believe so.  I mean, there has been joint

           15    litigation together from time to time.

           16    Q.   I'm not suggesting that there aren't.  I'm suggesting that

           17    RIAA never filed any claims on behalf of the music publishers

           18    in the past; is that correct?

           19    A.   I believe so.

04:13:01   20    Q.   And to your knowledge, the RIAA hasn't sent any

           21    infringement notices on behalf of any of the music publishers,

           22    right?

           23    A.   Correct.

           24    Q.   Now, the music publishers have their own trade

           25    association, right?
```

S. Marks - Cross

358

1    A.   Yes.

2    Q.   The National Music Publishers Association, right?

3    A.   Yes.

4    Q.   Now, you testified at length about the Copyright Alert

5    System on direct.  Is it true that you knew that there was

6    repeat infringement on every network and that you were trying

7    to address it the best way possible through the MOU?

8    A.   Yes.  We knew that there was repeat infringement on all --

9    you mean ISP networks?

04:13:59 10  Q.   Let me, let me repeat the question.  You knew that there

11   was repeat infringement on every network, and you were trying

12   to address it in the best way possible through the MOU; is that

13   correct?

14   A.   I'm just asking whether "network" is referring to P2P

15   networks or ISP networks.

16   Q.   So if I use that word "network," you have no idea what I'm

17   talking about?

18   A.   It could be -- it's not that I don't have any idea.  I

19   have two ideas.  It could be P2P or the ISPs' network.  So I

04:14:30 20  was just asking for a clarification.

21   Q.   But standing alone, you don't understand what I'm saying;

22   is that correct?

23            THE COURT:  He's answered your question.

24            MR. ELKIN:  Okay.

25            THE COURT:  Ask your next question.

S. Marks - Cross

359

1          MR. ELKIN:  Sure.

2    MR. ELKIN:

3    Q.   Did you ever form a view as to whether or not there were

4    repeat infringers using the networks of the participating ISPs

5    notwithstanding compliance with the MOU?

6    A.   I, I don't believe we had data on that.  That was part

7    of -- I don't, I don't know specifically.  I don't, I don't

8    think we had that data.  The ISPs have that data, not us.

9    Q.   Okay.  So let me just now rephrase the question.  I'm

04:15:11 10  referring to ISP network, ISP network.  We knew -- did you know

11   that there was repeat infringement on every ISP network and

12   that you were trying to address it in the best way possible

13   through the MOU?

14   A.   Yes.  We thought that the MOU -- the program of CAS was

15   the way that we hoped would address what we knew was pervasive

16   infringement.

17   Q.   Now, the RIAA was a party to the MOU, right?

18   A.   Yes.

19   Q.   And you signed the agreement on behalf of the RIAA, right?

04:15:47 20  A.   I did.

21   Q.   As a representative of the record label members, right?

22   A.   Well, as RIAA, because RIAA had its own role in the

23   agreement.  So the individual record companies also signed it

24   in their own right.  RIAA had a role as, for example, having a

25   seat on the CCI board and things like that.

S. Marks - Cross

360

1    Q.   Right.  And the four record labels that signed the

2    agreement were Sony, Warner, EMI, and Universal, correct?

3    A.   Yes.

4    Q.   I think you testified on direct that it took a couple of

5    years for the MOU to get negotiated; is that right?

6    A.   Yes.

7    Q.   So the negotiations would have began around 2008 and were

8    concluded and signed in or about 2011, right?

9    A.   Correct.

04:16:58 10  Q.   And thereafter, there were separate implementation

11   agreements that were entered into between the record labels and

12   Motion Picture entities on the one hand and the five ISPs on

13   the other; is that right?

14   A.   Yeah.  The individual ISPs.  So there was a separate

15   implementation agreement with each ISP.

16   Q.   Right.  So there was -- I'm going to just refer to the

17   record labels and Motion Picture Studios as the content owners

18   for purposes of this question.  Is that okay?

19   A.   Yes.

04:17:30 20  Q.   So you have the content owners on one side.  They entered

21   into an implementation agreement with AT&T, correct?

22   A.   Correct.

23   Q.   And they also entered into an agreement with Cable Vision,

24   correct?

25   A.   Correct.

S. Marks - Cross

361

1    Q.   They entered into the -- the content owners entered into

2    an implementation agreement with Time Warner Cable, correct?

3    A.   Yes.

4    Q.   And the copyright owners also entered into an

5    implementation agreement with Comcast, correct?

6    A.   Yes.

7    Q.   And the content owners also entered into an implementation

8    agreement with Verizon; is that right?

9    A.   Yes.

04:18:00 10  Q.   And you, you participated in the negotiation of those

11   implementation agreements; is that correct?

12   A.   Yes, I was involved.

13   Q.   And Ms. Sheckler, who works with you, also was involved in

14   those discussions, right?

15   A.   Yes.

16   Q.   And the negotiations?

17   A.   Yes, as were others at RIAA.

18   Q.   And those implementation agreements -- and I'm going to

19   show them to you in a moment and offer them into evidence --

04:18:29 20  but do you recall when they were signed?

21   A.   I don't recall specifically when each one was signed, but

22   it was in the months following the July 11, 2015, agreement --

23   Q.   All right.

24   A.   -- with everybody.

25   Q.   So the agreement -- the implementation agreements were, to

S. Marks - Cross

362

1    your recollection, signed in or around 2012, right?

2    A.   Yes, that's generally right.

3    Q.   Right.  And the -- and sometime thereafter, the program

4    went live, right?

5    A.   Yes.

6    Q.   And it was extended some six times, right?

7    A.   I don't remember how many times it was extended, but it

8    was extended a number of times.

9    Q.   All right.  Well into 2016, right?

04:19:10  10   A.   Well, the, the agreement -- the initial agreement was a

11   four-year agreement, so that took us to the middle of 2015, and

12   I think as I testified earlier, there were a number of short

13   extensions to allow the parties to continue discussions about

14   whether to renew.

15   Q.   All right.  And the various extensions that continued took

16   the CAS out to somewhere in the middle of 2016, right?

17   A.   Yes.

18   Q.   And that covers the claims period here, 2013-'14, right?

19   A.   Yes.

04:19:44  20   Q.   In terms of the time frame.

21        Now, I think you testified that there were three

22   major -- three main components of the, of the CAS notification

23   program.  There was the notification or alert, and there's the

24   acknowledgement, and then there's the mitigation; is that

25   correct?

S. Marks - Cross

363

1    A.    The first one we called the education stage.

2    Q.    All right.  There were two --

3    A.    Yeah.  Education stage, acknowledgement, and mitigation.

4    We referred to all of them as alerts.

5    Q.    Right.  And the first two alerts were the education

6    alerts, right?

7    A.    One or two.

8    Q.    Right.  And then on the, the acknowledgement, there were

9    two acknowledgement alerts, right?

04:20:41 10    A.    Yes.

11    Q.    And then there were two -- one or two mitigation step

12    alerts; is that correct?

13    A.    One or two, yes.

14    Q.    And then at the end of that sixth, last alert, it was

15    discretionary with an ISP as to whether or not they needed to

16    do anything else, right?

17    A.    No.  I mean, it was -- the agreement itself didn't call

18    for specific action, but we all had an understanding that

19    whatever the law said about the requirements of implementing a

04:21:19 20    repeat infringer policy and otherwise addressing the

21    infringement, you know, still existed.  So it wasn't as if they

