UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,       :
                               :
     -vs-                      :    Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.       :
                               :
-------------------------------:
```

VOLUME  3  (A.M. Portion)

TRIAL TRANSCRIPT

December 4, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

400

<u>APPEARANCES:</u>

FOR THE PLAINTIFFS:                MATTHEW J. OPPENHEIM, ESQ.
                                   SCOTT A. ZEBRAK, ESQ.
                                   JEFFREY M. GOULD, ESQ.
                                   MICHAEL J. DRUCKMAN, ESQ.
                                   ANDREW L. GUERRA, ESQ.
                                   LUCY G. NOYOLA, ESQ.
                                   JIA RYU, ESQ.
                                   Oppenheim + Zebrak, LLP
                                   4530 Wisconsin Avenue, N.W.
                                   5th Floor
                                   Washington, D.C. 20015


FOR THE DEFENDANTS:                THOMAS M. BUCHANAN, ESQ.
                                   Winston & Strawn LLP
                                   1700 K Street, N.W.
                                   Washington, D.C. 20006-3817
                                     and
                                   SEAN R. ANDERSON, ESQ.
                                   MICHAEL S. ELKIN, ESQ.
                                   THOMAS P. LANE, ESQ.
                                   CESIE C. ALVAREZ, ESQ.
                                   Winston & Strawn LLP
                                   200 Park Avenue
                                   New York, NY 10166-4193
                                     and
                                   JENNIFER A. GOLINVEAUX, ESQ.
                                   THOMAS J. KEARNEY, ESQ.
                                   Winston & Strawn LLP
                                   101 California Street, 35th Floor
                                   San Francisco, CA 94111-5840
                                     and
                                   MICHAEL L. BRODY, ESQ.
                                   Winston & Strawn LLP
                                   35 West Wacker Drive
                                   Chicago, IL 60601
                                     and
                                   DIANA HUGHES LEIDEN, ESQ.
                                   Winston & Strawn LLP
                                   333 South Grand Avenue
                                   Suite 3800
                                   Los Angeles, CA 90071

401

1

2                                    <u>INDEX</u>

3

<u>WITNESS</u>                              <u>EXAMINATION</u>        <u>PAGE</u>

4

5   BARBARA A. FREDERIKSEN-CROSS

                                    DIRECT            405
6                                   CROSS             498

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

402

```
 1                    P R O C E E D I N G S

 2              NOTE:  The December 4, 2019, portion of the case

 3   begins in the absence of the jury as follows:

 4   JURY OUT

 5              THE COURT:  All right.  Good morning to each of you.

 6   I see that we're all present and accounted for.  Good morning.

 7   I hope you-all had a good evening, and I look forward to a

 8   good day.

 9              So any preliminary motions?  Mr. Elkin.

10              MR. ELKIN:  Good morning, Your Honor.

11              THE COURT:  Yes.

12              MR. ELKIN:  Just a brief housekeeping matter for me.

13   As you might recall, I fumbled with an exhibit during the last

14   examination, and it had to do with Defendants' Exhibit 80,

15   which was -- had another document appended to it, DX 81, and

16   we have replaced it.  Your Honor has the right copy as well as

17   the counsel for plaintiffs, but I just wanted to formally move

18   into evidence a new Defendants' Exhibit 81-A.

19              THE COURT:  All right.  Any objection to that?

20              MR. OPPENHEIM:  Very likely not, Your Honor.

21   Jeff Gould, who was handling this, is not present this

22   morning.  I told Mr. Elkin I'm sure there's probably no issue,

23   but I'd like him to look at it when he gets here.

