538

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  3  (P.M. Portion)

TRIAL TRANSCRIPT

December 4, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

539

APPEARANCES:

FOR THE PLAINTIFFS:             MATTHEW J. OPPENHEIM, ESQ.
                                SCOTT A. ZEBRAK, ESQ.
                                JEFFREY M. GOULD, ESQ.
                                MICHAEL J. DRUCKMAN, ESQ.
                                ANDREW L. GUERRA, ESQ.
                                LUCY G. NOYOLA, ESQ.
                                JIA RYU, ESQ.
                                Oppenheim + Zebrak, LLP
                                4530 Wisconsin Avenue, N.W.
                                5th Floor
                                Washington, D.C. 20015


FOR THE DEFENDANTS:             THOMAS M. BUCHANAN, ESQ.
                                Winston & Strawn LLP
                                1700 K Street, N.W.
                                Washington, D.C. 20006-3817
                                  and
                                SEAN R. ANDERSON, ESQ.
                                MICHAEL S. ELKIN, ESQ.
                                THOMAS P. LANE, ESQ.
                                CESIE C. ALVAREZ, ESQ.
                                Winston & Strawn LLP
                                200 Park Avenue
                                New York, NY 10166-4193
                                  and
                                JENNIFER A. GOLINVEAUX, ESQ.
                                THOMAS J. KEARNEY, ESQ.
                                Winston & Strawn LLP
                                101 California Street, 35th Floor
                                San Francisco, CA 94111-5840
                                  and
                                MICHAEL L. BRODY, ESQ.
                                Winston & Strawn LLP
                                35 West Wacker Drive
                                Chicago, IL 60601
                                  and
                                DIANA HUGHES LEIDEN, ESQ.
                                Winston & Strawn LLP
                                333 South Grand Avenue
                                Suite 3800
                                Los Angeles, CA 90071

540

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| BARBARA FREDERIKSEN-CROSS | | |
| | CROSS | 556 |
| | REDIRECT | 587 |
| SAMUEL BAHUN | | |
| | DIRECT | 605 |

CLOSING ARGUMENTS BY:

COURT'S RULINGS/JURY INSTRUCTIONS

1          NOTE:  The afternoon portion of the case on

2     December 4, 2019, begins in the absence of the jury as follows:

3     JURY OUT

4          THE COURT:  All right.  Mr. Buchanan, you want to

5     talk about pulse check, one another matter?

6          MR. BUCHANAN:  I had pulse check.  So, first, I was

7     going to do something that -- which I think there is no

8     objection to, which is maybe a first, but --

9          THE COURT:  Okay.  Okay.

14:01:27 10          MR. BUCHANAN:  -- I was going to move in Exhibit --

11     Defense Exhibit 81A.

12          MR. OPPENHEIM:  No objection.

13          THE COURT:  All right.  That's received.

14          MR. BUCHANAN:  And you had something?

15          MR. OPPENHEIM:  Yes, Your Honor.  I would like to

16     make a very clear record of what just happened because it took

17     me a little while to figure it out.

18          So Mr. Brody asked to use for impeachment an exhibit

19     that Cox refused to stipulate to us that we could use.  And we

14:02:00 20     had asked this morning -- Mr. Brody asked the Court and was

21     allowed to show that exhibit to the jury for what he claimed

22     was impeachment purposes.

23          Mr. Brody then asked his technical assistant to do a

24     search of that exhibit and look for something.  The technical

25     assistant did not do the search.  Instead, he called up a

542

1    demonstrative that had been prepared in advance and included

2    red boxes and highlighting, which is not in the exhibit.

3            At no time did anyone from Cox say that this was a

4    demonstrative.  In fact, had they come to us in advance and

5    discussed it with us, we would have addressed it.

6            When Ms. Frederiksen-Cross asked to see other columns

7    in the spreadsheet because she thought a search had been done,

8    the technical assistant obviously could not go to the other

9    columns because it was a static demonstrative.

14:02:57  10            So they went back to the actual exhibit, but the

11    search had not been run.  And so, then they couldn't provide

12    the information that Ms. Frederiksen-Cross needed to answer the

13    question.

14            This was not an error of failing to disclose a

15    demonstrative to us in advance.  Mr. Brody specific -- he

16    didn't say to his technical assistant, call up that

17    demonstrative.  He said, run a search.  That was an

18    intentionally misleading game.

19            And I say that very seriously.  I don't make these

14:03:30  20    kinds of allegations often.  I try to give opposing counsel

21    great leeway.  This crossed the line.

22            We've now looked at the other demonstratives they

23    want to use, apparently, with Ms. Frederiksen-Cross.  They also

24    contain additional information on them, like highlighting and

25    boxes.  And one of them appears to even contain some analysis

543

1    that was done that we've never seen before.

2              So we would ask for two things at this point, Your

3    Honor.  We would ask, first, that these demonstratives not be

4    permitted to be used.  You can't play these games and then

5    later get away with it.

6              And, secondly, that the jury be instructed to

7    disregard their prior view of them.

8              THE COURT:  What are the -- what is the underlying

9    data in the spreadsheets?  Is it not data that

14:04:25 10   Ms. Frederiksen-Cross relied on?

11             MR. OPPENHEIM:  So, Your Honor --

12             MR. BRODY:  Yes, Your Honor --

13             THE COURT:  Stop, stop, I'll give you the

14   opportunity.

15             MR. OPPENHEIM:  So all of the -- I'll answer the

16   question.  The spreadsheets -- the demonstratives that they

17   intend to use rely on spreadsheets and other data, so, for

18   instance, hard drives and other things, all of which we intend

19   to use with MarkMonitor.

14:04:48 20             THE COURT:  So you have no objection to that?

21             MR. OPPENHEIM:  To the underlying data in exhibits,

22   absolutely not.  And they should be admitted.  And they should

23   have agreed this morning to stipulate to them.

24             Instead, they said no, let us talk about it, let us

25   talk about it.  I have asked them three times.  Let us talk

544

about it.  And they should have an opportunity to talk about
it.

          But what they really were trying to do was play a
game with it.  And this, as you said, Your Honor, is not
supposed to be a game of gotcha.  And that's exactly what they
did.

          THE COURT:  Okay.  All right.  Thank you.

          Mr. Brody.

          MR. BRODY:  Thank you, Your Honor.

14:05:22  THE COURT:  Well, you haven't heard anything I'm
going to say, but go ahead for "thank you."

          MR. BRODY:  What we did was run these searches last
night -- or actually yesterday, I guess, and captured
screenshots of the results of the search.  We intended to offer
those as exhibits and to examine her on them.  We will not use
them.  There is no reason -- I mean, we'll simply use the live
spreadsheet.

          But all we did was make a callout of the underlying
exhibit, which we do all the time.  And I really -- there was
14:06:15  no deceit intended.  It was just meant to expedite the process.
That, obviously -- that, obviously, was not successful.

          So we'll just use the native spreadsheets, and that's
fine.  And we will go back and do stuff that was done before in
the native spreadsheet so there will be no surprise, no harm.
It's going to come up the same way.

545

```
 1              THE COURT:  What manipulation did you do of the

 2      spreadsheets, the information in the spreadsheets?

 3              MR. BRODY:  We did -- may I tender a copy of one of

 4      them to Your Honor?

 5              THE COURT:  Sure.

 6              MR. BRODY:  So this is --

 7              MR. OPPENHEIM:  Why don't you give him the whole

 8      packet?

 9              MR. BRODY:  He can have the whole packet, but that's

10      the one that the jury saw.

11              THE COURT:  So the underlying data here is from one

12      of the spreadsheets that have been produced by MarkMonitor.

13      You've looked at them.  You've looked at them.

14              MR. BRODY:  Exactly.

15              THE COURT:  The experts have all looked at them.  And

16      you called out Lady Antebellum --

17              MR. BRODY:  If you do the search -- yeah.  If you do

18      the search that is shown in that box, that box comes up, and

19      the results that are shown there come up.

20              THE COURT:  Okay.

21              MR. BRODY:  And it goes to the row -- there is going

22      to be a little green box around what is, as is shown, around

23      what's highlighted in yellow.  And we added yellow

24      highlighting, and we added a gray bar across just to call out

25      that row.
```

14:07:09

546

```
 1              THE COURT:  All right.
 2              MR. BRODY:  And, you know, there was nothing -- you
 3     know, it will come up exactly the same way in a live
 4     spreadsheet.  And if it doesn't, then I'm going to look like an
 5     idiot and I'm going to waste my time.
 6              But that really was the intent, was simply to call
 7     out the evidence and do this as efficiently as possible.  But
 8     we'll do it the other way.
 9              THE COURT:  All right.  And --
14:08:16 10              MR. BRODY:  Incidentally, on the stipulation issue,
11     we are still happy to do that.  We did have an open issue that
12     we wanted to resolve, and I have got an answer for him, but we
13     haven't, obviously, had that discussion.
14              THE COURT:  Well, what's going to happen with the
15     next spreadsheet that you want to put up?  Is it going to be
16     objected to if it's in its native form?  Or do we at least
17     have -- agree that the spreadsheets in native form are
18     admissible?
19              How could they not be admissible?  If everybody has
14:08:47 20     looked at them and they are coming out of MarkMonitor's
21     documents, everybody is going to use them, what objection could
22     there be to -- and the experts are both relying on them?
23              MR. OPPENHEIM:  Your Honor, I couldn't agree more,
24     they are admissible.  He's not trying to admit them.  He is
25     trying to use them for impeachment, show them to the jury, and
```

547

```
 1    not allow us to use them.  I don't know how he's going to keep
 2    them out.
 3           But, to me, it's like, why?  Just agree to admit
 4    them.  And let's not play games here.  Admit them --
 5           THE COURT:  So --
 6           MR. OPPENHEIM:  I have no idea if the searches are
 7    going to come up like this or not because I haven't had a
 8    chance to look.
 9           THE COURT:  Okay.
10           MR. OPPENHEIM:  But based on what's happened today,
11    I'm not confident.
12           THE COURT:  All right.
13           MR. BRODY:  So far as the spreadsheets go, Your
14    Honor, we are willing to stipulate to the three spreadsheets.
15           We have an objection to the hard drive coming in, in
16    part based on her testimony just now.  And there were two other
17    exhibits that Mr. Oppenheim asked me about that I think we can
18    do a stipulation on.  But we just haven't --
19           THE COURT:  So you're just going to use the three
20    spreadsheets that you agree can come in; is that right?
21           MR. BRODY:  Exact -- I mean, the '431 is subject to
22    all of our objections.  But, yes, that's all we'll use.
23           THE COURT:  All right.  Then we'll get --
24           MR. BRODY:  Okay.  Thank you.
25           THE COURT:  We can -- we can move forward based on
```

Timestamps: 14:09:26 (line 10), 14:09:52 (line 20)

548

1    the fact that the spreadsheets in their form as produced can

2    come in.  You know, the biggest problem here is you all have

3    been fighting with each other for a year, and the level of

4    distrust is a product of just spending too much time as

5    advocates against each other, I think for the most part.

6            So it's a complete breakdown in communication because

7    you can use the native piece.

8            MR. BRODY:  Yes.

9            THE COURT:  You could have your exhibit -- you could

14:10:41 10  have your witness ask to highlight something on the exhibit and

11   use it if you had done it step by step and plaintiffs

12   understood where all of this was coming from, at least that

13   would be my rulings.  Of course, you can use and highlight the

14   information that you want.

15           So what we're talking about is a -- is a real failure

16   to communicate, and also to identify what's a demonstrative and

17   what isn't.  And that needs to be done.  And that needs to be

18   done before you get up and take the podium and start with your

19   examinations.  Okay?  On both sides.  Okay?

14:11:29 20          MR. BRODY:  I couldn't agree more, Your Honor.  And

21   I -- well, I'm going to move ahead.

22           THE COURT:  Okay.  All right.  Mr. Buchanan, pulse

23   checks.  I mean, we've dealt with this.  I indicated I wasn't

24   going to listen to the discovery abuse side of it.  But what in

25   addition did you want to address?

549

1          MR. BUCHANAN:  Again, Your Honor, in your order you

2      said that you weren't going to exclude them at this time.  You

3      would consider it at trial.

4          THE COURT:  Yes, because I wanted to see what

5      foundation was laid and whether they were credible, admissible,

6      reliable type of documents.  And I didn't have enough

7      information just based on Lehr having -- and McGarty, I guess,

8      having relied on them.  So --

9          MR. BUCHANAN:  So in terms of expert testimony,

14:12:21 10   neither expert mentioned pulse checks in their expert reports.

11     They mentioned them during their testimony.

12         THE COURT:  Depositions?

13         MR. BUCHANAN:  Mr. Bahun, I believe, testified about

14     them.  And he's the individual that I have called him as a

15     sales representative, not the technical guy, which is

16     Mr. Paszkowski.  But whatever he is, he is going to testify

17     soon.  I think he's going to come in and say, hey, this is not

18     the limit of the infringement on the Cox network.  You know, we

19     would do these pulse checks, where we would go out and search

14:12:57 20   these peer-to-peer networks, and we would try to identify if

21     there was activity at a certain level that would indicate there

22     is potential infringement, and we could look at the IP

23     addresses and see and link those up with further investigation

24     to a particular --

25         THE COURT:  And he's a fact witness, not an expert

1  witness?

2          MR. BUCHANAN:  He is a fact witness.

3          THE COURT:  Okay.

4          MR. BUCHANAN:  And so, he testified, as I recall, I

5  have some excerpts about these.  And what he said is, it was

6  sort of a very low level activity that they would pick up, not

7  enough on any industry standard to send a notice.  It is

8  something below that.  So we have no documentation of it.

9          There is no expert that analyzed pulse checks that

14:13:43 10  testified about what they mean.  It's just this individual

11  salesperson, you know, that -- and I think that's what he was

12  using.  I'm not degrading the guy.  That's what he said.  The

13  question was:  What is your position?  He goes:  I'm a sales

14  guy.  He's marketing.

15          I think they used this to reach out and say, look, we

16  have got some activity.  Do you want us to do some more

17  investigation?  I am not sure.

18          But -- so it doesn't relate to the works in suit.  It

19  doesn't relate to the plaintiffs.  It relates to Cox,

14:14:13 20  allegedly.  It is not limited to the time period in question.

21  It is not limited to copyrighted works.  It doesn't involve

22  those.  It involves music and film and television.

23          And so, it's all sorts of things that are not even

24  part of the case.  And no documentation was produced.

25          Now, they will say, well, we didn't ask MarkMonitor

551

1    for it.  We asked them for a lot.  And they said --

2                THE COURT:  Yeah, don't go there.

3                MR. BUCHANAN:  Okay.  All right.  We had a fight over

4    that.  But the idea is, if we said give us information beyond

5    the works in suit, there was no way we were going to get that

6    from MarkMonitor.

7                THE COURT:  Okay.  All right.  Thank you.

8                Mr. Gould.

9                MR. GOULD:  Thank you, Your Honor.  I want to start

14:14:51 10  with your order on this, which was ECF No. 590.  On page 3 you

11   answered it this way:  Pulse checks are not excluded at this

12   time.  The Court will consider any further objections at trial.

13               What we just heard here was not a further objection.

14   It was a recycled --

15               THE COURT:  Yeah.  I want to know how you're going to

16   get it in.  Which is why I said what I did very inartfully, as

17   I do far too often, I am sure.  But how is a fact witness going

18   to identify -- and is he just going to talk generally about

19   what it is?  Is he qualified to do that?

14:15:30 20              I know you disagree with Mr. Buchanan about the

21   characterization of his role in the business.  So tell me that.

22               MR. GOULD:  So let's start there.  Cox likes to

23   characterize him as a sales guy.  It is part of his job.  We

24   talked about this a little bit.  You are going to hear from him

25   after Ms. Frederiksen-Cross.  Mr. Bahun has material roles at

552

1    this company --

2          THE COURT:  Yeah, I remember.

3          MR. GOULD:  -- that includes sales.

4          THE COURT:  I remember your --

5          MR. GOULD:  He does things like FBI and DoJ training

6    for piracy efforts to protect and avoid distribution of child

7    pornography.  This is not just a guy who's going door to door,

8    looking --

9          THE COURT:  But, see, he's not an expert, though,

14:16:15 10   right?  Are you going to try to qualify him as an expert?

11         MR. GOULD:  No.  He's going to testify about what

12   MarkMonitor actually did from a factual matter.

13         THE COURT:  Okay.

14         MR. GOULD:  MarkMonitor performed analysis by

15   observing peer activity, observing in the swarms, and observed

16   materially greater levels of peer-to-peer infringement,

17   infringing indicative behavior by Cox subscribers for years on

18   a daily basis, monumentally higher than what we've seen here.

19         THE COURT:  But how is he going to be -- what is he

14:16:49 20   going to rely on?

21         MR. GOULD:  Personal knowledge.

22         THE COURT:  Having done what?  I mean, reviewed what?

23         MR. GOULD:  Having been a part of those programs and

24   reviewed and understood that --

25         MR. OPPENHEIM:  I can offer a little more detail,

553

 1   Your Honor, since I'm going to present the witness, if you'd

 2   like.

 3             THE COURT:  Yes, sir.

 4             MR. OPPENHEIM:  One of the documents you're going to

 5   see is an attachment to an RIAA/MarkMonitor contract.  And that

 6   attachment shows the anticipated volume of notices for each

 7   ISP.

 8             And one of the things that's going to jump out, Your

 9   Honor, is you're going to see that Cox has a woefully low

14:17:31 10   number compared to other ISPs of relative size.

11             And that -- when you ask Mr. Bahun, well, why is

12   that?  Because of CAS.  Well, how did you decide on -- how did

13   the other numbers get arrived at?  Well, we do pulse checks,

14   and we provide that data to our customers and have a

15   discussion.

16             And he will describe what the pulse checks showed for

17   Cox and what -- and how it compared to the others.  And how

18   that Cox number is so low compared to everything else.  It is

19   all based on his personal knowledge, his personal experience,

14:18:08 20   and what he does day in/day out.

21             So the -- and you can keep -- Cox will keep saying,

22   he's a sales guy.  Yes, he's technically in the sales

23   department, that's correct.  But he's the guy who Homeland

24   Security calls in to help with money laundering cases.  This

25   guy has great, great experience in the field.

554

1        THE COURT:  Okay.  Mr. Buchanan.

2        MR. BUCHANAN:  So if -- what is interesting is that,

3   at least the first time I heard this, and I didn't take the

4   MarkMonitor deposition or Mr. Bahun's, was it was tossed out to

5   me during the depositions of Mr. McGarty and Lehr when I was

6   asking about the infringement, he goes, oh, but you don't know

7   there's these pulse checks out there.  And I asked them about

8   it.  And they didn't really quite understand it because I think

9   they have just been fed the information.

14:19:04 10        But I think you heard something interesting here.  He

11   said, he's a sales guy, they admitted that.  He goes out to the

12   FBI and Home -- he talks about piracy and things like that.

13   Sort of like Marks and the IRA -- the RIAA guy.  He's out there

14   doing marketing, promoting.  That's fine.

15        Then they said he has this data, okay, and that

16   there's data that he relies on.  He's not doing the analysis.

17   He's not doing the searches.  He's not sending the notices.

18   RIAA is doing that.

19        So he -- where is the data?  We don't have all this

14:19:33 20   data.  So in other words, for -- to be fair, if they were

21   really going to use this, it was so important, one, you know, I

22   don't want to get into MarkMonitor, but they would have said,

23   look, MarkMonitor, give us this pulse check stuff and we'll

24   produce that because we want our experts to rely on it, and we

25   want to rely on it, and we want to put a witness on for it, you

1    know.

2           And it's sort of being sandbagged here, is that, you

3    know, if we're fighting this third party and they won't give it

4    to us, and they say it's really important and valuable, and

5    they had it, why didn't they, meaning the plaintiffs, give it

6    to us in discovery?  Because we certainly had discovery

7    requests to them that would've covered this.

8           THE COURT:  All right.  Okay.  I'm going to allow the

9    witness to testify.  And let's see where it goes.  And I'm

14:20:18 10  mindful of your objections.  I'm -- I will be looking closely

11   to make sure that he's not giving expert testimony.  And when

12   you're dealing with this area, it's not a black and white line.

