674

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

<u>VOLUME  4  (A.M. Portion)</u>

TRIAL TRANSCRIPT

December 5, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

675

APPEARANCES:

FOR THE PLAINTIFFS:                MATTHEW J. OPPENHEIM, ESQ.
                                   SCOTT A. ZEBRAK, ESQ.
                                   JEFFREY M. GOULD, ESQ.
                                   MICHAEL J. DRUCKMAN, ESQ.
                                   ANDREW L. GUERRA, ESQ.
                                   LUCY G. NOYOLA, ESQ.
                                   JIA RYU, ESQ.
                                   Oppenheim + Zebrak, LLP
                                   4530 Wisconsin Avenue, N.W.
                                   5th Floor
                                   Washington, D.C. 20015


FOR THE DEFENDANTS:                THOMAS M. BUCHANAN, ESQ.
                                   Winston & Strawn LLP
                                   1700 K Street, N.W.
                                   Washington, D.C. 20006-3817
                                     and
                                   SEAN R. ANDERSON, ESQ.
                                   MICHAEL S. ELKIN, ESQ.
                                   THOMAS P. LANE, ESQ.
                                   CESIE C. ALVAREZ, ESQ.
                                   Winston & Strawn LLP
                                   200 Park Avenue
                                   New York, NY 10166-4193
                                     and
                                   JENNIFER A. GOLINVEAUX, ESQ.
                                   THOMAS J. KEARNEY, ESQ.
                                   Winston & Strawn LLP
                                   101 California Street, 35th Floor
                                   San Francisco, CA 94111-5840
                                     and
                                   MICHAEL L. BRODY, ESQ.
                                   Winston & Strawn LLP
                                   35 West Wacker Drive
                                   Chicago, IL 60601
                                     and
                                   DIANA HUGHES LEIDEN, ESQ.
                                   Winston & Strawn LLP
                                   333 South Grand Avenue
                                   Suite 3800
                                   Los Angeles, CA 90071

676

INDEX

OPENING STATEMENTS BY:

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| SAMUEL BAHUN | | |
| | CROSS | 687 |
| | REDIRECT | 754 |
| GEORGE McCABE | | |
| | DIRECT | 775 |

CLOSING ARGUMENTS BY:

COURT'S RULINGS/JURY INSTRUCTIONS

677

```
 1              NOTE:  The December 5, 2019, portion of the case
 2    begins in the absence of the jury as follows:
 3    JURY OUT
 4              THE COURT:  All right.  Good morning.
 5              Mr. Oppenheim, you wanted to address your motion.  Go
 6    ahead.
 7              MR. OPPENHEIM:  Good morning, Your Honor.  I don't
 8    believe Mr. Carothers is going to come up for a little while
 9    yet.  So if the jurors get here and we want to go, we can go
10    forward --
11              THE COURT:  Well, they should all --
12              MR. OPPENHEIM:  -- or we can deal with it right now,
13    that's fine.
14              THE COURT:  Let's deal with it right now, yeah.
15              MR. OPPENHEIM:  So I did review the BMG testimony
16    last night based on the question that Your Honor asked, both in
17    the deposition and in the trial, of Mr. Carothers.  He did not
18    testify to having done any study.  He did testify just that he
19    knew inherently.
20              We're not seeking to preclude him from saying
21    something to the effect of, I just happen to know based on
22    knowing the data.  That is what it is, and I have no issue with
23    that.
24              THE COURT:  All right.  Okay.
25              MR. OPPENHEIM:  If, however, he wants to take the
```

08:55:02 (line 10)
08:55:28 (line 20)

678

1    stand and testify to this, and he's asked the question, did you

2    do a study or an analysis, I think the answer has to be "no"

3    because they didn't produce it and his testimony was that he

4    didn't.

5             So it hopefully narrows the issue a little bit as to

6    what may separate us.

7             THE COURT:  Okay.  Thank you.

8             All right.  Mr. Elkin.

9             MR. ELKIN:  Good morning, Your Honor.

08:56:07 10            THE COURT:  Good morning.

11            MR. ELKIN:  So I -- after spending a couple hours

12   with some witnesses, by midnight I did have a chance to review

13   as well the facts here and what happened.

14            THE COURT:  You are the night team; is that right?

15            MR. ELKIN:  I'm on the night team, Your Honor.

16            THE COURT:  I suspected as much, yeah, with many of

17   your colleagues.

18            MR. ELKIN:  I was not alone.  In fact, I probably was

19   not the last to go to bed.

08:56:35 20            This issue, obviously, keys off of my opening

21   statement.  And I was very -- I attempted to go verbatim or

22   substantially verbatim with Mr. Carothers' testimony at his

23   deposition.

24            And this issue, just by the way, isn't a new

25   revelation in terms of how the so-called Hold For More issue

679

1    surfaced.  This happened in <u>BMG</u>.  Mr. Allan had questioned

2    Mr. Carothers four-and-a-half years ago about this.  There was

3    testimony.  Mr. Allan went further than Mr. Oppenheim did and

4    actually asked Mr. Carothers in his 30(b)(6) deposition what

5    the basis was for his finding.  And he testified to that.  And

6    as Mr. Oppenheim just recounted, Mr. Carothers did testify with

7    regard to the issues before this Court at trial.

8            I have the excerpts from each of these examinations

9    that I can hand up to the Court that we did sort of --

08:57:54  10        THE COURT:  Well, let's cut to the chase.  He was

11    deposed.  He said, I have two reasons for believing that the

12    first notice was unnecessary.  One is, I don't think that the

13    notices are accurate and we didn't want to unreasonably burden

14    our customers.

15            And second is, it didn't make any difference in when

16    they complied.

17            And when asked about, you know, what's your

18    information about the notices being often in error, he said,

19    you know, essentially, I don't know, and -- but I did talk to

08:58:31  20    my -- that's my belief.  And I also talked to my counsel a

21    couple days ago.  And there was conversation about that.

22            And then he said, you know, and also, it didn't make

23    a difference.  And he was asked, well, do you have a study that

24    supports that?  And the answer was, no.

25            And so, what would you expect he would testify now?

680

1   And Mr. Oppenheim has just agreed that he -- based on his

2   experience as the security head or main person, he's able to

3   testify to his opinion about, you know, why he did certain

4   things.

5            MR. ELKIN:  Well, it's beyond that, Your Honor.  Let

6   me make a proffer.

7            THE COURT:  Okay.

8            MR. ELKIN:  He's going to testify that he had access

9   to CATS.  He ran numerous queries.  And he's going to take the

08:59:29 10   Court and the jury through exactly what he did.  He ran queries

11   to -- this wasn't just something that came out of the thin air.

12   He had access to the database.

13            Now, he did not have -- he did not -- he's not like a

14   lawyer or, you know, someone who's preparing a formal report or

15   a study.  But I don't think that Rule 602 goes that far.

16            One of the points, as Your Honor knows, that was

17   omitted in the brief that was submitted, it says:  Evidence to

18   prove personal knowledge may consist of the witness' own

19   testimony.

09:00:10 20            He's going to take the court through the work that he

21   did to arrive at that conclusion.  And if they want to come and

22   argue, hey, you know, this is so important, you should have had

23   a study, you should have done an analysis, and you shouldn't

24   believe him because, you know, this is so important, you should

25   have, you know, prepared some formal memo or something like

681

1    that, that's fair if they want to do that.

2              But that's not a basis to exclude his testimony under

3    Rule 602.

4              THE COURT:  And was there, with Mr. Allan or any

5    prior time, testimony which supports what you believe his

6    testimony will be today?

7              MR. ELKIN:  Yeah.  Well, let me read this to you.  I

8    have copies if you want to read them.  It's really -- it's not

9    that extensive.

10             THE COURT:  All right.

11             MR. ELKIN:  It'll take you about 45 seconds.

12             THE COURT:  Okay.  Sure.  I'm happy to read them.

13             MR. ELKIN:  And let me just take Your Honor through

14   it quickly, if I may.

15             THE COURT:  Yes, sir.

16             MR. ELKIN:  So let's just start with -- we'll start

17   with Mike -- with Mr. Allan's 30(b)(6).  This was on June 3,

18   2015.  It's hard to believe that it's that long ago.  So I'm

19   reading from page 39 of that transcript.

09:01:26  20             Question:  Am I right that according to the current

21   policy, the company does not address the first notice of

22   infringement that it receives on a particular subscriber?

23             Line 12, the answer is:  Yes.

24             Line 14, Mr. Allan asked:  Why is that?

25             And if you skip to line 8 at page 40, he says:  We

682

1    have seen little or no difference in repeat offense rates

2    between customers who receive a first complaint and subscribers

3    for whom no action is taken.

4         Question:  And what do you base the last statement

5    on?  Is there data to support that?

6         Line 18:  There is.

7         Question on line 20:  What is it?  What does it

8    consist of?

9         Line 20:  The Cox Abuse Tracking System has a record

09:02:17  10    of all of the notices that have been sent and the actions that

11    have been taken.

12         He doesn't go beyond that.  And the trial, on

13    pages 15/14 of the BMG trial, line 9, question:  Let's start

14    with hold for more.  Can you explain what that is, please.

15         Answer on line 11:  For the specific case of a

16    copyright infringement complaint, we don't take a customer

17    facing action on the first complaint.  We create the ticket and

18    we store it, but we don't send the customer a warning on the

19    first complaint.

09:02:56  20         Question:  Why is that?

21         And if you skip to line 21:  We saw no statistical

22    difference between repeat complaint rates against customers who

23    did receive a warning versus those who did not receive a

24    warning.

25         And then finally in this case, the deposition,

683

1  30(b)(6) deposition, on page 146, lines 16 through 19:  We

2  didn't find a statistical difference in repeat offense rates

3  between customers who did or did not receive the first notice.

4  And on page 147:  Given that there wasn't a

5  statistical difference between repeat offense rates, we decided

6  to go with the hold for warning.

7  And then one of the things that was left out, I

8  think, of the brief that was submitted yesterday is on

9  page 150, lines 11 to 12:  The fact that there was no

09:03:51 10  appreciable difference in effectiveness.

11  Now, no one has elicited from him, you know, what

12  specifically did you do, Mr. Carothers?  And he's going to

13  testify exactly what he did.  And counsel will have an

14  opportunity to cross-examine him and grill him on it.

15  THE COURT:  Okay.  Thank you.

16  MR. ELKIN:  Thank you.

17  MR. OPPENHEIM:  Your Honor, I have absolutely no

18  problem with him sticking to what he has said previously.  But

19  what Mr. Elkin just described is going well beyond that.

09:04:23 20  If he's going to get up here and say, I ran numerous

21  queries, and he's going to try to show the jury queries run on

22  CATS data and to show some analysis that's created now for

23  which there is zero record after two depositions and trial

24  testimony, something entirely new, that is improper, Your

25  Honor.  That should have been produced.

684

1        The CATS system has millions and millions of records.

2  There's no way he could have done this analysis without having

3  really queried, analyzed, run calculations.  This is not easily

4  done.

5        If he wants to get up here and say, I looked at the

6  CATS data generally and this is what I knew, fine.  If he's

7  going to go and say, I did queries and did an analysis, they

8  needed to produce that.  They needed to testify to that.

9        THE COURT:  Okay.  Well, I mean, he was asked back in

09:05:23 10  2015, you know:  What's your basis and what does it consist of?

11  And he says:  That CATS has a record of all the notices that

12  have been sent and the actions that have been taken.  And it

13  was not followed up in 2015.  You specifically asked him about

14  whether he had a study.  He said no.

15        I don't think that precludes him from testifying

16  given he's the -- you know, the head of the security section

17  and principal security architect.

18        And if you believe that in order to cultivate the

19  underlying information necessary to give a credible opinion

09:06:16 20  about it, then that's what you do, is you cross-examine him on

21  that.

22        I'm not going to preclude him from testifying about

23  it on this record.  I don't find that he has boxed himself out

24  of providing that testimony.  We'll see how it develops more

25  specifically.

1          But if Mr. Elkin is saying that he's going to walk

2     him through it, I think you should be on notice that that will

3     be in some detail.  And I don't think he should be precluded.

4          I think it's -- is it credible?  You know, the jury

5     will make that determination.  Is it -- should it be precluded

6     at this stage?  I don't believe so.  But -- so your motion is

7     denied.

8          MR. OPPENHEIM:  I understand, Your Honor.

9          THE COURT:  All right.

09:06:57 10          MR. OPPENHEIM:  May I ask that he be required to lay

11    the foundation before he provides any of this testimony so we

12    can see whether or not there is a basis for it first?

13          THE COURT:  Yeah, let's -- you can make objection

14    like, you know, lack of foundation, and I'll rule on that the

15    some way.

16          MR. OPPENHEIM:  Thank you, Your Honor.

17          THE COURT:  Yes, sir.  All right.  Any other

18    preliminary matters before we get our jury?

19          MR. ELKIN:  Not here, Your Honor.

09:07:22 20          THE COURT:  Okay.  Are our jurors here, Joe?

21          COURT SECURITY OFFICER:  Yes, sir.

22          THE COURT:  Let's take just a short recess.  I've got

23    one other matter I need to take care of quickly, and we'll --

24    I'll be back in just a couple of minutes and we'll begin our

25    trial.

686

1           All right.  Let's -- do we have our witness here this

2   morning for cross-examination?

3           MR. OPPENHEIM:  Yes.

4           THE COURT:  Let's find our witness and be ready to

5   go.

6           All right.  We'll take a brief recess.

7           NOTE:  At this point a recess is taken; at the

8   conclusion of which the case continues in the absence of the

9   jury as follows:

09:14:10 10  JURY OUT

11          THE COURT:  All right, Joe.  Let's get our jury,

12  please.

13          NOTE:  At this point the jury returns to the

14  courtroom; whereupon the case continues as follows:

15  JURY IN

16          THE COURT:  All right.  Please have a seat.

17          Good morning, ladies and gentlemen.  Thank you,

18  again, for coming in on time this morning.

19          Again, did you heed my advice not to do any research

09:15:21 20  or investigation or talk to anybody?  Yes?  Thank you very

21  much.

22          All right.  Good morning, sir.

23          THE WITNESS:  Good morning.

24          THE COURT:  All right.  Cross-examination.

25          MR. BRODY:  That you, Your Honor.

S. Bahun - Cross

687

1          We've got a binder for the witness.

2          THE COURT:  All right.  Joe.  You can give that to

3   Joe.

4          THE WITNESS:  Okay.  Thank you.  I'll trade you for a

5   bigger one.

6          THE COURT:  Please, go ahead, Mr. Brody.

7          MR. BRODY:  I'm not asking about all of it, sir.  It

8   shouldn't be as threatening as it looks.

9          I wanted to start -- could I -- I understand you

10  folks control the ELMO?

11         THE COURT:  You are on live.

12         SAMUEL BAHUN, called by counsel for the plaintiffs,

13  having been previously sworn, continues to testify and state as

14  follows:

15      CROSS-EXAMINATION

16  BY MR. BRODY:

17  Q.   This is a summary exhibit that you put in yesterday.  And

18  I am sorry, I put a tab over it.  They shouldn't trust me with

19  exhibits because I wrote on it.

09:17:01 20         I just wanted to ask a question that I hadn't

21  understood when you were testifying yesterday.

22  A.   Sure.

23  Q.   There is an entry here for hashes.

24  A.   Yes.

25  Q.   What does that refer to?

S. Bahun - Cross

688

1    A.    Excuse me.  That entry is in reference to -- sorry -- the

2    terms "hashes" is kind of a shortened term for unique files,

3    unique song files in this case.

4    Q.    Okay.  So these are the -- that's what I wanted to

5    understand.  Thank you.

6              Can we have Plaintiff's Exhibit 4 up, please.  It's

7    admitted, I believe.

8              And we're calling up on the screen right now the 2012

9    statement of work.  And what happened was there was a sort of

09:18:01 10  an initial agreement, a Master Agreement with -- between RIAA

11   and MarkMonitor, and then each year there was a sort of a new

12   agreement entered into that specified the work you were going

13   to do during that year.

14             And those were called the statements of work, right?

15   A.    Correct.

16   Q.    Okay.  And this is the one for 2012, this is the first of

17   the series.  Yes?

18   A.    Oh, sorry, is that a question?

19   Q.    Yeah, I meant it to be a question.

20   A.    Sorry.

21   Q.    Is it the first of the series?  I am sorry.

22   A.    Yes, I believe so, but it is the 2012 agreement.

23   Q.    Okay.  And this agreement applied to -- the statement of

24   work applied to -- it applied to the Cox investigations, right?

25   A.    Yes.

S. Bahun - Cross

689

1    Q.   And it also applied to what is known as the CAS or cap

2    investigations?

3           MR. OPPENHEIM:   Objection.   I don't know what the

4    term "investigations" is.   It's not in the record.   It's not in

5    the documents.   It's misleading.

6           MR. BRODY:   Projects, tasks, whatever you want to

7    call it.

8           THE COURT:   All right.   As -- the question as

9    amended, if you can answer it, please go ahead.

09:19:12 10   A.   I'm sorry, can you repeat the question?

11   BY MR. BRODY: (Continuing)

12   Q.   Sure.   Does this agreement apply both to the work that you

13   did in connection with Cox and to the work that you did in

14   connection with the ISPs who were part of the Copyright Alert

15   System or copyright alert program?

16   A.   Yes.

17   Q.   Okay.   And the portion of the work you did that related to

18   Cox, that was referred to, throughout the document, as the

19   non-university peer-to-peer notice program, right?

09:19:47 20   A.   I would need to read through the document to be able to

21   answer that specifically.   Yeah, I would just need to look

22   through.

23   Q.   You're not sure what that -- well --

24          THE COURT:   Do you want to --

25   Q.   If you can go down to the -- no, leave that section up.

690

1    The one you had before -- the introduction.

2    A.    I do see that term here.

3    Q.    Yeah.  And what that refers to is the part of the work

4    that you were doing that did not relate to the CAS parties.

5          Let me just ask you:  What is that portion -- what

6    does that refer to?

7    A.    I am sorry, which -- what does what refer to?

8    Q.    The non-university peer-to-peer notice program.

9    A.    Yes, that's the portion of services -- correct, not

09:20:49 10  related to the copyright alert program in this case.

11   Q.    Okay.  And just to get back to where we started, this

12   agreement covers both?

13   A.    Yes.

14   Q.    Now, I want to talk a little bit about the obligations

15   that you undertook to perform -- the activities you undertook

16   to perform under this agreement.

17         One thing -- and actually, I am not sure it's in the

18   agreement, but you did share this with us at your deposition.

19         Is it correct that when you were doing your work in

09:21:34 20  these programs, it was not your intent to send notices to

21   business customers for the ISPs?

22   A.    Yes.

23   Q.    And, in fact, you implemented some features in your

24   software to make sure that notices -- or to do your best to

25   make sure that notices were not going to business customers,

691

1    right?

2    A.    Yes.

3    Q.    And if notices went to business customers, it happened

4    notwithstanding the safeguards that you built into your

5    software to avoid exactly that?

6    A.    I'm --

7    Q.    That was a bit of a long question.  Do you want me to

8    break it down for you?

9    A.    Yeah, if you can clarify it, please.

09:22:24 10   Q.    Okay.  So you were trying to make sure that notices didn't

11   get to businesses?

12   A.    Correct.

13   Q.    And if notices -- and you modified your software to

14   make -- to do your best to make sure that wouldn't happen?

15   A.    I don't know if I would subscribe it as modifying the

16   software.  But, yes, there was -- there was an element of it in

17   place to try to prevent that, yes.

