807

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                       :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                               :
-------------------------------:
```

<u>VOLUME  4  (P.M. Portion)</u>

TRIAL TRANSCRIPT

December 5, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

808

APPEARANCES:

FOR THE PLAINTIFFS:            MATTHEW J. OPPENHEIM, ESQ.
                              SCOTT A. ZEBRAK, ESQ.
                              JEFFREY M. GOULD, ESQ.
                              MICHAEL J. DRUCKMAN, ESQ.
                              ANDREW L. GUERRA, ESQ.
                              LUCY G. NOYOLA, ESQ.
                              JIA RYU, ESQ.
                              Oppenheim + Zebrak, LLP
                              4530 Wisconsin Avenue, N.W.
                              5th Floor
                              Washington, D.C. 20015


FOR THE DEFENDANTS:            THOMAS M. BUCHANAN, ESQ.
                              Winston & Strawn LLP
                              1700 K Street, N.W.
                              Washington, D.C. 20006-3817
                                and
                              SEAN R. ANDERSON, ESQ.
                              MICHAEL S. ELKIN, ESQ.
                              THOMAS P. LANE, ESQ.
                              CESIE C. ALVAREZ, ESQ.
                              Winston & Strawn LLP
                              200 Park Avenue
                              New York, NY 10166-4193
                                and
                              JENNIFER A. GOLINVEAUX, ESQ.
                              THOMAS J. KEARNEY, ESQ.
                              Winston & Strawn LLP
                              101 California Street, 35th Floor
                              San Francisco, CA 94111-5840
                                and
                              MICHAEL L. BRODY, ESQ.
                              Winston & Strawn LLP
                              35 West Wacker Drive
                              Chicago, IL 60601
                                and
                              DIANA HUGHES LEIDEN, ESQ.
                              Winston & Strawn LLP
                              333 South Grand Avenue
                              Suite 3800
                              Los Angeles, CA 90071

809

1

2                                    INDEX

3

WITNESS                              EXAMINATION      PAGE

4

5    GEORGE P. McCABE

                                     DIRECT           810
6                                    CROSS            816
                                     REDIRECT         865

7
     LINDA TRICKEY

8                                    DIRECT           877

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G. McCabe - Direct

810

1           A F T E R N O O N   S E S S I O N

2               NOTE:  The December 2, 2019, afternoon portion of the

3       case begins in the absence of the jury as follows:

4       JURY OUT

5               THE COURT:  All right.  Ready for our jury?

6               Okay.  Joe, let's get our jury, please.

7               NOTE:  At this point, the jury returns to the

8       courtroom; whereupon, the case continues as follows:

9       JURY IN

02:04:46 10             THE COURT:  All right.  Please have a seat.

11              GEORGE P. McCABE, PH.D., PLAINTIFFS' WITNESS,

12                   PREVIOUSLY SWORN, RESUMED

13              THE COURT:  All right.  Let's continue, please.

14              MR. ZEBRAK:  Thank you, Your Honor.

15                   DIRECT EXAMINATION (Cont'd.)

16      BY MR. ZEBRAK:

17      Q.   Good afternoon, Dr. McCabe.  Right before we broke for

18      lunch, you were in -- we were discussing your assignment to the

19      repeat infringer analysis, and I believe we were just about to

02:05:28 20     jump into this slide.  Would you please explain to the jury

21      what's being depicted in this slide?

22      A.   Yes.  So for this slide, I classified the, the 57,600

23      subscribers, which I'm calling the frame.  I classified them as

24      residential subscribers or business subscribers.  So there were

25      54,732 residential subscribers, and there were 2,868 business

G. McCabe - Direct

811

1    subscribers.

2         The pie chart depicts that -- those numbers expressed

3    as percents.  So 95 percent of the subscribers were

4    residential, and 5 percent were business.

5    Q.   And, Dr. McCabe, what is the source of the data records

6    you used to assess the breakdown of the Cox subscribers who

7    were the subject of MarkMonitor's notices?

8    A.   Could we go back to the slide that has the datasets on it?

9    Q.   Sure.  That would be -- please let me know when I'm there.

02:06:46  10  A.   Yeah, that's fine.  So it's along the top.  So it's Cox

11   data, and it's the third file, which is -- in this display is

12   called billing information.  So billing information is the

13   connector for the defining residential versus business.

14   Q.   I'm going to, if it's okay, bring us back to the slide we

15   were just on.  Is there anything else about this slide that --

16   A.   I think that's it.  95 percent versus 5 percent, yeah.

17   Q.   Okay.  And would you please explain to the jury what's

18   being depicted in this slide with respect to your repeat

19   offender analysis?

02:07:48  20  A.   Yes.  So here I looked at the -- excuse me -- I looked at

21   the, the source of the, of the notice.  So the notices that I

22   have recorded from, as infringers -- I'm sorry -- the notices

23   from going back to MarkMonitor, for those rights holders, my

24   understanding is they're the plaintiffs in this suit, but the

25   Cox file also contains notices from other rights holders.

G. McCabe - Direct

812

1      So basically here what I did was look again at

2  subscribers, so it's a subscriber analysis, and

3  17,729 subscribers had notices from other rights holders.

4      So, again, 17,729 out of 57,600, that's depicted in

5  the pie chart as 30.8 percent.  So 30.8 percent of the

6  subscribers had notices from other rights holders.

7  Q.   So out of the 57,600 Cox subscribers reported in

8  MarkMonitor's notices, a little less than a third of them were

9  also the subject of notices that led to tickets as reported by

02:09:26 10  the rights holders?  Is that what you're saying?

11  A.   That's correct.

12  Q.   Okay.  And is this also based on Cox's records, the ticket

13  data that you described earlier?

14  A.   That's correct.

15  Q.   Okay.  Looking at the next slide you have here, would you

16  explain to the jury what the purpose of this slide is?

17  A.   Yeah.  The purpose is to depict the analysis that I did

18  related to claims -- or notices, sorry, notices before the

19  claim period.  So if you look at the timeline on the bottom in

02:10:06 20  yellow there, the bar with arrows at the end, that's the

21  definition of a claim period, February 1, 2013, to November 26,

22  2014, with a caveat that there's a different start time for the

23  one plaintiff.

24      Superimposed on that in the gray is the time frame

25  for the Cox ticket data.  So for the Cox ticket data, that

G. McCabe - Direct

813

1   spans the years 2012, '13, and '14.  So it overlaps -- or the

2   claims period is a subset of that time frame.

3           So if we look at the, the notices before the

4   beginning of the claim period, that is, before February 1,

5   2013, there were 13,441 subscribers who had one or more tickets

6   in that before claim period, the period to the, the left of the

7   center cut in the slide.

8   Q.   Dr. McCabe, I'd like to ask you a question that contrasts

9   this with the works in suit analysis, and looking back at the,

02:11:33  10   if you wouldn't mind going back to the original slide, the

11   works in suit analysis was a third or later notice for a

12   subscriber in the claim period; is that correct?

13   A.   That's correct.

14   Q.   Okay.  But then looking -- and the repeat infringer

15   analysis is the who, it's the people; is that correct?

16   A.   The subscribers, yes.

17   Q.   Okay.  Well -- and then -- oops.

18           And so this -- is there anything else about this

19   slide that you'd like to explain?

02:12:18  20   A.   No.  But just as, as you mentioned or as I mentioned, it

21   depicts the contrast between the claims period and the larger

22   period of time covered by the Cox data that I used for the

23   repeat infringer analysis.

24   Q.   So the 23.3 percent, is it correct that Cox received

25   notices from them both during the claim period and prior to the

G. McCabe - Direct

814

1    period?  Is that essentially what this slide is showing?

2              MR. BUCHANAN:  Asked and answered and leading.

3              THE COURT:  All right.  I'll allow the question.

4    BY MR. ZEBRAK:

5    Q.   Would you like me to repeat the question?

6              THE COURT:  Well, just ask him:  What does this data

7    depict?

8              MR. ZEBRAK:  Sure.

9              THE WITNESS:  So, yes.  It's -- again, it's a count

02:13:12 10   of subscribers.  The frame is the 57,600 subscribers reported

11   by MarkMonitor.  Of those 57,600, 13,441 had tickets before the

12   claim period, so to the left of this time frame.  That 13,441

13   represents 23.3 percent of the 57,600, and that's what's

14   depicted in the, in the pie chart there, the 23.3 percent.

15   BY MR. ZEBRAK:

16   Q.   And whose records is this data based on?

17   A.   It's based on the ticket data from Cox.

18   Q.   Okay.  And are you familiar with someone by the name of

19   Christian Tregillis?

02:14:19 20   A.   Yes, I am.

21             MR. BUCHANAN:  Objection, Your Honor.  This is an

22   expert.

23             THE COURT:  Well, I think we've got a preview of a

24   slide with his name on it, but I don't know what that --

25             MR. BUCHANAN:  He hasn't testified yet, so -- I'm

G. McCabe - Direct

815

 1    anticipating it would be rebuttal.  And so you're going to ask

 2    him questions about his report when he hasn't testified yet.

 3           THE COURT:  Okay.  Overruled.  I think that's proper.

 4    Mr. Tregillis will have an opportunity to address issues.

 5    Well, let's see where you're going with this.

 6           MR. ZEBRAK:  Yeah, they had received the slides, and

 7    I hadn't heard of an objection, but I'm happy to proceed.

 8    BY MR. ZEBRAK:

 9    Q.   Are you familiar with who Christian Tregillis is?

02:15:06 10    A.   Yes.

11           THE COURT:  Is he going to critique his report at

12    this stage, or is this something else?

13           MR. ZEBRAK:  No, Your Honor.

14           THE COURT:  Okay.  Go ahead.

15           MR. ZEBRAK:  May we have a quick sidebar?

16           THE COURT:  Yeah.

17           MR. ZEBRAK:  Thank you.

18           NOTE:  A sidebar discussion is had between the Court

19    and counsel out of the hearing of the jury as follows:

02:15:35 20    AT SIDEBAR

21           THE COURT:  All right.  So we don't rebut somebody's

22    testimony based on the report.  We wait until they testify, and

23    then we report -- rebut their testimony if you feel it's

24    proper.

25           MR. ZEBRAK:  Yes, sir.

816

```
          1              THE COURT:  So what have you got here?

          2              MR. ZEBRAK:  Well, we thought it would just be useful

             for the jury to understand that Mr. Tregillis agrees that over

          4  95 percent of the works in suit match to infringement notices.

          5  It's really just showing -- you know, it's sort of

          6  provisionally indicating that Mr. Tregillis agrees, but, quite

          7  frankly, I mean, if Your Honor wants to do that, we can --

          8              THE COURT:  Yeah, let's move on beyond that.  You can

          9  cross-examine Mr. Tregillis on that.

02:16:20 10              MR. ZEBRAK:  Yeah.  We just thought it would be

         11  useful for the jury, but we can move on.

         12              THE COURT:  Okay.

         13              MR. ZEBRAK:  Thank you.

         14              THE COURT:  All right.  Thank you.

         15              NOTE:  The sidebar discussion is concluded;

         16  whereupon, the case continues before the jury as follows:

         17  BEFORE THE JURY

         18              THE COURT:  All right.  Please go ahead.

         19              MR. ZEBRAK:  We pass the witness at this point, Your

02:16:59 20  Honor.

