924

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
      -vs-                     :    Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

<u>VOLUME   5   (A.M. Portion)</u>

TRIAL TRANSCRIPT

December 6, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

925

APPEARANCES:

FOR THE PLAINTIFFS:                 MATTHEW J. OPPENHEIM, ESQ.
                                    SCOTT A. ZEBRAK, ESQ.
                                    JEFFREY M. GOULD, ESQ.
                                    MICHAEL J. DRUCKMAN, ESQ.
                                    ANDREW L. GUERRA, ESQ.
                                    LUCY G. NOYOLA, ESQ.
                                    JIA RYU, ESQ.
                                    Oppenheim + Zebrak, LLP
                                    4530 Wisconsin Avenue, N.W.
                                    5th Floor
                                    Washington, D.C. 20015


FOR THE DEFENDANTS:                 THOMAS M. BUCHANAN, ESQ.
                                    Winston & Strawn LLP
                                    1700 K Street, N.W.
                                    Washington, D.C. 20006-3817
                                      and
                                    SEAN R. ANDERSON, ESQ.
                                    MICHAEL S. ELKIN, ESQ.
                                    THOMAS P. LANE, ESQ.
                                    CESIE C. ALVAREZ, ESQ.
                                    Winston & Strawn LLP
                                    200 Park Avenue
                                    New York, NY 10166-4193
                                      and
                                    JENNIFER A. GOLINVEAUX, ESQ.
                                    THOMAS J. KEARNEY, ESQ.
                                    Winston & Strawn LLP
                                    101 California Street, 35th Floor
                                    San Francisco, CA 94111-5840
                                      and
                                    MICHAEL L. BRODY, ESQ.
                                    Winston & Strawn LLP
                                    35 West Wacker Drive
                                    Chicago, IL 60601
                                      and
                                    DIANA HUGHES LEIDEN, ESQ.
                                    Winston & Strawn LLP
                                    333 South Grand Avenue
                                    Suite 3800
                                    Los Angeles, CA 90071

926

INDEX

OPENING STATEMENTS BY:

WITNESS                                    EXAMINATION        PAGE

 LINDA TRICKEY

                                           DIRECT              930

CLOSING ARGUMENTS BY:

COURT'S RULINGS/JURY INSTRUCTIONS

927

1                    NOTE:  The December 6, 2019, portion of the case

2        begins in the absence of the jury as follows:

3        JURY OUT

4                    THE COURT:  All right.  Sony versus Cox, are you

5        ready this morning?

6                    MR. OPPENHEIM:  Absolutely.

7                    Your Honor, as a preliminary matter, I think we've

8        resolved the Zabek video issues.  So there are none to present

9        to Your Honor.

11:12:54 10                    THE COURT:  Well, that's what I -- I heard that last

11        night.

12                    MR. ELKIN:  Is that --

13                    MR. OPPENHEIM:  You heard that?  Okay.

14                    THE COURT:  Yeah.  All right.  Thank you.

15                    MR. OPPENHEIM:  And there's an Almeroth issue, but

16        we're trying to work it out.  So nothing to present at the

17        moment, but we're working on it.

18                    THE COURT:  Okay.  Stay tuned, I guess.

19                    MR. OPPENHEIM:  But I understand his timing is now

11:13:13 20        not restricted to Monday; is that --

21                    MR. ELKIN:  Yes.  We learned last night, Your Honor,

22        that for some reason Dr. Almeroth's court scheduling conflict

23        that the Court brought to our attention has been now dislodged.

24        So he will be called in our case for the moment.

25                    THE COURT:  Okay.  All right.  I haven't heard from

928

1     Judge Gilstrap, so that -- but maybe I'll get a message from

2     him -- or maybe I -- he has contacted me, I just haven't looked

3     at my mail, which is -- but thank you for that update.

4              All right, any --

5              MR. OPPENHEIM:  So we're trying to --

6              THE COURT:  -- other preliminary matters?

7              MR. OPPENHEIM:  No, let's -- no, as soon as Your

8     Honor is ready.

9              THE COURT:  Mr. Buchanan has one behind you.

11:13:52 10        MR. OPPENHEIM:  I'm sorry.  Apologies.

11             MR. BUCHANAN:  That's okay.  Good morning, Your

12    Honor.

13             THE COURT:  Good morning.

14             MR. BUCHANAN:  I just had one.  I know I'm not only

15    counsel of record, but the local counsel.  And we have a

16    witness, Roger Vredenburg, and so he's at the hotel.  So I

17    don't think it will come up, but in the event things move

18    quickly, is there a problem with the Court with me going back

19    to get him?

20             THE COURT:  No.  Yeah.

21             MR. BUCHANAN:  Or not being here for a short period

22    of time?

23             THE COURT:  No.  And if you need to be preparing

24    witnesses, you know, during the day, you absolutely have

25    permission not to be present with -- as long as other counsel

929

1    are present on the team.

2              MR. BUCHANAN:  Thank you.

3              THE COURT:  All right.

4              MR. BUCHANAN:  Okay.  Thank you very much.

5              THE COURT:  All right, thank you.

6              MR. OPPENHEIM:  And in order to address

7    Mr. Vredenburg's timing, we're going to call him next instead

8    of going to the Zabek video because we want -- he's from out of

9    town, he's a third party, we want to get him on so he can leave

11:14:44 10   for the day.

11             THE COURT:  Okay.  So that -- and you've notified --

12             MR. OPPENHEIM:  We have.

13             THE COURT:  Okay.

14             MR. OPPENHEIM:  We've communicated that to them.

15             THE COURT:  Okay.  Then good morning, Ms. Trickey.

16             THE WITNESS:  Good morning, Your Honor.

17             THE COURT:  All right.  Please come forward and join

18   our happy-go-lucky group here in the well of the Court.

19             Joe, let's get our jury, please.

11:15:30 20            NOTE:  At this point the jury returns to the

21   courtroom; whereupon the case continues as follows:

22   JURY IN

23             THE COURT:  All right.  Please have a seat.

24             I apologize for the delay.  I did my usual prediction

25   of when I would be done with that morning docket.  So I

1    apologize for bringing you in and having you sit.  But I think

2    it's -- I'm beginning to think it's a genetic problem.

3         All right.  We have Ms. Trickey back on the stand to

4    continue her testimony.

5         And, Mr. Oppenheim, please proceed.

6         MR. OPPENHEIM:  Good morning.  Thank you, Your Honor.

7         LINDA TRICKEY, called by counsel for the plaintiffs,

8    having been previously duly sworn, continues to testify and

9    state as follows:

11:16:30  10    DIRECT EXAMINATION

11   BY MR. OPPENHEIM:

12   Q.   Good morning, Ms. Trickey.

13   A.   Good morning.

14   Q.   Feeling a little better?

15   A.   Still dripping.  Sorry.

16   Q.   Sorry.  If you need a break, let me know.

17        May I ask whether you spoke to your counsel about the

18   case, either last night or this morning?

19   A.   No.

11:16:49  20   Q.   Last night -- or yesterday afternoon, we spoke about the

21   three-strike policy, some documents that are a three-strike

22   policy.  And we spoke about PX 165, which was a 2008 policy for

23   residential customers.

24        I'd like to now turn to PX 174, please.

25   A.   I'm sorry, 174?

1   Q.   Yes.

2            MR. OPPENHEIM:   Any objection?

3            MR. ELKIN:   No objection, Your Honor.

4            THE COURT:   All right.   It's received.

5            MR. OPPENHEIM:   Could we publish that, please,

6   Mr. Duval?

7   BY MR. OPPENHEIM: (Continuing)

8   Q.   Ms. Trickey, is this a 2011 version of Cox's graduated

9   response for residential customers?

11:17:52 10   A.   Yes.

11   Q.   And if we turn to page -- I'm going to go with 12 of 87.

12   We literally have four different pages on this.

13            Do you see where 12 of 87 is?

14   A.   Yes.

15   Q.   And that's the section that's -- it says:   Copyother;

16   right?

17   A.   Yes.

18   Q.   That was Cox's internal reference at this point in time

19   for copyright; is that correct?

11:18:19 20   A.   Yes.

21   Q.   And under this 2011 policy, if we go to the next page, it

22   says that when Cox received its first notice with respect to a

23   particular subscriber, that it would, it says here:   Note

24   ticket, hold for more and close.

25            Do you see that?

L. Trickey - Direct

932

1    A.    Yes.

2    Q.    Now, you don't know why Cox implemented that policy,

3    correct?

4    A.    I'm not positive why, but I have an idea.

5    Q.    Well -- and when I asked you in your deposition, in fact,

6    that I took of you back in April, I believe, April 15, 2019,

7    you indicated you didn't know, right?

8    A.    I may have.

9    Q.    What's that?

11:19:27  10    A.    I said I may have.  I don't recall exactly what I said,

11    but --

12    Q.    But you now believe you do know why?

13    A.    Well, I'm not positive, again, but I have -- you know,

14    I -- as I've reviewed documents, I, you know, believe I have an

15    idea, but I can't say for certain.

16    Q.    So at the time you didn't know.  But now having reviewed

17    some documents, you think you may know?

18    A.    Again, I'm not positive.

19    Q.    Okay.  Back when you were work -- doing work for the abuse

11:19:57  20    group, did you know?

21    A.    So back when this policy was done in 2011, I was not the

22    primary lawyer working on graduated response.  That would have

23    been Mr. Cadenhead.

24    Q.    But subsequently you were, and there was the same

25    provision in subsequent policies, right?

L. Trickey - Direct

933

1    A.   Yes.

2    Q.   So at the time that you were providing legal counsel to

3    the group, right, and they had this policy, did you know why it

4    was implemented?

5    A.   You know, I wasn't positive.  I believe I probably did

6    know at that time and just don't recall it today, or did not

7    recall it in my deposition.  But, you know, I probably knew at

8    one time.

9    Q.   Okay.  So you think you knew what it was back when you

11:20:43 10   were doing the work for that group, you didn't know it when I

11   took your deposition, and now you think you may know; is that

12   right?

13   A.   Well, again, I'm trying -- I have a recollection of

14   something, but I can't say for certain.

15   Q.   Okay.  But you don't know for sure, is what you're saying?

16   A.   Right.

17   Q.   Okay.  And then after the first step, the first notice

18   that Cox would receive with respect to any particular notice,

19   they would -- Cox would send a warning to the subscriber,

11:21:17 20   right?  And that's under Second right there?

21   A.   You're talking about section 6?

22   Q.   Yes.

23   A.   Yes, that was -- that's the warn by e-mail that we talked

24   about yesterday.

25   Q.   And what we're about to go through is only in those

934

| | |
|---|---|
| 1 | instances where Cox had an e-mail address for the subscriber, |
| 2 | right? |
| 3 | A.   Yes.  At that time, that's right. |
| 4 | Q.   So the second notice resulted in an e-mail warning to the |
| 5 | customer, as did the third, the fourth, the fifth, the sixth |
| 6 | and the seventh, right? |
| 7 | A.   Yes. |
| 8 | Q.   Okay.  So Cox receives six notices, and all they do is |
| 9 | send the same e-mail out, right? |
| 11:21:51  10 | A.   So they would send a warning e-mail that would, you know, |
| 11 | try to coach the customer, yes. |
| 12 | Q.   Okay.  And then after that, Cox would -- it says here: |
| 13 | Suspend (Tier 2) CATS - Auto - with Self-Reactivation Option; |
| 14 | right? |
| 15 | A.   Yes. |
| 16 | Q.   Now, the colloquial term that Cox uses internally for that |
| 17 | is it's a soft-walled garden, right? |
| 18 | A.   Yes. |
| 19 | Q.   Okay.  And what a soft-walled garden was was a situation |
| 11:22:25  20 | where Cox would suspend the customer's ability to surf the |
| 21 | Internet, and there would be a pop-up on the screen that the |
| 22 | subscriber was supposed to read and the subscriber could click |
| 23 | a button and reactivate the service, correct? |
| 24 | A.   Yes.  So it would quarantine them from being able to go |
| 25 | further in whatever activity they were trying to do, and it |

L. Trickey - Direct

935

1    would bring up information for them to read about the

2    complaints, and then there was a button for them to reactivate

3    once they read it.

4    Q.    But all the customer had to do to reactivate was click

5    "okay," right?

6    A.    Right.

7    Q.    Okay.  And that's exactly what the customer had to do on

8    the ninth notice as well, right?

