1009

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  5  (P.M. Portion)

TRIAL TRANSCRIPT

December 6, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1010

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                  SCOTT A. ZEBRAK, ESQ.
 3                                JEFFREY M. GOULD, ESQ.
                                  MICHAEL J. DRUCKMAN, ESQ.
 4                                ANDREW L. GUERRA, ESQ.
                                  LUCY G. NOYOLA, ESQ.
 5                                JIA RYU, ESQ.
                                  Oppenheim + Zebrak, LLP
 6                                4530 Wisconsin Avenue, N.W.
                                  5th Floor
 7                                Washington, D.C. 20015

 8
     FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
 9                                Winston & Strawn LLP
                                  1700 K Street, N.W.
10                                Washington, D.C. 20006-3817
                                    and
11                                SEAN R. ANDERSON, ESQ.
                                  MICHAEL S. ELKIN, ESQ.
12                                THOMAS P. LANE, ESQ.
                                  CESIE C. ALVAREZ, ESQ.
13                                Winston & Strawn LLP
                                  200 Park Avenue
14                                New York, NY 10166-4193
                                    and
15                                JENNIFER A. GOLINVEAUX, ESQ.
                                  THOMAS J. KEARNEY, ESQ.
16                                Winston & Strawn LLP
                                  101 California Street, 35th Floor
17                                San Francisco, CA 94111-5840
                                    and
18                                MICHAEL L. BRODY, ESQ.
                                  Winston & Strawn LLP
19                                35 West Wacker Drive
                                  Chicago, IL 60601
20                                  and
                                  DIANA HUGHES LEIDEN, ESQ.
21                                Winston & Strawn LLP
                                  333 South Grand Avenue
22                                Suite 3800
                                  Los Angeles, CA
23

24

25
```

1011

INDEX

OPENING STATEMENTS BY:

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| LINDA TRICKEY | | |
| | CROSS | 1015 |
| | REDIRECT | 1054 |
| | RECROSS | 1095 |
| ROGER L. VREDENBURG | | |
| | DIRECT | 1101 |

CLOSING ARGUMENTS BY:

COURT'S RULINGS/JURY INSTRUCTIONS

1012

```
          1              A F T E R N O O N   S E S S I O N
          2              NOTE:  The afternoon portion of the case on
          3    December 6, 2019, begins in the absence of the jury as follows:
          4    JURY OUT
          5              THE COURT:  Any preliminary matters?
          6              MR. ELKIN:  Just one thing I wanted to point out,
          7    Your Honor, which is in my direct or cross or whatever it is
          8    that I'm doing with Ms. Trickey, I have about six or so
          9    exhibits that I'm going to offer into evidence.  Some or many
14:10:53 10    or most of these exhibits in some version may have just been
         11    admitted, but I'm not confident of what versions they are, so
         12    rather than to mess around with this, I'm going to seek to
         13    offer them in, but I just didn't want to confuse the Court or
         14    the jury with the fact that they may have seen some of them on
         15    the -- on direct.
         16              THE COURT:  Okay.  That's fine.  And you can indicate
         17    that and you can --
         18              MR. OPPENHEIM:  We'll deal with it as it goes.
         19              THE COURT:  Okay.
14:11:22 20              MR. OPPENHEIM:  Very quickly on the binder issue, if
         21    I may, Your Honor?
         22              THE COURT:  Yes, sir.
         23              MR. OPPENHEIM:  First off, I don't have a binder for
         24    their examination now, which I thought the rule was we were
         25    going to get them.  So that's number one.  Two --
```

1013

```
              1          THE COURT:  Hold on.  They've got one for you.

              2          MR. OPPENHEIM:  Great.

              3          MS. GOLINVEAUX:  I think we gave one yesterday.  We

              4    have an extra one.

              5          MR. OPPENHEIM:  If that's the case, then my

              6    colleagues should have given it to me.

              7          Secondly, would it be appropriate to inquire whether

              8    the binder that was given to Ms. Trickey had any writings,

              9    comments, or highlightings in it, and can plaintiffs have an
14:11:57     10    opportunity to review it?

             11          THE COURT:  So as I understand it, the binder that

             12    was on her -- on the witness stand was, you know, placed back

             13    in the binder file, and that wasn't disturbed.  It was a

             14    courtesy copy that she received --

             15          MR. OPPENHEIM:  Yes.

             16          THE COURT:  -- this morning.

             17          Is that a fair representation?

             18          MR. ELKIN:  Yeah.  Your Honor, apparently,

             19    Ms. Trickey asked someone on our side for it.  It was given to
14:12:28     20    her.

             21          THE COURT:  Okay.

             22          MR. ELKIN:  And to the best of my knowledge, I -- you

             23    know, there was nothing in that document.  We can look at the

             24    binder to confirm that, but that's -- I don't want to get in

             25    over my skis.
```

1014

1    THE COURT:  Yeah, so please do.  Please review the

2  courtesy binder, and let me know if there is any writings in

3  the binder.

4    MR. ELKIN:  Your Honor, I've been assured by one of

5  my colleagues who's looked at the binder that there hasn't been

6  any markings at all.

7    THE COURT:  Okay.  All right.  Now that a formal

8  request has been made, give it one more look to make sure

9  there's nothing in the binder.  Okay?

14:13:07  10    MR. OPPENHEIM:  One of the things that was said at

11  sidebar is that they were all documents that Ms. Trickey had

12  seen before in her deposition.  I don't know that Ms. Trickey

13  had ever seen the termination data, and by giving her the

14  binder, she had an opportunity to see that I was going to ask

15  her questions on that, just to be clear.

16    So anyways, thank you, Your Honor.

17    THE COURT:  Okay.

18    MR. OPPENHEIM:  As I said, we'll reserve our rights

19  and deal with it later.  Thank you.

14:13:29  20    THE COURT:  Got it.  Got it.

21    Okay.  Joe, let's get the jury, please.

22    NOTE:  At this point, the jury returns to the

23  courtroom; whereupon, the case continues as follows:

24  JURY IN

25    THE COURT:  All right.  Please have a seat.

1015

```
 1              All right.  Mr. Elkin, cross-examination?

 2              MR. ELKIN:  Yes, sir.

 3              THE COURT:  Oh, Ms. Trickey, please, come take your

 4   place.

 5              THE WITNESS:  Oh.

 6              THE COURT:  Thank you.

 7    LINDA TRICKEY, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN, RESUMED

 8                       CROSS-EXAMINATION

 9   BY MR. ELKIN:

10   Q.   Good afternoon, Ms. Trickey.

11   A.   Good afternoon.

12   Q.   I'm going to follow up on some of the questions that

13   counsel for the plaintiffs asked you on direct, and since we're

14   taking you as well out of order relative to Cox's case, some of

15   those -- some of these questions may seem to be repetitive,

16   they're not intended to do that, and I'll be showing you some

17   exhibits that may have previously been introduced in a

18   different version as well.

