1138

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
              Plaintiffs,      :
                               :
     -vs-                      :  Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
              Defendants.       :
                               :
-------------------------------:
```

<u>VOLUME  6  (A.M. Portion)</u>

TRIAL TRANSCRIPT

December 9, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1139

<u>APPEARANCES:</u>

FOR THE PLAINTIFFS:              MATTHEW J. OPPENHEIM, ESQ.
                                 SCOTT A. ZEBRAK, ESQ.
                                 JEFFREY M. GOULD, ESQ.
                                 MICHAEL J. DRUCKMAN, ESQ.
                                 ANDREW L. GUERRA, ESQ.
                                 LUCY G. NOYOLA, ESQ.
                                 JIA RYU, ESQ.
                                 Oppenheim + Zebrak, LLP
                                 4530 Wisconsin Avenue, N.W.
                                 5th Floor
                                 Washington, D.C. 20015


FOR THE DEFENDANTS:              THOMAS M. BUCHANAN, ESQ.
                                 Winston & Strawn LLP
                                 1700 K Street, N.W.
                                 Washington, D.C. 20006-3817
                                   and
                                 SEAN R. ANDERSON, ESQ.
                                 MICHAEL S. ELKIN, ESQ.
                                 THOMAS P. LANE, ESQ.
                                 CESIE C. ALVAREZ, ESQ.
                                 Winston & Strawn LLP
                                 200 Park Avenue
                                 New York, NY 10166-4193
                                   and
                                 JENNIFER A. GOLINVEAUX, ESQ.
                                 THOMAS J. KEARNEY, ESQ.
                                 Winston & Strawn LLP
                                 101 California Street, 35th Floor
                                 San Francisco, CA 94111-5840
                                   and
                                 MICHAEL L. BRODY, ESQ.
                                 Winston & Strawn LLP
                                 35 West Wacker Drive
                                 Chicago, IL 60601
                                   and
                                 DIANA HUGHES LEIDEN, ESQ.
                                 Winston & Strawn LLP
                                 333 South Grand Avenue
                                 Suite 3800
                                 Los Angeles, CA 90071

1140

INDEX

OPENING STATEMENTS BY:

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| ROGER L. VREDENBURG | | |
| | CROSS | 1152 |
| | REDIRECT | 1172 |
| | RECROSS | 1185 |
| MATTHEW J. FLOTT | | |
| | DIRECT | 1188 |
| | CROSS | 1201 |
| | REDIRECT | 1230 |
| JASON ZABEK - via video deposition | | |
| | EXAMINATION | 1236 |

CLOSING ARGUMENTS BY:

COURT'S RULINGS/JURY INSTRUCTIONS

1      NOTE:  The December 9, 2019, portion of the case

2  begins in the absence of the jury as follows:

3  JURY OUT

4      THE COURT:  All right.  Good morning.  I see all

5  counsel are here.  I hope you all had a good weekend and -- Mr.

6  Buchanan.

7      MR. BUCHANAN:  Good morning, Your Honor.

8      THE COURT:  Good morning.

9      MR. BUCHANAN:  I have just a quick matter regarding a

09:03:39 10  witness, Paul Jarchow, who is a Cox employee.  And he is going

11  to be -- the plaintiffs want to bring him in as a witness or

12  force us to bring him as a witness from the West Coast.  He is

13  an ICOMS billing data individual.

14      The data in question or the exhibits in question

15  relate to the names of the business subscribers that are

16  involved in this case.

17      So early on in this case we, Cox, produced the

18  billing data for both residential subscribers and business

19  subscribers.  Then there was an issue about the names of the

09:04:17 20  business subscribers, the plaintiffs wanted those.

21      So we worked out a process similar to what happened

22  in BMG where we sent out notices to the business subscribers

23  alerting them that their names may be utilized in court or

24  disclosed.  And certain business subscribers responded.  Almost

25  all didn't.  So, therefore, they waived their objection.

1142

1        And so, the plaintiffs have identified in this data

2   that is in this exhibit, as have the defendants, including the

3   names of the business subscribers, and there's no objection on

4   either side.

5        So we don't feel that Mr. Jarchow, who collected the

6   ICOMS data for the business subscribers and the residential

7   subscribers, is a /necessary witness.

8        The plaintiffs want us to call him because they want

9   him, who is an administrator, again in Cox, ICOMS billing data,

09:05:10 10   to come in so they can cross-examine him or examine him on what

11   are the nature of the networks and the operations of the

12   networks of the business subscribers.  He can't testify to

13   that.  He has no knowledge whatsoever about that.

14        And by the timing that we produced this data, the

15   plaintiffs could have gone and picked selective business

16   subscribers and tried to depose them who fit within the

17   discovery regime.

18        So we do not believe that it's necessary to bring Mr.

19   Jarchow just to put him on the stand to say, I'm an

09:05:43 20   administrator, I don't know what some hospital or student

21   housing operations -- I don't know their system.  I'm not a

22   network guy to begin with, and I would never know what they do,

23   that's not my job.

24        So we were just trying to avoid bringing him all the

25   way from the West Coast when either party is objecting to the

1143

1        documents themselves.

2                THE COURT:  All right.  And have you tried to get an

3        affidavit or some kind of stipulation about what he would say

4        if he was called to testify?

5                MR. BUCHANAN:  We can do that, Your Honor.  I don't

6        think there is any dispute as to his job and his knowledge, but

7        we could do that.

8                THE COURT:  All right.  Thank you.

9                Mr. Oppenheim.

09:06:17 10              MR. OPPENHEIM:  Good morning, Your Honor.  Let me

11       begin by assuring the Court over the weekend we have made an

12       effort to try to hone our case so we can move this along.

13               THE COURT:  All right.

14               MR. OPPENHEIM:  With respect to this particular

15       issue, in the heat of the end of discovery when we were

16       triple-teaming depositions around the world, literally around

17       the world, this data list of business customers was produced.

18               It's, obviously, not the entirety of what's in Cox's

19       records regarding these subscribers.  It doesn't indicate

09:06:50 20      things that have come up in this trial.  Whether or not a

21       hospital, when they are listed as a customer, it's their public

22       WiFi or its their critical infrastructure.

23               The only experience we actually have is the one that

24       filed something in court, I believe it was, or at least sent a

25       letter raising questions about the disclosure of their

1144

1    information.  It was a hospital.  And that disclosure said it

2    was a public WiFi system.  But none of -- this data spreadsheet

3    doesn't say that.

4            So what they want to do is require the plaintiffs to

5    stipulate to this list of customers, which is an incomplete

6    dataset on those customers.  So we're not willing to do that.

7            If Mr. Jarchow can sponsor it, then, fine, we can ask

8    him questions.  He may not know the answers.  We don't know, we

9    didn't get a chance to depose him.  We certainly didn't have

09:07:47 10  time to depose all of the business customers.  Nor do I think

11   would Cox have allowed us to do that, go and start deposing

12   their business customers.

13           But anyway, if they want to offer some stipulation,

14   we are happy to consider it.  I don't think we should be

15   required to stipulate to an exhibit which we think is

16   incomplete.

17           THE COURT:  Well, you know, the day -- I have denied

18   Mr. Buchanan the right to look at -- to go through -- go back

19   through discovery issues with the production on the testimony

09:08:24 20  of MarkMonitor, and I'm not going to give you the opportunity

21   to do the same thing.  I mean, discovery is over.  You got what

22   you got.  I am not going back into the timing of anything.

23   That's Judge Anderson's job.

24           MR. OPPENHEIM:  Of course.

25           THE COURT:  And so, you know, try and work out a

1145

1    stipulation.  But if you are blindly calling somebody from

2    California not knowing what they're going to say, I'm not going

3    to permit that.

4             MR. OPPENHEIM:  Your Honor, we're not calling him.

5             THE COURT:  Oh.

6             MR. OPPENHEIM:  So would -- let me -- I'm not sure it

7    was presented quite the way I would have presented it.

8             The defendants want to force the plaintiffs to

9    stipulate to the admissibility of an exhibit for which they

09:09:06 10  have not laid a foundation and we believe is incomplete.

11            In order for them to lay a foundation for that

12   exhibit, they need Mr. Jarchow to come -- and I apologize if I

13   mispronounced his name -- to come from California.  And they

14   don't want to bring him from California.

15            We believe that if they want to put this exhibit in,

16   they need to bring him so we can ask him:  Mr. Jarchow, this

17   doesn't have information about whether it's critical

18   infrastructure or public WiFi.  This doesn't have information

19   in it about this or that.

09:09:37 20           To ask questions about -- they may get the document

21   in with him, but it gives us an opportunity to cross-examine

22   him about the document.  They want to forego that so they get

23   to force us to put a document in that they can then use to talk

24   about critical infrastructure which, in fact, may not be the

25   case.

1146

1      THE COURT:  Okay.  Now I better understand.  Thank

2 you.

3      MR. BUCHANAN:  Just to be clear.  They did depose

4 Mr. Jarchow, and they did depose him after they had the billing

5 data.

6      So the issue -- yes, it goes to a stipulation, but

7 not to the documents themselves.  So they identified these

8 business records and the names of the subscribers that have the

9 business names.  They have identified those, as have we, and

09:10:27 10 neither side has objected to the admission of those documents.

11      What they want Mr. Jarchow to come in -- and what

12 they won't stipulate to -- I guess I wasn't clear there.  They

13 want him to come out just so they can ask him, a billing

14 administrator:  Do you know how the networks of these

15 subscribers operates?

16      And I can give the Court an affidavit.  He will say:

17 I don't know.  I work in billing because I am an administrator.

18 I have no idea whether they have public WiFi or not.  I just

19 gathered in response to a court order.  I went into the system

09:11:01 20 and pulled the data and the names.

21      THE COURT:  Okay.  Understood.

22      MR. BUCHANAN:  So there is no objection to the

23 documents themselves.  They just want to have somebody say, I

24 don't know --

25      THE COURT:  You produced the documents.  They deposed

1147

1  somebody after they had the documents on what the documents

2  included or didn't include?

3        MR. BUCHANAN:  So they didn't ask him those

4  questions.  But, as I understand it, they deposed Mr. Jarchow

5  and they had this data.  And they don't object to the data,

6  it's just the underlying billing information.  They just want

7  to ask Mr. Jarchow --

8        So they -- just to be clear, they did depose him,

9  they had the billing data, but they didn't have the names at

09:11:47 10  that time.  So that came in afterward.  But they still had time

11  to depose, to go back to him if they wanted on that particular

12  issue or another witness they could have designated or asked us

13  to produce.

14        So now to bring him out -- and he just doesn't have

15  that information.  The point is, it's a courtesy thing.  If I'm

16  representing to the Court that you could -- the Court could

17  say, well, that is a relevant question, but this individual, he

18  is an administrator, he has no idea.  They should have asked

19  somebody else during discovery about that issue and determined

09:12:18 20  this whole WiFi issue and which ones have it.

21        But, you know, this witness is not going to be

22  helpful on that issue.

23        THE COURT:  Okay.  Thank you.

24        Mr. Oppenheim or Mr. Gould.

25        MR. OPPENHEIM:  To be clear, we did take

1148

1  Mr. Jarchow's deposition.  They avoided producing this

2  information until after we had taken his deposition.  We didn't

3  go back.  We --

4         THE COURT:  Okay.

5         MR. OPPENHEIM:  As the Court is aware, discovery was

6  very busy.  But that doesn't mean we waived our right to

7  examine a witness on a document.  So --

8         THE COURT:  Well, if he has no information to provide

9  beyond what's in the document because he's an administrator and

09:12:54 10  he's going to issue an affidavit or declaration which says

11  that, then I'm not going to have him come from the West Coast.

12         MR. OPPENHEIM:  Your Honor, we're happy to offer some

13  stipulative language on -- they didn't -- that while they

14  produced this document, it doesn't indicate whether it's

15  critical infrastructure or public WiFi, and offer that, and

16  negotiate a stipulation.

17         But I think what they're attempting to do is to get

18  this information in and not have anybody testify about it, and

19  then in closing make their critical infrastructure argument and

09:13:32 20  we'll have nobody that we can speak to about this.

21         THE COURT:  Okay.

22         MR. OPPENHEIM:  And that denies us the right to

23  present to the jury that that information is missing.

24         THE COURT:  Well, I can't force you to agree to admit

25  a document you think is incomplete and has no proper basis.

1149

1       And so, you all continue to work on that.  I mean, I

2   am not going to release a witness that Cox may be required to

3   call.  But on the other hand, if you look at these records and

4   all that you've got is what you got and you didn't depose

5   somebody about what else -- what is included and what is not

6   included in that document, then that's a matter that was --

7   that's a discovery-related document, you're not going to get

8   there, and you've got to live with it.

9       And, frankly, it's such a collateral issue, I know

09:14:37 10 you're tying up every bow that you can, but, you know, you

11  think the jury hasn't picked up on the fact that you've got

12  business clients who -- Cox has business clients who are big

13  clients who are fraternities or hospitals, and you've already

14  gone over the fact that they are, they do or they don't have

15  public WiFi, with multiple witnesses, at least significantly

16  with one of them, then you're not listening to the testimony

17  yourself.

18      I mean, this jury has heard it and they will make

19  credibility determinations on those issues.  And clearly

09:15:17 20 they've heard both sides of it.

21      But I am not going to bring a witness here from

22  California so that -- if he's -- if there is an affidavit or

23  declaration that says, I don't know what's in this, and I don't

24  know what these third-party customers, subscribers have on

25  their systems; then that's something you need to work out.

1150

1           MR. OPPENHEIM:  May I -- it's more about what Cox

2   knows about these customers that's not in that spreadsheet.

3           May I offer a suggestion for resolution that maybe

4   resolves it?

5           THE COURT:  Yeah.

6           MR. OPPENHEIM:  Maybe on Wednesday after court, since

7   he's on the West Coast, we could do a short telephonic

8   deposition on these issues, and then we can designate that in

9   rebuttal if need be.

09:16:11 10         THE COURT:  That sounds like a good suggestion.

11  Let's work on that.

12          MR. OPPENHEIM:  Okay.

13          MR. BUCHANAN:  Thank you, Your Honor.

14          THE COURT:  All right.

15          MR. OPPENHEIM:  So in light of the court -- turning

16  to the next issue, unless there was something else on that.

17          THE COURT:  No.

18          MR. OPPENHEIM:  In light of the Court's direction on

19  Friday evening --

09:16:30 20         THE COURT:  Yeah --

21          MR. OPPENHEIM:  -- we indicated to defendants on

22  Friday evening that we're going to rest with respect to

23  Mr. Vredenburg and pass the witness.

24          So we'll allow that to occur and just move forward.

25          THE COURT:  Okay.  So he's here.  You didn't send him

1151

1    back to Virginia Beach with no questions by you, Mr. Buchanan?

2         MR. BUCHANAN:  No, Your Honor.

3         THE COURT:  You're not going to take the stand in his

4    stead?  That would be entertaining.

5         All right.  Then are we ready for our jury?

6         MR. BUCHANAN:  Yes, Your Honor.

7         THE COURT:  Okay.  Joe, let's get the jury, please.

8         NOTE:  At this point the jury returns to the

9    courtroom; whereupon the case continues as follows:

09:17:42 10   JURY IN

11        THE COURT:  All right.  Good morning, ladies and

12   gentlemen.  Please have a seat.

13        Thank you again for making your way back in here.  We

14   had a few matters to discuss before we got you out here this

15   morning.  I apologize for the delay.

16        Let me have a nod of heads that you didn't do any

17   research or investigation or talk to anybody about the case.

18   All right.  Thank you very much.

19        I hope you all had a good weekend, and we are going

09:18:06 20   to begin -- the plaintiffs have ended their direct examination

21   of Mr. Vredenburg, and we're going to begin cross-examination

22   at this time.

23        Mr. Buchanan.

24        Oh, we need -- good morning, Mr. Vredenburg.  Please

25   come forward, sir.

1152

1       Good morning.

2       THE WITNESS:  Good morning, sir.

3       ROGER L. VREDENBURG, previously called by counsel for

4  the plaintiffs, having been duly sworn, continues to testify

5  and state as follows:

6       CROSS-EXAMINATION

7  BY MR. BUCHANAN:

8  Q.   Good morning, Mr. Vredenburg.

9  A.   Good morning.

09:18:59 10  Q.   How are you this morning?

11  A.   Oh, good.

12  Q.   Did you have a good weekend?

13  A.   Yeah, maybe.  It worked out good.

14  Q.   Are you here with your wife?

15  A.   Yes, sir.

16  Q.   Okay.  And where are you from?

17  A.   I'm from Virginia Beach.

18  Q.   Now, there has been some testimony about your term of

19  years or your employment at Cox.

09:19:20 20       Where did you work before you started at Cox?

21  A.   Before I started at Cox, I worked for Verizon.

22  Q.   Okay.  And what about before that?

23  A.   Before that, I was in the military, United States Navy.

24  Q.   And how long?

25  A.   26 years.

R.L. Vredenburg - Cross

1153

1   Q.   Was your wife also in the Navy?

2   A.   She did five years in the Navy, yes.

3   Q.   Okay.  And just briefly, what did you do in the Navy?

4   A.   I was assigned to several destroyers, working on weapons

5   systems.

6   Q.   Okay.  Thank you.  Now, I'd like you to -- if you could

7   pull up the Plaintiff's Exhibit 10.  I believe that was put

8   into evidence.  It's the ticket data.

9        So there's a number of items on this sheet that

09:20:09 10   Mr. Gould asked you about.  First of all, there is several -- I

11   think there's 20 that say -- refer to bandwidth limitation.

12   A.   Yes.

13   Q.   Okay.  Does that have anything to do with a DMC notice?

14   DMC --

15   A.   No, did not, separate issue.

16   Q.   And then there's some that talk about or reference hard

17   limit for complaint.  Do you see those?  I think there's 13 of

18   those.

19   A.   Okay.  I see one of them.

09:20:40 20   Q.   And I think this goes over a three-year period; is that

21   right?

22        MR. GOULD:  Your Honor, I'd just ask to please watch

23   the leading questions.

24        MR. BUCHANAN:  Well, this is cross, so --

25        THE COURT:  Yes.  But I'll allow the introductory

R.L. Vredenburg - Cross

1154

1   questions to be presented in this way.

2   BY MR. BUCHANAN: (Continuing)

3   Q.   Okay.  So on a hard limit, is that -- what does that mean?

4   A.   A hard limit is when the complainants were sending tickets

5   and they reached their amount for the day that they were able

6   to send.  So we would send a notice back that they reached

7   their limit.

8   Q.   Okay.  And does that give the opportunity for the

9   complainant or the content owner then to reintroduce the notice

09:21:24 10  the next day?

11  A.   Sure, yes.

12       MR. GOULD:  Objection, Your Honor, leading.

13       THE COURT:  I'm going to allow it.

14  BY MR. BUCHANAN: (Continuing)

15  Q.   Okay.  And then there's a number of "sent warning"

16  references in this document.  And do those relate to a

17  copyright notice?

18  A.   Yes, sir.

19  Q.   Okay.  Can you tell whether it's the same recording or

09:21:45 20  musical composition?

21  A.   Not without looking at the ticket, no.

22  Q.   Okay.  So could you go to the next page, flip over to

23  page 2 of the document.

24       Do you see where it identifies the infringing file?

25  A.   Yes.

R.L. Vredenburg - Cross

1155

1    Q.    What does it say?

2    A.    It's -- source is peer-to-peer.  Title is "Just Dance."

3    And then it gives the file name, "Just Dance, Disney Party."

4    It's the file size and the type of file.

5    Q.    That's a kid game, is it not?

6    A.    I -- "Just Dance, Disney Party," I would assume it's

7    something for young people, yes.

8    Q.    Okay.  So you were also asked about whether there was a

9    three-strikes-and-you're-out policy?

10   A.    Yes.

11   Q.    Okay.  Was there such a policy?

12   A.    No, there was no policy, three-strike policy.

13   Q.    Okay.  And could you explain.

14   A.    What the three-strike policy started out as, the phone

15   calls, of course, came into Tier 2 techs, the first -- that's

16   the first time a customer would talk to them about a DMCA

17   issue.  And for some reason, the techs -- we don't know why,

18   started telling customers that we have a three-strike policy.

19              The only thing we could think of, they were referring

09:23:02 20   to the graduated response.  And the three-strike, then kept

21   perpetuating because you get new techs on and they say, oh,

22   that's what we were supposed to tell them and then put it in

23   the notes.  But --

24              THE COURT:  All right.  Well, I'm having a little

25   trouble hearing you.  So slow down just a little bit.

R.L. Vredenburg - Cross

1156

1           THE WITNESS:  Okay.

2           THE COURT:  And speak into the mic, the microphone in

3     front of you.

4           THE WITNESS:  All right.  I'm sorry.  What it was --

5     like I said, there was a -- the three-strike policy was

6     something that the techs were telling the customers.  But it

7     wasn't anything official.  There was nothing written about the

8     three-strike policy.  It was just something that the techs were

9     using on the customers to give some sort of a scare tactic, I

09:23:35 10   would assume.  I don't know.

11          But then, later on, management abuse in Atlanta and

12    tech management came out and said, do not tell anybody there's

13    a three-strike policy, there's no such thing.  And then that's

14    when it basically ended or stopped being used.

15    BY MR. BUCHANAN: (Continuing)

16    Q.   So did you -- and when you spoke to subscribers that got

17    notices on the phone, did you use any sort of information or

18    techniques to try to discourage them from continuing to

19    download music, assuming they had done that?

09:24:07 20   A.   The techniques I would use would be just to let them know

21    that there are things out there that are happening in the

22    world.  You know, there are people being sued for thousands --

23    hundreds of thousands of dollars for, you know, sharing.

24    There's people that are being sued for different uses of their

25    system when it might not even be them using it.

1    Sorry.  I can't get this right.

2    And I would tell them, you know, just do this, do

3    that, and, you know, things can happen if you pursue it, if it

4    keeps going on.  It was just more of an information thing to

5    let them know.

6    Q.   So if I heard you right, you said you would reference

7    litigation that had been brought against subscribers to these

8    individual subscribers to discourage them from infringement?

9    MR. GOULD:  Objection, Your Honor.  Mr. Buchanan is

09:24:58 10    testifying.

11    THE COURT:  Overruled.  I think that's what he said.

12    But is what you just said a moment ago that was a

13    little hard to hear -- understand?

14    THE WITNESS:  Yeah, about referring to earlier

15    litigation?  Yes, we would tell the customers.  Sometimes I'd

16    even refer them, if it was current, to a Web site or a link and

17    say, hey, here's -- you could read about it all on your own.

18    Or I would tell them, just look in -- you know, go

19    ahead and do a Google search and look up litigation on stuff.

20    And then --

21    BY MR. BUCHANAN: (Continuing)

22    Q.   So I would like to move to the issue of the reduction in

23    force from 9 to 4.  Do you recall that Mr. Gould asked you

24    about that?

25    A.   Yes.

R.L. Vredenburg - Cross

1158

1  Q.    Did that affect your ability to handle DMCA notices?

2  A.    No, it did not.

3  Q.    Okay.  Could you look at Plaintiff's Exhibit 197 in the

4  plaintiffs' trial exhibits.  You should have a binder there.

5  A.    Is there a tab number or --

6  Q.    Yeah, it's Tab 4.  It says:  State of Customer Safety,

7  2011.

8          Do you see that document?  You should -- it should be

9  the plaintiffs' exhibit binder.  Are you looking at --

10  A.    Oh, I --

11  Q.    Okay.  You may have to --

12          THE COURT:  Joe, can you --

13  A.    Binder --

14          THE COURT:  What exhibit is it?

15          MR. BUCHANAN:  It's PX 197.  It's Tab 3 in my binder.

16  There's -- is there two binders up there?

17          COURT SECURITY OFFICER:  Yep, right here.  He has got

18  it, counsel.

19          MR. BUCHANAN:  Okay.  Sorry.  Okay.

09:26:44 20          THE WITNESS:  I see it.

21          MR. BUCHANAN:  I'd move this into admission at this

22  time.  It's the plaintiffs' exhibit.

23          MR. OPPENHEIM:  Your Honor, I tried to move this in

24  with Mr. Vredenburg.  He said he had never seen it and the

25  defendants objected.  We would maintain the objection as well.

R.L. Vredenburg - Cross

1159

