UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME 6 (P.M. Portion)

TRIAL TRANSCRIPT

December 9, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

```
                                                                    1294

 1    APPEARANCES:

 2
      FOR THE PLAINTIFFS:           MATTHEW J. OPPENHEIM, ESQ.
 3                                  SCOTT A. ZEBRAK, ESQ.
                                    JEFFREY M. GOULD, ESQ.
 4                                  MICHAEL J. DRUCKMAN, ESQ.
                                    ANDREW L. GUERRA, ESQ.
 5                                  LUCY G. NOYOLA, ESQ.
                                    JIA RYU, ESQ.
 6                                  Oppenheim + Zebrak, LLP
                                    4530 Wisconsin Avenue, N.W.
 7                                  5th Floor
                                    Washington, D.C. 20015
 8

 9    FOR THE DEFENDANTS:           THOMAS M. BUCHANAN, ESQ.
                                    Winston & Strawn LLP
10                                  1700 K Street, N.W.
                                    Washington, D.C. 20006-3817
11                                    and
                                    SEAN R. ANDERSON, ESQ.
12                                  MICHAEL S. ELKIN, ESQ.
                                    THOMAS P. LANE, ESQ.
13                                  CESIE C. ALVAREZ, ESQ.
                                    Winston & Strawn LLP
14                                  200 Park Avenue
                                    New York, NY 10166-4193
15                                    and
                                    JENNIFER A. GOLINVEAUX, ESQ.
16                                  THOMAS J. KEARNEY, ESQ.
                                    Winston & Strawn LLP
17                                  101 California Street, 35th Floor
                                    San Francisco, CA 94111-5840
18                                    and
                                    MICHAEL L. BRODY, ESQ.
19                                  Winston & Strawn LLP
                                    35 West Wacker Drive
20                                  Chicago, IL 60601
                                      and
21                                  DIANA HUGHES LEIDEN, ESQ.
                                    Winston & Strawn LLP
22                                  333 South Grand Avenue
                                    Suite 3800
23                                  Los Angeles, CA

24

25
```

1295

1

                                I N D E X

2

3    WITNESSES ON BEHALF OF
     THE PLAINTIFFS:

4

5    JASON ZABEK (Cont'd. Video Deposition)

6    Examination by Mr. Oppenheim:          Page 1297
     Examination by Mr. Elkin:         Page 1349
7    Further Examination by Mr. Oppenheim:       Page 1385

8
     BRENT BECK
9
     Direct Examination by Mr. Gould:        Page 1389
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1296

1    A F T E R N O O N   S E S S I O N

2         NOTE:  The afternoon portion of the case on

3    December 9, 2019, begins in the absence of the jury as follows:

4    JURY OUT

5         THE COURT:  All right.  Ready for the jury?

6         MR. OPPENHEIM:  Yes.  Just one very quick, apparently

7    one of the jurors attempted to talk in the elevator to one of

8    our clients.  He didn't respond, but it might be useful to just

9    tell the jury we're not being rude; we're just trying to

02:06:20 10   observe the formalities of the process and --

11        THE COURT:  Yeah.  Okay.  Thank you.

12        MR. OPPENHEIM:  Thank you, Your Honor.

13        THE COURT:  All right, Joe, let's get our jury.

14        MR. OPPENHEIM:  And by the way, I don't think it was

15   substantive at all.

16        THE COURT:  Okay.

17        NOTE:  At this point, the jury returns to the

18   courtroom; whereupon, the case continues as follows:

19   JURY IN

02:07:13 20        THE COURT:  All right.  Please have a seat.

21        All right.  Let me just remind you-all that, you

22   know, we all use the same elevators, and we, you know, come in

23   and out together at times.  And so if somebody doesn't greet

24   you and say hi, it's probably because they're afraid to, which

25   is a good thing.

J. Zabek deposition - Examination

1297

1          All right.  Let's continue our deposition.

2          NOTE:  The testimony of JASON ZABEK via video

3    deposition continues to be played into the record as follows:

4                    EXAMINATION (Cont'd.)

5    BY MR. OPPENHEIM:

6    Q.   Mr. Zabek, I'm going to hand you what was previously

7    marked Plaintiffs' 81, which is an e-mail from Roger Vredenburg

8    to a variety of individuals, yourself included, in May of 2012.

9    Correct?

02:08:15  10  A.   Take a look.  Okay.

11   Q.   So this e-mail exchange begins when Mr. Sikes -- who I

12   think you've previously said was your right-hand guy?

13   A.   He was our senior engineer.

14   Q.   Okay.

15        -- sending an e-mail out to the abuse group asking

16   for thoughts on the current format of the residual abuse M&P

17   doc, right?

18   A.   Yes.

19   Q.   And the residual abuse M&P doc would be the policies we

02:09:20  20  looked at earlier, the graduated response policies we looked at

21   earlier?

22   A.   The residential abuse, M&P doc, um-hum.

23   Q.   And Mr. Vredenburg responded to Mr. Sikes' invitation for

24   a comment, correct?

25   A.   He did respond.

J. Zabek deposition - Examination

1298

1    Q.   And in response, Mr. Vredenburg says that:  Right now

2    after customers are terminated and reactivated for DMCA, they

3    start all over again in the process (warnings, suspensions,

4    final, termination).

5             Right?  He says that?

6    A.   He does state that.

7    Q.   And then he says:  This gives the customer ten chances to

8    share files before they even have to talk to us (404) again.

9    Right?

02:10:05 10  A.   That is there.

11   Q.   And, and when he says:  before they have to talk to us

12   (404) again, that's a reference to being suspended so that they

13   have to call in to the highest level of corporate abuse,

14   correct?

15   A.   That is the -- yes, they are speaking of the (404) number.

16   Q.   And Mr. Vredenburg doesn't say that he had discretion to

17   terminate when there was a notice after reactivation, right?

18   He, he says that they start the process all over again,

19   correct?

02:10:38 20  A.   He does state that.

21   Q.   Okay.  He says then, suggests that he would like a

22   procedure to be that after the customer is reactivated from a

23   termination and Cox gets further complaints, then the customer

24   is suspended again to the (404) number right away, right?

25   A.   He is requesting that.

1299

1    Q.   So he's suggesting that you don't start the process all

2    over again with step 1 in the terminate graduated response

3    process, correct?

4    A.   He is.

5    Q.   Why is it that you would reactivate customers?

6    A.   Could be a multitude of reasons.  If we found certain

7    things that, you know, proxy servers were on -- again, malware,

8    proxy servers, open WiFi we discover and somebody stealing from

9    them.

02:11:47 10   Q.   But you would reactivate without any, without any

11   information that there was malware or proxy servers, correct?

12   A.   We would do our research on those.  And I can't tell

13   you -- I couldn't speak for every single case.  We would want

14   to make sure that we were doing our due diligence, and those

15   are the things that we would look for.  I couldn't tell you off

16   the top of my head every single case and why they got

17   reactivated.

18   Q.   Mr. Zabek, Cox had a policy that it would blacklist

19   certain vendors from sending infringement notices, correct?

02:12:29 20   A.   I don't know policy.

21   Q.   So Cox blacklisted certain vendors who were sending

22   infringement notices; is that correct?

23   A.   To my recollection, there was only one.

24   Q.   And who was that?

25   A.   Digital Rights Corp.

J. Zabek deposition - Examination

1300

1  Q.   And you don't recall that there were other vendors?

2  A.   I do not recall.

3  Q.   What about payartists.com?  Does that ring a bell?

4  A.   It does, yep.

5  Q.   And was payartists.com blacklisted?

6  A.   I do not recall that.

7  Q.   Is it possible that there were others who were blacklisted

8  and you just don't recall?

9  A.   I would say it's possible, but I don't recall.

10 Q.   Okay.

11 A.   The one that I know of would be Digital Rights.

12 Q.   And the blacklisting of vendors is something that was not

13 described in Cox's abuse policies, correct?

14 A.   I'm sorry, say that again?

15 Q.   Blacklisting was not described anywhere in Cox's abuse

16 policies, correct?

17 A.   Correct.

18 Q.   So like reactivation, blacklisting was something that

19 occurred by the abuse team but wasn't set forth in the policy,

02:13:50 20 right?

21 A.   The abuse team had not blacklisted anyone.  That would go

22 to our legal department, and they would make that

23 determination.

24 Q.   In addition to reactivation and blacklisting, the other

25 thing that wasn't contained within the graduated response

J. Zabek deposition - Examination

1301

1   policy was the fact that Cox imposed caps on vendors in terms

2   of the number of notices that Cox would take on a daily basis,

3   correct?

4   A.   With certain, yeah, copyright holders, there were caps on

5   those, and it was not documented in the policy.

6   Q.   And when you made that decision, you weren't making the

7   decision on the, on the number of notices that Cox would

8   receive based on the number of copyrights the copyright owner

9   held, right?

02:14:43   10   A.   Yes, I believe so.

11   Q.   The decision to impose caps on rights owners was the

12   result of Cox not wanting to overwhelm the abuse team's ability

13   to handle infringement notices as they came in, right?

14   A.   Well, a lot of it with our, with our automation, we were

15   incredibly efficient in getting those notifications out to our

16   customers.  By capping certain copyright holders coming in, it

17   was an assistance on help to those customers calling in.  We

18   wanted to make sure that we could get to those folks and they

19   weren't just leaving messages and being dropped.

02:15:26   20   Q.   So the decision to impose caps was in order to ensure that

21   Cox's abuse team could handle the incoming calls that would

22   result from infringement notices, right?

23   A.   To a certain extent, yeah.  Yeah.

24   Q.   In fact, you're not aware of any rights owners that were

25   not subject to caps, right?

J. Zabek deposition - Examination

1302

1    A.    I don't think I could answer that 100 percent.  I'm sure

2    there may be some that we never had to, if it was lower than,

3    than a certain amount, it was just a few coming in.  I don't

4    recall if there was any that we did or didn't have.

5    Q.    Were there any complainants that you would accept an

6    unlimited number of DMCA complaints from?

7    A.    I'm sorry, I can't remember if there was any of those at

8    this time.

9    Q.    In fact, you maintained a cap of 200 notices per weekday

02:16:40 10   for most copyright owners, correct?

11   A.    The 200 days about, yeah, an average for certain copyright

12   holders, yeah.

13   Q.    Put aside the average for a moment.

14   A.    Sure.

15   Q.    The default number of notices that Cox would receive --

16   was willing to receive from any copyright owner was 200 per

17   weekday, correct?

18   A.    Yeah, 200.

19   Q.    And, in fact, you would -- any notices that were received

02:17:16 20   over the 200 limit would be closed, correct?

21   A.    They would be attached to the account and then closed.

22   Q.    And you would do this without even speaking to copyright

23   owners from time to time, correct?

24   A.    When a copyright holder had hit a limit, they would get a

25   notification from our systems.

J. Zabek deposition - Examination

1303

1   Q.   Mr. Zabek, I'm handing you what's been marked as

2   Plaintiffs' 269, which includes e-mails back and forth between

3   Brent Beck, you, and others within the abuse department in

4   March of 2010, and you'll see at the beginning of this, there's

5   an e-mail from Brent Beck indicating that -- giving you a

6   heads-up that Starz Media was increasing their volume of

7   notices, right?

8   A.   That's what he is stating there.

9   Q.   And that at the time that he sent this e-mail, that Starz

02:18:41  10   Media had not been subject to a hard limit or a cap, right?

11   A.   That's what he is stating there.

12   Q.   And, and you respond to him:  Limit them to 200 like

13   everyone else and close the rest.  Right?

14   A.   That is what's stated there, yes.

15   Q.   From time to time, you would then increase the number of

16   notices that you would accept from certain copyright owners,

17   correct?

18   A.   I know in some cases, we, we had, when they had reached

19   out to us.

02:19:09  20   Q.   And among those you agreed to -- Mr. Zabek, you've been

21   handed what's been marked as Plaintiff's Exhibit 54, previously

22   marked as Plaintiffs' Exhibit 54.

23        This is an e-mail exchange that begins with an e-mail

24   from Matt Carothers on February 19, 2014, right?

25   A.   February 2019 -- or, I'm sorry, 2014?

J. Zabek deposition - Examination

1304

1  Q.   February 19, 2014, right.

2  A.   Yes, yes.

3  Q.   And Mr. Carothers asks Sara -- do you know who Sara is, by

4  the way?

5  A.   I do.

6  Q.   Who is Sara?

7  A.   Sara Roper.

8  Q.   And who is Sara Roper?

9  A.   At this time, I don't know what she's doing now.  I think

02:20:21  10  she's moved on.  But at this time, I believe she was part of

11  the CenturyLink abuse department.

12  Q.   Okay.  So Matt Carothers on February 19, 2014, asks

13  Ms. Roper whether or not she's seen a complaint spike from

14  Digital Rights Corp and what's been done with those complaints,

15  right?

16  A.   I believe that's what he's asking at the bottom here.

17  Q.   And Mr. Sikes responds:  We are limiting each DMCA

18  complainant by e-mail address to 200 per day.

19       Correct?

02:20:57  20  A.   That is what Mr. Sikes is stating.

21  Q.   And then David -- excuse me -- Ms. Roper responds with a

22  question, to which David Dee at CenturyLink -- which I guess is

23  part of the abuse department --

24  A.   Okay.

25  Q.   -- said:  Wow, you're limiting each complainant e-mail

J. Zabek deposition - Examination

1305

1    address to 200 per day?  Can we do that, Sara?  Can you imagine

2    what I could do with the freed-up computing and storage

3    resources?

4           Right?

5    A.   That is what David has put down here, yes.

6    Q.   Right.  And you respond to David, right?

7    A.   Yes.  Yes.

8    Q.   And in response to David's question about whether or not

9    you could limit the number of infringement notices that you

02:21:46 10  would accept, you responded:  F the DMCA!!!  Ya, we told each

11   copyright holder to limit them or give us money to hire people.

12          Right?

13   A.   That's what we had written down, yes.

14   Q.   That's what you wrote?

15   A.   Correct.

16   Q.   And by "F the DMCA," you meant fuck the DMCA, right?

17   A.   Yes.  There is a little bit more context around that also,

18   too.

19   Q.   Please explain.

02:22:20 20  A.   Sure.  I mean, with every issue that we have coming into

21   abuse, not just DMCA but everything else, and with Digital

22   Rights Corporation calling us on a consistent basis, it was

23   very tough.  They had their settlement notifications in there.

24   It was really frustrating the amount that, you know, they were

25   sending us on a basis.  They had already sent so many that they

J. Zabek deposition - Examination

1306

1    had actually slowed down our server.

2         So the frustration grows when we're trying to work

3    with them to get a good amount that comes in and send them to

4    our customers completely, but they were, they were very

5    unwilling to work with us on that, and it's a challenge.

6         For me, it was always with the law allowing a, you

7    know, a threat to a customer will sue you if not, and it just

8    didn't seem right on that.  And the frustration keeps growing.

9    So regrettable, but, you know, we said it.  Didn't mean we

02:23:20  10   didn't try to do our jobs, though.

11   Q.   Mr. Zabek, you didn't say "F Digital Rights Corp," did

12   you?

13   A.   No.  That was a joke earlier.

14   Q.   You said "F the DMCA," right?

15   A.   Yes.

16   Q.   And you're referring to the copyright law there, right?

17   A.   I'm referring to the actual DMCA.

18   Q.   What did you understand the DMCA to be?

19   A.   The Digital Millennium Copyright Act.

02:23:42  20   Q.   And then you said:  Ya, we told each copyright holder to

21   limit them or give us money to hire people.

22        Right?

23   A.   Um-hum.  I did write that.

24   Q.   You didn't say we told Digital Rights Corp to limit them

25   or give us money, right?

J. Zabek deposition - Examination

1307

1    A.    Right.

2    Q.    So you were talking about each copyright owner --

3    A.    Yeah.

4    Q.    -- correct?

5    A.    In this e-mail, but, again, the context -- I mean, we did

6    not tell every -- we didn't tell copyright holders to give us

7    money and things like that.  These were things that we were

8    talking to our friends over in -- another ISP.

9            You know, again, with the "F the DMCA," if they were

02:24:20 10  allowing a blackmail e-mail to come through for a customer

11   without due process, that's -- that was very interesting to

12   see.  It was very frustrating --

13   Q.    Mr. Zabek, this e-mail -- this e-mail that you're

14   responding to asks you the question about limiting each

15   complainant e-mail address to 200 a day.

16   A.    Um-hum.

17   Q.    The question you're asked says nothing about Digital

18   Rights Corp, correct?

19   A.    Correct.

02:24:44 20  Q.    And you're responding to that general question, correct?

21   A.    I'm just responding in general.

22   Q.    Okay.  And you were frustrated at the number of notices

23   that you were receiving at Cox, right?

24   A.    Not necessarily the number.  There was, of course,

25   definitely a lot.  The content of those in this area, where,

J. Zabek deposition - Examination

1308

1    you know, looking at -- again, telling our customers that you

2    will be terminated unless you pay us an amount of money and

3    then we'll forgive you, and that's where my frustration comes

4    in, where the law didn't really allow that.

5    Q.   So, so your testimony today is that the reason you

6    wrote "F the DMCA" is because you were frustrated with the

7    rights owners that were asking to settle with infringers; is

8    that right?

9    A.   That it would allow that to happen, yeah.  I thought it

02:25:32 10   was odd.  It doesn't mean we didn't process those, but it was

11   frustrating.

12   Q.   Nothing in your e-mail of February 19, 2014, references

13   that, does it?

14   A.   No, not at all.  And --

15   Q.   Mr. Zabek, the limits that you set or the caps that you

16   set were intended in your mind to make the process fair for

17   everyone, correct?

18   A.   The limits?

19   Q.   Yes.

02:25:59 20   A.   I would try to make sure that we had correct limits for

21   each of the copyright holders they could send in on a regular

22   basis, try and get it fair across the board.  However, there's

23   always flexibility, such as in the HBO, we could, you know,

24   increase if they called in and asked.

25   Q.   So you were trying to create a fair process?

J. Zabek deposition - Examination

1309

1          Is it fair that copyright owners get their works

2   distributed without their permission?

3   A.   Without their permission?  I think they should, should get

4   their permission.

5   Q.   So it's not fair, right?

6   A.   I would think that someone would get their permission

7   before they're doing it.

8   Q.   Is it fair that the copyright owners have to hire a

9   company to monitor peer-to-peer networks and send notices of

02:26:46 10   infringement?

11   A.   I really have no opinion on that.

12   Q.   Is it fair that Cox gets to decide how much infringement

13   they're willing to address in a given day?

14   A.   Well, you know, as we look at these in setting limits for

15   these, these copyright holders, again, we have increased it for

16   other folks when they have asked about it.  We were trying to

17   make sure, make sure that we could actually process every

18   single copyright complaint that did come in.  But again, if

19   someone wanted to increase their limits, give us a call, and we

02:27:16 20   will talk and see what we can do, as we've done in several

21   cases.

22   Q.   But you often refused to increase limits, correct?

23   A.   I'm sure there may have been one, maybe two, but I can't

24   characterize that there was a whole bunch we didn't, you know.

25          I'm sure there may have been one, maybe two, but I

J. Zabek deposition - Examination

1310

1    can't characterize that there was a whole bunch we didn't, you

2    know.

3    Q.    If you were always willing to increase the limits, why

4    would you need limits?

5    A.    Well, to keep in the amount coming in so we can make sure

6    that we are, again, handling our customers in a proper way and

7    in a quick way also, too.  If, if our SLAs would drop down to a

8    24-hour, 12-hour, things like that, we could then start looking

9    at increasing the limits for those copyright holders at that

02:28:10  10  time.

11    Q.    Is it fair that Cox decides whether to terminate a

12    customer who repeatedly and systematically violates Cox's AUP?

13    A.    Well, it is our network and our acceptable use policy.

14    Q.    Is it fair that the entire music industry is permitted to

15    send fewer notices to Cox than HBO, a single television

16    company?

17    A.    I'd have to look at what they were sending in to us.

18    Especially if they did feel that they would like that increase,

19    they could give us a call, like HBO did or like IP-Echelon did,

02:28:42  20  and, and we would definitely work with them to bring in more

21    notifications if they were unhappy with that.

22    Q.    Isn't it true that the reason you set caps or limits was

23    because ultimately Cox wanted less notices?

24    A.    No.  We wanted to make sure we were getting to our

25    customers and assisting them in a, in a quick amount of time.

