**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

---

SONY MUSIC ENTERTAINMENT, *et al.*,
*Plaintiffs*,

v.

COX COMMUNICATIONS, INC, *et al.*,

*Defendants*.

---

Civil No. 1:18-cv-950 (LO / JFA)

## COX'S INITIAL MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER FEDERAL RULE OF CIVIL PROCEDURE 50(A)

Defendants Cox Communications, Inc. and CoxCom, LLC ("Cox"), respectfully move this Court for judgment as a matter of law ("JMOL") pursuant to Federal Rule of Civil Procedure 50(a).

## STANDARD

Judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. Rule Civ. Proc. 50(a).   In addition to seeking judgment on sufficiency grounds, "a party may appropriately move for judgment as a matter of law on discrete legal issues." *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1236 (4th Cir. 1995).   Judgment as a matter of law is required where "a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." *Bennett v. CSX Transp. Inc.*, 552 F. App'x 222, 226 (4th Cir. 2014).

# ARGUMENT

**I.   Cox is entitled to JMOL limiting certain of Plaintiffs' statutory damages claims to one award per work.**

The Copyright Act provides for "an award of statutory damages for all infringements involved in the action, with respect to *any one work*[.]" 17 U.S.C. § 504(c)(1) (emphasis added). For the purposes of calculating statutory damages, "*all the parts* of a compilation or derivative work constitute one work." *Id.* (emphasis added). The undisputed evidence establishes that 2,412 of the sound recordings in suit are derivative of 2,412 music compositions that are also in suit, such that Plaintiffs cannot recover a separate statutory damages award for each.  The evidence at trial also showed that 6,070 of the Label Plaintiffs' 6,734 sound recordings were either registered as parts of albums or registered as "works made for hire," or both.  *See* PX1, PX 612 -PX 8478. As a matter of law, those 6,070 sound recordings are parts "compilations" for purposes of statutory damages under 17 U.S.C. §504(c), such that Plaintiffs are entitled there entitled to recover only one award of statutory damages per compilation.  Cox is entitled to judgment as a matter of law that Plaintiffs' damages are limited to award per derivative work and one award per compilation, resulting in a maximum number of damages awards of 2,327.[1]

**A.   Plaintiffs are entitled to only a single statutory damages award for a sound recording and the music composition from which it derives.**

It is a basic tenet of copyright law that a sound recording is a "derivative work" of a musical composition.  See 17 U.S.C. § 101 ("a sound recording" is an example of a "derivative work … based upon one or more preexisting works"); *see also, e.g.*, *TufAmerica, Inc. v. Codigo Music*

---

[1] The 2,327 number consists of 1,453 sound recordings plus 874 music compositions.  The 1,453 sound recordings, in turn, consist of 789 registered compilations and 664 registered singles.  *See* PX1, PX2.

*LLC*, 162 F. Supp. 3d 295, 303 n.5 (S.D.N.Y. 2016) ("Generally, '[a] sound recording is a deriva-tive work in relation to the musical work recorded therein, just as a motion picture is a derivative work in relation to the novel or screenplay upon which it is based.'") (quoting 1 Nimmer on Cop-yright § 2.10[A] n.8 (2015)).  Because a recording is derivative of the underlying composition, the recording and the composition together are eligible for a single award of copyright damages under §504(c), which provides that "all the parts of a … derivative work constitute one work."  17 U.S.C. § 504(c)(1).

Accordingly, Courts routinely hold that a sound recording and the music composition it embodies are a *single work* for purposes of calculating statutory damages. *See, e.g.*, *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 94 (2d Cir. 2016); *Capitol Records, Inc. v. MP3Tunes, LLC*, 28 F. Supp. 3d 190, 191–92 (S.D.N.Y. 2014).  In *Capitol Records*, the court held that when the defendants "infringed the copyright covering a sound recording and music compo-sition for the same song, they infringed only one work because the infringement was directed at the sound recording and the music composition was not exploited separately." *Capitol Records, Inc.*, 28 F. Supp. 3d at 192; *see also Spooner v. EEN, Inc.*, No. 08 Civ. 262, 2010 WL 1930239, at *5 (D. Me. May 11, 2010). As the Second Circuit has explained, "[a] plain reading of the Copyright Act's text supports" a finding "that the plaintiffs could recover only one statutory damages award for a musical composition and its corresponding sound recording, even where the composition and the recording were owned by separate plaintiffs." *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 94-95 (2d Cir. 2016). A contrary rule—that infringement of a single sound recording could entitle multiple plaintiffs to multiple statutory damages awards—could easily lead

to absurd, unfair, and unpredictable results, as a single act of infringement could expose a defend-ant to one, two, or hundreds of separate statutory damages awards. In the age of sampling, this is no mere theoretical possibility.

Here, Plaintiffs allege that Cox's subscribers downloaded sound recordings—not musical compositions, such as song lyrics or sheet music. Moreover, Plaintiffs concede that the great ma-jority of the Publisher Plaintiffs' musical compositions—2,412 of them—are embodied in alleg-edly infringed sound recordings that are also at issue.  *Compare* PX1 *with* PX2.[2]   Plaintiffs are therefore not entitled to separate awards of statutory damages for (at least) these 2,412 musical compositions, as they are part of the same "work" as the asserted sound recording.  That leaves 874 non-duplicative music compositions eligible for statutory damages.

