1429

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
    -vs-                       :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  7  (A.M. Portion)

TRIAL TRANSCRIPT

December 10, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1430

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                   SCOTT A. ZEBRAK, ESQ.
                                   JEFFREY M. GOULD, ESQ.
 4                                 MICHAEL J. DRUCKMAN, ESQ.
                                   ANDREW L. GUERRA, ESQ.
 5                                 LUCY G. NOYOLA, ESQ.
                                   JIA RYU, ESQ.
 6                                 Oppenheim + Zebrak, LLP
                                   4530 Wisconsin Avenue, N.W.
 7                                 5th Floor
                                   Washington, D.C. 20015
 8

 9    FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
                                   Winston & Strawn LLP
10                                 1700 K Street, N.W.
                                   Washington, D.C. 20006-3817
11                                    and
                                   SEAN R. ANDERSON, ESQ.
12                                 MICHAEL S. ELKIN, ESQ.
                                   THOMAS P. LANE, ESQ.
13                                 CESIE C. ALVAREZ, ESQ.
                                   Winston & Strawn LLP
14                                 200 Park Avenue
                                   New York, NY 10166-4193
15                                    and
                                   JENNIFER A. GOLINVEAUX, ESQ.
16                                 THOMAS J. KEARNEY, ESQ.
                                   Winston & Strawn LLP
17                                 101 California Street, 35th Floor
                                   San Francisco, CA 94111-5840
18                                    and
                                   MICHAEL L. BRODY, ESQ.
19                                 Winston & Strawn LLP
                                   35 West Wacker Drive
20                                 Chicago, IL 60601
                                      and
21                                 DIANA HUGHES LEIDEN, ESQ.
                                   Winston & Strawn LLP
22                                 333 South Grand Avenue
                                   Suite 3800
23                                 Los Angeles, CA

