1581

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
      -vs-                     :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  7  (P.M. Portion)


TRIAL TRANSCRIPT

December 10, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1582

APPEARANCES:

FOR THE PLAINTIFFS:           MATTHEW J. OPPENHEIM, ESQ.
                              SCOTT A. ZEBRAK, ESQ.
                              JEFFREY M. GOULD, ESQ.
                              MICHAEL J. DRUCKMAN, ESQ.
                              ANDREW L. GUERRA, ESQ.
                              LUCY G. NOYOLA, ESQ.
                              JIA RYU, ESQ.
                              Oppenheim + Zebrak, LLP
                              4530 Wisconsin Avenue, N.W.
                              5th Floor
                              Washington, D.C. 20015


FOR THE DEFENDANTS:           THOMAS M. BUCHANAN, ESQ.
                              Winston & Strawn LLP
                              1700 K Street, N.W.
                              Washington, D.C. 20006-3817
                                and
                              SEAN R. ANDERSON, ESQ.
                              MICHAEL S. ELKIN, ESQ.
                              THOMAS P. LANE, ESQ.
                              CESIE C. ALVAREZ, ESQ.
                              Winston & Strawn LLP
                              200 Park Avenue
                              New York, NY 10166-4193
                                and
                              JENNIFER A. GOLINVEAUX, ESQ.
                              THOMAS J. KEARNEY, ESQ.
                              Winston & Strawn LLP
                              101 California Street, 35th Floor
                              San Francisco, CA 94111-5840
                                and
                              MICHAEL L. BRODY, ESQ.
                              Winston & Strawn LLP
                              35 West Wacker Drive
                              Chicago, IL 60601
                                and
                              DIANA HUGHES LEIDEN, ESQ.
                              Winston & Strawn LLP
                              333 South Grand Avenue
                              Suite 3800
                              Los Angeles, CA 90071

INDEX


OPENING STATEMENTS BY:




WITNESS                          EXAMINATION      PAGE


MATT CAROTHERS

                                 CROSS            1584
                                 REDIRECT         1606


JOSEPH SIKES via video deposition

                                 EXAMINATION      1628


JORGE C. FUENZALIDA via video deposition

                                 EXAMINATION      1692
                                 EXAMINATION      1705



CLOSING ARGUMENTS BY:



COURT'S RULINGS/JURY INSTRUCTIONS

1584

1    NOTE:  The afternoon portion of the case on December

2    10, 2019, begins in the absence of the jury as follows:

3    JURY OUT

4    THE COURT:  All right.  Ready for our jury?

5    MR. ELKIN:  Yes, Your Honor.

6    THE COURT:  Okay.  Joe, let's get the jury, please.

7    NOTE:  At this point the jury returns to the

8    courtroom; whereupon the case continues as follows:

9    JURY IN

10    THE COURT:  All right.  Please have a seat.

11    We -- I guess we just need our witness, huh.

12    All right.  Please proceed.

13    MR. ELKIN:  Thank you, Your Honor.

14    MATT CAROTHERS, called by counsel for the plaintiffs,

15    first being duly sworn, testifies and states:

16    CROSS-EXAMINATION

17    BY MR. ELKIN: (Continuing)

18    Q.   Good afternoon, Mr. Carothers.

19    A.   Good afternoon.

20    Q.   Does Cox track what its users are doing online with Cox's

21    broadband system?

22    A.   It doesn't.

23    Q.   Why not?

24    A.   Two reasons.  One is lack of a technical capability to do

25    so.  And the second is that we have very strong privacy

M. Carothers - Cross

1585

1    policies.

2    Q.   I am going to take you back to the years 2013 and 2014.

3            Outside of any cyber security concerns, do you know

4    whether Cox blocked subscribers' access to any Web sites?

5    A.   It didn't.

6    Q.   And again, during this same time frame, again outside of

7    any cyber security concerns, did Cox reduce or throttle

8    subscribers' bandwidth or connection speeds?

9    A.   It didn't.

10   Q.   Why not?

11   A.   A couple reasons.  One is, again, a lack of technical

12   capacity.  And also, our lawyers advised us that we couldn't do

13   any sort of site blocking because it would be a violation of

14   the network neutrality laws.

15   Q.   Now, does Cox track what its customers upload and

16   distribute using it service?

17   A.   It doesn't.

18   Q.   Do you know whether Cox subscribes to and uses the

19   technology that would permit it to track what Cox users upload

20   and distribute on the Internet?

21           MR. OPPENHEIM:  Objection.

22           THE COURT:  Yeah, it's leading.  Let's ask

23   non-leading questions.

24   BY MR. ELKIN: (Continuing)

25   Q.   All right.  Do you know of any technology that would

M. Carothers - Cross

1586

1   permit Cox to track what its customers are doing?

2   A.   No.  No such technology exists.

3   Q.   Now, Mr. Oppenheim referred you to Procera or deep packet

4   inspection.  Do you remember that line of questioning?

5   A.   Yes.

6   Q.   Do you know whether deep packet inspection would permit

7   Cox to track copyright infringement of its users -- of its

8   users?

9   A.   No, it wouldn't do that.

10  Q.   Do you know whether Cox would use such a technology if it

11  was available?

12  A.   It wouldn't.

13          MR. OPPENHEIM:  Your Honor, can we stop with the

14  leading questions, please?

15          THE COURT:  Well, no, I will allow that question.

16  He's said he's familiar with it, and I think that's a fair

17  follow-up question.  Thank you.

18          You may answer the question.

19  A.   No, we wouldn't use such a technology if it existed.

20  BY MR. ELKIN: (Continuing)

21  Q.   Why not?

22  A.   It would be a gross violation of our customers' privacy.

23  Q.   Now, have you ever heard of a system referred to as CATS,

24  C-A-T-S?

25  A.   I have.

M. Carothers - Cross

1587

1   Q.   How did you hear about it?

2   A.   I invented it.

3   Q.   When did you do that?

4   A.   This would have been 2002-ish.

5   Q.   What does it stand for, CATS?

6   A.   CATS is the Cox Abuse Tracking System.

7   Q.   Why did you decide to develop that system?

8   A.   The volume of e-mails that comes into that abuse@cox.net

9   mailbox we talked about earlier is huge.  It is way too much

10  for people to handle manually.  So we needed an automated

11  system.

12  Q.   And what types of notices was CATS originally designed to

13  handle?

14  A.   All of them.

15  Q.   Such as?

16  A.   Denial of service attacks, spam, hacking, port scanning,

17  threats and harassments, copyright allegations, of course.

18  Q.   Do you know whether CATS has evolved over time?

19  A.   It has.

20  Q.   How so?

21  A.   It has gotten more and more automated.

22  Q.   Could you describe that a little bit.

23  A.   Sure.  It has the ability to automate a lot of the tasks

24  that a security engineer would want to do, such as figuring out

25  who was using an IP address at a time, figuring out what type

M. Carothers - Cross

1588

1  of abuse that is being complained about, and even taking

2  automated action, such as sending warning e-mails or taking

3  subscribers offline.

4  Q.  Who operated CATS, if you know, during the 2013-2014 time

5  frame?

6  A.  That was Brent Beck.

7  Q.  And to what extent did you interact or consult with

8  Mr. Beck about CATS during that time?

9  A.  Regularly.

10 Q.  Were you aware of how Mr. Beck was running the program at

11 that time?

12 A.  I was.

13 Q.  Could you describe -- we have had a lot of testimony on

14 this, so I'm going to be very brief, but could you explain to

15 the jury how CATS processes incoming notices on an automated

16 basis?

17 A.  Sure.  The e-mail arrives in the abuse@cox.net mailbox.

18 CATS downloads it.  It looks for some information about the

19 allegations, such as the IP address, the time of the offense,

20 and the list of infringing works.  It then looks up the

21 subscribers' IP address to see if we can identify who it is.

22 And then takes action appropriately.

23 Q.  And what kind of information does CATS extract from

24 incoming notices?

25 A.  So it gets the IP address that's being complained about.

1589

1   It gets the timestamp when the offense allegedly took place.

2   And it gets the list of infringing works.

3   Q.   Do you know whether CATS can recognize a notice of

4   copyright infringement?

5   A.   It can.

6   Q.   Have you ever heard of the term "copyother"?

7   A.   I have.

8   Q.   Who came up with that term?

9   A.   That was me.

10  Q.   What does it mean?

11  A.   So every ticket within the CATS system has a tag on it

12  that just describes what the type of complaint is.  It's a

13  short one or two-word phrase, usually an abbreviation.

14          So, for example, if the complaint is that the

15  customer sent spam intentionally, the tag on the ticket would

16  be Spam UCE.  UCE stands for unsolicited commercial e-mail.

17          If it was, on the other hand, spam that we thought

18  was sent from malware, it would be Spam Trojan to differentiate

19  the two.

20          At the beginning of the program the copyright

21  complaints that we got were almost entirely about an old system

22  called Usenet.  So the tag for those tickets was Copy Usenet.

23          And then we had a catchall bucket for all other types

24  of copyright complaints that was Copy Other.

25  Q.   Mr. Carothers, do you know whether CATS can determine from

M. Carothers - Cross

1590

1    a notice of copyright infringement whether an actual copyright

2    infringement has taken place?

3    A.    It can't.

4    Q.    Why can't it?

5    A.    There is no way to verify that the traffic was there, what

6    the contents of that traffic were, or whether or not the

7    customer held some copyright.

8    Q.    To what extent does handling copyright infringement

9    tickets require human intervention?

10   A.    It is almost entirely automated.

11   Q.    Has CATS ever been configured to automatically terminate a

12   customer in response to a copyright infringement complaint?

13   A.    It has not.

14   Q.    Why not?

15   A.    Termination is a very serious step.  It is something that

16   always requires human review.

17   Q.    Have you ever heard of the term "graduated response

18   program"?

19   A.    I have.

20   Q.    What is graduated response?

21   A.    Graduated response is a series of escalating steps that we

22   take to contact a subscriber, use the subject of copyright

23   allegations.  Each step is increasingly more intrusive in order

24   to get that contact with the customer.

25   Q.    Do you have an understanding of where the graduated

M. Carothers - Cross

1591

1    response program at Cox originated?

2    A.    I do.

3    Q.    Could you tell the jury.

4    A.    I invented it.

5    Q.    And why did you develop this?

6    A.    It's the most effective way of communicating with

7    subscribers.

8    Q.    When did you develop it?

9    A.    Early 2000s, probably 2002/2003 time frame.

10   Q.    What is the purpose of engaging in escalating steps with

11   customers related to copyright infringement?

12   A.    We need to make sure that we reach the actual account

13   holder, and sometimes that can be tricky.

14   Q.    And what, if anything, have you done to determine whether

15   the graduated response at Cox was effective?

16   A.    I have run a number of queries in the CATS database to

17   check repeat offense rates.

18   Q.    When did you do that?

19   A.    I did it throughout my time.  It was something that I did

20   just as the normal course of my job.

21   Q.    How often would you do it?

22   A.    It wasn't a set schedule, but I would say quarterly,

23   probably.

24   Q.    And what did you observe when you ran those queries?

25   A.    The program was very effective.  The vast majority of

M. Carothers - Cross

1592

1   customers never made it past the e-mail warning stage.

2   Q.   Now, how do you know that?

3   A.   I ran the numbers myself.

4   Q.   Does CATS sometimes aggregate complaints or notices into a

5   single ticket?

6   A.   It does.

7   Q.   What does that mean, to aggregate complaints?

8   A.   So when the first allegation comes in against a

9   subscriber, it generates a ticket in the CATS system.  And then

10  for 24 hours any subsequent allegations that we get are

11  appended to that one ticket rather than generating a new

12  ticket.

13  Q.   But why does CATS aggregate complaints rather than

14  treating each one as a separate incident?

15  A.   Fairness for the customers.  If every single notification

16  generated a new ticket, then we could potentially have someone

17  go through all steps of the program up through termination

18  within a few minutes before they had even had a chance to look

19  at the issue.

20  Q.   How many copyright notices will CATS aggregate?

21  A.   There is no set limit.

22  Q.   Do you know whether Cox also has a limit on the number of

23  customers CATS can automatically suspend?

24  A.   It does.

25  Q.   Why was there -- why was a suspension limit imposed, if

M. Carothers - Cross

1593

1    you know?

2    A.   A couple of reasons.  First is that we have seen issues of

3    false allegations against subscribers.  So we have documented

4    cases where complaints came in against IP addresses that

5    weren't even in use in our network.  So we know that some

6    portion of the complaints that we get are false accusations.

7    So --

8    Q.   Do you know why -- I am sorry, did you finish?

9    A.   Eh.

10   Q.   Okay.  Do you know why Cox doesn't automatically suspend

11   users past a certain limit?

12   A.   Yes.

13   Q.   Why?

14   A.   Well, a couple of reasons.  One is that we are concerned

15   about a haywire system or someone deliberating attacking the

16   system.

17           When we give a computer system the ability to take

18   our subscribers offline, that's a big deal.  We want to make

19   sure it's secure.  We want to make sure that someone can't game

20   the system and cause a situation that would take all of our

21   subscribers offline.

22   Q.   What was the auto suspend limit in 2013 and 2014?

23   A.   It was 300.

24   Q.   I want to refer now to some non-customer-facing actions.

25   Are there types of actions other than customer-facing actions

M. Carothers - Cross

1594

1   that CATS can take automatically?

2   A.   There are.

3   Q.   Such as?

4   A.   Well, for example, there is the hold for more, which I am

5   sure you all have heard about.

6   Q.   What is hold for more?

7   A.   Hold for more means that the very first allegation we

8   receive against a customer generates a ticket in the CATS

9   database, then that ticket is closed without taking customer-

10  facing action.

11  Q.   Now, I believe Mr. Oppenheim asked you a question

12  regarding when that happens.  Did you refer to it in that 2010

13  e-mail as ignoring the notice?

14       Can you comment on that.

15  A.   Yes, I did use that phrase.

16  Q.   Is that accurate?

17  A.   The notice isn't actually ignored.  It still generates a

18  ticket.  It is still there in the database.  And it's still

19  there for future reference if there are any subsequent

20  complaints.

21  Q.   And who at Cox decided to implement hold for more?

22  A.   That was a combination of myself and our legal counsel.

23  Q.   Can you describe the work that you did leading up to the

24  implementation of the hold for more rule?

25  A.   Yes, absolutely.  So we had a group of customers who did

M. Carothers - Cross

1595

1    not have cox.net e-mail addresses.  So without a way to send

2    them e-mail warnings, the very first allegation they received

3    would have resulted in a suspension of their service.

4           But as we have noted before, we had documented cases

5    where some of the rights holder software wouldn't actually

6    attempt to download the infringing content from the

7    subscriber's PC and verify the complaint.  And so, we had --

8           MR. OPPENHEIM:  Objection, no foundation, Your Honor.

9    And we move to strike.

10          THE COURT:  Sustained.  I will strike the last

11   answer.

12   A.   So due to the fact that we had seen these false

13   allegations, we didn't want to suspend --

14          MR. OPPENHEIM:  Objection.

15          THE COURT:  So the objection was that he's testifying

16   about what third parties may have told him, that's all hearsay.

17   It is inadmissible unless there is an exception to it.

18          I think he can testify to what, having heard this,

19   what they did.  Whether it is true or not, this is what he did

20   in response to that information.

21          All right.  Go ahead, Mr. Elkin.

22   BY MR. ELKIN: (Continuing)

23   Q.   Yes.

24   A.   Let me just -- I do have direct experience with --

25          THE COURT:  I am sorry, wait for the next answer --

M. Carothers - Cross

1596

1    the next question, excuse me.

2              THE WITNESS:  Sorry.  Okay.

3    BY MR. ELKIN: (Continuing)

4    Q.   I am going to put the same question, but I'm going to ask

5    you to limit it --

6    A.   Okay.

7    Q.   -- just to be clear to deal with the issues the Court just

8    raised.

9              I would like for you to comment on the work that you

10   did that led to the implementation of hold for more but not

11   discuss in your answer any conversations you had with third

12   parties.

13   A.   Okay.  So, long story short, we had some customers with

14   some historical data where they had not received a first

15   notice.  And so, I was able to conduct a study where I tested

16   to see what the difference was in response rates -- or, excuse

17   me, in repeat offense rates between customers who had --

18             MR. OPPENHEIM:  Objection.

19             THE COURT:  I am sorry, hold on.

20             MR. OPPENHEIM:  Objection.

21             THE COURT:  What's your objection?

22             MR. OPPENHEIM:  Your Honor, sidebar, I guess.

23             THE COURT:  He's indicating he did a study in

24   response to information he received.

25             Come to the sidebar, please.

1597

1           NOTE:  A sidebar discussion is had between the Court

2    and counsel out of the hearing of the jury as follows:

3    AT SIDEBAR

4           THE COURT:  Your objection is that there is no study

5    that you received any information about in discovery; is that

6    right?

7           MR. OPPENHEIM:  We have asked many, many times.

8    Nothing has been produced.  And so for him to back-door what

9    the Court has disallowed by saying, well, I recall I did a

10   study, and then testifying to the conclusion of it, is simply a

11   way of getting around a very clear ruling by the Court.

12          MR. ELKIN:  This is exactly what we argued and what I

13   think the Court ruled on a few days ago.  We submitted -- there

14   was a brief that was submitted.  I came to court, as Your Honor

15   will remember, going through all of the different transcripts,

16   recounting all of the questions that were put to Mr. Carothers

17   and the answers.  And I said I would lay a foundation.

18          Mr. Carothers stated in response to a question I put

19   to him two or three times ago that he ran the personal queries

20   himself.

21          And as Your Honor knows, under Rule 602, evidence to

22   prove personal knowledge may consist of the witness' own

23   testimony.  He's testified to that.

24          He can question him later, you know, you thought it

25   was so important, you didn't conduct a study, and then have the

M. Carothers - Cross

1598

1    jury conclude whatever he wants.

2            THE COURT:  Yeah, now he's saying he did conduct a

3    study.  That's what brought me in --

4            MR. ELKIN:  I didn't try to elicit that at all.  I am

5    going to ask him to --

6            MR. OPPENHEIM:  Whether he wanted to elicit it, that

7    was his testimony.  It was clear as could be.

8            THE COURT:  No, I was listening to the answer, not

9    the question.

10           MR. ELKIN:  So they asked about written studies, you

11   know.  And he's not talking about a written study.  We never

12   even -- there was never any written study.

13           I am going to ask him specific questions which go

14   into the queries themselves.  And I will try to do all I can to

15   prevent any reference to a study because I really don't want to

16   offend anybody.  That's really not what I am trying to do.

17           I am trying to get him to set forth a foundation so

18   that he can provide a basis for why he concluded.  This hold

19   for more didn't come out of thin air.  He made this suggestion.

20   I'm asking him to basically lay out, you know, the work that he

21   did even though it wasn't reduced to a tangible means of

22   written report.  And we discussed this the other day.

