1713

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
              Plaintiffs,      :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
              Defendants.      :
                               :
-------------------------------:
```

<u>VOLUME  8  (A.M. Portion)</u>

TRIAL TRANSCRIPT

December 11, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

                                                                1714

<u>APPEARANCES</u>:

FOR THE PLAINTIFFS:         MATTHEW J. OPPENHEIM, ESQ.
                            SCOTT A. ZEBRAK, ESQ.
                            JEFFREY M. GOULD, ESQ.
                            MICHAEL J. DRUCKMAN, ESQ.
                            ANDREW L. GUERRA, ESQ.
                            LUCY G. NOYOLA, ESQ.
                            JIA RYU, ESQ.
                            Oppenheim + Zebrak, LLP
                            4530 Wisconsin Avenue, N.W.
                            5th Floor
                            Washington, D.C. 20015


FOR THE DEFENDANTS:         THOMAS M. BUCHANAN, ESQ.
                            Winston & Strawn LLP
                            1700 K Street, N.W.
                            Washington, D.C. 20006-3817
                              and
                            SEAN R. ANDERSON, ESQ.
                            MICHAEL S. ELKIN, ESQ.
                            THOMAS P. LANE, ESQ.
                            CESIE C. ALVAREZ, ESQ.
                            Winston & Strawn LLP
                            200 Park Avenue
                            New York, NY 10166-4193
                              and
                            JENNIFER A. GOLINVEAUX, ESQ.
                            THOMAS J. KEARNEY, ESQ.
                            Winston & Strawn LLP
                            101 California Street, 35th Floor
                            San Francisco, CA 94111-5840
                              and
                            MICHAEL L. BRODY, ESQ.
                            Winston & Strawn LLP
                            35 West Wacker Drive
                            Chicago, IL 60601
                              and
                            DIANA HUGHES LEIDEN, ESQ.
                            Winston & Strawn LLP
                            333 South Grand Avenue
                            Suite 3800
                            Los Angeles, CA 90071

INDEX


OPENING STATEMENTS BY:

WITNESS                                EXAMINATION      PAGE


     WILLIAM H. LEHR


                                       DIRECT           1730
                                       CROSS            1799
                                       REDIRECT         1854

CLOSING ARGUMENTS BY:




COURT'S RULINGS/JURY INSTRUCTIONS

```
 1              NOTE:  The December 11, 2019, portion of the case
 2    begins in the absence of the jury as follows:
 3    JURY OUT
 4              THE COURT:  All right.  Good morning.  I see all
 5    counsel are present.
 6              Mr. Buchanan, you had a preliminary matter?
 7              MR. BUCHANAN:  Yes, Your Honor.  This has to do with
 8    the bench memo that was filed by the plaintiffs late last
 9    night --
09:05:43 10             THE COURT:  Yes, sir.
11              MR. BUCHANAN:  -- regarding Dr. Weber.  So the Court
12    had already ruled with regard to our using the term
13    "effective."  So we didn't intend to have her use that term and
14    say she did an effective study.
15              She'll just testify similarly to Dr. McCabe.  And
16    she, just as they've suggested, was proper, She'll go through,
17    you know, one, two, three, and four, and show how they ran off
18    with charts, and do some other graphs relating to that ticket
19    data and notice data.
09:06:17 20             THE COURT:  Okay.  How about the -- her use of the
21    customers' comments for the truth of them?
22              MR. BUCHANAN:  Well, she's going to -- not going to
23    do that.
24              THE COURT:  Okay.  All right.  Then does that take
25    care of it, Mr. Oppenheim?
```

1717

1        MR. OPPENHEIM:  I hope so.  But I'm a little

2   concerned because I'm not sure we're speaking the same

3   language.  So just to be clear.

4        Part of her opinion, which I believe the Court has

5   already ruled out, is discussion of effectiveness.  A

6   substantial part of her opinion is about the effect certain

7   notices had on the conduct of the subscribers.  Which is --

8   yes, it's the -- effect is contained within the word

9   "effectiveness," but it's a different thing and also should be

09:07:11 10   excluded.  And I just want to make sure that that's not coming

11   in because there has been absolutely no study done for

12   causation here.  So to suggest it would be problematic.

13        If that's what Mr. Buchanan is saying, then I think

14   we've resolved it.  If not, then I think we have an issue.

15        THE COURT:  Okay.  Mr. Buchanan, I think that --

16        MR. BUCHANAN:  Your Honor, you know, she's not going

17   to use the word, I mean, "effect."  Obviously, when it goes

18   from, say, you have one notice to two to three, I mean,

19   obviously there's an effect.  But she's not going to say, I did

09:07:43 20   an effectiveness study.  She can stay away from that word and

21   just say, if there was a reduction, it ran off with each

22   notice.

23        THE COURT:  Yeah.  I mean, I think she can testify to

24   the statistical information that's produced through her study.

25   And that -- but the effect of it and the causation is, I think,

1718

1  previously ruled on.  But if not, she's not going to talk about

2  the causation or the effectiveness.  She's just going to give

3  the numbers.

4          And as I said, the -- you know, attorney argument

5  about the effectiveness is -- can be made to the extent there's

6  testimony about it of the -- you know, as has been previously

7  identified and revisited last night in the brief -- you know,

8  she didn't do a control group.  She doesn't -- didn't do any

9  testing, or notices, or tickets, or the consolidation of limits

09:08:56 10  on, you know, daily notices.  And there's no information about

11  the customers and their truthfulness.  I've indicated that I

12  don't think the customers' comments are reliable, and I've

13  excluded them.

14          So I think you've stated that she's going to testify

15  within those limits, right?

16          MR. BUCHANAN:  Yes, Your Honor.

17          THE COURT:  Okay.  Then -- Mr. Oppenheim, then --

18  don't we have to wait and see what the testimony is?  You can

19  object and I'll exclude it if I think it's outside of the

09:09:28 20  bounds of the ruling.  Okay?

21          MR. BUCHANAN:  I think where Mr. Oppenheim is going,

22  we do have a few slides on the e-mail, which we're not going to

23  show.  We took them out?  Okay.

24          Then never mind, Your Honor.  I think we had them in,

25  and with the motion, we pulled them out.  I wanted to make sure

1719

1    they weren't in.

2              THE COURT:  They're out.

3              MR. OPPENHEIM:  We just got the slides.  We'll confer

4    with opposing counsel.

5              THE COURT:  Okay.

6              MR. OPPENHEIM:  And unless we resolve issues with

7    them, we'll have them with you.  I can see things in here that

8    are problematic.  We'll bring that to your attention later, if

9    necessary.

09:10:03 10           But, obviously, it's not just using the word

11   "effect," as Mr. Buchanan said, it's the concept.  If that's

12   the understanding, we're fine.  Thank you.

13             THE COURT:  Understood.  All right.  Anything else?

14             MR. BUCHANAN:  Yes, Your Honor, just a couple of

15   the -- we have objections to some of the demonstratives that

16   are being offered.  And maybe you could give the Court a copy?

17   Thank you.

18             THE COURT:  This is with Dr. Lehr?

19             MR. GOULD:  May I approach, Your Honor?

09:10:35 20           MR. BUCHANAN:  So the first one is 4, page 4.  It

21   says:  Impact of infringement is substantial.

22             MR. GOULD:  Page 4?

23             MR. BUCHANAN:  The slide 4.  Okay.  That comes from a

24   report that's not in evidence.

25             And then same with the next one, they're taking

1720

1    pieces from articles or reports that he read, and they're not

2    in evidence, they're not admissible.

3              THE COURT:  Okay.  4, 5 -- I'm with you.  Go ahead.

4              MR. BUCHANAN:  Okay.

5              MR. GOULD:  Your Honor, would you like to go issue

6    one by one or --

7              THE COURT:  Well, I don't know how many there are.

8    So how many do you have?

9              MR. BUCHANAN:  Just a handful, Your Honor.

09:11:36 10              THE COURT:  Okay.  Then go ahead.

11              MR. BUCHANAN:  9:  Cox paid billions in cash

12   dividends to its owners.  That wasn't in his report and it's

13   not relevant, that they paid dividends to the owners.

14              The profits of the company, revenues, they have that

15   in the slide, but this is something different.  It wasn't in

16   his reports.  He did three reports.

17              Also, the 17, 18, 19 rely on ICOMS billing data

18   that's not in evidence.

19              That's it, Your Honor.

09:12:55 20              THE COURT:  All right.  Thank you.

21              Mr. Gould.

22              MR. GOULD:  Thank you, Your Honor.  I can start at

23   the beginning.

24              The two slides that excerpt economic market studies

25   are certainly permissible things that Dr. Lehr can consider

1721

1 whether they're admissible or not.  And we would submit in this

2 case they actually are admissible under 803(17), exception for

3 market studies.

4          One of those two reports was admitted in BMG through

5 Dr. Lehr.  You spoke at length that Mr. -- Dr. Lehr was, in

6 fact, the first witness in that case who was qualified to

7 actually discuss and opine on those.  And we would offer that

8 the same here, and intend to admit one of them, PX 439 on slide

9 5, whether you consider it as admissible or even hearsay that

09:13:45 10 Dr. Lehr can consider, those are appropriate for an expert.

11          THE COURT:  All right.  And those were produced in

12 discovery?

13          MR. GOULD:  Yes, sir.

14          THE COURT:  Okay.  How about 9, dividends to owners?

15          MR. GOULD:  9 is a line item out of an audited

16 financial statement that the defendants produced later in

17 discovery.  Mr. -- Dr. Lehr testifies and reported at length on

18 Cox's profitability.

19          Understanding how much Cox paid to its upstream owner

09:14:14 20 from its profits is critically important information to

21 understand just the level of profitability that this company is

22 making, and the jury is well entitled to consider it.  It's a

23 gloss on the profitability analysis that he's provided.

24 There's no question that the statements are factually accurate.

25 The defendants won't contest them.

1722

```
 1              THE COURT:  On 9, the numbers?  Is that what you're
 2    talking about?
 3              MR. GOULD:  Yeah.
 4              THE COURT:  Okay.  And this -- and who was actually
 5    paid the -- was it Cox?
 6              MR. GOULD:  Cox Enterprise is the shareholder owned
 7    by the Cox family, family trust.
 8              THE COURT:  And that Cox Enterprise includes Cox
 9    Communications, Cox, LLC, what else?
10              MR. GOULD:  So Cox Communications is the -- as I
11    understand it, the operating entity is the defendant here.  Cox
12    Communications is wholly owned by Cox Enterprise.  Cox
13    Enterprise is the family trust, upstream parent that received
14    the billion-dollar dividend checks that Mr. Mencher testified
15    about in his deposition and who will appear later this week.
16    This is going to be in evidence.
17              THE COURT:  Okay.  How about 17, 18, 19, the billing
18    data not in evidence?
19              MR. GOULD:  So this relates to the Jarchow billing
20    reports that have been discussed at length.  There's no
21    question that the ICOMS billing reports, which we deposed
22    Mr. Jarchow on at length, are admissible.
23              And, in fact, we can do it now or later, we would
24    move to admit PX 467 to 474.  There's no basis to object to
25    those admissions.  If we need to, we're happy to put on another
```

09:15:06 (line 10)
09:15:45 (line 20)

1723

1    deposition clip to show Mr. Jarchow laying the foundation for

2    the business record.

3            Even that's not necessary because Dr. Lehr can

4    certainly rely on Cox's own admissions, business records,

5    billing information to provide in his report.

6            THE COURT:  And again, those were all produced during

7    discovery and identified by Jarchow?

8            MR. GOULD:  I'm sorry, Your Honor.  Could you repeat

9    that, please?

09:16:31 10          THE COURT:  So those were all admitted -- those were

11   all documents that were received by Cox and subject to the

12   Jarchow deposition; is that right?

13          MR. GOULD:  Those are Cox's documents.  Cox, by order

14   of court, was ordered to produce their billing records for

15   customers.  Slides 17 through 19 report on Cox's own billing

16   records.  We're surprised to hear the argument, to be honest.

17          THE COURT:  Okay.  Thank you.

18          All right, Mr. Buchanan.

19          MR. BUCHANAN:  In terms of paying dividends to the

09:17:09 20   trust, I don't think that is relevant.  Again, it was not in

21   his report.  He -- in his report he did analyze the revenues

22   and profits over a number of years of Cox and the parent

23   company.

24          But, you know, putting out what they paid to a trust

25   is -- I think it goes beyond -- they're not a defendant in this

1724

1    case, and it -- I don't think it's relevant at all.  And again,

2    they did not put this in the report.  He could have done that.

3    They have a lot of other data that they're using.

4           The ICOMS data, you know, they -- you know, it has

5    been produced, but, you know, here we have this issue with

6    Mr. Jarchow and taking his deposition, you know, whether they

7    allow it in subject to the deposition.  So they want to have it

8    both ways.

9           THE COURT:  Okay.  Well, why doesn't the trust

09:18:01  10   information, profits, why wasn't that in the report of

11   Dr. Lehr?

12          MR. GOULD:  The point -- so --

13          THE COURT:  My question first, then go ahead and try

14   to explain.

15          MR. GOULD:  Thank you.  I paused, realizing that.

16   The audited financials were produced later in discovery.  By

17   the time of his interim report, we received an incomplete

18   excerpt.  Out of a 60-page audited financial, they gave us

19   page 24, 26, and 28 that had some numbers.

09:18:37  20          It wasn't until we moved to compel, I think the last

21   week or two of discovery, successfully for the complete audited

22   financials with the body of consolidated footnotes and

23   information that Magistrate Judge Anderson understood and ruled

24   was necessary to understand the full scope of those reports.

25   My -- I can't recall the specific dates, but those complete

1725

1    reports came very late in discovery.

2            And as to the --

3            THE COURT:  So did he do a supplemental report to

4    include that?  Did you reference it?

5            MR. GOULD:  He doesn't talk about dividends in his

6    reports.  He does a profitability analysis and looks at it a

7    number of ways.

8            The amount of cash that Cox paid to its shareholder

9    is critical in understanding just how much money Cox could pull

09:19:31 10    out of this business and not feel any impact from it.

11            THE COURT:  All right.

12            MR. GOULD:  Lastly, Your Honor, on the ICOMS, so

13    there's two pieces of the ICOMS.  There's the very large

14    billing reports that Cox produced and Mr. Jarchow was deposed

15    on at length.

16            Later in time Cox produced what they're now calling

17    as also part of that same report, but all it does is identify

18    the business customer names.  It doesn't have any financial

19    data in it.

09:20:00 20            So the two, according to Cox, are related because

21    they come from the same database, but they're, very, very, very

22    different things.  One is just the name of the business

23    customers, one is the billing reports.

24            THE COURT:  Okay.  Thank you.

25            MR. GOULD:  And as to the -- just the last thing on

1726

1    the dividends.  Dr. Lehr references the audited financials that

2    he received in limited excerpted form during the interim

3    period.

4              THE COURT:  Okay.

5              MR. BUCHANAN:  Just one final point, Your Honor.

6              THE COURT:  Yes, sir.

7              MR. BUCHANAN:  Mr. Mencher was deposed before any of

8    Dr. Lehr's three expert reports over multiple months, and they

9    asked him about the dividends.  So they had that information

10   before he did his first, second, or third report.

11             THE COURT:  Okay.  All right.  Well, I'm going to

12   admit the demonstratives 4, 5, 17, 18, 19.  I think 4 and 5

13   clearly are admissible under 803(17), and I've seen them

14   previously.  17 and 18 are compilations of billing records that

15   were produced and testified in part.

16             And I find that they're -- I don't think it's

17   necessary to admit the underlying documents as long as they

18   have been produced and been subject to possible, you know,

19   depositions and other ability to understand the records, and

20   they're Cox's records to begin with that.

21             I don't -- I'm not going to allow 9.  I find that it

22   wasn't part of Dr. Lehr's report.  And if -- and that the

23   demonstrative shouldn't go in.  That if there is -- you know, I

24   may revisit it if it's proper -- if Dr. Lehr is asked

25   substantively about -- especially on cross-examination.

```
 1              So the underlying data was identified from which he
 2    could pull this information, but he didn't opine on it in his
 3    reports; is that right?
 4              MR. GOULD:  By the time of his initial report we
 5    hadn't received the audited financials.
 6              THE COURT:  Okay.
 7              MR. GOULD:  We pushed very hard to get those.  Seeing
 8    the writing on the walls, Cox excerpted about three pages from
 9    their 50 or 60-page financial report.  The bottom of each page
10    said something along the lines of:  The footnotes and
11    explanatory notes are necessary to understand these documents.
12              I'm paraphrasing.  You have seen audited financials,
13    you are familiar with what I am talking about.
14              Dr. Lehr didn't have those.  He didn't have those
15    during any of his three reports.  In his deposition he
16    testified that in order to understand the full audited
17    financials and what those meant, he would need the full audited
18    financials, including the notes.
19              We moved to compel on those, citing, among other
20    things, Dr. Lehr's testimony that he would need that
21    information to opine on those and understand them in full.
22    Magistrate Judge Anderson granted that request.  And Cox
23    produced them -- I don't recall the date -- very, very, very
24    late in discovery.
25              You know, there's -- I don't want to rehash
```

09:22:48 (line 10)
09:23:26 (line 20)

1728

1  discovery, but there is a reason that he didn't have the full

2  information at the time.  So he could have put something in his

3  report and then said, well, I don't know if this is right

4  because I haven't seen the rest, you know, behind the curtain,

5  but there is a number here.

6          I think, respectfully, Your Honor, we should be given

7  a little leeway on this one, and I would ask you to reconsider

8  admission of that slide.

9          THE COURT:  Okay.

09:24:07 10          MR. BUCHANAN:  Just one second.  They took

11  Mr. Mencher's deposition before his first of three reports,

12  which are probably issued over two months.  So they had that

13  piece of information.  They didn't need the audited financials

14  to know about the dividend.  Plus he did three reports over

15  three months.  They had all that audited financials before he

16  did --

17          THE COURT:  They are saying he didn't have the

18  audited financials when he -- this is Dr. Lehr --

19          MR. BUCHANAN:  Yes.

09:24:33 20          THE COURT:  -- when he issued his reports.

21          MR. BUCHANAN:  His first report.  I don't know about

22  the second and the third reports, but he -- they had the

23  information for this chart from Mr. Mencher's deposition, which

24  was before his first report.  He talked about that.

25          It's just a piece of information.  They don't need

1729

1    audited financials to find out what the dividends were.

2              THE COURT:  So those were disclosed in the --

3              MR. BUCHANAN:  As I understand it in Mr. Mencher's

4    deposition before Dr. Lehr's first report.

5              MR. GOULD:  If I could clarify on the timing.

6              Mr. Mencher -- I deposed Mr. Mencher.  It was in

7    April.  And he testified that he relied on the audited

8    financials in preparing for his deposition.  We hadn't received

9    those.  It was part of the reason that we asked for them and

09:25:16 10  pushed for them.

11             What Mr. Mencher testified about was the dividend

12   from 2018, 2017, and had a fuzzy memory of the dividend maybe

13   from 2016.  He had no memory at all of the dividends that are

14   presented in this chart.

15             THE COURT:  '12, '13, and '14?

16             MR. GOULD:  Correct.

17             THE COURT:  Okay.  All right.  I am going to allow

18   the demonstrative as well as the testimony.  I find that the

19   late-produced auditeds is good cause for them not to be in the

09:25:51 20  report.  And that the production of data in '17 and '18 is

21   not -- you know, wasn't going to be relevant to the time

22   period, and that the late produced, subsequent audited

23   financials, if he can testify about the information in those

24   reports, will be admitted.  And your exception is noted.

25             All right.  Let's -- ready for our jury?

1730

1           MR. BUCHANAN:  Yes, Your Honor.

2           THE COURT:  All right.  Let's get our jury, Joe.

3           NOTE:  At this point the jury returns to the

4   courtroom; whereupon the case continues as follows:

5   JURY IN

6           THE COURT:  All right, good morning.  Please be

7   seated everyone.

8           Thank you again for finding your way in on time.  And

9   I apologize, we had a couple matters that we didn't expect to

09:27:22 10   have to raise before we brought you out here.  Otherwise we

11   would have done it before 9 o'clock.  And so, I appreciate your

12   patience.

13           And please give me that nod of heads that you didn't

14   do any research or investigation or talk to anybody.  Thank

15   you.

16           All right.  Next witness, Mr. Gould.

17           MR. GOULD:  The plaintiffs call Dr. William Lehr.

18           NOTE:  The witness is sworn.

19           THE COURT:  Good morning, Dr. Lehr.

20           THE WITNESS:  Good morning.

21           THE COURT:  Please, Mr. Gould, proceed.

22           MR. GOULD:  Thank you, sir.

23           WILLIAM H. LEHR, called by counsel for the

24   plaintiffs, first being duly sworn, testifies and states:

25           DIRECT EXAMINATION

W.H. Lehr - Direct

1731

```
         1    BY MR. GOULD:

         2    Q.    Good morning, Dr. Lehr.  How are you?

         3    A.    Fine, thank you.

         4    Q.    Thank you for being with us here today.  Could you please

         5    state your full name for the record.

         6    A.    Yeah, it's William Herndon Lehr.

         7    Q.    If you could pull that just a tad closer.

         8    A.    Okay.

         9    Q.    Thank you, sir.

09:28:43 10    A.    It's William Herndon Lehr.

        11    Q.    And what is your occupation, Dr. Lehr?

        12    A.    I'm a telecommunications Internet industry economist with

        13    over 25 years of experience engaged in academic research and

        14    consulting to industry and policy makers on matters of

        15    relevance to the Internet ecosystem.  And a significant part of

        16    my work in that area relates to the evolution of broadband and

        17    the Internet and it's role as the principal platform for the

        18    distribution of digital media of all kinds.

        19    Q.    And have you done any work in connection with this case?

09:29:21 20    A.    Yes.

