1866

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,        :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                                :
--------------------------------:
```

<u>VOLUME  8  (P.M. Portion)</u>

TRIAL TRANSCRIPT

December 11, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1867

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                   SCOTT A. ZEBRAK, ESQ.
 3                                 JEFFREY M. GOULD, ESQ.
                                   MICHAEL J. DRUCKMAN, ESQ.
 4                                 ANDREW L. GUERRA, ESQ.
                                   LUCY G. NOYOLA, ESQ.
 5                                 JIA RYU, ESQ.
                                   Oppenheim + Zebrak, LLP
 6                                 4530 Wisconsin Avenue, N.W.
                                   5th Floor
 7                                 Washington, D.C. 20015


 8
      FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
 9                                 Winston & Strawn LLP
                                   1700 K Street, N.W.
10                                 Washington, D.C. 20006-3817
                                     and
11                                 SEAN R. ANDERSON, ESQ.
                                   MICHAEL S. ELKIN, ESQ.
12                                 THOMAS P. LANE, ESQ.
                                   CESIE C. ALVAREZ, ESQ.
13                                 Winston & Strawn LLP
                                   200 Park Avenue
14                                 New York, NY 10166-4193
                                     and
15                                 JENNIFER A. GOLINVEAUX, ESQ.
                                   THOMAS J. KEARNEY, ESQ.
16                                 Winston & Strawn LLP
                                   101 California Street, 35th Floor
17                                 San Francisco, CA 94111-5840
                                     and
18                                 MICHAEL L. BRODY, ESQ.
                                   Winston & Strawn LLP
19                                 35 West Wacker Drive
                                   Chicago, IL 60601
20                                   and
                                   DIANA HUGHES LEIDEN, ESQ.
21                                 Winston & Strawn LLP
                                   333 South Grand Avenue
22                                 Suite 3800
                                   Los Angeles, CA
23

24

25
```

1868

1

2                                    INDEX

3

WITNESS                        EXAMINATION      PAGE

4

5    SIDDHARTHA NEGRETTI
                                   DIRECT           1881
6                                  CROSS            1908
                                   REDIRECT         1941
7
     LYNNE JANET WEBER, PH.D.
8                                  DIRECT           1951

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A F T E R N O O N   S E S S I O N

 2              NOTE:  The afternoon portion of the case on

 3      December 11, 2019, begins in the absence of the jury as

 4      follows:

 5      JURY OUT

 6              THE COURT:  Preliminary matters.  Yes, sir.

 7              MR. GOULD:  Thank you, Your Honor.  There are a

 8      couple of exhibits plaintiffs wanted to move into evidence,

 9      several of which the parties have no dispute over:  PX 459,

10      DX 250, PX 443.

11              There's two additional sets of documents that there's

12      a slight difference of opinion on.  Several of them are the

13      large billing data reports that are referred to as the ICOMS

14      billing reports.  Plaintiffs move admission of PX 467 through

15      PX 474, as well as PX 479.

16              Those billing reports were authenticated, foundation

17      laid as business records in the deposition of Mr. Jarchow.

18      Your Honor will recall the defendants have been unwilling so

19      far to stipulate to admission of those unless plaintiffs also

20      stipulate to admission of apparently related information in a

21      different document that we didn't get to depose on.  I'm not

22      aware of a principled basis to oppose admission of the ones

23      I've identified notwithstanding the continued work and need to

24      resolve the one remaining document.

