UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

<u>VOLUME  9  (A.M. Portion)</u>

TRIAL TRANSCRIPT

December 12, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1999

1    APPEARANCES:

2    FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                  SCOTT A. ZEBRAK, ESQ.
3                                 JEFFREY M. GOULD, ESQ.
                                  MICHAEL J. DRUCKMAN, ESQ.
4                                 ANDREW L. GUERRA, ESQ.
                                  LUCY G. NOYOLA, ESQ.
5                                 JIA RYU, ESQ.
                                  Oppenheim + Zebrak, LLP
6                                 4530 Wisconsin Avenue, N.W.
                                  5th Floor
7                                 Washington, D.C. 20015


8
     FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
9                                 Winston & Strawn LLP
                                  1700 K Street, N.W.
10                                Washington, D.C. 20006-3817
                                    and
11                                SEAN R. ANDERSON, ESQ.
                                  MICHAEL S. ELKIN, ESQ.
12                                THOMAS P. LANE, ESQ.
                                  CESIE C. ALVAREZ, ESQ.
13                                Winston & Strawn LLP
                                  200 Park Avenue
14                                New York, NY 10166-4193
                                    and
15                                JENNIFER A. GOLINVEAUX, ESQ.
                                  THOMAS J. KEARNEY, ESQ.
16                                Winston & Strawn LLP
                                  101 California Street, 35th Floor
17                                San Francisco, CA 94111-5840
                                    and
18                                MICHAEL L. BRODY, ESQ.
                                  Winston & Strawn LLP
19                                35 West Wacker Drive
                                  Chicago, IL 60601
20                                  and
                                  DIANA HUGHES LEIDEN, ESQ.
21                                Winston & Strawn LLP
                                  333 South Grand Avenue
22                                Suite 3800
                                  Los Angeles, CA 90071
23

24

25

2000

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| LYNNE WEBER | | |
| | CROSS | 2005 |
| | REDIRECT | 2055 |
| RANDY CADENHEAD via video deposition | | |
| | EXAMINATION | 2073 |
| | EXAMINATION | 2107 |
| SLAWOMIR PASZKOWSKI via video deposition | | |
| | EXAMINATION | 2110 |
| | EXAMINATION | 2122 |

2001

```
                    P R O C E E D I N G S
 1
 2              NOTE:  The December 12, 2019, portion of the case
 3      begins in the absence of the jury as follows:
 4      JURY OUT
 5              THE COURT:  All right.  Good morning.  I see all
 6      counsel are here, thank you.  And good morning to all of you.
 7              All right, Mr. Buchanan.
 8              MR. BUCHANAN:  I just -- counsel was kind enough to
 9      give me the demonstratives for Dr. Weber and I had an issue
09:05:29 10    with one of them.
11              THE COURT:  Okay.
12              MR. BUCHANAN:  I can give you my copy, this one.
13              MR. OPPENHEIM:  We have an extra copy.
14              MR. BUCHANAN:  I just was looking at it.
15              So as you can see, this is a summary of DMCA notices
16      sent to Cox and Cox's responses.  You know, this particular
17      witness did not testify at all about, you know, Rightscorp.
18      But in addition, the issue of effectiveness is out of the case.
19              And so, this is what this is about, to show her the
09:06:10 20    volume to determine, you know, was it effective.  Here's all
21      these notices.  You know, they are suggesting that it wasn't
22      effective and you didn't do the control group study and all of
23      that.
24              So, I mean, if they're going to ask her about that, I
25      think she can -- she should be able to talk about whether it's
```

2002

1    effective or not rather than just answer, did you see these

2    notices or not.

3            Because they were blacklisted or blocked, they're

4    Rightscorp, so they didn't come into the system.  So they're

5    not really relevant in the sense that the lawsuit specifically

6    says this case is about a two-year time period, 2013 and '14.

7    It's about the plaintiffs' notices for the works in suit.  And

8    it's about those notices where the Cox subscriber got one

9    notice from the plaintiffs after receiving two other notices,

09:07:02 10  and those are all captured in the ticket data.

11           So now we've got all this data, you know, that's, you

12   know -- and it goes to the Rightscorp database, which has never

13   been authenticated in this case, no testimony put forward about

14   it.  No expert witness on their side has ever testified about

15   how they analyzed it and came up with these numbers.

16           And so, they're just going to throw them at her.  And

17   I am sure they're working off an answer to an interrogatory or

18   other things from that case, but this witness, I think it goes

19   way beyond the scope of direct.  Particularly with the Court's

09:07:37 20  admonition that she shouldn't testify about effectiveness.

21           THE COURT:  Okay.  Thank you.

22           Mr. Oppenheim.

23           MR. OPPENHEIM:  And I'm glad this was raised

24   beforehand because it's certainly not our intent to open the

25   door.

2003

1        Can I ask that Ms. Weber be excused from the room

2   while we're having this discussion about what her testimony may

3   or may not be about?

4        THE COURT:  Please, we will call you in just a

5   minute.  Thank you.

6        NOTE:  The witness leaves the courtroom.

7        THE COURT:  Go ahead.

8        MR. OPPENHEIM:  Thank you, Your Honor.  This slide

9   number 4, which I believe is what Mr. Buchanan was focused on,

09:08:16 10   is the exact same slide that was reviewed during Mr. Beck's

11   testimony and that he acknowledged was an accurate statement of

12   what happened with the notices based on interrogatory

13   responses.

14        And our intent is not to ask at all about

15   effectiveness, and that's not why we've put it in.  But

16   Ms. Weber in her slides has slides that say things like this:

17   After each step of Cox's graduated response, a substantial

18   percentage of subscribers are not the subject of more tickets.

19        And so, this is simply addressing, well, here is what

09:08:57 20   happens with notices.  It's not intended to open the door on

21   effectiveness, and it doesn't address effectiveness, and we

22   don't intend to ask about effectiveness at all, Your Honor.

23        THE COURT:  I am going to receive the demonstrative.

24   I mean, Dr. Weber's testimony is all about the statistical

25   analysis that she did and based on the information that she

2004

1    had.  And so, it's proper to look at the data she looked at or

2    didn't look at in forming her opinions or forming the

3    information that she provided and the numbers that she gave.

4              And so, I think it is highly relevant to her opinion.

5              We will not get into the effectiveness of the

6    graduated response program, as previously stated.  And don't

7    ask questions which would permit her to open the door to that.

8    All right?

9              And your exception is noted.

09:10:06 10    Then, Joe -- is there anything else?

11             MR. BRODY:  One.

12             THE COURT:  Yes, sir.  Good morning to you.

13             MR. BRODY:  Good morning.  Nice to be back.

14             At the end of court yesterday plaintiffs submitted,

15   as I understand it, a bench memo on Dr. Feamster.

16             THE COURT:  Yes, sir.

17             MR. BRODY:  I just want to let the Court know, we are

18   preparing a response.  We should have it certainly by the

19   break.  And my guess is Dr. Feamster will be up around

09:10:35 20   lunchtime.

21             The good news is I think most of the issues in there

22   are non-issues.  We are not planning to introduce a lot of that

23   testimony, but there is one thing that I think will require the

24   Court's attention.

25             THE COURT:  All right.  Well, thank you for letting

L. Weber - Cross

2005

1    me know.  And I am happy to wait for that, Mr. Brody.  Thank

2    you, sir.

3              MR. BRODY:  Thank you, Judge.

4              THE COURT:  Okay.  Joe, let's check on our jury,

5    then, please.

6              Okay.  Let's have them come in, please.

7              Let's get Ms. Weber back.

8              NOTE:  At this point the jury returns to the

9    courtroom; whereupon the case continues as follows:

09:11:45 10   JURY IN

11             THE COURT:  All right.  Good morning to you.  Please

12   have a seat.

13             Once again, I ask you whether you had -- didn't do

14   any research or investigation or -- thank you very much.

15             All right, Mr. Oppenheim.

16             Dr. Weber, please come and take the stand.

17             Good morning.

18             THE WITNESS:  Good morning.

19             THE COURT:  Mr. Oppenheim, go ahead, sir.

20             LYNNE WEBER, called by counsel for the defendants,

21   having previously been duly sworn, continues to testify and

22   state as follows:

23        CROSS-EXAMINATION

24   BY MR. OPPENHEIM:

25   Q.   Good morning, Dr. Weber.

L. Weber - Cross

2006

1    A.    Good morning.

2    Q.    You are the managing director of the Silicon Valley office

3    of Duff & Phelps, correct?

4    A.    I'm a managing director in the Silicon Valley office of

5    Duff & Phelps, that's correct.

6    Q.    And you heard the testimony of Dr. Lehr; is that correct?

7    A.    I was in the courtroom for his testimony, yes.

8    Q.    Did you hear or review the testimony of Dr. McCabe?

9    A.    I was able to review a transcript, but I was not here last

09:13:08 10    week.

11    Q.    So you're familiar with the fact that both of them

12    testified to how much they were being paid for their work on

13    this case; is that correct?

14    A.    I don't remember the exact testimony, but there were

15    questions about that, yes.

16    Q.    Now, Cox is paying Duff & Phelps $750 an hour for your

17    time; is that correct?

18    A.    That's correct.

19    Q.    And I believe you said yesterday that you've worked

09:13:34 20    approximately 400 hours on this matter?

21    A.    I've worked more than 400 hours on this matter, yes.

22    Q.    More than 400, you say?

23    A.    Yes.

24    Q.    And you also have a support team at Duff & Phelps who has

25    worked on this matter, correct?

2007

```
 1   A.   Yes.

 2   Q.   And I believe you said -- I apologize.  I believe you've

 3   indicated previously that that includes roughly six people?

 4   A.   There were three primary people that helped me on this

 5   case, and there were other people that put in small amounts of

 6   time.  And I am at this point in time fuzzy on exactly how

 7   many.

 8   Q.   And Duff & Phelps bills Cox for those individuals' time as

 9   well?
```
09:14:37
```
10   A.   Of course.

11   Q.   And then Duff & Phelps -- you have a colleague,

12   Christopher Bakewell, correct?

13   A.   I do.

14   Q.   And he also works for Duff & Phelps, correct?

15   A.   Yes.

16   Q.   And he's also worked on this matter, correct?

17   A.   Yes.

18   Q.   And he has a separate support team, correct?

19   A.   Yes.  There is -- there are a few individuals who have
```
09:15:08
```
20   occasionally helped us both out.  But, yes, he also has

21   individuals that did not support me.

22   Q.   And Cox is paying Mr. Bakewell and his team as well --

23   Duff & Phelps for Mr. Bakewell and his team as well, correct?

24   A.   I believe so, yes.  They're paying Duff & Phelps, that's

25   correct.
```

L. Weber - Cross

2008

1   Q.    And I know you said that the $750 an hour is not being

2   paid to you.  I think you said that you get paid a salary and

3   bonus; is that correct?

4   A.    I do get paid a salary and some years a bonus, yes.

5   Q.    How much have you been paid so far during your retention

6   in this matter?

7   A.    So I haven't been paid anything specific to the retention

8   for this particular matter.  I would have been paid my salary

9   for this matter.

09:16:01 10   Q.    I understand that.  And you're saying Duff & Phelps is

11   being paid for your time on this matter?

12   A.    Yes.

13   Q.    And you're not being paid directly by Cox, correct?

14   A.    Not directly, right.  So I get a salary whether I'm

15   sifting in this courtroom.  Or whether, like a couple weeks

16   ago, I was doing a recruiting interview.  Or whether I'm

17   working on many other projects that are going on.  Or whether

18   I'm doing internal R&D work for Duff & Phelps.  Or whether,

19   like in October, I was speaking at a conference for Duff &

09:16:36 20   Phelps.  Yes.

21   Q.    You do a lot of things for Duff & Phelps, right?

22   A.    I do.

23   Q.    But you've also worked over 400 hours on this matter,

24   right?

25   A.    Yes.

2009

1   Q.   And how much has Duff & Phelps paid you this year so far

2   in salary?

3   A.   I don't know.

4          MR. BUCHANAN:  Your Honor --

5          THE COURT:  You want to know what her annual salary

6   is?  Why don't you ask her what annual salary is?  I will

7   permit that.

8   BY MR. OPPENHEIM: (Continuing)

9   Q.   Dr. Weber, what is your annual salary?

09:17:11 10   A.   So I've been told by attorneys that because I live in

11   California, that's actually a question I don't have to answer.

12   But -- so I don't have to answer that question, it's private

13   information.

14          But if you would like, I can -- I will answer that

15   question today.

16   Q.   Sure.  I think given that we know what Dr. McCabe and

17   Dr. Lehr testified to, we would appreciate having --

18          THE COURT:  I don't think either of them testified to

19   what their salary was for MIT as a professor there.

09:17:50 20          I'll permit you to keep that matter private.

21          Let's move on.  You have explored that, sir.

22   BY MR. OPPENHEIM: (Continuing)

23   Q.   Dr. Weber, you said you have a degree in operations

24   research; is that correct?

25   A.   I do.  I have a Ph.D. in operations research.

L. Weber - Cross

2010

1    Q.   And I believe you described that as the application of

2    math to solving business problems, correct?

3    A.   Yeah, that's a -- that's a generic description of the

4    field.

5    Q.   That was what you said yesterday, right?

6    A.   Yes.

7    Q.   Okay.  Cox never retained you to assist them in 2010 when

8    it was being crushed with infringement notices and was trying

9    to stem the flow; is that right?

09:18:34 10    A.   I have not worked for Cox before this matter at all.  So,

11    sure.

12    Q.   Nor were you retained in 2012 when Cox decided to extend

13    its graduated response policy to 14 steps prior to termination,

14    correct?

15            MR. BUCHANAN:  Your Honor, asked and answered.  She

16    said she was just hired --

17            THE COURT:  All right, you can answer that, and then

18    let's move on.

19    A.   I have not worked for Cox prior to being engaged on this

09:19:01 20    matter.

21    BY MR. OPPENHEIM: (Continuing)

22    Q.   Are you -- you're not aware of anybody being retained by

23    Cox prior to this matter to conduct the type of analysis you've

24    done with respect to infringement notices, correct?

25    A.   Not by Cox, no.

L. Weber - Cross

2011

1    Q.    I want to turn to the scope of your testimony and make

2    sure we understand what it was you were testifying about and

3    what you were not testifying about.

4            In your opinions yesterday, you were not opining on

5    whether Cox's subscribers infringed plaintiffs' copyrights,

6    correct?

7    A.    No.  My opinions are not about infringement.  They are

8    about notices and tickets.

9    Q.    Nor were you opining on whether Cox's customers use

09:19:50 10   BitTorrent, Ares, Gnutella, or eDonkey, correct?

11   A.    My opinions are not about that, although I -- no, my

12   opinions that I expressed yesterday are not about that,

13   correct.

14   Q.    Nor are you opining on MarkMonitor's evidence collection

15   process, correct?

16   A.    I have opinions about the number of notices that were sent

17   per day on behalf of the RIAA by MarkMonitor from 2012 through

18   March of 2015, but I'm otherwise not opining, as you said.

19   Q.    So your only opinion with respect to MarkMonitor goes to

09:20:34 20   the number of notices that were sent, correct?

21   A.    I think that's right.

22   Q.    You would agree that between January 2012 and December 31,

23   2014, plaintiffs sent Cox at least 270,363 infringement

24   notices, correct?

25   A.    I don't know the exact number, but that -- that sounds

L. Weber - Cross

2012

1    about right.

2    Q.   And you would agree that Cox received those notices,

3    correct?

4    A.   I don't have opinions about receipt of notices, of all

5    those notices per se, but I have no reason to dispute that.

6    Q.   And you have no opinion on whether or not those notices

7    complied with Cox's requirements for what should be in an

8    infringement notice, correct?

9    A.   I do -- I do believe that I know that the -- that there

09:21:48 10   has been testimony that those notices did comply and that those

11   notices -- you see those notices also in the ticket data.

12   So -- and the address, e-mail address was repliable.  And I've

13   seen the notices -- the examples of the notices I've seen,

14   there were no settlement offers.

15          So the state of my knowledge is that they did comply.

16   Q.   And you're not disputing that Cox received infringement

17   notices from other copyright owners beyond the plaintiffs,

18   correct?

19   A.   That's right.

09:22:30 20   Q.   And you're not disputing that Cox processed infringement

21   notices it received from copyright owners beyond the

22   plaintiffs, correct?

23   A.   That's right.  For some of the -- for some of the

24   copyright owners other than the plaintiffs there were notices

25   processed, that's why there is more tickets than notices from

L. Weber - Cross

2013

1   the RIAA in the ticket data.

2   Q.   And you're not disputing that some of the notices sent by

3   other copyright owners were rejected because the copyright

4   owner or vendor was blacklisted by Cox, correct?

5   A.   That's my understanding, yes.

6   Q.   And you're not disputing that Cox silently deleted some

7   notices, correct?

8   A.   I think I've heard or read testimony about that.

9   Q.   Can we pull up Weber slide 6, please.

09:23:29  10          This was one of the slides, Dr. Weber, that you used

11   yesterday, correct?

12   A.   It is.

13   Q.   And as we look at this slide right now, there is nothing

14   that indicates that certain notice senders were blacklisted,

15   correct?

16   A.   That's not correct.  If you look at the animation, that's

17   not -- I believe that's -- I believe that's not correct.

18   Q.   So when Cox blacklisted a copyright owner, Cox didn't send

19   a notice back to that copyright owner that the notice had been

09:24:20  20   rejected, correct?

21   A.   So my understanding from the testimony is that Cox had a

22   conversation with the copyright owner when that occurred,

23   when -- prior to or as they were blacklisting them, there was a

24   conversation so that the rights holder was aware of the

25   situation.

L. Weber - Cross

2014

1    Q.   There was no response by CATS for each blacklisted notice

2    indicating that the notice was being rejected, correct?

3    A.   By the CATS system, that's correct.  That's my

4    understanding.

5    Q.   Nor does this diagram on slide 6 indicate that Cox

6    silently deleted certain notices, correct?

7    A.   I think that's -- I think that's a related point.  But,

8    yes, it indicates that not all the copyright holders' notices

9    get into the Cox ticket database.  That's really what the

09:25:30  10    exhibit was trying to demonstrate.

11    Q.   You heard or read the testimony of Mr. Beck, correct?

12    A.   I was here for some of his testimony.  I'm not sure if I

13    read or heard all of it.

14    Q.   You understand that with respect to, for instance, Digital

15    Rightscorp, there were two types of blacklisting, one where Cox

16    rejected the notices at the e-mail server, and one where Cox

17    took the e-mails in but then silently deleted them, right?

18    A.   Yeah.  I think they're called two different things.  I

19    think they're called blacklisting in one case and blocking in

09:26:12  20    the other case.  So if we can make that distinction, that will

21    be maybe a little bit clearer for me.

22    Q.   You can take that down, please.

23         Dr. Weber, you're not disputing that Cox capped the

24    number of notices it would accept from copyright owners

25    generally, right?

