2126

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
              Plaintiffs,      :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
              Defendants.      :
                               :
-------------------------------:
```

VOLUME  9  (P.M. Portion)

TRIAL TRANSCRIPT

December 12, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:


FOR THE PLAINTIFFS:              MATTHEW J. OPPENHEIM, ESQ.
                                 SCOTT A. ZEBRAK, ESQ.
                                 JEFFREY M. GOULD, ESQ.
                                 MICHAEL J. DRUCKMAN, ESQ.
                                 ANDREW L. GUERRA, ESQ.
                                 LUCY G. NOYOLA, ESQ.
                                 JIA RYU, ESQ.
                                 Oppenheim + Zebrak, LLP
                                 4530 Wisconsin Avenue, N.W.
                                 5th Floor
                                 Washington, D.C. 20015


FOR THE DEFENDANTS:              THOMAS M. BUCHANAN, ESQ.
                                 GEOFFREY P. EATON, ESQ.
                                 Winston & Strawn LLP
                                 1700 K Street, N.W.
                                 Washington, D.C. 20006-3817
                                   and
                                 SEAN R. ANDERSON, ESQ.
                                 MICHAEL S. ELKIN, ESQ.
                                 THOMAS P. LANE, ESQ.
                                 CESIE C. ALVAREZ, ESQ.
                                 Winston & Strawn LLP
                                 200 Park Avenue
                                 New York, NY 10166-4193
                                   and
                                 JENNIFER A. GOLINVEAUX, ESQ.
                                 THOMAS J. KEARNEY, ESQ.
                                 Winston & Strawn LLP
                                 101 California Street, 35th Floor
                                 San Francisco, CA 94111-5840
                                   and
                                 MICHAEL L. BRODY, ESQ.
                                 Winston & Strawn LLP
                                 35 West Wacker Drive
                                 Chicago, IL 60601
                                   and
                                 DIANA HUGHES LEIDEN, ESQ.
                                 Winston & Strawn LLP
                                 333 South Grand Avenue
                                 Suite 3800
                                 Los Angeles, CA

2128

INDEX

OPENING STATEMENTS BY:




WITNESS                         EXAMINATION      PAGE


CHRISTOPHER KENNETH MONSON

                                DIRECT           2149
                                REDIRECT         2176

NICK FEAMSTER

                                DIRECT           2181
                                CROSS            2249




CLOSING ARGUMENTS BY:




COURT'S RULINGS/JURY INSTRUCTIONS

2129

```
 1                 A F T E R N O O N   S E S S I O N

 2              NOTE:  The afternoon portion of the case on

 3   December 12, 2019, begins in the absence of the jury as

 4   follows:

 5   JURY OUT

 6              THE COURT:  All right.  Are we ready to address the

 7   Feamster issue?  Mr. Zebrak.

 8              MR. ZEBRAK:  Thank you, Your Honor.  So I spoke for

 9   quite a bit with Mr. Brody, and I think it makes sense to

10   identify where I think we have agreement about the scope of

11   Dr. Feamster's testimony and the issues that are not at play.

12              THE COURT:  Okay.

13              MR. ZEBRAK:  And then we can address what remains.

14              THE COURT:  Yes, sir.

15              MR. ZEBRAK:  So -- and this is not necessarily

16   exactly in the order of the bench memo, but I think this is

17   probably the easiest way to deal with it.  So Dr. Feamster is

18   not going to be testifying about the accuracy or reliability of

19   Audible Magic.

20              THE COURT:  Okay.

21              MR. ZEBRAK:  We're in agreement on that.

22   Dr. Feamster, No. 2, will not be testifying about MarkMonitor's

23   use of Audible Magic in terms of disputing whether for each of

24   the files, that they've been looked up in Audible Magic and

25   received a positive verification.  He's simply going to have a
```

2130

```
 1    little bit of context for his testimony where he explains that
 2    Audible Magic was a component of the MarkMonitor system, but
 3    he's not going to contest that it wasn't used for the initial
 4    file identification or that Audible Magic's, in any way,
 5    inaccurate or unreliable.
 6              THE COURT:  Okay.
 7              MR. ZEBRAK:  And then the third area actually has
 8    three subcomponents, but in the course of summary judgment
 9    briefing, Dr. Feamster put in two declarations, and he will not
10    be testifying about what was in those declarations.
11              Specifically, No. 1, that hash values are unreliable
12    because of something called hash collisions.
13              THE COURT:  Right.
14              MR. ZEBRAK:  Or, No. 2, that hash values are
15    unreliable because hashes can be broken with those that have
16    tremendous technical and monetary resources.  It was something
17    he had in one of his declarations about that.
18              And then the third area is that he will not be
19    testifying that peers sometimes share lawfully acquired files,
20    whether intentionally or inadvertently.  That was another area
21    that creeped into his summary judgment declaration that was not
22    part of his prior testimony.
23              THE COURT:  Wasn't part of his -- neither of those
24    were part of his expert report; is that right?
25              MR. ZEBRAK:  That's correct.
```

2131

 1              THE COURT:  Okay.

 2              MR. ZEBRAK:  And then the fourth and final area

 3    that's out, before we get to what is at issue, is that

 4    Dr. Feamster is going to testify with respect to the hard drive

 5    that was produced in this action.  He's simply going to say

 6    that he received it and looked at it.  He's not going to

 7    testify about any analysis of it, you know, in terms of what it

 8    contained or didn't contain and how that related to the other

 9    evidence.

10              THE COURT:  All right.

11              MR. ZEBRAK:  So I don't know if Your Honor wants me

12    to pause there and get to what is at issue or -- did I get that

13    right?

14              MR. BRODY:  If I could, Your Honor?

15              THE COURT:  Yes, sir.

16              MR. BRODY:  I think that's basically right, and like

17    I said this morning, I think a lot of these are non-issues.  On

18    Audible Magic, let me say what I think Mr. Zebrak was saying,

19    but -- just so we're on the same page.

20              THE COURT:  Accuracy of the --

21              MR. BRODY:  What he's going to testify to basically

22    is to kind of recapitulate some of what the jury has already

23    heard, what Audible Magic is, how it fits into the system, just

24    to set the context for the subject matter of his -- the real

25    subject matter of his testimony.  But we're not going to be,

2132

1    you know -- we've said what we had to say about Audible Magic

2    in motions, and we're not going to be rehashing that here.

3            THE COURT:  Okay.

4            MR. BRODY:  On the declaration, yes, no hash

5    collisions.  We're not going to elicit testimony that peers can

6    share files lawfully.

7            Broken hashes, I'm not quite sure what that means,

8    but I think we're not going to say that, elicit any testimony

9    on that.  We are going to elicit testimony, or we hopefully are

10   going to be eliciting testimony, depending on what Your Honor

11   has to say on the subject, about the issues that were addressed

12   during his deposition.

13           So our view is going to be depending on what you say,

14   what's in the deposition is fair game, but we have no intention

15   of going beyond that.  So whatever was in the declaration --

16   we're not relying on the declaration as a basis for introducing

17   new evidence.

18           And Mr. Zebrak's correct about the hard drive.  He's

19   just going to mention that that's something he reviewed.

20           THE COURT:  Okay.  So he's going to be limited to the

21   contents of his expert report, and he's not going to go outside

22   of that.  So if there were declarations which were put in

23   subsequently --

24           MR. BRODY:  Correct.

25           THE COURT:  -- he's not going to testify to those.

2133

1          MR. BRODY:  Well, yes to the second thing.  He will

2     certainly testify on what's in his report.  The dispute between

3     us is whether he can testify on the subject matter that arose

4     during his deposition.

5          THE COURT:  Well, what was that?  Is this the

6     bitfields and the --

7          MR. BRODY:  So -- yeah, yeah.  So basically what he

8     said in his report was that it's absolutely critical that you'd

9     download a piece of the file from the peer in order to know

10    what it is.  And I think everybody agrees he can testify about

11    that.  That's in the report, you know, he'll give his views.

12         At deposition -- so he does that on -- sets -- puts

13    in their report on the, I think, the end of May, 29th.  Two

14    weeks later, he's deposed, and Mr. Zebrak asked him about that,

15    and he testified that -- the report says that the peers may not

16    have all the pieces of a file and the -- let me get the exact

17    language.

18         It's absolutely critical to download file contents to

19    verify that a peer is, in fact, sharing content, because, one,

20    in many cases, a peer in a network such as BitTorrent often

21    does not have the entire file, but only portions or pieces of

22    the file.  In some cases, even the entire collection of peers

23    is exchanging a file or files and may not have the entire file.

24         And then he also said, a paragraph I'm not seeing,

25    that it is often the case that the pieces they have don't even

2134

1    amount to an operational file, that you couldn't play any of

2    the music.

3            At deposition, Mr. Zebrak asked him, appropriately,

4    what the basis for that was, and he explained that the reason

5    you'd have that disparity -- there are a couple of reasons.

6    One is that the file can be corrupted either in transit or in

7    storage on the hard drive, and the other is that there may be

8    dishonesty in BitTorrent.  People may lie about what files they

9    have.

10           And then there's 20 pages of questions and answers on

11   that subject.  And Mr. Zebrak's position, I think, is that

12   that's beyond the report and it's not fair game.

13           Our position is that it's, you know, explaining the

14   basis of the report, that it was asked about at the deposition,

15   that Ms. Frederiksen-Cross had an opportunity to respond, and

16   it's well within what the drafters of Rule 26 contemplated by

17   way of appropriate supplementation for an expert report.

18           As Your Honor's aware, I'm sure, the 1993 amendments

19   and the commentary specifically contemplate that experts can

20   supplement in deposition.  And so that's what we want to do.

21   We want to do what's in the report and what's in the

22   deposition.  No more, no less.

23           THE COURT:  Okay.  All right, Mr. Zebrak?

24           MR. ZEBRAK:  Thank you, Your Honor.  So this -- Your

25   Honor has already looked at this issue and ruled.  The --

2135

1          THE COURT:  Well, no, I excluded the dataset because
2    I found it wasn't reliable, hadn't been, you know,
3    authenticated and -- but that was really all I was presented
4    with as far as the Audio (sic) Magic.
5          MR. ZEBRAK:  Right.  Right.
6          THE COURT:  I don't know what other data has been
7    produced.  I mean, we looked at the rebuttal report.  It really
8    doesn't talk about lying, and it talks instead just about an
9    absence of data more than the other issues.  But you asked him
10   in his deposition about, okay, where does this come from?  And
11   he proceeded to tell you, right?  Isn't that what a -- that's
12   what the deposition is for.
13         So I guess the first question is do you believe that
14   he hit sufficiently on it in any of his report testimony, so
15   that it's fair for him to supplement in his deposition?  And if
16   not, why not?
17         MR. ZEBRAK:  Sure.  So the issue that we're
18   challenging here was not addressed in his report.  He did speak
19   to an aspect of it at his deposition, but --
20         THE COURT:  So tit for tat and the -- or is that
21   something different?
22         MR. ZEBRAK:  Well, that's something different --
23         THE COURT:  Okay.
24         MR. ZEBRAK:  -- that is in his report.
25         If I could just walk Your Honor through it briefly?

2136

1    So --

2              THE COURT:  Yeah, present it the way you intended to

3    present it, and see if I catch up with you.

4              MR. ZEBRAK:  Thank you, Your Honor.  Thank you, Your

5    Honor.  So, look, the -- Your Honor knows the rules very well.

6    An expert report is supposed to identify the conclusion and the

7    bases thereof.

8              His report says you need to do a download for two

9    reasons:  No. 1, the peer may not have the entirety of the

10   file.  They may have a portion of it.  Now, factually that's

11   legally confusing because -- but that's a separate issue for

12   later in the case.  And the second issue is he said the other

13   peers within the swarm may not have all the pieces you're

14   looking for.  Those were his two reasons, no more, no less.

15             At the deposition -- and Your Honor understands how

16   depositions go.  Lots of issues come up, and, you know, I

17   probed this issue because he, you know, raised this issue of

18   lying bitfields.  I never heard of lying bitfields, which is

19   another way of saying falsification of bitfield data.

20             Cox in its brief said that they don't understand what

21   we're referring to about lying bitfields.  I was shocked when I

22   saw that, Your Honor.  In the Daubert briefing, we specifically

23   had a whole section of our report -- of our Daubert motion

24   saying that Dr. Feamster should not be allowed to talk about

25   lying bitfields because it wasn't in his report.

2137

1            And they came back and gave Your Honor a counter-

2    argument to that in their opposition, and they had a long

3    footnote, and nowhere in their brief or their opposition did

4    they raise the argument they're now raising today, which is

5    that he supplemented it in his deposition and it's now fair

6    game.

7            They raised a whole host of other arguments that

8    don't hold water, and that precisely was the reason, I believe,

9    why Your Honor in the opinion about Dr. Feamster clarified that

10   he can't testify outside his report.  It was specifically the

11   briefing about what wasn't in his report that the parties

12   addressed about lying bitfield.

13           And this is very wonky, these lying bitfields.

14   Really what it concerns is that the BitTorrent system relies on

15   hash values, and a peer, once they receive a piece, they verify

16   what it contains, then they report to the world what they have.

17   They do it in two ways, Your Honor.  One is they identify the

18   hash for what they have, and the other is they identify in the

19   bitfield the percent of the file they have.

20           And what Dr. Feamster now wants to do is specifically

21   address what we in Cox argued and Your Honor ruled on at the

22   Daubert stage about lying bitfields, and he wants to take it

23   even a step further in his report and say not just do peers

24   sometimes report false bitfield information about the

25   percentage they have, but he also wants to talk, I believe,

2138

1   about false hash reporting.

2           And, you know, Your Honor, we've all worked really,

3   really hard on this case, and the idea that we're having this

4   issue now, if they wanted to supplement his report, they could

5   have, and we would have addressed it with our expert in

6   rebuttal -- in a reply report, and we would have put on

7   different trial testimony.

8           And this idea of corrupted files, again, it's not in

9   his report, and, you know, I don't know what else to say about

10  it, Your Honor, except this is not what he testified about.

11  And even when -- excuse me, not what he put in his report.

12          And even when I spoke to him about lying bitfields,

13  he couldn't cite any specific studies.  It was, it was this

14  general statement.  And then when I pushed him after all this

15  testimony that Mr. Brody referenced, he finally conceded, well,

16  maybe it could happen about 1 percent of the time.

17          And, Your Honor, this jury is not going to benefit

18  from more confusing testimony that distracts them from the

19  merits, and I think that's all this is.

20          THE COURT:  All right.  Thank you.

21          MR. BRODY:  May I respond, Your Honor?

22          THE COURT:  Yes, sir, you may.

23          MR. BRODY:  First of all, let me just clear up one, I

24  think, factual error.  I think Mr. Zebrak had some of the

25  testimony confused.

2139

1          He did testify that the disc corruption issue

2   occurred 1 to 2 percent of the time.  There never, there never

3   was testimony about the extent to which dishonesty happens in

4   these networks.  There was extensive questioning:  Do you think

5   it happens?  Do you think it's widespread?

6          Yes, I think it's widespread.  There are studies.

7          And it was that type of testimony that was available,

8   and that's all we would ask him to do.

9          Second --

10          THE COURT:  All right.  Yeah, I thought in the

11   deposition, the part that I read said he was, he was unaware of

12   any studies.

13          MR. BRODY:  I'll get Your Honor the citations.

14          THE COURT:  Maybe somewhere else --

15          MR. BRODY:  I think he says there are studies.  I

16   think he may even have said:  I can't remember what they are

17   right now just sitting here.

18          THE COURT:  Okay.

19          MR. BRODY:  But I've seen studies.  I know it's other

20   people who've counted.

21          I'm not going to ask him, you know, what are the

22   studies.  I'm really just going to ask him:  Is this a

23   phenomenon?

24          Well, what he says in his deposition, that there are

25   incentives to do it, there are ways to do it, and therefore,

2140

1    there's every reason to believe that it's widespread, or

2    "likely," I think, is the phrase he used.

3            So that's really what we're talking about.

4            THE COURT:  Why didn't you supplement his report to

5    add this new area?

6            MR. BRODY:  Well, I, I think there are two reasons

7    for that, Your Honor.  One is we'd already put in the report.

8    We didn't --

9            THE COURT:  Well, this is back in the end of May.

10           MR. BRODY:  Yeah.  So, so the deposition was between

11   the two reports.  So I think we felt that we had given -- they

12   had legitimately inquired, probed into what he did opine about,

13   namely, that this, this was inadequate, and the problem of why

14   anybody would want to sort of rehash these bitfields, and he

15   gave them that testimony.

16           And the -- I probably was being a little cryptic

17   before.  The, the 1993 commentary on the amendments to Rule 26

18   specifically say there is no obligation to provide supplemental

19   or corrective information that has otherwise been made known to

20   the parties in writing or during the discovery process, as when

21   a witness not previously disclosed is identified during the

22   taking of a deposition or when an expert during a deposition

23   corrects information contained in an earlier report.

24           Now, I will concede this is not a correction, but it

25   is, obviously, a -- I guess I'd say a clarification or an

2141

1    amplification of what is explicitly in the report, namely, that

2    this kind of checking is not done and that it should be done

3    and that he's going to -- as he explained, he was going to

4    contest the reliability of the data on that basis.

5            They had -- Ms. Frederiksen-Cross put her report in

6    two weeks later.  They scheduled the deposition when they did,

7    completely appropriately, so that they would be able to respond

8    to what was in the deposition, and with due respect, if they --

9    if we had simply written on a piece of paper what he said in

10   the deposition or just clipped it out and put the title page on

11   it, it would be, you know, a supplemental report.

12           They had -- everything that there was to have about

13   what he's going to say, they had an opportunity to respond to

14   it.  Mr. Zebrak is going to do a bang-up job of cross-examining

15   him on it, and, you know, I really think it's -- there's no

16   prejudice to the jury, and it's a chance to give them a

17   complete picture of how these systems operate and, and what the

18   challenges are for companies like MarkMonitor and Cox, when

19   they're trying to figure out what's going on on these

20   computers.

21           THE COURT:  Okay.  Thank you.

22           Mr. Zebrak, briefly.

23           MR. ZEBRAK:  Very briefly, Your Honor.  So I'm now

24   reading from page 313 of his deposition, line 3.

25           To date, you have no expert opinion about the

2142

1    percentage likelihood that the bitfield information about what

2    appears sharing will be inaccurate?

3            Sorry, too fast?  Oh, my apologies.

4            THE COURT:  Page 303?

5            MR. ZEBRAK:  313.

6            THE COURT:  313.

7            MR. ZEBRAK:  And then he proceeds to give more sort

8    of deflection.  Then he finally says:  But since you've asked

9    me over and over and over again specifically for numbers, let

10   me do my best.  These would probably be in the range of 1

11   percent, okay?

12           So, you know, Your Honor, we've been trying to argue

13   this based on the facts of what occurred.  Right here at his

14   deposition, he says probably 1 percent.

15           And again, in his report, he gave two reasons got why

16   a download is needed, and it was the two I said --

17           MR. BRODY:  What page is that, Mr. Zebrak?

18           MR. ZEBRAK:  313 of his deposition, sir.

19           THE COURT:  He's asking him the percentage likelihood

20   that the bitfield information about what a peer is sharing will

21   be inaccurate.

22           MR. ZEBRAK:  Yeah.  And to Mr. Brody's benefit, he

23   wasn't at the deposition; somebody else was.

24           THE COURT:  Right.

25           MR. ZEBRAK:  So I don't fault him for saying I got

2143

1    this wrong.

2              THE COURT:  Mr. Lane.

3              MR. ZEBRAK:  But I was there, and I've looked at the

4    transcript very closely, as I did his report, and we're, we're

5    significantly prejudiced if -- this is not a clarification

6    about his earlier --

7              THE COURT:  Well, but you had it since end of May,

8    right?

9              MR. ZEBRAK:  Well, but -- yes, Your Honor, but here's

10   the issue:  Why would we -- you know, in a deposition, he's

11   answering my questions, you know?  In many other contexts,

12   counsel will say, well, we're not intending to do that at

13   trial.  He was just answering your questions.

14             So, you know, it's a catch-22.  Am I supposed to put

15   in new expert reports on issues they don't intend to present at

16   trial?  And, Your Honor, we briefed this.  They responded.

17   Your Honor looked at it.

18             And they didn't say, here, we intend to still put

19   this on at trial.  It's trial by ambush.

20             THE COURT:  Yeah.  No, but I didn't have the specific

21   information or at least I don't recall having the specific

22   information that you've honed in on now.  What I was talking

23   about was that the expert testimony at trial should be limited

24   to the expert reports, and -- but, you know, they're -- I'm

25   going to allow the testimony.  Your exception is noted.  And if

2144

1    they want to even put it in when he's stated that it would

2    apply to 1 percent of the data, then I'll allow him to do it.

3           He's limited to not now expressing a fact that, oh, I

4    went back and I did research after the deposition, and now this

5    is my position.  He'll be limited to the offer at the time of

6    the deposition.

7           But I think that the rules allow supplementation

8    through other forms, including deposition testimony, and you

9    did take him through it at length.  So I don't find that you're

10   surprised by it.

11          MR. ZEBRAK:  Well --

12          THE COURT:  How about the demonstratives?

13          MR. ZEBRAK:  Well --

14          MR. BRODY:  Your Honor, if I could just make one

15   heads up for what's coming?

16          THE COURT:  Yes, sir.

17          MR. BRODY:  I -- it's always a pleasure dealing with

18   Mr. Zebrak, but I actually think that passage is in a different

19   context from the one he represented.

20          THE COURT:  Okay.

21          MR. BRODY:  We'll thrash it out on the stand.

22          MR. ZEBRAK:  Well --

23          THE COURT:  Demonstratives.

24          MR. ZEBRAK:  Yes, Your Honor.  Might I ask for one

25   clarification about the foregoing?

2145

```
 1              THE COURT:  Yes, sir.

 2              MR. ZEBRAK:  So that was about bitfield information.

 3              THE COURT:  Correct.

 4              MR. ZEBRAK:  Today is he allowed to come in and say

 5    that peers sometimes falsely report the hashes they had?  That

 6    was not something he mentioned at deposition.

 7              THE COURT:  No.  I mean, if it's not in his

 8    deposition or his expert reports, it's not coming in.

 9              MR. ZEBRAK:  Okay.  So there were two issues we had,

10    Your Honor, about the slides.  I believe with Your Honor's

11    ruling, that now deals with slide 41, where he's going to talk

12    about corrupted files and lying peers, although I assume lying

13    peers will be restricted to bitfield information, not hash

14    values.

15              THE COURT:  Is that correct, Mr. Brody?

16              MR. BRODY:  No.  I believe he addressed hash values

17    in the deposition.  I'll find the passage.

18              MR. ZEBRAK:  Your Honor, the next issue is slide 44

19    of Mr. Feamster's demonstratives.

20              Oh, do you have their demonstratives, Your Honor?

21              THE COURT:  No.

22              MR. ZEBRAK:  Might I -- do you have a copy for the

23    judge?

