2329

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

<u>VOLUME  10  (A.M. Portion)</u>

TRIAL TRANSCRIPT

December 16, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2330

```
1    APPEARANCES:

2    FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                  SCOTT A. ZEBRAK, ESQ.
3                                 JEFFREY M. GOULD, ESQ.
                                  MICHAEL J. DRUCKMAN, ESQ.
4                                 ANDREW L. GUERRA, ESQ.
                                  LUCY G. NOYOLA, ESQ.
5                                 JIA RYU, ESQ.
                                  Oppenheim + Zebrak, LLP
6                                 4530 Wisconsin Avenue, N.W.
                                  5th Floor
7                                 Washington, D.C. 20015

8

     FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
9                                 GEOFFREY P. EATON, ESQ.
                                  Winston & Strawn LLP
10                                1700 K Street, N.W.
                                  Washington, D.C. 20006-3817
11                                  and
                                  SEAN R. ANDERSON, ESQ.
12                                MICHAEL S. ELKIN, ESQ.
                                  THOMAS P. LANE, ESQ.
13                                CESIE C. ALVAREZ, ESQ.
                                  Winston & Strawn LLP
14                                200 Park Avenue
                                  New York, NY 10166-4193
15                                  and
                                  JENNIFER A. GOLINVEAUX, ESQ.
16                                THOMAS J. KEARNEY, ESQ.
                                  Winston & Strawn LLP
17                                101 California Street, 35th Floor
                                  San Francisco, CA 94111-5840
18                                  and
                                  MICHAEL L. BRODY, ESQ.
19                                Winston & Strawn LLP
                                  35 West Wacker Drive
20                                Chicago, IL 60601
                                    and
21                                DIANA HUGHES LEIDEN, ESQ.
                                  Winston & Strawn LLP
22                                333 South Grand Avenue
                                  Suite 3800
23                                Los Angeles, CA 90071

24

25
```

2331

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| NICK FEAMSTER | | |
| | CROSS | 2345 |
| | REDIRECT | 2379 |
| | RECROSS | 2391 |
| | REDIRECT | 2397 |
| WILLIAM CHRISTOPHER BAKEWELL | | |
| | DIRECT | 2406 |
| | CROSS | 2436 |
| | REDIRECT | 2478 |

2332

P R O C E E D I N G S

1

2          NOTE:  The December 16, 2019, portion of the case

3     begins in the absence of the jury as follow:

4     JURY OUT

5          THE COURT:  All right, good morning.  I see all

6     counsel are present.  I hope you all had a good weekend.

7          Mr. Buchanan, good morning.

8          MR. BUCHANAN:  I don't know about the good weekend

9     part, Your Honor, but I appreciate it.

09:05:22 10          THE COURT:  Clearly, yes.

11          MR. BUCHANAN:  Good morning, Your Honor.  I would

12     like to move into evidence Dr. Weber's demonstratives.  I think

13     the Court said that the jury often likes to have those.

14          THE COURT:  Yeah.

15          MR. BUCHANAN:  And we've been putting some in.  And

16     so, I'd like to move those in now.  And they're --

17          THE COURT:  Any objection?

18          MR. OPPENHEIM:  Yes, Your Honor, we object.  They're

19     demonstratives.  They shouldn't be admitted.

09:05:43 20          THE COURT:  All right.  Well --

21          MR. OPPENHEIM:  We think they're --

22          THE COURT:  All right.  I'm not going to admit them

23     if the parties don't agree.

24          MR. BUCHANAN:  Okay.  The other issue was on notice

25     of witnesses.  We have a three-day rule.  And we've asked the

2333

1    plaintiffs who they're going to call, you know, tomorrow in

2    rebuttal.  And they said maybe Dr. McGarty, but we're not going

3    to tell you anything beyond that because we want to see how the

4    case develops.

5           Well, you know, we know how the case has developed

6    because we have expert reports, we have rebuttal reports, we

7    have reply rebuttal reports.  And so, everybody knows who the

8    experts are and what they're going to testify to.

9           So I'd just like to ask the Court to direct the

09:06:27 10  plaintiffs to identify, you know, if they're going to call

11   someone tomorrow, who that might be.  And it's past the

12   three-day limit.  And we've got Dr. McGarty.  If there's no one

13   else, fine.  But they -- in my view, it applies to rebuttal

14   witnesses as well, and they should have told us three days ago.

15          THE COURT:  Okay.  All right.  Thank you.

16          MR. BUCHANAN:  And --

17          THE COURT:  So McGarty is going to testify; is that

18   correct?

19          MR. OPPENHEIM:  Likely, Your Honor.  We want to see

09:06:46 20  how the evidence comes in, how we think the jury is receiving

21   it, reacting to it, what is said.  There are a lot of things

22   that have been in the reports, Your Honor, that haven't

23   necessarily come out on the stand.

24          THE COURT:  Yeah.

25          MR. OPPENHEIM:  There have been some disputes about

2334

1     the scope of where certain experts can testify.

2            So is it possible that we may call some other

3     witnesses beyond Dr. McGarty?  Yes.  At this point, we're not

4     certain of it.

5            THE COURT:  Okay.

6            MR. OPPENHEIM:  It's hard -- they've put on two,

7     three witnesses at this point, Your Honor.  They have a whole

8     bunch to come.

9            THE COURT:  Okay.  Well, plan on Almeroth testifying.

09:07:27  10   I'm going to deny plaintiffs' motion to preclude Dr. Almeroth

11    from testifying.  Your exception is noted.  But I'm going to

12    hold with my prior ruling on that.

13           And that may have something to do with McGarty

14    testifying as well.

15           What else you got?

16           MR. BUCHANAN:  So, Your Honor, as I -- is it -- are

17    they then exempt with regard to rebuttal witnesses to give us

18    three-days notice?

19           THE COURT:  No, they should tell you.  I mean, I

09:07:53  20   think there's good cause not to know who you're going to call

21    in rebuttal when you haven't even put on half your case yet.

22    So I understand that.  But as soon as they decide, they ought

23    to identify them.

24           Are you considering anybody other than Dr. McGarty?

25           MR. OPPENHEIM:  I'll tell you who we're considering,

2335

1    but I don't know whether we'll bring them or not.

2            THE COURT:  Yeah, well --

3            MR. OPPENHEIM:  We're potentially considering

4    bringing Dr. Lehr back to respond to certain points that may

5    get made.  And we're also considering bringing back

6    Ms. Frederiksen-Cross back as well for a short rebuttal.

7            But we haven't made any decisions at this point.

8            THE COURT:  Okay.

9            MR. OPPENHEIM:  We're very aware of the time issues.

09:08:39 10  We're -- you know, we're waiting to see how the testimony comes

11   in, Your Honor.

12           THE COURT:  Okay.  All right.  At least you got

13   the --

14           MR. BUCHANAN:  Right.  Thank you, your Honor.

15           THE COURT:  You got the three, and we'll see

16   whether --

17           MR. BUCHANAN:  I mean, just -- I don't want to

18   belabor this, because I know the jury is out --

19           THE COURT:  Yeah.

09:08:52 20          MR. BUCHANAN:  -- but we did give them notice, like

21   five days ago, that we were going to call rebuttal witnesses to

22   Lehr, who they were.  So they know exactly what they're going

23   to testify to from their reports.  And they've never, up to

24   this point, said that they're going to call Lehr or BFC.

25           So I would move to prevent them from calling Dr.

2336

1    Lehr.

2              THE COURT:  Okay.  I'm not going to do that.

3              MR. BUCHANAN:  Okay.  The final issue, Your Honor, is

4    with regard to the registration certificates regarding the

5    works in suit.

6              THE COURT:  Yes, sir.

7              MR. BUCHANAN:  We would move to admit those.  They

8    were part of the plaintiffs' exhibit list until the Friday

9    before trial and they removed them.  The registrations as to

09:09:35 10  the sound recordings are on our witness list, and then we have

11   a savings clause as to that.

12             But as you recall, the Court basically took judicial

13   notice of those when it granted summary judgment.  They were

14   referenced in the complaint.  They were referenced in the

15   summary judgment motions.  There was an affidavit from six

16   different corporate representatives covering every single

17   registration, saying that they were business records, they were

18   authentic, they had reviewed them, they were stored in the

19   normal course.

09:09:59 20            And so, we want to move those.  And the plaintiffs

21   are saying, look, we took them off our list on Friday, so

22   you're out of luck, we're not going to stipulate to them.

23             So we said, okay, let's call the witnesses.  And we

24   gave them notice, bring them back so that we can authenticate

25   them.  And they said they're not available.

2337

1           So we don't want to do that.  And the Court has

2   already granted summary judgement.  It's part of the case.

3   It's almost a jurisdictional issue.

4           So we would just move to admit those.

5           Thank you, Your Honor.

6           THE COURT:  All right, thank you.

7           MR. OPPENHEIM:  On these last two issues, if I could

8   just back up a little, Your Honor.  So at the charging

9   conference on Thursday afternoon we had a discussion about the

09:10:38 10   two potential instructions on the SR/PA overlap issue and the

11   album track issue.

12           THE COURT:  Yeah.

13           MR. OPPENHEIM:  And I pointed out that Cox had not

14   put forward to the jury a single piece of evidence for argument

15   on either of these issues, so any instruction on these issues

16   would leave them confused.

17           Mr. Elkin's response was, we haven't forgotten about

18   it.  We intend to submit interrogatory responses and RFAs.

19           Okay.  If that's what they want to do, they certainly

09:11:10 20   can propose doing that.  But apparently over the weekend Cox

21   decided to change its strategy.  And on Saturday evening they

22   sent us an e-mail and they asked us to stipulate to the

23   admission of 70 -- roughly 7,200 exhibits.

24           Now, these 7,200 exhibits were never on the

25   defendant's list.  They were on an old list of the plaintiffs'

2338

1    before the Court granted summary judgment.

2           They are -- we haven't gone through all of them, but

3    they include chain of title documents that include artist's --

4    certain artist agreements and certain very sensitive financial

5    information, as well as certain SRs and PAs.  And they asked us

6    to just stipulate to their admission, even though they weren't

7    on any current exhibit list.  And they said, and if you don't

8    stipulate to them, then you need to bring back corporate

9    representatives for each of the companies so we can then move

09:11:59 10  these into evidence.

11          Of course, they had four corporate representatives.

12   They didn't ask them a single question about them.  And they

13   said, well, we're giving you notice, you've got three days,

14   bring them here.

15          They're obviously outside the subpoena power.

16   They're out in L.A. and elsewhere.  And if they had done what

17   we did at the beginning of the trial and say, here are your

18   witnesses that we want to examine, we could have coordinated

19   this.  They could have examined the witnesses who were already

09:12:25 20  on the stand.  They apparently didn't think this through, and

21   now they're trying to fix a problem of their own making.

22          THE COURT:  Aren't the registrations in already?

23          MR. OPPENHEIM:  No.

24          THE COURT:  I mean, you used them for summary

25   judgment, right?

2339

1            MR. OPPENHEIM:  Well, for summary judgment,

2     certainly, Your Honor.  They haven't identified -- the

3     registrations are the registrations.  I don't think they're

4     business records, by the way, but the registrations are the

5     registrations.

6            THE COURT:  You don't object to the registrations?

7            MR. OPPENHEIM:  Well --

8            THE COURT:  How could you object to the

9     registrations?  They were your -- they were your proof to

09:12:59 10   ownership.

11           MR. OPPENHEIM:  Of course.  But I'm not -- look, I'm

12    not disputing their authenticity --

13           THE COURT:  Well, they're in.

14           MR. OPPENHEIM:  -- their appropriateness, any of

15    that.

16           THE COURT:  They're in.

17           MR. OPPENHEIM:  But the problem is they haven't

18    identified just the registrations.

19           THE COURT:  Okay.

09:13:08 20   MR. OPPENHEIM:  They've given us this mass of

21    documents that raise all kinds of other issues.  And then the

22    question --

23           THE COURT:  The rest of them, I see your argument.

24    The registrations are in.  If they want to move separately,

25    other exhibits, they can lay them out, tell us what they are,

2340

1    and we'll deal with them.  How about that?

2            MR. OPPENHEIM:  I mean, I -- frankly, I think that

3    this is a problem of their own making, and they shouldn't be

4    permitted to do that, Your Honor.  But I recognize the Court's

5    view on it, and --

6            THE COURT:  It's big picture here.  Just a little bit

7    of big picture, I mean.  Okay?

8            MR. OPPENHEIM:  I get it, Your Honor.

9            THE COURT:  Okay.

09:13:48  10            MR. OPPENHEIM:  We need to have a clearly defined set

11    of exhibits that they ask us to stipulate to and that we can go

12    through and say, this is in, this is not in.  They haven't done

13    that.  It's not easy.  There are a lot of works in this case.

14    And the registrations that were produced include works beyond

15    the works in suit.

16            So if they want to fix this, they need to actually

17    fix it in a way that can be done precisely to the case.

18            THE COURT:  Okay.  All right.

19            MR. BUCHANAN:  Judge, what we are talking about is

09:14:21  20    the registrations, and then the lookup pages where they needed

21    to do that to, you know, add to the registration.  That's it.

22            THE COURT:  All right.  Those are in.

23            MR. BUCHANAN:  Okay.  Thank you.

24            THE COURT:  Yeah, what are the numbers?  Will you get

25    us the numbers so that we do have an accurate identification of

2341

1  them?

2          MR. OPPENHEIM:  Your Honor, I would ask that they

3  give us the list of numbers, allow us to have somebody review

4  them and see whether it's right or not, before the Court enters

5  them into evidence.

6          THE COURT:  That's fine.  Yeah, let's --

7          MR. BUCHANAN:  The number would be DX 3758.

8          THE COURT:  Just one big -- yeah, I'm not even sure

9  it was ever downloaded.  Is it just digitally?

09:15:04  10          MR. BUCHANAN:  Yes, we would move it that way, Your

11  Honor.

12          THE COURT:  Okay.

13          MR. BUCHANAN:  We agree to them digitally.

14          THE COURT:  Okay.  Well, I'll rule on that once

15  plaintiffs have had an opportunity to look at it and make sure

16  what's in the exhibit.  Okay.

17          MR. BUCHANAN:  Thank you, Your Honor.

18          THE COURT:  All right.  Mr. Brody.

19          MR. BRODY:  I have two short things, Your Honor.

09:15:27  20  First, Your Honor permitted us to tender a written proffer

21  regarding the Audible Magic spreadsheets.

22          THE COURT:  Yes, sir.

23          MR. BRODY:  So I was going to do that right now.

24          THE COURT:  Okay.

25          MR. BRODY:  Counsel.

2342

1          THE COURT:  All right.

2          MR. BRODY:  Second, we have -- Mr. Zebrak gave me two

3   demonstratives that they plan to use, he plans to use with

4   Dr. Feamster.  One of them is fine.  The other one may be fine,

5   but I just wanted to flag an issue with respect to it.  If I

6   could tender the proposed demonstrative.

7          MR. ZEBRAK:  I gave it to Joe, he's got it.

8          MR. BRODY:  Okay.  And then I'm -- if I could also

9   tender slides 37 and 38 from Dr. Feamster's direct testimony.

09:16:40  10          Dr. Feamster, you should step out into the hall.

11          NOTE:  Dr. Feamster leaves the courtroom.

12          MR. BRODY:  The demonstrative slide that they

13   tendered is this one that says what MarkMonitor actually did,

14   and it's got the four boxes in it, all of them with black

15   typeface in them.

16          THE COURT:  Yes, sir.

17          MR. BRODY:  This looks like his slide.  As you can

18   see from the two I tendered to you, it actually isn't one of

19   the slides that he put up.

09:17:21  20          I certainly have no objection to them putting this up

21   and asking him, isn't it true that this is what MarkMonitor did

22   and so on and so forth.

23          What I'm concerned about is that there's going to be

24   some suggestion -- if you look at the one that looks most like

25   this, I guess I'd say, you'll see that the step 3 in the notice

2343

1    to Cox box are shaded out on the slide that he used, and that's

2    because he was talking during that slide about steps 1 and 2.

3    And when he actually got to steps 3 and 4, the other stuff was

4    there.

5              THE COURT:  The highlights.

6              MR. BRODY:  So I have -- like I said, I have no

7    problem with them using the demonstrative to talk about what

8    they actually did, I just think there should not be any

9    suggestion that this represents what he put up, what he showed

09:18:12  10    the jury, or that he was concealing anything from the jury.

11              THE COURT:  Okay.

12              MR. ZEBRAK:  Your Honor, I'm perplexed at this.  This

13    is his --

14              THE COURT:  You, perplexed?

15              MR. ZEBRAK:  Well, I mean, counsel is not entitled to

16    dictate what fair demonstratives I use.  It's his slide --

17              THE COURT:  He just doesn't want the jury confused

18    about the fact that some of them are highlighted -- or some of

19    them are bolded and some of them aren't.

09:18:41  20              So I'm going to allow you to use the demonstrative.

21    I don't think it's confusing to the extent that as long as

22    you're not representing that it is exactly the slide that Cox

23    presented, I think it's fine.

24              MR. ZEBRAK:  Thank you, Your Honor.

25              THE COURT:  Okay.  Your exception is noted, Mr.

2344

1    Brody.

2         MR. BRODY:  Thank you.

3         THE COURT:  All right.  I saw Mr. Feamster here a

4    minute ago.  You asked him to leave for a minute?

5         All right.  Anything else?

6         MR. BRODY:  Not from us, no.

7         THE COURT:  Okay.  Thank you.

8         Joe, then let's get our jury, please.

9         Come on up, Mr. Feamster, and take a seat.

09:19:41 10    NOTE:  At this point the jury returns to the

11   courtroom; whereupon the case continues as follows:

12   JURY IN

13        THE COURT:  All right.  Please have a seat.

14        Good morning, ladies and gentlemen.  Thank you for

15   making your way in on time again this morning.  I hope you all

16   had a good weekend.

17        Did you all heed my advice and not do any research or

18   investigation?  All right.

19        All right.  Where are we?  Mr. Zebrak, cross-

09:20:17 20   examination, sir.

21        MR. ZEBRAK:  Yes, Your Honor.  Thank you.

22        THE COURT:  Have you got what you need, Dr. Feamster?

23        THE WITNESS:  I think so.  I just need a little

24   space.

25        THE COURT:  Well, that's what--

2345

1          THE WITNESS:  It's big.

2          THE COURT:  -- we don't have a lot of, you're right.

3          All right, Mr. Zebrak.

4          MR. ZEBRAK:  Thank you, Your Honor.

5          NICK FEAMSTER, previously called by counsel for the

6    defendants, having duly sworn, continues to testify and state

7    as follows:

8          CROSS-EXAMINATION

9    BY MR. ZEBRAK: (Continuing)

09:22:27 10   Q.   Good morning, Dr. Feamster.  How are you?

11   A.   Good morning.  How are you?

12   Q.   You recall when we left off on Friday I was asking you

13   questions about your background and familiarity with

14   peer-to-peer?

15   A.   Thursday, yeah.  Absolutely remember.

16   Q.   Thank you.  Apparently I'm not warmed up yet.

17          So what I would like to do before we explore your

18   opinions in detail is just at a high level make sure that we

19   all understand what your opinions are.

09:22:53 20          Am I correct that your opinion is that there is no

21   reliable evidence of infringement unless MarkMonitor downloads

22   infringing content from each specific Cox subscriber for each

23   notice that it sends?

24   A.   Yes.

25   Q.   Okay.  And you understand that MarkMonitor downloads the

N. Feamster - Cross

2346

1    unique file, determines its contents via Audible Magic, and

2    then relies on hash values and the handshake process with Cox

3    subscribers, correct?

4            But your view is that it needs to do a download

5    before each notice; is that right?

6    A.   That's right.

7    Q.   Okay.  And the reason you gave, if I'm correct, about why

8    you believe a download is needed from each Cox subscriber at

9    the time of each notice is that without that download you don't

09:23:57  10  know if the Cox subscriber either has a corrupted file or is

11   lying; is that correct?

12   A.   That's not a complete list of everything that could go

13   wrong, but those are two reasons, yes.

14   Q.   Did you give any other reason in your testimony besides

15   those two reasons for what could go wrong?

16   A.   I can give you additional reasons if you're -- if you're

17   interested in hearing them.

18   Q.   Why don't you just, without explaining them, just list for

19   me what those reasons are, if you could.

09:24:29  20  A.   Right.  Another reason which is common, and for example,

21   the Gnutella network, is that peers leave the network after

22   they complete a download of the file, and the directory or the

23   ways that information about what peers have what information is

24   not often up to date.

25           There has been research, for example, showing that

N. Feamster - Cross

2347

1   70 percent of peers in the Gnutella network never actually

2   share any files after completing those downloads.  So that's

3   one example.

4   Q.   So, Dr. Feamster, I'm not sure if you heard my question.

5   I was asking you about your testimony on Thursday.  You

6   didn't --

7   A.   Yes.

8   Q.   What you just said was not something you covered on

9   Thursday?

09:25:08  10   A.   Well, you asked me to give additional reasons.  I'm happy

11   to stop.

12   Q.   I'm asking you what you testified about on Thursday.

13   Let's start there.

14   A.   Sure.

15   Q.   Did you testify about any other reasons why a download is

16   needed from a Cox subscriber at the time of each notice other

17   than your contentions about corrupted files or lying peers?

18   A.   Those are the two primary reasons, as I recall.

19   Q.   Okay.  And just to be clear, the testimony you now offered

09:25:40  20   up doesn't concern whether the peer actually had the infringing

21   file or not, it just concerned whether a peer leaves the

22   network?

23   A.   Oh, it absolutely does concern that.  There is an issue

24   with the consistency in the information that is available in

25   searches versus what peers actually have.

N. Feamster - Cross

2348

1   Q.   Dr. Feamster, again, I know this is your first time

2   testifying in court as an expert --

3   A.   Yes.

4   Q.   -- but I'm going to really ask that you only answer my

5   question.  You have able counsel with you today, and if you

6   have something else to explain --

7           MR. BRODY:  Your Honor, can we get to the question,

8   please?

9           THE COURT:  Okay.  All right.

09:26:16  10           THE WITNESS:  I'm sorry, I wasn't --

11           THE COURT:  Dr. Feamster --

12           THE WITNESS:  Yes, absolutely.  You're talking over

13   each other and you're not listening to each other.

14           And so, you ask the question.  And if you want a

15   narrow answer to your question, then ask a yes or no question.

16           MR. ZEBRAK:  Yes, Your Honor.

17           THE COURT:  And, Dr. Feamster, if you can answer yes

18   or no, please do.  If you can't answer without explaining

19   further, say, I can't answer yes or no.  And then your counsel

09:26:39  20   will follow up if he chooses to.

21           THE WITNESS:  I'm sorry, I misunderstood.  I thought

22   he wanted an exhaustive list.

