2483

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
    -vs-                       :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

<u>VOLUME  10  (P.M. Portion)</u>

TRIAL TRANSCRIPT

December 16, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

Norman Linnell and Anneliese Thomson - EDVA-OCRs  (703)549-4626

2484

<u>APPEARANCES:</u>

FOR THE PLAINTIFFS:              MATTHEW J. OPPENHEIM, ESQ.
                                 SCOTT A. ZEBRAK, ESQ.
                                 JEFFREY M. GOULD, ESQ.
                                 MICHAEL J. DRUCKMAN, ESQ.
                                 ANDREW L. GUERRA, ESQ.
                                 LUCY G. NOYOLA, ESQ.
                                 JIA RYU, ESQ.
                                 Oppenheim + Zebrak, LLP
                                 4530 Wisconsin Avenue, N.W.
                                 5th Floor
                                 Washington, D.C. 20015


FOR THE DEFENDANTS:              THOMAS M. BUCHANAN, ESQ.
                                 GEOFFREY P. EATON, ESQ.
                                 Winston & Strawn LLP
                                 1700 K Street, N.W.
                                 Washington, D.C. 20006-3817
                                   and
                                 SEAN R. ANDERSON, ESQ.
                                 MICHAEL S. ELKIN, ESQ.
                                 THOMAS P. LANE, ESQ.
                                 CESIE C. ALVAREZ, ESQ.
                                 Winston & Strawn LLP
                                 200 Park Avenue
                                 New York, NY 10166-4193
                                   and
                                 JENNIFER A. GOLINVEAUX, ESQ.
                                 THOMAS J. KEARNEY, ESQ.
                                 Winston & Strawn LLP
                                 101 California Street, 35th Floor
                                 San Francisco, CA 94111-5840
                                   and
                                 MICHAEL L. BRODY, ESQ.
                                 Winston & Strawn LLP
                                 35 West Wacker Drive
                                 Chicago, IL 60601
                                   and
                                 DIANA HUGHES LEIDEN, ESQ.
                                 Winston & Strawn LLP
                                 333 South Grand Avenue
                                 Suite 3800
                                 Los Angeles, CA

2485

INDEX

OPENING STATEMENTS BY:


WITNESS                          EXAMINATION        PAGE


PAUL JOHN JARCHOW

                                 DIRECT             2501
                                 CROSS              2509

SAMUEL RUBIN via video deposition

                                 EXAMINATION        2526
                                 EXAMINATION        2534

KEVIN CHRISTOPHER ALMEROTH

                                 DIRECT             2537
                                 CROSS              2574
                                 REDIRECT           2591

CLOSING ARGUMENTS BY:




COURT'S RULINGS/JURY INSTRUCTIONS

2486

```
          1              A F T E R N O O N   S E S S I O N

          2              NOTE:  The afternoon portion of the case on

          3    December 16, 2019, begins in the absence of the jury as

          4    follows:

          5    JURY OUT

          6              THE COURT:  Preliminary matters?

          7              MR. OPPENHEIM:  I think one very quick one and then

          8    one with respect to certain slides for Mr. Tregillis.  Cox has

          9    submitted a bench memo or a proffer on the Audible Magic

14:06:14 10    transaction logs.  We received it this morning.  I think Your

         11    Honor did as well.

         12              THE COURT:  Oh, the proffer, right.

         13              MR. OPPENHEIM:  Right.

         14              THE COURT:  Okay.

         15              MR. OPPENHEIM:  As Your Honor knows, this has been, I

         16    think, briefed many, many times.  To the extent the Court wants

         17    additional briefing on this, we can submit a response.  If it's

         18    just for purposes of Cox preserving the record and the Court is

         19    going to deny it, then may we avoid additional paper?  Whatever

14:06:41 20    Your Honor would like.

         21              THE COURT:  Okay.  I haven't even -- I haven't read

         22    it.  I made my decision, and I'm going to look at it, but I

         23    haven't had a chance to yet, and so if you want me to look at

         24    it and tell you whether I want a response, I'm happy to do

         25    that, but that may not be until after court today when that
```

2487

```
 1   happens.

 2            MR. OPPENHEIM:  That's fine.

 3            THE COURT:  Okay.

 4            MR. OPPENHEIM:  I'm not trying to push you.

 5            THE COURT:  No, that's fine.

 6            MR. OPPENHEIM:  I'm just trying to figure out what we

 7   can do to help.

 8            THE COURT:  Understood.  Okay.

 9            Is there objection to slides?

10            MR. ZEBRAK:  Yes, Your Honor.

11            THE COURT:  Okay.

12            MR. ZEBRAK:  I think it would be appropriate if

13   Mr. Tregillis gave us a few moments before -- while we sort

14   this out.  If he could leave the courtroom?

15            THE COURT:  Okay.  Thank you.

16            NOTE:  Mr. Tregillis left courtroom.

17            MR. ZEBRAK:  Is there -- can you hand up a set to the

18   judge?

19            Your Honor, there are, there are five slides and

20   fewer issues than five, though.  The slide numbers that I'd

21   like to talk about are 13, 21, 22, 23, and 26.

22            THE COURT:  13, 21, 23, 26?

23            MR. ZEBRAK:  22, 23, and 26.

24            THE COURT:  Okay.  Go ahead.

25            MR. ZEBRAK:  So on slide 13, this is one element of
```

14:07:12 (line 10)
14:07:39 (line 20)

2488

1    an analysis that Mr. Tregillis did not include in his report.

2    Beneath, beneath where you see the microphone, there's a list

3    of -- he breaks the works in suit down based on SR numbers that

4    have only one track in it as opposed to an album that may have

5    many more, or SR numbers with multiple tracks.

6         That issue resurfaces when you get to slide 21, where

7    again, the top part of the slide is fine, but the bottom row,

8    where he breaks the world down based on, you know, what's only

9    in an SR or only in a composition or what's in both, you know,

14:09:02 10  this is not analysis he put into his report, and I'll elaborate

11   on that in a moment.

12        And then in slides 22 and 23, the issue compounds

13   itself where Mr. Tregillis then breaks the universe down in

14   terms of, you know, one or the other or both, but then layers

15   in financial information on top of it in terms of his royalty

16   analysis.

17        And then finally on slide 26, this in our view is an

18   attempt at jury nullification, where initially Mr. Tregillis

19   had this notion of permissible infringement or permissible

14:09:46 20  notices.  Based on our concerns, Cox's counsel just agreed to

21   remove the word "acceptable," but respectfully, it's the body

22   that falls beneath it, gets at the same issue, which is, you

23   know, asking the jury at what point do notices matter to you,

24   and that's not the purview of this expert.  It's not necessary

25   to explicate his analysis.

2489

 1          And speaking broadly, Mr. Tregillis, what he did,

 2   just to frame this witness, Your Honor, he, he did kind of two

 3   analyses.  One is he looked at the infringement evidence in the

 4   case to see if works matched the notices, and then he did some

 5   financial and other projections.

 6          So, you know, he, of course, has access to this data,

 7   but there's no analysis in the way that I'm addressing here in

 8   his reports.  There is at most a footnote that referenced an

 9   excerpt with small amounts of data, but no analysis, anything

14:10:46 10  akin to what he's done here.

 11          THE COURT:  In 26?

 12          MR. ZEBRAK:  For all the slides.  26, 26 is the issue

 13   of -- and I apologize if I lumped them together, but 26 is the

 14   issue of nullification --

 15          THE COURT:  Right.

 16          MR. ZEBRAK:  -- which he brought up initially.

 17          But this issue of breaking -- you know, he did an

 18   analysis of the works in the case to see if they matched

 19   infringement notices, not to be an expert helping the jury

14:11:10 20  understand how the works break down between SRs, compositions,

 21   the overlap.  And then, you know, he did, he did a simple

 22   damages analysis where he tuned everything out and said, I'll

 23   look at each work in each notice -- I'll put a dollar on each

 24   of them, and it -- you know, what he's getting at here, I

 25   think, is further the issue Your Honor heard earlier today

2490

1   about Cox now wanting to address this issue that they haven't

2   put on previously with a witness who wasn't designated to

3   handle it.

4             THE COURT:  Okay.

5             MR. BUCHANAN:  Good afternoon, Your Honor.

6             THE COURT:  Yes, good afternoon to you.

7             MR. BUCHANAN:  So with all due respect, I think

8   Mr. Zebrak is incorrect.  We pointed out to Mr. Zebrak

9   throughout the -- Dr. Tregillis's -- Mr. Tregillis's report

14:12:11 10   where this information came from, okay?

11             So, for instance, slide 13 and 21 are in Schedule 6

12   of his expert report.  He tracks all the musical compositions,

13   checks the sound recordings.  And what he's done here, and it's

14   also in his opening brief, he references that.

15             Slides 22 and 23 are in Schedule 6 in the opening

16   report, pages 73 to 74, rebuttal report paragraph 40, and slide

17   26 is part of his reply report, 30 and 32.

18             The point being is what he's done is it's really just

19   showing how he -- one, he's computated the dollar, and then

14:12:49 20   he's showing how he applied it and how he gave them more credit

21   than necessarily they deserved in terms of the dollar and the

22   total amount of notices.  So he says you've got sound

23   recordings.  You've got musical compositions.  Sometimes

24   they're combined, sometimes they're separate, you've got

25   compilations.  And that's what he's doing.  He's saying --

2491

1   that's all he's doing.  He's breaking it out.

2          And it's all in his report.  It's just -- you know,

3   there's no data there that's not there.  They just don't like

4   for some reason why this is pulled out.  They haven't said it's

5   not relevant, but it's in his report.  And, you know, so I

6   think it's admissible, and he should be able to testify about

7   it.

8          THE COURT:  All right.  Thank you.

9          Mr. Zebrak, is it in his report, or is it not in his

14:13:29 10   report?

11          MR. ZEBRAK:  Suffice it to say, Your Honor, the

12   analysis in his slides is not in his report.  This is not a

13   question of did he have access to data from which he could have

14   done this analysis.  Yes, of course, if he had expertise at it

15   and if he actually did that analysis, but, you know, the point

16   is for them to provide a report that states his opinions and

17   the basis thereof.

18          This is being sprung on us now.  It's all a reaction

19   to the jury charge conference the other day, where Cox is now

14:13:57 20   having a bulk of his testimony be about viewing the case

21   through the lens of is it an SR, a composition, or both, and --

22          THE COURT:  Well, that may be relevant based on what

23   we talk about tonight about whether you can get, you know,

24   royalties for both a recording and a composition, and that

25   certainly -- wouldn't it be relevant to that?

2492

1          MR. ZEBRAK:  Well, Your Honor, to be clear, I'm

2   not -- you know, my objection was not based on relevance

3   initially and understanding the copyrights at issue in the

4   case.

5          THE COURT:  He said he didn't break it out this way

6   in his report.  The numbers are there, but -- I mean, what --

7   there doesn't seem to be a whole lot of analysis.  It's numbers

8   we're crunching, right?

9          MR. ZEBRAK:  Well, I mean, respectfully, Your Honor,

14:14:50 10   he has an excerpt -- he has a 41-page, single-spaced excerpt

11   cited in the footnote.  It doesn't indicate on this Schedule 6

12   that Mr. Buchanan referred to or that they've referred to me to

13   look at, it doesn't talk about the overlap in compositions and

14   SRs, and it certainly doesn't indicate he's going to do any

15   analysis and present it at trial.

16          And, you know, again, it has -- I mean, it has

17   different figures in terms of the number of tracks, too.  You

18   know, we've never received any -- you know, initially when he

19   did this Schedule 6, he indicates in Schedule 6 there are only

14:15:29 20   2,369 total tracks in the case.  His initial opinion was that

21   we sued -- that two-third of the works we sued on weren't

22   supported by the infringement evidence.  Now he says 98 percent

23   of it is.

24          But this analysis he did early on, he analyzed 2,369

25   tracks, whereas the slides today, Your Honor can see how much

2493

1    more it is.  He's now at our figures.

2         And it's just -- you know, it comes out of nowhere.

3    There's no analysis of it.  And these aren't even the figures

4    he gave back then.  It seems to us that he even abandoned his

5    early analysis when he essentially recognized that he

6    approached it in a faulty way and now agrees with us on almost

7    all the works.  So I don't --

8         MR. BUCHANAN:  So, so that was -- I don't know if

9    you'd call that a head fake or what, but that -- what happened

14:16:23 10  right there was we went off the rails.  We were talking about

11   these numbers, and then we were talking about his initial

12   report, where he looked at different data than Dr. McCabe, and

13   then he supplemented his report, but that had to do with the

14   total notices and the matching the ICOMS data and whether he

15   used IP addresses or the ICOMS data.

16        That's not an issue here.  They can cross him on

17   this.  It has nothing to do with this, zero.

18        All this is is taking -- they don't dispute these

19   numbers.  Sound recordings, musical compositions equal 10,017

14:16:55 20  claims were considered.  He's accepting their numbers, and he's

21   just breaking them down by those that are both and those that

22   are by themselves.  There's nothing controversial about it.

23        But the concern that the Court just raised is isn't

24   this relevant to the issue that may be discussed tonight.

25   That's exactly why they don't want it to come in, but that's

2494

1      not why necessarily he's offering it.

2              This is his analysis, and he's showing, look, I

3      didn't -- I didn't distinguish or not include if they didn't

4      have both the musical composition and the sound recording

5      together.  If they had one or they had the other, and that's

6      what this reflects, I counted a dollar.  If they had both

7      together, I counted a dollar.

8              It's that simple.  I don't know what the paranoia is.

9              THE COURT:  Okay.

14:17:38 10             MR. ZEBRAK:  Might I add one thing, Your Honor?

11             THE COURT:  Yes, sir.

12             MR. ZEBRAK:  So first of all, counsel's indicated and

13      pointed us to this schedule.  I have no reason to believe that

14      the information on this slide is computed from this schedule or

15      the analysis that went into this schedule.

16              I think he's maybe done this analysis off the current

17      lists of works in the case, but the bottom line is, Your Honor,

18      I don't know because this was never raised in a time where we

19      could cross-examine the witness, and I certainly don't want to

14:18:06 20      do it with a paid professional witness like Mr. Tregillis, who,

21      you know, I'm ill-equipped to proceed on this now because of

22      how they've approached the issue.

23              And, you know, again, it's not a question of initial

24      relevance.  It's just a lack of disclosure.

25              THE COURT:  All right.  Your exception is noted.  I'm

2495

1    going to allow him to testify on it, and, you know, if you have

2    specific objections that -- then you still may make them, but I

3    don't see in this slide presentation, you know, the type of

4    evasiveness that you suspect occurred.  And just pretty much

5    straightforward information.  And if it's contained in the

6    report and he's alluded to it in his report and you had the

7    opportunity to examine him on it in the report, then that's

8    where the disconnect is.

9             MR. ZEBRAK:  But, Your Honor, the -- you know, the

14:19:11 10   issue is this is not in his report, these figures.

11            THE COURT:  6,734 plus 3,283 equals 10,000?  That's

12   not in his report?

13            MR. ZEBRAK:  Go ahead.

14            MR. OPPENHEIM:  Your Honor --

15            THE COURT:  Come to the podium.

16            MR. OPPENHEIM:  Maybe it would be useful to have,

17   have Cox hand up to Your Honor the document that they believe

18   is in the report that supports this, because we're looking at

19   that document, and that document is not an analysis that's

14:19:42 20   remotely like this.  And so -- and it's not a matter of

21   arithmetic, Your Honor.  That's not what it is.

22            If, if we wanted to be able to figure out what it is

23   that --

24            THE COURT:  What --

25            MR. OPPENHEIM:  I'm on slide 21, just by way of

2496

1    example.

2            THE COURT:  Okay.

3            MR. OPPENHEIM:  If we wanted to be able to figure

4    out, well, what was he including in each of these categories at

5    the bottom, in the 4,324, in the 2,409, and in the 871, so that

6    we could figure out whether he had done that, that analysis

7    correctly, that analysis would have to be in his report, and

8    it's not.

9            So we have no way of knowing what he was putting in

14:20:21 10    each of these three buckets.  And if you look at the schedule,

11    he does try to, for lack of a better term, do some bucketizing,

12    but it's not of this number.  It's of 2,200 works.

13            So we have no idea as they present this testimony

14    whether -- what the basis of it is, and so we've not had an

15    opportunity to, to examine it or cross-examine him on it, and

16    so if he wants to testify as to what's in the Schedule 6 of his

17    expert report, he can do that.  He knows it's wrong.  He didn't

18    amend the report or modify the report.  But to now come forward

19    with a different analysis of a different list of works to us is

14:21:01 20    problematic.

21            So maybe they -- Cox could hand up, we don't have an

22    extra copy, a copy of the appendix to the report so Your Honor

23    could look at it while Mr. Jarchow is testifying.

24            THE COURT:  Well, it kind of sounds to me like you

25    want a ruling before he testifies, huh?

2497

1          MR. OPPENHEIM:  No, I'm sorry.  I think that

2   Mr. Tregillis is not the next witness.  I think Mr. Jarchow is,

3   so we have a little bit of time.  That's why I was suggesting

4   that process.

5          THE COURT:  Oh, yeah, absolutely.  And more

6   information is better.

7          MR. OPPENHEIM:  And I'm told, just to be clear, our

8   objection is not to the top here.  That's not a problem.

9          THE COURT:  Right.

10          MR. OPPENHEIM:  That's not a problem.

11          THE COURT:  It's at the bottom, 4,324 and -- right.

12   Okay.  All right, I'm happy to look at it.  Let's --

13          MR. BUCHANAN:  I'll just -- there's no dispute these

14   numbers are right and they come from the data, but --

15          THE COURT:  Well, it's not in his report and he's

16   done a further analysis, I mean, you know, rightly or wrongly,

17   I've held the parties to what's in the reports --

18          MR. BUCHANAN:  Right.

19          THE COURT:  -- and what they testified to in the

14:22:07 20   deposition.

21          I think that's the way I've always done it, and -- so

22   if he's done a new analysis, then it's not coming in, and it's

23   improper for him to go back and change his opinion after the

24   depositions, after his report, and --

25          MR. BUCHANAN:  But this isn't -- I just want to

2498

1    finish with it.  This isn't a changing of opinion.  This is

2    just looking at the current works in suit, which were amended,

3    as you know, several times by the plaintiffs, and then he

4    tracks it.

5           And these numbers they don't dispute at the top,

6    right?

7           THE COURT:  Right.

8           MR. BUCHANAN:  And this is just a breakdown of those

9    that are just, you know, a sound recording with one track and

14:22:48 10   sound recordings with multiple tracks.

11           THE COURT:  These are different numbers now, right,

12    than he had in his report?

13           MR. BUCHANAN:  Well, they're coming from the updated

14    data that the plaintiffs did as they went along in amending

15    their complaint.  So it's a moving target.  They amended it

16    several times, dropping some off and whatever.

17           But there's no dispute about, you know, what they

18    are.  It's made up --

19           THE COURT:  Is that right, Mr. Zebrak?  Do the

14:23:13 20   numbers -- is he adjusting to the different numbers of works

21    that are at issue in the case?  Because that did change several

22    times.

23           MR. ZEBRAK:  So, yes, Your Honor, the works did

24    change a few times.  He hasn't updated this analysis, as far as

25    I'm aware, since his April report.

2499

1          And the schedule, we have a copy of the binder --

2          THE COURT:  Yeah, but then if you -- if you've looked

3   at this and you say, okay, we amended our numbers, and I can

4   see from this that he obviously has now taken our new numbers

5   and done the new math, where's the prejudice in that?

6          MR. ZEBRAK:  But he's never done this math, to be

7   clear, Your Honor.  He at most is --

8          THE COURT:  If he's taking your new data and he's

9   using the same theory on how to identify the numbers, the same

10  equation, and he's putting in new numbers because you changed

11  the works in suit, then I don't see where the problem is.

12         MR. ZEBRAK:  His initial analysis, which has never

13  been updated, was analysis that made no sense.  It, it didn't

14  understand the nature of the infringement evidence.  He

15  appeared to disavow --

16         THE COURT:  So he's using a new formula.  Is that

17  what you're saying?

18         MR. ZEBRAK:  Well, certainly with respect to

19  identifying the works in the case.  I don't, I don't know how

20  he arrives at his numbers.  That's the -- and that's the issue

21  we have, is that because it was never disclosed.

22         THE COURT:  Yeah.

23         MR. OPPENHEIM:  So, Your Honor, here's the report.  I

24  flagged -- sorry.

25         I flagged the schedule at issue and the page where it

2500

1    shows the last number, and just for clarity sake, that schedule

2    is of 2,200-odd works.  We never -- our claim was never limited

3    to 2,200-odd works.  So it's not as though he did an analysis

4    of what we had at one point and then we changed it and he just

5    didn't amend.

6              I don't know why he did 2,200 works.  I'm sure there

7    was some reason back then, but he did, and that wasn't -- so

8    it's not a matter of us changing our works in suit.

9              THE COURT:  Okay.  Thank you.  That's important to

14:25:33 10   know.  Okay.

11             All right.  Let's get our jury, Joe, please.

12             NOTE:  At this point, the jury returns to the

13   courtroom; whereupon, the case continues as follows:

14   JURY IN

15             THE COURT:  All right.  Please have a seat.  Sorry

16   for the delay.  We're working out here so you wouldn't have to

17   listen to that wonderful noise machine.

18             Next witness.

19             MS. GOLINVEAUX:  Good afternoon, Your Honor.  Cox

14:26:35 20   calls Paul Jarchow.

21             THE COURT:  Okay.  Please come forward, sir.

22             PAUL JOHN JARCHOW, DEFENDANTS' WITNESS, SWORN

23             THE COURT:  All right.  Good afternoon, sir.  Please

24   proceed.

25             MS. GOLINVEAUX:  Thank you, Your Honor.

P. Jarchow - Direct

2501

1                    DIRECT EXAMINATION

2    BY MS. GOLINVEAUX:

3    Q.   Good afternoon, Mr. Jarchow.

4    A.   Good afternoon.

5    Q.   Could you please state your full name for the record.

6    A.   Paul John Jarchow.

7    Q.   And by whom are you employed?

8    A.   Cox Communications, Incorporated.

9    Q.   And how long have you worked for Cox?

14:27:30 10  A.   About 24 years now.

11   Q.   Briefly, sir, what is your educational background?

12   A.   I have a Master's, Master's Degree in Information Decision

13   Systems.

14   Q.   And what is your current position at Cox?

15   A.   I am the director of information technology.

16   Q.   And how long have you held that position?

17   A.   Approximately three years.

18   Q.   Before that, what was your title?

19   A.   Manager of information decision systems.

14:27:56 20  Q.   As director of information technology, what are your job

21   responsibilities?

22   A.   I am responsible for the configuration of the ICOMS

23   billing system, which includes rates and services.

24   Q.   And what was your role as senior manager of technology?

25   A.   I did the exact same thing.

P. Jarchow - Direct

2502

1  Q.    Okay.  You mentioned the ICOMS billing system.  Can you

2  please explain for us what is the ICOMS billing system?

3  A.    It's our subscriber management system.  We use it to keep

4  track of all of our customers, their addresses, rates, and

5  services that they subscribe to.

6  Q.    And all in all, how long have you been responsible for the

7  management and configuration of the ICOMS billing system?

8  A.    Approximately 20 years.

9  Q.    Mr. Jarchow, you mentioned that the ICOMS system maintains

14:29:00  10  subscriber management information.  What, what sort of

11  subscriber information does ICOMS store?

12  A.    We have names.  We have addresses, the services that are

13  available for sale, rates for those services, payments, payment

14  information, Social Security numbers, etc.

15  Q.    What information about customers' internet service is

16  stored in ICOMS, if any?

17  A.    We maintain information about their data tier and their

18  speed as well as managed WiFi services that they may subscribe

19  to.

14:29:38  20  Q.    Did you say managed WiFi services?

21  A.    Yes.

22  Q.    What is managed WiFi?

23  A.    It's the ability for a customer to subscribe to a WiFi

24  service from Cox.

25  Q.    Is managed WiFi public WiFi or secure WiFi?

P. Jarchow - Direct

2503

1    A.   It could be public WiFi, it could be secure WiFi, or both.

2    Q.   Well, is there information in the ICOMS system from which

3    you could determine if a customer's managed WiFi service was

4    public WiFi or was part of their secure network?

5    A.   No.  We just sell the managed WiFi service.

6    Q.   Mr. Jarchow, to what extent does ICOMS store subscribers'

7    addresses?

8    A.   We maintain an address for every location that we serve.

9    Q.   Would that include both residential and Cox Business

14:30:24 10    customers?

11   A.   That would.

12   Q.   To what extent does the ICOMS system distinguish between

13   residential and business customers?

14   A.   We have a clear delineation between the bill-type code.

15   For the residential subscribers, we use the S bill type, and

16   for the business subscribers, we use the C bill type.

17   Q.   And at what time in the account creation process does

18   ICOMS create a record of a subscriber's name?

19   A.   When we acquire a customer and sell them services.

14:30:54 20   Q.   Does ICOMS store that account name and address information

21   in the ordinary course of business?

22   A.   It does.

23   Q.   Does ICOMS system contain information that would show

24   whether a subscriber's internet service was used for public

25   WiFi?

P. Jarchow - Direct

2504

1   A.   It does not.

2   Q.   Does ICOMS contain information that would show whether a

3   subscriber's internet service was limited to particular

4   categories of end users like employees, contractors, guests, or

5   the like?

6   A.   It does not.

7   Q.   In addition to ICOMS, does Cox also have other databases

8   and systems?

9   A.   We have very many, many databases and systems, yes.

14:31:36 10   Q.   Mr. Jarchow, to what extent do you have knowledge of Cox's

11   other databases and systems beyond ICOMS?

12   A.   My primary job responsibilities are related to ICOMS.  I

13   have one or two ancillary databases that I have access to.

14   Q.   And, sir, are you personally aware of any database or

15   system at Cox with information about whether a subscriber uses

16   its Cox internet service for public WiFi versus for a secure

17   computer network or for both?

18   A.   No, I do not.

19   Q.   Mr. Jarchow, in connection with this lawsuit, were you

14:32:09 20   asked to retrieve information about certain subscribers from

21   the ICOMS system?

22   A.   Yes.

23   Q.   And how do you identify the subscribers whose information

24   you were asked to retrieve?

25   A.   A list of account numbers was provided by Brent Beck, and

2505

1  we took that list of the customers in question that may have

2  received a notice, and we ran that list against the ICOMS

3  database.

4  Q.    And do you have an understanding of what those account

5  numbers referred to?

6  A.    Yes.  People that had received copyright notifications.

7  Q.    And did you have an understanding of why you were being

8  asked to retrieve information about those accounts?

9  A.    Yes.  The court had ordered a request for data from ICOMS

14:32:59 10  related to how those customers were billed.

11  Q.    Mr. Jarchow, what information were you asked to retrieve

12  about those subscribers' accounts?

13  A.    We retrieved the site ID, the account number.  We

14  retrieved customer names, addresses, their bill type.  We

15  retrieved also monthly billing for those customers in net

16  across all of our categories of service from the periods 2012

17  through 2016.

18  Q.    How did you go about retrieving that information?

19  A.    Using the list provided by Mr. Beck, we -- I worked with

14:33:37 20  the -- our vendor, Netcracker.  We went through an extensive

21  process to pull together logic and scripting that would pull in

22  all of the data elements that were required per the court order

23  for the extracted report.

24  Q.    You mentioned Netcracker.  What is Netcracker?

25  A.    Netcracker is the software owner that we license ICOMS

2506

1    from.

2    Q.    Do you ordinarily work with Netcracker in retrieving

3    customer records like this?

4    A.    I work with Netcracker on a regular basis.

5    Q.    And in your experience, is that process accurate?

6    A.    Very accurate.

7    Q.    Mr. Jarchow, you should have a binder in front of you.

8    A.    Yes, I did.

9    Q.    If you could please look -- there should be three tabs in

14:34:29 10    the binder.  Do you see that, sir?

11    A.    I do.

12    Q.    And would you please take a look at those three documents

13    and tell me, do you recognize those documents?

14    A.    I do.

15    Q.    What are they?

16    A.    These are site IDs, account numbers, customer names,

17    customer addresses of our Cox Business subscribers that were

18    part of the original data extraction that we pulled for the

19    court, except for two customers that were left out per their

14:35:13 20    request.

21    Q.    Without revealing their names, what type of businesses

22    were those two customers?

23    A.    There was a hotel and a hospital.

24    Q.    And do you have an understanding as to why their

25    information was left out?

P. Jarchow - Direct

2507

1    A.   Their -- they filed a request to, to be anonymous.

2    Q.   And did you review that filing that they did?

3    A.   I did.

4    Q.   And did the filing say whether those two customers used

5    their Cox internet account for public WiFi or for their secured

6    computer systems?

7    A.   The hotel filing indicated that they used the WiFi in both

8    a secured and public way.  The hospital filing indicated that

9    their secure network was provided by another internet service

14:36:06 10  provider and their public WiFi was provided by Cox.

11   Q.   And, sir, do the three reports in your binder, with the

12   exception of the two subscribers you just mentioned, list all

13   the businesses on the list of accounts that you were provided?

14   A.   That is correct.

15   Q.   And with those two exceptions, how can you tell that this

16   report lists all the Cox subscribers who are the subject of

17   plaintiffs' notices?

18   A.   I've compared this to the original data extraction and

19   reviewed every account to make sure they were accurate.

14:36:37 20  Q.   And do the three reports accurately reflect the name and

21   address of the Cox Business subscribers from the master ICOMS

22   report you supervised?

23   A.   They do, yes.

24        MS. GOLINVEAUX:  Okay.  Your Honor, I'd move into

25   evidence DX 358, 359, and 360.

P. Jarchow - Direct

2508

1          THE COURT:  Any objection?

2          MR. GOULD:  No objection.

3          THE COURT:  Received.

4          MS. GOLINVEAUX:  Your Honor, these lists were

5    designated as confidential pursuant to the protective order

6    because there's really no purpose to disclose this list of Cox

7    Business names.  I would ask if the Court would consider

8    keeping these three documents under seal.

9          THE COURT:  It's just the names?

14:37:14 10          MS. GOLINVEAUX:  Yes, Your Honor.

11          THE COURT:  All right.  No.  Your exception is noted,

12    though.

13          MS. GOLINVEAUX:  Your Honor, the DX 358, 359, and 360

14    were submitted in electric form to the Court.  We also move to

15    introduce 358A, 359A, and 360A, which are merely paper copies

16    of those electric documents.

17          THE COURT:  All right.  They'll be received.

18    BY MS. GOLINVEAUX:

19    Q.   Mr. Jarchow, do you know how many commercial accounts are

14:37:49 20    listed in these three reports?