22    got through six notices and then they didn't have to do

23    anything.

24    Q.    I'm just talking about what was required by the agreement.

25    A.    Yes.

S. Marks - Cross

364

1    Q.    The implementation agreements with the five ISPs did not

2    require by the terms of those agreements anything for the ISPs

3    to do after the sixth alert; is that correct?

4    A.    Yes.

5    Q.    Let's take a look at -- this is DX 63 that was received

6    into evidence on your direct, tab 2 in your -- I don't know

7    whether it's tab 2 or what.

8    A.    It's tab 2.

9    Q.    Tab 2.

04:23:11   10           Take a look at page 13.  It's romanette iv, which

11   starts on page 12, and then it -- the language that I want to

12   refer you to is the language on page 13.  Tell me when you get

13   to that page.

14   A.    Yep.

15   Q.    Okay.  So if you skip your eye down to five lines right

16   before romanette v, there's a sentence that begins:  The

17   Participating ISP.  Do you see that?

18   A.    Yes.

19   Q.    Could you read that, please?

04:23:58   20   A.    The Participating ISP will, however, continue to track and

21   report the number of ISP Notices the Participating ISP receives

22   for that Subscriber's account, so that information is available

23   to a Content Owner Representative if it elects to initiate a

24   copyright infringement action against that Subscriber.

25   Q.    Now, do you recall whether or not the participating ISPs

S. Marks - Cross

365

1    actually provided information of that kind to the content

2    owners?

3    A.    I don't remember.

4    Q.    Do you recall whether or not the RIAA on the record

5    labels' behalf ever instituted any action against any

6    subscriber of each of these five ISPs based on the information

7    that was provided here?

8    A.    We did not.

9    Q.    Take a look at the same document, Mr. Marks.  Go to

04:25:34  10   page 7.  I'm going to call to your attention item G.  Could you

11   read that paragraph, please?

12   A.    The first paragraph of G?

13   Q.    It should be page 7, begins with the words:  Each

14   Participating ISP.

15   A.    All right.  Every paragraph on that page begins with that,

16   but if it's the one right at G --

17   Q.    Yeah, the one right at G.

18   A.    Okay.  Got it.

19   Q.    Let me just -- it says:  Each Participating ISP will

04:26:15  20   develop.

21   A.    Right.  Each Participating ISP will develop, implement and

22   independently enforce a Copyright Alert Program as described in

23   this Section 4(G) (each such program a "Copyright Alert

24   Program"), provided that each Participating ISP shall not be

25   required to exceed the notice volumes pertaining to its

S. Marks - Cross

366

1    Copyright Alert Program as established in Section 5 of this

2    Agreement.  Each Participating ISP's Copyright Alert Program

3    will be triggered by the Participating ISP's receipt of an ISP

4    Notice that can be associated with a Subscriber's account and

5    will result in the Participating ISP sending one (1) or more

6    notices to the applicable Subscriber concerning the ISP notice,

7    as further described below (each such alert notice a "Copyright

8    Alert).

9    Q.   Right.  So that was the notice provisions that were

04:27:10 10  required to be followed, right?

11   A.   Well, that paragraph is kind of setting it up by basically

12   saying, yeah, there's going to be this thing called the

13   Copyright Alert Program, and we're going to call the individual

14   notices a copyright alert.

15   Q.   And the -- with regard to processing of the notices, it is

16   correct, is it not, that the ISPs were permitted to actually

17   cap the number of notices that they would process from content

18   owners; is that correct?

19   A.   No.  We reached an agreement on how many notices would be

04:28:33 20  sent as part of this program, including how to ramp that up

21   over time.  The difference here is that the -- these ISPs had

22   created, they had spent millions and millions of dollars to

23   create the infrastructure to receive these notices and then

24   send one at each stage as they received them, and so we were

25   working cooperatively with them to ensure that they had time to

S. Marks - Cross

367

1   do that, that, you know, the notices ramped up over time as

2   those systems were put into place.

3   Q.   Didn't you want to have the ISPs to receive an unlimited

4   number of notices under this agreement?

5   A.   Yes.  We would have liked as many notices as possible.

6   Q.   And you weren't able to achieve that, right?

7   A.   For the reasons that I stated earlier, where we were at

8   the table trying to get whatever we could get to work with the

9   ISPs in light of, you know, the full deal here, that's, that's

04:29:44  10   correct.

11   Q.   And under each of the implementation agreements, the

12   content owners agreed, consistent with what you've just said,

13   to limit the notices that each of the ISPs in each of the

14   respective five implementation agreements that -- to process in

15   a given month, right?

16   A.   As part of the entire deal, that was one piece of it.  We

17   agreed to that.

18   Q.   So they were capped, right?

19   A.   It was an agreement on the number of notices at a

04:30:16  20   particular time.  It wasn't the ISPs unilaterally telling us:

21   We will not accept more than 200 per day.

22   Q.   But regardless of how it came about, the RIAA agreed to

23   limit from the ISPs' point of view how many notices it would

24   receive on a given -- in a given month, right?

25           MR. GOULD:  Objection.  Asked and answered many

S. Marks - Cross

368

1    times.

2         THE COURT:  Yeah.  Overruled.

3         You can answer once again.

4         THE WITNESS:  Can you repeat it again?

5    BY MR. ELKIN:

6    Q.   Sure.  The content owners agreed under the MOU to -- and

7    the implementation agreements to permit the ISPs to limit the

8    number of notices it could send in a given month; is that

9    correct?

04:31:00 10    A.   Yes.  There was an agreed upon number.  I don't know how

11   to say it any other way.

12   Q.   And again, you mentioned a number of ISPs that were

13   actually sued most recently, but you didn't mention any of the

14   five with whom the content owners signed the CAS agreements,

15   correct?

16   A.   That's correct.  They're not among those that have been

17   sued recently.

18   Q.   Did you form any conclusion that there was no longer any

19   peer-to-peer infringement on any of those networks for the five

04:31:45 20   ISPs?

21   A.   No.

22        MR. ELKIN:  I'm going to offer -- Your Honor, I think

23   it's going to be efficient if I do this in one fell swoop if I

24   can, if I'm permitted to do that, but I wanted to show

25   Mr. Marks for identification the five implementation

S. Marks - Cross

369

1    agreements.

2             THE COURT:  Go ahead, yeah.

3             MR. ELKIN:  So that would be DX 75, I think that

4    should be tab 4; DX 76, which is tab 5; DX 77, which is tab 6;

5    DX 78, which is tab 7; DX 79, which is tab 8.

6    BY MR. ELKINS:

7    Q.   Take a moment and review those documents, and if you can

8    identify them for us, we'd appreciate it.

9    A.   These do appear to be the implementation agreements.  I

04:33:22  10   won't take a look at every last page, but from a quick review,

11   it does appear that.

12   Q.   So just so it's clear, DX 75 is the agreement between the

13   content owners and AT&T?

14   A.   75 is AT&T, yes.

15   Q.   And DX 76 is the agreement -- implementation agreement

16   between the content owners and Comcast?

17   A.   Yes.

18   Q.   And DX 76 is the implementation agreement between the

19   content owners and Cable Vision?

04:33:59  20   A.   Yes.

21   Q.   And DX 78 is the implementation agreement between the

22   content owners and Time Warner Cable?

23   A.   Yes.

24   Q.   And DX 79 is the implementation agreement between the

25   content owners and Verizon?

S. Marks - Cross

370