24              THE COURT:  Okay.  All right.

25              MR. OPPENHEIM:  I can't imagine there would be a
```

403

1    problem.  If there is, I'm sure we'll work it out.

2              THE COURT:  All right.  Let me know after you speak

3    with Mr. Gould, and we'll admit it absent further argument.

4              MR. OPPENHEIM:  Thank you.

5              THE COURT:  All right.

6              MR. ELKIN:  Thank you.

7              THE COURT:  All right.  Joe, let's get our jury

8    then.

9              MR. BUCHANAN:  Your Honor?

10             THE COURT:  Yes, sir.

11             MR. BUCHANAN:  I apologize.

12             THE COURT:  Good morning, Mr. Buchanan.

13             MR. BUCHANAN:  I wanted to address the issue of the

14   pulse checks.  The Court reserved that.  This particular

15   witness I don't think is going to testify about pulse checks,

16   but the one following, so if you'd rather reserve it to that

17   time or I could do it now.

18             THE COURT:  Yeah.  No, let me -- let's get rolling.

19   I'll take a look at the pulse check issue again before we

20   argue it just to refresh my own recollection.

21             MR. BUCHANAN:  Okay.  Thank you, Your Honor.

22             THE COURT:  All right.

23             MR. BUCHANAN:  And I'd just like to introduce

24   Michael Brody.  You probably saw him in the back before.

25             THE COURT:  Yes, I did.

404

1          MR. BUCHANAN:  This is -- he's going to be handling

2    the examination this morning.

3          THE COURT:  All right.  Good morning, Mr. Brody.

4    Welcome.  I know you've been watching the trial, and nice to

5    see you here at counsel table.

6          MR. BRODY:  Thank you very much, Your Honor.

7          THE COURT:  All right.

8          MR. BRODY:  One just quick one, just to preserve our

9    record, I'm expecting that the '431 spreadsheet, which was the

10   subject of a number of motions previously, will be coming up

11   today.  I'd just like to renew our motions in limine and court

12   preclusion with respect to that.

13         THE COURT:  All right.  They're so noted.  Your

14   exceptions are noted, and your -- I think your record is very

15   adequately protected, sir.  All right.  Thank you.

16         MR. BRODY:  I'm guessing we didn't change your mind.

17         THE COURT:  I'm sorry?

18         MR. BRODY:  I said I'm guessing we didn't change

19   your mind this morning.

20         THE COURT:  Yeah, that's not -- that didn't happen,

21   no.

22         All right.  Joe, let's get the jury in, please.

23         NOTE:  At this point, the jury returns to the

24   courtroom; whereupon, the case continues as follows:

25   JURY IN

B. Frederiksen-Cross - Direct

405

1          THE COURT:  All right.  Please be seated.  Good

2   morning, ladies and gentlemen.  Thank you again for making

3   your way back in on time.  I hope you had a good evening, and

4   let me know again that you didn't do any research or

5   investigation or talk to anybody about the case.  Is that

6   right?

7          Okay.  Thank you very much.

8          All right.  Mr. Zebrak, next witness, sir?

9          MR. ZEBRAK:  Thank you, Your Honor.  We call Barbara

10  Frederiksen-Cross to the stand.

11          THE COURT:  All right.

12     BARBARA A. FREDERIKSEN-CROSS, PLAINTIFFS' WITNESS, SWORN

13                      DIRECT EXAMINATION

14  BY MR. ZEBRAK:

15  Q.   All right.  Good morning.

16  A.   Good morning.

17          THE COURT:  Please proceed, Mr. Zebrak.

18          MR. ZEBRAK:  Thank you, Your Honor.

19  BY MR. ZEBRAK:

20  Q.   Good morning, Ms. Frederiksen-Cross.  Nice to see you

21  again.

22  A.   Good morning, counsel.

23  Q.   For the record, would you please state your full name for

24  the jury?

25  A.   Yes.  It's Barbara Frederiksen-Cross.  That's

406

1    F-r-e-d-e-r-i-k-s-e-n-C-r-o-s-s.

2    Q.    And where do you currently work?

3    A.    JurisLogic.

4    Q.    And what is your position at JurisLogic?

5    A.    I am the director of forensic investigations.

6    Q.    And at a high level, could you explain what JurisLogic

7    is?

8    A.    It's a company that specializes in the analysis of

9    computer software and computer-based evidence in forensic

10   context primarily, but we also do work for evaluation of

11   software and technical due diligence, so mergers and

12   acquisitions.

13   Q.    Thank you.

14         And could you tell the jury what your connection to

15   this case is?

16   A.    I'm an independent, outside expert who was brought in on

17   behalf of plaintiffs to evaluate the source code and the

18   technical evidence that relates to some of the computer

19   systems that have been used in this case.  So the MarkMonitor

20   computer system, the Audible Magic computer system, and the

21   Cox CATS computer system.

22   Q.    And did you, in fact, perform those reviews?

23   A.    Yes, I did.

24   Q.    And are you prepared to testify to your analysis today?

25   A.    I am.

407

1    Q.   Let's take a step back.  Would you please tell the Court

2    something about yourself?

3    A.   I live in Portland, Oregon.  I've lived there a good

4    portion of my life, but I started out in the Silicon Valley

5    and went to the first years of grade school there.

6    Q.   And when did you start being involved with computers and

7    software?

8    A.   I was one of those nerdy kids who got involved early.  I

9    think I had my first contact with computers when I was 11 or

10   12 years old and then really got interested in seventh grade,

11   when I had a math teacher who -- I was in sort of a STEM --

12   what would be called a STEM program today, and he had arranged

13   for us to have access through a local college to the computer

14   system and to get an introduction to programming, and I loved

15   it.

16   Q.   And how old were you when you graduated high school?

17   A.   I left high school at 16 and went to a local college and

18   finished my high school diploma there and then went straight

19   into computer programming training.

20   Q.   And what age were you when you graduated college?

21   A.   Eighteen.

22   Q.   And for roughly how many years have you been involved

23   professionally in computers and software-related forensics?

24   A.   Forty-five years with computers and software development,

25   and forensics part-time since the mid '80s and full-time since

B. Frederiksen-Cross - Direct

408

1    1997.

2    Q.   So when you graduated college at age 18, what was your

3    first professional job?

4    A.   I had actually had the opportunity to work with the State

5    of Oregon in one of the local counties as a part of a

6    cooperative work study experience while I was in school, and

7    so when I graduated, they offered me a job, and I went to work

8    for the State of Oregon initially.

9    Q.   And what were you doing for the State of Oregon?

10   A.   Programming computers and developing online systems.

11   Q.   And what did you do after that?

12   A.   During the time I was with the state, I was fortunate

13   enough to get some specialized training from IBM.  So when I

14   was 21, I started a business that specialized in helping

15   people who had very large computer systems get optimum

16   performance out of their computer systems.

17   Q.   And so in the business that you said you started, what,

18   what types of clients did you have?

19   A.   In those days, it was primarily banks, insurance

20   companies, and telephone companies, because they had the big

21   computers and they had the need for speed in their systems,

22   and that was, that was really what I specialized in, was high

23   performance systems.

24   Q.   For roughly how long did you run that business?

25   A.   Throughout my career until I switched to forensics

B. Frederiksen-Cross - Direct

409

1    full-time.  Actually, I'm just winding down that business now

2    because I find that the forensic work is taking up all of my

3    time.

4    Q.   Okay.  We'll get to that in more detail in a moment.

5    Let's stay on the business that you founded after you left

6    work with the State of Oregon for a minute.

7         You just mentioned some of the clients by type that

8    you worked for.  Are there any well known names of these

9    clients that we might be familiar with?

10   A.   The ones you might recognize are probably some of the

11   banks and insurance companies principally.  That would be

12   First Interstate Bank, U.S. Bank, Blue Cross-Blue Shield,

13   MetLife, Standard Insurance, AT&T Telephone Company.  Also did

14   some work during that time for federal and state governments.

15   Q.   And what, generally, were you doing for these types of

16   clients?

17   A.   Generally, I was either developing operating system

18   modifications or tuning the performance of online systems, or

19   in a few cases of high-performance batch systems like the

20   systems that would process checking account transactions at

21   night, you know, if a customer couldn't get all of their

22   transactions processed in one night, I would come in and help

23   them tune the system so they could get that done.

24   Q.   Sure.  So to the nontechnical person, you talk about

25   developing and fine-tuning systems.  Does that involve

B. Frederiksen-Cross - Direct

410

1    software?

2    A.    Yeah.  It involves writing software or hunting down

3    problems in software, and also looking at the underlying data

4    and helping to, to create organizations for that data that

5    made performance more possible.

6    Q.    And now you've used the term "forensics."  Could you

7    elaborate on what that means?

8    A.    Yeah.  As I'm using that term, it means a formal

9    inspection of computers or computer-based data in order to

10   produce a report that can be used to discuss my findings here

11   in court or for an agency who's conducting some investigation.

12   Q.    And you mentioned you're -- you currently work at

13   JurisLogic, correct?

14   A.    That is correct.

15   Q.    And when did you start working with JurisLogic?

16   A.    Well, actually I started work with the predecessor

17   company, Johnson-Laird, Incorporated, I think it was about

18   1987 or 1988 and worked with them on and off over the years

19   when they needed the languages that I spoke, you know, the

20   computer languages I spoke or needed some of my specialized

21   skills, and then in 1997, I made the switch full-time and

22   joined the Board of Directors for Johnson-Laird and became

23   their senior managing consult, and we re-branded the company

24   as JurisLogic in 2017.

25   Q.    And how does forensics, as you'd use the term, relate to

B. Frederiksen-Cross - Direct

411

1   computers and software?

2   A.   Well, a lot of the work that I do involves, for instance,

3   inspecting software to understand how it operates, what it

4   does, what kind of data it produces, or in some cases actually

5   looking at the data that's produced by computer systems to

6   examine different bodies of data and say is this data

7   consistent and does it -- is it consistent with the software

8   itself?

9   Q.   And at a high level, what types of matters have you

10  worked on while at JurisLogic?

11  A.   It runs the gamut.  A fair amount of our work is

12  intellectual property, so patent, copyright, trade secret that

13  involve computer software.  I've also done computer -- or

14  criminal work, computer investigations in the context of

15  criminal work, which can include fraud, several murder

16  investigations, computer sabotage, and in various types of

17  intrusion in computer systems.

18  Q.   Let's, let's take that a step at a time.  In terms of the

19  civil side of civil litigation, could you tell the jury, maybe

20  name some of the clients who you've worked for?

21  A.   Sure.  I've worked on behalf of Microsoft, on behalf of

22  Oracle, the University of Pittsburgh in a patent matter, Levi

23  Strauss in several different matters that were internal

24  investigations and a couple of criminal investigations.

25  Q.   Sure.  Is that a complete list of the clients for whom

B. Frederiksen-Cross - Direct

412

1    you've worked while at JurisLogic?

2    A.   No.  I've worked on several hundred different cases, but

3    those are the ones that I think maybe would more recognizable

4    by name.

5    Q.   And when you say several hundred different cases, are you

6    talking with computer forensics matters?

7    A.   That is correct, yes.

8    Q.   And now you mentioned criminal matters.  Have you worked

9    with law enforcement on those matters?

10   A.   Yes.  I've worked both as a consultant to the FBI and to

11   the Department of Justice and also to local police departments

12   in several venues.

13   Q.   Ms. Frederiksen-Cross, do you belong to any professional

14   organizations?

15   A.   The IEEE and ACM.

16   Q.   We've been, I think, chuckling as each witness in this

17   case, as we do in Washington, D.C., uses acronyms, and you're

18   holding true to that.  Could you tell the Court what ACM is?

19   A.   Yeah.  It used to stand for Association of Computing

20   Machinery, but it's an educational institution that does

21   research and publication in the field across a broad spectrum

22   of computer-related or software-related areas of interest, I

23   guess I would say.

24   Q.   And you mentioned IEEE; is that correct?

25   A.   Yes.

B. Frederiksen-Cross - Direct

413

1    Q.    And what is that?

2    A.    That was originally an association of electrical

3    engineers but has also emerged as one of the, you know, the

4    leading organizations in the world that does peer-reviewed

5    research and publication of peer-reviewed research.

6    Q.    Ms. Frederiksen-Cross, I'm going to hand up to you a

7    document that's been marked as -- what we refer to as PX 494.

8    Ms. Frederiksen-Cross, do you recognize that document?

9    A.    Yes.  It's a copy of my résumé.

10   Q.    And does that résumé summarize your educational history

11   and work experience and publications?

12   A.    It's a high-level summary, yes.

13             MR. ZEBRAK:  Your Honor, we'd move the admission of

14   PX 494.

15             THE COURT:  Any objection?

16             MR. BRODY:  On the understanding we can do the same,

17   no objection.

18             THE COURT:  Yeah.  It will be received, and the same

19   ruling will apply to all of our experts unless there are

20   specific objections to the content, okay?  All right.

21             MR. ZEBRAK:  That's fine, Your Honor.

22             THE COURT:  All right.  Thank you.

23             MR. ZEBRAK:  Mr. Duval, could I have the clicker for

24   us to publish this?

25   BY MR. ZEBRAK:

414

1    Q.    Ms. Frederiksen-Cross, have you authored publications in

2    the field in which you practice?

3    A.    I have.

4    Q.    And are those listed on this document?

5    A.    They should all be here, yes.

6           MR. ZEBRAK:   Please publish it to the jury.  Thank

7    you.  Could you scroll down to the list of publications?

8    BY MR. ZEBRAK:

9    Q.    And, Ms. Frederiksen-Cross, we're not going to take these

10   one by one, but roughly speaking, how many publications have

11   you, have you authored that are listed here on this résumé of

12   yours?

13   A.    Between 75 and 80.

14   Q.    And are these geared toward any particular audience?

15   A.    They are -- most of the presentations are directed to the

16   legal community to help educate them about issues relating to

17   forensics and the handling of electronic evidence.  Some were

18   directed to law enforcement, and some were published in

19   peer-reviewed technical journals.

20   Q.    And is there any particular field or fields that these

21   publications generally relate to?

22   A.    They mostly relate to computer forensics or software

23   forensics.

24   Q.    And, Ms. Frederiksen-Cross, this résumé also lists

25   matters in which you've testified in litigation; is that

B. Frederiksen-Cross - Direct

415

1    correct?

2    A.    That is correct.

3    Q.    And again, we're not going to take this one by one, but

4    in what capacity were you involved in these cases generally?

5    A.    As an expert witness providing testimony on technical

6    matters, typically software or computer-based data.

7    Q.    And were you admitted to testify as an expert in these

8    cases?

9    A.    I've been admitted to testify as an expert in federal and

10   state court on 26 occasions.

11   Q.    And I see a reference before the trial testimony to --

12   there's a column labeled -- header labeled "Court Appointed

13   Expert."  Could you please explain what that means?

14   A.    Yes.  I served as the data systems advisor to the

15   Honorable Judge Marvin Garbis in the U.S. District Court for

16   the District of Maryland for a number of years.

17   Q.    And in what capacity did you serve?

18   A.    I was providing advice to the court and to the special

19   master in a case that involved the provision of special ed

20   services to students in the district and helping the court to

21   understand some of the computer technology at issue and some

22   of the issues related to problems with that system.

23   Q.    And again, we're not going to go through each of these

24   trial testimony matters, but did you only testify on behalf of

25   either plaintiffs or defendants in those cases?

416

1    A.    I think it's fairly evenly divided between plaintiffs and

2    defendants.

3    Q.    Thank you.

4          Ms. Frederiksen-Cross, are you being paid for your

5    work in this matter in terms of the time you invest?

6    A.    I am compensated at an hourly wage, yes.  I mean, my

7    company is.  I get a flat salary, but --

8    Q.    And what is the hourly rate?

9    A.    JurisLogic is paid $595 an hour for my time.

10   Q.    And roughly speaking, do you have an understanding as to

11   how much time you've spent working on this matter so far?

12   A.    I believe I have about 400 hours working on this matter

13   thus far.

14   Q.    And does the payment of the fees that we've just talked

15   about for your hard work in this matter, does that in any way

16   depend on what opinions you provide?

17   A.    Not at all.

18   Q.    And does the payment of those fees in any way depend upon

19   the outcome of this case?

20   A.    Not at all.

21         MR. ZEBRAK:  Your Honor, we'd move the admission of

22   Ms. Frederiksen-Cross as an expert.

23         THE COURT:  In any particular field?

24         MR. ZEBRAK:  Yes.

25         THE COURT:  Do you want to narrow it?

B. Frederiksen-Cross - Direct

417

1          MR. ZEBRAK:  Yes, Your Honor.  In the analysis of

2    computer software and computer-generated data.

3          THE COURT:  All right.  Any objection?

4          MR. BRODY:  I have no objection to her opining, Your

5    Honor.  I do have an objection as to -- I mean, we can do it,

6    too, but normally I would object to asking the Court to

7    certify her as an expert.

8          THE COURT:  I didn't hear the last couple of words.

9    Serving as --

10         MR. BRODY:  I have no objection to her opining,

11   giving opinion testimony.

12         THE COURT:  All right.

13         MR. BRODY:  I -- and we can do this with all the

14   experts if that's the practice, but normally I would object to

15   the Court -- asking the Court to certify the witness as an

16   expert.

17         THE COURT:  All right.  I understand now.  Thank

18   you.

19         I find that Ms. Frederiksen-Cross has the

20   educational and professional qualifications to testify on the

21   subjects that she's been asked to testify on.

22         All right.  Go ahead.

23         MR. ZEBRAK:  Thank you, Your Honor.

24   BY MR. ZEBRAK:

25   Q.   Ms. Frederiksen-Cross, are you familiar with the name

B. Frederiksen-Cross - Direct

418

1    MarkMonitor?

2    A.    I am, Counsel.

3    Q.    And what is your understanding of what MarkMonitor is?

4    A.    MarkMonitor is an antipiracy company, amongst other

5    things, and in the context of this case, their role was to

6    attempt to detect illicit trading of files on peer-to-peer

7    networks and to provide e-mailed notification of the events

8    that they detected to Cox.

9    Q.    And what is your understanding of why MarkMonitor was

10   engaged in that activity?

11   A.    They were engaged on behalf of the RIAA to provide that

12   information so that Cox would be able to take action upon

13   those notices.

14   Q.    And we're going to talk about this in much more detail in

15   a while, but these were notices of what?

16   A.    They were notices where MarkMonitor had detected Cox

17   subscribers who were using the peer-to-peer network on the

18   internet to copy and distribute files which belonged to the

19   recording companies.

20   Q.    And when you say files that belong to the recording

21   companies, what do you mean by that?

22   A.    Music files that were being traded using these

23   peer-to-peer networks.

24   Q.    And --

25   A.    Copyrighted music files specifically.

B. Frederiksen-Cross - Direct

419

1    Q.   And why was MarkMonitor reporting that to Cox

2    specifically?

3    A.   Well, because in the case of those particular detections,

4    Cox had been identified as the internet service provider who

5    was giving those individuals access to the internet.

6    Q.   All right.  So -- by internet service provider, I presume

7    you -- we're going to by shorthand just call that an ISP; is

8    that all right?

9    A.   That would be great.

10   Q.   Now I'm violating the rule of -- I'm going from the long

11   phrase to an acronym.  Before, I asked you to go the other

12   direction.

13           What is an ISP?

14   A.   An internet service provider, or ISP, is a company that

15   provides access to the internet for its customers so that they

16   are able to connect their computers, their home or their

17   business computers to the internet.

18   Q.   And do you have an understanding of when MarkMonitor sent

19   the notices relevant to this case to Cox on behalf of the

20   RIAA?

21   A.   I think that the time period of greatest interest is 2013

22   and 2014.  The evidence I have received was actually notices

23   for a little broader period, from 2012 through 2015.

24   Q.   And I believe you made a reference to MarkMonitor

25   monitoring for certain music files on peer-to-peer networks.

B. Frederiksen-Cross - Direct

420

1    Was that correct?

2    A.    That is correct.

3    Q.    Which specific peer-to-peer networks was MarkMonitor

4    trying to detect the sharing of music files on?

5    A.    There are four particular networks that MarkMonitor was

6    monitoring.  Those are BitTorrent, Ares, eDonkey, and

7    Gnutella, G-n-u-t-e-l-l-a.

8    Q.    Thank you.

9          And in the course of your work in this matter, did

10   you have the opportunity to review the MarkMonitor system that

11   was used to detect the sharing of these music files and report

12   that to Cox?

13   A.    Yes, I did.

14   Q.    And at a high level, what did your review consist of?

15   A.    I reviewed the source code for those systems, that is to

16   say, the human readable form of their computer programs.  I

17   also had the opportunity to interview MarkMonitor engineers,

18   and I was provided some documents that gave me some background

19   about the systems in anticipation of those reviews.

20         I also reviewed evidence that is produced or

21   collected by those systems, that is to say, the

22   contemporaneous records that those systems generate as they go

23   about their business.

24   Q.    And is that a complete recitation of everything you've

25   looked at, or is that just a summary?

B. Frederiksen-Cross - Direct

421

1  A.   That's just a summary.  There was a lot of material.  You

2  know, I've also seen deposition transcripts from some of --

3  and declarations from some of the MarkMonitor personnel and

4  other personnel who were involved in software used in these

5  systems.

6  Q.   And you mentioned, I believe you said you spoke with

7  MarkMonitor engineering employees.  Was that correct?

8  A.   Yes, with some of their engineers.

9  Q.   Did you speak with anyone else at MarkMonitor?

10  A.   There were two specific individuals, Sam Bahun and a

11  gentleman whose last name I'm sure I will mangle with a

12  Russian last name.

13  Q.   That's okay.  And, I'm sorry, I know you mentioned source

14  code and you gave a bit of a short description of what that

15  is, but could you please give the jury a little more of an

16  understanding of what source code is?

17  A.   Sure.  When programmers write a program, they do so in a

18  computer language that's designed specifically to facilitate

19  giving that instruction to the computer, and it's an

20  artificial language, but it has a syntax and verbs and nouns

21  you create and data structures, and you write out the

22  instructions that the computer is to perform.  Those then get

23  translated into the form that the computer actually uses.

24  Q.   And are you familiar with the name Audible Magic?

25  A.   I am.

B. Frederiksen-Cross - Direct

422

1   Q.    And what is Audible Magic?

2   A.    Audible Magic is one of the leading content

3   identification services.  I believe they are the leader in the

4   Western world at least.  And the services they provide,

5   amongst other things, are the identification of sound

6   recordings and movies and other types of electronic content,

7   but as they relate to this case, it's sound recordings.

8   Q.    And what do you mean by an "identification of sound

9   recordings"?

10  A.    Well, you can submit a recording that maybe you don't

11  know what the title and artist is to them or even a snippet of

12  a recording, and they are able using a proprietary and

13  patented technology to figure out what artist and title that

14  is and whether it's a copy of a, of a particular song.

15  Q.    And could you please explain at a high level your

16  understanding of Audible Magic's relationship to this case?

17  A.    Yes.  Audible Magic is a company that is used by

18  MarkMonitor to provide song identification services.  So when

19  MarkMonitor collects a song from one of these peer-to-peer

20  networks, in order to verify that that song is what they think

21  it might be, they submit it to Audible Magic to get an

22  identification.

23  Q.    And did you do any investigation in the course of your

24  work in this case with respect to the Audible Magic system?

25  A.    I did.

423

1    Q.   And did you come to any conclusions about the Audible

2    Magic system?  Just a yes or no question.

3    A.   Yes, yes.

4    Q.   And are you prepared to discuss those today?

5    A.   I am.

6    Q.   Thank you.

7         And did you come to conclusions with respect to the

8    overall MarkMonitor system?

9    A.   Yes, I did.

10   Q.   And are you prepared to discuss those today?

11   A.   Yes, I am.

12   Q.   At a high level, what was your conclusions about the

13   MarkMonitor system, including the Audible Magic system used as

14   part of it?

15   A.   Based on the evidence I've reviewed and examined, it's my

16   opinion that that system both accurately detects acts of

17   copying and distribution on the internet on these peer-to-peer

18   systems, and it also provides and produces accurate notices

19   that can be sent to an ISP like Cox to notify them of that

20   activity.

21   Q.   Thank you.

22        Ms. Frederiksen-Cross, were you in the courtroom on

23   Monday for the parties' opening statements?

24   A.   I was, Counsel.

25   Q.   And did you hear Cox's counsel argue that, in very stark

B. Frederiksen-Cross - Direct

424

1    terms, that there's no evidence of infringement in this case?

2    A.    I heard that argument.

3    Q.    And what do you think about that?

4    A.    I completely disagree.  I think that the amount of

5    evidence in this case is overwhelming that there were Cox

6    subscribers who were copying and distributing the plaintiffs'

7    music files on the internet.

8    Q.    And we're going to discuss the basis for your opinion in

9    much more detail today, but at a high level, would you please

10   explain why you believe what you just said?

11   A.    It is based first on a foundation of my understanding of

12   these peer-to-peer technologies, how they operate and the way

13   in which they allow the distribution and copying of content,

14   and then upon the specific evidence that I reviewed with

15   respect to the activity of Cox subscribers, and finally on my

16   inspection of the source code as well to understand exactly

17   how that worked and how it was able to do this detection and

18   how the notices were provided.

19   Q.    And finally, I believe you said you did some work with

20   respect to reviewing the Cox CATS system; is that correct?

21   A.    That is correct, Counsel.

22   Q.    And, generally speaking, what is the CATS system?

23   A.    CATS stands for the Cox Abuse Tracking System, and it's a

24   system that's designed to receive e-mails that are abuse

25   complaints and then to take the actions that Cox has

B. Frederiksen-Cross - Direct

425

1    programmed for that system to take based on those

2    notifications it receives.

3    Q.   And did you have an opportunity to review the CATS system

4    during your work in this case?

5    A.   Yes, I have.

6    Q.   And at a -- are you prepared to discuss that review

7    today?

8    A.   I am.

9    Q.   And at a high level, what is your conclusions with

10   respect to the CATS system?

11              MR. BRODY:  Your Honor, may I approach, please?

12              THE COURT:  Yes, sir.

13              NOTE:  A sidebar discussion is had between the Court

14   and counsel out of the hearing of the jury as follows:

15   AT SIDEBAR

16              MR. BRODY:  I have no objection to him asking her to

17   describe the operation of the system, but she specifically

18   disclaimed having any opinions -- of the CATS system that

19   is -- but she specifically disclaimed having any opinions

20   about the effectiveness of the system, and if we're not going

21   to go there, then that's not a problem.

22              MR. ZEBRAK:  I mean, that's a very high-level

23   question.  You're well acquainted with her testimony.  Do you

24   have a reason to think that she's testifying about the

25   effectiveness of these systems?

B. Frederiksen-Cross - Direct

426

1          THE COURT:  He's asking you what you can ask here in

2  trial.