13          But your exception is noted.

14          MR. BUCHANAN:  Thank you, Your Honor.

15          THE COURT:  And you -- if you believe we've gotten to

16   a stage where you should make further objections, I'll

17   certainly hear those as well.

18          MR. BUCHANAN:  Okay.  Can we just make sure that a

19   foundation is laid about his job, and then what he does, and

14:20:54 20  this data, and whether he actually analyzes it himself, and --

21          THE COURT:  Yeah.  I expect that we'll go through

22   what he does in his work there, and why he is familiar with

23   pulse checks, and how he is familiar with them, and what he

24   uses them for, and how they relate to the evidence in this

25   document that Mr. Oppenheim just referred to.

Barbara Frederiksen-Cross - Cross

556

1          MR. BUCHANAN:  Okay.  Thank you, Your Honor.

2          THE COURT:  All right.  Thank you.

3          All right.  Are we ready for the jury then?

4          All right.  Joe, let's get our jury, please.

5          Oh, and we can get our witness now, if you would, as

6    well.

7          NOTE:  At this point the jury returns to the

8    courtroom; whereupon the case continues as follows:

9    JURY IN

14:22:11 10          THE COURT:  All right.  Please have a seat.

11          All right.  I hope you found that coffee that you

12    were looking for.  Sorry for the delay.  We were out here

13    working.  If you couldn't hear us singing and yelling, that --

14    I'm sorry to delay our afternoon session.

15          All right.  Let's get our witness back and we'll

16    continue.  Here we are.

17          All right.  Good afternoon.  I hope you had a good

18    lunch.

19          And please go ahead.

14:23:05 20          MR. BRODY:  Thank you, Judge.

21          BARBARA FREDERIKSEN-CROSS, called by counsel for the

22    plaintiff's, having been previously sworn, continues to testify

23    and state as follows:

24          CROSS-EXAMINATION

25    BY MR. BRODY: (Continuing)

Barbara Frederiksen-Cross - Cross

557

1   Q.   All right.  Let's try it again.

2   A.   Yes.

3   Q.   And if I can't get it right this time, we'll just move on

4   to something else.

5          Could you please bring up Exhibit -- Defendant's

6   Exhibit 141, please.

7          Okay.  This is the Audible Magic spreadsheet.

8          Now -- oh, good.  You've copied and pasted SHA-1 hash

9   HC1EDC5EFE3FA552B56B6C97F8DC1000ADDF1791; is that -- do you see

14:23:54 10   that?

11   A.   I see that he has typed that in.  I didn't --

12   Q.   To the best of --

13   A.   I didn't follow every character.  But I see that he's

14   typed it in, yes.

15   Q.   Okay.  Can you hit the "find next," or "search," or

16   whatever it is?  Okay.  And it is behind -- there it is.  Can

17   you scroll down a little bit?  There we go.

18          Now, can you go to the right on the screen?  Just --

19   yeah, there we go.

14:24:27 20          Okay.  Now, the three columns on the right, there's:

21   Audible Magic info ID.

22          And you understand that's a code that MarkMonitor

23   enters to identify each return that it gets from Audible Magic,

24   right?

25   A.   That's my understanding, yes.

Barbara Frederiksen-Cross - Cross

558

1   Q.   Yeah.  And then:  Artist and track.

2        That's information that Audible Magic sends to

3   MarkMonitor and, not surprisingly, it identifies the artist and

4   the track associated with that hash, right?

5   A.   That's correct.

6   Q.   Okay.  Can we bring up the search box again?

7        And the artist and track that are identified here are

8   Lady Antebellum and "Need You Now."  Okay.

9        Can we do another search on that hash?  Yeah, so go

14:25:27 10   control F and search -- I want to find the next item in the

11   spreadsheet that has the same hash.

12        All right.  Well, go to -- oh, I'm sorry, go to

13   Gnutella.  There's a tab down there that says:  Gnutella.

14        There you go.  Okay.  Now do the same search.  Okay.

15   And can we scroll over to the right again?  Oh, I can -- you

16   can see it here.

17        The artist and track that come up in Gnutella is Tia

18   Ray, that's the artist, and the work is "Do You?"

19        Do you see that?

14:26:10 20   A.   I see that, counsel.

21   Q.   And what happened was we searched on one SHA-1 hash and we

22   got two different works, right?

23   A.   If --

24   Q.   Two different artists, two different tracks?

25   A.   Or at least we got two different identifications.

Barbara Frederiksen-Cross - Cross

559

1    Q.   Yes.

2    A.   I would want to listen to the tracks to see if they were

3    actually the same and one was mislabeled or --

4    Q.   Well, something is wrong.  It shouldn't work that way,

5    right?

6    A.   There does appear to be some error here, yes, counsel.

7    Q.   Okay.  Let's try another one.  And 141 -- by the way, do

8    you know how many times something like that happened?  How many

9    times Audible Magic returned different tracks for the same

14:27:08 10   SHA-1 hash?

11   A.   No.  I would want to check if that SHA-1 in the Gnutella

12   is the same SHA-1.  There's a SHA-132 and a SHA-1.  If it was

13   the same, which SHA-1 it was because it's not labeled clearly.

14   Q.   Yeah, we searched on the same SHA-1 hash, ma'am.

15        THE COURT:  Let her finish -- let her finish her

16   answer before you ask the next question.

17        MR. BRODY:  I apologize.

18        THE COURT:  All right.

19        THE WITNESS:  Well, I was just saying, there are two

14:27:30 20   different ways of calculating SHA-1.  One is SHA-132 and one is

21   SHA-1.  And I would want to see if both of those represented

22   the same type of SHA-1 calculation.  But this is very

23   interesting.

24   BY MR. BRODY: (Continuing)

25   Q.   Yeah, we searched on the same SHA-1 hash, the one that you

Barbara Frederiksen-Cross - Cross

560

1  told us would change if you even deleted a space in the

2  program.  You saw we did that twice and we got two different

3  songs, right?

4  A.   Right.  That's why I'm saying I would like to see if they

5  were the same SHA-1 calculation.  If the same formula is used,

6  it should generate the same value for the same.

7  Q.   So they're --

8  A.   But I am aware that there are two different types of SHA-1

9  calculation.  And that one of the peers uses a SHA-132.  And as

14:28:16 10  I sit here, I do not recall if that's Gnutella.  It's not

11  BitTorrent.

12  Q.   Can we go back -- do we have Gnutella up?  Can you go back

13  to Gnutella, please?  And can you do the search again?

14          Okay.  Can we move that search box away.

15          Okay.  The search came up in the SHA-1 hash column.

16  Do you see that?

17  A.   I see that, yes.  And seeing this is helpful.

18  Q.   Right next to the hash column is the SHA-1 hash base 32

19  column, right?

14:28:55 20  A.   I see that, yes.

21  Q.   So we search on the same SHA-1 hash in both spreadsheets

22  and we got two different works?

23  A.   I see that.  That's quite surprising to me.

24  Q.   Okay.  And my question to you was, do you know how often

25  that happens in these spreadsheets?

Barbara Frederiksen-Cross - Cross

561

1    A.   I'm surprised that it happens at all, counsel.

2    Q.   So the answer is, you don't know how often it happens?

3    A.   I don't know.  I would need to run a little calculation

4    and write a little program to figure that out.

5    Q.   Okay.  Okay.  So let's go back to BitTorrent.

6         And I want to search on this hash,

7    F041CF7EEFD3DB7CB5D0F5F0FE71E7ECEC4025EA.

8         Oh, I'm sorry.  We need to be in eDonkey for this

9    one.

14:30:04  10    And that work is Lady Gaga, "Poker Face," right?

11   A.   I see that, yes.

12   Q.   Okay.  Oh, here it is.

13        Can you go to the hard drive spreadsheet?  I think

14   that's Exhibit 213.

15        MR. OPPENHEIM:  Is that now admitted?

16        MR. BRODY:  Yes, I mean, we're fine with admitting

17   it.

18        THE COURT:  The hard drive?

19        MR. BRODY:  Yes.

14:30:46  20    THE COURT:  Is that what you just said?  All right.

21   It's admitted.

22        MR. BRODY:  We're fine with admitting the hard drive,

23   the Audible Magic, and the notice spreadsheets, the Audible

24   Magic, subject to our objections.

25        THE COURT:  All right.  Yeah, and just for the

Barbara Frederiksen-Cross - Cross

562

1     record --

2          MR. BRODY:  The hard drive spreadsheet.  We have an

3     objection to the hard drive.

4          THE COURT:  Well, I'm sorry.  I thought you just said

5     you were agreeing to admit the hard drive.

6          MR. BRODY:  So -- I'm sorry.

7          THE COURT:  Is it a different hard drive?

8          MR. BRODY:  There's a hard drive spreadsheet and

9     there's the hard drive itself.  The spreadsheet, we will agree,

14:31:15 10   is an accurate index of what's on the hard drive.

11          We have an objection to admitting the hard drive

12     because we believe it's an incomplete exhibit.  But we haven't

13     gotten there yet.

14          THE COURT:  All right.  Can you give us the actual

15     exhibit numbers so that we can identify them?

16          MR. BRODY:  Sure.  So what I was saying was that we

17     were agreeable to the admission of Defendant's Exhibit 141 -- I

18     am sorry, I don't have the plaintiffs' numbers down here --

19     Defendant's Exhibit 141, which is the Audible Magic

14:31:44 20   spreadsheet.

21          THE COURT:  All right.

22          MR. BRODY:  Defendant's Exhibit 213, which is what I

23     will call the hard drive spreadsheet.

24          And Exhibit 161, which is -- Defendant's Exhibit's

25     161, which is what I will call the notice spreadsheet.

Barbara Frederiksen-Cross - Cross

563

1          THE COURT:  All right.  Those are received.

2          All right.  Now, go ahead.

3          MR. BRODY:  So Exhibit 213, can you search on that

4     SHA-1.  Can you scroll that up a little bit?  Okay.

5     BY MR. BRODY:  (Continuing)

6     Q.   Now, in the Audible Magic spreadsheet, that came up as

7     Lady Gaga, "Poker Face."  Do you recall that?

8     A.   I didn't memorize the Bates number, but if you're

9     representing that to me, then I think that's fine.

14:32:47 10    Q.   Yeah, I think that's what we saw just about two minutes

11    ago.  And the hard drive spreadsheet, it's not Lady Gaga, it's

12    Taylor Swift, "Love Story," right?

13    A.   I see that that's what's here, counsel.

14    Q.   And it's got the same SHA-1 hash that we searched on in

15    the other spreadsheet?

16    A.   I also see that.

17    Q.   Okay.  Let's go back to the Audible Magic spreadsheet.

18    And that is Exhibit 141, I'm sorry.  And let's search on this

19    hash.  9FC9FC7FA194A -- oh, by the way, before we do that, do

14:33:40 20    you know how many times in the Audible Magic materials the

21    SHA-1 hash gave you one answer on the Audible Magic spreadsheet

22    and a different answer on the hard drive?

23    A.   I do recall seeing that in the hard drive where the song

24    was mislabeled, there were one or two occasions where, you

25    know, were matching there not against the Audible Magic

564

1    returned data, but the name of the song as a person named it

2    when it was put in the torrent.  Which means some human created

3    torrent with that name.  And I did identify one or two songs on

4    the hard drive that were misnamed.

5    Q.   The question, was, ma'am, do you know how often that

6    happened?

7    A.   I don't -- as I am sitting here, I have any recollection

8    of how often it happened, no.

9    Q.   Thank you.

14:34:25 10   A.   I just remember identifying that issue with the naming of

11   the songs.

12   Q.   Ms. Frederiksen-Cross, I always enjoy my time with you,

13   but regrettably I often spend more of it than I would like to.

14   So if you could just stick with yes or no, I would really

15   appreciate it.

16           MR. ZEBRAK:  Your Honor, this is highly

17   inappropriate.  She has been trying to answer his questions,

18   and he keeps interrupting her, and now is scolding her.

19           THE COURT:  Both of you stop commenting on the

14:34:46 20   evidence and framing it the way you want to frame it.

21           As we spoke earlier today, if you can answer a

22   question yes or no, please try.  And if you can't answer it as

23   asked, say, I can't answer it that way.

24           THE WITNESS:  Okay.

25           THE COURT:  And then your counsel on redirect will

Barbara Frederiksen-Cross - Cross

565

1    amplify your earlier answer if he believes that it needs

2    further explanation.  All right?

3              THE WITNESS:  Yes.

4              THE COURT:  Thank you.

5              All right, go ahead.

6              MR. BRODY:  Thank you, Judge.

7    BY MR. BRODY:  (Continuing)

8    Q.   All right.  Let's go back to this third hash.

9    9FC9FC7FA194A7D98E5C76E2AE9A4EA30E703167.  Okay.

14:35:45 10            And what that gets us in the Audible Magic

11   spreadsheet is Tammy Wynette, "Stand by Your Man."

12             That's what was returned by Audible Magic, right?

13   A.   Yes, that's in the Audible Magic artist and track.

14   Q.   Okay.  Can you go over to the column that is labeled --

15   not so fast:  Info Hash.  Click that.  Can you copy that into

16   the search box?

17             And can we go to the notice spreadsheet, that is

18   Exhibit 161.

19             So we have got Tammy Wynette, "Stand by Your Man,"

14:36:49 20   right?

21   A.   As being the first file on that group, yes.

22   Q.   Well, it's not just the first file, it is a SHA-1 -- a

23   SHA-1 hash identifies a song, a work, it doesn't identify the

24   entire torrent, right?

25   A.   I think this was the info hash, counsel, which --

Barbara Frederiksen-Cross - Cross

566

1    Q.   Let's go back and do it again.

2    A.   Okay.  I am sorry --

3    Q.   We did the SHA-1 hash and that got us Tammy Wynette, do

4    you remember?

5    A.   I do remember you used the SHA-1 hash to locate Tammy

6    Wynette, and then --

7    Q.   Used the SHA-1 hash to locate --

8            THE COURT:  Hold on, hold on.  You both can't talk at

9    one time.

14:37:22 10          MR. BRODY:  I apologize, Your Honor.

11           THE COURT:  Well, it just keeps happening over and

12   over again.  So let's -- you're in control of questioning.

13   Either object to her answering or let her answer.

14           MR. BRODY:  Okay.

15           THE COURT:  Let her finish.

16           MR. BRODY:  Okay.

17   BY MR. BRODY:  (Continuing)

18   Q.   We searched on the SHA-1 hash in the Audible Magic

19   spreadsheet and we found Tammy Wynette, right?

14:37:44 20   A.   That's my recollection, yes.

21   Q.   Okay.  Now, we're copying the info hash, and we are going

22   to use that to search in another spreadsheet.  Okay?

23   A.   Okay.

24   Q.   All right.  Let's go to the other spreadsheet.

25   Exhibit 161, the notice spreadsheet.

567

1          Can we search on that hash?  And you've done that.

2          And the file name on that spreadsheet -- I am

3  sorry -- the title and artist on that spreadsheet is "Lovely

4  Day" by Bill Withers, right?  It's columns --

5  A.   Yes.

6  Q.   -- F and G?

7  A.   Yeah, I see that that was the -- that that's what's in F

8  and G.

9  Q.   Okay.  So that means that the work that was identified in

14:38:38 10  that notice was Bill Withers, not Tammy Wynette, and they are

11  different people?

12  A.   The problem I am having with this, counsel, is that we

13  have switched hashes and we have gone from the identification

14  of a specific song to the identification of a torrent.  And

15  what I would -- and we see that these are both for the same

16  torrent.

17  Q.   Fair enough.

18          THE COURT:  Okay.

19  Q.   Can you search on that hash again?

14:39:15 20          Do the search -- James, do the search on the --

21          MR. OPPENHEIM:  Your Honor, can we approach?

22          THE COURT:  Yes, sir.

23          NOTE:  A sidebar discussion is had between the Court

24  and counsel out of the hearing of the jury as follows:

25  AT SIDEBAR

Barbara Frederiksen-Cross - Cross

568

1           THE COURT:  Yes, sir.

2           MR. OPPENHEIM:  I just noticed that the last

3   spreadsheet that defense counsel brought up, which he said was

4   the defendants' exhibit and was the native file, I looked at

5   the bottom and there is a tab on it which says:  48-hour test.

6           MR. BRODY:  Well, I am not going to go to that one.

7           MR. OPPENHEIM:  That is not part of the exhibit, and

8   it is in front of the jury.  It's --

9           THE COURT:  Is the data that she is looking at the

14:40:26 10  data that is from the exhibit?

11          MR. OPPENHEIM:  I am certainly -- I'm sorry.  Now I

12  am interrupting you.

13          THE COURT:  Okay.  That's a question for you.

14          MR. BRODY:  Yes.  It's the exhibit.  What was

15  apparently put up there is -- in a working copy I added a tab

16  where I did some work of my own.

17          But what is on the screen is the exhibit.  I will put

18  up any copy you want.  If you want me to put up a plaintiffs'

19  exhibit, I will put it up.  It is the same thing.

14:40:52 20          MR. OPPENHEIM:  I shouldn't have to play policeman on

21  exhibits being correct.

22          THE COURT:  I understand.  Are you about done with

23  this?

24          MR. BRODY:  This is the last one and then we are done

25  with the spreadsheets.

Barbara Frederiksen-Cross - Cross

569

1          THE COURT:  Okay.  Then I will allow it.  And your

2     exception is noted.

3          And let's not do this moving forward.  Okay?

4          MR. BRODY:  Okay.

5          NOTE:  The sidebar discussion is concluded; whereupon

6     the case continues before the jury as follows:

7     BEFORE THE JURY

8          THE COURT:  Okay.  Go ahead.

9     BY MR. BRODY:  (Continuing)

14:41:42 10   Q.   Okay.  Can you do the search again?

11    A.   Excuse me, counsel, which hash is this, the info hash or

12    the --

13    Q.   This is the info hash.

14    A.   Okay.

15    Q.   Can you click on "find all"?  Can you expand that all the

16    way?

17          Okay.  Those are all the info hashes, all the notices

18    with that info hash.  Do you see?  Do you see they are all Bill

19    Withers?

14:42:08 20   A.   I don't see where you are looking at that you see that

21    they are all Bill Withers.  That may not be visible on this

22    search.

23    Q.   I see.  Okay.  Shrink the box and just click "find next."

24    No, no, no.  Where it says -- there is a box that says "find

25    next."  There you go.  Bill Withers.  Click again.

Barbara Frederiksen-Cross - Cross

570

1    A.    I see that.

2    Q.    Bill Withers.  Click again.  Bill Withers.  Click again.

3    Bill Withers.  Click again.

4          There are 39 of them.  I will represent to you that

5    they are all Bill Withers.

6    A.    Okay.  I will accept your representation.

7    Q.    Now, the way the Audible Magic -- I'm sorry -- the

8    MarkMonitor system is built -- well, strike that.

9          Let me ask you about some structural issues with the

14:43:28 10   MarkMonitor system.  Can we put up -- can we put up slide 14

11   from Ms. Frederiksen-Cross' direct.

12          Now, this is your three modules.  There is the

13   verification module, and the detection module, and

14   notification.  I want to focus for a second on the first two.

15   A.    Okay.

16   Q.    So verification module, that's where MarkMonitor goes out

17   onto the Internet, a peer-to-peer network, finds the song,

18   sends it off to Audible Magic for verification, right?

19   A.    Correct.  And then gets back a response and stores it

14:45:04 20   away.

21   Q.    And then the detection module, that's where the song is

22   sent to -- the information about the song is sent to

23   MarkMonitor's, what they call their collection agents.  And

24   they go out on the peer-to-peer networks and they try to find

25   people who are sharing that song, right?

Barbara Frederiksen-Cross - Cross

571

1    A.   The detection module searches for a particular hash, yes.

2    Q.   Okay.  Well, what I really wanted to focus on is where it

3    is searching.  It is going out to the peers, to the people in

4    the peer-to-peer network, right?

5    A.   Right, with the info hash or hash of the song.

6    Q.   And if it hits on a Cox subscriber, that's the point in

7    the process where a Cox subscriber gets involved or caught up

8    in the search?