18   Q.    Okay.  Well, a portion of your software was intended to

19   prevent notices to businesses, correct?

09:22:56 20   A.    That's not exactly -- I mean, it's not exactly the way I

21   would describe it.  But, yes, there was -- there was an element

22   of it in place to try to prevent infringements from being sent

23   in notices that may be related to business customers of Cox,

24   yes.

25   Q.    Okay.  And if notices were sent to business customers of

S. Bahun - Cross

692

1    Cox, then what that meant was that that element that you had

2    put in place was unsuccessful, at least in that instance,

3    right?

4    A.   Again, I wouldn't describe it that way.  I mean, I think

5    you have to understand how that part of the process works.

6    Q.   Well, you were trying not to send notices to businesses.

7    And if you sent notices to businesses, then your effort was

8    unsuccessful; isn't that true?

9         MR. OPPENHEIM:  Asked and answered, Your Honor.

09:23:47 10       THE COURT:  Overruled.  You may answer.

11   A.   I think the way --

12        THE COURT:  You may answer yes, you may answer no.

13   He is asking for yes or no answers.  If you can't answer it yes

14   or no, then just say, I can't answer it yes or no.  Okay?

15        THE WITNESS:  Okay.  Thank you.

16   BY MR. BRODY: (Continuing)

17   Q.   Would you like the question reread?

18   A.   Yes, please.

19        MR. BRODY:  Can you reread the question, sir?

20        NOTE:  The court reporter read back the requested

21   portion.

22   A.   No.

23   BY MR. BRODY: (Continuing)

24   Q.   Okay.  Can we go to -- can we go to the back of the

25   document.  Go up -- I am sorry.  Yeah, that's what I want.

S. Bahun - Cross

693

1    Thank you.

2              Can you blow up the second portion?

3              And I wanted to talk about the question of caps.  We

4    spent a lot of time talking about that yesterday.

5              Now, first of all, in this exhibit it shows 7,200

6    notices a day going to Cox, right?  I am sorry, 7,200 notices a

7    month going to Cox?

8    A.   Yes.

9    Q.   And this was -- you sent notices on weekdays, right?

09:25:51 10   A.   Yes.  I believe at this time we were sending Monday

11   through Friday, yes.

12   Q.   Okay.  So in most months there are 20 weekdays, so 7,200

13   notices is 360 notices per day?

14   A.   Yes.

15   Q.   Did anybody from RIAA tell you that at that time the limit

16   was 400 notices, not 360?

17   A.   I don't -- I don't recall the exact amount.  I know it was

18   a low daily amount, but I don't recall the specific number.

19   Q.   Let me ask you this.  The 7,200 number, the 360 per day,

09:26:31 20   is that a number that RIAA gave you, or is that a number that

21   you put in there on your own?

22   A.   Ultimately it came from RIAA.

23   Q.   Okay.  And do you recall them telling you that, well, you

24   know, we can send some more notices, but we don't want to

25   bother, we just want to stop at 360 a day?

S. Bahun - Cross

694

```
         1    A.    No.
         2    Q.    Can we put up -- or could you turn to, in your binder, the
         3    tabs -- the tab for Deposition Exhibit 86 -- or Defendant's
         4    Exhibit 86, I am sorry.
         5          Have you got that?
         6    A.    Yes.  Sorry.  The binder is not quite fitting --
         7    Q.    That is -- what is that?
         8    A.    Sorry about that.
         9    Q.    I think it's the statement of work for 2013, right?
09:27:56 10   A.    Yes.
        11    Q.    Okay.  And if you look at the next tab, 87, that's the
        12    statement of work for 2014?
        13    A.    Yes.
        14    Q.    And you have seen and you are familiar with those
        15    documents, right?
        16    A.    Yes.
        17          MR. BRODY:  Okay.  I would move those exhibits,
        18    Defendant's Exhibits 86 and 87.
        19          MR. OPPENHEIM:  No objection.
09:28:20 20         THE COURT:  All right.  They are received.  There is
        21    no objection.
        22          MR. BRODY:  All right.  Let's -- can we put 86 up on
        23    the screen?  And can we go to page 86, DX 86-7.  And can you
        24    blow up the same section of that chart.
        25    BY MR. BRODY: (Continuing)
```

S. Bahun - Cross

695

1   Q.   Okay.  So this is the -- this is the number of notices

2   that you were going to be sending to Cox in 2013, right?

3   A.   Yes.

4   Q.   And that number went up, it went up from 7,200 a month to

5   9,000 a month, right?

6   A.   Yes.

7   Q.   9,000 a month, that would be 450 per workday?

8   A.   Yes.

9   Q.   Did anybody from RIAA tell you, you know, we could really

09:29:35 10   send 600 notices a month this year, but we're going to stop at

11   450?

12   A.   No.

13          MR. OPPENHEIM:  Objection.  You said "year."  I think

14   you meant "day," right?

15          MR. BRODY:  Day, yes.  Let me reask the question.

16          THE COURT:  He answered no.  I think he understood

17   what you meant.

18          MR. BRODY:  Okay.  Thank you.

19          THE COURT:  Go ahead.

09:29:52 20   BY MR. BRODY:  (Continuing)

21   Q.   Now, how did the number get from 7,000 to 9,000?

22   A.   I don't know.  I don't know the specifics.  Like I said,

23   it was a number that we were given.

24   Q.   You were given it by RIAA, right?

25   A.   Yes.

S. Bahun - Cross

696

1    Q.   And they told you that Cox had agreed to more notices that

2    year, right?

3    A.   I don't recall that specific statement, no.

4    Q.   Okay.  Well, let me put it this way.  If somebody from

5    RIAA said, we forgot to tell MarkMonitor that there was an

6    increase in the number of notices, that would be wrong because

7    you increased the number of notices, right?

8            THE COURT:  I'm not sure that that's a fair question.

9    You -- I don't recall his testimony being specific to these

09:31:01 10   numbers.  If you want to amend it and ask generally whether

11   there was a -- had he ever had a conversation, you may.

12           But that's an improper question.  That's not facts --

13   you're assuming facts that are not in evidence.

14           All right.  Ask your next question.

15           MR. BRODY:  Okay.

16   BY MR. BRODY: (Continuing)

17   Q.   Well, let me just stop with this question then.

18           RIAA, they were the ones who told you to increase the

19   number of notices from 360 to 450 a day, right?

09:31:40 20   A.   It would have been part of the discussion as generally

21   like involved in creating the new agreement, but I don't

22   remember that specific -- that one specific comment or

23   discussion, if that's what you're asking.

24   Q.   Well, maybe I need to ask a different question then.

25           Who decided that the number of notices to Cox would

S. Bahun - Cross

697

1    go from 7,000 to 9,000?

2    A.   RIAA.

3    Q.   Okay.  And that number stayed the same in 2014, it was at

4    9,000?

5    A.   I believe so, but I would have to look.  Can I look at

6    the --

7    Q.   Sure.  Please, go ahead.  And we can put it up for the

8    jury.

9           Can you put up 87 for the jury?  Can we blow up that

09:32:44 10   section?

11   A.   So, yes.

12   Q.   Can we blow up that entire chart.

13          Now, the so-called participating ISPs, these are the

14   ones who were participating in the CAS program, right?

15   A.   Yes.

16   Q.   There was a lot of talk yesterday or a fair amount of

17   testimony from you about where those numbers came from, the

18   monthly numbers for the CAS participants.  Do you recall that

19   testimony generally?

09:33:54 20   A.   Yes.

21   Q.   Did anybody from RIAA ever tell you that under the CAS

22   program there were limits on the number of notices that these

23   participants were required to accept?

24   A.   No, I don't recall it being presented that way.

25   Q.   Okay.  Let me ask you another question about these

S. Bahun - Cross

698

1    companies.  Not all ISPs are the same size, right?  I mean,

2    some are bigger than others?

3    A.    Correct.

4    Q.    Do you know -- for example, Comcast is 57,000 notices on

5    here.

6           Do you know what the relative size of Comcast's

7    subscriber base is compared to -- broadband subscriber base is

8    as compared to Cox?

9    A.    No.

09:35:04  10    Q.    Do you know the relative size of any of the participating

11    ISPs as impaired to Cox, the relative size of their broadband

12    subscriber base?

13    A.    No.

14    Q.    Okay.  And I'm using a little bit of jargon, which I

15    really shouldn't do.  When I say "broadband subscriber base,"

16    all I mean is some of these other -- I'm really asking whether

17    you know how many more broadband users, how many more broadband

18    subscribers any of the ISPs have as compared to Cox, or fewer.

19    How they compare.

09:35:39  20    A.    Yeah.  No, I don't know that information.

21    Q.    Now, I wanted to ask you -- you talked about the GDPI data

22    yesterday?

23    A.    Yes.

24    Q.    We can take that down.

25           And that's -- at your deposition, I think you

S. Bahun - Cross

699

1   referred to those -- that the accumulation of that data is a

2   pulse check.  I think that was the phrase you used.

3            Does that sound right?  You're familiar with that

4   term?

5   A.   That term sounds familiar.  I'm not sure if that's exactly

6   what I said in the deposition, but I'll --

7   Q.   Okay.  Now, when you go out into the Internet and try to

8   find what you folks refer to as infringements, there are a lot

9   of different ways you can do that.

09:36:34 10           Are you okay?  Do you need --

11   A.   Yeah.  Sorry.  No, I was just -- I was trying to get --

12   find the spot for the binder.  I apologize.

13   Q.   All right.  I'm sorry.  It's -- I never mastered the

14   logistics of those binders.

15            When you go out into the Internet and look for what

16   you folks describe as infringements, there are a lot of

17   different levels at which you can do that.  In fact, there's a

18   formal taxonomy of seven levels, right?

19   A.   Yes, there is a document that describes it in those terms,

09:37:11 20   yeah.

21   Q.   Yeah, I think it's the Movie Labs document?

22   A.   Yes.

23   Q.   Okay.  And the sort of check that you did to accumulate

24   this data, that was what's referred to as a Level 1 check,

25   right?

S. Bahun - Cross

700

1    A.    Yes.

2    Q.    Okay.  And in a Level 1 check -- and as you go up the

3    levels, basically you do more investigation of what it is that

4    you're finding?

5    A.    Yeah.  That's one of the potential misunderstandings or

6    errors in the way that document is structured.  But generally I

7    would say yes.

8    Q.    Okay.  Level 2, which you don't do when you do these pulse

9    checks, Level 2 involves pinging the computers that you've

09:38:08 10   identified, right?

11   A.    Yes.

12   Q.    And you ping a computer to find out whether it's active,

13   right?

14   A.    That's one of the purposes of that.  There are others

15   that -- there are others.

16   Q.    Well, if you ping it and it doesn't respond, it's not

17   active?

18   A.    Not necessarily.  But, yeah.

19   Q.    Okay.  Level 3, that level requires verifying that a peer

09:38:41 20   has a functional peer-to-peer application on it, right?

21   A.    Yeah, that's the way that that document describes it, yes.

22   Q.    Okay.  And then at Level 4, you would actually do a

23   handshake with the computer?  We had some testimony about that

24   yesterday.  That's where your computer actually starts

25   communicating with the computer that you're investigating?

S. Bahun - Cross

701

1    A.    Yes.

2    Q.    Okay.  And Level 1 doesn't do any of those things?

3    A.    Not in the manner that you've described the additional

4    steps.  They are unique to those.  Again, this is based on one

5    document that describes it in those terms.  But it's

6    essentially describing seven different -- is it okay if I give

7    a little bit more information to you?

8    Q.    No, I really -- you've got very competent counsel.  If he

9    thinks something got left out, he'll ask you about it, and he

09:39:46 10  should.

11   A.    Okay.

12   Q.    And I apologize if I have asked the wrong question, but

13   I've just got to do them in my own way.

14   A.    Sure.

15   Q.    Now, you would never send a notice to Cox based on a

16   Level 1 check of a computer, of a peer, right?

17   A.    No.

18   Q.    You would never accuse -- you'd never ask Cox to accuse

19   one of its subscribers of infringing a work based on those

09:40:22 20  Level 1 checks, would you?

21   A.    No.

22   Q.    Okay.  Can we have Exhibit 4 up again?  And can we go to

23   Appendix C, which I believe is the last page, yeah.  Blow up

24   that.  That's great.

25         Now, this is the pricing model for the services you

S. Bahun - Cross

702

1   performed for RIAA with respect to CAS and with respect to Cox

2   and the other ISPs, right?

3   A.   Yes.

4   Q.   Okay.  And in the pricing model you quote -- you give

5   three quotes at the bottom.  The bottom one is quote for

6   current level of verification, and then there's a little

7   footnote and says that's Level 4.  Do you see that?

8   A.   Yes.

9   Q.   And -- well, actually, I think it's the row, not the

09:41:43 10   column.

11          Level 4, that's the level that RIAA chose, isn't it?

12   A.   Yes.

13   Q.   And they stayed at that level throughout the entire

14   program.  We can look at the other documents, but I believe --

15   A.   Yes.

16   Q.   Okay.  Now, if they had wanted to pay more money, they

17   could have done Level 5, right?  You offered them a quote for

18   Level 5?

19   A.   Yes.

09:42:18 20   Q.   And that would have -- that would have -- how did Level 5

21   compare to Level 4?

22   A.   From -- sorry, what do you mean by --

23   Q.   What's the -- Level -- what is the --

24          MR. GOULD:  Your Honor, objection, please.  The

25   highlighting is going in a different direction.

S. Bahun - Cross

703

1          MR. BRODY:  Yeah, I -- if you could just -- I'll ask

2    you to highlight when I need it.  Thank you.

3          THE COURT:  All right.  Thank you.

4    BY MR. BRODY: (Continuing)

5    Q.   Level 5, each of these levels involves a more detailed

6    investigation of the peer computer that's being -- that's the

7    subject of a notice, right?

8    A.   No.

9    Q.   What's the difference between Level -- hash based Level 5

09:43:07 10  and Level 4?

11   A.   So it involves different steps that require -- and in

12   these particular cases, and in most, more resources on our

13   side.  Which is why you see an increase in the cost.

14   Q.   I understand.  And the additional steps you do, that

15   allows you to gather additional information, doesn't it?

16   A.   Yes, there's additional data involved in those.

17   Q.   Okay.  So Level 5 involves more steps and more data than

18   Level 4, right?

19   A.   Yes.

09:43:44 20  Q.   And you charge more for it as a consequence?

21   A.   Yes.

22   Q.   And the top level, the RIAA only, full download option,

23   that involves still more steps and still more data, right?

24   A.   Yes.

25   Q.   And full download, that means when you contact a peer,

S. Bahun - Cross

704

1   you're actually going to download the entire file on the peer

2   that you suspect of infringement, right?

3   A.   Yes.

4   Q.   And in Level 5 -- well -- and that's more expensive than

5   whatever you do at Level 5, right?

6   A.   Yes.

7   Q.   And RIAA chose Level 4?

8   A.   Yes.

9   Q.   Okay.  Now, we've got a lot of levels here.  Another thing

09:44:46 10   that comes in levels is the Audible Magic service, right?

11   A.   I believe so, but -- yeah, there are a couple different

12   levels, but that wouldn't be something that I am in control of

13   or typically involved in deciding.

14   Q.   Right.  RIAA decided what level of service to take from

15   Audible Magic?

16   A.   I would assume so, yes.

17   Q.   Okay.  And do you have an understanding of the -- of what

18   the different levels are and what the pricing is on those

19   levels for Audible Magic?

09:45:22 20   A.   No.

21        MR. OPPENHEIM:  Can we now take that exhibit down?

22        MR. BRODY:  Yes, we can take it down.

23   BY MR. BRODY: (Continuing)

24   Q.   You are familiar with the fact that RIAA selected Type 1

25   matching or Level 1 matching from Audible Magic for the Cox

S. Bahun - Cross

705

1    program, right?

2    A.    I know that -- I know that that was the type that was

3    being used, yes.

4    Q.    And they selected Level 3 for the CAS program, correct?

5    A.    I believe so.

6    Q.    Do you know why the RIAA chose a higher level for CAS than

7    it chose for Cox?

8    A.    No.

9           MR. OPPENHEIM:  Objection to the use of the term

09:46:17 10   "higher."  He hasn't established that Level 3 was higher than

11   Level 1.

12          THE COURT:  All right.  Sustained.  He's --

13   BY MR. BRODY:  (Continuing)

14   Q.    Do you know why RIAA chose Level 3 for CAS and Level 1 for

15   Cox?

16   A.    No.

17   Q.    I want to ask a series of questions that kind of start

18   with the hard drive that we looked at yesterday.

19          We played some songs off a hard drive that you folks

09:47:02 20   created, and I think that's Exhibit -- Plaintiff's Exhibit 39.

21          Do you recall that generally?

22   A.    Yes.

23   Q.    Okay.  When was that hard drive created?  When were those

24   songs put on that hard drive?

25   A.    I believe it was -- I can't tell you for certain, but I

S. Bahun - Cross

706

1   think it was the end of 2015, beginning of 2016, around that

2   time frame.

3   Q.   So that would have been two years after the end of the

4   notice period here?

5   A.   Yes.

6         MR. BRODY:  Your Honor, may I approach the bench?

7         THE COURT:  Yes, sir.

8         NOTE:  A sidebar discussion is had between the Court

9   and counsel out of the hearing of the jury as follows:

09:47:54 10   AT SIDEBAR

11         THE COURT:  All right.

12         MR. BRODY:  Your Honor, I move to strike Exhibit 39.

13         It was identified as copies of the recordings that

14   were downloaded, but it obviously was made two years after they

15   were downloading the files.

16         MR. OPPENHEIM:  That's not what he asked the -- I'm

17   sorry, Your Honor.  I didn't mean to interrupt you.

18         THE COURT:  Well, that's an insufficient basis for

19   striking it.  Just the timing of when it was made doesn't make

09:48:20 20   it any more or any less reliable unless you can establish that,

21   right?

22         MR. BRODY:  Maybe I misunderstood, but I thought the

23   testimony was that these were the files that they downloaded

24   and then sent to Audible Magic and then, you know, put in the

25   notices.  So these were supposed to be, if we want to know what

S. Bahun - Cross

707

1   Audible Magic checked, we're supposed to be able to listen to

2   these files.  But that can't be the case because they were --

3   the files were made and saved two years after, four years after

4   the notices were sent.  And they were submitted to Audible

5   Magic.

6          MR. OPPENHEIM:  First off, the infringing recordings

7   aren't submitted to Audible Magic.  So that's incorrect.

8          MR. BRODY:  The fingerprints, I'm sorry.

9          MR. OPPENHEIM:  But all he asked the witness was when

09:49:02 10  were these put on the hard drive.

11          THE COURT:  Right.

12          MR. OPPENHEIM:  He hasn't established anything that

13   he just said.

14          THE COURT:  That's an insufficient basis.  Your

15   motion is denied.  Your exception is noted.

16          MR. BRODY:  Okay.

17          THE COURT:  I mean, if you want to continue to a

18   probe further --

19          MR. BRODY:  I will.

09:49:17 20          THE COURT:  -- that's fine.

21          MR. BRODY:  We'll find out.

22          THE COURT:  Okay.  Thank you.

23          NOTE:  The sidebar discussion is concluded; whereupon

24   the case continues before the jury as follows:

25   BEFORE THE JURY

S. Bahun - Cross

708

1        THE COURT:  All right, please proceed.

2   BY MR. BRODY: (Continuing)

3   Q.   Mr. Bahun, how did the files get onto the hard drive?

4   Audible Magic -- I am sorry -- MarkMonitor put them there?

5   A.   Yes.

6   Q.   And where did you put them there from?  Where were they

7   when you put them there?