         21              THE COURT:  All right.

         22              MR. ZEBRAK:  Thank you.

         23              THE COURT:  Cross-examination, Mr. Buchanan?

         24              MR. BUCHANAN:  Yes, please, Your Honor.

         25                         CROSS-EXAMINATION
```

G. McCabe - Cross

817

BY MR. BUCHANAN:

Q.   Good afternoon, Dr. McCabe.  How are you?

A.   Fine.

Q.   I promise there will be no spreadsheets here for this examination.

        So you, as I understand it, have been associated with Purdue University for 50 years; is that right?

A.   That's correct.

Q.   Okay.  And from 2004 to 2018, you were a dean of a department; is that right?

A.   I was an associate dean for the College of Science.

Q.   And you also taught courses at the same time?

A.   I had a reduced teaching load.

Q.   Okay.  And you spent, I think, 75 percent of your time on administrative work related to being a dean?

A.   That's correct.

Q.   And then other time you were teaching as well a course a semester?

A.   I was primarily doing research, but, yeah, I did --

Q.   Okay.  So is it fair to say that over the last ten years, you've done very little expert testimonial work?

A.   Over the last?

Q.   Ten years.

A.   In court or related matters, I'm not sure.  I have --

Q.   It would be a very small amount of work in the last

G. McCabe - Cross

818

1    ten years that related to expert work, right?

2    A.   Probably the same amount during my 50 years.  I think it's

3    been a small amount throughout my career.

4            MR. BUCHANAN:  Can we give him the binder?

5    BY MR. BUCHANAN:

6    Q.   So I'd ask you to take a look at your deposition

7    testimony, page 81.

8            Can we pull that up, transcript 81, lines 3 through

9    8?

02:19:07 10          And maybe this would help you refresh your

11   recollection.

12           MR. ZEBRAK:  Excuse me, Your Honor.

13           THE COURT:  Yeah.

14           MR. ZEBRAK:  This is --

15           THE COURT:  Take the -- take it down.  Ask him --

16   let's not put it up on the screen.

17           MR. BUCHANAN:  Okay.

18           THE COURT:  Just ask him whether that refreshes his

19   recollection.

02:19:23 20          MR. BUCHANAN:  Okay.

21           THE COURT:  Ask him to read the section that you want

22   him to read.

23           MR. BUCHANAN:  Okay.

24           THE COURT:  Everybody does refreshing recollection

25   and past recollection recorded a little differently, so this is

G. McCabe - Cross

819

1  the way I would like to do it, Mr. Buchanan.  So if you'd just

2  identify the segment where you're looking and see whether it

3  refreshes his recollection.

4  BY MR. BUCHANAN:

5  Q.   Okay.  So if you look at your deposition transcript, do

6  you see that lines 3 through 8 on page 81?

7  A.   Page 81, lines 3 through 8?

8  Q.   Right.

9  A.   I'm not sure of the context of the question that I can get

02:20:13 10  from those -- I'm speaking --

11  Q.   If you look at, start with line 21:  Okay.  How about over

12  the last ten years?

13          MR. ZEBRAK:  Excuse me, Your Honor, Mr. Buchanan

14  understands the objection.

15          THE COURT:  No, he's focusing on a, on a specific

16  sentence.

17          MR. BUCHANAN:  That's -- I've given him the line.

18          THE COURT:  Yeah, that's proper.

19          MR. ZEBRAK:  Thank you, Your Honor.

02:20:39 20          THE WITNESS:  I see.  So if it's strictly speaking as

21  an expert witness, I have done very -- relatively little of

22  that, I'd say a dozen times or so over my career in court as an

23  expert witness.  I don't know if you count depositions or --

24  BY MR. BUCHANAN:

25  Q.   No, the, the question I had was in the last ten years, how

G. McCabe - Cross

820

1   much -- isn't it true that you've done a very small amount of

2   work as an expert witness?

3   A.   Yes.  I have done a small amount of work.

4   Q.   Okay.  Thank you.

5           And I know you -- and on your direct, you mentioned

6   some of the work you had done as an expert witness, and I think

7   you mentioned some equal employment cases; isn't that right?

8   A.   That's correct.

9   Q.   Okay.  Wasn't the last time you testified in court in

02:21:29 10   1996?  It was a case down in South Carolina?  You testified for

11   the Medical College of Charleston in a discrimination case?

12   A.   I recall that case.  I believe I testified in Kansas on a

13   food -- a pet food recall case.  I'm not sure that the issue

14   there was whether or not -- I can't remember the details, but I

15   did testify before a judge, not before a jury, and it was a

16   matter of whether there should be a separate trial in Kansas

17   versus the Kansas issues combined with a larger group of

18   plaintiffs.

19           So I don't know if that's called expert witness

02:22:26 20   testimony or not, but that was the last time I spoke in a court

21   with a judge.

22   Q.   Okay.  And you testified, I think, in some other

23   discrimination cases in the '70s and '80s?

24   A.   Yes.

25   Q.   Okay.  Isn't that sort of the last time you actually

G. McCabe - Cross

1    testified in court, in those cases for General Motors and

2    Michigan State University in class action discrimination cases?

3    A.   That would have been most of my in-court testimony, yes.

4    Q.   And you were representing Michigan State, General Motors,

5    the State of South Carolina against the plaintiffs, right?

6    A.   I'm not sure about the word "represented," but I was

7    employed by them.

8    Q.   Okay.  And I think you admitted or testified on direct

9    that you have never testified prior to this case in a case

02:23:22 10  involving copyright infringement or peer-to-peer networks;

11   isn't that right?

12   A.   That's correct.

13   Q.   Okay.  You're not an expert in any of those areas; is that

14   right?

15   A.   I'm not an expert in those areas.

16   Q.   Other than this case, you've never been retained by a

17   music company to testify; is that correct?

18   A.   By a music company?

19   Q.   Like one of the plaintiffs in this case, a recording

02:23:46 20  company, recording label?

21   A.   To testify in court, no.

22   Q.   Okay.  So you have been retained before by the plaintiffs'

23   counsel, have you not?

24   A.   That's correct.

25   Q.   And that was a case involving analyzing inventory of a dog

G. McCabe - Cross

822

1   books dog store and tracking the inventory and books going in

2   and out, right?

3   A.   That's correct.

4   Q.   Okay.  And how much did you get paid in that case; do you

5   recall?

6   A.   I don't recall.  It was a while ago.  It was relatively a

7   short, very specific task that I was asked to do there.

8   Q.   And how much have you been paid in this case?  I know

9   you -- you gave your hourly rate, and you said the hours.

02:24:34 10   What's the total, about 100,000?

11   A.   That would be correct in round numbers.

12   Q.   And you've been sitting in the courtroom for the last two

13   or three days, is that right, watching this?

14   A.   That's correct.

15   Q.   Okay.  Have you been paid for that?

16   A.   Yes.

17   Q.   Okay.

18   A.   I haven't been paid yet for that.  I assume I will be.

19   Q.   I hope you bill.  Okay.

02:24:54 20        So you're not an expert on, like, businesses and how

21   they operate and procedures of businesses, are you?

22   A.   I am not.

23   Q.   And I think you've actually acknowledged to me in your

24   deposition that you've never taken a business course; is that

25   correct?

G. McCabe - Cross

823

1    A.    That's correct.

2    Q.    Okay.  And your report, I think there were four reports,

3    were there not, that you wrote?

4    A.    I would have to verify that.  That sounds reasonable.

5    Q.    Did you write all those reports, or did you just outline

6    them?

7    A.    I wrote the reports.  They're my work.

8    Q.    Okay.  Could you take a look at your transcript, at

9    page 78, lines 5 through 15?

02:25:36 10   A.    Page 78, line 5?

11   Q.    Line 5 through 15.

12   A.    It says:  I outlined the report.

13   Q.    Okay.  And could you look at your same transcript, at 261,

14   line 21?

15   A.    Page 261?

16   Q.    Yeah.

17          THE COURT:  Do you have an objection?

18          MR. ZEBRAK:  Your Honor, I don't understand this

19   would be an impeachment issue.  He's just asking him --

02:26:03 20          THE COURT:  Well, let's just see where it goes.

21          MR. BUCHANAN:  Your Honor, if I might?

22          THE COURT:  Proceed.

23          MR. BUCHANAN:  All right, thank you.

24   BY MR. BUCHANAN:

25   Q.    So you have --

G. McCabe - Cross

824

1    A.   I'm sorry.  I'm not there yet.

2         Okay.  261?

3    Q.   Yes.

4         THE COURT:  What line?

5    BY MR. BUCHANAN:

6    Q.   21.

7    A.   I say:  In my view, I am the author.  I started with the

8    outline.

9    Q.   Okay.  So you said you wrote the reports, and I asked you

02:26:40 10   if you just outlined them.  So did you outline them or did you

11   write them?

12   A.   I wrote them.  I outlined them and I wrote them.  I always

13   start with an outline.

14   Q.   And if you look at your testimony there, doesn't it

15   describe that you had other people fill in the pieces and add

16   footnotes and add other text?  All that happened?

17   A.   Yes.

18   Q.   And did lawyers helped write it?

19   A.   Excuse me?

02:27:00 20   Q.   Did lawyers contribute to the reports?

21   A.   Well, there -- yeah, there are types of footnotes that I

22   don't know how to do properly, so in terms of you can see

23   there's technical legal things included in the report.

24   Q.   So --

25   A.   I --

G. McCabe - Cross

825

1    Q.   You testified that you were assigned a specific task here

2    and that at least the fundamental part of that task was to look

3    at all the ticket data that was given to you for the claim

4    period and determine how many notices were provided to Cox

5    subscribers by the plaintiffs for their works in suit after

6    they had received two; is that correct?

7              MR. ZEBRAK:   Objection, Your Honor.  That

8    mischaracterizes his prior testimony.

9              THE COURT:   Okay.  Why don't you ask him what his

02:27:54 10   understanding of what his assignment was.

11             MR. BUCHANAN:   Could we pull up their, their

12   demonstratives?  Yeah.  If you could go to the next?

13   BY MR. BUCHANAN:

14   Q.   So, so why don't you repeat again what your task was.

15   A.   My first task was to do a works in suit analysis.

16   Q.   So did you have a certain number of notices that you

17   looked at to try to determine whether someone was a so-called

18   repeat infringer?  I think you used that term.  That was three

19   or later, right?

02:28:51 20             MR. ZEBRAK:   Objection.  Mischaracterizes --

21             THE WITNESS:   I'm not sure if you're talking about

22   the works in suit analysis or the repeat infringer analysis.

23   BY MR. BUCHANAN:

24   Q.   Okay.  So you looked at -- what is the claims period in

25   this case?

G. McCabe - Cross

826

1    A.    It's on the slide --

2    Q.    No, I'm just asking you, do you know what it is?

3    A.    February 1, 2013, until November 26, 2014.  I'd have to

4    double-check that.  I'm sorry.

5    Q.    Okay.  So as I understand it, when you -- you were asked

6    to look at that time period and determine and to locate those

7    Cox subscribers that received a notice from the plaintiffs

8    after they had received two prior notices; is that right?

9    A.    That's right.  The third or more, and that's depicted as

02:29:41 10    the second bullet on this page.

11    Q.    So --

12    A.    I'm sorry, three or more.  Is that what I said?

13    Q.    Pardon me?

14    A.    I'm not sure if I said two or more or three or more.  I

15    meant three or more.

16    Q.    Were you able to determine -- when you did that, were you

17    able to determine how many of the three were from a third-party

18    content owner as opposed to one of the plaintiffs?

19    A.    I did not do that analysis.

02:30:07 20    Q.    Okay.  Did you do the analysis to determine how many

21    received just one notice during the claim period?

22    A.    I did calculate the number that received one, two, three,

23    four, every possible number.  I, I computed the actual number

24    and the --

25    Q.    Okay.

G. McCabe - Cross

827

1    A.    Yes.  So --

2    Q.    How many Cox subscribers received just one notice during

3    the claim period?

4    A.    I don't have that number stored in my memory.

5    Q.    Okay.

6    A.    I computed it.

7    Q.    How about two?  Do you know how many received just two

8    during the claim period?

9    A.    No, I don't --

02:30:49 10  Q.    But you did --

11   A.    -- recall.

12   Q.    -- compute it?

13   A.    I computed it for every number, one, two, three, four, up

14   to however many there were.

15   Q.    But -- so you didn't include it in your report or your

16   testimony because you were told not to; isn't that true?

17   A.    No.

18          MR. ZEBRAK:  Objection, Your Honor.  Compound.

19          THE COURT:  He answered the question no.

02:31:12 20  BY MR. BUCHANAN:

21   Q.    Okay.  Could you take a look at your deposition transcript

22   at page 91, please?  Line 14.

23   A.    I'm sorry, I'm not there yet.

24   Q.    Okay.

25   A.    Okay.  I'm on page 91.

G. McCabe - Cross

828

1    Q.    Okay.  Line 14 through 17, could you read that, please?

2    A.    And why did you not include the first and second notice?

3              MR. ZEBRAK:  Your Honor, may we have a sidebar?

4              THE COURT:  Well, no.

5              Does that refresh your recollection as to why you did

6    not include one and two?

7              THE WITNESS:  Line 14 just has a question why.

8              THE COURT:  All right, let's come to the sidebar.

9              NOTE:  A sidebar discussion is had between the Court

10   and counsel out of the hearing of the jury as follows:

11   AT SIDEBAR

12             THE COURT:  Okay.  What's the objection?

13             MR. ZEBRAK:  Well, on two fronts.  First of all,

14   Mr. Buchanan is a well-experienced attorney.  He knows how to

15   do impeachment.  And what he's doing is he purports to be

16   refreshing recollection, yet he's just asking him to read his

17   transcript into the record.

18             Number one, I believe that to be improper.  Number

19   two, he's conflating the repeat infringer analysis with the

02:32:59  20   works in suit analysis, and specifically he's already testified

21   that plaintiffs set the criteria for the works in suit

22   analysis, and now he's saying, in the works in suit analysis,

23   why didn't you look presumably for those works infringed in a

24   person's first or second notice, whereas plaintiffs, you

25   know --

G. McCabe - Cross

829

1          THE COURT:  He's framing what he was asked to do in

2    his report, and if that came from instructions from plaintiff,

3    that came from instructions from plaintiff.  If it didn't and

4    he made that decision independently, he can testify about that.

5    What's wrong with that?  I don't understand this.

6          MR. ZEBRAK:  Sir, there's nothing wrong with that,

7    and I don't object on that basis.  What I was saying is that he

8    already testified that plaintiffs' counsel gave him the four

9    criteria, and I just think that -- I have an issue with having

02:33:44  10  him just read his transcript into the record, and I think the

11   whole line of questioning is confusing because it's imprecise

12   between the two analyses.

13         THE COURT:  Okay.  So I've already asked that you --

14   if you're going to refresh his recollection, just point to the

15   page and line and let him read it and say, does that refresh

16   your recollection?  If it doesn't, then you can go to past

17   recollection recorded, and didn't you say previously, and then

18   he's allowed to read it into the record.

19         Is that -- am I missing something here?

02:34:15  20  MR. OPPENHEIM:  May I ask a -- offer an idea here?

21   Dr. McCabe is not an experienced witness, unlike a lot of the

22   experts here, and that's fine.

23         THE COURT:  Yeah.

24         MR. OPPENHEIM:  He doesn't understand that he's not

25   supposed to read it into the record when he's asked to refresh

G. McCabe - Cross

830

1    his recollection.  Maybe we could just instruct him that, have

2    him read it to himself --

3                 THE COURT:  Okay.

4                 MR. OPPENHEIM:  -- so we do this properly.

5                 He can either impeach him or he can refresh his

6    recollection, but, you know, there's a way to do this, and

7    Mr. Buchanan knows how to do it.

8                 THE COURT:  Okay.  Understood.  I'll so educate him.

9    All right?

02:34:42  10                 MR. OPPENHEIM:  Thank you, Your Honor.

11                 NOTE:  The sidebar discussion is concluded;

12    whereupon, the case continues before the jury as follows:

13    BEFORE THE JURY

14                 THE COURT:  All right.  So, Dr. McCabe, when counsel

15    asks you to -- when counsel asks you to look at a certain page

16    or paragraph to see whether that refreshes your recollection,

17    you don't need to read that into the record.  You just need to

18    read it to yourself and say yes or no, and then we'll follow up

19    from there.  Okay?

02:35:30  20                 THE WITNESS:  Thank you.

21                 THE COURT:  Does that work?

22                 THE WITNESS:  Yes.

23                 THE COURT:  All right.  Thank you.

24                 Please proceed, Mr. Buchanan.

25    BY MR. BUCHANAN:

G. McCabe - Cross

831

1   Q.   So I'll ask the question again:  Why didn't you include

2   those subscribers who received one or two notices in terms of

3   linking them to the works owned by the plaintiffs?

4   A.   Are we talking about the repeat infringer analysis or the

5   works in suit analysis?

6   Q.   We'll start with the works in suit.

7   A.   Okay.  So the works in suit analysis, yes, this talks

8   about linking notices with works in suit, and there I was told

9   that, and that was on the slide, that I should look at third or

02:36:18  10   later infringement.

11   Q.   Okay.

12   A.   So I counted the first infringement and second

13   infringement, but in works in suit, I looked at only those

14   infringements corresponding to a third or later infringements,

15   and, yes, I was told that was part of my assignment, if you

16   will, or the framework of what I was asked to do.

17   Q.   So you were told in that particular situation not to

18   include the one and two?

19   A.   I included them in that I counted them, and that's how I

02:36:49  20   determined which one was the third.  So, yes, they were

21   included in the analysis.  I need to know that there is a one

22   and a two to define what No. 3 is, etc.

23   Q.   But you didn't include it in your report, correct?

24   A.   It's not in a report of the works in suit.

25   Q.   So could we go to your expert report, your first one?

G. McCabe - Cross

832

1    It's tab 2, and look at paragraph 16a.

2              Do you have that?

3    A.    I do.

4    Q.    Okay.  So that section says Cox's copyright abuse ticket

5    records indicate that it received at least 315,054 notices

6    between January 1, 2012, and December 1, 2014.  Of those,

7    42,000 were sent regarding --

8              THE COURT:  Slow down a little bit so we make sure we

9    get this on the record, please.

02:38:17 10            MR. BUCHANAN:  Okay.

11   BY MR. BUCHANAN:

12   Q.    Of those, 42,236 were sent regarding a subscriber for whom

13   Cox had previously received at least one other notice.

14             Do you see that?

15   A.    I do.

16   Q.    So if you subtract 42,236 from 315,054, you get about

17   272,000 notices, right?

18   A.    I'll assume that your arithmetic is correct.

19   Q.    But those that -- that can't be right, could it, because

02:38:50 20   we have 57,000 subscribers, so you couldn't have 272,000

21   notices that went to 57,000 subscribers and just got one

22   notice.  That math is not right, is it?

23   A.    I'm not following your math or your argument.

24   Q.    Okay.  You say there that there were 315,000 notices,

25   right?

G. McCabe - Cross

833

```
 1              THE COURT:  Notices or tickets?

 2              MR. BUCHANAN:  Notices.

 3              THE COURT:  Okay.

 4    BY MR. BUCHANAN:

 5    Q.   Do you see that?  And you have --

 6    A.   Yes.

 7    Q.   -- 42,000 notices were sent to a subscriber for whom Cox

 8    had previously received at least one other notice.

 9    A.   At least one other --
```
02:39:23
```
10    Q.   Okay.

11    A.   -- notice.

12    Q.   So that means the difference went to the other

13    subscribers, right, the ones that just got one, those that

14    didn't get more than one, right?

15    A.   At least one other means two or more.

16    Q.   Okay.  So 42,000 of the 315,000 notices were sent to

17    someone that had at least two.  So that means the difference is

18    270,000, and that went to those that had one, right?

19    A.   We're talking about notices, not subscribers, right?
```
02:40:05
```
20    Q.   It said -- you wrote it.  It says notices.