9    A.    Yes.

11:23:09  10   Q.    So copyright owners now complain ten times about

11   infringement, and there -- there have been do nothing, there

12   have been seven warnings, and two suspensions they can click

13   out; is that right?

14   A.    If they had an e-mail address on file with us, which not

15   every customer did.

16   Q.    And then on the tenth, then Cox would actually suspend the

17   user, correct?

18   A.    Yes.

19   Q.    And the user could call into a customer call center and

11:23:44  20   get reactivated, right?

21   A.    Yes.

22   Q.    And that was what happened as well on the 11th, only they

23   had to call to a different customer call center, correct?

24   A.    Right.

25   Q.    And it wasn't until the 12th notice that Cox would -- the

936

1    12 infringement complaint for that particular subscriber that

2    Cox would terminate the subscriber, right?

3    A.    They were eligible for termination at that point, yes.

4    Q.    Well, you said:  Eligible for termination.  Can you go

5    down to Section 7 of that document, please.

6    A.    Yes.

7    Q.    Under No. 3 in Section 7, could you read that, please.

8    A.    Yes.  If DMCA complaints continue after the third

9    suspension/final warning, the account is terminated.  HSI

11:24:34 10   service should only be restored with the approval of Corporate

11   Abuse (Manager, Jason Zabek).

12   Q.    So what it says here is the account is terminated and

13   Mr. Zabek had the ability to restore it, right?

14   A.    That's what it says.

15   Q.    Let's turn to PX 179.

16   A.    179?

17   Q.    179, I apologize.

18           Any objection?

19           MR. ELKIN:  No objection, Your Honor.

11:25:27 20           THE COURT:  Thank you.  179 is received.

21   BY MR. OPPENHEIM: (Continuing)

22   Q.    Now, Ms. Trickey, this is yet another Cox policy and

23   procedure manual for how to handle graduated response for

24   residential customers, correct?

25   A.    Yes.

937

1    Q.   And this one is dated, it's a little small, but it looks

2    like October 18, 2012; is that correct?

3    A.   Yes.

4    Q.   If we can turn, please, to page 9 of the document.  You

5    see that that's where the copyright section begins again?

6    A.   Yes.

7    Q.   And Cox again use the term "copyother," correct?

8    A.   Yes.

9    Q.   By the way, have you ever heard the term "copyother" other

11:26:26  10   than its use in Cox?

11   A.   I think this is just how they termed it in CATS.  I don't

12   know why it changed.

13   Q.   Copyright isn't -- excuse me.  "Copyother" is not a term

14   that as a lawyer you've ever heard other lawyers use outside of

15   Cox, right?

16   A.   No.

17   Q.   So if we turn to page 10, it says at the bottom of that

18   page, again, that on the receipt of the first notice Cox would

19   hold the notice for further complaints, correct?

11:27:00  20   A.   Yes.

21   Q.   So this is, again, the same thing that existed in the last

22   policy, that for the first notice Cox would not send the

23   infringement notice to the customer, right?

24   A.   Yeah.  It looks like that it would -- they would ticket it

25   though, it would be assigned a ticket, and then it would be

L. Trickey - Direct

938

1   held to see if any additional complaints were ever received.

2   Q.   So, let me back up because I want to make sure that we're

3   all on the same page here.

4         We know what an infringement notice is.  That's

5   something that's sent by a copyright owner or one of their

6   antipiracy vendors, right?

7   A.   Yes.

8   Q.   But you just used the term "ticket," right?

9   A.   Right.

11:27:42 10   Q.   Now, a ticket is something that Cox would create when it

11   received a copyright notice, right?

12   A.   Yes.

13   Q.   Now, it didn't always create a ticket when a notice was

14   sent, right?

15   A.   I think most of the time a ticket was created.

16   Q.   Well, we'll come back to this later.  But when you say

17   "ticket," that was something -- that's Cox's term for what they

18   created in their computer system, right?

19   A.   Yes.  So they could track it.

11:28:11 20   Q.   Right.  Now, if Cox happened to get two notices with

21   respect to the same subscriber on the same day, let's say an

22   hour apart, the first one comes in, Cox creates a ticket, the

23   second one comes in, Cox wouldn't create a new ticket, right?

24   It would just append the second notice to the first ticket,

25   right?

L. Trickey - Direct

939

1    A.    I'm not positive, but I think that's right.  I think they

2    might have called that a child ticket.

3    Q.    All right.  So --

4    A.    I'm not sure.

5    Q.    So what that would mean is, there were times where Cox

6    would receive multiple infringement notices, but only create a

7    single ticket for that notice, right?

8    A.    That could be.

9    Q.    Okay.  So tickets and notices are not exactly the same,

11:28:56 10  right?

11   A.    I think that's right.

12   Q.    Okay.  And so, going back to this policy, so the first

13   time Cox receives a notice with respect to a particular user,

14   Cox wouldn't forward that notice at all to the user, right?

15   A.    Right.

16   Q.    The user would have no idea that they had been reported

17   for a copyright violation, right?

18   A.    Well, they didn't receive a notice from Cox.  I don't know

19   if they had no idea, but they didn't receive a notice.

11:29:22 20  Q.    Well, you know the copyright owners don't know who the

21   subscriber is, right?

22              MR. ELKIN:  Objection.

23              THE COURT:  Well --

24              MR. OPPENHEIM:  What's the objection?  I don't

25   understand.

940

1        THE COURT:  Well, leading, and you're permitted to

2   lead this witness.  So -- but we've gone over this multiple

3   times and you're retreading ground.  The jury has been

4   listening, I assure you.

5        So let's move it along.

6        MR. OPPENHEIM:  Okay.

7   BY MR. OPPENHEIM: (Continuing)

8   Q.   So Cox doesn't notify the subscriber.  On the second

9   offense, the third, the fourth, the fifth, the sixth, the

11:30:03 10   seventh, Cox just sends an e-mail warning to the customer,

11   right?

12   A.   Right, to try to educate them.

13   Q.   And educating the customer was important, right?

14   A.   Absolutely.

15   Q.   So if education was important, why didn't you educate the

16   customer on the first notice?

17   A.   Well, again, I said I have an idea, but I'm not positive.

18   I'm happy to provide my thought around why they did it.

19   Q.   Ms. Trickey, if you know for a certainty why something was

11:30:33 20   done, I would love to hear the testimony, and I'm sure the jury

21   would too.  But if you don't know for a certainty, I think we

22   don't really -- at least from my perspective, I'm not asking

23   you to speculate or guess.  Okay?

24        So we get to the eight notice and the ninth notice,

25   that's the soft-walled garden again, right?

L. Trickey - Direct

941

1    A.   Yes.

2    Q.   Okay.  And so, this is the same as the last policy so far,

3    everything is the same, right?

4    A.   Yeah.  Again, the idea of the soft-walled garden was to

5    create friction and to get their attention.

6    Q.   But in terms of steps, everything is the same up until, up

7    until step nine so far, right, from the last policy?

8    A.   I think that's right.

9    Q.   And on the tenth policy -- excuse me, the tenth notice

11:31:18  10   from a copyright owner, and the 11th, now the customer had to

11   actually call the call center, right?

12   A.   Yeah.  So their service was suspended without the ability

13   to reactivate themselves, so they had to call in.

14   Q.   And Cox has added an additional call into the call center,

15   correct, from what the last policy was?

16   A.   What was the previous numbered document?

17   Q.   Sorry.  I lost my exhibit as well.

18   A.   Was it 174?

19   Q.   Yes, it's 174, please.  And I believe it is page 13 of 87.

11:32:24  20   A.   So it's -- there's two suspensions where you have to call

21   in in 10 and 11.

22   Q.   Right.  Whereas the last policy, there was only one

23   suspension where you called in to the Tier 2 call

24   representative, right?

25   A.   Right.  But step 11 you had to also call in, but that was

L. Trickey - Direct

942

1    just to the TALK.  It was a different group.

2    Q.   Right.  I'm going to -- I'm going to get there.

3              So in this October 2012 policy, there's then three

4    instances where the customer is then suspended and they have to

5    call the TALK or the Atlanta group, correct?

6    A.   In the 2012?

7    Q.   Yes.

8    A.   There's one, two, three, four, five where they have to

9    call in.  You said the Atlanta group.  That's the 404 number

11:33:13 10   too.

11   Q.   Correct.  So there are five suspensions, but the

12   suspensions are slightly different, right?  The first two under

13   the policy, you call Cox's -- what you called your Tier 2 call

14   center, correct?

15   A.   Right.

16   Q.   And then the next three you called a higher level or a --

17   I should just say a different call center or different group

18   which was the TALK group that was based in Atlanta, right?

19   A.   Right.

11:33:36 20   Q.   Okay.  And so, we've added two more steps than what

21   existed in the last policy, correct?  Two more suspensions?

22   A.   Yes.

23   Q.   And what it says then -- and you don't know why Cox added

24   those two additional steps in this policy, correct?

25   A.   Well, I think this was an evolving policy.  So, you know,

L. Trickey - Direct

943

1    as the internet was evolving and usage was evolving, and I

2    think that this was constantly evolving as well too, so -- you

3    know, this was a balance, this was a balance between competing

4    interests of, you know, customers who need access to the

5    Internet and copyright holders.

6              So this was, you know, an evolving process.

7    Q.   Again, Ms. Trickey, when I asked you about this in your

8    deposition, you didn't know why --

9    A.   Well --

11:34:33 10  Q.   -- two more steps were --

11   A.   Well, not specifically, but I do understand now from

12   looking at all the documents this was an evolving process.

13   Q.   Okay.  But when you were questioned by me under oath in

14   this case and I asked you the exact same question I just asked

15   you, you didn't -- you didn't recall why two more steps had

16   been added?

17   A.   Not those specific two steps.

18   Q.   And now under this 2012 policy, the termination language

19   has changed, hasn't it?

11:35:09 20  A.   Yes.

21   Q.   Now it says:  Account will be reviewed and considered for

22   termination, correct?

23   A.   Yes.

24   Q.   And in the last policy it said the account would be

25   terminated and Mr. Zabek could reactivate it, right?

L. Trickey - Direct

944

1   A.   That's what it says.

2   Q.   So it's changing and providing discretion to other Cox

3   employees to not terminate, correct?

4   A.   Yes.

5   Q.   And in this version of the policy, if you turn to the next

6   page, under General Guidelines, Cox recognized that these

7   copyright notices, in fact, could be coming from peer-to-peer

8   file sharing applications, including Torrent, LimeWire, Kazaa,

9   and eDonkey among others, right?

11:36:00  10  A.   Yeah.  These are similar guidelines of the steps,

11   different steps of trouble-shooting and education that they

12   would do for customers.

13   Q.   We've just reviewed -- you can put that aside if you

14   like -- a number of different Cox policies over time for

15   residential subscribers, correct?

16   A.   I'm sorry.  Can you repeat the question?

17   Q.   Between yesterday afternoon and this morning, we've just

18   reviewed a number of different policies that Cox had for its

19   graduated response for residential customers, correct?

11:36:40  20  A.   Yes.

21   Q.   Did Cox expect its team to follow those policies?

22   A.   Yes.

23   Q.   Okay.  I'd like to turn -- I want to turn from the

24   residential side to Cox's business side if we can.

25        Can we please look at PX 478.

L. Trickey - Direct

945

1        Does Cox refer to the Cox -- the business side of

2    its -- the commercial side of its business as Cox Business?

3    A.   Yes, it is Cox Business.

4    Q.   And is this a Cox document with, I guess, Cox's older logo

5    or former logo?

6    A.   Yeah, that is the former logo.

7            MR. OPPENHEIM:  We'd move to admit, Your Honor.

8            THE COURT:  Any objection?

9            MR. ELKIN:  No objection to this document, although I

11:37:48 10    do have a foundation with regard to this exhibit.

11            THE COURT:  Okay.

12            MR. OPPENHEIM:  Simply background on the business,

13    Your Honor.

14            THE COURT:  Okay.  It'll be received.

15    BY MR. OPPENHEIM: (Continuing)

16    Q.   If we could just zero in on the top.  It's a two-page

17    document, correct, Ms. Trickey?

18    A.   Yeah, I'm actually looking at page 2 right now.

19    Q.   Sure.  Okay.

11:38:18 20            THE COURT:  Ask whether she's familiar with the

21    document or the information on the document during the course

22    of your examination, sir.

23            MR. OPPENHEIM:  Yes.

24    BY MR. OPPENHEIM: (Continuing)

25    Q.   Ms. Trickey, in your work for the abuse group, did you

1   have occasion to address issues associated with the graduated

2   response for Cox's business customers?