19              By whom are you employed?

20   A.   Cox Communications.

21   Q.   And what is your current position?

22   A.   Assistant general counsel, privacy and security.

23   Q.   And how long have you been at Cox?

24   A.   Seventeen years.

25   Q.   Okay.  You started in 2002?
```

14:14:48 (line 10)
14:15:19 (line 20)

1016

1    A.   Yes.

2    Q.   And can you give us an overview of the various positions

3    you've held from 2002 through the present?

4    A.    Sure.  When I started in 2002, it was primarily a

5    transactional role.  I was working on contracts primarily for,

6    like, multiple dwelling units, apartment complexes, and new

7    residential developments, and then in around 2003 or so, the

8    attorney that was handling the -- what was then the growing

9    internet service relocated, and so they asked me to assume the

14:16:12 10  responsibilities for the internet service as well.  So I did

11   that as what we called sort of the internet product lawyer for

12   a number of years, supporting, you know, the launch of new

13   products and services and things like that.

14           In early 2014, after Mr. Cadenhead retired at the end

15   of 2013, I took over part of his responsibilities but not all.

16   So I did take over graduated response, and I took over some of

17   the privacy work, too, that he had been doing for years.

18           And then in 2016, I think it was, they asked me to

19   move over to do more privacy and security full time because

14:16:53 20  that area is exploding as well, and so I've been doing privacy

21   and security for some time now.

22   Q.   Okay.  And as you know, the events about which we are in

23   court relate to the time period primarily 2013 and '14.  What

24   was the main focus of your work for Cox during that period of

25   time?

L. Trickey - Cross

1017

1   A.   So the main focus in 2013 would have still been the

2   internet product work as well as some -- a little bit of

3   privacy, and then in 2014, I continued to do the internet

4   product work.  I never seem to shed anything.  I just keep --

5   kept getting things.  But I kept doing the internet product

6   work and then I assumed privacy as well and then graduated

7   response.

8   Q.   Okay.  Are you familiar with the phrase "terms of use"?

9   A.   Yes.

14:17:45 10   Q.   What is that?

11   A.   Terms of use is similar to the, the Cox -- the subscriber

12   agreement we talked about.  So those are the -- those are the

13   terms between Cox and its customers relating to the products

14   and services.

15   Q.   And have you heard of the phrase "Acceptable Use Policy,"

16   or AUP?

17   A.   Yes.  We discussed those earlier today, Cox's Acceptable

18   Use Policy.

19   Q.   And just to refresh everyone --

14:18:16 20   A.   Sure.

21   Q.   -- could you just tell us what that is?

22   A.   Right.  That is -- that's the way to let our customers

23   know for internet service what is acceptable activity and what

24   is not acceptable activity.

25   Q.   Okay.  And did you have occasion to familiarize yourself

L. Trickey - Cross

1018

1    with Cox's terms of use and Acceptable Use Policy for its

2    broadband internet service?

3    A.    Yes.

4    Q.    And did you become familiar with the policies in

5    connection with both Cox's residential and business services?

6    A.    Yes.

7    Q.    Do you know whether Cox addresses copyright infringement

8    in the Acceptable Use Policy?

9    A.    Yes, it does.

14:18:57 10    Q.    Okay.  I'd like you to turn to tabs 1 and 2 of the binder

11    that we are in the process of putting on the witness stand, and

12    this is the Defendants' Exhibit 114 and Defendants' Exhibit

13    101.

14            MR. OPPENHEIM:  No objection to either, Your Honor.

15            THE COURT:  All right.  They're received.

16            MR. ELKIN:  Thank you.

17    BY MR. ELKIN:

18    Q.    Could you please identify what the first two items are in

19    the binder?

14:19:37 20    A.    Yes.  Exhibit 114 is the Cox High Speed Internet

21    Acceptable Use Policy dated November 18, 2011; and the other

22    document is the Exhibit 101, which is the Cox High Speed

23    Internet Acceptable Use Policy dated November 20, 2013.

24    Q.    And did you contribute to the contents of these policies?

25    A.    Yes.

L. Trickey - Cross

1019

1    Q.    Do you know whether or not these were in effect during the

2    2013 and '14 time frame?

3    A.    Yeah, I believe they were.

4    Q.    How often does Cox's Acceptable Use Policy change,

5    generally?

6    A.    Not very frequently.

7    Q.    What is the purpose --

8    A.    It's reviewed -- it's reviewed -- generally, it's reviewed

9    every year to see if anything needs to be updated, but it

14:20:28  10   doesn't actually change too often.

11   Q.    And what's the primary purpose of the Acceptable Use

12   Policy?

13   A.    That's to put customers on notice of the activities that

14   they can and cannot engage in in using the high speed internet

15   service.

16   Q.    And I believe this was covered on direct, but just to --

17   A.    Yes.

18   Q.    -- frame this up, to what extent are customers required to

19   agree to the AUP?

14:20:51  20   A.    Yes, they're required to agree to the AUP in order to use

21   the service.

22   Q.    Okay.  Take a look at page 1 of Defendants' 114.  That's

23   the tab 1.  Could you, could you read the sentence that begins

24   on line 3, beginning with:  This Acceptable Use Policy?

25   A.    Yes.  It says:  This Acceptable Use Policy (the "AUP") has

L. Trickey - Cross

1020

1    been designed to protect our service, our subscribers, and the

2    internet community from inappropriate, illegal, or otherwise

3    objectionable activities.

4    Q.   And what's your understanding as to the purpose of that

5    statement?

6    A.   Well, that's to -- you know, there are many parties in the

7    internet ecosystem, and so this was to put customers on notice

8    that the, what we have said in the AUP is designed to protect,

9    you know, us and our network as well as them and the internet

14:22:00 10  community from activities that they shouldn't be doing.

11   Q.   Okay.  If you skip the next sentence, could you read the

12   following sentence that begins with:  Violation of any term?

13   A.   Violation of any term of this AUP may result in the

14   immediate suspension or termination of either your access to

15   the Service and/or your Cox account.

16   Q.   Okay.  What is your understanding as to the purpose of

17   that statement?

18   A.   That's to put customers on notice that if they misuse the

19   service, that they could lose the privilege of the service.

14:22:35 20  Q.   And does Cox believe that this statement obligates Cox to

21   suspend or terminate a subscriber's access to the internet if

22   they violate any term of the AUP?

23   A.   No, I think the word "may" is in there because the

24   circumstances will, will vary, and so this is to put them on

25   notice that you, you could lose your service.

L. Trickey - Cross

1021

1    Q.    So in circumstances where a customer violates the AUP, do

2    you have an understanding as to what steps Cox will take?

3    A.    Yes.

4    Q.    And what are they?

5    A.    So if they violate the AUP and we become aware of it,

6    typically the, the goal is to reach out and to educate and to

7    modify behavior, to coach, to help them try to figure out

8    what's going on, how they can, you know, fix the problem, close

9    the open WiFi.  I mean, there's a lot of things that we walk

14:23:31 10    through.  So we try to educate and get them to, you know,

11    change behavior.

12    Q.    Okay.  On direct, I think there were questions that were

13    put to you as to the AUP related to a, I think, a zero

14    tolerance policy.  How did you view the AUP relative to any

15    notion of zero tolerance?

16    A.    Well, the -- you want to make sure your subscribers

17    understand in strong language, you know, what they can and

18    can't do using the service, but I did not believe that the AUP

19    required a zero tolerance because there are a variety of

14:24:12 20    circumstances that could be at play.

21    Q.    Well, wouldn't it have been easier if Cox just terminated

22    these subscribers if there was a violation of the AUP?

23    A.    Well, not really because, you know, internet access is a

24    very important part of our society, and people need it to, you

25    know, work, to shop, to do all kinds of things online.  Now we

1022

1    have streaming media that has risen so much.  So, you know, it

2    is a very serious thing -- as I stated earlier this morning,

3    it's a very serious thing to terminate someone's internet

4    access.

5    Q.    Do you have an understanding as to whether the AUP gives

6    Cox the right to watch what its customers are doing online?

7    A.    No.  We do not spy on what our customers do online.

8    Q.    Why don't you do that?

9    A.    Because we believe they have a privacy right in what

14:25:11  10    they're doing online, and we do not track or spy, you know, the

11    websites that they go to.

12    Q.    Okay.  Now, during the two thousand and -- I'm sorry --

13    2013 and 2014 time frame, absent cybersecurity reasons, do you

14    know whether Cox could block websites or throttle bandwidths?

15    A.    No.

16    Q.    Could they do that?

17    A.    No.

18    Q.    Why not?

19    A.    Well, first of all, I think technically we didn't have the

14:25:45  20    ability to do it, but in any event, you know, there was the

21    concept of net neutrality, which is still very much in the news

22    these days, and is -- the concept is that ISPs, being the

23    gatekeeper to the internet, should not be artificially blocking

24    or deciding, like, what traffic gets through and doesn't get

25    through.

L. Trickey - Cross

1023

1    So -- and so we, we don't block or throttle, slow

2  down the service artificially.

3  Q.   Does Cox have other types of customers besides

4  residential?

5  A.   Yes.  So as I talked about this morning, we have a wide

6  variety of business customers as well.

7  Q.   Okay.  I'd like for you to turn to tab 3 in your binder.

8  That's Defendants' Exhibit 103.

9  A.   Okay.  I'm there.

14:26:40 10  Q.   Can you recognize -- do you recognize Defendants' 103?

11  A.   Yes.

12  Q.   What is it?

13  A.   These are Cox Business policies -- pardon me -- including

14  the Cox Business Acceptable Use Policy is included in this.

15  Q.   Did you contribute to the content of these documents?

16  A.   Yes.

17         MR. ELKIN:  Your Honor, I would offer Defendants' 103

18  into evidence.

19         THE COURT:  Any objection?

14:27:15 20         MR. OPPENHEIM:  My apologies, Your Honor.

21         No objection, Your Honor.

22         THE COURT:  It's received.

23  BY MR. ELKIN:

24  Q.   Could you take the jury through what Cox Business policies

25  are covered in this exhibit?

L. Trickey - Cross

1024

1    A.   Well, let's see.  It starts out with your privacy rights.

2    There's an annual privacy notice that's actually included, and

3    then --

4    Q.   I'm sorry to interrupt you.  That was a bad question.

5    A.   Oh.

6    Q.   Let me direct you to the first page of the exhibit.  This

7    Cox Business policies, do you see the effective date of when

8    this particular policy went into effect?

9    A.   It says it was updated November 18, 2011.

14:28:00 10  Q.   And then let me direct your attention to the fourth page

11   of this exhibit.  In the middle of the page, do you see any

12   other new effective policy AUP for the business for Cox?

13   A.   Yes.  There's a Cox Business Acceptable Use Policy.  It

14   says it was updated October 1, 2012.

15   Q.   Do you know whether or not these were the Cox Business

16   AUPs that were in effect during the 2013 and 2014 time frame?

17   A.   I think so, yes.  I don't think there was a later business

18   one after this.

19   Q.   Does Cox view the business AUP violations differently than

14:28:50 20  residential AUP violations?

21   A.   Well, so how we treat the potential violations, we do have

22   different processes.

23   Q.   Why is that?

24   A.   Well, because business customers are very different from

25   residential customers, and as I stated earlier this morning,

L. Trickey - Cross

1025

1  business customers range from, you know, a very small business

2  up to very large businesses, but they are businesses, and they

3  are largely reliant on their internet service.

4         You also have many businesses that have users of the

5  internet service who they may not even know who the person

6  actually is, because they could be a doctor's office that

7  offers WiFi, or it could be -- you know, we talked about a

8  hospital.  We've got government buildings, you know, police,

9  fire, all kinds of different buildings, and so you don't always

14:29:45 10  know who the actual -- the identity of who the actual users

11  are.

12  Q.   Okay.  You can take that down, James.

13         I want to turn to a different subject, if I may.  Do

14  you know whether there was a particular group at Cox that dealt

15  with copyright infringement claims during 2013 and 2014?

16  A.   Yes.  That was the customer safety team.

17  Q.   And what was the customer safety team's role and

18  responsibility for this?

19  A.   So that, that team would ingest the complaints that came

14:30:21 20  in from the copyright holders into our -- what we called our

21  CATS system, the Cox abuse tracking system.  It would sign a

22  ticket, and they were responsible for carrying out the

23  graduated response.

24  Q.   Do you know what the focus of the customer safety team was

25  in dealing with customers who were accused of copyright

L. Trickey - Cross

1026

1    infringement?

2    A.   Yes.   Their role was very much based around education, and

3    it didn't -- wasn't just around copyright infringement.   There

4    were other activities that were considered to be abuses that

5    they tried to help the customers understand and troubleshoot.

6    So it was a, very much of an educational role, hey, here's

7    what's going on.   We need to help you with this.

8    Q.   You testified in your direct a little bit about Cox's

9    graduated response program.   Can you explain the -- what that

14:31:16  10   is for the jury, please?

11   A.   Yes.   So graduated response is the process of dealing with

12   the complaints that were coming in from the copyright holders,

13   and so it could be, you know, as we talked about this morning,

14   you could do warnings via e-mail, and then the reason it's

15   called graduated response is because if the activity continued,

16   then how we handle it got stricter.

17         So, of course, you know, if there was no response to

18   sort of the e-mail warnings, then we would suspend their

19   service to what we called the soft-walled garden, and they had

14:31:57  20   information to read to explain why their internet access had

21   been suspended, and then they could go to the bottom and click

22   through, and hopefully that got their attention, but if it

23   didn't, then ultimately they could be also suspended to a, what

24   we called the hard-walled garden, which they couldn't click out

25   of.   They had to actually talk to a human being who would help

L. Trickey - Cross

1027

1  coach and educate, and that really created a lot of friction

2  for them.

3        And then ultimately, there could be circumstances

4  where we would terminate as well.

5  Q.   Thank you.  I'm going to in a few minutes show you a

6  document and have you take the jury through the specific steps,

7  but before we do that, can you let us know based on your

8  knowledge when Cox actually began this graduated response

9  program, roughly?

14:32:52 10  A.   I think it was in the early 2000s, because Cox originally

11  offered its internet service through, you know, a third party;

12  I think it was called "Excite@Home"; and that was before I got

13  to Cox, but then when I got to Cox, they had started building

14  out their own network at that point.

15        So I think soon thereafter, we were actually the

16  first ISP to build a system to handle copyright infringement

17  complaints.  So I think it was maybe 2003-'4, somewhere in

18  there.

19  Q.   Okay.  Why were -- you mentioned a few minutes ago that

14:33:30 20  there were various steps along the way of graduated response.

21  Why were there multiple escalation steps in the process?

22  A.   Because again, it's to, it's to educate.  And so, you

23  know, if you're sending e-mails, you hope they get to the right

24  place.  There were some customers -- back then we actually

25  didn't even have a lot of e-mail addresses for our customers

L. Trickey - Cross

1028

1    because some of them had cox.net e-mails, but others did not,

2    and we wouldn't have an e-mail address on file for them, and

3    so, you know, we would -- I'm sorry, I forgot the question now.

4    Q.   Why there were multiple escalation steps.

5    A.   Oh, why there were multiple escalation steps.  Okay.  Yes.

6    Because you wanted to have an opportunity to have that touch

7    with the customer to try to educate and change their behavior.

8    Q.   Okay.  Now, to what extent did the graduated response

9    system become automated?

14:34:24 10   A.   Yeah.  At some point, and I don't know exactly what year

11   it was, but they automated the system so that when the

12   complaints came in, they could handle them in a more automated

13   fashion, up to the point where people were suspended and had to

14   talk to a human being.

15   Q.   I think you made reference to this early in your

16   testimony.  You've heard of the term "CATS," or the copyright

17   abuse tracking system?

18   A.   Yes.

19   Q.   What is that?

14:34:53 20   A.   So that's the actual system that Cox built to ingest and

21   handle abuse issues and keep track of them.

22   Q.   And to what extent is it a ticketing system?

23   A.   So it essentially is a ticketing system.  It's a ticketing

24   and tracking system, I guess, is the way I think of it.  So

25   when the complaints would come in, at least for copyright

L. Trickey - Cross

1029

1    infringement, then they could be assigned a ticket, and that

2    way they could be tracked and correlated.

3    Q.    And, Ms. Trickey, do you know whether CATS can take some

4    customer-facing actions on its own?

5    A.    Yes.  So CATS could generate an e-mail to the customer.

6    If we had their e-mail address, it could generate an e-mail to

7    the customer with the complaint.  It could also suspend them to

8    the soft-walled garden, and I think it could also suspend them

9    to the hard-walled garden, too, but at that point then, it

14:35:51 10   couldn't -- they couldn't reactivate.  They had to talk to a

11   human being.

12   Q.    Okay.  I'm going to turn now to the residential broadband

13   service.  Is there a document that sets out the steps of Cox's

14   graduated response program for copyright infringement with

15   respect to its residential internet accounts?

16   A.    Yes.

17   Q.    Turn to tab 4 of your binder.  This is Defendants' 210,

18   Defendants' 210?

19            MR. OPPENHEIM:  No objection.

14:36:27 20           THE COURT:  There's no objection.  It's received.

21            MR. ELKIN:  Thank you, Your Honor.

22   BY MR. ELKIN:

23   Q.    What is Defendants' 210?

24   A.    This is the residential abuse ticket handling procedures

25   for the customer safety team, dated October 18, 2012, and it is

1030

1  a lengthy document covering all sorts of situations, not just

2  copyright.

3  Q.   Was this in effect during the 2013-2014 time frame?

4  A.   Yes.

5  Q.   So beginning on page 10 of this document, at the bottom of

6  that page, there's something reference 6.0, Resolution -

7  Repeated Offenses.

8        Do you see that?

9  A.   Yes.

14:37:22 10  Q.   And it goes on to the next page.  What is this page, page

11  11?

12  A.   These are the various steps of the graduated response

13  process at that time.

14  Q.   So now that we have this document open, could you take the

15  jury now through step by step with regard to this process?

16  A.   Sure.  So the -- as we talked about this morning, the

17  first step was held to close for more to see if there were any,

18  any additional complaints that came in, and if other additional

19  complaints come in, the second through the seventh steps, the

14:38:04 20  customer would receive an e-mail warning if we had their e-mail

21  address on file.

22        On the eighth and ninth steps, that's when they ended

23  up going into a soft-walled garden, where they had information

24  that was to read that would explain to them why their service

25  was sort of interrupted, and then they would have a bottom -- a

L. Trickey - Cross

1031

1    button at the bottom that they could click through to

2    reactivate and move on.

3         If additional complaints were received after that,

4    they would get -- on the 10th and 11th steps, they would be

5    suspended to what we called our Tier 2 team, which was an 800

6    number, and there they had to call in if they wanted to get

7    their internet service back up and running.  They could not

8    reactivate it on their own, so they had to do the dreaded call

9    into, into the company.

14:38:57 10        And then the 12th and 13th and continued offense

11   steps, they would be suspended again, and this time it was to

12   sort of the higher-level abuse team number, which was we called

13   it the Atlanta 404, 404 being the area code.  And -- but -- and

14   then at each step, of course, there was education and

15   explanation going on.

16   Q.   So what would happen if there were further copyright

17   infringement notices affecting a subscriber on or past

18   continued offenses?

19   A.   Yes.  So at that point, they would be -- continue to be

14:39:40 20   suspended to 404, and they would be considered for termination

21   after step 13.

22   Q.   Why were there multiple warning steps?

23   A.   Well, because, you know, for residential customers, you

24   know, not everybody -- some people in the house were more

25   sophisticated than others, and so often the accountholder might

L. Trickey - Cross

1032

1    be a parent or somebody who has no idea what's going on that

2    their, you know, teenager might be engaging in, and so, you

3    know, if they get the e-mail, if they even see the e-mail, you

4    know, hopefully they can try to address it, but they, they

5    weren't always aware or didn't always understand the

6    technology.  Like, they would get a warning with some sort of

7    title on it and they're like, I've never heard of this song,

8    or, you know, I don't know what this is.

9              So, again, this was an opportunity to try to educate,

14:40:33 10  and so that's why there are, you know, guidelines in here, too,

11   about make sure you ask the customer these certain types of

12   questions to try to troubleshoot what's going on.

13             MR. OPPENHEIM:  Objection, Your Honor.  We'd move to

14   strike the hearsay in that answer, please.

15             THE COURT:  Overruled.

16   BY MR. ELKIN:

17   Q.   You made reference in your direct to the fact that Cox

18   subscribers who were accused of copyright infringement, as they

19   progressed through a graduated response, eventually had

14:41:08 20  resulted in the subscribers receiving fewer notices or, or not

21   at all.  Do you know if Cox ever observed that allegations of

22   infringement as relating to suspected subscribers decreased

23   after these different steps?

24             MR. OPPENHEIM:  Objection.  Can you lay a foundation,

25   please?

L. Trickey - Cross

1033

1       MR. ELKIN:  That's what I'm trying to do right now.

2       THE COURT:  Ask her whether she knows.  Yeah,

3  overruled.  You may answer the question.

4       THE WITNESS:  Okay.  I mean, yes.  I believe that the

5  process was effective and -- in reducing the number of repeat

6  offenses that we would receive.

7       MR. OPPENHEIM:  Your Honor, there's no foundation for

8  that testimony.

9       THE COURT:  Yeah, let's approach the bench, please.

10      NOTE:  A sidebar discussion is had between the Court

11 and counsel out of the hearing of the jury as follows:

12 AT SIDEBAR

13      THE COURT:  Do you expect this witness to testify

14 that she tracked the data and understood contemporaneously that

15 this program was effective?  Is that what she's going to

16 testify to?

17      MR. ELKIN:  No, Your Honor.  Let me just be clear so

18 there's no wrong impression.  As I mentioned earlier in the

19 proceedings, Mr. Carothers will be testifying with respect to

14:42:41 20 the specific steps that he took --

21      THE COURT:  Right.

22      MR. ELKIN:  -- as well as Mr. Beck.

23      But as part of her regular course of work at Cox in

24 terms of advising on graduated response -- and she's already

25 testified to this on direct, that the company was, was

L. Trickey - Cross

1034

1  effective in terms of the graduated response steps reducing the

2  incidents of further copyright infringement.  She had to

3  familiarize herself with that.

4          I'm not going to go any further, in fact, but I don't

5  want the jury to be under the impression that somehow she just

6  rubber-stamped this.  She advised on the program, and she had

7  to familiarize herself with it, but I'm not going to ask -- she

8  was not one of those folks who conducted the inquiries.

9          THE COURT:  The question is, she's testified that the

14:43:32 10  program was effective, and my question to you was did she have

11  a basis for saying that back in the day, or is that something

12  she's learned now?

13          MR. ELKIN:  Back in the day.  Back in the day.

14          THE COURT:  Okay.

15          MR. ELKIN:  She dealt regularly with the folks in the

16  copy safety team.

17          MR. OPPENHEIM:  Your Honor, there's, there's been no

18  testimony that at the time she reviewed the data, that she was

19  given any studies, that she has any basis to know this.  It's

14:44:00 20  just a -- it's a -- this is exactly what I thought foundation

21  was supposed to keep out.