```
 1              MR. BUCHANAN:  I wasn't sure that that was about this
 2    document, but --
 3              THE COURT:  Well, I think it was.
 4              MR. BUCHANAN:  Okay.
 5              THE COURT:  But see if he can -- do you want him to
 6    look -- reference any of it?  He may do that.
 7              MR. BUCHANAN:  That's what --
 8    BY MR. BUCHANAN: (Continuing)
 9    Q.   If you could look at page 2 where it says:  Stats.
10    A.   Okay.
11    Q.   All right.  And where it says:  We expected the time to
12    resolution would increase.
13              Do you see that?  Could you just read that particular
14    section, like three sentences.
15              THE COURT:  We don't have a -- the document isn't
16    admitted.  If -- read to himself and you've got a question for
17    him, that's fine.
18              MR. BUCHANAN:  Okay.  That's what I was trying to
19    refer him to.
20              THE COURT:  Right.  Don't -- you asked him to read it
21    out loud.
22              MR. BUCHANAN:  Oh, I'm sorry.
23    BY MR. BUCHANAN: (Continuing)
24    Q.   If you could just read that to yourself.
25    A.   All right.
```

R.L. Vredenburg - Cross

1160

1  Q.   So does that -- is that consistent with your recollection

2  as to whether the reduction in force affected the handling by

3  the Technical Review Centers of the copyright notices?

4  A.   It didn't -- to me, it's showing it didn't affect it at

5  all.

6  Q.   Okay.  Is that -- but is that what this is saying here?

7  A.   That's what it's saying to me, yes, sir.

8  Q.   Okay.

9        MR. GOULD:  Your Honor, I move to strike.

09:28:22 10  Mr. Buchanan is testifying --

11        THE COURT:  Yeah, it's --

12        MR. GOULD:  -- about the document.

13        THE COURT:  Overruled.

14  BY MR. BUCHANAN:  (Continuing)

15  Q.   So could you turn to tab 4 in my binder.

16        Now, before you answer any questions about this,

17  Mr. Vredenburg, I wanted to go over a few steps.

18        Now, I think you've testified that notices would come

19  in to Cox from copyright owners and they would be forwarded to

09:29:11 20  customers; is that right?

21  A.   Correct.

22  Q.   And along with the notice would be an e-mail from Cox that

23  would accompany that notice?

24  A.   Correct.

25  Q.   And did there come a time where subscribers would e-mail

R.L. Vredenburg - Cross

1161

1    back to Cox in response to those notices?

2    A.   Yes, they would.

3    Q.   Okay.  And how often did that occur?

4    A.   Oh, it was a few times, several times a week.

5    Q.   Pardon me?

6    A.   Several times a week.

7    Q.   Several times a week?

8    A.   Yeah.  We'd also get phone calls from them.

9    Q.   Okay.  And what would happen to those notices in

09:29:48 10   response -- or, sorry, those e-mails from subscribers in

11   response to the notices of infringement?

12   A.   You mean the ones they sent back to us?

13   Q.   Yeah.  Would they be -- come into the CATS system?

14   A.   Yeah, they come into the CATS system so we could review

15   them.

16   Q.   Would you have access to them?

17   A.   Yes.

18   Q.   On your computer?

19   A.   Yes.

09:30:05 20   Q.   And what would you do with them when they came in?

21   A.   We pull the ticket up and read it and respond to the

22   customer, whatever they were asking.

23   Q.   Okay.  And would you respond by e-mail or phone?

24   A.   It would depend on what was going on with the system.  If

25   it was going to be more difficult, we would call them up

R.L. Vredenburg - Cross

1162

1     from -- to give them better help.

2     Q.   And could you look at this particular e-mail.

3              MR. OPPENHEIM:  May we approach, Your Honor?

4              THE COURT:  Yes, sir.

5              NOTE:  A sidebar discussion is had between the Court

6     and counsel out of the hearing of the jury as follows:

7     AT SIDEBAR

8              THE COURT:  Yes, sir.

9              MR. GOULD:  The defendants, I believe, are about to

09:30:52 10   try and enter through Mr. Vredenburg a number of e-mails in

11    which customers responded, apparently to warnings that Cox

12    sent.  It's outside the scope of my cross.  Cox did not list

13    Mr. Vredenburg as a witness they intended to present.  Their

14    scope of their examine should be limited to the scope of my

15    examine.

16             MR. BUCHANAN:  So I believe it is within the scope

17    because he talked about the process of handling notices, how

18    they handled them, the ticket data.  He went through that one

19    ticket data that listed all that had a notice attached, it

09:31:25 20   references who to call, that's all in evidence.  That's one

21    thing.

22             Plus, we did not list him as a will call on ours, but

23    we captured all of their witnesses on ours.  We said anyone you

24    are going to call, then we're going to call.

25             MR. GOULD:  Respectfully, that last piece is a little

R.L. Vredenburg - Cross

1163

1  thin, but I understand the argument.

2          There is no testimony on my initial examine about any

3  direct interactions with customers.  That's beyond the scope.

4          THE COURT:  Yes.  We're not going to call him back

5  from Virginia Beach in Cox's case in chief to go through this,

6  and I am going to allow them to expand the cross-examination to

7  include customers.  And your exception is noted.

8          MR. GOULD:  Thank you, Your Honor.

9          THE COURT:  Hold on one second.  I don't know what

09:32:08 10  document this is because you are identifying tabs versus

11  exhibits.  So I don't know what this one looks like.

12          What is it, just one customer?

13          MR. BUCHANAN:  Yes.  And I will identify it right

14  now.

15          THE COURT:  Okay.  And what is your -- how broadly

16  are you going to question Mr. Vredenburg about customer

17  responses?

18          MR. BUCHANAN:  I am going to show him four responses

19  and ask if these are typical.  And then I'm going to ask him

09:32:34 20  about, say, did you look at a large -- like 50 others that I

21  gave him, and to see if those were similar.

22          And then the idea is to lay the foundation for the

23  1,700 that you've said could come under present sense

24  impression.  But I want to also expand that to business records

25  because these are part of their business records and were

R.L. Vredenburg - Cross

1164

1    retained in the CATS system.  I'm not going to spend very much

2    time on it, just a couple minutes.

3            THE COURT:  Okay.  I am going to allow the four of

4    his examples.

5            Where do the 50 come from?

6            MR. BUCHANAN:  So I have a folder where I had him go

7    through 50 others.

8            THE COURT:  Are they --

9            MR. BUCHANAN:  They are all part of the 1,700.  They

09:33:12 10   all have an exhibit.  But I will just reference -- the point

11   is, I wanted to lay a foundation.  If the Court is saying his

12   testimony right now in going over those four is enough to lay

13   the foundation --

14           THE COURT:  Well, he doesn't know any of the

15   specifics about any of these other customers.  And what I said

16   was, these numbers could come in for purposes of showing that

17   Cox employees knew the customers were being involved.  I think

18   having him identify the 50 and the specifics of what their

19   complaints were or -- I think is over the line.

09:33:45 20           MR. BUCHANAN:  So the only purpose I had him do the

21   50 is so that there's -- he could say, I looked at a lot of the

22   1,700, and these are the type of e-mails we got.

23           He is not going to tell us anything about the

24   specifics of the 50.  That was just going to go to the

25   foundation for the Court if it wanted.  And then Brent Beck

R.L. Vredenburg - Cross

1165

1   will testify how he pulled all 1,400 out of there, the ICOMS

2   database.

3        THE COURT:  Show him the four, ask him whether these

4   are representative of the type he got, and then we will get to

5   Brent Beck down the line with the rest.

6        Yes, sir.

7        MR. OPPENHEIM:  Your Honor, will the jury be given a

8   limiting instruction on what the purpose of the e-mails can be

9   considered for?

09:34:21 10       THE COURT:  Yeah, I will probably do that through

11  Beck.  But, yes.

12       MR. BUCHANAN:  Your Honor, not to belabor this, but

13  if they are business records, we can use them for more than

14  just present sense impression, correct?

15       THE COURT:  Well, I don't know that they're business

16  records.  You haven't established -- I allowed you to put them

17  in because they were responses that Cox was aware of.  If you

18  have a witness who can say, I'm aware of these complaints

19  coming back from our own customers, and so that -- to establish

09:35:04 20  that you knew that customers were pushing back and saying, I

21  didn't do anything wrong, that -- I don't know whether -- you

22  know, I allowed those without even -- without coming in for

23  the -- business records come in for the truth of them.

24       MR. BUCHANAN:  That's correct.

25       THE COURT:  And i did not allow business records to

R.L. Vredenburg - Cross

1166

1   come in for the truth of them.

2          So if you can establish that down the road --

3          MR. BUCHANAN:  Well, Your Honor, he just testified

4   that as part of the process -- so the notices come in as

5   business records, right?  Our e-mails attached come in as

6   business records.  Their database picks 39 without a single

7   witness testifying they listened to it, came in as they have

8   testified to it.

9          He just testified that part of the process was the

09:35:45 10   e-mails came back into the CATS system.  They accessed them on

11   their computer, and they had an obligation to respond to those,

12   and they did, by phone or e-mail.  They were captured in the

13   system and kept in the normal course of business.

14          THE COURT:  But he's -- I'm not sure he's the witness

15   that can do that --

16          MR. BUCHANAN:  Okay.

17          THE COURT:  -- to establish that they are business

18   records.  But I will consider that down the road.

19          Yes, sir.

09:36:06 20          MR. OPPENHEIM:  But even if they are business

21   records, the statements by the customers are not under oath,

22   they are still hearsay, obviously.

23          THE COURT:  Yeah.  And that's where I drew the line

24   last time.  But, okay.

25          MR. GOULD:  The last thing, Your Honor.

1167

```
 1          THE COURT:  Thank you for refreshing my recollection
 2   about that.
 3          MR. GOULD:  The last thing.  I'm little concerned if
 4   we wait until Mr. Beck's testimony for a limiting instruction,
 5   that this jury will be left with the misrepresentation that
 6   they may consider for the truth of the matter an e-mail from a
 7   senior citizen saying, I didn't do it, I don't know --
 8          THE COURT:  Let's see what he testifies to.  I agree
 9   with you, Mr. Gould.  Thank you.
10          NOTE:  The sidebar discussion is concluded; whereupon
11   the case continues before the jury as follows:
12   BEFORE THE JURY
13   BY MR. BUCHANAN:  (Continuing)
14   Q.   Mr. Vredenburg, I think you're looking at tab 4, which is
15   DX 1619.  Do you see that?
16   A.   Yes.
17   Q.   Okay.  And could you identify what that is for the Court
18   and the jury, please.
19   A.   It looks like a customer response to one of our tickets
20   that were sent out.
21   Q.   And the date on that is 3/22/2014, 2014; is that right?
22   A.   Yes.
23   Q.   Okay.  So what is the customer responding to specifically?
24   What is the issue here?
25   A.   He was using the system to violate law by sharing
```

09:36:41   10
09:37:36   20

R.L. Vredenburg - Cross

1168

 1   copyrighted material.

 2   Q.   But what is the statement that the particular individual

 3   is providing as an explanation for the copyright notice?

 4   A.   He's saying that he hasn't used that system, and he

 5   thought he deleted the program used for sharing awhile back.

 6   He says:  I'll make sure.  Thanks.

 7   Q.   And if you go down, do you see where it says:  Is this in

 8   reference to music downloading?

 9        Do you see that?

09:38:30 10   A.   Yes.

11   Q.   And what does he say there, this individual?

12   A.   Basically he's saying he only downloads from iTunes, which

13   is of course legal.  And I basically said, you can download

14   from iTunes all you want, but you're using a program probably

15   that is sharing it out, and that's the illegal part.

16   Q.   All right.  Then could you go to DX 496.

17   A.   Is that a tab?

18   Q.   And this is another e-mail that came from a customer dated

19   February 4, 2013.

09:39:00 20   A.   Is there a tab on that?  I'm sorry, is there a tab?

21   Q.   Yeah, it's the next tab, tab 5.

22        What is the explanation that this individual gives in

23   response to the notice?

24   A.   Basically he's saying that this does not come from his

25   system, and he's stating that he knows that people can access

1    probably his system, but he has no idea what to do with it or

2    anything about what's going on.

3    Q.   Could you read -- it says:  We are senior citizens.  Can

4    you read that?

5    A.   We are senior citizens, 77 and 74, and wouldn't even begin

6    to know how to do what is set forth below.  Please advise.

7         THE COURT:  Ladies and gentlemen, Mr. Vredenburg is

8    reading these e-mails that are coming back to Cox to

9    demonstrate that Cox was aware that customers were responding

10   to the e-mails, and some claiming that they had not been guilty

11   of the infringement that they were being charged with.

12        The document -- it's offered for that purpose, and

13   not for the truth of what the customers are saying.  All right?

14   Thank you.

15        All right.  Please, go ahead, Mr. Buchanan.

16        MR. BUCHANAN:  So I would move in DX 1619 and DX 496,

17   Your Honor.

18        THE COURT:  Any objection?

19        MR. GOULD:  Subject to our prior exception, Your

20   Honor.

21        THE COURT:  All right.  It will be received.

22   BY MR. BUCHANAN: (Continuing)

23   Q.   Could you look at the next tab, please, Mr. Vredenburg,

24   tab 6.  It is DX 511.

25        This is an e-mail response from a customer dated

R.L. Vredenburg - Cross

1170

1  2/12/2013.  Do you see that?

2  A.   Yes, sir.

3  Q.   Okay.  And could you read the response from this

4  particular customer.

5  A.   I have read this e-mail and found the content and deleted

6  both source and material.  I am 61 years old and not in the

7  habit of allowing my nephews to use my computer.  However -- I

8  am sorry -- and I am not in the habit of allowing my nephews to

9  use my computer.  However, not anymore.  I do apologize and

09:41:19 10  assure you this will not occur again.  Regards.

11           MR. BUCHANAN:  Okay.  I would move DX 511 into

12  evidence.

13           THE COURT:  It will be received, the same exception.

14  BY MR. BUCHANAN: (Continuing)

15  Q.   One more, the next tab, DX 544.  This is dated

16  February 26, 2013, another e-mail response.

17           DX 544, and it's dated February 26, 2013.

18  A.   It states:  I have already taken action with Cox to advise

19  me to delete this song, as well as Torrent, from my son's

09:41:55 20  computer, which was done.

21           MR. BUCHANAN:  Okay.  We would move in DX 544.

22           THE COURT:  It will be received, the same exception.

23  BY MR. BUCHANAN: (Continuing)

24  Q.   And are these type of responses typical of the e-mails you

25  received from customers and phone calls?

R.L. Vredenburg - Cross

1171

1   A.   Yes, they are.

2   Q.   Okay.  Would you look at the next tab, DX 534 -- this is

3   actually the last one.  And this is dated February 22, 2013.

4   A.   Okay.  I received this e-mail, it talks about unlawful use

5   of posting or transmitting a Michael Jackson song.  I talked

6   with my kids that use the computer and they say it was not

7   them.  Do have a wireless router, so it is possible that one of

8   my neighbors may be doing this.  Or is it possible that this

9   e-mail is a scam and they want me to click on the links below

09:43:16 10   in the e-mail body?

11          MR. BUCHANAN:  Okay.  Move in DX 534, Your Honor.

12          THE COURT:  It is received.  The same exception is

13   noted.

14   BY MR. BUCHANAN: (Continuing)

15   Q.   So, Mr. Vredenburg, what was your -- what do you see your

16   role at Cox to be as a, you know, review specialist down in

17   Hampton Roads on notices and dealing with customers?

18   A.   I always perceived my role as educating the customer and

19   trying to let them make sure they know what's going on with

09:43:55 20   their systems and how to resolve it, stop it from happening.

21   Q.   Okay.  And did you view your role as to terminate

22   somebody?

23   A.   No, I never -- that was not my role.  My role was to try

24   to, like I said, educate them.  Termination was farthest from

25   my mind.

1    Q.    So did you terminate subscribers?

2    A.    Yes.

3    Q.    About how many during the time you were there?

4    A.    A couple dozen.

5    Q.    Couple of dozen?

6    A.    Yes, sir.

7    Q.    And at what point did you decide to terminate them?

8    A.    I would decide to terminate them when I just felt like

9    they weren't doing anything anymore.  They were just -- like I

09:44:38 10   said, yeah, they were going to cooperate with us, they were

11   working with us, but they -- you could tell they just weren't.

12           And at that point, giving them every chance, every

13   opportunity, and I'd say, well, it's time to terminate them.

14   Q.    Was it a difficult thing to do?

15   A.    For me to terminate a customer?

16   Q.    Yes.

17   A.    Yeah.  I just didn't like doing it.  You know how

18   important the Internet was to a person or to a whole family,

19   you're just -- you're cutting that whole thing off, a whole

09:45:02 20   part of their life.  So it's not something you just want to do.

21           MR. BUCHANAN:  No further questions.

22           THE COURT:  Thank you.  All right.

23           Redirect.

24      REDIRECT EXAMINATION

25   BY MR. GOULD:

R.L. Vredenburg - Redirect

1173

1  Q.   Good morning, Mr. Vredenburg.

2  A.   Good morning.

3  Q.   How are you today?

4  A.   Good.  Thank you.

5  Q.   Could we pull up DX 1569, please.

6        I may run you a little bit.

7        Oh, I'm sorry, I guess we can't pull it up yet.  DX

8  1569.

9        Mr. Vredenburg, you answered some questions about

09:47:15 10  reviewing e-mails that customers sent in in response to e-mails

11  from Cox providing instances of copyright infringement

12  allegations.  Do you recall that?

13  A.   Yes.

14  Q.   And is DX 1569 an e-mail of that kind?

15  A.   Yes.

16  Q.   And, sir, in this e-mail, what's the date on this e-mail?

17  A.   March 4, 2014.

18  Q.   And this customer replies to Cox and says the following --

19        MR. BUCHANAN:  I'd just object.  It's not in evidence

09:47:57 20  yet, Your Honor.

21        THE COURT:  Yeah, do you --

22        MR. GOULD:  Excuse me.  Move to admit DX 1569.

23        THE COURT:  Any objection?

24        MR. BUCHANAN:  No objection.

25        THE COURT:  It's received.  Yeah, it's received.

R.L. Vredenburg - Redirect

1174

1  BY MR. GOULD:  (Continuing)

2  Q.   Could we pull up -- and this customer, Mr. Vredenburg,

3  says:  Thanks for the e-mail, I will remove it immediately once

4  I get home tonight.  It won't happen again.

5       Is that right?

6  A.   Yes.

7  Q.   And this was March 4, correct?

8  A.   Correct.

9  Q.   You can pull that down, please.

09:48:28 10       Can we pull up the Elmo, please.

11       Mr. Vredenburg, at the time Cox received this e-mail

12  at DX 1569, it would have had access to this customer's

13  copyright infringement ticket history, correct?

14  A.   Yes.

15  Q.   And, likewise, would have had access to this customer's

16  copyright infringement ticket history in the period following

17  May 4 -- March 4, 2014?

18  A.   Yes.

19  Q.   Mr. Vredenburg, what the -- what we've handed you is an

09:49:19 20  excerpt from a larger body of ticket data that was produced in

21  this case for a customer with the ICOMS ID listed on this

22  statement.  Do you see that?

23       MR. BUCHANAN:  Your Honor, I'm going to object.  He

24  just laid a foundation, himself, for a document that --

25       THE COURT:  No, I'm permitting that.

R.L. Vredenburg - Redirect

1175

1        MR. BUCHANAN:  -- where he--

2        THE COURT:  No, I'm permitting him to explain where

3   it came from.  But we'll see where we go.

4   BY MR. GOULD: (Continuing)

5   Q.   Mr. Vredenburg, does this appear to you to be information

6   consistent with a ticket history from a CATS database?

7   A.   Appears to be, yes.

8        MR. GOULD:  I would move to admit --

9        THE COURT:  Well, where does it come from?  What's

09:50:00 10   the larger set of documents?

11        MR. GOULD:  This is an excerpt from PX 19, which is

12   the ticket data history that Cox produced with something --

13   over 500,000 records.

14        THE COURT:  Okay.  All right.

15        MR. GOULD:  This is an excerpt for ICOMS ID

16   477012799107.  And I move to admit.

17        THE COURT:  All right.  Any objection?

18        MR. GOULD:  We can call it PX 550.

19        THE COURT:  It'll be received.

09:50:46 20        MR. GOULD:  And, Mr. Duval, if we could please pull

21   it up on the screen.

22   BY MR. GOULD: (Continuing)

23   Q.   Mr. Vredenburg, if I could direct you to the Ticket ID

24   column.

25        And, Mr. Duval, if you could zoom in on that vertical

1176

1   Ticket ID column?

2   Q.   And do you see that if you count the individual number of

3   tickets for this customer, there are seven individual ticket

4   IDs?

5   A.   It appears to be seven.

6   Q.   And let's -- if you could zoom out, Mr. Duval, and

7   highlight the entry for March 4.  There's two line entries for

8   March 4, 2014, horizontally, all the way across.

9         And do you see it -- sorry, could you just highlight

09:51:40 10   it, please.

11         And do you see that in response to this March 4

12   warning, the customer got a warning, correct?

13   A.   Correct.

14   Q.   And then how many tickets do you see that this customer

15   received after he said:  And I will remove it immediately, it

16   won't happen again?

17   A.   I wouldn't know.  I would never correlate that.

18   Q.   Well, let's take a look.  After this March 4 entry,

19   there's a ticket for -- there's a ticket on June 5, correct?

09:52:19 20   A.   Yes.

21   Q.   And on that, in response to that, Cox sent another

22   warning?

23   A.   Correct.

24   Q.   And then there's another ticket for this customer on

25   October 2014, correct?