J. Zabek deposition - Examination

1311

1    We didn't want them sitting on the phone, leaving messages,

2    things like that.  When they called, we were trying to get

3    one-call resolution for them.

4    Q.   And, in fact, if Cox received -- sent out less notices,

5    that meant that there would be fewer suspensions, right?

6    A.   That would be a byproduct.

7    Q.   And if there were fewer notices, that meant that there

8    would be less call center volume, right?

9    A.   Not necessarily.  If we were doing our jobs properly and

02:29:30  10   we had the information within the messages that we had sent our

11   customers that would maybe not even generate a phone call, we

12   would give them tools to, you know, understand what was going

13   on, help those things, and certain customers solved their

14   issues without even calling us, too.  So I can't say it would

15   increase or decrease.

16        Just on a number basis, it could definitely increase

17   it, but if we were doing our education portion to the customer

18   correctly, hopefully that would not have them call in and they

19   could handle the issue on their own, at their, at their

02:30:04  20   location.

21   Q.   To be clear, is it your testimony here today that it isn't

22   necessarily the case that less notices meant less call center

23   volume?

24   A.   Yeah.  I mean it's -- it would increase the call volume, I

25   would think, but I can't give you a number where it's

1312

1  exponentially, you know, if we got 400 more in, it was going to

2  be 400 more calls.

3  Q.   But you agree that more notices meant more call center

4  volume, right?

5  A.   It's absolutely possible.

6  Q.   And so by capping the number of notices, that meant less

7  call, call center volume, right?

8  A.   Could mean a steady call volume coming in.

9  Q.   And less notices also meant fewer terminations, correct?

02:30:41 10  A.   No, not necessarily, because the -- when the, the notices

11  came in, we did hold onto those, but you could get less

12  terminations for those, too.

13  Q.   Yeah.  So you'd end up with less terminations, right?

14  A.   It's possible.

15  Q.   Right.  And if there were less terminations, that would

16  mean that Cox would retain more revenue, right?

17  A.   That we would retain those customers and they would, yes,

18  still pay their bills on a monthly basis.

19  Q.   In addition -- so we've talked about a number of things

02:31:11 20  already that was not contained within the written graduated

21  response policy, or I think you referred to it as the M&Ps.  We

22  talked about auto- -- we talked about reactivations.  We talked

23  about caps.  We talked about blacklisting.  I now want to talk

24  about auto-suspend limits.

25  A.   Okay.

1313

1   Q.   Do you know what an auto-suspend limit is?

2   A.   I've heard -- yeah, I've heard the term.  Absolutely.

3   Q.   Was an auto-suspend limit the -- a limit on the number of

4   suspensions that Cox would implement in a day?

5   A.   Yes, for those.  Yes.

6   Q.   I'm sorry.  I didn't want to cut you off.  For those --

7   A.   For any abuse issue.

8   Q.   Right.  So an auto-suspend limit would cap the number of

9   suspensions that Cox would do in a day across all types of

02:32:06 10   abuse, right?

11   A.   Yes.

12   Q.   And if Cox received an infringement notice that would have

13   normally called for a suspension under the graduated response

14   policy but the auto-suspend limit had been hit, then Cox would

15   just send an e-mail to the customer instead of doing a

16   suspension, right?

17   A.   I gotta tell you, I'd have to go back through the

18   procedures.  It's been a while since I've even looked at those.

19   I'm sorry.

02:32:38 20   Q.   The normal auto-suspend limit was set at 300 suspensions

21   per day, right?

22   A.   Okay.  The number sounds familiar, but I can't be a

23   hundred percent.

24   Q.   Mr. Zabek, you've been handed what's been previously

25   marked as Plaintiffs' 74, which is an e-mail exchange among

J. Zabek deposition - Examination

1314

1    people in the abuse department in December of 2009, and if

2    we -- if you start at the back of the e-mail exchange --

3    A.    Um-hum.

4    Q.    -- you'll see Chris Burns is e-mailing Brent Beck and you,

5    and he says:  We've been hitting the 300 suspension limit

6    fairly regularly now.

7              Do you see that?

8    A.    I do.

9    Q.    Does that refresh your recollection that the auto-suspend

02:33:59 10   limit was normally set at 300 suspensions per day?

11   A.    Back in 2009, yes.  Yes.

12   Q.    And that in this e-mail exchange, in fact, Mr. Burns is

13   complaining that there was going to be a decrease in staffing

14   over the next several days?

15   A.    Um-hum.

16   Q.    And that there was a problem with handling the call

17   volume, and asked whether or not the auto-suspend limit could

18   be reduced to 250 per day, right?

19   A.    Um-hum.  That's what he is requesting here, yes.

02:34:38 20   Q.    And you go ahead and you authorize the auto-suspend limit

21   to be dropped to 250, correct?

22   A.    I do.

23   Q.    And then in January, you ask whether or not it can be

24   raised back up to 300 again, right?

25   A.    Asking Chris Burns, yes.  Again, with these, these are

J. Zabek deposition - Examination

1315

1    auto suspensions.  We can still suspend manually as other

2    issues were coming in.  Our auto suspension was one thing,

3    again, that was automatic.  If a DOS attack came in or anything

4    else, we could actually manually suspend them with these folks,

5    too.  So it wasn't just 250 or 300.  Those were just the auto

6    suspends.  But we did have the ability to do manual

7    suspensions.

8    Q.   And --

9    A.   So if somebody was attacking the network, you know, from

02:35:47 10    our -- inside of our network, we could take action on those.

11    Q.   And even though there was an auto-suspend limit that would

12    have covered all abuse situations, it's your testimony that if

13    there were suspensions that should have occurred for reasons

14    other than copyright infringement, that might still happen?

15    A.   It could be for any reason actually.  Even as Chris says

16    at the top, some San Diego agents are continued to process past

17    the 250, meaning we were doing manual suspensions for some type

18    of issue that really required it.

19    Q.   Are you aware of a single instance where there was a

02:36:19 20    manual suspension of a copyright infringement notice that was

21    over the cap?

22    A.   Ten years ago, I could not recall.  I'm sorry.

23    Q.   Mr. Zabek, you've been handed what's been marked as

24    Plaintiffs' 270, which is Bates labeled COX_SONY_974255 through

25    257, and this is in August of 2000 -- this is an e-mail

J. Zabek deposition - Examination

1316

1    exchange in August of 2011.

2    A.   '11.  Wow.

3    Q.   Correct?

4    A.   Those are the dates on here, yes, August 2011.

5    Q.   And this e-mail exchange indicates that you were dropping

6    the auto-suspend limit to 25, correct?

7    A.   Let me look through this here.

8    Q.   And I'll direct you to what I'm looking at.

9    A.   Yeah.

02:37:23 10   Q.   Is on the second page, middle of the page.

11   A.   Okay.

12   Q.   An e-mail from you where you say:  Hard times call for

13   drastic measures - drop it to 25.

14        And then you say:  Seriously.  I was about to say

15   zero and forget the maps issue -- issues, sorry.  And then you

16   then correct "maps" as actually MPAA.  It was an auto correct.

17   A.   Okay.  Yeah, so before the auto suspensions.  Okay.

18   Q.   So this was a situation where in August of 2011, because

19   of an oncoming hurricane, you decreased the auto-suspend limit.

02:38:01 20   You actually ended up decreasing it down to 100, correct?

21   A.   Oh, Hurricane Irene had hit several of our markets.  Yes,

22   we did lower the automated suspension limit on those to ensure

23   that -- well, goodness, the customers that had been hit by a

24   natural disaster could either talk to or get ahold of their

25   family members, call 911, whatever they, they needed to do.

J. Zabek deposition - Examination

1317

1    It's kind of a dire straits for them down with Hurricane Irene.

2            And again, on the auto suspensions on this also, too,

3    we were -- we had the ability to do manual suspensions as other

4    tickets and issues came in and just continue those also, too.

5    But we were trying to take a little bit in consideration for

6    the people, the victims in this area.

7    Q.   You didn't just auto suspend for the geographies that were

8    hit by Hurricane Irene, did you?

9    A.   We were not able to do that.  So what we had done is while

02:39:05 10  we had talked to our folks and say, please use your best

11   judgment again down in these areas that have been hit by a

12   hurricane.

13   Q.   Over the -- during the period that you were at Cox, did

14   you generally see an increasing number of infringement notices

15   being sent?

16   A.   Within abuse?  Yeah.  You know, as the internet grew, we'd

17   get more challenges out there that would be coming into the

18   company.  So yes, increases were part of it.

19   Q.   Increase in the number of infringement notices, right?

02:39:36 20  A.   Of any notices, abuse, spam, all of it.

21   Q.   Including infringement notices?

22   A.   Sure.

23   Q.   Mr. Zabek, you've been handed what's been marked as

24   Plaintiffs' -- what was previously marked by -- as Plaintiffs'

25   Exhibit 196, which includes e-mails by you in January -- on

J. Zabek deposition - Examination

1318

1       January 7, 2010, and in the first e-mail, at the bottom, you

2       say:  Well, we have hit the 300 auto-suspend limit...in fact,

3       as you saw, I believe it was hit about 9 a.m. this morning and

4       tickets are beginning to fill up as the screenshot shows.

5                   Right?

6       A.    That is what is stated here.

7       Q.    It goes on to say:  You may still suspend if the issue is

8       networking impact (DOS attack, etc.)  CATS is dropping tickets

9       for DMCA with the note of -- and then it has a note.  Right?

02:40:40 10                  And then you go on and say:  These customers really

11      should be suspended; however, at the rate the queue is filling

12      up, we are going to get really backed up.  So if you're working

13      in CATS, go ahead and send a warning letter unless you feel the

14      letter will create more inbound calls.

15                  Right?

16      A.    Yes.

17      Q.    And then you go on and say:  You may also focus on other

18      issues than DMCA, as these may just need a reply or manually

19      sent warning letter.

02:41:09 20                  Right?

21      A.    Yes.  I'm sorry, I barely remember this e-mail.

22      Q.    I'm handing you what's been marked as Plaintiffs' Exhibit

23      271, which is Bates labeled COX_SONY_00006759, and this has the

24      same first e-mail, and then it has a response from

25      Andrea Dameri, who we previously discussed, right?

J. Zabek deposition - Examination

1319

1    A.    Yes.

2    Q.    And, and she worked in the -- with the abuse -- in the

3    abuse group, correct?

4    A.    Correct.

5    Q.    And she responded that says:  Hi, just a personal

6    observation.  We have been hitting the limit for the last two

7    or three weeks.  It's rare when the limit is not reached by 9

8    or 10 a.m.

9          Right?

02:42:00 10  A.    This is what she's stating, yeah.

11   Q.    Do you have any reason to doubt what she's saying?

12   A.    I do not.

13   Q.    So, in fact, you were regularly hitting the auto-suspend

14   limit by 9 or 10 a.m. in the morning, correct?

15   A.    According to Andrea Dameri, yes.

16   Q.    And in -- turning back to Exhibit 15 -- excuse me --

17   Exhibit 196 for a moment, you indicated that if the customer

18   did not have a Cox.net e-mail address, that the abuse reps

19   should try to get one, right, because that way you could

02:42:52 20  forward it another address and you could send them a thousand

21   warning letters and then suspend them.  It does put off the

22   inevitable for a while.

23         Right?

24   A.    That is what's stated.

25   Q.    So in this back and forth on the issue of the auto-suspend

J. Zabek deposition - Examination

1320

1   limit, you posited the idea of sending a thousand warning

2   letters and put off the inevitable suspension for a while,

3   right?

4   A.   That is the statement there, but sending a thousand

5   warning letters would be a little, a little much.

6   Q.   Mr. Zabek, you've been handed what's been marked as

7   Plaintiffs' 272, which is an e-mail exchange Bates labeled

8   COX_SONY_00005516.  In this, there's an e-mail -- two e-mails

9   from you.  The first is on January 13, 2010, which is shortly

02:43:41   10   after the -- which is the day after the January 12 abuse call

11   meeting that we just discussed.  Correct?

12   A.   Um-hum.

13   Q.   And in this, you are announcing to the abuse group that

14   you've made changes to how CATS and the walled garden

15   functioned in the hope that it will reduce some of the inbound

16   calls.  Right?

17   A.   Yes.  Some of the calls coming into our TOC and call

18   centers.

19   Q.   Right.  So this is describing that the reason you are

02:44:23   20   making changes to CATS and the walled garden at this point was

21   to reduce inbound calls, correct?

22   A.   For these, yes.  It would be an assistance.

23   Q.   And it describes that customers would be put into a

24   soft-walled garden and would be able to reactivate themselves

25   twice, correct?

J. Zabek deposition - Examination

1321

1    A.   Yeah.  In those garden -- in those walled gardens, we

2    would give them pretty much all the information that we would

3    talk to them on the phone in our hopes they could solve their

4    challenge without actually picking up the phone.

5    Q.   And, and then you describe that CATS would then ignore all

6    first DMCA complaints and auto close the tickets and auto close

7    as the abuse type, correct?

8    A.   Correct.

9    Q.   So you were describing that going forward, CATS was going

02:45:07 10  to ignore the first DMCA complaint with respect to any

11   particular subscriber, correct?

12   A.   I think "ignore" was kind of a word I probably shouldn't

13   have used.  It's still on the customer's account at that time

14   for evidence, to be able to speak to them about.  But it would

15   auto close the ticket, as we discovered, and I think Matt

16   discovered, that many abuses were taken care of after the first

17   complaint would come in.

18   Q.   And as the next e-mail several hours later shows -- your,

19   your first e-mail led to what you described as big confusion,

02:45:39 20  right?

21   A.   Yeah.  And this is -- it goes back to some of the things

22   that people would either call and say, I'm sorry, I'm not clear

23   on this, let's have a weekly meeting or a discussion on it,

24   things like that.  So, obviously, I would say there was some

25   big confusion on that.

J. Zabek deposition - Examination

1322

1    Q.    Right.  And, and what you then said is -- with respect to

2    these changes, you said:  I think we didn't help anyone with

3    this action expect -- except the law-breaking customers.

4             Right?

5    A.    That is what I put in there, yes.  Again, part my sarcasm

6    and levity and funniness.  I used to be a lot funnier back

7    then.

8    Q.    What's funny about that?

9    A.    I'm sorry?

02:46:22 10  Q.    What's funny about that?

11   A.    I really couldn't explain it to you.  You'd have to be in

12   the midst of abuse issues.

13   Q.    And do you recall that, generally speaking, making these

14   changes had a positive effect on the number of inbound calls

15   that Cox was getting?

16   A.    I would kind of have to go back to the records on that.

17   Sitting here right now, I can't recall if it was positive,

18   negative, or indifferent.  It's not something I focused on in

19   the last couple of years.

02:46:51 20  Q.    Well, while you were at Cox, you never undid those

21   changes, did you?

22   A.    No.

23   Q.    Mr. Zabek, you were generally of the view that the amount

24   of time and money that Cox was spending on copyright

25   infringement notices was ridiculous, right?

J. Zabek deposition - Examination

1323

1    A.   It was a lot.  It was a lot.  A lot of our time was -- we

2    were handling these, these allegations, the complaints on

3    those.

4    Q.   And by "a lot," do you believe it was excessive?

5    A.   I don't know if I could characterize that now.  It was a

6    while ago.  In the midst of it -- probably, probably the

7    wording I would have used is something like this is a lot.  It

8    definitely is.  I can't say it was excessive or anything like

9    that at this point in time right now, but ten years ago, I

02:47:53  10    might have used that terminology.  I don't know.

11    Q.   I'm going to hand you what's been marked as

12    Plaintiffs' 275.  This is an e-mail -- excuse me -- this is

13    Bates labeled COX_SONY_00005561, and I'll direct your attention

14    to the e-mail on the top from you on June 3, 2010.

15    A.   Um-hum.

16    Q.   And you sent this to a variety of people involved with the

17    abuse group, correct?

18    A.   This is our legal team, my CISO.

19    Q.   What is that?

02:48:34  20    A.   Chief information security officer.

21    Q.   And you wrote this -- at the beginning of the e-mail, you

22    said you said:  Internal info.  Do not forward.

23         Do you see that?

24    A.   Yes.

25    Q.   In this e-mail, you say:  It costs us so much time and

J. Zabek deposition - Examination

1324

1    money to handle DMCA, it is getting ridiculous.

2         Right?

3    A.   I do.

4    Q.   And then you go on to say:  On a personal note, and most

5    of you know I am NO -- all caps -- angel; however, when

6    discussing P2P file sharing, no one seems to say you're

7    breaking the law.  They always say pirating or stealing, and

8    there are some arguments about stealing data, stupid ones but

9    arguments.  If they would just say "breaking the law," argument

02:49:25  10   over.  If you do not like the law, you do not break it, you try

11   and change it.

12        Right?

13   A.   Yeah, I did say that.

14   Q.   So the first thing is you did say in mid-2010 that you

15   thought that the amount of time and money that Cox was spending

16   on infringement notices was getting ridiculous, right?

17   A.   I did type that in there.  I can't say why -- what was

18   going on at the time.  It's been a period of time, of course.

19   Q.   But then you go on and you again say you're not an angel.

02:49:52  20   What -- we looked at an e-mail previously where you had a

21   similar reference.  Why do you say that?

22   A.   Well, to be going into part of my personal life, these

23   folks had known that years ago, I had spent a lot of time in

24   LA, spent a lot of time in bands and doing different things

25   that had happened, and they knew my background, and they knew

1325

1    who I was.  I wasn't always a nice guy, you know.  I didn't

2    beat people up or anything like that, but they knew, you know,

3    in my youth, I wasn't as solid as I felt I was in my later

4    years.

5    Q.   Mr. Zabek, when you began with the abuse group, it

6    originally had five members and then was reduced down to two.

7    Correct?

8    A.   Five?  Yes.  At our corporate office, there were five

9    people, not including the manager, Matt Carothers.

02:50:55 10   Q.   Okay.  And when did the reduction from five to two occur?

11   A.   To two?  I'm sorry, I can't recall.  If you can refresh my

12   memory on that?  To two?

13   Q.   Are you disputing or disagreeing that you -- that the

14   abuse group was reduced down to two members?

15   A.   I don't remember that number two.  I'm sure it could be,

16   but it doesn't sound familiar right now.

17   Q.   I'm going to ask you, Mr. Zabek, to look at your prior

18   deposition testimony, please.

19   A.   Sure.

02:51:52 20   Q.   This is deposition testimony that you provided under

21   oath --

22   A.   Um-hum.

23   Q.   -- on June 2, 2015, correct?

24   A.   Yes, yes.

25   Q.   I'd ask you to please turn to page 54, and starting on

J. Zabek deposition - Examination

1326

1    line 5, you were asked the question:  How many employees were

2    in the abuse group prior to you BMG manager?

3             Your answer:  Five.

4    A.    Um-hum.

5    Q.    Question:  Do you know why -- or do you have an

6    understanding of why the number of employees in the abuse group

7    was reduced from five to two?

8             Answer:  No.

9             Question:  Who made a decision to reduce the number

02:52:44  10    of employees in the abuse group?

11             Answer:  Somebody well above me, and it came down

12    through my leadership that the change was happening.

13             Question:  It came down through whom?

14             Answer:  Matt Carothers.

15             Does that -- was that testimony true and accurate

16    when you gave it?

17    A.    Yes, that does help to refresh.

18    Q.    Was that testimony accurate when you gave it?

19    A.    Yes.  To the best of my knowledge, yes.

02:53:12  20    Q.    The abuse team, the one that had been reduced from five to

21    two, would handle escalations from the TOC and from NSC,

22    correct?

23    A.    Yes.

24    Q.    As the manager of the abuse team, you would inform the TOC

25    and NSC of policies and procedures for handling infringement

J. Zabek deposition - Examination

1327

1    notices, correct?

2    A.    Yeah.  Any of the team in their corporate office could, of

3    course.

4    Q.    And the technical operations center, or the TOC, was run

5    by Cox, right?

6    A.    Yes.

7    Q.    And it would handle all the calls generated from

8    infringement notices, among other things, right?

9    A.    Yeah, and then several other things, yes.  Yes.

02:54:01 10    Q.    Cox as a general proposition didn't like it when

11    customers' calls weren't answered, right?

12    A.    In general, yeah, we did not want to have a customer hang

13    up, waiting, things like that.  We wanted to make sure that we

14    were handling their issue and helping them.