When Cox moved for summary judgment on this ground, Plaintiffs did not dispute that 2,412 of the music compositions in suit are also embodied in sound recordings at issue.  See Doc. 392 at 38-40.[3]  Instead, they argued for a novel reading of § 504(c)(1) the statute's use of the singular "copyright owner" means that "Section 504 assumes that the same person owns multiple copyrights implicated by the same infringement, and necessarily limits its application to such cases."  Doc. 392 at 38.  Plaintiffs argued that, because the recordings and compositions in this case are held by different owners, the one-recovery rule does not apply.  *Id.*

As Cox explained in its reply brief, however, Plaintiffs' "creative" reading of §504(c) to limit "copyright owner" to single owners is directly contrary to 1 U.S.C. §1, which provides that

---

[2] Because we prepare this Memorandum in advance of the trial testimony of December 17, Cox cannot currently cite to the trial testimony of Christopher Tregillis.  Suffice it to say that we ex-pect that testimony to support this calculation.

[3] At the time Defendants moved on this issue, the number of works at issue was 2,556.  Plaintiffs submitted an exhibit in summary judgment (PX38) confirming this number, but removed it from their exhibit list shortly before trial.

"[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise[,] words importing the singular include and apply to several persons, parties, or things[.]" 1 U.S.C. § 1. By statute, that is, the phrase "copyright owner" includes the plural "copyright owners." Plaintiffs make no attempt to explain how "the context indicates" an exclusively singular reading of "copyright owner" in §504(c), and could not do so: when Congress drafted §504(c)(1), it was well aware that "it is possible to have the rights of a number of owners of separate 'copyrights' in a single 'work' infringed by one act of a defendant," and it created the single-recovery rule with that knowledge. H.R. Rep. No. 94-1476, at 162 (1976); S. Rep. No. 94-473, at 144 (1975). The plain language of the Copyright Act, Congress' express statements in the legislative history, and the complete absence of anything to "indicate[] otherwise," entirely refutes Plaintiffs' statutory argument.

Plaintiffs also made a policy argument, supported by a single district court decision that the Second Circuit in *EMI Christian* expressly rejected, that it would be "absurd" if "suing separately allowed rights holders to each recover their own statutory damages award, but if suing in the same action they are limited to a single award." Doc. 392 at 40 (citing *Teevee Toons, Inc. v. MP3.com, Inc.*, 134 F. Supp. 2d 546, 548 (S.D.N.Y. 2001), *disagreed with by EMI Christian Music Grp.,* 844 F.3d at 94-95). Even if policy arguments could suffice to overturn a result expressly required by statute—and they cannot—Plaintiffs' argument is not persuasive here. Assuming (counterfactually) that it is correct that the two groups of Plaintiffs in this case could have sought separate and multiple awards if they had elected to sue separately, they chose to sue together—presumably to marshal resources and conserve expenses. Plaintiffs also ignore that because the Label Plaintiffs and Publisher Plaintiffs are suing together, the jury may properly consider their separate harms, if any, when determining the amount of statutory damages, it awards per work. It

cannot be unfair or absurd to hold Plaintiffs to a single award of statutory damages when that result is due to Plaintiffs' own pleading decisions—and more importantly, dictated by the plain language of the Copyright Act.

Because it is undisputed that 2,412 of the sound recordings in suit are derivative of musical compositions in suit, Cox is entitled to judgment as a matter of law that Plaintiffs cannot recover a separate award of statutory damages for those 2,412 works.

> **B.   A large majority of the sound recordings in suit were issued or registered as parts of "compilations," and are eligible for only one damages award per compilation.**

Statutory damages are available only for infringed "works," and by statute, "*all the parts* of a compilation … constitute one work." *Id.*  Here, the undisputed evidence establishes that 6,070 of the 6,734 sounds recordings in suit are "parts of a compilation," for one or both of two reasons. First, albums are "compilations," and 6,070 of the recordings at issue were registered as parts of 789 compilations—that is, a number of individual recordings were registered with same registration number.  Second, virtually all of those recordings were registered with the copyright office only as parts of "works made for hire" registrations that covered multiple songs.[4]  Those "works made for hire" were also "compilations."  Whether those 6,070 sound recordings are deemed parts of compilations because they are albums, or because they are registered as works made for hire (or both) the result is the same: Plaintiffs can only recover statutory damages for (at most) 1,453 sound recording works.[5]

---

[4] An additional 237 recordings in suit were registered as "works for hire" that covered only a single sound recording.

[5] The total number of available recoveries for sound recordings consists of 789 registered as compilations and 664 registered as singles.  *See* PX1.

### 1. For recordings issued on albums, Plaintiffs can recover only one award of statutory damages per album.

It is undisputed that the Label Plaintiffs registered 6,070 of the sound recordings in suit as albums—not as individual tracks or "singles." *See* PX1 (listing 6,070 sound recordings associated with only 789 registration numbers). "An album falls within the Act's expansive definition of compilation … [and] [b]ased on a plain reading of the statute, therefore, infringement of an album should result in only one statutory damage award." *Bryant v. Media Rights Prods. Inc*., 603 F.3d 135, 140-41 (2d Cir. 2010). As the Second Circuit explained in *Bryant*, in enacting §504(c), Congress specifically intended that the one-recovery rule for compilations should apply "regardless of whether … the individual items in the material have been or ever could have been subject to copyright." *Id*. at 141 (quoting H.R.Rep. No. 1476, 94th Cong., 2d Sess. 162, *reprinted in* 1976 U.S.C.C.A.N. 5659). Accordingly, the court held that because it was "the copyright holders" who "chose to issue albums," the "plain language of the Copyright Act limits the copyright holders' statutory damages award to one for each Album" infringed. *Id*. The court so held even though the accused infringers sold "the album's songs individually." *Id*. at 142.

The same result should apply here. Because it is undisputed that 6,070 of the recordings in suit were registered on 789 albums, Plaintiffs cannot recover more than 789 awards of statutory damages for the infringement of those works.

### 2. For recordings registered as parts of "works made for hire," Plaintiffs can recover only one award of statutory damages per registered work.