24

25
```

1431

1

2                                    <u>INDEX</u>

3

<u>WITNESSES</u>                          <u>EXAMINATION</u>      <u>PAGE</u>

4

5    BRENT BECK (Resumed)
                                    DIRECT          1434
6                                   CROSS           1456
                                    REDIRECT        1528
7                                   RECROSS         1542

8    MATT CAROTHERS
                                    DIRECT          1544
9                                   CROSS           1568

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1432

P R O C E E D I N G S

1      NOTE:  The December 10, 2019, morning portion of the
2  case begins in the absence of the jury as follows:
3  JURY OUT
4      THE COURT:  All right, good morning.  I see counsel
5  are all here.  Good morning to each of you.
6      Mr. Oppenheim, do you have a preliminary matter, or
7  you're just anxious to get to the podium?
8      MR. OPPENHEIM:  Actually, Your Honor, if the jury is
09:03:56 10  here, we'll -- we can move forward and hear testimony right
11  away.  We do have an issue we'd like to raise with Your Honor
12  at a break, when we're not taking up jury time, regarding
13  Mr. Monson, who has been designated as a deposition witness by
14  defense counsel, but we can leave it for a break.
15      THE COURT:  Okay.  Mr. Elkin?
16      MR. ELKIN:  Thank you, Your Honor.  I just have
17  very -- two brief issues.
18      THE COURT:  Yes.
19      MR. ELKIN:  I just wanted to remind the Court two
09:04:20 20  witnesses today that the plaintiffs are calling, Mr. Beck, who
21  is currently on the stand, and Mr. Carothers, we're going to go
22  outside of the cross since we're going to just call them in
23  support of our case-in-chief as well so we don't have to bring
24  them back.
25      THE COURT:  All right.

1433

1        MR. ELKIN:  And the other thing is that we said we

2   didn't have any objections with regard to the exhibits that

3   came in with the video played of Mr. Zabek.  It was -- I should

4   have said, and I failed to say it, that it was subject to the

5   issues that we raised in motions in limine 2 and 3 that the

6   Court decided against us.

7        THE COURT:  Okay.

8        MR. ELKIN:  Thank you.

9        THE COURT:  All right.  Your record is preserved,

09:04:59 10  then.  Thank you.  And I'll mention that Mr. Beck and

11   Mr. Carothers are being called jointly and that they're

12   witnesses for both parties.

13        MR. ELKIN:  Thank you.

14        THE COURT:  All right.  Joe, let's get our jury,

15   please.

16        NOTE:  At this point, the jury returns to the

17   courtroom; whereupon the case continues as follows:

18   JURY IN

19        THE COURT:  All right, good morning.  Please have a

09:05:47 20  seat.  Good morning, ladies and gentlemen.  I hope you had a

21   good evening, and thank you again for coming in on time.  Can I

22   have a nod of heads that you didn't do any research or

23   investigation or talk to anybody?

24   JURORS NODDING HEADS

25        THE COURT:  Thank you very much.

1434

1          Good morning, Mr. Beck.  Please come have a seat and

2    resume your testimony, sir.

3      BRENT BECK, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN, RESUMED

4          THE COURT:  Mr. Gould, go ahead.

5          MR. GOULD:  Thank you, Your Honor.

6          THE COURT:  Oh, I'm sorry.  Once again, Mr. Beck and

7    the next -- and another witness today, Mr. Carothers, are being

8    called jointly by both parties.  So they're witnesses on behalf

9    of Sony as well as Cox, all right?  Thank you.

09:06:40  10          All right.  Go ahead, Mr. Gould.

11              DIRECT EXAMINATION (Cont'd.)

12   BY MR. GOULD:

13   Q.   Good morning, Mr. Beck.  How are you?

14   A.   Good morning.

15   Q.   Thanks for returning with us today.

16   A.   Certainly.

17   Q.   Yesterday when we finished, we were talking about a number

18   of instances where Cox takes no customer-facing action in

19   response to receiving notices.  Do you recall that?

09:07:00  20   A.   I believe so, yes.

21   Q.   Now, I want to turn and talk about some of the instances

22   where Cox does take customer-facing actions in response to

23   infringement notices.  Okay?

24   A.   All right.

25   Q.   If we could turn to tab 13 in the witness binder?  And let

B. Beck - Direct

1435

1    me know if you recognize that, sir.  This would be PX 351.  And

2    I'm going to direct your attention to interrogatories No. 6 and

3    8, really just 8 actually.

4    A.   Okay.

5           MR. GOULD:  I move to admit PX 351, subject to the

6    same exception we noted yesterday on the interrogatories.

7           THE COURT:  All right.  Any objection?

8           MS. GOLINVEAUX:  Your Honor, subject to the same

9    exception of yesterday, no objections.

09:08:19 10          THE COURT:  That's fine.  Thank you.  All right.

11   It's received with that --

12          MR. GOULD:  Thank you.

13   BY MR. GOULD:

14   Q.   So this is another set of interrogatory responses, sworn

15   written responses verified and signed by Mr. Delgado again,

16   correct?

17   A.   Yes.

18   Q.   And if you could turn to interrogatory No. 8 that's on

19   page 23.  Do you see that this asks:  State the number of

09:08:53 20   Customers Or Users whose Internet service You terminated,

21   temporarily suspended, or otherwise affected, on a per penalty

22   basis, in response to DMCA notices for 2010 through -- for each

23   month from 2010 to present, and identify the persons most

24   knowledgeable about those penalties and the implementation.

25          Do you see that?

B. Beck - Direct

1436

1   A.   Yes.

2   Q.   And do you see that on page 27, towards the bottom,

3   Mr. Beck, you're listed as the person most knowledgeable about

4   the CATS database and the penalties, along with Mr. Zabek for

5   the penalties?

6   A.   Yes.

7   Q.   And you agree with that?

8   A.   Yes.

9   Q.   Now, I want to look at page 25.  There's a chart, and this

09:09:47 10   is similar in form -- if you could just zoom in on the headers,

11   please? -- and this is similar in form to the type of chart we

12   looked at yesterday, and what it shows here is starting at 2010

13   and continuing through early, I think, 2015, it shows the

14   number of instances in which Cox sent its customers warnings,

15   correct?

16   A.   The second column, yes, the warnings.

17   Q.   Warnings?  Those are the e-mail warnings like we looked at

18   yesterday?

19   A.   That's correct.

09:10:15 20   Q.   And the number of instances where Cox suspended customers,

21   correct?

22   A.   Yes.

23   Q.   And the number of terminations, correct?

24   A.   Yes.

25        MR. GOULD:  Okay.  If we could pull up the second

B. Beck - Direct

1437

1    slide of the demonstrative when you get a chance, Mr. Duval.

2    BY MR. GOULD:

3    Q.    So this is a slide, Mr. Beck, showing the date and the

4    three left columns:  Total, Accepted, and Deleted.  That's the

5    same information we looked at yesterday, the black, blue, and

6    red.  Do you recall those numbers?

7    A.    I recall a document like this.

8    Q.    Okay.  So the three left columns show 36 percent of the

9    notices accepted and 60 -- I'm sorry, 36 percent of the notices

09:11:09 10    accepted and 63 percent of the notices deleted.  And then we

11    have added here three green columns, and those three green

12    columns, Mr. Beck, correspond to the information listed in the

13    interrogatory that we just looked at, and we've limited this

14    here, sir, to the claim period.

15              Do you see that?

16    A.    I see the date range, yes.  I see the columns.

17    Q.    And you can look through the list and see month by month,

18    the number of warnings that Cox sent in response to those

19    5.7 million copyright infringement notices, correct?

09:11:52 20    A.    Restate.  I'm sorry.

21    Q.    You can look down the columns that says Warnings, and see

22    each month how many notices Cox forwarded as warnings to its

23    customers and compare that to the total number of notices for

24    that month, correct?

25    A.    You can do that, yes.

B. Beck - Direct

1438

1   Q.   Right.  So, for example, if we take just one month, we

2   could look at -- let's take January 2014.  That's the entry

3   just below the line.

4           Are you able to highlight?  Okay.  Oh, I can do it

5   here.

6           So if you look at January -- pardon my inartful

7   circle.  If you look at January, it shows that Cox received

8   about 276,000 notices that month, correct?

9   A.   Based on this document, yes.

09:12:49 10   Q.   Which is based on the sworn interrogatory from Cox.  Do

11   you recall that?

12   A.   Not that -- which one specifically, but --

13   Q.   Those numbers on the black, blue, and red columns came

14   from Cox's sworn statements.  Do you recall that?

15   A.   I don't recall the specific document, but if that is what

16   you're representing, then we'll go with that.

17   Q.   So of the 276,000 notices received in January 24, let's

18   look at the first green column.  Cox sent its customers

19   27,000-odd warnings, correct?

09:13:24 20   A.   Yes.

21   Q.   And then if you total up the number of warnings all from

22   top to bottom, you see there's a percentage at the bottom?  Do

23   you see that?

24   A.   Okay.

25   Q.   We did some math here and calculated that as a percentage

B. Beck - Direct

1439

1    of the total number of warnings.  And according to Cox's sworn

2    responses, sir, you agree that Cox sent warnings on just

3    9.38 percent of the, of the copyright infringement notices it

4    received in the claim period?

5    A.    Based on the numbers here, that would be right around the

6    10 percent range, yeah.

7    Q.    And assuming the math is correct.

8    A.    Yep.

9    Q.    Okay.  Let's look at the next column, Suspensions.  Same

09:14:10  10    principle.  We can look at the number of suspensions that Cox

11    issued, again, compared to the number of notices that were

12    received, correct?

13    A.    Correct.

14    Q.    So, for example, if we look at, say, on just any given

15    month, April 2014, Cox received over 373,000 notices, correct?

16    A.    Based on the document, yes.

17    Q.    And suspended just under 3,000, correct?

18    A.    Yes, just under 3,000 suspensions for that month.

19    Q.    So we can look at the number of suspensions against the

09:15:03  20    number of total, right?

21    A.    Yes.

22    Q.    And then we can do the same -- and if you look at the math

23    as a percentage, it looks like Cox suspended a little over

24    1 percent of the customers who received -- excuse me, over

25    1 percent of the customers in response to -- strike that.  I

B. Beck - Direct

1440

1        apologize.

2               Cox issued just over 1 percent of suspensions

3        compared to the total number of notices received in the claim

4        period, correct?

5        A.   Including the blacklisted notices that were not intaken,

6        yes.

7        Q.   Right.  Including the notices it deleted?

8        A.   Yes, yes.

9        Q.   And then if we look at the Terminations column, this is

09:15:44 10       the number of terminations -- now, sir, I -- this is not

11       limited to just the subscribers in the RIAA notices, but this

12       is information that Cox reported about system-wide, across this

13       entire subscriber base in this period of 2013, February,

14       through November 2014, Cox terminated a total of 20 customers

15       according to the sworn statements by Cox, correct?

16       A.   Restate that for me, if you would.

17       Q.   You see that there are 20 terminations in this period?

18       A.   Twenty terms in 2014?

19               THE COURT:  It's the far right column, at the bottom.

09:16:30 20               THE WITNESS:  Yep, I see the 20.

21       BY MR. GOULD:

22       Q.   And we can look at any given month.  In February, it was 0

23       terminations; March, 0 terminations; April, 0 terminations,

24       correct?

25       A.   Uh-huh.

B. Beck - Direct

1441

1    Q.   At the top, and then there's a 3 and a 1 and a 1.  And

2    throughout this period, there's between 0 and 3 terminations

3    per month, correct?

4    A.   Yes, I see.

5    Q.   And then, again, as a function -- or as a percentage of

6    the total number of notices, copyright infringement notices

7    received, we did the math here, and it's .0003 percent of

8    customers terminated in response to copyright infringement

9    notices, correct?

09:17:08  10    A.   Yes, assuming the math.

11    Q.   Now, if you add up all of those customer-facing actions,

12    the warnings, suspensions, and terminations, it's about

13    10 percent.  It's a little over 10 percent, right, 10 and

14    change?

15    A.   Yep.  We're getting, yeah, towards 10-1/2, yeah.

16    Q.   So what this shows is that in response to the 5.7 million

17    notices received during the claim period, Cox took a

18    customer-facing action on just over 10 percent of those

19    notices, correct?

09:17:33  20    A.   Including the ones we considered invalid, yes.

21    Q.   Including the ones that you deleted, that's right.

22    A.   Yes.

23    Q.   Which also means that for 90 percent of the infringement

24    notices that Cox received during the claim period, it took no

25    customer-facing action, correct?

B. Beck - Direct

1442

1   A.   There would have been no customer-facing notifications,

2   yes.

3   Q.   Now, I want to take a look at the ticket history of

4   several customers to see what it looked like on an individual

5   basis.  Sir, I've handed you what's been marked as PX 547.

6        Do you see that?

7   A.   I do, yes.

8   Q.   And you understand this is a -- an excerpt from the larger

9   set of ticket data that you prepared, correct?  This is an

09:18:52 10   excerpt for a single ICOMS ID, No. 436526627504?

11   A.   Yep.

12   Q.   I'm sorry, did you say yes, sir?

13   A.   Okay.

14        MR. GOULD:  I'd move to admit PX 547.

15        THE COURT:  Any objection?

16        MS. GOLINVEAUX:  No objection, Your Honor.

17        THE COURT:  It's received.

18        MR. GOULD:  If we could publish that?

19   BY MR. GOULD:

09:19:21 20   Q.   So what we've pulled up here is a soft copy, an Excel

21   version of the ticket excerpt that we just produced, and this

22   is for a residential customer, sir?  Does that sound right to

23   you?

24   A.   I would have to look up the account number in the billing

25   system to find out.

B. Beck - Direct

1443

1    Q.   Well, I'll represent to you that based on the data, this

2    is a residential customer.  Any reason to doubt that?

3    A.   I would have to look it up to be able to know.

4    Q.   And you could look, sir, and figure out -- could you

5    scroll up to the top, please? -- the number of -- can you

6    freeze the top row?

7         You could look up the number of -- you could figure

8    out the number of tickets, correct, by counting the individual

9    ticket IDs?

09:20:05  10  A.   Yes.  The second column would be the ticket IDs.

11   Q.   I realize this is a bit long.  We've done the count.  You

12   can scroll through -- if you could just scroll down gently?

13        You see that there are tickets for this customer

14   beginning in April 2012.  Do you see that?  Tickets beginning

15   in April 2012 and tickets lasting until, all the way at the

16   bottom, December 2014?

17   A.   I see.

18   Q.   And do you recall the period of data that you provided was

19   2012 to 2014, correct?

09:20:47  20  A.   Yes, that's correct.

21   Q.   Again, we don't know what happened with this customer

22   after 2012 -- after 2014.

23        And you could do the ticket count, but we counted.

24   Do you agree that there are 67 tickets for this customer?

25   A.   I'd have to go through and count them, but yes.

B. Beck - Direct

1444

1    Q.   You would have to count them?

2    A.   Yes.

3           MR. GOULD:   Okay.   And then let's go up to the top,

4    Mr. Duval, and run some filters on the Action column, column H.

5    Column H.   And let's filter first for warnings.

6    Q.   So this customer out of 67 tickets received, if you can

7    look at the bottom left, there's a number there -- oh, I want

8    to back up.   My colleague said that I may have said 57 tickets.

9    This was 67 tickets for this customer.

09:21:42    10          You can see that this customer had 28 warnings,

11   correct?

12   A.   I'm seeing 28 on the screen.

13   Q.   And now let's filter on hard limits.   Thank you.   That was

14   my fault.

15          It looks like this customer had 23.   Again, if you're

16   looking at the screen, you can look at the bottom left.   You

17   see the number that came up on the filter, 23 hard limits,

18   correct?

19   A.   I see 23 on the screen.

09:22:24    20   Q.   And this customer would not have received any

21   customer-facing action in response to those 23, correct?

22   A.   That's correct.

23   Q.   Okay.   And let's do another filter.   Clear that one.

24          On column H, this time for suspension.   And you see

25   that this customer, sir, was suspended nine times in response

B. Beck - Direct

1445

1    to some of these 67 tickets?

2    A.   Yes.  It's over about two years.

3    Q.   And the suspensions span from the fall of 2012 into the

4    winter of 2014, correct?

5    A.   Yes, about 26 months.

6    Q.   Okay.  And then if we filter column H again for

7    reactivated, please?

8         So remember there were nine suspensions, right?

9    Let's see how many times this customer was reactivated.

09:23:20 10         Nine.

11         Now, the other thing we talked about yesterday is you

12   can actually see the time differential between suspension and

13   reactivation, correct?  That data exists?

14   A.   Yes.

15   Q.   We did the math for this customer.  Would it surprise you,

16   sir, to learn that the average time between suspension and

17   reactivation for these nine suspension-reactivations was about

18   86 minutes?

19   A.   No, that wouldn't surprise me.  It's not meant to be a

09:23:45 20  punishment or a -- it's not meant to keep them offline for a

21   period of time.  It's meant to get their attention and then

22   bring them educational information.

23   Q.   Let's take a look at another ticket.  Oh, I'm sorry,

24   there's one more, if you could pull that one back up.  I

25   apologize.  Let's run one more filter and see if we can see how

B. Beck - Direct

1446

1      many times this customer was terminated on column H.

2              It doesn't look like termination is an option.  Do

3      you agree that's because this customer was never terminated in

4      this time period?

5      A.   Yeah.  If there was a termination logged in CATS during

6      this time period, it would be in the report.

7      Q.   Okay.  You can set that aside.

8              Let's take a look at another residential customer.

9      We'll call this one PX 545.  Sir, this is another ticket

09:25:04 10   excerpt of the kind we just looked at, labeled PX 545.

11              We would move to admit PX 545.

12              THE COURT:  Any objection?

13              MS. GOLINVEAUX:  Foundation, Your Honor.

14              THE COURT:  Is this another customer?

15              MR. GOULD:  Same type for ICOMS 131055410901.  This

16     is an excerpt for PX 19, a larger ticket data set.

17              THE COURT:  It will be received.

18     BY MR. GOULD:

19     Q.   This is a similar-looking excerpt from the larger ticket

09:25:39 20   data.  Do you understand that, sir?

21     A.   Yes.

22     Q.   And we could run the same kinds of filters analysis,

23     correct?

24     A.   Yes.

25     Q.   And this customer is another residential customer who had

1447

1   72 tickets.  Do you agree with that?

2   A.   I would have to go through and count them.

3   Q.   You'd have to count them.  Let's run a couple of filters.

4   I think we can get through these a little bit more quickly.

5   Let's look at column H for action.  There we go.  Let's look

6   for warnings.  Let's see how many times this customer with 72

7   tickets was warned.

8           Oh, we don't even need to look on the bottom.  We can

9   just count them.  It's seven warnings out of 72 tickets,

09:26:41 10   correct?

11   A.   I see seven on the screen, yes.

12   Q.   Okay.  Let's look at hard limits.  See if we can see how

13   many hard limits there are.  Actually, you know what?  This

14   customer doesn't have any hard limits.

15           Let's move to suspensions.  How many suspensions for

16   this customer with 72 tickets?  One suspension, okay?

17           And let's look at how many reactivations.  One

18   suspension, one reactivation, correct?

19   A.   That's what I see, yes.

09:27:14 20   Q.   And let's see if there's any terminations for this

21   customer.  It looks like that's not an option.  No terminations

22   for this customer, correct?

23   A.   None that I see in this document.

24   Q.   And this was a residential customer.  You understand that?

25   A.   I'd have to look that up in the billing system.

B. Beck - Direct

1448

1      MR. GOULD:  If you could clear the filter on that?  I
2  want to go back to the top.
3  Q.   So if you look, sir, you'll see that the first through
4  line 23, there's -- every entry says changed status to closed.
5      If you could just highlight those first 23 rows.
6      Do you see that, sir?
7  A.   I see.
8  Q.   And you see in response to those first 23 copyright
9  infringement tickets in this period, there's not a single
09:28:02 10  warning to the customer?
11  A.   Are we also representing this to be a residential account?
12  Q.   Yes, sir.
13  A.   Okay.  Yes, I see.
14  Q.   So in response to the first 23 copyright infringement
15  notices to this residential customer starting in 2012, Cox
16  didn't send a single warning, correct?
17  A.   No.  That's uncommon.
18  Q.   Certainly that's what the data you've provided shows,
19  right?
09:28:28 20  A.   For this customer, yes.
21  Q.   And so the first warning this customer got was in May
22  2012, after 23 -- I guess I counted the header -- after 22
23  prior notices, right?
24  A.   After 21 prior, discounting the --
25  Q.   I miscounted again.  21?

B. Beck - Direct

1449

1    A.    Yes.

2    Q.    Okay.  And then let's scroll -- leave that one highlighted

3    and just scroll down, if you would.  Let's see when the next

4    warning occurred.

5          There we go.  So now we're at line 66, right?

6    A.    Um-hum.

7    Q.    So we saw that customer's first warned on their 22nd

8    warning, and now we're up to -- if you count for the header and

9    the one we're on, it's probably the 64th copyright infringement

09:29:19  10  notice to this customer, right?

11   A.    Yeah.  That would probably be the 64th on the list, yes.

12   Q.    So this residential customer got 64 copyright infringement

13   tickets, which we've established is fewer than the number of

14   notices, potentially, correct?

15   A.    Potentially.

16   Q.    And got a second warning after 64 tickets, correct?

17   A.    That's what I'm seeing here, yes.

18   Q.    You can set that one aside.  I just want to take a look at

19   one more.

09:30:05  20        All right.  Let's see if I have a third copy -- oh,

21   here it is.  I apologize, we'll do the best we can.  I've given

22   my only spare copy to your counsel.  I'll represent to you,

23   sir, that it's another ticket extract of the same type for a

24   business customer for ICOMS ID 580070866401.

25         THE COURT:  Any objection?

1450

1    MS. GOLINVEAUX:  Objection, Your Honor.  The witness

2    doesn't have a copy of the document.

3    THE COURT:  Well, he's going to see it on the screen

4    if we admit it.  If we don't admit it, then it's not --

5    MS. GOLINVEAUX:  No objection.

6    THE COURT:  All right.  It's received.

7    MR. GOULD:  Thank you.  If we could produce --

8    publish -- do we have, is it 549?  I may be short on this one.

9    I could pull it up on the Elmo.

09:31:15 10   Oh, you have 549?

11   THE WITNESS:  You brought me two a moment ago.  One

12   of them was 549.

13   MR. GOULD:  If I could be so bold as to ask one of

14   you to borrow it so I can display it for the jury?  Because I

15   don't think I have this one --

16   THE COURT:  Joe, can we get one copy back from

17   Mr. Beck, please?

18   MR. GOULD:  Thank you.

19   So I'm going to go back in time a little and do this

09:32:01 20   one manually.

21   BY MR. GOULD:

22   Q.   Do you see, sir -- and it's a little hard to see, I

23   apologize, because it's a bit small.  Do you see this is

24   similar in kind to the documents we've just been looking at,

25   and it's a ticket extract for Cox Business customer with the

1    ICOMS that he's shown in this column?

2           You found it?  All right, let's pull it up.  We found

3    it.

4           I got it.  Beautiful, thank you.  It takes a village.

5           So on this third one, on the business customer, sir,

6    this was a fraternity based on the information that Cox

7    provided, so let's see what the fraternity did.

8    A.   If we found the -- a copy, do you mind if I get the paper?

9    Q.   Oh, yes.  Absolutely, sir.  And this is PX 549.

09:33:21  10    A.   I appreciate it.

11    Q.   So similar in kind, we've counted the number of tickets

12    for this fraternity business customer, and it was 67 tickets,

13    and you could figure that out by counting the unique number of

14    ticket IDs, correct?

15    A.   That can be determined by counting the ticket IDs, yes.

16    Q.   Okay.  So let's go to column H and filter again.  Let's

17    filter for warnings.

18           So out of 67 infringement notice tickets, if you look

19    on the bottom left, sir, you see that it's 48 warnings to the

09:34:09  20    customer?

21    A.   Yes, I see.

22    Q.   Okay.  And then if we filter for hard limits, that would

23    be instances where notice or tickets rejected for being over a

24    complainant's cap, with no customer-facing notice, correct?

25    A.   Yes, subject to possibly hold for more.  Yes.

B. Beck - Direct

1452

1    Q.    Nine hard limit replies with no customer-facing action,

2    correct?

3    A.    That's what I see.

4    Q.    And -- okay.  If you could clear that and go back to

5    column H, and let's look for suspensions or terminations.

6          We don't see any suspensions or terminations of the

7    fraternity, right?

8    A.    No.

9    Q.    And likewise, we don't see any terminations for the

09:34:57 10   fraternity?

11   A.    No, we do not.

12   Q.    Okay.  And if we could go, unfilter again, and look the

13   tickets range from March 2012, correct?

14   A.    Starting in March 2012.

15   Q.    All the way through November 2014, correct?

16   A.    Yes.

17   Q.    And we don't know what happened after that.  We don't know

18   what happened in 2015 because we don't have the data, right?

19   A.    Correct.  Yes, this report was scoped 2012, 2013, 2014.

09:35:34 20   Q.    And so for any tickets received but they received no

21   warning and no hard limit reply, do you know what happened to

22   those?  I think the count would be about 19.

23   A.    Do we have a way to filter for those?

24   Q.    We don't -- I mean, we could filter for -- on H for --

25   well, changed status to closed would be overinclusive.

B. Beck - Direct

1453

1   A.   Yeah, that would -- they would all eventually --

2   Q.   An entry that's closed with no other action, those are

3   just closed, right?

4   A.   Those are just closed, yes, but given that this is a

5   business customer, that could have been a phone call.

6   Q.   Could have been.  It doesn't show here.

7   A.   Yeah, phone calls are not a tracked action in CATS, so

8   those won't show up here.  And with business customers, the

9   level of support they get oftentimes is a phone call.

09:36:27  10        MR. GOULD:  Okay.  If we could pull up the third

11   slide from the demonstrative?  We're going to just summarize

12   what happened with the fraternity.

13            Oh, put that down, please.

14        MR. OPPENHEIM:  Pull that down, please.  Sorry.

15   Apologies, Your Honor.  Wrong exhibit.

16        THE COURT:  All right.

17   BY MR. GOULD:

18   Q.   Here we saw the fraternity had 67 tickets, 48 warnings,

19   9 hard limit replies, no suspensions, and no terminations.

09:37:17  20   Correct?

21   A.   That's correct.

22   Q.   With infringement tickets spanning the entire period,

23   virtually the entire period of the data set?

24   A.   Yeah, short a few months.  Yes.

25   Q.   Now, Mr. Beck, do you understand that Cox has argued that

B. Beck - Direct

1454

1   its system is effective because the steps it took were helpful

2   in getting subscribers to stop infringing?

3   A.   Generally, yes.

4   Q.   And Cox has argued in this case that the thrust of Cox's

5   graduated response was to educate and interact with customers

6   at a fairly intensive level?

7   A.   That sounds right.

8   Q.   But there was no education or customer interaction for

9   90 percent of the notices Cox received during the claim period;

09:38:11   10   isn't that right?

11   A.   If we talk about the blacklisted ones, those were

12   considered invalid notices by Cox.

13   Q.   But there's no customer-facing action on those, was there?

14   A.   There wouldn't be on an invalid notice, no.

15   Q.   And you understand that Cox has argued that the graduated

16   response was designed to work with customers to determine the

17   problem, but Cox never worked with customers for -- at all for

18   90 percent of those; isn't that right?

19   A.   Again, if it's an invalid notice, it wouldn't have been

09:38:40   20   subject to actions or anything.

21   Q.   Isn't my question -- isn't the answer to my question yes,

22   Cox didn't take any customer-facing action in response to

23   90 percent of the notices it received?

24   A.   I'd have to see stats again to say, but --

25   Q.   Okay.  Let 's pull it up one more time, slide 2 in the

B. Beck - Direct

1455

1    demonstrative.

2              We talked about this, the 10 percent versus the --

3    10 percent of customer-facing actions, right?  So isn't it true

4    that while Cox argues that the system was designed to work with

5    customers and interact with customers, that didn't happen for

6    90 percent of the notices received?

7    A.   That includes the invalid notices.

8    Q.   And --

9              MS. GOLINVEAUX:  Objection.

09:39:29 10         THE COURT:  He's answered the question.  I think that

11   your objection -- he's -- it's been asked and answered several

12   times, and he's qualifying the answer, and so let's move on.

13             MR. GOULD:  Yes.

14   BY MR. GOULD:

15   Q.   Those invalid notices, as you described, those contained

16   all of Cox's requirements for receipt of a valid copyright

17   infringement notice, correct?

18   A.   It depends on how we clarify as all of the requirements.

19   I think one of the requirements was not to have settlement

09:39:56 20   demands.

21   Q.   So you say that it had a little extra, but it had -- also

22   contained the matters that Cox required, right?

23   A.   I don't know if I'd refer to that as a little extra.

24   Q.   Okay.  It had a signature, correct?

25   A.   It had -- some of them did; some did not.

B. Beck - Cross

1456

1    Q.   Nothing in Cox's policies said that copyright infringement

2    notices couldn't make a settlement request; isn't that right?

3    A.   The policies, as I understood them from our counsel,

4    agreed that settlement demands resulted in an invalid notice.

5    Q.   So you're focused on why you didn't accept those notices,

6    but isn't my -- isn't the answer to my question, sir, that

7    90 percent received no customer-facing action?

8              THE COURT:  Yeah, that's the fifth time it's been

9    asked.  Let's -- you know, when I say let's move on, I mean

09:40:54 10  let's move on, okay?

11             MR. GOULD:  Thank you.

12             Thank you, Your Honor.  No further questions at this

13   time.

14             THE COURT:  All right.  Cross-examination.

15             MS. GOLINVEAUX:  Thank you, Your Honor.

16                          CROSS-EXAMINATION

17   BY MS. GOLINVEAUX:

18   Q.   Good morning, Mr. Beck.

19   A.   Good morning.

09:41:14 20  Q.   We've met, but my name is Jennifer Golinveaux, and I'm

21   going to be asking you some questions on behalf of Cox, okay?

22   A.   Certainly.

23   Q.   Sir, have you ever testified in court before?

24   A.   No.

25   Q.   And, Mr. Beck, please remind us, how long have you worked

B. Beck - Cross

1457

1    at Cox?

2    A.    Since 2001.

3    Q.    And did you go to college?

4    A.    Yes, I did.

5    Q.    Where did you go?

6    A.    Gwinnett Technical Institute.

7    Q.    And what'd you study there?

8    A.    Electronics technology.

9    Q.    When did you graduate?

09:41:41 10  A.    '93, if I remember correctly.

11   Q.    Did you get a degree or a diploma?

12   A.    A diploma in electronics technology.

13   Q.    Okay.  And briefly, sir, what did you do between

14   graduating and starting with Cox?

15   A.    So after graduation, I kind of wanted to combine my

16   personal love of music with the technical aspects I'd been

17   studying.  So I sought out a job repairing professional audio

18   equipment, so I deal with any matter of musical gear, recording

19   gear, keyboards, sound effects, you name it.

09:42:22 20        From there, I kind of evolved into more computer

21   support roles, worked for a number of companies along the way,

22   including Soft Sense, which became Radiant Systems.  They did a

23   lot of touch screen point of sale, so they did convenience

24   stores, movie theaters, restaurants.  I was kind of a data

25   support specialist for them, data recovery specialist.  I

B. Beck - Cross

1458

1    handled all of the tough cases, the escalation cases for

2    support, did data recovery for the server crashes and things.

3          After that, I believe I went to The Weather Channel,

4    so I worked for The Weather Channel in Atlanta, the data center

5    sitting just above the studio, if I remember correctly.  That

6    was a lot of fun.  I worked on some custom Unix equipment that

7    generates that animated forecast you see every ten minutes on

8    The Weather Channel, so I was one of the engineers on that,

9    that was a weather star.

09:43:23  10          I also worked for a company called Weather Plus,

11   which was a start-up company.  Similar business, but they do

12   content in Europe.  Since that was a start-up, it was a small

13   company, so it was like me and one other guy.  We basically did

14   anything IT, from plugging the mouse into the computer to

15   dealing with a full, you know, full-scale virus attack on the,

16   on the company network.

17          I also worked for Sprint, supporting some of their

18   business internet customers.  And I always feel like I'm

19   missing one somewhere along the line, but I think that brings

09:43:56  20   us up to 2001, and where I started in with Cox.

21   Q.   Mr. Beck, you mentioned a love for music.  Are you a

22   musician?

23   A.   I am, yes.

24   Q.   Do you play an instrument?

25   A.   Mostly guitar, but I will play anything I can get my hands

B. Beck - Cross

1459

1    on.  I really kind of want a cello, but --

2    Q.    Do you play in a band?

3    A.    I have a couple times over the years.

4    Q.    And, Mr. Beck, from the time you started at Cox in 2001,

5    can you describe briefly the positions you've held at Cox?

6    A.    Sure.  So when we started, we were bringing all of our

7    internet services in-house and getting everything, you know,

8    fired up and self-supported.  So there was a lot of discussion

9    about where to start, and I ended up starting in a role called

09:44:39 10  a system technician, or a sys-tech, and I started there because

11   I kind of got to get a little bit into everything, which

12   satisfied the curiosity element I have.

13          So I started there.  We basically monitored all of

14   our customer internet-related services 24/7, around the clock,

15   every day, every night.  Any issues with that, our in-house

16   built monitoring system would pick up on it, we would grab it,

17   troubleshoot it, try to fix it.  If we couldn't, we would

18   escalate to the people or the admins that specifically owned

19   that particular service, and then I moved up to become one of

09:45:19 20  those admins.  So then I got a, you know, smaller set of

21   services but a little more power into them for supporting them.

22          I began to take on a little bit more

23   software-related, coding-related responsibilities, and that

24   evolved into kind of a system engineer role.  And in 2007, I

25   took over the CATS platform, and I think it was around that

1460

1    time that I shifted over to a software engineer title, the

2    whole thing just kind of being a slow evolution really, rather

3    than sort of, you know, stair-step responsibility changes.  It

4    just sort of evolved and grew over time.

5    Q.   Sure.  And, Mr. Beck, what is your current position at

6    Cox?

7    A.   I think officially at the moment, I am considered a

8    software engineer 2.

9    Q.   Okay.  And can you describe generally what you do in your

09:46:10 10   current role?

11   A.   My current role, I handle pretty much all of the technical

12   aspects for the CATS platform, so everything from support to

13   architecture and design, software development, engineering.

14   Q.   And was that also your role during the 2013 and 2014 time

15   period?

16   A.   Yes, it was.

17   Q.   Okay.  And, Mr. Beck, we've heard from a number of folks