23           THE COURT:  I understand.

24           MR. OPPENHEIM:  Your Honor, there is a clear e-mail

25   chain that shows why hold for more was -- occurred.  And hold

1   for more occurred because they were trying to stem the flow of

2   notices.

3          He is now trying to say, oh, no, I conducted a study,

4   but a study is something that is written --

5          THE COURT:  Okay.  He is not going to say he

6   conducted a study.  I did rule that there was enough room in

7   that deposition testimony that you -- we all looked at that he

8   could ask this area of questioning.

9          Your exception is noted.  I am going to allow it.

10          I am going to strike the last answer about study.

11   You do your best to make sure he doesn't go out and talk about

12   studies.

13          MR. ELKIN:  I apologize, I had no idea that --

14          THE COURT:  No, when I heard the word "study," I knew

15   that we were going there.

16          MR. ELKIN:  Okay.  Thank you, Your Honor.

17          THE COURT:  All right.  That's my ruling.  Thank you.

18          NOTE:  The sidebar discussion is concluded; whereupon

19   the case continues before the jury as follows:

20   BEFORE THE JURY

21          THE COURT:  The motion to strike the last answer is

22   granted.  And you will disregard the last answer that

23   Mr. Carothers made.

24          And please proceed.

25   BY MR. ELKIN: (Continuing)

M. Carothers - Cross

1600

1   Q.   Okay.  I am going to ask this question again.  I am going

2   to limit it to help you.

3        We were talking about the hold for more.  And can you

4   describe the work that you did leading up to the implementation

5   that led you to suggest implementing the hold for more.

6        Please, in your response, don't reference anything

7   other than the actual work.  I don't want you to characterize

8   it as any analysis or study.  Just specify the work itself.

9   A.   Okay.  I logged into the CATS database --

10       MR. OPPENHEIM:  Your Honor, I object.

11       THE COURT:  All right.  Overruled.  Go ahead.

12  A.   I logged into the CATS database.  The CATS database is a

13  technology called MySQL, M-y-S-Q-L.  SQL is structured query

14  language, sometimes called sequel, and that's the language that

15  we use to interact with the database.

16       Inside the database the data is organized into

17  tables.  If you are familiar with Microsoft Excel, you can

18  think of a table like a tab in a spreadsheet.  It's organized

19  into columns and rows.

20       One of those tables is the tickets table.  The data

21  in there, the columns are things like the ICOMS ID, the IP

22  address, the timestamp, the type of complaint.  And each row is

23  an individual ticket.

24       There is another table then called Actions which logs

25  every action that is taken on a ticket.  So, for example, when

M. Carothers - Cross

1601

1  a ticket is closed, there is an Action row added on there that

2  says the ticket was closed.  When an e-mail warning, there is a

3  row added that says there was an e-mail warning sent.

4         So by joining those two tables together and grouping

5  them on the ICOMS ID, we get a count of each ICOMS ID and the

6  number and type of each action that was taken on them.

7         So starting from six months in the past, I would

8  query all the data six months and older to get that count.

9  Then I would find all the customers who had received at least

10  one notice and those that just had a hold for more.

11         Then I would move six months past that and say, for

12  that following six months, how many of those actually received

13  a second notice.

14         And the finding was that there was almost no

15  difference in the number of customers who repeat offended

16  between those who had -- who had received a first notice and

17  those who had not received a first notice.

18  Q.   Did you personally do this work yourself?

19  A.   I did.

20  Q.   Now, even if CATS doesn't take a customer-facing action on

21  the first notice, do you know whether CATS still processes the

22  notice?

23  A.   It does.

24  Q.   So if there is a second copyright infringement complaint

25  affecting the accused subscriber that you held for more, do you

M. Carothers - Cross

1602

1    know whether CATS will know whether there had been two

2    complaints?

3    A.    It will.

4    Q.    Okay.  Was there a limit on the number of copyright

5    notices that CATS would accept on a daily basis?

6    A.    There was.

7    Q.    Why did CATS permit that?

8    A.    Well, the main reason is so that we can predict what

9    resources we need.

10         The idea is that we have a steady flow coming in.  If

11   we have the same number every day, then we know exactly how

12   many people we need to hire, we know how many people need to be

13   in the office that day.

14         The second reason is also for fairness.  So if one

15   particular sender bombards us with thousands of e-mails on one

16   day, we don't want that one to be able to shove all of the

17   other rights holders out of the way.

18   Q.    Do you know whether a sender would know if they have

19   exceeded the limit?

20   A.    They would.

21   Q.    What happens?

22   A.    The CATS system sends them an e-mail back telling them

23   that they have exceeded their cap for the day and they should

24   resend the following day.

25   Q.    What does Cox do if a company needs to submit more

1603

1   copyright infringement notices?

2   A.   We negotiate that limit with them and we generally grant

3   them more.

4   Q.   Now, are you aware of any instances where Cox has actually

5   done that?

6   A.   Yes.

7   Q.   Can you give an example?

8   A.   Well, specifically for the RIAA, they asked for 5 or 600,

9   and we granted them 600.

10  Q.   Mr. Oppenheim made reference in some questions to you on

11  direct with regard to a company by the name of Rightscorp.

12       Who is Rightscorp?

13  A.   Rightscorp was a company that sent us copyright

14  allegations.

15  Q.   Now, at some point I believe you testified that Cox began

16  receiving copyright notices from Rightscorp?

17  A.   Yes, that's correct.

18  Q.   Do you know whether Cox forwarded Rightscorp's notices to

19  Cox's customers?

20  A.   It didn't.

21  Q.   Why not?

22  A.   We didn't consider them to be valid notices.  They had a

23  lot of extra stuff in them that we call settlement language.

24  The language was very threatening.  It asked the customers for

25  money.  And it also included URLs.

M. Carothers - Cross

1604

1  Q.    What is a URL?

2  A.    URL is a uniform resource locater.  That's a hyperlink

3  that someone might click on in an e-mail.

4  Q.    So if you were to hit that link, what happens?  If you

5  were to hit the Rightscorp link.

6  A.    Well, it would take you to a site controlled by

7  Rightscorp, and from there it's anybody's guess.

8  Q.    What did Cox do when it received the notices from

9  Rightscorp concerning -- that contained the settlement demands?

10  A.    We asked them to take the settlement demands out.

11  Q.    What happened?

12  A.    They didn't.

13  Q.    Then what happened?

14  A.    They offered to cut us in for a piece.  And we turned that

15  down too.

16  Q.    And then what happened?

17  A.    They decided that they were done negotiating with us, and

18  they bombarded us with tens of thousands of e-mails.

19  Q.    Then what happened?

20  A.    We had to block them because it was a denial of service

21  attack on CATS.

22  Q.    Okay.  Now, from time to time have you ever shared

23  information about CATS with other ISPs?

24  A.    I have.

25  Q.    Can you share some detail on that?  And I would ask you

1605

1    not to comment on specific conversations you have had.

2    A.   Yes.  I have shared the information about CATS with a

3    number of industry working groups.  I have presented it at

4    conferences.  And, of course, I have spoken one-on-one with

5    other ISPs.

6    Q.   Do you know whether CATS has ever been the subject of a

7    license to another ISP?

8    A.   It has.

9    Q.   Which ones?

10   A.   So Charter and Bright House, now known as Spectrum, and

11   also Suddenlink.

12   Q.   Did you participate personally in the licensing of CATS?

13   A.   I did.

14   Q.   What did Cox get in return for licensing CATS to these

15   ISPs?

16   A.   Mostly goodwill.

17   Q.   Did you charge any money?

18   A.   We didn't.

19   Q.   Why didn't you?

20   A.   We were just trying to make the world a better place.

21   Q.   Now, we heard some testimony I think in the beginning of

22   the case from one of the plaintiffs about how important this

23   case is to the music industry.

24            Is this also an important case for the ISP industry?

25   A.   Critically important.

1606

1 Q.    Why?

2 A.    We're concerned that it will set a precedent that ISPs

3 will be required to monitor their subscribers and try to

4 determine if they are violating copyright.

5            We are also concerned about the precedent that ISPs

6 might be responsible for crimes committed by their customers.

7            So if we, as an ISP, are responsible when our

8 customers violate copyright, what else might we be responsible

9 for?  If one of our customers uses our service to buy drugs,

10 are we drug dealers now?

11           MR. ELKIN:  Pass the witness.

12           THE COURT:  All right, Mr. Oppenheim.

13           MR. OPPENHEIM:  Thank you, Your Honor.

14      REDIRECT EXAMINATION

15 BY MR. OPPENHEIM:

16 Q.    Mr. Carothers, you testified at some length about security

17 issues in response to Mr. Elkin's questions, correct?

18 A.    Yes.

19 Q.    There were no security concerns with the notices that were

20 received from the RIAA, were there?

21 A.    No, none that I am aware of.

22 Q.    Do you believe that Cox takes copyright infringement

23 notices seriously?

24 A.    Absolutely.

25 Q.    So when you testified in response to Mr. Elkin's questions

M. Carothers - Cross

1607

1  and you analogized infringement notices to toxic chemicals, did

2  you take copyright notices seriously?

3  A.   No, that's -- that's not what I said.

4  Q.   It's not what you intended to say?

5  A.   No.

6  Q.   Now, a moment ago you testified that you licensed CATS to

7  other ISPs, correct?

8  A.   That's correct.

9  Q.   You didn't license Cox's graduated response policies,

10  right?

11  A.   That's correct.

12  Q.   All you licensed was the software for those ISPs to decide

13  on whatever graduated response they wanted, right?

14  A.   Yes.

15  Q.   So you are not testifying that any of those other ISPs

16  decided to have a 14-step program, correct?

17  A.   Correct.

18  Q.   And you're not testifying that those ISPs decided to re --

19  excuse me -- to terminate and then reactivate subscribers

20  immediately, right?

21  A.   No.

22  Q.   And you're not testifying that those other ISPs set caps,

23  correct, on the number of notices that rights owners could

24  send, right?

25  A.   Correct.

M. Carothers - Cross

1608

1    Q.   And you're not testifying that the other ISPs were

2    blacklisting particular rights owners, correct?

3    A.   Correct.

4    Q.   Pardon me one moment, Your Honor.  I need the exhibit

5    binder.  There it is.  Sorry.

6             Now, I believe you testified in response to Mr.

7    Elkin's questions that each step of Cox's graduated response

8    policy is intended to be more intrusive than the last.  Did I

9    get that right?

10   A.   Yes.

11   Q.   Can we please open PX 174.  If you could call that up.  I

12   believe this is in evidence.

13            So, Mr. Carothers, this is the 2011 version of the

14   graduated response policy, correct?

15   A.   Yes.

16   Q.   And if we turn to page 13 of 87, please.  I apologize,

17   let's turn to -- let's pull up PX 179.  So we're looking at the

18   most recent version of the graduated response.  It will appear

19   on your screen.

20            That's the 2012 version of Cox's graduated response

21   policy, correct?

22   A.   Yes, I believe so.

23   Q.   Can we go to the copyother section, please.

24            Let's scroll down so we see the 14 steps, please.

25   Keep going.  Keep going.  Let's stop right there, please.

1609

1          Now, Mr. Carothers, as you look at steps two through

2    seven, that means the second time there is a notice with

3    respect to a subscriber, a third time there is a notice with

4    respect to the same subscriber, fourth time, fifth time, sixth

5    time, seventh time, there is no steps up, correct?  It's the

6    exact same e-mail that goes out each time, right?

7    A.   Yes.

8    Q.   So that is not more intrusive, is it?

9    A.   I meant that warnings, suspensions, and hard suspensions,

10   each one of those was more intrusive than the last.  Not that

11   the individual e-mails were more intrusive than each other.

12   Q.   So it would be more intrusive, Mr. Carothers, right, if it

13   was a warning, a suspension, and then a termination, right?

14   Each step would be more intrusive, correct?

15   A.   Yes.

16   Q.   I believe you testified in response to Mr. Elkin's

17   question that the reason that Cox set suspension limits was

18   because of false allegations that it had received with respect

19   to particular subscribers; is that correct?

20   A.   That's one reason.

21   Q.   You've never indicated to anybody that the RIAA complaints

22   or notices were false allegations, have you?

23   A.   I have not.  I suspect that they could be, but I don't

24   have evidence to that.

25   Q.   Based on what you knew when Cox received those

M. Carothers - Cross

1610

1    allegations, you took those allegations to be fair and proper

2    infringement notices, correct?

3    A.   Yes.

4    Q.   If Cox is receiving false allegations from a rights owner,

5    those false allegations could concern the first notice, the

6    second notice, the third notice, it could concern any notice

7    with respect to a particular subscriber, correct?

8    A.   Technically possible, yeah.

9    Q.   So you have no information as you testify today to suggest

10   that it's more likely to have a false allegation with respect

11   to the first notice with respect to a subscriber than you would

12   the tenth notice with respect to a subscriber, correct?

13   A.   No, that's not correct.

14   Q.   In your response to Mr. Elkin's questions you indicated

15   that the term "ignore" for describing the decision to hold for

16   more on the first notice was inaccurate, correct?

17   A.   Yes.

18   Q.   But that was your term, right?

19   A.   It was.

20   Q.   You used the term "ignore" in your e-mail, correct?

21   A.   I did use that word, yeah.

22   Q.   Now, you testified that you did some analysis to decide to

23   engage in the decision to ignore and hold for more, correct?

24   A.   That's correct.

25   Q.   When did you do that analysis?

M. Carothers - Cross

1611

```
 1   A.   I have done it more than once.  The first time that sticks

 2   out was 2007, and probably again in 2009.

 3   Q.   So was this an important analysis to you?

 4   A.   It was.

 5   Q.   But you didn't capture it in writing anywhere, did you?

 6   A.   That's not true.  I sent it in e-mails.

 7   Q.   You sent e-mails about this analysis?

 8   A.   I did.

 9         MR. OPPENHEIM:  Your Honor, we would like a sidebar,

10   please.

11         THE COURT:  Yes, sir.

12         NOTE:  A sidebar discussion is had between the Court

13   and counsel out of the hearing of the jury as follows:

14   AT SIDEBAR

15         MR. OPPENHEIM:  Well, we are here again, and I

16   apologize for that, but --

17         THE COURT:  So you didn't get the --

18         MR. OPPENHEIM:  -- absolutely nothing was produced on

19   this.  And so, he's now testifying it was so important, he did

20   memorialize it.  It wasn't a study that was produced.

21         This is improper.  This is exactly why I didn't want

22   to be where we are now.

23         MR. ELKIN:  Clearly, if there are e-mails setting

24   forth analysis, we would produce it because it helps our case,

25   to say the very least.  I am dying to see them myself.
```

M. Carothers - Cross

1612

1      So I don't know what he is referring to.  He may have

2  just gave some testimony.  But, clearly, if it's something that

3  would justify this, we would have it and we would -- I have no

4  idea what he is referring to.

5      THE COURT:  Just ask him whether he was asked to

6  produce e-mails responsive to this lawsuit, whether he's aware

7  that there were no e-mails produced that had any of this type

8  of information in them.

9      MR. OPPENHEIM:  Very well.  Can I raise one other

10  issue before --

11      THE COURT:  Yes.

12      MR. OPPENHEIM:  -- so we don't end up having to come

13  up again.

14      THE COURT:  Yes.

15      MR. OPPENHEIM:  In response to questions, Mr. Zabek

16  testified as to the good character of -- excuse me.

17  Mr. Carothers testified as to the good character of Mr. Zabek

18  and Mr. Sikes, to indicate that clearly they were just joking

19  in those e-mails.

20      I think they -- Mr. Carothers has opened the door on

21  the question of whether Cox believed that Mr. Zabek had good

22  character.  And I would point, Your Honor, specifically to this

23  one paragraph of his annual review in 2018 where very clearly

24  Cox did not think he had good character with respect to these

25  e-mails.  Right there, Your Honor.  And I will provide opposing

1613

1    counsel a copy as well.

2            But, Your Honor, it goes to the question of his

3    performance.  Right there.

4            MR. ELKIN:  So, Your Honor, I don't want to interrupt

5    your review of it, but let me just suggest, first of all, this

6    has to do with a collateral issue not related to Mr. Carothers.

7            All I did was -- Mr. Oppenheim left the witness

8    hanging on this so-called paranoid panda e-mail.  And he

9    expressed something.  I gave him a chance to respond to it at

10   the outset of the testimony.

11           Mr. Oppenheim knows exactly what the witness was

12   going to say because he asked him that in his deposition.  So

13   there was no surprise with regard to that.  It's nothing more

14   than a setup.

15           And all he did was to comment on why he felt the way

16   he felt and to amplify his answer.  This does not open the

17   door.  We have not thrown these gentlemen under the bus.  That

18   was a representation that I made, of course, right before we

19   began the trial.  That was the position I think the Court had

20   articulated.

21           And I don't know why this has to be raised now while

22   we are --

23           THE COURT:  So this is Brian Cox giving this

24   recommendation?

25           MR. OPPENHEIM:  Supervisor of Mr. Zabek.  And so, I

1614

1    didn't elicit this testimony.  He volunteered it on his own.

2    He has raised the question of Mr. Zabek's character.  Cox here

3    has clearly demonstrated that they disagree with what

4    Mr. Carothers has said.  I should have an opportunity to

5    introduce this and ask him whether or not, you know, he agrees

6    or disagrees with what Cox -- with what Mr. Zabek's review

7    said.

8            MR. ELKIN:  The review is outside the claims period

9    anyway.

10           MR. OPPENHEIM:  But it's in direct response to his

11   activities within the claims period.  They did it after the BMG

12   trial, Your Honor.

13           THE COURT:  Okay.  All right.  Your exception is

14   noted.  I am going to -- I am not going to allow it.  I don't

15   think the door has been opened far enough.  And that is pretty

16   opaque in what he's talking about, and it's a different

17   individual than this witness.

18           So your exception is noted.  You may ask him those

19   questions that we just talked about and see what his answer is.

20   And if I need to instruct the jury that there has been no

21   e-mail produced because all the parties agree that that's the

22   case, then I will do that depending upon his answer.  Okay.

23           MR. ELKIN:  Thank you, Your Honor.

24           MR. OPPENHEIM:  Thank you, Your Honor.

25           NOTE:  The sidebar discussion is concluded; whereupon

M. Carothers - Cross

1615

1    the case continues before the jury as follows:

2    BEFORE THE JURY

3            THE COURT:  All right.  Please proceed.

4    BY MR. OPPENHEIM: (Continuing)

5    Q.   Mr. Carothers, a moment ago you indicated that your

6    analysis was contained within e-mails; is that right?

7    A.   That's correct.

8    Q.   Were you asked to provide those e-mails to counsel for

9    purposes of this case and producing them to plaintiffs?

10   A.   I wasn't.

11   Q.   Other than containing them within e-mails, did you

12   otherwise memorialize this study in any way?