        21    Q.    What were you asked to do?

        22    A.    I was asked to offer my assessment as a professional

        23    economist on three matters of relevance.  The first was whether

        24    or not the evidence supports the view that copyright

        25    infringement causes economic harm to rights holders.
```

W.H. Lehr - Direct

1732

1    Two, to assess the economics of Cox's business, how
2 it fits within this larger question of piracy and what happens
3 with piracy.
4    And third, to offer, you know, to assess Cox's
5 economic incentives and financial benefit from tolerating
6 infringement by subscribers on the Cox network.
7 Q.   Before we talk about those opinions, I want to understand
8 a little bit of your background.
9    How long have you been a telecommunications and
09:30:26 10 Internet industry economist?
11 A.   Well, I mean, I have been actively focused on these
12 industries for about 25 years.
13 Q.   Where are you currently employed, sir?
14 A.   I am currently employed at MIT, Massachusetts Institute of
15 Technology, in their computer science and artificial
16 intelligence lab where I participate in a research program
17 that's -- you know, multidisciplinary research program.
18 Q.   Tell us a little bit about your educational background,
19 please.
09:30:54 20 A.   I have a Ph.D. in economics from Stanford University in
21 1992.  And then I have a MBA in finance from the Wharton
22 Business School.  And then I have also a Master's in
23 engineering and two undergraduate degrees, one in engineering
24 and one in history from the University of Pennsylvania.
25 Q.   What year did you earn your Ph.D.?

W.H. Lehr - Direct

1733

1 A.   1992.

2 Q.   Now, I think you said you're a research scientist; is that

3 right --

4 A.   Yes.

5 Q.   -- at MIT?  Tell us a little bit about -- what do you do

6 as a research scientist?

7 A.   Not every university has positions like this, but my

8 appointment there is a non-teaching appointment.  I don't have

9 to -- I do teach occasionally, but I don't have to.  I don't

09:31:38 10 have regular things.  And what I do there is I participate in a

11 range of the multidisciplinary research programs as part of the

12 advance networking architecture group.  And some of those

13 programs are funded by The National Science Foundation.  Some

14 of those are funded by grants from industry, sponsors of the

15 research that goes on at MIT in the lab.

16 Q.   And just at a high level generally, what are some of the

17 topics of your academic research and writing?

18 A.   Well, you know, as I said, a key area of focus is on the

19 nexus of economic and policy issues that arise because of the

09:32:20 20 technological trends that are shaping and shifting the

21 broadband markets in the industry.  So how do changes in the

22 technology and the markets and the demand and the way these

23 technologies are being used affect and what are those sort of

24 feedback loops.

25        I also, you know, have spent time involved in a

W.H. Lehr - Direct

1734

1    number of projects thinking about the future network

2    architectures of the Internet.  And quite a bit of work on

3    things like the convergence of fixed and wireless networking.

4    And the management of our radio frequency spectrum, things

5    like, you know, how do you manage the airwaves that we use for

6    radio and sort of anything that goes over the air.

7    Q.    Dr. Lehr, there is a document in front of you labeled

8    PX 525.  Do you recognize that?

9    A.    Yes, I do.

09:33:09 10   Q.    What is that?

11   A.    This is my CV, my curriculum vitae.  It gives a

12   description, you know, brief biographical description, and my

13   sort of professional engagements and then, you know, my

14   publications.

15            MR. GOULD:  Move to admit PX 525.

16            THE COURT:  Any objection?

17            MR. BUCHANAN:  No objection.

18            THE COURT:  It's received.

19            MR. GOULD:  Thank you.

20   BY MR. GOULD: (Continuing)

21   Q.    Dr. Lehr, other than this trial, have you ever testified

22   as an expert witness before?

23   A.    Yes.

24   Q.    How many times?

25   A.    Either by deposition and filing reports or at trial,

W.H. Lehr - Direct

1735

1  probably, you know, since the mid-'90s, probably about 30 or 40

2  times.

3  Q.   And have you testified or done work in matters with issues

4  related to this case?

5  A.   Yes.

6        MR. BUCHANAN:  Objection, Your Honor.  May we

7  approach?

8        THE COURT:  Well, let's --

9        MR. GOULD:  I --

09:34:03 10        THE COURT:  Let's not go where Mr. Buchanan thinks

11  you're going.

12        MR. GOULD:  I have no intention.

13        THE COURT:  Okay.  Thank you.

14  BY MR. GOULD: (Continuing)

15  Q.   And have you done work in any matters related to this

16  case, just generally without identifying them?

17  A.   Yes.

18  Q.   Okay.  And, roughly, what percentage of your work is

19  devoted to this type of testifying or expert work?

09:34:29 20  A.   In terms of my time, I would say about 20 percent of my

21  time is directed towards non, you know, academic research.  And

22  I would say, you know, it varies year to year, something like

23  half of my time is spent on, you know, providing expert

24  testimony in the context of various litigation.  The other is

25  doing other sorts of advisory types of positions.

W.H. Lehr - Direct

1736

1    Q.    So half of what percent?

2    A.    So that would be about 10 percent, I guess, of my total

3    time.

4    Q.    So roughly 20 percent consulting, and half is this type

5    of --

6    A.    Half of the consulting time, I would say, roughly, is

7    devoted to, you know, participating in litigation.

8    Q.    And so, the other 80 percent is what?

9    A.    That's devoted to the work I do on -- you know, associated

09:35:15 10  with my economic research.

11   Q.    What kind of materials did you review in forming your

12   opinions in this case?

13   A.    Well, in the normal course of my work I'm constantly

14   reading the trade press and academic about -- you know,

15   literature on matters that are directly relevant to this case.

16   So all of that general background is, you know, stuff that I

17   relied on.

18            But more specifically, to answer and address the

19   issues I was requested to address in this matter, I did a sort

09:35:46 20  of more in-depth research of publicly available documents.  And

21   that includes, for example, you know, a more extensive review

22   of the academic literature in the area of sort of what

23   economists and other analysts have to say about copyright,

24   looking at publicly available sources.

25            But then because Cox is a privately held company and

W.H. Lehr - Direct

1737

1   because a lot of the information in this case is, you know,

2   confidential, a bunch of the information that was considered

3   was information that was provided in the context of this trial.

4   And some of the important information there are the various

5   internal documents from Cox or documents like the audited

6   financials we heard about earlier that speak to Cox's financial

7   statements.  So their profit/loss statements, the flow of cash

8   flows.  So those sorts of documents.

9           I also looked at data and information from -- that

09:36:42 10  was produced from the so-called CATS system, the Copyright

11  Abuse Tracking System, that documented the match between

12  subscribers and tickets received, the DM -- so-called DMCA

13  tickets, and then the ICOMS billing data, which is the internal

14  billing data.  And I had subsamples of -- I mean, I -- well, I

15  had the data that was produced by Cox, which are a subsample of

16  the total data that Cox has in its CATS system and in its

17  billing system.  And so, that's data also I considered.

18          And then I considered a number of other internal

19  documents that are produced in the context of this case that,

09:37:23 20  you know, represent internal communications, things like

21  e-mails that were passed amongst Cox managers.  Various

22  deposition testimony.  For example, Scott Mencher's deposition

23  testimony, I did review.  And a number of other documents,

24  reports that were considered by Cox and were produced by -- in

25  the context of this.

W.H. Lehr - Direct

1738

1    Q.   We'll talk about some of those moving forward.  Are you

2    being compensated -- are you being paid for your time here,

3    sir?

4    A.   Yes.

5    Q.   And at what -- how much?

6    A.   For my work associated with this, I'm paid at my normal

7    professional rate of $650 an hour.

8    Q.   And roughly how much time have you spent on this

9    engagement over the course of the time you've been engaged

09:38:12 10    throughout the case?

11   A.   Somewhere between 150 and 200 hours.

12   Q.   Is -- does your compensation for your work in this case

13   depend in any manner on reaching a particular conclusion or a

14   particular outcome in the case?

15   A.   No.  I mean, I was asked to offer my opinions and, you

16   know, given access to the data that I thought I needed to

17   address to offer those opinions, and then my opinions are what

18   my opinions are.  My assessment is what it is.

19   Q.   Did you reach any conclusions that you think will assist

09:38:41 20    the jury in understanding issues in this case?

21   A.   Yes.

22        MR. GOULD:  Your Honor, we would tender Dr. Lehr as

23   an expert in the field of Internet industry and

24   telecommunications industry economics.

25        THE COURT:  Any objection for him -- receiving him

W.H. Lehr - Direct

1739

1    for those purposes?

2              MR. BUCHANAN:  No, Your Honor.

3              THE COURT:  All right.  He's received for those

4    purposes.

5              MR. GOULD:  Thank you.

6    BY MR. GOULD: (Continuing)

7    Q.   Dr. Lehr, I want to walk through a summary of your

8    opinions, and then we'll circle back and we'll go through each

9    one of them in detail.

09:39:07 10          Did you prepare some slides to assist with your

11   testimony today?

12   A.   I did.

13   Q.   So let's talk through what -- can you explain them briefly

14   for the jury?  What was your first opinion in this case?

15   A.   Sure.  So the first opinion that I'm going to be

16   explaining is that copyright infringement causes significant

17   economic harm to rights holders.

18          You know, this is an opinion that, as I'll explain,

19   is why -- is almost universally, I believe, supported by the

09:39:34 20  evidence available.

21   Q.   And what was your second opinion?

22   A.   That while it's easy to understand the conclusion that

23   copyright infringement causes very significant harm, it turns

24   out, for reasons I'll explain, that the data just doesn't exist

25   to be able to really quantify the economic harm that's --

W.H. Lehr - Direct

1740

1  plaintiffs suffer, you know, in this matter or even more

2  generally with any kind of precision.

3  Q.   And your third opinion, Dr. Lehr?

4  A.   When you look at Cox's business, you can understand, first

5  off, that where they sit now, they're a highly profitable

6  business.  And that having infringing subscribers on their

7  network has contributed significantly to their business and

8  their profitability.

9  Q.   And your fourth opinion, Dr. Lehr.

09:40:38 10  A.   The fourth opinion is that Cox has a significant economic

11  incentive and derives a financial benefit from having

12  infringing subscribers on its network, retaining those

13  subscribers on its network.

14  Q.   Now, let's turn to your first opinion.

15        Dr. Lehr, could you walk us through the bases for

16  your opinion, please.

17  A.   Yeah.  I mean, the basic economics of copyright, and sort

18  of the economic theory that underlies it, is pretty straight

19  forward.  Copyright exists so that rights holders have a legal

09:41:15 20  protection and an opportunity to realize the value of the

21  content that they hold the copyright to.

22        And if -- what piracy does is it forces them, in

23  trying to realize the value of their copyrighted content, to

24  compete against zero priced goods, free goods.  And that is

25  fundamentally disruptive to their ability to recover it.

W.H. Lehr - Direct

1741

1       And what that means is that in a world with piracy,

2   their revenues are significantly lower.  And as a consequence,

3   their profitability is significantly lower.

4       And so, you can understand that by going through the

5   various pieces of what is involved in computing what their --

6   what the effect on their revenues is.

7   Q.  So what does -- what do you mean by displaced legitimate

8   sales in the first bullet on your slide?

9   A.  So you can break down revenues into two pieces.  You can

09:42:11 10 look at what it is, how many units they sell and how they sell

11  them, and you can look at what the prices are.

12      So if people are downloading lots of or getting

13  available access to lots of free illegal copies, then those

14  illegal copies out there are competing and displacing sales,

15  legal sales, unit sales of the content by all the different

16  ways that those legal sales might take place.

17      So there's the -- there's a cannibalization so that

18  the number of sales they can make is lower.  That's the first

19  effect.  That's sort of the Q or quantity effect.

09:42:48 20 Q.  And the second -- so the first talks about the quantity.

21  The second bullet:  Piracy negatively impacts pricing.

22      What do you mean by that?

23  A.  That the pricing at which they're able to sell legal sales

24  is driven down.  So the prices they can charge for the sales

25  they're still able to make in a world with piracy are lower

W.H. Lehr - Direct

1742

1    because they're always competing against free goods.

2          And so, both the P and the Q are lower in a world

3    where piracy exists.  And so, the product of them are, in a

4    sense, doubly lower.  So revenues are lower because of both of

5    those effects in a world where they're having to deal with

6    piracy.

7    Q.   You talked about P and Q.  And just to clarify, what's the

8    P and what's the Q?

9    A.   The P is the price that they can sell.  Now, they sell in

09:43:37 10    many different ways, so there's actually lots of prices.  But

11    like the price for the box sets, the price for the DVDs, the

12    price for the streaming content, all of that, all of those

13    prices are adversely impacted by having to compete with the

14    fact that people can get the thing for free if they're willing

15    to steal it.

16    Q.   And Q is quantity?

17    A.   Q is the quantity, the number of sales of all the

18    different categories of things they sell.

19    Q.   Now, this third bullet point:  Copyright holders incur

09:44:06 20    substantial enforcement costs.

21          What do you mean by that, sir?

22    A.   Well, setting side sort of the revenue implications, by

23    avoiding having to deal with infringing subscribers directly,

24    you're avoiding having to incur the enforcement costs.  Which

25    includes sending notices, handling the calls, staffing your

W.H. Lehr - Direct

1743

1    department that deals with this.  Those sorts of costs are

2    examples of costs that are avoided.

3    Q.   So for the copyright holders, you're talking about the

4    copyright holders' enforcement costs?

5    A.   Oh, sorry.  The copyright holders actually have been

6    forced to do a lot in that it's -- you know, they've had to

7    pursue litigation.  They've actively had to pursue enforcement

8    and try to address this directly.

9         And then, of course, it's had a big disruption effect

09:44:54 10  on their business models.  So, for example, you know, copyright

11   holders are more reticent, for example, to release really high

12   resolution versions, digital versions of their content into a

13   world where it could easily be pirated.  Because a digital

14   copy, once it gets out there, can be replicated, you know,

15   perfectly.  And if it's a high resolution copy, then, you know,

16   it's a more dangerous copy out there by pirates.

17        So their ability to pursue different ways to build

18   out their business models has been adversely affected.

19   Q.   And the last point:  Piracy defers -- deters future

09:45:37 20  investments and reduces incentives to create.

21        What do you mean by that?

22   A.   Yeah, the impact of piracy, you know, plays out over time

23   because the incentives of copyright holders to invest in new

24   artists and incurring the risky costs of, you know, helping

25   manage those artists' careers, producing the musical

W.H. Lehr - Direct

1744

1    recordings, marketing and distributing them, if they don't --

2    if they expect that they're not going to be able to recover the

3    revenues they have a reasonable expect -- they should have a

4    reasonable expectation to be able to recover, then that's going

5    to deter or limit their sense of investment.

6         Piracy just sucks oxygen out of the whole ecosystem

7    and means that there's less money available and less of an

8    incentive to use the money to invest in creative content.

9    Q.   Now, apart from your own background as an Internet

09:46:34 10  industry economist, did you review any articles specifically

11   related to this opinion?

12   A.   Yes.

13   Q.   And could you tell us about that.

14   A.   Yeah.  Well, as I mentioned earlier, I looked at the

15   economics literature with a special care to see whether or not

16   in fact what, you know, I had understood before, you know,

17   being involved in these sort -- you know, being involved in

18   sort of litigation, especially with copyrights, was that, you

19   know, it's obvious to an economist, theoretically, that, you

09:47:10 20  know, copyright infringement would harm rights holders.  That,

21   you know, stealing goods is bad for a business that's trying to

22   sell goods.

23        But the question about how it harms them is a

24   question about the empirical evidence.  Like if you were going

25   to try and quantify it, and say, how significant is the harm?

W.H. Lehr - Direct

1745

1   You need to look at the empirics.  And so, I considered that

2   literature.

3          And in the context of this case where we're focusing

4   on infringement by the use of peer-to-peer applications like

5   BitTorrent, there's a question about how much does BitTorrent

6   traffic -- how does that relate to the likelihood that that

7   traffic is infringing -- copyright infringing traffic?

8          So I considered, for example, papers that addressed

9   that kind of point.

09:47:57 10   Q.   And how many papers, at a ballpark, did you consider, or

11   studies or articles?

12   A.   Well, I think I referenced in my various earlier reports

13   somewhere between 20 and 30 papers.  And, you know, I don't --

14   I mean, the number of papers that I've read on this subject is

15   probably -- you know, is obviously much more than that.  But a

16   lot of these papers -- a number of the papers I cited are

17   survey papers that have gone back and said, okay, at different

18   points in time, here's what the literature says.  There are X

19   number of studies and they've reached the conclusion.

09:48:29 20          And the overwhelming indication from that, those

21   sorts of survey articles in this field is that economists all

22   agree that there is a very significant adverse impact on the

23   sales and the businesses of copyright holders due to piracy.

24   But because they're using different datasets and because

25   they're coming at it using different methodologies at different

W.H. Lehr - Direct

1746

1    timeframes, they come up with very different estimates.  But

2    all of them are big.

3    Q.   Now, you said the word "papers."  What do you mean that

4    you've reviewed papers?  What are these papers?

5    A.   Oh, sorry.  A number -- what economists or an analyst

6    looking at this field does is you look at sort of the

7    literature.  And one of the first things you look at in terms

8    of the literature is, you know, the academic peer-reviewed

9    press.  And there's many different publications.

09:49:23 10          But, you know, the typical pattern by which academics

11   publish their research is they submit it to a journal that has

12   an audience of folks that are interested in that, which is

13   usually other professionals.  And then before the journal will

14   publish that, they send it out to peer review.

15          And then there's also conferences that are attended

16   by other experts and this sort thing.

17          So that's how the professional sort of academic world

18   works.

19   Q.   And did any of the articles that you reviewed discuss the

09:49:52 20   impact on revenue received by the recording industry?

21   A.   Yes.  I mean, the ones I directly cited were all directly

22   relevant to this question, the 24 -- or whatever it was -- so

23   between 20 and 30 publications I cited in my reports.

24   Q.   And did you observe a general consensus or agreement in

25   the literature on the issue of harm?

1747

1    A.    Yeah.  I mean, one of the more recent or latest -- I

2    forget the precise date of it, reviews of the literature, but

3    it was -- I believe it was after the 2014, said that they found

4    26 studies of whether or not there was economic harm to rights

5    holders, and they found that something like 23 out of those --

6    out of the 26 studies found significant economic harm.

7          Now, when you say "significant," what you mean is

8    that you're actually able to demonstrate it within the dataset

9    using statistical methods to basically sort of pass muster.

09:50:52 10          So it's not like I found evidence, but it's not

11   statistically significant.  So it doesn't mean that's

12   meaningless, it just means that, you know, it doesn't cross

13   that higher bar that academics try and set for themselves in

14   published literature.

15          So when they say 23 out of 26 studies found

16   significant harm, that's -- you know, I would say, you know, a

17   demonstration of almost universal consensus in the profession.

18   Q.    And did you agree with that consensus?

19   A.    Absolutely.  And I think all the other evidence I

09:51:25 20  considered in this matter just goes to confirming that.

21   Q.    Have you prepared a slide excerpting one of the studies

22   you reviewed?

23   A.    Yes.

24   Q.    Could you tell us about this study and why you've put this

25   slide here, Dr. Lehr?

W.H. Lehr - Direct

1748

A.    Yeah.  This is one of the studies that I cited, and the

title of the study is Quantifying Global Transfers of

Copyrighted Content Using BitTorrent.

        And it's by Alexandria Mateus and John Peha.  And

I've highlighted, you know, excerpts from this.  So the first

excerpt is that 10.7 songs were transferred using BitTorrent

for every song sold.

        And then also, that the vast majority of music and

video content transferred using BitTorrent is copyrighted.

        And they find that only .55 percent, less than, you

know, 1 percent, about half a percent of the content in

BitTorrent is not copyright infringing and potentially

legitimate.

        So they conclude that BitTorrent transfers result in

hundreds of millions of copyright violations worldwide per day,

and the copyright holders fail to realize significant revenues

as a result.

        What these guys did in the study was they looked in

some detail and care at actually what's going on in BitTorrent

traffic.  And, you know, it's a fairly comprehensive study, I

think, in doing that.

        And what they're saying here is essentially this

research says that the number of illegal copies that are out

there -- because almost all these copies that are going by

BitTorrent are illegal, that's what this is saying, is that

W.H. Lehr - Direct

1749

1    it's copyrighted material that are being shared over the

2    BitTorrent network -- it's ten times what the legal sales are.

3    Q.   Now, Dr. Lehr, there is a document in front of you,

4    PX 439.

5    A.   Yes.

6    Q.   Do you recognize that?

7    A.   Yes.

8            MR. GOULD:  I'd move to admit PX 439.

9            THE COURT:  Any objection?

09:53:32 10          MR. BUCHANAN:  Yes, Your Honor, I would -- no

11   objection.

12           THE COURT:  All right.  Your exception is noted

13   previously.

14           MR. GOULD:  If we could pull up--

15           THE COURT:  The exhibit is received.

16           MR. GOULD:  Actually, you know what, I have got a

17   slide, so it's fine.

18   BY MR. GOULD:  (Continuing)

19   Q.   Dr. Lehr, what is PX 439?

09:53:47 20   A.   This is another one of the, you know, documents that I

21   reviewed in reaching my opinions.  It was, you know, a study

22   that looked at -- it was another study also looking at some of

23   the same issues that were touched on in the paper I just saw,

24   looking at what's actually in BitTorrent traffic.

25               And so, what they did was they only identified out of

W.H. Lehr - Direct

1750

1    the torrent files, out of 12,500 torrents analyzed, there were

2    only two files that they offered -- or two torrents that --

3    files that offered non-infringing content.  So that results in

4    them including that 99.97 percent of content was infringing.

5         So this is another example of research of the sort

6    that was relied upon by analysts and academics trying to think

7    about this question of does, you know, peer-to-peer file

8    sharing result in piracy that harms rights holders?

9         And, you know, it goes to the point of, you know,

09:54:52 10  people that actually looked at this, documents what was, I

11   would say, commonly known by people that were thinking about

12   these issues at the time that, you know, of course, the

13   traffic, peer-to-peer traffic is almost all illegal copyright.

14   Q.   So how does this -- how do these two articles and the body

15   of literature tie in with your opinion that this peer-to-peer

16   infringement causes economic harm?

17   A.   Well, what the peer-to-peer does is it basically makes it

18   extremely easy.  So it is kind of like piracy on steroids.

19   While piracy did happen and has been a problem forever -- you

09:55:35 20  know, when people did discs, you know, did copyright CDs, that

21   just wasn't quite the same thing.

22        But if someone can put on the Internet a copy via

23   broadband connection, especially via a high-speed broadband

24   connection a copy, the number of times that can be shared is

25   potentially unlimited.

W.H. Lehr - Direct

1751

1          So the viral nature of file sharing and the way

2    peer-to-peer networks work means that it's an extremely

3    dangerous, you know, from the perspective of rights holders,

4    vehicle for, you know, producing illegal copies.

5    Q.   Now, moving to your second opinion that the quantity is --

6    you can't quantify the harm.  Could you walk us through the

7    basis for that opinion.

8    A.   Yeah.  So the first, you know, opinion is that, you know,

9    the evidence and, you know, sort of universally the people that

10   have looked at it, the economists and other analysts, have

11   concluded that there is a really significant harm to rights

12   holders.

13         It turns out that, you know, if you want to try and

14   quantify that in dollar terms, like what is the economic damage

15   that plaintiffs would suffer in a case like this, that data

16   just doesn't exist.

17         To an economist trying to estimate something like

18   economic harm, what you're trying to do is figure out, here is

19   the way the world exists today, so I know what sales are in

20   today's world, but what would sales have been in the but-for

21   world where the piracy problem that I'm worried about did not

22   exist.

23         So I'm trying to estimate what the profits and

24   revenues might have been to rights holders in a world where

25   piracy did not exist.  And I fundamentally do not have the data

W.H. Lehr - Direct

1752

1    to do that, nor does it actually exist.

2    Q.   So there are three points on your slide here.  Can you

3    just walk through and just briefly explain why this data

4    doesn't exist.

5    A.   Sure.  So the first issue, problem, if you try to estimate

6    the revenues -- so I'm trying to figure out how much lower

7    revenues were as a consequence of the piracy.  That's what I

8    would have needed to have done if I was going to try and

9    estimate what the economic harm to plaintiffs would be.

09:58:10 10          It was clear to me, after looking at the evidence and

11   what was available in the literature, that evidence did not

12   exist.  So I didn't attempt to do that.

13          But if you -- the first thing you would have to do is

14   estimate that Q, how many unit sales would they have sold in a

15   world without piracy.  So to do that, the first thing you have

16   to do is figure out how many illegal copies are out there as a

17   consequence of the piracy.

18          So in this case, the data we have is evidence of

19   infringement using peer-to-peer by subscribers repeatedly, you

09:58:42 20   know, engaging in infringing activity.  We don't observe how

21   many actual copies were distributed by those subscribers, nor

22   could we given the way the data was actually collected.  So

23   that at best we have a lower bound estimate of the amount of

24   infringing activity.

25          So MarkMonitor, which is the principal source of the

W.H. Lehr - Direct

1753

1   data, wasn't surveying every Cox subscriber all the time.  And

2   the -- so they wouldn't have known everything that was going

3   on.

4           And a file, even potentially more important, a file

5   that is distributed illegally, once it gets out there virally,

6   how many illegal copies that copy can spawn.  You would --

7   there is no way to precisely estimate that.

8           So that's the Q.  You don't know what the Q is.  And

9   the data in the case doesn't allow you to reliably estimate

09:59:43 10   that, the number of illegal copies.

11          Now, that number of illegal copies isn't -- doesn't

12   equate directly to the number of sales that would have

13   happened.

14   Q.   Why not?

15   A.   Because the second thing you have to know is you have to

16   know how many of those illegal copies would have -- had they

17   not existed, would have translated into legal sales.

18          Now, if you say the legal sales would have taken

19   place at a zero price, then it's okay.  But if you say it's a

10:00:11 20   non-zero price, some of the things that went out there

21   illegally might not have been bought.

22          So you have to figure out what was the purchasing

23   behavior of the subscribers, what they would have done if they

24   hadn't been able to get the pirated copies.  And that data

25   doesn't exist.  We don't have detailed data on Cox's

W.H. Lehr - Direct

1754

1   subscribers' music-purchasing behavior.  So we don't know what

2   the displacement effect would have been given a number of

3   illegal sales.

4          So I need to know the number of illegal sales and

5   then I need to have an estimate, a reliable estimate of the

6   displacement effect to figure out what the change in Q, the

7   quantity of units sold, would be.

8          And the third thing is, as I mentioned earlier, the

9   prices.  What would the prices have to have been or could have

10:00:58 10  been -- would have been in a world without the piracy taking

11  place.  The prices I observe have been driven down because of

12  the existence of the piracy.

13         So I don't have any of those core elements.  So I

14  can't reliably estimate the revenues that were lost because of

15  the piracy.

16  Q.  So you talked about all this data you don't have.  Why

17  can't you just look at the number of notices that the

18  plaintiffs sent and estimate damages based on that?

19  A.  Well, first off, I'm not here testifying about how you go

10:01:38 20  from the notices to the details of figuring out what some

21  number of infringements are.  That's not stuff I'm talking

22  about.

23         But the notices were part of a complex process that,

24  as I have already said, did not detect, nor could be expected

25  to detect, every element of infringement.

W.H. Lehr - Direct

1755

1        So the number of times, like the subscribers who may
2    have been infringing, it's reasonable to believe there were,
3    that might not have been detected.  So they've never been --
4    it's possible no notice at all.
5        And the notices were of an observation that a file
6    was being made available, a copyrighted file was being made
7    available at a particular IP address.  But it doesn't tell you
8    how many times that file may have been shared.  And, you know,
9    all the other ways.  That data -- no one has.  BitTorrent
10   doesn't have it.  Cox doesn't have it.  And certainly the
11   rights holders don't have it.
12   Q.   I want to turn to your next opinion about the industry
13   economics and Cox's revenue and profits.
14       Before we go -- as we go into that, can you describe
15   a little bit the economic nature of Cox's business as an
16   Internet service provider?
17   A.   Yeah.  To think through and understand the financials of
18   Cox and come to the opinions that I have, you have to
19   understand a little bit about the nature of that business at a
20   high level and even at a level with some more detail.  And
21   that's something I have spent a lot of my time doing.
22       I mean, Cox is a provider of telecommunications
23   network services using a complex network that they have built
24   up that allows them to offer a range of services that we'll be
25   talking about.

W.H. Lehr - Direct

1756

1      So the three most common or the three most sort of

2  important of those services we are talking about are their

3  high-speed Internet access service, or broadband, I'll use

4  those two interchangeably; their video services or pay

5  television services; and their voice services or telephone

6  services.  They offer those services and additional ones over

7  this complex platform that they deploy.

8      Now, that platform is a network that has wires in it

9  that go by specific houses and businesses.  So when they go --

10:04:02 10  and they have built this network out, Cox has, into 18 states,

11  I believe, and within those states a number of local markets.

12  So, you know, towns, neighborhoods, communities where Cox

13  service and their network is available.

14      They go out and they build that network out, and then

15  that network is available to basically support the services

16  they want to sell.  And then they have to go out and sign up as

17  many of the businesses and households that are passed by the

18  wires that Cox has to the services that those subscribers want

19  to take.  And Cox wants them to buy as many services as

10:04:39 20  possible.

21      And the typical, for example, residential customer

22  buys multiple services from Cox at a monthly subscription price