25              THE COURT:  Okay.
```

02:05:00 appears at line 10
02:05:44 appears at line 20

1870

1        MS. GOLINVEAUX:  Mr. Gould, can I have the list,

2   please?

3        MR. GOULD:  Yeah.

4        MS. GOLINVEAUX:  Your Honor, no objection with

5   respect to PX 459 or DX 450 or PX 443.  We do object at this

6   time as to PX 467 to 474, which is the ICOMS billing report

7   that Mr. Gould just referred to.  As Your Honor is aware from

8   last week, there's -- those reports were initially produced

9   with one column that listed out the customer name redacted out

02:06:40 10   in order to protect the privacy, and then subsequently,

11   pursuant to a stipulated order that Judge Anderson entered, we

12   went ahead and produced that one missing column for the

13   business customers.

14        We are open to stipulating admission of the ICOMS

15   reports along with that column, but the plaintiffs are still

16   taking issue with that, so we're trying to work that out.  We

17   do not -- we object to producing the partial reports without

18   that column.

19        THE COURT:  So you want to produce now with the

02:07:09 20   customer names included?

21        MS. GOLINVEAUX:  The business customers only, Your

22   Honor.

23        THE COURT:  The business customers only.

24        MS. GOLINVEAUX:  Yes, Your Honor.

25        THE COURT:  And what's the objection to that?

1871

1          MR. GOULD:  This is the issue we discussed.  We're

2    looking to potentially and likely have a phone deposition with

3    Mr. Jarchow Friday to explore the second piece, which they're

4    telling us is somehow part of this one, but there's no question

5    that the documents they produced and that were deposed on are

6    business records, and Cox doesn't dispute that.

7          They're somehow trying to hold up admission of

8    admissible business records unless we agree to stipulate to

9    something else, and they are two separate issues.  We have

02:07:57  10   documents that Cox produced we relied on, Dr. Lehr relied on.

11   It's core evidence in this case.

12         THE COURT:  Okay.  I understand.  All right.  I'll

13   provisionally admit 467 to 474, with just the two columns of

14   data, and then we'll revisit after we've had the opportunity to

15   do the deposition and whatever other evidence comes before me.

16         MR. GOULD:  I'm not sure -- I apologize.

17         THE COURT:  Go ahead.  Yeah.

18         MR. GOULD:  I'm not sure I understand what you mean

19   by the two columns of data.

02:08:27  20         THE COURT:  467 -- what did 467 through 474 include?

21         MR. GOULD:  These are massive spreadsheets of monthly

22   billings over a four- or five-year period.

23         THE COURT:  Produced by Cox.

24         MR. GOULD:  Produced by Cox for all of the business

25   and all of the residential customers, and what Ms. Golinveaux

1872

1  has represented is that they removed the names of the

2  customers.  They don't dispute that these are authentic

3  business records from their files.

4         THE COURT:  Right.

5         MR. GOULD:  What Ms. Golinveaux is saying is they'll

6  only agree to stipulate to admission of the actual billing data

7  if we also agree to stipulate to admission of the names of the

8  business customers.  They're separate issues.

9         THE COURT:  I think -- and I was trying to make a

02:09:08 10  ruling that said they're separate issues, and it may be that

11  the additional data with the names of business customers comes

12  in at a different time, but it should not prevent the

13  underlying data that was produced by Cox in the slightly

14  redacted form and was relied on by the plaintiffs shouldn't go

15  in at this time.  So your exception is noted, but I'm going to

16  receive 467 through 474.

17         MR. GOULD:  Thank you.  And then 479, I think was no

18  objection as well; is that right?  The key?

19         MS. GOLINVEAUX:  We have no objection to 479, Your

02:09:41 20  Honor.  May I be heard for one moment, Your Honor?

21         THE COURT:  Yes.

22         MS. GOLINVEAUX:  Your Honor, to be clear, the reports

23  that they're admitting now, there's two columns that were

24  redacted, and those are the subject of the remaining dispute,

25  and we're presenting an affidavit for Mr. Jarchow with respect

1873

1    to those.

2              With respect to the deposition plaintiffs are

3    seeking, it's not clear to us that that's proper.  They say

4    they want what amounts to a discovery deposition, but we're

5    going to try to resolve that amongst the parties once they see

6    his affidavit indicate authenticating those columns, and then

7    we'll determine whether we have anything left to bring to the

8    Court on that.

9              THE COURT:  Okay.  All right.  So let me, let me back

02:10:28  10   up.  The data that Lehr -- that Cox produced initially that was

11   relied upon has two columns missing or one column missing?

12             MS. GOLINVEAUX:  Your Honor, it's the customer name

13   and address.  So they're broken into two columns.

14             THE COURT:  Okay.  Otherwise, you don't disagree that

15   the data is accurate?

16             MS. GOLINVEAUX:  That's correct, Your Honor.

17             THE COURT:  Okay.  And whether or not this -- and you

18   want the customer names and addresses in?

19             MS. GOLINVEAUX:  The Cox Business customers.

02:11:03  20             THE COURT:  Business customers.

21             MS. GOLINVEAUX:  Yes, Your Honor.

22             THE COURT:  And you think that that's relevant for

23   your case, and there's a dispute at this stage as to whether

24   that comes in.

25             MS. GOLINVEAUX:  That's correct, Your Honor.

1874

1    THE COURT:  Okay.  So I'll, I'll allow the redacted

2    exhibits, which I believe are 467 to 474.  Is that correct?

3    MR. GOULD:  Yes, Your Honor.

4    THE COURT:  To come in now, and we can revisit the

5    admissibility of the complete exhibit as -- the next time you

6    tell me it's time.

7    MS. GOLINVEAUX:  Thank you, Your Honor.

8    THE COURT:  Okay.

9    MR. OPPENHEIM:  So two issues, Your Honor.  I want to

02:11:37 10  speak to the deposition issue that just came up and also

11   resolve an issue with respect to Mr. Cadenhead's designations.

12   And if we want to put that off until later, that's fine.

13   The issue that we discussed the other day with

14   respect to the names of the business customers has to do with

15   how much information was disclosed.  The, the defendants have

16   been arguing these are critical infrastructure.  These are

17   military bases and hospitals and things like that.

18   All they've disclosed in that information --

19   THE COURT:  So this is just further argument about

02:12:11 20  that.  We'll do that after the jury goes home.

21   MR. OPPENHEIM:  That's fine, Your Honor.

22   THE COURT:  Okay.  Thank you.

23   MR. OPPENHEIM:  That's fine.  Okay.

24   THE COURT:  Let's do it all after the jury goes home.

25   MR. OPPENHEIM:  As well as the Cadenhead issue?

1875

1    That's fine.

2              THE COURT:  Thank you.  Unless somebody's not going

3    to be here at the end of the day because you've been tasked to

4    do something else.  Does that work?

5              MS. LEIDEN:  I'm happy to address it now.  I think it

6    wouldn't take too much of the Court's time.  And then the only

7    issue is that he's the next video after one of the witnesses,

8    so then we can then finalize --

9              THE COURT:  Okay.  Go ahead with that one.

02:12:42  10         MR. OPPENHEIM:  I think we've resolved all the issues

11   really except for one document and the testimony surrounding

12   that document, and the document is DX 74, Your Honor, and the

13   document is a PowerPoint presentation that Mr. Cadenhead

14   believes he used at a presentation to CAS.  It includes the

15   infamous 96 percent study.  And so the first eight slides were

16   not created by Mr. Cadenhead, so they're, they're not his, and

17   the last several slides are the 96 percent study.

18             Cox has asked to admit this.  It's classic hearsay

19   from our perspective, and even if you -- as they've suggested,

02:13:35  20   well, they're not offering it for the truth of the matter

21   contained within it, but for the purpose of saying, well, they

22   had told CAS about what Cox was doing, but that is not a --

23   it's just not a relevant issue, Your Honor.

24             There is no statute of limitations issue in this

25   case.  There is no laches issue.  There has been plenty of

1876

1    testimony about CAS, whether -- and any testimony that

2    Mr. Cadenhead provides about, well, I told them about ignoring

3    the first notice, that's fine, but the actual document itself

4    is hearsay and should not come in, Your Honor, even in its --

5    even if we surgically cut off the front end and the back end.

6              THE COURT:  Okay.  Thank you.

7              MS. LEIDEN:  Thank you, Your Honor.  So just one

8    thing to clarify, which is, as Mr. Oppenheim referred to, we

9    have offered to and expect to take off the last two slides of

02:14:30 10   this presentation, which are the only two slides in this

11   PowerPoint that refer to the 96 percent study, and so the

12   remainder of the PowerPoint, that's DX 74, and there's also an

13   e-mail that attached, which is DX 73, the remainder of that

14   presentation relates to -- with the exception of a few

15   introductory slides, which Mr. Cadenhead said in his deposition

16   he did not personally create, but the remainder refers to Cox's

17   graduated response and notice program that Mr. Cadenhead

18   presented to the RIAA content owners and the ISPs in 2010

19   during the negotiations of CAS.

02:15:14 20        So I think here, you know, the jury's heard several

21   times that Cox did not join CAS, and frankly, you know, this is

22   relevant to and helps illustrate why they didn't do so, and the

23   fact that Cox presented its graduated response to the eventual

24   members of CAS and that the members of CAS then agreed to a

25   type of graduated response themselves is highly relevant to

1877

1    this case.

2            And just with respect to the hearsay issue, as, you

3    know, Mr. Oppenheim alluded, we're not offering the slides for

4    their content.  We're offering them to show that the

5    presentation was made and the information was conveyed, and I

6    discussed with one of Mr. Oppenheim's colleagues this morning

7    that we would be open to a limiting instruction to address that

8    issue to ensure that the jury is aware of that issue.

9            MR. ELKIN:  Just one additional point, if I may, Your

02:16:11  10  Honor.  The, the issues surrounding Cox presenting to the CAS

11   members what they were doing in terms of graduated response and

12   our position and I think what the testimony and the evidence

13   reflects is that Cox did participate.  We demonstrated the

14   steps that it at least took.  It at some point pulled out.  The

15   jury's already heard that.

16           For the jury not to hear without that 96 percent

17   business, the fact that Mr. Cadenhead actually did address

18   them, I think, is not particularly a complete picture, and we,

19   obviously, readily agree pursuant to Your Honor's order to

02:17:07  20  excise that portion of it, but I think they're trying to,

21   respectfully, de-neuter what he did, and he testified at length

22   in his deposition, both Mr. Oppenheim and I were there, it went

23   on for a long time.

24           So we're not trying to talk about whether or not

25   graduated response was effective 96 percent or any of that,

1878

1  just that he was there, they made a presentation, he stated

2  that he and Cox decided not to participate for whatever

3  reasons, and that's really the purpose of it.

4           THE COURT:  So how many of these slides do you want

5  to use?  I mean, like, there's one that says annual notice

6  volume.  If they're not being offered for the truth of the

7  contents, then what other purpose is there for offering them?

8           MR. ELKIN:  We're more than happy to work out an

9  acceptable stipulation to remove whatever is maybe

02:17:59  10  objectionable as far as that goes.  We just want to be able to

11  say that, hey, look, we were there and we took this seriously.

12  We made a presentation.  Regardless of whether, what they

13  thought of it, you know, we thought enough of this to actually

14  do something.

15           THE COURT:  All right.

16           MR. ELKIN:  That's all.

17           MR. OPPENHEIM:  Your Honor, to be clear, I've not

18  objected to Mr. Cadenhead's testimony that he made a

19  presentation.  That's fine.  If he did, he testified he made a

02:18:26  20  presentation, that's fine.  Actually putting the hearsay

21  evidence in of that, of that is, is what is the problem, Your

22  Honor.

23           So to the extent that Mr. Elkin's point is they just

24  want to say, hey, they were there and they did this

25  presentation, that's in the testimony, Your Honor, and there's

1879

1  no need to put this document in, which raises all kinds of

2  questions, frankly, Your Honor.

3          THE COURT:  Well -- yes.

4          MS. LEIDEN:  And just to clarify, the specific

5  slides, if you have them in front of you, they begin on

6  slide 8, which is titled Cox Graduated Response, and then the

7  slides immediately following describe the notice requirements,

8  e-mail, and then certain of the steps of graduated response,

9  including the walled-garden suspension, Cox graduated -- and

02:19:17 10  Cox graduated steps.

11          So we would certainly be amenable to removing the

12  slides that don't relate specifically to the graduated response

13  both before and after those slides.

14          THE COURT:  All right.  You know, I think that -- as

15  I've already ruled, that the -- what Cox did on its own in

16  deciding not to join the CAS program is of some relevance, and

17  Mr. Cadenhead should be allowed to testify that he went and he

18  gave this presentation, and see if you can't, you know -- so is

19  he live or is he by video?

02:19:54 20          MS. LEIDEN:  By video, Your Honor.

21          THE COURT:  Okay.  And he's going to refer to this as

22  something that he brought to the CAS meeting and used in the

23  presentation, and you can redact the document as you-all agree

24  or as we decide, without interfering with your ability to put

25  the video on?

1880

1         MS. LEIDEN:  Yes.

2         THE COURT:  Okay.  Then see if you can't work it out,

3    and I'll admit it under the parameters that we've just talked

4    about.

5         MS. LEIDEN:  Thank you, Your Honor.

6         THE COURT:  Okay.  All right.  Are we ready for the

7    jury then?

8         MR. OPPENHEIM:  Yes.

9         THE COURT:  Okay.  Joe, let's get our jury.

10        NOTE:  At this point, the jury returns to the

11   courtroom; whereupon the case continues as follows:

12   JURY IN

13        THE COURT:  All right.  Please, have a seat.

14        Mr. Oppenheim?

15        MR. OPPENHEIM:  Your Honor, subject to recognizing

16   that the plaintiffs will be taking some testimony during the

17   course of defendants' case from some of their witnesses and the

18   right to take rebuttal, the plaintiffs at this point will rest

19   their case to defendants.

02:21:43  20        THE COURT:  All right.  Thank you, sir.

21        MR. ELKIN:  Good afternoon, Your Honor.

22        THE COURT:  Good afternoon.

23        MR. ELKIN:  Defendants call Sidd Negretti.

24        THE COURT:  All right.

25        THE COURT SECURITY OFFICER:  Yes, sir.  Come in,

1881

1    please.

2          SIDDHARTHA NEGRETTI, DEFENDANTS' WITNESS, SWORN

3              THE COURT:  Good afternoon, sir.

4              Please, Mr. Elkin, proceed.

5              MR. ELKIN:  Thank you, Your Honor.

6                      DIRECT EXAMINATION

7    BY MR. ELKIN:

8    Q.   Please state your full name for the record.

9    A.   My name is Siddhartha Negretti.

02:22:53 10  Q.   Good afternoon, sir.

11   A.   Good afternoon.

12   Q.   By whom are you employed?

13   A.   I am employed by Cox Communications.

14   Q.   And what's your position at Cox?

15   A.   I am the executive director of product marketing strategy.

16   Q.   And how long have you been at Cox?

17   A.   I've been with Cox since January of 1999, so just over 20

18   years.

19   Q.   Okay.  How soon after college did you join Cox?

02:23:14 20  A.   It was three years.  It was my second job out of college.

21   Q.   Okay.  And tell the Court about your college education.

22   A.   Sure.  I went to my undergrad at Arizona State University

23   in Tempe, Arizona.  I've got a Bachelor's in Broadcast

24   Marketing.

25              THE COURT:  Get a little closer to the microphone, if

S. Negretti - Direct

1882

1    you would, sir.

2            THE WITNESS:  Sure.

3    BY MR. ELKIN:

4    Q.    And do you have an advanced degree?

5    A.    Yes.  I have my MBA, or a Master's of Business

6    Administration, from Emory University in Atlanta, Georgia.  I

7    got that in 2009.

8    Q.    Is that during the time you were still at Cox?

9    A.    Yes.

02:23:51  10   Q.    And when you first joined Cox in 1999, what was your job?

11   A.    Sure.  I actually started at Cox as a technical support

12   representative, which meant I was a customer service

13   representative on the phones.

14   Q.    Okay.  And how long did you have that position?

15   A.    Not too long.  About a year and a half or so.

16   Q.    Okay.  At some point, did you join the marketing

17   department?

18   A.    Yes.  In December of 2003, just about four years after I

19   started with the company, I got my first job in the product

02:24:21  20   marketing group.

21   Q.    So since 2003 to the present, you've been in the marketing

22   department at Cox?

23   A.    That's correct.

24   Q.    Could you take the jury through the different -- briefly,

25   the job responsibilities that -- the titles and job

S. Negretti - Direct

1883

1 responsibilities you've had since you joined Cox's marketing

2 group in 2003?

3 A.    Sure.  As Michael said, I have been in the product

4 marketing role with Cox Communications for over 16 years, but

5 my capacity and my role has changed and evolved each and every

6 time I moved to different locations.

7         So as we talked about, I started out as a technical

8 support representative.  It was for our digital telephone

9 product.  When I joined the marketing department, I was the

02:25:04 10 product manager for that digital telephone product.  So that's

11 the cable service offering telephone service to its customers.

12         In 2005, I expanded that role to a national product

13 marketing manager for digital telephone, and that was in

14 Atlanta, Georgia.

15         After I got my MBA that we talked about earlier, I

16 expanded my role even further by going out to our Las Vegas

17 market, and I was the director of product marketing in Las

18 Vegas.  So at that point in time, not only was I responsible

19 for digital telephone, but also for Cox's high-speed internet

02:25:37 20 and Cox's television services.

21 Q.    Let me just stop you there for a moment.  How did your

22 responsibilities change once you became the director of product

23 marketing?

24 A.    Sure.  As a director, we're more responsible for making

25 leadership-level decisions and setting the strategy forward for

S. Negretti - Direct

1884

1   what we do in terms of bringing products and services to

2   market.

3   Q.   And how long did you have that job?

4   A.   That specific job was two years, but I still have a role

5   in that capacity today.

6   Q.   Okay.  And did your job change in 2014?

7   A.   Yes.  In 2014, I actually came back to Atlanta, Georgia,

8   where I live today, and I became the executive director of

9   product marketing strategy, the role that we talked about

02:26:15 10   earlier.

11   Q.   Okay.  What is product marketing?

12   A.   Sure.  That's a fair question.  So product marketing

13   basically is looking very intently at the needs, wants, and

14   desires of our consumers and understanding what they need or

15   want from a company like ours and then turning around and

16   looking at what types of products and services that we can

17   deliver in order to entice the consumers to do business with

18   us.

19   Q.   Okay.  Well, how is product marketing different than,

02:26:43 20   let's say, advertising?

21   A.   Sure.  So product marketing is the division of the company

22   that helps define what the product will be that we offer to our

23   customers, but advertising is another part of marketing that

24   helps educate the consumer on what the product is.  It gives

25   them awareness about it.  It gives them education about it, and

S. Negretti - Direct

1885

1    tells them how they can purchase it.

2           You'll see advertising on websites; you'll see

3    advertising in your mailbox, on TV, all those kinds of things.

4    So that's a communications arm of marketing.

5    Q.   Okay.  I think you've referred so far in your testimony to

6    both customers and consumers.  Are they the same?

7    A.   They are not exactly the same.  There are some nuances

8    there.  So when I'm referring to consumers, I'm talking about

9    the marketplace as a whole.  All of us in this room, we are all

02:27:30 10  consumers of products.  Whether we do have a relationship with

11   a specific company or not, we're consumers of different

12   products.

13          So when I'm talking about customers, I'm talking

14   about people who we have an existing relationship with.  They

15   pay us every month, and they subscribe to our services.

16   Q.   So when you think about consumer research, can you give an

17   example as to how these two terms, "consumer" and "customer,"

18   might be different from Cox's perspective?

19   A.   Sure.  As I talked about, the customer is a person that we

02:27:56 20  currently have a relationship with.  We currently do business

21   with them, and so when we're doing research, we want to

22   continue -- we want to understand what it takes to continue to

23   make them a happy customer.

24          However, consumers are people we don't currently have

25   a relationship with, so we need to earn their business.  We

S. Negretti - Direct

1886

1  need to figure out why they choose not to do business with us.

2  Maybe they're entrenched with their current provider in the

3  marketplace, or maybe they have been with us before and they've

4  left us, and so when we are doing consumer research, we're

5  looking specifically about why customers are rejecting us.

6  Q.   Okay.  I want you to direct your attention back to

7  2013-2014 time frame.  Do you know whether Cox had a mission

8  statement or motto during this period that influenced the way

9  that you would make decisions as a product marketer?

02:28:42 10  A.   Sure, absolutely.  I was talking about how I worked in Las

11  Vegas, Nevada, during that time frame, and there's actually a

12  mission statement that was on the walls of our building there,

13  and it was to be the most trusted provider of entertainment and

14  communication services in America.

15  Q.   And during this same time frame, did you have any

16  responsibility for product marketing for Cox's high-speed

17  internet service?

18  A.   Yes, absolutely.

19  Q.   And what was the nature of your responsibility for product

02:29:07 20  marketing related to that product?

21  A.   Yeah.  So a lot of things that we would think about is

22  what price to charge for the product, what speeds to offer for

23  the product, as well as how to differentiate that product from

24  other products in the marketplace that looked very similar from

25  our competitors.

S. Negretti - Direct

1887

1    Q.   Okay.  Would you explain -- please explain to the jury how

2    important it is, if at all, that as part of your job in

3    marketing, to understand what consumers want?

4    A.   Yeah, absolutely.  So as you know, the marketplace that

5    we're in today is a very competitive marketplace, and so

6    there's lots of people offering options to our consumers.  If

7    we don't bring to our consumers things that they think are

8    relevant, things that they would value, and things that would

9    get them to spend money with us, then they'll reject us.  So

02:29:54 10   it's very important for us to understand that.

11   Q.   Okay.  Generally speaking, Mr. Negretti, what kind of

12   consumer research do you consider when assessing how best to

13   position Cox's products to consumers?

14   A.   Sure, absolutely.  There's a wide range of consumer

15   studies that can be done.  We could do everything from

16   purchasing syndicate research, which is research that a third

17   party creates and then can share with us in terms of their

18   insights about the marketplace.

19        We could do things like field our own research.  We

02:30:23 20   could hire a team of researchers to go out and ask consumers

21   exactly what they're thinking.  We could do things like focus

22   groups, where we sit down with a few customers and ask them

23   questions directly and understand from them what their

24   responses may be.

25        We can do things in terms of sitting in their homes

S. Negretti - Direct

1888

1    with them and watching how they use our products and services

2    so we understand what points of friction are and where there

3    are responsibilities to make it better.

4    Q.   Have you ever heard of a group within Cox by the name of

5    the consumer insights group?

6    A.   Yes, absolutely.

7    Q.   Who are they?

8    A.   So the consumer insights group is another part of the

9    marketing group, just like the advertising group.  These folks

02:30:59   10    are a support group for us.  So when we're thinking about the

11    strategic question that we want to answer or the hypothesis we

12    have in terms of what a consumer might want and does that meet

13    the products and services that we want to bring to market,

14    they're the people that are directly responsible for creating

15    the research elements that go into coming up with that answer

16    for us.

17    Q.   Have you personally worked with them in the past?

18    A.   Yes, absolutely.

19    Q.   Can you describe how you work with the consumer insights

02:31:25   20    group to help you figure out what consumers want?

21    A.   Yes.  So as I was explaining before, often we will have a

22    hypothesis in terms of the idea that we have based off our

23    prior knowledge.  We might even have a strategic question or

24    problem that we're trying to solve for, but we don't know how

25    to get an unbiased understanding of what the consumer is

S. Negretti - Direct

1889

1 thinking, and so the consumer insights team will work with us

2 to figure out what type of survey instrument or what type of

3 research mechanism should be used to get that answer in the

4 most unbiased way possible.

5 Q.   And what are some of the tools that the consumer insights

6 group uses to determine what consumers want?

7 A.   Sure, absolutely.  There's lots of different surveys that

8 could be done, surveys where they call you on the telephone and

9 ask you questions, surveys where they send you an e-mail and do

02:32:15  10 something online with you.  It could be things like

11 qualitative, which is asking a series of open-ended questions,

12 or quantitative, which is asking very discrete questions, in

13 order to help build some of that information.

14 Q.   And generally speaking, can you explain to the jury what

15 consumer surveys would show relative to Cox's broadband

16 service?

17 A.   Well, it often shows the top things that drive a customer

18 to consider broadband and where points of friction are with the

19 service, and even some of the less desirable reasons why they

02:32:44  20 wouldn't consider broadband service at all.

21 Q.   And can you describe what kinds of questions you would

22 expect a consumer survey in Cox's broadband service to ask?

23 A.   A perfect example would be if I gave you a list of ten

24 choices, can you explain to me your top two reasons for making

25 a choice for internet?  Why do you use it in the home?  What

S. Negretti - Direct

1890

1    are your top five reasons for using the internet in your home?

2    What speeds do you need in your home in order to feel satisfied

3    as a customer?

4              Those are probably some examples of questions we

5    would ask.

6    Q.   And do they also do research on competitors?

7    A.   Absolutely.

8    Q.   So in your experience in product marketing, why do people

9    choose Cox for internet service?

02:33:29 10  A.   Yes.  So there's two key reasons, and this is a two

11   longstanding key reasons why people choose our service.  Number

12   one is based on the speeds that we provide in the marketplace,

13   and number two is based on the price that we charge for our

14   service.

15   Q.   So relative to other factors, including the one that you

16   mentioned, do you know whether speed is an important

17   consideration for consumers?

18   A.   Yeah.  It's actually the leading consideration for a

19   consumer.  As much as we as product marketers would like to

02:33:58 20  differentiate some of those considerations, it is the leading

21   reason why consumers choose internet providers in the

22   marketplace.

23   Q.   And do you have an understanding about what drives

24   consumers' desire for high speeds?

25   A.   Sure.  If you think about your own lifestyles and you

1891

1    think about the things that you're doing in your home, it's

2    very similar to the consumers that we're talking about here,

3    which is consumers have a need and want information inside