L. Weber - Cross

2015

1    A.    I believe that there were caps on many, if not all, of the

2    incoming copyright holders, yes.

3    Q.    And that the default cap was 200 notices per sender,

4    correct?

5    A.    I believe I have read that.  There were, obviously,

6    senders that had higher limits than that, including the

7    plaintiffs.

8    Q.    But as to other senders, the default was generally set at

9    200, correct?

09:27:00 10    A.    Again, I believe the default was, but I believe there were

11    other senders besides the plaintiffs who had a higher limit.

12    Q.    You're not disputing that Cox's Acceptable Use Policy

13    forbids all infringement, right?

14    A.    I don't have any opinions about the legal issues, about

15    the Acceptable Use Policy.

16    Q.    In your report in this case you referenced the Acceptable

17    Use Policy, correct?

18    A.    Correct.

19    Q.    So presumably you read it, right?

09:27:44 20    A.    Yes.

21    Q.    And you're not here opining on -- strike that.

22          You're not claiming that the Acceptable Use Policy

23    permits any infringement, are you?

24    A.    Oh, no.

25    Q.    And that's true both for residential and business

L. Weber - Cross

2016

1    customers, correct?

2    A.    I believe so, yes.

3    Q.    And you're not disputing that the Acceptable Use Policy

4    requires a subscriber to be responsible for infringement that

5    occurs on their account, correct?

6    A.    I believe there are words to that effect.  Yeah, I don't

7    remember the policies word-for-word, but I do believe there are

8    words to that effect.  But again, I'm not a lawyer, I'm not

9    opining on legal matters.

09:28:30 10    Q.    I understand.  Thank you.

11          You're not disputing that Cox had repeat infringers,

12    are you?

13    A.    I'm not disputing that Cox had subscribers who got

14    multiple notices of copyright infringement.  I'm not opining

15    specifically on whether or not infringement occurred.

16    Q.    You're not disputing that Cox had customers that were the

17    subject of multiple notices, correct?

18    A.    That's right.

19    Q.    Multiple infringement notices, correct?

09:29:02 20    A.    Yes.

21    Q.    And you're not disputing that Cox continued to provide

22    high-speed Internet service to subscribers who had previously

23    been caught and been the subject of an infringement notice,

24    correct?

25    A.    I'm not disputing that, no.

L. Weber - Cross

2017

1   Q.   And you have no idea as you sit there today of the total

2   number of infringement notices over time that the RIAA has sent

3   to Cox, correct?

4   A.   Correct.  I only have the data for a certain period of

5   time for a certain set of customers, true.

6   Q.   Did you ask Cox to provide you with complete information

7   on all of the infringement notices it received from the RIAA

8   over time?

9   A.   I didn't ask for that.  I asked for the data that was

09:29:54 10  produced in this matter.

11  Q.   And you have no idea as you sit here today how many Cox

12  subscribers Cox has identified as having been reported in an

13  infringement notice, correct?

14  A.   Sure.

15  Q.   You agree?

16  A.   Yeah.

17  Q.   You have no idea?

18  A.   I only have the data that was produced in this case.

19  That's all I've got.

09:30:38 20  Q.   Would you pull up the last page of the demonstrative,

21  please.  Our demonstrative, not hers.

22       Dr. Weber, I believe earlier you indicated you were

23  here for part of Mr. Beck's testimony, correct?

24  A.   I was.

25  Q.   And did you see this demonstrative that was used with

L. Weber - Cross

2018

1  Mr. Beck that included data from Cox's interrogatory responses?

2  A.   I have seen this demonstrative.  I couldn't tell you

3  conclusively if it was with Mr. Beck or not, but it was

4  sometime this week.

5  Q.   Okay.  Very well.

6         You're not disputing any of the figures set forth in

7  this demonstrative, are you?

8  A.   I'm not disputing the numbers or the calculations.  I

9  agree with Mr. Beck that looking at the percentage of -- either

09:31:41 10  Mr. Beck or whoever I saw testifying about it, that looking at

11  the percentage of total notices is not the complete story.

12  Q.   You reviewed interrogatory responses as part of your

13  assignment in this case, correct?

14  A.   Some, but far from all of them.

15  Q.   Dr. Weber, do you dispute Cox's sworn interrogatory

16  response all right.  That indicates that between 2013, February

17  2013 and November 2014 it received roughly 5.77 million

18  notices?

19  A.   I don't dispute that, no.

09:32:19 20  Q.   And do you dispute that Cox only accepted roughly

21  2 million of those 5.77 million notices?

22  A.   I have no reason to dispute those numbers.

23  Q.   And do you dispute that Cox deleted the difference, which

24  would be roughly 3.68 million notices?

25  A.   I have -- I do not dispute that, no.

L. Weber - Cross

2019

1  Q.   And do you dispute that of the two million, roughly

2  two million notices that Cox accepted, that it only sent

3  warnings on 541,000 of them?

4  A.   Right.  That's not surprising.

5  Q.   You're not surprised by that?

6  A.   No.

7  Q.   And you're not disputing that of the two million, Cox only

8  suspended 67, roughly 67 or 68,000 of those subscribers?

9  A.   That's right.  That's not surprising either.

09:33:20 10         THE COURT:  Sent notices to those?

11         MR. OPPENHEIM:  I'm sorry?

12         THE COURT:  I'm sorry, what --

13         MR. OPPENHEIM:  Did I misstate the question?

14         THE COURT:  Yeah.

15         MR. OPPENHEIM:  Let me try it again.  I apologize.

16  BY MR. OPPENHEIM: (Continuing)

17  Q.   Dr. Weber, are you disputing that Cox only suspended

18  67,891 subscribers who were the subject of 5.77 million

19  infringement notices?

09:33:48 20  A.   Oh.  So, yeah, you said subscribers, and this is not about

21  subscribers.  This is about the response to notices.  So it

22  would be 67,891 suspensions in response to the bit over

23  two million accepted notices.  But that's not necessarily

24  67,891 different subscribers.

25  Q.   That's an excellent point.  In fact, of the 5.7 million

L. Weber - Cross

2020

1    infringement notices, Cox only undertook roughly 67, 68,000

2    suspensions, and that could be for far less customers or

3    subscribers than that number, correct?

4    A.   Well, again, I would be focusing on suspensions as a

5    percentage of the notices.  But, yes, that's correct.

6    Q.   Nor are you disputing that there were only 20

7    terminations, correct?

8    A.   Actually, I thought I saw a chart from Dr. Lehr yesterday

9    that had a different number than that.

09:35:12 10   Q.   Are you disputing the sworn interrogatory response by Cox

11   in this matter?

12   A.   No.  I don't have any opinion on the number of

13   terminations.

14   Q.   Yesterday, Dr. Weber, at some times you were talking about

15   notices, right, and sometimes you were talking about tickets,

16   right?

17   A.   That's true.

18   Q.   And those are not the same thing, right?

19   A.   Not -- no, they're not.  They're two -- yeah, I could

09:35:58 20   explain more.  But, no, they are -- they're related, they

21   overlap.  But, no, they are not the same thing.

22   Q.   In fact, when you did an analysis of notices, you were

23   looking only at notices that were sent by the RIAA, correct?

24   A.   For the analyses that I presented yesterday when I was

25   talking about notices from the RIAA, yes, those analyses were

L. Weber - Cross

2021

1    from -- about notices from the RIAA.

2            And when I was talking about tickets, that included

3    more broadly what was in the CATS system related to notices

4    that had come from both RIAA and other rights holders.

5    Q.   Dr. Weber, not a single one of your analyses about notices

6    that you provided yesterday to the jury included notices from

7    other copyright owners outside of the plaintiffs, correct?

8    A.   That's right.  For -- specifically for the notice analysis

9    that I provided, that was a notice -- that was an analysis

09:37:10 10   related to the RIAA notices, as I said yesterday.

11   Q.   So your analysis, when it comes to notices, is not the

12   full extent of infringement notices received by Cox, not only

13   by time but also by rights holders, correct?

14   A.   For that analysis, that's right.

15   Q.   And you understand that when you do a ticket analysis,

16   that the tickets could actually be one ticket for multiple

17   notices, correct?

18   A.   Yes.  That can happen, yes.

19   Q.   So when you were looking at tickets, you did not consider

09:37:50 20   what are called "child tickets," correct?

21   A.   That's correct.  The data that was provided was for

22   tickets.  The CATS system itself has more information, but --

23   with respect to child tickets.  But, yes, that's right.

24   Q.   So the CATS database does track child tickets, correct?

25   A.   That is my understanding from the testimony I've heard.

2022

1   Q.   But you weren't given any data about child tickets,

2   correct?

3   A.   The data that I was given was the data for the ticket,

4   the -- that's right.  The data that was produced did not have

5   child tickets in addition to the ticket.

6   Q.   So you did not have data on child tickets, correct?

7   A.   That's right, yeah.

8   Q.   And you got all of the data, as you understand it, that

9   was produced in this case with respect to CATS tickets,

09:38:54 10   correct?

11   A.   As far as I know, yeah.

12   Q.   So let's talk about the notice data that you looked at.

13   When you were looking at notice data, you didn't look at any of

14   the data about notices prior to 2012, correct?

15   A.   I have seen some data prior to 2012, but for my analyses,

16   that was actually discussed at this trial.  But for the

17   analysis that I did in my report and that I talked about

18   yesterday, that's correct.

19   Q.   So in your analysis and what you testified to yesterday,

09:40:05 20   you didn't consider any notices from the RIAA prior to 2012,

21   right?

22   A.   That's right.  I worked with the same data file that

23   Dr. McCabe did, and those notices were from January 1 of 2012

24   through March 31 of 2015.

25   Q.   And so, you also didn't consider any notices that were

L. Weber - Cross

2023

1    sent after March 31, 2015, correct?

2    A.    No, that's not true.  I did look at that for the -- I did

3    look at those notices for the analysis that I did of the

4    notices per day that MarkMonitor sent.

5    Q.    But you didn't include any of that in your analysis

6    about -- well, let's hold on one moment.

7             Let's pull up Weber slide 7, please.

8             So, Dr. Weber, you didn't -- you prepared this slide,

9    correct?

09:41:25  10  A.    I did, yes.  I have to say that I'm not as good with

11   graphics as to make the image of the funnel.  But, yes, the

12   rest of it, yes, I -- those are my words, yes.

13   Q.    And in doing this analysis that you have here, you didn't

14   consider any notices from the RIAA prior to 2012 or after

15   March 31, 2015, correct?

16   A.    Correct.

17   Q.    Let's turn to the next page, please, of this

18   demonstrative.

19             And similarly for this analysis that you did, you

09:42:13  20  didn't include -- didn't consider any notices prior to

21   January 1, 2012, or after March 31, 2015, correct?

22   A.    That's correct.  This is just about the -- well, actually,

23   this chart is focused on the relevant period.  Just like

24   Dr. McCabe did, I focused on the relevant period.

25   Q.    Now -- so when you're saying relevant period, you're

2024

1    referring to that in the slide, correct?

2    A.    Yeah.

3    Q.    And relevant period to you actually didn't even include

4    2012, correct?

5    A.    Yes.  Just like Dr. McCabe, both of us focused on the

6    relevant period.  I can explain why, if you like.

7    Q.    All I want to do for the moment, Dr. Weber, is make sure

8    we understand what data you looked at for doing this analysis.

9           And so, in doing this analysis, all you looked at was

09:43:28 10   data from February 4, 2013, through November 26, 2014, correct.

11          MR. BUCHANAN:  Your Honor, I'm just going to

12    interpose an objection.  She has testified as to the data that

13    she looked at, the notice data and ticket data.

14          THE COURT:  Okay.  I'm going to permit the question.

15    He's just trying to get the parameters of what she looked at.

16          You've asked it.  She's answered it.

17          So can you answer the question?

18          THE WITNESS:  I think the answer -- if I remember the

19    question, I think the answer was yes.

09:43:59 20   BY MR. OPPENHEIM: (Continuing)

21    Q.    And when you included the percentages here, those

22    percentages are cumulative percentages, correct?

23    A.    Exactly right.  Exactly right.  78 percent is -- it has

24    three or fewer notices, one, two, or three notices in the

25    relevant period.

L. Weber - Cross

2025

1    Q.   Okay.  So you have cumulative percentages here, and you

2    have cumulative percentages for one notice, two notice, three

3    notice, four notice, five notice, then you aggregate six and

4    seven, right?

5    A.   Yeah.  The bar is actually for 7.  The bar is actually --

6    it should probably be labeled 7.

7    Q.   So we should take the 6 out?

8    A.   Yeah, I mean, the bar is actually at 7.

9    Q.   Okay.  And then you have one for 8 or 9.  Should that just

09:44:46 10  be 9?

11   A.   Yeah.  The bar actually represents, represents the 9.

12   Q.   So we should probably take the 8 out?

13   A.   If you wanted to be precise, yes.

14   Q.   Precision is important when you're testifying about

15   statistics and numbers, right?

16   A.   I will agree with that.

17   Q.   And then there is something missing here, right?  Because

18   you go from 8 and 9 to 12, right?

19   A.   Yeah.  In my -- I can explain.

09:45:14 20  Q.   I just -- first of all, do we have it right that you

21   skipped 10 and 11?

22   A.   They're not shown on this chart because in my report it

23   was exactly the same as 6, 7, 8, 9.  My report was labeled 10

24   to 12, but, again, the bar is about 12.  Just like the 6 to 7

25   bar is about 7, and the 8 to 9 bar is about 9, the 10 to 12 bar

L. Weber - Cross

2026

1  is about 12.

2  Q.   Okay.  So the reason that you say you skipped 10 and 11

3  here is because, well, you did it before as well, so it's okay

4  to do it again?  Is that what you are saying?  Is that correct?

5  A.   So the 12 is a correct label for that bar, right.  I could

6  have had more bars in here.  It just would have been a lot more

7  bars.  I was trying to simplify it a little bit for

8  presentation.

9          But the 12 is correctly labeled.  That's the

09:46:17 10  cumulative percent for 12.

11  Q.   So let's -- can we clear that off?  I'm not sure how to --

12  there we go.  Thank you.

13          I want to focus for a minute on the 13+.

14          You have this up to the top here, which is

15  100 percent, correct?

16  A.   Sure.

17  Q.   If you had just put 13 and not 13+, that wouldn't be

18  100 percent, correct?

19  A.   No.

09:46:46 20  Q.   In fact, if this one here was 1+, then this would be

21  100 percent, too, correct?

22  A.   Sure.  Those other numbers are also in my report.

23  Q.   So let's turn to slide 9, please, of her report.

24          Excuse me, her -- and somehow how do I erase?  Okay.

25  You got it.  Thank you.

2027

1          You're aware, Dr. Weber, that the RIAA notices

2     identified 57,600 Cox subscribers, correct?

3     A.   Yes, there are 57,600 subscriber IDs that Cox was able to

4     tie to the notices in the relevant period that we just talked

5     about from February 4, 2013, to November 26, 2014.

6     Q.   So -- and I believe in this slide what you were attempting

7     to do was to explain that you believed that there was -- if you

8     looked at the entire dataset, there was bias, right?

9     A.   So what I was trying -- what I was -- this slide is kind

09:48:23 10   of missing the gray area for the relevant periods.  That makes

11    it a little harder to look at.

12          But what I was trying to communicate was that the set

13    of accounts that -- for which the data was produced, the set of

14    accounts matched to the relevant period, which is pretty close

15    to the claim period, off only by a few days, the set of

16    accounts that were matched to the relevant period is not an

17    unbiased representation of the general Cox subscriber account

18    that was the subject of an RIAA notice.

19    Q.   Okay.  So can we go to our demonstrative number 1 here,

09:49:14 20   please.

21          So I believe that you said that you had read

22    Dr. McCabe's testimony.  And this was one of the demonstratives

23    that he used.

24          And this demonstrative shows, does it not, that the

25    original dataset identified 57,600 subscribers, and of those

L. Weber - Cross

2028

1    Cox only terminated 13, right?

2    A.    I believe that's what this communicates, yes.

3    Q.    So this was the dataset that you were trying to take the

4    bias out of, correct?

5    A.    The dataset that I was trying to take the bias out of was

6    both the notice data as well as the ticket data, yes.

7    Q.    And I believe you testified yesterday that in order to

8    sidestep the bias, you decided to exclude from your dataset

9    roughly 15,000 subscribers who had been first identified in

09:50:26 10   notices in 2012, correct?

11   A.    Not if you're -- not if you're describing notices from the

12   RIAA, no.  That's not correct.

13   Q.    You did say you were trying to sidestep the bias issue,

14   correct?

15   A.    Yes, I was trying to -- I was trying to do the best I

16   could to provide an unbiased representation of the -- of a

17   subscriber account from Cox that was subject to a notice from

18   the RIAA.  And I didn't have that with the set of accounts that

19   are at issue here.

09:51:18 20   Q.    And in order to get what you believed was an unbiased

21   dataset, you eliminated roughly 15,000 subscribers from the

22   dataset, correct?

23   A.    It was 23 percent of the at-issue subscriber accounts that

24   were taken out for that analysis.  You know, 15,000 sounds like

25   it might be the reasonable estimate of the number.

L. Weber - Cross

2029

1  Q.   So I've pulled up the second demonstrative in this stack,

2  and you went from 57,600 to 42,025, correct?

3  A.   That number sounds familiar, yes.

4  Q.   But the point about terminations up here actually now has

5  to change, right?  Because the 13 applied to the 57,600, right?

6  A.   I don't have any opinions about terminated subscribers, so

7  the --

8  Q.   Let's go to the next slide, please.

9       Do you dispute that if you look at the 42,025, that

09:52:36 10  now there are only seven terminations?

11  A.   I don't have any opinions about terminated subscribers.  I

12  can neither confirm nor deny whether that seven is correct.

13  Q.   And the subscribers that you sought to exclude from this

14  dataset were subscribers that had been the subject of

15  notices -- the first notice in 2012, correct?

16  A.   Again, if you're talking about RIAA notices, that's not

17  correct.  You know, you wanted it to be clear about notices

18  versus tickets, so --

19  Q.   So you excluded subscribers who had their first ticket in

09:53:22 20  2012, is that what you are saying?

21  A.   Yeah.  Dr. McCabe called it a prior ticket in his

22  analysis.  But it was the subscribers that had -- did not have

23  -- the subscribers that were excluded were those that had a

24  ticket in the time period before the relevant period.  So that

25  was January, that would have included all of 2012 and also

L. Weber - Cross

2030

1    January and a couple days in February of 2013.

2    Q.   Okay.  And so, in reducing the period you looked at, you

3    eliminated an entire year, essentially, of data which would

4    include potentially the subscribers who had been subject to

5    notices for the longest possible period of time in your

6    dataset, correct?

7    A.   I was very clear about that yesterday, that's correct.

8    That's what I needed to do to come up with a set that was

9    representative -- more representative of the general population

09:54:33 10   of subscriber accounts that had been the subject of an RIAA

11   notice than the set of at-issue subscribers.