24              THE COURT:  I was thinking it was going to go up on

25    the screen any moment now.
```

2146

1          MR. ZEBRAK:  So, Your Honor --

2          THE COURT:  44?

3          MR. ZEBRAK:  Yes, Your Honor.

4          THE COURT:  Yeah.

5          MR. ZEBRAK:  I didn't want to proceed before Your

6    Honor had looked at it.

7          THE COURT:  Okay.

8          MR. ZEBRAK:  Your Honor, this slide is incredibly

9    misleading and prejudicial, and I'll explain why.  Dr. Feamster

10   did not analyze the content files produced on the drive that

11   have the hashes that were the subject of these notices.  His

12   opinion is you need to do a download, and he, he wants to

13   characterize hash values, which is a scientific term, he wants

14   to call them metadata, and he's going to want to say metadata

15   isn't enough, and that's fine.  He's going to do that, and

16   we'll deal with him appropriately on cross, but what counsel is

17   doing here is implying or expressly stating that he did an

18   analysis he never did.

19          What you see here on the slide before you, Your

20   Honor, are examples that were discussed earlier in the trial

21   with this Bill Withers and Tammy Wynette.  He never did this

22   analysis.

23          When I spoke with Mr. Brody, it's my understanding

24   that Dr. Feamster is using this merely to illustrate his point

25   that it's just data, and you can have the same name but

2147

1    different contents, but instead, it's very deceptive.  He wants

2    to use it for what occurred in the trial earlier, and he's

3    basically tailoring this slide to the earlier evidence, and it

4    sort of lets the jury think he did an analysis he never did.

5            And so we would ask that they either delete this

6    slide or, as I asked Mr. Brody a few hours ago, illustrate the

7    generic point he's trying to make with anything he wants, but

8    not the earlier evidence regarding an analysis he never did.

9            THE COURT:  Okay.  Is that it?  41 and 44 are your --

10   41 is --

11           MR. ZEBRAK:  41 is mooted by Your Honor's ruling.  44

12   is the remaining slide that we take an issue with.

13           THE COURT:  Okay.  All right, Mr. Brody, do you want

14   to be heard?

15           MR. BRODY:  Well, I have to admit I thought I had

16   understood from Mr. Zebrak that we had resolved this issue and

17   it wasn't going to -- it was going to turn on the deposition

18   question, but that's okay.  So I often misunderstand people,

19   and we'll just deal with the problems that exist.

20           What we thought would be helpful in this slide was

21   simply to put the generic point that he's making in the context

22   of the actual files in the case, so that we're talking about

23   something concrete.

24           So that was the basic motivation behind it.  It is

25   not -- I am certainly not going to ask him if he's done an

2148

1    analysis of this particular file, you know, because he didn't,

2    and nobody has.  And really, that's kind of the point of his

3    testimony.  The point of his testimony is that when you -- if

4    you look at that jewel case, in the evidence, the equivalent of

5    that jewel case showing Bill Withers is a line on that

6    spreadsheet that says Bill Withers' song was matched by Audible

7    Magic and so on and so forth, and his point is that nobody went

8    behind that, that there was never this download and rehash that

9    was done, so the investigation wasn't done, and you don't know

10   what's in the file.

11            And I don't -- you know, I will not even remotely

12   represent that he's done some kind of forensic analysis.

13            THE COURT:  All right.  I'm going to allow 44 for

14   that purpose.  Anything else before we get the jury?

15            MR. BRODY:  Your Honor, two things.  Well, I'm going

16   to -- while the next witness is up, I'm going to find the

17   passage about hashing so I can share that with Your Honor.

18            THE COURT:  Okay.

19            MR. BRODY:  Second, we would like to make a proffer

20   on the Audible Magic spreadsheet, recognizing that Your Honor

21   has addressed that issue in limine.

22            THE COURT:  Yeah.

23            MR. BRODY:  I can do that pretty quickly if you'd

24   like it now or at break or whatever.

25            THE COURT:  How quickly?

C. Monson - Direct

2149

1          MR. BRODY:  I don't know, five minutes, two minutes.

2          THE COURT:  All right.  We'll do it at a break then,

3   or you can put it in writing.

4          MR. BRODY:  Okay.  We'll put it in writing and submit

5   it.

6          THE COURT:  All right, fine.

7          All right, Joe, let's get our jury, please.

8          NOTE:  At this point, the jury returns to the

9   courtroom; whereupon the case continues as follows:

10  JURY IN

11         THE COURT:  All right, please have a seat.

12         All right, next witness?

13         MS. LEIDEN:  Cox calls Dr. Christopher Monson.

14   CHRISTOPHER KENNETH MONSON, PH.D., DEFENDANTS' WITNESS, SWORN

15         THE COURT:  All right.  Good afternoon.  Please

16  proceed.

17         MS. LEIDEN:  Thank you, Your Honor.

18                    DIRECT EXAMINATION

19  BY MS. LEIDEN:

20  Q.   Good afternoon, Dr. Monson.

21  A.   Good afternoon.

22  Q.   Can you please state your full name for the record.

23  A.   Christopher Kenneth Monson.

24  Q.   And, Dr. Monson, what is your occupation?

25  A.   CTO of Data Machines Corp. and --

C. Monson - Direct

2150

1    Q.    And --

2    A.    Sorry, I'm a lecturer at Johns Hopkins.

3    Q.    And what type of company is that?

4    A.    Government contractor, research.

5    Q.    And you, I believe, said that your position was a CTO?

6    A.    Correct.

7    Q.    And what does that stand for?

8    A.    Chief technology officer.

9    Q.    Dr. Monson, briefly, what is your educational background?

10   A.    I have a Ph.D. in Computer Science from Brigham Young

11   University.

12   Q.    Do you hold any other degrees?

13   A.    Yes.  I also have a Master's Degree in Computer Science

14   and a Bachelor's Degree in Electrical Engineering from the same

15   school.

16   Q.    Dr. Monson, was there a time that you worked for a company

17   called Harbor Labs?

18   A.    Yes, in 2013.

19   Q.    What type of company is Harbor Labs?

20   A.    I think a legal consulting company would be a good way to

21   put it, security.

22   Q.    And you said that you worked there in 2013?

23   A.    Correct.

24   Q.    What was your title at Harbor Labs, if any?

25   A.    I believe it was senior research engineer.

C. Monson - Direct

2151

1  Q.   And generally speaking, what were your duties at Harbor

2  Labs?

3  A.   Code review, writing expert witness reports, briefing

4  expert, Dr. Avi Rubin specifically, on expert testimony.

5  Q.   And generally speaking, on what topics did you draft

6  expert reports and conduct analysis?

7  A.   Typically related to security, computer security.

8  Q.   Computer security?

9        And you said that you had left Harbor Labs in 2013?

10 A.   Yes.

11 Q.   Where did you work immediately following Harbor Labs?

12 A.   A company called Data Tactics.

13 Q.   What type of company is that?

14 A.   A government contracting company, research, also.

15 Q.   And did you have a job after that before you came to your

16 current position?

17 A.   Yes.  I was there for a few weeks and then rejoined Google

18 for several years.

19 Q.   What was your position at Google?

20 A.   Senior software engineer.

21 Q.   And you moved from Google to Data Machines Corporation?

22 A.   That's correct.

23 Q.   While you were working at Harbor Labs in 2013, were you

24 involved with an evaluation of the MarkMonitor AntiPiracy

25 system?

C. Monson - Direct

2152

1    A.   Yes.

2    Q.   And going back a little bit, prior to working at Harbor

3    Labs, had you conducted analyses of other software systems?

4    A.   Not formally, but informally certainly.

5    Q.   Can you expand on that?

6    A.   Well, as part of the job as a software engineer, you do

7    lots of analyzing of other software systems.  So I would write

8    documents, design documents to extend other systems and so

9    forth.

10   Q.   And now turning it back again to the evaluation of the

11   MarkMonitor AntiPiracy system, can you explain what your

12   involvement with that evaluation was?

13   A.   It was a collaborative effort between me and Dr. Seth

14   Nielson.  We came up with the content together as we

15   interviewed various people about the system, and then I wrote

16   the bulk of the words in the report.

17   Q.   And was there a report issued by Harbor Labs containing

18   the evaluation of the MarkMonitor AntiPiracy system?

19   A.   Yes.

20   Q.   Dr. Monson, could you turn to tab 1 in your binder, which

21   is DX 89?  This was previously admitted.

22        And, James, if you could publish it, please?

23   A.   Yes.

24   Q.   Okay.  Dr. Monson, do you recognize this document as the

25   evaluation that Harbor Labs drafted concerning the MarkMonitor

C. Monson - Direct

2153

1    system?

2    A.    May I look at it for a moment?

3    Q.    Yes, you may.  Please take your time.

4    A.    To the best of my knowledge, this is the report, yes.

5    Q.    And, Dr. Monson, do you have an understanding of what the

6    MarkMonitor AntiPiracy system is?

7    A.    My memory is a little fuzzy, but yes, vaguely.

8    Q.    And what is your understanding?

9    A.    That it is intended to discover when copyrighted material

10   is available for download via various networks like BitTorrent,

11   etc., and then issue -- to hopefully do so with high fidelity,

12   and then issue -- what's the word I'm looking for -- notices to

13   people who are hosting this content or downloading it.

14   Q.    And you mentioned BitTorrent.  Do you have an

15   understanding of what BitTorrent is generally?

16   A.    As a general -- as a general system, yes.  Not in detail.

17   Q.    What's your general understanding?

18   A.    Large files, like videos, are split up in small pieces and

19   spread out on multiple computers on the internet, and to

20   download, you connect to all those computers and pull down

21   various parts of file and then reassemble them on yours.

22   Q.    And have you heard the term "peer-to-peer file sharing"?

23   A.    Yes.

24   Q.    And would that be something that you would characterize

25   BitTorrent as?

C. Monson - Direct

2154

1   A.   Yes.

2   Q.   Okay.  Have you ever used peer-to-peer file sharing?

3   A.   Yes.

4   Q.   In what context?

5   A.   Downloading Linux ISOs, for example, just images of

6   operating systems.

7   Q.   And in what context did you do that downloading of those

8   files?

9   A.   I still do it now actually.  It's a faster way to get

10  images to install on your machine.

11  Q.   So you do that as part of your current job?

12  A.   Not as part of the job.  Often as a hobby.

13  Q.   And turning back to the MarkMonitor evaluation that's in

14  front of you, do you have a recollection of why Harbor Labs

15  came to evaluate the MarkMonitor system?

16  A.   I do not.

17  Q.   Do you have an understanding of what the Center for

18  Copyright Information is?

19  A.   More or less.

20  Q.   What's your understanding?

21  A.   People who are interested in making sure that copyrights

22  are honored.

23  Q.   And, Dr. Monson, were there portions of this report that

24  you drafted?

25  A.   Yes.

C. Monson - Direct

2155

1   Q.   Do you recall which portions, generally speaking?

2   A.   I drafted most of this report.  Most of the language is

3   mine.

4   Q.   Did you have a hand in drafting all of the sections?

5   A.   I believe so.  As I review it, it looks -- that seems to

6   be according to my recollection, yes.

7   Q.   And at the bottom of that first page that you're looking

8   at, there is a section called Materials Relied Upon.

9        Do you see that?

10  A.   Yes.

11  Q.   And does that look like an accurate representation of the

12  source material that you had access to for this evaluation?

13  A.   Yes, it does.

14  Q.   Okay.  And one of the documents that's listed in the

15  materials relied upon is the memorandum of understanding.  Do

16  you see that?

17  A.   Yes.

18  Q.   Do you have an understanding of what that memorandum of

19  understanding is?

20  A.   I don't recall.

21  Q.   If you could please turn to page 6 of that document?

22  A.   Oh, I see.  Yes.

23  Q.   And when you're there, do you see that there is a section

24  on this page entitled Reliability?

25  A.   Yes.

C. Monson - Direct

2156

1  Q.   So, Dr. Monson, did Harbor Labs assess the reliability of

2  the -- of MarkMonitor's software?

3  A.   Of the software directly, no.

4  Q.   Of the MarkMonitor system?

5  A.   For what we had access to.

6  Q.   And were you personally involved in that analysis?

7  A.   Yes.

8  Q.   Okay.  Do you recall why -- or strike that.

9            James, if you could, go back to the full page,

10 please.

11           Do you see that on this page and the page immediately

12 following, there's a number of subheaders relating to testing?

13 A.   Yes.

14 Q.   Okay.  Why are there different types of testing listed

15 under the Reliability section?

16 A.   Different kinds of testing can catch different kinds of

17 problems with software, and usually if you only use one kind,

18 then it's not sufficient to catch all the problems.

19 Q.   Is it fair to say that testing is important to determine

20 whether a system is accurate?

21 A.   Yes.

22 Q.   Okay.  And also to determining whether or not a system is

23 reliable?

24 A.   Yes.

25 Q.   And as I mentioned, there's, it looks like, three

C. Monson - Direct

2157

1   different types of testing that are called out here on pages 6

2   and 7.  Do you see those three headers?

3   A.   Yes, I do.

4   Q.   And that's unit testing, whole-system testing, and canary

5   testing, right?

6   A.   Correct.

7   Q.   Okay.  So at a high level, why did Harbor Labs look into

8   all three types of these testing?

9   A.   I don't remember.

10  Q.   Fair enough.  It's been five years.

11        Starting with the unit testing on page 6, do you see

12  that section?

13  A.   Yes.

14  Q.   Okay.  And at a high level, what does unit testing entail?

15  A.   It tests a small piece of a system in isolation.

16  Q.   And what's the purpose of conducting that type of test?

17  A.   Well, small pieces of systems can have bugs in them, and

18  if they have bugs, then the bigger pieces that assemble them

19  don't work either.  So you start there.

20  Q.   And according to Harbor Labs' evaluation, was MarkMonitor

21  carrying out unit testing?

22  A.   Yes.

23  Q.   And what was the basis for Harbor Labs' understanding that

24  MarkMonitor was carrying out that unit testing?

25  A.   That was as reported by the people we interviewed.

C. Monson - Direct

2158

1    Q.    And who were those people that were interviewed?

2    A.    I don't remember names.

3    Q.    Was it personnel at MarkMonitor?

4    A.    Yes.

5    Q.    Okay.  So your understanding that MarkMonitor was carrying

6    out unit testing was solely the reporting from MarkMonitor

7    personnel?

8    A.    That's correct.

9    Q.    Okay.  Now, looking at the next section there on page 7 --

10   James, could you blow up the whole-system testing section?

11   Thank you.

12          And generally speaking, Dr. Monson, what does

13   whole-system testing entail?

14   A.    Well, how much detail would you like?

15   Q.    A high level of detail.

16   A.    High level of detail.  Well, when you assemble all the

17   pieces together that you've unit tested, hopefully, you have a

18   big system.  So a whole system might be everything from the

19   user interface to the servers that it's contacting to the

20   e-mails that it sends and all those parts.  So a whole-system

21   test would make sure that all the pieces work together

22   properly.

23   Q.    And what would be the purpose of conducting a whole-system

24   test?

25   A.    To ensure that the connections between other tested

C. Monson - Direct

2159

1    components actually work right.  An example would be you can

2    check that a dishwasher door opens properly and that a cabinet

3    door opens properly, but if you don't check that they're not

4    together, so you can't open both at the same time, that would

5    be a -- that would be a whole-system test failure, even though

6    the components are tested and work.

7    Q.   Thank you.  And according to this Harbor Labs evaluation,

8    was MarkMonitor conducting whole-system testing of the system?

9    A.   Yes, after a manner of speaking.

10   Q.   I'm sorry, what was the last --

11   A.   After a manner of speaking, yes.

12   Q.   What do you mean by as a manner of speaking?

13   A.   There are many ways to conduct whole-system tests.

14   There's ad hoc, and there's more principled, and from what I'm

15   recalling as I read this document, they had more ad hoc

16   approaches to whole-system testing, but they were doing it.

17   Q.   And what would ad hoc whole-system testing entail?

18   A.   Well, there's a lot of ways to be ad hoc.  As described in

19   this report, they would actually just try running things and

20   see if they seemed to work, which is pretty common.

21   Q.   And you -- under this section here, can you read that

22   first sentence there?

23   A.   Under Whole-System Testing?

24   Q.   Yes?

25   A.   MarkMonitor currently has no periodic whole-system test

1    mechanism.

2    Q.   If you could continue with the rest of the paragraph?

3    A.   Certainly.  They do occasionally perform such whole-system

4    end-to-end tests, but infrequently and without repeatable,

5    controlled conditions (for example, where agents would run in a

6    controlled environment with mocked torrent clients serving

7    known content with predictable characteristics designed to

8    exercise different features of the system).

9            Would you like me to continue?

10   Q.   Yes, with that last sentence, please.

11   A.   Thus, they rely wholly on the aforementioned unit testing

12   and on live-traffic tests to determine whether a new agent

13   deployment is functioning properly.

14   Q.   Thank you.  And generally speaking, would it be important

15   to conduct whole-system testing with repeatable and controlled

16   conditions?

17   A.   Yes.  There is some importance to that.

18   Q.   Can you expand on that a little bit?

19   A.   Sure.  If, if a whole-system test is not repeatable, then

20   there's a big chance you can miss something after things have

21   changed.  An example would be if I am -- I'm trying to think of

22   an example.  I thought I had one.

23           If you went to Google and your search didn't work all

24   of a sudden, and they said, sorry, you're part of a test, you

25   wouldn't be very happy.  What you want for them to do before

C. Monson - Direct

2161

1   they launch it to the public is test it themselves in a way

2   that they're sure you're not going to run into that problem.

3   And so if you don't have a periodic repeatable test, then

4   there's -- you're running the risk of problems surfacing in

5   front of people and affecting people in a way that you may not

6   have intended.

7          MR. ZEBRAK:  Your Honor, may we approach?

8          THE COURT:  Yes, sir.

9          NOTE:  A sidebar discussion is had between the Court

10   and counsel out of the hearing of the jury as follows:

11   AT SIDEBAR

12          MR. ZEBRAK:  Dr. Monson is here as a fact witness.

13   He hasn't been tendered as an expert.  He shouldn't be offering

14   opinions on the stand about why or how something should be

15   happening like that in marketing in terms of when and why

16   whole-system testing should occur and whether it should have

17   occurred here.

18          THE COURT:  Ms. Leiden?

19          MS. LEIDEN:  Dr. Monson indeed is not being offered

20   as an expert witness.  He had personal involvement in the

21   assessment of the MarkMonitor system.  I'm simply asking him to

22   go over the findings of the report and explain the bases of

23   that.  The fact that he's also a software engineer is a fact,

24   but we're not offering him as an expert.

25          THE COURT:  He's testifying at a high level about the

C. Monson - Direct

2162

1    report, and I think it's -- it's a murky area.  I think it's

2    permissible.  Your exception is noted.

3              MR. ZEBRAK:  Thank you.

4              MS. LEIDEN:  Thank you, Your Honor.

5              NOTE:  The sidebar discussion is concluded; whereupon

6    the case continues before the jury as follows:

7    BEFORE THE JURY

8              THE COURT:  Go ahead, please.

9    BY MS. LEIDEN:

10   Q.   Dr. Monson, we were discussing the whole-system testing

11   just a moment ago.  Do you recall that?

12   A.   Yes.

13   Q.   And I believe that the question was -- and apologies if

14   you had answered this already, but is it important to conduct

15   whole-system testing with repeatable and controlled conditions?

16   A.   Yes.

17   Q.   And why is that?

18   A.   Would you like me to try to repeat exactly what I said?  I

19   don't know if I remember.

20   Q.   That's all right.  That's all right.  Were you finished

21   with your answer?

22   A.   Yes, I was.

23   Q.   Okay.  Thank you.

24              And, Dr. Monson, you -- sorry.

25              And going down on page 7 there, there's the third

2163

1  type of testing, which is canary testing.  Do you see that?

2  A.   Yes.

3  Q.   Okay.  And at a high level, what is canary testing?

4  A.   So you can imagine launching something out into the wild

5  but only for a small portion of people.  So going back to the

6  Google example, maybe they did do a test, maybe you were an

7  unlucky one, but you were only one of a billion people that

8  experienced a bad thing, and then they have systems that catch

9  that.  That would be like a canary.

10          So you would be the unfortunate canary in that case.

11  So canary testing is launching a system in a small scale to

12  check and see if it stays working, and then as you gain

13  confidence, you can launch at a larger scale.

14  Q.   And according to the Harbor Labs evaluation, was

15  MarkMonitor conducting canary testing?

16  A.   Yes.

17  Q.   And did Harbor Labs make any observation with respect to

18  how MarkMonitor was conducting those canary tests?

19  A.   As it says here in the report, canary tests appear to be

20  performed manually in an ad hoc fashion.

21  Q.   And where it says "ad hoc fashion," is that similar to the

22  ad hoc fashion that it was conducting the other testing?

23  A.   Yes.

24  Q.   Now, what are the implications, if any, of conducting

25  canary testing in an ad hoc fashion?

2164

1    A.   It's a little more risky than having something established

2    that is periodic and automated.

3    Q.   And could you look at the last sentence in that section

4    that starts with the word "Accordingly"?

5    A.   Sure.

6    Q.   And could you read that, please?

7    A.   Accordingly, the canary testing performed by MarkMonitor

8    may miss false positives produced by an agent when more closely

9    watched behavior appears similar to existing agents.

10   Q.   And do you have an understanding in this context what

11   false positives would be?

12   A.   In the context of this report, I believe false positives

13   means content incorrectly identified as copyright -- no, a

14   download of content incorrectly identified as infringing, I

15   believe.

16   Q.   And, Dr. Monson, based on Harbor Labs' analysis of

17   MarkMonitor, did Harbor Labs make any recommendations to

18   MarkMonitor?

19   A.   I believe so.

20   Q.   And were some of these recommendations relating to

21   MarkMonitor's testing of its, of its system?

22   A.   Yes.  Here on page 8, I see that.

23   Q.   You're a little ahead of me.  Yes, if you could turn to

24   page 8?  And there's a section there titled Recommendations.

25   Could you read that sentence?

C. Monson - Direct

2165

1   A.   Certainly.  According to the information available to us

2   during the review process, the MarkMonitor AntiPiracy system

3   appears to be operating generally within the parameters set

4   forth within the MOU.  That said, there are some areas that

5   call into question the long-term success of the system as

6   currently operated.  Each of these will receive its own

7   subsection below.

8   Q.   Thank you.  And do you see there under the Recommendations

9   section, there's a subsection called Testing?  Do you see that?

10  A.   Yes.

11  Q.   Okay.  And generally speaking, what were Harbor Labs'

12  recommendations to MarkMonitor with respect to, to testing?

13  A.   Sorry, my memory is not as good as the writing.

14  Q.   If it helps, we can go through the specific types of

15  testing --

16  A.   If you like.

17  Q.   -- on the following page.

18       If you go to page 9 of that report, do you see again

19  there's another section, subsection called Unit Testing?

20  A.   Yes.

21  Q.   And could you read that first paragraph?

22  A.   We believe that the unit testing described to us by the

23  MarkMonitor technical staff is largely sufficient.  A QA

24  engineer ensures that modules have sufficient unit tests,

25  including negative tests, boundary tests, and so forth.  Our

C. Monson - Direct

2166

1    only recommendation in this area is that the unit tests that

2    affect allegations of infringement receive extra attention in

3    their design.

4    Q.   And why did the Harbor Labs make that recommendation?

5    A.   I do not remember.

6    Q.   And could you go to the next subsection, titled

7    Whole-System Testing again?

8    A.   Yes.

9    Q.   And in that whole-system testing section, what were Harbor

10   Labs' recommendations to MarkMonitor with respect to

11   whole-system testing?

12   A.   It appears that we wrote to add more testing for negative

13   outcomes to ensure that they are marked as negative and to make

14   sure the canary testing is part of policy with -- yeah, that's

15   what it says here.

16   Q.   And do you see there in the fourth -- excuse me, third and

17   fourth paragraphs down, there's a reference to BitTorrent

18   there?

19   A.   Yes.

20   Q.   Okay.  Would you mind reading that first paragraph that

21   starts "For example"?

22   A.   For example, when new agents are released, they should at

23   the very least be tested against a dishonest BitTorrent client

24   that uploads incorrect pieces.  The MarkMonitor design should

25   catch these faulty pieces during the check of the SHA-1 hash;

C. Monson - Direct

2167

1    an end-to-end test where this behavior is verified is

2    essential.

3    Q.   Can you read the next paragraph as well?

4    A.   Another example is testing the conjunction of requirements

5    for generating an infringement notice.  For example,

6    MarkMonitor requires that at least one full BitTorrent piece be

7    downloaded (this is essential for accuracy).  It also requires

8    that some specified percentage of the data be downloaded.  In

9    addition to these, an agent should be subjected to a test where

10   it receives a full piece but not enough of the download, and a

11   test where it receives enough of the download but never a full

12   and complete piece.  In both of these cases, such tests would

13   verify that the agent cannot generate an infringement report.

14   Q.   Thank you.  And was it Harbor Labs' understanding that

15   MarkMonitor was downloading a piece of a file from BitTorrent?

16   A.   Yes.

17   Q.   And why, why would that be essential for accuracy?

18   A.   That was not my argument, so I'm not sure why.  I'm not a

19   BitTorrent expert.

20   Q.   But you do recall that it was MarkMonitor's -- excuse

21   me -- that it was Harbor Labs' understanding that MarkMonitor

22   was doing that downloading?

23   A.   Yes.

24   Q.   And could we go back to the unit testing section on that

25   same page?

2168

1  A.   Yes.

2  Q.   And do you see that -- could you read that first

3  paragraph, please?

4  A.   We believe that the unit testing described to us by the

5  MarkMonitor technical staff is largely sufficient.  A QA

6  engineer ensures that modules have sufficient unit tests

7  including negative tests, boundary tests, and so forth.  Our

8  only recommendation in this area is that the unit tests that

9  affect allegations of infringement receive extra attention in

10  their design.

11  Q.   Thank you.  And could you read the example underneath

12  there?

13  A.   For example, every element of the design examined in this

14  report must be tested.  There must be unit tests validating the

15  correctness of the SHA-1 check on the downloaded pieces.  There

16  must be a test ensuring that only content marked as verified in

17  the database can generate infringement case reports.  There

18  must be similarly -- there must similarly be a test that the

19  torrent file used to download the verified content is the same

20  (or has the same info hash) as the torrent file used to track

21  alleged infringers.

22  Q.   Thank you.  Do you have any reason to doubt that this was

23  Harbor Labs' conclusion with respect to unit testing?

24  A.   No.

25  Q.   And finally, if we could go to the last section there on

C. Monson - Direct

2169

1    that page called canary testing?

2    A.   I don't see canary testing on page 9.

3    Q.   I'm sorry.  There's not a header, but I believe it's

4    referenced in the last paragraph on that same page.

5    A.   Oh, I see.  Okay.  Would you like me to read that?

6    Q.   Yes, please.

7    A.   Furthermore, we recommend that the canary testing

8    occasionally performed by MarkMonitor be codified by policy

9    into a requirement for agent release.  Moreover, the canary

10   test must include some check to ensure that all infringement

11   reports that would have been generated meet the requirements of

12   the design (e.g., the content was verified, the pieces

13   downloaded were accurate, etc.)

14   Q.   I believe earlier you testified that all three types of

15   the testing that we went over are important, correct?

16   A.   Yes.

17   Q.   Important to the accuracy of a system?

18   A.   It depends on what you mean by "accuracy."

19   Q.   What would you understand -- you may have testified to

20   this before, but what accuracy would mean with respect to the

21   MarkMonitor AntiPiracy system?

22   A.   Well, as laid out in the report, there are two different

23   aspects to accuracy that we talked about.  One is recall, and

24   the other is precision.  I think testing would actually be

25   important to both of them, so maybe it's not a word I should

C. Monson - Cross

2170

1   worry about right now.

2   Q.   And I believe earlier you had testified that specifically

3   in this circumstance, accuracy would involve avoiding false

4   positives, correct?

5   A.   That would -- yeah, that would be the definition of

6   precision, which would be a part of accuracy.

7   Q.   So testing was important in the MarkMonitor system in

8   order to avoid false positives?

9   A.   Correct.

10           MR. GOULD:  Objection.  Leading.

11           THE COURT:  It is leading.  I'll allow it.

12   BY MS. LEIDEN:

13   Q.   Dr. Monson, do you know if MarkMonitor adopted any of

14   Harbor Labs' recommendations?

15   A.   No.

16           MS. LEIDEN:  I pass the witness.

17           THE COURT:  All right.  Thank you.

18           Cross-examination?

19                     CROSS-EXAMINATION

20   BY MR. GOULD:

21   Q.   Good afternoon, Dr. Monson.  Nice to see you again.

22   A.   Good afternoon.

23   Q.   Dr. Monson, in conducting the review that Harbor Labs

24   performed -- let me back up.  In conducting a review of any

25   system, you are able to look only at the information and system

C. Monson - Cross

2171

1    that's provided and available to you; is that right?

2    A.    Right.

3    Q.    You're not presenting any opinions here or in the Harbor

4    Labs report, are you, sir, about any MarkMonitor system other

5    than the one that you looked at and considered that's

6    referenced in the Harbor Labs report, correct?

7    A.    Correct.

8    Q.    Not here to talk about, didn't report on the reliability

9    or accuracy of any other product, service, configuration that

10   MarkMonitor has ever put into the world?

11   A.    Correct.

12   Q.    Do you understand -- we looked at the beginning of the

13   Harbor Labs report and it talked about CCI, and you understand

14   that was in connection with something called the Copyright

15   Alert System?

16   A.    Yes.

17   Q.    And do you understand, sir, that the Copyright Alert

18   System was a program jointly run by a number of content owners

19   and ISPs, including the movie studios, the Movie Picture

20   Association of America on the one hand and the record companies

21   on the other?

22   A.    Yes.

23   Q.    And the review and information you considered had to do

24   with verifying content in videos, in movies, correct, in part?

25   A.    Yes.

C. Monson - Cross

2172

1    Q.    And I assume, sir, that you have no knowledge of an

2    independent MarkMonitor system used for a separate record

3    company program?

4    A.    Correct.

5            MS. LEIDEN:  Objection.

6            THE COURT:  Overruled.

7    BY MR. GOULD:

8    Q.    I think you were asked some questions in your deposition,

9    sir, do you recall -- or let me ask a different question.  You

10   agree that the MarkMonitor testing that you observed in your

11   interactions at that time were consistent with industry

12   practices?

13           If it would help refresh your recollection, I can

14   show you a page in your deposition?

15   A.    Can you define "observed" for me?

16   Q.    Bear with me for a moment, please.

17           I'll move on.  I can't find my spot.  Do you

18   disagree, sir, that MarkMonitor's testing that you observed was

19   consistent with industry practices, as you've previously

20   testified?

21   A.    I'm not sure what you mean by "observed."

22   Q.    Do you agree that MarkMonitor's testing was consistent

23   with -- excuse me, do you agree that the testing that

24   MarkMonitor did, as described to you, was consistent with

25   industry practices?

2173

1    A.   I'm struggling to answer this in a way that doesn't say

2    more than I want to, because there are many, many industry

3    practices, some good and some bad.

4    Q.   You think, you think additional testing may be beneficial,

5    but didn't you agree in your deposition, sir, that their

6    testing was in line with industry practices?

7    A.   Oh, in part.

8    Q.   And in that regard, you commonly recommend additional

9    testing of systems that you review; isn't that correct?

10   A.   Yes.

11   Q.   And, in fact, it's not uncommon -- in fact, you've seen

12   many systems work exactly as intended even though additional

13   testing may be recommended?

14   A.   Yes.

15        MR. GOULD:  If we could please pull up DX 153?  It's

16   already in evidence.  DX.

17   BY MR. GOULD:

18   Q.   Sir, I believe you said you left in late 2013, correct?

19   A.   Yes.

20   Q.   And there's a document in front of you.  Do you recall

21   seeing -- having access to MarkMonitor's response to the Harbor

22   Labs report at the time that you were still at Harbor Labs?

23        MS. LEIDEN:  I have an objection to that.  I don't

24   believe this document is in evidence.

25        MR. GOULD:  Oh, can you please pull it down?  I

C. Monson - Cross

2174

1    think --

2            THE COURT:  Okay.  Thank you.

3            MR. OPPENHEIM:  It's in evidence.

4            MR. GOULD:  I believe it is with Mr. Bahun from

5    MarkMonitor.

6            THE COURT:  Is it in?

7            MR. OPPENHEIM:  I believe it was moved into evidence

8    and accepted by the Court during Mr. Bahun's testimony.

9            THE COURT:  Do you have it in?  All right.  We have

10   it as admitted.  All right.

11           MS. LEIDEN:  Thank you, Your Honor.

12           THE COURT:  Sure.

13   BY MR. GOULD:

14   Q.   Dr. Monson, you didn't see MarkMonitor's written response

15   to the Harbor Labs report at the time, 2013-'14, did you?

16   A.   No.

17   Q.   Okay.  I want to show you some of the language that

18   MarkMonitor provided in response to this report, and let's

19   focus on the first recommendation:  Harbor Labs should extend

20   the testing, including more thorough end-to-end testing.

21           Let's look at MarkMonitor's response.  If you could

22   blow that up, please, Mr. Duval?

23           MarkMonitor responded:  We regularly review our

24   existing unit test coverage to determine the adequacy for all

25   areas of the system.  In addition, we currently perform

C. Monson - Cross

2175

1    scheduled periodic whole-system tests in a controlled

2    environment to measure all aspects of the system with positive

3    and negative input.  This testing process is also reviewed

4    regularly to investigate any opportunities for improvement.

5            Do you recall your report and testimony said you

6    thought that it had been reported to you or you believed that

7    MarkMonitor's whole-system testing was ad hoc, correct?

8    A.    Correct.

9    Q.    And this -- MarkMonitor here has stated that it performs

10   scheduled whole-end testing, correct?

11   A.    That's what I'm seeing, yes.

12   Q.    We can put that down.  Actually, you know what?  Let's

13   take a look at the other recommendations.

14           In the next one, Harbor Labs recommended verifying

15   that content is infringing by having a human review all newly

16   identified content.  Do you understand, sir, that the record

17   company verifications of content occurred in an automated

18   basis, not a manual basis?

19   A.    I don't remember.

20   Q.    Okay.  We can move on past that one.

21           Dr. Monson, notwithstanding the recommendations that

22   you made, I want to take a look at the findings of the report.

23           If we could pull up DX 89?  Page -- let's start at

24   page 4.  Actually, you know what?  Let's just go to page 1, and

25   pull up paragraph starting with "As described."

C. Monson - Redirect

2176

1          And, sir, ultimately, Harbor Labs, with your

2    contributions, concluded that it found MarkMonitor's AntiPiracy

3    system is designed to correctly identify file sharing without

4    generating false positives, correct?

5    A.   Yes.

6    Q.   And that it undergoes testing to increase confidence in

7    the implementation of the design, correct?

8    A.   Yes.

9    Q.   And generates thorough case data for alleged infringement

10   tracking, correct?

11   A.   Yes.

12          MR. GOULD:  Thank you.  No further questions.

13          THE COURT:  Any redirect?

14          MS. LEIDEN:  Yes, very briefly.

15                    REDIRECT EXAMINATION

16   BY MS. LEIDEN:

17   Q.   Dr. Monson, earlier in response to a question from

18   Mr. Gould, I believe you said that the MarkMonitor system was

19   consistent with industry standards in part.  Do you recall

20   that?

21   A.   Yes.

22   Q.   What did you mean by "in part"?

23   A.   If I may correct, industry practice, not standards.

24   Q.   Yes.  Thank you.

25   A.   By "in part," I mean that, if I understood the implication

1    correctly, it was that this is commonly done in the industry

2    this way and accepted practice, and that is true for the unit

3    testing as in the report.  The report also says that it's not

4    so true for the whole-system testing.

5    Q.   And Mr. Gould had asked you a question regarding a

6    document that reflected apparently MarkMonitor's responses to

7    the Harbor Labs report.  Do you recall that?

8    A.   Yes.

9    Q.   Do you have any information about the basis for

10   MarkMonitor's responses?

11   A.   No.

12   Q.   Had you ever seen that document before?

13   A.   No.

14   Q.   And finally, Mr. Gould had referenced the design of the

15   MarkMonitor system on that first page of the report.  Do you

16   recall that?

17   A.   Yes.

18   Q.   If something is designed to be accurate, it doesn't

19   necessarily mean that it is accurate, correct?

20   A.   That's correct.

21          MS. LEIDEN:  No further questions.

22          THE COURT:  All right.  May Mr. Monson be excused?

23          MS. LEIDEN:  Yes, Your Honor.

24          THE COURT:  All right.  Thank you.  Thank you.

25   You're excused at this time, Mr. Monson.  Please don't relate

2178

1    your testimony to -- discuss your testimony with anyone until

2    our trial is over.  All right, sir?

3              THE WITNESS:  Thank you.  Yes.

4              THE COURT:  All right.  Thank you.  Have a good

5    afternoon.

6    WITNESS EXCUSED

7              THE COURT:  All right.  Next witness?

8              MR. BRODY:  Cox calls Dr. Nick Feamster, Your Honor.

9              THE COURT:  Okay.

10             MR. BRODY:  I have an answer to the question that

11   came up during the break.  Would you like --

12             THE COURT:  Let's come to the sidebar then, yes, sir.

13             NOTE:  A sidebar discussion is had between the Court

14   and counsel out of the hearing of the jury as follows:

15   AT SIDEBAR

16             THE COURT:  Yes, sir.

17             MR. BRODY:  So the question that came up was whether

18   Dr. Feamster talked about essentially fabricating a hash value

19   during his deposition.

20             THE COURT:  Yes.

21             MR. BRODY:  I went back and reread the deposition,

22   and I apologize for having been a philosophy, not a computer

23   science, major.  What I think he said in the deposition and

24   what I expect him to testify on the bench was that the peer

25   will misrepresent whether it has a bitfield, and what that

2179

1    means is it's misrepresenting whether it has that portion of

2    the file with that hash.

3            THE COURT:  Okay.

4            MR. ZEBRAK:  What I said before, Your Honor, was

5    accurate.  I still stand by it.  I've quoted the transcript

6    accurately.  He's now interpreted what Dr. Feamster apparently

7    meant, as he clarified in his deposition, not what he put in

8    his report, and it's just -- it's constant mission creep here.

9            MR. BRODY:  The question -- we'll get the questions.

10   The questions were all under what circumstances does the -- or

11   is it likely or does it happen that the peer is misrepresenting

12   what it has.  And then he gave lots of testimony about that,

13   and then he talked about how it would misrepresent the bitfield

14   as a way of doing it.  That is the mechanism by which it

15   misrepresented what it had, and that's what the deposition

16   said.

17           THE COURT:  He can go as far as he went in his

18   deposition, but to go beyond that to explain what he meant

19   when -- what was in the deposition is not going to be

20   permitted.

21           MR. BRODY:  That's --

22           THE COURT:  And it doesn't give notice to Sony as to

23   what his underlying, you know, reasoning is, and it's outside

24   of the expert report to begin with, and so I won't allow that.

25           MR. BRODY:  I appreciate that.

2180