23           THE COURT:  No, no.

24           THE WITNESS:  Okay.

25           THE COURT:  Listen to the next question.  Go ahead.

N. Feamster - Cross

2349

1    BY MR. ZEBRAK: (Continuing)

2    Q.    Dr. Feamster, you're aware that MarkMonitor connects to

3    and engages in a handshake process with each Cox subscriber

4    before sending a notice, correct?

5    A.    Yes, I am.

6    Q.    So just to be clear, the example you just gave, yes or no,

7    was an example disassociated with a handshake process, it was

8    about just seeing what a torrent said about who had what,

9    correct?

09:27:22  10    A.    I am not sure I understand what you mean by disassociated.

11    Q.    The example you gave --

12    A.    Yes.

13    Q.    -- was about sending notices just based on what a torrent

14    says about who has files, correct?

15    A.    Notices are sent based on the results of that scanning

16    process, yes.

17    Q.    Dr. Feamster, my question to you is, MarkMonitor sends

18    notices to Cox after having already downloaded a file and

19    looked it up via Audible Magic, right?

09:27:50  20           We've covered that, correct?  That's a yes or no

21    question.

22    A.    Actually, that's no.  That doesn't always happen.

23    Q.    Your testimony is that MarkMonitor doesn't download files

24    in the first instance and look it up in Audible Magic in order

25    to determine known infringing hashes?

1            That's a yes or no question.

2    A.    That process does happen.  Occasionally notices are sent

3    before that verification takes place.  Those two -- my

4    testimony as I gave on Thursday is that steps 2 and 3 are not

5    always sequential.

6    Q.    Okay, Dr. Feamster.  Step 4, though, is the notice

7    process, isn't it?

8    A.    Yes, it is.

9    Q.    So what you're testifying about in steps 2 and 3 is the

09:28:43  10    look up in Audible Magic and the collection of evidence.

11    That's what you're saying is not always sequential, correct?

12    A.    That's correct.

13    Q.    Right.  But the notice process happens only after the file

14    has been confirmed via Audible Magic, correct?

15    A.    That is what's supposed to happen, yes.

16    Q.    Thank you.  And that's -- what you just said differs from

17    what you just said a minute ago, didn't it?

18    A.    I don't know what you're referring to as what I said a

19    minute ago.  What are the two things you say are different?  I

09:29:11  20    think I've been consistent.

21    Q.    Well --

22            THE COURT:  Ask your next question.

23    Q.    We have established that on Thursday the two reasons you

24    gave for why a download was needed from each Cox subscriber

25    were lying peers and corrupted files.  I would like to explore

2351

1    those two in more detail.

2    A.    Absolutely.

3    Q.    Mr. Duval, would you pull up the demonstrative slide,

4    please.

5              So, Dr. Feamster, do you recognize this, generally?

6    A.    It appears --

7              MR. BRODY:  Objection, Your Honor.  May I approach,

8    please?

9              MR. ZEBRAK:  Let me clarify this, Your Honor.

10             THE COURT:  Okay.

11             MR. ZEBRAK:  If that could move things along.

12             THE COURT:  Yes.

13             THE WITNESS:  I don't recognize this exactly.

14             MR. ZEBRAK:  Well, there is --

15             THE WITNESS:  Sorry, you asked the question.  There

16   seems to be a page number on here, 1.  This doesn't look like

17   exactly what I presented in my testimony.

18             MR ZEBRAK:  Your Honor, might I clarify what this is

19   and ask --

09:30:08 20            MR. BRODY:  Can we approach, Your Honor?

21             THE COURT:  Yeah.

22             NOTE:  A sidebar discussion is had between the Court

23   and counsel out of the hearing of the jury as follows:

24   AT SIDEBAR

25             THE COURT:  Yes, sir.

N. Feamster - Cross

2352

1        MR. BRODY:  So this is exactly what I was complaining

2   about.  He puts it up and says, do you recognize this?  And

3   it's not his exhibit.

4        MR. ZEBRAK:  I am attempting to clarify what it is.

5   And I'm going to say, it's his slide and I'm going to explain

6   what I highlighted.  That's why I said I would like to clarify

7   before counsel asked for the sidebar.

8        MR. BRODY:  I don't believe counsel gets to testify

9   as to what his demonstratives are.

09:30:58 10        THE COURT:  Yeah, he can explain it.  What's the

11   prejudice in him explaining that this is my slide, it's not

12   your slide, but do you recognize the content on the slide?

13        MR. BRODY:  That would be great.

14        THE COURT:  Okay.  Let's do it.  Thank you.

15        MR. ZEBRAK:  Thank you, Your Honor.

16        NOTE:  The sidebar discussion is concluded; whereupon

17   the case continues before the jury as follows:

18   BEFORE THE JURY

19        MR. ZEBRAK:  Would you republish the slide,

09:31:41 20   Mr. Duval.

21   BY MR. ZEBRAK: (Continuing)

22   Q.   Dr. Feamster, do you recognize the four steps listed in

23   this slide?

24   A.   Yes, I do.

25   Q.   Am I correct these are the four steps listed in the

2353

1    MarkMonitor process, and where you have disagreement with the

2    reliability of the MarkMonitor process resides in step 3?

3    A.   We talked about problems in step -- well, we talked about

4    -- in my testimony on Thursday, I discussed steps 3 and -- this

5    slide is kind of confusing, actually.  Step -- the box on the

6    right side doesn't say step 4.  I don't know what's going on

7    with this slide, actually.  It doesn't look like what I

8    presented.  What's --

9    Q.   All right.  I'm not saying --

09:32:30 10  A.   Can we use the one I presented?

11   Q.   Well, Dr. Feamster, we're not going through your --

12   A.   Okay.  I mean, I don't quite recognize this, actually,

13   because the box on the far right, mine said, Step 4.  And this

14   one doesn't.

15          So I -- and it looks like there's some overlay here

16   in the box on the far right.  It looks like you've overlaid my

17   text.

18          So I'd like to see mine.  If you could show mine and

19   then maybe we can compare.

09:32:57 20         THE COURT:  Dr. Feamster --

21          THE WITNESS:  Yeah.

22          THE COURT:  He asked you whether you recognized the

23   text in the slide?

24          THE WITNESS:  No, I don't.

25          THE COURT:  Okay.

N. Feamster - Cross

2354

```
       1    BY MR. ZEBRAK:  (Continuing)

       2    Q.    Okay.  Dr. Feamster --

       3            THE COURT:  This is not -- this is not your slide?

       4            THE WITNESS:  This is not my slide and --

       5            THE COURT:  This is plaintiffs' slide.  They're

       6    allowed to use their own slides.

       7            THE WITNESS:  Okay.  Okay.

       8            THE COURT:  So don't fight the fact it's not your

       9    slide.  Let's answer substantive questions, if you can.

09:33:17 10            THE WITNESS:  Okay.  Okay.  You asked whether I --

      11    and there's something going on with the box on the far right,

      12    that doesn't look like mine.

      13    BY MR. ZEBRAK:  (Continuing)

      14    Q.    Dr. Feamster --

      15    A.    Yeah.

      16    Q.    -- you've made it perfectly clear that this is not your

      17    slide.

      18    A.    Okay.

      19    Q.    What I'm going to ask you to do is put aside your set of

09:33:35 20    slides for a minute.

      21    A.    Okay.

      22    Q.    And I'd like to ask you some questions about the

      23    MarkMonitor process.  You understand that that's why you're

      24    here today, right?

      25    A.    Absolutely.
```

2355

1    Q.   Okay.  You understand that in step 1 MarkMonitor scans

2    peer-to-peer networks for what it suspects are infringing files

3    and then it does a download, we've established that, correct?

4    A.   Yes, we have.

5    Q.   Okay.  And then in steps 2 and 3 it's looking up the

6    contents of the file via Audible Magic, and it's also engaging

7    in a handshake process with peers, trying to figure out -- you

8    know, going through the process of the handshake and a hash

9    match, correct?

09:34:19 10  A.   That is correct.

11   Q.   Okay.  And it's within step 3 that we have a --

12        MR. BRODY:  Your Honor, I apologize.  May I approach

13   the bench, please?

14        THE COURT:  Yes, sir.

15        NOTE:  A sidebar discussion is had between the Court

16   and counsel out of the hearing of the jury as follows:

17   AT SIDEBAR

18        MR. BRODY:  My concern is I didn't get a copy of the

19   slide with all these little --

09:34:52 20       THE COURT:  So that was a surprise when that showed

21   up?

22        MR. BRODY:  It was a small surprise.

23        MR. ZEBRAK:  It's not on the printed --

24        MR. BRODY:  No, it's not what you gave me.  I'm sure

25   it's fine, but just give me copy so I can look at it.

N. Feamster - Cross

2356

1          MR. ZEBRAK:  I understand.

2          THE COURT:  What else is on there?

3          MR. ZEBRAK:  I think that's it.

4          MR. BRODY:  These are our slides.

5          MR. ZEBRAK:  These are his slides.  The bubbles on

6   the next page that you -- that Your Honor sees on slide 2, this

7   is meant just to facilitate the testimony.  There's nothing

8   substantively wrong.  And I apologize that the demonstrative

9   didn't have the little icons there.  I can move off the slide

10  and not use it.

11         THE COURT:  Yes, just move off the slide.

12         MR. ZEBRAK:  That's fine.

13         THE COURT:  Okay.  All right.

14         MR. ZEBRAK:  I'm just going to move to the next one

15  that has the bubble that he has seen.

16         THE COURT:  Has it got new --

17         MR. ZEBRAK:  Nothing.

18         THE COURT:  Is that material that Mr. Brody hasn't

19  seen?

09:35:37  20         MR. ZEBRAK:  Nothing new on it.  I'm going to show

21  you the next slide, just the 2 with the bubble.  I just want to

22  show the two bubbles -- you know, in fact, let's move off the

23  slides.  This is taking -- it's too much difficulty.

24         THE COURT:  All right.

25         NOTE:  The sidebar discussion is concluded; whereupon

N. Feamster - Cross

2357

1    the case continues before the jury as follows:

2    BEFORE THE JURY

3    BY MR. ZEBRAK: (Continuing)

4    Q.   Okay.  Step 3 is where you contend --

5    A.   I can't see it.

6    Q.   You don't need to look at the slides anymore.  I'm just

7    speaking with you now.

8    A.   Okay.  Okay.

9    Q.   In the MarkMonitor process, when it collects information

09:36:24 10   from the peers, the Cox subscribers, before it reports them,

11   that's where you believe a download is required, right?

12   A.   Step 3, yes.

13   Q.   Right.  Okay.  MarkMonitor relies on the handshake and the

14   hash match, but you think you need to download the content?

15   That's the crux of the disagreement, correct?

16   A.   I disagree with how you phrased that.  MarkMonitor does

17   not perform a hash match, so that statement is not correct.

18   Q.   MarkMonitor relies on the Cox subscribers' BitTorrent

19   software reporting what it is distributing, correct?

09:37:06 20   A.   Yes.

21   Q.   Okay.  And on Thursday during your testimony you

22   testified, am I correct, that the -- in the wild, the chance of

23   encountering a corrupted file is maybe about 1 percent; is that

24   right?

25   A.   What I told you in my deposition --

N. Feamster - Cross

2358

```
 1              THE COURT:  No, wait, wait.

 2              THE WITNESS:  Oh, I'm sorry.

 3              THE COURT:  Listen to the question.  Answer the

 4    question.  On Thursday in your testimony, did you say that?

 5              THE WITNESS:  Yes.

 6    BY MR. ZEBRAK: (Continuing)

 7    Q.   Okay.  And isn't it true that at the time of your expert

 8    analysis and subsequent deposition, you believed that the

 9    likelihood of peers lying was also only about 1 percent?

10    A.   Incorrect.  I never said that.  In fact, I said it was

11    quite likely.  And I'd be happy to offer you precise statistics

12    on that.

13              THE COURT:  Okay.  Okay.  All right.  Just, you know,

14    try and answer the question.

15              THE WITNESS:  Sorry.

16    BY MR. ZEBRAK: (Continuing)

17    Q.   You recall that you were under oath in your deposition,

18    right?

19    A.   Yes.

20    Q.   And you tried to tell the truth in your deposition, right?

21    A.   I did tell the truth.

22    Q.   Do you remember in your deposition I asked you if there

23    was a question you didn't understand, to let me know, right?

24    A.   Yes.

25    Q.   All right.  I'm going to play a clip at lines 312-25 to
```

09:37:52 (line 10)
09:38:13 (line 20)

N. Feamster - Cross

2359

1    313-20.

2              Mr. Duval, would you please bring up clip 26.

3              NOTE:  At this point a portion of a video recording

4    is played into the record as follows:

5    BY MR. ZEBRAK:  (Video)

6    Q.   I'm asking you what you've done to date.  To date, you

7    have no expert opinion about the percentage likelihood that the

8    bitfield information about what a peer is sharing will be

9    inaccurate.

10             MR. LANE:  Form.

11   A.   I can tell you a ballpark number, which would certainly

12   be -- you know, around -- certainly in the ballpark of --

13   again, you're asking me to offer precise numbers on something

14   which isn't in my report and that I haven't had the opportunity

15   to do research on.  So I'm going to reserve the right to -- to

16   revise my statistics here.

17             But since you asked over and over again specifically

18   for numbers, let me do my best.

19             These would probably be in the range of the

09:39:29 20  1 percent.  Okay.

21             NOTE:  The video recording is concluded.

22   BY MR. ZEBRAK:  (Continuing)

23   Q.   Okay.  Dr. Feamster, let's move on to some things that I

24   think we can likely agree upon.

25             You understand that BitTorrent was one of the

N. Feamster - Cross

2360

1    successor peer-to-peer networks to Napster, don't you?

2    A.    Yes.

3    Q.    And when you did your analysis in this matter and were

4    subsequently deposed, were you aware that copyright

5    infringement was against the law?

6    A.    Absolutely.  But -- yes.

7    Q.    And again, Dr. Feamster, you -- could you look at the

8    deposition that you have in front of you.  It should be in the

9    small book.  It should be the last tab.

09:40:25  10  A.    Sure.  The last tab is my expert report.  Let's see.  8

11   maybe?

12   Q.    And if you could look at page 66, and I'll refer you to

13   the line number when you get there.

14   A.    I'm there.

15   Q.    Could you look at lines 22, 66-22 to 67-05, and see if

16   that refreshes your recollection about whether you were aware

17   copyright infringement was against the law at the time of your

18   deposition?

19   A.    Yes, it agrees with what I just told you.

09:41:05  20  Q.    At your deposition did you refuse to answer the question

21   about whether copyright infringement was against the law?

22   A.    No, I did not.

23   Q.    Mr. Duval, would you play clip eight that captures the

24   same page and line numbers?

25             NOTE:  At this point a portion of a video recording

N. Feamster - Cross

2361

1  is played into the record as follows:

2  BY MR. ZEBRAK: (Video)

3  Q.   Do you have an understanding about whether copyright

4  infringement is a lawful activity?

5  A.   I'm not going to actually offer an opinion there because

6  that's -- that's not my area of expertise.

7        NOTE:  The video recording is concluded.

8  BY MR. ZEBRAK: (Continuing)

9  Q.   Dr. Feamster, when you came up with your idea on how to

09:41:41 10  improve BitTorrent so people could locate and download content

11  even more efficiently, were you aware that copyright

12  infringement was unlawful at that time?

13  A.   Yes, I was.

14  Q.   And when you were coming up with that idea on how to

15  improve BitTorrent, did you give any consideration to the

16  feature where you would give peers plausible deniability about

17  what they were hosting and where it came from in terms of how

18  that could impact fostering copyright infringement?

19  A.   No, because the purpose of that system was to design a

09:42:21 20  more efficient peer-to-peer file sharing system, and it was

21  completely orthogonal to copyright infringement.

22        As you're aware, there are many uses of peer-to-peer

23  networks that involve --

24        THE COURT:  Okay.

25  A.   -- legitimate exchange of traffic.

2362

1          THE COURT:  All right.  Answer the question, and then

2     your -- as I said, your counsel will ask you to follow up if he

3     believes it's appropriate.

4          THE WITNESS:  Okay.  Okay.  Thank you.

5     BY MR. ZEBRAK:  (Continuing)

6     Q.   Dr. Feamster, the terms "exchanging," "sharing," and

7     "swapping," they're really referring to the copying and

8     distribution of files; is that correct?

9     A.   Depends on the context in which you're using them.

09:43:04 10   Q.   Well, Dr. Feamster, you understand you're here to talk

11    about peer-to-peer, aren't you?

12    A.   Yes.

13    Q.   In the context of peer-to-peer, exchanging, sharing, and

14    swapping refer to copying and distribution of files, correct?

15    A.   Or pieces of files, yes.

16    Q.   Dr. Feamster, BitTorrent is not an obscure piece of

17    software, is it?

18    A.   No, it's not.

19    Q.   It's been around about 20 years, do you agree?

09:43:33 20   A.   Yes, yes, I do.  That's right.

21    Q.   Hundreds of millions of users over the course of that

22    time?

23    A.   Sounds about right.

24    Q.   Lots of academic research about BitTorrent?

25    A.   A lot.

N. Feamster - Cross

2363

1    Q.    Pretty popular piece of software, right?

2    A.    I would agree.

3    Q.    People like it, right?

4    A.    Can't comment on that.  I would assume so.

5    Q.    Works pretty well overall, right?

6          It's a yes or no question, sir.

7    A.    I can't give you a precise yes or no on that.  Certain

8    things work well, certain things don't.

9    Q.    Yes or no, it wouldn't work pretty well if everybody was

09:44:17 10   out there lying about what they were sharing, right?

11   A.    Disagree.

12   Q.    Dr. Feamster, in the tit-for-tat model in BitTorrent, any

13   participating peer will generally be both downloading or

14   retrieving pieces of the file as well as providing or uploading

15   those pieces, correct?

16   A.    Depends.  In the case where there are lying peers, no.

17   There's also a process by which peers can cheat and lie about

18   the fact they're uploading anything.  So if it's working as

19   it's supposed to, I agree.

09:44:49 20   Q.    Dr. Feamster, I'm going to ask you once again to please

21   listen to my question.  My question, and I'm going to ask it

22   again, sir --

23   A.    Yes.

24   Q.    -- is that in the tit-for-tat model in BitTorrent, any

25   participating peer will generally be both downloading or

2364

1  retrieving pieces of the file as well as both providing or

2  uploading the file, correct?

3  A.   I'm going to say no.

4  Q.   Dr. Feamster, again, do you remember when I asked you this

5  same question at your deposition?

6       It's a yes or no question.

7  A.   Yes, I do.

8  Q.   And again, you tried to tell the truth at your deposition,

9  right?

09:45:33 10  A.   Yes, I did.

11  Q.   Okay.  Mr. Duval, would you please play clip 31.  It is at

12  line -- page 201, lines 6 through 16 -- excuse me, I apologize

13  for that, Mr. Linnell.  It's page 201, lines 6 through 16.

14       NOTE:  At this point a portion of a video recording

15  is played into the record as follows:

16  BY MR. ZEBRAK: (Video)

17  Q.   So your testimony is that the tit-for-tat model means that

18  a peer is both disseminating pieces of a file as well as

19  downloading pieces of the file; is that correct?

09:46:06 20  A.   In the BitTorrent protocol, any participating peer will

21  generally be downloading or retrieving pieces of the file, as

22  well as providing.  If you want to use the term "uploading,"

23  that's fine.

24       NOTE:  The video recording is concluded.

25  BY MR. ZEBRAK: (Continuing)

N. Feamster - Cross

2365

1   Q.   Dr. Feamster, a digital copy of a digital file has the

2   same content as the original, correct?

3   A.   Yes.

4   Q.   And if you compare the hash values of the original and the

5   copy, they should be the same, right?

6   A.   Not if you don't recompute the hash.

7   Q.   Dr. Feamster, if I have a digital file and I know its

8   contents and I run across another digital file with the same

9   hash value, the file I run across will have the same contents

09:47:05  10   as the known original, yes or no?

11   A.   That second file you just talked about, you didn't perform

12   the computation, so I can't tell you the answer to that.

13            MR. ZEBRAK:   Your Honor, could I have an instruction

14   for the witness to answer the questions?

15            THE COURT:   He just said he can't answer the

16   question.   Ask another question.

17   BY MR. ZEBRAK: (Continuing)

18   Q.   Dr. Feamster, do you recall at your deposition me asking

19   you the question about -- well, strike that.

09:47:35  20            A digital copy of a digital file has the same content

21   as the original, we just established that, right?

22   A.   Yes.

23   Q.   And that's true whether you compute the hash or not,

24   correct?

25   A.   That is absolutely true.

N. Feamster - Cross

2366

1    Q.    Okay.  So put aside how one verifies that they are the

2    same, and please answer the question I am about to ask you.

3            If I have a digital file and I know its contents, and

4    I run across another digital file with the same hash value, the

5    file I run across will have the same contents as the known

6    original?

7            And that's a yes or no question.

8    A.    I can't -- that's the same question you just asked.  The

9    second file, you didn't perform the computation.  And,

09:48:17  10    therefore, I can't answer your question.

11    Q.    Okay.  And again, I asked you the same question at your

12    deposition and --

13    A.    Slightly different wording, actually.

14    Q.    I would like to play that for you.  It is at page 190,

15    lines 7 through 19.

16            Mr. Duval, it's clip 28.

17            MR. BRODY:  Your Honor, can we --

18            THE COURT:  I'm sorry.  Hold on, stop it for a

19    minute.

09:48:46  20            MR. BRODY:  Can we ask him to look at the -- he has

21    got the transcript right there.

22            MR. ZEBRAK:  This is impeachment, Your Honor.

23            MR. BRODY:  The question -- I'm sorry.  My objection

24    would be that he was asked whether it was the same question and

25    answer.  He can answer that question by letting him look at the

N. Feamster - Cross

2367

1    deposition.

2              THE COURT:  Is the same question that you just asked

3    him the question that's in your video, or is it a different

4    question?

5              MR. ZEBRAK:  Your Honor, it's the question I've asked

6    that he's, I believe, giving an inconsistent answer now to than

7    he did in his deposition.  I'd like to impeach him --

8              THE COURT:  The question in the deposition is the

9    question you just asked him here in court?  So it's

09:49:30 10  impeachment; is that correct?

11             MR. ZEBRAK:  Yes, Your Honor.  It's impeachment that

12   I want to do.

13             THE COURT:  Okay.  All right.  Your exception is

14   noted.

15             You can play the video.

16             MR. ZEBRAK:  Mr. Duval, hold on a moment, please.

17   Could you hold on a moment, please.

18             Okay.  Go ahead and play it, sir.

19             NOTE:  At this point a portion of a video recording

20   is played into the record as follows:

21   BY MR. ZEBRAK: (Video)

22   Q.   If I have a file and I know its contents --

23   A.   Yes.

24   Q.   -- and I know the hash value for that file --

25   A.   Yes.

N. Feamster - Cross

2368

1  Q.   -- if I run across another file with that same hash value,

2  does that mean that the file I run across has the same contents

3  as the first?