21    A.   Approximately 2,800.

22    Q.   And why are there three separate reports?

23    A.   Due to the timing of notification.  We needed to provide

24    them with different time.  So the first report, etc., is based

25    on timing of notification.

2509

1  Q.   And what types of businesses, Mr. Jarchow, are reflected

2  on the three reports by category?

3  A.   They're all, all types of businesses.  There's businesses,

4  medium businesses.  There's hospitals.  There's firehouses.

5  There's government agencies.  There's foundations.  Any type of

6  business you could think of is in this report.

7          MS. GOLINVEAUX:  Thank you, sir.

8          Your Honor, pass the witness.

9          THE COURT:  All right.  Cross-examination?

14:38:41 10                  CROSS-EXAMINATION

11  BY MR. GOULD:

12  Q.   Good afternoon, Mr. Jarchow.  Nice to see you again.

13  A.   Hello, Mr. Gould.

14  Q.   You were asked to produce ICOMS billing and payment data

15  for approximately 58,000 customers who were identified in

16  plaintiffs' infringement notices, correct?

17  A.   That's correct.

18  Q.   And approximately 95 percent of those customers were

19  residential customers, correct?

14:39:11 20  A.   That's correct.

21  Q.   Roughly 5 percent were business customers?

22  A.   Approximately, yes.

23  Q.   And that 5 percent of business customers came to just

24  about 2,800?  That's the 2,800-ish that you described, correct?

25  A.   That's correct.

P. Jarchow - Cross

2510

1    Q.   And Cox hasn't provided the names of the residential

2    customers, correct?

3    A.   It has not.

4    Q.   You understand that the business customers were given an

5    opportunity to object in court to the disclosure of their

6    names?

7    A.   Yes.

8    Q.   And you mentioned, I think, two that you said did?

9    A.   Yes, sir.

14:39:52 10         MR. GOULD:  Could you pull up DX 358, please?

11              Please scroll to the top, please.

12   BY MR. GOULD:

13   Q.   Mr. Jarchow, this is DX 358, which has the bulk of those

14   customers' names, correct?

15   A.   Yes, sir.

16   Q.   I think it was about 2,700 or so that were on this

17   particular spreadsheet, give or take.

18   A.   Yes.

19   Q.   Now, if we look at some of the names of the business

14:40:32 20  customers, No. 5 is Olympia Skate Center, and right below that

21   is a Computers & More, right?  And you keep going down and you

22   can see there's a college, and one's a fire station.

23              If you keep scrolling down, towards the bottom,

24   Margaritas, let's see, line 21 says Margaritas Mexican Bar &

25   Grill.  And right below that is Cars R Us.

P. Jarchow - Cross

2511

1          Did I read those correctly?

2     A.   That's what I'm reading, yes, sir.

3          MR. GOULD:  If you could just click down another

4     page?

5     BY MR. GOULD:

6     Q.   Let's take a look at some of the other names.  There's a

7     couple of Starbucks, right?

8     A.   Yes.

9     Q.   And there's an art gallery, correct, at line 49?

14:41:27 10  A.   Yes.

11    Q.   Let's take a look at another page, okay?  Line 79, there's

12    something called Crystal Chandelier, right?  And then an

13    infirmary and a diner and a coffee shop, and then at 87, you

14    see Sal's Seafood and Chicken.

15          Did I read those correctly?

16    A.   Yes, sir.  And 86, Staybridge Suites.

17    Q.   Let's take a look at another page.  At line 103, you have

18    5 Minute Oil Change Shop.  Below that is a barbershop, and then

19    at 106, there's a Pipes R Us Plumbing, correct?

14:42:09 20  A.   Yes, sir.

21    Q.   Okay.  Let's take a look at another page.  At the top,

22    you've got a nail and spa, right?

23    A.   Yes, sir.

24    Q.   And at 117, there's a restaurant and oyster bar?

25    A.   And 116, Benchmark Communications.

P. Jarchow - Cross

2512

1    Q.    Yeah.  And at 122, we have Cairo Cafe?

2    A.    That's correct.

3    Q.    There's a TGI Fridays right at the bottom?

4    A.    Yes.

5    Q.    Let's just look at one more page to get a sense here.  At

6    155, you have Smooth Movers, correct?

7    A.    That's correct.

8    Q.    And 166, something called Underground Audio?  Did I read

9    that correctly?

14:43:01 10    A.    That's correct.

11    Q.    And these are fairly representative of the types of

12    customers and names that are listed in these three exhibits,

13    correct?

14    A.    In general, yes.

15    Q.    And there's also a handful of hospitals, doctor's offices

16    or medical centers, right?

17    A.    Doctors' offices, medical centers, library, government

18    facilities, yeah.

19    Q.    Saw a couple of volunteer fire stations, correct?  Sound

14:43:34 20    familiar?  You've looked at these?

21    A.    Yes.

22    Q.    You understand, sir, that Cox has argued in this case that

23    it can't be expected to terminate Internet service of business

24    customers for copyright violations if those customers are

25    hospitals, police, fire, or other critical infrastructure?

P. Jarchow - Cross

2513

1        MS. GOLINVEAUX:  Objection, Your Honor.  Scope.

2        MR. GOULD:  Your Honor, this witness is listed on our

3   exhibit list as well.

4        THE COURT:  Yeah, I'm going to allow the question.

5   Your exception is noted.  Thank you.

6   BY MR. GOULD:

7   Q.   Sir, do you understand that Cox has argued in this case

8   that it can't be expected to terminate internet service for

9   business customers for copyright violations if those customers

14:44:14 10   may include critical infrastructure or health care services?

11   A.   I understand.

12   Q.   And I think you testified that the ICOMS database from

13   which this information came doesn't actually tell Cox what the

14   customer uses that service for, correct?

15   A.   That is correct.

16   Q.   It could include a field here that says it's used for

17   WiFi, right?

18   A.   Managed WiFi.  If we sold them managed WiFi service.

19   Q.   You could include a field that says this customer used our

14:44:43 20   service for WiFi, correct?

21   A.   If we sold them managed WiFi service.

22   Q.   But there's no way to distinguish based on the billing

23   records or the ICOMS database whether those WiFi users were

24   using some secured private network or a public WiFi network,

25   correct?

P. Jarchow - Cross

2514

1    A.    That is correct.

2    Q.    And likewise, for a hospital client or a volunteer fire

3    station, there's similarly no way to tell on your end whether

4    the customer is using Cox's service for some secured private

5    network to, say, provide emergency services or in a lobby,

6    correct?

7    A.    The ICOMS system does not have records that represent

8    secured or private or --

9    Q.    Now, I've looked through these three exhibits.  Would it

14:45:28 10  surprise you if I told you that of the 2,800 or so, there's by

11   name alone approximately 68 that appeared to potentially maybe

12   relate to some sort of health or infrastructure-type service?

13   A.    Hard to say.  I didn't count specific categories.

14   Q.    But you looked through this whole list, and we've just

15   scanned through some pages, correct?

16   A.    Yes.  I've reviewed the entire list.  I didn't

17   specifically count.

18   Q.    Now, as the director of information technology, your job

19   duties focus on the technical support of the business systems

14:46:06 20  that Cox Communications uses to provide its services, correct?

21   A.    I manage the configurations of the ICOMS billing database.

22         MR. GOULD:  I'm sorry, I handed you the wrong

23   document.  I apologize.

24   BY MR. GOULD:

25   Q.    Sir, I want to show you a document and ask you if it

P. Jarchow - Cross

2515

1    refreshes your recollection.  If you look at the first sentence

2    of paragraph 2, does this refresh your recollection that your

3    current job duties focus on the technical support of the

4    business systems that Cox Communications uses to provide its

5    services?

6    A.    The first sentence, but the second sentence, the primary

7    system I'm responsible for is ICOMS customer subscriber

8    management system, yes.

9    Q.    Sir, you recall submitting a sworn declaration in this

14:47:26 10   case in which you testified that your current job duties focus

11   on the technical support of the business systems that Cox

12   Communications uses to provide its services?

13   A.    Yes.

14   Q.    And do you agree with that?

15   A.    With the primary system, I'm responsible for it, being

16   ICOMS, yes.

17   Q.    So I'm just asking you about the first sentence in your

18   sworn declaration.  Your job duties focus on the technical

19   support of the business systems that Cox Communications uses to

14:47:54 20   provide its services.  Is that your job duties or not?

21   A.    Yes, sir.

22   Q.    So we already talked about ICOMS, but given those job

23   duties, I think what you're saying is beyond ICOMS, you're also

24   not aware of any other databases at Cox that contain

25   information about whether a Cox Business customer at issue here

P. Jarchow - Cross

2516

1  used their internet service to provide emergency services,

2  correct?

3  A.   I don't manage any other systems at Cox.  I communicate

4  with leaders that do manage those other systems, yes.

5  Q.   You just don't know?

6  A.   I don't know.

7  Q.   And the same is true of whether any of these customers

8  provide critical infrastructure services through Cox's internet

9  services, correct?

14:48:41 10  A.   That's not subject to my --

11  Q.   I think you testified that you have reviewed an objection

12  to disclosure of the customer's name from a hospital to whom

13  Cox provides internet service, correct?

14  A.   I have reviewed that.

15  Q.   And I wasn't sure I understood what you said.  I want to

16  make sure I got it correctly.  I think you said that the

17  hospital reported that its internal secured network for

18  employees and health services was operated by someone different

19  than Cox, correct?

14:49:14 20  A.   That is what was filed.

21  Q.   And the hospital said that -- the only thing that the

22  hospital said in its statement was that it purchased internet

23  access that it used for public WiFi from Cox, correct?

24  A.   That was what was in the filing, yes.

25       MR. GOULD:  I have no further questions.

2517

```
 1              THE COURT:  Any redirect?

 2              MS. GOLINVEAUX:  No, Your Honor.

 3              THE COURT:  All right.  May Mr. Jarchow be excused?

 4              MR. GOULD:  Yes.

 5              MS. GOLINVEAUX:  Yes, Your Honor.

 6              THE COURT:  All right.  All right.  Thank you, sir.

 7    You're excused at this time.  Please don't discuss the

 8    testimony you've given with anyone until our trial is over.

 9    All right, sir?

14:49:50 10              THE WITNESS:  Thank you.

11              THE COURT:  All right.  Have a good afternoon.

12              NOTE:  The witness stood down.

13              THE COURT:  All right.  We have one matter to

14    resolve, so let's have you go sit comfortably in the jury room

15    instead of as a sidebar.  So take a quick recess.  Thank you.

16              NOTE:  At this point, the jury leaves the courtroom;

17    whereupon, the case continues as follows:

18    JURY OUT

19              THE COURT:  Okay.  Well, I've looked at the Tregillis

14:51:05 20    expert report very quickly and then the exhibit that

21    Mr. Oppenheim forwarded up to me, which is a 41-page exhibit

22    which identifies -- what does it say, exhibit listed as the

23    tracks on Exhibit A and B and also appearing in independent

24    notice database.

25              So that's what I have.  And I don't see in the report
```

2518

1   where it's broken down at all, but perhaps you can tell me

2   where this all comes from.

3           MR. BUCHANAN:  Your Honor, I --

4           THE COURT:  First of all, what this has to do with

5   your demonstrative.

6           MR. BUCHANAN:  Okay.  I will show you from pages 9,

7   10, and 11.  I think it is of his --

8           THE COURT:  In your demonstratives?

9           MR. BUCHANAN:  And page -- yeah, 9, 10, and 11 of his

14:52:12 10  reply report.  If you can -- I've highlighted these pages, and

11  you can see what he's doing is he's calculating across the

12  board.  Here's an excerpt from a -- sorry.

13          And I've highlighted that, and you can see that he's

14  breaking it down by musical composition, sound recordings, and

15  which, you know, have one, which have both.  You can see the

16  columns.  He does that throughout the report.  Then there's

17  some text there.  They had all this information before his

18  deposition.

19          And Dr. McCabe did this in his dataset.  He did this

14:53:01 20  type of analysis of musical recordings, sound recordings, which

21  one had one, which had both.  That's in his dataset that was

22  produced to Dr. Tregillis.  You can see page after page where

23  he's going through various musical compositions and sound

24  recordings, and he's matching it up, whether it's one or both,

25  and they didn't ask him any questions about that in his

2519

1    deposition.

2         MR. OPPENHEIM:  I'm sorry, am I looking in the right

3    place?  Can you just show me where you're looking here?

4         THE COURT:  He's forwarded pages 9, 10, 11, and 31.

5         MR. ZEBRAK:  Your Honor, the data in the report here,

6    these were specific little examples that were here for a

7    different -- a different purpose.  It's not an overall analysis

8    of, you know, the works in the case, which is what they're now

9    doing in these summary slides in a way that we can't -- you

14:54:10 10   know, we can't follow, but I just -- it's the same point we

11   made before.  It's just not, not disclosed in the report.

12        MR. OPPENHEIM:  I still don't see on the pages where

13   those numbers appear.

14        MR. ZEBRAK:  Oh, the numbers -- well, sorry.

15        THE COURT:  I'm sorry.  You don't have -- you want --

16        MR. OPPENHEIM:  No, no, I have the report that

17   Mr. Buchanan was referring to.

18        THE COURT:  Okay.

19        MR. OPPENHEIM:  I don't see where in those pages

14:54:43 20   there's a reference to the numbers that are in this --

21        THE COURT:  And he doesn't say that there are.  He's

22   saying this is a -- these are examples of how Mr. Tregillis has

23   worked the numbers and for different purposes, which I don't

24   understand but maybe I'll get there.

25        MR. OPPENHEIM:  I see that he has a number of

2520

                1    registrations broken out by sound recordings and musical

                2    compositions in paragraph 27.

                3          THE COURT:  Right.

                4          MR. OPPENHEIM:  But the rest of the paragraphs are

                5    about, as far as I can tell, numbers of notices by work, and it

                6    doesn't have to do with overlap issues.  So this is not what

                7    they referred to as -- us to earlier.  So maybe I'm missing

                8    something in reading it quickly.

                9          THE COURT:  So your objection is to the overlapping

14:55:38 10    SR and MC?  Is that what --

               11          MR. OPPENHEIM:  So there are two slides I'm looking

               12    at here.  One is 13, which has this 664 one-track, 789 multiple

               13    tracks.  I don't see any reference to that in the report.  If

               14    it's there and they can point me to it, great, but I don't see

               15    it.

               16          The other one is on the bottom of page 21, the 4,324,

               17    2,409, and 871.  I don't see that there, either.  So I don't

               18    know what falls into each of those buckets.

               19          THE COURT:  What -- you don't think that's in his

14:56:28 20    report?

               21          MR. OPPENHEIM:  Not that I'm seeing, Your Honor.

               22    We've asked -- before we came to court after -- during lunch,

               23    we asked them the questions, hoping we could resolve this.

               24    They pointed us to the schedule, which I handed up to Your

               25    Honor, which didn't do it for us.  They're now pointing to

2521

1    something else.  I still don't see it.

2            If it's somewhere else, maybe it's okay, but we're

3    not -- we don't believe that Mr. Tregillis did this analysis,

4    and we are in no position to know what goes into each of those

5    buckets in his analysis to know whether he did it properly or

6    not.

7            THE COURT:  How did he determine the 664 sound

8    recordings with one track versus 789 with --

9            MR. BUCHANAN:  He went through the identical dataset

14:57:17 10    that Dr. McCabe used.  He did it in his dataset, and he pulled

11    it out and it's --

12            THE COURT:  That's from the 41-page exhibit from his

13    original report; is that right?

14            MR. BUCHANAN:  This is -- you know, this is

15    basically -- so first of all, what I gave you was the same type

16    of analysis.  He's going through and showing whether there's a

17    musical composition as well as a sound recording for those

18    particular works in suit.

19            Those are examples he goes through, and he goes

14:57:43 20    through -- this is the compilation of all of them.  And had

21    they asked him about that -- they never asked him about any of

22    that, said, how did you do this?  Where is this coming from?

23    What's it about?  What's the purpose of this?  What's the

24    relevance, and how many -- what's the total?

25            You know, and they never asked him about that.

2522

1          THE COURT:  Yeah, but how does he come up with, for

2    instance, on No. 13, 664 single tracks, 789 multiple tracks?

3    He didn't do that analysis before?

4          MR. BUCHANAN:  No.  It's in -- he did not break down

5    exactly like this, but what he did is he did examples of

6    various, you know, sound recordings and musical compositions

7    throughout his report, and he has references to them, I think,

8    even in the text that he talks about how many there are.

9          The point is that he took Dr. McCabe's dataset.

14:58:36 10   Dr. McCabe does in, you know, a huge dataset.  He does it, and

11   he pulls it from there.  They don't have any disagreement.

12         The whole point of this is just to show what he did

13   to come up with a dollar per work in suit, and the sound

14   recordings and musical composition, how he's given credit for

15   those that just have a sound recording and a musical

16   composition.  That's all he's doing.  He's breaking it out.

17         This is no great analysis.  This is just counting,

18   and it's not disputed.

19         THE COURT:  All right.  Your exception is noted.  I'm

14:59:03 20   going to allow him to use the additional numbers, and you try

21   and track it, cross-examine him.  If this is erroneous, then

22   I'll strike it in hindsight.

23         MR. OPPENHEIM:  Your Honor -- and I recognize your

24   ruling.  Just so that there's a record on it, the, the pages

25   that Mr. Buchanan is pointing you to here are 9 and 10, with

2523

1    these lists, have nothing to do with tracks or albums or

2    overlap between SRs and PAs.  That has to do with the number of

3    notices.

4              THE COURT:  I understand that.  SRs versus the -- and

5    so it is a leap, but I'm going to -- I'm going to allow it.

6    Your exception is noted.  If you think that the -- that the

7    numbers are wrong, then we can revisit it.  But I just don't

8    think this is much of a leap in that, especially if it's

9    related to McGarty's testimony.  I think it -- or McCabe's,

15:00:10 10  whatever.  I think it's not out of bounds, so I'll allow it.

11             MR. OPPENHEIM:  May I --

12             THE COURT:  Yes, sir.

13             MR. OPPENHEIM:  Understood.  I'm not pushing back.

14   Your Honor, is it possible then that we can have Mr. Tregillis

15   testify tomorrow so we can have an opportunity to actually look

16   at these numbers and try to understand them before we have to

17   cross-examine him?

18             THE COURT:  Who else do you have here that you can --

19             MR. BUCHANAN:  He's next up.  He's scheduled --

15:00:39 20            MR. ELKIN:  We have a 16-minute video.  We have

21   Dr. Almeroth and Mr. Mencher left in our case, plus just moving

22   in some miscellaneous exhibits.  That's what our case is.

23             THE COURT:  All right.

24             MR. ELKIN:  So Mr. Tregillis is -- he's ready to go,

25   and --

2524

1          THE COURT:  Yeah, but I don't know enough to know

2     whether this is important or not.  It's not hitting me as

3     critical data, but maybe I'm not appreciating something.  So

4     let's put Almeroth up and, and give them a chance, and if we

5     get to Tregillis's direct, we'll see where we're going.  But

6     let's give them the opportunity to understand where this data

7     came from.

8          What are you going to do that's going to give you

9     that information tonight?

15:01:35 10          MR. OPPENHEIM:  I'm sorry, Your Honor, I was --

11          THE COURT:  What are you going to do that's going to

12     give you the key to unlock these numbers tonight that -- where

13     a delay is -- and juggling witnesses is proper?

14          MR. OPPENHEIM:  So, Your Honor, I'm going to ask

15     these very smart gentlemen who work with us here to try to go

16     back and re-create what he's done to see if we can come up with

17     those numbers.  We don't know what he did.  We're going to try

18     to figure it out.

19          I -- Your Honor, I also don't know whether it's

15:02:06 20     important, but this is a last-minute issue, and we're

21     certainly -- we're not prepared for it because it wasn't in the

22     deposition.

23          And the notion that we should have asked -- excuse

24     me -- in the reports.  And the notion that Mr. Buchanan put

25     forward that we should have asked about it in depositions is

2525

1   kind of humorous since how would we know to ask?  It wasn't in

2   the report.

3           THE COURT:  All right.  Take a look at it tonight.

4           Let's go forward with Almeroth, who is not here,

5   and -- because he didn't expect to have to testify.

6           MS. GOLINVEAUX:  Your Honor, he's across the street

7   at the hotel.  I'll go get him.

8           THE COURT:  Okay.

9           MS. GOLINVEAUX:  Perhaps we could play the video now

15:02:43 10  in the meantime.

11          THE COURT:  An excellent suggestion.  Thank you.

12          All right.  All right, Joe, let's get our jury back.

13          NOTE:  At this point, the jury returns to the

14   courtroom; whereupon, the case continues as follows:

15   JURY IN

16          THE COURT:  All right.  Please be seated.

17          All right.  I understand our next witness will be by

18   deposition and video.

19          Mr. Elkin?

15:04:03 20    MR. ELKIN:  Yes, Your Honor.  Good afternoon.

21   Defendants call Samuel Rubin, former employee at Stroz

22   Friedberg.

23          THE COURT:  Okay.

24          NOTE:  The testimony of SAMUEL RUBIN via video

25   deposition is played into the record as follows:

S. Rubin Deposition - Examination

2526

```
             1                    EXAMINATION

             2   BY MR. BROPHY:

             3   Q.   Good morning, Mr. Rubin.

             4   A.   Good morning.

             5   Q.   As you've just heard, my name is Michael Brophy, and I

             6   represent the defendant, Cox Communications, Inc., and CoxCom,

             7   LLC, and I may in this deposition jointly refer to them as Cox.

             8   Do you understand?

             9   A.   I do.

15:04:38    10   Q.   Where are you currently employed?

            11   A.   I currently work at a company called The Crypsis Group,

            12   C-r-y-p-s-i-s.

            13   Q.   And what is your title at The Crypsis Group?

            14   A.   Vice president.

            15   Q.   And when did you start working there?

            16   A.   September 1, 2017.

            17   Q.   And prior to working at The Crypsis Group, where did you

            18   work?

            19   A.   Stroz Friedberg.

15:05:04    20   Q.   Now, it is my understanding that you're testifying today

            21   on behalf of Stroz Friedberg; is that correct?

            22   A.   I think that's correct, yes.

            23   Q.   When did you first work for Stroz Friedberg?

            24   A.   February 2003.

            25   Q.   And did you work there continually until you left in 2017?
```

S. Rubin Deposition - Examination

2527

1   A.   Yes.

2   Q.   Are you familiar with an entity called the Center for

3   Copyright Information?

4   A.   Yes.

5   Q.   And if I refer to that as CCI, you'll know what I'm

6   talking about?

7   A.   Yes.

8   Q.   So what is your understanding of how Stroz Friedberg

9   became engaged by CCI?

15:05:54 10   A.   Stroz Friedberg was referred to Jill Lesser, who is the

11   representative from CCI, by one or more of both parties on the

12   content side, as well as certain participants on the internet

13   service provider side who were familiar with Stroz Friedberg

14   and our work.  Its work.

15   Q.   What is your knowledge of Stroz Friedberg's work for any

16   of the other entities listed under parties to the agreement?

17   A.   I can say generally that Stroz Friedberg has worked on

18   behalf of parties on both the content owner representative

19   side, as well as the participating ISP side.

15:06:55 20   Q.   What can you tell me about the methodology that Stroz

21   Friedberg initiated to get from the engagement stage to the

22   report stage?

23   A.   I think that that's a broad question, and the, the answer

24   is best set forth in the documents that Stroz Friedberg

25   produced in connection with this deposition.  At the highest

S. Rubin Deposition - Examination

2528

1  level, Stroz Friedberg conducted an assessment of the

2  methodologies that MarkMonitor undertook to identify infringing

3  works, to collect evidence related to those works, to search

4  for those infringing works being shared or downloaded on

5  peer-to-peer networks, and to notify the internet service

6  providers that were participating in the CAS, Copyright Alert

7  System.

8  Q.   I'd like to mark this as Stroz Exhibit 5.

9        Mr. Rubin, do you recognize this exhibit by its

15:08:27 10  cover?

11  A.   Yes.

12  Q.   And what is this document?

13  A.   This is Stroz Friedberg's report -- draft report, with the

14  title Independent Expert Assessment of MarkMonitor Antipiracy

15  Methodologies, dated October 31, 2012.

16  Q.   And is this a document that you would have had a role in

17  creating?

18  A.   Yes.

19  Q.   Now, Stroz Friedberg was tasked with making enhancement

15:08:56 20  recommendations, correct?

21  A.   Yes.

22  Q.   Who at Stroz Friedberg was involved in formulating these

23  recommendations?

24  A.   I was along with some of the same names that we've

25  mentioned here today:  James Hung, Danny Lungstrom, and James

S. Rubin Deposition - Examination

2529

1    Aquilina, principally.

2    Q.   Did any other entity or individual propose any changes to

3    Stroz Friedberg's recommendations after the first draft report

4    was circulated?

5    A.   Not that I'm aware of.  And I, I haven't done a

6    side-by-side comparison of all the drafts.  I'm sure you or

7    your team will do that, but as I sit here right now, I don't

8    know.

9    Q.   And at the time that you -- that Stroz Friedberg issued

15:09:49 10   its final report, you stood by the six listed enhancement

11   recommendations listed in the report?

12   A.   Yes.

13   Q.   If I could have you turn to page HL_186 to look at the

14   first recommendation?

15   A.   Yes.

16   Q.   And this is entitled Augment the File Identification Audit

17   Trail.

18        And this recommendation makes reference to a ripple

19   effect.  What is meant by "ripple effect" in the context of

15:10:26 20   this recommendation?

21   A.   The general point is that if a file is identified as an

22   infringing work, as a false positive, falsely identified, and

23   it's reflected in MarkMonitor's operational databases as such,

24   the rest of the process, which is very automated, would go on

25   to identify a file that is not infringing, as infringing, and

S. Rubin Deposition - Examination

2530

1    then generate notices to be sent to the participating ISPs of

2    false positive identified works.

3          So the ripple effect is essentially the downstream

4    consequences of the misidentification of a file as, as

5    infringing.

6    Q.   And so circling back to what we talked about before, if

7    there was an error in verification via one of the components

8    such as Audible Magic, any errors with Audible Magic's

9    verification process would have a ripple effect throughout

15:11:35 10   MarkMonitor?

11   A.   That's true.  If it were not otherwise captured by one of

12   the controls in place.

13   Q.   Now, I'd like you to, to focus at No. 2 now, where the

14   recommendation states:  Deploy a high percentage of "verified"

15   infringing works to the collection agents.

16   A.   Yes.

17   Q.   Do you have an understanding as to why MarkMonitor

18   collected files that had not been verified as infringing?

19   A.   It was generally done -- my understanding is that it was

15:12:12 20   an efficiency approach and one for scalability in that

21   essentially they could start collecting data almost

22   immediately, before -- one, one method would entail doing some

23   amount of kind of prescreening to sift through works to

24   identify which are true infringing copies and which are not and

25   then ceding the verified infringing work torrents in the

2531

1   collection agency -- agents.

2          Another method would just be to use more of a, a --

3   cast a wider net and just sweep everything that was identified,

4   and then later verify those that were collected, and do that on

5   an ongoing basis.  And that latter approach is the method that

6   MarkMonitor chose to, to use.

7   Q.   In looks like the third sentence, it says:  And though

8   there are subsequent steps in place to ensure notices are only

9   generated on verified infringing works, collection by the

15:13:30 10   agents of these non-infringing files introduces inefficiencies

11   into the process --

12   A.   Sure.

13   Q.   -- and increases the chances that notices will be

14   generated for non-infringing files.

15   A.   Okay.  Thank you.

16          And your question is how does it do that?

17   Q.   In what way did it increase the chances that that would

18   happen?

19   A.   Because a greater number of works in total, protected and

15:13:57 20   nonprotected, would be swept into the system, versus only

21   targeting verified infringing or protected works; thereby, the

22   entire population includes by virtue of the setup of the system

23   both protected and nonprotected works.

24   Q.   And is -- if MarkMonitor had sent a notice for a, a

25   non-infringing file, would that be an example of a false

S. Rubin Deposition - Examination

2532

1    positive, as you've used that term?

2    A.    Yes.

3    Q.    And was it your -- was it Stroz Friedberg's recommendation

4    that if additional steps were taken to remove non-infringing

5    works from being swept into the system, it would decrease the

6    chances of false positives?

7    A.    I think the recommendation was to increase -- to deploy a

8    higher percentage of verified infringing works.  I think there

9    was an acknowledgement that without careful verification,

15:15:24 10  there's no way to ensure that you're only collecting infringing

11   works, and that this was a process designed for maximum

12   efficiency.

13          And so there was no -- there was no opinion or

14   recommendation that it was not a, a viable approach, but the

15   recommendation was to consider a method to increase the

16   percentage of verified works as related -- as compared to the

17   total population.

18   Q.    Well, going back to the third sentence that I read a loud,

19   it ends with:  That collection by these agents of these

15:16:07 20  non-infringing files introduces inefficiencies into the process

21   and increases the chance that notices will be generated for

22   non-infringing files.

23          And so my question for you is, are you -- was Stroz

24   Friedberg making this recommendation in part because they

25   wanted to decrease the chances that notices would be generated

S. Rubin Deposition - Examination

2533

1    for non-infringing files?

2    A.   The recommendation was made as an overall system

3    enhancement, and part of the steps that would enhance it would

4    reduce the risk of error.

5    Q.   Okay.  And as stated here in this context, one of the

6    potential errors would be a notice generated for a

7    non-infringing file?

8    A.   That's correct.

9    Q.   Recommendation No. 3 references file identification names.

15:17:07 10   A.   Sure.

11   Q.   And I'm trying to understand if you could explain to me

12   why file identification names are relevant to the MarkMonitor

13   assessment program or the MarkMonitor program.

14   A.   The point that Stroz Friedberg was making with this

15   recommendation was that the identification of infringing works

16   was limited to those that had a, a matching name, and that

17   it's, you know, possible, likely, and certainly the case that

18   many infringing works don't contain a name that directly

19   correlates to the content.

15:17:53 20        And so the point we're making is that by limiting the

21   program to only include those, they were probably missing some

22   infringement, infringement cases that if they augmented the

23   program, they could have captured.

24   Q.   Do you know if MarkMonitor implemented any, any changes in

25   response to this recommendation?

2534

1    A.    I don't.

2                        EXAMINATION

3    BY MS. MUSTICO:

4    Q.    And I want to point your attention to Section No. 2,

5    summary of findings and recommendations, and the first bullet

6    point says:  MarkMonitor's methodologies effectively identify

7    P2P online copyright infringers.

8              Do you see that?

9    A.    Yes.

15:18:38 10  Q.    Do you stand by this conclusion as accurate when it was

11   drafted?