```
  1   A.   Yes.

  2   Q.   Your Honor, I -- did you sign each of those agreements on

  3   behalf of the RIAA?

  4   A.   Yes.

  5        MR. ELKIN:  Your Honor, I would offer each of those

  6   five exhibits into evidence.

  7        MR. GOULD:  No objection.

  8        THE COURT:  They're received.

  9   BY MR. ELKIN:

04:35:02 10   Q.   Let's take a look at first at what should be tab 4.  This

 11   is the AT&T implementation agreement.

 12   A.   Yes.

 13   Q.   Why don't you go to page 14 of that agreement.  See the --

 14   it's "Attachment C-1 - Minimum Notice Volumes."

 15        Do you see that?

 16   A.   Yes.

 17   Q.   Is that the -- is that where in this implementation

 18   agreement the content owners and AT&T set forth how many

 19   notices would be processed?

04:35:58 20   A.   Yeah.  I mean, this is -- we had broken it down into ISP

 21   Tiers 1, 2, 3, based on the size of the ISP.

 22   Q.   And this had to do with the RIAA and the national -- and

 23   the, the Motion Picture Association, right?

 24   A.   Yes.

 25   Q.   Of America, MPAA?
```

S. Marks - Cross

371

1    A.   Yes.

2    Q.   Now, I guess it's just the Motion Picture Association; is

3    that right?

4    A.   Yes.

5    Q.   So those volume levels relate to all of the constituents

6    that were involved in CAS, right?

7    A.   Yes.  It was for both music and movies.

8    Q.   And take a look at Attachment D, page 16, "Mitigation

9    Measure(s)."

04:36:52 10    A.   Yes.

11    Q.   The second paragraph reads:  AT&T will redirect

12    Subscribers to a "Landing Page" to complete meaningful

13    educational instruction on copyright.

14         Do you see that?

15    A.   Yes.

16    Q.   Is that your understanding as to the mitigation step that

17    was required by AT&T under this agreement?

18    A.   Yes.  I believe they had to take a test, the subscribers

19    had to take a test as part of that.

04:37:15 20    Q.   Okay.  And there was no mitigation step here that called

21    for the termination of an AT&T subscriber, correct?

22    A.   That's correct.  As I testified earlier, termination was

23    not something that we could get as part of this agreement.

24    Q.   I'm just asking yes-or-no questions.  If you can answer

25    them yes or no, I'd appreciate it.

S. Marks - Cross

372

1    A.    Will do.

2    Q.    Let's take a look, if we can, next at tab 5, which is the

3    DX 76, the Comcast implementation agreement.  Let me direct

4    your attention to page 13.  This is headed at the top

5    "Attachment C-1 - Minimum Notice Volumes."

6          Do you see that?

7    A.    Yes.

8    Q.    This is where the content owners and Comcast agreed to the

9    number of notices that would be required to be processed by

04:38:27 10  Comcast by all of -- for all of the participating content

11   owners; is that correct?

12   A.    Correct.

13   Q.    And take a look at pages 15, 16, 17, and 18, and I guess

14   it carries over to 19 as well.  I apologize for that.  On page

15   15, it's entitled "Mitigation Measure(s)."  Can you describe

16   what, the mitigation measure here that was negotiated with

17   Comcast?

18   A.    So basically, the, the -- anybody using the account when

19   they went to go online would be met with this pop-up that says:

04:39:27 20  An important message from Comcast.  Your household's primary

21   accountholder must call Comcast security in order to have this

22   removed, and that they'll explain things about P2P and risks

23   associated with it and things like that.

24   Q.    Okay.  So there's no mitigation step here that requires

25   termination of the subscriber; is that correct?

S. Marks - Cross

373

1    A.    Correct.

2    Q.    Take a look now at DX 77, the Cable Vision implementation

3    agreement, and specifically page 13.  This is the "Attachment

4    C-1 - Minimum Notice Volumes."

5          Do you see that?

6    A.    Yes.

7    Q.    This is what is -- was required with regard to the notices

8    that would need to be processed by the content owners -- by the

9    ISPs that were sent on behalf of the content owners under this

04:40:44 10  implementation agreement?  Is that your understanding?

11   A.    Yes.

12   Q.    And then take a look at "Attachment D - Mitigation

13   Measure(s)," which is page 27.  Could you tell the jury what

14   the mitigation step here is?

15   A.    Temporary redirection to a Landing Page until the

16   Subscriber calls the Service Provider or its designee and

17   discusses with it the Copyright Alerts.

18   Q.    And there's no -- there was no mitigation step here that

19   required Cable Vision to terminate the subscriber, correct?

04:41:25 20  A.    Correct.

21   Q.    Take a look at tab 7, Exhibit 78, the Time Warner

22   implementation agreement.  Let's go to page 14, please.  This

23   is the "Attachment C-1 - Minimum Notice Volumes."

24          Do you see that?

25   A.    Yes.

S. Marks - Cross

374

1    Q.   This sets forth the notices that the ISPs would process

2    from the copyright owners on a monthly basis under this

3    implementation agreement; is that correct?

4    A.   Yes.

5    Q.   And they were not -- just to be clear, your understanding

6    is that the -- with regard to both this and the other

7    implementation agreements that we've seen, there was no

8    obligation under the implementation agreements for the ISPs to

9    process any more notices than what was set forth here, correct?

04:42:32  10   A.   Not under this program.

11   Q.   Okay.  And then take a look, if you will, at tab 8, the

12   Verizon implementation agreement, specifically, page 14,

13   "Attachment C-1 - Minimum Notice Volumes."

14   A.   Yes.

15   Q.   And this is setting forth the actual limit of notices that

16   the -- that Verizon would have to process on a monthly basis

17   sent by the copyright owners under this implementation

18   agreement?

19   A.   Yes.