3          MR. ZEBRAK:  Yes, sir.

4          THE COURT:  And if it's in the report and it's part

5  of the discovery, then it's fair game.

6          MR. ZEBRAK:  Yes, Your Honor.

7          THE COURT:  If it's something that wasn't covered,

8  it's not.

9          MR. ZEBRAK:  Yes, Your Honor.  And I perfectly

10  acknowledge and respect the fact that she's not testifying

11  outside her report.  We have no intention nor do I have any

12  reason to believe she's going to testify about the

13  effectiveness of the CATS system.  I merely asked that

14  question because this appears to come out of the blue, and I'm

15  just surprised by it.  That's why.

16          MR. BRODY:  It's paragraph 8A of her reply report,

17  but if he's not going to ask about it, that's fine.

18          MR. ZEBRAK:  No, I don't.

19          THE COURT:  All right, thank you.

20          MR. BRODY:  Thank you.

21          THE COURT:  Thank you.

22          NOTE:  The sidebar discussion is concluded;

23  whereupon, the case continues before the jury as follows:

24  BEFORE THE JURY

25          THE COURT:  All right.  Please continue.

B. Frederiksen-Cross - Direct

427

1          MR. ZEBRAK:  Thank you, Your Honor.

2     BY MR. ZEBRAK:

3     Q.   Ms. Frederiksen-Cross, let's dig in in a little more

4     detail to some of the technological background in this case.

5          And, Your Honor -- excuse me, strike that.

6          Ms. Frederiksen-Cross, could you explain what

7     happens when someone sits down at their computer and types in

8     a website, a URL?

9     A.   Yes, I can, and I've actually provided -- or produced

10    with the assistance of the trial graphics folks a few slides

11    that might help the jury follow that, if I can be allowed to

12    use them.

13    Q.   Sure.  And you mentioned slides.  Do those slides relate

14    just to the question I asked or do they speak to your overall

15    conclusions in this case?

16    A.   More broadly to my overall conclusions, but I have slides

17    for that specific question.

18    Q.   And are those slides an accurate and fair representation

19    of what you're prepared to testify on today?

20    A.   Yes.

21          MR. ZEBRAK:  Your Honor, permission to publish the

22    slides as demonstratives?

23          THE COURT:  Any objection?

24          MR. BRODY:  No, Your Honor.

25          THE COURT:  All right.

B. Frederiksen-Cross - Direct

428

1          MR. ZEBRAK:  Thank you.  Mr. Duval, if you could

2    bring it up?

3    BY MR. ZEBRAK:

4    Q.   So turning to the first slide, it says -- would you walk

5    the jury through?  It says:  Basics of internet communication

6    requests.  Can you explain to the jury what the purpose of

7    this slide is?

8    A.   Yeah.  What I'd like to do with this slide is to just

9    introduce a little terminology and just to show you some of

10   the basic interactions that a computer has when it

11   communicates with another computer across the internet.

12   Q.   Okay.  And let's kind of take this a step at a time and

13   explore this slide.  So there's a computer on the left side

14   that says -- or there's actually three users, Users 1, 2, and

15   3, within a box that says, "Cox."  What is that depicting?

16   A.   Okay.  This is in miniature a selection of Cox customers

17   who might be using Cox's service to access the internet.  This

18   could be any really ISP, but because Cox is in this case, I've

19   chosen them.

20   Q.   Okay.  And beneath User 1, I see a reference to an IP

21   address.  Could you explain what that is?

22   A.   Yeah.  Just like your home has a street address that

23   allows mail or parcels to be delivered to you, computers also

24   have an address that allows communication that's going to or

25   from that computer to be identified as the sender or

B. Frederiksen-Cross - Direct

429

1    recipient.

2    Q.   And beneath it -- oh, and it says, "IP address," and it

3    has a long string of numbers.  What do those numbers

4    represent?

5    A.   Those numbers represent a specific communication point on

6    the internet.  So when a message comes from that, from a

7    computer with that number, or goes back to a computer with

8    that number, that's how the message gets routed to the right

9    location, the right destination.

10   Q.   Thank you.  And would Users 2 and 3 have -- what, what

11   would that reflect with respect to their IP addresses?  Would

12   it be the same as what we see for User 1 or something

13   different?

14   A.   Unless they were, like, within the same network, for

15   instance, within the same home or the same business, they

16   would typically have their own.

17   Q.   But let's say if they were three separate homes.  They

18   would each have their own IP addresses?

19   A.   That's correct, yes.

20   Q.   But they'd all be IP addresses where Cox is providing

21   individuals from that home with access to the internet; is

22   that correct?

23   A.   Right.  In this example, each of those homes would be

24   getting their service through Cox.

25   Q.   And what -- beneath the IP address, I see something, the

B. Frederiksen-Cross - Direct

430

1    words "port number."  Could you explain what that signifies?

2    A.    Yeah.  If we go back to our example of a letter that is

3    being exchanged between two people, the street address says

4    where to deliver it, or the IP address in this instance.  The

5    port number says who to deliver it to.

6             So, for instance, a particular program like a web

7    browser would have one port number where a different program,

8    like, maybe a streaming TV service, would have a different

9    number, and so when information comes in from the internet to

10   that IP address, the port number can be used to associate that

11   information with the program that's going to handle it.

12   Q.    And on the right side of this slide, there's the

13   word "server."  Could you explain what that's depicting?

14   A.    Yeah.  I'm going to use a really simple example here of

15   one computer getting information, like a file or web page,

16   from another computer on the internet.  So a server is a

17   computer that provides content to others, and it might be an

18   e-mail server, it might be a video server.  You know, there's

19   all different kinds of content that could be provided.  But

20   it's typically a computer that is sending -- or responding to

21   a request for information and sending that information back.

22   Q.    At a -- maybe a more generalized level, would that

23   include, let's say, a user visiting a website?

24   A.    Sure.  A web server would be an example of that.

25   Q.    So, for instance, if User 1 visited cnn.com, is that what

B. Frederiksen-Cross - Direct

431

1    would be depicted here?

2    A.   In a simplified version, yes.

3    Q.   And there's a reference to an IP address above server,

4    but it looks like it's a different IP address number than we

5    see in the -- as compared to User 1.  Why, why are they

6    different?

7    A.   Well, again, just as two houses won't have the same

8    street address, two computers on the internet or two entry

9    points to a computer system won't have the same IP address.

10   Q.   And then what happens when the user makes a request to

11   the server?

12   A.   If we could advance the slide, User 1 would send a

13   request through the internet, and it would be routed to that

14   other -- that second address to the server address.  So it

15   would be a request for information of some sort, then packaged

16   with the IP address and the routing information required to

17   get it there.

18   Q.   And then what happens once that request reaches the

19   server?

20   A.   The server would process the request, look up the

21   requested file or page, and then part of that package of

22   information that goes just like an envelope has the sender and

23   the recipient, that package is encapsulated with that same

24   kind of information but for the IP address, and so the server

25   can take the recipient's address and say, ah, I know who to

B. Frederiksen-Cross - Direct

432

1   send this -- or, I'm sorry, the sender's address, and say, ah,

2   I know who the recipient of my message is, and encapsulate its

3   own message and send it back so that that message, in this

4   case the web page, gets sent back to the appropriate computer

5   that had requested it.

6   Q.   And do you have a slide that depicts what happens during

7   the response?

8   A.   I do, yeah.  If we could -- if we could advance to the

9   next slide?

10   Q.   All right.  So -- well, first of all, what is file types?

11   Why do you have that on this slide?

12   A.   Oh, just to underscore the point that a server might be

13   serving almost any kind of file.  It could be a data file, it

14   could be a document, it could be a web page, it could be a

15   music file, it could be a YouTube video or a movie.  You know,

16   there's all sorts of different content that are exchanged in

17   essentially the same way.

18   Q.   But is it your testimony that the users receive back the

19   response because their request includes their IP address?  Is

20   that essentially how it works?

21   A.   Yeah.  The request would include not only their IP

22   address, of course, but what specific information they're

23   requesting.

24   Q.   And could you explain what a peer-to-peer protocol is?

25   A.   Yes.  A peer-to-peer is a different kind of file

B. Frederiksen-Cross - Direct

433

1    distribution system that's also used on the network.  And I

2    have a few slides about peer-to-peer that might help

3    illustrate that as well.

4    Q.   And what's being illustrated in this slide?

5    A.   One of the principal differences between client server

6    and peer-to-peer is that in a peer-to-peer network, any

7    computer that's in that network can be sending or receiving

8    information from any other computer.  So it -- the boundaries

9    of who's the sender and who's the receiver are, are less

10   clearly defined because each computer is both a sender and a

11   receiver.  That's why they're called peers.  They're equal

12   within the network.

13   Q.   And you've used the phrase "peer-to-peer protocol" and, I

14   believe, "peer-to-peer network."  Is there a difference

15   between the two?

16   A.   The protocol is what enables the exchange -- and that's

17   the proper technical term really -- but these are often

18   referred to as peer-to-peer networks because it's a group of

19   computers who are intercommunicating, and so in that sense, it

20   is a network.  They're networking.

21   Q.   So the network are the groups of computers or peers

22   communicating with each other on that protocol; is that

23   correct?

24   A.   That's correct.

25   Q.   Are you familiar with the term "file share"?

B. Frederiksen-Cross - Direct

434

1    A.    Yes, I am.

2    Q.    And what does that refer to?

3    A.    A file sharing network is a network that uses a protocol

4    in order to facilitate the -- typically the copying and

5    distribution of files.  Sometimes it's used for files that

6    just -- or for networks that just distribute.  But in this

7    context that we're going to talk about here, it's a network

8    that's used to both copy and distribute.

9    Q.    Now, you mentioned that -- you mentioned BitTorrent,

10   Ares, Gnutella, and eDonkey.  Are those file sharing networks?

11   A.    They're file sharing protocols whose users together form

12   the networks.

13   Q.    And, you know, when I think of the term "sharing," I

14   think of maybe loaning someone a book that I just bought from

15   the bookstore.  Is that -- is that how it works in file

16   sharing?

17   A.    No.  With electronic file sharing, a copy is distributed

18   such that -- like, if I have a file and I, I share a copy with

19   you, I'm actually creating a copy of that work and providing

20   you with that copy I've created.  So I still have my copy, and

21   now you have a copy, too.

22   Q.    Now, you mentioned that MarkMonitor monitored four

23   peer-to-peer file sharing networks for the RIAA; is that

24   correct?

25   A.    That is correct, yes.

B. Frederiksen-Cross - Direct

435

1   Q.   With respect to the notices that MarkMonitor sent to Cox,

2   was -- did they relate to each of those four networks equally,

3   or was -- did the notices involve one network at a higher

4   level?

5   A.   The primary network was BitTorrent.  That is to say, it

6   had the largest volume of notices, in the order of 60 to 65

7   percent of the notices were BitTorrent, and then followed by

8   Ares, which had roughly 30 percent of the notices, and then

9   the others were much smaller.

10  Q.   Okay.  Are you prepared today to talk about these four

11  networks, though?

12  A.   I am, yes.

13  Q.   All right.  I'm going to advance the slide, if that's all

14  right.

15  A.   Yes, please.

16  Q.   Okay.  So just to be clear, these are different file

17  sharing systems; is that correct?

18  A.   Yes.  They each have their own peculiarities and

19  protocols, but they operate in essentially the same fashion

20  and for the same purpose.

21  Q.   What do you mean by that?

22  A.   Well, the purpose of each of these protocols is the

23  efficient and robust distribution of copies of files.  I mean,

24  that's what they were designed to do, is to allow people to

25  copy and distribute content using their specific protocol.

B. Frederiksen-Cross - Direct

436

1    Q.   And is there a common technique upon which these

2    peer-to-peer file sharing systems each rely?

3    A.   Well, they have several common characteristics.

4    Obviously, they're all designed to operate on the internet, so

5    they all rely on internet connections to be able to carry out

6    the distribution.  They also all rely very heavily on a

7    technique called hashing for file identification and for

8    authentication of content.

9    Q.   Could you elaborate on what hashing is?

10   A.   Yeah.  I think if we go to the next slide, I'd like to

11   introduce an icon here that I'll be using throughout too.

12   This little fingerprint icon is going to be used when I talk

13   about hashing, just to help to remind you about that, but

14   hashing is a technique -- or a hash is a technique that was

15   developed by the U.S. government.  It's based on a specific

16   calculation of the file's contents, and it uniquely identifies

17   what a file's contents are.

18        So if you have a hash that you have gotten from one

19   file and you see that hash again, you know that the file --

20   the second file with that same hash has got the same contents.

21   Q.   And if you could turn your attention back to the image on

22   this, on this slide, it looks like there's a fingerprint with

23   a little icon in the lower right.  What is that depicting?

24   A.   This is the hash that represents a particular file.  So I

25   have combined the fingerprint, because sometimes these are

B. Frederiksen-Cross - Direct

437

1    called digital fingerprints, with the file icon to distinguish

2    this.  Because we'll be talking about another kind of hash

3    algorithm later on in this matter, or another kind of

4    fingerprint actually.  It's not a hash, per se.

5    Q.    But this symbol here with the little file icon, you're

6    referring to that as a file hash?

7    A.    Yes, that's correct.

8    Q.    Okay.  And you mentioned that this hash technology was

9    created by the U.S. government.  Is that correct?

10   A.    Yes.  It was developed originally by the NSA for secure

11   communications.

12   Q.    Could you expand upon that a little bit?

13   A.    Well, if I send an important message to you, you're going

14   to want to have a way of making sure that that message hasn't

15   been tampered with in any way, or that during transmission,

16   you know, no part of the message has been lost, and so one way

17   that, that I can ensure that or can help you ensure that is to

18   also send the hash of the file, and that way, when you receive

19   the file, you run the same computation that I originally ran

20   to generate the hash, as you've got the same program, and by

21   comparing the two hashes, you know that the content is exactly

22   the same as what I sent if the hashes match.

23          And if there's any difference, even the tiniest

24   difference, the hashes won't match, and you know something is

25   wrong, and you can say:  Hey, send me that file again.

B. Frederiksen-Cross - Direct

438

1    Something happened.

2    Q.   When you talk about a tiniest difference, let's say it's

3    a long ten-page letter.  If one word changes or someone, you

4    know, goes into the file, deletes one word, will the file

5    still have the same hash when it's saved?

6    A.   No, not at all.  If any character changes, even if an

7    extra space is added, that file is going to have a different

8    hash.

9    Q.   But if you know -- so then if you know the contents of a

10   file and you know its hash, every time you look at a file's

11   hash, you know its contents; is that what you're saying?

12           MR. BRODY:  Your Honor, objection.

13           THE COURT:  It's leading, yeah.  Sustained.

14           MR. ZEBRAK:  That's fine.  We can --

15           THE COURT:  Reask the question if you'd like.

16           MR. ZEBRAK:  Yeah.  I think it's -- quite frankly,

17   we've covered it.  I'll just move on.

18           THE COURT:  Okay.  Thank you, sir.

19   BY MR. ZEBRAK:

20   Q.   Could you explain the context in which hashes are used?

21   A.   They're actually used all the time in, in everyday

22   applications.  Banking transactions, financial transactions,

23   wire transfers of money, those things are all -- use one form

24   or another of hashing to help ensure that the message is

25   transmitted accurately.

B. Frederiksen-Cross - Direct

439

1            It's also used to secure and authenticate documents,

2      so for instance, if I was sending my will to my attorney, I

3      would also send a hash with it and ask him to verify the hash

4      just to make sure that there was -- you know, nothing had gone

5      amiss or scrambled in that document.

6            And it can also be used, obviously, in much more

7      serious contexts.  If a general was sending some information

8      about where to muster troops, they might want to not only

9      encrypt that information for secure transmission but also send

10     a hash to make sure that there was no inadvertent or

11     deliberate tampering of that message in its, in its course of

12     delivery.

13     Q.   What relationship, if any, do hashes have to this case?

14     A.   All, all four of the peer-to-peer clients that we're

15     going to talk about rely on hashes to identify content and to

16     verify that content has been transmitted without corruption,

17     and the MarkMonitor system also relies on hashes to identify

18     content.

19     Q.   Sure.  And we're going to talk much more about the

20     MarkMonitor system, but what do you mean by the MarkMonitor

21     system relying on hash values?

22     A.   Well, for instance, to identify a particular unique sound

23     recording, the MarkMonitor system retains the hash value

24     associated with that particular file so that it can identify

25     that file whenever it encounters it again, and there are also

B. Frederiksen-Cross - Direct

440

1    some of the files that are used as part of the mechanics of

2    the BitTorrent system that have their own hashes, and

3    MarkMonitor also retains a record of those hashes.  And we'll

4    get into that, I think, in a little more detail once I've

5    introduced the right terminology.

6    Q.   Are there different types of hash values?

7    A.   There are different types, that is to say, they're

8    created using different mathematic algorithms, but they also

9    operate in essentially the same, same way.  They apply a

10   computation against the contents of a file and get back this

11   value that represents the contents, that is to say, it's

12   associated with the contents of the file.

13   Q.   And is it fair to describe hashes as a file

14   identification technique?

15   A.   It's very widely used for that.  We use it extensively in

16   forensics as well to identify duplicate files, or if we're

17   tracing the transmission of a file to point-to-point and want

18   to see if it showed up on multiple computers, we use hash

19   techniques to do that.

20   Q.   Does a file's hash value change over time?

21   A.   Not unless its contents does.  So if I were to create a

22   file -- a hash today for a file, that same file -- that would

23   be the same hash I would get tomorrow or five years from now

24   for that same file unless something had changed in the file.

25   Q.   So what happens if I upload a file to the internet and it

B. Frederiksen-Cross - Direct

441

1  gets passed around and just copied, copied and copied and

2  copied?  Without any changes to the file, the same file itself

3  is just copied.  Will those have different hash values?

4  A.   No.  Each of the copies will have the same hash file

5  unless there was something in the copying process that changed

6  the file.  So if part of the file was chopped off, for

7  instance, you would get a different hash, but if it's a

8  perfect copy of the file and it goes out, each copy will have

9  an identical hash and can be recognized through that hash when

10 you, when you look at the hash value for the file.

11 Q.   So let's talk a little bit more about BitTorrent.  Could

12 you generally explain to the jury what BitTorrent is?

13 A.   Sure.  BitTorrent is one of these peer-to-peer protocols

14 that is used to copy and distribute files.

15 Q.   And do you have an understanding of the popularity of

16 BitTorrent versus other peer-to-peer networks?

17 A.   It's probably at this point in time still the most

18 popular of the file distribution networks.  At any point in

19 time, there will be between 15 and 30 million users on

20 exchanging files using that technology.

21 Q.   And could you walk the jury sort of at a high level how

22 BitTorrent works?

23 A.   Sure.  If we can advance the slide, what I'd like to do

24 is sort of show you the steps that a user would go through to

25 be able to use BitTorrent.

B. Frederiksen-Cross - Direct

442

1  Q.   Sure.  So -- okay.  So could you walk us through what

2  step 1 is here?

3  A.   Yeah.  The first thing a user has to do to be able to use

4  BitTorrent is they have to download and install on their

5  computer the BitTorrent software.  So just like you have to

6  have Microsoft Word to use Word or an e-mail client to use

7  e-mail, you have to have the BitTorrent software on your

8  computer in order to be able to use BitTorrent.

9  Q.   Okay.  And there's a set of dots going from the user

10  through the internet to something depicted at the top of the

11  slide.  Could you explain to the jury what that is showing?

12  A.   Yeah.  uTorrent is one of the more popular BitTorrent

13  clients, so I've borrowed their logo for the top of the slide

14  there, and this just shows that a user would go out to the

15  internet, they could just Google "torrent client" or "uTorrent

16  client."  It would take them to a site, they click on it,

17  download it, it comes down to their computer, and then they

18  click on it again to install it.

19  Q.   And generally speaking, does it cost anything to download

20  a copy of that software and put it onto your computer?

21  A.   No, it's free.

22  Q.   Okay.  And what's, what's the -- I see a pirate ship on

23  the right.  What is that depicting?

24  A.   That's the logo of Pirate Bay, which is one of the sites

25  that someone can go to to get what's called a torrent file.

B. Frederiksen-Cross - Direct

443

1    The next step in the process is to get a torrent file for the

2    particular music you want.

3    Q.   And do you have an understanding about the popularity of

4    the Pirate Bay as a place for torrent files?

5    A.   It's one of the most popular places to go.  There's quite

6    a number of these sites, but it's probably the largest and

7    best indexed.

8    Q.   And just very briefly because we're going to explore this

9    in more detail in a moment, but could you, since we're talking

10   about it now, explain what a torrent file is at a very high

11   level?

12   A.   Sure.  It's a file that's used by BitTorrent to help you

13   locate the music you want.  It doesn't actually contain the

14   music, but it helps you get to the music.

15   Q.   Okay.  And finally, there's a bunch of computers labeled

16   "peers" down there.  Why are they on this slide?

17   A.   Well, they're the peers who have the copies of files that

18   you're looking for.  So if I were to go out to the internet

19   and say I want ZZ Top "Legs" and I say give me a torrent for

20   ZZ Top "Legs" and open that torrent on my computer, what would

21   happen is right away I would be automatically provided with

22   the information that -- the software would be provided with

23   the information and would be able to begin collecting the

24   pieces of that file from those peers.

25   Q.   And just for clarification, because we all have our own

B. Frederiksen-Cross - Direct

444

1   different tastes in music, but would you explain when you said

2   ZZ "Legs," what were you referring --

3   A.    ZZ Top "Legs."

4   Q.    Okay.  And that's a band and a song by them?

5   A.    Yeah.

6   Q.    Okay.  Thank you.

7           And -- okay.  And then what's being depicted here in

8   the third slide -- in the third step in a little more detail,

9   please?

10  A.   Well, as soon as you open that torrent file in your

11  client software, it automatically goes and gets this

12  information, goes out and begins establishing the connection

13  with those peers that will allow you to copy that content to

14  your machine and actually to distribute it to others as well.

15  Q.   Now, there's three steps listed here.  Does this mean if

16  I don't -- every time if I'm someone that wants to go get my

17  music from one of these peer-to-peer sites, that I have to do

18  each of these steps every time?

19  A.    No.  You just install the software once, and you could go

20  out to a site and download a whole bunch of torrents at once

21  if you want to, or you could download a torrent whenever you

22  want to go get some new music.

23  Q.   And generally speaking, I know you said it doesn't cost

24  anything to download the software.  Does it generally speaking

25  cost anything to download torrent files?

B. Frederiksen-Cross - Direct

445

1    A.   No.  That's free.

2         MR. BRODY:  Objection, Your Honor.

3         THE COURT:  Overruled.

4    BY MR. ZEBRAK:

5    Q.   I'm sorry.  So -- and does it cost anything to download

6    and distribute files with peers?

7    A.   No.  That's free, too.

8    Q.   And what's happening in that process at a very high

9    level?

10   A.   The peers are creating copies and distributing copies of

11   the particular song that's represented or songs.  It could be

12   a whole album or even a collection of albums that that torrent

13   file represents.

14   Q.   Okay.  And I know there's three steps, and I know you

15   said that you don't have to download the software each time,

16   but once you have the software on your, on your computer, is

17   it a complicated process to download the torrent files?

18   A.   No, not at all.  It's -- you go to Google and run a

19   search, or you go to one of these sites like Pirate Bay and

20   run a search, and then you download the torrent.  It's a

21   couple of clicks.

22   Q.   And -- okay.  Thank you.

23        Now, you mentioned and provided a little bit of an

24   overview of these torrent files.  Are you prepared to explain

25   those in a little bit more detail?

B. Frederiksen-Cross - Direct

446

1   A.   Sure.

2   Q.   I believe you have a -- there we go.

3   A.   Thank you.

4   Q.   And so what -- could you explain what this slide is

5   depicting?

6   A.   Yeah.  One of the really important things to understand

7   about a torrent file is it does not contain the music or the

8   software or the movie, whatever it is you're downloading.

9   Rather, it's just information that helps you locate it.  And

10  that's part of what makes it so hard to take any effective

11  action against a torrent-providing site, because there's

12  really nothing illegal they have in their file.

13  Q.   Well, let's explore that in a little more detail.  So --

14       MR. BRODY:  Your Honor, may I approach?

15       THE COURT:  Yes, sir.

16       MR. BRODY:  I have an objection.

17       NOTE:  A sidebar discussion is had between the Court

18  and counsel out of the hearing of the jury as follows:

19  AT SIDEBAR

20       THE COURT:  Yes, sir.

21       MR. BRODY:  I object to him asking her for an

22  opinion about legal strategy and how to pursue these people.

23       MR. OPPENHEIM:  I didn't hear it.

24       THE COURT:  The comment on BitTorrent, that it's

25  hard to detect.  There's nothing on BitTorrent that is being

447

1    stored, so -- is that what you're talking about?

2          MR. BRODY:  Maybe I misheard the question.  I

3    thought the question was:  Is that a reason why it's hard to

4    pursue these people?

5          MR. ZEBRAK:  No, sir, that's not what I asked.

6          THE COURT:  He didn't ask it.  She offered it on her

7    own there.  It was a little bit off the target of the

8    question, but she sua sponte, as they say, did that.

9          All right.  Let's move along.  The jury, we've got a

10   good jury.  They understand things.

11         MR. ZEBRAK:  You think they understand that?

12         THE COURT:  You know, and you keep saying "at a high

13   level," and we're going to get to the real specifics, but

14   you're actually getting to the specifics.

15         MR. ZEBRAK:  Okay.  Yes, sir.  And I don't mean to

16   make it sound like there's a large thing to follow.  I think

17   we're moving along at a fast clip, sir.

18         THE COURT:  Okay.  Thank you.  So, I mean, are you

19   moving to strike it?  I don't think it was --

20         MR. BRODY:  I don't think it needs to be -- if I

21   misheard, I misheard.  I thought he was asking her to draw --

22   to opine about why it would be difficult to sue people.

23         THE COURT:  Yeah.  No.

24         MR. BRODY:  Okay.  Then if we're not going there,

25   we're not going there.

B. Frederiksen-Cross - Direct

448