9    A.   Sure.

14:45:52 10   Q.   Yeah.  Now, the detection module and the verification

11   module operate in parallel, right?

12   A.   They are separate systems, yes.  So I don't know what you

13   mean by in parallel.  But they operate separately, they are not

14   synchronous tasks.

15   Q.   What I meant by parallel -- and maybe this is what you

16   meant -- was that the collection module to go out -- that goes

17   out and looks for Cox subscribers and other people who are

18   supposed to be infringers, it doesn't wait for Audible Magic to

19   report back on the song?  It -- it goes out and searches the

14:46:40 20   peers before the Audible Magic verification is completed,

21   right?

22   A.   That's correct.  It's just not eligible for notice until

23   it's been verified.

24   Q.   Well, that's certainly the theory.  But let's take it one

25   step at a time.

Barbara Frederiksen-Cross - Cross

572

1           Isn't it the case that the detection module starts

2    searching peer-to-peer computers for the presence of a file

3    before MarkMonitor knows whether Audible Magic has made the

4    match?

5    A.   It starts searching for a file.  At that point in time

6    MarkMonitor may or may not know depending upon when in the

7    relative time periods the confirmation from Audible Magic has

8    come back.  So it may know or it may not at that point in time.

9    Q.   So it -- if it may not know, then that means that it

10   doesn't depend on Audible Magic actually concluding that

11   search?

12   A.   For the detection module, that's correct.

13   Q.   Okay.  Now, you're aware that doing it that way results in

14   the collection of thousands of files that are later determined

15   not to be infringing works?

16   A.   I think that could be true.  I mean, they might be

17   somebody else's infringing works, or they might not be

18   infringing works at all.

19   Q.   And you understand, don't you, that that increases the

20   chances that notices will be generated for non-infringing

21   works?

22   A.   That is not my understanding of the operation of the

23   system, counsel.

24   Q.   Okay.  Can we bring up Defendant's Exhibit 130, please.

25   And can we go to HL -- can you go to the end of the exhibit?

Barbara Frederiksen-Cross - Cross

573

1    Go up a page, up one more page.  And can you blow up paragraph

2    2?

3         Now, this is the Stroz Friedberg report that we heard

4    about from a previous witness, and this is one of the things

5    that you reviewed, right?

6    A.   That is correct.

7    Q.   And Stroz Friedberg was hired by RIAA to sort of audit the

8    MarkMonitor system to see whether it was doing what it was

9    supposed to do?  Do you understand that generally, right?

14:49:34 10   A.   Yes, I do.

11   Q.   And they made a number of recommendations at the end of

12   their report, and this is one of the recommendations, right?

13   A.   I believe this is in the Recommendation section, yes.

14   Q.   And what they said was:  In the current model, MarkMonitor

15   deploys all instances of in-scope work to its collection

16   agents, regardless of whether or not that file has been

17   verified as an infringing work.

18        Do you see that?

19   A.   I see that.

14:50:02 20   Q.   And that's what we were just discussing.  That means that

21   the collection agents go out to the peer computers, including

22   the Cox subscribers, regardless of whether Audible Magic has

23   returned a match on a particular file?

24   A.   That is my understanding as well.

25   Q.   And then they say:  This is an efficient approach as the

Barbara Frederiksen-Cross - Cross

574

1    agents can start searching for and identifying content

2    immediately.  However, it also results in the collection of

3    thousands of files that are later determined not to be

4    infringing works.

5         And that's what we just agreed was the case, right?

6    A.   I would agree that that could happen if they're not

7    somebody else's infringing works, sure.

8    Q.   Then they say that:  Though there are subsequent steps in

9    place to ensure notices are only generated on verified

14:50:41 10  infringing works, collection by the agents of these

11   non-infringing works introduces inefficiency into the process

12   and increases the chances that notices will be generated for

13   non-infringing works.

14        Do you see that?

15   A.   I see that.

16   Q.   And you understand that was Stroz Friedberg's finding?

17   A.   I understand that that was their finding, yes.

18   Q.   Okay.  Let's talk about Audible Magic matching.

19        Now, you told me earlier that MarkMonitor did Type 1

14:51:27 20  and Type 3 matching, and you weren't quite sure of the mix?

21   A.   I'm not quite sure of the mix, that's correct.

22   Q.   Okay.  Now, you understand -- and what they did was they

23   took a 20-second clip --

24        MR. ZEBRAK:  Your Honor, this is a misstatement of

25   the evidence.  He said MarkMonitor as --

Barbara Frederiksen-Cross - Cross

575

1          MR. BRODY:  Oh, I apologize.

2          THE COURT:  Okay.

3          MR. ZEBRAK:  Excuse me, sir.

4          THE COURT:  All right.  Thank you for that.  Rephrase

5     your question.

6          MR. BRODY:  Yes, yes.  Absolutely.

7     BY MR. BRODY: (Continuing)

8     Q.   Well, Audible Magic did Type 1 and Type 3 matching in

9     response to the MarkMonitor inquiries sent on behalf of RIAA,

14:52:06 10   right?

11    A.   That is my understanding, yes.

12    Q.   Okay.  And you -- I think you told us that the matching

13    that Audible Magic did was to use a 20-second clip that starts

14    a few seconds past the beginning of the recording, right?

15    A.   I believe that's correct, yes.

16    Q.   Okay.

17    A.   About eight seconds, if I recall the precise number.

18    Q.   I'm sorry.  I didn't --

19    A.   I think it's about eight seconds past the beginning of the

14:52:39 20   clip, if I recall.

21    Q.   Okay.  Now, I've got a couple of questions about that.

22    First, do you recall that Audible Magic actually thought that

23    you should be doing a 60-second clip in order to do Level 1

24    matching?

25    A.   I do not recall that, no.

Barbara Frederiksen-Cross - Cross

576

1   Q.   I'm sorry.  Actually, this is very exciting for me.

2   People usually tell me I speak too softly, but I'm having

3   trouble hearing you.

4           THE COURT:  She said she does not recall that.

5           MR. BRODY:  Okay.  Thank you.

6           THE WITNESS:  Yeah, I don't recall that.  If there's

7   something you could show me to refresh my recollection.

8           MR. BRODY:  Okay.  Could we bring up Defendant's

9   Exhibit 8, please.

10  BY MR. BRODY: (Continuing)

11  Q.   Let me -- before I do that, one of the things that you

12  reviewed in doing your work was the Audible Magic programming

13  guide.  It's a technical document that they sent to their

14  customers explaining how to use their system.

15          Do you recall that generally?

16  A.   I believe I did see that document, yes.

17  Q.   Okay.  Can I have leave to --

18          THE COURT:  Do you have that in hard copy?

19          MR. BRODY:  Do I have it in hard copy?  Yeah.

14:53:55 20          THE COURT:  Yeah, why don't you show it to her and

21  ask her whether she --

22  BY MR. BRODY: (Continuing)

23  Q.   It should be in your --

24  A.   Is it in my binder?

25  Q.   Yes.

Barbara Frederiksen-Cross - Cross

577

1   A.   I've got it.  I've got it, yeah.  Thank you.

2   Q.   If you go to page 5 of the document, it's Audible Magic

3   0000011.

4            MR. OPPENHEIM:  Do we have a copy of this?

5            MR. BRODY:  Yes, you do.  It's right there, DX 8.

6            MR. OPPENHEIM:  Thank you.

7   BY MR. BRODY: (Continuing)

8   Q.   Have you got it?

9   A.   Oh, I do see it, yes.

14:55:01 10   Q.   The second paragraph there --

11   A.   Yeah, I see it.

12   Q.   File Identification?

13   A.   Yes, I see it.

14   Q.   Okay.  And in --

15            THE COURT:  Is this a document that you looked at

16   during your review of discovery matters?

17            THE WITNESS:  I looked at an electronic version,

18   rather than paper, but it -- I believe it's the same document.

19            THE COURT:  All right.  Go ahead.

14:55:19 20   BY MR. BRODY: (Continuing)

21   Q.   For the Type 1 matching, the basic lookup mode, it says:

22   In this mode, an application will typically fingerprint the

23   first 60 seconds of a media file for lookup.

24            Do you see that?

25   A.   Yes.  And then it goes on to say it selects a segment

Barbara Frederiksen-Cross - Cross

578

1    within that 60 seconds to use for the lookup.

2    Q.    All right.  But 60 seconds, not 20 seconds, right?

3    A.    Right.  That's correct.

4    Q.    Okay.  Now, the other thing about this type of matching is

5    it's not actually properly used for -- or the types of songs

6    that it should be used for, types of media it should be used

7    for, are not peer-to-peer files?

8    A.    Respectfully, I disagree with that, counsel.  If you read

9    the -- what it's appropriate for, it includes, for instance,

14:56:18 10    files from a disk ripped from CD, which would often be the case

11    in peer-to-peer file sharing.

12    Q.    Well, let's read the whole passage:  For file ID

13    identification to work, that's Level 1, is critical that the

14    beginning of the unknown media sample correspond within a few

15    seconds to the beginning of the original song or video.

16          And that's critical because it has to be -- you have

17    to be within the first eight seconds, like you said.

18    A.    I don't remember if it was exactly eight, but that's my

19    recollection as I sit here, yes.

14:56:48 20    Q.    Whatever it is, eight, ten, five.  Then it says:  The type

21    of -- the type file ID is appropriate for -- the file ID is

22    appropriate for applications that need to identify audio from a

23    CD.

24          That's not a peer-to-peer file, right?

25    A.    A physical CD would not be.

Barbara Frederiksen-Cross - Cross

579

Q.    DVD, that's not a peer-to-peer file?

A.    The physical DVD copy would not be.  That's correct.

Q.    A disk ripped from CD, a DVD, or a DRM-protected file.

A.    And that could --

Q.    And that's not we're talking about?

A.    No, that could be because a --

Q.    A disk?

      THE COURT:  Let her finish.

A.    A disk file, I read that to be a file that was on disk
that had been ripped from one of those.  And ripping is just a
copy program that allows you to copy contents from those media
to disk.

Q.    Okay.  Or an Internet stream that signals the start of
each new play.  And that's not what we're talking about either?

A.    I don't believe we're talking about Internet streams here.

Q.    Okay.  And then Level 3, which you said some of the --
some of the matching used, that is appropriate -- it's over on
the next page -- for applications that only have an arbitrary
piece of the work, such as user-generated content, Web sites,
or customers that have just a portion of audio to identify.

      Do you see that passage?

A.    I see that passage.

Q.    Okay.  I want to talk about the download question.

      When a -- in the detection module or the collection
module, when the MarkMonitor agent connects to the peer

Barbara Frederiksen-Cross - Cross

580

1   computer --

2            If we could get slide 18 up.  Okay.  There we go.

3            When MarkMonitor connects to the peer computer, it

4   collects information off of the computer about the peer-to-peer

5   file that the peer has, right?

6   A.   Right.

7   Q.   The Cox subscriber?

8   A.   Correct.

9   Q.   And one thing you say here is that:  Hash match (no need

15:00:09 10   to redownload.)

11            And what you meant by that was that MarkMonitor looks

12   to see what the hash is on the Cox subscriber's computer, it

13   downloads the hash, but it does not download any of the file,

14   right?  Any of the payload, if you will, the content, the

15   music?

16   A.   There were a few exceptions in the evidence I saw where

17   the connection had not been broken in time and some small

18   portion of the song was downloaded.

19            But generally the design of this system for this

15:00:49 20   particular scanning was not to download the files, that's

21   correct.  To rely on the hash.

22   Q.   And, in fact, both you and our expert, Mr. --

23   Dr. Feamster, you guys looked at all 175,000 evidence packages,

24   and I think there are 143 or something, 144, where there's a

25   little bit of data downloaded.

581

1          But all the rest of them have nothing downloaded from

2     the peer computer, no content?

3     A.   That's correct.

4     Q.   And I think you even told me that the MarkMonitor software

5     is written so that it assures that the MarkMonitor computer

6     will break off the connection with the peer before any content

7     is downloaded?

8     A.   Well, it breaks off the connection very quickly, which

9     typically would result in that, yes.

15:01:39 10   Q.   Well, but the -- I mean, it -- the -- it's designed to

11    avoid downloading content?

12    A.   With the particular variant of the software that I was

13    looking at that was what was used in this case, yes, it

14    attempts to break connection very quickly.

15    Q.   So if anybody said -- if I were to say to you that I

16    believe that MarkMonitor actually downloaded pieces of the

17    files on the peer computers, you would tell me I was wrong,

18    wouldn't you?

19    A.   In what context?

15:02:16 20   Q.   This context.

21    A.   So specifically in the software as it was configured to

22    run for the RIAA in this litigation?

23    Q.   Exactly.

24    A.   And can you repeat back your question again?  I just want

25    to make sure I was --

Barbara Frederiksen-Cross - Cross

582

1    Q.   Sure.  If I told you or anybody told you that MarkMonitor

2    was downloading the content of the files from the peer

3    computers, not just the hash and not just, you know, the other

4    data associated with the file, but the file itself, if somebody

5    said, MarkMonitor was doing that, downloading pieces of the

6    file, you would tell them they were wrong, right?

7    A.   With the exception of that little tiny fraction where the

8    connection is not broken in time that we just spoke of, they

9    would be mistaken, yes.

15:03:08 10  Q.   Well, it's a little stronger than that.  You looked at

11   170-odd thousand files, and none of them had any downloaded

12   content, or 143 or '4 had some, right?

13   A.   There was no downloaded content present in the evidence

14   packages that I examined.  I don't recall if I checked every

15   single record to see if there had been any and they simply

16   weren't a part of the package.

17        But my recollection is that aside from 143 files,

18   there was no downloaded content.

19   Q.   Could we have -- one of the things you looked at in

15:03:46 20  preparing your report was a document that MarkMonitor prepared

21   for RIAA to explain how they were going to perform this work,

22   and they did it in -- I think it was April of 2012.  Do you

23   recall that?

24   A.   I recall looking at several documents they prepared for

25   RIAA.  I'd be happy to take a look at the one you're talking

Barbara Frederiksen-Cross - Cross

583

1    about.

2    Q.   Okay.  Do you want to look at tab 17 in your binder, DX

3    17.

4    A.   A particular page, counsel?

5    Q.   Well, let's, first of all, get ourselves oriented with

6    respect to the document.

7            This is something called P2P enforcement process, and

8    it says it's prepared by the Motion Picture Association of --

9    I'm sorry, prepared for the Motion Picture Association of

15:04:41 10   America and the Recording Industry Association of America.

11   It's dated April 11 of 2012.

12           You got that.

13   A.   Yes, I see that.

14   Q.   Okay.  And I think you described this in your initial

15   report as a MarkMonitor document prepared for the RIAA and the

16   MPAA that describes MarkMonitor's peer-to-peer enforcement

17   process.

18           Does that sound like a fair characterization?

19   A.   That would have been how I described it based on the

15:05:14 20   title, yeah.

21   Q.   If you look at -- if you look at MM 198, it is page 10 of

22   the document, there is a section headed:  P2P Data Collection

23   Agents.

24   A.   I see that, counsel.

25   Q.   And there is some text.  And it describes the general

1    approach of the collection agent.

2           And step 3 of the general approach is:  The agent

3    tries to download a piece of data from the users while

4    connected with them.

5           Do you see that passage?

6    A.   Let me just read a little bit of the surrounding text to

7    get a context here, if I may.

8           Okay.  I see that, counsel.

9    Q.   Then it describes downloading the file from the swarm and

15:07:17 10   sending it to Audible Magic.

11          And then the second to the last paragraph on the page

12   reads:  The agent will request only a single piece of data of

13   each individual user --

14          MR. OPPENHEIM:  Can I -- just a moment.  This is not

15   in evidence.  We are doing again what I think we did before.  I

16   thought we were trying to avoid this.

17          THE COURT:  Do you recognize this document as one of

18   the ones you reviewed or --

19          THE WITNESS:  I believe I have seen this document or

15:07:44 20   a similar document.

21          THE COURT:  Direct her to the area you want her to

22   look at and ask a question instead of reading everything into

23   the record.  All right?  Please.

24          Thank you.

25   BY MR. BRODY:  (Continuing)

Barbara Frederiksen-Cross - Cross

585

1    Q.   The last two paragraphs indicate that MarkMonitor was

2    going to download a piece of data and verify the hash, right?

3    A.   I see that here.

4    Q.   Okay.  And it says the same thing -- I'm sorry.  It says

5    the same thing on page MM 205, page 17, the very end.  It says

6    that the data proceeds -- sorry -- the agent proceeds to

7    download data from the user.

8              THE COURT:  Is there a question in there?  Does it

9    say that?  Is that your question?

15:09:16 10          MR. BRODY:  Yes, that was my question.

11             THE COURT:  Okay.  If that's what it says.

12   A.   I see that on the page, counsel.

13   BY MR. BRODY:  (Continuing)

14   Q.   So MarkMonitor told the RIAA that they would be

15   downloading data from the users, right?

16             MR. OPPENHEIM:  How would she know?  No foundation.

17             MR. BRODY:  Your Honor --

18             THE COURT:  Stop, stop, stop.  If you can answer the

19   question, answer the question.

15:09:39 20          The question is, is this a MarkMonitor document and

21   does it say what Mr. Brody says it says?  That's all.

22             THE WITNESS:  Yes.  It was prepared for the Motion

23   Picture Association of America and RIAA.  And I was just trying

24   to determine if I could tell which of those two parties this

25   section was directed to, if it was specific to one or the

Barbara Frederiksen-Cross - Cross

586

1    other.

2            THE COURT:  All right.  Move on.

3    BY MR. BRODY:  (Continuing)

4    Q.   You looked at the Stroz Friedberg audit, right?  We talked

5    about that already.

6    A.   Yes, sir.

7    Q.   And you look at the Harbor Labs audit as well, right?

8    A.   Yes, I did.

9    Q.   And each of those was at a subsequent point in time after

15:10:19 10   this peer-to-peer piracy network, one was about six months

11   later and one was about a year-and-a-half later.

12   A.   I don't recall the specific dates, but if that's your

13   representation.

14   Q.   Okay.  Do you recall that in both of those audits

15   MarkMonitor told Stroz Friedberg and Harbor Labs that it would

16   be downloading data from the peer computers?

17   A.   I don't recall that specifically.  But if you want to show

18   it to me, I am happy to take a look at it.

19           THE COURT:  We are not going back through that again.

15:10:59 20   You have already gone through that testimony.  We are not going

21   back through that again.  If you can't --

22           MR. BRODY:  My point is made and I will stop.

23           THE COURT:  Okay.

24   BY MR. BRODY:  (Continuing)

25   Q.   I want to ask you a few questions about CATS, and then we

Barbara Frederiksen-Cross - Redirect

587

1    are done.

2          First of all, can we have slide 23 up.

3          When this slide was up, you talked about what

4    happened to blacklisted notices.  Do you recall that generally?

5    A.   I do.

6    Q.   Okay.  Do you understand that the notices from the RIAA,

7    from the plaintiffs here, were not blacklisted, right?

8    A.   Not in the specific configuration files that I saw for the

9    version of code I looked at, that's correct.

15:12:10 10  Q.   Okay.  And what those files indicated was that the

11   plaintiffs' notices went through that top layer of processing,

12   reads e-mail, look up subscriber information, and so forth,

13   right?

14   A.   Correct.  So long as -- yeah, at this part of the

15   processing, that is correct.

16          MR. BRODY:  That's all I have got.  Thank you.

17          THE COURT:  All right.  Thank you.

18          Redirect.

19          MR. ZEBRAK:  Yes, Your Honor.

15:12:53 20     REDIRECT EXAMINATION

21   BY MR. ZEBRAK:

22   Q.   I would just like to clarify a few things,

23   Ms. Frederiksen-Cross.

24          Let's start with the document that we were just

25   looking at.  If we could call of DX 17, please.

Barbara Frederiksen-Cross - Redirect

588

1          Oh, excuse me.  I thought he had introduced that.

2          You have in front of you a document in that binder

3     labeled DX 17?

4     A.    I do.

5     Q.    Do you know the context in which that document was

6     prepared?