8   A.   One of our systems where we would -- where we would have

9   stored the files.

09:50:11 10   Q.   Okay.  So you had them -- and when did they go onto your

11   system?

12   A.   I'm sorry, I don't quite understand the question.

13   Q.   You said that they were -- they would have come from some

14   place in your system where you stored the files.  I just wanted

15   to know when they were stored on your system, wherever they

16   were stored.

17   A.   I don't know the exact date.  I mean, they would have been

18   different dates.

19   Q.   Would they have been stored on the system when they were

09:50:46 20   first downloaded from the Internet -- from a peer-to-peer

21   network?

22   A.   Possibly some of them.  I don't recall the specific

23   details.  I mean, they are -- they are the files based on the

24   hash value, you can determine that.

25   Q.   I understand.  I mean, they are files and they have hash

S. Bahun - Cross

709

 1    value and, you know, that matches or it doesn't.

 2              What I was trying to ask and understand was where

 3    they -- how you came to possess them?

 4    A.   So we downloaded them from the peer-to-peer networks.

 5    Q.   And you downloaded them at different times?

 6    A.   Yes.

 7    Q.   Some of them were downloaded the first time you found a

 8    file, and some of them were downloaded at other times?

 9    A.   Yes.

09:51:43 10   Q.   And I think you said you weren't sure what those other

11    times might have been?

12    A.   Right.  And some files are downloaded multiple times, you

13    know, throughout the course of the time period we are talking

14    about.

15              MR. BRODY:  Your Honor, I would renew my objection.

16              THE COURT:  Denied.

17    BY MR. BRODY:  (Continuing)

18    Q.   Now, the files that you downloaded and stored on your

19    system, were some of them downloaded from BitTorrent?

09:52:27 20   A.   Yes.

21    Q.   Were some of them downloaded from eDonkey?

22    A.   Yes.

23    Q.   Were some of them downloaded from Gnutella?

24    A.   Yes.  I don't think that any of the Gnutella files -- in

25    the form that we produced the drive, I don't think there were

S. Bahun - Cross

710

1    any designated as Gnutella, but there were -- the files that

2    were found on Gnutella, because there was overlap, there was

3    duplicates.  So on the drive, we provided one copy of each

4    song.

5    Q.   The drive has zero Gnutella files, right?

6    A.   It's not exactly right.

7    Q.   There are no files on the drive that were downloaded from

8    Gnutella; isn't that correct?

9         I understand there is SHA-1 hashes that match files

09:53:22 10  that were downloaded from Gnutella, but at some point you guys

11   went out onto Gnutella, you found a file that you thought was

12   infringing, you downloaded it, you stored it in something or

13   another, and none of those files that you downloaded from

14   Gnutella and stored someplace went onto the hard drive that is

15   Exhibit 39?

16   A.   I don't -- the way you're describing it is a little

17   tricky.

18   Q.   It wasn't meant to be tricky.  Look, what you want -- I

19   can tell that what you're trying to tell me is that you

09:53:59 20  downloaded files from multiple networks that had the same SHA-1

21   hash and you only put one copy on Exhibit 39.  Isn't that what

22   happened?

23   A.   Yes.

24   Q.   Okay.  And as a consequence of that, of your doing that,

25   none of the files that were initially downloaded from Gnutella

S. Bahun - Cross

711

1    made it onto the hard drive because you had the SHA-1 hash in

2    the BitTorrent directory?

3    A.   Again, the files are the same so.  So I am not -- I

4    apologize, I am not --

5    Q.   Let me -- let me ask you to focus on the question.

6    A.   Okay.

7    Q.   The files that were downloaded from Gnutella -- so I'm

8    asking kind of a historical question about a file.

9    A.   Okay.

09:54:59  10  Q.   A file that was borne on Gnutella.  That file is in your

11   system someplace, but it's not on Exhibit 39?

12   A.   Yes.  I mean, it's the same file.  But I think if I

13   understand the way you're asking the question, yes.

14   Q.   Well, it's the same file because they all share the same

15   SHA-1 hashes, right?

16   A.   I mean, that -- that proves that they are identical.

17   Q.   James, could we open Exhibit 141, please?  Oh, I am sorry,

18   that's Plaintiff's Exhibit 11.

19            Now, we searched yesterday with Ms. Frederiksen-Cross

09:55:55  20  for a file with the SHA-1 hash started 8C1EDC.

21            Do you have that hash?  Can you find it?

22            Okay.  And can you scroll to the right.  There you

23   go.  Keep going.

24            Okay.  Those columns K, L, and M, that's the -- I am

25   sorry, just K, L, and M.  It actually goes over to N, too, I

S. Bahun - Cross

712

1   guess.

2          That's the information that Audible Magic returned to

3   you about the file with that SHA-1 hash, right?

4   A.   Yes.

5   Q.   And what it said was that that file with that SHA-1 hash

6   was Lady Antebellum, "Need You Now" --

7   A.   Yes.

8   Q.   -- right?

9   A.   Yes.

09:57:02 10   Q.   Okay.  And if we went to the hard drive, we could play

11   that song.  And I have to admit, I wouldn't recognize Lady

12   Antebellum if she walked in off the street, but I would assume

13   it would be Lady Antebellum.

14   A.   Yes.  I mean -- I am sorry, can you repeat the question?

15   Q.   Sure.  If we went to the hard drive and looked for the

16   file that we have identified here and played it, it would be

17   Lady Antebellum singing "Need You Now"?

18   A.   Yes.

19   Q.   Okay.  Now, can we go to the Gnutella tab, please.  And

09:57:41 20   can we search on the same SHA-1 hash.

21          And can you scroll to the right, please.  Now --

22   whoops, back.  There you go.

23          Now, we just searched on the same SHA-1, which means

24   it is supposed to be the same file, right?

25   A.   Yes.

S. Bahun - Cross

713

1    Q.   But it's not the same file, at least Audible Magic said it

2    wasn't the same file?  Audible Magic said it was Tina Ray -- or

3    Tia Ray singing "Do you."  That's what the spreadsheet says,

4    right?

5    A.   Yeah, that's what the spreadsheet says.

6    Q.   But we can't go to the hard drive and listen to that file,

7    can we?

8    A.   I wouldn't know without having -- without looking it up on

9    the hard drive.

09:58:42 10   Q.   There are no Gnutella files on the hard drive, right?

11   A.   I would have to search for this hash to see if the hash is

12   available in the files that were provided --

13   Q.   If you search for the hash you will find --

14          THE COURT:  No, no.  Stop.  Finish your answer.

15          MR. BRODY:  I'm sorry.  I apologize.  I genuinely

16   apologize.

17          THE COURT:  Go ahead and finish your answer.

18   A.   I mean, that was it.  I would have to look on the hard

19   drive for the hash.

09:59:10 20   BY MR. BRODY:  (Continuing)

21   Q.   Yeah.  And if you did, you would certainly find the one in

22   the BitTorrent directory, right?  But you would not find any

23   file matching that SHA-1 hash in the Gnutella directory because

24   there is no Gnutella directory on the hard drive?

25   A.   I'm sorry, was that a question?

714

1   Q.   Yes, sir.  That was a question.

2   A.   I am sorry, can you repeat it?  What was the question?

3   Q.   Isn't it true that you could not search on the SHA-1 hash

4   on the hard drive in the Gnutella directory because there is no

5   Gnutella directory?

6   A.   There is no Gnutella directory, correct.

7   Q.   Which means you can't search on the SHA-1 hash in the

8   directory that doesn't exist?

9   A.   The hash may still exist.  I would have to look.

10:00:06 10   Q.   Can you search for anything in any Gnutella directory -- I

11   think we have covered the ground.

12        Do you have -- do you have the Bahun demonstrative

13   there, James?

14        You can take this exhibit down.

15        I'll put it on the ELMO.

16        Okay.  This is -- this is a demonstrative that you

17   used yesterday, right?

18   A.   Yes.

19   Q.   We've been using the word "download" a lot, and I want to

10:01:47 20   focus on two points in the process and talk about what

21   downloads do or didn't, or should or shouldn't have occurred.

22   Okay?

23        Now, in the second step of the process, you -- well,

24   let's just walk through it.

25        The first step of the process, MarkMonitor is going

S. Bahun - Cross

715

1  out on a peer-to-peer network, you're searching for potentially

2  infringing files, right?

3  A.   Yes.

4  Q.   I need to leave this behind.  I wanted to ask you one more

5  question about the SHA-1 hashes that we were looking at before

6  in the hard drive.

7        I will tell you, because I know my good friend will

8  raise the question, those songs are not among the works that

9  are at issue in this case.  But I wanted to ask you a question

10:02:49 10 about the operation of your system.

11  A.   Okay.

12  Q.   Does it depend on whether or not a file that you download

13  ends up at issue in a lawsuit?  Is it as accurate -- is it

14  accurate for every file that you download, or is it only

15  accurate for some?

16  A.   I'm sorry, is what accurate?

17  Q.   Your system, the whole system of downloading and matching

18  and hashing and comparing and saving and noticing.  Everything

19  that you do, you do the same for every file that you download,

10:03:20 20 right?

21  A.   Yes.

22  Q.   Okay.  And it doesn't matter -- you didn't in this case,

23  the files where you found them and sent notices to Cox, you

24  didn't process them any differently depending upon whether or

25  not they ended up in this lawsuit, did you?  They were all

S. Bahun - Cross

716

1   processed the same?

2   A.   Yes.

3   Q.   Okay.  Thank you.  Let's go back to this demonstrative.

4        So the first step, you go out into the peer-to-peer

5   network, you look for potentially infringing files.  So that's

6   those search terms that you gave to us before, right?

7   A.   Yes.

8   Q.   And when you find one that may be potentially infringing,

9   you download it and confirm it, and that's the Audible Magic

10:04:09 10  process?

11  A.   Yes.

12  Q.   And the reason you download it and confirm it is because

13  you don't actually know what's in the file until you do that,

14  right?

15  A.   Yes.  I mean, not -- yeah.

16  Q.   Because people can name these files -- you know, they name

17  them arbitrarily, they name them however they choose to name

18  them, right?

19       They are not like -- that's the question.  Isn't it

10:04:38 20  true that they name them however they choose to name them?

21  A.   They have that ability, yes.

22  Q.   Okay.  And they're not -- well, never mind.

23       Okay.  So you go to Audible Magic.  You download the

24  file, fingerprint it, send the fingerprint to Audible Magic.

25  Audible Magic matches it to their database.  They send you back

S. Bahun - Cross

717

1    a message and they tell you, here is what you found.  Right?

2    A.   At a high level, yeah.

3    Q.   Okay.  And that -- what do you -- Ms. Frederiksen-Cross

4    referred to that as, I believe, the verification module of your

5    system yesterday.  Is that a usable term?

6    A.   Yes.

7    Q.   Okay.

8    A.   Yeah.

9    Q.   Then the next step I think she referred to as the

10:05:24  10   collection or the detection module.  Let's go with collection

11   because that's what you have here.

12         And that's where you go to one of the peers in the

13   network to see whether they have got a copy of whatever it is

14   that you just sent off to Audible Magic, right?

15   A.   It's not exactly, but kind of.

16   Q.   Okay.

17   A.   Sorry.

18   Q.   Well, this is -- this is the point where you're contacting

19   individual peers, or in this case Cox subscribers, the IP

10:06:06  20   addresses of Cox subscribers, to investigate whether they have

21   the file that you have sent off to Audible Magic?

22   A.   Yes.

23   Q.   Okay.  And in that process, you do not download data,

24   right?  Or you do not download a copy of the file or any

25   portion of the file?

S. Bahun - Cross

718

1          I'm sorry.  That's a bad question.  The file is a

2    little ambiguous here.

3          The file that you download and fingerprint and send

4    to Audible Magic, that's actually the music file, right?  The

5    audio file?

6    A.    Yes.

7    Q.    And when you download it, of course that's in digital

8    form, right?

9    A.    Yes.

10:06:52 10    Q.    Okay.  And what you're trying to find out in the

11   collection stage is whether that same digital audio file is on,

12   in this case, the computer of a Cox subscriber?

13   A.    That's not exactly the way I would describe it, no.

14   Q.    At the end of the process, when you contact the computer

15   of a Cox subscriber, whatever you do, at the end of that

16   process have you satisfied yourself that the Cox subscriber has

17   a copy of the same file that you sent off for fingerprinting to

18   Audible Magic?

19   A.    Yes.

10:07:46 20    Q.    Okay.  But when you do that, when you investigate the

21   peer, you do not download the digital music file or any piece

22   of it; isn't that true?

23   A.    It's not necessary, so I'm not understanding the --

24   Q.    I think -- I'm sorry.  Please finish.

25   A.    I just -- could you clarify because I don't understand

S. Bahun - Cross

719

1    what you're asking.

2    Q.   The question was -- I understand your views that it's not

3    necessary, but I just want to establish the fact.

4          When you investigate the peers, the Cox subscribers,

5    you do not download the digital music file or any portion of

6    it, any piece of it; isn't that true?

7          MR. OPPENHEIM:  Objection.  He's using a term

8    "digital music file," and I don't know what that means.

9          THE COURT:  Yeah.  Yeah, let's add from where.

10:08:45 10  BY MR. BRODY: (Continuing)

11   Q.   So when you're -- I actually don't think there's a dispute

12   about this, but I seem to be asking the question wrong.

13         When you contact a Cox subscriber -- or when you're

14   out in the peer-to-peer network --

15   A.   Yes.

16   Q.   -- and you download the copy of the song that you're going

17   to send for fingerprinting, you don't know whether those --

18   that's not the part of the process where you determine whether

19   a Cox subscriber is infringing?

10:09:16 20         That's just getting the file so you know what you're

21   looking for when you're investigating potential infringers; is

22   that fair?

23   A.   That's the main purpose of that step in the process.  I

24   think -- well, sorry, go ahead.

25   Q.   I'm sorry.  And the places you get that file from, they

S. Bahun - Cross

720

1    may be Cox subscribers, they may be Comcast subscribers, they

2    may be people in China, they could be anybody who's on the

3    peer-to-peer network, right?

4    A.   Yes.  In that process, yes.

5    Q.   Okay.  Then in the third step of the process, the

6    collection step, you're zeroing in on the people you think have

7    copies of that file, and in this case those are Cox

8    subscribers?

9    A.   Yes.

10   Q.   Now, do you download any portion of the song when you're

11   investigating the Cox subscribers?

12   A.   Sorry.  I'm just trying to make sure I understand your

13   question clearly.

14   Q.   What is it you don't understand about the question?

15   A.   In that step, in that specific step, it's unnecessary

16   because that portion of the work has already been done at that

17   stage.

18          MR. BRODY:  Your Honor, I move to strike the answer.

19          THE COURT:  He's explaining that he already has done

20   that step.  But if you want to --

21          MR. BRODY:  Yeah.

22          THE COURT:  Listen to the question carefully.

23          THE WITNESS:  Okay.

24          THE COURT:  Ask it one more time.  And he's asking,

25   at this particular step do you download the music, right?  Is

S. Bahun - Cross

721

1    that correct?

2              MR. BRODY:  That's exactly right, Your Honor.

3              THE COURT:  Okay.

4              MR. BRODY:  That's exactly right.

5              THE COURT:  Then can you answer that question, or do

6    you need it asked again?

7              THE WITNESS:  No, I think that's clear.  So at this

8    step in the process, we do not redownload any additional

9    portion of the file.

10:11:17 10   BY MR. BRODY:  (Continuing)

11   Q.    Thank you.

12   A.    Sorry.

13   Q.    I thought we were in agreement on that, and that really is

14   what I wanted to ask you.

15   A.    Sure.

16   Q.    And if we went to the evidence packages that you looked

17   at, those computerese things, and we looked to see whether any

18   data was downloaded, in all of the relevant fields we'd see

19   zero, right?  Because no -- none of the music was downloaded?

10:11:49 20   A.    What do you mean by all of the relevant fields?

21   Q.    I'm sorry.  That's -- I'll withdraw that question.

22              Now, you did commit in the statements of work to --

23   for subsequent detected instances of the same file match, that

24   is to say after you found something that's been verified by

25   MarkMonitor, you were required to download enough of the file

S. Bahun - Cross

722

1   to be able to prove that the user was offering the file and

2   also to verify that the file was a valid peer-to-peer file?

3   A.   Could you -- am I supposed to be looking at a document or

4   are you just --

5   Q.   Well, I was just asking.

6   A.   Oh, I'm --

7   Q.   I mean, I can direct you to the place in the document if

8   you'd like to see it.

9   A.   It might help, but --

10:13:06 10   Q.   Sure.

11   A.   If you --

12   Q.   It's in all of them.  But if you look at Exhibit --

13   Plaintiff's Exhibit -- do we have it there?

14        Look at Defendant's Exhibit 87.

15   A.   Okay.

16   Q.   That's the 2013 agreement?

17        MR. BRODY:  Can we turn this off?

18        MR. OPPENHEIM:  This is the 2014, I think.

19        MR. BRODY:  Oh, it's 2014.  I'm sorry.

10:13:49 20        MR. OPPENHEIM:  I think that's right.

21   BY MR. BRODY: (Continuing)

22   Q.   And if you go to --

23   A.   Okay.

24   Q.   All right.  Go to tab 86.  The language changed a little

25   bit in the 2014 document.

S. Bahun - Cross

723

1          Oh, I'm -- it's my fault.  I was giving you the wrong

2     page.  Can you go to page 9 of either one, whatever you've got

3     opened.

4          MR. OPPENHEIM:  Let's just pick one.

5     Q.   Yeah, let's -- 2013, Exhibit 86.  Plaintiff's Exhibit 86.

6     A.   Okay.

7     Q.   Oh, I'm sorry, Defendant's Exhibit 86.  There's a

8     paragraph there called Hash Based Verification.  Do you see

9     that?

10:15:52 10  A.   Yes.

11    Q.   And that's the type of verification you were doing for

12    RIAA when you investigated the computers of the Cox

13    subscribers, right?

14          MR. OPPENHEIM:  Objection.  We keep using this term,

15    "investigated the computers of Cox subscribers," and there's no

16    testimony that that's what was done.

17          THE COURT:  Yeah.

18          MR. OPPENHEIM:  And it's just not the right language.

19          MR. BRODY:  When you pulled -- I'm sorry.

10:16:15 20        THE COURT:  Yeah, rephrase the question.  Sustained.

21    BY MR. BRODY:  (Continuing)

22    Q.   When you collected data from the computers of the Cox

23    subscribers.

24    A.   I'm sorry.  Can you repeat the question?

25    Q.   When you went to the Cox subscriber computers, you

S. Bahun - Cross

724

1    promised that you would download enough of the file to be able

2    to record the source and destination, and to prove that the

3    user was offering the file, that the user is a valid P2P user,

4    and also to verify the file is a valid P2P file.

5            Then you went on and said:  MarkMonitor will

6    communicate with the IP address -- so that's the IP address of

7    the Cox subscriber -- to the extent necessary to verify all

8    music files and their associated unique hashes from the P2P

9    networks.

10:17:20 10            Right?

11   A.   That's what the language in this clause says, yeah.

12   Q.   And that's what you promised to do?

13   A.   So the reason I wanted you to direct me to the actual

14   language, this is actually in Appendix B.  I would need to take

15   a look at this because -- it is okay to explain?