21    A.   Notices.

22    Q.   Okay.  So you can't --

23    A.   But your arithmetic was doing subscribers, right?

24    Q.   I'm just -- I'm doing your math.  315,000 notices,

25    42,000 notices went to subscribers who had two or more.  That
```

G. McCabe - Cross

834

1  means the difference went to the others, which would be those

2  with one.  And you can't send 270,000 notices to 57,000 people

3  and have one for one, can you?

4  A.   This isn't counting people.  The other displays were

5  counting subscribers.  This is notices.

6  Q.   Well --

7  A.   And the arithmetic doesn't match because it's --

8  Q.   But you wrote this.  I'm just asking you --

9  A.   Yeah, I'm not disputing what I wrote.  I don't understand

02:41:03  10  why it's inconsistent with something else I wrote concerning

11  subscribers.

12  Q.   Well, I don't know what else -- you say you're referring

13  to some other thing you wrote.  I'm just looking at this, the

14  summary of your opinions, the very first one in this report

15  that you spent, looked at all that data and analyzed it, and

16  the very first one doesn't seem to me to make any sense.

17  A.   So it says -- so I -- I don't understand what doesn't make

18  sense.  You took the 315,000 and subtracted 40,000, and what

19  doesn't make sense about that subtraction?

02:42:04  20  Q.   Because that means 42,000 of the 315,000 notices went to

21  people that had two or more, which means the difference,

22  270,000, went to those that had one, but if you have 57,000

23  subscribers and there's 270,000 notices, that is not one for

24  one.

25          All right.  Why don't we go to another calculation.

G. McCabe - Cross

835

                    MR. OPPENHEIM:  There's no answer.

                    THE COURT:  Yeah, let him answer.  Do you want to

explain that?

                    THE WITNESS:  No, I'm still a little confused about

what, what you're --

                    THE COURT:  Okay.  All right.  Please proceed,

Mr. Buchanan.

BY MR. BUCHANAN:

Q.    Okay.  Could you turn to paragraph 50 of your report?

02:43:03         So here's one of your findings --

A.    I'm sorry, I'm not there yet.

Q.    Okay.  It's page 10.

A.    Got it.

Q.    Paragraph 50, you talk about some action content data, and

what I'm focusing on, you have hard limits for complaints with

24 percent, and you cite appendix 6.  Do you see that?

A.    I do.

Q.    Okay.  Let's look at appendix 6.  Hard limit for

complaints is about 47,000, right?

02:43:40 A.    I'm sorry, where -- you're at appendix 6?

Q.    This is your appendix, right?  You created this?

A.    We're on appendix 6?

Q.    Yeah.  You created this document, right?

A.    Yes.

Q.    Okay.  Hard limits for complaints, do you see that,

G. McCabe - Cross

836

1    47,000?

2    A.    46,997, yes.

3    Q.    Okay.  Can we use 47,000?

4    A.    Yes.

5    Q.    Okay.  So you're saying the hard limit for complaints

6    was -- this 47,000 was 27 percent of 315,000 unique tickets,

7    right?

8              Go back to paragraph 50 on page 10.  Do you see the

9    24 percent?

02:44:22 10   A.    Yes.

11   Q.    And it's actually 14 percent if you divide 315,000 into

12   47,000, is it not?

13   A.    I'm not following what you're saying, but I think you're

14   addressing the missing values.  Is that --

15   Q.    Do you see paragraph 10?  It says hard limits for

16   complaints was 24 percent of 315,000.

17              Correct?

18   A.    Hard limits for complaints was 24 percent.  Yes.

19   Q.    But 47,000 --

02:45:01 20            THE COURT:  Hold on.  Let him look at it.

21            MR. BUCHANAN:  Okay.

22            THE WITNESS:  I see it says 24 percent there, yes.

23   BY MR. BUCHANAN:

24   Q.    Okay.  So that's 24 percent of 315,000, right?

25   A.    Where are you getting the 315 from?

G. McCabe - Cross

837

1   Q.   48, paragraph 48.

2   A.   Oh, I'm sorry, where on paragraph 48?

3   Q.   So we were at paragraph 50.  Now we're trying to get the

4   calculations that you did, you know, using the applied

5   statistics.

6   A.   Okay.  So in paragraph 48, where --

7   Q.   It says --

8   A.   You're taking the number 315,054 --

9   Q.   Right.

02:45:42 10   A.   -- unique tickets.

11   Q.   So if you divide 315,000 into 47,000, it's not 24 percent,

12   is it?

13   A.   I don't think that's the arithmetic that we're -- I don't

14   think we're on the same page there.  Because you're talking

15   about the number of unique tickets?  So a particular ticket

16   could have more than one action content form entries, I

17   believe.  So I don't think the -- you can, you can do that.

18   I'm not sure.

19   Q.   So where did you -- what is the 47,000 hard limits, what

02:46:27 20   is that 24 percent of?

21   A.   Of the --

22   Q.   Okay.  Take --

23   A.   It would be of the appendix 6 --

24        THE COURT:  Hold on, let him finish.  Go ahead.

25   Finish, Doctor.

838

1          THE WITNESS:  If you look at appendix 6, and this is

2    a standard thing in the output, the last line there says:

3    Frequency missing, 369,284.

4          So that's the number of entries in the Cox ticket

5    data that had nothing in the field action content form.  Action

6    content form could have any of these things listed in

7    appendix 6, or it could have nothing.

8          So the percent was computed -- which one were we

9    talking about?  The --

02:47:34  10          THE COURT:  24 percent.

11          THE WITNESS:  The 24 percent for hard limit for

12   complaints, and that's given in this output.  So it's

13   23.4 percent.  That's of the non-missing entries for the field

14   action content form, 24 percent or 23.4 percent of those had

15   the words "hard limit for complaints" entered into that field.

16   BY MR. BUCHANAN:

17   Q.   So --

18   A.   So that's what's computed here.

19   Q.   So, I'm sorry, you divided what number into the 47,000?

02:48:23  20   A.   The -- I didn't divide.  This is what the software

21   produces, standard output for this kind of data.  You look at

22   the entries that are not missing, and you divide out by the

23   total number of those.

24          So if you take the column Frequency in appendix 6 and

25   add up all of those, that's the denominator that's used as the

G. McCabe - Cross

839

1    basis for the, for the 24 percent.  That number is not given on

2    the output.  What is given is just the -- at the bottom with an

3    asterisk the number of missing or it calls it null, null values

4    for action content form.

5    Q.   So you're saying that if you divide 370,000 into 46,000,

6    it comes to 24 percent?

7    A.   Could you say that again?

8    Q.   We can move on.

9         Why don't I direct your attention to your transcript,

02:49:36  10   page 194.  See if that refreshes your recollection that we

11   discussed that in your deposition.

12   A.   194?

13   Q.   Yes, line 7, 7 through 11.

14   A.   I'm sorry, I'm not there yet.

15   Q.   Okay.

16   A.   Page 194, line 7.

17   Q.   So read, read the question and answer there, and tell me

18   if that doesn't refresh your recollection as to how we did the

19   calculation during your deposition, when you were -- you were

02:50:23  20   also under oath there as well.

21   A.   I recall the conversation that we had, and my

22   understanding is that it's exactly the same as the conversation

23   that we just had.

24   Q.   Okay.

25   A.   I explained to you what the software does, that that's a

G. McCabe - Cross

840

1    standard output for a categorical variable.  When you compute

2    percents, you divide by the number of non-missing values.

3    There would be an option to divide by some other number if you

4    would like to divide by some other number, but that's not what

5    the, the default or standard calculation is.

6    Q.   So if I may just read the Q&A of this, that's --

7              THE COURT:  Is it inconsistent with what he just

8    talked about?

9              MR. BUCHANAN:  It is inconsistent.

02:51:09 10              THE COURT:  Go ahead.

11   BY MR. BUCHANAN:

12   Q.   Okay.  So what I asked you -- by the way, there's two

13   lawyers that are objecting, you know.

14              THE COURT:  I haven't heard any objection.

15              MR. BUCHANAN:  All right.

16              THE COURT:  And let's be calm and quiet here unless

17   you have a formal objection.  Then stand up and say, "Object,"

18   okay?

19              MR. OPPENHEIM:  Yes, sir.

02:51:27 20              THE COURT:  Okay.

21   BY MR. BUCHANAN:

22   Q.   So there you say -- I asked you:  Okay.  So a hard limit

23   for complaints of 46,997 is not 24 percent of 315,000, is it?

24              That's correct.

25              So -- it's 14 -- it's about --

G. McCabe - Cross

841

1          It's necessary to read it very carefully.  So 16a

2    says -- and then you talk about the copyright, and then --

3          MR. ZEBRAK:  Objection, Your Honor.  He's not reading

4    it.

5          THE COURT:  Overruled.

6    BY MR. BUCHANAN:

7    Q.   So, so you read that?  I ask you:  So a hard limit for

8    complaints of 46,997 is 24 percent of 315,000?

9          And you said:  That's correct?

02:52:15 10  A.   I'm sorry, what line are you on?  I'm having trouble

11   following you.

12   Q.   Line 7.

13   A.   Line 7, okay.  This says 24 percent is not something, and

14   that's just arithmetic you're saying, right?

15   Q.   Right.  That's how we started out as doing that

16   calculation, and here you agreed that the arithmetic worked,

17   and you didn't dispute the numbers in the calculation, did you?

18   A.   If you take 46,000 and divide by 350,000, you don't get 24

19   percent.  I agree.  I think that's what I was -- it's hard to

02:52:53 20  take this out of context, so yeah.  But that --

21   Q.   Could, could you take a look at your report, paragraph 49

22   and 50?  We were just there.

23          And you have a lot of data here, part of your

24   findings, 49 and 50, we went over one part of it, but isn't it

25   true when you put that information in there, that you didn't

G. McCabe - Cross

842

1 understand what it was?

2 A.   No.

3 Q.   Okay.  Could you look at paragraph -- page 189 of your

4 deposition?  So --

5 A.   I'm not there yet.

6 Q.   Okay.

7 A.   Okay.

8 Q.   All right.  So if you look at page 189 of your deposition,

9 line 3, can you just read down and over to the next page, down

02:54:27  10 to 14?

11 A.   Wait.  So read page 189, starting on line 3?

12 Q.   At line 1 -- or line 3, yes.  And then if you go over

13 to --

14 A.   I don't understand what it's referring to, starting on

15 line 1 or line 3, because it says:  You're not suggesting that

16 means --

17 Q.   Okay.

18 A.   I don't know what that refers to.

19 Q.   Okay.  Go back -- just a little higher and start with

02:55:05  20 line 16 on 188, where it says:  Then if you look at sent

21 warning, changed status to closed.

22         All right?

23 A.   Okay.  I need to do this a little bit slowly because I

24 haven't looked at this in a while.

25 Q.   Okay.  That's fine.  And then if you need to, you can go

G. McCabe - Cross

843

1    back to paragraphs 49 and 50 of your report and see if that's

2    not what we're discussing there.

3    A.   So I -- you asked me a question:  Do you have any idea why

4    they're using that terminology?

5            And I said:  No, I don't know why Cox is using that

6    terminology in their data file.  All I know is that the

7    relative frequency of the different terms that they used -- and

8    that's what I reported in that appendix, or No. 6.  I don't

9    know if --

02:56:21 10   Q.   So --

11   A.   But I don't know anything more than what those words said,

12   and I, you know, had the computer read those words and put them

13   in, in the summary.

14   Q.   So my question was those are more findings that you made

15   using the applied statistics, and what I was asking you is even

16   though you put those findings in there, you didn't really know

17   what they meant.  And are you agreeing with that?

18            THE COURT:  What they meant to Cox?

19            MR. BUCHANAN:  What they meant to him in reading

02:56:54 20   them.

21            THE WITNESS:  What they meant to me was that they

22   were different entries in the computer file.

23   BY MR. BUCHANAN:

24   Q.   But you didn't --

25   A.   As I said, I took the data at face value.  This is Cox's

G. McCabe - Cross

844

1    data, and I made a table of the different possible entries that

2    could be in that column and counted them.

3    Q.   Okay.   These are findings, and isn't it true that you put

4    these findings in there even though you didn't know what the

5    data meant?   Isn't that what that passage is I just showed you?

6    Doesn't it say --

7    A.   I did not have any definition of those terms; that's

8    correct.

9    Q.   Okay.   So if you don't have a definition, that means you

02:57:30  10   don't know what they mean.

11   A.   Not necessarily, but I would -- as I said, I don't, I

12   don't know why they're using that terminology.

13   Q.   Okay.

14   A.   I don't know the meaning of those things.   I was just

15   trying to describe the data that was given to me by Cox.

16   Q.   And didn't you actually ask people -- in fact, you asked a

17   lot of people what that meant, but you couldn't get any

18   answers; isn't that right?

19   A.   No.

02:57:55  20   Q.   Isn't that what -- go read the passage again.   See if it

21   doesn't say that.

22   A.   That it says I asked a lot of people?   I didn't see that.

23            MR. BUCHANAN:   Can I read or no?

24            THE WITNESS:   Where are you?

25            THE COURT:   Direct him to a line and --

G. McCabe - Cross

845

BY MR. BUCHANAN:

Q.   Okay.   Line 1, page 190:   -- tell me what they mean, give
me definitions.   Give me -- we even have words for that.   In
some computer statistical packages --

          And you say you called it a code book?

          MR. ZEBRAK:   Your Honor?

          THE COURT:   Yes, sir.

          MR. ZEBRAK:   I'm not sure what's happening now.

          THE COURT:   All right.

02:58:33  MR. ZEBRAK:   This is --

          THE COURT:   Well, let's go back, the question was --
did you ask -- he asked you whether you had asked lots of
people.   He directed you to this specific reference in the page
and line, and does that refresh your recollection?

          THE WITNESS:   No, not, not what I read on page 190.

          THE COURT:   Okay.   All right.   Next question.

          MR. BUCHANAN:   I'm sorry, I didn't hear that.

          THE COURT:   He said no, it doesn't refresh his
recollection.   I don't know what's on the page.   Do you want
02:59:09  to -- do you want to --

          MR. BUCHANAN:   Am I allowed to --

          THE COURT:   Yeah, you can now use the statement and
ask him did he not -- did I not ask you this question and did
you not say the following?

          MR. BUCHANAN:   All right.

G. McCabe - Cross

846

```
 1              THE COURT:  Please go ahead.

 2    BY MR. BUCHANAN:

 3    Q.   So, so we'll start there, and at the top, it says -- you

 4    actually answered my question about did you try to find --

 5              THE COURT:  Let's ask questions and see if he

 6    answered it inconsistently with what he's saying today.

 7    BY MR. BUCHANAN:

 8    Q.   Okay.  The question I asked you earlier was, you already

 9    said you didn't know the definitions of the words and you just
```
02:59:54
```
10    put them in there as your findings, and I asked you didn't you

11    actually go try to find out the answers to that?

12              And you made a reference to, like, the code book in

13    applied statistics, that that's what you're looking for.

14              THE COURT:  None of that's in the record.  It's all

15    stricken.

16              MR. BUCHANAN:  All right.

17              THE COURT:  And I know you're trying to explain the

18    setting here, but that is not the way this works, because now

19    you're testifying again, and we went through that.
```
03:00:21
```
20              MR. BUCHANAN:  All right.

21              THE COURT:  It assumes facts not in evidence.  But if

22    you have a question and an answer which is inconsistent with

23    what he's said today, you certainly may impeach him with that,

24    but not the following paragraphs and see if you don't get a

25    sense of this or that.
```

G. McCabe - Cross

847

         1          THE WITNESS:  If I could clarify my answer, I

         2    think --

         3          THE COURT:  No, let's wait for --

         4          MR. BUCHANAN:  I can, I can read what he testified to

         5    now, right?

         6          THE COURT:  If there's a question that you asked him

         7    and he answered inconsistently, you certainly can read that and

         8    say, didn't you say that previously?

         9          MR. BUCHANAN:  All right.

03:00:59 10          THE COURT:  Sure.

        11          MR. BUCHANAN:  He says he doesn't remember, but the

        12    passage says what he says.

        13          THE COURT:  Didn't you say in your deposition when

        14    you were asked the following question and the following answer?

        15    BY MR. BUCHANAN:

        16    Q.   Now, I'll ask it again, and this is how we started, and I

        17    asked you -- you gave me one answer, that -- about you didn't

        18    have the definition.  I asked you:  Did you ask people that you

        19    were working with, including, you know, all the people you're

03:01:29 20    working with, whether, in fact, you sought from them what those

        21    words meant that went into those two findings?

        22          And are you saying that you didn't ask anyone?

        23    A.   I can explain.  I apologize that I answered too quickly.

        24    I did not read all of page 190.  I felt a little bit rushed.  I

        25    read the top part; I didn't read the bottom part.

848

1           So there is a question that was asked to me, and I

2    answered:  I always asked everybody give me what I would call

3    the code book.

4           That answer refers to my general behavior or

5    procedures when I get data, and that is, can you give me the

6    code book?  That code book is particular jargon for a

7    statistical package called SPSS, and it does exactly what --

8    the kind of things we were talking about.  It would give me the

9    list of possible values for those fields that are given in

03:02:43 10  that, that appendix, and what each of them means.

11          I said:  Do you have that?  I asked plaintiffs'

12   counsel:  Do you have a code book that explains all these

13   variables?

14          The answer was no.

15          So -- but the context of did I ask everybody, I

16   always ask everybody:  Can you give me some data, tell me what

17   I need to know about each of the fields and the meaning of

18   those, those entries.

19          THE COURT:  All right.  Thank you, sir.

03:03:13 20         All right.  Next question.

21   BY MR. BUCHANAN:

22   Q.   Okay.  And I think you -- okay.  So you said that you

23   asked for it, and you didn't receive it, and I think -- do you

24   recall that you don't know why you never received it?

25   A.   I don't think it exists.

G. McCabe - Cross

849

1   Q.   Why don't you take a look at your testimony there and tell

2   me if, in fact, you say that, that it doesn't exist.  Why don't

3   you read where it starts, line 11:  So I never received that,

4   and I don't know why.

5         And then read the rest after that.

6   A.   I had a lot of other things to do, and I never pursued

7   this any further than to summarize in the summary that I gave

8   in this report.

9   Q.   So you had a lot of -- those are findings in your report,

03:03:59 10   and you had -- you're saying you had a lot of other things to

11   do, and so you just moved on.

12   A.   That's a fair summary of what I said, I believe.

13   Q.   Okay.  All right, can we pull up their slides?

14         Okay.  Let's go to slide 7.  Now, the claims period,

15   I think you correctly testified, is in February 2013 to

16   November 2014.  Do you remember that?

17   A.   I do.

18   Q.   Okay.  This goes beyond that, a year earlier and a month

19   later, right?

03:05:13 20   A.   That's correct.

21   Q.   Okay.  So did you actually analyze this same data for the

22   claims period which is at issue in this case?

23   A.   No.

24   Q.   Okay.  And is that because you were told not to do it?

25   A.   No.

G. McCabe - Cross

850

1   Q.   You just decided not to do it?

2   A.   I didn't decide not to do things.  I decided to do things.

3   Q.   Okay.  In fact, you did run the numbers.

4        THE COURT:  Let him finish answering.

5        MR. BUCHANAN:  Okay.

6        THE COURT:  Were you finished, sir?

7        THE WITNESS:  I think so.

8   BY MR. BUCHANAN:

9   Q.   You did run those numbers, though, right?

03:05:47 10  A.   No.

11  Q.   You never did.

12       So let's start with January 1, 2012.  You have 31,000

13  that had three or more, right?

14  A.   That's what the display says, yes.

15  Q.   How many had three?

16  A.   It's not given on this chart.

17  Q.   Well, I see that.  I'm sorry.  But did you calculate that?

18  A.   Yes.

19  Q.   Okay.  What is it?

03:06:17 20  A.   I don't recall.

21  Q.   Okay.  So this -- if you have 57,000 subscribers and

22  31,000 had three or more, how many had one or two?

23  A.   The number is not on the chart.  I computed it, and I

24  don't have it in my memory.

25  Q.   Okay.  Well, I'm just -- I was asking you to do the math

G. McCabe - Cross

851

1    for me.  57,000 minus 31,000 is about 26,000.

2    A.    The difference would be the number who had two or one.

3    Q.    Okay.  That's statistics, right?  That's sort of --

4    A.    It's arithmetic.

5    Q.    Okay.  So that means of all these subscribers, or all

6    tickets, which means we're talking about a three-year period, a

7    year beyond the claims period, right, and 26,000 had one or

8    two; is that right?

9    A.    Approximately, yes.

03:07:13  10    Q.    And do you know how many of those 26,000 had one?

11    A.    As I said, I don't.

12    Q.    Okay.  And so then you go to six-plus, so again we're

13    talking about three years, and all ticket data means notices

14    from everyone that came into the tickets for that three-year

15    period, right, from the plaintiffs and from other content

16    holders that sent notices, right?

17    A.    Correct.

18    Q.    Okay.  So if we go to six-plus, if you take -- subtract

19    31,000 from 16,000, we get 15,000 that had five or less,

03:07:54  20    correct?

21    A.    You're doing 57 minus --

22    Q.    31,000 minus --

23    A.    -- 16?

24    Q.    -- 16,000, trying to get to those who had five or less.

25          Maybe you could do it for me.

1    A.    To get five or less?  I don't think you can recover that

2    from here.

3    Q.    Well, if you have six-plus had 16 and you have 31,000 that

4    had three-plus, isn't the difference those that are in between?

5    A.    Four or five.

6    Q.    Yes.

7    A.    But you said five, I thought.

8    Q.    Oh, I said five or less.

9    A.    Five or less.  Yes, you could do that subtraction.

03:08:35 10    Q.    Okay.  So that would be 41,000 that had five, four, three,

11    two, or one, right?

12    A.    You're saying 57,000 minus 16,000, okay.  Is that what

13    you're saying?

14    Q.    No.  So what I'm getting at, if we get 31,000, 57,000,

15    that gave us 26,000 that had one or two?

16    A.    You know, you're reading, it, and I can't process it that

17    fast; I'm sorry.  I could write it down if you want or if you

18    want to write it down, but I -- you're just throwing numbers at

19    me.  I can't do that.

03:09:11 20    Q.    Okay.  Just -- okay.  Tell me how many had five or less

21    based on your chart.  Can you calculate that?

22    A.    That would be the difference between the total and the

23    number who have six or more, yes.

24    Q.    And so how many would that be?

25          THE COURT:  He just said he can -- if you want him to

G. McCabe - Cross

853

1    write it down and subtract it, he'll do it.  Otherwise, he's

2    given you his answer.

3            MR. BUCHANAN:  Okay.

4            THE COURT:  He's answered your question.  Move on to

5    the next question.

6            MR. BUCHANAN:  Okay.

7            THE COURT:  Unless you want to give him a number and

8    ask him whether that sounds reasonable.  I assume you have done

9    the math, and he's not here to do math, okay?  I mean, he's not

03:09:50 10   here to do this function of the math.  So if you have the

11   number --

12           MR. BUCHANAN:  All right.  Okay, Your Honor.  I did,

13   I thought I tried to calculate.

14   BY MR. BUCHANAN:

15   Q.   It's 41,000 that had five or less, right?

16   A.   Yes, that looks right.

17   Q.   Okay.  And then isn't it nine or less, isn't it almost

18   50,000?

19   A.   You do the complement of those numbers; that's correct.

03:10:11 20   Whatever that number, that arithmetic gives you, yes.

21   Q.   So if you had nine or less, that could be three a year,

22   three in 2012 through three in 2013, three in 2014, right?

23   A.   I wouldn't draw that conclusion.  You say an average of

24   three or --

25   Q.   Do you know when these notices came in?

G. McCabe - Cross

854