3   A.   Yes.

4   Q.   And you're generally familiar with the fact that Cox has a

5   separate part of its business, which was Cox Business?

6   A.   Yes.

7   Q.   And did you understand that that was a separate set --

8   part of the business that was tracked financially differently?

9   A.   Yes.

11:39:00 10   Q.   Than the residential?

11   A.   Sure.

12   Q.   So let's look at the top part of this document, please,

13   the Executive Overview, if we can.  And could you read the

14   first sentence there.

15   A.   Cox Business is the commercial services segment of Cox

16   Communications, representing 1.8 billion in revenue and

17   tremendous growth.

18   Q.   And let's skip down to the fourth bullet point, please.

19   And could you read that.

11:39:25 20   A.   In 2000, Cox Business was 100 million in annual revenue,

21   exceeded 1 billion in annual revenue in 2010, along with our

22   peers at Time Warner Communications and Comcast.

23   Q.   And then that sub-bullet, if you would?

24   A.   We expect to reach 2 billion in revenue by 2016.

25   Q.   So according to this document, Cox Business in 2000 was at

L. Trickey - Direct

947

1   100 million in revenue; at 2010, was over a billion; and

2   expected by 2016 to be over 2 billion, right?

3   A.   Yes, that's what it says.

4   Q.   And it was a -- so it was a growing business?

5   A.   Uh-huh, yes.

6   Q.   I'd like to turn to PX 178, please.

7   A.   I'm sorry, what document again?

8   Q.   I'm sorry, PX 178.

9          MR. OPPENHEIM:  Any objection?

11:40:36  10          MR. ELKIN:  No objection, Your Honor.

11          THE COURT:  It's received.

12   BY MR. OPPENHEIM: (Continuing)

13   Q.   Ms. Trickey, earlier we looked at an Acceptable Use

14   Policy.  That was for residential customers, right?

15   A.   Yes.

16   Q.   This is the Acceptable Use Policy for business customers,

17   correct?

18   A.   Yes.

19   Q.   And this particular copy is as of October 1, 2012,

11:41:03  20   correct?

21   A.   Yes.

22   Q.   And the -- could you read the first two sentences of this

23   document, please.

24   A.   This Acceptable Use Policy, AUP, applies to all Cox

25   Business Internet-related services, including, without

L. Trickey - Direct

948

1    limitation, services provided through WiFi, service or

2    services.  Use of any of the services shall at all times be

3    subject to the terms and conditions of this AUP.

4    Q.   And then it goes on to say that -- strike that.

5         Those first sentences say that this AUP applied to

6    all Cox Business customers, correct?

7    A.   For the Internet-related services.

8    Q.   For Internet-related service, not for necessarily

9    telephone, right, or television --

10   A.   Right.

11   Q.   -- or other services?  But for Internet, it applied to all

12   of Cox's business customers, right?

13   A.   Yes.

14   Q.   And then the next sentence says:  This AUP is incorporated

15   into any applicable agreement between Cox Business and the

16   customer -- excuse me -- that states the AUP applies, including

17   without limitation, any applicable commercial services

18   agreement and retail or wholesale master services agreement;

19   correct?

11:42:21 20   A.   Yes.

21   Q.   And so, this is saying that this is -- this applied even

22   if there is another agreement that Cox might have with that

23   customer, Cox Business may have with that customer, right?

24   A.   Yeah, typically there was a customer service agreement

25   that incorporated this document by reference.

949

1    Q.    And the next paragraph says that if there's a conflict

2    between those two contracts, this AUP trumps, or is in charge,

3    or applies, right?

4    A.    Yes, it says the terms of this AUP will govern.

5    Q.    Govern.  And by saying "will govern," that if there's a

6    conflict between a specific agreement and the AUP, the AUP is

7    what the customer has to follow, correct?

8    A.    Yes.

9    Q.    Okay.  Now, in section A-1, that's much like the

10   residential AUP, it prohibits the customer from doing anything

11   that would -- on the Internet service that would violate

12   federal law, correct?

13   A.    Yes.

14   Q.    And as before, federal law included copyright

15   infringement, correct?

16   A.    Yes.

17   Q.    And then it goes on at the last sentence of that paragraph

18   to say, that the customer also could not use the service in a

19   manner that infringes on copyright, among other things,

20   correct?

21   A.    Yes.

22   Q.    So again, just like the residential agreement, Cox

23   Business customers were not allowed to commit copyright

24   infringement on Cox's high-speed Internet service, in two

25   different places it's prohibited, correct?

L. Trickey - Direct

950

1    A.    You mean residential and business?  Is that what you mean

2    by "two different places"?

3    Q.    No.

4    A.    Oh.

5    Q.    In two different provisions of this agreement --

6    A.    Oh, I see.

7    Q.    -- say, you're not allowed to use Cox's Internet service

8    to commit copyright infringement?

9    A.    Yes.

11:44:11 10    Q.    In section 5 on the next page it says, well, any reference

11   in this agreement to customer shall also apply to any end user

12   of the service, correct?

13   A.    Yes.

14   Q.    So, for example, if I run an apartment building, and I am

15   the customer of Cox, and I've got residents in the apartment

16   building who are end users, those end users are subject to this

17   AUP, correct?

18   A.    Yes.

19   Q.    And it goes on to say that if the customer allows others

11:44:51 20   to use the service, the customer is responsible for ensuring

21   that the end users comply with the AUP, right?

22   A.    Yeah, typically via contract.

23   Q.    Right.  So going back to my example, I then, if I'm

24   managing the apartment building, would have to make sure that

25   the residents comply with the AUP, right?

L. Trickey - Direct

951

1    A.    Yeah.  You'd probably put it in your lease.

2    Q.    Maybe that's how I'd it, right.  And then it goes on and

3    says:  Customer is responsible for ensuring that all accounts,

4    sub-accounts, and alternative account names associated with

5    customer's principal account comply with the AUP, right?

6    A.    That's what it says.

7    Q.    Now, let's turn to section six of this document, please.

8    And that's a section called Resale and Redistribution Services,

9    correct?

11:45:54 10   A.    Yes.

11   Q.    So this applies in situations where Cox's customer maybe

12   is running their own small ISP, correct?

13   A.    It could be an ISP, yes.

14   Q.    Right.  So I might be located in -- I don't know, pick a

15   small town somewhere, and I want to run an ISP in that town, I

16   may enter into an agreement with Cox, Cox provides me with the

17   ability to then sell to others in the town, right?  That would

18   be the situation?

19   A.    That's one possible situation, yes.

11:46:33 20   Q.    Among many situations, right?

21   A.    Right.

22   Q.    Okay.

23   A.    Yeah, it lists a number of them in here in this paragraph.

24   There's a lot of options.

25   Q.    And the first paragraph of this, it says -- let's --

L. Trickey - Direct

952

1    actually, let me skip down to -- skip down to row (vi), or

2    romanette (vi).

3            Could you read that, please.

4    A.   Customer is responsible for ensuring that all end users of

5    the services agree to the terms and conditions of this AUP as

6    may be amended from time to time.

7    Q.   Okay.  So this is, again, just like what we were reading

8    before, that the customer is responsible for end users, where I

9    use my apartment building as an example, this is saying the

11:47:32 10  same thing applies with respect to a reseller of Cox's

11   services, right?

12   A.   Yes.

13   Q.   And then it goes on and it says in the next parentheses,

14   romanette (vii):  If customer becomes aware of violation of the

15   AUP by any of its end users, customer shall suspend the

16   services to such end users and shall notify Cox Business in

17   writing as soon as reasonably practicable, right?

18   A.   That's what it says.

19   Q.   So the first time that a customer becomes aware that one

11:48:23 20  of its end users is violating the AUP, that customer must

21   suspend the end user, right?

22   A.   Well, that's what it says.

23   Q.   And it uses the word "shall," right?

24   A.   Yes.

25   Q.   It's not discretionary, right?

L. Trickey - Direct

953

1    A.   I mean, that's what it says.

2    Q.   There's no graduated response here, right?  It's, you get

3    caught once, you suspend?

4    A.   Yeah.  I don't know if the customer had their own

5    graduated response process or procedure.  I'm just going by

6    what the document says.

7    Q.   According to Cox, that customer was not allowed to have a

8    graduated response, correct?

9    A.   Okay.  Yeah, I -- no, I don't know that.

11:49:04 10   Q.   Well, isn't that what this provision says when it says

11   that the customer shall suspend services to the end user?

12              MR. ELKIN:  Objection.

13              THE COURT:  Overruled.

14              Do you have an understanding from reviewing the words

15   themselves?  You may respond.

16              THE WITNESS:  Yeah, I'm --

17              THE COURT:  If you don't understand --

18              THE WITNESS:  Right.  I'm not sure.

19   BY MR. OPPENHEIM: (Continuing)

11:49:27 20   Q.   So you were involved with the abuse group for a year as

21   their legal counsel, and you were also responsible for the

22   business AUP, and you're testifying that you don't understand

23   what the legal obligations were you were imposing on the Cox

24   Business customers?  Is that your testimony?

25   A.   So I know what it says, but I never actually had occasion

954

1    to work on a specific situation where this language came into

2    play.

3    Q.   But you would agree with me, based on what it says, that

4    the customer was not allowed to have a graduated response

5    policy, correct?

6    A.   No, I don't agree with that because I'm not sure.

7            THE COURT:   Okay.  Let's move on.

8    Q.   In the next -- let's turn to the graduated response that

9    Cox had for business customers, PX 164, please.

11:50:39  10    A.   I'm sorry, 160 --

11   Q.   '4.  I apologize if my voice is fading.

12           Any objection, Mr. Elkin?

13           MR. ELKIN:  No objection, Your Honor.

14           THE COURT:  All right.  It's received.

15   BY MR. OPPENHEIM: (Continuing)

16   Q.   Ms. Trickey, this document is Cox's -- includes Cox's

17   graduated response policies for business customers as of

18   January 17, 2007, correct?

19   A.   That's what it says.

11:51:36  20    Q.   And that's what it is, right?

21   A.   Yeah, I mean, I wasn't involved personally back then, but

22   that is what the document says.

23   Q.   Let's turn to page 5 of 63, please.

24   A.   Okay.

25   Q.   And let's skip down to Resolution, please.

L. Trickey - Direct

955

1     So here Cox describes its graduated response for

2  business customers as of 2007, right?

3  A.   Yes.

4  Q.   And it says that on the first notice by a copyright owner,

5  Cox is going to call the customer and inform them about the

6  infringement notice, right?

7  A.   That's what it says.

8  Q.   And then on the second notice Cox is going to do the same

9  thing, right?

11:52:27 10  A.   Yes.

11  Q.   Then when Cox receives a third notice with respect to that

12  customer, Cox is supposed to quarantine the customer's account,

13  correct?

14  A.   Yes, it says:  Quarantine/fax compliance letter.

15  Q.   And fax a compliance letter, right?

16  A.   Yes.

17  Q.   And on the fourth infringement notice, Cox would terminate

18  that business customer, correct?

19  A.   It says -- it says that's the action on the fourth

11:52:59 20  complaint.

21  Q.   In --

22  A.   But I do see also that the same level of education

23  occurred as well too, advising them, giving them

24  trouble-shooting, looking for open wireless networks.  So...

25  Q.   Thank you.  I'll pose a question now, if I may.

L. Trickey - Direct

956

```
         1              In Section 2 here, it says that Cox -- that Cox was

         2     to inform the customer that Cox had received a report from,

         3     whoever the copyright owner was, that file sharing of copyright

         4     material has occurred on a particular date using their IP

         5     address, correct?

         6     A.    That's what it says.

         7     Q.    And it uses the term "has occurred," right?  It says --

         8     A.    Well, that the report says it has occurred on that date

         9     using their IP address.

11:54:05 10    Q.    It says to inform the subscriber that file sharing of

        11     copyrighted material has occurred, correct?

        12     A.    No.  It says:  Inform them that Cox has received a

        13     report -- from whoever that is -- that file sharing of

        14     copyright material has occurred.  The report says that.

        15     Q.    Cox wasn't in any way suggesting that the file sharing

        16     didn't happen, right?

        17     A.    No.  We would have no way of knowing if it happened.

        18     Q.    And if you turn to the next page under General Guidelines,

        19     Section 1, it says:  If DMCA complaints -- and that's again

11:54:46 20    infringement notices, right?

        21     A.    Yes.

        22     Q.    Continue -- If DMCA complaints continue after Quarantine,

        23     the account is terminated with no recourse to get their HSI

        24     service back; right?

        25     A.    That's what it says.
```

957

1    Q.    And HSI is high speed Internet, correct?

2    A.    Yes.

3    Q.    So under this 2007 policy as applied to businesses, by the

4    fourth notice, infringement notice, Cox had a mandatory

5    termination provision, correct?