22          THE COURT:  Well, she says:  I spoke regularly to my

23  team.  I was in charge of the team.  I understood -- without

24  stating what they said, my impression was that it was

25  effective.

L. Trickey - Cross

1035

1           MR. OPPENHEIM:  Can we get her to say that?  Because
2      I don't think she said that, Your Honor.
3           THE COURT:  Well, I think that's what I'm getting at.
4      There has to be that kind of foundation or that testimony will
5      be stricken.
6           MR. ELKIN:  Okay.
7           MR. OPPENHEIM:  So can we ask that that foundation be
8      laid, and if not, then we'll strike?
9           THE COURT:  We're going to go -- we're not going to
14:44:32 10    strike it right away.  We're going to see what she says, but
11     ask those questions, please.
12          MR. ELKIN:  Very well.  I will, Your Honor.  Thank
13     you.
14          THE COURT:  Yep.
15
16
17
18
19
20
21
22
23
24
25

L. Trickey - Cross

1036

1           NOTE:  The sidebar discussion is concluded;

2   whereupon, the case continues before the jury as follows:

3   BEFORE THE JURY

4           THE COURT:  Are you-all warm enough?  No?  Do you

5   want a little more heat, or are you okay?

6           A JUROR:  I'll take more heat.

7           A JUROR:  She's cold.

8           THE COURT:  Okay.  Let's make it a little warmer.

9   I'm always cold so -- and nobody cares, but you're important.

14:45:16 10         All right.  Let's continue, please, Mr. Elkin.

11          MR. ELKIN:  Thank you, Your Honor.

12   BY MR. ELKIN:

13   Q.   So, Ms. Trickey, I want to ask you to harken back to the

14   time when you took over Mr. Cadenhead's responsibilities for

15   looking after the, the safety team.  Did you have occasion to

16   familiarize yourself with the graduated response steps during

17   that time?

18   A.   Yeah.  I mean, I was already -- I was already aware and

19   had knowledge, general knowledge about the steps even before I

14:45:59 20   took over for Mr. Cadenhead, because as the internet product

21   lawyer, I needed to be aware of that.  I just wasn't the

22   primary person that supported the safety team on those issues.

23          And then in 2014, you know, I familiarized myself

24   more with, you know, in general, but I largely left in place

25   what Mr. Cadenhead had already, you know, created with the

L. Trickey - Cross

1037

1  safety team, because it seemed like it was working well.

2  Q.   Who -- what members of the safety team did you interact

3  with during that period?

4  A.   So I would have interacted with Jason Zabek, Joe Sikes,

5  Andrew Thompson.  I don't know that I interacted with anyone in

6  the Virginia office or not, but primarily those three.

7  Q.   What about Brent Beck?

8  A.   Oh, well, Brent, of course.  He was more the technical guy

9  who ran the system, yes.

14:46:53 10  Q.   And did you interact with Matt Carothers at any time

11  related to the system?

12  A.   Yeah, yeah, some.  Yeah.

13  Q.   And did you have occasion in your interactions with the

14  safety team to form any conclusions with regard to whether the

15  graduated response system worked?

16  A.   Yeah.  I mean, it seemed to -- it seemed to work.  It

17  seemed to have the, the desired effect, particularly as you got

18  further into the steps.

19       THE COURT:  Did you actually speak with them about

14:47:28 20  the graduated response program?

21       THE WITNESS:  Oh, absolutely, yeah.

22       THE COURT:  Okay.  All right.  Go ahead.

23       MR. ELKIN:  Thank you, Your Honor.

24  BY MR. ELKIN:

25  Q.   Now, I may have lost the thread, so if you don't follow

L. Trickey - Cross

1038

1   me, just let me know, but what if after repeated warnings, Cox

2   continued to receive notices of infringement pertaining to the

3   same customer accounts?  What would happen?

4   A.   Well, I mean, you know, as we -- as it says in here, I

5   mean, at that point, they would probably do a final discussion,

6   and then some of those accounts would be considered for

7   termination.  Some would be terminated.

8   Q.   And were customers automatically terminated when they hit

9   the last step?

14:48:22 10   A.   No.  I mean, this, this safety team had a lot of knowledge

11   in working with customers, and, you know, they had discretion

12   to decide what was appropriate, and so it wasn't an automatic

13   termination, but they would decide whether, whether the

14   circumstances were appropriate to terminate.

15   Q.   And what was your understanding as to why Cox didn't

16   automatically terminate subscribers when they hit that point?

17   A.   Well, because these, you know, these again -- these were

18   guidelines, and so, you know, the whole graduated response -- I

19   mean, you know, to my knowledge, when the law was passed, it

14:49:01 20   never set for requirements for specific steps or anything like

21   that that you had to do.  So each ISP had to decide what was an

22   appropriate process for them to implement that would balance

23   the needs of their customers, and I said this earlier, their

24   customers as well as the needs of the other parties in the

25   whole internet ecosystem.  So this was a balancing.

L. Trickey - Cross

1039

1  Q.   So aside from the automation, do you have an understanding

2  as to whether the graduated response steps were hard-and-fast

3  rules?

4  A.   No.  I mean, they weren't hard-and-fast rules.  They were,

5  they were, you know, guidelines and procedures.

6  Q.   Mr. Oppenheim, plaintiffs' counsel, on direct took you

7  through some earlier versions of the ticket handling procedures

8  pertaining to copyright infringement.  Do you remember that?

9  A.   Yes.

14:49:56 10  Q.   And do you remember that some of those versions had fewer

11  steps related to graduated response as it pertained to

12  copyright infringement?  Do you remember that?

13  A.   Yes.

14  Q.   And first of all, do you know whether or not those

15  procedures were in effect during the 2013-2014 time frame?

16  A.   I, I think no.  I think the ones we went through were

17  earlier than that.

18  Q.   Did -- now, with regard to the steps that were in place

19  during this claims period, do you know whether Cox decided to

14:50:40 20  increase the number of steps so that it wouldn't have to send

21  more notices out to Cox customers about copyright infringement?

22          MR. OPPENHEIM:  Leading, Your Honor.

23          THE COURT:  Well, I'm allowing him to lead.

24          THE WITNESS:  I'm sorry, I'm not sure I understand

25  the question.

L. Trickey - Cross

1040

1        THE COURT:  Well, you know, you're right; I

2   apologize.  You can answer that question, but let's try not to

3   lead.

4        MR. ELKIN:  Sure.

5   BY MR. ELKIN:

6   Q.   So the steps in the version of, of graduated response

7   during the claims period --

8   A.   Right.

9   Q.   -- had more steps than the prior -- did they have more

14:51:17 10  steps than the prior versions?

11  A.   Oh, yes.

12  Q.   Was that designed to, to permit more copyright

13  infringement on Cox's system?

14        THE COURT:  Yeah, ask her why that was designed that

15  way.

16  BY MR. ELKIN:

17  Q.   Why was it designed that way?

18  A.   Well, I mean, I think I said earlier I didn't know exactly

19  why they had added the additional steps, but I am assuming that

14:51:40 20  this, you know, team had based it upon, you know, some kind of

21  data or something and -- but, again, as I stated before, too,

22  this was an evolving process.  So you're not going to launch

23  something in 2002 or '3 or '4 and have it look completely the

24  same 15 years later or 10 years later.

25        So I think this was just an evolving process.  It

L. Trickey - Cross

1041

1    wasn't designed to, you know, hide or do anything.  It was

2    just, again, balancing the needs of the internet ecosystem from

3    the subscribers in -- to the copyright holders, and we were

4    stuck in the middle.

5    Q.   Could you describe the staffing levels at Cox with regard

6    to handling residential copyright notices during 2013 to 2014?

7    A.   So if a, if a customer got a complaint via e-mail or

8    somehow, then if they called in, some people would maybe call

9    what we call our Tier 1 customer care, which is our general

14:52:44 10   customer care support.  They probably could answer very basic

11   questions but really weren't highly trained to deal with these

12   kinds of issues, but they did number in, you know, the

13   hundreds.

14        You know, typically, they would end up going to,

15   like, what we called our Tier 2, which was a group of

16   persons -- I can't remember, I think they were in multiple

17   locations, maybe there were multiple dozen of them.  Then we

18   also had a group called Tier 2.5, which was a smaller group but

19   also had more experience in these areas, and then ultimately,

14:53:26 20   we also had this group in Atlanta we called the safety team,

21   the Atlanta 404.

22        So there was -- there were quite a few people who

23   could handle these kinds of things.

24   Q.   So during 2013 and 2014, are you aware of approximately

25   how many people Cox employed in these groups?

L. Trickey - Cross

1042

1     A.   Well, I mean, again, the Tier 1 was not really -- there

2     was a large number of Tier 1, but they really weren't very

3     sophisticated in dealing with customers on this issue, so they

4     probably would have put them to Tier 2.  I think Tier 2 maybe

5     had -- I'm not sure exactly, but I think maybe around 80-ish or

6     so persons that could deal with abuse issues in general.

7     Tier 2.5, I think, was around maybe four or five people, and

8     then we also had the safety team in Atlanta.

9     Q.   Okay.  Now, I'm going to turn to business customers, Cox

14:54:28 10   Business customers.  Did Cox also receive and process copyright

11    infringement notices for Cox Business customers?

12    A.   Yes.

13    Q.   Was there a particular group that handled copyright

14    tickets for the Cox Business accounts?

15    A.   The safety team.

16    Q.   Okay.  And was there any special call center that was set

17    up to address them?

18    A.   Well, there was a -- there was a call center in Las Vegas

19    that was called the NSC, and they, they would field a lot of

14:54:58 20   different kinds of business calls, but they could also field

21    the calls that business customers would make regarding

22    copyright infringement.

23    Q.   Okay.  Now, did Cox's graduated response program for

24    business subscribers differ from how it handled copyright

25    infringement notices for its residential customers?

L. Trickey - Cross

1043

1      A.    Yes.

2      Q.    Why was that?

3      A.    Well, with business customers, again, they're heavily

4      reliant on the internet service for their actual business, and

5      so, you know, you wouldn't want to just immediately suspend

6      their service because you could disrupt their entire business

7      operations, and so -- and we had a smaller number of business

8      customers, too.

9              So we had -- the process was to reach out directly to

14:55:50 10    the business customer to, to try to figure out what was going

11     on.

12     Q.    And were these processes laid out in any company

13     documents?

14     A.    Yeah.  They had a procedures document for Cox Business.

15     Q.    Okay.  Turn, please, to tabs 5 and 6 in your binder.

16             MR. ELKIN:  And, Your Honor, this is Defendants'

17     Exhibit 106 and Defendants' Exhibit 107.

18             THE COURT:  Any objection?

19             MR. OPPENHEIM:  No, Your Honor.

14:56:14 20    THE COURT:  All right.  It's received -- or they're

21     received.

22             Sometimes you're going to get a plaintiffs' exhibit

23     that will be the same as a defendants' exhibit.  It may have

24     maybe a modest tweak to it, but that's why we're doing it this

25     way.  Thank you.

L. Trickey - Cross

1044

1    BY MR. ELKIN:

2    Q.    Please identify the -- these two documents, please.

3    A.    Defendants' Exhibit 106 is the customer safety and abuse

4    operations for Cox Business dated November 1, 2012, and then

5    the second document, 107, is also Cox Business abuse ticket

6    handling procedures.  It looks like it's dated -- well, the

7    first date is November 1, '12, and the second date is 5/7/2013.

8    Q.    Do you know whether these documents were in effect --

9    these policies were -- procedures were in effect during the

14:57:16 10    2013-2014 time frame?

11    A.    Yes, I believe so.

12    Q.    What kinds of businesses or entities have Cox Business

13    accounts?

14    A.    Well, as we talked about this morning, we serve a wide

15    variety of businesses, from, you know, individual sort of

16    mom-and-pops, you know, the coffee store, the bagel shop, you

17    know, all the way up to, you know, bars and restaurants.

18           Moving on up the chain, you know, we have government

19    buildings.  We have schools.  We have hospitals.  We have

14:57:52 20    doctors offices and dentists offices and police stations and

21    fire stations and universities.  We have a lot of universities,

22    you know, colleges that we serve.

23    Q.    Okay.  Please turn to page 9 in tab 6, which is

24    Defendants' 107.  Describe what that is.

25    A.    I'm sorry, did you say page 6?

L. Trickey - Cross

1045

Q.    Page 9 --

A.    Oh, page 9.  I'm sorry.

Q.    -- of the documents listed in your binder at tab 6, which is Defendants' Exhibit 107.

A.    Yes.  I'm sorry, did you ask a question?

Q.    Yeah.  Please take the jury through that.

A.    Oh, okay.

Q.    Those procedures.

A.    So this is the -- these are the resolution steps for business customers for the second complaint and beyond.  It says you would, you know, call the customer, you make contact with them, you try to get the business owner or the manager or if they're a sophisticated enough business that actually has its own IT person or administrator, I mean, many businesses don't but some do, you try to reach them.

       If you don't reach them directly and you have to leave a message, you know, you need to provide a call-back number because you want them to contact us, and you want to give them the CATS ticket number so that they had a reference when they called back in, that they had to give that number, and we could match it up in the system to figure out what the complaint was.  And then we would note this in the CATS ticket work log, the phone number we called and whom we had left the message for.

       The next step would be if you reached the customer,

L. Trickey - Cross

1046

1    you receive them -- excuse me -- you inform them that we have

2    received a report from whomever the complaining party is, and

3    we would say that someone on their network is making

4    copyrighted content available to the internet illegally and

5    that the business owner could be held responsible for this.

6         You can disclose any and all information listed in

7    the complaint over the phone and/or via e-mail if you wanted to

8    forward the complaint to them.

9         We would -- again, in our advisory role, in our

14:59:59  10   education role, we would advise the customer that their IT

11   person or network administrator, if they have one, should

12   attempt to track down the source of the infringement and

13   disable it, and if they have logging enabled in their routers,

14   not everybody has logging or is sophisticated enough to even

15   know how to get the logs, but if they did, they could search

16   for traffic by the source port listed in the complaint and the

17   date and time stamp that was provided.  So they could try to

18   track it back.

19        But, you know, many businesses have open WiFi.  I

15:00:32  20   mean, it's everywhere nowadays.  Everywhere has open WiFi:  the

21   airport, you know, I don't know about this building, but -- and

22   they said that if a business does provide free open WiFi to

23   their patrons, you should advise them that they should at least

24   post a terms of use on their premises or splash page, if you

25   bring them to a page, like when I go to the hotel and I bring

L. Trickey - Cross

1047

1    up the hotel's internet, I have to -- there's a splash page in

2    there.

3            So you could put on there -- and you could state the

4    terms of use and then the user should acknowledge that prior to

5    joining the network.

6            And then the next step, of course, is to make sure

7    that they have a copy of the complaint, and so we would send

8    that to the party we're speaking to.  We would make a note of

9    who we spoke to in the CATS log, and we would put their phone

15:01:24 10  number and their e-mail address as well.

11   Q.   Okay.  So if you take a look at the -- in the middle of

12   the page here, page 9, it's the second complaint and beyond,

13   it's focused on calling the customer.  Why would Cox call the

14   customers directly?

15   A.   Well, because the customer, you know, the business

16   customer is the one who's the accountholder, so we would want

17   to reach the customer or their designee so that we could

18   explain to them what is going on and try to see if there's

19   anything that they can do to, you know, avoid getting anymore

15:01:58 20  complaints.

21   Q.   Okay.  Take a look at the end of that page.  You see 7.0,

22   General Guidelines?

23   A.   Yes.

24   Q.   Do you see the second sentence reads:  However, proceed

25   with caution, if the business is a medical practice, fire or

1048

1    police station?

2         Do you see that?

3    A.   Yes.

4    Q.   Why do these types of accounts merit extra caution?

5    A.   Well, because they're medical practices, fire or police

6    station, you don't want to disrupt critical services.  So, you

7    know, they would want you to -- this is a section saying, you

8    know, if you can't reach somebody, then it is acceptable to

9    quarantine, but if they're, you know, a medical practice or a

15:02:42 10  fire or police station or something that could actually harm

11   someone, then you want to be extra careful before you do that.

12        And then, of course, you could -- it says you could

13   use search engines to try to find another contact, as you

14   obviously weren't able to get ahold of them.

15   Q.   So why didn't Cox have a mechanism here to suspend or

16   terminate business subscribers in these procedures?

17   A.   Well, because, again, as I stated before, with businesses,

18   you know, there are multiple people using business internet.

19   You know, if you're a patron of a business, you know, if I'm

15:03:19 20  going to, you know, Starbucks or something and I'm using their

21   WiFi, they have no idea who I am.  I've bought my coffee, I sat

22   down, I've used their -- I'm not giving them my name and e-mail

23   in order to use their WiFi.

24        So there was no way to pinpoint back to whomever the,

25   the person was.

L. Trickey - Cross

1049

1    Q.   So I'm going to turn to another subject that was raised on

2    direct, this issue of caps, notice caps.  Was there a limit on

3    the number of notices that -- notices of copyright infringement

4    that CATS could accept on a daily basis?

5    A.   Yes.  So the, the team, whomever it was, you know, years

6    ago had established caps of 200 per, per day or per weekday, I

7    think, and that was in order -- because there were multiple

8    senders that were sending in tickets, and so they wanted to be

9    able to have it be a manageable amount of tickets received

15:04:23 10   across the board, because when you would send notices out to

11   consumers, it could result in a -- customer, not consumer,

12   sorry -- customer, it could result in someone calling back in

13   and saying, I don't understand what's going on.  Help me.

14          And you don't want people sitting on hold for hours,

15   waiting to talk to somebody about what this thing is that they

16   received.

17   Q.   What if a copyright owner wanted to send more notices than

18   the default limit?

19   A.   So it started at 200.  There were some copyright holders

15:05:03 20   that did ask to send more than the 200 per day.  There were

21   several, I believe, that asked.  And, you know, before I was

22   responsible for this, I know that Mr. Cadenhead worked with the

23   safety team to say, can we absorb additional notices coming in?

24   And they, they raised the caps for quite a few.

25   Q.   Can you think of any examples?

L. Trickey - Cross

1050

1    A.   Yeah.  I know, well, RIAA, who was the agent sending on

2    behalf of the parties here, they asked for -- to have their

3    caps raised, and so at one point, Cox doubled it to 400 per

4    day.  They also asked, you know, several years later, I think,

5    to -- I think they maybe even asked for a higher number, but

6    Cox said, no, we really can't accommodate right now, but back

7    again.

8         They checked back again and they said, well, can you

9    raise to 500 or 600 a day?

15:05:58 10      And Cox said -- you know, went back and looked at the

11   analysis of how many complaints were coming in and the call

12   volume and everything, and they said, yeah, we think we can

13   accommodate 600 per day.  So they actually went to the upper

14   limit of that.

15        And there were other copyright holders that asked for

16   additional, their caps to be raised, too.

17   Q.   Okay.  Now, we talked about processing notices.  Are there

18   circumstances under which Cox would refuse to process copyright

19   notices?

15:06:26 20   A.   Yeah.  So as I discussed this morning, when we became

21   aware of complaints that had language in there that was

22   demanding the payment of money to settle the matter, you know,

23   we felt that that was, you know, preying upon people's lack of

24   understanding or knowledge, and sometimes people don't

25   understand that if they clicked on the link in that notice,

L. Trickey - Cross

1051

1    that the sender of that could actually be gathering information

2    on them just by them clicking on the link.

3              And so, you know, our policy or Mr. Cadenhead's

4    policy with the safety team before I even took over was that we

5    would not process notices that had, you know, pay up or else

6    demands in them because we did not feel like that was

7    appropriate, but as soon as they would remove that language, we

8    would process the notices.

9    Q.   Okay.  And have you ever heard of an entity called

15:07:23 10   Rightscorp or Digital Rightscorp?

11   A.   Yes.

12   Q.   Who are they?

13   A.   So they were a -- an agent that was sending notices, on

14   whose behalf I can't recall, but they, they were the ones that

15   they also had that demand for money in their, in their notice,

16   and, you know, we told them we wouldn't process it.

17             They even offered us a scheme at one point where they

18   said, if you process these with the demands, you know, we'll

19   give you essentially a kickback of some portion of the money

15:07:59 20   that they would collect, and we declined.  We didn't think that

21   was appropriate.

22             And so we did not process their notices because they

23   would not remove the language.

24   Q.   Now, did Cox at some point entirely block Rightscorp's

25   notices from even coming into the Cox system?

L. Trickey - Cross

1052

1  A.    Yeah.  At some point, I don't remember exactly when it

2  was, but I remember -- you know, my understanding was that they

3  had, you know, flooded -- sent a massive number, such a huge

4  number that we were concerned that it was going to actually,

5  you know, harm our system or take down our system or not allow

6  us to process and, you know, then at that point, nobody can get

7  their notices in, so we just blocked them.

8  Q.    Okay.  I want to turn to the issue of privacy, something

9  you do every day.  How important is customer privacy to Cox?

15:09:02 10  A.    It is extremely important to all ISPs.

11  Q.    Does Cox have a policy with respect to responding to

12  requests for customer information for third parties -- by third

13  parties?

14  A.    Yes.  So if a third party wants to understand, like, who a

15  subscriber is or wants their information on a subscriber, they

16  have to -- we have a whole team dedicated to subpoenas, filling

17  subpoenas out, but we have to receive a subpoena or court

18  order, some other type of legal process.  We can't just hand

19  over information about our customers to third parties.

15:09:37 20  Q.    What steps, if any, does Cox take to safeguard its user's

21  privacy in that situation?

22  A.    Well, in that situation, we require a subpoena.  I mean,

23  we, we can't just hand over, you know, based upon what some

24  third party might tell us, oh, this person did this, and, you

25  know, we can't just hand it over.  We need a legal process.

1053

1  Q.   Does Cox provide information in response to a copyright

2  owner that follows that procedure?

3  A.   Yes.  If we received a subpoena, we would fulfill the

4  subpoena.

5  Q.   Do you know whether Cox ever had a practice whereby it

6  would turn a blind eye to copyright infringement of its

7  customers?

8  A.   No.  I mean, you know, I think that the fact that we were

9  the first ISP to actually create a graduated response process

15:10:24 10  before anybody else to me shows we did not turn a blind eye,

11  and this was a very complex issue with a lot of people in the

12  internet ecosystem that you had to balance, and so, you know,

13  my position is that I felt like this evolved over time

14  according to the needs of, you know, customers, Cox, and the

15  copyright holders.

16         But I do not believe, I mean, the fact that you're

17  first creating a process that nobody else had even done yet to

18  me shows you didn't turn a blind eye.  You actually took it

19  seriously.  We had a gentleman, Matt Carothers wrote the code

15:11:00 20  for the whole CATS system.

21         MR. ELKIN:  No further questions, Your Honor.

22         THE COURT:  All right.  Thank you.

23         Redirect or cross.  You may lead.  Thank you.

24         MR. OPPENHEIM:  Call it whatever you want, Your

25  Honor.

1054