```
             THE COURT:  October 13 or --
 1
 2   Q.   October 13, 2014?
 3   A.   Yes.
 4   Q.   And you see where it says:  Sent reply, hard limit for
 5   complaints?
 6   A.   Yes.
 7   Q.   That in fact means that there's no warning sent to the
 8   customer, doesn't it?
 9   A.   Right.
10   Q.   And then if you move down on October 22, 2014, this
11   customer received yet another copyright infringement ticket,
12   correct?
13   A.   Correct.
14   Q.   And Cox sent another warning, correct?
15   A.   Yes.
16   Q.   And then in December, customer received another copyright
17   infringement ticket, correct?
18   A.   Correct.
19   Q.   And Cox sent another warning, correct?
20   A.   Correct.
21   Q.   And are you aware of what happened with this customer's
22   ticket history after December 2014?
23   A.   No, I wasn't.
24   Q.   Because it's not shown in the data?
25   A.   Correct.
```

R.L. Vredenburg - Redirect

1178

1    Q.   You have no way, as you sit here today, whether this

2    customer infringed once more, twice more, 100 times more in

3    2015 and later, do you?

4    A.   With this material, no.

5    Q.   Mr. Vredenburg, I've handed you another e-mail from a

6    customer responding to an e-mail warning from Cox.

7            Do you see that?

8    A.   Yes, sir.

9            MR. GOULD:  I would move to admit DX 786.

09:54:19 10          THE COURT:  Is this from the same PX 19?

11           MR. GOULD:  This is a customer e-mail.  I'm going to

12   do a customer e-mail and then an excerpt from PX 19, Your

13   Honor.

14           THE COURT:  Oh, all right.  Any objection?

15           MR. BUCHANAN:  No, Your Honor.

16           THE COURT:  It's received.

17   BY MR. GOULD: (Continuing)

18   Q.   Now, if we could zoom in and highlight the customer

19   e-mail.

09:54:36 20          This customer responds to an e-mail warning from Cox

21   on June 8, 2013, correct?

22   A.   Correct.

23   Q.   And if the Court would pardon my language, the customer

24   says:  Well, this is bullshit.  I haven't downloaded anything

25   illegally using Cox Internet service.  I have a Torrent -- I

R.L. Vredenburg - Redirect

1179

1    have a uTorrent application on my computer that's been on there

2    for a couple of years.  If that's illegal, then kiss my ass.

3            And that's what the customer told Cox in response to

4    the warning, correct?

5    A.    Correct.

6    Q.    Is this an e-mail that you believed -- is this one of the

7    customer e-mails, sir, that you believed was providing an

8    effective education program to the customer?

9    A.    I don't know what we responded to it.

09:55:29 10   Q.    And Cox had access to this customer's ticket history at

11   the time it received this e-mail and subsequently, correct?

12   A.    It should have, yes.

13   Q.    Let's take a look at that customer's infringement history.

14           I'm handing the exhibit, what's marked as PX 551.

15           THE COURT:  All right.

16   Q.    And this is another excerpt of Cox's ticket data pulled

17   from PX 19 for the customer with the ICOMS ID 436050642911.

18           Do you see that, sir?

19   A.    Yes.

09:56:18 20           MR. GOULD:  I move to admit PX 551.

21           THE COURT:  Any objection?

22           MR. BUCHANAN:  No, Your Honor.

23           THE COURT:  It's received.

24   BY MR. GOULD: (Continuing)

25   Q.    And this is another ticket history extract, similar to the

R.L. Vredenburg - Redirect

1180

1  one we just looked at, but this one from the customer who had

2  the friendly e-mail to Cox we looked at a moment ago.  And you

3  recall, sir, that e-mail was dated June 8, 2013?

4  A.   Correct.

5  Q.   And, Mr. Duval, if you could just highlight in yellow, the

6  entry horizontally from June 8, 2013.

7        And then -- actually, if you count the individual

8  ticket IDs presented by this customer's ticket history, would

9  you agree with me that there were 14 infringement tickets in

09:57:10 10  this customer's history?

11  A.   I'll agree with you.

12  Q.   And then if we look at the infringement history after this

13  friendly e-mail from the customer, we see that just a few days

14  later, on June 14, 2013, this customer receives another

15  copyright infringement ticket, correct?

16  A.   Correct.

17  Q.   And Cox sent a warning?

18  A.   Correct.

19  Q.   A couple days later, on June 18, the customer received yet

09:57:35 20  another copyright infringement allegation, correct?

21  A.   Correct.

22  Q.   Cox sent another warning, correct?

23  A.   Correct.

24  Q.   And then a couple months later, same thing happens again,

25  correct?

R.L. Vredenburg - Redirect

1181

1    A.    Correct.

2    Q.    So this is a customer that, more or less, told Cox to

3    stick it; is that fair to say?

4    A.    That's fair.

5    Q.    And this customer continued to infringe?

6    A.    Apparently he did, yes.

7    Q.    Sir, I've handed you another customer e-mail dated -- I'm

8    sorry, with the Exhibit DX 1602.  Do you see that, sir?

9    A.    Yes.

09:58:53 10   Q.    And this is another -- a similar kind that we've been

11   looking at, correct?

12   A.    Correct.

13              MR. GOULD:  I'd move to admit DX 1602.

14              THE COURT:  Any objection?

15              MR. BUCHANAN:  No, Your Honor.

16              THE COURT:  It's received.

17   BY MR. GOULD: (Continuing)

18   Q.    And if we could pull up the customer's response.

19              On March 14, 2014, the customer says to Cox in

09:59:11 20   response to a notice:  We will make sure this is taken off and

21   not used again.  Thank you.

22              Correct?

23   A.    Correct.

24   Q.    And Cox would have had access to this customer's

25   infringement ticket history, both before and after this date?

1182

1    A.    Correct.

2    Q.    Now, let's take a look at this customer's ticket history.

3          MR. BUCHANAN:  What was the exhibit number?

4          MR. GOULD:  552.

5    A.    Thank you.

6    BY MR. GOULD:  (Continuing)

7    Q.    And this will be Exhibit 552, Plaintiff's Exhibit 552,

8    PX 552.  A similar extract from Cox's larger ticket history

9    data produced in this case.

10:00:01 10          Do you see that, sir?

11   A.    Yes.

12         MR. GOULD:  I would move to admit PX 552.

13         THE COURT:  Any objection?

14         MR. BUCHANAN:  No objection, Your Honor.

15         THE COURT:  Received.

16         MR. GOULD:  If we could pull that up on the screen,

17   please.

18   BY MR. GOULD:  (Continuing)

19   Q.    And in this ticket history for the customer who assured

10:00:34 20   Cox that the infringing content would be taken off and not used

21   again, we see that this customer has six tickets in their

22   history, correct?

23   A.    Yes.

24   Q.    And those are six separate instances of copyright

25   infringement notices that Cox received for this customer,

R.L. Vredenburg - Redirect

1183

1    correct?

2    A.   Yes.

3    Q.   And the e-mail in which the customer promised not to do it

4    again was dated March 17, 2014.

5              Mr. Duval, if we could yellow highlight.

6              So after this customer with ICOMS 436138689605

7    promises not to infringe again, do you see that two days later

8    Cox receives another copyright infringement notice from the

9    same customer?

10:01:21 10  A.   Yes.

11   Q.   And Cox sent another warning, correct?

12   A.   Correct.

13   Q.   And then in December of that year, Cox -- there is a

14   ticket entry here -- I am sorry, just one up, Scott.

15             Do you see on this one here Cox received another

16   warning on December 2, 2014, but this time there isn't even a

17   warning listed?

18   A.   Yes, apparently there wasn't a warning.

19   Q.   So no warning.  So this ticket came in, didn't even tell

10:02:03 20  the customer about this one, right?

21   A.   Without seeing the actual ticket, I would have no idea

22   what happened to it.

23   Q.   But certainly the data provided by Cox demonstrates that

24   there is no warning to the customer, correct?

25   A.   Yes, for some reason there wasn't a warning sent, yes.

R.L. Vredenburg - Redirect

1184

1    Q.    And then on December 8, a couple days later, Cox receives

2    another copyright infringement notice about this customer,

3    correct?

4    A.    Right.

5    Q.    And Cox sends yet another warning, right?

6    A.    Correct.

7    Q.    And I think we -- I think you were asked about this.  The

8    warnings are the same, each one is the same, right?

9    A.    Yeah, the warning is all the same except for the content

10:02:39 10  of what was infringed upon.

11   Q.    So they may have infringed more or different or other

12   works, but the language that Cox uses to explain what's going

13   on to the customer is the same?

14   A.    Correct.

15   Q.    And then we look -- did I do December 11?

16        So December 11 there is yet another copyright

17   infringement ticket for this customer who nine months

18   previously promised, I will never do this again, correct?

19   A.    Correct.

10:03:03 20  Q.    And then you see that the ticket history for this customer

21   ends in December 2014?

22   A.    Correct.

23   Q.    Do you have any idea, Mr. Vredenburg, how many times this

24   customer infringed after December 2014?

25   A.    No, I do not.

R.L. Vredenburg - Recross

1185

1  Q.   Could have been once?

2  A.   It could have been.

3  Q.   And it could have been 100 times; is that right?

4  A.   Yes.

5        THE COURT:  Mr. Vredenburg, when it says, changed

6  status to closed, tell us again, what does that mean?

7        THE WITNESS:  That means that the action on the

8  ticket has -- a warning has been mailed.  And so they are just

9  closing out the ticket.

10:03:48 10       THE COURT:  Thank you.

11       MR. GOULD:  Thank you, Mr. Vredenburg.  I have no

12  further questions at this time.

13       RECROSS-EXAMINATION

14  BY MR. BUCHANAN:

15  Q.   Could you pull up that last exhibit, 552.  And could

16  you --

17       THE COURT:  Ladies and gentlemen, this is another one

18  of the witnesses who is a former employee of Cox, but is

19  testifying at one time instead of coming back in Cox's case in

10:04:19 20  chief, so that we don't inconvenience him unreasonably.

21       Thank you.

22  BY MR. BUCHANAN:  (Continuing)

23  Q.   So, Mr. Vredenburg, do you see what is highlighted by the

24  plaintiffs?

25  A.   Yes.

R.L. Vredenburg - Recross

1186

1    Q.    Okay.

2              MR. GOULD:   You mean by the defendants' team?

3              MR. BUCHANAN:   You highlighted it.

4    BY MR. BUCHANAN: (Continuing)

5    Q.    So, anyway, what is highlighted there, you have a "sent

6    warning" on March 19, 2014, right?

7    A.    Correct.

8    Q.    Okay.  And then there is the warning in question where the

9    individual said, I will do my best to stop on March 17, 2014,

10:05:15 10    right?

11   A.    Yes.

12   Q.    Okay.  So that could -- that warning could be for the same

13   particular copyrighted work, right?

14   A.    Yes, sure.

15   Q.    Because the person that is sending the notice,

16   MarkMonitor, they could be taking some time to detect it and

17   sending it, so there would be a delay, so it could be for the

18   same thing?

19   A.    Yes, sir.

10:05:40 20   Q.    In fact, the later ones on 12/8 and 12/11, if the

21   individual didn't actually delete the file, you know, he just

22   forgot, or he thought he did it and didn't do it right, that

23   would generate another warning, wouldn't it?

24   A.    Correct.

25   Q.    Okay.  So for all these items that the plaintiffs

R.L. Vredenburg - Recross

1187

1     highlighted for you over different times, there is no

2     indication that that isn't for the same piece of work, correct?

3     A.   On this here, no.

4     Q.   Okay.  And on the others you showed, there was various

5     tickets, but the warnings that were sent out, they could be for

6     one or two different pieces of work even if there is eight

7     notices, they could be for the same or they could be for two

8     different copyrighted works, right?

9     A.   Correct.

10:06:31 10         MR. BUCHANAN:  Okay.  I've no further questions.

11         THE COURT:  All right.  May Mr. Vredenburg be

12     excused?

13         All right.  You are excused with our thanks, sir.  I

14     hope you have a safe trip back and that the weather isn't too

15     bad for you.

16         Please don't discuss the testimony you have given

17     here until our trial is over.  All right?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  All right.  Have a good day.

10:06:59 20         THE WITNESS:  Thank you.

21         NOTE:  The witness stood down.

22         THE COURT:  All right.  Next witness.

23         MR. OPPENHEIM:  Plaintiffs call Matt Flott.

24         NOTE:  The witness is sworn.

25         THE COURT:  Good morning, sir.

1188

1           THE WITNESS:  Good morning.

2           THE COURT:  Please proceed.

3           MATTHEW J. FLOTT, called by counsel for the

4    plaintiffs, first being duly sworn, testifies and states:

5           DIRECT EXAMINATION

6    BY MS. NOYOLA:

7    Q.   Good morning, sir.  Please state your full name for the

8    jury.

9    A.   Matthew James Flott.

10:08:19 10   Q.   Mr. Flott, where do you work?

11   A.   I work at Warner Music Group.

12   Q.   What is your position at Warner Music Group?

13   A.   I am the executive vice-president and chief financial

14   officer for the Recorded Music Division.

15   Q.   Is the Recorded Music Division, that houses the record

16   labels of Warner Music?

17   A.   Yes.

18   Q.   What are your general responsibilities as executive

19   vice-president and chief financial officer?

10:08:44 20   A.   I have the responsibility for managing the overall

21   financial performance for the Recorded Music Division.  That

22   includes reporting our actual results, forecasting our

23   performance, budgeting.  It also includes responsibility over

24   our deal process.  It includes as well comparisons to market

25   trends, our competitors, and generally supporting the Warner

M.J. Flott - Direct

1189

1  Music senior team in reporting to the Board of Directors and

2  our external reporting.

3  Q.   How long have you held this role at Warner Music?

4  A.   A little over four, four total years.

5  Q.   What is your educational background?

6  A.   I have a bachelor of science in accounting.

7  Q.   And how long have you worked in the music industry?

8  A.   A little over 25 years.

9  Q.   How much of that time has been at Warner Music?

10:09:53  10  A.   16.

11  Q.   What other roles have you had at Warner Music?

12  A.   I first started in 1983 as a staff accountant.  When I

13  returned in 2016, I was the CFO for the independent label

14  group.

15       I then moved to be the CFO for our Warner Music Group

16  distribution.  I then moved to be the international CFO for

17  Recorded Music.  Came in for the first time to the CFO for --

18  over all recorded music.  And then I became the chief financial

19  officer for global financial analysis and operations.

10:10:37  20  Q.   And then where did you work before you joined Warner

21  Music?

22  A.   I joined -- I worked -- just prior to coming back, I

23  worked for Take-Two Interactive in the video game business for

24  three years.  I was at BMG Entertainment for four years.  I was

25  at Caroline Records for six years.  I spent five years at Sony

M.J. Flott - Direct

1190

1    Video on the movie side of the business.  And I did an odd year

2    at Exxon as an analyst on the oil and gas side of the business.

3    Q.   All right.  Let's turn back to Warner Music Group.  Can

4    you tell us a little bit about your company and how it fits in

5    the music industry.

6    A.   Sure.  Warner Music, within the music business, is

7    considered one of the three global majors.  And, you know, we

8    operate like everyone else, trying to find the most talented

9    artists and partnering with them to build their brands and, you

10:11:54 10  know, develop their careers around the globe.

11   Q.   I think you said majors.  What do you mean by majors?

12   A.   Majors are generally, if you look at the size of one's

13   market share, so Universal, Sony, and ourselves, the three of

14   us have market share that would be considered, you know, larger

15   than the other smaller, independent companies.

16   Q.   What are some of the record labels in Warner Music Group?

17   A.   The three primary labels that we were built off of were

18   Atlantic Records, Warner Brothers Records, now Warner Records,

19   and Elektra Records.

10:12:39 20       We also have a variety of other labels that come

21   underneath each of those labels from Nonesuch, to Roadrunner,

22   to Fueled By Ramen, just to name a few.  But there are hundreds

23   of labels that we have around the world.

24   Q.   Are any of the plaintiffs in this case Warner Music Group

25   record labels?

M.J. Flott - Direct

1191

1    A.   Yes.

2    Q.   Did you assist in the preparation of a demonstrative for

3    your testimony today?

4    A.   I did.

5    Q.   I would like to pass up to the witness a copy of that

6    demonstrative.

7         THE COURT:  Any objection to publishing that?

8         MR. BUCHANAN:  No objection.

9         THE COURT:  All right.  Thank you.

10:13:30  10  BY MS. NOYOLA: (Continuing)

11   Q.   Mr. Flott, what does this slide show?

12   A.   This slide shows six of our labels that are in the suit.

13   Q.   May I refer to all six of these entities as the Warner

14   Music plaintiffs?

15   A.   Yes.

16   Q.   All right.  You can take that down, Mr. Duval.

17        Mr. Flott, are you familiar with the Warner Music

18   plaintiff sound recordings at issue in this case?

19   A.   I am.

10:14:03  20  Q.   I would like to publish PX 1, which has already been

21   received into evidence.

22        MR. BUCHANAN:  No objection.

23        MS. NOYOLA:  I also have a copy for the witness.

24   BY MS. NOYOLA: (Continuing)

25   Q.   Mr. Flott, I would like to direct your attention to

M.J. Flott - Direct

1192

1  page 112, starting at lines 5446 to the very last page.

2          What do these entries show?

3  A.   These show the sound recordings that are included as being

4  infringed in this case of the Warner -- our Warner copyrights.

5  Q.   And about how many sound recordings of the Warner Music

6  plaintiffs are listed in this exhibit and at issue in this

7  case?

8  A.   Approximately 1,300.

9  Q.   All right.  You can put that to the side.

10:15:14 10          Did you assist in the preparation of a demonstrative

11  medley of some of the works in this case?

12  A.   Yes.

13          MS. NOYOLA:  Your Honor, with your permission, I'd

14  like to play that medley.

15          NOTE:  The audio recording is played.

16  BY MS. NOYOLA: (Continuing)

17  Q.   Mr. Flott, I noticed you nodding your head to music there.

18  Are you familiar with the sound recordings that we just played?

19  A.   Yeah, I am.

10:17:35 20  Q.   And how are you familiar with them?

21  A.   Many of them from when I was growing up.  You know, one in

22  particular, "Cashmere," was one of the first concerts I ever

23  went to out at the Capital Center.  You know, being the

24  youngest of 13 kids, that was, you know, one of the first ones

25  that I could really go to see.

M.J. Flott - Direct

1193

So brings back a lot of good memories.

Q.   And how -- what do these sound recordings represent to Warner Music Group?

A.   They're some of the most iconic songs in our catalog and, you know, we want to make sure they're protected.

Q.   Have you listened to any of the infringing music files in this case?

A.   I have.

Q.   How many?

10:18:19 A.   I listened to 100.

Q.   And how were those 100 selected?

A.   It was a random statistical sample.

Q.   And why did you listen to a sample of the infringing music files in this case?

A.   I wanted to make sure that I familiarized myself with what was being infringed and whether they were in fact our songs.

Q.   And what did you conclude after listening to those files?

A.   That they are in fact our songs listed within the exhibit.

Q.   All right.  Let's turn to the revenues generated from

10:18:55 Warner Music's -- Warner Music Group's sound recordings.

What are the different ways that Warner Music makes money from its sound recordings?

A.   We will sell our music in various formats to customers. And we will also license music into sound tracks, into commercials, films.

M.J. Flott - Direct

1194

1        We will license them to competitors in some cases to
2   put together compilations and other works.
3        It will also lead to what we call artist services and
4   expanded rights.  So those are other ancillary rights that we
5   might have in concert promotion, in merchandise, and some other
6   areas like that.
7   Q.   You mentioned formats.  What are the different types of
8   formats that Warner Music Group sells with sound recordings?
9   A.   Sure.  We sell records in a physical format, so that would
10:20:01 10  be either a compact disc or a vinyl record.  They may also come
11  in a box set.  We sell it in digital formats, downloads, and
12  streaming.  We also sell it in mobile formats, ring back tones.
13       Those are the primary formats that we sell music in.
14  Q.   What is Warner Music Group's view on paying its artists?
15  A.   We see it as fundamental to our business.  Our initial
16  relationship is with the artist.  We have to build the trust
17  that they know that we're going to help them develop their
18  careers and that they know that they will be -- they will be
19  paid for the sales that we do on their behalf and our behalf.
10:20:56 20  Q.   How would you react if someone said that the Warner Music
21  Group record labels are not collection agents for their
22  artists, but that they actually just collect money for
23  themselves?
24  A.   I would say they're misinformed and patently wrong.
25  Fundamental to how and why we've been in business for the

M.J. Flott - Direct

1195

1   decades that we've been in business and, you know, our

2   competitors in some cases longer than that, if we didn't have

3   the trust of our artists that they were going to get paid, then

4   we wouldn't be able to continue to sign and develop and attract

5   artists year in and year out.

6   Q.   In your role as executive vice-president and chief

7   financial officer, are you familiar with peer-to-peer piracy?

8   A.   I am.

9   Q.   Has Warner Music Group been impacted by peer-to-peer

10:22:01 10   piracy?

11   A.   We have.

12   Q.   What has been that impact?

13   A.   It has been -- it's been enormous and significant.  In a

14   period of time when music consumption has risen year in and

15   year out, as an industry we've seen revenues decline over that

16   period, over a period of time from its peak to where we are

17   today.

18   Q.   What were the consequences of this revenue decline to the

19   music industry as a whole?

10:22:46 20   A.   Well, first and foremost, you know, artists were not

21   getting paid.  Copyright holders weren't getting paid, as well

22   as union members, as well the musicians working on those

23   records.

24           We, as Warner Music Group, had to rationalize our

25   infrastructure or the labels that we had, and we've had to go

M.J. Flott - Direct

1196

1    through at different points in time and either close labels

2    down, merge them together.

3         Probably the clearest example I could give you would

4    be two of our kind of founding labels of Atlantic and Elektra

5    being merged together to rationalize their costs simply because

6    of the revenue decline.

7         You know, Elektra is the home of artists like "The

8    Doors" and "The Eagles" and "Anita Baker" and others like that.

9    So we also had to lay off people just in terms of looking at

10:23:57 10   what our revenue base could afford and what we wanted to return

11   to our owners.

12   Q.   I'd like to hand up the witness a copy of an exhibit

13   that's been premarked as PX 486.  Thank you.

14        Mr. Flott, have you seen this document before?

15   A.   I have.

16   Q.   And at a high level, what is this document?

17   A.   It reflects the revenues of the U.S. recorded music

18   business over a period of time.

19   Q.   Where does this document come from?

10:24:39 20   A.   It comes from the RIAA, which is our U.S. industry

21   association.

22   Q.   And how is it that you come across this type of document?

23   A.   It is regularly published, and it's a document that I look

24   at on a regular basis.

25        With the RIAA, we do a regularly quarterly call where

M.J. Flott - Direct

1197

1     we go through performance.  It's also on their Web site as

2     well.

3             MS. NOYOLA:  I'd like to move PX 486 into evidence.

4             THE COURT:  Any objection?

5             MR. BUCHANAN:  No, Your Honor.

6             THE COURT:  It's received.

7     BY MS. NOYOLA: (Continuing)

8     Q.   Mr. Flott, can you describe what this chart shows.

9     A.   This chart is reflecting the U.S. recorded music revenues.

10:25:28 10   If I look at the left most column, that's marked as the year

11    2000 where industry revenues were in excess of $14 billion.

12            It continues to the right to 2014 where the revenues

13    are just under $7 billion.

14    Q.   And is this chart specific to Warner Music Group?

15    A.   No, it's the U.S. recorded music revenues.

16    Q.   Tell us what these different colors on this chart show.

17    A.   Each color represents a different format.  So the largest

18    color that you see on the left side of the page being orange,

19    that's the compact disc.

10:26:15 20         And as you move to the right, you'll see other

21    formats as they came into play.  So in 2004, you start to see

22    purple.  That is the -- that's a download, and the different

23    shades are the different forms of whether it was a single or an