15    Q.    You didn't want dropped calls, among other things, right?

16    A.    Yes.

17    Q.    So one of the key issues for Cox was making sure that it

18    had an adequately sized TOC staff for whatever number of calls

19    would come in, right?

02:54:35 20    A.    That was to be the goal.

21    Q.    And then the number and type of customer facing actions

22    that Cox took in response to infringement notices would impact

23    the staffing needed in the TOC, right?

24    A.    It could.

25    Q.    Or put another way, Cox needed to make sure that the

J. Zabek deposition - Examination

1328

1    graduated response policies that they had in place would only

2    generate as many calls as the staff could handle, correct?

3    A.   I think like anybody's business back then, trying to

4    reduce the phone calls and assist the customer either via the

5    web and e-mail or some kind of help file in a chat was much

6    more efficient for the customers themselves.  They can handle

7    the issue quickly also, too.

8    Q.   And so the abuse group and Cox would adjust the graduated

9    response policies to try to encourage more automation and less

02:55:36  10    individual phone calls, correct?

11    A.   I don't think those things necessarily went hand in hand.

12    I think we were always looking at more automation in any way,

13    shape, or form.  I think especially back in those times, it was

14    the wave of the future, as it is now.

15         Even in my current position, we look for automation

16    instead of just trying to put a body back there.  If we can

17    make it quick and efficient for the customer, the client,

18    copyright holder, sending us those in, then if we could do it

19    automatically, we would, we would do automation with them.

02:56:09  20    Q.   On several different occasions, you went to folks in Cox

21    and sought to increase the size of the abuse team, right?

22    A.   Yes.

23    Q.   And in each of those instances, your requests were turned

24    down, right?

25    A.   In the corporate area, yes, we did not hire folks, things

1329

1    like that, but we did get more personnels as we moved forward

2    in the TOCs, dedicated resources and even with Cox Business

3    also, too.  So there were other areas, maybe not directly under

4    my control, that we would get assistance with.

5    Q.   And one --

6    A.   And again, our automation was pretty stellar in a lot of

7    areas.  It was nice.

8    Q.   At one point, you went to Mr. Metz and sought to increase

9    the size of your abuse team, right?

02:56:53 10    A.   Yes.

11    Q.   My question was Mr. Metz rejected your request, correct?

12    A.   Mr. Metz was unable to provide us more help.

13    Q.   He rejected your request, Mr. Zabek?

14    A.   Yes.

15    Q.   Okay.  And then you went to a Mr. Williams on a different

16    occasion, correct?

17    A.   He was after Mr. Metz had left.

18    Q.   And this was a separate request or a different request to

19    increase the size of the abuse team, correct?

02:57:12 20    A.   It was a separate request.

21    Q.   I'm sorry, if you'd please turn to page 112.

22    A.   Okay.

23    Q.   Line 12, you were asked the question:  So Mr. Williams --

24    did Mr. Williams tell you that it would be nice to expand the

25    abuse group?

J. Zabek deposition - Examination

1330

1    Answer:  Yes.

2    Question:  But was the abuse group expanded?

3  A.    Um-hum.

4  Q.    Answer:  I'd have to go back to look to be accurate.

5    Question:  To be accurate about whether the abuse

6  group was expanded?

7    Answer:  Oh, maybe I misunderstood the question.  I'm

8  sorry.

9    Question:  Was the abuse group expanded?

02:57:50 10    Answer:  My apologies.  No.

11    And was that testimony that you provided in June of

12  2015 accurate?

13  A.    To my knowledge, yes.

14  Q.    And, in fact, quite apart from the abuse group, in 2011,

15  Cox downsized the TOC, or the technical operations center,

16  correct?

17  A.    They did reduce the numbers, yes.

18  Q.    And this was during a period when the number of

19  infringement notices was fairly high, correct?

02:58:36 20  A.    I was going to say they were always high.  But yes, they

21  were, they were one of our larger issues coming in.

22  Q.    In, in -- specifically in April of 2011, Cox reduced the

23  number of TOC employees handling abuse complaints from nine to

24  four, correct?

25  A.    During that time, yes.

J. Zabek deposition - Examination

1331

1  Q.   And as you sit here today, do you have any understanding

2  about why Cox made that reduction?

3  A.   Really, unfortunately, I can't remember exactly why they

4  would have made it, why they made it.  It put us into more

5  automation at that time, which was, which was nice.  We got a

6  lot more complaints and issues out to the customers and

7  everything, knowing that we had, you know, smaller personnel.

8  Q.   Are you now trying to claim that the reduction was nice?

9  A.   No.  No.  Like I said before, I always want other -- I

02:59:38  10  would always want many hands; they make light work definitely;

11  but I think part of it was we were being forced to say what can

12  we do now here; and that's where we really started kicking in

13  automation.

14  Q.   Even apart from people letting go, you were unhappy about

15  the reduction in the staffing to address abuse notices,

16  correct?

17  A.   Well, any reduction in staffing --

18           Any reduction of our staff was a bummer.

19  Q.   And this reduction was going to reduce -- reduce abuse

03:00:07  20  call center staffing to 44 percent of its prior level, right?

21  A.   Yes, approximately.

22  Q.   And, and it was a 75 percent reduction in the workforce

23  for residential abuse, correct?

24  A.   If those numbers were accurate, yes.

25  Q.   I'm going to hand you what was previously marked,

Case 1:18-cv-00950-PTG-JFA   Document 650   Filed 12/17/19   Page 40 of 136 PageID# 27154

1332

1    Mr. Zabek, as Plaintiff's Exhibit 54.  Do you recognize this

2    document, Mr. Zabek?

3    A.    Yeah, familiar.

4    Q.    Is this a document that you drafted, Mr. Zabek?

5    A.    I believe so.

6    Q.    And in this document, you described that the past status

7    prior to April 1 of 2011, the TOC had nine people working

8    customer safety tickets.  Is that correct?

9    A.    Yes.

03:01:24 10  Q.    And then down below, you say:  On April 1, 2011, the TOC

11   realigned its workforce and replaced the nine team members with

12   four, and you go on to say:  These remaining -- these four

13   remaining technicians are not dedicated to abuse, as they

14   assist with other issues that come into the TOC.

15           Right?

16   A.    That is what is stated.

17   Q.    And you go on on the next page to say that this

18   represented a 45 percent reduction in workforce for residential

19   abuse, correct?

03:01:58 20  A.    From nine to four, yes.

21   Q.    And you acknowledge that there are now large gaps in

22   coverage on overnight and weekends, correct?

23   A.    Yes, I do see that.

24   Q.    And then you say:  Corporate did not have a voice in this

25   redistribution.

J. Zabek deposition - Examination

1333

1          Right?

2    A.   On that second paragraph:  Corporate did not have a voice

3    in the redistribution.

4    Q.   By that, you mean you didn't have a voice, correct?

5    A.   Correct, or anybody in our team.

6    Q.   And you expected that this would lead to longer call hold

7    times, correct, and call response times?

8    A.   That was my suspicion at the time.

9    Q.   And on the third page, in the conclusion, you said:  To

03:02:48  10   deal with the decrease in personnel, corporate abuse has placed

11   more automation on DMCA complaints (our number one issue).  We

12   increased the number of times a customer can

13   "self-reactivate" for a DMCA complaint and forced all large and

14   medium copyright holders to place a digital signature in their

15   reports so our system can automate the process.

16          Right?

17   A.   That is what is stated.

18   Q.   So you were extending the graduated response steps in

19   order to deal with the reduction in staffing, correct?

03:03:23  20   A.   If I remember correctly, we -- there was one more

21   self-reactivate in the walled garden added on to this, as we

22   brought up our automation, yes.

23   Q.   And then on the, on the -- I guess it's the sixth page,

24   where it says "Cox Business tickets for 2010"?

25   A.   Yes.

J. Zabek deposition - Examination

1334

1    Q.    And there you say:  There is no auto processing of Cox

2    Business tickets.  Is that right?

3    A.    That is correct.

4    Q.    So there was no automated e-mail notification process to

5    Cox Business subscribers, correct?

6    A.    Correct, not automated.

7    Q.    Nor was there an automated suspension process to Cox

8    Business customers, correct?

9    A.    Correct, not automated.

03:04:19 10  Q.    Nor was there any kind of automatic trigger for potential

11   termination, correct?

12   A.    Not automated.

13   Q.    And so the policy in two thousand -- November 2012

14   essentially eliminated for all intents and purposes

15   terminations of business customers, correct?

16   A.    Well, like I said in here, if we believe that it's

17   necessary for a termination, we wanted them to contact

18   corporate abuse.  We -- this is one thing that we didn't want

19   our folks in the field terminating internet access on -- we had

03:04:57 20  a lot of different customers, and, of course, each of them have

21   different situations.  But hospital, you know, we don't want to

22   hurt their -- kill their internet access from this.  It could

23   be -- who knows where it could be coming from.  Maybe we needed

24   to assist them more at that time.  But if we're going to go

25   into that area, we would want to talk to our legal department

J. Zabek deposition - Examination

1335

1    on that first.

2    Q.    When you say it could be a hospital, you don't know

3    whether it's a hospital, correct?

4    A.    Not until I was alerted of the, the issue when they would

5    contact us and say, hey, we think that this needs to be

6    terminated.

7    Q.    So you could have had a policy that said, look, we're not

8    going to terminate hospitals, but other business customers we

9    may, right?

03:05:35  10  A.    You're getting a lot of specifics on that, and try not to

11   write too many specifics on that because who knows what the

12   next customer would, would be.  Like, you know, if we said

13   hospital or fire department or police station or 911, would

14   that offer us any flexibility if there was somebody else where

15   it was a brand new ambulance service?  I don't know.  It was

16   always for the things that we couldn't think of in the future,

17   too.

18   Q.    Mr. Zabek, do hospitals, fire departments, and ambulance

19   services have an infinite right to infringe copyrights?

03:06:10  20  A.    I don't believe they do, but --

21   Q.    Do you think they should?

22         I'm sorry, please finish your answer.

23   A.    I don't believe they do, but I do know that a lot of those

24   places also had things like public WiFi for their guests, for

25   people who are waiting for their loved ones to come out of some

J. Zabek deposition - Examination

1336

1   kind of surgery.  We can't -- we were unable to pinpoint -- not

2   looking at every data that's coming out of our customers'

3   locations to see, was it that, was it their full network, who

4   was actually doing this.  You're talking thousands of people on

5   something like that.

6          So we're erring on the side of caution, talk to our

7   legal department and see where we can go from there.

8   Q.   So do you think that there's any instance where it's

9   appropriate for Cox to allow a business subscriber to be the

03:06:56 10   subject of thousands of infringement notices without Cox

11   terminating the account?

12   A.   I can't think of a situation at the present time.  If

13   there's a public WiFi, they may not even know what's going on,

14   even after we contacted them.  There's a lot of gray possible

15   area in there, but we don't want copyright infringement

16   happening on any of our networks, whether it was CB or even

17   HSI.

18   Q.   Mr. Zabek, I'm going to hand you what's been marked as

19   Plaintiffs' 276, which is an e-mail exchange between you and an

03:07:27 20   individual by the name of Jason Barnhardt in March of 2011.

21   Did I mispronounce that name?

22   A.   No, not at all.

23   Q.   And this is an e-mail exchange -- excuse me, the Bates

24   label on this is COX_SONY_00005540 through 41.

25          In this, it appears that Mr. Barnhardt is sending you

J. Zabek deposition - Examination

1337

1    CATS ticket info on a customer account, and he then says -- at

2    the bottom of the history says:  Spoke to the customer this

3    morning and he flat out is refusing to do anything on his side

4    and insists nothing is coming from it despite multiple tickets.

5    I tried working with him and have him reset his Linksys

6    password and even changed it if he has one and go through

7    everything, and he is doing nothing but yelling about his

8    system and saying it is not happening, despite me trying to

9    show him the IP address for his router perfectly matching that

03:08:34 10   from the complaint -- matches, excuse me -- that from the

11   complaint.

12         If possible, please give me some insight on where we

13   should go from this point; i.e., suspension or something of the

14   sort.

15         And you responded:  Hey, Jason, you can, of course,

16   suspend, but I would suggest you just forward any DMCA

17   complaints to his e-mail.  Look at the other DMCA complaints,

18   and you will see blank as their e-mail.

19         He has -- he just has to realize that we must send

03:09:05 20   these to him.  If a copyright holder decides to sue, then we

21   want to make sure the customer knows why... and it's the law.

22   Make sense?

23         And then you go on to say:  I am not concerned about

24   DMCA and not ready to terminate a CB or Cox Business customer

25   for it yet.  It does not cause a big problem on the network.

J. Zabek deposition - Examination

1338

1    Not like spam, DOS attacks, hacking, etc.

2            You then continue:  The customer is doing this on

3    purpose.  I just know it (I can feel it) and is not owned IMO,

4    in my opinion.  They just want to steal stuff....

5            P.S.  Please use our distro -- I assume that's the

6    distribution list -- in case one of us is not in the office.

7            Mr. Zabek, this is a situation where there's a Cox

8    Business customer that you're convinced is intentionally

9    engaged in infringement, and rather than suspend or terminate

03:10:11 10   the account, you say go ahead and just send him an e-mail,

11   right?

12   A.   Well, no.  Telling Mr. Barnhardt that, of course, he can

13   suspend, but I'm suggesting go ahead and forward those

14   complaints to him.  But if John -- or, I'm sorry -- Jason felt

15   that was right, he absolutely could suspend.

16   Q.   But, but you would have -- in your judgment, even though

17   you believed that the customer was doing it on purpose, you --

18   all you wanted to do was forward the DMCA complaint to his

19   e-mail, to the customer's e-mail, correct?

03:10:46 20   A.   With the complaints he had here, I would continue -- we

21   always would continue to forward them down to him so they would

22   be aware of what's going on, especially if a copyright holder

23   came after them.

24   Q.   You said:  You can, of course, suspend, but I would

25   suggest that you just forward any DMCA complaints to his

J. Zabek deposition - Examination

1339

1    e-mail.

2    A.   Yes.

3    Q.   That's what you said, right?

4    A.   Yeah.  A suggestion, yeah.

5    Q.   Mr. Zabek, I'm going to hand you what's been marked as

6    Plaintiff's 277.  This is an e-mail -- excuse me -- Bates

7    labeled COX_SONY_00003761 through 62.  This is an e-mail

8    exchange between a variety of corporate abuse folks about an

9    infringement notice associated with a book, and Mr. Sikes says

03:11:37  10   in the top e-mail:  Our main responsibility is to pass DMCA

11   complaints on to the CB customers.  We do not suspend.

12          Do you see that?

13   A.   I do.

14   Q.   Do you believe that Mr. Sikes accurately described Cox's

15   policies of not suspending business customers as of February

16   2013?

17   A.   No.  I personally have actually suspended CB customers for

18   all types of violations, including copyright violations.  I

19   don't know why he's making a blanket statement on this one, on

03:12:17  20   we do not suspend.  I've suspended customers many a time.

21   Q.   Earlier, I think you indicated that for -- infringement

22   notices for Cox Business customers were handled manually and

23   not automatically, correct?

24   A.   Yes.

25   Q.   At some point in time, that changed, correct?

J. Zabek deposition - Examination

1340

1    A.   We hadn't put any automation in for the Cox businesses

2    that I recall.  Everybody would get a, a phone call or an

3    e-mail sent to them manually.  In some cases, we would speak to

4    that person, and depending on, you know, what it was, you know,

5    a malware, a spam, especially like a spam, we could set up an

6    agreement with them that -- we'll just say if it was spam or

7    something, that if that came in, we would automatically send

8    that down, but manually, so we'd have to type it out and send

9    that down to the folks.

03:13:18  10        That was just kind of on cycle when we were talking

11   to our customers, trying to be friendly and help them.

12   Q.   So every single infringement notice that Cox received with

13   respect to a business customer should have resulted in some

14   communication one way or the other with the customer, correct?

15   A.   I think it's going to depend on the incident, but there

16   should be some kind of contact with them.

17   Q.   So every single copyright infringement notice that Cox

18   received with respect to a business customer should have

19   resulted in some communication from Cox to that business

03:13:54  20  customer, correct?

21   A.   Oh, with the lack of probably the first one that we would

22   kind of hold-for-more, yes, they would contact the customer.

23   Q.   Well, up until --

24   A.   Yeah.

25   Q.   -- November 1 of 2012, even the first one, there should

J. Zabek deposition - Examination

1341

1   have been some contact with customer, correct?

2   A.   We wanted to have a contact with that customer, yes.

3   Q.   And then after November 1, 2012, you would hold-for-more

4   on the first notice, correct?

5   A.   In those cases, yes.

6   Q.   But after that first notice, every single notice should

7   have resulted in some contact with the business customer,

8   correct?

9   A.   In those cases, that was the goal.

03:14:29 10   Q.   I've put in front of you, Mr. Zabek, what's been marked as

11   Plaintiffs' 278, which is Bates labeled COX_SONY_00005566

12   through 68.  These are a series of e-mails between you and some

13   other folks associated with a business account.

14   A.   Okay.

15   Q.   And, and I draw your attention to the first e-mail, which

16   is dated October 28, 2011, from you to Lindsay Shelly and

17   others in Oklahoma City.  Do you see that?

18   A.   I do.

19   Q.   And the subject matter of the e-mail is "Abuse Issue."

03:15:10 20   Right?

21   A.   Yes.

22   Q.   And you say:  Hello, all.  I am sorry this is so long;

23   however, it is very important.

24           Right?

25   A.   Um-hum.

1342

1  Q.   And you a couple paragraphs down say:  I noticed that your

2  market went from the top of the list to the bottom of the list

3  in about 20 minutes.  I pulled each ticket, and

4  matthew.cash@cox.com had closed 60 -- 60, excuse me -- tickets

5  in OKC and Tulsa in 13 minutes.  These were all copyright

6  infringement complaints.  He noted each ticket with "CST will

7  remove files" and then closed the ticket.

8          Would CST be customer in your experience, Mr. Zabek?

9  A.   In my experience, it would be.

03:16:03 10  Q.   And then you go on in the e-mail and you say:  The

11  customer was never called, never sent the follow-up e-mail,

12  etc.  He just noted the ticket with a fake note and closed

13  them.  No procedures were followed.  Tickets were not updated

14  with ICOMS; none of them.

15          Right?

16  A.   Yes.

17  Q.   So this is clearly an instance where there had been 60

18  tickets associated with copyright infringement complaints where

19  customers had not been called, correct?

03:16:35 20  A.   In this case, yes.

21  Q.   And you go on to explain in this e-mail that the Cox

22  Business rep has to call the customer, correct?

23  A.   They're to call the customer, get the IT person on the

24  phone.

25  Q.   And so this is an e-mail criticizing that individual in

J. Zabek deposition - Examination

1343

1   that group for not doing -- following Cox's policies, correct?

2   A.   Yeah.  In, in this instance, that representative was not

3   doing what we needed them to do, not assisting our customers at

4   all.

5   Q.   In the e-mail, you indicate that you understood that

6   you -- Cox had an obligation to contact the customer and

7   provide them a copy of the complaint, right?  Yes?

8   A.   Yes.

9   Q.   Was your understanding of that based on a discussion you

03:17:30  10   had with legal counsel?

11   A.   We did.

12   Q.   And similarly, this e-mail says you could be held liable

13   if you didn't do this.  Is your understanding of that based on

14   some discussion you had with legal counsel?

15   A.   Yes.

16   Q.   If you had an understanding that you had an obligation to

17   notify the customer under the law, why is it that you changed

18   your policy in 2010 to ignore an auto close the first notice

19   that you received with respect to any customer?

03:18:10  20   A.   With, I think, talking to our legal team, yeah, I think it

21   would be probably better answered by them.

22   Q.   So your understanding was based on some discussion you had

23   with legal counsel?

24   A.   Yes, sir.

25   Q.   I'm going to hand you what's been marked as

J. Zabek deposition - Examination

1344

1    Plaintiffs' 280.   This is Bates labeled COX_SONY_00512332

2    through 335, and I'll direct your attention to the beginning of

3    this e-mail chain, if possible, an e-mail from you on

4    February 28, 2013, to John Civiletto and Phil Agcaoili.

5    A.    "Agcaoili."

6    Q.    So this e-mail chain in February of 2013, Mr. Civiletto is

7    asking you whether Cox is, is moving down the same road as the

8    Copyright Alert System, correct?

9    A.    Right.   It should be more like a book.   Summary and

03:19:39  10   briefing.   Okay, yeah.   It looks like John was asking about if

11   we're moving down that road, as was getting more, I guess,

12   advertisement.   Um --

13   Q.    Publicity?

14   A.    Publicity.   Thank you, yes.

15   Q.    So you, you were responding to Mr. Civiletto?

16   A.    Um-hum.

17   Q.    And you responded by saying that Cox has had a policy ever

18   since you could remember, correct?