There is no dispute that 1,113 of Plaintiffs' albums, containing virtually all of the sound recordings at issue here, were registered as "works made for hire"—a designation that, by statute,

is only available when *all* of the sound recordings covered by the *single* registration are parts of a *single* "compilation."[6] A "work made for hire" is—

> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas[.]

17 U.S.C. § 101. Plaintiffs have never claimed—or produced evidence to show—that any of the recording artists were their employees. Nor can they show that any sound recordings at issue, and registered collectively as a work made for hire as an album, were "specially ordered or commissioned" as a part of an audiovisual work, nor as a translation, supplementary work, instructional text, test, answer material for a test, or atlas. That leaves only a "contribution to a collective work" or "compilation." Because "[t]he term 'compilation' includes collective works[,]" 17 U.S.C. § 101, Plaintiffs' election of work-for-hire registrations for these sound recordings means that, by operation of law, they *cannot be anything but* compilations.[7]

Plaintiffs' copyright registrations establish that all but a handful of recordings in suit were registered as "works made for hire," and thus necessarily compilations.[8] Those registrations "constitute prima facie evidence of … the facts stated in the certificate[s]" in "judicial proceedings." 17 U.S.C. § 410(c). Because Plaintiffs have offered no evidence to rebut (and in fact have never

---

[6] There were 1,113 albums registered as "works for hire" as of the time of the summary judgment proceedings. The Plaintiffs subsequently removed a small number of those works from the suit.

[7] This form of registration provides Plaintiffs with a significant commercial advantage by establishing a corporate registrant as the work's "author" for purposes of copyright law, and precluding the work's human creators from asserting any rights in the future.

[8] The number of works made for hire at the time of the summary judgment proceedings was 6,766. Plaintiffs have since removed a small number of works from their list.

disputed) the "work made for hire" designation on the recordings in suit, it is an established fact in this case.  The consequence is that those works are eligible for no more than one award per registration.

### 3. The independent economic value rule does not override the plain meaning of §504(c)(1), and Plaintiffs lack sufficient evidence of independent value.

When Cox moved for summary judgment on the one-recovery rule, Plaintiffs disputed neither that 96% of the sound recordings in suit were issued as albums nor that they were registered as works for hire.  Instead, they argued in response that because "the sound recordings in suit were [also] published, distributed, and licensed by the Record Company Plaintiffs as individual works," they had independent economic value and were therefore eligible for statutory damages on a per-work basis.  Doc. 392 at 38.  The Court denied Cox's motion without specifically addressing it. Because Plaintiffs' reliance on the independent economic value theory is misplaced, and because in any event they offered no evidence at trial sufficient to support a finding that their works in fact had independent economic value, the Court should grant Cox judgment as a matter of law that Plaintiffs can claim statutory damages for only the compilations.

As a threshold matter, Plaintiffs' reliance on the independent economic value theory is misplaced. The Copyright Act "specifically states that all parts of the compilation must be treated as one work for the purpose of calculating statutory damages … [it] provides no exception for a part of a compilation that has independent economic  value[.]" *Bryant*, 603 F.3d at 142; *see also Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1281 (11th Cir. 2015) ("[I]f the dispositive factor for whether a work has independent economic value is whether it can conceivably be sold on its own, Congress's express mandate in 17 U.S.C. § 504(c)(1) that 'all parts of a compilation [are to] constitute one work' would be meaningless.")  Indeed, the Copyright Act's definition

of "collective work"—"a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole"—*presupposes* that each individual work in the collection has independent value. *Id*. (quoting 17 U.S.C. § 101). Allowing Plaintiffs to evade the statutory damages limitation by claiming independent economic value therefore makes no sense within the statutory scheme. As the Fourth Circuit has explained, "[a]lthough parts of a compilation or derivative work may be "regarded as independent works for other purposes[,]" for purposes of statutory damages, they constitute one work." *Xoom, Inc. v. Imageline, Inc*., 323 F.3d 279, 285 (4th Cir. 2003), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010) (citing H.R.Rep. No. 94–1476, at 162 (1976)); *Sullivan v. Flora, Inc.*, 936 F.3d 562, 568-569 (7th Cir. 2019).[9] Although the Seventh Circuit in *Sullivan* suggested that the Fourth Circuit in *Xoom* sent "mixed signals, following the Second Circuit's approach in *Bryant* but suggesting different facts may fit with a different construction of §504(c)(1), the fact remains that *Xoom* did follow *Bryant*, and the Fourth Circuit has not revisited the issue. Cox believes that *Bryant* represents the correct understanding of § 504(c) as Congress wrote it, and that the independent economic value theory has no application here.

Even if the independent value theory applied here to vitiate the one-award-per-compilation rule, which it does not, Plaintiffs lack sufficient evidence from which a reasonable jury could find for them on this issue. As described above, the trial evidence—in the form of Plaintiffs' own copyright registrations—undisputedly establishes that 6,070 of the sound recordings in suit were

---

[9] As the Seventh Circuit explains in *Sullivan*, there is an apparent circuit split on this issue, with several other Circuits interpreting §504(c)(1) to require, or at least permit, application of the independent value test to determine if each work in suit has "copyright value unto itself and [is] therefore an independent work … for purposes of awarding statutory damages." *Sullivan*, 936 F.3d at 570 (citing *Gamma Audio & Video v. Ean-Chea*, 11 F.3d 1106, 1118 (1st Cir. 1993).

registered as compilations and issued as albums, and so are presumptively entitled to only one award of statutory damages per compilation, no matter how many songs they include.  To avoid the result required on the face of the statute, Plaintiffs had to come forth with evidence sufficient to support a finding that each of the 6,734 sound recordings at issue were available as "singles" during the Claim Period and so had "independent economic value."  They failed to do so.