18   about CATS, about Cox's CATS system.  What is CATS at a high

19   level?

09:46:45 20   A.   So I guess CATS, to start, is the Cox abuse tracking

21   system, and that's an in-house-built system that was stood up

22   to, to be able to handle -- pardon me, abuse complaints related

23   to our customer internet services.  So generally speaking,

24   abuse complaints are sent to abuse@ whatever, you know, the

25   domain is.  And so abuse@cox.net or any other Cox domains we

B. Beck - Cross

1461

| | |
|---|---|
| 1 | have tend to flow into the front of CATS, and CATS can pick up |
| 2 | those complaints, document them, take actions, so forth. |
| 3 | Q.   Okay.  And, Mr. Beck, putting aside for the moment the |
| 4 | blacklisted complainants that Mr. Gould asked you about, can |
| 5 | you give us a sense of the volume of copyright complaints that |
| 6 | CATS processed during the 2013 and 2014 time period? |
| 7 | A.   Yes.  If I remember correctly, we -- in that time frame, |
| 8 | I think 2013 was probably just over a million; 2014 was about |
| 9 | 1.4 million. |

09:47:59 10    Q.   I'm sorry?

11    A.   I believe it was about 1.4 million for 2014, a little over

12    a million for 2013.

13    Q.   All right.  And, Mr. Beck, do you know approximately how

14    many abuse complaints total, including copyright complaints,

15    CATS processed in the 2013 and 2014 time period?

16    A.   Yeah.  So including all of the abuse types that we deal

17    with in CATS, that would have been on average about in excess

18    of 3 million per year average in that time range.

19    Q.   All right.  Mr. Beck, have you heard of an entity called

09:48:37 20    the Recording Industry Association of America, which is also

21    referred to as the RIAA?

22    A.   Yes, I have.

23    Q.   And to your knowledge, did Cox receive copyright notices

24    from the RIAA during the 2013 and 2014 time period?

25    A.   Yes, we did.

B. Beck - Cross

1462

1    Q.    And did Cox keep copies of all the notices it received

2    from the RIAA during that period?

3    A.    Yes.

4    Q.    As part of this lawsuit, were you asked to retrieve copies

5    of those notices that Cox received from the RIAA?

6    A.    Yes.

7    Q.    How did you retrieve them?

8    A.    Performed inquiries into the CATS database, so that's --

9    you know, we have a database at the, at the heart of the CATS

09:49:17 10  platform is a database, and that's where all the information is

11   stored, you know, in a structured fashion.

12          So querying the database is basically, you know,

13   there's an SQL language.  I don't want to get too technical,

14   but there's a programming like language you can formulate

15   advanced searches or filters and ways to retrieve out

16   particular data, so I performed database queries using that

17   method to find that information.

18   Q.    And what is -- you referred to database queries.  What is

19   a -- what is a query?  Can you explain that for us, please?

09:49:51 20  A.    Sure.  It's just a -- it's a special way of formulating

21   commands to tell the database, you know, which information

22   you're looking for in this particular case.  In this particular

23   example, pulling the complaints here, I would be able to write

24   a small snippet of code that basically says, you know, grab all

25   of the records where, you know, the dates are between this date

B. Beck - Cross

1463

1   and that date and where the sender is, you know, whatever at

2   riaa.com or whatever the particular address was that those

3   complaints were sent to us from.  Since we store that, that

4   sending address in a particular field in the database, it

5   allows me to be able to perform queries like that based on that

6   field.

7   Q.   Okay.  And does the CATS database contain copies of all

8   the copyright notices that Cox received from the RIAA during

9   that period?

09:50:41 10   A.   Yes, it does.

11   Q.   And does Cox receive those notices in the ordinary course

12   of business?

13   A.   Yes, certainly.

14   Q.   Does Cox maintain them in CATS in the ordinary course of

15   business?

16   A.   Absolutely.

17   Q.   And, Mr. Beck, do you know approximately how many notices

18   Cox received from the RIAA during that period?

19   A.   Let's see.  It was -- the RIAA notices that we received,

09:51:09 20   that was -- I feel like that was 163, 164,000, if I remember

21   correctly.

22            MS. GOLINVEAUX:  Your Honor, I'd move to, to

23   introduce DX 347.

24            THE COURT:  Any objection?

25            MR. GOULD:  What is it?

B. Beck - Cross

1464

         1          MS. GOLINVEAUX:  It's the collection notices he's

         2   just been discussing.

         3          MR. GOULD:  I think that -- no objection to that.  I

         4   think that every notice that the RIAA sent is already in

         5   evidence.  There's no objection to another copy of a subset of

         6   those in the time frame Ms. Golinveaux has identified.

         7          THE COURT:  Okay.  It's received without objection.

         8          MS. GOLINVEAUX:  James, could you display DX 347,

         9   please?

09:52:03 10          MR. GOULD:  Is that in the binder?

        11          MS. GOLINVEAUX:  No, there's a slip sheet.  It's an

        12   electronic document.

        13          MR. GOULD:  Oh.

        14          MS. GOLINVEAUX:  Got it?

        15          MR. GOULD:  Yes.  Thank you.

        16   BY MS. GOLINVEAUX:

        17   Q.   Mr. Beck, looking at the first page of DX 347, do you

        18   recognize this?

        19   A.   Yes.

09:52:19 20          MS. GOLINVEAUX:  And, James, if you could scroll down

        21   in DX 347?

        22   Q.   Mr. Beck, is this the collection of approximately 164,000

        23   e-mails that Cox received from the RIAA that you were just

        24   discussing?

        25   A.   Yes.

B. Beck - Cross

1465

1  Q.   And scrolling back up to the first document in DX 347, can

2  you, can you walk us through what this document is, Mr. Beck?

3  A.   Certainly.  So we are looking at what I refer to as an

4  abuse complaint.  I suppose here we've often basically said

5  this is a copyright infringement notice, may be a few other

6  ways to refer to this, but basically this is an e-mail from the

7  RIAA, yep, and we have the from address here is what CATS would

8  consider as the complainant.

9         And this e-mail would be received by CATS and

09:53:41 10  basically describes, you know, an incident of alleged copyright

11  infringement.  It's going to show us the date and time that it

12  was sent to us, sent to abuse@cox.net.  The subject we also

13  store specifically in the database, and the subject has a

14  unique ID number there, which is a reference number from the

15  RIAA.

16         And then we have a signed message body.  So the

17  message body will just describe the general abuse situation

18  that they're seeing.  And if we want to scroll down a little

19  more, I suppose --

09:54:33 20         MS. GOLINVEAUX:  Turn to the next page, please,

21  James.

22         THE WITNESS:  Yep.  And here we have some more

23  information from the complainants generally, and then moving

24  down, we get to some other interesting stuff here.  This is

25  going to tell us first of all in more human readable form,

B. Beck - Cross

1466

1    which our Cox reps would also be potentially looking at if they

2    were manually reviewing this e-mail, this describes the, the

3    work in question.

4              So it will describe the title of the work, the artist

5    of the work in this case, file size.  Then we have some other

6    technical information:  IP address, port, and there's a date

7    and time stamps up above those as well, and those are some of

8    the key pieces that CATS will be looking for because that's

9    going to help us to figure out which customer we're talking

09:55:40  10    about.

11             So if we look below this, you know, more human

12   readable section, you'll see something that says Start ACNS

13   XML, and this is, this is for the machines.  This is kind of a

14   structured format to represent the data so that it can be

15   machine parsed in a reliable way.

16             So ACNS XML refers to a standard, a standard

17   representation, and it was developed, if I remember correctly,

18   by all of the involved parties.  So basically, a lot of the

19   major copyright rights holders got together, the studios, the

09:56:25  20    companies representing them, the ISPs involved, everybody got

21   together and kind of collaborated on this standard way of

22   representing the data so that when we do these complaints, we

23   can have kind of one way for all of us to do it, and that way

24   we don't have to do something special for each different source

25   or do something special for each different ISP.  So we have one

B. Beck - Cross

1467

1   good, clean way.

2          So this is the part that CATS is really going to dig

3   into to try to extract some good information.

4   BY MS. GOLINVEAUX:

5   Q.   I see.

6          And, James, if you could scroll down a little bit

7   more to see if we're at the end of this first notice from RIAA?

8          Mr. Beck, do you see the last line, where it says End

9   PGP Signature?

09:57:09  10   A.   Yes.

11   Q.   Is that the end of this first notice?

12   A.   I believe that is the end of the entire notice, yes.

13   Q.   Okay.

14   A.   That's going to indicate a digital signature that

15   encompasses the body of this message, which gives us some good

16   value as well.  That allows us to verify the integrity of the

17   message, that it hasn't been altered in transit, and that it

18   had been digitally signed by the owner of the key, and when we

19   validate that signature, it will show which key sent it, and as

09:57:35  20   long as we have a reasonable trust that that key still belongs

21   to who it says it belongs to, then we kind of get that good

22   feeling of, yeah, this was sent from that party, and no one has

23   altered it or adjusted it in transit, it's not forged, you

24   know, everything is happy and intact.

25   Q.   And, Mr. Beck, why would that be important?

B. Beck - Cross

1468

1    A.   Well, because a lot of our actions are automated, without

2    this kind of safety check, it could be dangerous, I suppose, it

3    could be easy to misuse the system, to really formulate an

4    attack even on our customers or on us, and we have, in fact,

5    seen in the past a case where a bad-acting entity, shall we

6    say, to be polite, was actually forging entry -- forging

7    copyright notices to us in a sense to make them look like one

8    of the major common copyright reporting -- complaint reporting

9    sources.

09:58:42   10          The only thing that saved us there from having a mass

11   impact on our customers was they weren't able to implement a

12   digital signature like this, so we did not automate them.  We

13   were able to manually look at them, and when we look at them

14   with human eyes and we go, that doesn't look like it's supposed

15   to, these, you know, normally look a certain way, and we

16   started digging a little further and we realized that, hey,

17   these are, there are actually fakes.  These are forgeries.

18   Q.   And what specifically is that?  This references a PGP

19   signature.  What's that?

09:59:13   20   A.   PGP is a key-pair-based encryption algorithm, and it can

21   be used for encrypting data or digitally signing data or both.

22   In our case, we just use it for signatures.  There's nothing

23   supersecret about the information, so there's no need to

24   actually encrypt it.

25          If I can try to boil it down and not get overly

B. Beck - Cross

1469

1    technical, basically they -- the sender has a secret key that

2    only they have, and they look at the message body when they're

3    ready to send it.  They calculate, like, a little checksum

4    technically.  They run a little bit of math over it, and they

5    come up with a unique number, and then they take their key and

6    they sign that unique number, and it kind of creates just a --

7    just encrypts that little number, and then that goes along in

8    the signature block.

9            When we get it, we can decrypt it with their public

10:00:13  10   key showing us the result, and then we can do the same math,

11   and if it matches, we know it came from them, and we know which

12   key signed it, so we know who sent it to us and that it hasn't

13   been altered or fiddled with.

14   Q.   It helps prevent the type of incidences you were just

15   describing if someone is trying to forge a signature?

16   A.   Absolutely.  At a high level, it tells us who sent it and

17   that the message is -- the integrity is intact.

18            MS. GOLINVEAUX:  Okay.  James, could you scroll back

19   to that last -- go back to the last page of that notice?

10:00:42  20   Q.   And is that the end of this first notice, Mr. Beck?

21   A.   Yes, it should be.

22            MS. GOLINVEAUX:  Okay.  James, could you scroll back

23   up to the first page of the notice?

24   Q.   And, Mr. Beck, with reference to this first notice in

25   DX 347, which is a collection of all the notices Cox received

B. Beck - Cross

1470

1    from the RIAA, can you please explain to the jury how CATS

2    processes a copyright notice like this once it's received, at a

3    high level?

4    A.   Okay.  So once we retrieve this notice from the

5    abuse@cox.net inbox, the first general thing we're going to do

6    is just sort of parse over the text in here and try to first

7    determine, you know, what kind of abuse is this, since CATS

8    will handle, you know, any kind of -- pardon me -- abuse

9    related to our data customers.  So we're just going to take a

10:01:31  10   quick parse over it and see if we can find a starting point,

11   what kind of abuse is this.

12   Q.   And in this instance, would CATS be able to determine that

13   this is a copyright complaint?

14   A.   Yes, certainly.

15   Q.   How would you do that?

16   A.   We're really just looking for certain common strings or,

17   you know, sequence of characters, some words or phrases that

18   will clue us in to what we're looking at.  In this particular

19   case, we know if it has ACNS XML, that standard is only used

10:02:02  20   for copyright.  So we have a good understanding right away with

21   this one that it's going to be a copyright complaint.

22   Q.   Okay.  And, Mr. Beck, can CATS determine from a copyright

23   notice whether, in fact, any copyright infringement has

24   occurred?

25   A.   No.  It can't actually validate the behavior that -- you

B. Beck - Cross

1471

1    know, of the complaint.  It can't actually tell what's happened

2    or verify that, no.  We're basically just taking the complaint,

3    you know, at face value, you know, someone is saying this is

4    happening.

5    Q.   And once CATS determines that this is -- this incoming

6    e-mail is a copyright notice, what does it do next?

7    A.   So once we have determined this is a copyright notice,

8    we're going to continue parsing the body, try to extract some

9    key information out of there, especially like IP port, time

10   stamp, run some back inquiries and see if we can take that

11   information and match it up to a customer account hopefully,

12   and even if we don't match it up to a customer account, we're

13   most likely going to move on and create a ticket, and then from

14   that ticket, we can take customer-facing actions as

15   appropriate.

16        Those could be automated.  They could be done

17   manually by a Cox representative, either way.

18   Q.   Okay.

19   A.   But generally, we're going to parse it, get some

20   information, and create a ticket in the CATS system.

21   Q.   Okay.  And you mentioned CATS would try to match this

22   notice up to a customer account.  How, how does it do that?

23   A.   So to match it up to a customer account, we may perform a

24   series of queries within Cox.  Most of the time, we're looking

25   for DHCP records, but we're going to take that -- the IP

B. Beck - Cross

1472

1    address from the complaint.

2            And since IPs can change over time, they are

3    technically dynamic, for the most part, they -- almost all of

4    them are going to typically be dynamic.

5            Then we're going to use that date and time that the

6    complaint says the event occurred, and we're going to use that

7    combined with the IP and possibly the port and see if we can

8    match up, you know, find a record where the IP at that

9    particular time, you know, which device was that associated

10:04:20  10  with, which customer account is that, in turn, associated with.

11   So that's typically the flow that we're going to follow.

12   Q.   And, Mr. Beck, does determining the account also determine

13   the user that engaged in the alleged behavior?

14   A.   No, that's not really possible.

15   Q.   Why not?

16   A.   That's -- it's not really a technically possible sort of

17   thing.  I mean, we can -- the IP will match up to most likely a

18   cable modem or something of that nature, and then that modem

19   is, of course, you know, associated to a particular customer

10:04:56  20  account.  But, you know, within a customer's home, you know,

21   there could be multiple people.  We don't really know who's

22   actually using the internet at that time.  It could be any

23   number of situations.  I mean, typically, it's going to have

24   multiple people in it.

25           Basically if you see a car speed down the road, you

B. Beck - Cross

1473

1   can report the tag, but you don't really know if the owner of

2   the car was driving or their spouse or their kid or their

3   neighbor or their guest.

4   Q.   Well, and is it possible for someone other than a family

5   or household member to use an account service?

6   A.   Oh, certainly.  So, you know, you could have people

7   visiting, of course.  You could have guests in the home.  You

8   could have a neighbor on the WiFi, especially if you, you know,

9   bought a new router, plugged it in, and didn't realize that the

10:05:50 10   default password was "password."  That happens.  So your

11   neighbors may figure that out and get on there and think that

12   they get free internet by just riding on top of yours.  So

13   there are certainly cases where that can happen, and that's

14   just in the residential space.

15        If we get into other use cases, you could see

16   certainly other people involved with business use cases, that

17   sort of thing.

18   Q.   Well, does Cox have both residential and business

19   subscribers for its internet service?

10:06:23 20   A.   Absolutely.  We certainly do.

21   Q.   And does CATS receive copyright notices directed to Cox

22   Business subscribers as well as residential subscribers?

23   A.   Certainly.  Absolutely.

24   Q.   And might a business account also have multiple users?

25   A.   Even more so, I would say.  Absolutely.

B. Beck - Cross

1474

1   Q.   Can you give us an example?

2   A.   Sure.  I mean, even if we just start with a small

3   business, you know, all of their employees.  It could be -- you

4   know, any of those employees could be using the internet.  I

5   would imagine most of them probably would just in day to day.

6        But, I mean, working up the, up the line with

7   business, you have all sorts of these cases.  So they may offer

8   guest WiFi services, you know, maybe they have a guest WiFi in

9   their waiting room and -- or it's a small restaurant or

10:07:05 10   something, maybe they have WiFi in their cafe.

11       But then you get into larger use cases with

12  commercial, too.  So you could have situations like

13  universities.  You could have situations like military bases.

14  You could have hospitals.  We certainly have a number of

15  hospitals as customers.

16       So even -- there are even hospitality cases like

17  convention centers.  That's going to be a huge number of users

18  really.  So there are definitely some, some situations like

19  that.

10:07:41 20   Q.   Now, once CATS identifies the subscriber, is Cox able to

21  contact the subscriber?

22  A.   Yeah, typically.  A customer account is going to typically

23  have contact information on it, yeah.

24  Q.   And once a ticket is created in CATS, what does CATS do

25  with the complaint?

B. Beck - Cross

1475

1    A.    So once a ticket is created in CATS, the complaint is

2    associated to that ticket.  So, you know, if anyone brings up

3    that ticket in CATS, you'll see the complaint directly beneath

4    the ticket details.  So it's directly associated to the ticket.

5    Q.    And does CATS ever associate a copyright notice with an

6    existing ticket?

7    A.    It can, yes, under certain circumstances.

8    Q.    And what circumstances?

9    A.    So a complaint can be associated to an existing CATS

10:08:38  10   ticket where we're kind of looking to see if it's in the same

11   time frame.  So if we get a -- probably an example is the

12   easiest.  If we get a complaint and they say, you know, an

13   incident happened at 9:00 and we create a ticket and we notify

14   the customer, and, you know, an hour later, we get another

15   complaint, and it says, you know, same type of abuse, same

16   customer, in or around 8:58 or 9:15 or maybe, you know, three

17   hours prior to that or anything along those lines, it'll say

18   hey, you know, this happened, we may see that there's an

19   existing ticket right around that same time frame, and we've

10:09:27  20   notified this customer about this type of behavior.  So we're

21   going to take this complaint and attach it to that ticket as

22   supplemental evidence.  And then if a rep goes in and looks at

23   the ticket, then they'll see that it has multiple complaints

24   attached to it, and they'll be able to see each of those.

25   Q.    Is that sometimes referred to as "rolling up"?

B. Beck - Cross

1476

1    A.   Yes, we would refer to that as rolling up or rolling a

2    complaint into a ticket.  Sometimes we say we've correlated the

3    complaint with the ticket.

4    Q.   And why does CATS do that?

5    A.   I think that it gives us a little more efficient way to

6    deal with them, because, I mean, ultimately, we want to educate

7    the customer on the situation that's happening, on the behavior

8    that's happening, and if we can roll complaints from, you know,

9    around the same time together, then if that customer is having

10:10:18  10   a conversation with a Cox rep and they're looking at the

11   ticket, it's a lot easier for them to be able to see the

12   complaints in one place.

13        It also allows us to kind of de-clutter the overall

14   view of everything so that we can see -- the other customers

15   that are receiving complaints, that we can see those more

16   plainly and be sure that we're actioning those more

17   efficiently, rather than, you know, sending the same customer

18   multiple warnings, you know, moment after moment.

19        We want to make sure that we get kind of as wide of a

10:10:49  20   touch as we can.

21   Q.   And once the ticket is created in CATS, what happens next?

22   A.   So once the ticket is created, then CATS will take a final

23   peek at it, make sure everything is tidy and in order, and then

24   it will look to see if this is a situation where we can take

25   maybe an automated customer-facing action.

B. Beck - Cross

1477

1        And if it's able to do so, then it will proceed with

2   that and file the ticket; and if it's not, then it can create

3   the ticket and place it out in open status so that one of the

4   Cox representatives can take a look at that ticket, and then

5   they can potentially take the actions manually if they see it

6   appropriate or add additional documentation, request additional

7   documentation, whatever it is they need to do.

8   Q.   So what automated, what automated actions can CATS take

9   with respect to copyright notice in particular?

10:11:54 10  A.   So an automated action we can take could include an e-mail

11  warning.  We would call it, you know, sending a warning, and

12  that's an e-mail-based notification that we would send toward

13  the customer.

14  Q.   Mr. Beck, would you turn to tab 2 in your binder?

15        And, James, you have a copy of our binder for

16  plaintiffs?

17        This is not the binder -- the bigger binder that you

18  were just working through with plaintiffs?

19  A.   No.  I believe you took that one.  So I have the --

10:12:29 20  Q.   No -- yeah, you've got the right one.  You've got the

21  right one.

22  A.   Yep.  We're good.

23  Q.   So, Mr. Beck, as part of this lawsuit, were you asked to

24  retrieve from CATS copies of the e-mails that Cox sent to its

25  subscribers, forwarding on the notices from RIAA?

B. Beck - Cross

1478

1   A.   Yes.

2   Q.   Okay.  How'd you do that?

3   A.   Queries to the CATS database to retrieve that information.

4   So given the time frame in question, which I think was February

5   2013 to November 2014 generally, since we were able to pull the

6   notices for the RIAA customers, we were able to associate those

7   to their corresponding tickets, and then from those -- you

8   know, from the tickets, we can see the actions that were taken

9   and copies of any e-mail warnings that were sent.

10:13:18  10   Q.   And does the CATS database contain copies of all those

11   e-mails?

12   A.   Certainly, yes.

13   Q.   Okay.  And does CATS send those e-mails on to its

14   subscribers in the ordinary course of business?

15   A.   Yes.

16   Q.   And does it maintain them in CATS in the ordinary course

17   of business?

18   A.   Yes, it does.

19          MS. GOLINVEAUX:  Your Honor, I'd move to admit

10:13:40  20   DX 3695 into evidence.

21          THE COURT:  Any objection?

22          MR. GOULD:  No objection.

23          THE COURT:  It's received.

24   BY MS. GOLINVEAUX:

25   Q.   Mr. Beck, once it comes up on your screen, please tell me,

B. Beck - Cross

1479

1    do you recognize the document?

2    A.    Yes.

3    Q.    What is it?

4    A.    These documents are copies of the outbound e-mail

5    warnings, notifications that we sent toward the customers, and

6    these -- can we scroll down one of these?

7              MS. GOLINVEAUX:  James, are you able to bring up a

8    full?  Can you scroll down into the set?

9              THE WITNESS:  Yep.  Okay.  Can we run back up to the

10:14:51 10   top?

11   BY MS. GOLINVEAUX:

12   Q.   Mr. Beck, do you know approximately how many e-mails there

13   are in this set?

14   A.   These are the e-mail warning notifications sent to the

15   customers.  I think that was somewhere in the 79,000 range.

16   Q.   Okay.  Mr. Beck, if you would turn to tab 2A of your

17   binder, please?  Mr. Beck, we've excerpted the first e-mail in

18   3695 into a paper copy in your binder marked 3695A.

19              Do you see that?

10:15:42 20   A.   I do, yes.

21              MS. GOLINVEAUX:  Your Honor, I move 3695A into

22   evidence.

23              THE COURT:  Any objection?

24              MR. GOULD:  No objection.

25              THE COURT:  It's received.

B. Beck - Cross

1480

1          MS. GOLINVEAUX:  James, if you could bring up 3695A,

2     please?

3     BY MS. GOLINVEAUX:

4     Q.    Mr. Beck, with reference to 3695A, does this indicate how

5     the notice in the RIAA was handled?

6          Could you go to the full screen view, James, please?

7     A.    Yes.  So this customer, this customer was sent the e-mail

8     warning notification for this particular infringement notice.

9     Q.    And is that what we're looking at at the screen on page 1

10:16:45 10     here?  Is that the e-mail notification that was sent to the

11     customer?

12     A.    Yes.  That's the copy of the e-mail that the customer

13     would have been -- received.

14     Q.    Okay.  And are there other kinds of customer-facing

15     actions that CATS takes with respect to copyright tickets?

16     A.    Certainly.

17     Q.    What are they?

18     A.    CATS can do an action which we refer to as "suspend."

19     Sometimes we'll say "quarantine," same thing.

10:17:08 20     Q.    Okay.

21     A.    And that's placing them into what we call an abuse walled

22     garden environment.  It's another method for notifying and

23     educating the customer.

24     Q.    And in connection with copyright notices specifically, are

25     there different types of walled gardens?

B. Beck - Cross

1481

A.    So we will sometimes use the term "soft-walled garden" and "hard-walled garden."  Technically speaking, the underlying process is very similar, but when we call them soft and hard, it refers to a certain distinction in the way that the experience goes.

Q.    And, Mr. Beck, does CATS ever send communications to complainants who have sent in copyright notices?

A.    Pardon me.  Yes.

Q.    What types of e-mails might CATS send to complainants?

A.    So when we send back to complainants, and assuming they have a, you know, functional address that they've sent to us from and it's not, you know, noreply@example.com, the most basic could be an auto reply.  So we may send them a short, you know, a short form that just says, thank you, we've received your notice, you know, we'll look into it, so forth, so on.

        We may also send replies back to the customer if there is anything we see may be missing, invalid, or not well formed in the complaints.

Q.    Okay.  And so, Mr. Beck, we still have up on the screen an example of the letter that would be generated out of CATS to the customer with a copyright notice, right?

A.    Yes.

Q.    Do Cox subscribers ever respond when CATS forwards them a copyright notice?

A.    Certainly.

B. Beck - Cross

1482

1    Q.   What happens when customers respond to copyright notices?

2    A.   So when we send them the notification, we send it -- we

3    send that e-mail from abuse@cox.net.  So when they respond --

4    and granted, sometimes they'll pick up a phone and call us, but

5    if they want to respond to the e-mail, if they just click

6    Reply, it's going to come back to abuse@cox.net.

7         So that's going to go right in the front door of CATS

8    again, as everything to abuse@cox.net does, but when CATS picks

9    up that new reply from the customer, picks up that e-mail and

10:19:39  10  starts parsing it, it's going to see certain characteristics

11   which we can see in the subject here.

12        There's kind of a section in brackets that has a date

13   and a number.  That number is actually the CATS ticket number.

14   So when we see that pattern at the beginning of a subject, we

15   realize within CATS that this is a customer reply.

16        So CATS will look up that original ticket number,

17   consider that the parent ticket, and to make a long story

18   short, we'll create a new ticket, and we'll call it a child

19   ticket, and we'll associate it to that original parent ticket

10:20:16  20  that's mentioned in the subject, and that child ticket is left

21   in an open status so that one of the Cox representatives can

22   take a look at that and respond accordingly, and when they take

23   a look at that ticket, they'll have a little link in CATS that

24   says this ticket is a child of ticket number blah, and they can

25   click on that right away, go right up to the parent ticket, see

B. Beck - Cross

1483

1 the original story, come back to the child ticket, respond

2 accordingly, whatever they need to do.

3 Q.   Okay.  Well, let me ask you, does CATS ever automatically

4 respond to these child tickets?

5 A.   No.  It's always going to form the open ticket and let

6 that be manually reviewed by a person.

7 Q.   Okay.  And was it the duty of the customer safety team to

8 review these child tickets in the ordinary course of business?

9 A.   Yes, it would be.

10:21:03 10 Q.   And were they maintained in CATS, these child tickets, in

11 the ordinary course of business?

12 A.   Certainly.  We do that for any of the abuse types.

13 Q.   During the period from February 2013 to November 2014,

14 which is the claims period in this case, do you know whether

15 any subscribers sent e-mails in response to Cox forwarding

16 notices from the RIAA?

17 A.   Yes.

18 Q.   And did Cox receive those e-mails in the ordinary course

19 of business?

10:21:26 20 A.   Yes, certainly.

21 Q.   And did Cox maintain copies of them in the ordinary

22 course?

23 A.   Yes.

24 Q.   And in connection with this lawsuit, sir, were you asked

25 to retrieve copies of the e-mails that Cox received from its

B. Beck - Cross

1484

1    subscribers during this time period concerning forwarded RIAA

2    notices?

3    A.   Yes.

4    Q.   Approximately how many e-mails did you retrieve?

5    A.   If I remember correctly, I believe there were about 1,700.

6    Q.   And would you turn to tab 3 in your binder, please?

7            Your Honor, I move to introduce DX 496 through 2200,

8    which is the set that Mr. Beck was just describing.

9            THE COURT:  Any objection?

10:22:08  10        MR. GOULD:  Yes, sir.  May we approach?

11            THE COURT:  Yes, sir.

12            NOTE:  A sidebar discussion is had between the Court

13    and counsel out of the hearing of the jury as follows:

14    AT SIDEBAR

15            THE COURT:  Yes, sir.

16            MR. GOULD:  This is the voluminous set of documents

17    related to Mr. Vredenburg's testimony.  Mr. Vredenburg looked

18    at three or four of them.  Ms. Golinveaux is now trying to move

19    in 1,700.

10:22:39  20        They're hearsay.  We don't believe they're business

21    records just because they were kept in CATS.  They're e-mails

22    from customers.  The content is hearsay.  Your Honor has

23    already ruled on that.  The fact that they were stored doesn't

24    make them a business record, per se.

25            In addition, we think that the use of them in that

B. Beck - Cross

1485

1    volume is for an improper purpose, and it's not to show that

2    they existed or that they gave notice, but to present the jury

3    with a large stack of paper that they will implicate are

4    similar to the few we saw from senior citizens and folks who

5    disclaim knowledge or intent in this material.

6         Lastly, in looking at the database of documents

7    produced by Cox in this case, my understanding, and if I'm

8    misspeaking, certainly let me know, I believe that the 1,700 is

9    a subset of the customer e-mails.  I thought that the March 15,

10:23:32  10  2019, production, which included this volume, included many,

11   many, many, many more and that the 1,700 are a set that they

12   selected.

13        If I've misspoken, then please correct me.  That was

14   my understanding.

15        THE COURT:  Go ahead.

16        MS. GOLINVEAUX:  Your Honor, it's not a subset.

17   We're introducing all the e-mails that we got back in response.

18   We didn't offer them in paper, so this is not a ploy to show a

19   stack of paper.  We provided them in court on an electronic

10:23:59  20  copy.

21        And Your Honor ruled that if Cox could establish that

22   these communications back from the subscribers in response to

23   RIAA notices was relevant to Cox's state of mind during the

24   time period, as opposed to retroactively we're just pulling

25   them up to say, well, they did come in, then they could be

B. Beck - Cross

1486

1   admissible by Cox for that purpose, and that's the purpose

2   we're, we're offering them, Your Honor.

3          We've established that they all came in, they had to

4   be manually reviewed.  The abuse team did that.  Mr. Vredenburg

5   testified to that as well, and we think they're properly

6   admissible for that purpose.

7          THE COURT:  As business records or as information

8   that Cox received in administering the CATS program?

9          MS. GOLINVEAUX:  Well, Your Honor, we --

10:24:42 10   respectfully, we believe they're admissible as both.  We think

11   we've laid a solid foundation that they are business records,

12   but we also think they are admissible as to state of mind

13   during the period.

14          MR. GOULD:  They've already established the types of

15   e-mails, how Cox received and handled them, and Mr. Beck has

16   already testified that there are 1,700.  There's no added

17   benefit to admitting in the record 1,700 documents.

18          THE COURT:  Okay.  Your exception is noted.  I'm

19   going to admit them.  I'm going to go with my prior rulings.  I

10:25:12 20   think they are information that Cox received back in the

21   CATS program, and customers were -- some of them were pushing

22   back.

23          We're not going to go through these documents, but

24   the testimony is already there that they've testified the

25   contents of the documents are hearsay.  I have no idea of the

1 reliability.  You demonstrated on a number of them that there's

2 no reliability to the information that was received back from

3 Cox, but notwithstanding, that's why I don't think they should

4 come in as records that the truth of their content is

5 established, but I think the notice and the state of mind, I'm

6 going to allow it for that purpose.

7 MR. GOULD:  Thank you, Your Honor.  Two

8 clarifications:  One, I would ask that you provide the same

9 instruction again; and secondly, I've reviewed many of those

10:26:09 10 documents.  I've seen a fair bit of either duplication or

11 instances where Cox actually responds to someone.

12 Is the 1,700 just e-mails from customers, or does it

13 also include Cox's responses to customers?  Because on that

14 point, the number --

15 THE COURT:  Well, let her answer that question first

16 before you go on your next.