13   A.   I don't think so.  I think I only spoke about it verbally.

14           THE COURT:  Just for the record, there were no

15   e-mails produced which contained any analysis that

16   Mr. Carothers had authored.

17   BY MR. OPPENHEIM: (Continuing)

18   Q.   To be clear, Mr. Carothers, no documentation has been

19   provided to plaintiffs or this Court to support the fact that

20   you claim that you did an analysis that supported this hold for

21   more decision, correct?

22   A.   Correct.

23   Q.   And, in fact, the document we looked at from January 2010

24   says that you decided to ignore the first notice because you

25   were trying to stem the flow, right?

1616

1   A.    That was part of it.

2   Q.    Can we pull up PX 32A, please.  And scroll down.  I

3   believe it is the third paragraph we are looking for.

4         Can you please highlight that third paragraph,

5   please.

6         Mr. Carothers, can you read that paragraph, please,

7   out loud.

8   A.    As an Internet service provider, Cox is responsible under

9   the Digital Millennium Copyright Act, DMCA, to advise when we

10  receive a notice asserting infringement by you.  We are also

11  required to take appropriate action if further complaints are

12  -- excuse me, if further claims are received that you do not

13  resolve.

14  Q.    So when Cox decides to ignore the first notice, Cox is not

15  doing what this e-mail from Cox says it will do, correct?

16  A.    I wouldn't say that.

17  Q.    Well, this e-mail very clearly says that as an ISP Cox is

18  responsible to advise when it receives a notice asserting

19  infringement, right?

20  A.    It does.

21  Q.    And yet when Cox receives the first notice with respect to

22  any particular customer, Cox does not advise the customer of

23  that infringement, correct?

24  A.    That is true.

25  Q.    Nor does Cox provide any notice to a customer of

M. Carothers - Cross

1617

1   infringement when there are multiple notices in a day, right?

2   A.   Well, we provide the one notice.  We don't provide

3   additional notices for the additional complaints.

4   Q.   So the customer may be told, you have been identified

5   infringing, hypothetically, Bruce Springsteen, "Born to Run,"

6   but you wouldn't tell the customer, by the way, you've also

7   been identified as infringing a movie, a book, a piece of

8   software, or any other type of content, correct?

9   A.   That's correct.

10  Q.   Earlier you indicated that -- you answered some questions

11  in response to Mr. Elkin on the issue of caps, right?

12  A.   Yes.

13  Q.   And you said that what Cox wanted was a steady flow,

14  right?

15  A.   That's correct.

16  Q.   And that Cox was doing it out of a sense of fairness,

17  correct?

18  A.   Yes.

19  Q.   I apologize.  You indicated in response to those caps

20  e-mails, that when the RIAA asked, that Cox increased the caps,

21  correct?

22  A.   Yes.

23  Q.   Can we please pull up PX 234, please.  234, I believe.

24           Have you seen this e-mail exchange before,

25  Mr. Carothers?

M. Carothers - Cross

1618

1    A.   I don't think so.

2    Q.   In this e-mail, again, you'll see in the middle of the

3    first page Victoria Sheckler from the RIAA asking Cox whether

4    or not they could get an increase of daily notices to 800 or a

5    thousand per day, correct?

6         MR. ELKIN:   Objection, foundation.

7         THE COURT:   Overruled.

8    A.   Yes, I do see that.

9    BY MR. OPPENHEIM: (Continuing)

10   Q.   And Mr. Cadenhead responded above by saying:  Nope, can't

11   do that, hit the maximum number; right?

12   A.   Yes.

13   Q.   So, in fact, it's not true that Cox just regularly

14   increases the cap when asked, right?

15   A.   I can't say that we approve every request.

16   Q.   Of course, if you did approve every request, there would

17   be no reason to have a cap, right?

18   A.   I suppose.

19        MR. OPPENHEIM:   Any objection to this?

20        MR. ELKIN:   Your Honor, may we approach?

21        THE COURT:   Yes.

22        NOTE:   A sidebar discussion is had between the Court

23   and counsel out of the hearing of the jury as follows:

24   AT SIDEBAR

25        MR. ELKIN:   Counsel just handed to me about a

M. Carothers - Cross

1619

1  minute-and-a-half ago this demonstrative.  And I have just not

2  had a chance to review it.  I don't know whether I find it

3  objectionable or not.  I have just not had a chance to review

4  it.

5          And so, I think it's unfair to sort of spring this on

6  us without our having a chance to look at it.

7          MR. OPPENHEIM:  Your Honor, I --

8          MR. ELKIN:  This is not -- this is supposed to be --

9          THE COURT:  It's just a hypothetical.  If you got a

10  thousand complaints and -- tell me what you want to use this

11  for.

12          MR. OPPENHEIM:  Right.  So I didn't know exactly what

13  Mr. Carothers was going to testify to.  I, obviously, had some

14  inkling if he would go down this road, so I prepared this in

15  case.  Excuse me, I'm losing my voice.

16          It shows on the first day if your cap is 200, but you

17  get thousand notices, 800 are below the cap get rejected.

18          Then after five days, if you still have a thousand

19  each day, you get a thousand in, but there are 4,000 that get

20  rejected.  Then it shows the impact over a year of what

21  happens.

22          So this daily flow argument, obviously, is entirely

23  dependent on the number of notices that you receive and what

24  your cap is.  And so, in response to this steady flow comment,

25  I want to demonstrate to the jury the impact of it.

M. Carothers - Cross

1620

1       MR. ELKIN:  Your Honor, there is no evidence -- this
2  is not tethered to any evidence at all.  I mean, why not a
3  million?  It's a hypothetical to a non-expert.
4       MR. OPPENHEIM:  In fact, there was evidence presented
5  before as to one of the movie studios who was trying to send
6  3,700 a day, over 3,700 a day, but they were capped.  There was
7  evidence of others who were capped.
8       So there's plenty of evidence -- I actually -- a
9  thousand is low compared to what many folks wanted to send.
10       THE COURT:  I am not going to receive the exhibit as
11  demonstrative.  You may ask him questions about it.  I am not
12  going to let you use a demonstrative.
13       A thousand -- you can use it in closing argument, but
14  you're not going to use it with this witness in a hypothetical
15  situation without him having identified the numbers of
16  complaints that are coming in and his personal knowledge.
17       I did allow the last question based -- even though it
18  is Cadenhead and not him because he has testified about his
19  familiarity with the limitations imposed on it, and I thought
20  it was fair game.
21       MR. ELKIN:  I understand.
22       THE COURT:  Okay.  All right.
23       MR. ELKIN:  Thank you, Your Honor.
24       THE COURT:  Yes, sir.
25       NOTE:  The sidebar discussion is concluded; whereupon

M. Carothers - Cross

1621

1    the case continues before the jury as follows:

2    BEFORE THE JURY

3    BY MR. OPPENHEIM: (Continuing)

4    Q.   Mr. Carothers, in response to Mr. Elkin's questions you

5    indicated that one of the reasons that Cox instituted caps on

6    the number of notices that a rights holder could send was

7    because you wanted a steady flow of notices; is that right?

8    A.   That's correct.

9    Q.   And -- but that actually doesn't work if the rights holder

10   consistently wants to send more than the cap, right?

11   A.   No, it still works.

12   Q.   Well, it still works from Cox's perspective because they

13   only get the cap every day, but from the rights holder's

14   perspective, the backlog of notices that they can't send just

15   keeps backing up and backing up and backing up, correct?

16   A.   I suppose so.

17   Q.   You also indicated that one of the reasons that Cox

18   instituted caps was because of fairness, correct?

19   A.   Yes.

20   Q.   Do you believe it's fair that a copyright owner shouldn't

21   be allowed to report infringement on Cox's network that they're

22   aware about?

23   A.   It's -- well, yeah.  If one copyright owner is allowed to

24   lock out all the others, then the others don't get to report

25   that infringement.

M. Carothers - Cross

1622

1    Q.   Do you agree with the testimony of others in this --

2    strike that.

3           You indicated at the end of your testimony in

4    response to Mr. Elkin that this case was important for ISPs

5    because of the concern that ISPs might be held responsible for

6    what their customers do on their network, right?

7    A.   Yes.

8    Q.   You're familiar with the DMCA, are you not?

9    A.   Somewhat.

10   Q.   And you understand that the DMCA explicitly contemplates

11   an ISP being responsible to respond to notices that they are

12   sent, right?

13   A.   Yes.

14          MR. OPPENHEIM:  I have no further questions.

15          THE COURT:  Okay.

16          MR. ELKIN:  No further questions, Your Honor.

17          THE COURT:  All right.  May Mr. Carothers be excused?

18          MR. ELKIN:  Yes.

19          THE COURT:  All right.  You are excused with our

20   thanks, sir.  Please don't discuss the testimony you have given

21   here today with anyone until our trial is over.  All right?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  All right.  Have a good afternoon.

24          THE WITNESS:  Thank you.  You too.

25          NOTE:  The witness stood down.

1623

1          THE COURT:  Next witness.

2          MR. OPPENHEIM:  Your Honor, the plaintiffs will call

3    Joseph Sikes by video.

4          THE COURT:  All right.

5          MR. OPPENHEIM:  I will assure you that it is far

6    shorter than the Zabek video.

7          THE COURT:  All right.  Let's go ahead.

8          MR. ELKIN:  Your Honor, there is one issue that just

9    was brought to my attention regarding a last minute designation

10   deletion that may affect the playing of the video that I'm just

11   hearing about for the first time.

12         THE COURT:  Okay.  So you want a minute to work

13   through that?

14         MR. ELKIN:  Yes, please.

15         THE COURT:  All right.  Then we'll take a short

16   recess and we'll come back shortly.  Let's plan on -- well, I

17   guess we'll take our mid-afternoon break, although it is a

18   little early.

19         We will try and keep it a little shorter than

20   15 minutes, and maybe we will have a second break later.

21         Okay.  All right, thank you.  You are excused.

22         NOTE:  At this point the jury leaves the courtroom;

23   whereupon the case continues as follows:

24   JURY OUT

25         THE COURT:  Is this something you expect to take

1624

1    five minutes, or ten minutes, or is this --

2              MR. OPPENHEIM:  We don't know what it is.

3              THE COURT:  We don't know.  Okay.

4              MR. ELKIN:  We probably just need two or

5    three minutes to speak to ourselves, confer with them, and

6    decide whether we need to bring something to Your Honor's

7    attention.

8              I apologize for the break in the action.  I didn't

9    know what was going to be an issue.

10             THE COURT:  That's not a problem at all.  All right.

11   Just let me know how you are doing, and otherwise we will plan

12   on being back within 15 minutes.

13             MR. ELKIN:  Thank you.

14             THE COURT:  All right.  We're in recess.

15             NOTE:  At this point a recess is taken; at the

16   conclusion of which the case continues in the absence of the

17   jury as follow:

18   JURY OUT

19             THE COURT:  Yes, sir.

20             MR. OPPENHEIM:  I am pleased to tell Your Honor that

21   we are coming close to the end of our case in chief, but it

22   creates a dilemma based on something Your Honor said earlier

23   for us that we want to try to work through.

24             THE COURT:  Sure.

25             MR. OPPENHEIM:  So we have Mr. Sikes' video, which

1  will go roughly an hour-and-a-half.  And then we have

2  Mr. Fuenzalida, which is about 20 minutes of video.

3          MR. GOULD:  30.

4          THE COURT:  Okay.

5          MR. OPPENHEIM:  30?  Okay, I lied.  30.

6          THE COURT:  Okay.

7          MR. OPPENHEIM:  Assuming the Court is trying to push

8  as close to 6:00 as we can, we'll have time -- our last witness

9  is Mr. Lehr.  So we're --

10          THE COURT:  Okay.

11          MR. OPPENHEIM:  And I believe, you know, we can get

12  him from the hotel.  He's ready to go.  He has been here for

13  quite sometime.  But I know Your Honor said to Mr. Buchanan

14  that we wouldn't call Mr. Lehr until tomorrow.

15          THE COURT:  Well, that will get us until 5:30 or

16  5:40.  We will take a ten-minute recess after the first

17  hour-and-a-half deposition, and then do the follow-up one.

18  That should that take us to the end of the day, don't you

19  think?

20          Mr. OPPENHEIM:  That's fine.  I just didn't know how

21  long you wanted to go today.

22          THE COURT:  That's fine.  That will work.

23          MR. OPPENHEIM:  Okay.  Great.  The second issue, just

24  to draw to Your Honor's attention, the Tuesday pretrial that we

25  had, Your Honor asked for a short bench memo on the issue of

1626

1    the scope of Dr. Weber's testimony.

2             So our -- I believe that counsel for Cox intends to

3    call Dr. Weber tomorrow, assuming it is ready.  So our

4    inclination was to submit something this evening by e-mail, if

5    Your Honor accepts.  I don't understand that Cox is going to

6    submit something, but I don't know.

7             Oh, you will?  Okay.  I don't want to speak for them.

8             MR. ELKIN:  First of all, Your Honor, we worked out

9    the issues related to the Sikes designations.  Thank you very

10   much for breaking and giving us a chance to work that out.

11            THE COURT:  That's great, thank you.

12            MR. ELKIN:  We will -- if we don't have something by

13   late tonight, we will have it first thing in the morning.  So

14   we will have a submission on Weber for you.

15            THE COURT:  Okay.  All right.  Then I will look for

16   it, for that either later tonight or -- likely if it's late, I

17   am not going to look at it until first thing in the morning any

18   way.  And so, that works fine.

19            All right, that's terrific.  Good news.  And I

20   appreciate you working out the deposition issue.

21            And so, let's get the first one on, and we'll take a

22   ten-minute recess and we will do the second one.

23            MR. OPPENHEIM:  Very well.

24            THE COURT:  All right.  Thank you.

25            All right, Joe, let's get our jury.

1627

```
1           NOTE:  At this point the jury returns to the
2   courtroom; whereupon the case continues as follows:
3   JURY IN
4           THE COURT:  All right.  Please have a seat.
5           So I understand we are going to have two depositions
6   for the rest of the afternoon, one is about an hour-and-a-half,
7   and then we'll take a ten-minute recess and we'll come back and
8   hear the other one, it's only about 25, 30 minutes long.
9           So that should get us to the end of the day, right
10  around, you know, 5:30 or so, if that works.
11          All right.  Mr. Oppenheim, your next witness by
12  deposition is --
13          MR. OPPENHEIM:  Joseph Sikes.  And there are exhibits
14  contained within that deposition which we can move into
15  evidence after the jury has left, if it's acceptable, yet show
16  them on the screen so the jury can see them.
17          THE COURT:  Yeah.  There is no objection to that?
18          MR. ELKIN:  No objection, Your Honor.
19          THE COURT:  Okay.
20          MR. OPPENHEIM:  And this deposition excerpt they are
21  going to see will include designations from both Cox and from
22  the plaintiffs.
23          THE COURT:  All right.  And is he a joint witness for
24  both parties, is that right, or is he just --
25          MR. ELKIN:  We didn't -- he is not -- he wasn't
```

1628

1    called by --

2            THE COURT:  In your case.

3            MR. ELKIN:  -- Mr. Zabek or Mr. Sikes called in our

4    case.  It's their case.

5            THE COURT:  All right.  Thank you then.

6            MR. OPPENHEIM:  Wait a minute, hold on.

7            THE COURT:  So he's --

8            MR. OPPENHEIM:  Cox made affirmative designations for

9    the deposition.  I don't think we need to make an issue out of

10   this, but there were designations from both sides, Your Honor.

11           MR. ELKIN:  Absolutely.  I didn't mean to imply

12   otherwise.

13           THE COURT:  Yeah, I confused you with the question.

14   I conflated two different issues.

15           So you will hear direct examination and

16   cross-examination of this witness, who is a Cox employee.

17           All right.  Let's play our deposition.

18           NOTE:  The testimony of Joseph Sikes via video

19   deposition is played into the record as follows:

20       EXAMINATION

21   BY MR. GOULD:

22   Q.   Good morning, Mr. Sikes.  We met a moment ago.  My name is

23   Jeff Gould.  How are you?

24   A.   Doing well.  How are you this morning?

25   Q.   Good.  Thank you.

J. Sikes - Video Deposition

1629

1        When did you join Cox Communications, Mr. Sikes?

2    A.   In 2003, of November.

3    Q.   And at some point did your employment with Cox end?

4    A.   Yes, in January 2016.

5    Q.   You spent about 12 or 13 years at Cox; is that right?

6    A.   Going on 13 years, yes.

7    Q.   Did you receive promotions during that time?

8    A.   I did.

9    Q.   Pay increases?

10   A.   Yes.

11   Q.   You felt you worked hard?

12   A.   I did, yes.

13   Q.   Did you have performance reviews?

14   A.   Yes.

15   Q.   How were those reviews, generally?

16   A.   Usually very well.

17   Q.   Who reviewed you?

18   A.   Jason Zabek, Matt Carothers, Tim Metz.

19   Q.   Ever receive a bad review?

20   A.   Never, no.

21   Q.   Did you think you deserved to be fired?

22   A.   I wasn't fired.

23   Q.   That's not what I asked you.

24        Did you think you deserved to be fired in

25   January 2016?

1630

1   A.   If I was fired, I would have understood.  I wouldn't have

2   questioned it.

3   Q.   Did you think that you deserved to be fired by Cox in

4   January 2016?

5   A.   No.

6   Q.   Mr. Sikes, I have handed you Exhibit 111.  Do you

7   recognize it?

8   A.   Yes.

9   Q.   What is it?

10  A.   This is what I understood to be my, I guess, nondisclosure

11  agreement with Cox.

12  Q.   You think this is a nondisclosure agreement?

13  A.   That was how I -- yeah, that's what I was told and that's

14  what I remember.

15  Q.   Do you believe that Exhibit 111 is an accurate copy of the

16  agreement that you signed from Ms. Keever around January 2016?

17  A.   I believe it is, yes.

18  Q.   Did you discuss the terms of your separation with

19  Ms. Keever?

20  A.   No, I didn't discuss it with her.

21  Q.   You mentioned something about a pension plan and a bonus.

22  Do you recall?

23  A.   Yes.

24  Q.   You had a bonus that you thought was coming to you after

25  2015?

J. Sikes - Video Deposition

1631

1  A.  Yes.

2  Q.  How much was that bonus to be?

3  A.  9,000-something dollars.

4  Q.  And did you collect that bonus?

5  A.  Yes.

6  Q.  So with your resignation, Cox agreed to pay you your

7  bonuses?

8  A.  Yes.

9  Q.  Go down to paragraph 6.  There is a confidentiality

10  statement.  And then a second sentence that says:  You agree

11  you will not engage in any conduct or activities detrimental to

12  the best interests of Cox, its owners, affiliates, or

13  subsidiaries, including, but not limited to, any disparaging,

14  denigrating, or untrue statements about Cox or any -- or about

15  any employee of Cox or its owners, affiliates, or subsidiaries.

16       Did I read that correctly?

17  A.  Yes.

18  Q.  So even if you had the worst things in the world to say

19  about Cox, you couldn't, correct?