23  that varies depending on what they purchase from them.  And

24  then Cox provides those services and bills the subscribers a

25  monthly rate for as long as Cox has those subscribers as

W.H. Lehr - Direct

1757

1    customers.

2              So that's sort of the basic business that Cox is in.

3    Q.   Now, considering that model and having looked at Cox's

4    financials, did you form a view or any conclusions about how

5    Cox does at this job it tries to do?

6    A.   Yes.  Cox is -- this is a hard thing to do.  So not -- big

7    companies do this.  Cox is a big company.  And Cox has been

8    very successful in doing this.  Cox is the eighth largest, I

9    believe, Internet service provider, provider of these kinds of

10:05:39 10    services in the country.  And they -- their network that they

11    have built out passes something like ten million homes.  And

12    they've signed up something like six million more subscribers,

13    business and residential subscribers that are in the businesses

14    and houses that are passed by Cox's network.

15             So I would say they have been very successful in

16    executing on this business model.

17    Q.   Now, before we turn to some of the numbers, what kind of

18    information did you review to get a quantitative sense of Cox's

19    success at this?

10:06:19 20    A.   Well, I mean, the general description of the business is

21    something I'm well familiar with.  But to understand the

22    specifics of Cox's business, because it's a privately held

23    company, I had to get information, you know, in the context of

24    this proceeding.

25             And some of the information that I've used is their

W.H. Lehr - Direct

1758

1    own internal profit and loss statements.  So these are their

2    statements that describe what are the revenues coming in from

3    the customers by product line, and then what are the costs that

4    are directly attributable to those product lines that are, you

5    know, variable.  And then also, what are all the fixed costs.

6    So, what are all the operating costs that are associated.  And

7    then that, you know, down to the bottom.

8              And then after I've done my -- those are the

9    documents that I considered, and I got that both for their

10:07:08 10   residential customers when I did my original first report, and

11   then later, we got additional similar information on their

12   commercial customers.  And that's the principal data.

13             And then after my all reports were finished, we

14   finally got access to their complete audited, financial audited

15   statements.  A thing that looks like an annual report that

16   normally would be publicly available and you could download

17   from the Securities and Exchange Commission site.  You know,

18   that -- the version of the report that looks like that.

19   Q.   Talk us through -- talk the jury through, please, if you

10:07:44 20   could, what you observed and concluded in terms of Cox's

21   revenues and profits from its residential and business

22   customers.

23   A.   Right.  So to make even more concrete what I was

24   explaining before, you can see that, you know, Cox had revenues

25   in 2013 of $9.5 billion.  Revenues in 2014 of $10 billion.  For

W.H. Lehr - Direct

1759

1    a total of $19.5 billion.

2         So round numbers, they're basically a $10 billion

3    company.  And that comports with sort of what you would expect

4    given sort of what I have already said.

5         The other point to recognize, and this slide

6    demonstrates, is they're a quite profitable company.  So when

7    you take -- using Cox's financial internal documents, you take

8    off all the costs, except for taxes and interest that Cox

9    incurs in realizing those revenues -- so they have to maintain,

10:08:45 10  you know, a networking engineering department, and marketing

11   department, and they have to have people doing their accounting

12   and personnel, take all those costs out, in 2013, they earned

13   $4 billion.  And in 2014 they earned $4.3 billion.  For a total

14   of $8.3 billion.

15        So the profit margin, just talking about the cash

16   flow that's flowing to the business and that they can then, you

17   know, use to invest in the business or do other things with,

18   that's, you know, a margin around 43 percent.

19   Q.   So I want to understand a couple of terms you used.  What

10:09:26 20  is revenue just at a high level?

21   A.   Revenue was the total receipts they get from their

22   subscribers.

23        So as I said, they send bills to subscribers, and

24   some of the subscribers have discounted service for the first

25   couple of months or whatever.  And so, that's all factored in.

W.H. Lehr - Direct

1760

1    It's what the customers actually pay.  That's the money coming

2    in.

3              And then money that goes out is what they have to pay

4    their employees to make this whole engine work and --

5    Q.   And what is net profit?

6    A.   Net profit the revenues minus those costs.  And it's --

7    here, what net profit is is the operating cash flow.  So it's

8    taking out their operating costs.  It's not taking out their --

9    the interest expenses and some things that, you know,

10:10:15 10   accountants may use if they're computing something like net

11   income.

12   Q.   And you used another term, "margin."  What does margin

13   mean, and how does that relate to this slide?

14   A.   Margin, again, is just a measure of profitability.

15   There's many ways in which one might assess profitability.  So

16   margin, here, is just very simply net profit divided by

17   revenue.  It gives you an idea.

18              The higher that number is, it tells you, if I get a

19   dollar in and my margin's really high, I'm going to keep most

10:10:41 20   of that dollar that I get in and be able to flow it down to the

21   bottom line, and then use it to build my business or make the

22   people that gave me the money to run the business happy to go

23   do whatever they want to do.

24   Q.   Now, did you consider any other measure of profitability?

25   I think this might be on your next slide.

W.H. Lehr - Direct

1761

A.    Well, I mean, one of the -- I mean, when you look at
something like operating -- the operating cash flow, that's
something that, as an economist, when you consider a business,
is very important.

And so, if a business is growing and trying to
execute their model, they have to basically keep a bunch of the
money they -- profit they make, so that they continue to make
profit in the future years.  So they have to reinvest in the
business.  Okay.

10:11:24   But if you own stocks or, you know, invest in the
market, there's two ways you can make money.  One is the stock
value appreciates and you can sell the stock at a higher value
later.

Another way is the company sends you dividends.  And
if they send you dividends, you can take that money and do
whatever you want with it.  You can go on a vacation, you can
buy a car, you can do whatever you want.

So what this is showing is Cox's dividends in 2012,
2013, and 2014.  And you can see that they were able to pay
10:11:59   dividends of a billion dollars and more out of their net
profits and still, you know, maintain their business and invest
in their business and grow their business as they thought
appropriate.  So this is money they thought they could safely
take out of the business.

Now, if you think of a start-up company or something

W.H. Lehr - Direct

1762

1  like that, most of the time they're under water because they're

2  consuming more cash building their business than they're

3  producing.

4         That's not the case with Cox.  Cox is very, very

5  profitable.

6  Q.  And just for clarity, what's a cash dividend?

7  A.  A cash dividend basically is a -- you know, you give the

8  money in cash.  You haven't said, oh, here's -- you know,

9  here's a nice button or something like that that we value.

10:12:43 10  It's actual dollars.  This was a billion dollars or more that

11  they were pulling out of the business to do other things with.

12         And what my concern here is, to understand the

13  business of Cox and how that operates to, you know, create

14  value for Cox.  I mean, to make that business work.

15         And this is saying that, you know, of the 4 billion,

16  they don't need 4 billion every year.  You know, they're --

17  they can keep 3 billion in the business roughly and --

18  Q.  Do you have an understanding of whether Cox was growing

19  over these years?

10:13:20 20  A.  Yeah, Cox was.  Cox was continuing to grow.

21  Q.  And how does this cash dividend relate to that notion?

22  A.  Well, this is totally separate.  This is not money that

23  they were using to grow their business.

24  Q.  They were growing even after paying these dividends?

25  A.  Yes, yes.  So the other costs, for example, the payment on

W.H. Lehr - Direct

1763

1   interest and things like that, the taxes and, you know, other

2   stuff like that, that's not in the net profit, you know, that's

3   covered by the other stuff that still allowed them to pay these

4   dividends.

5   Q.   And you say:  Cash dividends to its owners.  Do you know

6   who the owners are?

7   A.   I don't know specifically.  But it's a privately held

8   company, and as I understand, it's relatively closely held.  So

9   it's the Cox family mostly, and friends.

10:14:06 10   Q.   Now, you've been talking about Cox's profitability and

11   margins.  Did you compare Cox's margins and profitability to

12   any other metrics, to any other industries?

13   A.   Yeah.  Well, I mean, to -- you know, and it's also

14   relevant in the context of this case to look at, you know,

15   who -- what -- how does Cox's business compare to the

16   plaintiffs'.

17          So, you know, what this slide does is it looks,

18   again, from the, you know, the publicly available documents for

19   the plaintiffs.  So I have Sony Music, Sony/ATV, Universal

10:14:41 20   Music Group, and Warner Music Group.  And Sony Music and

21   Sony/ATV are split because Sony Music is the recording company

22   and Sony/ATV is the music publishing.  In the case of Universal

23   Music Group and Warner Music Group, they've consolidated those.

24          And so, you can see that if you go and look at this,

25   Cox is an order of magnitude larger, you know, than any of the

W.H. Lehr - Direct

1764

1  individual plaintiffs.  And if you add up in aggregate the

2  plaintiffs' revenues, you come up with a number that's a little

3  bit more than the 10 billion that Cox earned in 2014.

4           What's more --

5  Q.   Go ahead, sir.

6  A.   Sorry.  What's even more revealing is if you look at sort

7  of what the net profit is -- so the net profit that Cox

8  realized was 4.3 billion in 2014.  And, you know, if you sum up

9  the 65 million, 174 million, the 514 million, and the 130

10 million, you come up with a number that's less than a billion.

11 I forget exactly what it is.

12           But if you compute that, you know, over -- so you

13 take that billion -- less than a billion over the slightly more

14 than 10 billion, and you calculate what's the margin for that,

15 it's 8.6 percent.

16           So you compare the 8.6 percent margin, that's the

17 difference between dollars they get coming in and how much

18 they're able to keep, to the 43 percent that Cox is getting,

19 right?  And the reason is, is because the music business has a

20 lot more operating costs.  You know, it's expensive to, you

21 know, pay for the artists, and the production, and the

22 distribution rights and all that.  And their financial

23 statements, you know, reflect that.  And that's why their

24 margin is, you know, one-fourth of the margin that Cox is

25 seeing.

10:15:44  (line 10)
10:16:16  (line 20)

W.H. Lehr - Direct

1765

1    Q.    So you said that Universal and Warner, as shown here, are

2    consolidated.  Did you mean consolidated financially?

3    A.    No.  What I meant was they're -- they don't differentiate

4    or break out separately in their financial statements their

5    recording business and their music composition business.

6    Q.    Report in consolidated financials?

7    A.    Yes.

8    Q.    And there's a footnote here at the bottom.  Could you

9    explain what that means.

10:17:00 10    A.    Oh, well, Cox, as I said, operates in 18 states.  So they

11    don't represent the whole, you know, market for services like

12    the services Cox offers.

13         Whereas the music -- the plaintiffs in this case, in

14    the case of Universal Music Group and Warner Music Group, this

15    represents their global financials.  So this is -- they're

16    competing globally, and this is what they realize.  And Sony,

17    it's their U.S. sales.

18         So it's a little bit of an apples and -- you know, I

19    mean, in that I'm acting as if these guys are competing for the

10:17:35 20    same customer market, and they're not.

21    Q.    And why did you do this comparison?

22    A.    Well, one is because, you know, to just give people some

23    concrete numbers to understand, when I say that Cox is very

24    profitable, you can see that in many ways.  You can see that in

25    the amount of money they get.  You can see that in the margin

W.H. Lehr - Direct

1766

1    they get.  You can see that in dividends they pay.  And you can

2    see this by comparison of another industry.

3           This is not to say that the music industry is, in any

4    sense, a bad industry, you know, earning an 8.6 return here.

5    It's just saying that Cox is great -- that's a great business.

6           Building a network is hard.  But having built the

7    network, if you're successful in getting subscribers, which Cox

8    has done, is a great business as long as you can retain those

9    subscribers.

10:18:24 10   Q.   Now, focusing on Cox's business again.  Can you unpack a

11   little bit and explain where its revenues are coming from for

12   its different products.

13   A.   Sure.  So now, just so we're clear, I'm talking about the

14   residential.  This slide shows data from just their residential

15   revenue and profits.  And I'm doing that for two reasons.

16   First, because residential is, by far, the vast majority of

17   their revenues and profits.

18           But also, because in the DMCA notices, 95 percent of

19   those relate to residential subscribers.

10:18:59 20   Q.   Are you referring to the pie chart in the corner?

21   A.   Yes.

22   Q.   I want to make sure we all understood that.  Could you

23   repeat it, please.

24   A.   Yes.  Sorry.  The pie chart in the corner is just to

25   remind us that, you know, of the subscribers, 95 percent -- of

W.H. Lehr - Direct

1767

1  the alleged infringing subscriber accounts, 95 percent of those

2  are residential.  So I believe it's especially important to

3  understand how residential subscribers behave.

4          Although the business subscribers are also very

5  important because even though there are fewer numbers, there's

6  a lot more revenue associated with business subscribers on a

7  per account basis.  Which, you know, if you -- the original --

8  the numbers in revenues were about 10 billion.  The total

9  revenues that are earned by the products, the principal

10:19:48 10  products that are sold to residential households, is

11  8.2 billion.  This is for 2014.

12  Q.   Now, why have you demonstrated this slide showing the

13  different revenues, profits, and margins by service type?

14  A.   Well, this is telling us a couple things.  One, is it's

15  telling us, you know, something about how the residential

16  subscribers -- the business model works.

17          So the business model, again, is you have this

18  network that goes by, and then you sell -- and the costs of

19  doing that, most of those costs are, I got the network by the

10:20:20 20  building, and I'm ready to sell them services.  Then you sell

21  them as many services as you can.

22          And the three services that are principally bought,

23  there's some other ancillary ones I won't talk about, are

24  high-speed Internet or broadband service.  And so, the total

25  revenues for their residential subscribers associated with

W.H. Lehr - Direct

1768

1    their high-speed Internet/broadband business is 2.8 billion.

2            They also sell video services to their residential

3    subscribers, and they get $4.2 billion for that.

4            And then for their voice services, they sell those

5    and they get $1.1 billion for that.

6            Now, the typical subscriber of Cox purchases multiple

7    services.  So I believe in 2014, two-thirds of their

8    subscribers bought at least another service, one of these other

9    services.

10:21:10 10            42 percent of the subscribers bought all three.  So

11    the typical way in which subscribers buy services and the way

12    in which Cox wants to sell them to subscribers is to get them

13    to buy this, they sometimes refer to it as the Triple Play.  So

14    you sell them this.

15            The other thing to notice about this is that the

16    margins differ by these services.  And the calculations of

17    these margins and the net profit is based on Cox's internal

18    profit and loss statements by product segment.  So this is the

19    way they think about it.  It is consistent with the investment

10:21:49 20    community, Wall Street analysts think about it, and other folks

21    that analyze this industry do.

22            But these numbers are calculated using Cox's own

23    internal profit and loss statements.  And what it shows you is

24    that they view their high-speed Internet service as the highest

25    margin, most profitable of these services.  It has a margin of

W.H. Lehr - Direct

1769

1    59.8 percent.

2            The next most profitable service is their voice

3    service, which has a margin of 52.5 percent.

4            And then the least profitable of these services is

5    their video or television service, which still has a margin of

6    21.5 percent.  Compare that to the 8.6 percent that the record

7    industries get.  The reason it's 21.5 percent and the reason

8    the video business in that sense is more expensive for Cox is

9    because Cox has to pay for the programming it delivers to the

10:22:41 10   subscribers on a per subscriber basis.

11           So some of that $4.2 billion is going to the -- you

12   know, people like HBO and other folks that are providing the

13   programming.

14   Q.   Now, Dr. Lehr, does the understanding of this business and

15   Cox's financials tie into your next opinion about Cox's

16   economic incentives in this case?

17   A.   Yeah, absolutely.  You can see that the basic business

18   here is to acquire subscribers, sell them a bunch of services,

19   and keep them on your network.  So Cox has a strong incentive

10:23:19 20   to do that.

21           And Cox likes to keep all subscribers that are

22   profitable on its network.  As in, if you pay your bills,

23   you're profitable, in this business.  And there is evidence

24   from Cox's own billing records that keeping infringing

25   subscribers on its network was very profitable to Cox.

W.H. Lehr - Direct

1770

1   Q.   Now, could you just walk through the bases for your

2   opinion on incentives here, and then we'll go through each one.

3   So at this step just touch on them, please.

4   A.   Sure.  So first off, there is evidence in this case about

5   the, you know, subscribers who are -- have been identified as

6   infringing.  And those subscribers, Cox billed $307 million, so

7   we're talking about a lot of money, between February 2013 and

8   2016.

9         Two, there is evidence from multiple sources that

10  suggests that Cox infringers actually paid more for Internet

11  service on average and are likely to have purchased more

12  expensive Internet plans than your average subscriber.

13        Three, that Cox saved costs by not addressing the

14  copyright infringement.  I talked a little bit about that at

15  the very beginning, you know.  And so these -- this is

16  referring to the costs that Cox avoided as opposed to the costs

17  that the plaintiffs incurred in trying to do their -- you know,

18  what they could to fight privacy.  But Cox saved costs by not

19  addressing copyright infringement.

20        And that by not addressing copyright infringement,

21  Cox was able to maintain a larger subscriber base over time

22  than they would have had they been more aggressive in dealing

23  with the infringement by subscribers on the Cox network.

24  Q.   So let's turn to your first opinion that Cox billed

25  subscribers 307 million in the time frame you've identified.

W.H. Lehr - Direct

1771

1    Can you -- what information did you consider in

2    forming this opinion?

3    A.   So I actually -- in this case I actually got, it was

4    closed, a subsample of Cox's data about the levels of

5    infringement.  So excerpts from their CATS system that

6    documented the -- you know, matched the tickets to subscriber

7    accounts from 2012 to 2014.

8         So I know what -- how many tickets and when those

9    tickets arrived for those subscribers in that data.

10:26:11  10    I also received for that subsample of subscribers

11   from Cox's billing system all of the bills that were billed and

12   paid by Cox subscribers identified in the CATS data, that

13   subsample we got, from 2012 to 2016.

14        So I have like month by month this is how much they

15   paid for the services they got.  So I had that data and I

16   matched that up.

17        And when you match that data up -- there were a few

18   missing records, you know, in terms of things, but basically

19   there were 57,279 subscribers that were identified as

10:27:05  20   infringing.  In other words, they had received at least one

21   ticket, for which I had billing data.

22   Q.   And for those 57,000-odd subscribers, what did you

23   determine Cox billed those customers?

24   A.   Well, then having matched those datasets up, you can go

25   through and you can sum the revenue over whatever period you

W.H. Lehr - Direct

1772

1  want.  And the period that I summed it over for this table was

2  from February 2013 to December 2016.  And that number for all

3  those subscribers in that -- those 57,279, it is $307 million

4  that were billed.

5  Q.  Now, this time frame that you've identified here, why did

6  you use that time frame?

7  A.  I used that time frame because I think it's -- one, it's

8  the claim period in this case and it's illustrative of this.  I

9  could have used a different time period.  I mean, I could have

10:28:02 10  shown even more, the numbers would be bigger.

11      And I didn't -- I wouldn't -- I didn't -- I stopped

12  at 2016 because that's all the data I had.  I believe a number

13  of these subscribers were still subscribers and were still

14  producing revenue.  So that would drive the number up if I had

15  been given data up to the present.

16      And presumably also, since the ticket data ends at

17  2014, a number of those subscribers received additional tickets

18  and it's possible that additional, you know, subscribers would

19  have been provided.

10:28:32 20      So this number here is what the data is.  I am

21  showing you what's in the data and give you an idea of what

22  it's telling you.

23  Q.  I'll turn to 3+ and 5+ in a moment.  But I want to

24  understand what do the amounts that Cox billed and collected

25  from these customers tell you about Cox's incentives or

W.H. Lehr - Direct

1773

1  benefits in respect to infringement or infringing customers?

2  A.   Well, there is various standards one might have to

3  determine, you know, what's infringing.  But this is evidence

4  that I believe -- I think the evidence in this case

5  demonstrates credibly that Cox knew they had a significant

6  number of infringing subscribers on their network.

7         And we will talk about other things.  Like for

8  example, they knew they had a lot of peer-to-peer traffic on

9  their network.  And they also knew that peer-to-peer traffic is

10:29:29 10  almost all infringing traffic.

11         But this is data from their own billing system of

12  subscribers that were identified to them by the RIAA in the

13  messages sent to them as these are subscribers engaging in

14  infringement.  And Cox continued to bill these subscribers even

15  though they were infringing, deriving a direct financial

16  benefit from these subscribers that is in the hundreds of

17  millions of dollars.

18  Q.   Why have you included in your slide here, Dr. Lehr, an

19  entry showing direct infringers with just one ticket?  How does

10:30:08 20  that demonstrate Cox's economic incentives versus a direct

21  infringer who had just one ticket in Cox's system?

22  A.   Well, first off, I think to understand what's going on

23  here, you ought to have some sense of the dataset.  So the

24  dataset begins with infringers that have one or more tickets.

25  So I think that's the first reason you absolutely want to show

W.H. Lehr - Direct

1774

1 it.

2          But the other is because you're trying to get a

3 handle on evidence that shows that Cox actually benefitted,

4 that its incentives -- what the theory tells you comports with

5 what the evidence actually shows and is demonstrated by Cox's

6 actual behavior.

7          So the theory tells you that a business operates to

8 generate profits and do the right things.  And so, it's in

9 Cox's incentive to retain profitable subscribers.

10:31:00  10          Cox, indeed, retained profitable subscribers.  And it

11 chose to retain and earn significant revenues and profits from

12 subscribers that were identified as infringing.

13          Now, you know, whether or not these -- you should

14 say, oh, you know, those subscribers that only got one ticket

15 weren't really infringing, I'm not arguing with that.  Although

16 the data suggests that the fact that they got one ticket, given

17 what I said earlier and given what we know about the nature of

18 the sampling of the data, means that there is maybe a bunch of

19 people that never got a ticket that were infringing merrily.

10:31:42  20 They got one ticket and they infringed a lot more, but didn't

21 get subsequent tickets.  And we don't know how many

22 infringements are associated with the subscriber that got

23 identified.

24          So I'm not trying to tell you how to map to a number

25 of infringements.  That's not my testimony here.  It's about

W.H. Lehr - Direct

1775

1 what is their economic incentive to knowingly tolerate having

2 infringing subscribers on their network.

3          And I believe the $307 million gives you an idea that

4 they had a very large economic and financial incentive from

5 that.

6 Q.   Now, when Cox would have considered the value of these

7 direct infringing subscribers in the context of this economic

8 incentive opinion, would Cox have considered just some of the

9 value of that customer, or more of the value of that customer,

10:32:27 10 or the entire value of that customer?

11 A.   Cox is in a continuous business of trying to get

12 customers, trying to hold on to the customers it has.  And

13 that's especially valuable because it costs money to acquire

14 customers.  And if you already have them, it is much more

15 profitable to keep them.  And so Cox was continuously doing

16 that.  And so, as I said, the economic basic data shows that.

17          This data shows that in fact they were capturing

18 significant revenue from infringing subscribers.  And the fact

19 that I catch you at some certain point in your career doesn't

10:33:05 20 mean you weren't infringing before.  I don't have ticket data

21 about what -- some of these subscribers that may have been

22 subscribers before 2012.  I only have data of these subscribers

23 and the tickets they received between 2012 and 2014.  That's a

24 sliding window.  And I don't have the revenue from before.

25          So, these subscribers and the benefit to Cox is

W.H. Lehr - Direct

1776

1    greater than the evidence that I have here.

2    Q.   Now, looking again at the time frame.  If you had limited

3    this to just the claim period, February 2013 to November 2014,

4    would that impact your opinion?

5    A.   Well, it wouldn't impact my opinion that Cox had a very

6    significant economic benefit.  It would change the numbers

7    because, for example, it would make the billing charges that

8    are reported here go down.

9         And just one other point here.  These numbers are the

10:33:58 10   billing charges.  The evidence shows and the testimony by Cox

11   is that the actual revenues received by Cox were almost

12   99 percent of what was billed.

13        So it's not like this is what was billed, but maybe a

14   bunch of these people didn't pay their bills.  No, most of

15   these people did pay their bills.  And so, the difference

16   between what was actually received and the billing charges,

17   it's very close.

18   Q.   Okay.  So I just want to make sure we understand.  What

19   does the 3+ and 5+ show?

10:34:36 20   A.   So, again, my purpose with this is to sort of give you

21   some sense of what is going on in the data and what we see.

22        So if you say, take that dataset and then only look

23   at the total billings associated with the subset of subscribers

24   that had three or more DMCA tickets, the 57,279 subscribers

25   goes down to 31,514 subscribers.  And then the billed charges

W.H. Lehr - Direct

1777

1    also goes down to 208 million.

2          And then if you ask the question about, okay, well,

3    what about 5+ DMCA subscribers, that number goes down to 20,189

4    subscribers, and their total billed charges were $164 million.

5    So, you know, still a very large number.

6    Q.   And so, the 5+ is direct infringers who received -- are

7    there 20,000 direct infringers with 5+ tickets?

8    A.   Identified in the subsample of total infringements by the

9    RIAA that is already, you know, by all reasonable estimates

10:35:45 10   expected to be a subsample of the total amount of infringing

11   activity and infringing subscribers that exist on Cox's

12   network.

13   Q.   You talked earlier, sir, about the bundling of products.

14   How does that factor into this analysis?

15          Can you tell the jury what kinds of services the

16   customers represent in this slide, subscribed to and paid for.

17   A.   Well, this, again, is looking at all the services those

18   subscribers paid for.  So it's not just looking at, you know,

19   what revenue did they get from these subscribers associated

10:36:16 20   with their high-speed Internet service.  Because that's not how

21   the service is sold.

22          Customers buy a bundled service.  When you buy a

23   bundled service, you get a different price.  In fact, you get a

24   discount.  And consumers want to buy bundled services because

25   it gives them one point of contact, because it's simpler, they

1778

1   get a lower price.  And that's how Cox wants to sell the

2   service.

3        And typically when subscribers move, if they decide,

4   oh, I don't like this, they move often everything.

5        So the reason it's appropriate, I believe, to look at

6   the total bills to these customers is because that represents a

7   measure of the value to Cox of retaining these subscribers on

8   its network.

9   Q.   Did you consider any of Cox's internal writings or e-mails

10:37:08 10   or communications in connection with this opinion that Cox had

11   an economic incentive to tolerate infringement?

12   A.   Sure.  So like I said, from the basic number, they have an

13   incentive.  But their internal documents, some of which -- you

14   know, when I was sitting in court the other day, I heard

15   testimony about -- you know, showed that when they thought

16   about like whether or not they should address the

17   infringement -- like whether or not, for example, they should

18   terminate particular subscribers, they definitely considered,

19   you know, how profitable these subscribers were.

10:37:41 20        So these are excerpts from two e-mails.  One, the

21   first one from March 27, 2014, from Joe Sikes who worked in

22   their -- you know, the group that was supposed to be addressing

23   copyright abuse.  He said:  This customer pays us over $400 a

24   month.  And if we terminate their Internet service, they will

25   likely cancel the rest of their services.

W.H. Lehr - Direct

1779

1        So this is a statement from Sikes saying they

2   recognize what was commonly known in the business, that

3   basically you sell and attract customers on the basis of a

4   Triple Play.

5        And also, it's worth noting this guy is paying over

6   $400 a month.  The average revenue captured from the average

7   subscriber at Cox was like $130 per month in 2014.  This is

8   $400.  So this more than, you know, a regular number.

9        And so, don't terminate this subscriber, that's what

10:38:31 10  this e-mail tells me they were saying.

11       The second one also from him is -- well, this is an

12  e-mail.  This is a communication that was documented, is

13  talking about the soft termination.

14       So Cox did have, you know, a plan they said was how

15  they dealt with copyright abuse.  And that called for

16  terminating subscribers after some number of messages and back

17  and forth.

18       But what they actually did was, evidence suggests is

19  they would -- if they terminate a subscriber, they wouldn't

10:39:07 20  actually like -- basically, okay, that subscriber is no longer

21  ours, you know, get them out of the system.

22       No, they would basically turn off his service and

23  then turn it right back on again.  That was what they meant by

24  soft termination.

25       And it says:  For DMCA, we don't want to lose/loose,

W.H. Lehr - Direct

1780

1    you know, finger typing, you know, the revenue.

2          So basically they're caring about how much revenue a

3    subscriber is delivering, how profitable a subscriber is, when

4    they are evaluating whether or not they should adhere to their

5    own public statements of what they do about copyright

6    infringers.  And --

7    Q.   Now -- I'm sorry, I didn't mean to interrupt.

8    A.   Yeah, sorry.  You know, he says, it's a new policy, this

9    soft termination is a relatively new way for them to not have

10:39:55 10   to deal with losing customers who are actually -- you know,

11   that they have knowledge of, significant knowledge of being

12   repeat infringers.

13   Q.   Now, we looked at the aggregate value of the direct

14   infringers in a slide a couple moments ago.  Did you also

15   consider the value of individual subscribers that Cox would

16   have considered in forming your view of economic incentive to

17   tolerate infringement?

18   A.   Yes, I did.  So when I described that dataset, visualizing

19   what that looks like might be a little bit problematic for

10:40:34 20   people.  So you can look at individual records.  I mean, if you

21   really want to, you can look at 57,000 records that have month

22   by month by month by month the revenues and when the tickets