4    their home on their different devices.  They're doing things

5    like streaming videos, and they're doing things like looking up

6    things on social media.  They're participating in society and

7    shopping using the internet, and so the more speed they have,

8    the more satisfactory that performance is.

9    Q.    Do you know whether Cox actually promotes the speed of its

02:34:41  10    service?

11    A.    Yes, absolutely.

12    Q.    How does it do that?

13    A.    Often we will talk about their reasons to do business with

14    us, but at the end of the day, the consumer wants to get down

15    to brass tacks in making a purchase decision, and again, that

16    purchase decision is based off of speed and price, and so we

17    will showcase those speeds and those prices in the marketing

18    piece.

19          Oftentimes, however, the speed of the service falls

02:35:07  20    flat in terms of what a consumer can do with it.  They don't

21    understand what of 60 meg or 80 meg or a gig of speed does for

22    them, so we will have to paint visual illustrations for them to

23    give them examples.  If you're this type of household, this is

24    what you can use the internet for at this speed.

25    Q.    So how do you bring it to life, the notion of speed?

S. Negretti - Direct

1892

1   A.   Well, what we'll do is we'll create messages and images on

2   the marketing pieces, for example, that depict, for example,

3   people -- a group of people sitting in their living room on

4   their tablets or their laptops watching streaming video,

5   posting to social media, doing electronic gaming, things like

6   that.

7   Q.   And have you learned the types of internet activities that

8   speed is important for?

9   A.   Yes, absolutely.

02:35:49 10   Q.   What are they?

11   A.   Yeah, it's not a surprise because I've said it a couple

12   times, but by far and away, people want to be able to consume

13   content, and when I mean consume content, things like streaming

14   video, being able to watch Netflix.  People like posting to

15   social media, being able to post to Facebook.  People like

16   being able to use their electronic gaming machines to --

17   particularly the younger generation, to be able to play video

18   games.

19   Q.   Mr. Negretti, have you assisted in the preparation of

02:36:22 20   certain slides to illustrate the different activities in which

21   speed is used with your internet service?

22   A.   Yes, absolutely.

23   Q.   Okay.  I'd like to ask you to take a look at your, your

24   slides and take the jury through what you've presented.

25   A.   Sure.  And I thought it was helpful to go through some

S. Negretti - Direct

1893

1  basic terms in terms of the speed of internet comes through for

2  three or four different ways for the consumer.  The first one

3  is streaming, and I talked about wanting to get access to

4  things like Netflix, and so that's the top use, one of the top

5  uses of the internet today and was for -- has been for quite

6  some time.

7          And so when you're streaming, you're basically

8  pulling information down from a single server or remote

9  location onto your devices of choice in the living room.  So

02:37:11 10  for example, you see a family of four using the internet for

11  different purposes.  They're streaming information to them.

12  They're not bringing or downloading that information to them.

13  It's located on a remote location.

14  Q.    Please proceed to your next slide.

15  A.    Sure.  So we often talk about downloading as well.  You'll

16  hear that term used, and you've probably used it yourself.

17  Downloading is slightly different but achieves the same

18  purpose.  So instead of information staying on that remote

19  server, it's being pulled down from that remote server onto the

02:37:40 20  customer's device.  So the customer then has a copy of that

21  information.

22          A pretty common use of this is downloading a photo or

23  downloading a file such as a Word document or a PowerPoint

24  document.  Then you physically have a copy of it on your device

25  as well.

S. Negretti - Direct

1894

1    Q.    And what do you show in your next slide?

2    A.    Sure.  And then the internet is also a two-way

3    communication device, which means not only can I get

4    information from it; I can put information on it, and I think a

5    lot of people are doing this today in terms of being able to

6    use the internet to upload.

7            And so taking the information that's on my device, on

8    my cell phone, or on my laptop, and uploading it to the

9    internet, to that remote server so that other people can see

02:38:19  10   it.  A perfect example is using it to upload photos of my

11   family.

12   Q.    How has Cox changed its marketing based on its

13   understanding as to how people use the internet?

14   A.    Sure, absolutely.  As consumer needs change in the

15   marketplace, which they often do, and as the competitors

16   continue to come out with their own versions of products and

17   services that they can offer their customers, we have to

18   continue to make sure that our marketing messages stay relevant

19   to the consumer, particularly the person that we don't yet have

02:38:46  20   a relationship with.  We need to be able to cut through the

21   clutter and explain to them why we have a strong value

22   proposition.

23   Q.    And what activities were you emphasizing in the 2013-2014

24   time frame?

25   A.    Yeah.  Again, it's somewhat unchanged from today, which is

S. Negretti - Direct

1895

1    that we're emphasizing the speed and the price of the services.

2    Q.   Okay.  Any particular type of activity?

3    A.   Sure.  Things like streaming video from Netflix.  Again,

4    not to wear that point down, but that's a very important part

5    of why consumers use the internet, being able to access things

6    like YouTube and post videos on YouTube, social media.

7    Q.   And just again harkening back simply to the issue of

8    speed, based on your familiarity with how your competitors

9    promote their high-speed internet, is Cox unique in promoting

02:39:36  10  the speed of its services?

11   A.   Well, again, as a product marketer, I like to think that I

12   can bring a unique flavor to their experience, and in a lot of

13   ways, we try to understand from the consumers' perspective what

14   unique things that we can do, but at the end of the day,

15   they're often making a tradeoff between the speed that they can

16   get from us and the price that they have to pay for it.

17            We will often try to insert things like the trusted

18   factor of doing business with us or the reliability factor of

19   doing business with us, but the consumer most often is making a

02:40:03  20  decision based on us and other companies in the marketplace

21   based on the speed and the price of our services, and that's

22   how they're marketed in the marketplace.

23   Q.   So in your experience at Cox, is the desire for fast

24   internet service uniquely associated with any particular kinds

25   of uses?

S. Negretti - Direct

1896

1    A.   Well, as we talked about, and that's perhaps one of the

2    benefits of those definitions, streaming capacity uses a lot of

3    internet speed, and so the ability to stream better comes with

4    the ability to have higher speeds.

5    Q.   What are high -- what are bandwidth intensive uses?

6    A.   Yes.  So streaming content is one of them.  Watching shows

7    on Netflix, electronic gaming, playing things like Fortnite, if

8    you have children that are doing that, those are things that

9    are high bandwidth intensive usage activities.

02:40:57 10   Q.   Okay.  I'd like you to turn to, it may be Exhibit -- it

11   may be tab 1 in your binder.  It's Defendants' 239.

12            And I think, Your Honor, this is the one document

13   where the parties agreed to substitute for purposes of the

14   examination a more legible copy.

15            THE COURT:  All right.

16            MR. ELKIN:  An older document.

17            THE COURT:  All right.  Thank you.

18            THE WITNESS:  Tab 1 or tab 2?

19   BY MR. ELKIN:

02:41:24 20   Q.   It should be, the first page should be Opportunities to

21   Maximize Demand.

22   A.   Tab 2, yes.

23   Q.   Yes.  And do you know who prepared this document?

24   A.   This is a document prepared by our consumer insights group

25   that we spoke about earlier.

S. Negretti - Direct

1897

1    Q.    And did the Cox product marketing team play any role in

2    the preparation of this study?

3    A.    Yes.  We were the customer for a document like this.

4    Q.    And was this study conducted by Cox in the ordinary course

5    of its business?

6    A.    Absolutely.

7    Q.    And was this document maintained by Cox in the ordinary

8    course of business?

9    A.    Absolutely.

02:41:53  10          MR. ELKIN:  Your Honor, I would offer into evidence

11    Defendants' Exhibit 239.

12          THE COURT:  Any objection?

13          MR. ZEBRAK:  No objection, Your Honor.

14          THE COURT:  It's received.

15          MR. ELKIN:  Thank you, Your Honor.

16    BY MR. ELKIN:

17    Q.   Mr. Negretti, could you just explain to the jury what this

18    study is?

19    A.   Yeah, absolutely.  So this document that we're looking at

02:42:10  20    here was done, like many documents, to understand different

21    ways that we could package our internet services.  As the

22    environment became more and more competitive, as we spoke about

23    earlier, it became important for us to understand are there

24    different things that we could package together in our internet

25    service to make our internet service more attractive to the

S. Negretti - Direct

1898

1    consumers in the marketplace.

2    Q.   Okay.  And what's the date of this?

3    A.   This was done in August of 2014.

4    Q.   Okay.  Turn to the second page of this exhibit, and can

5    you read the second sentence under the word "Objectives"?

6    A.   Starting with "Cox management"?

7    Q.   Yes, sure.

8    A.   Sure.  Cox management seeks to explore alternative ways of

9    packaging its internet services to both increase appeal among

02:42:58 10   key consumer segments and simplify decision making.

11   Q.   Why did Cox management want to do this?

12   A.   Again, the environment continues to be competitive in the

13   marketplace, and at this time, it was very competitive, with

14   alternative sources of high-speed internet available to them,

15   and so Cox wanted to make sure that we had the best products

16   and services for the customers to choose from in the

17   marketplace, and so this was --

18   Q.   And how did this study concern itself with understanding

19   how Cox's customers use the internet?

02:43:26 20   A.   There's a couple different ways.  It asks them when you're

21   making a selection for your internet provider, what's important

22   to you?  And then when you're using the internet, what's

23   important to you?  And then it asks them to give us answers

24   based off of that.

25   Q.   Okay.  Turn to the sixth page of this exhibit.  It should

S. Negretti - Direct

1899

1  be on your monitor as well.

2  A.   Yes.  Price and download speed?

3  Q.   Tell the jury what this, this slide depicts.

4  A.   Sure.  So I talked about wanting to understand what

5  features are important to a consumer when they're making a

6  selection for an internet provider, and this is a stack ranking

7  of different features that we thought of and thought were

8  important to the consumer, and we wanted to get a reaction from

9  them how important they were.

02:44:21  10       And it's broken up into four different key areas:

11  core features, things that are absolutely important; important

12  features, things that are equally important but maybe slightly

13  less valuable; and then so on and so forth down to less

14  important features.

15       So what this basically does is it helps us understand

16  when a customer is making a selection for internet, why they

17  might be choosing it.

18  Q.   Okay.  Do you see the material in the box following the

19  first paragraph?  In the second line in parentheses, it says

02:44:52  20  N = 1513.  What does that refer to?

21  A.   Yes, okay.  Great point.  That means this is how many

22  people were surveyed and gave responses to us to these

23  questions.  So the 1,513 people were asked and gave responses

24  to these questions.

25  Q.   Okay.  And do you -- on this slide, are there

S. Negretti - Direct

1900

1  characteristics that are identified as the core features?

2  A.    Yes.   There's two, and they're not different from what I

3  had been talking about earlier, which is the monthly

4  subscription price of internet as well as the download speed of

5  the service.

6  Q.    Okay.  And does this slide also refer to download speed

7  and upload speed?

8  A.    Yes, it does.

9  Q.    To what extent in your experience is download speed

02:45:36 10  related to downloading content to a subscriber's computer?

11  A.    That's the key thing in terms of being able to use the

12  internet, either downloading or streaming services to their

13  devices for enjoyment.

14  Q.    And to what extent does download speed apply to streaming

15  applications?

16  A.    Again, these are -- this is -- the best visual way to

17  think about this is download speed refers to the number of

18  lanes available to a consumer on a freeway, and then the more

19  lanes they have, the faster download speeds they have available

02:46:08 20  to them to be able to get to the content they want.

21  Q.    Okay.  Please turn to page 8 of this exhibit.  What does

22  this slide depict?

23  A.    Okay.  So this is slightly different.  The slide before it

24  talked about why you might make a selection of internet

25  providers.  This one gets into frequent internet activity that

S. Negretti - Direct

1901

1    the consumer is actually using inside their home.

2         So this talks about, again, a stack ranking based on

3    choices that the consumer was given about what they're using

4    the internet for.

5    Q.   And how does streaming audio and video relate to

6    downloading in terms of what's more prevalent --

7    A.   Well, first of all --

8    Q.   -- that's depicted on this slide?

9    A.   -- as you see here, it's actually 20 percent more

02:46:48  10   important to a consumer in terms of what they're using the

11   internet for than downloading speeds, for example, downloading

12   things.

13   Q.   And have you observed trends in your work at Cox in how

14   consumers use the internet to consume music?

15   A.   Sure, absolutely.

16   Q.   Could you comment on that?

17   A.   Sure.  Again, then, just as today, there are services such

18   as iHeartRadio, Pandora, and Spotify available to a consumer to

19   allow them to stream music services into their home, not only

02:47:17  20   onto their, you know, laptops and tablets, but also on their

21   phones so they can use inside and outside of the home to be

22   able to listen to music.

23        MR. ELKIN:  Okay.  You can take that down, James.

24   BY MR. ELKIN:

25   Q.   In your job, did you ever review at any time any surveys

S. Negretti - Direct

1902

1    or studies that looked at the prevalence of copyright

2    infringement by consumers?

3    A.    There's two answers to that.  The first answer is no, and

4    then the second answer is not only did I not review it, we

5    never fielded any studies like that.

6    Q.    And why is that?

7    A.    It's not helpful to us.  It doesn't help us understand

8    what the consumer wants to use the internet for.  As you saw

9    earlier, there's lots of different uses for the consumer to use

02:48:02  10   the internet both in terms of making a purchase decision and in

11   what they actually use the internet for, and that's not

12   something that helps us.

13          Mainly, it's an illegal activity that we don't want

14   anything to do with.

15   Q.    To your knowledge, do you know whether Cox ever asked

16   survey questions about copyright infringement in any consumer

17   surveys?

18   A.    No.

19   Q.    Have you ever reviewed any surveys or studies that concern

02:48:30  20   consumers' use of peer-to-peer file sharing?

21   A.    Sure.  And that's a little different than infringing

22   copyrighted material.

23   Q.    And what effect did that information, file sharing, have

24   on Cox's marketing strategies?

25   A.    Not much.  Although there are some mentions in some

S. Negretti - Direct

1903

1    different research studies from time to time about the presence

2    of peer-to-peer as a source of activity for consumers, it

3    doesn't rate high or popular with most of our consumers, so

4    it's not something that we actively use to create messages.

5    Q.    Okay.  Take a look at the other exhibit in your binder,

6    and this is Defendants' Exhibit 337.

7    A.    Okay.

8    Q.    Do you know -- have you seen this document before?

9    A.    Yes.  A member of my team, Robert Jordan, prepared this

02:49:24 10   document.

11   Q.    Okay.  And do you know whether Mr. Jordan prepared this in

12   the ordinary course of business?

13   A.    Yes, he did.

14   Q.    Did he have a business duty to do so?

15   A.    Yes, he did.

16   Q.    Was this maintained in the ordinary course of business at

17   Cox?

18   A.    Yes, it was.

19         MR. ELKIN:  Your Honor, I would offer into evidence

02:49:39 20   Defendants' Exhibit 337.

21         THE COURT:  Any objection?

22         MR. ZEBRAK:  No objection, Your Honor.

23         THE COURT:  It's received.

24   BY MR. ELKIN:

25   Q.    Could you take the jury through the contents of this?

S. Negretti - Direct

1904

1    A.   Yes.  So this is a relatively simple document.  This is a

2    rate card basically.  This tells us internally at Cox

3    Communications the different rates that we charged in 2013,

4    according to this sheet here, and then there's a second tab for

5    2014, that we charged for our internet services.

6         And the simple way to read this is on the left-hand

7    side or the left axis, the Y axis, was a list of all the

8    different cities in which we offered our high-speed internet

9    service in 2013.  Then along the top of the page, or the X

02:50:19 10  axis, was a list of the five or six different internet tiers

11   that we offered our consumers -- our customers at that point in

12   time.  There were starter and essential tiers, which were lower

13   speed tiers, on up to premium and ultimate, which were higher

14   speed tiers.

15        And then this simply is a rate card that lists out

16   the rates that we charge for a customer who had other services

17   with us as well as internet, such as cable TV and/or telephone

18   service or just purchased internet by itself.

19   Q.   And what were the years covered by these rack rates?

02:50:52 20  A.   I'm sorry, say that again?

21   Q.   What were the years covered?  What years?

22   A.   Yes.  So again, this is 2013 on this page here.  There's a

23   subsequent tab at the bottom that shows the rack rates for

24   2014.

25   Q.   And why are there different -- on the left-hand side of

S. Negretti - Direct

1905

1   each of these two pages, there are different locations.  Why,

2   why do you have different locations?

3   A.   Yeah.  So we serve different parts of the country with our

4   internet services, and so at that point in time, these

5   individual markets, as we call them, or cities all had their

6   own responsibility for creating these internet services and

7   distributing them to our customers, and so this shows the

8   different rates that were charged.  A lot of them started to be

9   the same, but there are some differences in different parts of

02:51:39 10  the -- in different parts of the geography.

11   Q.   Will the rack rates vary by geographic region?

12   A.   Yes.  There are some examples here, for example, where in

13   Kansas, Arkansas, we charge 46.99 for our essential product,

14   and in Tulsa, Oklahoma, we charge 44.99 for the same product.

15   Q.   Okay.  And what are the differences among the different

16   tiers of services?

17   A.   Sure.  There are two key differences.  Key difference

18   number one, as I mentioned, is the download speed or the speed

19   of internet service.  So again, the starter and the essential

02:52:14 20  tiers, they were slower tiers; and then the higher you go

21   across this page, the faster those internet service speeds

22   would be.

23         And then the second difference would be the amount of

24   data consumption that you would get with each of these tiers.

25   Q.   And could you take the jury through the differences in the

1906

1 amount of data that a subscriber can use for different tiers of

2 service?

3 A.    Yes.  So I don't have the exact amounts of data off the

4 top of my head, but what I'll say is similar to the speeds, the

5 more speed you purchase and the more you pay for your service,

6 the more data consumption that you are allotted for each of

7 those tiers.

8 Q.    Was there a limit on the amount of data that they could

9 use?

02:52:48 10 A.    There was a limit.

11 Q.    Do you know whether or not those limits were enforced

12 during the 2013 to 2014 period?

13 A.    Unfortunately, they were not enforced.

14 Q.    So in your experience, what factors are the most important

15 in driving consumer preference -- you can take that down.

16 Sorry.  Withdrawn.

17         In your experience, what factors are the most

18 important in driving consumer preferences for increased speed?

19 A.    Again, we've been talking a lot about this in the last

02:53:18 20 half-hour or so, but it comes down to the speed and the price

21 that they pay for the service based on what they want to use it

22 for, being able to use it in their home to be able to get to

23 things like Netflix, streaming video through their iPhone or

24 their tablet, for example.

25 Q.    So in your -- in your knowledge and capacity in product

S. Negretti - Direct

1907

1 marketing, to what extent does Cox want to retain existing

2 customers?

3 A.   Yes.   It's very beneficial of us to keep our existing

4 customers.   We've invested in those customers.   We've offered

5 them discounts to do business with us, and it's a lot easier

6 financially for us to maintain a relationship with them than

7 going out into the marketplace and acquiring new subscribers.

8 Q.   Are there some customers that aren't good for Cox?

9 A.   Sure, absolutely.   There are many customers.

02:54:05 10 Q.   Which ones?

11 A.   Well, we talked earlier about people who use the internet

12 for copyright infringement.   Those customers are not good for

13 Cox.

14 Q.   Why not?

15 A.   Well, first of all, they're doing an illegal activity, and

16 we don't want anything to do with that.

17 Q.   To what extent, if you know, does Cox benefit if

18 subscribers access content illegally for free?

19 A.   It's actually not a benefit.   It's a risk.

02:54:32 20 Q.   Is there any -- to what extent does Cox give customers

21 special treatment with respect to copyright infringement

22 because they bring in a lot of revenue?

23 A.   We don't give them any special treatment.   In fact, we

24 would probably prefer not to do business with them at all.

25 Q.   Why not?

1908

1    A.   Again, they're doing something fraudulent and illegal, and

2    we prefer them to do it on someone else's network, not ours.

3              MR. ELKIN:   Thank you very much.   I pass the witness.

4              THE COURT:   All right.   Thank you.

5              Cross-examination, Mr. Zebrak?

6              MR. ZEBRAK:   Yes, Your Honor.   Thank you.

7                           CROSS-EXAMINATION

8    BY MR. ZEBRAK:

9    Q.   Good afternoon, Mr. Negretti.   Nice to see you again.

02:55:18 10  A.   Nice to see you as well.

11   Q.   Before we get into the questions I'm going to ask you, I'd

12   like to begin by the slides that you prepared for today.

13   A.   Sure.

14   Q.   Do you recall talking about those?

15   A.   I do.

16   Q.   Okay.   And you testified that you prepared those slides;

17   is that correct?

18   A.   I gave guidance on how the slides should be prepared, yes.

19   Q.   Well, first of all, in those slides, remember there were

02:55:46 20  little bits floating around for uploading and downloading?

21   A.   Sure.

22   Q.   And you were talking about content being consumed, right?

23   A.   Content being passed from the internet to the customer or

24   from the customer back to the internet, yes.

25   Q.   And content, for instance, music, right?

S. Negretti - Cross

1909

1    A.    Yes.  It could be.  It wasn't specific, but it could be.

2    Q.    And -- well, I mean, you're aware that many Cox customers

3    download music using the Cox service, right?

4    A.    I do know that customers use music streaming sites such as

5    iHeartRadio and Spotify, absolutely.

6    Q.    Cox doesn't create sound recordings or musical

7    compositions, does it?

8    A.    We do not.

9    Q.    It makes money as people are uploading and downloading

02:56:27  10   that content, right?

11   A.    Well, we make money off of people who pay us to use the

12   internet for the purposes they want to, correct.

13   Q.    So let's turn your attention back to your slides for a

14   minute.  We don't need to pull them up, but do you recall the

15   first slide had a little girl with a teddy bear in it?

16   A.    I do maybe recall that, yes.

17   Q.    And I think it had a father watching baseball on his

18   computer.  Do you recall that?

19   A.    I do recall that, yes.

02:56:52  20   Q.    And in some later slides, I think there was one of perhaps

21   Christmas morning with snowflakes outside?

22   A.    Sure.  Very relevant for this time of the year, sure.

23   Q.    And I think there was a little, a little puppy there as

24   well?

25   A.    Perhaps, yes.

S. Negretti - Cross

1910

1    Q.    Did you ask for that to be included in the slides?

2    A.    Well, my intent was to be able to convey as best as we

3    could to the audience here today the differences between

4    streaming, downloading, and uploading.  The artistic licensing

5    was just probably the best way to bring that forward.

6    Q.    So to depict streaming or downloading, you needed to show

7    teddy bears and puppy dogs and Christmas?  Is that what you're

8    saying?

9    A.    I wanted to show a visual representation.  As a marketer,

02:57:29  10    it's always my job to make sure that people understand in clear

11    visual images what these terms mean.  So when I'm talking about

12    speeds of internet, if I'm talking about the services that

13    we're charging a customer for or giving an example in a

14    courtroom, creating a visual image to stimulate that is very

15    important, yes.

16    Q.    Do you know how many Cox subscribers were the subject of

17    plaintiffs' copyright infringement notices to Cox?

18    A.    I do not, no.

19    Q.    You don't.  You spent time preparing for your deposition

02:57:57  20    in this case, right?

21    A.    I did, yes.

22    Q.    At least a full day, right?

23    A.    Yes.

24    Q.    Did you spend time preparing for your trial testimony

25    today, sir?

S. Negretti - Cross

1911

1    A.    Yes, I did.

2    Q.    How long was that?

3    A.    Several weeks, yes.

4    Q.    Preparing for several weeks?

5    A.    Yes.

6    Q.    Okay.  And one of the topics that you were designated for

7    as a person most knowledgeable as a Cox corporate

8    representative at your deposition was Cox's knowledge of

9    copyright infringement of music by its subscribers using

02:58:31 10   BitTorrent, wasn't it, sir?

11   A.    That's correct.

12   Q.    And you understand that today's case is copyright

13   infringement, right?

14   A.    That is correct.

15   Q.    And do you understand who the plaintiffs are in this case?

16   A.    I do.

17   Q.    And your testimony, though, is you have no idea how many

18   Cox subscribers have been the subject of plaintiffs'

19   infringement notices to Cox?

02:58:55 20   A.    That's correct.  As a product marketer, this is not

21   something that I need to understand to be able to acquire

22   subscribers.

23   Q.    Right.  So it's not your testimony that the, the scenes

24   that you painted in the slides with teddy bears and the puppies

25   and all that other stuff is indicative in any way of the

1912

1    subscribers who are the subject of the plaintiffs' notices to

2    Cox, correct?

3    A.    It is not the intent to show that there is infringed

4    activity happening in those slides, correct.

5    Q.    You referred to a survey from the consumer insights group

6    during your direct testimony.  Do you recall that?

7    A.    Is it the exhibit that we were showing?

8    Q.    Yes, sir.

9    A.    Yes.

02:59:45  10    Q.    Okay.  And that's a survey from Cox's consumer insights

11    group, correct?

12    A.    That is correct.

13    Q.    The consumer insights group conducts many surveys each

14    year, right?

15    A.    Absolutely.

16    Q.    In fact, Cox spends millions of dollars per year doing

17    research on how its customers use the internet, correct?

18    A.    I don't know the exact dollar amount, but we spend

19    extensive money and time trying to understand the uses of the

03:00:10  20    internet that our customers have.

21    Q.    Sure.  How many people are in the consumer insights group,

22    generally speaking?

23    A.    At this point in time or in 2013-'14?

24    Q.    Let's do 2013-'14.

25    A.    Probably eight to ten people perhaps.

S. Negretti - Cross

1913

1  Q.   And lots of their work involves use of outside survey

2  entities, right, to conduct the surveys?