12   Q.   So, Dr. Weber, I would like to look at just a couple of

13   examples of the types of subscribers that you eliminated from

14   your dataset.  So could you please turn to tab 41 in the binder

15   that is in front of you.

16        Your Honor, we would -- this is ticket data from PX

17   19, and we will mark this as -- 560, PX 560.

18        Do we have a copy we can hand up to the Court because

19   I don't believe he has one.

09:55:34 20        Dr. Weber, this is -- you would agree this looks like

21   ticket data from Cox's CATS system, correct?

22   A.   It does.

23        MR. OPPENHEIM:  Your Honor, we would move PX 560 in

24   evidence.

25        MR. BUCHANAN:  I don't know that this has been

2031

1    verified by anyone.  It is just pulling from the ticket data.

2    So there is no witness that has testified about this.

3              THE COURT:  I am going to allow it.  It is received.

4              MR. BUCHANAN:  Which tab?

5              MR. OPPENHEIM:  I'm sorry, Tab 41.  I thought I said

6    that.

7    BY MR. OPPENHEIM:  (Continuing)

8    Q.   So, Dr. Weber -- can we pull that up, please?  It is 3404.

9    Can we pull that up?

09:56:31  10           So, Dr. Weber, this is ticket data for a Cox customer

11   where it shows 79 tickets.  I will represent that to you.  If

12   you would like to count it, you can.

13   A.   I don't think I want to count it, but I will accept your

14   representation.

15   Q.   And so, this was one of the customers -- well, let's look,

16   actually.  Strike that.

17           You see that the create date of the first ticket is

18   1/17/2012, right?

19   A.   That's correct.

09:57:11  20   Q.   So this would have -- based on that, this would have been

21   a Cox subscriber who was excluded from your analysis that we

22   just talked about, correct?

23   A.   Absolutely.

24   Q.   And this subscriber if we counted up the 79 tickets, we'll

25   see 16 suspensions; is that correct?

L. Weber - Cross

2032

1    A.    Let's see.  I see some warnings.  I see a Trojan

2    compromise, which is malware.  I see some hard limits.  I see

3    some suspensions.  Yeah.

4    Q.    And you also see some DMCA sent warnings, correct?

5    A.    If I missed saying that then, yeah, I meant to, yeah.

6    Q.    You may not have.  I may have just missed hearing it.

7          I want to -- so all told, I believe, that out of

8    these 79 tickets there was 29 tickets that were closed for hard

9    limits.  Do you have any reason to dispute that looking at

09:58:27 10    this?

11    A.    I'll accept your representation.

12    Q.    And that there were 26 warnings sent?

13    A.    Again, I will accept your representation.

14    Q.    Okay.  And I believe we said earlier 16 suspensions,

15    right?

16    A.    Again, that's actually a lot harder to count, but I will

17    accept your representation.

18    Q.    I want to focus on the first suspension.  Actually, before

19    we go to the first suspension, I am sorry, let's -- the first

09:59:08 20    changed status to closed.  Do you see -- I am sorry, I take

21    that back.

22          Let's go to the first suspension.  So that is on

23    January 27, 2012.  Do you see that?

24    A.    I do.

25    Q.    Now, you understand under Cox's graduated response policy

L. Weber - Cross

2033

1    that there would have had to have been at least seven tickets

2    before that suspension, for it to occur under their normal

3    graduated response policy, right?

4    A.   So that depends on the -- that depends on the type of

5    customer.  And I don't know -- I can't tell from the ticket

6    data without the billing data what -- well, no, actually, I can

7    tell.  Never mind, I can tell.

8           That would be -- that would be typical, yeah.

9    Q.   And we don't see seven warnings above that first

10   suspension, correct?

11   A.   I think it's six warnings.

12   Q.   You're right, six warnings and one auto close, ignore auto

13   close, right?

14   A.   Yeah, one hold for more.  So, yes, that's right.  There is

15   only three warnings back through January 17th.

16   Q.   So this -- based on looking at this, we could pretty

17   fairly presume that there were infringement notices that

18   predated -- well, it would be January 1, 2012, right?

19   A.   That wouldn't surprise me.  That would be a reasonable --

20   that would be a reasonable assumption.

21   Q.   And then, let's look at the -- this first -- excuse me --

22   the first suspension and reactivation.  Can you tell how long

23   it took for this customer to reactivate after that first

24   suspension?

25   A.   Yeah.  So that happened right away.  And I know why.

L. Weber - Cross

2034

1  Q.   So that was 31 minutes?

2  A.   Oh, I'm sorry.  I was looking at the wrong line.  I

3  apologize.  You're right.  It's not right away, it's

4  31 minutes, yes.

5  Q.   And then the next suspension, it only took 30 minutes to

6  reactivate, correct?

7  A.   That's looks like it's correct.

8  Q.   Okay.  Can we turn to the last line of this ticket data,

9  please?

10:02:12 10        It shows that there was an infringement notice that

11  was sent to Cox on December 12, 2014, correct?

12  A.   You said an infringement notice sent to Cox; is that what

13  you said?

14  Q.   Yes.

15  A.   Yes, that's correct.

16  Q.   And we have, based on this -- and there was no -- that

17  notice was never forwarded to the customer, right?

18  A.   That notice hit the hard limit for complaints for that

19  copyright holder on that day, which means it probably was not

10:03:01 20  the RIAA.

21  Q.   And given this long history of tickets and the fact that

22  there was an infringement notice in mid-December, we have no

23  reason to believe that there weren't additional infringement

24  notices that continued into 2015, correct?

25  A.   Right.  That is consistent with my analysis.

L. Weber - Cross

2035

1    Q.   Let's please turn to tab 42.

2              This is more ticket data out of PX 19, Dr. Weber.

3    A.   Okay.

4              MR. OPPENHEIM:  We would move to admit 561.

5              THE COURT:  Any objection?

6              MR. BUCHANAN:  The same objection as before, Your

7    Honor.

8              THE COURT:  All right.  It's received.

9              MR. BUCHANAN:  We will just make a running objection

10:03:51  10   that there is three more of these, or two more of these.

11             THE COURT:  Yes, sir.

12             MR. BUCHANAN:  Thank you.

13   BY MR. OPPENHEIM: (Continuing)

14   Q.   Dr. Weber, now this shows -- let's look at the first line

15   of this -- actually, let's start big picture.

16             Would you disagree with me if I told you there were

17   33 tickets this, in the history for this customer?

18   A.   I would accept your representation if that's what you say.

19   Q.   And of those 33 tickets, there were 18 that are listed as

10:04:26  20   hard limits, which means that Cox never forwarded the notices

21   to the subscriber?

22   A.   Again, without counting them, I will accept your

23   representation on that.

24   Q.   And that there were eight warnings, only eight warnings

25   sent to the subscriber out of the 33 tickets?

L. Weber - Cross

2036

1    A.    That looks to be correct.

2    Q.    And there are five suspensions of this customer?

3    A.    Without counting them, again I will accept your

4    representation.

5    Q.    And if we look at the first line of this, it shows that

6    the first ticket was created on January 19, 2012, correct?

7    A.    That's correct.

8    Q.    So based on the way you conducted your analysis, this is

9    another subscriber that you would have excluded?

10:05:33 10   A.    That's right.  I talked about this yesterday.  That a lot

11   of the -- a lot of the -- very small percentage of the at-issue

12   subscriber accounts that had lots of tickets, those are, not

13   all, but mostly not in the dataset that is more representative

14   of the general Cox population that was subject to an RIAA

15   notice.

16   Q.    Dr. Weber, let's look at the first line of this.  It shows

17   that the very first response here on January 19, 2012, was a

18   suspension, correct?

19   A.    That's correct.

10:06:25 20   Q.    So based on Cox's graduated response policies, there had

21   to have been notices prior to January 19, 2012, correct?

22   A.    At least one.

23   Q.    At least one.

24   A.    One, yes.

25   Q.    Could be many more, right?

L. Weber - Cross

2037

1    A.   Well, actually, it doesn't even have to be one.   There is

2    actually a scenario in which there aren't any other ones.

3    Q.   Is it your testimony that Cox had a policy to suspend

4    subscribers upon the receipt of the first copyright

5    infringement notice?

6    A.   No.  But, you know, as has been discussed, sometimes two

7    notices can come in on one day.  And when that happens, the

8    first such notice counts as the hold for more.  And the second

9    notice actually triggers the next step in the process.

10:07:28  10          And so, one ticket on one -- the first ticket could

11   conceivably -- again, I just said it was one scenario --

12   could -- the first ticket could conceivably result in the

13   second step.

14   Q.   Dr. Weber, you have absolutely no basis to believe that

15   that's what happened here, do you?

16   A.   No, but you're asking me what could have happened, and I'm

17   responding about the different scenarios.

18   Q.   Let's look at the suspension on 3/19/2013, please.

19          Do you see that happened at 3:01 p.m.?

10:08:15  20   A.   Yes.

21   Q.   And that the reactivation occurred 41 minutes later?

22   A.   Yes.

23   Q.   Let's look at the last line of this ticket data.  Let's

24   skip all the way down.

25   A.   Do you want to discuss why that happened or what -- I'm

L. Weber - Cross

2038

1    sorry, where do you want me to go?

2    Q.   The very last line, if you would, please.

3          This subscriber, according to this CATS history, was

4    the subject of a notice as late as December 22, 2014, correct?

5    A.   That's correct.

6    Q.   And so, based on this, we have no reason to believe that

7    this subscriber stopped infringing as of that date, correct?

8    A.   Right.  There is no evidence one way or another, but I

9    couldn't say that they did not continue to be the subject of

10:09:11 10   additional notices after this.

11   Q.   Let's pull up Weber slide 14, please.

12          Before we look at this slide, Dr. Weber, we just went

13   through two examples of subscribers whose ticket history you

14   did not look at as part of your -- this analysis that's in

15   front of us right now, correct?

16   A.   That's correct.

17   Q.   But you agree that I could go through, many, many, many

18   more subscribers like the two we just went through and show

19   that you excluded them as well, correct?

10:10:13 20   A.   Well, I excluded 23 percent.  They wouldn't all look like

21   those.  Those are the extreme.  You have given me some extreme

22   examples that are a small fraction of the at-issue subscriber

23   population.  And even a small fraction of the set of

24   subscribers that are in the 23 percent.

25   Q.   So is it your opinion that the representative examples I

L. Weber - Cross

2039

1    just gave you are extreme examples of what you excluded?  Is

2    that your opinion, Dr. Weber?

3    A.   They are among -- there are worse ones, right?  There's

4    like the ones with -- you showed me some single-family

5    residential subscribers, right.  And there are commercial

6    subscribers with 4,000 tickets.  So there is certainly worse

7    ones.

8            But, yeah, the -- in terms of the single-family

9    residential subscribers, I mean, the first one you showed me

10   had more than 70 tickets.  And the percentage of single-family

11   residential subscribers that had, you know, that many tickets

12   is very small.

13   Q.   Dr. Weber, you've not performed any analysis or provided

14   any opinion about what happened with respect to the 15,000

15   subscribers that you excluded, correct?

16   A.   Well, I have done analyses with them on my earlier slides,

17   absolutely.  I showed analyses of all the accounts at issue for

18   the number of notices they got.  And I did the same analysis

19   for tickets, which I presented -- which is in my report that

20   you have seen.

21            So I have done analyses with that.

22   Q.   I'm not asking you, Dr. Weber, whether or not you did

23   other analyses that may have included the entirety of the

24   dataset.  I believe you testified a moment ago that the

25   examples that I showed you were extreme examples of the 15,000

L. Weber - Cross

2040

1    subscribers you excluded.

2            And my question to you is, did you ever conduct an

3    analysis of that 15,000 such that you can opine about which are

4    extreme examples and which are not?

5            Because I have read your report, I haven't seen it, I

6    didn't hear it yesterday --

7            THE COURT:  All right, now you're testifying.  The

8    question is asked.

9            MR. OPPENHEIM:  Okay.

10:12:38 10          THE COURT:  Did you do a separate analysis on those

11   15,000?

12           THE WITNESS:  I don't have to do a separate

13   analysis --

14           THE COURT:  The answer is, no, you didn't do a

15   separate analysis.  And you can explain why, either Mr.

16   Oppenheim will ask or your counsel will follow-up.

17           Go ahead, ask your next question.

18   BY MR. OPPENHEIM: (Continuing)

19   Q.   So we are looking at Weber slide 14 here.

10:12:58 20          Now, this is the analysis that you did that included

21   the 42,025 subscribers, correct?

22   A.   This is one of them, yes.

23   Q.   And of those 42,000 subscribers, you concluded that 18,600

24   were the subject of three or more notices from the RIAA,

25   correct?

L. Weber - Cross

2041

1    A.    Can I go back and correct some prior testimony?  I

2    realized --

3    Q.    I am sure your counsel will ask you lots of questions

4    and --

5    A.    Sure.  I am sorry, can you repeat your question?

6    Q.    Of the subscribers, 42,000 subscribers you looked at, you

7    concluded that 18,600 were reported in RIAA notices after

8    having received three or more notices, correct?

9    A.    No, that's not correct.

10:14:12 10   Q.    Your analysis here shows that of the 42,025 subscribers

11   that you looked at, 18,600 were the subject of three or more

12   tickets, correct?

13   A.    That is correct.

14   Q.    Okay.  And that actually -- if we calculate that out, that

15   is 44.3 percent of the subscribers who were subject to

16   infringement notices in your unbiased dataset had been the

17   subject of three or more tickets, correct?

18   A.    For single-family residential subscribers, that sounds --

19   without doing the math, that sounds about right.

10:14:51 20   Q.    If we added in commercial, it would probably be higher,

21   right?

22   A.    Commercial is -- yeah.  Commercial is different.  But,

23   yes.

24   Q.    It would be higher, right?

25   A.    The average number of tickets is higher for commercial

L. Weber - Cross

2042

1   subscribers.  So probably, yes.

2   Q.   Yes.  So the percentage would be higher than 44.3 percent,

3   correct?

4   A.   I believe -- again, that's in my report, I could tell you,

5   but it's --

6   Q.   Dr. Weber, if we look at how many were the subject of five

7   or more notices, it's 24.3 percent, or 10,200 Cox subscribers,

8   correct?

9   A.   Yes, that were the subject of five or more tickets, yes.

10:15:36 10   Q.   So roughly a quarter of the Cox subscribers who were the

11   subject of notices in your reduced dataset were the subject of

12   five or more infringement notices, right?

13   A.   I forgot the percentage that you had said.  Was it --

14   Q.   Well, I calculated it at 24.3 percent.

15   A.   Okay.

16   Q.   Right?

17   A.   Okay.  I will take your representation.  I could look up

18   the numbers in my report, but I will take your representation.

19   Q.   Well, it's 10,208 and 42,025, right?

10:16:11 20   A.   Yeah.  Right, yeah.

21   Q.   You would agree that is roughly 25 percent?

22   A.   It looks like it's in the ballpark, sure.

23   Q.   Let's look at the 13-plus tickets.  So there, even using

24   your reduced dataset, there were 1,330 subscribers who

25   continued to be reported in notices after the 13th notice,

2043

1    correct?

2    A.   Well, again, we're talking tickets, not RIAA notices.

3    But, yes, there are -- 13 or more tickets, it is 1,330.

4    Q.   And that's just of residential subscribers, correct?

5    A.   Yes.  It's -- I think it's surprisingly not that different

6    actually in commercial.  But, yes, it's -- yes, it's -- I think

7    it's single-family residential.

8    Q.   And of those, only seven were actually terminated,

9    correct?

10:17:18 10   A.   I don't have an opinion on that.

11   Q.   Let's turn to Weber slide 16, please.

12          Dr. Weber, this was an example you described

13   yesterday that shows a subscriber who was caught and

14   reported -- excuse me -- distributing the song "No Lie" on

15   July 10, 2013, correct?

16   A.   Well, I don't have an opinion about whether they were

17   distributing.  But, yes, they were the subject of a notice, two

18   notices about "No Lie" by 2 Chainz.

19   Q.   Well, they were reported as distributing in those notices,

10:18:04 20   correct?

21   A.   They were reported by MarkMonitor as being observed.  And

22   you are getting into the technical area that is really not my

23   expertise, so I probably shouldn't express an opinion about

24   that.  All I know is that there was a notice from MarkMonitor

25   about that song to -- with respect to this subscriber account.

L. Weber - Cross

2044

1  Q.   You testified earlier, I believe, that you said you had

2  reviewed those notices, right?

3  A.   I reviewed the notice data, correct.

4  Q.   Did you review an example of a notice?

5  A.   Yes.

6  Q.   And didn't that notice indicate that MarkMonitor was

7  informing Cox that they had identified somebody as distributing

8  particular recordings illegally?

9  A.   I do not recall the exact words.  If you -- if you want to

10:19:04 10  show me such a notice, I am happy to read the words.

11  Q.   Let's move on.  So, Dr. Weber, this subscriber was then

12  caught and reported again two days later, correct?

13  A.   Yes.  There was a notice about this subscriber two days

14  later for the same song.

15  Q.   Did you hear -- excuse me -- did you hear Mr. Negretti's

16  testimony yesterday?

17  A.   I did not.

18  Q.   Did you review it?

19  A.   No.  I don't think the transcript was -- I don't recall

10:19:41 20  whether I got the transcript in time for me to even look at it.

21  Q.   Are you aware that Cox advertises that its customers can

22  download 100 songs in three seconds?

23  A.   Oh, you know -- so I was here for part of Mr. Negretti's

24  testimony because that does sound familiar.  Okay.  Can you

25  repeat your question?

L. Weber - Cross

2045

1    Q.    So did you hear Mr. Negretti's testimony that Cox

2    advertises that its customers can download 100 songs in three

3    seconds?

4    A.    So I -- that sounds -- I won't swear to exactly what he

5    said, but that sounds about like what I heard, yeah.

6    Q.    Did you hear him say that Cox does not want as a customer

7    anyone who is breaking the law?

8    A.    Maybe.  You know, I don't recall.  That's not as

9    memorable.  I don't recall whether he said that or not.

10:20:34 10    Q.    Dr. Weber, did you do an analysis to determine how many

11    times "No Lie" by 2 Chainz was distributed in the two days on

12    this slide?

13    A.    That data is not -- I don't think that such data has been

14    produced.  I am not even sure that MarkMonitor collects that

15    data.  I don't think they do.

16    Q.    So the same subscriber was then caught on August 14, 2013,

17    correct?

18    A.    There is a notice on -- also a notice for a different song

19    on August 14 of 2013, yes.

10:21:13 20    Q.    And that's the song "The A Team" by Ed Sheeran?

21    A.    Yes.

22    Q.    And do you know how many copies of plaintiffs' recordings

23    that this subscriber distributed during the course of his

24    infringing activities?

25    A.    Again, I don't think that there is data available on that.

L. Weber - Cross

2046

1    I don't think MarkMonitor collects that kind of data.  I'm not

2    even sure if it's feasible to do that.

3    Q.   Do you know whether or not the artists were paid for these

4    infringements?