```
 1          THE COURT:  Okay.  So you focus your questions so you
 2   try and make sure he doesn't go there.  Do your best.
 3          MR. BRODY:  I will do my best.
 4          MR. ZEBRAK:  Your Honor, can I ask for one
 5   clarification?
 6          THE COURT:  Yes.
 7          MR. ZEBRAK:  I know Mr. Brody is now aware of the
 8   limits on what we've agreed upon, but do we have an
 9   understanding about whether Dr. Feamster is aware of these?
10   Because I don't want to have any hiccups where he works things
11   out from the stand.
12          THE COURT:  Yeah.
13          MR. BRODY:  I told him -- I told him that he was
14   restricted to what's in his deposition.  I told him he should
15   not be volunteering anything about quantitative -- the
16   quantitative extent of lying.  He did give testimony --
17   qualitative testimony about that.  He said it was quite likely.
18   And I will ask him that.
19          You know, if Mr. Zebrak wants to ask him what "quite
20   likely" means, I'm sure he'll answer the question, but that's
21   at Mr. Zebrak's choice.
22          THE COURT:  Okay.  All right.  So you've spoken to
23   him about the rulings we've made here.
24          MR. BRODY:  Yes.
25          THE COURT:  And you'll do the best you can to guide
```

2181

1    him that way.

2            MR. BRODY:  We will, and I think he understands.

3            THE COURT:  Okay.  All right.

4            MR. ZEBRAK:  Does that include what we said is off

5    limits before we --

6            THE COURT:  All right, let's go.  Let's go.

7            MR. BRODY:  I'm not going to ask him about that

8    stuff, sir.

9            NOTE:  The sidebar discussion is concluded; whereupon

10   the case continues before the jury as follows:

11   BEFORE THE JURY

12       NICK FEAMSTER, PH.D., DEFENDANTS' WITNESS, SWORN

13           MR. BRODY:  Are you guys good?

14           MR. GOULD:  Yes, sir.

15                        DIRECT EXAMINATION

16   BY MR. BRODY:

17   Q.   Hi, Dr. Feamster.

18   A.   Hi there.

19   Q.   Could you state your name for the record and please spell

20   your last name for the court reporter?

21   A.   Yes.  It's Nick Feamster, F-e-a-m-s-t-e-r.

22   Q.   And do you have a general understanding of why you're here

23   today and what you're going to be testifying about?

24   A.   Yes, I do.

25   Q.   What is that?

2182

1    A.   I've been asked to render my opinion on certain technical

2    matters in this case.

3    Q.   I'd like to get into those opinions, but first I think we

4    ought to spend a little time explaining to the jury what your

5    background is and why you're going to be offering those

6    opinions.  So can I ask you to turn in your binder to the tab

7    that's labeled 152?

8    A.   I'm there.

9    Q.   Okay.  What is Defendants' Exhibit 152?

10   A.   That is a version of my CV.

11   Q.   And what is your CV?

12   A.   A CV is basically a version of a résumé that an academic

13   researcher typically maintains that contains a record of all my

14   work.

15        MR. BRODY:  Your Honor, we'd move the admission of

16   Exhibit 152.

17        THE COURT:  Any objection?

18        MR. ZEBRAK:  No objection, Your Honor.

19        THE COURT:  Received.

20        MR. BRODY:  Can we publish that to the jury?

21        THE COURT:  Yes, sir.

22   BY MR. BRODY:

23   Q.   How long does this CV run, sir?  How many pages?

24   A.   It's 34 pages.

25   Q.   Okay.  Have you prepared some slides to assist in your

N. Feamster - Direct

2183

1   testimony today?

2   A.   Yes, I have.

3   Q.   Okay.  And does one of those slides pick out some of the

4   highlights of that résumé?

5   A.   Yes, it does.

6   Q.   Okay.  Could we put those slide up, please?  And let's go

7   to the second slide.

8           Is this the one that summarizes your, your

9   background?

10  A.   That's the one.

11  Q.   Okay.  So where did you go to school, sir?

12  A.   I received three degrees from the Massachusetts Institute

13  of Technology.

14  Q.   Which degrees did you receive from that school?

15  A.   I received a Bachelor's Degree in Electrical Engineering

16  and Computer Science, and I received a Master's Degree in

17  Electrical Engineering and Computer Science, and finally I

18  received a Ph.D. in Computer Science.

19  Q.   Okay.  And where do you work currently?

20  A.   I'm glad you brought that up because it's updated since

21  the CV that was entered.  I now am a chaired and tenured

22  professor in the computer science department at the University

23  of Chicago.

24  Q.   Okay.  And where were you working when the CV was

25  prepared?

2184

1   A.   I was a full professor in the computer science department

2   at Princeton University.

3   Q.   So you just moved from Princeton to Chicago recently?

4   A.   Just over the summer for the weather.

5   Q.   Okay.  That was a big mistake.  And I say that as a

6   Chicagoan.

7           You -- how long have you -- when did you get your

8   Ph.D.?

9   A.   2005.

10  Q.   Okay.  And you've been teaching and doing research and

11  scholarships since then?

12  A.   Since before then, in fact.

13  Q.   Okay.  Have you -- are you a member of any professional

14  organizations in your field?

15  A.   Yes, I am.

16  Q.   Okay.  I think Ms. Frederiksen-Cross mentioned that she

17  was a member of an organization called CAM.  Are you familiar

18  with that organization?  Sorry, ACM.

19  A.   The ACM, the Association of Computing Machinery.  Yes, I

20  know it well.

21  Q.   Okay.  Are you a member as well?

22  A.   I am a member.  Pretty much anyone can join.  You could

23  join if you wanted to.

24  Q.   Have you had any -- received any honors from that

25  organization?

N. Feamster - Direct

2185

1   A.   Yes, I have.  I was named a fellow of the ACM.

2   Q.   And what is a fellow of the ACM?

3   A.   A fellow is typically reserved for the top 1 percent of

4   all computer scientists in the field.

5   Q.   And who makes that determination?

6   A.   The association does.  That's basically determined by a

7   panel of other computer scientists, essentially peers.

8   Q.   Do you do any writing for their publications, ACM's?

9   A.   Absolutely.  All the time.

10  Q.   Ms. Frederiksen-Cross mentioned an organization that she's

11  a member of called IEEE.  Are you a member of that

12  organization?

13  A.   I am not.  That's primarily an electrical engineering

14  organization, although they do have some computer science

15  publications.

16  Q.   Have you ever been a member?

17  A.   Some time ago I was.  When I was doing my electrical

18  engineering studies, I was.

19  Q.   And when you were a member, did you have any -- what kind

20  of activities did you participate in?

21  A.   Well, it's interesting that you mention that, because you

22  don't need to be a member to participate in certain types of

23  activities.  So, for example, one of the top security --

24  computer science security conferences is organized by the IEEE,

25  and I've published there in the past.  I continue to publish in

N. Feamster - Direct

2186

1  that because it's a computer security journal, so -- even

2  though you're -- you don't have to be a member to publish in

3  these journals.

4  Q.   Do you write regularly for the journals of the IEEE?

5  A.   The computer security ones, yes, I do.

6  Q.   Okay.  While we're talking about publications, is there a

7  list of your publications in the -- in Exhibit 152?

8  A.   There is.

9  Q.   Do you know how many publications you have listed there?

10  A.   I haven't counted in a while.  And I've published since,

11  since this particular document, but it's, it's somewhere

12  between 150 and 200 peer-reviewed publications.

13  Q.   What do you mean by "peer review"?

14  A.   Generally in academic research, you can't just write a

15  document and, you know, throw it up on the internet, or I

16  couldn't just give something to you and say, here it is.

17        In order to publish in an academic journal, we have a

18  process called peer review, which is kind of like what it

19  sounds.  You write, you write a research paper describing the

20  work that you did.  You submit it for review.

21        And there's a process by which other researchers in

22  the field, they may be other academic researchers, they may be

23  other people in industry, etc., but essentially they're peers,

24  experts in the area, and they determine whether or not this is

25  worthy of publication.

N. Feamster - Direct

2187

1    Q.   And does everything that gets submitted into a

2    peer-reviewed journal get published?

3    A.   No.  Typical acceptance rates at the journals that we're

4    looking at here, I think, are actually published in my CV, but

5    the top journals and conferences, the acceptance rates run at

6    about 10 or 20 percent.  So 20 is a standard number for the

7    best journals and conferences.

8    Q.   Have any of your peer-reviewed publications been awarded

9    any honors?

10   A.   Yes, they have.  I think there's a summary of those on the

11   second page.

12   Q.   Okay.  What kind of honors have they received?

13   A.   A number -- I think there's a couple of different types of

14   awards that papers receive.  Best Paper Award is something that

15   again a peer -- the peer review process decides to confer on

16   certain publications.

17           There's also another award that I've received for at

18   least one of my pieces of work called a Test of Time Award,

19   which means essentially the work was done a certain time ago,

20   typically a decade ago or more, and at some point, our

21   community of peers determines that, yes, that work you did was

22   not only good then; it's still good.  You know, it's had a

23   significant impact on the field.  So I've received that award

24   as well.

25   Q.   Have you written any books?

N. Feamster - Direct

2188

1    A.    I have written some book chapters.  Those are, those are

2    outlined in my CV.  And forthcoming, I am a coauthor on the

3    next edition of the Computer Networks textbook by Tanenbaum,

4    which is essentially one of the, one of the predominant

5    computer networking textbooks that's used around the world.

6    Q.    How about software?  Do you have any experience with

7    software?

8    A.    Yes.

9    Q.    What's your experience with software?

10   A.    I, I write it frequently.  I think my CV also talks about

11   some of the software that I have both written and also

12   supervised other students on having written, and I regularly

13   write software as part of my job.

14   Q.    Have any of your programs been released for use by others?

15   A.    Yes.

16   Q.    How many?

17   A.    I don't know exact count, but it's probably on the order

18   of ten-ish, maybe more.  I keep track of the highlights ones.

19   There have been some that have been quite widely used.

20   Q.    Okay.  And then the last thing I wanted to ask you about

21   is your experience with some of the industries and technologies

22   we're talking about today.

23   A.    Sure.

24   Q.    So have you done any research regarding peer-to-peer

25   networking?

N. Feamster - Direct

2189

1    A.    I have.

2    Q.    Can you describe that research?

3    A.    Sure.  One of the, one of the pieces of work that I did

4    was back in the mid-2000s, looking at essentially the

5    incentives in BitTorrent, peer-to-peer file sharing, and the

6    incentives that peers have to share certain parts of the file

7    or not share certain parts of the file.  So we looked at some

8    of the deficiencies in the, in the protocol and ways to address

9    those.

10   Q.    And was that work published?

11   A.    It was.

12   Q.    In a peer review journal?

13   A.    In a peer review journal, yes.

14   Q.    Have you done any research or consulting regarding digital

15   fingerprinting?

16   A.    Yes, I have.

17   Q.    Can you describe that briefly?

18   A.    Right.  So it's important to note that that work was not

19   peer reviewed, but I did some consulting work on audio-based

20   digital fingerprinting technology quite recently, in fact.

21   Q.    Okay.  Have you done any consulting or research concerning

22   cable broadband networks?

23   A.    Both consulting and research, yes.

24   Q.    Okay.  And who's funded -- who has funded that research?

25   A.    I would say about 80 percent of the, the research that I

N. Feamster - Direct

2190

1   do is funded by the National Science Foundation, which

2   essentially all of you are paying for it through your tax

3   dollars.  Another fairly significant portion of my research is

4   funded by an organization called DARPA, which is the research

5   arm of the Defense, Department of Defense.

6           Also -- oh, you were asking about industry, I

7   believe.  So in industry, some of the groups that have funded

8   my work include the ISPs, Comcast.  They run something called

9   the Tech Research Fund.  I work quite closely with Comcast on a

10  number of issues.  Google, also I've worked with Google on a

11  number of issues.  They funded my work.

12          CableLabs is -- you may not have heard of CableLabs

13  necessarily, but they are essentially the R&D wing, if you

14  will, of the cable industry.  They basically developed the

15  technology and standards that go into basically every cable

16  modem that we have.

17  Q.   I see you have Cisco on here.  Have you worked with them?

18  A.   I have, both in a consulting and a research capacity.

19  Q.   And is that a networking company as well?

20  A.   Yes, it is.

21  Q.   Have you ever testified at trial before?

22  A.   No.  I'm a rookie.

23  Q.   Okay.  Have you ever worked as an expert in a lawsuit?

24  A.   Yes, I have.

25  Q.   How many times?

N. Feamster - Direct

2191

1   A.   Between five and ten.

2   Q.   And then finally, are you getting paid for your work on

3   this case?

4   A.   Thankfully, yes.

5   Q.   How much?  What's your rate?

6   A.   $450 an hour.

7   Q.   And how many hours have you worked?

8   A.   About 200.

9   Q.   So about $90,000?

10  A.   That's about right.

11  Q.   You've heard -- you've been here for some of the

12  testimony; is that right?

13  A.   I sure have.

14  Q.   And have you read a transcript of other portions of the

15  testimony?

16  A.   Yes, I have.

17  Q.   Do you feel comfortable testifying about the technical

18  issues that have been presented during the course of the trial?

19  A.   For the testimony that I've heard, yes, or read, yes.

20  Absolutely.

21  Q.   Why do you feel that way?

22  A.   For a number of reasons.  One, I think as we've been going

23  through, I've essentially worked in the field of computer

24  networking for my entire professional career.  Peer-to-peer

25  networking, of course, is the topic of this particular case.

N. Feamster - Direct

2192

1    That's basically one aspect of my general area of knowledge,

2    but I obviously have studied that extensively as well.

3         I've kept up with the research in this area, and

4    also, I've done a lot of work in the industries for which this

5    material pertains.

6         MR. BRODY:  Your Honor, I would tender Dr. Feamster

7    as an expert in the analysis of computer software,

8    computer-generated data, computer networking, cable data

9    networks, and peer-to-peer networking.

10        THE COURT:  All right.  Any objection?

11        MR. ZEBRAK:  Your Honor, I'd first ask for Mr. Brody

12   to repeat that.  It went a little fast for me.

13        MR. BRODY:  Computer software, computer-generated

14   data, computer networking, cable data networks, and

15   peer-to-peer networking.

16        MR. ZEBRAK:  May we approach, Your Honor?

17        THE COURT:  Yes, sir.

18        NOTE:  A sidebar discussion is had between the Court

19   and counsel out of the hearing of the jury as follows:

20   AT SIDEBAR

21        MR. ZEBRAK:  So there -- I have no objection to an

22   expert on computer networking and computer software, but I

23   don't believe his -- that he's an expert on computer-generated

24   data.  I think that was one of them that -- which I just think

25   there's no foundation for that.

N. Feamster - Direct

2193

1          I think he's -- you know, predominantly, Your Honor,

2     his experience is in computer networking and secondarily

3     computer software, but the data portion, I think there's no

4     foundation for that.

5          MR. BRODY:  I think it was the -- I meant it to be

6     the analysis of computer software and computer-generated data.

7     I'll lay some more foundation if you want.

8          THE COURT:  No, I mean, he's -- what about the cable

9     networking?  Is that relevant to this case?

10          MR. BRODY:  Yeah.  We're talking about cable

11     networks.  These are -- the Cox network is a cable data

12     network.

13          THE COURT:  Right.  Is he going to get into the --

14          MR. BRODY:  He's not going to be testifying about

15     the, you know, the intricacies of the cable system, but I just

16     wanted to be sure that there would be no question about his

17     ability to opine about how the Cox network functions and, you

18     know, how people connect to one another in --

19          THE COURT:  At a higher level?

20          MR. BRODY:  Yeah, yeah, yeah.

21          MR. ZEBRAK:  And I apologize, Your Honor, I know I

22     asked for him to repeat it once, but are you using the term

23     "P2P" for any of his expertise with regard to computer

24     software?

25          MR. BRODY:  I asked peer-to-peer networking.

2194

1          MR. ZEBRAK:  Yeah, see, Your Honor, I don't -- he's a

2    computer networking, computer scientist, and he has a

3    familiarity, a deep familiarity with computer software, but I

4    think there's no foundation for him being an expert on P2P and

5    certainly not computer-generated data.

6          MR. BRODY:  He's done research in the field.  He's

7    published in the field.  We think he's competent.

8          THE COURT:  And he's indicated that he's kept up with

9    peer-to-peer and read materials and considers himself an

10   expert.  Your exception is noted.  I'm going to allow him to

11   testify.

12         MR. BRODY:  Thank you, Judge.

13         NOTE:  The sidebar discussion is concluded; whereupon

14   the case continues before the jury as follows:

15   BEFORE THE JURY

16         THE COURT:  All right.  He'll be permitted to testify

17   in the areas that you've identified.  As long as you don't get

18   too long-winded about it, we'll be just fine.

19         MR. BRODY:  That'll be a challenge for me, Your

20   Honor, but I'll do my best.

21         THE COURT:  That was a preemptive strike.

22   (Laughter.)

23         MR. BRODY:  Well aimed.

24   BY MR. BRODY:

25   Q.   Dr. Feamster, did you prepare a slide that outlines the

N. Feamster - Direct

2195

1    topics that you intend to cover -- expect to cover in your

2    testimony?

3    A.   Yes, I did.

4    Q.   Can we have the next slide, please?

5         So what topics do you expect to discuss?

6    A.   All right.  So I plan to talk about what I investigated

7    for this matter, the materials that I reviewed in connection

8    with this -- with my investigation for this case.  I'll

9    summarize my opinions and the basis for those opinions.

10   Q.   Okay.  Well, let's start at the beginning.

11        Can we go to the next slide?

12        What did you investigate?

13   A.   Right.  So the central question that I was looking at in

14   this matter was whether MarkMonitor had a system that reliably

15   determined whether Cox subscribers were sharing copies of

16   plaintiffs' works, whether the version of software they used in

17   this case did that.

18   Q.   What do you mean by that?  So what does it -- what --

19   excuse me.  We'll get to these in detail.

20   A.   Sure.

21   Q.   So let's go the second topic.  What materials did you

22   review?  Have you got a slide that summarizes that?

23   A.   I do.  The highlights.

24   Q.   Okay.  What are the highlights?

25   A.   Okay.  So these are the highlights.  So we -- I looked at

N. Feamster - Direct

2196

1    a variety of material that described the capabilities of the

2    MarkMonitor software, okay.  So some of those we've seen

3    earlier today and earlier in the trial, both the MarkMonitor

4    and Audible Magic technical documents that described how their

5    systems were used in the Copyright Alert Program or System, the

6    Harbor Labs and Stroz Friedberg audits of the MarkMonitor

7    system for that Copyright Alert Program.

8          I also looked at the source code for MarkMonitor, the

9    MarkMonitor system, as well as the source code for the Audible

10   Magic digital fingerprinting system, and I've listened to a

11   variety of testimony at trial.

12         I should mention that I obviously haven't listened to

13   Rubin since we haven't heard from him yet, but I have either

14   listened to or read the transcript of all of the other

15   testimonies that are listed here.

16         A second class of things I looked at were materials

17   that allowed me to determine what MarkMonitor was actually

18   doing in this matter to detect infringement on the Cox network.

19   Okay.  So I was provided with more than 170,000 so-called

20   evidence packages or evidence files that MarkMonitor assembled

21   in connection with this case.  I was also provided with a hard

22   drive that had upwards of about 40,000 audio recordings, and

23   also have listened to the testimony and read some of the

24   testimony that I described.

25   Q.   The 170-odd-thousand evidence packages, the jury has heard

N. Feamster - Direct

2197

1    testimony about some spreadsheets that the folks at MarkMonitor

2    compiled on some of these issues.

3    A.    Yep.

4    Q.    What's the relationship between those spreadsheets and the

5    evidence packages that you looked at?

6    A.    There were a number of spreadsheets.  There was a notice

7    spreadsheet, there was a spreadsheet that described the

8    contents of the hard drive, and there was a spreadsheet

9    describing the Audible Magic fingerprints.

10   Q.    Okay.

11   A.    Okay.  So these were derivative of what we're talking

12   about here.

13   Q.    Okay.  So you went and looked at the underlying data; is

14   that what you said?

15   A.    That's correct.

16   Q.    And with all of that by way of introduction, can you give

17   us a short summary of the opinions you expect to testify to?

18   A.    Yes, I can.

19   Q.    What, what would that summary be?

20   A.    The version of the MarkMonitor system that was used in

21   this matter routinely failed to verify what was in the files on

22   the computers of Cox's subscribers.  It's my opinion that

23   there's no reliable evidence that the Cox subscribers were

24   sharing copies of plaintiffs' works based on the evidence I've

25   seen.

N. Feamster - Direct

2198

1   Q.   Okay.  Let's zero in on that word, "verify."

2           Can we have the next slide?

3           Why is it important -- why was it important for

4   MarkMonitor to verify what it found on the computers of the Cox

5   subscribers?

6   A.   Yeah, there's two aspects to verification.  One is --

7   first of all, needed -- needs to determine if it has a -- you

8   know, given if it had a complete copy of a file, it needs to

9   know what that file is or represents, right?

10          So there's an aspect to verification that says, is

11  this file one of the works?  Okay.  So --

12  Q.   And the "it" here, is that MarkMonitor?

13  A.   That's --

14  Q.   Can we go back, please?

15  A.   That's right.

16  Q.   And what's the second aspect of verification?

17  A.   So as I mentioned, the first aspect basically just says,

18  what is this file?  Let's check that.

19          The second aspect says, what is a peer in a

20  peer-to-peer network actually doing?  Is it sharing that file

21  all -- in all -- all or in part, right?

22  Q.   Okay.

23  A.   So first relates to the content; second relates to what is

24  a peer doing or not doing.

25  Q.   Okay.  And I gather you concluded that the verification

N. Feamster - Direct

2199

1   was not sufficient in this case; is that right?

2   A.   That's what I said, yes.

3   Q.   Can we see the next slide, please?

4           What did you -- what conclusion did you draw from the

5   deficiencies in the verification process?

6   A.   Because the verification process was deficient, right,

7   essentially because they didn't adequately verify what was

8   going on, there's no reliable evidence that the Cox subscribers

9   actually were sharing copies of the plaintiffs' works.

10  Q.   Okay.  And the verification we're talking about here,

11  that's verification of what was going on on the subscribers'

12  computers, right?

13  A.   That's correct.

14  Q.   Okay.  So with all that by way of prelude, can you briefly

15  summarize the basis for your -- the opinions that you reached?

16  A.   Yes.

17  Q.   Next slide, please.

18          What -- how are you going to do that?

19  A.   Right.  So before we get into the details there, what I

20  need to do is lay some groundwork and talk a little bit about

21  how peer-to-peer networks operate, and I'm going to do that in

22  the context of BitTorrent.  Okay?

23  Q.   Okay.

24  A.   Then what we're going to do, given that basic

25  understanding, is talk about the general capabilities of the

N. Feamster - Direct

2200

1    MarkMonitor system, some of which we've heard about a little

2    bit at trial as well, but how basically it operated in the

3    context of the Copyright Alert System.

4    Q.   Okay.

5    A.   And then by way of contrast, I should say, we'll talk

6    about how it operated in the context of this trial.

7    Q.   So let's start with the operation of peer-to-peer

8    networks.

9              Can we have the next slide, please?

10             What's the -- what's illustrated on this slide?

11   A.   Right.  So here we have a cartoon picture of the internet.

12   It's a little bit more complicated than this, but the main

13   thing to -- that I want to point out here is that while, you

14   know, it's sort of common to think in colloquial terms of the

15   internet as, you know, one homogenous thing, it's actually not

16   that at all.

17             Internet actually comes from the word "internetwork,"

18   okay, meaning that there's actually tens of thousands of

19   independently operated networks that connect to form the

20   internet, upwards to 70,000 now, I think, all around the world.

21   Cox is but one of those.

22             So when you transfer a file on the internet, as the

23   animation is showing, your data actually might start in the Cox

24   network but end up somewhere, somewhere completely different in

25   a totally different network.

N. Feamster - Direct

2201

1   Q.   How does the internet relate to peer-to-peer networking?

2   A.   Good question.  So in the context of a peer-to-peer

3   network, the peers in a peer-to-peer network like BitTorrent

4   are going to be located all around the internet, all right, so

5   not just all on the Cox network.  There might be one peer on

6   the Cox network.  There may be other peers in other parts of

7   the, of the internet.

8   Q.   Okay.  Can we -- have you got a slide that illustrates

9   that?

10   A.   Yes.

11   Q.   Can we see the next slide, please?

12        What does this slide show?

13   A.   Right.  It shows what I just described, and then we're

14   going to get into a little bit more detail.  You can see here

15   peer 1 is sitting in the Cox network, and then we've basically

16   got a bunch of other peers in that peer-to-peer network.  In

17   BitTorrent parlance, we'd call this a swarm.

18        So these are all peers who would like to exchange or

19   obtain copies of a particular file.  This one, for the sake of

20   illustration is, in deference to Mr. Zebrak, a good song, "Lean

21   on Me," Bill Withers, and in this particular case, what we're

22   seeing is the peer says, I'm interested in, you know, getting a

23   copy of, you know, "Lean on Me."

24   Q.   Okay.  Before we --

25   A.   Yes.

N. Feamster - Direct

2202

1    Q.    -- start downloading music --

2    A.    Sure.

3    Q.    -- let me just ask you some questions to orient us with

4    respect to the network.

5          First of all, are you going to talk about a

6    particular type of network for the most part in your testimony?

7    A.    We'll focus mostly on BitTorrent for the sake of examples

8    here.

9    Q.    Okay.  And the jury's heard about three other peer-to-peer

10   networks:  Ares, Gnutella, and eDonkey.

11   A.    That's right.

12   Q.    For purposes of your testimony today, how do those differ

13   from BitTorrent?

14   A.    There are some differences.  I think for the purposes of

15   today, we can think of them as substantially the same.

16   Q.    Okay.  Now, in this illustration, one of the peers has a,

17   what I take it is a complete copy of "Lean on Me," and one has

18   nothing, and three have portions of the file.  What does that

19   illustrate?

20   A.    That is -- that's what we're seeing.  Okay.  So basically,

21   this is pretty fundamental to the operation of BitTorrent, and

22   this is one of the differences, right, is that BitTorrent,

23   actually, the peers exchange pieces or chunks.  In Ares and

24   Gnutella, I believe they exchange entire files.

25   Q.    Okay.

1   A.   Here the idea is that all these peers eventually want to

2   get a complete copy.  Only one in this case, peer 4, has that

3   complete copy.  It's called a seeder.  Okay?

4           But in order for everybody to get the copy, they have

5   to trade pieces.  Obviously, if we're going to trade, I need to

6   have something you don't have, and you need to have something I

7   don't have.  So there are some strategies that -- and aspects

8   of the design of BitTorrent that kind of make it all work out,

9   but generally speaking, this is sometimes referred to as tit

10  for tat.

11  Q.   What -- you said that tit for tat creates some incentives.

12  What's the incentive that tit for tat creates?

13  A.   It's a good question.  So this is, this is really

14  important, right?  Because in order for me to download pieces

15  of a file that I want, I have to have pieces that somebody else

16  wants.  If you can see, there's a bootstrapping problem here,

17  right?  If you start out with nothing, I've got a problem.

18          Now, BitTorrent has some ways to get around that

19  particular corner case, but generally speaking, we're trading,

20  and so I have incentives to basically say that I have certain

21  pieces of a file that you want, all right?

22          So, Mike, if you have a piece that -- if you're

23  looking for a piece and I'm looking for a piece that you have,

24  I might say, I've got that piece.

25  Q.   Are you familiar with the concept of a bitfield in

N. Feamster - Direct

2204

1    BitTorrent?

2    A.    Yes.

3    Q.    Okay.  And can you -- can a peer use the bitfield to

4    advertise that it has a piece of a file?

5    A.    That's, that's generally the mechanism that it uses to do

6    so.

7    Q.    Okay.

8    A.    In fact, we sort of see a version of that here on, on the

9    slide itself.

10   Q.    Okay.

11   A.    You can see -- yeah.

12   Q.    So let's go back to our peer who's been -- had his

13   question lingering.  What, what is the peer doing, peer 1 doing

14   at this point?

15   A.    At this point, peer 1 doesn't have any of the file, so

16   peer 1 is trying to determine who has pieces of this file,

17   "Lean on Me," okay?  So what it's going to do is basically ask

18   something called a tracker.

19   Q.    Okay.  How does it -- who does peer 1 direct that -- how

20   does peer 1 find out who has the pieces of the file?

21   A.    That's, that's a good question.  So there are two steps to

22   that.  The first thing it has to do is actually get something

23   called a torrent file, and it's got to search the internet for,

24   for the torrent file.  Okay.

25           Once it has the torrent, the torrent file is going to

2205

1   point that peer towards something called a tracker, okay?  The

2   tracker basically is a machine on the internet shown on the

3   right side of this slide that keeps track of the other peers in

4   the so-called swarm that are supposed to have pieces of that

5   file.  It's also keeping track of essentially the information

6   that we see right there on the -- in the graphic.

7   Q.   Okay.  And does the tracker send that information to the

8   peer requesting it?

9   A.   That's right.

10          MR. BRODY:  Can we click again, please?  There it is.

11  BY MR. BRODY:

12  Q.   What's the next step in this process?

13  A.   Okay.  So at this point, peer 1 has learned from, from the

14  tracker which peers have which pieces.  Now, what this

15  illustration isn't showing is that, that swapping that I just

16  described, of course, that's important, but for the sake of

17  illustration, we're just looking at the download half.

18          Through that process that I described, the peer

19  begins to accumulate and assemble pieces or chunks.  If I use

20  the word "chunks," I mean pieces, same things.  Pieces or chunk

21  of that file, begins to assemble them.  As those pieces come

22  in -- yeah, please.

23          MR. BRODY:  Can we click again?

24  BY MR. BRODY:

25  Q.   What happens when the pieces come in?

N. Feamster - Direct

2206

1    A.    As those pieces come in, the peer is going to check

2    whether or not that piece that it just downloaded from some

3    other peer on the internet is actually a piece of the file that

4    it thinks that it's getting.  So this is the verification that

5    we actually just heard about in the Harbor Labs testimony.

6    Q.    And we got three checks and an X.  What is the X supposed

7    to indicate?

8    A.    The X would indicate that a peer did this check and that

9    the check failed.

10   Q.    Okay.

11   A.    And at that point, the peer would determine, okay, this

12   chunk of content that I just received actually isn't part of

13   the file that I'm seeking, the thing that the peer just sent me

14   isn't going to be useful for reassembling this, so at that

15   part -- at that point, it will discard that piece and try to go

16   find that piece from some other peer in the swarm.

17            MR. BRODY:  Okay.  Can you click again, please?  And

18   there it goes.

19   BY MR. BRODY:

20   Q.    Now, let me ask you a couple of questions about this

21   checking process.

22   A.    Yes.

23   Q.    First of all, what is a consistent -- what is the peer

24   doing to check the piece?

25   A.    Good question.  So there's a couple of pieces to that

N. Feamster - Direct

2207

1   check -- sorry, a couple of aspects to that check.  There's a

2   check on the individual piece that we saw, and then there's

3   also a check on the whole file, okay?

4          So this process is done -- I'm sorry, this check is

5   done through a process called hashing.  We sometimes call it

6   computing the hash.  And the word "computing" is also quite

7   important, right?  The peer that received it needs to compute a

8   hash on the piece it just received.

9          Computing isn't enough, right?  Because that's just

10  going to give you a value, right?  What the peer is going to do

11  with the result of that computation, that's the SHA-1 hash that

12  we may have heard about, what it's going to do with the result

13  of that computation is compare it against another value, right?

14  That other value is sitting in the torrent file, and so the

15  torrent file contains a list -- for every piece, the torrent

16  file says this is the hash value for that piece, okay.

17         So when the peer basically gets this piece from

18  somewhere else on the internet, says, I don't know what the

19  heck this is.  Let me run this hash computation and compare it

20  against what's in the torrent file.  If those two things match,

21  boom, we're good.  If they don't match, that piece was garbage.

22  Q.   And this --

23  A.   There's also a hash over the entire file, which is what

24  we're seeing here in the diagram.

25  Q.   And this process of computing the hash, does that require

N. Feamster - Direct

2208

1    actually examining the content of the piece that the peer is

2    receiving?

3    A.    Depends on what you mean by the word "examining," but yes,

4    basically what that is is a computation over the contents of

5    that piece.

6    Q.    So the peer doesn't simply rely on whatever hash it's been

7    told it would be receiving?  It actually verifies that?

8    A.    Yeah.  The hash by itself actually is meaningless.  That's

9    just basically a report of, like, if you find something on the

10   internet, if you want to know that it matches, you know, that

11   piece that you think it is, then perform the computation and do

12   the comparison.

13   Q.    Why, why is there any risk?  Why, why would it be the case

14   that a peer would get a piece or a file that is not what it

15   purports to be?

16   A.    Yeah, that's a good question.  There are a whole host of

17   reasons, both benign and not so benign, but this really comes

18   to, to the fundamental operation of how BitTorrent works, which

19   as we talked about, was -- it centers around incentives, all

20   right?

21           So you remember that example I gave before where, you

22   know, Mike and I can only trade a piece if he has something

23   that I want and I have something he wants.  Well, what if I

24   want what he has and I don't have anything he wants?  Well,

25   then there's a huge incentive for me to basically say, I've got

N. Feamster - Direct

2209

1    this piece, everybody, Mike, and I'd give you anything.  If you

2    don't check it, all bets are off.

3            That's why BitTorrent actually runs the check we just

4    talked about.

5    Q.   Okay.

6    A.   That's one example.  There are a few others, but that's a

7    predominant sample.

8            MR. BRODY:  Okay.  And can we click the last step in

9    this process?

10   BY MR. BRODY:

11   Q.   What is this illustrating?

12   A.   So at this point, the peer has basically received all

13   pieces of that file.  This is, this is the last piece that

14   basically it's checking against.  At that point, it can

15   reassemble the entire file and perform a check over the, over

16   the entire file.

17   Q.   Is there any risk of -- are there any other reasons other

18   than dishonesty that you were talking about or the

19   misrepresentation on why it would be important to perform the

20   check, the hash check?

21   A.   Sure.  Files can be corrupted.  I think actually I

22   listened to the Bahun testimony.  We heard about a disc

23   corruption case there.

24           Bit errors, there can be errors in transmission.

25   Now, network protocols are supposed to correct for those types

N. Feamster - Direct

2210

1    of things, but it doesn't always happen.  So those are some

2    other, some other possibilities.  That's not an exhaustive

3    list.

4    Q.   You said, you said that you might want to misrepresent to

5    me what it is that you've got so that I'll trade with you.

6    How, how would you go about doing that?

7    A.   Well, it's pretty straightforward.  Just in the way that

8    I -- we just did it in human space here.  A piece of software

9    could do the exact same thing, basically just say, I've got a

10   piece.

11   Q.   And is there software like that available to peers on a

12   network?

13   A.   Quite a lot.  I guess I should add it's --

14            THE COURT:  No, wait for the next question.

15            THE WITNESS:  Yes, please.  Thank you.

16            MR. BRODY:  Can we have the next slide, please?

17   BY MR. BRODY:

18   Q.   So we saw this slide before, and you told us before that

19   verification was a key issue for your analysis of the

20   MarkMonitor system.  What you've just explained to us about how

21   the peer-to-peer network works and how it checks these pieces

22   as they come in, how does that relate to the overall question

23   of MarkMonitor's verification?

24   A.   Yeah, that's a very good question.  So let's go -- just

25   bounce back up a level.

1           Remember I was saying that there are two aspects to

2    verification, right?  One is like, what are these individual

3    pieces?  What is the peer actually sharing with me?  Is it what

4    it says it is?  So we've talked at length about that.

5           The other is, okay, in that animation, we just

6    watched peer 1 assemble a whole file.  Okay.  Great, it's got a

7    whole file.  What is it?  It could be junk, right?  So you've

8    got to check that.

9           Now, the SHA-1 hash is there to -- of the entire

10   file, basically says, well, this is what the torrent says it

11   is, right?  So there's some torrent file out there that says

12   there's a file with a certain name and, okay, you just

13   downloaded a bunch of bits that correspond to that torrent

14   file.  But we still haven't answered a key question, which is,

15   like, is this a work, you know, is this an infringing work, or

16   is it -- it could be anything basically.

17   Q.   Okay.  And could it be -- okay.

18          Have you prepared a slide that shows kind of the

19   types of ambiguities that can arise when you -- when a peer

20   downloads -- searches for and downloads a file?

21   A.   Yes, I have.

22          MR. BRODY:  Okay.  Can we look at the next slide,

23   please?

24   BY MR. BRODY:

25   Q.   Now, there's a work at issue in this case called "Lean on

N. Feamster - Direct

2212

1    Me," a song by Mr. Bill Withers.  You're aware of that

2    generally?

3    A.   I've heard the song, yeah.

4    Q.   And I think the registration in the case identifies -- we

5    can look at this if you want, but I think the registration in

6    the case identifies it as a work on an album called Still Bill.

7    Okay?

8    A.   Okay.

9    Q.   If you go out, MarkMonitor goes out into the network or a

10   peer goes out into the network and looks for "Lean on Me" from

11   the Still Bill album --

12          MR. ZEBRAK:  Objection, Your Honor.  I move to strike

13   because counsel is testifying, and I'm checking it, I'm not

14   sure that's even a work in suit.

15          MR. BRODY:  I'll go back through the exhibit if you

16   want me to.  It's a work in suit.

17          THE COURT:  All right.  Why don't -- time for a

18   break.  Why don't we take a break.  It's 4:00, and we'll take

19   15 minutes, and we'll continue the testimony.

20          NOTE:  At this point, the jury leaves the courtroom;

21   whereupon the case continues as follows:

22   JURY OUT

23          THE COURT:  All right.  So there's been quite a bit

24   of leading questions, and when I'm about to tell you, hey, you

25   know, stop leading now, then you ask a, you know, a what,

N. Feamster - Direct

2213