4  A.   That's typically how we use hash -- hash values.  If I've

5  got two files and I want to make sure they're -- they're the

6  same --

7           NOTE:  The video recording is concluded.

8           THE WITNESS:  You cut it off, excuse me.

9           THE COURT:  Hold on.

09:50:30 10           THE WITNESS:  The very next line --

11           THE COURT:  Hold on.

12           MR. BRODY:  Your Honor, I move to strike.

13           THE WITNESS:  It's -- the very next line says --

14           THE COURT:  Stop, stop, stop.  Listen, you're going

15  to leave if you don't listen.

16           All right.  Your objection is that he didn't complete

17  the answer?  You may complete the answer.

18           MR. ZEBRAK:  Sorry.

19           THE COURT:  We're going to strike that.

09:50:52 20           MR. ZEBRAK:  Yes, Your Honor.

21           THE COURT:  You may read in the question and his

22  answer and you read along.  Let's --

23           MR. ZEBRAK:  I'm happy to strike this entirely and

24  move on, Your Honor.

25           THE COURT:  All right.  It's stricken.  Move on.

N. Feamster - Cross

2369

BY MR. ZEBRAK: (Continuing)

Q.   Sir, your position is you need to compute the hashes and you can't just rely on what a peer is reporting that they're distributing, right?

A.   Exactly right.

Q.   Okay.  That's your position, you've made that clear.  I would like to explore that with you on that.

A.   Okay.

Q.   And I think in order to do that, we need to understand the bitfield data, correct?  The concept of bitfields, that's at the center of all this, am I correct?

A.   No.

Q.   Okay.  A peer's bitfield indicates the pieces of the file that the peer has already downloaded, correct?

A.   Not exactly.

Q.   A peer's BitTorrent software in the bitfield reports to the world the pieces that they're sharing, correct?

A.   Yes.

Q.   And a peer does not report that it has a piece to share until it has checked the hash value for the piece and matched it against the hash value for what the torrent says the piece should be, correct?

A.   Unless it's lying about that piece, that's correct.

Q.   And you agree, sir, do you not, that MarkMonitor's software looks at and captures the peer's bitfield information,

N. Feamster - Cross

2370

1    correct?

2    A.    Sometimes.

3    Q.    The evidence packages in this case, you received those,

4    correct?

5    A.    I did.

6    Q.    And those evidence packages for BitTorrent have bitfield

7    information in them, correct?

8    A.    They often do.

9    Q.    Well, so you say they often do.  You actually didn't

09:53:18  10    examine the bitfield information in the evidence packages, did

11    you?

12    A.    I did.

13    Q.    But the subject of your testimony is really about the need

14    for a download, not what bitfield data reflects, correct?

15    A.    Correct.

16    Q.    Okay.  And you did not at the time of your expert analysis

17    and deposition review the bitfield information to see what

18    percentage of the file the peer was reporting they were

19    sharing, correct?

09:53:57  20    A.    I was focused on the download information, you're correct.

21    Q.    Right.  So at the time of your expert analysis and

22    deposition, you didn't disagree with Barbara Frederiksen-Cross'

23    analysis that the Cox customers identified in the notices,

24    based on her review of these evidence packages, that in

25    virtually every instance reported that they were sharing 90 to

N. Feamster - Cross

2371

1    100 percent of the known infringing file, correct?

2    A.    If I remember correctly, I didn't dispute the bitfield

3    analysis, that's right.

4    Q.    And out of that pool, the bitfield information in those

5    evidence packages at the time of your analysis and deposition

6    indicated that about 85 percent of these peers had 100 percent

7    of the file, correct?

8    A.    I disagree with how you framed that question.  So, no.

9    Q.    Again, at the time of your analysis and deposition you

09:54:55  10    hadn't reviewed the bitfield information to see the percentages

11    that the peers were sharing, right?

12    A.    What the peer is reporting in a bitfield is irrelevant to

13    what it's actually sharing without performing the download, is

14    what I said.  You can't verify anything, that's what I said in

15    my deposition.

16    Q.    Dr. Feamster, you have made your position clear about

17    downloads.  I'm asking you about --

18             THE COURT:  Ask your next question.  You're just

19    testifying now.  Just ask the question.

09:55:21  20             MR. ZEBRAK:  Yes, Your Honor.

21    BY MR. ZEBRAK:  (Continuing)

22    Q.    Barbara Frederiksen-Cross -- strike that.

23             At the time of your analysis in this matter, and your

24    subsequent deposition, you didn't disagree with Barbara

25    Frederiksen-Cross' opinion that 85 percent of the peers in

2372

1  these evidence packages had 100 percent of the file based on

2  the bitfield information, correct?

3  A.   Again, you framed --

4       MR. BRODY:  Asked and answered, Your Honor.

5       THE COURT:  If you can answer, go ahead.

6  A.   The same question, you framed that as though they have the

7  file.  I don't dispute the bitfields -- what the peers are

8  reporting about their bitfields, but it has nothing to do with

9  what they're actually sharing as far as the contents of the

09:56:09 10  file.

11  BY MR. ZEBRAK: (Continuing)

12  Q.   My question is simply, you don't dispute that these peers

13  reported that they had -- that 85 percent of these peers

14  reported that they had 100 percent of the file, correct?

15  A.   I agree with you on reporting, yes.

16  Q.   And you also agree, Dr. Feamster, that at the time of your

17  analysis and subsequent deposition, you hadn't listened to the

18  recordings on the hard drive that was produced in this matter,

19  correct?

09:56:40 20  A.   I might have listened to one or two, but I -- it wasn't

21  really material to my report.  And so, no, the vast majority of

22  them I did not listen to, yeah.

23  Q.   Dr. Feamster, yes or no, you didn't find any instances

24  that any of the infringements reported in this matter were

25  associated with corrupted files, correct?

N. Feamster - Cross

2373

1    A.    For the vast majority of notices there was no download, so

2    I had no way of checking that.  I can't answer that question.

3    Q.    And because of that, that's why you're relying on the

4    notion that corrupted files could occur in the wild about

5    1 percent of the time; is that correct?

6    A.    That's not what I'm relying on.  So, no, I disagree with

7    your comment.

8    Q.    With respect to the theoretical possibility that the files

9    that the Cox subscribers were sharing were corrupted files,

09:58:05 10  because you couldn't examine the actual files, you're relying

11   on the idea that they may have been corrupted about 1 percent

12   of the time, correct?

13   A.    No.  I'm generally relying on the fact that peers lie and

14   that can happen up to 70 percent of the time.

15           MR. ZEBRAK:  Your Honor, may we have a sidebar,

16   please?

17           THE COURT:  Ask your next question, please.

18           MR. ZEBRAK:  I move to strike that answer.

19           THE COURT:  All right, it's stricken.

09:58:33 20  BY MR. ZEBRAK: (Continuing)

21   Q.    Dr. Feamster, let's talk about incentives to lie.

22           You've testified, am I correct, that peers have an

23   incentive to lie when they're newcomers to BitTorrent and don't

24   yet have something to share?

25   A.    That's one instance where peers have incentive to lie.

N. Feamster - Cross

2374

1    There are others.

2    Q.   And you agree, of course, that BitTorrent has a mechanism

3    to welcome newcomers that come empty handed, doesn't it?

4    A.   It's called optimistic unchoking, right.  Exactly.

5    Q.   Okay.  And the idea there is that it provides for peers

6    that don't yet have anything to receive something, correct?

7    A.   In the case of newcomers, there is a mechanism to account

8    for that, yes.

9    Q.   Right.  So those newcomers don't need to lie, they can

10:59:52 10   rely on that mechanism, at least in some cases, correct?

11        It's a yes or no question, sir.

12   A.   They still gain benefit from lying.  So, yes, there is

13   some benefit to lying.  Yes.

14   Q.   And let's talk a little bit more about your theory of --

15   well, first of all, is it your theory that all 57,600 Cox

16   subscribers in MarkMonitor's notices were lying about what they

17   were sharing?

18        It's a yes or no question.

19   A.   No, that's not my theory.

10:00:22 20   Q.   But your theory is that 1 percent of them, at least at the

21   time of your deposition and analysis, may have been lying,

22   right?

23   A.   No, that's not.  1 percent refers to a file corruption

24   likelihood.  The lying --

25        THE COURT:  Okay.  All right.

N. Feamster - Cross

2375

1          THE WITNESS:  Sorry.

2          MR. ZEBRAK:  May I have 30 seconds, Your Honor?

3     BY MR. ZEBRAK: (Continuing)

4     Q.   Dr. Feamster, isn't it also true that BitTorrent

5     self-polices against lying and actually disincentivizes it?

6     A.   Part of that is dependent on performing the download and

7     verification, yes.  There are built-in mechanisms in BitTorrent

8     to protect against that.

9     Q.   Right.  And what happens in BitTorrent, sir, is that peers

10:01:18  10    who -- if they hand out garbage are blacklisted, correct?

11          It's a yes or no question, sir.

12    A.   If the verification is performed, then, yes.  Otherwise,

13    no.

14    Q.   I'd like to talk to you a little bit about your idea of

15    how peers could be lying.

16          Isn't it true that at the time of your expert

17    analysis and subsequent deposition, you were unable to name

18    even a single BitTorrent software client that would enable a

19    peer to lie?

10:01:58  20          And that's a yes or no question, sir.

21    A.   At the time you asked me, I was unable to give you a

22    precise name.  I told you that it was -- there were many such

23    systems, and I'm happy to offer the names of several if you'd

24    like them now.

25          THE COURT:  Listen.  You heard the question.  You're

2376

1    a bright man, you know, you've got lots of degrees, and the

2    question was pretty clear.

3           At the time of your deposition, did you not at that

4    time give that answer?  Right?

5           THE WITNESS:  I gave that answer, yes.

6           THE COURT:  Okay.

7    BY MR. ZEBRAK: (Continuing)

8    Q.   Dr. Feamster, you agree that the Cox subscribers at issue

9    here reported that they were sharing files identified by hash

10:03:07 10   value that MarkMonitor had already confirmed as infringing,

11   correct?

12   A.   I disagree.

13   Q.   The evidence packages in this case, sir, contain

14   information showing that the Cox subscribers reported that they

15   were sharing files identified by their hash value that

16   MarkMonitor had already downloaded and confirmed were

17   infringing, correct?

18   A.   That's not quite right.  I'd be happy to offer more detail

19   if you want.

10:03:39 20   Q.   We've already established that MarkMonitor downloads files

21   that it suspects are infringing, right?

22   A.   Yes, we have.

23   Q.   And it looks it up in Audible Magic, right?

24   A.   For the files it has downloaded, it does so, yes.

25   Q.   Right.  And once it has the match, it has what it calls as

2377

1   a known infringing file, right?

2   A.   Yes.

3   Q.   And it has the hash value for that file, right?

4   A.   It computes the hash value for each of those, yes.

5   Q.   And then subsequently it connects to the Cox subscriber on

6   one of these peer-to-peer networks -- and I'm only asking you

7   about BitTorrent now.  I know you didn't analyze the other

8   three peer-to-peer networks.  So my questions to you are aimed

9   solely at BitTorrent.  Okay?

10:04:20  10   A.   Okay.

11   Q.   And so, it connects to the Cox subscriber and it does a

12   handshake, and in the process thereof the Cox subscriber

13   reports what it's sharing, correct?

14   A.   Yes.

15   Q.   Dr. Feamster, you had a slide that -- actually, if we

16   could --

17        Mr. Duval, could you pull up the slide 24.

18        Do you remember this slide, Dr. Feamster?

19   A.   Yes.

10:05:09  20   Q.   Okay.  So it indicates here -- it's talking about a file

21   name.  You acknowledge, sir, that it's the known infringing

22   hash that MarkMonitor looks for when it connects to a Cox

23   subscriber, correct?

24   A.   Where are you referring to on the slide?

25   Q.   Do you see where it says:  Identifying --

N. Feamster - Cross

2378

1          Mr. Duval, if you could highlight the word "named."

2          Do you see that?  It's boxed off.

3  A.   Yes.

4  Q.   You're not purporting to tell the jury that MarkMonitor is

5  detecting and reporting infringements just based on the name of

6  a file, are you?

7  A.   I am not.

8  Q.   Okay.  And so, all these things that we see here on the

9  slide about why you need to examine a file, that's all rooted

10:06:08  10  out in the Audible Magic lookup process to see what's within a

11  file, correct?

12  A.   No.

13  Q.   Well, let's put aside lying and corrupted files on the

14  right side for a minute.  Okay?  Put those aside.

15  A.   Let's put those aside, sure.

16  Q.   In order to know a file's contents, MarkMonitor looks it

17  up in Audible Magic, correct?

18  A.   Correct.

19  Q.   Right.  And so, in that process, that's where you'd figure

10:06:34  20  out is it a home video versus a song really by Bill Withers or

21  something else?

22          It's a yes or no question, sir.

23  A.   That's what it's supposed to do.

24  Q.   And we've already covered lying and corrupted files.  But

25  again, this slide, am I correct, sir, this is not about

N. Feamster - Redirect

2379

1    MarkMonitor specifically, this slide is about background on

2    peer-to-peer, correct?

3    A.    No.

4    Q.    Well, am I correct, sir, that this slide in a section of

5    your slide deck about background on peer-to-peer, not about the

6    MarkMonitor process specifically?

7    A.    No, it's its own slide.  It's about verification.

8    Q.    Right.  It's about the need for verification?

9    A.    Yes.

10:07:21 10    Q.    Generally, right?

11    A.    It's about all the types of things that go wrong if you

12    don't perform verification.

13    Q.    Right.  And you acknowledge, sir, that MarkMonitor does

14    verification the first time it downloads a file, correct?

15    A.    On the files that it downloads, it does perform

16    verification.

17            MR. ZEBRAK:  I pass the witness, Your Honor.

18            THE COURT:  All right.  Redirect.

19            MR. BRODY:  Thank you, Your Honor.

10:07:50 20        REDIRECT EXAMINATION

21    BY MR. BRODY:

22    Q.    So first of all, let's get this bitfield stuff straight.

23            Does the fact Mr. Zebrak alluded to, that -- I think

24    it was 90 percent of the peers investigated by MarkMonitor

25    reported having 100 percent of the bitfields, does that tell

N. Feamster - Redirect

2380

1  you anything at all about whether they have copies of the

2  actual files of the works in suit?

3  A.   It tells you nothing.

4  Q.   Why not?

5  A.   Because a peer, as we've discussed, has incentives to tell

6  other peers that it has files or pieces of files that it may

7  not have.  There are a number of reasons for which that could

8  be the case.

9  Q.   And we've talked, both on direct and cross, about

10:08:51  10  dishonest peers and lying peers.  What is it that such peers

11  are being dishonest about?  What kind of lies are they telling?

12  A.   It's a wide range of lies that peers can tell for a

13  variety of reasons.  Some of them are small, some of them are

14  big.  I'll give you an example of each.

15       A peer could lie about a particular piece or a chunk

16  that it has because BitTorrent tries to do something called

17  rarest piece first.  A peer has an incentive to say that it has

18  a piece of a file that nobody else has so that everybody wants

19  to talk to it.  That's a small case.

10:09:28  20       A larger case that happened in other -- in BitTorrent

21  and other peer-to-peer networks like Gnutella, something called

22  file pollution where attackers often would put fake copies of

23  files on these peer-to-peer networks.  In fact, the recording

24  industry had a practice of doing this.

25       MR. ZEBRAK:  Your Honor, can we have a sidebar?  I

N. Feamster - Redirect

2381

1    move to strike.

2         THE COURT:  Yeah, come to sidebar.

3         NOTE:  A sidebar discussion is had between the Court

4    and counsel out of the hearing of the jury as follows:

5    AT SIDEBAR

6         THE COURT:  Is this contained within his expert

7    report, or is it --

8         MR. BRODY:  The last statement is not in his report

9    and it wasn't -- it was not in his deposition.  I'll move to

10:10:18 10   strike it and I'll ask him to respond yes or no.

11        MR. ZEBRAK:  Yeah.  And it's kind of hard to unring a

12   bell when he keeps doing things like this.  And we'll move

13   to --

14        THE COURT:  Well, then make the objection sooner.

15        MR. ZEBRAK:  Yeah, I understand, but -- yeah.

16        THE COURT:  Okay.  All right.  So you're going to try

17   and confine him to his report and --

18        MR. BRODY:  The question I asked him goes to --

19        THE COURT:  What other types of lying were there.  So

10:10:41 20   you asked him the substantive.  And he said, I can give you

21   examples, and you just waited for him to give you examples.

22        So if that's outside of his report, then don't --

23        MR. BRODY:  Those example -- that example was outside

24   of his report.

25        THE COURT:  Okay.

N. Feamster - Redirect

2382

1        MR. BRODY:  I think I just asked him what they would

2   lie about.  And I was expecting him to say the content of the

3   file, and he went farther.

4        THE COURT:  Okay.

5        MR. BRODY:  So I'll move away and ask him to respond

6   specifically.

7        THE COURT:  Okay.  I'll strike the last answer.  And

8   you ask the next question.  Okay.

9        NOTE:  The sidebar discussion is concluded; whereupon

10  the case continues before the jury as follows:

11  BEFORE THE JURY

12        THE COURT:  All right.  I'm going to strike the last

13  answer.

14        And, Dr. Feamster, still in your answer, sir, try and

15  limit your answers to those that were in your expert report

16  and/or deposition.  But don't reflect other work that you may

17  have done since that time.  Okay?

18        THE WITNESS:  Yes, Your Honor.

19        THE COURT:  All right.  Thank you.

10:11:53  20        THE WITNESS:  Thank you.

21        THE COURT:  Please, go ahead, Mr. Brody.

22  BY MR. BRODY:  (Continuing)

23  Q.   So let me ask a different version of that last question.

24  And I just mean this to be a yes or no question.

25        When peers are being dishonest and when they're

N. Feamster - Redirect

2383

1  lying, are they lying about the contents of the files that they

2  possess?

3  A.   Yes.

4  Q.   Okay.  And is one way that they do that by misrepresenting

5  what bitfields they have?

6            THE COURT:  I'm sorry.  It's leading.

7  Q.   Is bitfield reporting ever used to perform dishonestly?

8  A.   Yes.

9  Q.   Okay.  Mr. Zebrak asked you a question on cross about

10:13:03  10  whether notices are sent before the lookup takes place, and I

11  think your response was that that happens.  That that happens.

12            Do you recall that exchange?

13  A.   Can you ask that one more time?  I just want to make sure

14  I heard it correctly.

15  Q.   Sure.  I'm sorry.

16  A.   Yeah.

17  Q.   It wasn't a very well-phrased question.  He asked you some

18  questions about whether notices are sent to the Cox subscribers

19  before the Audible Magic lookup takes place.  And I think you

10:13:31  20  testified that that happens sometimes?

21  A.   I remember that exchange, yes.

22  Q.   Okay.  Could you look at tab -- the tab for Deposition

23  Exhibit 130 in your binder, please.

24  A.   I think it's the only one.

25            MR. BRODY:  May I approach, Your Honor?  I just want

N. Feamster - Redirect

2384

1   to make sure I'm not trespassing on a boundary.

2              THE COURT:  What do you want to look at?

3              MR. BRODY:  I'm going to ask -- I was asking if I

4   could approach the bench.

5              THE COURT:  A sidebar, yes, sir.

6              NOTE:  A sidebar discussion is had between the Court

7   and counsel out of the hearing of the jury as follows:

8   AT SIDEBAR

9              THE COURT:  Getting your exercise this morning.

10:14:23 10       MR. BRODY:  But you have got me trained about where

11   to stand.

12             So Mr. Zebrak did ask -- there was that exchange.

13   And the question was, is it ever the case that they send the

14   notices before Audible Magic actually does the look up.

15             He didn't discuss that in his report.  It didn't come

16   up in his deposition.  It is in the Stroz-Friedberg report,

17   which is in his binder and which he did review.  And I was

18   simply going to point him to that passage, ask him to explain

19   his answer.  I think he opened the door to that.

10:14:54 20       THE COURT:  I don't know -- I don't remember -- I

21   don't recall that question.  What do you recall?

22             MR. ZEBRAK:  So, Your Honor, the witness -- let me

23   answer the question, but also take a step back while I do it.

24             So the witness blurted a non-responsive answer out

25   where he mistakenly said, notices go out before there is an

N. Feamster - Redirect

2385

1    Audible Magic confirmation.

2            And then I followed up on it to clarify.  And he then

3    rescinded that answer and said, really what he meant is that

4    sometimes the collection is happening while the look-ups are

5    also happening, but no notices go out until later.

6            And I was merely clarifying the record, bringing his

7    testimony in so it was clear.  And it was from a non-responsive

8    question.

9            What he is attempting to do now is go back to this

10:15:44  10   Stroz-Friedberg and some other report that says, the idea of

11   collecting before you verify creates some risk that you might

12   send a notice before you've done your verification.  They have

13   done this with 100 witnesses already and it is certainly not

14   what I elicited.

15           THE COURT:  A hundred?

16           MR. ZEBRAK:  Well, it seems like it.

17           MR. BRODY:  I can't ask the court reporter to go over

18   the transcript, but I'm -- he directly elicited that response

19   because he wanted to establish that the notices never go out

10:16:14  20   before the Audible Magic check is done.  And that's not the

21   truth.

22           And the witness, I think, gave a qualified answer,

23   said it happens sometimes, and then there was some back and

24   forth.  But I just want to direct him to the basis for that

25   answer.

N. Feamster - Redirect

2386

1          THE COURT:  Well, I'm not going to let you go back

2   into the report, but you can ask him to complete his answer to

3   the questions on cross-examination that he believes it happens,

4   and we'll leave it at that.

5          MR. BRODY:  Okay.

6          MR. ZEBRAK:  Your Honor, just so we have it smoother

7   when we get back.  The issue I have is that Mr. Brody is

8   referencing his first answer, but not his answer that he later

9   rescinded.

10:16:53 10          So when he says, here's what you testified about,

11   he's not explaining and he's reading into the record not what

12   he actually said.

13          THE COURT:  Okay.  So let's not -- because you can't

14   capture the actual question that was asked on cross-examination

15   exactly, just don't preface -- just ask him directly.

16          MR. BRODY:  I will ask him, is it always the case

17   that -- is it ever the case that a notice goes out before the

18   Audible Magic check is completed.

19          THE COURT:  All right.  I will allow the question.

10:17:28 20   Your exception is noted.

21          NOTE:  The sidebar discussion is concluded; whereupon

22   the case continues before the jury as follows:

23   BEFORE THE JURY

24          THE COURT:  Go ahead, sir.

25   BY MR. BRODY: (Continuing)

N. Feamster - Redirect

2387

1    Q.   Okay.  On this subject of notices and checks, is it ever

2    the case that MarkMonitor -- let me ask it this way.