12   A.    Yes.

13   Q.    Do you have any reason to believe that statement is

14   inaccurate?

15   A.    No.

16   Q.    Now?

17   A.    No, I do not.

18   Q.    Thank you.  The second bullet says:  MarkMonitor

19   methodologies are well developed and matured.  Do you stand by

15:19:00 20  that statement as accurate when it was drafted?

21   A.    Yes.

22   Q.    Is there any reason to believe now, some years later, that

23   that statement is not accurate?

24   A.    I have no reason to believe it isn't -- it is inaccurate.

25   Q.    Okay.  The third bullet says:  MarkMonitor's evidence

S. Rubin Deposition - Examination

2535

1    collection in connection with P2P infringement is robust,

2    defensible, and will withstand adverse party scrutiny or

3    evidentiary challenges.

4            Do you believe that statement to have been accurate

5    when it was drafted?

6    A.   Yes.

7    Q.   Do you have any reason to believe that that statement is

8    no longer accurate?

9    A.   No.

15:19:41 10  Q.   The fourth bullet says:  The methodologies include

11   appropriate checks and balances at key points in the work flow

12   to ensure accuracy.

13           Do you believe that statement or that conclusion was

14   accurate at the time it was drafted?

15   A.   Yes.

16   Q.   Any reason to believe that it is no longer accurate?

17   A.   No.

18   Q.   The fifth bullet point, page HL_172, says:  The reporting

19   and notice-generating abilities allow MarkMonitor to accurately

15:20:17 20  report on identified infringers.

21           Do you see that?

22   A.   Yes.

23   Q.   Do you believe that conclusion to have been accurate when

24   this report was issued?

25   A.   Yes.

S. Rubin Deposition - Examination

2536

1   Q.   Do you have any reason to believe now that that statement

2   is no longer accurate?

3   A.   No.

4   Q.   And the last bullet in that section, which I think is

5   No. 6, says:  The methodologies have a number of inherent and

6   added system redundancies designed to ensure that MarkMonitor

7   can provide continuous and consistent scanning.

8        Do you believe that statement is accurate -- was

9   accurate when it was drafted?

15:20:55 10   A.   Yes.

11   Q.   And do you have any reason to believe that it is no longer

12   accurate?

13   A.   No.

14   Q.   Do you believe that the MarkMonitor system to identify

15   infringing files on peer-to-peer networks that you reviewed as

16   part of the CCI engagement functioned as it was intended to at

17   the time that you reviewed it?

18   A.   Yes.

19   Q.   In Stroz Friedberg's analysis of MarkMonitor on behalf of

15:21:24 20   CCI, did you identify evidence that indicated that

21   MarkMonitor's system was producing false positives?

22        A VOICE:  Object to the form.

23        THE WITNESS:  No.

24   BY MS. MUSTICO:

25   Q.   Did you identify -- excuse me.

K. Almeroth - Direct

2537

1          Did Stroz Friedberg identify any evidence that

2    MarkMonitor's system committed errors in collecting case

3    packages?

4    A.   I don't believe we identified any.

5              NOTE:  End of video deposition.

6              THE COURT:  All right.  That concludes the video

7    deposition of Mr. Rubin.

8              All right.  Next witness?

9              MS. LEIDEN:  Thank you, Your Honor.  Cox calls

15:22:17 10   Dr. Kevin Almeroth.

11             THE COURT:  All right.

12    KEVIN CHRISTOPHER ALMEROTH, PH.D., DEFENDANTS' WITNESS, SWORN

13             THE COURT:  Good afternoon, Mr. Almeroth.  Please

14   proceed.

15             MS. LEIDEN:  Thank you, Your Honor.

16                        DIRECT EXAMINATION

17   BY MS. LEIDEN:

18   Q.   Good afternoon, Dr. Almeroth.  Could you please state your

19   full name and introduce yourself to the jury.

15:23:14 20   A.   Sure.  My name is Kevin Almeroth, Kevin Christopher

21   Almeroth, and I'm a professor in the department of computer

22   science at the University of California in Santa Barbara.

23   Q.   And, Dr. Almeroth, have you submitted written testimony in

24   this case in the capacity as an expert?

25   A.   Yes, ma'am, I have.

K. Almeroth - Direct

2538

1    Q.   And generally speaking, can you tell the jury what you're

2    here to do today?

3    A.   I'm here to offer rebuttal testimony and to describe

4    network monitoring in Cox's network and also to describe Cox's

5    abuse ticketing system.

6    Q.   And, Dr. Almeroth, did you assist in preparing some slides

7    to illustrate your testimony today?

8    A.   Yes, ma'am, I did.

9    Q.   And do some of those slides summarize your background?

15:24:02 10   A.   That's correct.

11            MS. LEIDEN:  With permission, I'd like to hand the

12   witness a hard copy of the slides.

13            THE COURT:  Certainly.

14            MS. LEIDEN:  And permission to publish the slides on

15   the screen?

16            THE COURT:  Any objection?

17            MR. ZEBRAK:  No, Your Honor.

18            THE COURT:  All right.  They'll be received for

19   publication for demonstrative purposes.

15:24:27 20           MS. LEIDEN:  Thank you.

21   BY MS. LEIDEN:

22   Q.   And, Dr. Almeroth, do some of these slides summarize your

23   background?

24   A.   Yes, ma'am.

25   Q.   And I believe that you have requested to -- oh, you got

K. Almeroth - Direct

2539

1    the clicker.  Great.

2              Could you go through your background, please?

3    A.   Certainly.  So currently, as I said earlier, I'm a

4    professor in the department of computer science.  I've been a

5    professor there since 1997.  I started as an untenured

6    assistant professor, received tenure, was promoted to associate

7    professor, and eventually promoted to full professor, and along

8    the way, I have also served as the vice chair of the department

9    and also as an associate dean in the college of engineering.

15:25:13 10  Q.   And generally speaking, what do you do as a professor at

11   UC Santa Barbara?

12   A.   I do three things:  I teach, I also do research, and then

13   I do service to the field, things like serving on editorial

14   boards, conferences, that kind of thing.

15   Q.   And starting with the first, what types of classes do you

16   teach at UC Santa Barbara?

17   A.   I teach both undergraduate courses and graduate courses to

18   master's and Ph.D. students, and I generally teach courses

19   about how the internet works, all sorts of details, protocols,

15:25:51 20  architecture for the internet, how it's structured, and how it

21   works.

22   Q.   And at a high level, what types of topics are covered in

23   those classes?

24   A.   We cover things like the protocols that are used in the

25   internet, the rules for how data is exchanged.  We also cover

K. Almeroth - Direct

2540

1    services on the internet like streaming media, peer-to-peer as

2    an example, how to do network monitoring and management, and

3    generally how the internet works.

4    Q.   And you also mentioned research, I believe.  What do you

5    do as a researcher at UC Santa Barbara?

6    A.   The goal of a researcher and what I do in writing my lab

7    is to try and look at problems that exist in the internet,

8    opportunities for new services, and to try and solve those

9    problems, do experimentation, try and understand if those kinds

15:26:41 10  of systems will work, and then disseminate our results through

11   things like publications and the development of prototype

12   software systems.

13   Q.   What do you mean by "prototype software systems"?

14   A.   Part of what you have to do as a researcher is not just

15   propose an idea, but to evaluate it and show that it will work.

16   So, for example, an early project I did was essentially what

17   we, we understand TIVO to be, and so one of the things I wanted

18   to do in testing that over the internet was to create kind of a

19   prototype system to stream multimedia data over the internet

15:27:18 20  and then to be able to receive it and display it and listen to

21   it, and we wrote software to do that, and we put it on our web

22   page for others to use.

23   Q.   And, Dr. Almeroth, could you briefly walk us through your

24   educational background?

25   A.   Certainly.  So I started at Georgia Tech in 1988 in the

K. Almeroth - Direct

2541

1  computer science program and left in 1997, about nine years

2  later, and along the way, I earned a bachelor's degree, a

3  master's degree, and then eventually a Ph.D., all in computer

4  science.

5  Q.   And have you been recognized at all for your work in the

6  area of computer networking?

7  A.   Yes, ma'am, I have.  The next slide identifies some awards

8  and honors, and they really break across the two areas of

9  teaching and research.  I've been awarded the Department

15:28:07 10  Teaching Award about a half a dozen times in computer science

11  at UCSB, and I've also received the Campus Teaching Award.

12        And then for my research, there's a number of Best

13  Paper Awards.  That's where you submit papers to a conference,

14  they're reviewed, and then of all the papers that are accepted,

15  they take the best one and recognize it.

16        There's also the second bullet here that I've been

17  recognized as a fellow of the IEEE.  The IEEE is the Institute

18  of Electrical and Electronics Engineers, and I think you heard

19  testimony where a fellow is essentially the top 1 percent of

15:28:50 20  the membership for people who have been honored for lifetime

21  achievement.

22  Q.   And at a high level, what's been the focus of your

23  research?

24  A.   When I started at UCSB, the research that I was interested

25  in focusing on was really two different parts:  This idea of

K. Almeroth - Direct

2542

1    adding services to the internet to make it more useful, for

2    example, in the mid-'90s, when I first started doing research,

3    there was almost no streaming media.  It was essentially all

4    web and e-mail.  So I was interested in trying to add new

5    services as the internet grew.

6              The second theme was whenever you add those kinds of

7    new services and create traffic demands in the internet, it

8    puts a strain on the underlying infrastructure, the network

9    devices that move the data around the network, and so I've

15:29:44 10  undertaken research to try and develop support in the network

11   to help it go faster, to run more efficient.

12             And as part of that, you get to the third bullet on

13   the left side of the slide, which is I've done monitoring --

14   network monitoring and management research, trying to

15   understand what's happening in the network in the course of

16   providing these kinds of services.  And so doing that kind of

17   monitoring tells us if it works, if it doesn't work, how to

18   improve it, that sort of thing.

19   Q.   And have you done any research on peer-to-peer networks?

15:30:16 20  A.   Yes, I have.  I think you've heard testimony over the

21   course of the last couple weeks that as peer-to-peer networking

22   developed in the early 2000s, the late 1990s, it was seen as a

23   real revolution in the way networking was done.  Instead of

24   always going to a server to get content, you could go and ask

25   peers for content that they might have.

K. Almeroth - Direct

2543

1           And so researchers saw a lot of opportunity in that

2    kind of paradigm, and so I've written a number of papers that

3    talk about peer-to-peer and how that service can be used, for

4    example, by service providers to deliver new kinds of services.

5    Q.   And has any of the research that you just mentioned been

6    published?

7    A.   It has.  There's a number of papers we've published in

8    conferences.  My students love to publish their papers because

9    they get to go to interesting places and present that research.

15:31:12 10  Q.   And have any of the -- those publications been

11   peer-reviewed journals?

12   A.   Yes.  Sort of pardon the pun, I'm peer-reviewed, but in

13   that case, you get other researchers to look at your work and

14   to determine if it's of acceptable quality, and so they'll pick

15   the top 10 or 15 or 20 percent of the papers that are submitted

16   and allow the mostly students to go and present those results.

17   Q.   And, Dr. Almeroth, are you active in any industry working

18   groups?

19   A.   Yes.  So there's what's called the Internet Engineering

15:31:48 20  Task Force, that's the IETF.  They're responsible for

21   developing and publishing most of the standards that people

22   might be aware of in the internet, things like HTTP for web

23   traffic delivery, SMTP for mail.  I could go on with dozens and

24   dozens of acronyms for protocols that run in the internet.

25           And I've been active in the IETF.  I've written

K. Almeroth - Direct

2544

1   standards.  I've collaborated with a number of other companies

2   who are interested in things like network management in the

3   IETF.

4   Q.   And could you briefly just describe some of the industry

5   collaborations that you have on the right side of the slide

6   there?

7   A.   Certainly.  One of the themes of my research and one of

8   the reasons I went into academia, because I didn't just want to

9   sit in kind of the proverbial ivory tower and publish papers, I

15:32:40 10  wanted to see the work that I was doing make it out into

11  industry, into the internet, which is one of the reasons we

12  published some of the software that we had done.

13          But over the course of my research, working in the

14  IETF, I've had an opportunity to do research and collaborate

15  with companies, some of which you see here on the right.  Some

16  of them are fairly well known.  They make devices that run in

17  the internet.  There's also companies that have built new

18  services on top of the internet, and I've collaborated with

19  them to see my research make it out into the real world.

15:33:14 20  Q.   Did you provide an example of one of the more interesting

21  projects that you've worked on?

22  A.   Yes.  So you see about halfway down on the left side,

23  Lockheed Martin is mentioned.  I was given an opportunity to

24  work on an advisory board in collaboration with the U.S. Air

25  Force to design the next generation internet for the military.

K. Almeroth - Direct

2545

1          It was a fantastically interesting project in the

2     sense that it involved satellite-to-ground communication.  It

3     involved significant security.  A lot of the communications was

4     mobile communication in harsh environments where networks don't

5     always do particularly well.

6          So I was given an opportunity to apply some of the

7     research that I did to advance that project.

8     Q.   And, Dr. Almeroth, have you had the occasion to serve as

9     an expert witness in the field of computer networking before?

15:34:12 10   A.   Yes, ma'am, I have.

11    Q.   How many times, if you can estimate?

12    A.   I'd say it's about 60 or quite possibly a little bit more.

13         MS. LEIDEN:  And I'd like to hand the witness a

14    binder, please.

15    BY MS. LEIDEN:

16    Q.   And, Dr. Almeroth, when you have a moment to open that up,

17    if you could please turn to the first tab of your binder, which

18    is DX 169, and take a look at, please.

19    A.   Yes, ma'am.

15:34:45 20   Q.   And is that document a copy of your CV?

21    A.   Yes, ma'am, it is.

22    Q.   And are the things that we just talked about for the last

23    ten minutes or so listed or summarized in that CV?

24    A.   That's correct.  That's pretty much my life history since

25    I was an undergrad.

K. Almeroth - Direct

2546

1          MS. LEIDEN:  Your Honor, I would move to admit DX 169

2     into evidence.

3          THE COURT:  Any objection?

4          MR. ZEBRAK:  No objection, Your Honor.

5          THE COURT:  It's received.

6          MS. LEIDEN:  Thank you, Your Honor.  And Cox would

7     offer Dr. Almeroth as an expert in the field of internet

8     architecture, network monitoring and management, and

9     peer-to-peer networks.

15:35:18 10        THE COURT:  Any objection?

11         MR. ZEBRAK:  No objection, Your Honor.

12         THE COURT:  All right.  He'll be received for those

13    purposes.

14         MS. LEIDEN:  Thank you, Your Honor.

15    BY MS. LEIDEN:

16    Q.   And you can set aside the big binder for now.

17         Dr. Almeroth, did you also assist in preparing some

18    slides that are going to outline the topics that you'll be

19    discussing today?

15:35:35 20   A.   Yes, ma'am.

21    Q.   And before we get into the substance of those opinions,

22    could you please describe what you were asked to do in this

23    case?

24    A.   I was generally asked to respond to some of the testimony

25    and the expert reports and the opinions that have been offered

K. Almeroth - Direct

2547

1   in this case and basically be able to provide a description of

2   the role of Cox's network in the internet and then also to

3   provide opinions as it relates to CATS, the Cox graduated

4   response system.

5   Q.   And are you being compensated for your time as an expert

6   today?

7   A.   Yes, ma'am.

8   Q.   How much per hour?

9   A.   $650 per hour.

15:36:18 10   Q.   And do you have an estimation of about how many hours

11   you've spent working on this case?

12   A.   I would say about 150 hours.

13   Q.   So around $100,000, somewhere around there?

14   A.   Yes, ma'am.

15   Q.   And, Dr. Almeroth, could you please summarize the opinions

16   that you reached in this case?

17   A.   Yes.  I have a demonstrative on that.  It's No. 5.

18           The first was that I developed opinions around the

19   technical background, Cox's role in the broader internet

15:36:50 20   ecosystem and the challenges of network monitoring.  You've

21   heard the internet described as a network of networks, and so

22   I've prepared opinions trying to put Cox and other ISPs into

23   the context of the broader internet.

24           The second is to provide opinions on the use of

25   network management tools and the limitation of those tools to

K. Almeroth - Direct

2548

1    monitor BitTorrent levels at the subscriber level.

2              And then the third is to evaluate evidence relating

3    to CAS and then Cox's CATS system and to respond to

4    Ms. Frederiksen-Cross's opinions relating to that evidence.

5    Q.   And with respect to those three, could you summarize for

6    the jury the opinions that you did reach?

7    A.   Yes.  So there's basically two opinions in addition to

8    being able to describe how Cox fits into the internet, and the

9    first opinion is here on the screen.  It's that there are

15:37:48 10   limitations to using network management tools to identify

11   infringing traffic or to manage peer-to-peer traffic.

12             And then the second is that Cox's graduated response

13   system was tougher than the industry standard, the Copyright

14   Alert System, and that both systems were designed to educate

15   subscribers and to mitigate infringement.

16             And I disagree with Ms. Frederiksen-Cross's testimony

17   that CATS could have been rewritten to terminate subscribers

18   after three strikes.

19   Q.   And, Dr. Almeroth, as part of providing your opinions

15:38:24 20  relating to network management tools, did you develop an

21   understanding of Cox's role specifically within the internet?

22   A.   Yes, ma'am, I did.

23   Q.   And did you prepare some slides to illustrate that

24   understanding?

25   A.   Yes, ma'am, I did.

K. Almeroth - Direct

2549

1   Q.   So just to start, how do home subscribers connect to the

2   internet?

3   A.   So to kind of level set, I've got a demonstrative here

4   that shows a home network.  It shows blue and tan packets

5   flowing around between different devices.  Those represent

6   requests and responses, data that's being sent through the

7   network.  And it all goes through kind of this one device that

8   I've circled and show as an example a Cox set top box, or cable

9   modem, and that cable modem from a user's perspective is

15:39:13 10   essentially the interface between that user's home and the rest

11   of the internet.

12          And so you can have something like a cable modem from

13   a cable service provider, an ISP like Cox.  And then you can

14   have other ISPs, for example, Verizon is shown here, and it has

15   what's called a DSL modem.

16          The next slide then shows that you can have a variety

17   of end users, customers, businesses, other ISPs, that all are

18   customers of one or more ISPs.  So these homes, these

19   businesses, these other ISPs have to be able to connect into

15:39:48 20   the internet at large.

21   Q.   And does this slide illustrate what you referred to before

22   as the network of networks?

23   A.   Yes.  So you see the kinds of entities, people or

24   businesses that connect to the internet at the bottom, and then

25   the next click of the animation shows just how complex this can

K. Almeroth - Direct

2550

1    get and how quickly it can get complex, but what you see is you

2    have other clouds on here, you have Cox in the upper left, you

3    have other ISPs.

4            All of those are different ways in which customers

5    and users and businesses can connect to the internet, and then

6    those networks have to connect to each other, so that if I, for

7    example, want to send an e-mail to my mother, who still uses

8    AOL, it would have to go onto one network and then transition

9    to a different network.  And so all of the networks end up

15:40:44 10   getting connected together, and that's one of the reasons why

11   you call this a network of networks.

12           Now, at the top, there's a set of content providers,

13   things like Google and e-mail, Netflix, the new Disney+

14   streaming service.  Those are businesses that provide content.

15   And so users who connect to the internet are able to make

16   requests through this network, through the network of networks,

17   and to request content from those kinds of content providers.

18   Q.   And with respect to those content providers, is an ISP

19   like Cox the source of that content?

15:41:19 20   A.   No.  I think this slide pretty effectively illustrates

21   that example.  Cox provides what's called transit.  They don't

22   source or sync traffic.  They don't generate the traffic.  It's

23   the users who generate it.  They don't provide the content.  It

24   comes from other places:  Facebook, Google, etc.

25   Q.   And would this graphic also relate to how data is

K. Almeroth - Direct

2551

1  transferred over peer-to-peer protocols?

2  A.   Yes, ma'am.  So there's what's called a client server

3  model, where you have clients and servers, and the clients make

4  requests of servers.  They host the content.

5         The other model that we've all talked about or heard

6  over the last couple of weeks is peer-to-peer.  So instead of

7  getting the content from the content providers, that content

8  can be provided by other peers.  And that's an interesting

9  opportunity because it shifts the burden of distributing that

15:42:18 10  content from the content providers.  And that's, for example,

11  some of the research I've looked at.

12  Q.   So now that you've walked us through the broader picture,

13  I'd like to focus back on Cox's network specifically.  So

14  what's contained in that cloud that's Cox?

15  A.   Yes.  The next demonstrative I have kind of expands out

16  the Cox network.  Cox is what's considered to be a national

17  ISP.  It has a very large geographic footprint, and you see

18  inside of this network, there's a number of kind of gray lines.

19  Those represent sort of the conduits through which data would

15:42:57 20  flow.  So, for example, a series of pipes that would carry

21  data.

22         You also see kind of half-height blue cylinders.

23  Those represent network devices in the internet, including some

24  that are in Cox's network, that provide routing for data.

25         So just like in the mail analogy for the internet,

K. Almeroth - Direct

2552

1  you put letters in a mailbox, they get delivered to the post

2  office, the post office has to make decisions on where that --

3  those letters will go.  Routers and switches in the internet

4  perform the same kind of function.  They look at the packets.

5  They look at data.  It has information on where that data

6  should go, and it flows through the network choosing a path

7  using these routers and switches.

8  Q.   And I believe you've referenced Cox's customers on the

9  bottom row there.  What types of customers does Cox have?

15:43:51 10  A.   Cox has home networks, individual subscribers.  I think

11  there was testimony from Dr. Weber, she also indicated that

12  there were businesses who are subscribers to Cox.  She

13  indicated multi-family residences, so, for example, apartments,

14  and then also that you can see towards the bottom, there's

15  another cloud called Pixius Communication.  There's regional

16  ISPs who are also customers of Cox.

17  Q.   Who is Pixius Communication?

18  A.   Pixius Communication is what's called a regional ISP.  It

19  has a much smaller geographic footprint than a national ISP

15:44:34 20  like Cox.  And, in fact, I've got a slide that kind of expands

21  out and shows the cloud for Pixius Communication.

22       But other than its kind of size and geographic

23  footprint, it's very similar to Cox, and to the extent it has

24  downstream customers, single-family homes, businesses,

25  multi-family residences, Pixius has routers in its network, and

K. Almeroth - Direct

2553

1    it essentially uses Cox as a gateway into the rest of the

2    internet.

3              As, as part of the network of networks, Pixius is

4    just a little bit smaller version of what Cox is.

5    Q.   And so going back to Cox's network more broadly, can you

6    discuss how data is transmitted across the internet at a high

7    level?

8    A.   Yes.  So we're back to the main Cox slide.  I've started

9    to animate it to show data flowing through this network.  It's

15:45:27 10   a series of dots.  Those dots are really packets, data packets.

11             And again, the analogy of the post office fits at

12   this kind of level.  Just like we would take a letter or a

13   package and we would put a header on the outside, we'd put a

14   destination address, we'd put a return receipt address.  Those

15   addresses have a structure to them; for example, you use a

16   two-state -- or a two-letter state abbreviation.  That's by

17   convention, by protocol, by rule.

18             Packets that flow in the internet essentially do the

19   same thing.  There are protocols and rules for how data is

15:46:05 20   divided up into these little segments and sent through the

21   network.

22   Q.   And do ISPs like Cox have a role in that process?

23   A.   They do.  They're one of the network of networks, and so

24   for customers of Cox who send and receive data to the larger

25   internet, Cox will forward that data to the internet, and any

K. Almeroth - Direct

2554

1   responses that come back, Cox will forward that on to its

2   customers.

3   Q.   And you mentioned the analogy of envelopes and the postal

4   service.  Does that analogy apply to how packets are

5   transmitting the network?

6   A.   Yes.  I think it generally applies to kind of give some

7   insight.

8   Q.   Would that apply to the volume of data that's transmitting

9   the network?

15:46:47 10   A.   No.  The volume of data that exists on the internet today

11   is almost unimaginable.  We're talking about routers that can

12   handle upwards of 10 million packets per second, 100 million

13   packets in one second.  And so the volume of data that exists

14   in the current internet is huge.

15        It wasn't quite so high in, say, for example, the

16   mid '90s, but it's grown to be quite significant.  In fact, I

17   have kind of a step-through of the animation to describe this

18   concept.  You see a speedometer up here on the upper right.

19   Right now it's on the green.  Everything is moving fairly

15:47:29 20   slowly.

21        The next step in the animation shows what it would

22   look like if it were yellow.  This is the kind of evolution of

23   the internet that I was talking about when I was describing the

24   themes of my research at the beginning, that the volume of

25   traffic becomes much higher, there's more types of traffic, and

K. Almeroth - Direct

2555

1    so the pipes, the connections between routers has to grow.

2              And this process has grown essentially exponentially

3    over the last couple of decades, and so the final part of this

4    animation shows more data going faster, requiring greater

5    capacity, and it creates a real monitoring and management

6    challenge in the internet as it existed in 2013 and 2014 and

7    today as well.

8    Q.   And would you mind pausing just so we can give our eyes a

9    break?  Thank you.

15:48:21 10            How do -- given all of that, how do ISPs like Cox

11   manage the amount of data that's transmitting their network?

12   A.   The way that they -- that Cox would manage the amount of

13   data is that it would use network monitoring tools, tools that

14   could observe the traffic that was flowing through the network

15   and to be able to make decisions about what kind of traffic

16   that is.

17   Q.   And, Dr. Almeroth, will you be providing opinions relating

18   to, to network monitoring today?

19   A.   Yes, ma'am.

15:48:53 20   Q.   How did you reach those opinions?

21   A.   So I have a methodology for kind of what I looked at in

22   considering what Cox can do with respect to network monitoring.

23   The first point is to look at the scope and complexity of Cox's

24   network, some of which I've talked a little bit about, but I've

25   also reviewed information and talked to employees at Cox, some

K. Almeroth - Direct

2556

1    of whom have testified here either live or by deposition, and

2    then combined that with an understanding of the kinds of tools

3    that were available to Cox and that Cox used in monitoring its

4    network.  And so based on that, I formed opinions about what

5    Cox could do.

6    Q.   And at a high level, what are network monitoring tools

7    like Procera?

8    A.   If we go back to the slide that shows sort of Cox's

9    network, to answer that question, I've added three little boxes

15:49:48 10  labeled Data Centers and also Procera.  Procera is a tool from

11   a company called Sandvine that performs network monitoring

12   functionality, and what's also important on this slide is the

13   location of the three Procera devices.  They need to be in

14   strategic positions in the network so that they can see the

15   flow of data through the network.

16          So if data is to be monitored, if it's to be

17   analyzed, copies of that data have to be provided to the

18   software that will do an analysis of that data.

19   Q.   And is it your understanding as what types of network

15:50:26 20  monitoring tools that Cox used?

21   A.   Yes.  So Sandvine's Procera was one of the tools that Cox

22   used.

23   Q.   And what would Cox do with the information that it

24   received from Procera?

25   A.   So Procera would provide information about the types of

K. Almeroth - Direct

2557

1    packets, who sent and received those packets.  It would create

2    statistics that could be used to understand what was happening

3    in Cox's network, at least from a high level.  What it would

4    then do with those statistics is to try and do things like

5    capacity planning.

6            So there was testimony by videotape of a gentleman

7    from inCode, and he testified in the video about receiving

8    information from a tool like Procera, plugging it into kind of

9    a forecasting system, and then providing feedback to Cox about

15:51:25 10   how the volume and type of traffic in Cox's network might

11   evolve over a period of time.  So those are the kinds of things

12   that Cox could do with its monitoring tools.

13   Q.   And you have Traffic Monitoring there on the top.  What

14   types of traffic can Procera monitor?

15   A.   Procera can look at the headers of a protocol and look at,

16   for example, what's called a port number.  Some port number are

17   reserved for particular applications, so, for example, Port 80

18   would be for web traffic, and so Procera could look at these

19   port numbers and determine what kinds of applications the port

15:52:05 20  numbers relate to.

21           So to the extent you have a set of ports that are

22   used for an application, Procera can collect statistics and

23   provide reports based on that kind of information.

24   Q.   What would be some examples of those types of

25   applications?

K. Almeroth - Direct

2558

1    A.    Web traffic, streaming media traffic, peer-to-peer

2    traffic, those kinds of applications.

3    Q.    You mentioned peer-to-peer.  Could Procera be used to

4    monitor the amount of BitTorrent traffic that a specific Cox

5    subscriber uses on a particular day?

6    A.    Yes.  Procera would be able to perform that kind of

7    monitoring and to provide statistics at least about the fact

8    that it was BitTorrent traffic and do that on a per subscriber

9    basis.

15:52:52 10  Q.    How would it do that?

11   A.    Again, it would get copies of packets that were sent

12   across Cox's network and that were provided to the Procera

13   devices for processing, and it would be able to analyze those

14   headers and create the statistics about the types of traffic.

15   Q.    Are there -- are there limits on what Cox could do with

16   that functionality of Procera?

17   A.    Yes, ma'am, there are.

18   Q.    What are those limits?

19   A.    So the next slide talks about what some of these limits

15:53:20 20  would be with respect to network monitoring tools, and I have

21   three of them.  The first is that Cox can't determine the

22   content of BitTorrent traffic.  Much of the BitTorrent traffic

23   is encrypted, and so even if you look into the payloads of

24   traffic, you can't really determine what types of files there

25   are, in particular if it's encrypted.  So the most you can

K. Almeroth - Direct

2559

1    really do is determine that it's of an application type that's

2    BitTorrent or that's peer-to-peer.

3         The second point is that Cox can't determine whether

4    BitTorrent traffic is infringing.  So setting aside the fact

5    that it's encrypted, if Cox could look at that traffic, it

6    isn't able to determine whether or not it's infringing.  Cox

7    doesn't have the kinds of hashes, it doesn't have the kinds of

8    information that you've heard testimony about that's used in

9    this particular case.

15:54:17 10        MR. ZEBRAK:  Objection.

11        THE WITNESS:  The second point around Cox not being

12   able to determine whether BitTorrent traffic is infringing, I

13   mean, there is the exchange of copyrighted information.

14   There's also the exchange of information that's not copyrighted

15   or where the copyright owner allows that information to be

16   exchanged.

17        MR. ZEBRAK:  Objection, Your Honor.

18        THE COURT:  I'm sorry?

19        MR. ZEBRAK:  Objection, Your Honor.  Lack of

15:54:40 20   foundation for this.  He's speculating about infringement

21   issues.