04:43:35  20   Q.   And there would be no requirement for them to process any

21   more notices under this agreement; is that correct?

22   A.   As part of this program.

23   Q.   Under this program, correct?

24   A.   Yeah, under the program.

25   Q.   Right.

S. Marks - Cross

375

1    A.   I'm not sure I'd say under the agreement, but under this

2    program.

3    Q.   Okay.  And then take a look at "Attachment D - Mitigation

4    Measure(s)" on page 25.  Can you tell the jury what the

5    mitigation measure was here?

6    A.   Page --

7    Q.   16 rather.

8    A.   Yes.  Verizon would reduce the speeds, upload and download

9    speeds for a period of two days, and in addition, they're

04:44:25  10  saying they would redirect to a landing page to view an

11   educational video at the acknowledgement stage.

12   Q.   Okay.  And there was no termination of an ISP subscriber

13   that was required as a mitigation step under this agreement,

14   correct?

15   A.   Correct.

16   Q.   Now, is it your understanding under the MOU that despite

17   the notice requirements here, that if the call centers of the

18   ISP would be unable to process as many notices as would be

19   required, there'd be some dispensation?

04:45:19  20  A.   No, I don't recall that provision.

21   Q.   And do you recall any provision under the MOU that

22   addresses the extent to which notices would be -- the

23   processing of notices requirement would be lessened to the

24   extent there was a technological inability for the ISPs to

25   process those notices?

S. Marks - Cross

376

1    A.    The way I recall it is that because this was experimental,

2    the ISPs didn't know how many calls would be generated that

3    they would have to answer, you know, to differentiate between

4    this stage or that stage or whatever it was, and they asked for

5    a provision that said basically if these are so through the

6    roof that we literally cannot absorb them, there was kind of

7    like a fail-safe for them to be able to just pause everything

8    to, you know, kind of get their house in order and address it.

9    Q.    You thought that was reasonable, right?

04:46:26  10    A.    I thought that it was -- I mean, it wasn't a provision

11    that I personally liked in the agreement, but it was part of an

12    agreement where we were getting a lot of other things, so this

13    fell into the we had to compromise on that.

14    Q.    Did you think the ISPs were being irrational in asking for

15    that?

16    A.    I, I knew from the discussions that this was a true

17    fail-safe, you know, that they just didn't know how this was

18    going to go given that we were doing something new here, and

19    they just wanted to be able to hit the pause button if

04:47:02  20    necessary.  So again, it got baked into the agreement as part

21    of the overall compromise.

22    Q.    Okay.  So I know we've gone through five agreements, and

23    to make it easier, I think, for the jury and for all concerned,

24    I'm just going to show you -- have exhibited on your screen a

25    demonstrative, Your Honor, that we showed to counsel earlier

S. Marks - Cross

377

1    today.

2          THE COURT:  Any objection?

3          MR. GOULD:  Yes, Your Honor.

4          THE COURT:  All right.  Come to the sidebar then,

5    please.

6          NOTE:  A sidebar discussion is had between the Court

7    and counsel out of the hearing of the jury as follows:

8    AT SIDEBAR

9          MR. ELKIN:  So, Your Honor, let me just show this to

04:47:51 10   you and explain the purpose for it.  We've reviewed a lot of,

11   in a quick fashion, all of the agreements that were dense.  I

12   just thought I would -- this would be the demonstrative, which

13   basically goes through the two points in the five agreements,

14   and I was just going to have him summarize for me, you know,

15   the effect of what he just testified to.

16         MR. GOULD:  Mr. Elkin asked Mr. Marks on several

17   occasions whether that was a cap, that was a cap, that was a

18   cap, and Mr. Marks did not agree to that.  He said this was a

19   negotiated agreement where we agreed to certain things in the

04:48:28 20   context of a compromise.  He specifically did not agree this

21   was a cap.

22         THE COURT:  I'm going to -- not going to allow the

23   demonstrative.  You can, you can go over it with him --

24         MR. ELKIN:  Sure.

25         THE COURT:  -- one at a time.

S. Marks - Cross

378

1        So just do that.  Then you can perhaps revise it

2   slightly and use it later on in argument to the jury, but

3   demonstratives, you know, if they've got language that you

4   disagree on, I'm not going to allow that during the course of

5   the question and answer of witnesses.  All right.

6            MR. ELKIN:  Understood, Your Honor.  Thank you.

7            THE COURT:  All right.  Thank you.

8            NOTE:  The sidebar discussion is concluded;

9   whereupon, the case continues before the jury as follows:

04:49:49 10  BEFORE THE JURY

11  BY MR. ELKIN:

12  Q.   So I may have gone too fast, Mr. Marks, and failed to ask

13  a question that related to the Time Warner Cable agreement as

14  it relates to the mitigation.  Go to page 16 in this tab.

15  A.   Which tab is this?

16  Q.   It's tab 7.  Yeah, it's tab 7.

17  A.   That's right.

18  Q.   Could you tell the jury what this mitigation measure is

19  here?

04:50:18 20  A.   Temporary redirection to a Landing Page until the

21  Subscriber contacts the Participating ISP to discuss with it

22  the Copyright Alerts.

23  Q.   Okay.  So -- and was there any termination step that was

24  required under the program as set forth in this implementation

25  agreement for Time Warner to terminate an ISP subscriber as a

S. Marks - Cross

379

1   mitigation step?

2   A.   No.

3   Q.   So just to review each of what we -- each of these