```
1               THE COURT:  Good.  Thank you, sir.

2               MR. BRODY:  Thank you.

3               NOTE:  The sidebar discussion is concluded;

4    whereupon, the case continues before the jury as follows:

5    BEFORE THE JURY

6    BY MR. ZEBRAK:

7    Q.   Thank you.

8               So you're explaining what a torrent file is, and I

9    believe you said it's not the content but it's -- and then you

10   were in the middle of explaining.

11   A.   Right.  It contains a couple of key pieces of information

12   that help the software that's running on your computer locate

13   the music files you're looking for.  So one of them is the

14   location of a computer called a tracker, and the other is

15   information about the music files you're seeking.  So that

16   includes the hash of the music file -- or the hash of this

17   particular collection of music files, it's not the hash for an

18   individual file, and other information that's used so that

19   when you collect that file, it can be verified to be an

20   accurate copy.

21   Q.   Does the person who's downloaded the software on their

22   computer need to understand how these torrent files work?

23   A.   Not at all.  All they need to know how to do is to

24   download a torrent file and to open it in their client.

25   Q.   And then just at a very high level, what's the function
```

B. Frederiksen-Cross - Direct

449

1    of a tracker?

2    A.    A tracker provides to the computer that's seeking music

3    or seeking this file a list of those other peers who are

4    sharing that particular file at that particular point in time.

5    It's not all the peers that are sharing it, but you get a nice

6    set of them.

7    Q.    Sure.  And then so what happens next in the process?

8    A.    If we can go to the next slide.

9           So on my computer, I've downloaded a torrent file,

10   and I've drug it into my torrent window or opened it from the

11   torrent software, and what will happen at that point without

12   any other activity on my part if I'm using the normal settings

13   is my computer will reach out to the tracker and get a list of

14   peers that I show over here on the left-hand side of the --

15   or, I'm sorry, on the right-hand side of the screen, and it

16   will begin requesting the music I want from those peers so

17   that it can assemble that file, and it can get a piece from

18   each peer or it can download the file in multiple pieces from

19   multiple peers at the same time, which makes the process

20   really fast, and it also makes it really robust because if one

21   of those peers goes away, well, there's somebody else I can

22   ask for the piece.  So it's a really efficient way to transfer

23   and copy data.

24   Q.    Sure.  You've used the phrase "piece."  What do you mean

25   by that?

B. Frederiksen-Cross - Direct

450

1   A.   Well, the sound file or files that I'm looking for will

2   be broken up into pieces, and one of the pieces of information

3   that the torrent has is what the size of that piece is.

4   Q.   And --

5   A.   And each of these peers that's using the same torrent to

6   exchange that same file will have the same size pieces, and it

7   will have whatever part of that song they currently have in

8   those pieces, and the torrent file helps you put them back

9   together.

10  Q.   Okay.  And so what's being depicted on the left side of

11  this slide?

12  A.   That's the computer that's just about to open a torrent.

13  Q.   Okay.  And in this example, the box around it, does that

14  illustrate how they're connected to the internet?

15  A.   Right.  In this case, Cox is providing that connection to

16  the internet.

17  Q.   Okay.  And what -- what's depicted in the -- so there's

18  different percentages on the computers on the right side of

19  the screen.  What is that?

20  A.   Well, at any point in time, as soon as you have a piece

21  that's been verified, your computer can be distributing that

22  piece to others.  It doesn't wait with BitTorrent until it has

23  the entire file.

24        So in this group of peers, some may have 100

25  percent, some may be just like you starting out with

B. Frederiksen-Cross - Direct

451

1    0 percent, and others might have some other number of pieces.

2    Q.   Okay.  So in this example, does the empty -- the user

3    connected through Cox, is the idea that that user doesn't have

4    anything at that point?

5    A.   That's right.

6    Q.   Okay.  Okay.  And then so what happens when the user has

7    the software on their computer and opens up a torrent file?

8    A.   The computer -- the user's computer will go out and do

9    what's called a handshake with each of these peers on this

10   forum so that, you know, do you have this file?

11              Yeah, I have this file.

12              And then they will begin exchanging pieces of the

13   file.

14              So if you could click here and watch the -- watch

15   what happens in the box on the computer.  You see that as it

16   collects those pieces, it very quickly is able to collect and

17   assemble all of the pieces, and at the same time, the peers on

18   the other side are also exchanging pieces with each other so

19   that they can all build complete copies of that file as well.

20   Q.   And then what happens?

21   A.   Well, once the, the, all of the pieces are collected, the

22   torrent file allows them to be reassembled in the proper

23   sequence so that the music can be played by the user.

24   Q.   And does the user have to do anything to put those pieces

25   together?

B. Frederiksen-Cross - Direct

452

1    A.    No, no.   That all happens automatically, just like the

2    distribution.   You know, as soon as a user computer gets a

3    piece, it can be sharing that piece with others, and as soon

4    as it gets all the pieces, a little icon pops up that that

5    song is fully assembled, and you can play it now.

6    Q.    And I see a reference on the slide to a peer swarm.   What

7    does that refer to?

8    A.    Well, this -- there's only so much room on a slide.   You

9    know, I showed four peers here.   A typical swarm is larger

10   than that, and the actual number of computers that might be

11   trading in a particular piece of music at a particular time

12   can be in the tens of thousands.

13   Q.    I see.   And you -- this slide depicts -- now it depicts

14   more computers.

15   A.    A few more joined the swarm.

16   Q.    And do you have an understanding about the number of

17   users that are on the BitTorrent network?

18   A.    The most recent reputable study I found was by IEEE, and

19   it's a few years old.   It indicates that at any one point in

20   time, there'll be between maybe 15 and 27 million peers

21   exchanging content on the internet, and it's -- that's at any

22   one point in time.

23   Q.    Is there an official place one can go to see exact

24   measurements of how many users there are on the BitTorrent

25   network?

B. Frederiksen-Cross - Direct

453

1    A.    No, there is not.

2    Q.    And why is that?

3    A.    Well, the communication for any of these computers -- any

4    of the peers is between the peers, and some of these

5    peer-to-peer systems use a tracker, so if you were to put a

6    test tracker up with the right monitoring stuff, you could see

7    the transactions maybe that were going to that tracker, but

8    you still couldn't see everything else that was going on in

9    the network.

10   Q.    So, so there's nowhere you can go to see the number of

11   users on the network overall; is that correct?

12   A.    That's correct.  By design, these systems are extremely

13   robust and these machines talk directly to each other without

14   central control.

15   Q.    What about if I went to the Cox user that downloaded and

16   is then distributing files to others?  Could I uncover the

17   number of times that Cox user distributed files from a review?

18   A.    Not in any practical way, no.

19   Q.    What do you mean by that?

20   A.    Well, if you just went to a user's computer and inspected

21   it forensically, you might have some evidence of their

22   activity, but you would not have evidence of all of their

23   activity.

24   Q.    Let me ask you --

25   A.    And you would, you would have to actually do a forensic

B. Frederiksen-Cross - Direct

454

1    examination of that machine to get any information.

2    Q.   Let me ask it to you this way:  Are logs kept with --

3    from the software otherwise of the number of times that user

4    distributes a file?

5    A.   No.

6    Q.   Okay.  Can you explain a little bit about the other three

7    peer-to-peer networks that were identified in MarkMonitor's

8    infringement notices to Cox?

9    A.   Sure.  Can we go on to the next slide?

10   Q.   Okay.  And so these are the other three?  Is that the

11   Ares logo?

12   A.   Yes, Ares, Gnutella, and eDonkey.

13   Q.   Okay.  And I see again the, the file hash value image

14   we're using.  Why is that there?

15   A.   Again, all of these systems rely on hash to authenticate

16   and identify files.  That's a really important technology.

17   That's one of the foundation technologies of these systems.

18   Q.   And there's a bunch of icons under file types.  What is

19   that meant to convey?

20   A.   Again, these networks can be used to distribute any kind

21   of file.  Anything that's in an electronic form can be

22   transmitted on BitTorrent, so electronic books, movies, music,

23   if I want to send a video of my dog chasing her tail, any of

24   that can be distributed on the -- using BitTorrent across the

25   internet to others.

B. Frederiksen-Cross - Direct

455

1    Q.   Sure.  And why is there the internet cloud on this, this

2    slide?

3    A.   They all rely on the internet for connection to each

4    other, for the peers to be able to connect to each other and

5    to be able to search for music, to download music, and to

6    distribute copies of music.

7    Q.   What, what happens if, if the peer that's downloading and

8    distributing the music file is disconnected from the internet?

9    Can they still engage in that, that activity at that moment?

10   A.   No.  When a peer is disconnected from the internet, it

11   can neither send nor receive files from any other computer on

12   the -- across the internet.

13   Q.   And did you when you were listening to Cox's counsel's

14   opening statement see a box saying Cox has no control over the

15   infringement?

16   A.   I remember seeing that, yes.

17   Q.   And, and what's your reaction to that?

18   A.   I disagree, and I disagree for two reasons.  One is that

19   Cox is the only party who can take an internet -- an IP

20   address and determine what customer was using that internet

21   address at that point in time, so they're the only ones who

22   can actually forward that notice to an actual customer who

23   might be able to affect the behavior.

24            MR. BRODY:  Your Honor, I have an objection.

25            THE COURT:  What's your objection?

456

1           MR. BRODY:  It's outside the scope of the report.

2           THE COURT:  This testimony about --

3           MR. BRODY:  Yes.

4           THE COURT:  Come to sidebar, please.

5           NOTE:  A sidebar discussion is had between the Court

6    and counsel out of the hearing of the jury as follows:

7    AT SIDEBAR

8           THE COURT:  Your partners may want to hear.  Go

9    ahead.

10          MR. ZEBRAK:  Me or him?

11          THE COURT:  No, no.

12          Your objection, sir.

13          MR. BRODY:  Her report contains a discussion of how

14   Cox's system operates.  That's fair game, that sort of

15   summary.  Her report does not opine about Cox's ability to

16   control people.  It does not -- it certainly doesn't opine

17   about vicarious liability, which is effectively what he just

18   asked her.  So I think it's just inappropriate.

19          I have no problem with her describing how the system

20   operates, but the second step, drawing the conclusion that Cox

21   can control, that's inappropriate, and it's not in the report.

22          THE COURT:  Overruled.  There's nothing more basic

23   than the fact that the ISPs have the customer numbers and can

24   identify specific customers and that they're -- and that they

25   can terminate them and that they can notify them and they have

B. Frederiksen-Cross - Direct

457

1    contact with them.  There's nothing controversial about that.

2           MR. BRODY:  And I have no controversy with that.

3           THE COURT:  Okay.

4           MR. BRODY:  They can do what they can do.  Most of

5    that's not in dispute.

6           What I do have a dispute about is the use of the

7    word "control," which supports a legal conclusion, and the --

8    well, that's what I have a problem with.

9           THE COURT:  Okay.  All right.  I think you're

10   hashing it too finely.  She's not using that as a legal term,

11   and you certainly are not going to argue that.

12          MR. ZEBRAK:  No, sir.

13          THE COURT:  But focus her on the technical

14   capacity --

15          MR. ZEBRAK:  Yes, sir.

16          THE COURT:  -- of the ISP system.

17          MR. ZEBRAK:  Sure.  And, Your Honor, just while

18   we're on the record, to be clear, Your Honor has already

19   instructed the jury that terminology will be used, but it's

20   being used in a factual or technical sense, that the jury

21   ultimately will follow the law and apply it to these facts.

22   And I'm just talking about control in a technical sense of --

23          THE COURT:  Yeah.  Stop using the word "control."

24   If you can use another word, you know, access, capacity to do

25   this or to do that, okay?

B. Frederiksen-Cross - Direct

458

1          MR. ZEBRAK:  Yes, sir.

2          THE COURT:  All right.  Thank you, counsel.

3          MR. BRODY:  Thank you.

4          NOTE:  The sidebar discussion is concluded;

5  whereupon, the case continues before the jury as follows:

6  BEFORE THE JURY

7          THE COURT:  We lost a juror for the moment here.

8  We'll just wait a minute.  And we'll take a break at about

9  quarter to eleven, if that works for everyone else.  Good.

10  Thank you.

11          As you-all know, if you need to stand and stretch at

12  any time and if you need a break, while we're at sidebar is a

13  perfect time to escape the room, but if you want a little more

14  time and a formal break, then just raise your hand, get my

15  attention, and I'm happy to oblige at any time.  All right?

16          MR. ZEBRAK:  May I continue, Your Honor?

17          THE COURT:  No.  We're down one juror.

18          MR. ZEBRAK:  Oh, I'm sorry.  I didn't realize.

19          THE COURT:  Okay.  You're focused.

20          MR. ZEBRAK:  You're generous, Your Honor.  Thank

21  you.

22          THE COURT:  You know, on Friday mornings or Fridays

23  each week, all the judges have a criminal docket starting at

24  9:00, or actually starting at 8:30 now.

25          MR. GOULD:  It sounds like our juror needs some help

1    getting back in the courtroom.

2            THE COURT:  Ah, okay.  The door is locked.

3            MR. GOULD:  It sounds like she needs some help.

4            THE COURT:  Well, she may have gone around the other

5    way, huh?

6            MR. ZEBRAK:  You know, Your Honor, I've done some

7    bad direct examinations, but this takes the cake.

8            THE COURT:  There we go.

9            THE COURT SECURITY OFFICER:  All right, Your Honor,

10   we're good to go.

11           THE JUROR:  Sorry, Judge.

12           THE COURT:  No, I didn't realize the door was locked

13   to come back in.

14           All right.  As I was saying, on Friday mornings,

15   we -- each judge has a docket of criminal cases starting at,

16   you know, 8:30 for me on Friday, and then there's a civil

17   docket, and we really don't -- can't control a lot of that.

18   The parties decide when they want to have issues heard.

19           I've been able to get -- move most of my docket, but

20   we probably won't start at 9:00 on Friday.  We'll probably

21   start closer to either 10:15 or 10:30, and I just wanted to

22   give you that information, all right?  Okay.

23           All right.  Please go ahead.

24           MR. ZEBRAK:  Sure.  Thank you.

25   BY MR. ZEBRAK:

B. Frederiksen-Cross - Direct

460

1    Q.   So, Ms. Frederiksen-Cross, could these networks function

2    without hash values being reliable?

3    A.   No.

4    Q.   And before we had that sidebar, what, what happens with

5    respect to the user that's downloading or distributing if

6    their internet access is taken away?

7    A.   Then they can't download and distribute.

8    Q.   Let's, let's shift gears for a moment and -- or actually

9    not for a moment.  Let's shift gears and talk about your

10   review of the MarkMonitor system, okay?

11   A.   Okay.

12   Q.   So you said MarkMonitor's role was to detect infringement

13   of -- and report it to Cox, correct?

14   A.   That's correct.  Cox and other subscribers, but -- or

15   other ISPs, but in this case, Cox is the focus.

16   Q.   Okay.  And at a high level, would you describe what your

17   review of the MarkMonitor system consisted of?

18   A.   Sure.  I reviewed the MarkMonitor source code.  I

19   reviewed evidence produced by the MarkMonitor system.  I

20   reviewed sound recordings that corresponded to the hashes of

21   infringing content.  I reviewed samples of the notices that

22   MarkMonitor sent out and records about how many notices it had

23   sent out, and I also reviewed records that provided -- that

24   were drawn from MarkMonitor's records that provided

25   information about both the songs and the Audible Magic

1    verification associated with those songs, so song files and

2    Audible Magic verifications.

3    Q.   And you -- did you speak with anybody at MarkMonitor?

4    A.   I did have the opportunity, as I mentioned, to discuss

5    the operation of the MarkMonitor system with two MarkMonitor

6    employees, and I also had the opportunity to read their

7    depositions and/or declarations and some of the other

8    information that was made available to me about the system.

9    Q.   Okay.  Let's jump in in more detail to that MarkMonitor

10   system.  What, what are the components of that system?

11   A.   If we could go to the next slide, I have the three

12   principal components listed.

13   Q.   Okay.  What's the first component?

14   A.   The verification module.

15   Q.   And what is that?

16   A.   The verification module is used to identify -- or to

17   create a database of known infringing works, and so there's

18   really two parts to that.  One is downloading works, and then

19   the other is confirming their content, so you know that a

20   particular hash is associated with a file that is known to

21   contain some of plaintiffs' -- you know, either one of

22   plaintiffs' files or in some cases multiples of plaintiff's

23   files.

24   Q.   Sure.  So you mentioned downloading the file.  Where is

25   it downloaded from?

B. Frederiksen-Cross - Direct

462

1   A.    It's downloaded using the peer-to-peer networks.

2   Q.    I see.  And what's the detection module?

3   A.    The detection module then is the part that goes out to

4   the peer-to-peer networks to see who is trading in those

5   files, you know, who is, who is creating copies of files and

6   distributing, using that particular hash or using that known

7   file.

8   Q.    And what's the notification module?

9   A.    That's the part that based on the evidence MarkMonitor

10  collects, prepares and sends notifications to the ISPs like

11  Cox about the activity it detects.

12  Q.    Sure.  Could you describe the verification module in more

13  detail?

14  A.    I can.  Can we go to the next slide for that?

15  Q.    Sure.  So can you quickly walk us through what's depicted

16  here in this slide?

17  A.    Yeah.  Reading from left to right, and this is just sort

18  of the data flow in this process, the Recording Industry of

19  America provides a list of copyrighted works to MarkMonitor.

20  Using things like the title of those works and the artist

21  involved, MarkMonitor searches the internet to identify

22  potentially infringing files on the peer-to-peer networks that

23  we're talking about today, and then the first time it finds a

24  file, just the first time, it downloads a full copy of that

25  file, and it submits that copy of the file to Audible Magic so

B. Frederiksen-Cross - Direct

463

1    that Audible Magic can confirm what that file contains, and it

2    gets back from Audible Magic a response that lets it tell if

3    that file has been identified as having the artist and title

4    that MarkMonitor thought it might have, and if it does, it

5    makes an entry in its database of known infringing files.

6            So that has the file's hash and artist and title and

7    information that MarkMonitor can subsequently use when it sees

8    another copy of that hash.

9    Q.   Sure.  And could you explain a little bit more about what

10   Audible Magic's role is here?

11   A.   Well, again, Audible Magic takes an unknown file and it

12   identifies that file as either having or not having one of the

13   protected works -- specific protected work actually, and it

14   passes back the artist and title.

15   Q.   And do you have a sense about how widely used Audible

16   Magic is?

17   A.   Well, it's used in a lot of different contexts besides

18   just MarkMonitor.  I mean, that's certainly not their only

19   customer.  My understanding from discussing the system with

20   MarkMonitor's engineers is that they process on the order of

21   10 million transactions a day.

22   Q.   And, I'm sorry, you said MarkMonitor engineers.

23   A.   Oh, I'm sorry.  Well, Audible Magic engineers.  I

24   misspoke.  Thank you, Counsel.

25   Q.   Okay.  So you say you've interviewed engineers at Audible

B. Frederiksen-Cross - Direct

464

1    Magic?

2    A.   Yes.  I also spoke to an engineer at Audible Magic about

3    the system.

4    Q.   And what -- do you have a sense -- and so your testimony

5    is that Audible Magic -- and what is, what is a transaction,

6    when you say it's used for millions of transactions per day?

7    A.   That's a request for identification.  That's what I'm

8    calling a transaction is someone sends them a request for

9    identification of a song, and they do that about 10 million

10   times a day.

11   Q.   And, and you did a review of, you said, of -- did you say

12   of the Audible Magic source code as well; is that correct?

13   A.   I was given the opportunity to review the Audible Magic

14   source code, to talk to their people, and to get an

15   understanding of how the system operates.  I actually even had

16   the opportunity to use it myself and to -- so that I could

17   examine the kinds of data that a finger -- an Audible Magic

18   fingerprint, you know, what does that look like, what does it

19   contain, and then what does their response have.

20   Q.   Have -- what did you look up using the Audible Magic

21   tool?

22   A.   I installed the fingerprinting software on my laptop, and

23   I used files from the hard disc that was produced in this

24   litigation that contains copies of the infringed works that

25   were downloaded from the internet and identified by hash.  So

B. Frederiksen-Cross - Direct

465

1    I took those files -- or a sample of those files, submitted

2    them to Audible Magic, got back their response, and then to be

3    able to, to convince myself that the response was accurate

4    because I had picked my samples at random and some of the

5    songs I wasn't familiar with, I actually went out to iTunes

6    and got copies of the songs so that I could play the official

7    iTunes version and compare it to the song on the hard disc.

8    Q.   And what did you conclude?

9    A.   They were the same.  As best as my ear can discern, they

10   were identical.

11   Q.   And do you have any reservations about the reliability of

12   the Audible Magic technology?

13   A.   I do not.

14   Q.   Could you walk us through in a little more detail how

15   this identification process works to create a database of

16   known infringing files by hash?

17   A.   Yeah.  If we could go on to the next slide, I have a

18   similar little data flow there.

19   Q.   Sure.  And just -- there's a lot of information that

20   appears on this slide.  Could you just briefly walk through

21   what's being depicted here?

22   A.   Yeah.  One thing I want to do, just to introduce a new

23   image here, is I want to start in the middle of the slide, if