7     A.    My understanding is that that document was prepared both

8     with respect to presentations being made to the Motion Picture

9     Association of America and to the RIAA for discussion of an

15:13:34 10   approach to doing their monitoring.

11    Q.    Are you familiar with something called the Copyright Alert

12    System?

13    A.    I am.

14    Q.    Do you have any understanding about whether this document

15    bears any relation to the Copyright Alert System?

16    A.    I was trying to find that because my recollection is that

17    it did.

18    Q.    Well, let me -- you can put the document aside for a

19    moment.  Let me ask you a question.

15:13:57 20        Counsel pointed you to a number of different portions

21    of this document and asked some questions about whether

22    MarkMonitor had indicated to the RIAA that it would download

23    content from these peers prior to sending notices.

24        Do you recall that?

25    A.    I recall we looked at those sections, yes.

Barbara Frederiksen-Cross - Redirect

589

1   Q.   Yes.  And do you recall that this document is prepared --

2   well, first of all, what does MPAA refer to?

3   A.   The Motion Picture Association of America.

4   Q.   And do you know whether the portions of the document that

5   counsel asked you to acknowledge in terms of what they say in

6   that document relate to work done for the RIAA as opposed to

7   the MPAA?

8   A.   My understanding was that it was done for the MPAA as

9   opposed to the RIAA.

15:14:51 10   Q.   Do you have a view about whether the portions of the

11   document counsel asked you to just speak to and read aloud bear

12   any relationship to the actual process done by MarkMonitor in

13   this case that you've concluded to be reliable and accurate?

14   A.   It is my understanding that those portions were not

15   related to this case, but rather to a different engagement.

16   Q.   Okay.  Let's turn your attention to another document you

17   have in the binder in front of you, DX 0008, I believe that's

18   the Audible Magic guide that you indicated you looked at during

19   the course of your review.

15:15:44 20   A.   I see that.

21   Q.   Is that correct?

22   A.   Yes.

23   Q.   Okay.  Would you turn your attention, please, to page 10

24   of that document.

25        And I believe counsel published this to the jury, in

Barbara Frederiksen-Cross - Redirect

590

1    which case we would ask for permission to do the same.

2                THE COURT:  Go ahead.

3                MR. ZEBRAK:  And if you could drill down under -- on

4    page 4 of this document, Mr. Duval.

5    BY MR. ZEBRAK:  (Continuing)

6    Q.    Now, I am going to direct you to a portion of the document

7    counsel didn't show you.  So it's -- if you are looking at the

8    binder in front of you, it's on page 4.

9    A.    Physical page 4, not Bates No. 4.

15:16:29 10                THE COURT:  Is this paragraph 2 or a different

11    document?

12                MR. ZEBRAK:  Sorry, Your Honor, there are several

13    different numbering schemes on the document.  My apologies.

14                THE COURT:  All right.

15    BY MR. ZEBRAK:  (Continuing)

16    Q.    So again, this isn't --

17    A.    Okay.

18    Q.    You didn't have the opportunity to look at this a moment

19    ago.  But when you reviewed this document, did you -- did you

15:16:52 20    look at this portion here under:  Accuracy?

21    A.    I did, yes.

22    Q.    And could you read in --

23                THE COURT:  Let me hold you up for just one second.

24    Is this in evidence?  Or do you want to move it in evidence?

25    Or what --

Barbara Frederiksen-Cross - Redirect

591

1        MR. ZEBRAK:  Counsel just asked her questions about

2   it, and I would like to --

3        THE COURT:  That's fine, but if it's going up on the

4   screen, and the jury is looking at it all, why don't you move

5   it in.

6        MR. ZEBRAK:  We have no objections to that, Your

7   Honor.

8        THE COURT:  All right.  Any objection?

9        MR. BRODY:  No, Your Honor.

15:17:25 10        THE COURT:  All right.  Then it's received.

11        Then go ahead put it up on the screen.  Thank you.

12        MR. ZEBRAK:  Thank you, Your Honor.  I appreciate it.

13   BY MR. ZEBRAK: (Continuing)

14   Q.   If we could turn your attention back to that page,

15   Ms. Frederiksen-Cross.  Could you read what it says about a

16   third of the way down the page where it begins:  Audible Magic

17   services are all -- yeah, there you go.

18   A.   Yes:  Audible Magic services are all tuned to have

19   essentially zero false positives.  We believe that application

15:17:58 20   developers have enough to do without having to second-guess

21   identification.  We test our services in-house to provide a

22   false positive rate of less than one in a million, and

23   practically speaking our customers report that our services

24   have zero false positives in audio identification.

25   Q.   Are you familiar what a false -- with what a false

Barbara Frederiksen-Cross - Redirect

592

1   positive is in the context of the Audible Magic service?

2   A.   Yes, I am.

3   Q.   And would you explain to the jury what that is.

4   A.    If there were misidentification, it could be either a

5   false positive or a false negative.  A false positive would be

6   saying that a song was something that it wasn't.  A false

7   negative would be saying, we couldn't identify the song even if

8   there was some matching fingerprint.

9   Q.   And here it indicates that -- so what does it mean --

15:19:01 10   would you have an understanding what it means that Audible

11   Magic says that it's tuned to have essentially zero false

12   positives?

13   A.   Yes.  That means that the system is tuned to favor

14   accuracy over just the raw number of identifications.  So if

15   there is any question of identification, they will return a

16   false, that is to say, I couldn't identify it, rather than a

17   true, that I was able to identify it.

18         So it is optimized for accuracy.

19   Q.   And is -- and so, a false negative is a no match; is that

15:19:38 20   correct?

21   A.   Right, a no match.

22   Q.   Okay.  And so, are false negatives an issue at all with

23   respect to the matches that Audible Magic did for the files

24   that were the subject of the notices to Cox?

25   A.    No, because if the file couldn't be matched, then it

Barbara Frederiksen-Cross - Redirect

593

1    wouldn't be eligible to generate a notice.  So it might mean

2    that fewer notices went out, but it wouldn't mean that an

3    inaccurate notice went out.

4    Q.   Okay.  Now I'm going to ask you about a few different

5    songs that -- so, first of all, do you recall that counsel

6    asked you to follow him when he took you through different tabs

7    and rows in a big spreadsheet?

8    A.   Yes.

9    Q.   Okay.  So that spreadsheet -- well, first of all, do --

15:20:20 10    well, there were multiple spreadsheets, but do you recall the

11    one where he was asking about specific songs?  And we'll start

12    with Lady Antebellum, "I Need You Now."

13    A.   Yes, I recall that.

14    Q.   Okay.  Well, first of all, I'd like to -- if you could --

15    I'd like to ask you -- well, I'd like to publish for the jury

16    the list of sound recordings at issue in this case, which is PX

17    1.

18         And then I'd like to ask the witness whether she is

19    aware of whether Lady Antebellum, "Need You Now," appears on

15:20:55 20    this list of works in the case?

21         And, sir, if you could do a search when you have a

22    moment within PX 1, which is the record company sound

23    recordings at issue in the case.

24         MR. DUVAL:  And what am I searching?

25         MR. ZEBRAK:  Search "Need You Now."

Barbara Frederiksen-Cross - Redirect

594

BY MR. ZEBRAK: (Continuing)

1   Q.   Well -- okay.  So do you recall counsel asking you about

2   the song "Need You Now" by Lady Antebellum, right?

3   A.   Correct.

4   Q.   And we've just seen here that it doesn't appear on the

5   list of sound recordings in the case, correct?

6   A.   That's correct.

7   Q.   Okay.  Now, what I'd like to do is call up in front of the

8   jury PX 2, which is the list of copyrighted musical

9   compositions in the case, and we're going to do a similar

15:21:48 10   search for "Need You Now."

11   A.   Okay.

12   Q.   Now, do you see the search return?

13   A.   I do.  It was not found.

14   Q.   Okay.  So as a result of this, is -- I think it's -- is it

15   correct that counsel was asking you about a song or a recording

16   that's not in this case?

17   A.   That's correct.

18   Q.   Okay.  Now, we're going to turn to the second song that

15:22:23 19   Cox's counsel is asking you about.  And it's called "Stand By

20   Your Man," by Tammy Wynette.

21            And, sir, Mr. Duval, if you could call up PX 1, the

22   list of sound recordings.  And put it up -- a find search for

23   "Stand By Your Man."

24            And what does the search reflect?

25

Barbara Frederiksen-Cross - Redirect

595

A.   The search results reflect that that song is not found in the list.

Q.   Okay.  And, Mr. Duval, if you could do the same thing in PX 2 in terms of a key word search for "Stand By Your Man."

        And, Ms. Frederiksen-Cross, does "Stand By Your Man" appear on PX 2?

A.   No, that file was not found in the list of compositions.

Q.   Is that another example of counsel asking you about a song that's not in this case?

15:23:37 A.   That's correct.

Q.   Okay.  Thank you.  Do you recall counsel asking you about the song "Love Story," by Taylor Swift?

A.   I think so, yeah.

Q.   Okay.  Well, we're going to --

A.   They kind of ran together after awhile there.

Q.   We can skip that one if you don't recall.

        Finally, do you recall counsel asking you about the song "Lovely Day," by Bill Withers?

A.   Yes.

15:24:10 Q.   He happens to be one of my favorite artists.

        So, Mr. Duval, could you pull up PX 1, please.  And search "Lovely Day."

        Ms. Frederiksen-Cross, what's the result of searching for the song "Lovely Day" on PX 1?

A.   That song is not amongst the copyrighted sound recordings

Barbara Frederiksen-Cross - Redirect

596

1    in this case.

2    Q.    Okay.  Mr. Duval, could you search for "Lovely Day" on PX

3    2.

4         Okay.  Ms. Frederiksen-Cross, what's the result of a

5    search for the song "Lovely Day" on PX 2?

6    A.    That song is not amongst the copyrighted compositions

7    either.

8    Q.    Okay.  So, again, this represents instances where counsel

9    was asking you about data concerning songs and recordings not

15:25:30 10  in the case; is that correct?

11   A.    That is correct.

12   Q.    Okay.  Thank you.  Do you recall counsel asking you

13   several questions about the Stroz and Harbor Lab reports?

14   A.    Yes.

15   Q.    And did the Stroz reports point to even a single

16   inaccuracy in the MarkMonitor system?

17   A.    No.  They found the system to be accurate.

18   Q.    Do you recall whether the Harbor Lab report pointed to

19   even a single inaccuracy in the MarkMonitor system?

15:26:02 20  A.    No.  Harbor Labs also confirmed that the system was

21   accurate.

22   Q.    And in the course of your -- oh, I'm sorry, how many hours

23   did you say you worked on this matter?

24   A.    Approximately 400.

25   Q.    Okay.  In the course of your 400 hours in this case thus

Barbara Frederiksen-Cross - Redirect

597

1    far, have you run across a single instance where you have been

2    able to point to a MarkMonitor notice going out for a file

3    that, in fact, was non-infringing?

4    A.   No, I was not able to find any such evidence.

5    Q.   Do you recall counsel asking you questions about

6    MarkMonitor submitting file hashes to Audible Magic?

7    A.   I recall those questions, and I tried to kind of clean

8    that up because it was confusing.  But I do recall the

9    questions.

15:26:50 10   Q.   So what is it that Audible -- that MarkMonitor submits to

11   Audible Magic for a lookup?

12   A.   Audible Magic uses sound fingerprints for its lookup,

13   which are based on the acoustic characteristics of the sound,

14   not a hash value.

15   Q.   And do you recall counsel asking you several questions

16   about the various levels of the Audible Magic lookups in terms

17   of a Level 1 versus a Level 3?

18   A.   Yes, I do.

19   Q.   And do you have an understanding about whether there are

15:27:25 20   any reliability differences for lookups as between a Level 1 or

21   a Level 3?

22   A.   My understanding, both after doing a few mathematical

23   calculations and trying to find a difference, and also after

24   speaking to Audible Magic's engineers, is that there is no

25   difference in the accuracy.  They're both ultimately reliant on

Barbara Frederiksen-Cross - Redirect

598

1    the same length of sound clipping to generate the actual

2    fingerprint and have the same reliability according to their

3    testing with respect to the results.

4    Q.   And do you recall counsel asking you a number of questions

5    about a directory of files from a hard drive?

6    A.   I do, yes.

7    Q.   And just to be clear, that spreadsheet that has the

8    directory of the files on the hard drive, that's something

9    separate from the notice data that contains the information

15:28:13 10   that was reported to Cox, correct?

11   A.   Absolutely, yes.

12   Q.   All right.  So -- and to be clear, the digital

13   fingerprints that are submitted to Audible Magic for a lookup,

14   that's something separate than a hash ID for file

15   identification, correct?

16   A.   That is correct as well.

17   Q.   Okay.  So let's say that there's a file with a hash.  For

18   simplicity purposes, we'll just call it XYZ.

19   A.   Okay.

15:28:41 20   Q.   I've looked at a number of these.  It's too hard to

21   pronounce.

22          First of all, if a file -- and we're just identifying

23   the file by hash XYZ, do you know if that file with that hash

24   XYZ can be distributed on both the -- on more than one

25   peer-to-peer network at a time?

Barbara Frederiksen-Cross - Redirect

599

1    A.    Absolutely.

2    Q.    For instance, could a file with a hash XYZ be distributed

3    on both the BitTorrent and Gnutella network?

4    A.    Yes, it could.

5    Q.    And provided files have the same hash value -- okay?  So

6    let's go back to the XYZ example for a moment.  Provided that

7    they have the same hash value, will they have the same contents

8    regardless whether I pull it off today, or pull it off a year

9    ago, or a year from now?

15:29:33 10   A.    The contents will be the same regardless of when you pull

11   it, unless there has been some damage to the file.

12   Q.    So do you recall counsel asking you some questions about

13   your review of evidence packages?

14   A.    I do.

15   Q.    And I believe you indicated you reviewed something like

16   175,000 evidence packages; is that correct?

17   A.    It was between 175 and 176.  I don't remember the exact,

18   but yes.

19   Q.    And counsel, I think, asked you whether you were able to

15:30:05 20   -- whether there was an evidence package available for your

21   review corresponding to every single notice that went to Cox.

22         Do you recall those questions?

23   A.    I recall those questions.

24   Q.    And I think you indicated that there was some portion of

25   the notices, the evidence packages, weren't available for your

Barbara Frederiksen-Cross - Redirect

600

1   review, right?  You were -- so --

2   A.    That's correct, yes.

3   Q.    Okay.  Did your ability to review 175,000 evidence

4   packages rather than the ones corresponding to all notices, did

5   that have any impact on your ability to assess the accuracy and

6   reliability of the MarkMonitor system?

7   A.    No.  Because I looked at the evidence that was made

8   available in this case, and I cross-correlated the evidence of

9   the evidence packages to the notices where I was able to do

15:30:56 10  that.  Obviously did that mostly programatically, though I also

11  visually inspected it.

12        I found it to be entirely consistent.  And it was

13  also entirely consistent with the software.  And so, I found no

14  deviation there.

15        So I would expect that the remainder of the notices,

16  which contain copies of information from the evidence files,

17  had those evidence files been available, they would have been

18  consistent with everything else that I saw.

19  Q.    Let me just follow up with a couple final questions.  So,

15:31:32 20  first of all, you reviewed the data in the notices for every

21  notice that went out in this multiyear period to Cox from

22  MarkMonitor, correct?

23  A.    My programs and I did, yes.

24  Q.    I understand that.  And am I correct that you testified

25  earlier that the notices at issue draw information from the

Barbara Frederiksen-Cross - Redirect

601

1    evidence packages, correct?

2    A.   That's correct, yes.

3    Q.   Yeah.  So does your ability to review the notices in any

4    way have any impact or give you any insights to evidence

5    packages for those detected infringements?

6    A.   Well, based on the 175,000 that I looked at, the

7    information in the notices comes directly from the evidence

8    packages.

9         So the same evidence is present in both places, at

15:32:25 10   least with respect to that evidence used in the notices or used

11   for the notices.

12   Q.   Sure.  And, you know, my last question right now concerns

13   the timing of the notices for which the evidence packages

14   weren't available at the time of your review.

15        How -- do you recall how those relate to the timing

16   of the claim period in this case?

17   A.   I think that they either predate or come right at the very

18   beginning of the time period.  I would want to look back to my

19   report with the note about the exact date of where that cutoff

15:33:04 20   was.

21   Q.   Sure.  Why don't we give you the opportunity to refresh

22   your recollection by looking at your report.

23   A.   Sure.

24   Q.   And I believe that's in the binder in front of you.  It's

25   the first -- it appears to be 4-A, and you may arrive at the

Barbara Frederiksen-Cross - Redirect

602

 1    page faster than I might.  It's page 29.

 2    A.   Okay.  Thank you, counsel.  The time period where the

 3    notices were missing was January 16, 2013, which I understand

 4    to be a time period before the time period for the notices that

 5    are at issue in this case.

 6    Q.   Okay.  So for the notices that went to Cox during the

 7    claim period in this case, you were able to review the source

 8    code, the evidence packages, the notices, and the notice data

 9    that issued, as well as do all the other things you talked

15:34:19 10   about today?

11    A.   Let me just check something here.

12           That is correct with respect to a smaller number of

13    notices that were missing during the time frames of 6 to 8 p.m.

14    for a few days in 2013.

15           MR. ZEBRAK:  But you have -- do you have any reason

16    -- well, actually, strike that.  We're done.

17           Thank you, Your Honor.

18           THE COURT:  Okay.  All right.  May

19    Ms. Frederiksen-Cross be excused?

15:35:01 20          MR. BRODY:  May I have a very brief recross?

21           MR. ZEBRAK:  Yes, Your Honor.

22           THE COURT:  No, we've done enough.

23           All right, you're excused with our thanks.  Please

24    don't discuss the testimony that you've given with any -- here

25    today with anybody else until our trial is over.  All right?

Barbara Frederiksen-Cross - Redirect

603

1           THE WITNESS:  Okay.

2           THE COURT:  All right.  Have a good evening.  Thank

3    you.

4           THE WITNESS:  Thank you very much.

5           NOTE:  The witness stood down.

6           THE COURT:  All right.  Let's take our afternoon

7    recess.

8           We'll take 15 minutes and we'll come back with

9    further testimony.

15:35:30 10           Thank you.  You're excused.

11           NOTE:  At this point the jury leaves the courtroom;

12    whereupon the case continues as follows:

13    JURY OUT

14           THE COURT:  All right.  Anything before we recess?

15           MR. ZEBRAK:  No.  Thank you, Your Honor.

16           THE COURT:  All right.  We're in recess.

17           NOTE:  At this point a recess is taken; at the

18    conclusion of which the case continues in the absence of the

19    jury as follow:

16:00:46 20    JURY OUT

21           MR. OPPENHEIM:  I think we have reached agreement to

22    stipulate to the entry of certain exhibits.  We can just do

23    that before the jury comes out, and then we're ready to go.

24           THE COURT:  That's fine.

25           MR. OPPENHEIM:  So, Your Honor, I believe that there

604

1    is agreement for entry of PX 11, PX 16, PX 33, PX 17, and

2    PX 14.  Did I get that right?

3              MR. BRODY:  I think so.

4              MR. OPPENHEIM:  I skipped this one.

5              MR. BRODY:  Yes.  PX 11, yes.  PX 16, yes.  PX 33,

6    yes.  PX 17, yes, on the understanding that's a compilation of

7    notices, there are two of those, one that was sent to us --

8    their copy of what they sent to us and our copy of what we

9    received are slightly different.  We want both of them in.

16:01:46 10            MR. OPPENHEIM:  Okay.  In which case, then I'll just

11   lay a foundation because I don't know what exhibit that is.