16   Q.   Sure.

17   A.   This Appendix B is a -- it's an overview of the RFP

18   related to the CAS system.  I need to double-check to answer

19   your question the references tying this in.  But the language

10:18:06 20   here is specific to that program, and I just want to

21   double-check and verify this.

22   Q.   Let me just ask a high-level question, maybe that'll save

23   us a little time.  When you contacted the computer of a Cox

24   subscriber and collected data from that computer, you were

25   supposed to collect enough data so that you could report to

S. Bahun - Cross

725

1    RIAA -- or, I'm sorry, so that you could determine whether the

2    Cox subscriber had a copy of the file that you had downloaded

3    and sent off to Audible Magic?

4    A.    Yes.

5    Q.    Okay.  And again, just not to belabor a point, but just to

6    get back to the place where we were in our discussions, the way

7    you did that was by matching the hashes, but you did not

8    download any portion of the music on the -- from the Cox

9    subscriber?

10:19:17 10    A.    Yes, with -- I mean, with the way you're describing that,

11   yeah, in that step, we weren't redownloading the file that we

12   had already downloaded.

13   Q.    Okay.  Now, do you remember telling the RIAA that in fact

14   you did intend to download pieces of music from the

15   subscriber's computers?

16   A.    No, I don't -- I mean, I don't recall that specifically.

17   Q.    Do you remember telling them that you were going to

18   download those pieces of the music file and rehash them to make

19   sure they were the same as what you'd found on the Internet?

10:19:57 20    A.    I mean, that process is done through the communication

21   when you're connected to a peer.  So I don't know if I

22   understand your question.

23   Q.    Did you tell the Cox -- did you tell RIAA that you were

24   going to download a piece of the music file from a Cox

25   subscriber and rehash that piece to make sure that the piece

726

1   matched the file that you had sent off to the -- the same piece

2   and the file that you had sent off to Audible Magic?

3   A.   No, I don't believe so.

4   Q.   Okay.  Could you look at the tab for Defendant's

5   Exhibit 17 in your binder, please.

6   A.   Yes.

7   Q.   That's a copy of a document titled -- well, you're

8   familiar with that document, right?

9   A.   Yes.

10:21:22 10   Q.   It's a document that MarkMonitor prepared for the RIAA and

11   MPAA?

12   A.   Yes.

13   Q.   And you participated in its preparation, right?

14   A.   Yes.

15          MR. BRODY:  I'd move the admission of Defendant's

16   Exhibit 17, Your Honor.

17          THE COURT:  Any objection?

18          MR. OPPENHEIM:  No objection, just subject to the

19   confidentiality issue that Your Honor has been dealing with.

10:21:48 20          THE COURT:  All right.  And that will be waived and

21   it'll be admitted publicly.  Thank you.

22   BY MR. BRODY: (Continuing)

23   Q.   All right.  Now, as it says on the face, this is a

24   document that was prepared by MarkMonitor for RIAA and MPAA,

25   right?

S. Bahun - Cross

727

```
 1   A.   Correct.

 2   Q.   And it was prepared in connection with the CAS program?

 3   A.   Yes.

 4   Q.   But at least insofar as it describes the data collection

 5   process from the peer computers, the document describes not

 6   only the CAS program, but also the Cox program?

 7   A.   Can you clarify your -- I don't understand what you're

 8   asking.

 9   Q.   Does the document describe the peer-to-peer enforcement

10   process that would have been used for both the copyright alert

11   program and the RIAA's non-university notice program in effect

12   as of April 11, 2012?

13   A.   There are some -- there are some elements that are

14   similar.  But this document, if I recall correctly -- can I

15   review the document?

16   Q.   Sure.

17   A.   So I won't sit here and read every word, but I just kind

18   of wanted to refresh my memory.  I believe this document was

19   primarily or maybe entirely produced related to the

20   CAS program.

21   Q.   Right.  But it -- as it turned out, it described both of

22   them, both the CAS and the non-university program; isn't that

23   true?  That was your answer at deposition.

24   A.   Yeah.  I mean, in general because there are similarities

25   in the technologies used and some of the processes that we are
```

S. Bahun - Cross

728

1  running, then, yes, there are some things in this document that

2  would apply to the non-participating or the non-CAS program,

3  yeah.

4  Q.   Well, one thing that would apply is that both the CAS

5  program and the non-CAS program use Level 4 and performed Level

6  4 data collection on the peer computers, right?

7  A.   For RIAA?

8  Q.   Uh-huh.

9       THE COURT:   We can't translate uh-huh.

10:25:36 10  Q.   Yes.  That was a yes.

11  A.   I apologize, but can you ask the question one more time.

12  Q.   Sure.  Both -- for both programs you were doing, we looked

13  at it before in the statement of work.

14  A.   Okay.

15  Q.   You were doing this Level 4 investigation of the -- not

16  investigation, collection of data from the peer computers?

17  A.   Yes.

18  Q.   Okay.  So when you talk about what you're going to be

19  doing when you collect data from a peer computer in this

10:26:14 20  document, that applies both to the CAS program and to the

21  non-CAS program, which means it also applies to Cox?

22  A.   Well, that's -- that's where I'm hesitating because this

23  document includes elements outside of the RIAA.

24  Q.   At your deposition -- you have your -- you should have

25  your deposition in that binder.

S. Bahun - Cross

729

1    A.    What tab is it?

2          MR. OPPENHEIM:  Is this impeachment?

3    Q.    The tab is called Deposition, I believe.

4    A.    Sorry, it was hiding.

5    Q.    I think it's the last tab.

6          Can I help the witness, Your Honor?

7          THE COURT:  I think he has found it.

8    A.    Yes, I have got it.

9          THE COURT:  What page do you want him to look at?

10:28:20 10   Q.    I want you to look at page 260, please.

11   A.    Okay.

12   Q.    Have you got it?

13   A.    Yes.

14   Q.    And at line 20, beginning at line 20, were you asked this

15   question and did you give this answer?

16          Question:  And does this document describe the

17   peer-to-peer enforcement process that would have been used for

18   both the copyright alert program and the RIAA's non-university

19   notice program in effect at this time, April 11, 2002?

10:29:14 20          Answer:  So, yes, but that's not on purpose.

21          And then you went on to explain that there was some

22   overlap in particular with respect to Level 4.

23          Were you asked that question and did you give that

24   answer, sir?

25   A.    Yes.  I mean, that's listed in the transcript.

S. Bahun - Cross

730

1          THE COURT:  Okay.  I think you meant 2012.

2          MR. BRODY:  I believe I did, April 11, 2012.

3          THE COURT:  All right, let's move on.

4          MR. BRODY:  Now, let's look at what's inside the

5  document.

6          MR. OPPENHEIM:  One moment, Your Honor.  Can we read

7  the rest of that under the --

8          THE COURT:  You may redirect him.

9          MR. BRODY:  I will read it in, if you like.

10:30:00 10          THE COURT:  What?

11          MR. BRODY:  I said I can read it in, if you like.

12          THE COURT:  Whatever you choose to do.

13          MR. OPPENHEIM:  Continuing on to page 261, please.

14          MR. BRODY:  Sure.

15          MR. OPPENHEIM:  It's right here if you would like to

16  use my copy.

17          MR. BRODY:  So, yes, but that's not on purpose.  Can

18  you explain that?  The document is not meant to describe

19  specifically the non-university program.  It just happens that

10:30:25 20  that was also brought under the same guidelines.  So this

21  document doesn't reference -- for example, this document

22  doesn't reference that other programs that Cox notices were

23  related to, but I can tell you that the requirements specified

24  and described in this document are the same.  With the

25  exception -- I don't know.  I would have to look.  With the

S. Bahun - Cross

731

1    exception of possibly the difference I mentioned in the Audible

2    Magic, all of their other collection steps are the same, but

3    that's just a coincidence.  My point is clarifying that this

4    document, the purpose of it and what's described in it was not

5    intended to describe the non-university notice program.

6    BY MR. BRODY:  (Continuing)

7    Q.    That was your full answer?

8    A.    Yes.

9    Q.    Okay.  And the only difference you identified in that

10:31:06 10    answer had to do with Audible Magic?

11    A.    Yeah.  I seem to recall.  I would have to look back

12    through, but I think there was some other discussion in

13    deposition related --

14    Q.    Let's just stick with the deposition for now.  We'll go

15    through the document.

16          Were you asked those questions at your deposition and

17    did you give those answers?

18    A.    Yes, as read from the transcript, yes.

19    Q.    Okay.  Could we go to page 7 of the document.  I'm not

10:32:48 20    sure what it is in the exhibit.

21    A.    I'm sorry, which document?  Oh, right there.

22    Q.    We are still in this P2P enforcement process document.

23    A.    Okay.

24    Q.    DX 17.  Now, at this page of the document, you're

25    describing the operation of the BitTorrent network.  Do you see

S. Bahun - Cross

732

1    that?  Generally it starts on page 4 of the document.

2    A.    Sorry, page 4?

3    Q.    Sir?

4    A.    Did you say page 4?

5    Q.    Page 4.

6    A.    Page 7 was on the screen.  Sorry.

7    Q.    There is a section titled Data Collection, and you list

8    the file sharing networks to be monitored.  And there is

9    something called BitTorrent Overview.

10:33:56 10  A.    Yes.

11   Q.    Okay.  And then at page 7, when we're still in the

12   BitTorrent overview -- blow up the second paragraph on that

13   page.  You're explaining here to RIAA that in the BitTorrent

14   process an essential step is that when a peer downloads a copy

15   of a file or a piece of a file from another peer, it's going to

16   check that piece to confirm that it's what's it's supposed to

17   be.

18         Do you recall that generally as a feature of

19   BitTorrent?

10:34:54 20  A.    Yes.

21   Q.    Okay.  And you told RIAA that you would be doing basically

22   the same thing --

23         MR. OPPENHEIM:  Objection.  He keeps saying he told

24   RIAA.  And the witness testified that this was a document both

25   for the RIAA and MPAA.  So let's be clear about it, please.

S. Bahun - Cross

733

1          THE COURT:  Okay.  Let's clear that up, if you would.

2     I mean, he's answered -- you had the deposition testimony.  So

3     to the extent there is a distinction, please address that.

4     Okay.  All right.

5          MR. BRODY:  Yes, sir.

6     BY MR. BRODY: (Continuing)

7     Q.   Did you tell that to MPAA and not RIAA, or did you tell it

8     to both of them?

9     A.   Through -- through this document, is that what you are

10:35:42 10   asking?

11    Q.   Yeah.

12    A.   I mean, the document went to both.  I don't recall the

13    exact purpose of this document, but --

14    Q.   It went to both, is that -- that's correct?

15    A.   Yes.

16    Q.   Okay.  And both includes RIAA.  So when you put something

17    in this document, you were telling it to RIAA, right?

18    A.   Yes.  Yeah, they received the document, but not everything

19    in the document is equally applicable or is being communicated

10:36:16 20   directly to one or the other parties.

21    Q.   Okay.  Now, the next page -- or, I am sorry, let's go to

22    page 10 of the document.  And there is a section there that is

23    titled P2P Data Collection Agents.  And then there is a

24    description of the BitTorrent data collection agent.

25          Now, P2P data collection agents, that's the -- sort

S. Bahun - Cross

734

1    of the software entity that actually does the -- does the

2    collection of data from the computer of, in this case, the Cox

3    subscriber, right?

4    A.    Yes.

5    Q.    Okay.  And in this passage on this page, there is no

6    distinction drawn between MPAA -- the collection agents that

7    you're going to use for MPAA and RIAA, is there?

8    A.    No, I don't believe it -- this section of the document

9    just draws the distinction.

10:37:59 10  Q.    And what you wrote in this section and sent to RIAA, as

11   well as MPAA, was an explanation that your general approach was

12   going to be that you were going to download a piece of data

13   from the users while you were connected with them and that you

14   were going to check the hash on that downloaded piece to make

15   sure you had the right thing.

16             Isn't that what you were telling them?

17   A.    The challenge with this document --

18   Q.    Sir, is that a yes or a no, or --

19   A.    I can't -- I can't answer the question.

10:38:34 20  Q.    Okay.  Then let's look at what it says.

21   A.    Okay.

22   Q.    It says:  The general approach of the agent -- this is the

23   one, two, three, four, fifth paragraph right above the numbered

24   -- if we could blow up starting with the general approach and

25   going through three.

S. Bahun - Cross

735

1          The general approach of the agent to finding users

2    and documenting their activities can be described in the

3    following steps.

4          And then the third step is:  The agent tries to

5    download a piece of data from the users while connected with

6    them.

7          Do you see that passage?

8    A.   I do see that passage.

9    Q.   And that appears in this document, and this is the

10:39:17 10   document you sent to RIAA along with MPAA?

11   A.   It's --

12   Q.   Is it the document you sent to --

13          THE COURT:  The question is:  Is this the document

14   that you sent to those other parties?

15          THE WITNESS:  Yes, those parties received this

16   document.

17   BY MR. BRODY: (Continuing)

18   Q.   And then can we go to the bottom two paragraphs on the

19   page.

10:39:43 20          Those paragraphs read:  The agent will request only a

21   single piece of data from each individual user sharing a

22   torrent to minimize the overall amount of data that has to be

23   downloaded as a part of data collection.  By downloading a

24   single piece from a user and calculating the hash value of that

25   data, the agent can confirm that the data is the same as that

S. Bahun - Cross

736

1    of the original content.  Once a piece of data has been

2    downloaded and successfully verified by hash, the system

3    proceeds to examine other users.

4              Do you see that passage?

5    A.   I do.

6    Q.   And that also appears in the document that you sent to

7    RIAA in April of 2012, doesn't it?

8    A.   I am sorry, say the last part of your question again.

9    Q.   Doesn't that passage appear in the document you sent to

10:40:38 10   RIAA in April of 2012?

11   A.   I think the document speaks for itself.  So, yes, it's

12   there, yeah.

13   Q.   And if you go onto the next page, that describes other

14   data collection agents.

15              And basically what you were explaining is you took

16   the same approach for Gnutella, Ares, and eDonkey that you took

17   for BitTorrent with appropriate variations for the protocols?

18   A.   Sorry, was that a question?

19              THE COURT:  He is asking for a yes or no.  Is this --

10:41:25 20   does this paragraph state essentially what he just asked?

21              THE WITNESS:  I believe it does, yes.  But --

22   BY MR. BRODY:  (Continuing)

23   Q.   Okay.

24   A.   Okay.

25   Q.   And you even provided screenshots showing how that was

S. Bahun - Cross

737

1    going to happen, right?

2    A.    I'm sorry, on what page?

3    Q.    Sure.  Let's look at -- two, four -- can we go to page 16

4    of the exhibit.

5            Can you blow up the section beginning:  Activity Log.

6    And going down through the figure 5 activity log.  Up a little

7    more.  This one is really tiny, so we have got to get this as

8    big as we can.  Just under where it says figure 5.  Okay.

9            So this was a screenshot that you put into the paper

10:42:44 10   that you sent to RIAA, this -- the picture here, figure 5?

11   A.    Yes.

12   Q.    And this is a screenshot of an activity log, right?

13   A.    Yes.

14   Q.    And we looked at one of those yesterday from this case.

15   Do you remember?  It was formatted differently, but --

16   A.    Right.

17   Q.    -- it wasn't as pretty as this one, but it was the same

18   type of report.

19   A.    A similar type, yeah.

10:43:16 20   Q.    And in this document, you told the folks you were sending

21   it to that you were going to give them an activity log that

22   would document the steps that were going to be taken in the

23   entire process of the investigation of a peer computer?

24   A.    I am sorry.

25   Q.    That's what you told them you were doing, right?

S. Bahun - Cross

738

1    A.   Are you referring to the description underneath the

2    screenshot?

3    Q.   Yeah.  I was asking what is, in effect, said in the

4    description above the screenshot.

5    A.   Oh, above it.  So, I'm sorry, can you repeat the question?

6    Q.   The activity log was meant to give the people, RIAA and

7    MPAA, a time line for the entire process of what was going

8    happen when you were connected to a user's computer?

9    A.   Generally, that's -- yeah, that's an accurate description

10:44:35 10    of the activity log.

11    Q.   Okay.  Can you highlight the two lines, or pull up the two

12    lines in the log that are fourth and fifth from the bottom?

13    Can you blow them up?

14         Okay.  So the entry at -- the entries we've

15    highlighted say:  Piece downloaded, piece hash checked

16    complete.

17         Do you see that?

18    A.   Yes.

19    Q.   And that, too, was part of what you put in the document

10:45:24 20    that you sent to RIAA?

21    A.   Oh, yes.  Yeah, I mean, it's on -- yeah, it's right here

22    on the document.

23    Q.   All right.  And there's -- I'll do it if you really want

24    to, but you're aware that there is similar information in the

25    other log examples that are included in the document.

S. Bahun - Cross

739

1      So in the communications log and in the contact info

2 log, you also show a download of data and a hash verification?

3 A.   I would assume so.  I mean, I can look at them if you'd

4 like.  But I believe the document was intended to show

5 consistency in the examples that were given.

6 Q.   Okay.

7           MR. BRODY:  Now, Your Honor, how much time do I have

8 before the break?

9           THE COURT:  We're going to take a break in about ten

10:46:30 10 minutes.  Does that work?  Okay.

11          MR. BRODY:  Okay.

12          THE COURT:  Let's try and finish up.

13          MR. BRODY:  We can leave that document.

14 BY MR. BRODY: (Continuing)

15 Q.   Now, the jury heard yesterday, I guess has heard a couple

16 of times, about these operational reviews or audits that were

17 done at the request of RIAA and MPAA by Stroz Friedberg and

18 Harbor Labs.

19          You're familiar with that generally, right?

10:47:08 20 A.   Yes.

21 Q.   And you were involved -- you were actually the point -- or

22 one of the point people -- one of the point persons for both of

23 those reviews?

24 A.   Yes.  I was involved in both of them, yeah.

25 Q.   And, in fact, for Stroz Friedberg, you helped put together

740

1   a presentation for them to give them information about how the

2   system worked?

3   A.   Yeah, I believe we produced that presentation in this

4   case.

5   Q.   Can we bring up -- can you turn to the tab DX 91?

6   A.   Yes.

7   Q.   That's a copy of -- that's a copy of the Stroz Friedberg

8   report.  That's the copy -- a copy of the report that Stroz

9   Friedberg submitted --

10:48:45 10   A.   Yes, it appears to be.

11           MR. BRODY:  Okay.  I'd move the admission of -- what

12   are we calling it?  DX 81 -- DX 91.

13           THE COURT:  All right.  Any objection?

14           MR. OPPENHEIM:  I thought it was in.  So it's either

15   in or I don't object.

16           THE COURT:  All right, it's received.  It may be in

17   another --

18           MR. OPPENHEIM:  Hold on one moment.  This one seems

19   to have a different date, and I just --

10:49:15 20           MR. BRODY:  Oh, I see.  I'm sorry.  It came in -- it

21   did --

22           MR. OPPENHEIM:  This may have --

23           MR. BRODY:  It did come in.  It came in as DX 130.

24           MR. OPPENHEIM:  That's a different document, I think.

25   Can we have a moment to explore this, Your Honor?

S. Bahun - Cross

741

1          THE COURT:  Yes, sir.

2          MR. BRODY:  All right.  My mistake.  Can you go to

3    Tab 130, DX 130.

4          MR. OPPENHEIM:  So just for clarity's sake, so 91 is

5    not in?