```
 1   A.   No.
 2   Q.   Do you know whether they relate to a business subscriber
 3   or a home?
 4   A.   No.
 5   Q.   So you don't know if they're, like, a hotel or -- a hotel
 6   or a hospital versus a residence?
 7   A.   I was not given that information.
 8   Q.   Okay.  But you, you do know how many business subscribers
 9   there were, correct?
```
03:10:51 10   A.   Yes.
```
11   Q.   Okay.  And you originally calculated that like 1800, and
12   then you increased it in your supplement report to 2800, right?
13   A.   I don't recall all those numbers, I'm sorry.
14   Q.   So do you recall the average amount of notices that a
15   business subscriber received during this time period?
16   A.   I don't believe I calculated that kind of summary, but I
17   could have.
18   Q.   All right.  So, so could you go to your reply report?  I
19   think it's tab, tab 4, paragraph 23.  If you read that
```
03:12:16 20   paragraph of your report -- you wrote this, right?
```
21   A.   Yes.
22   Q.   Okay.  So you say there's 2,868 business subscribers, and
23   what's the mean or the average?
24   A.   I said I replicated Dr. Weber's calculation finding -- and
25   the median is given as 4 and the mean is given as 15.9.  This
```

G. McCabe - Cross

855

1   is a classic example why the mean is not a good descriptor of

2   the center of a distribution.  It's highly skewed.

3   Q.   I asked you if you calculated the mean.  That's all.

4   A.   That's what it says.

5   Q.   That's what it says.  You did that, right?

6   A.   Yes.

7   Q.   Okay.  So when we go over here, if you apply the business

8   subscribers to the 13-plus and the 14-plus, they average 16?

9   A.   I didn't -- I said I replicated Dr. Weber's calculation.

03:13:20 10   Q.   And who is Dr. Weber?

11   A.   One of your experts, I believe.

12   Q.   She calculated numbers like you did in terms of --

13   A.   I calculated what she reported and verified the accuracy

14   of her arithmetic.

15   Q.   So you just -- is there a footnote to her report here?

16        All right.  So you just took her number and put it in

17   your report, but you agree with it, right?

18   A.   I verified the arithmetic that she performed.

19   Q.   And then you used it in your report, so it must have had

03:14:00 20   some significance, right?

21        MR. OPPENHEIM:  Your Honor, Dr. Weber has not

22   testified.

23        THE COURT:  Stop.  You're testifying, and he has a

24   right to ask why he put it in the report.

25        Ask him, do you recall -- you may testify as to why

G. McCabe - Cross

856

1    that is put in your report.  I think you just testified that

2    you were testing her math; is that right?

3              THE WITNESS:  That's correct.

4              THE COURT:  All right.  And is that why it's in the

5    report?

6              THE WITNESS:  Yes.

7              THE COURT:  All right.  Let's move on.

8    BY MR. BUCHANAN:

9    Q.   Okay.  So the question I have for you is did you

03:14:44 10   determine, like, for those who had 14 or more, how many of

11   those were business subscribers considering that they averaged

12   16 notices?

13   A.   I didn't --

14   Q.   Okay.

15   A.   -- do that calculation to the best of my knowledge, no.

16   Q.   So when we get to, like, 14, what percentage of 4,400 is

17   of 57,000?

18             So in other words, if you've calculated how many

19   subscribers had dropped off at this point were no longer

03:15:19 20   getting notices at the 14 level, is that about 90-some percent,

21   95 percent?

22   A.   You're asking me to compute 4,400 divided by 57,600?

23   Q.   Yes.

24   A.   I don't have my phone or I would do it.

25   Q.   Okay.

G. McCabe - Cross

857

1    A.   I can't do that -- I don't do arithmetic in my head

2    particularly with a microphone in my face.

3    Q.   Okay.  You could do -- 5,700 of 57,000 would be 10

4    percent, right?

5    A.   In rough, round numbers, yeah.

6    Q.   So that would be 90 percent.  So 4,400 would be more like

7    93, 94 percent?

8    A.   If you say so.

9    Q.   Okay.

03:16:11  10    A.   I don't doubt it.

11        MR. BUCHANAN:  All right.  We'd like to move this

12    into evidence, Your Honor.

13        THE COURT:  All right.  This exhibit with the

14    highlights is a new exhibit?

15        MR. BUCHANAN:  This demonstrative.

16        THE COURT:  Okay.  Is there any objection?

17        MR. ZEBRAK:  Well --

18        MR. BUCHANAN:  It's their exhibit.

19        THE COURT:  Yeah.

03:16:28  20        MR. ZEBRAK:  It's fine, but is his entire set of

21    slides going into evidence?

22        MR. BUCHANAN:  I'm just moving this one.

23        MR. ZEBRAK:  Well, if we move it all into evidence,

24    we're fine with that, Your Honor.

25        THE COURT:  Yeah.  All right.  I'll consider that.

G. McCabe - Cross

858

1   We'll talk about that later.

2          MR. BUCHANAN:  Okay.  Could we go to the next slide?

3   Next one?  Oh, go back to that one.  Thanks.  Sorry.

4   BY MR. BUCHANAN:

5   Q.   These 13 terminated subscribers, they only relate to these

6   particular notices, right?  They don't relate to other notices

7   that we got during the time period?  In other words, you're

8   just talking about --

9   A.   They refer to the ticket data that I have.

03:17:20 10   Q.   Beyond this, beyond this 57,000 subscribers, you didn't

11   look at data beyond that to see how many terminated subscribers

12   there were for this period beyond these particular works in

13   suit or these particular subscribers, right?

14   A.   These 13 are a subset of the 57,600, yes.

15   Q.   All right.  Can we go to the next slide, please?

16          So earlier -- you just -- when I was asking you about

17   the subscribers, business subscribers, and then you calculated

18   it here, right?

19   A.   Yes.

03:17:53 20   Q.   And is this Dr. Weber's number?

21   A.   I don't know.

22   Q.   Okay.

23   A.   I don't know if she had -- I didn't -- these are my

24   numbers.

25   Q.   Okay.  Let's go to the -- so on this one, 17,729

G. McCabe - Cross

859

1    subscribers had tickets for notices from other rights holders,

2    right?  So, so how many, how many tickets are we talking about

3    from these other rights holders?  Are we talking about one for

4    the 57,000, you've determined that there was at least one

5    ticket relating to another rights holder for the subscribers in

6    question?

7    A.    For each of the 57,600 subscribers, I computed a variable,

8    yes or no.  Yes, they had a notice corresponding to another

9    rights holder, or no, they did not have a notice from another

03:19:03 10  rights holders.  And this is the proportion of yeses for that

11   calculation.

12   Q.    So when you actually did the task that you were to do,

13   which was to determine how many -- during the claim period, how

14   many Cox subscribers received a notice from the plaintiffs for

15   a work in suit after receiving two others, that two others

16   could be -- both those two others could be from some third

17   party, right?

18   A.    That's correct.

19   Q.    Did you determine how many of the 57,000 received two out

03:19:40 20  of the three from somebody else, like, you know, Amazon, HBO,

21   Disney?

22   A.    I did not perform that calculation.

23   Q.    And did you determine when these notices regarding the

24   17,729, did they come in in 2012, '13, or '14?

25   A.    I did not calculate that.

G. McCabe - Cross

860

1    Q.    And in terms of the notices that we talked about, did you

2    determine whether they were with regard to the same musical

3    composition or sound recording?  Well, actually forget musical

4    composition.  Sound recording.  Did you determine whether any

5    of those -- how many came into the particular subscriber that

6    related to the same song or album?

7    A.    I'm not sure I understand the question.

8              MR. BUCHANAN:  Can we back up?  Keep going.  One

9    more.  Thanks, James.

10   BY MR. BUCHANAN:

11   Q.    So the people that got one or two, did you determine

12   whether it related to the same song or not?

13   A.    I just counted tickets.

14   Q.    Okay.

15   A.    I did not look at the song.

16   Q.    So the people that got three, they could have gotten -- it

17   could be all -- it could be a kid that downloaded a Disney

18   game, and the family got three notices for the same downloaded

19   game over three days, right?

03:21:11  20   A.    I believe so.

21             MR. ZEBRAK:  Your Honor --

22             THE WITNESS:  I don't have -- I know what's in the

23   data.  That's all.

24             THE COURT:  Overruled.  If you can answer.

25             THE WITNESS:  Yes.

861

1          THE COURT:  He's asking you about, you know --

2          THE WITNESS:  I guess I don't have -- I can't -- I

3    don't have that information.

4    BY MR. BUCHANAN:

5    Q.   So in the bigger numbers, like 13-plus and 14-plus, the

6    13, that can relate to an internet service provider that had a

7    subcontract with us and then had, you know, 100,000

8    subscribers, right?

9    A.   All I know is what was in the data that I have.  I don't

03:21:47 10   know what it could have been.  I know what was in the data.

11   Q.   Okay.  So you didn't look behind the data to see if it was

12   a residential subscriber, a business subscriber, or what type

13   of business subscriber, right?

14   A.   I did not.

15   Q.   Okay.

16          James, can you -- okay.

17          So you've talked about report -- repeat infringing,

18   or repeat infringers.  This shows that as you move along,

19   there's fewer and fewer people repeating, right?

03:22:19 20   A.   That's correct.

21   Q.   The more notices they get, the fewer additional notices?

22   A.   That would always be true for data displayed in this way.

23   Q.   And that's what Lynn Weber's data showed, right?

24   A.   I don't recall.

25   Q.   Okay.  And I think, isn't it your view that -- I guess you

G. McCabe - Cross

862

1    didn't look at it for the claims period, but do you recall when

2    I asked you in your deposition about isn't it true that over

3    time, that you had -- most people had one or two and then some

4    had three, some had four; it just sort of then decreased,

5    right?

6    A.   That's correct.

7            MR. BUCHANAN:   Okay.  So could you go to the next

8    slide, please?  Go down a couple.  The next one, please, James.

9    Thank you.

10   BY MR. BUCHANAN:

11   Q.   So here again, we're outside the claims period by one

12   month on one side and a year on the other side, right?

13   A.   That's correct.

14   Q.   And you think your counsel asked you to do that?

15   A.   That's the data that I was given.

16   Q.   Okay.  And you were asked to do this, right?  You didn't

17   do this on your own.  You were told to do this, right?

18   A.   I was told to do a repeat infringer analysis.

19   Q.   So your 13,400, obviously, that number of the subscribers

03:23:42 20   that got tickets before the claim period, these are subscribers

21   that got a ticket during the claim period, at least one?

22   A.   That's correct.

23   Q.   Okay.  So they got one during the period 2013 and '14, and

24   then you're saying they got at least one in 2012?

25   A.   Or before February 1, 2013.

G. McCabe - Cross

863

1    Q.   Okay.  So that's three.  So do you know the -- you know,

2    what time period they received the three notices?

3    A.   For a particular --

4    Q.   Yeah.

5    A.   -- subscriber?

6         I mean, I have that information.  I didn't summarize

7    that or report it.

8    Q.   Did you distinguish between a business subscriber or a

9    residential subscriber?

03:24:24  10    A.   I did not in this analysis.

11   Q.   So this would be about 80 percent of the subscribers in

12   question in this case got no notices -- or got no tickets in

13   the year 2012 in the month of January prior to the claims

14   period, right?

15   A.   That's correct.

16   Q.   So 80 percent for 13 months got no tickets, and that would

17   mean including a notice from the plaintiffs or any other rights

18   holder that sent a notice in?

19   A.   You're using 80 percent as the complement of 23 percent?

03:25:05  20    Q.   Yes.  I know it's 77.

21   A.   Yes.  So yes.

22   Q.   Okay.

23        Is there another slide here?  We can move that.

24        So Cox -- are you aware that Cox had 4.5 million

25   subscribers?

G. McCabe - Cross

864

1  A.   No.

2  Q.   Okay.  You were here for the testimony of

3  Dr. Barbara Frederiksen-Cross, right?

4  A.   I heard some of her testimony.  I don't think I was here

5  for all of it.

6  Q.   Did you hear when she said there were 30 million people on

7  BitTorrent and these other sites on a daily basis?

8  A.   I don't recall storing that information.

9  Q.   Okay.  So you testified at the beginning of your direct

03:26:15  10  examination that you accepted all of the data that was given to

11  you on face value, right?

12  A.   That's correct.

13  Q.   You didn't look behind it, correct?

14  A.   That's correct.

15  Q.   So if it was unreliable, then your, your analysis or

16  conclusions would be unreliable, right?

17  A.   My understanding is that the data -- that somebody else

18  was responsible for the reliability of the data.  I was not

19  responsible for it.

03:26:43  20  Q.   But the question was if that data turns out to be

21  incorrect or inaccurate and you relied on it, then that would

22  make your conclusions potentially inaccurate?

23  A.   Yes.

24          MR. BUCHANAN:  Okay.  I have no further questions,

25  Your Honor.

G. McCabe - Redirect

865

|  |  |
|--|--|
| 1 | THE COURT:  All right.  Thank you. |
| 2 | Redirect? |
| 3 | MR. ZEBRAK:  Yes, Your Honor.  Thank you. |
| 4 | Could you pull up the demonstratives, Mr. Duval? |
| 5 | REDIRECT EXAMINATION |
| 6 | BY MR. ZEBRAK: |
| 7 | Q.  Let's first start, Dr. McCabe, with the time you spent |
| 8 | working on this matter.  Would you describe this -- how would |
| 9 | you characterize the degree of how hard you worked on this |
| 03:27:51 10 | matter? |
| 11 | MR. BUCHANAN:  Your Honor, I -- that's way beyond the |
| 12 | scope of cross. |
| 13 | THE COURT:  Oh, no. |
| 14 | MR. BUCHANAN:  Okay. |
| 15 | THE COURT:  I'll permit it. |
| 16 | BY MR. ZEBRAK: |
| 17 | Q.  Before the objection, sir, I asked you how would you |
| 18 | characterize how hard you worked on this matter? |
| 19 | A.  I worked very often from early, very early in the morning |
| 03:28:14 20 | until late at night. |
| 21 | Q.  Did you have to work at nights? |
| 22 | A.  Yes. |
| 23 | Q.  Weekends? |
| 24 | A.  Yes. |
| 25 | Q.  Did you have to travel? |

G. McCabe - Redirect

866

1   A.   Limited travel, yeah.

2   Q.   When you arrived here to testify this week, did you know

3   exactly what day you would have to testify?

4   A.   I did not.

5   Q.   Did you know how long plaintiffs' counsel or Cox's counsel

6   would take questioning witnesses?

7   A.   I did not.

8   Q.   Do you enjoy being away from your family for this matter?

9        THE COURT:  All right, let's move on.  This is

03:28:47 10  beyond -- I thought you were going to ask what he did during

11  the 100 or more hours that he worked on the case, and this is

12  outside of that.  So let's move on.

13        MR. ZEBRAK:  Yes, Your Honor.  I'll move on.

14  BY MR ZEBRAK:

15  Q.   Counsel asked you questions about the mechanics of the

16  preparation of your report.  Do you recall that?

17  A.   Yes.

18  Q.   Asked you questions about who typed particular words or

19  footnotes going from your outline and revisions?  Do you recall

03:29:17 20  that?

21  A.   I recall the questions.

22  Q.   Whose work product is reflected in that report?

23  A.   It's my report.

24  Q.   Do you stand behind that work product?

25  A.   I do.

G. McCabe - Redirect

867

1    Q.   Does anything from counsel's questions today cause you to

2    doubt the accuracy and reliability of your findings?

3    A.   No.

4    Q.   Now, I'm going to ask you not just about your reports but

5    about -- let's start with your demonstrative slides.  Does

6    anything from counsel's questions today cause you to doubt the

7    accuracy and reliability of those slides?

8    A.   No.

9    Q.   Does anything from counsel's questions today cause you to

03:29:50  10   doubt the accuracy and reliability of the testimony you've

11   given?

12   A.   No.

13   Q.   Now, let me ask you some other questions.  Counsel asked

14   you a series of fast questions about several pages of your

15   deposition testimony, and I believe they, they concerned

16   warnings.  Do you recall that -- those questions?

17            MR. BUCHANAN:  I'm going to object to that.

18            THE COURT:  Warnings?

19            MR. ZEBRAK:  Well, I'm framing the question, Your

03:30:18  20   Honor.

21            THE COURT:  Well, you're testifying.  Ask him --

22            MR. ZEBRAK:  Yes, Your Honor.

23            THE COURT:  -- whether he agrees or disagrees with

24   something that was brought to his attention.

25            MR. ZEBRAK:  Sure.

G. McCabe - Redirect

868

BY MR ZEBRAK:

1

Q.   I'd like to bring your attention, sir, to your deposition

2

testimony that counsel referred you to, at page 188 to 191.

3

I'd like to just remind yourself what he was questioning you

4

about.  I'm going to ask a follow-up question.

5

MR. BUCHANAN:  Your Honor, this is improper.

6

THE COURT:  No, I think he's asking whether he would

7

like to further explain questions -- whether to further -- he

8

would like to amplify his answer to questions you asked on

9

03:31:01 10

direct where he was limited.

11

Is that right?

12

MR. ZEBRAK:  That's exactly what I'm doing, Your

13

Honor.  I'd like to give the witness an opportunity to look at

14

those pages so he understands the subject matter of the

15

questions from Cox's counsel, and I'm going to follow up.

16

THE COURT:  Where do you want him to read?

17

MR. ZEBRAK:  Oh, it was page -- I had done that

18

before the objection.  It was --

19

THE COURT:  188 to 191?

03:31:23 20

MR. ZEBRAK:  Yes, sir.

21

THE COURT:  All right.  Please review those pages,

22

Dr. McCabe.

23

THE WITNESS:  Yes, I'm familiar with those pages.

24

BY MR. ZEBRAK:

25

Q.   Are you familiar with what the phrase "sent warning"

869

1    refers to?

2    A.    Not in fine detail.

3    Q.    Does anything about your demonstrative slides today

4    address warnings?

5    A.    It does not.

6    Q.    Did anything about your testimony on direct involve a

7    calculation of the number of warnings Cox sent to customers?

8    A.    I don't believe so.

9    Q.    Now, I want to bring up one of your demonstrative slides,

03:32:26  10   sir.  So we're back in the repeat infringer analysis.  This is

11   the who, the repeat infringers, correct?

12   A.    Correct.

13   Q.    Okay.  Now, the source of the information for this

14   analysis are whose records?

15   A.    The --

16          MR. BUCHANAN:  Your Honor, I'm going to object.  He

17   asked -- asked and answered on direct, so I never asked

18   anything about it.

19          THE COURT:  You asked lots of questions of where --

03:33:07  20   of the dates of the data and what the data represented, so I

21   think it falls within redirect.  Ask your question.

22          MR. ZEBRAK:  Thank you, Your Honor.  I was just

23   framing the question to follow so it had some context before

24   the objection.

25          THE COURT:  Go ahead.

G. McCabe - Redirect

870

BY MR. ZEBRAK:

Q.   Let me start again.  Whose records are you analyzing with respect to repeat infringers?

A.   This is the Cox ticket data.

Q.   And these are ticket records concerning -- that stem from copyright infringement notices, correct?

A.   That's right.

Q.   Okay.  Now, do you know for what years Cox produced ticket data for the 57,600 subscribers who were the subject of MarkMonitor's notices?

A.   The framework is the years 2012, '13, and '14.

Q.   Now, do you know if -- do you know whether Cox produced ticket data for 2009 in this litigation?

A.   I have not seen any data from 2009.

Q.   Do you know if Cox produced ticket data for 2010 in this litigation?

A.   I have not seen that.

Q.   Do you know if Cox produced ticket data for 2011 for that year?

A.   I don't know.

Q.   If that information existed, would that be something -- do you have an objection?

     THE COURT:  Go ahead.

BY MR. ZEBRAK:

Q.   If that information existed, would that be something that

G. McCabe - Redirect

871

1 you would include in a repeat infringer analysis to bring above

2 the fold what copyright infringement tickets Cox received for

3 the subscribers reported by MarkMonitor's notices in the claim

4 period?

5          MR. BUCHANAN:  Objection, Your Honor.

6          THE COURT:  Yes, sustained.

7          MR. BUCHANAN:  Pure speculation.

8          THE COURT:  Sustained.  Let's move on.

9          MR. BUCHANAN:  And just for -- if I may, I would also

03:34:55 10 object because the Court is the one that provided what data

11 would be produced, and so I don't want to testify, but he's

12 suggesting that somehow --

13          THE COURT:  Understood.  Let's go.  That's why I

14 think it's an improper line of questioning.  So let's move

15 along.

16 BY MR. ZEBRAK:

17 Q.   As a statistician, do you choose to discard data that may

18 be relevant to your analysis?

19 A.   No.  I'm very sensitive about doing the best that I can

03:35:36 20 with all of the data that's available to me, no matter what the

21 circumstances.

22          MR. ZEBRAK:  Thank you, Your Honor.  No further

23 questions.

24          THE COURT:  All right.  May Dr. McCabe be excused?

25          All right.  You're excused with our thanks,

872