6    A.    Well, that's what it says.

7    Q.    Can we please turn to PX 172.  And actually the second

8    page, if you would, please.

9              MR. ELKIN:  Your Honor, I don't have any objection to

11:56:12 10   this, the document, except for the first page seems to be a

11   copy with some e-mails on it.  I'm not sure if that is supposed

12   to be part of the exhibit.

13             MR. OPPENHEIM:  Just for clarification sake, I

14   believe, Mr. Elkin, if you look at it, the way this was

15   produced, was it was an attachment to the document.  That's

16   all.

17             MR. ELKIN:  I guess I have no objection with regard

18   to everything except for the first page.

19             MR. OPPENHEIM:  We're happy to --

11:56:41 20   THE COURT:  Yeah, redact the e-mail portion of that.

21             MR. OPPENHEIM:  We can do that, or if I establish a

22   foundation later, we'll put it in.  But we'll work it out with

23   Mr. Elkin one way or another.

24             THE COURT:  All right, thank you.

25   BY MR. OPPENHEIM:  (Continuing)

L. Trickey - Direct

958

1    Q.    So, Ms. Trickey, this document indicates it's -- on the

2    second page -- that it's the Cox business -- includes Cox

3    Business' graduated response as of November 1, 2010, correct?

4    A.    For CBS, yes.

5    Q.    And CBS is Cox Business Services, correct?

6    A.    Yes.

7    Q.    And so, this was for the business customers, right?

8    A.    Yes.

9    Q.    Okay.  And in Section 5, it says that -- if we go down to

11:57:24  10   the section on Resolution again, it says for the first

11   infringement notice that Cox received, it would hold for more

12   and close, right?

13   A.    That's what it says.

14   Q.    Okay.  So this is a different first step than the 2007

15   policy we were looking at where you sent a warning on the first

16   notice, correct?

17   A.    Yes.

18   Q.    Okay.  And so, when in this -- now as of 2010 Cox says,

19   we're going to receive the infringement notice and we're not

11:57:57  20   going to tell the subscriber about the infringement notice,

21   correct?

22   A.    Yes.  So they would note the ticket and then close the

23   first one.

24   Q.    So Cox -- when it says, note the ticket, that just means

25   they were going to make a record of it in the CATS system,

L. Trickey - Direct

959

1    right?

2    A.   Right.

3    Q.   But Cox wasn't in any way informing the subscriber about

4    the infringement notice, correct?

5    A.   Yeah.  I guess they made it consistent with the

6    residential policy.

7    Q.   And Cox didn't -- it doesn't indicate in here that Cox

8    informed the copyright owner that they were not going to

9    forward it to the subscriber, right?

11:58:40 10    A.   The document is silent on that.

11    Q.   If we go to the next page, it describes what happens after

12    that first notice, right?

13    A.   Yes.

14    Q.   For every single notice after the first one, Cox said it

15    would call and warn -- hold on one moment.

16         Do you have that page?  I apologize.  Am I moving to

17    quickly?  007.  There you go.  Okay.  I think we are okay.

18         Do you want me to ask the question again, or do you

19    have it?

11:59:21 20    A.   Yes, please.

21    Q.   Okay.  Apologies.  So for every infringement notice that

22    Cox received after the first one, Cox would do the same thing,

23    which was to call and warn, correct?

24    A.   Yeah, among other things listed in here.

25    Q.   But what it says here on the top is call and warn,

L. Trickey - Direct

960

1    correct?

2    A.   Yes, that's the first thing you would do.

3    Q.   Okay.  And it says the best way for these complaints to be

4    handled is to get an e-mail address and forward the complaint

5    to the -- to the subscriber, right?

6    A.   Yes, similar to the residential process.

7    Q.   The second best way is to call and speak to the

8    subscriber, correct?

9    A.   Yeah, the owner or the general manager of the company, it

12:00:06 10   says.

11   Q.   And then it says, well, if neither of those works, you

12   may, may, quarantine based on your discretion, right?

13   A.   Right.  If you're not able to reach them and you have no

14   other option, then you can quarantine.

15   Q.   And then the document goes on and recognizes that there

16   may, in fact, under this policy be excessive violations,

17   correct?

18   A.   Yeah, that you may decide to quarantine.

19   Q.   And the reason you may decide to quarantine is because

12:00:33 20   this policy recognized that there may be excessive violations,

21   correct?

22   A.   Yes.

23   Q.   And then it goes on and says it is not likely that we

24   would terminate a business customer for a copyright

25   infringement notice, correct?

L. Trickey - Direct

961

1    A.   Yeah, it says that because of the nature of the business

2    accounts.

3    Q.   And it says if you -- it's saying to the Cox employee, if

4    you believe it's necessary to terminate the business customer

5    or you have a question, you should call corporate abuse,

6    correct?

7    A.   Yes.

8    Q.   And since this was a policy in 2010, that would have been

9    Mr. Jason Zabek, correct?

12:01:20  10   A.   Well, he was not the entire Abuse Team.  He was one of

11   them.

12   Q.   He was the head of the abuse group, correct?

13   A.   Right.

14   Q.   Okay.  And if you go to the next page, please, 6.0.  And

15   let's look at the first line there:  If DMCA complaints

16   continue after quarantine, the account is terminated with no

17   recourse to get their high speed Internet service back,

18   correct?

19   A.   That's what it says.

12:01:51  20   Q.   This is up to the discretion of the abuse engineer,

21   correct?

22   A.   Yes.

23   Q.   And what does the last sentence say?  Could you read that?

24   A.   We do not want to terminate anyone.

25   Q.   Let's turn to PX 181, please.

L. Trickey - Direct

962

1        MR. ELKIN:  No objection, Your Honor.

2        THE COURT:  All right, thank you.  It's received.

3   BY MR. OPPENHEIM: (Continuing)

4   Q.   Now, Ms. Trickey, this is the November 1, 2012, version of

5   the policies, correct?

6   A.   Yes.

7   Q.   And this again applies to the business customers, correct?

8   A.   Yes.

9   Q.   And if you turn to page, pages 5, 6, and 7, would you

12:03:03 10  agree that the policies are exactly the same as what we just

11   looked at?

12   A.   Okay, I'll have to compare.  What was the previous

13   document?  I'm sorry.

14   Q.   172.  I'll represent to you that they both have the same

15   day, one says Release 1.0 and the other says Release 3.0.

16   A.   Oh, okay.  Yes, they look the same.

17   Q.   I'm trying to avoid going through every provision and just

18   move along.

19        THE COURT:  You do what you need to do to be able to

12:04:03 20  answer the questions, though.  Okay?

21        Go ahead, sir.

22        MR. OPPENHEIM:  Sorry, I didn't mean to imply

23   anything.

24        THE COURT:  All right.

25   BY MR. OPPENHEIM: (Continuing)

L. Trickey - Direct

963

1  Q.   Do you agree that the policies are the same?

2  A.   Yes.

3  Q.   And so, under this policy as it existed as of November 1,

4  2012, a Cox business customer could be reported in 50 notices,

5  and Cox would not want to terminate their service, correct?

6  A.   Well, you never want to terminate anybody.

7  Q.   And under this policy, Cox explicitly said it didn't want

8  to terminate that customer, correct?

9  A.   Right.  You prefer to try to work with them and, again,

12:04:40 10  educate them, modify the behavior, and help them.  You never

11  want to terminate anyone.

12  Q.   So after 50 instances of calling them or e-mailing them,

13  you would still be trying to educate them, is that what you're

14  saying?

15  A.   No.  I mean, this is saying that the account can be

16  terminated, it is says that under the general guidelines.  But

17  you asked about want do you want to.  I mean, you don't want to

18  terminate, but you may have to terminate.

19  Q.   So do you think at 50 notices you would have to terminate?

12:05:09 20  A.   I mean, I can't answer that as a yes or no.  I don't know

21  the circumstances.  I mean, you know, the document we talked

22  about earlier today about CB talks about the critical services

23  we provide to healthcare organizations.  So do I want to cut

24  off a hospital?

25  Q.   Are you aware of whether or not any of WiFi -- any of the

964

1   business -- strike that.

2           Your Honor, I would move to strike that last answer.

3           THE COURT:  Overruled.  It will be allowed.

4           MR. OPPENHEIM:  Do you know --

5           THE COURT:  You asked her a hypothetical, and she

6   answered.

7           MR. OPPENHEIM:  Okay.

8   BY MR. OPPENHEIM: (Continuing)

9   Q.   Are you aware of whether or not there were any critical

12:05:46 10   hospitals provided high speed Internet service in this case

11   other than public WiFi, and are you aware whether that

12   information was ever produced to the plaintiffs?

13           MR. ELKIN:  Objection.

14           THE COURT:  Sustained.  Okay.  We're not going to get

15   into discovery production issues with -- let's move along.

16           MR. OPPENHEIM:  Okay.

17   BY MR. OPPENHEIM: (Continuing)

18   Q.   So you believe there are circumstances under which a Cox

19   Business customer could receive 50 notices and you would still

12:06:15 20   attempt to be -- still be attempting to educate them; is that

21   correct?

22   A.   I can't answer that question.  I don't know what the

23   circumstances are.  I mean, if you have a hospital, you are

24   talking about hundreds of users.

25   Q.   What about if there were hundreds of notices?

L. Trickey - Direct

965

1    A.    Again, I think you're going to work with that customer.

2    But, again, you -- I don't know -- we have customers that range

3    from the smallest, you know, coffee shop, retail store, up into

4    the largest hospitals, government buildings.  I mean --

5    Q.    Fair enough.  What if you had an apartment building that

6    had hundreds of notices.  Do you think you would still be

7    trying to educate them?

8    A.    You know, that's a hypothetical I can't answer.  I don't

9    know what all the circumstances are.

12:06:56 10    Q.    What about --

11    A.    And that -- and that could -- I don't know if that's

12    residential or business.  I mean, there's an infinite number of

13    variables.  But we would certainly work to try to stop any kind

14    of that behavior.

15    Q.    What about a fraternity that was the subject of dozens and

16    dozens of notices?  Are you still trying to educate the

17    fraternity?

18    A.    Well, I don't know.  At what point?  I mean, is a

19    fraternity -- are you talking about as a business account or a

12:07:22 20    residential account?  So --

21    Q.    So to be clear, Ms. Trickey, the AUP for business

22    customers says zero infringement, zero tolerance, correct?

23    A.    Well, the documents at that point in time -- no, actually

24    it -- which document are we referring to again, the AUP?

25    Q.    Acceptable Use Policy.

L. Trickey - Direct

966

1    A.    Oh, I'm sorry.  Yes, the AUP, yes.

2    Q.    The AUP that the customer agreed to had a zero tolerance

3    policy, right?

4    A.    Yes.

5    Q.    And that not only applied to the customer, but all of the

6    customers' end users, correct?

7    A.    That's what the document says.

8    Q.    And that's what those customers agreed to, correct?

9    A.    That's what they agreed to.

12:08:00 10  Q.    And that's what Cox required them to agree to?

11   A.    Yes.

12   Q.    But you believe there are situations where it's okay, it's

13   possibly okay for that customer to have been the subject of

14   thousands of infringement notices within a several-year period

15   of time without being terminated?  Is that your testimony?

16   A.    No, I didn't say that.  And, again, it would depend on the

17   business.  It would depend upon a number of variables.

18           So, no, I did not say that.

19   Q.    What I'm asking you is, do you believe it's possible that

12:08:30 20  there is a scenario that within a three-year period a Cox

21   business was subject to thousands of notices or even hundreds

22   of notices and you wouldn't terminate?

23   A.    You're talking about a business?

24   Q.    Yes.

25   A.    You mean like a stadium or an arena?  I mean, what --

L. Trickey - Direct

967

1    you're trying to get me to answer a yes or no.  It's not a yes

2    or no answer for me.

3    Q.    We discussed a reseller of Internet services a little

4    while ago, right?

5    A.    Right.

6    Q.    And that reseller of Internet services agrees to the

7    Acceptable Use Policy, right?

8    A.    Yes.

9    Q.    And they -- they're required to impose that on their sub-

12:09:10  10  customers, correct?