```
                1            THE COURT:  Yeah.

                2            THE WITNESS:  Am I going to need the other binder

                3    back?

                4            MR. OPPENHEIM:  We'll see.

                5            THE WITNESS:  Okay.

                6            MR. OPPENHEIM:  I'm not sure yet.

                7                      REDIRECT EXAMINATION

                8    BY MR. OPPENHEIM:

                9    Q.   Yeah, why don't we start with the binder.  That may be

    15:11:41    10    easier.

               11            You know what?  We can use the exhibits you were just

               12    looking at.  It's a smaller binder.  It may be in here.

               13    A.   Oh, all right.

               14    Q.   Let's look at DX 106, which I think is tab 5.

               15            Can you pull that up, Mr. Duval, please?

               16    A.   You said 106?

               17    Q.   I'm sorry, I've got the wrong one.  Let me find the right

               18    exhibit here.  210, which is tab 4.

               19            Thank you, Mr. Duval.

    15:12:17    20            So this is --

               21    A.   Tab 4, okay.

               22    Q.   Do you have it there, Ms. Trickey?

               23    A.   Yes.

               24    Q.   Very good.  So, again, this is the residential abuse

               25    ticket handling procedures as of 2012, right?
```

L. Trickey - Redirect

1055

1    A.   Yes.

2    Q.   And it has within it Cox's graduated response policy for

3    copyright, correct?

4    A.   Yes.

5    Q.   And that Cox calls that "copyother," correct?

6    A.   Yes.

7    Q.   Now, let's turn, please, to -- is it possible to do a

8    split screen of 10 and 11?

9                 MR. DUVAL:  Yes.

15:12:59 10                 MR. OPPENHEIM:  I think this document printed a

11   little funny, and I just want to try to clear this up.

12   BY MR. OPPENHEIM:

13   Q.   So Cox has two different procedures, one for preferred

14   customers or cox.net e-mail accounts, correct, and one set of

15   procedures for those subscribers who are not preferred

16   customers or cox.net e-mail addresses, right?

17   A.   Yes.

18   Q.   And if all we do is look at page 11, there's that 7.0 --

19   can I draw on this?

15:13:37 20                 MR. DUVAL:  Yes.

21   BY MR. OPPENHEIM:

22   Q.   This right here doesn't actually apply to these steps,

23   right?  Because what applies to the steps there is this, right?

24   A.   So, yes.  The first -- the e-mail warnings applied only if

25   we had an e-mail.  If we didn't have an e-mail, there was no

1056

1    way to e-mail them.

2    Q.   Right.   I'm just trying to -- just because of the way it

3    printed out, it kind of looks like the without preferred is

4    next to those steps, but that's not quite right, is it?

5    A.   Oh, I see what you're saying.   Yes.   Yes.

6              MR. OPPENHEIM:   So I'm not sure how to clear that.

7    I'll let you do it.

8    BY MR. OPPENHEIM:

9    Q.   What's a preferred account?

15:14:16 10   A.   It's not a preferred account.   It's a preferred e-mail

11   address.   So that would be the customer's preferred e-mail

12   address, meaning I -- you know, if they have a Gmail or a Yahoo

13   or AOL back then, that was the e-mail address that they

14   preferred to be contacted at, as opposed to a cox.net or

15   something else.

16   Q.   Why wouldn't you just say with an e-mail address?   Why do

17   you have to say preferred or cox.net e-mail address?

18   A.   I don't know why they -- I mean, it might even be

19   something in one of our -- it might even be in our system.   You

15:14:52 20   know, in our billing system or something, it may be called a

21   preferred e-mail.   So we probably have more than one field for

22   e-mail addresses.   Probably one of them is called preferred

23   e-mail.

24   Q.   Does every Cox subscriber get a cox.net e-mail address?

25   A.   No.

L. Trickey - Redirect

1057

1    Q.    Who gets a cox.net e-mail address?

2    A.    Well, back then, more of them did, but we found that many

3    people didn't use the cox.net e-mail addresses, didn't check

4    them, and so they were using, you know, an AOL or a Gmail or a

5    Yahoo or something.  So at some point several years ago, they

6    stopped just assigning them out to people because it was just

7    costing us, you know, money to have them on there but they were

8    unused.

9    Q.    Virtually everybody has an e-mail address, right?

15:15:36 10  A.    Right.  And so most people have, you know, something other

11   than cox.net.

12   Q.    Even in 2012, most everybody had an e-mail address,

13   whether it was a Cox e-mail address or another e-mail address,

14   right?

15   A.    Yeah.  We just didn't always have them on our account,

16   though.  For whatever reason, we didn't always get one

17   collected at the time they set up the account.

18   Q.    Now, you mention that Cox didn't want to engage in

19   bandwidth throttling, right?

15:16:11 20  A.    Right.

21   Q.    And was that that Cox didn't want to engage in bandwidth

22   throttling in the period of 2012 through 2014?

23   A.    Right.  We did not do it in that period of time.

24   Q.    And bandwidth throttling is where you would decrease the

25   speeds at which a subscriber could use their account, correct?

L. Trickey - Redirect

1058

1     A.   Yes.  So you could essentially, sometimes I call it, like,

2     traffic shaping.  You know, if you have periods of congestion

3     on the network, you know, they would want to, like, kind of

4     shape the traffic down.  There were multiple different

5     technical ways to actually do it, but it was highly frowned

6     upon by the FCC.

7     Q.   I had a discussion with my kids about it, and I described

8     it as kind of trying to walk through mud up to your waist as

9     opposed to walking without anything.  Just slows you down.  You

15:17:05 10   can still go, but it slows you down.  Is that --

11    A.   I think it depends on how you implement it, because there

12    are different technical measures for implementing throttling if

13    you were going to do it.  But again, the FCC had a very dim

14    view of any kind of artificial, you know, touching of -- the

15    shaping of the traffic or messing with the speeds.

16    Q.   Right.  And you said that, that net neutrality was the

17    reason that you didn't want a bandwidth throttle, right?

18    A.   Well, there's that.  That was the primary reason.  I mean,

19    Comcast actually got in trouble for it years before the time

15:17:41 20   period we're talking about.  You know, they were trialing it,

21    and they got in trouble for it.

22    Q.   In 2008 or '9?

23    A.   I think it was like '9 or so, yeah.

24    Q.   And then the D.C. Circuit reversed that and said that the

25    fine against Comcast that was imposed on them for throttling

L. Trickey - Redirect

1059

1    was reversed and there was no penalty, right?  And that

2    happened in about 2011, right?

3    A.    Um-hum.

4    Q.    And then --

5    A.    But the area has never been settled at all by the FCC and

6    the advocacy groups.

7              THE COURT:  Okay.  Just one at a time.

8              MR. OPPENHEIM:  I know.  I'm trying to ask clear,

9    short questions.  I apologize, Your Honor.

15:18:17 10            THE COURT:  All right.

11   BY MR. OPPENHEIM:

12   Q.    Now, the FCC actually passed net neutrality at some point,

13   correct?

14   A.    Yes.

15   Q.    But that wasn't until April of 2015, correct?

16   A.    No.  There were principles that were in effect before that

17   that the advocacy groups out there were making a big deal out

18   of net neutrality all the way from probably 2008 or '9 up until

19   the present day.  It is still very much alive and well.

15:18:46 20            Nobody has cracked the nut on what is an acceptable

21   way to do any kind of, you know, bandwidth network management

22   other than they just keep adding capacity.

23             THE COURT:  Move on.

24             MR. OPPENHEIM:  No, Your Honor, I need to -- I

25   apologize but --

L. Trickey - Redirect

1060

1       THE COURT:  Ask your next question.

2           So if he asks you a yes-or-no question, answer it yes

3  or no, and Mr. Elkin will have an opportunity to follow up if

4  he believes it's appropriate.  All right?

5       THE WITNESS:  Okay.

6       MR. OPPENHEIM:  Just so I have a record on this, Your

7  Honor, one more question.

8  BY MR. OPPENHEIM:

9  Q.   Do you deny that the FCC adopted net neutrality on

15:19:21 10  April 13, 2015, and it was repealed on December 14, 2017?

11  A.   I, I believe that is correct.

12  Q.   Okay.  Ms. Trickey, you, you indicated that for Cox,

13  privacy and spying were critical issues, right?

14  A.   Well, we, we -- our customers have an expectation of

15  privacy, and we don't track, you know, what websites they visit

16  and where they go on the internet.

17  Q.   I think your exact words were privacy is extremely

18  important to Cox, right?

19  A.   Yes.  All ISPs.

15:20:07 20  Q.   And you don't have any reason to believe that the notices,

21  the infringement notices that the RIAA was sending to Cox

22  raised a privacy or security issue -- excuse me, privacy or

23  spying issue, do you?

24  A.   Just by receiving the notices themselves?

25  Q.   Right.

L. Trickey - Redirect

1061

1    A.    No.  No, we received the notices.

2    Q.    And it wasn't a privacy or spying issue for Cox to act on

3    those notices, correct?

4    A.    Right.

5    Q.    And Cox -- because privacy was incredibly important to

6    Cox, Cox implemented procedures to ensure there was privacy

7    within the company, something to that effect, correct?

8    A.    Yes.

9    Q.    And presumably, Cox implemented controls and policies

15:21:03 10    regarding the privacy of customers' information, right?

11   A.    Yes.

12   Q.    Did you -- do you believe that Cox's controls and policies

13   for protecting privacy were effective?

14   A.    In what context?  I mean --

15   Q.    The same way that you would --

16   A.    -- privacy is a very broad area.

17            What are you -- you know, what context?

18   Q.    Do you believe that Cox effectively protected its

19   customers' privacy?

15:21:32 20   A.    In general?

21   Q.    Yes.

22   A.    Yes.  I like to think we do.

23            MR. OPPENHEIM:  I'd like to mark an exhibit, Your

24   Honor.

25            Where are the stickers, please?  Where are the

L. Trickey - Redirect

1062

1    stickers?

2           Sorry, Amanda, I know you gave them to us in advance.

3           I'm going to mark this as PX 542.  Sorry for the

4    delay, Your Honor.

5           Mr. Elkin and the judge and the witness.

6    BY MR. OPPENHEIM:

7    Q.   Ms. Trickey, you've been handed what's been marked as

8    PX 542, which is an FCC order.  Do you recognize this document?

9    A.   Oh, yes.

15:23:29 10   Q.   And this is an FCC order in the matter of Cox

11   Communications, Inc., correct?

12   A.   Yes.

13   Q.   And it has to do with privacy issues; is that correct?

14   A.   Actually, it's security.

15   Q.   Security issues?

16          Your Honor, we'd move this into evidence.

17          THE COURT:  Any objection?

18          MR. ELKIN:  No objection, Your Honor.

19          THE COURT:  It's received.

15:23:49 20          MR. OPPENHEIM:  May we publish this, please?  Oh, I'm

21   sorry, I forgot that that's what we need to do here.  I'm so

22   used to you having it by computer.

23   BY MR. OPPENHEIM:

24   Q.   And, Ms. Trickey, this is an order from the FCC that was

25   released on November 5, 2015, correct?

L. Trickey - Redirect

1063

1    A.   Yes, um-hum.

2    Q.   And this was an order that came about because of what's

3    set forth in paragraph 2 -- and if you can just pull that up a

4    little there? -- where it says:  Cox's electronic data systems

5    were breached in August 2014 when a third party used a common

6    social engineering ploy known as pretexting.

7         And then a little further down, it says:  The

8    relevant data systems did not have technical safeguards, such

9    as multi-factor authentication, to prevent the compromised

15:25:28  10   credentials from being used to access the PI and CPNI of Cox's

11   customers.

12        Ms. Trickey, what is PI?  Is that personal

13   information?

14   A.   Yes.

15   Q.   And what is CPNI?

16   A.   That's a very hard one to explain.  It stands for customer

17   proprietary network information.  It's a rather archaic telecom

18   rule that nobody understands, at least outside the industry.

19   Q.   Okay.  And then the FCC order goes on to say:  Thus, the

15:25:57  20   third party was able to make use of the credentials to view

21   personal data of Cox's current and former customers, including

22   sensitive personal information such as name, home address,

23   e-mail address, phone number, partial Social Security number,

24   partial driver's license, and telephone customer's

25   account-related data.

L. Trickey - Redirect

1064

1         Is that correct?

2    A.   Yes.

3    Q.   And if we turn to the second page here, in paragraph 4, it

4    sets forth that to settle this matter, Cox will pay a civil

5    penalty of $595,000 and develop and implement a compliance plan

6    to ensure appropriate processes and procedures are incorporated

7    into Cox's business practices to protect consumers against

8    similar data breaches in the future.

9         Right?

15:26:45 10  A.   That's right.  And we did.

11   Q.   And if we look further in this document on page 4, further

12   in this document -- actually, let's just flip for a moment,

13   you'll see that there's a consent decree on the -- three pages

14   in, roughly.

15   A.   That's right.

16   Q.   And in the background section of the consent decree, it

17   describes that -- how the Cox systems were breached, right?

18   A.   Well, actually, the better explanation, I think, for most

19   people is on the first page of the order, section 2, when it

15:27:24 20  describes how an, you know, unsuspecting care rep from a

21   contractor was basically -- they call it social engineering or

22   pretexting.  She, she fell for someone posing as somebody else,

23   and someone posed as someone authorized, and she entered her

24   credentials into a website that the person had sent to her.

25        What this doesn't say is this involved around 60

1065

1    people.

2              THE COURT:  Well, that's really not responsive to the

3    question.

4              THE WITNESS:  Okay.  I'm sorry.

5              THE COURT:  So listen to the question.

6              THE WITNESS:  But anyway, section 2, I think, is the

7    better description of what happened.

8    BY MR. OPPENHEIM:

9    Q.   Ms. Trickey, isn't it, in fact, the case that one of Cox's

15:28:08  10    employees made their credentials available on a phishing site

11   that violated Cox's own internal policies on safety and

12   security?

13   A.   So there was a Cox --

14   Q.   That's a yes-or-no question, if you would, Ms. Trickey,

15   please.

16   A.   Well, it's a yes and no.

17   Q.   Can you or can't you?

18             THE WITNESS:  Yes.  I guess yes.

19             THE COURT:  Okay.

15:28:26  20    BY MR. OPPENHEIM:

21   Q.   And as a result of the actions, the hackers had access to

22   Cox's electronic data systems, correct?

23   A.   Yes.

24   Q.   Now, you testified -- strike that.

25             In the course of your work in the 2012 to '14 -- oh,

L. Trickey - Redirect

1066

1    I'm sorry, I want to go back to that for one more time.  Can we

2    put that back up one more time?

3              One of the things that the FCC noted in this report

4    was that Cox failed to report the breach to the FCC, right?

5    A.   Well, just the -- just on the one person who's CPNI.  They

6    weren't required to report to the FCC except for the CPNI, and

7    it was one person.

8    Q.   So Cox failed to report that breach to the FCC, correct?

9    A.   Yeah, about that one person.

15:29:39 10   Q.   That's fine.  Let's move on.

11             THE COURT:  How much more do you have?

12             MR. OPPENHEIM:  Fifteen minutes maybe.  Do you want

13   to take a break, Your Honor?

14             THE COURT:  Yeah.  Why don't we break now, take our

15   mid-afternoon break.  We've been going for close to an hour and

16   a half.  So we'll take 15 minutes and we'll come back.

17             NOTE:  At this point, the jury leaves the courtroom;

18   whereupon, the case continues as follows:

19   JURY OUT

15:30:29 20             THE COURT:  All right.  Anything before we break?

21             MR. OPPENHEIM:  I assume the witness rule is in

22   effect during the break, Your Honor?

23             THE COURT:  Yes.  All right.  All right.  We're in

24   recess.

25             NOTE:  At this point a recess is taken; at the

1067

1    conclusion of which the case continues in the absence of the

2    jury as follows:

3    JURY OUT

4         THE COURT:  All right.  Ready for our jury?

5         Okay.  Joe, let's get --

6         MR. OPPENHEIM:  Yes, I apologize, Your Honor.

7         THE COURT:  I'm sorry.

8         MR. BUCHANAN:  I think he said yes.

9         THE COURT:  Oh.

15:51:48 10        MR. OPPENHEIM:  Yes.  I apologize, Your Honor.  I am

11   trying to make sure I'm ready to go.

12        THE COURT:  A day late, dollar short.

13        MR. OPPENHEIM:  More than one.

14        THE COURT:  Sure.

15        NOTE:  At this point the jury returns to the

16   courtroom; whereupon the case continues as follows:

17   JURY IN

18        THE COURT:  All right.  Please have a seat.

19        And please continue, Mr. Oppenheim.

15:52:28 20        MR. ELKIN:  Thank you, Your Honor.

21   BY MR. OPPENHEIM: (Continuing)

22   Q.   Ms. Trickey, during the break just now were you back in

23   the defendants' conference room with defense counsel?

24   A.   I went back there for a moment, yes, but we did not talk

25   about the case.  Talked about me calling Delta Airlines and

1068

1    changing my ticket.

2    Q.   I would like to turn to -- I was trying to use their

3    binder.

4    A.   What do I do with this?

5    Q.   You can just lay it down right there and we will retrieve

6    it later.  Thank you.

7             THE COURT:  Mr. Ruelas, why don't you grab that?

8    Joe.  Thank you.

9             Go ahead.

15:53:24 10  BY MR. OPPENHEIM: (Continuing)

11   Q.   So I would like to go back to DX 210, which is Tab 4 in

12   the smaller of the binders.

13   A.   Yes.

14   Q.   Now, when Mr. Elkin was examining you on this and other

15   graduated response policies, I believe that you testified that

16   it wasn't really a policy, it was more of a guideline.

17             Is that what you said?

18   A.   Well, policy, guideline.  It wasn't a hard and fast rule.

19   Q.   So did you expect -- when Cox has policies and procedures

15:54:10 20  at its company, does Cox expect its employees to abide by those

21   policies and procedures?

22             Because I -- and I thought I asked you this on direct

23   and you said yes, but I am a little confused now.

24   A.   Well, yeah, these are actually -- this is a procedure

25   document, not a policy document.

L. Trickey - Redirect

1069

1   Q.   So --

2   A.   The one you're talking about here, 210, is a procedures.

3   Q.   Okay.  So this is a procedure document.  And your

4   testimony is that Cox employees do not have to necessarily

5   follow procedures?

6   A.   No.  I just think that -- I think what I'm trying to say

7   is that, yes, they generally do, but there was still discretion

8   built into this.

9   Q.   Well, sometimes --

15:54:51 10   A.   I mean, it even says, will be reviewed and considered for

11   consideration.

12           THE COURT:  Go ahead.  Ask your next question.

13           MR. ELKIN:  I apologize, Your Honor.

14   BY MR. ELKIN:  (Continuing)

15   Q.   I didn't mean to speak over you.

16           We looked at other graduated response policies where

17   there was no discretion, correct?

18   A.   Well, the document said there was -- just said, you know,

19   whatever the statement was, termination or whatever.  We would

15:55:09 20   have to go back and look at the documents.

21   Q.   Would you like to?  Because I am fairly certain that those

22   early policies did not give the abuse personnel or anybody at

23   Cox discretion.

24   A.   So, again, this was an evolving process.  These procedures

25   evolved over time.

L. Trickey - Redirect

1070

1  Q.   Is it your testimony that these are just generally

2  guidelines that don't have to be followed at any time, or is it

3  your testimony that these are procedures that need to be

4  followed, and if the procedures say you have discretion, then

5  you get discretion?

6  A.   Well, I think, again, this was an evolving process.  The