24    album.

25            And then we start to see in 2005 green start to come

—

M.J. Flott - Direct

1198

1    in.  And that is streaming and the different types of streaming

2    revenues that come through.

3    Q.   Are you familiar with the term "music consumption"?

4    A.   Yes, I am.

5    Q.   What does that term mean?

6    A.   Music consumption means the number of hours that a

7    consumer is -- generally commits to listening to music.

8    Q.   And in your day-to-day work, have you become familiar with

9    the volume of music consumption over this time frame of 2000 to

10:27:19 10   2014?

11   A.   Yes.

12   Q.   And how so?

13   A.   In additional reports that either I've seen come from the

14   RIAA or other published articles, there's reference made to the

15   number of hours that a consumer, you know, has committed and

16   how it's grown from 2000 through to today.

17   Q.   What is your understanding of the volume of music

18   consumption from 2000 to 2014?

19   A.   It has continued to increase year over year, and I think

10:27:58 20   towards the end of this chart, I believe consumers are

21   committing almost a week a year -- a week a -- sorry.  A day a

22   week to consuming music.

23   Q.   So how does that trend of music consumption compare to the

24   trend that's shown here about -- on recorded music revenues?

25   A.   Well, in a normal business model, you would expect -- as

M.J. Flott - Direct

1199

1    consumption grows, you would expect revenues to grow in line

2    with it.  There may be some shifts as things go, but generally

3    the trend that we've seen with other formats as they've come in

4    is that you've seen revenue growth, not revenue decline.

5    Q.   So how do you explain the revenue decrease over this time

6    period if music consumption is increasing over the same time

7    period?

8    A.   At this same point in time where we made the turn of the

9    century is really when peer-to-peer piracy was starting to grow

10   at just increasing rates.  And peer-to-peer piracy, by its

11   nature, is not a sale.  It's actually -- it's stealing music.

12   None of those tracks that are being shared peer-to-peer are

13   being paid for.

14            And as a byproduct, artists, copyright holders,

15   union, and the rest of the people within the music industry

16   aren't being paid for those illegal transactions.

17   Q.   And has Warner Music Group ever tried to calculate its

18   harm from peer-to-peer piracy?

19   A.   We've not, other than on a macro -- you know, a macro

20   basis.

21   Q.   And why haven't you calculated -- why haven't you been

22   able to calculate Warner Music Group's harm?

23   A.   The nature of peer-to-peer piracy is it's viral, and

24   probably maybe the best way I can try and explain how viral it

25   works is if we use an example of a pebble going into a pond and

M.J. Flott - Direct

1200

1    it's starting to create ripples.  It's not about the first

2    transaction or the first infringement that takes place.  Once

3    that track gets put up on a site that can be shared, it's then

4    shared amongst, you know, whoever wants to take it and whoever

5    then they share it with and they share it with.

6              So if you kind of think about that initial pebble

7    coming in, and then the next person taking it and their pebble

8    dropping in, it creates just these multiple waves.  So the

9    viral nature of it, just trying to understand where that wave

10   stops is -- has not been -- it's not something that we've been

11   able to do.

12   Q.   When users illegally download and distribute works on

13   these peer-to-peer networks, how do record companies get paid?

14   A.   We don't because they're stolen and they don't -- they're

15   not paying anyone.

16   Q.   And how did --

17   A.   Including our artists, including our copyright holders,

18   including, you know, all of the other people within the chains,

19   the union musicians, the marketing people, and, you know, the

20   artists themselves.  You know, ultimately no one is getting

21   paid from those transactions.

22              MS. NOYOLA:  Thank you, Mr. Flott.

23              Pass the witness.

24              THE COURT:  Cross-examination.

25              MR. BUCHANAN:  Yes, Your Honor.

M.J. Flott - Cross

1201

1    CROSS-EXAMINATION

2    BY MR. BUCHANAN:

3    Q.    So the -- good morning, Mr. Flott.

4    A.    Good morning.

5    Q.    My name is Tom Buchanan.  I have a few questions for you.

6    A.    Okay.

7    Q.    This -- the source of this information is your lobbying

8    group, RIAA; is that right?

9    A.    It's our industry association, yes.

10:32:17 10   Q.    And I think you said you're the executive vice-president

11   and CFO of Warner Music Group?

12   A.    Of the Recorded Music Division.

13   Q.    Okay.  Did you prepare a chart like this like on a

14   quarterly or annual basis for your Board?

15   A.    No, we would've leveraged this schedule since it's put

16   together for the overall industry.

17   Q.    So the answer is, you did not present a chart like this to

18   your Board during this period of time?

19   A.    I don't know during this period of time.

10:32:51 20   Q.    Okay.  When I say, this period of time, I'm talking about

21   2000 to 2014, those 14 or 15 years.  Was this something that

22   you as the CFO of the company would typically would prepare and

23   present to the Board of Directors so they would know what was

24   going on in the market?

25   A.    During this period of time from 2000 to 2006, I was not

M.J. Flott - Cross

1202

1    with the company.  And in 2014 is when I initially took the CFO

2    for Recorded Music job.

3    Q.    Okay.

4    A.    So it may have -- it may have been presented prior, but I

5    -- during this period of time, I would not -- I did not present

6    it.

7    Q.    Okay.  When did you start with the company?

8    A.    Initially or?

9    Q.    Initially.

10:33:36 10   A.    1983.

11   Q.    Okay.  And so, what period of time were you there from

12   2000 to 2014?

13   A.    2006 through 2014.

14   Q.    Okay.  So do you recall this type of data being presented

15   to the Board of Directors while you were there?

16   A.    I don't know.

17   Q.    You don't know?  Did you ever do it?

18   A.    I did not do it on --

19   Q.    Okay.

10:33:58 20   A.    -- you know, for the Board.  They may have gotten it from

21   the existing management team at the time.

22   Q.    Okay.  So have you ever -- you prepared for this trial to

23   come in and testify, correct?

24   A.    Yes.

25   Q.    So this says RIAA.  I am asking you now, did you go back

M.J. Flott - Cross

1203

1  and try to determine from all the financial records that you

2  have access to by computer to determine whether this sort of

3  data was gathered considering its importance and present it to

4  the Board of Directors at any time?

5  A.   I did not, no.

6  Q.   Okay.  So this is -- this covers the globe, right, this

7  data?

8  A.   No.

9  Q.   Okay.  So these are U.S. sales, right, of your company?

10:34:45 10  A.   No.  This is U.S. sales of the recorded music.

11  Q.   Okay.  So what I'm getting at in terms of the impact of

12  piracy only, that would be global, right?

13  A.   That's correct.

14  Q.   Okay.  So that would be China, India, the Far East, South

15  America, the entire world?

16  A.   That's correct.

17  Q.   Okay.  Do you know what the impact of piracy by people

18  outside of the United States, how that impacted this?

19  A.   Well, the United States is the largest market and has been

10:35:15 20  the largest market in the world for as long as I can recall.

21  And --

22  Q.   So do you -- but there are, obviously, a lot of other

23  people out there with computers that could access music through

24  BitTorrent, correct?

25  A.   Sure.

M.J. Flott - Cross

1204

1    Q.    There are billions out there, right?

2    A.    Sure.

3    Q.    Okay.  I am wondering, does this in any way distinguish

4    between the impact of piracy on the sales of CDs or whatever

5    else and the peer-to-peer piracy?  Does this chart capture the

6    impact of those people outside the United States versus those

7    in?

8    A.    This chart wouldn't because it only reflects legitimate

9    sales.

10:35:57 10  Q.    Okay.  But the piracy, you're trying to capture the impact

11   of piracy on revenues, right?

12   A.    That's correct.

13   Q.    Okay.  So if people outside the United States are

14   downloading music illegally, that doesn't distinguish between

15   the people who did it in the United States?  This is just a

16   chart that shows the numbers going down.

17           So do you know who, in fact, is doing this, you know,

18   outside the United States?  Do you have any idea of the impact

19   on peer-to-peer networks of illegal downloading outside the

10:36:28 20  United States during this time period?

21           MS. NOYOLA:  Objection, Your Honor.

22           THE COURT:  This document doesn't capture any piracy

23   numbers.  So your question is confusing.  Reframe it, please.

24           MR. BUCHANAN:  Okay.  All right.

25   BY MR. BUCHANAN:  (Continuing)

M.J. Flott - Cross

1205

1    Q.   So this document just shows revenues for these different

2    types of products sold by your company and other record label

3    companies in the United States, correct?

4    A.   That's correct.

5    Q.   Okay.  And the point you're making here, is it not, by

6    this chart is try to show the impact of piracy on sales?

7    A.   All this chart does is reflects the trend, what has

8    happened to our revenues from 2000 to 2014 by the formats that

9    we operated.

10:37:08   10   Q.   Okay.  So you don't know what is driving this revenue

11   down?  Say the great recession, 2007, 2008, 2009, you don't

12   have any idea how that impacted these particular sales that are

13   reflected on this chart?

14   A.   Well, we do know that while -- well, we do know that if

15   you look at music consumption and in a normal business model,

16   you would not expect revenue decline in a period when you have

17   consumption increasing.

18   Q.   Okay.  So increased consumption could be someone goes on

19   iTunes, buys a song, listens to it all week long.  How does

10:37:47   20   that affect the revenues on here, that increased consumption?

21   A.   If someone goes to iTunes and buys a song, it's treated as

22   one sale.

23   Q.   Right.

24   A.   Regardless of how many times they listen to it, it's still

25   in this chart and would only be reflected as one song.

M.J. Flott - Cross

1206

1  Q.   Okay.  And isn't that a very common way for people to

2  listen to music today or in the last five years, is on their

3  phones and with head pieces?

4  A.   It is, but that consumption has changed from a download to

5  more of a streaming market as evidenced by the way the bars are

6  going.

7  Q.   Right.  And streaming is going up dramatically, it has

8  been going up dramatically for years, correct?

9  A.   That's correct.

10:38:31 10  Q.   And that is reflected on this chart?

11  A.   That's right.

12  Q.   And you're capturing revenue from streaming?

13  A.   We are.

14  Q.   Right.  And that's a natural consequence, right?  That

15  people that are switching from, say CDs, which are bulky and

16  cost a lot of money, to switch to streaming; isn't that true?

17  A.   That's one, that's one factor.  But while you -- while you

18  look at that, at the same time you would not expect in a market

19  where consumption is increasing, for your revenue to decrease.

10:39:00 20      We want to make sure that consumers have the ability

21  to enjoy their music in whichever medium and whichever format

22  they have.  If you go back to when other formats have been

23  introduced over time, when the CD came in, when other formats

24  have come in, we have not seen a decline in revenue the way

25  that we're seeing here.

M.J. Flott - Cross

1207

1         And if you look at the increase in peer-to-peer

2    activity and what it has done on consumption, you're not seeing

3    revenue correlate with the increased demand for music overall.

4    Q.   So in terms of the decrease of CD sales in this chart,

5    isn't it true that there was an industry where people were

6    actually manufacturing CDs and basically stealing them?

7    A.   That was a type of piracy similar to people buying

8    cassettes back in the '70s and '80s and creating their own mix

9    tapes.

10:40:14 10   Q.   So is that reflected in this chart, the impact of piracy

11   on sales versus people's downloading music illegally versus

12   manufacturing illegally CDs?

13   A.   Again, any illegitimate sale, any, you know, element of

14   piracy, whether it's physical piracy, whether it is download

15   piracy, whether it is -- now what we're dealing with is stream

16   ripping, none of those are sales.  So we would not have

17   collected any revenue, paid our artists, and they wouldn't be

18   reflected within the revenue of this chart.

19   Q.   So the illegal downloading that you've referenced, that

10:40:55 20   takes place by subscribers do that who are on ISPs who have

21   access to Internet service, correct?

22   A.   Yes.

23   Q.   Okay.  And I believe in your deposition you said there are

24   sort of three approaches that you take to try to stop this --

25        MS. NOYOLA:  Objection, Your Honor.

M.J. Flott - Cross

1208

1   Q.   Peer-to-peer, is one --

2           THE COURT:   I'm sorry, there is an objection.   Just

3   ask him straight out.

4           MR. BUCHANAN:   Okay.

5   BY MR. BUCHANAN:  (Continuing)

6   Q.   Isn't it true that there are sort of three approaches that

7   you take at your company to try to stop this illegal

8   downloading, education, legislation, litigation, right?

9   A.   That's correct.

10:41:33 10   Q.   Okay.  And your company for years sued individual

11   subscribers, did it not?

12           MS. NOYOLA:   Objection, Your Honor, outside the scope

13   of direct.

14           THE COURT:   Overruled.  I will allow it.

15   BY MR. BUCHANAN:  (Continuing)

16   Q.   Isn't that true?

17   A.   Yes.

18   Q.   Okay.  And how many years did you pursue that strategy of

19   suing individual subscribers?

10:41:54 20   A.   I don't recall the specific, but for a number of years.

21   Q.   Maybe ten?  Do you know?

22   A.   I don't know.

23   Q.   Okay.  And it didn't matter who the individual subscriber

24   was, whether it was a grandmother, a kid, a student, you would

25   sue them for illegal downloading, right?

M.J. Flott - Cross

1209

                  MS. NOYOLA:  Objection, Your Honor.  The witness has

1   testified he doesn't know.

                  THE COURT:  Yeah.  Sustained.

BY MR. BUCHANAN: (Continuing)

Q.   So do you know when you stopped that strategy of suing

individual subscribers?

A.   I don't recall the specific year, no.

Q.   Okay.  Do you know why you stopped it?

A.   Our preference has always been not to act to litigate.

Our preference would be to deal with education and with

legislation, and to, you know, work with those networks, the

ISPs, to make sure that their customers are educated and

understand that there are consequences to performing illegal

activity.

Q.   So if your preference was education, why did you have a

campaign for at least five years of suing individual

subscribers?

                  MS. NOYOLA:  Objection, Your Honor, again --

                  THE COURT:  Sustained.  Facts not in evidence.  He

just said he didn't know how long.  So revise your question,

please.

BY MR. BUCHANAN: (Continuing)

Q.   So forget the years part.  You testified that you had a

campaign where you sued individual subscribers for a number of

years, you don't know how many.

M.J. Flott - Cross

1210

1      And so I am saying, at what point in time did you

2  decide -- did the company decide the preference wasn't to sue

3  individual subscribers but to educate?

4  A.   Well, all three of those go hand in hand.  You know,

5  education, legislation, and litigation.  Our preference was not

6  to go through and to litigate.  But, you know, at that

7  particular point in time there was a question as to the

8  legality of the point.  So we had to protect our artists'

9  rights, and we needed to make sure that individuals understood

10 that if they were -- if they were stealing, that they needed to

11 understand that there were consequences.

12      You wouldn't, you wouldn't walk into -- I don't think

13 anyone would think that if you walked into a car dealership and

14 they gave you the keys, that you could just drive off.  And

15 intellectual property is not any different than that.

16 Q.   So my question is, as you said, you had legislation,

17 education, and litigation.  So we talked about the litigation

18 against individual subscribers.

19      What were you doing education-wise while the campaign

20 to sue individual subscribers was going on?

21 A.   The RIAA had a number of different programs.  We have

22 information that was put within our CDs, information on our

23 website.

24      So I know that I, myself, you know, would talk to my

25 kids' friends who would come over and try and get them to

M.J. Flott - Cross

1211

1   understand that it's stealing.  And, you know, it was not the

2   most comfortable conversations in my house with their friends,

3   and some of them wouldn't come back.

4   Q.   So isn't the reason -- isn't the reason that your company

5   stopped suing individual subscribers, file sharers, is because

6   of the bad publicity?

7   A.   No.

8   Q.   You don't believe that's the case at all?

9   A.   I believe that our strong preference is not to litigate

10:45:38 10   and -- but we also needed to make sure that individuals

11   understood the consequences of doing things illegally.  And

12   we've tried to move forward from there and, you know, continue

13   with education and legislation.

14   Q.   So part of that education process was when your company

15   and the other record labels entered into the Copyright Alert

16   System with five of the major --

17            MS. NOYOLA:  Objection, Your Honor, outside the

18   scope.  And counsel is testifying as to facts not in evidence.

19            MR. BUCHANAN:  It's cross.

10:46:17 20            THE COURT:  I am going to allow it.  It is beyond the

21   scope of direct examination.  I will allow you to redirect if

22   you think it's appropriate.

23            If he is aware of it.

24            MR. BUCHANAN:  Right.

25   BY MR. BUCHANAN:  (Continuing)

M.J. Flott - Cross

1212

1    Q.    So you talked about education being important?

2    A.    Yes.

3    Q.    And the Copyright Alert System was based not on litigation

4    but on education, right?

5    A.    Yes.

6    Q.    Okay.  And your company and other record label companies

7    spent years studying the ability for the CAS program to work,

8    right, before they entered into these memorandum of

9    understandings?

10:46:57  10    A.    I believe so.

11    Q.    Okay.  And so, did you look at any of the due diligence

12    that was done by the record label companies before they entered

13    into CAS, the data that went into it, to indicate that this

14    education system by using notices versus termination or

15    litigation would work?

16    A.    I didn't, but it's not in my area of responsibility.

17    That's, you know, for our business and legal affairs team.

18    Q.    Right.  But the decision to enter into CAS was very

19    important to your shareholders and to your artists, right?

10:47:34  20    A.    Yes.

21    Q.    Because you were making a decision as a company, along

22    with the other record label companies, to stick with alerts and

23    notices and not termination or litigation, right?

24              MS. NOYOLA:  Objection, Your Honor, foundation.

25              THE COURT:  Yeah, there's no foundation.  Sustained.

M.J. Flott - Cross

1213

1   BY MR. BUCHANAN: (Continuing)

2   Q.   Okay.  Do you understand CAS, that it didn't require

3   termination, right?

4   A.   I have a general understanding of it.  Our legal

5   department is really the area where that is handled.

6   Q.   Okay.  So you understand with an education program, it

7   didn't require termination of a subscriber, right?

8           MS. NOYOLA:  Objection, vague, Your Honor.

9   A.   I don't know that.

10:48:12 10          THE COURT:  Okay.  He answered.  He said, I don't

11  know.

12  BY MR. BUCHANAN: (Continuing)

13  Q.   All right.  So again, you agree, though, that this was a

14  major step because you're basically foregoing litigation and

15  you're going toward education with the ISPs, right?

16  A.   I don't think we were foregoing litigation.  Our

17  preference was to go education.

18  Q.   Okay.

19  A.   But, again, it's not my area of responsibility.

20  Q.   Right.

21  A.   It's the responsibility of our general counsel and our

22  business and legal affairs department.

23  Q.   So are you aware that under CAS, they would -- the ISPs

24  would collect all the data that came in from the -- as to the

25  subscribers, all the notices per subscriber per day, and they

M.J. Flott - Cross

1214

1     would collect that data and they would send it back to your

2     company?

3              MS. NOYOLA:  Objection, Your Honor, same issue,

4     foundation.

5              THE COURT:  Yeah, let's --

6              MS. NOYOLA:  He has already asked and answered that

7     he doesn't have any familiarity --

8              THE COURT:  Stop, stop.  Do you understand the

9     question?  The specifics of the -- he's indicated he doesn't

10:49:26 10    have any personal familiarity, it's not his area of the

11    company.  And you're hitting with a pretty broad question.

12             MR. BUCHANAN:  Okay.

13             THE COURT:  So ask him whether he's familiar with

14    what CAS was doing with any data.

15    BY MR. BUCHANAN: (Continuing)

16    Q.   So I'm asking you, as the CFO of Warner Music Group, did

17    you get any data pursuant to CAS, either you or anyone in the

18    company, pursuant to CAS that showed the effectiveness of this

19    education program that was so important to your artists?

10:50:05 20    A.   So just to correct, the CFO for Recorded Music, not Warner

21    Music.

22    Q.   Okay.

23    A.   It is possible it went into our legal department.  I don't

24    have knowledge of whether we received it or what was done with

25    it.

M.J. Flott - Cross

1215

1   Q.   So you were deposed in this case, correct?

2   A.   Yes.

3   Q.   And you prepared for your testimony here today, right?

4   A.   I did.

5   Q.   So is it -- and you're saying that in doing both of those

6   things, you never looked at the data that you got pursuant to

7   this CAS program from the ISPs to see if it was effective --

8            MS. NOYOLA:  Objection, asked and answered.

9   Q.   -- and that they were actually stopping --

10            THE COURT:  Hold on.

11   BY MR. BUCHANAN: (Continuing)

12   Q.   They were actually stopping infringement --

13            THE COURT:  Overruled.

14   BY MR. BUCHANAN: (Continuing)

15   Q.   Did you --

16            THE COURT:  He may answer.

17            THE COURT REPORTER:  I'm sorry, Your Honor.

18            THE COURT:  Yeah, I apologize.  If you understand the

19   question.

20            But he wasn't the CFO at the time during CAS, so

21   let's be clear about that as well.

22            MR. BUCHANAN:  Right.

23            THE COURT:  But back in -- if you want to direct him

24   to 2010 and ask him whether he was aware -- go ahead.

25   BY MR. BUCHANAN: (Continuing)

M.J. Flott - Cross

1216

1  Q.   So do you know if the data that CAS was collecting on the

2  effectiveness of this education program to protect the rights

3  of all these artists you talked about, whether that was

4  provided to your company?

5  A.   I don't personally know.

6  Q.   Have you attempted to look for that information as part of

7  your coming into court today and to testify to the Court and

8  the jury?

9  A.   My understanding was that's not what I was being asked to

10  be here to testify to.

11  Q.   Okay.  So are you aware of the members of CAS, that it was

12  Verizon, and Comcast, Cablevision, Time Warner, AT&T?

13  A.   Again, I have a general understanding of CAS.  I don't

14  have the specific understanding of CAS.

15  Q.   Did you know that those companies were the other members

16  with your company and the other record label companies that

17  made up CAS?

18  A.   Again, I don't know.  So I'm not going to say that I do

19  know.  I apologize.

20  Q.   Would you agree that -- you just gave an example about

21  someone going into a used car dealership or something and

22  stealing a car.

23      So would you agree that if those five, those five

24  ISPs that were part of CAS, whether -- if they were basically

25  for five years given the opportunity to process notices but not

M.J. Flott - Cross

1217

1    terminate anybody for five years, would that not create a

2    market for infringement?

3            THE COURT:  That was a totally improper question.

     And the objection is sustained.

5            Let's move on.

6            MR. BUCHANAN:  Okay.

7    BY MR. BUCHANAN: (Continuing)

8    Q.   So do you have any idea of -- you know, you talked about

9    in that chart what you believe is the impact of illegal

10   downloading on U.S. sales.  And do you recall you testified

11   that you believed that consumption was going up and that

12   American citizens were the main people that are consuming music

13   in the world comparatively; is that right?

14   A.   I believe what I said is the U.S. is the largest

15   territory.  But this schedule here just reflects the U.S.

16   recorded music business.

17   Q.   And so, for a U.S. -- person in the United States to

18   illegally download music, they would have to use an ISP in the

19   United States, right?