19   A.    Yes.

03:20:02  20   Q.    And Cox has enforced that policy, correct?

21   A.    Um-hum.

22   Q.    And then you say Cox has a more liberal strike policy that

23   it enforces, correct?

24   A.    Yes.

25   Q.    And you say "they," referring to CAS, use the No. 6,

J. Zabek deposition - Examination

1345

1    right?

2    A.    Yes.

3    Q.    And you say:  We are around ten before termination,

4    correct?

5    A.    At that time, yes.

6    Q.    So based on your review of the copyright -- excuse me --

7    the Cox graduated response policy as of 2012, isn't it, in

8    fact, true that you weren't at ten strikes before termination.

9    You were at 14 strikes before termination, correct?

03:20:46 10   A.    Looking at these, the number would be around 13, 14, yeah.

11   Yes.

12   Q.    And then you go on to say -- why do you say 13 or 14?

13   Doesn't the document say 14?

14   A.    13th and then continued offenses after that, so 14.

15   Q.    And then in the e-mail that you sent to Mr. Civiletto, you

16   say:  We only terminate five to six people a year.

17         Right?

18   A.    That is stated in there, yes.

19   Q.    So as of 2013, you are saying you only terminated five to

03:21:18 20   six per year, and then you go on and say:  And if they call me

21   and start crying and begging, I feel bad and turn them back on.

22         Correct?

23   A.    It does state that.

24   Q.    You go on at the last paragraph -- excuse me.

25         And you indicate that Randy Cadenhead had been part

J. Zabek deposition - Examination

1346

1    of the CAS discussions, correct, but that Cox decided not to

2    participate for several reasons, right?

3    A.    Okay.  I'm sorry.  Stating that we already had a system in

4    place and working, they wanted calls to go to our call center

5    run by third party.  Yes, these were via messages from

6    Mr. Cadenhead.

7    Q.    And Cox -- it also says that Cox didn't want to pay the

8    fee that each ISP was going to have to pay as part of the CAS

9    program, correct?

03:22:33 10   A.    Yeah.  And their info -- and there was a fee that each ISP

11   paid to the third party.

12   Q.    In the last paragraph, you say:  Last month, CATS handled

13   50,670 DMCA complaints, taking action automatically, compared

14   to 2,409 DMCA complaints that had to be worked manually by our

15   teams.

16         Correct?

17   A.    That's last month, 56 -- 50,670, yes.

18   Q.    So here you're telling the senior executives within the

19   company that in a single month, you received over 50,000 DMCA

03:23:32 20   complaints, and of those 50,000, only about 2,400 of them had

21   to be worked manually, correct?

22   A.    That, yeah, 2,409 had to be reviewed by an actual physical

23   person before any kind of warning, messages, or anything,

24   action was taken.

25   Q.    Mr. Zabek, I'm going to hand you what's been marked as

J. Zabek deposition - Examination

1347

1    Plaintiff's 281.  This is an e-mail exchange in April of 2012

2    between you and others within the abuse group, correct?

3    A.    Okay.  A message between, yes, the abuse corporate office

4    and our Hampton Roads, with Andrea Dameri in Hampton Roads.

5    Q.    Right.  So, Mr. Zabek, this is a situation where you're

6    presented with a customer that you described as, as having been

7    terminated and then after being terminated was subject to six

8    suspensions, correct?

9    A.    Since his last termination, six suspensions.

03:24:51 10   Q.    Is that correct?

11   A.    That is what is stated, yes.

12   Q.    And you go ahead and say:  Give him one last chance.

13         Correct?

14   A.    This would be his last chance, and I would instruct Joe or

15   Drew to give him a call.

16   Q.    So in order to get to termination, this subscriber in

17   April of 2012 had to have been subject to at least 12 different

18   infringement tickets, correct?

19   A.    Yeah.  I would really want to look at his account, but by

03:25:25 20   our graduated, he would have a couple on there.

21   Q.    A couple or 12 under the graduated response policy?

22   A.    I need, I need to look at his account to really go on that

23   and say exactly.

24   Q.    But under graduated response, termination would happen

25   after -- at this point in time after 12 tickets, correct?

J. Zabek deposition - Examination

1348

1    A.    If things were worked properly.

2    Q.    Okay.  So it could be more than 12, right?

3    A.    It could be less also, too.

4    Q.    And then even after termination, you must have reactivated

5    him, correct?

6    A.    It seems to be the case.

7    Q.    And then there were six more suspensions, correct?

8    A.    Um-hum.

9    Q.    You would often reset after reactivation so that they

03:26:00 10    would start again at the first notice, correct?

11    A.    Well, as we had stated before, that was one of the

12    guidelines, but they could if they saw, you know, in this case,

13    he's got six suspensions.  They were not warning him.  They

14    were just starting to do suspensions, getting a little bit

15    heavier with this, with this person.

16    Q.    And, and you at this point were being asked whether -- you

17    were being asked to review his account for possible

18    reactivation, right?  That's what Mr. Sikes says in his e-mail?

19    A.    Yes.

03:26:30 20    Q.    And you said yes, we should reactivate him and give him

21    one last chance, correct?

22    A.    With the results that I see in here, yes.  It looks like

23    he had an issue with his router, and this was one of the --

24    probably the situations that we had where we would want to make

25    sure that we were doing everything correctly, that he wasn't

J. Zabek deposition - Examination

1349

1  doing -- wasn't somebody stealing his WiFi, going through

2  there.  And, in fact, it looks like we made suggestions for him

3  to lock his system down even more.

4  Q.   Do you know how many infringing files this customer

5  distributed over the period of time that Cox had him on the

6  network and didn't terminate him?

7  A.   I would not know.

                              EXAMINATION

9  BY MR. ELKIN:

03:27:14 10  Q.   I'm counsel for Cox, and I'm going to ask you now a series

11  of questions.  I just want to ask you some background

12  introductory questions, although some of this was covered

13  earlier.

14           Where do you live?

15  A.   Presently?

16  Q.   Yes.

17  A.   Atlanta, Georgia.

18  Q.   Okay.  And how long have you lived in Atlanta,

19  approximately?

03:27:39 20  A.   I always estimate around, around 15 years.  Somewhere

21  around there.

22  Q.   Okay.

23  A.   Probably a little more.

24  Q.   And you started working at Cox, although not in Atlanta,

25  since when?

1350

1  A.    1991, January of 1991.

2  Q.    And for how long a period of time did you work for Cox?

3  A.    It was 25 years.

4  Q.    And take us through the various positions and time

5  frames -- I'm not going to hold you to them specifically --

6  that you had from 1991 to 2016.

7  A.    Well, the refresher earlier -- some of the dates start

8  blurring -- but I spent five, six years just in customer

9  service on the phones, answering calls from customers for

03:28:28 10  billing, sales, everything.  Learned just about every product

11  we had on those.

12       From there I moved on to the marketing department,

13  had some folks over there, they -- you know, computers,

14  personal computers were getting even bigger at that time, and

15  they knew I knew some stuff about Excel and needed some help

16  with payroll, so I moved over to the marketing department for

17  approximately about two years.

18       One of the leaders in that group had known I had been

19  into computers and video games and things like that and said,

03:29:04 20  hey, this new thing of cable modems is coming.  Would you like

21  to be involved in that?

22       And I said, of course, yes.

23       Did the beta test, installed five cable modems after

24  hours with one engineer, in different areas, and that was

25  our -- the first modems ever, ever installed within Cox

J. Zabek deposition - Examination

1351

1    Communications.

2          From there, I moved directly into the field service

3    supporting -- installing and supporting those modems for our

4    customers and, of course, their equipment as much as we could.

5    We couldn't take responsibility for their equipment, but if we

6    could help them, heck, yeah, we were going to help them, you

7    know.

8          Spent a couple years doing that.  I think it was

9    about two years.  And I kind of -- I have to look at the dates,

03:29:52 10  but I kind of got sick being in the field.  It's kind of

11   lonely.  I liked people, so I wanted to get back into the

12   office, and Cox Business had an opening where -- for technical

13   support, so not only modems, but fiber lines, telephone, very,

14   you know, large internet pipes that we were selling at that

15   time, too.  Moved on to them for that.

16         Then from there -- my wife actually worked for Cox

17   Communications, too, and had a job offer in Atlanta, and after

18   a lot of resistance, because I didn't want to leave California,

19   scared of change, we made the decision, yeah, let's move to

03:30:33 20  Atlanta and see what happens, and got here, and there was a

21   position within the abuse department.

22         Of course I had a couple of friends here, and said,

23   yeah, turn your résumé in.  And I turned it in to Matt

24   Carothers, who I had never met before, and they hired me to

25   handle the Cox Business side and really was managing and making

J. Zabek deposition - Examination

1352

1   sure that people were contacting customers and doing hopefully

2   the right thing for folks.

3           From there became lead, handled some of the

4   residential or started learning residential, handling that.

5           From there Matt had moved on to an engineering

6   position, which he was incredibly well-suited for, and I moved

7   into the manager role from there.

8           And then senior manager at the end.

9           They're both rescues.  One's in the hospital right

03:31:18 10  now, but, you know, she's going to be okay.

11  Q.    Okay.  When you were first hired, when you first acceded

12  to your position as an abuse engineer, what department within

13  Cox were you employed?

14  A.    There was the just abuse department, which was -- which

15  fell under -- I believe it was security, information security.

16  Q.    What was the role of the abuse department?

17  A.    It was to handle complaints, allegations, whatever was

18  coming into our systems that were -- they were telling us that

19  there might be some type of nefarious activity originating from

03:32:06 20  our network.  Could be -- could be a router, could be a

21  customer, could be a server, could be anything.  But if it

22  originated -- again, originated from our network, we would get

23  those complaints.

24          We would research those complaints and then take the

25  next actions, depending on, on what they were.  That was daily,

J. Zabek deposition - Examination

1353

1    consistently doing that.

2    Q.   Were there broad areas of concern that the abuse

3    department focused on at that time?

4    A.   There was always challenging issues, like DOS attacks and

5    spam that would, you know, hit the network and copyright and

6    everything, but really every complaint that came in, we -- I

7    felt we took very seriously, you know, trying to get the

8    information to the customer and assist them as fast as

9    possible.

03:32:55 10   Q.   And who did you first report to when you became an abuse

11   engineer?

12   A.   That was Matt Carothers.

13   Q.   And what were your duties as a -- as the lead abuse

14   engineer when you acceded to that position?

15   A.   Pretty much trying to handle all the questions that Matt

16   would have had so he could focus on other things in his

17   position.  If there was a question on maybe what should we do

18   with this or what type of complaint is this or maybe someone

19   was not understanding a complaint that was sent in, they'd call

03:33:24 20   me and we'd go over it and see if we could actually determine

21   what was going on, and if not, we'd reach back out to those

22   folks and say, maybe give us some more information, those types

23   of things.

24   Q.   I'm going to mention a few different areas that I think

25   your deposition testimony touched on, and I'm going to ask you

J. Zabek deposition - Examination

1354

1    to describe for me exactly what you did as lead engineer, lead

2    abuse engineer on -- in those areas.

3           One is with respect to network security.

4    A.   With network security, we had always wanted to make sure

5    that our network itself, whether that was, again, server,

6    customer, cable modem, router, whatever it was, was not

7    impacting the rest of the internet.  And I think it was kind of

8    a feeling with all the ISPs.  We -- big, giant network, as the

9    internet is, we can affect each other by not handling certain

03:34:21 10  violations that would come from the network, such as, say, a

11   DOS attack.  So we would be very vigilant in making sure those

12   were not hurting hopefully the rest of the internet coming at

13   least from us.

14   Q.   And what did you do with respect to customer safety?

15   A.   Customer safety was trying to make sure our customers were

16   safe on the internet.  I used to say a long time ago when I

17   would give speeches, it was if I knew -- if you knew what I

18   knew about the internet, you would not be on the internet.

19   Back in those days, interesting place, scary place, lots of

03:34:51 20  folks, you know, blackmail, e-mails, malware, things like that,

21   and it was very scary.

22          So we were trying to protect our customers as much as

23   possible to make sure they, they were safe, really.  I mean, we

24   didn't want identity theft and those things happening to

25   anybody.

J. Zabek deposition - Examination

1355

1   Q.   And what types of abuses would be visited upon Cox

2   customers that you would have to focus on?

3   A.   There's not ones that we didn't focus on.

4   Q.   Just describe what they are, some examples.

5   A.   Copyright.  Again, DOS attack, hacking, threats of

6   harassment.  The worst one, child pornography, you know.  We'd

7   have to handle those cases if it was coming or originating from

8   our network and do research on those types of things.  A lot of

9   spam also, too.  Botnets, organized crime, botnets.  Did a lot

03:35:45  10  of takedowns of those with law enforcement, also.  So we had a

11  myriad of issues coming in, myriad.

12  Q.   Now, at some point, did the abuse group change names?

13  A.   Oh, yes.  Yeah.

14  Q.   What would -- what did it change to?

15  A.   It changed.  We noticed that when you call a customer to,

16  you know, tell them what was going on and assist them and you'd

17  say, hi, my name is Jason, I'm with the abuse department, it

18  kind of sets them back into a defensive position.  We didn't

19  want that.  We were there to help them every single time.

03:36:18  20          They were -- they're not computer experts.  They just

21  wanted to talk to their grandkids or kids or whatever.

22          So we decided to change the name to customer safety,

23  and it became a more friendly, as we called those folks, and

24  especially from the letters, and in my opinion, it felt that

25  they would work with -- or they would work with us at that

J. Zabek deposition - Examination

1356

1    point in time instead of being in a defensive and I'm not --

2    you know, "it's not me" type of thing doing that.

3            So we felt it was a lot more customer friendly.

4    Q.   And at the time that you became the lead abuse engineer,

5    who reported to you?

6    A.   Well, really nobody really reported to me.  Like I said, I

7    didn't do reviews or hiring or anything.  I would consult, of

8    course, with Matt.  What we needed at that time was an

9    escalation point, and I became that at that time, making

03:37:06 10   myself -- made myself the lead.  It wasn't a raise or anything

11   like that or anything with it.  It was just you're doing a

12   great job, so we think you can do more.

13   Q.   I want to focus on the periods -- period of 2013 and '14.

14   A.   Okay.

15   Q.   2013 and '14, as best you can.

16           What role did you have within the safety department

17   during those two years?

18   A.   At that time, I believe I was the manager of customer

19   safety.

03:37:39 20   Q.   And what were you -- what were your duties and

21   responsibilities during that period?

22   A.   Just about everything that we had talked about before but

23   we were now responsible for, you know, the top level of policy

24   enforcement reviews of our folks, training, budgeting, which

25   was never fun, those types of things.

J. Zabek deposition - Examination

1357

1    Q.   And during your tenure at the safety department, this goes

2    back to the entire period of time that you worked either in the

3    safety department or its predecessor name, the abuse

4    department --

5    A.   Okay.

6    Q.   -- did you ever have occasion to speak directly to Cox

7    subscribers about abuse complaints?

8    A.   Of course, yes.  That was probably one of the more

9    enjoyable ones.  Not always.  You get yelled at a lot, but I

03:38:32 10  did enjoy helping customers and speaking with them.

11   Q.   And approximately how many customers would you say you've

12   spoken to over time?

13   A.   Oh, I could -- I, I -- it would be tough to even fathom a

14   guess on there.  It would probably be in the triple digits, a

15   couple hundred.  I'm --

16   Q.   Hundreds?

17   A.   Yeah.  I really wouldn't want to speculate, but it was a

18   lot.

19   Q.   Okay.  And what was the nature of those conversations,

03:38:58 20  generally?

21   A.   Depended on what the, what the abuse issue was.  Each one

22   we would, you know, take individually and we would talk to the

23   customer and, first of all, explain the situation that was

24   happening, make sure that they got the complaint, and we'd read

25   it along with them.  If there was any information that we could

J. Zabek deposition - Examination

1358

1    give them to help explain it more, or even websites sometimes,

2    we would pass that information along also, too.  But it depends

3    on what it really was.

4              If they needed help securing some of their equipment,

5    we would do the best we could.  We didn't know every piece of

6    equipment out there, but we would try to help them also secure

7    it also, too, so violations didn't happen, if that's where they

8    were originating from.

9    Q.   To what extent, if any, did the role of education play in

03:39:43  10   speaking to customers?

11   A.   I really determined that our job was really a customer

12   service and education field.  The folks out there buying

13   internet access in a lot of areas are not computer geniuses.

14   They just want to plug in and talk to their families and do

15   well at, you know, Facebook and all that stuff, and that's all

16   they want to do.

17             They don't know about firewalls and routers and, you

18   know, antivirus and things like that.  So we would -- well, we

19   would try to educate them as much as possible.

03:40:19  20        In fact, we even had after we would talk to them,

21   again, depending on the situation, we'd have follow-up letters

22   that would describe everything that we talked about and say try

23   these certain things and hopefully that will help you.

24             But again, in a lot of cases, every situation can be

25   different.  Yeah.

J. Zabek deposition - Examination

1359

1  Q.    Did you ever -- do you recall ever speaking to any Cox

2  subscribers about copyright infringement?

3  A.    Yes, definitely.  Several customers.

4  Q.    And do you recall the role that you played in the

5  conversations that you had with customers related to copyright

6  infringement?

7  A.    It was just like any other role that I would have, is

8  talking about them, what the, you know, what the accusation

9  was, what the complaint was.  The -- we'd send them a copy of

03:41:12 10  it, of course, also, too.  And if they had further questions on

11  it, what was the next steps to do.

12         We would then try to help them and say, you know,

13  hey, let's look through all the software that you have, is

14  there something on there, and hopefully try to assist them into

15  stopping any kind of activity.

16  Q.    You testified earlier in your deposition about copyright

17  infringement notices that came in through CATS.  Did you ever

18  personally have occasion to review any of those notices?

19  A.    Yes.

03:41:41 20  Q.    And were you ever able to determine the accuracy of the

21  alleged copyright infringements in any notices?

22  A.    No.

23  Q.    Why not?

24  A.    Well, I think I've said a couple times we didn't watch our

25  customers and what they were doing.  We didn't spy on them.

J. Zabek deposition - Examination

1360

1    You know, again, there was the, you know, allegation, but we

2    couldn't determine if the customer was actually doing it.  We

3    didn't see their data at all, and I think it's -- it was good

4    we didn't spy on our customers from that.

5    Q.    A number of questions that Mr. Oppenheim put to you

6    earlier in the deposition insinuated that somehow you took a

7    flippant attitude toward copyright infringement as a type of

8    abuse.  Do -- is that true?

9    A.    I -- we weren't flippant about any complaint that came in.

03:42:33 10    Every one we took seriously, and this is why, you know, our

11    ticketing system, of course, was set up.  But we wanted to make

12    sure that we were going through those and doing the right

13    thing, again, for the customers, the internet, and the

14    complainants also, too.  Took every one very seriously.

15          Just because we might have a laugh afterwards or try

16    and keep the levity out there does not mean that we did not

17    take any of that seriously.  It's a very difficult job, and

18    those people would get beat down, and trying to keep them up

19    and happy, to make, to make that next phone call, you know, was

03:43:07 20    part of our job responsibilities, too.

21    Q.    How much of your time was actually spent dealing with

22    copyright infringement notices?

23    A.    Hum.  Possibly half.  Maybe around 60 percent of, of those

24    times.

25    Q.    Would you have done this job had you not wanted to take

1361

1   copyright infringement seriously?

2   A.   I love this job.  I would have done it no matter what.

3   You probably could have paid me less and I would have done it.

4          Well, yeah, we would want to make sure that any

5   infringement was handled properly, whether it was copyright or

6   spam.

7   Q.   Now, what steps did you take to take it seriously?

8   A.   Oh, we would always have research when a, when a complaint

9   would come in.  If there was any questions or any challenges

03:44:02  10  around that, we would actually contact the copyright holder.

11  We would then, of course, also make sure that we were available

12  if the customer had any also questions around it, too.  And

13  then any complaint coming in, we would want to make sure that

14  it had the proper information that was in there that we could

15  then give down to our, our customer.