Plaintiffs survived summary judgment on this issue by presenting declarations by record label witnesses from Sony, Universal, and Warner, each of whom stated that "during the Claim Period," his company "distributed" or "exploited" all "or virtually all" of its "claimed copyrighted sound recordings as individual tracks available online."  Doc. 392-6 (McMullen Declaration ¶ 6); Doc. 392-6 (Leak Declaration ¶ 6); Doc. 392-3 (Glass Declaration ¶ 6).

At trial, however, Plaintiffs offered virtually no evidence to support their claim that the recordings in suit were offered as singles during the Claim Period.  They produced no documents demonstrating how any of the works in suit were issued or when.  Only three witnesses testified for the record label plaintiffs:  UMG's Alasdair McMullan, Warner's Matthew Flott, and Sony's Dennis Kooker.  McMullan and Flott said nothing about how their works were available during their trial testimony.  *See* Tr. 218:5-267:10 (McMullan); Tr. 1188:3-1234:22 (Flott).  The only information even touching on this issue came from Sony's Kooker, whose pertinent testimony consisted of a single sentence stating that sound recording downloads "typically would be available as individual tracks or also as albums."  Tr. 112:16-17.  Kooker's testimony concerned sound recordings generally; it did not address the works in suit, or even the works in suit claimed by Sony.

This is not sufficient.  In the face of documentary proof that 6,070 of the recordings in suit were registered as 789 compilations, a statement by a Sony executive that sound recordings in

general were "typically" available as singles "*or*" (not "and") as albums since "roughly, [the] early 2000s" cannot provide the basis for a reasonable juror to conclude which (let alone all) of Sony's works in suit—never mind the other Plaintiffs'—were available as and had separate economic value as individual tracks.   The situation in *BMG* is readily distinguishable.   There, the plaintiffs' evidence of independent economic value was significantly stronger: a representative of the only plaintiff in the case testified specifically that "every one of these compositions [in suit] is, in fact, available for purchase or downloading individually."   *BMG Rights Mgmnt (US) v. Cox Commn'cns, Inc*., 199 F. Supp. 3d 958, 983 (E.D. Va. 2016).   Plaintiffs here offered no such testimony regarding the recordings actually in suit, and witnesses for two of the three sound recording plaintiffs offered no testimony whatsoever on the issue.   In these circumstances, Plaintiffs lack sufficient evidence to support a judgment, and the Court should enter judgment that Plaintiffs can claim statutory damages for only 1,453 works.

## II.   Cox is entitled to JMOL of no direct infringement.

To prove contributory and vicarious infringement by Cox, Plaintiffs were required first to prove that the 10,017 works in suit were directly infringed by Cox's subscribers, either by distributing the works in suit or by reproducing them.   Plaintiffs failed to prove either.   With respect to reproduction, Plaintiffs have no evidence sufficient to prove that the copies of the works-in-suit identified on subscribers' computers were copied unlawfully, rather than legally downloaded from iTunes or burned from a purchased disc.   As for distribution, Plaintiffs' trial evidence established (at most) only that Cox's subscribers made the works-in-suit available for download by others— and as this Court held in BMG, merely making works available does not violate the Plaintiffs'

distribution right.  Because Plaintiffs have no evidence of direct infringement sufficient support a

jury verdict, Cox is entitled to judgment as a matter of law of no infringement.

**A.   Cox is entitled to JMOL of no direct infringement of the reproduction rights, because Plaintiffs lack evidence sufficient to prove that Cox subscribers actually copied the works in suit.**

To hold Cox indirectly liable for a subscriber's direct infringement of the reproduction

right, Plaintiffs must prove that the subscriber actually made an infringing copy of a work at issue

using Cox's network. *Towler v. Sayles*, 76 F.3d 579, 581 (4th Cir. 1996); *Columbia Pictures In-*

*dus., Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013).

But Plaintiffs have presented no evidence sufficient to prove that any Cox subscriber made

unauthorized copies of any of the works-in-suit, because there is no evidence showing *how* any

Cox subscribers obtained those works. The MarkMonitor system cannot determine whether the

purported copies of Plaintiffs' works on devices associated with Cox subscribers' IP addresses

were initially purchased from iTunes, legally uploaded from a purchased CD, or obtained from

another legal source. Asked specifically whether MarkMonitor can determine whether a particular

peer "obtained it from another peer on the network as opposed to a legitimate source like iTunes

or Amazon or something like that," Plaintiffs' expert Dr. Frederickson-Cross gave the following

response:

> Well, in the evidence I examined, it was often the case that the -- I mean, in approximately, I think, 15 percent of the records, the peer was still collecting the evidence. So they only had part of the file, you know, 90 percent but not 100 percent. So that certainly tells me that in those instances, that peer was not getting it off of Amazon.

Tr. 484:16-25.

At most, this testimony creates a jury question as to whether "approximately" 15% of the

works in suit were copied from some unauthorized source.  However, assuming that "approxi-

mately" 15% means 15%, and assuming 10,017 works in suit, Dr. Frederickson-Cross's testimony

amounts to an admission that Plaintiffs have no proof of unlawful copying for 8,962 of those works. That is self-evidently insufficient to carry Plaintiffs' burden to prove that all the works-in-suit were copied unlawfully.

Indeed, it is insufficient proof to establish that *any specific* work was unlawfully copied. The generic assertion that 15% of files were unlawfully copied leaves the jury with no basis for determining that a particular file was copied. This can be a critical shortcoming. For example, in the event that the Court disagrees with Cox's "compilation" argument and finds that the jurors can determine as a matter of fact whether particular works do or do not have independent economic value, it would be necessary to also determine whether the works that have such value were unlawfully downloaded. Simply saying that 15% of files are unlawfully copied leaves the jury guessing, and gives them only a 1 in 7 chance of getting it right.