17 MS. GOLINVEAUX:  It's a set of just the ones that

18 came in to Cox, Your Honor.

19 THE COURT:  So there may be duplications.  There's

10:26:40 20 no guarantee.

21 MR. GOULD:  On that representation, we stand on our

22 objection.

23 THE COURT:  Okay.  All right.  Thank you, counsel.

24 MS. GOLINVEAUX:  Thank you.

25 THE COURT:  How much more do you have on this

B. Beck - Cross

1488

1    witness?

2              MS. GOLINVEAUX:  Your Honor, I think maybe 20

3    minutes, 25 minutes.

4              THE COURT:  Okay.  We'll see whether we can finish

5    that up before we go to the next.

6              MS. GOLINVEAUX:  Okay.

7              THE COURT:  What -- you've got Cadenhead next?

8              MR. OPPENHEIM:  Carothers.

9              THE COURT:  Carothers next.  Okay.

10:27:07 10        Now, duplication, if I start hearing the same stuff

11   that's come from Zabek and Beck, you're toast.  Okay?  Just --

12             MR. OPPENHEIM:  Our Carothers examination will be, I

13   believe, reasonably surgical.

14             THE COURT:  Okay.

15             NOTE:  The sidebar discussion is concluded; whereupon

16   the case continues before the jury as follows:

17   BEFORE THE JURY

18             THE COURT:  All right.  The exhibit is accepted.

19   These are the subscribers responding back to Cox after they got

10:27:51 20  notices, and as I said, I believe, yesterday, they're admitted

21   for purposes of demonstrating that Cox was receiving customer

22   information back and -- but not for the truth of the, of the

23   statements that the customers made back to Cox, just the fact

24   that they received them.  Okay?

25             All right.  Please, continue.

B. Beck - Cross

1489

| | |
|---|---|
| 1 | MS. GOLINVEAUX:  Could you display DX 496 to 2200, |
| 2 | James? |
| 3 | BY MS. GOLINVEAUX: |
| 4 | Q.   And, Mr. Beck, I'm just going to ask, do you recognize |
| 5 | this set as the documents you just described for us with the |
| 6 | communications coming back from customers' response to RIAA |
| 7 | notices? |
| 8 | A.   Yes. |
| 9 | MS. GOLINVEAUX:  James, you can take it down. |

10:28:50 10   Q.   Mr. Beck, would you please turn to tab 4 in your binder?

11   It's an exhibit that's been marked as DX 140, and just tell me,

12   do you recognize this document?

13   A.   Yes.

14           MS. GOLINVEAUX:  Okay.  Your Honor, I'd move to

15   introduce DX 140.

16           THE COURT:  Any objection?

17           MR. GOULD:  Yes, Your Honor.  With my apologies, may

18   we approach?

19           THE COURT:  Okay.

20           NOTE:  A sidebar discussion is had between the Court

21   and counsel out of the hearing of the jury as follows:

22   AT SIDEBAR

23           THE COURT:  Yes, sir.

24           MR. OPPENHEIM:  Your Honor -- I'm sorry.

25           THE COURT:  Go ahead.

B. Beck - Cross

1490

1        MR. OPPENHEIM:  So I understand the defendants want

2   to admit DX 140.  The Court has already ruled on this issue.

3   This is part of the 96 percent study that the Court in its

4   motion in limine has already excluded.  We've had argument on

5   it.

6        This particular document, in addition to having all

7   the problems inherent in the motion in limine, is classic

8   hearsay, so it shouldn't come in for that reason.  Moreover,

9   this document purports to, to communicate data.  That data was

10:30:33  10  never provided to the plaintiffs, we asked for it repeatedly,

11  and so we've never had an opportunity to review it.

12       They now, I suspect, want to have Mr. Beck testify as

13  to the very things that this Court has excluded by looking just

14  at this data, but the real data was never provided.

15       So it's another way of just trying to get around this

16  Court's prior rulings.

17       MS. GOLINVEAUX:  Your Honor, I disagree that it was

18  covered in the Court's prior rulings.  I believe the Court's

19  rulings on the motion in limine were directed specifically to

10:31:08  20  Mr. Cadenhead's PowerPoint in the e-mail forwarding that

21  PowerPoint.

22       This is Mr. Beck's e-mail where he forwards the data

23  that he pulled to Mr. Cadenhead.  He testified during his

24  deposition that that is the data.  There wasn't additional data

25  to provide to plaintiffs.

B. Beck - Cross

1491

1     And the Court indicated at the pretrial conference

2  that this could be relevant to Cox's state of mind if we

3  established foundation that it was contemporaneously reviewed

4  by folks at Cox, and Mr. Beck is about to testify exactly how

5  he queried the system for that data and who he shared it with

6  and discussed it with.

7          MR. OPPENHEIM:  Your Honor, may I respond?

8          THE COURT:  Yeah.

9          MR. OPPENHEIM:  What Ms. Golinveaux just said is

10:31:51 10  inaccurate in at least one very clear respect.  This document

11  was not produced until virtually the last week of discovery.

12  No witness testified about this or was given an opportunity to

13  testify.  We asked repeatedly for the data underlying the 96

14  percent study, and it was only literally the last week of

15  discovery that they sent us this.

16          THE COURT:  So, I'm sorry, did Beck -- was Beck

17  deposed and did he --

18          MR. OPPENHEIM:  Well before this was produced.

19          MS. GOLINVEAUX:  He -- sorry, Your Honor.

10:32:20 20          THE COURT:  That's all right.

21          MS. GOLINVEAUX:  He did testify about the e-mail

22  during his deposition, and we produced it promptly thereafter

23  because of the testimony.

24          THE COURT:  All right.  I'm not going to admit 140 on

25  two separate bases.  One, it was produced late, after his

B. Beck - Cross

1492

1    deposition.  He wasn't asked specifically about it.

2         And second, the underlying documentation wasn't

3    produced, and the queries that he's doing are not clear from

4    the exhibit itself, but clearly the plaintiff should have had

5    an opportunity to depose him on this exhibit and have an

6    opportunity to look at the underlying data, and that was not

7    produced.  So your exception is noted.  I'm not going to admit

8    140.

9         MR. GOULD:  Thank you, Your Honor.

10        NOTE:  The sidebar discussion is concluded; whereupon

11   the case continues before the jury as follows:

12   BEFORE THE JURY

13        THE COURT:  Please, proceed.

14        MS. GOLINVEAUX:  Thank you, Your Honor.

15   BY MS. GOLINVEAUX:

16   Q.   Mr. Beck, plaintiffs' counsel asked you at some length

17   about blacklisting copyright complainants.  Do you remember

18   that?

19   A.   Yes.

10:33:48  20   Q.   Sir, what does that term mean with respect to CATS?

21   A.   So with respect to CATS, blacklisting would be something

22   we would apply based on the sender, and that would be -- that

23   would be in cases where there is, you know, a persistent issue

24   with the complaints from that sender.  Typically, a blacklisted

25   sender, we would delete those notices as they come in.  In some

B. Beck - Cross

1493

1    rare cases, we may ticket them and close the tickets as well.

2    There are some circumstances for that.

3    Q.    And do you have an understanding of why in general Cox

4    might blacklist a sender?

5    A.    There can be a number of reasons.  There can be a number

6    of reasons.  Generally, as I said, it means there's a

7    persistent issue with the complaints from that sender.  So --

8    Q.    Pardon me, Mr. Beck.  Please continue.

9    A.    No worries.  We do have cases where we'll have entities

10:35:03 10   sending us complaints that are abusive or hostile or just

11   generally -- yeah, just -- I don't even know how to describe

12   that.  But we do have cases where we're getting, you know,

13   non-useful complaints, hostile language, that sort of thing.

14        But for this case, since we're talking about

15   copyright-related complaints, blacklisting would -- I believe

16   the only reason we did any blacklisting -- well, two reasons we

17   did blacklisting.  One was complaints that contained settlement

18   demands, and the other goes back to the incident I mentioned

19   about forged complaints.  Obviously, we don't want to action a

10:35:55 20   fake complaint.

21        So those are the two primary reasons that would come

22   up as -- regarding copyright-related complaints.

23   Q.    Okay.  Mr. Beck, to your knowledge, does Cox inform

24   complainants before putting them on a blacklist?

25   A.    Yes.  Typically, yes.  We would want to give them an

B. Beck - Cross

1494

1    opportunity to address any issues that we're seeing.

2            MS. GOLINVEAUX:  Okay.  With the Court's permission,

3    I'd like to hand up to the witness what's been marked as

4    PX 349.  It's not yet in evidence.

5            THE COURT:  All right.

6            MS. GOLINVEAUX:  It should be tab 12.

7            THE WITNESS:  Thank you.

8            THE COURT:  Do you know whether he can identify it?

9    BY MS. GOLINVEAUX:

10:36:50  10    Q.   Mr. Beck, can you -- do you identify this -- can you

11   identify this document?

12   A.   Yes.

13   Q.   What is it?

14   A.   This is a page from what we call the CATS wiki, which is

15   an internal documentation site.

16   Q.   What is a wiki, sir?

17   A.   I guess the easiest starting point, a lot of people are

18   familiar with Wikipedia online.  A wiki, in general, is a type

19   of website where users, some or sometimes all, can edit the

10:37:30  20    content of the pages.  So it's often used to -- for

21   documentation, Wikipedia being the most well known wiki, I

22   think.

23            So you can have a page documenting something, and

24   people with appropriate permissions can edit the page and make

25   adjustments on the fly.  So basically it's a living document,

1495

1    modifiable easily.

2    Q.    And, Mr. Beck, with reference to PX 349, did you create

3    that document?

4    A.    Yes.

5    Q.    And is this page from the wiki that lists out the senders

6    Cox had blacklisted?

7    A.    Yes.  Yes, they would be on here.  Yes.

8              MS. GOLINVEAUX:  Your Honor, I move to admit PX 349

9    into evidence.

10:38:14  10              THE COURT:  Any objection?

11             MR. GOULD:  No objection.

12             THE COURT:  It's received.

13   BY MS. GOLINVEAUX:

14   Q.    So, Mr. Beck, can you explain to us what this particular

15   CATS wiki page covers, just as a high level, not going through

16   each section?

17   A.    Sure.  This was a page I put up so that we could

18   internally document issues with specific complainants.  So

19   these are senders, complainants, people -- or e-mail addresses

10:38:53  20   that are sending to abuse@cox.net or any of our other abuse

21   addresses, and this attempts to just sort of describe what the

22   problem was with each of them that we were encountering and

23   whether or not we had any mitigating actions in place with

24   respect to that.

25   Q.    And is this page specific to issues with copyright

B. Beck - Cross

1496

1    complainants?

2    A.    No.   This is issues with any complainants sending to CATS.

3    Q.    What other types of complaints might be addressed on this

4    wiki page?

5    A.    So we have had cases where people will just sort of send

6    us angry streams of expletives.   It's obviously not a useful

7    abuse complaint.   And in some of these cases, replying only

8    resulted in more angry expletives coming back towards us.   So

9    there were some -- there were some abusive cases like that

10:39:45 10   where we've done stuff.

11         We've also had cases where senders will repeatedly

12   send us notices, for example, sending us spam that they've

13   received, which just as a high level, we would normally be able

14   to take an action if one of our customers was sending spam out,

15   and then we could reach out to them and say, hey, that's not

16   cool with our terms, but when they're receiving junk mail,

17   there's not a lot we can do other than kind of offer some help

18   about, you know, how to help filter spam and that sort of

19   thing.

10:40:21 20        But we have a special e-mail address at Cox for

21   recording inbound spam, and that goes into our e-mail platform

22   and helps them dynamically adjust their spam filters and that

23   sort of thing, and that's outside of CATS.   But we've had

24   complainants before where they continue to automatically

25   forward all their junk mail to us, and we continue to tell

B. Beck - Cross

1497

1    them, you know, if you don't mind, please send that to our spam

2    report address.  It would be very helpful.

3            But they continue to send it to abuse.  So instead of

4    having our reps waste time closing these tickets every day,

5    then we just mark them so that we create a ticket and close it,

6    you know, we've advised the customer where they -- where this

7    would be best sent to, and we want to make sure our agents have

8    time to focus on the more pressing issues.

9            MS. GOLINVEAUX:  Okay.  And, James, if you could

10:41:08 10  scroll down to page 2 of this wiki page?

11   BY MS. GOLINVEAUX:

12   Q.   And, Mr. Beck, there's a section -- let me direct your

13   attention to an entry on page 2.  There's a sender identified

14   as DMCA@DigitalRightsCorp.com.  Do you see that?  It's about --

15   it's just a little more than halfway down the page.  Okay.

16           And, James, before we talk about Digital Rightscorp

17   specifically, if you could blow up that second half of the page

18   for us?

19           And, Mr. Beck, does this portion of the wiki list out

10:41:51 20  the complainants that Cox had blacklisted with respect to

21   copyright notices?

22   A.   There are several on here that were copyright related,

23   yes.

24   Q.   Okay.  And with respect to -- and does it all -- strike

25   that.

B. Beck - Cross

1498

1        Does it also list the reasons for Cox blacklisting

2   this -- the particular complainant?

3   A.   It should, yes.  I can take a look here, but yeah,

4   generally we wanted to list each address and then, you know,

5   what our, what our reasons and/or mitigating actions were, so

6   yes.

7   Q.   Okay.  Well, let's look at that with respect to the

8   Digital Rightscorp's entry.

9        If you could blow that up, please, James, on the

10:42:38  10   whole entry, not just the -- okay.  Thank you.

11       Mr. Beck, can you read the reasoning here on this

12   listed for Digital Rightscorp being on the blacklist?

13   A.   Certainly.  The sender was DMCA@DigitalRightsCorp.com.

14   The note I put in here:  This complainant sends DMCA complaints

15   demanding a monetary settlement to avoid further legal action

16   (not unlike a blackmail threat).  Complaints are now

17   auto-deleted.

18   Q.   And, Mr. Beck, do you have an understanding of why Cox

19   blacklisted notices from Digital Rightscorp?

10:43:20  20   A.   Yes.  Yes, I do.

21   Q.   Why is that?

22   A.   So starting with the description here, they had settlement

23   demands in the language.  It felt threatening, to be honest.

24   Not casually threatening.  It felt imposing.

25       But our legal and privacy counsel advised us that

B. Beck - Cross

1499

1   these notices could be blacklisted, that they would not be

2   considered in spirit of the DMCA.

3   Q.   Well, Mr. Beck, do you know if Cox had a policy to

4   blacklist notices that demanded payments by Cox's subscribers?

5   A.   Yes.  Anytime we've seen these settlement demands, that's

6   been a blacklist situation for us.

7   Q.   And if a sender was blacklisted, what did Cox do with

8   their notices?

9   A.   Typically, those notices would be deleted as they arrive.

10:44:34 10   Q.   And if a complainant agreed to remove the settlement

11   demand language from their notices, would Cox reconsider the

12   blacklisting?

13   A.   Certainly.  We'd much rather have the notices tidied up

14   and be able to deal with them than to have to, you know, have

15   them on a special list and that kind of thing.

16   Q.   Are there examples of when that occurred?

17   A.   Yeah, that's definitely occurred.

18   Q.   Okay.  With reference to page 2 of this document, do you

19   see an example of that occurring?

10:45:00 20   A.   Yes, certainly.  We're going to -- we're going to be

21   talking about the bottom of page 2 here.  There's an entry for

22   an entity that is named CEG TEK, C-E-G T-E-K.

23        That's the one.  Yep.

24   Q.   And what happened with CEG TEK?  Were they initially on

25   the blacklist?

B. Beck - Cross

1500

1    A.    Yep.   They were, they were sending settlement demand

2    language.   They were sending complaints with settlement demands

3    in them.   They were threatening and, yeah, those are my words.

4    It felt kind of blackmailish.   It was basically give me a stack

5    of money or I'm dragging you, you know, into court, and we're

6    going to -- we're going to sue you for a ton.   That's basically

7    the feeling that they came across with.

8              But yes, we were blacklisted them --

9              MR. GOULD:   Objection, Your Honor.   Move to strike.

10:45:56  10   He's got -- Mr. Beck has no foundation for this -- for these

11   statements.

12             THE COURT:   Yeah, I'm going to strike the last

13   answer.

14   BY MS. GOLINVEAUX:

15   Q.    All right.   Mr. Beck, let me ask you this:   Did at some

16   point CEG TEK come off the blacklist?

17   A.    Yes.   Yes, they did.

18   Q.    Why is that?

19   A.    CEG TEK did reach out to us to inquire, you know, hey,

10:46:17  20   we'd like to work with you.   What can we do to get our notices,

21   you know, proper and get them processed?

22             So there was modifications made on the CEG TEK

23   notices.   Cox took a look at those, the settlement demands were

24   removed from the notices, and CEG TEK was removed from the

25   blacklist, and they were processed normally thereafter.

B. Beck - Cross

1501

1  Q.   Now, plaintiffs' attorney asked if you're aware that Cox

2  had at some point blocked notices from Rightscorp at the mail

3  server.  Do you remember that?

4  A.   Yes.

5  Q.   And I believe you explained to us that blocking at the

6  mail server was different than blacklisting.  Is that right?

7  A.   That's correct.

8  Q.   Can you remind us, what is the difference between blocking

9  at the mail server versus blacklist?

10:47:06 10  A.   Okay.  So when they're blacklisted with CATS, the e-mails

11  are sent to abuse@cox.net.  They arrive in our inbox, and as

12  CATS goes through the inbox, it will see the sender of each

13  message, and if that sender is on the blacklist, then that

14  message is typically deleted, and we move on to the next

15  message.

16  Q.   Okay.

17  A.   When complaints are rejected at the mail server level, at

18  that point -- I won't make this too technical or dry -- the

19  complainant will send the complaint.  It goes to the

10:47:48 20  complainant's mail server.  They send it to the Cox mail

21  server.  So those two servers are talking.  It says, I have an

22  e-mail for you, and Cox says, I'm not going to accept that

23  e-mail from you.  I'm rejecting that.

24        So the mail server on the complainant side would then

25  see that the message was rejected, and it would either queue or

B. Beck - Cross

1502

1      move on.  So those messages do not come into the Cox e-mail

2      platform at all.

3      Q.   And I believe you testified that at one point, Rightscorp

4      was on the blacklist, and then they were blocked at the mail

5      server level; is that correct?

6      A.   That's correct.  They were initially blacklisted in CATS

7      and then moved on to being rejected at the mail server platform

8      out of necessity.

9      Q.   Do you know why Cox blocked Rightscorp's notices?

10:48:38  10   A.   Yes.

11     Q.   Why?

12     A.   The initial blocking of the Rightscorp notices was due to

13     the presence of settlement demands.

14     Q.   And what happened after they were blacklisted to have Cox

15     move to the -- to blocking them?

16     A.   So after they were blacklisted, the -- sometime shortly

17     thereafter, the volume of complaints that we received from

18     Rightscorp shot up dramatically, and it went up to a high

19     enough volume that we were no longer able to take in any new

10:49:21  20   abuse complaints from any senders for any type of abuse at all.

21     Even with the blacklist in place, there would -- they were

22     sending us just way too many for us to be able to maintain

23     functionality on the CATS platform.

24          Rejecting them upstream at the mail server platform

25     before they come down to the CATS level was the only feasible

1503

1  technical way that we had to resolve that issue and get CATS

2  functional again.

3  Q.   Now, Mr. Beck, to be clear, did Cox ever blacklist notices

4  sent from the RIAA?

5  A.   No, no.

6  Q.   Did Cox ever block notices sent from the RIAA?

7  A.   No.

8  Q.   How do you know?

9  A.   I would have been the one to make the configuration in

10:50:14  10  CATS if we were to blacklist them, and Rightscorp was the only

11  entity where we had a technical need to go so far as to reject

12  at the mail server, but we don't reject from the mail server

13  for any other, any other complainant.

14  Q.   Mr. Beck, would you please turn to tab 5 in your binder?

15        MR. OPPENHEIM:   In our binder?

16        MS. GOLINVEAUX:   Our binder.

17  BY MS. GOLINVEAUX:

18  Q.   Mr. Beck, as part of this litigation, did you create a

19  report using CATS to match RIAA notices to customer account

10:51:04  20  numbers?

21  A.   Yes.

22        MS. GOLINVEAUX:   Your Honor, I'd move to admit DX 125

23  into evidence.

24        MR. GOULD:   No objection.

25        THE COURT:   It's received.

B. Beck - Cross

1504

BY MS. GOLINVEAUX:

Q.   Mr. Beck, can you walk us through, what is this report?

A.   Sure.  So this report is two columns.  This is a report matching the, the subject line from the RIAA's notices within the time scope in question, and the column on the right is the Cox customer account number, which may be sometimes referred to as an ICOMS ID.

Q.   So what does this report tell us?

A.   So for each of the, each of the RIAA complaints in scope, this tells us which customer account that complaint was associated to.  We basically are taking the complaint with that subject, finding the associated ticket within CATS, and then looking for the customer account number from that ticket.

          MS. GOLINVEAUX:  James, would you please pull up Plaintiffs' 547?

Q.   Now, Mr. Beck, you may recall this is one of the ticket report excerpts for a subscriber that Mr. Gould took you through earlier this morning.

A.   Yes.

Q.   Do you remember that?

A.   Yes.

Q.   And he offered this as an example of a subscriber had received multiple tickets.  Do you remember that?

A.   Yes.

Q.   Mr. Beck, can you tell from this ticket excerpt that's

B. Beck - Cross

1505

1    Plaintiffs' 547 how many RIAA notices this subscriber got?  Are

2    you able to tell that?

3    A.   No.  The report is not distinguishing the sender of the

4    origin complaint for each ticket, no.

5    Q.   So you can't tell from this ticket excerpt?

6    A.   No.

7    Q.   Okay.  If we filter for this customer in the report we

8    were just talking about, the subject to accounts report that

9    links customers to RIAA notices, would we be able to determine

10:54:31   10   that?

11   A.   Yes.  The subject to complaints would contain all of the

12   RIAA complaints in the -- in scope, and it would match them to

13   their corresponding customers.  So yes.

14         MS. GOLINVEAUX:  James, if you could pull back up,

15   please, DX 125?  And if you could search on that customer

16   number in that ticket excerpt Mr. Gould took him through?

17   Q.   So, Mr. Beck, it looks like we got one hit here on this

18   customer number.  What does that tell you?

19   A.   If the customer account number in question, the ICOMS ID

10:55:59   20   in question, appears in this report once, then that was one,

21   one RIAA notice associated to that customer.

22   Q.   So we could tell from that that this customer received

23   exactly one RIAA notice; is that correct?

24   A.   Yes.

25   Q.   I see.

B. Beck - Cross

1506

1    You can take that down, James.

2    Could you bring back up DX 125, please?

3    Now, Mr. Beck, you said this report covered all the

4    copyright notices Cox received from the RIAA during the period

5    at issue, February 2013 to November of 2014, right?

6    A.   Yes.

7    Q.   Mr. Beck, do you recall approximately how many notices are

8    listed out on this report?

9    A.   This report had -- I believe it was in the 163, 164,000.

10:57:01  10  Q.   And were some of the RIAA notices associated with the same

11   account number?

12   A.   Yes.  Yes, they would, yeah.

13   Q.   How many different account numbers are listed on this

14   report?

15   A.   That -- if I remember correctly, I believe it was near

16   58,000.  It was approaching 58,000, if I remember right.

17   Q.   58,000?

18   A.   Yeah.

19   Q.   And that would be the total number of Cox subscribers who

10:57:31  20  received RIAA notices during the period?

21   A.   Yes.

22   Q.   And you mentioned earlier that Cox has both business and

23   residential customers.  Does this report indicate whether an

24   account is residential or business?

25   A.   No, it does not.

B. Beck - Cross

1507

1      MS. GOLINVEAUX:  James, could you please bring up

2  PX 19?

3  BY MS. GOLINVEAUX:

4  Q.   Mr. Beck, this is the ticket actions report that you were

5  testifying about earlier.  Do you remember that?

6  A.   Yes.

7  Q.   And could you just remind the jury at a high level what

8  this report is?

9  A.   Sure.  So the ticket action history, I'll try to boil this

10:58:48 10  down, of the RIAA notices in scope, of the customers associated

11  with those, for that set of customers, we gathered all of the

12  copyother tickets for 2012, 2013, 2014, regardless of the

13  sender, and this report shows all of the actions that occurred

14  within those tickets.

15  Q.   And, Mr. Beck, I'll represent to you that there's a little

16  more than 315,000 tickets listed on this report, and remind us,

17  approximately how many subscriber accounts got the RIAA

18  notices?

19  A.   I believe that was -- the subscriber accounts, I believe,

10:59:39 20  was nearly 58,000.

21  Q.   Okay.  So we've got 315,000 and change tickets and

22  approximately 58,000 subscribers.  So on average, approximately

23  how many copyright tickets is that per subscriber over the

24  three-year period?

25  A.   So over the three-year period, if I just do

1508

1    pencil-in-the-air math, 58,000, we make it 60.  Pull the

2    315,000 out, about 300.  You're like 60 into 300, 6 into 5.

3    You're talking about 5-point something per customer average.

4    Q.   Over the two-year period?

5    A.   Three-year.

6    Q.   Three-year period.  Thank you.

7             And to be clear, that average includes all the Cox

8    Business subscribers on the list, correct?

9    A.   That's correct, yes.

11:00:28 10  Q.   Okay.  Let's -- I'm not going to belabor this report

11   because Mr. Gould --

12             THE COURT:  How much more do you have?  I'm sorry.

13             MS. GOLINVEAUX:  Your Honor, I have about ten

14   minutes.

15             THE COURT:  Okay.  Then let's take our mid-morning

16   break at this stage.  Let's take 15 minutes, and we'll come

17   back and continue with this testimony.  All right.  You're

18   excused.  Thank you.

19             NOTE:  At this point, the jury leaves the courtroom;

20   whereupon the case continues as follows:

21   JURY OUT

22             THE COURT:  All right.  Anything before we break?

23   NO RESPONSE

24             THE COURT:  Okay.  Then let's take 15 minutes.  We're

25   in recess.

1509

          NOTE:  At this point, a recess is taken; at the
1  conclusion of which the case continues in the absence of the

2  jury as follows:

3  JURY OUT

4          THE COURT:  All right, good morning.  Good morning,

5  Mr. Buchanan.  You're at the podium, I assume, for a reason.

6          MR. BUCHANAN:  I am, Your Honor.

7          THE COURT:  Okay.

8          MR. BUCHANAN:  And it's not to testify.  No, the --

9  11:22:07 10  it's an issue with regard to the order of witnesses.

11          THE COURT:  Yes, sir.

12          MR. BUCHANAN:  So this morning, the plaintiffs

13  advised that they were moving Dr. Lehr up two spots.  He'd been

14  set for three days.  And they just gave me his demonstratives,

15  which would have been due 9 a.m. this morning.  So I object to

16  them putting him on prior to those other witnesses.  I think we

17  should maintain the order we had.  It would be unfair prejudice

18  to us.

19          THE COURT:  Yeah, what -- how much time do you

20  11:22:40  need -- when would he go on?

21          MR. GOULD:  Your Honor, what we informed defendants

22  this morning was that depending on how long Mr. Beck and

23  Mr. Carothers took, we may advance Dr. Lehr in front of a

24  couple of videos because he's here and present and gave them

25  that notification as a courtesy and give them the slides.  It's

B. Beck - Cross

1510

1    not happening for several hours at most.

2           We just don't know how long these witnesses are going

3    to go, so Dr. Lehr will either go on after -- sometime this

4    afternoon or sometime tomorrow morning, which was always the

5    intention.

6           THE COURT:  Okay.  All right.  Put him on tomorrow

7    morning at the earliest, and give counsel an opportunity to

8    review the demonstratives.

9           MR. BUCHANAN:  Thank you, Your Honor.

11:23:25 10         THE COURT:  All right.  Anything else?

11          MS. GOLINVEAUX:  Your Honor, quick question.

12          THE COURT:  Yes.

13          MS. GOLINVEAUX:  In light of Your Honor's ruling at

14   the last sidebar, I just wanted to raise one issue before I

15   continue with Mr. Beck.

16          THE COURT:  Yes.

17          MS. GOLINVEAUX:  I'd like to -- there's a line of

18   questioning, a short line of questioning I'd like to pursue,

19   and I want to make sure I'm not bumping up against what Your

11:23:42 20   Honor ordered.  What I would intend to ask Mr. Beck is whether

21   he looked at CATS data during the claims period to look at the

22   incidence of repeat infringer rates specifically and whether he

23   discussed that with anyone, and I just want to make sure that

24   we're on the same page before that proceeds.

25          THE COURT:  So are you going to take him through the

B. Beck - Cross

1511

1    number of repeats after three notices and six notices?  Is that

2    what you're talking about?

3                MS. GOLINVEAUX:  No, Your Honor.  I intended simply

4    to ask him whether he was -- he reviewed CATS data during that

5    period to determine those types of --

6                THE COURT:  Just generally whether he was keeping an

7    eye on the --

8                MS. GOLINVEAUX:  And whether he was discussing that

9    with others at Cox.

11:24:28 10                THE COURT:  Okay.  How specific are you going to get?

11   I guess that's my problem.

12                MS. GOLINVEAUX:  That is how specific I would get,

13   Your Honor.  I would just ask him whether that was something he

14   would do, he'd query the CATS database to look at the incidence

15   of repeat infringer rates.

16                THE COURT:  Okay.  All right.

17                MR. GOULD:  I have a question about that.  I'm not

18   sure I --

19                THE COURT:  Well, come to the podium.

11:24:57 20                MR. GOULD:  Thank you, Your Honor.  I'm not sure I

21   understand.  It sounds like the purpose is to tell the jury

22   that Mr. Beck was looking at it and that he told Carothers, so

23   Carothers could talk about what he -- it all sounds a bit like

24   the back door to talking about data analysis and studies, that

25   were as you well know --

1512

         1              THE COURT:  I'm going to allow it.  Thank you.  I

         2     mean, I've ruled previously that if there was communications

         3     going back and forth generally, then that certainly would be

         4     something that would be admissible, and so your exception is

         5     noted.

         6              All right, Joe, let's get our jury.

         7              NOTE:  At this point, the jury returns to the

         8     courtroom; whereupon the case continues as follows:

         9     JURY IN

11:26:16 10              THE COURT:  All right.  Please, have a seat.

        11              Can we get our witness back, please?

        12              THE COURT SECURITY OFFICER:  All right, sir.  Come on

        13     in, please.

        14              THE COURT:  Please, proceed.

        15              MS. GOLINVEAUX:  Thank you, Your Honor.

        16              Could you pull back up PX 19, please?

        17     BY MS. GOLINVEAUX:

        18     Q.   So, Mr. Beck, before we broke, we were looking at PX 19,

        19     which is the ticket action report, and you testified that this

11:27:23 20     shows -- for the Cox subscribers who received RIAA notices, you

        21     said it was approximately 58,000, this report shows all the

        22     copyright tickets they got from any source during the period.

        23     Is that correct?

        24     A.   That is correct.

        25     Q.   Okay.

B. Beck - Cross

1513

1    A.    2012, 2013, 2014, all senders.

2    Q.    Thank you.

3          And so just briefly to orient the jury to this

4    report, if you could take us through the first subscriber

5    listed, the very first subscriber listed on the report, and

6    tell us what this data shows us?

7    A.    Okay.  So the report is grouped by the ICOMS ID, which is

8    the customer account number.  So for any particular customer

9    account, we're going to see all of the -- all of the entries

11:28:17  10    grouped together to make it easier to see it from that

11    standpoint, at a customer grouping, if you will.

12          So the first data row here for -- it's an account

13    number ending in 50115, it is the only row for this account.

14    So we'll just quickly walk through that row.  Second column has

15    a ticket ID.  That's the CATS ticket number.  The create date

16    next to that is when CATS -- when the CATS ticket was created,

17    and then we have IP address and source port.  Those are both

18    values that we extracted from the original notice or complaint.

19    So those are pivotal in identifying, you know, that customer

11:29:10  20    account.

21          The next column is abuse type, and these are copy

22    other.  Of course, that's the abuse type that is going to refer

23    to the copyright complaints here.

24          The next column is action date, so that's the date

25    and time that this particular action occurred, and I believe we

B. Beck - Cross

1514

1    did all of these in GMT.

2              And then the next column is action.  So that's the

3    particular action -- each row in the report is an action.  So

4    if a ticket had more than one action, it would have, you know,

5    more than one row in a series there.  So this action says

6    changed status to closed, and that is the only row for this

7    ticket and the only row for this customer.  And that was --

8    we're talking about July of 2014.

9              So for me looking at this, this is telling me that

11:30:10  10  this is a -- this was going to be the first complaint for this

11   customer.  So this would have been a hold for more, and that's

12   why we just see the status changed to closed.

13   Q.   So can you tell from the report, and I apologize, maybe

14   this is what you're saying, but how many tickets this customer

15   ending in 115 received during the period?

16   A.   Just the one ticket.

17   Q.   And you could tell that because the customer number only

18   appears once; is that correct?

19   A.   Yes.  The results are grouped by ICOMS ID, which is the

11:30:44  20  customer account number.  So if there were additional tickets

21   or actions related to this customer, they would appear right

22   here, next to this row.  Since that's the only row we see with

23   that ICOMS ID, then we know that is the only ticket and the

24   only action for that particular customer in the scope of this

25   report.

B. Beck - Cross

1515

1  Q.   And you indicated with respect to the action, that this

2  looked like a hold for more.  How do you -- how do you

3  determine that?

4  A.   So this is just based on the fact that the ticket was

5  closed, and there are no tickets preceding it.  And since this

6  report goes back to the beginning of 2012, so that tells me

7  that throughout 2012 and throughout 2013 and all the way up

8  through this point, July of 2014, there are no previous

9  copyother tickets for this customer.

11:31:34 10          So the natural conclusion here is that this is the

11  first one, and if this is the first one, our appropriate step

12  there is to mark it as a hold for more.

13  Q.   Okay.

14  A.   And so far within the scope of this, no additional

15  complaints -- no additional tickets were created.  So we're not

16  seeing any additional rows in the report.

17  Q.   Okay.  So let's just do one more, Mr. Beck.  Looking at

18  the very next customer listed in this report ends in Customer

19  No. 63715, take us through what happened with this customer

11:32:15 20  during the period.

21  A.   Sure.  So I think we've touched on what each of the

22  columns mean.  So we'll take a quick read across down each of

23  these rows and kind of form a story.  So --

24  Q.   Before you start, Mr. Beck --

25  A.   Okay.  Sure.

B. Beck - Cross

1516