20  A.  I basically can't say anything that's not true about Cox.

21  Q.  And you can't say anything to disparage or denigrate Cox,

22  correct?

23  A.  If it's not true.

24  Q.  Sir, paragraph 6 says you agree not to disparage or

25  denigrate Cox, correct?

J. Sikes - Video Deposition

1632

1   A.   Yes.

2   Q.   You are contractually prohibited from denigrating or

3   disparaging Cox, correct?

4   A.   I guess so, yes.  That's what it says.  And I had no

5   problems agreeing with that.  Like I said, I had nothing, I had

6   nothing disparaging to say about Cox, you know, even during

7   this time that I was leaving, I didn't -- you know, like I

8   said, I took -- I was accountable for my own actions, my own

9   words and Cox, did nothing wrong.

10  Q.   Are you being paid to be here?

11  A.   No.

12  Q.   And are you being paid for your time?

13  A.   No.

14  Q.   Were you paid for your travel expenses to get here?

15  A.   No.

16  Q.   You are required to testify today based on your

17  contractual obligation to Cox, correct?

18  A.   Correct.

19  Q.   You're prohibited from saying anything bad about Cox here

20  today, correct?

21  A.   Correct.

22  Q.   If you say anything bad here about Cox, Cox has a right to

23  nullify this agreement and Exhibit 111, correct?

24  A.   Correct.

25  Q.   And if you say anything bad about Cox today, you have to

J. Sikes - Video Deposition

1633

1    repay all of the money Cox has paid to you since the date of

2    this agreement, correct?

3    A.    Correct.

4    Q.    Probably not going to say anything bad about Cox under

5    that circumstance, are you?

6    A.    I have nothing bad to say about Cox.

7    Q.    How much pay have you received from Cox since

8    January 2016?

9    A.    Um, I received my last paycheck -- I don't, I don't know

10   the exact amount.

11   Q.    Well, give me a ballpark or walk me through --

12   A.    Since.

13   Q.    Walk me through the pieces of it.

14         I didn't mean to cut you off, I apologize.

15   A.    I apologize for cutting you off.

16         So I received my final paycheck a couple of weeks

17   after I left, or within a couple weeks after I left, for a few

18   thousand dollars.  In February I received my bonuses, which

19   totaled an amount of about $16,000 after taxes.

20         So I don't know, do the math, 35 percent, I don't

21   know what it was taxed at, but I don't remember what the -- the

22   before-tax bonus was.

23   Q.    You previously talked about two bonuses, one for 16,000

24   after taxes and one for 9,000 or so after taxes; is that

25   correct?

J. Sikes - Video Deposition

1634

1   A.   No.  The 16,000 was the total of the bonuses.  There were

2   two bonuses.  One was a retention bonus for $9,500, and one was

3   my individual contributor performance bonus.

4   Q.   Do you feel like your interests are aligned with Cox in

5   this case?

6   A.   Cox was a very significant part of my life.  Over half of

7   my adult life was spent there.  And I've got a lot of good

8   friends and people I almost consider family at Cox.  So, you

9   know, if they need me to help out, I'm -- it's my interest to

10  be here.

11        And, also, this was -- anyway, this -- this means a

12  lot to me.  So I don't know if my interests are aligned, but I

13  personally feel -- I don't -- I don't believe that they're not.

14  I don't know how to answer that question.

15  Q.   Mr. Sikes, you worked in the abuse and safety group at

16  Cox; is that right?

17  A.   Yes.

18  Q.   There is an emphasis on customer service in that

19  department; is that correct?

20  A.   Yes.

21  Q.   And in keeping with that customer satisfaction, Cox also

22  wanted to retain customers, correct?

23  A.   Of course.

24  Q.   Those also were goals in your work on the abuse team,

25  correct?

J. Sikes - Video Deposition

1635

1   A.   No.  They weren't our goals.  We had no -- we had no

2   influence over retaining customers.  Or it really wasn't -- it

3   wasn't our department's objective to retain customers.

4   Q.   In the abuse department you handled various types of

5   complaints, correct?

6   A.   Yes.

7   Q.   Phishing, spam, malware, correct?

8   A.   Yes.

9   Q.   Copyright infringement notices?

10   A.   Yes.

11   Q.   Mr. Sikes, I've handed you Exhibit 115.  This is an e-mail

12   dated the same date, January 12, 2010, from you -- between you

13   and Mr. Carothers, correct?

14   A.   Correct.  Yes.

15   Q.   Mr. Carothers asks you to send him topics you would like

16   to discuss on today's DAB abuse call, correct?

17   A.   Correct.

18   Q.   And you reply:  Hey, Matt.  Here are some topics I'm

19   interested in.

20        The first one says:  Abuse life after DMCA -- could

21   we really ignore the bulk of the DMCA notices?

22   A.   Okay, yes.

23   Q.   You were concerned -- were you concerned about ignoring

24   the bulk of DMCA notices?

25   A.   I don't remember.  I don't remember this, this e-mail, or

J. Sikes - Video Deposition

1636

1    what -- what I thought at that time.

2    Q.   But on that date you expressed a question or a concern to

3    Mr. Carothers about whether Cox could ignore the bulk of DMCA

4    notices, correct?

5    A.   It looks like I did, yes.

6    Q.   Mr. Sikes, could you just walk me through your job history

7    at Cox quickly, please.

8    A.   I will -- yeah, I'll try my best.  I started in November

9    of 2003 as -- I guess my title was abuse engineer.  Technically

10   in HR my title was service delivery engineer.  But they -- our

11   job was in the abuse department.  So my job title was abuse

12   engineer.  I --

13   Q.   I'm sorry.

14   A.   No, go ahead.  I'm finished.

15   Q.   How long did you have that position?

16   A.   For several years, I believe at least -- I was referred to

17   as an abuse engineer for -- from 2003 to 2009 or '10.

18   Q.   And your job responsibility was to address abuse tickets

19   that Cox received?

20   A.   That was part of it, yes.

21   Q.   And what was your next job at Cox?

22   A.   Well, my next job -- technically, my next job was an

23   information security consultant, which I started in 2015.

24   But -- are you talking about my, I guess, process through

25   the -- through my job as an abuse engineer or --

J. Sikes - Video Deposition

1637

1    Q.   Yeah, I just want to know your job progression at Cox.

2    A.   Like I said, it's -- I don't remember exact dates and

3    titles other than unofficial titles.  But, yes.  So I was the

4    abuse engineer through -- from 2003 through 2009 to -- or

5    possibly 2010.  At some point I received a promotion in that

6    time to a Level 2 service delivery engineer.  Still was -- my

7    title was still abuse engineer.

8              At some point, it may have been 2009 or '10, I was

9    promoted to a Level 3 service delivery engineer, and my title

10   became senior abuse engineer.

11   Q.   You were essentially a Level 1, and then a Level 2, and

12   then a Level 3 abuse engineer?

13   A.   Yes.

14   Q.   Did your job responsibilities change with each of those

15   different positions?

16   A.   I mean, I was told I had more responsibility and I took, I

17   took more of a lead role and, I guess, trained new hires, and I

18   trained people in customer service and the TOC.  I guess I --

19   as I became a senior abuse engineer, I was looked upon to

20   provide guidance and consult other teams on -- on handling

21   abuse concerns.

22   Q.   At some point you became the lead senior abuse engineer?

23   A.   Yeah.  That was not a real title, but, yeah, senior lead

24   abuse engineer.  In 2013 -- so as I remember, like I said, I

25   made it up to a Level 3 service delivery engineer.  And then I

J. Sikes - Video Deposition

1638

1    think at some point my role changed to security administrator.

2    And they changed -- they kind of redid the roles in HR, and I

3    became a Level 2 security administrator.

4             In 2013, I don't remember what happened with my title

5    exactly, but I did receive a promotion around 2013.  And,

6    basically, you know, it's kind of like, what do you want on

7    your business card?  And I put senior lead abuse engineer, I

8    guess to commemorate the promotion.

9             And, anyway, it was definitely a great conversation

10   when I would hand out my business cards, but it wasn't an

11   official title.  I was a Level 3 something, engineer,

12   administrator, I don't know, but --

13   Q.   As the lead senior engineer position that you described,

14   one of your job responsibilities was to train others in abuse

15   handling, correct?

16   A.   Correct.

17   Q.   You were essentially the No. 2 person on the abuse team;

18   is that correct?

19   A.   What do you mean by No. 2 person?  Under Jason Zabek, yes,

20   I was -- Jason Zabek was our manager, and I was his lead

21   engineer.

22             So, I guess, yes, for our three-person team, I was

23   No. 2 in title.

24   Q.   And the third was Andrew Thompson; is that right?

25   A.   Yes.

J. Sikes - Video Deposition

1639

1  Q.   The abuse department was led by Jason Zabek, correct?

2  A.   Yes.

3  Q.   You as the lead senior abuse engineer were the No. 2 in

4  command of the abuse department in the 2013/2014 time period,

5  correct?

6  A.   I was No. 2 in title to Jason Zabek.  I was not a manager

7  or a -- I was not any form of supervisor.  I was an individual

8  contributor.

9  Q.   Part of your job responsibilities were enforcing Cox's

10  Acceptable Use Policies, correct?

11  A.   Correct.

12  Q.   Those policies prohibit customers from using Cox's service

13  to engage in copyright infringement, correct?

14  A.   That is part of it, yes.

15  Q.   Part of your job responsibility was assisting in making

16  decisions about whether to terminate customers' Internet

17  service, correct?

18  A.   More or less, yes.

19  Q.   Including whether to terminate customers' Internet service

20  after Cox received multiple copyright infringement notices,

21  correct?

22  A.   Correct.

23  Q.   Also involved in addressing other types of abuse, like

24  excessive bandwidth use, correct?

25  A.   At some point I dealt with bandwidth concerns.  It depends

J. Sikes - Video Deposition

1640

1 upon what period of time you're referring to.

2 Q.   I'm generally talking about the 2012 to 2014 period.

3 A.   I don't recall in 2012 to 2014 if I was handling bandwidth

4 concerns.

5 Q.   Bandwidth is one of the issues that the abuse department

6 dealt with in terms of complaints about customers' use,

7 correct?

8 A.   There were multiple types of bandwidth abuse that I dealt

9 with in my time at Cox.  At some point they implemented a

10 process that was fully automated to address customers that were

11 using excessive amounts of bandwidth and impacting service to

12 other customers.

13 Q.   The abuse team was involved in addressing abuse complaints

14 for both residential and Cox Business customers, correct?

15 A.   Correct.  There was a residential abuse team and a Cox

16 Business abuse team.

17 Q.   Which team were you on?

18 A.   I helped with both teams.  I was in the corporate abuse

19 team in Atlanta under Jason.

20 Q.   And did you interact with Cox Business customers in

21 response to abuse complaints?

22 A.   Occasionally, yes.  I talked to some Cox Business

23 customers directly.  I also joined calls with our Cox Business

24 abuse team and Cox Business customers.

25 Q.   So the corporate abuse team involving you, Mr. Zabek, and

J. Sikes - Video Deposition

1641

1   Mr. Thompson handled both residential and Cox Business abuse

2   complaints, correct?

3   A.   Correct.  We -- yes.

4   Q.   Were you also involved in the decisions of whether to

5   terminate the service of Cox Business customers?

6   A.   There -- yes.  Not for copyright infringement, but for --

7   if we had cases of Cox Business customers that were basically

8   spammers, and Jason handled a lot of those because Jason came

9   from the Cox Business side of Cox.

10          So -- but, yes, I was involved in terminating at

11  least one Cox Business subscriber.

12  Q.   For what?

13  A.   For, for being a spammer.  For basically setting up mail

14  servers and blasting spam all over the Internet.

15  Q.   Do you recall a Cox Business customer ever being

16  terminated for abuse complaints related to copyright

17  infringement?

18  A.   No.

19  Q.   Do you know why Cox wasn't terminating business customers

20  for copyright infringement abuse?

21  A.   I don't know exactly -- well, that was just -- that was

22  the longstanding policy.  We didn't suspend Cox Business

23  customers either unless we couldn't get in touch with them.

24          But in most cases a lot of our Cox Business customers

25  were hotels, universities, resellers of Cox service.  So, you

J. Sikes - Video Deposition

1642

1    know, we -- we generally would not terminate those, those

2    businesses.

3           Also, in my experience, I found that a lot of Cox

4    Business customers were highly responsive when you speak to a

5    manager or the owner of a business, and usually they have an IT

6    staff or someone to help them trouble-shoot or identify the

7    issue.

8           I mean, there wasn't -- in most cases that I was

9    aware of, there -- Cox Business customers were highly

10   cooperative and compliant.

11   Q.   It was Cox's policy not to terminate or suspend Cox

12   Business customers for copyright infringement abuse, correct,

13   during the 2013/'14 time frame?  Yes or no?

14   A.   I don't know.  So what I do know when I started assisting

15   with Cox Business abuse concerns in around maybe 2006, I was

16   just told, we don't suspend.

17          No one has ever said, we don't terminate Cox Business

18   customers for copyright infringement.  That was never told to

19   me.  I never read any documents that said that, or I don't

20   remember any, but I do remember being told, we do not suspend

21   the customer, we call them for every abuse complaint.

22   Q.   Mr. Sikes, I've handed you what's marked as Exhibit 116.

23   Do you recognize it?

24   A.   Yes.

25   Q.   This is a Customer Safety and Abuse Operations Ticket

J. Sikes - Video Deposition

1643

1     Handling Procedures for Cox Business abuse, correct?

2     A.    Correct.

3     Q.    And the revision history on the front page shows that this

4     was last revised in May 2013, correct?

5     A.    Yes.

6     Q.    You and your team had oversight of the Cox Business abuse

7     team that implemented these procedures, correct?

8     A.    We consulted with them, yes.

9     Q.    Were you involved in developing the Cox Business abuse

10    ticket handling procedures?

11    A.    I contributed to this document.

12    Q.    How did you contribute?

13    A.    I don't recall.

14    Q.    If you would turn to page 8.  It shows Copyother.  Does

15    that refer to copyright infringement abuse?

16    A.    Yes.

17    Q.    On page 9 at the top, it describes action items for

18    resolving copyright infringement notices to Cox Business

19    customers, correct?

20    A.    Correct.

21    Q.    And the first step is to -- within a six-month period is

22    to hold for more and close the ticket, correct?

23    A.    Correct.

24    Q.    That's the same process that we saw earlier which

25    Mr. Carothers described as ignoring the first ticket, correct?

J. Sikes - Video Deposition

1644

1    A.    Correct.

2    Q.    And then at 6.0 it shows that for the second complaint and

3    beyond, and it has some action items.  Do you see that?

4    A.    Yes.

5    Q.    And do you see at the top of that box for second complaint

6    and beyond, those are the procedures for -- that would be for

7    the second complaint, correct?

8    A.    Yes.

9    Q.    And the third?

10   A.    Yes.

11   Q.    And the tenth, correct?

12   A.    Assuming so, yes.

13   Q.    And the 50th complaint, correct?

14   A.    Perhaps, yes.

15   Q.    It would indicate a serious problem to you if a Cox

16   Business customer received 50 takedown notices, correct?

17   A.    Yes.  And it would indicate a serious problem to the

18   customer as well.  I don't think any business would want to

19   have thousands of complaints caused by activity on their

20   network.

21   Q.    Are you aware that there are Cox Business customers who

22   received hundreds of copyright infringement notices?

23   A.    I don't remember.

24   Q.    Are you aware that there are Cox Business customers in the

25   2012 to 2014 time frame who received thousands of copyright

J. Sikes - Video Deposition

1645

1    infringement abuse notices?

2    A.   I don't seem to recall that, no.

3    Q.   Would it concern you if you learned that a Cox Business

4    customer was the subject of hundreds or thousands of copyright

5    infringement notices?

6    A.   Yes.

7    Q.   Do you think Cox should be doing something about that?

8    A.   Absolutely.

9    Q.   Like what?

10   A.   Work with that customer.  Work with that customer to

11   identify the source of the issue and offer suggestions to

12   mitigate the problem.  Because, like I said, I don't think any

13   Cox Business customer would want that level of complaints being

14   caused by activity from their network.

15         I mean, first of all, it could -- you know, it sounds

16   like they could have a serious virus or compromise on their

17   network.  Anyway, there's a lot of -- there's a lot of concerns

18   in addition to the large volume of copyright infringement

19   complaints.

20   Q.   You don't know if there is something Cox could have done

21   to prevent thousands of instances of copyright infringement

22   occurring by its Cox Business customers through Cox's network?

23   A.   What I do know is that Cox can work with a customer and

24   consult with the customer on identifying the issue.  If the

25   customer, himself or herself, is the one that's causing that

J. Sikes - Video Deposition

1646

1    level of infringement, then that customer is terminated from

2    the network.

3            But, yeah, if a large hotel or reseller of Cox

4    service was -- had thousands of complaints originating from the

5    network, the only thing that I can think of right now is that

6    Cox could -- would consult with that customer.

7    Q.   If you turned off -- if Cox turned off the Internet

8    service for a Cox Business customer, wouldn't that stop

9    infringement that's occurring through that service?

10   A.   It would stop all Internet activity coming from that

11   customer.

12   Q.   Including copyright infringement occurring on that

13   network, correct?

14   A.   Sure.

15   Q.   Cox Business has many customers, correct?

16   A.   Correct.

17   Q.   They are not all hospitals, are they?

18   A.   No, of course not.

19   Q.   And they are not all emergency service providers, are

20   they?

21   A.   True.

22   Q.   In fact, Cox Business provides service to all variety of

23   businesses, correct?

24   A.   Correct.

25   Q.   Commercial businesses, correct?

J. Sikes - Video Deposition

1647

1    A.    Correct.

2    Q.    Retail businesses?

3    A.    Yes.

4    Q.    Schools?

5    A.    Yes.

6    Q.    Other kinds of businesses, right?

7    A.    Yes.

8    Q.    So setting aside the particular dates, you recall that Cox

9    increased the number of copyright infringement notices it would

10   require before terminating a customer's service, correct?

11   A.    Correct.

12   Q.    You also recall that Cox increased the number of

13   suspensions to a soft-walled gardened where customers could

14   self-reactivate, correct?

15   A.    Correct, yes.  That e-mail did not mention there was an

16   additional self-reactivation added, yes.

17   Q.    And Cox also increased the number of suspensions to the

18   hard-walled garden where Cox customers would have to call in

19   and speak to a Cox agent to be reactivated?

20   A.    Yes.

21   Q.    And Cox added a procedure we saw in 2010 to ignore the

22   first notice without warning customers, correct?

23   A.    Cox added a procedure to hold that complaint and hold for

24   the next -- hold for another complaint to come in.

25   Q.    Which Mr. Carothers described as ignore it, correct?

J. Sikes - Video Deposition

1648

1  A.   Those were his words.  I don't believe he meant it in that

2  way.