23   came in.

24          But I've -- you know, just to give you an idea of

25   sort of what some of the customers that are in that dataset

W.H. Lehr - Direct

1781

1   looked like, I pulled a couple of examples.  And I pulled

2   examples for subscribers that had at least 13 tickets

3   because -- you know, as I'll explain in a minute.  So this --

4   Q.   So, Dr. Lehr, can you explain for us what's shown in this

5   slide 17?

6   A.   Okay.  So this chart is just showing by month -- so months

7   are on X axis, the lower axis going from 2012 to 2016.  And

8   then on the Y axis is showing you dollar amounts.  And the cap

9   here on this slide is $250.  And so, it's basically showing the

10:41:30 10   cash flows by month.

11        And then it's -- I've marked out in these black flags

12   highlighted when in the dataset it shows they had received a

13   certain number of tickets.

14        So this customer is identified as Customer ID

15   580702666207, was a residential subscriber that in the

16   dataset -- within the dataset from 2012-2014, had received 101

17   tickets associated -- DMCA tickets that were in the CATS

18   database that Cox maintained.  They had received the fifth

19   ticket already by early in 2012, and the 13th ticket already

10:42:14 20   relatively early in 2012.

21   Q.   And why did you highlight those ticket numbers, the 13th

22   in particular?

23   A.   Well, there's some discussion about what Cox's graduated

24   response or way of dealing with this was.  And one of -- you

25   know, a later version of this was that, well, after 13 tickets,

W.H. Lehr - Direct

1782

1    this is a customer that, you know, we think should be

2    terminated.  And then, you know, we -- you know, the other one

3    says, they had this sort of soft termination process.  But the

4    details of that, that changed over time.

5         But basically, even by Cox's admissions, it's hard to

6    argue that a subscriber that has gotten 13 tickets, Cox is --

7    doesn't think is a repeat infringer, you know, and that they

8    don't have a knowledge of this.  Yet they're continuing to bill

9    that subscriber.  They could have been billing this subscriber

10:43:00 10    since before 2012.  They were certainly billing them through

11    this period of time.

12         But what I'm showing you here in these bars is

13    starting in February 1, 2013 -- and you can see in each month,

14    those bars, and they're relatively flat, around $200.  There's

15    one out here where there's an arrow, that means that it was --

16    that month, they billed that subscriber more than $250 and

17    something up there.

18         But that if you add up all those bars in there, that

19    subscriber was billed $8,594 by Cox.

10:43:34 20    Q.   So this is just one residential subscriber?

21    A.   This is one residential subscriber.

22    Q.   So how does looking at one residential subscriber tie into

23    your earlier opinion about the aggregate value of all of the

24    direct infringers?

25    A.   Well, you can -- you know, there's a number like this for

1    each of the different subscribers.  And there are some that

2    billed lower amounts and some that billed higher amounts.  And,

3    you know, this is a subscriber that billed a fair amount.

4         It turns out that this amount is not that different

5    than sort of what you might think the average value of

6    subscriber would be over their lifetime.  You know, it's order

7    of magnitude.  It's okay, it's a little bit more valuable.  So

8    this is -- you know, this also would go to a thing of like,

9    geez, a 101 ticket subscriber also billed $8,594 in the

10:44:25 10   subsample of the data that I'm showing.

11        You know, that shows this is an infringing subscriber

12   that Cox is deriving a direct financial benefit from.  And they

13   were close to 60,000 subscribers that have a different number

14   like this.

15        But, you know, you look at them and I showed other

16   ways to think about that with the --

17   Q.   But this is a residential.  Did you consider a couple of

18   business customers to demonstrate?

19   A.   Yeah, the business -- yes, I did, and the next one is the

10:44:48 20   business subscriber.  The business subscribers were, as I said,

21   a smaller number, but they account for a lot more dollars per

22   account typically.  And this one was one of the observations

23   that had one of the highest numbers of tickets in the whole

24   dataset to give you an idea.

25        So this one got eventually 4,074 tickets.  And they

W.H. Lehr - Direct

1784

1    also had received their 13th ticket by early in 2012.  And this

2    particular account is a reseller of Cox's broadband services.

3    So it might -- you know, it could be like one of these like

4    WiFi resellers that's selling, you know, access.  Cox billed

5    that customer $706,000.

6              And if you look at this, there are some things that

7    look a little strange.  So you see these arrows like around

8    2015, and then the numbers drop way down.  We don't know

9    precisely what's going on there.  But what it looks like is

10:45:48 10   that this customer prepaid for like a year of service.  And so,

11   they didn't get billed in subsequent months because they had --

12   that's sort of what I would interpret that means.

13             But this is what the data looks like.

14   Q.   And did you look at another business customer?

15   A.   Sure.

16   Q.   And what does this show us?

17   A.   Well, this just shows you, again, this turns out to be a

18   fraternity, surprise, surprise, that had 67 tickets and had

19   gotten its 13th ticket in 2012, also.  That Cox billed, you

10:46:18 20   know, from February 2013 to 2016, $12,525 to this account, you

21   know.  So --

22   Q.   And why did you select these examples, Dr. Lehr?

23   A.   Because I understand there has been testimony here about,

24   you know, characterize the nature of their business customers

25   and their residential customers.  And the fact of the matter

W.H. Lehr - Direct

1785

1   is, is that Cox wants to sell service to all the customers that

2   it can make money from and is profitable.  That's a normal

3   business, you know, proposition, and Cox does that.

4          And it sells it to its infringing customers, and many

5   of its business customers and many of its residential customers

6   are, you know, all kinds of different businesses, and there's a

7   lot of heterogeneity.  The thing that's clear is that the vast

8   majority of their customers, including their infringing

9   customers, are highly profitable to Cox.  Some are more

10:47:16 10  profitable than others.  But almost all of them are profitable

11  to Cox.

12  Q.   Now, I want to turn to your next opinion, Dr. Lehr, that

13  repeat infringers are --

14          THE COURT:  Let me stop you there.

15          The -- let's take our morning break now.  So let's

16  take 15 minutes and we'll come back and continue our testimony.

17  Thank you all.

18          NOTE:  At this point the jury leaves the courtroom;

19  whereupon the case continues as follows:

10:48:10 20  JURY OUT

21          THE COURT:  All right.  I got the signal from one of

22  the jurors that it was time for a break.

23          Anything before we go?

24          All right.  Let's take 15 minutes then.  We're in

25  recess.

W.H. Lehr - Direct

1786

1        NOTE:  At this point a recess is taken; at the

2   conclusion of which the case continues in the absence of the

3   jury as follow:

4   JURY OUT

5        THE COURT:  All right.  Joe, let's get our jury,

6   please.

7        NOTE:  At this point the jury returns to the

8   courtroom; whereupon the case continues as follows:

9   JURY IN

11:09:45 10        THE COURT:  All right.  Please be seated.

11        Mr. Gould, continue, sir.

12        MR. GOULD:  Thank you, Your Honor.

13   BY MR. GOULD:  (Continuing)

14   Q.   Dr. Lehr, did you reach any conclusions about the relative

15   value and benefit to Cox of retaining repeat infringing

16   subscribers?

17   A.   Yes, I did.  There's -- I considered several types of

18   evidence to -- regarding this matter.

19   Q.   And could you walk us through the basis for this opinion.

11:10:11 20   A.   Yeah.  First off, when Cox sells its broadband service, it

21   doesn't have just a single, you know, broadband service.  It

22   offers different tiers.  You know, like a -- you know, a low

23   tier service that's less expensive, provides a lower data rate

24   and tells the customers that, you know, their data allowance is

25   going to be less.  And that's suitable for people that are

W.H. Lehr - Direct

1787

1    going to be really light broadband users.

2            And then it has higher tiers.  And the higher the

3    tier, the higher the price for the service, the more you get.

4            So it's like a lot of things.  So it is sort of if

5    you want to get a fully-loaded car, you pay more for the

6    extras.  You want to have broadband that runs really fast and

7    has a big data cap, supports multiple users in your household,

8    these sorts of things, you get a higher tier service.  So --

9    Q.   You talked about data, but you also just mentioned speed.

11:11:08 10   What does this -- how does the speed impact the tiers?

11   A.   Well, they --

12   Q.   Or relate to the tiers.

13   A.   They -- when they define the nature of the service, they

14   also tell you what its likely performance is going to be, you

15   know, so what -- they'll say a data rate up to this certain

16   speed, and sort of what's the average data rate you could

17   expect.

18           And so, for certain activities, for example,

19   downloading files, having something like BitTorrent work and

11:11:34 20   having a usable experience, you need -- the faster your service

21   is, the faster the files will download, the better the

22   experience you'll have if, for example, you're using it to

23   infringe, which is what it's principally used for, and the

24   better the experience other subscribers in the BitTorrent, you

25   know, world will have when they pull the file from you, you

W.H. Lehr - Direct

1788

1    know.

2              So if you try to basically, you know, download a file

3    and the connection is too small, it's like trying to drive on

4    the highway in a Model T Ford, you know.  It's not going to be

5    a pleasant experience.

6              You know, whereas if you have a very fast speed

7    service, you'll download files quickly, you can download more

8    of them.  And you'll also, you know, have -- it won't interfere

9    with other things that you're doing.

11:12:23 10   Q.   Now, on this notion of -- the second and third point:  P2P

11   consumes more bandwidth and was a key driver of Cox's

12   bandwidth.

13             Did you prepare a slide showing some of the

14   information you considered?

15   A.   Yeah, I did.  I mean, what's important to understand is

16   that it -- you know, the broad -- the companies that provide

17   broadband service have to manage their network and provision

18   their network for the peak traffic loads.  And they also want

19   to look at sort of what people are doing and what -- you know,

11:12:55 20   what kind of services they have so they can give those

21   customers the experience those customers, you know, want and

22   expect.

23             And so, they look at the different types of traffic.

24   And if you have someone that all they're doing is e-mail

25   occasionally, they're not moving a lot of data and they're

W.H. Lehr - Direct

1789

1    not -- they don't need a very fast high speed service.

2         If someone's doing something like peer-to-peer,

3    that's one of the most intensive -- bandwidth intensive

4    services, both on the upload and the download, that broadband

5    subscribers do.

6         And this slide is -- you know, pieces out of a

7    consultancy report that was prepared by this company, inCode

8    that, you know, provided advice to Cox on sort of, you know,

9    what they should be expecting in the future, what traffic

11:13:45 10   looked like in the Internet, what traffic looked like, and what

11   other, you know, broadband providers around the country were

12   doing.

13        And what this one says is basically what I've been

14   saying.  Is that peer-to-peer is the most bandwidth intensive

15   category.  And this one shows that, you know, peer-to-peer

16   households were 13 percent of all broadband households.  Which

17   is a much higher number, for example, than the 60,000

18   subscribers that have been identified here relative to the

19   4.5 million broadband subscribers that Cox had.

11:14:19 20        So 60,000 over 4.5 million is well less than

21   13 percent.  Which would suggest and is consistent with the

22   inference I make that we were only observing a subset of the

23   actual infringement that was happening on the network.

24        But this is -- this one is showing that this is a

25   heavy use thing.

W.H. Lehr - Direct

1790

1           Now, the lower chart is showing the forecast that
2   these consultants prepared for sort of the typical household's
3   monthly usage.  And so, there are three lines here.  There's a
4   yellow line, a red line, and a green line.  And in its models
5   for coming up with these forecasts, it characterizes what these
6   firms -- you know, what these types of households do.

7           So the yellow lines are households that are doing --
8   you know, using the Internet relatively lightly.  And their
9   bandwidth demand is relatively low.  And they're candidates for
11:15:11 10  this Starter or Essential tier, the lower priced services, you
11  know, these lower dark blue bands that run across.

12          But if you're in the red band, you need to be in the
13  Preferred tier.

14          And if you're a green type of customer, you need to
15  be the Premiere band or the Ultimate tier because your
16  utilization doesn't fit with the experience you have.

17          Now, the users of peer-to-peer are most likely to be
18  in this green band or the red band, but certainly not in this
19  yellow band.

11:15:39 20          So just understanding the character of what
21  peer-to-peer is and what people are doing, and understanding
22  that peer-to-peer is almost all infringing activity, Cox is,
23  you know, listening to and knows -- this is evidence that Cox
24  internally knew that the customers that were doing peer-to-peer
25  were more likely to be customers and candidates for its more

W.H. Lehr - Direct

1791

1 expensive broadband services.

2           So that's a piece of evidence.  That's some of the

3 evidence that goes with the general understanding of how the

4 business operates.

5 Q.   And how does this tie in, Dr. Lehr, to your opinion that

6 Cox had an economic incentive to tolerate infringement?

7 A.   Well, these customers that are providing and are in the

8 higher tier services are more profitable than the lower tier

9 services because almost all the costs of providing the service

11:16:28 10 to the customers is fixed, it doesn't really depend upon the

11 actual use of the customers.

12           So, for example, when customers are heavy users, they

13 may not be heavy users during the peak period, which is when

14 they size the network.

15           It's like you figure out how big a pipe do I need

16 during my busiest hour to make sure that the customers that I

17 promised service to get the service they expect.  But if

18 customers use that pipe when it's not particularly busy, then

19 that doesn't cost me anything because I have the pipe there

11:17:00 20 anyways.

21 Q.   Now, did you have any access to Cox data that reported the

22 actual tier, the actual tier that the direct infringing

23 subscribers in this case subscribed to?

24 A.   No, I don't, because the ICOMS billing data just says what

25 they were billed, but it doesn't tell me what tier those

W.H. Lehr - Direct

1792

1    customers were in.  And so, I didn't have that data, but I do

2    have the ICOMS data and the ticket data.  So there are things I

3    can infer from that.

4    Q.   So just remind us, sir, what's the ICOMS data?

5    A.   The ICOMS data is the internal billing system.  So they

6    keep this for all their subscribers.  But, you know, the subset

7    of the data we got was for those subscribers who had been

8    identified as infringing subscribers in the CATS data with one

9    or more DMCA tickets.  And then we had their revenue payments

11:17:55 10   from 2012 to 2016.

11   Q.   And were you able to look, sir, at the Cox billing data

12   for the direct infringers in this case and draw conclusions

13   about their relative value?

14   A.   Yeah.  So one of the things you can do is you can say,

15   let's look at the data payments.  So not all the revenues they

16   billed, but the data payments which shows up in two different

17   elements within the dataset for each customer.  And you can

18   say, what was the average of only those subscribers, the

19   average billing per month for only those subscribers that

11:18:32 20   received one to two tickets?  And we can -- can we compare it

21   to subscribers that received more tickets.

22         And so, for example, can we compare it to subscribers

23   who got 20 or more tickets?  So if you got 20 or more tickets,

24   the evidence is showing you are, by the evidence, assuming the

25   evidence straightly maps directly to your infringing behavior,

W.H. Lehr - Direct

1793

1 that you're a heavier infringer.

2          When you do that comparison and you apply statistical

3 tests, you find that there is a statistically significant

4 increase in the data billed and revenues paid by the more heavy

5 infringers.

6          So this is data from a limited subsample of Cox's own

7 internal billing of these infringing subscribers that have been

8 identified as infringing that statistically shows that there is

9 a large, 8 percent increase in the data billings to those

11:19:30 10 subscribers.

11          And that, you know, goes as consistent with the other

12 stuff, stuff their internal documents and what you would

13 otherwise infer.

14 Q.   What do you mean by statistically significant?

15 A.   You apply statistical tests and say, given the size of the

16 sample I have and the variability in that sample, is this a

17 difference that looks as if it could be explained as just

18 random, or does it look like it's actually, you know,

19 statistically significant.

11:19:56 20 Q.   And it looks like -- the 8.4 percent increase, what

21 charges does that relate to?

22 A.   That's just the charges associated with their payment for

23 data services.

24 Q.   And it looks like it's about a six-and-a-half or so dollar

25 incriminate.  $6 doesn't seem like that big of a difference.

W.H. Lehr - Direct

1794

1    Why does that matter here?

2    A.   Well, first off, you know, as an economist and someone who

3    cares about looking at the data, it is statistically

4    significant.  So that matters.  8 percent is a big difference.

5    That is more an trivial amount.

6          And six bucks does make a difference.  It makes a

7    difference to individual subscribers.  I would certainly care

8    if my bill was $6 more or less for this.

9          And if you have 60,000 subscribers that there might

11:20:45 10  be this kind of difference or incentive, or, you know, some

11   number of subscribers -- you remember, Cox is dealing in

12   subscriber numbers that are in the millions, hundreds of

13   thousands, tens of thousands.  You multiple that, that's a big

14   number.  That's a big additional incentive.

15         It's not like the subscriber that charges 43 bucks or

16   even 30 bucks a month in data services isn't profitable for Cox

17   and Cox doesn't want to retain that subscriber.  It's just that

18   they really want to retain these subscribers that are more

19   valuable.  And if they're higher infringing, it looks like

11:21:19 20  they're valuable.

21   Q.   How does that tie into your opinion that Cox benefited

22   from retaining these direct infringers?

23   A.   Well, it speaks to the economic incentive that Cox had to

24   retain, you know, repeat infringers on its network even when it

25   knew, you know, that it had -- these were repeat infringers,

W.H. Lehr - Direct

1795

1  and that it's incentives were greater when these repeat

2  infringers -- there is evidence suggesting that they were even

3  heavier infringers.

4  Q.   I want to move to the next part of this opinion.

5       You said that Cox saved by not addressing

6  infringement.  What do you by that, sir?

7  A.   Well, I talked a little bit about that in my opening

8  statement.  So had Cox addressed the infringement more

9  aggressively, you know, they would have probably had to deal

11:22:10  10  with more customer service calls.  They would have had to mail

11  more notices and had more interactions to deal with

12  subscribers.  They would have incurred direct costs associated

13  with the response.

14       They probably couldn't have gotten away with reducing

15  the personnel of the department that was dealing with the abuse

16  stuff, as they actually -- as I understand they actually did.

17       But, you know, so they would have incurred additional

18  costs.

19  Q.   Were able to quantify the costs saved by Cox by not

11:22:44  20  addressing the infringement?

21  A.   I wasn't able to quantify these because, first off, I'm

22  not offering an opinion here about what more and specifically

23  Cox should have done.  And what Cox specifically might have

24  done would affect what the incremental costs would have been.

25       But certainly they should have done more than they

W.H. Lehr - Direct

1796

1  did do.  My opinion is that their economic incentive was not to

2  do anything, that's what I am testifying about.  And part of

3  that is to avoid the costs, but I don't have an estimate of

4  what those costs would have been.

5  Q.  And moving to your last point, Dr. Lehr:  Cox maintained a

6  larger subscriber base.

7      How does this tie into your economic incentive

8  opinion?

9  A.  Well, you know, in any sort of business like this, there

10  is a certain amount of churn.  Customers move, customers leave,

11  and sometimes you have an incentive to get rid of customers.

12      In my comments today I have emphasized that Cox has a

13  strong financial economic incentive to retain subscribers on

14  their network that are profitable.

15      So Cox doesn't want to retain subscribers on their

16  network that are not profitable.

17      And so, it's also worth looking at, was Cox willing

18  and able without, for example, rocking the boat of their

19  general cost structure, able to terminate numbers of

20  subscribers when it wasn't in their interest.

21      And so, I looked also at Cox termination behavior

22  between 2013 and 2014.  And I did this for a couple reasons.

23  First off, the evidence shows that between 2013 and 2014, Cox

24  was willing to terminate and did terminate over 600,000

25  subscribers for non-payment of their bills.  619,711

11:23:27 (lines 9-11)
11:24:04 (lines 19-20)

W.H. Lehr - Direct

1797

1    subscribers were terminated.

2            Of those, 597,796 were residential subscribers, and

3    21,915 were business subscribers.

4            So like any business, if you're selling to someone a

5    repeat service and they stop paying their bills, the reasonable

6    thing to do is stop selling them service.  And Cox does that.

7    Cox has to do that on a fairly regular basis because not

8    everybody pays their bills.  This is on the order of 25,000 a

9    month, is sort of what their terminations are.

11:25:10 10          And they were able to do that level of terminations

11   and still come up with the profit and loss accounting data that

12   I looked at.

13           So terminating customers, you know, at some number,

14   you know, that's below 25,000 a month, is probably not going to

15   move their costs much because they've accounted for that.

16           It's also worth comparing that to what they actually

17   did for copyright infringement.  So over that period, they only

18   terminated 32 customer accounts.  32 of them were residential,

19   0 were business.

11:25:47 20          And of those 32, I believe the ones that are

21   associated with the 60,000 notices, roughly 60,000 notices that

22   are associated with the RIAA, was 13.  So 13 of something like

23   57,000, that's all the terminations they did for copyright.

24           So this is additional evidence that I believe

25   supports the contention that Cox is more than willing to make

1798

1   decisions about termination when they see a clear financial

2   benefit to doing that.

3           When they see it's copyright infringement, apparently

4   they don't see it in their best interest to terminate those

5   subscribers.  But they are more than willing to do that when

6   there is evidence that it's not in their financial benefit,

7   like, for example, when those customers are not paying their

8   bills.

9   Q.   I think you said out of 57,000 notices.  Did you mean out

11:26:40 10   of 57,000 direct infringing customers?

11   A.   Sorry.  Out of 57,000 subscribers that are identified with

12   the, you know, 270,000 or whatever it is notices that they

13   received.

14   Q.   Dr. Lehr, can you just briefly summarize.

15   A.   Yeah.  So what I have been explaining here is that

16   evidence, I believe, shows very clearly that copyright

17   infringement causes very significant harm to copyright holders.

18   This is I think, you know, by any reasonable basis, the

19   consensus opinion that comports with what you would expect

11:27:17 20   theoretically and what is demonstrated in the empirical

21   evidence.

22           And having said that, it's also the case that you

23   can't precisely quantify what that financial harm is to the

24   plaintiffs in a particular case.

25           The second point is that Cox's business, when you

W.H. Lehr - Cross

1799

1      understand it, is quite profitable and is throwing off a lot of

2      money when they retain subscribers.  And they have a strong

3      economic incentive, I believe the evidence shows, to tolerate

4      the infringement on their network, to retain infringers for

5      which they have significant evidence are repeat infringers.

6      And to, you know, continue that -- those business practices.

7              MR. GOULD:  Thank you, Dr. Lehr.  No further

8      questions at this time.

9              I would move to admit PX 521, which I forgot to do

11:28:10 10   earlier.  That's the Mateus and Peha study that Dr. Lehr looked

11     at.

12             THE COURT:  All right.  Any objection?

13             MR. BUCHANAN:  No, Your Honor.

14             THE COURT:  All right.  It is received.

15             All right.  Mr. Buchanan.

16         CROSS-EXAMINATION

17     BY MR. BUCHANAN:

18     Q.   Good afternoon, Dr. Lehr.

19     A.   Good afternoon.

11:28:58 20   Q.   So you mentioned that by not taking more action as to

21     infringement, Cox saved itself money with regard to customer

22     calls and mailing more notices; is that right?

23     A.   I think that's close to right.  It avoided incurring costs

24     that it would have incurred had it addressed the copyright

25     infringement more aggressively than it did.

W.H. Lehr - Cross

1800

1    Q.   Such as --

2    A.   I mean, I wouldn't call that saving revenues, but --

3    Q.   Okay.  Avoiding costs?

4    A.   The costs they would have incurred, had they adopted a

5    more effective strategy, were contingent costs.  And they

6    avoided incurring those contingent costs.

7    Q.   Okay.  So you said, mailing more notices, that was an

8    example.  Do you know that they did not mail notices, they

9    e-mailed them?  Did you know that?

11:30:07 10   A.   Yes.

11   Q.   Okay.  So what is the cost to e-mail a notice through the

12   CATS system?

13   A.   I don't know precisely.  I know that, were one to think

14   about that, one would want to consider the fully loaded costs.

15   So what are the costs of the personnel and systems that are

16   operating and all of that.  Once you've got those costs

17   incurred, the incremental costs of selling -- sending an

18   individual e-mail might be relatively low.

19          But the repercussions of sending such a communication

11:30:42 20   to a customer is likely to translate into additional customer

21   service calls and all that sort of stuff.  I did not have data

22   to allow me to estimate precisely what those effects would be.

23          And so, I didn't because I wouldn't know exactly what

24   the content or text of the e-mail would be.

25          So, for example, if you were to mail a customer

W.H. Lehr - Cross

1801

1   something that basically says, you know, we got a notice that

2   you're infringing, you know, that's it, the customer may not do

3   anything with it, may just ignore it.

4          If you mail one that says, you are violating the law,

5   this is a serious problem, and the customer had to read it, and

6   then the customer might call.  So I don't -- you know, I don't

7   have an opinion about that.

8          But had they done more, it likely would have affected

9   the number of customer service calls they would have gotten.

11:31:27 10   Q.   Okay.

11   A.   The personnel they would have needed to do that, you know,

12   and all that sort of stuff.

13   Q.   So -- and just yes or no, Dr. Lehr.  Did you attempt to

14   quantify the cost of mailing more notices by e-mail to the CATS

15   system if Cox had a more aggressive policy in dealing with

16   infringement?

17          Yes or no, did you quantify it?

18   A.   I can't answer that as a simple yes or no question because

19   I would say --

11:31:53 20          THE COURT:  Okay.  Just say, I can't answer that yes

21   or no.

22          THE WITNESS:  I'm sorry.  Okay.  I can explain.

23          THE COURT:  So if you can answer a question yes or

24   no --

25          THE WITNESS:  Okay.

W.H. Lehr - Cross

1802

1    THE COURT:  -- or I can't answer it as asked, please
2    do that.  And then your counsel will follow up if he think it's
3    appropriate.  All right?
4    THE WITNESS:  Okay.  Thank you, Your Honor.
5    THE COURT:  All right.  Thank you.  Go ahead.
6    A.   I can't answer that yes or no.
7    BY MR. BUCHANAN: (Continuing)
8    Q.   Did you attempt to quantify it?
9    A.   I can't answer that as a yes or no question.  I can
11:32:24 10   explain to you what I did and how I thought about that problem.
11   It's not a yes or no question.
12   Q.   Okay.  So you said that you understand it goes through an
13   automated system, the e-mail that comes in, right?
14   A.   Yes.
15   Q.   The notice?  Okay.  And you know that -- you looked at the
16   notice, right, that's prepared by the RIAA and sent to Cox?
17   You reviewed that?
18   A.   I looked at some of those, yes.
19   Q.   And the CATS system doesn't need to do anything with that
11:32:50 20   notice, it just needs to forward it after it reads it, right?
21   MR. GOULD:  Objection, Your Honor, foundation, and
22   outside the scope.
23   THE COURT:  If he knows, he can answer.  If you
24   looked at that.
25   A.   I don't know precisely how the CATS system operates

W.H. Lehr - Cross

1803

1    because as an economist, I wouldn't think that this was this

2    thing that you just put out there as this box and it's all

3    completely automated.  There were interactions -- and when I

4    talk -- when I say something, so there's no misunderstanding,

5    when I say something like they would've dealt with the

6    copyright infringement, you know, more aggressively, it

7    wouldn't be just turn a dial on the CATS system.  It might be

8    modifying the CATS system, modifying the content of the notes,

9    changing the staffing of those groups, all those sorts of

11:33:31 10   things.

11            And so, I did consider those sorts of things and

12   concluded that those costs would likely be material.  But I did

13   not try and come up with a dollar estimate of those because to

14   do so would have required me to formulate an opinion about

15   specifically what Cox should have done, and I didn't do that.

16   BY MR. BUCHANAN: (Continuing)

17   Q.   Right.  So you're not saying that Cox should have

18   terminated after one notice, are you?

19   A.   No.

11:34:00 20  Q.   Okay.  Now, before we get to that, I believe you testified

21   that piracy was a global problem, right?  Piracy involving file

22   sharing and piracy with regard to copyright infringement was a

23   global problem?

24   A.   Well, I don't believe I testified to that.  But I wouldn't

25   disagree with that.  I believe it is a global problem.

W.H. Lehr - Cross

1804

1  Q.   And Cox, in terms of its market share or number of its

2  subscribers, is very small in the United States compared to the

3  rest of the total number of subscribers that use Internet

4  service, right?

5  A.   You mean globally?

6  Q.   No.  I said in the United States.

7  A.   Oh, sorry.  I wouldn't say very small.

8  Q.   Okay.

9  A.   I said they were the eighth, you know, largest.  And

11:34:45 10  4.5 million subscribers is not what I would consider a small

11  number of subscribers.

12  Q.   So could you look at your expert report in your binder?

13  A.   I filed several reports.  You mean the -- which --

14  Q.   The first one.

15  A.   Sorry.  Okay.  Yes.

16  Q.   Okay.  Paragraph 24, page 9, second to last sentence, do

17  you have that?  The carryover paragraph, carryover from

18  paragraph 24, do you see where it says:  Notably?  Paragraph

19  24.  Okay.  Page 9?

11:35:46 20  A.   It says:  Notably, Cox's revenues --

21  Q.   Yes.  Go ahead and read that.

22  A.   Notably, Cox's revenues are generated entirely in the

23  U.S., and Cox subscribers represent a fraction of all U.S.

24  broadband subscribers.

25  Q.   Okay.  Thank you.

W.H. Lehr - Cross

1805

1    A.    Which is true.

2    Q.    Thank you.

3    A.    But it's not small.

4    Q.    Okay.  So how does it compare to Verizon, or Comcast, Time

5    Warner?

6    A.    It's smaller.

7    Q.    Okay.  And you talked about that Cox should have used a

8    more aggressive approach to dealing with copyright

9    infringement.

11:36:23 10         Do you know what the approach that Verizon and

11   Comcast, Time Warner, AT&T, and Cablevision were doing during

12   the time period in question through the Copyright Alert System?

13         MR. GOULD:  Objection, Your Honor, misstates

14   Dr. Lehr's testimony.  He never testified about what Cox should

15   have done.

16         MR. BUCHANAN:  I think he just did.

17         THE COURT:  Yeah, rephrase the question.

18   BY MR. BUCHANAN: (Continuing)

19   Q.    I said are you -- you said that they should have adopted a

11:36:46 20   more aggressive approach.  And what I'm asking you is, do you

21   know what the approach was in dealing with copyright

22   infringement that was being utilized by the Copyright Alert

23   System members that had a contract with your clients and how

24   they dealt with copyright infringement during the time period

25   in question?

W.H. Lehr - Cross

1806