3  A.   Correct.  Both and inside survey design, survey fielding,

4  and then being able to create those surveys into output

5  statements for us.

6  Q.   And through those surveys, Cox has learned that a

7  substantial portion of its subscriber base uses Cox's internet

8  service for peer-to-peer activity, correct?

9  A.   I don't recall that being a relevant finding in any of our

03:00:55 10  surveys, no.

11  Q.   Is it your testimony that you're unaware that a

12  substantial portion of Cox's network traffic involves

13  peer-to-peer activity?  It's a yes-or-no question.

14  A.   I think to be clear, the word "substantial" is the one

15  that I object to.

16  Q.   Cox in the course of all these customer surveys has never

17  bothered to conduct research on the extent to which its

18  customers are engaging in copyright infringement, correct?

19  A.   I wouldn't say it never bothered.  We do not find that to

03:01:26 20  be valuable information to us as product marketers when

21  determining what types of products to bring to our customers.

22  Q.   You don't want to know if they're using peer-to-peer for

23  unlawful activity, correct?

24  A.   Well, again, peer-to-peer is different from copyright

25  infringement, but we do not want to distribute products to

S. Negretti - Cross

1914

1    consumers that enable them to use the internet illegally.

2    Q.   Well, but you know that a substantial portion of -- well,

3    let's put aside the word "substantial."  Whatever portion it is

4    of Cox's customer base that is engaging in peer-to-peer

5    activity, there is a certain known percentage for that,

6    correct?

7    A.   There is a certain known percentage of consumers during

8    this time period that we're talking about, 2013 to '14, that

9    use the internet for peer-to-peer services, correct.

03:02:12 10    Q.   And whatever that figure is, whether it's 20 percent, 30

11    percent, or some other figure, you are unaware of Cox ever

12    attempting to do research to understand the extent to which

13    that peer-to-peer activity is infringing activity, correct?

14    A.   I'm unaware of how it's being used in a relevant way for

15    us to make marketing decisions, correct.

16    Q.   Right.  Because you don't want the research in order to

17    stem the tide of infringement.  You want it to help you sell

18    more internet service, correct?

19    A.   I want the research to be able to educate myself and my

03:02:44 20    teams on how we can build products and services to maintain

21    relationship with existing customers as well as field new

22    customers for our internet service.

23    Q.   Sir, you're aware of what a close-ended question is in a

24    survey, are you not?

25    A.   Yes, absolutely.

S. Negretti - Cross

1915

1  Q.    And a closed-ended question is, it's kind of a multiple

2  choice question, isn't it, where the options are laid out

3  before you?

4  A.    Yes.  That's an example of a closed-ended question,

5  correct.

6  Q.    Right.  As opposed to a freeform question, where the

7  survey respondent gets to list anything they want, right?

8  A.    That is correct.

9  Q.    Right.  And these surveys you've talking about haven't

03:03:25  10  asked customers whether if Cox were more aggressive about

11  enforcing its authorized usage policy, whether they would

12  discontinue their subscriptions, correct?

13  A.    Well, again, authorized usage policies, peer-to-peer, and

14  copyright infringement are three completely separate areas.  We

15  certainly have asked consumers about acceptable usage policy

16  treatment.  That's different than using the internet for

17  peer-to-peer services, which is also very different from using

18  the internet for copyright infringement.

19  Q.    Well, so on one hand, you're testifying about what you

03:04:00  20  know from a product marketing perspective.  Now it seems you

21  have some knowledge about copyright infringement, so I'd like

22  to focus on the copyright infringement knowledge for a moment.

23        I asked you before about how many Cox subscribers

24  were the subject of plaintiffs' notices.  Do you recall that?

25  A.    I do.

S. Negretti - Cross

1916

1  Q.   Do you recall roughly how many notices plaintiffs sent to

2  Cox concerning whatever that amount of infringing subscribers

3  is?

4  A.   I don't have that information, unfortunately, no.

5  Q.   Do you know roughly how many copyright infringement

6  notices Cox receives in a year?

7  A.   I do not have that information, no.

8  Q.   As a product marketer, you used the term "value

9  proposition" before, right?

03:04:45  10  A.   That is correct.

11  Q.   Right.  So your job is to figure out how to add more value

12  to consumers, to attract and retain, retain subscribers,

13  correct?

14  A.   I'll buy that, yes.

15  Q.   And if, if speed and price are equal, Cox hopes that

16  better customer service will be what helps it attract and

17  retain subscribers, correct?

18  A.   That would be one of the additional attributes, correct.

19  Speed -- aside from speed and price, customer service, trust,

03:05:21  20  reliability.

21  Q.   And, in fact, Cox hopes that even if at times it has a

22  slower service or is pricier, that its customer service will

23  lead consumers to want to be a Cox subscriber, correct?

24  A.   Yeah.  If we are not able to adequately compete on speed,

25  such as a city that we're in today, where Verizon Fios offers

S. Negretti - Cross

1917

1 service, yes, by enabling a better customer service experience,

2 higher levels of trust, or stronger reliable services, we hope

3 that that would be able to win a customer, yes.

4 Q.   And I believe you said before that Cox knows that some

5 segment of its subscribers use its service for copyright

6 infringement, right?

7 A.   Yes, that's correct.

8 Q.   Right.  And, in fact, it's not just a general knowledge.

9 It receives infringement notices from particular rights owners

03:06:06 10 telling Cox which particular accounts are being used for

11 infringement, correct?

12 A.   I'll have to trust you on that.  That's not information

13 that I have or know or understand.

14 Q.   Well, you understand what infringement notice is?

15 A.   I do understand, but I don't understand the process in

16 which Cox received notices from other entities.

17 Q.   Well, so let's talk about the segment of the Cox customer

18 base that wants to use the service for infringement, okay?

19 A.   I don't have a lot to give you an answer on that, but

03:06:36 20 we'll try, yes.

21 Q.   Well, I mean, you've already said that there is some

22 segment of Cox's customer base that uses the service for

23 infringement.  We've already established that, right?

24 A.   Yes.

25 Q.   Okay.  So whatever that pool of subscribers is, whatever

S. Negretti - Cross

1918

1   size it is, Cox's service is more appealing for those

2   subscribers, is it not, if Cox gives, gives that subscriber

3   warning after warning, without terminating their service?

4   A.   I don't have any substantiation for that.

5   Q.   Well, you used the term "friction" in your direct

6   testimony.  Do you recall that?

7   A.   I do.

8   Q.   Friction is something the customer doesn't want, correct?

9   A.   That's correct.  That's correct.

03:07:16 10   Q.   Something that interferes with them using the service how

11   they want it, when they want it, right?

12   A.   Correct.

13   Q.   In the way they want it, right?

14   A.   That's correct.

15   Q.   For instance, a suspension would be an example of

16   friction, correct?

17   A.   Perhaps.  If a customer was suspended for not paying our

18   bill, regardless of the level of friction it creates, we don't

19   want to have a relationship with them.  If a customer was

03:07:41 20   suspended for doing something fraudulent or illegal, we

21   wouldn't mind that friction because we wouldn't want to have a

22   relationship with them.

23   Q.   So your testimony is that if Cox is aware that its

24   customer has violated the rules for using its service, it

25   doesn't want a customer relationship with them; correct?

S. Negretti - Cross

1919

1    A.    That is correct.

2    Q.    So there'd be no reason for Cox to be told again and again

3    and again and again of specific subscribers engaging in

4    infringement but retain them as a customer, would there?

5    A.    I don't have details on that, but I can trust that that

6    would be something we would not want to do.

7    Q.    You want your customers to have a deep connection with the

8    Cox service, right?

9    A.    That's right.

03:08:22 10   Q.    And friction gets in the way of that, right?

11   A.    Correct.  It does.

12   Q.    For example, if you're identified in notices as being an

13   infringer and your service is suspended, that's an example of

14   friction, right?

15   A.    Well, if -- again, what we were just talking about, that

16   may be an example of friction for the consumer that we're

17   willing to take on because the consumer might be doing

18   something illegal that we don't want to do business with them.

19   Q.    You're aware, as we've been talking about, that Cox has a

03:08:50 20   set of rules that govern its customers' use of its internet

21   service, right?

22   A.    I am aware of that, yes.

23   Q.    It's called an AUP?

24   A.    Acceptable Usage (sic) Policy, yes.

25   Q.    And one of the things it does is prohibit use of the

S. Negretti - Cross

1920

1    service for copyright infringement, right?

2    A.    That's correct.

3    Q.    Your view, am I correct, is that if a company has a set of

4    rules but it doesn't enforce those rules because it thinks that

5    not enforcing those rules will give its customers some added

6    value, that that would be a company engaging in fraud, correct?

7    A.    That is not my view, no.

8    Q.    Well, sir, do you recall when I took your deposition in

9    this matter?  Do you recall that?

03:09:32 10   A.    Sure, absolutely.

11   Q.    It was on June 14 of this year?

12   A.    That's correct.

13   Q.    You had Cox's counsel with you at that deposition, right?

14   A.    I did, yes.

15   Q.    And you took an oath to tell the truth in that deposition,

16   right?

17   A.    To the best of my ability to the understanding of the

18   questions being asked, correct.

19   Q.    And you took that oath seriously and told the truth,

03:09:54 20   right?

21   A.    Absolutely.

22   Q.    So I'm going to now read you beginning at page 140 of your

23   deposition, at line 17.

24            Question:  Are you aware of whether Cox considers not

25   enforcing its authorized usage policy as something as a means

S. Negretti - Cross

1921

1  for giving added value to customers?

2         Now, here's your answer:  That's a funny statement.

3  I have to be honest, because you're saying -- you're literally

4  saying that we say the Acceptable Use Policy that we give and

5  distribute to every one of our customers, that we ask for the

6  customer compliance on, we would not enforce that as a way of

7  delivering added value, and that statement doesn't make a whole

8  lot of sense.  That statement essentially builds to fraud, and

9  I don't know that a company could stay in business very long if

03:10:42 10  we were to conduct ourselves in a way that, you know, willfully

11  commits fraud.

12  A.   Correct.

13  Q.   That was your accurate testimony, correct, sir?

14  A.   That was my testimony.

15         MR. ELKIN:  Objection.  He misread.  He left out a

16  few words that were important.

17         MR. ZEBRAK:  Well, I'm happy to read it again.  I

18  don't think I did, but I'll read it more slowly this time.

19         THE COURT:  All right.  Do so.

03:11:04 20  BY MR. ZEBRAK:

21  Q.   Okay.  I'm going to try and read it more slowly.

22         Let's play the video.  This way there will be no

23  issue about it.  We have that teed up.  Would you play that,

24  Mr. Duval?

25  VIDEO EXCERPT PLAYED AS FOLLOWS

1922

BY MR. ZEBRAK:

Q.   Are you aware of whether Cox considers not enforcing its authorized usage policy as something -- as a means for giving added value to customers?

A.   That's a funny statement.  I have to be honest because you -- you're saying -- you're literally saying would we say the Acceptable Use Policy that we give and distribute to every one of our customers, that we ask for the customer compliance on, would we not enforce that as a way of delivering added value, and that statement doesn't make a whole lot of sense. That statement essentially builds to fraud, and I don't know that a company could stay in business very long if we were to conduct ourselves in a way that, you know, willfully commits fraud.

END OF VIDEOTAPE EXCERPT

BY MR. ZEBRAK:

Q.   That was your -- that was you in the testimony that, that you just saw and that I tried to read correctly, right?

A.   Yes.  That's the same testimony that you just read, correct.

Q.   And, and -- well, let's just move on.

Sir, you're aware that copyright infringement is unlawful, correct?

A.   That is correct.  I've stated that, yes.

Q.   Are you aware that Cox has received dozens or more

1923

1  infringement notices for particular specific subscribers but

2  not terminated their service?

3  A.   I don't have all the details other than the context of

4  that statement.

5  Q.   And you do accept, do you not, sir, that it's more costly

6  for Cox to obtain a new customer than it is to retain an

7  existing one, correct?

8  A.   Yes.  Independent of the previous statement that you just

9  made, it is more expensive for us to acquire new subscribers in

03:12:58 10  the marketplace than maintain existing ones.

11  Q.   Sir, are you familiar with who inCode is?

12  A.   I am familiar with the company, yes.

13  Q.   It's a strategic advisor for Cox, correct?

14  A.   Strategic advisor for many years of Cox, correct.

15  Q.   And you, you receive and have access to inCode documents

16  as a regular part of your job, correct?

17  A.   In the past, there have been documents received by inCode.

18  In my current role, I have not seen many of those, if at all.

19  Q.   Well, I'm going to show you two inCode documents.  We're

03:13:35 20  going to talk about each of them briefly.  They're each already

21  admitted into evidence in this case.

22         The first one is PX 212.  If you could pull that up?

23  And if I could have the binders, please?

24  A.   Okay.

25  Q.   All right.

S. Negretti - Cross

1924

1    A.    I have it on the screen.

2    Q.    And, sir, the first document I'm going to ask you to look

3    at, which has already been admitted into evidence, is PX 212.

4    It's in tab -- should be tab 4 of your binder.  If you'd just

5    let me know once you're there.

6    A.    Titled "Midterm Readout"?

7    Q.    Yes, sir.

8    A.    That's correct, yes.

9    Q.    Okay.  So, again, this is a -- and you've seen this

03:14:29  10   document before, correct?

11   A.    Yes.  This is a document that we reviewed during the

12   deposition process, correct.

13   Q.    Right.  And a document that you reviewed in preparation

14   for your deposition as well, correct?

15   A.    Both in preparation and during the deposition itself.

16   Q.    Right.  And this, this document is among other things

17   doing an analysis to help Cox forecast broadband data usage for

18   the 2012 to 2015 time frame, correct?

19   A.    That's correct.

03:14:56  20   Q.    Okay.  So I'd like to turn your attention, sir, to page 4

21   of this document, where it says "Executive Summary."

22   A.    Okay.

23        MR. ELKIN:  And could you highlight the second bullet

24   point, please?

25   BY MR. ELKIN:

S. Negretti - Cross

1925

1  Q.   Do you see where it says:  P2P is the most

2  bandwidth-intensive category?

3  A.   Yes.

4  Q.   You don't have any reason to dispute that at the time of

5  this research report from Cox's strategic advisor, inCode, that

6  peer-to-peer was not the most bandwidth-intensive category, do

7  you?

8  A.   In context, I don't have enough information, but I have to

9  trust that this is what the document represents.

03:15:38  10  Q.   Okay.  So let's -- there are a few things in this

11  parentheses.  This document says that -- after saying that P2P

12  is the most bandwidth-intensive category, it indicates that P2P

13  households are 13 percent of all broadband households.  Is that

14  correct?

15  A.   That's what this document says, correct.

16  Q.   So is that, in effect, saying that -- according to inCode,

17  that if you look at the pool of households that subscribe to

18  broadband services, that 13 percent of them are using P2P,

19  correct?

03:16:11  20  A.   That would be correct.

21  Q.   Okay.  And it's saying here that on average, P2P

22  households use 82 gigabytes per month, right?

23  A.   Correct.

24  Q.   And it's saying here that that accounts for 21 percent of

25  all internet traffic, right?

S. Negretti - Cross

1926

1   A.   Correct.

2   Q.   And as we sit here today, you have no reason to dispute

3   these figures, do you?

4   A.   I do not.

5   Q.   So when Cox received -- receives a research survey like

6   this indicating that -- well, first of all -- strike that.

7        Do you think that -- so if Cox is told that 13

8   percent of its customer base is using P2P, would you call that

9   a substantial portion of its customer base?

03:17:02 10   A.   I'd have to see the other uses to compare it to.  If the

11   other uses were in the 40 and 50 percent range, then it might

12   not be substantial.

13   Q.   So does Cox consider 13 percent of its overall customer

14   base to be a substantial portion of its customer base?

15   A.   Again, the term "substantial" is subjective, so it's 13

16   percent.

17   Q.   If Cox lost 13 percent of its customer base, it wouldn't

18   regard that as insubstantial, would it?

19   A.   That's correct.

03:17:31 20   Q.   Okay.  So when Cox receives a research survey like this,

21   does Cox try to understand how much illegal activity is

22   happening within that very large percentage of its customer

23   base?

24   A.   I'm not sure I associate peer-to-peer on this slide as a

25   bullet point as being tied to illegal activity in any way.

S. Negretti - Cross

1927

1   It's not indicated as so.

2   Q.   Well, you recall Mr. Elkin asking you questions about

3   reviewing industry studies, right?

4   A.   Correct.

5   Q.   Right.  So are you familiar with the fact that

6   peer-to-peer is overwhelmingly infringing activity, close to

7   100 percent?

8   A.   I am not aware of the specifics about peer-to-peer

9   activity other than to say peer-to-peer activity is used in

03:18:08 10   many forms.

11   Q.   Okay.  But you understand, sir, that regardless the exact

12   percentage, it's predominantly used for infringing activity, do

13   you not?

14   A.   I don't have any evidence to support that.

15   Q.   And you don't have any evidence -- so you don't have any

16   evidence to dispute it, do you?

17   A.   Other than the fact of saying -- making that statement, it

18   could be incorrect because it's not stated as so in the

19   document.

03:18:33 20   Q.   So -- excuse me a second.

21        I apologize.

22        THE COURT:  You're excused for your own counsel

23   interrupting you and making it difficult for you to regain your

24   train of thought.  Maybe you ought to rethink that.

25        MR. ZEBRAK:  Thank you, Your Honor.  If my two

S. Negretti - Cross

1928

1    teenage daughters were here right now, they would be the first

2    to say I have a delicate concentration.

3    BY MR. ZEBRAK:

4    Q.   Okay.  So from a sales and marketing perspective, when you

5    see a figure like that indicating that a very substantial

6    portion of Cox's customer base uses the service for P2P

7    activity, does it matter to you whether it's legal or illegal

8    usage?

9    A.   Yeah, it absolutely would matter.

03:19:56   10    Q.   In what sense?

11    A.   Well, if the correlation was made that peer-to-peer

12    traffic is being used for illegal purposes, we wouldn't want to

13    be able to support that in any way.  If it's being used for

14    legal and authentic purposes and it's of value to us, we'd want

15    to be able to understand more about it so perhaps we could

16    tailor products, services, or messages towards it.

17    Q.   All right.  You already said, sir, did you not, that you

18    don't really understand what happens when a copyright

19    infringement notice comes in to Cox, right?

03:20:23   20    A.   I do not have full detail on the copyright infringement

21    process with Cox, correct.

22    Q.   Right.  So you don't really know what the group that

23    handles Cox's response to infringement notices does after an

24    infringement notice comes in, do you?

25    A.   That's correct.

S. Negretti - Cross

1929

1    Q.    Right.  So when you say Cox wouldn't want to support an

2    illegal usage, you're just speaking from your personal

3    perspective, right?

4    A.    From a sales and marketing point of view.

5    Q.    Right.  You don't know about all those other areas of the

6    company like the abuse group and the folks they report up to

7    that might think very differently, do you?

8    A.    I don't have firsthand knowledge of what that group's

9    extent is, no.

03:20:58 10  Q.    So let's look at -- well, actually, before we leave this

11   document, I'd like you to remember that, the 82 gigabytes per

12   month that the average peer-to-peer household used at the time

13   of this midterm readout.  Okay?

14   A.    Okay.  Sounds good.

15   Q.    Let's look at the next document, which has already been

16   admitted into evidence, and it should be in your binder.  It's

17   PX 214, and this is the final readout.  It should be behind

18   tab 6 in your binder.  Let me know when you're there, sir.

19   A.    Okay.  I have this.

03:21:39 20  Q.    And this is also a document you've seen before, right?

21   A.    That's correct.

22   Q.    Okay.  And this is the final readout that came after that

23   midterm readout, right?

24   A.    I'm assuming by the title of it, yes, that's correct.

25   Q.    And this is a document you saw in preparing for your

S. Negretti - Cross

1930

1    deposition, right?

2    A.    That's correct.

3    Q.    Did you see that document in the few weeks you spent

4    preparing for today's trial as well?

5    A.    I did not, no.

6    Q.    So could you turn -- well, first of all, in this final

7    readout, inCode had verified its, its analyses by matching it

8    against actual Cox usage data, right?

9    A.    I do recall that, right.

03:22:26 10    Q.    Can you turn to page 4 of this document, sir?  So -- and

11    specifically, if you could look under where it says Data Usage

12    Trends and look at the third bullet point?

13         If you could highlight that, Mr. Duval?

14    A.    Sure.

15    Q.    Excuse me, the second bullet point.  My apologies.  I'm

16    looking sideways.  That's my fault.

17         Do you see where it begins with:  The average

18    household?

19    A.    Yes.

03:23:02 20    Q.    So here it says the average household in 2011 used 37.3

21    gigabytes per month of traffic, right?

22    A.    That is correct.

23    Q.    And so that's less than half of the average peer-to-peer

24    household, right?

25    A.    Well, yes, by mathematical standards, that's correct.

S. Negretti - Cross

1931

1    Q.   Right.  And to -- the more data that you use, the more

2    speed you need, right?

3    A.   I'm sorry, could you repeat that?

4    Q.   More data requires more speed, right?

5    A.   Yes.  Usually, yes.

6    Q.   Right.

7    A.   It's not a requirement, but usually people who want more

8    data will get more speeds.

9    Q.   Right.  And could you turn, sir, to page 25 of this

03:23:53 10   document?  So this slide is profiling online activities for Cox

11   to use as inputs for a data calculator, right?

12   A.   This is correct.

13   Q.   And a data calculator is where Cox tells its customers by

14   engaging in the following type of activity, you use the

15   following kind of data, and it helps them forecast what tier to

16   subscribe to, right?

17   A.   Yes.  It's a very helpful visual to be able to get a

18   customer to understand what they could use the internet for,

19   correct.

03:24:29 20   Q.   Sure.  And can you look at the right column that says Life

21   Style Activities?

22   A.   Yes.

23   Q.   And do you see where it says P2P BitTorrent?

24   A.   I do see that.

25   Q.   Does Cox regard P2P and BitTorrent as a lifestyle

S. Negretti - Cross

1932

1    activity?

2    A.   Cox doesn't -- at least Cox's sales and marketing group

3    doesn't regard peer-to-peer and/or BitTorrent in many regards

4    whatsoever.

5    Q.   Do you personally think that P2P is a -- or BitTorrent is

6    a lifestyle activity?

7    A.   I don't have a comment on that matter, unfortunately.

8    Q.   But you do understand that copyright infringement is

9    unlawful, correct?

03:25:05  10    A.   I do.

11    Q.   Okay.  You can put that document aside.

12          So you said that from 2014 to 2016, you oversaw

13    marketing for Cox's internet service across the whole United

14    States, right?

15    A.   That's correct.

16    Q.   And before that, you were in charge of several important

17    geographic markets for Cox but not restricted solely to the

18    internet service; is that right?

19    A.   That's correct.

03:25:41  20    Q.   Okay.  So you're well familiar, are you not, sir, that

21    when Cox advertises its internet service, a key issue that it

22    markets to its subscribers is speed?  We've talked about that,

23    right?

24    A.   That is correct.

25    Q.   Right.  And when Cox markets speed, it doesn't do it in

S. Negretti - Cross

1933

1    the abstract, right?  It tries to relate it to specific online

2    activities; is that correct?

3    A.   That's absolutely my mission and our mission as a company,

4    to help the customer understand that, correct.

5    Q.   Right.  Because just seeing bits and bytes doesn't mean

6    anything to a customer.  They want to know how fast can I do a

7    certain kind of activity, right?

8    A.   That is correct.

9    Q.   Okay.  So it is true, is it not, sir, that downloading

03:26:21 10  music is one of the key online activities that Cox has marketed

11   to consumers while trying to sell its internet service?

12   A.   It is definitely a key activity.  It's not the only

13   activity, but it's definitely a key activity.

14   Q.   So -- and, in fact, it's been a very effective marketing

15   message for Cox, has it not, to advertise use of its internet

16   service for downloading music?

17   A.   Again, I think that's a subjective answer to whether it's

18   been very effective.  It is an element that we have used in

19   different marketing messages in the past, correct.

03:26:50 20  Q.   You'll acknowledge that it's been effective for Cox to

21   advertise downloading music as a marketing message to sell its

22   service, right?

23   A.   I acknowledge that we have used it.  We do not currently

24   use messages like that.  One, the marketplace has changed, and

25   two, the responses to that haven't been overwhelming.

S. Negretti - Cross

1934

1  Q.   Okay.  Sir, I'm going to remind you of something you said

2  when I deposed you, which we've already established that you

3  tried to tell the truth and were under oath, right?

4  A.   That's correct.

5  Q.   Okay.  So page 65 of your deposition, beginning at line 7:

6  So is downloading of music one of the online activities that

7  Cox has advertised in terms of activities where speed can be

8  used?

9         So when downloading music was part of the consumer as

03:27:33  10  a whole, their need to access internet, the internet, when that

11  was important and popular, then that was a marketing message

12  that became effective for us to use.

13  A.   That's correct.

14  Q.   Okay.  So marketing your service to download music has

15  been effective for Cox, correct?

16  A.   Has been effective at different points in time but is not

17  currently an effective message that we use.

18  Q.   So you're saying that today, Cox doesn't advertise

19  downloading music?

03:28:00  20  A.   That's correct.

21  Q.   So why don't we look at -- well, are you aware, sir, that

22  Cox for many years has tried to sell its service by relating

23  speed to downloading music in the form of a hundred songs in

24  three seconds?

25  A.   That's correct.  That is the visual imagery that we were

S. Negretti - Cross

1935

1    trying to connote when it came to music.

2    Q.   Right.  So you admit that for many years, including 2013

3    and '14, Cox has advertised speed in relation to downloading

4    music, correct?

5    A.   I don't know if it was many years, but definitely during

6    that time frame is correct.

7    Q.   And that includes --

8    A.   It was in association with our gig internet products, yes.

9    Q.   And that includes downloading a hundred songs in three

03:28:48 10   seconds, right?

11   A.   Correct.

12   Q.   Right.  And by doing the simply math, a hundred songs in

13   three seconds would be a thousand songs in thirty seconds,

14   would it not?

15   A.   That's correct.

16   Q.   Okay.  Sir, I'm going to show you a document that's

17   already been admitted as evidence in this case as PX 1, and I'm

18   just going to actually just pull it up on the screen.  It's not

19   in the binder that you have in front of you.

03:29:12 20        And I'm going to ask Mr. Duval to scroll through

21   that -- or actually, excuse me, Mr. Ruelas is helping me out,

22   making me look good.

23        Why don't you take a few seconds and look at what's

24   behind tab 1.  That's a list of the sound recordings that are

25   at issue in this case, and there's 6,734 of them.  Take a look

S. Negretti - Cross

1936