5    A.   Again, this is an allegation of infringement.  I don't

6    know -- I don't know if the person bought a legitimate copy of

7    these songs.  And I don't know whether there was -- you know, I

8    don't know whether or not there was any actual downloading by

9    others of these songs from this particular subscriber's

10:22:16 10   account.

11   Q.   So you're not aware that -- of whether or not the artists

12   were paid for these distributions?

13        THE COURT:  Yeah, let's move on to a subject that she

14   is focused -- her testimony is focused on, please.

15   BY MR. OPPENHEIM:  (Continuing)

16   Q.   Do you know how much money Cox collected in monthly

17   billings from this subscriber during the period that they were

18   reported infringing?

19   A.   I don't have any opinions on dollar amounts in billings

10:22:44 20   other than having looked at whether they were non-zero, you

21   know, to figure out when the last billing date was.  But other

22   than that, I don't have any opinions about bills.

23        THE COURT:  She hasn't given any opinion on billing

24   data, so let's move along.

25        MR. OPPENHEIM:  I am moving off this.  That's what I

2047

1    am doing, Your Honor.

2    BY MR. OPPENHEIM: (Continuing)

3    Q.   Could you please look at tab 47 in your binder.

4              THE COURT:  Do you have an exhibit number?

5              MR. OPPENHEIM:  Yes.  We are -- this would be PX --

6    we will mark it as PX 565.

7              Your Honor, may I approach Amanda to hand it up since

8    Joe is missing?

9              THE COURT:  Yes.  Matt.

10:23:55 10              MR. OPPENHEIM:  Thanks.

11   BY MR. OPPENHEIM: (Continuing)

12   Q.   Does this look like another set of ticket data, Dr. Weber?

13   A.   This does look like another set of ticket data.

14             MR. OPPENHEIM:  Your Honor, we would move the

15   admission of PX 560.

16             THE COURT:  It is received with the same exception

17   noted.  You know, if this is the same testimony, we have heard

18   it.

19             MR. OPPENHEIM:  One different point, Your Honor, and

10:24:17 20   then I will move on.

21             THE COURT:  Let's make it.

22   BY MR. OPPENHEIM: (Continuing)

23   Q.   Dr. Weber, this is a subscriber who had 29 tickets over

24   two months.  Do you want to count that, or will you take my

25   word for it?

L. Weber - Cross

2048

1    A.    No, I will take your word for it.

2    Q.    Can you tell me based on this notice data how many times

3    this Cox subscriber was sent a warning notice?

4    A.    So this -- in terms specifically of e-mail warnings sent,

5    there --

6    Q.    I'm sorry, did you finish your answer?  I don't want to

7    interrupt.

8    A.    I didn't.  I'm --

9    Q.    Okay.  Sorry.

10:25:19 10  A.    If you wouldn't mind, I would like to actually look at

11   this a little bit.

12   Q.    Absolutely, please.

13   A.    No, there is no e-mail notice sent.  There is some manual

14   working of this file, but there is no e-mail notice sent.

15   Q.    So, Dr. Weber, you would agree, would you not, that

16   looking at this data, that this subscriber was the subject of

17   20 -- at least 29 infringement notices, and yet Cox never sent

18   this subscriber a warning, never suspended them, and never

19   terminated them, correct?

10:26:22 20  A.    There may well have been conversations with this

21   subscriber.  That's what the file may indicate.  But there --

22   right, there were no warnings.  There were no -- there were no

23   warnings.  There were no suspensions.  What was the third one?

24   Q.    Or terminations.

25   A.    Yeah, I don't -- right.  It looks like there were no

L. Weber - Cross

2049

1    warnings, no suspensions, no terminations, but there was some

2    manual working of the file here.  So there could well have been

3    conversations with the account.

4    Q.   But you don't know if there were or weren't at this point,

5    right?

6    A.   I'm sorry?

7    Q.   As you sit here today, you don't know whether there were

8    conversations or not, correct?

9    A.   No.  That's an inference that one could draw from, from

10:27:15 10   looking at this.  You also haven't told me if this is a

11   commercial account or a single-family residential account.

12   Q.   I believe it's a residential account, but neither here nor

13   there on that.

14          Let's turn to, if we can, Weber slide 19.

15          Dr. Weber, your first bullet point on this slide that

16   you used yesterday is a calculation based on tickets, correct?

17          It's up on the screen if that's easier, whichever you

18   like.

19   A.   Oh, sorry -- no, I thought you were turning me to a page

10:28:02 20   in the binder.  But, yeah, I am happy to look at the screen.

21          I am sorry, go ahead.

22   Q.   This was a slide you used yesterday, right?

23   A.   Yes.

24   Q.   And the first bullet point is a calculation based on

25   tickets, right?

L. Weber - Cross

2050

1    A.   That's right.

2    Q.   And the second bullet point is a calculation based on

3    notices, right?

4    A.   Yes.  This is -- the first is tickets for the three-year

5    period.  That's all the tickets.  And the second one happens to

6    be RIAA notices in the relevant period, which is around the

7    claim period, yeah.

8    Q.   So this is three years, roughly, and this is roughly two

9    years, right?

10:28:41  10    A.   Sure.

11    Q.   Okay.  But as we have discussed, tickets and notices

12    aren't the same, right?

13    A.   That's right, there is more tickets than there are RIAA

14    notices.

15    Q.   Now, did you look at the number of subscribers with 50-

16    plus -- 50-plus but tickets instead of notices, so that you had

17    tickets above and tickets below?

18    A.   That's not in my report, but I actually, since then I

19    think I have done -- I have looked at that, yeah.

10:29:26  20    Q.   So isn't it in fact, true, Dr. Weber, that if you had

21    used -- in the second bullet, you had said, okay, let's look at

22    50-plus, but let's do the same thing as we did in the first

23    point and let's look at tickets -- I am going to use the

24    shorthand -- right.  Wouldn't that, in fact, show 27.4 percent

25    were residential?

L. Weber - Cross

2051

1    A.    What?  Oh, I see what -- you're not saying that

2    27.4 percent of the Cox residential subscribers got 50 or more

3    tickets.  No, it's a really tiny percentage that got 50 or more

4    tickets, tiny.

5          But I actually don't know how many of them are

6    commercial or residential, I couldn't -- I couldn't confirm or

7    deny.  I was looking at 100-plus tickets because that's what

8    the other expects from the plaintiffs were looking at in this

9    case, so that's why I chose 100-plus.

10:30:27 10   Q.    Well, that's on the first one, but then you decided to do

11   a second analysis because you wanted to conclude that almost

12   all are commercial.  But instead of using tickets, you used

13   notices, right?

14   A.    So I wanted --

15   Q.    If you had used tickets, it would have been 27.4 --

16   sorry -- 27.4 percent?  That mike is a little hot, sorry.

17   A.    Right.  So I didn't do 100-plus RIAA notices because there

18   is only one residential subscriber with 100-plus tickets.  So,

19   you know, it didn't make any sense to do 100 with RIAA notices.

10:31:03 20        I also could only do that in the relevant period

21   because the notices and tickets aren't actually tied together

22   except in the relevant period.  So I could only look for the

23   RIAA notices in the relevant period.  So that's what I did.

24        And I chose 50-plus because 100-plus didn't make any

25   sense.  There was only, you know, it was -- I was already going

L. Weber - Cross

2052

1    to say there was only one out of -- that there was only one

2    residential subscriber out of more than 50,000 who got more

3    than 100 tickets.  So that's why I chose 50.

4    Q.   Can we turn to Weber slide 22, please.

5              One moment, Your Honor.  We are checking for a clean

6    copy of this slide.

7              THE COURT:  Yes, sir.

8              MR. OPPENHEIM:  Apologies for the delay.

9    BY MR. OPPENHEIM: (Continuing)

10:32:34 10   Q.   In the -- I want to focus on that first bullet point for a

11   moment here.  What you say is that terminating an ISP could cut

12   off the Internet for thousands of households not the subject of

13   notices, right?

14   A.   Yes.

15   Q.   Now, Cox had options other than just terminating, correct?

16   A.   Sure.

17   Q.   In fact, under the business AUP, Cox can demand

18   information on the infringing end user, correct?

19   A.   I'm not familiar with those, those aspects of -- I mean,

10:33:13 20   that gets into the legal area.  It's not part of my opinion.

21   Q.   And Cox could require that the commercial customer suspend

22   the end user, right?

23             MR. BUCHANAN:  Your Honor, I think she just testified

24   that she didn't have expertise between what Cox could do

25   vis-à-vis the ISP and what they could do vis-à-vis a

1    subscriber.

2          THE COURT:  Well, I think -- if you can answer that

3    question, you can answer it.  That's not ---

4          THE WITNESS:  Can you repeat the question, please?

5    BY MR. OPPENHEIM: (Continuing)

6    Q.   Cox could require the business AUP to suspend the end

7    user, correct -- excuse me -- the business subscriber to

8    suspend the end user, correct?

9    A.   I don't actually know.

10:34:00  10   Q.   Cox could throttle the bandwidth of this subscriber,

11   correct?

12   A.   Of the Internet service provider?  That would affect all

13   of the households.  But I assume they -- actually, I don't even

14   -- I don't know if in this time frame they could do that.

15   That's not my area of expertise.

16   Q.   Cox could temporarily suspend the subscriber, correct?

17   A.   Cox could -- presumably could suspend the subscriber.  And

18   that, too, would affect all of that subscriber's households.

19   Q.   Cox could tell the subscriber, you have 30 days to get

10:34:37  20   your house in order, right?

21   A.   Presumably, sure.

22   Q.   And you are aware that --

23   A.   And, you know, I know they had conversations with their

24   business subscribers.  I don't even know that they, you know,

25   weren't having those kinds of conversations.

L. Weber - Cross

2054

1    Q.    Can we you pull up PX 365, please.  And go to page 17.

2    Yes, it's in evidence.  And highlight the bottom box, please.

3           You are aware that during this period of time Cox

4    terminated 21,915 business subscribers for non-payment,

5    correct?

6    A.    I did not do any analysis of -- outside of the area of

7    copyright infringement notices from the RIAA and ticket data,

8    and the little bits of the use of billing data I have talked

9    about.

10:35:46  10           I didn't -- my analysis and my opinions are

11    restricted to those areas that are not about any other types of

12    abuse.

13    Q.    Let's go back to the slide we were just looking at a

14    minute ago.

15           So when you're opining here that terminating an ISP

16    could cut off the Internet for thousands of households not the

17    subject of notices, that's not based on ticket data, right?

18    A.    That's based on my general knowledge, yes.

19    Q.    It's --

10:36:23  20    A.    Right.  But I don't have specific knowledge about the

21    other kinds of abuse and how much of this, that, or what.

22    Q.    But, similarly, if Cox terminated 21,915 business

23    subscribers for non-payment, under your slide that would also

24    cut off the Internet for thousands of households not the

25    subject of notices, right?

2055

1    A.   No, that's incorrect.  My slide is specific to Internet

2    service providers.  I don't know if that were the case that

3    you're talking about these other businesses that were

4    terminated.  I do not know and do not have an opinion that it

5    would affect thousands of subscribers.

6    Q.   You have no information as to whether or not that 21,915

7    commercial business subscribers that Cox terminated included

8    ISPs, police, or fire, correct?

9    A.   I have no opinions about the number or who or anything for

10:37:22 10   other types of abuse.

11             MR. OPPENHEIM:  No further questions, Your Honor.

12             THE COURT:  All right.  Redirect?

13             MR. BUCHANAN:  Your Honor, would it be appropriate to

14   take --

15             THE COURT:  No, let's try and finish and then --

16   redirect okay before we break?  All right.

17             Yes, let's go ahead.

18        REDIRECT EXAMINATION

19   BY MR. BUCHANAN:

10:37:48 20   Q.   Now, Dr. Weber, you were asked a number of questions about

21   blacklisting and blocking of notices.  Do you recall that?

22   A.   I do.

23   Q.   Were any of the notices sent by the plaintiffs in the case

24   blacklisted or blocked?

25   A.   No, the plaintiff -- the plaintiffs' notices were not

L. Weber - Redirect

2056

1    blacklisted or blocked, to my knowledge.

2    Q.   You were also asked about whether you had looked at

3    notices from the RIAA prior to the relevant time period.  Do

4    you recall that?

5    A.   I do recall that.

6    Q.   Okay.  So you are a rebuttal expert in this case, are you

7    not?

8    A.   I am.

9    Q.   Could you explain who you were rebutting?

10:38:39 10   A.   Sure.  I was rebutting -- predominantly rebutting two

11   experts, Dr. McCabe -- who has already testified -- and

12   Professor -- Dr. McGarty, who has not yet testified.  And then

13   there was a portion of what I did that was used in

14   Mr. Bakewell, who is another expert for Cox in his rebuttal to

15   Dr. Lehr.

16   Q.   Okay.  And what was the data, and specifically from what

17   time period was the data that the individuals that you were

18   rebutting, that is Dr. McCabe and Dr. Or Professor McGarty?

19   A.   Right.  So Dr. McCabe, just like me, and -- Dr. McCabe did

10:39:40 20   an analysis of notices.  And when he was -- from the RIAA.  And

21   when he was doing that analysis of notices to try and count how

22   many -- how many tickets there were before the notice about a

23   particular song, when he did that, the notices he was using

24   were that same relevant period that I looked at from

25   February 4, 2013, to November 26, 2014, because that's the

L. Weber - Redirect

2057

1    period we could match the notices to the ticket data and the

2    specific accounts.

3            He also looked at tickets.  And he had an analysis of

4    how many subscribers got certain numbers of tickets.  And I

5    think he had -- I think he had 100-plus in there.  But he had

6    several analyses of that.

7            And then he also had analyses of what percentage of

8    the subscribers were business subscribers versus residential

9    subscribers.  And what the average number of tickets, for

10:41:00 10   example, was for a business subscriber, as well as for the --

11   all of the at-issue subscribers.

12   Q.   So the point being is that you examined the same set of

13   data that the experts for the plaintiffs examined and which you

14   are rebutting; is that correct?

15   A.   That's correct.  From their opening reports, that's

16   correct.

17   Q.   So counsel also asked you, did you look at RIAA notices

18   prior to 2012 or after.  And did you look at that data?

19   A.   So, yes, there was -- there were some notices that were

10:41:44 20   put into evidence in this trial from prior to 2012.  My

21   analysis for my report was focused on the same as Dr. McCabe,

22   the RIAA notices, 2012, or in the relevant period.

23   Q.   So who sent these notices that counsel was referring to

24   that were before the 2012 period, 2011 or '10?  Who sent those?

25   A.   So there --

L. Weber - Redirect

2058

1  Q.   I mean, did they come from the RIAA?

2  A.   So there is several different sets of notices that I have

3  seen in this case that are from before 2012.  Some of them are

4  from Rightscorp, and some of them are -- there are a few that

5  were produced in trial here that --

6  Q.   I am just talking about the RIAA notices.  If they sent a

7  notice, they would have a copy of that notice, right?

8  A.   I don't know.

9        MR. OPPENHEIM:  I'm not sure there is a foundation

10:43:08 10  for this, Your Honor.

11        THE COURT:  She said she didn't know.

12 BY MR. BUCHANAN:  (Continuing)

13 Q.   So you were asked about RIAA notices and whether you

14 looked at them beyond the relevant time period.  And so my

15 question is, if -- who possesses those notices?  Does the RIAA

16 have those notices?

17 A.    If anybody has got the notices that the RIAA sent, it

18 would be either MarkMonitor or the RIAA.

19 Q.    Okay.

10:43:26 20        MR. OPPENHEIM:  Objection, no foundation.

21        THE COURT:  There is no foundation for that.  And her

22 assumption is her assumption.

23        Let's move along, please.

24 BY MR. BUCHANAN:  (Continuing)

25 Q.   And also in terms of the relevant time period, are you

L. Weber - Redirect

2059

1    aware of the time period alleged in the complaint?

2    A.    Yes, I am.

3    Q.    And that's called the claim period?

4    A.    That's called the claim period.

5    Q.    And so what time period is that?

6    A.    So the claim period is February 1, 2013, through

7    November 26, 2014, for most of the plaintiffs.  There is a bit

8    of an exception, it is a little narrower for some.

9          And the relevant period that Dr. McCabe and I looked

10   at differs by three days from that.

11   Q.    Okay.  So you were also shown several pages of ticket data

12   from various subscribers.  Do you recall that?

13   A.    I do recall that, yes.

14   Q.    Okay.  And these were supposedly subscribers that fell

15   into the 23 percent in the 2012 time period?

16   A.    Yeah.  They were not a representative or average or

17   typical subscriber in that group.

18   Q.    Okay.

19         MR. OPPENHEIM:  Objection, no foundation.  She

20   testified she didn't do that analysis.

21         THE COURT:  No, I am going to allow the question.

22   She said she wanted to explain further.  Overruled.

23   BY MR. BUCHANAN: (Continuing)

24   Q.    Okay.  Could you explain why those four subscribers out of

25   4.5 million total and 57,000 in this case, why they weren't

2060

1    representative?

2    A.    Right.  So I know for all 57,000 subscribers there is only

3    2 percent that had even 13 or more notices.

4            The percentage that had -- the number of notices that

5    were being shown to me were tiny.  Right.  So even of that

6    23 percent -- because there are so few of them, even within the

7    23 percent, these have to be a very small -- you know, these

8    are in the tail end of a distribution, a statistician would

9    say.  These have to be a small percentage even of the

10:45:53  10    23 percent of the subscribers that -- that I took out to unbias

11    the data.

12            THE COURT:  The 15,000, is that what -- the

13    23 percent is the 15,000?

14            THE WITNESS:  The 23 percent is 15,000, right.  But

15    there is only 2 percent of the 57,000 that had 13 or more

16    tickets.  Right.  And those are disproportionately commercial.

17    And he was showing me residential.  It's just not close to

18    average or typical in that 23 percent.

19            THE COURT:  You're giving a statistical explanation

10:46:30  20    to respond?

21            THE WITNESS:  Correct.

22            THE COURT:  All right.  Thank you.

23            Go ahead, Mr. Buchanan.

24    BY MR. BUCHANAN: (Continuing)

25    Q.    You also asked counsel to get a chance to correct

L. Weber - Redirect

2061

1    something in your testimony.  Do you need to recall that or do

2    you need to do that?

3    A.   Yes.

4            THE COURT:  I think that was, but --

5            MR. BUCHANAN:  Okay.

6            THE COURT:  Joe --

7            THE WITNESS:  Yeah, I did say that.  So counsel had

8    subtracted -- had 57,000 and subtracted 42,000, and got 15,000,

9    which that math is correct.  But the 57,000 includes 2,700 or

10:47:09 10   so commercial subscribers.

11           And so, if the comparison and discussion was about

12   residential, which my slide was about single-family

13   residential, then it wasn't 15,000, it was fewer than that.