```
 1    where, when, how question, and it's not leading, and so we move
 2    forward.  So let's, let's start again.  That was -- the
 3    objection is sustained.  Let's go back and let's stop asking
 4    leading questions, okay?
 5            MR. BRODY:  Okay.
 6            THE COURT:  All right.
 7            MR. BRODY:  I apologize.
 8            THE COURT:  No, it's quite all right.
 9            All right.  Anything else before we break?
10            MR. ZEBRAK:  Your Honor, just very briefly, I believe
11    that the work counsel was just asking about or explaining to
12    the witness is in the case, but he's testifying that there's an
13    album listed on PX 1.  It doesn't list albums, Your Honor.
14            MR. BRODY:  No, the --
15            MR. ZEBRAK:  And I just -- excuse me, sir.
16            MR. BRODY:  I'm sorry.
17            MR. ZEBRAK:  And, likewise, we just received the
18    documents -- we're supposed to exchange binders at the start of
19    the day.  We just got their binder.  There's a document in it
20    that is not on his list of materials considered.  I don't know
21    what it's about.  It's one of the registration materials, and
22    he hasn't examined any registration materials.  So I would
23    object to any use of it.
24            THE COURT:  Okay.  Talk about it and see if you
25    can --
```

N. Feamster - Direct

2214

1           MR. BRODY:  Sure.

2           THE COURT:  -- get an understanding of what it is,

3  and when we come back, we'll address it if we need to, okay?

4           MR. BRODY:  Thank you, Judge.

5           THE COURT:  All right.  We're in recess.

6           NOTE:  At this point a recess is taken; at the

7  conclusion of which the case continues in the absence of the

8  jury as follow:

9  JURY OUT

10          THE COURT:  Okay.  Where are we?

11          MR. BRODY:  I understand counsel has an issue, Your

12  Honor.

13          THE COURT:  Yes, sir.  Go ahead, Mr. Zebrak.

14          MR. ZEBRAK:  May I ask that the witness be asked to

15  leave the courtroom?

16          THE COURT:  All right.  Yeah, please, go -- head to

17  the hallway.  Neophyte.

18          NOTE:  The witness leaves the courtroom.

19          THE COURT:  Yes, sir.

20          MR. ZEBRAK:  Your Honor, this situation just keeps

21  worsening.  The document that I raised with Your Honor, it

22  turns out it's a copyright registration.

23          Now, Mr. Brody now tells me at the start of the

24  break, he said he wasn't going to use it -- he said he was

25  going to use it, and now he says he's not going to use it.  But

N. Feamster - Direct

2215

1    it's the context.  And even if he now doesn't use it, I still

2    need to explain what's happening here, Your Honor.

3              First of all, he didn't do anything with copyright

4    registrations.  This was not a document he has ever seen.  We

5    saw it just now.

6              I had raised a concern, Your Honor, about the slides

7    because he didn't do an analysis of what was on the hard drive

8    to match it up to see if the --

9              THE COURT:  Which slide are we talking about now?

10             MR. ZEBRAK:  Well, I raised it in the context of

11   slide 44, Your Honor.

12             THE COURT:  Yes, sir.

13             MR. ZEBRAK:  But it's this issue where he didn't --

14   slide 44 depicts a CD called "Still Bill" by Bill Withers.

15             THE COURT:  Yes, sir.

16             MR. ZEBRAK:  And it has a hash beneath it, and it's a

17   hash concerning what Cox --

18             THE COURT:  Two sets of numbers, and I don't know

19   what either of them are.

20             MR. ZEBRAK:  Well, yes, sir.  So it's one --

21             THE COURT:  Is it hash values?

22             MR. ZEBRAK:  It's one long set of numbers.  And on

23   this slide, it has it for the proposition that within "Still

24   Bill," you don't know if it's Tammy Wynette or "Still Bill" or

25   something else.

N. Feamster - Direct

2216

1          And this isn't an example he picked out of the air.

2    They picked it because they want to relate it to testimony

3    earlier in the case.

4          THE COURT:  That's perfectly appropriate, right?

5          MR. ZEBRAK:  Well, I mean --

6          THE COURT:  Why wouldn't you try and relate it to

7    something that's happened in the course of the trial, if you

8    can?

9          MR. ZEBRAK:  Well, Your Honor, he conducted no

10   analysis of this.  And this implies that -- or it states that

11   he does, and -- but let me explain further, sir.

12         THE COURT:  You're -- if you're just rehashing what

13   we just talked about an hour ago, cross-examine him and narrow

14   the confines of what he testifies about.

15         MR. ZEBRAK:  Well, yes, sir, and I'm happy to do

16   that.  May I explain one final piece to it, which I didn't

17   realize earlier, because it was -- until I saw the registration

18   when he handed me the binder during the testimony.

19         Earlier in the slides, they show a track, which is

20   the track at issue in this case, "Lean On Me," and they show it

21   next to the album, which they have throughout here.  Right.

22   The hash is not that, yet they have the "Lean On Me" next to

23   the album, right and left, and they're trying to confuse the

24   jury to make it think like a work in suit is the example for

25   Tammy Wynette.  It's incredibly deceptive.  And it's exactly

N. Feamster - Direct

2217

1    what counsel said he wasn't going to use the slide for.

2            THE COURT:  All right.  Your exception is noted.

3            Ready for the jury?

4            MR. BRODY:  Yes, sir.

5            THE COURT:  And let's get Mr. Feamster back.

6            NOTE:  At this point the jury returns to the

7    courtroom; whereupon the case continues as follows:

8    JURY IN

9            THE COURT:  All right.  Please have a seat.

10           And please resume, Mr. Brody.

11   BY MR. BRODY: (Continuing)

12   Q.   Dr. Feamster, before we broke I think I asked you a

13   question along the lines of whether you had prepared a slide to

14   illustrate the ways in which there can be ambiguities in what

15   you find when you search one of these peer-to-peer networks for

16   a song.

17           Do you recall that generally?

18   A.   I remember that question, yeah.

19   Q.   Have you prepared such a slide?

20   A.   I have, yes.

21   Q.   We have -- oh, I've got the clicker.

22           What's the first -- so if you were searching on

23   something called "Still Bill," what's the first thing you might

24   find?

25   A.   "Still Bill," okay.  So you might find, for example, a

N. Feamster - Direct

2218

1    copy of the album called "Still Bill."  So it might be the

2    actual thing that you are looking for.

3    Q.   What else might you find?

4    A.   You might find a copy of a track on that album, okay?

5    Q.   Okay.

6    A.   So not the whole album.  Right.  It might be the original

7    version of that song.  Right.  So it might be that work.  It

8    could be something else entirely.

9         This is why we do the digital fingerprinting for

10   verification.  Could be any of the number of things that

11   we've -- that I've shown here.

12   Q.   Okay.  What's another example that you might find?

13   A.   Another example might be, and I'm sure we're all familiar

14   with this general concept, that two different pieces of work

15   might have the same album name.  So you might be searching for

16   Bill Withers' album "Still Bill," and you might get some other

17   album with the same name.

18   Q.   I guess I should have asked you to talk about the search

19   "Lean On Me."

20   A.   Okay.

21   Q.   That probably would be more fitting for this slide.

22   A.   Okay.

23   Q.   So is that still going to produce this range of

24   possibilities that you've been describing?

25   A.   Correct.

N. Feamster - Direct

2219

1  Q.    Okay.  What's another possibility?

2  A.    Maybe someone's made a home video.  It might just be --

3  you know, not the Bill Withers album entirely.  So if, you

4  know, I make a home video, it's called "Lean On Me."

5         It could also be some home video that has "Lean On

6  Me," the song in the background, for example.

7  Q.    How about another one?

8  A.    Something that occurs, and I think we heard about in some

9  of the other testimony, is that sometimes files can be

10 completely mislabeled.

11 Q.    Okay.  What's another possibility?

12 A.    This relates to what we talked about earlier where,

13 essentially, I might say that I have something, in all or in

14 parts, and not -- and have something completely different.

15 Q.    This is the problem with the dishonest peer who's

16 misrepresenting what it possesses?

17 A.    The dishonest peer that we talked about earlier and that

18 we also heard about in the Harbor Labs report that I relied on.

19 Q.    And I don't want you to give me a number for this, but do

20 you have a qualitative sense about how likely it is that you're

21 actually going to encounter one of these dishonest peers?

22 A.    Oh, it's quite likely.

23 Q.    Okay.  What about -- what's your last one here?

24 A.    File could be corrupted.  We talked about that when we

25 talked about the context of corruption of a piece of a file,

N. Feamster - Direct

2220

1    the same thing could happen.  Obviously, if you've got a piece

2    of a file that's corrupted, you put that together, it's -- the

3    file is going to be corrupted.  So --

4    Q.   Okay.  So now if what you were looking for was the "Lean

5    On Me" track in the "Still Bill" album, which of these would --

6    have you got a slide that indicates which of these would be the

7    wrong file?

8    A.   Sure, sure.  Yeah, if you could just advance, we'll see

9    that.

10             Right.  So none of these things in red would be what

11   we were looking for originally.

12   Q.   Okay.  And we talked about this piece-checking process?

13   A.   That's right.

14   Q.   Does that help with this problem of ambiguity, of

15   unclarity as to what's being returned?

16   A.   It's essential.

17             MR. ZEBRAK:  Objection, Your Honor, leading.

18             THE COURT:  Yeah.  All right.  He has answered.

19   Let's not lead, please.

20   BY MR. BRODY:  (Continuing)

21   Q.   Is there another way to -- is there -- what is the

22   helper -- the hash checking that we just looked at?

23   A.   Right.  So the hash checking is going to -- is going to

24   mainly defend or check against some of these things that we're

25   looking at on the right side of the slide.

N. Feamster - Direct

2221

1          So, for example, if the file is corrupted, the hash

2    check would pick up on -- pick right up on that.

3          If the file has been lied about -- so, for example,

4    remember what I talked about earlier where I said, okay, the

5    torrent file has hashes for each of the pieces, right, so if a

6    piece of the file has been corrupted, that hash check is going

7    to fail.

8          If the peer is lying about a piece, right, says, hey,

9    I got a piece of "Lean On Me," and it's actually not, then the

10   check is going to pick up on that lying.

11         Now, some of these others that we've shown here,

12   it -- that particular piece check isn't necessarily going to

13   pick up on those.  But there are other ways to do that.

14   Q.   The jury has heard about a technique called digital

15   fingerprinting, which is done by a company called Audible

16   Magic.  Have you prepared a slide that illustrates that

17   concept?

18   A.   Yes.  We should talk about that.

19   Q.   What does this slide show?

20   A.   Right.  So on that previous side, we talked about a whole

21   bunch of things that could possibly go wrong when searching for

22   "Lean On Me."  Some of the other things on the slide were,

23   okay, I download something, I don't know what it is.  Is it

24   erroneously named?  Is it I downloaded a different copy of the

25   song?  Is it a cover?  Is it, you know, music in the back of an

N. Feamster - Direct

2222

1  advertisement?  Is it a live recording of the same thing?

2          I actually want to know what it is.  Okay.  So the

3  process of digital fingerprinting, in this case Audible Magic

4  is an example of that, would say, okay, I've downloaded

5  something, basically a collection of bits, now let's -- it's

6  essentially a slight simplification, but let's listen to it,

7  let's see what it sounds.  Okay.

8          And then I'm going to compare that sound to what the

9  original work sounds likes.  Are those basically the same?  If

10 yes, then we got a match.

11 Q.   Okay.

12 A.   If not, then no match.

13 Q.   And is that what this slide illustrates?

14 A.   Yes.  So basically, you know, here's what the slide shows.

15 So on the bottom half, we basically have -- this is sort of a

16 nice graphic showing the -- you know, what an audio wave form

17 would look like.  And what that's meant to represent is

18 essentially what would be stored in the Audible Magic database

19 in some form.  Not exactly this.  This is for the sake of

20 illustration.  But Audible Magic basically knows what Bill

21 Withers' "Lean On Me" song sounds like.  Okay.

22          Now, in the top half of the slide, if someone has

23 just downloaded something from BitTorrent, okay, is it Bill

24 Withers' "Lean On Me"?  I don't know, let's check.  Let's

25 listen to it.  Or let's basically turn that bag of bits into an

2223

1    audio representation and see if it's actually "Lean On Me."

2            And to do that, basically you're comparing -- you're

3    trying to play back what you just downloaded from BitTorrent,

4    turn it into some audio, and then compare it against what

5    Audible Magic says is, ah, this is "Lean On Me."

6    Q.   Okay.  And does that process help with eliminating these

7    ambiguities?

8    A.   In many cases, yes, it can do so.

9    Q.   Let's talk about -- you said that -- so we've talked about

10   peer-to-peer networking.  You said that you were going to talk

11   about how the MarkMonitor system was capable of operating and

12   how it operated for CAS.

13           Were there any particular documents that you found

14   helpful on that subject?

15   A.   We're looking at three of those right here.  I can

16   describe them to you.

17   Q.   Tell us what they describe, please.

18   A.   So the one on the left is MarkMonitor's description of

19   the -- of its system as it operated.

20   Q.   And what exhibit is that, please?

21   A.   That is DX 19 as I see it.

22   Q.   Okay.

23   A.   The second, I'm sure fresh in our minds, is the Harbor

24   Labs audit of the MarkMonitor antipiracy system.  That's

25   Exhibit DX 89.

2224

1          And then over on the right side, we have DX 130,

2    which is a similar audit that was performed by Stroz Friedberg.

3    Q.   Okay.  And you heard the testimony from Mr. Bahun about

4    MarkMonitor's system, right?

5    A.   Yes, I did.

6    Q.   And you heard the testimony just now from Mr. Monson about

7    the Harbor Labs report?

8    A.   Yes, I did.

9    Q.   And the jury will hear from Mr. Rubin of Stroz Friedberg,

10   but you've read his deposition and read the report, right?

11   A.   Yes.

12   Q.   Okay.  Did you prepare a slide that summarizes the key

13   steps of the process that was implemented for the Copyright

14   Alert System?

15   A.   Yes, I did.

16   Q.   What does this slide show?

17   A.   Okay.  So we've heard about this in some previous

18   testimony, but I'll relate it and explain it as I understand

19   it.

20          Okay.  So there are four steps in this process.

21   We're going to go through each one of them in more detail.

22   Okay.  But the first -- step one is locating and downloading

23   a potentially infringing file on the peer-to-peer network.  So

24   in that step, it's basically going to do the full download.

25          Okay.  Step two, right, what we just talked about,

N. Feamster - Direct

2225

1    right.  So after the download, you've got to figure out, what

2    the heck did you just download.  Okay.  So step two is perform

3    that digital fingerprinting process that we just described to

4    say, is that a work -- is that an infringing work.

5         Okay.  Step three, right.  We talked about two

6    aspects that -- you know, two things we're trying to discover.

7    One is, what is this thing?  And the other is, what are the

8    peers actually doing.  Right.

9         So essentially in parallel to step two is an

10   investigation of peers on the peer-to-peer network.  So

11   MarkMonitor has a piece of software that basically acts as an

12   agent going out on to the BitTorrent or peer-to-peer network, I

13   should say, to try to determine whether or not a peer is

14   sharing a file in all or in parts.

15        And then finally, if through steps two and step three

16   the MarkMonitor software determines that there is an IP address

17   on the Internet -- I didn't say what an IP address was, but

18   basically a machine on the Internet that's identified by an

19   interpret address.  Right.  Says, okay, I found a peer located

20   at that place on the Internet that appears to be sharing a

21   piece of this infringing work, now I'm basically going to send

22   a notice to the corresponding ISP.

23        And that's something that you can do because you can

24   map the IP address to the corresponding ISP.

25   Q.   Okay.  And have you prepared some slides that illustrate

N. Feamster - Direct

2226

1    each of these steps?

2    A.   Yeah, let's talk about each of them in more detail.

3    Q.   Okay.  Let's talk about step one.  So what does this slide

4    show about how step one is performed?

5    A.   Right.  So in this case, you know, we've already talked

6    about how a search on a peer-to-peer network would work.  And

7    this step operates in substantially the same way as what we

8    described.

9         So MarkMonitor has a piece of software, an agent,

10   that basically goes out on a peer-to-peer network and attempts

11   to download a complete copy of that file.

12   Q.   And then what happens?

13   A.   Just as we described before, if all goes well, the agent

14   obtains a complete copy of that file.

15   Q.   Okay.

16   A.   That's step one.

17   Q.   What's -- what does your slide show about step two?

18   A.   Right.  So this is, this is sort of what I was just saying

19   before, is that, okay, the file has been downloaded and

20   assembled.  I don't know what it is.  So let's now ask Audible

21   Magic, what is this?  Is this something that is recognized in

22   this database as an infringing work?

23   Q.   Okay.

24   A.   Okay.

25   Q.   And then what does this slide illustrate about that step?

N. Feamster - Direct

2227

1    A.    Okay.  So basically this is a simplification.  I should

2    say, that there are a variety of ways that Audible Magic does

3    digital fingerprinting that we're not going to get into.  But

4    essentially what this is showing is on the top half, this is

5    the downloaded file, right, we take that bag of bits and

6    convert it into some signal, wave form, audio essentially.  I'm

7    simplifying, but that's essentially what's going on.  It's

8    called a fingerprint.

9         And then that gets submitted to Audible Magic and

10   compared against what's on the bottom half of the screen,

11   that's called the reference file.  If those match, all right,

12   or if Audible Magic has something in its database that matches

13   that, it's going to say, yep, there's a match, I got it, and

14   here's what it is.

15   Q.    Before we get to the next slide, I want to look at some of

16   the documents you put up previously --

17   A.    Okay.

18   Q.    -- and the jury has heard about.  So can we get

19   Defendant's Exhibit 89 in evidence, the Harbor Labs report.

20        And this is the report that Mr. Monson testified

21   about just earlier this afternoon, right?

22   A.    That's right.

23   Q.    Can we go to page 3 of the exhibit, please, 003.

24        Can you blow up the -- I'm sorry, 004.  Can you blow

25   up the -- from the header design down to the paragraph beneath

N. Feamster - Direct

2228

1    the numbers.  That's right.

2              So this is --

3              Your Honor, may I have leave to just kind of

4    encapsulate this to get to the passage that I want him to look

5    at?  It will be leading in nature.

6              THE COURT:  All right, go ahead.  We'll see.

7    BY MR. BRODY:  (Continuing)

8    Q.   So the opening paragraph says that they believe that the

9    design meets the goal of precision.  And they say it meets it

10   under certain assumptions stated below.

11             Can you highlight certain assumptions.

12             Okay.  And then we're going to look at those

13   assumptions.

14             Now, can you read -- Dr. Feamster, can you read

15   number two?

16   A.   Sure:  The same torrent file, or a torrent file with a

17   matching info hash that was used to download the content for

18   the verification step is also used for downloading a complete

19   piece from a file sharer for the evidence generation step.

20   Q.   What does that mean?

21   A.   That basically means that the -- okay.  So there is --

22   recall that there are two steps, right, that we talked about.

23   One is where the MarkMonitor agent downloads a complete copy of

24   the file, and then subsequently does a digital fingerprinting

25   match to say this is infringing.  That is the verification

N. Feamster - Direct

2229

1    step.  Okay.

2           So there's the torrent file associated with that.

3    Okay.

4           Then there's another step, right, where we go out --

5    where the MarkMonitor agent goes on a peer-to-peer network and

6    tries to find other versions of that, other copies.  There's a

7    torrent copy for that as well, supposed to be the same.

8           So that's -- that is basically what that's saying

9    right there.

10          And also, it does refer to downloading a complete

11   piece from the file sharer for the evidence generation step.

12   So it is also saying that during that evidence generation step,

13   the agent is -- is to download a complete piece from the file

14   sharer.

15   Q.   Okay.  And then can you -- can I direct your attention to

16   the last paragraph here.  Can you -- it's been blown-up.  Can

17   you read that passage, please.

18   A.   Under these conditions, the hash of the piece the agent

19   downloads is verified against the expected hash of that piece

20   from the torrent file.  Any mismatch is rejected.

21          Should I keep reading?

22   Q.   That's fine.

23   A.   Okay.

24   Q.   And how does that relate to the hash checking that you've

25   been describing as part of the BitTorrent process?

N. Feamster - Direct

2230

1    A.   That is the same check that a BitTorrent client would do

2    when downloading a piece of a file that it's trying to get.

3    There's an expected hash of the piece in the torrent file.  And

4    there's a hash that the agent is supposed to compute from the

5    downloaded piece.  Those have to match.  That's exactly what a

6    BitTorrent client does.

7    Q.   And this is what MarkMonitor was doing in the CAS system;

8    is that right?

9    A.   That's my understanding from the description in this

10   document.

11   Q.   Could we go to page 009 of the document, please.  The

12   second paragraph from the bottom, can you blow that up, please.

13            Can you read that first sentence.

14   A.   Sure:  Another example is testing the conjunction of

15   requirements for generating an infringement notice.

16   Q.   And the second sentence?

17   A.   Okay:  For example, MarkMonitor requires that at least one

18   full BitTorrent piece be downloaded.  This is essential for

19   accuracy.

20   Q.   Do you have an understanding why that -- first of all, is

21   this the same step we were just describing, discussing?

22   A.   Yes, downloading a piece.  Yes, that's -- that's a

23   prerequisite to checking, checking the hash.  So, yes.

24   Q.   Okay.  And why is that essential for accuracy?

25   A.   Well, we already talked about that actually.  There are --

2231

1   there are many reasons that a client could download a piece of

2   something from a peer and that piece has nothing to do with the

3   actual file its seeking.  So we talked about lying peers.  We

4   talked about file corruption.  We talked about a number of

5   other scenarios that could happen there.

6   Q.   Okay.  Can we go a little further up on the page, it's the

7   third paragraph:  For example.  There we go.

8            Can you read -- can you read the first two sentences

9   of that paragraph?

10  A.   For example, every element of the design examined in this

11  report must be tested.  There must be unit tests validating the

12  correctness of the SHA-1 check on the downloaded pieces.

13  Q.   And what is a SHA-1 check on the downloaded pieces?

14  A.   That's the hash that we've been talking about.

15  Q.   Okay.  And why would Harbor Labs -- why would it be

16  mandatory to make tests to validate the correctness of that

17  check?

18           MR. ZEBRAK:  Objection, Your Honor.

19  A.   Well, that's essential because --

20           THE COURT:  I'm sorry.

21           MR. ZEBRAK:  It's leading and no foundation.

22           THE COURT:  All right.  It's leading.  Rephrase your

23  question.

24  BY MR. BRODY: (Continuing)

25  Q.   Do you have an understanding of why Harbor Labs said that

2232

1    that must be tested?

2    A.    I do.

3             MR. ZEBRAK:   Objection, Your Honor, no foundation.

4    He didn't include this in his report.

5             THE COURT:   Overruled.   Based on what you read in the

6    report?   Go ahead.

7             THE WITNESS:   Can you ask the question again, please.

8    I'm sorry.

9    BY MR. BRODY: (Continuing)

10   Q.    I forgot the question.   So do you have an understanding of

11   why Harbor Labs would have said that MarkMonitor must -- there

12   must be unit tests on the downloading of a SHA-1 hash check?

13   A.    Yes, I do.

14   Q.    What's your understanding?

15   A.    The reason that Harbor Labs would say this, and I believe

16   it -- if I'm not mistaken, there's another part of the report

17   where they talk about ways that that piece that a client

18   downloads could go wrong, and they specifically talk about an

19   instance of dishonest peers.

20   Q.    Why don't we go down to that then.   Let's look at the

21   third paragraph from the bottom.   It begins:   For example.

22             Can you read that?

23   A.    There it is, yep:   For example, when new agents are

24   released, they should, at the very least, be tested against a

25   dishonest BitTorrent client that uploads incorrect pieces.   The

N. Feamster - Direct

2233

1    MarkMonitor design should catch these faulty pieces during the

2    check of the SHA-1 hash.  An end-to-end test where this

3    behavior is verified is essential.

4    Q.   And why would it be important to test the agents against

5    dishonest BitTorrent clients in uploads of incorrect pieces?

6    A.   Without performing that hash check, the agent has

7    absolutely no idea of what it just downloaded from a peer.  It

8    could be absolutely anything.

9    Q.   Okay.  Now, I think another one of the documents you put

10   up that helped you understand this -- the CAS system, was

11   Defendant's Exhibit 17.

12            Can we get that document up, please.

13            Was there anything in this document that helped you

14   understand what MarkMonitor was doing with respect to this hash

15   checking --

16   A.   Yes, this was, this was useful.

17   Q.   Can we go to page 20 of the exhibit.

18   A.   Yep.

19   Q.   Can you blow up the screen shot in the middle of that

20   page?

21            Does this show anything about whether MarkMonitor was

22   actually performing the download and SHA-1 hash check from a

23   peer in the CAS implementation of its system?

24   A.   Yes, it does.

25   Q.   How does it show that?

N. Feamster - Direct

2234

1    A.   This is one of the files in the so-called evidence package

2    that the MarkMonitor software assembles when investigating a

3    peer.  And this is, this is the content info file within that

4    evidence package.

5         So I believe we heard about that in earlier

6    testimony.  But in particular, the -- what we're interested

7    in -- and there's a number of interesting things here.  But

8    what you asked about was, can we figure out what's going on

9    with download and hash-based verification.  And there are two

10   lines in this file where you can see that that has been logged.

11   Q.   Which are those?

12   A.   There's one that says:  Downloaded.  Okay.  And to the

13   right of that you can see a report or a log for this

14   investigation, how much of the agent -- sorry, how much of this

15   file the agent downloaded.

16        And there's a second line that says:  Verified.  And

17   that refers to how much of this file the agent performed that

18   hash-based verification on.

19        And we see both the number of bytes, kilobytes in

20   this case it's represented as, and the percentage of the file

21   for which it did that download and verification.

22   Q.   Did you prepare a slide that illustrates how this step is