3          Is there ever a reason why MarkMonitor might send a

4    notice before it has completed the Audible Magic check?

5          MR. ZEBRAK:  Objection.

6    A.   Yes.

7          THE COURT:  Overruled.

8          MR. ZEBRAK:  Lack of foundation, calls for

9    speculation.

10:18:25  10          THE COURT:  Thank you.  Overruled.

11   BY MR. BRODY: (Continuing)

12   Q.   And what is that reason?

13   A.   As described in some of the audit documents, step 2 and

14   step 3 in the MarkMonitor process were not performed

15   sequentially.  The scanning of the peer-to-peer networks for

16   peers that report to be sharing a file sometimes occurred

17   before the Audible Magic fingerprint checks.

18   Q.   Okay.  Thank you.

19          Now, counsel directed you to -- or he didn't actually

10:19:19  20   direct you to it, he played a clip of your deposition from

21   page 312 of the transcript about the 1 percent, what the --

22   whether there was a 1 percent inaccuracy problem of some sort.

23          Do you recall that generally?

24   A.   I remember him playing that clip.

25   Q.   Okay.  Could you take a second and look at pages 309

N. Feamster - Redirect

2388

1    through 311?

2            Do you recall the context of that question at your

3    deposition?  And I would direct you to the pages immediately

4    preceding it to refresh your recollection.

5    A.   Yes, I remember this pretty clearly from the deposition as

6    well.

7    Q.   What do you recall being the context of that question and

8    answer that he played to the jury?

9    A.   That line of questioning was exclusively in the context of

10:20:10  10  bit errors in storage and transmission.

11   Q.   Okay.  So is this related to the corrupted file issue that

12   we were talking about?

13   A.   About the likelihood of a corrupted file, exactly.

14   Q.   Could you look at page 289 of your deposition.  I will

15   direct you in particular to lines 21 through 24.

16   A.   I see it.

17   Q.   Okay.  Did Mr. Zebrak ask you about how frequent or how

18   likely it was that there would be dishonest reporting of files

19   in a BitTorrent network?

10:20:47  20  A.   Many times.

21   Q.   Okay.  Now, I don't believe you gave a quantitative answer

22   to that question at your deposition, but did you give a

23   qualitative answer?

24   A.   Yes, I did.

25            MR. ZEBRAK:  Objection, Your Honor.  He is

N. Feamster - Redirect

2389

1    testifying.  That isn't consistent with the witness' testimony

2    at deposition.

3              THE COURT:  Does it refresh his recollection about

4    what he said in the deposition?

5              MR. BRODY:  Yes.  Fine.

6    BY MR. BRODY:  (Continuing)

7    Q.   Were you asked about the prevalence of dishonest peers in

8    a BitTorrent network at your deposition?

9              That's a yes or no question.

10:21:17 10   A.   Yes.

11   Q.   And what did you say at your deposition?

12   A.   I'll read it.

13             THE COURT:  Does that refresh your recollection about

14   what you said at your deposition?

15             THE WITNESS:  I've got it right here.  I said:  It's

16   quite likely.

17   BY MR. BRODY:  (Continuing)

18   Q.   Okay.  And that's the answer you gave on direct, right?

19   A.   Yes.

10:21:34 20   Q.   And that's the answer you believe to be true, isn't it?

21   A.   Yes.

22   Q.   Now, Mr. Zebrak's first question to you, almost his first

23   question was, in the, I think he said, 200 hours that you

24   worked on the case, did you find any inaccurate notices?

25             Do you recall that question?

N. Feamster - Redirect

2390

1    A.    I remember that question.

2    Q.    Did you find any reason why it is likely that inaccurate

3    notices were sent?

4    A.    Yes.  We talked about some already.

5    Q.    Okay.  And what was the reason why it's likely that

6    inaccurate notices were sent?

7    A.    The predominant reason is that MarkMonitor, the

8    MarkMonitor software never actually performed checks upon

9    scanning the peer-to-peer networks.  So they had no way of

10:22:26 10   telling what content the peers were actually sharing.

11   Q.    Okay.  And you said you reviewed Mr. Bahun's testimony and

12   Ms. Frederiksen-Cross' testimony, did I understand that

13   correctly?

14   A.    I was here for most of that, and I read the transcripts,

15   yes.

16   Q.    Do you recall portions of their testimony when it became

17   clear that inaccurate notices were in fact sent?

18   A.    Pretty striking, yes.

19          MR. ZEBRAK:  Objection, Your Honor.

10:22:54 20   A.    I do remember.

21          THE COURT:  Overruled.

22          MR. BRODY:  That's all I have, Your Honor.

23          THE COURT:  All right.  Thank you.

24          MR. ZEBRAK:  Your Honor, may I have very brief

25   clean-up?

2391

1          THE COURT:  Yes, sir, you may.

2          RECROSS-EXAMINATION

3    BY MR. ZEBRAK:

4    Q.    Dr. Feamster, do you recall me asking in your deposition

5    whether you could name a single study or piece of research

6    about peers lying?

7    A.    I remember the question.

8    Q.    And you couldn't identify even a single piece, correct?

9    A.    I told you there were many, yes.

10:23:22 10    Q.    Right.  But you -- and I asked you several times and you

11   couldn't name a single one, correct?

12          It's asking you a question --

13   A.    I gave you the names -- I remember giving you the names of

14   some authors about file corruption, for example.

15   Q.    Right.  I am -- see, sir, I'm asking you to please pay

16   attention to my question.

17   A.    Yeah.

18   Q.    I'm not talking about file corruption.

19   A.    Okay.

10:23:39 20    Q.    You couldn't name a single study about peers lying,

21   correct, at the time of your deposition?

22   A.    I just remember telling you there were many such studies.

23   Q.    And do you recall counsel just gave you an opportunity to

24   explain more about the context for your answer about the

25   percentage of the time that peers might be lying in their

N. Feamster - Recross

2392

1   bitfield information?

2   A.   I remember him asking me what my answer was to your

3   question at deposition.

4   Q.   Right.  I think --

5   A.   And why peers might lie.  Is that what you are asking?

6            THE COURT:  I haven't heard a question yet.

7            THE WITNESS:  I'm sorry.  I don't know what the

8   question is.

9            MR. ZEBRAK:  I just --

10:24:18  10            THE COURT:  Let's ask a question.

11   BY MR. ZEBRAK: (Continuing)

12   Q.   Sir, a moment ago --

13   A.   Yeah.

14   Q.   -- you provided some more context for your deposition

15   testimony where you said that bitfield information would be

16   inaccurate about 1 percent of the time, that was the clip I

17   played.  Do you recall that?

18   A.   That's not what I said, ever.  You keep asking questions

19   saying things that I didn't say.

10:24:37  20            THE COURT:  Let's move on.

21   Q.   Sir, do you remember the clip we played where you -- a

22   little while ago you said I asked you the same question 14

23   times and then you finally gave an answer and you said it was

24   1 percent?

25   A.   I remember you taking it out of context, yes.

N. Feamster - Recross

2393

1    Q.   Okay.  So I'd like you to --

2              THE COURT:  Hold on.  Hold on.

3              MR. BRODY:  We have been through this 15 times.

4              THE COURT:  Asked and answered five times at least.

5         And you're not going to make it any clearer if you

6    keep asking the same questions.  He's going to give you the

7    same answer.

8              Whether it's responsive or not, the jury can make

9    that decision.

10             MR. ZEBRAK:  Yes, sir.

11             THE COURT:  Have you got something else?

12             MR. ZEBRAK:  Yes, Your Honor.  I was merely going to

13   have him look at the question before and as for the one we

14   played.

15             THE COURT:  Go ahead, you may do that.

16   BY MR. ZEBRAK:  (Continuing)

17   Q.   Sir, would you look back at your deposition testimony.

18   And specifically look at -- I'm going to look at pages 320 and

19   321.

10:25:38  20             MR. BRODY:  I think the clip was on page 12.

21             MR. ZEBRAK:  Oh, excuse me.  That's right.  Thank

22   you.

23             MR. BRODY:  You're welcome.

24   BY MR. ZEBRAK:  (Continuing)

25   Q.   I'm at 312 and 313.  Excuse me.

N. Feamster - Recross

2394

1   A.   Sorry, I was -- okay.

2        MR. BRODY:  Your Honor, I have a fairness objection.

3   Can he look at the entire context of the question and answer?

4        THE COURT:  Read what you want to read.

5        THE WITNESS:  Okay.  Yeah, I'll probably read a

6   little bit before that, if it's okay.

7        THE COURT:  Go ahead.

8   BY MR. ZEBRAK: (Continuing)

9   Q.   See, on page 312, do you see -- does that refresh your

10:26:14 10   recollection about what I asked you about before the clip we

11   played where you said 1 percent?

12   A.   Yeah, but actually I have to go back to page 307 to really

13   get the full context of that.  Where you say -- I mean, I can

14   read back to you what kind of refreshes my memory about it.

15        THE COURT:  No.  Wait for the next question.

16   BY MR. ZEBRAK: (Continuing)

17   Q.   So I am asking you right now.

18        So the question before the clip we played was about

19   bitfield data, right?

10:26:43 20   A.   Well, the broader context of the line of questioning at

21   the deposition was actually about a whole range of things.  You

22   actually have to go back a few more pages to get the full

23   question.  So, no, I don't agree.

24        THE COURT:  The question --

25        THE WITNESS:  Yeah.

1          THE COURT:  Wait.  Do you want to -- read the

2    question and tell him, wasn't this his answer.  And then --

3          MR. ZEBRAK:  Yes, sir.

4    BY MR. ZEBRAK:  (Continuing)

5    Q.   You -- excuse me.  I'm reading now at page 312, line 12.

6    Was this not your question and answer:  You -- you have not

7    offered any opinion about the percentage of likelihood that any

8    of these reasons that you attribute to the bitfield data being

9    possibly inaccurate -- inaccurate about what appears to be

10   sharing -- about what appears actually sharing, are you?

11          Answer:  Since you're asking the question, I -- I

12   reserve the right to -- to offer those numbers after the

13   opportunity of doing that research.

14          That question and answer, I read that accurately,

15   correct?

16   A.   Yes.

17   Q.   And --

18   A.   That small snippet of testimony is exactly as we had,

19   yeah.

20   Q.   And then am I correct, the clip we played before reads as

21   follows:  --

22          MR. BRODY:  Objection, asked and answered.

23          THE COURT:  Yeah, it --

24          MR. ZEBRAK:  Just -- okay.  I'll move on, Your Honor,

25   and the --

2396

```
 1              THE WITNESS:  I mean, you're slicing and dicing the

 2  transcript.

 3              MR. ZEBRAK:  Okay.

 4              THE WITNESS:  It's really tough for me --

 5              MR. BRODY:  Stop.

 6              THE COURT:  Stop.

 7  BY MR. ZEBRAK:  (Continuing)

 8  Q.   So the --

 9  A.   Yeah.

10:28:07 10  Q.   We just read in the question before and after the clip we

11  played?

12  A.   Yeah, yeah.

13  Q.   Now, the question after --

14              THE COURT:  No.

15  Q.   -- the clip we played.

16              THE COURT:  Oh, the question after the clip that you

17  played?

18              MR. ZEBRAK:  Yes, yes.

19              THE COURT:  Go ahead.

20              MR. ZEBRAK:  It was a follow-up.

21  BY MR. ZEBRAK:

22  Q.   Question -- this is on page 313, line 21:  Thank you.  And

23  sitting here today, you don't have any specific studies or

24  measurements or research supporting your conclusion that

25  1 percent of the time bitfield information about what a user
```

N. Feamster - Redirect

2397

1  is -- has on their computer for share will be inaccurate?

2           And the answer:  Oh, I'm very familiar with the

3  research in this area.  And I referred you to some of that

4  research already.

5           That was your answer right after the clip we played,

6  correct?

7  A.   That was my answer, yes.

8           MR. ZEBRAK:  Thank you.  No further questions, Your

9  Honor.

10:28:56  10           MR. BRODY:  May I have one question, Your Honor?

11           THE COURT:  Yes.

12           MR. BRODY:  I promise, one.

13           THE COURT:  Yes, sir.

14      REDIRECT EXAMINATION

15  BY MR. BRODY:

16  Q.   What happened at page 307 of your deposition?

17  A.   Mr. Zebrak narrowed the context of this line of

18  questioning to set a condition that peers were telling the

19  truth.

20           THE COURT:  Okay.

21  Q.   Telling the truth for any reason?  Telling the truth or --

22  A.   Well, that they were not lying.

23  Q.   Page 307.

24  A.   Yeah.  Can I read lines 14 --

25           MR. ZEBRAK:  Your Honor, may we have a sidebar?

N. Feamster - Redirect

2398

1           THE COURT:  Yes, sir.

2           NOTE:  A sidebar discussion is had between the Court

3    and counsel out of the hearing of the jury as follows:

4    AT SIDEBAR

5           MR. BRODY:  Your Honor, I'll withdraw the question.

6           MR. ZEBRAK:  Well, Your Honor, he just testified --

7           THE COURT:  I'm sorry.  Hold on.  Hold it, hold it,

8    hold it.  What did you say?  You're going to withdraw the

9    question?

10:30:05 10           MR. BRODY:  Yeah.  I asked him about the wrong page.

11   I should have asked him about 309, not 307.

12           THE COURT:  Okay.  Well, what -- do you want ask him

13   about 309?

14           MR. BRODY:  I wanted to ask him -- I'm just going to

15   ask him, what was the context of the question that he read back

16   to him.

17           THE COURT:  Well, we just heard this testimony that

18   he -- that Mr. Zebrak specifically limited how he could answer

19   the question and took -- you know, and forced him to assume

10:30:32 20   certain facts.  So where are we with that?

21           MR. BRODY:  Let me ask him the question.  Your Honor,

22   may I --

23           THE COURT:  I haven't read the deposition obviously.

24           MR. BRODY:  Yeah.

25           THE COURT:  What's going on here?

N. Feamster - Redirect

2399

1          MR. BRODY:  Here's -- they spent a ton of time

2    talking about dishonesty.  And then the topic switched to

3    storage errors.  And the questions that he has been reading in

4    impeachment came at the end of the storage error discussion.

5    And they were asked in exactly --

6          THE COURT:  They're fairly clear questions, right?  I

7    mean -- but if there was -- if he was limited in how to answer

8    them by a previous question --

9          MR. BRODY:  Well, I think he --

10:31:12 10          THE COURT:  I think that was fair.

11          MR. BRODY:  I think he was -- I think what the

12    deposition shows is that they were talking about the accuracy

13    with respect to problems caused by corruption.  And then he

14    said how often are they accurate, and he gave that answer.

15          When they were talking about the accuracy with

16    respect to dishonesty, he gave him the very likely answer.  I

17    mean, if that's already been --

18          THE COURT:  It's out there.

19          MR. BRODY:  Okay.  Then let's just leave it.

10:31:42 20          MR. ZEBRAK:  But, Your Honor, here's the problem I

21    have.  Counsel just stood up and basically called me a liar in

22    front of the jury, and he indicates that the transcript says

23    something that it didn't say.  And this has now happened

24    repeatedly through this testimony, both with counsel testifying

25    and the witness.  And I'm not sure what we do about it other

2400

1   than an instruction.

2          THE COURT:  Okay.  I'll correct the last couple of

3   questions and answers and say that they should -- there was

4   some confusion about the testimony.  And their answers are --

5   the questions and answers are stricken and shouldn't be

6   considered.

7          MR. BRODY:  That's fine.

8          MR. ZEBRAK:  And is he -- is this done now or is

9   he --

10:32:17   10          THE COURT:  That's it, we're done.

11          MR. BRODY:  I'm sitting down.

12          THE COURT:  We're done.

13          NOTE:  The sidebar discussion is concluded; whereupon

14   the case continues before the jury as follows:

15   BEFORE THE JURY

16          THE COURT:  There were -- there was some confusion

17   about deposition testimony, what was, what wasn't in the

18   deposition testimony.  And the bottom line is that you should

19   not consider the last series of questions or answers at all

10:32:53   20   because of that confusion.  And so, I'm striking them from your

21   consideration.  It was just some confusion by everybody.

22          So, Dr. Feamster, you are excused, sir.  Thank you,

23   and have a good day.

24          THE WITNESS:  Thank you, Your Honor.

25          MR. BRODY:  Thank you, Your Honor.

2401

```
 1              NOTE:  The witness stood down.

 2              THE COURT:  All right.  Next witness.

 3              MR. BUCHANAN:  Your Honor, Cox would call

   Mr. Christopher Bakewell to the stand.

 5              THE COURT:  Okay.

 6              MR. GOULD:  Your Honor, we have an issue with one

 7   slide that we were handed just before Dr. Feamster.

 8              THE COURT:  All right.  Approach the bench.

 9              NOTE:  A sidebar discussion is had between the Court

10   and counsel out of the hearing of the jury as follows:

11   AT SIDEBAR

12              THE COURT:  Yes, sir.

13              MR. GOULD:  Mr. Buchanan handed us a slide deck for

14   Mr. Bakewell just moments before Dr. Feamster went on, and I've

15   been reviewing them during Dr. Feamster's testimony.

16              There's a slide number 10 with an image and the

17   headline says:  Accused activity is a small fraction of data

18   usage.

19              Mr. Bakewell has offered no opinions on the

20   percentage or amount of data usage that this accused activity

21   is for.  He has given a generic opinion that the -- that Dr.

22   Lehr hasn't accounted for other types of activities, but he had

23   no quantification.  It's misleading and outside the scope of

24   his report to say "small fraction."  I think the headline can

25   be adjusted to correct the problem.
```

10:34:28 (line 20)

2402

```
 1                THE COURT:  Yes, sir.
 2                MR. BUCHANAN:  This is in response to Dr. Lehr's
 3    exhibits where I asked him and I went through and I said, how
 4    much about the revenue, and can you take out the video, and you
 5    take out, you know, TV and phone, and we reduced it down.
 6                And he does testify in his deposition and he does
 7    reference in the report, the focus that -- he speaks in
 8    generalities as opposed to focusing on the activities in
 9    question.  You know, 57,000 subscribers, and the activity in
10    question is downloading music.
11                And this is just his term.  I mean, it's just a term.
12    He's not stating what percentage.  He can cross him on it.  I
13    don't think it's misleading --
14                THE COURT:  Can you take it off of there, or is it
15    too late to do that?
16                MR. BUCHANAN:  Well, I can -- unless we take a break,
17    I mean --
18                MR. OPPENHEIM:  I'm sure their hot seat man can do
19    this change real quickly.  Our guys could.
20                MR. GOULD:  I was informed the other day when we had
21    the discussion about the dividend slide with Dr. Lehr, that my
22    tech gentleman was able to quickly hide that slide.
23                And when we had --
24                THE COURT:  Yeah, just say -- hide the amount.
25                MR. GOULD:  I would propose we remove the slide.
```

2403

```
 1              THE COURT:  Just, you know -- frankly, I'm surprised
 2    there haven't been more objections by the parties to the
 3    headers because it -- both parties are, you know, testifying in
 4    part on the headers information.
 5              But let's just have him strike the top line and then
 6    you just go -- take him through the substance.
 7              MR. GOULD:  Okay.
 8              THE COURT:  Okay.
 9              MR. OPPENHEIM:  Your Honor, a clarification.  Would
10:36:35 10    the witness be permitted to testify to this fact even though
11    it's not in -- it wasn't in his report or deposition?
12              THE COURT:  No, he can't.  If he didn't quantify it
13    in his deposition, he can't -- or report, he can't quantify it
14    today.
15              I'm not sure how critical it is to his testimony.  I
16    don't remember that it's of great import, but -- I mean, is
17    there any doubt that the -- this P2P use is a small percentage
18    of users' time on the internet?
19              MR. GOULD:  I think so.  I think that it's --
10:37:11 20    testimony and evidence in the record is directly to the
21    contrary, that peer-to-peer users who do so consume a great
22    balance -- spend substantial amounts of time and a substantial
23    percentage of internet traffic overall is attributable to
24    peer-to-peer during this time.
25              THE COURT:  Okay.
```

2404

```
 1              MR. BUCHANAN:  5 percent was downloading music
 2    versus, you know, film and video and gaming and downloading
 3    that.
 4              MR. OPPENHEIM:  I don't believe that's accurate.
 5              MR. BUCHANAN:  I think it is.  But I'll just ask him
 6    to go through this, and he'll just testify about all these
 7    other uses.
 8              MR. ELKIN:  I just want to say one thing, and I
 9    apologize for interrupting.
10              THE COURT:  Yeah.
11              MR. ELKIN:  But Mr. Negretti was asked in his
12    testimony about certain studies.  And in that study was
13    reflected peer-to-peer activity.  He even testified to the
14    percentage, I think, even on that survey was somewhere on the
15    order, I think around 11 percent.
16              So we're not talking about a major percentage.  And
17    that was -- he was subject to direct and cross-examination.
18              MR. GOULD:  An inCode report that Dr. Lehr testified
19    to, which was provided to Cox, showed 21 percent of traffic was
20    attributable to peer-to-peer.  To me, that's not a small
21    fraction.  If I need to cross-examine on it, I will.
22              THE COURT:  Okay.  Let's pull it out.  And if he
23    hasn't discussed the percentage, let's not have him now testify
24    about percentages if it wasn't in his report or deposition.
25    Okay?
```

2405

1              MR. BUCHANAN:  Okay.

2              THE COURT:  All right.  Thank you.

3              NOTE:  The sidebar discussion is concluded; whereupon

the case continues before the jury as follows:

4

5    BEFORE THE JURY

6              MR. BUCHANAN:  Your Honor, if you wanted to take the

7    morning break so that I can make sure the witness has the

8    correct approach and I can adjust that exhibit?

9              THE COURT:  Okay.  That's a good idea.  Thank you.

10:39:12 10              All right.  It's a little early, but we're going to

11   take the morning break now.  Let's take 15 minutes and we'll

12   come back and continue.

13              Thank you.  You're excused.

14              NOTE:  At this point the jury leaves the courtroom;

15   whereupon the case continues as follows:

16   JURY OUT

17              THE COURT:  So, Mr. Gould, no other objections to the

18   demonstratives?

19              MR. GOULD:  Well, given your --

10:40:14 20              THE COURT:  I wasn't inviting any other changes.

21              MR. GOULD:  I think we can live with these.  If I

22   change my mind, I certainly will make the Court aware.

23              THE COURT:  Okay.  All right.  Then let's take

24   15 minutes.

25              We're in recess.

C. Bakewell - Direct

2406

1              NOTE:  At this point, a recess is taken; at the

2     conclusion of which the case continues in the absence of the

3     jury as follows:

4     JURY OUT

5              THE COURT:  All right.  Are we ready for our jury?

6              MR. BUCHANAN:  Yes, Your Honor.

7              THE COURT:  All right.  Joe, please.

8              NOTE:  At this point, the jury returns to the

9     courtroom; whereupon, the case continues as follows:

10    JURY IN

11             THE COURT:  All right.  Please have a seat.

12             Good morning, sir.

13             THE WITNESS:  Good morning.

14             THE COURT:  Let's swear him first, right?

15             THE COURT SECURITY OFFICER:  We're going to swear you

16    in.