22        THE COURT:  Sustained.  Lay a foundation.  Go ahead.

23        MS. LEIDEN:  Thank you, Your Honor.

24   BY MS. LEIDEN:

25   Q.   Dr. Almeroth, as part of your research and work in

K. Almeroth - Direct

2560

1    peer-to-peer traffic, have you done any research as to

2    legitimate purposes, uses of peer-to-peer networks?

3    A.   Yes, ma'am.  I've published a number of papers that talk

4    about peer-to-peer traffic, talk about the ways in which

5    peer-to-peer can be used for legitimate purposes to develop new

6    services.  For example, content providers who own content can

7    use peer-to-peer to distribute content through a peer-to-peer

8    network, and there's reasons why even someone who owns a

9    copyright would want to use a peer-to-peer network to

15:55:34 10   distribute their content.

11              THE COURT:  Go ahead.  You may proceed.

12              MS. LEIDEN:  Thank you.

13   BY MS. LEIDEN:

14   Q.   Dr. Almeroth, was there another opinion that you had with

15   respect to the limitations on using network monitoring tools?

16   A.   Yes.  There's this concept of net neutrality, and the

17   concept of net neutrality is inconsistent with this concept of

18   blocking peer-to-peer traffic.  So, again, even to the extent

19   that Cox had the ability to look at encrypted traffic, if Cox

15:56:06 20   had the ability to determine that that content was copyrighted,

21   that it was copyright infringement, the concept of net

22   neutrality would really prohibit Cox from taking any particular

23   role in managing that network traffic.

24              And just to be clear, as I pointed out in the first

25   two bullets, Cox doesn't have those capabilities.  I mean,

K. Almeroth - Direct

2561

1    that's the whole point of encryption is so that people who see

2    your packets can't tell what you're sending.

3    Q.   And from a technical perspective, why might blocking

4    peer-to-peer traffic be inconsistent with the concept of net

5    neutrality?

6    A.   So net neutrality is this idea in the internet where

7    traffic from different providers should be treated the same,

8    and the concept of net neutrality was put in place to keep

9    traffic on the internet flowing, to make it a fair place for

15:57:09 10    ISPs to exchange traffic.

11              There's a good example.  If Google gets very big,

12    which it is, and it decided that somebody was trying to start a

13    new search engine that would compete with Google, Google is so

14    big, they could go to ISPs and say:  We will pay you money not

15    to deliver the traffic of this new search engine, and they can

16    thwart competition in the marketplace by exerting undue

17    influence on whether or not their packets versus the packets

18    and traffic of another competitor flow through the network.

19              So the idea of net neutrality is that the traffic in

15:57:51 20    the network should be unencumbered, that it shouldn't have

21    restrictions on it as it flow through the network.

22    Q.   And briefly going back to the second point there, where

23    you said Cox cannot determine whether the traffic is

24    infringing, and I believe you had said that you had actually

25    conducted research on legitimate uses of BitTorrent; is that

K. Almeroth - Direct

2562

1    correct?

2    A.    Yes, ma'am.

3    Q.    And do you have a slide that illustrates that in part?

4    A.    I do.  The next slide -- there's testimony and papers that

5    identify legitimate uses of peer-to-peer.  I guess I'm touting

6    some of my own work here, but sometimes that's what happens.

7         A student of mine wrote a paper called "Pixie," and

8    we were looking to support the efficient peer exchange of

9    content and to use peer-to-peer networks on behalf of content

15:58:40 10  providers to enable new kinds of services.

11        As an example, there's also been testimony.  One good

12   example is what's happened with NASA.  NASA generates a huge

13   volume of traffic, satellite images, images from telescopes,

14   including the Hubble telescope, and as a government agency,

15   NASA doesn't have the infrastructure to make a petabyte's worth

16   of data, billions and trillions and quadrillion bytes of data

17   available from all of the different missions.  And so NASA uses

18   BitTorrent for the exchange of that information, and you heard

19   testimony on that earlier this week.

15:59:21 20       There's other instances, too.  There's Linux is an

21   operating system.  Updates to the Linux operating system are

22   distributed using BitTorrent and peer-to-peer file sharing

23   protocols, and a number of witnesses have testified to that as

24   well.

25        So kind of in this time frame of 2013 to 2014, there

K. Almeroth - Direct

2563

1  were a significant number of legitimate uses of BitTorrent, and

2  if Cox had attempted to block that traffic, it first of all

3  wouldn't be able to tell what was infringing, and it would be

4  inappropriate for them to block that traffic according to net

5  neutrality.

6  Q.    And, Dr. Almeroth, did you come to any conclusion with

7  respect to Cox's use of network monitoring tools?

8  A.    Yes.

9  Q.    What were those conclusions?

16:00:04 10  A.    Cox was able to use its monitoring tools to determine

11  types of applications, who was sending and receiving data, what

12  times of day, but beyond those kinds of statistics, Cox wasn't

13  in a position to use that kind of data in any meaningful way as

14  it relates to monitoring peer-to-peer traffic.

15            THE COURT:  Is this is a good time for a break now,

16  or do you have a final couple of --

17            MS. LEIDEN:  I have two more questions and then it

18  would be a natural break.

19            THE COURT:  Please.  All right, great.  Go ahead.

16:00:38 20  BY MS. LEIDEN:

21  Q.    Dr. Almeroth, do you have an understanding of whether Cox

22  used the information that it could obtain from Procera about

23  the volume of BitTorrent traffic in relation to processing

24  copyright notices?

25  A.    I do.  The understanding I have is that they didn't need

K. Almeroth - Direct

2564

1    to use Procera because they accepted the copyright notices as

2    being accurate.  And so there wasn't a need as part of

3    receiving these copyright notices for them to do any kind of

4    confirmation that the information in those notices were

5    correct.  They simply assumed that they were correct.

6            MS. LEIDEN:  Thank you.  This would be a good time

7    for a break.

8            THE COURT:  All right.  Thank you.

9            All right.  Let's take our mid-afternoon break and

16:01:20 10  take 15 minutes, and we'll come back and continue.

11           Thank you.  You're excused.

12           NOTE:  At this point, the jury leaves the courtroom;

13   whereupon, the case continues as follows:

14   JURY OUT

15           THE COURT:  All right.  Anything before we break?

16           MS. LEIDEN:  No, Your Honor.

17           THE COURT:  All right.  Then let's take 15 minutes.

18   We're in recess.

19           NOTE:  At this point a recess is taken; at the

20   conclusion of which the case continues in the absence of the

21   jury as follow:

22   JURY OUT

23           THE COURT:  Ready for our jury?

24           MS. LEIDEN:  Yes, Your Honor.

25           MR. ZEBRAK:  Yes, Your Honor.

K. Almeroth - Direct

2565

1          THE COURT:  All right.  Joe, let's get the jury,

2     please.

3          NOTE:  At this point the jury returns to the

4     courtroom; whereupon the case continues as follows:

5     JURY IN

6          THE COURT:  All right.  Please have a seat.

7          Please continue.

8          MS. LEIDEN:  Thank you, Your Honor.

9     BY MS. LEIDEN: (Continuing)

16:23:24 10   Q.   Welcome back, Dr. Almeroth.

11    A.   Thank you.

12    Q.   I believe in the beginning of your testimony today you

13    mentioned that you were also here to rebut portions of the

14    testimony of Barbara Frederiksen-Cross; is that right?

15    A.   Yes, ma'am.

16    Q.   And did you have the opportunity to observe

17    Ms. Frederiksen-Cross' testimony in court a few weeks ago?

18    A.   Yes, ma'am.

19    Q.   And just to clarify, are you going to be discussing or

16:23:47 20   evaluating everything she said?

21    A.   No, just one particular portion of her testimony.

22    Q.   And could you please explain what portion of

23    Ms. Frederiksen-Cross' testimony that you evaluated.

24    A.   Yes.  So I've put it up on the screen.  It's from the

25    trial when she was asked questions about the Cox CATS system.

K. Almeroth - Direct

2566

1    And she described that it was operated by Cox.

2            And she was asked the question:  So could Cox have

3    programmed this, let's say, to have three strikes and then

4    termination, for example?

5            And she responded:  But Cox could have programmed the

6    system to do whatever they wanted to program the system to do.

7    I mean, this is just -- the programmers wrote the code

8    initially to apply these actions and Cox chose the actions.

9    And so whatever they chose, you know, one strike, two strikes,

16:24:43 10  three strikes, ten strikes, that's up to what Cox decided to

11   do.

12   Q.   And in addition to that testimony, did you have the

13   opportunity to either see in person or review other trial

14   testimony and documents relating to the CATS system and the

15   Copyright Alert System?

16   A.   Yes, ma'am, I did.  And I have a slide on that.  There was

17   testimony from Mr. Marks from the RIAA about CAS.  There was

18   testimony from Mr. McMullan at the Universal Music Group also

19   about CAS.

16:25:22 20          And then Mr. Carothers from Cox testified about CATS,

21   the Cox graduated response system, because he invented it and

22   wrote the code for it.

23   Q.   And on the left side that you have, there are some

24   documents there.  Could you briefly describe the types of

25   documents that you reviewed with respect to these opinions.

K. Almeroth - Direct

2567

1    A.   Yes.   There is a memo of understanding, an MOU, describing

2    CAS.   There is information from the Center for Copyright

3    Information that ran CAS.

4           There is information about CATS, including its

5    customer safety and abuse operations.

6           And then there was also the Stroz Friedberg reports

7    describing what the different ISPs were doing with respect to

8    CAS.

9    Q.   And, Dr. Almeroth, how did you go about forming an opinion

16:26:16 10  in response to the evidence and the testimony that you reviewed

11   and heard?

12   A.   So the methodology for my opinions here are basically to

13   look at that information, to look at the information regarding

14   CATS, which was Cox's graduated response.   And then to look at

15   the industry standard that had been agreed to by rights holders

16   and some of the largest ISPs called CAS, the Copyright Alert

17   System.

18   Q.   And did you form an opinion in response to the testimony

19   and evidence that you saw and read?

16:26:48 20  A.   Yes, ma'am, I did.

21   Q.   What is that opinion?

22   A.   The opinion is that Ms. Frederiksen-Cross' testimony that

23   Cox could have designated the CATS system to do anything,

24   including the three strikes and terminate, failed to consider

25   some important evidence and what these systems were trying to

K. Almeroth - Direct

2568

1  do.

2          Really, the first point is that Cox has a role as an

3  ISP in the broader context of the Internet, as I described

4  earlier, that Internet ecosystem or network of networks.  And

5  in that context, Cox has more than just residential subscribers

6  as customers.  It has businesses and other ISPs as well.

7          And then the second point is that the industry

8  standard, this Copyright Alert System, was focused on education

9  and engagement as a way for providing mitigation of copyright

16:27:41 10  infringement.  But the CAS system didn't require termination as

11  part of the MOU that had been agreed to.

12  Q.   And starting with the first bullet on your slide there,

13  why is it your opinion that Ms. Frederiksen-Cross should have

14  considered Cox's role in the broader context of the Internet?

15  A.   Yes.  So the next slide is one that I showed earlier with

16  Pixius Communications as a regional ISP.  That is one of the

17  regional ISPs that had received infringement notices from the

18  RIAA.  And the idea that you could program CATS with, for

19  example, the three strikes and then terminate, what that would

16:28:25 20  mean is if some of the customers of Pixius Communication were

21  using peer-to-peer and they were terminated, that wouldn't just

22  be those customers on that ISP.  That would be terminating all

23  of the ISP.  That's what Ms. Frederiksen-Cross' suggestion

24  would have as an implication for a Cox customer that's a

25  regional ISP.

K. Almeroth - Direct

2569

1          MR. ZEBRAK:  Objection.  Your Honor, may we have a

2    sidebar?

3          THE COURT:  Yes, sir.

4          NOTE:  A sidebar discussion is had between the Court

5    and counsel out of the hearing of the jury as follows:

6    AT SIDEBAR

7          THE COURT:  Yes, sir.

8          MR. ZEBRAK:  Your Honor, Barbara Frederiksen-Cross at

9    the tail-end of her testimony spent a few moments explaining

16:29:18 10   how the CATS system operated.  And she merely -- in the portion

11   they're quoting, merely explained that Cox controls how to

12   program CATS, its functionality.

13          And they are now kind of lopping onto her an opinion

14   she hasn't offered, saying that -- almost as if Cox should have

15   terminated its whole ISP just based on three notices.  It is

16   very misleading.  And I have been trying to give a lot of

17   leeway on this, but -- let me -- let me stop there.

18          THE COURT:  Okay.

19          MS. LEIDEN:  She was asked -- she did testify rather

16:29:51 20   at length about the CATS system and how it was designed

21   throughout her testimony.  And she was specifically asked the

22   question:  Could Cox have programmed CATS to terminate

23   subscribers after three strikes?  And she said:  Yes.

24          She also -- I recognize she said it could terminate

25   after any number of strikes, but the question was asked, three

K. Almeroth - Direct

2570

1    strikes.  And this is well within Dr. Almeroth's expert report.

2               THE COURT:  Yeah, I think it is.  So your exception

3    is noted.  I am going to allow it.

4               NOTE:  The sidebar discussion is concluded; whereupon

5    the case continues before the jury as follows:

6    BEFORE THE JURY

7               THE COURT:  All right.  Please proceed.

8               MS. LEIDEN:  Thank you.

9    By MS. LEIDEN:  (Continuing)

16:30:43 10   Q.   Dr. Almeroth, I believe you were just referring to Pixius

11   Communication.  What would be the consequence of terminating

12   the Internet service of a regional ISP like Pixius

13   Communication?

14   A.   If Pixius -- if Pixius Communication were terminated, its

15   connection to the Internet that you see here at the top through

16   Cox and onto the rest of the Internet would also be terminated.

17   Meaning all of its customers -- or none of its customers would

18   be able to reach the Internet for any kind of service.  Whether

19   those customers are businesses or individuals or public safety

16:31:20 20   organizations, they would not be able to reach the Internet at

21   all.

22   Q.   And going back to your discussion of what you believe that

23   Ms. Frederiksen-Cross did not consider, why did you consider

24   the Copyright Alert System in forming your opinions?

25   A.   The Copyright Alert System was an industry system that had

K. Almeroth - Direct

2571

1    been agreed to by content owners here on the left and some of

2    the largest ISPs.  And as such, it was really a good basis for

3    comparison against what Cox was doing with its graduated

4    response.

5    Q.   And before this case, had you ever heard of the Copyright

6    Alert System?

7    A.   I had not.

8    Q.   Had you ever looked into why it was established?

9    A.   No.

16:32:13 10  Q.   And had you looked into why -- or excuse me -- into the

11   circumstances of how the memorandum of understanding was

12   negotiated?

13   A.   No.

14   Q.   But you do have an understanding today based on the

15   documents that you had put on the slide previous as to what the

16   Copyright Alert System is, correct?

17   A.   Yes, ma'am, I do.

18   Q.   And in the context of the Copyright Alert System, do you

19   have an understanding of how copyright notices were handled?

16:32:38 20  A.   Yes, ma'am, I do.

21   Q.   Could you explain that to the jury.

22   A.   Sure.  I have another slide here that shows the CAS

23   graduated response system here on the left, which was the

24   subject of that industry standard in the MOU.  And it

25   essentially describes in that document a set of responses 1

K. Almeroth - Direct

2572

 1   through 6.

 2            And you see here what's described, you would start

 3   with e-mail warnings, and then click-through messages, and then

 4   ultimately at offense five and six there were temporary

 5   restrictions.

 6            And in the CAS graduated response system, there would

 7   be one alert sent per week.  At that point, once that had

 8   happened, then nothing else happened after that.  And you see

 9   testimony here describing that after that sixth alert, nothing

16:33:35 10  happens.  There is no requirement for termination or

 11   consideration for termination, for example.

 12   Q.   And in your analysis of that, did that differ from Cox's

 13   graduated response?

 14   A.   Yes.  So I think the witnesses and the testimony over the

 15   last couple weeks, including from Mr. Carothers, have described

 16   the Cox graduated response system in a fair amount of detail.

 17   And it had that first step, the hold for more, then there was a

 18   series of e-mail warnings.

 19            Now, you will notice that in the Cox graduated

16:34:05 20  response system, those e-mail warnings, and working through the

 21   offenses second through seventh, happens one e-mail sent per

 22   day.  As compared to CAS and one sent per week.

 23            And then you get into the escalating steps of

 24   suspension and limited warning pages, suspension and required

 25   to call a support technician, and then suspension and required

K. Almeroth - Direct

2573

1    to call a specialized technician, and then, eventually,

2    consideration for termination.

3    Q.   And what was your conclusion, if any, on the comparison

4    between the two systems?

5    A.   Well, when you compare the two systems, including the fact

6    that CAS didn't have further action after that sixth offense, I

7    felt that both systems were intended to be educational, and

8    that the Cox graduated response system had greater restrictions

9    than what CAS had.

16:35:02 10   Q.   And did you form a conclusion regarding the testimony and

11   evidence that you just summarized regarding CAS and CATS with

12   respect to Ms. Frederiksen-Cross' testimony?

13   A.   Yes.

14   Q.   What is that conclusion?

15   A.   That I believe Ms. Frederiksen-Cross should have

16   considered CAS as a benchmark for what the industry had

17   negotiated and agreed to in her assessment of Cox's graduated

18   response.

19   Q.   Dr. Almeroth, do you agree with Ms. Frederiksen-Cross'

16:35:36 20   testimony that Cox -- that CATS, excuse me, could have been

21   programmed to do anything?

22   A.   That's a difficult question to answer.  On the one hand,

23   computer programming is very flexible.  You could have a

24   computer program and write a computer program to do just about

25   anything, but what you have to consider is the education and

2574

1    engagement goals of what CATS was designed for.

2            And so, if that's the kind of system you're trying to

3    implement, then that constrains what you can do with the

4    application.  It means you can't really just do anything if you

5    are trying to meet those goals.

6            MS. LEIDEN:  Thank you very much.

7            Pass the witness.

8            THE COURT:  Cross-examination.

9            MR. ZEBRAK:  Thank you, Your Honor, yes.

16:36:44  10    CROSS-EXAMINATION

11    BY MR. ZEBRAK:

12    Q.   Nice to see you again, Dr. Almeroth.

13    A.   Nice to see you, sir.

14    Q.   You're not testifying today as a legal expert, are you?

15    A.   No, sir, I am not.

16    Q.   You're not giving a legal opinion on net neutrality, are

17    you?

18    A.   No, sir, I am not.

19    Q.   And by the same token, I take that to mean that you're not

16:37:43  20    giving a legal opinion on how ISPs are permitted to respond or

21    not respond to infringement notices, correct?

22    A.   That's correct, yes, sir.

23    Q.   Now, do you recall discussing net neutrality during your

24    testimony a little while ago?

25    A.   Yes, sir.

K. Almeroth - Cross

2575

1  Q.   And nothing about net neutrality limits how ISPs can

2  receive infringement notices, correct?

3  A.   No, sir, I don't believe so.

4  Q.   And likewise, nothing about net neutrality limits how ISPs

5  respond to infringement notices, correct?

6       Let me clarify that actually.  Nothing about net

7  neutrality, in your non-legal view of it, prohibits an ISP from

8  suspending a customer who is using the Internet service for

9  infringement, correct?

16:38:47 10  A.   That's correct.  When it comes to suspension, an ISP

11  should be able to suspend a user.

12  Q.   And likewise, you're not here today saying that Cox was

13  prohibited from terminating the accounts of customers that it

14  realized were engaging in repeat infringement, correct?

15  A.   That's correct.

16  Q.   And even let's just take a step back on net neutrality for

17  a moment so there's no confusion about it.

18       Do you recall the year it was that the FCC fined

19  Comcast for throttling BitTorrent traffic?

16:39:25 20  A.   I don't remember the year.  My recollection is that it was

21  before the claim period here.

22  Q.   Are you familiar with whether the D.C. Circuit told the

23  FCC that it did not have the authority to prevent Comcast from

24  throttling?

25  A.   Yes, there were quite a number of decisions on the legal

K. Almeroth - Cross

2576

1    level that created a fair amount of confusion as to what ISPs

2    could do with respect to net neutrality.

3    Q.   Would it surprise you if I told you that it was in 2011

4    that the D.C. Circuit told Comcast -- excuse me, told the FCC

5    that it couldn't prohibit an ISP from throttling BitTorrent

6    traffic?

7    A.   That seems to be consistent with my recollection.

8    Q.   You talked a lot about Barbara Frederiksen-Cross in

9    your -- in your testimony.  I would like to follow up on that.

16:40:32 10   A.   Yes, sir.

11   Q.   So now, you reviewed the transcript of her testimony; is

12   that correct?

13   A.   No, sir, I was here to see her testimony.

14   Q.   All right.  But you're not here contending that

15   Barbara Frederiksen-Cross testified on what Cox should do with

16   respect to terminating infringers, correct?

17   A.   That's hard to say.  It's not entirely clear what her

18   intent was with the testimony I put on the slide.

19   Q.   Do you recall that the testimony on the slide really was

16:41:15 20   getting at the issue of who programs CATS; is that fair?

21   A.   I think that's true.  And if that was all of the

22   implication that was to be taken from that testimony, then I

23   think that's perfectly fine.

24   Q.   All right.  Now, you talked about some of what you -- you

25   talked about some legal uses of BitTorrent in your direct

2577

1    testimony.

2           Do you recall that?

3    A.   Yes, sir.

4    Q.   You didn't at the time of your analysis do any kind of

5    quantification on how common those uses are, did you?

6    A.   No, I didn't.

7    Q.   Your testimony -- your purpose for talking about them

8    today was just to show that there are some legal uses; is that

9    fair?

16:42:07 10    A.   Absolutely.  There are some legal uses and, in fact, some

11    very important legal uses.

12    Q.   But in terms of the prevalence of the illegal activity, at

13    the time of your analysis in this matter you had no reason to

14    dispute the studies showing that BitTorrent activity was well

15    over 90 percent infringing, correct?

16    A.   I'm not sure what studies you're referring to.

17    Q.   We'll get to that in more detail in a bit.  And you also

18    discussed content owners potentially using BitTorrent.

19           Do you recall that?

16:42:47 20    A.   Yes, sir.

21    Q.   Nothing in your analysis in this case has led you to

22    believe that any of the plaintiffs in this matter have used

23    BitTorrent for distributing their music, correct?

24    A.   I am not aware of any instances where the plaintiffs here

25    have used it for legal purposes.

K. Almeroth - Cross

2578

1    Q.   Now, we're going to get into your understanding of CAS and

2    how it compares to what Cox did in a moment in more detail, but

3    at a high level, I would just like to make sure I'm

4    understanding this correctly.

5         You referred to it as what you call an industry

6    standard, CAS, correct?

7    A.   Yes, sir.

8    Q.   And you had never heard of CAS before your work on this

9    matter, right?

16:43:36 10  A.   That's correct.

11   Q.   And your understanding of CAS comes from reading some

12   documents about it, right?

13   A.   That's true in part.  Also from testimony that I've seen.

14   Q.   You didn't speak with the stakeholders in CAS, right?

15   A.   No.

16   Q.   And you didn't speak with other ISPs, right?

17   A.   No, I didn't need to.

18   Q.   Right.  So your basis for calling it an industry standard

19   doesn't involve you going out and interviewing other ISPs that

16:44:04 20  didn't participate in CAS about how they handle infringement

21   issues, right?

22   A.   That's correct.

23   Q.   You have no idea what they do, correct?

24   A.   That's correct, I didn't look.

25   Q.   And in terms of calling CAS an industry standard, you have

K. Almeroth - Cross

2579

1  no idea what the ISPs who participated in CAS did outside of

2  CAS, correct?

3  A.   I think that's correct.  The only caveat would be to the

4  extent their activities were summarized in the Stroz Friedberg

5  reports.

6  Q.   You have no understanding of the extent to which the ISPs

7  who participated in CAS terminated subscribers outside of CAS,

8  correct?

9  A.   That's correct.

16:44:49 10  Q.   And likewise, in your comparison -- first of all, your

11  conclusion is that Cox's policy is more stringent than CAS,

12  correct?

13  A.   I think that's correct.  If you look at them as a whole,

14  that's correct.

15  Q.   Now, in order to understand a policy, you need to know a

16  little bit about how it was implemented too, don't you think?

17  A.   I don't think so.

18  Q.   Well, I mean, would you agree that a piece of paper is not

19  worth anything if it's not followed, correct?

16:45:25 20  A.   That's hard to say.  I get the implication.  It certainly

21  might be true.  I think generally it stands to reason.

22  Q.   But I'm correct, you have almost no understanding of what

23  Cox did with respect to implementing CAS, correct, implementing

24  its own policy, correct?

25  A.   That's true.  And by implication, that means I have some

K. Almeroth - Cross

2580

1    understanding.

2    Q.    Okay.  We'll get -- you don't know why Cox structured its

3    graduated response the way it did, do you?

4    A.    No.  You would have to talk to Mr. Carothers.

5    Q.    And you don't know at the time of your expert analysis in

6    this case whether Cox considered retaining subscribers as a

7    factor in formulating its graduated response, do you?

8    A.    That's correct.  That would be a question for

9    Mr. Carothers.

16:46:13  10    Q.    All right.  So you don't know why Cox over the years made

11    its policy more and more lenient, do you?

12            MS. LEIDEN:  Objection, misstates the evidence.

13            THE COURT:  Yeah.  Lay a foundation.

14    BY MR. ZEBRAK: (Continuing)

15    Q.    Do you have an understanding, sir, about whether Cox has

16    increased the number of steps in its policy over the years?

17    A.    I would have to double-check.  That's not my recollection.

18    It's not my recollection.

19    Q.    Do you know what -- and you didn't know whether Cox had a

16:46:51  20    practice of imposing daily caps on how many notices it would

21    receive per rights owner, do you?

22    A.    I -- I think I do.  I mean, there's been testimony this

23    week, including by Dr. Weber.

24    Q.    Well, let me -- let me be more precise with my question.

25            At the time you did your analysis in this matter, you

K. Almeroth - Cross

2581

1    were unaware that Cox imposed caps on the number of notices a

2    rights owner could submit per day, correct?

3    A.    I think when you took my deposition, that was my answer.

4    Q.    And at the time I took your deposition, you were also

5    unaware of Cox's policy of blacklisting certain notice senders

6    such that Cox wouldn't even receive their notices, correct?

7    A.    It's hard to remember what I remembered at the deposition.

8    I defer to whatever my deposition said.

9    Q.    Fair enough.  And at the time you did your analysis in

16:47:52 10    this matter, you didn't know what factors, if any, Cox

11    considered when it decided whether to terminate a repeat

12    infringer, correct?

13    A.    That's correct.  That's another question for

14    Mr. Carothers.

15    Q.    In terms of Cox's practices in implementing its graduated

16    response policy, at the time you did your analysis you were

17    unaware, sir, were you not, that Cox was rolling up multiple

18    notices that come in on a given day into a single ticket for a

19    subscriber?

16:48:51 20    A.    I don't recall if that was my understanding at the depo.

21    Certainly we've heard testimony to that effect I believe during

22    this trial.

23    Q.    And at the time you did your analysts in this matter, you

24    were unaware, were you not, whether Cox had a daily cap on how

25    many accounts it would suspend a day regardless of how many

K. Almeroth - Cross

2582

1  warranted that suspension, correct?

2  A.    Again, if that's what I said in my depo, then that's what

3  I remembered when you took the depo.

4  Q.    And you were aware at the time you did your analysis in

5  this case, were you not, sir, that -- that you didn't have an

6  understanding as to Cox's practice for when it actually would

7  terminate a subscriber, for actually reactivating it

8  immediately thereafter?

9  A.    I'm sorry.  Could you repeat the question?

16:49:39 10  Q.    That was a terrible question.  Let me say that more

11  cleanly.

12              Are you aware of Cox's practice of reactivating

13  subscribers in the rare instances where it terminated the

14  subscriber?

15  A.    As I sit here now, I don't remember if there was testimony

16  here, but I believe there was testimony at some point that

17  customers could be reactivated after termination.  For some

18  reason, the number of six months stands out in my head, but

19  that wasn't something I recalled.

16:50:16 20  Q.    And I believe you said on direct testimony that you didn't

21  know anything about the negotiations that led to CAS, correct?

22  A.    That's correct, at the time of my depo.  I think we heard

23  some of that earlier from Mr. Marks.

24  Q.    And I think we already covered this, but I just want to be

25  very clear.

K. Almeroth - Cross

2583

1          Ahead of your work in this case and looking at the

2    CAS documents, you had never done any research on how ISPs

3    respond to copyright infringement allegations, correct?

4    A.   That's correct, not something that specific.

5    Q.   And that by the same token, you had never provided

6    services to ISPs on responding to infringement notices,

7    correct?

8    A.   That's correct, not that specific.

9    Q.   And am I correct, sir, that at the time of your deposition

16:51:28 10  in this case, you didn't even know whether CAS was still in

11   effect?

12   A.   I believe that was accurate at the time of my deposition.

13   I think it's -- my understanding now is that it has ended.

14   Q.   Sir, you've written an article on peer-to-peer file

15   sharing before, correct?

16   A.   Close.  I'm not sure I would call it peer-to-peer file

17   sharing.  More sort of content exchange.  But you're in the

18   ballpark, so I'll say yes.

19   Q.   I'm sorry.  Would you look behind what's in Tab 9 of the

16:52:37 20  binder that you have in front of you.

21   A.   Yes, sir.

22   Q.   Do you recognize what that is?

23   A.   Yes, sir.

24   Q.   And what is it?

25   A.   It's the paper that I had mentioned in my direct

K. Almeroth - Cross

2584

1    examination.  It's a paper on a system called Pixie that I

2    coauthored with one of my students.

3              MR. ZEBRAK:  Okay.  Your Honor, we would like to move

4    this into evidence.

5              THE COURT:  Any objection?

6              MS. LEIDEN:  No objection.

7              THE COURT:  Received.

8              MR. ZEBRAK:  Would you publish the document,

9    Mr. Duval.

16:53:11 10             THE COURT:  What's the number of it?

11             MR. ZEBRAK:  586, PX 586.

12             Thank you, Mr. Gould.

13   BY MR. ZEBRAK:  (Continuing)

14   Q.   So the idea here was to come up with the technology to

15   improve locating and distributing content in P2P networks, at a

16   high level; is that correct?

17   A.   I don't think that's accurate.

18   Q.   Well, if you look at the top of -- why don't you look at

19   the top of the first page.  Do you see where it says:  In this

16:54:04 20   work?

21   A.   Yes.

22   Q.   Mr. Duval, on the right side of the first page.

23   A.   I think you mean in the Abstract, right, sir?

24   Q.   No, on the right side, under your name where it says --

25   there we go.