4   agreements, the implementation agreements, there was -- for

5   each of the ISPs, there was a, a limit to the number of notices

6   that would be required for them to process in a given month,

7   correct?

8   A.   It's an agreed upon notice volume.

9   Q.   Right, agreed upon notice volume.  They did not have to

04:51:15  10   exceed the volume that was set forth in Attachment C-1 to each

11   of those agreements, correct?

12   A.   For this program.  I just want to be clear that they would

13   accept notices beyond the program.

14   Q.   You've made it very clear, and I'm clear on it as well, by

15   the way.  There was no requirement under this program under

16   this agreement for the ISPs to process notice volumes that

17   exceeded the limits set forth in Attachment C-1 to each of

18   these agreements; is that correct?

19   A.   Yes.

04:51:47  20   Q.   And there was no requirement under each of these

21   implementation agreements for an ISP to terminate a subscriber

22   as part of this program; is that correct?

23   A.   Yes.

24   Q.   On direct, counsel showed you a demonstrative, I think it

25   was having to do with this -- I don't have copies of it here.

S. Marks - Cross

380

1    It's this pie chart, the one that's one day, February 23, 2010,

2    and one is a one-year, March 1, 2009 - February 28, 2010.

3         Do you see that?

4    A.    Yes, I remember it.

5    Q.    You remember that?

6         You understand that this was significantly prior to

7    the claims period here, 2013-'14?

8    A.    Yeah.  I mean, the dates on there are different than the

9    claims period.

04:53:02 10   Q.    And the, the volume of notices that Cox agreed in

11   accordance with the e-mail exchange between Ms. Sheckler and

12   Cox in 2013 was 600 a day, correct?

13   A.    Yeah.  At some point in 2013, it increased to 600.

14   Q.    And have you been made aware of the fact that for the vast

15   majority of every day in 2013 and 2014, MarkMonitor didn't even

16   exceed 500 notices per day?

17   A.    I don't know about every day, but as I explained on

18   direct, that was a mistake on our end in communicating the

19   increase to MarkMonitor.

04:53:46 20   Q.    Okay.  And by the way, MarkMonitor, the relationship

21   between MarkMonitor and the parties here was MarkMonitor and

22   RIAA, right?

23   A.    Yes, I believe that's right.

24   Q.    And Cox and the RIAA had their own communications

25   regarding the number of notices, correct?

S. Marks - Cross

381

1   A.   Yes.  So we had the discussion with Cox directly, and we

2   failed -- once, once Cox said, yes, we'll try 600 -- and,

3   again, I didn't realize this at the time, but that did not make

4   its way to MarkMonitor as a vendor, and that was our fault.

5   Q.   Okay.  So you also referenced in response to questions put

6   to you by counsel on direct that you hadn't sued any of the

7   four so-called peer-to-peer protocols that we're fighting about

8   here; that is to say, eDonkey, BitTorrent, Ares, and Gnutella,

9   right?  Do you remember that?

04:54:58  10   A.   Not the protocols.  We had sued individual companies that

11   were using those protocols.

12   Q.   Are you aware that BitTorrent is a company that actually

13   is related to the BitTorrent protocol?

14   A.   Well, it's, it's not the same kind of thing.  No, it's

15   not.  It was a company that kind of co-opted the name to use

16   it, and they had all -- we had discussions with them as well,

17   that particular company, but we did not equate that company

18   with BitTorrent.  It was very confusing.

19   Q.   Your testimony is that you determined that it was not the

04:55:35  20   same entity, correct?

21   A.   It was not, no.  I don't believe it was the same entity,

22   because BitTorrent was an open source technology protocol.

23   Q.   And did you ever file any lawsuit, RIAA, against any of

24   the creators of any of these peer-to-peer protocols, these

25   four?

S. Marks - Cross

382

1   A.   I don't believe so.   I'm trying to think whether there

2   were any individuals in their capacity as individuals, but I

3   don't, I don't remember that.

4   Q.   Okay.   And one of the things that I think I heard you say

5   on direct is that, that you thought that CAS was a good program

6   because it had graduated response.   Do you remember that?   Do

7   you think graduated response is a, is a program designed to try

8   to address copyright infringement?

9   A.   Yes.   That was one of the goals.

04:56:28  10   Q.   And also, you thought that CAS was useful because it had

11   some teeth, correct?

12   A.   Yes.   More than just a mere education program.

13   Q.   Now, I think you testified on direct that you had reviewed

14   certain material by this company called Stroz Friedberg,

15   correct?

16   A.   Yeah.   Stroz Friedberg, yeah.

17   Q.   And actually, Stroz Friedberg, in addition to what you

18   testified on direct, actually assessed how each ISP actually

19   implemented the CAS, correct?

04:57:20  20   A.   Yes.

21   Q.   So -- Your Honor, collectively, I'd like to provide five

22   documents that we're going to offer into evidence.

23        THE COURT:   He's going to show you multiple

24   documents, and take your time to go through them, and we'll

25   proceed from there.   Go ahead.

383

1           THE WITNESS:  Thank you, Your Honor.

2           MR. ELKIN:  This would be -- should be tab 9, which

3    is DX 80; tab 10, which is DX 81; tab 11, which is DX 82; tab

4    12, DX 83; and tab 13, DX 84.

5    BY MR. ELKIN:

6    Q.   If you could review those and identify whether these are

7    documents you've seen before.

8    A.   So tab 9 appears to be the report for AT&T.  Tab 10 has

9    the Comcast report at the top, but I think it's got all the

04:59:05 10  others included in the same tab as well.

11   Q.   Okay.

12   A.   So the Time Warner one is in there.  The AT&T one is in

13   there again.