24   I may, and you see I have a fingerprint there with a music

25   symbol next to it.  Audible Magic gets recordings from the

B. Frederiksen-Cross - Direct

466

1    content providers, that is to say, from the record companies,

2    and it uses its patented software to create the fingerprints

3    that are present in each song recording, and it puts those in

4    a database along with information like the song's artist and

5    title, and that's what I'm going to call a reference database.

6             So I've shown it in the kind of orange-gold color

7    here that's the reference database of music that Audible Magic

8    has.  So then the way this process works is MarkMonitor has

9    downloaded a file from the internet --

10   Q.   Excuse me.  Is that on the left column?

11   A.   On the left-hand column, yes.

12   Q.   Okay.

13   A.   MarkMonitor has downloaded a file now, and, you know,

14   it's found that file by searching for the artist and title, so

15   it wants to confirm that that's what's in that file, and so a

16   fingerprint is generated from the file.  Audible Magic uses

17   that fingerprint, which is the blue fingerprint I show on the

18   left here, to match against the fingerprints in the reference

19   database and to search for that particular fingerprint, and if

20   it finds it, then it's able to say, okay, I've matched it and

21   I know the artist and title.

22            So that content identification process is what, is

23   what I'm calling the matching step there.

24            And then Audible Magic sends back to MarkMonitor

25   information about whether it was able to find a match and if

B. Frederiksen-Cross - Direct

467

1  it was able to find a match, what's the artist and title and

2  album that that unknown fingerprint matched to.

3  Q.   Okay.  And then -- and this -- if you go back to the

4  prior slide, once Audible Magic returns a match, is that then

5  what gets populated in MarkMonitor's database of known

6  infringing files?

7  A.   Right.  MarkMonitor updates its database to reflect that

8  for the information that it collected when it downloaded that

9  file to reflect that now it's been matched --

10 Q.   Okay.

11 A.   -- and here's who it is.

12 Q.   And that's the verification process?

13 A.   That's the verification process on the MarkMonitor side,

14 yes.

15 Q.   Excuse me, the verification module, right?

16 A.   Yes.

17 Q.   Okay.  And could you explain what the collection module

18 is, generally speaking?

19 A.   Yeah.  If we can go forward back to the slide we left

20 off?

21      The collection module is the part that actually goes

22 out to peers on these peer-to-peer networks and identifies

23 whether or not those peers are copying and distributing the

24 file.

25 Q.   Okay.  And I see two hands have -- doing a handshake in

B. Frederiksen-Cross - Direct

468

1   the middle there.  What is that depicting?

2   A.   Well, for BitTorrent, that's actually what it's called, a

3   handshake, but it's -- for instance, if I'm on a machine -- on

4   a computer and I'm interacting with a swarm of peers, I make a

5   handshake with each computer in that swarm where I say this is

6   what I'm looking for, and they can respond back whether they

7   have it and how much they have and which pieces they have, and

8   so that's, that's what that handshake represents.

9   Q.   So --

10  A.   It's the beginning of the download process really, but no

11  content has actually been -- no actual music content has been

12  transferred yet.

13  Q.   So what's the significance of a handshake being between

14  the MarkMonitor computer and the Cox user computer here in

15  this slide?

16  A.   Well, again, the MarkMonitor collection agent behaves

17  exactly like any other peer except that it's creating these

18  evidentiary records with respect to reaching out to peers,

19  making a handshake with the peers, getting information about

20  what the peers have.  So the, the MarkMonitor collection agent

21  is shaking hands with a Cox peer in this, in this slide.

22  Q.   And in this slide, could you just -- so it says -- walk

23  us through what's happening in the left bubble off of

24  MarkMonitor, please.

25  A.   Okay.  So once the MarkMonitor system connects to that

B. Frederiksen-Cross - Direct

469

1    specific peer, that's essentially the commencement of a

2    download process, and so certain information is exchanged back

3    and forth between the MarkMonitor system and a peer at that

4    time, and the purpose of this exchange of information is to

5    verify that the peer is online, actively running a BitTorrent

6    client or one of the other clients that we've discussed,

7    actively responding to requests for a particular hash value

8    that has been verified to have known content that is some of

9    plaintiffs' copyrighted works.

10           And then, you know, because this is, is using the

11   hash which is what the BitTorrent system itself uses, at that

12   point, instead of downloading content, it breaks off the

13   connection because there's no need to -- the peer has already

14   said, yes, I have the hash, I have these pieces of the hash.

15   So at that point, the system breaks the connection and creates

16   an evidentiary record that's -- that records that exchange of

17   communication.

18   Q.   What -- it says:  Hash match (no need to re-download).

19           Why is that on your slide?

20   A.   Just to remind me to point out, A, that it doesn't

21   actually download the file, it doesn't create another copy of

22   the file, but it has used that hash, that is, the fingerprint

23   of the file, just as any BitTorrent client would, to say this

24   is the file.

25           Yes, I've -- and the peer is responding, yes, I have

B. Frederiksen-Cross - Direct

470

1    that file or I have pieces of that file.

2    Q.   And when you say re-download it, is that because in the

3    -- one step earlier in the verification module, MarkMonitor

4    already downloaded a file that has that hash?

5    A.   That's correct, yes.  It's a known hash here, so there's

6    no need to download it.

7                 THE COURT:  Can we stop here for our morning break?

8    Does that work?

9                 MR. ZEBRAK:  Of course, Your Honor.

10                THE COURT:  All right.

11                MR. ZEBRAK:  We don't have that much more.

12                THE COURT:  Okay.  Then let's take 15 minutes.

13   We'll come back and continue the testimony.  Thank you.

14   You're excused.

15                NOTE:  At this point, the jury leaves the courtroom;

16   whereupon, the case continues as follows:

17   JURY OUT

18                THE COURT:  All right.  Anything before we break?

19                MR. ZEBRAK:  No, Your Honor.

20                THE COURT:  Okay.  All right.  Let's take 15 minutes

21   then.  We're in recess.

22                NOTE:  At this point, a recess is taken; at the

23   conclusion of which the case continues in the absence of the

24   jury as follows:

25   JURY OUT

B. Frederiksen-Cross - Direct

471

 1              MR. BRODY:  Sorry.

 2              THE COURT:  No, that's all right.  Any preliminary

 3    matters?

 4              MR. ZEBRAK:  Not from the plaintiffs, Your Honor.

 5              MR. BRODY:  We're trying to work out some issues

 6    with respect to some of the exhibits.  It just raises a lot of

 7    questions.  I'm not sure we're --

 8              MR. OPPENHEIM:  So, Your Honor, after

 9    Ms. Frederiksen-Cross completes her examination, we're going

10    to call Samuel Bahun from MarkMonitor.

11              THE COURT:  Right.

12              MR. OPPENHEIM:  Many of his exhibits are not normal

13    documents.  They're native files, which we can't just hand him

14    a paper copy of, obviously, and because we can't -- anytime we

15    publish, the jury sees it, we're trying to work out in advance

16    whether there was just no objections to the list of native

17    files, in which case we could just publish right away.  Then

18    everything will go much more quickly.

19              So that was the issue, and we were trying to work it

20    out in advance, but I'm not sure where we are.

21              MR. BRODY:  We're trying to work it out is where we

22    are.  I think there's a lot of progress we can make, but I

23    just need to have a fuller conversation with --

24              THE COURT:  Okay.  Which you're going to do --

25              MR. BRODY:  Which we're going to do over lunch.

B. Frederiksen-Cross - Direct

472

1          THE COURT:  Yeah.  Right.

2          MR. OPPENHEIM:  So our issue may be that we'll get

3   to Mr. Bahun before lunch --

4          THE COURT:  Yeah.

5          MR. OPPENHEIM:  -- I suspect from the current

6   timing, unless Your Honor wants to take an early lunch, but I

7   made the mistake of suggesting that yesterday.

8          I'm not going to do that again.

9          THE COURT:  Yeah.  I'll give you an opportunity to

10  work it out after we're done with Ms. Frederiksen-Cross, but,

11  you know, this is not the time to be working this stuff out.

12  And so if you can't work it out, then I'll rule on objections

13  as we move along.

14         MR. OPPENHEIM:  Yes, Your Honor.

15         THE COURT:  Okay?

16         MR. BRODY:  Fine.

17         THE COURT:  All right.  Thank you.

18         All right.  Joe, let's get our jury, please.

19         NOTE:  At this point, the jury returns to the

20  courtroom; whereupon, the case continues as follows:

21  JURY IN

22         THE COURT:  All right.  Please have a seat.

23         All right.  Counsel, please continue.

24         MR. ZEBRAK:  Thank you, Your Honor.

25  BY MR. ZEBRAK:

B. Frederiksen-Cross - Direct

473

1    Q.    Ms. Frederiksen-Cross, before we took the brief break,

2    you were discussing this collection module.  Without us

3    getting into the details again, could you explain why it's

4    called a collection module?

5    A.    Because its role is to collect evidence from the peers

6    that it contacts.

7    Q.    And when I asked you the three components of the

8    MarkMonitor antipiracy system, the second component here says,

9    "detection module."

10          Is that something different from the collection

11   module we've been discussing?

12   A.    No.  That's, that's the component that, that detects and

13   collects this evidence.

14   Q.    Okay.  Thank you.

15          Was there anything else about this slide that you

16   wanted to cover before we moved on?

17   A.    I don't recall if I mentioned that the peer provides

18   information about how much of the file it has available.  So

19   remember I said they could collect by pieces?  The peer, when

20   it answers up to that handshake, will provide information

21   about whether it has the full file or part of the file and

22   which parts that it has, but beyond that, I think we've

23   covered everything.

24   Q.    And -- okay.  And then what's -- what happens in the next

25   step in this process?

474

1    A.    The MarkMonitor system after making this connection and

2    collecting this information creates the evidence, what's

3    called an evidence package or case package for that particular

4    peer for that particular communication that it just engaged

5    in.

6    Q.    Could you explain the evidence packages in more detail

7    that you're describing?

8    A.    Yeah.   Could we go to my next slide, please?

9    Q.    Sure.   And -- okay.   And what's depicted on this slide

10   generally?

11   A.    Well, each, each evidence package or case package, as

12   they're sometimes called, is -- contains six different files

13   that record different aspects of the information received from

14   the peer, and so this lists those six files.

15   Q.    And, you know, without, without going into detail in all

16   six files, what -- is there certain key aspects of this

17   information that's important to discuss today?

18   A.    Well, I think I'd like to just touch briefly on the first

19   three.   The first one, the activity log, gives you things like

20   what time the contact occurred and, you know, what was going

21   on in that particular contact.

22          The second one, the communications log, is a more

23   detailed record of the exchanges.   So it says at this

24   particular time, I asked for this particular file, and the

25   peer responded back saying it had this file at this particular

B. Frederiksen-Cross - Direct

475

1    time.  And so it provides some rich information about what

2    happened during that exchange.

3              And then the content information is important

4    because that's where it passes back that BitTorrent -- bit

5    field or the size, the amount of the file that that particular

6    peer has, and that information is used later in the

7    processing, so I wanted to just point to that's where that

8    comes from.

9    Q.   And are hash values involved in this size or bit field

10   data at all?

11   A.   Not in the size data itself, but it is the hash of a

12   particular requested file or requested torrent, which is a

13   collection of files that the bit field pertains to.  And the

14   hash is recorded in the evidence logs as well.

15   Q.   And Cox's counsel in their opening statement made

16   reference to the word "spying."  Do you recall that?

17   A.   I think I heard that word a couple of times in their

18   opening presentation, yeah.

19   Q.   In this process when MarkMonitor goes to a peer-to-peer

20   network to request a file -- well, first of all, do you have

21   an understanding of whether that process involves spying?

22   A.   No.  The MarkMonitor software acts like just any other

23   peer with two exceptions.  It creates a record of what it's

24   done, and it doesn't typically download -- at least in the use

25   that we see in this case, it doesn't download the file.

B. Frederiksen-Cross - Direct

476

1           I wouldn't characterize that as spying, because it's

2    just a random peer in a swarm that's been provided through the

3    normal BitTorrent process and it's creating a record of the

4    communication.  It's not looking into that person's life or

5    computer or anything.

6    Q.   Okay.  And I believe you said that the third component of

7    the MarkMonitor system is a notification module; is that

8    correct?

9    A.   That's correct.

10   Q.   Okay.  Could you explain that to the jury in more detail?

11   A.   Yeah.  Can we advance the slide here?  Again, the

12   notification module takes information that was obtained from

13   those evidence files, and it prepares an e-mail notice by

14   merging that information with -- you can think of it almost as

15   a form letter that then gets sent out to the ISP requesting --

16   or notifying them that this particular detection has occurred.

17           And so for each detection that they make,

18   potentially they could prepare one of these notices.  There's

19   some other factors that come into play, but we'll talk about

20   those, I'm sure.

21   Q.   Sure.  And I'm sorry, I didn't mean to interrupt you.  I

22   thought you had finished.

23           And so on the left side of this slide, could you

24   walk through how -- you know, how the MarkMonitor -- after

25   MarkMonitor detected what it concluded to be an infringement

1    and notified Cox, how that worked with regard to the actual

2    e-mail?

3    A.   Sure.  The MarkMonitor system reads the data.  It

4    prepares the e-mail.  That e-mail then gets sent to the ISP,

5    in this case Cox.  It does that by looking up the IP address

6    and saying, oh, this is the ISP that administers that

7    particular IP address.

8              And the e-mail addresses that I show here on the

9    left, antipiracy2@riaa.com, is where -- is the sender identity

10   in that e-mail, and abuse@cox.net is the recipient, and that

11   is an e-mail address that Cox publishes to the world.  It's

12   that if you have a complaint about, for instance, copyright,

13   this is who you're supposed to e-mail to.

14   Q.   Sure.  And could you explain to the jury what you have on

15   the right side of this slide?

16   A.   Yeah.  I think I alluded a moment ago that there are some

17   other tests that are made before a notice is sent out in order

18   to ensure the currency of the notice and to send the most

19   relevant notices.

20             So the file has been verified as infringing before

21   the detection process, the evidence collection process ever

22   can be used to send a notice.  So if a file hasn't been

23   confirmed to contain infringing content, that, that evidence

24   package is not eligible to send a notice.

25             Then the, the system also tests -- remember I said

B. Frederiksen-Cross - Direct

478

1    that the size information gets used later.  The system looks

2    at the size of the file and the size that's passed back from

3    the peer, and if the file isn't at least 90 percent complete,

4    if the peer is not advertising that it has at least 90 percent

5    of the file to share, then no notice is sent.

6           Also, just to make sure that the information is

7    current enough that Cox and ultimately hopefully the recipient

8    will take action upon it, it only produces notices if the

9    actual detection occurred within the last 48 hours of when the

10   e-mail preparing notice ran.  So it doesn't send notices on

11   things that are months old.  It has to be within the last 48

12   hours.

13          And then finally, if the IP address that was

14   captured during the interaction with the peer can't be looked

15   up for some reason to figure out who the ISP is, then

16   obviously no notice would be sent because you don't know who

17   to send it to.  So Cox only gets the notices that are related

18   to Cox customers, and other ISPs would get the notices related

19   to their customers.

20   Q.   And is this slide a complete depiction of every nuance of

21   the notification process?

22   A.   No.  There are other, other checks and requirements that

23   the system goes through as well in order to, to ensure

24   accuracy and the appropriateness of the, the message that's

25   being sent, but I think these are probably the most important

B. Frederiksen-Cross - Direct

479

1    ones.

2    Q.   And where does the information come from that MarkMonitor

3    includes in the infringement notice that goes to Cox reporting

4    a Cox subscriber for infringement?

5    A.   The vast majority of it comes originally from the peer

6    and then from the evidence files where that was stored after

7    the interaction with the peer.

8    Q.   And could you explain to the jury in a little more detail

9    what key information is included in the infringement notice

10   from your perspective?

11   A.   Yeah.  The -- I mean, a lot of the really important

12   things for the ISP to be able to process this notice or for

13   the consumer who receives it, assuming it's forwarded, to be

14   able to understand it and how it relates to their computer

15   system is you have to have -- the notice identifies the ISP

16   based on the IP and port address, and that's also reflected,

17   the IP and the port address are also contained in the notice.

18   Who the ISP is, of course, is a part of the notice because

19   it's who the e-mail is sent to.

20        The infringing file by name and by the file hash

21   that was detected, so if it's a torrent hash or the other --

22   one of the things I didn't mention about the other

23   peer-to-peers is at this point in time that's relevant for the

24   litigation, they were exchanging whole files, so it would be

25   the hash associated with that file.

B. Frederiksen-Cross - Direct

480

1           A sample track infringe -- so -- and by sample

2    track, I mean if the torrent was an entire album that maybe

3    had ten tracks on it, it wouldn't list all ten of them.  It

4    would just list a sample, you know, this is one of the tracks

5    from that torrent to help the recipient of that notice

6    understand what music was causing the problem, and the date

7    and time of detection both so that the recipient in the notice

8    can understand it, but also because Cox needs the date and

9    time to be able to figure out who the consumer is, because

10   MarkMonitor doesn't have records about who Cox's customers

11   are.  That's the part that Cox has to be able to supply in

12   order to forward the notice.

13   Q.   And did I hear you correctly earlier that you reviewed

14   some of the actual notices that MarkMonitor sent to Cox?

15   A.   Yes, I did.

16   Q.   And did you also say that you looked at a larger set of

17   data about sort of the whole complete set of notices that

18   MarkMonitor sent to Cox?

19   A.   That's correct.  There were approximately a quarter

20   million notices in the, in the set.

21   Q.   And do you have any understanding about whether

22   MarkMonitor is able to detect the entirety of the unauthorized

23   reproduction and distribution of, you know, the list of works

24   that the RIAA asked it to find on peer-to-peer networks?

25   A.   That's not technically feasible to be able to capture

B. Frederiksen-Cross - Direct

481

1  every client -- or every peer on the network that could be

2  exchanging information that they weren't entitled to exchange.

3  Q.   And why -- I'm sorry.

4  A.   It's just, it's just the sheer size of the network.  You

5  know, again, you're talking about a network that has hundreds

6  of millions of users, and at any point in time, there's 15,

7  20, 30 million of them active.  It's just not feasible to have

8  one person monitor that much traffic.  Technically, it's a

9  problem.

10  Q.   In a moment -- well, could you remind the jury about your

11  overall conclusions about the accuracy and reliability of the

12  MarkMonitor system?

13  A.   Yes.  I find that the system accurately detects peers

14  that are copying and distributing the plaintiffs' copyright

15  works, and I find that it prepares and sends accurate notices

16  about that infringement activity that it detects.

17  Q.   And Cox's counsel in Cox's opening statement said that

18  there's, I believe, no proof that plaintiffs -- that a Cox

19  customer actually possessed a copy of plaintiffs' works.  Do

20  you have a reaction to that?

21  A.   I completely disagree.

22  Q.   And could you explain why?

23  A.   The evidence that I saw was, first of all, voluminous in

24  nature.  The evidence -- I examined about 175,000 evidence

25  cases.  Every one of those cases included hash information for

B. Frederiksen-Cross - Direct

482

1   the file that the peer itself had reported that it was making

2   available to distribute, and these peers, recall, are on this

3   peer-to-peer file-sharing network.

4           This is not just some random search of people's

5   computers, but it's actual activity that the peer running the

6   client software is responding to a request for a file with

7   information about the file it has to share.

8           And the, the information I looked at was very

9   internally consistent.  For instance, I could take a hash from

10  a notice and trace it all the way back to a hash in a record

11  that MarkMonitor had about when that information was collected

12  from that peer, and I could match up other pieces of the

13  notice.  You have the time matches; you have the title

14  matches.

15          I could also use the hash to match it to that copy

16  of the infringing work that was on the disc and play the music

17  for myself and say, yes, you know, this is, this is this song.

18  I can go out to iTunes and verify that.

19          And when I looked at the whole set of the evidence I

20  got, it was logically consistent from end to end, from song to

21  detection to notice, and so based on that, you know, I'm very

22  confident that these -- this is reliable information and

23  accurately documents what those clients were doing.

24  Q.   So Cox's counsel in Cox's opening statement said that

25  there's no proof that the files that MarkMonitor identified in

B. Frederiksen-Cross - Direct

483

1    these infringement notices reporting Cox subscribers to Cox

2    actually contained copies of the works in question here.  Do

3    you have a reaction to that?

4    A.   Again, I think that completely ignores the evidence of

5    the hashes and the fact that the hashes themselves have been

6    verified against copies of songs provided by -- or

7    authenticated through Audible Magic to fingerprints of songs

8    that were provided by the recording -- by the recording

9    industry.

10          So I think that that information again is reliable