12             THE COURT:  Keep working on that one, then.

13             MR. BRODY:  And PX 14 is fine.

14             THE COURT:  Good.  Thank you for working that out.

15   Those will be received.

16             Are we ready for our jury, then?

17             All right, Joe.  Let's get our jury, please.

18             NOTE:  At this point the jury returns to the

19   courtroom; whereupon the case continues as follows:

16:02:55 20   JURY IN

21             THE COURT:  All right.  Please have a seat.

22             Mr. Oppenheim, next witness, sir.

23             MR. OPPENHEIM:  Your Honor, plaintiffs would call

24   Samuel Bahun.

25             NOTE:  The witness is sworn.

S. Bahun - Direct

605

|  | | |
|---|---|---|
| | 1 | THE COURT:  Good afternoon, sir. |
| | 2 | Please proceed, Mr. Oppenheim. |
| | 3 | MR. OPPENHEIM:  Thank you, Your Honor. |
| | 4 | SAMUEL BAHUN, called by counsel for the plaintiffs, |
| | 5 | first being duly sworn, testifies and states: |
| | 6 | DIRECT EXAMINATION |
| | 7 | BY MR. OPPENHEIM: |
| | 8 | Q.   Good afternoon, Mr. Bahun. |
| | 9 | A.   Good afternoon. |
| 16:04:01 | 10 | Q.   Where do you work? |
| | 11 | A.   I work for MarkMonitor. |
| | 12 | Q.   And what is MarkMonitor's business? |
| | 13 | A.   MarkMonitor is a global leader in brand protection, |
| | 14 | antipiracy, and antifraud services, as well one of the largest |
| | 15 | domain registrars. |
| | 16 | Q.   And just for the benefit of the court reporter, because |
| | 17 | I'm saying Bahun, and I've made this mistake myself, how do you |
| | 18 | spell your last name? |
| | 19 | A.   It's B-a-h-u-n. |
| 16:04:33 | 20 | Q.   Thank you.  And what is your current position at |
| | 21 | MarkMonitor? |
| | 22 | A.   I am the director of strategic accounts. |
| | 23 | Q.   And as the director of strategic accounts, what do you do? |
| | 24 | A.   So I work under the antipiracy division of the company. |
| | 25 | And I'm responsible for working with the larger accounts, the |

S. Bahun - Direct

606

1    more important accounts that we have, managing various aspects

2    of the antipiracy services that we deliver to them.

3    Q.    And, technically, what department is your -- are you in

4    within antipiracy?

5    A.    So my position under the org chart falls under the sales

6    organization, but I am more of a hybrid role.  I -- a lot of

7    what I do is more consultative, working with various content

8    owners from kind of the start of their evaluation of issues

9    that they're facing and problems that they're seeing with

16:05:37 10   piracy, all the way through the sales process, and then the

11   implementation, kind of the management of the technical aspects

12   of their services.

13   Q.    Do you provide end-to-end service --

14   A.    Yes.

15   Q.    -- for your clients?

16   A.    Yes.

17   Q.    And how long have you worked for MarkMonitor?

18   A.    I have worked for MarkMonitor for nine-and-a-half years.

19   Q.    And prior to working at MarkMonitor, where did you work?

16:06:00 20   A.    I worked for a company called MediaSentry.

21   Q.    And what is MediaSentry or was MediaSentry?

22   A.    Yeah, MediaSentry was also a vendor that provided

23   antipiracy services.

24   Q.    And how did those antipiracy services differ from the

25   antipiracy services that MarkMonitor offers?

S. Bahun - Direct

607

1    A.    There were a lot of similarities, they covered many of the

2    same areas.  Back when we started, you know, the space was a

3    little different, so there were some variations, but

4    essentially the same services.

5    Q.    And what was your role at MediaSentry?

6    A.    When I started off, it was more of a technical role.  So I

7    worked in operations, did analyst work, and held a few

8    different positions throughout the time that I was there,

9    starting off in more technical and then working kind of into

16:06:54 10   more business-related roles.

11   Q.    And for what period did you work at MediaSentry?

12   A.    So I started at MediaSentry in May of 2003.  So I was

13   there for about six-and-a-half years.

14   Q.    So all told, how many years have you been working in the

15   business of antipiracy?

16   A.    Just over 16 years.

17   Q.    Let's talk a little bit more about MarkMonitor.  When was

18   MarkMonitor founded?

19   A.    MarkMonitor was founded in 1999.

16:07:31 20   Q.    And can you describe the different types of business that

21   MarkMonitor is in.

22   A.    Sure.  Yes.  So originally it was founded as a brand

23   protection company.  So they were focused on helping companies

24   protect their brands and their presence online.  They actually

25   were kind of the inventor of that space.

S. Bahun - Direct

608

1          And then from there, they grew into working with

2     antipiracy and antifraud and the domain services as the

3     registrar.

4     Q.   And what kinds of clients does MarkMonitor provide

5     services to?

6     A.   A pretty broad list.  We work with, I think, over half of

7     the Fortune 100 companies across virtually every industry.  So

8     we have -- we work with companies like Verizon, Nissan,

9     Coca-Cola.

16:08:30 10          On the domain side, it's -- the list is very long.

11    We work with companies like Apple and Google, that sort of

12    companies.

13    Q.   Does MarkMonitor do work in the financial industry?

14    A.   We do, yes.

15    Q.   And does MarkMonitor do work in -- with respect to sports

16    leagues?

17    A.   Yes.  We work with most of the major pro sports leagues.

18    Q.   And what kind of services does MarkMonitor provide to

19    professional sports leagues?

16:09:06 20   A.   So the sports leagues own a lot of content from the games,

21    video content.  And so, the work we do with them is primarily

22    focused on piracy of the live streams.

23          So, you know, the football games that are airing, a

24    lot of times those streams get pirated and offered to consumers

25    through a variety of pirate environments.  So, yeah.

S. Bahun - Direct

609

1    Q.    Is it more than just football?

2    A.    Yes.

3    Q.    Does MarkMonitor also do work in the film and television

4    space?

5    A.    Yes.

6    Q.    And what kind of work does MarkMonitor do there?

7    A.    Again, kind of a variety.  For film and TV content, we

8    provide services related to peer-to-peer piracy, Web piracy,

9    piracy that's made available on search engines.  There is a

16:10:05 10  number of areas.  Really virtually any area that we see piracy

11   occurring, we provide services to identify that and take

12   action.

13   Q.    Are there other content industries that MarkMonitor does

14   work for in the antipiracy space beyond movies and television?

15   A.    Yeah, yes.  So I think virtually all the media types.  We

16   work with film, TV, music, publishing, video games, software,

17   all the different categories you would assign to that content,

18   yeah.

19   Q.    And what types of antipiracy services does MarkMonitor

16:10:45 20  offer with respect to peer-to-peer networks?

21   A.    The main focus is in monitoring the infringing activity

22   that is taking place.  So identifying the infringement that is

23   occurring, collect evidence, and send notices to the ISPs to

24   inform them of it.

25   Q.    And how many ISPs does MarkMonitor send notices to?

S. Bahun - Direct

610

1    A.   Globally, it's in the thousands.  In the U.S., hundreds.

2    Q.   So you have mentioned a lot of large companies and

3    industries that retain MarkMonitor.  Based on your experience

4    in talking to them, do you have a sense of why MarkMonitor is

5    retained by all these companies?

6    A.   Yeah.  I mean, our reputation, our history and our

7    reputation that we maintain in this area is impeccable.  I

8    mean, we have become in many ways kind of the leaders in this

9    space.  And the services that we provide are critical for

16:11:58 10   content owners to identify and understand the level of

11   infringement that is taking place and, you know, do something

12   about it.  So ...

13   Q.   In the course of your antipiracy work, do you have any

14   background in working with law enforcement?

15   A.   Yes.  So, yeah, in addition to all the stuff we have

16   already talked about, I have assisted the Department of Justice

17   in conducting training with their agents, as well as FBI and

18   Homeland Security.

19        I have also worked in kind of a consultative role

16:12:38 20   with the Royal Canadian Mounted Police in their efforts to

21   identify and address things like human trafficking, child

22   exploitation, that kind of thing.

23        As well as I have done kind of ongoing -- I

24   occasionally do work with local and state law enforcement and

25   teams of prosecuting attorneys.

S. Bahun - Direct

611

1    Q.    And when you're doing work with law enforcement like this,

2    is this just sales work, or is it something different?

3    A.    No, actually, none of that would be considered sales.  It

4    is more related to training and consulting those groups to help

5    them understand, you know, the technology that is involved and

6    the crimes that they're working with and, you know, helping

7    them understand how to -- how to monitor it and how to interact

8    with those issues, yeah.

9    Q.    Do you also work with state law enforcement from time to

16:13:35 10   time?

11   A.    Yes.

12   Q.    When did you start working on peer-to-peer networks?

13   A.    So I started -- back at the beginning of my career, I

14   actually started my career in antipiracy on a team that was

15   hired to work with the music industry related to Napster.  So

16   at the very beginning of peer-to-peer.

17   Q.    And what role did your team play in the Napster case?

18   A.    So we were hired at that time to collect data on the

19   infringing activity taking place and provide evidence that

16:14:14 20   supported the various enforcement efforts that were going on at

21   that time.

22   Q.    Over the course of the last -- over the course of the time

23   that you have been working on peer-to-peer activities, roughly

24   how much of your time is dedicated to peer-to-peer versus other

25   types of piracy?

S. Bahun - Direct

612

1   A.   Probably -- I mean, it has been continuous throughout the

2   16-and-a-half years.  But I would -- I would estimate about

3   half of my time.  I mean, it's a big portion of what I do,

4   yeah.

5   Q.   At a high level, over the course of your time working with

6   peer-to-peer, can you describe for me, consumer perspective,

7   what a peer-to-peer network is for?

8   A.   Yes.  So, I mean, at a high level, peer-to-peer networks

9   predominantly are used to gain access to pirated content.

16:15:19 10   Q.   Can peer-to-peer -- based on your understanding, can

11   peer-to-peer be used for other purposes?

12   A.   Sure, yes.

13   Q.   And what experience do you have in seeing peer-to-peer

14   used for non-piracy purposes?

15   A.   I mean, there are -- there are some examples where

16   software companies and others have been able to leverage the

17   technology as a means to distribute content, you know, across

18   different groups of people.

19        Most of the time, I think, the legitimate -- or, you

16:15:58 20   know, the legitimate uses of it, it's often integrated in the

21   background of a piece of software.  So the people don't even

22   know that it is leveraging that.

23        But that is, you know, one example that I can think

24   of where peer-to-peer software can be used in a legitimate

25   manner.

S. Bahun - Direct

613

1    Q.    And are you aware of the four peer-to-peer networks at

2    issue in this case?

3    A.    Yes.

4    Q.    And what are they?

5    A.    BitTorrent, eDonkey, Gnutella, and Ares.

6    Q.    And in your experience, to what extent of the content on

7    those networks is infringing or is piratical?

8              COURT REPORTER:  I am sorry, counsel?

9              MR. BRODY:  Objection.

16:16:38 10              MR. OPPENHEIM:  I said piratical, but I'll go with

11    piracy.  Maybe that's a little easier.

12              THE COURT:  All right.  Overruled.

13              THE WITNESS:  I'm sorry.  Can you repeat the

14    question?

15    BY MR. OPPENHEIM: (Continuing)

16    Q.    In your experience on those four networks --

17    A.    Yeah.

18    Q.    -- to what extent is the content piracy?

19    A.    It'd be difficult for me to quantify it.  But the

16:16:58 20    overwhelming majority of the content we see on those networks

21    is pirated content.

22    Q.    In the course of your work, do you monitor what's

23    happening on peer-to-peer networks?

24    A.    Yes.

25    Q.    And how do you do that?

S. Bahun - Direct

614

1  A.   So we've developed proprietary technology at MarkMonitor

2  that interacts with the peer-to-peer networks in very similar

3  ways to a typical user.  But our technology allows us to do it

4  at a much larger scale.

5        And so, we use the scanning technology that we've

6  developed to monitor that activity.

7  Q.   And do you ever monitor it just to get a sense of the

8  total measure of what's happening on the networks?

9  A.   Yes.

16:17:53 10  Q.   And how often do you do that?

11  A.   So we have kind of an ongoing monitoring project that we

12  run independent of any of our customers.  It focuses -- it's --

13  there's so much content on those networks, it's difficult to

14  cover everything.  So we developed a methodology that

15  identifies kind of a -- in a consistent manner, a sample set of

16  the most popular film, TV, and music content.  And we monitor

17  on an ongoing basis for that content.

18  Q.   And what do -- does that monitoring generate reports or

19  information in some way?

16:18:35 20  A.   Yeah.  So the data that we -- the data we collect from

21  that gives us kind of an accurate view, at least in a

22  consistent way from a statistical standpoint, on how much

23  pirated activity we see taking place on those popular titles.

24        And so, we use it in a number of ways.  Some

25  customers purchase that data for their own types of analysis.

S. Bahun - Direct

615

1    But internally, we can analyze it to determine what volumes of

2    infringements we're seeing from certain ISPs, for certain types

3    of content.  You know, a variety of things we can analyze.  But

4    those are some of what we use it for.

5    Q.    Is there a term for this ongoing monitoring that you use

6    internally or externally for that matter?

7    A.    Sure.  Yeah, the name that we've run it under is -- we

8    call it the global digital piracy index, or GDPI for short.

9    Q.    Okay.  And the reports that are generated out of that, are

16:19:38  10  those reports you -- that you have occasion to read?

11   A.    Yes.

12   Q.    And how often do you review those reports?

13   A.    When I have time, daily.  But I would say on average,

14   probably two to three times a week I'm looking at that data for

15   various reasons.

16   Q.    And is it important in the work you do?

17   A.    Yes.

18   Q.    And is it important that you know it for your clients'

19   purposes?

16:20:05  20  A.    Yes.

21   Q.    I want to turn now to MarkMonitor's relationship with the

22   RIAA.

23        Can you describe when MarkMonitor first began working

24   with the RIAA?

25   A.    Yes.  So I started with MarkMonitor in 2010, and at that

S. Bahun - Direct

616

1    time they had an existing relationship with RIAA.

2    Q.   And do you know how far back it went?

3    A.   I don't -- I don't know 100 percent for sure, but I think

4    it was around 2008, maybe, when they started working together.

5    Q.   And when did you first begin working with the RIAA at

6    MarkMonitor?

7    A.   When -- basically when I joined.  I had worked with the

8    RIAA prior to working for MarkMonitor, so there was an existing

9    relationship personally.  But -- so when I joined MarkMonitor,

16:21:01 10  it was easy for me to kind of start working with them

11   immediately.

12   Q.   And what was your role?  What did you -- what did you do?

13   A.   So at that time, again, with my background in

14   peer-to-peer, I was working with a few others at MarkMonitor to

15   kind of assist and manage the scanning projects and notice

16   sending programs that we were running for RIAA.

17   Q.   And were there ongoing scanning projects -- excuse me.

18        Were there ongoing scanning projects as far back as

19   2010?

16:21:44 20  A.   Yeah.  I don't -- again, I don't remember what was going

21   on prior to that.  But, yes, around that time when I got

22   involved there was a project that was being worked on, yeah.

23   Q.   And did those scanning projects involve any kind of notice

24   sending?

25   A.   Yes.

S. Bahun - Direct

617

1    Q.    And to whom were notices being sent?

2    A.    There were a couple different groups, but primarily I

3    recall residential ISPs.

4    Q.    And when you say "residential ISPs," would that include

5    Cox Communications?

6    A.    Yes.

7              MR. OPPENHEIM:   Did we give him a notebook yet?   All

8    right.   We forgot to -- can we hand up the notebook to the

9    witness, or have we done it already?

16:22:40 10            THE COURT:   Yes.

11             MR. OPPENHEIM:   Thank you.

12   BY MR. OPPENHEIM:   (Continuing)

13   Q.    Mr. Bahun, in this notebook could you please look at PX 4,

14   which I believe should be the second tab of the notebook.   It's

15   the next --

16             Move it into evidence.

17             THE COURT:   I've got it.

18             MR. OPPENHEIM:   We'll move it into evidence.   Cox

19   does not object.

20             THE COURT:   No objection?

21             MR. BRODY:   No objection.

22             THE COURT:   All right.   It's received.

23             MR. BRODY:   Okay.   Can we publish this to the jury,

24   please?

25             THE COURT:   Yes, sir.

S. Bahun - Direct

618

1   BY MR. OPPENHEIM: (Continuing)

2   Q.   Do you recognize this document, Mr. Bahun?

3   A.   Yes.

4   Q.   And what is it?

5   A.   This is an SOW, what we call a statement of work.

6   Basically the contract between MarkMonitor, at this time doing

7   business under the name DtecNet, and the RIAA.

8   Q.   If you would pull that microphone just a little bit closer

9   to you because your voice is fading a little.

10  A.   Okay.  Sorry.

11  Q.   This happens late in the day.  Thank you.

12       So you -- there was a bunch there.  So you used the

13  name DtecNet.  Who is DtecNet?

14  A.   So DtecNet was an antipiracy company that was acquired by

15  MarkMonitor and essentially became MarkMonitor's antipiracy

16  division.

17  Q.   Were you actually working for DtecNet in 2010?

18  A.   Yes.

19  Q.   When it became MarkMonitor?

16:24:27 20  A.   Yes.

21  Q.   Okay.  And what is the -- what is the date of this

22  agreement?

23  A.   February 15, 2012.

24  Q.   And this is -- is this the agreement under which

25  MarkMonitor was sending notices in the 2012 to 2013 time frame?

S. Bahun - Direct

619

1    A.    Yes.

2    Q.    And were there subsequent agreements like this for -- that

3    extended this program out to 2015?

4    A.    Yes.

5    Q.    I'd like to direct your attention to page PX 00040004.

6          Do you see the section where it says:  Supported file

7    sharing networks?

8    A.    Yes.

9    Q.    Can you explain what this provision of the agreement is?

16:25:27 10   A.    Yes.  This section described the four peer-to-peer

11   networks that we were scanning as part of this agreement.

12   Q.    And what were those networks?

13   A.    BitTorrent, Gnutella, eDonkey, and Ares.

14   Q.    Between 2012 and 2015, did MarkMonitor add any additional

15   networks to its scanning work?

16   A.    No, I don't believe so.

17   Q.    And you used the term "scanning," and then I picked it up.

18   But could you explain what you mean by scanning?

19   A.    Sure.  So it is kind of a general term, but essentially

16:26:20 20   scanning is where we would deploy our system to identify

21   infringing files on these networks, and then we would monitor

22   for the infringements that are occurring.

23         So generically we would refer to that as scanning.

24   Q.    And is there an -- did this agreement contemplate that

25   there would be certain quantities of notices that would be sent

S. Bahun - Direct

620

1  under it?

2  A.   Yes.  I believe there's a page in the agreement that

3  describes that.

4  Q.   Can you tell me which page that is?

5  A.   It is PX 00040008, labeled Appendix A.

6  Q.   Can we pull that up, please.

7       And -- great.  Can you explain what this appendix

8  shows.

9  A.   Yes.  So this table details the estimated volume of

16:27:43 10  notices that we would send by ISP per month.

11       So on the left-hand side, you have a list of ISPs put

12  into kind of two groups there.  And then across the top, you

13  can see months.  And the corresponding numbers describe the

14  volume of notices per month.

15  Q.   So there seem to be, I think, five ISPs at the top and it

16  says:  Participating.

17       Do you see that?

18  A.   Yes.

19  Q.   What is that a reference to?

16:28:13 20  A.   At this time there was a notice program in place where the

21  five ISPs in that section were kind of willing participants.

22  So they -- the term that was used for those was to describe

23  them as participating.

24  Q.   And what was that program called?

25  A.   It was the Copyright Alert System.  So CAS for short.

S. Bahun - Direct

621

1   Q.   And so, the volumes of notices there set for the CAS

2   participating ISPs, do you know how those volumes were set?

3   A.   I don't know all of it.  But the data I described earlier,

4   the GDPI data that we used to kind of evaluate volumes, was one

5   element of it.

6          Ultimately, the decision was not ours.  So, you know,

7   it was -- RIAA had a process they went through, and I think

8   they took the data that we provided as kind of one element of

9   that decision.

16:29:12  10   Q.   And it appears that some of these ISPs seem to, over time,

11   increase their numbers.  Can you explain that, please.

12   A.   Yes.  So at the beginning of the -- this graduated

13   response program, there was a ramp-up period.  And so, you

14   know, it didn't start with kind of the full volume that was

15   expected from day one because it was a -- kind of a structured

16   program, we -- that they had planned for the volumes to kind of

17   increase gradually over the first few months.