6          MR. BRODY:  Yeah, I withdraw 91.  My error.

7          THE COURT:  Okay.  And do you have any objection to

8    130?

9          MR. OPPENHEIM:  No, 130 is in.

10          MR. BRODY:  Well, 130 is in.

11          THE COURT:  It's already in?

12          MR. BRODY:  130 is in.

13          THE COURT:  All right.  Good.  Let's use 130.

14    BY MR. BRODY: (Continuing)

15    Q.   Okay.  130.  This is the report that this -- is it -- do

16    you know, is it Stroz or Stroz?

17    A.   I believe it's Stroz.

18    Q.   Okay.  This is a copy of the report that Stroz Friedberg

19    did after their investigation, their analysis of your system,

10:50:31 20    evaluation of your system, right?

21    A.   It appears to be, yes.

22    Q.   Okay.  And Stroz Friedberg, they didn't come into the --

23    their work understanding how your system worked, they had to

24    learn that from you, right?

25    A.   Correct.

S. Bahun - Cross

742

1    Q.   Okay.  And what they learned from you was that you were

2    going to download pieces of data from the peer computers, the

3    Cox subscribers computers, and rehash them when you did your

4    data collection?

5    A.   No.

6              MR. OPPENHEIM:  Objection, not in evidence.  There's

7    no foundation for that.

8              MR. BRODY:  Well, let's put in evidence.

9              THE COURT:  Overruled.  He's answered the question.

10   He said no.

11             MR. BRODY:  Okay.

12   BY MR. BRODY: (Continuing)

13   Q.   Could you turn to page -- can you turn to page 4 of the

14   document?

15   A.   Okay.

16   Q.   Stroz Friedberg, in this part, they're reporting on their

17   understanding of the platform.  It's called Platform Overview.

18   Have you got that?

19   A.   I'm sorry.  Where -- which page?

20   Q.   Yeah, on the prior page, they say -- there's a section

21   that's titled Assessment of MarkMonitor Antipiracy Platform.

22   And they start by doing an overview of the platform.

23             THE COURT:  On page 3.

24   Q.   It's on page 3.

25   A.   The -- is the heading Summary of Findings and -- I don't

S. Bahun - Cross

743

1    know --

2    Q.    No.   I'm sorry.   Can we have page 3 of the document, HL --

3    A.    Page 3 of the documents.   I'm sorry.   I'm looking at the

4    DX page.   My apologies.

5          Okay.   Yes, I think --

6    Q.    Okay.

7    A.    -- Assessment of MarkMonitor Antipiracy Platform.   Is that

8    what you're -- is that the section you're referring to?

9    Q.    Yeah, Assessment of MarkMonitor Platform.

10:53:05  10          James, can you go two pages further?

11   A.    Oh, I think -- I was about to say I think they're doing

12   the same thing on the screen that I was doing.

13   Q.    I'm sorry.   This is always confusing.   Okay.

14   A.    Okay.   Now --

15   Q.    And we're in a section where they're providing their

16   assessment of your platform or your system, and they're

17   starting out by giving an overview of the system, right?

18   A.    Yes, the CAS system.

19   Q.    Okay.   And then on the next page, if you could blow up

10:53:57  20   that second-to-last paragraph.

21          They're talking about what happens in the collection

22   process.   And the last sentence of that paragraph, they say:

23   The collection agents search for, download portions of, and

24   create evidence packages or cases of infringing works,

25   including, among other data points, IP address, port, time,

S. Bahun - Cross

744

1   date, size, PeerID, and hash.

2          Okay.  That's one of the steps in the process?

3   A.   Yes, that's what it says.  I mean -- I'm sorry.  What

4   was -- was that the question?

5   Q.   Okay.  That was a question and you answered it.  Thank

6   you.

7   A.   Okay.

8   Q.   And what the collection agents do, among other things, is

9   request and download a piece of the file and check those pieces

10:55:01 10   by cryptographic hash; isn't that true?  That's what

11   Stroz Friedberg understood to be happening based on what you

12   told them?

13          MR. OPPENHEIM:  Objection, foundation.  He can't

14   testify what Stroz Friedberg understood.

15          THE COURT:  I understand, foundation.  Sustained.

16   BY MR. BRODY: (Continuing)

17   Q.   After meeting with you and your colleagues, the report

18   that Stroz Friedberg wrote stated that the collection agents

19   were going to request and download pieces of the file and those

10:55:44 20   pieces would be checked by cryptographic hash.

21          It's on page 6 of the document, HL 176, which is page

22   -- it's the paragraph right below the figure, the last

23   sentence.  I'm sorry, I pointed to the wrong passage.

24          THE COURT:  All right.  Let's break and take our

25   mid-morning break.  We'll come back in about 15 minutes and

745

1    we'll give Mr. Brody an opportunity to reorganize.

2            All right.  Thank you very much.  You're excused.

3            NOTE:  At this point the jury leaves the courtroom;

4    whereupon the case continues as follows:

5    JURY OUT

6            THE COURT:  Anything before we break?

7            MR. BRODY:  No, except my sincere apologies.

8            THE COURT:  No, just focus a little bit, and we'll

9    get there.

10           MR. BRODY:  Yeah.

11           THE COURT:  All right.  And you're, again, in the

12   middle of your testimony.  So don't discuss it while you're on

13   break.  All right?

14           Okay.  All right.  Thank you all.

15           We're in recess.

16           MR. BRODY:  Thank you.

17           NOTE:  At this point a recess is taken; at the

18   conclusion of which the case continues in the absence of the

19   jury as follows:

11:20:18  20   JURY OUT

21           THE COURT:  All right.  Ready for the jury?

22           All right.  Joe, let's get our jury, please.

23           NOTE:  At this point the jury returns to the

24   courtroom; whereupon the case continues as follows:

25   JURY IN

S. Bahun - Cross

746

1          THE COURT:  All right.  Please have a seat.

2          And, Mr. Brody, please continue, sir.

3          MR. BRODY:  Thank you, Your Honor.

4    BY MR. BRODY: (Continuing)

5    Q.    Home stretch, Mr. Bahun.

6    A.    I'm sorry?

7    Q.    I said, we're in the home stretch.

8    A.    All right.

9    Q.    So we were on Exhibit 130.

11:21:23 10    A.    Yes.

11    Q.    That's the Stroz Friedberg report.  And I think I had

12   asked you to confirm that the understanding -- that Stroz

13   Friedberg reported that you guys were going to be downloading

14   pieces of these files from the peers and cryptographically

15   hashing them.  And I meant to direct you to a passage where I

16   thought that was said, but I messed it up.  So let me get the

17   right page.

18          If you go to page 9 of the exhibit, page 7 of the

19   document, and the paragraph above that figure.

11:22:22 20          The second sentence reads:  Also, unlike a standard

21   P2P client, the collection agent requests and download only a

22   portion of a shared file from each peer, typically around 512

23   kilobytes.  These individual pieces are verified by SHA-1

24   cryptographic hash values to be part of the original targeted

25   work, and after the content is confirmed to be part of the

S. Bahun - Cross

747

1    original targeted work the download is stopped.

2             Do you see that passage?

3    A.   Yes.

4    Q.   And that's what Stroz Friedberg reported to RIAA and MPAA,

5    right?

6    A.   Yes, that's what the document says.

7    Q.   Okay.  And there's nothing in that passage that says we're

8    going to do it for RIAA, but not for MPAA?  Or for MPAA, but

9    not -- we're not going to do it for one and not the other?  It

11:23:14 10    doesn't differentiate between the parties here, does it?

11   A.   I don't see any text -- no, I don't see any that

12   differentiates here.

13   Q.   Okay.  And in fact, you guys set up a -- sort of a -- some

14   more of these screenshots.  You actually showed them how that

15   was going to turn up in the activity logs.

16             Do you recall that?

17             MR. OPPENHEIM:  Are you referring to the document?

18             MR. BRODY:  Yes.

19             MR. OPPENHEIM:  So you're saying he -- no foundation.

11:23:45 20   He didn't create these documents, the Stroz document.

21             THE COURT:  Identify the document, the graph you want

22   him to look at.

23             MR. BRODY:  Sure.

24   BY MR. BRODY:  (Continuing)

25   Q.   We're -- all right.  Can you look at page 12 of the

S. Bahun - Cross

748

1    document -- of the exhibit?  At the bottom.

2           THE COURT:  Is it on page 12 or page 30?  Where --

3           MR. BRODY:  It's page 12 of the exhibit, page 10 of

4    the document and HL 180.

5           THE WITNESS:  Okay.

6           MR. BRODY:  Okay.

7           THE COURT:  Go ahead.

8    BY MR. BRODY:  (Continuing)

9    Q.   At this point Stroz Friedberg reports that you were going

11:24:35 10   to be providing an XML file called Content Info.  And that's

11   one of the files we looked at yesterday?

12   A.   Yes.

13   Q.   And that that was going to include the name SHA-1 hash

14   value, size of the target file, as well as how much of the

15   infringing work was shared by that user and the portion

16   downloaded and hash verified by the collection agency -- agent,

17   I'm sorry?

18   A.   Yes.

19   Q.   And then on the next page, there is a screenshot of one of

11:25:04 20   those reports.  And it actually shows 1,024 kilobytes

21   downloaded and verified, right?

22   A.   Yes, that's what is displayed here in the diagram.

23   Q.   And that too was reported to RIAA and MPAA?

24   A.   Yes.

25   Q.   And that passage does not differentiate between how that

S. Bahun - Cross

749

1    was going to be done for the two parties?  It doesn't say,

2    we're doing it for the record labels, but not for the motion

3    picture folks, or vice versa?

4            There is nothing like that in the passage, is there?

5    A.   Not in the way you described.  But if you look on the

6    screenshot -- oh, I am sorry, okay.

7    Q.   Can we turn to Exhibit -- Defendant's Exhibit 89, which is

8    in evidence.  And this is the report of Harbor Labs, which is

9    the second of these two companies.

11:26:19 10          And I think you told us that you were the contact,

11   one of the contact people for Harbor Labs as well as Stroz

12   Friedberg, right?

13   A.   Yes.

14   Q.   That original document we looked at, the P2P enforcement

15   document that you folks prepared, that was April of 2012,

16   right?

17   A.   Can I turn to the document?

18   Q.   Can you trust me on that one?  I'm happy to point you to

19   it, but it was April of --

11:27:15 20  A.   If that's what it says on the document, then yes.

21   Q.   Okay.  And the one we just looked at, the Stroz Friedberg

22   report, that was October of 2012.  Do you recall that?

23   A.   Again, I'll assume that it's on the document.

24   Q.   You will trust me on that one?

25   A.   Yes.

S. Bahun - Cross

750

1    Q.   I promise you Mr. Oppenheim will jump down my throat if I

2    got it wrong.

3    A.   Okay.

4    Q.   The Harbor Labs report, Exhibit 89, that's December of

5    2013, right?

6    A.   Yes, that's the date.

7    Q.   So together these three documents cover a period of about

8    a year-and-a-half?

9    A.   Correct.

11:27:50 10   Q.   Okay.  Now, the Harbor Labs folks at the time of their

11   report, they also understood or at least they reported that you

12   would be downloading a piece of a file and hashing it, right?

13   A.   I don't know, actually.

14        MR. OPPENHEIM:  Objection, no foundation.  Again, he

15   didn't write this document.

16        THE COURT:  Overruled.  His answer is, I don't know.

17   He is a contributor to the study.

18        So go ahead, ask your next question.

19        MR. BRODY:  Sure.

11:28:28 20   BY MR. BRODY:  (Continuing)

21   Q.   If you could turn to page 4 of the document, of the

22   exhibit.

23   A.   Okay.

24   Q.   Could you blow up the paragraph -- the paragraph that

25   begins:  The following conditions.  And then the three numbered

1   paragraphs.

2           I'm sorry, could you blow up the paragraph that

3   begins the:  The following conditions.  And then the three

4   numbered paragraphs.

5           At this point in the report, Harbor Labs explains

6   that the following conditions are assumed for the correctness

7   of the design.

8           And the second condition is that the same torrent

9   file or a torrent file with a matching hash that was used to

11:29:19 10  download the content for the verification step -- verification

11  step is the Audible Magic step -- is also used for downloading

12  a complete piece from a file sharer for the evidence generation

13  step.

14           Do you see that passage?

15  A.   Yes.

16  Q.   Okay.  And again, this is what Harbor Labs was reporting

17  they had concluded after their assessment of the process,

18  right?

19           MR. OPPENHEIM:  Objection, vague and ambiguous.  What

11:29:51 20  process?

21           THE COURT:  This is what's written in the report.

22  BY MR. BRODY: (Continuing)

23  Q.   It's what's written in the report, right?

24           THE COURT:  That's what's written on the document?

25  A.   Yeah, the document -- I mean, it's here in front of me,

S. Bahun - Cross

752

1    so, yes.

2    Q.   And they were getting their information from you, and I

3    guess they reviewed the Stroz report as well, right?

4    A.   Yes.

5    Q.   Okay.  And do you recall being told that they thought that

6    this was important enough that you needed to institute testing

7    to make sure it was happening, this piece download?

8    A.   I'm sorry, which -- what are you referring to?

9    Q.   Do you recall being told that they thought it was

10   important enough to make sure --

11              THE COURT:  Who is "they"?

12   Q.   I'm sorry.  Harbor Labs thought it was important enough,

13   this downloading of pieces from the user computers, the peer

14   computers, do you recall them saying they thought that you

15   needed to test your system to make sure that that was happening

16   and it was happening accurately?

17   A.   No.

18   Q.   Okay.  Could I direct you to page 9 of the exhibit.

19              MR. OPPENHEIM:  I am going to -- I am going to

20   object.  He asked him what he was told --

21              THE COURT:  Stop, stop.  There is no question

22   pending.  He has directed him -- we don't have a question

23   pending.

24              MR. OPPENHEIM:  I think he's going to try to impeach

25   him based on -- fine, Your Honor.  Then I will object.

S. Bahun - Cross

753

1    BY MR. BRODY: (Continuing)

2    Q.   Now, the document says that -- it's in the third paragraph

3    from the bottom:  When new agents are released, they should, at

4    the very least, be tested against a dishonest BitTorrent client

5    that uploads incorrect pieces.  The MarkMonitor design should

6    catch these faulty pieces during the check of the SHA-1 hash,

7    an end-to-end test where this behavior is verified as

8    essential.

9             Were you told that that was something you should be

11:32:34 10   doing?

11   A.   I don't think I can answer the question with a simple yes

12   or no.

13             THE COURT:  It's not does that appear in the

14   document.  He was asking a separate question of whether you

15   were told by the group about this issue.

16             Is that the question.

17   Q.   Right.  Whether by Harbor Labs, or RIAA, or anybody, that

18   you should be --

19   A.   But I think that this is being taken out of context.

20   That's why I'm having --

21             THE COURT:  So you can't answer the question the way

22   it is --

23             THE WITNESS:  Okay.  I can't -- yeah, I can't answer

24   the question.

25   BY MR. BRODY: (Continuing)

S. Bahun - Redirect

754

1    Q.   You can't answer the -- were you told that that

2    recommendation had been made by Harbor Labs, the one I just

3    read?

4              THE COURT:  Well, did you read this report?  You read

5    this?

6              THE WITNESS:  I don't believe I have ever seen this

7    report --

8              THE COURT:  Okay.

9              THE WITNESS:  -- in this format.

11:33:42 10   BY MR. BRODY:  (Continuing)

11   Q.   I know.  Now I'm asking you whether anybody conveyed to

12   you the information that was in the report?

13            Did anybody tell you that that recommendation had

14   been made?

15   A.   Yes, in a different format.  This information -- like I

16   said, I don't believe I've seen in particular document before.

17            But, again, it's taken out of context.  Sorry.

18   Q.   All I'm asking --

19            THE COURT:  Ask your next question.

11:34:11 20   MR. BRODY:  That's all I have got left.  I appreciate

21   your time.

22            THE COURT:  Redirect.

23            MR. OPPENHEIM:  Thank you, Your Honor.

24      REDIRECT EXAMINATION

25   BY MR. OPPENHEIM:

S. Bahun - Redirect

755

1    Q.   Why don't we start right there, Mr. Bahun.  Do you want to

2    put that document into context, please.

3    A.   Sure.  So this document appears to be a full copy of

4    Harbor Labs' report, which I don't believe I have seen

5    previously.  And it's specifically related to the Copyright

6    Alert System, which was not in any way and did not involve Cox.

7    Q.   I would like to kind of for a moment expand our view from

8    very specific documents and talk big picture.

9    A.   Okay.

11:35:10 10    Q.   There was a program for CAS, right?

11    A.   Yes.

12    Q.   And non-CAS, for the RIAA, correct?

13    A.   Correct.

14    Q.   And within CAS there was also a component for the motion

15    picture studios, correct?

16    A.   Yes.

17    Q.   Now, within CAS, for the RIAA and the MPAA, can you --

18    were those programs the same for you, for MarkMonitor?

19    A.   No.

11:35:44 20    Q.   So MarkMonitor was doing different things for the movie

21    studios than it was for the record companies; is that right?

22    A.   Yes.

23    Q.   We looked at a Stroz Friedberg report, and a Harbor Labs

24    report, and a document for the MPAA and RIAA from MarkMonitor.

25         Do you remember those three exhibits?

S. Bahun - Redirect

756

1    A.   Yes.

2    Q.   What were those for?  Was it for non --

3             THE COURT:  It's leading.  And what was it for.

4             MR. OPPENHEIM:  Sorry, I apologize, Your Honor.

5             THE COURT:  Go ahead.  The first part of the question

6    was just fine.

7             MR. OPPENHEIM:  You're right.

8    BY MR. OPPENHEIM: (Continuing)

9    Q.   What were those documents for?  Which program?

11:36:36 10   A.   Those were all for the Copyright Alert System.

11   Q.   And do those documents -- is there any aspect of those

12   documents that you -- strike that.

13            Were those documents prepared for the program that

14   was collecting evidence for Cox?

15   A.   No.

16   Q.   At some point in time did you become aware of -- well,

17   strike that.

18            You indicated that you had never seen DX 89, the

19   Harbor Labs report there, right?

11:37:16 20   A.   I don't believe so.  I have a recollection -- and I don't

21   think -- I can't remember why, but I don't think I was allowed

22   to see at the time for the full report.  I got a summarized

23   portion of it.  Yeah.

24   Q.   And can you describe that summarized portion that you got.

25   A.   Yeah.  I mean, the main focus with us after the review and

         1   the report took place was to ask about the recommendations that

         2   were specifically made by Harbor Labs and give us a chance to

         3   respond to those, whether or not those were things we already

         4   had in place and, you know, are these things that we had

         5   investigated before, that sort of thing.

         6              So we were provided with the recommendations, at

         7   least a summarized version of what I think is described maybe

         8   in more words in this particular exhibit.  And then we

         9   evaluated that and provided recommendation -- or provided our

11:38:13 10   responses to the recommendations.

        11   Q.   So you saw a document that had recommendations and you

        12   responded to it?

        13   A.   Yes.

        14   Q.   Can I ask you to take a look at DX 153?  That would be in

        15   the binders, please, or I can hand it up if that is easier.  I

        16   don't know that's in that binder, actually.

        17              Oh, it's in the defendant's binder?  Okay.

        18   A.   I guess I will just look at this.

        19              THE COURT:  Is that the entire exhibit, one page?

11:38:57 20              MR. OPPENHEIM:  We went double-sided.  So one page,

        21   two sides.