```
 1   Dr. McCabe.  Please don't discuss the testimony you've given
 2   with anyone until our trial is over.  All right?
 3            THE WITNESS:  Thank you, yes.
 4            THE COURT:  All right.  Thank you, sir.  Have a good
 5   afternoon.
 6   WITNESS EXCUSED
 7            THE COURT:  All right.  We're going to take our
 8   mid-afternoon break.  We'll take 15 minutes and we'll come back
 9   and we'll be, we'll be adjourning at 5 p.m.  All right?
10            So you're excused.  Thank you.
11            NOTE:  At this point, the jury leaves the courtroom;
12   whereupon, the case continues as follows:
13   JURY OUT
14            THE COURT:  All right.  Why don't you-all discuss
15   what you want to do with demonstratives now that Mr. Buchanan
16   made the motion to admit one of the slides.  As you all know,
17   jurors are always interested in the demonstratives, so discuss
18   that at break and see if you can resolve that, and then we'll
19   talk about it when we come back.
20            Anything else before we break?  Where are we on --
21   are we playing a deposition now?
22            MR. OPPENHEIM:  We're going to call Linda Trickey
23   next, Your Honor.  Frankly, we didn't think we were going to go
24   so long with Dr. McCabe.
25            THE COURT:  Okay.
```

03:36:15

03:37:13

873

1          MR. OPPENHEIM:  I would be highly skeptical, based on

2    the way things are going, if they're going to do Ms. Trickey's

3    direct in our case, that we're going to get past Ms. Trickey

4    today.

5          THE COURT:  Okay.

6          MR. OPPENHEIM:  But we are prepared to put forward to

7    the Court some issues with respect to the Zabek deposition so

8    we can get them resolved by the Court, whether you want to do

9    that.

03:37:52 10          THE COURT:  Well, it sounds like -- the way I do that

11    is you give me a deposition transcript that has the direct and

12    the cross and the objections that each have, and you give me a

13    chance to look at it, and then we'll talk about it in the

14    morning.

15          MR. OPPENHEIM:  So we have that cut with the

16    specifics.  Does that work, color-coded?

17          THE COURT:  Yeah, that's fine.

18          MR. OPPENHEIM:  Does that work?

19          MR. ELKIN:  We have some -- I need to take a final

03:38:20 20    look to see where it is, because they've been going back and

21    forth for a couple of days.  So I'm hoping to be able to later

22    today, to look at that to get it resolved, if we can.

23          After Ms. Trickey, we have Mr. Carothers, Mr. Beck,

24    and Mr. Vredenburg here because they wanted them in their case.

25          THE COURT:  Okay.  It doesn't sound like we'll get

874

1   much past Ms. Trickey, but if we do, then call a live witness

2   after Ms. Trickey.

3          MR. OPPENHEIM:  We're prepared to put the Zabek

4   objections before you now.  We want as the plaintiffs to put

5   Mr. Zabek's testimony before the Court before Mr. Carothers

6   comes.  That's the plaintiffs' choice.  We should have that

7   option.

8          Mr. Elkin has had plenty of opportunity to look at

9   these objections, his other partners have, and I would hate to

03:39:08 10   have delay cause us not to put our case on in a sequence that

11   makes sense to the jury.

12          MR. ELKIN:  That's not the issue.  The issue is that

13   it's four hours, and you've called these witnesses to support

14   your case-in-chief, and they've come out of town for this over

15   our objection, and we understand the ruling was against us.

16   They're here.

17          THE COURT:  Yeah.  As I said earlier, I'm not going

18   to have the jury sitting in there while you're fighting about

19   objections after the case has been, you know, in theory ready

03:39:36 20   for weeks, if not a month, and I understand your objection

21   about do you put your case on in the order that you want, but,

22   I mean, if there's a portion of your deposition which does not

23   have any objections that you want to put in to start to end the

24   day, I don't have any objection to that, and if not, if you

25   want to start a -- you know, if we get to that and you want to,

875

1    you know, just put the witness on whose got the least amount of

2    information that they're going to support.

3          Mr. Oppenheim?

4          MR. OPPENHEIM:  My only point was, Your Honor, I

5    believe that the objections are currently ripe.  This is the

6    first I've heard that now that it's already been reviewed by

7    one of Mr. Elkin's partners, that he now needs to look at it.

8    I think it's ripe for you.

9          THE COURT:  Well, he's lead dog.  He gets the

03:40:34 10    opportunity to do that.

11          MR. GOULD:  May I just provide a bit more context,

12    Your Honor?  We have the objections down to, I think, one

13    objection on plaintiffs' side and four, maybe five small, short

14    objections on the other side.  They can be resolved very

15    quickly.  There's no chance that video is going on today.

16    There's no way that Ms. Trickey is going to be finished today.

17          So we're prepared to move forward with it tomorrow,

18    but the order of witnesses --

19          THE COURT:  Well, then this is a -- yeah.  Okay.

03:41:00 20    Then this conversation -- I mean, you can put the deposition on

21    first thing in the morning if that's what you want to do, but,

22    I mean, my concern was if there were live witnesses here and we

23    were sitting in this courtroom without the jury, then that was

24    wasted time.  Otherwise, you put the case in, and I'm sorry

25    those witnesses will be inconvenienced because they've been

876

1    here a little longer than they thought they would need to be.

2         All right.  Let's take recess.

3         NOTE:  At this point, a recess is taken; at the

4    conclusion of which the case continues in the absence of the

5    jury as follows:

6    JURY OUT

7         THE COURT:  Why don't we talk about the demonstrative

8    issue after we let the jury go at five?  Does that work?

9         MR. ELKIN:  Oh, sure.

04:00:44 10    THE COURT:  Yeah.  That's more time to debate it then

11   and so we don't lose time with the jury.

12        MR. ELKIN:  Sure.

13        THE COURT:  Yeah, do you have something else?

14        MR. ELKIN:  Yeah, just very, very briefly, Your

15   Honor.  I just wanted to remind the Court about my request

16   yesterday regarding Ms. Trickey and the other Cox witnesses

17   since we're not going to recall them.

18        THE COURT:  Right.  Sure.

19        Okay.  Joe, let's get the jury.

04:01:07 20    Do you have your next witness?

21        MR. OPPENHEIM:  It's Ms. Trickey from Cox.  I believe

22   she's in the hallway.

23        THE COURT:  Okay.

24        THE COURT SECURITY OFFICER:  Oh, are we ready?

25        THE COURT:  Yes.

L. Trickey - Direct

877

1          NOTE:  At this point, the jury returns to the

2     courtroom; whereupon, the case continues as follows:

3     JURY IN

4          THE COURT:  All right.  Please have a seat.

5          Next witness?

6          MR. OPPENHEIM:  Your Honor, the plaintiffs would call

7     Linda Trickey from Cox.

8          THE COURT:  All right.  Ladies and gentlemen,

9     Ms. Trickey is going to testify both as a witness for plaintiff

04:02:13  10   and as a witness for Cox at one time so that she doesn't have

11    to come back in Cox's case.  All right?

12         All right.  And as a result, there will be a direct,

13    a cross-examination, a redirect, and a recross examination to

14    give both parties the opportunity to examine her.  All right,

15    thank you.

16          LINDA TRICKEY, PLAINTIFFS' WITNESS, SWORN

17         THE COURT:  All right.  Good afternoon.  Please

18    proceed.

19         MR. OPPENHEIM:  Is it all right if I --

04:03:10  20   THE COURT:  Yes, sir.

21                    DIRECT EXAMINATION

22    BY MR. OPPENHEIM:

23    Q.   Good afternoon, Ms. Trickey.  How are you?

24    A.   Fine, thank you.

25    Q.   Nice to see you again.

L. Trickey - Direct

878

1    A.    Thank you.

2    Q.    You're currently employed by Cox, correct?

3    A.    Yes.

4    Q.    And you've been at Cox for roughly 17 years; is that

5    right?

6    A.    Yes.

7    Q.    And at one point in time, you were responsible for

8    providing legal counsel to the abuse group or the safety

9    department; is that right?

04:03:39 10  A.    The customer safety team, yes.

11   Q.    And at one point in time, that team was called the abuse

12   group; is that correct?

13   A.    Yeah, many years ago.

14   Q.    You're not a copyright lawyer, are you?

15   A.    No.

16   Q.    And in addition to providing counsel to the safety

17   department/abuse group, your duties include privacy and

18   security, correct?

19   A.    At what point in time?

04:04:11 20  Q.    At one point in time, they did?

21   A.    No, no.  I'm saying at what point in time are you

22   directing your question?

23   Q.    Well, let me try it this way:  At one point in time, you

24   provided counsel to Cox as a privacy and security lawyer,

25   correct?

L. Trickey - Direct

879

1    A.    Yes.  So currently my title is assistant general counsel

2    of privacy and security.

3    Q.    So on a day-to-day basis, you're not responsible for

4    handling intellectual property matters, correct?

5    A.    No.

6    Q.    And by intellectual property, you know that includes

7    copyright, correct?

8    A.    Yes.

9    Q.    Cox has a website, correct?

04:04:46 10  A.    Yes.

11   Q.    Cox.com or something like that?

12   A.    Yes.

13   Q.    And that website, like a lot of websites, has a section

14   that says "About," and you can pull down and see things about

15   Cox Communications, correct?

16   A.    Yes.

17   Q.    Let me ask you to -- there should be a binder up there for

18   you from us.

19         Did we put one up there for the witness?  I apologize

04:05:12 20  if we didn't do it yet.  We'll do it right now.  Sorry.

21   A.    Thank you.

22   Q.    Could I ask you -- it's a large binder, my apologies for

23   that, and I'm going to ask you to turn all the way to the end,

24   to PX 451, if you would.

25   A.    Okay.

L. Trickey - Direct

880

1    Q.    Do you see that document?

2    A.    Yes.

3    Q.    And that's a document that you can tell from the top came

4    from Cox.com, correct?

5    A.    It appears to, yes.

6           MR. OPPENHEIM:  Your Honor, we'd like to move Exhibit

7    PX 452 into -- excuse me -- 451 into evidence.

8           THE COURT:  Any objection?

9           MR. ELKIN:  No objection, Your Honor.

04:06:15 10           THE COURT:  All right.  It's received.

11           MR. OPPENHEIM:  If we could maybe just zero in on the

12    top.

13    MR. OPPENHEIM:

14    Q.    So this is a document at the very top, it says, "News

15    Room/About Us."  Do you see that?

16    A.    Yes.

17    Q.    And it's a fact sheet, right, of some sort about Cox

18    Communications?

19    A.    Yeah.  It looks like something put out by our public

04:06:45 20    affairs department.

21    Q.    Okay.  And at the top, it says:  Cox Communications is a

22    broadband communications and entertainment company.  Correct?

23    A.    Yes.

24    Q.    And it says that it provides advanced digital video,

25    internet, telephone, home security, and automation services,

881

1    correct?

2    A.    Yes.

3    Q.    And then it goes on to say that Cox is the largest private

4    telecom company in the U.S., right?

5    A.    Yes.

6    Q.    And it says that Cox serves more than 6 million residences

7    and businesses, right?

8    A.    Yes, that's what it says.

9    Q.    And if we skip down to the company stats, about halfway

04:07:29 10   down, could you just read the first two bullets, please?

11   A.    Cox has approximately 6 million total residential and

12   commercial customers.  Total revenues of 11 billion in 2016.

13           Do you want me to read on?

14   Q.    And then let's skip down to the fourth bullet point, if

15   you would.

16   A.    Cox has approximately 20,000 employees nationwide.

17   Q.    All right.  And the next bullet point, if you could?  I'm

18   sorry.

19   A.    I'm sorry.

04:08:00 20   Q.    Do you need some water up there?

21   A.    No, no.  I've just got the remnants of a cold still, so --

22   Q.    My apologies.

23   A.    Thank you.

24   Q.    Could -- I'm sorry, could you read the bullet point that

25   starts with the word "Approximately"?

L. Trickey - Direct

882

1    A.    Approximately two-thirds of our customers are in a bundle,

2    approximately one-third of customers are triple play.

3    Q.    And the term "bundle" refers to Cox customers who use two

4    or three different Cox services between television, telephone,

5    and internet, correct?

6    A.    Yes.

7    Q.    And if we could skip down to the second-to-the-last bullet

8    point, if you would?

9    A.    Cox Communications is 55 years old and remains a wholly

04:08:48 10    owned subsidiary of Cox Enterprises, a privately held

11    family-owned corporation with 20 billion in annual revenues for

12    2016.

13    Q.    So that -- do you understand that to mean that the

14    corporate entity Cox Communications is owned entirely by Cox

15    Enterprises?

16    A.    Well, it says wholly owned subsidiary.

17    Q.    So that's how you would understand it?

18    A.    Yes, I believe so.

19    Q.    And that Cox Enterprises is then privately held by a

04:09:18 20    family-owned corporation, is that correct?

21    A.    Yes.

22    Q.    And that Cox Enterprises has annual revenues in 2016 of

23    $20 billion, is that correct?

24    A.    That's what it says.

25          MR. OPPENHEIM:  You can take that down, please,

L. Trickey - Direct

883

1    Mr. Duval.  Thank you.

2    MR. OPPENHEIM:

3    Q.   I think you indicated earlier, but if I didn't elicit it,

4    you're a lawyer, correct?

5    A.   Yes.

6    Q.   And as a lawyer, you know what a lobbyist is, correct?

7    A.   Yes.

8    Q.   Would you agree that a lobbyist is somebody who petitions

9    the government?

04:10:01 10   A.   I guess that could be one of the things that they do.

11   Q.   Among others, right?

12   A.   Yeah.

13   Q.   And there's absolutely nothing wrong with being a

14   lobbyist, is there?

15   A.   I guess I've never really thought about it, but no.

16   Q.   You know, in fact, Cox engages in lobbying itself, right?

17   A.   I actually am not familiar with the lobbying activities,

18   if any.

19   Q.   Are you familiar -- do you, do you know whether or not Cox

04:10:32 20   has lobbyists?

21   A.   I can assume.  I mean, I know that we're a member of

22   different, you know, groups that relate to our services, but I

23   would presume there's lobbying involved.

24   Q.   Would it surprise you if I told you that if I Googled

25   "Cox" and "lobbying," I found out that right now, that Cox is

L. Trickey - Direct

884

1    trying to hire a senior manager of government and regulatory

2    affairs to do lobbying?

3    A.   I don't know what you mean by surprising.  It's very

4    possible.

5    Q.   And would it surprise you that if I Googled to find out

6    about PACs that Cox had, that you would find that Cox operated

7    something called Cox Enterprises PAC that in 2014 paid federal

8    candidates over $1.2 million?  Would that surprise you?

9    A.   Well, again, I'm not sure what you mean by surprising.  I

04:11:30 10  think that's very possible, yes.

11            THE COURT:  She said she's not involved in the

12   lobbying section, so, you know, you're asking her about

13   information that I've already indicated in previous days I

14   don't want you asking facts which aren't in evidence of which

15   the witness is unaware of.  All right?

16            MR. OPPENHEIM:  Can we call up PX 175?

17   MR. OPPENHEIM:

18   Q.   And if you could look at that in your binder, please.

19   A.   I'm sorry, 175?

04:12:15 20  Q.   Yes, 175.

21   A.   Okay.  I think I'm there.

22            MR. OPPENHEIM:  Any objection?