11   A.    Yes.

12   Q.    Or on their customers, I guess?

13   A.    The --

14   Q.    Your sub-customers?

15   A.    Right.

16   Q.    And they're required to suspend a customer immediately

17   upon learning that the -- their customer has violated the AUP,

18   correct?

19   A.    The document says that.

12:09:32  20  Q.    But Cox will allow a business customer to be subject to

21   hundreds or even potentially over a thousand notices in a

22   three-year period and won't necessarily suspend or terminate,

23   correct?

24   A.    It's possible.  I don't know.

25   Q.    Now, you're aware, Ms. Trickey, that Cox imposed a cap or

L. Trickey - Direct

968

1    a limit on the number of notices it would accept from the RIAA,

2    correct?

3    A.   Well, yeah, that cap was consistent on everybody.  It

4    wasn't just RIAA that got the cap.

5    Q.   So Cox had a cap that applied to all copyright owners,

6    correct?

7    A.   Yes, to manage volume.

8    Q.   And for -- in the first instance for the RIAA, the cap

9    started at 200 per day, correct?

12:10:35 10    A.   Yes.

11    Q.   And the main reason -- eventually that cap increased up to

12    600, correct?

13    A.   Yes.

14    Q.   Okay.

15    A.   Upon request.

16    Q.   And it never went above 600, correct?

17    A.   Not that I'm aware of.

18    Q.   And the main reason that Cox imposed the cap is because

19    Cox didn't have enough manpower, correct?

12:10:59 20    A.   No.

21    Q.   Ms. Trickey, as I indicated earlier, I took your

22    deposition in April of -- April 15, 2019, correct?

23    A.   Yes.

24    Q.   And at that time, you were under oath, right?

25    A.   Yes.

1   Q.   And you responded to questions I asked of you, correct?

2   A.   Yes.

3   Q.   And I asked you the following question, and you gave the

following answer:  So you're saying there were two resource

4

limitations, one was the CATS system and the other was CATS

5

personnel -- strike that.

6

7        I'm sorry.  I'm looking at the wrong page, I

8   apologize.

9        So I asked you the following -- line 18.  I asked you

12:12:36 10   the following question and you provided the following answer:

11   So you're not aware of whether the technology could take an

12   unlimited number of notices, but you are aware that there was

13   limited manpower?

14        And you responded:  I do know that you couldn't take

15   an unlimited number because at one point or another the company

16   tried to flood the system and it will end up crashing the

17   system, and then nobody gets their notices processed.

18        I'm sorry, I'm now reading the wrong -- give me one

19   moment, please.  I have the wrong cite here.

12:13:14 20        MR. ELKIN:  May we approach?

21        THE COURT:  Yes, sir.

22        NOTE:  A sidebar discussion is had between the Court

23   and counsel out of the hearing of the jury as follows:

24   AT SIDEBAR

25        MR. ELKIN:  Your Honor --

L. Trickey - Direct

970

1         THE COURT:  Yes, sir.

2         MR. ELKIN:  This subject did crop up at the

3    deposition.  And the reason why Mr. Oppenheim is probably

4    finding it a little murky is because it went on for a number of

5    passages.  I think it's improper impeachment because while she

6    used the word "manpower" at a certain point, she basically

7    talks about the fact as well that it was to provide an

8    equitable share of the resources.

9         And if he's about to impeach her with regard to one

12:14:06 10   snippet without the other part, it's misleading.  And so,

11   it's -- I don't think it's proper impeachment.  And I think the

12   jury shouldn't be misled to think that it is.

13        THE COURT:  Okay.

14        MR. OPPENHEIM:  Her testimony is her testimony.  He's

15   free to cross-examine her, to examine her later.

16        THE COURT:  Well, do you have a clean answer to the

17   question?

18        MR. OPPENHEIM:  I do.  So my question was -- and I

19   apologize for the bumbling, Your Honor.  But the question was:

12:14:29 20   So you're saying there were two resource limitations, one was

21   the CATS system, the other was CATS personnel?

22        Answer:  I think the CATS system itself had -- could

23   not accept the flood of notices, but Brent Beck would be a much

24   better witness on that.  But then the main thing was the

25   manpower.

L. Trickey - Direct

971

1          That's clean, Your Honor.

2          MR. ELKIN:  If you go on to read the rest of it,

3    which is right here, you'll see that it's -- actually she -- it

4    goes on for a while.  I just think it's misleading to try to

5    leave it that way, especially given how he set this up.

6          MR. OPPENHEIM:  She goes on and she says:  So I think

7    that's true throughout, the entire company, everybody feels

8    resource constraint.

9          I mean, she reiterates this.

12:15:10  10          THE COURT:  Okay.  Here's what we're going to do.

11    And this came up yesterday as well.  When there isn't a clean

12    prior inconsistent statement that you want to use as

13    impeachment of a -- of not just a recollection, but of a prior

14    inconsistent statement, it's got to be clean.

15          And to -- yesterday we went on for, you know,

16    essentially about this long with an impeachment of another

17    witness.  And it's very confusing, and I'm not going to permit

18    it anymore.

19          So if you have clean inconsistent statements in the

12:15:50  20    deposition, they'll be allowed.

21          Otherwise, you can use this to say, didn't you say

22    that there were resource issues, and attempt to elicit that

23    testimony from her, but -- in her deposition.  But we're not

24    going to go on for paragraphs to try and clarify an answer.

25          And if she has given a conditional answer which

L. Trickey - Direct

972

1    involves this much information, I don't think it's proper

2    impeachment.  So I'm going to -- I'm not going to allow it.

3    Okay?

4              MR OPPENHEIM:  Very well, Your Honor.

5              MR. ELKIN:  Thank you.

6              THE COURT:  Thank you.

7              NOTE:  The sidebar discussion is concluded; whereupon

8    the case continues before the jury as follows:

9    BEFORE THE JURY

12:16:44 10           THE COURT:  We need to hold on just for a minute.

11             There we go.  Go ahead.

12             MR. OPPENHEIM:  Thank you, Your Honor.

13   BY MR. OPPENHEIM: (Continuing)

14   Q.   Isn't it true that Cox didn't have sufficient resources to

15   deal with an uncapped number of notices?

16   A.   Okay.  So I think where I got thrown before was you said

17   "enough resources."  And so, our process was our process that

18   we built.  And so, we had limited resources.

19             But the question you asked me was because we didn't

12:17:37 20   have enough resources.  And to me, that's different.

21   Q.   I'm asking you a different question now, Ms. Trickey.

22   A.   Okay.

23   Q.   Isn't it true that Cox didn't have sufficient resources to

24   deal with an uncapped number of notices?

25   A.   So we had limited resources.  And so, we established a cap

L. Trickey - Direct

973

1    that was consistent across the board.

2    Q.   And by "limited," do you mean that Cox did not have

3    sufficient resources to handle an uncapped number of notices?

4    A.   Well, I think what we had was we had certain personnel who

5    could field calls.  These notices, when sent to the customers,

6    drove calls in.  And because we didn't want people to be

7    sitting on hold, we limited the number of notices that could

8    come in from each copyright holder.

9              MR. OPPENHEIM:  Your Honor, I've asked the same yes

12:18:29 10   or no question three times and haven't gotten an answer yet.

11             THE COURT:  Well, she's answering it the way she

12   thinks she -- ask your next question.  Maybe you can get more

13   of an understanding.

14   BY MR. OPPENHEIM: (Continuing)

15   Q.   So Cox made business decisions based on its budget on

16   where to put resources, and Cox chose not to resource the Abuse

17   Team so that copyright owners could send all of the notices,

18   infringement notices that it was finding on Cox's network,

19   correct?

12:18:57 20   A.   No, I don't think that's entirely accurate.  Any business

21   has to make a decision on resources.

22   Q.   Ms. Trickey, isn't it the case that I took your deposition

23   on April 15, 2009, and at line 12, I asked you the following

24   question --

25             THE COURT:  2019.

L. Trickey - Direct

974

1          MR. OPPENHEIM:  '19, I apologize.

2          THE COURT:  Yeah.  It's all right.

3    BY MR. OPPENHEIM: (Continuing)

4    Q.   2019.  And on page 203, line 12, I asked you the following

5    question and you provided the following answer:  So Cox was

6    making business decisions based on its budget on where to put

7    its resources, and Cox chose not to resource the Abuse Team so

8    that copyright owners could send all of the notices of

9    infringement that it was finding on Cox's network?

12:19:38 10          And your answer was:  So, yeah, there was not.  So

11   Cox was trying to be fair and equitable among the copyrights

12   owners.  It was a finite resource.  The copyright owners were

13   aware of it.  They always were very thankful when they asked

14   and the number got raised, thank you very much.  It was a very

15   good relationship, as far as I could tell.  They knew it was an

16   unlimited resource, so of course they're going to staff it

17   according to what seems reasonable in the context of the whole

18   business.

19          Isn't that -- wasn't that your answer to my question?

12:20:10 20   A.   Yes.

21   Q.   And that answer began with "oh, yeah," right?

22   A.   Well, I'm not sure what the "oh, yeah" was referring to.

23   But, yes, I mean, we staffed according to what the process that

24   we had established.

25   Q.   I apologize, I misstated that.  You didn't say:  Oh, yeah.

L. Trickey - Direct

975

1   You said:  So, yeah, there was not.  Right?

2   A.   Okay.

3   Q.   So if Cox had more resources, dedicated more resources,

4   Cox could have taken more notices, correct?

5   A.   Well, maybe.

6   Q.   In fact, Ms. Trickey, in your deposition on page 198,

7   line 20, when I asked you that question and you provided this

8   answer, it went like this.

9        Question:  If Cox had dedicated more resources, Cox

12:20:57 10   could have taken more notices, right?

11        Answer:  Well, yes.  But again, you know, every

12   business has to decide how many resources it can devote to any

13   particular aspect of its business.  Would I love to have a lot

14   bigger legal department?  You betcha.  There are days there are

15   just not enough lawyers.  So that's true throughout the entire

16   company, everyone, everybody feels resource constraint.

17        Wasn't that the question and answer from your

18   deposition?

19   A.   Yes.

12:21:32 20   Q.   The copyright owners were not aware -- strike that.

21        You never personally -- you do not know -- you do not

22   know whether the copyright owners were aware of Cox's resource

23   limitations, were you?

24   A.   The copyright owners or the agents were all aware of the

25   caps and why we had the caps.

L. Trickey - Direct

976

1  Q.   I'm not talking about the caps, Ms. Trickey.  I'm talking

2  about the reason that you just stated for the caps, which was

3  resource limitations.

4  A.   Yes, they were aware that that was the reason we had the

5  caps.

6  Q.   You're not aware of anybody ever talking to the copyright

7  owners about that, right?

8  A.   I'm sure they had conversations about it, yes.

9  Q.   I am not asking you to speculate, Ms. Trickey.

12:22:27 10  A.   No.  I mean, I've seen the e-mail exchanges.  So, yes they

11  made them aware of the caps and the reason why there were caps.

12  Q.   So I asked you the following question and you provided the

13  following answer in your deposition:  And were the copyright

14  owners aware of the resources that Cox was putting towards it?

15       Answer:  They knew that the resources were limited.

16  I don't know that they ever sat there and talked about them.

17       Isn't that the question and answer that was provided

18  in the deposition?

19  A.   Yes, but I've seen e-mails now.

12:22:57 20  Q.   So now you've looked at e-mails, but at the time of your

21  deposition you hadn't?

22  A.   Well, yeah, there's -- you've got them in the binder.

23  Q.   At the deposition you were designated as Cox's corporate

24  representative on the issue of caps, were you not?

25  A.   Yes.

L. Trickey - Direct

977

1    Q.    If Cox had not put caps on the number of notices it would

2    receive from copyright owners, Cox would have had more

3    information about infringement, correct?

4    A.    Can you ask that again, please?

5    Q.    If Cox had not put caps on the number of notices that it

6    would accept from copyright owners, Cox would have more

7    information about infringement on its network, correct?

8    A.    It would have presumably received additional complaints.

9    Q.    And those additional complaints would have given Cox more

12:24:11 10  information about its subscribers that were alleged to have

11   engaged in copyright infringement, correct?

12   A.    I think so.

13   Q.    Now, Cox didn't just put caps on copyright owners, Cox

14   actually blacklisted some rights owners, correct?