7  whole process changed some over time.  And so, you know,

8  typically I believe the steps were generally followed and

9  then -- but there could always be circumstances where when you

15:55:56 10  got to the end, you might not -- not terminate, you might be

11  review and consider it, but you might not, particularly for

12  business customers.

13  Q.   Let me try asking you a clearer question.  And this is a

14  yes or no question, if you can.

15  A.   Okay.

16  Q.   If you can.  If under this document it does -- the

17  document does not say that a Cox employee has discretion, are

18  you testifying that the Cox employee does not have to follow

19  it?

15:56:30 20  A.   Which part of it?

21  Q.   Any part of it.

22  A.   No.  I mean, I'm saying that these are procedures.  It's

23  not a policy, it's procedures.  And so, there is always going

24  to be -- in any business there is always going to be

25  circumstances where you may take one particular action or

L. Trickey - Redirect

1071

1    another.

2    Q.   So --

3    A.   I think they generally tried to follow these.

4    Q.   But you would acknowledge that even these procedures Cox's

5    abuse team did not follow?

6              MR. ELKIN:   Objection.

7              THE COURT:   Make it a clearer question.  I mean, what

8    policies are you talking about?

9              MR. OPPENHEIM:   Yes, sir.

15:57:08 10   BY MR. OPPENHEIM: (Continuing)

11   Q.   You would agree, Ms. Trickey, that Cox employees did not

12   necessarily abide by the procedures set forth in Exhibit

13   DX 210; is that correct?

14             THE COURT:   The graduated response program.

15   Q.   Yes.  The graduated response program as of October 18,

16   2012.

17   A.   No, I believe they generally did follow them.  The final

18   step said it will be reviewed and considered for termination.

19             So I have no reason to believe they didn't consider

15:57:40 20   an account for termination.

21   Q.   With respect to all the graduated response policies, could

22   the Cox employees simply do what they wanted on any step?  Did

23   they have that kind of discretion?

24   A.   Well, I think most of this was automated.  And so, you

25   know, you -- there wouldn't be -- I mean, the complaint came in

L. Trickey - Redirect

1072

1    and it went through the automated process.  It was only toward

2    the end that it wasn't automated.

3    Q.   So you think that Cox followed these policies implicitly

4    for everything that was automated?  Is that what you're saying?

5    A.   I'm not sure.

6         MR. ELKIN:  Objection.

7    Q.   You don't know?

8    A.   I'm not sure on every single -- every single circumstance

9    and situation and every single complaint.  I cannot say.

15:58:25 10   Q.   I believe you testified that you believe that education

11   was important to Cox, right?

12   A.   Educating customers?

13   Q.   Yes.

14   A.   Yes.

15   Q.   And under that graduated response policy that you're

16   looking at now, there was an e-mail process that sets forth --

17   excuse me -- under the graduated response policy as of

18   October 2012, it provided that there would be six different

19   e-mail warnings, correct?

15:58:58 20   A.   If we had an e-mail address.

21   Q.   If you had an e-mail address.  Did Cox attempt to change

22   the way it articulated its e-mail message in each of those

23   messages so as to have a greater likelihood of educating a

24   customer?

25   A.   You mean whether the text changed in the e-mails?

L. Trickey - Redirect

1073

1  Q.   Yes.

2  A.   I'm not sure.

3  Q.   Isn't it in fact true that Cox just simply sent the same

4  e-mail over and over and over and over again?

5  A.   I'm not certain.

6  Q.   You don't know?

7  A.   It seems reasonable, but I don't know.

8  Q.   You think it's reasonable --

9  A.   I don't personally know.  I haven't read the notices.

15:59:35 10  Q.   And you believe that it was appropriate, I believe you

11  testified, to have six e-mails in a row to try to educate for

12  copyright infringement, correct?

13  A.   Yeah, that's what -- I think that's what the team that

14  built this decided was appropriate.

15  Q.   Isn't it in fact true that a customer who is more than 30

16  days overdue on their bill has their service disconnected

17  automatically?

18  A.   I don't think so.

19  Q.   You think they have --

16:00:06 20  A.   They might be suspended briefly, but I believe they're

21  given a much longer period of time before their service is

22  disconnected.  But I am not in finance, so I am not the best

23  person to ask.

24  Q.   Isn't it in fact true that they disconnect after 30 days,

25  and it's a soft disconnection, and if within two weeks of that

1074

1    soft disconnection the bill remains unpaid, Cox does a hard

2    disconnect; isn't that true?

3    A.    I don't know.

4    Q.    You don't know?

5    A.    No, I don't.  I am not in finance.

6    Q.    So you can't testify one way or another if Cox --

7          THE COURT:  She said she didn't know.  Let's move on.

8    Q.    When you were providing legal counsel to the abuse group,

9    did you have access to CATS on your computer?

16:01:02 10    A.    You know, I think at one time they might have given me

11    CATS credentials, but I don't think I ever logged in.

12    Q.    Did you review CATS data?

13    A.    Specifically what?  I mean, what kind of data?

14    Q.    Did you come in every morning and say, let me see what

15    happened last night in CATS?

16    A.    No.

17    Q.    Did you on a weekly basis say, I want to see what's

18    happened in CATS this week?

19    A.    No.

16:01:32 20    Q.    How about monthly?

21    A.    No.  I mean, I was a resource for them if they needed to

22    come and get advice.  Because, again, the procedures had been

23    in place with Mr. Cadenhead, and I largely left everything in

24    place.

25          So I was a resource if they needed me.

1075

1    Q.    Did you regularly get -- did you get, for instance, a

2    weekly report from the abuse group on what was happening with

3    ticket data?

4    A.    No, not weekly.  I mean, I know we met and talked from

5    time to time and talked about the state of things and

6    everything, but I can't tell you even with what frequency we

7    met.

8    Q.    So you would meet and they would tell you things about

9    what was happening?

16:02:11 10   A.    Yes, we would have a phone call, probably more likely a

11   phone call.

12   Q.    I am going to try not to interrupt you --

13   A.    I am sorry.  I didn't mean to interrupt.  I am sorry.

14   Q.    For the benefit of the court reporter.  Thank you.

15   A.    Yeah.

16   Q.    So you would meet and you would be told information about

17   CATS, but you weren't given any regular reports on CATS data,

18   correct?

19   A.    I wouldn't say I got regular data, huh-uh.

20   Q.    Did you ever --

21   A.    It was more anecdotal.

22   Q.    You got anecdotal information?

23   A.    Yeah, we chatted.

24   Q.    And, of course, you didn't have any internal studies on

25   effectiveness, the effectiveness of graduated response at the

L. Trickey - Redirect

1076

1  time that you were working with the abuse group, right?

2  A.   I don't know that I saw any kind of study.  I think, you

3  know, there may have been information I saw or discussed with

4  them.  I'm not really sure.  That's quite a few years ago.  I

5  wouldn't call it necessarily a study.

6          MR. OPPENHEIM:  Your Honor, I will just put a pin in

7  this issue.  I think we can deal with this at the end of the I

8  day, unless you want us to approach on it.

9          THE COURT:  It's up to you --

16:03:38  10          MR. OPPENHEIM:  I will move on because time is short.

11          THE COURT:  Okay.

12  BY MR. OPPENHEIM: (Continuing)

13  Q.   Ms. Trickey, let's turn to the issue of caps.

14          I am sorry, Your Honor, I hate to do this, but may we

15  approach?

16          THE COURT:  Yes.

17          NOTE:  A sidebar discussion is had between the Court

18  and counsel out of the hearing of the jury as follows:

19  AT SIDEBAR

16:04:21  20          MR. OPPENHEIM:  I tried.

21          THE COURT:  That's all right.  Gould, you're out of

22  here.

23          MR. GOULD:  Not the first time.

24          THE COURT:  All right.  Go ahead.

25          MR. OPPENHEIM:  Your Honor, we expressed reservations

L. Trickey - Redirect

1077

1    at the time that Ms. Trickey provided testimony that graduated

2    response was effective.  We asked for a foundation to be laid.

3    The foundation that was laid I thought was inadequate at the

4    time because it referenced the policies, not what actually

5    happened.

6              Now, based on the information that I have elicited,

7    she didn't look at the ticket data.  All she knew was

8    anecdotal, what she was told, so it is all hearsay.

9              And so, that testimony about effectiveness should be

16:04:59 10   stricken and the jury should be instructed to disregard.

11             THE COURT:  I am going to allow the testimony.  Your

12   exception is noted.

13             All right.  Let's go.

14             NOTE:  The sidebar discussion is concluded; whereupon

15   the case continues before the jury as follows:

16   BEFORE THE JURY

17             THE COURT:  Please proceed.

18   BY MR. OPPENHEIM: (Continuing)

19   Q.   You testified in response to questions from Mr. Elkin

16:05:37 20   regarding the issue of caps, correct?

21   A.   Caps?

22   Q.   Caps.

23   A.   Yeah.  Not CATS, but caps.  Okay.

24   Q.   I know it is a little confusing.

25   A.   Yes.

L. Trickey - Redirect

1078

1    Q.   And that Cox worked with the copyright owners to

2    accommodate their request to raise the caps, right?

3    A.   Yeah, when possible.

4    Q.   Could we please pull up PX 234, which I believe is already

5    in evidence.

6    A.   Okay.  I have got it here.  That's all right.  I have got

7    it here.

8    Q.   And if we could scroll down just a little bit please,

9    Mr. Duval.  There we go.

16:06:32  10          Do you know who Victoria Sheckler is, Ms. Trickey?

11   A.   She appears to be the deputy general counsel of the

12   Recording Industry Association of America.

13   Q.   Got it.  And you see in this e-mail in July of 2009 she

14   was asking Randy Cadenhead at Cox whether or not it was

15   possible to raise the cap to 800 to a thousand per day?  Do you

16   see that?

17   A.   Yes.

18   Q.   And she said, please let us know if this is acceptable,

19   right?

16:07:03  20   A.   Right.

21   Q.   Let's scroll towards the top of the document and see

22   Mr. Cadenhead's response, please.

23          And could you read the first sentence there, which is

24   Mr. Cadenhead's response.

25   A.   Sure:  I checked and found that we are currently at the

1079

1    maximum number of notices we can process measured against the

2    staff we have to process calls from customers.

3    Q.   Okay.  We can take that down, please.

4              Let's turn next to PX 332.

5              Actually, let's not pull it up.  I didn't anticipate

6    this one, so if we could pull it out of the binder, Your Honor.

7              THE COURT:  Okay.  Joe, 232.

8              MR. OPPENHEIM:  It is PX 332.

9              THE COURT:  332.

16:08:15  10    A.   Do I have it?  332?

11    BY MR. ELKIN: (Continuing)

12    Q.   Yes, it's not in -- it should be in one of the big

13    binders.

14    A.   Oh.

15              THE COURT:  Hold on a minute while counsel gets a

16    copy.

17              MR. OPPENHEIM:  Absolutely.

18              MR. ELKIN:  I have it, Your Honor.

19              THE COURT:  You have it?  Okay.

16:08:33  20              MR. OPPENHEIM:  Ms. Trickey doesn't yet.

21              THE COURT:  Right.

22              MR. OPPENHEIM:  So let's hold up a minute.

23    BY MR. OPPENHEIM: (Continuing)

24    Q.   Ms. Trickey, do you know who HBO is?

25    A.   Yes.

L. Trickey - Redirect

1080

1    Q.    Home Box Office, right?

2    A.    Yes.

3    Q.    A movie studio of sorts?

4    A.    Yes.

5    Q.    And you know who Jason Zabek is obviously, right?

6    A.    Yes.

7          MR. OPPENHEIM:  Your Honor, we would move this into

8    evidence.

9          THE COURT:  Any objection?

16:09:22 10       MR. ELKIN:  No objection, Your Honor.

11         THE COURT:  All right, it's received.

12   BY MR. OPPENHEIM: (Continuing)

13   Q.    Let's -- so this is an e-mail exchange, is it not,

14   Ms. Trickey, about the cap for HBO that Cox had implemented on

15   the number of notices that Cox would accept?

16   A.    Okay.  I need some time to read through this, please.

17   Q.    Absolutely.  If it helps, it is one of these e-mail

18   exchanges where it starts in the back, or the last ones, and

19   you have got to read forward.

16:09:51 20  A.    Read forward.

21   Q.    And you will see the first one there is May 8, 2013, from

22   Jason Zabek to Jake Snyder at HBO, and you're copied on that.

23   A.    Yes, I see that -- so if I am correct here, does the

24   exchange begin Wednesday, May 8, 2013?

25   Q.    I believe it does, Your Honor.

L. Trickey - Redirect

1081

1    A.    Okay.

2    Q.    Ms. Trickey, I apologize.   Now I've made you honorable,

3    which is fine.

4              Let's just take these one at a time.

5              THE COURT:   Just give her a chance to finish.

6              MR. ELKIN:   Sure.

7              THE COURT:   Have you read it?

8              MR. OPPENHEIM:   Okay.

9              THE WITNESS:   I think I have got through them.

16:10:47 10            THE COURT:   Okay.   Go ahead then.

11   BY MR. OPPENHEIM: (Continuing)

12   Q.    You see in the first e-mail exchange Jake Snyder from HBO

13   gets an e-mail from Jason Zabek.   And Mr. Zabek says:   Jake, so

14   we all went drinking the other night and decided that since you

15   are such good partners with us, that we have increased the

16   daily limit for you to 400.

17              Do you see that?

18   A.    Yes.

19   Q.    And then Mr. Zabek says a little further down:   This is

16:11:18 20   the highest we can go right now with current levels.

21              Right?

22   A.    Yes.

23   Q.    Okay.   And then there is a comment below that about give

24   you a higher level if you get me something, a role in Game of

25   Thrones, right?

L. Trickey - Redirect

1082

1    A.   Yeah.  He was being facetious.

2    Q.   I assume so.  And then there is an e-mail -- and a little

3    later on where Jason Zabek sends a follow-up on, it looks like

4    it's May 29, 2013.  And he says:  As a reminder -- if we could

5    highlight that, please -- as a reminder, we have increased the

6    number of complaints HBO can send in.  Last week we did receive

7    almost 4,000 complaints in one day and could not process.  This

8    slowed down our reaction time to alert customers of the issues.

9    A.   Right.  So he thinks somebody added an extra zero on

16:12:28 10   accident.

11   Q.   Right.  He says, if you scroll down a little bit further,

12   let's get it all:  Maybe someone fat-fingered the 400 to 4,000.

13   So if you could just remind everyone and check any automation

14   on these.

15        So Mr. Zabek thinks maybe it was just somebody

16   accidentally allowed too many to happen?

17   A.   A mistake.  Mistake, yeah.

18   Q.   Right.  And then there is a response to that by

19   Adrian Leatherland who is the person for the vendor for HBO,

16:12:55 20   right?

21        And he says:  Hi, Jason.  Thanks for the heads up.

22   I'll check.  It wasn't fat-fingered.  On the call we discussed

23   sending more than the limit on each day.  The idea was that

24   even though you may only process the 400 notices, the

25   additional submissions may help flag the worst infringers

L. Trickey - Redirect

1083

1   there.

2           And then he says a little below that:  If 4,000 is

3   too many or you don't want overflow, let me know.

4           Right?

5   A.   Yeah.

6   Q.   And Mr. Zabek responds that same day, within six minutes,

7   it appears:  4,000 is too many.

8   A.   Right.

9   Q.   Ms. Trickey -- you can take that down.  Thank you.

16:13:58  10          You made a comment during your responses to Mr. Elkin

11   that -- about Digital Rightscorp.  Do you recall that?  You had

12   a discussion about that?

13   A.   Yes.  And with you.

14   Q.   And you commented that at one point Digital Rightscorp

15   offered Cox a kickback that if Cox would accept their notices,

16   correct?

17   A.   The notices with the language demanding money.

18   Q.   Isn't it in fact true, Ms. Trickey, that what they offered

19   was to help defray Cox's administrative costs in handling the

16:14:52  20   increased notices and Cox said no?

21   A.   I wouldn't characterize it as that.

22   Q.   Now, Ms. Trickey, I want to talk about business customers

23   for a moment.  They pay more per month typically than

24   residential customers, correct?

25   A.   Typically.

L. Trickey - Redirect

1084

1  Q.   And so, if Cox terminates a business customer, Cox loses

2  more revenue than it would lose if it terminates a residential

3  customer, correct?

4  A.   I guess if you're comparing them, yes.

5  Q.   You testified earlier that -- you can put that aside.  We

6  are done with that.  I apologize.

7  A.   Oh, okay.  There is more in here, so I thought we were --

8  Q.   No.  If we went through every document we had in this

9  courtroom, we would never finish this trial.

16:16:00 10          It was in the CATS system that ticket data was

11  stored, correct?

12  A.   Yes.

13  Q.   And ticket data was organized by -- by, among other

14  things, something called an ICOMS ID, correct?

15  A.   That might have been one of the pieces of information that

16  would be associated with a ticket.

17  Q.   And the ICOMS ID is basically an account number, at some

18  level -- I'm sure it is more complex, but it is basically an

19  account number for a customer, correct?

16:16:38 20  A.   Yeah, account number or billing ID.  I'm not sure which it

21  is.

22  Q.   It was a way that Cox could identify a customer without

23  using the customer's name, at some level?

24  A.   Right.

25  Q.   So if you went into the ticket data and you searched on a

L. Trickey - Redirect

1085

1    particular ICOMS ID, you could see all the tickets associated

2    with that customer, right?

3    A.   I don't know.  That's not really in my area.

4    Q.   Have you ever looked at ticket data?

5    A.   I'm sure I have seen ticket data over time, but not in the

6    last few years.

7                 MR. OPPENHEIM:  Okay.  Your Honor, we would introduce

8    Plaintiff's 543.

9                 THE COURT:  Do you want to show it to Ms. Trickey?

16:17:29 10   Or are you moving --

11               MR. OPPENHEIM:  I was going to establish a foundation

12   first, Your Honor.

13               THE COURT:  Yes, please.

14               MR. ELKIN:  Unless -- do you have one more copy?

15               THE COURT:  I can get -- have you got it?  You got

16   enough?  I can get mine out of the book.

17               MR. OPPENHEIM:  No, no, no.  We apparently have it.

18               THE COURT:  All right.

19               MR. OPPENHEIM:  Mr. Duval is ahead of me.

16:17:57 20            THE COURT:  All right.

21   BY MR. OPPENHEIM: (Continuing)

22   Q.   Ms. Trickey, so looking at this document, do you see that

23   there is a column on the left that says ICOMS ID?

24   A.   Yes.

25   Q.   I will represent to you this is an excerpt of ticket data

1086

1    that was produced in this case for the ICOMS ID, which is

2    listed here, which is 333050900801.  And it shows different

3    ticket IDs associated with that ICOMS ID, the dates it was --

4    it occurred, what the abuse type was, when that action

5    occurred, and what Cox did in response to that ticket, right?

6              MR. ELKIN:  Objection, with respect to use of this

7    document without a foundation.

8              MR. OPPENHEIM:  That's what I am establishing.

9              THE COURT:  Okay.  Well, ask her if she recognizes

16:18:55 10   the document.  A little more general information.

11             MR. OPPENHEIM:  I am sorry, Your Honor.

12   BY MR. OPPENHEIM: (Continuing)

13   Q.   Do you recognize the types of information contained within

14   this document?

15   A.   Well, I don't know where it comes from.  I mean, I see the

16   different elements in here, but I don't know -- I don't

17   think --

18             THE COURT:  Is it consistent with the tickets that

19   you looked at several years ago that you said you used to look

16:19:19 20   at?

21             THE WITNESS:  Maybe.  I mean, it could be.  Is this

22   residential or business?

23   BY MR. OPPENHEIM: (Continuing)

24   Q.   This happens to be a business customer.

25   A.   Oh.  I mean, I will do my best.  If you're going to

L. Trickey - Redirect

1087

1   represent to me it came out of CATS, I'm not going to disagree.