20   A.   That would be one way that they could, yes.

21   Q.   So did you attempt to determine how much of the illegal

22   downloading took place during the five years of CAS by the five

23   ISPs that were part of CAS?

24           MS. NOYOLA:  Objection, Your Honor.

25           THE COURT:  Sustained.

M.J. Flott - Cross

1218

1     MR. BUCHANAN:  Okay.

2  BY MR. BUCHANAN: (Continuing)

3  Q.   Do you know if there was any information about -- and you

4  may not know this either, but with regard to CAS, any data, was

5  it -- do you know if it was ever shared with the artist?

6     MS. NOYOLA:  Objection.  Your Honor, we would like a

7  sidebar.

8     THE COURT:  I'm sorry?

9     MS. NOYOLA:  We would like a sidebar, please.

10    THE COURT:  Yes.

11    NOTE:  A sidebar discussion is had between the Court

12 and counsel out of the hearing of the jury as follows:

13 AT SIDEBAR

14    MS. NOYOLA:  Your Honor, Mr. Buchanan has had some

15 questioning of the witness material times on CAS, and he's

16 already testified that he has no personal knowledge about the

17 specifics of CAS.  And he was not CFO during the negotiations

18 of the CAS.

19    THE COURT:  Where are you going?

20    MR. BUCHANAN:  Well, where I was going is he

21 basically testified as an expert about, you know, the music

22 industry, how it was going down, the impact of piracy, the

23 American consumption of music, even though he is the CFO for

24 this short period of time.  So how does he get all of that

25 information?  Okay.  The RIAA gives it to him.  And he makes

M.J. Flott - Cross

1219

1    this chart.

2            What I'm trying to show is, well, look, if that's so

3    important, okay, if it's the ISPs out there that are allowing

4    this infringement, what are you doing with regard to the five

5    that you didn't take any action against and you basically gave

6    them a free pass?  That created a market for everybody to go

7    to, arguably --

8            THE COURT:  Yeah, but he doesn't have that

9    information.

10           MR. BUCHANAN:  Okay.

11           THE COURT:  I mean, he's different than the other

12   people who were up here.  He is a CFO -- and he wasn't the CFO

13   during the CAS period of time.

14           MR. BUCHANAN:  Right.

15           THE COURT:  He has answered.  I mean, frankly, I

16   thought you had been asking these questions just so I'll object

17   and it will somehow look like I'm trying to preserve the

18   witness from having to testify.

19           MR. BUCHANAN:  No, no.

10:56:18  20           THE COURT:  But this is way off his plate.

21           MR. BUCHANAN:  Okay.  All right.

22           THE COURT:  So your objection is sustained.  Let's

23   move on to something else.

24           MR. BUCHANAN:  All right.

25           MR. OPPENHEIM:  Does this mean there will be no

M.J. Flott - Cross

1220

1   further questions on CAS with this witness?  Because this has

2   become --

3             THE COURT:  Yes, yes, no more CAS.

4             NOTE:  The sidebar discussion is concluded; whereupon

5   the case continues before the jury as follows:

6   BEFORE THE JURY

7             THE COURT:  I was trying to finish up this witness

8   before our break, but would you like a break now or --

9             A JUROR:  I could use it.

10:56:54 10             THE COURT:  You would like a break now?

11             Okay.  All right.  Let's take 15 minutes right now.

12   We have got a couple of heads shaking that they would like it

13   now.

14             So let's take 15 minutes and we'll come back.

15             NOTE:  At this point the jury leaves the courtroom;

16   whereupon the case continues as follows:

17   JURY OUT

18             THE COURT:  All right.  Anything before we break?

19             MR. BUCHANAN:  No, Your Honor.

10:57:37 20             THE COURT:  Okay.  Then we're going to take

21   15 minutes.

22             Mr. Flott, you're in the middle of your testimony, so

23   don't discuss the testimony you've given so far while you're on

24   break.  All right, sir?

25             All right.  Thank you.

M.J. Flott - Cross

1221

1        All right, we're in recess.

2        NOTE:  At this point a recess is taken; at the

3   conclusion of which the case continues in the absence of the

4   jury as follow:

5   JURY OUT

6        THE COURT:  All right.  Are we ready for our jury?

7        MS. NOYOLA:  Your Honor, we wanted to raise an issue

8   regarding the scope of Mr. Buchanan's cross-examination.  We

9   understand he may raise some questions about current streaming,

11:16:53 10   current -- and Warner Music's current revenues.

11        We do not believe these are relevant to the issues in

12   the case.  It is outside the bounds of the direct examination,

13   outside the bounds of this case.

14        THE COURT:  So present day streaming numbers?

15        MR. BUCHANAN:  Well, the witness testified that

16   streaming -- when it started and how it progressed, and it came

17   up to the present.

18        THE COURT:  And he had the graph.

19        MR. BUCHANAN:  In addition, Dr. Lehr has all this

11:17:19 20   comparisons between the current value of Cox, you heard that in

21   opening, how much we were worth.  And so, you know, we have a

22   right to compare what these companies are worth.

23        THE COURT:  Hasn't this testimony already came in --

24   come in for the other plaintiffs in the case?

25        MR. OPPENHEIM:  Not the current -- so I think the

M.J. Flott - Cross

1222

1    issue is current revenues and streaming revenue, not relevant.

2            Cox's revenues are clearly relevant under the factors

3    for statutory damages.  But the plaintiffs, during the time at

4    issue, absolutely.  But beyond the time at issue, not.

5            At a high level, do we care?  But it's outside the

6    scope.  But I believe that what's going to be elicited here,

7    just based on some documents that we are seeing, is we are in

8    the trends of streaming revenues now and what's happening.  And

9    all of what happened after 2014 in terms of revenue trends, is

11:18:17 10   outside the scope of this case.

11           MR. ELKIN:  Your Honor, very briefly, not to rehash

12   everything.

13           THE COURT:  Mr. Elkin.

14           MR. ELKIN:  I don't think that Mr. Buchanan is going

15   to get very much into this, really if at all, but I just want

16   to put a bookmark here.  It has come in through Kooker, it has

17   come in through other witnesses.  Quite a number of witnesses

18   so far have either touched upon it directly or indirectly.

19           As I mentioned when this issue cropped up earlier in

11:18:44 20   the trial, I do think to the extent they are seeking willful

21   copyright infringement and seeking statutory damages,

22   deterrence is an issue.  The market has changed, I don't think

23   it's really in dispute.

24           I don't want to belabor the other points, I just

25   wanted to make sure that we had that reminder.

M.J. Flott - Cross

1223

                    THE COURT:  Okay.  Thank you.

                    MR. OPPENHEIM:  One last point, if I may, Your Honor.

                    THE COURT:  Yeah.

                    MR. OPPENHEIM:  In the opening, if we could just pull

up the slide, this is the slide that was put up in the opening

by Cox.

                    THE COURT:  I understand.  And I allowed the general

revenues to come in for the point that Mr. Elkin just made,

which is the industry has gone away from P2P -- that's a

misstatement.

                    The industry has moved on to different ways to

transfer digital music, and that it may relate to whether or

not there is a likelihood of future infringement given the

marketplace.

                    So if it's not clear to you what I just said --

                    MR. OPPENHEIM:  So if what Your Honor is getting at

is the issue of deterrence under the -- as one of the factors

in statutory damages --

                    THE COURT:  Right.

                    MR. OPPENHEIM:  -- what the current revenues

structure is for the plaintiffs is not a reflection of the harm

that is potentially done from a particular type of piracy.

                    So let's say we had a new format, and that new format

was USB hard drives that got sold in stores.  That would be

entirely -- you know, if it happens after the point in time, it

M.J. Flott - Cross

1224

1    is irrelevant to the question of the deterrence of Cox.

2         The peer-to-peer piracy may be the reason that

3    downloads are down.  I mean, they could elicit that.  But going

4    into what a new format is is entirely irrelevant.

5         All they are trying to do is say, look, these

6    companies are now making a lot of money because they are

7    finding ways to deal with the piracy that we're allowing.

8    That's not a place this case should go.

9         THE COURT:  Well, it is of marginal relevance.  I'll

11:21:07 10    allow you to ask whether he is aware of the revenues, whether

11   they have recovered using different methods, and then let's

12   move on.  Okay?

13        All right, thank you.  Your exception is noted --

14        MR. OPPENHEIM:  Thank you, Your Honor.

15        THE COURT:  -- Mr. Oppenheim.

16        All right.  Let's get our jury, Joe.

17        NOTE:  At this point the jury returns to the

18   courtroom; whereupon the case continues as follows:

19   JURY IN

11:22:02 20        THE COURT:  All right.  Please have a seat.

21        And let's continue, Mr. Buchanan.

22   BY MR. BUCHANAN:  (Continuing)

23   Q.   A few more questions, sir.

24        On this chart, it starts in 2000, correct?

25   A.   Yes.

M.J. Flott - Cross

1225

1    Q.    And 1999 was the advent of Napster; is that correct?

2    A.    In that area, yes.

3    Q.    Okay.  And in 2001 you had iTunes and Apple?

4    A.    No, it -- iTunes started late 2003, early 2004.

5    Q.    Okay.  And that led to what they call the disaggregation

6    of the album, the CD album, correct?

7    A.    It created a different format.

8    Q.    Right.  And the format was you could now pick and choose

9    whatever individual song you wanted, you didn't have to go buy

11:23:01 10    a CD with 26 songs that cost 25 bucks; isn't that right?

11    A.    If a consumer chose to do that, yes, but they still had

12    the ability to buy music in whichever way that they wanted to.

13    Q.    Right.  But they could make a choice between going on to

14    iTunes and paying a dollar for their favorite song versus going

15    to a record store and paying $25 for an album that had 25 songs

16    and really only wanted one, right?

17    A.    That is -- was their option, yes.

18    Q.    So one of the other things that, as I understand it, that

19    your company did to counter the loss of CD sales due to piracy

11:23:42 20    and downloading was to sign artists up to what they call

21    360 deals; is that right?

22    A.    That's correct.

23    Q.    And they involved basically trying to find artists at the

24    beginning of their career and then expanding the rights that

25    your company would own vis-à-vis that artist, right?

M.J. Flott - Cross

1226

1    A.   We approached artists, not just at the beginning of their

2    career, but during their career as well.

3    Q.   But the 360 deals, didn't you sort of use those to expand

4    the rights that would be owned by your company versus the

5    artists' rights, right?

6    A.   They still were the artists' rights, we just created

7    whatever the contractual relationship would be as to how much

8    they would get paid from us working those rights for them.

9    Q.   Okay.  So it basically -- and I read this in the financial

11:24:32 10    statement about these expanded rights, what it meant was that

11    you then would have a greater return of the return on their

12    product, correct?

13    A.   That's not necessarily the case.  You would have to look

14    at each right and how we shared those different revenues.

15    Q.   Okay.  So -- but isn't it true that under these 360 deals,

16    you went to artists and you then tried to capture an interest

17    in more of what you were doing for them to increase revenues

18    for your company?

19    A.   We didn't do anything that any business would do.  We were

11:25:10 20    trying to acquire the maximum amount of rights that we could --

21    Q.   Okay.

22    A.   -- and they benefit both the artist and ourselves.

23    Ultimately, it's the artist's decision as to whether they

24    wanted to sign up with us and have us work those rights for

25    them.

M.J. Flott - Cross

1227

1    Q.   Right.  So you talked about the work you do for artists.

2    It's true that you had disputes over ownership and collections

3    with your artists over the years, haven't you?

4                MS. NOYOLA:  Objection, Your Honor, outside the

5    scope.

6                THE COURT:  Sustained.

7                MR. BUCHANAN:  Okay.  Your Honor --

8                THE COURT:  This whole field is off.

9    BY MR. BUCHANAN: (Continuing)

11:25:53 10   Q.   Okay.  So I want to ask you some questions about the

11   financials of the company.  And I have -- do you have a binder

12   there?

13                First of all, Warner Music Group, you are owned by

14   Access Industries; is that correct?

15   A.   Currently, yes.

16   Q.   And that's a private equity company?

17   A.   Yes.

18   Q.   Okay.  And who is the major shareholder in that company?

19   A.   Len Blavatnik.

11:26:33 20   Q.   And he is a Ukranian; is that right?

21                MS. NOYOLA:  Objection, Your Honor.

22                THE COURT:  Relevance is sustained.  I said you could

23   get into the revenues in just kind of a conclusory manner, and

24   you may do that, please.

25   BY MR. BUCHANAN: (Continuing)

M.J. Flott - Cross

1228

1    Q.   And do you know what price that Access Industries paid for

2    Warner Music Group?

3              MS. NOYOLA:   Objection, Your Honor.

4              THE COURT:   You may answer the question if you know.

5    A.   It was a little over $3 billion.

6    BY MR. BUCHANAN: (Continuing)

7    Q.   Okay.  And when did that take place?

8    A.   I believe it was July of 2011.

9    Q.   Okay.  And what is the approximate worth of your company

11:27:18 10   today?

11   A.   We don't -- we don't trade external debt.  So you would --

12   if you are asking me just about the Recorded Music Division

13   versus overall Warner Music Group?

14   Q.   What is -- do you know what the current value is of Warner

15   Music Group?

16   A.   I don't because it -- there is multiple factors that would

17   go into what the value would be currently.

18   Q.   That is not something that you calculate for the Board or

19   for the --

11:27:55 20   A.   I don't.  The corporate, the corporate group does that.

21   Q.   All right.  But you don't know that information?

22   A.   I -- you know, there are different valuations that are

23   done at different points in time.  I don't have the current

24   value.

25   Q.   So you understand that the claim period here is

M.J. Flott - Cross

1229

1  February 2013 through November 2014; is that right?

2  A.   That's my understanding.

3  Q.   All right.  And do you know the amount of revenue that WMG

4  generated for the fiscal year 2014?

5  A.   I believe it's in one of these documents, right?

6  Q.   Right.  So I can show you the document, but is it about

7  $3 billion?  Would that be about right?

8  A.   Again, I would want to look at the exhibit.

9  Q.   Okay.  That's fine.  Why don't you look at tab 6.

11:28:46 10  A.   Okay.

11  Q.   And see if you can -- I would look at page 44, the big

12  number down at the bottom, DX 2844.

13  A.   Okay.

14  Q.   Do you see the Total Revenue column?

15  A.   I do.

16  Q.   It says for 2014, three billion?

17  A.   I do.

18  Q.   And then 2013, 2.8 billion?

19  A.   That's correct.

11:29:22 20  Q.   And for 2012, 2.7 billion; is that correct?

21  A.   2.8, yes.

22  Q.   All right.  Now, you mentioned streaming before.

23  Streaming is a large, significant part of the revenue that has

24  been coming into the company for the last two or three years,

25  is it not?

M.J. Flott - Redirect

1230

1    A.    It is.

2    Q.    Okay.  And do you know how much -- the percentage that

3    revenue from streaming has gone up over, say, the last year or

4    two?

5    A.    The last year being which period of time?

6    Q.    Say 2019, are you aware that the streaming revenue was up

7    23 percent in 2019 over 2018?

8    A.    That sounds like it's right from our external reporting we

9    just did.

11:30:17 10   Q.    Right.  And for streaming, active streaming, for people to

11   stream, they need a high speed internet service, correct?

12   A.    They don't have to have it, but it makes the experience

13   better if they do.

14        MR. BUCHANAN:  I think that's all the questions I

15   have.  Thank you.

16        THE COURT:  All right.  Redirect.

17        REDIRECT EXAMINATION

18   BY MS. NOYOLA:

19   Q.    Mr. Flott, as chief financial officer for Warner Music

11:30:57 20   Group, what sort of information do you regularly provide to the

21   Board of Directors?

22   A.    We provide the performance of the company on a periodic

23   basis.  Normally looking at kind of current quarter and our

24   fiscal years to date.  And comparing that as well to our prior

25   periods on either an as-reported or a constant-currency basis.

M.J. Flott - Redirect

1231

1  Q.   Does the information you provided to the Board include

2  market trends?

3  A.   It does.

4  Q.   Why do you as chief financial officer look at music

5  consumption levels and compare that to revenues?

6  A.   Based on normal consumption, we are trying to determine

7  whether or not the market is growing.  And it gives us an

8  indication as to whether we are growing at the same level or

9  whether there are other factors impacting our growth.

11:32:07 10  Q.   Do you recall some questions regarding CD piracy?

11  A.   That's correct.

12  Q.   How does CD piracy compare to the peer-to-peer piracy that

13  is at issue in this case?

14  A.   If you look at kind of CD piracy, it's a -- it's having to

15  do with a physical copy and, you know, it is a, you know, a

16  machine-to-machine basis.

17        Peer-to-peer, it can be done in almost any digital

18  format through phone, through computer, through tablet, through

19  any other sources, and then can spread.  You know, it's a

11:32:59 20  virtual copy that then can be spread and shared seamlessly and

21  much easier than CD piracy.

22  Q.   And with peer-to-peer piracy, how can you tell how many

23  copies are further made or distributed after that first copy?

24        MR. BUCHANAN:  I am going to object, Your Honor.  I

25  don't think he is an expert in this area.  He already went

M.J. Flott - Redirect

1232

1    through this.

2              THE COURT:  Lay a foundation.

3              MS. NOYOLA:  I will move on to the next question.

4    BY MS. NOYOLA: (Continuing)

5    Q.   Do you recall your testimony, your being asked questions

6    about the prices of CDs back in the '90s and early 2000s?

7    A.   Yes.

8    Q.   What was the general price point of CDs during that time

9    frame?

11:33:42 10   A.   There really wasn't a general price point.  If you looked

11   at between box sets, which could be sold in, you know, the

12   upper hundred dollars to a normal -- if you took a standard CD,

13   it would sell probably somewhere in the 15 to $16 range per, at

14   retail.

15   Q.   If we could please pull up PX 486.

16             Mr. Flott, where on this chart does it reflect

17   peer-to-peer piracy levels?

18   A.   It doesn't.

19   Q.   You can take that down.

11:34:35 20             Counsel asked you some questions about a transaction

21   between Access Industries and the acquisition of Warner Music

22   Group.  Do you recall a three billion number?

23   A.   Yes.

24   Q.   What did that three billion transaction cover in terms of

25   the geographical areas and the divisions of Warner Music Group?

M.J. Flott - Redirect

1233

1    A.   It covered the world.  It also encompassed all of the

2    companies within Warner Music, which is the Recorded Music

3    Division as well as the Music Publishing Division, and the

4    companies that exist underneath each of those divisions.

5    Q.   And a similar question with respect to the 10k that

6    Mr. Buchanan asked you about.  I believe that you provided some

7    numbers regarding the total revenues --

8    A.   Yep.

9    Q.   -- over 2012 to 2014; is that right?

11:35:30 10   A.   Yes.

11   Q.   And what geographical areas did those revenues cover?

12   A.   That's the world.

13           MS. NOYOLA:  No further questions, Your Honor.

14           THE COURT:  All right.

15           MR. BUCHANAN:  I just would move in DX 28, Your

16   Honor.

17           THE COURT:  Any objection to DX 28?

18           MS. NOYOLA:  That's fine, Your Honor.

19           MR. OPPENHEIM:  No objection, Your Honor.

11:35:51 20           THE COURT:  It will be received.

21           All right.  May Mr. Flott be excused?

22           All right, you are excused with our thanks, sir.

23   Please don't discuss the testimony you have given with anyone

24   until our trial is over.  All right?

25           THE WITNESS:  Okay.

1234

1           THE COURT:  All right.  Have a good day.

2           THE WITNESS:  Thank you.

3           NOTE:  The witness stood down.

4           THE COURT:  All right.  Next witness.

5           MR. OPPENHEIM:  Your Honor, at this point the

6    plaintiffs and the defendants have agreed to the deposition of

7    Mr. Zabek.

8           THE COURT:  Okay.

9           MR. OPPENHEIM:  So we will play it.  It includes,

11:36:23 10  obviously, both sides.

11          THE COURT:  All right.  So we are going to hear

12   testimony by deposition.  And Mr. Zabek's deposition was taken

13   in lieu of his appearing here in court.  You should consider it

14   just the way you would consider the testimony of a live

15   witness.

16          All right.  Are you all set up?

17          And again, it's a witness that is being called by

18   plaintiffs, but also giving testimony on behalf of Cox as well.

19   So it's a witness for both the plaintiff and defendant.

11:37:06 20  MR. GOULD:  Your Honor, would it be helpful to give

21   the jury a sense of how long this video might go so they can

22   mentally prepare for it?

23          THE COURT:  Sure.

24          MR. GOULD:  This video is approximately four hours

25   long.

1235

1        THE COURT:  Four hours?

2        MR. GOULD:  Roughly, four hours.  A little more than

3   half is information that the plaintiffs designated, and a

4   little less than half is the information that the defendants

5   have designated.

6        MR. OPPENHEIM:  It's about three-and-a-half, not

7   four.  If you believe that it started much longer, we have

8   reduced it down to that.

9        Also, Your Honor, there are documents in the

11:37:44 10   deposition --

11        THE COURT:  Right.

12        MR. OPPENHEIM:  -- which I believe have been

13   integrated into the video, so the jury will see them.  We would

14   just move the admission of all of the documents for both sides

15   at this point in time so that they are in, and the jury can see

16   them.  And there is no issue about them.

17        MR. ELKIN:  No objection, Your Honor.

18        THE COURT:  All right.  Then they will all be -- each

19   be received.  And you'll keep a record of them?

11:38:06 20        MR. OPPENHEIM:  We will give you a list.

21        THE COURT:  All right.  Thank you.

22        MR. OPPENHEIM:  Absolutely, Your Honor.  There you

23   go.

24        Could you use a smaller piece of paper?

25        MR. GOULD:  Everyone is a critic.

J. Zabek - By Depositon

1236

1     MR. OPPENHEIM:  Can we go ahead and start it?

2     THE COURT:  Yes, sir.

3     MR. GOULD:  Someone brought popcorn?

4     THE COURT:  Yeah.  If you'd cut it down to two hours,

5  I would have done popcorn, but not if you're going to keep it

6  at this.

7     NOTE:  The testimony of Mr. Jason Zabek via video

8  deposition is played into the record as follows:

9     EXAMINATION

10  BY MR. OPPENHEIM:

11  Q.   Mr. Zabek, the court reporter will swear you in now.

12     NOTE:  The deponent is sworn.

13  Q.   Good morning, Mr. Zabek.

14  A.   Good morning.

15  Q.   Did you discuss with counsel the possibility of testifying

16  in this trial?

17  A.   Yes, we had talked about that.

18  Q.   And do you -- are you willing to testify at trial if

19  asked?

11:39:03  20  A.   If asked, of course.

21  Q.   How old are you?

22  A.   50.

23  Q.   Could you just briefly tell us what your educational

24  background is, please.

25  A.   I have a high school diploma.

J. Zabek - By Depositon

1237

1    Q.    Okay.  No college education?

2    A.    No.  Couple of classes here and there, but I wasn't lucky

3    enough to go.

4    Q.    So I'm going to hand you what is going to be marked as

5    Plaintiff's Exhibit 254.

6    A.    Thank you.

7    Q.    Is this a copy of the separation agreement that you were

8    just referring to?

9    A.    Yes, it looks like it.

11:40:04 10    Q.    I will note that this separation agreement does not

11    contain a signature.  Do you see that on the second -- the

12    third page?

13    A.    Yes.

14    Q.    Did you ever sign this agreement?

15    A.    Yes.

16    Q.    Do you believe that this agreement is currently in effect?

17    A.    To the best of my knowledge, I believe it is.

18    Q.    Are you aware of Cox not fulfilling any of their promises

19    to you in this agreement?

11:40:26 20    A.    No.  They fulfilled everything that I know of.

21    Q.    Under the second paragraph, Cox was obligated to pay you a

22    $50,000 sum payment; is that correct?

23    A.    Yes.

24    Q.    And they did that on the basis of your resignation,

25    correct?

J. Zabek - By Depositon

1238