16  Q.   What is -- what does CATS do?

17  A.   CATS, it's a -- well, short for Cox Abuse Tracking System.

18  It's a --

19          THE COURT:  Why don't we cut it off now.  Let's take

03:44:34  20  our mid-afternoon break, all right?  Sorry if I startled

21  anybody.

22          All right.  Let's take 15 minutes.  Thank you.

23  You're excused.

24          NOTE:  At this point, the jury leaves the courtroom;

25  whereupon, the case continues as follows:

J. Zabek deposition - Examination

1362

         1    JURY OUT

         2              THE COURT:  About how much more is left?

         3              MR. DUVAL:  I believe 20-30 minutes.

         4              THE COURT:  Okay.  And you've got another witness

         5    after that?

         6              MR. OPPENHEIM:  Mr. Beck, who will be a live witness,

         7    which I think everybody needs.

         8              THE COURT:  Okay.  All right, anything before we

         9    break?

03:45:42 10              MR. OPPENHEIM:  Not from me.

        11              MR. ELKIN:  No, Your Honor.

        12              THE COURT:  All right.  Thank you.  We're in recess.

        13              NOTE:  At this point, a recess is taken; at the

        14    conclusion of which the case continues in the absence of the

        15    jury as follows:

        16    JURY OUT

        17              THE COURT:  I have an update.  I'm not going to be

        18    able to sit on Friday.  I can't get enough time between the

        19    docket and I have a memorial service for a former deputy clerk,

04:09:30 20    and so it doesn't make any sense to bring the jury back for two

        21    hours, and so I just want to let you know we won't sit on

        22    Friday, and I'll let them know now.  Okay?

        23              Anything else before we continue?

        24              MR. OPPENHEIM:  Not from plaintiffs, Your Honor.

        25              THE COURT:  All right.  Thank you.

J. Zabek deposition - Examination

1363

1               All right, Joe, let's get our jury, please.

2               NOTE:  At this point, the jury returns to the

3       courtroom; whereupon, the case continues as follows:

4       JURY IN

5               THE COURT:  All right.  Please have a seat.

6               Just an update on our schedule.  We're not going to

7       sit on Friday.  I've got a whole docket that I can't rearrange

8       and also some other personal obligations, and I don't want to

9       bring you in just for two hours of testimony and cost you the

04:10:48 10     whole day.  So we won't -- we'll go through Thursday, but we

11      won't have court on Friday.  All right?  Thank you.

12              All right.  Let's continue.

13              NOTE:  The testimony of JASON ZABEK via video

14      deposition continues to be played into the record as follows:

15              THE WITNESS:  It's a stand-alone system that would

16      take in any complaints, allegations, whatever, to the e-mail

17      address of abuse@cox.net.  It had some AI logic in there that

18      would look for key words with inside the e-mails and/or

19      subjects, also digital signatures, as we had stated before,

04:11:35 20     from, say, copyright holders, valid e-mail addresses that we

21      had known coming back from.

22              So a lot of the AI processing that it would do to

23      make sure that the, the complaint was valid, and then it would

24      create a ticket on that automatically for somebody to look at.

25              In the past, we had to look at the e-mail and then

J. Zabek deposition - Examination

1364

1    create a ticket from it after reviewing it.  So it really sped

2    up, I mean, sped up a ton, a ton of production on that.

3    BY MR. ELKIN:

4    Q.    Did you think CATS was an effective mechanism to address

5    issues of copyright infringement?

6    A.    Was it effective?

7    Q.    Yes.

8    A.    I believe it was, yeah.  We had different sections in

9    there that it could definitely create the tickets to, and I

04:12:17 10   think some other ISPs also found it also a good system, too, as

11   I believe we licensed it to one or two other companies, too.

12   Q.    Do you remember which ones?

13   A.    I believe that one of them was CenturyLink, with Sara and

14   them down in Florida, and I keep thinking that the other one

15   might be Bright House.  I might be wrong on that.

16   Q.    All right.  What about Charter?

17   A.    It's a possibility.  I just don't remember that one, I'm

18   sorry.

19   Q.    What was the primary purpose behind CATS?

04:12:49 20   A.    Oh, it was to organize the abuse complaints that would

21   come in and then put them again into hopefully a nice

22   organization.  You could see what the complaints were coming

23   in, how many spam complaints came in, how many copyright

24   complaints came in, how many malware, hacking complaints came

25   in.

J. Zabek deposition - Examination

1365

1    And they could be laid out all in front of you to

2    tackle the day and start working those tickets.

3    Q.    Was any aspect of CATS automated?

4    A.    Well, as we had talked about, a lot of it was, was

5    automated.  With -- especially on the copyright complaint,

6    certain spam complaints we could send down also, too, depending

7    on the complaint and where it was coming from.  We had a lot of

8    automation in there.  We could send customers warning letters

9    automatically.  It was quick, very fast.

04:13:45  10  Q.    Percentage-wise, during the 2013-'14 time frame, what

11   would you say in terms of a percentage was CATS automated?

12   A.    I'd probably feel, to the best of my knowledge, somewhere

13   around, more than likely, 80 percent, give or take.

14   Q.    And what automated responses could CATS take with respect

15   to copyright infringement complaints?

16   A.    Well, if the -- the first thing is if the, the complaint

17   was not valid, maybe it didn't have the actual alleged

18   infringed works, it could actually send an e-mail back to them

19   saying, hey, we're missing these types of things, and we'd

04:14:27  20  actually give them a list of, you know, please ensure that

21   you're getting these, and those folks would kindly send them

22   right back after fixing them.

23         When we would receive those in, depending on steps,

24   it could automatically e-mail the customer from that.  From

25   there, it could then actually suspend the modem also, too.

J. Zabek deposition - Examination

1366

1   Q.   When you -- when you said earlier, Mr. Zabek, that the
2   CATS could automatically send e-mails, what would it do with
3   those e-mails?  Would it contain anything?
4   A.   Oh, yeah.  If we were sending an e-mail to the customer,
5   it would have a full description of what was going on.  We'd
6   also send the complaint to them also, too, at the bottom of the
7   e-mail.  And then wording in there, you know, to please ensure,
8   you know, that this activity is not going on, secure your
9   router, make sure you're not infected.  We'd give them a, a lot
04:15:22 10   of different steps that hopefully they could take to stop the
11   infringement.
12   Q.   Okay.  You mentioned suspensions a moment ago.  What kind
13   of automated suspensions was CATS capable of doing?
14   A.   They could suspend on -- on the highest level, it could
15   suspend the modem itself, taking it -- taking the customer so
16   they could not get online at all and then forcing the customer
17   to actually give a phone call and call us to get their service
18   back on.
19   Q.   And what was the primary purpose for all of these
04:15:56 20   automated steps?
21   A.   For a lot of that, it was a lot of efficiency.  I mean,
22   automation is -- in so many cases, is the wave of the future,
23   and it has been for years.  It's faster.  You know, if CATS can
24   parse through an e-mail in a couple of seconds, that's a lot
25   faster than a human looking at it, and we can get the

J. Zabek deposition - Examination

1367

1    complaints down to those folks relatively quickly.

2    Q.    And did you ever form a view as to whether or not they --

3    CATS fulfilled the -- its purpose?

4    A.    Yes, I think it did.

5    Q.    In what way?

6    A.    Well, fulfilling its purpose was as those complaints would

7    come in, it would send those notifications out.  We would -- in

8    some cases, we would actually get feedback from the customers,

9    whether it was a phone call or an e-mail back asking for more

04:16:44  10    help.

11          I think it did a really good job, and again, I think

12    that's why we were able to license it to a couple of other

13    ISPs, and I think they felt pretty good about it, too.

14    Q.    Mr. Oppenheim asked you a series of questions throughout

15    the deposition about terminating a subscriber.  Do you know

16    whether Cox could automatically terminate a subscriber based on

17    a copyright infringement complaint?

18    A.    Not automatically.  We would always want a human to

19    review.

04:17:15  20    Q.    Why, why is that?

21    A.    To make sure that we were doing the right thing, make sure

22    that everything was accurate, make sure that we also -- did we

23    help the customer enough down there, was there something that

24    we missed or that we didn't -- we weren't able to assist them

25    with.

1368

1      Terminating their service is a pretty big deal,

2 internet access.  Maybe in the early days it wasn't, but at

3 least in this day and age, I mean, people are running

4 everything off the internet, alarm systems, their phones.

5 Goodness.  I don't know much in my house that doesn't have an

6 internet connection, including my, my thermostat.

7      So, you know, doing a termination is -- it's big,

8 it's dramatic, and we wanted to make sure that we were doing

9 the right thing before we took that step.

04:18:08 10 Q.   I want to now turn to Cox's graduated response process,

11 and again, I want to focus for the moment on the 2013 and 2014

12 period.  Could you describe Cox's graduated response process

13 during that time period?

14 A.   Yeah.  During that time period, we would -- as we were

15 getting a copyright notification in, we would generally at that

16 time hold the first one, kind of a hold-for-more, gathering

17 more evidence.  Then the second one, third one, fourth -- I

18 think I'm probably going to get the numbers wrong -- would be

19 message warnings to the, to the folks, with our phone number on

04:18:48 20 there, of course, to call us at any time with any questions.

21      Then we'd move into suspensions.  That was the --

22 somewhere around the 10th, 11th, 12th -- I'm sorry, I think it

23 was around the -- I'd have to look at the number, but there was

24 two suspensions into what we called our soft-walled garden,

25 where we would have a myriad of information on why, you know,

1369

1    they were in this, in the walled garden, and they would be able

2    to release themselves after acknowledging it.

3             And then from there, it would go into the hard-walled

4    garden, where they actually had to make a phone call into our

5    office.

6    Q.   What was the purpose of having customer care in the

7    graduated response program?

8    A.   Oh, we really felt that -- e-mails are in many cases

9    incredibly impersonal.  It doesn't show tone.  You know, things

04:19:48 10  can be very much lost in an e-mail, and really, if there was a

11   chance to -- if a customer was confused and needed assistance,

12   we really did want to talk to them.

13            I mean, we tried as much automation as we could to

14   make sure that the customer would be able to solve that problem

15   without making a phone call and it would be easy for them

16   hopefully, but if they needed to be, we wanted to make sure

17   that they understood that we were there.

18            And I think the conversations with them, I think it

19   made a bigger impact.  We could answer questions right there on

04:20:19 20  the fly after a couple of minutes instead of maybe 20 or 30

21   e-mails back and forth.

22            For me it was a personal connection.  I liked a lot

23   of our customers.  I thought they were -- you know, it was nice

24   talking to them every once in a while.  Not all of them.  You

25   know, some of them were very mean, as customers could be.

J. Zabek deposition - Examination

1370

1    Q.    To what extent did education play any role in the

2    graduated response?

3    A.    It was almost the entire extent on that.  Every time

4    someone would call in, we were trying to educate them to make

5    sure that, you know, look, you need to stop doing this.  If

6    it's -- if you're not doing it and you're infected, we need to

7    help you to try and figure that out.  If you need to get

8    professional help, we'll help you out there and send you to

9    somebody who can give you an assistance on it.

04:21:07 10   Q.    And what was the -- what was the purpose behind sending

11   the customer's actual notices of the complaint itself?

12   A.    Well, I think they had a right to know that somebody had

13   kind of said an allegation against them.  I think they -- it

14   was -- you know, we'd want them to know about it when we would

15   talk to them, or send it via e-mail also, too.  They should see

16   the complaint that was lodged against them, and that's why we

17   sent it down to them.

18          They could then at that point in time, maybe they

19   were searching their hard drives or there was something

04:21:44 20   actually going on.  We felt that it did help them to do a

21   little research on if this was actually happening or not.

22   Q.    And did you -- with regard to this soft wall and hard wall

23   suspensions that Mr. Oppenheim took you through on your direct,

24   what was the purpose behind the soft wall suspension?

25   A.    You know, for me it was -- if they got to that point, it

J. Zabek deposition - Examination

1371

1    kind of felt -- couldn't take on everything, but it kind of

2    felt maybe did we fail them?  Did they not get the e-mails?

3    Did their kids get the e-mails and delete them?  Who knows?

4          It was more of a dramatic type of alert saying, hey,

5    there's something going on here and why haven't you handled it?

6    And we wanted to make sure that, you know, again an escalation

7    of the issue for them.  And hopefully, that would hit home with

8    them more than just possibly an e-mail, too.

9    Q.   And what about the hard wall suspension?  What was the

04:22:47 10   purpose of that?

11   A.   At that point in time, then we'd have to say that it looks

12   like our, you know, maybe some of other steps were not working.

13   Again, it was, hey, you know, did your son or daughter get into

14   the wall garden when they got home from school and then the,

15   you know, the parents maybe not even know about it as the

16   accountholder?  We would, of course, hope they did.

17         Putting them into the hard-walled garden would force

18   the actual accountholder to then call, call us.  You know, a

19   kid couldn't call and say, hey, I don't have my internet

04:23:22 20   access.  We'd say, great.  What's your last four of your

21   social, verify this, and we would make sure that we were

22   talking to the parents or at least the accountholder, not a

23   roommate, or maybe just not a visitor in the household at that

24   time.

25   Q.   Mr. Zabek, did you ever perform a review as to whether or

J. Zabek deposition - Examination

1372

1    not the various steps in the graduated response that Cox had,

2    such as the warnings and the suspensions, were effective in

3    reducing the number of copyright infringements related to the

4    customers who had been the subject of earlier notices?

5    A.   We felt that it did help them.  I don't -- I'm not going

6    to sit here and say it helped everybody, but we felt that it

7    did help them to really hopefully bring the impact home that

8    there's something going on here, we need you to fix it now.

9    Q.   Thank you.  How do you -- how did you -- how do you know

04:24:13 10  that helped them?

11   A.   We'd see certain customers and the copyright infringements

12   would stop.  They'd move on with their lives and not doing it

13   anymore.  And we felt that really the soft-walled garden and

14   the hard-walled garden would help in those cases.

15            In certain other cases, we'd see that one or two

16   e-mails would also stop the infringement also, too.

17   Q.   Did you ever form an understanding as to whether most

18   subscribers would continue to receive copyright infringement

19   notices after being warned?

04:24:47 20  A.   We would see certain accounts -- I have to say accounts

21   because I can't -- I don't know how many people were living

22   there -- you know, not have copyright infringements after a

23   certain number of warnings, and even into our soft and

24   hard-walled garden, we would see those.

25            In other places, you know, customers would continue

J. Zabek deposition - Examination

1373

1    to do it also, too, but we felt that we had a pretty good,

2    pretty good handle on helping that customer to stop the, stop

3    the actions.

4    Q.   And did you ever form an understanding as to whether most

5    subscribers would continue to receive copyright infringement

6    notices after being suspended by the soft-walled garden?

7    A.   Been a period of time, but if I remember correctly, the

8    numbers did show that we would have repeat offenders not repeat

9    offending after going into either our soft or hard-walled

04:25:49 10   garden.  And again, the caveat is not every customer, of

11   course, but we felt we had -- we were doing a pretty good job

12   in educating our customers on what was going on.

13   Q.   Okay.  You anticipated my next question, which is, did you

14   ever form an understanding as to whether most subscribers would

15   continue to receive copyright infringement notices after being

16   suspended in the hard-walled garden?

17   A.   That was a -- that was kind of our big one.  They -- you

18   know, once going into there and talking to our 2.5 folks, we

19   did, we did have an opinion that did help quite a bit for those

04:26:22 20   customers, especially having personal conversations with them.

21   Q.   Yes.  Did you ever form a view as to whether Cox's

22   graduated response as to copyright infringement had any

23   educational aspect to it?

24   A.   I think our entire response was education.  If you've seen

25   the letters that we sent out to our -- even some of the things

J. Zabek deposition - Examination

1374

1    that we would talk to customers about, it was a lot of

2    education.  These were folks that had no idea what they were --

3    what was going on.  So we'd want to try and educate them as

4    much as possible so they could do the right thing.

5    Q.    At some point, customers who continued to be the subject

6    of a copyright infringement notice would be reviewed for

7    termination, whether it's step 13, 14, or thereafter, correct?

8    A.    Yes.  We would always have a review by humans.

9    Q.    Would Cox ever automatically terminate a subscriber's

04:27:18 10   account based on copyright infringement complaint when it got

11   to that point?

12   A.    We, we never had an automatic termination on any

13   complaint, including copyright.  There was always a human

14   looking at it, ensuring that we've, you know, done our due

15   diligence and do the right thing.

16   Q.    And why was that?

17   A.    We didn't want to make a mistake.  Again, I go back to,

18   you know, shutting somebody's internet service off, you know,

19   even back then was big, very dramatic.

04:27:52 20            I see, you know, kids doing homework on the internet

21   and all these other things, you know.  So we wanted to make

22   sure if that had to happen, that we were, we were doing it the

23   right way and that all the evidence pointed to that.

24   Q.    I think it was right before we broke for lunch,

25   Mr. Oppenheim had asked you some questions about whether in

J. Zabek deposition - Examination

1375

1    December of 2012 the so-called reactivation after a customer

2    was terminated was dispensed with.

3              Have you had occasion to consider since Mr. Oppenheim

4    asked you that question whether the so-called reactivation

5    consideration was dispensed with?

6    A.   If I remember correctly, around that time, that was when

7    our counsel had stated that we could review the accounts for

8    reactivation after, like, a six-month period of time.

9    Q.   And when did that take place, approximately?

04:28:58 10  A.   Oof.  I would be off on the dates if I was saying that.  I

11   think it was -- I believe it was somewhere around that 2012

12   year.

13   Q.   So with respect to the period of 2013 and 2014, when a Cox

14   customer was terminated, they did not get reactivated until six

15   months?

16   A.   That was the -- yeah, that was the goal.

17   Q.   And to the best of your knowledge, did that occur?

18   A.   To the best of my knowledge.

19   Q.   Earlier, you had testified that, in words to this effect,

04:29:40 20  that Cox wouldn't spy on its customers, that you don't do that,

21   you can't do that.  My question is actually a little different.

22   Do you know whether Cox could actually verify whether its

23   subscribers was, was committing copyright infringement, as set

24   forth in the copyright infringement notices that you received?

25   A.   No, we couldn't see if they were actually doing that.

J. Zabek deposition - Examination

1376

1   Again, we didn't look at the data that they were doing or what

2   they were doing on, on the internet.

3          This is privacy, to allow those customers to have

4   hopefully a good experience out there without their ISP

5   watching their every move.

6   Q.   Do you know whether you could access a subscriber's

7   computer to verify that they had a copy of the copyrighted

8   content claimed to have been infringed?

9   A.   Oh, goodness, no.

04:30:36 10   Q.   Do you know whether there was any way that Cox could have

11   accessed the subscriber's computer?

12   A.   I mean, I think the only way that we could would be to

13   call them and say, give us your computer.  That might be about

14   it, but nothing remotely that they -- no.

15   Q.   You never did that?

16   A.   Of course not, no.

17   Q.   In your experience, did you ever discover times when you

18   believed a notice was incorrect as to whether an infringement

19   actually occurred?

04:31:12 20   A.   Um, it's been -- it's been a while.  I couldn't give out

21   specifics, but talking to some of our, our customers in certain

22   areas seemed -- some things always seemed different.  You'd be

23   talking to maybe somebody in -- we had a large populace in

24   Phoenix and Florida which were elderly, and we would get some

25   complaints for music and/or movies that they had no idea who

J. Zabek deposition - Examination

1377

1    they were.  You know, you'd talk to maybe an elderly couple --

2    and I'm sorry, I don't mean that flippantly as elderly.

3            You know, looking at those -- it was always a

4    challenge to look at that and say, you know, nice, Mrs. Jones,

5    85-year-old lady downloading Lil Wayne and stuff, and she

6    didn't even know who they were.

7            So it was -- when you'd hear something like that,

8    you'd want to maybe possibly do some more research on that.

9    Q.   Okay.  So -- thank you for that.

04:32:27 10          So there was some prior questions that Mr. Oppenheim

11   put to you on your use of the words "DMCA" and whether or not

12   you used that term synonymous with copyright infringement.  Do

13   you remember that?

14   A.   Yes.

15   Q.   Are you a lawyer?

16   A.   No.

17   Q.   When you made reference from time to time in various

18   e-mails related to we're obligated under the DMCA to do this

19   and we're obligated under the DMCA to do that, were you

04:33:05 20   referencing some legal understanding on your part as to what

21   Cox was obligated to do in order to avoid copyright

22   infringement?