**B.      Cox is entitled to JMOL of no direct infringement of the distribution right, because Plaintiffs' evidence established (at most) "making available" of copyrighted works.**

As a matter of law, "to establish a direct infringement of a rights holder's distribution right" under §106(3), the Plaintiffs were required to "show an actual dissemination of a copyrighted work." *BMG v. Cox*, 149 F. Supp. 3d at 670 [*BMG I*] (discussing cases). Here, Plaintiffs have not proven "actual dissemination" of any work-in-suit to anyone, making it impossible for a reasonable jury to find that Cox subscribers violated Plaintiffs' distribution rights.

The easy and obvious way to prove that a Cox subscriber "actually disseminated" a particular recording would have been to use a file-sharing protocol to actually download that recording directly from the subscriber's computer. *See BMG*, 149 F. Supp. 3d at 972 ("Courts have consistently relied upon evidence of downloads by a plaintiff's investigator to establish both unauthorized copying and distribution of a plaintiff's work.") (quoting *Arista Records LLC v. Lime Grp. LLC*, No. 06–cv–5936, 2011 WL 1641978, at *8 (S.D.N.Y. Apr. 29, 2011)).

It is undisputed that—at least with respect to 9,973 of the 10,017 works in suit—neither Plaintiffs themselves, the RIAA, or MarkMonitor ever did this.[10]   Indeed, the MarkMonitor system was intentionally configured *not* to download allegedly infringing files.  *See, e.g.*, Tr.  469:10-470:6; 475:22-25; 581:4-582:18 (Frederickson-Cross). The MarkMonitor system can be configured to download a copy of every allegedly infringing file, but Plaintiffs chose to purchase a cheaper option that relies entirely on metadata.  The only actual download of any file occurred when the system downloaded a "reference file," from which metadata was extracted that was later used as a point of comparison for metadata obtained from Cox subscribers.   There is no evidence, or even any allegation, that any of those reference file downloads were obtained from a Cox subscriber.

Plaintiffs' failure to actually download any of the allegedly infringing files makes this case readily distinguishable from *BMG*, in which the record label's agent "downloaded approximately 100,000 full copies of BMG's works using Cox's service."  *BMG*, 149 F. Supp. 3d at 663, 670; *see also BMG*, 199 F. Supp. 3d 958, 972 (E.D. Va. 2016) (holding that "the evidence that Cox IP addresses uploaded 100,00 copies of BMG's works to Rightscorp can form the basis of a distribution claim.").  Without evidence of actual downloads of the allegedly infringing files, Plaintiffs have no direct evidence of "actual dissemination" sufficient to carry their burden of proof.

Nor is there circumstantial evidence sufficient to support a finding of actual dissemination. At most, Plaintiffs' evidence demonstrated that a particular Cox subscriber was making available

---

[10] For just 143 out of the 175,968 "Evidence Packages" that constitute Plaintiffs' evidence of infringement, the value of the "downloaded" variable is non-zero, but still shows that *less* than the entire file may have been downloaded. Plaintiffs cannot prove that any such fragmentary portion would have included *any* pieces from *any* of the works-in-suit. Accordingly, Plaintiffs' claim for infringement of their distribution right also fails with respect to these 143 Evidence Packages— which, in any event, pertain to only 44 of the works-in-suit. *See* Tr. 580:9-581:3.

a particular work for sharing.  Responding specifically to a question asking why she disagreed that Plaintiffs lacked evidence of infringement, Plaintiffs' expert Dr. Frederickson-Cross explained that she had "examined 175,000 evidence cases, and that "every one of those cases included hash information for the file that the peer itself had reported that it was *making available to distribute*." Tr. 481:17-482:3 (emphasis added).  She further explained that the evidence cases represented "actual activity that the peer running the client software is responding to a request for a file *with information about the file it has to share.*"  Tr. 482:4-7 (emphasis added).  That is, the evidence cases do not establish that a file was actually shared; they establish only that a particular subscriber's computer provided information to about a file it *could* share.  Indeed, asked whether it was possible to "uncover the number of times that [a] Cox user distributed files," Dr. Frederickson-Cross replied, "Not in any practical way, no."  Tr. 453:15-18.   She then explained that (absent the download that indisputably did not happen except, arguably, in 143 cases) there is no way for Plaintiffs (or anyone else) to determine whether a Cox subscriber actually distributed a file to others without conducting a forensic examination of his computer—and even in that case, "you would not have evidence of all of their activity."  Tr. 453:15-454:5.

As a matter of law, that evidence is insufficient to prove the "actual dissemination" required to establish direct infringement of the distribution right.  At most, it proves that Cox subscribers were making available particular works for potential downloading by others.  But as this Court has explained, "evidence of Cox account holders making copyrighted works available for download is insufficient to show distribution."  *BMG*, 149 F. Supp. 3d at 664.  Other courts reach the same conclusion.  *See, e.g.*, *Atlantic Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 983 (D. Ariz. 2008) ("Merely making an unauthorized copy of a copyrighted work available to the public does

not violate a copyright holder's exclusive right of distribution."); *UMG Recordings, Inc. v. Hummer Winblad Venture Partners (In re Napster, Inc.)*, 377 F. Supp. 2d 796, 802 (N.D. Cal. 2005) ("merely listing a copyrighted musical composition or sound recording in an index of available files falls short of satisfying these 'actual dissemination' or 'actual transfer' standards.")