```
 1    Q.   I'm sorry to interrupt you, but why is this customer
 2    listed out -- it looks like some of the ticket numbers repeat.
 3    Can you explain that for us?
 4    A.   Certainly.  So each row in the report will be a distinct
 5    action, and we're seeing the actions in column H.  So if a
 6    given ticket ID had multiple actions within it, then we'll see
 7    a row for each of those actions.
 8          And so for the highlighted ones, you see there are
 9    three rows with the same ticket ID for this customer.  So there
10    are three corresponding actions and the action dates next to
11    them.
12    Q.   And I'm sorry, but before you move off the ticket ID --
13    A.   Uh-huh.
14    Q.   -- can you tell from this how many total tickets this
15    customer got during that two-year period?
16    A.   Certainly.  So we know it's grouped by ICOMS ID, so we
17    know that, you know, the -- they're all going to appear in a
18    row.  So we have, you know, row 3 through row 12 here.  So that
19    tells me we have ten rows for this ICOMS ID.
20          If we look at the second column, though, that's the
21    ticket ID.  So we have to count the number of unique tickets,
22    and I believe we're sorted here probably by ticket ID after
23    customer account.  So it should be pretty easy to eyeball.
24          So we have one, a couple of rows for the second one,
25    there's three, that's four, and then five.  So it appears to be
```

11:33:05 appears before line 10
11:33:33 appears before line 20

B. Beck - Cross

1517

1    five tickets actually for the customer.

2    Q.    Okay.  Thank you.

3          And can you walk us through the actions in the action

4    column for this particular customer?

5    A.    Certainly.  So starting at the top, and that'll bring us

6    down chronologically, the first one, there's one row for that

7    ticket.  That's -- yep, 5303 is the ticket.  The action was

8    changed status to closed.

9          So much like the first example, we see that there

11:34:26 10  were no tickets for this particular customer account throughout

11   all of 2012, 2013, and leading up to this particular -- you

12   know, this first row in May of 2014, and the action was simply

13   changed status to closed.  So that should be a hold for more

14   situation.  So that ticket would be marked as closed, and that

15   would be the only action for that ticket.

16         The next ticket, we see three rows for it.  Thank

17   you.  So we see that the action toward the customer was that we

18   suspended the customer's data service, and I think we discussed

19   before, that's putting them in the abuse walled garden,

11:35:13 20  temporarily interrupting their internet service.

21         Then immediately afterwards, the ticket status is

22   changed to closed, and that's normal.  Once we take the

23   customer-facing notification, we mark the ticket as closed,

24   agents are still able to view these tickets, make additional

25   notes, take additional actions if they need to, anything they

B. Beck - Cross

1518

1    want to do.  It's just by marking it closed, we're basically

2    filing it, you know.  We're setting it down and saying, okay,

3    we've taken the customer-facing notification, we're going to

4    mark that as closed.

5             And then we see shortly --

6    Q.   Mr. Beck, before you move on, so why -- so it looks like

7    first ticket got changed status to closed, and you explained

8    that's hold for more?

9    A.   Uh-huh.

11:35:57  10    Q.   And the very second ticket, am I reading this correctly,

11   the customer got suspended; is that right?

12   A.   That's correct.

13   Q.   And why might that be based on how CATS operates?

14   A.   Yeah.  Normally, we would have expected that second notice

15   to be an e-mail warning to the customer.  So if this was a

16   suspension action, that tells me that the customer probably

17   didn't have any e-mail addresses on file with us.  So maybe

18   they don't have any cox.net e-mail addresses and they don't

19   have a preferred e-mail address listed in our billing system.

11:36:33  20             So without an e-mail address, we obviously can't send

21   an e-mail warning, but we still want to make sure we're

22   notifying this customer.  So although suspending their service

23   is, you know, several steps further in, we're still going to

24   skip ahead to that because that's the first viable action we

25   have available to us since we can't send them an e-mail.  We've

B. Beck - Cross

1519

1    already done a hold for more.  So we go ahead and suspend the

2    customer service to get their attention, you know, start that

3    discussion, get that education going.

4    Q.    Okay.  And with respect to that same ticket, after

5    suspended, it says changed status to closed.  I think you were

6    explaining why that would be.

7    A.    I did, yes.  So once we notify the customer, once we have

8    taken our, you know, actions on a ticket, once we've done what

9    we're going to do, for the most part, we'll go ahead and mark

11:37:25  10    the status as closed.  And a rep can still get into the ticket

11    and make changes afterwards if they need to, if they're talking

12    to a customer, or whatever they need to do there.  We're just

13    filing it.

14    Q.    Okay.

15    A.    And then the third action for this ticket is reactivated

16    the customer.  Of course, that's the natural flow.  You know,

17    we've suspended them, so they've either seen the walled-garden

18    content and/or they have called in and talked to somebody, and

19    now we're reactivating their service now that we have, you

11:37:56  20    know, properly notified them.

21    Q.    What happens next?

22    A.    So after that, we move on to another ticket, and it has

23    two rows here.

24    Q.    Well, this is the same customer, right?

25    A.    Same customer still.

B. Beck - Cross

1520

1    Q.    So we're looking at five tickets for this customer; is

2    that right?

3    A.    Yes, that's correct.

4    Q.    Okay.

5    A.    So now we're on the third ticket.  This is over a month

6    later, so we're talking about close to five weeks later, I

7    think.

8    Q.    Uh-huh.

9    A.    We've gone from May 21 to June 27 of 2014.  So the action

11:38:33  10    here was sent warning, and we've discussed that's sending the

11    e-mail warning notification to the customer.  And since this is

12    a sent warning, we -- we're going to see the final column here

13    finally get some play, the action content form.

14            This is something that would only be populated in the

15    report for an e-mail type of action where we've based that

16    e-mail on a template form that we have in our system, and so

17    this column describes what template form we built that e-mail

18    from.

19            So in this case, it says DMCA, and that's just the

11:39:17  20    simple descriptive name of our residential e-mail warning form.

21    So yep, we sent them an e-mail warning -- we sent them the

22    e-mail warning form.  This would have been our template letter.

23    It would have had a copy of the associated complaint appended

24    to the bottom of that e-mail letter as well, and then beneath

25    that, we'll see the action that shows we changed the status to

B. Beck - Cross

1521

1   closed.

2   Q.   Okay.  And am I reading this correctly that there is two

3   additional tickets for this customer that were both sent

4   warnings and changed status to closed?

5   A.   Yes, that's correct.

6   Q.   Okay.  Would the -- so they -- this customer had a total

7   of five tickets, with the last one coming in in July, is that

8   16 of 2014; is that right?

9   A.   Yes, that's correct.

11:40:02 10   Q.   Okay.  And can you tell whether this customer got any more

11   tickets during the period?

12   A.   During the period, so after July 16, for the period of

13   this report, there are no additional tickets for this customer.

14   Otherwise, they would appear right below this row in sequence

15   with the rest of them.  So that was the end of their ticket

16   history for this report for that customer.

17   Q.   Okay.  And you explained that with respect to this

18   customer, they were likely suspended right after the first hold

19   for more because they may not have had an e-mail address on

11:40:37 20   file with Cox; is that right?

21   A.   That's correct.

22   Q.   And so then after they're reactivated, we see a warning

23   going out.  What does that data tell you?

24   A.   So that tells me that somewhere in between, an e-mail

25   address has been configured in the contact information for that

B. Beck - Cross

1522

customer.  The likelihood is that when they were suspended,

they probably ended up talking to a representative on the

phone.  So they probably went ahead and put an e-mail address

on file as contact information at that time.

Q.   Okay.  Okay.  Thank you, Mr. Beck.  That's very helpful.

And to be clear, these are simply the first two

customers listed out in this massive ticket action report,

right?

A.   That's correct.

Q.   Okay.  Thank you.

You can take that down.

Now, Mr. Beck, as the administrator of CATS, the guy

in charge of CATS, did you ever look at CATS data during the

2013-2014 time frame to look at the incidence rates of repeat

offense or repeat tickets of accused Cox subscribers?

A.   Yes.

Q.   And did you ever discuss that data with anyone at Cox?

A.   Yes.  Yes, I did.  That data would have been discussed

with Randy Cadenhead, Jason Zabek.  I do have some memory of

discussing that with Matt Carothers as well.

And beyond that, I don't remember specifically, but I

would imagine that would have been discussed with other members

of the Corporate Abuse Team as well.

Q.   Okay.  Mr. Beck, I just have a few more questions for you.

If we could pull up PX 365, please?  Now, Mr. -- Your Honor, I

B. Beck - Cross

1523

1    believe -- is this PX 360 -- 365, thank you.

2              Your Honor, I believe this one's already been

3    admitted.

4              THE COURT:  All right.  Yes, it has.

5    BY MS. GOLINVEAUX:

6    Q.   Mr. Beck, in connection with this litigation, were you

7    asked to provide information about the number of subscribers

8    that Cox terminated for AUP violations?

9    A.   Yes.

11:43:06 10    Q.   Okay.  And looking at this, at this document, this is

11    another set of these interrogatory responses that we looked at,

12    a different set with plaintiffs' counsel earlier this morning.

13    Do you remember that?

14    A.   Yes.

15    Q.   This is where Cox is providing some information as part of

16    the lawsuit?

17    A.   Yes.

18    Q.   Okay.  If we could --

19              MR. GOULD:  Your Honor, a brief issue on this before

11:43:26 20    the document is displayed?  Can we approach?

21              THE COURT:  Yes, sir.

22              NOTE:  A sidebar discussion is had between the Court

23    and counsel out of the hearing of the jury as follows:

24    AT SIDEBAR

25              THE COURT:  Yes, sir.

B. Beck - Cross

1524

1    MR. GOULD:  Your Honor, I think Ms. Golinveaux has

2    the chart.  I don't have one with me.  It shows by quarter the

3    number of terminations of their AUP violations, and Mr. Beck

4    will testify, as he did in his deposition, that each of those

5    was in response to copyright.

6          Now, what the data shows is a pretty substantial

7    spike in queue form 2014, which corresponds to the time during

8    and after which the BMG lawsuit was filed.  It came up as a

9    precautionary matter to understand defendants' intent with

11:44:27 10   respect to arguing or presenting information and suggests that

11   towards the end of this period, they did much more and why they

12   did so, and if they're doing that, I think we're getting pretty

13   close to opening the door about a lot of information about the

14   BMG case and what they did and why in that period.

15         THE COURT:  Go ahead.

16         MS. GOLINVEAUX:  Your Honor, this is information the

17   plaintiffs requested in discovery.  I'm merely going to walk

18   him through the total number of AUP -- termination for AUP

19   violations for 2013 and 2014.

11:45:04 20         THE COURT:  Can I just see the date?

21         You can ask him whether -- anything about the 16 in

22   the final quarter of 2014?  Are you going to ask him?

23         MR. OPPENHEIM:  Somebody's -- I mean, if you're going

24   to put that in front of the jury, it's going to raise questions

25   that should be answered.  The problem is --

1525