3  Q.   But you, obviously, don't know what's in Mr. Carothers'

4  head, do you?

5  A.   I don't know what's in his head, but I know Mr. Carothers

6  very well and --

7  Q.   So --

8          MR. ELKIN:  You have got to let him finish.  Go

9  ahead, finish your answer.

10 A.   No, I know Matt very well.  I don't -- I don't think he

11 meant ignore, just toss it aside.

12 Q.   And in that entire period, Cox was capping or limiting the

13 number of copyright infringement notices it would receive from

14 abuse complainants, correct?

15 A.   Not correct.

16 Q.   What's not correct?

17 A.   Not the entire time.  At some point the caps were

18 implemented, but not from 2003 to 2010, I don't -- I don't

19 know.

20 Q.   Okay.  Well, let's start at, say, 2008.

21 A.   Okay.

22 Q.   From 2008 to 2015, Cox imposed caps on the number of

23 copyright infringement notices it would receive from parties,

24 correct?

25 A.   I don't remember -- 2008 to -- sometime in there, in that

J. Sikes - Video Deposition

1649

1    time period, yes.  I don't -- yeah, I don't know if it was

2    2008, 2009, 20 --  I don't remember.

3    Q.   Do you have an understanding one way or another whether

4    Cox deleted those notices?

5    A.   I don't know.  You would have to ask Brent Beck on how

6    that was handled.

7    Q.   Mr. Sikes, I'm handing you Exhibit 119.  This is a

8    May 2012 e-mail exchange between you and a number of others in

9    the abuse department, correct?

10   A.   Yes.

11   Q.   And if you look down at the beginning, it's an e-mail from

12   you regarding Resi -- Residential Abuse M&P Format and

13   Improvements?

14   A.   Yes.

15   Q.   And you say that you'll be updating and hopefully

16   improving the Residential Abuse M&P Doc.  That's the procedures

17   guidelines we've been looking at?

18   A.   Yes.

19   Q.   And you're soliciting input from the team; that there was

20   another format that worked better or had other suggestions,

21   correct?

22   A.   Correct.

23   Q.   And Mr. Vredenburg replies on May 24, 2012.

24   Mr. Vredenburg was a Level 2.5 TOC rep, correct?

25   A.   Correct, yes.

J. Sikes - Video Deposition

1650

1  Q.   He says -- can you read the second sentence of his e-mail,

2  please.

3  A.   Right now after customers are terminated and reactivated

4  for DMCA, they start all over again in the process (warnings,

5  suspensions, final, termination).

6  Q.   And the next sentence, please.

7  A.   This gives the customer ten chances to share files before

8  they even have to talk to us, (404), again.

9  Q.   And (404) refers to the requirement that they call in to

10  the Atlanta office, correct?

11  A.   Well, it's -- yeah, the Atlanta number that was forwarded

12  to the TOC, yes.

13  Q.   And in the next sentence Mr. Vredenburg proposes a

14  procedure that after a customer is reactivated from the

15  termination and we get further complaints, then the customer is

16  suspended to the (404) number right away and on each subsequent

17  violation, rather than going through the whole process again,

18  correct?

19  A.   Correct.

20  Q.   Wouldn't it have made more sense to take subsequent

21  copyright infringement abuse complaints more seriously than

22  clean slate?

23  A.   If the customer was working on the issue, like I said, if

24  the customer was taking it seriously, we felt that the customer

25  deserved more time to try to address the issue.

J. Sikes - Video Deposition

1651

1    Q.    So between 2008 and 2010, Cox added two additional notices

2    before it would terminate or consider termination?

3    A.    It appears that we did, yes.

4    Q.    And the reasons described for the changes are to reduce

5    customer calls, correct?

6    A.    Yes.

7    Q.    Neither you, nor Mr. Zabek, say anything about reducing

8    copyright infringement on Cox's network, correct?

9    A.    That's not stated in this e-mail, no.

10   Q.    And neither you, nor Mr. Zabek, say anything about

11   protecting the rights of artists or songwriters, correct?

12   A.    That is not stated in the e-mail, no.

13   Q.    And it doesn't say anything about increasing the number of

14   contacts with customer -- with customers to improve their

15   education, does it?

16   A.    Not in this document, no.

17   Q.    In fact, it talks about reducing the costs, right?

18   A.    Yes, it talks about reducing, yeah, calls to the -- to

19   Tier 2.

20   Q.    When the TOC or Tier 2.5 level rep is making termination

21   decisions at the 13th and higher steps, they have access to

22   certain information about the customers' use history, correct?

23   A.    What do you mean by "use history"?

24   Q.    The agent has access to the customer's -- to the complaint

25   that generated that 13th or higher notice, correct?

J. Sikes - Video Deposition

1652

1    A.   Yes.

2    Q.   And the agent has access to the customer's ticket history

3    for other complaints, correct?

4    A.   Correct, yes.

5    Q.   And the customer's -- the TOC rep also has access to a

6    bandwidth meter showing how many megabytes the customer has

7    been uploading and downloading, correct?

8    A.   I -- at some point I remember there was something called a

9    bandwidth meter.  I don't know if that was available at this

10   time or not.

11   Q.   I've handed you Exhibit 122, which is Cox_Sony_520018 to

12   520019.  This is a March 2010 e-mail exchange between you and

13   Brent Beck and Jason Zabek and others on distribution lists?

14   A.   Yes.

15   Q.   In the first e-mail on 122, Brent Beck describes reaching

16   the limit on daily suspensions.  Do you see that?

17   A.   Yes.

18   Q.   And he talks about processing up to 500 complaints per day

19   for Fox, correct?

20   A.   Yes.

21   Q.   And then he replies -- you reply and say:  Unbelievable,

22   exclamation point.

23          Do you recall this?

24   A.   I don't -- no, I don't recall this conversation.

25   Q.   And Brent replies and says:  We can add a hard limit for

J. Sikes - Video Deposition

1653

1    Fox, if desirable?

2    A.    Yes, I see that.

3    Q.    You respond to Brent's idea of adding a hard limit and

4    say:  We will see what Jason says; correct?

5    A.    Yes.

6    Q.    You say:  I'm sure he will agree.

7          And then you say in all caps, in all capital letters:

8    We need to cap these suckers, exclamation point.

9    A.    Yes.

10   Q.    Do you know what you meant there?

11   A.    I was being playful, being crass.  I don't remember.

12   Q.    Didn't you mean set a hard limit on the number of DMCA

13   complaints that Cox would receive from Fox?

14   A.    Yeah, I mean, assuming that's what he's talking about with

15   the hard limit.  But before we would set any limit, we would

16   discuss it with the complainant.

17         So it wasn't like it was just, ahh, we're going to

18   cap those suckers right now.

19         I mean, basically anytime we would cap a complainant,

20   as I recall, we would reach out to them, talk to their legal

21   counsel.  Basically we come to an agreement.

22         So I don't remember what happened with Fox, if we

23   actually did cap them, but -- but, yeah, that was -- for --

24   Q.    Let me ask you the question.  What does it mean to

25   blacklist a copyright complainant?

J. Sikes - Video Deposition

1654

1   A.   So, basically, if a particular copyright complainant

2   doesn't send a notice containing -- or containing what we

3   require in a notice, or containing beyond what we require in a

4   notice, or containing anything such as marketing or settlement

5   offers -- and these are the things -- there may be other

6   conditions.  But basically if the complainant is not complying

7   with our requirements for a copyright infringement notice --

8   you know, and, again, we discuss all this with the complainant.

9   And most complainants that I recall working with had no problem

10  with our caps or what we asked for in their complaints.

11  Q.   When Cox blacklisted copyright claimants from sending in

12  notices, that meant it would not accept and receive and process

13  DMCA notices from them, correct?

14  A.   I can't remember if they would get processed in CATS at

15  all or if they just get dropped or if they'd go into -- I don't

16  know what would happen to them.

17          All I know is we wouldn't -- we not take action on

18  them.  Or customer -- we would not take customer-facing action

19  on them.

20  Q.   Mr. Sikes, I've handed you a document marked in a previous

21  deposition in this case as Exhibit 76.

22  A.   Yes.

23  Q.   Have you seen this document before?

24  A.   Yes, I have.

25  Q.   Do you recall what's going on here?

J. Sikes - Video Deposition

1655

1    A.    Yes, I remember.

2    Q.    Sara was someone at an ISP called CenturyLink, correct?

3    A.    Yes.

4    Q.    Are you familiar with Digital Rightscorp?

5    A.    Yes, I am.

6    Q.    That's a company that sends copyright complaint notices to

7    Cox, and potentially others?

8    A.    Well, we didn't allow them to send them to us, but, yeah,

9    they were a sender of copyright infringement complaints.

10   Q.    And so, on February 19 at 11:23 a.m. you reply and note

11   that:  We're limiting DMCA complainants by e-mail address to

12   200 per day; correct?

13   A.    Yes.

14   Q.    Those were the caps we talked about earlier, right?

15   A.    I believe so, yes.

16   Q.    And the chain continues and someone named David Dee from

17   CenturyLink on February 19 at 2:48 p.m. and he says:  WOW, in

18   all capital letters.  And then he says:  You're limiting each

19   complainant e-mail address to 200 per day?  Can we do that,

20   Sara?  Can you imagine what I could do with the freed-up

21   computing and storage resources?

22        Did I read that correctly?

23   A.    Yes.

24   Q.    Mr. Dee appears surprised at Cox's cap of 200 per day,

25   correct?

J. Sikes - Video Deposition

1656

1    A.    That's what it seems, yes.

2    Q.    And then Mr. Dee lists the number of notices that

3    CenturyLink had been receiving from Digital Rightscorp around

4    this time, this week, correct?

5    A.    Yes.

6    Q.    And then Mr. Zabek replies on February 19 at 1305.  And

7    that appears to be 1:05 p.m., correct?

8    A.    Yes.

9    Q.    And he says:  F the DMCA, with three exclamation points?

10   A.    Yes.

11   Q.    Ya, we told each copyright holder to limit them or give us

12   money to hire people, smiley face.

13             Did I read that correctly?

14   A.    Yes.

15   Q.    It says:  IIRC or DRC, it's hard to read, complainants get

16   one auto response after they cross the limit and then all

17   subsequent mail during the next 24-hour rolling window is

18   silently deleted.

19             Do you see that?

20   A.    Yes, okay.

21   Q.    Actually, Mr. Carothers was talking about auto responses

22   after they cross the limit.  It sounds like he's talking about

23   caps, correct?

24   A.    So what I do know about this time period is that

25   Brent Beck was the -- was the full-time administrator of CATS.

J. Sikes - Video Deposition

1   Matt Carothers wasn't really doing that at this time.

2          So Brent Beck made changes to CATS after Matt handed

3   over that role to him.  So I don't know if Matt -- Matt may or

4   may not have been -- I mean, I certainly don't know if that's

5   an accurate statement.

6   Q.   You reply a little later -- or you reply on the e-mail in

7   the middle of the page dated February 19 at 1:28 p.m., and in

8   response you say -- could you actually read your e-mail?

9   A.   So we actually do not accept any complaints from

10  dmca@digitalrightscorp.com, and have blacklisted them from

11  sending to abuse@cox.net.  Our legal department deemed their

12  blackmail styled complaints as not being in the spirit of the

13  DMCA.  And because of this, they no longer send to us.  So,

14  yeah, F the DRC!

15  Q.   And what did you mean by, F the DRC?

16  A.   Well, I mean, I don't know -- obviously, I regret putting

17  this in the e-mail.  Actually, I remember typing it and

18  removing it and putting it back in.  But my intent of including

19  that comment, which I guess I regret and it's completely

20  unprofessional, my intention was to reframe Jason's comment of,

21  F the DMCA, because basically I was trying to convey that it

22  wasn't the DMCA that we had a problem with.  It was the Digital

23  Rightscorp and their notices.

24  Q.   And by, F the DRCA -- F the DRC, what did you mean?

25  A.   Basically screw those guys.

J. Sikes - Video Deposition

1658

1   Q.   That doesn't mean, fuck the DRC?

2   A.   It's -- yes, it's an expletive, sure.

3   Q.   Does it mean something else?  I just want to make sure I

4   understand.

5   A.   No -- yes, yes, it's -- yes, it's -- but I didn't mean it

6   in that way.  I just basically meant that it's -- you know,

7   like I said, it wasn't the DMCA that we had the problem with.

8   It was Digital Rightscorp that we -- that we were having issues

9   with.

10          It was an unprofessional comment.  And like I said, I

11   regret it.  I even considered not, not including that in my

12   e-mail, but I felt I needed to convey that it wasn't the DMCA

13   that we had a problem with, it was Digital Rightscorp.

14   Q.   Do you have any sense of how many copyright infringement

15   notices Rightscorp was sending to Cox in the 2004 time period?

16   A.   I don't know in that particular time period.  I remember

17   seeing e-mails or hearing that they were sending a lot.

18   Q.   You keep saying, a lot.  Can you give me some framework

19   for it because I don't know if you mean 100,000, or a million,

20   or 10 million?

21   A.   I don't know where this is coming from, but I seem to

22   recall an amount of 30,000 in one day.  Around -- somewhere

23   around there.  I don't know when that was or if that's true.  I

24   just -- I guess that would seem like a lot.

25   Q.   And that would be consistent with the number of notices

J. Sikes - Video Deposition

1659

1   that CenturyLink appeared to be getting in February 2014,

2   correct?

3   A.   And that might be where I'm getting that figure from.  The

4   problem with Digital Rightscorp's notices is that they were

5   often repetitive.  It was often for the same thing over and

6   over.

7            So those 30,000 notices were not for actual 30,000

8   individual incidents of alleged copyright infringement.

9   Those -- they were -- basically they would mail bomb us or mail

10  bomb ISPs with these notices, from what I remember.

11           We didn't accept it.  We didn't -- we didn't work

12  with them.  So ...

13  Q.   I'm handing what's marked Exhibit 124.

14           Anyway, going on to Interrogatory 8 asks Cox to:

15  State the number of customers or users whose Internet service

16  you terminated, temporarily suspended, or otherwise adversely

17  affected on a per penalty basis in response to DMCA notices for

18  each month from January 1, 2010, to the present, and identify

19  the persons most knowledgeable about those penalties.

20           And do you see -- do you understand that question?

21  A.   Yes.

22  Q.   And do you see on page 25 -- at the top of 24 it says:

23  Response to Interrogatory No. 8.  And then on 25 it provides an

24  answer and some information.

25  A.   Yes.

J. Sikes - Video Deposition

1660

1   Q.   And the chart on 25 through 27, Cox provides information

2   showing -- which purports to show by month the number of

3   warnings, suspensions, and terminations.  Do you see that?

4   A.   Yes.

5   Q.   In response to a question for warnings, suspensions, and

6   terminations in response to DMCA notices, correct?

7   A.   Yes.

8   Q.   Now, I want you to take a look back, sir, at Exhibit 43,

9   which is the 2012 procedures to refresh your recollection on

10  the number of infringement notices that were part of the

11  graduated response program starting in October of 2012.  Okay?

12  A.   Yes.

13  Q.   Do you recall that it's at 13-plus step process as of that

14  time?

15  A.   Yes.

16  Q.   Now, if you refer back to Exhibit 124, the interrogatory

17  responses, take a look at the number of terminations starting

18  in September and October 2012.

19  A.   Yes.

20  Q.   And do you see that starting in September 2012 the

21  terminations go to virtually zero?

22  A.   Yes.

23  Q.   There's a couple months with one or two.  Most of the

24  months, many of the months there are zero terminations,

25  correct?

J. Sikes - Video Deposition

1661

1  A.   Correct.

2  Q.   The terminations starting in September 2012, October 2012,

3  would have been under the expanded graduated response program

4  for 13-plus infringement notices, correct?

5  A.   Yeah, I'm not sure if -- when these took effect.  The

6  procedure was updated in October of 2012, but I don't know

7  if -- if that had a direct effect on this.  But -- I'm not

8  sure.

9  Q.   Under the 2010 graduated response, customers could receive

10  12 notices before termination review, correct?

11  A.   Correct.

12  Q.   And Cox terminated in the ballpark of 20 or so customers

13  per month, correct?

14  A.   Correct.

15  Q.   Starting in -- around September or October 2012, Cox used

16  a 13-plus infringement notice procedure for implementing its

17  graduated response program for copyright infringement ticket

18  handling, correct?

19  A.   That was the -- when the procedure was updated, yes, in

20  October 2012.

21  Q.   And starting around the same time, October 2012, the

22  number of terminations dropped to virtually zero, correct?

23  A.   So, yeah, those dates appear to align in some way.  I --

24  like I said, I don't -- yeah, I -- just because a procedure is

25  put into effect or has been written in the procedure document,

J. Sikes - Video Deposition

1662

1    doesn't mean it's already being followed or is currently being

2    followed.

3         It's -- I mean, you could draw that conclusion, but

4    just because we put it in a document and say, here's the new

5    procedures, it doesn't mean that they're actually being

6    followed.

7         So I don't know what -- I can't say definitively if

8    this was -- this procedure was being followed in just

9    October 2012.

10   Q.   Just because Cox put something into a procedure document

11   doesn't mean that the procedure is being followed, correct?

12   A.   Not always, yes.  It's possible that there are members of

13   the TOC who aren't up-to-date on the procedure.  I mean,

14   it's -- like I said, just because we put -- this document is a

15   guideline on how to basically handle certain abuse types.  It

16   does not necessarily mean it's being followed to a T or it is

17   -- it's what's being done.

18        So I -- I can't confirm that or say definitively if

19   that was the case.

20   Q.   Exhibit 43 is a document that was revised, according to

21   Cox, in October 2012, correct?

22   A.   Apparently so, yes.

23   Q.   Okay.

24   A.   Version 4 was supposedly updated in -- yes, October 18,

25   2012, yes.

J. Sikes - Video Deposition

1663

1   Q.    And in that document Cox reports that its procedure for

2   handling copyright infringement notices as a 13-plus step

3   process leading to termination review, correct?

4   A.    Correct.

5   Q.    Okay.  Thank you.  In Exhibit 124, Cox reports that as of

6   October 2012 it terminated zero customers in October 2012,

7   correct?

8   A.    That's what it shows here, yes.

9   Q.    And one customer in November 2012 for DMCA violations,

10  correct?

11  A.    Yes.

12  Q.    And in the subsequent months, again it's one, zero, zero,

13  zero, zero, correct?

14  A.    Correct.

15  Q.    I've handed you an exhibit marked 125, Exhibit No. 125.

16  A.    Okay.

17  Q.    This is an e-mail with a Bates number COX_SONY_510844 to

18  510846 from April 2011 in which you are a sender and recipient.

19  Do you see that?

20  A.    Yes.

21  Q.    We just looked at an e-mail from Mr. Vredenburg where he

22  discussed seeing additional suspensions after four, correct?

23  A.    Yes.

24  Q.    And the procedure that was in place at the time was

25  supposed to be termination after four suspensions, correct?