```
 1   A.   I have some general understanding about that.

 2   Q.   Okay.

 3   A.   But I'm not in detail.  And I haven't considered, or in

 4   any level of detail, what specifically other providers were

 5   doing.  I've considered the evidence about Cox.

 6   Q.   Okay.

 7   A.   So, you know, I don't have an opinion whether, for

 8   example, they were doing more than they should have or less

 9   than they should have, or what they did was right or whatever.

10   I don't have a detailed understanding of that.

11   Q.   Okay.  But you're an expert in the area and you've cited

12   like four -- six pages of articles you've read and you've

13   testified about how much you know about the Internet, you're an

14   expert.

15        So I want you to know -- I want to ask you, at the

16   time period in question, 2013 and 2014, the claims period, did

17   you not know or have you not learned since then as to what was

18   happening in terms of copyright infringement notices and how

19   they were being dealt with by the five largest Internet service

20   providers vis-a-vis your client?

21        That was a major --

22        THE COURT:  Well, you're -- you have a question

23   pending.  Thank you.

24   BY MR. BUCHANAN:  (Continuing)

25   Q.   Did you -- are you saying you have no idea about the
```

11:37:36 (line 10)
11:38:13 (line 20)

W.H. Lehr - Cross

1807

1 copyright --

2          THE COURT:  Let him answer the question.  I'm sorry.

3 A.   I'm sorry.  I thought my answer to you was, I do have an

4 idea, it's a general idea.  I don't know specifically what they

5 were doing with respect to the Copyright Alert System or the

6 history or how that evolved over time.

7 BY MR. BUCHANAN: (Continuing)

8 Q.   So you talked about Cox's revenues based on terminating

9 after one, three, and five notices, correct?

11:38:58 10 A.   No.

11 Q.   Okay.

12          MR. GOULD:  Objection, Your Honor.  It misstates the

13 testimony.

14          THE COURT:  He answered the question.

15          Ask your next question.

16 BY MR. BUCHANAN: (Continuing)

17 Q.   So you're aware that those -- all the Internet service

18 providers that are members of CAS, they did not terminate

19 anyone?  They had no obligation to terminate?

11:39:17 20          Are you aware of that.

21 A.   I believe --

22          THE COURT:  It assumes facts not in evidence.

23          MR. BUCHANAN:  It's in the --

24          THE COURT:  Objection sustained.  Ask your next

25 question.

W.H. Lehr - Cross

1808

1          MR. BUCHANAN:  There are --

2          THE COURT:  Come to the sidebar.

3          NOTE:  A sidebar discussion is had between the Court

4   and counsel out of the hearing of the jury as follows:

5   AT SIDEBAR

6          THE COURT:  All right.  I jumped before you -- what's

7   your objection?

8          MR. GOULD:  The whole line of questioning.  I mean,

9   we anticipated this.  This is the third, fourth, fifth witness

11:39:58 10   Mr. Buchanan has cross-examined where he has tried to use them

11   as a backboard to reinforce the CAS names with a witness who

12   has no foundation for the knowledge, didn't testify about it,

13   didn't form his opinions based on it.  And it's improper.

14          THE COURT:  This doesn't -- did you -- is this part

15   of the depositions or --

16          MR. BUCHANAN:  Yeah, I asked him in the deposition.

17   He said he understood it, he understood CAS.  But he said he's

18   their expert on the telecommunications industry and what's

19   going on in the industry with all the different service

11:40:29 20   providers, with infringement, piracy and everything.

21          And this was highly publicized.  So there are

22   articles there, and I am going to show him, in which I think

23   Verizon, AT&T, and others make it clear with CAS, they do not

24   terminate.

25          So the idea is, he says we should have done more, but

W.H. Lehr - Cross

1809

1   here I want to ask him about that.  And then, of course, that's

2   the draw from us to them by -- with all this advertisement.

3         In other words, I think it's relevant to his

4   knowledge of the industry.  It's very relevant how he has

5   testified what's happening with others, what they're doing.  He

6   just talked about how he felt we should have done more, if we

7   had done more we would have had additional costs, and we would

8   have had to do this and that.

9         And I think it's relevant to say, okay, when you say

11:41:13 10   we should have done more, and that we were not tolerate -- we

11   were too tolerant, that's stuff that others didn't do.

12         MR. GOULD:  Two points, Your Honor.  Number one,

13   Mr. Buchanan is misstating the evidence in the record.  He

14   stood up and asked the questions about, you're aware that

15   Verizon and AT&T didn't terminate.

16         There's no -- that is not a substantiated fact.  All

17   the record shows so far is that within the confines of this

18   private compromise agreement, certain parties agreed that

19   termination would be not a required element of that.  That's

11:41:45 20   number one.

21         Number two, Dr. Lehr testified at a very high level

22   that I am not opining on what Cox should have done.  I'm simply

23   saying from what I've seen here, I believe they should have

24   done more.

25         THE COURT:  Well, you know, the CAS agreement doesn't

W.H. Lehr - Cross

1810

1    speak of terminations, and I looked at it several times, one

2    way or the other.  It just was off the table.  There has been

3    testimony about the fact that it was something that the

4    industry, the music industry wanted to have as part of the

5    discussions over this two-year period.  But the ISPs weren't

6    willing to do that.  So that's in the record.

7              And your exception is noted.  I'm going to allow the

8    testimony.  But if he says, I don't know --

9              MR. BUCHANAN:  Okay.

11:42:35 10              THE COURT:  -- and I'm unaware one way or the other,

11    then we'll move on.

12              MR. BUCHANAN:  I can show him articles on the Web --

13              THE COURT:  Well, if he says, I'm unaware of

14    terminations, then what is the -- then you can't show him.

15              MR. BUCHANAN:  He said he has read everything in the

16    world.  He has read 25 --

17              THE COURT:  If you ask him -- I'm going to permit you

18    to ask him a question about whether he is aware that no one

19    else was terminating anybody in -- no other ISPs were

11:42:59 20    terminating anybody.  If he says I don't know, then we're done.

21              MR. BUCHANAN:  So I can't show him a newspaper

22    article where they announce --

23              THE COURT:  No.  He says, I don't know.  And you can

24    say to him, if you knew that no one else was terminating any of

25    their subscribers, would it make a difference to your opinion,

W.H. Lehr - Cross

1811

1   absolutely.

2          MR. GOULD:  One last point, Your Honor.  There is

3   evidence in the record that the ISPs in CAS had to still comply

4   with their AUPs.  And if they wanted to select the safe harbor,

5   comply with that as well.

6          So it is misleading to testify -- for Mr. Buchanan to

7   argue and ask questions about that.  You're aware that nobody

8   else terminated, that's improper.  That misstates the evidence.

9          THE COURT:  All right.  Your exception is noted.  Go

11:43:43 10   ahead.

11          MR. GOULD:  Thank you.

12          NOTE:  The sidebar discussion is concluded; whereupon

13   the case continues before the jury as follows:

14   BEFORE THE JURY

15          THE COURT:  All right.  Go ahead, Mr. Buchanan.

16   BY MR. BUCHANAN: (Continuing)

17   Q.   So, Dr. Lehr, are you aware that -- of whether pursuant to

18   CAS there -- the member ISPs did not have to terminate notices

19   that they received from the plaintiffs under that agreement?

11:44:44 20          MR. GOULD:  Objection, Your Honor.  The question is a

21   bit unclear.

22          THE COURT:  Overruled.  You may answer, sir, if you

23   can.

24   A.   I don't believe -- first of all, I don't believe there was

25   just one agreement with CAS.  I think that CAS was a system

W.H. Lehr - Cross

1812

1   that evolved.  And I don't know specifically what was involved

2   in that agreement.

3          I believe I read some testimony either here or

4   elsewhere that -- and I don't -- you know, that may have said

5   that it didn't require -- I think that might have been in the

6   opening statements.  I read some of the opening statements from

7   this trial that said that it did not require.

8          And so, you know, that may be the case.  And whether

9   that is or isn't wouldn't affect my opinion because it's about

11:45:29 10  what other providers did to address the infringement.  And I am

11  not testifying about what other providers did or should have

12  done.

13         I am not even testifying about what Cox should have

14  done except to say they should have done more than what they

15  did.

16  Q.   Okay.  So you just said they should have done more.  If

17  the other ISPs, the largest five in the county, had an

18  arrangement with the plaintiffs that they were not required to

19  terminate, would it be also okay for Cox to have an arrangement

11:46:07 20  with the plaintiffs where they didn't have to terminate?

21  A.   I don't know.  I mean, that's a hypothetical that has too

22  many things that I am not sure what matters.

23         I don't think that the question about Cox's agreement

24  with plaintiffs about whether they had to terminate or not is

25  the matter.  The question is, what was Cox's incentive to

W.H. Lehr - Cross

1813

1    knowingly tolerate infringing subscribers on its network.

2            And my testimony is that they had a very strong

3    economic incentive to tolerate that infringement and derived a

4    direct financial benefit from knowingly retaining those

5    subscribers on their network.

6    Q.   So would you agree then that with the other ISPs that are

7    part of CAS, if they have an agreement that no one has to

8    infringe, right, so that would be an attraction for any Cox

9    subscriber to leave its service and go over to one of the

11:47:20 10   others since they have a much more tolerant policy toward

11   infringement and termination?

12           MR. GOULD:  Objection, Your Honor.

13           THE COURT:  Sustained.

14           MR. GOULD:  Incomprehensible.

15           THE COURT:  Facts not in evidence.

16   BY MR. BUCHANAN: (Continuing)

17   Q.   So did you read any articles at the time about CAS and

18   when it came into play?  Since you were reading -- you know,

19   you testified that you follow -- you're an expert in the area

11:47:45 20   and you follow what's happening in the market.

21           Did you read any articles when CAS came into play

22   about how it would operate and how it would affect subscribers?

23   A.   Well, over -- I have certainly read articles in the normal

24   course of my work that address CAS.  Precisely when it came

25   into play and all of that, as I sit here right now I don't

W.H. Lehr - Cross

1814

1 precisely recall.  Because people were doing about something

2 like this for years.  They were a lot of things.

3          The idea of how to deal with piracy, as I said in my

4 original testimony, wasn't a new phenomenon.  This has been an

5 ongoing concern that predates.

6          What was relatively new was this sense in which, you

7 know, broadband became such an important problem and so, you

8 know, how to deal with that.

9          So, yes, I did read articles about.

11:48:39 10 Q.   Okay.  So I would like you to take a look in your binder

11 at tab 6.

12          THE COURT:  All right.  Approach the bench, please.

13          NOTE:  A sidebar discussion is had between the Court

14 and counsel out of the hearing of the jury as follows:

15 AT SIDEBAR

16          THE COURT:  So he said he hadn't read anything about

17 terminations except in opening statements here.  Which,

18 obviously, is not the subject of his examination or would be a

19 proper subject of his examination.

11:49:19 20          Now he says he knows generally that there was a CAS

21 system discussed in several agreements.

22          Where are you going with this?

23          MR. BUCHANAN:  So he just said he had read some

24 articles at the time.  I'm going to ask him if he read these

25 articles.

W.H. Lehr - Cross

1815

1    THE COURT:  And what's the point behind asking him

2    whether he read those articles?

3    MR. BUCHANAN:  Because the articles are a statement

4    in response to the concern in the market by subscribers that

5    none of them are terminating, and telling everyone they are not

6    terminating.

7    So I can refresh his recollection.  He says he has

8    read a lot about it.

9    THE COURT:  He says he hasn't read about the

11:49:53 10   terminations.  He doesn't know one way the other, and it

11   doesn't matter to his opinion.  So there may be a witness that

12   you get this in through, but it is not going to be Dr. Lehr.

13   Your exception is noted.  We are not going through this.

14   MR. BUCHANAN:  Okay.

15   NOTE:  The sidebar discussion is concluded; whereupon

16   the case continues before the jury as follows:

17   BEFORE THE JURY

18   BY MR. BUCHANAN: (Continuing)

19   Q.   So you list here the revenue and net profits and margins

11:51:59 20   of Cox vis-à-vis four of the plaintiffs in this space, right?

21   A.   Yes.

22   Q.   Okay.  And I know you put up a slide that showed the

23   dividend that went to the -- the sort of parent company of some

24   dividend of like 1.4 billion.  Do you recall that slide?

25   A.   I wouldn't describe it as the parent company.  I would

W.H. Lehr - Cross

1816

1    describe it as like the owners of the company, sort of the

2    investors.  Which, you know --

3    Q.   So on this slide you have Sony Music and Sony/ATV.  Sony,

4    the parent company, is worth $60 billion, is it not?

5    A.   As I sit here right now, I'm not sure.  But what I was

6    focusing on was the recording and record business.  Sony also

7    deals in a number of other product markets.  They sell

8    appliances and other things like that.  They are a consumer

9    goods supplier.

11:53:04 10             And I'm just focusing on here the portion of the Sony

11   business that's in the relevant business of managing art

12   copyright.

13   Q.   So do you know whether the parent company Sony Corporation

14   is worth $60 billion?

15   A.   Do I know that precise number as I sit here right now?

16   No.  I just said that.

17   Q.   Okay.  So do you know who owns the Warner Music Group?

18   A.   I don't -- I mean, it's a publicly traded company, but I

19   don't know specifically who owns it.

11:53:47 20   Q.   So have you heard the name Vivendi?  Do you know if that's

21   the owner?

22   A.   As I sit here right now, I don't recall.  Yes, I have

23   heard the name Vivendi.

24   Q.   You have heard that name.  Do you know they are worth

25   $14 billion?

W.H. Lehr - Cross

1817

```
 1              MR. GOULD:  Objection, Your Honor.  No foundation and

 2    it's inaccurate.

 3              THE COURT:  Overruled.  He said he doesn't know.

 4    BY MR. BUCHANAN:  (Continuing)

 5    Q.   Do you know what Vivendi is worth?

 6    A.   No.

 7    Q.   Okay.  Do you know that Vivendi actually -- Access

 8    Industries, have you heard of them?  They own the Warner Music

 9    Group, are you aware of that?  They are a private equity

10    company.

11    A.   No.  But, again, we're talking --

12    Q.   It's a yes or no, a yes or no answer.

13    A.   I don't know who precisely the owners are.  Just like I

14    don't know precisely whose Cox's family is that receives the

15    dividends.  I just know in general terms that the investors are

16    different.

17              THE COURT:  Wait for the next question.  Thank you,

18    sir.