```
 1   and tell me if you're familiar with any of those artists as you

 2   flip through it.

 3   A.   I'm familiar with many of them.

 4   Q.   And why is that?

 5   A.   Because these are either artists that I personally enjoy

 6   or artists that the consumers in the marketplace enjoy.

 7   Q.   All right.  And could you turn to the last page of that

 8   document, sir, and tell me, do you agree with me, sir, that

 9   there's 6,734 sound recordings there on that list?

10   A.   I agree the list ends at 6,734.

11   Q.   And will you agree with me, sir, that downloading a

12   thousand songs in thirty seconds means that it takes just about

13   three-and-a-half minutes for someone to download the entirety

14   of that list?

15   A.   That sounds like the correct mathematical assessment if

16   done linearly; that's correct.

17   Q.   Have you ever downloaded amounts like that from iTunes?

18   A.   Well, I don't have that kind of budget, so I can't afford

19   that much music.

20   Q.   Are you familiar with what a permanent download is?

21   A.   No, unfortunately I'm not, other than to say it sounds

22   like something that the customer retains a copy of.

23   Q.   Right.  Well, you understand that streaming involves

24   listening to music, but you don't keep a copy afterwards,

25   correct?
```

03:30:09  10
03:30:41  20

S. Negretti - Cross

1937

```
 1   A.    That's correct.
 2   Q.    Okay.  Whereas permanent download -- you've bought a song
 3   from iTunes before, right?
 4   A.    Absolutely.  Not 6,734 of them, but yes.
 5   Q.    Because it costs money to buy something from iTunes.  Do
 6   you agree?
 7   A.    Yes, that's correct.
 8   Q.    All right.  And after you buy it, you have a copy for
 9   yourself, right?
10   A.    If you download a song through iTunes, yes.
11   Q.    Right.  And when one obtains a recording from a
12   peer-to-peer network, they also obtain a permanent copy of the
13   song, don't they?
14   A.    It sounds like it, yes.
15   Q.    Well, I mean, you're familiar with peer-to-peer networks,
16   aren't you?
17   A.    I am not that familiar with them.
18   Q.    Well, you've used them before, haven't you?
19   A.    I don't know that I have.
20   Q.    You've never used Napster to get music?
21   A.    I don't know that I have or haven't.  It's a long time
22   since Napster's been in business.
23   Q.    Do you recall me asking you about whether you've used
24   Napster at your deposition?
25   A.    I do.
```

03:31:09 (line 10)
03:31:33 (line 20)

S. Negretti - Cross

1938

1    Q.    And do you recall saying that you did?

2    A.    I recall saying I did not have clarity.  I probably did; I

3    don't know.

4    Q.    Your testimony today is you don't recall whether you've

5    ever obtained music from a peer-to-peer network?

6    A.    My testimony is it's been many years since Napster was in

7    business.  I cannot recall based on the different business

8    models that Napster had if I've used Napster, and if I did use

9    Napster, which version of the business model I used.

03:32:28 10    Q.    Sir, in your time at Cox, Cox's high-speed internet

11    product has grown year over year, correct?

12    A.    Yes, that's correct.

13    Q.    And over the course of your time there, Cox's high-speed

14    internet service has become Cox's largest product both in terms

15    of revenue and customers, correct?

16    A.    That is correct.

17    Q.    Cable TV used to be its largest product, but the

18    high-speed internet service is the one that's the future for

19    Cox, right?

03:32:53 20    A.    That is correct.

21    Q.    And Cox still gains more subscribers every year, doesn't

22    it?

23    A.    That is correct.

24    Q.    And Cox faces a tough competitive environment, right?

25    A.    There is a very tough competitive environment in the

S. Negretti - Cross

1939

1    marketplace, yes.

2    Q.   Right.  And it -- and you've testified before that

3    customer service is one of the ways that Cox positions itself

4    against competitors in the marketplace, right?

5    A.   That is correct.

6    Q.   Reducing friction, making it easier for customers to use

7    the service how they want it in the way they want it, right?

8    A.   That is correct.

9    Q.   Now, you said before that there are certain uses of the

03:33:35 10   Cox internet service that Cox does not want to support, right?

11   A.   That is correct.

12   Q.   Copyright infringement, for example, right?

13   A.   That's a good example.

14   Q.   Cox doesn't tell its customers when it markets its service

15   not -- that it can't be used for infringement, does it?

16   A.   When we market the service?  No.  But when the customer

17   signs up for service, they get a document that explains that.

18   Q.   Right.  Knowing that a, that a really substantial portion

19   of its user base uses the service for P2P and that an

03:34:09 20   overwhelming percentage of P2P is infringing, Cox very well

21   could include a marketing statement encouraging customers not

22   to use P2P for infringement, right?

23   A.   Yeah, I'm not sure I follow you on the substantial size of

24   the base, even despite the figure that we looked at.  There

25   were other figures on the page that were larger.

S. Negretti - Cross

1940

1          Secondarily, we focus on the marketing messages that

2    are most enticing to our customers as a whole.

3          And third, in any use of downloading music,

4    association with peer-to-peer, we're assuming that the consumer

5    is using the products legally and ethically.

6    Q.   Pretty risky assumption, isn't it?

7    A.   It's the assumption we have to go off of.

8    Q.   Because you don't want to know what they're actually using

9    it for?

03:34:55 10  A.   That's not what I'm stating.

11   Q.   Okay.  Well, let's take a step back.  It's your view, is

12   it not, that it would not go over well with Cox's customers if

13   in your marketing you said we have a really fast music, but

14   don't steal music, right?

15   A.   It would not go over well because it's irrelevant to most

16   customers that we are trying to marketing to.  It might be

17   funny, but it would not go over well because it's not relevant

18   to the consumers.

19   Q.   Do you recall telling me in your deposition that it

03:35:21 20  wouldn't go over well with Cox's customers for you to encourage

21   people not to steal music?

22   A.   That's correct.

23   Q.   And I think your view is that Cox prides itself on doing

24   what it says it would do, right?

25   A.   That is correct.

1941

1   Q.   Do you know if Cox says that use of its service for

2   infringement is prohibited, but then it doesn't enforce that

3   rule once it knows that someone is caught infringing?

4   A.   I don't have specifics on that.  I could assume that there

5   obviously are some challenges in that area; otherwise, we

6   wouldn't be sitting here today.

7            MR. ZEBRAK:  No further questions, Your Honor.

8            THE COURT:  All right.  Thank you.

9            Redirect?

03:36:03 10            MR. ELKIN:  Thank you, Your Honor.

11                        REDIRECT EXAMINATION

12   BY MR. ELKIN:

13   Q.   Just a couple of questions, Mr. Negretti.

14   A.   Sure.

15   Q.   Counsel showed you some documents from inCode.  Do you

16   remember that?

17   A.   Yes.

18   Q.   Do you know whether that data in those studies was unique

19   to Cox?

03:36:28 20   A.   Well, to be candid, inCode is not a direct customer of the

21   product marketing group, so that study wasn't fielded for

22   product marketing, and so the insight that I have is in

23   preparation for cases such as this as opposed to normal

24   everyday business usage when it comes to documents like that.

25            However, what I can say is that data that they do is

S. Negretti - Redirect

1942

1  largely available to many groups, including Cox, and we decided

2  to build a relationship with them and used that data to be able

3  to understand certain things about data on our network.

4  Q.   And specifically, was it Cox data?

5  A.   I'm sorry, what?

6  Q.   Was it Cox data?

7  A.   It was not Cox data.  It was bounced up -- and we actually

8  talked about that -- it was bounced up against Cox's data to

9  see if there was a match.

03:37:15 10  Q.   Okay.  And there were questions about advertising that Cox

11  did with regard to downloading music.  Do you remember those

12  questions?

13  A.   That's correct, yes.

14  Q.   To what extent were you -- was Cox advertising lawful

15  versus unlawful downloading --

16  A.   100 percent lawful.

17  Q.   Sorry?

18  A.   100 percent lawful, 0 percent unlawful.

19  Q.   How do you know that?

03:37:42 20  A.   Well, because we don't, again, want to do business with

21  people who are infringers or using the internet in any way

22  that's fraudulent or illegal, and we don't create a marketing

23  message in any way for customers who are using it in any way

24  other than the most ethical ways.

25       MR. ELKIN:  One second.

1943

1    I have no further questions.

2    THE COURT:  All right.  May this witness be excused?

3    MR. ELKIN:  Yes, please.

4    THE COURT:  All right.  Thank you, sir.  You're

5    excused at this time.  Please don't discuss the testimony

6    you've given with anyone until our trial is over.  All right?

7    THE WITNESS:  Sounds great.

8    THE COURT:  All right.  Have a good afternoon.

9    THE WITNESS:  Thank you very much.

03:38:28 10    WITNESS EXCUSED

11    MR. ZEBRAK:  Thank you, sir.

12    THE COURT:  It's a little early, but are you ready

13    for a break?  Is that a yes, sir?  All right.  Let's take our

14    mid-afternoon break, and maybe we'll break a little later for

15    short, but let's take 15 minutes now.  Thank you.  You're

16    excused.

17    NOTE:  At this point, the jury leaves the courtroom;

18    whereupon the case continues as follows:

19    JURY OUT

03:39:13 20    THE COURT:  All right.  Anything before we break?

21    MR. OPPENHEIM:  I don't know -- we're trying to

22    resolve some issues with Ms. Weber's demonstratives.  I'm not

23    sure where we are with them.  Maybe if we just have a few

24    minutes, Your Honor, and then before the jury comes back, if we

25    haven't resolved something, we can determine.

1944

```
 1              THE COURT:  All right.  We're in recess then.

 2              NOTE:  At this point, a recess is taken; at the

 3    conclusion of which the case continues in the absence of the

 4    jury as follows:

 5    JURY OUT

 6              THE COURT:  Preliminary matters?

 7              MR. OPPENHEIM:  We got it down to two issues, Your

 8    Honor.

 9              THE COURT:  Okay.

04:04:03 10     MR. OPPENHEIM:  Do you have a set you can share with

11    the judge?

12              MR. BUCHANAN:  I think we can pull it up.

13              MR. OPPENHEIM:  Can you pull it up?

14              MR. BUCHANAN:  22.

15              MR. OPPENHEIM:  So, Your Honor, these are the slides

16    with respect to Dr. Weber --

17              THE COURT:  Okay.

18              MR. OPPENHEIM:  -- that defendants are proposing to

19    use.

04:04:27 20     On the very last line here, you'll see they've

21    included -- sorry.