14   BY MR. BUCHANAN: (Continuing)

15   Q.   Okay.  Counsel also showed you a summary of DMCA notices

16   sent to Cox and Cox's responses.  Do you remember that, that

17   chart that listed total notices, accepted notices, deleted

18   notices, warnings, and suspensions?  Do you recall that?

19   A.   I do recall that chart.  Not every number in it, but, yes.

10:47:51 20   Q.   But I think you indicated that you were not surprised by,

21   you know, certain numbers in there or suspensions and warnings.

22   Do you recall that?

23   A.   I do, yes.

24   Q.   And why are you not surprised?

25   A.   So the warnings -- so if you look at the notices that Cox

L. Weber - Redirect

2062

1    did process and then you look at the warnings -- so we know the

2    first ticket is the hold for more.  And we know that, you know,

3    almost half the people, half the accounts only get one ticket.

4            So there is -- you know, it's not surprising that

5    there is not -- you know, that the number of warnings is not

6    enormous because they often hold for more, and often the

7    account doesn't get any more.  Right.  So that's not

8    surprising.

9            And then there are commercial customers.  Right.  And

10:48:46 10  the commercial customers, they -- after the -- by the time they

11   get to the second ticket, the commercial customers, they are

12   having conversations with them.  So they're not sending

13   warnings.

14           And then some of the tickets that were in fact

15   processed, we know, we heard testimony before, you know, that

16   14.9 percent of tickets hit the hard limit, not usually for the

17   plaintiffs, but they hit the hard limit.

18           So that's -- so, you know, it just wasn't surprising

19   to me that the number of e-mail warnings there was the number

10:49:29 20  that it was.  It wasn't surprising at all.

21           And then for suspensions, you know, that's completely

22   consistent with the funnel that I showed.  That, you know, you

23   don't get all that often up to the point where you have enough

24   tickets to hit, to trigger that suspension.

25   Q.   Could you briefly just explain "hold for more," what that

L. Weber - Redirect

2063

1 concept involves?

2 A.   So my understanding of it, from the testimony and from my

3 looking at the data, is that the first notice that comes in for

4 a subscriber account, the first notice -- if there haven't been

5 any other notices within the prior six months, that first

6 notice, after a six-month hiatus, is held for more.

7        Basically, a ticket is created.  So the ticket --

8 there is a ticket in the ticket data about that, you know, as

9 long as the rights holder wasn't blocked or blacklisted.  But

10:50:42 10 otherwise there is a ticket in the ticket data, but no

11 customer-facing action is taken.  They wait for a

12 customer-facing action to see if there is another one.

13 Q.   And customer-facing action means?

14 A.   Customer-facing action would be -- it could be an e-mail.

15 It could be a suspension.  It could be a conversation,

16 particularly for a business customer, it could be a

17 conversation that they have with them.

18 Q.   And do you know why they held for more?

19        MR. OPPENHEIM:  Objection, Your Honor.  Approach.

10:51:17 20        THE COURT:  Yes, sir.

21        NOTE:  A sidebar discussion is had between the Court

22 and counsel out of the hearing of the jury as follows:

23 AT SIDEBAR

24        THE COURT:  Yes.  Go ahead.

25        MR. OPPENHEIM:  So I believe that what Mr. Buchanan

L. Weber - Redirect

2064

1   is doing is soliciting testimony about the study that was never

2   done and was never produced.  And, A, it was not a subject of

3   my examination, so it's outside the scope.

4          But, B, there is no foundation for it.  Mr. Carothers

5   shouldn't have been permitted to testify to it.  It was never

6   produced.  There was no documentation for it.  And she

7   shouldn't be able to repeat it.

8          MR. BUCHANAN:  Well, I think it was part of her study

9   she analyzed how they dropped off after one, they got

10:52:08 10   50 percent.  And she looked behind that and determined that the

11   reason for the policy was because they didn't --

12          THE COURT:  Well, what she did, her opinion is based

13   on her own work that she did, not on anything that Cox did.

14   Right?

15          MR. BUCHANAN:  Well, she obviously read things, but,

16   yeah, she did her study.  So I can limit it to --

17          THE COURT:  Sustained.  Let's just confine your

18   examination to that on cross-examination.

19          MR. OPPENHEIM:  Yes.

10:52:40 20          THE COURT:  All right.

21          MR. ELKIN:  Your Honor, that's fine.  I just wanted

22   to point out, just for good order's sake, that the issue

23   regarding Carothers was not a study.  It was based on his

24   running queries and doing an analysis and providing testimony.

25          THE COURT:  And I permitted it for that reason.

2065

1              MR. ELKIN:  Thank you.

2              THE COURT:  And so, I know you keep saying study, but

3     it was -- all right.  So let's move along.

4              Thank you.  Your exception is noted.

5              NOTE:  The sidebar discussion is concluded; whereupon

6     the case continues before the jury as follows:

7     BEFORE THE JURY

8     BY MR. BUCHANAN: (Continuing)

9     Q.   Dr. Weber, you testified -- and I want to limit this

10:53:37 10   about -- well, I will just move on on that.

11              The ticket data that you looked at, there was

12    sometimes a reference to hard limit?

13    A.   That's correct.

14    Q.   And do you understand when the hard limit was hit, that a

15    notice would go to the copyright holder that sent the notice?

16    A.   If the copyright holder had a repliable e-mail address,

17    then -- and the RIAA was one such, yes.  When they hit the hard

18    limit, a reply would be sent if the e-mail -- if there was an

19    e-mail address that could be replied to.

10:54:29 20             Some of the e-mail addresses from some of the rights

21    holders would be one of these e-mail addresses, you have

22    probably gotten them, where they say, don't reply to sender or

23    no reply.  And if the Cox CATS system replied to that, then it

24    would bounce back again, and Cox would reply to that, and it

25    would bounce back again, and it would be an infinite loop and

L. Weber - Redirect

2066

1    it would not be good for anybody.

2         So if the e-mail address was repliable, yes, the

3    sender got a response back from the CATS system saying, you've

4    hit your limit for today.

5    Q.   Okay.  And so, then they could send a notice the next day

6    for that particular work in suit?

7    A.   They could certainly choose to do that.

8    Q.   And the ticket data you looked at, could you tell from

9    that ticket data whether any of the information on there

10:55:26 10   related to a work in suit or a song or musical composition in

11   this case?

12   A.   The ticket data that was produced, which we have seen it

13   on the screen, did not -- the ticket data did not have songs.

14        The RIAA produced data, the notice data I believe had

15   indications of songs.  But not in the ticket data that was

16   produced.

17   Q.   So you couldn't tell whether it was a work in suit in this

18   case?

19   A.   Not from the ticket data.  You could -- not purely from

10:56:06 20   the ticket data.  The only way --

21   Q.   Okay.  And counsel didn't indicate to you during, looking

22   at that ticket data that it was related to one of their songs

23   by the plaintiffs, correct?

24   A.   Which --

25   Q.   The four -- the ticket data that you looked, those four

L. Weber - Redirect

2067

1    tabs in the binder that you went through.

2    A.    Oh, yeah.  Well, I could tell that many of them probably

3    were not related to their songs because they hit the hard

4    limit, which hardly every happened for the RIAA notices that

5    MarkMonitor sent.

6          So the hard limit ones were certainly not their --

7    well, not certainly.  Were very unlikely to be the plaintiffs'

8    notices.

9    Q.    Okay.  And with regard back to just a few more questions

10:56:57 10    on the 23 percent.  And you looked -- you talked about looking

11    at that data and certain data you didn't look at because of

12    trying to unbias the data; is that right?

13    A.    That's right.

14    Q.    But is it fair to say ultimately you looked at all the

15    data that you had to do your analysis?

16    A.    I did.

17    Q.    Okay.  And there was a reference to notices that came in

18    and that were blocked, like the Rightscorp data.  Do you recall

19    that?

10:57:25 20    A.    Yes.

21    Q.    Would that -- looking at that have affected your analysis?

22    A.    No, not at all.

23    Q.    And why is that?

24    A.    Because I analyzed what actually happened with the

25    policies that Cox had in place and how they implemented them.

L. Weber - Redirect

2068

1    So there were other rights holders, like Rightscorp, Digital

2    Rightscorp, that were sending notices that were either blocked

3    or blacklisted and didn't become tickets.

4            But my analysis shows that in spite of that, you

5    know, in spite of all the blacklisting and blocking that

6    occurred, in spite of however many notices those were that got

7    sent, my analysis shows that given what Cox did, the notices

8    from the RIAA --

9            MR. OPPENHEIM:  Objection, Your Honor.  The testimony

10:58:24 10   should be stricken and no response, please.

11           THE COURT:  Well, the question was, did you use the

12   data and did you consider it.  And you said, no, you didn't

13   think it was relevant.  Let's stop right there.  I'm not sure

14   where she is going further, but she has respond to your

15   question.  So sustained.

16   BY MR. BUCHANAN:  (Continuing)

17   Q.   So with regard to the Rightscorp data, would -- analyzing

18   that, would that have affected your analysis in any way and

19   your conclusions?

10:59:30 20   A.   No, I don't believe if I -- I do not believe that that

21   would have affected my conclusions in any way.

22   Q.   Why?

23   A.   Because my conclusions are relevant to and about what

24   actually happened.  And they are relevant to the fact that the

25   notices stopped for the vast majority even though -- for the

2069

1    plaintiffs, even though these Rightscorp notices and other ones

2    were blocked.

3              MR. BUCHANAN:  Okay.  No further questions.

4              THE COURT:  All right.  May Dr. Weber be excused?

5              MR. OPPENHEIM:  We have got more ticket data, but I

6    will pass, Your Honor.

7              THE COURT:  All right.  All right, thank you.  You

8    are excused at this time.  Thank you, and have a good day.

9              THE WITNESS:  Thank you.

10             NOTE:  The witness stood down.

11             THE COURT:  All right.  We'll take our morning recess

12   now and take approximately 15 minutes and come back.  So you

13   are excused.  Thank you.

14             NOTE:  At this point the jury leaves the courtroom;

15   whereupon the case continues as follows:

16   JURY OUT

17             THE COURT:  All right.  Anything before we recess?

18             MR. BUCHANAN:  No, Your Honor.

19             MR. OPPENHEIM:  I don't believe so, Your Honor.

11:01:13 20        THE COURT:  Okay.  All right.  Let's take 15 minutes.

21             We are in recess.

22             NOTE:  At this point, a recess is taken; at the

23   conclusion of which the case continues in the absence of the

24   jury as follows:

25   JURY OUT

1           THE COURT:  All right.  Any preliminary matters?

2           MR. ELKIN:  Your Honor, I just wanted to preview with

3    the Court the order of witnesses that we have for the rest of

4    the day.  We would suggest playing the Cadenhead and the

5    Paszkowski videos, which I think will take us to about 1:00.

6           THE COURT:  Okay.

7           MR. ELKIN:  And then after lunch, it would be

8    Mr. Monson from Harbor Labs and Dr. Feamster.  If we had time,

9    there would be an additional video.

10          There are some technical issues with regard to the

11   two first videos, and Ms. Leiden would like to address the

12   Court so that Your Honor is informed.

13          THE COURT:  All right.  Thank you.

14          MS. LEIDEN:  Just two quick things that I've already

15   told plaintiffs' counsel, which is for Mr. Cadenhead, which

16   would be the first video that we would start playing right now,

17   there is a point in the video clips where the video part of the

18   deposition freezes, but it was an issue that occurred when the

19   deposition was taken, but the audio continues to play.

20          I just didn't want -- you may, up to Your Honor's

21   obvious discretion, want to inform the jury that it will

22   continue playing and it's not an issue that will prevent them

23   from hearing it.

24          THE COURT:  Okay.

25          MS. LEIDEN:  And then for Mr. Paszkowski's, that

2071

1    deposition was taken remotely, and the audio is a little bit

2    fuzzy, so we have -- we are putting in subtitles from the

3    deposition transcript for that one.

4              THE COURT:  All right.  And there's no objection to

5    that, correct?

6              MR. OPPENHEIM:  I guess not.  We haven't seen any of

7    this, but I guess not.

8              THE COURT:  All right.

9              MR. BRODY:  Your Honor --

10             MR. GOULD:  We were informed.  We haven't seen it.

11             THE COURT:  Okay.

12             MR. BRODY:  One other -- I had mentioned that we have

13   a -- I regret to show you this -- a bench memo in response to

14   the Feamster memo you got last night.  I'd like to tender that

15   to the Court.

16             THE COURT:  Yes, sir.  And if that's all an original

17   brief without any attachments, I'll be really impressed.

18             MR. BRODY:  It reads like a novel, Your Honor.

19   You'll love it.

20             THE COURT:  All right.

21             MR. BRODY:  It's five pages.

22             MR. ZEBRAK:  It's a game of musical chairs with all

23   the attorneys coming up.  Your Honor, just with respect to the

24   bench memo, I'd just like to point out that that's -- it's all

25   been prepared without the benefit of seeing Dr. Feamster's

2072

1    slides, the 50 slides we just received this morning, and I

2    think it actually extends the issues because -- and for reasons

3    we'll discuss afterward, but I think some of the issues in the

4    bench memo --

5            THE COURT:  Let me take a look at the slides, and I'm

6    happy to consider them after you've had a chance to look at

7    them.

8            MR. ZEBRAK:  Yes, sir.  And we'll try to speak with

9    opposing counsel about it but --

10           THE COURT:  You definitely will talk at lunch with

11   counsel at lunch and see if you can't work it out.  Okay?

12           MR. ZEBRAK:  Yes, sir.

13           THE COURT:  So that we're not keeping the jury

14   waiting.  Okay?  And if you, you know, want to play two

15   depositions now, if you want to go out and start working on

16   that right now, I think that's a great idea.

17           MR. ZEBRAK:  Absolutely.

18           THE COURT:  Okay.  Good.

19           All right.  Then are we ready for our jury?

20           MR. ELKIN:  (Nodding head.)

21           THE COURT:  Okay.  Joe, let's get our jury, please.

22           NOTE:  At this point, the jury returns to the

23   courtroom; whereupon, the case continues as follows:

24   JURY IN

25           THE COURT:  All right.  Please have a seat.

R. Cadenhead Deposition - Examination

2073

1          We're going to have a couple of video depositions

2    coming up now, and, you know, as I said previously, it's just

3    the same testimony as the person here in person.  They're just

4    not present in court, but their deposition has been taken under

5    oath at a prior occasion for presentation here today.  You

6    should consider it like all other evidence in the case.

7          On the first video, there's a portion of where the

8    video is frozen but the audio continues, so don't be surprised

9    by that, and the testimony is still preserved by audio; and in

10   the second one, there's some audio difficulties, so there'll be

11   some text on the bottom of the video, as I understand, to --

12   which represents the words that are being spoken.  Okay?  So if

13   you have difficulty hearing it, you'll be able to read it.

14          All right.  Is that correct?

15          MS. LEIDEN:  Yes, Your Honor.

16          THE COURT:  Okay.  Then your first video?

17          MR. ELKIN:  Yes.  The deposition of Randy Cadenhead.

18   Both sides designated portions of the video.

19          THE COURT:  All right.  Thank you, sir.

20          NOTE:  The testimony of RANDY CADENHEAD via video

21   deposition is played into the record as follows:

22          EXAMINATION

23   BY MR. OPPENHEIM:

24   Q.   You said that you stood by your testimony, but, but

25   subsequent to giving the testimony, you've learned some things

R. Cadenhead Deposition - Examination

2074

1   that may have qualified what you said, and so I'm curious what

2   those things are.

3   A.   I think that Cox's administration of the things I

4   testified to may not have been as consistent as I thought they

5   were.  I think that's what -- that's general, but I think

6   that's the best way to answer your question.

7   Q.   When you say "Cox's administration of things," do you --

8   are you referring to the, for instance, Cox administration of

9   the graduated response program?

10  A.   Certain -- yeah, that.  Yeah.

11  Q.   But the thing that jumps out at you is Cox's

12  administration of the graduated response program; is that fair?

13  A.   That's for sure, yeah.

14  Q.   And in what way do you think that Cox's administration was

15  inconsistent with the way you thought it was being handled?

16  A.   Well, I don't know how Cox's administration actually

17  occurred, but I, I have the sense that, that it wasn't always

18  consistent with the program as it was designed.

19  Q.   When did you first begin working at Cox Communications?

20  A.   I think it was the fall of 2002, I think.

21  Q.   And when did you depart --

22  A.   Wait a minute.  Maybe it was '3.  Maybe it was '3.

23  Q.   So you began working at Cox Communications in the fall of

24  2003?

25  A.   I think that's right.

R. Cadenhead Deposition - Examination

2075

1   Q.   And when did you leave Cox Communications?

2   A.   At the end of 2013.

3   Q.   When you were initially hired in 2003, what was your

4   title?

5   A.   Privacy counsel.

6   Q.   And you served as in-house legal counsel for Cox

7   Communications?

8   A.   Yeah.

9   Q.   And did you maintain that same title throughout your

10  tenure at Cox?

11  A.   Yes.

12  Q.   Were you ever promoted?

13  A.   No.

14  Q.   And that while at Cox, you handled copyright-related

15  matters, especially as it related to the Digital Millennium

16  Copyright Act, correct?

17  A.   I did, yes.

18  Q.   So if I'm doing my math right, 2003 was 16 years ago, and

19  so you were 48 years old when you joined Cox?

20  A.   I'll take your word for it.

21  Q.   And you left when you were 58 years old; is that correct?

22  A.   Eight or nine.

23  Q.   Okay.

24  A.   Yeah.

25  Q.   58 or 59 years old.

R. Cadenhead Deposition - Examination

2076

1          What were the circumstances around your departure

2   from Cox Communications?

3   A.   I retired.

4   Q.   58, 59 years old is fairly young to retire; wouldn't you

5   agree?

6   A.   It is, and I was proud to do it.  My father retired from

7   his job -- he really basically had one job his entire career,

8   and he retired at 59, and he's 90 years old now, and I thought

9   that was a good idea, and so I planned my career with that

10  opportunity in mind.

11  Q.   Were you asked to leave Cox in any way?

12  A.   No, sir.

13  Q.   As you sit here today providing testimony, are you being

14  compensated in any way by Cox?

15  A.   No, sir.

16  Q.   And are your expenses being reimbursed?

17  A.   No, sir.

18  Q.   But Ms. Mast is your counsel at the moment; is that

19  correct?

20  A.   Right.

21  Q.   And is it your expectation that Cox will pay her?

22  A.   Yes.

23  Q.   And why do you have that expectation?

24  A.   They've had communications with each other about those

25  arrangements, and that's just my understanding.

R. Cadenhead Deposition - Examination

2077

1   Q.   You agree that the unauthorized uploading and downloading

2   of copyrighted works on peer-to-peer networks is copyright

3   infringement, right?

4   A.   That's my understanding of the law.

5   Q.   You understand that when individuals are uploading and

6   downloading music owned by record companies without permission,

7   they're not buying the music legally, they're committing

8   copyright infringement, correct?

9   A.   Yeah, I think that's a pretty good, a fair statement of

10  what I, I understand, yeah.