23   performed in the CAS, the Computer Alert System implementation

24   of MarkMonitor's system?

25   A.   Yes.

N. Feamster - Direct

2235

1   Q.   We've got to go back.  I think I may have advanced this

2   slide.  Okay.

3           Is this the slide?

4   A.   That's right.

5   Q.   What does this show?

6   A.   Okay.  So at this point, I forget the MarkMonitor

7   terminology for this part of the software, but basically the --

8   this is the agent that basically joins the peer-to-peer network

9   and attempts to find other peers in that peer-to-peer network

10  around the Internet that may be sharing all or part of that

11  file in question.  Okay.

12  Q.   And what's the next -- what happens next?

13  A.   Yeah.

14  Q.   Should we get a response, I do, then what happens?

15  A.   Right.  I should mention also, the way that it does that

16  is, you know, exactly the same way that a BitTorrent client

17  would go hunting for that.

18  Q.   Okay.

19  A.   And now what we're looking at, I think to remind folks, is

20  what was -- you know, what the system was capable of, and my

21  understanding of what it did in the CAS.  As described in the

22  report we just looked at, the agent would download and verify a

23  piece of that file that it was searching for in the

24  peer-to-peer network.

25  Q.   And how does this compare to what a typical peer would do

N. Feamster - Direct

2236

1    in a BitTorrent network?

2    A.    That particular step is identical.  Now, it's only

3    downloading one piece.  Right.  So a real BitTorrent client,

4    obviously probably interested in the whole file.  But the step

5    of downloading a piece and verifying would be exactly as a

6    BitTorrent client would do it.

7    Q.    And did you prepare a slide about the fourth step in this

8    process?

9    A.    I did, yes.

10   Q.    What happens in the fourth step?

11   A.    Okay.  So at this point -- and there's an important --

12   sort of deduction to this "if."  Right.  If an infringing file

13   is found, right, at a CAS participating ISP, there's a notice

14   sent.  Okay.  So there's a bunch of things that sort of -- you

15   know, we break that done.  And one is, of course, the IP

16   address.  We've got to figure out if that IP address is in fact

17   a CAS -- a participating CAS ISP subscriber.

18          The other is, have we found an infringing file?  And

19   there's a process by which steps 2 and 3 are joined to

20   determine that, ah, that piece that I just found not only is a

21   piece of the file that was advertised in the torrent, it's a

22   real piece, the verification checked, but also it's a piece of

23   an actual work.

24          So putting steps 2 and 3 together allows the software

25   to make that inference and generate the -- you know, decide

2237

1   that it's time to generate a notice.

2   Q.   By the way, were you able to examine the software that

3   implemented that step?

4   A.   No.   That step I never saw.   I can only deduce what must

5   have happened.   I was able to see the source code for steps

6   three and step four.   I was able to identify those parts of the

7   software.

8            And it was really puzzling actually, because the two

9   databases that were used in these two steps appeared to be

10  completely different.   Okay.

11           Now, I also was not provided with the schemas for

12  these databases --

13           MR. ZEBRAK:   Objection, Your Honor.

14           THE COURT:   Sustained.   Sustained.

15           THE WITNESS:   Okay.   Sorry.   I'm sorry, academics

16  like to ramble.   I apologize.

17           MR. ZEBRAK:   I move to strike.

18           THE COURT:   Ask another question.

19           MR. BRODY:   Yes, sir.

20  BY MR. BRODY:  (Continuing)

21  Q.   What happens in this step?

22  A.   Can you clarify which step you're talking about?

23  Q.   Step four.

24  A.   I -- oh, I think I described that in maybe too much

25  detail.   But to abbreviate that, if the software is able -- or

2238

1    if the -- I should say if the process is able to make that

2    deduction, there is a separate piece of software that generates

3    the notice and sends it to the ISP.

4    Q.   Okay.  Did you prepare some slides that contrast the

5    implementation of MarkMonitor's system for CAS, for the

6    Copyright Alert System, with the implementation for Cox?

7    A.   Sorry.  Can you repeat that question?

8    Q.   Sure.  Did you prepare some slides that show how this

9    was -- this process was implemented for Cox?

10   A.   Yes, I did.

11   Q.   Okay.

12   A.   Yes.

13   Q.   How did the first two steps of the Cox system compare to

14   the CAS system?

15   A.   Those were substantially the same.

16   Q.   Okay.  In the third step, what happened?  How did that

17   differ?

18   A.   This was a hugely significant difference.  The software,

19   in this case, did not download any content from the subscriber

20   and --

21   Q.   And what are you trying to indicate by that little box

22   with the question mark on it?

23   A.   Right.  So recall that there were two things we looked at

24   in that evidence file.  Right.  There was downloaded and

25   verified.  Okay.  So verification, as we talked about, is

N. Feamster - Direct

2239

1    critical.  Right.  But if you don't download, you can't verify.

2    There's nothing to verify.

3             So the fact that the software failed to download

4    anything means that it can't verify anything.  It actually has

5    no idea what the peer is actually -- what it actually has.

6    Q.    Okay.  Did you prepare a slide that summarized the

7    evidence you saw with respect to whether or not the Cox

8    implementation performed the download that the CAS

9    implementation utilized?

10   A.    I did.

11   Q.    Okay.

12   A.    That was in the evidence packages that we've been talking

13   about.

14   Q.    What does this slide show?

15   A.    Right.  So as part of -- as part of my analysis, I

16   reviewed the evidence packages that were prepared by

17   MarkMonitor and given to me, totaling more than 175,000

18   evidence packages.  So we looked at an example of one of those

19   earlier.

20             And then, basically, I looked at a number of things

21   in those evidence packages, including the content info file

22   that we just looked at in all of them.  There's an indication

23   there of what was downloaded and what was verified.

24             Okay.  So that -- those files indicated that for all

25   but 143 of them, MarkMonitor software, in this case, did not

N. Feamster - Direct

2240

1    perform a download.  So, essentially, almost no downloads were

2    performed as a -- as part of producing this evidence.

3    Q.   Did you also examine the software to confirm your analysis

4    of the evidence packages?

5    A.   I sure did.  I'd be happy to talk about that.

6    Q.   Did your review of the software -- was it consistent with

7    what you saw in the evidence packages?

8    A.   That's an interesting question.  So the software, of

9    course -- there's software and then how it's configured.

10   Right.  Okay.  So I saw some interesting things in the

11   software.  Okay.

12        Among them were some variables, including variables

13   that would basically control whether or not the software would

14   perform a download.  And if it performed the download, was

15   there a threshold of how much the -- you know, the software --

16   the agent was to download.

17        So in examining the source code, I couldn't tell

18   precisely how those variables were set, and no information was

19   provided to me regarding the configuration of the software.

20        MR. ZEBRAK:  Objection, Your Honor.  May we have a

21   sidebar on this?

22        THE COURT:  Approach the bench.

23        NOTE:  A sidebar discussion is had between the Court

24   and counsel out of the hearing of the jury as follows:

25   AT SIDEBAR

N. Feamster - Direct

2241

1        THE COURT:  Okay.

2        MR. ZEBRAK:  Your Honor, and I suspect this will be

3   an issue with these other experts as well, they want to have

4   their experts bring in non-raised discovery disputes and

5   essentially claim that they were unable to do their review.

6        And Your Honor already told counsel not to bring in

7   discovery disputes.  It's not even a discovery dispute.  It's a

8   nonraised discovery dispute.  And I suspect this is the first

9   of several.  He has already done this now several times.

10        MR. BRODY:  I'll move to strike the answer.

11        MR. ZEBRAK:  Right.

12        MR. BRODY:  I wasn't expecting that response.  I just

13   wanted him to say that he looked at the software, if it had the

14   capability of doing the downloads or not, and that the evidence

15   packages --

16        THE COURT:  Did he -- did you get that software that

17   he looked at and --

18        MR. BRODY:  Yeah, yeah, yeah.  For this software, I

19   thought he actually had the software.  He did not have the

20   portions that he referred to.

21        THE COURT:  Right.  Okay.  All right.  Let's strike

22   the last answer.  And ask -- and we're not going to get into

23   this discovery disputes about what you got or what you didn't

24   get.  We're going to live with what we got in the testimony

25   here.

N. Feamster - Direct

2242

1          MR. BRODY:  Yes, sir.

2          THE COURT:  All right.  Thank you.

3          NOTE:  The sidebar discussion is concluded; whereupon

the case continues before the jury as follows:

4

5   BEFORE THE JURY

6          MR. BRODY:  Your Honor, I move to strike the last

7   response.

8          THE COURT:  All right.  That's granted.

9   BY MR. BRODY: (Continuing)

10  Q.   Dr. Feamster, I just want to focus very narrowly on

11  whether your review of the software for the step three process

12  was consistent with what you saw in the evidence packages?

13  A.   Yes, it was.

14  Q.   And did you reach a conclusion about whether or not the

15  Cox implementation of MarkMonitor's system differed from the

16  CAS implementation with respect to step three?

17  A.   My conclusion was that it was possible to configure the

18  software to behave in different ways with respect to

19  downloading, and that the configuration for Cox -- for the Cox

20  manner was different.  It did not perform the downloads.

21  Q.   Okay.  Thank you very much.

22          Did you -- have you prepared a slide that summarizes

23  your view about the importance of downloading and verifying a

24  piece of the file from the peer computer, the subscriber's

25  computer?

N. Feamster - Direct

2243

1    A.    I have.

2    Q.    What is your view on that subject?

3    A.    My opinion is that downloading and verifying at least a

4    piece of the file is an essential piece of the BitTorrent

5    protocol.  It's also an essential piece of MarkMonitor's

6    Copyright Alert System method for detecting infringement.

7    Q.    And did you prepare a slide that illustrates why that's

8    the case?

9    A.    Yes.

10   Q.    What does the slide illustrate?

11   A.    So we've talked about this in some detail earlier, so I'll

12   just recap a bit.

13            But just to restate what I had said before, there are

14   significant reasons to be concerned about whether a peer

15   actually has a copy of the file that it claims to have.  There

16   are a number of reasons why it might not.  File corruption is

17   one.  Peers lying about pieces that they may or may not have is

18   another.  And as I said before, is quite likely that that could

19   happen.

20   Q.    How likely is the -- is the corruption issue -- how likely

21   is the corruption issue?

22   A.    That is much less likely.  Okay.  I would say maybe --

23   this is, at most, 1 percent.  It's probably even less than

24   that.  There are mechanisms in place to correct for those types

25   of errors as well.  So --

2244

1    Q.   So do you -- okay.  Thank you.  Which do you think is the

2    more important problem?

3    A.   The lying peers aspect is far more likely, is far more

4    important.  In this particular matter, it's more prevalent.

5    And there has been a lot of research on that.

6    Q.   Okay.  The -- did that -- this analysis --

7            THE COURT:  I'm going to strike the -- his second

8    part of his answer about any --

9            MR. BRODY:  About the research?

10           THE COURT:  Yeah.

11           MR. BRODY:  Yes, sir.

12           THE COURT:  Listen to the question and answer the

13   question, please.

14           THE WITNESS:  I'm sorry.

15   BY MR. BRODY: (Continuing)

16   Q.   The -- did you prepare a slide that summarizes your --

17   well, I'm going to skip past this slide.

18           Did you prepare a slide -- just save a few minutes --

19   that summarizes your opinion about the reliability of the

20   MarkMonitor system as implemented for Cox?

21   A.   Yes, I did.

22   Q.   And is this the slide?

23   A.   That's it.

24   Q.   What is your conclusion?

25   A.   If the MarkMonitor software did not perform a download, if

N. Feamster - Direct

2245

1    it didn't download at least a piece of the file from that peer,

2    there is no basis for the software to conclude that that file

3    is what the peer says it is.

4    Q.   Well, the jury heard some testimony about the ability to

5    use a SHA-1 hash to perform a verification.  Have you prepared

6    a slide that addresses that issue?

7    A.   Yeah, let's talk about that next.

8    Q.   What does this slide show?

9    A.   Okay.  What I'm going to do is summarize a little bit

10   here.  So -- and refer to some of my earlier testimony.  Okay.

11        So, a SHA-1 hash -- you can think about a hash value

12   as basically just a compact representation, or basically a name

13   or a label for a bigger file.  Okay.  It's -- if those two

14   things correspond, the SHA-1 hash is a based on a computation

15   of what's in the file.

16        But in the absence of that computation, a SHA-1 hash

17   is just a string of bits.  And if I know what that value is,

18   right, if I'm interested in saying, I've got Bill Wither, "Lean

19   on Me," and I know the corresponding hash for that, then I

20   could just say, I've got Bill Withers, "Lean on Me," here's the

21   SHA-1 hash, and it's up to you to check it.  Okay.

22        You could perform that computation and say, ah, it

23   doesn't match, right, it's something else.  But if you don't

24   perform that computation, it doesn't mean much.

25   Q.   Okay.  And did MarkMonitor perform that computation for

N. Feamster - Direct

2246

1    Cox?

2    A.    Not for Cox.

3    Q.    Let's talk about step four.

4    A.    Can I clarify my -- no, please go ahead, I'm sorry.

5    Q.    Trust me, you'll get plenty of questions related to

6    verification.

7    A.    Thank you.

8    Q.    So let's talk about step four.  What -- what happens in

9    step four of the Cox -- or really either of the systems?

10   A.    Right.  So we talked about this already, so I'll just

11   briefly recap.  Right.

12          So the process -- at some point the process is

13   reaching a conclusion that some machine on the Internet, some

14   peer has an infringing file in whole or in part, and that it's

15   sitting on an IP address that is part of the Cox network.

16   Okay.

17          If it reaches that conclusion, then the e-mail notice

18   is sent.  And a notice is sent to the ISP, to Cox in this case.

19   Q.    Okay.  And have you prepared a slide illustrating how

20   that -- what happens in that process for a business subscriber

21   to Cox?

22   A.    Sure, yeah.  Let's talk about that.

23   Q.    What does this slide show?

24   A.    Okay.  So on the Internet there is -- there are devices,

25   hosts, machines, homes, et cetera, connected to the network.

2247

1    And in its simplest form, you know, any connected device has an

2    IP addresses and -- let me back up.

3           What -- the goal, right, is ultimately to match the

4    IP address to a subscriber, an individual, somebody who is

5    basically doing the infringement.  However, there is technology

6    in the Internet, there's something called network address

7    translation, or NAT, right, that allows a single IP address to

8    basically, you know, act as the connection point for many, many

9    other individuals and devices.

10          So actually most home networks even operate like

11   this, but more importantly, you know, a business might be

12   behind a NAT.

13   Q.   Okay.  And when a notice is directed to an IP address that

14   is a NAT, where does the notice go?  What's illustrated on this

15   slide about where the NAT goes?

16   A.   On this slide, what we're looking at here is basically a

17   school or some kind of organization, but the organization

18   basically is buying Internet service from Cox.  That

19   organization may have many, you know, many connected end

20   points.  And the notice is basically going to some, presumably

21   some e-mail address that's associated with that organization.

22   Q.   And have you prepared a variation on this slide that

23   illustrates what information that notice gives you about the

24   individuals who are actually doing, supposedly doing the

25   infringing?

N. Feamster - Direct

2248

1    A.    Sure.

2    Q.    What does the notice show?

3    A.    Right.  So that, that individual IP address says nothing

4    about, you know, who behind that NAT actually is engaging in

5    that behavior.

6    Q.    Okay.  Have you prepared a slide that summarizes your

7    concerns about the way the MarkMonitor system was implemented

8    for Cox?

9    A.    Yes.

10   Q.    What does this slide show?

11   A.    So to summarize, and to contrast with the -- with what

12   MarkMonitor did for CAS, the first two steps were substantially

13   the same.  The problems come in the subsequent steps.  And in

14   particular, the failure to verify that a Cox subscriber was

15   actually sharing a piece of an infringing work, in particular

16   the failure to download content, which is a prerequisite for

17   doing that verification, is a critical missing link in this

18   process.

19   Q.    And finally, did you prepare a slide that states your

20   conclusion about the MarkMonitor system as implemented for Cox?

21   A.    Yes, I did.  Based on what I just summarized, it's my

22   opinion there's no reliable evidence that Cox subscribers were

23   sharing copies of the plaintiffs' works.

24         MR. BRODY:  I tender the witness, Your Honor.

25         THE COURT:  All right, thank you.

N. Feamster - Cross

2249

1          All right, cross-examination?

2          MR. ZEBRAK:  Yes, Your Honor, thank you.

3     CROSS-EXAMINATION

BY MR. ZEBRAK:

4

5     Q.   Good afternoon, Dr. Feamster.

6     A.   Good to see you again.

7     Q.   Likewise.  Do you remember I took your deposition in this

8     matter, right?

9     A.   I do.

10    Q.   And do you recall you took an oath to tell the truth at

11    that deposition?

12    A.   I do.

13    Q.   And you're similarly under oath here today, right, sir?

14    A.   Yes, I am.

15    Q.   Sir, do you agree that there's a risk that if I walk

16    outside this courtroom today, I might get hit by lightening?

17    A.   Absolutely.

18    Q.   That's not very likely, is it?

19    A.   Not likely.

20    Q.   You talked a lot in your testimony about what could

21    happen, didn't you?

22    A.   I sure did.

23    Q.   But you didn't really talk much about probabilities, did

24    you?

25    A.   No, I did not.

2250

1   Q.   Okay.  Well, I would like to start from there, and we'll

2   explore the difference.

3   A.   Sure.

4            MR. BRODY:  Your Honor, may I approach?

5            THE COURT:  Yes, sir.

6            NOTE:  A sidebar discussion is had between the Court

7   and counsel out of the hearing of the jury as follows:

8   AT SIDEBAR

9            MR. BRODY:  So here's my concern.  If he's going to

10  ask this witness, do you know what the probabilities are, he

11  knows what the probabilities are, and he's going to answer

12  those questions.

13           So if you want me to --

14           THE COURT:  He already said highly likely about one.

15  I'm not sure what --

16           MR. BRODY:  But there's, there's research out there

17  that gives numbers that quantifies this.  He has looked at that

18  research.

19           I just -- if Mr. Zebrak asks that question, then he's

20  going to get a truthful answer.  I just want to be clear about

21  that, unless you want me to tell the witness that he cannot

22  respond that way.  In which case I have an objection.

23           THE COURT:  Well, the way to avoid going outside of

24  his report in a deposition is to ask the question, is there

25  anything in your report or previous testimony that identified

2251

1  any probability statistics.  If you ask it that way, I think

2  he's got to answer it that way.

3          MR. BRODY:  That's fair enough.

4          MR. ZEBRAK:  Yes, Your Honor.

5          MR. BRODY:  I just want to be clear if he's going to

6  ask the question, he's going to answer it.

7          THE COURT:  Right.  And I appreciate you coming

8  forward and asking -- how much do you have on

9  cross-examination?

10         MR. ZEBRAK:  Oh, quite a bit, but I would like to do

11  a little bit right now before we break, if that's okay, Your

12  Honor.

13         THE COURT:  Yeah, that's fine.  This jury is going

14  home for the weekend, they're going to want to know what's

15  going on next week.

16         Do you have a prediction on how much time it will

17  take for you to put your case on?

18         MR. ELKIN:  We'll be finished by Tuesday.

19         THE COURT:  I'm sorry?

20         MR. ELKIN:  We'll be finished by Tuesday.

21         THE COURT:  Okay.  And you've got -- end of the day,

22  middle day, or hard to --

23         MR. ELKIN:  I don't know how much they're going to

24  do.  I was thinking before we started with Feamster, I was

25  hoping to get it done by Tuesday morning, give them a chance

N. Feamster - Cross

2252

1   for rebuttal.  But I think it may drag on through Tuesday.

2            So I'm not confident, if they have a rebuttal case,

3   that we'll be done.  But my goal was to be done by early to

4   mid-afternoon Tuesday.  But Tuesday in any event.

5            THE COURT:  Okay.  Then I'll tell them we're hoping

6   to get to the case to them on Wednesday to begin their

7   deliberations.  And I think that will be enough so we won't

8   have any problems.  I think I mentioned Wednesday when we

9   started the jury selection.

10           All right, so let's tighten it up over the weekend,

11  you've got all that time to narrow and focus.

12           MR. ZEBRAK:  I will.

13           THE COURT:  All right, thank you all.

14           MR. ZEBRAK:  We'll be ready to go.  Thank you, Your

15  Honor.

16           NOTE:  The sidebar discussion is concluded; whereupon

17  the case continues before the jury as follows:

18  BEFORE THE JURY

19           THE COURT:  All right, please proceed.

20           MR. ZEBRAK:  Thank you, Your Honor.

21  BY MR. ZEBRAK: (Continuing)

22  Q.   And, Dr. Feamster, for today when I ask you a yes or no

23  question, I would appreciate you either answering yes or no.

24  Or if you can't do so, please tell me that and I'll try and ask

25  a different question.

2253

1    A.    I'll do my best.

2    Q.    Okay.  So right before counsel's objection or request for

3    a sidebar I had asked you about the difference between the

4    theoretical risk of something versus the likelihood it might

5    actually happen.  Do you recall that?

6    A.    I remember that.

7    Q.    Okay.  So in your 200 or so hours working on this case,

8    yes or no, sir, am I correct, you did not find a single

9    instance of an inaccurate MarkMonitor notice to Cox, correct?

10   A.    No, I did not.

11   Q.    Thank you.  So, Dr. Feamster, after obtaining your

12   degrees, you've been a professor since then; is that correct?

13   A.    That's correct.

14   Q.    And am I correct that -- you said this is your first time

15   actually being admitted to testify in court as an expert,

16   right?

17   A.    That's correct.

18   Q.    And you, am I correct, sir, view the idea of being an

19   expert as a learning experience or a growth opportunity,

20   correct?

21   A.    That's correct.

22   Q.    You view it as a chance to look under the hood of a

23   working -- strike that.

24         You view your work as an expert as an opportunity to

25   get to look under the hood of a working system in the real

N. Feamster - Cross

2254

1    world; is that correct?

2    A.    Absolutely.

3    Q.    And during your direct testimony, Dr. Feamster, I believe

4    you said that you've been retained as a testifying expert for

5    Cox, correct?

6    A.    That's right, yes.

7    Q.    So I don't believe you mentioned your role as a consultant

8    capacity for Cox in this matter, did you?

9    A.    I have also been retained in that capacity.

10   Q.    Let's talk a little bit about that.

11   A.    Sure.

12   Q.    So in your role as a consultant to Cox -- or, actually

13   excuse me, was it Cox or Cox's counsel that retained you in

14   this matter?

15   A.    I was retained by Cox's counsel.

16   Q.    Okay.  So in your role as a consultant, let's explore that

17   for moment.

18   A.    Sure.

19   Q.    Your role there is to assist Cox's counsel in preparing

20   its case, am I correct?

21   A.    Yes.

22   Q.    Help it with its litigation strategies and questioning of

23   witnesses, correct?

24   A.    My role -- I am sorry, I can't answer that with a direct

25   yes or no.

2255

1  Q.   Let me move on and I'll ask you a question you can answer.

2  A.   Sure.

3  Q.   You have helped counsel with their outlines for

4  depositions, right?

5  A.   I have helped with parts of outlines, yes.

6  Q.   Okay.  And you've sat around a room with counsel talking

7  about trial strategy, right?  It's a yes or no.

8  A.   For my testimony, yes.

9  Q.   Well, speaking of that, how long have you prepared for

10  your testimony today?

11  A.   Depends on how you define "prepare."  But let's call it --

12  I'm not sure I can answer that precisely because I don't know

13  quite what you mean by "prepare."

14  Q.   Well, let's start with ballpark.  How many days have you

15  spent meeting with counsel to prepare your testimony?

16  A.   Two.  I've been here since Tuesday, and I was here last

17  week as well for a bit.

18  Q.   You've never worked in a professional capacity as an

19  expert, or otherwise, for any music industry company, have you?

20  A.   No, I haven't.

21  Q.   You've worked quite a bit for ISPs, correct?

22  A.   I sure have.

23  Q.   By the way, did you receive training on how to present to

24  a jury?

25  A.   No, I did not.

N. Feamster - Cross

2256

1   Q.    No?  Did you receive a script for your testimony today?

2   A.    No, I did not.

3   Q.    Questions or answers?

4         MR. BRODY:  Your Honor --

5   A.    No, I did not.

6         MR. BRODY:  Some of this is inappropriate.

7         THE COURT:  Yeah, sustained.  Let's move along.

8         MR. ZEBRAK:  Okay.

9   BY MR. ZEBRAK: (Continuing)

10  Q.   So you said that you have done quite a bit of work for

11  ISPs, but not any music industry company, correct?

12  A.   That is correct.

13  Q.   Done work for AT&T?

14  A.   Not only for them, I also worked for them as a research

15  intern, yes.

16  Q.   Okay.  And am I correct, sir, you've also done work for

17  Comcast?

18  A.   Yes, I have.

19  Q.   Okay.  And you've also done work for Charter, right?

20  A.   Yes, I have.

21  Q.   And in fact, you've served as an expert witness for

22  Charter, though you weren't admitted to testify in court in

23  that matter, correct?

24  A.   That's right.

25  Q.   Okay.  Now, in that matter, do you recall what that matter

2257

1    involved?

2    A.   I sure do.

3    Q.   Yeah.  Charter was accused of misrepresenting to consumers

4    the speed it was selling its Internet service at, right?

5    A.   That's correct.

6    Q.   And you were serving as an expert on Charter's behalf,

7    correct?

8            MR. BRODY:  Objection.

9    A.   Yes, I was.

10           THE COURT:  All right.  Approach the bench.

11           NOTE:  A sidebar discussion is had between the Court

12   and counsel out of the hearing of the jury as follows:

13   AT SIDEBAR

14           THE COURT:  Where are you going here?  We're not

15   going to explore whether, you know, some judge decided he

16   wasn't --

17           MR. ZEBRAK:  No, sir.

18           THE COURT:  All right.  Where are you going?

19           MR. ZEBRAK:  I just want to explore the nature of

20   what he did in that case, much along the lines that they've

21   done with our experts about their prior engagements.  And it

22   won't be very long, just a few questions.

23           MR. BRODY:  He thinks that Charter was a bad apple in

24   this case, and he wants the jury to think that Dr. Feamster was

25   complicit in that, and that's just inappropriate.

N. Feamster - Cross

2258

1              MR. ZEBRAK:  They've -- Your Honor, they've squarely

2     tried to interject lots of issues and tried to taint record

3     companies.  And I'm just asking about his prior engagement.  I

4     don't think it's anything different than what they've done