17             THE COURT:  We didn't get very far when you came

18    forward.

19        WILLIAM CHRISTOPHER BAKEWELL, DEFENDANTS' WITNESS, SWORN

20                           DIRECT EXAMINATION

21    BY MR. BUCHANAN:

22    Q.   Good morning, Mr. Bakewell.

23    A.   Good morning.

24    Q.   Would you please introduce yourself to the Court and the

25    jury by stating your full name and spelling your last name,

C. Bakewell - Direct

2407

1   please?

2   A.   Yes, I can.  Good morning.  My name is William Christopher

3   Bakewell.  I go by Chris, and you spell my last name

4   B-a-k-e-w-e-l-l.

5   Q.   And could you just generally state why you're here today,

6   what testimony you intend to offer on a very high level?

7   A.   So I'm here to respond to testimony that was provided last

8   week by Dr. Lehr regarding some financial issues.

9   Q.   And could you explain to the jury what you do for a

10  living?

11  A.   Sure.  So my specialty is I value intellectual property

12  rights.  That's the practice that I've had for the last 15

13  years or so.  I lead a practice within a firm called Duff &

14  Phelps, our intellectual property advisory services practice.

15  I also specialize in financial analysis and finance.  My entire

16  career has been focused on kind of what I call the intersection

17  of technology and finance.  That's my professional background

18  in a nutshell.

19  Q.   You -- could you -- you mentioned that you analyze

20  intellectual property.  Would that include copyrights?

21  A.   Yes.  Patents, copyrights, trade secrets.  Really

22  intangible assets as well, so customer lists and good will

23  would be examples of that.

24        My specialty, as I said, is where technology and

25  finance comes into play, and so technology-rich businesses is

C. Bakewell - Direct

2408

1    another area that you can describe as being a focus.

2    Q.   So how does the, the act or evaluating intangible assets

3    apply to this case?

4    A.   Well, we have allegations of copyright infringement, and

5    we've been talking about copyrights and the value of

6    copyrights.  Dr. Lehr had a couple of slides where he talked

7    about value and value of intellectual property, and so that's,

8    that's why it's relevant.

9    Q.   So you mentioned Dr. Lehr.  He's in the -- I think he's in

10   the courtroom now, is he not?

11   A.   Yes, he is.

12   Q.   Okay.  Do you think he -- his evaluation was proper and

13   consistent with the requirements of an expert in his position?

14   A.   I think there are some issues that he missed, frankly,

15   and -- with all due respect to Dr. Lehr, and I think those are

16   some things that the ladies and gentlemen of the jury are

17   entitled to hear.

18   Q.   Okay.  So have you been utilized as an expert in

19   litigation?

20   A.   Yes, I have.

21   Q.   Okay.  So how many times have you done the type of work

22   you just described, that is, to analyze the value of intangible

23   assets, such as copyrights, trademarks, and patents?

24   A.   Well, I've been working for about 25 years or so now, and

25   I would say over the course of my career, which has been split

C. Bakewell - Direct

2409

1    between industry and the consulting world, I've worked for a

2    firm that made things for a long time, I would say it's

3    hundreds, many hundreds of times that I've been tasked with

4    valuing intangible assets.

5    Q.   How many times have you testified in depositions as an

6    expert?

7    A.   Over a hundred, I think, certainly.

8    Q.   How about trial and/or arbitrations?

9    A.   Probably about 50 or so.

10   Q.   Okay.  I'd like to turn briefly to your educational

11   background.  Could you briefly summarize that for the jury and

12   the Court?

13   A.   Sure.  So I have two degrees.  I have a bachelor of

14   science degree in finance from a liberal arts college right in

15   the middle of Illinois called Bradley University, and I have an

16   MBA not far from here, from University of Maryland at College

17   Park.  That degree is -- my focus was in finance and

18   information systems.

19   Q.   Okay.  Have you written or published anything in the area

20   of intangible asset valuation?

21   A.   I have.  I've had articles published in peer-reviewed

22   journals.  I've had a textbook where there's a chapter that's

23   been updated.  I think it's in its third or fourth edition.

24   I've written articles upon request for various places,

25   Licensing Executive Society journals, etc.

C. Bakewell - Direct

2410

1   Q.   And where do you work now?

2   A.   I work for a firm called Duff & Phelps.

3   Q.   Okay.  And Dr. Weber also works there?

4   A.   Yes, she does.

5   Q.   Okay.  Are you being compensated for your time on this

6   case?

7   A.   My firm is.  Duff & Phelps is.

8   Q.   Similar to Dr. Weber, the firm is paid, and they charge an

9   hourly rate for you?

10  A.   Correct.  $750 per hour.

11  Q.   Okay.  Do you know how many hours you spent working on

12  this matter?

13  A.   Probably about a hundred or so through today.

14  Q.   That would include -- did you write a report in this case?

15  A.   I did.

16  Q.   Okay.  Did you testify at deposition in this case?

17  A.   I did.

18  Q.   Okay.  And then you prepared for your trial testimony,

19  right?

20  A.   Correct.  And I've been here for part of the trial and

21  read the transcript.  I saw Dr. Lehr testify.

22  Q.   Now, you mentioned that you have an expertise or your

23  practice is involved in analyzing intangible assets.  Is there

24  a particular intangible asset that you focused on in this

25  particular case?

C. Bakewell - Direct

2411

1   A.   Well, here it's the allegations that have been made.   I

2   think that's overall the intangible asset, and then there's

3   specific issues that relate to copyright infringement.

4   Q.   Okay.  Does your compensation in this case depend in any

5   way on the outcome of the matter?

6   A.   No, not at all.

7   Q.   Would you please turn to tab DX 216 of your binder?  I

8   believe that's your curriculum vitae, résumé?

9           MR. GOULD:  Can I have a binder?

10          THE WITNESS:  Yes, it is.

11          MR. BUCHANAN:  Did you give him the exhibit?  It's

12  just that.

13          MR. GOULD:  Okay.

14  BY MR. BUCHANAN:

15  Q.   Is that your résumé?

16  A.   It is.

17          MR. BUCHANAN:  Okay.  Your Honor, I'd move that into

18  evidence.

19          THE COURT:  Any objection?

20          MR. GOULD:  No objection.

21          THE COURT:  It's received.

22          MR. BUCHANAN:  And at this point in time, Your Honor,

23  I would offer Mr. Bakewell as an expert in finance and

24  intangible asset valuation.

25          THE COURT:  Any objection?

C. Bakewell - Direct

2412

1        MR. GOULD:  Yes, Your Honor.  Mr. Bakewell hasn't

2   provided any opinions in this case related to any intangible

3   asset valuation, including the asset property.  There's no

4   objection to him being admitted for his specialized knowledge

5   and experience in finance, but not the other matter.

6        THE COURT:  All right.  Well, I'll receive him for

7   the finance portion.  Do you believe you'll be asking him

8   questions about intangible assets?

9        MR. BUCHANAN:  It's the value of the subscriber that

10   Dr. Lehr talked about.

11        THE COURT:  Okay.  He'll be permitted to testify

12   within the confines of what we've previously discussed, right?

13        MR. BUCHANAN:  Yes, Your Honor.

14        THE COURT:  Okay.

15        MR. GOULD:  I don't believe Mr. Bakewell testified

16   about any background or experience valuating subscribers in the

17   United States.

18        THE COURT:  Okay.  Well, if it hasn't been in your

19   reports and you weren't deposed about it, then that's going to

20   be the confines of your testimony.  So please be mindful of

21   that, sir, okay?

22        THE WITNESS:  I understand, Your Honor, yes.

23        THE COURT:  Yes, sir.

24        All right.  Go ahead, Mr. Buchanan.

25        MR. GOULD:  Thank you, Your Honor.

C. Bakewell - Direct

2413

1   BY MR. BUCHANAN:

2   Q.   So let's talk about any opinions you might have in this

3   case.   First, were you in the courtroom through the trial?

4   A.   Yes, I was for parts of it, including Dr. Lehr's

5   testimony, and then I reviewed the trial transcript for the

6   parts I haven't been here.

7   Q.   And what other things did you review in preparation for

8   your testimony here today beyond just sitting in the courtroom

9   and listening to Dr. Lehr and reviewing transcripts?

10  A.   Oh, so there's a process that occurs prior to us all

11  getting into, as experts, to testifying.   It involves writing

12  reports and then being deposed about the reports.   And in my

13  case, Dr. Lehr submitted an expert report.   I had the

14  opportunity to review that, along with all the materials that

15  he cited in his expert report, and then I had the opportunity

16  to do my own research, which I did.

17          I wrote a report, and then Dr. Lehr had the

18  opportunity to reply to it, and I could review his reply report

19  and all those materials.   And then there's a process of

20  depositions, and there's things that are marked in depositions

21  and questions that people are asked, including Dr. Lehr and

22  myself, and so I reviewed those materials and everything

23  connected with that as well.

24  Q.   Did you interview anyone at Cox, sir?

25  A.   Yes, I did.   I interviewed a person named Sandy Mencher,

C. Bakewell - Direct

2414

1    and I believe that he'll be testifying later after me, sometime

2    either today or tomorrow.

3    Q.   And do you recall what his position was at Cox?

4    A.   He's an executive financial person, a financial executive.

5    He's knowledgeable about Cox's cost structure.

6    Q.   And is that -- why did you interview him?

7    A.   To gain an understanding of the details of the business

8    and how it operated.  There were some observations that

9    Dr. Lehr made that had some questions from Mr. Mencher about as

10   well.

11   Q.   So with regard to preparing your testimony here today to

12   rebut the opinions of Dr. Lehr, did you provide -- create any

13   slides or demonstratives?

14   A.   I did.

15            MR. BUCHANAN:  Permission to publish, Your Honor?

16            THE COURT:  Yes, sir.

17            MR. BUCHANAN:  Could we pull up the first slide,

18   James?  Thank you.

19   BY MR. BUCHANAN:

20   Q.   So this is entitled Big Picture Issues with Dr. Lehr's

21   Testimony.  Why don't you explain what, what you're referencing

22   here.  You have two items, and why don't you go through them

23   each and explain them to the jury.

24   A.   Sure.  So there's two big picture issues.  We'll get into

25   some details later, but these are the two main takeaways that I

C. Bakewell - Direct

2415

1    had as I heard Dr. Lehr testify.  The first is that he included

2    information, financial information that I say is irrelevant.

3    It lacks relevance or lacks a connection.

4           In our field, my field, we call it causation or a

5    causal link, and I sat and listened in the courtroom for

6    Dr. Lehr to say the word "because," these numbers are here

7    because of something that happened in the case, and he didn't,

8    he didn't use that word, which is an indication that the

9    information lacks relevance.  It lacks that causal link or

10   causation.  That's the first point.

11          And then there's some very basic errors in terms of

12   calculating the value of a subscriber.  He said that he

13   calculated the value of a subscriber in several places, and he

14   made some mistakes, one of which being not including any costs,

15   which is a pretty remarkable error from my perspective.

16   Q.   So based on, you know, this analysis, do you think these

17   errors are correctable?

18   A.   No, they're not.  These are very significant errors.

19   Q.   Okay.  So with regard to the financial data he relied on,

20   you now have a slide with regard to that; is that correct?

21   A.   Yes.

22   Q.   Okay.  Could you explain why you created this slide to the

23   jury and the Court?

24   A.   Yes.  So this on the left is a slide that Dr. Lehr used

25   last week, and on there, he says that, hey, there's a lot of

C. Bakewell - Direct

2416

1   revenues here that are attributable to internet, video, and

2   voice, but those are not specific to the allegations in this

3   case.  Those are not because, right?  They're not caused by the

4   57,000 subscribers, 57,600 subscribers that are in this case.

5   In fact, as I wrote here on the right side, let's keep some

6   context here, 57,000 subscribers out of 4.5 million subscribers

7   is only 1 percent of Cox's subscriber base.

8            There's another issue, which is less important but

9   also important, in that only internet is accused, right?  And

10  internet is about -- it's 2.8 out of $8.2 billion for all the

11  revenues.  It's only about a third of everything, yet Dr. Cox

12  includes it all, right?  Again, even though there's only 57,600

13  subscribers that are at issue in this case out of 4.5 million.

14  That's the main point.

15  Q.   Okay.  Did you see any other issues with regard to

16  Dr. Lehr's testimony and with regard to the demonstratives that

17  he utilized to tell the jury?

18  A.   I did, I did.

19  Q.   Okay.  And this next slide that has just been displayed is

20  entitled:  Dr. Lehr's Value of Subscribers is Flawed.

21           Could you explain what you mean by that to the jury?

22  A.   Sure.  So I've done the same thing here on this slide, is

23  I put Dr. Lehr's slide on the left, and then I put some bullet

24  points on the right, which were my observations from the

25  process that we went through, including sitting at trial.

C. Bakewell - Direct

2417

1            First of all, he says in the title that this is the

2    value of infringing subscribers.  It's not the value of

3    infringing subscribers because it is only revenues.  It doesn't

4    include costs.  That's the last bullet that I have on the

5    right, but that's probably the biggest, most glaring issue that

6    jumped out at me is that, how can you say something is worth

7    something if you don't have any costs associated with those

8    revenues?

9            I mean, we all know that if you want to be in

10   business and you want to generate revenues, you're going to

11   have to incur some costs to support those revenues; yet

12   Dr. Lehr didn't include any costs.  He just includes billing

13   charges.

14           There's other issues, too.  We heard during his

15   cross-examination about the one-, three-, and five-ticket

16   counts and what Dr. Lehr said about that was that he didn't

17   have any basis before those numbers.  There's an issue that

18   relates to the time frame.  He included a time frame from 2013

19   until 2016, which is broader than the time frame at issue in

20   this case.

21   Q.   Let me stop right there.  So when you say the time period

22   in this case, are you aware of what the time period is and

23   whether it's stated in the lawsuit filed by the plaintiffs?

24   A.   Yes, it -- yes, I am.

25   Q.   And is -- and what is that time frame?

C. Bakewell - Direct

2418

1    A.   It's narrow.  It's 2012 to 2014, if I believe I'm right.

2    Q.   Okay.  So other than that he narrowed it, beyond that, you

3    also mentioned he committed an error by not indicating to the

4    Court and the jury that that $307 million and those other two

5    numbers didn't include costs.  Do you recall what he said on

6    cross-examination when I asked him whether there were costs?

7    A.   I do.  I don't recall that he had a real plausible

8    explanation for that other than when you asked him what the

9    costs were, I think he and I are of some agreement that if you

10   did apply costs, you'd subtract 60 percent from that number.

11   The profit margin that Dr. Lehr had, and which I'll accept for

12   purposes of today, is 40 percent.

13   Q.   Right.  So as I understand it then, you're -- the first

14   issue is that he did not advise the jury with this chart that

15   there was 60 percent in costs.  Is -- do you recall the time

16   period, the claims period in the complaint being February 2013

17   to November of 2014?

18   A.   Oh, that's correct.  I think I said 2012 accidentally, and

19   you're correct.  It's from 2013.

20   Q.   Okay.  And again, you --

21            THE COURT:  I'm sorry.

22            MR. GOULD:  Your Honor, I'd just ask if we can limit

23   the leading questions, please.  If he would just ask the

24   witness open-ended questions that he can answer without

25   testifying?

C. Bakewell - Direct

2419

```
1              THE COURT:  Leading?  Yeah.

2              You're leading.  Go ahead.

3    BY MR. BUCHANAN:

4    Q.   So -- and with regard to the one-, three-, and five-ticket

5    count, why do you consider that to be arbitrary?

6    A.   Well, he said on cross-examination that he didn't have any

7    basis for that number.  In fact, he -- I know from his expert

8    report and deposition testimony that he only chose those

9    numbers because he was told to by the lawyers.

10   Q.   Okay.

11   A.   He didn't have any economic basis for that number.

12   Q.   Did you prepare a slide that demonstrated the impact of

13   adding those subscribers?

14   A.   Well, I think the next slide shows what all the issues

15   are.  It summarizes what the issues are.  I think if we can

16   keep --

17   Q.   All right.  If we could move on to the next slide?

18              So you've noted as to each of these columns

19   "Arbitrary," and you've just explained that?

20   A.   So the one, three, and five, those are arbitrary.  That

21   part of his slide included arbitrary information.

22              If we go to the next one, the billing charges,

23   remember I said that there's three categories of revenues.

24   This case is about internet, not video and voice, right?  The

25   allegations here are about internet usage, and he included
```

C. Bakewell - Direct

2420

1   phone and video and didn't separate them out on this chart.  So

2   that's another issue.

3   Q.   Okay.  And do you recall him giving any explanation as to

4   why he didn't exclude phone and video?

5   A.   Well, he talked about this idea of triple play, but his

6   discussion of that was incomplete.  There's more to consider,

7   like cord cutting and another connection issue, causal link.

8   Q.   All right.  Any other comments with regard to this

9   particular demonstrative?

10  A.   Yes.  So the numbers, there was something that came up on

11  the animation.  The numbers for billing charges do not include

12  costs, so those are overstated.  So I flagged that as an issue,

13  which leaves subscriber counts.

14          I think that we agree on, at least generally, the

15  amount of subscribers.  It's approximately 57,000 with one-plus

16  ticket and about 20,000 with five or more tickets.  I think

17  those numbers are generally agreed to.  The context that that's

18  out of 4.5 million subscribers, I think, is important, and

19  Dr. Lehr didn't spend a lot of time discussing that.

20  Q.   So we've gone over sort of the highlights.  Do you want to

21  go down to maybe to the film, Dr. Lehr's testimony in more

22  specifics?  Did you do a more systematic review of his

23  testimony and his expert report?

24  A.   I did.  As I mentioned, there was a longer process with

25  expert reports and the like, and there were more details

C. Bakewell - Direct

2421

1  that -- detailed types of observations that I raised, and I

2  have those summarized in this.

3  Q.   Okay.  Okay.  Could we go through those one by one?

4  A.   We can.

5  Q.   Okay.  The first one is unrealistic (lacks causal

6  connection to alleged infringement)?

7  A.   That's the because, the lack of a because, and we talked

8  about that.  He had presented some numbers that weren't driven

9  by the alleged infringement.

10  Q.   Okay.  And then includes other services/value provided by

11  Cox?

12  A.   That's right.  So there was an issue that we already

13  talked about, and that includes -- that's the fact that he

14  included video and voice, but there's other issues that relate

15  to that as well.

16  Q.   And then the termination assumption is inaccurate?

17  A.   Right.  So those, those are all in the category called

18  "bad fit."  Those are reasons why his analysis isn't a good fit

19  and it's not really correctible.  And then the second group

20  where it's overreaching, those are more detailed issues that I

21  have.

22  Q.   Okay.  So did you prepare a -- well, you talked about

23  overreaching.  So why don't we take a look at that?  We say

24  also includes video and voice revenue.

25  A.   We can take a look at that, and I think the next

C. Bakewell - Direct

2422

1    demonstrative actually relates to other services and value

2    provided by Cox.  Those are inter- -- those issues relate to

3    one another.

4    Q.   Right.  So did you prepare a demonstrative with regard to

5    the second bullet?

6    A.   Yes.

7    Q.   Okay.  Could we pull that up, please?

8         Okay.  This is entitled:  Dr. Lehr Includes Entire

9    Value Cox Provides to Customers, and you've talked about that a

10   little bit.  Could you explain the purpose of this

11   demonstrative and how it relates to your opinion there?

12   A.   Sure.  What I think the ladies and gentlemen of the jury

13   should understand as they evaluate the information that

14   Dr. Lehr set forth and the numbers is that those revenues are

15   generated from all of Cox's services that it provides.  And to

16   illustrate this, I mean, we all have sort of different

17   environments that we're in, but I chose kind of, hopefully, a

18   general household that's easy to imagine.

19        And you can see how things are, when they're going on

20   in a house, there can be people in every room that are using

21   the internet, they're using the video services that are

22   provided, watching television and cable TV, and talking on the

23   phone, although that's less common today.  Most people use cell

24   phones.

25        And then up in the top, I have this kid who

C. Bakewell - Direct

2423

1    downloaded a song, and then that might be accused, it might not

2    be.  For purposes of here, let's say that it's accused.

3            Out of everything that's been provided to this

4    household over a long period of time, that only occurred, as we

5    saw, the animation happened over a, you know, relatively small

6    moment in time, and I think that consideration is important.

7            This is another way of representing that, is that if

8    you're streaming in a bunch of information through the

9    internet, and this could include video and voice services, too,

10   you can see there's all kinds of content that is provided to a

11   household from sources like Netflix and Pandora.  People play

12   games that stream data and they're super data intensive.

13   People use Facebook and stream information there.  That

14   sometimes can be very data intensive.  YouTube, Hulu, Amazon,

15   there's all kinds of things that are going on.

16           The accused activities are relatively small, right?

17   There's -- I have the same sort of graphic where the alleged

18   wrongful act occurs just at a moment in time.  But there's

19   other value that's being provided to this household that is

20   significant, and Dr. Cox didn't -- excuse me, Dr. Lehr didn't

21   separate any of that information out when he presented his

22   financials.

23   Q.   So what -- all those services that Cox provides, utilizing

24   Dr. Lehr's one -- assuming, you know, one notice and then

25   you're out, what happens to all those services, when that

C. Bakewell - Direct

2424

1  13-year-old boy that you've indicated gets a notice under his

2  scenario?

3  A.   Well, the --

4           THE COURT:  He's just using an example.  All right.

5           MR. GOULD:  This --

6           THE COURT:  Stop.  Overruled.  Go ahead.

7           THE WITNESS:  Dr. Lehr included those.  He included

8  the value associated with those other services in his math.

9  For that reason, it's -- his numbers are far overstated

10 relative to the allegations in this case.

11 BY MR. BUCHANAN:

12 Q.   Okay.  Now, what about with regard to business customers?

13 We've heard a little bit about them in the case, some hotels

14 and fraternities and other types of businesses, hospitals.

15 A.   Same issue there.  You can imagine at a hospital, let's

16 say that this -- somebody downloaded a song that gets counted

17 in the 57,600 number or 57,000 number that we've heard.

18 Dr. Lehr didn't include just that; he included all the revenues

19 associated with providing services to that hospital.

20           You can think of any business as an example.  A

21 fraternity would be an example, a business like in an office

22 building.  He didn't separate out or distinguish between the

23 services that are accused versus those that aren't.

24 Q.   Okay.  So then there's a next bullet:  Termination

25 assumption unrealistic.  Could you explain that?

C. Bakewell - Direct

2425

1    A.   Right.   His termination assumption is inaccurate.   And so

2    this relates to the one, three, and five.   This is not very

3    realistic.   It's a bad fit, as I wrote, the way that he did it.