2585

1    A.    I see.  I'm sorry.  That's in this paper, on the left side

2    it said:  In this work.

3    Q.    You were coming up with a new data location service to

4    layer onto existing P2P networks; is that correct?

5    A.    Not quite.  Probably the best description is under that

6    Abstract there, I can read that if you like.

7    Q.    Can you move over to the Abstract?

8          Why don't you tell us what this paper was about just

9    at a very high level.

16:55:14 10  A.    Sure.  Essentially what it was trying to do is create this

11   distribution architecture and service, like a jukebox.

12         So the idea is, you go into a restaurant, like a

13   jukebox, you put in a quarter, you select a song, and then

14   everybody in the restaurant can hear what that song is.  That's

15   kind of the jukebox model.

16         And we wanted to reduce the load on the network by

17   creating this kind of distribution mechanism like a jukebox.

18         Take, for example, a Web site like CNN.  Lots of

19   people look at CNN.  And so, if you distribute CNN across the

16:55:53 20  Internet using sort of a peer-to-peer distribution model, then

21   it doesn't put the burden of distributing that main Web page of

22   CNN on the CNN servers.  It can be spread across a peer-to-peer

23   network, in effect, to accomplish one to many distributions.

24         So it's what I described in my direct testimony where

25   you're reducing the load and the distribution burden on the

K. Almeroth - Cross

2586

1    content holders by allowing peers to participate in providing

2    the service that the content provider is intending.

3    Q.   But nothing in this abstract is talking about paying for

4    music across a peer-to-peer network, correct?

5    A.   That's correct.  This really isn't about music, per se.

6    Q.   Right.  And could you turn to the inside of the second

7    page, on 2.1, and read the 2.1, the second paragraph.

8         Could you read those first two sentences to the jury.

9    A.   Yes, sir:  Napster's pioneering efforts spawned a number

16:56:53 10  of academic and industrial projects aimed at developing

11   efficient peer-to-peer content exchange applications.  The

12   primary use of these applications has been the exchange of MP3

13   music files, but -- oh, sorry, that's the third sentence.  I'll

14   stop.

15   Q.   Right.  And in this document you were coming up with a

16   more efficient system for distributing this content across a

17   peer-to-peer network, correct?

18   A.   That's correct.  To support the kinds of applications I

19   just described.

16:57:52 20  Q.   I just want to make sure I understood your direct

21   testimony about Cox's use of Procera.

22        Am I correct that Cox was able to use and did use

23   Procera to gain insights as to the type of traffic occurring

24   across its network; is that correct?

25   A.   Yes, with an emphasis on the type of traffic.

K. Almeroth - Cross

2587

1   Q.   So, for instance, it could generate and did in fact

2   generate reports telling it the percentage of traffic on its

3   network that, for instance, fell into the category of

4   peer-to-peer traffic, correct?

5   A.   That's correct, at that level of detail.

6   Q.   And I want to make sure that this is clear as well.  I

7   believe -- am I correct, you testified that the Procera tool

8   that Cox had, including as Cox had it implemented in its

9   system, allowed Cox to look at the subscriber's traffic by

16:58:50 10  type; is that correct?

11  A.   By type, that's correct.

12  Q.   So just by way of example, Cox, in its abuse department,

13  if it wanted to look at a subscriber who was repeatedly

14  appearing in infringement notices, it could have used that tool

15  to see if that subscriber was still going back to BitTorrent,

16  correct?

17  A.   It could have, that's correct.  I haven't seen evidence

18  that they might actually have used it that way.

19  Q.   Dr. Almeroth, if you could look back at the binder we gave

16:59:39 20  you at -- behind tab 7.  Let me know once you are there,

21  please.

22  A.   Yes, sir, I'm there.

23  Q.   Do you recognize that document?

24  A.   I can't say that I recognize it.  Unfortunately, I looked

25  at lots of documents, so I don't --

K. Almeroth - Cross

2588

1    Q.   Would it help refresh your recollection if I gave you the

2    opportunity to look at the list of materials you considered

3    with your expert report?

4    A.   You could do that, or you could represent that it's on

5    there.

6    Q.   Well, I will represent that.  And it's actually in your

7    report itself, too, if you want to look at paragraph 136, just

8    to refresh your recollection.

9    A.   Thank you, sir.

17:00:37 10         Okay.  I see that paragraph, and I see the reference

11   to the document that is at tab 7.

12   Q.   So why don't you -- and this is a document you used and

13   relied on in your expert report, correct?

14   A.   That's correct, for the purpose that I indicated in

15   paragraph 136.

16         MR. ZEBRAK:  So, Your Honor, permission to publish

17   this?

18         THE COURT:  Yes, sir.

19         MR. ZEBRAK:  Thank you.

20   BY MR. ZEBRAK:   (Continuing)

21   Q.   So this is the document we were just talking about, right?

22   A.   Yes, sir, that's correct.

23   Q.   And you read this document in connection with your expert

24   analysis, right?

25   A.   Yes, I did.

K. Almeroth - Cross

2589

1    Q.   Okay.  Could you, Mr. Duval, turn to --

2         First of all, just by way of background, what's your

3    understanding of what Enders Analysis is?

4    A.   I don't recall who they were sitting here, what their

5    qualifications were, what the providence of this document was,

6    other than, as you pointed me to, paragraph 136 of my report.

7    Q.   What is -- under Executive Summary, what is the -- if you

8    want to take a look at that and see if that refreshes your

9    recollection about what this report involves.

17:02:38 10  A.   I see the Executive Summary.  It actually has subsections.

11   And so, spans four pages before you get to the Table of

12   Contents.

13   Q.   Okay.  Why don't you turn, sir, to the page labeled 10279

14   in the lower right corner.  It says:  Piracy and Antipiracy

15   Overview.

16   A.   Yes.

17   Q.   Mr. Duval, if you could highlight the first two sentences.

18        Could you read those aloud to the jury, sir.

19   A.   Digital piracy is the free option for consumers of all

17:03:21 20  digital cultural products, whether music, video, or books.  The

21   only requirement is a broadband connection.  Piracy of CDs and

22   hard disk sharing are also well established practices.

23   Q.   Right.  And so, someone who is using their Internet

24   service to infringe, once that Internet service is suspended or

25   terminated, they can't use that service for infringement any

K. Almeroth - Cross

2590

1    more; is that correct?

2    A.    Not that service, that's correct.

3    Q.    I would like to show you a document that has already been

4    admitted into evidence as PX 325.

5    A.    Do you have a tab?

6    Q.    I apologize, we don't.

7    A.    Okay.

8            THE COURT:  It's up on the screen.

9    Q.    It's up on the screen in front of you.

17:04:17 10  A.    Thank you.

11   Q.    Do you know who Jason Zabek is?

12   A.    I have heard the name.  I see his title here and his

13   signature on the page you're about to scroll past, that's

14   probably the extent of what I understand about Mr. Zabek's

15   position at Cox.

16   Q.    Can you see what it says under:  Hello, gentlemen?

17   A.    Yes, sir, I can.

18   Q.    Now, in this e-mail Mr. Zabek is saying that Cox has a

19   more liberal strike policy than CAS.

17:05:11 20          Do you have any reason to think that that's not the

21   case?

22          MS. LEIDEN:  Objection, only that it's not what the

23   e-mail states.

24          THE COURT:  Well, he can read it.

25          So the question is, can you answer that question or

K. Almeroth - Redirect

2591

1    not?

2            THE WITNESS:  I'm not really sure of the context of

3    this e-mail.  Right.  I see that it says the number 6.  I mean,

4    I know that CAS has potentially six steps, but there is no noun

5    for the word -- for the pronoun "they."  So I'm not sure

6    exactly what he's referring to.

7    BY MR. ZEBRAK:  (Continuing)

8    Q.   You didn't speak with Mr. Zabek in connection with your

9    work in this matter, correct?

17:05:57 10  A.   No, I did not.

11   Q.   And at the time you did your analysis in this matter, am I

12   correct that you weren't aware of any other scenario in which a

13   customer of a service is given 13 or more chances to stop using

14   that service to violate the law, correct?

15   A.   That's correct, largely because I haven't looked or tried

16   to find any.

17           MR. ZEBRAK:  No further questions, Your Honor.

18           THE COURT:  All right.  Any redirect?

19           MS. LEIDEN:  Yes, Your Honor.

17:06:39 20      REDIRECT EXAMINATION

21   BY MS. LEIDEN:

22   Q.   Are we good?

23   A.   Yes, ma'am.

24   Q.   Thank you.  Dr. Almeroth, do you recall both on direct and

25   cross that you discussed net neutrality?

K. Almeroth - Redirect

2592

1    A.   Yes, ma'am.

2    Q.   And, James, could you pull up again page 17 of

3    Dr. Almeroth's slides, please.  Thank you.

4         Dr. Almeroth, what should be coming up is on that

5    17th page -- you should have it there, too -- that was part of

6    your opinion that you were discussing on direct examination

7    with respect to net neutrality.

8         Do you recall that?

9    A.   Yes, ma'am.

17:07:39 10   Q.   Okay.  And did you base that third opinion on any evidence

11   that you put on that slide there?

12   A.   Yes.  I based it on testimony from Ms. Trickey.  I believe

13   she referred to net neutrality.  And I believe I also based it

14   on conversations with Mr. Summers.

15        And I don't recall if Mr. Carothers also talked about

16   net neutrality.  But certainly it has come up over the course

17   of the trial.  And that's some -- that's similar to the

18   evidence that I've relied on.

19   Q.   And this sentence on the slide, was there a particular

17:08:22 20   time period that you were looking at in stating that -- Cox's

21   understanding there?

22   A.   Yes.  It was during the claims period, so from early 2013

23   to late 2014.

24   Q.   And I believe that Mr. Zebrak mentioned or stated that --

25   made reference to a decision by the D.C. Circuit to not impose

2593

1    a penalty on Comcast in 2011.  Do you recall that?

2    A.    Yes, I do.

3    Q.    What was your understanding of -- or strike that.

4          Could you explain what you mean in your number 3

5    given that you were discussing the 2012 to 2014 time frame?

6    A.    Yes.  So that was only one of the events in the back and

7    forth between some of the ISPs and the FCC and the courts.  I

8    believe that after that action, the FCC rewrote its rules with

9    respect to net neutrality.

17:09:20 10          The bottom line is that there was a lot going on

11    through this time frame with respect to net neutrality.  ISPs

12    had been sued, and so were using the testimony, for example, of

13    someone like Ms. Trickey to understand sort of their perception

14    of net neutrality.  And what they could and what they couldn't

15    do was part of the consideration as to what you could do with

16    traffic monitoring and tools like Procera.

17    Q.    Thank you.  If you could take that down.  Thank you.

18          Dr. Almeroth, do you recall on cross-examination

19    Mr. Zebrak asked you if you had considered or knew a number of

17:10:02 20    factors relating to the Copyright Alert System?

21    A.    Yes, ma'am.

22    Q.    And would that -- that included the fact of whether you

23    spoke to or interviewed ISPs or content owners with respect to

24    the Copyright Alert System?

25    A.    Yes, ma'am.

K. Almeroth - Redirect

2594

1    Q.   Was that important to your analysis?

2    A.   It was not.

3    Q.   Why?

4    A.   Because the MOU sets forth what the steps are and what the

5    policies are.  It was the basis of that document and what had

6    been negotiated and agreed to that mattered.  That was the

7    baseline against which I could compare Cox's graduated

8    response.

9           And so, how it came to be, or the negotiations, or

17:10:44 10  any of those kinds of factors weren't really relevant in my

11   analysis because I had the signed MOU, I knew the parties, and

12   I knew what the agreement set forth.

13   Q.   And do you recall Mr. Zebrak also posing questions to you

14   about whether you knew what ISPs were doing outside of the

15   Copyright Alert System?

16   A.   Yes.

17   Q.   Okay.  And was that something that you considered

18   important to your analysis?

19   A.   Also not important.  So, no.

17:11:13 20  Q.   Why?

21   A.   The same thing.  That the baseline here is CAS.  It was

22   the agreement, it was negotiated, it set forth the steps.  If

23   ISPs wanted to do things above and beyond what CAS had

24   prescribed, that was up to their decision as what to do.

25          But trying to come up with something that I could use

K. Almeroth - Redirect

2595

1   as a baseline to compare against Cox's graduated response

2   system, the CAS MOU was a great baseline against which I could

3   do that comparison.

4   Q.   And on cross-examination do you recall Mr. Zebrak asking

5   you questions about whether you knew if Cox had increased the

6   number of steps in its graduated response over time?

7   A.   Yes, ma'am.

8   Q.   And what period of time were you looking at the Cox

9   graduated response?

17:12:05 10   A.   I was looking at the procedures of the graduated response

11   system during the claims period.  So early 2013 to late 2014.

12   Q.   And did you look at Cox's graduated response before the

13   claims period?

14   A.   I did.

15   Q.   And can you explain that.

16   A.   Yes.  So I looked at documents that talked about what CATS

17   looked like from the time that Mr. Carothers designed it and

18   programmed it.  And I didn't see any differences to the way

19   that it was used during the claims period.

17:12:41 20   Q.   And, James, could you bring up the document that Mr.

21   Zebrak had put on.  I believe it was PX 325.

22          Dr. Almeroth, do you recall looking at this e-mail on

23   your cross-examination a few moments ago?

24   A.   Yes, ma'am.

25   Q.   Okay.  And do you recall reading out loud a couple of the

2596

1    sentences in that first paragraph under:  Hello, gentlemen?

2    A.   Yes, ma'am.

3    Q.   Could you read the last two sentences of that paragraph.

4    A.   Yes.  It says:  Luckily -- or, lucky, 80 percent of our

5    customers that share copyrighted material stop by the second

6    warning.  At each step we educate them on the illegal activity

7    and our AUP, the Acceptable Use Policy.

8    Q.   And is that statement consistent with the information that

9    you learned with respect to CATS?

17:13:37 10   A.   Yes, ma'am.  That it was educational and engaged customers

11   to educate them.

12   Q.   And that first sentence there that you read with respect

13   to 80 percent of your customers, is that also consistent with

14   the materials that you reviewed in putting together your

15   opinions?

16            MR. ZEBRAK:  Objection, Your Honor, no foundation.

17            THE COURT:  Sustained.  It's beyond his testimony.

18            MS. LEIDEN:  No further questions.

19            THE WITNESS:  Thank you.

17:14:05 20            MS. LEIDEN:  Thank you.

21            THE COURT:  All right.  You're excused, Dr. Almeroth.

22   Thank you, sir.  Have a good evening.

23            You are excused.  Have a good evening.  Thank you.

24            Mr. Ruelas wants to have the last word with all of

25   our witnesses.

2597

```
 1          THE WITNESS:  He told me to stay put, Your Honor.
 2  Thank you.
 3          THE COURT:  All right.  You were wise to listen
 4  carefully.
 5          NOTE:  The witness stood down.
 6          MR. OPPENHEIM:  Your Honor, may we approach?
 7          THE COURT:  Yes.
 8          NOTE:  A sidebar discussion is had between the Court
 9  and counsel out of the hearing of the jury as follows:
10  AT SIDEBAR
11          THE COURT:  Yes, sir.
12          MR. OPPENHEIM:  Now that we've actually heard
13  Dr. Almeroth's testimony, I would like to renew our prior
14  motion.
15          So what's come through here is that he had absolutely
16  no knowledge of CAS over than reading the MOU.  He didn't speak
17  to any of the participants in CAS.  He didn't do any study or
18  investigation into CAS.  He simply read a document, which is a
19  legal document, but he's not a lawyer and he said he wasn't a
20  lawyer.
21          He then tried to compare it to Cox's graduated
22  response.  And he testified that he had no knowledge outside of
23  the few documents that he reviewed about major aspects of Cox's
24  graduated response.  And so, his comparison is, therefore,
25  flawed.
```

2598

1          He also testified that he had no knowledge of what

2     ISPs were doing outside of CAS or -- CAS, sorry, and outside of

3     Cox.  So, whereby, he can't testify as to what an industry

4     standard is, he has no idea what the industry was doing.

5          All he did was read a couple of documents that were

6     in the record and given to him by counsel.  And I would,

7     therefore, ask that his testimony on CATS and CAS be stricken

8     and the jury be instructed to disregard it.  I think the

9     testimony was improper.

17:16:17 10          MS. LEIDEN:  First of all, I think it's not correct

11    that he reviewed one document.  There was a slide that he put

12    up that had at least seven documents, and as well as interviews

13    with Cox and hearing the trial testimony over the last couple

14    of weeks.

15          THE COURT:  The only thing that I'm concerned about

16    is that he said it was the industry standard, and whether he

17    could -- was able to support that.

18          MS. LEIDEN:  Yes.  And I believe that what came out

19    in his testimony was that his understanding of what CAS was,

17:16:48 20    was an agreement between the content owners on one side and the

21    five largest ISPs on the other side.  And that was what he

22    based his understanding of what an industry standard was.

23          And counsel is free to cross-examine him on, you

24    know, why he considered it an industry standard, and that

25    didn't come out on cross-examination.

2599

1              THE COURT:  I mean, he put up the slide just like the

2       prior witness with the members of the group that met and over a

3       two-year period worked on the elements of the CAS system.  And

4       we've had prior testimony on whether it was an industry

5       standard or an attempt by the music industry to try and get the

6       ISPs to cooperate.

7              So all that's been subject of prior, far more

8       in-depth testimony.

9              MR. OPPENHEIM:  For somebody to be given the ability

17:17:45 10     to testify as the expert and to say it's an industry standard,

11      when he doesn't know what the industry is doing, is improper.

12      He has no idea what the industry was doing, industry of ISPs.

13             To the extent that he was testifying as to what the

14      plaintiffs and the movie studios were willing to accept, his

15      testimony was contrary to the testimony of the witnesses there

16      who said that outside of CAS there was a termination obligation

17      either because you exceeded six steps or you weren't a

18      participant in CAS.

19             THE COURT:  Did he say that?

17:18:21 20     MR. OPPENHEIM:  There was unequivocal testimony to

21      that effect by Mr. Marks --

22             THE COURT:  Oh, no, I thought you were talking about

23      Mr. Almeroth.

24             MR. OPPENHEIM:  Oh, no, no, not Mr. Almeroth.  He

25      didn't testify to that.

2600

1          THE COURT:  Right.

2          MR. OPPENHEIM:  What he testified to was in fact that

3  there was no termination by these ISPs, which is contrary to

4  the evidence that was in the record.

5          And he just doesn't know, that's the reality.  He

6  came up here, no offense intended, but as a puppet.  And he

7  shouldn't be permitted to testify that something is an industry

8  standard when he has no idea what the industry is doing.

9          MR. ELKIN:  Your Honor, Mr. Oppenheim is basically

17:18:53 10  delivering his summation of the case.  Which, again, he's a

11  couple days away from that.

12          THE COURT:  Well, I mean, his point is a valid point.

13  You've got an expert testifying up here now who is well

14  credentialed and is saying, this is the industry standard.  And

15  does he have the foundation to make that statement?  Because

16  that has some extra meaning, "industry standard."

17          MR. BUCHANAN:  If I may, I believe there's testimony

18  that the five ISPs that constituted CAS compromised 70 percent

19  of the ISPs in the United States.

17:19:29 20          So if 70 percent of the market has that, that's

21  pretty much an industry standard.

22          MR. ELKIN:  That did come in a couple times.  That

23  came in unrebutted.

24          THE COURT:  It was on the slide that you showed him

25  this afternoon about who was participating in it.

2601

1          MR. OPPENHEIM:  May we -- I'm sorry.  There was

2    testimony from Mr. Marks, who did participate, who was a fact

3    witness, who also is a lawyer who could read the documents, who

4    testified it was not an industry standard.

5          So now we have an expert who comes up and says it is,

6    but he has no basis for that, no foundation.

7          And we've been, I get it, objecting all along, and

8    Your Honor has been reluctant to limit his testimony, but we

9    had to see how it came in.

17:20:17 10          We've now seen how it has come in, and it couldn't

11    have been more clear that he just has no basis to testify about

12    what ISPs were doing.

13          MR. ELKIN:  Your Honor, if he would have objected to

14    that question when it was elicited and that motion was granted,

15    you would have granted it, we would have -- there could have

16    been other testimony that could have been elicited at that

17    time.

18          The whole purpose of his testimony was to try to

19    convey some information with regard to how Cox had organized

17:20:47 20    its graduated response in connection with what was appropriate

21    in the circumstances.  Looking at CAS as a benchmark was well

22    within the ambit of what he put in his report and what he

23    testified to at his deposition.

24          THE COURT:  Okay.  All right, I'm going to give them

25    a limiting instruction on his testimony.  And I'm going to say

2602

 1    that they heard what information he used to do make that

 2    determination, and they'll be the determiner of what weight to

 3    give the CAS system.  And that his calling it the industry

 4    standard was based on a limited understanding of what the

 5    industry was involved in.

 6              And your exception is noted.

 7              MR. ELKIN:  All right.

 8              THE COURT:  Where are we --

 9              MR. OPPENHEIM:  I was just going to go to that.

17:21:37 10              THE COURT:  Yeah.  So where are --

11              MR. ELKIN:  So we have two witnesses left.  I think

12    there are issues with both because I think that they don't want

13    to go forward with Tregillis.  I think Your Honor indicated

14    that Tregillis has to go on tomorrow, which is fine.

15              THE COURT:  Yeah.

16              MR. ELKIN:  And I don't think they're ready for

17    Mencher either.  So I think those are our last two witnesses.

18              THE COURT:  What's wrong with Mencher?  How long is

19    he going to take?

17:22:02 20              MR. ELKIN:  I would say he's probably a 45-minute

21    examination.

22              THE COURT:  Is that by deposition or live?

23              MR. ELKIN:  He's here.  But, unfortunately, when we

24    learned that he wasn't -- they weren't ready for him, we didn't

25    call him to come across the street.

2603

1          MR. OPPENHEIM:  We're fine him going on on direct

2    today, that's fine.  And if you want to push through, Your

3    Honor.

4          Or if you want to wait until tomorrow, that's fine

5    too.  Either way.

6          MR. ELKIN:  When they told us that they weren't ready

7    for him today, we didn't drag him over here.

8          THE COURT:  Okay.  All right.  Then we're going to

9    break now.  So we have two witnesses left.

17:22:39 10          MR. ELKIN:  And then we'll move in some documents,

11    some exhibits.

12          THE COURT:  All right.  And you've got a rebuttal

13    case with at least --

14          MR. OPPENHEIM:  At least one.  And we'll figure out

15    tonight whether it's more than one.

16          MR. BUCHANAN:  Could you identify the one?

17          MR. OPPENHEIM:  Mr. McGarty -- or Dr. McGarty.

18          THE COURT:  McGarty.

19          MR. BUCHANAN:  And so, I want to be heard because the

17:22:59 20    judge limited to what he could testify about in your order.

21    You said he couldn't testify about certain things like

22    effectiveness.

23          THE COURT:  We can let the jury go.  So hold on.  So

24    we may do closings tomorrow afternoon; is that right?

25          MR. ELKIN:  Yes.

2604

1          THE COURT:  Yeah.  Let's shoot for closings tomorrow

2    afternoon.

3          MR. ELKIN:  Okay.

4          THE COURT:  And we'll work to get the instructions

5    completed tonight.  Okay?

6          MR. ELKIN:  Thank you, Your Honor.

7          MS. LEIDEN:  Thank you, Your Honor.

8          MR. OPPENHEIM:  Yes.

9          THE COURT:  Thank you.

17:23:29  10          NOTE:  The sidebar discussion is concluded; whereupon

11    the case continues before the jury as follows:

12    BEFORE THE JURY

13          THE COURT:  All right.  So we have some logistics

14    issues with witnesses.  So we're going to let you go a little

15    early tonight.

16          I wanted to let you know that Dr. Almeroth talked

17    about an industry standard, CAS being an industry standard.

18    And then you heard on cross-examination the foundation, he

19    really hadn't talked to a lot of people in the industry.

17:24:09  20          So I'm going to strike that testimony that it was an

21    industry standard.

22          Now, you've heard quite a bit about the CAS system

23    from other witnesses, and you may make your own conclusion as

24    to its importance and look at, for instance, the participants

25    that were involved in the negotiations, but just -- not just

2605

1    based on Dr. Almeroth's statement.  But independently using all

2    the evidence.

3            So we're going to end for today.  We're going to come

4    back at 9 o'clock.  We're going to have -- I think Cox has two

5    witnesses.  The plaintiffs will have a rebuttal witness, or

6    maybe two, I'm not sure.  But we should get to closing

7    arguments tomorrow afternoon.  And we'll work to make that

8    happen.

9            So, please, no research, no investigation, no talking

17:25:15 10   about the case with anyone.  And enjoy the evening, and we'll

11   see you tomorrow at 9 o'clock.  All right.

12           NOTE:  At this point the jury leaves the courtroom;

13   whereupon the case continues as follows:

14   JURY OUT

15           THE COURT:  All right.  Have a seat.

16           Mr. Buchanan.

17           MR. BUCHANAN:  Yes, Your Honor.  As you just heard,

18   the plaintiffs indicated they may call Dr. McGarty, who I have

19   great admiration for, and he is a good man, but --

17:26:09 20           THE COURT:  But --

21           MR. BUCHANAN:  But this just goes to your order, not

22   to any qualifications he may or may not have on subjects.  You

23   ordered that Dr. McGarty could testify about functional and

24   technical abilities and general network architecture.

25           So I think at this point in the case, that's -- I

2606

1    don't know if he is going to testify about that, it's somewhat

2    cumulative.

3         You said:  Testimony will not be allowed regarding

4    reasonableness or effectiveness of Cox's procedures or why Cox

5    made certain decisions.

6         And that was because he was -- part of his -- one of

7    his rebuttal reports, reply reports went to Dr. Weber's use of

8    the term "effective."  So that's not in the case.

9         You said:  Plaintiff will not be allowed to offer

17:26:53  10   expert testimony related to Cox's procedures to the extent it

11   is cumulative at trial.  And that goes to, you know, hold for

12   -- hold the first one, and the six steps, and then all that.

13        So that's totally cumulative at this point.  It's

14   already in.  And his testimony is, he's not opining on what Cox

15   should have done or what they didn't do, he's just -- his

16   testimony and his report were just that here are the steps,

17   here is what they did, here's what are the policies and

18   procedures.

19        So I just would like to get some clarification as to

17:27:25  20   what they intend to offer him on at this point.

21        THE COURT:  All right.

22        MR. OPPENHEIM:  With the caveat that we're still

23   working on what he's going to say, we have to yet hear from Mr.

24   Tregillis, but we're calling him as a rebuttal witness to --

25   only to respond to the testimony that's been proffered so far

2607

1    in the case.  You know, he has the ability to attest to what

2    Cox was capable of doing and will, I'm sure, speak to that.

3         We don't intend to ask him what Cox's policy should

4    have been.  That's not for him or, frankly, anyone to testify

5    to.  The jury can decide that, Your Honor.

6         But we'll also ask him to respond to other statements

7    that have been made by other experts during the course of this

8    proceeding about, you know, network architecture issues and the

9    like.

17:28:37 10    But it will all be rebuttal, Your Honor, to existing

11   testimony.

12        THE COURT:  I am not going to limit -- I mean,

13   Dr. Almeroth talked quite a bit about the network, and also the

14   CAS versus the Cox systems, of the graduated response.

15        And so, as long as we're not prolonging a rehash of

16   the direct evidence that you had, but are focused on areas that

17   you believe are probative, I'm not going to bar you from doing

18   that.

19        I just didn't want you to get up and get Dr. McGarty

17:29:29 20   up and remind the jury of everything that they heard over the

21   last two weeks.  Which, believe me, I have had people attempt

22   to do that.  So -- and I understand why that might be the idea.

23        So as long as you're mindful of the testimony by the

24   Cox witnesses about these issues, you're not going to have a

25   problem.

2608

1          MR. OPPENHEIM:  Thank you, Your Honor.

2          THE COURT:  Okay.  All right.

3          MR. BUCHANAN:  Your Honor, just one point on that.  I

understand he may be rebutting whomever, but I assume he's

confined to what he said in his expert report.

6          In other words, he gave an opening report, and then

Dr. Weber, for example, gave a report, and he responded at

length, an entire report about effectiveness and control group.

So that was out.  So I assume we're not going to hear about

17:30:20 10   that because he -- you know, the Court ruled she couldn't

11   testify about effectiveness.

12         THE COURT:  I think that's a jury issue.  And I want

13   to preserve that for the jury.

14         MR. BUCHANAN:  Okay.  And I don't want that to be the

15   subject of either side's experts.  And I think we all

16   understand that.

17         Okay.  So no problem with that, Mr. Oppenheim?

18         MR. OPPENHEIM:  No problem with that, Your Honor.

19         THE COURT:  Okay.  Are you going to get some sleep

17:30:45 20   tonight then?  Is that what this is all about?

21         MR. OPPENHEIM:  But no problem with the second issue

22   that he described.  The first --

23         MR. BUCHANAN:  The sleep part?

24         MR. OPPENHEIM:  The first, Your Honor, is that we

25   expect Dr. McGarty to respond to the testimony that came in

2609

1    today.

2         THE COURT:  Within the confines of his reports, and

3    not going -- or deposition, and not going -- oh, all right.  I

4    see what you're saying.

5         MR. OPPENHEIM:  He's a rebuttal witness.

6         THE COURT:  Rebuttal witness, yeah.

7         MR. BUCHANAN:  But his report -- so, I mean, it's

8    not -- this is not in a vacuum.  Again, Dr. Almeroth filed a

9    report, and he rebutted it in limited part.  Okay.  He had

17:31:31 10   certain information, for instance.  And then he rebutted on

11   Procera.  And so, we have that.

12        So, in other words, he had the opportunity to rebut.

13   So Dr. Almeroth was limited to his expert report.  And what I'm

14   saying is, Dr. McGarty should be limited to his rebuttal report

15   in response to that.

16        THE COURT:  It certainly ought to be relevant to

17   Cox's case, but exactly, you know, in the -- within the four

18   corners, I don't automatically think that that is the -- a

19   rebuttal expert's limitations.  I think they can -- there may

17:32:10 20   be some areas -- you know, let's just take it --

21        MR. BUCHANAN:  One step at a time.

22        THE COURT:  -- question by question.

23        MR. BUCHANAN:  That's fine.  Thank you, Your Honor.

24        THE COURT:  All right, thank you.

25        All right.  Let's take a short recess and come back

2610

1  and do jury instructions if we don't have other issues.  Okay.

2         Let's take ten minutes and we'll -- have you all --

3  you know, I heard some promises out there last week, oh, we're

4  going to look at this, and we're going to look at that, and

5  maybe we will look at taking the word "intentional" out.