14   Q.   Well, let me do this.  I want to make sure that we're -- I

15   thought I would make it easy, but I have to confess I did not

16   fly spec exactly the binder that you have.  So maybe we have to

17   do this, unfortunately, the old-fashioned way.

18           Let me show you --

19           MR. GOULD:  If I could -- I think I could make a

04:59:47 20  clarification for the record, Mr. Elkin, that may be able to

21   help.  First, DX 80, I happened to look at last night -- 81.  I

22   believe the first 25 pages, Comcast is (inaudible).

23           Secondly, Your Honor, for DX 80 through 84 and DX 75

24   through 79, that implicates the confidentiality issue we spoke

25   about earlier.

S. Marks - Cross

384

1          THE COURT:  All right.  Well, there won't be --

2     they'll be published and the confidentiality agreements will be

3     complied with based on my order.  Maybe we need to take a step

4     back and go through them one at a time.  Is that what you're

5     proposing to do?

6          MR. ELKIN:  Yeah.  I apologize to the Court and the

7     jury for this.  Let's just --

8          THE WITNESS:  It just looks to me that in one -- in

9     tab 10, all of them are included.

05:00:45 10          THE COURT:  Sorry?

11          THE WITNESS:  It looks like tab 9 has one, tab 10 has

12     four or five of these, and then tab 11, 12, and 13 have one.

13     So I think in compiling this, tab 10 has more than just the one

14     you meant to include in the tab.

15     BY MR. ELKIN:

16     Q.   Yes.  I apologize for that.  So let's just do them one at

17     a time, if we can.  And I -- so let's go first of all to the

18     AT&T one, Exhibit DX 80.

19          Have you seen this before?

05:01:21 20     A.   Yes.

21          MR. ELKIN:  Your Honor, I would offer DX 80 into

22     evidence.

23          THE COURT:  Any objection?

24          MR. GOULD:  No objection.

25          THE COURT:  It's received.

385

BY MR. ELKIN:

Q.   Now, let's go to tab 10, which is DX 81.  This is the one for Comcast that has an extra document in it.

          Yeah, I see what you're saying now, and I apologize. If you just look at, at the bottom right-hand side, Mr. Marks, the Bates stamp number DX 0081-0001, and if you take it to -0025, what is that?

A.   Yeah, that's the Stroz Friedberg report with respect to Comcast.

Q.   Okay.  You've seen this before?

A.   Yes.

Q.   And, and then let's take a look at DX 81, from page 26 to 49.  What is that?

A.   That is the Stroz Friedberg report with respect to Time Warner Cable.

Q.   Okay.  And you've seen that before?

A.   Yes.

Q.   Okay.

          MR. OPPENHEIM:  I'm sorry, what?

          MR. ELKIN:  I'm going to move all of this into evidence after we go through the pages.  It will be less confusing.

          THE COURT:  All right.

          MR. OPPENHEIM:  Could you just tell us through which page that is?  I lost track, sorry.

S. Marks - Cross

386

1           MR. ELKIN:  Yeah, of course.  So that was --

2           THE WITNESS:  26 to 49.

3           MR. ELKIN:  Yeah, 49.  The next one begins at 0050,

4     and it goes to --

5           THE WITNESS:  That one is the same as the one in

6     tab 9.  The one starting at 0050 is the same as tab 9.

7           MR. ELKIN:  So this is an extra.  Oh, I see.  Okay.

8           So Ms. Leiden just informed me that I can actually

9     move into evidence the DX 81, which is the Comcast report, and

05:04:04 10     then I can -- the other ones make sense.

11           THE COURT:  Any objection?

12           MR. GOULD:  I think the record is a bit unclear on

13     this.  We don't object to the substance.

14           THE COURT:  Let's just take a look at them tonight

15     after we recess.

16           MR. GOULD:  Thank you, Your Honor.

17           THE COURT:  And we'll see whether we have -- so we

18     have clean exhibits.

19           MR. GOULD:  I would propose provisional admission

05:04:32 20     subject to making sure --

21           THE COURT:  Yeah, that's fine.  All right.  Thank

22     you, Mr. Gould.

23     BY MR. ELKIN:

24     Q.   Okay.  So now let's take a look at tab 11, which is DX 82.

25     A.   Yes.

S. Marks - Cross

387

1   Q.   What is that?

2   A.   That is the Stroz Friedberg report with respect to Cable

3   Vision.

4   Q.   Okay.  Have you seen this before?

5   A.   Yes, I have.

6           MR. ELKIN:  Your Honor, I move DX 82 into evidence.

7           THE COURT:  Any objection?

8           MR. GOULD:  No objection.

9           THE COURT:  All right.  Received.

05:04:58 10  BY MR. ELKIN:

11   Q.   Take a look at tab 12, DX 83.  Tell me if you've seen that

12   before.

13   A.   We've seen that one before, too.

14   Q.   What is that?

15   A.   That is the Time Warner Cable Stroz Friedberg report.

16           MR. ELKIN:  Okay.  I move DX 83 into evidence.

17           THE COURT:  Any objection?

18           MR. GOULD:  No objection.

19   BY MR. ELKIN:

05:05:20 20  Q.   And take a look at tab 13, DX 84.  Have you seen that

21   before?

22   A.   Yes, I have.

23   Q.   What is it?

24   A.   It's the Stroz Friedberg report with respect to Verizon.

25           MR. ELKIN:  Your Honor, I move DX 84 into evidence.

388

1          THE COURT:  Any objection?

2          MR. GOULD:  No objection.

3          THE COURT:  Received.

4   BY MR. ELKIN:

5   Q.   Your understanding is that Stroz Friedberg actually as

6   part of its review looked at the extent to which the ISPs were

7   operating in accordance with the implementation agreements,

8   correct?

9   A.   Yes.  As part of the MOU that this analysis, a review

05:06:07  10  would be done.

11  Q.   Okay.  And these documents set forth, among other things,

12  what mitigation steps the ISPs were taking under the

13  implementation agreements, right?

14  A.   Yes.  I believe they're included in that.

15  Q.   In reviewing them, did you observe to your knowledge

16  anything that was inaccurate in these reports?