11   and accurate, and so I disagree with the statement completely.

12   Q.   Just to be clear, you're not providing a legal opinion

13   here today, are you?

14   A.   No.  I am here just to describe the technology and the

15   evidence I've seen and help the jury understand what that

16   evidence is and the story it tells.

17   Q.   Just another couple questions and we're going to turn to

18   the CATS system quickly.  Do you recall that Cox's counsel

19   during opening statement for Cox said that there's no proof

20   that any online files were unlawful copies of the works at

21   issue in this case?  Again, without giving a legal opinion, as

22   a technical matter, what's your reaction to that?

23          MR. BRODY:  Objection, Your Honor.  I don't think --

24          THE COURT:  Rephrase the question.  Just ask whether

25   they were copyrighted works, and I think you can narrow it

B. Frederiksen-Cross - Direct

484

1    down.

2              MR. ZEBRAK:  Sure.  Let me --

3              THE COURT:  Thank you.  Go ahead.

4    BY MR. ZEBRAK:

5    Q.   Well, let me rephrase the question as Your Honor

6    suggested.

7              When MarkMonitor identifies a peer, a Cox subscriber

8    on one of these file sharing networks with a file on their

9    computer, is MarkMonitor able to identify whether that's a

10   copy of a file that the peer obtained lawfully?

11             MR. BRODY:  Objection, Your Honor.

12             MR. ZEBRAK:  I could say it differently, Your Honor.

13             THE COURT:  Yeah.  Sustained.

14             MR. ZEBRAK:  Sure.

15   BY MR. ZEBRAK:

16   Q.   When MarkMonitor identifies a peer, a Cox subscriber on a

17   network with a file, can it tell if the peer obtained it from

18   another peer on the network as opposed to a legitimate source

19   like iTunes or Amazon or something like that?

20   A.   Well, in the evidence I examined, it was often the case

21   that the -- I mean, in approximately, I think, 15 percent of

22   the records, the peer was still collecting the evidence.  So

23   they only had part of the file, you know, 90 percent but not

24   100 percent.  So that certainly tells me that in those

25   instances, that peer was not getting it off of Amazon.

B. Frederiksen-Cross - Direct

485

1          And with respect to the, you know, the implication

2     that all of these peers might have gotten something legally

3     and then gone out there and created torrents for it

4     presumably -- because if they got it legally, they wouldn't

5     have a torrent -- it's kind of like saying you walk into a bar

6     and there's a guy there with a beer in his hand.  Where did he

7     get it?  Well, he probably bought it in the bar.

8          Is it possible that one of those guys or two of

9     those guys were the ones who first created a torrent?  As a

10    hypothetical, that could be possible, but it's improbable.

11          MR. BRODY:  Your Honor, I object.  That's

12    speculation.

13          THE COURT:  Hold on, hold on.  No, overruled.  I'm

14    going to allow her to use the example.  Go ahead.

15          THE WITNESS:  I'm just saying it would be extremely

16    improbable to think that that could happen on such a massive

17    scale, that somehow all of these people bought something and

18    then created torrents for it so they could give it away to

19    total strangers en masse.  That's just a nonsensical

20    interpretation of the evidence.

21    BY MR. ZEBRAK:

22    Q.   And even -- let's take -- call that a nonsensical

23    interpretation of the evidence, that somebody would -- well,

24    let me not --

25    A.   And I didn't mean any disrespect by that, but it just --

B. Frederiksen-Cross - Direct

486

1    it flies in the face of reason.

2    Q.   Sure.  No, I understand.

3           Let's take that hypothetical scenario where it was

4    something that someone obtained from, let's say, iTunes and,

5    you know, was on the network with it.  What, what would happen

6    for anyone else on the network who wanted that file from that

7    person?

8    A.   Well, they would start downloading it if they opened the

9    torrent that was associated with the file, or at least at some

10   point, they would begin downloading that content.  Because

11   once the torrent is out there, that makes the file able to be

12   downloaded by other peers.

13   Q.   And final, final question before we quickly cover the

14   CATS system:  Do you recall during Cox's counsel's opening

15   statement an assertion was made that there's no proof that

16   Cox's customers actually provided copies of the files to

17   others that they were reported for -- in these notices to Cox?

18   Do you recall that?

19   A.   I do recall that.

20   Q.   And do you have a reaction to that?

21   A.   I disagree with that statement, again, based on the

22   evidence that I've reviewed and my knowledge of how the

23   BitTorrent and Ares, Gnutella, and eDonkey software works, and

24   the fact that you cannot accidentally share a file via

25   BitTorrent, and it's extremely unlikely to do so, in my

B. Frederiksen-Cross - Direct

487

1    opinion, via the other three products.

2           I just don't think that, that there is any lack of

3    proof that the Cox clients were participating in these file

4    sharing networks and were providing content that based on its

5    hash identification is plaintiffs' content.

6    Q.   Sure.  And for those Cox subscribers that were reported

7    in these notices that hadn't yet obtained 100 percent of the

8    file, I think you said there were about 15 percent of them

9    that had somewhere between 90 to 100 percent of the file; is

10   that correct?

11   A.   Yes.

12   Q.   What were -- what's your understanding, if any, of what

13   those peers were engaged in at that time of detection?

14   A.   Well, I'm sure that they were probably distributing as

15   well as copying, but for at least some of them, when I went

16   through the evidence records, I could see that over time, the

17   amount of the file that they had moved from less than 100

18   percent when it was detected on one detection to later moving

19   to 100 percent of the file.  So I know for a fact that they

20   were downloading copies.

21   Q.   Sure.

22   A.   And because of the tit-for-tat way that BitTorrent works,

23   it's almost impossible to conceive that they were not also

24   uploading those copies to others.

25   Q.   What do you mean by the tit-for-tat way of BitTorrent?

B. Frederiksen-Cross - Direct

488

1    A.    BitTorrent and the other three protocols that we

2    discussed earlier are all designed to prioritize exchanges

3    with peers that are, are downloading to you.  So if I have ten

4    peers asking me for content, I'm going to give content -- I'm

5    going to download from and give content to those four peers or

6    three peers that are giving me the best content exchange

7    possible.  So I'm uploading as well as downloading.

8              And if you're not also uploading, the tit-for-tat

9    system kind of puts you at the back of the line, and although

10   it's still possible to get content if you're not uploading,

11   it's not the way these systems are designed to work, it's not

12   the way the protocols are designed to work.  All of them have

13   built into them this notion of exchange, that it's two peers

14   exchanging content.

15   Q.    Thank you.  I'd like to turn your attention now to the

16   Cox CATS system, okay?

17   A.    Okay.

18   Q.    You said you had an opportunity to review the CATS system

19   in your work in this case?

20   A.    Yes, I have.

21   Q.    Okay.  And at a high level, what did your review involve?

22   A.    It involved, again, looking at the source code of the Cox

23   CATS system, some of the configuration data related to how

24   that system was set up to operate.  I looked at copies of some

25   of the policies that the CATS system was intended to implement

489

1    so that I could see if its behavior was -- if it was actually

2    implementing those policies.

3    Q.   Okay.  And I'm not today going to -- well, strike that.

4              Can you walk us through what happens when

5    MarkMonitor sends an infringement notice by e-mail to Cox?

6    A.   Yeah.  Can we go to the next slide?  Thank you.

7              So on the left, I have the MarkMonitor e-mail.  When

8    it goes into the Cox system, it arrives in the mailbox

9    associated with abuse@cox.net, just like anybody's e-mail goes

10   to their e-mail box on their server.

11             The Cox system then has software that actually reads

12   that e-mail from the server and looks for things in the

13   e-mail, and based on what it finds, it does certain kinds of

14   processing, and so this -- I've kind of outlined the big steps

15   here.  I mean, obviously, there's a lot of little steps in

16   between, but these are sort of the big pieces.

17             Would you like me to walk through them or --

18   Q.   Yeah.  If you wouldn't mind, please, what -- if you

19   could -- so once an e-mail is received at Cox's e-mail

20   servers, what happens next?

21   A.   Well, the, the -- probably the biggest next thing from

22   the standpoint of this litigation, there are some important

23   things that happened back there, but the e-mail header is read

24   to identify who the e-mail is from, just like you might going

25   through your inbox look to see which e-mail do I want to read

B. Frederiksen-Cross - Direct

490

1   first.  That e-mail is checked against what's called a

2   blacklist, and a blacklist is a list of senders that -- whose

3   e-mail Cox will not process, and --

4   Q.   And -- oh, I'm sorry.

5   A.   No.  If it's blacklisted, then the Cox system is not

6   going to take additional action in the steps that I'm going to

7   describe next on that e-mail.  But assuming that the e-mail is

8   not on the blacklist, the Cox system then looks up -- or it

9   reads the rest of the e-mail.  It then reads the whole e-mail

10  to pull out certain information, like that IP address that I

11  said was in the notice and the date and time, and it uses the

12  IP address and date and time to look up against its ICOM

13  system, which is just an internal Cox system for customers,

14  what customer was assigned that IP address at that specific

15  date and time, because then the Cox system can create a ticket

16  about that e-mail notice, and then that ticket gets processed

17  in the next phase of their processing.

18  Q.   Sure.  On the slide in the lower right corner, there's a

19  reference to an existing ticket and a new ticket.  Can you

20  explain what that refers to?

21  A.   Yeah.  If a, if a particular Cox subscriber has gotten

22  multiple e-mail warning notices for copyright in the, in the

23  same day, within a 24-hour period, those can get rolled up

24  into a ticket.  So the first, first notice in a day will

25  create a new ticket, but then if there was a second or third

B. Frederiksen-Cross - Direct

491

1    or fourth notice, those get rolled up into that same ticket.

2    Q.   Oh, and when you're talking about multiple notices,

3    you're talking about multiple notices necessarily from a

4    single submitter or what -- what were the permutations on how

5    that could work?

6    A.   Okay.  It could be multiple notices from MarkMonitor, or

7    there are other companies that provide similar service to

8    other rights holders in the industry, and so it could be maybe

9    a notice from MarkMonitor and then a notice from another

10   company that does copyright enforcement services.  So the

11   e-mails don't have to all be from MarkMonitor.

12   Q.   Is there something in the MarkMonitor notification

13   process that speaks to how frequent an e-mail notice can be

14   submitted to Cox?

15   A.   In the MarkMonitor system, MarkMonitor actually -- once

16   it prepares an e-mail to send out, it puts that IP address and

17   the artist, title information, the identity of the specific

18   music file, in what's called a quarantine, and so it won't

19   send another e-mail out for a detection in the same day.

20        So it's not that you couldn't send two e-mails in a

21   day.  Like, if I detected on a Thursday and detected on a

22   Friday, both of those e-mails might happen to go out on

23   Friday, but if I detected twice on Friday, I would not send

24   two e-mails.  I would send one e-mail, and then the rest go in

25   the quarantine.

B. Frederiksen-Cross - Direct

492

1    Q.   And in your review of the notice data, did you become

2    familiar with whether that scenario you described of two

3    notices going out in a single day is a common circumstance?

4    A.   I wouldn't characterize it as common.  Out of, I think,

5    275,000 notices, it happened about 3,300 times, and I

6    inspected every one of those and verified that in each

7    instance, it was a case where the actual detection happened on

8    different days but multiple notices went out on that one

9    day -- multiple e-mails went out to Cox on that one day.

10            But I found no occasion where two occurrences of a

11   notice detected the same day went out -- both went out the

12   door.

13   Q.   How were you able to review so much data?

14   A.   I wrote simple programs to help me filter and extract the

15   information I wanted from the data so that I could look at

16   various things about the data, you know, how many were

17   BitTorrent, how many were the other types, how many went out

18   the same day.

19   Q.   Sure.

20   A.   How many times a customer got a notice.

21   Q.   So then what happens once Cox either opens a new ticket

22   or rolls multiple notices into an existing ticket?

23   A.   Okay.  If you go to the next slide, let me kind of walk

24   through this.  There's a thing in the Cox system called a

25   sender hard limit cap, and what that means is that for any

B. Frederiksen-Cross - Direct

493

1  particular e-mail sender, there will be a hard limit -- or

2  there's a system default if it's somebody they've never heard

3  of, but there's a hard limit on the number of e-mails that the

4  Cox system will actually process from a particular sender in

5  one day.

6          And surplus e-mails are closed up until, I think the

7  default was 5,000, and then if there were more than 5,000

8  e-mails sent in a day, they kind of go into a holding pool

9  that might be processed the next day if they don't hit their

10  limit again.

11  Q.   So let me ask you a question:  So when an e-mail is

12  submitted, let's say Cox doesn't -- hasn't blacklisted the

13  submitter, right, so it isn't put off to the side, but it --

14  so it passes the blacklist gateway, and let's say it passes

15  this hard limit restriction.

16  A.   Okay.

17  Q.   What then happens?

18  A.   Okay.  Then the, the ticket is compared against the

19  subscriber's history to see how many tickets have they had in

20  the last 180 days, and depending on the number of tickets

21  they've had in the last 180 days, the system's programmed to

22  check that and to take different actions, depending on how

23  many tickets they've had.

24          It's kind of like a speeding ticket.  You know, you

25  might get a ticket the first time, and if you're a habitual

B. Frederiksen-Cross - Direct

494

1  offender, you might lose your license.  You know, so it's --

2  it kind of goes through the gamut from just very -- on the

3  first ticket, really nothing happens.  They just make a record

4  that the ticket has been received, and they take no further

5  action.

6  Q.   Okay.  So after Cox's CATS system looks at the subscriber

7  history, what actions from a software perspective could occur?

8  A.   Well, the principal actions are called close -- which I

9  think we've already discussed, you just close the ticket and

10 move on -- hold, warn, suspend, and terminate.  Hold is for

11 like the first ticket you get, you mark that you got the

12 ticket, so it goes in the history file, but you take no

13 further action.  You're holding pending additional tickets.

14      Warn means you send the notice on to that individual

15 who was the offender, so you forward the notice that you got

16 to the offender, or in some cases, it's reformatted slightly

17 but not for the Cox system.  It looks like they're just

18 forwarded.  And that's the warn state.  So you're forwarding a

19 warning to the consumer that they've been detected in this

20 activity and that it's illegal activity and so on.

21      After, let's see, first offense and then the next

22 seven are warnings.

23 Q.   Okay.  And then --

24 A.   And then after that -- so you get warning after warning

25 up to a certain level, and then the next one is what they

B. Frederiksen-Cross - Direct

495

1  called suspend, and there's two different kinds of suspend.

2  The first two suspenses just means that if I try to go on the

3  internet after I've had that many tickets, I get a -- I'm

4  redirected to a website that gives me a web page that I have

5  to read and acknowledge before I can go on, and that's just,

6  you know, making sure that I know I have a warning.

7          Then after a couple of those, you go to the next

8  level, which is to -- the website doesn't let me go on.  I

9  have to pick up the phone and I have to call someone before I

10 can go on, and then they'll re-enable me, and I can go on my

11 way.

12         And the last one is what we call terminate.

13 Q.   Okay.  Let me before we explore terminate just ask you a

14 couple questions.  Are each of the warnings essentially the

15 same process from a software perspective, or is there any

16 difference in what occurs when these warnings are issued?

17 A.   Are you saying with respect to the e-mail that goes out

18 or -- I'm not sure what question you're asking, counsel.

19 Q.   Well, let me take a step back.  So the first notice that

20 comes in, you said it's just held without any action taken?

21 A.   Correct.  Yeah.  It gets a record in the history file but

22 no further action taken.  It doesn't go out to the, to the

23 customer.

24 Q.   Okay.  And then the warnings, is it essentially the same

25 process for each warning?

B. Frederiksen-Cross - Direct

496

1    A.    For the successive warnings in that level of handling,

2    yes.

3    Q.    Okay.  And then I believe you just explained the suspend

4    process as well, correct?

5    A.    Right.  Right.  That's where the user is, at least for

6    moments and maybe as long as it takes to make a phone call,

7    restricted from internet access.

8    Q.    So the user's internet access is not restricted at all

9    during the hold stage or the multiple warnings, correct?

10   A.    Right.  They just get an e-mail during the warning, and

11   the user would never even know it happened during the hold

12   stage.  They would have no visibility to the fact that they'd

13   been detected in doing something wrong.

14   Q.    And then at the suspend stage, is the user -- I know you

15   mentioned the user is required to call in.  Is there also an

16   aspect of the suspend stage that's automated, that doesn't

17   involve calling Cox?

18   A.    Yeah, that's what I meant.  The first two suspensions,

19   they actually can just click to acknowledge and go back about

20   their business, and the next two, they have to call in and

21   talk to a customer support person.

22   Q.    And who designed the Cox CATS system?  And I'm not

23   talking about the specific individual, but who decides how the

24   CATS system operates?

25   A.    Well, Cox does.

B. Frederiksen-Cross - Direct

497

1    Q.    I'm sorry, what's that?

2    A.    Cox does.

3    Q.    Cox does.  So could Cox have programmed this, let's say,

4    to have three strikes and then termination, for example?

5              MR. BRODY:  Objection.

6              THE COURT:  Overruled.

7              THE WITNESS:  Let me make something clear before I

8    answer that, and that's that termination -- this system does

9    not terminate a customer, and that's why I put the quotes

10   around "terminate."  That was to remind me to explain to the

11   jury that the termination does not end a customer's internet

12   service.

13             What it does is instead, it sends the customer's --

14   the subscriber's history to a Cox person to review.  So I want

15   to make that clear before I answer your question.

16             But Cox could have programmed the system to do

17   whatever they wanted to program the system to do.  I mean,

18   this is just -- the programmers wrote the code initially to

19   apply these actions, and Cox chose the actions, and so

20   whatever they chose, you know, one strike, two strikes, three

21   strikes, ten strikes, that's up to what Cox decided to do.

22             MR. ZEBRAK:  Thank you.  I pass the witness, Your

23   Honor.

24             THE COURT:  All right.  Cross-examination?

25             MR. BRODY:  Thank you, Your Honor.  Sorry.  Too many

B. Frederiksen-Cross - Cross

498

1    toys here.

2                         CROSS-EXAMINATION

3    BY MR. BRODY:

4    Q.    Hello.

5    A.    Good afternoon -- or good late morning, I guess.

6    Q.    Nice to see you again.

7    A.    Good to see you, sir.

8    Q.    So that was a lot to take in.  I want to go back through

9    some of it, try to hit some of the high points --

10   A.    All right.

11   Q.    -- and see where we are.

12           So let me talk a little bit with you about your

13   background and your professional experience.  You said your

14   company is called JurisLogic; is that right?

15   A.    Since 2017, yes.

16   Q.    Okay.  And the Juris part, I assume that refers to the

17   legal profession?

18   A.    Yes.

19   Q.    Yeah.  So it's basically a legal consulting company; is

20   that correct?

21   A.    Not entirely.  We do work outside the legal profession as

22   well, though it's mostly directed to internal investigations

23   or, as I mentioned, companies who are engaged in mergers and

24   acquisitions and want someone to look at the software that

25   they're potentially buying.

B. Frederiksen-Cross - Cross

499

1    Q.   Yeah.  So not entirely but primarily, fair enough?

2    A.   I think that's fair to say, yes.

3    Q.   Okay.  And I think you said you've testified in hundreds

4    of cases?  Did I hear that?

5    A.   No.  I said that I have, have worked on hundreds of

6    cases.  I have testified in court 26 times and at arbitrations

7    seven or eight times.  They don't all make it to court.

8    Q.   And depositions 40 times, I think you testified.

9    A.   Thirty-nine or 40.  I don't know that we actually asked

10   about depositions here today, but it's 39 or 40.  I'd have to

11   look at -- and count them real quick.

12   Q.   And you, you mentioned some publications that you've

13   written.  I think you mentioned -- I counted 77.  I've been

14   known to miss or add, so let's call it -- I think you said 75

15   to 80.

16   A.   Yeah, it's in that ballpark.  I haven't counted them

17   recently myself.

18   Q.   Okay.  And by my count, 56 of those were for law schools,

19   bar associations, law offices, prosecutors, or basically legal

20   entities and conferences.  Does that sound right?

21   A.   I think that does sound right, yeah.

22   Q.   Okay.  You said you've worked 400 hours at 595 an hour?

23   A.   I think in the ballpark of 400, you know, I would say

24   give or take five, but it's in that ballpark.

25   Q.   So you've billed about a quarter of a million -- a little

B. Frederiksen-Cross - Cross

500

1    less than a quarter of a million dollars in this case?

2    A.    I think that math is correct, yes.

3    Q.    I want to talk a little bit about -- a lot of the things

4    you talked about the jury hasn't seen yet.  They haven't come

5    into evidence.  So I wanted to kind of go through some of

6    those items.

7              THE COURT SECURITY OFFICER:  Counsel, excuse me, the

8    jury can't hear you.

9              MR. BRODY:  Oh, I apologize.  I have been

10   frustrating juries for 40 years.  I promise I'll do better

11   today.

12                        (Laughter.)

13   BY MR. BRODY:

14   Q.    I was starting to say that a lot of the material that you

15   were referring to has not yet come into evidence, so the jury

16   hasn't heard it or seen it, so I thought maybe we could create

17   a little checklist of the things that you relied on and are

18   important to your opinion and they should keep their eyes out

19   for, okay?

20   A.    That's an excellent idea.

21   Q.    I'm glad you agree.

22             So one thing is you've talked about information

23   about how these hashes are used and how notices are sent, and

24   that information is compiled in spreadsheets, right, or at