18   Q.   Looking at March of 2013, the last month in the year here,

19   what was the anticipated notice volume for AT&T?

16:30:04  20   A.   28,750.

21   Q.   And how about Cablevision?

22   A.   17,250.

23   Q.   And how about Comcast?

24   A.   29,000.

25   Q.   How about -- what is TWC?  That's the next one.

S. Bahun - Direct

622

1   A.    Time Warner Cable.

2   Q.    Okay.  So what was the anticipated notice volume for TWC?

3   A.    20,125.

4   Q.    And what was the notice volume for Verizon?

5   A.    43,125.

6   Q.    Now, skip down below.  Do you see Cox in the next box?

7   A.    Yes.

8   Q.    For that same month in 2013, what was the anticipated

9   notice volume there?

16:30:44 10   A.    7,200.

11   Q.    And do you know why that number was as low as it was?

12   A.    Yeah.  The -- Cox is kind of the one that stands out as an

13   exception in this table because I -- and I recall it because

14   it's the only time we've ever seen this occur.  We were -- we

15   were told by the RIAA that a cap, a daily limit had been set by

16   Cox and communicated to them.

17           MR. BRODY:  Objection.  Move to strike.

18           MR. OPPENHEIM:  I can clarify it if you'd like, Your

19   Honor.

16:31:31 20           THE COURT:  Well, it's hearsay.

21           MR. OPPENHEIM:  It is, but it -- if he's offering it

22   because that was the basis of what was in the contract, his

23   understanding of what was in the contract, it goes to why they

24   entered into that agreement.

25           THE COURT:  Yeah.  I'm going to strike it.  Objection

S. Bahun - Direct

623

1    sustained.

2          Go ahead.  Ask your next question.

3    BY MR. OPPENHEIM: (Continuing)

4    Q.   In the lower box here that starts with AOL, could -- do

5    you know generally how the quantities of notices were

6    determined?  The anticipated -- excuse me.  The anticipated

7    notice volume was determined for the boxes down below, the ISPs

8    in the box down below?

9    A.   Yes.  The part of the process we were involved in was

16:32:17 10   looking and analyzing that -- the infringement volume that I

11   mentioned earlier, to get a sense of what -- you know, how much

12   infringing activity we were seeing on the networks for these

13   specific ISPs.

14          And so, based on that and some analysis around that

15   data, we were able to come up with estimated volumes that we

16   would expect.

17   Q.   I apparently skipped a point.  In that box, it says:

18   Non-participating; does it not?

19   A.   Yes.

16:32:47 20   Q.   Right above it.  What does non-participating mean?

21   A.   Again, just a general term that was used to differentiate

22   ISPs who were not participating in the Copyright Alert System.

23   Q.   And so for those ISPs, with the exception of Cox, what

24   data did you use to insert anticipated notice volumes?  I'm

25   sorry.

S. Bahun - Direct

624

1   A.   The infringement data that we collected on the broader set

2   of content just to kind of analyze and estimate what level of

3   infringing activity we were seeing on the various networks.

4   Q.   And that was the GDPI data you discussed earlier?

5   A.   Yes.

6   Q.   Do you recall what the GDPI data showed for Cox at that

7   period of time?

8            MR. BRODY:  Your Honor, may I approach?

9            THE COURT:  Yes, sir.

16:33:43  10            NOTE:  A sidebar discussion is had between the Court

11   and counsel out of the hearing of the jury as follows:

12   AT SIDEBAR

13            THE COURT:  Yes, sir.

14            MR. BRODY:  This is the pulse monitoring question.

15   So we maintain our objection.  I think that the testimony that

16   he gave was that all they are doing is basically seeing how

17   many -- how much traffic there is with respect to swarms.  It

18   has nothing to do with infringement.  It has nothing to do with

19   anything.

16:34:30  20            There is no foundation.  I think if he's asked, he

21   will testify that the information they gathered was

22   insufficient to support notice.  I think he will testify that

23   they didn't determine whether the peers involved were actually

24   running P2P software.

25            I think he will testify that they didn't actually

S. Bahun - Direct

625

1    determine that the computers were operational.  Those are

2    higher levels of inquiry than what they did.

3            And as a consequence -- I think he also testified

4    that he actually wasn't the one who was preparing and

5    collecting this data, and that he is basically relying on what

6    other people did.

7            So I think that the bottom line, the data is -- it's

8    being offered to create the inference that Cox had a lot more

9    infringement on its network than is commensurate with the level

16:35:41 10  of notices that they were receiving.  And it's not probative of

11   that fact.  It simply isn't probative of infringement.

12           MR. OPPENHEIM:  I don't think that is quite an

13   accurate description of what Mr. Bahun said.  He said that they

14   used music, movies, and televisions to do searching, and that

15   that formed a basis for the pulse checks for GDPI data.  He

16   testified that it's something that they do regularly.  He

17   relies on it regularly.  He reviews it regularly.  He uses it

18   to inform his clients regularly.

19           He said it informed him on the decisions of what the

16:36:15 20  other ISPs -- the anticipated notice volumes for the other ISPs

21   would be.  And I think he's laid a foundation, and Mr. Brody is

22   free to cross-examine him on it.

23           THE COURT:  Well, it obviously does not have to be

24   just data collected for purposes of sending notices.  Right?  I

25   mean, that's not the only use you can make of this kind of

S. Bahun - Direct

626

1    data.

2           So that is something that I had been thinking about

3    earlier.  So --

4           MR. OPPENHEIM:  I can clarify that, Your Honor, that

5    the GDPI data was not used for sending notices.

6           MR. BRODY:  Can we also -- can I also ask for a

7    clarification that it is not indicative of the level of

8    infringement on the Cox system?  Because that's the real issue.

9    They want to use this as evidence of the amount of infringement

16:37:08 10  that was going on.

11          THE COURT:  Of traffic, P2P traffic?

12          MR. BRODY:  It could be his --

13          THE COURT:  He is not going to say it is all

14   infringement.  He hasn't looked at it.  But he has said already

15   generally that most of the P2P traffic is pirating.  So it's

16   already in.

17          What's his response going to be to these questions?

18          MR. OPPENHEIM:  That when he looked, he saw well over

19   10,000 Cox subscribers distributing works on peer-to-peer

16:37:43 20  networks per day at this point in time.

21          And I also think that when he was doing searching,

22   what they were searching for was, in fact, infringing content,

23   movies, music, television shows.  So it's not fair to say that

24   it's not indicative necessarily of piracy.

25          Again, I'm not saying, and he has not said that it's

S. Bahun - Direct

627

1    a basis for infringement notices, but this is the basis upon

2    the contract --

3              THE COURT:  What's the reliability of the underlying

4    cultivation of the information?  He hasn't testified about

5    that.  And that's my point.  Where is it coming off of?  I

6    mean, he did say --

7              MR. OPPENHEIM:  I'm happy to ask him that, if you'd

8    like, Your Honor, and lay that foundation.

9              THE COURT:  Is this the same platforms and software

16:38:30 10   systems that they are using for all the other information?

11             MR. OPPENHEIM:  I believe he will say he's using the

12   same monitoring system, but obviously not the same evidence

13   collection notice sending because they don't go that far.

14             THE COURT:  All right.  Lay a foundation for that

15   and --

16             MR. BUCHANAN:  Can I say something?

17             THE COURT:  Yes.

18             MR. BUCHANAN:  It's just we don't have any of that

19   data.

16:38:51 20             THE COURT:  Yeah, I know.  And your record is

21   preserved on that.

22             All right.  Lay a foundation for that, where the data

23   is coming from.

24             And then your exception is noted.  I will allow it.

25             Are these records that I have just said were hearsay,

S. Bahun - Direct

628

1   are these business records or -- I mean, I don't know whether

2   they are or they aren't.  I just expected that those would

3   be --

4           MR. OPPENHEIM:  Which --

5           THE COURT:  Five minutes ago I sustained an objection

6   on a hearsay ground based on Cox's low numbers in the chart

7   they were keeping for preferred and non-preferred.

8           MR. OPPENHEIM:  So the question to him was, did he

9   understand why the numbers were so low.  And he said, well, the

16:39:35 10   RIAA --

11          THE COURT:  I talked to someone else and they told

12   me --

13          MR. OPPENHEIM:  Right, which is why the agreement

14   entered into it --

15          THE COURT:  It's classic hearsay.

16          MR. OPPENHEIM:  Well, but it is what's -- it's the

17   basis for the contract -- it's his understanding as to why they

18   entered into the contract.

19          THE COURT:  Okay.  Then my ruling was correct.

16:39:52 20          MR. OPPENHEIM:  That's fine.

21          THE COURT:  All right.  Let's continue.

22          NOTE:  The sidebar discussion is concluded; whereupon

23   the case continues before the jury as follows:

24   BEFORE THE JURY

25          THE COURT:  Please, go ahead.

S. Bahun - Direct

629

1   BY MR. OPPENHEIM: (Continuing)

2   Q.   Mr. Bahun, I would like to go back and talk about the GDPI

3   data for a moment again.

4            When MarkMonitor is collecting this data -- strike

5   that.

6            How does MarkMonitor go about collecting this data?

7   A.   So it starts with going out to the peer-to-peer networks

8   and searching for files that match for the titles that we're

9   scanning for.  So in the case of GDPI, it's film, TV, and

16:41:02 10   music.

11            So we select a sample of the most popular film

12   titles.  The most -- the television series, and the prime time

13   window on major networks.  And we primarily focus on the top

14   billboard charts for music.  That gives us a consistent way of

15   selecting the titles that we'll look for in that data set.

16   Q.   Let me pause right there.  Let me just interrupt you with

17   a quick question.

18            Those files that you're looking for, that you just

19   described, do you understand that you're looking for files that

16:41:36 20   are infringing or non-infringing?

21   A.   Infringing.

22   Q.   Okay.  So please continue then.  What's the next step in

23   the process?

24   A.   So once we've -- once we've defined the titles that we're

25   looking for, we then go to the networks, the peer-to-peer

S. Bahun - Direct

630

1   networks, and scan looking for, at that stage, potentially

2   infringing files.

3           When we find them, we download a full copy so that we

4   are able to verify that the files are, in fact, what we think

5   they are.

6           From there, we monitor the swarms around these files

7   and identify as much peer activity as we can.  And then that's

8   where the -- that's where the scanning process for that

9   finishes.

16:42:24 10   Q.   And how do you -- how do you capture that data?

11   A.   I'm not -- I don't know if I understand the question.

12   Q.   I think you said that you monitor the swarm, right?

13   A.   Correct.

14   Q.   Once you monitor the swarm, what do you see?

15   A.   So we -- yeah, the result set is basically a list of peers

16   which are represented as IP addresses from that data set.  So

17   we have a list of IP addresses which represent the active peers

18   in the swarm.  And we're able to look up information based on

19   those IP addresses to evaluate which ISPs they are associated

16:43:06 20   with, you know, do some analysis on the volumes, that type of

21   thing, to provide estimates so that we're not -- you know, we

22   have some level of expectation based on the activity we see.

23   Q.   Can you explain to the jury what a swarm is.

24   A.   Sure.  So on each of these peer-to-peer networks, if you

25   think of like a unique file, the files are distributed on the

S. Bahun - Direct

631

1   network.  And the group of people who connect around a specific

2   file, who are at some point downloading, but then eventually

3   distributing the file, that group of people who are

4   participating in the distribution of that file collectively are

5   referred to as the swarm.

6           So you can almost think of it like a swarm of bees.

7   I mean, I think that's where the term originates from.  But

8   it's that group of people who are distributing that unique

9   file.

16:44:02 10   Q.   And you are saying group of people.  Would that be the

11   same as calling them peers?

12   A.   Correct, yep.

13   Q.   And then do you preserve the data that you collect from

14   this GDPI scanning?

15   A.   Yes.

16   Q.   And does it get digested in some manner?

17   A.   Yeah, we preserve it and store it in a database.  And then

18   through kind of the reporting interfaces that we have, we

19   present the data in a more kind of digestible format for humans

16:44:34 20   to look at in reports and things like that.

21   Q.   And is that data organized by ISP?

22   A.   Yes.  That's one of the views, yeah.

23   Q.   And in your experience, how reliable is this data?

24   A.   It's very reliable.  In the ways that we use it for

25   evaluating the overall volume and activity of the piracy, you

S. Bahun - Direct

632

1  know, for that type of an analysis, it's extremely accurate.

2  Q.   Now, you're not using this data to send notices, are you?

3  A.   No, never.

4  Q.   And so, in the -- in the period at issue in the contract

5  that's in front of you, PX 4, did you have GDPI data for Cox?

6  A.   Yes.

7  Q.   And do you have a recollection of what that GDPI data

8  showed?

9  A.   I do.  I don't recall the exact number, but I remember

16:45:38 10  there being more than 10,000 infringements per day that we

11  observed across that data set related to subscribers or, you

12  know, Cox customers.

13  Q.   Now, you said per day, right?

14  A.   Correct.

15  Q.   Now, Appendix A, is that -- are those figures per day?

16  A.   No.  Those are -- those are monthly volumes.

17  Q.   So roughly speaking, if you were sending notices 20 days

18  in a month at 10,000 a day, what would that have been, the

19  volume?

16:46:17 20  A.   I'm sorry, 10,000 a day?

21  Q.   Yeah --

22  A.   For 20 days?

23  Q.   For 20 days in a month, what would that volume have been?

24  A.   So 200,000.  Testing my math skills.

25  Q.   You passed.  Are you familiar with how the MarkMonitor

633

1  system works to send notices under the agreement with the RIAA?

2  A.   Yes.

3  Q.   And did you help prepare a demonstrative to explain that

4  to the jury?

5  A.   Yes.

6        MR. OPPENHEIM:   Can we please call up -- with your

7  permission, Your Honor, we will publish.

8        THE COURT:   Yes, sir.

9  BY MR. OPPENHEIM: (Continuing)

16:47:26 10  Q.   Is this the demonstrative that you helped prepare,

11  Mr. Bahun?

12  A.   Yes.

13  Q.   Can you walk the jury through -- I see there are four

14  steps here; is that correct?

15  A.   Correct.

16  Q.   Can you walk the jury through the first step of what

17  MarkMonitor does in this process.

18  A.   Sure.  And I mentioned some of this when we were talking a

19  little bit about GDPI.  But you can basically think of it in

16:47:53 20  these kind of high-level steps.  So the initial step is where

21  we would take the information related to the song files in this

22  case that we were searching for and go to the P2P networks and

23  search for files matching those song titles.

24  Q.   Okay.  And then what would you do?

25  A.   So once we -- again, at that stage we would consider those

S. Bahun - Direct

634

1    potentially infringing files.

2            The next step would be to download a full copy of any

3    of those files that we've detected with the initial search.

4    And once they're downloaded in their entirety and we have

5    songs, we can then verify that they are, in fact, you know, the

6    song that we were looking for.

7    Q.   And how do you go through that verification process?

8    A.   For that step, we use a piece of technology from a company

9    called Audible Magic.

16:48:49 10   Q.   And where are you downloading the files from?

11   A.   The files are downloaded from the peer-to-peer networks

12   where they're found to exist.

13   Q.   And why do you use Audible Magic to do the identification?

14   A.   For a couple of reasons.  One, they're the most accurate.

15   They're kind of the industry standard for this type of thing.

16           But they also allow us to conduct this step of the

17   process, the verification at a very large scale.  We're dealing

18   with thousands of files.  And so, it's more accurate and more

19   scaleable to use Audible Magic's technology.

16:49:32 20   Q.   And for how long have you been using Audible Magic?

21   A.   I've been working with Audible Magic's technology, I

22   think, for at least 15 years.  I mean, it goes back to very

23   early in my career.

24   Q.   And roughly speaking, do you have any idea of how many

25   files you've submitted to Audible Magic?

S. Bahun - Direct

635

1    A.   Over the course of that time, it's in the millions.

2    Q.   And have you ever had occasion to see Audible Magic

3    misidentify a recording?

4    A.   No, never a single one misidentified.

5    Q.   So what happens after you get a confirmation that a file

6    is infringing?

7    A.   So once it's confirmed that it's infringing, then we move

8    on to the third step in this diagram here where we collect

9    evidence.

16:50:21 10         And what's involved there is we actually connect --

11   we establish a full connection with every peer who is involved

12   in the swarm to collect that evidence about the file that

13   they've distributing.

14   Q.   And where do you collect that evidence to?

15   A.   Into our system, yeah.

16   Q.   And what is the process of collecting the evidence?  Can

17   you describe that.

18   A.   Sure.  So after the file has been verified as infringing

19   and we're monitoring the swarm, we see peers, in some cases

16:51:02 20   peers that are already actively distributing the swarm.  Our

21   system will sit and monitor that so we can see as new peers

22   enter.

23         And as new peers are discovered, our system will

24   establish a full connection with that peer.  That connection

25   allows us to kind of communicate back and forth through the

S. Bahun - Direct

636

1    specified process that the peer-to-peer network has

2    established.

3           Each of those communication steps are logged in the

4    evidence that we store for that instance of infringement.

5    Q.   If you don't connect to a peer, can you see what a peer on

6    the swarm is doing?

7    A.   Can you clarify?  Sorry.

8    Q.   I think you testified that when a peer comes into the

9    swarm, you connect to them, and so you can exchange

16:52:01 10   information.  Are you able to see what one peer is doing with

11   another peer if you're not connected to them?

12   A.   No.

13   Q.   And why is that?

14   A.   It's the design of the protocols.  So we can have full

15   visibility into what the peer is doing if we are connected

16   directly to them, but we don't have visibility of their

17   communication with other peers.

18   Q.   And what is it that -- the process of connecting to the

19   peer that you engage in, what is that called?

16:52:36 20   A.   Oftentimes we call it the handshake.

21   Q.   And what is the handshake?

22   A.   So it's essentially a process, you can think of it as a

23   digital handshake where there's an exchange of certain messages

24   from our side and from the other peer's side, and kind of that

25   mutual exchange of messages is what we refer to as the

S. Bahun - Direct

637

1    handshake.

2         And part of those messages, there's some key data

3    that's exchanged.  The peer confirms to us what file.  Based on

4    the unique file identifier, it's called a hash.  They give us

5    that hash.  They also tell us how much of the file they have

6    and are distributing in the swarm.

7    Q.   Does MarkMonitor actually download the infringing file

8    from that peer?

9    A.   No.  At that point, it's not necessary.

16:53:34 10   Q.   Why not?

11   A.   Well, we've already downloaded the file in its entirety

12   when we initially found it.  So we know what the file is, and

13   we have the unique file identifier that guarantees what that

14   file is.  It's unique to that specific file.

15        And so, when we communicate with the peer, they tell

16   us what they have, which confirms the file, and they tell us

17   what they're distributing.  So there's no need to go further

18   than that when they've confirmed it.

19   Q.   Okay.  So what happens after MarkMonitor collects

16:54:11 20   information about a peer's distribution and stores it?

21   A.   So after we collect that information, the collection of

22   all of that data is packaged up and certain elements of the

23   data are then inserted into what we call a notice.  You can

24   think of it as an e-mail.

25        We put that information into the notice, and then the

S. Bahun - Direct

638

1    notice gets sent out to the ISP of the peer that we've observed

2    or collected.

3    Q.    And would that notice also sometimes be called an

4    infringement notice?

5    A.    Yes.  Sorry, yeah, infringement notice.

6    Q.    And in the case of RIAA, how would the infringement notice

7    be sent?

8    A.    In the case of this program we're talking about, we were

9    sending them through e-mail.

16:55:07 10  Q.    And who was the sender?

11   A.    MarkMonitor.

12   Q.    Did the RIAA participate in that process?

13   A.    They, I believe, provided us with an e-mail address that

14   they wanted us to send it from.  But we were the ones carrying

15   out the actual sending of the notices.

16   Q.    And was that e-mail address a MarkMonitor address or an

17   RIAA address?

18   A.    I believe it was an -- yeah, it was an RIAA address.

19   Q.    Let me turn to the records that you kept for this process.

16:55:43 20         I believe PX-11 is already in evidence, Your Honor.