        22              THE COURT:  Okay.

        23   BY MR. OPPENHEIM: (Continuing)

        24   Q.   Do you recognize that document, Mr. Bahun?

        25   A.   Yes.

S. Bahun - Redirect

758

1    Q.    And what is that document?

2    A.    That is the response that we prepared and provided to the

3    executive summary of -- from Harbor Labs.

4          MR. OPPENHEIM:  Your Honor, subject to the

5    confidentiality issues that we've discussed, I'd like to move

6    this in evidence.

7          THE COURT:  All right.  It's received.

8          MR. BRODY:  No objection.

9          THE COURT:  Thank you.

11:39:31 10   BY MR. OPPENHEIM: (Continuing)

11   Q.    And can you just kind of briefly walk the jury through

12   what it is you did with this response to the Harbor Labs

13   summary.

14   A.    Sure.  So this -- I mean, this response is kind of an

15   outline.  It's structured with bullets to make it easy to

16   identify.  Kind of each bullet represents Harbor Labs'

17   recommendation.  And just below that it identifies

18   MarkMonitor's response there in bold.

19         Do you want me to go through them or --

11:40:07 20   Q.    If you can do it reasonably quickly, that would be great.

21   A.    So the short version is, for each of these, a response

22   identified things that we were already doing to address these

23   recommendations.

24         And for many of them, they had been processes that we

25   had in place for a long period of time.  And so, for whatever

S. Bahun - Redirect

759

1    reason, during the review they may have overlooked or not

2    explicitly seen the elements related to these recommendations.

3              But by providing this response, we were able to make

4    that information clear to them so that they knew what we were

5    doing and what we had in place.

6    Q.   Subsequent to -- I'm sorry, what -- whatever happened with

7    -- what did you do with DX 153 after you created it?

8    A.   I believe this was sent to -- I believe it was sent to

9    individuals at MPAA and RIAA who were directly involved with

11:41:07 10  the Copyright Alert System.  And they, I believe, delivered

11   this to Harbor Labs.  I don't think we delivered it directly to

12   Harbor Labs.

13   Q.   But it was provided to Harbor Labs, you believe?

14   A.   I believe so, yes.

15             MR. BRODY:  Objection.

16             THE COURT:  I mean, is that just a guess, or is that

17   -- do you have reason -- reasonable belief that that occurred?

18             THE WITNESS:  We were asked to produce this specific

19   document.  So we were provided the recommendations, and we were

11:41:39 20  told, you know, look, some of these recommendations need a

21   response.  Can you put together a document so that we can -- so

22   my understanding, based on why we were asked to create this,

23   was that it was given to Harbor Labs so that they had that

24   information.

25             THE COURT:  All right.  That will be received.

S. Bahun - Redirect

760

1    Objection is denied.

2           Go ahead.

3    BY MR. OPPENHEIM: (Continuing)

4    Q.    Mr. Bahun, was there any other follow-up subsequent to

5    this in terms of other Harbor Labs concerns that you're aware

6    of?

7    A.    No.

8    Q.    Looking at DX 89, the Harbor Labs report for one minute,

9    please.  Can you just look at the first line of that.

11:42:34 10    A.    DX 89?  The first sentence under the overview?

11   Q.    Yes.

12   A.    Okay.

13   Q.    Reading that sentence, can you determine who this overview

14   was commissioned by or requested by?

15   A.    Yes, the Center for Copyright Information.

16   Q.    And do you understand who was a participant -- well, let

17   me back up.

18          Do you know what the Center for Copyright Information

19   was?

11:43:07 20   A.    Yes.

21   Q.    What was it?

22   A.    It was an independent group formed to provide transparency

23   and some overview of the Copyright Alert System.

24   Q.    And do you know who sat on the Board or directed the

25   operations of CCI in terms of industries?

761

1  A.   Oh, in terms of industries?  I don't know the individuals,

2  but, yes, the RIAA and the MPAA.

3  Q.   Were the ISPs represented on the Board of CCI?

4  A.   I believe so.  But I -- again, I don't know the specific

5  individuals.

6  Q.   Did you have any input into the creation of this -- strike

7  that.

8       Were you ever given a draft of the Harbor Labs report

9  in order to edit or do anything with of any sort?

11:44:13 10  A.   No.

11  Q.   I'd like to turn to the Stroz report, please.  I believe

12  that is DX 130.

13       MR. BRODY:  Your Honor, as a general matter, I'd ask

14  if we could watch the leading questions.

15       THE COURT:  I'm sorry?

16       MR. BRODY:  I said, as a general -- I don't want to

17  pop up every time, but if we could watch the leading questions,

18  I think that would be helpful.

19       THE COURT:  All right.  Thank you.

11:44:54 20       Yep, let's not lead.

21  BY MR. OPPENHEIM: (Continuing)

22  Q.   What role did you play in drafting this report?

23  A.   None.

24  Q.   Who did draft this?

25  A.   The -- I believe the folks at Stroz Friedberg.

S. Bahun - Redirect

762

```
 1    Q.    And who was it created for?

 2    A.    I believe this one was also for CCI.

 3    Q.    And -- I'm sorry, I didn't meant to interrupt.  Please

 4    finish.

 5    A.    No, I said CCI, the Center for Copyright Information.

 6    Q.    And which program of the RIAA -- strike that.

 7          Which program did this apply to?

 8    A.    The Copyright Alert System.

 9    Q.    Would you turn to page 130.  It's DX 130-0013, please.

10    A.    Yes.

11    Q.    Mr. Duval, can we expand on the image there of the

12    screenshot?

13          Do you recall being asked questions about this

14    screenshot?

15    A.    Yes.

16    Q.    And looking at this screenshot, can you tell whether it's

17    a screenshot that's related to music content or to movie

18    content?

19    A.    Yes.

20    Q.    How can you tell?

21    A.    Because it says at the bottom:  Type - movie.  And it also

22    lists the film studio and the file name.

23          There's a number of components here that -- I mean,

24    the file size.  There's a number of elements to this that

25    clearly indicate that it's video or film content.
```

11:46:17 (line 10)
11:46:49 (line 20)

S. Bahun - Redirect

763

1          Thank you for asking that.  It was like an itch I

2    couldn't scratch before.

3          MR. BRODY:  Your Honor, and I move to strike the last

4    answer.

5          THE COURT:  Strike the last answer -- last part of

6    the last answer.  It wasn't responsive to a question.

7          So just answer the questions.

8          THE WITNESS:  Sorry.  Yeah.

9    BY MR. OPPENHEIM: (Continuing)

11:47:38 10  Q.   Let's turn to DX 17, the MarkMonitor report to the RIAA

11   and MPAA, please.

12   A.   Okay.

13   Q.   Do you recall being asked questions about this document?

14   A.   Yes.

15   Q.   Can you describe why this document was created?

16   A.   Yeah.  I believe that this document was created at the

17   time related to helping multiple people involved understand

18   some of the elements that were involved in the Copyright Alert

19   System from MarkMonitor's perspective.  Like the services that

11:48:29 20  we provided specific to the Copyright Alert System.  Yeah.

21   Q.   Who is this -- which program was this prepared for?

22   A.   The copyright alert program.  I mean, this -- internally,

23   we would call it a program, but it's the set of services we

24   were providing specific to the Copyright Alert System.

25   Q.   I'd like to turn to -- one moment, please.

S. Bahun - Redirect

764

1          Earlier I believe you indicated that the movie

2   studios and the record companies had a different process; is

3   that right?

4   A.   Yes.

5   Q.   Okay.  Can you describe --

6          MR. BRODY:  Objection, Your Honor.

7          THE COURT:  Overruled.

8   BY MR. OPPENHEIM: (Continuing)

9   Q.   Can you describe why they had different processes?

11:50:12 10   A.   Yeah.  So, I mean, there can be multiple reasons.  There

11   are some differences between music content and video content.

12   One of the -- I mean, it -- I think it's important to

13   understand that even with some of the differences, the elements

14   and steps taken to collect this evidence and provide this data,

15   as far as the notice-sending process and the general -- like

16   the most critical pieces of data, they're the same.

17          The additional steps are really to collect additional

18   data that can be used for other types of analysis and -- yeah.

19   Things that aren't critical to the notice sending or the

11:51:02 20   verification and evidence collection.

21   Q.   I believe that in your cross-examination the term "Movie

22   Labs" came up.  Do you recall that?

23   A.   Yes.

24   Q.   Can you describe what Movie Labs is?

25   A.   Movie Labs is a non-profit organization that has existed

S. Bahun - Redirect

765

1    for a number of years.  They do a lot of research on technology

2    that exists and, in some cases, you know, issues that exist and

3    the kind of technology involved.  And they write different

4    papers to help inform, you know, the industry, primarily the

5    movie industry.  That's why they're called Movie Labs.

6           But, you know, some of their evaluation of technology

7    obviously applies beyond that.  So ...

8    Q.   And in your experience, would Movie Labs be involved in

9    looking at the kind of data that you were collecting under CAS

11:52:03 10  with the additional data being downloaded?

11   A.   Yes.  I mean, they -- yeah, definitely.

12   Q.   I'd like to turn to the RIAA agreement with MarkMonitor.

13          Okay.  There are several of them.  I want to start

14   with the one that's probably in your white binder, which

15   appears as PX 004.

16          And can we turn to Appendix A, please.

17   A.   Yes.  Sorry, there.

18   Q.   This is a document we looked at yesterday, do you recall?

19   A.   Yes.

11:53:28 20  Q.   Can we highlight -- that's fine, including the Cox line a

21   little further down, please.  Just enlarge it.  Great.

22          And what's the Cox line there per month in the

23   anticipated notice volume?

24   A.   7,200.

25   Q.   Okay.  And what is -- I want to go to the first page of

S. Bahun - Redirect

766

1    this agreement.  What is the date that you entered into this

2    agreement?

3    A.    February 15, 2012.

4    Q.    Okay.  Let's remember that.  Let's now turn to PX 327,

5    please.  You don't have that in front of you, but let's just

6    call it up on the screen and publish, please.

7              Yes, 327, I believe.  Okay.

8              THE COURT:  Is that in evidence?

9              MR. OPPENHEIM:  I believe it was put into evidence

11:54:32 10   yesterday.

11             THE COURT:  Yeah, is it?

12             MR. OPPENHEIM:  Excuse me, earlier, yes.

13             THE COURT:  All right.  It's in.  Yeah, we have it as

14   being in.

15             MR. OPPENHEIM:  Okay.  You got me worried there.

16             THE COURT:  I'm sorry.

17   BY MR. OPPENHEIM: (Continuing)

18   Q.    Have you ever seen this document before?

19   A.    No.

11:54:48 20   Q.    And looking at this document, which I realize you haven't

21   seen before, can you see the -- do you know who Vicki --

22   Victoria Sheckler is, by the way?

23   A.    Yes.

24   Q.    And who is she?

25   A.    Vicki works with the RIAA.  She was one of the people that

S. Bahun - Redirect

767

1    I've interacted with throughout the providing of these

2    services, yeah.

3    Q.   And do you see who the other -- who the From line is here

4    in -- let's go down to the one below that, it says:  Randy

5    Cadenhead.

6          Do you know who he is?

7    A.   No, I don't.

8    Q.   But do you see his e-mail address?

9    A.   Yes.

11:55:30 10  Q.   Do you see it says @cox.com, right?

11   A.   Yes.

12   Q.   And can you read the sentence that Mr. Cadenhead wrote

13   that starts with:  They think?

14          MR. BRODY:  Objection, Your Honor.  This document is

15   already in evidence.  The witness has never seen it.  He

16   doesn't even know who the people are.

17          THE COURT:  He's going to ask him whether he has

18   anything to say about it.  Overruled.

19   BY MR. OPPENHEIM: (Continuing)

11:55:57 20  Q.   You can just read that, Mr. Bahun.

21   A.   It says:  They think -- they think that we can try

22   accepting 600 per weekday, subject to unexpected call concerns

23   that might arise.

24   Q.   Okay.  Do you know anything about that?

25   A.   I don't.  I'm not even quite sure who the "they" is in

S. Bahun - Redirect

768

1    this sentence.

2    Q.   Okay.  What's the date of that e-mail?

3         MR. BRODY:  Your Honor, I object to the question.  I

4    object to the line of questioning.

5         THE COURT:  Overruled.  You may answer the question.

6    BY MR. OPPENHEIM: (Continuing)

7    Q.   You can answer the question.

8    A.   I'm sorry, I think you asked me the date.  It's Thursday,

9    April 18, 2013.

11:56:45 10   Q.   So that was -- was that before or after you entered into

11   the contract that we just looked at with the RIAA?

12   A.   It's more than a year after the date on the contract.

13   Q.   So now let's turn to -- let me get my exhibits right here.

14   DX 86, please.

15   A.   DX 86?

16   Q.   Okay.  So what is -- what is the date of this agreement?

17   A.   March 22, 2013.

18   Q.   And look at Appendix A again, please.  And indicate what

19   the Cox number, the anticipated number, is, please.

11:58:08 20   A.   9,000 a month.

21   Q.   And is this before or after the e-mail we just looked at a

22   moment ago?

23   A.   The agreement is before the date that was on that e-mail.

24   Q.   Staying in that agreement for the moment, let's look at

25   Appendix B, I believe was the one you were looking at with

769

1   Mr. Brody; is that right?

2          Oh, I'm sorry, let's look -- I'm sorry, he was

3   showing you DX 87.  I thought we were in 86.  But let's go to

4   87 and let's look at page 0010, please.

5   A.   Okay.

6   Q.   And can you explain what this page is in this contract.

7   A.   Yeah.  So for whatever reason, I can't recall the exact

8   reason, but Appendix B was an excerpt of an RFP response

9   related the Copyright Alert System.

11:59:48 10   Q.   Did you -- what aspect of Appendix B was a contractual

11   obligation for MarkMonitor?

12          MR. BRODY:  Objection.

13          THE COURT:  What's the basis --

14          MR. BRODY:  It asks for a legal conclusion.

15          THE COURT:  He can ask what's his understanding of

16   the document.  Your exception is noted.

17          THE WITNESS:  I would need -- to be certain, I would

18   need to look at the SW and see where Appendix B was referenced.

19          THE COURT:  Yeah, rephrase your question.  I am not

12:00:30 20   sure what your point is.  What did he believe was MarkMonitor's

21   response to this should be, or where --

22   BY MR. OPPENHEIM:  (Continuing)

23   Q.   Was the response -- did you understand that the response

24   to the RFP was part of the contract and what you were doing for

25   the RIAA?

S. Bahun - Redirect

770

1    A.    No, I don't believe so.

2    Q.    And I used the term "RFP."  What is that?

3    A.    Sorry, that stands for request for proposal.

4    Q.    Still looking at that appendix, please.  One moment.

5          Let's move on.  I am taking too much time on that.

6          Earlier you recall that Mr. Brody was asking you

7    questions about the absence of a folder of Gnutella hashes.  Do

8    you recall that?

9    A.    Yes.

12:02:15 10    Q.    Can you explain why that is.

11    A.    Well, I think I may have mentioned before that, you know,

12    when we're looking at song files, we often find the same file.

13    And you can confirm that based on the hash across multiple

14    peer-to-peer networks.

15          And so, in the case of the song files that we put on

16    that drive to provide, it contains, you know, one copy of each

17    unique song file.

18          And, yeah, the majority of which on that drive are --

19    pertain to BitTorrent because BitTorrent had the largest volume

12:02:52 20    of unique music files.

21    Q.    Earlier you were asked questions about Audible Magic

22    levels.  Do you recall that?

23    A.    Yes.

24    Q.    Can you describe what your understanding is as to the

25    reliability of level one, which the RIAA was using, you said?

S. Bahun - Redirect

771

1    A.   Yes.  I don't believe the correct terminology is levels

2    with Audible Magic.  I think they -- the terminology I have

3    heard is "type."  And type -- I don't -- I am not aware of any

4    difference in accuracy between the different types.

5         My understanding is they have a different

6    methodology, but based on my experience I've not seen

7    inaccuracies regardless of the type.

8         MR. BRODY:  Your Honor, could -- I would move to

9    strike the answer.  I would appreciate it if we could go back

12:03:55 10   and lay some foundation.  I thought he testified on cross that

11   he didn't know about this.

12        THE COURT:  Overruled.  This has all been subject to

13   extensive testimony already, including -- so --

14        MR. BRODY:  That's for truth of the matter.  Thank

15   you.

16        THE COURT:  -- overruled.

17   BY MR. OPPENHEIM: (Continuing)

18   Q.   Now, let's turn to -- I believe there was testimony about

19   levels with respect to -- not what Audible Magic was doing, but

12:04:19 20   what MarkMonitor was doing.

21        Do you recall that?

22   A.   Yes.

23   Q.   And you indicated, I believe, that Level 1 was used for

24   GDPI; is that correct?

25   A.   Yes.

S. Bahun - Redirect

772

1   Q.   Can you describe whether or not using -- describe the

2   reliability of level one for doing that analysis from your

3   perspective.

4   A.   It's very reliable.  The reason we use it is because of

5   its reliability.  So there are possibilities for small margins

6   of error with Level 1, which is a big part of why we would

7   never send notices based on that data.

8           However, the broad set of data gives us an extremely

9   accurate view of the overall infringing activity that we see

12:05:18 10  around these files on the peer-to-peer networks.

11  Q.   And what kinds of clients do you provide that information

12  to on a regular basis?

13  A.   I mean, the film, TV, music companies.  There is a number

14  of other companies that are interested in the analysis of that

15  data because they are -- you know, they're relying on the

16  accuracy of it to tell them how much piracy is occurring for

17  different types of content by different users on those

18  networks.

19  Q.   Do you recall there ever being any criticism of the data

12:06:00 20  you've obtained through that GDPI process?

21  A.   None that I recall specifically, no.

22  Q.   There was also some testimony about the difference between

23  using Level 4 or Level 5 for the RIAA.  Do you recall that?

24  A.   Yes.

25  Q.   Did you ever make a recommendation to the RIAA as to what

S. Bahun - Redirect

773

1    level they should use for purposes of collecting evidence?

2    A.   It's possible that that came up in discussions.

3    Q.   And do you recall what you -- what you said?

4         MR. BRODY:  Objection.

5         THE COURT:  Don't speculate.  If you don't recall any

6    conversation, then just say, I don't recall.  Or -- yeah.

7    BY MR. OPPENHEIM: (Continuing)

8    Q.   In your experience, when you advise -- you regularly

9    advise the content companies that retain MarkMonitor about what

12:07:06 10   services they should use from MarkMonitor, correct?

11   A.   Yes.

12   Q.   And in the course of providing that advice, what advice do

13   you give as between Level 4 and Level 5?

14        MR. BRODY:  Can we have something to tie this to the

15   actual --

16        THE COURT:  Well, he has already testified that his

17   position involved sales as well as other matters.  So I am

18   going to allow the question.  Your exception is noted.

19        MR. BRODY:  Okay.

12:07:30 20   A.   Yeah.  So when you're looking at a notice program, I think

21   it's important to note that this is not -- it's not isolated to

22   the RIAA.

23        So when you look at industry standards, there are

24   millions of these infringement records collected in a year and

25   millions of notices that get sent.  And the overwhelming

S. Bahun - Redirect

774

1    majority of those are done at a Level 4.  And the reason is, is

2    that once you have collected all of the data and information

3    using Level 4 with full verification of the file that is being

4    distributed, it's unnecessary to take any additional steps.