23            Hold on a moment.

24            THE COURT:  Why don't you have --

25            MR. OPPENHEIM:  Do you have another binder?  I think

L. Trickey - Direct

885

1    they're struggling with it.  Were you able to get to it?

2            MR. ELKIN:  No objection.

3            MR. OPPENHEIM:  We'd move it into evidence, Your

4    Honor.

5            THE COURT:  175 is received.

6    BY MR. OPPENHEIM:

7    Q.   Do you recognize this document, Ms. Trickey?

8    A.   Yes.

9    Q.   What is it?

04:13:08  10    A.   This is the Cox High Speed Internet Acceptable Use Policy,

11    dated November 18, 2011.

12    Q.   And at the beginning of this document, it says:  CoxCom,

13    LLC, and its affiliates and/or distribution partners

14    (collectively "Cox") are pleased that you have chosen Cox High

15    Speed Internet service.

16            Do you see that?

17    A.   Yes.

18    Q.   And would the -- would the CoxCom -- excuse me.

19            Would the CoxCom, LLC, and its affiliates include Cox

04:14:03  20    Communications, Inc.?

21    A.   You know, I'm not positive of the organizational

22    structure, but I believe CoxCom, LLC, is a subsidiary of Cox

23    Communications, Inc., I think.

24    Q.   So Cox Communications would be affiliated as a subsidiary,

25    correct?

L. Trickey - Direct

886

1    A.    Yes, I believe so.

2    Q.    And this AUP is the agreement that all high speed internet

3    subscribers to Cox must agree to, correct?

4    A.    It's one of them.

5    Q.    One of the agreements they must agree to.

6    A.    Right.

7    Q.    Okay.  And in fact, if a subscriber is unwilling to agree

8    to this, they're not allowed to use the service; is that right?

9    A.    Yes.  I mean, they, they have to agree to it if they want

04:14:54  10    to use the service.

11    Q.    So can we skip down to halfway through the first

12    paragraph, there's a sentence that begins with the word "All,"

13    and it may be easier to see on the screen.

14    A.    Oh, okay.

15    Q.    If that's easier for you.  It's your choice.

16    A.    Yes, I see that.

17    Q.    Could you read that sentence and the next sentence,

18    please?

19    A.    All users of the Service must abide by this AUP.

04:15:19  20    Violation of any term of this AUP may result in the immediate

21    suspension or termination of either your access to the Service

22    and/or your Cox account.

23    Q.    And so by that, you understand it's a condition of use of

24    the service, correct?

25    A.    To abide by the AUP.

L. Trickey - Direct

887

1    Q.    Yes.

2    A.    Yes.

3    Q.    And can you go to the first sentence of the next

4    paragraph, please?  And could you read that?

5    A.    By using the Service, you agree to abide by, and require

6    others using the Service via your account to abide by the terms

7    of this AUP.

8    Q.    So this means that not only does the subscriber have to

9    agree to the AUP, but others using the service also have to

04:16:04  10  agree to it, correct?

11   A.    Yes.  They don't actually -- I mean, a family member

12   doesn't necessarily agree to the terms, but they are supposed

13   to abide by the terms.

14   Q.    Correct.  And then could you read the sentence in all caps

15   in that paragraph, please?

16   A.    Beginning with "If"?

17   Q.    Yes, please.

18   A.    If you do not agree to be bound by these terms, you should

19   immediately stop the use of the services and notify the Cox

04:16:35  20  Customer Service Department so that your account may be closed.

21   Q.    And by this, it means exactly what it says, that if a

22   subscriber is unwilling to agree to these, they should have

23   their account closed, correct?

24   A.    Yeah, or stop use of the service.

25   Q.    And then in the next paragraph, it lists prohibited

L. Trickey - Direct

888

1  activities, correct?

2  A.   Yes.

3  Q.   And could you read the, the first sentence of prohibited

4  activities, please?

5  A.   You may not use the Service in a manner that violates any

6  applicable local, state, federal, or international law, order

7  or regulation.

8  Q.   All right.  And let's turn to the page to No. 2, please.

9  And could you read the first sentence of No. 2, including the

04:17:26 10  title?

11  A.   No. 2, Intellectual Property Infringement.  You may not

12  use the Service to post, copy, transmit, or disseminate any

13  content that infringes the patents, copyrights, trade secrets,

14  trademark, moral rights, or propri- -- I think that's a typo --

15  proprietary rights of any party.  Cox assumes no

16  responsibility, and you assume all risk regarding the

17  determination of whether material is in the public domain, or

18  may otherwise be used by you for such purposes.

19  Q.   You would agree that paragraph 1 that we read on the first

04:18:04 20  page would prohibit using the service for copyright

21  infringement, correct, because that would be a violation of

22  federal law?

23  A.   Yeah.  I mean, reading it with Section 2 as well.

24  Q.   And Section 2 essentially repeats that by saying you can't

25  commit copyright on the service, correct?

L. Trickey - Direct

889

1    A.    It's more specific.

2    Q.    Right.  Two different ways customers are told you cannot

3    commit copyright infringement on the network, correct?

4    A.    Yes.

5    Q.    And neither of these provisions have any exceptions to

6    them, correct?

7    A.    No.

8    Q.    Nothing in this agreement says it's okay to commit a

9    little bit of copyright infringement, right?

04:18:45 10   A.    No.

11   Q.    It says not allowed to commit any copyright infringement,

12   correct?

13   A.    I mean, the document says what it says.

14   Q.    Right.  So --

15   A.    Yeah.

16   Q.    -- absolutely no copyright infringement, right?

17            Now, this document that we looked at was dated

18   November 18, 2011, correct?

19   A.    Yes.

04:19:13 20   Q.    Could we please --

21   A.    Yes, yes.

22   Q.    I'm sorry, I didn't mean to interrupt you.

23            Can you please turn to PX 184?  Do you have that

24   there, Ms. Trickey?

25   A.    Yes, I'm there.

L. Trickey - Direct

890

1   Q.   Now, do you recognize this document?

2   A.   Yes.

3   Q.   Is this an updated version of the Acceptable Use Policy?

4   A.   Yes.  This is the Acceptable Use Policy dated November 20,

5   2013.

6            MR. OPPENHEIM:  Your Honor, we would offer --

7            MR. ELKIN:  No objection, Your Honor.

8            THE COURT:  All right.  It's received.

9   BY MR. OPPENHEIM:

04:20:04 10   Q.   And, Ms. Trickey, are you familiar with this Acceptable

11   Use Policy?

12   A.   Yes.

13   Q.   And would you agree that all of the provisions that we

14   just looked at in the 2011 policy remain in this 2013 policy?

15   A.   Yes.

16   Q.   And under this policy in 2013, it still prohibited all

17   infringement, correct?

18   A.   Yes.

19   Q.   It didn't allow a little bit.  It prohibited it all

04:20:35 20   together, correct?

21   A.   Yeah.

22   Q.   If we could please look at PX 183.  Do you have that in

23   front of you, Ms. Trickey?

24   A.   Yes.

25   Q.   And what is the title of that document?

L. Trickey - Direct

891

1   A.   "Cox Communications High-Speed Internet Training, Network

2   Security Procedures Participant's Guide."

3          MR. OPPENHEIM:  Your offer -- Your Honor, we would

4   offer this.

5          MR. ELKIN:  There's no foundation but we have no

6   objection.

7          THE COURT:  All right.  It's received.

8   BY MR. OPPENHEIM:

9   Q.   Could you please turn to page 6 of this document?  For

04:21:38 10  clarity sake, it's the document -- the page that says "The CHSI

11  Network Security Process" in the middle of the page.  Do you

12  see that?

13  A.   Yes.

14  Q.   Okay.  And so -- do you see at the very top left page, it

15  says:  Let's look at two common Network Security violation

16  situations?

17          Do you see that at the very top?

18  A.   I'm sorry, at the top of page 6?

19  Q.   Yes.

04:22:09 20  A.   Yes.  I see it on here now.

21  Q.   Okay.  And do you see the first bullet point there?  Could

22  you read that, please?

23  A.   A CHSI customer is using file-sharing software to allow

24  other internet users to download MP3 files of copyrighted music

25  from his computer.  This is clearly a case of Network Security

892

1    violation since he is allowing copyrighted -- excuse me --

2    copyright-protected materials to be shared, which is a

3    violation of federal law.

4    Q.    Could we please turn to page 29?  Do you see the bottom of

5    that page, where it says "DMCA Issues"?

6    A.    Yes.

7    Q.    Could you read the first, first sentence, please?

8    A.    The Digital Millennium Copyright Act (DMCA) is a federal

9    law passed in 1998 that extends the copyright laws to digital

04:23:14 10  materials such as music, movies, and software.

11   Q.    Okay.  And then it goes on to say that under the AUP,

12   customers are not allowed to share, and then it lists movies,

13   games, music, and TV shows, right?

14   A.    Yes.

15   Q.    And this is consistent with the AUP, correct?

16   A.    Yes.

17          MR. ELKIN:  Objection, Your Honor.  Witness

18   foundation.  The document is in.  There's been no foundation as

19   far as this witness is concerned.

04:23:48 20          THE COURT:  Ask her whether she is involved in these

21   activities if you're going to ask her questions about the

22   document, Mr. Oppenheim.

23          MR. OPPENHEIM:  Your Honor --

24   BY MR. OPPENHEIM:

25   Q.    Well, let me ask you this:  Ms. Trickey, you were

L. Trickey - Direct

893

1  designated as a Cox witness on the issue of Cox's Acceptable

2  Use Policy, were you not?

3  A.   Yes.

4        THE COURT:  Okay.  All right.  Go ahead.

5  BY MR. OPPENHEIM:

6  Q.   The next sentence, could you read that, please?

7  A.   The AUP also does not allow the use of file sharing

8  programs used to make the above files available to the general

9  Internet.

04:24:30  10  Q.   And then it goes on to say:  Examples of the programs,

11  referring to file sharing, examples of file sharing programs

12  include BitTorrent, right?

13  A.   Yes, that's an example.

14  Q.   And Ares?

15  A.   Yes.

16  Q.   And another one called FrostWire, correct?

17  A.   That's what it says.

18  Q.   So under this document, this training document, it

19  indicates that the AUP does not allow subscribers to use

04:24:57  20  BitTorrent or Ares, correct?

21  A.   No, I don't think it's saying that.

22  Q.   I'm sorry, you're right.  I misspoke.  Under this, it says

23  that subscribers are not allowed to use those programs to share

24  movies, games, music, or TV shows, correct?

25  A.   Right.

L. Trickey - Direct

894

1   Q.   And again, the document doesn't indicate that you're

2   allowed to commit a little bit of file sharing, correct?

3   A.   It's silent on that topic.

4   Q.   Well, it prohibits the use of file sharing to share music

5   altogether, correct?

6   A.   Yes.

7   Q.   In what years were you -- I'm sorry.  Earlier -- you can

8   take that down, please, Mr. Duval.

9        Earlier you indicated that you did provide counsel to

04:26:07  10  the safety department or abuse group, correct?

11  A.   Yeah, at one point in time.

12  Q.   And what was that point in time?

13  A.   So I would -- I was sort of tangentially involved because

14  I was the internet lawyer during the time period up until about

15  two thousand -- to the end of 2013, but when Mr. Cadenhead, who

16  was the attorney who primarily advised on at least the

17  copyright-type issues, he retired at the end of 2013, and so in

18  2014, I assumed responsibility for Cox's graduated response

19  process.

04:26:45  20  Q.   So you were the internet lawyer for the company up until

21  2013, and then in 2014, you took on the abuse group or safety

22  department, correct?

23  A.   Yeah.  I mean, I did, I did work with the safety team

24  periodically on other types of issues relating to internet.

25  Q.   And you obviously understood that the abuse group or

L. Trickey - Direct

895

1    safety team had responsibility for implementing Cox's graduated

2    response policy, right?

3    A.   Yes.

4    Q.   Could you please turn to PX 193?

5         So this is an internal document on how to respond --

6    an internal Cox document, excuse me, on how to respond to

7    customers who have been suspended for copyright infringement,

8    correct?

9              MR. ELKIN:  Objection.  Foundation.

04:27:58 10              THE COURT:  Yeah.  Lay a --

11             MR. OPPENHEIM:  That's what I'm doing.

12             THE COURT:  Okay.  Well, you're describing the

13   document in a fair amount of detail.  Why don't you just ask

14   first do you recognize the document?  What is it?

15        And go from there, please.

16   BY MR. OPPENHEIM:

17   Q.   Ms. Trickey, is this a Q&A for Cox DMCA process?

18   A.   Well, it says that at the top, but I don't believe I was

19   involved in the preparation of this document.

04:28:24 20             MR. OPPENHEIM:  Your Honor, we'd move this into

21   evidence.  It's a Cox-produced document.  It's relevant to

22   their DMCA process.

23             MR. ELKIN:  Objection, Your Honor.  No foundation.

24             THE COURT:  Well, does it have a date on it?

25             MR. OPPENHEIM:  Your Honor, one moment.

L. Trickey - Direct

896

1          THE COURT:  What's the, what's the number of the

2   document?  Plaintiffs' what?

3          MR. OPPENHEIM:  I'm sorry, PX 193.

4          THE COURT:  193.

5          MR. GOULD:  Your Honor, if it would be helpful, I've

6   got a smaller notebook for you.

7          THE COURT:  I've got it.  I'm looking at it.  Thank

8   you.

9          I'll receive the document.  It's within her field and

04:29:32  10   appears to be relevant to the time period.  Go ahead.  It's

11   received.

12          MR. OPPENHEIM:  Could we bring that up, please,

13   Mr. Duval?

14   BY MR. OPPENHEIM:

15   Q.   Ms. Trickey, this is an internal training document on how

16   to respond to customers who have been suspended for copyright

17   infringement, is it not?

18   A.   I'm not sure.  It says "Internal use only!" at the top, so

19   I assume it's an internal document.

04:30:09  20   Q.   Ms. Trickey, you recall that you and I first met at your

21   deposition; isn't that correct?

22   A.   Yes.

23   Q.   And I took your deposition on April 15 of this year,

24   correct?

25   A.   Yes.

L. Trickey - Direct

897

1   Q.   And when I took your deposition, you were sworn under

2   oath, correct?

3   A.   Um-hum.

4   Q.   And you answered questions that I asked you, correct?

5   A.   Yes.

6   Q.   And on page 297, line 2 of your deposition, did I not ask

7   you about this document?

8           Question:  Do you know what it is?

9           Answer:  It looks like an internal how to talk to

04:30:56 10   customers if they call in, you know.  Once again, gosh, they

11   don't ever seem to label anything with the date, so I have no

12   idea if this is, unless there is some metadata that would help,

13   if this was something back in the early 2000s or the mid 2000s.

14   I don't see -- I don't recall seeing it.

15           But it's actually scripting out.  So this would be

16   for some kind of care person who is going to be handling

17   customer calls.  Thank you for calling us.  Your access was or

18   is suspended due to a copyright infringement notice we received

19   from the copyright group.

04:31:31 20           Is that the question and answer that I posed to you

21   April of this year?

22           MR. ELKIN:  Objection.  There's no impeachment.

23           THE COURT:  Overruled.

24           THE WITNESS:  Okay.  Well, thank you for reminding me

25   about that.  So I guess this is the document we looked at.  I

L. Trickey - Direct

898

1    didn't recall.  It didn't look familiar to me again, but I'll

2    do my best.

3    BY MR. OPPENHEIM:

4    Q.   Thank you.  That's all I can ask for.