15   A.    Yes.

16   Q.    And by "blacklist," that means that Cox wouldn't even

17   accept the notices, correct?

18   A.    Yes, but only if they had certain behavior.

19   Q.    And, I'm sorry, a moment ago you indicated that the reason

12:24:54 20  you now know about Cox -- the copyright owners being aware of

21   Cox's resource limitations is because of e-mails in the binder,

22   is that what you just said?

23   A.    That is one way I know.

24   Q.    And you're referring to the binder that's right in front

25   of you?

L. Trickey - Direct

978

```
1    A.   Yes.

2    Q.   And when did you look at that binder?

3    A.   I skimmed over it this morning.

4    Q.   Before testimony began?

5    A.   Yeah.

6              MR. OPPENHEIM:  Your Honor, may we approach?

7              THE COURT:  Yes, sir.

8              NOTE:  A sidebar discussion is had between the Court

9    and counsel out of the hearing of the jury as follows:

10   AT SIDEBAR

11             THE COURT:  Yes, sir.

12             MR. OPPENHEIM:  Your Honor, I understand there's a

13   witness rule in effect.  And I also understand that there's a

14   rule that counsel is not supposed to be having contact with a

15   witness while they're on the stand.

16             We provided the binders to opposing counsel as a

17   courtesy for opposing counsel.  They should not have been

18   giving it to Ms. Trickey to review and prepare her testimony

19   today.  That is improper, I believe, Your Honor.

20             THE COURT:  What's in the binder?

21             MR. OPPENHEIM:  It includes all of the documents that

22   we might use with Ms. Trickey during her examination.  It's

23   provided as a courtesy, but it's not provided as a study guide.

24             MR. ELKIN:  Well, I don't know what he's referring

25   to.  I have not spoken -- we have not spoken to Ms. Trickey or
```

Timestamps in left margin: 12:25:51 (line 10), 12:26:16 (line 20)

L. Trickey - Direct

979

1    discussed any documents or showed her any documents.

2          Whatever she's doing with the binder, we made -- we

3    went beyond what Your Honor had even ordered about not talking

4    about the testimony that she had.  We didn't discuss the case

5    with her or any documents.

6          I do want to put -- I do want to raise an issue after

7    he has --

8          THE COURT:  Okay.  So you gave the binder to counsel.

9    When did she get the binder?  Does anybody know when she got

12:27:01 10    the binder?

11          MR. GOULD:  Likely would have been yesterday morning.

12          MR. OPPENHEIM:  We provided a binder to opposing

13    counsel --

14          THE COURT:  And she had it yesterday when she was on

15    the stand.

16          MR. OPPENHEIM:  And it had stayed in the courtroom.

17          THE COURT:  Right.

18          MR. OPPENHEIM:  As it should have.  And to say, well,

19    I didn't talk to her, but I gave her all the materials that

12:27:18 20    you're going to be examined on, is violating that rule.

21          THE COURT:  Well, the documents are Cox documents

22    that she's seen before.  So I don't think that -- but you can

23    inquire about this if you would like to as to whether she

24    studied the documents and gained information that she's now

25    using in her testimony.

L. Trickey - Direct

980

1          MR. OPPENHEIM:  Well, I think she's already testified
2     to that effect, Your Honor.
3          THE COURT:  Well, you've run her through six or eight
4     documents and asked her to look at specific information in
5     those documents.  I can't imagine that her testimony has been
6     modified as a result of that.
7          And she just did say, however, that she looked at
8     some e-mails.  If you want to clear up whether she had changed
9     her answer from the deposition because she looked at those
12:28:08 10   e-mails now, absolutely you may ask her that.
11         MR. ELKIN:  So, Your Honor --
12         MR. OPPENHEIM:  Before we move on --
13         MR. ELKIN:  -- there is --
14         THE COURT:  Stop, stop, both of you stop.  You can't
15    both talk at once.
16         MR. ELKIN:  It's related, Your Honor.
17         THE COURT:  No, this is not -- this is not a small
18    matter.  This is a big deal.  The witnesses shouldn't be given
19    books that are meant for you to go over so that they can
12:28:36 20   prepare with the specific documents that are going to be used.
21         They've -- you've interviewed them, you have gone
22    over the documents that you believe are going to be relevant.
23    They're, I'm sure, well prepared based on the documents that
24    have been produced and marked for exhibits, there's nothing
25    nefarious about doing that, that's what your job is.

L. Trickey - Direct

981

1          To actually isolate six documents and say, okay,

2    these are the ones that they're going to ask you about

3    tomorrow, unless you have an agreement to do that, I don't

4    think that's appropriate.  So that's where we are.

5          And so, you may ask whether her e-mails -- and we

6    won't do that again, and we'll make sure that doesn't happen

7    moving forward.  Your separate --

8          MR. OPPENHEIM:  Your Honor --

9          THE COURT:  What else do you want?  What else do you

12:29:23 10   want me --

11         MR. OPPENHEIM:  All I want to do is reserve the

12    opportunity, if it's appropriate, to seek an instruction after

13    we take a look at the law on this.

14         THE COURT:  Certainly.

15         MR. ELKIN:  So, Your Honor, some of the impeachment

16    is coming, he's just reading passages.  And it's -- I'm not

17    going to address whether or not it's impeachment or not.

18         But at page 205, and it goes to 206, lines 23, Mr.

19    Oppenheim asked Ms. Trickey:  Isn't it in fact true that

12:29:54 20   copyright owners knew there were caps because Cox told them

21    there were caps, and that's why the copyright owners knew there

22    were caps, right?

23         Answer:  I feel confident that I saw it in e-mail

24    between Randy Cadenhead and maybe Ms. Vicki Sheckler, might be

25    her name.  It talks about the fact that we were at the number

L. Trickey - Direct

982

1    we can handle processing today, we can go up to this, but we've

2    got to stick here.  And his, his statement was around, you

3    know, the resources, but I might be mis -- misremembering the

4    e-mail.

5              So the question:  Cox communicated to the copyright

6    owners that were caps, right?

7              Answer:  Yes.

8              So there are references there --

9              THE COURT:  Through the e-mail traffic back during

12:30:36  10    the deposition.

11              MR. ELKIN:  And he misled that.

12              MR. OPPENHEIM:  I'm sorry.  I'll wait.

13              THE COURT:  Yeah.  Okay.  So --

14              MR. OPPENHEIM:  Obviously --

15              THE COURT:  -- your response to that.

16              MR. OPPENHEIM:  -- she didn't say, oh, I know that

17    because I reviewed my prior testimony, or this is my testimony.

18    She said, I now know that because I reviewed the documents in

19    the binder.

12:30:52  20              THE COURT:  No.  The question is, is it proper

21    impeachment if you know that she's answered in her deposition

22    that she had looked at e-mails at her deposition.

23              MR. OPPENHEIM:  It is -- so as I stand here, I

24    haven't looked at that entire section.  But, of course, Mr.

25    Elkin is free to say, doctrine of completeness, okay.

L. Trickey - Direct

983

1        THE COURT:  I understand.

2        MR. OPPENHEIM:  I am not trying to impeach her on a

3   gotcha.  But, you know, these were witnesses who would never

4   give clean, short answers.  So it was very difficult to get

5   impeachment.  I have done the best I can.

6        THE COURT:  Okay.  I understand that.  Let's be

7   mindful that -- and don't point to paragraph, sentence 16, when

8   on sentence 21 they have a more robust answer --

9        MR. OPPENHEIM:  Understood.

12:31:38 10        THE COURT:  -- which is inconsistent.

11        MR. OPPENHEIM:  Understood, Your Honor.

12        THE COURT:  All right.

13        MR. ELKIN:  Thank you, Your Honor.

14        THE COURT:  Thank you.

15        NOTE:  The sidebar discussion is concluded; whereupon

16   the case continues before the jury as follows:

17   BEFORE THE JURY

18        THE COURT:  All right.  Are you all comfortable going

19   until close to 1 o'clock?  Does that work?  Okay.  Good.  Thank

12:32:07 20   you.

21        All right, please continue.

22   BY MR. OPPENHEIM: (Continuing)

23   Q.   Ms. Cox, I think a moment ago -- excuse, Ms. Trickey, from

24   Cox.  I apologize.

25   A.   I wish I was one of the family members.

1    Q.    Me too.  Ms. Trickey --

2    A.    Yes.

3    Q.    -- I believe a moment ago you indicated that you had

4    reviewed the e-mails in the binder that's in front of you,

5    right?

6    A.    Yeah, but this is not the first time I had seen them.

7    Q.    But when did you get that binder to review?

8    A.    Well, I think, I think you gave it to everybody yesterday.

9    And then I just asked if I could see it this morning because I

12:32:52 10   wanted to familiar myself with some of the documents.

11   Q.    And when, roughly, this morning did you get it?

12   A.    9 o'clock maybe.  8:30, 9.

13   Q.    And did you go through the documents in the binder?

14   A.    Not all of them, but I kind of skimmed through.

15   Q.    You skimmed through all of them?

16   A.    Yeah.

17   Q.    And who did you ask to get the binder from?

18   A.    I just asked one of the support team if I could see the

19   binder.

12:33:23 20   Q.    Do you remember who it was by name?

21   A.    No.

22   Q.    Was it somebody who worked for Winston & Strawn?

23   A.    Yes.

24   Q.    So let's go back to the issue of blacklisting.  There were

25   certain rights owners I believe you testified who were

L. Trickey - Direct

985

1   blacklisted by Cox, right?

2   A.   Yes.

3   Q.   And blacklisting meant that Cox would refuse to accept

4   infringement notices from those vendors, correct?

5   A.   I'm trying to remember if it meant they wouldn't come in

6   at all or they were not processed.  No, they -- I think they

7   were not forwarded on.

8           I'm trying to remember if there were two different

9   kinds of blacklisting.  One where the notices did not come in

12:34:10 10  at all, or the other type where they came in but were not

11   forwarded on because of the language in the notice.

12   Q.   Some of the notices came in, Cox received them --

13   A.   Got ticketed.

14   Q.   -- but Cox didn't do anything with those notices, right?

15   A.   Because of the language in the notice.

16   Q.   But when it came to Digital Rightscorp, at some point in

17   time Cox refused to allow Digital Rightscorp to even send

18   e-mails to the cox@e-mail address, right?

19   A.   Yeah, because they were trying to flood the system.

12:34:41 20  Q.   Well, they were sending so many infringement notices that

21   it -- Cox was going to be overwhelmed, right?

22   A.   Right.  It could have taken the system down.

23   Q.   The e-mail box would have been taken down by receiving all

24   those notices of infringement?

25   A.   Right.

L. Trickey - Direct

986

1    Q.   So Cox wouldn't even -- wasn't willing to receive those

2    notices?

3    A.   Well, they were well in excess of the limits.  And so

4    they -- Digital Rightscorp was, I think, being -- trying to be

5    retaliatory in some way.

6    Q.   Do you -- how do you know -- strike that.

7         Do you have any evidence as you sit here right now of

8    what was in the mind of Digital Rightscorp indicating that they

9    were being retaliatory?

12:35:25 10  A.   I think it was just based upon the huge number that they

11   were trying to send at one time.

12   Q.   That was your perception, that they were being

13   retaliatory?

14   A.   Yes.

15   Q.   From their perspective, they may have been just trying to

16   enforce rights, correct?

17   A.   I don't know.

18   Q.   You don't know --

19        MR. ELKIN:  Your Honor --

12:35:42 20       THE COURT:  You don't -- move on.  Those are

21   speculative questions.

22   BY MR. OPPENHEIM: (Continuing)

23   Q.   When Cox blacklisted Rightscorp and wouldn't accept the

24   notices, Cox, then, didn't learn about the infringement that

25   Rightscorp was attempting to inform Cox about, right?

L. Trickey - Direct

987

1   A.   The ones that they did not receive, yes.

2   Q.   And the reason that Cox blacklisted Rightscorp is because

3   there was language in the notice and a link in the notice where

4   Rightscorp was offering to settle the copyright infringement

5   claim with Cox's subscriber, right?

6   A.   Okay.  I think we're talking about, again -- one, you were

7   talking about when they sent them and we blocked them because

8   they were trying to flood the system.

9          Now you're talking about the other type where we said

12:36:31 10   we would not process them and send them to customers because

11   they had language in them that was, we felt, akin to, you know,

12   blackmail extortion.  I mean, they were trying to get them to

13   pay up or else.

14   Q.   Copyright owners, when they have their rights infringed,

15   are allowed to assert those rights, right?  You don't dispute

16   that?