2   Q.   I will tell you it came out of PX 19, which was ticket

3   data produced in this case.

4   A.   Okay.

5   Q.   And PX 19 is a massive file, and if we tried to pull it up

6   on the computer system on its own, we would be here for a

7   while.

8   A.   Okay.

9   Q.   So I was trying to expedite the process.

16:20:07 10         THE COURT:  Okay.  All right.  Go ahead.

11         MR. OPPENHEIM:  May I publish, Your Honor?

12         THE COURT:  Yes, it's received.

13         MR. OPPENHEIM:  I just want to talk through and make

14   sure we all understand what's in this document.

15   BY MR. OPPENHEIM: (Continuing)

16   Q.   So, Ms. Trickey, the far left column is the ICOMS ID,

17   correct?

18   A.   That's what it says.

19   Q.   And that's what we were discussing earlier, that's

16:20:33 20   essentially kind of an identifier for the customer, correct?

21   A.   And this is a business customer?

22   Q.   That's what we understand, yes.

23   A.   Okay.

24   Q.   And you see that for all of these columns, this entire

25   spreadsheet, all eight pages, is the same customer ID,

L. Trickey - Redirect

1088

1    correct -- or the same ICOMS ID, correct?

2    A.    Yes, it looks like it.

3    Q.    And then on the next column, it shows Ticket id.  And that

4    would be the number of the ticket that the CATS system

5    generated, correct?

6    A.    I suppose.

7    Q.    And the Create Date would be the date on which that ticket

8    was created?

9    A.    I assume so.

16:21:12 10    Q.    Okay.  And we talked about IP Addresses and Ports.

11           Let's skip to the next one, Abuse Type.  Copyother is

12    the same term that is in the graduated response policies that

13    we have looked at previously, correct?

14    A.    Yes.  Copyother.

15    Q.    So these abuses are not phishing or fraud or malware or

16    viruses, these are all copyright infringement notices, correct?

17    A.    I think so.

18    Q.    And the Action Date is the date on which Cox acted on the

19    ticket, correct?

16:21:51 20    A.    I don't know, but I think that's a reasonable explanation.

21    Q.    And then the last -- the second-to-last column -- the last

22    column is empty -- indicates what the action was that was

23    taken, correct?

24    A.    I believe so.

25    Q.    So on the first page -- if we could zoom out a little so

L. Trickey - Redirect

1089

1     the jury can see.

2              If you look at the first page, the first date is

3     January 7, 2019, correct, first create date?

4     A.    2012?

5     Q.    Excuse me, 2012.  You're right.  I apologize.  I misspoke.

6     A.    Can you tell me what kind of business customer this is?

7     Q.    I'm not in that position at the moment.

8              So the first ticket occurred on January 9, 2012.

9     A.    January 7.

10    Q.    Well, I'm sorry --

11    A.    The second ticket was January 9 --

12    Q.    You are right.  The ticket was created on January 7, the

13    action was on January 9, correct?

14    A.    I see.  Okay.  Yes.

15    Q.    So Cox received the copyright infringement notice, because

16    it is copyother, right, on January 7, 2019, but Cox didn't

17    actually take action until two days later, correct, and that

18    would be January 9, 2012?

19    A.    Well, on the ticket, I don't know if Cox took other action

16:23:14  20    outside of the ticketing system.

21    Q.    I understand.  But according to this document, all it

22    shows is that the action that was taken was that the ticket was

23    closed, and it doesn't say suspend or terminate at all, right?

24    As of January 9, 2012, right?

25    A.    That's what it says.

L. Trickey - Redirect

1090

1  Q.   Okay.  And if we look at that entire first page, right,

2  all the way through down to the bottom, March 9, 2012, which is

3  basically three months later, they're all the same:  Changed

4  status to close, right?

5        There was no instance where there was a warning sent,

6  no instance where there was a suspension or a termination,

7  correct?

8  A.   Well, with business customers, they could have made a

9  phone call.

16:24:02 10  Q.   But on this document, it doesn't say that a warning was

11  sent?

12  A.   I don't -- but I don't know how they -- how they noted it,

13  necessarily.  I mean, this is just talking about the ticket.  I

14  don't know if there was some other action that they took.

15  Because I don't even know what kind of business customer this

16  is.

17  Q.   Isn't it in fact true, Ms. Trickey, that if CATS sent a

18  warning as its action, the action would say, sent warning,

19  correct?

16:24:37 20  A.   I don't know for sure.  I think -- I think it denoted

21  something like that, but I'm not positive.

22  Q.   May I just hand this to the witness to refresh her

23  recollection, Your Honor?

24        Mr. Elkin, this is what I am going to hand to her to

25  refresh her recollection.  It's just the -- more of the data

1091

1    out of 19.

2            And I will ask that you simply look at the Action

3    column on the first page.  Thank you.

4    A.    Okay.

5    Q.    And to be clear, that's a different ICOMS ID, so a

6    different Cox customer.

7    A.    Oh, okay.  All right.

8    Q.    And does that refresh your recollection that if CATS,

9    C-A-T-S, had sent a warning, it would say under Action, sent

16:25:31 10   warning?

11   A.    Okay.  Yes.

12   Q.    Thank you.  And so, looking at Exhibit 243 that you are

13   looking at now, according to the CATS system, no warnings were

14   sent in the first three months, correct?

15   A.    Yeah.  Again, I don't know what kind of business customer

16   this was, but it does not indicate that a warning was sent

17   according to this.

18   Q.    And I will represent to you that there are 51 tickets on

19   this first page.

16:25:58 20   A.    Okay.

21   Q.    Do you -- are you willing to believe me, or do you want to

22   count them?

23   A.    No, I don't need to count them.

24   Q.    So turn to the next page.  And that goes from March 12,

25   2012, through April 19, 2012.  And there are, again, another 51

L. Trickey - Redirect

1092

1   infringement notices, and every single one of them is:  Changed

2   status to closed; right?

3   A.   Right.  I mean, the whole document is a two-year period

4   almost.

5   Q.   Right.  So the document is a two-year period, and no

6   warnings indicated on the second page, correct?

7   A.   It doesn't say, sent warning.

8   Q.   And it doesn't say, suspension or termination, right?

9   A.   It would really help to know what kind of business

16:26:38 10   customer this was.

11   Q.   On the third page, the same thing, going from April to

12   June of 2012, another 51 entries, all exactly the same,

13   correct?

14   A.   Yep.

15   Q.   When we get to the fourth page, finally the monotony ends

16   and we get on July 14, 2019 --

17   A.   2012.

18   Q.   Thank goodness you're correcting me on this.  I apologize.

19         On July 14, 2012, that in response to an infringement

16:27:15 20   notice, it says:  Hard limit for complaints.

21         Do you see that?

22   A.   Yes.

23   Q.   And that meant that the sender of the infringement notice

24   had sent a notice that exceeded the daily cap, correct?

25   A.   That seems to be what it indicates.

L. Trickey - Redirect

1093

1   Q.   Okay.  And so, they replied to the sender there that they

2   were not going to -- they were not going to act on the notice,

3   correct?

4   A.   I guess so.

5   Q.   And then if we keep going, we see that there are two more

6   instances of that on this page?

7   A.   Yes.

8   Q.   So there were 48 instances of "changed status to closed"

9   on this page, correct?

16:27:55 10   A.   If you say so.

11   Q.   And on the next page, another 51 entries, of which four of

12   those entries the infringement notice has exceeded the cap,

13   correct?

14   A.   It says:  Hard limit for complaints.  So, yes.

15   Q.   And then we get to page 6, still yet more infringement

16   notices about this Cox customer and more "changed status to

17   closed" and --

18   A.   Yes.

19   Q.   -- ten were closed because it exceeded -- the infringement

16:28:30 20   notices were over the cap, right?

21   A.   Yes.

22   Q.   And then on the next page, yet more infringement notices

23   about this customer.  And there are six instances where those

24   notices exceeded the cap here, correct?

25   A.   Yes.

1094

1    Q.    And we get to the last page.  And the last page is on

2    December 12, 2014, so roughly, as you said, a two-year period,

3    and there are roughly another 40 "changed status to close,"

4    correct?

5    A.    If you say so.

6    Q.    And, in fact, this ticket data shows that this particular

7    business customer in a two-year period was subject to 373

8    infringement notices.  Do you disagree with that?

9    A.    If you say so.

16:29:24 10    Q.    Well, I don't want --

11    A.    I haven't added these up.  So if you're saying this is

12    373, I will accept that.  Over a two-year period.

13    Q.    There are 373, Ms. Trickey.

14    A.    Okay.

15    Q.    But the fact that it says this, this is Cox's data,

16    correct?

17    A.    Yeah, I guess so, yeah.

18    Q.    And so, according to Cox's data, this particular business

19    subscriber who agreed to an Acceptable Use Policy that said

16:29:54 20    that they were not permitted to infringe, and their end users

21    were not permitted to infringe, was subject to 373 infringement

22    notices in a two-year period, there was not a single suspension

23    or termination or warning letter sent, according to this CATS

24    data, correct?

25    A.    Yes.  And I don't know what kind of business customer it

L. Trickey - Recross

1095

1    was.  It would be really helpful to have that context.

2              MR. OPPENHEIM:  No further questions, Your Honor.

3              THE COURT:  All right, Mr. Elkin.

4              MR. ELKIN:  Thank you, Your Honor.

5         RECROSS-EXAMINATION

6    BY MR. ELKIN:

7    Q.   Hello, Ms. Trickey.

8    A.   Hello.

9    Q.   All right.  Just a few questions for you.

16:30:40 10  A.   Okay.

11   Q.   Let's turn back to -- I believe the bailiff has this --

12   542.  This is the FCC order.  This is Plaintiff's 542.

13   A.   Okay.

14   Q.   I think that Mr. Oppenheim was questioning you about this

15   document, and he made a reference to, I guess, the consent

16   decree and the background.  And I think he wanted to point to

17   paragraph 2 as the background.

18             Can you provide to the jury some background with

19   regard to this matter.

16:31:29 20  A.   Yes.  So, you know, it was incredibly unfortunate, and we

21   certainly regretted that this happened.  And since then we

22   instituted multiple security -- additional requirements to

23   protect the security of the data.

24             But putting this in context, this was around 61

25   people that this happened to.  And you compare that to an

L. Trickey - Recross

1096

1    Equifax breach of 150 million, this seems a little bit, almost

2    quaint.

3           Now, I am not diminishing it because it was very

4    upsetting to us, but -- and it was good in the sense that it

5    jumped -- caused us to jump into action and to put in some

6    additional things, like multifactor authentication and some

7    other procedures, and a lot more training for people who had

8    access to the data.

9    Q.   Okay.

16:32:19 10    A.   But it still is only 61 people that were involved.

11    Q.   Okay.  With regard to now Plaintiff's Exhibit 543 that

12    Mr. Oppenheim just took you through, why is it important for

13    you to know what kind of business customer it is?

14    A.   Well, because, you know, it could be a business customer

15    that is very large.  I mean, for all I know, this could be, you

16    know, a stadium, or an arena, a hospital, it could be a

17    university building, it could be, you know, a college dorm.  I

18    don't know.

19           It helps to put this into context as to the action

16:33:00 20    that was taken or not taken by understanding more of what the

21    business customer was.

22    Q.   Okay.  So if I were to represent to you that --

23           MR. OPPENHEIM:  Your Honor, wait a minute.  If he is

24    about to indicate who the customer is, I would like to

25    approach.

1      THE COURT:  All right.  Please come forward.

2      NOTE:  A sidebar discussion is had between the Court

3  and counsel out of the hearing of the jury as follows:

4  AT SIDEBAR

5      MR. ELKIN:  Mr. Oppenheim --

6      THE COURT:  What's the objection?  You pulled a

7  customer out of an enormous database, P 19, and marked a new

8  document.  He has not seen it before.  They have gone back and

9  looked at it, and in their file they believe they have found

16:33:58 10  the name of the customer, right?

11      Do you know the name of the customer?

12      MR. OPPENHEIM:  I do.

13      THE COURT:  Who is it?

14      MR. OPPENHEIM:  I have it back at the podium, but --

15  so it's not in evidence.  When we asked --

16      THE COURT:  This smacks, this smacks of improper

17  examination.  Surprising somebody with this and not giving the

18  name and the context is improper --

19      MR. OPPENHEIM:  Your Honor --

16:34:22 20      THE COURT:  -- in my book.

21      MR. OPPENHEIM:  It is certainly not my intent --

22      THE COURT:  Well, you didn't answer her?

23      MR. ELKIN:  Well, one, it's not in evidence.  And

24  there is --

25      THE COURT:  The document, P 19, is in evidence,

L. Trickey - Recross

1098

1    right?

2           MR. ELKIN:  But that doesn't have this information.

3    We asked for this information in discovery.  What we got was an

4    extremely limited amount of information which doesn't indicate

5    what it is.

6           Mr. Elkin has it right there.  And so, for instance,

7    it says, hospital, but it doesn't say whether it is a public

8    WiFi system.

9           So what they want to do is put in what was a very

16:34:55 10  self-serving document that they created on who the customers

11   are, which is not complete.  And we've said, if you lay a

12   foundation, you can put it in.

13          I didn't want to mention it because it's not in

14   evidence.  And I don't think it's --

15          THE COURT:  So P 19 doesn't contain this information?

16          MR. OPPENHEIM:  It does not.  It does not.  I'm not

17   excluding it --

18          THE COURT:  I thought you said it was part of P 19.

19          MR. OPPENHEIM:  No.  No.  No, Your Honor.  The only

16:35:17 20  way you can figure it out is through other information, which

21   they gave us a tiny snippet of information from which they can

22   say, oh, it's a hospital, but it is not nearly enough to say

23   what it really is.

24          So that's why I've objected.  I certainly did not

25   mean in any way to offend anybody or hijack anything.

L. Trickey - Recross

1099

1          THE COURT:  This needed to be aired out before we got

2    into this little back and forth.  So what customer is it?

3          MR. ELKIN:  It's university housing.

4          THE COURT:  University housing?

5          MR. ELKIN:  We provided this information pursuant to

6    a stipulated order.  This information was provided.  They had

7    the information.  He had the information when she kept asking

8    him, and he spent ten minutes obviously taking her through it.

9          So, obviously, I have to take her through that

16:36:00 10   information.

11          THE COURT:  You will be permitted to identify it, and

12   whether that makes a difference to her in looking at the data.

13          MR. ELKIN:  Okay.  Thank you.

14          THE COURT:  Okay.  Your exception is noted.

15          NOTE:  The sidebar discussion is concluded; whereupon

16   the case continues before the jury as follows:

17   BEFORE THE JURY

18          THE COURT:  All right.  Please proceed.

19          THE WITNESS:  I need -- I just want to say something.

16:36:36 20   I don't know where you guys ended up on this, but you shouldn't

21   say the name of a customer.  You can say the type of customer,

22   but you shouldn't say the name.

23   BY MR. ELKIN:  (Continuing)

24   Q.   I won't say the name.

25   A.   Okay.

L. Trickey - Recross

1100

1   Q.    So Mr. Oppenheim just spent some amount of time taking you

2   through the data associated around the ticketing history of a

3   particular entity.

4         My first question is, would it matter to you the

5   nature of the entity in responding to the questions with regard

6   to how Cox handled this particular set of complaints?

7   A.    Well, it would certainly -- I mean, all I have here is

8   what's in this document.  So there is a lot of information

9   missing to be able to really make sense of what it means.

16:37:18 10   Q.    So if I were to tell you that the customer in question is

11   university housing, how, if in any way, would that impact your

12   answers?

13   A.    Okay.  Yes, so that does certainly put it in more context.

14   University housing has probably hundreds of users.

15         MR. ELKIN:  I have no further questions, Your Honor.

16         THE COURT:  All right.  May Ms. Trickey be excused?

17         MR. OPPENHEIM:  Yes, Your Honor.

18         THE COURT:  All right.  Ms. Trickey, you are excused

19   with our thanks.  Please don't discuss the testimony you've

16:37:52 20   given so far with anyone until our trial is over.  All right?

21         THE WITNESS:  Okay.

22         THE COURT:  I'm not sure if you're subject to further

23   testimony, but --

24         THE WITNESS:  I sure hope not.

25         THE COURT:  -- you are free to leave at this time,

R.L. Vredenburg - Direct

1101

1    and have a good evening.  All right?

2              THE WITNESS:  Thank you.

3              THE COURT:  Thank you.

4              NOTE:  The witness stood down.

5              THE COURT:  All right.  Next witness.

6              MR. OPPENHEIM:  We call Roger Vredenburg, Your Honor.

7              THE COURT:  Okay.

8              NOTE:  The witness is sworn.

9              THE COURT:  Good afternoon.

10             Please, proceed, Mr. Gould.

11             MR. GOULD:  Thank you, Your Honor.

12             ROGER L. VREDENBURG, called by counsel for the

13   plaintiffs, first being duly sworn, testifies and states:

14        DIRECT EXAMINATION

15   BY MR. GOULD:

16   Q.   Good afternoon, Mr. Vredenburg.

17   A.   Good afternoon.

18   Q.   My name is Jeff Gould.  I'm an attorney with the

19   plaintiffs.  Thank you for being here today.  I know it's late

16:39:50 20   on a Friday.  We will do our best to be efficient.

21             Can you please state your full name for the record.

22   A.   Roger Lee Vredenburg.

23   Q.   You used to work at Cox; is that right, sir?

24   A.   Correct.

25   Q.   Retired in 2016?

R.L. Vredenburg - Direct

1102

1    A.    Yes.

2    Q.    Currently live down in the Virginia Beach area?

3    A.    Correct.

4    Q.    Thank you for coming up here.  I know it is a long drive

5    for you.

6              You joined Cox in 2004, correct, sir?

7    A.    Yes.

8    Q.    And you started -- the first position you had there was as

9    a Tier 2 data technician; is that right?

16:40:23 10  A.    Yes.

11   Q.    That was in the abuse group?

12   A.    No, that was in tech support.

13   Q.    Tech support.  Is that also called the TOC, or the

14   Technical Operation Center?

15   A.    No, that is just called Tier 2 techs.

16   Q.    At some point you moved up to a Level 2.5 rep, correct?

17   A.    Yes.

18   Q.    Is that position in the abuse group?

19   A.    It was in the abuse group, yes, and the TOC, it was both.

16:40:45 20  Q.    I am sorry, I didn't hear.

21   A.    It was in the abuse group and TOC.

22   Q.    So the abuse group and there is something called TOC,

23   T-O-C, and that stands for Technical Operations Center?

24   A.    Correct.

25   Q.    Sometimes also called network security tech; is that

R.L. Vredenburg - Direct

1103

1    right?

2    A.   Yes.

3    Q.   So several names all essentially mean the same thing.   We

4    have a Level 2.5, correct?

5    A.   Yes.

6    Q.   And a TOC, or a T-0-C, correct?

7    A.   Yes.

8    Q.   And a network security tech, correct?

9    A.   Yes.

16:41:13 10    Q.   So if we use those terms, we'll understand that they are

11    interchangeable here?

12    A.   Correct.

13    Q.   And all -- you worked out of the Technical Operations

14    Center in Virginia, correct?

15    A.   Yes.

16    Q.   In Hampton Roads, Virginia?

17    A.   Yes.

18    Q.   And that group -- during your time in the TOC, you

19    reported to folks in Atlanta; is that right?

16:41:39 20    A.   Correct.

21    Q.   And the folks in Atlanta, that was the corporate abuse

22    group?

23    A.   Yes.

24    Q.   And that was primarily run by a gentleman named