```
 1   A.    Yes.

 2   Q.    And did they make that payment to you?

 3   A.    Yes, they did.

 4   Q.    Do you believe that you have an obligation under this

 5   agreement to provide testimony in this case if Cox so requests?

 6   A.    I believe that is true.

 7   Q.    Do you know whether Cox is paying for your counsel?

 8   A.    It is my understanding that they are.

 9   Q.    And for your time here today, are you being compensated in

10   any way?

11   A.    No, I am not.

12   Q.    Are you being reimbursed?

13   A.    No, I am not.

14   Q.    And, in fact, in paragraph 6, the agreement you agreed to

15   says that you:  Agree that you will not engage in any conduct

16   or activities detrimental to the best interests of Cox, its

17   owners, affiliates, or subsidiaries, including, but not limited

18   to, any disparaging, denigrating, or untrue statements about

19   Cox or about any employee of Cox or its owners, affiliates, or

20   subsidiaries, correct?

21   A.    That is what is stated here, yep.

22   Q.    And you agreed to that, right?

23   A.    When I did sign, yes.

24   Q.    So you understand as you testify today you are not

25   permitted to denigrate Cox; is that correct?
```

11:41:16  (line 10)
11:41:44  (line 20)

J. Zabek - By Depositon

1239

1  A.   I do understand what you're saying and everything, but,

2  you know, it does not mean that I can't come in and tell you

3  what happened and tell you the truth.

4  Q.   But you understand as you testify today, you are not

5  permitted by contract to disparage or denigrate Cox, correct?

6  A.   I do understand that, but I don't have much to say

7  disparaging them.

8  Q.   And you understand that if you did say something that were

9  disparaging, you would potentially put at risk the $50,000

11:42:24 10  payment that you received from Cox, correct?

11  A.   I do understand that.

12  Q.   You began working for Cox Communications in 1991, correct?

13  A.   I believe so, yes.

14  Q.   And your first role was doing customer service, correct?

15  A.   Yes, sir.

16  Q.   And you did that for roughly six years, right?

17  A.   Yeah, approximately about six years.

18  Q.   And then you moved to sales and marketing, correct?

19  A.   Yes, I did.

11:42:48 20  Q.   And you did that for roughly two years, correct?

21  A.   Yeah, I think so.  To the best of my knowledge, yes.

22  Q.   And then you became a field service representative, right?

23  A.   Yes.

24  Q.   And in that job, you would install modems and hook up

25  subscribers' computers, correct?

J. Zabek - By Depositon

1240

1    A.   Yes, sir.

2    Q.   And you did that for roughly two years, correct?

3    A.   Yes, about two years.

4    Q.   And then you moved into business technical support,

5    correct?

6    A.   Correct.

7    Q.   And you did that for roughly four years, correct?

8    A.   I would say approximately, yeah.

9    Q.   And after that you became a Level 1 abuse engineer,

11:43:28 10   correct?

11   A.   Yes.

12   Q.   And in that job you handled complaints against

13   subscribers, including copyright infringement notices, correct?

14   A.    In that position, I did.

15   Q.   And you would often refer to those complaints as DMCA

16   complaints, correct?

17   A.    Yeah.  It was a shorter way to describe it, absolutely,

18   quicker than saying, you know, copyright complaint, of course.

19   Q.   And you served as a Level 1 abuse engineer for

11:43:57 20   approximately three to four years, correct?

21   A.    Yeah, somewhere around that time.

22   Q.   And after that you were promoted to becoming the lead

23   abuse engineer, correct?

24   A.    I was.

25   Q.   And then after that, you were promoted to become the

J. Zabek - By Depositon

1241

1   manager of the abuse group, correct?

2   A.   Correct.

3   Q.   So over the course of your career at Cox, you received

4   many promotions, correct?

5   A.   Several, yeah.

6   Q.   As the manager of the abuse group, you oversaw that group,

7   correct?

8   A.   Uh-hum.

9   Q.   Yes?

11:44:27 10   A.   Yes.

11   Q.   And your deputy within that group was a gentleman by the

12   name of Joseph Sikes, correct?

13   A.   He was one of our probably -- yeah, high level folks.  I

14   would call my right-hand person.  It was not an official title

15   or anything like that, but it was -- we would brainstorm and

16   things like that.  But we do that with the whole group also,

17   too.  But while I was out or possibly maybe on vacation or

18   anything like that, I would -- Joe would be in charge.

19   Q.   And you also worked closely with Matt Carothers, correct?

11:45:01 20   A.   Yes.

21   Q.   Now, Matt Carothers had previously held the position of

22   being manager of the abuse group at some point, correct?

23   A.   I believe he was the manager, yes, when I first, first

24   started, when I first came to Atlanta, yeah.

25   Q.   And Mr. Carothers is the individual who originally built

J. Zabek - By Depositon

1242

1    the CATS system, correct?

2    A.    It was his brainchild.

3    Q.    And at one point you would refer to you and Mr. Sikes and

4    Mr. Carothers as the Axis of Evil, correct?

5    A.    I think there was a presentation that I had brought out

6    where we were -- yeah, we had a demographic such as that, and

7    it was -- it was to bring levity to, of course, the thing.  We

8    were stopping nefarious hackers and bad people on the Internet.

9    Q.    And in that presentation you need to refer to the three of

11:45:59 10   you as the Axis of Evil, correct?

11   A.    Sure.

12   Q.    Did you agree to resign in lieu of being fired?

13   A.    When I signed the paper, yes.

14   Q.    And you -- but you didn't believe that you had any choice

15   but to sign the paper, otherwise you wouldn't continue to be

16   employed at Cox, correct?

17   A.    I think there is always a choice.  I think that -- yeah, I

18   think there is always a choice.  But I think it might have been

19   the choice that was right for myself and the company.

11:46:30 20   Q.    Do you believe, with the benefit of hindsight, that it was

21   appropriate for you to have left?

22   A.    I don't.  I don't.

23   Q.    And why is that?

24   A.    We had been doing this job for quite a period of time and

25   had a lot of successes in areas, a lot of compliments.  We took

J. Zabek - By Depositon

1243

1    down a lot of botnets for organized crime, partnered with law

2    enforcement around the world, taking down absolute criminal

3    organizations, and compliments from the FBI, Interpol.  So,

4    yeah.

5    Q.    So you felt like you had done a good job at Cox?

6    A.    I felt we did, yes.

7    Q.    While you were at Cox, did you receive annual reviews?

8    A.    I did.

9    Q.    And how did you do with those annual reviews?

11:47:31 10    A.    From the last time I checked, they were pretty good.  I

11    had no disciplinary actions or anything of that nature.  It

12    seemed that we were doing a good job.

13    Q.    Did you ever receive a negative review?

14    A.    No.

15    Q.    Did you ever receive a lukewarm review?

16    A.    Yeah, I don't know what you mean by lukewarm.  We always

17    talked about areas of improvement.  But, of course, in any

18    position there is always an area of improvement, whether that's

19    in speaking with a customer or taking too long of a lunch.  You

11:47:57 20    never know.

21         But lukewarm, no.  I think they were all very

22    positive.  Even on the ones where I had work to do, I could see

23    where I had work to do and get better every single day,

24    hopefully.

25    Q.    And did you receive a bonus each and every year you were

J. Zabek - By Deposition

1244

1    at Cox?

2    A.    No.

3    Q.    And in what years did you not receive bonuses?

4    A.    Bonuses at the time were only given to managers and above.

5    So before -- before, I was a manager, I did not -- I got a

6    turkey for Thanksgiving, which was cool, but not a bonus during

7    that time.

8    Q.    So since the time you became a manager, did you receive a

9    bonus every year?

11:48:45 10  A.    Yes, I did.

11   Q.    So for how many years did you serve as the manager or the

12   person responsible for the abuse group?

13   A.    Oof.  As a manager, I believe it was four to five years.

14   Q.    So roughly 2011 to 2016?

15   A.    Somewhere around there.

16   Q.    Okay.  And before that, you were part of the abuse team,

17   just not the manager, correct?

18   A.    Yes.

19   Q.    Okay.  And so, you're very familiar with the abuse team at

11:49:20 20  Cox, correct?

21   A.    At that time, yeah.

22   Q.    And you understood that the abuse team was primarily

23   responsible for the enforcement of Cox's Acceptable Use Policy,

24   correct?

25   A.    Correct.

J. Zabek - By Depositon

1245

1    Q.    And the Acceptable Use Policy is part of Cox's agreement

2    with its Internet account holders and governs the way in which

3    account holders are authorized to use or are prohibited from

4    using Cox's service, correct?

5    A.    That is my understanding, that it is the way our clients

6    would act while using our service.

7    Q.    Cox's Acceptable Use Policy provides that Cox may

8    terminate an account holder's Internet service for copyright

9    infringement, and the abuse team manages the methods,

11:50:06 10    procedures, and processes by which Cox enforces that provision,

11    correct?

12    A.    Our Acceptable Use Policy gives right where we may

13    terminate someone's service for violations on any of them,

14    including copyright.

15    Q.    And that the abuse team would manage that, correct?

16    A.    For our team, yes, we'd manage that.

17    Q.    Cox's abuse ticket handling procedures set forth how Cox

18    handled different types of abuse, correct?

19    A.    We would be our -- our guides, yeah.

11:50:40 20    Q.    And Cox refers to the steps for handling complaints as the

21    graduated response procedure or policy, correct?

22    A.    We did have a graduated response for those.

23    Q.    And you understand that the Cox Abuse Tracking System is

24    referred to as CATS, C-A-T-S, correct?

25    A.    Yes, we did refer to it as CATS.

J. Zabek - By Depositon

1246

1  Q.   The graduated response procedure encompasses actions by

2  customer service reps, automatic actions by CATS, and actions

3  by the abuse team working with CATS and customer service

4  representatives, correct?

5  A.   Yes.  That was the system that our folks would work in to

6  track allegations and complaints that came in from the

7  Internet.

8  Q.   And the Cox abuse ticket handling procedures instruct the

9  abuse team and Cox's customer safety representatives about how

11:51:47 10  to respond to different types of problems, correct?

11  A.   With those are -- with our -- the things that we give our

12  folks, they were our guidelines on how they could handle

13  something that was coming in if -- so they weren't confused

14  when it came in.

15  Q.   And specifically, the document that is referred to

16  internally at Cox called the Cox Abuse Ticket Handling

17  Procedures instruct Cox's representatives on how to handle

18  incoming complaints, including copyright infringement

19  complaints, correct?

11:52:21 20  A.   It was our guidelines for those people on the phones that

21  would be talking to customers or handling tickets.

22  Q.   And a Tier 1 customer service rep is the first level of

23  customer service representative at Cox, correct?

24  A.   If I remember correctly, the Tier 1 was the first person

25  answering the phone call.

J. Zabek - By Deposition

1247

1  Q.   So they would answer the routine questions, but then would

2  reroute customers who had more specialized questions to an

3  appropriate department, correct?

4  A.   If they could answer a question and assist a customer on

5  that first call, absolutely.  From there, if they did need

6  anything else, it would then be escalated.

7  Q.   Okay.  And Tier 2 representatives had more specialized

8  training, including how to handle basic questions relating to

9  notices of copyright infringement, correct?

11:53:10 10  A.   They would have that knowledge to assist the customer and

11  educate and help them, yes.

12  Q.   And the Technical Operations Center was often referred to

13  as the TOC, T-O-C, correct?

14  A.   The TOC, T-O-C.

15  Q.   And the TOC was a small team of more senior customer

16  service representatives who would address the most complex and

17  serious circumstances of account holders who received multiple

18  abuse notices, correct?

19  A.   They would handle the challenging ones but also, depending

11:53:43 20  on what it was, they could handle a mundane one also, too.

21  They were trained in different areas.

22  Q.   And Cox also had a National Support Center, often referred

23  to as the NSC, which would focus on answering questions about

24  business customers, correct?

25  A.   The National Support Center, yes, for business customers.

J. Zabek - By Depositon

1248

1    Q.    Broadly speaking --

2    A.    Sure.

3    Q.    -- there were -- within Cox's abuse procedures, there were

4    several different types of actions that Cox might take in

5    response to an infringement notice, correct?

6    A.    Depending on the infringement, there were different

7    situations that we could take action on.

8    Q.    When you say, depending upon the infringement, are you

9    saying something other than copyright infringement?  Or are you

11:54:30 10    saying depending on the type of copyright infringement?

11   A.    No.  Other ones, such as spam or malware.  We had, you

12   know, different procedures for certain things.

13   Q.    And when Cox received multiple copyright complaints in a

14   single day for a particular customer, Cox would associate all

15   of those complaints on a single ticket, correct?

16   A.    If it did come in, we put it under the customer's account,

17   and that would be sent to the actual customer under a ticket.

18   Q.    Mr. Zabek, I am going to hand you what's been marked as

19   Plaintiff's 255.

11:55:14 20          Do you recognize this document?

21   A.    Yes.

22   Q.    And this is a declaration that you signed on or around

23   October 12, 2015, correct?

24   A.    October 12?

25   Q.    Correct.

J. Zabek - By Depositon

1249

1    A.    Yeah.

2    Q.    Of 2015, correct?

3    A.    Correct.

4    Q.    And that's your signature, correct?

5    A.    It is.

6    Q.    And did you in fact sign this?

7    A.    Yes.

8    Q.    And when you signed it, were you attesting that the

9    contents of this declaration were true and accurate?

11:55:45 10   A.    To the best of my knowledge, yes.

11   Q.    If you could please turn to page 5 of this declaration.

12   A.    Yes.

13   Q.    In footnote 2, it says in the first sentence:  Cox

14   associates multiple copyright complaints it receives in one day

15   for a given account with a single CATS ticket and will take a

16   single action on that ticket, but Cox makes note of every

17   copyright complaint received during that day on that ticket.

18          Do you see that?

19   A.    I do.

11:56:29 20   Q.    Does that refresh your recollection that when Cox received

21   multiple copyright infringement complaints with respect to a

22   single subscriber on a single day, that Cox would aggregate

23   those complaints onto a single ticket?

24   A.    It does.  It does refresh.  Yes.  And as we would keep

25   each complaint within the account also, too.

J. Zabek - By Deposition

1250

1    Q.   Mr. Zabek, I am going to hand you what has been marked as

2    Plaintiff's Exhibit 256.

3              Do you recognize this document, Mr. Zabek?

4    A.   Vaguely.  It has been awhile.

5    Q.   This is a transcript of your deposition taken on June 2,

6    2015.

7    A.   Uh-hum.

8    Q.   Is this the deposition transcript that you reviewed in

9    advance of this deposition?

11:57:21 10  A.   Yes.

11   Q.   I would ask you to please turn to page 39 of this

12   transcript.  And I -- I'm sorry.  And I would ask you to go

13   down to line 17.

14             You were asked the question:  Is there mandatory

15   training -- let me just simplify the question.  Is there

16   mandatory training for the employees of the abuse group?

17             And you responded:  There is not a mandatory

18   training.

19             Do you see that?

11:57:56 20  A.   I do.

21   Q.   And that was your deposition then --

22   A.   Yeah.

23   Q.   -- on June 2, 2015, under oath, correct?

24             And you understand that a customer of Cox who was

25   using file sharing software to allow Internet users to download

J. Zabek - By Depositon

1251

1    MP3 files of copyrighted music from his computer, that that

2    would be a network security violation, correct?

3    A.   It would be more of an AUP violation.  You can say it was

4    a network issue.

5    Q.   It would be a violation of Cox's policies, correct?

6    A.   Yes.

7    Q.   In your mind, did you understand that the distribution of

8    music over a peer-to-peer network without authorization was

9    copyright infringement?

11:58:45  10    A.   Without permission?

11    Q.   Yes.

12    A.   Yes.

13    Q.   And that when an individual engaged in that behavior, that

14    harmed the owner of the copyrights, correct?

15    A.   Not talking to the copyright holder, I don't know where --

16    you know, how it is harming them.  And we never saw -- with our

17    customers, I could never tell if they were actually doing any

18    copyright infringements.  We only had the allegations that we

19    would go with.

11:59:15  20    Q.   Mr. Zabek, the use of peer-to-peer networks to distribute

21    copyrighted music without authorization harms the copyright

22    owner, correct?

23    A.   Yeah, I think it's a possibility that it does.

24    Q.   Have you ever used BitTorrent?

25    A.   Have I?

J. Zabek - By Deposition

1252

1    Q.   Yes.

2    A.   No.

3    Q.   Have you ever use -- did you ever use Napster?

4    A.   No, I never had any -- I still buy physical CDs.

5    Q.   Did you ever use Grokster?

6    A.   No.

7    Q.   Did you ever use Kazaa?

8    A.   No.

9    Q.   Did you ever use Gnutella?

11:59:51 10  A.   No.

11   Q.   You know what BitTorrent is used for, correct?

12   A.   Yes.

13   Q.   It's used primarily for piracy, correct?

14   A.   I would not agree that it's used for -- there's been many

15   cases of legitimate -- NASA has released large photos using the

16   BitTorrent network because it was the easiest way to get it

17   sent.  I believe there's several bands that have actually

18   released their albums on it and then came back and said, pay us

19   for it.

12:00:23 20       So there's a -- there are definitely many legitimate

21   uses for it out there.

22   Q.   While you were at Cox working in the abuse team, did you

23   understand that BitTorrent was primarily used for piracy?

24   A.   If we look at our complaints that we would get in, yeah,

25   you could draw that conclusion, absolutely.

J. Zabek - By Deposition

1253

1    Q.   I am going to hand you what has been marked as

2    Plaintiff's 258, which is Bates-labeled Cox_BMG_00188943 and

3    '944.

4            This is an e-mail that you sent -- on the top of this

5    document is an e-mail that you sent to Steven Wimmer at Cox on

6    October 16, 2012; is that correct?

7    A.   October 16, 2012, yes.

8    Q.   And you sent this e-mail, correct?

9    A.   I do see that it is from me.

12:01:24 10  Q.   And this e-mail, the re line says:  Archer Incident

11   IR 155, possible BitTorrent use on internal network - Closed.

12           Do you see that?

13   A.   I do.

14   Q.   Do you know what this e-mail is about?

15   A.   I believe -- let me look through.

16           I don't remember.  Generally this is -- looks like

17   somebody was using BitTorrent within the corporate network.

18   Q.   A Cox employee or somebody on the internal Cox network was

19   using BitTorrent; is that correct?

12:02:25 20  A.   I can say -- somebody on the internal network seemed to be

21   using it, yes.

22   Q.   And your response to that was:  Better fire that person!

23   BitTorrent is used for only -- is used for one thing only ...

24   and I would know.

25           Right?

J. Zabek - By Depositon

1254

1    A.   Yep.

2    Q.   And why did you say, better fire that person?

3    A.   Oh, well, kind of in my personality -- I mean, as you can

4    see, we have got two exclamation points and a smiley face at

5    the end here.  Kind of being sarcastic to them.  You know, oh,

6    my gosh, that's what it's for, we better fire them.

7         But this is why we have conversations with these

8    folks, we do the investigations, see exactly what was going on

9    there.  We don't even know if it was an employee.  So how could

12:03:11 10  we fire somebody?

11   Q.   But in this e-mail you said, better fire that person,

12   because you presumed that they were using BitTorrent for piracy

13   purposes, correct?

14        MR. McGUFFEE:  Objection.

15   A.   No, not in this case.  I mean, we are looking at -- we use

16   sarcasm and joking and say, you know, oop, better fire that

17   person.  You know, unfortunately, tone doesn't come out and

18   sometimes personality doesn't come out in e-mail.

19        But that's where we again would have conversations

12:03:36 20  with these folks and find out what's going on and then make our

21   next moves to do that.

22   Q.   And you said, BitTorrent is used for only -- is used for

23   one thing only, because you knew that BitTorrent was used

24   primarily for piracy, correct?

25   A.   No.  Like I stated before, it's not always used just for

J. Zabek - By Deposition

1255

1    piracy.   NASA has released photos.   Bands have released music.

2    Can't tell exactly what this person was doing with it, but --

3    Q.   And you said, I would know, because you in fact had used

4    BitTorrent for piracy purposes, correct?

5    A.   No.   As I had stated before, I wasn't a BitTorrent user or

6    peer-to-peer network user.   A lot of this would come from just

7    the things that we had seen within the allegations coming in.

8    Q.   So you -- it's your testimony here today that when you

9    said, BitTorrent is used for one thing only and I would know,

12:04:21 10   that that testimony -- that statement was made in light of the

11   fact that you had never used BitTorrent, according to you,

12   right?

13   A.   That comes from my knowledge of seeing the tickets that

14   would come in for peer -- copyright infringements and with the

15   BitTorrent network.   Not from my personal use of using it.

16   Q.   So you were aware that Cox had received many infringement

17   notices from copyright holders, correct?

18   A.   Yes.   We continued to receive infringement notices,

19   allegations from many, yeah, many copyright holders.   And they

12:04:57 20   would always, of course, send it to us when they felt it was a

21   violation.

22   Q.   And these notices were advising Cox that the alleged

23   infringement had occurred on the Cox network, which is why they

24   were sent to Cox, right?

25   A.   Yeah, the -- the allegations would state that it

J. Zabek - By Depositon

1256

1  originated from the Cox network, which is why we would receive

2  the complaint.

3  Q.    And when you say, it originated from the Cox network, you

4  are referring to the alleged infringement, correct?

5  A.    For this case, yes.

6  Q.    Okay.  While you were working in the abuse department, Cox

7  received millions of infringement notices, correct?

8  A.    We got a lot.  I can't give you a number.  I'm sorry, I

9  don't remember the exact numbers.

12:05:52 10  Q.    But it was a lot?

11  A.    It was a lot.

12  Q.    Assuming that the infringement notices came in included

13  all of the requirements that Cox set forth, Cox presumed that

14  the infringement notices were valid, correct?

15  A.    Yeah, not every single time.  One of the things that we

16  did is we would set up partnerships.  When I say partnerships,