23   A.   My understanding would generally come from our counsel,

24   and that's where I would get the direction from.

25   Q.   You made various references to DMCA and e-mail

J. Zabek deposition - Examination

1378

1    communications.

2    A.    Um-hum.

3    Q.    Mr. Oppenheim asked some questions about various caps or

4    limits on the number of notices that CATS would receive from

5    time to time.  Do you remember those questions?

6    A.    Yes.

7    Q.    Do you remember those questions?

8    A.    I do remember those, yes.

9    Q.    Were those limits for various copyright content providers

04:34:02  10  or their agents ever increased?

11   A.    Oh, yes.

12         Yes.  I think we had seen that in a couple of the

13   messages that were brought out today.

14   Q.    Why would Cox increase the limits for certain copyright

15   content owners?

16   A.    They asked.

17   Q.    Was it -- why did you accommodate them?

18   A.    Well, in many cases, they, they had a valid argument, and

19   in other cases, there was a nice discussion.  We wanted to make

04:34:40  20  sure that we were helping them out as much as possible and that

21   they were comfortable with it also, too.

22         One thing is, is our automation, when we really

23   started getting that rolling with the signatures and

24   everything, too, it really freed up some time to be able to

25   take in more, you know, complaints into the system also, too.

J. Zabek deposition - Examination

1379

1    Q.   And did you personally support increasing the caps for

2    various copyright content owners from time to time?

3    A.   Oh, sure.  I mean, I would see myself on several of those

4    e-mails, like with the HBO, IP-Echelon, for that; and I thought

5    it was a good idea.

6    Q.   So I think during the course of your testimony today, I

7    believe you have recounted instances of working at the Cox

8    safety group --

9    A.   Yeah.

04:35:33 10   Q.   -- related to addressing copyright infringement

11   allegations against subscribers.

12        Do you remember testimony that you've been giving all

13   through today?

14   A.   Yes.

15   Q.   Did you think it was a waste of time to do that while you

16   were at Cox?

17   A.   No.

18   Q.   Why not?

19   A.   Well, I think it was kind of important.  You know, with

04:35:58 20   violations of copyrights, we want to make sure that people

21   aren't grabbing that stuff on the internet without compensation

22   to the right people.

23        Again, all of our abuse complaints were really,

24   really important that would come in, and we wanted to make sure

25   our customers were hopefully doing the right thing.

J. Zabek deposition - Examination

1380

1    Q.   See if you can find 261 in there.  I would try to find it

2    myself, but --

3              MR. OPPENHEIM:  Can you describe what it is so that

4    we --

5              MR. ELKIN:  Yes.  261 is a document that

6    Mr. Oppenheim marked.  It is a two-page document --

7              THE WITNESS:  Oh.

8              MR. ELKIN:  -- that is Bates-stamped COX_SONY_ 8318,

9    and it is -- that's the document.

04:36:51 10   Q.   Now, when Mr. Oppenheim -- do you remember reading this?

11   I'm looking at -- I direct your attention to the first e-mail

12   on the first page.  This is the one that Andrew Thompson sent

13   to the HRD-TOC and CCI - Abuse Corporate on June 12, 2014, at

14   7:40 a.m.

15             Do you see that?

16   A.   I do.

17   Q.   And Mr. Oppenheim directed your attention to the second

18   sentence, to insinuate that, that Cox kept the subscriber to

19   retain the revenue.

04:37:31 20             Do you remember that discussion?

21   A.   I do remember that.

22   Q.   Now, he did not refer you to the third paragraph.  Could

23   you read that out loud?

24   A.   From Mr. Thompson's message?

25   Q.   Yes.

J. Zabek deposition - Examination

1381

1    A.    Please tell the customer we are giving them one more

2    chance and be sure to cover all bases -- be sure to cover all

3    bases to help the customer prevent further complaints, as you

4    always do.

5    Q.    That's it.

6          Do you -- did you think it was important that, that

7    the safety department be sure to cover all bases to help

8    customers to prevent further complaints?

9    A.    Absolutely.  We wanted to make sure that we were giving

04:38:19 10   our customers every bit of information that could assist them

11   to stop any kind of activity, whether, again, it was copyright

12   or malware or spam or anything.  Make sure before we go into

13   that termination, which can be pretty devastating, we wanted to

14   make sure that we had done all of our due diligence with these

15   folks and help them as much as possible.  I think it's just the

16   right thing to do.

17   Q.    So take a look at the next sentence on the second page

18   that says:  Once the customer has been terminated for DMCA,

19   we've fulfilled the obligation of the DMCA safe harbor and can

04:39:01 20   start over.

21          And then it goes on to say -- and this is the one

22   that I wanted to ask you about, the second paragraph -- but,

23   again, no real right or wrong.  We have some leeway here, but

24   know that once a termination happens, we have fulfilled safe

25   harbor.

J. Zabek deposition - Examination

1382

1     What do you mean by use of the words "we have some

2    leeway here"?

3    A.    Well, it goes back to, again, trying to empower our people

4    who are actually our frontline folks -- I always call them

5    boots on the ground -- that, you know, as they did research on

6    the, on the complaints, on the allegations, that if there was

7    something that didn't maybe look right, something seemed odd,

8    could be a couple of things, that they could turn around and

9    either talk to the customer, possibly give them another chance,

04:39:57  10  talk to the copyright holder.  Again, going and doing the right

11    things, we had some, some leeway around that.

12    Q.    You remember that Mr. Oppenheim took you through the

13    subject of Cox receiving notices of copyright infringement

14    which contained settlement offers?

15    A.    Yes.

16    Q.    And you recall a portion of those questions dealt with

17    Digital Rights Corp, or Rightscorp?

18    A.    Yes.  A portion of that did, yeah.

19    Q.    So let me direct your attention to -- on pages 6 through,

04:40:35  20  through 8, at the bottom of page 6, under the heading "Cox's

21    Treatment of Rightscorp's notices."

22    A.    Okay.

23    Q.    Do you see where I am?

24    A.    No. 15?

25    Q.    Yes.

J. Zabek deposition - Examination

1383

1    A.    Yes, sir.

2    Q.    So, now, 15 begins on March 9, 2011, Rightscorp, using the

3    name Digital Rights Corp, began sending notices of claimed

4    copyright infringement to abuse@cox.net.

5              I'm skipping over a sentence referring to an exhibit.

6              Quote, these notices stated your ISP has forwarded

7    you this notice.  This is not spam.  Your ISP account has been

8    used to download or upload or offer for upload copyrighted

9    content in a manner that infringes on the rights of the

04:41:29  10  copyright owner.  Your ISP service could be suspended if this

11   matter is not resolved.  You could be liable for up to $150,000

12   per infringement in civil penalties.  We represent the

13   copyright owner.  This notice is an offer of settlement.  If

14   you click on the link below and log into Rightscorp, Inc.,

15   automated settlement system, for $10 per infringement, you will

16   receive a legal release from the copyright owner.

17             Do you see that?

18   A.    Yes, I do.

19   Q.    What was wrong with that?

04:42:04  20  A.    Well, I mean, if you're looking at this is they're saying

21   that, you know, you get a legal release if you actually pay us

22   for it, but it's, again, after the fact.  And, you know, my

23   understanding of what we wanted is the activity to stop, and

24   looking at this, in my opinion, they're saying it's okay to do

25   it; just pay us after the fact.  I mean, it's, it's a larger

J. Zabek deposition - Examination

1384

1    amount, of course, at $10 for a song.

2         But I did not see -- it's interesting, I did not see

3    where it would stop the copyright.  It was more like, hey, it's

4    cool.  Thank you for giving us this money, and everything is

5    hunky-dory and continue on with your life.  Yeah.

6    Q.   Well, do you see -- so if I direct your attention to

7    paragraphs 16, 17, and 18, you, you see the various

8    conversations that you had with Mr. Cadenhead?

9    A.   Yes.

04:43:00 10  Q.   Do you remember those discussions that you had with him

11   about the Rightscorp notices?

12   A.   Yes.  Some of them, yes.

13   Q.   Did the two of you speak with regard to whether he

14   determined whether those settlement -- whether the copyright

15   notices from Rightscorp should be accepted by Cox?

16   A.   Yes.  He had made a determination on it that -- saying

17   that we should not accept them, as they were asking for

18   monetary demands and threatening against our, our customers.

19   Q.   Did you agree with him?

04:43:39 20  A.   I did.

21   Q.   Why?

22   A.   Again, I'm not a lawyer, but my understanding was to stop

23   the infringement, and looking at this, it was like it's okay if

24   you pay us.  But the other thing is is, you know, we don't know

25   if the customer was actually doing the infringing also, too.

J. Zabek deposition - Examination

1385

1        So, again, it seemed that it's not what the, the DMCA

2   was trying to do at that time, to create a whole another

3   revenue stream for someone else.  That's what Mr. Cadenhead had

4   also stated.

5   Q.   So paragraph 17 refers to an e-mail that you sent to

6   Rightscorp asking them to remove the settlement offer and for

7   you then to process the notices.  Did they ever agree to that?

8   A.   No, not to my knowledge.

9                       FURTHER EXAMINATION

04:44:27  10   BY MR. OPPENHEIM:

11   Q.   Mr. Zabek, roughly speaking, during the period of 2010

12   through some period of 2012, when you were head of the abuse

13   department, Cox would, after it terminated subscribers for

14   copyright infringement, would regularly reactivate them shortly

15   after the termination.  Is that generally speaking true?

16   A.   I wouldn't say regularly.  I'd say we'd still review all

17   the cases on those, and there have been reactivations.

18   Q.   And those reactivations would occur immediately after --

19   often would occur immediately after the termination, correct?

04:45:06  20   A.   I'd have to go back and look at the records.  I couldn't

21   tell you how fast or how long they waited.

22   Q.   So based on your testimony with -- to Mr. Elkin, something

23   changed in 2012; is that correct?

24   A.   Yes.

25   Q.   What changed?

J. Zabek deposition - Examination

1386

1    A.    I believe that was the conversation with Randy Cadenhead

2    and the reactivation for some DMCA.

3    Q.    And what was that conversation?

4    A.    That if we reviewed the account, you know, and felt there

5    was any kind of evidence, could we bring the customer back onto

6    the, onto the network.

7    Q.    But you were already bringing customers back onto the

8    network, so I don't understand how -- what you were changing.

9    A.    With, with his -- there was a period of time he wanted us

04:45:54 10   to at least wait six months before we'd even start reviewing

11   those types of things.

12   Q.    So in late 2012, Mr. Cadenhead instructed you that if

13   you're going to reactivate, you should wait at least six

14   months?  Is that what you're saying?

15   A.    That's what he had stated.

16   Q.    And is that what you, in fact, started doing in late 2012?

17   A.    In the cases, you'll see some of them, yeah, looking at

18   those afterwards, if the customer would call in.  We would

19   never contact the customer, but if the customer would call in.

04:46:25 20   Q.    Okay.  So -- and this was in roughly December of 2012; is

21   that right?

22   A.    Roughly, yeah.

23   Q.    So, so just so I understand the big picture, prior to

24   December of 2012, when you would terminate a subscriber for

25   copyright infringement and you reactivated, you would often

1387

1    reactivate immediately.  After December 2012, when you reviewed

2    the account for termination, you would be waiting six months

3    before you would consider a reactivation.

4            Is that an accurate summary of what you've said?

5    A.   Nobody got reactivated without a review.  I would have to

6    look at the records also, too, to say how long was it.  In

7    certain cases, I'm sure it was probably short.  In other cases,

8    it was probably long.

9    Q.   And after December of 2012, when you changed your internal

04:47:16  10  policy about reactivation, did the abuse department terminate

11   less subscribers for infringement?

12   A.   I don't know if it was --

13   Q.   Was there any internal --

14   A.   -- more or less.

15   Q.   I'm sorry, I didn't mean to interrupt you.

16   A.   I don't know if it was more or less.  I couldn't --

17   Q.   Was there any internal discussion that said anything along

18   the lines of, well, if we're not going to reactivate them right

19   away, we really shouldn't terminate as many people?

04:47:49  20  A.   No.  Not to my knowledge at all.

21   Q.   So if the numbers show that there were far less

22   terminations after December of 2012, would you have an

23   explanation for that?

24   A.   There could be a multiple -- multitude of reasons.  I

25   would like to think it was because we were getting actually

J. Zabek deposition - Examination

1388

1    better at doing our automation and assisting the customer in

2    solving the challenge before it got to that point.

3    Q.    You were asked a series of questions by Mr. Elkin as to

4    whether or not you under- -- you believed that CATS was

5    effective at addressing copyright infringement.  Do you

6    remember those questions?

7    A.    Yes.

8    Q.    And you answered that you did believe that CATS was

9    effective at addressing copyright infringement, correct?

04:48:35 10    A.    I do.

11    Q.    So you -- when you say "effective," you're testifying that

12    CATS was effective at processing the incoming notices and, and

13    dealing with them.  Is that what you're saying?

14    A.    Well, in processing with our -- with the automation, yeah,

15    it was very quick and did a very good job.

16    Q.    Right.  And, in fact, you said that you didn't want to spy

17    on your customers, correct?

18    A.    Well, Cox didn't like to spy on its customers, of course.

19    Q.    You were doing all of these things, and yet it's your

04:49:04 20    testimony that you believe that CATS was effective at stopping

21    infringement?  Is that -- is that accurate?

22    A.    I believe not only CATS but also our team, in helping

23    those customers to understand what was going on and then solve

24    the challenge.

25    Q.    Did you ever ask a copyright -- one of the copyright

1389

1  owners whether they thought the infringement was decreasing?

2  A.   No.

3  Q.   So when you're testifying that you believe that CATS was

4  effective, it's purely based on whether or not you saw

5  additional notices, correct?

6  A.   That and the -- yeah, the reduction of those coming into

7  our network.

8           NOTE:  End of videotape deposition.

9           THE COURT:  All right, that completes our deposition.

04:49:52 10           All right, next witness.

11           MR. GOULD:  Your Honor, we wanted to read into the

12  record, if we needed to, the list of exhibits that was entered

13  during the Zabek deposition.  If you'd like, we can do that

14  once the jurors leave.

15           THE COURT:  Yeah, why don't we do that at the time.

16           MR. GOULD:  Respect their time.

17           The plaintiffs call Brent Beck.

18            BRENT BECK, PLAINTIFFS' WITNESS, SWORN

19           THE COURT:  Good afternoon, Mr. Beck.

04:51:24 20           THE WITNESS:  Good afternoon.

21           THE COURT:  Please proceed, Mr. Gould.

22                    DIRECT EXAMINATION

23  BY MR. GOULD:

24  Q.   Nice to see you again, Mr. Beck.  My name is Jeff Gould.

25  We've met before?

B. Beck - Direct

1390

1    A.    Indeed.

2    Q.    Thank you for being here.

3          Mr. Beck, you work at Cox Communications, correct?

4    A.    Yes, that's correct.

5    Q.    And your primary role there is to support CATS, correct?

6    A.    Yes.

7    Q.    In fact, you're the primary person responsible for

8    managing CATS?

9    A.    Yes, that's correct.

04:51:45 10  Q.    And you're the lead developer and engineer for CATS?

11   A.    Yes.

12   Q.    You develop software for CATS?

13   A.    Yes.

14   Q.    You fix software bugs, try to fix software bugs in CATS?

15   A.    Yes.

16   Q.    And you write and add new software feature in CATS?

17   A.    Yes, I do.

18   Q.    You don't have any degrees in software development, do

19   you, sir?

04:52:07 20  A.    Degrees in software development, I do not.

21   Q.    And what about programming?

22   A.    Programming --

23   Q.    You don't have any degrees in programming, do you?

24   A.    Not in computer software programming.

25   Q.    When Cox receives an infringement notice by e-mail at

B. Beck - Direct

1391

1   cox@abuse.net -- let me strike that.

2              Cox receives infringement notices at cox@abuse.net,

3   correct?

4   A.   Abuse@cox.net.

5   Q.   And CATS, the copyright abuse -- excuse me, the Cox abuse

6   tracking system then pulls e-mails from that inbox into CATS,

7   correct?

8   A.   That is our general flow.

9   Q.   Now, focusing on the 2012 to 2014 time frame, CATS didn't

04:52:57 10   actually pull all the incoming infringement notices from that

11   abuse inbox; isn't that correct?

12   A.   Did not pull all of them from the inbox.  One could say

13   that, yes.

14   Q.   And, in fact, starting in 2011, Cox didn't pull any

15   e-mails from that inbox from an entity named Rightscorp or

16   Digital Rights Corp; isn't that correct?

17   A.   I do not remember the exact timeline.

18   Q.   Approximately 2011, give or take?

19   A.   I don't recall the timeline exactly, but --

04:53:32 20   Q.   And Rightscorp is an antipiracy vendor who sent copyright

21   infringement notices to Cox on behalf of a music publisher;

22   correct?

23   A.   I understand they sent complaints on behalf of a music

24   publisher.

25   Q.   Those notices never made it into Cox's inbox because Cox

B. Beck - Direct

1392

1    just blocked them at the e-mail level, right?

2    A.    There was a time where they were rejected at the e-mail

3    server level.

4    Q.    So this wasn't an instance where the e-mail came in, you

5    looked at it, did something with it, and then said we don't

6    want to do this.  For the Rightscorp notices, they just -- they

7    never even made it into the e-mail inbox, right?

8    A.    At a particular period in time, yes, that became

9    necessary.

04:54:15 10   Q.    And you're aware, Mr. Beck, that Rightscorp claims that in

11   the 2012 to 2014 period, it sent Cox over 9 million copyright

12   infringement notices?

13   A.    In the -- can you repeat the time frame, please?

14   Q.    You're aware that in the 2012 to 2014 time frame,

15   Rightscorp claims to have sent Cox over 9 million infringement

16   notices?

17   A.    That's quite a lot.

18   Q.    You're aware that that's their position, right, that

19   they've said that?

04:54:44 20   A.    I believe I have heard that.

21   Q.    In fact, didn't you state that in a sworn declaration in a

22   prior matter?

23   A.    Possibly.

24   Q.    But you can't verify that number, can you?

25   A.    How many they had sent to us?  So if they were rejected at

B. Beck - Direct

1393

1   the mail server level, then that wouldn't have been something I

2   would have spoke to in a, in a declaration, I don't think.

3   Q.   But you can't verify it, can you, whether it's right or

4   wrong?

5   A.   That would have to be at -- I mean, I'm inside the mail

6   server basically.  So, I mean, I'm on the other side of the

7   mail server, so I wouldn't have visibility to do that if

8   they're rejected at that level.

9   Q.   I want to make sure I understand.  Cox blocked these at

04:55:34 10   the mail server level, which means the inbox -- it never popped

11   up in the inbox, correct?

12   A.   Yeah, they were rejected by the mail server.

13   Q.   And because they never popped up in the inbox, Cox just

14   doesn't know how many were blocked in that manner, right?

15   A.   CATS certainly would not know.

16   Q.   CATS wouldn't know.  You don't know?

17   A.   I don't know.

18   Q.   So you can't verify or dispute the number of notices that

19   Rightscorp sent, correct?

04:56:00 20   A.   Once the reject rule was put in place, no.

21   Q.   I'm sorry, did you say no?

22   A.   Once the mail server reject rule was put in place, I have

23   no way to verify further inbound volume.

24   Q.   I didn't mean to interrupt.  I apologize.

25   A.   No worries.

B. Beck - Direct

1394

1  Q.   Now, setting aside the number of notices that Rightscorp

2  may have sent, Cox didn't forward any of those to its

3  customers, correct?

4  A.   Sorry, setting aside -- can you repeat that?

5  Q.   Setting side whether it was 1 million or 10 million or

6  50 million, Cox didn't forward to customers the blocked

7  Rightscorp notices, correct?

8  A.   No.  Those were, those were blocked for reasons, yes.

9  Q.   It didn't send them to the customers?

04:56:44 10  A.   Correct.

11  Q.   And Cox didn't suspend any subscribers based on

12  infringement allegations received from Rightscorp, correct?

13  A.   No, not if they were blocked.

14  Q.   And Cox didn't ask any customers or subscribers to call in

15  and talk to the abuse department about allegations of

16  infringement based on Rightscorp notices that Cox blocked,

17  correct?