Responding to this argument in opposing summary judgment, Plaintiffs had little to say. They referred to the Fourth Circuit's decision in *Hotaling v. Church of Jesus Christ of Latter-Day Saints,* 118 F.3d 199 (4th Cir. 1997), but this Court already considered that decision at length in *BMG* and rejected its application here. *See BMG*, 149 F. Supp. 3d at 665-667. They also pointed to the supposedly "tit-for- tat way that BitTorrent works," suggesting that because "[i]n the Bit-Torrent protocol, any participating peer will generally be downloading or retrieving pieces of the file as well as providing" pieces of the same file, it must be true that "when MarkMonitor detected the Cox subscribers online, running the P2P software, and 'sharing' an unauthorized copy of Plaintiffs' works, there can be no reasonable question that the subscriber distributed the file." Doc. 392 at 19-20. The logical flaws in that argument are obvious. First, at the most it is applicable to the 15% of files that Ms. Frederiksen-Cross allegedly observed downloading. For the 85% of peers that were not observed downloading a file, there is no basis to assume they were doing anything other than making an upload available. Second, the argument equates the presence of BitTorrent software on a computer and the reported availability of a file for sharing with actual distribution. But that is exactly what the cases preclude.

Plaintiffs' trial evidence is deficient for the same reasons. Asked to explain why she believed that Plaintiffs had sufficient evidence that Cox subscribers distributed infringing files, Dr. Frederickson-Cross referred to the "tit-for- tat way that BitTorrent works," explaining that because BitTorrent "prioritizes exchanges with peers that are … downloading to you," evidence that a

particular peer was downloading files necessarily means the peer was simultaneously uploading files.  Tr. 486:14-488:14. But as explained above, Plaintiffs have no evidence that any particular Cox subscribers were downloading any particular files.  And absent such evidence, the "tit for tat" argument is simply another way of saying that files were available for distribution.

## III.    Cox is entitled to JMOL of no liability for infringement by Cox Business subscribers.

Certain of Plaintiffs' claims relate to Cox's liability for alleged infringement by users of networks supported by Cox's "Cox Business" broadband services. Cox Business subscribers include large and small organizations whose networks may be used by dozens, hundreds, or thousands of end users. But Plaintiffs' evidence only identifies alleged infringers by the IP address of the Cox Business subscriber, which is shared by every end user on the business' network. As such, identification of a Cox Business IP Address where infringement is allegedly occurring is not sufficient to identify anyone who actually engaged in alleged infringement. That failure of evidence dooms these claims.

In the only decision to have considered the issue, the Ninth Circuit held that a plaintiff cannot make a claim of direct or contributory copyright infringement against a broadband subscriber merely by identifying the IP address of a business where some unidentified person has engaged in infringing activity. *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142 (9th Cir. 2018). *A fortiori*, if a business cannot be held liable for copyright infringement merely because some unidentified person is infringing on the network located at the business's IP address, then such evidence is insufficient to prove contributory infringement by an ISP that merely provides broadband services to the IP address registered to that business.

### A.    Evidence that infringement has occurred at a Cox Business subscriber's IP address is insufficient to support liability for infringement by the Cox Business subscriber.

Proving the predicate act of direct infringement necessarily requires proof that a particular person did the infringing. *See, e.g.*, *Cobbler,* 901 F.3d at 1147 (to prove direct infringement, a plaintiff "must show that … the defendant himself violated" the copyright statute) With respect to alleged infringement by Cox Business subscribers, Plaintiffs have no such proof.

The only evidence of any Cox Business subscriber's direct infringement consists of "Evidence Packages" purporting to show that acts of infringement occurred at an IP address registered to a Cox Business subscriber. But Cox Business subscribers are (unsurprisingly) businesses. They operate networks which, in turn, provide internet access to multiple end users.  Tr. at 1437:21-1474:19. All of a Cox Business subscriber's end users access the internet using the same IP address—the one assigned to the business subscriber. *See* Tr. at 1472:12-1473:3.  If the subscriber is (for example) a public university, then that single IP address would be associated with thousands of individual students, faculty, visitors, and employees. *Id.*

Plaintiffs' inability to prove *which* user of a particular Cox Business subscriber's IP address purportedly infringed a particular copyright is fatal to their direct infringement claims. In *Cobbler* the copyright owner traced apparent infringement to a particular IP address assigned to defendant Gonzales, whose account provided Internet service for residents of and visitors to the adult foster-care home he operated. *Id.* at 1145. The plaintiff sought to hold Gonzales liable for direct infringement "by copying and distributing works himself," or in the alternative, for contributory infringement because he had failed to secure his internet connection. *Id.*

The district court dismissed the direct infringement claim on the pleadings, and the Ninth Circuit affirmed. The court explained that "[t]o establish a claim of copyright infringement," a plaintiff "must show that … *the defendant himself* violated one or more of the plaintiff's exclusive rights under the Copyright Act." *Id*. at 1147 (emphasis added; internal quotation omitted). Plaintiff

could not make that showing, because the defendant's IP address "did not permit identification of a specific party that is likely to be the infringer." *Id*. (quotation omitted). Because of this inherent uncertainty, the Ninth Circuit held that "an allegation that a defendant is the registered subscriber of an Internet Protocol ('IP') address associated with infringing activity" is insufficient to state a claim for direct infringement against the subscriber. *Cobbler*, 901 F.3d 1142. Notwithstanding the more than 400 infringement notices received by the *Cobbler* defendant, the Ninth Circuit also concluded that, under the circumstances, a claim for contributory infringement on his part was not sustainable, because "a bare allegation that Gonzales failed to police his internet service … does not sufficiently link Gonzales to the alleged infringement." *Id.* at 1147-1148.

The defects that were fatal to the direct and contributory infringement claims in *Cobbler* are equally fatal here. Cox Business customers, like the nursing home operator in *Cobbler*, provide Internet service to their employees, customers, guests, and visitors.  Tr. at 1474:1-1474:19; 964:25-965:4; 990:11-20.  Here, as in *Cobbler*, there is no evidence establishing a connection between any act of infringement and the Cox Business subscriber itself (beyond a generalized allegation that the subscriber failed to police its network), nor is there any evidence connecting any alleged act of infringement to any particular user of the subscriber's IP address. For precisely the reasons cited by the Ninth Circuit in *Cobbler*, mere evidences that a Cox Business subscriber's IP address has been used by someone to engage in infringement is insufficient to show that either any end-user or the business subscriber itself is a direct or contributory infringer. Absent proof of direct infringement by *someone*, no claim of contributory infringement by Cox can be sustained.