```
          1            THE COURT:  When was BMG filed?

          2            MR. OPPENHEIM:  Right then.

          3            MR. GOULD:  November 26, 2014.

          4            THE COURT:  I'm not going to allow it.  It's not

          5   significant enough, and you may take him through that and you

          6   may ask him whether he's aware of any reason why that number

          7   spiked at that stage.  What's he going to say if he's asked

          8   that question?

          9            MS. GOLINVEAUX:  I don't think he's aware, Your
11:45:51 10   Honor.

         11            MR. GOULD:  Well, could I ask him the leading

         12   question that you changed your practices because you'd been

         13   sued for the very claims presented here?

         14            THE COURT:  No.

         15            MR. GOULD:  I don't think anyone is looking to open

         16   the door.

         17            THE COURT:  Yeah, well --

         18            MR. ELKIN:  Your Honor, could she elicit information

         19   without regard to this and then simply if he needs to refresh
11:46:08 20   his memory, resort to this?

         21            THE COURT:  Sure, however you want to present it.

         22   You know, I think it's legitimate to inquire as to when you've

         23   got a jump the way that those numbers jump off the sheet, but I

         24   don't want to open the door to BMG.  And if he's unaware of it

         25   and why it spiked, then that takes the issue -- then there's no
```

B. Beck - Cross

1526

1    issue.

2            MR. OPPENHEIM:  Well, except then the question is do

3    I ask Mr. Carothers the question -- I mean, somebody has to --

4    it seems obvious that that has to be why it happened, Your

5    Honor, at least the implication.

6            THE COURT:  We're not going -- we're not going there

7    based on just that document.  Okay?  I mean, that would open up

8    BMG.  It's too significant.

9            MR. OPPENHEIM:  Would it be simpler to just not show

11:47:05 10   him that quarter?

11           THE COURT:  Do you want to ask him the totals for the

12   year?

13           MS. GOLINVEAUX:  Sure.  That's fine, Your Honor.

14           THE COURT:  Why don't you do it that way.

15           MR. GOULD:  Ask for 2013 and '14?

16           THE COURT:  And '14, yeah.

17           MR. GOULD:  Without the document?

18           THE COURT:  Without the document.

19           MR. GOULD:  Thank you.

20           NOTE:  The sidebar discussion is concluded; whereupon

21   the case continues before the jury as follows:

22   BEFORE THE JURY

23   BY MS. GOLINVEAUX:

24   Q.   So, Mr. Beck, in connection with this litigation, were you

25   asked to provide information about the total number of Cox

B. Beck - Cross

1527

1    subscribers that Cox terminated for AUP violations for the

2    years 2013 and 2014?

3    A.   Yes.

4    Q.   And do you recall the total number of subscribers that Cox

5    terminated in those years?

6    A.   The total number was low 30s.  I feel like it was 31, 32,

7    33.  I can't remember the exact number, but it was in the 31 to

8    33 range, if I remember correctly.

9    Q.   And that's the total number of subscribers that Cox

11:48:29 10  terminated for violations of its AUP during the years 2013 and

11   2014?

12   A.   Yes, that's correct.

13   Q.   And, Mr. Beck, of those 31, 32, or 33 terminations, do you

14   know how many were for -- in connection with a customer getting

15   a copyright notice?

16   A.   They were all for copyright.

17   Q.   All of them?

18   A.   Yes, that's correct.

19   Q.   And, sir, of those terminated subscribers, do you recall

11:48:52 20  how many had received copyright notices specifically from the

21   RIAA?

22   A.   I believe it was 13.  I believe it was 13, if I'm

23   remembering correctly.

24   Q.   If we pull up the ticket action report and sort on

25   terminations, would we get that number?

B. Beck - Redirect

1528

1    A.    Yes.  The ticket action history report would reflect

2    termination actions.  We could sort by action.

3              MS. GOLINVEAUX:  James, could you pull the ticket

4    action report and sort on terminations?

5    Q.    Mr. Beck, how many does this show?

6    A.    Thirteen.

7    Q.    Okay.  So does that tell you 13 subscribers who received

8    RIAA notices during the period were terminated by Cox?

9    A.    Yes.

11:49:53 10              MS. GOLINVEAUX:  Thank you.

11              Your Honor, no further questions.

12              THE COURT:  All right.  Thank you.  Redirect?

13              MR. GOULD:  Yes, please.

14              MS. GOLINVEAUX:  Pass the witness, Your Honor.

15              THE COURT:  All right.  Thank you.

16                        REDIRECT EXAMINATION

17    BY MR. GOULD:

18    Q.    Mr. Beck, you were asked a number of questions and talked

19    at some great length about forged copyright infringement

11:50:23 20    notices.  Do you recall that?

21    A.    Yes, I do.

22    Q.    There's no suggestion here that any of the RIAA notices

23    are forged, is there?

24    A.    No.  None of RIAA notices were forged, to my knowledge.

25    Q.    You testified about instances of infringement where

B. Beck - Redirect

1529

1   someone else using the customer's account might be the one

2   doing the infringement, correct?  Do you recall that?

3   A.   Yes.  That can happen a number of ways.

4           MR. GOULD:  Can we pull up PX 184, please?  This is

5   already in evidence.

6   Q.   This is Cox's Residential Acceptable Use Policy.  Are you

7   familiar with this, sir?

8   A.   Generally.

9   Q.   And if we could -- we looked at this the other day.  If we

11:51:13 10   could scroll down to on the second page and highlight or call

11   out the content under -- keep going, please -- under User

12   Content, just blow up that whole paragraph?

13           And, sir, do you see that this user AUP that Cox

14   requires every subscriber to agree to says:  You -- and that

15   means the subscriber -- are solely responsible for any

16   information that is transmitted from your IP address or your

17   account on the web or other internet services.  You must ensure

18   that the recipient of the content is appropriate and must take

19   appropriate precautions to prevent minors from receiving

11:51:52 20   inappropriate content.

21           Are you familiar with that?

22   A.   I see that.

23   Q.   This means that the customer, the subscriber is

24   responsible for whatever happens to their IP, correct?

25   A.   I don't know that I'm in a position to interpret the legal

B. Beck - Redirect

1530

1     context of our terms of service.

2     Q.   You understand that this means the subscriber is

3     responsible for the transmission of information through their

4     IP; isn't that correct?

5     A.   I can read the document.

6     Q.   Is that how you understand it?

7               MS. GOLINVEAUX:  Objection, Your Honor.

8               THE COURT:  Overruled.  You can answer the question

9     is that how you understand it or not, or I don't feel

11:52:34 10   qualified.  Answer it the way you would wish.

11              THE WITNESS:  Yeah.  To me, I mean, for terms and

12    conditions, it feels like the sort of thing that a lawyer would

13    interpret the meaning of to me.

14              THE COURT:  Okay.  Move on.

15    BY MR. GOULD:

16    Q.   Let's move to PX 178 and call this up.  It's already in

17    evidence.  This is the Cox Business customer AUP.  And if we

18    could scroll to the bottom of page 2, please, and the top of

19    page 3?

11:53:02 20             And there's language that kind of touches on a

21    similar point here.  It says to the business customers:

22    Customer Responsibility for End Users.  All references to

23    "Customer" in this AUP shall apply to any end-user of the

24    Service(s).  If Customer allows others to use the Services,

25    Customer is responsible for ensuring that all such end-users

B. Beck - Redirect

1531

1    comply with this AUP.  Customer is responsible for ensuring

2    that all accounts, sub-accounts, and alternative account names

3    associated with Customer's principal account comply with this

4    AUP.  In the event of a suspected violation of this AUP,

5    Customer will cooperate with Cox Business and will promptly

6    provide Cox Business with information about Customer's

7    end-users upon request from Cox Business.

8            Did I read that correctly?

9    A.   I was doing a little bit of reading of my own at the same

11:54:13 10  time.

11   Q.   You understand, sir, that this says that the Cox Business

12   customer is responsible for the end user's activity through

13   their account?

14   A.   As stated here, yes.

15   Q.   Thank you.

16           Now, you testified about, something about military

17   bases, customers who are military bases, but you understand,

18   sir, that Cox doesn't provide internet service to the military

19   base itself, correct?  In fact, Cox provides perhaps internet

11:54:48 20  service to housing on a military base?

21   A.   I can't say that we do or don't do base versus

22   residential.  I know we have military customers.  I know we

23   have military bases that are customers.

24   Q.   You think that Cox has military bases that are actual

25   customers?

B. Beck - Redirect

1532

1    A.    It's possible.  I don't know.

2    Q.    You don't know.

3    A.    I mean, I don't know the distinction.  I know that we have

4    military bases that are customers.  I don't know what the

5    individual situations are of the users that are using those

6    services.

7    Q.    Would it surprise you if those services were provided to

8    housing on the military bases?

9    A.    No.

11:55:28 10    Q.    And you would agree that U.S. government and the military

11    both prohibit copyright infringement?

12    A.    That's what we're discussing here, I'm sure.

13    Q.    You testified about a number of e-mails that Cox received

14    from customers in response to infringement notices from the

15    plaintiffs.  Do you recall that?

16    A.    Yes.

17    Q.    Do you see, Mr. Beck, that DX 455 is actually an e-mail

18    from Cox?

19    A.    Yes.  That's from abuse@cox.net.

11:56:16 20    Q.    And it may have an e-mail from the customer down below, so

21    this is a response likely to a customer?

22    A.    From the highlighted sections, I can't tell who the

23    response is to.

24    Q.    Well, we can scroll down and take a look.  Do you see that

25    the customer's name is redacted for confidentiality?  Let's

B. Beck - Redirect

1533

1    scroll down a little bit and see what we see.

2    A.   I don't think it notes that it's a customer's name that's

3    redacted.

4    Q.   So, so the customer sent an e-mail, and then Cox

5    responded?

6    A.   Okay.  I see the text here.  The recipient of the e-mail

7    is trying to figure out where this is coming from.  IP is not

8    one of their main building.  Okay.

9    Q.   But the e-mail at the top is an e-mail from Cox, right?

11:57:24 10   A.   Yes.  That's from, that's from abuse@cox.net, yes.

11   Q.   So if you're counting in the set of documents that your

12   counsel has admitted, that she called e-mails from customers,

13   this also counts e-mails from Cox, right?

14   A.   No, this would not be a ticket.  This is an action sent

15   from a ticket based on a response from a customer, so --

16   Q.   Your -- Ms. Golinveaux admitted into evidence a number of

17   documents that were described as e-mails from customers.  Do

18   you recall that?

19   A.   Yes.

11:58:01 20   Q.   And this document here, 455, is one of those documents

21   described as an e-mail from a customer, correct?

22   A.   I would have to see that it was in the other set, but yes.

23   Q.   Okay.  Let's take a look at DX 655, and if we could pull

24   up the top?

25                This is another e-mail that was described in the set

B. Beck - Redirect

1534

1    of e-mails from customers asking about plaintiffs' copyright

2    infringement notices, and you see that this is just a rejected

3    notice for -- the e-mail didn't go through?  So --

4    A.    I see this.

5    Q.    I'm sorry?

6    A.    Sorry.  Yes, I see.

7    Q.    So among these so-called 1,700 customer e-mails, we've

8    seen e-mails from Cox, right, and we've seen rejected e-mails

9    that never were delivered, right?

11:58:56  10    A.    Yeah, they -- the e-mail from Cox was in response to a

11    customer's reply to us.  That was an interaction relating to

12    one of the tickets.  This one being a bounce message probably

13    resulted in some additional research to try to find a better

14    way to contact that customer.

15    Q.    But if we look at the number 1,700, we have some from Cox,

16    we have some that were rejected.  So we don't know what the

17    actual number of e-mails from customers is.  Now, even if you

18    assume that it's 1,700, those were in response, according to

19    you, sir, to the 162,000, 162,000 notices from the RIAA in the

11:59:34  20    2013-2014 time period, correct?

21    A.    Yes.

22    Q.    Okay.  So 1,700 responses at the outside divided by

23    approximately 160,000 notices is just about 1 percent.  Do you

24    agree with that, 1,700 into 160?  It's 1 percent and change?

25    A.    I don't think our e-mail notifications really require a

B. Beck - Redirect

1535

```
         1    response.  I don't think they're soliciting a response from the

         2    customer.

         3    Q.    That wasn't my question.  My question was Cox received at

         4    the most 1,700 e-mail responses out of the 160,000 notices from

         5    RIAA, correct?  And that's approximately 1 percent?

         6              MS. GOLINVEAUX:  Your Honor, may we have a sidebar?

         7              THE COURT:  Yes.

         8              NOTE:  A sidebar discussion is had between the Court

         9    and counsel out of the hearing of the jury as follows:

12:00:45 10   AT SIDEBAR

        11              THE COURT:  Yes.

        12              MS. GOLINVEAUX:  Sorry, Your Honor.  The set of

        13    documents I sought to admit were DX 496 to 2200.  The first

        14    e-mail Mr. Gould just showed the witness was DX 455.

        15              THE COURT:  Which is not admitted.

        16              MS. GOLINVEAUX:  Not in the set.

        17              MR. GOULD:  That's correct.  That was a mistake on my

        18    part.  I can look for a similar e-mail within the set and make

        19    the point, but certainly that was a mistake on my part.

12:01:16 20             THE COURT:  Okay.  Well, do you need the exhibit to

        21    make the point, the 163,000 versus the 1,700?  Those figures

        22    are -- are they in evidence already or not?