J. Sikes - Video Deposition

1664

1   A.   Correct.

2   Q.   So looking at Exhibit 125, that initial e-mail that begins

3   this chain from Roger Vredenburg to a couple of e-mail

4   distributions groups, abuse - corporate and abuse - TOC -- do

5   you see that?

6   A.   Yes.

7   Q.   Mr. Vredenburg reports:  This is the customer's third

8   termination.  He is waiting a call.  What do I tell him when I

9   call him?

10          Do you see that?

11  A.   Yes.

12  Q.   And you respond on April 20, 2011, at 1:19, and say:

13  WWJZD?   (What would Jason Zabek do?)

14  A.   Yes.

15  Q.   Can you read that next sentence, please.

16  A.   I'm sure Jason would say, reactivate.  But I would also

17  advise them of their legal liability and increasing risk of

18  getting sued should they continue to distribute/serve

19  copyrighted files to the Internet without permission.

20  Q.   Why did Cox -- why did you advise reactivating a customer

21  who had been terminated at least two times before for copyright

22  abuse notices?

23  A.   I don't remember if I -- it looks like I responded via my

24  mobile phone.  Maybe I -- I don't know if I knew that this

25  customer was on their third termination or not.

J. Sikes - Video Deposition

1665

1     But basically I was deferring this really to Jason,
2     it was Jason's call.  But if the TOC felt there was a reason to
3     reactivate this customer, then, like I said, they need to be,
4     you know, advised that they were basically -- they were getting
5     into trouble for -- if they were allowing their network to
6     continue to distribute copyright files.
7     Q.   And then you advise that they should be advised of the
8     customer's potential legal liability, correct?
9     A.   Correct.
10    Q.   And Mr. Zabek responds and says:  DMCA = reactivate?
11    A.   Yes.
12    Q.   Let me ask you a question, okay?  Do you think that
13    reactivating a customer who has twice been terminated for
14    copyright abuse is an effective way to defer -- deter that
15    customer from further copyright infringement?
16    A.   In most cases the customer, the account holder, the
17    subscriber wasn't the person that was responsible for the
18    activity or that was causing the activity.  It was usually
19    someone in their home, someone outside of their home, someone
20    who had access to their network.  In some cases it was a
21    computer virus.  We didn't feel like it was fair to punish a
22    customer that was in that situation.
23    Now, if it was a customer that said, yes, I'm doing
24    this and you can't stop me -- any case that I was aware of in
25    that circumstance, the customer was terminated.

J. Sikes - Video Deposition

1666

1   Q.   Mr. Sikes, you were trying to hold onto the customers,

2   correct?

3   A.   We were trying to help the customers.

4   Q.   And help Cox keep the customer, correct?

5   A.   That -- that's an objective that was stated.  You know,

6   I've heard that throughout this time that we've got to -- we

7   don't want to lose the revenue, or we've got to -- we don't

8   want to lose subscribers.

9         But, you know, the number of subscribers that were

10  reaching, you know, this point of the process were -- were --

11  were pretty limited.  It was a very small amount.

12        So I didn't really see it so much as saving every

13  single little customer, but more as, you know, having an

14  opportunity to educate and help these customers and help them

15  stop the activity.  I mean, that was -- that was what was

16  important to us.  We wanted -- we wanted them to understand the

17  importance, and that they needed to take action.

18  Q.   One of the ways you tried to help customers was by

19  reactivating their service?

20  A.   If they seemed to understand that they needed to -- the

21  importance of the issue and if they were sincere about trying

22  to address it.

23  Q.   And you were able to gauge their sincerity?

24  A.   In the cases that I dealt with, the customers that I spoke

25  to, I felt like they were in a circumstance that was either

J. Sikes - Video Deposition

1667

1   beyond their control or was difficult for them to -- to -- to

2   manage.

3           I mean, most of the customers that we were dealing

4   with didn't have the -- you know, at this point a lot of them

5   didn't have the technical wherewithal to identify the source of

6   the issue.  And, I mean, as customers -- as WiFi came on, you

7   know, customers' networks became more complex, more devices

8   were added to their networks, and their Internet service was

9   very important to them.

10          So that, you know, the folks that we were talking to,

11  you know, mothers, fathers, and people with roommates --

12  anyway, I can only speak to the cases that I have, you know,

13  firsthand experience with.  But ...

14  Q.   I'm handing what's been previously marked in this case as

15  Exhibit 80.  It's an e-mail with a Bates number

16  COX_SONY_512197.  That begins with an e-mail from Andrea Dameri

17  to CCI - abuse corporate to which you respond.

18          Do you see that?

19  A.   Yes.

20  Q.   And Ms. Dameri, she's a TOC level 2.5 technician, correct?

21  A.   Yes.

22  Q.   Ms. Dameri says:  It seems no one has let them know in San

23  Diego that DMCA terms are not really terminations any longer.

24          Do you see that?

25  A.   Yes.

J. Sikes - Video Deposition

1668

1  Q.   And then you reply:  This is not an official thing or part

2  of the MMPs, and we do not tell customers this; correct?

3  A.   Yes.

4  Q.   Is that another unwritten semi-policy?

5  A.   I think it's -- this is related to the unwritten

6  semi-policy.

7  Q.   You had input into the procedures for handling copyright

8  infringement notices, correct?

9  A.   At some point in my time there I believe I did, yes.

10  Q.   And you -- in the 2012 to 2014 time frame, correct?

11  A.   Most likely, yes.

12  Q.   You were also involved in implementing those procedures,

13  correct?

14  A.   As far as when you say implementing, including them in

15  documentation and communicating them to the TOC.

16  Q.   So you had input into the procedures, correct?

17  A.   I had input or was aware of the procedures, yes.

18  Q.   And you helped the team use the procedures, correct?

19  A.   Yes.  Yeah.

20  Q.   You also were involved in helping the team decide whether

21  or not to terminate customers based on copyright infringement

22  notices, correct?

23  A.   I helped the team decide on certain cases if it was time

24  to terminate or what further action -- I consulted the team on

25  what actions -- what they should do in particular cases.

J. Sikes - Video Deposition

1669

1   Q.   You helped make some of those decisions, didn't you?

2   A.   I helped them -- like I said, I helped consult the team

3   that was doing the terminations or working with the customer.

4   Q.   Do you recall instances in which a TOC rep was trying to

5   decide whether to terminate and would ask what you thought?

6   A.   Yes.

7   Q.   And there were times in response to those kinds of

8   questions where you would tell the TOC rep what you thought,

9   correct?

10  A.   Yes, yes.

11  Q.   Sometimes you might say, give another warning, for

12  instance, correct?

13  A.   Well, in most cases that I recall, or many cases I recall,

14  basically I would ask them -- the TOC would come to us and say,

15  should we terminate this customer?  And I would say, well, have

16  you done all these things that we've talked about many times?

17  Have you checked -- you know, have you gone over these things?

18  Have you notated it in the work log?  And trying to let them,

19  you know, make the decision.

20        But, yeah, basically I was involved with

21  conversations with the TOC, yeah.

22  Q.   In assessing whether to terminate customers based on

23  receipt of multiple copyright infringement notices, one of the

24  things that you considered was the amount of revenue Cox

25  received from those subscribers, correct?

J. Sikes - Video Deposition

1670

1    A.   Incorrect.

2    Q.   You're telling me the amount of revenue Cox was receiving

3    from subscribers did not factor into the decision of whether or

4    not to terminate a subscriber based on receipt of multiple

5    copyright infringement notices?

6    A.   It did not.

7    Q.   Mr. Sikes, 127 is an e-mail chain from March 2014, Bates

8    No. COX_SONY_512138 to 512141?

9    A.   Yes.

10   Q.   In which you -- whether named by your actual name or

11   through a recipient list are included as a recipient or sender

12   in this chain, correct?

13   A.   Correct.

14   Q.   Any reason to think you did not receive and send the

15   e-mails in Exhibit 127?

16   A.   No.  I was on this e-mail chain.

17   Q.   It begins on the last page of the exhibit, 512141 at the

18   bottom with Mr. Mathews.  Mr. Mathews was a level 2.5 TOC rep,

19   correct?

20   A.   Correct.

21   Q.   And the subject is:  Request for Termination; correct?

22   A.   Yes.

23   Q.   And Mr. Mathews says:  The last ticket -- he identifies

24   the ticket number -- the customer was warned that further

25   complaints would result in termination.  We have received an

J. Sikes - Video Deposition

1671

1    additional complaint.

2              Did I read that correctly?

3    A.   Yes.

4    Q.   And ask about the process leading to that point, correct?

5    A.   Yes.

6    Q.   And you make a reference to BitTorrent client running on a

7    computer, correct?

8    A.   Correct.

9    Q.   Does that indicate to you that this was a copyright

10   infringement notice related to file sharing on a peer-to-peer

11   protocol?

12   A.   So, yeah, I remember this e-mail.  I don't remember this

13   particular case.

14   Q.   That's fine.

15   A.   But, I mean, basically I was just giving them my standard

16   advice.  Did you cover -- did you cover possible unsecured

17   wireless network?  Did you -- did you ask the customer to, you

18   know, check and make sure there are no file sharing clients

19   running on any of their computers?

20             And basically I'm just saying, hey, you know, if you

21   have not covered this -- I mean, at this point, you know, the

22   TOC has kind of -- has been asking about these cases.  And just

23   telling them, you know, look, if you've covered all this stuff,

24   go ahead and terminate this customer.

25   Q.   One of the things you say is:  The customer pays us over

J. Sikes - Video Deposition

1672

1  $400 per month, and if we terminate their Internet service,

2  they will likely cancel the rest of their service.

3        Correct?

4  A.   Yes.

5  Q.   Every terminated customer becomes lost revenue and a

6  potential detractor to our net promoter score.  We should make

7  absolutely certain we've covered each and every possibility

8  with them to the bitter end before we terminate them.

9        Did I read that correctly?

10  A.   Correct.

11  Q.   And Mr. Mathews replies, and says that -- it looks like

12  P2P -- do you understand that to mean peer-to-peer?

13  A.   Yes, I assume so.

14  Q.   Looks like P2P programs were discussed back on ticket --

15  and he lists the ticket number -- which was also a final

16  suspension as well.

17        Correct?

18  A.   Yes.

19  Q.   So on the prior final warning, this customer had a

20  discussion with Cox about P2P programs?

21  A.   Yes.

22  Q.   And you asked Mr. Vredenburg to please suspend this

23  customer one last time, correct?

24  A.   Let's see.  Well, yeah, assuming we're talking about the

25  same customer in this thread at this point.  There were

J. Sikes - Video Deposition

1673

1    multiple CATS tickets mentioned.

2            But, yes, I guess I reviewed the information that

3    Roger provided, and it looked like there was a potential topic

4    or item that may have been missed or maybe not emphasized with

5    the customer.

6    Q.   I have handed you Exhibit 129.  It's a two-page chat log

7    with a Bates number Cox_Sony_512421 to 512422.  The top line

8    says:  Conversation with JoeSikesATL on January 12 -- I'm

9    sorry, January 27, 2012.

10   A.   Yes.

11   Q.   And it appears to be a chat with someone that goes by the

12   handle GchaosL2.

13   A.   Yes.

14   Q.   Do you recognize this log?

15   A.   I do, yes.

16   Q.   You believe GchaosL2 is Brent Beck, correct?

17   A.   Yes.

18   Q.   If you go down -- so just setting the stage, you and Mr.

19   Beck appear to be having a discussion about -- discussion about

20   termination versus suspension, correct?

21   A.   We're discussing terminations, suspensions, bandwidths.

22   It seemed to be the topic of our discussions, yes.

23   Q.   Now, I want to direct your attention to the entry at 6:04

24   and 35 seconds towards the bottom.  Can you read --

25   A.   Yes.

J. Sikes - Video Deposition

1674

1    Q.    -- what you wrote at those next two sentences.

2    A.    We have been soft terminating for DMCA because we didn't

3    want to loose the revenue.  But if the gross bandwidth abusers

4    are costing us way more than we are making from them, it makes

5    sense to terminate.

6    Q.    And Mr. Beck replies:  That's supposed to be the driver,

7    that they cost more than we make from them.

8                Correct?

9    A.    Correct.

10   Q.    Mr. Sikes, I've handed you Exhibit 130, which is a

11   three-page chat log on the same date.  Also appears to be

12   between you and Mr. Beck again, correct?

13   A.    Correct.

14   Q.    And the Bates number is BMG -- sorry.  The Bates number is

15   Cox_BMG_6385 through 6387.  Any reason to doubt that you sent

16   and received the messages in Exhibit 130?

17   A.    No.

18   Q.    This chat log in Exhibit 130 is on the same day and

19   shortly after the Exhibit 129 we looked at, correct?

20   A.    Correct, yes.

21   Q.    Again, you and Mr. Beck appear to be discussion --

22   discussing termination procedures or logistics, correct?

23   A.    Correct.

24   Q.    And at 6:52:06 p.m. Mr. Beck asks you:  What is soft term?

25                Do you see that?

J. Sikes - Video Deposition

1675

1    A.   Yes.  Basically a suspension that is called a termination

2    with the likelihood of reactivation for DMCA.  We don't want to

3    loose the revenue.

4    Q.   And then looking down further at 7:00 and 13 seconds, you

5    explain this further.  Can you read what you said there?

6    A.   This is a relatively new process that we've been doing for

7    the past year, again, to retain revenue.

8    Q.   Exhibit 132, Mr. Sikes, is an e-mail chain from

9    December 2012, Bates number Cox_Sony_513220 to 513221 in which

10   you are a sender and recipient based on your personal address

11   or through an abuse corporate distribution group, correct?

12   A.   Correct.

13   Q.   Any reason to think you didn't send and receive -- send or

14   receive the e-mails in Exhibit 132?

15   A.   No.

16   Q.   The e-mail starts with an e-mail from Mr. Mathews, who is

17   a TOC Level 2.5 rep, correct?

18   A.   Yes.

19   Q.   And the subject is:  Termination Review CATS Ticket, and

20   it lists the ticket number, correct?

21   A.   Correct.

22   Q.   He says:  The customer was warned the next infraction

23   could result in termination of service, lists the ticket

24   number.

25             And it says:  Please advise.

J. Sikes - Video Deposition

1676

1         Do you see that?

2    A.   Yes.

3    Q.   And this time Mr. Zabek says:  Do it, they've had plenty

4    of chances.

5         Do you see that?

6    A.   Yes.

7    Q.   And Ms. Dameri, another TOC Level 2.5 rep, correct?

8    A.   Yes.

9    Q.   Replies and says:  Please ensure when terminating a

10   customer for real that we remove the CHSI charges, correct?

11   A.   Yes.

12   Q.   CHSI is Cox high-speed Internet?

13   A.   I believe so, yes.

14   Q.   And then you reply December 12, 7:33 p.m.  And could you

15   read your response, please.

16   A.   Yep.  Good point, Andrea.  Now when we terminate

17   customers, we really terminate the customer (for six months).

18   Q.   And REALLY is in all caps, is that why you emphasized it

19   in your reading?

20   A.   Yes, as in the service is removed from the customer's

21   account, the HSI service is removed, as Andrea mentions below.

22   Q.   And you describe that as a real termination or really

23   terminating, correct?

24   A.   It's not a -- it's not a soft termination.  And I -- I

25   regret to use that word because, like I said, that's my own --

J. Sikes - Video Deposition

1677

1     that's not our process?  But, yes, it's a -- it's a termination

2     where the high-speed Internet service was removed from the

3     account.

4     Q.   So you're making a distinction in Exhibit 132 between a

5     soft termination and a real termination, correct?

6     A.   Well, a soft termination, I mean, you know, as we

7     discussed, basically there is a possibility that the customer

8     may be reactivated.

9          So this -- in this case, this customer apparently

10    had -- had been through the process however many times and was

11    a candidate to have their service cut off.  Basically we worked

12    with them, exhausted all efforts and, you know, had to make the

13    decision to -- to terminate them from the Cox network and cut

14    them off from Internet services.

15    Q.   So just to be clear, when you talk about really

16    terminating in 132, you're drawing a distinction between a soft

17    termination and a real termination, correct?

18    A.   Correct, yes.

19    Q.   And so, by looking at a real termination, that gives you

20    some context to understand what you were describing as a soft

21    termination before, correct?

22    A.   Correct.  Yes.  The CHSI service was removed from their

23    account.

24    Q.   But continued offenses occurred -- the continuing offenses

25    section of the procedures occurred on the 14th notice, correct?

J. Sikes - Video Deposition

1678

1    Started on the 14th notice, correct?

2    A.   Yes.

3    Q.   And sometimes you would give another warning to that

4    customer and reactivate them, correct?

5    A.   Correct, yes.  Depending on the circumstances.

6    Q.   Something you called special circumstances?

7    A.   Special circumstances, yes.

8    Q.   What -- what would special circumstances be?

9    A.   Well, I guess for the example of the customer that had the

10   mentally disabled child and that we had -- well, Cox had sent

11   them a brand new router and secured it for them.

12         We -- I mean, there were cases where the customer

13   clearly didn't understand what the cause or where the source of

14   the alleged infringement was.

15   Q.   I've handed you what's marked Exhibit 134.  It's a

16   one-page e-mail, Cox_Sony_511299 from March 2014, with the

17   subject:  Termination Review.  In which you are a recipient or

18   a sender either individually or through a distribution group,

19   correct?

20   A.   Yes.

21   Q.   Mr. Mathews says:  Customer's son has once again

22   reinstalled the BitTorrent program and resumed file sharing

23   again.  Customer was informed last time that I talked to her

24   that further complaints could result in termination of service.

25   This will be the third time that her son has reinstalled the

J. Sikes - Video Deposition

1679

1    BitTorrent client after she has uninstalled it.

2            Did I read that correctly?

3    A.   Correct, except there was no "it."  You did the same

4    thing.  Yes, we know it's an implied it.

5    Q.   According to Mr. Mathews, the customer acknowledged use of

6    BitTorrent in the program for file sharing, correct?

7    A.   Apparently that was what her son was -- was using for file

8    sharing, yes.

9    Q.   And this call represented the third time that her son had

10   reinstalled the BitTorrent client after she had uninstalled it,

11   correct?

12   A.   That's what it says, yes.

13   Q.   You responded to Mr. Mathews and said:  Please ask her to

14   explain to her son that if he keeps reinstalling and using

15   BitTorrent or any other peer-to-peer application that allows

16   him to illegally download copyrighted media, they will likely

17   receive another complaint or potentially a lawsuit from a

18   copyright holder, and we will be required to terminate their

19   Internet service for at least six months.  And then in all

20   caps, THIS IS THEIR FINAL SUSPENSION/REACTIVATION.

21            Did I read that correctly?

22   A.   Yes, you did.

23   Q.   Termination review occurs on -- begins on the 13th notice

24   to customers, correct, under the 2012 procedures?