19              THE WITNESS:  Sorry.

20    BY MR. BUCHANAN:  (Continuing)

21    Q.   Do you know that they are worth $10 billion?

22    A.   Sorry, the private equity firm?

23    Q.   Yes.  Do you know what they're worth is?

24    A.   I don't know.  And I don't know who they are.

25    Q.   And the fact that whether it's the music companies or the
```

W.H. Lehr - Cross

1818

1  parent companies of these, that we just mentioned, Sony,

2  Vivendi, there is no suggestion by you that because they are

3  incredibly wealthy and successful and profitable, that they

4  would do anything to harm, say the artists that they represent,

5  are you?

6  A.   No, absolutely not.

7  Q.   Okay.  Could you put up slide 14.

8       So, Dr. Lehr, you see slide 14?  It's titled Cox

9  Value of Infringing Subscribers, February 2013 to 2016.

11:56:15 10       Do you see that?

11  A.   Yes.

12  Q.   Okay.  So what is the claims period in this case?

13  A.   February 2013 through I believe the end of November 2014.

14  Q.   Okay.  So your analysis adds two additional years, 2015

15  and 2016, to the claims period, right?

16  A.   I'm showing data through 2016.  But to say it adds it I

17  think is a mischaracterization of what I'm presenting here and

18  what I meant to present when I explained it.

19  Q.   Okay.  So what were the numbers -- if you could just

11:56:53 20  examine the claim period, what would the numbers on this chart

21  reflect if you just did 2013 and 2014?

22  A.   The numbers would be lower.

23  Q.   How much?  50 percent?

24  A.   As I sit here right now, I don't remember precisely how

25  much lower.  They would still be, you know, a large number.

W.H. Lehr - Cross

1819

1  Q.  Okay.  Okay.  It would be large.  So would it be

2  50 percent lower?  60 percent?  You did the calculation, right?

3  A.  Yeah.  But as I sit here right now, I'm not going to offer

4  expert testimony about a number that I don't know precisely

5  what it would be.

6          And, you know, as I said, or implied, I could have

7  shown earlier data also.  I chose not to.  And had I had later

8  data, I would have included that.  I would have for this.  I

9  didn't have it.

11:57:39 10  Q.  So I understand that.  And you would have done a lot of

11  things.

12          What I am asking you, did you do the analysis, and I

13  believe you said yes, with regard to the claims period, but you

14  just don't remember what that -- those results were; is that

15  right?

16  A.  I believe I calculated what it would be if I looked at

17  that lower period.  And I did not -- I concluded that that

18  wasn't appropriate in terms of representing --

19          THE COURT:  Okay.  The question was --

20          THE WITNESS:  Yes.

21          THE COURT:  -- did you do the 2013/'14 data

22  separately?  And you didn't include it this demonstrative, but

23  you did it at an earlier time; is that correct?

24          THE WITNESS:  Yes, before I sat in this seat I had

25  done that calculation.

W.H. Lehr - Cross

1820

1    THE COURT:  Okay.

2    THE WITNESS:  And as I sit here --

3    THE COURT:  Thank you.  Wait for your next question.

4  BY MR. BUCHANAN: (Continuing)

5  Q.   So you have numbers here of 307 million, 208 million, and

6  164 million.  And so, you're saying that you cannot even

7  estimate what they would be based on an analysis just including

8  the claim period; is that right?

9  A.   I can't give you, as I sit here right now, a dollar

11:58:50 10  estimate for that updated thing.  It would be an easy enough

11  thing to compute from the data that's in evidence here.  And it

12  would be in the tens of millions of dollars, but I can't offer

13  you a specific number as I sit here now.

14  Q.   Okay.  So these three numbers, 307 million, 208 million,

15  164 million, they're actually -- they reflect the bills that

16  went to these particular subscribers, right?

17  A.   Yes.

18  Q.   Okay.  So I think you said the profit margin was

19  40 percent; is that right?

11:59:27 20  A.   Well, in 2014 it was, I believe, 43 percent, yes.

21  Q.   Okay.  You remembered that.  What about 2013 and 2015 and

22  '16, do you remember what the profit margins were then?

23  A.   As I sit here right now, I don't recall.

24  Q.   Okay.  So if we wanted to get to the profit margin though,

25  we would basically take 60 percent away from these numbers,

W.H. Lehr - Cross

1821

1 right?

2 A.   Well, as I sit here, as a sort of ballpark calculation, I

3 don't think that's an unreasonable thing to do.

4 Q.   Pardon me?

5 A.   As I sit here now, I would want to do it precisely.  But,

6 you know, I think that approximately, as I sit here right now,

7 you know, estimating that the net profit that would correspond

8 to these billing charges would be 99 percent of these numbers,

9 and then, you know, 40 percent of what you got from that.

12:00:33 10           So the calculation you suggested was not

11 unreasonable.

12 Q.   All right.  So now I want to get to the 57,279 subscriber

13 count.  So these subscribers, that's basically all the

14 subscribers that are in the case, right?

15 A.   No.  It's the subscribers that I was able to match up

16 between the billing and this.  So they're slightly different

17 numbers.  But the 57,279 are the subscribers for which I had

18 both billing data and ticket data, and I was able to do that

19 matching.

12:01:18 20           And that's close to the number of subscribers that

21 have been identified as, you know, infringing and associated

22 with the RIAA notices.

23 Q.   So for these 57,279, and I'll just say -- let's assume one

24 of them is a hospital.  At what point in time in this 2013 to

25 2016 period, four years, did that -- you know, did the

W.H. Lehr - Cross

1822

1    average -- we'll, just pick the average.  Did the average

2    subscriber that got one DMCA ticket in this 57,279, the

3    average, when did they get their first ticket or their only

4    ticket during this period of 2013 to 2016?

5    A.   The average one?

6    Q.   Well, pick any one.

7    A.   Well, first off, the ticket -- all the subscribers that

8    are in this dataset, I only know about the tickets they got

9    between 2012 and 2014.

12:02:15 10         It's reasonable to suspect, since Cox was tolerating,

11   had a strong economic incentive to tolerate infringement, that

12   there were additional subscribers and additional tickets that

13   would have happened in 2014 to 2016.  But I don't know what

14   those were because I never saw that data.  It wasn't provided.

15         MR. BUCHANAN:  Your Honor, I would object, totally

16   non-responsive.

17         THE COURT:  No.  You asked a question which was

18   beyond the yes or no.  I won't strike it.

19         But listen carefully to the questions and answer yes

12:02:47 20   or no if you can.  And if you can't answer the question, say

21   you can't answer the question.

22         THE WITNESS:  So, Your Honor --

23         THE COURT:  No, no.

24         THE WITNESS:  Oh, okay.

25         THE COURT:  Okay?  All right.

W.H. Lehr - Cross

1823

1           THE WITNESS:  I apologize.

2    BY MR. BUCHANAN: (Continuing)

3    Q.   So did you look at -- with regard to these 57,279

4    subscribers, did you look at any of them to determine when they

5    got the one DMCA ticket during this period of 2012 to 2014?

6    A.   Yes.

7    Q.   Okay.  So when did they get their ticket?  The ones that

8    got one, when did the typical subscriber within that mix get

9    their first ticket during that period?  Was it 2012, 2013, or

12:03:30 10   2014?

11   A.   In the data sample, there are observations of subscribers

12   that have their first reported ticket in all of those years.

13   So there are some that got it in 2012.

14   Q.   Okay.

15   A.   There are some that got it in 2013.  And there are some

16   that got it in 2014.

17   Q.   Okay.  How many of the 57,000 got it in 2014, after the

18   claims period, or during --

19   A.   I'm, sorry.  You mean between -- in December 2014?

12:04:06 20   Q.   No.  How many got it in 2014?  We'll just go for the whole

21   year.

22   A.   As I sit here right now, I don't remember precisely what

23   that was.

24   Q.   Okay.

25   A.   It was something that, you know, you could compute that in

W.H. Lehr - Cross

1824

1    the dataset.

2    Q.   Okay.  But you didn't compute it, is what you're saying?

3    A.   I may have looked at that and computed it.  As I sit here

4    right now, I don't remember specifically having done that

5    calculation.

6    Q.   Let's just pick a number and assume that in 2014 10,000

7    got their one ticket, and they were terminated at that point,

8    getting the one ticket.  You would not be able to capture the

9    revenue from that based on that termination date for the two

12:04:51 10   prior years, would you?

11            In other words, if when you terminate -- I'll ask it

12   this way.  If you terminate somebody for having one ticket,

13   they stop paying when you terminate them, right?

14            MR. GOULD:  Objection, Your Honor.  Mr. Lehr has

15   already testified --

16            THE COURT:  It's a hypothetical.  I'm sorry?

17            MR. GOULD:  Dr. Lehr has already testified that it is

18   not his opinion that Cox should have terminated after one

19   ticket.

12:05:18 20   THE COURT:  Okay.  But he's asking a hypothetical.

21   Thank you.

22   A.   Well, I mean, so I'm trying to understand what the

23   hypothetical would mean.

24            So the first thing, it's a hypothetical that

25   presumes, if I hear you correct, that Cox is in a world where

W.H. Lehr - Cross

1825

1    they are terminating subscribers.

2            The data shows that of this 57,000 subscribers, they

3    only ever terminated 13.  Okay.

4            So this is a hypothetical that's radically different

5    from the world in which they actually exist.  And my testimony

6    was definitely not that they should have terminated.

7            But the question you asked, the final part, I thought

8    you said, if they terminated, let's say, a ticket, then they

9    wouldn't -- I wouldn't count the revenue after the termination.

12:05:59 10  And that's true because had they terminated the subscriber,

11   that revenue wouldn't have been in the ICOMS database for the

12   period after that because they wouldn't have been collecting

13   revenue from that subscriber.

14   BY MR. BUCHANAN:  (Continuing)

15   Q.   So in your -- when you -- you have 57,279 subscribers that

16   you say have one ticket, and that they were billed

17   $307 million.  And you're saying that Cox, had they had an

18   appropriate infringement policy, that they would never have

19   gotten any of that money; isn't that right?

12:06:38 20  A.   No.

21   Q.   Okay.  What about with three?  Isn't it true that what's

22   represented here, is you've calculated how much money that

23   was -- how many bills, the amount of the bills that were sent

24   to these subscribers that got three or more tickets during the

25   period 2013 to 2016?

W.H. Lehr - Cross

1826

1    You're calculating how much they were billed, right?

2  A.   This calculation is a mechanical calculation from the

3  dataset.  And what it shows is, having those 31,514 subscribers

4  on Cox's network for which it had evidence of them being

5  infringers, it billed those subscribers $208 million.

6         Which I take as evidence, as an economist, that they

7  knew they had repeat infringers on their network that they were

8  deriving significant financial benefit from.

9  Q.   So is it your testimony then that a subscriber, whether it

12:07:47 10  be a hospital, or an older lady in a nursing home, got one

11  ticket, that that person is a repeat infringer?

12  A.   That's not my testimony.  I wouldn't know.  They very well

13  might be a repeat infringer or not.  Because I've testified

14  that the data about the tickets is -- doesn't tell you exactly

15  whether they're a repeat infringer or not.

16         Certainly if the little old lady got, let's say,

17  hypothetically, 100 tickets, I would say -- I'd be more

18  inclined to believe that there was evidence that that little

19  old lady was a repeat infringer if such an example existed in

20  the data.

21  Q.   So you looked at the ticket data which captured all the

22  notices from the plaintiffs and any third parties to the

23  subscribers in question in this case for the period 2012 to

24  2014, right?

25  A.   Well, I looked at that subsample of the data that was

1827

1    provided, you know, from the CATS system.

2    Q.   So isn't it true, Dr. Lehr, that you're basically saying

3    that as to these 57,279 subscribers that paid $307 million,

4    that Cox should have been omniscient and should have

5    anticipated that they would get one ticket and we should have

6    terminated them before they came, because otherwise, we --

7    that's why we would have never got the $307 million?

8         They had -- they could have never been on the network

9    for us to not get the $307 million, right?

12:09:28 10  A.   No, I think that's a significant mischaracterization of my

11   testimony.

12        What I'm saying is, these are the subscribers that

13   were -- there was evidence they were infringing and Cox had

14   evidence that would allow them to know that.  And they had

15   other evidence, which I also explained.  Like the volume of

16   peer-to-peer traffic on their network, you know, that they knew

17   they had a lot of infringing subscribers.

18        This is concrete evidence of specific subscribers

19   that were demonstrated -- you know, that demonstrated that they

12:10:04 20  were engaging in infringing activity.

21   Q.   Okay.  So -- but your testimony is not that Cox should

22   have terminated after one, after three or five notices, right?

23   A.   That's right.  I'm not testifying that Cox should have

24   terminated any specific number of users.

25   Q.   Okay.  So the $307 million that you have here, that goes

W.H. Lehr - Cross

1828

1   from -- that's for 2013, '14, '15 and '16, four years of

2   billings; is that right?

3   A.   Yes.

4   Q.   Okay.  And I think you've testified that in terms of when

5   they got the one ticket vis-à-vis the billings over the

6   four-year period for that individual subscriber, that's

7   irrelevant to your calculation; is that right?

8   A.   It's not irrelevant.  I explained how I did the

9   calculation, and I know when they got the ticket.  I don't

10  think -- it's not in this particular calculation.

11  Q.   So let's go back.  So you know when they got the ticket.

12  So let's go to 2014.  Someone gets a ticket, one ticket.  All

13  right?  They're terminated, right?

14  A.   Right.

15  Q.   Okay.  So all Cox loses is the revenue that comes -- would

16  come after that, correct?

17  A.   Well, in that hypothetical, that is correct.

18  Q.   Okay.  And that's the same with three and five, the

19  revenue would stop when they hit three and five and they were

20  terminated, right?

21  A.   Well, again, in that hypothetical, that assumes that Cox

22  actually was terminating subscribers that the demonstrative

23  evidence demonstrates they weren't in fact doing.

24  Q.   Did I ask you that --

25  A.   I'm trying --

W.H. Lehr - Cross

1829

1 Q.   Dr. Lehr, you're not --

2 A.   Go ahead.

3 Q.   Dr. Lehr, the question, it's simple -- I know you

4 constantly want to put this other information back in.  After

5 three or five notices, if the person was terminated, then the

6 revenue associated with that particular subscriber would end on

7 the date of termination, right?

8 A.   Yes.  I believe I already answered that.

9 Q.   Okay.  All right.  But what you've done is basically said,

12:12:24 10 it's the same as if these people, these subscribers -- we'll

11 start with the 57,000 -- had never been subscribers?

12 A.   I'm sorry.  I don't understand.  Is that a question?

13 Q.   So -- yes, 300 --

14 A.   Are you --

15 Q.   Okay.  Listen.  $307 million, okay, were billed to people

16 that had one or more notices, one or more DMCA tickets, right,

17 57,279?

18 A.   Yes.

19 Q.   Okay.  So if you're attributing this $307 million as

12:13:00 20 something that they -- obviously you're saying that they paid,

21 okay, after they got their bills, the only way Cox would not

22 get any of that money is if they were never subscribers, right?

23        MR. GOULD:  Your Honor, objection.  It's a

24 mischaracterization of the opinion on economic incentive.

25        THE COURT:  Well, overruled.  If you can track this

1830

1    question and answer it, go ahead.

2    A.   This may be a little bit complicated, but the records that

3    are in here, if those people had never been subscribers, then

4    their revenues never would have been in the ICOMS dataset.

5         But probably --

6         THE COURT:  All right.  So that's the answer to

7    your --

8         THE WITNESS:  No.  Sorry, I don't believe it is.

9         THE COURT:  Okay.

12:13:43 10        THE WITNESS:  Because he said that those

11   subscribers -- it's a mischaracterization of the data.  The

12   number might not change.  You pull out any individual

13   subscribers, you'd be in a different hypothetical world where

14   you would have observed different subscribers, with a different

15   dataset.

16        Now, all of the data suggests that infringing

17   activity and piracy is very popular.  We have specific data

18   that was provided here.  I'm not making an opinion here about

19   how many of these they should have terminated, which seems to

12:14:11 20   be the mischaracterization.

21        Had these people not been on their network, other

22   infringers probably would have been.  And I don't believe that

23   someone that has one ticket --

24        THE COURT:  Okay.  You weren't asked that question.

25   All right, stop there.

W.H. Lehr - Cross

1831

1       Go ahead, Mr. Buchanan.

2       THE WITNESS:  Okay.

3       MR. BUCHANAN:  I move to strike that, Your Honor.

4       THE COURT:  Yeah, I will strike the last answer.  It

5   may be that it's asked in redirect, but it's not responsive,

6   sir.

7       THE WITNESS:  I apologize.

8   BY MR. BUCHANAN: (Continuing)

9   Q.   So, again, whether you look at the 57,000 that got one,

12:14:36 10   31,000 that got three, the 20,000 that got five, okay, the only

11   way that we would not have had any of this revenue associated

12   with them is if they had never come onto the network, right?

13       THE COURT:  Revenue from those specific subscribers?

14   Q.   Yes.

15   A.   For that period of time.  So I only have data for 2016.

16   If those subscribers had come onto the network afterwards or

17   before it left, then there would still be revenue, but I

18   wouldn't have it.

19       So I think, you know, subject to those provisos,

12:15:15 20   which is to interpret what the data is I am presented with.

21   Q.   And you've talked a lot about incentives to keep them.

22   So, obviously, would you agree that if Cox has a policy, let's

23   say it's one, terminate after one, hypothetical, or three, or

24   five, either one of those, and other ISPs do not terminate,

25   there is certainly an incentive for the people that want to

W.H. Lehr - Cross

1832

1  download music to go to those networks and sign up there,

2  right?

3           That would be an economic incentive for someone to

4  move from Cox, assuming they terminated after one, three, and

5  five, to go somewhere where they did not terminate for

6  downloading music?  Wouldn't that be true?

7  A.   What I'm hearing in your question is that if Cox

8  terminated subscribers for infringing activity, that is how

9  they chose to address it, but the subscribers could move to

12:16:17 10  another account, that would be an incentive for them to move.

11           And so, that's the reason why Cox didn't want to

12  terminate or had incentive to retain them, because they made

13  money from those subscribers.

14  Q.   So did you happen to look at any data that was provided by

15  the CAS members in which they collected notices, and how they

16  were dealing with notices, and that was provided to the

17  plaintiffs in the course of the CAS -- on the CAS -- pursuant

18  to the CAS system, the CAS agreement?

19  A.   I don't believe I did.  Whether -- if I saw such

12:17:07 20  information, it would have been noted in my reports.  But as I

21  sit here right now, I don't recall having looked at that.

22  Q.   So you don't recall seeing any data that tracked

23  subscribers and how many subscribers got how many notices among

24  the CAS members, Verizon, Comcast, AT&T, Time Warner,

25  Cablevision?

W.H. Lehr - Cross

1833

1    A.   I don't recall having seen that.

2    Q.   Would that data have allowed you to determine whether

3    people --

4             MR. GOULD:  Objection, Your Honor.

5             THE COURT:  Let's move on.

6    BY MR. BUCHANAN: (Continuing)

7    Q.   So on the same slide, as I understand it, and if I can

8    find my notes here, was it -- what percentage -- it was

9    20-something percent of the Cox subscribers that you were

12:18:08 10  analyzing here that had just Internet service; is that right?

11   A.   That sounds -- I don't know.  It was in my report, but I

12   don't know as I sit here right now whether it was 20 percent.

13   But that sounds close.

14            THE COURT:  It's on another slide, right?  Do you

15   want to show him the other slide that has the high-speed

16   service, the voice, the video, the --

17            MR. BUCHANAN:  I can do that, Your Honor.

18            THE COURT:  I mean --

19            MR. BUCHANAN:  If I can find it here.  I don't think

12:18:45 20  it broke it down.  But let me just -- sorry.

21   BY MR. BUCHANAN: (Continuing)

22   Q.   So you would agree, Dr. Lehr, that -- okay.  11.  It

23   doesn't show percentages, but you have already said it was

24   20 percent for just the Internet.

25            So we have video, voice, and high-speed Internet.  So

W.H. Lehr - Cross

1834

1 20 percent of these subscribers in question just had Internet

2 service, right?

3 A.   No.  Sorry.  When I agreed to 20 percent, that was of

4 subscribers that subscribed to Internet service.  Only

5 23.4 percent only subscribed to Internet service.  So of the

6 total number of subscribers, the share that subscribed to only

7 Internet service would be a smaller number.

8 Q.   A smaller number?

9 A.   Yeah, less than 23.4 percent.

12:20:08 10 Q.   What would it be?  Do you know?

11 A.   I don't know.  Presumably you could calculate that.

12 Q.   10 percent?

13 A.   No, it would be much higher than that, but I don't

14 remember exactly, precisely.

15 Q.   So if you -- let me talk about video.  So, obviously,

16 using your television, watching HBO, NFL package, you're not,

17 you're not using -- you are not affecting copyright

18 infringement, right?

19        If you're using television or your phone, you can't

12:20:38 20 engage in peer-to-peer file sharing, can you?

21        MR. GOULD:  Objection, foundation.

22        THE COURT:  If you can answer the question, answer

23 the question.

24 A.   I'm not sure what the question is.

25 BY MR. BUCHANAN: (Continuing)

W.H. Lehr - Cross

1835

1  Q.   Someone doesn't use their telephone or their fax machine,

2  their landline or their fax machine, to download music from the

3  Internet, do they?

4  A.   No, they don't.

5  Q.   Okay.  And you don't use your TV to do it, do you?

6  A.   Not generally.

7  Q.   So -- but when you calculated the 307 million, the

8  208 million, and the 164 million, you didn't exclude revenue

9  for video and voice, did you?

12:21:29 10  A.   No, of course not.

11  Q.   Okay.  Let's go to slide 17.

12        So you've found this individual that had 101 total

13  tickets.  What's the time period that he had this -- the

14  tickets?

15  A.   Between 2012 and 2014, because that's the subsample of the

16  data that we were provided.

17  Q.   Okay.  And so, this person is an outlier, wouldn't you

18  agree?

19        Do you know any other individual subscriber,

12:22:25 20  residential subscriber that had 100 tickets?

21  A.   I saw some other ones.  As I sit here right now, I

22  certainly wouldn't remember their customer ID number, and I

23  don't know them specifically.

24  Q.   You're saying under oath that you know that there is

25  another residential subscriber that had over 100 tickets?

W.H. Lehr - Cross

1836

1    A.    It was my understanding there was, yes.

2    Q.    Would you know that there were 49 subscribers that had

3    over 100 tickets, and 48 were commercial enterprises?  Do you

4    not know that?

5    A.    I would have to go back to the dataset.  As I recall, this

6    was not the greatest number of tickets that a residential

7    subscriber got.  As I sit here right now, I might be wrong

8    about that, but I don't think so.

9    Q.    Okay.  So let's go to PX 18 -- I'm sorry, it's PX -- it's

12:23:25 10   slide 18.  Sorry.

11          So this is an Internet service provider, correct?

12   A.    Yes.

13   Q.    Had 4,000 tickets, 4,074 tickets over, what, a four-year

14   period; is that right, or longer?

15   A.    Well, again, it's 2012 to 2014.

16   Q.    Okay.  Three years.

17          Do you know how many subscribers this Internet

18   service provider had?

19   A.    No, I don't.

12:23:57 20   Q.    Do you know if it was over 100,000?

21   A.    I don't know as I sit here now.

22   Q.    Does it matter to you?

23   A.    For the purpose of the opinion and for which I presented

24   this, I don't think it would make any difference.

25   Q.    So you basically -- you've taken the worst, the worst

W.H. Lehr - Cross

1837

1    subscribers in terms of -- or the subscribers with the most

2    tickets, haven't you, in these three examples that you could

3    find?

4    A.   Well, within the data sample, the average number of

5    tickets amongst the 60,000 is certainly less than 101 tickets,

6    and certainly less than 4,000 tickets.  But to say that these

7    are the worst, it's just that the distribution -- we have

8    evidence that is spread out.

9    Q.   With respect to --

12:24:50 10   A.   And what I'm highlighting is that, you know, these are --

11   there are examples in there of subscribers that, you know, were

12   I think by all -- were repeat infringers.  And Cox realized

13   substantial benefits even after having acquired significant

14   evidence --

15   Q.   Did I ask you did they receive substantial benefits,

16   Dr. Lehr?

17              MR. GOULD:  Objection.

18              THE COURT:  Ask the next question, please.

19   BY MR. BUCHANAN: (Continuing)

12:25:21 20   Q.   So let's go back when you said repeat infringers.  So we

21   have got -- you referred to the person with ISP with

22   potentially tens of thousands or more subscribers itself that

23   got 4,000 tickets in three years is a repeat infringer.

24              Are the people that got three tickets, are they

25   repeat infringers as well?  The 31,000 that got three or more,

W.H. Lehr - Cross

1838

1    are they repeat infringers?

2    A.   I believe that the evidence, as I've presented it here,

3    speaks for itself.  And I believe the evidence suggests that

4    indeed they are.  I believe the evidence suggests even that

5    someone that got one DMCA ticket may very well be a repeat

6    infringer.

7          I am not opining about what the definition of repeat

8    infringer is or what the actual number of infringements would

9    be.  I have already said that I believe that the whole DMCA

12:26:20 10    database is an understatement of the actual amount of

11    infringing activity.

12          And so, I'm working with the data I have and I'm

13    trying to present it as transparently as I can.

14    Q.   So here, according to the ticket data, which captures this

15    period of time, notices from the plaintiffs, okay -- you

16    understand that the plaintiffs in this case sent notices,

17    right?

18    A.   Yes.

19    Q.   Okay.  And you understand that they never exceeded the cap

12:26:46 20    that they had of 600 on any one day in terms of the notices

21    that were sent?  Do you understand that?

22    A.   Well, I understand the cap changed and that there is some

23    variation about the number of notices.  And I don't know in

24    detail whether or not the -- what the process was for

25    processing the notices.  I am generally familiar with that, but

W.H. Lehr - Cross

1839

1   I'm not going to testify about that.

2   Q.   Well, you just testified about how you thought there was a

3   lot more infringement activity out there, and that you knew

4   that.  But -- so what I'm asking you now is, do you know for a

5   fact, okay, are you aware that the plaintiffs in this case and

6   the notices they sent never came close to their cap of 600 a

7   day?

8            MR. GOULD:  Objection, misstates the evidence.

9            THE COURT:  Sustained.

12:27:40 10   BY MR. BUCHANAN: (Continuing)

11   Q.   Do you know whether they ever came close to the 600 notice

12   cap in a single day?

13   A.   As a fact?  No, I don't know that.  I don't have an

14   opinion about that.

15   Q.   Okay.  So back -- if you look at this -- what we're

16   looking at, this chart here, 14, you can look -- so we have the

17   ticket data that captures not only all the notices from the

18   plaintiffs, but any notices to these same subscribers during

19   the time period from a third party content owner, you are aware

12:28:15 20   of that?

21            That's what's in the ticket data, are you aware of

22   that?

23   A.   I believe that's true.

24   Q.   Okay.  So based on this, I mean, if you look at this,

25   those that had four or less, according to your tabulation, is

W.H. Lehr - Cross

1840

1    like 38,000 subscribers who received at least one ticket, and

2    you had four or less based on this, correct?