22              THE COURT:  Go ahead.

23              MR. OPPENHEIM:  They've included the line:

24    Terminating all Cox services could cut off internet access to

25    emergency personnel (police, fire).
```

1945

1        This is exactly the issue that's unresolved because

2   of the Jarchow issue.  We have no idea that these are -- that

3   Cox's provision of service to these police and fire stations is

4   the essential service, and, in fact, I highly, highly doubt it.

5        And so to put that in front of the jury, you know,

6   they're not putting in Sal's Chicken & Waffles, which is also

7   on the list.  They're putting on police and fire, and they're

8   doing it for one specific reason, and there's no foundation for

9   it at this point, Your Honor.  So that's issue No. 1.

04:05:21 10        Issue No. 2 --

11        THE COURT:  Well, let's get -- you're going to put up

12   a different slide, so let's do this one.

13        MR. BUCHANAN:  So there is a foundation, Your Honor.

14   Ms. Trickey testified extensively about -- in response to

15   questionings -- questions on, I think, cross, about the type of

16   business customers they had.  Now, I'll just read a little bit

17   of what she testified to:

18        "Does Cox view the business AUP violations

19   differently than residential AUP violations?"

04:05:52 20        "Well, so how we treat the potential violations, we

21   do have different processes."

22        "Why is that?"

23        "Well, because business customers are very different

24   from residential customers, and as I stated earlier this

25   morning, business customers range from, you know, a very small

1946

1    business up to very large businesses, but they are businesses,

2    and they're largely reliant on their internet service.

3           "You also have many businesses that have users of the

4    internet service who they may not even know who the person

5    actually is, because they could be a doctor's office that

6    offers WiFi, or it could be -- you know, we talked about a

7    hospital.  We've got government buildings, you know, police,

8    fire, all kinds of different buildings, and so you don't always

9    know who the actual -- the identity of who the actual users

04:06:31 10   are."

11          She goes on and is asked:  "What kinds of businesses

12   or entities have Cox Business accounts?"

13          Well, as we talked about this morning, the

14   mom-and-pops, the coffee shops, the bagel stores, but also

15   moving on up the chain, we have government buildings.  We have

16   schools.  We have hospitals.  We have doctors' offices,

17   dentists' offices and police stations and fire stations and

18   universities --

19          THE REPORTER:  Can you slow down, please?

04:06:52 20   MR. BUCHANAN:  Okay.  I'm sorry.

21          THE COURT:  That's all I need to hear.  All right.

22   I'm going to allow the exhibit, and you can cross-examine on

23   what Ms. Weber knows.

24          What's the other one?

25          MR. OPPENHEIM:  The next is slide 28, Your Honor.

1947

1    And if we could pull up slide 28?  And then I'll pull up

2    another document.

3            So they propose to have Ms. Weber testify as to the

4    price per notice under the RIAA contract, but the contract

5    doesn't in any way contemplate a price per notice, and, in

6    fact, if I can pull up the contract, the one relevant page of

7    the contract, Your Honor, what you see is there's an

8    anticipated notice volume, right, which isn't a set notice

9    volume.  It's not X number for this price, but even per month,

04:07:35 10  as the notice volume changes, the price remains the same.

11            So to suggest to the jury that, that the plaintiffs

12   were paying a price per notice, there's no foundation for that.

13   It's inaccurate and misleading, and there's no foundation for

14   it, Your Honor.

15            MR. BUCHANAN:  Well, what that shows, this is

16   basically simple arithmetic.  The, the anticipated amount of

17   notices that would go to Cox was exactly the amount --

18            THE COURT:  Meaning going from 200 or 400 --

19            MR. BUCHANAN:  Right.

04:08:12 20           THE COURT:  -- or 600?

21            MR. BUCHANAN:  Yeah.  I think that said 9,000 maybe,

22   I think, I couldn't see the small print, but whatever the

23   number is, it's anticipated, but that's what they actually

24   agreed to, that's what they actually did or tried to do, and

25   we -- it just merely subtracted the amount, you know, under the

1948

1    contract that was provided, and we came up with a per notice.

2            I mean, he can cross-examine her on this.  It's very

3    simple.  She'll just say, I looked at the contract.  I looked

4    at the total amounts.  I looked at what you said.  I divided it

5    by what the price was, and I came up with these amounts per

6    notice.

7            MR. OPPENHEIM:  Your Honor, the 9,000 -- so the

8    one -- let's pull that one back up, if we can.  The Cox number

9    was static.  This -- I pulled up 2014, but we could pull up any

04:09:00 10  year.  Okay?  And in 2014, you see that the Cox number is

11   static.

12           THE COURT:  I don't see it.

13           MR. OPPENHEIM:  There we go.

14           THE COURT:  Where -- what column and line?

15           MR. OPPENHEIM:  Cox is in the second box down.  If

16   you could highlight that, Mr. Duval, please?

17           So that is static.  There's no pricing for just Cox,

18   no pricing for just Cox.  So the pricing is at the bottom, and

19   you'll see that even though the volumes -- so if you look at

04:09:27 20  the top, for instance -- and the best example is, where you can

21   see it is -- well, actually it's in the last one, not this one,

22   but the pricing is not per notice, and you can't divide it out.

23           If you went back to 2013, you'd see a ramp-up in

24   notices, and yet the pricing per month remained the same.  This

25   is anticipated notice volume.

1949

1          The only one who had a set cap was Cox.  There's

2    testimony as to that.  So to suggest that there was a -- that

3    you could do this or that MarkMonitor was willing to -- that

4    they based their charges per notice is misleading.  There's no

5    testimony of that.

6          They could easily have asked Mr. Bahun, do you charge

7    per notice?  Do you increase your pricing by notice?

8          They could have asked all those questions.  They

9    chose not to ask it.  There's absolutely no basis to suggest

04:10:20  10    that there is a price per notice.

11          They're free to talk about the overall cost, right,

12    that's in the record, and they can do that, but this suggestion

13    is, there's no foundation for it.

14          MR. BUCHANAN:  Your Honor --

15          THE COURT:  Yes.

16          MR. BUCHANAN:  -- still it's just a simple

17    mathematical.

18          Those are the numbers that actually were sent, the

19    witness will testify that she talked about in her report.

04:10:47  20          THE COURT:  The question is if there's any evidence

21    that anybody contemplated a price per notice, and Bahun didn't

22    testify to that and --

23          MR. BUCHANAN:  Yeah, they wouldn't produce their

24    billing information, so we couldn't get that.  However, this is

25    something that was in the report.  She didn't do it by price,

1950

1    but she talks about all the contracts and what the, the amounts

2    were under the contracts, the amount of notices, and this --

3    you can always have a volume and divide it by what the price is

4    to break it down for notice.  People do that all the time.

5            THE COURT:  All right.  I'm going to allow it.

6            MR. BUCHANAN:  Okay.

7            THE COURT:  Your exception is noted.  And you can

8    cross-examine it.

9            MR. OPPENHEIM:  I'm sorry, you said you are going to

04:11:32  10    allow it?

11            THE COURT:  I'm going to allow it, yes, I am.

12            MR. ELKIN:  Your Honor, one more housekeeping thing,

13    which is we were going to call in our case Jill Lesser, who is

14    the former executive director of the Center for Copyright

15    Information, and pursuant to a stipulation, where in lieu of

16    her attending in our case, we would -- counsel for the

17    plaintiffs have agreed to stipulate to the admission of two

18    exhibits that I'd like to offer into evidence now.

19            THE COURT:  Yeah, go ahead.

04:12:10  20            MR. ELKIN:  That would be Defendants' Exhibit 65 and

21    Defendants' Exhibit 66.  These are, I guess I will characterize

22    them as FAQs that were on the Center for Copyright Information

23    and Copyright Alert System.

24            THE COURT:  Okay.  And there's no objection?

25            MR. OPPENHEIM:  No objection, Your Honor.

L. Weber - Direct

1951

1    THE COURT:  Okay.  They're received.

2    MR. ELKIN:  Thank you, Your Honor.

3    THE COURT:  Thank you.

4    All right.  Let's get our jury, Joe, please.

5    NOTE:  At this point, the jury returns to the

6    courtroom; whereupon the case continues as follows:

7    JURY IN

8    THE COURT:  All right, please have a seat.

9    Next witness, Mr. Buchanan?

04:13:20 10    MR. BUCHANAN:  The defense would call Dr. Lynne

11   Weber, Your Honor.

12   LYNNE JANET WEBER, PH.D., DEFENDANTS' WITNESS, SWORN

13   THE COURT:  All right, good afternoon.

14   Please, Mr. Buchanan, proceed, sir.

15                      DIRECT EXAMINATION

16   BY MR. BUCHANAN:

17   Q.   Dr. Weber, can you please state your full name for the

18   record, spell your last name, please?

19   A.   Lynne Janet Weber, W-e-b-e-r.

04:14:22 20   Q.   Dr. Weber, did you prepare some demonstratives to use as

21   you walk through your background and anticipated testimony

22   today?

23   A.   I did.

24   MR. BUCHANAN:  With the Court's permission, could we

25   bring these up?

L. Weber - Direct

1952

1    THE COURT:  Yes, sir.

2    MR. BUCHANAN:  Thank you.

3  BY MR. BUCHANAN:

4  Q.   So to start, could you explain your educational background

5  to the jury, please?

6  A.   I can.  So I started out on the East Coast, and I went to

7  undergraduate school at Cornell University, where I earned a

8  Bachelor's Degree in Mathematics; and then after that, after

9  four cold winters in upstate New York in the snow belt, I ran

04:15:01 10  out to California, where I went to graduate school at Stanford,

11  and I earned a Master's in Statistics and a Ph.D. in Operations

12  Research.

13  Q.   And, Dr. Weber, are you married?

14  A.   I am.  I have a wonderful husband.  For more than 30

15  years, we've been married.

16  Q.   Do you have any children?

17  A.   I do.  I have two beautiful children, a boy and a girl,

18  aged 31 and 28.

19  Q.   So you indicated that you got your Ph.D. in Operations

04:15:35 20  Research.  Could you briefly describe what operations research

21  is for the jury?

22  A.   Sure.  Operations research is the application of math to

23  solving business problems.

24  Q.   Okay.  So after you got your Ph.D., what did you do next?

25  A.   So after that, I joined a small consulting company.  I

L. Weber - Direct

1953

1    think I was employee No. 12 or 13 when I joined.  And they did

2    a wide, wide variety of things, and I stayed with them for 18

3    years, became a principal after a few years, and then we let

4    ourselves get acquired by PricewaterhouseCoopers.  That's a

5    very large audit and accounting firm.

6            And then three years after that, so the part of

7    PricewaterhouseCoopers that had acquired us, that same piece

8    was sold to Standard & Poor's, so I -- after being a principal

9    at PricewaterhouseCoopers, I became a managing director at

04:16:44 10   Standard & Poor's, and then four years after that, that came

11   group was sold to Duff & Phelps.  So I became managing director

12   at Duff & Phelps at that time in 2005, and I've been there ever

13   since.

14           So it kind of looks like I've, I've moved around

15   companies a lot, but really I haven't looked for a job in 39

16   years.  It's just that the name over the door keeps changing.

17   Q.   Okay.  And what do you do at Duff & Phelps?

18   A.   So I'm a managing director.  I do a wide variety of

19   things, mostly involving quantitative analysis of some kind.

04:17:25 20   So I develop financial projections, I conduct market research,

21   I do data analysis, I do statistics, and I do that -- all of

22   that work, I do that work for companies who have business

23   problems, applying my skills and training, and then I also --

24   with part of my time, I also serve as an expert witness in

25   disputes like this.

L. Weber - Direct

1954

1   Q.   Have you developed any expertise in the topic of consumer

2   behavior?

3   A.   Yes.  Actually, that was the first area that I was

4   attracted to at Applied Decision Analysis when I started was

5   forecasting markets for new products and services.  So my

6   company, for example, think forecasting the market for cell

7   phones in 1984.  Think about forecasting the market for

8   electric cars in 1991, or we did it again in 2000.

9          So forecasting the market for new products and

04:18:33 10   services, in order to do that, you needed to really understand

11   consumers -- potential customers for these new technologies,

12   these new products and services, and so I conducted a lot of

13   market research.  I moderated over 200 focus groups.  I've led

14   more than 200 market research surveys.  I've done more than 200

15   engagements with companies to help them understand and forecast

16   their markets.  I've built over a hundred models of product

17   marketplaces over the course of my career.

18   Q.   Have you ever been engaged as an expert in a lawsuit or

19   dispute?

04:19:19 20   A.   I have.

21   Q.   On how many occasions?

22   A.   It's more than 60 matters at this point.

23   Q.   Okay.  Have you ever testified at a trial or an

24   arbitration?

25   A.   I have.  I've testified -- before this I've testified once

L. Weber - Direct

1955

1    in federal court, four times in arbitrations, including

2    international arbitration.

3    Q.   How about in depositions?

4    A.   Between 15 and 20 depositions.

5    Q.   So you've reviewed your educational and professional

6    background.  What areas do you believe you have an expertise?

7    A.   So I believe I have expertise in data and -- data

8    analysis, data analytics, in statistics, and in consumer

9    behavior.

04:20:06 10   Q.   Okay.  Do you have a copy of your most recent résumé or

11   curriculum vitae?

12   A.   I assume it's in the binder here.

13        Yes, I do.

14   Q.   It's DX 173?

15   A.   That's correct.

16   Q.   Okay.  And did you prepare that in anticipation for your

17   testimony here today?

18   A.   Yes.  I prepared this when I did my original expert

19   report.

04:20:43 20        MR. BUCHANAN:  Okay.  And I would like to move DX 173

21   into evidence.

22        THE COURT:  Any objection?

23        MR. OPPENHEIM:  No objection, Your Honor.

24        THE COURT:  It's received.

25   BY MR. BUCHANAN:

L. Weber - Direct

1956

1    Q.    So in what industries or sectors do you typically work?

2    A.    So I work cross-industry.  Over the course of my career,

3    I've probably worked in dozens of different industries, but

4    more of my work than any other industry is in high tech,

5    including telecommunications.

6    Q.    Do you have any experience with copyright?

7    A.    Well, I'm not a lawyer, but I have worked on a few

8    copyright cases, yes.

9              MR. BUCHANAN:  Your Honor, I'd like to offer

04:21:27 10  Dr. Weber as an expert in the areas of statistics, data

11   analytics, and consumer behavior.

12             MR. OPPENHEIM:  Your Honor, may we approach, please?

13             THE COURT:  Yes, sir.

14             NOTE:  A sidebar discussion is had between the Court

15   and counsel out of the hearing of the jury as follows:

16   AT SIDEBAR

17             THE COURT:  Yes, sir.

18             MR. OPPENHEIM:  Plaintiffs have no objection to the

19   data analytics or the statistics.  The consumer behavior,

04:22:02 20  however, none of the testimony that she's included in her

21   report on consumer behavior should be admissible at this point

22   given the Court's rulings, previous rulings, and so I would not

23   have her certified as to consumer behavior.

24             MR. BUCHANAN:  Your Honor, I, I think she is an

25   expert in that area.  She's not going to testify about the

L. Weber - Direct

1957

1  e-mails, but there may be some areas that she touches on

2  involving consumer behavior.

3          THE COURT:  Where?

4          MR. BUCHANAN:  Well, it could come up on

5  cross-examination, for one.  And also in the areas where she

6  talks about she's worked in the telecommunications industry,

7  there is issues with these, some testimony about the ISPs and

8  if they were terminated, the impact.

9          I don't think I'm going to get into consumer

04:22:48 10  behavior, but I think there's a chance it could come up in

11  cross, so I wanted her to be certified for that purpose.

12          THE COURT:  Okay.  Let's qualify her for the first

13  two and not the last.  So reask your question.  Your exception

14  is noted.  If it turns out she wants to give testimony that's

15  admitted, then certainly we'll qualify her for that as well.

16          MR. BUCHANAN:  Okay.

17          THE COURT:  Okay.  Thank you.

18          NOTE:  The sidebar discussion is concluded; whereupon

19  the case continues before the jury as follows:

04:23:30 20  BEFORE THE JURY

21          THE COURT:  She'll be qualified for data analytics

22  and statistics and -- for purposes of examination right now.

23          MR. BUCHANAN:  Okay.  All right.

24          THE COURT:  All right.  Thank you.

25  BY MR. BUCHANAN:

L. Weber - Direct

1958

1  Q.   Dr. Weber, are you being compensated for your work on this

2  case?

3  A.   Well, actually, Duff & Phelps, my company, is paid for my

4  time.  I do earn a salary, but I'm not compensated particularly

5  for this case.

6  Q.   Okay.  And what is your hourly rate that you're charging

7  with this case?

8  A.   So Duff & Phelps is charging $750 per hour for my time on

9  this case.

04:24:08 10  Q.   So you're not getting all that or a percentage of that?

11  A.   I am not.

12  Q.   And how many hours have you worked on this case,

13  approximately?

14  A.   At this point, it's more than 400.

15  Q.   Okay.  And did you prepare a report in this case?

16  A.   I did.

17  Q.   And did your work, the hours that you spent, a lot of that

18  go into that report?

19  A.   A fair amount, sure.

04:24:33 20  Q.   Did you form any opinions in connection with your work on

21  this case?

22  A.   I did.

23  Q.   Okay.  And could you explain or summarize those opinions

24  to the jury and the Court?

25  A.   Sure.  So I have four opinions that I'm going to be

L. Weber - Direct

1959

1    talking about today.  The first is after each step in Cox's

2    graduated response, fewer subscribers continue to be the

3    subject of copyright infringement notices; the second one is

4    for 88 percent of subscribers, there's more than a year after

5    the last RIAA notice with no more RIAA notices; the third is

6    for the subscribers with the most tickets, the subscribers with

7    100-plus tickets, they're almost all commercial; and the fourth

8    is that the RIAA sent far fewer notices than Cox agreed to

9    allow.

04:25:41 10   Q.   So you have some icons here, starting with -- I don't know

11   if it's a martini glass or golf tee, but could you explain what

12   those are?

13   A.   I think it does look a little bit like a golf tee, but

14   it's not supposed to.  So that first one is supposed to be a

15   funnel to illustrate that you have a lot of subscribers with

16   one or more notice and very few percentage-wise that, by the

17   time you get down to 13 or more notices, but each of these

18   icons is going to be a guidepost so that the jury and I will

19   know where, where I am in my opinions, can follow each section

04:26:22 20   at a time.

21   Q.   So before we go over each of these opinions, could you

22   describe to the jury and the Court what sort of information you

23   reviewed to substantiate and support your opinions?

24   A.   I'd be happy to.  So the two primary data sources that I

25   looked at were the RIAA notice data that I think the jury has

L. Weber - Direct

1960

1    heard a lot of about.  The other one that was primary was the

2    Cox ticket data that the jury has also heard a lot about.

3         I also did look at, at Cox billing data, for example,

4    to be able to tell whether a particular subscriber was

5    residential or commercial subscriber.  And then I also looked

6    at quite a lot of Cox, RIAA, and MarkMonitor documents and

7    depositions.

8    Q.   Can you explain the distinction between the RIAA notice

9    data and Cox ticket data, please?

04:27:28  10  A.   Sure.  So I'll do that with, with an illustrated example.

11   And I'll be brief because I know the jury has heard this

12   probably a lot, but the RIAA notice data, that's in the top

13   left here, that is data from the RIAA.  MarkMonitor is actually

14   sending it.  It has a date, a notice ID, an IP address, among

15   other information.

16        There are also notices coming from other copyright

17   holders into Cox.  Cox -- the notices from the RIAA, they

18   actually all pass Cox's compliance check.  So they, they comply

19   with all of Cox's policies and don't have settlement offers and

04:28:23  20  other things that Cox considers problematic.  Some of the other

21   copyright holders' notices, however, do not comply.

22        So this kind of illustrates graphically that the

23   notices from the RIAA, they all go through and they will be

24   incorporated in tickets in the Cox ticket database, whereas

25   only some of the notices from the other copyright holders will

L. Weber - Direct

1961

1    go through and become incorporated as tickets in the ticket

2    database.

3         And then in the ticket database, we have the data

4    that was produced.  We have the date, a ticket ID, a number for

5    the ticket.  We have the account ID, which identifies the

6    subscriber.  We have the IP address, and we have the actions

7    that were taken based on, on that ticket.

8         And you'll notice that both the RIAA notice database

9    and the ticket database that's Cox's, they both have a date and

04:29:26 10   an IP address, and I think you've already heard testimony that

11   that is how the two are linked together.

12   Q.   And what did you look at with regard to the Cox billing

13   data?

14   A.   So for the Cox billing data, I looked at whether the

15   subscriber was a single family residential subscriber, what's

16   called a multifamily residential subscriber, which is a very

17   small subset of the subscribers at issue here, and the

18   commercial subscribers.  I used it for that.

19        And then I also used it to determine at what point

04:30:09 20   the subscriber left Cox and was no longer being billed, and

21   that -- you'll see that may be -- that will be relevant to some

22   of my analyses.

23   Q.   So let's turn to your first opinion.  Do you have it on

24   the screen?

25   A.   I do.

L. Weber - Direct

1962

1    Q.    And could you explain how you reached conclusions in this

2    opinion?

3    A.    Okay.  So the opinion is that after each step in Cox's

4    graduated response, fewer subscribers continued to be the

5    subject of copyright infringement notices, and by the 12th such

6    notice, the notices stop for the vast majority of subscribers.

7              So that's the opinion, and I got to that opinion by

8    analysis of the RIAA notices as well as the Cox tickets.

9    Q.    Okay.  You used the term "vast majority."  What do you

04:31:06  10    mean by that?

11    A.    So I mean it's not -- it's more than half and it's

12    not just a little bit more than half.  It's, it's the vast

13    majority.  It's -- and for the cases I'm going to talk about,

14    it's over 90 percent.

15    Q.    Do you have additional slides that show your analysis and

16    your results?

17    A.    Yes, I do.  So, so the first thing I looked at was I

18    looked at the RIAA notices.  These are the notices that are in

19    the database that MarkMonitor allegedly sent to Cox.  And the

04:31:46  20    49 percent of the at-issue subscribers here only got one

21    notice -- were only the subject of one notice from the RIAA in

22    the relevant period, which is roughly February 2013 through the

23    end of November 26, 2014.  So almost half only got one.

24              When we go to three or fewer notices, 78 percent, or

25    more than three-quarters of the at-issue subscribers got one,

1963

1    two, or three notices, were the subject of one, two, or three

2    notices from the RIAA.