11  Q.   And you understood that peer-to-peer networks were

12  frequently used for infringing on record companies' copyrights,

13  correct?

14  A.   That's the way I understood it.

15  Q.   And the next provision says that if that customer, the

16  business customer, becomes aware of a violation of the AUP by

17  any of its end users, that customer shall suspend the services

18  to the end user and shall notify Cox in writing as soon as

19  reasonably practicable, correct?

20  A.   That's, that's what it says.

21  Q.   Earlier I believe you testified that -- about -- that Cox

22  had a graduated response program; is that correct?

23  A.   Yes, yes.

24  Q.   Would you call that a program or a policy, just so I get

25  the lingo correct?

R. Cadenhead Deposition - Examination

2078

1  A.   I'm not sure I know the difference, but I guess I'd call

2  it a policy.

3  Q.   Okay.  Do you know when the graduated response policy was

4  first developed?

5  A.   As I recall, it must have been first developed before I

6  came to Cox.

7  Q.   So prior to 2003?

8  A.   I think so.

9  Q.   When you -- so when you came to Cox, there was a graduated

10 response policy in place already?

11 A.   I think so.

12 Q.   And that graduated response policy contained within it a

13 process for dealing with copyright infringement notices; is

14 that correct?

15 A.   Yeah.  Yes.

16 Q.   Were you the legal counsel responsible for overseeing that

17 graduated response policy?

18 A.   For most of the time I was there, yes.

19 Q.   What was the policy when you first joined Cox in 2003 with

20 respect to copyright infringement?

21 A.   Maybe you could be more specific because I -- it's been a

22 long, long time.

23 Q.   What was the policy when you first joined Cox in 2003 with

24 respect to copyright infringement?

25 A.   Maybe you could be more specific because I -- it's been a

R. Cadenhead Deposition - Examination

2079

1   long, long time.

2   Q.   When you first came to Cox, what is your recollection of

3   what the graduated response policy was?

4   A.   The, the team of people that -- when I first came to Cox,

5   the team of people who, who managed that process came to me and

6   asked me to take a look at it to see if, if I felt it was, it

7   was consistent with the law and if I had any suggestions, I

8   guess, and so I, I did do that.

9         And it was, it was a -- it seemed to me to be a

10   pretty robust and well-thought-out program.  It involved being

11   able to receive electronically notices of infringement under

12   the DMCA, to -- and, and they had automated the ability to

13   document receipt and, and to automate -- on an automated basis

14   begin the graduated response process that they had built.

15         And the program did evolve over time, but basically

16   it involved one or more ways to notify the customer about

17   receipt of the complaint, helping to educate the customer, and

18   if problems seemed to continue, that the automated process was

19   taken over by the customer having to talk to, as people say

20   these days, a live person who's trained to help educate the

21   customer, and at the -- if that still didn't solve the problem,

22   then the, the process was built such that the customer service

23   could and, if necessary, would be terminated.

24         And that's, that's kind of the way I recall it

25   originally being set up.  It did evolve over time, but

R. Cadenhead Deposition - Examination

2080

1    that's -- I hope that answers your question.

2    Q.   So why, why did Cox have a graduated response program?

3    What was the purpose of it?

4    A.   I'll give you my opinion because I don't speak for Cox,

5    but my opinion was that Cox recognized that there was a real

6    issue and a real problem with, with copyright infringement, and

7    that your clients, the recording industry, had some, some

8    proper concerns about it, and that our customers needed to

9    understand better why that was a problem and that -- and that

10   copying music, let's say, without paying for it was not the

11   right thing to do.

12           And so we, we wanted to -- I think Cox wanted to find

13   a way to help your clients and our customers understand -- I'm

14   sorry -- your clients with this problem and our customers with

15   some ignorance, understand what was the right thing to do,

16   and -- so they tried to design a system that would deal with

17   that, would fix it.

18   Q.   So you began your answer, Mr. Cadenhead, by saying your

19   opinion, but you don't speak for Cox.  Just to be clear, I want

20   to know what you understood at the time you were at Cox was the

21   purpose of the graduated response program.

22   A.   That's what I think it was.

23   Q.   So you understood that the purpose was to address real

24   problems with copyright infringement that copyright owners

25   had --

R. Cadenhead Deposition - Examination

2081

1    A.    Um-hum.

2    Q.    -- and to help customers be educated; is that correct?

3    A.    So they'd stop.

4    Q.    Did, did Cox at the time that you were there actually want

5    to stop the piracy that was occurring on its network?

6    A.    Well, you use "piracy."  That's a loaded term.  But I

7    think the answer to your question is yes.

8    Q.    But you do believe -- or you did believe when you were at

9    Cox that one of the purposes of the graduated response program

10   was to stop copyright infringement on the Cox network, correct?

11   A.    Yes.  And I think more specifically its, its first purpose

12   was to get the customers to stop, and if that didn't work, then

13   for Cox to do something about it.

14   Q.    Well, Mr. Cadenhead, did Cox care whether or not copyright

15   owners were being infringed?

16   A.    I thought so.

17   Q.    You did think so?

18   A.    I thought so.

19   Q.    Did Cox -- when you -- when you arrived at Cox in, in 2003

20   and you looked at the graduated response policy that was in

21   place, was there a mechanism to measure whether or not the

22   policy was effective at stopping infringement?

23   A.    I don't know.

24   Q.    So when you first arrived at, at Cox in 2003, the

25   graduated response policy was a three-strike rule, correct?

R. Cadenhead Deposition - Examination

2082

1    A.   I don't -- I don't think so.

2    Q.   You don't recall that Cox's graduated response policy in

3    2003 was a three-strike rule?

4    A.   I don't remember it that way.

5    Q.   What do you remember it being?

6    A.   I, I remember that there were automatic notices to

7    customers -- automated notices to customers.  I remember that

8    if necessary, customers would be forced to talk to trained

9    individuals who would help to educate the customer and get them

10   to change their behavior, and if that didn't occur, then the

11   customer would be subject to being -- service to being

12   terminated.  Not the customer terminated but the service

13   terminated.

14        And that could, that could occur -- it didn't

15   necessarily occur, I think, in, in, in any kind of lockstep,

16   but maybe there were three layers or something, but I don't

17   remember anything about a -- what did you call it, a

18   three-strike?  I don't remember that.

19   Q.   You don't recall Cox ever having a three-strike rule?

20   A.   I don't, I don't think that we did.  I don't think that's

21   a term I recall from Cox.

22   Q.   When you first arrived at Cox in 2003 --

23   A.   Um-hum.

24   Q.   -- do you remember at what point a customer would be

25   suspended -- excuse me -- terminated for copyright

R. Cadenhead Deposition - Examination

2083

1    infringement?

2    A.   Let me try and answer it.  I know that it evolved over

3    time, and I don't remember any, anything like a specific

4    number.  I do remember that, that Cox required an actual human

5    conversation with the customer, sometimes more than one, before

6    they would terminate service, and I don't -- and, and my, my

7    recollection is that that number probably varied based upon the

8    conversations with the customer.  That's my recollection.

9    Q.   When you were counsel for Cox overseeing the graduated

10   response program, did you understand that Cox permitted its

11   subscribers to engage in some level of copyright infringement?

12   A.   No, I don't think it did.

13   Q.   Cox was clear that users were strictly prohibited from

14   engaging in copyright infringement, correct?

15   A.   I think that's what the policy said.

16   Q.   Mr. Cadenhead, I'm asking you, as the lawyer responsible

17   for overseeing the legal aspects of the graduated response

18   program --

19   A.   Um-hum.

20   Q.   -- was it your understanding that when Cox received its

21   first notice of infringement from a copyright owner with

22   respect to a subscriber, that Cox would permit that subscriber

23   to continue to infringe?

24   A.   I don't think that's a, a -- I don't think that's a fair

25   characterization.

R. Cadenhead Deposition - Examination

2084

1   Q.   Why not?

2   A.   Because you're, you're describing it as if Cox was doing

3   something actively, and I, I don't remember that being the

4   case.

5   Q.   What do you recall it being?

6   A.   When Cox got a notice, it started its graduated response

7   process.

8   Q.   And during that process, did Cox find a way to prevent the

9   subscriber from infringing?

10  A.   The process was meant, as I understood it, to educate the

11  customer so that the customer would not do that.

12  Q.   So as you oversaw the graduated response program, you

13  recognized that some of Cox's subscribers may be infringing

14  copyrights intentionally, correct?

15  A.   Well, I, I oversaw it from a legal standpoint, and I, I

16  think the program -- the process recognized that some customers

17  were infringing and almost certainly knew they were infringing

18  and needed to stop, and we tried to get them to stop.

19  Q.   Was there a point in time when Cox instituted a policy --

20  a graduated response policy that had a specific number of steps

21  before a customer would be terminated?

22  A.   Cox began with notifying the customer through several

23  means and steps, which varied over time.  Cox required that

24  there be an actual communication between a knowledgeable

25  representative at Cox and the customer at least once and

R. Cadenhead Deposition - Examination

2085

1  sometimes until the representative -- this is the way I

2  understood it -- till the representative recognized that the

3  customer wasn't going to change his or her behavior, and then

4  Cox could terminate -- that, that, that representative was

5  authorized to terminate the, the customer's service.  And

6  that's the way I understood it.

7  Q.   So I'm going to ask my question again, which is:  Was

8  there a point in time where you recall that Cox instituted a

9  graduated response policy that had a specified number of steps

10 before the customer would be terminated?

11 A.   I wouldn't say -- of course, I'm remembering, but I

12 wouldn't say it that way.

13 Q.   So during all ten years that you were at Cox, between 2003

14 and 2013, where you served as legal counsel overseeing the

15 graduated response program, you don't have any recollection

16 that that program had a specific number of steps that Cox would

17 go through before it would consider terminating the subscriber;

18 is that correct?

19 A.   There's, there's two parts to that answer.  First of all,

20 for the last two years that, that I was with Cox, I was not

21 doing much, if anything, related to this subject matter.  So

22 put that aside.

23        The, the policy -- and some of these documents

24 probably make reference to it -- as a rule, Cox did not

25 terminate a customer service -- the policy wasn't to terminate

R. Cadenhead Deposition - Examination

2086

1   a customer service until the process had run its course, and

2   the process evolved over time, and it began with notices to the

3   customer and then requiring the customer to talk to one of the

4   Cox people, and after one or more of those conversations, if

5   the customer didn't behave -- change behavior, the policy was

6   that that person who had talked to the customer had authority

7   to terminate the customer's service.  I understood that that's

8   the way the program worked.

9   Q.   You indicated that the, the process had to run its course.

10  What process are you referring to?

11  A.   The one I just described.

12  Q.   And you indicated that the process evolved over time.  How

13  did it evolve?

14  A.   I've been gone a long time.  My recollection is that there

15  was a -- in the olden days, even an internet company didn't

16  always have the e-mail address of its customers.  I know that

17  sounds funny today, but that was, that was a reality back

18  somewhere in that time, and so they had to figure out what to

19  do about a customer that they couldn't send an e-mail to.  So

20  they had to -- you know, they had to adjust the process to, to

21  deal with that.

22        There may be other things, but I just don't recall

23  specifically.  I just remember that, that they adjusted the

24  process to deal with some realities and, and their experience

25  with customers.

R. Cadenhead Deposition - Examination

2087

1   Q.   So I believe that you said that if the customer did not

2   change behavior, that the customer representative had authority

3   to terminate the subscriber.  Is that correct?

4   A.   Yeah, that was the, the policy.

5   Q.   How would Cox know whether or not the customer changed

6   their behavior?

7   A.   I guess it would be two things:  One, if the customer

8   said, I'm not changing my behavior; and the other, the other

9   would be if, if Cox continued to receive DMCA notices related

10  to that customer.

11  Q.   Of course, it's possible that Cox wouldn't have received

12  DMCA notices, but the customer would continue to infringe,

13  correct?

14  A.   I don't know the answer to that.

15  Q.   You said that if the customer did not change behavior, but

16  then you -- if I understand it, apart from the customer who

17  admitted that they were infringing and weren't going to change

18  their behavior, I think what you said was that you would look

19  to see whether or not other notices were received with respect

20  to that customer, right?

21  A.   That is one way.

22  Q.   Was there any other way?

23  A.   I don't know.  That was clearly a good way.

24  Q.   On page 11, it describes 14 steps before an account would

25  be reviewed for termination assuming that Cox has an e-mail

R. Cadenhead Deposition - Examination

2088

1   address for the subscriber, or eight steps if Cox does not have

2   an e-mail address?

3   A.   That, that looks to be correct, but, but I'm just reading

4   with you.

5   Q.   Okay.  So do you recall while you were at Cox that between

6   2010 and 2012, that Cox extended its graduated response from 10

7   steps to 12 steps to 14 steps for subscribers for whom it had

8   an e-mail address?

9   A.   I don't recall that specifically.  I do recall that the

10  process evolved over time based upon, as I understood it, based

11  upon the experience of the people who administered it, as, as

12  how best to, to accomplish its goals within the resources they

13  had.

14  Q.   So what goals were those?

15  A.   Well, we talked about them before, and that was to, to

16  teach customers to modify their behavior if they were

17  infringing on copyrights.

18  Q.   I believe that you also described a goal of stopping

19  infringement, right?

20  A.   Right.

21  Q.   Do you believe that by extending the graduated response

22  process from 10 steps to 14 steps, that it served the goal of

23  stopping the infringement?

24  A.   I'm, I'm not in a position to, to, to know the answer to

25  that.

R. Cadenhead Deposition - Examination

2089

1    Q.   Were you aware while you were at Cox of the extension of

2    the program?

3    A.   I knew that there were changes that, that took place and

4    that some of them did extend the number of, of contacts with

5    customers.

6    Q.   And did you review and approve those changes?

7    A.   I was consulted about some changes, and my, my inquiry was

8    always, was, was always, are you -- is this, is this working?

9    Is, is your change going to continue to make it work?  Is it

10   going to make it better?

11          And, and I relied upon their hands-on experience to

12   try and answer those questions.

13   Q.   When you say "is this working," is what working?

14   A.   The process, the process to try and get people to

15   either -- oh, I'm sorry, I didn't mean to close that -- either

16   change their behavior or terminate the service.  That's -- that

17   was my inquiry.

18   Q.   So when you were consulted about extending the number of

19   steps in the graduated response program, the question that you

20   were concerned with was whether or not it would reduce the, the

21   level of infringement?  Is that what you're saying?

22   A.   No, I didn't say it that way.  I said whether it would --

23   I forgot the exact words.  Whether, whether it would educate

24   the customer to change his or her behavior and whether, if

25   necessary, we'd still be able to, to follow the policy and

R. Cadenhead Deposition - Examination

2090

1    terminate a customer.

2    Q.   And you believed that the changes that were made furthered

3    the process of educating the customer and reducing the level of

4    infringement?  Is that what you're saying?

5    A.   No.  I said I asked those questions.

6    Q.   Okay.

7    A.   And I understood the answer to be yes.

8    Q.   And who answered those questions for you?

9    A.   Well, it depended on, on the time -- it depended on who it

10   was at the time, but whoever was in charge of the badly named

11   abuse group.

12   Q.   Between 2010 and 2012, was that Jason Zabek?

13   A.   I think so.

14   Q.   Let's try this:  Mr. Cadenhead --

15   A.   Yes.

16   Q.   -- did you provide legal advice to Jason Zabek on the

17   graduated response program?

18   A.   Yes.

19   Q.   Did you do that in the years between 2010 and 2012?

20   A.   Probably.

21   Q.   You've been handed what's been marked as Plaintiffs' 187,

22   an e-mail exchange from you -- at the top from you and to

23   Jason Zabek and others on or around April of 2011.

24   A.   Okay.

25   Q.   And starting at the back of this document, it shows an

R. Cadenhead Deposition - Examination

2091

1   exchange regarding the subject of 7803013.

2   A.    I see that.

3   Q.    Which appears to be a ticket number, is that correct?

4   A.    It says ticket.

5   Q.    Yep.  And that ticket number would have been something out

6   of the CATS system; is that right?

7   A.    I think so.

8   Q.    Yeah.  And in the first e-mail in the chain from

9   Mr. Vredenburg, it indicates that this is the customer's third

10  termination.  Do you see that?

11  A.    Yeah.

12  Q.    Were you aware that there were instances where Cox

13  customers were terminated three times and then still subject to

14  additional notices?

15  A.    I don't, I don't think so.

16  Q.    Does, does that surprise you?

17  A.    I think it would.

18  Q.    And Mr. Vredenburg asks what he should do.

19  A.    Yeah.

20  Q.    And Mr. Sikes appears to respond:  I'm sure Jason would

21  say "reactivate."

22           Do you see that?

23  A.    I do.

24  Q.    And then further on, Mr. Zabek, Jason, does, in fact, say:

25  DMCA = reactivate...

R. Cadenhead Deposition - Examination

2092

1           Do you see that?

2    A.   I do see that.

3    Q.   Were you aware that, that the head of the abuse department

4    was telling members of the abuse department that DMCA equals

5    reactivate?

6    A.   No.  I don't -- no.

7    Q.   This morning when we began, I believe that you indicated

8    with the benefit of hindsight that you had learned certain

9    things about the way the graduated response policy had been

10   implemented that were contrary to your prior understandings, in

11   my words, not yours.  Is that --

12   A.   That's pretty close.

13   Q.   Okay.  Is this one of those things that you viewed as an

14   implementation that was not consistent with what you

15   understood?

16   A.   This would be one of the documents that I saw that seemed

17   inconsistent with everything I knew.

18   Q.   And when you say "everything you knew," you're describing

19   what you understood the graduated response policy to be?

20   A.   Right.

21   Q.   You said earlier that one of the purposes -- one of the

22   two purposes of graduated response was to reduce infringement,

23   correct?

24   A.   I think I said it was to educate customers so that they

25   would stop.

R. Cadenhead Deposition - Examination

2093

1    Q.   But you, you said there were two purposes.  One was to

2    educate customers, and the other was to reduce infringement.

3    Is that not correct, you didn't want to reduce infringement?

4    A.   I think what I said was education, and if that didn't

5    work, terminating the customer.

6    Q.   Did Cox want to reduce the infringement on its network?

7    A.   I believe that.

8    Q.   Mr. Cadenhead, apart from the technical restrictions, you

9    also indicated that there was a limitation, I believe, of how

10   many human beings could handle the notices, or something to

11   that effect; is that right?

12   A.   Something like that.  Yeah, that's pretty fair.

13   Q.   Put more eloquently, Cox had limited call center employees

14   to respond to calls from those who were the subject of

15   infringement notices; is that more accurate?

16   A.   That's, that's good.

17   Q.   Isn't it also the case that at that same point in time,

18   that Cox was reducing the level of staffing at the call centers

19   to respond to those calls?