5     throughout the case.

6              MR. BRODY:  He's established that he worked for

7     Charter.

8              THE COURT:  Yeah, your objection is sustained.  Let's

9     move on.

10             MR. ZEBRAK:  Okay.  Thank you, Your Honor.

11             NOTE:  The sidebar discussion is concluded; whereupon

12     the case continues before the jury as follows:

13    BEFORE THE JURY

14             THE COURT:  All right.  Please, go ahead.

15             MR. ZEBRAK:  Thank you, Your Honor.  Very well.

16    BY MR. ZEBRAK: (Continuing)

17    Q.   Dr. Feamster, you're aware, are you not, that there are

18    four peer-to-peer protocols at issue in this case?

19    A.   I am aware of that.

20    Q.   BitTorrent is one?

21    A.   Yes.

22    Q.   Ares is another, the third is Gnutella, and the fourth is

23    eDonkey; am I correct?

24    A.   Yes.

25    Q.   And you feel you're qualified to testify with respect to

N. Feamster - Cross

2259

1   each of those protocols?

2   A.   I can't answer that as -- in terms of a yes or no

3   question.

4   Q.   Well, you understand, sir, that notices to Cox involving

5   Cox's customers who are being reported for infringement,

6   reported them for infringement across those four networks,

7   right?

8   A.   I understand that.

9   Q.   And you're here today contending that there's -- you're

10  taking issue with the reliability of the infringement evidence,

11  correct?

12  A.   Yes.

13  Q.   So my question to you is very straightforward.  Do you

14  feel that you are competent to testify about each of the four

15  protocols that are at issue in this case?

16          MR. BRODY:  Objection.

17  A.   I can't answer that question.  It depends on what you ask

18  about those protocols.

19  Q.   Do you know how those protocols, the other three relate to

20  BitTorrent?

21  A.   I know how they work.

22  Q.   Well, at the time of your analysis, sir, in this case, did

23  you have any understanding of whether Ares and Gnutella operate

24  in a substantially similar way as BitTorrent?

25          It's a yes or no question, sir.

2260

1    A.   Can you clarify what time you're referring to?  When I

2    performed my analysis?

3    Q.   At the time you performed your analysis -- well, first of

4    all, you performed your analysis ahead of the deposition I took

5    of you in this matter, correct?

6    A.   That is correct.

7    Q.   Okay.  And do you recall me asking you the same question

8    I'm asking you now at your deposition, about whether Ares and

9    Gnutella operate substantially the same way as BitTorrent?

10   A.   I do remember that.

11   Q.   And do you recall what you said?

12   A.   If you could refresh my memory, that would help.

13   Q.   Well, let's play it.  It's page 178 and it -- well,

14   actually, you refused to answer my question at that time.  Do

15   you recall that?

16          You said you hadn't done an analysis of those two

17   networks for purposes of your expert report; do you recall

18   that?

19   A.   I do remember that -- I remember saying that I was asked

20   by counsel to focus on BitTorrent, which is what I did.  And

21   so, when you asked me about Ares and Gnutella, I said I hadn't

22   studied those as carefully.  Yes, I do remember that.

23   Q.   Right.  I think you said:  I didn't review either of those

24   for -- in preparation for my report, and so I'm not going to

25   comment on that today.

1          Does that sound like something you said?

2   A.   Absolutely.

3   Q.   Okay.  But you're here today contending that MarkMonitor

4   has no reliable evidence of infringement, correct?

5   A.   That's what I said.

6   Q.   And it's your view that they don't have any evidence of

7   infringement or just what you deem reliable, which one, sir?

8   A.   I'm not sure I understand the distinction.

9   Q.   Well, first of all, is your definition of "reliable" the

10  lightening that might strike me when I walk out of here today,

11  or is it something other than that?  Let's start there.

12  A.   Lightening striking has no bearing on reliability.  Those

13  two concepts are not even relatable.

14  Q.   For you, is reliability certainty?  It's a yes or no

15  question, sir.

16  A.   No, it is not.

17  Q.   Well, let's explore a few other things.

18          So we've already established that at the time you did

19  your analysis, you hadn't reviewed how Ares and Gnutella

20  compared to BitTorrent, we've established that.  Let's --

21  correct, sir?

22  A.   Yeah, I agree.

23  Q.   Okay.  And I also asked you -- well, strike that.

24          At the time you did your analysis in this matter --

25  A.   Yeah.

N. Feamster - Cross

2262

1    Q.   -- am I correct, you didn't know whether content files are

2    broken into pieces on the Gnutella protocol like they are on

3    the BitTorrent protocol, correct?

4    A.   As I mentioned, I didn't review Gnutella in preparation

5    for my testimony that day.

6    Q.   Right.  So in preparation for your -- so for your analysis

7    in this case, in effect, you didn't review three of the four

8    protocols; is that fair to say?  You didn't have an

9    understanding as to how those worked?

10   A.   That is not correct.  You asked me two different questions

11   there.  So if you could split them up, that would be great.

12   Q.   Sure.  Well, at the time of your deposition, I asked you a

13   very basic question about whether on the Gnutella protocol

14   files are broken into pieces and then reassembled like on

15   BitTorrent.

16        Do you recall that?

17   A.   I do vaguely remember that, yes.  Yeah.

18   Q.   Well, would you like me to read you your answer?  You're

19   not disputing that you --

20   A.   Oh, I definitely remember we had this discussion.  And I

21   also remember telling you that in fact I had not refreshed my

22   memory on how those other three protocols worked.  Yeah, I --

23   Q.   Isn't that kind of just a very basic question about the

24   Gnutella protocol, sir, about whether files are distributed in

25   a unitary whole versus broken into pieces?

N. Feamster - Cross

2263

1    A.   Well, there are a lot of different peer-to-peer protocols.

2    These are just four.  Okay.  So there's actually many, many

3    peer-to-peer protocols.  And the difference -- you know, every

4    one of these has differences.

5         And so, you know, it's -- I don't know, it's been

6    about, you know, several years since we -- you know, we've been

7    looking at these.

8         And so, of course, I would need to refresh my memory.

9    And if I hadn't been asked to do so, then I wasn't prepared to

10   comment at that point with certainty.

11   Q.   Well, so did you only do what counsel asked you to do in

12   this matter?  I mean, you said you weren't asked -- you weren't

13   asked to look at the other three protocols, right?  It's a yes

14   or no question.

15   A.   Yes, I was asked to focus on BitTorrent, yes.

16   Q.   All right.  But I mean, you take your expert work

17   seriously, right?

18   A.   Absolutely.

19   Q.   Right.  You signed a report attesting to your opinion

20   about the infringement evidence in this case, didn't you?

21   A.   Can you ask that again?  I --

22   Q.   You signed an expert report in this matter, right?

23   A.   I sure did.

24   Q.   And I took your deposition to ask you questions so I could

25   understand your opinions in this matter, right?

2264

1    A.   Yes.

2    Q.   And -- well, first of all, your expert report in this

3    matter doesn't talk about lying bitfields, does it?

4    A.   What the -- it does not mention those -- that phrase.

5    Q.   Okay.  Let me move on.

6         So you looked into BitTorrent, but not the other

7    three protocols, because counsel asked you to look into

8    BitTorrent; is that correct?

9         THE COURT:  I think we've heard that enough times.

10   Let's move along.

11        MR. ZEBRAK:  Thank you, Your Honor.

12        THE WITNESS:  Actually, can I answer it?

13        THE COURT:  No.

14        THE WITNESS:  Okay.

15   BY MR. ZEBRAK: (Continuing)

16   Q.   And am I also correct that at the time you did your

17   analysis in this case, you were unaware of whether files are

18   broken into pieces on the Ares protocol like on BitTorrent,

19   correct?

20        MR. BRODY:  Your Honor, can we move ahead?

21        THE COURT:  I'm sorry?

22        MR. BRODY:  Objection, asked and answered.

23        THE COURT:  All right.  He's indicated he didn't look

24   at anything but BitTorrent.  So let's not go through each one

25   when he's already testified.

N. Feamster - Cross

2265

1          MR. ZEBRAK:  Sure.  Yes, Your Honor.

2          THE COURT:  Thank you.

3   BY MR. ZEBRAK: (Continuing)

4   Q.   Dr. Feamster, on peer-to-peer networks, downloaders don't

5   pay for the music that they're downloading, right?

6   A.   That's a complicated question.  I think if you could be

7   more specific, I can --

8   Q.   Sure.  Let me ask the question a little more precisely.

9          When a peer downloads content from another peer on a

10  peer-to-peer network, they're not paying money to the peer that

11  distributed the file to them, correct?

12  A.   That depends upon who is distributing the file and the

13  manner in which they're distributing the file.  There are cases

14  when a peer does pay.

15  Q.   Okay.  Let's start with BitTorrent, sir.  That's the one

16  peer-to-peer protocol you analyzed for your work in this case,

17  correct?

18  A.   Yes.

19  Q.   On the BitTorrent protocol, let's say a Cox subscriber has

20  a file and I want it.

21  A.   Yes.

22  Q.   Right.  And I ask that Cox subscriber to distribute the

23  file to me.  I'm not paying money to that Cox subscriber that

24  distributes it to me, am I?

25  A.   If we're talking about one Cox subscriber to another,

N. Feamster - Cross

2266

1    generally, no.  No money is changing hands there.

2    Q.   Let's say I'm on Comcast and I ask a Cox subscriber for

3    the file -- peers are -- I'm not paying that Cox subscriber for

4    it, am I?

5    A.   Generally speaking, no.

6    Q.   Okay.  Do you recall me asking you at your deposition

7    whether peers pay other peers for the files?  And you said you

8    didn't know the answer to that, was that correct?

9    A.   I don't recall.  I'll take you at your word.

10        Actually, I can't imagine that I wouldn't know the

11   answer to that.  So I -- I don't remember saying that.  But it

12   might be the question was unclear.

13   Q.   Page 92 of your deposition, line 11.

14   A.   Okay.

15   Q.   In your knowledge of peer-to-peer --

16        MR. BRODY:  Hold on a second.

17        THE COURT:  I'm sorry, we --

18   A.   I need to find it.  Thanks.

19        THE COURT:  Yeah, let's give him an opportunity.

20   What page and what line, please.

21        MR. ZEBRAK:  I thought I was just going to impeach

22   him with it, Your Honor.

23        THE COURT:  He said he doesn't remember.  So try and

24   refresh his recollection.

25        MR. ZEBRAK:  That's fine.  We can move on.

N. Feamster - Cross

2267

1    BY MR. ZEBRAK: (Continuing)

2    Q.   Let's look at page 92, beginning on line 11.

3    A.   Right.  I see that.

4    Q.   Does that refresh your recollection about the question I

5    asked and the answer you gave?

6    A.   Yes.  And the ambiguity in the question you asked and the

7    lack of the technical nature was exactly the same as the one

8    you just asked me.

9    Q.   Well, let's -- let's move on.

10           So, Dr. Feamster, you're aware, sir, are you not,

11   that peer-to-peer systems are overwhelmingly used for copyright

12   infringement; is that correct?

13   A.   I'm having a problem with the use of the word

14   "overwhelmingly."  So I can't answer that question as you

15   framed it.

16   Q.   Do you have an understanding about whether the high

17   majority of the use that occurs on peer-to-peer networks is for

18   purposes of copyright infringement?

19   A.   Again, high majority I'm not sure.  But, you know, I

20   don't -- I agree with you that copyright infringement takes

21   place on peer-to-peer networks, absolutely agree with you.

22   Q.   So -- but you just don't have an understanding one way or

23   another about any percentage of how often it occurs; is that

24   correct?

25   A.   As far as prevalence, that's actually quite difficult

N. Feamster - Cross

2268

1  to -- to put a precise number.  And I would be happy to tell

2  you why it's tough to put a precise number on that if you want

3  more detail.

4  Q.   You've never tried to calculate the degree to which

5  copyright infringement occurs on peer-to-peer networks,

6  correct?  You yourself?

7  A.   I have not done so.  It's quite difficult to do so.

8  Q.   When did you first become familiar with what a

9  peer-to-peer network is?

10  A.   Actually, I was a grad student around the time that they

11  were being invented.

12  Q.   Have you used one -- oh, I'm sorry.  Were you finished?

13  A.   I wanted to clarify because I think I know where you're

14  headed with this, and it sort of depends upon what you mean by

15  peer-to-peer network.  But let me stick with my answer and then

16  we can -- we can expand on that.

17  Q.   You've used Napster -- the Napster peer-to-peer network

18  for your personal use, correct?

19  A.   I have used it.

20  Q.   And you used it to get music, correct?

21  A.   As I recall, yes.

22  Q.   And you used it to get music without paying for it,

23  correct?

24  A.   That is true.

25  Q.   Could have gone into a Tower Records or some other record

N. Feamster - Cross

2269

1    store to get the music, but instead you went to a peer-to-peer

2    network to download it for free, correct?

3    A.    Generally I went to Tower Records actually.  But in this

4    particular case, I was kind of curious how Napster worked

5    because as a computer scientist, you know, everyone was talking

6    about it, and I wanted to see what this thing was all about.

7    So, yeah, I downloaded a file with Napster.  That was 1999, I

8    think.

9    Q.    So you did it for research purposes?

10   A.    Not for research.  I -- at that point I was an

11   undergraduate, but I was curious.  So like any curious person,

12   I wanted to learn what the hype was all about, how this thing

13   worked.

14   Q.    And how many times did you go to Napster to get music for

15   free rather than buying it in a store?

16   A.    Once.

17   Q.    You're sure, only once?

18   A.    I remember the instance.  I can even tell you where I was.

19   Couldn't give you the exact date.  But, yeah, I do remember.

20   Q.    And besides using peer-to-peer for your own personal use,

21   you've also done a little bit of research on peer-to-peer; is

22   that correct?

23   A.    That's a very good characterization, yes.

24   Q.    And that research you did was back in 2007, correct?

25   A.    That sounds right.

N. Feamster - Cross

2270

1    Q.    And could you tell the jury, please, the year that

2    BitTorrent was invented.

3    A.    Oh, invented?  It was probably around 2000, 2001,

4    somewhere in there.

5    Q.    So about six years into BitTorrent's existence you did a

6    little bit of research on BitTorrent, right?

7    A.    That's right.

8    Q.    And do you have an understanding of when the infringement

9    notices from plaintiffs went to Cox in this case?

10   A.    That was, if I remember correctly, the 2013 time frame,

11   somewhere in there.

12   Q.    So about six or seven years past the instance in which you

13   did a little bit of research on peer-to-peer, right?

14   A.    That's right.

15   Q.    So basically BitTorrent doubled in age since the time you

16   did your research on BitTorrent, correct?

17   A.    If we're talking about that particular paper that was

18   published in 2007, yeah, that's right, it occurred about right

19   in the middle of that time.

20   Q.    And by the way, you say that paper.  You've only punished

21   one paper focusing on file sharing, correct?

22   A.    I would have to go back and look at my CV.  I've got a

23   pretty long list of publications.  And if you want to talk

24   about BitTorrent, then you're absolutely right.

25              If we're talking about content distribution, I got a

2271

1    long list of publications that I can read off to you if you

2    want to go through my CV on content distribution.

3    Q.   Well, I don't want to belabor the point by talking about

4    content distribution.

5    A.   Okay.

6    Q.   I'm interested in filing sharing.  Do you understand, sir,

7    that this network is about file sharing -- this case is about

8    file sharing networks, right?

9    A.   Content distribution is a way to share files.

10   Q.   Okay.  Well, let's -- could I have the binders, please?

11            THE COURT:  How much more do you have, Mr. Zabek?

12            MR. ZEBRAK:  Well, I won't finish today, but I could

13   go for another ten, 15 minutes if that's okay with Your Honor.

14            THE COURT:  Is that good?  Okay, let's go for another

15   ten or 15 minutes.  Thank you.

16            MR. ZEBRAK:  Just give me the hook when it's time.

17            THE COURT:  All right.

18            MR. ZEBRAK:  Thank you, Your Honor.

19            So here's one for the witness.  Here's one for

20   counsel.

21            THE WITNESS:  Thank you.

22   BY MR. ZEBRAK: (Continuing)

23   Q.   Dr. Feamster, if you could please turn to tab 6, and let

24   me know when you're there.

25   A.   Okay, I'm there.

N. Feamster - Cross

2272

1  Q.    And do you recognize the document that's behind tab 6?

2  A.    I do.

3  Q.    And what is it?

4  A.    This is a paper that I published.  It's the paper that

5  you've been referring to, yes.

6  Q.    So this is -- this is the paper on file sharing you wrote

7  in 2007, right?

8  A.    This is the paper that specifically talks about issues in

9  BitTorrent where there might be a BitTorrent swarm where an

10 entire copy of the file does not exist in the swarm.

11 Q.    Okay.  And, Dr. Feamster, am I correct, this is the only

12 time in your professional career that you've done testing on

13 BitTorrent; is that correct?

14 A.    I would have to check.

15 Q.    Well, I'm not asking you to check.  I'm asking you right

16 now, sir, whether this is the only instance in which you've

17 done any testing on BitTorrent?

18 A.    I don't recall another instance.

19 Q.    Now, you did this research and wrote this paper because

20 you saw a problem with respect to how BitTorrent was

21 functioning, correct?

22 A.    That's right.

23 Q.    Right.  The idea is in your view BitTorrent was working

24 really well for popular content, but not so much for content

25 that might be a little less popular that maybe as many peers

N. Feamster - Cross

2273

1    didn't have; is that correct?

2    A.    That's a generalization to say that it was working really

3    well, because there were other problems that I've talked about.

4    But there was a particular problem for which it -- which it

5    wasn't working well.  And you've characterized that particular

6    problem well.  The problem was with unpopular files, yes.

7    Q.    So sometimes a peer in a swarm couldn't get everything

8    they wanted, and you were trying -- and you were doing some

9    research and writing on that issue, correct?

10   A.    That is correct.

11           MR. ZEBRAK:  Okay.  Your Honor, I would like to move

12   this into evidence.  It's DX 162.

13           THE COURT:  Any objection?

14           MR. BRODY:  No objection.

15           THE COURT:  It's received.

16           MR. ZEBRAK:  Mr. Duval, if you could publish that,

17   please.

18   BY MR. ZEBRAK: (Continuing)

19   Q.    So -- and the problem you saw was that -- you were trying

20   to improve BitTorrent with this idea, right?

21   A.    I was trying to solve a particular problem and --

22   Q.    Right.  Have BitTorrent work even better for those people

23   that wanted to locate and download content, right?

24   A.    Yes.

25   Q.    Right.  Okay.

N. Feamster - Cross

2274

1          And if you could, please, pull up right under

2    Introduction, that first paragraph.

3          And, Dr. Feamster, if you could look at that first

4    paragraph.  Would you -- so here it says in the second -- or in

5    the first sentence:  Estimates place its contribution to all

6    Internet traffic at 35 percent.

7          Could you explain to the jury what that means.

8    A.   Right.  So at the time that this was written, that was

9    2007, as you pointed out, what that basically refers to is

10   that -- there's a lot of traffic going across the Internet, Web

11   traffic, e-mail, these days a lot of video streaming.

12          And at the time this was written, BitTorrent traffic

13   was 35 percent of all traffic on the Internet by some estimates

14   by reference 1.  And there we're doing a percentage by volume.

15   Right.  So if we're counting bytes flying across the Internet,

16   it's 35 percent.

17   Q.   And a little bit further in that paragraph you say:

18   BitTorrent works well for popular content.

19          Do you see that, sir?

20   A.   I see that.

21   Q.   And by popular content, are you referring to popular music

22   and movies and the things that people are interested in

23   downloading from BitTorrent?

24   A.   Not necessarily.

25   Q.   What were you referring to when you saw popular content?

N. Feamster - Cross

2275

1    A.   Content is a general term.  We heard in the last

2    testimony, for example, that BitTorrent could be used to

3    distribute a variety of files.  Some of those include, for

4    example, ISOs for Linux, which turns out to be really popular,

5    popular thing that people want.  We just heard about that.

6    Q.   Right.  And regardless of the exact percentage at which

7    peer-to-peer activity is infringing, you've already agreed that

8    a very significant portion of it involves infringement, yes or

9    no, sir?

10            MR. BRODY:  Object to the question.

11   A.   You keep putting adjectives in front --

12            THE COURT:  Stop --

13   A.   -- of that make it really tough for me to give you a yes

14   or no answer.

15            THE COURT:  Stop.  Hold on.

16            THE WITNESS:  Oh, I'm sorry.

17            THE COURT:  There's an objection.

18            THE WITNESS:  Yes.

19            THE COURT:  So when you hear an objection, hold.

20            THE WITNESS:  I'm sorry.

21            THE COURT:  You misstated his prior testimony.  So

22   it's -- objection sustained.

23            MR. ZEBRAK:  Well, let me move on.

24   BY MR. ZEBRAK: (Continuing)

25   Q.   Dr. Feamster, what do you think is more popular on

2276

1    BitTorrent, a Lady Gaga song or some Linux software?

2    A.   I'm personally more interested in Linux software.

3    Q.   And your idea here was, you came up with a concept to

4    solve this problem where some people who wanted to download

5    something couldn't find it, right?  That's what we're talking

6    about in this article?

7    A.   What we're talking about is a particular problem

8    where what -- that happens in BitTorrent where a particular

9    peer has a complete portion of the file, and then it's got the

10   entire portion of the file and it has no incentive to basically

11   share that with other people once it has the complete file.

12   And so, it leaves the network.

13   Q.   Right.  And you --

14   A.   Right.  That's the problem we're talking about.

15   Q.   I apologize.  I thought you had finished.

16   A.   I'm sorry.

17   Q.   Excuse me.  And you went about proposing how to solve this

18   problem by coming up with a concept to pay peers to actually

19   store content so that it could be available kind of across

20   swarms; is that correct?

21   A.   That's right.

22   Q.   Right.  And money that they could cash in and put in their

23   pocket for storing content, right?

24   A.   I don't know if we talked about currency.  Actually, this

25   was -- I believe it could be currency.  But actually the

N. Feamster - Cross

2277

1    concept here is a generic form of credits.

2    Q.    And you wanted a very strong degree of secrecy and

3    anonymity to what those peers were doing, right?

4    A.    It's been awhile since I've read this article, but if you

5    want to point me to something, I can comment on it.

6    Q.    All right.  Why don't you look on page 5, you --

7    specifically section 4.4 on the left side.

8    A.    Yes, I see that.

9    Q.    Does that refresh your recollection about what you were

10   proposing here?

11   A.    If I can read it, that would be great.

12         I see that.

13   Q.    And you were proposing that the peers have what you call

14   plausible deniability, am I correct, sir?

15         If you could highlight that.

16   A.    I don't see that -- oh, I see that, yes.

17   Q.    Do you understand what the term "plausible deniability"

18   means within the context of what you're proposing here?

19   A.    Absolutely.

20   Q.    And that -- the idea is you didn't want peers to be able

21   to indicate where they got the content from, right?  To know

22   that information, am I correct?

23   A.    I believe, if I'm remembering correctly, that the

24   deniability relates to -- we don't want the peer to know

25   exactly what it's storing if it's coming from some -- if it's

2278

1    doing this on behalf of the swarm.

2    Q.   So, Dr. Feamster, if this was lawful activity, is there

3    any reason why a peer would need plausible deniability to know

4    what they're hosting and where it came from?

5    A.   Oh, yeah, absolutely.

6    Q.   It's not because if it turned out to be infringing

7    content, you didn't want that peer to be in a position to know

8    where it came from, was it?

9    A.   Absolutely not.  This is all about privacy.  And as we

10   know, that's very important.

11   Q.   Privacy?  What about where content came from that your

12   hosting implicates a privacy right?

13   A.   What this is -- what this is about is essentially what you

14   have is a shared storage mechanism.  Okay.  And this shared

15   storage mechanism, the peers and the swarm are basically

16   cooperating to make sure that even if somebody leaves the

17   swarm, that that swarm still contains a complete copy of that

18   file.  Okay.

19          So do I need to know where that original piece came

20   from?  If my goal is just to preserve a copy of the file in the

21   swarm, there's no reason for anyone who's contributing in that

22   fashion to have that information.

23          And this is something that typically systems

24   engineers care a lot about, is preserving the privacy of the

25   users who are participating in a system.

N. Feamster - Cross

2279

1    Q.    And it wasn't just where the files came from, you didn't

2    even want these peers that paid for this activity to even know

3    what they were hosting, right?

4    A.    In the case of maintaining these particular pieces, no.

5    Q.    And BitTorrent has -- you have an understanding of how

6    BitTorrent exists in the time period in which the notices went

7    to Cox; am I correct?

8    A.    I believe so, yeah.

9    Q.    And in -- at the state in time in which BitTorrent

10   existed, records aren't kept of what one peer distributes to

11   another peer, are they?

12   A.    I can't answer that question in a yes or no.

13   Q.    Am I correct?

14   A.    You phrased it as a passive voice, so I didn't know who's

15   keeping the records.

16   Q.    Well --

17   A.    Yeah.

18   Q.    Dr. Feamster, am I correct that there's no place to go to

19   get logs of the overall activity of what's happening on a

20   BitTorrent network?

21   A.    The tracker has some information about that in some cases,

22   although there has been some developments in BitTorrent that

23   make that harder to do.  So I would generally agree with your

24   statement.

25   Q.    Developments like encryption, that sort of stuff?

N. Feamster - Cross

2280

1    A.    No.  I mean like distributed trackers.

2    Q.    Okay.

3    A.    Encryption would, of course, help as well though.

4    Q.    Right.  But you agree that other than one peer's

5    interaction with another peer, that there's no place to go to

6    get records of what peers are distributing to each other on

7    your -- on a peer-to-peer protocol, correct?

8    A.    You just asked that.  So let me see if I can give you the

9    same answer.  The tracker maintains some information about

10   that, but not all, generally speaking.

11   Q.    Well, let me ask you this question.

12   A.    Yes.

13   Q.    If I see a Cox user distributing the file of a really

14   popular, let's say a Lady Gaga song, for example --

15   A.    Okay.

16   Q.    Right.  And I want to get records of all the different

17   times that that Cox subscriber has distributed to other people.

18   There's nowhere I can go to get those records, right?

19   A.    That would be extremely difficult, I agree.

20            MR. ZEBRAK:  So, Your Honor, we're at good breaking

21   point if it makes sense.

22            THE COURT:  Okay.  Thank you.

23            All right.  So you've got a long weekend, and I hope

24   that you enjoy it.  I hope you don't do any research or

25   investigation or talk to anybody about the case.

N. Feamster - Cross

2281