4         He -- when there's termination that he says should

5    occur or should be assumed, the one, three, or five, he counts

6    the entire revenue stream no matter where the termination

7    occurred.   He doesn't separate out the before and the after

8    termination, didn't do that.   You asked him about that on

9    cross-examination, and it's evident from the materials that I

10   reviewed.

11   Q.   So do you recall if Dr. Lehr registered an opinion about

12   whether Cox should pursue termination at the one, three, and

13   five level?

14   A.   Well, he didn't really offer an opinion about that.   He

15   said it was an assumption, and he didn't have any basis for

16   that assumption.   He said he couldn't justify if there would be

17   termination.

18        MR. GOULD:   Your Honor, objection.   Misstates his

19   testimony entirely.   I move to strike.

20        THE COURT:   Yeah, yeah.   The jury will recall the

21   testimony.   Your recollection is what matters, and so I'm not

22   going to strike the answer.

23        Please, ask your next question.

24        MR. BUCHANAN:   Yes, Your Honor.

25   BY MR. BUCHANAN:

C. Bakewell - Direct

2426

1   Q.   So did you prepare a demonstrative with regard to this,

2   the one, three, and five assumption?

3   A.   Yes, I did.

4   Q.   And apply it to Dr. Lehr's analysis and testimony?

5   A.   I did.  It's not this slide we --

6   Q.   Move to the next slide.

7   A.   Well, this indicates where he did it, but I think the

8   illustration is on the next slide.

9   Q.   Okay.

10  A.   This is it.

11  Q.   Okay.  So explain this slide to the jury and Court,

12  please.

13  A.   So this is the time frame that Dr. Lehr used.  We saw that

14  earlier from 2013 to 2016.  And here, I'm just -- for purposes

15  of illustration, I'm saying, hey, let's just assume the first

16  ticket occurs right in the middle, right?  We'll set aside the

17  details of that just to understand the concept here.

18       So you've got a situation where the customer has

19  already been billed, right, and they pay their bills every

20  month.  And then let's say that there's an accused activity

21  that occurs sort of right smack dab in the middle.  We call

22  that on this slide the first ticket, right?  So they did

23  something that's accused right in the middle.

24       Well, there was nothing wrong that happens in the

25  green area prior to that.  Why would you include those related

C. Bakewell - Direct

2427

1   to the alleged infringement?  It doesn't make sense.  But

2   Dr. Lehr did it.  He didn't separate it out, and that's what

3   the X and the red thing says, is, like, Dr. Lehr includes

4   everything billed before the first ticket.

5          It's clear that's -- even if you're going to make

6   this assumption that somehow there should be termination after

7   one ticket, it doesn't -- there's no reason or justification

8   for including everything prior to that.  So that's an issue.

9   Q.   I think you had another demonstrative along these lines.

10  A.   So here's another situation, where, let's say, it's the

11  first and the last ticket.  It just happened once.  The user

12  said, you know what?  This was -- I was wrong, and it shouldn't

13  have happened, and they don't do it again.

14         Well, in the one scenario, Dr. Lehr, if we go to the

15  next slide, he includes everything billed after it, right?  He

16  includes the entire thing there, and that's -- lacks basis as

17  the way that we talk about that in my field.  That's not a

18  valid assumption.

19  Q.   Okay.  Do you recall if Dr. Lehr offered up some examples

20  of subscribers who received more than 13 tickets?

21  A.   Yes.

22  Q.   Okay.  And did he do the analysis that you said with

23  regard to those particular three subscribers?

24  A.   For 13 --

25  Q.   Yes.

C. Bakewell - Direct

2428

1   A.   -- or three?

2   Q.   No, there were three subscribers that he identified that

3   had 13 or more.

4   A.   Oh, I understand now.

5   Q.   Do you remember the frat house, the individual, and the

6   ISP?

7   A.   Yes.

8   Q.   Okay.  So what did that indicate to you?

9   A.   Well, he was just picking the most extreme examples there,

10  and even though those were the most extreme examples, he still

11  didn't offer an explanation about this, like, hey, I'm going to

12  include through a certain period of time, and then after, I'm

13  going to exclude, or vice versa, right, I'm going to exclude

14  the amount before and then include the amount after.  He

15  doesn't have any math or analysis that's specific to those

16  particular facts, even though those are, those are extreme,

17  right?

18        And then because those are extreme, it helps us

19  understand kind of what's going on, then knowing that those are

20  extreme, there's all kinds of other examples that are more like

21  the one instance that I showed on the prior slide, and Dr. Lehr

22  didn't explain how he dealt with that other than to say that he

23  included everything, which just isn't a valid way to approach

24  solving a problem like this.

25  Q.   Do you recall that on the exhibits you used, Dr. Lehr,

C. Bakewell - Direct

2429

1   with regard to the frat house, the ISP, and the individual,

2   that he picked, he picked 13 tickets?  Do you recall that?

3   A.   Yes.

4   Q.   And then he showed a chart beyond after they got the 13

5   tickets?  Do you recall that?

6   A.   Yes.

7   Q.   Okay.  And isn't that what you're suggesting he should

8   have done with regard to the one, three, and five?

9   A.   He should have done something to distinguish between the

10  activities that happened before and those that happened after

11  and then make some assumptions about some mathematics that he's

12  going to apply.  Just counting everything is not a valid way to

13  go about things.

14  Q.   Now, do you recall the ISP that he put up?  Do you know

15  how many subscribers that ISP has?

16  A.   So there was one --

17          MR. GOULD:  Objection, Your Honor.  No foundation.

18          THE COURT:  He's -- lay a foundation.

19          MR. BUCHANAN:  Okay.

20  BY MR. BUCHANAN:

21  Q.   Did -- you saw the demonstrative that identified an ISP

22  that had, like, 4,000 notices over three years?

23  A.   So you're talking about the one -- if I can ask to

24  clarify -- the one internet service provider, so that's like a

25  reseller of internet, an internet services provider, and he had

C. Bakewell - Direct

2430

1    an example of that one ISP, and that had, like, 13,000

2    subscribers.

3    Q.   Okay.

4              MR. GOULD:  Objection, Your Honor.  No foundation.

5    Move to strike.

6              THE COURT:  Overruled.  The jury's recollection

7    will -- approach the bench.

8              NOTE:  A sidebar discussion is had between the Court

9    and counsel out of the hearing of the jury as follows:

10   AT SIDEBAR

11             THE COURT:  What's the objection?

12             MR. GOULD:  The name of the ISP is not in the record.

13   There's been no testimony, documents, anything in this case

14   about the number of subscribers to the reseller of Cox's

15   service, who hasn't been named in this case.  He's trying to

16   pollute the jury's mind with this notion that these resellers

17   have so many customers that Cox couldn't possibly be on the

18   hook for it.

19             It's improper.  It's not in the record.  It should be

20   stricken and instructed.

21             THE COURT:  Okay.

22             MR. BUCHANAN:  Well, they picked that particular

23   subscriber, and they put the, the IP address or whatever in

24   there, and they identified him as an ISP.  We all know who it

25   is, but we are not using the name.  So he just looked it up,

C. Bakewell - Direct

2431

1    and he came up with a number.  So they utilized that to say,

2    look, they got 4,000.  Well, the jury should know how many

3    subscribers do they have.

4              THE COURT:  None of that's in his report, of course,

5    or based on his deposition?

6              MR. BUCHANAN:  Well, not in this example by Dr. Lehr.

7    We were then reading his report.  That wasn't in his report,

8    the ISP with the 30 -- he didn't have any charts in there.

9              MR. GOULD:  It was in his later report to which

10   Mr. Bakewell had an opportunity to supplement and respond, and

11   he did not.

12             MR. BUCHANAN:  Bakewell responded and he didn't

13   reply.  He picked some examples.  I don't remember the ISP.

14   But in any event, he has a right to identify the amount of

15   subscribers to the jury because otherwise, they're left with

16   how many notices went to how many people.

17             THE COURT:  Well, the testimony is already in that

18   there were these other ISPs, so I'm going to strike the last

19   answer.

20             MR. BUCHANAN:  Okay.

21             THE COURT:  You guys, a little too much exchange too

22   close to the jury.

23             MR. OPPENHEIM:  Okay.  Got it.

24             NOTE:  The sidebar discussion is concluded; whereupon

25   the case continues before the jury as follows:

C. Bakewell - Direct

2432

1    BEFORE THE JURY

2             THE COURT:  I'm going to strike the last answer about

3    the numbers of the ISPs who were signed on to Cox's ISP.  There

4    really hasn't been testimony about that previously.

5             Otherwise, go ahead, Mr. Buchanan.

6    BY MR. BUCHANAN:

7    Q.   Now, so what is the impact of Dr. Lehr's conclusions in

8    your view?

9    A.   Well, there's two impacts.  One is that there -- it's a

10   bad fit, right?  His analysis is invalid and doesn't fit the

11   facts of the case.  And then the second is that there are some

12   instances where he overstated numbers.  So even if you accept

13   it, the numbers are far too high.

14   Q.   Is there any way that this analysis, these calculations

15   can be fixed?

16   A.   I don't think so.

17   Q.   Okay.  Let's go to the next slide.  I believe you have a

18   bullet here or category called Overreaching.

19   A.   Correct.

20   Q.   And it says:  Also includes video and voice revenue.

21            Could you -- you talked about that a little bit.

22   Could you explain that to the jury in more detail?

23   A.   Sure.  So Dr. Lehr said that video and voice revenue is an

24   issue because of the triple play and because there's some risk

25   or potentially some likelihood, some unspecified likelihood

C. Bakewell - Direct

2433

1    that a subscriber would terminate everything or would leave Cox

2    altogether if it had its internet services discontinued, and I

3    think that's an overstatement by Dr. Lehr.

4    Q.   Okay.  So can you separate out the video and voice with

5    regard to the residential and business profits Cox received?

6    A.   Yes, those -- yes.  Those figures are provided for

7    separately.

8    Q.   Okay.  Can we go to the next demonstrative?

9         And this is what you're referring to?

10   A.   Right.  So even in Dr. Lehr's own slide, he shows that

11   what Cox provides in terms of financial data is separate

12   categories of internet, voice, and video.

13   Q.   Okay.  Did you, did you yourself create a chart that

14   reflects the revenue with regard to all three services:  video,

15   voice, and internet?

16   A.   I do have information with that.

17   Q.   Okay.  Did you create a slide for that?

18   A.   I think if we go to the next slide, what I do on the right

19   side is show that the internet services work out to be about

20   one-third of the revenues in 2014.  So if you take any of

21   Dr. Lehr's numbers, knowing that only a third of it relates to

22   internet is a good way to think about it.  That's using

23   Dr. Lehr's own information.

24   Q.   Okay.  So just with regard to internet service, are you

25   familiar with the testimony by Dr. Lehr that he focused on the

C. Bakewell - Direct

2434

1    one component, downloading music?  What are other things that

2    people use internet service?  I think you had a chart, and if

3    you could just summarize those?

4    A.    Right.  There's lots of other reasons why you would use

5    internet.  So I'm not saying that, hey, if you take a third of

6    any of Dr. Lehr's numbers, then you have boiled things down to

7    the alleged infringement.  There are still other things that

8    are going on when you -- when internet is being provided to Cox

9    subscribers.  We talked about that earlier, for example,

10   Netflix being something that's not accused or Facebook and the

11   like.

12   Q.    Okay.  I think now we'll talk about disregarding

13   inappropriate costs.  I think that was the next item.

14   A.    Right.

15   Q.    I think you talked about that a little bit, but could you

16   explain in more detail again?

17   A.    Sure.  So Dr. Lehr was asked about whether he included

18   costs and what the costs -- the profit margin would be, and as

19   I said at the beginning of my testimony, I think that for

20   purposes of our discussion here, Dr. Lehr and I have agreed

21   from his slides at least that the applicable profit margin is

22   40 percent, yet the slide that he put up where he said "value"

23   didn't include costs.  It was only billings or revenues.

24   Q.    Okay.  So in terms of the points you've made about the

25   assumptions on one, three, and five, the claim period versus

C. Bakewell - Cross

2435

1    the four-year period Dr. Lehr utilized, and not taking out

2    costs, what happens when you apply those three points to

3    Dr. Lehr's analysis?

4    A.   If you just made those adjustments, his numbers would

5    decline dramatically.

6    Q.   And what about if you assume that instead of one, three,

7    and five, it were six?

8    A.   Well, then -- or six, he doesn't have anything to support,

9    like, an assumption of six.  For example, there's no, no basis

10   for his figures then.

11   Q.   So could you just again summarize your opinions for the

12   jury?

13   A.   Sure.  So we've talked about all of this now.  There's a

14   bad fit.  There's a lack of causal connection, that's the no

15   because, the -- or a lack of because.  He has value and

16   services provided in his numbers that are not specific to the

17   allegations in this case.  We've got the issue with the

18   termination assumption, the one, three, and five; and then

19   we've got some reasons why his numbers are overreaching or

20   overstated.  He didn't include costs, and he included video and

21   voice.

22            MR. BUCHANAN:  Okay.  Thank you.

23            Pass the witness, Your Honor.

24            THE COURT:  All right.  Thank you.

25            Cross-examination?

2436

1                       CROSS-EXAMINATION

2     BY MR. GOULD:

3     Q.    Good morning, Mr. Bakewell.  How are you?

4     A.    Good morning.  I'm fine.  How are you?

5     Q.    Good.  Nice to see you again.

6     A.    Thank you.  It's nice to see you, too.

7     Q.    You did no work in this case related to valuing

8     intellectual property assets, correct?

9     A.    Well, it's related to valuing intellectual property

10    assets, yes.  I would disagree with you.

11    Q.    You did no work to value the copyrights at issue in this

12    case, correct?

13    A.    I don't have an opinion of the specific value of the

14    copyrights; that's correct.

15    Q.    It sounds like you agree with me.  You did no work to

16    evaluate the value of the copyrights in this case, correct?

17    A.    I'm sorry, I disagree with that question.

18    Q.    Okay.  You submitted a report in May 2019 with your

19    opinions in this case, correct?

20    A.    Correct.

21    Q.    You haven't submitted a supplemental or additional report

22    since that time, correct?

23    A.    That's true.

24    Q.    And as of May 19, I think you testified about this, you

25    listed that in the prior four years, you had testified, I think

C. Bakewell - Cross

2437

1   it was 94 times; is that right?

2   A.   Right.  It was actually higher.  The -- it's more

3   inclusive, overinclusive.  We had a discussion about this.

4   That's probably too high, but there is a pretty long list of

5   testimony; that's correct.

6   Q.   And given testimony since May of 2019?

7   A.   Yes.

8   Q.   And despite that volume of testimony, you don't recall

9   ever providing any opinions or testimony relating to copyright

10  infringement occurring through BitTorrent, correct?

11  A.   Not specifically through BitTorrent.  I've provided

12  opinions about copyright infringement, though.

13  Q.   So if we do the math, if we're somewhere in the 95 to 100

14  range, it's roughly 23 or 24 testimonies per year, ballpark?

15  A.   I'm not sure what you mean by that, testimonies per year.

16  Q.   Well, you listed 94 in four years, and if I divide that by

17  four, it's about 23-1/2 per year, correct?

18  A.   That's probably too high because that's a bigger period

19  than we talked about.  The 90 occurred over a larger period

20  than four years.  But I will accept the fact that there's a

21  number that's greater than 10 or maybe greater than 15.

22  Q.   And there are additional cases in the past years where

23  you've provided an opinion or a report but didn't testify?

24  A.   Correct.

25  Q.   And you've described yourself as having some valuation

C. Bakewell - Cross

2438

1    experience, and your report and testimony talked about business

2    transactions and counseling.  Do you recall that?

3    A.    Yes.

4    Q.    But, in fact, you spend most of your time working on cases

5    like this as a paid testifier, correct?

6    A.    More than 50 percent.  Not all of it but more than half,

7    yes.

8    Q.    Now, one of the two overarching opinions that you

9    provided, Mr. Bakewell, is that Dr. Lehr had errors, correct?

10   A.    Yes.

11   Q.    And what you mean by that is you disagree with some of his

12   concepts, correct?

13   A.    I'll accept that.

14   Q.    You don't -- you're not testifying that he made errors in

15   his calculations?

16   A.    Well, not including costs as an error.  I mean, that's

17   pretty egregious.  So I'd have a hard time -- I'm trying to

18   agree with you where I can, but I have a hard time being nice

19   about that one.

20   Q.    You don't dispute his math and his calculations, correct?

21   A.    I've tried to accept everything and make that not an

22   issue.

23   Q.    Mr. Bakewell, have you ever had your expert opinion or

24   testimony excluded by a court?

25   A.    I think that's happened, given the number of times I've

C. Bakewell - Cross

2439

1   testified, sure.

2   Q.   You recall I asked you this question previously in your

3   deposition?

4   A.   Yes.

5   Q.   And you gave a different answer, didn't you?

6   A.   I think I gave pretty much the same answer.

7   Q.   Okay.  Could we pull up clip 3, please?  It's page 46,

8   line 22.

9           NOTE:  At this point a portion of a video recording

10   is played into the record as follows:

11   BY MR. GOULD:

12   Q.   Do you recall instances in which you're -- you've been

13   exclude by a court as an expert?

14   A.   I've not been excluded as an expert.

15           NOTE:  The video recording is concluded.

16   BY MR. GOULD:

17   Q.   So, Mr. Bakewell, would you like to correct your prior

18   sworn testimony?

19   A.   No, because you asked a different question.  One is if

20   I've been excluded as an expert.  Another is if some of my

21   testimony has been excluded, and those are two different

22   things.  I've not been excluded as an expert.  There's been

23   parts where parts of my testimony have been excluded.  Those

24   are two different things.

25   Q.   You recall providing an expert opinion in a case of

2440

1   <u>Versata Software v. SAP America</u> in the Eastern District of

2   Texas?

3   A.   Yes.

4   Q.   If you could turn to tab 3 of your binder?  This is a copy

5   of that decision in that case.  Do you recall?

6   A.   I don't have your binder.

7   Q.   I'm sorry, sir.  Okay.

8   A.   Thank you.  Oh, thank you, sir.

9        MR. BUCHANAN:  Your Honor, I would just note that I

10  don't think this is really -- I don't know if this is proper

11  cross, where he admitted that he's had situations, and now he's

12  showing him the situation.

13       THE COURT:  Well, I'm going to allow it.  Your

14  exception is noted.

15  BY MR. GOULD:

16  Q.   Mr. Bakewell, in the first paragraph of the decision from

17  the federal court in the Eastern District of Texas in <u>Versata</u>

18  <u>v.</u> -- <u>Versata Software v. SAP America</u>, do you see that the

19  court says:  The following memorandum further explains the

20  basis for the Court granting Defendants SAP America, Inc.'s and

21  SAP AG's (collectively SAP) Motion to Exclude the Expert

22  Testimony of Neeraj Gupta, Christopher Bakewell, and Roy

23  Weinstein as it relates to the proposed reasonable royalty

24  analysis?

25  A.   Correct.

C. Bakewell - Cross

2441

1    Q.   And on the next page, at the top, the Court --

2              MR. BUCHANAN:  Your Honor, I just note just to be --

3    he testified that it happened that the testimony was excluded,

4    but he wasn't excluded.  And this isn't evidence.

5              THE COURT:  He's impeaching him, and I think it's

6    proper impeachment.

7              MR. BUCHANAN:  Okay.

8              THE COURT:  So overruled.

9    BY MR. GOULD:

10   Q.   Mr. Bakewell, at the top of the second page, the court

11   continues:  Based on the Court's review of Versata's experts'

12   reports, the Court concludes that Versata's experts have not

13   followed this Court's or the Federal Circuit's guidance.

14   Rather, their reasonable royalty analysis relied on speculation

15   and guesswork, and was divorced from the factual and economic

16   realities of this case.

17             Correct?

18   A.   I see that.  I think you're lacking some context, and I'd

19   be delighted to explain.

20   Q.   And on the third page, the second-to-last paragraph, the

21   court concludes:  The experts' reports -- excuse me, the

22   experts' respective reports and testimony regarding the revised

23   reasonable royalty analysis was excluded from the jury trial.

24   This included the reports and testimony of Mr. Gupta,

25   Mr. Bakewell, and Mr. Weinstein as they related to the revised

C. Bakewell - Cross

2442

1   royalty analysis.

2          I read that correctly, sir?

3   A.   You read that correctly.  You're taking it out of context.

4   I testified at that trial.

5   Q.   I'm sure that your counsel will ask you about it if he

6   wants to follow up on it.

7          Now, you were here for Dr. Lehr's testimony, correct?

8   A.   Yes, I was.

9   Q.   And you were asked to review and respond to his report and

10  testimony?

11  A.   Yes, I was.

12  Q.   And you focused primarily on Dr. Lehr's financial

13  calculations, correct?

14  A.   Sort of.  I can agree with that in part, not in the

15  entirety.

16  Q.   I think you said in your report and deposition, you

17  focused primarily on his profit calculations and assessments?

18  A.   I'd have to know the context.  I think in one way, that

19  might be true.  That's not really a complete characterization,

20  but in a sense, that's accurate.

21  Q.   In fact, there are quite a few areas that you don't

22  dispute things that Dr. Lehr provided, correct?

23  A.   That's true.

24  Q.   For example, you recall Dr. Lehr testified that it's

25  impossible to determine the number of infringements that

C. Bakewell - Cross

2443

1   occurred through BitTorrent?

2   A.   I don't take an issue with that.

3   Q.   And you recall Dr. Lehr discussed a number of academic

4   studies and articles concerning the impact of piracy on

5   copyright holders?

6   A.   I do.

7   Q.   Okay.  And you -- including that the overwhelming majority

8   of traffic on BitTorrent, 99-plus percent, is of copyrighted

9   material.  Do you recall that?

10  A.   I recall that he said that.

11  Q.   And he was citing academic reports and showed excerpts and

12  slides and studies that were admitted to the court?  Do you

13  recall that?

14          MR. BUCHANAN:  Your Honor, I would object.  He's not

15  here as an expert on piracy.

16          THE COURT:  Yeah.

17          MR. BUCHANAN:  He's just on the financials.

18          THE COURT:  We're not going to go through Dr. Lehr's

19  expert report.  Let's focus on what -- the testimony that he

20  offered.

21          MR. GOULD:  Sure.

22  BY MR. GOULD:

23  Q.   If I could just wrap up, you don't disagree with what he

24  testified, not providing anything, correct?

25          MR. BUCHANAN:  Objection, Your Honor.  He just --

C. Bakewell - Cross

2444

1          THE COURT:  Yeah, sustained.

2     BY MR. GOULD:

3     Q.   Dr. Lehr testified at some length about his view of Cox's

4     economic incentive to tolerate infringement.  Do you recall

5     that?

6     A.   Yes.

7     Q.   As a general matter, you would agree, sir, that Cox wants

8     to retain internet customers, correct?