6         So if you have reached -- or if you have redrafted

7  any instructions based on -- I don't know, whatever we met last

8  week --

9         MR. OPPENHEIM:  So we did have a conference call last

17:32:59 10  night.  And I think we maybe narrowed some of the issues, Your

11  Honor.  Not surprisingly, we haven't resolved them all.  But I

12  think where we could reach some agreement, we have.  And

13  hopefully can define the issues that remain for you succinctly.

14         MR. ELKIN:  I think he's correct.

15         THE COURT:  Thank you.  I look forward to that.  I

16  appreciate you trying.

17         All right.  We're going to take ten minutes.

18         We're in recess.

19         NOTE:  At this point a recess is taken; at the

20  conclusion of which the case continues in the absence of the

21  jury as follow:

22  JURY OUT

23         THE COURT:  All right.  Do you all have a plan on how

24  to do this?  We used plaintiffs' jury instructions last time.

25  They don't include several of the defendants' proposed

2611

1   instructions.  But how do you want to proceed?

2         MR. ELKIN:  Well, Your Honor, I guess -- let me just

3   report on what we tried to do, just to set the stage,

4   Mr. Oppenheim alluded to it.

5         As he recounted, we did have a conference call last

6   night.  We reviewed issues that were outstanding with regard to

7   both the jury instructions and the verdict sheet.  I think we

8   narrowed the gaps on the verdict sheet.  And we provided a

9   redline to counsel.  So that's one issue.

17:51:31 10         I think there are a handful of issues that do remain

11   with the jury instructions sort of keying off the hearing that

12   we had with Your Honor last Thursday night.  I think there is

13   probably more disagreement, you know, with regard to that, but

14   there are no big surprises, I don't think.

15         But whatever the Court's pleasure is in terms of

16   using the documents is fine.  We can proceed any way that the

17   Court would like.

18         THE COURT:  Well, then why don't we start out by

19   talking about the works and your 504 issue.  And -- you know,

17:52:15 20   we have had a chance to look at some of the cases on, you know,

21   whether the Second Circuit EMI case, or there is kind of an

22   interesting Seventh Circuit case that came out in August where

23   they do a little, you know, tour of the circuits and reference

24   back to Fourth Circuit cases.

25         I mean, the Fourth Circuit cases, whether it's Judge

2612

1    Davis or Judge Gregory -- Judge Gregory's is pretty dated and

2    pretty minimal.

3          But why don't we start there?  What do you propose

4    that we do with the instruction on how many works count for

5    purposes of infringement?

6          MR. ELKIN:  Sure.  So there are two issues, as Your

7    Honor knows.  One is on the copyright registrations, all of the

8    songs that were registered as a compilation.  And then the

9    other issue is where the registrations in the case have a music

17:53:38 10   composition, a PA, that correlates to the same song that's a

11   sound recording.

12          And just so that we're on the same page, and this is

13   our most up-to-date recounting, and we could sort of -- what I

14   intended to do was sort of brief this and hand up -- I was

15   going to present this really at the close of our case tomorrow,

16   which I'm hoping will occur before lunch.

17          One of the things that we talked about, at least on

18   our side, is to actually call Mr. Mencher first.  I think

19   that's probably a 25- or 30-minute direct.  And then have

17:54:22 20   Mr. Tregillis, who is probably no more than 30 or 40 minutes,

21   and whatever cross there is.  And we could move some documents

22   in, and we would probably file a motion, a Rule 50 motion at

23   that time and include this.

24          But what you'll find of the -- all of the works in

25   suit, the way we've done our math, is that you would end up

2613

1   with, if the Court were to agree with the application, as we

2   have argued, you would end up with 1,453 sound recordings and

3   870 music compositions, or PAs, for a total of 2,323.

4          We, obviously, have to present that in a way for, for

5   both the other side to understand and for Your Honor to be

6   faced with.

7          But to the extent that Your Honor is going to decline

8   ruling on the Rule 50 motion, then, you know, we have -- I

9   think we did lay out the instructions in our initial jury

17:55:42 10   instructions to sort of deal with both of those issues.

11          And we would take the jury through -- we will move in

12   the certificates tomorrow before we close, and basically do --

13   I'll do my level best to try to describe it.  It's not the

14   easiest thing, as I mentioned last week, but I will muddle my

15   way through it.

16          That's what I would propose.

17          THE COURT:  Okay.  I mean, there is just a lot of

18   moving and shaking as to whether the jury should do that or --

19   you know, which is why I -- you know, looking at that when I

17:56:24 20   did, I just essentially deferred on it until we really had

21   focused on it.  And so, that's why we're here now talking about

22   this.

23          MR. ELKIN:  So my experience in the past, and I have

24   actually been in their shoes, I have been on the plaintiff's

25   side and the defendant's side on these matters, and I just -- I

2614

```
 1   think these are straight legal issues.  We're not really
 2   quibbling.  It's either -- you've got the certificates and you
 3   have got the law, and it's -- from our point of view, we think
 4   that whatever your -- you know, whatever the answer is, the
 5   Court can rule on that.
 6            THE COURT:  Should I be looking at independent
 7   economic value as to whether I should consider albums and
 8   compilations versus individual songs, or is that a jury issue?
 9            MR. ELKIN:  Well, I think the economic -- independent
10   economic value is something that the courts look to, as Your
11   Honor has observed, I am sure, from reading the jurisprudence,
12   in situations where there is an issue about whether something
13   is a compilation, whether or not it has -- like in BMG, the
14   music, we know these were individual musical compositions,
15   there were no correlative sound recordings.
16            But here you have by force of nature, and why this is
17   sort of an easier issue in some respects to take up from a
18   legal perspective, because you have certificates of
19   registration that have identified the sound recordings in the
20   case of the sound recordings argument that were registered as a
21   compilation.
22            And there is no surprise to that because we know that
23   the music industry has the -- for many years now has -- with
24   some exceptions -- there are clearly sound recordings that have
25   their own SR in the case, and that will be excluded both from
```

17:57:24 (line 10)
17:58:10 (line 20)

2615

1    our motion and from the -- what we're asking for here, from the

2    numbers that I just recounted.  The only time that an

3    individual SR would be implicated in the 504(c)(1) context is

4    where there is a PA for the same song.

5            So I think the independent economic fact finding is

6    something that becomes relevant where there is an issue about

7    whether something, you know, was at some point published

8    separately.  And whether it was exploited separately and

9    whether or not it can be viewed and deemed to be, you know,

17:59:24 10   part of some sort of a collective work.

11           But I don't think there is any serious issue when you

12   have a limitation, as we are proposing in terms of the argument

13   that I'm attempting to frame up, where all of the constituent

14   sound recordings are registered as a compilation.

15           THE COURT:  Okay.  Thank you.

16           MR. ELKIN:  Okay.  Thank you.  You're welcome.

17           MR. OPPENHEIM:  Your Honor, I'm somewhat at a loss as

18   to how this could be done on a Rule 50 motion.

19           The idea that the day before the trial ends we're

18:00:04 20   being told that there should be a Rule 50 motion to reduce the

21   number of works in the suit from 10,000 to 2,300 without any

22   evidence that has been put forward in the case about how they

23   arrived at that number, to me doesn't make any sense.

24           And if he's going to orally get up here and try to

25   give you some summary and analysis and expect that the

2616

1    plaintiffs are going to be able to respond in this context,

2    that's not the purpose of a Rule 50 motion.  It's not how I've

3    ever seen it used in a copyright case, and don't think it's the

4    proper vehicle here.

5         There's been testimony, which has not been challenged

6    by Cox, from the record company and the music publisher

7    witnesses, all of whom testified that these works have their

8    own independent lives, they're marketed and sold

9    independently -- individually.  They're also sold as albums.

18:01:08  10    The fact that they may be copied -- the copyright

11   registration may be a compilation, is not a function of whether

12   or not they should get individualized protection.

13        And so, the idea that we're going to present this in

14   a Rule 50 to me doesn't work, it doesn't make sense.

15        THE COURT:  It all is going to fall, you know, from

16   the framework of the jury instructions, which are an

17   independent consideration, whether we have a Rule 50 motion or

18   we have -- the jury needs to be told how to calculate damages.

19   And the case law is, frankly, all over the place as to

18:01:50  20    whether -- if you have compilations, whether individual works

21   within that compilation get their own separate damages

22   consideration, or you look at the compilation.  Right?

23        MR. OPPENHEIM:  So, Your Honor, I'm not sure on the

24   compilation issue that the case law is kind of all over the

25   place.  I believe that on that issue that the case law has all

2617

1    been leaning towards allowing individual works to be subject to

2    a separate damage award.

3          And we can, we can address that as a matter of law,

4    Your Honor.  But the way -- I mean, Cox chose to present it to

5    you in a way -- in a summary judgment brief that I think wasn't

6    the proper way to put it forward to the Court, and the Court

7    appropriately denied it.

8          The idea now that it's a Rule 50 motion -- it's not a

9    directed verdict.  It's a -- the question that they're asking

18:02:56 10  is whether or not you should be able to get a damage award with

11   respect to certain works in the suit.  That's the question.

12   That's not a directed verdict question.  So I don't think it's

13   a Rule 50 issue.

14         Now, the question of whether it goes to a jury is a

15   separate question.  So -- and on that issue, I think the jury

16   would see the instruction, have absolutely no idea what to do

17   with it because there's been no testimony on it.

18         So I would be inclined to say there should be no

19   instruction on it because there's no reason to confuse the jury

18:03:27 20  on the last day of the trial on something like this.

21         To the extent that they believe that as a matter of

22   law -- let's assume the jury comes back with a -- there's no

23   instruction on it to the jury, there's no Rule 50 motion, and

24   the jury returns a verdict on 10,000 or so works.  To the

25   extent that Cox believes as a matter of law that is improper

2618

1    because certain works shouldn't have received an award, they

2    can file that as a post-trial motion and the Court can consider

3    that.

4            I think at this point, that's the only way to do --

5    to deal with this issue.

6            THE COURT:  I think I read some cases that said that

7    the District Court shouldn't be looking at remittitur, and they

8    should have asked the right question at the right time of the

9    jury instead of trying to --

18:04:25 10          MR. OPPENHEIM:  Having tried two copyright cases that

11   were remitted three times, that actually happened, I may be the

12   only guy in history who has done that.  I'm not suggesting that

13   this Court do it through a remittitur.  But there are other

14   mechanisms by which -- that they can file post-trial motions

15   and outside of a remittitur, I believe.

16           But I just, I don't -- rule -- and it's not incumbent

17   on me to tell them how to present their case and how to push it

18   forward.  And so, I'm not doing that.  But Rule 50, it's not a

19   directed verdict issue, it's just not.

18:04:58 20          And I think that if they had -- they had every

21   opportunity to present evidence and witnesses and even experts

22   had they wanted to on the issue, on these issues.  They chose

23   not to.  And they at the last minute, frankly, only by Your

24   Honor's grace, having allowed them to put in the SRs and PAs,

25   which otherwise they weren't even putting in evidence before.

2619

1          So this is a problem of their making, and it's not

2     for me to solve it.  But it's not Rule 50, and I don't think

3     confusing the jury at this point is the way to go on that.

4          THE COURT:  Well, what's your answer to the bottom

5     line as to what we should instruct the jury on whether

6     compilations, if they include ten songs and they're registered

7     as a compilation versus individually -- and I can't remember

8     what the testimony was from the plaintiffs on how -- you just

9     explained a little bit about how they're marketed, and they're

18:06:12 10   individual, and they're considered individually --

11          MR. OPPENHEIM:  With your permission, Mr. Zebrak

12     argued this on be summary judgment, I'll defer to him on these.

13          THE COURT:  Certainly.

14          MR. ZEBRAK:  On this -- so as Your Honor is aware,

15     there are two statutory damages issues that Cox's counsel is

16     raising.  We're going to put aside for a moment the SR/PA

17     issue.  Just on the compilation issue.

18          The case that they rely on, the MP3Tunes case from

19     the Second Circuit came after LimeWire, several other courts.

18:06:39 20   They've all recognized that in this digital era where works are

21     commercialized both on an album, but also individually, the

22     fact that they're on an album doesn't preclude them from

23     receiving separate statutory damages awards.  And that's what I

24     believe happened in the MP3Tunes case and what LimeWire did

25     before that, and is exactly the testimony here.  Which is that

2620

1    all these works have been commercialized individually.

2              And so, I get the SR/PA issue is separate, but on

3    this issue, quite frankly, I don't believe they've cited any

4    case law at all saying that works commercialized in this time

5    period of the infringement don't get individual awards.

6              And what is a work is not determined by the

7    registration.  What is a work is a separate issue.  And I think

8    all the cases support us here.

9              THE COURT:  So did you read the Sullivan versus Flora

18:07:30 10   case, the Seventh Circuit case from August?

11             MR. ZEBRAK:  I, standing here right now, don't recall

12   one way or the other, but we'll be happy to look at it.

13             THE COURT:  Well, I mean, it directs -- it goes

14   through the Ninth and 11th and D.C. Circuits, and follows the

15   First Circuit, and then they have the Second Circuit, and they

16   identify that -- you know, it's dated.  And that:  We conclude

17   in keeping with the First, Ninth, that that 504(c)(1) requires

18   Courts confronted with circumstances with multiple works and

19   multiple infringements, to determine or to charge a jury with

18:08:14 20   factfinding tailored to answering whether the protected works

21   have value only in and through their composite whole instead of

22   their standalone value at the level of one work.

23             And it has:  Protected work has standalone value if

24   the evidence shows that the work has distinct and discernible

25   value to the copyright holder.

2621

1          And if that were the instruction to the -- that I

2     gave, what's the evidence that they could use to consider that?

3     That would be the testimony of the plaintiffs' witnesses on the

4     value and they're looked at individually?  Is that your

5     response to that?

6               MR. ZEBRAK:  Yes, Your Honor.  And I'm --

7     Mr. Oppenheim will speak more about the verdict form itself,

8     but I'm not sure the jury even needs that instruction because

9     that's the only evidence in the case in terms of them being

18:09:12 10   commercialized individually.

11              Their experts looked at royalty information.  I mean,

12    there's no dispute that these things have all been

13    commercialized individually and have their own economic life.

14    And so, I know that SR/PA issue is separate, but I think on

15    this one just everything is in our favor.

16              THE COURT:  Okay.

17              MR. ELKIN:  So briefly, Your Honor, I don't think

18    that we've respectfully ambushed anybody.  We moved on summary

19    judgement --

18:09:41 20             THE COURT:  Yeah, and that's fine.

21              MR. ELKIN:  As soon as we got Your Honor's

22    instruction -- Your Honor's motion for summary judgment, I was

23    in Dubai on a business trip, and we arranged for a conference

24    call with the other side, and we were trying to work out

25    stipulations.  One of the stipulations that I was proposing was

2622

1    the copyright registrations.  That tipped them off and then

2    they withdrew it, because I was very much concerned about this.

3         We didn't have a chance to put on our case until, as

4    Your Honor remembers, towards the middle of late to last week,

5    the middle of last weak, and we've been having this discussion

6    with other side since.

7         And no one is trying to ambush anybody.  They know

8    about this issue.  We've been very concerned about the issue

9    given the scale of the case and the exposure to my client.

18:10:31 10      The issue here, frankly, is I wasn't going to just

11   make a verbal motion for a Rule 50.  There will be a written

12   motion which lays all of this out.

13        And -- but in terms of the instructions, which is

14   what Your Honor had asked, we had crafted instructions.  The

15   other -- you know, the plaintiffs haven't done that.  I'm happy

16   to, you know, have a discussion about the instructions that we

17   proffered, but I -- we thought they were appropriate.

18        And I don't -- I can't speak to Mr. Oppenheim's

19   experience.  He's an experienced trial lawyer handling many

18:11:04 20  cases.  I can tell you that any time that I've done this over

21   the years, it's always been through at this stage Rule 50

22   motions, or it's happened earlier on summary judgment.

23        So, obviously, we're prepared to go to the jury with

24   it, but we did submit instructions.

25             THE COURT:  Okay.

2623

```
 1              MR. OPPENHEIM:  May I --
 2              MR. ELKIN:  And the other thing I would say, Your
 3     Honor, is I may be wrong because it's been a long trial, but my
 4     recollection of the plaintiffs' testimony as to separate
 5     economic value, there was probably two sentences from
 6     Mr. Kooker, the first witness from Sony, and that was really
 7     about it.
 8              So the notion that somehow they put on a case to go
 9     through 10,000 or so works and describing how they were used
10     and how they're unique, I just -- I think that's a bridge too
11     far.
12              MR. OPPENHEIM:  So, Your Honor -- I'm sorry.
13              THE COURT:  No.  I was just going to say that I don't
14     want you to forget about the SR and PA, whatever it is.
15              MR. OPPENHEIM:  Before we turn to that, if I may,
16     Your Honor.  Two things on this.
17              One is, the witnesses did speak to the individual
18     recordings, absolutely.  And while Mr. Elkin may say, you know,
19     that they've been thinking about this all along, they didn't
20     ask a single record or publishing industry witness a single
21     question about this.  They didn't elicit anything on the issue
22     of compilation.  They didn't put an SR or a PA in front of any
23     of those witnesses to ask them about it.  There is no record
24     whatsoever on this yet, other than the record we've presented.
25     And that record, I believe, fully supports all 10,000 works
```

2624

1    being in the case.

2         I also believe, Your Honor, that -- that there's an

3    issue here in terms of estoppel.  Your Honor ruled on this

4    compilation issue I believe in BMG1, and it was not -- that was

5    not one of the issues that the defendants appealed.

6         THE COURT:  But they were all sound recordings, and

7    we didn't have the -- I don't think there was even any

8    evidence -- there may have been evidence of compilations, but

9    no one --

18:13:31 10    MR. OPPENHEIM:  They were all I think published

11   works, right?

12        THE COURT:  Right.

13        MR. OPPENHEIM:  But in any event, Your Honor, you

14   know, I just -- given that there's zero evidence before the

15   jury on this compilation issue, giving them an instruction on

16   it, to me, I think they can scratch their heads and say, what

17   are we supposed to do with this?

18        And we certainly don't want them to sit back there

19   with, you know, thousands and thousands of registrations

18:13:57 20   thinking that they've got to figure this out when nothing has

21   been presented to them on it.

22        On the second issue -- and again, I'll allow

23   Mr. Zebrak to speak to the pure legal issue.  I do think that

24   there's -- I believe there's only one circuit that has spoken

25   to it, there's a Second Circuit decision, there's a Southern

2625

1    District decision.  The Second Circuit decision, I think,

2    doesn't interpret the clear language of the statute.  I think

3    it's wrong.  I think Judge Rakoff in New York had it right.

4            But putting that aside, again, there's nothing for

5    the jury here to get their arms around and understand and be

6    able to digest.  And I think it's the exact same thing.

7            And similarly, it's not a Rule 50 issue.  That

8    argument applies again on this.  It goes to the question of how

9    many statutory -- for statutory damages purposes, how many

18:14:57 10  works the jury gets to consider.  It's not a directed verdict

11   on those.  You could still have those works independently

12   infringed.  The only question is whether you get statutory

13   damages on them.  That's not a directed verdict issue.

14           But I'll let Mr. Zebrak speak to the pure legal

15   issue.

16           THE COURT:  Okay.  Go ahead, Mr. Zebrak.

17           MR. ZEBRAK:  I'll just hit the highlights.  I know

18   you have briefs from summary judgment.

19           As Mr. Oppenheim mentioned, we're aware of one

18:15:24 20  circuit having reached this issue, the Second Circuit in the

21   MP3Tunes case.  So oddly enough, that case that they brought

22   forward on that issue, they didn't bring forward on the

23   compilation issue.  So it kind of cuts two ways for each side.

24           But we think the Second Circuit got it wrong.  And

25   the Second Circuit, quite frankly, did not address the issue

2626

1    that we're raising here.  It would just be an absurd

2    interpretation or application of this statute --

3            THE COURT:  When a song and the recording are

4    combined and presented to the audience as one, that it would be

5    absurd not to give two awards?

6            MR. ZEBRAK:  Well, I'm happy to answer that, but I

7    would like to do it in the context of the statute, and that's

8    what I was referring to, not the -- I mean, I recognize these

9    are complex issues that we're all addressing.

18:16:22 10          What I'm addressing by absurd is the notion that the

11    statute could be interpreted in a way where the record company

12    and music publisher could pursue separate actions and each get

13    their own awards, but for judicial efficiency and lots of other

14    reasons are in one case, then they only get one award.  That

15    could not be what Congress intended.  There is no indication in

16    the legislative history that that's the scenario that Congress

17    had in mind.

18            You know, the statute speaks in terms of the

19    copyright owner, singular.  And I know that words can be

18:17:00 20    pluralized, but, you know, there is a long-standing doctrine of

21    kind of reading all the language together so, you know, it

22    doesn't have sort of a crazy result.

23            And that is what, I submit, is exactly what would be

24    here.  The context doesn't indicate that you can pluralize the

25    word because to do so would mean that we couldn't be here in

2627

1    this case.  There would be multiple cases around the country

2    instead of just this one.

3            And, you know, the Second Circuit did reach the

4    result that Mr. Elkin is advocating for, but it didn't address

5    the legislative history argument I'm raising now.  Instead,

6    it -- excuse me -- I didn't say legislative -- I didn't mean

7    legislative history.  It didn't address the statutory language

8    interpretation I'm raising now.

9            The Second Circuit merely cited to the Patry treatise

18:17:53 10   and the legislative history and didn't -- you know, didn't

11   address what we're raising now.  And, you know, we're dealing

12   with the copyright statute.  There are purposes to it in terms

13   of promoting creation and dissemination.

14           And, you know, the concepts behind the statute, as

15   well as just strict statutory interpretation, I just think

16   can't lead to this result.  These are separate, separate works,

17   separate owners.  You know, these are separate companies that

18   own these things.

19           You have a music publisher that is associated with a

20   songwriter that creates and owns a work, a composition.  Then

21   you have a separate record company and its artists involved.

22   These have separate economic values.  They're separate work,

23   separate owners.

24           And, you know, the only reason we're here is because,

25   you know, that one statutory provision talks about the

2628

1    copyright owner, singular, and then talks about the compilation

2    and the language you're familiar with.

3            THE COURT:  All right, thank you.

4            Mr. Elkin.

5            MR. ELKIN:  Thank you, Your Honor.  So this has been

6    the discussion, not only of jurisprudence, but the House

7    Judiciary Committee actually has held hearings and there have

8    been roundtables that have been convened by the U.S. Copyright

9    Office.  I even testified seven or eight years ago when this

18:19:19 10  issue was being taken up.

11           It's -- a sound recording and music composition are

12   looked at under the law as something that derives out of each

13   other.  The sound recording clearly derives out of the music

14   composition.  I don't think there is any serious issue.

15           I think what they're struggling with is this notion

16   of having separate copyright owners in the same action, but

17   they made that decision.  Which is fine, they made that

18   decision to join their claims in one case.  That's their

19   prerogative.

18:20:04 20          And had they elected, which is still their election,

21   to go for compensatory damages, then they don't -- they're not

22   affected by this rule.  The only issue is statutory damages in

23   one claim.

24           Mr. Oppenheim a few minutes ago, before he released

25   the lectern to Mr. Zebrak, made reference to this Judge Rakoff

1   decision that I think we had discussed before you on summary

2   judgment.  And I actually represented the plaintiffs in that

3   case.  And there were separate publishing companies from sound

4   recording companies.  And I made that same argument, and Judge

5   Rakoff agreed with that.

6          The MP3Tunes case overruled that decision and

7   expressly took on that issue.  I don't think it's a big stretch

8   to see how a sound recording derives out of the music

9   composition, and it's a pretty clear decision.

18:21:05 10        I know that Mr. Zebrak raised this plain text

11  argument on the Rule 56 motion.  I am not going to repeat those

12  same arguments.  I think Your Honor has it, but I think it's

13  clear that these -- that one derives out of the other, and I

14  think there is clear precedent for it.

15         THE COURT:  So it fair game then for argument to be

16  made that for these combined works where you have both, that

17  the jury could consider the statutory damages framework in some

18  heightened capacity?

19         MR. ELKIN:  I'm not sure that the factors that Your

18:21:46 20 Honor would consider identifying for the jury as something they

21  should consider would specifically go into those issues.  I

22  suppose it could.

23         But I think, you know, as a matter of law, they

24  shouldn't be charged with having to decide whether any works

25  that are otherwise barred under Section 504(c)(1) is something

2630

1    that they could find to be eligible for a separate statutory

2    damages award.

3           I'm not suggesting that they can't find that the

4    works are infringed.  They're in the case, they're in the case,

5    works are works.  But solely for -- if they get down to the

6    point in the verdict sheet where they're awarding statutory

7    damages and they're actually considering so many of the works

8    in issue that are compilations or otherwise subject to the --

9    you know, to the collective or compilation statutory language,

18:22:50 10   I think that's -- I think that runs afoul of the rule.

11          THE COURT:  Yeah.  I mean, if I give the plaintiffs'

12   statutory damages instruction, which, of course, we will talk

13   about in a minute, but it does talk about circumstances of the

14   infringement, the revenues lost.

15          Okay.  Understood.  Thank you.

16          MR. ELKIN:  Thank you, Your Honor.

17          MR. OPPENHEIM:  If I can just add one thing.

18          There is a huge distinction between what we have in

19   this case and what was in MP3Tunes in the Second Circuit

18:23:29 20   because in that case the plaintiff, the same plaintiff company

21   owned both the SR and the PA.

22          Here, Mr. Kokakis gave test -- who is from Universal

23   Music Publishing Group, he gave testimony that wasn't

24   challenged, that there were many instances in this case where

25   one of the record companies owned a recording and the

2631

1    underlying composition to that recording was owned by an

2    entirely separate and different music publisher.

3         You know, so, for example, that Sony ATV, the music

4    publisher, may have owned the composition, but Universal owned

5    the sound recording.

6         And so, you end up with this very perverse situation

7    if you lump them all together, that if you give one award, how

8    much does Sony ATV get?  How much does Universal get?  How much

9    does the songwriter get out of that?  How much does the

18:24:36 10    recording artist get out of that?

11         So in MP3Tunes --

12         THE COURT:  But there isn't any evidence as to how

13    many times that occurred.  It was just -- not anecdotal, but it

14    was, here's the reality of what's going on and, you know, at

15    least there are -- there is separation in ownership between the

16    song and the music.  And so, the jury couldn't calculate that.

17         MR. OPPENHEIM:  I agree.  That was not -- Cox has not

18    presented any evidence of overlap, if you will, if that's what

19    you want to call -- for lack of a better term, overlap.

18:25:17 20         THE COURT:  Right.

21         MR. OPPENHEIM:  But it really -- it's critical

22    because the witnesses spoke to the fact that, you know, that

23    monies get paid out to the artists and to the engineers and to

24    the unions and everything else.  And if you lump them together

25    across different companies, that's a situation that the Second

2632

1    Circuit never considered.

2            And so, I think it is a very different fact pattern.

3            THE COURT:  Thank you.

4            MR. ELKIN:  Your Honor, I think Mr. Oppenheim

5    inadvertently misspoke.  The MP3Tunes did involve separate --

6    it did involve separate plaintiffs.  That's why it overruled

7    the TVTunes versus MP3.com.  There were separate plaintiffs

8    that had the different rights.

9            Unless there are further questions, I think you have

18:26:11 10   it.

11           THE COURT:  No.

12           MR. OPPENHEIM:  Just -- they were all EMI Capital

13   entities.  So they were different companies, but all owned

14   under the same umbrella.  So I acknowledge, as a technical

15   matter that's true.  The reality was, it was much like here, we

16   have -- what, 57 plaintiffs, but the reality is we have six

17   plaintiff groups.  And so, that's the distinction.

18           THE COURT:  Okay.  All right.  Where do you want to

19   go from here?

18:26:45 20   MR. OPPENHEIM:  So I have a list of issues, and I

21   take them in whatever order Your Honor would like.

22           So we have hit two of them.  I don't know whether

23   Your Honor just wants to take them in the order of the

24   instructions and go through them, if that's the easiest way to

25   do it.

2633

```
          1             THE COURT:  That's fine.  Are you working off

          2    plaintiffs' instructions?

          3             MR. OPPENHEIM:  Yes, Your Honor.  Let me grab my

          4    binder.

          5             THE COURT:  Okay.

          6             MR. OPPENHEIM:  So I believe, Your Honor, that the

          7    first issue that was addressed last time, the last charge

          8    conference was an issue with respect to instruction 18.

          9             Your Honor ruled against plaintiffs' request for

18:27:37 10    instruction number 18.  We just renew and reserve our rights on

         11    that, Your Honor.

         12             This was the --

         13             THE COURT:  Testimony and documents by lawyers?

         14             MR. OPPENHEIM:  Right, just to preserve our

         15    objection, Your Honor.

         16             THE COURT:  Okay.

         17             MR. OPPENHEIM:  And then the next issue is the DMCA

         18    instruction.

         19             THE COURT:  And I've looked at that.  And had the

18:27:55 20    opportunity to get your latest comments on it.

         21             And I'm going to give Cox's instruction, which is

         22    essentially my instruction at the beginning of the case cleaned

         23    up.  And your exception is noted on that.

         24             MR. OPPENHEIM:  We had -- so there were two parts to

         25    our proposal.  And the second part was to address potential
```

2634

1    jury nullification.  And the language we had asked for, Your

2    Honor, was, "to the extent that Cox's witnesses have testified

3    and Cox's counsel have argued that an ISP should not be held

4    liable for the infringing acts of its subscribers, you should

5    follow my instructions on the law of contributory and vicarious

6    liability."

7            THE COURT:  And I am giving them those instructions.

8    And that's what they're going to be looking at when they

9    determine -- so you make that clear in your closing argument,

18:28:50 10  but I am not going to put it in an instruction.

11           MR. OPPENHEIM:  Very well, Your Honor.  I think the

12   next issue was the failure to call available witnesses.

13           THE COURT:  Yeah.  And again, I am not going to give

14   that instruction, but your exception is noted.

15           MR. OPPENHEIM:  Thank you, Your Honor.  I think then

16   we get to the copyright definition section.  And I thought we

17   may have reached agreement on that.

18           Mr. Elkin, I think you said you were okay, but I

19   don't want to speak for you out of turn.

18:29:15 20          MR. ELKIN:  This is instruction 22?

21           MR. OPPENHEIM:  Yeah, the definition.

22           MR. ELKIN:  So Ms. Golinveaux I think will address

23   this.

24           THE COURT:  I am sorry, which instruction is this?

25   22?