17  A.   I haven't reviewed them that thoroughly recently, so I

18  can't say that now, but I did review them at the time and don't

19  remember there being anything inaccurate.

05:06:48  20  Q.   Okay.  So I believe on direct, Mr. Marks, you made

21  reference to a Harbor Labs, correct?

22  A.   Yes.

23  Q.   And who are they again?  Since it's been a while since

24  your direct.

25  A.   Sure.  This was the vendor that was hired after the Stroz

389

1   Friedberg analysis of the MarkMonitor systems to address the

2   optics that somebody at Stroz had worked on behalf of RIAA at

3   one point.  So Harbor Labs was the company that we hired so

4   that we had another report.

5          It wasn't that there was anything inaccurate in the

6   Stroz report.  It was just, again, we wanted to ensure that

7   there was, you know, complete transparency as well as that

8   there were no questions about the reliability or accuracy of

9   these reports.

05:08:19   10   Q.   So to avoid the appearance of impropriety, right?

11   A.   Yes.

12   Q.   I'd like to, to show you a document that's been marked for

13   identification as Defendant's 89.

14          THE COURT:  Joe, I think -- is it in the book?

15          MR. ELKIN:  It's not in the book.

16          THE COURT:  Joe --

17          MR. ELKIN:  This issue cropped up on direct, so we're

18   just dealing with it now.

19          THE COURT:  Give it to him now.

05:08:53   20          THE WITNESS:  Yeah, thank you.

21   BY MR. ELKIN:

22   Q.   Do you recognize DX 89?

23   A.   Yes.

24   Q.   What is it?

25   A.   This is the report by the company, Harbor Labs, to

390

1    evaluate and review the MarkMonitor systems.

2         MR. ELKIN:  Your Honor, I offer DX 89 into evidence.

3         THE COURT:  Any objection?

4         MR. GOULD:  Object to the same confidentiality

5    agreement.

6         THE COURT:  Okay.  All right.  It will be received.

7    The confidentiality will not be honored here.  It will be made

8    public.  Thank you.

9         MR. ELKIN:  Mr. Marks, thank you very much.  I have

05:09:28 10   no further questions.

11        I pass the witness.

12        THE COURT:  All right.  Redirect?

13        MR. GOULD:  Thank you, Your Honor.

14        Could you pull up that last document, DX 89, please?

15   The very last one.

16                    REDIRECT EXAMINATION

17   BY MR. GOULD:

18   Q.   Mr. Marks, this is the Harbor Labs report that you

19   described, correct?

05:10:08 20   A.   Yes.

21   Q.   And could we just -- could you read the title, the header?

22   A.   "Evaluation of the MarkMonitor AntiPiracy System."

23   Q.   And can we zoom in on the portion beginning:  As

24   described?

25        And could you read the findings -- could you read the

S. Marks - Redirect

391

1    highlighted portion of the DX 89 Harbor Labs report on the

2    MarkMonitor system, please?

3    A.    As described in further detail in this document, we have

4    found that the antipiracy system, one, is designed to correctly

5    identify file sharing without generating false positives; two,

6    undergoes testing to increase confidence in the implementation

7    of the design; and, three, generates thorough case data for

8    alleged infringement tracking.

9    Q.    Thank you.  You can pull that down.

05:11:04 10          Mr. Marks, you were asked a number of questions about

11   implementation agreements in CAS.  Do you recall that?

12   A.    Yes.

13   Q.    Do those agreements say anything about ISPs' conduct

14   outside of CAS?

15   A.    No.

16   Q.    You were asked several questions about your compensation

17   in this matter.  Do you recall that?

18   A.    Yes.

19   Q.    Why are you being compensated here, Mr. Marks?

05:11:28 20   A.    Because I'm taking time away from the business that I'm

21   trying to run, and my time is very valuable, frankly, because

22   it's a 24-hour/7 kind of job.

23   Q.    Why is it a 24/7 job?

24   A.    Every cliché that exists about startups I can tell you is

25   pretty much true, including the amount of work that's required.

S. Marks - Redirect

392

1    Q.   Is your compensation here today in any way based on the

2    substance of your testimony?

3    A.   Not at all.

4    Q.   You were asked some questions about -- excuse me for a

5    moment.

6              THE COURT:  Yes, sir.

7    BY MR. GOULD:

8    Q.   Mr. Marks, you were asked some questions about the Stroz

9    Friedberg report about Mark- -- excuse me.

05:12:45 10              Mr. Elkin asked you several questions about Stroz

11   Friedberg's reports on the ISPs' conduct within CAS.  Do you

12   recall that?

13   A.   Yes.

14   Q.   Did the Stroz Friedberg reports on the CAS ISPs have

15   anything to do with the ISPs' behavior outside of CAS?

16   A.   No.

17   Q.   You were asked some questions about -- the

18   word "experiment" has come up a lot, experiments in the process

19   of figuring out antipiracy measures.  Do you recall that?

05:13:19 20   A.   Yes.

21   Q.   Why does the -- why does the RIAA experiment in different

22   ways with different antipiracy approaches?

23   A.   Well, in this case, we were hit by an avalanche, you know,

24   in 1999 with Napster, and it continued for many years, and our

25   industry was the so-called canary in the coal mine.  We were

S. Marks - Redirect

393

1    the -- we were the first to suffer, you know, the consequences

2    of all of the illegal distribution and copying that went on in

3    those systems, and, you know, this -- I mean, stepping back, in

4    the history of intellectual property enforcement, there had

5    never been anything like this, and so there was no playbook by

6    which you look back to and say, oh, if, you know, this happens,

7    you just do this.

8             We had to create that, you know, entirely and use our

9    best judgment with respect to different kinds of things that