25   least a lot of it is?

B. Frederiksen-Cross - Cross

501

1   A.   As I received it, it was in spreadsheets or in a form

2   that could be loaded into a spreadsheet or database, yes.

3   Q.   Okay.  And there's a spreadsheet of the notices, right?

4   A.   There are notices themselves on a spreadsheet of the

5   notices, yes.

6   Q.   And --

7   A.   And just to be clear, that records the information that's

8   put into the notices --

9   Q.   Right.

10  A.   -- and information about when they were mailed out and

11  things like that.

12  Q.   And then there's, like, this mammoth file of the notices

13  themselves?

14  A.   Mammoth file is a good word for it, yes.

15  Q.   Okay.  And then there's a spreadsheet that I think when

16  we were together before, you called the Audible Magic

17  spreadsheet, and that lists the hashes for files when they

18  were first found, it gives some of the information that

19  Audible Magic sent to MarkMonitor about the spreadsheets.  You

20  remember that document as well?

21  A.   Yes.  I'm hesitating because I think I received it in two

22  different formats, but there was a spreadsheet and then also a

23  text/comma-separated-value spreadsheet for that, or a file for

24  that that I could load in.

25  Q.   That's the same information, just in different formats?

B. Frederiksen-Cross - Cross

502

1    A.    As I received the original spreadsheet, there was --

2    actually I think that's the one that had an error in it where

3    part of the script that had been used to pull the data was

4    embedded in the spreadsheet, so I mostly used the other one,

5    but generally it was the same information.

6    Q.    And then there's a -- you mentioned a hard drive with

7    some songs on it.  I heard that correctly, right?

8    A.    That's correct, yes.

9    Q.    And that's what, a collection -- that's basically all of

10   the songs -- well, never mind.

11           And then there's a spreadsheet that's kind of an

12   index to that hard drive, right?

13   A.    That's correct also, yes.

14   Q.    Okay.  Now, you looked at technical information about

15   Audible Magic, for example, right?

16   A.    Some technical information in the source code, yes.

17   Q.    Yeah.  And you looked at a deposition, I think?

18   A.    I'm sorry, yes, I did.

19   Q.    Okay.  The Audible Magic system works by matching files

20   to a reference database of all of the songs that are covered

21   by the system?

22   A.    It actually works by matching this digital fingerprint of

23   a song to a database of digital fingerprints.  It's not

24   matching a file to a file.  It's, it's the digital fingerprint

25   to the digital fingerprint stored in the database.

B. Frederiksen-Cross - Cross

503

1    Q.    Okay.  And you saw information about how the fingerprints

2    get to Audible Magic for being matched, right?

3    A.    Yes.  I actually got to test that process myself.

4    Q.    Did you have a chance to inspect the Audible Magic

5    database of fingerprints?

6    A.    The reference database?

7    Q.    Um-hum.

8    A.    I did not inspect the reference database.

9    Q.    Okay.  And did you -- well, did you talk directly to

10   anybody at Audible Magic?  You said you interviewed some

11   MarkMonitor folks.  Did you interview them?

12   A.    Yes, I also spoke to an individual at, at Audible Magic.

13   Q.    You -- with respect to the CATS system, you mentioned --

14   well, I'll save that until later.  We'll get to the CATS

15   system in a while.

16          Let's talk a little bit about BitTorrent, and again,

17   I just want to get some vocabulary straight so that when we

18   get kind of to the substance of your opinion, we'll be talking

19   the same language.

20          Now, you talked about the -- excuse me, about the

21   files that are shared in the BitTorrent system, and can we --

22   for the time being, can we just use BitTorrent as sort of a

23   stand-in for peer-to-peer networks?  If I've said something

24   that doesn't apply to the others, will you let me know?

25   A.    I will try to if I pick up on it when we're discussing

B. Frederiksen-Cross - Cross

504

1    it.

2    Q.   Okay.  So in the BitTorrent network, what happens is

3    somebody sends out a search looking for, say, a piece of

4    music, and they get back information about a file that's being

5    shared in the, in the, in the peer-to-peer network, right?

6    A.   Typically, it's not exactly like that.  Like, I might go

7    to the internet, and if I were to enter a search term that was

8    a particular artist and title, what I would normally be

9    directed to, because I would probably put the word "torrent"

10   in there just to narrow the searches a little bit, I would

11   normally be directed to a site like Pirate Bay or another site

12   where I could download that torrent.  So I'm not getting back

13   the file necessarily but the torrent file.

14   Q.   That's exactly the point I wanted to make.  What you --

15   A.   Okay.

16   Q.   -- what you get back is basically the name of something

17   with a lot of other information about how you can access that

18   thing, whatever it might be, right?

19   A.   You get -- well, it depends, it depends what you click on

20   when you get your search results.  You either get the link to

21   the file itself or you get the place you can go to get the

22   file, and that file contains a lot of information, but you as

23   the user don't really need to know anything about what's in

24   that file because you don't have to do anything with it.  The

25   software takes care of that.

B. Frederiksen-Cross - Cross

505

1    Q.   Yeah.  I'm not asking the questions well.

2         All I really want to get to is initially, what you

3    get back from BitTorrent, if you go out and look for a piece

4    of music, all you're going to get back is the names and

5    identities and ability to access a file that has that name.  I

6    mean, you don't actually know what's in the file until you go

7    out and download it and check it, right?

8    A.   Okay.  I think I see where we've missed communication

9    here.  You're assuming that I'm searching, like, from within a

10   torrent client.  So I'm running the BitTorrent software, and

11   I'm actually doing my search from within BitTorrent.

12        Is that correct or --

13   Q.   We can start there.  That's fine.

14   A.   Okay.  So what I get back is information that will allow

15   me to download the file if I open the torrent or if I load it

16   into my, my torrent client.

17   Q.   But if you -- the only point I want to be clear on or

18   make sure that we're both clear on is that what you're getting

19   back -- you don't know what you're getting back signifies

20   until you actually get the file and listen to it or hash it or

21   do whatever you're going to do with it.  So let me give you an

22   example.

23   A.   Okay.

24   Q.   If you -- if you're trying to find a recording of "Stand

25   By Your Man," Tammy Wynette --

B. Frederiksen-Cross - Cross

506

1    A.   Okay.

2    Q.   -- and you find a torrent that says I've got "Stand"

3    -- or my torrent is named "Stand By Your Man," you don't know

4    whether that's Tammy Wynette or it's an anniversary video or

5    it's, I don't know, a sitcom.  All you've got is the kind of

6    title to the file, and then you're going to have to get the

7    file downloaded and actually check it to see what that means.

8         Am I right about that?

9    A.   It depends where you've looked, and the reason I say that

10   is, like, a lot of the torrent sites, there are actually user

11   reviews on particular torrents that are confirming they don't

12   have viruses or garbage or whatever.  So it depends, but

13   generally speaking, I think what you're saying is correct,

14   that you're getting a file that although your software may be

15   verifying it as it's downloaded, you, the human, are not going

16   to know what it is until it's in a form you can open.

17   Q.   It's a little surprise.

18   A.   Huh?

19   Q.   I said it's a little surprise, hopefully not.

20   A.   Well, again, you know, because the authentication works

21   off the hash files and the BitTorrent software, for instance,

22   as each piece is downloading, it's individually verifying that

23   those pieces are accurate, it's not -- the system tends not to

24   be very surprising, based on my testing of BitTorrent anyway.

25   Q.   It's verifying that they are accurately copies of

B. Frederiksen-Cross - Cross

507

1    whatever --

2    A.   The expected content is, yes.

3    Q.   Let's say I thought about verifying because I think it's

4    important.

5           Now, you've told all of us several times that files

6    with identical hash values are identical, right?

7    A.   For all practical purposes in a context like this, yes.

8    Q.   And what the hash value tells you, if the two, if the two

9    hash values match one another, if you have two files with hash

10   values that match, that tells you those files are identical,

11   right?

12   A.   Say that again, please?

13   Q.   I said if you have two files with identical hash values,

14   that tells you the files are identical?

15   A.   As I say, for all practical purposes, that is correct.

16   Q.   Well, for the purpose -- I mean, you just spent about

17   20 minutes during your testimony saying that once you got the

18   hash value and if you matched the hash value, you've matched

19   the files.  You stand by that testimony, right?

20   A.   There is about a one in a trillion-trillion chance

21   mathematically as an abstract possibility that two files with

22   the same -- with different contents could generate the same

23   hash.  That's 1 followed by 24 zeros.

24          And I'm aware that computationally using some very

25   sophisticated complex processors, there is one instance where

B. Frederiksen-Cross - Cross

508

1   that mathematical proof has been proven.  The articles I've

2   read about it said it cost about $175,000 to rent the

3   computing processing to do that.

4            So -- and I'm not aware of it ever having happened

5   in the wild, which is why I say for all practical purposes and

6   certainly in a context like this, where I'm sure there are

7   many less than a trillion-trillion music files in the world, I

8   think that it's a reliable way of identifying the content of a

9   file.

10  Q.   Ma'am, you told Mr. Zebrak they're identical.  Why don't

11  you want to tell me they're identical?

12  A.   They do have identical hashes.

13  Q.   Okay.  And they are identical files?

14  A.   That is true, yes.  With respect -- I mean, that is the

15  way the BitTorrent is, is designed to work.  If you're

16  theorizing that --

17  Q.   Is that a yes or a no, ma'am?

18  A.   They would be identical files.

19  Q.   Okay.  Now, you said something a second ago that I

20  thought was interesting, and I want to make sure we're clear

21  on that.  This downloading process for the BitTorrent files,

22  that's a, as you said, a piece-by-piece process.  So you got a

23  piece from this guy and a piece from that computer and a piece

24  from her, and eventually you've got the whole file, right?

25  A.   Correct.

B. Frederiksen-Cross - Cross

509

1   Q.   And you said, I think, in your answer that when you get

2   the -- when a peer on the peer-to-peer network is looking for

3   a file and is receiving it, it actually checks those pieces as

4   they come in.  Did I hear that right?

5   A.   That is correct.  The BitTorrent software itself, the

6   BitTorrent client verifies the integrity of each piece it

7   receives using information that is in the info hash portion of

8   the torrent file.

9   Q.   And what that verification consists of is rehashing the

10  piece basically, right?

11  A.   Right.  The system has stored in the torrent file the

12  expected hash, and as the piece is received, the software

13  calculates a hash and compares it to the expected hash for

14  that piece slot.

15  Q.   Um-hum.

16  A.   And then it will either reject it or if the piece is

17  confirmed, then it puts it in the appropriate slot, and it ups

18  the bit flag in the bit field to indicate that it has that

19  piece.

20  Q.   And the, the torrent software and the torrent system

21  insists on that rehashing in order to preserve the integrity

22  of the files that are being transferred, right?

23  A.   Again, I'd probably have to distinguish BitTorrent here

24  from the other three because BitTorrent does that specific

25  hashing against the information contained piece by piece.  In

B. Frederiksen-Cross - Cross

510

1    the time frame of interest for this case, the other three did

2    it based on the entirety of the file.  So they would not be

3    able to -- let me think if that's correct.  No, that's not

4    correct for all of them.

5            Depending on which client you were running for Ares,

6    Gnutella, and eDonkey in the time frame, most of the clients

7    for those three would only be able to hash on the entire file.

8    Now, that's changed since then, and it changed at various

9    points in time, but just to make that distinction that in the

10   period of time here, most of the other three clients were just

11   dealing in full files.

12   Q.   So whether it's piece by piece or for the entire file,

13   all of the peer-to-peer protocols and software don't just rely

14   on the hash; they actually look at the content of the file

15   itself.  Just like when you were describing sending a will to

16   your lawyer, you said:  If I send a will to my lawyer and I

17   compute a hash on it, I tell him to recompute the hash to make

18   sure he's got the same thing.

19           Did I get that analogy?

20   A.   That's close enough, yeah.

21   Q.   Okay.  And that's exactly what happens in the

22   peer-to-peer networks, that when the peer-to-peer network --

23   when a peer downloads a file, it doesn't just trust the hash,

24   it doesn't just trust the title of the file.  It actually

25   takes the content of that file, runs the hash algorithm, and

B. Frederiksen-Cross - Cross

511

1    generates a hash to make sure that the two match, right?

2    A.   That's not exactly correct.  Let's take the instance of

3    BitTorrent, for example.  I would request a file, and so I'd

4    go out and find a torrent hash for the file I wanted, and I go

5    out and I download it.

6         Now, that download happens, the individual pieces

7    are verified, but there's no verification against the work

8    because the work is presumed to be the work identified by that

9    hash, and I would never know that were not true until I

10   actually opened the file and went, hey, it's my file.  So --

11   Q.   I'm sorry --

12   A.   So the system itself is operating based on the hashes.

13   The identification through the file is on the hashes, and

14   while it's true that portions of the file might be checked

15   individually, the system as a whole does not then -- like in

16   BitTorrent, it doesn't then reconfirm and recalculate the

17   torrent hash, because in BitTorrent, the hash of the file is

18   the hash of the torrent.

19   Q.   Ma'am, we're way past a response to my question.  If we

20   could just focus, I think this will go a lot faster.

21   A.   Okay.  So the short answer is no, you didn't get it

22   right.

23   Q.   Okay.  Well, in the other -- that's helpful.

24   A.   Well --

25   Q.   In the other -- in BitTorrent, there's a rehash of each

B. Frederiksen-Cross - Cross

512

1    piece of the file, right?

2    A.    At the piece level, yes.

3    Q.    Okay.  And each piece of the file, the torrent file

4    supplies a hash for that piece, and then the piece is rehashed

5    to make sure that the two match, right?

6    A.    When it's received, correct.

7    Q.    Okay.  And in the other systems, that's done on the file

8    level.  That is to say, there's a hash for the file, and when

9    the file is received, it's rehashed to make sure that the

10   hashes match, right?

11   A.    That's correct.

12   Q.    Okay.  So in other words, all -- none of these protocols

13   simply trust the fact that a hash has been provided.  They

14   actually recalculate the hash to make sure they're getting

15   what they were promised either for the file or for the pieces?

16   A.    Right.  But again, the identification is no more than the

17   identification of the hash.

18   Q.    Is that a yes or a no?  I really -- it will be much --

19   A.    It's not a yes-no question, Counsel.  You're implying

20   that the content is what's being verified when, in fact, all

21   that's being verified is that the content matches the hash

22   expected.  That does nothing more or less than the hash itself

23   would do other than to confirm transmission has not been

24   corrupted.

25   Q.    But you just told me that the hash is identical with the

513

1    content.  If you have a particular content, then you're going

2    to have a particular hash, and if the hashes are identical,

3    the content is identical except for the 1 in 32 trillion or

4    whatever it is.

5    A.    Trillion-trillion.

6    Q.    That's true, right?

7    A.    The same content will always generate the same hash.

8    Q.    Okay.  And maybe we can just get this one out and then

9    we'll leave the topic:  In all of these systems, even though

10   the peer is receiving the content and receiving the hash, it's

11   actually going to recalculate the hash to make sure that the

12   content is what it's supposed to be, the hash for the file or

13   the hash for the pieces?

14   A.    It will recalculate the hash to make sure that the

15   material transmitted matches the expected hash.  That is not

16   the same as the identity of content, which is, I think, why

17   we're mismatching here.

18   Q.    Well, nobody is interested in whether or not the hashes

19   match.  What they're trying to figure out is whether the

20   content matches; isn't that true?  That's why they calculate

21   the hashes and compare them.  That's why MarkMonitor captures

22   the hashes and compares them.

23         THE COURT:  If you understand the question, you can

24   answer it.

25         THE WITNESS:  Yeah, I feel like we're talking past

514

1    each other because the software doesn't verify content as in

2    what it is.  These are protocols.  They're designed for

3    efficient file transfer.  They allow people to, to look things

4    up by hash, and they verify that what's received has a hash

5    that matches the expected hash, but that's not a verification

6    of content.

7            That's why MarkMonitor has to go through that

8    separate step of looking up and confirming via Audible Magic

9    that a particular hash has a particular content.  The

10   verification of content is only verified with respect to

11   matching the hash.  The identity of content requires something

12   like the MarkMonitor lookup.

13           I hope that clarifies because I feel like we're

14   talking past each other --

15   BY MR. BRODY:

16   Q.   That's actually very helpful.

17   A.   -- and I don't mean to be troubling to you, but --

18   Q.   So simply matching the hash doesn't confirm to you that

19   you've got, you've got identical content?

20   A.   Unless you know what the hash value matches to already,

21   yeah.

22   Q.   Okay.  That helps.

23   A.   Good.

24   Q.   So let's work through the vocabulary of the MarkMonitor

25   system briefly.

515

1                James, can we get slide 15 from

2     Ms. Frederiksen-Cross's deck up?

3                This is the verification module, right?

4     A.    Correct.

5     Q.    First I just wanted to make sure -- and this is partly

6     going back to our checklist -- when it says that there's a

7     download of full files, that's the step you reference there in

8     the middle.

9     A.    Yes.

10    Q.    Those are the files that are on that hard drive that we

11    were talking about before?  Is that your understanding?

12    A.    The files on the hard drive were produced, it's my

13    understanding, by MarkMonitor, and they are downloaded files,

14    yes.

15    Q.    Right.  They're the files that were captured during that

16    downloading step in the process?

17    A.    Yeah.  They are the files associated with the known

18    infringing hashes, the ones that have been verified.  It's my

19    understanding that MarkMonitor captures new files whenever

20    they encounter them, but I think that all of them on that hard

21    disc, it's my understanding, are ones that have already been

22    through the verification process.

23    Q.    And so that actually raises two questions.  The first is

24    those are the files that are sent to Audible Magic, right, or

25    the files that are fingerprinted and the fingerprints are sent

B. Frederiksen-Cross - Cross

516

1  to Audible Magic?

2  A.   They are files who would have been fingerprinted at some

3  point in time and gone to Audible Magic or at least copies of

4  those files.  I imagine they were just copied from the system

5  onto the hard drive.

6  Q.   Okay.  And then --

7  A.   And if I can clarify, I'm just -- these are not the

8  reference files.  They are the files that were unknown and

9  were identified just for the jury's benefit.

10  Q.   Right.  These are the -- these are the files that

11  MarkMonitor finds out on the internet, it downloads them onto

12  a hard drive at its system, it fingerprints them and sends

13  that fingerprint to Audible Magic for matching, right?

14  A.   And gets back a confirmation, yes.

15  Q.   Well, or a disconfirmation, depending.

16  A.   Yeah.  Thank you.

17  Q.   Okay.  And that's what's on the hard drive.  The ones

18  that were downloaded, matched, those were all saved to the

19  hard drive, and that's what you inspected?

20  A.   Yeah.  A copy of those files are on the hard drive.

21  Q.   Now, when Mark -- I'm sorry, when Audible Magic does its

22  matching of the fingerprints, you're aware that there are a

23  variety of levels of matching that Audible Magic can perform.

24  There's Level 1, Level 2, Level 3, I think, are the poetically

25  named choices.

517

1   A.   Yes.  I think there's probably a couple more levels even,

2   but yes, they're cleverly named 1, 2, 3, and 4.

3   Q.   And in your report, you explained that MarkMonitor uses

4   Level 1, which means that it matches 20 seconds at the start

5   of the song.

6   A.   It's actually 20 seconds near the start of the song.

7   It's not the very first 20 seconds.  They offset a little bit

8   to get past white noise and stuff.

9   Q.   Right.  Okay.  And that's the technique that MarkMonitor

10  uses and used in this case to match these files, right?

11  A.   As I --

12  Q.   I mean, sorry, Audible Magic used?

13  A.   As I said in a later version of my report, you know, the

14  initial evidence I had received was that they used the first

15  20 seconds.  It appears that in some instances, they also

16  relied on 20 seconds that came from later in the file, which I

17  believe would have been Level 3, if I remember the levels

18  correctly.  There was some confusion about that initially.

19  Q.   And how many files were matched at Level 1 and how many

20  were matched at Level 3?

21  A.   I would have to look at my spreadsheet to see.  I don't

22  remember the number as I sit here.

23  Q.   Do you know which one predominated?

24  A.   I don't recall as I sit here.

25  Q.   There was one thing I wanted to -- can you put up

B. Frederiksen-Cross - Cross

518

1    slide 17?

2            One thing I just want to be clear about.  You've got

3    your fingerprint icon at two places on this slide.  That's

4    not -- elsewhere in the SlideDeck, you used that icon to refer

5    to the SHA-1 hash or the hash value of the file.  Here it's

6    actually referring to something called a digital fingerprint,

7    right?

8    A.   Let me be clear.  It's not -- when I refer to the file,

9    it's got the file rather than musical notes beside it, and

10   where it's got the musical notes, that's the digital

11   fingerprint using the Audible Magic-style fingerprinting.  I

12   thought I was clear on that, but my apologies if there was any

13   confusion.  If it shows the fingerprint and a file, that's the

14   hash value.

15   Q.   Well, MarkMonitor doesn't send Audible Magic a SHA-1

16   hash.  It sends Mark- -- Audible Magic a digital fingerprint,

17   right?

18   A.   Right.  That's why the little music icon there, yes.

19   Q.   Okay.  I just want to make sure -- I hadn't been clear on

20   that, and I appreciate your helping me with it.