21   I'd ask to publish.

22         THE COURT:  Yes, go ahead.  You may publish any

23   exhibit that's already in evidence that you choose.

24         MR. OPPENHEIM:  Thank you, Your Honor.

25   BY MR. OPPENHEIM: (Continuing)

S. Bahun - Direct

639

1    Q.   Do you recognize this document?

2    A.   Yes.

3    Q.   And can you just briefly -- is this a MarkMonitor

4    document?

5    A.   Yes.  This is a spreadsheet that we produced containing

6    the records of all of the song files that we downloaded and

7    verified using Audible Magic.

8    Q.   Okay.  I see there are four tabs.

9    A.   Yes.

16:56:33 10   Q.   And they relate to each of the networks; is that right?

11   A.   Correct.

12   Q.   If we look through the four tabs, would they generally

13   look similar?

14   A.   Yes.

15   Q.   Okay.  Can you just quickly walk across this spreadsheet

16   and describe what's in it.

17   A.   Sure.  So we're on the first tab, meaning BitTorrent.  So

18   all of these files were downloaded from BitTorrent.

19          The first column is a Torrent ID, it's just a unique

16:57:09 20   identifier that we attach to a specific torrent file.

21          The next column is Info Hash.  So this is the SHA-1

22   hash value or the unique identifier for the torrent.

23          The next column is Matched As.  This shows you the

24   key words that we matched when we were looking for the

25   potentially infringing file.

S. Bahun - Direct

640

1    Q.    So that was what you were searching for?

2    A.    Correct.

3    Q.    In the first step?

4    A.    Correct.  The next is Verified Type Name.  This is simply

5    a flag in our database to indicate that the file has been

6    confirmed as real.  So you'll see "real" in there.

7    Q.    Mr. Duval, could you just scroll up and show that there --

8    on this tab.

9              Mr. Bahun, would you ever see on a spreadsheet like

16:58:06 10   this, this column ever have anything other than "real"?

11   A.    No.

12   Q.    And why is that?

13   A.    Because this data set is for files that were contained in

14   the notices sent to Cox.  And no notice would have been sent on

15   a file that wasn't identified as "real."

16   Q.    And "real" meaning it was confirmed as what?

17   A.    It was a confirmed infringing copy of the song.

18   Q.    Okay.  Sorry.  I got us off the titles.  There you go.

19   Can you continue on E, please.

16:58:43 20   A.    Sure.  So then you have First File Name.  That's the name

21   of the individual song the first time we saw it.

22              The next is File Size --

23   Q.    Can I just stop on that First File Name?

24   A.    Oh, I'm sorry.  Yeah.

25   Q.    Is that first file name generated by Audible Magic?

S. Bahun - Direct

641

1    A.    No.

2    Q.    Who generates that first file name?

3    A.    It's a value that we capture when we find the file.  So

4    this is the actual name of the file that we found when we did

5    the search.

6    Q.    So the peer potentially named it or got it from somebody

7    else who named it?

8    A.    Correct.

9    Q.    Okay.  Keep going, please.

16:59:17 10   A.    So then column F is File Size.  This is the file size in

11   bytes of the individual song you see listed in each row.

12   Q.    Next.

13   A.    The next is the SHA-1 Hash Value.  So we calculate the

14   SHA-1 hash of each individual song file contained here.

15   Q.    Okay.  Next.

16   A.    The next is First Found.  So this is the first date and

17   timestamp when we saw this file.

18   Q.    Okay.  Next.

19   A.    The next is the Torrent Size.  So this is -- again, in

16:59:55 20   bytes, but it's actually the file of the full collection of

21   songs in a given torrent.

22   Q.    So why would the -- it looks like that the first, I don't

23   know, seven of them or so have the same torrent size.  Why is

24   that?

25   A.    So because these were all -- all of these songs were

S. Bahun - Direct

642

1    bundled together in a single torrent.

2            So for purposes of displaying the data in this

3    spreadsheet, each row represents an individual song, but this

4    whole group was part of one torrent that you could download on

5    BitTorrent.

6    Q.   So all of these Black Sabbath recordings would have been

7    in a single torrent?

8    A.   Yes.

9    Q.   Okay.  Next column, please.

17:00:39 10    A.   Next is the Torrent Name.  So this is the name of the

11   torrent file that would allow the user to download the content.

12   Q.   Now, that again -- is that generated by Audible Magic?

13   A.   No.  That's a value that we capture when we collect it.

14   Q.   When you say "we capture it," it's not created by

15   MarkMonitor, is it?

16   A.   Not created, no.  It's an existing name of a file when we

17   discover it on BitTorrent.

18   Q.   Is it only as reliable as the user who named it?

19   A.   Yes.

17:01:08 20    Q.   Okay.  Next column.

21   A.   The next is -- actually the next four are values that we

22   capture from Audible Magic.  Audible Magic provides these to

23   us.  So the first is the Audible Magic info ID, which is a

24   unique identifier.  And then they give us artist, track, and

25   album.

S. Bahun - Direct

643

1          So these are kind of what they have confirmed the

2     file as being.

3     Q.   Now, for the recordings on this spreadsheet, listed on

4     this spreadsheet, did MarkMonitor -- does MarkMonitor have

5     copies of them?

6     A.   Yes, we have, I believe, most of the songs that are in

7     this spreadsheet, they're -- we have copies of the songs, yeah.

8     Q.   And were those produced in this case?

9     A.   Yes.

17:02:01 10   Q.   Your Honor -- and how -- just how were they produced?

11    A.   So we provided a drive, a hard drive containing all of the

12    music files related, yeah.

13          MR. OPPENHEIM:  Actually, can we open -- which is the

14    directory of the hard drive?  16, I think 16 is in.  So publish

15    PX-16, please.

16          THE COURT:  Is that in?  Is that already admitted?

17          MR. OPPENHEIM:  I thought it was if I -- yes?  Yes.

18          THE COURT:  Okay.

19          MR. OPPENHEIM:  I believe it's in.

17:02:42 20         MR. BRODY:  The directory is in, yes.

21          MR. OPPENHEIM:  Is this it?  I am sorry.  I am having

22    trouble seeing it.

23    BY MR. OPPENHEIM: (Continuing)

24    Q.   Do you recognize this?

25    A.   Yes.

S. Bahun - Direct

644

1  Q.   And can you describe what this is.

2  A.   So this is another Excel file that we provided that

3  details the -- all of the song files that we provided on the

4  drive.

5  Q.   And do these song files correlate by hash to the song

6  files in PX 11 that we were just looking at?

7  A.   Yes.

8           MR. OPPENHEIM:  So, Your Honor, we would like to move

9  into evidence PX 39, the hard drive that contains the

17:03:34 10  infringing audio files?

11           THE COURT:  Any objection?

12           MR. BRODY:  May we approach, Your Honor.  Yes, there

13  is an objection.

14           THE COURT:  All right.  Yes, come on.

15           NOTE:  A sidebar discussion is had between the Court

16  and counsel out of the hearing of the jury as follows:

17  AT SIDEBAR

18           THE COURT:  Yes, sir.

19           MR. BRODY:  The concern is this.  The testimony while

17:04:07 20  Ms. Frederiksen-Cross was on the stand was that the hard drive

21  contains -- I think it's four files from Ares and zero files

22  from Gnutella, and that those are 40 percent of the total

23  notices.

24           So the hard drive, if the hard drive is being offered

25  as a complete set of everything that was downloaded, it

S. Bahun - Direct

645

1   manifestly is not.

2          MR. OPPENHEIM:  So first off, it's apples and oranges

3   that he is confusing notice data with the infringing files.

4          So -- and by the way, Ms. Frederiksen-Cross isn't the

5   one sponsoring this.

6          But having said that, let me -- right.  What happens

7   here is -- and I have explained this, apparently not well

8   enough -- that Gnutella and BitTorrent can use the same

9   infringing file.

17:05:10 10          And so, you can have an infringing file that is in a

11   BitTorrent folder that is used for infringement on -- excuse

12   me, an infringing file in the BitTorrent folder that can be

13   used on Gnutella.

14          And so, you can then find infringements on Gnutella

15   and send notices, which would then lead to having notices for

16   Gnutella.

17          If Mr. Brody wants to cross-examine on this issue, he

18   is free to.  But there is no issue of the reliability of this

19   evidence.

17:05:40 20          THE COURT:  So he can identify what's on this hard

21   drive?

22          MR. OPPENHEIM:  Yes.

23          THE COURT:  He has reviewed it?

24          MR. OPPENHEIM:  We are going to open it, we are going

25   to look at it, may even listen to a song.

646

1          THE COURT:  It may be incomplete.  And then you can

2    go into that.  But I don't see why that --

3          MR. BRODY:  I think it's a question of what it is

4    being offered for, Your Honor.  I mean, it is a hard drive.  It

5    has got songs on it.  I am not disputing that.

6          THE COURT:  Yeah.

7          MR. BRODY:  If it is being offered -- the

8    representation is that this is a complete set of what they

9    downloaded.  It's not.

17:06:11 10          THE COURT:  Okay.

11          MR. BRODY:  And I think the evidence has been

12    explicit on that.

13          MR. OPPENHEIM:  So, he said it was infringing files

14    that correlate to files in -- on the spreadsheet.

15          THE COURT:  Well, so it doesn't include all of what's

16    on 16?

17          MR. OPPENHEIM:  It's both over and under exclusive

18    because there were a lot of works that we didn't sue on.

19    Right?  And there were --

17:06:38 20          THE COURT:  Well, the concern is that the jury is not

21    being told what's on 11 and whether it's the same that's on 16.

22          And so, you need to clear that up if it's separate,

23    if you can -- if you can identify the reliability of the

24    information that's on the hard drive.  Right?

25          MR. OPPENHEIM:  So Mr. Brody is free to cross-examine

1   and say, you don't have everything, or you have at too much,

2   but that is entirely up to him.

3          THE COURT:  He doesn't want you to represent on

4   direct examination that it contains everything.

5          MR. OPPENHEIM:  I don't believe I have.

6          THE COURT:  I know you haven't so far.

7          MR. OPPENHEIM:  Okay.

8          MR. ELKIN:  Your Honor, just one point.  One issue

9   that we have with regard to the hard drive is that there hasn't

17:07:21 10  been any evidence that anyone at MarkMonitor has actually

11  listened to what it is.

12          There has been no foundation that Mr. Bahun has even

13  listened to what it is being offered for.  I think there is a

14  foundational issue that I did address at summary judgment that

15  I don't think this testimony has overcome.

16          MR. OPPENHEIM:  Every one of the files went through

17  Audible Magic, which did essentially the equivalent of a

18  digital listening.  And Mr. McMullan testified that he listened

19  to a sample of them.  And other witnesses -- as did -- excuse

17:07:57 20  me -- Barbara Frederiksen-Cross said she did.  So did

21  Mr. Kokakis.

22          So that is simply not accurate.

23          MR. BRODY:  At the same time, during

24  Ms. Frederiksen-Cross' examination, we saw examples where the

25  files that were identified in 16, the Audible Magic

S. Bahun - Direct

648

1    spreadsheet, didn't match what was on that spreadsheet.

2              So, you know, it's --

3              THE COURT:  Your exception is noted.  I am going to

4    let it in.  You clear up the fact that it -- what it is and

5    what -- where it came from.  And I think that's sufficient.

6              All right.  Your exceptions are noted.

7              MR. ELKIN:  Thank you.

8              NOTE:  The sidebar discussion is concluded; whereupon

9    the case continues before the jury as follows:

17:09:23 10  BEFORE THE JURY

11             THE COURT:  All right.  That exhibit will be

12   received.

13             And please proceed.

14             MR. OPPENHEIM:  Mr. Duval, can you bring up PX 39.  I

15   will apologize in advance, it's not a document.  It's a big

16   hard drive of music files.

17             THE COURT:  Okay.

18   BY MR. OPPENHEIM: (Continuing)

19   Q.   Do you recognize this directory, Mr. Bahun?

17:09:48 20  A.   Yes.

21   Q.   And do you know where this -- and do you know what's

22   within this directory?

23   A.   Yes.  So there is -- we've organized it by a series of

24   folders.  And inside of each folder are the song files that

25   were downloaded from the corresponding peer-to-peer networks.

S. Bahun - Direct

649

1   Q.   And was this produced by MarkMonitor?

2   A.   Yes.

3   Q.   Can we -- so it looks like that there is one folder that

4   is labeled Ares; is that right?

5   A.   Correct.

6   Q.   Mr. Duval, could you just open that, please.

7          Can you describe what's in this file, please, or this

8   folder.

9   A.   Yes.  For Ares, there were four audio files that we

17:10:51 10   downloaded and placed on the drive.  So, yeah, there's -- you

11   see four separate MP3 files here.

12   Q.   Okay.  Can we go back to the main directory, Mr. Duval.

13          And there are a lot of BitTorrent ones, just like

14   No. 7, let's go down.

15          And so, what is this we are seeing right now,

16   Mr. Bahun?

17   A.   Yes.  So BitTorrent functions a little bit differently.

18   You will see some differences by peer-to-peer network.  And so,

19   for BitTorrent, within each folder there is an individual

17:11:27 20   folder named what the hash value is for the infringing file.

21          So if you open one of those, inside you will see, in

22   this case, two files.  There could be multiple though.  If you

23   have a -- if you have a full album or something like that, you

24   may see a whole -- a larger set of files.

25          In this particular case, you see the MP3 file and

S. Bahun - Direct

650

1    then -- excuse me -- the .torrent file.  So we preserved both

2    in this set of data.

3    Q.    Would you just play ten seconds of that file.

4          NOTE:  A music excerpt is played.

5    BY MR. OPPENHEIM: (Continuing)

6    Q.    Do you recognize that recording, Mr. Bahun?

7    A.    Yes.

8    Q.    Do you have an understanding as to how many -- I'm sorry,

9    let's go back to the first directory.  Thank you.  Go down to

17:12:35 10   the bottom three.

11          What are those -- what are those called, Mr. Bahun?

12   A.    So those three are related to downloads we did on -- from

13   the P2P network eDonkey.

14   Q.    Can you just open one of those, please.

15          And can you describe what this is, Mr. Bahun.

16   A.    Yes.  Again, based on the way this peer-to-peer network

17   works, or functions, you just see a collection of all of the

18   individual songs that we downloaded.

19   Q.    Okay.  Can we go back to the first directory, please.

17:13:09 20          I notice that one of the peer-to-peer networks isn't

21   here; is that correct?

22   A.    Yes.

23   Q.    And which one is missing?

24   A.    Gnutella.

25   Q.    And why is it not here?

S. Bahun - Direct

651

1    A.   At the time when we loaded these songs onto the drive,

2    there are a lot of songs that we can find that exist on

3    multiple networks.  So I believe that there was just overlap of

4    a lot of those songs.

5              So the ones from Gnutella probably were contained in,

6    most likely because of the size here, probably the BitTorrent

7    folders.

8    Q.   Do you have a rough understanding of how many song files

9    there are in total on this hard drive?

17:13:50 10  A.   I don't have the exact number, but I think there is in

11   excess of 40,000 on here.

12   Q.   We can pull that down, please.

13             Can we publish PX 16, please.

14             Do you recognize this document, Mr. Bahun?

15   A.   Yes.  I think -- is this -- this is the same document as

16   we had up before; is that right?

17   Q.   I think this should be PX 16; is that right?  Okay.

18             No, this is a different document.  I think the one

19   before we had the tabs.  This says something else.

17:14:47 20             We put this one up before?  Oh, I apologize.  You are

21   right, apparently.  Let's just move on then.  I think everyone

22   will be happy with that.

23             Let's turn -- can we please pull up PX 33.

24             Do you recognize this directory?

25   A.   I believe so, but could you open one of the folders?

S. Bahun - Direct

652

1    Q.    Sure.

2    A.    Yes.

3    Q.    And what do you recognize this directory to be?

4    A.    So these are what we call evidence packages.  So each of

5    these zipped files contained within the folders in this

6    directory each individual one represents an evidence package

7    related to a unique infringement.

8    Q.    Okay.  Can we, I guess we -- let's just go back for a

9    minute to the last directory, the higher level directory, if we

17:15:50 10   can.

11         Okay.  And how does this -- how is this directory

12   organized?

13   A.    So we created folders for -- you can see they are named

14   year and month.  And just organized, all of the zip -- the

15   evidence packages, the zip files within each of those folders.

16   Q.    And so, now let's open one, please.

17         Okay.  And they are zip files.  So do you have to

18   unzip them to open them?

19   A.    Yes.

17:16:21 20   Q.    Okay.  And I think Mr. Duval is doing that.  Okay.

21         Is this what you typically see when you unzip them?

22   A.    Yes.  So there are six log files within each of the

23   packages, yes.

24   Q.    Okay.  And can we open the first one, please, Mr. Duval?

25         And can you just describe what this is, please,

653

1    Mr. Bahun.

2    A.   Yeah.   I think first it might be helpful to mention

3    generally all of these log files are in a format that we call

4    XML.

5         So you will see at the top of all the log files kind

6    of the blue -- so the format might look a little bit different

7    than kind of a typical txt document.

8         But for this particular one, the activity log, you

9    can see this one captures the individual steps of the -- of the

17:17:22 10  activity in the collection of this case.

11        So if you look at the first, under the section where

12   it says Activities, you see Activities Timestamp.

13        So it provides a date and timestamp, and then it

14   lists what activity was conducted at that date and time.   So

15   shared files list connecting to the peer and then down the

16   list.

17        Do you want me to --

18   Q.   Yeah, just walk through each step quickly, though, because

19   I think everybody is --

17:17:58 20  A.   Okay.   So we -- you can see we connect to the peer, and

21   then the peer connection is closed.

22        Then we connect -- in this particular case, we

23   connect to the peer again.   It notes where we send the client

24   handshake.

25        Again, the peer connection is closed.

S. Bahun - Direct

654

1          And then we connect to the peer again.  Do another

2     handshake.  We receive the peer's handshake at that time.

3     So -- and then you will see where it notes that the connection

4     is fully established.

5          So the handshake has been completed, we're connected

6     to the peer, communicating with them.

7          And then you'll see "download stopped" and "peer

8     connection closed."

9          And then the last step of the process is to conduct

17:18:42 10    what's called a trace route.

11    Q.   Mr. Bahun, why did -- in this example, did you connect

12    three times?

13    A.   It's hard to say why.  I mean, this can occur.  We -- but

14    it shows that we connected.  The peer connection was closed.

15    We connected again.  And eventually they did complete the

16    handshake.  And you can see where the connection was fully

17    established.

18    Q.   So it wasn't sufficient for MarkMonitor the first

19    connection because the handshake wasn't completed; is that

17:19:21 20    correct?

21    A.   Correct, correct.

22    Q.   So MarkMonitor will continue to try to connect until the

23    handshake is done?

24    A.   Correct.

25    Q.   Okay.  So let's go out of this.  Go to the next log,

S. Bahun - Direct

655

1    please.

2              And can you describe this one, please.

3    A.   Sure.  So is this the communication log.  And this

4    captures the kind of relevant steps in the -- in a little more

5    detail in the communication process.

6              So, again, looking to the section just where it's

7    labeled Communications, you can show that it captures the

8    direction of the communication, the timestamp, some of the

9    information related to the handshake.  So you can see the peer

17:20:08 10   ID.

11             And it's recorded both directions, so in and out.  So

12   the messages that are being sent to us by the peer and the

13   messages that we're sending back to that peer are captured

14   here.

15             And then --

16   Q.   Okay.  Can we go to the next log, please.

17             And can you describe this one, please.

18   A.   Yes.  So this log we call the content info log.  This is

19   related to the specific hash, the file that's being distributed

17:20:40 20   on the peer-to-peer network.

21             So you can see here under the Content List, it shows

22   a series -- or a few different pieces of information.  The

23   content shared, that's the size in bytes that the user is

24   distributing, the -- it says:  Verified, downloaded, the size

25   again in bytes.  And then you've got the name of the MP3 file,

656

1    in this case, Jake Owen, "The One That Got Away."

2    Q.   And why is -- why do you have both the content shared

3    number and the size number?