5    You have all the information.

6         You've downloaded the song in its entirety and done a

7    full inspection of that file to determine that it is, in fact,

8    an infringing copy of the song that you were looking for.

9         You've then gone back to the network and had -- you

12:08:33 10  can think of it as direct conversations with the individual

11   peers.  And they have told us, we have this file.

12        We then take that hash, match it over here, and we

13   can say, this is definitely the file that we downloaded and

14   expected.

15        And then they're telling us, we have this file and

16   this is how much we're distributing.

17        So at that point you have a full view of the evidence

18   and the data involved.  So going beyond that point for notice

19   sending, it would be -- it's just unnecessary.

12:09:07 20  BY MR. OPPENHEIM: (Continuing)

21   Q.   Based on the documents that you went through with

22   Mr. Brody, the information you saw, and your past experience,

23   has any of that caused you to believe that the evidence that

24   you collected was in any way inaccurate or inadequate?

25   A.    No.

S. Bahun - Redirect

775

1       MR. OPPENHEIM:  No further questions, Your Honor.

2       THE COURT:  All right.  May this witness be excused?

3       All right.  You are excused with our thanks.  Please

4  don't discuss the testimony you have given with anyone until

5  our trial is over.  All right?

6       THE WITNESS:  All right.

7       THE COURT:  Have a good day.

8       THE WITNESS:  Thank you.

9       NOTE:  The witness stood down.

12:10:04 10       THE COURT:  All right.  Next witness.

11       MR. ZEBRAK:  Plaintiffs call Dr. George McCabe.

12       NOTE:  The witness is sworn.

13       THE COURT:  All right.  Good afternoon, Mr. McCabe.

14       Please proceed, Mr. Zebrak.

15       MR. ZEBRAK:  Thank you, Your Honor.

16       GEORGE McCABE, called by counsel for the plaintiffs,

17  first being duly sworn, testifies and states:

18       DIRECT EXAMINATION

19  BY MR. ZEBRAK:

12:11:02 20  Q.   Good day, Dr. McCabe.

21  A.   Good day.

22  Q.   For the record, will you please state your full name.

23  A.   George McCabe.

24  Q.   Where do you work, sir.

25  A.   Purdue University.

776

1    Q.   What is your position at Purdue University?

2    A.   I'm a professor of statistics.

3    Q.   And who retained you in this litigation?

4    A.   Plaintiffs' counsel.

5    Q.   And at a very high level, could you please tell the jury

6    what you were retained to do.

7    A.   Yes.  I was asked to complete two analyses.

8    Q.   And what were they, at just a high level, sir?

9    A.   One was a work in suit analysis.  And the second was a

12:11:43 10   repeat infringer analysis.

11   Q.   And were you able to form any opinions on those two topics

12   that you were asked to research?

13   A.   Yes, I was.

14   Q.   Okay.  Well, let's explore your background, and then we

15   are going to dive into those analyses you have done.

16        Dr. McCabe, I'm going to hand up to you what has

17   already been marked as PX 526.

18   A.   Thank you.

19   Q.   Do you recognize that document, sir?

12:12:18 20   A.   I do.

21   Q.   And what is it?

22   A.   It is a document I prepared.  It's called a CV, and it

23   basically lists my background and my accomplishments as a

24   statistician.

25   Q.   And is it an accurate summary?

S. Bahun - Redirect

777

1    A.    It is.

2           MR. ZEBRAK:  Okay.  Your Honor, we move its admission

3    as evidence.

4           THE COURT:  Any objection?

5           MR. BUCHANAN:  No, Your Honor.

6           THE COURT:  All right.  It's received.

7           MR. ZEBRAK:  Thank you, Your Honor.

8           Mr. Duval, if you could publish the document, please.

9    BY MR. ZEBRAK: (Continuing)

12:12:51  10    Q.    Dr. McCabe, this is a 38-page document, correct?

11    A.    I believe so.

12    Q.    So we're not going to go through it in detail.  It has

13    been a long day already.  But I would just like to spend a few

14    moments on your background before we move into your analysis.

15           Could you start by telling the jury your educational

16    history?

17    A.    Yes.  I have a bachelor's degree in mathematics from

18    Providence College.  And I have a Ph.D. from Columbia

19    University in mathematical statistics.

12:13:22  20    Q.    And has your entire career involved statistics?

21    A.    Yes, it has.

22    Q.    And where have you spent your career after you obtained a

23    Ph.D. in mathematical statistics?

24    A.    I came to Purdue University, and I have been there ever

25    since.

S. Bahun - Redirect

778

1   Q.    And for roughly how long has that been that you have been

2   working at Purdue University?

3   A.    It will be 50 years in June.

4   Q.    All right.  Congratulations.

5   A.    Thank you.

6   Q.    So at a high level, what responsibilities have you had as

7   a professor of statistics at Purdue University?

8   A.    My responsibilities basically consist of three tasks,

9   teaching, research, and service.  Sometimes service is called

12:14:13  10   engagement.

11   Q.    And what has been the subject matter or matters for your

12   teaching?

13   A.    I've taught statistics courses, primarily for graduate

14   students, graduate students, both those getting Master's

15   degrees and Ph.D.s in statistics, and also graduate students in

16   other departments who need to use statistics in their own work.

17   Q.    And what generally has been the subject of your research?

18   A.    Most of my research has been collaborative.  So I work

19   with other researchers who have data that needs to be analyzed.

12:14:52  20   And I'm the one who analyzes their data for them.

21   Q.    Okay.  Well, we'll get into that in a little more detail

22   in a moment.  But I believe you said there was a third area?

23   A.    Yes, the third area would be engagement.  So for most of

24   my career, from 1970 to 2004, I was the director of an

25   organization called the Statistical Consulting Service, which

S. Bahun - Redirect

779

1   provided help for people who needed to use statistics within

2   the university.  That includes faculty, graduate students, and

3   other people who might need the work, but all internal to

4   Purdue.

5   Q.   Okay.  Let's turn your attention back to your CV, sir.

6        Is that an accurate recitation of your professional

7   experience?

8   A.   Yes, it is.

9   Q.   And, Mr. Duval, if you could pan down a little lower.

12:15:57 10        And does that list your teaching positions?

11   A.   Excuse me?

12   Q.   Dr. McCabe, does that list your teaching positions on the

13   first page?

14   A.   Yes.

15   Q.   And if you could turn to the next page of the document,

16   Mr. Duval, underneath Professional Activities.

17        And does this list your professional activities and

18   other honors and societies you've been a part of throughout

19   your career?

12:16:36 20   A.   Yes, it does.

21   Q.   And by the way, where have you been a professor besides

22   Purdue in terms of teaching experience?

23   A.   Yeah, I hold an adjunct professorship at the National

24   University of Ireland in Galway.  I've had sabbaticals at

25   several different places, I think they're listed on the first

780

1    page.  I was at Princeton.  I've been at something called

2    CSIRO, which is a research organization in Australia.  A

3    visiting position at University of Berne in Switzerland.

4    Several other places for shorter periods of time.

5    Q.    Thank you, Dr. McCabe.  And I apologize, I asked you

6    before whether this was a 38-page document, but what page,

7    though, does it begin at with its numbering?

8    A.    Oh, page 12.

9    Q.    And what does it say at the top of this document?

12:17:44 10   A.    Appendix 1.

11   Q.    And why does it begin -- well, first of all, what was it

12   an appendix to?

13   A.    I don't remember.

14   Q.    Well, did you provide a written expert report in this

15   matter?

16   A.    Yes.

17   Q.    And did that include a copy of your CV?

18   A.    That's correct.

19   Q.    Okay.  Okay.  Thank you, Dr. McCabe.

12:18:06 20            So have you written any books in the fields of --

21   field of statistics?

22   A.    Yes, I have.

23   Q.    Mr. Duval, if you could pan over to that.

24            Are those listed here on your CV?

25   A.    Yes, they are.

S. Bahun - Redirect

781

1    Q.   Could you tell the jury something about one of your books.

2    A.   Yeah.  So the first book listed there, actually the first

3    two entries refer to the same book, but we added a different

4    coauthor.

5         So it's a book that's in its ninth edition.  The

6    first edition was in 1989, and we're working on the tenth

7    edition now.  It's used by a large number of colleges and

8    universities, both in the United States and elsewhere.  It's

9    been translated into several foreign languages.

12:18:59 10   Q.   Thank you, Dr. McCabe.

11        And, Mr. Duval, if you could turn to the list of

12   publications on what's numbered page 15.

13        Dr. McCabe, is this an accurate list of publications

14   you've authored during your career?

15   A.   Yes, it is.

16   Q.   And that begins on page 15 and runs all the way through

17   page 30, about 229 of them; is that correct?

18   A.   That's correct.

19   Q.   And do these all involve the field of statistics?

12:19:26 20   A.   Yes, they do.

21   Q.   Have you testified as an expert in litigation previously?

22   A.   Yes, I have.

23   Q.   And in what field?

24   A.   In a variety of fields.  Initially, in several suits

25   related to equal employment opportunities, salary, promotion,

S. Bahun - Redirect

782

1    hiring.  More recently, I testified in an issue related to the

2    recall of pet foods that were contaminated.

3    Q.   Well, putting aside the subject area of the disputes, what

4    was the purpose for your involvement in those litigations in

5    terms of what you brought to them?

6    A.   Basically my job was to take data, analyze it, present the

7    results of my analysis to people who needed to use those

8    results.

9    Q.   Were you testifying in the field of statistics in those

12:20:35 10  matters?

11   A.   Yes.

12   Q.   And in -- apart from expert work in litigation, applying

13   statistics and your work at Purdue, did you have other

14   experience in the field of statistics?

15   A.   Yes, I have.

16   Q.   And could you elaborate on that a little bit.

17   A.   Yeah.  So some recent work was on women's bone health and

18   osteoporosis, and the use of botanicals like plums and

19   blueberries to prevent bone loss.

12:21:13 20       I've also recently worked on a project on the use of

21   some plants that are grown by Native Americans in North

22   Carolina that have potential benefits for Parkinson's patients

23   to help with their symptoms.

24   Q.   I'm sorry.  I didn't --

25   A.   Yes, and, you know, many other things.

S. Bahun - Redirect

783

1   Q.   And in those matters that you've been referring to, are

2   you the subject area expert, For instance, in Parkinson's

3   disease or in the other issues you were mentioning?

4   A.   No, I'm not.

5   Q.   And what is the expertise that you brought to bear in

6   those matters?

7   A.   It's my background in applied statistics, which I use to

8   work on the data provided by those people.

9   Q.   Sure, and -- well, first of all, let me take a step back.

12:22:05 10   You just mentioned applied statistics, and I'm going to get to

11   that.  But can you start off and -- you know, many of us --

12   many of us have probably heard the word "statistics" before.

13        But as a -- someone who has taught in the field for a

14   very long time, could you explain what statistics is.

15   A.   Yes.  The way I view it is I use mathematics and I use

16   computing to study data.  The study involves analyses that I

17   perform.  And part of my role also is then to take the results

18   of my analyses and present them to people who would need to

19   make decisions.  That could be the -- a national workshop or a

12:22:57 20   peer review journal.  Or, as today, a jury who might -- needs

21   to make a decision.

22   Q.   Have you done work on government panels previously?

23   A.   Yes, I have.

24   Q.   And in what capacity?

25   A.   Again, as a statistician or a statistical expert.  I

784

1    worked on the school lunch program, and then several other

2    issues related to health generally.

3    Q.   Thank you, Dr. McCabe.  Could you explain why statistics

4    is valuable.

5    A.   Yes.  I think it's valuable because we need to have a

6    solid foundation for our decisions.  So some statistics is

7    labeled as decision analysis.

8              Today, we also hear about evidenced-based medicine

9    that when people are treated, we need to have a sound

12:23:55 10  foundation for that treatment.  We need to know that it works,

11   and that process involves statistics.

12             So, in general, there's an idea that statistics is

13   used to assist people in making decisions.

14   Q.   And, Dr. McCabe, are you being paid for the time you spend

15   working in this case?

16   A.   Yes, I am.

17   Q.   And are you being paid by the hour?

18   A.   Yes.

19   Q.   And how much do you charge per hour?

12:24:34 20  A.   $450.

21   Q.   Thank you, Dr. McCabe.  Is the payment of your fees in any

22   way dependent upon the substance of whatever opinion or

23   opinions you provide?

24   A.   No, it is not.

25   Q.   And is the payment of your fees in any way contingent upon

S. Bahun - Redirect

785

1    the outcome of this case?

2    A.    No.

3    Q.    And, Dr. McCabe, do you have an understanding of roughly

4    how many hours you've spent working on this case thus far?

5    A.    Yes.  It's more than 200.

6    Q.    Your Honor, I would move -- well, I'm -- let me take one

7    step before I proceed there.

8              Dr. McCabe, you mentioned the term "applied

9    statistics."  What is that?

12:25:22 10   A.    That involves what I described, that it primarily involves

11   collaboration with other researchers who have data that needs

12   what I am able to do for them.

13             MR. ZEBRAK:  Your Honor, I would offer Dr. McCabe as

14   an expert in the field of statistics, and allow him to testify

15   as such.

16             THE COURT:  All right.  Any objection?

17             MR. BUCHANAN:  No objection.

18             THE COURT:  All right.  He will be received for that

19   purpose.

12:25:47 20   BY MR. ZEBRAK: (Continuing)

21   Q.    Dr. McCabe, just to be clear, are you providing a legal

22   opinion here today?

23   A.    No.

24   Q.    Are you an expert in the field of copyright law?

25   A.    I am not.

786

1   Q.    Are you an expert in the field of -- or are you an expert

2   in peer-to-peer technology?

3   A.    No.

4   Q.    But your experience, statisticians are oftentimes retained

5   to apply their statistical expertise on data in which they're

6   not an expert in, you know, the content of that data; is that

7   correct?

8              MR. BUCHANAN:  Leading, Your Honor.

9              THE COURT:  I'll allow it for --

12:26:25 10  A.    That's correct.

11  BY MR. ZEBRAK: (Continuing)

12  Q.    Dr. McCabe, did you make any assumptions about any data

13  you reviewed as part of your analysis in this case?

14  A.    Yes, I did.

15  Q.    And why is that?

16  A.    In order to do my analysis, the starting point was

17  collection of data sets.  And I assumed that the data speak for

18  themselves, that they -- I took them at face value.  I did not

19  collect the data or verify or establish anything else about

12:26:57 20  them.  I take them as given at face value.

21  Q.    In your experience, is it unusual for you as a

22  statistician to take the data that you're collecting and

23  analyzing at face value?

24  A.    That would be the usual standard, yes.

25  Q.    Dr. McCabe, do you have any reason to believe that the

S. Bahun - Redirect

787

1    data that you were given for purposes of your analysis in this

2    case is not reliable?

3              MR. BUCHANAN:  Objection, Your Honor.  He just said

4    he assumed it was accurate.

5              THE COURT:  Yeah, sustained.

6              MR. ZEBRAK:  We don't need to -- we can just move on.

7              THE COURT:  And we don't need -- you know, counsel

8    have all been making comments about matters today.  Let's just

9    ask our questions and not comment on answers or speak back and

12:27:55 10  forth to each other.  It is confusing to the jury.

11             Please.  Thank you.

12             MR. ZEBRAK:  Yes, Your Honor.  We're moving right on.

13   BY MR. ZEBRAK:  (Continuing)

14   Q.   Dr. McCabe, did you prepare any slides to assist you in

15   your testimony today?

16   A.   I did.

17   Q.   And are those demonstrative slides an accurate summary of

18   your analysis in this case?

19   A.   They are.

12:28:17 20            MR. ZEBRAK:  Okay.  Your Honor, permission to publish

21   the slides.

22             THE COURT:  Any objection?

23             MR. BUCHANAN:  No, Your Honor.

24             THE COURT:  All right, go ahead.

25   BY MR. ZEBRAK:  (Continuing)

S. Bahun - Redirect

788

1    Q.    Dr. McCabe, let's turn to the first slide.  I believe you

2    said you did -- you had two assignments in this case, a works

3    in suit analysis and a repeat infringer analysis, correct?

4    A.    That's correct.

5    Q.    Okay.  So let's review assignment one, the works in suit

6    analysis.  Would you explain to the jury what your assignment

7    was with respect to the works in suit analysis.

8    A.    Yeah, so the first line below the title defines the scope

9    of my analysis.  Sometimes we -- or I would call that a frame,

12:29:04 10   it's a statistical term.  So the frame here is what are called

11   the works in suit.  And there are 10,017 of those works.

12           There are four icons below that.  And these are the

13   requirements that I used or applied to accomplish the works in

14   suit task.

15           So the first requirement is that the work -- and this

16   is analysis about the works in suit.  Again, it's the 10,017

17   works that we're talking about.  So that work must in an

18   infringement notice -- an infringement notice during the claim

19   period.

12:29:54 20          The second is that the work in suit should be in a

21   notice that is the third or later notice for a particular

22   subscriber.

23           In other words, I labeled the notices as a first, a

24   second, a third, et cetera.  So I only looked at third or later

25   notices.

S. Bahun - Redirect

789

1          Next, the infringing notice must contain the work in

2    suit.

3          And the fourth requirement is that the infringing

4    file is on a hard drive that was created by MarkMonitor.

5    Q.    Dr. McCabe, I would like to draw your attention to the

6    third bullet.  A moment ago I believe you said the infringed --

7    well, could you explain what that third bullet is in a little

8    more detail.

9    A.    Yes.  So the notice contains information.  And the

12:30:54 10    information, depending upon the protocol, points either to one

11    work in suit or it can -- in the case of BitTorrent, it can

12    refer to a collection of works.

13    Q.    What is the significance to the reference to "infringing

14    file" in that third bullet?

15    A.    The infringing file is part of the notice.  And that

16    points to -- through these hashes, it points -- it gets us to

17    the works in suit.

18    Q.    Do you have an understanding as to whether the infringing

19    file is identified in the notice?

12:31:34 20    A.    Yes, it is.

21    Q.    And by the way, when we talk about notices, what are we

22    referring to here?

23    A.    They are the e-mails sent by MarkMonitor to Cox.

24    Q.    Okay.  And were you able to form any -- and, first of all,

25    you said that you're not providing any -- you're not testifying

S. Bahun - Redirect

790

1    as a legal expert today, correct?

2    A.    That's correct.

3    Q.    So these requirements that you applied here, where did you

4    come up with those requirements?

5    A.    In consultation with plaintiffs' counsel.

6    Q.    Okay.  Who set these requirements?

7    A.    These were set as part of my assignment, if you will.

8    Q.    Thank you, Dr. McCabe.  Let's turn to your conclusions.

9          Were you able to form any conclusions with respect to

12:32:24 10    your works in suit analysis?

11   A.    Yes.

12   Q.    And did you prepare a slide to overview those conclusions?

13   A.    Yes.

14   Q.    With respect to the top bar labeled Findings, would you

15   please explain to the jury what your overall findings are?

16   A.    Yes.  So that top line is a summary of my findings that

17   all of the 10,017 works in suit were qualified.

18         In other words, they satisfied the four requirements

19   that are described on the previous slide and are illustrated on

12:33:02 20    this slide.

21   Q.    And could you walk us through this slide one component at

22   a time.  What's the checked box next to Claim Period signify?

23   A.    So that means that -- if you recall, the previous slide

24   said the first requirement was that the work in suit should

25   appear in a notice during the claim period.

S. Bahun - Redirect

791

1          So on this slide, the claim period is denoted or

2   described by the yellow bar at the top.  It starts February 1,

3   2013, and ends November 26, 2014.