5         And let's look at the, the first paragraph, please.

6    Could you read the first sentence -- the first two sentences,

7    please?

8    A.   When speaking to a subscriber regarding an alleged DMCA

9    abuse issue, they may have questions about the infringement.

04:32:21 10   This document will help you in answering the most common

11   questions subscribers may have.

12   Q.   Thank you.

13        And then could you read what's in bold that comes

14   next?

15   A.   Please do not use the verbiage "three strikes" with our

16   customers.

17   Q.   And then it goes on, does it not, to say Cox follows a

18   graduated warning process for escalating handling of

19   infringement claims, correct?

04:32:49 20   A.   Yes.

21   Q.   And then could we turn to the bottom of the page, where it

22   says, "If escalation"?  Do you see that?

23   A.   Um-hum, yes.

24   Q.   Could you read that, please?

25   A.   If escalation is needed, here is the section of the DMCA.

L. Trickey - Direct

899

1    Q.   And could you go ahead and read that?  And I know it

2    continues into the next page.

3    A.   Okay.  In order for a service provider such as Cox to

4    limit its liability for copyright infringement on its network,

5    the service provider must have adopted and reasonably

6    implemented, and inform subscribers and accountholders of the

7    service provider's system or network of a policy that provides

8    for the termination in appropriate circumstances of subscribers

9    and accountholders of the service provider's system or network

04:33:36  10    who are repeat infringers.

11    Q.   And the next sentence, could you read the part that says,

12    "What this means (in basic English)"?

13    A.   What this means (in basic English) is that for Cox to not

14    be held liable for subscribers who infringe a copyright while

15    the material is transported through Cox's system, we must have

16    a policy that provides for termination of service in

17    appropriate circumstances for repeat infringers.

18    Q.   And there are on the next couple pages some questions and

19    answers, correct?

04:34:34  20    A.   I'm sorry, on that page?

21    Q.   Well, it kind of --

22    A.   It looks likes there's Q&A in here, yes.

23    Q.   And you understand Q&A means questions and answers?

24    A.   Yes.

25    Q.   Okay.  And, and -- and could you read the first Q&A,

L. Trickey - Direct

900

1    please?  I'm sorry, strike that.

2           The second one.  I'm looking at the wrong section.

3    The one that -- well, let me ask -- I'll ask the question; you

4    read the answer.  How about that?

5           Question:  How many times can I do this until I lose

6    my service?  (Terminate)

7           And what was the answer?

8    A.   The answer says:  This depends on the circumstances --

9           MR. ELKIN:  Objection.

04:35:29 10        THE WITNESS:  Sorry.

11         MR. ELKIN:  This is misleading.  May we have a

12   sidebar, please?

13         THE COURT:  Yes.

14         NOTE:  A sidebar discussion is had between the Court

15   and counsel out of the hearing of the jury as follows:

16   AT SIDEBAR

17         THE COURT:  Yes, sir.

18         MR. ELKIN:  As Your Honor well knows, as we've

19   previously discussed with the Court, we anticipated that there

04:36:04 20   would be some confusion with respect to whether Cox is liable

21   here because there's no ability to claim -- we knew we had to

22   with regard to the DMCA safe harbor.

23         He's reading this document.  He's asking her to read

24   the document, which I get, but then he's just asked her a

25   question and then asking her what the answer is.

1          I think it's misleading because he's, he's creating

2     the impression she's answering something when all she's doing

3     is answering a question with respect to the ultimate question

4     of DMCA liability, and I just -- I think it's confusing and

5     misleading.

6          THE COURT:  Well, you're just having her read the

7     exhibit, and obviously, I would think you would be using this

8     with Mr. Cadenhead or other people.  I don't know whether they

9     were involved in other issues, but, you know, if you're just

04:36:58 10   going to have her read the question and answer just to show

11    that this was part of the document -- is that what your purpose

12    is?

13         MR. OPPENHEIM:  So first, unfortunately,

14    Mr. Cadenhead is not going to join us at this party.

15         THE COURT:  Right.

16         MR. OPPENHEIM:  And so -- and this is the only Q&A

17    out of this document that I'm going to read, and I've asked her

18    to read the answer.

19         Simply admitting documents and not showing them to

04:37:23 20   the jury is not a useful thing, so there are certain provisions

21    of these documents that I want the jury to understand so they

22    have a full picture.  I'm trying to do this without badgering

23    her, without pushing her, but these are Cox's own internal

24    documents.

25         THE COURT:  I understand they are.  I'm just trying

L. Trickey - Direct

902

1    to understand why you were offering them.  Are there other

2    follow-up questions, or you just wanted her to document the

3    fact that this was the policy in effect?

4              When is this controlling?  What time frame?

5              MR. OPPENHEIM:  Well, this document has no date --

6              THE COURT:  I know.

7              MR. OPPENHEIM:  -- but -- sorry, but I believe the

8    metadata indicates it's 2011.

9              MS. GOLINVEAUX:  Correct.

04:38:00 10              MR. OPPENHEIM:  And I can -- if you like, I can offer

11    that.  I don't know if she'll know that.

12              THE COURT:  Okay.

13              MR. OPPENHEIM:  Or if you want to stipulate it, we'll

14    inform the jury of it.

15              THE COURT:  All right.  I'll let you do the Q&A for a

16    few more of these.  I think it's certainly relevant, and the

17    document does speak for itself, but I'll let you highlight it

18    to the witness.

19              And your exception is noted.

04:38:17 20              MR. ELKIN:  Thank you, Your Honor.

21              THE COURT:  Yes, thank you.

22              NOTE:  The sidebar discussion is concluded;

23    whereupon, the case continues before the jury as follows:

24    BEFORE THE JURY

25              THE COURT:  All right.  Please proceed.

903

BY MR. OPPENHEIM:

Q.   Ms. Trickey, I'm going to -- we were on the page labeled -- there are so many pages numbers here -- 002 on the bottom, and I'm going to ask -- there's a question there that says:  How many times can I do this until I lose my service?  (Terminate)

         Could you read the answer, please?

A.   This depends on the circumstances, but we don't make any particular number public.  However, please keep in mind that Cox does not want to have to terminate any customers, so we work closely with our customers to avoid service interruption.

Q.   So this document is an internal use only document; is that correct?

A.   It appears to be, yes.

Q.   That provision or that Q&A doesn't say that if you infringe, you'll be terminated, does it?

A.   It says that you can be terminated.

Q.   But it doesn't say you will be terminated, correct?

A.   Well, it says it depends on the circumstances.

Q.   And in fact, it says that Cox doesn't want to terminate any of its customers, correct?

A.   It says:  We work closely with our customers to avoid service interruption.

         But then the next question says you can lose your service permanently.

L. Trickey - Direct

904

1   Q.   Does it not say:  However, please keep in mind that Cox

2   does not want to have to terminate any customers, correct?

3   A.   Yes, it says that.

4   Q.   Can we please turn to PX 203?  Do you have that in front

5   of you, Ms. Trickey?

6   A.   I do.

7   Q.   At the very top of this document, it says "CATS."  Is that

8   correct?

9   A.   Yes.

04:41:29 10   Q.   Do you know what CATS is?

11         MR. ELKIN:  Objection.  Is this in evidence?

12         MR. OPPENHEIM:  Not yet.  I'm laying a foundation.

13         MR. ELKIN:  Objection.

14         THE COURT:  Have her identify the document, please.

15   Go ahead.  Go ahead.

16   BY MR. OPPENHEIM:

17   Q.   What is -- what does the top of this document say it is?

18   A.   It doesn't.  I don't know what it does.  It just says

19   "CATS," which I know what CATS means, but I don't know what the

04:41:53 20   rest of the document is.

21   Q.   What does "CATS" mean?

22   A.   CATS stands for the Cox Abuse Tracking System.

23   Q.   And then it says:  What is "Abuse?"  Correct?

24   A.   That's what it says.

25   Q.   So this is a document about abuse and CATS, is it not?

L. Trickey - Direct

905

1    A.    Well, may I look at the whole document, please?

2    Q.    Please do.  Please do.

3    A.    So it looks like an internal document used by the, the

4    abuse team.

5          MR. OPPENHEIM:  Your Honor, we'd offer it in

6    evidence.

7          THE COURT:  Any objection?

8          MR. ELKIN:  We object, Your Honor.  No foundation.

9          THE COURT:  All right.  It's received.

04:42:56 10       MR. OPPENHEIM:  Can we just highlight the first two

11   paragraphs there, please, Mr. Duval?

12   BY MR. OPPENHEIM:

13   Q.    I think earlier, Ms. Trickey, you said that you had

14   provided services to the safety department and that that was

15   also known as the abuse group at one point in time; is that

16   right?

17   A.    Yes.

18   Q.    And "abuse" is a term that Cox uses to refer to certain

19   violations of the AUP, is that correct, or the Acceptable Use

04:43:31 20  Policy?

21   A.    Certain activities using the internet service.

22   Q.    Including copyright infringement, correct?

23   A.    Yes.

24   Q.    Okay.  And so here it says -- this document says:  What is

25   "Abuse?"  Correct?

L. Trickey - Direct

906

1    A.    Yes.

2    Q.    And then it describes two common abuse situations; is that

3    correct?

4    A.    That's what it says.

5    Q.    And could you read the first of those two, please?

6    A.    A CHSI customer is using file-sharing software to allow

7    other Internet users to download MP3 files of copyrighted music

8    from his computer.  This is clearly a case of abuse since he is

9    allowing copyright-protected materials to be shared, which is a

04:44:17  10   violation of federal law.

11   Q.    And --

12   A.    Did you want me to read the second one, too?

13   Q.    No, it's not necessary.

14         CHSI, what is that a reference to?

15   A.    It's a short version of Cox high speed internet.

16   Q.    And then in the fourth paragraph, it says:  In both

17   cases -- so it's that scenario plus the next one -- the

18   customers will be warned or have their services suspended or

19   even their disconnected, in order to protect the CHSI network,

04:44:57  20   correct?

21   A.    That's what it says.

22   Q.    Okay.  And then it lists as one of the types of abuse

23   copyright violations, correct?

24   A.    Yes.

25   Q.    Could you turn to the third page of this document, please?

L. Trickey - Direct

907

1   And could you -- this paragraph refers to the abuse team.  Is

2   that the same as the abuse group, do you think?

3   A.   Yes, I think so.

4   Q.   And then it says that that team regularly checks for newly

5   created abuse tickets.  Do you see that?

6   A.   That's what it says.

7   Q.   And tickets are things that are in the CATS system; is

8   that correct?

9   A.   Yes.  So I guess you could say an activity using the

04:45:40 10   service could translate -- if it's an abuse activity, could

11   translate to a ticket.

12   Q.   So if somebody reports an abuse violation, that may end

13   up -- and it's sent in to CATS, it may end up becoming a

14   ticket; is that correct?

15   A.   Yes.

16   Q.   So -- and that would include if a copyright owner sends an

17   infringement notice that goes to Cox, that could become a

18   ticket, correct?

19   A.   Yes.

04:46:09 20   Q.   So here it says that the abuse team regularly checks for

21   new tickets, right?

22   A.   That's what it says.

23   Q.   And that the abuse members review each ticket and research

24   prior complaints about the suspected abuser, correct?

25   A.   That's what it says.

L. Trickey - Direct

908

1    Q.   And what -- and the reason -- excuse me, the reason that

2    the abuse team would do that research is to know whether that

3    suspected abuser had been the subject of a prior notice,

4    correct?

5              MR. ELKIN:  Objection.  Foundation.

6              THE COURT:  Yes, sustained.  I mean, ask her if she

7    has any personal familiarity with how this is applied in this

8    unit.

9    BY MR. OPPENHEIM:

04:46:55 10   Q.   You understand that the abuse team reviews tickets that

11   are in the CATS system, correct?

12   A.   Well, I'm a little confused at what point in time this is

13   because, you know, the CATS system was automated at some point

14   in time, so they wouldn't necessarily be reviewing each ticket.

15   So I'm not quite sure.  If you could give me some more context

16   as to the time period, I might be able to assist.

17   Q.   So -- but you understand that, that at one point in time

18   before the CATS system was fully automated, the abuse group

19   would review tickets that were in CATS, correct?

04:47:40 20             MR. ELKIN:  Objection.  Foundation.

21             THE WITNESS:  You know, I guess it would --

22             THE COURT:  Overruled.

23             THE WITNESS:  I'm sorry.  I guess it would depend on

24   what the abuse issue was.  I don't -- I'm not sure.

25             THE COURT:  Can you orient yourself in time based on

L. Trickey - Direct

909

1    your position and experience at Cox as to when this step 2 was

2    in place?

3            THE WITNESS:  No.  I'm not actually sure because I'm

4    not exactly sure when the CATS system was, was automated to

5    handle tickets.

6            THE COURT:  Okay.  Thank you.

7    BY MR. OPPENHEIM:

8    Q.   So you don't know the exact time frame, but you know that

9    at some point in time, CATS had a manual process, and then at

04:48:18  10  some point in time, it became more automated?  Is that what

11   you're saying?

12   A.   I think -- that sounds right, I think, yeah.

13   Q.   And this document, you think, would have related to when

14   it was being operated manually; is that correct?

15   A.   Well, again, I'm a little confused.  I'm not sure because

16   there are other types of abuse issues, and so there could have

17   been some abuse issues that might have always been looked at

18   manually as opposed to automated.  I'm not entirely positive.

19           THE COURT:  All right.  Let's move on.

04:48:46  20  BY MR. OPPENHEIM:

21   Q.   Let's go down to the three bullet points in step 2,

22   please.

23   A.   In step 2?

24   Q.   Yes.

25   A.   Okay.

L. Trickey - Direct

910

1   Q.   We're in step 2, please.

2   A.   Yep.

3   Q.   Look at those three bullet points, please.

4        And does this document describe a scenario where the

5   first offense indicates there would be an e-mail warning to the

6   customer; the second offense indicated that the customer's high

7   speed internet service would be suspended; and on the third

8   offense, the customer's high speed internet service would be

9   terminated?

04:49:29 10   A.   That's what the document says, yes.

11   Q.   And if we turn the page to the next page, at the bottom of

12   the page, there's a paragraph that says, "Termination of

13   Service:   The '3-Strike' Rule."

14        Do you see that?

15   A.   I see that.

16   Q.   Could you just read the first two sentences of that

17   paragraph, please?

18   A.   It is important to understand that suspensions and

19   terminations occur when a customer repeats the same type of

04:50:00 20   abuse.   Cox has established a 3-Strike Rule for routine

21   abusers.

22   Q.   So according -- strike that.

23        Let's now turn to PX 165, please.

24   A.   I'm there.

25   Q.   Faster than me apparently.