17   A.   Well, but they were preying upon peoples' lack of

18   knowledge.  Yes, they can assert their rights.

19   Q.   Ms. Trickey, if you -- I'm going to try to ask my

12:37:01 20   questions clearly, and if you could answer my questions, that

21   would be great.

22          A copyright owner whose works are infringed by

23   peer-to-peer has a right, you know this as a lawyer, to assert

24   a claim against that infringer, right?

25   A.   Yes.

L. Trickey - Direct

988

1  Q.   And like anybody else who has a right, if that's right --

2  right is violated, that copyright owner can offer to settle

3  that claim, right?

4  A.   Well, we happily processed the notices that did not have

5  money demand language in them.  So we sent all of those -- you

6  know, we sent those on.

7        But these were, we felt, preying upon peoples' lack

8  of knowledge or understanding, were actually trying to trap

9  them.

12:37:42 10  Q.   Ms. Trickey, I'm going to try to walk through a sequence

11  here and see if we can stay in line.

12        So the copyright owner has a claim, and a copyright

13  owner is allowed to try to settle that claim if they want,

14  right?

15  A.   Sure.  And they could have sent us a subpoena for the

16  identity of the person and then gone after them to try to

17  settle the claim at that point.

18  Q.   It's actually -- there are lots of times where somebody

19  has a right that they believe is violated, and they try to

12:38:13 20  resolve it without filing a lawsuit so they can get a subpoena,

21  right?

22  A.   Yes.

23  Q.   And so, just like all those other situations, a copyright

24  owner say -- may say, I don't want to have to sue every

25  subscriber.  I'm going to try to resolve the dispute without

L. Trickey - Direct

989

1   suing them.  That's perfectly, conceptually fine, right?

2   A.   Yeah.  And we tried to resolve that with our graduated

3   response process.

4   Q.   And the reason you blacklisted Rightscorp is because you

5   didn't like the way they were offering to settle those claims,

6   correct?

7   A.   Well, I think they were threatening people with the loss

8   of their Internet service, which was not -- you know, we're the

9   Internet service provider, they're not.

12:39:03 10   Q.   Like I said, you didn't like the way they were seeking to

11   resolve the claim, right?

12   A.   Correct.

13   Q.   Okay.  Now, that was Digital Rightscorp, correct?

14   A.   Yes.

15   Q.   And you blacklisted them, correct?

16   A.   We did not process their notices.

17   Q.   Even Cox uses the term "blacklisting," right?  That's not

18   my term.

19   A.   Well, yeah, blacklisting is when we did not forward the

12:39:31 20   notices.

21   Q.   Now, the -- not a single notice that the plaintiffs have

22   ever sent included that settlement language or anything that

23   was extortionate in your -- I'm not sure if "extortion" was the

24   word you used.  "Blackmail," I think, is the word used.

25        None of plaintiffs' notices had any of that, right?

L. Trickey - Direct

990

1    A.    No, we had a good relationship with RIAA.

2    Q.    You thought that Cox had a good relationship with RIAA,

3    right?

4    A.    Yes.

5    Q.    So just to be clear, because I guess I wasn't, there are

6    basically two kinds of blacklist, one where the notices come in

7    but don't get forwarded, and one where the notices never get

8    in; is that accurate?

9    A.    Right.  And then there's the third where the notices do

12:40:18 10   come in and get forwarded.

11   Q.    Earlier we were talking about commercial customers.  And

12   you indicated the situation where a hospital might have -- be a

13   Cox Business customer, correct?

14   A.    Correct.

15   Q.    That hospital, as a business, may have Internet for, let's

16   say, its doctors and nurses, correct, its staff?

17   A.    Yeah, and patients, and family members, and workers.

18   Q.    Okay.  But that hospital may also have a public WiFi

19   system that is different than what the doctors use, right?

12:40:53 20   A.    Yes, they could.

21   Q.    And in fact, most hospitals these days, modern hospitals

22   do have a public WiFi system, right?

23   A.    That's probably the case.  I would think so.

24   Q.    The cardiac surgeons working in the hospital don't have to

25   go onto the public WiFi system, do they?

991

1   A.   I don't know.  Probably not.  They might use it as well

2   though.

3   Q.   They may use it --

4   A.   Yeah.

5   Q.   -- but there's usually a different account for the people

6   who work in the hospital than the public WiFi system?

7   A.   Like a different SSID, you mean?

8   Q.   Yeah.

9   A.   Yes, there could be, yeah.

12:41:29 10   Q.   And a different business account, right?

11   A.   Yes.

12   Q.   So just because an account may say it's a hospital, you

13   have no idea based on looking at the name of the account

14   whether it's a public WiFi system or it's important for the

15   staff of the hospital, right?

16   A.   Well, it would still be under the same Cox Business

17   account.  They may just have a separate wireless SSID that they

18   display for patients and guests and people to use.  It's still

19   the same business account.

12:42:01 20   Q.   You could have a Cox Business customer account which was

21   just for public WiFi at a hospital, correct?

22   A.   I suppose you could.

23   Q.   Yeah.  And if the account --

24   A.   It would seem unusual, but I guess you could.

25   Q.   And the account name could just say it's a hospital,

L. Trickey - Direct

992

1   right?

2   A.   Sure.

3           MR. OPPENHEIM:  I've got about 15 to 20 minutes.  Do

4   you want to break now or keep going?

5           THE COURT:  Let's go.

6           MR. OPPENHEIM:  Okay.

7   BY MR. OPPENHEIM: (Continuing)

8   Q.   Ms. Trickey, would you agree that losing access to the

9   Internet has grave consequences?

12:42:47 10   A.   Sure.

11   Q.   And that Cox only terminated customers in extreme cases,

12   right?

13   A.   I believe so.

14   Q.   And Cox would pause before taking any such action, because

15   taking such action is a grave situation, right?

16   A.   Well, it's very disruptive to residents and, you know,

17   customers and businesses if they don't have -- especially

18   businesses if they don't have Internet access.

19   Q.   And, in fact, between 2012 and 2014 Cox only terminated 13

12:43:27 20   subscribers who were the subject of plaintiffs' infringement

21   notices, correct?

22           MR. ELKIN:  Your Honor, may we approach?

23           THE COURT:  Yes, sir.

24           NOTE:  A sidebar discussion is had between the Court

25   and counsel out of the hearing of the jury as follows:

L. Trickey - Direct

993

1    AT SIDEBAR

2              THE COURT:  Yes, sir.

3              MR. ELKIN:  Okay.  Your Honor, this is a fact not in

4    evidence, the way the question was phrased.  There's no

5    question that with regard to the RIAA, only 13 subscribers were

6    terminated during the claims period.  But there were actually

7    32 --

8              MS. GOLINVEAUX:  32.

9              MR. ELKIN:  32 subscribers during the claims period

12:44:18 10   who were other than RIAA.  And he's -- he just mentioned in his

11   question 13 --

12             THE COURT:  He didn't limit it to -- right.

13             MR. OPPENHEIM:  I did limit it, Your Honor.  I

14   absolutely limited it.  And the -- it is in evidence because

15   Dr. McCabe testified to it.

16             THE COURT:  Right.  I understand that.  But --

17             MR. ELKIN:  Mr. -- Dr. McCabe misstated it yesterday.

18   And we know what the record is.  And they have interrogatory

19   answers, and it's been verified, and it's really not the

12:44:48 20   subject of a dispute.

21             THE COURT:  So there's 13 RIAA subscribers or notices

22   -- subscribers who --

23             MR. OPPENHEIM:  Do you want me to do it for you,

24   Your Honor?

25             THE COURT:  Yeah, do it.

L. Trickey - Direct

994

1        MR. OPPENHEIM:  There were 13 Cox subscribers who

2   were the subject of RIAA notices who were terminated.

3        THE COURT:  RIAA notices.  Okay.  During the relevant

4   period.

5        MR. OPPENHEIM:  Well, I said '12 to '14, which is the

6   data we got.  And, in fact, it's right.  I double-checked it

7   very carefully before I said it.

8        The information that Mr. Elkin just referred to about

9   32 subscribers, they refused to produce that.  They objected to

12:45:24 10  producing it.

11        MR. ELKIN:  Sorry.

12        MR. OPPENHEIM:  I apologize.  I stand corrected on

13   that.  Thank you.

14        So we did get an interrogatory response.  Most of

15   those 32 were immediately after the BMG trial.  So in the

16   complaint filed --

17        THE COURT:  Do you know how many were in the relevant

18   period, the '13 to '14?

19        MR. OPPENHEIM:  I don't know.  I don't know what the

12:45:58 20  totals are, but I am sure that he will draw -- Cox will draw

21   that out on cross-examination.

22        COURT REPORTER:  I'm sorry, counsel.

23        THE COURT:  Yeah.  Not RIAA.

24        MR. ELKIN:  Not RIAA, just the totals.  But the way

25   the question was put to the witness --

L. Trickey - Direct

995

1          THE COURT:  Yeah.

2          MR. ELKIN:  -- it suggested that there were -- that

3   he was asking for confirmation that there were 13 during that

4   period of time.

5          THE COURT:  Overall.  All right.  So the -- reask the

6   question again.

7          MR. OPPENHEIM:  I'll ask it again and --

8          THE COURT:  And limit it.

9          MR. OPPENHEIM:  And I am certain I limited it, but

10  I'll do it again so there's no doubt.

11         THE COURT:  Okay.  All right.  Thank you.

12         NOTE:  The sidebar discussion is concluded; whereupon

13  the case continues before the jury as follows:

14  BEFORE THE JURY

15         THE COURT:  All right.  Please continue.

16  BY MR. OPPENHEIM:  (Continuing)

17  Q.   I will go back for a minute and clean up something

18  apparently I missed.

19         While a customer, a Cox customer is in the graduated

20  response process, whether it be two steps for business or 14

21  steps for residential, does Cox continue to charge the customer

22  fees?

23  A.   You mean are we charging them for their Internet access?

24  Q.   Yes.

25  A.   Yes.

L. Trickey - Direct

996

1  Q.   So Cox continues to be paid while that customer is in the

2  graduated response process, correct?

3  A.   Yes, because they still have their service.

4  Q.   Going back to the issue of termination.  I believe you

5  testified earlier, but I want to make sure we have a very clear

6  record.

7        Isn't it in fact true that between 2012 and 2014 Cox

8  only terminated 13 subscribers who were the subject of RIAA

9  notices?

12:48:10 10  A.   I don't actually know the number myself.  I'm not -- I'm

11  not sure how many people were terminated.  But you have to

12  remember that as you move through graduated response, the

13  number of repeat offenders goes down and down and down.

14        THE COURT:  So you don't know the number --

15        THE WITNESS:  I don't know the number.

16        THE COURT:  -- of terminations?

17        THE WITNESS:  No, I don't know the number.

18        THE COURT:  All right.  Go ahead.

19  BY MR. OPPENHEIM: (Continuing)

12:48:33 20  Q.   That 2012 to 2014 period was a period during which you

21  were legal -- part of that time you were legal counsel to the

22  abuse group, correct?

23  A.   No.  I took over at the beginning of 2014 when

24  Mr. Cadenhead retired at the end of 2013.

25  Q.   All right.  So if --

1   A.   So I wasn't involved in any terminations.

2   Q.   So you came in at the very end of 2014?

3   A.   No, the beginning of 2014, January 1 technically.

4   Q.   Okay.  So if we look at a period that goes from 2012 all

5   the way through the end of 2014, you were the legal counsel for

6   the last third of that period, correct?

7   A.   Yes.  So I was still familiar generally with what was

8   going on during that time period.  I just wouldn't have been

9   the person specifically consulted on issues until 2014.

12:49:24 10   Q.   And you would agree that copyright owners do not get paid

11   when their copyrights are being infringed, correct?

12   A.   Correct.

13   Q.   Let's turn back to Exhibit 175, please.  This is the AUP,

14   correct?

15   A.   Yes.

16   Q.   And we previously looked at it in terms of its

17   prohibitions against copyright infringement, correct?

18   A.   Yes.

19   Q.   The zero tolerance policy as I called it earlier; is that

12:50:08 20   right?

21   A.   The intellectual property infringement language?

22   Q.   Correct.

23   A.   Yeah.

24   Q.   And that there was zero tolerance for copyright

25   infringement in this document, correct?

L. Trickey - Direct

998

1    A.    It's prohibited.

2    Q.    Can I ask you to please turn to page 005.  And let's look

3    at the bottom of that page, please.