25    Jason Zabek, correct?

1104

1    A.    Correct.

2    Q.    And the number two lieutenant there was a man named

3    Joseph Sikes, correct?

4    A.    Correct.

5    Q.    Now, we've talked about Level 2 and Level 2.5.  I just

6    want to make sure that I understand and the jury understands

7    what those different levels mean.

8              Why don't we start at the beginning?  There is a Tier

9    1 level customer service rep in Cox's business as well,

16:42:15 10   correct?

11   A.    Correct.

12   Q.    That's sort of the first line of customer service.

13   Someone calls and says, my phone is not working or my Internet

14   is not working, they would get a Level 1 tech, correct?

15   A.    Correct.

16   Q.    And if the Level 1 tech can't solve the problem, they may

17   escalate it to a Level 2, right?

18   A.    Correct.

19   Q.    And Level 2, among the other things that they do with

16:42:38 20   escalations, is handle certain types of issues and complaints

21   that arise out of abuse complaints, correct?

22   A.    Yes, they did.

23   Q.    And Tier 2 is a higher level technician than a Level 1,

24   correct?

25   A.    Yes.

R.L. Vredenburg - Direct

1105

1   Q.   And a Tier 2 rep may handle calls or issues or tickets

2   related to copyright infringement?

3   A.   Yes.

4   Q.   I'm sorry.

5   A.   My fault.  Yes, they can.

6   Q.   And then there is something called the 2.5 at the TOC.

7   And a 2.5 level rep -- is it Tier 2.5 or Level 2.5?

8   A.   Tier 2.5.

9   Q.   As long as we say 2.5, we're on the same page.  So a 2.5

16:43:21 10  level rep has more experience still and is able to resolve more

11  issues than a Level 2, fair to say?

12  A.   Yes.

13  Q.   And that's the highest level abuse rep handling copyright

14  infringement tickets on a day-to-day basis, correct?

15  A.   Correct.

16  Q.   And you, sir, worked as a 2.5 level rep from approximately

17  the years 2008 through 2015, correct?

18  A.   That sounds right, sir, yes.

19  Q.   And in your work at the TOC or as a 2.5 level rep, your

16:44:03 20  responsibilities covered abuse complaints for the entire Cox

21  network, correct?

22  A.   Yes.

23  Q.   You weren't limited to just one geographic region, you

24  covered the whole country?

25  A.   Correct.

R.L. Vredenburg - Direct

1106

1    Q.   And that includes the roughly four to four-and-a-half

2    million Cox residential customers at that time?

3    A.   Yes, sir.

4    Q.   Mr. Vredenburg, you are familiar with something called the

5    AUP?

6    A.   Yes, sir.

7    Q.   And that's the Acceptable Use Policy, correct?

8    A.   Yes, sir.

9    Q.   And among the things that is embodied in the Acceptable

16:44:40 10   Use Policy is that it prohibits users of Cox's network from

11   engaging in illegal conduct, correct?

12   A.   Yes.

13   Q.   And one the things that it prohibits is use of Cox's

14   network to engage in copyright infringement, right?

15   A.   Yes.

16   Q.   And every customer that uses Cox's service agrees to abide

17   by those terms?

18   A.   I believe when they sign up for service, yes, they agree

19   to abide by it.

16:45:07 20   Q.   And if they don't, they shouldn't be on Cox's network,

21   correct?

22   A.   True, yes.

23   Q.   And a big part of your responsibility as a TOC rep was

24   to -- in the abuse department was to address AUP violations?

25   A.   Yes.

R.L. Vredenburg - Direct

1107

1  Q.   Including copyright violations that came to Cox's

2  attention?

3  A.   Yes.

4  Q.   And during your time, isn't it right, sir, that the bulk

5  of the abuse complaints that you dealt with in your time had to

6  do with copyright abuse violations?

7  A.   Yes, I would say the bulk were copyright.

8  Q.   And sometimes you could resolve those issues on your own,

9  correct?

16:45:43 10  A.   Yes.

11  Q.   And other times you would want to escalate those and ask

12  someone else about them?

13  A.   About copyright?

14  Q.   If you had a question or an issue or you weren't sure what

15  to do, you might escalate and ask somebody else for -- what

16  they thought?

17  A.   We would contact Atlanta.

18  Q.   You would contact Atlanta.  And Atlanta was typically

19  Mr. Zabek and Mr. Sikes?

16:46:07 20  A.   Correct.

21  Q.   And you took direction from Mr. Zabek and Mr. Sikes?

22  A.   Yes.

23  Q.   And you looked to Mr. Zabek and Mr. Sikes to make -- to

24  help make decisions about how to handle certain kinds of abuse

25  issues?

R.L. Vredenburg - Direct

1108

1    A.    Yes.

2    Q.    Including at times whether to terminate the service of

3    repeat copyright infringers, correct?

4    A.    That's correct.

5    Q.    When you weren't sure whether to terminate a customer who

6    might have been at that stage of consideration in the graduated

7    response, you might reach out to Mr. Sikes and say, what should

8    I do here?

9    A.    Correct.

16:46:38 10    Q.    Those gentlemen, Mr. Zabek and Mr. Sikes, set the tone for

11    the abuse group, correct?

12    A.    Yes.

13    Q.    Mr. Zabek and Mr. Sikes provided guidance and the

14    direction for the TOC team handling abuse issues on a

15    day-to-day basis, correct?

16    A.    Correct.

17    Q.    Now, when you started at Cox in 2004 as a 2.0 tech -- as a

18    2.0 tech, you said?  I am sorry, let me ask --

19    A.    Tier 2.

16:47:07 20    Q.    Tier 2.  Thank you.

21          And when you first started with Cox around 2004,

22    there was a three-strike policy for copyright infringement and

23    the customers were terminated, correct?

24    A.    No.

25    Q.    Mr. Vredenburg, there was a three-strike policy for

R.L. Vredenburg - Direct

1109

1   copyright infringement notices when you started and the

2   customer was terminated; is that correct?

3   A.   As far as I remember, there was never a three-strike

4   policy.  We had our graduated response system, but I don't ever

5   remember it being called a three-strike policy.

6          THE COURT:  Was it three warnings and then

7   termination?

8          THE WITNESS:  No.

9          THE COURT:  Is that the terminology?

16:48:04 10         THE WITNESS:  No, it would go up by steps.

11         THE COURT:  Okay.

12  BY MR. GOULD: (Continuing)

13  Q.   Mr. Vredenburg, do you recall -- do you recall testifying

14  at a trial in a prior case involving Cox Communications?

15  A.   Yes, sir.

16  Q.   And issues arose in that case related to Cox's graduated

17  response system?

18  A.   Yes, sir.

19  Q.   And when you gave that testimony, you swore to tell the

16:48:31 20  truth, right?

21  A.   Yes.

22  Q.   Just like you raised your right hand and swore to tell the

23  truth today?

24  A.   Absolutely.

25         MR. GOULD:  Page 871, line 6, of his BMG testimony.

R.L. Vredenburg - Direct

1110

1        MR. BUCHANAN:  Got it.

2        MR. OPPENHEIM:  Tab 13.

3        MR. BUCHANAN:  Show it to him?

4        MR. GOULD:  No.

5        THE COURT:  He is impeaching him, not trying to

6    refresh his recollection.

7    BY MR. GOULD: (Continuing)

8    Q.   Mr. Vredenburg, in your sworn -- that was in December

9    2015 --

16:49:04 10        THE COURT:  Just ask him what question he was asked

11    and what his answer was.

12    BY MR. GOULD: (Continuing)

13    Q.   Were you asked this question and did you give this answer,

14    Mr. Vredenburg:  And when you started -- excuse me -- all

15    right.  So when you started in 2004, you were a 2.0 TOC; is

16    that correct?

17        When I started in 2004, I was 2.0 tech.

18        And when you started, there was a three-strike policy

19    for copyright infringement notices and the customer was

16:49:28 20    terminated; is that correct?

21        As far as I know, yes, there was a three-strike.

22        Are you changing your testimony, sir?

23    A.   No, I am not changing.  There was never an actual

24    three-strike policy.

25    Q.   And you recall over time Cox's graduated response was

R.L. Vredenburg - Direct

1111

1    extended out quite a bit beyond three strikes?

2    A.    Correct.

3    Q.    At one point it became a ten-strike policy, correct?

4    A.    I don't recall the exact count, sir.  Sorry.

5    Q.    That's okay.  And then do you recall it later became a

6    12-strike policy?

7    A.    I don't recall this.

8    Q.    And I guess you also don't recall that it later became a

9    13- or 14-strike policy?

16:50:09 10    A.    Barely.  If I can put a clarification on the Acceptable

11    Use Policy -- or not the Acceptable Use Policy policy, the

12    three-strike policy --

13    Q.    I think I will just ask my questions.  I appreciate it.

14    A.    All right, sir.  Not a problem.

15    Q.    Your counsel will be certainly free to ask you any

16    questions he would like to clarify.  Thank you.

17    A.    Absolutely.

18    Q.    Do you recall over time, Mr. Vredenburg, an increase in

19    the number of copyright infringement notices that Cox was

16:50:38 20    receiving over time?

21    A.    Yes, sir.

22    Q.    And you heard the phrase "DMCA" or "DMCA notices"?

23    A.    Correct.

24    Q.    And in your work at Cox, that would typically refer to

25    copyright infringement notices, correct?

R.L. Vredenburg - Direct

1112

1    A.    Yes.

2    Q.    Do you recall how many notices a year Cox was receiving?

3    A.    I don't know the exact count, sir.

4    Q.    Leading up into -- the years leading up to, say 2010, you

5    just don't remember?

6    A.    I don't have the number, sir.  I just do not recall.  I

7    have never had that information on exact numbers.

8    Q.    I believe I have a binder for you, sir, with some

9    documents.  There should be one more Vredenburg document.

16:51:31 10        Mr. Vredenburg, if I could direct your attention to

11   Tab 6 of your binder.

12   A.    Okay.  Yes, sir.

13   Q.    Do you see on Tab 6, this is PX 240, there is a From and a

14   To, and it's from Matt Carothers and it's to a group called

15   CCIDAB-abuse team?

16         Do you know what CCIDAB-abuse team is?

17   A.    I have no idea what DAB-abuse team is.

18   Q.    You were a part of certain e-mail distribution groups in

19   work -- in your work as the abuse team?

16:52:16 20   A.    Correct.

21         MR. GOULD:  Move to admit 240.

22         MR. BUCHANAN:  Objection, no foundation.  He just

23   said he didn't even know what the group was and he didn't get

24   this information.

25         MR. GOULD:  If I might, this is also an exhibit in

1113

1    the Zabek deposition designation that the defendants haven't

2    objected to.  It's going in with the next trial date.

3              THE COURT:  Well, he has indicated he is unaware of

4    what the document is.

5              MR. GOULD:  Fair enough.

6              THE COURT:  All right.  So it's not coming --

7              MR. OPPENHEIM:  That's fine.

8    BY MR. GOULD:  (Continuing)

9    Q.   Sir, could you look at the -- there is a small chart on

16:52:52 10   the top of the first page.  Could you take a look at that and

11   see if it refreshes your recollection about the number of

12   infringement notices Cox was beginning to receive over time?

13   A.   It looks like it is a number they received, but I never

14   saw, you know, in part of my job, the overall numbers.

15   Q.   Is it your memory, sir, that the number of DMCA notices

16   was decreasing over time or increasing over time?

17   A.   I would have to say increasing.

18   Q.   And that would include in the years leading up to 2010,

19   correct?

16:53:31 20   A.   Yes, sir.

21   Q.   And in the years after 2010, correct?

22   A.   I would assume they increased.  I don't know.

23   Q.   Could we turn to Exhibit PX 197.

24              MR. BUCHANAN:  What tab?

25              MR. GOULD:  4.

1114

1           THE COURT:  190 what?

2           MR. GOULD:  197.  Your Honor, I took you at your word

3   that you didn't want another binder.  I apologize, it's

4   inconvenient.

5           THE COURT:  I have the binder.  I just need to get to

6   it.

7   BY MR. GOULD: (Continuing)

8   Q.   Mr. Vredenburg, you said you were part of the abuse team

9   in 2011, correct?

16:54:22 10   A.   Yes.

11   Q.   And do you recall a period of time in 2011 when the TOC

12   abuse team, the 2.5 level team out of Hampton Roads, was

13   substantially reduced in size?

14   A.   Yes, I remember.

15   Q.   Do you recall seeing any documents discussing that at the

16   time?

17   A.   I don't recall seeing any documents.

18   Q.   Let me just back up for a moment.

19           Do you recall in the years around 2010 there were

16:55:13 20   about 14 Tier 2 reps?

21           THE COURT:  At multiple locations or any one

22   location?

23           MR. GOULD:  If you will allow me a little leeway,

24   Your Honor.

25           THE COURT:  Yes, go ahead.

R.L. Vredenburg - Direct

1115

1    BY MR. GOULD: (Continuing)

2    Q.   Do you recall testifying previously that there were around

3    14 Tier 2 reps in 2010?

4    A.   Are you referring to Tier 2 or TOC reps?

5    Q.   I am sorry.  Do you recall testifying previously that

6    there were around 14 Tier 2.5 reps in 2010?

7            MR. BUCHANAN:  When he is referring to testifying,

8    today or --

9            THE COURT:  Yeah.  I interrupted the line of

16:55:57 10   questioning.  So start again.  Just ask him does he recall

11   whether -- how many reps there were on a date that you want to

12   use.

13   BY MR. GOULD: (Continuing)

14   Q.   Mr. Vredenburg, you recall there were about 14 Tier 2.5

15   reps around the year 2010, correct?

16   A.   Yes, sir, that sounds quite right.

17   Q.   And at that time, 2010, the TOC or the level 2.5 group was

18   staffed around the clock, 24 hours, seven days a week, correct?

19   A.   Yes.

16:56:29 20   Q.   And then there came a time in 2011 when the TOC, the tier

21   2.5 group, was really slashed materially, wasn't it?

22   A.   Yes.

23   Q.   And you said in 2010 it was about 14.  So now we get to

24   sometime -- do you recall it was about April of 2011 that that

25   group was cut to four people?

R.L. Vredenburg - Direct

1116

1    A.   I don't believe -- I don't know the exact date, but, yes,

2    it was cut to four people.

3    Q.   It was cut to four.  You agree with that part?

4    A.   Yes, sir.

5    Q.   And 14 to four is -- I'm no mathematician, but more

6    than -- I won't embarrass myself with math.  Let's leave it at

7    that.

8             It is a reduction of eight -- no, see, I did it.

9    It's a reduction from 14 to 4.  I will leave it at that.

16:57:22 10           MR. OPPENHEIM:  Ten.

11   Q.   It's ten, correct?

12   A.   Yes.

13           MR. OPPENHEIM:  Sorry, Your Honor.

14           THE COURT:  Friday evening.

15           MR. GOULD:  It's late on a Friday, I apologize.

16   BY MR. GOULD: (Continuing)

17   Q.   And after the reduction of the TOC from -- down to four,

18   the hours changed too, correct?

19   A.   If I remember correctly, yes, they did.

16:57:41 20   Q.   So while it was once 24/7 people could reach the TOC and

21   get access to customer service, those hours were reduced to

22   something less than that, right?

23   A.   Yes.

24   Q.   And all of those changes meant you're going to have to

25   work a little bit harder to keep up with the work loads, right?

R.L. Vredenburg - Direct

1117

1    A.    Correct.

2    Q.    You had to work harder because you had to do more with

3    less?

4    A.    Correct.

5    Q.    If you could turn to Tab 1 in your binder, please.

6          Do you recognize the document -- PX 10 for the

7    record.  Do you recognize the document at tab 1 of your binder,

8    PX 10?

9    A.    This particular document?

16:58:41 10   Q.    This type of document.

11   A.    This type of document, yes.

12   Q.    And what is it?

13   A.    It looks like a record of abuses by a customer.

14   Q.    It's a CATS ticket, right?

15   A.    CATS ticket, correct.

16   Q.    When you open up CATS to go work tickets, this is what you

17   see, right?

18   A.    Pretty much, yes.

19         MR. GOULD:  I move to admit PX 10, Your Honor.

16:59:08 20   THE COURT:  Any objection?

21         MR. BUCHANAN:  No, Your Honor.

22         THE COURT:  It's received.

23   BY MR. GOULD: (Continuing)

24   Q.    Now, in your work as a Level 2.5 rep, when you log into

25   CATS to go work a ticket, you see something that looks like

R.L. Vredenburg - Direct

1118

1  this, correct?

2  A.   Yes.

3  Q.   Now, I want to go through this to make sure that I

4  understand and the jury understands what is going on here, what

5  these things mean, because I want to understand the process.

6  Okay.

7          This particular customer that is referenced in this

8  one isn't one of the subscribers that received a notice from

9  the plaintiffs, but it's important that the jury understands

16:59:59 10  the process, sir.

11          THE COURT:  Ask your questions.  We don't need

12  testimony.  Ask your questions.

13          MR. GOULD:  Thank you, Your Honor.

14  BY MR. GOULD: (Continuing)

15  Q.   At a high level, the CATS ticket shows a bunch of

16  descriptive information at the top, correct?

17  A.   Yes.

18  Q.   And then if you scroll down, you see a long list of

19  historical tickets associated with this customer, correct?

17:00:23 20  A.   Correct.

21  Q.   And then if you keep scrolling down, keep scrolling down,

22  keep scrolling, right there, you see the infringement notice

23  that triggered this particular ticket, correct?

24  A.   Are we talking about here or here?

25  Q.   I'm sorry, I was looking at the screen, but if you prefer

R.L. Vredenburg - Direct

1119

1   to look in your notebook, if you could just flip a couple of

2   pages, you will see the notice, the copyright infringement

3   notice that came in and triggered this CATS ticket, correct?

4   A.   Yes, sir.

5   Q.   And that appears to be a copyright infringement notice

6   about a video game from a software -- the ESA Trade

7   Association, correct?

8   A.   Yes, sir.

9   Q.   Now, if we could go back up to the first page.  First I

17:01:16 10   want to highlight and make sure we understand some of the

11   information in this.

12          First, do you see -- maybe I will just do this.  This

13   might be easier.

14          Do you see that's a residential customer?  Is that

15   right, sir, this is for a residential customer?

16   A.   Yes.

17   Q.   And you see that this is for a copyright infringement

18   notice?

19   A.   It appears to be.

17:01:51 20   Q.   And if you look at this right here, it tells you the abuse

21   type?

22   A.   Correct.

23   Q.   And copyother, that refers to a copyright infringement

24   ticket, right?

25   A.   Correct.

R.L. Vredenburg - Direct

1120

1    Q.    And at the top left it shows the ticket number?

2    A.    Correct.

3    Q.    And it shows as well the abuse date down a couple of

4    lines, and that's the date --

5    A.    Correct.

6    Q.    -- the infringement occurred?

7    A.    Yes.

8    Q.    Do you see right above that it shows the ICOMS ID for a

9    customer?

17:02:35 10   A.    Correct.

11   Q.    And the ICOMS ID is essentially a unique customer account,

12   correct?

13   A.    Yes.

14   Q.    And that can be connected to the specific customer on the

15   account, John Smith, right?

16   A.    Yes.

17   Q.    And that allows you in your work at Cox to know exactly

18   who this ticket is about, correct?

19   A.    Yes.

17:02:54 20   Q.    And below that is a section for Correlated Tickets.  Do

21   you see that?  I am not sure where to stand.

22   A.    Yes.

23   Q.    There is a section for Correlated Tickets.  And it lists a

24   number of matching -- it lists a number of tickets matching by

25   a variety of different ways.  It shows tickets matching by IP

R.L. Vredenburg - Direct

1121

1    address, correct?

2    A.   Correct.

3    Q.   And the MAC address, and the ICOMS, and the node, right?

4    A.   Correct.

5    Q.   And those are all different ways of tracking data and

6    information across Cox's systems, right?

7    A.   Yes.

8    Q.   And it shows us that Cox has a fair bit of visibility into

9    the activity on its network, doesn't it?

17:03:40 10  A.   I would say so, yes.

11   Q.   And then below that it shows the Order Ticket History.  Do

12   you see that?

13   A.   Yes.

14   Q.   And it says right there that there are -- two lines up it

15   says that there are 50 other tickets matching the ICOMS ID.

16        Do you understand that to mean 50 other abuse

17   complaints, abuse tickets associated with this customer,

18   correct?

19   A.   That's the way I would see it, yes.

17:04:05 20  Q.   And each of those 50 is a separate ticket, right?

21   A.   Should be, yes.

22   Q.   Well, I counted them a couple of times on this long list

23   and it came to 48.  Do you want to count those, sir, or do you

24   want to take my word for it?

25   A.   I will take your word for it.  I will take your word for