17  we would talk to a lot of copyright holders that wanted to send

18  these in, and we would make sure that they would have the right

19  information in there.  So digital signatures, things like that.

12:06:26 20  Ones like that that came in, we could look at that and have

21  good faith in saying that it was.

22       If we would get something from, say, a mom-and-pop

23  shop, which did happen every once in a while, or from somebody

24  even trying to even fake their buddy out or friends, we have

25  seen those in the past, to get them in trouble, those were

J. Zabek - By Depositon

1257

1    absolutely under scrutiny.

2    Q.   And you're aware that Cox received notices from the RIAA,

3    correct?

4    A.   Yes, we did receive notices from them.

5    Q.   And when you received those notices, you presumed they

6    were valid, correct?

7    A.   As long as they had the proper information on there, P2P

8    signatures, things like that, that we had spoke with them, yes,

9    we would assume that it was valid and make an action letter.

12:07:08 10   Q.   And in your opinion, the vast majority of the subscriber,

11   Cox subscribers who were using peer-to-peer were doing so on

12   purpose, correct?

13   A.   I would not speculate that our customers were using it on

14   purpose every single time.  I'm sure, you know, some were.  But

15   every customer, I don't know exactly what they were doing with

16   it.  I am sure there were some that were actually using it for,

17   you know, nefarious activity.

18   Q.   In fact, you believe that 99 percent of the infringement

19   notices is from people using peer-to-peer on purpose, correct?

12:07:49 20   A.   With our complaints that were coming in, if they were

21   against the Bit -- against BitTorrent, for using BitTorrent,

22   that in those cases they were -- they would have more than

23   likely installed it or at least using it at that point in time.

24   Q.   And using it on purpose, correct?

25   A.   I would believe so.  The only other case I know is that if

J. Zabek - By Depositon

1258

1    a hacker got on their computer, was running proxy server or

2    software, things like that, we have seen infections in those

3    kind of cases.  There are always some areas where it's not

4    known.

5    Q.   But that was the exception, correct, not -- not the rule?

6    A.   We saw several of those out there.  I couldn't give you an

7    exact number on it.

8    Q.   But in the overwhelming majority of instances, you

9    believed that the peer-to-peer activity was taking place on

12:08:35 10   purpose, correct?

11   A.   That they wanted to use it.

12   Q.   Yes.  And you believed, Mr. Zabek, that if a customer was

13   doing something on purpose and you could discover it, then you

14   didn't want them on the Cox network, correct?

15   A.   Not necessarily.  If we could help the customer, educate

16   them on anything that they didn't understand, felt they were

17   doing incorrectly, if we could do that, we would want to see if

18   we could help them instead of immediately just disconnecting

19   them.

12:09:21 20   Q.   If a Cox customer was intentionally using -- engaging in

21   spam, hacking, or DOS attacks, you didn't want those people on

22   the Cox network, correct?

23   A.   Again, each case is kind of different.  I mean, we have

24   seen DOS attacks where the customer wasn't even aware it was

25   happening, they were infected.  Those people I still would want

J. Zabek - By Deposition

1259

1  on the network, but they need help, they need education, to get

2  clean, fixed, and made whole to protect not only our network,

3  but the Internet also, too.

4          So if we had a spam complaint, it wasn't an

5  immediate, you know, you're off of the Cox network.  We felt a

6  responsibility to help those folks.  They may not know that

7  they are actually spamming.  They're just thinking that they

8  are sending out a mailing list for their soccer team.  And

9  we've seen those too.

12:10:17 10         So in each case we wanted to help and educate the

11  customer as much as possible.

12  Q.   Mr. Zabek, when you found a Cox subscriber who was

13  intentionally or on purpose engaging in spam, hacking, or

14  denial of service attacks, you didn't want those people on the

15  Cox network, correct?

16  A.   Well, again, you know, it's going to be a case-by-case

17  basis.  Even spammers who are doing it intentionally, if we

18  could talk to them and say, you're doing this the incorrect

19  way, you need something like a confirmed opt-in list, don't

12:10:49 20  purchase your e-mail addresses, we would educate and help them.

21  We were pretty successful in those areas, too.

22          So, no, it was not an automatic, you're off the Cox

23  network.  We wanted to make sure that we were assisting them as

24  much as possible.  A lot of folks don't know a lot of things

25  about the Internet.  We were trying to help.

J. Zabek - By Depositon

1260

1    Q.   Mr. Zabek, I would ask you to look at your prior

2    deposition testimony which is before you, Exhibit 256.  And I'd

3    ask you to please turn to page 225, please.

4          And at line 17 you were asked:  Then you say, DMCA

5    doesn't hurt the network like DOS attacks, spam, or hacking.

6    What did you mean by that?

7          And you answered:  Something of a DOS attack, D-O-S

8    attack, can actually cripple our network where no one can get

9    online.  All several million of our customers, because of one

10   person doing something nefarious and very bad on our network,

11   that affects everyone immediately.

12         And then you were asked:  So you didn't want to

13   terminate it and then reactivate DOS attacks, spam, or hacking

14   because that hurt the Cox network?

15         Your answer:  Not necessarily.  If they're doing

16   something on purpose and we can discover that, that they are --

17   which is sometimes difficult, then, no, we don't want to bring

18   them back on.

19         Do you see that?

20   A.   I do see that.

21   Q.   And so, it was your testimony, at least in June of 2015,

22   that when you found a Cox subscriber who was on purpose

23   engaging in spam, hacking, or DOS attacks, that you didn't want

24   those people back on the Cox network, correct?

25         MR. McGUFFEE:  Object to form.

J. Zabek - By Deposition

1261

1    A.   Well, as we say, if we could find something that they were

2    doing on purpose and everything, we still wanted to work that

3    customer.  There is always an underlying that if they're going

4    to continue that type of activity, we don't want them on the

5    network if we didn't assist them properly.  But every referral

6    has got assistance --

7              I am sorry.  Too fast.  No problem.

8              But if there was a way to help them to stop this

9    activity, then we would want to try and keep them on the

12:13:27 10   network, if we could.

11             But we don't want bad -- we did not want bad people

12   on the network if they were just going to continue to do those

13   things and attack our customers with DOS.

14   Q.   You understand that copyright infringement injures

15   copyright holders, correct?

16   A.   From what I understand and what I have been told, yes.

17   Q.   In 2010, Mr. Zabek, while you were working the abuse

18   group, you considered using a technology that would block

19   peer-to-peer traffic, correct?

12:14:06 20   A.   Ten years ago?  I'm sorry, I don't recall.

21   Q.   Mr. Zabek, I'm going to hand you what's been marked as

22   Plaintiff's 259, which is Bates labeled Cox_Sony_00523061

23   through 62.

24             This appears to be an e-mail exchange between you and

25   Chris Buechler, B-u-e-c-h-l-e-r, at a company that you used the

J. Zabek - By Deposition

1262

1    e-mail address pfsense.org.

2           Do you see that?

3    A.   I do.

4    Q.   And at the bottom of this document you, on May 20, 2010,

5    sent an e-mail to PF Sense, and you identified yourself as

6    working for Cox Communications in the abuse department,

7    correct?

8    A.   Yes.

9    Q.   And you said you were looking for equipment that you could

12:15:37 10   suggest to your customers to stop file sharing, correct?

11   A.   Yes.

12   Q.   And you say that you have looked through your -- the

13   forums and found several posts about blocking peer-to-peer

14   traffic, and I think your system will work for our customers.

15   I'm writing you just to confirm at your stuff would be able to

16   assist and easy -- is easy to set up.

17          Do you see that?

18   A.   I do.

19   Q.   It's probably a typo, you meant that your stuff, I assume,

12:16:13 20   correct?

21   A.   Sure.  Sure.

22   Q.   So you were reaching out to a company called PF Sense in

23   2010 to see whether or not they had a technology that would

24   stop peer-to-peer file sharing for your customers, correct?

25   A.   Yes.  This was for our -- yeah, our business customers,

J. Zabek - By Depositon

1263

1   yes.

2   Q.   And you said at the bottom of this e-mail that:  I know

3   the battle of peer-to-peer versus the copyright holders is

4   lost, but I have to do my job.

5        Right?

6   A.   I did put that in there.

7   Q.   So is it your testimony that the written policy in 2011

8   gave the abuse group authority to decide not to terminate?

9   A.   Yes, as we reviewed each case individually.

12:17:02 10   Q.   In implementing the graduated response procedure, you

11   would keep in mind the effect on the Cox business, including

12   the potential loss of revenue, of the actions you would take at

13   various stages, correct?

14   A.   We tried not to look at the revenue coming in.  We had

15   terminated a lot of customers that had paid us lots of money.

16   I don't know a business that likes to lose customers.  But we

17   were always looking at what was best for the customers, the

18   company, and the Internet in general also, too.

19   Q.   You did look at the potential loss of revenue in making

12:17:45 20   decisions on what to do, correct?

21   A.   It was not a consideration when we did this.  We

22   terminated spammers that were -- paid us a lot of money, but

23   they were spammers, so they had to go.

24   Q.   But when it came to making decisions about copyright

25   infringement, you did consider the potential loss of revenue,

J. Zabek - By Depositon

1264

1    correct?

2    A.   Loss of revenue was always a bummer for any kind of -- any

3    kind of company.  We did not want to lose customers at all.

4    But in my cases when I reviewed these, I would make sure that I

5    didn't want -- did not want to look at what they were paying

6    every single month.

7    Q.   I'm going to ask you to look at your declaration, which is

8    Plaintiff's Exhibit 255, please.  And I would call your

9    attention to paragraph 16, please.

10   A.   I am sorry, page?

11   Q.   It's paragraph 16 on page 16, please.

12   A.   Okay.

13   Q.   And this is the declaration that you signed under penalty

14   of perjury, correct?

15   A.   Yes.

16   Q.   Mr. Zabek, is it not true that in this declaration you

17   said:  Because Cox's accountholders form the foundation of its

18   business, it is also true that in implementing the graduated

19   response procedure we keep in mind the effect on the business,

20   including potential loss of revenue, of actions taken at

21   various stages of the procedure.

22            Isn't that in fact what you wrote and signed in this

23   declaration in 2015?

24   A.   Well, looking at any of the customers, you know, there was

25   always a way, if we had to terminate them, it was a loss of

J. Zabek - By Deposition

1265

1  revenue, but it wasn't our main strong point in looking at

2  that.

3  Q.   Mr. Zabek, isn't it in fact true that you, in this

4  declaration in 2015, testified that when you implemented the

5  graduated response procedure, you would keep in mind the effect

6  on Cox's business, including the potential loss of revenue?

7  A.   We would keep that in mind.  We would keep it in mind.

8  Q.   And you understood that when their rights were infringed,

9  that that was a violation of federal law, right?

12:19:56 10  A.   If -- I think if we could prove that, possibly with a due

11  process, to look through their computers.  But again, we've got

12  good faith on one side, we've got good faith on the other side

13  with the customer also, too.

14        When we would assist these customers, you know, we

15  try to help them to see, are they using these products, you

16  know, legitimately?  Are they using it nefariously?  Are they

17  even aware of any of the issue also -- any of these issues.

18  Q.   I'm handing you what's been marked as Plaintiff's

19  Exhibit 260, which is an e-mail exchange between you and

12:20:33 20  Terran, T-e-r-r-a-n, Williams in August of 2010.  And this

21  document is Bates labeled Cox_Sony_00005212.

22        Mr. Zabek, in your e-mail exchange with Ms. Williams,

23  didn't you in fact say at the bottom of your e-mail:

24  99 percent of DMCA violations is from people using peer-to-peer

25  on purpose and not Trojan activity; correct?

J. Zabek - By Depositon

1266

1    A.   Back then, yes, I did state that.

2    Q.   And yet you also understood that Cox didn't want to lose

3    customers over copyright violations, correct?

4    A.    Well, Cox didn't want to lose customers over almost

5    anything that we could help to avoid it if there was something

6    that we could assist that customer with.  I don't know a

7    business that does want -- that wants to lose customers.  And,

8    no, we did not want to lose customers.

9    Q.   What were the factors that the abuse department would

12:21:52 10   consider in deciding whether or not to terminate a customer?

11   A.    There are many.  I can't -- it's been so long.  Um, to

12   give you those.  A lot of things we would look at would be, you

13   know, was -- did the customer have any violations for, again,

14   malware.  You know, any kind of proxy.  Could we assist them,

15   you know.  Was there -- was there any software on the computer

16   that they may not have been aware of that maybe somebody else

17   put on there.  Or, again, if they were enacted by a hacker and

18   being used to actually transport that data through them also,

19   too.

12:22:34 20        So we would look at many different -- several

21   different factors on there too.  We'd also interview, of

22   course, the customer also, too, on that.

23   Q.   You just described -- I asked you --

24   A.   Yeah.

25   Q.   -- what were the factors that the abuse department would

J. Zabek - By Deposition

1267

1  consider in deciding whether or not to terminate a customer.

2  And what you described were a number of things, all of which go

3  to the question of whether or not the subscriber was using file

4  sharing on purpose, correct?

5  A.   That was where we would try to get to, yes.  That was the

6  information we were trying to get to.

7  Q.   Were there any other factors that you would consider?

8  A.   I can't recall any others at the present time.  I am sure

9  there might have been, but I can't recall any others.

12:23:15 10  Q.   Would you consider --

11  A.   It has been a while.

12  Q.   -- the number of infringement notices that had been

13  received regarding that subscriber?

14  A.   The number of infringement notices was something we

15  definitely looked at.

16  Q.   Did you look at the number of tickets?

17  A.   On the account?

18  Q.   Yes.

19  A.   Yes, we did.  And if there were any different tickets from

12:23:34 20  DMCA also, too.

21  Q.   Did you look at who the copyright owner was that had made

22  the infringement allegations?

23  A.   Yes.

24  Q.   And how did that play a role?

25  A.   Well, we would be looking at was it a -- you know, maybe

J. Zabek - By Depositon

1268

1   one of our partners that we had spoken with before, that they

2   had, you know, signatures on and things like that.  Or was it

3   maybe coming from a mom and pop, you know, that just suspected

4   something and wanted to send us a letter.  You know, was it a

5   valid DMCA complaint.

6   Q.   And who are the partners that you're referring to?

7   A.   Well, I use that term, it's just like the folks with HBO,

8   you know, MPAA.  Folks that we had talked to in the past and

9   made, you know, some agreements with, we will take their

12:24:14 10   notifications in and send them down to the customers.

11   Q.   Did you believe that the RIAA was a partner?

12   A.   I did.

13   Q.   But you don't mean partner in the formal sense of the

14   word, do you?

15   A.   No, no.  That we would be working together to hopefully

16   help each other out.

17   Q.   And why do you think you were working together with the

18   RIAA?

19   A.   Why?

12:24:39 20   Q.   Yes.

21   A.   Well, it would be kind of, I think, hopefully the right

22   thing to do.  So that the information they were giving us was

23   correct and the information that we were acting on was also

24   correct.  And that we were hopefully assisting them in getting

25   their notifications to our customers quickly.

J. Zabek - By Depositon

1269

1    Q.    You never spoke to them, did you?

2    A.    Myself?  No.  But our team had, to make sure that we were

3    getting in their notifications in properly.  And anytime that

4    we talked to somebody, even like the HBO or anything that we

5    had, we would consider them a partner at that time and they

6    could call us anytime if there were any issues.

7    Q.    You agree that a copyright holder who had evidence of

8    infringement on the Cox network had every right to send Cox an

9    infringement notice, whether or not Cox wanted it or not,

12:25:20  10    right?

11    A.    They could definitely send those in.

12    Q.    And the RIAA didn't need to be a partner or reach an

13    agreement with Cox in order to send notices, correct?

14    A.    No.  They could put them in an e-mail and send them over

15    if they wanted to.

16    Q.    Frankly, they could have sent you paper notices, right?

17    A.    I guess they could.  I never really got one though.

18    Q.    And they --

19    A.    It's always been an e-mail.

12:25:45  20    Q.    Paper notices would have been very difficult to manage,

21    correct?

22    A.    Oh, sure.  Yes, of course.

23    Q.    Even e-mail notices would have been difficult to manage,

24    correct?

25    A.    They were a little bit easier, but they can be

J. Zabek - By Depositon

1270

1     challenging.

2     Q.   And in fact, Cox wanted to receive notices in a specific

3     format with a specific set of criteria to a specific address,

4     correct?

5     A.   Yes.  We wanted them to do it in specific formats

6     following, you know, the digital signatures, things like that,

7     if we could get that.  This way it was easier for us to

8     actually process that complaint quickly and get it out to the

9     actual customer.

12:26:24 10   Q.   But, Mr. Zabek, based on your understanding, the RIAA

11    didn't have to send the infringement notices in a specific

12    format with a specific type of digital signature the way you

13    wanted them, right?

14    A.   Oh --

15    Q.   They could have sent the notices in a lot of different

16    ways that would have, as you understand it, put Cox on notice

17    of infringement on its network, correct?

18    A.   From my understanding, they could send them in in

19    different forms, sure.  Definitely.

12:26:58 20   Q.   But the RIAA, in fact, complied with all of your

21    requirements in terms of how they sent the notices, correct?

22    A.   Yes, as far as I recall, they did.

23    Q.   And they didn't need your agreement to send the notices,

24    right?

25    A.   From my understanding, yes.

J. Zabek - By Deposition

1271

1    Q.   And you would also look at the amount of money that the

2    subscriber was paying Cox, correct?

3    A.   You cannot look at the billing on there, but it wasn't a

4    factor in trying to keep the customer on.  We always wanted to

5    make sure we were doing the right thing.

6         But looking at that, there's always something there

7    that says, you know, this customer does pay us a bill and we

8    don't want to lose that if we can, of course, avoid it and

9    doing the right thing, hopefully keep them in our network if it

12:27:49 10  is possible, if it's possible.

11   Q.   Was the amount of money that the Cox subscriber was paying

12   you each month a factor that the abuse department would

13   consider in deciding whether to terminate a customer?

14   A.   In certain cases, we would look at it, but it was not a

15   huge factor.  But we would want to look and see how much they

16   were paying us each month.

17   Q.   So, yes, it was a factor?

18   A.   Yeah.  It wasn't a huge factor, but we would review their

19   accounts.

12:28:11 20  Q.   Mr. Zabek, you have Plaintiff's Exhibit 261, which is

21   Bates labeled Cox_Sony_00008318 through 8319.

22        This is an e-mail at the top from Thomas -- excuse

23   me -- Andrew Thompson in June of 2014.

24        Do you know who Andrew Thompson is?

25   A.   I do.

J. Zabek - By Deposition

1272

1    Q.    Who was -- who is Andrew Thompson?

2    A.    He was one of our abuse engineers.

3    Q.    And in this e-mail, he was -- the subject of the e-mail is

4    Termination Review, correct?

5    A.    Yes.

6    Q.    And in this e-mail he's trying to decide whether or not to

7    terminate a subscriber who had already been subject to three

8    suspensions to the (404) number?

9    A.    Third suspension to (404)?

12:29:16 10    Q.    So yes?

11    A.    Yes.

12    Q.    And in this e-mail, Mr. Thompson says:  This customer will

13    likely fail again, but let's give him one more change.  He pays

14    $317.63 a month; correct?

15    A.    Uh-huh, that is what is stated, yes.

16    Q.    You can put that aside.  Thank you.

17          The graduated response policies were not hard and

18    fast policies in your mind, were they?

19    A.    They were our guidelines to that.  We did make sure that

12:30:22 20    we had flexibility to make sure, again, we were just doing the

21    right thing for the customer.

22    Q.    Your concern was the customer, right?

23    A.    Well, the customer, the network, the Internet itself,

24    everyone else out there on the Internet.  We all had to live in

25    it -- live on it at the same time.

J. Zabek - By Deposition

1273

1  Q.   And you in fact would change the guidelines if it didn't

2  help your customer, correct?

3  A.   Depends.  There would be different factors on that.  Did

4  it help the network?  Did it help the Internet?  Was it helping

5  other folks on the Internet?  And did it help our -- yeah, and

6  did it help our customers to have a good -- hopefully a good

7  experience.

8  Q.   I am going to hand you what has been marked as Plaintiff's

9  Exhibit 262.  This is a Bates labeled Cox_Sony_00520152 through

12:31:08 10  155, an e-mail exchange with a number of people, including

11  yourself and Raymond Massenburg in April of 2011.

12          Who was Mr. Massenburg?

13  A.   I believe he was one of our abuse personnel in the TOC.

14  Q.   And in this e-mail exchange Mr. Massenburg was asking you

15  about suspensions for bulk accounts, correct?

16  A.   Yes.

17  Q.   And you indicated on April 18 on the third page of this

18  e-mail exchange that you couldn't just close the ticket due to

19  the DMCA and Cox's responsibility under the law, correct?

12:32:21 20  A.   I do see that there.

21  Q.   And then you go on in the next page in response to various

22  e-mails to say on April 19, 2011:  Guidelines are meant to be

23  broken/changed if it does not help the customer; correct?

24  A.   It does state that there.

25  Q.   And that's what you told him and others within the abuse

J. Zabek - By Depositon

1274

1    group, correct?

2    A.    The people on this list.

3    Q.    We looked at three different versions of Cox's graduated

4    response policies, correct?

5    A.    Yes.

6    Q.    The 2010, 2011, and 2012 versions, correct?