18  A.   No, not if the notices were blocked.

19  Q.   And Cox didn't take any customer facing action at all with

04:57:11 20  respect to those --

21       THE COURT:  Well, they weren't received, so naturally

22  that's the answer.  So let's move on.

23  BY MR. GOULD:

24  Q.   Cox doesn't know what customers were referenced in those

25  infringement notices, does it?

B. Beck - Direct

1395

1   A.   Not in those particular notices if they were blocked.

2   Q.   Including whether those infringement notices implicated

3   any of the same subscribers that received infringement notices

4   from plaintiffs, correct?

5            MS. GOLINVEAUX:  Objection, Your Honor.

6            THE COURT:  He doesn't know the answer to any of your

7   questions, you've made that pretty clear, because the e-mails

8   never were received.  Thank you.  Let's move on.

9            MR. GOULD:  If we could pull up, actually in your

04:57:52 10  binder, tab 11?  PX 335.

11           MR. OPPENHEIM:  Does the witness have a binder?

12           MR. GOULD:  I'm sorry.

13           THE COURT SECURITY OFFICER:  All right, counsel.

14  Thank you, sir.

15           All right, Mr. Beck.

16           THE WITNESS:  Thank you.

17  BY MR. GOULD:

18  Q.   At tab 11, sir.

19  A.   Did you say 11?

04:58:25 20  Q.   11, yeah.

21  A.   Thank you.

22  Q.   Mr. Beck, do you recognize this e-mail?

23  A.   Take a quick look over this.

24  Q.   If it helps, sir, I'm just going to focus on the top

25  e-mail from you on the front page.

B. Beck - Direct

1396

1    A.    Okay.  Yes.

2              MR. GOULD:  I move PX 335 into evidence.

3              THE COURT:  Any objection?

4              MS. GOLINVEAUX:  No objection, Your Honor.

5              THE COURT:  It's received.

6              MR. GOULD:  If you could pull up the top e-mail from

7    Mr. Beck.

8    BY MR. GOULD:

9    Q.    Mr. Beck, this is an e-mail chain from February 2014 with

05:00:19 10    several of your colleagues and folks at CenturyLink, some --

11    and this continues from a chain earlier.  I want to focus on

12    your language at the top, starting with "Sources."  You say:

13    Sources like Digital Rights Corp are blacklisted with us, so we

14    silently delete the e-mail messages without any

15    parsing/ticketing/etc.  As soon as our POP3 client recognizes

16    the From address in the headers as blacklisted, we delete the

17    message without retrieving its message body."

18              Do I read that correctly?

19    A.    I believe so, if I followed along.

05:00:57 20    Q.    Now, Mr. Beck, you're asking describing a different kind

21    of blacklisting than we talked about a few minutes ago with

22    Rightscorp, aren't you here?

23    A.    Earlier we discussed rejecting at the mail server

24    platform.

25    Q.    Earlier we discussed rejecting at the mail server

B. Beck - Direct

1397

1    platform, and here you're describing the blacklist process

2    where you actually receive e-mails and then delete them, right?

3    A.    They're received to the inbox.

4    Q.    And then silently deleted?

5    A.    They are deleted if the sender matches the -- a

6    blacklisted sender.

7    Q.    And you wrote here that they're silently deleted; is that

8    right?

9    A.    That is the phrasing, yes.

05:01:31 10  Q.    And this process relates to other blacklisted parties but

11   not to Rightscorp, right?

12   A.    This, this applied to Rightscorp initially.

13   Q.    For a short time until they moved to blocking at the mail

14   server level?

15   A.    Yes.

16   Q.    So respectively, at this point in time, there were two

17   kinds of blacklists, one for blocking e-mails coming in and one

18   for receiving and deleting e-mails?

19   A.    So rejecting in the mail server was specifically in

05:01:58 20  regards to an event with Rightscorp.  It wasn't really

21   something that we had built and designed to do that.  It's not

22   something we applied to any other sender at any time.  So that

23   was more of a, a failure mitigation step.

24         The blacklisting method within CATS, where we're

25   actually seeing the messages in the inbox, that has been

B. Beck - Direct

1398

1    applied to other senders.

2    Q.   They are two separate processes, one blocked at the e-mail

3    and one received and deleted, correct?

4    A.   Yeah.  One is rejected by the mail platform.  The others

5    comes into the inbox and then are considered.

6    Q.   And we talked about with the Rightscorp blocked notices,

7    but with these received and deleted e-mail messages, Cox --

8    excuse me -- CATS also did not retrieve the body of the e-mail,

9    correct?

05:02:45  10    A.   Yes, that's correct.  The blacklisting was based on the

11   sender.

12   Q.   And so like the Rightscorp notices, the blacklisted

13   deleted e-mails also didn't make it into CATS, didn't generate

14   a customer action, correct?

15   A.   Yes, that's correct.  That was the intent of the

16   blacklist.

17   Q.   One difference, though, is that with the deleted messages,

18   you actually have some logs about how many came in and were

19   deleted; isn't that right?

05:03:08  20    A.   I can't speak to what logs the mail servers would have

21   had.  I can only speak to the CATS platform.  So for the CATS

22   platform, we could see how many we were -- how many were

23   hitting that blacklist.

24   Q.   So for that second category of blacklist, we might be able

25   to find some numbers about how many came in and were deleted in

B. Beck - Direct

1399

1    that manner, right?

2    A.   Yes, that's possible.

3    Q.   Let's take a look.  Tab 14.  Is tab 14 in your binder,

4    sir, PX 353?

5         And, Mr. Beck, do you generally recognize the

6    document?

7    A.   Yes.

8         MR. GOULD:  I'd move to admit PX 168 -- I'm sorry --

9    PX 353.

05:04:15 10      THE COURT:  353.  Any objection?

11        MS. GOLINVEAUX:  Yes, Your Honor.  May we approach?

12        THE COURT:  Yes.

13        NOTE:  A sidebar discussion is had between the Court

14   and counsel out of the hearing of the jury as follows:

15   AT SIDEBAR

16        THE COURT:  What's your objection?

17        MS. GOLINVEAUX:  Your Honor, these are interrogatory

18   responses served in the BMG case.  Your Honor denied Cox's

19   motion in limine to exclude BMG documents in evidence, but

05:04:53 20  without prejudice to our raising issues during trial in this,

21   we think it's inappropriate for them bringing in interrogatory

22   responses from the BMG case for this purpose.

23        THE COURT:  What's the purpose of the document?

24        MR. GOULD:  So the purpose of the document is that

25   there is -- there are a couple interrogatories that are

B. Beck - Direct

1400

1    extremely critical to the issues in this case:  State the

2    number of DMCA notices you received each month during these

3    years and the person most knowledgeable, and there's a chart

4    which shows the number received and number deleted.

5            This is highly probative evidence of how Cox was

6    handling abuse complaints at this time and what they did and

7    didn't do and what they made their customers aware of and how

8    that impacted in notices in steps in the graduated response

9    that the customers were at when they received other notices.

05:05:50  10            THE COURT:  Okay.  Why can't we redact the BMG part

11    of this?

12            MR. GOULD:  Yeah, we'd be fine with that.

13            THE COURT:  It seems to be relevant otherwise.  Does

14    that work?

15            MS. GOLINVEAUX:  That's fine, Your Honor.

16            THE COURT:  Okay.  All right.  Let's redact it out.

17            MR. OPPENHEIM:  We can just ask him not to show it,

18    and then we'll redact it.

19            THE COURT:  Correct.

05:06:06  20            MR. GOULD:  And just to preview, there is another

21    interrogatory that I'm going to use, the third supplemental,

22    where they gave the list of warnings, suspensions, and

23    terminations.  The position -- our position is the same.  Maybe

24    we can save ourselves some time, but certainly --

25            MS. GOLINVEAUX:  We were just given this as he went

B. Beck - Direct

1401

1       up, so we're going to have to look at it.

2               MR. ELKIN:  Your Honor, we don't have a problem with

3       the evidence.  It's just a question of the BMG.

4               THE COURT:  Right.  I agree.

5               MR. GOULD:  We have no problem redacting that out.

6               THE COURT:  Okay.  All right.  Thank you.

7               NOTE:  The sidebar discussion is concluded;

8       whereupon, the case continues before the jury as follows:

9       BEFORE THE JURY

05:07:10 10             MR. GOULD:  Your Honor, I'd move to admit PX 353

11      subject to the discussion we just had.

12              THE COURT:  All right.  It's received.

13      BY MR. GOULD:

14      Q.   Mr. Beck, you're familiar with what an interrogatory is?

15      A.   Yes.

16      Q.   It's a, it's a question and sworn answer that's provided

17      in a litigation like this?

18      A.   Yes.

19              MR. GOULD:  If we could turn to the very last page of

05:07:34 20      353 and pull that up for the witness on the screen?

21              Oh, yes, it's okay.

22      BY MR. GOULD:

23      Q.   Mr. Beck, do you see that this is a sworn verification

24      from Marcus Delgado?

25      A.   Okay.

B. Beck - Direct

1402

1    Q.   And Mr. Delgado is swearing that the information is true
2    to the best of his knowledge in this document, correct?
3    A.   That appears to be what it states.
4    Q.   If you could turn to page 11, please?  I want to look at
5    interrogatory No. 5.  And the question that's asked here is:
6    State the number of DMCA notices you received each month from
7    January 1, 2010, to the present, and identify the person(s)
8    most knowledgeable about such notices since January 1, 2010.
9         Do you see that?
05:08:49 10  A.   Yes.
11   Q.   And then if you flip ahead a couple of pages, you'll see
12   at the end of a chart, you're listed as the person most
13   knowledgeable about the CATS database?  I'm just asking you on
14   the last page, it lists you as the person most knowledgeable
15   about the CATS database, correct?
16   A.   Yes, I see that.
17   Q.   Do you agree with that statement?
18   A.   Yes.
19   Q.   Now, I want to go back to the narrative answer and chart
05:09:33 20  on this question, and the narrative answer starts on page 12
21   and goes into 13, and it describes information that appears in
22   this chart on the next few pages, correct?
23   A.   Yes.
24   Q.   And the first thing it says is that, starting with e-mail
25   notices:  E-mail notices received at abuse@cox.net that relate

B. Beck - Direct

1403

1   to alleged copyright infringement are handled in one of two

2   ways.  If the sender is not blacklisted, the notice is entered

3   into Cox's CATS system.

4           That's the second column in the table below, right?

5   A.   Um-hum, yes.

6   Q.   And if you'd just look at the table, it has a column

7   listing that first thing, "Notices in CATS."  Do you see that?

8   A.   Yes.

9   Q.   Okay.  And then the next sentence -- and we'll look at

05:10:29 10   some of those, but I want to make sure we understand this

11   chart.  The second sentence says:  If the sender is

12   blacklisted -- this is what we were talking about before -- the

13   e-mail notice is automatically deleted and not entered into the

14   CATS.

15           And then it describes an exception, correct?

16   A.   Yes, it does.

17   Q.   And the exception is the Rightscorp notices; is that

18   right?

19   A.   I'm looking for the exception explanation.

05:11:04 20   Q.   It says:  The figures in the third column below do not

21   reflect e-mail notices that were not received at abuse@cox.net

22   because those notices were blocked by the Cox mail server?

23   A.   Yes.

24   Q.   So the first column is notices that Cox received -- I'm

25   sorry -- CATS received, and the second column, called "Deleted

B. Beck - Direct

1404

1    Notices Not Stored in CATS," the second one, deleted notices,

2    those are the notices that Cox deleted, correct?

3    A.    Those were deleted by CATS, yes.

4    Q.    And the notices from Rightscorp that were blocked don't

5    appear in these charts?

6    A.    That's correct.

7    Q.    Okay.  And then this third column, it looks like it's a

8    small exception about a small number that I think we can just

9    move past.

05:11:53  10          Now, the last sentence of the narrative says that for

11   a particular month, the sum of those columns reflect all e-mail

12   notices received at abuse@cox.net in that month that relate to

13   alleged copyright infringement, correct?  Basically, you could

14   do the math horizontally and figure out the total notices per

15   month?

16   A.    Yes.  Yes, that should be correct.

17   Q.    Now, if we could just go to the chart, please, and just

18   kind of -- let's go to the next page and zoom up a little bit,

19   and then just kind of scroll down slowly, and let's look and

05:12:41  20   eyeball the figures in the first two columns:  notices in CATS

21   and deleted notices, and do you see that over time, Mr. Beck,

22   keep going, the deleted notices start to increase?

23          Let's go to the next page, please.

24          Do you see that by 2013, the deleted notices starting

25   in February 2013 start to increase a bit more into the 114,000,

B. Beck - Direct

1405

1   123,000, 109,000?  Do you see that?

2   A.   Yes.

3   Q.   And you see that as the months continue, that the deleted

4   notices actually exceed the number of notices that CATS

5   accepted?

6   A.   That is the case for some of the months, yes.

7   Q.   Isn't it the case for all of the months there shown in

8   2013, sir?

9   A.   No, it's not.

05:13:53 10   Q.   No, it's not?  Is there one that you see where the deleted

11   notices are smaller than the accepted notices?

12           Oh, you're right.  May 2013, there were about 10,000

13   more accepted than deleted.  And the other months, the deleted

14   exceeded the accepted, correct?

15   A.   Yes.  That matches what I'm seeing.

16   Q.   Now, I've done the math here, and I counted the number of

17   deleted notices in the years shown in this chart, and it's

18   about 5 million.  And is there any reason to doubt my math?

19   A.   I would have to run the numbers myself to speak to that.

05:14:37 20   Q.   Okay.  And then I did the same for the claims period.

21           And if we could pull up the first slide of the

22   demonstrative?

23           What this slide shows, sir, is the claim period,

24   February 2013 through November 2014, for the information we

25   just looked at, including the accepted notices, the deleted

B. Beck - Direct

1406

1    notices, and the total notices.

2           Do you see that the total number of notices was about

3    5.7, 5.8 million that Cox received in this time period?

4    A.   Based on the document, yes.

5    Q.   Assuming the math is correct.

6    A.   That's right.

7    Q.   And do you see that the number that Cox accepted was just

8    over 2 million, and that comes to about 36 percent of that

9    total?

05:15:31 10  A.   I see.

11   Q.   And do you see, Mr. Beck, that the number that Cox deleted

12   is about 3.68 million, which comes to about 63 percent of the

13   notices?

14   A.   I see that.

15   Q.   So according to this sworn information that Cox provided,

16   Cox deleted over 63 percent of the infringement notices it

17   received in 2013 and 2014, correct?

18   A.   Based on the numbers we're looking at.

19   Q.   And not one of those would have received a customer facing

05:16:03 20  action of any kind, correct?

21   A.   For the deleted notices.  They may have received notices

22   from non-blacklisted senders, however.

23   Q.   Of those 3.68 million, not a single customer faced any

24   action, correct?

25   A.   For those particular notices.

B. Beck - Direct

1407

1   Q.   And you don't know how many of those millions of notices

2   pertain to the subscribers who are identified in the notices

3   from plaintiffs, do you?

4   A.   I just know if they are deleted, then we do not have

5   copies of those.

6   Q.   Now, I want to talk a little bit about what CATS does when

7   it receives a copyright infringement notice from a

8   non-blacklisted party.  So first CATS automatically scans the

9   notice for information.  You call it parsing; is that right?

05:16:54   10   A.   That's a general term I would use, yes.

11   Q.   And CATS tries to figure out what type of abuse complaint

12   it is?

13   A.   Yes.

14   Q.   So it tries to figure out is this a copyright infringement

15   complaint?

16   A.   Yes, that's correct.

17   Q.   And it looks for an IP address, a date, and a time related

18   to the instance of infringement identified, correct?

19   A.   Yes.  Those are some of the things we look for.

05:17:15   20   Q.   And that allows CATS to match that infringement notice to

21   a particular customer?

22   A.   Those are some of the key values we would use.

23   Q.   So that's a process that CATS does.  It matches that

24   information to try and find the customer, right?

25   A.   Yes, that's part of the flow.

B. Beck - Direct

1408

1   Q.   And this tells Cox who the customer is that was the

2   subject of this infringement notice, that the notice was about,

3   right?

4   A.   That ties us back to the customer account in question.

5   Q.   I want to turn to what we sometimes call in this case the

6   ticket data.  It's PX 19.  And I'm afraid I can't give you a

7   paper copy because it's quite large.  It's one of the digital

8   exhibits.

9        Mr. Beck, you were involved in preparing a

05:18:07  10   spreadsheet of certain ticket data for infringement notices in

11   this case; is that correct?

12   A.   Is this the --

13   Q.   Actions ticket history?

14   A.   What we're referring to as the ticket action history, yep.

15   Q.   Did I get it wrong?  Ticket action history?

16   A.   I think ticket action history.

17   Q.   You're familiar with the document I'm talking about?

18   A.   I am, yes.

19   Q.   It's a large spreadsheet?

05:18:28  20   A.   Yes.

21            MR. GOULD:  We move to admit PX 19.

22            THE COURT:  Any objection?

23            MS. GOLINVEAUX:  No objection, Your Honor.

24            THE COURT:  All right.  I thought it was in.

25   BY MR. GOULD:

B. Beck - Direct

1409

1    Q.   At a high level, Mr. Beck, this ticket data reflects

2    copyright infringement tickets and actions that Cox took on

3    those tickets for the 57,000 or so subscribers identified in

4    plaintiffs' infringement notices, correct?

5    A.   Yes, I believe that's correct, if I followed that right.

6    Q.   For a limited time frame, for 2012 to 2014, right?

7    A.   Yes.  2012, 2013, 2014 were included.  This will show

8    actions taken on any copyother tickets for those customers.  If

9    they're one of the customers that received an RIAA notice

05:19:29 10    during the February 2013 to November 2014, for that set of

11    customers, we gathered the slightly longer timeline of 2012,

12    2013, 2014, and gathered all of the copyother tickets,

13    regardless of where those complaints may have sourced from as

14    long as they were one of these customers in the set.

15         This is showing all of the action events from those

16    tickets.

17    Q.   That's helpful, thank you.

18         I want to make sure that everyone -- that I

19    understood it and everybody understood it.  You started with

05:20:02 20    the 57,000 subscribers that received copyright infringement

21    notices from plaintiffs, correct?

22    A.   Yes.

23    Q.   And then you looked for every copyright infringement

24    notice about those customers for the period of 2012 to 2014,

25    correct?

B. Beck - Direct

1410

1    A.    I believe so, yes.  That sounds right.

2    Q.    So we get a, kind of a three-year snapshot of infringement

3    tickets?

4    A.    Yes.

5    Q.    And it's been talked about a bit here.  Infringement

6    tickets and infringement notices aren't the same thing.

7    A.    No.  Not exactly, no.

8    Q.    And, in fact, a number of notices may roll up into a

9    single ticket, correct?

05:20:43 10    A.    That is possible, yes, under certain conditions.

11    Q.    So we may know the number of copyright infringement

12    tickets in this three-year period, but we don't from that data

13    know the number of copyright infringement notices about those

14    customers, correct?

15    A.    That is a distinction, yes.

16    Q.    And the ticket data doesn't include any information at all

17    about the infringement history of these customers prior to

18    2012, correct?

19    A.    Say that part again, if you would?

05:21:09 20    Q.    The PX 19 ticket data doesn't tell us anything about the

21    infringement ticket history of these customers prior to 2012,

22    correct?

23    A.    It is geared to 2012, 2013, 2014.

24    Q.    And by the same token, it doesn't tell us anything about

25    their infringement history after 2014?

B. Beck - Direct

1411

1    A.   Right.  2012, 2013, 2014.

2    Q.   And just in this limited time frame, do you recall that

3    there were approximately 315,000 tickets in this document?

4    A.   That sounds -- that matches what I recall, yes.

5    Q.   You've reviewed this.  You remember it.  That sounds about

6    right?

7    A.   Yeah.  315,000 tickets in here.

8    Q.   Now, if we look at column H in the ticket data, it's a

9    column called "Action."  Do you see that?

05:22:02 10   A.   Um-hum.

11   Q.   And we can filter it in different ways to figure out how

12   many, how many times Cox took different kinds of actions,

13   correct?

14   A.   That column does show what the action was taken.

15   Q.   For example, we could filter on column H for sent reply.

16        Why don't we do that, Mr. Duval.  Sent reply.  There

17   you go.

18        And you see on the bottom left, there's a number

19   there that tells you how many records came up after you

05:22:46 20   filtered in that way?