**B.    Cox cannot be held contributorily liable for the infringing conduct of unspecified individuals using the networks of its business subscribers.**

Of necessity, if the Cox Business subscribers cannot be held liable for direct infringement occurring on the networks that they administer, Cox cannot be held liable for that behavior merely

because it connects the networks of Cox Business subscribers to the internet. In *BMG*, the Fourth Circuit specifically precluded expansion of the contributory infringement doctrine to Cox in its role as an internet service provider merely because it had "generalized knowledge …that infringement was occurring somewhere on its network." *BMG II* at 311. Such knowledge "is exactly what falls short" of the kind necessary to prove contributory infringement. *Id*.

## IV.    Cox is entitled to JMOL of no contributory liability.

To prove that Cox is liable for contributory infringement by its subscribers, Plaintiffs had to establish that Cox induced, caused, or materially contributed to specific acts of direct infringers. Material contribution is found when the defendant "engages in personal conduct that encourages or assists the infringement." *Perfect 10, Inc. v. Visa In'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007). Plaintiffs presented no evidence sufficient to meet that standard.

The only evidence Plaintiffs offered to prove "material contribution" was evidence that: (1) Cox provided internet access to subscribers who used that access to infringe, and (2) did not terminate those subscribers after receiving a certain number of infringement notices. That evidence is insufficient to permit the jury to conclude that Cox "encouraged or assisted" the direct infringement. Indeed, the evidence shows that Cox had an active and effective policy of *dis*couraging infringement, notifying its subscribers of infringement allegations, graduating to soft and then hard suspensions that required direct customer engagement, and ultimately—in some cases— terminating the subscriber. On this evidence, a reasonable jury could not conclude that Cox was "encouraging or assisting" that infringement.

Cox's active efforts to discourage infringement are what distinguishes this case from (for example) the Ninth Circuit's decision in *Perfect 10, Inc. v. Amazon.com*, 508, F.3d 1146, 1172 (9th Cir. 2007), in which it held that "Google could be held contributorily liable if it had knowledge that infringing Perfect 10 images were available using its search engine, could take simple

measures to prevent further damage to Perfect 10's copyrighted works, and failed to take such steps." Here, Cox *did* take "simple measures to prevent" further infringements by its subscribers, and the evidence showed that those measures were largely successful. *See* Tr. at 1962:1-1963:0 (Weber testimony stating that "98 percent of the at-issue subscribers were the subject of no more than 12 notices from the RIAA. So that means that 2 percent got -- were the subject of 13 or more notices from the RIAA in this relevant period."); *id.* at 1591:14-1592:3; PX 325. That those measures did not always include the most drastic available measure—termination—does not some-how convert Cox's efforts to discourage infringement into the encouragement of infringement.

In light of the evidence presented at trial, a reasonable jury could not find that Cox materially contributed to any direct infringements. Cox is entitled to JMOL of no contributory liability.

## V.     Cox is entitled to JMOL of no vicarious liability.

Vicarious liability is "[a] variant on *respondeat superior*," by which a defendant may be held "accountable for third-party infringement if he (1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited copyrighted materials." *BMG I* at 673 (quotation omitted). Cox is entitled to JMOL on Plaintiffs' vicarious liability claims here, because they failed to provide evidence that Cox had a "direct financial interest" in the alleged infringement. And regarding alleged infringement by Cox Business

subscribers, the undisputed evidence establishes that Cox lacked the ability to supervise or control it.

A.    **Plaintiffs have no evidence that Cox derives a direct financial benefit from any alleged infringements of Plaintiffs' works by Cox's subscribers.**

Plaintiffs cannot show that Cox has a "direct financial interest" in the alleged infringements of Plaintiffs' works. The necessary "direct financial interest" requires proof of a "causal relationship" between "the infringing activities *at issue in th[e] case* and a direct financial benefit to the defendant." *BMG I* at 675-76 (emphasis in original) (quotation omitted).

Plaintiffs cannot establish any such "causal relationship." It is undisputed that the only revenue Cox received from its subscribers was a monthly subscription fee. *See* DX337 and Tr. 1904:1-1906:7 (Negretti). While Cox offered different levels of service to meet the needs of its subscribers, and charged different flat rates for the different levels, it is also undisputed that Cox's revenues from these flat-rate subscriptions did not depend on the manner or purpose for which its subscribers used the service. *Id.* The law is clear that a flat fee-for-subscription revenue model is not sufficient to establish the necessary causal relationship with infringement by subscribers.

As this Court explained in *BMG*, "flat periodic payments for service . . . ordinarily would not constitute receiving a financial benefit directly attributable to the infringing activity." *BMG I* at 676 (quotation omitted). The Court went on to explain that because "Cox provides a content-neutral commercial service that makes a wide selection of services and activities available to its subscribers … [and] charges the same flat monthly fees to its users whether they use Cox's service for infringing or non-infringing purposes … the relevant inquiry … is whether the infringing activity constitutes *a draw for [Cox's] subscribers*, not just an added benefit." *BMG I* at 676 (emphasis added) (citations and internal quotation marks omitted). Without evidence that "some portion of [Cox's] fees is generated from subscribers that are drawn to Cox's service at least in part

*because* of the infringing activity alleged *in this case* … the requisite causal connection between the benefit and the infringing activity is not established." *Id*. (emphasis added). *See also, e.g.*, *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673-74 (9th Cir 2017); *Ellison*, 357 F.3d at 1079; *UMG Recordings, Inc. v. Grande Commnc'ns. Networks, LLC*, 2018 U.S. Dist. LEXIS 160492, at *9 (W.D. Tex. Sep. 20, 2018) ("Plaintiffs contend the infringing subscribers infringed the Copyrighted Sound Recordings [is] by use of the internet and the Bit-Torrent protocol, which one can access through any ISP. Again, the draw must be something more than this to state a vicarious infringement claim.").