        23              MR. GOULD:  I'm sorry, is what in evidence?

        24              MR. OPPENHEIM:  They're in, the figures are.

        25              THE COURT:  The figures are, all right.  Okay.  All
```

B. Beck - Redirect

1536

1     right.  Well, I'll tell the jury that that exhibit wasn't

2     admitted that you were asking about, and I don't know what you

3     want to do about --

4             MR. OPPENHEIM:  Why don't we just move the exhibit's

5     admission and ask if it's an example of the types of e-mails

6     that are contained within that exhibit?

7             MR. ELKIN:  I think that the jury is entitled to know

8     that this was not one of the exhibits that was elicited on

9     Mr. Beck's testimony, because now it's misleading.

12:02:05 10           THE COURT:  Yeah, what does 455 include that's

11    different from the Beck exhibits admitted?

12            MR. GOULD:  It has a Cox response.  And I believe --

13    maybe I misrepresent, but I'll have to double-check -- that

14    within the set that defendants have admitted, I believe they

15    are similar.  Cox is the sender, which would reduce by volume

16    the number of e-mails from customers.

17            My point is it's 1 percent if you consider all of

18    them, it's less if you take out the ones from Cox that have

19    duplication, and it's less if you take out the failure to

12:02:40 20    deliver.

21            THE COURT:  Okay.  My question is do you think that

22    this witness can -- is familiar with 455 and could recognize it

23    and identify it as a Cox document or not?  Is it a Cox

24    document, or is it a document that you generated?

25            MR. GOULD:  I think if we assume that he is the

B. Beck - Redirect

1537

1    foundational witness for the 1,700, then he sure should be able

2    to talk to that one.

3            MS. GOLINVEAUX:  May I, Your Honor?

4            THE COURT:  Yes.

5            MS. GOLINVEAUX:  I think it's highly misleading for

6    Mr. Gould to have told the jury that 455 was part of the set

7    that we introduced when it was not part of the set we

8    introduced.  He misled the witness on that front as well.

9            THE COURT:  Okay.  I'll correct that.

12:03:27 10            MS. GOLINVEAUX:  Thank you, Your Honor.

11            THE COURT:  Now, the second question is, is -- where

12    does this document come from?  Where does the information in

13    the document come from?

14            MS. GOLINVEAUX:  We weren't provided it prior to

15    Mr. Beck's testimony, so we're just seeing it for the first

16    time right now, I mean, during his examination.  So we'd have

17    to look into that.

18            THE COURT:  All right.

19            MR. GOULD:  May I?

12:03:43 20            THE COURT:  You may ask him whether he can identify

21    the document.  I'm going to tell them that the document was

22    incorrectly identified as having been part of a group of

23    documents that were part of the prior testimony and that we're

24    going to see whether he can identify it at this time.  Okay?

25    And you go from there.

B. Beck - Redirect

1538

1    MR. GOULD:  Thank you.

2    THE COURT:  And if you independently can pull the

3    numbers, 163,000 and 1,700, which I believe are --

4    MR. GOULD:  Already there.

5    THE COURT:  -- numbers that he testified, then your

6    last question about is it a little more than 1 percent, that

7    certainly, I don't believe, is objectionable.

8    MR. GOULD:  Thank you, Your Honor.

9    MS. GOLINVEAUX:  Thank you.

12:04:28  10    MR. GOULD:  I apologize.  It was never my intent to

11    misrepresent.

12    NOTE:  The sidebar discussion is concluded; whereupon

13    the case continues before the jury as follows:

14    BEFORE THE JURY

15    THE COURT:  All right.  So we have lots of documents,

16    as you know.  The last exhibit, 455, I believe -- counsel

17    believed was part of an earlier admitted series of documents

18    with Mr. Beck.  Turns out, it was not.  So you should disregard

19    the testimony that it, in fact, was part of that earlier called

12:05:12  20    out number of documents.  All right?

21    Go ahead, Mr. Gould.

22    MR. GOULD:  Thank you, Your Honor.

23    BY MR. GOULD:

24    Q.   Mr. Beck, you testified having familiarity with e-mails

25    received from customers to cox@abuse.com, correct -- @.net?

B. Beck - Redirect

1539

1      A.   Yes.

2      Q.   And are you also familiar and aware that at -- from time

3      to time, Cox abuse personnel respond to those e-mails?

4      A.   Certainly.

5           MR. GOULD:  I move admission of DX 455, Your Honor.

6           THE COURT:  Why don't you ask him whether he can

7      identify it?

8      BY MR. GOULD:

9      Q.   Sir, we looked at the e-mail previously from Cox to a

12:05:45  10  customer.  Do you recall that?

11     A.   I do.

12     Q.   And that's the type of e-mail that you just described

13     you're familiar with?

14     A.   That would be an outbound action.  I thought the

15     collection in question was a collection of inbound e-mails

16     from -- as responses to outbound notifications.

17     Q.   You're also aware that Cox abuse personnel respond

18     outbound to some of those messages from time to time?

19     A.   They do.  I thought that was a different -- I thought that

12:06:15  20  was a different set, though.

21          THE COURT:  The question is whether the exhibit that

22     you just were looking at a minute ago is consistent with others

23     that you have viewed where Cox is responding back to your

24     subscribers.

25          THE WITNESS:  Yeah.  I'd say so, yeah.  That's --

1540

1    that e-mail does show us responding back from a child ticket.

2             MR. GOULD:  All right.  Move to admit DX 455.

3             THE COURT:  Any objection?

4             MS. GOLINVEAUX:  No objection, Your Honor.

5             THE COURT:  All right.  It's received.

6    BY MR. GOULD:

7    Q.   Now, again, back to the set of documents, e-mails received

8    from customers, 1,700, 1,700 out of 160,000 notices from RIAA

9    is approximately 1 percent, correct?

12:07:00 10  A.   Somewhere in that neighborhood, I believe.

11   Q.   Well, 1 and change.  1600 would be 1 percent of 160, so

12   1,700, a hair over 1 percent, correct?

13             And when you were asked to pull the customer e-mails

14   from CATS in response to the plaintiffs' notices, you undertook

15   to identify and produce all of those e-mails, right?

16   A.   Repeat that for me again?  You think these --

17   Q.   You were asked to go into CATS and find all of the

18   customer e-mails that related to the RIAA's notices in the

19   2013-'14 time frame, right?

12:07:45 20  A.   I believe so, yes.

21   Q.   And, in fact, you've produced all of those, correct?

22   A.   All of the customer e-mails, reply inbound, those would

23   have been complaints associated to child tickets.  I'll try to

24   remember specifically.  Responses would have been complaints to

25   child tickets.  I'm trying to find where that distinction is.

B. Beck - Redirect

1541

1  The response from Cox to the customer would have been as an

2  action within a ticket, whereas a response from a customer

3  would be a complaint.

4  Q.   I'm just talking about the customer e-mails to Cox.

5  A.   Um-hum.

6  Q.   In response to the RIAA notices, you produced all of them,

7  correct?

8  A.   I believe so.

9  Q.   Okay.  So if 1 percent of those notices generated e-mails

12:08:48 10  from customers, that also means that 99 percent of the 160,000

11  did not generate an e-mail from a customer, correct?

12  A.   Mathematically speaking, yes.  We wouldn't really expect

13  them to, though.

14  Q.   If we could pull up the second slide of this

15  demonstrative, please?

16       And, Mr. Beck, this is the chart where we showed

17  accepted deleted notices against warnings, suspensions, and

18  terminations.  Do you recall that?

19  A.   Yes.

12:09:25 20  Q.   And you kept making a distinction about the deleted

21  notices, so let's assume for a moment that we left those out.

22  Would you agree that the warnings, suspensions, and

23  terminations adds up to approximately 600,000?  I think it's

24  actually 609,000?

25  A.   That sounds about right.

1542

1   Q.   Yep.  And 600,000 as a function of 2 million accepted

2   notices, that comes to just about 70 percent, doesn't it?  70.

3           I'm sorry, 29 percent.  It's the -- I think we can

4   all agree that I'm not the mathematician in the court.

5   A.   Rough math, that's about right.

6   Q.   So even if you disregard the deleted notices, the number

7   of customer-facing actions that Cox took in response to the

8   2 million notices that it did accept was about 29 percent,

9   which means that Cox took no customer-facing action in response

12:10:38 10  to approximately 70 percent, correct?

11  A.   No -- yes, that should be about right here.  Yep.  And --

12           MR. GOULD:  No more questions, Your Honor.

13           MS. GOLINVEAUX:  Your Honor, just two questions?

14           THE COURT:  Yes, go ahead.

15           MS. GOLINVEAUX:  Thank you, Your Honor.

16                    RECROSS EXAMINATION

17  BY MS. GOLINVEAUX:

18  Q.   Mr. Beck, are you aware that approximately 25 percent of

19  the RIAA notices that came in to Cox during the claims period

12:11:20 20  were directed to Cox Business customers?

21           MR. GOULD:  Objection.  Leading.

22           THE COURT:  It's leading.  Sustained.

23  BY MS. GOLINVEAUX:

24  Q.   Mr. Beck, when Cox Business -- when a notice came in on a

25  Cox Business customer, are you aware of how Cox and the

B. Beck - Recross

1543

1    business customer typically communicated about that notice?

2    A.    Yes, I am.

3    Q.    And can you describe that for us?

4    A.    For business customers, due to the nature of their

5    business, we usually want to work directly with them if we can.

6    We try our best to avoid suspending them if we can because that

7    can have an impact on -- a heavy impact on their business.  So

8    with a business customer, although we'll often send them an

9    e-mail, it's often as a follow-up to a phone call.  They prefer

12:12:16 10    to call business customers directly and speak with them

11    directly to deal with issues like that.

12    Q.    And, Mr. Beck, are you aware of the total number of RIAA

13    notices that came in to Cox Business customers?

14    A.    For business customers, generally speaking, our business

15    customer complaint volume, you're going to be looking at 20 to

16    30 percent of the volume of RIAA's complaints are for business

17    customers.

18    Q.    Okay.  And with respect to the set of 1,700 e-mails that

19    counsel was asking about, those are the written responses from

12:12:55 20    Cox customers to Cox in response receiving a notice, the

21    business customers may be calling back in; is that right?

22    A.    That is true.  Even the residential customers will often

23    pick up the phone.  Especially in this day and age, with this

24    much phishing and stuff goes on, if they see an e-mail that

25    says something is going on with the Cox service, they may be

M. Carothers - Direct

1544

1    like, well, let me just get my bill and call the phone number

2    on it.  That way I know I'm talking to the right people.

3            MS. GOLINVEAUX:  Thank you, sir.  No further

4    questions.

5            THE COURT:  Thank you.  All right.  May Mr. Beck be

6    excused?

7            MS. GOLINVEAUX:  Yes, Your Honor.

8            THE COURT:  All right.  You're excused with our

9    thanks, Mr. Beck.  Please don't discuss the testimony you've

12:13:33 10  given with anybody until our trial is over.  All right?

11           THE WITNESS:  Okay.

12           THE COURT:  All right.  Have a good day.

13           THE WITNESS:  Thank you.

14   WITNESS EXCUSED

15           THE COURT:  All right.  Next witness?

16           MR. OPPENHEIM:  Your Honor, plaintiffs would call

17   Matt Carothers.

18           MATT CAROTHERS, PLAINTIFFS' WITNESS, SWORN

19           THE COURT:  Good afternoon, sir.  Please, proceed.

12:14:46 20                  DIRECT EXAMINATION

21   BY MR. OPPENHEIM:

22   Q.   Good afternoon, Carothers -- Mr. Carothers.  We've met

23   before, correct?

24   A.   We have.

25   Q.   Nice to see you.

M. Carothers - Direct

1545

1        You're currently employed at Cox?

2   A.   I am.

3   Q.   And you've been with Cox for approximately 18 years; is

4   that right?

5   A.   A little over, yeah.

6   Q.   And between the years of 2001 and 2007, you were part of

7   the abuse group, correct?

8   A.   Yes.

9   Q.   And in 2007, you transitioned to a different role in the

12:15:16 10   security engineering department or group, correct?

11   A.   Yes.

12   Q.   So it's been 12 years since you were in the abuse group,

13   correct?

14   A.   Correct.

15   Q.   So you're now more involved in security than you are

16   abuse; is that correct?

17   A.   Well, abuse is part of security.

18   Q.   One of the tools that you use to detect security threats

19   on the Cox network is called Procera, correct?

12:15:51 20   A.   Yes.

21   Q.   And Procera is what is referred to as a deep packet

22   inspection tool?

23   A.   Yes.

24   Q.   Often people use the acronym DPI, deep packet inspection

25   tool, for it?

M. Carothers - Direct

1546

1    A.   That's correct.

2    Q.   And a deep packet inspection tool looks at network traffic

3    going back and forth across Cox's network, identifying broadly

4    what types of traffic is there, and then stores statistics

5    about that traffic, right?

6    A.   That's correct.

7    Q.   And among the things that the deep packet inspection can

8    do is determine the volume of BitTorrent traffic on Cox's

9    network?

12:16:36  10    A.   That is correct.

11    Q.   And so Cox can monitor the amount of BitTorrent traffic

12    that a specific subscriber uses on a particular day?

13    A.   We can.

14    Q.   I'm sorry, did you say, "We can"?

15    A.   We can.

16    Q.   If Cox identified that a -- let me back up for a minute.

17         You understand that many users of BitTorrent will

18    access sites like ThePirateBay to initiate their, their

19    downloading process, correct?

12:17:11  20    A.   Yes.

21    Q.   And as head of security, you're aware that Cox can block

22    subscribers from being able to access particular sites,

23    correct?

24    A.   No, that's not correct.

25    Q.   Well, isn't it true that Cox has the technical capability

1547

1    of blocking sites?

2    A.    Not really, no.

3    Q.    Mr. Carothers, I took your deposition, right?

4    A.    Yes.

5    Q.    And I took your deposition on April 25, 2019, right?

6    A.    Correct.

7    Q.    And during that deposition, you were sworn under oath,

8    were you not?

9    A.    Yes.

12:17:56 10   Q.    And you swore that you would tell the truth in that

11   deposition, right?

12   A.    I did.

13   Q.    And in that deposition, on page 303, line 16 to 19, I

14   asked you the following question and you gave the following

15   answer:

16         So you're technically capable of doing a block, but

17   you choose not to do so, but you don't block any -- strike

18   that.  Excuse me.

19         Starting at line 14, I apologize, on page 305:

12:18:30 20        You technically could block a torrent site, correct?

21         Answer:  There is a technical capacity, but there is

22   not a right to do so.

23         Was that -- was that your testimony when I took your

24   deposition?

25   A.    May I see the testimony?

M. Carothers - Direct

1548

1      MR. ELKIN:  May we approach, Your Honor?

2      THE COURT:  Yes.

3      NOTE:  A sidebar discussion is had between the Court

4  and counsel out of the hearing of the jury as follows:

5  AT SIDEBAR

6      THE COURT:  Yes, sir.

7      MR. ELKIN:  Thank you.  This is another situation

8  where I believe counsel may be trying to elicit some statement

9  that Mr. Carothers had in his deposition, and if you read

12:20:11  10  through at a couple of pages, he specifically says they can't

11  block because of net neutrality, and there is a portion where

12  he gets him to say you can't block a torrent site.

13      You can't possibly look at his testimony unless you

14  read two or three pages in.  It's not a clean admission.  And I

15  don't know what Mr. Carothers had in his mind when he answered

16  that question, but he clearly said that they can't block it

17  because of net neutrality.  It's misleading.

18      MR. OPPENHEIM:  That's an unfair --

19      THE COURT:  Okay.  You have a chance to respond.

12:20:45  20      MR. OPPENHEIM:  The question and answer is very

21  clear.  I asked the question about the technical ability.  Now,

22  he can answer we may have had the technical ability, but we

23  felt as though legally we couldn't, and I'm happy to get into

24  that issue, but whether or not they have the technical ability

25  is a very clean question.  I'm happy to show you the

1549

1    transcript, Your Honor.  It's a clean question and a clean

2    answer.

3              THE COURT:  He read it correctly; is that correct?

4              MR. OPPENHEIM:  Yes.

5              THE COURT:  All right.  Then it's for

6    cross-examination.  I'm going to allow it.

7              MR. ELKIN:  Thank you, Your Honor.

8              THE COURT:  All right.  Your exception is noted.

9              NOTE:  The sidebar discussion is concluded; whereupon

10   the case continues before the jury as follows:

11   BEFORE THE JURY

12   BY MR. OPPENHEIM:

13   Q.   Mr. Carothers, isn't it, in fact, true that Cox has the

14   technical capacity to block a, a website, including a torrent

15   site?

16   A.   So let me clarify my answer.  There is a way to block a

17   site.  It's not an effective way to block a site.  It's

18   trivially easy to get around.

19   Q.   So Cox has the ability to block the site, but you believe

12:22:05  20   that somebody who has technical abilities might be able to get

21   around Cox's block.  Is that what you're saying?

22   A.   Trivially, yes.

23   Q.   Trivial to you maybe.

24   A.   Trivial to anyone.

25   Q.   I'm pretty technically capable.  I'm not sure I could do

M. Carothers - Direct

1550

1  it, but how do you -- on what grounds do you say that it would

2  be trivial for anyone?

3  A.   So our blocking is based on something called DNS, or

4  domain name system, and the way you would get around such a

5  block is just to change your DNS servers.  It's a few clicks.

6  Q.   And your view is that anyone would know how to change

7  their DNS servers.  Is that your testimony?

8  A.   Oh, absolutely.  Anybody who can Google it.

9  Q.   Could you please -- sorry.  What number in the binder is

12:23:22 10  PX 240?

11       Could you turn to, please, Exhibit PX 240?  It should

12  be in your binder.

13       Oh, we haven't provided it.  Okay.

14       Do you have PX 240 in front of you?

15  A.   I do.

16  Q.   And is that a -- an e-mail that you sent on or around

17  January 12, 2010?

18  A.   It is.

19       MR. OPPENHEIM:  We'd move to have this e-mail

12:24:06 20  admitted, Your Honor.

21       MR. ELKIN:  No objection, Your Honor, subject to our

22  position from our motions in limine 2 and 3.

23       THE COURT:  All right.  It's received.

24       MR. OPPENHEIM:  If we could just zero in on the

25  header for a moment, please, there, Mr. Duval?

1551

BY MR. OPPENHEIM:

Q.   So, Mr. Carothers, you sent this e-mail on Tuesday, January 12, 2010, in the evening; is that right?

A.   Yes.

Q.   And you sent it to CCI - DAB - Abuse Team; is that right?

A.   That's correct.

Q.   And who, who would be included in that e-mail group?

A.   DAB was the data advisory board.  It was a cross-functional group of people from around the company who might have some interest in customer safety issues.  So, of course, the customer safety team was in there, people like product development, marketing.  Probably the legal team as well.

Q.   And this e-mail, the subject of it is DAB Abuse call meeting minutes, correct?

A.   Yes.

Q.   And then it says 1/12/2010, so that would have been a meeting held that same day that you sent this e-mail, right?

A.   Correct.

Q.   And the -- you indicate then in the top of this that among the attendees at the meeting was Mr. Sikes, correct?

A.   Yes.

Q.   Mr. Beck, correct?

A.   Yes.

Q.   And Mr. Zabek, right?

         1    A.   Yes.

         2    Q.   Among others, right?

         3    A.   Um-hum.

         4    Q.   Yes?

         5    A.   Yes.

         6    Q.   Sorry, I didn't hear you.

         7         And the -- then at the top of the e-mail, it says:

         8    DMCA - We are getting crushed.  Right?

         9    A.   It does.

12:25:48 10   Q.   And then it says:  Suspension limits being hit early in

        11    the day.  The TOC is dropping calls.  We had 92 abandoned calls

        12    in one day last week.

        13         Right?

        14    A.   That's correct.

        15    Q.   And then it says:  Annual DMCA complaint volume, and it

        16    has a chart, right?

        17    A.   It does.

        18    Q.   And that chart then shows the number of DMCA tickets that

        19    Cox was receiving each year between 2002 and 2009, correct?

12:26:25 20   A.   Yes.

        21    Q.   And it shows that the number of those tickets are

        22    increasing dramatically, right?

        23    A.   Yes.

        24    Q.   And, in fact, in 2009, there were 672,000 tickets, right?

        25    A.   Yes.

M. Carothers - Direct

1553

1    Q.   And frankly, there could have been even more infringement

2    notices, because sometimes multiple notices get tacked onto a

3    single ticket, correct?

4    A.   There could have been, yes.

5    Q.   And then in the next sentence, you say that we are on

6    track -- and by "we," I assume that means Cox, correct?

7    A.   That's correct.

8    Q.   So Cox is on track for 1.16 million notices for 2010 based

9    on the first two weeks' volume.  Correct?

12:27:08   10    A.   Yes.

11    Q.   Then you go on to say:  We are trying to take some

12    steps -- excuse me -- we are taking some steps to try and stem

13    the flow.  Right?

14    A.   Yes.

15    Q.   And what you lay out after this is what was discussed at

16    this meeting that you had that day, correct?

17    A.   It is.

18    Q.   And what you were trying to do was stem the flow of the

19    number of complaints that Cox was receiving, correct?

12:27:33   20    A.   The flow on any given day, yes.

21    Q.   I'm sorry, I didn't hear you.  Could you say that again?

22    A.   The flow on any given day, yes.

23    Q.   On any given day?

24    A.   Yes.

25    Q.   There's no daily volume listed here, is there,

1554

1    Mr. Carothers?

2    A.   No, but at the top of the e-mail, it's talking about the

3    number of suspensions per day and the number of calls per day.

4    Those are the drivers.

5    Q.   It says you're on track for 1.16 million notices and that

6    you're trying to stem the flow.  It's your testimony that you

7    weren't trying to stem the flow of notices?

8    A.   No.  That's correct.  We were not trying to stem the flow

9    of notices.  We were trying to make sure that we got a

12:28:14 10   predictable number each day.

11   Q.   So your testimony, let me just see if I understand this,

12   is that stemming the flow just meant you wanted a predictable

13   number every day?  It wasn't actually trying to reduce the

14   number of notices?

15   A.   Exactly.  We're trying to smooth out spikes.

16   Q.   Where in your e-mail does it say "smooth out spikes"?  Can

17   you point me to that language?

18   A.   It doesn't use the word "spike," but if you look at the

19   top, it talks about the daily suspension limits and the number

12:28:46 20   of calls being dropped in a given day.

21   Q.   Where does it say "smooth out"?

22   A.   Oh, I don't know that I use the word "smooth" in there,

23   but that's what I meant.

24   Q.   That's what, that's what you meant?

25   A.   Yes.

M. Carothers - Direct

1555

1   Q.   Mr. Zabek was at the same meeting, right?

2   A.   Yes.

3   Q.   Let's take a look at PX 244, why don't we?  And I don't

4   think it's in evidence yet, so just take a look at it if you

5   would, please.

6        Mr. Carothers, is PX 244 an e-mail exchange among

7   folks who were handling abuse issues on behalf of Cox in

8   January of 2010?

9   A.   One moment while I read the e-mail.

12:30:09 10        THE COURT:  What number is it?

11        MR. OPPENHEIM:  It's 244, Your Honor.

12        MR. ELKIN:  Your Honor, I object.  Foundation.

13        THE COURT:  What was the question?

14        MR. OPPENHEIM:  I believe I asked him, Your Honor,

15   whether or not this was an e-mail amongst people in the abuse

16   group on January 12, 2010, or something to that effect.  It

17   relates to the exact -- 244.  It relates to the exact same

18   meeting, Your Honor.

19        THE COURT:  DX?

12:31:49 20        MR. OPPENHEIM:  244.

21        MR. ELKIN:  P as in Plaintiffs.

22        MR. OPPENHEIM:  P, P, I'm sorry.

23        THE COURT:  All right.  Hold on a second, please.  I

24   had DX, which is a business report.

25        Objection is foundation?

M. Carothers - Direct

1556

1        MR. ELKIN:  Yes, Your Honor.  There's no indication

2   that he's reviewed this before.

3        THE COURT:  All right.  You can -- you may ask him

4   whether he's familiar with the document and --

5   BY MR. OPPENHEIM:

6   Q.   Are you familiar with the document, Mr. Carothers?

7   A.   No, I'm not.

8   Q.   On this is the e-mail address CCI - Abuse Group, correct?

9        MR. ELKIN:  Objection.  Foundation.

12:32:55  10        THE COURT:  Overruled.  I'll keep -- I'll let him ask

11   about the document.

12        THE WITNESS:  It says CCI - Abuse Corporate, yes.

13   BY MR. OPPENHEIM:

14   Q.   And you're in that e-mail group, are you not?

15   A.   I'm not.

16   Q.   Your testimony here is today that you're not within that

17   e-mail address?

18   A.   That's correct.

19   Q.   There's also a Data Ops e-mail address.  Are you within

12:33:16  20   that e-mail group?

21   A.   I'm not.

22        MR. OPPENHEIM:  Okay.  Your Honor, we would move to

23   admit as -- between -- let me ask, between 2012 and 2014, were

24   you on any of -- either of those e-mail groups?

25   A.   I don't think so.

M. Carothers - Direct

1557

1  Q.   But you don't know for a certainty?

2  A.   I can't say for sure.

3          MR. OPPENHEIM:  Your Honor, we would move its

4  admission as a business record and an admission.  It speaks to

5  the exact same meeting, somebody else's notes of the meeting.

6          MR. ELKIN:  Objection, Your Honor.  He hasn't laid

7  any foundation for any business records exception.

8          THE COURT:  Yeah.

9          MR. OPPENHEIM:  It's --

12:33:54 10          THE COURT:  All right.  Objection is sustained.  You

11  may ask him whether he's familiar with any of the information

12  in the document and whether there were discussions going on.

13  Ask him.

14  BY MR. OPPENHEIM:

15  Q.   Are you familiar with the fact that Mr. Zabek also

16  reported on what happened at the January 12, 2014 -- excuse me,

17  2010 meeting?

18  A.   I'm not.

19  Q.   Would it surprise you if Mr. Zabek described what

12:34:19 20  happened -- the conversation that you had at that meeting as an

21  effort to reduce the inbound phone calls?

22  A.   No, I guess not.

23  Q.   And would it surprise you that Mr. Zabek never said

24  anything about smoothing out daily spikes?

25          MR. ELKIN:  Objection.  Speculation.

M. Carothers - Direct

1558

1          THE COURT:  Overruled.

2          THE WITNESS:  Well, again, we didn't use that

3     specific language.

4     BY MR. OPPENHEIM:

5     Q.   He didn't use any language that it was even remotely close

6     to speaking about daily spikes, did he?

7     A.   Actually, at the very end of this e-mail, he says:  We're

8     going to hold off on limiting the number of complaints that we

9     can accept per day for now and see how this affects our

12:35:13 10   suspension counts.

11    Q.   In fact, doesn't that support that he -- that the meeting

12    wasn't about addressing daily issues, if anything?

13    A.   No, he says "per day" right there.

14    Q.   He says:  We're going to hold off on limiting the number

15    of complaints that we can accept per day for now and see how

16    that affects our suspension, right?

17    A.   Yeah, but he's clearly talking about per day.

18         THE COURT:  All right.  Let's move on.

19    BY MR. OPPENHEIM:

12:35:40 20   Q.   Let's turn back, Mr. Carothers, to PX 240, and let's look

21    at what it is that you said Cox was going to do to stem the

22    flow.  So in this e-mail, you describe three things that Cox

23    was going to do to stem the flow, right?

24    A.   Yes, that's correct.

25    Q.   And the first thing that Cox was going to do was to allow

M. Carothers - Direct

1559

1    two self-reactivations in the walled garden before requiring a

2    call-in, right?

3    A.    Yes, that's correct.

4    Q.    So that's extending the graduated response by two more

5    steps, correct?

6    A.    By one more step.

7    Q.    By one more step?

8    A.    Yes.

9    Q.    And then the next thing that Cox said it was going to

12:36:25 10   do -- I'm sorry, and that was soft-walled garden, correct?

11   A.    Yes, that's correct.

12   Q.    And the soft-walled garden is where a user can just look

13   on their computer and click on an "okay" and get back on the

14   internet, correct?

15   A.    They can see the list of infringing works and acknowledge

16   that they've seen it in order to click themselves out, yes.

17   Q.    One click, suspension is gone, right?

18   A.    That's correct.

19   Q.    Okay.  The next thing that you say Cox is going to do to

12:36:53 20   stem the flow is to ignore auto-close the first complaint

21   against each customer, even if they have a cox.net e-mail

22   address, right?

23   A.    Yes, that's correct.

24   Q.    So previously under Cox's policy, if Cox had a cox.net

25   e-mail address, Cox would forward the notice, right?

M. Carothers - Direct

1560

1    A.    Yeah, that's correct.

2    Q.    But now, at this meeting, you decided in order to stem the

3    flow, you were going to ignore the first notice, right?

4    A.    Yes.

5    Q.    Okay.  And you actually explain in the e-mail that you

6    only do it for -- you currently only do it for customers

7    without a cox.net e-mail and so now you're extending it, right?

8    A.    Yes.

9    Q.    Okay.  The third thing that you guys decide to do is to

12:37:46 10   institute hard limits for all senders, right?

11   A.    That's correct.

12   Q.    And so you go on to explain that you had only high -- hard

13   limits on certain senders before this, but now you're going to

14   have hard limits on everybody, right?

15   A.    Yes.

16   Q.    And you say that any notice over that limit will be

17   automatically closed with a response back to the sender, right?

18   A.    Yes.

19   Q.    And if we look at Cox -- excuse me, CATS, C-A-T-S, data,

12:38:21 20   when -- under this new policy, if somebody had sent in -- if a

21   copyright owner or a vendor had sent in too many notices, there

22   would be a reply to the rights owner that said hard limit for

23   sender.  That's what you see in CATS data, right?

24   A.    Yes.

25   Q.    And there would be no notification whatsoever of the

M. Carothers - Direct

1561

1    infringement to the subscriber when that happened, right?

2    A.    That's correct.

3    Q.    You're familiar with an entity called Digital Rightscorp,

4    correct?

5    A.    I am.

6    Q.    Also often referred to in the shorthand as either

7    Rightscorp or DRC, right?

8    A.    Yes.

9    Q.    And you know that Rightscorp sent infringement notices to

12:39:27 10  Cox, correct?

11   A.    I do.

12   Q.    And they did so on behalf of BMG Music Publishing,

13   correct?

14   A.    Yes.

15   Q.    Among others maybe, right?

16   A.    BMG is the one I'm familiar with.

17   Q.    Let's turn to PX 336, please.  I may have the wrong --

18   A.    I don't have a 336.

19   Q.    Pardon me.

12:40:16 20          THE COURT:  Did you say 366?

21           MR. OPPENHEIM:  One moment, Your Honor.  I -- we may

22   have the wrong --

23           MR. GOULD:  It's already in evidence.

24           MR. OPPENHEIM:  It's already in evidence.  So

25   let's -- it's already in evidence.  Can we just pull it up,

M. Carothers - Direct

1562

1  Your Honor?

2           THE COURT:  What exhibit number is it?

3           MR. OPPENHEIM:  It is 336.

4           THE COURT:  PX 3- --

5           MR. OPPENHEIM:  Yeah.  It's on the screen at the

6  moment, Your Honor.

7           THE COURT:  All right.  Thank you.

8           MR. OPPENHEIM:  And let's scroll, let's scroll to the

9  bottom of this e-mail, if we could, Mr. Duval.

10  BY MR. OPPENHEIM:

11  Q.   Now, Mr. Carothers, this first e-mail on February 19,

12  2014, is from you, right?

13  A.   It is.

14  Q.   And you are e-mailing a bunch of other people within Cox,

15  asking a question from somebody by the name of Sara; is that

16  right?

17  A.   Yeah, that's correct.

18  Q.   And Sara is actually -- was actually Sara Roper,

19  Ms. Roper, who worked for a different ISP, correct?

12:41:35 20  A.   That's correct.

21  Q.   And your question is -- to the group was about a complaint

22  spike from a DMCA monitor called Digital Rightscorp, right?

23  A.   Yes, that's correct.

24           THE COURT:  Mr. Oppenheim, we don't have this as

25  being in.  Is there any objection to 336?

M. Carothers - Direct

1563

1      MR. OPPENHEIM:  I'm sorry, I thought it was in.

2      MR. ELKIN:  We have no objection, Your Honor, subject

3  to the objection.

4      THE COURT:  Correct.  It's received.  Your exception

5  is noted.

6      MR. OPPENHEIM:  I thought it came in with -- as an

7  exhibit to Mr. Zabek's deposition because we went through it.

8  I apologize if it wasn't in.

9      THE COURT:  All right.  We didn't have it listed, but

12:42:09 10  there's no objection to it.  It's in.

11      MR. ELKIN:  I think there were various iterations

12  that follow this particular e-mail related to this witness, and

13  I think versions of that were admitted yesterday.

14      THE COURT:  Okay.  All right.  Thank you for that.

15  Go ahead.

16  BY MR. OPPENHEIM:

17  Q.   And following this chain up, Mr. Sikes e-mailed Sara Roper

18  to ask who the complaint spike was coming from and says:  We

19  are limiting each DMCA complainant by e-mail address to 200 per

12:42:53 20  day.

21          Do you see that?

22  A.   I do.

23  Q.   And then David -- Mr. Sikes then asks whether he can get

24  an answer to the question about who the spike is coming from,

25  and you get an answer from Mr. Dee, correct?  And -- or

M. Carothers - Direct

1564

1    actually, I'm sorry -- yes, from Mr. Dee, indicating it's

2    Digital Rightscorp, correct?

3    A.   Yes.

4    Q.   And Mr. Dee says:  Wow, you're limiting each complainant

5    e-mail address to 200/day?  Can we do that, Sara!?!?  Can you

6    imagine what I could do with the freed-up computing and storage

7    resources!?

8         Right?

9    A.   I do see that.

12:43:42 10   Q.   And that's a reference to what we often refer to as caps,

11   right, or hard limits on senders?

12   A.   It is.

13   Q.   And Mr. Zabek responded to that by saying:  F the DMCA!!!

14   Ya, we told each copyright holder to limit them or give us

15   money to hire people.

16        Right?

17   A.   That's correct.

18   Q.   And Mr. Dee responded:  Nice!  I will defer the political

19   response to Sara!

12:44:08 20        Right?

21   A.   Um-hum.

22   Q.   And then you responded, and you said:  IIRC, but you meant

23   DRC as Digital Rightscorp, right?

24   A.   No, that's not correct.

25   Q.   What is IIRC?

M. Carothers - Direct

1565

1    A.    It's shorthand for "if I recall correctly."

2    Q.    Okay.  So you say:  If I recall correctly, complainants

3    get one auto response after they cross the limit and then all

4    subsequent mail during the next 24-hour rolling window is

5    silently deleted.

6          Right?

7    A.    Yes.

8    Q.    You didn't in your response comment on Mr. Zabek's "F the

9    DMCA," did you?

12:44:45 10  A.    Not in that response, no.

11   Q.    Not in that response.  Your first response basically just

12   keeps talking.  You acknowledge that Mr. Zabek said -- you

13   don't even knowledge that Mr. Zabek said, "F the DMCA," right?

14   A.    That's correct.

15   Q.    Then Mr. Sikes responds to you, right?

16   A.    Yes.

17   Q.    And, and Mr. Sikes says -- basically explains that the cap

18   doesn't apply to Rightscorp because Rightscorp has been

19   blacklisted, right?

12:45:24 20  A.    Yes.

21   Q.    And then he goes on to say:  So, yeah, F the DRC!

22          Right?

23   A.    Yes.

24   Q.    And DRC is Digital Rightscorp, correct?

25   A.    That's correct.

M. Carothers - Direct

1566

1    Q.    And you respond to that, right?

2    A.    Yes.

3    Q.    Can you read your response out loud for the jury, please?

4    A.    Sorry to be Paranoid Panda here, but please stop sending

5    out e-mails that say F the law or F some company.  If we get

6    sued, those e-mails are discoverable and would not look good in

7    court.

8    Q.    Now, you didn't say, guys, we need to respect the

9    copyright laws, cut it out, did you?

12:46:08 10    A.    I didn't say that.

11    Q.    And you didn't say, we need to represent artists -- we

12    need to -- sorry, we need to respect artists, did we?

13    A.    No, I didn't say that either.

14    Q.    And you didn't say, gentlemen, you need to change the way

15    you conduct yourself because this is not in Cox's values, did

16    you?

17    A.    No, I didn't say that.

18    Q.    Your concern was how their e-mails would look in court,

19    right?

12:46:35 20    A.    Yeah.  All the context is lost.

21    Q.    And, and your concern of how they would look in court was

22    well-founded because you expected that you might well be in

23    court over these issues, correct?

24    A.    No, that's not correct.

25          MR. OPPENHEIM:  No further questions at this time,

M. Carothers - Cross

1567

1    Your Honor.

2              THE COURT:  All right.  Mr. Elkin?

3              MR. ELKIN:  Thank you, Your Honor.

4                         CROSS-EXAMINATION

5    BY MR. ELKIN:

6    Q.   Good afternoon, Mr. Carothers.

7    A.   Good afternoon.

8    Q.   Before I get into some background questions, let me just

9    pick up where Mr. Oppenheim stopped.  I think you made a

12:47:22 10   response to his question about the, you know, the Paranoid

11   Panda e-mail, that all the context is lost.  What did you mean

12   by that?

13   A.   So there's a lot of context that's lost when you send an

14   e-mail.  The emotional context is lost.  The situational

15   context is lost.  Sitting here reading that e-mail, I know it

16   was about one specific company, Digital Rightscorp, that was

17   extremely frustrating to us because of the way they were

18   attacking our customers.

19             I know the character of Jason and Joe.  I hired both

12:47:57 20   of them.  I wouldn't have hired them if they weren't good

21   people.  I wouldn't have recommended Jason to be the manager of

22   the group after me if I didn't think he cared about our

23   customers.

24             And just reading a sentence out in front of a court

25   from an e-mail loses all of the emotional context that the

1568

1    person was thinking of when they were writing that e-mail.

2         For example, when Jason says, "F the DMCA," he has

3    three exclamation points after that and a big smiley face at

4    the end of the sentence.  He was clearly joking, but that

5    doesn't come out when counsel is just reading the sentence out.

6    Q.   Thank you for that.

7         I'm going to take you from the beginning, if I can,

8    so I'm not going to ask you to come back in our case.  By who

9    are you employed?

12:48:40 10   A.   Cox Communications.

11   Q.   And what's your current job title?

12   A.   I am Cox's senior principal security architect.

13   Q.   And what are your responsibilities as senior principal

14   security architect?

15   A.   I do forward-looking security research.  I act as a

16   consultant and escalation point to other security teams, and I

17   work with other organizations, both public and private,

18   throughout the world.

19   Q.   And what -- tell the jury what types of security issues

12:49:06 20   Cox confronts.

21   A.   All kinds.  Denial of service attacks, hacking, spamming,

22   threats and harassment, copyright allegations, obviously.

23   Q.   And are you aware of security issues more broadly in Cox's

24   industry?

25   A.   I am.

M. Carothers - Cross

1569