25   A.   It can.  I mean, it can begin earlier on in the process.

1680

1    But, yes, generally it would begin later at the 13th or after

2    the 13th step.

3    Q.   Do you think Cox was terminating people earlier in its

4    process?

5    A.   Cox could be considering customers for termination earlier

6    on in the process.  Sure, that's a possibility.  It's --

7    Q.   Is that what you remember happening?

8    A.   I have a recollection of some customers that were defiant

9    that basically said, yeah, I'm doing this and you can't stop

10   me.  Those customers were, I guess, escalated and were

11   terminated more promptly or more --

12   Q.   On this termination review in 134 you advised Mr. Mathews

13   to give another suspension and reactivate, correct?

14   A.   Yes.  That was their final, basically this was it, this

15   was the last, the last straw.  This was, as I mentioned in all

16   caps, THIS IS THEIR FINAL SUSPENSION/REACTIVATION.

17   Q.   Are there any special circumstances in the exchange at

18   Exhibit 134 that you are aware of using the phrase "special

19   circumstances" that you used earlier?

20   A.   Yeah.  This is a mother -- a mother with a minor child who

21   she is having trouble getting to, to comply.  And it's putting

22   her at risk of losing her Internet service and cutting her off

23   from the Internet.

24   Q.   There is nothing in Exhibit 134 that says "minor child,"

25   is there?

J. Sikes - Video Deposition

1681

1  A.    No, but it basically says the customer's son -- you're

2  right, it's -- I'm just going from other cases that I've dealt

3  with recalling a single mother that did have a son that she was

4  having trouble getting him to stop using peer-to-peer file

5  sharing, and her services were being suspended and terminated.

6  And she was a single mom working several jobs and was also in

7  school.

8           And basically, we were working with her

9  circumstances.  I don't know if this is the case, but that may

10  have been some of the context to this conversation.

11  Q.    You have no idea if the person discussed in 134 is a

12  single mother, do you?

13  A.    I have no idea, no.  I'm just --

14  Q.    So you have no idea the age of the son listed in Exhibit

15  134, do you?

16  A.    I have no idea today right now about this particular

17  circumstance.  But, like I said, there may have been additional

18  context that is not captured here in this conversation.

19  Q.    Your response came 18 minutes after Mr. Mathews' e-mail,

20  correct?

21  A.    Correct.

22  Q.    So to you the special circumstances that would have

23  warranted an additional suspension instead of a termination is

24  that it was the customer's son doing something on the account?

25  A.    Someone other than the account holder was -- was causing

J. Sikes - Video Deposition

1682

1    trouble for the account holder, and we were giving her another

2    chance to try to talk to her son.

3         I mean, again, I'm speculating on the circumstances.

4    But for whatever reason, I felt it was reasonable to give them

5    one more chance before terminating them.

6    Q.   Exhibit 127 is a request for termination from a level 2.5

7    TOC rep, correct?

8    A.   Correct, yes.

9    Q.   At the time when the 2012 procedures were in place,

10   correct?

11   A.   Correct.

12   Q.   We've looked at this document before, and certainly feel

13   free to review it again.

14        You recall this is one where you advised to suspend

15   the customer one last time?

16   A.   Yes.

17   Q.   Are you aware of any special circumstances regarding the

18   customer in Exhibit 127?

19   A.   Well, basically they were told to secure their WiFi.  And

20   they were saying, obviously, it did not work, and that there

21   must be some sort of BitTorrent client running on one of their

22   computers.  Perhaps a guest computer, someone who comes to

23   visit them once a month, because that seems to be the frequency

24   of their complaints.

25   Q.   Isn't it possible that he's infringing copyrights through

J. Sikes - Video Deposition

1683

1  BitTorrent?

2  A.   It's possible, but I did not get that impression in

3  this -- or I wouldn't have -- I'm assuming I did not get that

4  impression in this conversation.

5        Again, if the customer was -- was infringing, if the

6  customer admitted to the activity, they would be terminated.

7  This was a customer that was obviously still trying to work out

8  the issue.

9  Q.   I've handed you what's marked as Exhibit 135.  This is

10  another e-mail from -- this e-mail is from May 26, 2014, with a

11  Bates number Cox_BMG_181434 in which either individually or as

12  member of an e-mail distribution group you are a recipient are

13  a sender, correct?

14  A.   Yes.

15  Q.   And like the last one, this a request from Mr. Mathews, a

16  level 2.5 TOC rep, for termination review, correct?

17  A.   Yes.

18  Q.   Mr. Mathews says:  Request for termination review, and

19  lists a ticket number.  And then he says:  This is the third

20  time to the (404) number; correct?

21  A.   Yes.

22  Q.   Was warned on the last call that the next offense would

23  result in termination review.

24  A.   Yes.

25  Q.   Notes advise that the customer was advised to remove file

J. Sikes - Video Deposition

1684

1   share programming on the last call; correct?

2   A.   Yes.

3   Q.   Mr. Mathews says:  This is the third time to the (404)

4   number; correct?

5   A.   Yes.

6   Q.   In the 2012 procedure, the third time to the (404) number

7   is the continued offenses section on the 14th notice, correct?

8   A.   Okay, yes.

9   Q.   And you reply -- and can you read your answer, please.

10  A.   Yes.  Since the customer knows it's "his fault," please

11  ask this customer what he will do to prevent this from

12  happening again and note it in the ticket work log.  Then let

13  him know that one more complaint will result in a six-month

14  termination.  Please also note this in the work log.  Thanks

15  Martin.

16  Q.   You reference that this customer knows it's his fault,

17  correct?  Yes or no?

18  A.   That's what I said, yeah.

19  Q.   Yeah.  And is there anything to indicate to you in

20  Exhibit 135 that there are special circumstances that would

21  warrant another reactivation?

22  A.   Not that I am aware of.  I don't remember this particular

23  case.  I might have had more information on it than what's in

24  this e-mail, but --

25  Q.   I've handed you what's marked Exhibit 136, it's an e-mail

J. Sikes - Video Deposition

1685

1    with a Bates number Cox_Sony_511291 dated June 5, 2014.

2              Do you see that either individually or as a recipient

3    from an e-mail distribution group you are a recipient or sender

4    of this e-mail?

5    A.    Yes.

6    Q.    And once again, Mr. Mathews begins an e-mail chain subject

7    titled:  Termination Review.

8              Do you see that?

9    A.    Yes.

10   Q.    And Mr. Mathews says:  This customer is well aware of his

11   actions and is upset that after years of doing this he is now

12   getting caught.  Customer was advised to stop sharing, check

13   his wireless, and remove his P2P programs.

14             Did I read that correctly?

15   A.    Yes.

16   Q.    Can you read your response.

17   A.    Please advise this customer that this is their final

18   suspension and reactivation.  If we receive one more complaint,

19   we will regretfully not be able to provide them with data

20   service for six months.

21   Q.    Isn't this the poster child for termination, Mr. Sikes?

22   A.    Yes.  And if they continued after this point, they would

23   be terminated, yes.

24   Q.    So given that termination review on the 13th infringement

25   notice, it's still not enough?

J. Sikes - Video Deposition

1686

1    A.   Well, I don't know if this is the 13th step or not.  I

2    mean, the thing is -- like I said, termination review could

3    happen sooner than the 13th step.  You've been fixated on this

4    13th step, 12th step, 14th -- I mean, I don't know.  I wasn't

5    pulling out a procedure and saying, okay, well, here we have

6    got the 14th step, it's time -- you know, like I said, this

7    customer said, hey, you know, either cut it out or get the heck

8    off our network.  I mean, that was basically where this

9    customer was at.

10   Q.   Mr. Sikes, I want to ask you some questions comparing

11   Cox's abuse handling procedures for a copyright infringement on

12   the one hand compared to Cox's handling of other abuse types.

13   Do you understand?

14   A.   Yes.

15   Q.   Let's pull out Exhibit 33, which is the October 2012 abuse

16   ticket handling procedures for residential.

17          We've looked at the copyright graduated response at

18   length, do you recall?

19   A.   Yes.  Yes.

20   Q.   13 steps for termination review, and then continued

21   offenses get additional termination review, correct?

22   A.   Yeah.

23   Q.   Let's take a look at bandwidth.  Bandwidth -- overuse of

24   bandwidth is one of the issues that the abuse department dealt

25   with at times, correct?

J. Sikes - Video Deposition

1687

1    A.    Correct, yes.

2    Q.    If you turn to page 5 to 7, it describes the procedures

3    for addressing bandwidth abuse issues?

4    A.    Yes.

5    Q.    Exhibit 43 describes two processes, one for DUAE, which is

6    defined as data usage allowance education, correct?

7    A.    Correct.

8    Q.    And one for excessive user, which is defined as a

9    subscriber who is grossly abusing their bandwidth limitation

10   using two times more their allotted bandwidth within a single

11   billing cycle?  On the next page.

12   A.    Yes.  That's a definition that's provided.  This wasn't

13   always accurate.  I just want to note that they were just --

14   sometimes they literally pulled them off Wikipedia, some of

15   these things here.

16          But, yeah, I guess that's more or less an accurate

17   description.

18   Q.    That's what the procedures defined it as, correct?

19   A.    Yes.

20   Q.    And excessive users are those that are using two times or

21   more their allotted bandwidth, correct?

22   A.    That's what it says, yes.

23   Q.    And looking at the excessive user process at 4.0, it says:

24   Excessive user will be a mostly automated, hard three-strike

25   process -- three-strike process.  It will be automated up to

J. Sikes - Video Deposition

1688

1    termination.  CATS will automatically suspend the subscriber

2    for the first two strikes.  The third complaint within a

3    180-day period will result in a six-month termination.

4              Did I read that correctly?

5    A.   Yes.

6    Q.   And was it your understanding that as of late 2012,

7    excessive use was a hard three-strike rule for terminating

8    customers who were identified as excessive users?

9    A.   I recall something to that effect, yes.

10   Q.   Something to the effect of a hard three-strike rule to

11   terminate excessive users?

12   A.   Yes.

13   Q.   If you could turn to page 22, I want to look at hacking.

14             On page 22 of Exhibit 43, that's the 2012 abuse

15   handling procedures.  This procedure defines the steps to

16   respond to complaints of hacking and unauthorized access

17   attempts, correct?

18   A.   Yes.

19   Q.   And on page 23 it lists the procedure for first and repeat

20   offenses, correct?

21   A.   Correct.

22   Q.   And you see here for hacking, Cox's procedure in 2012 was

23   to suspend on the first offense, correct?

24   A.   Yes.

25   Q.   And to suspend again on the second and third complaints,

J. Sikes - Video Deposition

1689

1    correct?

2    A.   Correct.

3    Q.   And to terminate on the fourth complaint, correct?

4    A.   Correct.

5    Q.   Turn to page 35, please.  I want to look at something

6    called Open Relay.

7         The Open Relay section describes the purpose as --

8    this procedure defines steps for responding to spam complaints

9    as a result of open relay; is that correct?

10   A.   Yes.

11   Q.   This relates to a process for handling abuse related to

12   viral spam that occurs on the network?

13   A.   Yes.

14   Q.   The open relay procedure is describing how Cox handles

15   abuse related to certain types of viral spam, correct?

16   A.   Correct, yes.

17   Q.   And it describes the process as three suspensions,

18   correct?

19   A.   Yes.

20   Q.   And on the fourth complaint terminating the customer's

21   Internet account, correct?

22   A.   Correct.

23   Q.   We just looked at several abuse types and the abuse team's

24   graduated response for handling those types of abuses, correct?

25   A.   Correct.

J. Sikes - Video Deposition

1690

1    Q.   For excessive use violations, Cox had a hard three-strike

2    procedure leading to termination, correct?

3    A.   Correct.

4    Q.   And for hacking, we saw that Cox -- the guideline for Cox

5    was to terminate on the fourth complaint, correct?

6    A.   Yes, that was the guideline.

7    Q.   And for copyright infringement, we saw that termination

8    review occurred on the 13th or later notice, correct?

9    A.   Correct.

10   Q.   Are you aware of the existence of technology that would

11   permit the blocking of peer-to-peer traffic?

12   A.   So, I mean, you can block -- you can block ports on a

13   firewall.  You can block -- you can block all the ports except

14   for, you know, Internet ports like port 80, and 443, and

15   e-mails.  Like I think what mentions in the document, 25 and

16   587.

17        I mean, you can -- you can block ports, but it

18   doesn't necessarily mean that you're blocking the peer-to-peer

19   protocol.  And, also, if you're -- I mean, not all peer-to-peer

20   traffic is infringing traffic.

21        So just blocking peer-to-peer in and of itself is

22   not -- is not something that Cox would do or that any Internet

23   service provider would do.

24   Q.   You don't know what any other service provider would do,

25   do you?  You couldn't possibly testify about that, could you?

J. Sikes - Video Deposition

1691

1        MR. ELKIN:  Objection, argumentative.

2  A.   You're right, I don't, I don't know.  I've -- I've talked

3  to folks who have their ISPs.  And, yes, I mean, blocking

4  traffic was just not something that -- that we were able to do,

5  from what I remember.

6        NOTE:  The video deposition is concluded.

7        THE COURT:  Does that conclude the first deposition?

8        MR. OPPENHEIM:  Yes, it does, Your Honor.

9        THE COURT:  Okay.  Then let's take ten minutes and we

10  will come back and we will hear the second deposition.  All

11  right.

12        Thank you, you are excused.

13        NOTE:  At this point the jury leaves the courtroom;

14  whereupon the case continues as follows:

15  JURY OUT

16        THE COURT:  All right.  Anything before we break?

17        MR. OPPENHEIM:  Not from plaintiffs, Your Honor.

18        MR. ELKIN:  No, Your Honor.  I just wanted to say

19  that I have to, with the Court's permission, at 5:35 or 5:40

20  there is an emergency I have to address.  Ms. Leiden will be

21  here, if that's okay with the Court.

22        THE COURT:  That's fine, certainly.

23        MR. ELKIN:  Thank you.

24        THE COURT:  You are certainly excused.

25        All right, we're in recess.

J.C. Fuenzalida - Video Deposition

1692

1          NOTE:  At this point a recess is taken; at the

2    conclusion of which the case continues in the absence of the

3    jury as follows:

4    JURY OUT

5          THE COURT:  All right.  Joe, let's get our jury,

6    please.

7          NOTE:  At this point the jury returns to the

8    courtroom; whereupon the case continues as follows:

9    JURY IN

10         THE COURT:  All right, please have a seat.

11         All right.  Let's play our last video of the day.

12         MR. OPPENHEIM:  So the plaintiffs will be playing --

13   the video is of Jorge Fuenzalida, George -- George Fuenzalida.

14   And there are designations from both sides in the video.  It's

15   roughly 25 to 30 minutes, as Your Honor indicated.

16         THE COURT:  All right, thank you.

17         NOTE:  The testimony of Jorge C. Fuenzalida via video

18   deposition is played into the record as follows:

19       EXAMINATION

20   BY MR. ZEBRAK:

21   Q.   Good morning, sir.

22   A.   Good morning.

23   Q.   I know we just met before the deposition, but, again, for

24   the record, my name is Scott Zebrak.  I'm counsel for the

25   plaintiffs in this case.

J.C. Fuenzalida - Video Deposition

1693

1          And we're here, as just mentioned, for the deposition

2     of your employer, Ericsson, Inc.

3          Before we begin, would you please state your full

4     name for the record.

5     A.   Yes.  It is George Carlos Fuenzalida.

6     Q.   And where do you live, sir?

7     A.   Here in Atlanta.  Do you want the address?

8     Q.   Atlanta is fine.  Thank you.

9     A.   Okay.

10    Q.   And who is your current employer?

11    A.   Ericsson, Inc.

12    Q.   Okay.  And you understand that you're here today to

13    testify on behalf of Ericsson, Inc. pursuant to a subpoena

14    calling for its deposition testimony; is that correct?

15    A.   Yes.

16    Q.   Could you please start by giving me a high level overview

17    of your education and employment history.

18    A.   Yeah.  The -- so my education is BSEE from University of

19    Virginia.  MBA from Duke.

20         And then my employment history is primarily in the

21    telecommunications field.  About two-thirds or more on the

22    consulting side with Booz Allen and Hamilton, Deloitte

23    Consulting, and inCode.

24         And then also on the carrier side, with BellSouth,

25    which is now a division -- what's now AT&T.  And then about

J.C. Fuenzalida - Video Deposition

1694

1  three years during a start-up, also in the software space, for

2  mobile networks.

3  Q.   And would you characterize your work experience as being

4  entirely within the telecommunications industry?

5  A.   Yeah, almost entirely, yeah.

6  Q.   And for what rough period of time have you worked in the

7  telecommunications industry?

8  A.   Over 30 years.

9  Q.   Could you please give me an overview of the relationship

10  between inCode and Ericsson.

11  A.   Yeah, inCode was acquired by Ericsson in 2010.  It was

12  acquired in its entirety.  InCode continues as a brand

13  underneath Ericsson, but those of us that have been part of

14  inCode are full-time employees of Ericsson.

15          So, in effect, it's a division and a brand that

16  performs consulting projects.

17  Q.   So it's not a separate entity --

18  A.   No.

19  Q.   -- it's just a division within Ericsson?

20  A.   That's right.

21  Q.   And can you just give me a high level overview of what

22  products or services inCode provides?

23  A.   Yeah.  InCode provides management consulting, primarily

24  for the telecommunications industry, which includes carriers,

25  like AT&T, Verizon, and cable companies, such as Cox, Comcast.

J.C. Fuenzalida - Video Deposition

1695

1          The work is a combination of business consulting and

2   technology consulting.  And it generally encompasses both

3   helping folks, helping our clients analyze markets, but also to

4   design and configure technologies and architectures.

5   Q.   Can you describe your personal role and responsibilities

6   at inCode at a high level?

7   A.   Well, today is different than where it was.  Okay.  So

8   today I have two jobs.  One is I'm the head of strategy for a

9   division of Ericsson called Digital Services for North America.

10  And then I'm also on the inCode side working on consulting

11  projects.  But during a previous era I was the overall general

12  manager of inCode.

13  Q.   And so, is it fair to say that your role today, part of it

14  remains on the inCode --

15  A.   Yes.

16  Q.   So your role today, part of it remains on inCode side, but

17  part of it involves doing work for Ericsson outside of the

18  inCode division?

19  A.   Yes.

20  Q.   And for what period of time were you the general manager

21  of inCode?

22  A.   From 2012 until 2018.

23  Q.   And do you know when the relationship between Cox and

24  inCode began?

25  A.   Yes, 2005.

J.C. Fuenzalida - Video Deposition

1696

1    Q.    And does inCode currently provide services to Cox?

2    A.    Yes.

3    Q.    And from 2005 until today, has inCode provided consulting

4    services to Cox in the area of business consulting and

5    technology consulting?