3    A.    Sorry, where do you see four or less on this?

4    Q.    I see where you say five or more is 20,000.  So I'm

5    subtracting 57,000 from 27,000.

6    A.    Okay.

7    Q.    That's 37,000 that had, according to this data right here,

8    one, two, three or four, right?

9    A.    Okay.

12:29:00 10    Q.    That's right?

11    A.    Yes.

12    Q.    And you're not saying those 37,000 should have been

13    terminated, are you?

14    A.    No, I'm not saying any specific number of subscribers

15    should have been terminated.

16    Q.    All right.  Let's go to the next, 17.  I'm sorry, 19.

17          So this is a college fraternity that had 67 tickets

18    over, what, a three-year period; is that right?

19    A.    Yes.

12:29:48 20    Q.    Okay.  Do you know what college fraternity this was?

21    A.    As I sit here right now, I don't recall.

22    Q.    Do you know if they were in a dormitory or in a house?

23    A.    As I sit here right now, I don't recall.

24    Q.    Do you know if their system was tied to the university?

25    A.    As I sit here right now, I don't recall.

W.H. Lehr - Cross

1841

1     MR. GOULD:  Objection, Your Honor, he just testified

2  he doesn't know.

3     THE COURT:  All right.  He doesn't know.

4  BY MR. BUCHANAN: (Continuing)

5  Q.   Can we turn to 23.

6     Okay.  So the first question I have is, I see that

7  you've got $43.19 and then you've got 49.71, right?  You

8  created this chart?

9  A.   Yes.

12:31:26 10  Q.   Okay.  So why did you make it look like one was three

11  times higher than the other one and there's only an 8.4 percent

12  difference?

13  A.   Well, this was created on my behalf, but the numbers --

14  Q.   Don't you think that's misleading?

15  A.   No.  I think the numbers are really clear and they're in

16  big font.  I mean, I -- you know --

17  Q.   Okay.  What about the bar graph?  One is three times

18  higher than the other, it likes like it's 300 percent greater.

19  Did you do that?

12:31:58 20  A.   Well, I didn't actually generate -- I told them the slides

21  I wanted.

22  Q.   Okay.

23  A.   But I' not actually adept enough at PowerPoint to do this.

24  Q.   So here you've taken 20-plus tickets, okay?  Those are

25  outliers, would you not agree, based on what we just went over

W.H. Lehr - Cross

1842

1   with the other document?  How many subscribers got one, two,

2   three or four?

3   A.   No, I wouldn't regard those as outliers.

4   Q.   Okay.

5   A.   They were in the sample.  Usually when someone refers to

6   an -- I mean, I can explain what an outlier means to me.

7   Q.   Okay.  That's all right.  If you say it's not an outlier

8   to you, that's fine.

9          But you didn't do this -- what were the people that

12:33:09 10   got three or four tickets, did you realize what they were

11   paying, or five or six or seven or eight?

12   A.   I don't think so.  I don't recall specifically.

13   Q.   Okay.  So when you -- and you're talking about here, you

14   believe that people that got more tickets needed more data, so

15   they paid a higher price; is that sort of your thought?

16   A.   Well, as I explained when I was providing my testimony,

17   there's a lot of evidence to suggest that in fact that would be

18   true.  And so, then this was a way to demonstrate that using

19   the actual empirical billing data and tickets data that Cox

12:33:54 20   had.

21          But, you know, if I didn't have this data, I had

22   other evidence to suggest that was true, and I presented that

23   also.

24   Q.   So what you're suggesting though is people that had 20 or

25   more tickets, they necessarily purchased more data, paid a

W.H. Lehr - Cross

1843

1    higher price, a higher tier?  Is that what you're saying?

2    A.   Within the data sample I had, that's what the data, the

3    observation of the data says.

4    Q.   Okay.

5    A.   Is they -- that they purchased more.  It was --

6    statistically the average of what they purchased was

7    statistically 8.4 percent higher.  That's what the --

8    Q.   Okay.  But you do not know why any of the people that had

9    20-plus tickets actually purchased the higher tiered service,

12:34:40 10   do you?  You can't say why.

11         It could have been for any number of reasons, that

12   they wanted more data, right?

13   A.   Well, I can't speak in detail to the decisions -- the

14   purchase decisions of any specific subscriber.

15   Q.   Okay.

16   A.   I can say that if they wanted to --

17         THE COURT:  Okay.  All right.  You answered the

18   question.  Next question.

19   BY MR. BUCHANAN:  (Continuing)

12:35:05 20   Q.   And so, are you -- so the tickets here, so you're talking

21   about -- you're talking about 20-plus tickets, right?

22   A.   Yes.

23   Q.   Okay.  So how many notices are involved with these

24   particular subscribers that got 20-plus tickets, do you know?

25   A.   I don't know precisely as I sit here right now.

W.H. Lehr - Cross

1844

1   Q.   And over what period of time did these subscribers get

2   20-plus tickets?

3   A.   Well, it would have been over -- between 2012 and 2014

4   because that's the data I had.

5   Q.   2012, '13, '14; is that right?  Three years?

6   A.   Yes.

7   Q.   Okay.  And there could be one notice for every ticket,

8   right?

9   A.   When you say one notice, you mean identification of one

12:35:58 10   song that generated the ticket?  I'm not sure --

11   Q.   No, a notice.  A notice comes in from the plaintiffs, that

12   generates a ticket, right?

13   A.   Oh, okay.

14   Q.   Okay.  Is there -- is it a -- do you know that if a notice

15   generates a ticket or not?  Do you know how a ticket is

16   generated?

17   A.   Generally, I do.

18   Q.   Okay.  What is it, do you know?

19   A.   Well, that generally MarkMonitor would track and identify

12:36:24 20   the evidence that there were IP addresses that were associated

21   with distributing copyrighted material that belonged to the

22   plaintiffs.  And then they would send those notices on --

23   MarkMonitor on behalf of RIAA to Cox.  And then Cox would

24   process those.

25           And there were issues about when the notices arrived

W.H. Lehr - Cross

1845

1  as to how exactly they mapped into tickets and whether tickets

2  got issued.  You know, so if multiple notices arrived in a

3  fairly short period of time, there was a question about how

4  those things got mapped into tickets.

5          And the details of all that, other than this kind of

6  stuff that I'm being generally familiar, this was the evidence

7  of infringing activity, the precise details of how that mapped

8  is not something that, you know, I'm here offering testimony

9  on.

12:37:12 10  Q.   Okay.  So this could be -- these 20 tickets could

11  represent 20 notices, right?

12  A.   As I understand it, as I sit here right now, that sounds

13  reasonable.

14  Q.   Okay.  And those 20 notices could be one song that was

15  repeatedly detected as being on the file of the particular

16  subscriber by MarkMonitor, right?

17          MR. GOULD:  Objection, Your Honor, foundation.

18  A.   I would say no.

19          THE COURT:  Yeah, hold on.  Do you understand the

12:37:44 20  question?

21          THE WITNESS:  Not really.

22          THE COURT:  Okay.

23          THE WITNESS:  But I think I do, but --

24  BY MR. BUCHANAN:  (Continuing)

25  Q.   So do you know how many different songs constitute the

W.H. Lehr - Cross

1846

1   20-plus tickets of these particular subscribers?

2   A.   I don't know precisely, but I'm generally familiar with

3   what the kind of ticket data looked like.  And the distribution

4   that -- for example, the really high ones were only -- the guys

5   that got lots of tickets, were only noticed for a single song,

6   it was the same song every time.  That's generally not what the

7   data looks like.

8           There may be a subscriber for which that was the

9   case, but I -- you know, my sense, and like I say, I'm

12:38:21 10  generally familiar, that there were, you know, 60,000

11  subscribers in this dataset, and I looked at the data --

12          THE COURT:  He's asking you whether MarkMonitor would

13  send out notices each day if a particular song stayed in a

14  subscriber's database?

15          Is that correct, Mr. Buchanan?

16          MR. BUCHANAN:  That's correct.  You did a better job

17  than I did.

18  A.   Yeah, I would say so.  It's my -- you --

19          THE COURT:  So you --

12:38:47 20          THE WITNESS:  That's not the question I heard from

21  him, but I think I can answer the question as you phrased it.

22          THE COURT:  Well, let's let him ask it if he wants

23  to.

24  BY MR. BUCHANAN: (Continuing)

25  Q.   So you can answer the judge's question.  Go ahead.

W.H. Lehr - Cross

1847

1    A.   But that hypothetically could happen, it's my

2    understanding of the process at the level which I understand

3    it.   Whether it did or didn't happen, I'm not a sufficient

4    expert.

5    Q.   Okay.  So you're not -- are you saying that the ticket

6    data indicates the content?

7    A.   It's my understanding the ticket data began to identify

8    the number of songs.  But, for example, it wouldn't always

9    identify all of the songs that might have been infringing.  It

12:39:32 10   might, for example, identify only some of them.

11          So it's not a complete index.  And that there's a

12   much more complicated bunch of testimony and expert to

13   understand exactly how that process works.

14   Q.   All right.

15   A.   And so, the hypothetical -- or the, sorry, the

16   characterization of the question as Your Honor described, I

17   believe that that is something that could have happened.  But

18   I'm not testifying if in fact it did or the extent to which

19   that may have happened.

12:39:59 20   Q.   Okay.  So just to get it clear, you're testifying that the

21   ticket data that you looked at identifies the songs?

22          MR. GOULD:  Wait.  Your Honor, objection.

23          THE COURT:  Mischaracterizes his testimony.

24   BY MR. BUCHANAN: (Continuing)

25   Q.   Okay.  Is that your understanding, though?  Do you have an

W.H. Lehr - Cross

1848

1    understanding whether the tickets identify the content?

2             THE COURT:  You may answer if you know.

3    A.   I -- as I sit here right now, I don't remember

4    specifically what was on the tickets.

5             THE COURT:  Okay.  All right.  Go ahead.  Move on.

6    BY MR. BUCHANAN:  (Continuing)

7    Q.   So are you aware that if -- under Cox's contract with its

8    subscribers, if you exceeded your data limits, you were charged

9    more?  Were you aware of that?

12:40:53 10  A.   I saw evidence that suggests that Cox did not in fact

11   enforce its data limits by charging its subscribers more.

12   Q.   Okay.  So are you aware that that was something that

13   subscribers were aware of, that were attracted to Cox, because

14   they could get high-speed Internet service and Cox wouldn't

15   charge them more if they happened to exceed it on a monthly

16   basis?

17   A.   Well, the fact -- I don't know what subscribers all knew.

18   Certainly the fact that Cox was advertising data limits would

19   suggest to me, and I would infer as an economist, that some

12:41:37 20  subscribers believed that it would be enforced.  Whether, in

21   fact, it was or was not, you know, they would not necessarily

22   know, unless they exceeded that data limit.  And then they

23   might find out, gee, they're not enforcing it, that's great.

24            And it's my understanding that Cox did, in fact, not

25   charge customers that overexceeded their data limits for

W.H. Lehr - Cross

1849

1   exceeding their data limits.

2   Q.   So there are lots of Internet-based activities that

3   consume data, right?

4   A.   Yes, in various amounts, yes.

5   Q.   Streaming Netflix?

6   A.   Yes.

7   Q.   Streaming Spotify?

8   A.   Yes.

9   Q.   Watching HBO Go, Hulu, playing on video games?

12:42:19 10   A.   Yes, to engage in streaming activities are data intensive.

11   Q.   Okay.  In your analysis, did you attempt to determine, you

12   know, Cox's habits or their subscribers' habits with regard to

13   those particular activities?

14   A.   Well, I considered the evidence that was available to

15   generally characterize, you know, the behavior of, you know,

16   customers.  Some of that was based on sort of average broadband

17   subscribers' behavior and not Cox specific.

18   Q.   Okay.  So did -- you didn't account for the amount of

19   video streaming a video consumes per hour in your analysis, did

12:43:04 20   you?

21   A.   Yes, I did.

22   Q.   Okay.  And what is that?

23   A.   Well, I mean, when you say I accounted for it, I accounted

24   for the fact that if you were a heavy high speed user of video

25   services, then you would need to be probably in one of the

W.H. Lehr - Cross

1850

1   higher tiers.  And that there's evidence that there's a

2   significant amount of the traffic -- in fact, the most

3   significant growth in the traffic is associated with streaming

4   video.

5           However, the false inference some people make from

6   that is that peer-to-peer traffic disappeared.  And that's

7   not -- in fact, the evidence doesn't show that.

8           And so, I considered what was happening with video

9   traffic because what also matters is peer-to-peer.  And my

12:43:46  10  focus here was really what was going on peer-to-peer.  But I

11  did need to consider what was going on with video.

12  Q.   But we're speaking of these people that have 20-plus

13  tickets.  You don't know if they were seeking a higher Internet

14  service and a higher tier because they did a lot of streaming

15  video?  Did you consider that?

16  A.   Well, yes, I mean, in the sense that the Cox subscribers

17  would have needed to be at a higher tier to do the

18  peer-to-peer.  If they also, while they were infringing, wanted

19  to watch a lot of TV -- and most Internet users that do a lot,

12:44:23  20  do a lot of everything -- then they also would need the higher

21  tier.  They'd be even more valuable to Cox.

22  Q.   Okay.  So you're saying that you needed -- every Cox

23  subscriber needed the higher tier of service to do peer-to-peer

24  file sharing?  Is that what you're saying?

25  A.   No, because you said "every," and I definitely didn't say

W.H. Lehr - Cross

1851

1    "every."

2    Q.   So these 22 -- again, the people that have the 20-plus

3    tickets, do you know why they purchased a higher tier of

4    service?  Was it because they wanted to do video?  They wanted

5    to play games?  They wanted to, you know, download streaming

6    music?  Any of those things?

7         Do you actually know, as you sit here under oath, why

8    any of those people, the 20-plus, why they purchased the higher

9    tier?

12:45:15 10    A.   I don't know why any individual subscriber did anything.

11   Q.   Okay.  And that's -- so did you account, when you did this

12   analysis, as to whether the people that had these 20-plus

13   tickets, whether some were more concentrated in an area like

14   Connecticut, or Las Vegas, or Oklahoma, and Connecticut where

15   it would cost more to buy the same package that you might get

16   somewhere else?

17   A.   I believe I did check whether or not the distribution was

18   representative over the customer, you know, sort of sample in

19   this, but I don't recall if -- you know, there are -- I don't

12:45:59 20   recall if I did that calculation.

21   Q.   And you would agree that there are likely many subscribers

22   who have top tier service and have never infringed and

23   subscribers with bottom tier service who do infringe?  You

24   would agree with that, right?

25         MR. GOULD:  Objection, Your Honor.  There is no

1852

1    foundation.

2            THE COURT:  If you can answer, go ahead.

3    A.   Well, I don't know for a fact.  But since they have

4    4.5 million broadband subscribers, and we're only talking about

5    60,000 subscribers here, you know, and even by other estimates,

6    the estimates is the majority of subscribers don't appear to

7    engage in infringing activity.  But a significant number do.

8            So I'm interested in the significant number that do,

9    not the majority.

12:46:44 10   BY MR. BUCHANAN:  (Continuing)

11   Q.   That wasn't the question.  The question was, weren't there

12   many subscribers who have top tier service who never infringe

13   and some subscribers at the bottom tiers that do?

14   A.   And my answer was that I don't know that.

15   Q.   Okay.

16   A.   But I infer that from the data.  That there are many, you

17   know, high tier subscribers that don't infringe --

18   Q.   Okay.  I'm going to --

19   A.   -- and there are some low tier.  But I did testify if you

20   were --

21           THE COURT:  Okay.  All right.  Stop, stop.

22   BY MR. BUCHANAN:  (Continuing)

23   Q.   Sir, I am going to read your answer to that same question

24   from your deposition, transcript 355, 12 through 17.

25           THE COURT:  I think he is agreeing with you.  Did you

W.H. Lehr - Cross

1853

1    listen to the answer?  He said, I don't disagree with you that

2    in this statistical numbers, that that's possible.

3            If you want to -- go ahead, if you want --

4            MR. BUCHANAN:  I just want --

5    BY MR. BUCHANAN: (Continuing)

6    Q.   There's certainly a number of subscribers --

7            MR. GOULD:  Your Honor -- excuse me, Your Honor,

8    objection.

9            THE COURT:  I'm sorry, your objection?

12:47:39  10    MR. GOULD:  Improper impeachment.  He wants to

11    refresh his recollection.  The witness agreed with him.

12            THE COURT:  Well, I don't know whether he did or not

13    based on the -- what he said in his deposition.  So go ahead.

14    BY MR. BUCHANAN: (Continuing)

15    Q.   There is certainly a number of subscribers that got one to

16    two tickets that don't, you know, and there are probably a

17    bunch of subscribers that don't infringe at all that have the

18    top tier service.  And so, they're going to bias these numbers.

19            Right?  In that's talking about those numbers, the

12:48:06  20    20-plus tickets, right?

21    A.   As I sit here right now, I don't remember exactly in the

22    context of what that was.  I mean, I could imagine that that

23    would be consistent with the answer I just gave to the

24    question.

25            But, you know, when you look at these numbers, the

W.H. Lehr - Redirect

1854

1    reason why sometimes I don't -- I don't feel I can just give a

2    yes or no answer is because they are very nuanced.  And I am

3    trying not to opine about quantity numbers unless I'm

4    reasonably precise about what exactly those quantity numbers

5    are and what I'm relying on about them.

6              MR. BUCHANAN:  No further questions.

7              THE COURT:  All right.  Redirect?

8              MR. GOULD:  Thank you, Your Honor.

9         REDIRECT EXAMINATION

10   BY MR. GOULD:

11   Q.   Dr. Lehr, ending on the last point.  You don't know, sir,

12   whether subscribers are -- strike that.

13              Apart from the infringement evidence you have looked

14   at in this case, you don't know what Cox's other subscribers

15   are doing, do you?

16              MR. BUCHANAN:  Objection, leading.

17              THE COURT:  Well, it is leading.  Rephrase the

18   question.

19   BY MR. GOULD:  (Continuing)

12:49:14 20   Q.   Apart from the evidence you have looked at in this case,

21   do you know what other subscribers are doing on the network?

22   A.   Well --

23              MR. BUCHANAN:  I am going to object, Your Honor.

24   Could I approach because --

25              THE COURT:  Yes.

W.H. Lehr - Redirect

1855

1        MR. BUCHANAN:  -- I have a feeling that --

2        MR. GOULD:  I am not --

3        MR. BUCHANAN:  He -- never mind, Your Honor.  He just

4   told me he wasn't going there.

5        MR. OPPENHEIM:  We are not going where he thinks.

6        THE COURT:  Okay.

7   BY MR. GOULD: (Continuing)

8   Q.   As a general matter, are you aware personally of what a

9   subscriber who is not listed in the infringement ticket data

10  does with their time on the Internet?

11  A.   Generally, I'm familiar with evidence of sort of like, you

12  know, what I do, what my friends do, what the general average

13  broadband subscriber does.  And there is evidence in the case

14  from many different perspectives on what different broadband

15  Cox subscribers do.

16        But like, I don't know, for example --

17        THE COURT:  Okay.  All right.  Why don't we try a new

18  question.

19  BY MR. GOULD: (Continuing)

20  Q.   I want to pull you up slide 23.

21        Mr. Buchanan asked you, sir, if you were trying to

22  misrepresent something by this slide.  Were you trying to

23  misrepresent data or your opinions with the slides shown here?

24  A.   No.  I was trying to represent the data as clearly as

25  possible.  It says:  8.4 percent higher.  If it was three times

W.H. Lehr - Redirect

1856

1    higher, that would be 300 percent.  Which means it's obvious

2    it's not 300 percent.

3    Q.   Was this slide generated at your direction?

4    A.   Yes.  I mean, yes.

5    Q.   This is your slide, sir?

6    A.   Well, this is my slide but, again, I don't do PowerPoints.

7    So the fact that this was higher, I didn't even notice that.

8    Q.   Thank you.  Slide 19, please.

9            Dr. Lehr, do you recall Mr. Buchanan asking you if

12:51:07 10   you picked the highest and worst direct infringers of all of

11   Cox's direct infringers?

12   A.   Yes.

13   Q.   You see the fraternity listed here?  Do you recall that's

14   a business customer?

15   A.   Yes.

16   Q.   Was 67 tickets the business customer with the greatest

17   number of infringements?

18   A.   No, because I showed another business customer with 4,000.

19   Q.   And are there residential customers with more than 67

12:51:33 20   tickets?

21   A.   Yes, because I showed one that had 101 tickets, as I sit

22   here, and there were other ones I saw too.

23   Q.   You were asked questions about data caps and the tiers of

24   Internet.  Do you recall that?

25   A.   Yes.

1857

1   Q.   Mr. Buchanan didn't ask you about the speeds.  When a

2   subscriber purchases a tier of Internet, does it come with a

3   limit on speed as well as data?

4   A.   Yes.

5            MR. BUCHANAN:  Objection.

6            THE COURT:  Overruled.

7   BY MR. GOULD: (Continued)

8   Q.   And whether or not a data cap is imposed, do you know how

9   ISPs deliver speed to customers based on the tier selected?

12:52:17 10          MR. BUCHANAN:  Your Honor, I am going to object.  He

11   is not an expert on the infrastructure.

12           THE COURT:  Yeah, sustained.

13   BY MR. GOULD: (Continuing)

14   Q.   Mr. Buchanan asked you several questions about should they

15   have terminated with one ticket.  Do you recall that?

16   A.   Yes.

17   Q.   And I think you said no.  Did you mean that you had

18   that --

19           MR. BUCHANAN:  Objection.

12:52:49 20          THE COURT:  It's going to be leading.  Ask him what

21   he meant.

22   BY MR. GOULD: (Continuing)

23   Q.   What is your opinion, if any, about when Cox should have

24   terminated?

25           MR. BUCHANAN:  I am going to object if he already

W.H. Lehr - Redirect

1858

1   answered.  I tried to get that out of him and he said --

2            THE COURT:  No, I think he said clearly he's not here

3   to opine on that.

4            MR. GOULD:  I am just trying to clarify that, Your

5   Honor.

6            THE COURT:  All right.  You may answer.

7   BY MR. GOULD: (Continuing)

8   Q.   Do you have an opinion, sir, about when Cox should have

9   terminated repeat direct infringing customers?

12:53:18 10   A.   Well, my testimony today was that I am not offering a

11   number about a specific number of tickets at which -- some

12   specific level of evidence at which they would have terminated.

13            But, you know, to me --

14            THE COURT:  Okay.  All right.  Thank you.

15   BY MR. GOULD: (Continuing)

16   Q.   You are not a lawyer, sir?

17   A.   I am not a lawyer.

18   Q.   You were asked some questions about the parent or the

19   corporate owners of certain of the plaintiffs.  Do you recall

12:53:49 20   that question?

21   A.   Yes.

22   Q.   Do you know whether, for instance, Sony also sells

23   electronics, the Sony parent corporation?

24   A.   Well, I believe that's what I said, but I just don't know

25   what their total market value is.

W.H. Lehr - Redirect

1859

1   Q.   Stereos?

2   A.   Yes, consumer appliances.

3   Q.   Computers?

4   A.   Yes.

5   Q.   And Vivendi, the corporate owner of some of the Universal

6   entities, are you -- do you understand they also sell

7   televisions and run advertising agencies?

8   A.   Yeah.

9   Q.   And when you reported on your revenues and profits for Cox

12:54:32 10   Communications, did you include all of Cox's other businesses

11   besides residential and commercial business?

12   A.   No.  I mean, there's other things they are involved in.

13   Q.   Did you include Cox's auto loan business?

14   A.   No, because, you know, I was focused on their business

15   that, you know, leads them to sell the broadband services to

16   the commercial and residential consumers that's used for the

17   copyright infringement that is at issue in this case.

18   Q.   Did you include Cox Media, that's Cox's business that

19   sells advertisements?

12:55:08 20   A.   No.

21   Q.   Dr. Lehr, you were asked a number of questions about your

22   inclusion of revenue calculations based on customers that

23   received -- excuse me -- based on customers for whom Cox

24   reported processing one infringement ticket.  Do you recall

25   that?

W.H. Lehr - Redirect

1860

1    A.   Yes.

2    Q.   Just so we can understand, why did you include the 1+

3    revenue calculation?

4    A.   Well, again, it was to characterize the data.  The fact

5    that someone got one ticket demonstrates that there is evidence

6    that they were an infringing subscriber.  And, you know,

7    whether you should infer they were a repeat infringer

8    subscriber or not, you know, that's -- I'm not offering opinion

9    about that.

12:56:02 10         But, you know, I did offer an opinion about the fact

11   that the sample of the data we had was a subsample of even

12   those subscribers' tenure with Cox and of the potential

13   infringing behavior.

14         So it's when they observe it.  It's not necessarily

15   when they started infringing or not.

16   Q.   And even if you set that aside and look at the direct

17   infringers with three-plus tickets, what does that tell you?

18   A.   That's just even more evidence that they -- that those

19   infringers were repeat infringers.  And even if you look at

12:56:37 20  that and you shorten the revenue, any way you cut -- reduce

21   that, you still end up with a very large number that speaks to

22   the economic incentive that Cox had to tolerate infringement on

23   its network.  Which is the core of my opinion that I'm offering

24   here.

25         MR. GOULD:  Thank you.  No further questions.

W.H. Lehr - Redirect

1861

1        THE COURT:  All right.  May Dr. Lehr be excused?

2        MR. GOULD:  Yes, sir.

3        THE COURT:  All right.  Dr. Lehr, you are excused

4    with our thanks, sir.  Please don't discuss the testimony you

5    have given with anyone until our trial is over.  All right?

6        THE WITNESS:  Yes, thank you.

7        THE COURT:  All right.  Thank you.

8        I am not sure that applies to experts.  Maybe we can

9    talk about that in a minute if there is some consultation

12:57:18 10  sought.  But let's excuse Dr. Lehr for now.

11       Thank you, sir.

12       NOTE:  The witness stood down.

13       THE COURT:  Yes, sir.

14       MR. OPPENHEIM:  Subject to the witnesses who

15   defendants will be calling and plaintiffs -- sorry, one moment.

16       Your Honor, sorry.  We're not as organized as I had

17   hoped we would be.  Maybe we could do this right after lunch

18   and --

19       THE COURT:  Okay.  All right.  Let's take our lunch

12:58:04 20  break and we'll come back at 2 o'clock.

21       Thank you, you're excused.

22       NOTE:  At this point the jury leaves the courtroom;

23   whereupon the case continues as follows:

24   JURY OUT

25       THE COURT:  Does either side have any objections to

1862

1       consulting with experts after their testimony is complete?  I

2       over-generalized my instructions there.

3               MR. OPPENHEIM:  Not for experts, Your Honor.

4               THE COURT:  Yeah.  Mr. Elkin?

5               MR. ELKIN:  We don't have any either, Your Honor.

6               THE COURT:  Yeah, I -- okay.  Let's --

7               MR. ELKIN:  I'd like to --

8               THE COURT:  Yes, sir.

9               MR. ELKIN:  If I could just raise one issue?  I

12:59:09 10  suspect that after Mr. Oppenheim checks his notes and he rests,

11      our first witness is going to be Mr. Negretti.

12              I had prepared a very, very simple demonstrative to

13      help explain the issue of speed because it's sort of ephemeral,

14      and illustrations related to uploading, downloading, and

15      streaming.

16              I understand that counsel has an objection.  I just

17      figured I would get this resolved quickly.  And if I could hand

18      this up.

19              THE COURT:  Sure.  I'm happy to look at it.  Joe is

12:59:40 20  back with the jury and --

21              MR. ELKIN:  Sorry about that.

22              THE COURT:  That's all right.

23              MR. ELKIN:  Didn't mean to leave you shorthanded.

24              MR. ZEBRAK:  Your Honor, might I be heard on that as

25      you look at it?

1863