3              When we get to five, 88 -- 87 percent of the at-issue

4    subscribers were the subject of five or fewer notices from the

5    RIAA.  We go up a little bit more and we see that by the time

6    we get to 12 notices, that 98 percent of the at-issue

7    subscribers were the subject of no more than 12 notices from

8    the RIAA.  So that means that 2 percent got -- were the subject

9    of 13 or more notices from the RIAA in this relevant period.

04:33:18 10   Q.    Okay.  Did you analyze this data in any other way?

11   A.    I did.

12   Q.    Did you put it on a slide?

13   A.    I did.  So, so the -- I have two issues with this data,

14   and the first issue is the set of subscriber accounts is

15   biased.

16   Q.    Which set of accounts?

17   A.    The set of accounts that are in the data, both in the RIAA

18   notice data and also, more importantly, in the, in the Cox

19   ticket data.  That set of subscriber accounts is biased.

04:33:58 20   Q.    Okay.  And you say you took a deeper dive to determine

21   this bias.  First, explain the bias.

22   A.    Sure.  So, I mean, you might think, how can it be biased?

23   It just is the set of at-issue subscribers, right?  You would

24   think it's not biased, but it is biased, and let me see if I

25   can explain how.

L. Weber - Direct

1964

1       So if there's a -- and I'm going to use an example of

2  three notices received, a subscriber who was the subject of

3  three notices from the RIAA in 2012.  So if a subscriber was

4  the subject of three notices from the RIAA to Cox in 2012 and

5  then no notices at all after that in 2013 and '14, that

6  subscriber is not in any of the data I looked at or any of the

7  other experts you've heard testify so far looked at in -- as

8  far as the RIAA data and the Cox ticket data.

9  Q.   Why, why is that?  Why are they excluded?

04:35:05  10  A.   Because this, this period, the relevant period, which is

11  very similar to the claim period, it's just off by a couple

12  days from the claim period, this relevant period is the period

13  for which Cox matched the RIAA notices and the IP addresses in

14  those notices to their customer database.

15       So if there was a subscriber that didn't get any, any

16  notices from the RIAA in 2013 or 2014, that subscriber was not

17  one of the accounts that was picked out as matching, and so I

18  don't see that subscriber in, in any of the data that, that I

19  was given for this case.

04:35:57  20       However, consider another subscriber who also got

21  three notices -- was the subject of three notices from the RIAA

22  in 2012, but that subscriber also had some notices that they

23  were the subject of from the RIAA in 2013.  All right.  That

24  same subscriber is in, but the subscriber who got three notices

25  and then no more is out.

L. Weber - Direct

1965

1    So the data is biased from the point of view of the

2    2012 -- and it's actually 13 months, January of 2013, the data

3    is biased because the people who got one or two or three

4    notices from the RIAA in that year and no notices afterwards,

5    right, and we've seen already that there's a lot of the

6    at-issue subscribers who got only one or two or three notices,

7    those subscribers are excluded, but if they kept going, if they

8    kept having notices for that subscriber, that the subscriber

9    was the subject of, that one is included, and so that's biased,

04:37:11 10   right?

11   That is -- it's not like a deliberate bias.  It's

12   not -- you know, it's not nefarious in any way.  It's just

13   that's how the data was drawn, and so the data itself is

14   biased.

15   Q.   So did -- how did you adjust for this bias in your

16   analysis?

17   A.   So to adjust it for this bias, I chose to look at

18   subscribers, the at-issue subscribers who have their first

19   ticket in the relevant period.  So that, that cuts out this

04:37:43 20   issue that I have in 2012 with not including the people who

21   only got one or two or three notices and no more, but, yes,

22   including the people who, one or two or three and then got

23   more.

24   So by cutting it off and looking at the subscribers

25   in the first ticket in the relevant period, I essentially

L. Weber - Direct

1966

1    sidestepped that bias issue.

2    Q.    Okay.  And did you prepare a chart to capture that

3    analysis?

4    A.    Sure.  So when I looked at that subgroup, the first

5    interesting thing is that subgroup of the people that didn't

6    get a ticket in 2012 and January of 2013, that's more than

7    three-quarters of the at-issue subscribers, so 77 percent of

8    the at-issue subscribers did not have any tickets in not just

9    RIAA notices, any tickets at all in the ticket database from --

04:38:44  10    for all of 2012 and January of 2013.

11    Q.    Excuse me, Dr. Weber.  Did Dr. McCabe, who testified for

12    the plaintiffs in this case, have a similar graph?

13    A.    I think he -- I wasn't here for his testimony, but I read

14    his testimony, and I think he described the gray area.  He

15    described the 23 percent that were the ones that did have a

16    ticket in that first 13 months' period that I have ticket data

17    for.

18    Q.    So then did you further analyze this data?

19    A.    I did.  So okay, so now I'm looking at the 77 percent,

04:39:31  20    which is representative of a general population of Cox

21    subscribers that are the subject of an RIAA notice, and

22    surprisingly to me actually when I first looked at it, the

23    results are very similar.  So instead of 49 percent getting

24    only one ticket, it's only gone up to 50 percent.  Instead of

25    78 percent getting three or fewer tickets, it's gone up to 80

L. Weber - Direct

1967

1    percent.  And, similarly, at 12 tickets, it's, it's still 98

2    percent have 12 or fewer tickets.

3           So this was a big surprise to me because obviously

4    I -- you know, I've cut out the people that got -- you know,

5    the guy that was shown earlier that got 4,000 tickets.

6    Obviously, you know, that person was -- or that -- it was a

7    business subscriber, but, you know, I've cut out that business

8    subscriber that was, that was getting lots of tickets every

9    year.  So I was very surprised that even when I cut that 23

04:40:37 10   percent out, that the numbers didn't change very much.

11          And so that, that tells me particularly looking at

12   the 98 percent, that there's only 2 percent that get 13 or

13   more, whether I look at it, all the people or the 77 percent,

14   it tells me that a lot of the 23 percent look fairly similar to

15   the 77 percent.  There's a small percent that don't, that are,

16   you know, very different, but a lot of them look like the 77

17   percent.

18   Q.   So did you further analyze the data in, in your, in your

19   work for the defense?

04:41:14 20   A.   I did.  I mentioned that there were two issues.  So

21   there's a second issue.  So the second issue is, well, maybe,

22   maybe the first RIAA notice is near the end of the period I

23   have data for and we just don't see the later notices.  So it's

24   kind of on the opposite side.  I have boundaries on both sides.

25   It's kind of on the opposite side.

L. Weber - Direct

1968

1       So, for example, if I had a subscriber who is the

2   subject of three notices, let's say, as an example at the end

3   of 2014, and then, you know, those three notices are in the

4   RIAA notice database I was working with, but if there continued

5   to be additional notices, then those are not necessarily in the

6   data that Dr. McCabe and I both used for the relevant period is

7   what we were, we were both looking at.  And so that's, that's

8   also a problem.

9   Q.   So how did you deal with, with this issue?  How did you

04:42:25 10   analyze it?

11   A.   Right.  So to deal with this issue, what I decided to do

12   was to look at the subscribers whose first ticket was in the

13   first six months of the relevant period.  So that gives me a

14   long time to look out, right?  It actually gives me on average

15   twice as long to look out for those people.  On average, it's

16   almost 19 months for me to look and see if they got more

17   notices from the RIAA.

18       So I have a longer runway to look and see what

19   happens, and then those people who got their first ticket in

04:43:11 20   the first six months, it shouldn't matter whether I look at the

21   people that got their first ticket in the first six months or

22   the second six months or the third six months, you know, it

23   shouldn't really matter except that I have longer -- you know,

24   longer to watch and see what -- and MarkMonitor has longer to

25   watch, also, and see what happens with that subscriber.

L. Weber - Direct

1969

1       So, so this subgroup of people is actually reasonably
2  representative of all the 77 percent that I talked about
3  before.
4  Q.   So what were the results of this analysis?
5  A.   So unsurprisingly, it's, it's a subgroup of that 77
6  percent, so it's actually 26 percent.  It's still thousands of
7  at-issue subscribers, but it's 26 percent of the population
8  have their first ticket in February through August 2013.
9  Q.   So you're focusing on that 26 percent just so you have the
04:44:16 10  long runway to see what happens over the length of the claims
11  period?
12  A.   That's exactly right.  I have twice as long a runway.
13  So --
14  Q.   And this, and this -- and you're doing this again, as I
15  understand it, to see if they have another ticket over that
16  period; is that right?
17       MR. OPPENHEIM:  Can we not lead, Your Honor, please?
18       THE COURT:  I'll allow that question.
19       THE WITNESS:  Yes.  I'm doing that to see when I
04:44:42 20  look -- when I have twice as long to look, do I see, you know,
21  many more notices and tickets when I have twice as long to
22  look.  That's exactly what I'm doing.
23  BY MR. BUCHANAN:
24  Q.   And what is, what is, again, the relevance of that looking
25  out over that period of time?

1970

1    A.    Okay.  So if I have twice as long to look, and so twice as

2    long -- in the case of the RIAA notices, twice as long for

3    MarkMonitor to be watching and looking and seeing if they

4    observe any infringing behavior, right, twice as long to look,

5    so I get -- the idea is that if I -- I would have expected

6    what -- you know, if you didn't know any better, you would

7    expect, gee, if I have nine months to look on average, which is

8    true for the broader data, I might see so many notices.  If

9    I -- for a particular subscriber account.

04:45:45  10          If I look twice as long, I would expect, you know,

11   many of those subscribers, if -- I would expect to see twice as

12   many notices from the RIAA for many of the subscriber accounts

13   with twice as long to look.

14   Q.    Okay.

15   A.    That's what I would have expected, but it's not what I

16   see.

17   Q.    Okay.  You've pulled up a demonstrative here.  Does this

18   reflecting results of your -- of what you just described?

19   A.    It does.  Before I talk about this, I should actually

04:46:17  20   mention that ultimately when I go to talking about tickets,

21   which I'm going to do next, tickets are, tickets are a

22   ticket -- you know, there are tickets on a day, right?

23          Notices -- notices can -- you could have multiple

24   notices on the same day.  We've already heard testimony from

25   the -- that with respect to the RIAA notices, that almost --

1971

1       that rarely happens.  It doesn't happen very much.  MarkMonitor

2       tries to avoid it, and it doesn't happen very much.

3            So for this analysis, I actually had looked to see if

4       there was much difference.  If I looked at how many notices a

5       subscriber account was the subject of or how many days notices

6       came in for that subscriber, and it's a very small difference,

7       only very small difference.

8            So for this chart, I've actually shifted to talking

9       about how many days a subscriber was the subject of RIAA

04:47:21 10     notices, and I've changed both bars so it's apples to apples.

11      But that's why they're a little -- the ones on the left are a

12      little different than the last chart I showed you was because

13      it's now days.

14           Okay.  So like I said, I would expect to see a lot

15      of, a lot of change, a big gap between these two sets of bars,

16      but I don't see very much change.  The results typically only

17      differ by 1, 2, or 3 percent.

18           So, for example, in this subgroup of the 26 percent,

19      where I have twice as long to look at, I still only have 49

04:48:03 20     percent getting only one notice -- one day of notices from --

21      that they're the subject of from the RIAA in twice as long.

22      It's 51 percent -- again in days, it's 51 percent of the counts

23      are the subject of an RIAA notice when I have half as long, and

24      when I have twice as long, it only drops to 49 percent.

25           Similarly, if you look at three or fewer notices, if

L. Weber - Direct

1972

1    I have the short period to look, on average it's 80 percent of

2    the accounts of three or fewer.  With twice as long, it only

3    changes by 2 percent.  It just goes down to 78 percent.

4          And when I get up to 12 or fewer notices, it's

5    actually 99 percent for -- 99 percent of the accounts have 12

6    or fewer days on which they get RIAA notices, and it only drops

7    down to 98 percent for 12.  So there's still -- even with twice

8    as long, there's still only 2 percent of the at-issue

9    subscribers that are the subject of 13 or -- RIAA notices on 13

04:49:27 10   or more days.

11   Q.   So what does this mean?

12   A.   Well, to me, I was just really, really surprised.  I mean,

13   I would have expected to see that the accounts that had two

14   notices -- many of the accounts that had two notices, now I

15   would see when I'm looking at this subset that has twice a

16   long, I would expect a lot of them to move over and be getting

17   four notices.  And the ones that were getting three notices, I

18   would have expected with twice as long to look on average, I

19   would be getting more of them seeing six notices.  And the ones

04:50:06 20   that had seven, eight, nine, ten, 11 notices, I would expect

21   them to move over to the 13-plus column.

22          And that's not what I see, and so that tells me that

23   the, the RIAA notices mostly, mostly really stopping.  Okay.

24   Not for all accounts, right, not for the 2 percent and not for

25   the 1 to 3 percent that seem to continue when I, when I doubled

L. Weber - Direct

1973

1    the length of time, but for the vast majority of them, the RIAA

2    notices are really stopping.

3    Q.   Okay.  So we've talked about notices now.  Did you look at

4    the same, the same analysis with ticket data?

5    A.   Yes.  So I did many of the same things with ticket data,

6    and the big picture is that the results -- the conclusions are

7    similar for tickets.  Now, there are more tickets than notices,

8    right, because the tickets are not just from the RIAA.  The

9    tickets are from other, other copyright holders that, that are

04:51:14 10   sending the Cox notices that comply with Cox's policies.  So

11   there's, so there's a lot more copyright holders who are

12   sending notices.

13           So yes, there's more tickets than notices,

14   absolutely.  I did the similar analysis, and the tickets really

15   do mostly stop.  Again, there's a percentage that continue on,

16   and there's that 13-plus percent always, so -- but they really

17   do mostly stop.

18           And then, you know, for this sample, and this is

19   again the 26 percent, that's representative of Cox's

04:51:55 20   subscribers who are the subject of RIAA notices, 33 percent get

21   only one ticket.  So there's more tickets, so that, you know,

22   that number is obviously smaller than, than for one RIAA

23   notice.  77 percent get five or fewer tickets, and when you get

24   to 12 or fewer tickets, it's, it's 95 percent that get 12 or

25   fewer tickets.

L. Weber - Direct

1974

1  Q.   Can you draw any opinions from the analysis of the ticket

2  data in this fashion?

3  A.   Yes.  So the, the -- I can.  I think I have another slide

4  to show that, and here, here we have the infamous golf tee to

5  try and illustrate that situation.  So here I'm looking at

6  the -- I'm actually looking at the three-quarters now, the 77

7  percent, but I'm looking -- and you can see that from the pie

8  chart up in the top right -- I'm looking at single family

9  residential subscribers because, of course, Cox's policy is

04:53:07  10  different for single family residential than it is for business

11  customers.

12         So I'm focused on single family residential

13  subscribers with RIAA notices.  There are 42,025 such

14  residential subscribers in our data who got at least one

15  ticket.

16         Then as we move forward and we watch and observe and

17  more tickets come in, you see that by the time you get to

18  people who have three or more tickets, it's gone down quite a

19  bit.  It's now down to 18,600.  By the time you get to five or

04:53:47  20  more tickets, it's down more.  It's down to 10,200.

21         By the time you get to 13 or more tickets for this

22  group of 77 percent, it's down to 1,330, which is only 3.2

23  percent of the original population.

24         And remember, these -- this is the 77 percent that is

25  where the data has been unbiased, and so it's reflective of the

L. Weber - Direct

1975

1    general population of single family residential subscribers who

2    are the subject of an RIAA notice.

3    Q.    Now, Dr. Weber, do you recall hearing or reading testimony

4    in this trial that, that concerned or indicated that Cox took

5    certain actions that limited the number of notices it

6    processed?

7    A.    Yes, I did hear that testimony.

8    Q.    Okay.  And how did any of those actions affect your

9    analysis?

04:54:54 10   A.    So I thought about all of those actions as I was doing my

11   work here, but the big picture is that it's all baked in.  So

12   whatever Cox's policy was and however they implemented that

13   policy, that's all in that analysis, all right?  This is what

14   actually happened, and this is what actually happened given

15   everything you've heard about.

16           Everything that Cox did, the limits, whatever you've

17   heard about, all of that is baked in here that given what

18   they -- given every way in which they implemented their policy,

19   this is what actually happened.  The notices really do stop for

04:55:51 20   the vast majority in spite of all of the actions that, that

21   have been testified about so far.

22   Q.    Do you have anything else to offer with regard to your

23   first opinion in this matter?

24   A.    I think that's it for the first opinion.

25   Q.    Okay.  Okay.  And so what is your second opinion?

L. Weber - Direct

1976

1    A.    So the second opinion is for a group that's representative

2    of Cox subscribers who are the subject of an RIAA notice, for

3    88 percent, there's more than a year after the last RIAA notice

4    with no more RIAA notices.

5    Q.    Okay.  Is there a different way of looking at it?

6    A.    Yeah.  So I'm actually going to illustrate how I came to

7    that conclusion, first by showing an example.

8    Q.    Okay.

9    A.    So this is an example subscriber that has been the subject

04:56:50 10   of three RIAA notices.  The first two come in July of 2013.

11   They're both for "No Lie" by 2 Chainz.  The third one comes in

12   about a month later in August, and it's for "The A Team" by

13   Ed Sheeran.

14         And the other thing that's relevant is not only when

15   the notices come in, but how long I have to look after the last

16   notice.  So in this particular subscriber -- so for some

17   subscribers, I can go all the way out to the end of the claim

18   period.  I can go all the way out to November 26, 2014.

19         For this particular subscriber, like some others,

04:57:40 20   their last billing month, which I can tell from the billing

21   data, comes earlier than that, right?  So I -- that person's

22   last billing month is in October, and the days between the

23   first notice and that last billing month is 448.

24         So -- and I have a graph to illustrate kind of what

25   I'm going to do, so I'm going to look for the time of the first

L. Weber - Direct

1977

1  notice to the time of the last notice, and then I'm going to

2  compare it to the end of what I can see, which is either the

3  last bill or the end of the claim period.  That's, that's

4  what's in the RIAA notice data that both Dr. McCabe and I

5  worked with.

6  Q.   Okay.  Did you do any other analyses related to the amount

7  of time subscribers are not subject to notices?

8  A.   Right.  So this was just, just an example to illustrate

9  the timeline.  So I did this with this group that I have a long

04:58:38 10  time to look, right?  This is that same group I have on average

11  almost 19 months to look and see what happens and do they get

12  additional notices.

13        So for that group, the -- on average, the time from

14  the first notice to the last notice is a little over two

15  months.  The time from the -- the time after that until the

16  last bill on average is 487 -- is 487 days.  So --

17  Q.   Let me ask you, the last bill, again, why is that

18  relevant?  Why are you looking at that?

19  A.   Well, I don't want to -- I don't want to do it wrong,

04:59:23 20  right?  I don't want to use all of the, of the claim period

21  when that subscriber might not even have been a Cox subscriber

22  then.  I don't want to count, oh, they didn't get any notices

23  in November of 2014, when they weren't even a subscriber then,

24  so, of course, they didn't get any notices.

25  Q.   So the bill indicates that they're still a subscriber?

L. Weber - Direct

1978

A.   Correct.  The bill -- yes, I guess I should have said
that.  The bill indicates that they are, in fact, still a
subscriber.

        So -- anyway, so on average, the time after the last
notice, on average, that period is almost 500 days.  So -- and
then when I looked at it a different way, I looked for 88
percent of these representative subscribers, you know, that I
have a long window to look at, for 88 percent of them, there
was more than a year after the last RIAA notice with no more
05:00:27 RIAA notices.
Q.   Okay.  Now, did you, did you look at this in another way,
utilize it in another way?
A.   I did.  I also look at it in terms of percent of time, and
the percent of time, that's what the -- I think that's what the
icon is, with the red and green.

        So the percent of time, the average -- the first
notice to the last notice on average is 12 percent of the total
time I can see from the first notice until the last bill.
Q.   Did you look at this using ticket data instead of RIAA
05:01:03 notices?
A.   I did use it -- do it using ticket data.  Remember,
there's a lot more tickets, but even with ticket data, on
average, it was only 16 percent of the time from first -- from
the first ticket to the last ticket in the -- that I see as
compared to the total time from the first ticket to the last,

L. Weber - Direct

1979

1   the last bill or the end of the, of the claim period.

2   Q.   So do you have anything else with regard to your second

3   opinion?

4   A.   I don't think so.  I think that's it.

5   Q.   So let's go to your third opinion.  Do you have a

6   demonstrative?

7   A.   I do.

8   Q.   Okay.

9   A.   So the third opinion is -- you've heard some in this trial

05:01:49 10   already about some subscribers with a lot of tickets, so I

11   chose to look at the subscribers with the most tickets and

12   notices, and it turns out that the subscribers with 100 or more

13   tickets over the three-year period that we have ticket data

14   for, they're almost all commercial subscribers, and the

15   subscribers with 50 or more notices from the RIAA in that

16   relevant period, they are all, all of them -- there aren't that

17   many, but they're all of them commercial.

18   Q.   Have you prepared a demonstrative for this?

19   A.   Yes.  So I'm going to focus on the, on the first one, the

05:02:29 20   subscribers with 100 or more tickets.  So first you have to

21   understand the population in general.  I think actually -- I

22   think Dr. McCabe actually already testified that 95 percent of

23   the at-issue subscribers are single family residential.  5

24   percent of them are commercial.

25         There's a teeny, tiny sliver that you can't even see

L. Weber - Direct

1980

1    that are multifamily residential, which is -- that's like

2    apartment buildings, where there's just one, one subscriber

3    account for the, the whole building.  This is very small.

4            MR. OPPENHEIM:  Objection.  No foundation.  Move to

5    strike.  That doesn't --