20   A.   I, I do recall, and I don't remember when, that there --

21   that there was some reorganization that occurred, and it

22   probably resulted in fewer people who, who would answer these

23   calls, but, but the way I understood it was that the intent was

24   that they would centralize the process into a group that I

25   think was in Atlanta rather than have it distributed around

R. Cadenhead Deposition - Examination

2094

1    among the various systems, and the -- and it was -- and its

2    intent was that that group would then be able to be more

3    efficient in handling calls.

4    Q.   And as the number of subscribers grew, you also

5    understood, based on documents we've looked at today, that the

6    number of infringement notices was increasing, correct?

7    A.   Yes.

8    Q.   During that period of time, did Cox grow the resources

9    that it was dedicating to respond to infringement notices?

10   A.   I'm not the best person to answer that, but I understand

11   that it did.

12   Q.   How did it do that, to your understanding?

13   A.   I believe that they, that they did -- took some steps to

14   expand the ability of CATS to receive notices, and they made

15   some modifications to the graduated response program to give --

16   this is my opinion -- to give the, the more automated aspects

17   of the system more opportunity to work by educating the

18   customer.  And, and those are ones that I, that I understand

19   were done.

20   Q.   It extended the graduated response process, right?  That's

21   what you're saying?

22   A.   No, I don't think that -- I don't think I said that.  I

23   think they made modifications to it, and the way I understand

24   it is that they -- one of the things they did was change the,

25   the number of times that a customer would be sent to

Case 1:18-cv-00950-PTG-JFA   Document 657   Filed 12/17/19   Page 98 of 128 PageID# 28681
R. Cadenhead Deposition - Examination

2095

1    informative pages either by which they could click out of or

2    that they could not click out of and had to talk to somebody.

3              And, and, and I can't tell you what the specifics of

4    that were, but that's the best answer I can give you.

5    Q.   Mr. Cadenhead, are you aware of whether or not as the

6    number of subscribers at Cox increased and as the number of

7    infringement notices increased, whether or not Cox increased

8    the number of employees who were responding to calls regarding

9    infringement notices?

10   A.   I don't know the answer to that.

11   Q.   You're not aware that the company did increase its

12   resources, are you?

13   A.   I think my answer is I just don't know.

14   Q.   Mr. Cadenhead, are you aware that Cox imposed caps on the

15   number of notices it would accept from copyright owners?

16   A.   Yes.

17   Q.   When did that first begin?

18   A.   I really don't recall.  You showed me a document earlier

19   that I hadn't seen before that made reference to something like

20   that, but beyond that, I don't know.

21   Q.   Do you know whose idea it was to implement caps on, on the

22   number of notices that a copyright owner could send?

23   A.   No.

24   Q.   Do you know why Cox instituted caps?

25   A.   I don't know why.  My understanding was that, that they --

R. Cadenhead Deposition - Examination

2096

1  that, that it began to get a number of -- I think, in fact, I

2  think that document you showed me referenced dropped calls,

3  and, and what that normally refers to in a, in a customer

4  service organization is people waiting so long to get --

5  actually talk to somebody that they just hang up.

6         And so just based upon what that document says, it

7  sounds like they were having trouble actually getting to the

8  calls coming in.

9  Q.   So you believe that Cox instituted caps because it didn't

10 have sufficient resources to respond to notices from copyright

11 owners?

12 A.   It was probably more complex than that, but I think that

13 had something to do with it.

14 Q.   Mr. Cadenhead, you did do that work, didn't you?  You had

15 direct discussions with copyright owners imposing caps on them,

16 right?

17 A.   I only remember one set of communications.

18 Q.   And who do you remember those communications to be with?

19 A.   I think it was -- I hope I get the name right --

20 Victoria Sheckler from, from Sony.

21 Q.   From Sony?

22 A.   I think she was with Sony.

23 Q.   From the Recording Industry Association?

24 A.   Oh, if you're correcting me, I'll agree with you there.  I

25 just -- I'm not sure.

2097

1    Q.   I'll represent to you that Vicky, or Victoria Sheckler,

2    worked for the RIAA, as you'll see in documents shortly.

3    A.   Okay.  All right.  Well, sorry about my memory.  I told

4    you it wasn't very good.

5    Q.   No apology necessary.

6    A.   But that's all I remember.

7    Q.   But you, you were directly involved in those discussions,

8    correct?

9    A.   That one, yeah.

10   Q.   Mr. Cadenhead, you were involved in discussions with

11   Vicky Sheckler, I believe you said a moment ago, correct?

12   A.   Yes.

13   Q.   And she was speaking to you on behalf of at least a

14   portion of the music industry, correct?

15   A.   Um-hum, yes.

16   Q.   So why were you in discussions with her about imposing

17   caps on a part of the music industry?

18   A.   Well, actually, the way I remember it was that, that she,

19   she reached out to me and, and wanted to see if the number of

20   notices that Cox would, would accept from what I remember to be

21   Sony, if that could be adjusted.  And I knew her, and I

22   respected her, and I thought that the right thing to do was for

23   me to carry that message to our people and ask them if they

24   could do that.

25   Q.   Why would Cox want to blind itself to some of the

R. Cadenhead Deposition - Examination

2098

1  infringement notices that copyright owners wanted to send?

2  A.   I don't think -- I don't think "blind itself" is a, is a

3  fair term.  Cox wanted to focus on as many customers as it

4  could to address the problem and help the customer fix it, and

5  Cox wanted the industry to also help us focus on the people

6  that were downloading a lot of music, as opposed to the, the

7  one who might just do one.  And I don't know how well or able

8  the industry was to do that, but I remember bringing that up as

9  something they could do to help us.

10 Q.   You, you wanted to work with copyright owners to focus on

11 repeat infringers; is that what you're saying?

12 A.   Yeah, the people who were doing the, the really worst of

13 it.

14 Q.   Okay.  But if Cox really wanted to stop the infringement

15 on its network, wouldn't it want to learn about as much of the

16 infringement as it could so it could respond to as much as of

17 it as it could?

18 A.   I know that the human touch as a part of the process was a

19 fundamental thing that -- Cox believed that that was the most

20 effective way in the long term to get results.

21        And you may disagree, but there are -- I know

22 anecdotally of instances in which human contact made a

23 difference and some indications in which, unfortunately, bad

24 things happened before human contact occurred.

25 Q.   My question is, why is it that Cox, Cox didn't want to be

Case 1:18-cv-00950-PTG-JFA   Document 657   Filed 12/17/19   Page 102 of 128 PageID# 28685
R. Cadenhead Deposition - Examination

2099

1   aware of all of the infringement that the copyright owners were

2   prepared to inform it of?

3   A.   It's not that Cox didn't want to know; it's what -- it's

4   that they wanted to be able to do everything they could with

5   what they had.  That's my understanding of, of their thought

6   process.

7   Q.   Did you sign off or approve on caps being imposed?

8   A.   I did.  I did approve, yes.

9   Q.   And did you have any concerns at the time that Cox was

10  essentially telling copyright owners, don't tell us about

11  things happening on our network that we've prohibited and that

12  are violating your rights?

13  A.   I didn't think that process -- I didn't think that way at

14  all.

15  Q.   You, you weren't concerned that when copyright owners

16  wanted to send you more notices and were being injured by it,

17  that you were prohibiting it?

18  A.   I believed that the copyright -- I believed that the

19  conversations between our people and the copyright owners

20  were -- explained our limitations, asked them to focus on, on

21  where real problems were.  If there was something specific that

22  they had that was worrying them, that they could call, and, and

23  that's my understanding.

24  Q.   I mean, you just said that you wanted the copyright owners

25  to focus on where real problems were.  Was it your view,

R. Cadenhead Deposition - Examination

2100

1    Mr. Cadenhead, that infringement notices, as they were sent day

2    to day, weren't real problems for the copyright owners?

3    A.   No, that's not fair, and I'm sorry if you interpreted it

4    that way because that's not what I meant.

5    Q.   Well, what did you mean?

6    A.   There were an unfortunately large number of people who

7    were downloading apparently a whole lot of music, and those are

8    people we -- I think we all would have wanted to go deal with

9    first.

10   Q.   So why did you cap the number of notices that the RIAA

11   could send?

12   A.   My understanding was that in talking with the, the senders

13   and telling them that we needed limits -- and I think other

14   companies did that, too -- that the conversation also included

15   two things:  One, try to send us ones related to people that

16   are -- that you seem to be able to see are copying a whole lot

17   of stuff because we all want to deal with that first.  And if

18   you got something that's just out of the ordinary and somebody

19   that needs to be dealt with, pick up the phone.

20             That's my understanding of what the conversations

21   were supposed to be.

22   Q.   Do you have any idea as you sit here today why Cox chose

23   to distribute the number of notices that rights owners were

24   allowed to distribute in an inequitable way?

25   A.   I don't know whether it was equitable or not because I --

R. Cadenhead Deposition - Examination

2101

1    with, with the one exception I've mentioned, I don't remember

2    ever being involved in any specific changes related to anybody.

3    Q.   Why did you need to confer with Matt Carothers in order to

4    respond to the RIAA request?

5    A.   I can say that in my opinion, he was the right person to

6    communicate with about this particular kind of question.

7    That's, that's it.

8    Q.   You see that Ms. Sheckler on behalf of the RIAA in April

9    of 2013 reaches out to you to ask whether or not Cox will

10   increase the limit of 400 notices per day?

11   A.   Right.

12   Q.   And you respond several days later, saying:  We have a

13   fairly hard limit on the number of calls from customers that

14   our team can handle in a day, but within those parameters, we'd

15   be happy to discuss the number of notices that we accept from

16   you.

17            Do you see that?

18   A.   Um-hum.

19   Q.   And you ask her a sense of what she's thinking, right?

20   A.   Right.  I did.

21   Q.   And she responds 500 to 600 per weekday?

22   A.   Right.

23   Q.   And you then, I guess, forward that to Brent Beck; is that

24   right?

25   A.   That sounds right.

R. Cadenhead Deposition - Examination

2102

1   Q.   And --

2   A.   It may have included Jason.  It says it's cc'd to Jason

3   Zabek, just -- go ahead.

4   Q.   Correct.  And, and then you got an e-mail back from Jason

5   Zabek, correct?

6   A.   I did.

7   Q.   Why did you forward these notices to the two of them?

8   A.   They, they were the people around that time that, that

9   were managing the, you know, the flow of, of these notices and

10  the processing, and they were the right ones to answer her

11  question.

12  Q.   So at the time, you didn't view it as a negotiation, but

13  rather just an effort to work with the RIAA's request?

14  A.   I never analyzed it one way or the other.  I -- my primary

15  interest and concern was responding to the recording industry

16  re Vicky, about a legitimate question that, that, that she, she

17  wanted us to, to consider, and, and we did.  And I asked if

18  that sounded okay.  She said thanks.

19          And I didn't draw any legal conclusions from that at

20  the time, and it's been so long, I don't think I could answer

21  your question about legal anyway at this point.

22  Q.   So, Mr. Cadenhead, you personally participated in the

23  discussions regarding the copyright alert system, correct?

24  A.   I did.

25  Q.   And you served as, for lack of a better term, Cox's

R. Cadenhead Deposition - Examination

2103

1  representative in those discussions?

2  A.    One of them.

3  Q.    And did you participate in the discussions for as long as

4  Cox participated in them?

5  A.    I think so.

6  Q.    Cox ultimately decided not to join the copyright alert

7  system, correct?

8  A.    Right.

9  Q.    Why?

10  A.    I can give you my general recollection, although I think

11  there's a document floating around that you probably have that

12  summarizes it better than, than I could, and for the sake of

13  time, maybe, maybe that would be smart.

14  Q.    No, no.  I'm not aware of the document you're referring

15  to, so --

16  A.    Oh, so maybe you just have to do best with my memory.

17  We'll do that.  That's fine.

18  Q.    Well, that and the RIAA's, but --

19  A.    Oh, well, no.  You're asking me.  I don't know theirs.

20          Cox -- I presented our process early in the

21  discussions to the whole group as an example of the fact that

22  good things could be done to do meaningful work to address

23  copyright infringement issues over the internet, and, and the

24  negotiations that went on and took place, there were

25  companies -- you know, negotiations have give and take, and

R. Cadenhead Deposition - Examination

2104

1    there were companies that had things that they just couldn't or

2    weren't willing to do, and -- so the ultimate agreement, in my

3    opinion, fell short of what our process was designed to do and

4    would have required us to, to spend a good deal of money to, to

5    revise it in a way that seemed to -- seemed to me to be less

6    effective.

7             And so I felt like the process we had designed was

8    better and under, under all the circumstances, it made sense

9    for us to apply what we were doing, apply what we had designed.

10   And that was, that was my recommendation.

11   Q.   In your participation in CAS, did you have a view one way

12   or the other on whether or not CAS was intended to provide the

13   paradigm for how ISPs would comply with the DMCA safe harbor

14   requirements?

15   A.   I don't think so.  I think it was -- it wasn't replacing

16   any law.  It was, it was, it was a cooperative effort to work

17   together to put together a program that everybody could live

18   with, that addressed the problem everybody recognized, that

19   there was a need for dealing with content infringement from

20   people on the internet.

21   Q.   And it was principally focused on the issue of education,

22   correct?

23   A.   No.  I, I think it was -- it was what it was, and I --

24   it's not fair to call it one thing.

25   Q.   Was one of the principal issues that was discussed as part

R. Cadenhead Deposition - Examination

2105

1   of CAS the desire to have an educational program?

2   A.   Absolutely.

3   Q.   I'm going to hand you what's been marked as Plaintiff's

4   Exhibit 201.  Mr. Cadenhead, Plaintiff's Exhibit 201, which is

5   Bates labeled COX_SONY_00519137 through 199.  Earlier you

6   described that -- I believe you described having given a

7   presentation to those who were participating in the CAS

8   discussions.  Is that correct?

9   A.   Yes.

10  Q.   Is the presentation you gave the document that is attached

11  to Plaintiff's Exhibit 201?

12  A.   Some of it looks familiar.

13  Q.   Mr. Cadenhead, I'm going to focus on pages 8 --

14  A.   Oh, good.  Thank you.

15  Q.   -- through 22 of the presentation, which I do believe was

16  part of the presentation you gave, but you tell me.

17  A.   Yeah, this, this looks -- this looks like -- I gave, I

18  gave presentations like this, I don't know, a bunch of times,

19  but I did give it to the group and -- or a version of it to the

20  group, and this looks like that, a version of something close

21  to that, yeah.

22  Q.   And according to the cover e-mail, you gave this

23  presentation on March 11, 2010.  Does that sound right to you?

24  A.   That's a good guess.

25  Q.   Okay.  And did you create the slides, at least 8 to 22?

R. Cadenhead Deposition - Examination

2106

1    A.    Yeah, I think I did pretty much.  Yeah.

2    Q.    And did you present this to the, to the participants, or

3    those who were involved in the CAS discussions?

4    A.    Yeah.  If this is the -- if this is the same one, then

5    yes, I, I did present, yes.

6    Q.    Why did you give this presentation?  Do you recall?

7    A.    I do.  I volunteered in conversations with all the folks

8    that were pulling the group together, because I felt like we

9    had a pretty good example of, of one way that, that ISPs could

10   respond fairly and, and what we felt was effectively to a

11   problem that needed addressing and that, and that would go at

12   least a long way towards helping the people in the content

13   industry.

14   Q.    Did you disclose to the record industry and the motion

15   picture studios that Cox would ignore the first notice it

16   received with respect to a particular subscriber?

17   A.    Actually, that's in here.

18   Q.    Where is that?

19   A.    Okay.  Let's do that.  It's on -- first of all, it's on,

20   hmm, page 12 twice.

21          Have you got it?

22   Q.    So where it says "hold close" --

23   A.    Right.

24   Q.    -- you explained to everybody that that meant that Cox was

25   ignoring the notice?

R. Cadenhead Deposition - Examination

2107

1   A.   That's not a fair statement.

2   Q.   I'm using the term in the document that was circulated in

3   Cox.  It's not my term; it's Cox's term.

4   A.   I'm sorry, but that's not my term, and you asked me a

5   question, and that's not what this says.

6   Q.   Okay.  Did you describe to the RIAA and the motion picture

7   studios that Cox was not taking any action on the first notice

8   it received with respect to any particular subscriber?

9   A.   That's not what I said, and that's not what this says.

10  Q.   I'm asking whether you described that to the RIAA and

11  MPAA.

12  A.   No, you describe what you say took place.  What did

13  took -- take place was that we received the notice, logged it,

14  and closed it.  It's in the record.  It was in the record as a

15  notice having been received.

16  Q.   Did you describe to the record industry and the music --

17  movie studios that you did not forward that notice or indicate

18  to the subscriber that they had been the subject of an

19  infringement notice?

20  A.   I did.  I made that very clear.

21       EXAMINATION

22  BY MR. ELKIN:

23  Q.   So let's start, if we could, with two exhibits that were

24  marked by Mr. Oppenheim.  The first is 195, which I'm handing

25  to you.

2108

1    A.    Okay.

2    Q.    This is the, the correspondence between you and

3    Ms. Sheckler of the RIAA.

4    A.    Yeah.

5    Q.    And I just -- I direct your attention to the, I guess,

6    third e-mail on the first page of this exhibit, the one where

7    Ms. Sheckler is writing to you on Tuesday, April 16, 2013, and

8    she writes:  How about 5 or 600/weekday?

9          Do you see that?

10   A.    Right.

11   Q.    And then you write back in response to her, and you --

12   among other things, you state:  They think that we can try

13   accepting 600 per weekday, subject to unexpected call concerns

14   that might arise.  Does that sound okay?

15         Why did you not simply limit the number of notices

16   that you would receive to 500 since she asked you:  How about

17   500 or 600 per weekday?

18   A.    I think I said that I had a lot -- have a lot of respect

19   for her and, and for people she works for and, and their

20   concerns and their needs, and I was trying to be helpful,

21   within the bounds of what our people said they could handle.

22   Q.    And Ms. Sheckler writes back to you in response on

23   April 18, 2013, at 11 a.m.:  Thanks.

24         How did -- what did you understand her to mean by

25   that?

R. Cadenhead Deposition - Examination

2109

1    A.   She asked for 500 or 600 per weekday, and, and I

2    responded, well, we'll give it 600 -- we will try -- we can try

3    accepting 600 per weekday, etc., which, which was the

4    highest -- higher of the two numbers that she was kind of

5    floating in -- with me.

6            So she said thanks, and I think that meant that,

7    that, that she appreciated it and that they were going to go

8    forward with that.

9            NOTE:  End of video deposition.

10           THE COURT:  All right.  Your second deposition?

11           MR. ELKIN:  Yes, Your Honor.  We now call

12   Mr. Paszkowski.  I don't want to pronounce his first name

13   because I'm sure I'm going to mess it up.

14           MR. GOULD:  Slawomir.

15           MR. ELKIN:  Okay.  Whatever was just said, I adopt.

16   And again, we're calling him in our case, but both sides

17   provided designations.

18           THE COURT:  All right.  Thank you, sir.

19           MR. GOULD:  We countered it.

20           MR. OPPENHEIM:  We countered this.  It doesn't make

21   any difference.