```
 1              I know you're interested in an update on where we

 2     are, and I think we'll -- you know, we're hopeful that we'll

 3     have closing arguments to you on Wednesday, and you'll begin

 4     your deliberations on Wednesday.  Okay?  That's the best I can

 5     do.

 6              And, you know, there's -- obviously it's an important

 7     case, and I think the lawyers have worked hard to try and get

 8     the evidence to you and in the form that's appropriate.  And so

 9     I know this has been a lot of time, but I think that we'll be

10     able to get the case to you and for your deliberations on

11     Wednesday at some stage during the day.

12              All right.  So I hope you enjoy the weekend, and

13     we'll see you Monday at 9:00.  Does that work?

14              Okay.  Thank you all.  You're excused.

15              NOTE:  At this point the jury leaves the courtroom;

16     whereupon the case continues as follows:

17     JURY OUT

18              THE COURT:  All right.  Mr. Feamster, you're in the

19     middle of your testimony.  You are not -- you may speak with

20     your counsel about your testimony, not to be advised to change

21     any testimony.  But if you have questions, certainly counsel is

22     available to you.

23              We'll see you at 9 o'clock on Monday morning.  All

24     right?

25              THE WITNESS:  Yes.  See you then.
```

2282

1           THE COURT:  Does that work?  Okay.  All right.

2   You're excused.  Thank you, sir.

3           THE WITNESS:  Thank you much.

4           NOTE:  The witness stood down.

5           THE COURT:  All right.  So we're going to have a jury

6   instruction conference.  We'll take a short recess.  Whoever is

7   responsible for filing an amended Cox revised proposed jury

8   instructions today, after I had gone through the other ones at

9   least five times, will be drawn and quartered on the courtyard

10  steps.

11          So give me a few minutes to look at these and we'll

12  come back.  Let's take ten minutes, okay?

13          MR. BRODY:  Yes, Your Honor.

14          THE CLERK:  Judge --

15          THE COURT:  Somebody wants to read in the exhibits

16  from the videos?

17          MS. LEIDEN:  Yes, Your Honor.

18          THE COURT:  Please, go ahead and do that.

19          MS. LEIDEN:  For -- from the testimony of

20  Mr. Cadenhead, it was DX 72, DX 73 and DX 74A, which is pages

21  or slides 8 through 12 of original DX 74, and PX 286.

22          THE COURT:  Is that it?  Okay.  All right.

23          MS. GOLINVEAUX:  Your Honor, may I raise one other

24  issue briefly?

25          THE COURT:  Yes.

2283

1           MS. GOLINVEAUX:  We had the issue of Mr. Jarchow, the

2    ICOMS administrator and the Cox billing reports.

3           THE COURT:  Right.

4           MS. GOLINVEAUX:  We sent over a proposed custodial

5    affidavit to opposing counsel yesterday in an attempt to

6    resolve the issue, and it addresses both the business record

7    foundation for the Cox Business names from ICOMS, and also the

8    issue that opposing counsel had identified that they were

9    concerned that there may be additional data in the ICOMS

10   database that identified whether the customers used the service

11   for public WiFi.  And he confirms that it does not.

12          We've asked opposing counsel whether it resolves it.

13   They say they're still considering it.  But since we're not in

14   court tomorrow, we'll be in a position where we have to fly him

15   over the weekend to testify if we don't get it resolved.

16          So I just wanted to raise it now.

17          THE COURT:  Okay.  So you're going to work on it

18   tomorrow and try and get it resolved?

19          MR. OPPENHEIM:  Yes, Your Honor.

20          THE COURT:  Yeah.  And the same kind of advice, don't

21   bring somebody who has got a declaration that says I don't have

22   any idea how to answer the questions you want me to answer

23   because that -- you know, that's unnecessary.  Okay?

24          MR. OPPENHEIM:  Understood, Your Honor.

25          THE COURT:  All right.  All right, we're going to

2284

1    take ten minutes.  We're in recess.

2              NOTE:  At this point a recess is taken; at the

3    conclusion of which the case continues in the absence of the

4    jury as follows:

5    JURY OUT

6              THE COURT:  All right.  I would like to use -- to

7    begin with, to work off of plaintiffs' jury instructions, which

8    is -- I normally do.

9              And I would assume that there's no objection to the

10   O'Malley federal practice instructions that both parties have

11   cited to with modest changes to fit the names of the parties in

12   this case.

13             Am I correct about that, Mr. Elkin?

14             MR. ELKIN:  Your Honor, that's correct.  And I want

15   to accept the blame for the late-minute filing.  There was --

16   the night shift was busy last night, and we identified six

17   instructions that were inconsistent with what our current

18   thoughts were, or the Judge -- or you -- the Court had already

19   issued rulings, or thinks were out of the case.

20             So we just wanted to clean it up.  But I apologize.

21             THE COURT:  No, and I -- that was tongue in cheek.

22   There hasn't been a case, especially a complex civil case,

23   where I haven't gotten the instructions, the final instructions

24   at the last minute.  And I was just giving you a hard time.

25             MR. ELKIN:  Okay.

2285

```
 1                    THE COURT:  So, thank you, though.

 2              So are there any of the general O'Malley instructions

 3    that you -- either party wants to discuss?

 4                    MR. OPPENHEIM:  I don't know through which

 5    instruction Your Honor is referring.  The first --

 6                    THE COURT:  Well, go all the way through up to really

 7    -- the only one in controversy is failure to call available

 8    witnesses.  Are you still seeking that?  That's number 20 on

 9    your list.

10                    MR. OPPENHEIM:  I had one suggestion on number 17, if

11    we want to take them sequentially.

12                    THE COURT:  Sure.

13                    MR. OPPENHEIM:  Your Honor, I apologize.  I think in

14    number 17, it's the only party that's introduced in

15    interrogatory responses are plaintiffs.

16                    THE COURT:  Yeah.

17                    MR. OPPENHEIM:  So we should maybe just fix that so

18    instead of saying each party, it just says:  Plaintiffs have.

19                    THE COURT:  I don't know whether you intend to

20    introduce any interrogatory answers or other discovery.

21                    MR. ELKIN:  It does relate to an issue that we want

22    to get to at some point concerning the copyright registrations.

23    Our position is -- we're still -- when we get to the damages

24    issue, there's still a Section 504(c)(1) issue.

25                    And we have to sort through whether there are answers
```

2286

1   to interrogatories -- I think it's answers to interrogatories

2   and not admissions in the deposition testimony.  But we still

3   have to sort that out.

4          THE COURT:  Okay.  So No. 17 we'll put a hold on.

5   But I understand your proposed modification.

6          MR. OPPENHEIM:  And then, Your Honor, I would --

7          THE COURT:  19 is -- let's go back to 18, testimony

8   and documents by lawyers.

9          MR. OPPENHEIM:  So, Your Honor, I'm not -- with

10  respect to 18, I guess it probably makes sense to put a pin in

11  that until we deal with the DMCA safe harbor instruction where

12  I think we may have some discussion.  And then -- if it's all

13  right with Your Honor.

14         THE COURT:  Yeah, that's fine, let's go to 19, which

15  is your DMCA, which goes -- which works off of my BMG

16  instruction.  And it essentially is the preliminary instruction

17  that I gave, with the addition of the 507(j), I think,

18  instruction.

19         MR. OPPENHEIM:  So, Your Honor, in light of how the

20  case has come in in terms of evidence, there are really I think

21  two issues that are raised in terms of how we discussed the

22  DMCA.  The first is that the jury has seen provisions of the

23  DMCA in certain documents, and heard testimony about it.

24         And I believe that the preliminary instruction that

25  was given was appropriate at the time, but now in light of

2287

1    those documents and the testimony, providing some clarity to

2    the jury so they're not confused as to the difference between

3    your instruction and what's in those documents would be useful.

4            And so, we have a proposal we can hand up on that,

5    Your Honor, just trying to very much track the law a little

6    bit.

7            The second issue I think that's raised is --

8            THE COURT:  So you have revised instructions?

9            MR. OPPENHEIM:  We also worked the late shift, but

10   thought we would not submit it beforehand because we've been

11   working on it, Your Honor.  Apologies.  I can hand it up if you

12   would like, Your Honor.

13           THE COURT:  Yeah, I need to see and read and touch

14   those things.

15           MR. OPPENHEIM:  The second issue that we think is

16   raised by the DMCA is really a more fundamental one.

17           Cox has gotten up and argued very clearly and

18   solicited testimony from witnesses basically saying that an ISP

19   should not be held liable for the infringing acts of its

20   subscribers.

21           And that argument does not speak to any of the

22   elements of the law.  It is, essentially, a request for jury

23   nullification.

24           And so, we think that the jury should be instructed

25   that in light of that argument, that they should follow your

2288

1    instructions on the law of contributory and vicarious liability

2    so that they're not requested to nullify.

3              The DMCA -- and the law on this could not be more

4    clear.  And we can cite many cases that speak to this -- was a

5    balancing act that Congress put forward to avoid an ISP

6    claiming that they shouldn't be held liable for the infringing

7    acts of their subscribers.  It was meant to balance the rights

8    of copyright owners with the needs of an ISP.

9              And for the ISP to still make that argument, without

10   the jury being informed about the details of the DMCA, the

11   balance, and the fact that they at this point should only apply

12   the elements of contributory and vicarious liability, I think

13   would put the jury in a position of not understanding how does

14   that request, that argument about an ISP not being held liable,

15   how does it fit within the contours of this case.

16             THE COURT:  Okay.

17             MR. ELKIN:  We'll look at the instruction, but let me

18   say the following, if I could.

19             THE COURT:  Yeah.

20             MR. ELKIN:  We think the instruction that you gave --

21   Your Honor gave at the beginning of the case is the correct

22   one.  And we most vehemently object to the -- any insinuation

23   that somehow the reverse is true.  And that if we don't -- if

24   Cox doesn't qualify for the DMCA, it has -- it has essentially

25   no defense with respect to contributory or vicarious liability.

2289

1          The section 512(l) of the DMCA could not be any more

2     clear.  Even if Cox otherwise would have potentially committed

3     direct or indirect copyright infringement, the fact that we

4     completely -- even if we assert it in this case and lost, it

5     has no bearing at all on what the instructions are for the

6     secondary liability claims are and the defenses that we have.

7          Counsel can argue whatever he's going to argue with

8     regard to whatever Your Honor instructs the jury on, but I

9     think if you take a look at that statute, and you look at the

10    Fourth Circuit case in CoStar versus Loopnet, it's very clear

11    that failure to be able to claim safe harbor doesn't prevent

12    you from putting on defenses with respect to secondary liable.

13         And in fact, the -- Your Honor's instruction is very

14    clear, the opening instruction, I think the Court told the jury

15    that we don't have a safe harbor defense here.

16         He's free to argue whatever he wants to argue, but to

17    now sort of change the rules of the game because e-mails came

18    into the case -- it's not a big surprise that e-mails came in

19    referencing DMCA.  We knew that was going to happen.  It

20    happened in BMG.  It's always going to happen with these

21    confined facts.  And I think Your Honor dealt with balancing

22    the competing interests by giving that opening instruction.

23         THE COURT:  Well, you know, the e-mails were

24    addressed pretrial.  I made a ruling on those.  I found that

25    they were relevant.  And so, we did know that they were going

2290

1    to come in, which is part and parcel of why I gave the

2    preliminary instruction, and also the statutory consideration

3    that indicates that it's -- that defendant still has the right

4    to defend the action under the DMCA.

5            When I looked at the other issue where you -- after

6    your -- I guess after your opening statement when I learned

7    really for the first time what your theory of the case was,

8    then, you know, I modified a ruling on admissibility of the

9    termination numbers.

10           And also, we were looking at -- I was looking at

11   statutory damages.  I'm looking at, you know, the willfulness

12   issue, which is, I think, a very significant issue in this

13   case.  And I think it bears on what Cox did and why they did

14   it, and whether it was willful, their conduct, or not.

15           You know, I think it's -- your defense is relevant at

16   least for that purpose.  And that's why I gave the preliminary

17   instructions and have followed up with the various rulings I've

18   given.

19           We're going to talk about statutory damages, but

20   that -- I looked at those as being companion issues.  And I

21   don't know whether you want to comment on that or not.

22           MR. ELKIN:  Sure.  I think with regard to -- so

23   statutory damages, I have several issues, and not necessarily

24   in any particular order.  I guess the one that for us is the

25   most important in many respects because it deals with the scope

2291

 1    of potential exposure here is the shear number of works that

 2    the jury gets to decide.  If they find Cox liable, they can tag

 3    a statutory damages award on.

 4            And I know that Your Honor did not decide the issue,

 5    the Section 504(c)(1) issue, on summary judgment, but now we

 6    have a situation where clearly there are sound recordings that

 7    were published as albums.  We have corresponding music

 8    compositions with sound recordings.

 9            Assuming that Your Honor is going to -- if Your Honor

10    doesn't agree with our arguments, then it's really no issue.

11    But to the extent that Your Honor is inclined to consider that

12    issue, I -- the way I -- my experience in the past, not to say

13    that it matters to the Court, is that a lot of that can be

14    dealt with on a Rule 50 motion because it's going to be very

15    difficult and complex for a jury to follow all of that with the

16    evidence and looking at the certificates of registration.

17            But to the extent that that's not going to happen and

18    that goes to the jury, then being able to parse that -- they

19    did not have -- plaintiffs did not have in their jury

20    instructions, as I'm sure Your Honor observed, those issues.

21    And so, I definitely want to sort of take that issue up.

22            The other factors related to damages are, you know,

23    what the jury can consider on statutory damages, of course, and

24    the issue of willfulness and -- innocent infringement,

25    obviously, is out of the case, so we don't have to worry about

2292

1    that.

2            And, you know, as far as willfulness, we made the

3    argument that Your Honor declined in BMG, and we appealed it

4    and lost that at the Fourth Circuit.  I have to reserve on it.

5    I know what the decision here is, but if this case were to go

6    up to en banc or beyond that, I have to reserve on that.

7            THE COURT:  Sure.

8            MR. ELKIN:  So I'm not going to sit here and -- I'm

9    going to stand here and argue that, but I have to do that.

10           THE COURT:  Okay.

11           MR. ELKIN:  But with regard to the, you know,

12   statutory damages, I do think that the issues that we have

13   are -- I'm sure Your Honor is not going to be surprised to hear

14   this, you know, Cox's profits and size, we heard a lot of that

15   testimony the last couple of days, and also this notion that

16   they have in their proposed instruction about punishing, I find

17   that -- you know, that's also an issue.

18           I just want to make sure I'm sort of done.

19           THE COURT:  Yeah, I mean, we'll revisit these later

20   instructions, so I'll ask you --

21           MR. ELKIN:  Is that helpful?  Is that what you wanted

22   to hear?

23           THE COURT:  Yeah.  Thank you.  Let me hear from --

24           MR. OPPENHEIM:  Unless the Court wants otherwise, I'm

25   going to limit my comment to just this safe harbor issue for

2293

1    the moment.

2                THE COURT:  Sure.

3                MR. OPPENHEIM:  Not for a moment are we suggesting

4    that Cox can't make an argument that because it's an ISP, that

5    in terms of culpability, the jury can consider that, or

6    consider it in the context of willfulness or consider it in the

7    context of damages.

8                But the idea that they can argue that because they're

9    an ISP, they should never be held liable for the infringement

10   of their subscribers, doesn't go to any of the elements.

11               We're not suggesting they can't make the argument or

12   the argument should be disregarded --

13               THE COURT:  I didn't hear that they should never be

14   held liable.  And if you did, I think it was Zebrak, you know,

15   whispering in your ear.

16               MR. ZEBRAK:  Well deserved, Your Honor, thank you.

17               MR. OPPENHEIM:  I believe that the testimony of

18   Mr. Carothers was squarely to that point.  And we can cite it

19   to the Court later if you would like, Your Honor.

20               THE COURT:  I was thinking of the opening statement.

21   But -- okay.

22               MR. OPPENHEIM:  So what we tried to do in that last

23   paragraph that we proposed here is not -- we're not trying to

24   reach, Your Honor.  All we're saying is that to the extent that

25   you're considering that argument, you must follow the

2294

1   instructions on the law of contributory and vicarious

2   liability.  If you want to add in and, you know, statutory

3   damages, fine.

4          But the idea being that they need to look at that

5   argument within the context of the legal framework that you've

6   given.  That's all we're suggesting, Your Honor.  We think it's

7   an appropriate instruction to avoid nullification given the

8   evidence that's been suggested.

9          THE COURT:  Okay.  All right, we'll take it

10  understand consideration.  And, obviously, we've got another

11  two days of testimony, and it may change things.  So you be

12  mindful of that.  And if you keep looking at it and think

13  instructions -- I hope to get you my proposed instructions

14  probably sometime on Monday.  Tomorrow is a mess.  But I would

15  hope that sometime on Monday we'll be able to get you proposed

16  instructions.

17         And to the extent you haven't had the opportunity to

18  object or -- I'll give you an opportunity to do that before we

19  charge the jury.

20         How about failure to call available witnesses?

21         MR. OPPENHEIM:  Your Honor, in light of the testimony

22  by Mr. Zabek, and I believe Mr. Sikes, I believe it's

23  appropriate.  They testified, Mr. Zabek -- I remember his

24  testimony very clearly.  He said that he was willing to come,

25  he had an obligation under the agreement.  And yet they didn't

1    call him.

2              So we would --

3              THE COURT:  Okay.  I'm not going to give 20.  Your

4    exception is noted.  They're outside the jurisdiction of the

5    Court.  They're, you know, bound by employment agreements to

6    cooperate, but I don't read it as broadly.  And they were --

7    their testimony was fully explored.  And I don't think that

8    there was any prejudice to plaintiffs that they were taken by

9    deposition.

10             Exhibits will go back.

11             22 is the instruction on the definition of

12   "copyright."  Is that -- is plaintiff still proposing the same

13   instruction, or do you have a revision on that one?

14             MR. OPPENHEIM:  We're still good with that one, Your

15   Honor.

16             THE COURT:  Okay.  Then, Mr. Elkin, there's a

17   slight -- you've narrowed it just down to the set that you

18   think -- a couple that are most relevant to this case.

19             MR. ELKIN:  Your Honor, I think some of this --

20   depending upon how we come out with regard to the -- some of

21   the other issues -- I'm not fussed about this.  Really, it's

22   going to boil down to the extent to which -- what the jury is

23   going to consider in terms of the number of works.

24             But that's the only caveat that I had.  But I have no

25   problem with this particular language.

2296

1          THE COURT:  Okay.  So --

2          MR. ELKIN:  Oh, I'm sorry.  Mr. Eaton reminded me

3   that I misread the number because we have different numbering.

4   You were asking about the definition of "copyright."  My

5   apologies to the Court.  That's fine.

6          THE COURT:  Okay.  So why don't we bounce -- go

7   beyond the number of works, and go to direct infringement,

8   which is 25 by -- plaintiffs' 25.

9          MR. OPPENHEIM:  So, Your Honor, we would offer one --

10  we're working on a revision in light of the testimony that's

11  just come in.

12         One minor modification to this, which is very

13  consistent with the law here, that says that the distribution

14  and reproduction -- apparently I have language.  I didn't

15  realize this.  I apologize.

16         THE COURT:  If you find that they uploaded or

17  downloaded copyrighted works without authorization?

18         MR. OPPENHEIM:  Just to add the language "all or part

19  of plaintiffs' copyrighted work."  Because, obviously, you can

20  engage in an infringement without reproducing or distributing

21  the entirety of the work.

22         And I think, with your permission, Your Honor, I can

23  hand up that proposal.

24         THE COURT:  Yeah, certainly.

25         MR OPPENHEIM:  Which I didn't even realize we had

2297

1    until right now.  One from us as well.

2              THE COURT:  Thank you.

3              MR. ELKIN:  So, Your Honor, I guess there are two

4    issues here.  One is something I -- we did raise on our Rule 56

5    motion, this offer to upload that I know Your Honor addressed

6    in the BMG summary judgment motion.

7              THE COURT:  Yeah.

8              MR. ELKIN:  So we clearly are looking to have that

9    addressed in this instruction.  The concern I have with "a part

10   of," it's -- I think it's a slippery slope.  We know, as a

11   matter of copyright jurisprudence, if it's de minimis, there's

12   no liability.

13             I'm not quibbling with regard to the fact that you

14   need to have the entirety, but I think that it's a little

15   fuzzy, and I do worry about that.

16             MR. OPPENHEIM:  Mr. Elkin and I agree that,

17   obviously, a de minimis would not necessarily constitute

18   infringement.  I don't think that that's raised here, but we

19   can work on that together.

20             THE COURT:  Okay.

21             MR. OPPENHEIM:  And refine that if the Court would

22   like.

23             THE COURT:  Yeah, certainly.  If you can work

24   together on the instruction, we'll be happy to get one that's

25   agreed versus not agreed.  So we'll put a place holder on

2298