9     A.   No.  I can't agree with that in its entirety, no.  I think

10    there's --

11    Q.   Do you agree that as a general matter, Cox wants to retain

12    internet customers?

13    A.   I think, like, from the view of, like, an airplane, that

14    might be true, but there's more to consider when you get into

15    the details.

16    Q.   You agree, sir, that at a high level, that's true?  Cox

17    wants to retain internet customers?

18    A.   Super high level, that's true, of course.

19    Q.   And you agree that Cox has incentive to retain customers,

20    internet customers, correct, generally speaking?

21    A.   Without going into any sort of substance, just as a

22    general idea, like proposition, generally that's true.  There's

23    details that need to be considered that can be the opposite.

24    Q.   Mr. Bakewell, I'll put up a slide from your testimony.

25    You heard Dr. Lehr testify that in the years shown here,

C. Bakewell - Cross

2445

1   February 2013 through '26 (sic), Cox billed the 57,000

2   customers at issue in this case approximately 370 -- $307

3   million for those subscribers who had at least one DMCA ticket

4   in the 2012 to 2014 period, correct?

5   A.   The billings were from 2013 to 2016, and the tickets were

6   from 2012 to 2014.

7   Q.   And you didn't offer any opinions in your report or in

8   your deposition disputing that Cox billed these customers these

9   amounts, correct?

10           MR. BUCHANAN:  Your Honor, I just ask that we focus

11   on the testimony, not the deposition.  Must he be shown that?

12           THE COURT:  Well, his last question was just:  You do

13   not dispute that they billed that much.  So I don't think there

14   was a qualifier in there.  I didn't hear it, but -- so I'll

15   allow the question.

16   BY MR. GOULD:

17   Q.   You don't dispute the calculations that Cox billed these

18   customers these amounts, correct?

19   A.   So I've accepted that number as being accurate.  There's

20   issues, some serious issues with that number, but I've accepted

21   that as being accurate.

22   Q.   Sure.  We'll get to that.  But you agree that you did the

23   calculation correctly?  Cox billed these customers this amount

24   shown on slide 12 of your testimony, correct?

25   A.   I'm sorry, I can't agree that he did the calculation

C. Bakewell - Cross

2446

1    correctly.  What I can say is that I accepted it for purposes

2    of expediting or moving things along.

3    Q.   You don't take any issues with the ICOMS billing data that

4    he replicated, correct?

5    A.   No.  I agree with you; that's correct.

6    Q.   And that's true for the one, three, and five-plus

7    customers, correct?

8    A.   If you narrow it down to the data, I don't take an issue

9    with it.  His use of the data is what I take an issue with.

10   Q.   And you would agree that Cox has reported that it collects

11   on balance 98 to 99 percent of the bills that it sends to

12   customers, correct?

13   A.   Yes.

14   Q.   Your -- one of your opinions is that the one-, three-,

15   five-ticket count is arbitrary.  And you understand, sir, that

16   the ticket count and information provided here is based on

17   infringement ticket data that Cox reported, correct?

18   A.   Are you asking me about the one, three, five, or are you

19   asking me about the data?  Your question doesn't match.  You

20   have two different ideas in your question.

21   Q.   You reviewed some ticket data in this case, correct, sir?

22   A.   Yes.

23   Q.   And that's data that Cox produced and provided about

24   infringement tickets that it handles on its system, correct?

25   A.   Correct.

C. Bakewell - Cross

2447

1    Q.   And you understand that Dr. Lehr calculated the one-plus,

2    three-plus, and five-plus based on Cox's own data, correct?

3    A.   That's the part where there's a disconnect.  The one,

4    three, and five is arbitrary, so there's no basis for it.  He

5    applied the one, three, and five to that data, but it's not

6    based upon the data.  It's totally arbitrary.

7    Q.   You understand that his counts for one, three, and five

8    are counts that come out of Cox's infringement ticket data,

9    correct?

10        I think you said you didn't take issue with the

11   subscriber counts, but maybe I misunderstood.

12   A.   With the data and -- but the basis for his one, three, and

13   five, he doesn't have any economic basis for the one, three,

14   and five.

15   Q.   That's not remotely what I asked you.  I asked you, sir,

16   if you understood that these subscriber counts on this line are

17   numbers that Dr. Lehr calculated based on infringement ticket

18   data that Cox produced.  Do you understand that or not?

19   A.   Now, I do because you didn't embed one, three, and five in

20   your question, and so that I agree with.

21   Q.   And you understand and agree that those counts are just

22   about -- you didn't take issue with those counts, right?

23   A.   No.  I said I agreed with those on one of my slides.  I

24   had everything else X'd out and said that's an area where we

25   agree.

C. Bakewell - Cross

2448

1   Q.   Do you understand, sir, that Cox deleted millions of

2   incoming infringement notices that it received in this time

3   frame?

4            MR. BUCHANAN:  Objection, Your Honor.  That's way

5   beyond the scope of his testimony.

6            THE COURT:  Well, no.

7            MR. BUCHANAN:  May we have a sidebar, Your Honor?

8            THE COURT:  Yes, sir.

9            NOTE:  A sidebar discussion is had between the Court

10  and counsel out of the hearing of the jury as follows:

11  AT SIDEBAR

12            THE COURT:  Yes, sir.

13            MR. ELKIN:  Your Honor, there's been a lot of

14  testimony in the case about blacklisting and blocking, and so

15  that it's clear from the testimony, at least from the Cox

16  witnesses, because it's been a little amalgamated through some

17  of the cross-examination questions, when the tickets are

18  blacklisted, they're deleted.  When they are blocked, they

19  don't come in, and they're not deleted.

20            THE COURT:  Right.

21            MR. ELKIN:  The question that I think counsel is

22  asking and eliciting testimony about, he's conflating the two,

23  and I think it's very -- as you know from the BMG case, it was

24  1.4 million tickets that never came in.

25            And I don't know where it's coming.  Maybe he's

C. Bakewell - Cross

2449

1   asking the right question, but I think without any

2   characterization, it's potentially misleading.

3           MR. BUCHANAN:  I have a more specific objection.  He

4   didn't testify anything about all this data.  He's just taking

5   what -- Dr. Lehr's slides and testifying about the numbers and

6   what they mean, the one, three, five.  He didn't testify that

7   there were so many notices that came in and so many that were

8   blocked.  He's testified about nothing about that.  He never

9   looked at that.  That's not an issue here.

10          THE COURT:  Okay.  Go ahead.

11          MR. GOULD:  Mr. Bakewell has testified that it was

12  arbitrary for Dr. Lehr to consider and present the jury with

13  information on value of subscribers with one, three, and five

14  tickets.  Dr. Lehr opined in his reports that Cox was not

15  processing all the notices it received.  That includes the

16  millions that it deleted and the millions, separate millions

17  that it blocked.

18          So for Mr. Lehr -- excuse me -- Mr. Bakewell to opine

19  that it's arbitrary, I'm simply demonstrating that he really

20  didn't consider a substantial portion of notices, and

21  therefore, the one, three, and five, that's just based on Cox's

22  ticket data, but those could be tens, twenties, and thirties.

23          MR. BUCHANAN:  So, first of all, he did not

24  testify --

25          THE COURT:  Who's "he," Lehr?

C. Bakewell - Cross

2450

1          MR. BUCHANAN:  Dr. Lehr did not testify about all

2     these blocked or blacklisted.  He picked one, three, and five;

3     and he testified that counsel gave him those numbers.  They

4     provided them to him, one, three, and five, and said:  You go

5     calculate it.

6          That calculation has nothing to do with blacklisting

7     or blocking.  That was his testimony.  It might have been

8     referencing one part of his report.  He never testified about

9     blacklisting or blocking that had anything to do with this one,

10    three, five.

11         THE COURT:  In his testimony?  I think I recall him

12    talking about the additional notices or tickets, which never

13    got there but -- I'm not going to swear to it, but I think he

14    did.

15         MR. BUCHANAN:  But he did not apply the one, three,

16    and five to that.  That's what I'm talking about.  He was

17    provided -- he said that counsel told me to go apply one,

18    three, five; I didn't pick that; and I just applied that on the

19    57,000 subscribers.  He didn't say anything about that

20    application having anything to do with blocked or blacklisted.

21         THE COURT:  All right.  I'm going to allow you to

22    inquire as to whether he considered the notices or the tickets

23    which were either not received or were blocked.  We'll see what

24    he says.  I'm going to allow it.

25         Your exception is noted.  Thank you.

2451

1          MR. ELKIN:  Thank you.

2          NOTE:  The sidebar discussion is concluded; whereupon

3    the case continues before the jury as follows:

4    BEFORE THE JURY

5          MR. BUCHANAN:  Your Honor, I would just like one

6    clarification, just that on the question, the foundational

7    question just asked if he's aware of notices being blocked, and

8    not put any number in there.

9          THE COURT:  Okay.  All right.

10          MR. GOULD:  Your Honor, there's very clear testimony

11    on those numbers.

12          THE COURT:  Just ask him whether he's aware.

13    BY MR. GOULD:

14    Q.   Sir, did you review Mr. Beck's testimony in this case?

15    A.   I did.

16    Q.   You did.  Do you recall testimony from Mr. Beck

17    demonstrating that Cox deleted millions of incoming notices?

18    A.   I don't know if that's the correct characterization of it.

19    Q.   Did you consider the millions of deleted notices that

20    Mr. Beck talked about?

21    A.   I was aware that there was a process and there were limits

22    and there were ways of things going in and out.  I don't know

23    if your characterization is accurate, though.

24    Q.   And did you consider the millions of notices from

25    Rightscorp that Cox blocked and didn't ever receive?

C. Bakewell - Cross

2452

1    A.   Well, again, I'm aware of a process and some agreements

2    between the parties that you're discussing.  Whether you call

3    it blocking or not, that's -- I don't know that I can offer a

4    memory even, frankly, on it, if that's the right word.

5    Q.   You're not testifying that Rightscorp agreed that millions

6    of notices could be blocked, are you?

7    A.   What I am telling you is what I remember and that there

8    was a process that was agreed upon and some back-and-forth and

9    negotiations, and the specifics I don't recall, and whether

10   that's an accurate characterization, I can't say yes or no.

11            MR. BUCHANAN:  May we approach, Your Honor?

12            THE COURT:  Yes, sir.

13            NOTE:  A sidebar discussion is had between the Court

14   and counsel out of the hearing of the jury as follows:

15   AT SIDEBAR

16            THE COURT:  Yes, sir.

17            MR. BUCHANAN:  Maybe I'm wrong, but I don't remember

18   anyone testifying about Rightscorp and the total number of

19   infringement notices that were blocked, and certainly this

20   witness, it's not in his report, and I would ask that that be

21   stricken, that number.

22            THE COURT:  Where's the number coming from?

23            MR. GOULD:  Mr. Beck testified to his understanding

24   that Rightscorp had reported submitting millions that were

25   blocked.  He couldn't verify or dispute it.

C. Bakewell - Cross

2453

1          THE COURT:  Okay.  I remember thousands being bandied
2    around, but I don't remember millions.
3          MR. GOULD:  So two things.  On the Rightscorp, he has
4    a sworn declaration at BMG, and I asked him about it.  He
5    understood that Rightscorp submitted -- he understood that
6    Rightscorp claimed to submit over 9 million notices in 2012 to
7    2014 alone.  He said he couldn't verify or dispute it.
8          Separately, on the deleted notices, there are sworn
9    interrogatories from Cox from which we prepared a chart, you
10   may remember, that demonstrates they deleted millions of
11   notices.
12         THE COURT:  That was in this case.
13         MR. GOULD:  Yes, sir.
14         THE COURT:  That was presented in this case.  Okay.
15         MR. ELKIN:  I think the -- clearly, the answers to
16   the interrogatories are in this case related to deleted.  I
17   don't think there's been testimony with respect to the number
18   of Rightscorp tickets or notices that were blocked.  We know
19   from BMG it was 1.4 million.  So I think his answer,
20   "millions," is just going well beyond what we understand the
21   facts to be.
22         THE COURT:  Okay.
23         MR. BUCHANAN:  I don't think there's testimony in
24   this case about that number.
25         THE COURT:  The interrogatory.

C. Bakewell - Cross

2454

1          MR. BUCHANAN:  But this witness never looked at any

2     of that data.

3          THE COURT:  I understand that.  So let's, let's just

4     ask him concerning these tickets.  I mean, do you have a reason

5     for going through this other than wanting to get the numbers of

6     tickets in?  Aren't you going to ask him whether this, in fact,

7     skewers his analysis or his data?

8          I mean, what's the point of all of this?

9          MR. GOULD:  We've got a very experienced witness on

10    the stand.  I'm not going to ask him that question.  I'm going

11    to let the jury make that clear calculation on its own when it

12    realizes all the things that Mr. Bakewell didn't consider.

13         So respectfully, if I could continue, I certainly

14    won't say millions of Rightscorp notices.  I think we can move

15    on.

16         THE COURT:  Okay.  Okay.  All right, thank you.

17         NOTE:  The sidebar discussion is concluded; whereupon

18    the case continues before the jury as follows:

19    BEFORE THE JURY

20    BY MR. GOULD:

21    Q.   Mr. Bakewell, we're still talking about your opinion that

22    Dr. Lehr's one-, three-, and five-ticket counts were arbitrary.

23    We talked about a couple of things that you didn't consider, I

24    think, and that -- did you consider the notion that Cox would

25    receive multiple infringement notices and roll them up into one

C. Bakewell - Cross

2455

1   ticket?

2   A.   I'm aware that there was a process like that.

3   Q.   Did you consider that as part of when you were forming

4   your opinion that his counts were arbitrary?

5   A.   I'm trying to accept that.  I mean, if Dr. Lehr considered

6   that, I've accepted that characterization.  I'm not taking an

7   issue with that.  I don't think some of your -- well, I guess

8   I'll just leave it there.

9   Q.   And did you consider the notion that Cox would cap and put

10  a hard limit on the number of infringement notices it would

11  accept from any one complainant?

12  A.   I'm aware that there was a process of back-and-forth the

13  parties had agreed upon, including caps and sending certain

14  amounts of notices, yes.  I'm aware of that, and I think that

15  was -- there was testimony about that last week, too.

16  Q.   And did you consider that when you formed your opinion

17  that his one, three, and five counts were arbitrary?

18  A.   Yes.

19  Q.   Okay.  You have no idea, sir, how many infringement

20  notices Cox received in the 2012 to 2014 period that did not

21  result in tickets, correct?

22  A.   I can't give you a number like that.

23  Q.   Because you have no idea, right?

24           MR. BUCHANAN:  Your Honor, I'm just going to object.

25           THE COURT:  Overruled.

C. Bakewell - Cross

2456

           THE WITNESS:  Not in the way that I can give you a

number.  I know how the process worked, but I can't give you a

specific number.

BY MR. GOULD:

Q.   It sounds like a no?

           THE COURT:  He's answered the question.  Ask your

next question.

BY MR. GOULD:

Q.   You next talk about ticket counts outside the claim

period.  Do you recall that?

A.   Yes.

Q.   You said Dr. Lehr shouldn't have done that.  That's your

opinion, right?

A.   Well, I'm not sure that he made it clear that there was

the mismatch, and I think that's something that a jury should

understand.

Q.   You don't dispute, sir, that tickets that Cox receives

about a direct infringing subscriber in 2012 inform its view of

that customer in 2013 or 2014, do you?

A.   They can.

Q.   And on this slide, sir, you criticized Dr. Lehr for

counting revenue that Cox collected from these infringing

subscribers after their last ticket, correct?

A.   Correct.  He included everything before and after.

Q.   I think we talked about this, right?  The ticket data ends

2457

1    in 2014, doesn't it?

2    A.   That's true.

3    Q.   And you have no idea what these customers' infringement

4    history is after 2014, do you?

5    A.   That's false.  I disagree.

6    Q.   Okay.  There's no data in the Cox ticket data

7    demonstrating whether the infringers with data through 2014

8    continued to infringe after 2014, correct?

9    A.   That's false, too.  I disagree with you.  That's totally

10   wrong, in fact.

11   Q.   You also criticized Dr. Lehr for including -- for

12   reporting only on revenue collected from infringing subscribers

13   and not subtracting costs, correct?

14   A.   Correct.  There's the slide we just looked at that just

15   had revenues.

16   Q.   Mr. Bakewell, slide 18, you're shown a chart showing the

17   percentage of revenues by product type, correct?

18   A.   Yes.

19   Q.   And here you're just looking at the revenues, right?

20   A.   No.  There's cost.  There's net profit.  The profit margin

21   is 40 percent.  It's right there.

22   Q.   The chart that -- the pie chart that you've created is to

23   inform the jury that 51 percent of the revenue that Cox is

24   collecting is coming from video, correct?

25   A.   That's true.

C. Bakewell - Cross

2458

1    Q.    Okay.  So in one instance --

2    A.    It's -- actually that's not entirely true.  The purpose is

3    to show the amount that's attributable to internet, not the

4    portion for video.

5    Q.    Fair enough.

6    A.    But otherwise, I agree.

7    Q.    35 percent attributable to video, correct?

8    A.    Correct.

9    Q.    And here again, your report -- I'm sorry, 35 attributable

10   to internet, correct?

11   A.    Yes.

12   Q.    I misspoke; I said video.

13   A.    No problem.

14   Q.    So -- but here -- you criticize Dr. Lehr for trying to

15   demonstrate something with revenues, but here, you're doing

16   exactly the same thing, aren't you?

17   A.    No.

18   Q.    And if you actually look at the net profits, these

19   percentages change pretty substantially, don't they?

20   A.    They do.

21   Q.    And if you look at high-speed internet as a percentage of

22   total net profit, it's actually 52 percent -- I'm sorry, 53

23   percent.  There we go again.  Correct?

24   A.    You did the math correct.  I don't think what you're

25   suggesting is correct, but the math is correct.

C. Bakewell - Cross

2459

1  Q.   And for video, the percentage of net profit as a function

2  of overall is 29 percent, correct?

3  A.   That's correct.  That's less profitable, that business.

4  Q.   And if you look at voice, it's 17 percent, correct?

5  A.   Correct.

6  Q.   So when it suits you, you criticize Dr. Lehr for ignoring

7  costs; and when it suits you, you ignore those costs as well,

8  correct?

9  A.   I totally disagree.  That says "revenues" on it, and that

10 slide has the 40 percent profit margin that I talked about

11 earlier.  I totally disagree with what you just said.

12 Q.   If we could pull up Lehr slide 17, please?

13      Mr. Bakewell, you heard Dr. Lehr testify that from

14 2012 to 2014, this residential subscriber receives 101 tickets,

15 correct?

16 A.   Yes.

17 Q.   And Cox billed this subscriber over $8,500 in the years

18 from 2013, February, to 2016, correct?

19 A.   Yes.

20 Q.   And all of those billings were after this customer had

21 received more than 13 infringement tickets, correct?

22 A.   That's true for this one customer.

23 Q.   And you haven't offered any opinions in your reports or

24 here at trial that dispute either the ticket calculation or the

25 billings calculation, correct?

C. Bakewell - Cross

2460

1   A.   That's not true.  I think that I have an issue with this

2   calculation because it's misleading.  This is an outlier, and

3   this is not representative of the population of data.

4   Q.   You agree, sir, that this type of analysis could be done

5   for every subscriber, to compare billings against ticket data,

6   correct?

7   A.   I think the data is available for every single subscriber;

8   that's correct.  That's why just pulling one out is not

9   reasonable.

10  Q.   And you understand that even under Cox's lengthy graduated

11  response system, even Cox would consider or claim to consider

12  termination after 13 tickets, correct?

13  A.   It depends upon the situation.  I think that their --

14  certainly their awareness might be -- or their interest might

15  be piqued, and as we heard testimony, they don't want people

16  doing things that are wrong on their network, but they would

17  also consider whether or not education would work or what the

18  fundamentals are.

19  Q.   I thought I asked you a simple question.  You understand,

20  sir, that under Cox's graduated response in the 20- -- late

21  2012, 2013, and 2014 period, even Cox would consider

22  termination after 13 tickets that it processed, correct?

23         MR. BUCHANAN:  Asked and answered, Your Honor.  And

24  now he's testifying about the graduated response.

25         THE COURT:  No, he identified the 13, which is coming

C. Bakewell - Cross

2461

1    off the slide.  I'll permit it, and ask it again.

2    BY MR. GOULD:

3    Q.   You understand, sir, that under Cox's graduated response,

4    even Cox under its elaborate system would consider termination

5    of subscribers after 13 tickets that it processed, correct?

6    A.   I'm aware that the process changed over time.  There were

7    different thresholds that were considered, and the overall

8    direction was towards education.  I would have to see something

9    specific to be more specific in my answer.

10   Q.   Taking a look at the customer history shown on the slide

11   on your screen, you would agree that if Cox had terminated this

12   customer's internet service after 13 tickets, it wouldn't have

13   collected any -- it wouldn't have billed or collected any

14   revenue for internet service, correct?

15   A.   Correct.

16   Q.   You take issue with including billings and video and

17   voice, and we'll get to that, but for the purposes of this

18   question, you agree that after termination, they wouldn't bill

19   and collect those payments, correct?

20   A.   I'll agree with that.  I don't think that's totally right

21   because you can reinstate somebody after they've been

22   terminated, but setting aside reinstatement and the possibility

23   for that, then that's true.

24   Q.   So if this infringer -- sorry.  So if this infringer had

25   been reactivated immediately based on Cox's then in place

C. Bakewell - Cross

2462

1    policy, they might continue to collect revenue from them?

2    A.    It depends.  You need to know what the circumstances are

3    for reactivation and whether or not it was a situation where

4    reeducation was permitted and there was some comfort that the

5    behavior was going to change.

6    Q.    And likewise --

7    A.    You have to know more.

8    Q.    I didn't mean to interrupt, I'm sorry.

9    A.    No, fair enough.

10   Q.    Are you finished?

11   A.    Yes.

12   Q.    And --

13          MR. BUCHANAN:  Your Honor, can we have a sidebar,

14   please?

15          THE COURT:  Yes, sir.

16          NOTE:  A sidebar discussion is had between the Court

17   and counsel out of the hearing of the jury as follows:

18   AT SIDEBAR

19          MR. ELKIN:  Your Honor, the -- we're talking about

20   the claims period.  The reactivation stopped from and after

21   December 2012.  He solicited testimony in his question,

22   assuming the reactivation occurred immediately.  There's no

23   testimony to that.

24          In fact, we know from the testimony that that

25   practice, about which Your Honor had written extensively on

C. Bakewell - Cross

2463

1    summary judgment in the prior case, had stopped, and he's got

2    to confine his question to the time frame where that's

3    happened.

4             MR. GOULD:  I think the question was general and fair

5    that if he's reactivated, they get back on.  There's -- I also

6    don't think there's any foundation or testimony in the record

7    about when that process stopped.