2635

1          MR. OPPENHEIM:  Yes, the definition of copyright.

2          THE COURT:  Okay.

3          MS. GOLINVEAUX:  So, Your Honor, plaintiffs had

4    proposed a revised instruction number 25 on direct infringement

5    where they had added in the language, "a work is infringed by

6    the downloading or uploading of all," and then they added in

7    "or a part of a copyrighted work."

8          THE COURT:  Right.

9          MS. GOLINVEAUX:  And as we discussed last Thursday

18:29:56 10  evening with Your Honor, we think that is a misstatement of the

11    law and confusing, particularly in the direct infringement

12    section.

13          So when we were -- and Your Honor did not give that

14    language in the BMG instruction.  It would clearly encompass,

15    for example, de minimis copying.  And it's particularly

16    confusing in a case involving bits of data in the BitTorrent

17    network.

18          What we discussed with the opposing counsel last

19    night was to address their concern instead in the instruction

18:30:26 20  on the definition of copyright.

21          So where -- and what we would propose, if Your Honor

22    is inclined to do it -- and again, the Court didn't do it in

23    the BMG case at all, and I think it was clear, it is clear

24    without it, but it's more appropriate here when it refers to

25    the "exclusive right to reproduce the copyrighted work."

2636

1        And what we would propose, if you -- again, if you're

2   inclined to do it, is "or a substantial part of it in copies."

3   That's the more appropriate place to deal with the issue.

4        THE COURT:  You're on -- you're back on instruction

5   22?

6        MS. GOLINVEAUX:  That's right, Your Honor.  It's

7   instruction number 22 of the plaintiffs' proposed.  And I'm

8   looking at the number 1, reproduce the copyrighted work.

9        THE COURT:  Uh-hmm.

18:31:22 10        MS. GOLINVEAUX:  And we would propose "or a

11   substantial part of it in copies."

12        MR. OPPENHEIM:  Your Honor, if I may.  So Mr. Elkin

13   raised the de minimis issue at the charge conference last week.

14   And we went back and took a look at it and thought about it.

15        De minimis copying only comes up in a substantial

16   similarity case.  It's not an issue here.  This is not a

17   substantial similarity case.

18        So the concept of in whole or in part is the right

19   concept.  And I suppose we could deal with it in the copyright

18:32:07 20   definition.  I don't -- we would have to include it in every

21   single one of the provisions, not just the reproduction.  But

22   it also wouldn't be "substantial part."  It's "in whole or in

23   part," that's the law.  And "substantial part" is not the law.

24        So we could, I suppose, live with it in 22, but it

25   would make this even more painful because you would have to put

2637

1      it in through -- in all of Sections 1 through 5, I believe.

2              MS. GOLINVEAUX:  Your Honor, if I may, briefly.

3              THE COURT:  Yes.

4              MS. GOLINVEAUX:  I don't think you need to put it in

5      1 through 5 because 1 through 5 aren't appropriate in this

6      case.  I believe it's just 1 and 3, the reproduction rights and

7      the distribution rights at issue.

8              MR. OPPENHEIM:  I don't disagree that those are what

9      are at issue, but I would hate to misstate the law in an

18:33:04 10    instruction even if they're not necessarily at issue.

11             I think it's easier to just deal with in the context

12     of -- of 25.  That way you only have to say it once.  Which is,

13     I think, where it, frankly, belongs.

14             THE COURT:  I'm not -- I must have the wrong copy of

15     25.  Where does it say --

16             MR. OPPENHEIM:  We provided you with a revised 25 on

17     Thursday, Your Honor.

18             THE COURT:  Oh, that's where it disappeared.

19             MR. OPPENHEIM:  I have brought one copy, but I'm

18:33:46 20    happy to give you my one copy.  I'll just make sure I have --

21             THE COURT:  I think we looked at it -- looked for it

22     here, and I have made it disappear forever.  Is that it?

23             MR. OPPENHEIM:  Oh, so I get your copy and he gets

24     mine.  Thank you.

25             So if you look at the last paragraph, "if you find."

2638

1    We added the language "all or a part of," which I think is a

2    lot simpler, cleaner way to deal with this than putting it in

3    the other provisions.

4              THE COURT:  Okay.  And you object to that,

5    Ms. Golinveaux?

6              MS. GOLINVEAUX:  We do, Your Honor.  And the

7    authority that they cite to support that doesn't support it.

8    It talks about -- when you look at the two cases at the end of

9    the authority that they cite, they refer to "substantial

18:34:48 10   portions of the works at issue."

11             So we really think it's inappropriate there.  If it's

12   going to be properly dealt with, we do think it's in the

13   definitional section.

14             THE COURT:  Why am I putting it in at all?  Is there

15   testimony about that?

16             MR. OPPENHEIM:  So, I think the -- the reason is I

17   don't -- I don't know what Mr. Elkin is going to say in his

18   closing, but I don't want him to get up and say, well, if they

19   only downloaded or uploaded a portion of the work, it's not an

18:35:20 20   infringement under the instruction.  And I don't want to have

21   that issue after the fact.

22             MR. ELKIN:  I'm not doing that.

23             THE COURT:  Okay.

24             MR. OPPENHEIM:  But I will strongly disagree with

25   what Ms. Golinveaux just said.  If you look at the Supreme

2639

1    Court's decision in <u>Harper & Roe</u> and the cite there, copying of

2    300 words from a 200,000-word manuscript was held to be

3    infringing.  I'm pretty sure 300 out of 200,000 isn't

4    "substantially all."

5         THE COURT:  Okay.  All right, I'm going to give the

6    revised 25 instead of changing the definition of "copyright"

7    under instruction 22.  And your exception is noted.

8         Where are we going now?

9         MR. OPPENHEIM:  I actually think -- hate to move

18:36:09 10  backwards, but we skipped 23 where I believe that Cox had

11   proposed breaking out SRs and PAs.  I mean, that's the

12   substantive difference.  And I think that that depends upon

13   what -- that's going to depend on what Your Honor decides to do

14   on the two issues that we began this charge conference on.

15        THE COURT:  Right.  Okay.  So if I decide that they

16   are -- that the SR/PAs are only entitled to one statutory

17   damages award, then you have looked at Cox's proposed

18   instructions and, of course object, but don't object on the

19   actual text?

18:37:17 20       MR. OPPENHEIM:  So I don't believe that Cox's

21   proposed instruction deals with the overlap issue.  So I'm not

22   sure that there's any instruction -- if somebody wants to

23   correct me, please do.  I don't believe there's any instruction

24   currently proposed by Cox that suggests what the overlap is.

25   And there's certainly no evidence in the record yet on that.

2640

1          So I think that 23 as we have drafted it is fine.  I

2     don't even have a substantial objection to adding to the

3     plaintiffs' this many are SRs and this many are PAs, I don't

4     think that makes a difference.  And that's fine from our

5     perspective as well.

6          I don't know that we need -- it needs to be the rest

7     of what Cox has proposed makes sense.  There's more there than

8     is necessary or appropriate.

9          MR. BUCHANAN:  Go ahead.

18:38:22 10          MR. ELKIN:  So at least I think, if you take a look,

11     Your Honor, at -- I'm struggling because I see some red ink

12     here.

13          Was this original?

14          So Cox's proposed jury instruction 34 does deal with

15     the recordings and compositions.

16          THE COURT:  I'm sorry, 24?

17          MR. ELKIN:  34.

18          THE COURT:  34, okay.  Hold on.

19          MR. ELKIN:  I think.  It's entitled Statutory

18:39:04 20     Damages, Number of Works, Recordings and Compositions.

21          THE COURT:  Okay.  My 34 is Failure to Mitigate.

22          MR. ELKIN:  So I was worried about that, that we

23     might have different ones.

24          MR. OPPENHEIM:  It may be, Your Honor, that the

25     original of 34 was labeled Number of Works, Recordings and

2641

1    Compositions.

2         MR. ELKIN:  Sorry.  I have it now.  I apologize.  The

3    one I have now is 32, Your Honor.

4         THE COURT:  Okay.  I'm with you.

5         MR. ELKIN:  So that's the recordings and

6    compositions.  And then there's one --

7         MR. OPPENHEIM:  Is this your revised version?

8         THE COURT:  Yeah.

9         MR. ELKIN:  And then 31 deals with the number of

18:39:51 10   works and the compilations.

11        THE COURT:  Yeah, this is the revised filed on

12   December 12.  And -- right.

13        MR. OPPENHEIM:  I apologize, Your Honor.  We're at a

14   little bit of a loss.  I'm looking for their revised version.

15        MS. GOLINVEAUX:  We have an extra copy.

16        MR. ELKIN:  We have an extra copy.

17        MR. OPPENHEIM:  That would be very helpful, thank

18   you.

19        You are in 31?  Which instruction, Michael, did you

18:40:46 20   just --

21        MR. ELKIN:  I think I was referring to 31 and 32.

22        MR. OPPENHEIM:  We would object to these, Your Honor.

23   The jury will have absolutely no idea what to do with these.

24   There's nothing that's been presented that they could use with

25   this.

2642

```
 1              THE COURT:  I'm listening.
 2              MR. OPPENHEIM:  I think we would read this to them,
 3    if they actually paid attention, they would scratch their heads
 4    and say, how do we do this?  And if I were on the jury, I would
 5    too.  And I get the issue.
 6              I mean, how would they possibly figure out how to
 7    follow this instruction?  It just invites all kinds of
 8    potential error and mischief.
 9              THE COURT:  All right.  I'm going to pass on that.
10    What's your next one?  What is Tregillis going to say
11    about -- I realize you've got 40 demonstrative slides, but the
12    bottom line is he's going to say that you should use iTunes,
13    and one song is worth a dollar, and I'm being generous because
14    when you look at the profitability numbers for songs, they're
15    actually at $0.60 or $0.70, right?
16              MR. ELKIN:  I don't want Mr. Buchanan to get mad at
17    me, because I -- it's his witness, and I don't know what
18    they've done in the last several days to get ready.  But I
19    think, Your Honor, essentially he's looking at a song and sort
20    of merging them, the music composition and sound recording, to
21    the extent that it's one.
22              He's looking at the net profit.  So if it's a dollar
23    -- and I hope I'm not being held to this.  I'm just trying to
24    give you an overview of my understanding.
25              THE COURT:  Yeah.
```

2643

```
 1              MR. ELKIN:  So let's say iTunes would charge a $1.19,

 2     and his understanding is that the record companies would get a

 3     buck, and he's going to sort of add that up -- dollar.  And if

 4     you multiple that by the number of works that were infringed,

 5     allegedly, you would get to a certain number.

 6              THE COURT:  Yeah.

 7              MR. ELKIN:  And of course, that's just one benchmark

 8     that we're going to offer up that they should consider in

 9     looking at statutory damages.

18:43:50 10              THE COURT:  Okay.  Thank you.  Go ahead.

11              MR. OPPENHEIM:  So, Your Honor, I think we're at 26

12     and 27, which are the copyright and vicarious instructions

13     which, I believe, there were no objections to at the

14     conference.

15              MR. ELKIN:  Yes.  Just in the order of expediency, I

16     think with respect to 26, I just mention that we're just

17     reserving on that issue on the substantial infringing works.

18              We know what Your Honor's position is on that and the

19     Fourth Circuit's opinion.  But for good order sake, I'm just

18:44:37 20     raising and want to reserve on that.

21              And then on vicarious, I think the issue that I

22     thought we resolved at the last charging conference was to

23     insert the word "direct," which I think was in their

24     instruction as well.

25              And the other thing is --
```

2644

1          MR. OPPENHEIM:  I'm sorry.  Where did you want to

2   insert "direct," just so I'm following?  I thought it was in.

3          THE COURT:  It's in.  Yeah.

4          MR. ELKIN:  Yes.

5          THE COURT:  There was a direct infringement --

6          MR. ELKIN:  I think last time they had argued that

7   they had wanted to -- for Your Honor to include that the right

8   to supervise includes the right and ability to suspend or

9   terminate, which we did not agree with.  And I thought Your

18:45:22  10   Honor had said that you would not include that, that was not

11   part of your opening instruction, and we were fine with that.

12          THE COURT:  I had, I think, focussed on whether or

13   not the person knew of the infringement, but maybe we talked

14   about the right and ability to supervise the infringing --

15          MR. ELKIN:  Right.  I think the one thing I pointed

16   out was in the -- in the opening instruction there was, I think

17   a typo in the instruction.  It says right in the ability to

18   supervise, it should be the right and the ability.

19          THE COURT:  Right, and the ability.

18:45:59  20          MR. ELKIN:  But other than that, we were fine with

21   the instruction with the exception of including the word

22   "direct."  I think both sides have agreed that "direct" is

23   appropriate.  I think "direct" was not part of the opening

24   instruction.

25          THE COURT:  Okay.  All right, I am going to give

26

2645

1    and 27 as you've agreed to amend.

2            Where do we go now?

3            MR. OPPENHEIM:  I think the next issue is the

4    statutory damages, instruction number 30.  And I think there

5    were a couple different issues here, Your Honor.

6            THE COURT:  Penalty and --

7            MR. ELKIN:  I'm sorry, Your Honor.  Can we just go

8    back?  Can we just hear the language on vicarious?  There's

9    some dissonance on our side of the aisle in terms of

18:46:47 10   understanding exactly what it is.  And I would appreciate it.

11           THE COURT:  All right.  So I've got vicarious

12   infringement, instruction 27, on page 32 of Sony's instruction.

13   That's where I am.  So tell me where you disagree with --

14           MR. ELKIN:  Well, they had in their -- if you skip

15   down to the third paragraph, they have "the right and the

16   ability to supervise such infringing activity."  And they --

17   it's the rest of that sentence --

18           THE COURT:  Oh, right.

19           MR. ELKIN:  -- that we have a problem with.  And I

18:47:23 20   think Your Honor at the last conference said you would not

21   include that.

22           THE COURT:  Yeah, that's pretty gratuitous, and I'm

23   going to strike that part.  Thank you.

24           MR. ELKIN:  Thank you, Your Honor.

25           MR. OPPENHEIM:  So I think the next issue, the next

2646

1    issue is the punishment issue, Your Honor.

2            THE COURT:  Yes.

3            MR. OPPENHEIM:  We've submitted -- I think we both

4    submitted bench memos on this, Your Honor.

5            On the issue of punishment, and I gave a brief

6    overview of this on Thursday evening --

7            THE COURT:  Yeah, I read your brief, so -- and the

8    cases.  So I'm on it.

9            MR. OPPENHEIM:  I'm sorry?

18:48:00 10          THE COURT:  I'll hear anything you want to say.  I

11   don't want you to go over what you argued in your brief.

12           MR. OPPENHEIM:  Right.  I won't -- I think, look,

13   Your Honor, the Supreme Court, First Circuit, Second Circuit,

14   Eighth Circuit, Ninth Circuit have all spoken to this, clearly,

15   and it's in there.

16           And in this context, you know, the way punishment

17   might be mete out is different than the way -- than deterrence

18   might be thought of by the jury.

19           And so, I think the jury should be allowed to

18:48:32 20   consider both.  And I think that's what the weight of the law

21   suggests the jury should consider.  I mean, I think the memos

22   speak at this at length.

23           I will say that with respect to the defendants' memo,

24   they cite to the Patry treatise.  The Patry treatise cites to

25   an 1899 Supreme Court case called <u>Brady versus Daly</u>.  Needless

2647

1   to say, that decision predated not only the '76 Act, but the

2   1909 Act, and really bears no relevance whatsoever to this.

3            So I think that what's been cited by defendants is

4   really not applicable.

5            MR. EATON:  Good evening, Your Honor.

6            I'm sure counsel just misspoke.  We have not

7   submitted a brief on this.  They handed us this this morning.

8   And I tried hard to turn one around by lunch, but I'm not quite

9   that good.

18:49:39 10            So if you will bear with me, I'll try and respond

11   orally.  And if you still have questions after, we will submit

12   one after, but I'll double-check if you still want us to do

13   that.

14            THE COURT:  Okay.

15            MR. EATON:  I think what you're thinking of is our

16   other brief had some stuff in it about this issue, but that was

17   the mitigation brief, which you filed a different brief on and

18   so did we.

19            MR. OPPENHEIM:  The mitigation brief addressed this

18:50:01 20   issue.  That's obviously what I intended.

21            THE COURT:  Yeah.  Go ahead, please.

22            MR. EATON:  So, Your Honor, a couple of things.

23            The language that they want to include is the need to

24   tell the jury that they can consider the need to punish Cox.

25   What they told you on Thursday was that they were going to come

2648

1    back over the weekend with authority that used that

2    instruction, but they didn't find any.  They don't cite a

3    single jury instruction in here that uses that language, and I

4    have never seen one.  That's kind of point one.

5            They also said -- you know, I had made the argument

6    previously that to the extent punishment is relevant here at

7    all, it is relevant to the issue of deterrence, which everyone

8    agrees is an appropriate consideration in this context.

9            And Mr. Oppenheim said, well, no deterrence and

18:50:46 10    punishment are completely different things.

11           If that's true, and I'm not so sure that it is, then

12    their reliance on the very important Supreme Court case of F.W.

13    Woolworth versus Contemporary Arts is not particularly

14    persuasive.  Because F.W. Woolworth, which is kind of the

15    fountainhead of this entire issue, says nothing at all about

16    punishment.  What it says is:  Statutory damages are designed

17    to compensate the rights holder and to discourage wrongful

18    conduct.

19           That's deterrence.  And deterrence and punishment

18:51:21 20    overlap to some extent, right?  I mean, you punish in order to

21    deter.

22           What you don't do, at least outside the criminal law,

23    is punish for the sake of punishment.  And I think if you look

24    at the case law as it evolved down the years, what you'll see

25    is that to the extent that there are cases that talk about

2649

1   punitive -- the punitive nature of this sanction, primarily

2   what they're saying is, you know, it's punitive in the sense

3   that it's intended to discourage wrongful conduct.  Which is

4   all that Supreme Court has authorized in this context.  None of

5   the other Supreme Court authorities that they rely on say

6   anything to the contrary.

7          There is -- oh, let me see.  Again, I had about two

8   hours to work on this.

9          You know, Superior Form Builders, which is a Fourth

18:52:05 10   Circuit case they rely on pretty heavily, is sort of notable

11   for improving an instruction that says nothing about

12   punishment.  It talks a little bit about culpability, but

13   that's not at all the same thing.

14          Sony BMG Music versus Tenenbaum, an important case

15   from the First Circuit, the First Circuit actually rejected the

16   district court's determination that the statutory damages award

17   should be largely -- sorry, am I talking too fast?  Forgive me.

18   It's a bad habit.  I will back up.

19          Sony BMG Entertainment versus Tenenbaum, First

18:52:32 20   Circuit, 2011, the Court in that case rejected the district

21   court's determination that statutory -- and I am quoting --

22   "that statutory damages awards should be treated largely as

23   punitive and not compensatory awards," ultimately holding that

24   statutory damages should not be treated as punitive for Seventh

25   Amendment purposes.

2650

1          On Davis versus The Gap, under the Second Circuit

2     cases they cite, was a case about actual damages, not statutory

3     damages.  So this sort of offhanded line that the Court

4     mentioned about statutory damages is dicta in the truest sense.

5          To the extent that -- I mean, it is absolutely true

6     that there are cases out there that use the word "punitive" in

7     the context of -- in this context.  I'm not aware of any of

8     them that say anything that would suggest that you should

9     consider punishment outside of its capacity to deter future

18:53:24 10   infringing conduct.

11          That's all the Supreme Court has ever authorized.  I

12     am not aware that the Fourth Circuit has authorized anything

13     beyond that, or any other circuit, in the way that they are

14     arguing it, at least.

15          Let me see if I have further points here.  You know,

16     and, of course, Your Honor, when they say, you know, "nearly

17     every court to consider the issue has recognized that statutory

18     damages serve a punitive function," they are forgetting that

19     this Court said explicitly in BMG that the Copyright Act

18:53:55 20   statutory damages are not penal.

21          So I think they have significantly mischaracterized

22     the law in this area.  I don't think that the copyright law has

23     evolved in this kind of manichaean way where we're trying to

24     punish wrongdoers rather than simply deter the wrongful conduct

25     that is occurring.

2651

1          I haven't seen any precedent for actually instructing

2    the jury to punish the defendant.  And we strongly object to

3    the inclusion of that language.

4          THE COURT:  All right.  Thank you.

5          MR. OPPENHEIM:  Your Honor, what counsel failed to

6    refer the Court to is the Feltner decision out of the Supreme

7    Court.  And the Feltner decision out of the Supreme Court says,

8    quote:  An award of statutory damages may serve purposes

9    traditionally associated with legal relief, such as

18:54:42 10   compensation and punishment.

11          As to the Tenenbaum case, Your Honor, the Court there

12   did include as a factor punishment.  I know, I litigated the

13   case.

14          So the picking and the choosing the issue of

15   punishment from the First Circuit as it related to a due

16   process challenge is inapt.

17          As for the fact that the argument that we didn't cite

18   to any jury instructions -- well, jury instructions are a

19   product of the case law.  And they should -- the jury

18:55:25 20   instructions, obviously -- and I am not telling you anything

21   Your Honor hasn't known for many, many years -- the jury

22   instructions should be built off of what the case law is.

23          And if the case law says, as we have cited and

24   believe it does say, that punishment is a factor, then

25   punishment should be included in the jury instructions.

2652

1          And the idea that punishment only exists in the law

2    in order to deter is just flat wrong.  There are times where --

3    that in order to punish somebody, you may level a much larger

4    or a much smaller award than what you would level when you're

5    trying to deter somebody.  They call for different things.

6          And culpability, the notion that culpability is not

7    related to punishment, is, I think, just wrong.  You only

8    punish those who are culpable.  That's why we consider

9    culpability, in order to punish them.

18:56:23 10        So I think that opposing counsel has not cited cases

11   I believe that go the other way.  I also think though, it's, I

12   will admit, somewhat of a difficult road to get there, the

13   Gonzalez decision out of the Fourth Circuit, which does talk

14   about punitive measures, does have some applicability here.

15   It's not in the context of the statutory damages regime, but it

16   does talk about the monetary assessments serving punitive

17   purposes.

18         So on that, I think we've presented to Your Honor

19   everything that is in our brief already.

18:57:01 20        THE COURT:  All right.  Well --

21         MR. EATON:  Your Honor, if I may.

22         THE COURT:  Yes, sir.

23         MR. EATON:  I will be quick.

24         THE COURT:  Yeah.

25         MR. EATON:  Your Honor, with respect to Feltner,

2653

1    forgive me for not mentioning it.  I thought it was so

2    unimportant that I had it in a footnote in my notes.  And the

3    reason for that is that it is not about this subject at all.

4        The question in that case was whether statutory

5    damages are a jury issue or a legal issue.  And it made a

6    comment about what the general rule of monetary damages is,

7    which it says can include both compensatory and punitive

8    features.

9        It doesn't say -- it is by no means authority for the

18:57:35 10   proposition that the Supreme Court has said that you're allowed

11   to tell juries that you can punish copyright defendants.  It's

12   nowhere close to that, Your Honor.

13       Let me think if there was something else I wanted to

14   get to.  Oh, Gonzalez, Your Honor, as counsel correctly points

15   out, is from universes away from this context.  It is an

16   immigration case involving a penalty.  It has no possible

17   bearing here.

18       That's all, Your Honor.

19       THE COURT:  Okay.  Thank you.  All right.  I will

18:58:00 20   look at the Feltner case.  I didn't give it in the BMG case.

21   And I am sure there was a good reason for that, but I forgot it

22   a long time ago.

23       MR. EATON:  Your Honor, forgive me.  Would you like

24   us to submit my two-thirds finished brief?  I can do it.

25       THE COURT:  Did you get the cases that Mr. Eaton

2654

1    cited, which is really all we need?

2           MR. EATON:  There is more than I said aloud.

3           THE COURT:  Well, I am sure you focused on the

4    important cases.

5           MR. EATON:  100 percent.

6           THE COURT:  I will give you -- why don't you just

7    give us the cases you relied on --

8           MR. EATON:  We will do that after.

9           THE COURT:  -- and we will take a look.  Thank you.

18:58:42 10           But if you, for the record purposes, want to submit a

11   brief, I certainly am not going to stop you from doing that.

12          MR. EATON:  Thank you, Your Honor.

13          MR. OPPENHEIM:  Your Honor, otherwise in all right.

14   30, there is also -- there was a discussion we had on Thursday

15   on --

16          THE COURT:  On the last paragraph?

17          MR. OPPENHEIM:  The last two paragraphs, I think.  I

18   think the last paragraph there shouldn't be any dispute about

19   that.  That is Woolworth.

18:59:17 20           The second-to-last paragraph, there was a discussion

21   about.

22          THE COURT:  "The effect the award may have on other

23   Internet service providers in the marketplace"?

24          MR. OPPENHEIM:  Yes, Your Honor.

25          THE COURT:  And have you thought about that?  Do you

2655

1    want to withdraw that sentence?

2            MR. OPPENHEIM:  I kind of like it, Your Honor.  And I

3    think I would like to have the Court deliver it.  I recognize

4    that you're laughing, Your Honor, so maybe I'm just going to

5    have to just lose this one gracefully.

6            THE COURT:  Yeah, I am going to cut that out.  I

7    mean, do you want to modify and say, "the effect the award may

8    have on Cox"?  Or do you want to leave it, "in considering what

9    amount would have a deterrent effect, you may consider Cox's

19:00:08 10   total profits"?

11           MR. OPPENHEIM:  It is certainly appropriate for the

12   jury in considering deterrence and punishment to consider Cox's

13   total profits.  And that is true.  And though I like the idea

14   of adding in "the effect the award may have on Cox," I think

15   even if you end it just at "profits," we could live with that,

16   Your Honor.

17           THE COURT:  Okay.

18           MR. EATON:  Sorry, I'm just trying to see what --

19   what was the idea that you just proposed?

19:00:49 20           THE COURT:  "The effect the award may have on Cox in

21   the marketplace."

22           MR. EATON:  We don't have objection to that, Your

23   Honor.

24           THE COURT:  All right.  I will give it that way.

25           MR. EATON:  On this one, there were -- their bench

2656

1    brief, I think, raised at least one other issue, which is the

2    total profits issue, which I didn't get a chance to do a bench

3    brief on in response.  We addressed this, to an extent, on

4    Thursday.

5              THE COURT:  Yeah, in terms of what entity --

6              MR. EATON:  Well, there is that issue, absolutely,

7    Your Honor.  We think to the extent that you give this

8    instruction, I think it's important that you tether it to the

9    entities that are actually accused of infringement and not the

10   wider conglomerates.

11             You know, we object to its inclusion in general

12   because the instruction as currently written already instructs

13   the jury to consider the profits that Cox earned due to the

14   infringement, which we think is the appropriate context for

15   considering that issue.

16             It is certainly true that if you jack the damages up

17   large enough, that will have a larger deterrent effect.  But

18   there has to be a limiting principle on that, Your Honor.  It

19   can't be true that the size of your company determines the

20   deterrent effect, the amount of deterrence for every action

21   that you take.  Right?  I mean, you can overdeter to a

22   substantial extent.

23             And to the extent that counsel is arguing that

24   statutory damages are punitive in nature, well, then it's

25   hornbook law that they absolutely must be proportional to the

2657

1    harm at issue.  You can't get away from that if it's a

2    punishment.  So we object to the inclusion of the total

3    profits.

4              Hold on a second, let me just make sure I'm done on

5    this issue.

6              THE COURT:  So the first bullet, "profits Cox earned

7    because of the infringement," that's what --

8              MR. EATON:  We're fine with that.  Yes.  It's the bit

9    later on on the second page of their instruction, "you may

19:02:36 10   consider Cox's total profits," was the part I was objecting to,

11   Your Honor.

12             And let me just --

13             THE COURT:  How would you --

14             MR. OPPENHEIM:  Maybe a clarifying statement helps on

15   this.  Counsel, you haven't necessarily been here for the proof

16   that's been presented.

17             I think the only proof of profits that's been put in

18   is with respect to the one entity that's in the case.  So I

19   don't know that there's going to be any confusion about other

19:03:02 20   entities' profits here.

21             MR. ELKIN:  That's not true at all.  They talked

22   about $20 billion in terms of the Cox family of companies.

23   That was elicited on --

24             THE COURT:  Bless you.

25             MR. ELKIN:  That was elicited --

2658

```
 1              THE COURT:  There were some big numbers floating
 2      around, but -- so how do you suggest we focus on Cox, on the
 3      plaintiff -- on the defendants in the case?
 4              MR. OPPENHEIM:  I believe --
 5              THE COURT:  Because that's --
 6              MR. OPPENHEIM:  The profits figure that was put in is
 7      the profits figure with respect to the defendant.  I think
 8      that's what's in evidence.
 9              Maybe there's some confusion over revenues issues,
19:03:46 10     but revenues aren't the issue here.  It's profits.  We're
11      not -- we're not suggesting that they should consider Cox's
12      revenues.  That's a much larger number.  Right?
13              THE COURT:  Understood.
14              MR. OPPENHEIM:  That's the 20 billion number.
15              THE COURT:  Okay.  All right.  And your objection,
16      Mr. Eaton, to that is --
17              MR. EATON:  Let me get to the podium.
18              Specifically -- I'm sorry, to clarify your question?
19              THE COURT:  I'm looking at the language, "in
19:04:15 20     considering what amount would have a deterrent effect, you may
21      consider Cox's -- defendant Cox's total profits."
22              And you object to that?  You know, it's late and I'm
23      old.  I'm missing --
24              MR. EATON:  Sure.  Understood.  We do, Your Honor,
25      for the simple reason that, as I explained, we think that the
```

2659

1    appropriate measure that the jury should consider is profits

2    attributable to the infringement, which the instruction already

3    deals with.

4         THE COURT:  Right.

5         MR. EATON:  Your Honor, our only other issue --

6         THE COURT:  You're not arguing -- are you arguing

7    that profits of the company should be considered?

8         MR. OPPENHEIM:  Absolutely they should be, yes, Your

9    Honor.

19:04:49 10       THE COURT:  Okay.  Understood.

11        MR. EATON:  Your Honor, we only had other on this

12   one.  Which is that their instruction, unlike ours, does not

13   include mitigation as a consideration.  There's obviously

14   reasons for that.  Mitigation has metastasized into a, into a

15   large issue again, but that's our -- so long as mitigation

16   remains in the case, which I believe it does, it's

17   appropriately considered here as it was in BMG.

18        THE COURT:  So in the BMG case I gave a mitigation

19   instruction.  It passed muster with -- in the Fourth Circuit it

19:05:19 20  may not have even been an issue that was raised because the

21   jury didn't find mitigation.  Or I don't know whether they did

22   or not because I didn't -- it wasn't in the jury instructions

23   themselves.  It was something the jury should consider.