05:14:21  10    would help or that we thought might help the problem.

11    Q.   Do you recall some questions about the record companies

12    and the RIAA's work with the publishers?

13    A.   Yes.

14    Q.   Do you know if the publishers, music publishers were a

15    part of the Napster lawsuit?

16    A.   Yes.

17    Q.   Were they?

18    A.   Yes, they were.

19    Q.   And what about the Grokster lawsuit?

05:14:46  20    A.   Yes.

21    Q.   And the Kazaa lawsuit?

22    A.   Yes.

23    Q.   I believe -- were the Grokster and Kazaa together?

24    A.   Yeah, they were together, but they were --

25    Q.   You were asked some questions about suing BitTorrent.  Do

S. Marks - Redirect

394

1  you remember that?

2  A.    Yes.

3  Q.    Is there a company that you're aware of named BitTorrent?

4  A.    There was a company at bittorrent.com, and my recollection

5  is basically they were trying to position themselves as

6  BitTorrent, but they really weren't BitTorrent, and I gather

7  that that internet name was not taken, so they were able to

8  take that.  They were a site that was, you know, trying to

9  build some kind of business or another that was called that.

05:15:32  10        It was not -- they weren't software, P2P software

11  being used on the BitTorrent protocol.  It was different from

12  that.

13  Q.    Is that company or website, BitTorrent, the same or

14  different as the BitTorrent protocol that we've been discussing

15  here?

16  A.    Different.

17  Q.    Do you understand which of those two BitTorrents is at

18  issue with respect to the RIAA notices to Cox?

19  A.    Yes.  It's not that company, bittorrent.com.  It's

05:16:19  20  BitTorrent the P2P protocol.

21  Q.    And has the RIAA or the record industry ever sued the

22  BitTorrent protocol that's at issue in this lawsuit against

23  Cox?

24  A.    No.  And, you know, neither have we sued the people who,

25  you know, created the protocols, because they were creating a

S. Marks - Recross

395

1    technology.  The technology wasn't -- we weren't trying to sue

2    the technology out of existence.  We were trying to address bad

3    actors who were using that technology for the widespread

4    infringement that we've discussed.

5    Q.   You were asked some questions about agreements that the

6    RIAA and the recording industry made with ISPs.  Do you recall

7    that?

8    A.   Yes.

9    Q.   Did the RIAA or the record companies ever agree that Cox

05:17:12 10   could ignore the first notice sent to it?

11            MR. ELKIN:  Objection.

12            THE COURT:  Overruled.  Foundation?  I think he's

13   discussed this.

14            MR. ELKIN:  It's a leading question.

15            THE COURT:  It was a leading question.  I'll allow

16   it.

17            THE WITNESS:  No.  That's not something we would have

18   agreed to.

19            MR. GOULD:  No further questions.

05:17:34 20            THE COURT:  All right.

21            MR. ELKIN:  Can I please have one question?

22            THE COURT:  Is it going to be one?  Yes.

23                      RECROSS EXAMINATION

24   BY MR. ELKIN:

25   Q.   Pull up, if you will, DX 89, the Harbor Labs exhibit.

396

1    A.   Yep.

2    Q.   Mr. Gould asked you about a paragraph that begins with:

3    As discussed in further detail.  Could you read the following

4    paragraph that begins:  There are, however, and then there are

5    three bullet points?

6    A.   Yes.  There are, however, aspects of the system that we

7    believe must be improved:  One, consistent and regular

8    end-to-end (whole-system) testing; two, improved verification

9    approaches, including tamper-evident infringement case data;

05:18:19 10  three, tighter and more principled controls over employee

11   access to sensitive data.

12   Q.   Any reason to disagree with that comment?

13   A.   No.

14        MR. ELKIN:  No further questions, Your Honor.

15        THE COURT:  All right.  May Mr. Marks be excused?

16        MR. GOULD:  Yes, Your Honor.

17        MR. ELKIN:  Yes, Your Honor.

18        THE COURT:  All right.  You're excused with our

19   thanks, Mr. Marks.  Please don't discuss the testimony you've

05:18:40 20  given today with anyone until our trial is over, all right?

21        THE WITNESS:  Yes.  I understand.  Thank you.

22        THE COURT:  Okay.  Good.  Have a good evening.  Thank

23   you, sir.

24        THE WITNESS:  Thank you very much.

25   WITNESS EXCUSED

397

1          THE COURT:  I don't see any faces begging me to

2     continue on later tonight.

3                         (Laughter.)

4          THE COURT:  I have one.

5          Yeah.  All right, we'll adjourn for tonight.  We'll

6     start at 9:00 tomorrow morning.  Again, please don't discuss

7     the case with anybody or do any research or investigation.

8     Have a good evening.  We'll see you tomorrow morning.  Thank

9     you.

05:19:29 10          THE JURORS:  Thank you.

11          NOTE:  At this point, the jury leaves the courtroom;

12     whereupon, the case continues as follows:

13     JURY OUT

14          THE COURT:  All right.  Anything we need to discuss

15     before we break for tonight?

16          MR. ELKIN:  Not for defendants, Your Honor.

17          THE COURT:  Okay.

18          MR. GOULD:  No, Your Honor.

19          THE COURT:  All right.  Thank you-all.  We're in

05:20:15 20     recess until 9:00 tomorrow morning.

21          NOTE:  At this point, the December 3, 2019, portion

22     of the case is concluded.

23

24

25

398

1                    CERTIFICATE OF COURT REPORTERS

2


3
          We certify that the foregoing is a true and
4
     accurate transcription of our stenographic notes.
5

6

7                    /s/  Norman B. Linnell
                Norman B. Linnell, RPR, CM, VCE, FCRR
8

9

10                   /s/  Anneliese J. Thomson
                Anneliese J. Thomson, RDR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25