21           Next -- and I'm sorry to sort of spend so long

22   clearing my throat here -- I want to talk about the collection

23   module and again make sure I'm understanding what you're

24   telling us.  You said that you examined 175,000 records to

25   understand what was included in the, in the evidence packages

B. Frederiksen-Cross - Cross

519

1    that were generated?

2    A.    Right.   There were more individual records, but 175,000

3    approximately case files.

4    Q.    Right.

5    A.    So a case file consists of, like, six individual files.

6    Q.    Okay.   There were, I think, 248,000 notices sent to Cox,

7    right?

8    A.    That is correct.   Approximately a quarter million.

9    Q.    Why didn't you examine all 248,000 evidence packages?

10   A.    There were some evidence packages that were not

11   available.

12   Q.    Like 10 or 100 or something?

13   A.    I believe the number was somewhere on the order of

14   97,000.   It was, it was larger than ten.

15   Q.    How many?

16   A.    I believe it was 97,000 approximately.

17   Q.    They weren't available?   What happened to them?

18   A.    They were principally older records that had -- that were

19   no longer in existence or couldn't be located.

20   Q.    They were -- when you say "older," you mean -- the

21   notices were all sent between 2012 and 2014.   Were they older

22   than that?

23   A.    I don't remember the exact date.   If you have a copy of

24   my report handy, I set it forth in my report what the cutoff

25   date was.

B. Frederiksen-Cross - Cross

520

1   Q.   It's, it's in your -- your report is in your binder.

2   A.   I don't have a binder.  I just have my résumé.

3   Q.   I was so eager to talk to you about it, I forgot to share

4   this material.

5   A.   Thank you.  Would you like me to locate that number?

6   Q.   I think it's in -- it's in paragraph 99 of your report.

7   A.   Thank you.

8   Q.   94,474 evidence packages were missing from the period

9   before January 16, 2013.

10  A.   I knew the date was in there.  Thank you.

11          MR. ZEBRAK:  Your Honor, I mean, if he's refreshing

12  her recollection, he ought not to be reading this into the

13  record.

14          THE COURT:  I'll permit modest reading to focus the

15  witness on the area.  She may -- you may focus on what you

16  would like her to testify -- where your questions are going,

17  okay?  Not more than that, but let's --

18          MR. BRODY:  That's all I meant.

19          THE COURT:  Okay.  All right.  Go ahead.

20          MR. BRODY:  She had asked for a passage, and I was

21  just trying to point it out to her.

22  BY MR. BRODY:

23  Q.   Have we got it?

24  A.   Yes, that's correct.  The date was January 16, 2013, that

25  appeared to be the cutoff date, and I saw no records older

521

1    than that.

2    Q.   Okay.  So about a third of the records were missing?

3    A.   I think that's approximately correct in the math, yes.

4              MR. BRODY:  Can we put slide 20 up?

5    BY MR. BRODY:

6    Q.   This was your slide summarizing the notification module,

7    right?

8    A.   Yes, that's correct.

9    Q.   And when you say "requirements," what that means is each

10   of those four boxes has to be checked before a notice goes

11   out?

12   A.   That's correct, yes.

13   Q.   Okay.  And MarkMonitor's system is -- if it's operating

14   properly, if one of those boxes isn't checked, the notice

15   doesn't go out, right?

16   A.   That was correct with respect to what I observed with the

17   exception of 247 records, I believe was the count, that were

18   less than 90 percent.

19   Q.   Okay.

20   A.   But the vast majority certainly fell within the

21   parameters that had been identified.

22   Q.   Well, we'll come back to some of these checks.

23   A.   Okay.

24   Q.   Make sure all of the boxes were checked.

25              But again, I want to make sure we're understanding

B. Frederiksen-Cross - Cross

522

1    what's in the boxes.  So file verified as infringing, that

2    means that Audible Magic, Audible Magic has returned a match,

3    right?

4    A.   Audible Magic has returned a hash against a particular

5    hash, and the peer client was detected to be providing that

6    hash, that specific hash.

7    Q.   And Audible Magic determined that that file matched a

8    file in its reference database?

9    A.   Audible Magic determined that the hash matched -- or that

10   the -- Audible Magic determined that a file that had been

11   passed matched a file in its reference database, and

12   MarkMonitor determined that the hash associated with that

13   file -- or added that information to the hash for a particular

14   file, because MarkMonitor does its detection based on hash.

15   Q.   Audible Magic matches the file to something in its

16   reference database.  MarkMonitor matches the hashes in the two

17   files?

18   A.   Correct.

19   Q.   Okay.  Peer distributing 90 to 100 percent of the file,

20   what you're talking about there is what's known as the bit

21   field in a, in a torrent file, right?

22   A.   Well, there's both bit field and size data.  So just to

23   be clear, for the non-BitTorrent clients, it's based on the

24   size data reported.  For the BitTorrent clients, there are a

25   few BitTorrent clients that also do not report bit field.

523

1    Instead, they send half pieces.  And so for those, size was

2    also used.

3    Q.   So what, what is being determined there is that 90 to 100

4    percent of what is supposed to be in the file is actually in

5    the file?

6    A.   The client is reporting that it has 90 to 100 percent of

7    the file.

8    Q.   Okay.  And that's based on your report?

9    A.   So it's based on the information that the client provides

10   to the MarkMonitor software.

11   Q.   Right.  But obviously, the file can't contain more than

12   it contains.  That seems kind of --

13   A.   I'm not sure what you're asking.  Are you saying could

14   the size be larger than the noted size of the file?

15   Q.   The file -- I'll make it a clearer question.  What we're

16   interested in here are works, copyrighted works, so like a

17   song, right?

18   A.   Um-hum.

19   Q.   If somebody finds a file on the internet that has a part

20   of the song and then reports that it's got 100 percent of

21   whatever was found on the internet, what it's saying is that

22   I've got 100 percent of part of the song, not 100 percent of

23   the song?

24   A.   I'm not following you exactly.  Just I'm trying to apply

25   that to my understanding of BitTorrent.

B. Frederiksen-Cross - Cross

524

1    Q.    Then let me try a better question.

2    A.    Okay.

3    Q.    If what's being shared in a peer network is, say, just to

4    be arbitrary, half of a song, and the peers for whatever

5    reason are sharing half of a song, then when a peer reports

6    that it has 90 percent of the file, what it's saying is that

7    it has 95 percent of half of the song.  In other words, it's

8    reporting on how much of what is being shared it possesses.

9    It's not reporting on how much of the work it possesses.

10   A.    Let me make sure I understand your hypothetical here.

11   You're saying that for some reason, someone created a torrent

12   that had half a song in it, and then -- and so that torrent is

13   really only the first two minutes of the song, and they're

14   sharing that, and so a client that received that torrent might

15   think it had 100 percent of the torrent, but it would still

16   only have 50 percent of the song or 90 percent of the torrent.

17   Q.    Right.  That's exactly right.

18   A.    In that hypothetical, what you say is true.

19   Q.    Well, so, for example, if somebody downloaded a TV

20   commercial that had a little snip of a song in it, you know,

21   30 seconds or something, and it reports 90 percent of whatever

22   the torrent is that has that TV commercial, it may have 90

23   percent of the TV commercial, but it's only got 30 seconds of

24   the song, right?

25   A.    Yes, but a song like that or a situation where you had a

B. Frederiksen-Cross - Cross

525

1    half a song, it's not clear to me that that would match -- I

2    mean, it would go through all of the necessary matches and

3    still generate a notice, but I'm with you so far.

4    Q.   Okay.  Well, then we'll get it straightened out later.

5         You said you looked at the hard drive that contains

6    the works that were downloaded, right?

7    A.   That's correct.

8    Q.   Do you remember how many works on that hard drive were

9    from -- well, you -- I think you said there were four

10   networks -- there were recordings from four networks on that

11   hard drive, right?  BitTorrent, Ares, Gnutella, and eDonkey.

12   A.   The hard drive just lists the works based on their --

13   they're identified in folders by their hash values so that

14   they can be matched back to other things, and because some of

15   these networks use the same hash, I don't know that I can tell

16   for certainty whether the works came from a particular

17   network.

18   Q.   Don't you remember that the, the spreadsheet that indexes

19   the hard drive, it actually lists the, the path, the computer

20   path, the way that you find files, sort of the address on the

21   hard drive for each of the files, and that structure is

22   organized by network?  Do you remember that?

23   A.   The spreadsheet you're talking about is actually not, as

24   I understand it, the index of the hard drive, if I'm thinking

25   of the same spreadsheet you're speaking of, but rather is the

B. Frederiksen-Cross - Cross

526

1    one that has the Audible Magic lookup data that there's a

2    separate index that I --

3    Q.   No, I'm talking about a different spreadsheet.

4    A.   Okay.  Could you show me a sample of it so I could see?

5    Q.   Sure.  Could you -- we can only do this electronically,

6    Your Honor.

7              THE COURT:  Okay.

8              MR. BRODY:  But that means the jury is going to see

9    it.

10             THE COURT:  Is there any objection to looking at the

11   spreadsheet?

12             MR. OPPENHEIM:  So this is the issue I raised with

13   you earlier, which I didn't yet have a stipulation on, but

14   they should all come in, Your Honor.  That way we can avoid

15   this time delay with the jury.

16             THE COURT:  Do you have any objection to this one?

17             MR. OPPENHEIM:  I don't know which specific one he's

18   offering because he hasn't told me a PX number but probably

19   not.

20             MR. BRODY:  I want to offer it for impeachment.  I'm

21   not offering it for evidence.

22             THE COURT:  Okay.

23             MR. BRODY:  We'll figure out the evidentiary issues

24   later.

25             THE COURT:  I'll allow you to have it identified,

527

1  and we'll go from there.  Thank you, sir.

2           MR. BRODY:  Okay.  Could you put up the Defendants'

3  Exhibit 213?

4  BY MR. BRODY:

5  Q.   This is the spreadsheet that's kind of an index to what's

6  on that hard drive, right?

7  A.   I'm looking at it, Counsel.  Let me just orient myself.

8  Q.   I'm sorry, I can't hear you, ma'am.

9  A.   I'm looking at it.  Let me just orient myself.  I think I

10  have seen this spreadsheet before.

11  Q.   Okay.  And the column in the middle, that's, that's the,

12  the list of path names for each of the files.  That's the, the

13  list that shows you where to look on the file -- on the hard

14  drive to find each file, right?

15  A.   Correct.

16  Q.   Okay.  We sorted that alphabetically.

17  A.   Okay.

18  Q.   And you can see the first four files are labeled "ARES,"

19  right?

20  A.   I see that.

21  Q.   Yeah.  And that means those are the files that were

22  downloaded from Ares, right?

23  A.   I didn't create this hard drive.  That would be my

24  presumption looking at the folder names.

25  Q.   Well, you, you actually looked at the hard drive itself.

B. Frederiksen-Cross - Cross

528

1  You relied on it, you used it, you understand it, don't you?

2  A.   I looked at the hard drive.  I looked at it specifically

3  from the standpoint of matching content for various hashes

4  back to various notices and doing confirmation on the

5  evidence.

6         If I'm recalling this spreadsheet correctly, it

7  does -- or the hard drive actually -- I think that three of

8  the four peer-to-peer protocols are represented on the hard

9  drive, because as I said, since there's an overlap in the hash

10  values used in the other two, that is to say they both used

11  the SHA-1 hash calculation, that those files were not

12  downloaded twice.  They were identified by the hash is my

13  understanding.

14         But I, I think this is a representation, at least as

15  far as I can tell from this segment of it, of the contents of

16  that hard drive.

17  Q.   MarkMonitor downloaded recordings from all four networks,

18  right?

19  A.   That is my understanding, yes.

20  Q.   Okay.  This hard drive has four recordings that were

21  downloaded from Ares, right?

22  A.   That appears to be true based on the content here.

23  Q.   Okay.  Could --

24  A.   But that doesn't mean that those were only --

25  Q.   Thank you.  I appreciate that.

B. Frederiksen-Cross - Cross

529

1    A.    -- Ares -- okay.

2            MR. ZEBRAK:  Your Honor?

3            THE COURT:  Yeah.  If you can answer yes or no --

4            THE WITNESS:  Okay.

5            THE COURT:  Please.  And if your counsel wants to

6    ask additional questions on redirect, he may do so at that

7    time.  Thank you.

8            Go ahead.

9            THE WITNESS:  Sure.

10           MR. BRODY:  James, could you do a search in this

11   spreadsheet on the string "G-N-U"?  So Ctrl F, G-N-U.  G-N-U.

12   Okay.

13           Then ask it to find all of the files with that --

14   ask it to find -- I'm sorry, folks, I really apologize -- ask

15   it to find all of the files with that, those three letters on

16   it.  Just hit "Find."

17           Okay.  Can you go to that file?

18   BY MR. BRODY:

19   Q.   Okay.  So that file is actually in the BitTorrent

20   directory.

21   A.   I see that.

22   Q.   Okay.  So when we look for Gnutella files on here, we

23   can't find any.  Isn't that what that means?

24   A.   My understanding of this file is it represents a copy for

25   the hashes that was downloaded from various sources.  It is

B. Frederiksen-Cross - Cross

530

1    not my understanding that this corresponds to every file

2    downloaded from each network, but, rather, represents each

3    hash that was provided in the notices.

4    Q.   Does the file contain any -- does the directory, the

5    spreadsheet, the hard drive, do they contain any files

6    downloaded from the Gnutella network?

7         That's just a yes-or-no question.

8    A.   They don't contain any in a GNU directory.  I don't know

9    the specific answer to that because it doesn't matter with

10   respect to the hash value.

11   Q.   Ma'am, I really would appreciate it if you could just

12   answer my question.

13        THE COURT:  She's answered the question.  Ask your

14   next question.

15   BY MR. BRODY:

16   Q.   Now, I think you said before that about 40 percent of the

17   files were actually downloaded from Ares and Gnutella.  I

18   think it's 38 percent.

19   A.   Again, that number is in my report.  So if you're

20   representing that's what I have in my report, it's correct.

21   Q.   I think it is.  It's 40 percent of the notices, I'm

22   sorry.

23   A.   Yeah, I think it was like 30 to 40.  I don't remember the

24   exact number.

25   Q.   And that would be tens of thousands of files, right?

B. Frederiksen-Cross - Cross

531

1    A.   Based on my analysis of the evidence packages, that is

2    correct, yes.

3    Q.   Okay.

4    A.   At least of file copies.  I don't know how many unique

5    files that would be, but of file copies.

6    Q.   All right.  Now, I want to make sure that we're -- I want

7    to test some of the things that you said about these hashes,

8    and the first thing I think you told me was there's a

9    one-to-one relationship between a hash and essentially a work,

10   that if you've got a hash of one song and you find that hash

11   again, you know that you're going to find the same song,

12   right?

13   A.   Can I clarify?  If --

14   Q.   Is that a -- have I got it wrong?

15   A.   It depends how you're identifying "song."  If you're

16   saying a song with identical content, that would be true.

17   Q.   Right.

18   A.   But, for instance, if the Rolling Stones recorded the

19   same song three times, different recordings, it could have

20   three hashes.

21   Q.   Ma'am, I appreciate the answer is no.

22             THE COURT:  Let her finish the answer.

23             MR. BRODY:  I'm sorry.  Yes, sir.

24             THE WITNESS:  There will be a correspondence between

25   a hash and an identical copy of that song, but in the

B. Frederiksen-Cross - Cross

532

1    instance -- I don't know how you're using the identity of a

2    song.  If you're saying a physical copy of a song recording,

3    the electronic copy, the answer is yes, but if you're

4    saying --

5    BY MR. BRODY:

6    Q.   If you've got two files with the same hash, you've got

7    the same song, right?

8    A.   Yes.

9    Q.   Okay.  Are you aware of any instances when Audible Magic

10   identified this -- concluded that the same hash identified two

11   different songs?

12   A.   Counsel, I'm sorry, but your question doesn't make sense.

13   Audible Magic doesn't work with hashes.  It works with

14   fingerprints.

15   Q.   Well, are you aware of any instances when Audible Magic

16   received a file with a hash and said:  I fingerprinted that

17   file and it matches song A, and then later it received a file

18   with the same hash and it said:  I fingerprinted that file and

19   it's song B?

20   A.   I'm thinking about it.  Just give me a moment to

21   recollect.

22        I believe that I have seen instances in the

23   evidence -- I'm trying to remember if it was in this case or a

24   different case -- where Audible Magic returned, for instance,

25   the karaoke version of the song and another version when the

B. Frederiksen-Cross - Cross

533

1    hash was -- or when the fingerprint was generated off of a

2    purely instrumental part of the song.  So I think that I have

3    seen instances where the hash returned two identifications for

4    the same song from different albums based on the acoustic

5    properties that were in a particular fingerprint.

6    Q.   So it is possible that Audible Magic could identify two

7    different songs even though the files for those songs have

8    identical hashes?

9    A.   Again, I am not aware of a case where an identical --

10   where two different, two different copies of a song with

11   identical hashes were submitted to Audible Magic and got back

12   two different identifications.  As I sit here, I am not aware

13   of that.

14   Q.   Can we put up --

15   A.   If you're saying the hash value -- we're talking about

16   the SHA-1 value, not the fingerprint, right?

17   Q.   Can we put up for impeachment purposes Exhibit 141,

18   please?  This is the spreadsheet with the Audible Magic data

19   in it.

20   A.   431 spreadsheet, yes, I recognize it.

21           MR. BRODY:  Okay.  James, can you search on the

22   SHA-1 hash 8C1EDC5EFE3FA552B56B6C97 F8DC1000ADDF1791?

23   BY MR. BRODY:

24   Q.   Okay.  And that -- the right-hand side here, we've got

25   the information that Audible Magic returned, right?  It shows

B. Frederiksen-Cross - Cross

534

1   the artist and the track for that hash as Lady

2   Antebellum, "Need You Now."  The right column.

3   A.   Can you scroll just a little bit farther right?  I

4   remember that this particular spreadsheet has a, a kind of a

5   complex structure, and I'd just like to look all the way

6   across, if I could go left to right slowly.

7           MR. BRODY:  Click on the arrow at the bottom right,

8   James.  There's an album track to the right is the last thing

9   that's on here.

10          THE WITNESS:  Okay.  Now, could you go back left?

11  Because I'm seeing the torrent name and artist and track, and

12  I'd just like to go -- if I could just scroll all the way

13  across at once, I would appreciate it.

14  BY MR. BRODY:

15  Q.   Okay.  What are you looking for?

16  A.   I'm waiting for A, B, C, D to come up on the screen, and

17  if you're able to keep the column headers, I would appreciate

18  it.

19          MR. BRODY:  Why don't you just, okay, make that full

20  size.  Go up to the top.  Ctrl Home.

21          THE WITNESS:  Or just go to View and say keep the

22  top row on this screen.

23  BY MR. BRODY:

24  Q.   Yeah, but we've got to get to the top first.

25  A.   Oh, got you.

535

1          MR. BRODY:  Go to the spreadsheet, just click on any

2   cell on the spreadsheet, hit Ctrl Home.  Okay?

3          THE WITNESS:  Thank you.

4   BY MR. BRODY:

5   Q.  Okay.  Now, the columns L -- what is it?  I think it's

6   L -- can we go back to that prior screen with the result of

7   the search?  You had a screen up before that you sort of boxed

8   something in red.

9          MR. OPPENHEIM:  Is that screen a demonstrative, or

10  is it the exhibit?

11         THE WITNESS:  Oh, I see you're not to -- yeah.

12         MR. OPPENHEIM:  So this is a demonstrative, not the

13  exhibit.

14         MR. BRODY:  Yeah, this would be a demonstrative.

15  It's a, it's a screenshot of what happens when you do the

16  search on the spreadsheet.

17         MR. OPPENHEIM:  Okay.  If you're going to introduce

18  the demonstrative --

19         THE COURT:  Okay.  All right.  All right, let's do

20  this:  We've spent enough time digging through these exhibits.

21  Let's take our lunch break now.  We'll take an hour.  We'll

22  try to come back at maybe 5 minutes to two, and we'll resume

23  the testimony.  We'll have this all worked out.  Thank

24  you-all.  You're excused.

25         NOTE:  At this point, the jury leaves the courtroom;

536

1    whereupon, the case continues as follows:

2    JURY OUT

3           THE COURT:  All right.  You-all look at these

4    exhibits and -- or the underlying data sheets and tell me

5    where you're going to go when we get back.  Collectively, you

6    can share with Ms. Frederiksen-Cross information that you

7    decide you want her to be able to focus on when you come back

8    if it will help her in looking at some of these spreadsheets.

9    Otherwise, you're on your lunch break.

10          And please don't discuss the testimony you've given

11   so far with anyone until we come back, all right?

12          MR. OPPENHEIM:  Your Honor, could we get a copy of

13   the demonstrative that they were just using so we can take a

14   look at it?  We've not seen it.

15          MR. BRODY:  I can give you copies of what we're

16   going to be doing so you can see them all.  I can give them.

17          THE COURT:  Yeah.

18          MR. OPPENHEIM:  In my experience, you can't just put

19   a demonstrative up and not tell the judge, the jury, or

20   opposing counsel you're doing that.

21          THE COURT:  Yeah.  Let's -- I assume you're sharing

22   demonstratives beforehand because you didn't object to hers,

23   going through hers, and so I'm sure -- I assume that you

24   had those --

25          MR. ZEBRAK:  No, sir, that's not correct.  We shared

537

1   ours with them this morning.  This is a live demonstration.

2            THE COURT:  That's what I said.  I assume you shared

3   with them --

4            MR. ZEBRAK:  Yes, sir.

5            THE COURT:  Okay.  I mumble also, so I apologize.

6            MR. ZEBRAK:  No, that's my fault.

7            THE COURT:  So let's do that.  Before we resume,

8   let's -- you know, if you need to eat the ham sandwich out on

9   the courthouse steps, then let's get that done so that we can

10  come back at 5 minutes to two.

11           Mr. Buchanan, if you want to address that -- the

12  issue you raised this morning, we can do that right away when

13  we come back as well.  Okay?

14           MR. OPPENHEIM:  Thank you.

15           THE COURT:  All right.  We're in recess.

16           NOTE:  At this point, the December 4, 2019, morning

17  portion of the case is concluded.

18                  CERTIFICATE OF COURT REPORTERS

19

20           We certify that the foregoing is a true and
             accurate transcription of our stenographic notes.

21

22                     /s/  Norman B. Linnell
                  Norman B. Linnell, RPR, CM, VCE, FCRR

23

24                     /s/  Anneliese J. Thomson
                  Anneliese J. Thomson, RDR, CRR

25