4    A.   So those pieces of information allow us to calculate how

5    much of the file this individual peer is distributing in the

6    swarm.

7    Q.   And in this instance, how much of the file are they

8    distributing?

9    A.   In this instance they're distributing 100 percent of the

17:21:32 10    file.

11    Q.   Okay.  Let's go to the next log file, please.

12    A.   So then you have the file list.  This can vary a little

13    bit depending upon the peer-to-peer network because, again,

14    they function a little differently.

15          In the case of files where -- or, yeah, like a

16    torrent that had multiple files, what you would see here is a

17    list of all the individual songs.  In this particular example,

18    there was one MP3.  So it just lists that single song that is

19    related to this case.

17:22:09 20    Q.   Okay.  Can we go to the next log file, please.

21    A.   So the Investigation Info is more specific to information

22    that identifies this peer.  What I mean by that is you can see

23    the Initiated Date and Timestamp, the Completed Date and

24    Timestamp.

25          So that's -- you know, the initiated is when we first

S. Bahun - Direct

657

1    connected to the peer.  Completed is when we finished and

2    disconnected.

3         It lists the protocol, in this case, BitTorrent.

4    Their IP address.  The port that they're using to communicate.

5    And a series of other information.  I don't know if you want me

6    to walk through everyone.  But essentially it's information

7    that identifies the ISP and kind of some general location

8    information based off of the IP address.

9    Q.   And who was the ISP listed here?

17:23:06 10    A.   Cox Communications.

11    Q.   Okay.  Can we go to the next log file, please.

12    A.   And then the last one is the trace route.  So this is the

13    last step in the process for us.  We do a trace route.  It's --

14    Q.   Can you explain what a trace route is to the jury, please.

15    A.   Sure.  It's essentially a way to map from our system or

16    our computer, how the connection flows across the Internet to

17    where the peer is located.

18         So you can see that it takes a series of hops, and we

19    record information about each of the hops that it takes to get

17:23:45 20    from our agent or our server, in this case, where the scanning

21    is occurring, all the way down through to where the peer is.

22    Q.   We can close that out, please.

23         Did we cover all the -- okay.

24         And are you aware that some of the evidence packages,

25    for purposes of this case, were not produced?

S. Bahun - Direct

658

1    A.    Yes.

2    Q.    And can you explain that?

3    A.    Yeah.  So when we went to produce the evidence packs

4    related to each of the notices, those were stored in archives.

5    This data goes back to 2012, I believe.

6          And so, when we went to pull that information from

7    the archives, we did have an event occur with our archives

8    where we had a drive in our archive setup that failed.  This

9    was sometime ago.

17:24:46  10          And our engineering team and IT staff did everything

11    they could to recover as much as possible, but there was a

12    portion of data from that failed drive that was related to this

13    case and wasn't recoverable.

14          There was also other data, too.  It wasn't just

15    related to the RIAA in this case.  But we recovered as much as

16    we could.  But there is some missing.

17    Q.    Are you aware of kind of what time period that data came

18    from?

19    A.    Yeah.  I was just going to say, it was one of the oldest

17:25:17  20    of the drives or one of the older drives.  So I think the

21    overwhelming majority of the evidence packages we lost from

22    that occurrence were in the 2012 time period.

23    Q.    But not from 2013/'14?

24    A.    Correct.  I don't recall how many there may have been from

25    that time period.  I think it was only a very small number, if

S. Bahun - Direct

659

1    any.  But the majority of the ones we were unable to produce

2    were from 2012.

3    Q.   Can we, please, look at PX-17.  Publish that, please.

4         It may be -- unless you recognize it from this, I

5    will ask Mr. Duval to open one of these folders.

6         Do you recognize this directory?

7    A.   Yeah, if you could open one --

8    Q.   Open one of the folders?

9    A.   Yeah.

17:26:24  10   Q.   And maybe open one of those.

11   A.   Yes.  Okay.  Yes, I recognize it.

12   Q.   What is this exhibit?

13   A.   So these are copies of all of the notices -- excuse me,

14   all of the notices that were sent to Cox Communications.

15   Q.   And do you know roughly the time frame for the notices

16   that were sent in this directory?

17   A.   Yes.  I believe it -- excuse me, I believe it was January

18   of 2012 through March of 2015.

19   Q.   And I want to look at just one of these notices, please.

17:27:08  20   And we have one up.  Great.  Can we zoom in on just the top

21   piece there that says -- above:  Begin PGP sign message.

22        Can you just describe what this portion of the notice

23   is.

24   A.   Yeah, I'm sorry.  You said the top section here?

25   Q.   Yeah, just the top section.

S. Bahun - Direct

660

1    A.   So the -- yeah.  The way we store these, the top section

2    that kind of is above the:  Begin PGP sign message where the

3    dashes are, is actually the message header.  So this is just --

4    we store the information about the message when it was sent.

5    So --

6    Q.   And then below that, the -- with:  Dear sir.

7    A.   Yeah, so that's --

8    Q.   Sir or madam.  Sorry.

9    A.   Yeah, that portion is what we call the body of the notice.

17:28:02 10   It's the actual e-mail that was sent to Cox.

11   Q.   And who would have drafted that language?

12   A.   This would have been an approved notice template that we

13   got from the RIAA.

14   Q.   Okay.  And can we just scroll down a little, please.

15        So this is the notice that would have gone to Cox?

16   A.   Yes.

17   Q.   Okay.  Keep scrolling, please.  Okay.

18        And can you go to the bottom part of the notice,

19   please.

17:28:36 20        All right.  From List of Infringing Content down, do

21   you see that?  Can you describe what that is, please.

22   A.   Yes.  In between kind of the rows of dashes there, that's

23   where we list out the infringement or the infringing content

24   that we identified related to this specific notice.

25   Q.   So it says:  Infringing work, "No Love."  What is that?

S. Bahun - Direct

661

1   A.   That would be the -- or infringing work -- "No Love" is

2   the name of the song in this case.

3   Q.   Okay.  And what is File Name?

4   A.   The file name is the actual name of the file that we found

5   on the peer-to-peer network.

6   Q.   Okay.  And what is First Found and Last Found?  What does

7   that mean, excuse me?

8   A.   The first found and last found are specific timestamps --

9   previously in the logs, I think it was called initiated and

17:29:39 10   completed.  But these are essentially start and stop time

11   periods of when we saw the peer distributing in this particular

12   infringement.

13          It's meant to give the ISP a marker so that they can

14   use it to look up the subscriber that was using this IP during

15   that window of time.

16   Q.   All right.  I think we know what File Size is.

17          What is the IP Address?

18   A.   So this is the IP address.  And just below it the port

19   specific to the peer that we observed infringing here.

17:30:12 20   Q.   And the network in this case?

21   A.   Gnutella.

22   Q.   So the information contained within this, where does that

23   come from?

24   A.   This comes directly from the log files that we went

25   through.  So this is the -- essentially the infringement

S. Bahun - Direct

662

1    record.

2              So it's stored within the log files, and also in kind

3    of some other various parts of our database, all part of what

4    we call the infringement record.

5    Q.   You testified earlier that a hard drive -- archived hard

6    drive crashed and you lost some of the evidence files.

7              Did that impact the notices that you had?

8    A.   No.  I believe we had all of the notices preserved and

9    were able to produce those.

17:30:57 10  Q.   So even though you may have lost some of the evidence

11   packages for certain infringement notices, you did have the

12   information from those evidence packages in these notices; is

13   that correct?

14   A.   Yes.

15   Q.   Can we pull up PX-14, please.

16             Do you recognize what this is, Mr. Bahun?

17   A.   Yes.

18   Q.   What is it?

19   A.   So this is a document -- or again, spreadsheet that we

17:31:54 20  provided containing records of all of the notices on some of

21   the corresponding infringement data related to those notices.

22   Q.   Mr. Duval, could you just kind of scroll down.

23             While Mr. Duval is scrolling slowly, if he were to

24   come to the end, do you have any sense of how high the number

25   would be, Mr. Bahun?

S. Bahun - Direct

663

1   A.   Yes.  I think in this, I think we had 284,000.  Yeah,

2   280,000 -- or, excuse me, 284,444, not counting the header

3   column or header row.

4   Q.   And where were those 284,000 notices sent, infringement

5   notices sent?

6   A.   They were sent to Cox Communications at the abuse@cox.net

7   address you see listed in column D.

8   Q.   And, Mr. Duval, can you now kind of just scroll to the

9   right so the jury can see the rest of the spreadsheet.  I'll

17:33:09 10   resist going through every line.

11            Can we open PX-11 again, please.

12            Bear with me.  I'm going to try to manipulate my way

13   through several of these with respect to one issue that was

14   raised earlier.

15            Can you go to row 118, please.  Oh, I'm sorry, you're

16   on the BitTorrent tab.  Can you go to the eDonkey tab, please.

17   And now go to row 118?  Okay.

18            And, Mr. Bahun, what is -- is there a way that we can

19   see the column headings while you do this?  No?  Okay.

17:34:50 20            So maybe you -- if we need to, we'll scroll up.

21            What is this -- can you describe what this line is on

22   this spreadsheet?

23   A.   Yes.  This row would represent a specific file that we

24   downloaded and verified.

25   Q.   And is the -- is column B what your search terms were?

S. Bahun - Direct

664

1    A.   Yes.

2    Q.   Wait a minute.  Hold on.  He is trying to do what I asked

3    him to do.  Apologies.  There we go.

4              Now, go to 118.  Okay.  Now this will work a little

5    better.

6              So 118, Mr. Bahun, so what -- what is Lady Gaga

7    "Poker Face" there?  Was that what you searched for?

8    A.   Yeah.

9    Q.   Okay.  And then it -- what does it mean that it says:

17:35:59 10   Real?

11   A.   When we processed it against Audible Magic, this file

12   matched a referenced fingerprint in their database.

13   Q.   And if we scroll to the right, will we see what that was?

14   A.   Yep, yes.  If you go all the way to the right, you should

15   see.

16   Q.   Maybe highlight -- okay.  And what did it match as?

17   A.   Lady Gaga, "Poker Face."

18   Q.   Okay.  Now, go back to the left, if you would, Mr. Duval.

19             And do you see where it says that first file name

17:36:33 20   column?

21   A.   Yeah.

22   Q.   What does it say there?

23   A.   Taylor Swift, "Love Story."

24   Q.   Do you understand why there might be a difference here

25   between it saying Taylor Swift and it being Lady Gaga?

S. Bahun - Direct

665

1    A.   Yeah.  Yeah.  We do see files on the networks that are

2    mislabeled at times.  This could be called anything.  You know,

3    in this particular case, the file was called or was mislabeled

4    as Taylor Swift, "Love Story" in the file name.  But when we

5    downloaded it and processed it, it was positively matched to

6    the song "Poker Face" by Lady Gaga.

7    Q.   Okay.  Mr. Duval, PX 39, please.  The hard drive that we

8    looked at earlier.

9         Okay.  And we were on eDonkey tab.  So let's look in

17:37:29 10   eDonkey here, part one, please.  And can you look for the one

11   that has a file named Taylor Swift, "Love Story."

12   A.   Yes.

13   Q.   Is that -- would that correlate back to what we were just

14   looking at on the other spreadsheet, Mr. Bahun?

15   A.   It appears to.  Could you switch back to the other file

16   just for a second?

17        Yes, it does correspond to this file.

18   Q.   And how do you know?

19   A.   I was looking at the hash value in the file name.  So we

17:38:04 20   append that here.  We add the hash value as the unique

21   identifier.  So I am able to -- yeah, to determine that based

22   on that.

23   Q.   Okay.  So let's go back to the hard drive, please.  And

24   Mr. Duval, let's listen and see whether it is Taylor Swift or

25   Lady Gaga.

1            NOTE:  A music excerpt is played.

2     BY MR. OPPENHEIM: (Continuing)

3     Q.   Mr. Bahun, do you recognize that recording?

4     A.   Yes, I do.

5     Q.   You recognize that recording?

6     A.   Yes.

7     Q.   Now, was that Taylor Swift or Lady Gaga?

8     A.   That was -- that was Lady Gaga.

9     Q.   Let's turn to PX 12, please.  I am sorry.

10           Did you -- just the first page of it.

11           So we have a stipulation on the first page of PX 12.

12           THE COURT:  All right.

13           MR. OPPENHEIM:  So if you could publish just the

14     first page, please, Mr. Duval.

15     BY MR. OPPENHEIM:  (Continuing)

16     Q.   Do you recognize this document, Mr. Bahun?

17     A.   Yes.

18     Q.   Can you describe what it is?

19     A.   This is a summary of the notices that we sent to Cox

20     between 2012 and 2015.

21     Q.   And did you assist in the preparation of this summary?

22     A.   Yes.

23     Q.   And can you describe the difference between the column

24     that says Full Data Set and the column that says February 1,

25     2013, to November 26, 2014?

S. Bahun - Direct

667

1   A.   Sure.  So the full data set is -- we provided data from

2   January 1 of 2012 through March 31 of 2015.

3        So the first column -- or the full data set column

4   there represents a summary of the numbers involved with those

5   notices.

6        And then the other one is kind of a subset, it's

7   trimmed down.  And basically within the time frame specified,

8   those are the corresponding numbers.

9   Q.   And you said the time frame specified.  Do you understand

17:40:47 10   that that's the claim period of this case?

11   A.   Yes.

12   Q.   Okay.  And can you just describe the notices sent in the

13   full data set.

14   A.   Yes.  So during -- or in the full data set, we had 284,444

15   notices sent.

16   Q.   To whom?

17   A.   To Cox.

18   Q.   And what kind of notices?

19   A.   Infringement notices.

17:41:09 20   Q.   And then within the claim period, how much infringement

21   notices were sent to Cox?

22   A.   163,148.

23   Q.   And all of them came from the antipiracy2@riaa e-mail

24   address?

25   A.   Yes.

668

1    Q.    And where did all of them go to?

2    A.    They were all sent to abuse@cox.net.

3          MR. OPPENHEIM:  No further questions.  We will pass

4    the witness.

5          THE COURT:  All right.  I think that we will end the

6    testimony for tonight now and go to cross-examination tomorrow

7    morning.

8          So thank you all for your patience.  It was a long

9    day.

17:41:51 10        On Monday afternoon, when I initially instructed you,

11   I talked about infringement and using the word "infringement"

12   and "infringement notices."  And you have seen the words.  And

13   we have talked about it a lot during the course of the trial.

14         I just wanted to remind you that the ultimate

15   decision on whether Cox is liable for infringement is yours.

16   It's an issue of -- ultimately an issue of fact.  And what you

17   have been hearing is evidence in support of that or non-support

18   of that.

19         So I just want you to keep that in mind.  I know it

17:42:28 20   was just a day-and-a-half ago, but I am sure it seems like

21   quite a bit longer than that.

22         So have a good evening.  Again, no research, no

23   investigation, please don't speak to anybody about the case.

24   Thank you.

25         We will see you tomorrow at 9 o'clock.

669

1          NOTE:  At this point the jury leaves the courtroom;

2     whereupon the case continues as follows:

3     JURY OUT

4          THE COURT:  All right.  Anything before we adjourn?

5          MR. ELKIN:  Just very briefly, Your Honor.  I think

6     tomorrow, time permitting, there may be two Cox witnesses that

7     will be called to support plaintiffs' case in chief.  As I have

8     notified both the Court and counsel, I intend to sort of on my

9     cross, go outside of cross to take them in our case.

17:43:45  10          I was wondering whether the Court would actually let

11     the jury know what's going on so that when it comes time to our

12     case and we have no witnesses, they will know what is

13     happening.

14          THE COURT:  I am happy to do that.  I think that's

15     proper.

16          And you are in the middle of your testimony, so

17     please don't discuss the testimony that you have given so far

18     with anybody tonight before you come back tomorrow on the

19     stand.  You may discuss other matters, testimony that we

17:44:15  20     haven't discussed so far, but not any of the testimony you have

21     given.  All right?

22          THE WITNESS:  Yes.

23          THE COURT:  Okay.  All right.  Yes, sir.

24          MR. GOULD:  Should we let Mr. Bahun go while we take

25     up other issues?

670

1           THE COURT:  All right.  You are excused until

2   9 o'clock tomorrow morning.

3           NOTE:  The witness stood down.

4           MR. OPPENHEIM:  Your Honor, an issue was raised in

5   Mr. Elkin's opening where he flagged -- or flagged is not the

6   right word -- foreshadowed what Mr. Carothers was going to say

7   with respect to the decision to throw away the first notice --

8   or, excuse me, ignore the first notice.  And we would like to

9   offer, if the Court will accept it, a bench memo on the issue.

17:45:12 10         Mr. Carothers, in his deposition, denied that any

11  such study was done.  And in discovery we requested every

12  possible way to get that kind of information.  And nothing was

13  produced.  And we don't believe that Mr. Carothers should now

14  be allowed to get up and testify to something for which there

15  is no foundation and for which we've asked and been told it

16  doesn't exist.

17          MR. ELKIN:  Your Honor, that's just -- I haven't seen

18  the memo, but we are happy, obviously, to respond to it.

19          Mr. Carothers testified in his deposition not about

17:45:45 20  studies, but that he who had developed CATS, and he who had

21  been the system administer for a long time, observed himself

22  patterns.  And there was no -- it's like the same thing, you

23  know, are there studies?

24          If you are observing and working and living and

25  breathing this each and every day, he is going to testify to

671

1    the same thing that he has been -- it has been his experience

2    based upon his examination of what happened at the time.

3          So he didn't just invent "hold for more" out of thin

4    air.  It was based on his experience.  And he will provide the

5    background for that, and they can cross-examine him on it.

6          THE COURT:  So is that --

7          MR. OPPENHEIM:  Your Honor -- I am sorry.

8          THE COURT:  So is that consistent or inconsistent

9    with his testimony from BMG?  Do they correlate at all?

17:46:40 10        I am just wondering whether this was ground that was

11    covered back with the BMG case?

12          MR. OPPENHEIM:  I don't believe so, but we can check

13    overnight, Your Honor.  And what Mr. Elkin just represented was

14    Mr. Carothers' testimony is not my recollection when I took his

15    deposition, that he said anything of the sort.

16          We are citing in this bench memo the snippet of

17    testimony that we think is relevant, but we are happy to have

18    them produce additional testimony --

19          THE COURT:  Yeah, send me the deposition and I will

17:47:16 20    look at it tonight.

21          MR. OPPENHEIM:  Can I offer the bench memo as well?

22          THE COURT:  Yes, you may.

23          MR. ELKIN:  I believe, Your Honor, he testified at

24    BMG with regard to this very issue.  I don't know what's in

25    this bench memo.  We will look at it and respond.

672

1          Thank you.

2          THE COURT:  All right.  And, you know, I'm here

3   early, so if you want -- if you want to discuss this at 8:45

4   because it is going to be an issue tomorrow, let's come back in

5   at 8:45 and talk about it then.

6          And will that give you an opportunity to respond?  I

7   know you have the nightshift going, but let's -- and if you

8   have to do it orally with exhibits, I will accept that as well.

9   We are getting this at the last minute.

17:48:08 10          And so do the best you can to at least collect the

11   information you want to put forth, and I will look at it.

12          MR. ELKIN:  Thank you, Your Honor.  I appreciate

13   that.

14          THE COURT:  Yes, sir.  All right.  I have a 1:15 plea

15   tomorrow?

16          COURT SECURITY OFFICER:  1:10.

17          THE COURT:  1:10.  So we will adjourn at 1 and go

18   until 2, but you are going to have to clean up the first tables

19   a little bit for another case.

17:48:32 20          All right.  Well, thank you.  We'll see you at 8:45,

21   then, tomorrow.  We're in recess.

22          NOTE:  The December 4, 2019, portion of the case is

23   concluded.

24          ---------------------------------------------

25

673

CERTIFICATE OF COURT REPORTERS


        We certify that the foregoing is a true and
    accurate transcription of our stenographic notes.




                        /s/  Norman B. Linnell
                    Norman B. Linnell, RPR, CM, VCE, FCRR




                        /s/  Anneliese J. Thomson
                    Anneliese J. Thomson, RDR, CRR