4          And the checkmark means that all of the 10,017 works

5   in suit did correspond to a notice during this claims period.

6   Q.  Was the claim period the same claim period for every

7   single plaintiff group in this case?

8   A.  No.  There is a note below the bars for the years that --

9   for the Sony ATM/EMI claims, the start of the claim period was

12:34:24  10  August 1, 2013, rather than February 1, 2013.  But that period

11  was the same, the ending date of the claims period for Sony

12  ATM/EMI was the same as for all the others.

13  Q.  And, Dr. McCabe, would you briefly walk the jury through

14  the remaining three checked boxes on this slide.

15  A.  Yes.  So the second is that -- this issue of the third or

16  later notice for a particular subscriber.  So that was

17  satisfied for all of the 10,017 works.

18          That the infringing file in the notice contains the

19  work in suit.

12:35:11  20          And that there is a copy of the work on a hard drive

21  created by MarkMonitor.

22          So all of these -- the four requirements are

23  satisfied.  And the term I'm using is that means those works in

24  suit were qualified.

25  Q.  Dr. McCabe, what data sources did you use for your

1    analysis in this case?

2    A.   Yes, I think I prepared a slide for that.  That should be

3    the next one.

4    Q.   Or actually, Dr. McCabe, let me ask you a question.  A

5    moment ago when you were explaining each of the four

6    requirements for your analyses were satisfied, you used the

7    term "qualified."

8         What does that mean?

9    A.   It basically means that the work in suit is connected to a

12:36:23 10   notice.  So we could view it the other way around.  You start

11   with the notice, it points to the work in suit.  So there is a

12   direct connection between those two.

13        And that's what I'm calling qualified, that I can

14   draw the link from the notice to the work in suit.

15   Q.   Okay.  Well, let's turn back to your data sources, and I

16   can ask you a few questions about that.

17        So what is being depicted in the left column with

18   respect to data sources?

19   A.   The left column describes the source of the data sets.  So

12:37:04 20   there are three sources, MarkMonitor, Cox, and the plaintiffs.

21   Q.   And what data from MarkMonitor was within your analysis in

22   this matter?

23   A.   So MarkMonitor is the top data source there.  And there

24   are three files listed to the right.  The first is the notices

25   or the -- actually, I didn't have the notices, but I had a file

1    that lists the notices and the information contained in each

2    notice.  So all that -- these are all data files that I had.

3            So there is a file for notices from MarkMonitor.

4    There is a file for the downloads that MarkMonitor downloaded.

5    And there is a file from MarkMonitor about the Audible Magic

6    procedure or connections to go from hashes to works.

7    Q.   And what is depicted with respect to Cox in terms of data

8    from Cox that you considered within your analysis?

9    A.   So Cox also provided three data sets.  The first one

10   listed there is subscriber identification.  So the Cox CATS

11   system has identifiers for subscribers.  It was necessary to

12   have that information to be able to perform my analysis.

13           So it's the file itself connected subscriber IDs with

14   notices.

15           The second file is what I have called the ticket

16   file.  It's the large file that contains the tickets that Cox

17   recorded in their CATS system.

18           And the third is a file that identifies Cox

19   subscribers as -- I used it to distinguish residential from

20   business subscribers.

21   Q.   And when you say the third file, was that the billing

22   information file?

23   A.   I am sorry, the billing information file, yes.

24   Q.   And, finally, to the right of plaintiffs, there is an

25   Exhibit A and B.  What are those two files?

S. Bahun - Redirect

794

1    A.   Right.   These two files comprise the works in suit.   So

2    the first is a collection of sound recordings, and the second

3    is list of compositions.

4    Q.   And I apologize, Dr. McCabe, but would you please

5    elaborate slightly on looking back to the MarkMonitor box, what

6    the middle file is that says Downloads.

7    A.   The downloads are the works that -- or it's a list of the

8    works that are on -- that have been downloaded and are on the

9    MarkMonitor generated drive that they prepared.

12:40:16 10   Q.   I see.   Okay.   Thank you, Dr. McCabe.

11             And what did you do with these data sources once you

12   received them?

13   A.   My first task was to connect them.   And I think the next

14   slide gives an idea of what that involved.

15   Q.   And before we turn to that slide, Dr. McCabe, what does it

16   mean to connect data sources generally?

17   A.   What that involved was to take -- in each step take two

18   data sets and combine the information into a single data set.

19   So there needs to be a connector to track the information that

12:41:02 20   is shared.   There needs to be some sharing of information to

21   merge the files together, basically.

22   Q.   And what benefit, if any, is there in being able to

23   connect data sets with respect to then analyzing data?

24   A.   That was the way that I performed my analysis, it was

25   necessary to make those connections.   In other words, to go

S. Bahun - Redirect

795

1    from the top notices all the way to the bottom recordings, I

2    had to make a series of connections all the way through.

3    Q.   Well, let's look at the next slide then.

4            So these are the data sources that you considered

5    that we just reviewed on the last slide, correct?

6    A.   That's correct.

7    Q.   Okay.  And can you give us some examples of how you

8    connected -- I know it has been a long day already.  We are not

9    going to go through all of these.  But if you could connect

12:42:03 10   some of these for the jury.

11   A.   Yes.  So the simplest one would be the one across the top

12   with the three Cox files.  So there is a variable or an

13   identifier, it is a piece of the file that identifies a Cox

14   subscriber, and it's called an ICOMS ID.

15           So that identifier is in the left most data file,

16   which is the copy infringement tickets.  That's the large

17   ticket file.

18           It's also in the billing information.  And the

19   connector is in this subscriber ID, which is the way to connect

12:42:47 20   those three files -- I am sorry -- it's the ICOMS ID.  Yeah.

21   Q.   Okay.  And so what is the purpose of these lines that we

22   see on this?  So prior to the animation coming up, we just have

23   your data sources.

24           What's the significance of the lines that then

25   appears when the animation pops up?

S. Bahun - Redirect

796

1    A.    So those are the -- those identify the variable that is

2    used to connect the data sets.  Basically, we're merging data

3    sets to combine -- to create a new file that combines the

4    information for the two source files.

5    Q.    And then, Dr. McCabe, once you've -- and were you able to

6    make a connection between these data sources to go from the top

7    to the bottom as you described it?

8    A.    So going from, let's say, the Cox domain to the

9    MarkMonitor domain, we have notice IDs and subscriber IDs.  So

12:43:52 10   there -- that's the way to connect the notices with the

11   subscribers.

12          The notices themselves do not contain an identifier

13   for the subscriber.  So we obtained a subscriber ID file from

14   Cox to attach that identifier to the notices.

15   Q.    But once you connected all these different data sources,

16   what did you then do with respect to analyzing the data?

17   A.    So the analysis is basically to connect the notices with

18   the works in suit.  And that's the bottom line of what -- of

19   what I did.  And to satisfy these four criteria.

12:44:42 20   Q.    Okay.  And just before we move on to your second

21   assignment in terms of the repeat infringer analysis, can you

22   remind the jury of your overall finding with respect to the

23   works in suit.

24   A.    Yes.  My overall finding is at the top of this slide, that

25   all 10,017 works in suit did correspond to a work that

S. Bahun - Redirect

797

1   satisfied these four requirements.

2   Q.   Okay.  Let's turn to your second assignment, which you

3   referred to as a repeat infringer analysis.

4          Would you explain to the jury at a high level what

5   your repeat infringer analysis involved.

6   A.   Yes.  So in contrast to the first task, which was about

7   works or works in suit, this task was about Cox subscribers.

8   In particular, as indicated on the slide, the frame here, if

9   you will, is the 57,600 subscribers that were reported by

12:45:55 10  MarkMonitor.  So that's the frame.

11          And again, the analysis is an analysis of those

12  57,600 subscribers and their repeats.  So I created a file and

13  counted infringement No. 1, infringement No. 2, et cetera, to

14  be able to look at the repeat pattern of infringements.

15  Q.   And are these -- what's the significance of these items

16  that appear below the frame that you defined of the 57,600

17  subscribers reported by MarkMonitor?

18  A.   So my task was to describe and analyze the patterns of

19  repeat infringers.  That's what I did.  So the five icons there

12:46:57 20  indicate five summaries that I generated as part of my

21  analysis.  The first is what's the distribution of tickets,

22  meaning how many had one ticket, how many had two tickets,

23  et cetera.

24          I looked at the entries that identified subscriber

25  terminations in the Cox ticket data.

798

1        I think I mentioned above, the distinction between

2   residential versus business subscribers.

3        And there are also in the Cox data, there were

4   tickets for notices from other rights holders.

5        So again, these are still the 57,600 subscribers

6   reported by MarkMonitor, but my analysis included notices or

7   tickets generated by notices from other rights holders.  And it

8   also included, as noted on the last entry, it included tickets

9   that occurred or that were generated before the claim period.

12:48:03 10  Q.   Dr. McCabe, you've been discussing use of tickets for this

11  repeat infringer analysis.  Whose data is the ticket data that

12  you're analyzing?

13  A.   The ticket data is the Cox CATS data.

14  Q.   And so, these are Cox's records as to the subscribers who

15  are the subject of MarkMonitor notices; is that correct?

16  A.   That's correct.

17  Q.   Okay.  And let's take these one by one.  Let's first look

18  at your slide on distribution of tickets.

19        So would you walk the jury through this slide, first

12:48:47 20  starting at the -- where it appears in black:  All tickets.

21  A.   So again, that's the frame I use.  It's the 57,600

22  subscribers.  And I looked at all tickets for those that were

23  contained in the -- what I call the ticket data, the Cox data.

24        The red bar at the top indicates the range of dates

25  that are included in that ticket data file that I received from

799

1    Cox.

2            So the start date is January 1, 2012, and the end

3    date is December 31, 2014.  So there are three years, 2012, '13

4    and '14 that are covered by this analysis.

5    Q.   Dr. McCabe, let me ask you a question, if I could draw

6    your attention in blue where it says:  Cox Copyright

7    Infringement Tickets.

8            Do you see that?

9    A.   I do.

12:49:44 10   Q.   How does that relate to all tickets on the top?  And

11   I'm sorry, that was a clumsy question.

12            When you say you considered all tickets for this pool

13   of 57,600 subscribers reported by MarkMonitor --

14   A.   Yes.

15   Q.   -- is it the case that this includes copyright

16   infringement tickets generated from notices from others in

17   addition to MarkMonitor?  Is that the --

18   A.   That's correct, yes.

19   Q.   Okay.  And let's take it one frame at a time.

12:50:23 20           So what's being depicted in the column that says 3+

21   with the number beneath it?

22   A.   So again, there are -- there's a picture, three or more,

23   and -- there's a picture of three, sorry.  And the 3+ means

24   that I counted the number of subscribers that had three or more

25   tickets.  And that number is 31,628, given in black below the

S. Bahun - Redirect

800

1   3+ and the three icons.

2          So of the 57,600 subscribers that are the frame for

3   my analysis, 31,628 had three or more tickets.

4   Q.   Okay.  And what about the -- if you could move to the next

5   column.  Is the idea there that the top bar represents the

6   number of copyright infringement tickets for the 16,818 Cox

7   subscribers depicted beneath it?

8   A.   That's correct.  So there is -- that's the number, 16,818

9   is the number of subscribers who had six or more tickets.

12:51:43 10   Q.   And, Dr. McCabe, is a copyright infringement ticket --

11   what's your understanding of how that relates to an

12   infringement notice?

13   A.   My understanding is that when MarkMonitor sent an

14   e-mail -- an e-mail notice, if you will, to the Cox system,

15   that caused a ticket to be generated.

16   Q.   Do you know what happens if Cox receives multiple

17   infringement tickets for the same subscriber -- strike that.

18          Do you know what happens when -- in a scenario where

19   Cox receives multiple infringement notices from different

12:52:24 20   parties on a single day for a single subscriber?

21          MR. BUCHANAN:  I'm just going to object.  I don't

22   think he has been offered as an expert on the system, just on

23   data.

24          THE COURT:  All right.  Lay a foundation if you want

25   him to testify to that.  Sustained.

801

1          MR. ZEBRAK:  Sure.

2     BY MR. ZEBRAK: (Continuing)

3     Q.   Dr. McCabe, what's your understanding of what a copyright

4     infringement ticket is?

5     A.   My understanding is that it is generated by a notice.  I

6     believe it can correspond to more than one notice, but I don't

7     recall a lot of details about that part of the structure.

8               In terms of the data, I treated the entry of a ticket

9     as the basic piece of information that I use to compute this

12:53:30  10   distribution.

11     Q.   So this repeat infringer analysis is an analysis of Cox's

12     records?  It's its ticket data, however Cox generates that

13     data; is that correct?

14     A.   That's correct.

15     Q.   Okay.  And can you walk the jury through the successive

16     three columns, starting at 10+?

17     A.   So for ten or more tickets, we had 8,495 subscribers.  For

18     13 or more tickets, there were 5,120 subscribers.  And for 14

19     or more tickets, there were 4,404 tickets.

12:54:16  20   Q.   Okay.  And, Dr. McCabe, I believe you indicated there were

21     a total of five characteristics of these 57,600 subscribers you

22     looked at?

23     A.   That's correct.

24     Q.   And we just reviewed the first one, distribution of

25     tickets; is that correct?

S. Bahun - Redirect

802

1   A.   Yes.

2   Q.   Okay.  Let's turn your attention to the next one.  What --

3   could you walk the jury through what -- through your analysis

4   that's depicted in this slide.

5   A.   Yes.  As I mentioned before, I looked at the Cox data and

6   looked at the entries corresponded to terminations.  When I did

7   that, I found 13 terminations.  So this graphic is an attempt

8   to make a picture out of that finding.

9        So again, we start with the frame, if you will, the

12:55:06 10   57,600 subscribers, and that's the bar on the left-hand side.

11        If you look on the right-hand side, it's a blown-up

12   version of the upper right-hand corner square for the 57,600.

13   And the squares colored yellow with the little icons

14   representing people, they represent subscribers.  Actually,

15   those are the 13.

16   Q.   And what was the time frame for which you had this Cox

17   ticket data that's the subject of your repeat infringer

18   analysis?

19   A.   It's the time frame for the ticket data that we had, which

12:55:56 20   was the three years, 2012, '13 and '14.

21   Q.   So turning your attention back to the slide of the

22   distribution of tickets, in -- these don't consider whatever

23   notices, if any, these 57,600 Cox subscribers may have received

24   prior to 2012; is that correct?

25   A.   Could you repeat that?  I didn't --

S. Bahun - Redirect

803

1  Q.  Sure.  If any of these 57,600 Cox subscribers had

2  copyright infringement tickets prior to January 1, 2012, would

3  that be depicted here in your analysis?

4  A.  Prior to January 1, 2012?

5  Q.  Yes.

6  A.  Yeah, they would be included.

7  Q.  Well, but you just said a moment ago that your -- that the

8  data only is for 2012 to '14, correct?

9  A.  I'm sorry, yes.  I had it reversed.

12:56:55 10     So it does not include data before -- the Cox data

11  that we have starts 2012, ends 2014, those entire three years.

12  And anything outside that range, I did not have data for those.

13  Q.  Okay.  So let's move on to your -- and so, relating these

14  two slides, out of the 57,600, the Cox ticket data showed you

15  that Cox terminated only 13 of that pool; is that correct?

16  A.  That's what the data say, yes.

17  Q.  And that's -- and the ticket distribution includes those

18  that received ten or more, 13 or more, 14, correct?

19  A.  That's correct.

12:57:46 20 Q.  So -- okay.  So out of the -- let's turn to your next --

21  the third of your five areas.

22     THE COURT:  You know, what don't we stop here before

23  you get into the third area.

24     MR. ZEBRAK:  Oh, sure.

25     THE COURT:  We're almost at 1 o'clock.

S. Bahun - Redirect

804

1          MR. ZEBRAK:  Yes, sir.

2          THE COURT:  So let's take our lunch break.  We'll

3    come back at 2 o'clock.  All right.

4          Thank you, you're excused.

5          NOTE:  At this point the jury leaves the courtroom;

6    whereupon the case continues as follows:

7    JURY OUT

8          THE COURT:  All right.  So anything before we recess?

9    Okay.  Then we have a --

12:58:56 10          MS. LEIDEN:  Sorry, Your Honor.

11          THE COURT:  Yes.

12          MS. LEIDEN:  One issue from defendants, briefly.

13          Plaintiffs intend to call by video deposition Jason

14    Zabek.  And depending on witnesses that go today, that video

15    may be at least started today.

16          The parties have exchanged designations and various

17    objections, and we have -- we are going to try to work out any

18    remaining objections that we have prior to the video

19    deposition.  But we wanted to raise to your attention that

12:59:24 20    there may be remaining objections to deposition testimony and

21    exhibits that we will need to resolve with Your Honor before

22    the video begins to be played.

23          THE COURT:  Okay.  So any of the text of the video

24    that you still object to, get it to me as soon as you can and

25    give me an opportunity to look at it and rule on it.  And if

S. Bahun - Redirect

805

1    you need -- if you want to be able to argue it, I'll give you a

2    brief time to do that.

3           And for the other deposition designations that are

4    still being worked on, try and get them to me the night before

5    so that you have an opportunity to splice and put them together

6    not at the last -- they're videos, right?  They're not just

7    transcripts?

8           MR. OPPENHEIM:  They are, Your Honor.  And this, in

9    part, is plaintiffs' fault because last night we tried to cut

13:00:20 10  back and shorten that video because it's far too long for, I

11   think, anybody's desire.

12          So that's why we didn't get it to you in advance.

13   Our apologies.

14          THE COURT:  Okay.  All right.  So -- yes, sir.

15          MR. ELKIN:  A related point, Your Honor, is that

16   currently as it stands, it's about four hours.  And I'm not

17   being critical of it.  But all I'm suggesting is the following.

18   We have from Atlanta and from Hampton Roads, I think, we've got

19   Ms. Trickey, Mr. Carothers --

20          THE COURT:  Mr. Cadenhead.

21          MR. ELKIN:  -- Mr. Vredenburg.  And if it's going to

22   be a four-hour video and these witnesses are already here --

23   and I'm mindful of the fact that it's their strategy, they want

24   to put the witnesses in their order, and I respect that, but if

25   these witnesses are already here out of town.  I would just ask

806

1    the Court to consider how that -- how we proceed.

2              THE COURT:  Yeah.  If putting this video on before

3    those witnesses involves having that jury sit and twiddle their

4    thumbs while we're going through objections, then I'm not going

5    to permit it.  We're going to do it with live witnesses.

6              And after they're done, after we send the jury home,

7    we can go through the deposition designation objections.

8              This case has been going on a long time, and the last

9    thing that I'm going to permit is us to have the jury sitting

13:01:52 10   around while we're yakking about whether something is

11   objectionable.

12             So thank you for bringing that to my attention.

13             All right.  So I have a plea.  The defendant is in

14   custody.  So the, you know, pencils and that kind of stuff

15   probably aren't a good idea.

16             All right.  We're in recess.

17             NOTE:  The morning portion of the case on December 5,

18   2019, is concluded.

19   ------------------------------------------

         CERTIFICATE OF COURT REPORTERS

20

21        We certify that the foregoing is a true and
     accurate transcription of our stenographic notes.

22

23             /s/  Norman B. Linnell
          _____
          Norman B. Linnell, RPR, CM, VCE, FCRR

24

25             /s/  Anneliese J. Thomson
          _____
          Anneliese J. Thomson, RDR, CRR