L. Trickey - Direct

911

1          This is a copy of Cox's ticket handling procedures as

2     of September 18, 2008, correct?

3     A.   That's what the document says.

4               MR. OPPENHEIM:   Okay.   We'd move this into evidence,

5     Your Honor.

6               MR. ELKIN:   No objection, Your Honor.

7               THE COURT:   It's received.

8     BY MR. OPPENHEIM:

9     Q.   And this is -- can we just pull that up?

04:51:15 10        This is -- I just want to make sure we all understand

11    what this is because we're going to see a bunch of these

12    documents.   It says on the top here "Abuse Department."   That's

13    the same as the abuse group or the safety department, right?

14    Same thing?

15    A.   Yes.

16    Q.   Okay.   Just the names are interchangeable?

17    A.   Yes.

18    Q.   Okay.   And ticket handling procedures, this is a reference

19    to that this includes Cox's graduated response policy, correct?

04:51:43 20   A.   This is the procedures for all handling of, I think, all

21    CATS tickets.

22    Q.   And would that include the graduated response policy?

23    A.   Yes.

24    Q.   And maybe it includes other things beyond that?

25    A.   Yes.

L. Trickey - Direct

912

1    Q.   Okay.  And, and this particular document is the version

2    of -- includes the version of graduated response as of

3    September 18, 2008, correct?

4    A.   Yes, I think so.  What page do you want me to turn to?

5    Q.   If we could turn to page 10 of 85.

6    A.   Okay.

7    Q.   The one labeled "Copyright."

8    A.   Yes.

9    Q.   And this is the document that lays out what the graduated

04:52:31 10  response policy for Cox was as of 2010 as it relates to

11   copyright infringement, correct?

12   A.   I thought it said 2008 on the front.

13   Q.   I'm sorry, you're right, 2008.

14   A.   Yes.

15   Q.   And let's actually go to the next page, which is

16   page 11 -- and actually, I apologize, at the bottom of page 10,

17   getting ahead of myself, in section 5.0, it says:  Resolution -

18   First Offense.

19        Do you see that?

04:53:05 20  A.   Yes.

21   Q.   And if I look over on the right, it says:  Warn Customer.

22        Correct?

23   A.   Yes.

24   Q.   So if Cox had the e-mail -- I'm sorry, I read that

25   backwards.  On the left, it says if Cox has an e-mail address

L. Trickey - Direct

913

1   for that subscriber, then Cox would warn the customer, right?

2   A.   Yes.

3   Q.   So what this is saying is if Cox gets a copyright

4   infringement notice from the copyright owner or one of their

5   representatives and it's the first notice with respect to a

6   particular user, Cox would e-mail the user a warning, right?

7   A.   Yes.  I think they would send them probably the complaint

8   along with some sort of information.

9   Q.   They would forward the infringement notice?

04:53:48  10   A.   Right.  I think so, yeah.

11   Q.   And then if we go to the next page, it describes what

12   happens for repeat infringers at the top, correct?

13   A.   It -- if they got additional complaints.

14   Q.   Okay.  So if they get additional complaints here, what

15   happens on the first one of those additional complaints?

16   A.   It says:  Warn by e-mail.

17   Q.   Okay.  And then what happens on the second infringement

18   notice with respect to that subscriber?

19   A.   Warn by e-mail.

04:54:24  20   Q.   Okay.  And what happens with the third infringement notice

21   with respect to that subscriber?

22   A.   Warn by e-mail.

23   Q.   And what happens with the fourth infringement notice?

24   A.   They would send an e-mail warning.

25   Q.   And the fifth?

L. Trickey - Direct

914

1    A.    Another e-mail warning.

2    Q.    And the sixth?

3    A.    A final e-mail warning.

4    Q.    And do you know as you sit here if those e-mail warnings

5    looked any different each time?

6    A.    I'm not aware if they were different or not.

7    Q.    So after six -- after six, what happened -- on the seventh

8    notice that Cox got, seventh infringement notice with respect

9    to a particular subscriber, what happened?

04:55:16  10    A.    Their service was suspended.

11    Q.    Actually, let me go back to the warnings.  Before we get

12    to the suspensions, let's go -- so there were six warning

13    e-mails, right?

14    A.    Yes.

15    Q.    Do you -- you don't know why the graduated response policy

16    changed from what it was to have six warnings, do you?

17    A.    I'm sorry, changed from what?

18    Q.    From what it was before 2008.

19             THE COURT:  Do you believe that's the three-step?

04:55:45  20             THE WITNESS:  Yeah, I'm not sure, what did we

21    establish before 2008?

22             THE COURT:  Right.

23             THE WITNESS:  I don't remember talking about a date

24    at all before 2008.

25    BY MR. OPPENHEIM:

L. Trickey - Direct

915

1    Q.    We just looked at a three-step policy, did we not?

2    A.    Yeah, but I said I didn't know what -- when that was in

3    effect.

4    Q.    Oh.  Do you think the three-step policy came after this

5    ten-step policy?

6    A.    I'm just not familiar with that policy.

7    Q.    Okay.  So do you know why there were six steps here?

8    A.    Well, I mean, so, again, you know, as we've said in the

9    documents you've looked at, we tried to work with our

04:56:18  10  customers.  So, of course, we are providing them opportunities

11   to see e-mails, and not everybody checks their e-mail all the

12   time, so this was an attempt to, you know, educate and inform

13   the customers.

14   Q.    As you sit here today, do you know what the policy was

15   before September 18, 2008?

16   A.    I'm not positive of what it was.

17   Q.    And you don't know that it wasn't the three-step policy,

18   correct?

19   A.    Right.

04:56:46  20  Q.    It could have been, right?

21   A.    I don't know what the policy was.  I wasn't -- I wasn't

22   supporting this team at that point in time, not even in 2008.

23   Q.    So you have six e-mail warnings -- actually, it's seven

24   because the first one is on the other page, right?

25   A.    Okay.

L. Trickey - Direct

916

1    Q.   And then -- so now really it's the eighth infringement

2    notice.  What happens?

3    A.   So then their service was suspended.

4    Q.   And it says tier 2.  What does that mean?

5    A.   So tier 2 would have been a group of persons that were

6    able to field calls that came in from subscribers whose service

7    had been suspended.

8    Q.   So on the seventh -- or actually it's now we said the

9    eighth notice, because the first one is on the other page.  At

04:57:31  10   the eighth infringement notice, the customer would have their

11   service temporarily suspended until they called in to speak

12   directly to a Cox representative; is that correct?

13   A.   I believe that is what had to happen at this point in

14   time.

15   Q.   Okay.  And they could -- if they called in, they could get

16   their service restarted, correct, or un-suspended?

17   A.   Well, the, the person that they spoke with would engage in

18   coaching and try to help them understand why this was occurring

19   and why they were getting these warnings.  So they would walk

04:58:03  20   them through steps that they needed to take, and then they

21   would reinstate their service, reactivate.

22   Q.   And the -- I'm sorry, I didn't mean to --

23   A.   No.  "Reactivate" is a better choice, not "reinstate."

24   Q.   So after they're suspended, they get reactivated?  That's

25   the term?

L. Trickey - Direct

917

1    A.    After the coaching and education.

2    Q.    And then if there were a ninth notice, the same thing

3    would happen again?

4    A.    Yes.

5    Q.    And on the tenth notice, the same thing would happen, but

6    they had to call a different call center, right?

7    A.    Yes.  In that situation, they would be suspended to a

8    group called the TOC, which was, I think, the technical

9    operations center, which is a different group of people.

04:58:45   10    Q.    A more sophisticated and smaller group that dealt with

11    these issues all the time, right?

12    A.    I believe that's right, yes.

13    Q.    And if there were 11 notices, at that point, Cox would

14    terminate the subscriber, correct?

15    A.    It was a possibility of being terminated.

16    Q.    So if the customer had been the subject of seven notices

17    that were warnings and three different suspension scenarios,

18    two where they called a regular representative and one where

19    they called this TOC group, it was only after all of that that

04:59:25   20    Cox would terminate the subscriber, correct?

21    A.    Right.  Well, they wanted to give the subscriber an

22    opportunity to either figure out, you know, how this was

23    occurring or modify behavior or, you know, coach and educate

24    them to get them -- the goal was to get them to change

25    behavior.

L. Trickey - Direct

918

1    Q.   And if you --

2             THE COURT:  All right.  Are you almost finished with

3    this?

4             MR. OPPENHEIM:  I think I have two more -- five more

5    questions on this document, and then I'm done with this one.

6             THE COURT:  Yeah, and then we'll break.

7    BY MR. OPPENHEIM:

8    Q.   So could we just look at 7 below, please, and look at

9    item 3 in section 7?  And doesn't that, Ms. Trickey, indicate

04:59:59 10  that if the DMCA complaints -- which you would agree is the

11   same as an infringement notice, right?

12   A.   Yes.

13   Q.   Okay.  If the DM complaints continue after the third

14   suspension/final warning, the account is terminated with no

15   recourse to get their high speed internet service back,

16   correct?

17   A.   That's what it says at that point in time.

18   Q.   Okay.  And -- so the termination was not optional

19   according to this document, correct?

05:00:28 20  A.   That's what it says.

21   Q.   One last thing before we break for the day.  Go back up to

22   6.  I just want to make sure I don't mislead anything here.

23   Under -- so section 1 is if Cox knew the e-mail address of

24   their subscriber, correct?

25   A.   Right.

L. Trickey - Direct

919

1   Q.   In those scenarios where Cox didn't know the e-mail

2   address of their subscriber, there was a different process,

3   right?

4   A.   Right.

5   Q.   And that process, very quickly, was do nothing with the

6   first notice, right?

7   A.   Right.

8   Q.   Suspend on the next three notices, right?

9   A.   Yes, that's what it says.

05:01:02 10   Q.   And on the fifth notice, there would be a termination,

11   correct?

12   A.   That's what it says.

13             MR. OPPENHEIM:  Your Honor --

14             THE COURT:  All right.

15             MR. OPPENHEIM:  -- that may be more than five; I

16   apologize.

17             THE COURT:  All right.  Thank you.

18             All right.  So as I indicated, I've got a docket

19   tomorrow morning.  I'm going to start at 8:30 and hopefully --

05:01:21 20   I don't do a great job of predicting.  I've got, I think, eight

21   or nine cases, but I think I'll be done so that we can resume

22   at 10:30.  So I would ask you to come back at -- and be ready

23   to continue the testimony at 10:30 tomorrow morning.

24             And again, please don't do any research or

25   investigation or anything -- speak to anybody about the case,

920

1      and have a good evening.  Thank you.

2              NOTE:  At this point, the jury leaves the courtroom;

3      whereupon, the case continues as follows:

4      JURY OUT

5              THE COURT:  All right.  Have a seat.

6              Ms. Trickey, you're excused at this time.  Please

7      don't discuss the testimony you've given so far with anyone

8      until you come back tomorrow.  All right?

9              THE WITNESS:  Yes, Your Honor.

05:02:26 10          THE COURT:  All right.  Have a good evening.

11     WITNESS STOOD DOWN

12             THE COURT:  All right.  Did you have a chance to talk

13     about demonstratives?

14             MR. ELKIN:  Your Honor, we didn't, but I will say

15     that we -- I think there is a suggestion that we just simply

16     accept all of the demonstratives that were put in with

17     Dr. McCabe.  We don't have a problem with that with one

18     exception, which is the, the one dealing with Tregillis, since

19     that subject matter wasn't covered.

05:03:10 20          THE COURT:  Wasn't covered.  Okay.

21             Any objection to that?

22             MR. OPPENHEIM:  No, Your Honor.

23             THE COURT:  All right.  And, you know, discuss them

24     in an ongoing basis, but that one -- those will be received,

25     and if -- we'll need to mark them as a plaintiffs' exhibit

921

1    since it was your witness sponsoring them.

2          MR. OPPENHEIM:  We'll mark them and move them in

3    tomorrow morning if -- that way we can create a record then

4    with a number.

5          THE COURT:  Right.  Thank you.

6          And you're going to work on the deposition

7    designations.  Hopefully, there won't be -- and if you have a

8    debate, then I just need to see them by 8:00 so I can look at

9    what you're talking about.

05:03:58 10          MR. ELKIN:  I'm advised by Mr. Gould that we're down

11   to the short strokes, so we'll try to get it done.

12          THE COURT:  Okay.  Let me know if you can't, and send

13   me the, the problems you still have.

14          Anything else we need to talk about tonight?

15          MR. GOULD:  Your Honor, I think we're going to make

16   this pretty simple for you.  With the limited designation

17   objections that remain, we have a marked copy of a transcript

18   for you that clearly marks the two spots where the plaintiffs

19   have objected to one thing and the defendants have objected to

05:04:29 20   one group of things.

21          THE COURT:  Yeah.  Mr. Elkin hasn't had a chance to

22   look at it, and he -- you know, I was the same way.

23          MR. ELKIN:  I understand.

24          THE COURT:  You know, he's one of the people who

25   knows all of the parts as they're working independently, and he

922

1    wants to make sure that somebody that doesn't fully understand

2    everything he's trying to do is -- he just wants to take a look

3    at it.

4            Is that right.

5            MR. GOULD:  Understood.

6            THE COURT:  Is that fair to say?

7            MR. ELKIN:  Thank you, Your Honor.  Exactly.

8            MR. GOULD:  In terms of timing, Your Honor, would it

9    be -- I'm just trying to think constructively to get ahead of

05:05:08 10  the ball.  Could we pop in for five minutes in the morning to

11   present materials to you so you can consider them?  We can get

12   some guidance from you by the time we return at 10:30.  We can

13   cut the video while Ms. Trickey is testifying and be ready to

14   go.

15           THE COURT:  Yeah, absolutely.  Or if you're going to

16   take a look at them now before you leave, it's only 5:00, I'm

17   happy to look at them.  I'll be here for quite a while.

18           So if you want to just sit down and see whether you

19   can work them out, if you can't, then Joe will hang around --

05:05:42 20  or somebody will be here, one of the law clerks will be here,

21   and just let them know where the problems continue, and I'll

22   get you out a decision right away.

23           MR. GOULD:  Thank you, Your Honor.

24           THE COURT:  Okay.  All right.  Thank you-all.  We're

25   in recess.

923

1          NOTE:  At this point, the December 5, 2019, portion

2     of the case is concluded.

3

4

5                    CERTIFICATE OF COURT REPORTERS

6

7

8          We certify that the foregoing is a true and
           accurate transcription of our stenographic notes.

9

10

11                    /s/  Norman B. Linnell
                   Norman B. Linnell, RPR, CM, VCE, FCRR

12

13

14                    /s/  Anneliese J. Thomson
                   Anneliese J. Thomson, RDR, CRR

15

16

17

18

19

20

21

22

23

24

25