4    A.    Are you talking about the Cox high speed Internet

5    subscriber agreement?

6    Q.    Yes.  This is the --

7    A.    It's a different document.

8    Q.    It's within the same exhibit, correct?

9    A.    Right.

12:50:48 10    Q.    And this -- so, okay, so let's back up, I'm sorry, to

11    page 4.  Just for clarity sake.

12          And this is attached to the Acceptable Use Policy in

13    this exhibit, correct?

14    A.    Yes.

15    Q.    And it's the Cox high speed Internet subscriber agreement,

16    correct?

17    A.    Yes.

18    Q.    And this -- like the Acceptable Use Policy, this is an

19    agreement between CoxCom and all of its affiliates and the

12:51:16 20    subscribers, correct?

21    A.    Yes.

22    Q.    And every subscriber has to agree to this agreement,

23    correct?

24    A.    Yes.

25    Q.    And if a subscriber is unwilling to agree to this

L. Trickey - Direct

999

1   agreement, this says that they should immediately stop using

2   Cox's service, correct?

3   A.   Right.

4   Q.   And this agreement, this version of the agreement at the

5   very top says it's the agreement in effect as of December 20,

6   2011, correct?

7   A.   Yes.

8   Q.   And if we go to the bottom of this page, there's a

9   provision on payment terms, correct?

12:51:49 10   A.   Yes.

11   Q.   And that provision says, you, referring to the customer,

12   correct, agree to pay all monthly fees and installation charges

13   including, but not limited to.

14        And then it lists a number of other things, right?

15   A.   Yes.

16   Q.   And then it says, monthly fees will be billed one month in

17   advance, right?

18   A.   Yes.

19   Q.   And that if the payment is not received by the due date,

12:52:15 20   late fees and/or collection charges may be assessed, right?

21   A.   Yes.

22   Q.   And it goes on to say, if you don't pay, your service may

23   be terminated, correct?

24   A.   Yes.

25   Q.   So under this agreement, there was absolutely no question

L. Trickey - Direct

1000

1   that Cox had the right to terminate a subscriber if they didn't

2   pay, correct?

3   A.   Yes.

4   Q.   And it was important for Cox to get paid, correct?

5   A.   Well, sure.  Any business wants to be paid.

6   Q.   Right.

7   A.   Sure.

8   Q.   Including record companies, right?

9   A.   Sure.

12:52:54 10   Q.   And music publishers, right?

11   A.   Sure.

12   Q.   And just like record companies and music publishers, Cox

13   needed revenue, right?

14   A.   Yes.

15   Q.   And revenue was derived from subscribers paying their

16   bills, right?

17   A.   Yes.

18   Q.   And if a Cox customer didn't pay for the service, Cox

19   could terminate the user, right?

12:53:15 20   A.   Yes.

21   Q.   And in fact, between 2013 and 2014, Cox terminated a

22   massive number of users who didn't pay their bills, correct?

23   A.   What's a massive number?

24   Q.   Well, why don't we look at PX 365, please.

25   A.   I'm sorry, PX what?

L. Trickey - Direct

1001

1    Q.   365.

2                Your Honor, this is Cox's second supplemental

3    responses to plaintiffs' first set of interrogatories, with a

4    verification page on the back.

5                We would move to admit.

6                THE COURT:  Any objection?

7                THE WITNESS:  I have the document.  Where am I going?

8                THE COURT:  He's moved to admit the document.  And

9    your exception to our prior submissions is preserved.

12:54:19 10                Otherwise, are there any other reasons --

11               MR. ELKIN:  Just foundation with this particular

12   witness.

13               THE COURT:  Okay.  All right, let's see where we go

14   with that.

15               Go ahead, sir.

16   BY MR. OPPENHEIM: (Continuing)

17   Q.   Could you please turn to --

18               MR. OPPENHEIM:  Well, is it admitted, Your Honor?

19               THE COURT:  I'm going to admit, yes.

12:54:36 20               MR. OPPENHEIM:  Can we please publish for the jury.

21   BY MR. OPPENHEIM: (Continuing)

22   Q.   Now, Ms. Trickey, an interrogatory is a situation where

23   the plaintiffs have the opportunity of posing questions to Cox

24   and Cox provides under oath answers, correct?

25   A.   Yeah, I'm aware.  Yeah.

L. Trickey - Direct

1002

1    Q.   You're a lawyer, of course you are.  And, in fact, I know

2    we went -- so can we -- let's just go to page 21 of this

3    document, if we could.

4         And can we go to the page right before that, please.

5    It should be the verification page.

6         And this is the verification page here that says that

7    somebody by the name -- not somebody, Mr. Delgado, who is here

8    in the courtroom, indicates that he's verifying based under the

9    penalty of perjury the answers set forth in this interrogatory,

12:55:57 10   correct?

11   A.   That's what it says.

12   Q.   And if we scroll down, it shows Mr. Delgado's signature as

13   of March 29, 2019, correct?

14   A.   I'm sorry.  What page number are we on?

15   Q.   So if you look at the PX numbers, it's 0365.0022.

16   A.   Oh, okay.  All right.  I'm with you now.

17   Q.   And that's Mr. Delgado's signature on the document,

18   correct?

19   A.   I'm sure it is.

12:56:26 20   Q.   And so, let's turn now to 365.0017.  And what I would like

21   to do here is --

22        So this is an interrogatory response where Cox at the

23   top here -- let's just zoom in at the top half.  It indicates

24   the number of subscribers that Cox terminated for failure to

25   pay by quarter for 2013 and 2014, correct?

L. Trickey - Direct

1003

1    A.    Yes.

2    Q.    And this, this box is just residential accounts, correct?

3    A.    That's what it says.

4    Q.    Okay.  And the subscriber was terminated and then it goes

5    on and it says:  And their data service was disconnected;

6    correct?

7    A.    Yes, it says, data service.

8    Q.    And it says that the data service was disconnected,

9    correct?

12:57:28  10    A.    Yeah, for non-payment, right.

11    Q.    For non-payment.  And then in 2013 and '14 it has each

12    quarter's terminations, correct?

13    A.    Yes.

14    Q.    And disconnected above means that their Internet -- high

15    speed Internet service from Cox was taken away, correct?

16    A.    Yes.

17    Q.    Okay.  And so, in the first quarter of 2013, how many

18    subscribers did Cox terminate for non-payment?

19    A.    In first quarter of 2013?

12:58:02  20    Q.    Yes.

21    A.    64,616.

22         MR. OPPENHEIM:  Let's open up a spreadsheet because I

23    want to count these.  Can we do that as a demonstrative,

24    please.

25         THE COURT:  Let's not -- if you're going to add it

L. Trickey - Direct

1004

1    up, add it up.  Let's not belabor this.  The jury can see the

2    numbers themselves.  And if you've got a total and you want her

3    to agree to it -- let's not spend the additional time going

4    through that for --

5              MR. OPPENHEIM:  Very well.  Understood, Your Honor.

6              THE COURT:  -- every one of these quarters.

7              MR. OPPENHEIM:  Let's go back to the interrogatory

8    then.

9    BY MR. OPPENHEIM: (Continuing)

12:58:33 10  Q.   So then in quarter two it was 73-and-a-half-thousand

11   subscribers terminated?

12   A.   Yes.

13   Q.   And in quarter three it was 83,000, correct?

14   A.   Yes.

15   Q.   A little more.  And quarter four it was over 70,000,

16   correct?

17   A.   Yes.

18   Q.   And then in 2014 Cox took away Internet service from

19   63-and-a-half-thousand for non-payment, correct?

12:59:03 20  A.   Yes.

21   Q.   And disconnected Internet service in the second quarter

22   for 72, almost 73,000; is that correct?

23   A.   Yes.

24   Q.   And almost 90,000 in the third quarter?

25   A.   Yes, 89,487.

L. Trickey - Direct

1005

1   Q.   And in the last quarter of 2014, how many did Cox

2   terminate?

3   A.   79,745.

4   Q.   Would it surprise you if I told you that in 2013 and 2014

5   Cox terminated 597,796 residential subscribers for not paying

6   Cox's bill?

7   A.   Is that -- I'm sorry, for both years combined?

8   Q.   For both years, yes.

9   A.   Yeah, I don't know what you mean by "surprising."  If

12:59:52 10   that's what it is, I'll accept that you're saying that.

11   Q.   And if we go down below -- now, that's just residential,

12   right, according to the document?

13   A.   Yes.

14   Q.   If we go down below, it has figures for the number of

15   business subscribers who were terminated, correct?

16   A.   Yes.

17   Q.   And it says their data -- here it says their data service

18   was disconnected as well, correct?

19   A.   Yes.

13:00:19 20   Q.   And here it shows in 2013, between 2 and 3,000 business

21   customers terminated each quarter, correct?

22   A.   Yes.

23   Q.   And in 2014, it's the same, except that in the third

24   quarter, the number goes up to over 3,200, correct?

25   A.   Yes.

L. Trickey - Direct

1006

1    Q.   And would it surprise you that that -- let me ask that a

2    different way.

3         Would you disagree with me if I told you that that

4    was 21,915 business subscribers who were terminated by Cox in

5    2013 and '14 for non-payment?

6    A.   So I don't have a calculator, but I'll accept what you

7    say.

8    Q.   And so overall, between its business customers and its

9    residential customers, Cox terminated roughly 500 and -- excuse

13:01:16 10  me, 618,000 customers for not paid -- for nonpayment, correct?

11   A.   If you say so.

12   Q.   And so, did Cox recognize that when it was terminating

13   those customers for nonpayment, that Cox was taking away their

14   Internet service?

15   A.   Yeah.  But just like with graduated response, we work with

16   our customers and try to avoid having to disconnect them for

17   non-pay.  They get pretty generous time limits and sometimes

18   they work out payment plans.

19        And so, you know, in general, we try to work with

13:01:53 20  people.

21   Q.   So if there were 13 subscribers who were terminated for

22   copyright infringement of plaintiffs' works and there were over

23   600,000 who were terminated for nonpayment, do you think that's

24   the same?  You said it's just like graduated response.

25        Do you think that's the same.

L. Trickey - Direct

1007

1    A.   No, I said -- what I said was the same is how we work with

2    our customers.  In graduated response, the number that gets

3    down to actually that last step is a dramatically smaller

4    number of people than who got the notices at the first step.

5    So it works, it goes down.

6         And so, I think it's very different.  I think you're

7    comparing apples and oranges.

8    Q.   And the difference is that for graduated response, it's

9    the copyright owners who aren't getting paid, whereas for

13:02:44 10   nonpayment, it's Cox that's not getting paid, correct?

11   A.   So again, for graduated response, we're trying to educate

12   the customer so that they don't have to lose their Internet

13   service.  But sometimes they don't modify behavior or fix a

14   problem, so --

15   Q.   And you terminated roughly 618,000 subscribers for

16   nonpayment between 2013 and 2014, despite understanding that

17   that had grave consequences for that subscriber, correct?

18   A.   Yes, and after trying to work with them.

19        MR. OPPENHEIM:  We'll pass the witness, Your Honor.

13:03:29 20        THE COURT:  All right, thank you.

21        Let's break for lunch.  We'll come back at five

22   minutes after 2:00.

23        All right.  Thank you, you're excused.

24        NOTE:  At this point the jury leaves the courtroom;

25   whereupon the case continues as follows:

L. Trickey - Direct

1008

1    JURY OUT

2             THE COURT:  All right.  Anything before we break?

3             MR. ELKIN:  Not here, Your Honor.

4             MR. OPPENHEIM:  Not from the plaintiffs, no.

5             THE COURT:  Okay.  All right.  Thank you all.

6             We're in recess until five minutes after 2:00.

7             THE COURT:  You're in the middle of your testimony,

8    so don't discuss the testimony you've given so far with anyone

9    until we get back.

13:04:35 10            THE WITNESS:  All right.  Thank you.

11            THE COURT:  Thank you.

12            NOTE:  The morning portion of the case on December 6,

13    2019, is concluded.

14       --------------------------------------------------

15

16

17                   CERTIFICATE OF COURT REPORTERS

18

19          We certify that the foregoing is a true and
          accurate transcription of our stenographic notes.

20

21                   /s/  Norman B. Linnell
                  Norman B. Linnell, RPR, CM, VCE, FCRR

22

23

24                   /s/  Anneliese J. Thomson
                  Anneliese J. Thomson, RDR, CRR

25