R.L. Vredenburg - Direct

1122

1    it.

2    Q.   Do you know why it would say 50 tickets, in the Other

3    Tickets -- in the Other Tickets Matching ICOMS would have 48

4    tickets on the list?

5    A.   No, sir, I don't.

6    Q.   And then if you look at each of these tickets here going

7    left to right, it has a bunch of information.  It has -- first

8    thing appears to be the ticket number, correct?

9    A.   Yes.

17:04:58 10   Q.   And then a date, a CATS abuse e-mail address, and then an

11   action that CATS took, correct?

12   A.   Correct.

13   Q.   So "sent warning DMCA," that's an action that CATS took,

14   correct?

15   A.   Yes.

16   Q.   And then on the far right side it tells you the abuse

17   type, and this first one it was "copyother."  That means

18   copyright infringement, correct?

19   A.   Yes.

17:05:22 20   Q.   And if you scroll down a little bit, you can see on the

21   right-hand side there is two types we see on this ticket.

22   There is a bunch of copyother and there is a bunch of

23   bandwidth.  Do you see that?

24   A.   Yes, sir.

25            MR. BUCHANAN:  Your Honor, just considering the time,

R.L. Vredenburg - Direct

1123

1  this is in, they have looked at all the data, if he is just

2  asking him to repeat what's on it --

3         THE COURT:  Yeah.  I am going to allow him to go

4  through the ticket, but you are correct about the time.

5         How much more do you have on your direct examination?

6         MR. GOULD:  I think I have an hour.  Maybe I could

7  cut it to half hour.

8         THE COURT:  Well, we are not going to -- the jury is

9  not going to be here for an hour, I don't think.  And then you

17:06:07 10  got cross, and then we have got redirect.  So I'm afraid we are

11  just going to have to have Mr. Vredenburg come back.

12         And I apologize for that, sir.  We don't really have

13  the ability to estimate how long examinations are going to be

14  and I know you have been waiting to testify.

15         How late do you want to go?  Do you want to go until

16  5:15?  Do you want to go until 5:30?

17         A JUROR:  5:15 if he is coming back.

18         THE COURT:  He is coming back Monday, right.

19         MR. BUCHANAN:  Your Honor, could we approach?

17:06:41 20         THE COURT:  Yes, sir.

21         NOTE:  A sidebar discussion is had between the Court

22  and counsel out of the hearing of the jury as follows:

23  AT SIDEBAR

24         MR. BUCHANAN:  So Mr. Vredenburg -- I have been

25  working to try to work this out.  And he drove up, and he has

R.L. Vredenburg - Direct

1124

1   been waiting.  And his wife is back at the hotel, but she

2   covers the kids, the grandkids, and she babysits for them.

3          And, you know, if there is any way we could try to

4   get this done, maybe the jury would stay until 6:00.  If you

5   feel that's too much for them, I am not going to push that, but

6   he is at his wits end and he has been sitting around.  And I am

7   not blaming this on anybody.

8          THE COURT:  Right.

9          MR. BUCHANAN:  But if there is some way we could,

17:07:39 10   without affecting your examination, try to get this done by

11   6:00 -- but if that's just too much, then it's too much.

12          THE COURT:  You have got an hour?

13          MR. GOULD:  I could try to shave that and be

14   efficient, and recognizing the patience of the jury and the

15   Court --

16          THE COURT:  Well, but you have got cross-examination,

17   right?  How much cross do you have?

18          MR. BUCHANAN:  If you let me testify, I can go really

19   fast.

17:08:09 20          MR. OPPENHEIM:  I don't think that will be any

21   faster, Your Honor, I'm just saying.

22          THE COURT:  Proffer the witness, yes.

23          MR. OPPENHEIM:  Do we get to cross him then?

24          THE COURT:  It is not going to work.  And I

25   apologize, it's not going to work.

R.L. Vredenburg - Direct

1125

1    MR. BUCHANAN:  All right.

2    THE COURT:  And if you want him to come up and not be

3  here until noontime, if that helps, and then he could -- you

4  would call somebody else and then finish with him, I will do

5  that, that's fine.

6    MR. OPPENHEIM:  Or if a different day is better, we

7  can finish him on a different day.  We can accommodate that.

8    MR. GOULD:  And, respectfully, we have tried to

9  accommodate.  We were clear about the date.  We thought we

17:08:49 10  would take him -- we took him out of order today.  Today went

11  slower than I think anybody anticipated.

12    MR. BUCHANAN:  I am not complaining about --

13    MR. GOULD:  Yeah, I understand.

14    MR. OPPENHEIM:  We understand.

15    MR. BUCHANAN:  And so, it's not going to happen

16  today.  So I think he will probably stay for the weekend.  So

17  we can finish him first thing Monday then?

18    MR. GOULD:  Yeah, that works for me.

19    MR. BUCHANAN:  I know you had a corporate witness you

17:09:08 20  still wanted to call.

21    MR. OPPENHEIM:  No, that's fine.  We will still get

22  the corporate witness in.

23    THE COURT:  All right.  How late do you want to go

24  then?

25    MR. OPPENHEIM:  Well, looks the jury wants to go.  If

R.L. Vredenburg - Direct

1126

1    we're keeping him anyway, I'd rather not upset the jury.

2              THE COURT:  Let's let the jury go then and we will --

3              MR. BUCHANAN:  Your Honor --

4              THE COURT:  Yes, sir.

5              MR. BUCHANAN:  -- to my benefit, could you just say

6    something to Mr. Vredenburg about --

7              THE COURT:  About the fact that we tried?

8              MR. BUCHANAN:  Like I gave it -- I said I would

9    testify, and you said no, and --

17:09:33 10              THE COURT:  Okay.

11              MR. GOULD:  At the risk of irritating everyone, could

12   I have about five more minutes to finish this piece?

13              THE COURT:  Yeah, that's fine.

14              MR. GOULD:  Thank you.

15              THE COURT:  Okay.

16              NOTE:  The sidebar discussion is concluded; whereupon

17   the case continues before the jury as follows:

18   BEFORE THE JURY

19              THE COURT:  We are going to finish this subject

17:10:05 20   matter and then we're going to break for the night.

21              Please, go ahead.

22              MR. GOULD:  Thank you, Your Honor.

23   BY MR. GOULD: (Continuing)

24   Q.   We were looking at the different information we can glean

25   from this ticket history.  And one the things we looked at was

R.L. Vredenburg - Direct

1127

1    that it shows the action that Cox or CATS has taken, correct?

2    A.   Correct.

3    Q.   Of course, the ticket history in this image only shows

4    tickets that Cox created, correct?

5    A.   Correct.

6    Q.   So if Cox didn't create a ticket, we wouldn't see it in

7    the ticket history, right?

8    A.   No.

9    Q.   You understand, sir, that Cox deleted a number of notices

17:10:51 10   from several blacklisted notice senders without creating

11   tickets?

12        MR. BUCHANAN:  Your Honor, could he lay a foundation

13   for that?  It has nothing to do with this document.

14        THE COURT:  Well, identify on the document where

15   you're pointing to and ask him whether he understands what that

16   means.

17        MR. GOULD:  It's not shown on the document, but I

18   will ask the witness a question.

19   BY MR. OPPENHEIM:  (Continuing)

17:11:15 20   Q.   Mr. Vredenburg, in your work in the abuse group, did you

21   have an understanding that Cox blacklisted certain copyright

22   infringement complainants?

23   A.   I don't know if I they ever used the word "blacklisted."

24   I know they did send back and say, we're not accepting your --

25        I'm sorry.  I know that they, Cox Abuse, did talk to

R.L. Vredenburg - Direct

1128

1  people and tell them they were not going to accept their

2  complaints.  I don't know of the word "blacklisted."  I don't

3  know.

4  Q.   There were certain copyright complainants for whom Cox did

5  not accept notices, correct?

6  A.   As far as I know, yes.

7  Q.   And if Cox didn't accept notices, it didn't create tickets

8  on them, correct?

9  A.   Correct.

17:11:59 10  Q.   And are you aware that there is at least one notice sender

11  for whom Cox didn't even receive e-mails?

12        MR. BUCHANAN:  Your Honor, I thought the testimony

13  was going to be about this document?

14        THE COURT:  Yeah.  He is sprinkling other matters.

15  Let's get done with this document and then let the jury go.

16        MR. GOULD:  I think it's a good time to call it.

17        THE COURT:  Okay.  All right.  Then I know it has

18  been a long week.  We will come back and continue testimony on

19  Monday at 9 o'clock.

17:12:43 20        All right.  So you have some free time for a change,

21  and, you know, hopefully you'll be able to do some things you

22  couldn't do during the week and enjoy the weekend.

23        And, please, no research, no investigation, no

24  talking to anybody about the case.  All right?

25        All right.  Thank you very much.  Have a good

R.L. Vredenburg - Direct

1129

1        weekend.

2                NOTE:  At this point the jury leaves the courtroom;

3        whereupon the case continues as follows:

4        JURY OUT

5                THE COURT:  All right.  Mr. Vredenburg, Mr. Buchanan

6        made an impassioned argument on your behalf to get you done

7        today, and I am sorry I just can't do it.

8                So we are going to have to have you come back on

9        Monday morning.  And I apologize for inconvenience.

17:13:52 10               Please don't discuss the testimony you have given so

11        far with anybody until we see you on Monday morning at

12        9 o'clock.  Does that work for you?

13                THE WITNESS:  Yes, sir.

14                THE COURT:  Okay, thank you.  Then you are excused at

15        this time.

16                NOTE:  The witness stood down.

17                THE COURT:  All right.

18                MR. BUCHANAN:  I have --

19                THE COURT:  Yes, sir.  You have got one matter, and

17:14:25 20        then I will have a matter from Mr. Oppenheim.  And

21        Mr. Oppenheim knows what I am going to ask him, because it's

22        Friday night and I want to see where he is.  And I hope he has

23        got great news for all of us as we leave tonight.

24                Go ahead.

25                MR. GOULD:  About Shabbat?

1130

1     THE COURT:  I am sorry?  Yeah.

2     MR. BUCHANAN:  So although I doubt Mr. Vredenburg is

3  going to be willing to speak to me, but --

4     THE COURT:  I tried.

5     MR. BUCHANAN:  Judge, I appreciate it.  No.  I was

6  curious on the direction to the witness that he can't to talk

7  anyone about what he has testified to.

8     THE COURT:  So far.

9     MR. BUCHANAN:  Right.  So am I allowed to talk to him

17:15:08 10  about things that he hasn't been asked?

11     THE COURT:  Yes.  And also about -- you just -- I

12  mean, can't say, I am going to ask you about A, B, and C

13  because you have listened to his testimony, right?  I think

14  that's -- that is coaching based on his testimony so far.

15     MR. BUCHANAN:  I don't know that I will even talk to

16  him, but I just wanted to get clarification.

17     THE COURT:  If you call him and said, do you have any

18  questions, and we have gone over your testimony, and do you

19  have any questions about that, there's no -- I don't think

17:15:47 20  that's a problem.

21     MR. BUCHANAN:  And then counsel shared with me a

22  binder, although I have the same documents in my binder, and I

23  have looked at his binder, I assume that -- I know where all

24  that runs into.

25     THE COURT:  Binders are out.  They are not going to

1131

1    be showing him little binders that counsel have given as

2    courtesies to the witness.  I just think that is against the

3    spirit of what we agreed to.

4              MR. BUCHANAN:  Okay.

5              THE COURT:  All right.  Thank you.

6              MR. OPPENHEIM:  I hate to beat a dead pony, but -- so

7    the ruling you just articulated is very different than what

8    I've understood in my experience, so I would like some clarity.

9              I understood once a witness took the stand, neither

17:16:29 10   party was allowed to talk to the witness until they had

11   completed their testimony.

12             THE COURT:  Well, they certainly can talk to them.

13   They just can't talk to them about their testimony.

14             Like Ms. Trickey, I mean, she is talking to her boss

15   about transportation issues, and you see them together and

16   asked the question, which they -- you know, we're dealing with

17   professional people.

18             And I understand your concern about the hiccup here,

19   but I've never told witnesses they couldn't talk to their

17:17:02 20   counsel during the course of their testimony.  They just can't

21   talk about their testimony that they have given so far.

22             MR. OPPENHEIM:  So -- and, obviously, I wasn't

23   suggesting they can't talk about their kids, their travel,

24   their dogs, whatever.  But about the substance of the case, my

25   understanding was -- and if you're telling me it's a different

1132

1    rule here, Your Honor, we will follow it -- but once a witness

2    took the stand, everything about any of the issues in the case

3    was totally off limits.  You are saying that's not the rule?

4         THE COURT:  Well, they are not allowed to coach them

5    about, you know, the testimony they gave.  And I am going to

6    ask you this in response to that.  Or would you please go over

7    this document I'm giving you because of the testimony you gave.

8         But if there is questions about, you know, you showed

9    me a couple of documents, I would like to see document X and --

17:17:58 10   or did you say that we were going to cover the period of 2010

11   to 2012, I don't have any objections to that.  That is not

12   coaching the witness.

13        MR. OPPENHEIM:  Very well.  I understand, Your Honor.

14   Thank you for the clarification.

15        THE COURT:  I know it is a slippery slope, but that's

16   always been my rule.

17        All right.  So where are we in the case?

18        MR. OPPENHEIM:  I would like to say we are on

19   schedule, Your Honor, unfortunately, we're not.  We are about,

17:18:28 20   I would say, based on our prior guesstimates, about a

21   day-and-a-half behind schedule, which is obviously not where we

22   want to be.  And partially I think we didn't account for how

23   long some witnesses would go on direct and cross.

24        THE COURT:  Well, the cross isn't part of your

25   responsibility.  But -- so is the delay the fact that Cox has

1133

1   taken longer to do their crosses, or are you talking about your

2   own case?

3        MR. OPPENHEIM:  Well, Your Honor, I was trying to

4   avoid pointing fingers because I didn't want to be

5   antagonistic.  I mean, I will give you an example, right.

6        So we had a witness, Mr. McCabe, I asked, just for

7   timing purposes, and I wasn't trying to lock him in,

8   Mr. Buchanan, how long he thought he would go.  He told me a

9   half hour.  It was two hours.

17:19:20 10        And I don't blame Mr. Buchanan, he wanted to go as

11   long as he wanted to go, but it makes it very hard to kind --

12        THE COURT:  I'm just trying to understand how you're

13   calculating this day-and-a-half too late, because what I was

14   trying to was give people, you know, four days, and then you

15   insisted you needed six, and I said -- you know, you may need

16   five, I would hope you could do it in five.

17        But that's your time, not total time, right?  That's

18   the way -- and you're on the clock, right?  Do you understand

19   what being on the clock is?  Maybe I should have started --

17:19:54 20        MR. OPPENHEIM:  I actually understood from our

21   pretrial on Tuesday that we weren't doing a clock.  If we were,

22   then I didn't know that we were timing and counting.  And if we

23   are, we have not been keeping track of directs and crosses.

24        We can certainly go back to the transcripts and look

25   and apply it both ways, Your Honor.  And I am absolutely

1134

1    prepared to do that.

2              I apologize if I misunderstood that.

3              THE COURT:  So we've been keeping time.  And, you

4    know, I didn't say that just once.  I have been saying that for

5    weeks.

6              MR. OPPENHEIM:  Your Honor, you did absolutely say

7    several times.  And then when we met on Tuesday, what I heard

8    was, well, what's important here is the fair administration of

9    justice.  I didn't understand you and I apologize if that's my

17:20:56 10  misunderstanding.

11             Where are we in terms of timing and then let us -- if

12   I can ask since you've been keeping it.

13             THE COURT:  We have you at 12-and-a-half hours, which

14   just doesn't include today.  And Cox at almost eight, almost

15   nine hours.

16             And I don't know whether you have been keeping it

17   separately, but is that about right?

18             MR. ELKIN:  Yeah.  That's exactly right, Your Honor.

19             Two things, by the way.  Our time with Mr. McCabe was

17:21:32 20  70 minutes.  We did go over by ten minutes.  And we understood

21   what Your Honor said.  In fact, we had a number of

22   conversations with plaintiffs' counsel with regard to what

23   being on the clock meant.

24             I don't think there is any doubt that the time, we're

25   charged with the time when we have the witnesses, and vice

1135

1    versa.

2           So I don't think there is any misunderstanding with

3    regard to that.

4           THE COURT:  Okay.  We are on the clock.

5           MR. OPPENHEIM:  And how many -- what is --

6           THE COURT:  They are seven-hour days.  We have got,

7    you know -- or at least I ordinarily look at seven-hour days.

8    You get an hour for lunch.  We start at 9.  We've been ending

9    at 5.  That's eight hours.  Or 5:30.  And hopefully we get

17:22:20 10  about seven hours.  But I have always used seven hours as the

11   number.

12          Now, let's -- so you need to be monitoring your time.

13          MR. OPPENHEIM:  Absolutely.

14          THE COURT:  I promised this jury that I was going to

15   get them out of here in the middle of the following -- by the

16   18th.  They were going to be focused on Christmas.  There is no

17   reason why we can't do that.

18          I mean, you have had eight witnesses.  You have put

19   in an awful lot of the evidence I think that you wanted to --

17:22:54 20  that you want to put in.  You have got some depositions.  I

21   don't know what your other plan is.

22          MR. OPPENHEIM:  Yes.

23          THE COURT:  But you need to take a look at your case,

24   and look at where you can cut back.

25          MR. OPPENHEIM:  Yes, Your Honor.

1136

1        THE COURT:  And also, you know, no criticism,

2   Mr. Zebrak is going through resumés.  They're in evidence.

3   They are your experts.  You can cut down the time it takes to

4   qualify an expert and just highlight and not spend 20 minutes

5   on somebody's resumé who has taught for 50 years at Purdue

6   University.

7        I mean, there is ways to focus.

8        MR. OPPENHEIM:  Yes, Your Honor.

9        THE COURT:  And you really need to do that for next

17:23:39 10  week.

11        MR. OPPENHEIM:  You will see a faster pace next week,

12   Your Honor.

13        THE COURT:  And this jury is listening carefully.

14   They are taking good notes.  There is no reason to go over

15   things three times.

16        I know the whole recency/primacy repetition everybody

17   was taught.  But, you know, it's -- you have got a lot of

18   territory to cover, and you have got a limited time to do it.

19   So let's go work on that weekend.

17:24:05 20       MR. OPPENHEIM:  Absolutely, Your Honor.

21        THE COURT:  Okay.  Anything else at this time?

22        MR. BUCHANAN:  No, Your Honor.  Thank you.

23        MR. OPPENHEIM:  Not from plaintiffs, Your Honor.

24        THE COURT:  All right.  I hope you all have a good

25   weekend.  And we will see you at 9 o'clock on Monday morning,

1137

1    if not sooner around town.

2            All right.  We're in recess.

3            NOTE:  The December 6, 2019, portion of the case is

4    concluded.

5        -----------------------------------------------------

6

7

8

9

10

11

12

13                    CERTIFICATE OF COURT REPORTERS

14

15

16

17           We certify that the foregoing is a true and
         accurate transcription of our stenographic notes.
18

19

20            _____
              /s/  Norman B. Linnell
              Norman B. Linnell, RPR, CM, VCE, FCRR
21

22

23            _____
              /s/  Anneliese J. Thomson
              Anneliese J. Thomson, RDR, CRR
24

25