7    A.    Okay.  I believe so.

8    Q.    There was nothing in those written policies indicating

9    that a subscriber could be reactivated immediately after being

12:33:20 10    terminated, correct?

11    A.    I would have to go back to review, but I believe there is

12    not.

13    Q.    I'm going to hand you, Mr. Zabek, what's been marked as

14    Plaintiff's Exhibit 263, which is Bates labeled

15    Cox_Sony_00005514, which includes an e-mail from you on

16    August 12, 2009, to CCI - Abuse TOC.

17          Do you see that?

18    A.    Yes.

19    Q.    Do you know that e-mail address CCI - Abuse TOC?

12:34:28 20    A.    Yes.

21    Q.    And was that an e-mail address that went to the abuse

22    group?

23    A.    Yes, it would go down to our TOC personnel.

24    Q.    So this was an e-mail that you blasted out to the Cox TOC

25    group?

J. Zabek - By Depositon

1275

1    A.    People handling the tickets or phone calls coming in.

2    Q.    And the subject of the e-mail was DMCA Terminations,

3    correct?

4    A.    Yes.

5    Q.    And by DMCA, you were referring to copyright infringement?

6    A.    It was interchangeable as we would speak.

7    Q.    The DMCA was interchangeable for copyright infringement?

8    A.    Yeah.

9    Q.    And in this e-mail you headed off in bold language --

12:35:17 10  bolded -- excuse me -- language, that says:  Proprietary Info!

11   This is not to be shared about outside of Cox or abuse reps.

12   It is not to be passed to Tier 1 or Tier 2.  This info stays

13   within Tier 2.5 only; correct?

14   A.    That is what it stated.

15   Q.    So this was a document that you were sending out that was

16   not only internal to Cox, but internal to just Cox 2.5 reps,

17   correct?

18   A.    It would be to our highest level of reps.

19   Q.    And in this document you go on to indicate that:  As we

12:36:00 20  move forward in this challenging time, we want to hold on to

21   every subscriber we can; correct?

22   A.    It does state that.

23   Q.    And by we, you're referring to Cox, correct?

24   A.    In this one I believe I am.

25   Q.    And then you say:  With this in mind, if a customer is

J. Zabek - By Depositon

1276

1  terminated for DMCA or copyright infringement, you are able to

2  reactivate them after you give them a stern warning about

3  violating our AUP and the DMCA.

4          Do you see that?

5  A.   I do.

6  Q.   And that's what you wrote, right?

7  A.   That's what I typed out, yeah.

8  Q.   And then you went on to tell the team that:  We still must

9  terminate in order for us to be in compliance with safe harbor,

12:36:50 10  but once the termination is complete, we have fulfilled our

11  obligation; correct?

12  A.   That is what is stated there.

13  Q.   And then you say that:  After you reactivate them, the

14  DMCA counter restarts; the procedure restarts with the sending

15  of warning letters, just like a first offense; correct?

16  A.   That is stated there.

17  Q.   And by that, what you meant was that after somebody was

18  terminated, if they were reactivated, they wouldn't be

19  suspended or terminated for another notice, they would be

12:37:24 20  subject to another e-mail, and potentially seven other e-mails,

21  before they would be suspended again, correct?

22  A.   Not in every case.  Again, we had given the flexibility to

23  our folks that they could absolutely suspend off another single

24  one.  Things that we had talked about within our weekly

25  meetings.  You know, again, if anything wasn't clear and they

J. Zabek - By Depositon

1277

1    would ask on them, we would clear it up later.

2    Q.   But here what you were saying was that the procedure was

3    to restart with warning letters?

4    A.   That we could restart.

5    Q.   It doesn't say, could, does it?

6         It says:  The procedure restarts with sending of

7    warning letters.

8         Right?

9    A.   It does say that.

12:38:03 10    Q.   It doesn't say, use your best judgment to do what's best

11    for the copyright holders, does it?

12    A.   It does not say that specifically.

13    Q.   Well, it doesn't even infer it, does it?

14    A.   Yes.

15    Q.   Yes, it doesn't?

16    A.   Correct.

17    Q.   And this e-mail says:  This is to be an unwritten

18    semi-policy; right?

19    A.   Yes.

12:38:28 20    Q.   We do not talk about it or give the subscriber any

21    indication that reactivating them is normal; right?

22    A.   Correct.

23    Q.   Now, this new policy you say in here only pertains to

24    copyright infringement, not to spammers or hackers, correct?

25    A.   In this case, yes.  Our folks would not be able to look at

J. Zabek - By Depositon

1278

1  a spammer or a hacker and make a judgment using their best

2  judgment to turn them back on.  They were empowered in these

3  cases.

4  Q.   So the reactivation policy that was set out in your

5  August 12, 2009, e-mail only applied to copyright infringement

6  violations, not to other violations of the AUP, correct?

7  A.   In this -- in this message?

8  Q.   Yes.

9  A.   Yes.

12:39:33 10  Q.   When you say in the beginning of this e-mail, as we move

11  forward in this challenging time, what do you mean by

12  "challenging time"?

13  A.   I couldn't tell you.  Unfortunately, it's too long ago, I

14  am sorry.

15  Q.   Was it a reference to the increasing number of DMCA

16  notices or infringement notices that the abuse group was

17  receiving?

18  A.   I wouldn't want to guess.

19  Q.   This e-mail you didn't want to be shared with customers,

12:40:09 20  correct?

21  A.   That would be correct.

22  Q.   And you didn't want it to be shared with reps other than

23  abuse group, correct?

24  A.   Other than our 2.5 representatives.

25  Q.   And in fact, the reason that you said that you sent this

J. Zabek - By Depositon

1279

1  e-mail was because you wanted to hold on to every subscriber,

2  correct?

3  A.   Well, we were sending this, we wanted to make sure that we

4  were doing the right -- again, always the right thing for the

5  customers.  Are we helping them enough?  Did they understand

6  what could happen if they go through that?

7       Yeah, we wanted to make sure that our -- you know,

8  helping our customers and helping our folks down in the field

9  to hopefully make the right decisions on this.

12:40:52 10       But we would not tell the customers because we did

11  not want them, well, gaming the system.  I could go up to this

12  many and, you know, and they just come right back on.

13  Everything was a -- we tried to do a case-by-case basis.

14  Q.   In your prior testimony on this document, you in fact

15  testified in 2015, did you not, that you sent this semi-policy

16  out because you wanted to hold on to every subscriber?

17  A.   There -- again, there's no company that wants to lose

18  customers.  And, yes, we do want -- we did want to hold on to

19  every customer that we could as long as they were a good

12:41:33 20  customer.

21  Q.   Mr. Zabek, was the reason you sent out this unwritten

22  semi-policy because you wanted to hold on to every customer?

23  A.   These were sent out -- again, we don't -- we never wanted

24  to lose a customer.  Again, I don't know businesses that do.

25  We also wanted to make sure that our 2.5 people understood that

J. Zabek - By Depositon

1280

1    they were really the only ones that could really review the

2    case and see if we could reactivate them at the time.  This is

3    why I only stayed here with Tier 2.5.  We didn't authorize this

4    or send it out to any of the customers.  Yeah.

5    Q.   I have handed you what's been marked as Plaintiff's 264,

6    which is Bates-labeled Cox_Sony_00005520 through 21.  It

7    appears to be a series of e-mail exchanges that starts with an

8    e-mail from Kat Rhodes to CCI - Abuse Corporate in June of

9    2010.

10   A.   Uh-hum.

11   Q.   So now this is roughly ten months after your e-mail, the

12   unwritten semi-policy that we were discussing in exhibit -- in

13   the prior exhibit, right?

14   A.   Yeah, prior -- or before.

15   Q.   And in this e-mail Ms. Roads asks:  Just for

16   clarification, when a customer is terminated for the first

17   time, do we need your okay to turn them back on, or do we make

18   the call?

19            And she says:  Going by the documentation, it is your

12:43:20 20   call; right?

21   A.   I'm sorry?

22   Q.   That's what the e-mail that she sent says?

23   A.   She is asking.

24   Q.   Yeah.  And you responded to her e-mail the next morning,

25   correct, on June 17, 2010?

J. Zabek - By Deposition

1281

1    A.    Yes.

2    Q.    And in your response you say:  If it is for DMCA or

3    copyright infringement, you can go ahead and reactivate; right?

4    A.    I see that.

5    Q.    That's what you said, right?

6    A.    I see that, yeah.

7    Q.    And it is what you said?

8    A.    It is what I typed out there.

9    Q.    Yeah.  And then you said:  Any other issues, hacking,

12:43:55 10   spam, et cetera, give us a heads up and we can all look

11   together; right?

12   A.    That is stated there.

13   Q.    And then Ms. -- do you know who Casey Fraysier is?

14   A.    Yes.

15   Q.    And who is Casey Fraysier?

16   A.    He was one of our abuse representatives.

17   Q.    And Mr. Fraysier wrote on June 22, 2010, that:  I think

18   it's a good idea because in 99 percent of the cases we're going

19   to turn the customer back on.

12:44:23 20          Do you see that?

21   A.    I do see that.

22   Q.    Well, is that how you would interpret that sentence,

23   reading it?

24   A.    I would say he is incorrect in that, but that is the way I

25   would be reading it.  I don't know if that was his intent.  I

J. Zabek - By Depositon

1282

1    don't know his intent.

2    Q.    Nothing within the graduated response policy talks about

3    reactivations, correct?

4    A.    Yes.

5    Q.    And in fact, you sent e-mails to others within Cox

6    indicating that from your perspective DMCA equaled reactivate,

7    correct?

8    A.    At one point in time I had sent an e-mail on that to a

9    particular individual.

12:45:06 10    Q.    In fact, you didn't just send it to a particular

11    individual, did you, Mr. Zabek?  You sent it broadly to others

12    within the abuse group, correct?

13    A.    Yeah, I think it was a reply to all.

14    Q.    I'm going to hand you what's been marked as Plaintiff's

15    265, which is Bates-labeled 00005532 through 33.

16          And in this e-mail exchange, Mr. Zabek, on April 20,

17    2011, you sent an e-mail to Mr. Sikes and to the entire Hampton

18    Roads abuse group and abuse corporate group indicating that

19    DMCA equaled reactive, correct?

12:45:53 20    A.    I do see that there.

21    Q.    And that's what you wrote, correct?

22    A.    Yes.

23    Q.    And then you followed up that e-mail literally a minute

24    later saying:  Well -- excuse me.  You followed up that e-mail

25    literally one minute later saying:  You can make them wait a

J. Zabek - By Depositon

1283

1 day or so if you want, smiley face; correct?

2 A.   Yes.

3 Q.   But you didn't make sure that they understood those things

4 in that e-mail, did you?

5 A.   No, I didn't think I had to.  Hopefully they were very

6 smart people that we hired down there and would understand

7 that.

8 Q.   Mr. Zabek, I'm going to hand you what was previously

9 marked as Plaintiff's 82.

12:46:40 10        This is an e-mail from you on January 17, 2010, to

11 Andrea Dameri and CCI - abuse corporate, correct?

12        This exhibit is an e-mail exchange between you and

13 Andrea Dameri in January of 2010, correct?

14 A.   Yes.

15 Q.   And in this e-mail exchange -- this e-mail exchange

16 concerns a particular customer, correct?

17 A.   This is speaking about a particular customer.

18 Q.   The e-mail exchange with -- begins with Ms. Dameri asking

19 you about a particular customer, correct?

12:47:32 20 A.   Yes.

21 Q.   And Ms. Dameri indicates that that customer has had

22 several e-mail warnings, followed by suspensions up to TOC, and

23 was terminated December 8.

24        She then goes on to say:  Voicemail call back on

25 January 7 shows I explained to the account holder they could

J. Zabek - By Depositon

1284

1    request review in six months for possible reactivation.

2    A.    Uh-hum.

3    Q.    Do you see that?

4    A.    Yeah.

5    Q.    And then it says that:  The ICOMS notes show that somebody

6    called about -- that the customer called about the January bill

7    on January 11 and was reinstated; right?

8    A.    ICOMS notes shows -- it does state that.

9    Q.    And then Ms. Dameri says:  We already have a DMCA

12:48:23 10    complaint on -- and then lists a ticket number, right?

11    A.    Yes.

12    Q.    So she is saying that even after being reinstated, now

13    there is another DMCA complaint, correct?

14    A.    Correct.

15    Q.    And then you respond to Ms. Dameri, correct?

16    A.    Yes.

17    Q.    And you say:  This is fine.  If asked, I would have

18    allowed them back on; right?

19    A.    I did say that.

12:48:57 20    Q.    And you say:  We've been turning customers back on who

21    have been terminated for DMCA complaints.  Correct?

22    A.    I do show that there.

23    Q.    And then you say:  As long as our process of warnings,

24    suspension, then termination is followed, we can turn the

25    customer back on and start the DMCA count over; right?

J. Zabek - By Depositon

1285

1   A.   That is stated there.

2   Q.   Okay.  And that is what you wrote, correct?

3   A.   Yes.

4   Q.   And then you went on and say:  During this time, as we try

5   to keep customers and gain more RGUs, it is important to try

6   and balance the needs of the company with the protection of the

7   network; correct?

8   A.   Yes.

9   Q.   So I understand what it means to say, as we try to keep

12:49:39 10   customers, what does "gain more RGUs" mean?

11   A.   That would be more customers, revenue generating units.

12   Q.   RGU stands for revenue generating units?

13   A.   Trying to -- yeah, trying to grow our customer base, of

14   course.

15   Q.   Then you go on to say:  DMCA does not hurt the network

16   like DOS attack, spam, or hacking; right?

17   A.   Yes.

18   Q.   And then you say:  It is not something we advertise,

19   however; correct?

12:50:10 20   A.   It does state that there.

21   Q.   The DOS attacks, spam, and hacking, would hurt Cox, right?

22   A.   It would actually hurt our customers realistically.

23   Q.   Cox and the customers, correct?

24   A.   Depending on the -- it depends on the attack.  But it

25   could be either/or or both.  But, realistically, most of those

J. Zabek - By Depositon

1286

1  cases, it was really our customers that got hurt.

2  Q.   And who got hurt by the copyright infringement was the

3  copyright holders, correct?

4  A.   If there was that going on in the network, yes, it would

5  be the copyright holders.

6  Q.   Mr. Zabek, you have been handed what has been marked as

7  Plaintiff's 266, which is Bates labeled Cox_Sony_00005528 and

8  29.

9         This is an e-mail exchange between you and, among

12:50:57 10  others, Casey Fraysier in August of 2010, correct?

11  A.   I see that here.

12  Q.   And originally Mr. Fraysier -- it is a mister, right?

13  A.   It is.

14  Q.   Mr. Fraysier indicates to you that there seems to be some

15  confusion, so he wants to make sure that we're all on the same

16  page, right?  And -- right?

17  A.   This is what he is stating.

18  Q.   And then he asks:  If you have a customer who has been

19  terminated for DMCA, and we have subsequently reactivated their

12:51:40 20  CHSI service, or high-speed service, the next complaint for

21  DMCA that they receive is to be treated as a brand-new

22  complaint.

23         He goes on and says:  Once terminated, the customer

24  is given a clean slate so that the next complaint after

25  termination should be a hold for more complaints.

J. Zabek - By Depositon

1287

1    He goes on to say:  The next one after that would

2    start their warnings 1 through 6, then the suspensions.

3    Right?  Is that what Casey says, Mr. Zabek?

4    A.   This is what he is stating, yes.

5    Q.   And you respond to his e-mail and you say:  Hey all,

6    internal info only, do not forward.  After termination of

7    DMCA -- or, in other words, for a copyright infringement,

8    right?

9    A.   Uh-hum.

12:52:30 10   Q.   If you do suspend someone for another DMCA violation, you

11   are not wrong.

12   And by DMCA violation, again you mean copyright

13   infringement, right?

14   A.   Yes.

15   Q.   However, if the customer has a Cox.net e-mail, we would

16   like to start the warning cycle over, hold for more, et cetera.

17   That's what you say, right?

18   A.   That is there.

19   Q.   And then you say:  A clean slate, if you will; right?

12:52:58 20   A.   Uh-hum.

21   Q.   And then you go on to say in this e-mail:  This way we can

22   collect a few extra weeks of payments for their account; right?

23   A.   I did say that in there with my sarcastic smiley face,

24   yes.

25   Q.   Well, but it was in fact true that you would continue to

J. Zabek - By Deposition

1288

1  collect payments, correct?

2  A.   Well, if we did have them on there, they would be paying

3  their bills.

4  Q.   Right.  So if you reactivated the subscriber, Cox would

5  now get paid.  Whereas if you didn't reactivate them, Cox would

6  not be paid by that subscriber, right?

7  A.   The billing would start at that time, yes.  But in these

8  cases, you know, with, again, sarcastic remarks to our folks in

9  the field that we had relationships with to make sure that we

12:53:43 10  kept at least our relationship open too.  We would do that

11  every once in a while.  But it's not --

12  Q.   What was sarcastic about that?

13  A.   You know, it's little things like, hey, we can collect a

14  couple extra bucks, you know, wink wink, fudge fudge, whatever.

15         We had really good relationships with our folks down

16  there.  And it wasn't always straight up -- wasn't always

17  straight up seriousness that we took everything.

18         But the statement, I mean, obviously, if we did, you

19  know, reactivate the customer, we would be getting billing back

12:54:08 20  for them to collect their, you know, dollars from them.

21  Q.   I'm going to hand you, Mr. Zabek, what has been marked as

22  Plaintiff's 267.

23         Now I have really handed you 267, which is Bates

24  labeled Cox_Sony_00511210.

25         This is an e-mail exchange between you and

J. Zabek - By Depositon

1289

1    Mr. Vredenburg, among others, correct?

2    A.    Yes.

3    Q.    Who was Mr. Vredenburg?

4    A.    Roger was one of our technical operations team members.

5    Q.    He reported to you either directly or indirectly; is that

6    right?

7    A.    He reported to Chris Burns.  He would work the tickets as

8    they would come in, or assist customers as they were calling

9    in.

12:55:04 10  Q.    Was he in the abuse group somehow?

11   A.    He was, yes.  But none of them reported directly to me at

12   all.

13   Q.    And Mr. Vredenburg e-mails you and others and says -- with

14   reference to a ticket number here and says:  Here is another

15   example of a customer that I consider an habitual abuser.

16          Do you see that?

17   A.    I do.

18   Q.    And then he goes on and says:  In a year was terminated

19   twice and turned back on; right?  That's what he says?

12:55:42 20  A.    That is what is stated here.

21   Q.    And then Mr. Vredenburg goes on to say:  I suspended him

22   again since no e-mail address.  And according to procedure, he

23   starts the process over again -- process over; right?  Correct?

24   A.    That is what is stated here.

25   Q.    And you responded on March 5, 2011, to Mr. Vredenburg and

J. Zabek - By Deposition

1290

1    you say:  It is fine, we need the customers; correct?

2    A.    I do see that.

3    Q.    Well, but Roger called him a habitual user, and you've

4    repeatedly told us today that the discretion was left to the

5    abuse group representative, right?

6    A.    Yes.

7    Q.    And yet Roger is calling this guy a habitual abuser, and

8    you say its okay for Roger to reactivate him again, right?

9    A.    I do.

12:56:34 10    Q.    You just said you don't spy on your customers, right?

11    A.    Yes.

12    Q.    Do you believe that when Cox received a notification of

13    infringement, that that meant that customer had engaged in one

14    act of copyright infringement?  Or do you believe that the

15    copyright owner was telling you that a subscriber was

16    infringing generally on the network with respect to a

17    particular work?

18    A.    I would hope that they weren't doing anything other than

19    the violation that we did receive.  I don't speculate if the

12:57:05 20    customer or guess if they were going to be sending out

21    thousands and thousands and we only got one.

22          My feelings on that, they could have been.  But until

23    we actually see, you know, some kind of evidence or a complaint

24    on it, I wouldn't want to try and guess.

25    Q.    So, Mr. Zabek, so you believed that when you received an

J. Zabek - By Depositon

1291

1    infringement notice from a copyright holder, that that was just

2    notice of a single infringement and you weren't aware that that

3    subscriber may have been broadly engaged in infringement other

4    than that one point in time?

5    A.    Really, I'd have no proof that they were doing anything

6    other than that one -- than that one violation.  We could

7    suspect or guess or my gut or anything.  And as Roger says

8    here, he considers them a habitual abuser.  But that's his

9    feeling on it.  And we try not to go with feelings, of course.

12:57:59 10   Q.    What do you mean you don't want to go by feelings?  Didn't

11   you say that it's up to the representative to make

12   discretionary choices?

13   A.    As we got up to other terminations and when they looked at

14   that evidence, that body of evidence that was in there, they

15   could make their determinations on that and, again, make their

16   best judgment call on those issues.

17        But to say that we're going to just -- this is a

18   habitual user, or they're a bad person, you know, that was not

19   the biggest -- not our big factor saying that they're just

12:58:34 20   considering and doing it constantly all the time.

21   Q.    With the benefit of hindsight, do you think this was a

22   mistake letting this customer back on the network, Mr. Zabek?

23   A.    I don't know.  I would have to go back, and I would want

24   to look at the account.

25   Q.    Mr. Zabek, I'm going to hand you what was previously

J. Zabek - By Deposition

1292

1      marked Plaintiff's 81 --

2              THE COURT:  Why don't we stop here since you have got

3      a new document, and it's 1 o'clock.

4              All right.  We are going to break for an hour, and we

5      will come back and continue to listen to the deposition.

6              So have a good lunch, and we will see you at

7      2 o'clock.

8              Thank you, you are excused.

9              NOTE:  At this point the jury leaves the courtroom;

10     whereupon the case continues as follows:

11     JURY OUT

12             THE COURT:  Okay.  Anything before we break?

13             MR. ELKIN:  Not here, Your Honor.

14             MR. OPPENHEIM:  Not from the plaintiffs, Your Honor.

15             THE COURT:  All right.  We're in recess for one hour.

16             NOTE:  The morning portion of the case on December 9,

17     2019, is concluded.

18             ------------------------------------------

19

20                    CERTIFICATE OF COURT REPORTERS

21             We certify that the foregoing is a true and
               accurate transcription of our stenographic notes.

22                          /s/  Norman B. Linnell

23                     Norman B. Linnell, RPR, CM, VCE, FCRR

24                          /s/  Anneliese J. Thomson

25                     Anneliese J. Thomson, RDR, CRR