21   A.   I see.

22   Q.   And what's that number?  What's that number, sir?

23   A.   The number showing here is roughly 48,000.

24   Q.   So 48,018, is that correct?

25   A.   Yep, out of the 570,000-plus total.

B. Beck - Direct

1412

1   Q.   But that's out of 315,000 tickets, right?

2   A.   Yes.  570,000 is the count of the number of actions, and a

3   given ticket could have multiple action entries.

4   Q.   Sometimes a ticket has multiple entries because it might

5   say sent a reply for one entry and then closed the ticket on

6   another entry?

7   A.   That is correct.  That is one possible.

8   Q.   So in order to understand the number of actions taken out

9   of the number of tickets, we really want to look at it out of a

05:23:32 10   function of 315,000, correct?

11   A.   Possibly.  It depends on what we're looking at.

12   Q.   Let's do that.  So we have 48,000 instances of sent reply

13   out of these 315,000 tickets.  Now, "sent reply" is the

14   language that Cox and CATS uses typically when CATS receives an

15   e-mail that exceeds a given sender's hard cap limit, correct?

16   A.   Depends on the action content form here.

17   Q.   And you see on the action content form in column I, they

18   all look like hard limit complaints?

19   A.   For this particular page, yes.

05:24:09 20   Q.   I think there might be a couple of other ones, but let's,

21   let's do this:  Let's unselect and just select hard limit

22   complaints.  So for all of those hard limit complaints, it's

23   46,997?

24   A.   Yes.

25   Q.   Okay.  So just about 47,000 times that Cox sent a hard

B. Beck - Direct

1413

1    limit reply to a sender.  Am I correct, sir, that means that

2    Cox sent an e-mail back to whoever sent it, closed the ticket,

3    and did nothing as to the customer?

4    A.   I can't say that we did nothing, but yes, we did not take

5    a customer facing notification at that time.

6    Q.   So you took no customer facing notification.

7    A.   Correct.

8    Q.   Didn't send the customer a warning for those 47,000,

9    correct?

05:24:53  10    A.   No, but it will serve as their first step in our graduated

11    response program if they haven't received any other complaints.

12    Q.   So this might replace the ignore hold for all?

13    A.   The hold for more, yes.

14    Q.   So this might replace the ignore hold for more, but other

15    than that exception, this doesn't bump them up in the graduated

16    response step, correct?

17    A.   No.  It can take the place of the hold for more, but

18    there's no additional customer facing action on those.

19    Q.   This would not give the customer a warning e-mail, would

05:25:25  20    it?

21    A.   No.

22    Q.   They wouldn't be suspended based on this, right?

23    A.   No.  That would be a customer facing.

24    Q.   There would be no customer call, correct?

25    A.   That would be customer facing action.

B. Beck - Direct

1414

1    Q.    There would be no suspension?

2    A.    Also customer facing action.

3    Q.    And no termination?

4    A.    That would be very much a customer facing action.

5    Q.    And as for the graduated response, I want to make sure I

6    understand how that works.  So ordinarily, when CATS receives a

7    notice that it takes a customer facing action, it might bump up

8    the customer in the graduated response, correct?

9    A.    Conversationally speaking, yes.

05:25:54 10   Q.    Conversationally speaking.  That's -- that works for me.

11         Say a customer is on their fifth ticket under the

12   graduated response and then they get their sixth ticket.

13   Ordinarily if it it's a notice -- if it's a ticket that Cox

14   processes and recognized, it would bump that customer up to the

15   sixth step, correct?

16   A.    Yes.

17   Q.    Okay.  But if it's a hard limit reply, that customer just

18   stays at the fifth?

19   A.    Yes.

05:26:20 20   Q.    They essentially get a free pass on the graduated

21   response, don't they?

22   A.    I don't know that I would call it a free pass.  The

23   complainant can resend the complaint at a later time if they

24   have a lower volume spot.

25   Q.    Can we pull up -- actually in your binder, please, take a

B. Beck - Direct

1415

1    look at 310, PX 310, tab 10.  PX 310.

2           Mr. Beck, this is a two-page e-mail that you're

3    included on.  Let me know if you can -- if you recognize that,

4    sir.

5    A.    Okay.  Give me just a moment to review.

6    Q.    Sure.

7    A.    Okay.

8           MR. GOULD:  I'd move to admit PX 310.

9           THE COURT:  Any objection?

05:27:43 10         MS. GOLINVEAUX:  No objection, Your Honor.

11          THE COURT:  It's received.

12          MR. GOULD:  So if we pull that up and start at the

13   second page, please, just zoom in on the whole e-mail, if you

14   could.

15   MR. GOULD:

16   Q.    So, Mr. Beck, here you're sending an e-mail to the

17   corporate abuse and data ops - CATS teams, and the subject is

18   High Complaint volume for Universal Studios, correct?

19   A.    Yes.

05:28:05 20   Q.    And you say:  We have a "hard limit" of 200/day applied

21   for Universal's complaints to us, but we're seeing quite a bit

22   more than that coming in.  In general it isn't a big deal

23   really (we create closed tickets once the limit is exceeded

24   each day), but this complainant in particular has had daily

25   complaint volumes as high as 3,700+ lately.  Does that seem

B. Beck - Direct

1416

1    excessive to you?

2            Do I read that correctly?

3    A.    I believe so, if I followed along correctly.

4    Q.    I'm sorry, I didn't hear that.

5    A.    I said I believe so, if I followed along correctly.

6    Q.    And what's happening here, Mr. Beck, is you're explaining

7    that Universal Studios is sending a great deal of copyright

8    infringement notices above its 200 per day cap, correct?

9    A.    Yes, above what it -- if I'm reading and remember this

05:28:51 10   right, it's probably a statement that their current volume may

11   be higher than it's been in the past, so it's basically a

12   pattern change, something that catches our eye.

13   Q.    And as to the particular content, the point is that

14   they're well over the 200 per day cap?

15   A.    Yes.

16   Q.    And you say it's no big deal because you just close the

17   tickets, right?

18   A.    Those are the words here, yes.

19   Q.    But what you mean there, Mr. Beck, is it's no big deal for

05:29:22 20   Cox; isn't that right?

21   A.    No, it's not.  What I'm saying here is that it's not --

22   Q.    Mr. Beck --

23            THE COURT:  Let him finish.  Let him finish the

24   answer.

25            THE WITNESS:  I was basically just saying that when I

B. Beck - Direct

1417

1    say it's not a big deal here, I'm saying it's not causing,

2    like, a system-impacting issue.  It's not causing a degradation

3    of CATS' ability to handle notices and such.

4    BY MR. GOULD:

5    Q.   It's not causing a big deal for Cox's computer systems?

6    A.   For the CATS platform.

7    Q.   It's not causing a big deal for CATS?

8    A.   Correct.

9    Q.   You certainly don't mean that it's no big deal for the

05:29:58 10   copyright owner?

11   A.   No, that's not the implication here.  This is about system

12   availability.

13   Q.   And those 3,500 notices above Universal Studios' cap

14   ordinarily might trigger a hard limit reply like we saw if

15   there was an e-mail address to send to, right?

16   A.   Yes.

17   Q.   But if you look down at this chart on the bottom, do you

18   see that the complainant has a reply address that says no

19   reply?

05:30:25 20   A.   Yes.

21   Q.   And doesn't that mean, sir, that CATS doesn't send a reply

22   to them?

23   A.   Yes, that's correct.  We assume it would bounce, that it's

24   not a serviceable address.

25   Q.   So in this case, Cox and CATS not only takes no customer

B. Beck - Direct

1418

1    facing action; it also takes no action as to the complainant;

2    isn't that right?

3    A.    The complainant hasn't given us a valid way to reach them

4    for these.

5    Q.    And you asked the abuse team whether this seems excessive?

6    A.    Those were the words, yes.

7    Q.    And on the next page, Mr. Sikes replies and says:  Yes,

8    this does seem a bit excessive?

9    A.    Yes.

05:31:07 10   Q.    Mr. Beck, is it excessive to report massive theft or to

11   ignore notice of it?

12   A.    I think I alluded to it earlier, when I said excessive, I

13   think I meant that does this seem like an unusually high volume

14   compared to what we've normally received from them.

15   Q.    Now, I want to turn back to the ticket data, PX 19.

16   Actually, one of the fields -- one of the fields in the ticket

17   data is sent warning, correct?

18   A.    That is one of the actions, yes.

19   Q.    And we could figure out the number of warnings sent to

05:31:49 20   those customers, correct?

21   A.    Yes.

22   Q.    Now, I want to pull up a document that I'm going to call

23   PX 32A, which is not in your binder.  It's the first of the

24   compilation of warning e-mails that Cox sent to its customers,

25   and I have one open for you to look at because I did not plan

B. Beck - Direct

1419

1    ahead on this one.  I apologize.

2            Mr. Beck, you're familiar with the e-mail warnings

3    that Cox sends to its customers, correct?

4    A.   Yes, generally.

5    Q.   You've seen those before?

6    A.   Um-hum, yes.

7            MR. GOULD:  PX 32A is a single one of those warnings,

8    and I move to admit PX 32A.

9            THE COURT:  Any objection?

05:32:39 10          MS. GOLINVEAUX:  No objection, Your Honor.

11           THE COURT:  All right.  It's received.

12           MR. GOULD:  If you could pull up PX 32A.

13   BY MR. GOULD:

14   Q.   Now, Mr. Beck, this is an example of one of the warning

15   e-mails that CATS sends to customers, correct?

16   A.   It does appear to be so, yes.

17   Q.   And this message is to advise that Cox has received a

18   notice of infringement.  And I want to look at the second

19   paragraph -- actually, the third paragraph.  Let's blow that

05:33:20 20   up.

21           In the third paragraph, Cox says to its customers:

22   As an internet provider, Cox is responsible under the Digital

23   Millennium Copyright Act, DMCA, to advise when we receive a

24   notice asserting infringement by you.  We are also required to

25   take appropriate action if further claims are received that you

B. Beck - Direct

1420

1    do not resolve.

2              Did I read that correctly?

3    A.   If I followed along, yes.

4    Q.   Now, we just looked at a number of categories of instances

5    where Cox actually doesn't advise a customer when it receives a

6    notice asserting infringement, didn't we?

7    A.   Can you repeat?  I'm sorry?

8    Q.   We just looked at a number of categories of, categories of

9    procedures where Cox actually doesn't advise the customer when

05:34:16 10  it receives an infringement allegation against them; isn't that

11   right?

12   A.   For various different reasons, yes.

13   Q.   Yeah.  We talked about hard limits, right?

14   A.   Hard limits, yes.

15   Q.   We talked about two kinds of blacklists, right?

16   A.   Yeah.  The blacklists, we would believe something to be

17   improper with the complaint.

18   Q.   And we talked about how multiple notices might roll up

19   into a single ticket?

05:34:40 20  A.   Yes.

21   Q.   So, in fact, Cox doesn't advise the customer when it

22   receives a notice asserting infringement by you in all cases;

23   isn't that right?

24   A.   Not every single notice will be passed directly to the

25   customer.

B. Beck - Direct

1421

1    Q.   One of the other things we can look at in the ticket

2    action data is how many times that CATS suspended a customer

3    and reactivated a customer, correct?

4    A.   Yes.  We should be able to see those actions.

5    Q.   And you would agree Cox had the ability to suspend

6    customers' internet service, correct?

7    A.   Generally, yes.

8    Q.   And when Cox suspends a customer in response to copyright

9    infringement complaints, that restricts the customer's ability

05:35:25  10    to use Cox's internet service, correct?

11    A.   During the time of the suspension, it will, yes.

12    Q.   And during the time of the suspension, a customer, a Cox

13    customer can't use peer-to-peer programs through Cox's network,

14    correct?

15    A.   Correct.

16    Q.   And likewise, during a suspension, a Cox customer can't

17    infringe plaintiffs' copyrights through Cox's network, correct?

18    A.   I can't imagine how, no.

19    Q.   And when Cox reactivates a customer who was suspended,

05:35:54  20    that customer regains access -- regains the ability to use

21    Cox's internet service, correct?

22    A.   Yes.  That restores the internet connectivity.

23    Q.   I'm sorry, I didn't hear you.

24    A.   Reactivation does restore the internet connectivity, yes.

25    Q.   And that would include the ability to use Cox's internet

B. Beck - Direct

1422

1    service to infringe if they wanted to, correct?

2    A.    It restores their connectivity to the internet.

3    Q.    They can do whatever they want on it?

4    A.    That's as much as I can say, yes.

5    Q.    And, in fact, the CATS data also shows the, the time

6    differential between the suspension and activation, too.  We

7    could look at that, right?

8    A.    Sure.

9    Q.    In the ticket data, you can also see the number of

05:36:40 10  terminations of the 57,000 customers, correct?

11   A.    Yes.  Termination would be one of the actions that would

12   show.

13   Q.    And a terminated customer indicates that a customer's data

14   service has been cut off, correct?

15   A.    Yes.  They're off the internet.

16         MR. GOULD:  If I could look at PX 19, and filter

17   column H for a terminated customer, please.

18   Q.    Do you see, Mr. Beck, in the three-year period of all

19   copyright infringement tickets for the 57,000 customers, that

05:37:27 20  Cox terminated 13 of those customers?

21   A.    Yes.  Thirteen of the customers that received RIAA notices

22   during that time frame.

23   Q.    Thirteen terminations of the 57,000 customers who received

24   plaintiffs' RIAA notices?

25   A.    Yes.

B. Beck - Direct

1423

1    Q.    And you would agree, sir, that Cox had the ability to

2    terminate customers' service?

3    A.    We have terminations listed here.

4    Q.    And so you would agree Cox had the ability to terminate

5    customers' service, correct?

6    A.    That is a given.  If the actions occurred, then we had the

7    ability.

8    Q.    And when Cox terminates a customer's internet service,

9    that restricts the customer's ability to use Cox's internet

05:38:14 10   service?

11   A.    Yes.  When they're terminated, they're off the internet.

12   Q.    And likewise, after a customer's internet service is

13   terminated, that customer can't use peer-to-peer programs

14   through Cox's network, correct?

15   A.    They should not have network connectivity if data services

16   are terminated.

17   Q.    And similarly, after a customer's internet service is

18   terminated, that customer can't infringe plaintiffs' copyrights

19   through Cox's network, correct?

05:38:37 20   A.    They should not be able to unless they are finding some

21   other inappropriate way to connect to our network.

22   Q.    To your knowledge, the answer would be no, they can't do

23   it?

24   A.    No.  Not practically, no.

25   Q.    Now, I want to talk a little bit about what happens at

B. Beck - Direct

1424

1    termination.  If we could pull up PX 292 -- actually, don't

2    pull it up yet, please -- tab 9 in your binder, please.

3            Do you recognize this, Mr. Beck?

4    A.    Okay.  Yes.

5            MR. GOULD:  I move to admit PX 292.

6            THE COURT:  Any objection?

7            MS. GOLINVEAUX:  No objection, Your Honor.

8            THE COURT:  It's received.

9    BY MR. GOULD:

05:39:41 10   Q.    Mr. Beck, PX 292 is a chat log between you and a gentleman

11   named Harry Spriggs from Monday, August 22, 2011, correct?

12   A.    Yes, that's correct.

13   Q.    And Mr. Spriggs, you believe, was a Tier 2.5 tech at the

14   time?

15   A.    If I remember correctly.

16   Q.    And in the first few lines, you appear to be asking

17   Mr. Spriggs a process question about what happens to the actual

18   service and modem at termination.  Do you see that?

19   A.    Yes, I see.

05:40:15 20   Q.    That's the third line.

21           And then Mr. Spriggs replies -- let's call up

22   Mr. Spriggs' reply, please.  I guess it doesn't get us much

23   bigger, does it?

24           Mr. Spriggs replies and says:  The same as what

25   happens with a regular suspension.  It used to be that we

B. Beck - Direct

1425

1    completely removed all HSI -- high-speed internet services --

2    but since so many of them were just getting reactivated again

3    the next day, and because it's such a huge pain to re-add

4    services once they've been removed, Jason gave us the go-ahead

5    to just use the AUP and call it a termination.

6              Did I read that correctly?

7    A.   If I followed along, yes.

8    Q.   And you understand Jason refers to Mr. Zabek?

9    A.   That would be my assumption.

05:41:05 10  Q.   And when he uses the phrase "just use the AUP and call it

11   a termination," "AUP" here means suspend, doesn't it?

12   A.   Yeah, it's the -- that's a term that falls somewhere in

13   the technical aspects of suspending, so, yes, that's a

14   reference to suspension.

15   Q.   And you reply:  Okay.  And talk a little bit about CATS.

16             And then moving down, Mr. Spriggs replies again, and

17   let's take a look at Mr. Spriggs' reply.  Mr. Spriggs says:  I

18   see what you mean.  It's been kind of a "semi-official"

19   procedure change, mostly to make things easier on us.  Whatever

05:41:48 20  you can do with it, I know we'd all appreciate it.

21             Do you recall this semi-official procedure change?

22   A.   Say again?  I'm sorry?

23   Q.   Do you recall this semi-official procedure change?

24   A.   Other than what I'm reading, not particularly.  The

25   procedures for termination, though, wouldn't really involve me.

1426

1    Q.   If you could turn to tab 13 in your binder, please.

2         Do you recognize this similar-looking but different

3    document that we looked at earlier?

4              THE COURT:  How much more do you have?

5              MR. GOULD:  I've got a bit.

6              THE COURT:  Meaning?

7              MR. GOULD:  Mindful of the time, if you'd like to

8    break, I can begin this section tomorrow.  I've got a bit after

9    it as well.

05:43:31  10              THE COURT:  So you've got more than ten minutes

11   and -- well, you have cross-examination that's going to go on

12   for a while, I would imagine, further examination.

13              MS. GOLINVEAUX:  Yes, Your Honor.

14              THE COURT:  Okay.  All right.  We could continue, but

15   it's quarter to six.  Are you-all ready to go home for the day?

16   Does that make sense to you-all?  Okay.

17              All right.  Let's break for tonight, and we'll come

18   back at 9:00 tomorrow morning.  And again, please, no research,

19   no investigation, no talking to anybody about the case.  Thank

05:44:09  20   you for your time today, and we'll see you tomorrow at 9:00.

21   All right.  You're excused.

22              NOTE:  At this point, the jury leaves the courtroom;

23   whereupon, the case continues as follows:

24   JURY OUT

25              THE COURT:  All right.  Mr. Beck, you're excused at

B. Beck - Direct

1427

1    this time.  We'll see you tomorrow at 9:00.  Please don't

2    discuss the testimony you've given so far with anybody until

3    you return tomorrow.  All right, sir?

4              THE WITNESS:  Okay.  Thank you very much.

5              THE COURT:  All right.  Have a good evening.  You're

6    excused at this time.

7    WITNESS STOOD DOWN

8              THE COURT:  You wanted to identify some exhibits from

9    the deposition exhibit?

05:45:12 10              MR. GOULD:  I think it's probably the moment

11   everyone's been waiting for.  We would move into the record

12   based on the Zabek deposition designation PX 429, PX 318,

13   PX 258, PX 264, PX 347, PX 282, PX 253, PX 262, PX 287, PX 245,

14   PX 266, PX 277, PX 316, PX 252, PX 337, PX 235, PX 296, PX 236,

15   PX 237, PX 242, PX 197, PX 278, PX 324, PX 298, PX 325, and

16   PX 312.

17             MR. ELKIN:  No objection, Your Honor.

18             THE COURT:  All right.  Thank you.  They're received.

19             Did you get them all?  All right.

05:46:23 20             Okay.  Anything we need to discuss before we return

21   tomorrow at 9 a.m.?

22             MR. ELKIN:  No, Your Honor.

23             MR. OPPENHEIM:  Not from plaintiffs, Your Honor.

24             THE COURT:  All right.  All right, then we're in

25   recess.  We'll see you tomorrow at 9:00.

1428

1    NOTE:  At this point, the December 9, 2019, portion
2  of the case is concluded.

3

4

5

6                    CERTIFICATE OF COURT REPORTERS

7

8

9

10

11       We certify that the foregoing is a true and
12    accurate transcription of our stenographic notes.

13

14

15

16                      /s/  Norman B. Linnell
17               Norman B. Linnell, RPR, CM, VCE, FCRR

18

19                      /s/  Anneliese J. Thomson
20               Anneliese J. Thomson, RDR, CRR

21

22

23

24

25