The requirement of a "causal connection" between infringement and financial benefit dooms Plaintiffs' theory that Cox benefited from infringement by not terminating accused subscribers and continuing to receive revenue for its ISP service. And Plaintiffs have zero evidence that Cox's supposed failure to terminate alleged infringers was a draw to its service. Indeed, the only available evidence is to the contrary: that Cox's AUP document prohibited copyright infringement, Cox, responded to breaches of that contractual obligation by actively discouraging infringement, and, virtually alone among major ISPs, *did* terminate repeat infringers.  *See* Trial Tr. at 1020:20-1021:11; *id.* at 332:3-8 ("[t]ermination was nor required under CAS … [t]he ISPs that we were negotiating with wouldn't agree to that as part of the system."); *id.* at 1606:22-24; 1053:5-20.  This is, if anything, the exact opposite of a "draw."

There is no evidence showing that any subscribers were drawn to Cox's service by the availability of unauthorized copies of *Plaintiffs*' works, or for that matter the availability of any infringing works. Nor is there evidence that the availability of Plaintiffs' music on Cox's network enhances the value of Cox's services to subscribers, that anyone subscribed to Cox's ISP service in order to obtain unauthorized copies of Plaintiffs' works, or that anyone chose Cox's service

over another because of a perceived ability to obtain copyrighted works over Cox's network. This case is thus distinguishable from *BMG*, in which the plaintiff offered a customer survey purporting to show that for some fraction of Cox subscribers, the ability to obtain free music from certain websites was one reason (among many) they subscribed to Cox's service. *BMG I* at 676. While recognizing that BMG's disputed survey evidence was "hardly overwhelming," the Court never-theless found that it was sufficient to present a genuine fact question for the jury. *Id*. Here, because Plaintiffs lack any comparable evidence—or indeed any evidence at all—to support their essen-tially identical claim, vicarious liability is not a "close question." *See id.* No reasonable jury would hold otherwise. The Court should grant Cox summary judgment on Plaintiffs' vicarious liability claim.

**B.      Plaintiffs have no evidence that that Cox derived a direct financial benefit from alleged infringement by Cox Business subscribers' end users.**

The infirmities discussed above are fatal to Plaintiffs' vicarious liability claims, including those based on Cox's relationships with both residential and Cox Business subscribers. But Plain-tiffs' claims with respect to the Cox Business subscribers have multiple additional infirmities.

*First*, Plaintiffs offered no evidence to show that there is any difference in the revenues Cox receives from Cox Business subscribers accused of infringement, and those not so accused.

*Second*, there is no evidence that any of the Cox Business subscribers are themselves *direct* infringers, and Plaintiffs have no evidence showing that any Cox Business subscriber met the cri-teria for contributory infringement *or* vicarious liability, either. *Compare Cobbler Nevada,* 901 F.3d 1142.

Finally, there is no dispute that individual "end users" who are actually doing the alleged infringing do not pay Cox directly for their use of the Cox Business customer's system, and Cox

neither directly derives any revenue from them, nor any benefit from any alleged infringing activities. Plaintiffs therefore cannot show the essential "causal relationship" of Cox's revenues from Cox Business subscribers to "'the infringing activities at issue in th[e] case." *BMG I* at 675-76. Plaintiffs have no evidence whatsoever that any Cox Business subscribers were "drawn" to subscribe to Cox's service so that their end users could infringe Plaintiffs' works. Nor is there evidence, nor any plausible argument, that Cox Business subscribers are likely to purchase more expensive services so that their end users can obtain unauthorized copies of Plaintiffs' works.

### C. There is no evidence that Cox had the practical ability to supervise the alleged infringements by Cox Business subscribers' end users.

Plaintiffs' vicarious liability claims against Cox Business subscribers also fail because Cox lacked the "practical ability" to supervise the alleged infringement by those users. Vicarious liability requires "both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Zillow*, 918 F.3d at 746 (citation omitted). Under this standard, a defendant is not required to do extensive research to "ferret[] out" and stop infringement when it had only generalized notice that it was occurring. *See id.* (no vicarious liability where "ferreting out claimed infringement … was beyond hunting for a needle in a haystack"). The alleged infringement on Cox Business networks was perpetrated by unidentified individuals with whom Cox had no relationship. Cox had no way to "stop or limit the direct infringing conduct." It is entitled to summary judgment of no vicarious liability for that conduct.

Dated: December 17, 2019

<div style="margin-left:50%">

Respectfully submitted,

/s/ Thomas M. Buchanan
Thomas M. Buchanan (VSB No. 21530)
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.*
*and CoxCom, LLC*

</div>

*Of Counsel for Defendants*
Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
Sean R. Anderson (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email:  melkin@winston.com
Email:  tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
Thomas J. Kearney (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA  94111-5840
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
Email:  jgolinveaux@winston.com
Email: tkearney@winston.com

Michael L. Brody (*pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
Email: mbrody@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750
Email:  dhleiden@winston.com

Geoffrey P. Eaton
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5705
Fax: (202) 282-5100
Email: geaton@winston.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 17, 2019, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users.

_/s/ Thomas M. Buchanan_
Thomas M. Buchanan (VSB No. 21530)
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

_Attorney for Cox Communications, Inc._
_and CoxCom, LLC_