```
 1   Q.    How so?

 2   A.    I work continuously with not only other ISPs but

 3   government organizations.  We are part of U.S. critical

 4   infrastructure, so I work with the Department of Homeland

 5   Security.  I work with the FBI on criminal investigations, and

 6   I routinely cooperate with other security researches, vendors,

 7   and the other ISPs both here in the U.S. and abroad.

 8   Q.    Give us some examples of the ISPs that you actually work

 9   with.

10   A.    So both the wireless ones and the wireline ones, so AT&T,

11   Sprint, T-Mobile, Verizon, Comcast, Spectrum; outside the U.S.,

12   companies like TELUS or Bell Canada, British Telecom.

13   Q.    And what does Cox do as a member of these groups?

14   A.    We exchange best practices.  We exchange specific threat

15   intelligence about attacks that are going on.  We share what

16   we're doing and what we think the best way to do it is.

17   Q.    And how long have you participated in these industry

18   security groups?

19   A.    For as long as I've been with Cox.

20   Q.    And how long has that been?

21   A.    Eighteen-and-a-half years.

22   Q.    When did you start with Cox?

23   A.    April of 2001.

24   Q.    And to what extent is your participation in these industry

25   groups part of your job at Cox?
```

M. Carothers - Cross

1570

1   A.   It's a core part of my job.

2   Q.   So before you started at Cox in 2001, what did you do

3   before that?

4   A.   I was studying computer science at the University of

5   Oklahoma.

6   Q.   Is this is your first job out of college?

7   A.   Yes.

8   Q.   And what's your complete upper educational background?

9   A.   So I also have a Bachelor's Degree in IT Cybersecurity

12:51:08 10  from Western Governors University, and I have a stack of

11  certifications.

12  Q.   So what was your first job at Cox in 2001?

13  A.   I was a network engineer.

14  Q.   And what did you do as a network engineer?

15  A.   Well, I worked on a lot of tasks like automation and

16  programming, and I also founded Cox's first abuse department.

17  Q.   Okay.  I'm going to come back to that in a moment.  Just

18  take the jury through, very briefly so we can get this out of

19  the way, the different positions you've had at Cox since the

12:51:37 20  time that you joined in 2001 and your corresponding duties and

21  responsibilities.

22  A.   Sure.  Started out as a network engineer.  I was promoted

23  to manager, and I was the manager of the abuse department.

24  Then we had a reorganization that split the engineering

25  functions off from the operations functions.  The abuse team

M. Carothers - Cross

1571

1    went off to the operations side of the house, and that's when

2    Mr. Zabek took over as the leader.

3         I moved over to the engineering side of the house as

4    a security engineer.  From there, I was promoted to principal

5    security architect and then eventually senior principal

6    security architect.

7    Q.   Okay.  Have you ever heard of the term "Acceptable Use

8    Policy," or "AUP"?

9    A.   Yes.

12:52:19 10   Q.   What is that?

11   A.   Acceptable Use Policy is the document that lays out what

12   our customers are and are not allowed to do with the service.

13   Q.   And have you heard of the term abuse, a-b-u-s-e, in the

14   context of your security work?

15   A.   I have.

16   Q.   What is abuse?

17   A.   Abuse is an industry term for the group within a company

18   that deals with AUP violations.

19   Q.   Are you familiar with the sorts of activities that

12:52:43 20   violates Cox's AUP?

21   A.   I am.

22   Q.   Could you tell the jury some examples?

23   A.   Sure.  Any kind of cyber attack, denial of service

24   attacks, hacking, spamming, threatening people, anything that

25   breaks the law, including copyright violations.

M. Carothers - Cross

1572

1    Q.    Is there a group at Cox that enforces the AUP?

2    A.    There is.

3    Q.    Who is that?

4    A.    That's the customer safety team.

5    Q.    And did the customer safety team originally go by a

6    different name?

7    A.    Yes.  The industry term is the abuse team.

8    Q.    Why did they change its name from abuse to safety?

9    A.    The mission of the team changed drastically over the

12:53:20 10    years.  When it was initially founded, it was dealing with

11    customers who were doing things on purpose, and over the years,

12    the landscape of cyber threats has changed, and most of the

13    people who violate the AUP these days are victims of malware.

14    So they're actually victims rather than perpetrators, and so

15    that's why we changed the name to customer safety.

16    Q.    Okay.  Were you ever a member of the abuse team or safety

17    team?

18    A.    Yes.

19    Q.    Do you know who founded that department?

12:53:47 20    A.    I did.

21    Q.    Now, have you heard of the term "tiers," t-i-e-r-s, used

22    in relationship to customer safety?

23    A.    I have.

24    Q.    What does that mean?

25    A.    So our customer safety organization is organized sort of

M. Carothers - Cross

1573

1    like a wedding cake.  At the bottom tier, it's the largest

2    group, that's Tier 1.  Tier 1 is the first line that a Cox

3    customer would reach when they call in for customer support.

4             Above that is a somewhat smaller tier, which is

5    Tier 2.  Tier 2 is a smaller group of people who are more

6    highly trained, more technically advanced.

7             Above that is another even smaller group called Tier

8    2.5, also known as the TOC, the Technical Operations Center,

9    and then above that is the customer safety team itself.

12:54:42 10   Q.   Okay.  And is there a dedicated team to deal with abuse

11   complaints for Cox Business customers?

12   A.   There is.

13   Q.   What's that called?

14   A.   It's called the National Support Center, or NSC.

15   Q.   Okay.  Which of those organizations or structures that you

16   just identified have responsibility for dealing with customer

17   copyright complaints?

18   A.   So Tier 2, Tier 2.5, and the customer safety team, as well

19   as the NSC.

12:55:07 20   Q.   Okay.  Are you aware of the makeup by numbers of the

21   Technical Operations Center in 2011?

22   A.   Yes.

23   Q.   Can you talk about the, the numbers of folks who were in

24   that group?

25   A.   Yes.  So originally there were nine people in the

M. Carothers - Cross

1574

1       Technical Operations Center, and they had mixed duties.  They

2       would accept escalations from Tier 2 for any kind of issue.  It

3       could be an abuse issue, or it could be, you know, a customer's

4       WiFi is not working, that kind of stuff.  And additionally,

5       they would be in the Cox abuse tracking system, working on

6       those tickets.

7                    Sometime around that time, we reorganized a bit.  We

8       shifted five of those people from the TOC down into Tier 2,

9       leaving four people in the TOC and 85 in Tier 2.  At that time,

12:55:59  10    the TOC's duties were also reduced to just handling the abuse

11      tickets.

12      Q.   Okay.  And with respect to Tier 2, is that -- do the folks

13      in that group handle among other things copyright infringement

14      complaints?

15      A.   They do.

16      Q.   Now, does the customer safety group at Cox still enforce

17      Cox's AUP?

18      A.   It does.

19      Q.   Has the nature of the threats that Cox handles changed

12:56:25  20    over time?

21      A.   It has.

22      Q.   Could you tell us how that has occurred?

23      A.   In the early days, when we would see a customer, for

24      example, sending out spam e-mails, it was because they were

25      doing it on purpose.  They were trying to send out e-mails for

M. Carothers - Cross

1575

1    their own business or something along those lines.

2              But cyber criminals have gotten more and more

3    advanced, and these days what they do is infect innocent

4    people's PCs with malware.  Then they use the malware to launch

5    network attacks or send spam, things of that nature.

6              So over time, the abuse department's mission changed

7    from tracking down people who were doing something on purpose

8    to protecting our customers, who were actually victims of

9    attacks.

12:57:05 10   Q.   What are the areas of focus of the customer safety group?

11   A.   There are three.  The first one is protecting Cox's

12   network from its own subscribers, the second is protecting our

13   subscribers from the internet, and the third is protecting the

14   internet from our subscribers.

15   Q.   Can you give the jury some examples of each of those three

16   areas of focus?

17   A.   Sure.  So protecting Cox's network from its subscribers,

18   if a subscriber is infected with malware, launching some kind

19   of network attack, it could be impacting our network.  It could

12:57:37 20   be slowing down the service of people around them, things of

21   that nature.

22              Protecting our customers from the internet, of

23   course, is a huge piece of the puzzle.  Our customers are under

24   constant attack from things like phishing e-mail and malware,

25   and we want to protect them as much as we can.

M. Carothers - Cross

1576

1         And then protecting the internet from our customers,

2    we think of that the same way we think of the environment.  In

3    the same way that we wouldn't want to dump toxic chemicals into

4    a river, we don't want to dump toxic packets out onto the

5    internet.  So a good example of that, of course, is copyright

6    infringement allegations.

7    Q.   Okay.  And how would the customer safety group --

8    withdrawn.

9         To what extent does the role of education factor into

12:58:24 10    the work of the safety group?

11   A.   It's practically the entire mission of the safety group.

12   Q.   How does Cox become aware of violations of the AUP?

13   A.   We have a mailbox.  Every ISP has a mailbox called abuse@

14   whatever the domain is.  Ours is abuse@cox.net.  And when

15   people around the world notice our customers doing something

16   wrong, say, they receive a spam e-mail from the customer, they

17   send an e-mail to abuse@cox.net to let us know what's going on.

18   Q.   And have you had occasion during the course of your work

19   in the safety area to actually speak to customers about AUP

12:59:08 20   violations?

21   A.   Many times, yes.

22   Q.   Have you formed a general view as to the level of

23   sophistications of customer -- customers' violations of AUP?

24   A.   I have.

25   Q.   What is that?

M. Carothers - Cross

1577

1    A.    Most people are not very technically savvy.  They're not

2    aware of what the AUP even is, much less how they violated it.

3    Q.    Can you discuss any instances where customers won't

4    understand the issues?

5    A.    Oh, absolutely.  Specifically for copyright allegations,

6    we often find that the accountholder is a parent, they have

7    teenagers in the house, and the teenagers are much more

8    technically savvy than the parents.  So the parents don't

9    really even understand what's going on, much less how to put a

12:59:51 10   stop to it.

11              We also have quite a --

12              MR. OPPENHEIM:  Objection.  No foundation.  I move to

13    strike, Your Honor.  He can't testify as to what a particular

14    customer was thinking of doing.

15              THE COURT:  Sustained.  And let's break now for our

16    lunch.  It's 1:00.  We'll come back at 2:00 and continue

17    hearing from Mr. Carothers.

18              All right.  You're excused.  Thank you.

19              NOTE:  At this point, the jury leaves the courtroom;

20    whereupon the case continues as follows:

21    JURY OUT

22              THE COURT:  All right.  Mr. Carothers, you're in the

23    middle of your testimony, so don't discuss what you've

24    testified so far with anybody, and we'll see you at 2:00, sir.

25    Okay?

1578

1      THE WITNESS:  Yes, sir.

2      THE COURT:  All right.  You're excused.  Thank you.

3      THE WITNESS:  Thank you.

4   WITNESS STOOD DOWN

5      THE COURT:  Did you have an issue with another

6   witness you identified earlier this morning?

7      MR. OPPENHEIM:  Yes, Your Honor.

8      THE COURT:  Yes, sir.  Go ahead.

9      MR. OPPENHEIM:  We've been informed that the

01:01:15  10   defendants intend to call Mr. Monson, who worked for Harbor

11   Labs, and as you'll recall, Your Honor, Harbor Labs issued a

12   report --

13      THE COURT:  Yeah.

14      MR. OPPENHEIM:  -- regarding CAS, C-A-S.

15      Mr. Monson lives in, as I understand, and works in

16   Baltimore or just outside Baltimore.  He's within the reach of

17   the subpoena power.

18      We -- when the defendants noticed their witnesses and

19   indicated that they might take him either live or by

01:01:51  20   deposition, we objected to a video deposition being used.  This

21   objection was lodged in July, when we first got their witness

22   list.  We understand they now want to show his video in lieu of

23   bringing him live, which is improper under the rules.  You're

24   not permitted to use a deposition testimony in lieu of live

25   testimony if a witness is within the subpoena power of the

1579

1    Court.

2            THE COURT:  Okay.

3            MR. OPPENHEIM:  So, you know, frankly, they've had

4    five months to deal with this since we objected, so we're

5    surprised to hear now that they are intending to use the video

6    and think it's improper, Your Honor.

7            THE COURT:  Okay.

8            MR. OPPENHEIM:  I also think, by the way, the jury

9    has heard more than they could possibly want to hear about CAS

01:02:41  10   at this point, and in that respect, it's also probably cumulous

11   of --

12           THE COURT:  Thank you.

13           MR. ELKIN:  I won't comment on the second part of it,

14   which we disagree with, of course.  But he'll come live.  It's

15   not a big deal, Your Honor.  The -- this was a courtesy to the

16   witness who was deposed, who didn't want to be here.  We

17   thought given the fact that he's going to testify for 15 or 20

18   minutes, but it's fine.  We'll make him available.

19           THE COURT:  All right.  Let's bring him.

01:03:08  20          All right.  Anything else before we recess?

21   NO RESPONSE

22           THE COURT:  Okay.  All right.  We're in recess until

23   2:00.

24           NOTE:  At this point, the December 10, 2019, morning

25   portion of the case is concluded.

1580

1      CERTIFICATE OF COURT REPORTERS

2

3

4         We certify that the foregoing is a true and
   accurate transcription of our stenographic notes.

5

6

7             /s/  Norman B. Linnell
        Norman B. Linnell, RPR, CM, VCE, FCRR

8

9

10            /s/  Anneliese J. Thomson
        Anneliese J. Thomson, RDR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25