6    A.    Yes.

7    Q.    Has inCode conducted research as to the types of

8    activities that Cox subscribers engage in online using the Cox

9    Internet service?

10   A.    No.

11   Q.    I want to show you a document that we're going to mark as

12   Exhibit No. 86.

13          For the record, this document, which is Exhibit 86,

14   is entitled Cox Communications Broadband Demand Project,

15   Project Kick-Off Meeting, dated September 1, 2009.  And it

16   bears the Bates No. Ericsson 001023 in the lower right corner

17   of the document on the first page, and it runs through Ericsson

18   00052.

19          Do you recognize this document, sir?

20   A.    Yes.

21   Q.    And could you tell me what this document is?

22   A.    Yeah.  This document is a presentation given to Cox at the

23   beginning of a project, hence the title Project Kick-Off

24   Meeting, to help estimate the future demand of traffic on their

25   network.

J.C. Fuenzalida - Video Deposition

1697

1  Q.   This project was a five-year demand forecast for data

2  consumption; is that correct?

3  A.   Yes.

4  Q.   This 2009 project involves a five-year demand forecast for

5  the Cox network, correct?

6  A.   Yes.

7  Q.   And the idea is that as part of this project inCode is

8  helping Cox assess over a five-year period the bandwidth demand

9  for use of its Internet service, correct?

10  A.   Yes.

11  Q.   And part of the project, including not just assessing

12  overall bandwidth needs, but also assessing bandwidth needs by

13  category, correct?

14  A.   Yes.

15  Q.   And do you have an understanding about why Cox wanted to

16  assess demand over the forthcoming five-year period from this

17  2009 project through 2014?

18  A.   My understanding is the primary goal was to understand the

19  amount of volume of data that would be demanded in aggregate,

20  to then allocate the proper network resources to meet that

21  demand.

22  Q.   And when you say, to allocate the proper resources to meet

23  that demand, does that mean having resources so that the

24  subscribers' uploading and downloading happens at a fast speed?

25  A.   Yes.

J.C. Fuenzalida - Video Deposition

1698

1    Q.   I'm going to show you a document that is being marked as

2    Exhibit 87, it's entitled Cox High Speed Internet Consumption

3    Usage Project, Project Kick-Off Meeting.  And it's dated

4    March 14, 2011.

5              Do you recognize this document?

6    A.   Yes.

7    Q.   Could you describe what this document is?

8    A.   Yeah.  This document was a project kick-off presentation,

9    similar in form to the one that we just went through, for

10   another project that was in some ways similar in scope with the

11   goal to estimate overall demand and demand based on activity

12   type.

13             I'll further note that the date of this project, if

14   you've got the other subsequent documents that are associated

15   with the project, they're all labeled 2011.  And in our

16   research with -- with the project team, they were all

17   mislabeled in terms of the year.  That they were all 2012.

18   That the same dating error occurred on the documents as they

19   went through.

20   Q.   So what you're saying is that this document that we're

21   looking at on Exhibit 87 entitled Cox High Speed Internet

22   Consumption Usage Project, Project Kick-Off Meeting, March 14,

23   2011, was actually a kick-off meeting on March 14, 2012?

24   A.   Yes.

25   Q.   For the record, could you please identify the -- in the

1699

1    lower right corner of Exhibit 88 the Bates number where it says

2    Ericsson, followed by a number, what that says?

3    A.    991.

4    Q.    Thank you.  And is it your testimony that this Mid-Term

5    Readout is a document provided to Cox on April 2, 2012, not

6    April 2, 2011?

7    A.    Yes.

8    Q.    Okay.  And what is this document?

9    A.    This is a document that, around the halfway point of the

10   project, provided initial findings for our work.

11   Q.    Okay.  I'm going to show you another document which we're

12   going to mark as Exhibit 89.  It's a document entitled Cox High

13   Speed Internet Data Usage Assessment, Final Readout, April 19,

14   2011, and it bears the Bates numbers Ericsson 825 through

15   Ericsson 851.

16         Do you recognize this document?

17   A.    Yes.

18   Q.    And what is this document?

19   A.    This is our final presentation to fulfill the project.

20   Q.    And is it your testimony that even the document is labeled

21   April 19, 2011, it's actually final presentation given to Cox

22   on April 19, 2012?

23   A.    Yes.

24   Q.    I'll show you one more document labeled Exhibit 90, and

25   it's entitled Cox High Speed Internet Data Usage Assessment

J.C. Fuenzalida - Video Deposition

1700

1    Appendix, April 19, 2011.  And it bears the Bates numbers

2    Ericsson 542 through Ericsson 592, I believe.

3              Do you recognize this document?

4    A.    Yes.

5    Q.    And what is this document?

6    A.    This is an appendix or supporting material that

7    accompanied our -- the project.

8    Q.    Okay.  And is the idea that even though this document is

9    labeled April 19, 2011, it's an appendix to the final report

10   that inCode provided to Cox on April 19, 2012?

11   A.    Yes.

12   Q.    Could you tell me what the scope of this 2012 consumption

13   usage project was about?

14   A.    Yeah.  It's twofold.  One is to estimate consumption that

15   may -- that may be impacting Cox's network for the period up

16   until 2014.  So, in effect, a three-year view.  Doing so on a

17   user category of low, medium, and high users.  So a little bit

18   more generic compared to the 2009 study.  And then doing so on

19   a per household basis.

20             Secondly, the project also compared attributes of

21   Cox's service in terms of education and offers compared to

22   eight of its competitors in the market.

23   Q.    And the consumer education piece of the project, was that

24   focussed on educating the consumer about the volume of data

25   they were consuming?

J.C. Fuenzalida - Video Deposition

1701

1   A.   Yes.

2   Q.   That consumer education didn't concern whether the

3   category of online behavior was lawful versus unlawful,

4   correct?

5   A.   No.

6   Q.   But as part of this project, Cox did break data

7   consumption down based on activity type, correct?

8   A.   Yes.

9   Q.   Sir, could you turn your attention back to the document

10  numbered Exhibit 88, please.

11  A.   Okay.

12  Q.   This is the Mid-Term Readout, correct?

13  A.   Yes.

14  Q.   And is this for the average Cox user across the board, or

15  is this for those Cox high-speed Internet subscribers that

16  engage in P2P usage?

17  A.   Neither.  So this is a, first of all, Mid-Term Readout.

18  So these are initial findings.  Many, if not nearly all of

19  them, would have changed or evolved between this readout and

20  the final readout.

21       And what this is is an industry view to -- to get

22  back to our scope, is to assign a level of usage for a low, a

23  medium, and a high user category customer for each service.

24       In this case, the assumptions that -- or the analysis

25  that was presented here changed as well before the final.

J.C. Fuenzalida - Video Deposition

1702

1   Q.   Okay.

2   A.   So these were not the final numbers.

3   Q.   Okay.  And if you could turn to page 4 of this same

4   exhibit, please.  This is a slide labeled Executive Summary.

5   There is a sub-bullet that says:  P2P is the most bandwidth

6   intensive category.

7           Then it says: (13 percent of all broadband

8   households) on average use 82 gigabytes a month, accounting for

9   21 percent of all Internet traffic.

10          Do you see that sub-bullet?

11  A.   Yes.

12  Q.   Could you explain what that means?

13  A.   Yeah.  This means for the U.S., and a lot of our analysis

14  was done for profiling the United States user base and then

15  applying it to Cox.

16          So this would mean that 13 percent of all broadband

17  households across the country engaged in P2P.  And those that

18  do, use an average of 82 gigabytes per household per month for

19  peer-to-peer.

20          And that total then extrapolated out accounts for

21  21 percent of all Internet traffic.

22  Q.   So at the time of this Mid-Term Readout, this was 2012,

23  correct?

24  A.   Yes.

25  Q.   And here you're indicating that Cox has five different

J.C. Fuenzalida - Video Deposition

1703

1    tiers of high-speed Internet service; is that correct?

2    Ultimate, Premier, Preferred, Essential, and Starter?

3    A.   Yes.

4    Q.   And is the idea that each of those tiers has a different

5    monthly data allowance?

6    A.   Yes.

7    Q.   And the idea is that the more data a customer consumes,

8    the higher the tier they need to move into unless they stop --

9    stop the usage, correct?

10   A.   Yes.

11   Q.   What online activities besides streaming or downloading a

12   video account for higher bandwidth usage than peer-to-peer?

13   A.   Okay, just give me a second.

14         Okay.  So if you refer to page 18 in the same

15   document, in terms of the overall, you'll see video streaming

16   of two different flavors, SD and HD, absorb more bandwidth.

17         So then on this slide, it would show that

18   peer-to-peer is third.  But what it doesn't show is the other,

19   which contains many other services.

20         So those detailed breakdowns are not there.

21   Q.   Okay.  So after video streaming, peer-to-peer represents

22   the category that consumes the most bandwidth usage by

23   subscribers that engage in that activity, correct?

24   A.   Yeah.  I would have to look at what's in Other, right?

25   Because Other is 17 percent.  So what I don't know is whether

J.C. Fuenzalida - Video Deposition

1704

1  there's something that's 6 or 7 or 8 inside of that.

2  Q.   And it says the data set was validated against Cox

3  high-speed Internet Procera data.

4          Could you explain what that means?

5  A.   Yes.  So the -- I'm just checking the year.  Yeah, it says

6  2011.  It's not -- it's not labeled there.

7          So this is basically our what we'll call, outside-in

8  view that I've described with leveraging some of the

9  third-party data.

10          The middle column is our estimate as to what we

11  believe Cox's demand would be.  Right?

12  Q.   Uh-hum.

13  A.   So we had taken the national -- the national forecasts,

14  came up with our own view, and possibly adjusted it thinking

15  about Cox's footprint.  So that was a view that we developed,

16  you know, entirely or almost entirely on our own.

17  Q.   And is it correct that this data that inCode provided to

18  Cox showed Cox that at least in terms of the forecast, was that

19  the downstream data consumption for those that engage in

20  peer-to-peer was forecast to increase in each of the years from

21  2011 through 2015, correct?

22  A.   Correct.

23  Q.   And in this data that inCode provided to Cox, with respect

24  to upstream traffic, it reflects that in each of the years from

25  2011 to 2015 data consumption demand for those that engaged in

J.C. Fuenzalida - Video Deposition

1705

1   peer-to-peer usage was forecasted to increase year over year?

2   A.   Yes.

3   Q.   And if you could turn to the High Household Profile

4   section of this excerpt.

5        Do you see that?

6   A.   Yes.

7   Q.   Does this reflect that inCode forecasted to Cox that for

8   those that engage in peer-to-peer activity, that their overall

9   data consumption for peer-to-peer would increase in each of the

10  years for 2011 to 2015?

11  A.   Yes.

12  Q.   In 2011 the Procera data showed that 12-and-a-half percent

13  of the data of Cox's network was being used for peer-to-peer

14  file -- file usage, correct?

15  A.   Yes.

16       EXAMINATION

17  BY MS. LEIDEN:

18  Q.   Could you first turn to the document that Mr. Zebrak

19  marked earlier as Exhibit 94.  That's the hard copy of the

20  spreadsheet that you were looking at electronically.

21  A.   Okay.

22  Q.   Just a couple of clarifying questions on this data.  If

23  you flip to the second tab after the first blue page, the page

24  titled Summary of Data Usage.

25  A.   Yes.

J.C. Fuenzalida - Video Deposition

1706

1   Q.   And I believe that you testified earlier that this

2   broadband consumption analysis took place predominantly in

3   2012, correct?

4   A.   Yes.

5   Q.   And does the 2011 data here reflect actual data?

6   A.   No.  This is our view of what actual data would be.  It

7   was then subsequently compared against Cox's Procera tool, but

8   this is our outside-in view, as you call it.

9   Q.   And when you say, outside-in view, is that because the

10  data is based on information from the third-party sources?

11  A.   Yes.

12  Q.   Such as Cisco?

13  A.   Yes.

14  Q.   And for the other years on this spreadsheet, 2012 through

15  2015, you testified that those were forecasts that inCode had

16  come up with, correct?

17  A.   Yes, based on, you know, the third-party research.

18  Q.   And going back to the 2011 data, and specifically talking

19  about this page of this spreadsheet for now, was any of this

20  data under 2011 a reflection of the broadband consumption of

21  Cox subscribers specifically?

22  A.   Well, the -- the -- in a few of the fields we gained

23  insights from Cox to help form this.  Okay.  I believe in the

24  peer-to-peer session usage, I'll call it, as I pointed out

25  earlier, and there may have been others, but it was more of

J.C. Fuenzalida - Video Deposition

1707

1    a -- a -- getting a variety of inputs that then fed our model,

2    which was primarily based on external research.

3    Q.   Thank you.  And for this specific page of the spreadsheet,

4    just to make sure I understand, for the 2011 data, are these

5    figures the data that inCode first received from external third

6    parties, such as Cisco, and compared to the Procera data?

7    A.   Well, we -- we developed the bottoms-up view, the usage

8    per application or this category we called it, and developed

9    this -- the numbers on this page through primarily the outside

10   sources, fed a little bit through some -- some inCode subject

11   matter experts, and a little bit from -- from Cox's -- the

12   interviews that we did with Cox.  Developed these numbers.  And

13   then as one event towards the end of the project, compared it

14   with Cox's Procera data.

15   Q.   And would it be your testimony that this data -- and

16   again, just talking for now about the data on this tab of the

17   spreadsheet -- well, I believe that you testified that it was

18   national data, correct?

19   A.   Yes, I believe that the -- here on the total yearly

20   traffic, it's an -- it's an estimate for national data.

21   Q.   And that would be the same for the 2011 data as well as

22   the 2012 through 2015 forecasts?

23   A.   Yes.

24   Q.   And if you could flip to the next tab of the after the

25   next blue page, the page titled Summary of Activity Types.

J.C. Fuenzalida - Video Deposition

1708

1          I would just like to clarify essentially the same

2    question.  Which is that the 2011 data reflected here is -- was

3    that data also based on inCode's review of third-party data

4    from Cisco and other sources?

5    A.   Yes, primarily.

6    Q.   Could you explain what you mean by primarily?

7    A.   So this is the -- in the spreadsheet you'll see notes as

8    to the source of different components of the analysis.  The

9    primary sources were Cisco, Analysis Mason, and the other one,

10   the one that we went through.  Here we go.  Informa.

11         But we used other sources as well.  And as I

12   indicated, for a couple of the drivers we interviewed Cox and

13   got some inputs that then fed into this model.

14         But the overall compilation of this analysis was, you

15   know, our summary view of the average traffic per household,

16   you know, across the United States.

17   Q.   And again, for this tab of this spreadsheet, that would be

18   the same for the 2011 actual data and the 2012 through 2015

19   forecasted data?

20   A.   Yes.

21   Q.   None of this data in this document that you have in front

22   of you then reflects solely activity of Cox subscribers,

23   correct?

24   A.   None of it does.

25         NOTE:  The video deposition is concluded.

1709

1       THE COURT:  All right.  That concludes our second

2  deposition.

3       So we will adjourn for tonight.  We will come back at

4  9 o'clock tomorrow morning.

5       Please no research, no investigation, please don't

6  speak to anybody about the case.  And we'll see you tomorrow at

7  9:00 a.m.  Thank you.

8       NOTE:  At this point the jury leaves the courtroom;

9  whereupon the case continues as follows:

10  JURY OUT

11       THE COURT:  All right.  So Lehr at 9 o'clock

12  tomorrow?

13       MR. OPPENHEIM:  Yes, sir.

14       THE COURT:  And you'll rest your case in chief, as I

15  understand it, after that; is that correct?

16       MR. OPPENHEIM:  Right.  So Dr. McGarty is not

17  available tomorrow, so we're going to call him in rebuttal

18  likely, which works anyways in response to Cox's witnesses.

19       But, yes, Your Honor -- one moment.

20       Right, yes.  There are certain witnesses they are

21  calling where we will cross outside the scope --

22       THE COURT:  Right.

23       MR. OPPENHEIM:  -- as we have discussed.  But, yes,

24  otherwise, yes, resting our case in chief.

25       THE COURT:  Okay.  Then Cox will be ready to begin

1710

1    their testimony after Dr. Lehr is finished?

2              MS. LEIDEN:  Yes, Your Honor.

3              THE COURT:  All right.  Is he going to take a couple

4    hours --

5              MR. GOULD:  Dr. Lehr?

6              THE COURT:  Yeah.  You're not asking the questions,

7    are you?

8              MR. GOULD:  I like to be thorough, Your Honor.  I am

9    going to look for opportunities to shorten it a bit tonight.

10             THE COURT:  Okay.

11             MR. GOULD:  And I will certainly look for Dr. Lehr

12   instead of me to do the math.  I think right now we're in the

13   ballpark of an hour-and-a-half.

14             THE COURT:  Okay.

15             MR. GOULD:  But I will see if I can get it down this

16   evening.

17             THE COURT:  Hour-and-a-half sounds all right in the

18   ballpark to me.  Three hours would have been a problem.  So --

19   and, you know, I'm just giving you a hard time.

20             MR. GOULD:  I will take it as a friendly nudge.

21             MR. OPPENHEIM:  So I take it we want to read some

22   exhibits that we are stipulating to into the record.

23             THE COURT:  Okay.

24             MR. OPPENHEIM:  And also, as we understand it from

25   Amanda, that Thursday evening Your Honor would like to have a

1711

1    discussion on jury instructions?

2              THE COURT:  Yes, let's do that after we finish on

3    Thursday.

4              Okay.  Go ahead.

5              MR. GUERRA:  Plaintiff's Exhibit 288.

6              THE COURT:  Please, all have a seat.

7              MR. GUERRA:  For Sikes, it's Plaintiff's Exhibit 288,

8    179, 182, 251, 239, 303, 305, 308, 316, 322, 336, 338, 342,

9    345, 346, 351, and 430.

10             And then for Fuenzalida, it's Plaintiff's Exhibits

11   207, 211, 212, 213, and 214.

12             THE COURT:  Okay.  And those are all admitted without

13   objection?

14             MS. LEIDEN:  Yes, Your Honor.

15             THE COURT:  Okay.  All right.  The jury instructions,

16   if we could get the Sony ones in Word, that would help us.

17             MR. OPPENHEIM:  Yes, Your Honor.

18             THE COURT:  Does that work?  Okay.  Anything else?

19             MR. OPPENHEIM:  E-mail those to Molly?

20             THE COURT:  Yes, Ms. McDonald.  All right.  Then have

21   a good evening.  We'll see you all tomorrow at 9 o'clock.

22             And we are in recess.

23             NOTE:  The December 10, 2019, portion of the case is

24   concluded.

25             ---------------------------------------------

1712

1

2

CERTIFICATE OF COURT REPORTERS

3

4

5        We certify that the foregoing is a true and
    accurate transcription of our stenographic notes.

6

7

8            /s/  Norman B. Linnell
        Norman B. Linnell, RPR, CM, VCE, FCRR

9

10

11

             /s/  Anneliese J. Thomson
12       Anneliese J. Thomson, RDR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25