```
 1              THE COURT:  Yeah.  Give me a chance to look it
 2    though, please, Mr. Zebrak.
 3              MR. ZEBRAK:  Of course.
 4              THE COURT:  Okay.  What's your objection?
 5              MR. ZEBRAK:  Well, first, I mean, it's -- it really
 6    is over the top, Your Honor.  This is just pandering to the
 7    jury with something that there's no basis that this is
 8    representative of what's happening.
 9              And the third slide depicts Christmas morning with
10    snowflakes in the background, a puppy.
11              On the first slide, the dad's watching baseball.
12    There's teddy bears.
13              And I mean, it -- this isn't necessary.  It doesn't
14    illustrate anything, technically speaking.  It's just argument
15    from some consultant, no doubt.  It's unnecessary.
16              And we've already given them the courtesy of -- well,
17    excuse me.  Go ahead.
18              THE COURT:  Yeah.  All right.
19              MR. ELKIN:  So, Your Honor, this was further -- we
20    tried to make the slide actually the most placid.  It has
21    nothing to do with Cox.  It has to do with having the witness
22    discuss, you know, what is downloading, what's uploading,
23    what's streaming.
24              It was to help sort of bring the discussion to life
25    without characterizing anything.
```

13:00:24 10

13:00:47 20

1864

1      So I -- you know, I think there have been slides that
2   have been used, frankly, by the other side that's far more
3   edgier than this, and we just did not have any issue with them.
4   But I am not going to sit here and fall on my sword with regard
5   to this.  I didn't think this was going to be the least bit
6   controversial.

7            THE COURT:  Yes, sir.

8            MR. ZEBRAK:  Your Honor, first of all, I take issue
9   with the idea that our slides come anywhere close to this.
10  We've already made numbers of modifications to our slides to
11  accommodate their objections.

12           And these slides don't illustrate anything about
13  streaming, downloading, or the Internet.  But obviously --

14           THE COURT:  All right.  I'm going to allow the
15  slides.  They are invoking some emotions, but not unduly.  And
16  I would imagine that they're going to be up and down within a
17  fairly discrete period of time.  And so, your exception is
18  noted, but I'll let them in.

19           Anything else before we break?

20           MR. ZEBRAK:  Well, there's one other item.  We
21  consented to allowing them to substitute in a color copy of an
22  illegible black and white PowerPoint that they produced in
23  discovery with their witness.

24           So we have no objection to them using the legible
25  color copy.

1865

1          MR. ELKIN:  And we appreciate that.

2          THE COURT:  Okay.  All right then, we're in recess

3    until 2:00 p.m.

4          NOTE:  The morning portion of the proceedings on

5    December 11, 2019, is concluded.

6          -------------------------------------------

7

8

9

10

11

12

13                    CERTIFICATE OF COURT REPORTERS

14

15

16          We certify that the foregoing is a true and
           accurate transcription of our stenographic notes.

17

18

19               /s/  Norman B. Linnell
               Norman B. Linnell, RPR, CM, VCE, FCRR

20

21

22               /s/  Anneliese J. Thomson
               Anneliese J. Thomson, RDR, CRR

23

24

25