6            THE COURT:  Lay a foundation.  I'll strike the last

7    answer, but lay a foundation if you'd like to go there.

8    BY MR. BUCHANAN:

9    Q.   So did you -- what did you look at to determine the makeup

05:03:28 10  of the commercial customers of Cox?

11   A.   Right.  So I looked at the billing data, which indicates

12   whether a customer is single family residential, multifamily

13   residential, or commercial subscribers, and I also looked at

14   deposition testimony from a Cox financial person, Mr. Jarchow,

15   also testifying about those different types of accounts.

16   Q.   Okay.  Did you look at anything else, any research that

17   was done with regard to these commercial accounts?

18   A.   I also looked at the other expert reports that had been

19   submitted by the plaintiff in this matter.

05:04:11 20  Q.   So based on that, are you able to determine the makeup of

21   the commercial customer --

22   A.   Oh, yes.  So the makeup of the -- of how many are single

23   family residential, commercial, or multifamily, that comes from

24   tying the information in the billing database to the

25   information from the ticket database or the RIAA notice

L. Weber - Direct

1981

1    database, you know.  It's been done both ways.

2         Dr. McCabe testified about the tickets, and I'm

3    testifying about the RIAA notices, notice database that he also

4    relied on, but, yes, so I tied the whether it's commercial,

5    multifamily, or single family residential in the billing

6    database, and then I used the account ID to find the people

7    that were the at-issue subscribers to tie those two together,

8    at-issue subscriber, what's the account ID, look in the billing

9    data, see if it's commercial, single family residential, or

05:05:20 10   multifamily.

11        I will say there were a few accounts I couldn't tell

12   but -- because the billing data, you know, didn't have an

13   indication, but that was just a very small number.

14   Q.   So did you hear Dr. Lehr testify about how many

15   residential subscribers had over a hundred tickets?

16   A.   I did.

17   Q.   Okay.  How many based on your research had over 100

18   tickets?  How many residential customers?

19   A.   They were -- it was only one single family residential

05:05:51 20   subscriber that it was at issue that had more than 100, and

21   it -- that particular residential subscriber had 101, so it

22   must be the one that -- the one that Dr. Lehr chose to pull out

23   and show the jury is the one with -- the only one over, with

24   over 100 tickets.

25   Q.   From an expert statistical standpoint, is that

L. Weber - Direct

1982

1    representative of what had transpired here?

2    A.   It is not at all representative of either the subscribers

3    with 100 or more tickets, and that one single family

4    residential subscriber with 101 tickets is -- it's, it's the

5    one out of over 50,000 single family representative -- single

6    family residential subscribers, it's the only one out of 50,000

7    that has more than 100 tickets.

8    Q.   You mentioned something about subscribers with 50 or more

9    RIAA notices in a relevant period.  What category did they fall

10   in?

11   A.   I do have that in my report.  Oh, no, no, I do know that.

12   So the ones with 50 or more -- that are subject to 50 or more

13   notices from the RIAA in the relevant period, all of them, and

14   I think there are 20-something of them, but all of them are

15   commercial accounts.

16        Should I go ahead and finish up on the --

17   Q.   Sure.  Can you break down further the type of subscriber

18   that we're talking about here?

19   A.   Right.  So with the subscribers with the 100-plus tickets,

20   the picture completely flips.  So for the subscribers with

21   100-plus tickets, 46 of 49 of them are commercial subscribers.

22   Two of them are the multifamily subscribers, and there's only

23   17 of them in the entire list of at-issue subscribers for

24   multifamily, and only one, the one we've just been talking

25   about that Dr. Lehr showed the jury, only one is a single

L. Weber - Direct

1983

1  family residential subscriber with actually 101 tickets.

2  Q.   And did you break down these commercial subscribers

3  further in your analysis?

4  A.   I did.  So of these 49 commercial -- 49 at-issue

5  subscribers that had 100 or more tickets over the three-year

6  period, they're mostly ISPs and multi-occupancy housing.  So

7  the largest number of them, 15 of them are ISPs.  They're other

8  ISPs.

9  Q.   And ISP is what?

05:09:03 10  A.   It's another internet service provider, a regional

11  internet service provider, for example, that contracts with Cox

12  so that that service provider can provide internet service to

13  their hundreds or thousands or tens of thousands of customers,

14  and they have a contract with Cox to do that.

15        So 15 of these subscribers with more than 100

16  tickets, they are internet service providers.

17  Q.   What about the breakdown for the rest?

18  A.   So for the rest, there's a fair number of university or

19  student housing.  There's hotels.  There's a few apartment

05:09:42 20  complexes.  There's a few that are military housing.  There's a

21  few that are retail and, as I said before, two multifamily and

22  one single family residential.

23  Q.   Were you able to determine which of this group had the,

24  the most tickets?

25  A.   Yes.  So I looked at the five subscribers with the most

1984

1    tickets in this period, and the five top subscribers ranged

2    from 713 tickets up to 4,786 tickets, and these five were all

3    regional internet service providers who have -- you know, as

4    I've mentioned before, they have potentially many, many

5    customers.

6    Q.   And what's the time period that these notices or tickets

7    were created with regard to these particular internet service

8    providers?

9    A.   It's a span of over three years -- sorry, not exactly.

05:10:48 10   It's a span of three years, from 2012, '13, '14.

11   Q.   Okay.  So what is the impact of terminating a local ISP's

12   access to Cox's networks?

13            MR. OPPENHEIM:  Objection.  No foundation.

14            THE COURT:  Sustained.

15   BY MR. BUCHANAN:

16   Q.   Okay.  You worked with internet service providers?

17   A.   I have.  I have worked with, for example, I've worked

18   with -- I've worked with many companies in the

19   telecommunications industry, including internet service

05:11:18 20   providers.  I've worked with AT&T.  I've worked with

21   Cablevision.  I've worked with a number of other internet

22   service providers.  I've worked with telecommunications

23   companies and satellite industry cell phones, etc.

24   Q.   Are you familiar with the operations between one ISP such

25   as Cox and a regional ISP?

L. Weber - Direct

1985

1   A.   I have, I have some knowledge of that.  I wouldn't say I

2   was an expert on it.

3   Q.   So you have on the screen here, it says terminating an ISP

4   could cut off the internet for thousands of households not the

5   subject of notices.  What do you mean by that?

6            MR. OPPENHEIM:  Objection, Your Honor.  May we

7   approach?

8            THE COURT:  Yes, sir.

9            NOTE:  A sidebar discussion is had between the Court

10   and counsel out of the hearing of the jury as follows:

11   AT SIDEBAR

12            THE COURT:  Yes, sir.

13            MR. OPPENHEIM:  Dr. Weber is not in a position to

14   testify to either of the two points that are currently on this

15   slide.  I objected to them at the time.

16            THE COURT:  The second one you objected to, not the

17   first one.

18            MR. OPPENHEIM:  And I'm now objecting because I'm now

19   hearing her testimony.  She even admitted she's not an expert

20   in this.

21            THE COURT:  Yeah.

22            MR. OPPENHEIM:  So I would like that there should be

23   no further questions on this, and the jury should be given an

24   instruction to disregard this, because she's really not in a

25   position to testify to it whatsoever.

05:12:34

L. Weber - Direct

1986

1    She would be speculating as to what happens in these

2    situations, and she would be speculating in a way that was

3    directly contrary to Cox's own policies.

4         MR. BUCHANAN:  I think, Your Honor, we already

5    reviewed this.  It's been put up on the screen.  He didn't

6    object to the first one.  The second one, you overruled his

7    objection.

8         She's testified about her experience with the ISPs.

9    It's pretty obvious if you cut off, terminate an ISP, what

05:13:11  10  happens.  She's looked at the data behind the ISPs, you know,

11   and who they serve --

12        THE COURT:  She's not going to go on and talk about

13   how these people were left without service for an average of 30

14   days or anything like that, right?

15        MR. BUCHANAN:  No.

16        THE COURT:  She's just going to say, my experience,

17   you cut off the internet, they don't get the internet.

18        MR. BUCHANAN:  That's it.

19        MR. OPPENHEIM:  Wait a minute.  What Mr. Buchanan

05:13:31  20  just said is a little surprising to me, that she looked at the

21   data behind these ISPs.

22        THE COURT:  That's why I asked him the follow-up

23   question.  She's not going to talk about what happens to any of

24   these -- do you think the jury will -- thinks it's a revelation

25   that if you cut off the internet service, that the person can't

L. Weber - Direct

1987

 1     contact -- get into the internet from that server?

 2              MR. OPPENHEIM:  Obviously not.  Its coming out of an

 3     expert's mouth, Your Honor, gives it a qualification which it

 4     shouldn't get.

 5              THE COURT:  All right.  I'll allow it.

 6              MR. OPPENHEIM:  They can draw that inference, I

 7     believe.

 8              THE COURT:  I'm going to allow it.  Your exception is

 9     noted.

10              NOTE:  The sidebar discussion is concluded; whereupon

11     the case continues before the jury as follows:

12     BEFORE THE JURY

13     BY MR. BUCHANAN:

14     Q.   So, Dr. Weber, back to the demonstrative and to the first

15     point at the bottom of the graph of the demonstrative, it says

16     terminating an ISP could cut off the internet for thousands of

17     households not the subject of notices.

18              Could you just briefly explain how that happens?

19     A.   Sure.  So if there is an ISP with thousands or tens of

05:14:58 20     thousands of subscribers, we only have -- you know, we don't

21     have tens of thousands of tickets here, right?  And those

22     tickets are probably not --

23              MR. OPPENHEIM:  Objection, Your Honor.  She has no

24     foundation as to the number of customers --

25              THE COURT:  Sustained.

L. Weber - Direct

1988

1    BY MR. BUCHANAN:

2    Q.   Just focus on what would happen.

3    A.   Got it.  Okay.  So, yes, if you cut off the internet

4    service to that ISP, then there would be no internet service

5    for all of that ISP's customers.

6    Q.   Okay.  And then your next point:  Terminating all Cox

7    services could cut off internet access to emergency personnel.

8    A.   So, again, the same thing.  If you cut off internet

9    access, that would include internet access to emergency

05:15:52 10  personnel such as, as police and fire.  They are also

11   subscribers of -- to internet service.

12   Q.   Okay.  So let's move to your fourth opinion.  What did you

13   look at for that, and what is that opinion?

14   A.   So that opinion, at a high level, is that the RIAA sent

15   far fewer notices to Cox than Cox agreed to allow.

16   Q.   So how many notices did the RIAA contract with MarkMonitor

17   to send to Cox during the claim period?

18   A.   Okay.  So I looked at the contracts that RIAA had with

19   MarkMonitor.  I actually looked at three years' worth of

05:16:38 20  contracts, but for this, we're going to talk about 2013 and '14

21   because that's the claim period.

22        The RIAA contract with MarkMonitor specified 450 a

23   day for Cox.

24   Q.   And for what period was this?  Is this 2014?

25   A.   So this is 2013.

L. Weber - Direct

1989

1   Q.    Okay.

2   A.    Starting in April of 2013.  And also in 2014, there was a

3   contract that took effect in April of 2013 and a second

4   contract that took effect in April of 2014, and they both

5   specified 450 per day for Cox.

6   Q.    So what is your understanding of the number of notices

7   that Cox agreed to accept from the RIAA during this time

8   period?

9   A.    So I think the jury has already heard testimony about

05:17:32 10   this, so I won't go into great detail, but as, as you may

11   remember, the RIAA asked, you know, could we have 5 or 600 in

12   April -- on April -- in April of 2013, and a few days later,

13   Cox -- Randy Cadenhead, head of Cox, replied:  We can try

14   accepting 600 per weekday.

15          So you can see that in the image, Cox was -- agreed

16   to accepting 600, but even after that agreement, the contract

17   for 2013 was unchanged, and the contract for 2014 also had 450.

18   Q.    So prior to Cox agreeing to 600 notices a day, do you know

19   what the prior agreement was with regard to accepting notices

05:18:22 20   between Cox and the RIAA?

21   A.    I do.  I think, I think I would best exhibit this with a

22   graph, so -- because it's a whole lot better to see it

23   graphically.

24          So this chart starts at the, at the beginning of the

25   claim period, February of 2013, and goes through November of

L. Weber - Direct

1990

1  2014.  So that's, that's the relevant period, the claim period

2  here, and the graph goes -- the bottom is 300 or fewer, and the

3  top is 600 or more, so the 600 -- well, we'll see how that

4  comes in.

5          So the first thing I'm going to show is the green

6  line is what Cox had in e-mails agreed to allow for the RIAA.

7  So they had agreed in -- to 400 --

8  Q.   And what period of time was that?

9  A.   I think the agreement actually was -- originally the

05:19:31  10  e-mail for 400, I think, was back in 2009, and then -- but that

11  continued through April -- through, sorry, April 18 of 2013,

12  when we had that e-mail between Randy Cadenhead and Victoria

13  Sheckler between Cox and the RIAA where Cox agreed to 600.  So

14  you see the green line jumping up to 600.

15  Q.   Okay.

16  A.   Okay.  The next line is going to be an orange line, and

17  this line is what the RIAA contracts with MarkMonitor called

18  for, and those contracts said at the beginning of the claim

19  period, February and March, this was the 2012 contract actually

05:20:19  20  was in effect there, which I've looked at, and that had 360.

21          So Cox was allowing 400, and the RIAA contract with

22  MarkMonitor was for only 360.

23          Then on April 1, the new contract went into effect.

24  You see the orange jumping up to 450.  A few days later, on

25  April 12, I think it was, Victoria Sheckler contacted Cox.  We

L. Weber - Direct

1991

1    need -- you know, can we get 5 or 600?

2         Cox on April 18 said yes.

3         But you see that the orange line jumps up to, not to

4    600, jumps up to 450 in April, and then after April 18, it

5    stays at 450 for the full length of the 2013 contract, and then

6    when the 2014 contract was put into place in April of 2014 is

7    when that took effect, it still stayed at 450.

8    Q.   So did you do anything to track the notices that were

9    coming in during this period of time from the RIAA?

05:21:33 10    A.   That's right.  That's right.  So far, all we know is what

11   Cox agreed to and what the, what the contract said, so I wanted

12   to know what actually happened, how many did they actually --

13   did MarkMonitor actually send per day, and I have this from the

14   notice data, and you can see that --

15   Q.   So what do those blue dots represent?

16   A.   The blue dots represent the number of notices each day in

17   the RIAA notice database, which is supposed to be the notices

18   that the -- that MarkMonitor sent on behalf of the RIAA to Cox.

19   So that's what the blue dots are supposed to be.

05:22:17 20        And you see that back in February and March, the

21   first couple of months of the claims period, the contract was

22   for 360, and on most days, they were sending about 360.

23        And then after April 1, the contract said 450, and on

24   most -- many -- most days, but many of the days, they were

25   sending around 450.  You'll notice that there's also some dots

L. Weber - Direct

1992

1       even below the 450, and those are days in which MarkMonitor

2       sent less than 450 notices, and, you know, the chart only goes

3       down to 300 or fewer, but they were sending less than 450

4       notices on 170 days -- I think more than 170 days in, in that

5       period after the, after the contract went to 450.

6       Q.    So if you look down, say, in 2014, there's a lot of blue

7       dots there at 300 and none that are on the orange line.  What's

8       happening there?

9       A.    So during those periods of time, the number of notices per

05:23:55 10     day that were being sent were less than 450.

11      Q.    And on how many occasions during the claims period did

12      MarkMonitor send notices above 450, the whole -- the contract

13      amount with RIAA?

14      A.    So for the period which had the 450, you'll notice that

15      there are six blue dots up on the 600 or more line, and on six

16      days after the contract became 450, on six days, MarkMonitor

17      sent exactly twice that.  They sent 900 on, on six days.  It

18      seems to -- I don't know, it seems like an error to me that

19      they sent 900 exactly twice on six occasions.

05:24:54 20     Q.    What about the blue dot that's at 600 before the claim

21      period?

22      A.    Right.  There's a --

23      Q.    Right around March, I guess.

24      A.    Right.  There's a -- also a blue dot at the 600 or more in

25      March of 2013, and at that point, the contract said 360, and

L. Weber - Direct

1993

1   there was one day in February-March where MarkMonitor sent

2   double that.  They sent 720 on that one day.

3   Q.   So even though it says 600, on those -- those blue dots

4   that are on the 600 line, they reflect a doubling of the amount

5   of the contract amount between MarkMonitor and the RIAA?

6   A.   That's correct.

7   Q.   And you mentioned you thought there was an error there.

8   Why did you think there was an error?

9   A.   It just looks like a glitch in the system to me.

05:25:48 10          MR. OPPENHEIM:  Objection.  No foundation.

11          THE COURT:  All right.  Objection sustained.  She's

12   speculating, so don't consider that, please.

13   BY MR. BUCHANAN:

14   Q.   So other than the seven days that you just outlined during

15   this time period where MarkMonitor sent double its contract

16   amount with the RIAA, did the RIAA ever hit the 600 limit that

17   we agreed to with them?

18   A.   Not in the claim period, no.

19   Q.   Did you look at the contracts between the RIAA and

05:26:26 20   MarkMonitor to determine how much money the RIAA saved by not

21   sending the number of notices Cox agreed to accept?

22   A.   I did look at the contracts to see what the, what the

23   pricing was.  So in the 2013 contract, Cox is one of several

24   internet service providers in kind of a bucket of internet

25   service providers that RIAA was paying MarkMonitor to send, and

L. Weber - Direct

1994

1    when you look in that bucket and you look at the number of

2    notices they send -- contracted to send for the year 2013 and

3    you divide by -- sorry, you look at the price that they paid

4    MarkMonitor -- RIAA paid MarkMonitor to send those notices and

5    you divide by the number of notices for the year, it comes out

6    to 17 cents per notice for the 2013 contract.

7    Q.    Okay.

8    A.    And when I did the same analysis with the 2014 contract,

9    although Cox's -- the number for Cox stayed constant, there

05:27:38 10   were some of the others that they increased the notices that

11   the RIAA contracted with MarkMonitor in that bucket, and so the

12   price changed, and the -- when you divide the price for the

13   bucket by the total number of notices, you get 14 cents per

14   notice.

15   Q.    So did you determine the cost of RIAA to increase from

16   sending 450 notices to 600, as Cox agreed to?

17   A.    So yes.  If you do the same and you say, well, what if

18   they had increased from 450 to 600 notices per weekday, it

19   would be about 500 a month.

05:28:19 20   Q.    Okay.  But they didn't do that?

21   A.    They did not increase the contract to 600; that's correct.

22   Q.    So could you briefly summarize your four opinions for the

23   jury, Dr. Weber?

24   A.    Sure.  So the four opinions are after each step in Cox's

25   graduated response, fewer subscribers continue to be the

L. Weber - Direct

1995

1    subject of copyright infringement notices; second, for 88

2    percent of subscribers, there's more than a year after the last

3    RIAA notice with no more notices; third, the subscribers with

4    100 or more tickets are almost all commercial; and fourth, the

5    RIAA sent far fewer notices than Cox agreed to allow.

6           MR. BUCHANAN:  That's all, Your Honor.  Thank you.

7           THE COURT:  All right, thank you.

8           How much do you have on cross-examination?

9           MR. OPPENHEIM:  It's going to be awhile.

05:29:17 10        THE COURT:  Okay.  All right, let's break for tonight

11   then.  We'll come back tomorrow morning at 9:00.

12          All right, thank you.  Same, same request, please.

13   All right, you're excused.  Thank you very much.  Have a good

14   night.

15          A JUROR:  Thank you.

16          A JUROR:  You too.

17          NOTE:  At this point, the jury leaves the courtroom;

18   whereupon the case continues as follows:

19   JURY OUT

05:30:02 20        THE COURT:  All right.  Anything before we adjourn

21   for the evening?

22          MR. BUCHANAN:  No, Your Honor.

23          THE COURT:  All right.

24          MR. OPPENHEIM:  Not that I can think of at the

25   moment, Your Honor.

1996

1        THE COURT:  I gave you long enough?  You're done.

2        MR. OPPENHEIM:  Oh, wait, there we go.

3        MR. ZEBRAK:  This is just for the Court's assistance,

4   Your Honor.  I'd like to pass up a bench memo.  I don't know

5   that Dr. Feamster will be testifying tomorrow, but there have

6   been a lot of issues with the limits of his testimony and sort

7   of expansion of it, so I just -- for the Court's, to facilitate

8   it coming in smoothly, we have a bench memo for it.

9        THE COURT:  Refresh my recollection, is that what

10  you're trying to do?

11       MR. ZEBRAK:  I won't read it into the record, Your

12  Honor.  I'll just pass it forward.

13       THE COURT:  That's correct; you won't.  All right.

14  Thank you.  I'll receive that, and we'll give Cox an

15  opportunity to respond if they choose, and we'll address it --

16  do we expect Mr. Feamster to testify tomorrow or -- probably?

17       MR. ZEBRAK:  Well, according to the list, I've seen

18  the list, I just don't know how long the witnesses would take.

19       THE COURT:  All right.

05:31:13 20       MR. ZEBRAK:  It's possible late tomorrow or Monday.

21  And to be clear, we're not asking for any relief in that memo.

22  We think it's the status quo but --

23       MR. ELKIN:  Your Honor, one last point.  I heard a

24  rumor to the effect that we were going to have a charging

25  conference tomorrow night.  Is that true?

1997

1           THE COURT:  Correct.

2           MR. ELKIN:  Okay.  So after the close of testimony

3   tomorrow?

4           THE COURT:  I'm sorry?

5           MR. ELKIN:  Is it following the --

6           THE COURT:  Yeah.  After the jury's released, we'll

7   talk about jury instructions.

8           MR. ELKIN:  Great.  Okay.  Thank you.

9           THE COURT:  Okay.  Yeah, you had to leave for that

05:31:44 10  emergency.  I'm sorry that -- but yeah, that's what I -- I

11  guess it's been a -- kind of a moving target.  I hadn't

12  indicated when.  I usually wait until later in the case, but

13  let's do that tomorrow after close of business -- close of jury

14  business.

15          MR. ELKIN:  Thank you.

16          THE COURT:  All right.  Good.  All right, have a good

17  evening.  We'll see you tomorrow at 9:00.  We're in recess.

18          NOTE:  At this point, the December 11, 2018,

19  afternoon portion of the case is concluded.

20

                    CERTIFICATE OF COURT REPORTERS
21
            We certify that the foregoing is a true and
22        accurate transcription of our stenographic notes.

23              /s/  Norman B. Linnell
            Norman B. Linnell, RPR, CM, VCE, FCRR
24
                /s/  Anneliese J. Thomson
25          Anneliese J. Thomson, RDR, CRR