22           THE COURT:  Designations and counter-designations.

23           MR. OPPENHEIM:  Yeah.

24           THE COURT:  Okay.

25           MR. ELKIN:  He's from the MarkMonitor organization.

2110

1          THE COURT:  All right.  Thank you.

2          MR. GOULD:  A bit of context may help us.  This was a

3  video deposition of a gentleman in Lithuania -- excuse me -- I

4  meant to stand, Your Honor -- a video deposition of a gentleman

5  in Lithuania, so it's going to look a little different

6  probably, maybe.

7          THE COURT:  Okay.  Thank you.

8          NOTE:  The testimony of SLAWOMIR PASZKOWSKI via video

9  deposition is played into the record as follows:

10     EXAMINATION

11  BY MR. BRODY:

12  Q.   Mr. Paszkowski, can you state your name and spell your

13  name for the record, please?

14  A.   So my name is Slawomir Paszkowski.  Last name is spelled

15  P-a-s-z-k-o-w-s-k-i.

16  Q.   And are you an employee of MarkMonitor?

17  A.   Yes, that is correct.

18  Q.   What's your position at MarkMonitor, Mr. Paszkowski?

19  A.   My position at MarkMonitor is director of engineering of

20  antipiracy.

21  Q.   And what does the director of engineering antipiracy do?

22  A.   I manage the engineering teams working on our software

23  systems.

24  Q.   How long have you been in that position, sir?

25  A.   I have been in this position for about one year and a

S. Paszkowski Deposition - Examination

2111

1    half.

2    Q.    And what did you do before you were the director of

3    engineering at -- for antipiracy?

4    A.    I was a senior manager of software engineering in

5    MarkMonitor.

6    Q.    And how long were you in that position?

7    A.    I believe three years.

8    Q.    So that would take us back to sometime in 2014?

9    A.    That sounds pretty accurate, yeah.

10   Q.    Okay.  What did you do before you were a senior manager of

11   software?

12   A.    I have been a product owner for one of the engineering

13   teams in MarkMonitor.  I have also been project manager, scrum

14   master.  So, yeah, I started out as a software engineer back in

15   2004 in a company called DtecNet, which was later acquired by

16   MarkMonitor.

17   Q.    And how long were you a product owner?

18   A.    I would say two years at least.

19   Q.    So that would go back to about 2012?

20   A.    Yeah.  It's pretty fluent, some of it, because I've been

21   holding multiple positions at the same time.

22   Q.    Okay.  What product were you the owner of?

23   A.    I have been the, the product owner of a P2P team, so

24   peer-to-peer collection and verification.

25   Q.    Okay.  Let's get out tab 10.  It's a document entitled

S. Paszkowski Deposition - Examination

2112

1    "P2P Process -- Enforcement Process," and let's mark that as,

2    as Exhibit 3.

3           Let's get out tab 10.  It's a document entitled "P2P

4    Process -- Enforcement Process," and let's mark that as, as

5    Exhibit 3.

6    A.   I got it.

7    Q.   Great.  Okay.  For the record, this is a document titled

8    "P2P Enforcement Process," dated April 11, 2012.  It bears

9    Bates Nos. MM189 through 221.

10          Mr. Paszkowski, have you ever seen this document

11   before?

12   A.   I cannot tell if I've seen the whole scope of this

13   document, but I believe it contains portions of documents that

14   I have seen in the past.  Basically from looking at the

15   headline, it's supposed to be a document outlining how we do

16   the different phases in our process.

17   Q.   Okay.  The document states that it's prepared for the

18   Motion Picture Industry Association of America and the

19   Recording Industry Association of America.

20          Do you see that?

21   A.   Yes.

22   Q.   And do you understand that MarkMonitor undertook a project

23   for those organizations beginning in late 2011?

24   A.   I understand that, yeah.

25   Q.   So, Mr. Paszkowski, I was asking you about Exhibit 3, and

S. Paszkowski Deposition - Examination

2113

1  the question I believe I asked was whether this describes the

2  technology that MarkMonitor proposed to use as of April 2012

3  for the RIAA and MPAA project.

4  A.   So based on the headline of the document, it should

5  describe what is supposed to be the P2P enforcement process.

6  Q.   Okay.  Now, let me direct you to -- I'm sorry -- to

7  page 15 of the document.  There is a section there that begins

8  there titled Case File Contents.  It's Bates No. MM203.

9  A.   Yes.

10  Q.   Let me know when you've got that page.

11  A.   Got that page.

12  Q.   Okay.  Now, case files are -- what are case files in the,

13  in the MarkMonitor system?

14  A.   So case files are files that are generated as a part of

15  the investigation, holding different items, including the logs

16  stored in an XML format and, yeah, having all kind of

17  information about the investigation.

18  Q.   Okay.  Could we mark -- Madam Court Reporter, could you

19  mark the document that's at tab 11 as Exhibit 4, please?

20          THE REPORTER:  Yes.

21          THE WITNESS:  Got it.

22  BY MR. BRODY:

23  Q.   Have we got that marked?

24  A.   Yes.

25  Q.   Mr. Paszkowski, do you recognize Exhibit 4 as -- I believe

S. Paszkowski Deposition - Examination

2114

1  it's two examples of the case files you were just referring to?

2  A.   I see this is an XML format with the different logs.  I'm

3  not familiar with the detailed content of it, but I can speak

4  to what it is that I'm looking at if you want to go into it.

5  Q.   I meant to ask a slightly different question.  We, we can

6  go into detail shortly, but these are -- for the record, I've

7  asked the court reporter to mark as Exhibit 4 -- I believe it's

8  15 pages of XML formatted material, which I believe

9  represent -- came from MarkMonitor, the MarkMonitor production,

10 MM -- and these were produced as examples of -- well, as part

11 of the entire population of case files that were prepared in

12 connection with the monitoring of Cox subscribers.

13           The question I think I meant to ask was do you

14 recognize these materials as embodying the case files that are

15 described -- that we just looked at in Exhibit 3?

16 A.   Yeah, these materials look like log files produced by our

17 software.  It has our signatures and our format.

18 Q.   Okay.  Let's go back to Exhibit 3.

19 A.   Exhibit 3?  Yes.

20 Q.   There's a screenshot in the middle of Exhibit 3 that --

21 well, do you know what that, what that screenshot shows?

22 A.   Are we on page 15?

23 Q.   Yeah.  I'm sorry, that's figure 4.

24 A.   Figure 4, yeah.  It's the overview tab of the case file.

25 Q.   Which one is not a BitTorrent package?

S. Paszkowski Deposition - Examination

2115

1   A.   So looking at Exhibit 4, we have two different evidence

2   packages here.  The first one is, looking at the investigation

3   info, is an Ares package.  The second one, looking at the

4   investigation info, is a BitTorrent evidence package.

5   Q.   Oh, I'm sorry, I got them backwards.  Okay.

6            Does the first one show MarkMonitor connecting to the

7   peer computer?

8   A.   The first one -- by the first one, you mean the Ares

9   evidence package or the BitTorrent evidence package.

10  Q.   The Ares evidence package.

11  A.   And actually, in both cases, it's a connection within a

12  MarkMonitor, and the peer is established to have this evidence

13  package in all instances.

14  Q.   Could you go back to Exhibit 3, the document -- the

15  April 2012 document?

16  A.   I got it.

17  Q.   Just so our vocabulary is clear, and this is, this is an

18  illustration of a BitTorrent connection; is that right?

19  A.   Yeah.  In the Exhibit 3 on page 16, figure 5, yes, it's

20  BitTorrent.

21  Q.   And in BitTorrent, files are divided up into pieces and

22  the peers are shared pieces of the file until a complete file

23  has been downloaded.  Is that generally true?

24  A.   So the torrent file is made up, made up of pieces, and the

25  users are distributing the pieces as long as they wish for.

S. Paszkowski Deposition - Examination

2116

1   Q.   Is that an exchange that takes place in Gnutella, Ares,

2   and eDonkey as well as BitTorrent?

3   A.   The exchange is different in different protocols.  They

4   have different messages, and they all work in a different way,

5   so it cannot be generalized that all of them work the same way

6   and have the same sequence and have the same messages.

7   Q.   No, I understand that, but I'm asking whether this message

8   is common to the four protocols.

9   A.   Not all protocols works the same way, so some protocols

10  have a message specifying what the user is -- the peer is

11  distributing, but not all of them have that type of message

12  because they by default distribute the whole content.

13          That is the difference between BitTorrent and the

14  other networks because in BitTorrent, the distribution starts

15  as soon as one piece of content is obtained from the network,

16  and it's distributed on to other peers that might be interested

17  in that specific piece of content.

18  Q.   The next paragraph of this page in Exhibit 3 says -- it

19  says that -- line 3, figure 6, shows the agent "indicates an

20  interest in the data shared by the other peer, by sending an

21  'Interested' message.  Eventually, about one minute later, the

22  agent receives a message which allows it to request data from

23  the peer.  This is the 'Unchoke' message."

24          Is that a sequence that is typically implemented in

25  the BitTorrent investigations?

S. Paszkowski Deposition - Examination

2117

1  A.    I believe this is one of the ways it can happen.

2  Q.    Well, is the software written to cause the system to

3  download a piece of -- a full piece of data when it contacts a

4  BitTorrent peer?

5  A.    The software does how it's instructed, and we have

6  different levels of investigation.  So if the software is

7  instructed to download a piece of the content, then that's what

8  it does, and after that, concludes the investigation.

9  Q.    Okay.  And this is illustrating what happens when the

10  software is instructed to download a piece of the content from

11  the peer; is that right?

12  A.    The document shows an example of how this could happen,

13  yes.

14  Q.    Is the software written to similarly download contents

15  from peers from the Gnutella, eDonkey, and Ares networks?

16  A.    The software is written to follow the protocols and get

17  the evidence needed for the -- to, yeah, to collect the data on

18  the peers infringing activity.

19  Q.    And in those other networks, does that data include pieces

20  or complete content files?

21  A.    Different networks have different characteristics, and

22  some networks have pieces and some don't have pieces.  Some

23  networks have full downloads, and that's the only way you can

24  get content from there.

25  Q.    The networks with full downloads would include eDonkey,

S. Paszkowski Deposition - Examination

2118

1    Ares, and Gnutella; is that correct?

2    A.    That is not correct because --

3    Q.    Okay.

4    A.    -- as far as I know, as far as I know, eDonkey also allows

5    for download of pieces and parts of a file.

6    Q.    And Ares -- and eDonkey also allows for full downloads; is

7    that correct?

8    A.    EDonkey allows for both piece, part, and full download

9    from other peer, depending on what is needed.

10   Q.    And Gnutella and Ares, they only allow for complete

11   download?

12   A.    As far as I recall, Ares and Gnutella, they are full

13   download networks.

14   Q.    What is the content info log?

15   A.    This is a log created by MarkMonitor to provide

16   information about the content that was distributed by the peer

17   where we secured evidence.

18   Q.    And the description says:  The content info section

19   contains the name, hash value, and size of the torrent, as well

20   as an indication of the percentage of the data which was shared

21   by the user, and the portion which was downloaded and hash

22   checked by MarkMonitor antipiracy.

23          Do you see that passage?

24   A.    That is correct.

25   Q.    And then that's illustrated in figure 9; is that correct?

S. Paszkowski Deposition - Examination

2119

1   A.   That is correct.

2   Q.   We were looking at the passage that says:  The content

3   info section includes the name, hash value, and size of the

4   torrent, as well as an indication of the percentage of the data

5   which was shared by the user, and the portion which was

6   downloaded and hash checked by MarkMonitor antipiracy.

7            Have you got that passage in front of you?

8   A.   Yes, I have that passage in front of me.

9   Q.   In BitTorrent investigations, are these fields

10  specifically collected?

11  A.   So we would know what we are dealing with, so that would

12  be a content info, and we would know what, what is the size of

13  the content.  We would know how much is shared, and if download

14  was part of the investigation, we would also know how much of

15  it we downloaded.  And same with hash value.

16  Q.   And you would know that because it's recorded in the

17  content info file?

18  A.   Well, in BitTorrent case, there are a couple of different

19  places where this information exists.  First of all, some of it

20  exists in the torrent file, because that's the start of the

21  investigation is based on the torrent file.  We have the file

22  name.  In this case, it's actually a torrent name.  We would

23  know what is the size of the whole torrent content that is

24  supposed to be downloaded, investigated.  We would know the

25  hash value of it, and then based on the investigation, we would

S. Paszkowski Deposition - Examination

2120

1    know how much was shared, distributed by the peer, and then we

2    would know if we download a piece, we would know how much of it

3    we downloaded.

4    Q.   And that is recorded, among other places, in the content

5    info file; is that correct?

6    A.   That is correct.

7    Q.   Let me, let me ask a different question because I'm not

8    quite understanding that answer.

9              You said that the downloaded content is verified

10   using a piece hash.  What does that mean?

11   A.   It means that the bytes we receive from the peer are the

12   bytes we should be getting in corresponding to the bytes that

13   are supposed to be distributed within the torrent.  So that

14   1,024 kilobytes we get from the peer are one piece, and that

15   piece has a piece hash in the torrent, and we calculate a piece

16   hash on our end on the kilobytes we received and compare that

17   against the piece hash in the torrent to make sure that the

18   downloaded bytes we have are exactly as they should be in the

19   torrent file.

20   Q.   What do you compare that piece hash to?

21   A.   Our calculated piece hash is compared to the piece hash

22   within the torrent file.

23   Q.   Okay.  And is a similar verification process used in the

24   Gnutella, Ares, and eDonkey investigations, recognizing that

25   they do not download pieces but only complete files?

S. Paszkowski Deposition - Examination

2121

1   A.   All networks use hashes, and all networks exchange data,

2   and hashing is an integral part of making sure that the data

3   received is the data that was requested.

4   Q.   So you do a similar hash verification in the other

5   investigations of BitTorrent; is that correct?

6   A.   If download is part of the investigation, then we do a

7   check on our end, yes.

8   Q.   I want to ask you a few more questions about Exhibit 4,

9   the evidence packages, and then we'll move on to a new topic.

10  In Exhibit 4, the third page of the exhibit is the content info

11  log for the Ares investigation.  Do you have that?

12  A.   Yes.

13  Q.   Okay.  And that shows verified equals 0 and downloaded

14  equals 0.  Do you see that?

15  A.   Yes.  I see that, yeah.

16  Q.   Does that mean that none of the file was downloaded and

17  none of the file was verified?

18  A.   That's what the log file says.

19  Q.   Okay.

20  A.   It says 0 download, 0 verified.

21  Q.   If you go to the -- I think it's the eighth page of that

22  exhibit.  It's the content info log file for the BitTorrent

23  investigation.  Let me know when you've got that.

24       I apologize, that's the 11th page of the exhibit.

25  That also shows verified equals 0 and downloaded equals 0; is

S. Paszkowski Deposition - Examination

2122

1    that correct?

2    A.   Yeah, it does.  Correct, yeah.

3    Q.   Okay.  So that means nothing was downloaded, nothing was

4    verified in that investigation, right?  Or no content was

5    downloaded or verified?

6    A.   That's what the log file says, yeah, for this type of

7    investigation for this particular project.

8         EXAMINATION

9    BY MR. GOULD:

10   Q.   Exhibit 4, I think that was tab 11.  These are the

11   excerpts of the evidence packages that MarkMonitor produced at

12   MM306.

13   A.   Yes.  I have it here in front of me.

14   Q.   If you could turn to the third page, the content info file

15   on the very same package you looked at with Mr. Brody?

16   A.   Yes.

17   Q.   Do, do you recall Mr. Brody asking you some questions

18   about the fields verified and downloaded that shows 0 on that

19   page?

20   A.   Yes, I recall that.

21   Q.   Does this evidence package information shown, the content

22   info file, pertain to file verification or infringement

23   verification?

24   A.   This is a purely infringement verification.  That's the

25   information we got from the investigation itself, so in this

S. Paszkowski Deposition - Examination

2123

1    case, connecting to a peer.

2    Q.   What's the difference between file verification and

3    infringement verification?

4    A.   Infringement verification is based on the different levels

5    of investigation, ranging from 1 to 7, and the file

6    verification is a verification of the whole content as it is

7    found in the network and how it's hashed -- physical files are

8    hashed, and we have a representation of the files that can be

9    connected to the investigations.

10   Q.   Are you familiar with the level 4 infringement

11   verification?

12   A.   Yes.  I'm familiar with the movie labs, infringement

13   verification levels from 1 to 7, and level 4 basically means --

14   yeah, level 4 basically means connect and handshake with the

15   peer without downloading anything.  Downloading would be a

16   level 5.

17   Q.   Before MarkMonitor sends an infringement notice to an ISP,

18   are they downloaded a full file for verification --

19   A.   Yes.

20   Q.   -- at some point prior in time?

21   A.   Yes.  A full file needs to be downloaded and verified

22   before any notices are sent and even before any infringements

23   are used in the BI data sources.

24            NOTE:  End of video deposition.

25            THE COURT:  All right.  Does that complete that?

2124

```
 1                    MR. ELKIN:  It does, Your Honor.

 2                    THE COURT:  All right.  Then we've heard those two

 3      depositions, and we'll break for lunch.  How about if you -- we

 4      come back around 10 minutes after two?  We have a couple things

 5      to talk about before we get you back here after lunch.  So 10

 6      minutes after two, please.

 7                    All right.  You're excused.  Thank you.

 8                    NOTE:  At this point, the jury leaves the courtroom;

 9      whereupon the case continues as follows:

10      JURY OUT

11                    THE COURT:  All right.  Anything before we break?

12                    MR. ELKIN:  I think Ms. Leiden just wanted to offer

13      into evidence several documents that were exhibited in those

14      depositions.

15                    THE COURT:  All right.  Let's do that now.  Yeah.

16                    MR. OPPENHEIM:  So can we confer with that -- about

17      that and then do it after lunch?

18                    THE COURT:  Sure.

19                    MR. OPPENHEIM:  Because I haven't had a chance to go

20      through it, and the person from our team who did isn't here.

21                    THE COURT:  Okay.  Yeah, we'll do that after lunch,

22      and let's come back at 2:00 so we can deal with the slides and

23      the testimony of Feamster.  Okay?  Mr. -- Dr. Feamster, excuse

24      me.  So we'll cut our lunch a couple minutes short and deal

25      with it at that time.
```

2125

1          All right.  We're in recess then.

2          MR. OPPENHEIM:  Thank you, Your Honor.

3          NOTE:  At this point, the December 12, 2019, morning

4    portion of the case is concluded.

5

6                    CERTIFICATE OF COURT REPORTERS

7

8

9          We certify that the foregoing is a true and
          accurate transcription of our stenographic notes.

10

11

12              /s/  Norman B. Linnell
             Norman B. Linnell, RPR, CM, VCE, FCRR

13

14

15              /s/  Anneliese J. Thomson
             Anneliese J. Thomson, RDR, CRR

16

17

18

19

20

21

22

23

24

25