```
 1    direct infringement.
 2              Contributory, number 26.
 3              MR. ELKIN:  Well, the -- this is one of the ones
 4    where we had modified because willful blindness is now out of
 5    the case since that has been -- that knowledge has been decided
 6    on summary judgment.
 7              Again, and not to be overly academic about it, but I
 8    think that in the BMG case it was argued before Your Honor, the
 9    substantial non-infringing uses should have been proposed
10    and/or used.  That was rejected by the Fourth Circuit, as Your
11    Honor well knows.
12              To the extent that there is review beyond that,
13    assuming it were to go up, we just want to reserve on that.
14              THE COURT:  Okay.  All right.  Well, I'll look at
15    your revised Cox jury instruction 27, although it looks like
16    there haven't been too much in the way of revisions.  But I
17    think the plaintiff has laid out the contributory infringement
18    as the Fourth Circuit has instructed.  But I'll look at that a
19    little bit more.
20              Vicarious infringement.
21              MR. ELKIN:  Yes, Your Honor.  I think we have two --
22              THE COURT:  Was this modified by plaintiff at any
23    time since this was filed?  Do you have a revised --
24              MR. OPPENHEIM:  No, no, Your Honor.
25              THE COURT:  Okay, good.  Then go ahead.
```

2299

1         MR. ELKIN:  So I have two -- I guess two the issues I

2    have here, one is they are seeking to impose a direct factual

3    finding about what is the right and the ability to control

4    infringing activity.

5         I think that Your Honor hit it right in the opening

6    instruction, although I think there was a slight typo in the --

7    it said "right in the ability," but I think it should have been

8    "and," but I thought that was the right --

9         THE COURT:  Okay.

10        MR. ELKIN:  With the one caveat that I'll get to in a

11   moment.  But to the extent that Your Honor in denying Cox's

12   motion for summary judgment in BMG, denied that motion and made

13   a reference that the jury could decide that if they found that

14   Cox had the ability to suspend or terminate, that could be a

15   basis.

16        But that was a decision that the Court made as to why

17   you were denying the motion for summary judgment.  You were not

18   deciding the case in favor of BMG on that ground.  And,

19   obviously, plaintiff is entirely able to argue to the jury, I

20   suspect that they will, that that gives Cox the ability to

21   supervise, but to be able to say, this is the standard as a

22   matter of law, is a bridge too far.  And there's no precedent

23   for that, notwithstanding that was the basis upon which you

24   denied Cox's motion for summary -- affirmative summary

25   judgment.

2300

1          The only issue about which I would quibble with

2    regard to the opening instruction is the absence of the word

3    "direct financial benefit."

4          THE COURT:  Financial benefit.

5          MR. ELKIN:  There's a -- as Your Honor, I'm sure,

6    well knows, there is a Fourth Circuit case that we've cited

7    that says an obvious and direct financial benefit -- I think

8    it's the Salabes case.

9          THE COURT:  Yeah.

10         MR. ELKIN:  It's the Nelson-Salabes, S-a-l-a-b-e-s,

11   versus Morningside Development, 284 F.3d 505.  It's a Fourth

12   Circuit 2002 case where the Court held that in order to

13   establish vicarious liability, I'm going to skip the first part

14   of it:  It possessed an obvious and direct financial interest

15   in the exploited copyrighted materials.

16         I would just call that to Your Honor's attention.

17         THE COURT:  Yeah.  And plaintiffs used "direct

18   infringement" and "detriment financial interest" in their

19   instruction as well.  So I think we're there.

20         How about the -- in your instruction, you have third,

21   that Cox had the right and practical ability to supervise the

22   direct infringement.  Where does "practical" from?

23         MR. ELKIN:  So that comes from the -- it's borrowed

24   from the Ninth Circuit, Perfect 10 versus Amazon.  And the

25   courts here have, you know, and other places around the country

2301

1   have followed that language.  And I would commend that to the

2   Court's attention.

3           THE COURT:  Yeah.  It got me in a lot of trouble in

4   the BMG case following the Ninth Circuit instructions.

5           MR. OPPENHEIM:  And I'm not sure that the Ninth

6   Circuit has consistently used that language, Your Honor.  In

7   fact, I think not.

8           THE COURT:  Okay.  All right.  Well, we'll look at

9   that.  And I understand your argument.  And I -- you know,

10  I'm likely that I'll take the language out regarding this

11  specific right and ability to suspend or terminate accounts.

12  And that's argument I'll save for counsel.  And I'll modify and

13  make sure that it contains the word "direct."

14          MR. OPPENHEIM:  Maybe, Your Honor, then, we would

15  consider, in the alternative, the Grokster language from the

16  Supreme Court about right to stop or limit it.

17          THE COURT:  Right to do something about it?  Yeah,

18  right to --

19          MR. OPPENHEIM:  I'm sorry.  Maybe I was too

20  shorthanded.

21          THE COURT:  Yeah.

22          MR. OPPENHEIM:  I think that the language that

23  Grokster -- the Supreme Court used in Grokster was:  One

24  infringes vicariously by profiting from direct infringement

25  while declining to exercise a right to stop or limit it.

2302

1          Right.  So to the extent that we're going to take

2    this out, maybe that's something we should consider.  Generally

3    a good authority to look to for these things.

4          THE COURT:  It's a little safer, yeah.

5          MR. ELKIN:  Yeah, so we -- Grokster, obviously, was a

6    case that turned on inducement.  And as a -- from a

7    contributory liability point of view, clearly if we're going to

8    go to Grokster, then the substantial non-infringing use is

9    something, again, we would commend to Your Honor's attention.

10          But I think Grokster has certainly spent a -- it

11    permeates this courtroom, I'm sure.

12          THE COURT:  If you had any idea how many times that

13    counsel came up to the podium and lectured me on Grokster, I

14    mean, it was amazing, and it was a terrific case, and --

15          MR. OPPENHEIM:  Thank you.

16          THE COURT:  -- stood at a time.  Okay.  At the time

17    it was decided, it was very important.  And we've gone a little

18    bit farther down the road in the years since, which we dealt

19    with, in part, in BMG.  And we continue to go down farther down

20    the road.

21          Okay.  Let's go to -- so -- all right.  Why don't

22    we -- why don't you give me your argument on the -- how you

23    want this number of works, Mr. Elkin, to work before we get to

24    damages.

25          MR. ELKIN:  So I -- so what I would propose to do is

2303

1    to -- I think that the copyright registrations are plain, and

2    the law is plain, and Your Honor could decide it in our favor

3    or not in our favor.

4           I, frankly, would rather have it decided one way or

5    the other on Rule 50 because it's going to be very complex to

6    take the jury through it, although I'm prepared to do it with

7    the right instructions.

8           THE COURT:  How does it play into the rulings I've

9    already made?

10          MR. ELKIN:  Well, Your Honor hasn't decided -- I

11   mean, let's just take a step back.

12          The plaintiff is able to recover on as many works

13   that the jury can find Cox has either contributorily or

14   vicariously infringed.

15          THE COURT:  Right.

16          MR. ELKIN:  And so, the issue -- and, frankly, if

17   they were pursuing compensatory damages, this is really not an

18   issue, right, because they were able to pursue damages on all

19   of those works.

20          But they're electing, which is their right, to pursue

21   statutory damages.  And the first -- and section 504(c)(1) says

22   that if you -- all parts of a compilation get merged into one

23   statutory damages award.

24          And I think the language is not only clear, there has

25   been a lot of cases, and we cited them -- I think I -- we both

2304

1    argued before Your Honor at the Rule 56 motion, whether it's

2    MP3 tunes or otherwise.  And the -- and this has been, you

3    know, debated in the halls of Congress.  This is not a subject

4    that's been lightly covered.

5           And the issue here, it's -- in many respects, this

6    case is easier than the case that you had before Your Honor in

7    BMG when you're dealing with music compositions, which is far

8    more murkier.

9           Here where you have sound recordings that are

10   typically, they're published as an album or a CD, and where

11   they are embodied on a certificate of registration, the only

12   way you get the ability to put them on a registration is if, by

13   force of nature, they are a compilation.

14          So all of the -- if there are ten songs that are in a

15   registration that is identified as such -- and there really

16   can't be any genuine issue as to whether or not the

17   certificates include the songs -- there's only an

18   identification of those songs in -- you know, as part of the

19   infringing works here.

20          What we had hoped to do, you know, at the close of

21   our case is to be able to hand up a schedule and point to the

22   evidence and to, you know, make a request for Your Honor to

23   rule on that.

24          But in the absence of that, we would ask for an

25   instruction, you know, consistent with what we've proposed, and

2305

1    the same could be said with respect to the music composition.

2    You didn't have sound recordings and music compositions in <u>BMG</u>,

3    but here, you know, we can identify the music composition that

4    correlates to a sound recording.

5         And to the extent that we can do that, they don't

6    have to be on the same registration because they, wouldn't be,

7    obviously, because it's not a PA versus an SR, those would be

8    sort of the subject either as part of our Rule 50 motion or

9    part of the instruction.

10        Personally, I'd rather not spend as much time in the

11   closing argument to have to go through all that, so this is a

12   little bit of a selfish request.  But if Your Honor gives that

13   instruction and doesn't rule on the Rule 50 motion, then I

14   think I need to do that.  It's a lot of exposure for Cox, and

15   I've got to do my job.

16        THE COURT:  Yeah.  Okay.  So that's 31, 32 -- yeah,

17   31 and 32 where you deal with number of works, compilations,

18   and recordings and compositions and, again, number of works.

19   Okay.

20        MR. ELKIN:  Thank you, Your Honor.

21        THE COURT:  All right.

22        MR. OPPENHEIM:  So I think, Your Honor, with respect

23   to both the compilation issue and the composition, sound

24   recording issue, there's a pure legal argument as to why the

25   instruction shouldn't be given, which we've made to Your Honor

2306

1    before in the context of summary judgment, and we can make

2    again.

3              But at this moment, the more, I think, compelling

4    reason that these instructions shouldn't be given is that there

5    has been zero testimony elicited on any of these issues or

6    evidence presented to the jury by which they could consider

7    this.

8              So Your Honor denied the defendants' summary judgment

9    motion on this.  So the -- so it was -- it's been incumbent on

10   them to present a case factually that the jury could consider

11   this.  And they have not done that.  There have been no --

12   there has been nothing on their side on this.

13             In the meantime, the plaintiffs have presented

14   witnesses who have talked about the independent value of the

15   works.  That they are sold -- that albums and tracks are sold

16   separately and differently.  That music publishers and record

17   companies are entirely different entities that do different

18   things.  And that the values of those compositions and the use

19   of those compositions are entirely different than the value and

20   the use of the sound recordings.

21             So we've made a case that everything that we've put

22   forward in the 10,000 works is appropriately there.

23             Cox has presented no evidence in support of either of

24   these positions.  And to give the jury an instruction on this

25   as they're suggesting, in light of the fact that there's no,

2307

1    absolutely no evidence, would be inapposite and just confuse

2    the jury, I believe, Your Honor.

3          MR. ELKIN:  It may shock the Court, but I actually

4    hadn't forgotten about putting on evidence with regard to this.

5          I think, as I mentioned a few minutes ago, we have

6    requests for admissions, answers to rogs.  And if we needed to,

7    we can rely on the deposition testimony because they're

8    admissions.  But they're certificate of registrations.  So

9    plaintiff need not worry, we understand that we have the burden

10   to put in that evidence.

11         THE COURT:  Okay.

12         MR. OPPENHEIM:  I don't know what the intent is with

13   respect to depositions.  We've put representatives of the

14   companies on the stand.  They've had opportunities to examine

15   them.  They haven't asked questions --

16         THE COURT:  Well, you know -- there's more to come.

17         MR. OPPENHEIM:  There is more to come and maybe,

18   maybe the landscape changes.  But as of right now, Your

19   Honor --

20         THE COURT:  All right.  I'm on notice.  We'll deal

21   with that the beginning of next week.  And I'm happy to look at

22   it again as a matter of law, or whether I decide it needs to go

23   to the jury, we'll look at it and continue to consider it.

24         MR. OPPENHEIM:  Not that I want to burden Your Honor

25   with additional briefing, but if you would like additional

2308

1    briefing on the issue, we're happy to submit it.

2            THE COURT:  I think the summary judgment pleadings

3    were pretty complete.  So I'll go back and look at those.  If I

4    need something, I'll let you know.

5            MR. OPPENHEIM:  Okay.

6            THE COURT:  Okay.  All right.  The effect of

7    instructions as to damages I think is pretty bland, and both of

8    you put in pretty close to the same thing.

9            Damages generally.

10           So let's go to statutory damages.  Mr. Oppenheim,

11   have you revised your instruction 30?

12           MR. OPPENHEIM:  No, we have not, Your Honor.  I can

13   respond briefly to the issue that Mr. Elkin raised previously,

14   which is the factor of punishment.

15           I believe the case law on this is clear, Your Honor.

16   We're happy to submit another bench memo on it.  But that the

17   jury gets to consider the issue of punishment, especially in

18   the case where there may be a finding of willfulness.

19           And that's particularly appropriate in this case,

20   Your Honor, we believe, given the evidence that's come in.

21           THE COURT:  Well, in your sixth bullet point in your

22   instruction, you say:  Whether Cox acted willfully or

23   intentionally in contributorily or vicariously infringing.

24           Did you mean for the word "intentional" to be in, "or

25   intentionally"?

2309

1          MR. OPPENHEIM:  That's probably not well written,

2    Your Honor, and we should revise that.

3          It really is trying to get at the issue of the

4    defendants' culpability.  And I would agree the "intentionally"

5    is probably not the appropriate word there.

6          THE COURT:  Okay.  All right.

7          MR. EATON:  Geoffrey Eaton, E-a-t-o-n.

8          Good evening, Your Honor.  I haven't stood up in here

9    before.

10          THE COURT:  Welcome.

11          MR. EATON:  Thank you, sir.  It's good to finally do

12    it.

13          We have a couple of issues on this instruction.  I'll

14    deal with that.

15          But the one counsel was just speaking of first on the

16    punishment issue.  That's inflammatory language, Your Honor.

17    We haven't found any precedents that use it.  It's really only

18    relevant -- even their instruction says it's only relevant to

19    willfulness.  And they've already got willfulness in their

20    bullet list.

21          And it's also -- you know, the punitive function of

22    statutory damages is itself largely about deterrence.  And

23    they've got a separate bullet on deterrence that we don't

24    disagree with either.

25          So they're doubling dipping or possibly triple

2310

1    dipping on adding punishment on top of willfulness and

2    deterrence.

3             I haven't seen anything -- I haven't seen this used

4    anywhere.  You didn't use it in BMG.  So it strikes us as being

5    a provocative thing to put in this instruction, and we're

6    opposed to it.

7             There's a couple of others on this that we would like

8    to address.  The sort of guts of this instruction are pretty

9    similar between the two parties.  So these are just kind of

10   extraneous things at the end.  There's a couple that we --

11   there's one that we think ought to be in there that isn't in

12   theirs, and a couple that's in theirs that we think ought not

13   to be.

14            The one that's in ours that we -- that they omitted

15   is including mitigation, failure to mitigate in the bullet list

16   of considerations.

17            There was such a bullet in the BMG case, Your Honor.

18   You know, we were allowed to put on evidence of failure to

19   mitigate.  So it's in the case.  So it's appropriate to include

20   here.

21            There are a bunch of other arguments.  They just

22   filed a bench brief on failure to mitigate, so we're going to

23   talking about this at some more length, but as of -- the way

24   the case currently stands, it's clearly appropriate here.

25            With respect to their proposed instruction, there are

2311

1    a couple of other things that we -- that we would take issue

2    with.  One Mr. Elkin raised earlier, which is the question of

3    Cox's total profits.  That's another kind of unicorn that we

4    haven't seen used in model instructions or in actual

5    instructions anywhere.

6            And it's inappropriate for a whole bunch of reasons.

7    One of which, Your Honor, is if you look back at the list, the

8    shared list of bullets that both parties agree on and the ones

9    that you gave in BMG, they already take account of profits.

10   But they only take account of profits to the extend they're

11   earned because of the infringement.  That's what the

12   instruction already says.  That's relevant, everybody I think

13   agrees about that.

14           And they're trying to explode this out to get a big

15   number in there before the jury.  We think that's

16   inappropriate, Your Honor.  It's an invitation to punish Cox

17   for being a big company rather than to punish Cox for the

18   narrow band of accused infringing activity that's at issue

19   here.

20           And at a minimum, Your Honor, we're staunchly opposed

21   to including this, but if you were to include it, at a minimum

22   you would have to specify what entities you're talking about.

23   A lot of numbers have been thrown around in court, some as high

24   as 20 billion.  You would have to focus it very carefully on

25   the entities that are actually accused of infringement here.  I

2312

1    don't know what that number is.  I don't think any of those

2    numbers should get into this instruction.

3              But at minimum, you would have to be a lot more

4    specific about it than they've been here.

5              The last issue, Your Honor, and probably the hardest,

6    their instruction includes, and ours does not, a number -- a

7    couple of sentences that speak to the relationship between

8    actual damages and statutory damages.  Some of that you

9    included in your BMG.  Some of is it in some model

10   instructions.  Some don't have it.

11             We think it's inappropriate here for a couple of

12   reasons.  The -- there are authorities in this Court, in

13   copyright cases, that use a principle of proportionality in

14   dealing with the relationship between actual damages and

15   statutory damages.  There's the Dae Han Video case, which I

16   think is 1990.  I have the cites over there, I'll have to pull

17   them for you.  And the Seoul Broadcasting Systems case, which

18   is just five years ago, or four years ago, I think, where they

19   both said that statutory damages have to bear a relationship to

20   actual damages.

21             And I think Judge Brinkema even said that actual

22   damages have to serve as a floor for any statutory damages that

23   are recovered.

24             So it's very difficult to square that proportionality

25   principle with a blanket statement that they don't have to show

2313

1    any kind of harm whatsoever to get statutory damages.

2              And just to be clear, we're not arguing that the jury

3    should be instructed contrary, that they should not be

4    instructed that the plaintiffs have to show actual damages to

5    get statutory damages.  We're suggesting that telling them

6    affirmatively that information the way it's been phrased here,

7    without any evidence of any concrete, anyway, evidence of harm,

8    is an unnecessary invitation to an excessive award that betrays

9    that proportionality principle that this Court --

10             THE COURT:  So reason that I think it's in here is

11   that the testimony in the trial has been, we can't prove actual

12   damages, there's no way to do it.  And even Dr. Feamster

13   agrees, you can't locate those numbers.

14             So how does that factor into your --

15             MR. EATON:  Your Honor, I would say that I think --

16   obviously, this is -- the intersection of these two things is

17   complicated.  I think the answer to that is probably that to

18   the extent they haven't even attempted to show any actual harm,

19   then perhaps the proportionality principle would require

20   minimum statutory damages in those circumstances.

21             Otherwise, it's just free play on that issue.  And I

22   don't think that's consistent with the way that issue has been

23   handled in other cases in this court.

24             THE COURT:  Well, but the broader world outside of

25   this courthouse says, and sometimes anecdotally, but more other

2314

1    times with more specificity, that if you can't prove actual

2    damages, then you go to statutory damages, and here's the

3    options that you have.  Right?

4              MR. EATON:  True.  But those cases all also say, and

5    I think the instructions that everyone here agrees are correct

6    all say, that actual damages are relevant to the determination

7    of statutory damages.

8              So the nexus of these things is a little hard to work

9    out.  We think that the way they've phrased theirs, it's an

10   invitation to an excessive award, and we would be object to it.

11             Counsel.

12             THE COURT:  Thank you.

13             MR. OPPENHEIM:  So, Your Honor, let me -- I think

14   there were four issues there.  Let me pick up with the last one

15   first, which is the issue of the relationship between actual

16   damages and statutory damages.

17             The Supreme Court in Woolworth has been very clear

18   about this, and this still remains good law and is cited

19   throughout the country.  And the Woolworth decision says that a

20   copyright plaintiff need not show any actual harm or actual

21   damages in order to obtain statutory damages.  And that's the

22   law.  And any court that cites -- says otherwise is ignoring

23   that Woolworth decision.

24             I believe the proportionality issue that opposing

25   counsel is citing to is more in the context of a due process

2315

1    argument.

2           Now, I am not aware of the Fourth Circuit ever taking

3    up the issue of due process in a copyright statutory damages

4    case.  I am, however, aware that it's gone up both in the First

5    Circuit in the Tenenbaum case and in the Eighth Circuit in the

6    Jammie Thomas case.  And in both those instances the Court said

7    that the due process limitations of proportionality did not

8    apply to statutory damages because of Woolworth.

9           So I don't believe that that law that's been cited is

10   law with regard to copyright.  So that's --

11          THE COURT:  All right.  So narrow it down.  And now

12   deal with cases where there are -- or, you know, believe to be

13   actual damages, but the plaintiff seeks statutory damages

14   instead.  And how does it play in there?

15          MR. OPPENHEIM:  So, the law also says that a

16   copyright owner gets the right to elect statutory or actual

17   regardless of what the evidence or the circumstances may be.

18   Even if we could show actual damages, we would have the right

19   to present or to seek statutory damages.

20          Now, the defendants would have the right to say, in

21   considering what the statutory damages are, the jury should

22   consider what evidence you heard on actual damages or the harm.

23   And the jury would get to consider it, and it's a factor.

24          Now, here unfortunately, as everybody has testified,

25   there's no ability to do that.

2316

1          THE COURT:  So the plaintiffs are going to propose $1

2     a work because that's what consumers pay for iTunes.  And is

3     that evidence that you believe that -- well, I mean --

4          MR. OPPENHEIM:  I assume you mean defendants are

5     going to propose, because we're certainly not going to propose

6     that.

7          THE COURT:  No, no.  Yeah, sorry.

8          MR. ELKIN:  That would be Chris Tregillis who will

9     testify early next week.

10          THE COURT:  I'm familiar with that testimony.  And I

11     apologize.  The defendant.

12          MR. OPPENHEIM:  That's all right.  It's been a long

13     week, Your Honor.  Two weeks.

14          Look, the jury is going to consider that.  The jury

15     is going to consider that.  And we're going to argue it.  And

16     it's a factor the jury can consider.

17          But the instruction needs to be given that -- and

18     this is in other copyright cases, including the Jamie Thomas

19     case, including the Tenenbaum case, the First Circuit and

20     Eighth Circuit cases I just cited to, this was the exact

21     situation.  Those were peer-to-peer copyright infringement

22     cases where there was copyright statutory damages sought, and

23     there was no proof of what the actual harm was.

24          Now, the other side argued exactly as Mr. Elkin

25     intends to argue to the jury.  And that is, you know, a dollar,

2317

1    or 99 cents a song, or 79 cents a song, whatever he's going to

2    argue -- and he can argue that.  And in both of those cases the

3    courts observed exactly what I am suggesting to Your Honor now,

4    which is that the jury should be told that they should award

5    statutory damages whether or not there is evidence of actual

6    damages suffered by the plaintiffs.  And that the not -- the

7    statutory damage award need not be based on the actual damages.

8    Because the whole concept of statutory damages is to encompass

9    all of these other factors.

10             THE COURT:  Yeah, understood.  Okay.

11             MR. OPPENHEIM:  Okay.  So that was issue one.  I'll

12   try to move more quickly through the other three issues that

13   were hit, Your Honor.

14             Deterrence and punishment.  Those are two very, very

15   different things.  Go back to our old philosophy days from

16   college, Hobbs talked about deterrence.  Others -- you know,

17   and punishment.  They're very different things.  And the jury

18   should get to consider them differently.

19             What it takes to punish a defendant is very different

20   than what it may take to deter a defendant.  And so, courts are

21   generally instructed on both.  And we're happy to submit some

22   authority to the Court over the weekend on this issue to help

23   advise it, if the Court would like.

24             THE COURT:  Yeah, that'd be fine if you want.

25             MR. OPPENHEIM:  On the issue of --

2318

1           THE COURT:  I don't need the definitions of the

2   terms, it's what I do every Friday.

3           MR. OPPENHEIM:  Yeah, you're right, Your Honor.  I

4   apologize.

5           Cox's profits.  Look, Cox's profits go directly to

6   the issue of deterrence, go directly to the issue of

7   punishment.  And the jury has to consider what Cox's profits

8   are in the context of addressing those issues.  This is a

9   company that while the record -- and the evidence came in on

10   this.  The record companies in a ten-year period lost half

11   their market size.  This company was putting profits, over a

12   billion dollars a year, in their pocket.  And that's something

13   that the jury should get to consider in those factors.

14           On the issue of mitigation.  The bench memo we've

15   submitted, Your Honor, not only rejects the notion of a

16   mitigation instruction when it comes to statutory damages, but

17   in fact, quite to the contrary, an instruction should be given,

18   Your Honor, that mitigation -- that you cannot suggest to the

19   jury that the plaintiffs' failure to sue the direct infringers

20   should be held against them for purposes of either determining

21   liability or damages.

22           It is very clear in the case law that a copyright

23   owner does not need to sue the direct infringers in order to

24   pursue a secondary case.  Because if it were otherwise, you

25   would never have a secondary case.  It just cannot be.

2319

1          And so, the Grokster decision, which Your Honor has

2     read many times, and I hate to be that lawyer who comes up on

3     it again, it directly addressed this and said, there are

4     instances, I'm paraphrasing, right, where it's appropriate to

5     pursue secondary claims instead of the direct infringers.  And

6     this is just one of those instances.

7          So to suggest to the jury not only that they can

8     consider mitigation, but that they should consider it in the

9     context of liability and damages, is contrary to the law.

10    There is no authority to support that, Your Honor.

11              THE COURT:  Okay.

12              MR. ELKIN:  Very briefly, Your Honor.

13              THE COURT:  Yeah.

14              MR. ELKIN:  So I think Mr. Oppenheim is conflating

15    the due process argument with our constitutionality argument,

16    which we won't be able to address until after the jury returns,

17    if they do.

18          The notion with regard to loss itself is -- it's a

19    separate issue.

20          I think with regard to mitigation, I -- if I have an

21    -- I will take a look at the bench memo and we'll --

22              THE COURT:  Yeah, and we'll give you an opportunity

23    to respond if you want.

24              MR. ELKIN:  It looks like a rehash of the Rule 56

25    motion on it.  I think there is ample authority in this circuit

2320

1    with regard to mitigation.  There is no per se rule in favor of

2    or against pursuing, you know, whatever the mitigation is in

3    any particular set of circumstances.

4            So, you know, the -- you know, we each were -- the

5    summary judgment motions were argued and decided and -- but

6    this seems, to me, to be more of a motion for reargument.

7            What I would say, separate and apart from the

8    mitigation issue, and this is where I thought counsel was

9    going, is that -- and I don't think he's gone this far, at

10   least, that in any statutory damages instruction, regardless of

11   whether or not we're in a circuit, which we are, where

12   mitigation can be an affirmative defense, a jury can always

13   consider mitigation in deciding where in the continuum of

14   statutory damages an appropriate award would lie.

15           But they seem to be making an argument, and again,

16   it's just a quick glance at their brief, that somehow the

17   Petrella case in the Supreme Court, which is a laches case,

18   sort of preempts any notion of copyright liability within the

19   statutory period.  It doesn't.  There's no precedent for that.

20           THE COURT:  Okay.  All right.  Well, I'll continue to

21   look at that.  And if you feel that -- and I'll look at the --

22           MR. EATON:  Your Honor, if I may?

23           THE COURT:  -- prior pleadings.  Mr. Eaton.

24           MR. EATON:  Very briefly.  I just want to make sure I

25   make a record on this.  There's one that I neglected to

2321

1    mention.

2          Which is that their instruction includes in their

3    list of considerations, the effect that the award may have on

4    other Internet service providers in the marketplace.  That's

5    another novel construction.  That seems to me to be an

6    invitation to make Cox sort of the whipping post for the entire

7    industry.  And we object to its inclusion.

8          THE COURT:  Okay.  I didn't even notice that one.

9    Where is that?

10         MR. OPPENHEIM:  It's next to the "profits" language,

11   Your Honor, I believe, on the second page of -- if I recall

12   correctly.  So it's on page 36 of the plaintiffs', I believe.

13   And the -- so you see at the top of 36, it says:  In

14   considering what amount would have a deterrent effect -- so

15   this is with respect to deterrence -- you may consider Cox's

16   total profits and the effect --

17         THE COURT:  How many other internet service --

18         MR. OPPENHEIM:  -- the award may have on other

19   Internet service providers in the marketplace.

20         Your Honor, in light of all of the testimony that's

21   been elicited about other ISPs, we think that this is

22   appropriate.

23         THE COURT:  That's pretty broad.

24         MR. ELKIN:  One thing I neglected to mention, Your

25   Honor, but I do think Mr. Eaton mentioned it, wherever Your

2322

1    Honor goes with regard to Cox's profits, it has to -- it can't

2    be an all-enveloping $20 billion company untethered to whatever

3    entities are actually being sued here.

4              THE COURT:  Yeah, it certainly should.

5              Okay.  Willfulness.  We've got 31, number 31 for

6    plaintiffs.

7              MR. ELKIN:  So I think with regard to willfulness, I

8    tried to address it at the outset.  An argument was made in BMG

9    that the instruction should focus on the intent of the

10   secondary infringer as opposed to the primary infringer.  Your

11   Honor didn't accept that.  The Fourth Circuit agreed with you.

12   If I thought there was a way convince you, I would try.  But I

13   just want to reserve on this for the reasons I mentioned.

14             THE COURT:  Yeah.  Okay.  I appreciate that.

15             Yeah, I, as you might understand, am going to

16   closely, as closely as possible, agree with the Fourth Circuit.

17   It's a much healthier way to proceed.  I have too many cases

18   already without worrying about getting them back on a regular

19   basis.

20             All right.  Cox's burden of -- oh, no, that doesn't

21   apply.  All right.  Then what other instructions do you want to

22   talk about tonight?

23             Mr. Eaton, would you get those cites on the

24   courthouse so -- the Dae Han and Judge Brinkema's case, if

25   you'll get those for us.

2323

```
 1              MR. EATON:  I can read them in now, or do it after
 2     we're done here, Your Honor.
 3              THE COURT:  Sure, just read them.
 4              MR. EATON:  Make sure they get it.  The first is Dae
 5     Han Video Production versus Chun.  The citation is -- oh, there
 6     we go.  It's a Westlaw cite.  It's 1990 Westlaw 265976.  And
 7     the other, Seoul Broadcasting System International versus Young
 8     Min Ro, also a Westlaw citation, it's 2011 Westlaw 3207024,
 9     2011.
10              THE COURT:  Okay.  Good.  Thank you.
11              All right.  Any other instructions we want to look at
12     tonight?
13              MR. EATON:  One quickly, Your Honor.  I think this
14     may be aborted.  But on mitigation, we were -- we've submitted
15     it, I don't know if you had a chance to review the red line
16     that we put in, we submitted a new instruction on mitigation
17     because we realized, belatedly, that when we did our jury
18     instructions and our verdict form, we had competing
19     understandings of how the mitigation instruction should read.
20     So we've tried to conform it.
21              The major issue is whether or not the jury is asked
22     to calculate an amount to reduce damages by.  It appears that
23     they have just filed a brief that addresses this very issue.
24              So it seems to me, and with Mr. Elkin's permission,
25     that we should probably just reserve on this until we've had a
```

2324

1    chance to review what they've submitted.

2            THE COURT:  Okay.

3            MR. EATON:  Okay.

4            THE COURT:  That's fine.

5            MR. OPPENHEIM:  Obviously, Your Honor, we just

6    received this red line at the same time you did.

7            THE COURT:  Right.

8            MR. OPPENHEIM:  And so when we submitted our brief,

9    we had not looked at their proposal.  So we'll take a look at

10   that and see if there's anything else we need to address.

11           THE COURT:  Okay.  Then I'll look at the summary

12   judgment pleadings again as they apply to some of the

13   instructions.  And you will file a brief on mitigation in

14   response to them if you'd like to.

15           And we'll look at the other comments you've made, and

16   I think probably -- I don't know whether Monday night's too

17   early or Tuesday night, but we need to see where we're

18   evolving.

19           And you need, to the extent you can agree on one or

20   more of the instructions as you've talked, please let me know.

21   And I'll continue to compile a proposed jury instruction list.

22           And what else do we need to do before Monday morning?

23           MR. ELKIN:  Will do, Your Honor.  Thank you for that.

24           THE COURT:  Okay.

25           MR. ELKIN:  I guess the only issue that -- I don't

2325

1   know whether Your Honor at some point intends to take up the

2   proposed verdict sheet with the parties or not.

3        THE COURT:  You know, I will, but let's do that

4   Monday.  I haven't -- you know, I saw it and I looked at it,

5   and I put it aside, and I have no idea what they say right now.

6   So --

7        MR. ELKIN:  Okay.

8        THE COURT:  But I appreciate the fact that you did it

9   already.  And they both -- they weren't very -- they weren't

10  substantially different.

11       MR. ELKIN:  We can take Your Honor through it when

12  you're ready.  And some of it may be affected by your

13  consideration of the issues that we've just argued this

14  evening.

15       THE COURT:  Right.  The number of works, right.

16  Okay.  I do remember that.

17       MR. OPPENHEIM:  I was pleasantly surprised that we

18  were not further off.  And I do think that once we resolve

19  issues on mitigation and the SR/PA issue, and the compilation

20  issue, that that'll -- that should help us then be at a point

21  where we can come to resolution maybe.

22       THE COURT:  Okay.  All right.

23       All right.  Then, well, thank you.  We'll see you all

24  on Monday morning.  If you get something in mind that you think

25  needs to be filed before Monday morning, please don't hesitate.

2326

1  Nothing would make us happier than have 40 or 50 pages of

2  briefs filed on Sunday afternoon.

3       But, no, let's make sure -- the goal is to get the

4  case to the jury and for us to be inconvenienced, but not them

5  be inconvenienced.  They're doing a great job and they're

6  staying with us.  And they were relieved to hear, I think, that

7  we would have the evidence done by Wednesday.

8       And if we wind up all day Tuesday arguing about new

9  issues, that won't help.  So we're happy to work off hours to

10 make sure that we've raised every issue we need to raise, and

11 made the decisions I make hopefully correctly, and we'll go

12 from there.  Okay.

13      MR. OPPENHEIM:  Your Honor, may I ask one question

14 before --

15      THE COURT:  Yes, sir.

16      MR. OPPENHEIM:  Just some direction on closings and

17 what your expectations are on that, and your process for that,

18 so that we can make sure we're ready.

19      THE COURT:  There's a guy a floor below us who is

20 asked that question, and his response is, do you know how long

21 most shows last on TV?  And he doesn't wait for you to say --

22 give you an answer.  He says a half hour, not including

23 advertising -- including advertising, and that's what you ought

24 to make it.

25      Actually, the guy on the eighth floor wouldn't give

2327

1    you a half an hour.

2           But, I mean, what do you want?  An hour?  Do you want

3    more than an hour?  I'm going to give you a reasonable amount

4    of time.  What I don't want you to do is, you know, beat the

5    dead horse.

6           I mean, the jury has been listening, and I want to

7    focus on them.  And you both took a little more than the time

8    allotted in openings, but it was reasonable, and I thought it

9    was very productive.

10          MR. OPPENHEIM:  I thought I was 56 minutes on the

11   mark, Your Honor.  I was over?  Shoot.

12          MR. ELKIN:  I was 59 minutes, but I can give him

13   three minutes on the closing.  How is that?

14          THE COURT:  So is that a reasonable amount of time?

15          MR. OPPENHEIM:  Maybe we can consider that over the

16   weekend, but it doesn't sound unreasonable.  And we can reserve

17   some amount for our rebuttal.

18          THE COURT:  And that will include a reservation for

19   rebuttal.

20          MR. OPPENHEIM:  I assume.

21          THE COURT:  So if you need a little more, that is

22   something we can consider.  But I think that's -- with the

23   length of the trial and the amount of information and the

24   number of witnesses, I think that taking an hour is reasonable.

25          MR. OPPENHEIM:  Very well, Your Honor.

2328

1          THE COURT:  Okay.

2          MR. ELKIN:  Thank you, Your Honor.

3          THE COURT:  All right, good.  You all have a nice

4     weekend, and we'll see you on Monday morning.

5          MR. OPPENHEIM:  Thank you, Your Honor.

6          MR. ELKIN:  You too, Your Honor.

7          THE COURT:  All right, we're in recess.

8          -------------------------------------------

9

10

11

12

13                    CERTIFICATE OF COURT REPORTERS

14

15

16          We certify that the foregoing is a true and
              accurate transcription of our stenographic notes.

17

18

19               /s/  Norman B. Linnell
                 _____
20               Norman B. Linnell, RPR, CM, VCE, FCRR

21

22               /s/  Anneliese J. Thomson
                 _____
23               Anneliese J. Thomson, RDR, CRR

24

25