8             THE COURT:  I'm not sure it's in this record.  I

9    don't recall hearing it in this record.  Who do you think --

10            MR. ELKIN:  It happened in my direct of Mr. Zabek.  I

11   asked him that question.

12            THE COURT:  Okay.  All right.  Then your question did

13   suggest that there was a reactivation taking place, the way I

14   heard it said.

15            MR. GOULD:  Immediately?

16            THE COURT:  Yeah, immediately.  So let's -- what was

17   his answer?

18            MR. GOULD:  It was long, and I'm not sure it answered

19   the question or whether I remember it, very frankly.

20            THE COURT:  If -- yeah, it was if you assume that it

21   reactivated right away, then your answer is correct.

22            I'll just say that the reactivation issue is --

23            MR. OPPENHEIM:  Your Honor, on this issue --

24            THE COURT:  Um-hum.

25            MR. OPPENHEIM:  -- I'd like an opportunity to look at

C. Bakewell - Cross

2464

1    the Zabek transcript because I -- my recollection is not the

2    same as Mr. Elkin, but I'd like to check it before we say

3    anything.

4            THE COURT:  I'm just going to tell them this last

5    question was a hypothetical and didn't assume any specific

6    facts in evidence, okay?

7            MR. BUCHANAN:  All right.  Your Honor, can I just --

8    I mean, they're examining this witness as if he's an expert on

9    graduated response.

10            THE COURT:  I mean, they've asked two questions.  So

11    are you going to continue on with -- he knows a whole lot more

12    about the Cox's system than you suggested early on in his -- in

13    this cross.  So he studied --

14            MR. BUCHANAN:  But I didn't ask -- what he might know

15    has nothing to do with what he testified to and what he was

16    responding to.

17            THE COURT:  But if he's disregarding what --

18            MR. BUCHANAN:  But he just took Dr. Lehr's one,

19    three, and five.  That's all he focused on.  Dr. Lehr didn't --

20            THE COURT:  And he said it makes no sense and it's

21    arbitrary.

22            MR. BUCHANAN:  Right.

23            THE COURT:  He can't get any stronger than arbitrary,

24    except it's nonsense.  And so I think that identifying what

25    Sony believes should have been other information that he should

C. Bakewell - Cross

2465

1    have considered is relevant, and it may -- you know, I mean,

2    he's answered -- I don't -- it doesn't change my opinion, but I

3    think it's in the wheelhouse.  So I'm going to allow it.

4            MR. ELKIN:  All right.  Thank you, Your Honor.

5            THE COURT:  All right.  Thank you.

6            NOTE:  The sidebar discussion is concluded; whereupon

7    the case continues before the jury as follows:

8    BEFORE THE JURY

9            THE COURT:  All right.  You've heard some testimony

10   about, you know, getting back into graduated response and when

11   Cox took -- may have taken certain actions.  Those were

12   hypothetical questions and not assuming facts in evidence.  So

13   just consider them as that, okay?  Thank you.

14           All right.  Please continue, Mr. Gould.

15   BY MR. GOULD:

16   Q.   Sir, you also agree that if Cox had terminated this

17   customer after three or five tickets, it wouldn't have billed

18   or received internet revenue from that customer during the

19   period of that termination, correct?

20   A.   In that hypothetical, during whatever that period of

21   termination would be, however that's defined, that would be

22   true by definition.

23   Q.   And I want to take a look at one more of these charts,

24   sir, a similar chart for a business customer that was a

25   fraternity.  You recall this slide and testimony about it?

C. Bakewell - Cross

2466

1   A.   Yes, I do.

2   Q.   And you don't dispute that Cox billed this customer over

3   $12,000 in the period after Cox had received and processed

4   13 tickets for the customer?

5   A.   I don't take issue with that.

6   Q.   And you agree that if Cox had terminated this customer

7   after 3 or 5 or 13, Cox wouldn't have billed or received any

8   revenue for the internet service for the period during the

9   termination?

10  A.   Only during the part where you say during the termination,

11  whatever that might be, I'd agree with because it's terminated

12  for whatever that period might be.

13  Q.   And your point, I think, is that if they sign back up,

14  then they would resume billing and revenue?

15  A.   You can terminate somebody and then reinstate.  Like, if

16  you discuss with them that their behavior is going to change

17  and you get some assurance, then you can -- they'd be

18  reinstated, and I'm sure everybody would be fine with that.

19  Q.   You understand, sir, that Dr. Lehr provided no opinions on

20  when Cox should have terminated customers?

21  A.   I agree.  I raised that as an issue.

22  Q.   And you understood his testimony to demonstrate in his

23  opinion for the jury, the different scenarios of what might

24  occur if Cox terminated at different scenarios?

25  A.   I don't think he quite said that, but I can accept that.

C. Bakewell - Cross

2467

1   I don't think that's exactly right, but for purposes of moving

2   things along, I'll accept it.

3   Q.   You recall this slide, sir?

4   A.   Yes.

5   Q.   And when you talked about this slide, you talked about

6   that the infringing activity was a small amount of the user's

7   activity or something along those lines, right?

8   A.   I don't think I actually said that, but I did say that

9   context is important, yes.

10  Q.   Well, I may have misheard because I didn't expect it, but

11  I thought you did.  You didn't do any measurement or analysis

12  or study to determine the amount of peer-to-peer activity

13  occurring on Cox's network, did you?

14  A.   I know the subscribers, I know some information that I've

15  read, but I haven't done, like, created an equation with that

16  in it.

17  Q.   And you don't dispute or disagree that peer-to-peer is a

18  highly bandwidth-intensive activity, do you?

19  A.   When it's done, it's bandwidth intensive.  The question

20  is, like, when it's done relative to everything else that's

21  happening --

22  Q.   And you -- I'm sorry.

23  A.   -- that might be -- might go to what you're asking.

24          But when it's done, it takes a fair amount of data,

25  yes.

C. Bakewell - Cross

2468

1  Q.   And you don't dispute, sir, that Cox's own consultant,

2  inCode, reported to Cox in 2012 that approximately 21 percent

3  of the U.S. traffic on the internet was based on peer-to-peer

4  activity, do you?

5  A.   In 2012, that might have been true.

6  Q.   Mr. Bakewell, you would agree that in order to understand

7  the value of a subscriber to Cox, you need to account for all

8  of the services that that subscriber purchases from Cox?

9  A.   I agree, generally.  I mean, there's more to it, but

10 generally, I agree.

11 Q.   And you recall Dr. Lehr's opinion that when Cox considered

12 whether to enforce a more aggressive termination policy, Cox

13 would have considered the full value of the subscriber?  Do you

14 recall him testifying to that?

15 A.   I remember what he said, and I took issue with that, and I

16 talked about that on my direct.

17 Q.   You have a difference of opinion, fair to say?

18 A.   We certainly do.

19 Q.   Dr. Lehr's opinion was that Cox would have considered the

20 full value of a subscriber in assessing its economic incentive

21 to tolerate infringement, correct?

22 A.   He said something like that.

23 Q.   That's how you understood it?

24 A.   Something of that nature.  Not exactly right.

25 Q.   But you think it was improper for Dr. Lehr to consider,

C. Bakewell - Cross

2469

1   for example, the video and voice revenue and value that Cox

2   ascribed from those customers?

3   A.   I do.  I think his analysis was incomplete, and he didn't

4   provide any inputs or reasonable assumptions or context for

5   things like cord cutting.

6   Q.   So I think that's a yes, you disagree that he shouldn't

7   have included voice and video.  That's your opinion?

8   A.   His analysis is incomplete is the closest I can come to

9   yes or no.

10  Q.   You're familiar -- well, on the cord cutting point, so the

11  cord cutting point is you're trying to express the view that

12  some people are getting rid of video and phone, correct?

13  A.   In short, true.

14  Q.   So when you look at the value of a subscriber, you can't

15  really consider video and voice because some of them in the

16  future may not have those services?

17  A.   Not exactly.  That's not exactly right.  I don't -- I

18  think that's only true in part.

19  Q.   Okay.  And you understood that when Dr. Lehr did his

20  calculations based on the ICOMS billing data, he was looking at

21  the actual billings for those customers, right?

22  A.   He was trying to, and he was overinclusive.

23  Q.   And what he included was the actual billings for those

24  customers' internet, video, and voice, correct?

25  A.   True.

C. Bakewell - Cross

2470

1  Q.    So you think he shouldn't have done it because some people

2  might cut the cords, but, in fact, they actually billed and

3  actually paid for voice and video during that time, correct?

4  A.    I don't agree with the first part of your question.  I

5  agree with the second part, though.

6  Q.    You're familiar with the concept of bundling at an ISP,

7  correct?

8  A.    Yes.

9  Q.    And bundling occurs where a customer buys multiple

10  products, it could be internet and TV; it could be internet,

11  TV, and phone, correct?

12  A.    That's true.

13  Q.    Sort of the classic triple play is internet, TV, and

14  phone?

15  A.    That's how people define it, yes.

16  Q.    And you understand that approximately two-thirds of Cox's

17  subscribers purchased some manner of bundled services?

18  A.    At some point in time, that was true.

19  Q.    You don't disagree with that?

20  A.    At some point in time, that was true.

21  Q.    And the ICOMS billing data that Dr. Lehr considered and

22  from which he did his calculations, again, reports on the

23  billings and collections from the customers for all the

24  services that they subscribed to from Cox during those years,

25  correct?

2471

1    A.    That is also true.

2    Q.    And one advantage of a customer bundling is getting a

3    discounted price, correct?

4    A.    To the customer.

5    Q.    So that's a yes, that's one of the advantages to the

6    customer?

7    A.    Now you said it's to the customer, so I agree.

8    Q.    Okay.  So we're in agreement.  Wonderful.

9          And another advantage to the customer is having fewer

10   providers to deal with?

11   A.    I'd agree with that.

12   Q.    And another advantage to the customer is having fewer

13   bills to keep track of and pay each month?

14   A.    I definitely agree with that as a customer.

15   Q.    And if Cox terminates one of a subscriber's bundled

16   services, the customer would lose that service, correct, that

17   particular service, correct?

18   A.    Yes.

19   Q.    So if, if a customer has a triple play and Cox terminates

20   internet, the customer would definitely lose the internet,

21   right?

22   A.    From that service for whatever that period of time is,

23   yes.

24   Q.    And notwithstanding this, you believe that Dr. Lehr had no

25   basis to include revenues from television and voice services in

C. Bakewell - Cross

2472

1    his calculation of Cox's economic incentive to tolerate

2    infringement, correct?

3    A.   Yes.  He -- he did not substantiate why he did that,

4    especially for every single customer.  Yes, I believe he had no

5    basis for that assumption.

6    Q.   You think that because the services are separable, there's

7    no basis to assume that, say, a triple play customer whose

8    high-speed internet is terminated would cancel their other

9    services?  That's what you put in your report and testimony,

10   correct?

11   A.   They're separable physically, and they're separable

12   economically, yes.

13   Q.   Let's pull up that slide 55.

14        The e-mail on the bottom is one that Dr. Lehr cited

15   in his report and I think we talked about in your deposition.

16   Do you recall this, sir?

17   A.   Yes.

18   Q.   And the e-mail at the bottom says:  This customer pays us

19   over $400/month, and if we terminate their internet service,

20   they will likely cancel the rest of their services.

21        Correct?

22   A.   Yes, I see that.

23   Q.   You understand that Mr. Sikes was a senior abuse engineer

24   in Cox's abuse group at the time?

25   A.   He worked for Cox, yes.

C. Bakewell - Cross

2473

1  Q.   But you disagree with Mr. Sikes, correct?

2  A.   No, not for that particular customer.  He's talking about

3  one customer, and he's talking about a likelihood.

4       Dr. Lehr turns that into all the customers into an

5  absolute certainty, and that's, that's the issue that I take

6  with this.

7  Q.   Let's pull up PX 19.  PX 19 is the ticket data we've

8  looked at at some length.  I'm sure everyone's thrilled to see

9  it again.  If we could filter on column H for terminated

10 customers?

11      So Cox terminated 13 customers who received

12 plaintiffs' notices during the time frame.  Let's -- I want to

13 focus on one of them with the ICOMS ID -- oh, you'll have to

14 scroll over to the left a little, please -- with the ICOMS ID

15 47605 -- yeah -- ending in 505.  Could you just highlight that

16 row?

17      And you see in the column G, sir, the action date for

18 the termination was June 25, 2014?

19 A.   Yes.

20 Q.   Okay.  Excuse me, sir.  I've got one more for the judge.

21      All right.  Thank you, sir.

22      THE COURT:  That was for me, Joe, I think.

23      THE COURT SECURITY OFFICER:  Oh, I'm sorry.

24      THE COURT:  Do you have one already?

25      THE WITNESS:  I do, yes.

C. Bakewell - Cross

2474

1    BY MR. GOULD:

2    Q.   Sir, you've reviewed the ICOMS billing data that was made

3    available in this case, correct?

4    A.   Yes.

5    Q.   I want to take a look at the customer's billing history --

6    billing and payment history for the terminated customer that we

7    just looked at.  That's Exhibit PX 566 that I just handed the

8    witness.  It's an excerpt from PX 473 and shows an excerpt of

9    the billing history for a customer with ICOMS ID 476054534505.

10           And I move to admit PX 566.

11           THE COURT:  Any objection?

12           MR. BUCHANAN:  No, Your Honor.

13           THE COURT:  It's received.

14           MR. GOULD:  Pardon me, Your Honor.  I apologize.

15           My apologies.

16   BY MR. GOULD:

17   Q.   This is the exhibit we just looked at, PX 566, for the

18   customer who was terminated on June 25, 2014.  Now, sir, you

19   recall in the -- I think this is the first time the jury has

20   seen this, so I want to explain.

21           Do you understand, sir, that that shows the total

22   monthly billings for cable products for this customer?

23   A.   Sort of.  It's accounts receivable, so it's not billings,

24   but it's sort of a proxy for that.

25   Q.   And that's the column titled Total AR Category C, for

C. Bakewell - Cross

2475

1   cable?

2   A.    Yes.

3   Q.    And then the next column, Total AR Category D, that's the

4   total monthly billings for data service or internet service for

5   this customer, correct?

6   A.    Yes.

7   Q.    And then you see the next column is the total accounts

8   receivable for the category telephone?  Do you see that, sir?

9   A.    I do.

10  Q.    So those three columns show the amount that Cox billed

11  this customer in these months shown for cable, internet, and

12  telephone, correct?

13  A.    Something close to that, yes.

14  Q.    And then if you look at the next three columns, it's

15  payments credited to those customers' accounts, payments for

16  category C, cable; payments for category D, data; and payments

17  for category T, telephone, correct?

18  A.    Yes.

19  Q.    And what we can look at -- let's do this:  Mr. Duval, can

20  you highlight vertically the June 2014 month, when this

21  customer's internet service only was terminated for copyright

22  infringement?

23          So what we've highlighted, sir, is the, the month

24  when this customer's internet service was terminated for

25  copyright infringement violations.  Do you see that?

C. Bakewell - Cross

2476

1   A.   Yes.

2   Q.   And you see that in the next month, there's -- it looks

3   like there's some sort of adjustment with a little bit of

4   billing and then a credit a couple months later?

5            MR. BUCHANAN:  I'm going to object to the testimony

6   what these numbers mean.  Some sort of adjustment.  He can ask

7   the witness if he's familiar with this document, has he looked

8   at it, and does he understand it.

9            THE COURT:  Okay.  All right.  You may ask him

10  whether he understands what the adjustment -- what you're

11  calling adjustments are within the categories payments for C,

12  D, and T.

13  BY MR. GOULD:

14  Q.   Sir, do you see that after June 2014, there's a charge --

15  some charges in July and then some credits in December of that

16  same year?

17  A.   I do see those.

18  Q.   And do you see that after that period, there are no

19  monthly billings for internet service, correct?

20  A.   After which period?  I didn't hear you, or maybe you

21  didn't say.

22  Q.   Well, with the exception of those, the July and December,

23  there's -- you don't know what happened with the July and

24  December, do you?

25  A.   I do, but there's a lot -- if you're trying to ask me if

C. Bakewell - Cross

2477

1   there's a lot of zeros, I'd agree with that.

2   Q.   So what this demonstrates is that although the internet

3   service was canceled, it sure looks like the phone and cable

4   service stopped as well, correct?

5   A.   I think all you know from this is for this particular

6   account number, what the data says here.  I think you have to

7   look and see whether or not for that same customer, another

8   account number was opened or if some behavior changed sort of

9   on a more macro or fundamental level, but we do know that

10  activities ceased in a large way, as reflected by the zeros.

11  Q.   And that was true for all the services, not just the

12  canceled internet service, correct?

13  A.   On this page alone, that's all you can say.

14  Q.   You're not aware of any evidence that this customer

15  started a new account, are you?

16  A.   Well, not for this particular customer, but I am aware of

17  evidence that the way that things would happen in the real

18  world is if somebody came back, they would come back under

19  another account number.  That's especially true today, when you

20  do things electronically.

21          MR. GOULD:  Move to strike, Your Honor.

22  Nonresponsive.  No foundation.

23          THE COURT:  Overruled.  He's talking about today, so

24  it's not talking about 2012, '13, '14.  Ask your next question.

25          MR. GOULD:  Yes, sir.

C. Bakewell - Redirect

2478

BY MR. GOULD:

1  Q.    Mr. Bakewell, you're not here to tell the jury what

2  factors to consider in assessing statutory damages, correct?

3  A.    I think if you're asking about what the legal

4  considerations are, I'm not offering any opinions about the

5  legal considerations.

6  Q.    You understand the Court will instruct on that, correct?

7  A.    That's what I understand, yes.

8  Q.    Pull up slide No. 9 from there.

9          Mr. Bakewell, I didn't see any slides in your deck on

10 the cash dividend that Cox paid to its owners.  You don't

11 dispute anything on this slide, do you, sir?

12         MR. BUCHANAN:  Your Honor, I object.  This is in

13 Dr. Lehr's report.

14         THE COURT:  Yeah, what's the relevance of this?

15 Let's just take it down and move on.

16         MR. GOULD:  That's fine.  No more questions at this

17 time, Your Honor.

18         THE COURT:  All right.  Thank you.

19         MR. BUCHANAN:  Just a few questions, Your Honor.

20         THE COURT:  Yes, sir.

21         MR. BUCHANAN:  Thank you.

22                      REDIRECT EXAMINATION

23 BY MR. BUCHANAN:

24 Q.    Mr. Bakewell, at the beginning of your testimony,

C. Bakewell - Redirect

2479

1  Mr. Gould you if you've ever been excluded as a witness?

2  A.   Correct.

3  Q.   And then he showed you a -- portions of a case that

4  referenced certain things about your testimony.  Do you want to

5  elaborate on that?

6  A.   Sure.  So that was a case that happened ten years ago.  In

7  that case, it happened during a period where all the law

8  changed on patent infringement damages.  And I think what's

9  clear from all the cases and opinions when you review that is

10  that I said that I was unwilling to offer certain testimony.

11       I did provide testimony about the issues I agreed to,

12  that somebody that this company, Versata, hired who was willing

13  to say things that I was unwilling to say said, and his

14  testimony was excluded.

15       What I did testify about at trial was a survey that I

16  did and some analysis of seats or subscribers, and I testified

17  that -- about that to its entirety at trial.  And, in fact,

18  there was a jury verdict that was consistent with that.  There

19  was a lost profits award that was consistent with my testimony.

20       So the characterization that was made that somehow I

21  was excluded as an expert by Mr. Gould was wrong.

22       And then the other thing I'd like to add from that,

23  and I think this is probably the biggest point from that, is

24  that, as I mentioned, I've testified at trial a bunch of times,

25  50 times, and from those experiences, I've learned quite a bit.

C. Bakewell - Redirect

2480

1          So when I take issue with what Mr. Gould says, it's

2    also with a degree of humility that I say it, and that part of

3    what -- the reason that I enjoy my job is because it's

4    challenging and I do encounter situations that are challenging

5    and I learn from them, and that, I would submit and underscore,

6    is the situation that I learned a lot professionally from.

7          I think that's evidenced by the fact that since then,

8    over that last decade, and as Mr. Gould pointed out, I've

9    testified quite a few times at trial and deposition.

10   Q.   So, Mr. Bakewell, Mr. Gould showed you a couple of slides,

11   a fraternity and -- was one of them and an ISP, I think, or

12   maybe it was an individual, and he -- and the graph that he

13   showed you showed 13 strikes and then revenue after that.

14   A.   I remember that.

15   Q.   And you used the term "outlier" with regard to your

16   description of those particular exhibits.  Could you explain

17   what you meant?

18   A.   Sure.  So there were a couple of instances that Dr. Lehr

19   used and then I was asked about in my cross-examination,

20   pointing to one customer at one point in time, and that's an

21   outlier.  Another word for that is cherry-picking.  We just

22   don't do that in our profession and try to draw conclusions

23   from looking at one data point when there's a whole bunch that

24   are available.

25          What we do are -- and what we're supposed to do is

C. Bakewell - Redirect

2481

1  use the tools that we have in our toolbox, statistics, right,

2  and math, not just to point to one person and say that's

3  somehow representative of an entire population.  That's just

4  wrong, and that's the issue that I had with that and as well as

5  with this spreadsheet that we just went through.

6  Q.  Okay.  What do you mean by this spreadsheet?  You mean

7  with regard to the single individual that was terminated

8  after --

9  A.  Correct.  It's just one instance, and there's more to

10  understand about the population of the data, and you can't

11  extrapolate from one data point a conclusion that's reliable.

12            MR. BUCHANAN:  Okay.  Thank you.  No further

13  questions.

14            THE COURT:  All right.  May Mr. Bakewell be excused?

15            All right.  Hearing no objection, you're excused,

16  sir.  Thank you, and have a good day.

17            THE WITNESS:  Thank you, Your Honor.

18            NOTE:  The witness stood down.

19            THE COURT:  All right.  Let's break for lunch.  We'll

20  take just an hour and a couple of minutes.  We'll come back at

21  2:00.  All right?  Thank you.  You're excused.

22            NOTE:  At this point, the jury leaves the courtroom;

23  whereupon the case continues as follows:

24  JURY OUT

25            THE COURT:  All right.  Anything before we break for

2482

1    lunch?

2            MR. BUCHANAN:  No, Your Honor.

3            THE COURT:  All right.  All right.  Then we are in

4    recess until 2:00.

5            NOTE:  The morning portion of the proceedings on

6    December 16, 2019, is concluded.

7                        CERTIFICATE OF COURT REPORTERS

8

9

10           We certify that the foregoing is a true and
             accurate transcription of our stenographic notes.

11

12

13            /s/  Norman B. Linnell
              _____
              Norman B. Linnell, RPR, CM, VCE, FCRR

14

15            /s/  Anneliese J. Thomson
              _____
              Anneliese J. Thomson, RDR, CRR

16

17

18

19

20

21

22

23

24

25