24        And now Cox has it as a line item in, you know, how

25   much should your vicarious infringement award be reduced

2660

1    because of the failure to mitigate.

2             So what's your position now on that?  I'm inclined to

3    give -- I'm going to give a mitigation instruction, and I'm

4    inclined to give the one I gave previously.  I think it's a

5    fair instruction.  There's evidence of -- I mean, it's not the

6    most compelling argument I've heard in a long time.  Go ahead

7    and, you know, sue 10,000 subscribers.

8             But, okay, to the extent you want to make that

9    argument, do you think -- do you still believe that it should

19:06:28 10  be in the jury instruction as well?

11            MR. EATON:  You mean the verdict form as well, or do

12   you mean --

13            THE COURT:  I'm sorry.  The verdict form.

14            MR. EATON:  Yeah, yeah, just making sure.  Yes, Your

15   Honor, we do.  I mean, we think it's appropriately included

16   there just as -- just as willfulness is, for example.  Both of

17   those things are -- if they're in the case, are things that the

18   jury should consider and that may effect the award that they

19   give.  And if it's not put in the verdict form, it seems fairly

19:06:52 20  unlikely that they're going to find a way to consider it, even

21   if they're instructed on it.

22            So we do think it's appropriate there, and it is

23   sometimes given in that way, Your Honor.  So we do favor its

24   inclusion in the form.

25            I see Mr. Oppenheim has a comment.

2661

1          THE COURT:  He's patiently waiting.

2          MR. OPPENHEIM:  Yeah.  This one, Your Honor -- and,

3     respectfully, I understand you gave it in BMG.  Respectfully,

4     you were wrong.  I won't -- I'm not going to color it another

5     way.

6          It's hornbook law in copyright law that when you have

7     joint tort-feasors, joint infringers, as a copyright owner,

8     you're allowed to select who you want to sue.

9          THE COURT:  There's no question about that.  But why

19:07:32 10   is that -- why are the two, you know, mutually exclusive?

11          I mean, the jury heard testimony about Napster.

12     About Sony suing individual subscribers.  They stopped doing

13     it.  Whether it was a PR problem or a management problem,

14     they've heard all that testimony, right?

15          MR. OPPENHEIM:  They have.  But what the -- what the

16     defense seeks to do is have the jury consider as a factor who

17     we decided to sue here.  And that goes contrary to fundamental

18     hornbook copyright law.  We get to choose who we get to sue.

19     That's number one.

19:08:09 20          And the jury doesn't get to discount the fact that we

21     didn't sue one or the other.  We get to decide who we sue,

22     that's number one.

23          Two, that mitigation here is -- what they're trying

24     to do is say, we should -- we should have to sue -- in order to

25     recover our full damages, we should have had to have sued the

2662

1    direct infringers.

2           But if that's the case, then <u>Grokster</u> is wrong.

3    <u>Grokster</u> recognizes there are instances where it's just

4    impossible.  And there -- that's why you have second liability

5    claims.

6           I -- there are a lot of things that happen in the

7    course of a trial where we may somewhat disagree with the

8    Court, and at the end of the day, it's likely harmless error.

9           This is -- this is potentially reversible error, I

19:08:56 10  believe, Your Honor, because the law is so clear that we

11   don't -- A, that we don't have to sue the direct infringers.

12   We're allowed to choose Cox.

13          And, B, we're not allowed to essentially have that

14   thrown against us when we decide to sue Cox.  The courts want

15   to encourage the efficiency of us going after the larger

16   entity.

17          So those are the first two arguments.

18          The third is, mitigation isn't about whether or not

19   you're precluded, which is what the defendants have been

19:09:27 20  arguing.  Mitigation is about offsetting damages.  That's what

21   mitigation is.  And there's no argument here that we could have

22   offset damages.  And they haven't presented any evidence on

23   that, nor could they.

24          So they've presented it as an all-or-nothing

25   proposition.  And the jury shouldn't, shouldn't be looking at

2663

1    that.  There is no scenario where we could have offset our

2    damages.  We're the victim.

3              And what they're trying to do is say, because we

4    chose to sue them instead of the direct infringers, we should

5    be held responsible for that decision, and the jury should

6    consider that and potentially reduce the damages.

7              That's contrary to what the existing law is, Your

8    Honor.

9              I'm not done, Michael, sorry.

19:10:15 10              The defendants haven't cited a single case -- they

11    have not cited a single case for the proposition that failing

12    to sue a direct infringer is worthy of a mitigation defense.

13    Not a single one.

14              They try to distinguish the Tenth Circuit case that

15    is analogous.  Now, it's not a copyright case, but it's an

16    ERISA case where there was a similar statutory framework.  And

17    there the Tenth Circuit clearly enunciated there was no

18    requirement to sue the underlying entity and there's no

19    mitigation.

19:10:53 20              So I believe that if we go down this road, that we're

21    essentially holding a plaintiff to a standard that the Supreme

22    Court has said we shouldn't be held to.

23              THE COURT:  All right.  Thank you.

24              MR. ELKIN:  I know Your Honor has heard a lot about

25    Grokster.  Believe it or not, you may be surprised to hear me

2664

1    say this, this really is not Grokster.

2         This is a case where they have said, the plaintiffs

3    have said that Cox should terminate subscribers, this is action

4    that we should take.  And I get why they have made that

5    argument.

6         The jury has heard a lot of evidence.  The issue is,

7    in our view at least, what should we have done?  Should we have

8    terminated them?  If we should have terminated them, at what

9    point?  And if we didn't terminate them, the worst of the

10   worst, what, if anything, could they do about it.

11        Grokster was not about that.  Grokster was not about

12   an ISP network.  It was about a company that induced file

13   sharers who used to be on Napster to use this decentralized

14   peer-to-peer technology to infringe copyrights.

15        This is different.  This is a case directly against

16   the network itself and whether or not Cox should be responsible

17   for throwing -- or addressing specific subscribers.

18        So it's really -- it's a very different situation.

19   And maybe the jury will find at this point that we are making

20   relevant or not.

21        But the other thing I would say is that I could not

22   disagree more that mitigation is not applicable in copyright

23   infringement cases.  It's -- there's an issue, frankly, about

24   the extent to which you could use it perhaps for damages in

25   certain circuits.  I think the circuit -- we did find law, I

2665

1    think it's reflected in our line item in the jury verdict

2    sheet, whether Your Honor accepts it or not, that says that you

3    can consider mitigation for some or all of the -- of what

4    they're claiming here.

5           I know that we disagree.  I just wanted to get those

6    points out, and I appreciate Your Honor's patient.

7           THE COURT:  No.  Thank you.

8           MR. OPPENHEIM:  In Grokster, Your Honor, companies

9    created a network, and that network induced infringement.  And

19:13:45 10   so, in many respects it is analogous.

11          But the issue --

12          THE COURT:  Well, did the Grokster decision say that

13   mitigation is not relevant when a rights holder sues an ISP?

14          MR. OPPENHEIM:  No, Your Honor.  The way Grokster

15   went up, I know this, unfortunately, all too well, is that the

16   District Court had granted summary judgment to the

17   defendants --

18          THE COURT:  Non-infringing uses, all that.

19          MR. OPPENHEIM:  On the Sony Betamax argument.  The

19:14:25 20   Ninth Circuit affirmed that.  The Supreme Court reversed at the

21   summary judgment stage.  And in so doing, they made the

22   point -- and so, it's not that the question of whether

23   mitigation was an applicable affirmative defense, that didn't

24   go up to the Court.

25          THE COURT:  Right.

2666

1          MR. OPPENHEIM:  But the point that the Court made

2   still applies.  Which is that there are times where a copyright

3   owner brings a secondary liability claim, it's more efficient

4   and it's more appropriate.

5          And to suggest that there should be a mitigation

6   instruction to the jury would be to undermine the principle

7   that the Supreme Court articulated.

8          But I come back to, mitigation is an offsetting of

9   damages issue.  And what the defendants have presented is this

19:15:15 10  idea that because we sued Cox, that they shouldn't be held

11  liable because we chose not to sue the direct infringers.

12  That's what they've said.

13         I also can't let go, Mr. Elkin got up here and said

14  that we have brought a case based on the idea that Cox didn't

15  terminate.  That's not what our case is.  And it's not a proper

16  interpretation of our case.

17         I think when you come back to the fundamental notion

18  that copyright infringers are jointly and severally liable for

19  an infringement, right, Cox is arguably jointly and severally

19:15:54 20  liable with the direct infringers, that's the way the law would

21  play out.

22         THE COURT:  Well, that's why you have contributory

23  and various infringement instructions, right?  I mean, the jury

24  is going to understand that that's what they're asked to

25  decide.

2667

1          MR. OPPENHEIM:  In the context of traditional

2   copyright law, if you have two parties who jointly engage in

3   infringement and you sue one, and you get a verdict against

4   one, that one can seek contribution from the other.

5          But there is no law that suggests that this one can

6   say, because you chose not to sue this one, the jury gets to

7   consider a lesser damage award.  The defendants haven't cited

8   to any case law like that because I'm not aware that it exists.

9   But that's the principle that they're putting forward.

19:16:42 10          THE COURT:  Okay.  I'll look at Grokster, but I

11   really don't believe your argument is correct.  I mean, I

12   think -- and we'll look at it a little further, but I don't --

13   I think you can -- unless I'm convinced otherwise, I'm going to

14   give the mitigation instruction.  And I'm just not sure whether

15   I'm going to put it in the verdict form or not.

16          So what's your next one?

17          MR. OPPENHEIM:  I'm not sure there were any issues on

18   the willfulness instruction, which would be the last one, I

19   believe.

19:17:37 20          MR. ELKIN:  Your Honor, we -- I think we addressed

21   this at the last charging conference.

22          THE COURT:  Yeah.

23          MR. ELKIN:  We -- Your Honor gave the instruction

24   that was upheld by the Fourth Circuit.  We know that you're not

25   going to change that instruction.  We're just reserving in case

2668

1    it goes up, up, up.

2         THE COURT:  Okay.  All right.  So I am going to give

3    instruction 31 on willfulness as plaintiffs have proposed.

4         And, of course, your exceptions are noted.

5         All right.  Where else are we going?

6         MR. OPPENHEIM:  Your Honor, I think the remaining

7    issues are -- for us to address is the verdict form and the

8    length of the closing.  That's all I have left on my list, I

9    believe.

19:18:30 10        THE COURT:  So we talked about giving you an hour

11   each, and you thought that was a good idea.  You might -- you

12   were thinking about whether you needed a little extra time for

13   the rebuttal.

14        Where are you on length?

15        MR. OPPENHEIM:  I think we can do our initial opening

16   in the hour, but we would like 15 minutes for rebuttal, Your

17   Honor.  We're trying to narrow the issues, and maybe we don't

18   need all that time, but we think that that's, that would allow

19   us to present the evidence cleanly.

19:19:05 20        THE COURT:  All right.  I will give you that.

21        Verdict form.

22        MR. OPPENHEIM:  Verdict form.

23        THE COURT:  Incredibly, I've found it.

24        MR. OPPENHEIM:  So we did make some progress, Your

25   Honor, on the verdict form.  There still remain some disputes.

2669

 1          Should we hand up a copy of your redline just so the

 2   judge can follow this and we can identify the disputes?

 3          So, Your Honor, I think the first question was

 4   whether or not there needed to be a direct infringement

 5   instruction, and Cox now agrees to remove that.  So we're past

 6   that hurdle.

 7          THE COURT:  Okay.

 8          MR. OPPENHEIM:  With respect to the liability for

 9   contributory and vicarious infringement, we think that our

19:20:07 10   approach in our proposed verdict form is the better approach.

11   It is a cleaner, easier question to the jury.

12          We think that including "preponderance of the

13   evidence" and the language of "for direct infringement of it

14   subscribers" is unnecessary here.

15          We think that there is a lot of instructions that

16   you're going to give the jury, and to just call out those two

17   to put them in, I think just what we have proposed is, "is Cox

18   liable for contributory infringement of plaintiffs' copyrighted

19   works"?  Yes or no.  I think that's a simpler, easier question.

19:20:50 20          THE COURT:  I always give the burden in the verdict

21   forms as well.  It is -- is it repetitious?  Yes, but I think

22   it's important to have it on the verdict form.

23          So I would leave it in there.

24          MR. OPPENHEIM:  Okay.  But we would recommend, Your

25   Honor, taking out "for the direct infringement of its

2670

1  subscribers," because that's actually not even quite right.  It

2  may be on the subscribers' account.  I think that we should at

3  least limit it, end it after the word "liable."

4         I also on -- sorry, I want to go back to the

5  preponderance question, but -- which is the use of the word

6  "prove."  We would prefer to use the word -- because that's a

7  loaded term, did plaintiffs establish or demonstrate, either

8  one of those would be fine if we are going to include the

9  preponderance language.

19:21:52 10        THE COURT:  You want to use what word?

11        MR. OPPENHEIM:  Instead of "prove," use either

12  "establish" or "demonstrate," either of those.

13        THE COURT:  All right.  Well, you see greater import

14  to the word "prove" than I do.  But, all right --

15        MR. EATON:  Your Honor, can we respond?

16        THE COURT:  Yeah, I will give you an opportunity.  I

17  am just highlighting the fact that they are -- okay.  We're

18  in --

19        MR. OPPENHEIM:  So we would take "for the direct

19:22:26 20  infringement of its subscribers" out and just end it after the

21  word "liable."

22        THE COURT:  "Liable," right.

23        MR. OPPENHEIM:  And then whatever we do on

24  contributory, we can --

25        THE COURT:  Do the same.

2671

1          MR. OPPENHEIM:  -- do the same for vicarious.

2          For the third question, the number of works

3   infringed, we have a -- just kind of, I think, a cleaner

4   presentation of it, but I think ultimately we get to the same

5   place.  They have agreed to put the number of works in.

6          I think ours is just -- I don't know if you're

7   looking at both.  I think ours is just a cleaner presentation

8   of it for the jury.

9          Do you want me to keep going, Your Honor?

19:23:18 10          THE COURT:  So this is your joint revised verdict

11   form?

12          MR. OPPENHEIM:  No, no.

13          THE COURT:  No?  Okay.

14          MR. OPPENHEIM:  Plaintiffs still believe their

15   approach is the right approach.  We think this is a simple,

16   easy form for the jury to read and follow.

17          The way we have laid it out with the question and the

18   instruction in italics, "please proceed to this question," or

19   "please proceed to this question," is what we have found has

19:23:47 20   worked in the past to avoid confusion.  We like that approach.

21   We think it is less likely to confuse the jury.

22          The defendants, after our conference, agreed to

23   certain changes, and that's the redline that you have been

24   handed, but it is not precisely what we presented.

25          Do you have the plaintiffs' proposed verdict form, or

2672

1    should I hand it up?

2         THE COURT:  I have yours, yes, absolutely.

3         MR. OPPENHEIM:  Okay.  With respect to -- so we

4    obviously think there is no place for a mitigation instruction

5    here.  Especially, I mean, if Your Honor is going to giving it

6    in the context of a factor the jury can consider in damages,

7    that's one thing.

8         But here, the way it is proposed by the defendants,

9    is basically to take the case away from the jury on the ground

19:24:42 10   -- you know, and render a verdict on their behalf because there

11   is mitigation.  I think totally improper, Your Honor.

12        On willfulness, poetry is sometimes found in less

13   words.  And what we do is we say, "was Cox's conduct willful?

14   Yes or no."  We think that's the way to do this.

15        Having an instruction:  Willful Infringement Damages

16   Adjustment -- which is what the defendants suggested, it's not

17   even a -- I don't know what that is.

18        And then including the preponderance of the evidence

19   and the contributory or vicarious, it's just unnecessary.  I

19:25:25 20   think the very clean, simple question is the way to go here.

21        And if you were going to use what the defendants have

22   suggested, the title should come out.  And I see no reason to

23   have "contributory or vicarious infringement" in here again.

24        If you were going to have them, it wouldn't be "or,"

25   it would be "and/or."  It's just a lot of -- I think we got it

2673

1    down to four words, Your Honor.  I think that's the way to go.

2         THE COURT:  Okay.

3         MR. OPPENHEIM:  In terms of amount of damages, Your

4    Honor, and this is based off of experience, we've proposed the

5    boxes at the top, which tell the jury what the range is for

6    each of the willful or non-willful.  And that gives them

7    guideposts so that you avoid error.  Because the last thing in

8    the world we want to do is have a jury say, for instance, not

9    willful and then come back at 35,000.  And then we have got a

10   problem.

11        So we think this box helps to avoid that problem and

12   is the right way to go.  The defendants disagree with us.

13        But we do agree that, you know, a simple question of

14   amount per work, we don't disagree on that.

15        Then the disagreement we have after that is should

16   there be -- should we ask the jury to do the math or the

17   arithmetic.  Mr. Gould has told me we shouldn't ask people to

18   do arithmetic.  Sorry, Your Honor, he gave it to me.

19        No, I -- really, the problem here, and Mr. Elkin and

20   I just disagree on this, I think, again, it invites the

21   possibility of error because if the math doesn't match the

22   amount per work, then we have to send the jury -- we have to

23   catch it and send the jury back to fix it.

24        So our preference would be to leave it off.

25   Mr. Elkin will say, we could check the math and fix it --

2674

1          THE COURT:  They will have a calculator back there.

2     They're kind of standard equipment for a jury.

3          MR. OPPENHEIM:  I'm not going to die on my sword on

4     this one.  Just aware that if we do give the calculation before

5     we release the jury, we should all double-check the math before

6     we let them go.

7          THE COURT:  Understood.  Okay.  Mr. Eaton.

8          MR. EATON:  Your Honor, I will be brief, I think.

9          As counsel told you, we agreed to drop the direct

19:28:05  10     infringement instructions.

11          On the contributory and vicarious infringement

12     instructions, I think Mr. Oppenheim objects to the word

13     "prove."

14          Your Honor, we're in a court of law.  We don't ding

15     people for $2 billion in damages because -- by demonstrating

16     something.  They are proving their case.  That's the correct

17     word to use.

18          They will be instructed on what that means.  That

19     instruction will include a sentence saying that, you know, to

19:28:32  20     the extent you know something about beyond a reasonable doubt,

21     that doesn't apply here.  It's the appropriate word to use.

22          I think Your Honor already said you are going to give

23     the preponderance standard in the instruction, so I won't

24     bother with that.

25          Including the language, they want to strike the words

2675

1   "for the direct infringement of its subscribers."  We would

2   like to keep that, Your Honor, kind of as an exchange for

3   dropping the separate instruction on it.  We think it's

4   important that the jury understand that this is secondary

5   liability, and that there is an intermediate step that has to

6   be found first.  We think that that is appropriate.

7          That is essentially -- the same issues, essentially,

8   I think, are in place on both contributory and vicarious.

9          On the number of works, we agreed to include the

19:29:19 10   numbers in there at their request.  I think their only other

11   quibble with that is the repetition of the words "vicariously"

12   or "contributorily."  It doesn't strike me as being a terrible

13   burden on the jury to have to read those two words.

14          Mitigation, I think we have kind of talked to death,

15   Your Honor.  I am happy to address it if you would like, but I

16   suspect you wouldn't like.

17          THE COURT:  No.  No.

18          MR. EATON:  On willful, we don't -- we are not wedded

19   to the word "damages adjustment" at the end of the title.  We

19:29:46 20   are happy to take that out.

21          The rest of it, I think, Your Honor, it's consistent

22   with the way we have written all the other instructions.  It

23   has the preponderance standard in it.  It mentions what kind of

24   infringement is at issue.  That strikes us as being pretty

25   vanilla.

2676

1          And on the amount of damages, the -- for reasons that
2    I could probably go into at some length, we think that the
3    multiplication of the per work times the number of works is the
4    appropriate way to ensure, in fact, that the jury understands
5    what it is doing and does it correctly.  It is a simple
6    multiplication and it will correctly convey the magnitude of
7    the award.

8          If Your Honor doesn't have any questions, I will sit
9    down.

19:30:27 10          THE COURT:  So on willful infringement, Mr. Oppenheim
11    mentioned it should be "contributory and/or vicarious
12    infringement was willful."

13          MR. EATON:  Well, Your Honor, the grammar police
14    would tell me that you should never use "and/or" as a
15    construction, and that "or" is always suitable where "and/or"
16    is wanted.  And I will leave it at that.

17          THE COURT:  Okay.

18          MR. OPPENHEIM:  I think the grammar police would say
19    if you put in "or," you need to put in "or both," which makes
19:31:04 20    it even longer.  It's like four words.

21          MS. GOLINVEAUX:  Your Honor, I apologize, but
22    speaking of willfulness, we skipped over something in the jury
23    instructions, if I you could just briefly.

24          THE COURT:  Back to 31?

25          MS. GOLINVEAUX:  This is Sony's instruction number

2677

1    31, that's right.

2              THE COURT:  Okay.  I am with you.

3              MS. GOLINVEAUX:  So, Your Honor, their first

4    paragraph is, I believe, verbatim what you gave in the BMG

5    case, but you ended after the first paragraph.

6              They have added on this second paragraph, which we

7    think is more confusing than anything else.  So we would ask

8    Your Honor give the first paragraph like you did in BMG.

9              MR. ELKIN:  Your Honor, just one discrete issue on

19:31:49 10   the verdict sheet.  I think Mr. Eaton hit it, but -- and I

11   think Your Honor also commented on it as well.  We do think

12   having them total the damages is very important.

13             I don't like to bring personal problems into this

14   discussion, but I -- back in 2001 we had a two-and-a-half week

15   jury trial.  And over my objection, the District Court judge

16   took that out.  And the jury came back with an award that was

17   inconsistent with their -- what they had decided.  And the

18   judge had summoned each of the eight jurors back, and

19   ultimately had to declare a mistrial because they didn't do the

19:32:38 20  math.

21             And I pointed that out last night to Mr. Oppenheim,

22   and I can hand up a decision which recounts all of these facts.

23   But we would implore Your Honor to allow the jury to do the

24   addition.

25             The only question I have in terms of the closing

2678

1    tomorrow is that if Mr. Oppenheim is going to get 75 minutes,

2    60 and 15, I don't know that I need more than hour, but I

3    assume that since he has a total of 75, if I went over up to

4    75, that's --

5              THE COURT:  You're not --

6              MR. ELKIN:  -- not going to be a problem?

7              THE COURT:  It's going to be a problem.

8              MR. ELKIN:  Thank you, Your Honor.

9              THE COURT:  All right.  So willfulness, instruction

19:33:18 10   31.

11             MR. OPPENHEIM:  So, Your Honor, the reason we

12   included the second paragraph is it's an instruction that we've

13   had given before, is that it explains what the first paragraph

14   means.

15             It gives it some context.  Otherwise it's throwing up

16   words like reckless disregard and willful blindness without

17   giving any kind of exposition as to what they all are.  They

18   are instructions that we've had given before in copyright

19   cases.  So I think it's appropriate here.

19:33:51 20            If Your Honor is ready, I'll go back to the verdict

21   form on the few issues that remain.

22             THE COURT:  Yes, sir.  Go ahead.

23             MR. OPPENHEIM:  I'm happy to answer any questions you

24   have on the willfulness instruction.

25             THE COURT:  No, go ahead.

2679

```
 1              MR. OPPENHEIM:  Okay.  So I think that -- the problem
 2     with including the "for the direct infringement of its
 3     subscribers" in the contributory and vicarious instruction is
 4     that Cox is proposing to insert one of the elements of the
 5     claim into the instruction, but not all of the elements into
 6     the claim.
 7              You could say "knowing," you could say, you know,
 8     "material contribution."  Direct infringement is just one of
 9     the elements of the claim.
10              So I'm not sure why we would insert that particular
11     element unless we really are attempting to -- to skew what the
12     jury is doing.
13              And less is more for the jury.  When instructions are
14     cleaner and shorter, it's easier for them.  And I think that
15     that certainly is the case here.  Especially the language they
16     use, because it's not the necessarily the direct infringement
17     of its subscribers.  It could be the direct infringement of the
18     subscriber's family members, the end users.  The AUPs, which
19     we've heard way too much about, all say that the subscribers
20     are liable for the activities on their account, whether it's an
21     end user, it's a family member, it's anybody else.
22              So to put in here something that's contrary to
23     evidence that's been presented, I think would be misleading.  I
24     would just take it out.  I think that's the appropriate
25     approach on this.
```

2680

1          THE COURT:  Well, what do you without having any

2     instruction on direct infringement then?  It's in the general

3     instructions, of course.

4          MR. OPPENHEIM:  Right.  And it's an element of the

5     claim.  I mean, we don't have on the verdict form "material

6     contribution."  We don't have "financial benefit."  We don't

7     have "right or ability to supervise."  "And ability," "and

8     ability to supervise."  Right.

9          We haven't put in the elements in the verdict form.

19:35:59 10   And there's a reason we haven't, because that's not what you

11    do.

12          So I don't see why we would do it here.  Just because

13    Cox magnanimously agreed to remove an otherwise totally

14    inappropriate question on the verdict form, doesn't mean that

15    they can insert it down below.  It was inappropriate above and

16    it's inappropriate below.

17          Again, less is -- is more here, Your Honor.

18          THE COURT:  What if we put in "was contributorily

19    liable for infringement"?

19:36:32 20        MR. OPPENHEIM:  We could live with that as a

21    compromise, Your Honor.

22          THE COURT:  Mr. Eaton?

23          MR. EATON:  Your Honor, we would -- thank you.  We

24    prefer the language as we have proposed it.  As Your Honor will

25    recall, you gave a direct infringement instruction, a separate

2681

1    one, in <u>BMG</u>.  It is not a wildly inappropriate instruction to

2    give.  Nor is it an element of the claim.  It's a condition

3    precedent to bringing the claim.  It's a significant part of

4    what is being litigated in this case.

5           We think that to have a verdict form with no

6    reference to it would be misleading.

7           Oh, "and subscribers," Your Honor.  We also think is

8    an important point.  The subscribers are the only people who

9    are bound by the authorized -- is it authorized use policy?

19:37:20  10   Acceptable Use Policy.  So they are the relevant party here,

11   that's all we would submit.

12          THE COURT:  Go ahead.

13          MR. OPPENHEIM:  That is precisely the mischief that

14   we're worried about, Your Honor.  We don't want an argument on

15   closing that says, well, if it were end users and they were --

16   it was a commercial ISP, then you shouldn't hold Cox liable for

17   that.  That would be an approach that -- that would be an

18   approach that really would seek to do mischief.

19          And I don't believe that the instruction that you

19:37:50  20   gave in <u>BMG</u> said anything about subscribers, Your Honor.  I

21   think it talked about users of Cox's Internet service.

22          Anyway, we're fine with your proposed compromise,

23   Your Honor.

24          My last comment, "direct infringement" is an element

25   of the claim.  I don't know what "condition precedent" is.

2682

1   That's a contractual issue.  It's not -- it's not something

2   that exists in copyright law.

3          THE COURT:  Okay.  Okay, all right.  The verdict

4   form, I'm going to -- the requirement of direct infringement is

5   right in the instructions.  I'm just going to say, "did

6   plaintiff prove by a preponderance of the evidence that Cox was

7   contributorily liable for infringement," and make the same

8   change, do the numbers.

9          And we'll get you the rest shortly.  I want to look

19:39:15 10   at the case about the mitigation, whether to put it in the

11   verdict form or not.

12          And also give you the -- our decision on whether

13   we're going to allow separate awards for the music versus the

14   songs.  And we'll get that to you tonight.

15          MR. OPPENHEIM:  Great.  May I suggest a logistics

16   question, Your Honor?

17          THE COURT:  Yes.

18          MR. OPPENHEIM:  Just trying to figure out the timing

19   of tomorrow.

19:39:46 20          I assume we're not going to be in a situation where

21   we're going to have, for instance, plaintiffs deliver their

22   closing, and then go home for the evening and come back, and

23   have the defendants deliver their closing?

24          So at what point in the day do we say, we're going to

25   do it Wednesday morning?

2683

1          THE COURT:  I'm not going to send the jury home at

2     3 o'clock because I think they'll stay late and finish it up.

3          If we're at 4 o'clock and only one closing is going

4     to be possible, then we'll do it the following morning.

5          Or do you want me to give my instructions before or

6     after your closing arguments?

7          MR. OPPENHEIM:  In all candor, what I -- my true

8     preference, Your Honor, would be to give the instructions, and

9     then to do the closing first things Wednesday morning to allow

19:40:48 10   us to incorporate -- to make sure we get the law right in our

11    closings as you deliver it.  Make sure we have the verdict form

12    right.

13         THE COURT:  Yeah.  I have been giving the

14    instructions first just so they can be used if appropriate.

15    And I think it's helpful to the jury.

16         It's not -- I think -- and I'm not sure if there's

17    another judge that does it that way here in EDVA, but it's been

18    done differently, different ways.

19         Mr. Elkin, do you have a preference?

19:41:19 20   MR. ELKIN:  No, Your Honor.  We'll go with whatever

21    Your Honor's practice is.

22         I think the jury has been working very hard.  I don't

23    think we've had any delays at all.  And I certainly, if the

24    Court is willing and there's sufficient time to stay late and

25    just get it done, let them deliberate and finish this.  So

2684

1    that's my preference.

2          I sort of took what Your Honor said to heart on

3    Thursday night to confine the closing to an hour, or frankly

4    even less, but I think we should let the jury get to their

5    work.

6          THE COURT:  Yeah.  If we can do it, we'll finish it

7    up tomorrow evening, and keep them a little later, and they can

8    begin the deliberations.  And you all can check to make sure

9    that the exhibits that they're going to get are the correct

19:42:14 10  exhibits, and -- but let's see how the -- part of that will

11   depend on whether we focus on the important testimony and it

12   doesn't get strung out tomorrow.

13         All right.  Then, thank you.  We'll get you an answer

14   on this and put our instructions together.  We'll probably not

15   have that -- we'll get you the decisions you need, but maybe

16   not the final instructions until the morning or sometime

17   mid-morning.

18         All right, we're in recess.  Have a good evening.

19         MR. OPPENHEIM:  Thank you, Your Honor.

19:42:56 20  MR. ELKIN:  Thank you, Your Honor.

21         NOTE:  The December 16, 2019, portion of the case is

22   concluded.

23         ---------------------------------------------

24

25

2685

CERTIFICATE OF COURT REPORTERS


         We certify that the foregoing is a true and
    accurate transcription of our stenographic notes.



                    /s/  Norman B. Linnell
               Norman B. Linnell, RPR, CM, VCE, FCRR



                    /s/  Anneliese J. Thomson
               Anneliese J. Thomson, RDR, CRR