2686

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                               :
     -vs-                       :    Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                               :
-------------------------------:
```

<u>VOLUME  11  (A.M. Portion)</u>

TRIAL TRANSCRIPT

December 17, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2687

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                  SCOTT A. ZEBRAK, ESQ.
                                  JEFFREY M. GOULD, ESQ.
 4                                MICHAEL J. DRUCKMAN, ESQ.
                                  ANDREW L. GUERRA, ESQ.
 5                                LUCY G. NOYOLA, ESQ.
                                  JIA RYU, ESQ.
 6                                Oppenheim + Zebrak, LLP
                                  4530 Wisconsin Avenue, N.W.
 7                                5th Floor
                                  Washington, D.C. 20015
 8

 9   FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
                                  GEOFFREY P. EATON, ESQ.
10                                Winston & Strawn LLP
                                  1700 K Street, N.W.
11                                Washington, D.C. 20006-3817
                                    and
12                                SEAN R. ANDERSON, ESQ.
                                  MICHAEL S. ELKIN, ESQ.
13                                THOMAS P. LANE, ESQ.
                                  CESIE C. ALVAREZ, ESQ.
14                                Winston & Strawn LLP
                                  200 Park Avenue
15                                New York, NY 10166-4193
                                    and
16                                JENNIFER A. GOLINVEAUX, ESQ.
                                  THOMAS J. KEARNEY, ESQ.
17                                Winston & Strawn LLP
                                  101 California Street, 35th Floor
18                                San Francisco, CA 94111-5840
                                    and
19                                MICHAEL L. BRODY, ESQ.
                                  Winston & Strawn LLP
20                                35 West Wacker Drive
                                  Chicago, IL 60601
21                                  and
                                  DIANA HUGHES LEIDEN, ESQ.
22                                Winston & Strawn LLP
                                  333 South Grand Avenue
23                                Suite 3800
                                  Los Angeles, CA
24

25
```

2688

<u>INDEX</u>

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| SANFORD MENCHER | | |
| | DIRECT | 2715 |
| | CROSS | 2737 |
| CHRISTIAN D. TREGILLIS | | |
| | DIRECT | 2766 |
| | CROSS | 2825 |

2689

```
 1                    P R O C E E D I N G S

 2               NOTE:  The December 17, 2019, morning portion of the

 3      case begins in the absence of the jury as follows:

 4      JURY OUT

 5               THE COURT:  All right, good morning.  I see all

 6      counsel are here.  Good morning to everyone.

 7               We have some preliminary matters, Mr. Buchanan?

 8               MR. BUCHANAN:  Yes, Your Honor.

 9               THE COURT:  We --
```
09:06:45
```
10               MR. BUCHANAN:  Cox would like to move into evidence

11      DX 96, which was introduced during the video testimony of

12      Mr. Paszkowski.

13               THE COURT:  Okay.

14               MR. BUCHANAN:  I don't think there's any objection.

15               THE COURT:  Any objection?  All right.  It's

16      received.

17               MR. OPPENHEIM:  Well, I don't know.  This wasn't

18      raised with us beforehand, so -- but we'll take a look at it,

19      Your Honor.

20               THE COURT:  Okay.

21               MR. BUCHANAN:  I mean -- okay.  Go ahead.

22               MS. LEIDEN:  This was actually addressed through

23      e-mail negotiations prior to the video being shown, and I gave

24      plaintiffs' counsel notice about exhibit a couple of times last

25      week, including --
```

2690

1            MR. GOULD:  No objection, Your Honor.

2            MS. LEIDEN:  Okay.  Thank you.

3            THE COURT:  All right.  96 is received.

4            MR. GOULD:  Wanted to double-check.

5            MR. BUCHANAN:  And, Your Honor, yesterday with regard

6    to the copyright registrations, the Court admitted them subject

7    to the plaintiffs reviewing the list, and I assume they've done

8    that.  So we would move into evidence PX 612 to PX 8478, the

9    electronic version of those copyright registrations and

09:08:03 10    lookups.

11            THE COURT:  All right.  Any objection?

12            MR. OPPENHEIM:  Yes, Your Honor.

13            THE COURT:  Okay.

14            MR. OPPENHEIM:  Your Honor, yesterday when the issue

15    came up, and I asked what they were actually seeking to admit,

16    Ms. Leiden indicated to the Court and us that they were seeking

17    to admit DX 3758.  I don't know -- to this day, I still don't

18    know what DX 3758 was.

19            Ms. Golinveaux came up to us yesterday afternoon and

09:08:34 20    said, no, no, no, that's not what we're trying to admit.  We're

21    trying to admit PX 612 to 8478.  So it seems to be a

22    back-and-forth here.

23            Now, we have not reviewed in great detail the

24    7,200-plus documents that that includes.  It does, however,

25    include registrations for works that aren't even in the case.

2691

1    It -- it's -- it is -- this is why -- I mean, the plaintiffs

2    would never have proceeded -- we put it on our list initially

3    out of an abundance of caution.  We would have cleaned it up

4    before trial, and that's what we did.  Now we've got this

5    wholesale effort to just throw everything against the wall and

6    admit it, and I think it's improper.

7         Also, by the way, none of these exhibits have ever

8    been marked, so I don't know what's on the hard drive.  What --

9    we had them on a list, but we don't actually have hard copies.

09:09:31 10  We have no idea that what we're talking about is 347 -- 612 to

11   8478 is what they're talking about.  So we would object, Your

12   Honor.  This is improper.

13        THE COURT:  Where did it come from?  It came from --

14   Sony produced the registrations, and how would it be --

15        MR. OPPENHEIM:  So --

16        THE COURT:  -- that they don't include registrations

17   for songs or music that aren't at issue in the case?

18        MR. OPPENHEIM:  During the course of the case, we did

19   a very large production.  As Your Honor is well aware, that

09:10:04 20  production often included works that we ended up not proceeding

21   on.  And, you know, sometimes you produce things out of an

22   abundance of caution because you don't know where things are

23   going, and from our perspective, we'd rather overproduce than

24   underproduce.

25        When we put these on our initial exhibit list, we

2692

1    didn't go through them and say, do we have absolutely every

2    registration that corresponds to the works in suit?  We put

3    the -- we put a list out so that we had a placeholder because

4    we didn't want, if we needed them, for anybody to come back

5    later and say, you didn't put them on.

6              We've not had an opportunity to go through and figure

7    out of these 7,200-plus exhibits that they propose putting

8    on -- putting into evidence, how they match up.  We don't know

9    that it includes everything, but we do know that it includes

09:10:58 10  more than it needs to.

11             This is -- you know, I recognize I made this argument

12   yesterday and I lost, but I'll make it again because I think

13   it's the right argument, which is the defendants should have --

14   if they wanted to put this in evidence, they should have had it

15   on their exhibit list, and they didn't.  They didn't produce --

16   they didn't put it in.  They haven't established any foundation

17   for it.  There is no basis for these registrations to go in,

18   Your Honor.

19             And when we get to the next issue, Your Honor, which

09:11:31 20  is the issue of Mr. Tregillis's ever-evolving analysis in

21   slides, which have changed now, I think, three times since,

22   since we initially discussed it, it just -- it further

23   demonstrates that this is a last-minute effort and this is

24   exactly what isn't supposed to happen at trials, Your Honor.

25             THE COURT:  But what is the -- are registrations of

2693

1  the accused infringing works already in evidence?

2            MR. OPPENHEIM:  No.

3            THE COURT:  They're --

4            MR. OPPENHEIM:  No.

5            THE COURT:  They're -- I mean, what relevance do they

6  have?  I'm just seeking where -- just trying to understand --

7            MR. OPPENHEIM:  The Court already determined -- I'm

8  telling you what you did.

9            THE COURT:  Yeah.  No --

09:12:20 10           MR. OPPENHEIM:  That the works in the case, the

11 10,017 works in the case are owned by the plaintiffs and

12 properly registered.

13           THE COURT:  All right.

14           MR. OPPENHEIM:  That doesn't mean that the

15 registrations have been admitted, and, in fact, there's no

16 reason to admit them.  That's why we took them -- took off the

17 list everything that could possibly have been a registration.

18           So now the defendants want to find a way of throwing

19 this evidence in at the last minute, without a single witness

09:12:47 20 to testify about it, without having reviewed these to make sure

21 that it is -- that it is -- addresses the specific works in

22 suit, and haven't set forth how the jury could possibly use

23 this.  This is really -- this whole last-minute thing is

24 intended to confuse not only the jury but the rest of us.

25           And if I can turn to the Tregillis slides, because it

2694

1     all goes hand in hand.

2            THE COURT:  Yeah, go ahead.

3            MR. OPPENHEIM:  So yesterday I asked the Court for an

4     opportunity to review and consider the slides in a little more

5     detail, and as I promised, my colleagues, who are a lot smarter

6     than I am, took a look at them and said this doesn't make a lot

7     of sense.

8            And sure enough, the defendants, they're trying to

9     fix their mistakes.  As of 9:30 last night, they send us a

09:13:45  10     revised version of the slides with different numbers than were

11    in the original version.  And then this morning, I got handed

12    yet additional slides, which have yet other numbers.

13           This just demonstrates, Your Honor, this was never an

14    analysis that was previously done by Mr. Tregillis.  This is an

15    analysis that is being done on the last day of a trial, and

16    this is exactly what isn't supposed to happen here.

17           THE COURT:  So what is it that you think --

18           MR. OPPENHEIM:  Oh, Mr. Tregillis should be excused.

19    I'm sorry, Your Honor.

09:14:16  20        THE COURT:  Mr. Tregillis, please wait outside.

21    Thank you, sir.

22           MR. TREGILLIS:  Sure.  Thank you.

23           NOTE:  Mr. Tregillis left the courtroom.

24           THE COURT:  So I looked -- I had a chance to look at

25    it last night as well, and Mr. Tregillis in his opening report

1    references the copyrights and the tracks and, slash, songs, and

2    has Schedule 6, which identifies the songs and the music and

3    the overlap of which ones -- which accused songs and music

4    overlap, right?  So that's in this Schedule 6.

5         MR. OPPENHEIM:  I believe if you look at the bottom

6    of that Schedule 6, Your Honor, the -- it references 2,000 or

7    2,200 works.

8         THE COURT:  Right.

9         MR. OPPENHEIM:  I'm just pulling it up here, which is

09:15:22  10    clearly -- that was -- I don't know where he came up with that

11    number, but that's never been a number in this case.

12         THE COURT:  Right.

13         MR. OPPENHEIM:  So there was no way we could look at

14    this and say, boy, he's done an analysis as to all the works in

15    suit, the 10,017.

16         THE COURT:  So he can't use this to come up with the

17    numbers of songs and music compositions which have -- which are

18    together in one --

19         MR. OPPENHEIM:  -- SR.

09:16:02  20         THE COURT:  Where the song and the composition are

21    included in the infringing work.

22         MR. OPPENHEIM:  I believe that what -- when he's

23    asked, what he will say is that he looked at some version of

24    PX 1 and PX 2, which is -- has been put before the jury so they

25    can see the works in suit.

2696

1           THE COURT:  All right.

2           MR. OPPENHEIM:  He's not looked, as far as I know,

3    and if he has, it's certainly not in his report, looked at a

4    single underlying copyright registration.  He's not looked at

5    whether or not there are multiple registrations for a

6    particular work, which happens all the time.

7           And we've produced in the discovery instances where

8    an album may have been registered and the individual track may

9    have been registered, which is entirely proper and the

09:16:52 10   copyright office allows.  And so he's not looked at any of

11   that.  All he's done is said, okay, I'm going to scan down

12   PX 1, and I'm going to look at the -- and I'm assuming this is

13   what he's going to say:  I'm looking at the SRs listed.

14          Those SRs listed there do not purport to be the

15   universe of SRs that are relevant to the registrations in the

16   case.  Those were marked and identified and admitted based on

17   the plaintiffs' testimony that those are the works in suit, and

18   not with reference to the registrations.  Benefit of hindsight,

19   we probably shouldn't have included the registration numbers on

09:17:34 20   there, but they -- nobody has purported that that's the entire

21   universe of registrations for those works.

22          So now he wants to do an analysis that he didn't do

23   before which doesn't look at the underlying registrations.

24   Now, if he gets up and says, I have, well, how does a forensic

25   accountant who's never looked at a copyright registration in

2697

1    his life have any expertise to do that analysis?

2           So that's the problem with page 13.  There are

3    further problems with page 21.

4           THE COURT:  So --

5           MR. OPPENHEIM:  I'm sorry.

6           THE COURT:  What's the problem with 13?  He can't add

7    up the number of sound recordings and music compositions, or he

8    can't identify which ones have one track and which ones have

9    multiple tracks?

09:18:19  10        MR. OPPENHEIM:  So he's purporting to do a 1006

11   summary, I think, I think.  But in order to do that, he has

12   to -- he has to know what he's summarizing, what it

13   constitutes.  What he's summarizing is simply plaintiffs'

14   exhibit of the works in suit, not the registration information.

15          Plaintiffs have never contended and never admitted

16   PX 1 with respect to that issue, but that's the only thing he's

17   looking at in that exhibit.  He has not looked at the

18   underlying registration, so he can't do that analysis.

19          So, yeah, we have no -- sorry, to be clear, we have

09:18:58  20   no objection to the top of this.  That's not a problem.  Our

21   only objection is the reference on the bottom of the page,

22   which refers to 664 SRs with one track -- and by the way, the

23   word "track" doesn't appear anyone on PX 1 -- and 789 SRs with

24   multiple tracks.

25          THE COURT:  Does he equate tracks with songs?  It

2698

1    seems in -- there's a reference in his opening report where he

2    says "tracks" and then has "(songs)."

3              MR. OPPENHEIM:  I presume that's what he's doing.

4              THE COURT:  Right.

5              MR. OPPENHEIM:  But again, Your Honor, what he's

6    purporting to do is do an analysis of PX 1.  While

7    Mr. Tregillis may have many talents and expertises, copyright

8    registrations is not one of them, and doing this -- this is not

9    how defendants get to do this.  If defendants wanted to put an

09:19:55  10  expert up on this, they could have.  If defendants wanted to

11   cross-examine plaintiffs' witnesses, they could have.  Using

12   Mr. Tregillis at the last minute when it's not in his expert

13   report, it wasn't part of his deposition, is outside the

14   bounds.

15             And what -- one of the things that Your Honor has

16   said -- one of the things that Your Honor has said is that

17   these trials are not supposed to be about ambush, which is why

18   you asked that we exchange exhibits in advance in binders, but

19   that's exactly what this is.  Plaintiffs are supposed to

09:20:28  20  have --

21             THE COURT:  Okay.  Let's go to 21, 22, 23.

22             MR. OPPENHEIM:  So with respect to 21, the question

23   is which version of 21 we should look at, the first version or

24   the second version.  So the first version, Your Honor, I

25   believe --

2699

1             THE COURT:  I just have what you passed up to me or

2    somebody passed up to me yesterday.

3             MR. OPPENHEIM:  Yesterday.  So that, I believe, on

4    the bottom of the page, on page 21, lists 4,324 --

5             THE COURT:  Right.

6             MR. OPPENHEIM:  -- only SR, right?

7             And the new version that we were handed -- given at

8    9:30 last night says 4,322.  And then on the SR and MC, the

9    first version said 2,409, and this version says -- the new

09:21:18 10   version says 2,412.  And then the final, and then the final

11   number about only musical composition, the first version said

12   871.  This version says 874.

13            I don't know, Your Honor, how anything could be more

14   evident that this analysis is still going on after, you know,

15   as of 9:30 last night.

16            THE COURT:  What, what do you object to in 21, 22,

17   and 23?  Everything below the number of recordings and

18   compositions?

19            MR. OPPENHEIM:  Yes, Your Honor.

09:21:52 20   THE COURT:  And is any of this in his report, any of

21   his reports?  And does he do the analysis of 32 percent of the

22   tracks are both SR and MC and -- I mean, Mr. Buchanan said

23   yesterday it's just doing the math, and evidently you're

24   telling me that this exhibit to his report, which contains

25   2,222 sound recordings and 1,195 isn't the exhibit, that he

2700

1    would have to have gone back to PX 1 and 2; is that right?

2            MR. OPPENHEIM:  Yeah, I don't know where he did this.

3    The sole reference that Cox has given us for this in his expert

4    report is the same Schedule 6, which doesn't do this.  So I

5    have no idea where this comes from, you know.

6            THE COURT:  Did he ever -- you know, was there any

7    evidence that he had analyzed a proper royalty rate for those

8    works which contained both an SR and an MC?

9            MR. OPPENHEIM:  As I understand it, his royalty

09:23:12  10    analysis just presumed that the works were in the case, and he

11    just, he just accepted all of them for purposes of his royalty

12    analysis.  That's now changing because he's, he's now changed

13    his analysis, because his initial analysis was I'm just going

14    to accept that everything is in and do my analysis.

15            THE COURT:  All right.

16            MR. OPPENHEIM:  There are other flaws with that, but

17    leave that for cross-examination.  But this, there's nothing

18    about this in his report.

19            And just so Your Honor doesn't think that we're done,

09:23:44  20    this morning we got handed two entirely new slides, which we've

21    never seen before, which purport to summarize this even

22    further.  I apologize -- oh, here we go.

23            So these slides aren't numbered.  I don't know if

24    counsel for Cox has a copy for the judge.

25            I'll just say while you're turning to the last two

2701

1    pages, Your Honor, the purpose of our pushing Mr. Tregillis

2    until today was not to give Cox an opportunity to change the

3    analysis and do more analysis.  The purpose was to give

4    plaintiffs an opportunity to take a look at what they had

5    already said they had done.

6            So these two new slides, you know, what I think

7    they're purporting to do is just they're going to say it's just

8    arithmetic, but those numbers, when you look at the first of

9    the two last -- I guess the second-to-the-last slide, which

09:24:57  10   starts with total number of works in suit, Your Honor, so they

11   start with 10,016.

12           Everybody in this courtroom by now knows it's 10,017,

13   so I have no idea where the 16 comes from.  Now, maybe they

14   say, oh, it was another math error, but just to our point.

15           And then the 2,408 number, which is the number of SRs

16   for which the PAs are in suit, that's not the same number

17   that's on slide 21.  Slide 21 has 2,412.  So I don't know where

18   2,408 comes from.  That's new.

19           When you go into the last slide, again, they're going

09:25:40  20   to say, well, this is just math, but, but this purports -- I

21   mean, this reads like adjusting for compilations.  Where is the

22   word "compilations" in anything he looked at?

23           There's nothing he looked at that talks about

24   compilations, as far as I can tell, unless they're going to get

25   up and say he's now reviewed all the registrations, and I come

2702

1   back to the same point.  He has no expertise to have done that,

2   and he didn't do it, and it's not in his report.  So --

3            THE COURT:  Okay.  Got it.

4            MR. OPPENHEIM:  -- I think there are serious problems

5   here, Your Honor.

6            THE COURT:  All right.  Thank you.

7            MR. OPPENHEIM:  One more minute.  Sorry, Your Honor.

8            I think last but not least, apart from this all being

9   new and the plaintiffs not having an opportunity to examine it

09:26:31 10   and that there's no real appropriate opinion here, the jury is

11   going to just be horribly confused by all of this.  It has not

12   been anywhere in the case to date, and on literally the last

13   day of trial, to try to throw this in, it just -- it reeks of

14   trying to sabotage the case.

15            THE COURT:  All right.  Thank you.

16            MR. BUCHANAN:  I didn't really consider that these

17   computations were sabotage, but in any event, Your Honor, with

18   regard to the copyright registrations, we can start there, the

19   Court admitted those yesterday, subject to them reviewing them.

09:27:24 20            And just so the Court knows, they know what the

21   copyright registrations are.  They are referenced in -- with

22   regard to the -- they're referenced in the complaint, and

23   they're also part of their summary judgment motion.  There's

24   six affidavits, one from each corporate representative,

25   attesting to all those.  They're all referenced.

2703

1          THE COURT:  But they're not the same registrations,

2     right?  This is a much larger set.  Some are relevant, some are

3     irrelevant, and nobody's evidently gone through them, and

4     they've never been analyzed, and they can't be reviewed by the

5     jury.

6          What, what is the value, what's the relevance for

7     putting these registrations in?

8          MR. BUCHANAN:  Well, first of all, just so -- we gave

9     them the list that we're talking about over the weekend, and we

09:28:17  10  discussed it.  So they can easily determine, you know, which

11    ones they don't want and which ones they do.  Obviously, the

12    copyright registrations is a jurisdictional issue.  They can't

13    bring the case.  They then used those copyright registrations

14    to get summary judgment.

15         THE COURT:  Right.

16         MR. BUCHANAN:  We listed the sound recordings

17    registrations as an exhibit, and we had a savings clause as to

18    the others.  We also had a clause that said -- actually we

19    identified all pleadings in the case as potential -- as

09:28:46  20  exhibits.

21         So in contrast to what plaintiffs' counsel said, we

22    identified the sound recordings as exhibits, we saved the rest,

23    and we also identified the pleadings, and all this was attached

24    to the pleadings.

25         And it's relevant.  It goes to the statutory damages

2704

1    issue, the 504 issue, and it goes to the whole, you know, their

2    case.  This is, in essence, their case.

3             They used them to get summary judgment, so they --

4    and the Court basically admitted them at that point.

5             THE COURT:  Yeah, my question was I didn't use 7,200.

6    They identified the fact they had registrations for X number of

7    works and -- but I'm trying to figure out what is the relevance

8    of the --

9             MR. BUCHANAN:  Well, the idea is it's not an exact

09:29:32 10  science, and, in fact, if there's more in there, it's not

11   impacting their case.  It's just creating a record.

12            THE COURT:  What are you going to do with this, or is

13   this just putting it in in case you need it down the road?

14            MR. BUCHANAN:  Yes.  Sure.

15            THE COURT:  Okay.  So this isn't subject to

16   Tregillis's testimony, or it's not going to be part of your

17   defense in closing argument to ask the jury to look at this --

18   these exhibits.

19            MR. BUCHANAN:  We're not going to point to the,

09:30:00 20  the -- we're not going to play the, the hard drive or, you

21   know, it's just -- it's important for the record that we have

22   this in there for our case, and that's why we want it in.  We

23   think it should be in.

24            We're not going to make use -- there's no surprise

25   here.  I mean, we asked them to stipulate to this a long time

2705

1   ago.  So there's been discussions forever about these exhibits,

2   and they've used them to their advantage to get summary

3   judgment.

4          So we think, you know, if they're out of the case,

5   then we should remove them from the summary judgment, and then

6   we don't have proof of ownership.

7          THE COURT:  Okay.  All right.  The registrations will

8   be received.

9          MR. OPPENHEIM:  Your Honor, may I just quickly

09:30:36 10   respond to that one point?  I understand where you're going,

11   Your Honor.

12          THE COURT:  Go ahead.

13          MR. BUCHANAN:  Judge --

14          THE COURT:  Hold on.  Let him finish this topic.

15          Go ahead, Mr. Oppenheim.

16          MR. OPPENHEIM:  So first of all, the idea that, that

17   the defendants can tell the plaintiffs over the weekend, here

18   are 72 exhibits, you have to go figure out which ones should be

19   in and which ones should be out, is ludicrous.  And it's not a

09:31:01 20   standing issue.

21          THE COURT:  All right.  I'm done.

22          MR. OPPENHEIM:  One last comment on this?  To the

23   extent that all they're trying to do with them is preserve

24   issues on appeal, they don't need them because the grant of the

25   summary judgment on ownership preserves that issue in its

2706

1    entirety for them.

2             THE COURT:  Well, I mean, if they argue that there

3    were no registrations and I made an error, that there were

4    registrations for this song or that song, I'm not sure that

5    that's preserved, but is it not relevant for that purpose?

6             MR. OPPENHEIM:  I, I would think that -- so a denial

7    of summary judgment is not preserved, but the grant of summary

8    judgment is always preserved.

9             THE COURT:  All right.

09:31:43 10         MR. OPPENHEIM:  And so they can always attack that

11    decision on -- not only on appeal but posttrial.  So, so --

12             THE COURT:  And are the registrations relevant to

13    that?

14             MR. OPPENHEIM:  The registrations were submitted for

15    that.  Your Honor had findings on that.  And we have no dispute

16    with that summary judgment decision and everything under that

17    summary judgment decision being something that the defendants

18    can rely on for purposes of posttrial motions and for appeal,

19    but that's very different than them being able to use it -- use

09:32:13 20    them with Mr. Tregillis to argue about them in closing.

21             THE COURT:  They just said they're not using it.

22    It's merely for record purposes.  That's, that's what I heard

23    Mr. Buchanan just say.

24             MR. OPPENHEIM:  Yeah.  My, my fear is, Your Honor, is

25    I don't want later, whether it be before Your Honor, who will

2707

1  know the record, or the Fourth Circuit, there to be some

2  argument, well, look at these 7,200.  They don't necessarily

3  include everything.  And -- because we haven't had an

4  opportunity to go through them.

5           To the extent that they need to preserve issues

6  posttrial or appeal, the summary judgment decision, Your Honor,

7  does that.  So I don't think we need to admit them for that

8  purpose.

9           THE COURT:  All right.  So I'm going to admit them

09:32:56 10  provisionally, and they're not going to be used in any further

11  testimony during this trial.  I'll give Sony an opportunity to

12  actually look at what's in there and file any supplemental

13  pleading that they think is appropriate.

14           But I think they're relevant.  We looked at a portion

15  of them, I'm not sure which ones, and in determining the

16  summary judgment, they aren't -- you know, that issue's been

17  resolved.  It's not a jury issue, but it's not irrelevant, and

18  so that's my ruling.

19           All right.  Mr. Buchanan?

09:33:47 20           MR. BUCHANAN:  On the, on the slides --

21           THE COURT:  Yeah.  Go ahead.

22           MR. BUCHANAN:  I'm sorry.  Do you need to address

23  that?

24           THE COURT:  Well, what exhibits are we talking about

25  now, 612 through 648?  Is that -- yeah, the DX 3758 is no

2708

1    longer in?

2              MR. BUCHANAN:  PX 612 through PX 8478.

3              THE COURT:  8478, okay.  And they're all -- they're

4    all digital?

5              MR. BUCHANAN:  Yes, Your Honor.

6              MR. OPPENHEIM:  I don't believe they've been marked,

7    Your Honor.

8              THE COURT:  Okay.

9              MR. BUCHANAN:  We'll confirm that, Your Honor.

09:34:36 10              THE COURT:  Okay.

11              MR. BUCHANAN:  On the slides, I mean, we went over

12   this yesterday, and we heard the same argument.

13              THE COURT:  Yeah, but I had a chance to look at the

14   Tregillis reports and the deposition, and where is any of this?

15   Is any of it --

16              MR. BUCHANAN:  So actually, I passed you -- I gave

17   you those passages from the reports.

18              THE COURT:  And it's not there.

19              MR. BUCHANAN:  Well, if you looked at -- if you

09:35:02 20   looked at those charts, he calculates those that are musical

21   composition, those that are sound recording, and those that

22   are, you know, separate and distinct.  So in some cases, you

23   have both a sound recording and musical composition.  Sometimes

24   you have a sound recording.  Sometimes you have a musical

25   composition.

2709

1            And in those pages I gave you, Your Honor, that's

2      what -- that's what he was doing, and if you looked at the

3      columns, you could see how he did that, and those were examples

4      that he went through, and that's all he's doing here.

5            I mean, the, the plaintiffs are making this out to be

6      some, you know, rocket science, and it's just simply we know

7      for a fact how many sound recordings we have, we know how many

8      musical compositions, and sometimes we have both and sometimes

9      we have them individually, and he's pricing them.  So one is 10

09:35:57 10   cents, one is 90 cents.  Okay?

11            So the pricing for these, according to the

12      plaintiffs' own testimony, you know, when they look at these to

13      price them, like, from iTunes -- and that's what he does.  If

14      you see in his demonstratives, he says, it's 10 cents here, 90

15      cents here, and I've given a dollar for everything.  So this

16      notion that he didn't do this in his report, he does.

17            And by the way, the Schedule 6, he updated it all

18      along.  So they referred to the initial Schedule 6.  He's

19      updated that.

09:36:31 20            THE COURT:  Well, that's -- the only one I have is

21      the one with the 2,222 -- but maybe I didn't look at the right

22      one, either.  What is -- those figures in that exhibit conform,

23      some- --

24            MR. BUCHANAN:  There's no dispute that these are

25      accurate.  I mean, in other words, they're not saying, look,

2710

1    these are inaccurate.

2              THE COURT:  The numbers are accurate.

3              MR. BUCHANAN:  Yeah.  I mean -- and the adjustments

4    that were made last night are like 1, 2, 1, 2, because we

5    fly-spec'd it last night, and we found that there was an

6    overlap, and there actually was overcounting by the plaintiffs

7    by one.

8              THE COURT:  Where in -- you know, I read the

9    supplemental rebuttal report, and then I looked at your nine,

09:37:16  10   ten, eleven pages of them and the rest of the rebuttal report.

11   What I don't see is any reference to identifying the tracks

12   which are both -- or works that are both SRs and MCs.

13             MR. BUCHANAN:  Sure.

14             THE COURT:  And any analysis he did on how to price

15   those.  Right?

16             MR. BUCHANAN:  Right.  So I -- as I mentioned, Your

17   Honor, I -- the pages I gave you, which I think were in the

18   reply report, maybe in the rebuttal report, he actually does

19   those computations.

20             THE COURT:  But what --

21             MR. BUCHANAN:  And it's all part of his analysis.

22             THE COURT:  What paragraph?

23             MR. BUCHANAN:  Okay.  So if you look at paragraphs

24   30, 31, 32 --

25             MR. OPPENHEIM:  I'm sorry, which report are we on?

2711

1            MR. BUCHANAN:  We're looking at the rebuttal report.

2            THE COURT:  Supplemental rebuttal report, May 15,

3       2019.

4            MR. BUCHANAN:  Right.  So in these paragraphs, 30,

5       31, 32, 33, you can see what he's doing, and while he's not

6       summing them up, he's going through the analysis, and it's all

7       part of his computation.  So he's showing, here is a list and

8       here's ones that have a musical composition, a sound recording,

9       here's ones that don't, and he goes through that.  And they

09:39:01 10      never asked him any questions about that.  Had they questioned

11      him in his deposition, he would explain what that was.

12           So it's all part of it, of his -- ultimately his

13      computation in this case, his calculations in terms of the

14      amount of alleged harm suffered by the plaintiffs.

15           And I would add that Professor McCabe did the same

16      thing.  He broke it out the same way.  He did it musical

17      compositions, sound recordings, computations individually, and

18      he's rebutting him.

19           THE COURT:  Okay.

09:39:32 20      MR. BUCHANAN:  So these numbers that they're

21      complaining about, that they're being shocked about, I mean,

22      they are factual numbers, and they have -- it's their data.

23           THE COURT:  Okay.  All right.  Thank you.

24           MR. OPPENHEIM:  And I'm looking at the paragraphs I

25      think we were just directed to, Your Honor.

2712

```
             1              THE COURT:  Well, they identify -- beginning back on
             2     28, where it's an SR plaintiff and then MC plaintiff and SR 1
             3     and MC 1, I'm not sure what those figures -- so he does
             4     identify works which contain both an SR and an MC, right, in 29
             5     and --
             6              MR. OPPENHEIM:  There is one individual example or
             7     two individual examples --
             8              THE COURT:  30, 34.
             9              MR. OPPENHEIM:  -- and now they want to claim that
09:40:58    10     because he referenced that in the context of a discussion about
            11     notices, that now because he references a couple of examples,
            12     that he gets to put in something that he did no analysis for?
            13     Yesterday, they were saying, look at Schedule 6.
            14              We looked at Schedule 6.  It's not what it is.
            15              And now they're saying, oh, no, no, no.  Let's try
            16     this.
            17              Your Honor, this is exactly what isn't supposed to
            18     happen.  You've been -- you've restricted the plaintiffs to
            19     presenting their experts, constrained by the reports and their
09:41:32    20     testimony.  The rules should apply equally.  It's -- this
            21     analysis is not here.
            22              And the fact that it's an ever-moving target of
            23     numbers, I mean, Mr. Buchanan said, you know:  We fly-spec'd it
            24     last night.
            25              That analysis was not done at the time of his report.
```

2713

         1    That's the question, was the analysis done at the time of his

         2    report, and the answer is no.

         3              THE COURT:  All right.  All right.  The motion to

         4    preclude the exhibits which contain the lower portions of 13

         5    and 21, 22, 23, 26, and the last two, the motion is granted.

         6    Those will be amended -- or not presented.  I find that the --

         7    in going over the reports, and in particular, the pages that

         8    defendants have pointed to, that the analysis was not done.

         9    There has been no notice that Mr. Tregillis was going to

09:42:35 10   testify about those matters.

        11              This is clearly outside of the report, the summaries

        12    that he gave of what his testimony was going to be, and

        13    although they're not, as Mr. Buchanan pointed out, the most

        14    resounding modifications, they are modifications, and they do

        15    change the dynamics of his report, and that's -- it's

        16    impermissible to do that this late in the -- on the last day of

        17    trial.  So the motion is granted to just -- those will be --

        18    exhibits will either be redacted or they won't be used.

        19              All right.  What else do we have this morning?

09:43:26 20             MR. OPPENHEIM:  I don't think anything else at the

        21    moment, Your Honor.

        22              THE COURT:  Okay.  All right.  What -- does that --

        23    who is -- Tregillis is the next witness?  Is that --

        24              MR. ELKIN:  No, Your Honor.  We're calling

        25    Mr. Mencher.

2714

1          THE COURT:  Okay.  All right.  Are we ready for our

2    jury then?

3          MR. ELKIN:  Yes, Your Honor.

4          THE COURT:  All right.  Joe, let's get our jury,

5    please.

6          THE COURT SECURITY OFFICER:  Yes, sir.

7          NOTE:  At this point, the jury returns to the

8    courtroom; whereupon, the case continues as follows:

9    JURY IN

09:44:44   10          THE COURT:  All right.  Good morning, ladies and --

11    please have a seat, everyone.  Sorry again for the delay.

12    Hopefully you were comfortable.

13          Thank you for coming in on time, and please give me

14    that nod of heads that you didn't do any research or

15    investigation or talk to anybody.

16          NOTE:  All jurors nodding heads.

17          THE COURT:  Thank you, sir.  Thank you-all.

18          All right.  Next witness?

19          MR. ELKIN:  Thank you, Your Honor.  The defendants

09:45:10   20    call Sanford Mencher.

21          THE COURT:  All right.

22          SANFORD MENCHER, DEFENDANTS' WITNESS, SWORN

23          MR. ELKIN:  May I inquire?

24          THE COURT:  Yes.  Good morning, sir.

25          Please proceed, Mr. Elkin.

S. Mencher - Direct

2715

1          MR. ELKIN:  Thank you, Your Honor.

2                    DIRECT EXAMINATION

3    BY MR. ELKIN:

4    Q.   Would you please state your full name for the record.

5    A.   Sanford Mencher.

6    Q.   And good morning, Mr. Mencher.  By whom are you employed?

7    A.   Cox Communications.

8    Q.   And how long have you worked at Cox?

9    A.   I've been at Cox a little over 24 years.

09:45:57 10  Q.   And what is your current position?

11   A.   I'm currently vice president of finance and accounting.

12   Q.   Okay.  Tell us a little bit about the positions you've

13   held over the past 24 years and your duties and

14   responsibilities, as briefly as you can.

15   A.   So I started with Cox in 1995 as a senior financial

16   analyst.  Over the next several years, I took on roles as

17   manager of financial analysis, director of business planning.

18            In 2001, I transferred down to our local market in

19   northwest Florida called the Gulf Coast, as director of

09:46:43 20  business operations, which is essentially the lead finance role

21   for the local market.  While I was down there, I was promoted

22   to vice president of business operations, and that role

23   essentially oversaw finance, accounting, collections, IT, and

24   warehousing for the local market.

25            In 2005, I had the opportunity to transfer back to

S. Mencher - Direct

2716

1    Atlanta with Cox into a role called executive director of

2    financial planning and analysis.

3              In 2008, I was promoted to vice president of

4    financial planning and analysis, and then in early 2013, took

5    on my current role as vice president of finance and accounting.

6    Q.   Thank you for that.

7              Given the 24 years you've worked in financial

8    positions with Cox, how familiar are you with the financial

9    workings at Cox?

09:47:45  10   A.   I would say very familiar.

11   Q.   And what are your current duties and responsibilities as

12   vice president of finance and accounting?

13   A.   Well, it really boils down to four major, major

14   responsibilities or key responsibilities.  No. 1, I have the

15   responsibility for the integrity and accuracy of our accounting

16   and our financial statements;

17             No. 2, I oversee the governance over our financial

18   statements internal controls to ensure the accuracy of our

19   accounting;

09:48:22  20   No. 3, I lead our financial planning process, which

21   includes forecasting, budgeting, and long-range financial

22   planning; and

23             No. 4, my team also has responsibility for doing

24   financial analysis on the overall corporate or company

25   performance.

S. Mencher - Direct

2717

1    Q.    Thank you.   Let's talk about Cox's business.   Are you

2    familiar with the Cox family of companies?

3    A.    I am.

4    Q.    What does Cox do?

5    A.    So Cox Enterprises is a family-owned business, founded

6    over 120 years ago by Governor Cox when he purchased the Dayton

7    Evening News, a newspaper in 19- -- excuse me, 1898.   The

8    company has operated for the next 120 years, really grounded in

9    the principles of a commitment to our customers, a commitment

09:49:22 10   to our employees, and a commitment to the communities in which

11   we serve.

12         Over those 120 years, we have built a business that

13   includes Cox Communications as well as two other businesses,

14   Cox Automotive and Cox Media Group, to the point now where Cox

15   Enterprises is in its fourth generation of family leadership,

16   with over 55,000 employees.

17   Q.    Thank you for that.

18         As you know, this case relates to Cox's internet

19   product.   Can you take the jury through how Cox developed its

09:50:02 20   internet product?

21   A.    Well, like I said, I started with the company in 1995, and

22   we were already moving down the path of what were then new

23   services, which was high-speed internet over cable as well as,

24   believe it or not, telephone services over cable as well.

25         We launched our high-speed internet product in 1996,

S. Mencher - Direct

2718

1   and really it has been really a bellwether product over the

2   last 20-plus years.  We continue to invest.  We continue to

3   invest in our network to increase speeds to make it more

4   reliable.  We've probably invested upwards of $15 billion over

5   the last ten years in an effort to continue to provide our

6   customers with the speeds and the reliability for the internet

7   product that they want.

8   Q.   Do those investments continue today?

9   A.   Absolutely.

09:51:05   10   Q.   Can you think of any community-based investments Cox has

11   made in its internet product?

12   A.   Well, several years ago, in an effort -- you know, we

13   talked about servicing the communities.  Several years ago, we

14   launched our Connect2Compete internet product, which is really

15   a $10-a-month high-speed internet service geared towards

16   low-income families in an effort to really bridge what I would

17   say the digital divide, right, to give low-income families the

18   opportunity and an affordable way to use the internet to help

19   make their lives better, to participate in the growth of, I'll

09:51:49   20   just say, the internet boom.  And over the years, that has

21   proved to be a very successful investment.

22   Q.   Do you know whether Cox has different tiers of its

23   internet service?

24   A.   Sure.  Other than Connect2Compete, we have six tiers of

25   service which range -- we call them Starter, Essential,

S. Mencher - Direct

2719

1   Preferred, Premier, Ultimate, and the most recent one is

2   Gigablast.

3   Q.   And what are the characteristics of each of the tiers?

4   What distinguishes one from the next?

5   A.   Primarily speed, all right, download and upload speeds,

6   obviously, a Starter being at the low end and Gigablst being at

7   the high end of service.  So with each one of those speeds

8   is -- really enables different capabilities for how people may

9   want to use the internet.

09:52:51 10   Q.   And do you know whether Cox's fees from its customers

11   depend on what type of websites they visit?

12   A.   I do know, and they don't depend on websites.  It's not a

13   factor in pricing.

14   Q.   Do you know whether Cox charges more for using certain

15   types of programs?

16   A.   We do not.

17   Q.   Now, to your knowledge, does Cox make more money if

18   customers are using their service for, say, copyright

19   infringement?

09:53:20 20   A.   No, we don't.

21   Q.   Why not?

22   A.   Well, the service agreement then, you know, when a

23   customer signs up for service, they are choosing what is the

24   level of service they want, what tier of internet service do

25   they want to utilize.  So how much they pay is based on what

S. Mencher - Direct

2720

1      speeds they desire.

2              We give them six different tier options to really

3      meet them where they are.  So depending on how a customer uses

4      the internet, depending on their financial situation, they have

5      the option of choosing do I want the highest end speed or the

6      lower end speed, and, and that is kind of, I'll say, a part of

7      their service, regardless of what they do with the internet,

8      what they use on the internet, and, and how they consume data

9      on the internet.

09:54:15  10   Q.   Have you ever heard of the term "data allowance"?

11     A.   I have.

12     Q.   What is data allowance?

13     A.   Data allowance is essentially kind of a guideline on what

14     is the amount of data a customer is allowed to consume given

15     the level of tier of service that they have signed up for.

16     Q.   So during the 2013 to 2014 time frame, what happened if

17     customers went above their data allowance?

18     A.   Really, other than receiving some e-mails communicating

19     that they've gone above their allowance, nothing.

09:55:01  20   Q.   Do you know whether customers were terminated by Cox for

21     going over their data allowance during the 2013-2014 time

22     frame?

23     A.   No, they were not.

24     Q.   To what extent is Cox's business built around promoting

25     copyright infringement?

S. Mencher - Direct

2721

1    A.   I would say it's, it's absolutely not built around

2    promoting copyright infringement.  I would go so far as to say

3    copyright infringement, other than the fact that it's illegal,

4    goes 180 degrees the opposite of the values of our business.

5    Q.   Does it affect your business in other respects?

6    A.   Yeah.  Well, if you really think about the concept of

7    copyright infringement and illegally downloading music or

8    videos, movies, we have a video business.  We've invested a lot

9    of money over the years in building a Video on Demand platform,

09:56:06  10   a Pay Per View platform.

11              We sell video.  To the extent that copyright

12   infringement allows customers or allows people to get that

13   stuff for free, it actually competes with our core video

14   product itself.

15   Q.   Do you know whether Cox wants to earn revenue from

16   subscribers who are using the internet to commit infringement?

17   A.   No.  We've never had that conversation as the leadership.

18   We don't want to make money off people who are doing things

19   illegally.

09:56:39  20   Q.   Well, doesn't it matter to Cox if they lose customers

21   because they're terminated for infringement?

22   A.   You know, we're a big business.  We're a $10 billion

23   business in the time frame you're talking about, and we'd just

24   as soon, you know, terminate a customer and really then worry

25   about it from a how does it impact our brand and how we view

S. Mencher - Direct

2722

1    ourselves and the values of our business.

2    Q.   I'm going to focus the next few questions about when Cox

3    actually terminates customers.  What are the expenses

4    associated when Cox actually does terminate a customer?

5    A.   Well, anytime we disconnect a customer, there's really two

6    things that go into it.  No. 1 is typically if a customer

7    calls, we'll answer the phone, and we'll process the

8    disconnect.

9             No. 2, we'll oftentimes, and usually I'll say, send a

09:57:38 10   field technician to the house itself and disconnect services at

11   the premise.

12   Q.   Do you know whether Cox builds in any variance within its

13   projected budget for subscribers leaving?

14   A.   Of course we do.  So we're, we're a high-transaction

15   business, right?  We probably connect upwards of 1.8 million

16   customers every single year, and we disconnect close to 1.8

17   million customers every year.

18            So part of my role as the leader of financial

19   planning is to ensure that we are budgeting for those millions

09:58:15 20   and millions of transactions in our plan.

21   Q.   By the way, you just made a reference earlier to the steps

22   that it takes for Cox to terminate a customer.  What does all

23   that cost on a per customer basis?

24   A.   It's probably no more than 20 or 30 dollars to disconnect

25   a customer.

S. Mencher - Direct

2723

1    Q.   Now, turning to termination for nonpayment, you do that,

2    right?

3    A.   We do.

4    Q.   If a customer stops paying for internet service, will Cox

5    terminate their account?

6    A.   Yeah, eventually we'll terminate a customer that, that

7    refuses to pay for the services that we provide.

8    Q.   Are you aware of the steps Cox takes before terminating an

9    account for nonpayment?

09:59:03 10   A.   I am.

11   Q.   I'm told that you actually have a binder by you.  Have you

12   assisted, Mr. Mencher, in the preparation of a demonstrative

13   exhibit to assist you in explaining the nonpayment process to

14   the jury?

15   A.   I have.

16   Q.   Now, please turn to tab 1 in your binder.  Is that the

17   exhibit that you assisted with preparing?

18   A.   It is.

19          MR. ELKIN:  Your Honor, may I publish that to the

09:59:43 20   jury?

21          THE COURT:  Any objection?

22          MR. GOULD:  No objection, Your Honor.

23          THE COURT:  All right.  It's in.  Go ahead.

24   BY MR. ELKIN:

25   Q.   So with reference to this demonstrative, can you take the

S. Mencher - Direct

2724

1    jury through the process Cox follows when terminating a

2    customer for nonpayment?

3    A.    Sure.  So the best way to, to walk you through it is to

4    use kind of real date examples, and in this example, it starts

5    with a customer being billed on March 1.  When a customer

6    receives a bill on March 1, that bill will typically be due on

7    or about March 22, which is three weeks later.  If a customer

8    has not paid as of March 22, they would be considered late or

9    past due.

10:00:36   10          On the, on the date of their next bill, which in this

11    case is April 1, it will really kick off what we would consider

12    our initial collections process.  First, there would be a

13    notification included in that month's bill to let the customer

14    know that they were late, but it also kicks off a series of

15    text messages, phone calls, and/or e-mails also to notify the

16    customer that they were late and to give them the opportunity

17    to make payment for services rendered.

18          If, if that March 1 bill has still not yet been paid

19    by April 22, which is the due date of the second bill, you see

10:01:31   20    we will process what we call a soft disconnect, which is

21    essentially deprovisioning any of their services, whether they

22    be video services, internet services, or phone services, and

23    kind of turning them off electronically.  The only thing that

24    is left on is 911 service if they are a phone customer.

25          After the soft disconnect, it then kicks off, kind of

2725

1    call it the next round of collections processes:  more texts,

2    more e-mails, and more phone calls; but in addition, we create

3    a work order or instructions to a field collections team, who

4    is really charged with reaching out to the customer directly

5    and oftentimes going directly to their home to really do one of

6    two things.

7              No. 1, obviously, is try and collect payment with the

8    customer itself; or if the customer is still not willing to

9    pay, getting a commitment that says, okay, we are going to

10:02:40  10   disconnect; and this way, while the field collectors are at

11   their home, we can process the disconnect, but also collect any

12   Cox-owned equipment that the customer may have on their

13   premises.

14   Q.   Why does Cox have so many steps in this process before it

15   terminates a customer?

16   A.   Well, we want -- I mean, the goal is to keep the customer.

17   We kind of have this agreement if you pay, we will provide

18   services, and we feel that it's important to really provide

19   more of a customer service orientation or a customer-friendly

10:03:20  20   type of way to, to really get them to pay for the services that

21   we've provided.

22             If all else fails, come May 6, we would process what

23   we call a hard disconnect, which is really terminating that

24   customer out of our billing system and doing a physical

25   disconnect of the side of the house.

S. Mencher - Direct

2726

1         MR. ELKIN:  Thank you, James.  You can take that

2    down.

3    BY MR. ELKIN:

4    Q.   Mr. Mencher, please turn to tab 2 in your binder, and let

5    me know if you recognize this document.

6    A.   I do.

7         MR. ELKIN:  Your Honor, this has already been

8    admitted as PX 459 in connection with Dr. Lehr's examination.

9    We'd like to publish it to the jury.

10:04:03  10         THE COURT:  Go ahead.

11         MR. ELKIN:  Thank you.

12    BY MR. ELKIN:

13    Q.   What is PX 459?

14    A.   So PX 459 is what we call our residential product P&L.

15    Q.   And for what purpose was this prepared?

16    A.   So the residential product P&L, if you really think about

17    our business, we operate our business, right, we have oriented

18    around the customer, residential customer really being the

19    initial orientation here.

10:04:35  20         So our residential business is how we run our

21    business, but what we do at these residential product P&Ls,

22    really create a little bit of what I'll call a hypothetical

23    view of if each of our individual residential products were a

24    stand-alone business, how would certain revenues and expenses

25    really be reflected on, on a P&L.

S. Mencher - Direct

2727

1          So we go through a series of calculations and

2   allocations to really assign, assign our costs, expenses, and

3   revenues down to a product level, which is reflected here.

4   It's not meant to represent, I'll say, full bottom line

5   profitability.  It's really more of an analysis and a report

6   around these revenues and expenses to help, to help us

7   understand the trends in the business at a product level.

8   Q.   Okay.  Please turn to the second page of this exhibit.

9   There may be a confusion about what the second page is, so let

10:05:44 10   me just tell you that it's headed at the top portion of what

11   you can read Res Data Product P&L.  Are you with me?

12   A.   I am.

13   Q.   What is this page?

14   A.   So this is the, the residential product P&L specific to

15   our internet or our data product.

16   Q.   And to what extent was this prepared to show the bottom

17   line profits of the business?

18   A.   That was not the purpose of this document.  The purpose of

19   the document was really to understand what are the data

10:06:23 20   revenues and how would these expenses that are reflected here

21   really flow to the data product itself.

22          If you were really interested in looking at bottom

23   line profitability, there would be a number of additional costs

24   and expenses that you would want to include in this report, but

25   obviously, this is an internal document.  That wasn't the

2728

1     purpose of why and how it was designed, and that's why it

2     wasn't included to begin with.

3     Q.    And to be clear, this pertains to Cox's residential

4     internet service?

5     A.    It does.

6     Q.    Please turn to tab 3 in your binder.

7           Your Honor, this is the demonstrative that was used

8     in Dr. Lehr's examination.

9           THE COURT:  All right.  Go ahead.

10:07:15  10   BY MR. ELKIN:

11    Q.    Have you had a chance to review this document,

12    Mr. Mencher?

13    A.    I have.

14    Q.    What's your understanding of it?

15    A.    So my understanding is the numbers on this page,

16    particularly if you -- really tie back to the numbers on the

17    residential product P&Ls that we were just looking at.

18    Q.    And do you know whether the figures on this slide as it

19    relates to the high-speed internet are accurate in your view?

10:07:46  20   A.    I would say no.  In particular, the net profit column and

21    the margin column are overstated based on what's on this page.

22    Q.    Okay.  Well, let's go back to PX 459, the spreadsheet that

23    you just examined specifically with respect to page 2 that you

24    just took the jury through.  With regard to that page, that

25    spreadsheet, do you have an understanding as to how this data

2729

1    relates to Dr. Lehr's slide?

2    A.   Yes.  So if you focus on the 2014 actuals column, which is

3    what Dr. Lehr is referencing here, total product revenue is

4    2.8 million, which ties to Dr. Lehr's slide.  However --

5    Q.   Please proceed.

6    A.   I was going to say if you go then in that same column and

7    go all the way down to the bottom, after operational expenses

8    and after administrative expenses, you get to a line called

9    product OCF, or OCF stands for operating cash flow, and that's

10:08:55  10   the 1.7 billion that is in Dr. Lehr's slide.

11   Q.   Okay.  Are there costs that are not accounted for in the

12   data that Dr. Lehr appears to have relied on?

13              MR. GOULD:  Your Honor, may we approach briefly?

14              THE COURT:  Yes, sir.

15              NOTE:  A sidebar discussion is had between the Court

16   and counsel out of the hearing of the jury as follows:

17   AT SIDEBAR

18              THE COURT:  Yes, sir.

19              MR. GOULD:  It strikes me that Mr. Mencher has seen

10:09:37  20   this slide before.  My understanding of the sequestration rule

21   is that Mr. Mencher shouldn't have seen this slide before as it

22   was part of Dr. Lehr's testimony that preceded his presence on

23   the stand.  If I'm mistaken, Mr. Elkin will let me know, but it

24   sure feels and seems like he's discussed --

25              THE COURT:  Well, what is -- what violates the

S. Mencher - Direct

2730

1    sequestration order if he's shown exhibits and asked whether

2    he's familiar with them?

3              MR. GOULD:  This was a demonstrative slide presented

4    by our expert.

5              THE COURT:  Correct.

6              MR. GOULD:  This is an exhibit -- I don't believe

7    it's in evidence.  I'm going by feel here, but something feels

8    off to me, and before we got too far down the road, I wanted an

9    opportunity to be heard.

10:10:30  10              MR. ELKIN:  Your Honor --

11             MR. GOULD:  In addition, it's a summary of Dr. Lehr's

12   testimony, and it -- with all due respect to Mr. Elkin, he's

13   working with and through this witness to explore topics that I

14   don't believe Mr. Mencher should have had access and

15   preparation for.

16             THE COURT:  Okay.  He's -- all right.  He's a

17   director of finance at Cox, so he's familiar with numbers.

18   He's all over numbers, so let's --

19             MR. GOULD:  I agree with that.

10:11:02  20              THE COURT:  Go ahead, Mr. Elkin.

21             MR. ELKIN:  Thank you, Your Honor.  So we did not

22   give Mr. Mencher testimony of any of the witnesses, but this

23   particular slide specifically picks apart a document that he

24   prepared, and Dr. Lehr -- our contention is that those figures

25   that the jury now has were picked off of this very exhibit that

2731

1    Mr. Mencher prepared and, frankly, testified to at the BMG

2    trial.  It's completely misleading.

3           So it's -- in order to discuss this particular amount

4    without reference to what the jury has heard, we felt this was

5    the most -- least intrusive way to be able to do that.  So I

6    just -- it really is about numbers.  It's not about anything

7    other than that.  He's basically trying to demonstrate what the

8    margin is, and it's just a -- it's a fallacious number.

9           THE COURT:  All right.  I'm going to allow it.  Your

10:12:01  10   exception is noted.  Thank you.

11          MR. GOULD:  Thank you, Your Honor.

12          NOTE:  The sidebar discussion is concluded;

13   whereupon, the case continues before the jury as follows:

14   BEFORE THE JURY

15   BY MR. ELKIN:

16   Q.   Okay.  What costs are not accounted for in the data that

17   Dr. Lehr relied on in this slide?

18   A.   So specifically if you look at the column called net

19   profit, right, net profit -- almost by definition, net profit

10:12:40  20   is meant to include not just the revenues but all the expenses

21   of the business.  When we referenced the product P&L, I made

22   reference to the fact that it only included certain expenses

23   and certain residential expenses on the product P&L.

24          Really it excludes four things that if I were looking

25   at net profit, I would include.  No. 1 would be corporate

S. Mencher - Direct

2732

1    overhead costs.  So obviously, we are a company that has

2    corporate overhead, and as I look at a full profit-oriented

3    P&L, I would want the residential data product to have its fair

4    share and account for its fair share of corporate costs.

5              No. 2 would be depreciation expense.  So the

6    residential business and the residential internet business is

7    built on a network of assets.  Depreciation expense is really

8    meant to represent the utilization of those assets.  You can't

9    really get to profitability without considering the usage of

10:13:49  10   those assets through the concept of depreciation.

11             The third piece is interest expense.  As a company,

12   we oftentimes borrow money in order to fund those investments

13   in our network and fund the investments in assets.  There is

14   interest expense on the borrowings that are used for our

15   business.

16             And then lastly is taxes, and income taxes

17   specifically, and as you look at net profit, the consideration

18   of paying income taxes on any business that is making a profit

19   also needs to be considered.

10:14:33  20             So really those four things are really critical to

21   consider if you're thinking about net profit at a product level

22   or at a segment level.

23   Q.   Do you know Cox's tax rate for the years 2013 and 2014?

24   A.   Yes.

25   Q.   What was it?

2733

1    A.    Our tax rate was approximately 37 percent.

2    Q.    Okay.  Now, how would you have arrived at a profit

3    analysis of Cox's internet business?

4    A.    Well, kind of similar to how I just laid it out, I would

5    use everything that we have in the product P&L, but then I

6    would take for each of those four elements, I would make sure

7    that we were allocating or assigning a portion of those costs.

8    Typically we would either use, let's say, revenue as a percent

9    of total company revenue or customers as a percent of total

10:15:28  10   company customers as a way to allocate those costs.

11   Q.    Okay.  Turning from the residential customer angle, do you

12   know whether Cox has other types of customers other than

13   residential customers?

14   A.    We do.

15   Q.    Can you give some examples?

16   A.    So when we operate our business, we really operate our

17   business in three segments.  There's the residential segment,

18   which is geared towards residential consumers; there is the

19   commercial segment, which we call Cox Business, which is

10:16:02  20   largely oriented to small- and medium-sized businesses, tend to

21   be less than 50 employees or so, but also we have also moved a

22   little bit up market, and we have customers really oriented to

23   school systems, hospitals is a big vertical for us, and

24   governmental agencies are three of the primary verticals as we

25   think about going up market.

2734

1           And then our third business is what we call Cox

2    Media, which is really the advertising sales arm of the cable

3    business.

4    Q.   The profit analysis that you just discussed in your

5    testimony related to residential, is that applicable to the Cox

6    Business customer data?

7    A.   No.  We were looking at the residential product P&L.  It

8    did not include anything related to Cox Business.

9    Q.   And, Mr. Mencher, to what extent, if you know, does Cox

10   have a policy to permit customers to commit copyright

11   infringement in order to make a profit?

12   A.   Well, I would say copyright infringement is illegal, and

13   not only do we not have a policy advocating it; it goes against

14   everything that we believe in.  It goes against the values and

15   is 180 degrees against the principles upon which we operate the

16   business.

17           MR. ELKIN:  Thank you.

18           Your Honor, I pass the witness.

19           THE COURT:  All right.  Thank you.

20           Cross-examination?

21           MR. GOULD:  Your Honor, may we approach briefly?

22           THE COURT:  Yes, sir.

23           NOTE:  A sidebar discussion is had between the Court

24   and counsel out of the hearing of the jury as follows:

25   AT SIDEBAR

10:17:00 (line 10)
10:17:33 (line 20)

S. Mencher - Direct

2735

1          THE COURT:  Yes, sir.

2          MR. GOULD:  I think Mr. Mencher quite squarely opened

3     the door to performance evaluations and Mr. Zabek discussing

4     that notion that his performance and values are consistent and

5     in line with Cox's corporate ethics and values.  He testified

6     at length about what Cox's values are and how this kind of

7     behavior in copyright infringement are clearly contrary to

8     them.

9          We think the record can demonstrate with those

10:18:35 10     performance evaluations that when the jury sees that language

11     from Cox's managers and directors, patting Mr. Zabek on the

12     back, in particular due to his values, that that will contrast

13     greatly with Mr. Mencher's testimony.  And it's an important

14     piece of information for the jury to consider, particularly as

15     we get this close to a verdict, and the jury's going to be

16     asked to decide what it is that Cox is all about.

17          THE COURT:  Well, why do you -- he did talk about the

18     culture at Cox, but you've got all the e-mails in evidence

19     already that you can use if you choose to impeach him on that.

10:19:14 20     Why do you need performance evaluations?

21          MR. GOULD:  I think it's the clearest statement that

22     Cox as a company, Cox the defendant needs to be held to account

23     here.  The jury could be left with the impression that

24     Mr. Zabek and Mr. Sikes were rogue employees who were doing

25     their own thing without the endorsement or knowledge of the

S. Mencher - Direct

2736

1  broader leadership.

2          Mr. Carothers testified that, you know, he knew

3  Zabek, and he wasn't surprised when he said those kinds of

4  things, but this is a little bit different.  This goes further.

5          Mr. Mencher is leadership, and he's testified about

6  the ethics and values of leadership and how these types of

7  allegations and behavior that we're discussing here are quite

8  contrary to it.

9          THE COURT:  Mr. Elkin?

10:20:07 10          MR. ELKIN:  Your Honor, first of all, I don't even

11  know whether Mr. Mencher even knows about any sort of

12  evaluation, but putting that to the side for a moment, I think

13  Your Honor's decision with regard to the performance evaluation

14  hinged on other issues related to that.

15          THE COURT:  Yeah.

16          MR. ELKIN:  But beyond that, Mr. Gould took

17  Mr. Mencher through e-mails at his deposition related to Zabek

18  and Sikes.  He's got those e-mails.  He can shove them in his

19  face and basically say, this is what you're talking about.

10:20:38 20          So he's got all of that ammunition already, and he's

21  done it in the past, and I don't -- I'm sure he was looking for

22  an opportunity to get -- to try to get this into the case, but

23  it's not -- something that I think is more due to circumstances

24  and not something I think Your Honor laid out in the Court's

25  decision.

1          MR. GOULD:  I'm happy to reiterate.

2          THE COURT:  No.  I'm not going to let you get into

3    performance evaluations.  I mean, the issue of the performance

4    evaluation is limited to whether Cox was going to say that

5    Zabek is a rogue and that they -- that it was his fault and

6    there was no -- as happened in BMG, and I have the

7    representation it wasn't going to happen in this case, it

8    hasn't happened in this case, and so I'm going to -- your

9    exception is noted.  I'm not going to allow it.

10:21:35 10          MR. GOULD:  Last word, if I might?  I think,

11   respectfully, he has opened the door to it by directly --

12          THE COURT:  Yeah.  No, no.

13          MR. GOULD:  Thank you, Your Honor.

14          THE COURT:  Your exception is noted.

15          NOTE:  The sidebar discussion is concluded;

16   whereupon, the case continues before the jury as follows:

17   BEFORE THE JURY

18                         CROSS-EXAMINATION

19   BY MR. GOULD:

10:22:31 20   Q.   Good morning, Mr. Mencher.  How are you?

21   A.   Good morning.

22   Q.   Nice to see you again.  Mr. Mencher, you said you're

23   familiar with the family of companies in the overall Cox

24   enterprise, correct?

25   A.   Yes.

S. Mencher - Cross

2738

1    Q.    You talked about a couple of portions of the Cox

2    Enterprises system, including the automotive business and the

3    media business that are part of Cox Enterprises, correct?

4    A.    Yes.

5    Q.    And you understand that in this case, there are two

6    defendants:  Cox Communications and CoxCom, LLC?

7    A.    Yes.

8    Q.    And CoxCom, LLC, is a subsidiary of Cox Communications,

9    correct?

10:23:13  10  A.    Yes.

11   Q.    But internally, you refer to Cox Communications as the

12   whole entity, correct?

13   A.    Cox Communications is the entity of Cox Communications

14   separate from Cox Enterprises, which I would consider a broader

15   entity.

16   Q.    When you took -- think about CoxCom and Cox

17   Communications, you refer to it internally as Cox

18   Communications as that entity?

19   A.    Yes.

10:23:36  20  Q.    And that's because CoxCom and the other entities that

21   consolidate up to Cox Communications are consolidated

22   financially, correct?

23   A.    Yes.

24   Q.    And in your financial work for Cox, when you're doing your

25   accounting and your financial reporting and your financial

2739

1    analysis, you look at the aggregate of those entities,

2    including CoxCom and Cox Communications, together?

3    A.   Yes.

4    Q.   You're familiar with the term "market share"?

5    A.   I am.

6    Q.   In this ISP context?

7    A.   Yes.

8    Q.   And that's a representation of how deeply penetrated Cox's

9    products and services are as a percentage of the total

10:24:24 10    opportunity to Cox, correct?

11   A.   Yes.

12   Q.   And market share is an important metric that Cox

13   considers, correct?

14   A.   Yes.

15   Q.   Cox wants greater market share?

16   A.   Generally, yes.

17   Q.   And the ability to have higher market share is directly

18   correlated to Cox's ability to have more subscribers and more

19   revenue, correct?

10:24:47 20    A.   Generally, yes.

21   Q.   And consistent with this, Cox wants more subscribers,

22   correct?

23   A.   More subscribers is good, but at a -- it also depends on

24   what does it cost to acquire and maintain those subscribers.

25   But more subscribers generally is a good thing.

S. Mencher - Cross

2740

1  Q.   And Cox receives a financial benefit from having a greater

2  number of subscribers, correct?

3  A.   We can.

4  Q.   Does Cox receive a financial benefit from having a greater

5  number of subscribers?

6  A.   It depends on the subscribers.  Generally, yes, but if a

7  subscriber is heavily discounted, they may cost more than what

8  they are paying us.  That would not necessarily be a financial

9  benefit, but as we operate our business as a whole, we tend to

10:25:42 10  operate it taking those factors into account.

11  Q.   Do you recall I asked you this question and you gave this

12  answer in your deposition, sir:

13       "Does Cox receive a financial benefit from having a

14  greater number of subscribers?

15       "Answer:  Yes."

16  A.   Yes.

17  Q.   And likewise, Cox receives a financial benefit from having

18  a greater market share, correct?

19  A.   Yes.

10:26:05 20  Q.   And related, the total number of subscribers or customers

21  factors into Cox's profitability?

22  A.   It does.

23  Q.   And the ability to retain existing customers factors into

24  Cox's profitability?

25  A.   It does.

S. Mencher - Cross

2741

1  Q.   And we talked about -- you talked a little bit about the

2  different tiers of service.  Do you recall that, the internet

3  tiers of service?

4  A.   Yes.

5  Q.   And generally, the higher the bandwidth and the higher the

6  speed, the higher the price for that service, correct?

7  A.   Yes.

8  Q.   And the different prices that Cox charges its tiers of

9  internet service factor into Cox's profitability?

10:26:47  10  A.   Yes.

11  Q.   And the payments received from customers that Cox retains

12  factors into Cox's profitability?

13  A.   Yes.  The payments we receive and the payments we don't

14  receive, for that matter, both factor into profitability.

15  Q.   Does Cox collect more revenue from a customer that it

16  terminates for copyright infringement or that it retains on its

17  network?

18  A.   I'm not familiar with what we terminate or don't terminate

19  for a copyright infringement.  What I can say is customers that

10:27:27  20  we have, we get revenue from, and customers that we don't have,

21  we don't get revenue from.

22  Q.   And that would include customers terminated for copyright

23  infringement, correct?

24  A.   Again, I don't know whether we are terminating or what's

25  the process for terminating customers for copyright

S. Mencher - Cross

2742

1    infringement, so it's difficult for me to answer that question

2    directly.

3    Q.   Are you saying you're not aware of whether Cox terminates

4    customers for copyright infringement violations?

5    A.   I'm not aware -- I don't -- I'm not familiar with the

6    details of the process through which customers get terminated,

7    so it's, it's difficult for me to say.

8    Q.   You're the vice president of finance and accounting.  Are

9    you aware, yes or no, whether Cox terminates customers for

10:28:08 10   copyright infringement violations?

11   A.   I believe we do.

12   Q.   And if a customer is terminated for a copyright violation,

13   does Cox collect more revenue from that customer or a customer

14   that it keeps on its network?

15   A.   Any customer that is terminated, we will no longer collect

16   revenue from.

17   Q.   You talked about Cox not charging data overage fees.  Did

18   I get that right?

19   A.   Yes.

10:28:36 20   Q.   You're talking about a particular time frame, though,

21   aren't you?

22   A.   I am.

23   Q.   Because starting in 2015, Cox actually began charging data

24   overage fees, correct?

25   A.   I don't remember the exact date, but we do collect overage

S. Mencher - Cross

2743

1    fees today.

2    Q.    Still do today.

3           And if we looked at the ICOMS billing data for

4    customers, we could determine whether or not they were charged

5    overage fees on any given day, correct?

6    A.    Yes.

7    Q.    Do you know whether any of the 57,000 customers that were

8    the notices of plaintiffs' infringement notices have been

9    subject to overage fees for bandwidth or data usage?

10:29:20   10    A.    I'm not.

11           MR. ELKIN:  Objection, Your Honor.  A quick sidebar?

12    I think it's going to be difficult for me to explain it.

13           THE COURT:  Okay.  Please.

14           NOTE:  A sidebar discussion is had between the Court

15    and counsel out of the hearing of the jury as follows:

16    AT SIDEBAR

17           THE COURT:  So I think he testified on direct that in

18    '13-'14, there were no data overage fees charged, right?  And

19    you asked him whether they've changed that policy, and so where

10:30:10   20    are we?

21           MR. ELKIN:  So the question that he raised in

22    isolation is a fine question, but in the context, it's

23    misleading because if the customers in 2014 and '15 continue --

24    they have data for these same customers in ICOMS from '15 and

25    beyond.  So I, I was slow to raise an objection with respect to

S. Mencher - Cross

2744

1   the question because -- but I think it's potentially misleading

2   if he asks that question and doesn't sort of collar it to the

3   time frame because it -- and so that's my concern, and I think

4   that to the extent he's going to follow up on that, I just

5   wanted to foreshadow that issue.

6           MR. GOULD:  Plaintiffs' view and Dr. Lehr's position

7   is that it's important to consider the revenue collected from

8   the infringing customers through and after the claim period,

9   including 2015 and 2016, for which we have ICOMS billing data,

10:31:07 10   and that data clearly shows that these customers were subject

11   to data overage fees in the time frame starting in 2015,

12   when they began --

13          THE COURT:  "These customers" meaning those who are

14   accused of infringement in the '13 and '14 period?

15          MR. GOULD:  Correct, some of the 57,000.  So the data

16   clearly shows that they do.

17          I actually don't have those ICOMS reports keyed up

18   and ready, and, frankly, I wasn't planning on going there until

19   Mr. Mencher opened the door and suggested that they don't

10:31:36 20   charge those fees.

21          THE COURT:  Well, but he was asked specifically about

22   '13-'14, right?  That was how I heard the question.

23          MR. GOULD:  That's right.  And I asked did they

24   change their policy since then and if he knows whether these

25   57,000 customers have been subject to any of those types of

S. Mencher - Cross

2745

1    fees since then, and he said he doesn't know.

2            It might be more compelling for the jury to actually

3    pull those out and show that they were.  The way it's left,

4    they're left to imagine whether they were or not.

5            THE COURT:  Well, there's -- you know, in Lehr's

6    report, in his testimony, he goes into '15 and '16 for some

7    information.  I'm not sure what it was.  I don't recall.  Was

8    it just revenues?  Was that what it was?

9            MR. GOULD:  It was one of the points to demonstrate

10:32:27 10   Cox's economic incentives to tolerate infringement.  For that,

11   he considered revenue beginning with the claim period and

12   through the period for which they provided ICOMS billing data.

13           MR. OPPENHEIM:  Billings, just to be clear.

14           MR. GOULD:  Billings.

15           THE COURT:  Billings?

16           MR. ELKIN:  But there's no reference in the

17   testimony, he's got no foundation to assume that there are any

18   data allowance charges for going over and beyond during the

19   claims period.  That's why I thought the question was

10:32:51 20   misleading.  That was my only point.

21           MR. GOULD:  He testified that he's familiar with the

22   ICOMS data.  He testified that we didn't charge these fees in

23   2013.  He testified that he's aware that they started charging

24   in 2015.  He's got the foundation.

25           THE COURT:  All right.  Are you going to put this in

S. Mencher - Cross

2746

1    through Lehr?

2           MR. GOULD:  I think I'm done, frankly.  I was going

3    to move on.

4           THE COURT:  Okay.  All right, move on.  I'll leave it

5    at that.  Thank you.

6           MR. ZEBRAK:  You could have said that in the

7    beginning.

8           MR. GOULD:  I should have started there.

9           THE COURT:  We got there eventually, yeah.

10:33:35 10       MR. ZEBRAK:  Thank you.

11          NOTE:  The sidebar discussion is concluded;

12   whereupon, the case continues before the jury as follows:

13   BEFORE THE JURY

14          THE COURT:  All right, proceed.

15   BY MR. GOULD:

16   Q.   Mr. Mencher, I'd like to take a look at the slide that we

17   reviewed a few minutes ago that was part of Dr. Lehr's

18   testimony.  I know you weren't here for that, but you've since

19   looked at this slide, correct?

10:34:19 20  A.   Yes.

21   Q.   And having not been here, you also wouldn't have heard

22   Dr. Lehr describe net profit in a couple of ways, and he

23   testified that -- let me ask a different question.

24          Are you aware -- you're familiar with the

25   term "operating cash flow"?

S. Mencher - Cross

2747

1    A.    Yes.

2    Q.    And at times in your work in the financial field for many

3    years, have you ever experienced people using different terms

4    to describe similar concepts?

5    A.    Yes.

6    Q.    Okay.  And are you aware that Dr. Lehr also described the

7    net profit field as operating cash flow?

8    A.    No.

9    Q.    And what's listed as net profit or operating cash flow,

10:35:09 10    you don't dispute the numbers on the slide, do you?

11    A.    The numbers on the slide tied to the product P&L, product

12    operating cash flow.

13    Q.    And another way of thinking about operating cash flow is

14    operating profits, correct?

15    A.    I would -- I think the term we typically use

16    interchangeably with operating cash flow is earnings before

17    interest, taxes, depreciation, and amortization.

18    Q.    Yet another term for the same concept, right?

19    A.    Yes.

10:35:40 20    Q.    We've now talked about three terms that essentially mean

21    the same thing, correct?

22    A.    I don't know how you're defining "operating profit," so

23    that's what I was just clarifying.  Inside of Cox, we use

24    operating cash flow and earnings before interest, taxes,

25    depreciation, and amortization.

S. Mencher - Cross

2748

1    Q.    And you understand, sir, that the numbers in Dr. Lehr's

2    slide came directly from the product P&L that your department

3    produced and provided, correct?

4    A.    That is correct.

5    Q.    And do you stand behind the accuracy of the financial

6    papers that you produced?

7    A.    I do.

8    Q.    Let's take a look -- one of things you testified, sir, is

9    that you're responsible for the integrity and accuracy of Cox

10:36:29  10  Communications' financials, correct?

11   A.    Yes.

12   Q.    And that would include PX 459, that dense financial

13   spreadsheet we looked at, correct?

14   A.    Well, PX 459 is a financial report.  When we talk about

15   the accuracy and integrity of our financial statements, in

16   particular, we are really referencing our audited financial

17   statements, which is from a Cox Communications consolidated

18   perspective.

19          There are plenty of reports and financial reports out

10:36:58  20  there that we also rely on, but I'll just say the accuracy --

21   the accuracy and the integrity of the financial statements is

22   really more geared towards our consolidated and audited

23   financial statements.

24   Q.    And you would stand behind the accuracy and integrity of

25   those audited financial statements, correct?

2749

1    A.    I would.

2    Q.    If you could turn to tab 6 in your binder, please?

3          And I believe this is in evidence, though someone

4    should correct me if I'm wrong.  PX 443, the 2014 audited

5    financial statements.

6          The PX 443 is in evidence.  This is the 2014, it

7    says, Annual Financial Supplement.  You recognize this, sir, as

8    the audited financials for Cox Communications for 2014?

9    A.    I do.

10:38:03  10   Q.    And you worked with -- Cox worked with an auditor named

11   Deloitte to prepare these, correct?

12   A.    We prepared the financials, and Deloitte reviews them.

13   Q.    Deloitte reviewed and audited them?

14   A.    Yes.

15   Q.    And you believe these are accurate, correct?

16   A.    I do.

17   Q.    If we could turn to page 61 of the PDF?

18         You recognize this letter as the independent

19   auditors' report on the financials?

10:38:35  20   A.    I'm sorry, what page?

21   Q.    I'm sorry, it's the second-to-last page of the entire tab,

22   the Deloitte letter at the end.

23   A.    Okay.  Yep, yes.

24   Q.    And it begins -- it's addressed to the Board of Directors

25   and Shareholders, and the shareholders, again, that's Cox

S. Mencher - Cross

2750

1    Enterprises, including the Cox family, correct?

2    A.    Yes.

3    Q.    It says:  We have audited the accompanying and

4    consolidated financial statements of Cox Communications, Inc.,

5    and its subsidiaries (the "Company") (a wholly owned subsidiary

6    of Cox Enterprises, Inc.), which comprise the consolidated

7    balance sheets as of December 31, 2014, and 2013, and the

8    related consolidated statements of operations, shareholders'

9    equity, and cash flows for each of the three years in the

10:39:26  10    period ended December 31, 2014, and the related notes to the

11    consolidated financial statements.

12            You understand that basically means we looked at all

13    this stuff and we reviewed it?

14    A.    Yes.

15    Q.    And if you look at the next page, at the top, the auditors

16    give an opinion that the consolidated financial statements are

17    in accordance with the accounting principles generally accepted

18    in the U.S.  This means Deloitte gave it a thumbs up, right?

19    A.    Yes.

10:39:59  20    Q.    Now, I want to turn to page 3.  That was just to give us a

21    lay of the land of what we're looking at here.  And -- page 3

22    of the PDF.

23            And on the page that's in front of you, it starts

24    with a management discussion and an executive overview,

25    correct?

S. Mencher - Cross

2751

1   A.   Yes.

2   Q.   And I'm -- starting on the paragraph -- actually towards

3   the bottom, if you could scroll up just a bit, Mr. Duval?

4        I'm reading here, it says:  Cox's business strategy

5   is to leverage the capacity and capability of its nationwide IP

6   network to deliver an array of services to consumers and

7   businesses while creating multiple revenue streams.  Cox

8   believes that its investments in the technological capabilities

9   of its nationwide IP network, the long-term advantages of

10:41:24 10   clustering, the competitive value of bundled services, and its

11   commitment to customer care and community service enhance its

12   ability to increase revenues in an increasingly competitive

13   environment.  Cox's primary focus in today's competitive

14   landscape is on continued growth and profitability of all of

15   its businesses and product lines and effective execution of its

16   bundling strategies.

17        Do you agree with that statement, sir?

18   A.   I do.

19   Q.   And at this time frame, in the 2014-2013 time frame, Cox

10:41:57 20   was growing, correct?

21   A.   Yeah, we were.

22   Q.   Much of Cox's business strategy is wrapped up in the

23   bundle -- in the bundle of services provided to customers,

24   correct?

25   A.   Yes.

S. Mencher - Cross

2752

1    Q.   And that's true for both residential and business

2    customers?

3    A.   Yes.

4    Q.   In fact, the primary lens through which Cox looks at its

5    business is inclusive of all -- inclusive of all of the

6    products and services provided?

7    A.   Yes, yes.

8    Q.   And a value of a customer to Cox is not just in the

9    individual services provided, but also the number of products

10:42:41 10   and services provided and how much the customer pays for each

11   and all of those services, correct?

12   A.   Yes.

13          MR. GOULD:  Can we turn to page 51 of the same

14   document?  51 of the PDF.  Scroll down a little bit.

15   BY MR. GOULD:

16   Q.   Mr. Mencher, we're now looking at a section of the audited

17   financials labeled Shareholders' Equity.  And you understand

18   this discusses the ownership interest by Cox Enterprises and

19   the Cox family, correct?

10:43:32 20   A.   Yes.

21          MR. GOULD:  If we can highlight the last sentence?

22   BY MR. GOULD:

23   Q.   According to the 2014 audited financials, it says here on

24   the last sentence:  For the years ended December 31, 2014,

25   2013, and 2012, Cox paid dividends to its shareholders of

S. Mencher - Cross

2753

1    $1 billion, $1.5 billion, and $1.4 billion, respectively.

2         Correct?

3    A.   Yes.

4    Q.   And those are cash dividends paid out of -- paid out from

5    Cox Communications' free cash flow?

6    A.   Yes.

7    Q.   And free cash flow is essentially what's left from Cox's

8    operating cash after accounting for taxes and capital

9    investments and interest payments, correct?

10:44:18  10   A.   Yes, in addition.  There are some other --

11   Q.   Some other things.  Depreciation?

12   A.   Investments.

13   Q.   Investments.  So the dividends come out of the free cash

14   available after Cox pays all of those things, correct?

15   A.   Yes.

16   Q.   So when you think of the dividend, the cash dividend, it's

17   cash paid out, what you have left over afterwards, right?

18   A.   I'm not sure I understand the question.

19   Q.   Well, I'll ask a better question.  The cash dividend shown

10:44:52  20   here is cash that Cox was able to take out of the business as

21   it was growing in the 2012 to 2014 period, correct?

22   A.   Yes.

23   Q.   When Cox bills its customers -- I'm shifting gears here a

24   little, just to give you a heads-up.  When Cox bills its

25   customers, it does a pretty good job collecting on the amounts

2754

1    billed, correct?

2    A.    I would say yes.

3    Q.    In general, Cox collects about 98 to 99 percent of the

4    bills issued, correct?

5    A.    Yes.

6           MR. GOULD:  Pull up PX 365.

7    BY MR. GOULD:

8    Q.    Mr. Mencher, I want to talk about disconnects for

9    nonpayment.

10:45:59  10          Page 11, please.

11          You testified about this in direct, but we didn't

12   look at the numbers.  So I want to make sure we're on the same

13   page here.

14          If you could pull up just the two paragraphs,

15   including the yellow?  That's fine.

16          And the jury has seen this before, so I'll move

17   quickly.  You agree, sir, that Cox has reported disconnecting

18   the internet service for roughly 600,000 and change residential

19   customers, and 21,000 and change business customers, in the

10:46:31  20   years 2013 and 2014, correct?

21   A.    Yes.

22   Q.    And you understand, sir, that Cox has argued in this case

23   that it can't be expected to terminate internet service of

24   business customers for copyright infringement violations

25   because they might include hospitals or fire stations?

S. Mencher - Cross

2755

1    A.    I'm unaware of any testimony in the case.

2    Q.    Notwithstanding, you would agree that Cox terminated over

3    21,000 business customers in the two years, 2013 to 2014?

4    A.    I haven't done the math, but that's -- it looks in the

5    general vicinity.

6    Q.    And you described a process of late bills and soft

7    disconnects about nonpayment.  I want to go through that in a

8    minute, but I first want to understand, was that the process

9    that's in place now or in the 2013-2014 period?

10:47:38  10    A.    That is the process that is in place now, but I don't know

11    of any major changes to that process over the last few years.

12    Q.    Fairly confident that it was the same process in

13    2013-2014?

14    A.    I am.

15    Q.    Not certain but fairly confident?

16    A.    Yes.

17    Q.    So I want to walk through that to make sure that I

18    understood it.  There's a lot going on in that slide.  The --

19    Cox sends a customer a bill, correct?

10:48:11  20    A.    We do.

21    Q.    And generally that bill is due in about 21 to 22 days.  I

22    think your slide showed the March 1 bill was due March 22,

23    correct?

24    A.    Yes.

25    Q.    And if the customer hasn't paid that bill within 30 days

2756

1    of the due date, then Cox disconnects the service, right, a

2    soft disconnect?

3    A.   Yes.

4    Q.   So if the bill's 30 days late -- 30 days late, turn off

5    their service, right?

6    A.   Thirty days late, we deprovision their services, yes.

7    Q.   From the customer's point of view, you turned off their

8    service, right?

9    A.   Yes.

10:48:47 10   Q.   And you called it a deprovisioning.  You basically flick a

11   switch on the modem, and maybe they still get 911, but they

12   can't do their TV, their phone, their internet, other than the

13   emergency call?

14   A.   That is correct.

15   Q.   And if the customer still hasn't paid for another two

16   weeks, 14 days, then you do a hard disconnect, right?

17   A.   Yes.

18   Q.   And a hard disconnect means you really shut them off,

19   correct?

10:49:14 20   A.   Yes.

21   Q.   I want to pull up a slide that you showed about this for a

22   second.  We have a due date, and then after 30 days, a soft

23   disconnect, and you've talked about some things here:  texts

24   and phone calls and e-mails.

25          Those are all automated things, correct?

2757

1    A.    They can be.

2    Q.    In fact, the phone calls typically are, like, robocalls or

3    automated phone calls, correct?

4    A.    Not necessarily.  We have, we have bill collections group

5    that actually makes phone calls.

6    Q.    Is your understanding, sir, that the bulk of those calls

7    for collections are based on automated robocalls?

8    A.    No.

9    Q.    Are you, are you aware of whether or not Cox has been sued

10:50:29   10    for collections efforts by robocalls to non-Cox customers?

11    A.    No.

12    Q.    Okay.  And after the soft disconnect, more of the same,

13    but this time you actually send some people out to knock on

14    doors, right?

15    A.    Yes.

16    Q.    And to collect equipment?

17    A.    Yes.

18    Q.    Assuming they --

19    A.    Assuming that they don't pay, yes.

10:51:00   20    Q.    I didn't mean to interrupt.  I apologize.

21              Fairly aggressive efforts by Cox in this limited

22    period to get the money from the customers, right?

23    A.    I don't know what you would consider aggressive or not

24    aggressive.  That's our process.

25    Q.    Do you think it's aggressive?

S. Mencher - Cross

2758

1    A.   No.

2    Q.   Phone calls, texts, e-mails, field collection agents, not

3    aggressive?

4    A.   No.

5            MR. GOULD:  Okay.  You can pull that down.  Wait one

6    second.

7    BY MR. GOULD:

8    Q.   You understand, sir, that Cox has a graduated response

9    program for responding to copyright infringement complaints

10:51:55 10  pursuant to which it considers terminating the internet service

11   of customers identified in copyright infringement notices?

12   A.   I've heard the term, but I'm not familiar with the details

13   of the process.

14           MR. GOULD:  Let's pull up that slide.

15   BY MR. GOULD:

16   Q.   There's been a lot of testimony in this case about that

17   process, and you recognize the information on the right of the

18   slide is the process for nonpayment terminations?  And the

19   first step is a soft disconnect after 30 days, correct?

10:52:31 20  A.   Yes.

21   Q.   And the second step is hard termination after 44 days,

22   correct?

23   A.   Yes.

24   Q.   And at the bottom of the slide shows the number of

25   residential and business customers terminated for nonpayment in

S. Mencher - Cross

2759

1    the 2013-2014 time frame, correct?

2    A.    Yes.

3    Q.    And what we've done here on the left, sir, is showed you

4    the process by contrast for how Cox responds under its

5    graduated response program to copyright infringement notices

6    leading to -- I was going to say termination, but really

7    consideration of termination.

8          Do you recognize that?

9    A.    No.

10:53:09   10    Q.    And are you aware, sir, that in the same two years, Cox

11    terminated just 32 residential customers for copyright

12    infringement?

13    A.    I was not.

14    Q.    Now, one of the things that can happen to a customer

15    terminated for nonpayment is they might want to get back

16    online, right?

17    A.    Yes.

18    Q.    And for a customer who's soft disconnected, Cox will,

19    subject to a charge of a late fee and a reactivation fee, maybe

10:54:15   20    put them back online?

21    A.    Yes, we will.

22    Q.    And we could look at the product P&L, that spreadsheet we

23    looked at earlier, and actually see it, line items for

24    2013-2014 showing millions of dollars in reactivation fees,

25    correct?

S. Mencher - Cross

2760

1  A.   I believe so.

2  Q.   So not only is Cox terminating customers for nonpayment,

3  but then when it puts them back online, it's charging more and

4  making more, correct?

5  A.   Well, we also have additional costs, so -- but we do have

6  that revenue.

7  Q.   I think you said for soft termination, it's deprovisioning

8  service.  Isn't that a flick of a switch?

9  A.   Yeah, but we are -- I was just pointing out that we're

10:54:57 10  incurring costs along the way as part of the collection efforts

11  leading up to the soft disconnect.

12  Q.   So flick a switch, some texts and e-mails, those are the

13  costs?

14  A.   Well, there are people involved, but yes.

15  Q.   You testified, sir, about -- I think you said leadership

16  doesn't promote allowing copyright infringement to continue

17  collecting revenue, something along those lines?  Did I get

18  that right?

19  A.   I don't -- I don't know.

10:55:41 20  Q.   Do you recall testifying about leadership's view of making

21  termination decisions of copyright infringement customers --

22  let me start fresh.

23       MR. ELKIN:  Objection.

24  BY MR. GOULD:

25  Q.   Do you recall giving testimony about leadership's view of

S. Mencher - Cross

2761

1  keeping customers online who have been subject to copyright

2  infringement notices so that it might continue to collect

3  revenue from them?

4  A.   I mean, you're talking today?

5  Q.   Yeah, I thought I heard it.

6  A.   Okay.  I was just -- I didn't know if you were referencing

7  the deposition.  So, no, I think my perspective is I don't

8  believe that we as a company want to be in the business of, of

9  doing things illegally, and we would just as soon not have a

10:56:41  10  customer than have an illegal customer.

11  Q.   You understand that if -- when Cox makes a decision to

12  keep a customer online who it has knowledge of their

13  infringement activity, is making a decision to retain their

14  revenues?

15  A.   Again, I don't know the process of the graduated response

16  system and the process of terminating customers, but I do agree

17  to the extent that we have a customer longer, there will be

18  more revenue.

19        MR. GOULD:  Could we pull up PX 304, please?

20  BY MR. GOULD:

21  Q.   Mr. Sikes, I -- excuse me -- Mr. Mencher, I believe we

22  looked at this in your deposition, and --

23        THE COURT:  We don't have that being in evidence.

24  Are you going to move it now or --

25        MR. GOULD:  Yes, I'd move PX 304.

2762

```
  1                  THE COURT:  All right.

  2                  MR. GOULD:  I apologize.  I thought it was in through

  3    the Sikes deposition.

  4                  MR. ELKIN:  I just have a question.

  5                  THE COURT:  About the document?

  6                  MR. ELKIN:  I'm not sure this was actually marked and

  7    shown to the witness.  There was other documents that were

  8    shown.  I don't know whether it was this particular one.

  9    That's not my -- in terms of the document, I mean, it's a
10:58:17
 10    different issue.  But it's a foundation issue.

 11                  THE COURT:  Okay.

 12                  MR. GOULD:  I'll simplify it.  We'll take a look at a

 13    different document.

 14                  THE COURT:  All right.

 15    BY MR. GOULD:

 16    Q.   Let's look at PX 342, please, and go to the third page.

 17                  THE COURT:  Is this in?  It's in, okay.

 18                  MR. GOULD:  Zoom in on the bottom e-mail.

 19    BY MR. GOULD:
10:58:39
 20    Q.   Everyone's seen this e-mail quite a few times, so I'll

 21    keep it brief.  Do you see the second-to-last sentence:  This

 22    customer pays us over $400/month, and if we terminate their

 23    internet service, they will likely cancel the rest of their

 24    services?  Do you see that?

 25    A.   I do.
```

S. Mencher - Cross

2763

1   Q.   You understand that Mr. Sikes was making a termination

2   decision for copyright infringement based on the ability to

3   keep that customer and keep that revenue flowing?

4            MR. ELKIN:  Objection.  Speculation.

5            MR. GOULD:  I asked his understanding.

6            THE COURT:  Yeah.  I'll allow the question.  Your

7   exception is noted.

8            THE WITNESS:  Without talking to Mr. Sikes, I really

9   don't know what he was, what he was implying.

10:59:21 10            MR. GOULD:  No further questions, Your Honor.

11            THE COURT:  All right.  Redirect?

12            MR. ELKIN:  No redirect, Your Honor.

13            THE COURT:  All right.  Then may Mr. Mencher be

14   excused?

15            MR. ELKIN:  (Nodding head.)

16            THE COURT:  All right.  Thank you, sir.  You're

17   excused.  Please don't discuss the testimony you've given with

18   anyone until our trial is over.  All right?

19            THE WITNESS:  All right.

10:59:40 20            THE COURT:  All right.  Have a good day.  Thank you.

21            THE WITNESS:  Thank you, Your Honor.

22            NOTE:  The witness stood down.

23            THE COURT:  All right.  Let's take our mid-morning

24   break, and we'll take 15 minutes, and we'll come back with our

25   next witness.  All right?  You're excused.  Thank you.

2764

```
1              NOTE:  At this point, the jury leaves the courtroom;
2    whereupon, the case continues as follows:
3    JURY OUT
4              THE COURT:  All right.  Anything we need to discuss
5    before we break?
6              MR. OPPENHEIM:  Not from the plaintiffs' perspective.
7              MR. BUCHANAN:  No, Your Honor.
8              THE COURT:  Okay.  All right.  We're in recess.
9              NOTE:  At this point, a recess is taken; at the
10   conclusion of which the case continues in the absence of the
11   jury as follow:
12   JURY OUT
13             THE COURT:  Ready for our jury?
14             MR. ZEBRAK:  Your Honor, one administrative issue.
15             THE COURT:  Yes, sir.
16             MR. ZEBRAK:  I'm sorry I have to raise with the
17   Court.  But Cox won't give us an updated copy of the slide
18   deck.  And when we do our cross-examination, we need to be able
19   to display it.  I can't, on the ELMO, use slides with different
20   numbers, and it -- this makes no sense to me.
21             We've offered a thumb drive for them just to hand it
22   over.  They refuse to do so.  We would like a copy.
23             MR. BUCHANAN:  So they have the original slides.  And
24   we told them, we're taking out the ones that the Court said
25   either take them out completely or take out that portion that's
```

2765

1    objectionable.

2           So the last two are out, and then 13, 21 -- those

3    other numbers are out.  I've given them the numbers.

4           So they have a set, and they just need to turn the

5    pages, and what will be displayed will just be the ones that

6    the Court said were permissible.

7           THE COURT:  Okay.  Is that -- can you use those that

8    you -- you already have a set of the old ones that you can pull

9    up, or you don't?

10          MR. ZEBRAK:  Yes, sir.  However, they'll have

11   different slide numbers on them.  It's not going to be exactly

12   the one they use.

13          This should have taken 30 seconds, and we're just

14   hoping to alleviate any confusion.  I don't see the reason why

15   they won't give us a slide.

16          THE COURT:  Can you do -- can you give them a copy of

17   the new ones?  I mean, how hard is that?

18          MR. BUCHANAN:  Well, we don't have it.  We didn't

19   print them out.  We didn't make the -- but what's going to be

20   displayed is what's --

21          THE COURT:  I understand, I understand.  The same

22   thing.  Page numbers different --

23          MR. BUCHANAN:  I don't know --

24          MR. ZEBRAK:  And we're not looking for a printed

25   copy, Your Honor.  We're just asking them to digitally move the

2766

1    file into a thumb drive.

2           MR. BUCHANAN:  All right, we'll give it --

3           THE COURT:  Let's give it to them if you could.

4           MR. BUCHANAN:  That was not something they ever

5    agreed to do with us.  But, okay, we'll do that.

6           THE COURT:  Thank you.

7           MR. ZEBRAK:  Thank you, Your Honor.

8           THE COURT:  All right.  Joe, let's get our jury,

9    please.

10          NOTE:  At this point the jury returns to the

11   courtroom; whereupon the case continues as follows:

12   JURY IN

13          THE COURT:  All right.  Please have a seat.

14          MR. BUCHANAN:  Your Honor, we'd call Dr. Christian

15   Tregillis to the stand.

16          THE COURT:  All right.  Please come forward, sir.

17          NOTE:  The witness is sworn.

18          THE COURT:  All right.  Good morning, sir.

19          Please, Mr. Buchanan, proceed.

20          CHRISTIAN D. TREGILLIS, called by counsel for the

21   defendants, first being duly sworn, testifies and states:

22       DIRECT EXAMINATION

23   BY MR. BUCHANAN:

24   Q.   Sir, could you state your full name for the record, and

25   spell your last name, please.

C.D. Tregillis - Direct

2767

1    A.   Sure.  Christian Dale Tregillis.  My last name is spelled

2    T-r-e-g-i-l-l-i-s.

3    Q.   And what is your occupation, sir?

4    A.   Thank you.  I am what is referred to as a forensic

5    financial analyst.  Which means that I perform accounting,

6    financial, and economic investigations.  The word "forensic"

7    means in the context of a pending or potential legal dispute.

8            So a lot of my work is in the context of legal

9    disputes, but not all of it.

10   Q.   Okay.  What is your educational background?

11   A.   I graduated with an undergrad degree in economics from

12   Occidental College in 1989.  I worked for a couple years from

13   1989 to 1991.  And then I went to graduate school and got a

14   Master's in business administration from the University of

15   Chicago in finance and accounting.

16           I also have continuing education obligations for

17   professional licenses that I have, but those are the only ones

18   in school since college.

19   Q.   Could you summarize your professional career for the jury

20   and the Court, please.

21   A.   Sure.  So after graduating in 1993, like I said, from

22   graduate school, I began working in the same field in which I

23   work today, which is, like I said, performing those accounting,

24   financial, and economic investigations.

25           I started off at what used to be called the Big Six

C.D. Tregillis - Direct

2768

1    accounting firms.  I worked at one called Coopers & Lybrand,

2    and then another one called Ernst & Young, and then another

3    one, Deloitte & Touche.  Which is -- well, now it's gone from

4    down to six, down to four.

5           But -- so like I said, I was a partner at Deloitte &

6    Touche, and then in 2004 I left there.  There were some new

7    legislation in Congress that changed the scope of what the big

8    accounting firms could do.  And so, I left, and a lot of people

9    in my industry left and moved on to other places.  And I have

10   continued to work, like I said, in the same capacity.

11          I've been at my current firm, which is called Hemming

12   Morse, since 2016.  But like I said, doing the same work all

13   the way through since graduate school.

14   Q.   Is there any particular area that you focused on in terms

15   of evaluating assets or doing forensic accounting?

16   A.   Yes.  Over the course of my career, I've focused pretty

17   significantly on intellectual property, but also generally in

18   the area of quantification of economic harm.

19          And so, in the course of my work, sometimes I work on

20   the plaintiff's side, sometimes on the defendant's side.  It's

21   about evenly mixed, a little bit more on the plaintiff's than

22   defendant's.

23          So in the case of intellectual property cases,

24   sometime they're, like I said, in the context of disputes,

25   sometimes not.  But if I'm working for a plaintiff that has

C.D. Tregillis - Direct

2769

1    intellectual property rights, like I said, a little bit more of

2    those than the defendant's side.

3            But then I'm quantifying economic harm a lot of

4    times.  Sometimes I work in a neutral role, so between two

5    sides that have a dispute.  Like I recently worked on a matter

6    in which there was a dispute about copyright values.  And so, I

7    helped the two sides work out a settlement in that case.

8            But like I said, a fair amount of intellectual

9    property work.

10   Q.   Okay.  About how many matters have you calculated the

11   amount of economic harm in a manner that you are retained?

12   A.   Hundreds.  I've testified about 120-something times.  The

13   vast majority of those pertain to economic harm.  Those include

14   depositions, not all of them get to trials or arbitrations.  I

15   think about 50 have gotten to trials.  But like I said, the

16   vast majority is the quantification of economic harm.

17   Q.   Okay.  And have you been retained by Winston & Strawn

18   before, my law firm?

19   A.   Yes.  I have been retained by Winston & Strawn folks.  I

20   have also worked against Winston & Strawn folks.  So been both

21   for and against.

22   Q.   Do you hold any certifications with regard to your

23   profession?

24   A.   Yes.  I am a CPA and -- a certified public accountant.

25   And I'm also what is called certified in financial forensics.

C.D. Tregillis - Direct

2770

1    We have a professional organization nationally called the

2    American Institute of CPAs, and I do work for the American

3    Institute of Certified Public Accountants.  And we created a

4    certification in financial forensics, which is a specialty for

5    people that do forensic accounting investigations like I do.

6    So we launched that about ten years ago, and I have one of

7    those.

8         I'm also accredited in business valuation, which is a

9    certification for CPAs who value businesses or intellectual

10   property rights like copyrights, and trademarks, patents, and

11   trade secrets.

12   Q.   Do you work --

13   A.   And there's one other one called certified licensing

14   professional, which is for people that work in licensing of

15   intellectual property.

16   Q.   Okay.  Do you work for any other entities besides your

17   firm, Hemming Morse?

18   A.   Yes.  I think I mentioned a moment ago, I do work for the

19   American Institute of Certified Public Accountants, and also

20   the California Society of CPAs.  That work relates to helping

21   people in my profession who do these kinds of investigations

22   understand how to do them.

23        So that means writing practice aids, or creating

24   standards, or helping educate people in how we do this kind of

25   work.

C.D. Tregillis - Direct

2771

1           So, for example, last -- well, earlier this year, it

2    was the culmination of a couple years to get it together, but I

3    was the co-author of a practice aid that was used as a

4    reference guide for what we call lost profits calculations.  So

5    teaching people in my profession how you quantify the amount of

6    profits that an injured party has suffered in the context of a

7    legal dispute.

8           Because that's a lot of what we do.  I don't get

9    involved in the decision of whether somebody is liable or not

10   liable.  I get involved in the quantification part of it,

11   quantifying the harm.

12          And so, there are a lot of people in my profession,

13   and we try to help -- for the IACPA, we help them understand

14   the best ways of doing that.  And so, I've helped in writing

15   and speaking throughout my career on those kinds of issues.

16   Q.   So you've used the term "intellectual property."  Would

17   that include copyrights?

18   A.   Yes, that's one of the four forms of intellectual

19   property:  Patents, trademarks, trade secrets, and copyrights.

20   Q.   And you've worked on matters assessing the value of

21   copyrights and trademarks and patents?

22   A.   Yes, all of the above.  Like I said, it's sometimes

23   valuing outside the context of a dispute.  For example, there

24   might be a license, somebody wants to negotiate the right

25   license rate, the royalty rate.  Or purchasing, we can see

C.D. Tregillis - Direct

2772

1   purchase transactions.  There can be reasons for financial

2   reporting.  Sometimes companies want to tell you about the

3   value of the assets that they have in their financial

4   statements.

5           So there are a variety of contexts, including in

6   legal disputes.

7   Q.   Mr. Tregillis, could you look at your binder at DX 259.

8           Is that your curriculum vitae or resumé.

9   A.   Yes.

10  Q.   Okay.

11  A.   This is from my April 10 report.  And this is my

12  curriculum vitae, right.  It's a summary of my professional

13  experience.

14          MR. BUCHANAN:  Okay.  I'd move that into evidence,

15  Your Honor.

16          THE COURT:  Any objection?

17          MR. ZEBRAK:  No objection, Your Honor.

18          THE COURT:  Received.

19  BY MR. BUCHANAN: (Continuing)

20  Q.   Mr. Tregillis, you're being paid as an expert in this

21  case?

22  A.   I'm not, not directly.  My firm, Hemming Morse, is paid

23  for my work in this matter, that's right.

24  Q.   Yeah.  And what is your hourly rate?

25  A.   $490 an hour is what the firm is paid.

C.D. Tregillis - Direct

2773

1   Q.    Okay.

2   A.    I don't get all of that, but they do.

3   Q.    And how many hours have you put into your work on this

4   case?

5   A.    Probably close to 200.

6   Q.    Okay.  And that would involve writing expert reports?

7   A.    Yes.  Performing analysis.  There was a lot of analysis

8   that was required here.  There are 10,000 copyrights in suit,

9   those all needed to be investigated.  So it takes a lot of

10  analysis.

11          And then, like I said, writing reports.  And there

12  has been some back and forth.

13          I also looked at the analyses of Dr. Lehr and Dr.

14  McCabe.  And we looked at some of the same kinds of issues.

15  Dr. McCabe and I performed pretty similar analyses.  So over

16  time we were able to figure out where there were differences,

17  or at least I was, and find some common ground.

18          But like I said, those reports reflect my analyses of

19  my opinions, including considering the opinions of Dr. Lehr and

20  Dr. McCabe.

21  Q.    And then you were deposed by the plaintiffs in this case

22  as well?

23  A.    Yes, that's right, I think in June or July.

24  Q.    Okay.  And then you prepared for your testimony here

25  today?

C.D. Tregillis - Direct

2774

1   A.   Correct.

2   Q.   Okay.  And the amount that you're being paid is not

3   affecting your views in this case or the outcome, how you look

4   at things?

5   A.   No.  Like I said, I testify on both sides of cases.  I am

6   not somebody who could survive in my profession if I was to

7   take a position that would be advantageous to one or the other

8   side.  It needs to be supported.

9           As a CPA, my professional standards require that my

10  opinions be supported by sufficient relevant data and evidence.

11  And that my work, if -- like I said, if I was to be constantly

12  on one side, expressing opinions that would help one or the

13  other side, that information would be brought back up to me on

14  future work.

15          MR. BUCHANAN:  Okay.  We'd proffer Mr. Tregillis as

16  an expert on the calculations of economic harm, Your Honor.

17          THE COURT:  All right.  Any objection?

18  Quantification of economic harm, is that --

19          MR. BUCHANAN:  Yeah, on the calculations of economic

20  harm.  Sorry.

21          THE COURT:  Okay.

22          MR. ZEBRAK:  May we approach, Your Honor?

23          THE COURT:  Yes, sir.

24          NOTE:  A sidebar discussion is had between the Court

25  and counsel out of the hearing of the jury as follows:

C.D. Tregillis - Direct

2775

1    AT SIDEBAR

2              THE COURT:  Yes, sir.

3              MR. ZEBRAK:  So we have no objection to him being

4    admitted as an expert on financial calculations, all that kind

5    of stuff.

6              But the way that that has been phrased is really to

7    tell the jury that his quantification of economic harm, that

8    he's the expert quantifying the harm.  And I just think it's

9    framed in too argumentative of a manner.

10             THE COURT:  Okay.  Your exception is noted.  I'm

11   going to allow him to be qualified with that understanding.

12   That's what he has repeated several times on the stand already.

13             MR. ZEBRAK:  Thank you, Your Honor.

14             NOTE:  The sidebar discussion is concluded; whereupon

15   the case continues before the jury as follows:

16   BEFORE THE JURY

17             THE COURT:  All right.  He'll be admitted as an

18   expert in the calculation and quantification of economic harm.

19             Go ahead, Mr. Buchanan.

20             MR. BUCHANAN:  Thank you, Your Honor.

21   BY MR. BUCHANAN: (Continuing)

22   Q.   What was your assignment in this matter, Mr. Tregillis?

23   A.   It was to analyze the amount of economic harm to the

24   plaintiffs in the context of this legal dispute.

25             And, additionally, to consider the opinions of Dr.

C.D. Tregillis - Direct

2776

1    Lehr and Dr. McCabe; and to the extent that I had thoughts on

2    their opinions, to express those.

3    Q.   So you reached some opinions in this case with regard to

4    those issues?

5    A.   Yes.  If I could just comment, Mr. Gould, I think one of

6    the jurors and I are looking, and you're obfuscating the

7    connection of my line of sight with the jurors.

8             THE COURT:  Well, just testify.

9             THE WITNESS:  Okay.

10            THE COURT:  We can't move your witness box and

11   counsel are allowed to sit in the front row there, so --

12            THE WITNESS:  Okay.  Very good.

13            I am sorry, could you ask the question again?

14   BY MR. BUCHANAN: (Continuing)

15   Q.   Could you -- I asked you, you said you had formed certain

16   opinions.  Did you develop some demonstratives or slides to

17   reflect those opinions?

18   A.   Yes, I did.

19   Q.   Okay.  Can we pull up the first slide, please.

20            And is this a summary of your opinions in this matter

21   that you formed based on the information you reviewed?

22   A.   Yes, it is.

23   Q.   Okay.  Could you go through them one by one.  The first

24   one says:  Dr. Lehr has offered unsupported opinions not tied

25   to the accused wrongful acts of Cox.

C.D. Tregillis - Direct

2777

1    Why don't you just go through and summarize them.

2    A.   Okay.  So I think you read it accurately, and that is what

3    I intend to -- intended to depict here.  I put these slides

4    together in an attempt to explain my opinions.

5        And so, this one relates to the idea that Dr. Lehr

6    has offered opinions that in some instances, like I said, I

7    find to be not supported, not supported by facts, and in some

8    situations are not tied to the accused wrongful acts of Cox.

9        I think I'll explain that in more detail when we get

10   into it.  But he talks about things that are more general harms

11   about piracy generally, but not related to what I understand to

12   be at issue in this lawsuit.  That's what that first one

13   relates to.

14   Q.   Okay.  And the second one?

15   A.   The second is using the infringement notices sent by the

16   RIAA, and assuming that each notice represents a displaced

17   legitimate digital download of each track with a copyright in

18   suit, I've calculated what I've referred to as displaced

19   downloads of $692,000.

20       So for all of the notices, each one, if that was to

21   have a $1 price tag associated with it, that adds up to

22   $692,000, if you pick up each of the tracks that has a

23   copyright in suit in those notices.

24   Q.   And your third opinion?

25   A.   The third is that many users and tracks had few notices.

C.D. Tregillis - Direct

2778

1    Dr. McCabe testified about the fact that there was one, at

2    least, notice that implicated each of the copyrights in suit.

3    And I thought I would go deeper and say, is it more than one or

4    how many?  I thought I would investigate that further.

5    Q.   Now, you testified a moment ago that you have additional

6    slides or information with regard to each of these opinions.

7    So could we start with the first of your opinions.

8         Did you prepare some slides to summarize or help with

9    your testimony in that regard?

10   A.   Yes.  So the first area is, like I said, is my opinion

11   relating to the opinions of Dr. Lehr.

12        And so, what I have done here is put up a slide that

13   was one of his slides in which he talks about, as it says in

14   the title:  Piracy harms copyright holders.

15        So like I was saying a minute ago, this is an opinion

16   about piracy, generally.  This is not an opinion about the

17   accused wrongful acts of Cox.

18        Cox is accused of engaging in its business in a way

19   that is alleged to be wrongful.  Again, I'm not taking on

20   whether it's wrongful or not.  That's not my opinion.  My

21   opinion though is that any time you're talking about

22   quantifying economic harm, it should be the harm relating to

23   the accused wrongful behavior, not piracy generally.

24        So Dr. Lehr, when he talks about the effects of

25   piracy generally, well, piracy has been something that has been

C.D. Tregillis - Direct

2779

1   in existence for roughly 20 years.  It relates to people

2   engaging in piracy and wrongfully downloading content of all

3   types all across the world on many ISPs relating to works that

4   are not part of this lawsuit.

5          This lawsuit, as I understand it, pertains to, again,

6   the work -- the actions of Cox, whether Cox should have

7   implemented a different policy and procedures and acted

8   differently.  So that's what I think is relevant.

9          What I see here is Dr. Lehr opining about piracy that

10  is not part of this case.  So just as a general matter, that's

11  my -- one of the big concerns there.

12  Q.   Do you have a slide that, you know, summarizes your

13  distinction that you just made between his views and your

14  views?

15  A.   Yes.  And somebody just forwarded it -- or moved forward

16  to that slide.  So, thank you.

17         So what I have done here is put up a comparison of

18  what I view to be Dr. Lehr's analysis, as I understand it, and

19  his testimony, which I read, in this case.

20         So Dr. Lehr is talking about the beginning of piracy

21  from the 1990s through today.  I understand this case is about

22  behavior between February 1, 2013, and November 26, 2014.

23         Dr. Lehr is talking about all internet users around

24  the world.  I understand this case is about Cox's subscribers,

25  all of which are in the United States.

C.D. Tregillis - Direct

2780

1          I understand Dr. Lehr is talking about all content,

2     movies, pornography, games, and music.  I understand this case

3     is only about music.

4          Dr. Lehr is talking about all music.  I understand

5     this case is about only the music owned by the plaintiffs and

6     which is covered by the copyrighted works in suit.

7          So it is just a fundamentally different analysis.

8     And so, when he talks about piracy has these effects, I think

9     that, as I see it, I think it's valuable to put information in

10     front of the jury to provide them with information about what's

11     at issue in this lawsuit, quantifying that.

12     Q.   Okay.  So do you have any observations about the sort of

13     global nature of piracy that Dr. Lehr testified about?

14     A.   Yes.

15     Q.   Do you have a slide?

16     A.   Well, if you could move forward to the next slide.  Now

17     you are sort of above my pay grade on slide creation, so I had

18     some other people create a slightly more complex graph.

19          But, yes, I -- there was a graph that was put

20     together for me that depicts a peer-to-peer network, in this

21     case looking at an example of a transfer of a single file.

22          So imagine there is somebody in Canada who says that

23     they want to get a copy of a track by Van Halen.  And they say,

24     okay, I would like to get a copy of that.  And they choose to

25     go to a peer-to-peer network.

C.D. Tregillis - Direct

2781

1          So we see in the center of this a computer that says,

2    okay, let's go find where out there in the world is there a

3    copy of this Van Halen song that I would like to go get.

4          Then the BitTorrent, or other peer-to-peer network,

5    would go search and see who is out there and who has that.  And

6    you can see that in this instance there are seven different

7    subscribers from around the world that all have a copy of this

8    file, one of which is the Cox subscriber, it's the fifth one.

9          And so, the user is then able to go get the pieces of

10   that file.  And the way I understand that the peer-to-peer

11   network works is the file can be an individual file in its

12   totality or in pieces.

13         So that's a key part of this, is the going and

14   obtaining those packets of information that are then assembled

15   at the computer of that example of that person I used in Canada

16   that would want to go get a copy of that file.

17   Q.   So how many subscribers are we talking about in this case

18   with regard to Cox that are implicated with the works in suit?

19   A.   How many subscribers are implicated with the works in

20   suit?  There are, as I understand it, 57,600 users that have

21   been identified as having a work in suit on their device as

22   part of MarkMonitor's process of investigating.  And that's

23   people that have one or two or three or more.

24         So you start out with 57,600.  I think 31,700 or so

25   had three notices.  But there were, I think, a total of 57,000

C.D. Tregillis - Direct

2782

1    or so if you consider all of the users that had been detected

2    as having a work in suit.

3    Q.   How many subscribers, broadband subscribers, did Cox have

4    at this time frame, 2013 to 2014?

5    A.   About 4.5 million, I understand.

6    Q.   All right.  So you have gone through this slide.  Do you

7    have another slide on this same issue?

8    A.   Yes.  So for purposes of my analysis, what I understand is

9    that if you talk about what's at dispute in this case, it is

10   that the Cox subscriber would potentially not be on the network

11   if Cox had acted differently.

12        Now, I understand one interpretation is all of those

13   57,600 people would have never had any of those notices.  If

14   that be the case, then that fifth source of this file to get

15   those packets of information that are assembled on the computer

16   by that user in Canada, that source would not have been

17   available.  And then the Canada user would have to go get that

18   packet of information, or packets that came from the Cox user,

19   would have to be obtained from the other sources that have the

20   same file out on the peer-to-peer network.

21        So in this example, that packet is obtained from a

22   Verizon subscriber.  That's the effect, like I said, if you

23   wipe out all of those 57,000 users and all of their having ever

24   made those files available on the peer-to-peer network.

25   Q.   So going back to Dr. Lehr's slide on piracy generally, do

C.D. Tregillis - Direct

2783

1    you have specific areas of disagreement?

2    A.   Yes.  Well, again, what happens here is if you go to the

3    next slide, you'll see one scenario here is that if you have

4    that Cox subscriber that got terminated, then they would

5    presumably go get internet access somewhere else.

6             MR. ZEBRAK:  Objection, Your Honor, foundation.

7             THE COURT:  Overruled.

8    A.   So to the extent that a subscriber goes and gets that

9    service from somewhere else, here you have Time Warner Cable as

10   the subscriber, then that subscriber would be back on the

11   internet, back on the peer-to-peer network and, again, having

12   their file available to have pieces of it that could be

13   downloaded and assembled at that user's computer in Canada.

14            So, ultimately, whether the person would be wiped out

15   completely like in the last slide and you have to go get the

16   packet from a Verizon subscriber, or whether the person just

17   moves to another ISP and then you get it from now what would be

18   a Time Warner subscriber, that's really what we're talking

19   about.

20            And that's just fundamentally not what Dr. Lehr was

21   talking about.

22   BY MR. BUCHANAN: (Continuing)

23   Q.   So why don't we go back to Dr. Lehr's slide on piracy

24   generally.  And do you have specific areas of disagreement with

25   regard to his other points?

C.D. Tregillis - Direct

2784

1   A.   Yes.  Well, we really at the title, just about the

2   difference between piracy generally and what's at issue in this

3   case, and that's a theme throughout these points, but if you go

4   here through the four points that are on this slide, one of his

5   points, the first is:  Infringing downloads and uploads

6   displace legitimate sales.

7           And I have done an analysis to reflect that.  I think

8   that's my second opinion.  So we will probably get to that in a

9   minute.

10  Q.   What about your opinions with regard to some of those

11  other points?

12  A.   Okay.  On the second one, the point is:  Piracy

13  negatively impacts pricing.

14          So again, does piracy generally -- over the last

15  20 years, has that had a negative effect on the price of

16  downloads?  Does that mean when you go to iTunes and you buy a

17  song for $1.29, if the world had been different for the last

18  20 years, would the price be higher than $1.29 per track?  Is

19  the price of CDs potentially going to be more than the price

20  that it has been?  Maybe.

21          That's not an investigation that Dr. Lehr performed.

22  Dr. Lehr testified and said that -- he said that there is a

23  double effect, that there is both a price and a quantity

24  effect.

25          Well, the way that it works in the field of economics

C.D. Tregillis - Direct

2785

1    is when we make an investigation, it's possible that if there

2    is a decrease in demand for something, that could be seen in

3    lower prices, it could be seen in fewer sales, but that's

4    something you have to investigate.

5           We go find facts.  We look at the pricing history.

6    We say, okay, is there evidence that the price would have been

7    lower or higher?  And so, is the $1.29 a deflated price?

8           That's not an investigation that Dr. Lehr performed.

9    He hasn't quantified it.  He has talked about the concept.

10          So there's no evidence of there being a double effect

11   or that there's any piracy, just from music -- or there has

12   been no price erosion as a result of the piracy generally.

13          And then there's certainly no analysis by Dr. Lehr of

14   a price erosion effect related to the wrongful acts accused

15   here.  So if you say Cox would've implemented prices

16   differently with its subscribers, and the prices would have

17   been -- or, sorry, the policies would have been different in

18   2013 and 2014, does that mean that the plaintiffs would have

19   charged more for their music if Cox had behaved differently for

20   its 5 percent of the United States internet that is a part --

21   that's less than 1 percent of the world internet?

22          That's not an analysis that Dr. Lehr performed, and

23   there's no evidence of that.

24   Q.   Now, what about his third point:  Copyright holders incur

25   substantial enforcement costs?  Do you have an opinion with

C.D. Tregillis - Direct

2786

1    regard to his testimony on that issue?

2    A.   Yes.  And it's just very similar to what I was talking

3    about before.  If Cox had behaved differently and implemented

4    different policies -- let's say they would have terminated

5    subscribers earlier, or sent more e-mails, or more aggressive

6    e-mails, or changed its policy, which, again, that's what I

7    understand this lawsuit to be about, would that have caused the

8    copyright holders to have incurred --

9           MR. ZEBRAK:  Objection, Your Honor.  Can we have a

10   sidebar, please?

11          THE COURT:  Yes, sir.

12          NOTE:  A sidebar discussion is had between the Court

13   and counsel out of the hearing of the jury as follows:

14   AT SIDEBAR

15          MR. ZEBRAK:  I believe he's testifying outside his

16   reports now and really presenting closing argument that

17   Mr. Elkin is intending to give.

18          Mr. Tregillis did two analyses, and Your Honor has

19   seen his reports.  He did a works in suit analysis, and he did

20   an analysis where he quantified actual damages looking at the

21   iTunes downloads.  He didn't measure overall incentives.

22          And this is a preview of closing argument.  And I

23   just -- and it's being directly elicited, Your Honor.  I

24   just --

25          THE COURT:  He's responding to statements that Lehr

C.D. Tregillis - Direct

2787

1    made, and he's saying there has been no analysis done by Lehr,

2    no --

3           MR. ZEBRAK:  I understand that.

4           THE COURT:  -- in this area.

5           MR. ZEBRAK:  I apologize, Your Honor.

6           THE COURT:  No, it's fine.

7           MR. BUCHANAN:  And it --

8           MR. ZEBRAK:  Well, let me finish.

9           MR. BUCHANAN:  Sorry.

10          MR. ZEBRAK:  So, yes, Your Honor, but he was

11   responding to Lehr in his original reports.  He didn't analyze

12   Cox's incentives.  He didn't say, if Cox had terminated this

13   earlier, that would have happened.

14          This is Mr. Elkin's closing argument via Mr. --

15          THE COURT:  Okay.  I don't need the preview of the

16   closing argument.  I want to know what your objection is to him

17   testifying about these matters.  It's outside of his reports?

18   He's never -- he wasn't asked this in his deposition?

19          MR. ZEBRAK:  Yes, Your Honor.

20          THE COURT:  He doesn't under -- he doesn't know what

21   Cox's incentives, economic incentives are?

22          MR. ZEBRAK:  All of the above.

23          THE COURT:  How is this admissible?

24          MR. BUCHANAN:  His reply report replies to Dr. Lehr

25   and Dr. McCabe, and he talks all about this, about piracy and

C.D. Tregillis - Direct

2788

1   how generic he is, and he doesn't confine it to the facts of

2   this case.  It's all in the reply report.

3            And he's responding to the slides that Dr. Lehr put

4   up, it's directly -- and he is a rebuttal witness.  It's

5   covered in his reply report.  And it's directly rebutting Dr.

6   Lehr's testimony, both in his reports and --

7            THE COURT:  I didn't read anything about Cox's

8   economic incentives regarding infringement, or lack of economic

9   incentive, or whether it's relevant or not.  That's where I

10  don't know --

11           MR. BUCHANAN:  I didn't -- I'm not sure that he's

12  going in that direction and if he made any reference to that.

13  Obviously, Dr. Lehr spoke at length about that, and Mr.

14  Bakewell responded to that.

15           But we'll keep him, you know, within his reply report

16  and responding to Dr. Lehr's testimony.

17           THE COURT:  Okay.

18           MR. ZEBRAK:  Your Honor, the notion that he can get

19  on the stand and say anything he wants about piracy and do an

20  analysis from the stand that he never did in his reports, we

21  object to that.

22           And counsel is saying that we'll keep him in his

23  reply report.  What he's just gone through, he never said if

24  Cox had done this after these number of steps, that would

25  happened.  He made the very thin observation that --

2789

1            THE COURT:  He hasn't said that now.

2            MR. ZEBRAK:  Well, he has been -- Your Honor,

3    respectfully, I think he has been on the stand saying, had Cox

4    terminated earlier, done this and that.

5            In his report, he object -- he made the very thin

6    observation that Dr. Lehr's analysis isn't an actual damages

7    analysis, he's talking about piracy generally.  And this is

8    just well outside his report.

9            And on top of that, they're eliciting testimony about

10   Cox's policy, not about the harm we've suffered.  It's, again,

11   not in his report.

12           MR. BUCHANAN:  Well, he was making just some

13   assumptions about dealing with Dr. Lehr.  Dr. Lehr says, piracy

14   is terrible, it lasted all these years, it had all these

15   impacts.  And he never tried to quantify them.

16           He's just pointing that out, let's look at this case,

17   here are the claims, here's the claim period, here are the

18   works in suit.  He has looked at those.  He has given a price.

19   And he's analyzed about what happens here with the Cox

20   subscriber if he left.  I mean, it -- you know, and what -- and

21   that's tied to the dollar --

22           THE COURT:  Okay.  Let's move into his analysis that

23   was done in his reply brief where he's talking about specific

24   -- the specific numbers and how he calculates what he believes

25   his royalty rate to be, yeah.

C.D. Tregillis - Direct

2790

1          MR. OPPENHEIM:  Sorry.  Just one other issue, Your

2    Honor.

3          Twice now, Mr. Tregillis has said, this case is about

4    whether or not Cox's policy was appropriate.  That's not what

5    this case is about.

6          THE COURT:  Yeah.

7          MR. OPPENHEIM:  This case is about copyright

8    infringement.  Whether or not Cox's policy was appropriate is

9    not the claim.  He shouldn't be testifying as to what this case

10   is about, and that needs to be cleaned up.

11         THE COURT:  Yeah.  Okay.

12         MR. OPPENHEIM:  And if I may, one second issue,

13   because I don't want to have to deal with another jury

14   instruction conference on this issue.

15         He's being asked questions about copying into Canada,

16   and the implication being, well, it's not in the U.S., so

17   there's no infringement.

18         Under the line of cases of Subafilms, any portion of

19   an activity that is infringing in the United States is

20   infringement here and can be rectified here.

21         We -- this shouldn't be inserted into the case so

22   that we have to put an instruction in to the jury about that.

23         THE COURT:  I don't know where the Canada stuff was

24   going from either.  What's that?

25         MR. BUCHANAN:  That had nothing to do with -- that

2791

 1    was just --

 2              THE COURT:  Why is he testifying about it?

 3              MR. BUCHANAN:  He's testifying -- he was testifying

 4    about the -- in his reply report, he responds to a lot of these

 5    points that Dr. Tregillis talks about, enforcement costs, and

 6    the piracy generating the harm.  And he's saying -- he's just

 7    giving an example that if you had a subscriber and he left the

 8    Cox network, you know, then someone could replace him.

 9              The Canada thing, it's just someone coming in and

10    downloading a song.  He's not saying it's legal there.  It was

11    just part of an example.

12              We're going to get to the whole issue of the piracy.

13    But he has a right, because he did his reply, to respond to Dr.

14    Lehr's points on that chart.

15              THE COURT:  To the extent he replied in his rebuttal

16    report, he can testify to that information.  Canada wasn't in

17    that report.  Using other ISPs wasn't in that report.  These

18    are all -- he's just thinking outside the box.  And that's not

19    permitted.

20              So let's focus him on what's in the reports.

21              MR. BUCHANAN:  Okay.  Well, I -- so what you -- when

22    you say, he's thinking outside the box, he was responding to

23    what Dr. Lehr, and he has --

24              THE COURT:  He had Lehr's reports.

25              MR. BUCHANAN:  And he commented, he said they were

C.D. Tregillis - Direct

2792

1    way too generic.

2              THE COURT:  Well, you can't just they're way too

3    generic.  You've got to have -- it has got to be in your

4    reports.

5              MR. BUCHANAN:  Well, he did.  He talked about how he

6    doesn't tie piracy to harm and into this case, and he talks

7    about that in his reports.

8              So I can narrow it.

9              THE COURT:  Let's move him into his --

10             MR. OPPENHEIM:  Can we get --

11             THE COURT:  Okay.  Hold on.

12             MR. OPPENHEIM:  -- a clarification for the jury that

13   what this case is about is what you'll instruct them it's

14   about?

15             I'm not asking you to correct him, but at least tell

16   the jury -- because he's now said it twice.  He's obviously --

17   it has been in his talking points or whatever has been created.

18   Let's clarify that it's what you say it is.  It's not about the

19   policy.

20             MR. BUCHANAN:  Well, Judge, I would object to that.

21   I mean, you can do that with the instructions to the jury.  You

22   say, you know, I meant -- to call him out and say he's outside

23   of it -- Dr. Lehr, I don't think he answered a single question

24   that I asked him.  He was all over the lot.

25             And so, I just don't think it's fair because this

C.D. Tregillis - Direct

2793

1   witness may be -- in the Court's view, said something that

2   wasn't tied directly to his reports.  There shouldn't be an

3   instruction to the jury about that.

4           MR. ZEBRAK:  Your Honor --

5           THE COURT:  Yeah.

6           MR. ZEBRAK:  I was just going to add that we've now

7   seen this with witness after witness, from Dr. Feamster and

8   others, where they're speaking about areas that the Court told

9   them not to speak to.

10          THE COURT:  Well, I didn't tell him it's --

11          MR. ZEBRAK:  Well, but Mr. Buchanan has --

12  understands that he needs to speak to --

13          THE COURT:  What do you want me to say?  Do you want

14  me to say that his testimony about what Cox's policy is is

15  not --

16          MR. OPPENHEIM:  To the extent that Mr. Tregillis has

17  indicated what this case is about, and that it's about Cox's

18  policy, the jury should disregard that.  You will instruct the

19  jury what the case is about --

20          THE COURT:  Well, it's his understanding of what the

21  case is about and why he prepared this testimony the way he

22  did, right?

23          MR. OPPENHEIM:  That's not what he said.  He

24  didn't -- there was no qualification to what he said.  Twice,

25  unequivocally, he said this is a case about whether or not

C.D. Tregillis - Direct

2794

1    Cox's policies were reasonable.  It's not a negligence case,

2    and it's not about the policies.

3            THE COURT:  Okay.

4            MR. ELKIN:  Thank you, Your Honor.  I think he's --

5    Mr. Oppenheim is extending what he said.  What he said, I heard

6    it a couple times now, because he did say it, that his

7    understanding of the case is not about X, it's not about Y.

8            I think how this case gets characterized -- I think

9    Mr. Buchanan can certainly rein him in to not elicit any of

10   that sort of going forward.  But the notion that somehow there

11   should be some instruction to the jury about what the case is

12   about and what the case is not about, I think it is not

13   necessary at this point.

14           THE COURT:  I'm not going to give them an instruction

15   at this stage.  Your exception is noted.

16           MR. ZEBRAK:  Your Honor, one final --

17           THE COURT:  But let's rein in him.

18           MR. ZEBRAK:  One final thing.

19           THE COURT:  No, come on.  We've had six roundabouts.

20           MR. ZEBRAK:  Yes, Your Honor.

21           NOTE:  The sidebar discussion is concluded; whereupon

22   the case continues before the jury as follows:

23   BEFORE THE JURY

24           THE COURT:  All right.  Mr. Buchanan, please

25   continue.

2795

1    BY MR. BUCHANAN:  (Continuing)

2    Q.   Okay.  So back to with regard to the third bullet:

3    Copyright holders incur substantial enforcement costs.

4            So are you aware of some of the costs that were

5    discussed by Dr. Lehr that are involved in this case in terms

6    of enforcement?

7    A.   Yes.

8    Q.   Okay.  And for example?

9    A.   These would include costs like hiring MarkMonitor to

10   investigate and sweep the internet.  And hiring Audible Magic.

11   It would include litigation costs.  Those kinds of expenses

12   that the copyright holders have incurred relating to enforcing

13   their cases.

14   Q.   Payments to the RIAA, would they be included?

15           MR. ZEBRAK:  Leading, Your Honor.

16           THE COURT:  Overruled.

17   A.   Yes.

18   BY MR. BUCHANAN:  (Continuing)

19   Q.   Okay.  And in -- what about internal costs, for example,

20   if the music companies had an individual --

21           THE COURT:  You can ask him whether he understands

22   internal costs, but don't lead him beyond that, please.

23           MR. BUCHANAN:  Okay.

24   BY MR. BUCHANAN:  (Continuing)

25   Q.   What about internal costs, say of the music companies,

C.D. Tregillis - Direct

2796

1    with regard to enforcing piracy?

2    A.   Yes, I understand there are internal people who work on

3    this at the music companies as well.

4    Q.   Okay.  Are those costs that you believe could have been

5    calculated?

6    A.   Yes.  That's a concern that I have with Dr. Lehr's

7    opinion, is that this is a blanket six words on a slide rather

8    than reflective of an investigation that he performed.  He

9    didn't interview, didn't look at those records, didn't make any

10   analysis of the quantum here that I believe would be something

11   he could have investigated.

12   Q.   And do you believe whether he even attempted to do that?

13   A.   I'm aware -- I'm not aware of him having attempted to do

14   that.  There was no testimony about attempting to do that.

15   Q.   Okay.  So the fourth bullet here:  Piracy deters future

16   investments and reduces incentives to create.  This is from

17   Dr. Lehr's slides.

18        Do you recall any testimony from him in his efforts

19   to try to quantify this or measure it in any way?

20   A.   No.  Again, this is just a generalized description of

21   piracy generally and talking about deterring future investments

22   and incentives to create.

23        I would think -- I haven't seen any evidence that

24   there are fewer songwriters writing songs or writing fewer

25   songs because of Cox's actions.

2797

1          And the investments, I'm not aware of any evidence of

2     any investments that the music companies would have made that

3     they didn't make because of Cox's investments -- or Cox's

4     behavior in --

5          THE COURT:  So you don't know one way or the other,

6     right?  You didn't do any discovery on that yourself; is that

7     right?

8          THE WITNESS:  That's right.  I'm not aware of any.

9          THE COURT:  All right.  I will strike your last

10    answer.

11         Let's proceed, please.

12    BY MR. BUCHANAN:  (Continuing)

13    Q.   Okay.  Now, Dr. Lehr, you recall, he also testified about

14    alleged benefits to Cox.  Do you recall that?

15    A.   Yes.

16    Q.   Okay.  And do you have a slide on that?

17    A.   Yes.

18    Q.   Okay.  So why don't you, you know, tell the jury and the

19    Court what your opinions are with regard to Dr. Lehr's attempt

20    to show the benefits to Cox.

21    A.   Again, what I see here is a description of Cox's benefit

22    from the infringement of its network.  If you go to the second

23    line on there -- I think the first line has been testified to

24    by others.  But the second line:  The repeat infringers paid

25    Cox more for internet service on average and likely purchased

C.D. Tregillis - Direct

2798

1    more expensive internet plans.

2          Dr. Lehr did look at data on that one.  And he

3    concluded, I think, there was about an 8 percent higher fee

4    paid by those subscribers that were the subject of 20 or more

5    notices, the residential subscribers with 20 or more notices,

6    compared to those with one or two notices.

7          My problem with that calculation is he has grabbed

8    two extremes.  By looking at those that have 20 or more

9    notices, that is a very small number of subscribers in that

10   category.  And to say, I'm going to compare those with the very

11   smallest group and say there is an 8 percent difference, that's

12   a very small amount of difference for grabbing the two

13   extremes.

14         He made no analysis of the everybody-in-between

15   group, the threes and fours and fives, and didn't say that

16   those were found to have had any significantly different amount

17   of data usage or fees compared to anybody else.

18         So it's sort of cherry-picking to grab only the very,

19   very highest and say that you're going to compare those to the

20   very lowest.

21   Q.   When you referred to notices, did you mean tickets?

22   A.   Yes.

23   Q.   Okay.  So also, did you hear Dr. Lehr's testimony with

24   regard to whether he considered the pricing for packages for

25   internet services geographically and if he calculated that into

C.D. Tregillis - Direct

2799

1    his equation?

2    A.   He didn't.  I understand that Cox has -- charges different

3    rates to different people based on things like geography.  For

4    example, I think there is a different rate in Connecticut

5    compared to other states.  That's not something that Dr. Lehr

6    considered or accounted for when he did his analysis comparing

7    the two far ends to see if there was any difference in rates.

8         So there can be rate fluctuations for other reasons.

9    Q.   And what about the issue of a notice or a ticket equalling

10   a download, did he analyze that at all?

11   A.   When you say -- the idea of a notice or a ticket not

12   equalling a download, what do you mean by that?

13   Q.   So do you recall whether he attempted to equate each

14   notice with additional data because it related to another

15   download?

16   A.   Oh.  No.  The identification of a ticket is just that

17   there was somebody who had a file available at a given time,

18   and that that showed up in the CATS system --

19        MR. ZEBRAK:  Objection, Your Honor.  He's not a

20   technical expert.

21        THE COURT:  Sustained.

22        MR. ZEBRAK:  I move to strike.

23        THE COURT:  Strike the last answer.

24        Ask your next question.

25   BY MR. BUCHANAN: (Continuing)

C.D. Tregillis - Direct

2800

```
1    Q.   So did --

2              THE COURT:  Mr. Tregillis, you're here to testify as

3    a forensic economist and quantify it.  This testimony about

4    matters that you weren't asked to testify about and which you

5    have demonstrated you don't have independent knowledge about,

6    you're just assuming, is not proper.

7              So let's testify about what you're here to testify

8    about, and not these other beliefs that you may have which are

9    outside of your reports and your deposition.  Okay?

10             Do we understand each other?

11             THE WITNESS:  Thank you very much, Your Honor.  Yes.

12             THE COURT:  All right, thank you.

13             Let's go.

14   BY MR. BUCHANAN:  (Continuing)

15   Q.   So in your reply report you discussed this testimony by

16   Dr. Lehr about the -- comparing the people with one to two

17   notices versus those with over 20 notices, correct?

18   A.   Yes.

19   Q.   Okay.  Were you able -- and he calculated -- if you

20   recall, he calculated in his report how much data might be used

21   by the people that had 20 or more, there would be more data.

22   Do you recall that?

23   A.   Yes.

24   Q.   Did you happen to calculate what it would take for, say

25   the subscribers, the 57,000 subscribers of Cox, if they wanted
```

C.D. Tregillis - Direct

2801

1    to download all the data and -- or the music that he indicated

2    in his reply report or his report?

3           MR. ZEBRAK:  Objection, Your Honor.  It's outside the

4    scope.

5           THE COURT:  Well, overruled.  I'm going to let him

6    answer the question.

7           Do you understand the question?  And is it part of

8    your analysis, sir?

9           THE WITNESS:  It is.  It's in my reply report, and

10   I'm aware of what he's asking about.

11          THE COURT:  All right.  Please go ahead, then.

12   A.   I did perform that analysis.  And what I calculated was

13   that there are in this dispute a number of notices that have

14   been identified.  And if you look at all of files that are in

15   those notices for all of the time period from 2012 through the

16   end of the notice period, the end of the claim period in 2014,

17   if you take all of those files and you were to have the 57,600

18   subscribers, and all of them were to be at the bottom tier of

19   Cox's programs, it would take 1 percent of one month to

20   download all of the files that were -- and all of the notices,

21   all of the occurrences that are at issue in this case, even

22   those beyond this case, going back to 2012.

23   BY MR. BUCHANAN:  (Continuing)

24   Q.   Okay.  Under any particular package?

25   A.   Under the bottom package, I think it's called the Standard

C.D. Tregillis - Direct

2802

1   Package.

2           MR. ZEBRAK:  Your Honor, may we have a brief sidebar?

3           THE COURT:  Yes, sir.

4           NOTE:  A sidebar discussion is had between the Court

5   and counsel out of the hearing of the jury as follows:

6   AT SIDEBAR

7           MR. ZEBRAK:  Sorry, Your Honor, I was confused.  I

8   thought it wasn't in his report.  I lost it.  I apologize.  He

9   is -- close enough.

10          THE COURT:  Okay.  All right, thank you.

11          NOTE:  The sidebar discussion is concluded; whereupon

12  the case continues before the jury as follows:

13  BEFORE THE JURY

14  BY MR. BUCHANAN:  (Continuing)

15  Q.   So let's go to bullet number 3:  Cox saved costs by not

16  addressing copyright infringement.

17          So on bullet 3, that relates to Dr. Lehr's testimony

18  about the costs saved by Cox by not addressing copyright

19  infringement.  Do you have an opinion about that?

20  A.   Yes.  It's similar to what I expressed earlier about

21  whether Cox saved moneys.  It's not an instance in which Dr.

22  Lehr performed a calculation, didn't investigate that.

23  Q.   Okay.  All right.  Let's go to your second opinion:  Using

24  the infringement notices sent by the RIAA, assuming each notice

25  represents a displaced legitimate digital download of each

C.D. Tregillis - Direct

2803

1    track with a copyright in suit, I calculate displaced downloads

2    of $692,000.

3           Now, you briefly described that before.  Can you now

4    go into more detail for the Court and the jury on that issue.

5    A.    Sure.  I think if you move forward in the slides, you'll

6    start to see the slides that I created to try to explain this.

7    Q.    Okay.  This says:  Works in suit claimed by plaintiffs.

8    And you've got some calculations here.

9           What's purpose of this slide.

10   A.    Well, it explains how my whole analysis started.  Like I

11   said, it's similar, it seems to me, to what Dr. McCabe did,

12   which is probably why we ended up with pretty similar outcomes.

13          And so, as Dr. McCabe testified, there are a

14   combination of sound recordings and musical compositions.  And

15   if you add those up, that gets you to works in suit, which are

16   alleged by the plaintiffs to be 10,017.

17          So a sound recording, as I tried to put into the

18   picture here, I understand for purposes of my analysis relates

19   to a recording of a track.

20          And the musical composition, I think of it more like

21   sheet music.  It's not specific to who would have performed

22   that -- performed that song.

23          So that's where it starts, is with what are -- these

24   lists of the sound recordings and the musical compositions.

25   Q.    Okay.  Could you walk us through the process on this

C.D. Tregillis - Direct

2804

1    particular opinion.

2    A.   Yes.  I think if you go to the next slide, what I did here

3    was I copied in the first ten lines of this sound recordings

4    list, which is PX 1 on the left, and the musical compositions

5    list on the right, PX 2.

6            And like I said, this is just the first ten lines.

7    There are 6,734 lines to the sound recordings.  And 3,283 lines

8    to the musical compositions.

9            So, for example, you can see Alabama, Alan Jackson,

10   Alicia Keys, and then it lists the tracks.  So for the sound

11   recordings, you have who performed it, and the track, and the

12   title of that song.

13           And then it has the registration number and the

14   plaintiff, as you can see on PX 1 on the left.

15           And then on the right, you don't have the performer

16   because it's just the music.  It doesn't -- if you have

17   different artists that are performing the same track, it would

18   still implicate the same copyright.  It doesn't matter who is

19   singing it.

20           So that's how we get to -- that's where my analysis

21   starts, is looking at PX 1 and PX 2.

22   Q.   Okay.  So there has been some testimony about how this

23   information was gathered and notices were sent with regard to

24   like MarkMonitor and Audible Magic.

25           You did not investigate their work, did you?

C.D. Tregillis - Direct

2805

1    A.   No.  For purposes of my analysis, I understand there is

2    some issues of dispute about whether the Audible Magic and

3    MarkMonitor --

4            MR. ZEBRAK:  Objection, Your Honor.  He doesn't need

5    to proffer --

6    Q.   Did you --

7            THE COURT:  I'm sorry.  I'm sorry, there's an

8    objection.  Sustained.

9    BY MR. BUCHANAN: (Continuing)

10   Q.   Did you --

11           THE COURT:  Ask your next question.

12   Q.   Did you consider Audible Magic or MarkMonitor, did you

13   look into anything they did?

14   A.   No, I didn't.  I accept that at face value.

15   Q.   Okay.  Thank you.  So -- okay.  You've identified this.

16   Can you give us -- I think you gave us the detail here.  So

17   what did you do with this information?

18   A.   Well, if you go to the next slide, then, again, it's going

19   back to the start.  And go forward one more.

20           What happens in my investigation is I'm trying to

21   understand how a download works, as I've tried to show that

22   graphically.  And I understand that there is a MarkMonitor

23   investigation that found -- in this case user A has a -- I put

24   a little yellow symbol there to show that there is a track that

25   was identified as part of a file on a user's computer.  And

C.D. Tregillis - Direct

2806

1    they got that from the users on the right.

2            So when I see that there is a MarkMonitor notice or

3    an RIAA-sent notice that MarkMonitor put together, then you

4    know that somebody had gotten that file.  And for purposes of

5    my analysis, I'm assuming they got it from a peer-to-peer

6    network wrongfully.

7    Q.   Okay.  So how did you use these infringement notices in

8    your analysis?

9    A.   The infringement notice, we have three examples here, and

10   then I'll show you the process that I undertook in making my

11   investigation.

12           So you start off, I have the three notices here.

13   This is for a track by Nicki Minaj called "Marilyn Monroe."  As

14   it says in the title at the top, there is no sound recording,

15   but there is a musical composition, and it has two different

16   numbers for it.  And you can see it was detected three times.

17   It was in 2013, in August and October and December.

18           And you can see the title and the artist and then

19   what is called the hash text.  And a hash text is the number

20   that is unique to this electronic file.  That's the Audible

21   Magic hash text.  And then you can see the file name and where

22   it was found.

23           MR. ZEBRAK:  Objection, Your Honor.  He's -- again, I

24   think he's testifying as to the underlying technology.

25           THE COURT:  No.  I'll allow him to testify.

C.D. Tregillis - Direct

2807

1          THE WITNESS:  Okay.

2          THE COURT:  Just at this level.  You're not

3    testifying about the technology and how it all works.

4          THE WITNESS:  Exactly.  Understood.

5          THE COURT:  All right.  Go ahead.

6    BY MR. BUCHANAN:  (Continuing)

7    Q.   Okay, proceed.

8    A.   So for purposes of my analysis, I took the hash text from

9    the notices, and then I went to the Audible Magic dataset, and

10   that's what's shown in the second part there that starts with:

11   Torrent ID.

12          And from the Audible Magic dataset, I could see the

13   same what's called info hash or hash text.  And then the

14   Audible Magic dataset tells me what is in that file, because

15   you could have a file that has one song or a lot of songs, some

16   are an album, for example.  And so, Audible Magic tells me

17   that.

18          And here what this tells us in Audible Magic is that

19   this hash file, this electronic file that is sitting on

20   someone's computer, has Nicki Minaj's "Marilyn Monroe."  That's

21   the only file or the only track that is part of this file.

22          So then I take it in the green box and say, now let's

23   go see if I can find Nicki Minaj's "Marilyn Monroe" in PX 1 and

24   PX 2.

25          So I trace it through.  And sure enough, you can see

C.D. Tregillis - Direct

2808

1    "Marilyn Monroe" is part of the PX 2, which is the list of the

2    musical compositions.  So there's -- it's not in the sound

3    recordings.  There's nothing by Nicki Minaj in the sound

4    recordings.  But Nicki Minaj does have tracks that are in PX 2

5    in the musical compositions.

6              So this is line 3,220, and shows us where it is in

7    PX 2.  And it tells us there who owns it and it lists the

8    copyright registration numbers.

9              So as you can see, I summarize at the bottom, you

10   have three notices, they're all in 2013.  There's one hash ID.

11   And it's a musical composition, but not a sound recording.

12             So I employed a similar analysis for all of the

13   tracks and all of the files and all of the copyrights.  I have

14   another example that goes the other way in the next slide.

15   Q.   Okay.  So what does this slide indicate to you, it's Katy

16   Perry, "Hot and Cold"?

17   A.   Yes, so now it's flipped.  Now this is a sound

18   recording -- you can see at the top, I showed the small piece

19   from PX 1.  And you can see in PX 1, it's Katy Perry's "Hot and

20   Cold."  You can see the sound recording number.

21             And then if you go look in the notice dataset, you

22   can see during the claim period, there were 46 times that "Hot

23   and Cold" was in there.

24             And again, there's a sound recording, but no musical

25   composition.  And if you follow that through, you can see in

C.D. Tregillis - Direct

2809

1    2013, there were 31 of them.  And in 2014, there were 15 of

2    them.

3              And then over on the right, I observed that sometimes

4    you would see the same hash ID at the same location in multiple

5    -- and there -- on multiple days.  So there's a new notice each

6    time that the MarkMonitor people found that same file at the

7    computer, the same computer on another day, it shows up in a

8    unique notice.

9    Q.   So in looking at all this notice data, did you reach any

10   conclusions?

11   A.   Yes.  I think if you go to the next slide, you can see by

12   going through that whole process for all of the notices, there

13   are 162,000 notices for the claim period.  162,502 from

14   February 1 to November 26.  I was able to make that

15   investigation and I observed what I described here.  Which is,

16   like I said, each notice allegedly states that a file was

17   available for download on that day.

18             So if you have it observed available on other days,

19   that's going to show up in another notice.  The notice can be

20   for a hash ID with one track or many.  I described that

21   earlier, how it could be an album for a particular hash ID or

22   it could be just one song, like in the case of "Marilyn Monroe"

23   by Nicki Minaj.

24             And then also, many of those hash IDs that were found

25   in the claim period don't relate to the works in suit.  There

C.D. Tregillis - Direct

2810

1    was about 49,000 and change that didn't have a work in suit,

2    but 113,000 I found that did.

3            And then also, like I said earlier, there are a lot

4    more of these in 2013 than 2014.

5    Q.   Okay.  So what did you do next with this data?

6    A.   If you go to the next slide, I think that -- well, here we

7    go back to that next slide.  And continue one further.  There

8    you go.

9            So what you found -- or what I found is, I was

10   able -- Dr. McCabe said he found all of the 10,017 claimed

11   works in suit.  I was able to find 9,801 of them.  So that's

12   98 percent agreement.

13           There are some examples where I disagreed with him.

14   It really is situations in which he has found what he thinks is

15   the musical composition.  It looked to me like it wasn't the

16   same musical composition.  It might be a different song with

17   the same title, and I thought that he had made an improper

18   connection.

19           But for purposes of my analysis, I'm just giving him

20   the benefit of the doubt.  It's only 2 percent, so I'm just

21   going to assume all of them, even if I disagree.  I'm going to

22   give him those anyway for purposes of my analysis.

23   Q.   Okay.  So let's go to the -- you looked at the notices and

24   tracks.  Let's go to the next slide, and this is:  Displaced

25   download and revenue share to plaintiffs.

C.D. Tregillis - Direct

2811

1        So what does this depict and how does this relate to

2   your conclusions and analysis.

3   A.   Well, like I was saying earlier, I calculated displaced

4   downloads of $692,000.  So I tried to put together a graph to

5   explain what that means.  What that means is, we have examples

6   where this user on the left has gotten files from those three

7   people that are each through BitTorrent making files available

8   and pieces of files that could be assembled on that user on the

9   left's computer.

10        What I'm saying is, if that didn't happen and it

11   didn't go through path 2 and it went through path 1, then what

12   does that turn into?

13        And you can see if that had been a legitimate

14   download, it would have been a purchase for between $0.79 and

15   $1.29 through iTunes.  And there's a part of that, a revenue

16   share that goes to the plaintiffs.

17        So for those that, like I said, it's a range of $0.79

18   up to $1.29, I looked at the information that the plaintiffs

19   produced about how much their revenue share is, and I rounded

20   it up.  And it looks at about $0.90 for sound recordings and

21   $0.10 for musical compositions.

22        And so, I used that in my calculation of the money

23   that the plaintiffs would have gotten if these downloads, that

24   group of downloads had gone through channel 1, had all been

25   iTunes types of purchases, instead of getting them from

C.D. Tregillis - Direct

2812

1    BitTorrent or another peer-to-peer network.

2    Q.   Okay.  So did you do any analysis or make any assumptions

3    with regard to whether if someone downloaded a song, whether

4    that same person would have purchased that same song from

5    iTunes if they were unable to download it?

6    A.   Yes.  I think Dr. Lehr testified about that.  There was a

7    question for many of these people who are going the route of

8    BitTorrent, would these people, if they weren't able to do that

9    and go through BitTorrent or a peer-to-peer network, would they

10   have purchased something from the plaintiffs?

11            Dr. Lehr said that it might not be all of them.  And

12   I agree, it might not be all of them.  But for purposes of my

13   analysis, I assumed every one of them, even if it's somebody

14   that maybe wouldn't have, I'm assuming they all would have

15   bought a download through iTunes or a similar source.

16   Q.   Okay.  So you talked about looking at the tracks and the

17   notices.  And so, what did you find or conclude after looking

18   at them and comparing them?

19   A.   I think if you go to the next slide, you can see here the

20   results of what I found.

21            And that is, there are 677 total, what I call, track

22   notices.  So I described earlier how there is that dataset of

23   the notices of about 162,000, about 113,000 of which contain

24   the works in suit.  But this shows that there are about six

25   tracks per notice, because there are a lot of albums.

C.D. Tregillis - Direct

2813

1          And so, if you say that each one -- let's say there's

2     an album of ten tracks, that's going to turn into $10 that

3     would go to the plaintiffs for purposes of my analysis, because

4     it depends on how many tracks are in each notice.

5          And so, all of the tracks in all of the notices gets

6     you to 677,000 of the ones that I was able to trace.  And that

7     is for a total of 7,421 tracks that are covered by those 9,801

8     works in suit that I found.

9          So it's a little higher if you give the benefit of

10    the doubt to Dr. McCabe and the plaintiffs.  Instead of 9,801

11    works in suit, then it goes all the way up to the 10,017.  And

12    7,421 becomes 7,608.

13    Q.   You used the term "a conservative approach or analysis"

14    several times.  What do you mean by that?

15    A.   There were multiple times in my analysis where I used what

16    I thought were conservative inputs.  Like, for example,

17    assuming all of these would have turned into legitimate

18    downloads that the plaintiffs would have gotten paid for.

19    That's an example.

20          But I think in the next slide, perhaps -- there you

21    go.

22          So you can see in the next slide that there is the

23    benefit of the doubt on that 2 percent.  So although there are

24    some with which I think Dr. McCabe, I think, got it wrong, I'm

25    saying, put those in there anyway.

C.D. Tregillis - Direct

2814

1          Also, I'm giving the plaintiffs a dollar per track no

2   matter how -- what copyright they hold.  Because as we

3   described earlier, like the Nicki Minaj track where they just

4   have a musical composition, if all they have is the musical

5   composition, they would only get the $0.10 musical composition

6   royalty for their revenue share.

7          If they have just a sound recording, like with Katy

8   Perry, they just would get $0.90.

9          I have assumed that for all of the 7,421 tracks, they

10  have all -- well, actually 7,608, I'm assuming -- because I'm

11  giving them the benefit of the doubt, I'm going -- I'm adding

12  that 2 percent in there.

13         So for all 7,608, they get credit for having a sound

14  recording and a musical composition, even if they only have

15  one, which is frequently.  Normally they have only one.  I gave

16  them the benefit of having both, gave them a dollar, not just

17  $0.90 or $0.10.

18  Q.   And you used the word "track."  What do you mean by

19  tracks?

20  A.   Well, like I said, a track is a song.  And so, you have

21  copyrights, there are 10,017 copyrights, but only 7,608 tracks.

22  And that's because some of the tracks have both a copyright

23  and -- a copyright and a musical composition and a sound

24  recording.  So you're going to have fewer.  There's a piece

25  that have just one, there's a piece that have just the other,

C.D. Tregillis - Direct

2815

1    and then there's a piece that has both.

2            So as a result, because there is overlap, then that

3    ends up being a smaller number.

4            MR. OPPENHEIM:  Your Honor, I think we discussed this

5    earlier, I would object and move to strike.  This was, I

6    believe, a product of a very lengthy earlier discussion.

7            THE COURT:  Yeah, sustained.  I'll strike the last

8    answer.

9    BY MR. BUCHANAN: (Continuing)

10   Q.   So, Mr. Tregillis, you are aware that the plaintiffs claim

11   that your assessment of a dollar per track is -- doesn't

12   measure the true amount of harm.

13           Do you understand that?

14   A.   Yes.

15   Q.   Okay.  And what is your response to that?

16   A.   Mr. Zebrak, in his deposition of me, asked me questions

17   about the dollar and my justification for that.  And I think

18   that my dollar rate is an appropriate rate.  I think that as I

19   identify here, there are some conservative elements of it.  For

20   example, the use of a dollar even if the plaintiffs only have

21   one form of copyright.  I think that that's conservative.

22           If it -- if they only have a musical composition at

23   $0.10 and I'm giving them a dollar, I think that's

24   conservative.

25   Q.   So your third point then:  Each notice included, even has

C.D. Tregillis - Direct

2816

1   the same hash ID.

2          Can you explain that?

3   A.   Yes.  So what I've done here is if you have a download of

4   a track on a -- identified on a user's computer, and it shows

5   up three days in a row, I'm saying that I'm going to triple

6   count that and say that although it seems to be the same file

7   on the same computer multiple days, I'm going to have the -- a

8   dollar for each of those tracks each of those days.

9          I think that's conservative.

10  Q.   Okay.  And what about with regard to your fourth

11  conservative assumption with regard to Dr. McCabe?

12  A.   I'm including all notices, not the standard that

13  Dr. McCabe had used.  Dr. McCabe had said that he was looking

14  at all of the notices, had shown all of the copyrights at issue

15  if the user had been the subject of two prior notices.

16          So I'm not using that standard.  I'm using all of the

17  notices.

18  Q.   Okay.  Now, I'd like to move to your third opinion:  Many

19  users and tracks had few notices.

20          And James will take us there when he gets a chance.

21  Thank you, James.

22          Could you explain this.

23  A.   Yes, I can.  I wanted to look deeper at the users and

24  tracks that are at issue here.  Dr. McCabe said he found each

25  of them one time, at least one time.  And I wanted to know how

C.D. Tregillis - Direct

2817

1    many times are we finding these.

2            So I put together some examples to show this, and I

3    have total numbers as well.

4    Q.   Okay.  James, could you --

5            So -- okay.  What does this slide depict?

6    A.   So this is all notices in the claim period by -- for

7    tracks covered by -- or tracks by the artist Jamiroquai.  And

8    you can see, there is one song called "Virtual Insanity."  And

9    all of these, there were, it looks like, eight notices.  And

10   there are eight notices, they all happened in a one-month

11   period.  They all happened in October of 2014.

12           And then I summarized that at the bottom.  And you

13   can Jamiroquai, you can see there is just an SR, a sound

14   recording.  There's no musical composition.  It's all on one

15   hash ID.  And it appeared eight times in October of 2014.

16   Q.   Okay.  And why did you pick this particular artist and

17   this information?

18   A.   This is just an example that I found.  I grabbed a few --

19   I think four of them that I'm showing here.

20   Q.   All right.  And I think you have one on Van Halen; is that

21   right?

22   A.   Van Halen, this is all notices in the claim period for

23   Van Halen.

24           So for all of Van Halen's songs, these all come from

25   one album of Van Halen's, from -- it's called "1984," which is

C.D. Tregillis - Direct

2818

1    Van --

2            MR. ZEBRAK:  Objection, Your Honor.

3            THE COURT:  I'm sorry?

4            MR. ZEBRAK:  Objection, Your Honor, foundation.  I

5    could explain on a sidebar, but he's now testifying about --

6            THE COURT:  All right.  Approach the bench, please.

7            NOTE:  A sidebar discussion is had between the Court

8    and counsel out of the hearing of the jury as follows:

9    AT SIDEBAR

10           THE COURT:  Yes, sir.

11           MR. ZEBRAK:  So, Your Honor, from recollection, I do

12   believe he talked about Van Halen in his report.  But in his

13   answer he's now talking about appearance of these tracks on

14   albums.  And I want to be very careful that he's not going to

15   do what Your Honor just struck from his slides and now talk

16   about interrelationship between tracks and albums.  It has

17   nothing to do with his damages analysis or how he determined

18   the works in suit.

19           MR. BUCHANAN:  He is not going to do that.

20           THE COURT:  Okay.

21           MR. ZEBRAK:  Well, he just mentioned an album, Your

22   Honor.  This keeps happening.

23           THE COURT:  All right.  Let's just focus --

24           MR. BUCHANAN:  Well, there is a calculation between,

25   you know, sound recording and musical composition, which he

C.D. Tregillis - Direct

2819

1    testified about.  So each one of these things is in his report.

2    He is just testifying about that he has looked at them, and it

3    shows the frequency of those artists.  So he has picked three

4    very popular artists.  It shows the frequency of how many times

5    they got tickets, people got tickets or notices related to

6    works.  And that's the information, all that information is in

7    the report.  He laid it all out.  They had a right to depose

8    him on that, and now they are just trying to box him in.

9          MR. ZEBRAK:  Your Honor, I have no objection to him

10   discussing how he did his damages analysis.  He doesn't need to

11   discuss albums.  Which is the issue -- the interrelationship

12   between tracks and albums.  He didn't do an analysis of all

13   that.  It does not involve his damages calculation.

14         He is now straying into the area that should be off

15   limits.

16         MR. OPPENHEIM:  And I believe the demonstrative shows

17   that there are three SRs for those tracks.  So there is no

18   foundation.  I mean, he can't look at it and say, well, it is

19   one SR or it's one album.  You can't determine that unless you

20   go outside of the record.  And I don't know whether its true or

21   not.

22         MR. BUCHANAN:  Look, he got this information, it's in

23   his report.  Whether it's a sound recording or musical

24   composition, it's in PX 1 and PX 2, he looked at that.  He

25   looked at the notice data, the ticket data.  And all this

2820

1    information is in his report.

2             So he did determine whether it is a sound recording

3    or musical composition, whether it's an album or a single, all

4    that.

5             THE COURT:  I understand that.  All right.  Let's

6    stay away from albums and move forward.  Thank you.

7             MR. ZEBRAK:  Thank you, Your Honor.

8             NOTE:  The sidebar discussion is concluded; whereupon

9    the case continues before the jury as follows:

10   BEFORE THE JURY

11   BY MR. BUCHANAN: (Continuing)

12   Q.  So were you finished explaining on the Van Halen notices

13   in the claim period?

14   A.  No, I was not.  What I observed here with Van Halen was,

15   like I said, it is nine tracks that are all from the Van Halen

16   album "1984" --

17            MR. ZEBRAK:  Objection, Your Honor.

18            THE COURT:  Yeah.

19   BY MR. BUCHANAN:  (Continuing)

20   Q.  Just refer to tracks.

21   A.  Okay.  Very good.  I observed nine tracks here.  And they

22   were all part of -- you can see on the far right, there is a

23   hash ID on the far right that shows up as 1, and one of them is

24   2.

25            So there is a hash ID that covers this whole set of

C.D. Tregillis - Direct

2821

1    tracks.  And then there is an additional hash ID that just

2    covers the top track.  And then you can see how many notices.

3           So for the hash ID that covers all of the tracks,

4    there were five of those in the claim period.  And then there

5    is another hash ID, like I said, for just the top track,

6    "1984," and there were two extra ones of those.

7           The five that occurred for the whole album were in

8    2013.  And then there was one -- the other one, like I said,

9    the two instances in 2014 relating to the single.

10   Q.   Okay.  Now, I think you also did a same sort of chart and

11   analysis for Celine Dion; is that correct?

12   A.   Yes.  I thought I would try a different kind of music

13   here.  So now we're looking at Celine Dion for all the notices

14   in the claim period for Celine Dion.  And you can see a range

15   of outcomes.  Her "My Heart Will Go On" track from "Titanic" is

16   the biggest at 214 notices.  And then the number goes down to

17   as few as five notices.

18          And it depends on the number of hash IDs because each

19   hash ID shows up some number of times.  And if you add those

20   all up, that's what you see here for Celine Dion.  And there

21   were far more "My Heart Will Go On" notices than there were the

22   ones that had the tracks at the bottom with as few as five.

23          So it's a range.  In this case, again, I'm showing

24   the sound recordings and the musical compositions.  All of

25   these have sound recordings.  Six of them have musical

C.D. Tregillis - Direct

2822

1    compositions.  Again, there were more in 2013 than 2014.

2    Q.   So did you do any analysis of the tickets and notices

3    during the claims period for the -- regarding the music in this

4    suit?

5    A.   I don't understand your question.

6    Q.   Okay.  Go to the next slide.

7         Okay.  We have one more, Annie Lennox.

8    A.   Yes.

9    Q.   And did you do a similar analysis with regard to Annie

10   Lennox as you did the other artists?

11   A.   Yes, I did.  So here we have one hash ID that covers all

12   of these -- well, I didn't mean to touch the screen.  Sorry

13   about that.  Ten tracks.  And there are 17 notices.  They are

14   covered by a combination of sound recordings and musical

15   compositions, as you can see in the -- now that I know I can

16   touch the screen and make a dot on it -- they are covered in

17   those two columns SR and MC.

18        So you have a combination, like I said.

19   Q.   Does "SR" stand for sound recording and "MC" stands for

20   musical composition?

21   A.   That's right.  And like I said, there's a total of 17

22   notices for all of Annie Lennox's music for the claim period.

23   Q.   So did you attempt to analyze how many users had had how

24   many notices in the claims period?

25   A.   Yes, I did.

C.D. Tregillis - Direct

2823

1    Q.    Okay.  And did you prepare a graphic or a demo for that?

2    A.    Yes, I did.

3    Q.    Okay.  And so, we're looking at this.  And so, what does

4    this depict?

5    A.    Well, I guess my green dots from touching the screen are

6    still there, so sorry about that.

7              But what I see here is this pie reflects the -- well,

8    this is the pie that I put together.  And it reflects how many

9    notices are we talking about for users.  And during the claim

10   period, you can see out of the 57,000, 31,000 had one or two

11   notices during the claim period.

12             And then you can see the distribution for notices in

13   the claim period to 51 or more, there are 14 of them in that

14   category.

15             So about 70 percent of them were in the one or two

16   notices in the claim period.

17   Q.    Okay.  How does this compare to Dr. McCabe's analysis?

18   A.    Well, there is a difference, which is Dr. McCabe was

19   looking at notices for a longer period of time.  I was saying

20   for just the claim period.

21             So he had, I think, a little bit under half in the

22   one to two category.  If you look as just the claim period, the

23   one to two category gets a lot bigger.

24   Q.    Okay.  Do you have a slide that shows different -- the two

25   and the five and above as well?

C.D. Tregillis - Direct

2824

1  A.   Yes.  I -- like I said earlier, I wanted to investigate

2  this idea of that if you have all notices included, then you

3  have notices per track.

4         And you can see the blue section of the pie is the

5  number of notices -- or number of tracks that have 1 to 50.

6  And then copper or orange, I guess, is 51 to 100.  And then 101

7  to 500.  And 501 to 1,000.  And 1,001 plus.

8         You can see if you consider all of the notices,

9  instead of disqualifying the first and the second the way that

10  Dr. McCabe did, then more conservatively you can see what the

11  pie distribution is.

12        I attempted to use a method more similar to what Dr.

13  McCabe did by looking at above the first two.  After the first

14  two, if you look at just those, then you can see, as you would

15  you expect, that you have fewer notices per track.  And so, the

16  blue part of the pie gets bigger.

17        And then if I adjusted that to another standard, what

18  if you were to look after the first five notices per user, then

19  you see a much smaller number here of notices per track.

20        And the number of tracks also falls because some of

21  these would fall away if you start eliminating notices.  But

22  you can see that the lion's share of these have very few

23  notices.  It's over half, even if you're including all of the

24  notices in the 1 to 50 category.  And it just gets to be more

25  and more of them that fall into that category if you're willing

2825

1   to take out the initial two or initial five notices.

2   Q.   Mr. Tregillis, could you summarize your opinions in this

3   case one last time.

4   A.   Well, I think I identified three of those --

5   Q.   Can we pull that -- go ahead.

6   A.   The three areas -- it's fine, I can describe them.  I had

7   areas in which I disagree with Dr. Lehr because I thought his

8   opinions were disconnected or not supported by facts and

9   investigation.

10          The second is I calculated that 692,000 using what I

11   think is a conservative methodology.  And the third is, I found

12   that there were many tracks and users that had very few

13   notices.  Generally what I observed is, like I said, there was

14   a trend here that was a downturn, a decrease, from 2013 to 2014

15   in the quantity of the notices at issue.

16          MR. BUCHANAN:  No further questions.

17          THE COURT:  Thank you.

18          MR. BUCHANAN:  Pass the witness, Your Honor.

19          MR. ZEBRAK:  Thank you, Your Honor.

20          THE COURT:  Cross-examination.  Go ahead.

21   CROSS EXAMINATION

22   BY MR. ZEBRAK:

23   Q.   Good afternoon, Dr. Tregillis -- excuse me -- Mr.

24   Tregillis.

25   A.   Mr. Tregillis, yes.

2826

1          THE COURT:  Let's go for about ten minutes and then

2     it is a good time to break.

3          MR. ZEBRAK:  Yes, Your Honor.

4     BY MR. ZEBRAK:  (Continuing)

5     Q.   Your parents would be proud, I just made you a doctor.

6          Mr. Tregillis, you are by no means serving as a

7     neutral here, are you?

8     A.   Correct.

9     Q.   Right.  So when you talked about acting as a neutral at

10    times, that has nothing to do with your work here, right?

11    A.   No, it's similar.  I perform accounting, financial, and

12    economic investigations, sometimes I'm on one or the other

13    side.  Sometimes I'm in a neutral role.  It's a similar

14    process.

15    Q.   Sure.  Well, let's follow up.  You talk about being on a

16    side.  Here -- well, first of all, it's Winston & Strawn that

17    hired you.  Yes or no, sir?

18    A.   Correct.

19    Q.   And you are on Winston & Strawn's side, correct?

20    A.   I believe they are the ones who have called me to testify

21    here today.

22    Q.   And you're obligated to serve their interests, are you

23    not, sir?

24    A.   No.  I am obligated to serve my own interest.  I was hired

25    to perform an investigation, and I do that of my own volition,

1  sticking to my own standards as a CPA.

2  Q.   Sir, let's talk about your own interests for a moment.

3  How many times have you been hired by Winston & Strawn, sir?

4  A.   Something between five and ten, I think it is.

5  Q.   And you indicated -- who is the client?  Is it Winston &

6  Strawn or Cox?

7  A.   Winston & Strawn is my client.

8  Q.   Okay.  And you indicated that you did your analysis

9  subject to a set of standards from the AICPA, right?

10 A.   Right.

11 Q.   Now, doesn't those standards require you to serve your

12 client's interests by seeking to accomplish the objectives

13 established in the matter?

14 A.   Yes, it does.

15 Q.   Okay.  So a moment ago you just said you're not serving

16 their interests, you're only serving your own interests?

17 A.   So the interest is my interest to perform my services in

18 an independent manner.  And that's what I understand Winston &

19 Strawn has asked me to do.

20 Q.   And you believe you have done this work in an independent

21 objective manner; is that correct?

22 A.   Yes, I do.

23 Q.   Okay.

24 A.   Absolutely.

25 Q.   Well, another one of the -- well, first of all, you

C.D. Tregillis - Cross

2828

1    believe you have done your work in compliance with these

2    standards, right?

3    A.   Yes.

4    Q.   Okay.  Another one of these standards is for you to have

5    sufficient relevant data, is it not?

6    A.   Yes, I described that earlier.

7    Q.   Right.  And you're not supposed to do your analysis unless

8    you have sufficient relevant data, correct, sir?

9    A.   I think that's right.  I am supposed to have sufficient

10   relevant data to support my conclusions.  To the extent I

11   express conclusions, I should have support for them.

12          That's one of the problems I had with Dr. Lehr is

13   not -- he's not a CPA, he doesn't have my standards.  But if he

14   did, I don't think he would follow my standards.

15   Q.   And your conclusions are not neutral conclusions?  They

16   are conclusions to serve your client's interests, correct, sir?

17   A.   They are neutral --

18   Q.   Yes or no, sir.

19   A.   No, I disagree with that.

20   Q.   Now, the sufficient relevant data standard requires you to

21   obtain sufficient relevant data to afford a reasonable basis

22   for conclusions or recommendations in relation to any

23   professional services performed; is that correct, sir?

24   A.   I think that's -- I think that's right, exactly.

25   Q.   And that's what you claim you complied with in this

C.D. Tregillis - Cross

2829

1    manner -- this matter, correct?

2    A.   Yes, yes.

3    Q.   Now, I think you testified earlier today that you've been

4    an expert over 120 times in matters; is that right?

5    A.   Yeah, I think that's right.

6    Q.   All right.

7    A.   A little over 120 matters in which I've testified.

8    Q.   Right.  And that doesn't mean necessarily that the courts

9    have admitted you as an expert in all of those cases, that's

10   just the number of matters in which you've been retained,

11   correct?

12   A.   That's right.  I've testified in right around 50.  And in

13   all of those cases I have been admitted.  There's no -- none of

14   those in which I wasn't.

15   Q.   Sure.  Okay.  Well, so you've been admitted in all the

16   cases in which you've testified; is that what you said?

17   A.   Right.

18   Q.   Okay.  And similarly, you would've done your work pursuant

19   to these AICPA standards when you've done damages analyses

20   before, right?

21   A.   Yes.

22   Q.   Right.  Well, I'm going to direct you, sir, to a binder

23   that we're going to pass up to you.

24            Can I have the binder, please.

25            So are you familiar with the document behind tab 4?

2830

1   A.   This looks like the opinion in the Grupo Televisa case.

2   Q.   Now, that was a case where you were hired to perform a

3   damages analysis, was it not?

4   A.   That's right.  I was on the plaintiff's side in that case.

5   But, yes, doing damage analysis.

6          MR. ZEBRAK:  Your Honor, permission to publish this

7   while I impeach?

8          THE COURT:  Any objection?

9          MR. BUCHANAN:  No objection.

10         THE COURT:  It's received.  You may publish.

11         MR. ZEBRAK:  Well, actually, we're not going to

12  publish it.

13  BY MR. ZEBRAK:  (Continuing)

14  Q.   I'm just going to ask you, sir, whether in this case, the

15  United States District Court for the Central District of

16  Florida concluded that your calculation of damages is

17  inadmissible because the testimony is not based on sufficient

18  facts or data, and is not the product of reliable principles

19  and methods?

20  A.   That's correct.  Would you like me to explain why?

21  Q.   Well, your counsel can do that later.

22         But just to be clear, this represents an instance

23  where a federal court indicated that your work was not the

24  subject of reliable principles and methods, correct?

25         That's a yes or no, sir.

C.D. Tregillis - Cross

2831

1   A.   I think those are the correct words.  I think you read

2   that accurately.  Like I said, I'll -- I won't expand on that

3   since you're not asking me to.

4   Q.   Well, yes, sir.  I mean, you understand the roles for --

5            THE COURT:  He answered the question.

6   Q.   Okay.  And likewise, I correctly read that the Court

7   indicated that your testimony was not based on sufficient facts

8   or data as well, correct?

9   A.   I think that's what -- that's what I thought you said

10  before, and I agreed with you before.

11  Q.   Okay.  And that wasn't the only time where testimony of

12  yours has been rejected by a federal court, has it?

13  A.   That's correct.

14  Q.   In another case, a Court similarly concluded that your

15  testimony on damages was not the product of a reliable

16  methodology?

17  A.   I think that might be the way the Court phrased it, that

18  might be in that opinion.

19  Q.   Now, you've reviewed Dr. Lehr's opinions during the course

20  of this litigation, right?

21  A.   Yes.

22  Q.   And you criticize him for -- well, first of all, you

23  understand that he concluded that data doesn't exist to do an

24  actual damages analysis here, correct?

25  A.   Yes.

C.D. Tregillis - Cross

2832

1    Q.   Right.  And the reason he has concluded that is because

2    the universe of all the distributions by these Cox subscribers

3    is unknown, correct?

4    A.   Yes.

5    Q.   And that's because records aren't kept of how many times

6    each of these Cox subscribers distribute those files all around

7    the world, correct?

8    A.   Right.

9    Q.   Right.  And you agree with his analysis that that data

10   doesn't exist, right?

11   A.   Yes, I do.

12   Q.   Right.

13   A.   I think that there is a subset.  Which is, when you have a

14   distribution that shows up at another computer, then if it is

15   seen at that other computer in the future, that's evidence of a

16   distribution.

17   Q.   Right.

18   A.   But it won't be all of them, but you will see some of

19   them.

20   Q.   Right.  And I think you -- your position is that when you

21   see lots of infringement evidence across different Cox

22   subscribers, you can make the inference that when you see it on

23   date A and date B, that the person got it from an earlier one?

24   Was that your testimony previously?

25   A.   Not necessarily, because a Cox subscriber could get it

C.D. Tregillis - Cross

2833

1    from somewhere else on the peer-to-peer network.

2    Q.   Right.

3    A.   But when you see that a Cox subscriber would have it

4    available and it would go somewhere, if there was some

5    expansion over time, then you would see it go from one to

6    another to another, and you might see it show up on multiple

7    Cox locations, in which case you'd see more notices.

8    Q.   Right.  And looking back at your slide, that's the viral

9    network effect with these peer-to-peer networks, right?

10   A.   Exactly.  That's what I was trying to depict, is the

11   idea --

12   Q.   Sure, yeah.

13   A.   -- that something could start small and get bigger.  I

14   think the way Dr. Lehr referred to it was in a viral way.  The

15   evidence didn't support that, but that's the concept I was

16   trying to describe.

17   Q.   Right.  Well, it spreads like wildfire across a

18   peer-to-peer network, that's the concept illustrated by all

19   those different arrows and dots, right?

20            It's a yes or no question, sir.

21   A.   That's what I was trying to depict, again, the data.

22   Q.   Okay.  And again, sir, that's the data that is unavailable

23   to you for this analysis because those records don't exist,

24   right?

25   A.   No, I --

C.D. Tregillis - Cross

2834

1    Q.   That's what you said, right?

2    A.   No.  I think the data are available to instruct on that.

3    And they tell us that that viral idea you're talking about

4    isn't happening.  But I appreciate the concept.

5    Q.   Well, sir, that -- what you just mentioned wasn't part of

6    your analysis in this case, was it?

7    A.   Yes, it was.

8    Q.   Sir, a few moments ago I asked you whether you agreed with

9    Dr. Lehr that actual damages -- that we can't calculate them

10   because the universe of distributions is unknown.  And you

11   agreed with me, correct?

12            And that's a yes or no.

13            MR. BUCHANAN:  I don't think that was the question,

14   about actual damages, Your Honor.

15            THE COURT:  He's --

16            MR. ZEBRAK:  Let me move on, Your Honor.

17            THE COURT:  He can't determine -- yeah, reask the

18   question.

19            MR. ZEBRAK:  Yeah.

20   BY MR. ZEBRAK: (Continuing)

21   Q.   Nobody knows how many distributions occurred here,

22   correct?

23   A.   I agree with you on that.

24   Q.   Right.  And it was for that reason that Dr. Lehr was

25   looking at Cox's economic incentives, rather than just doing

2835

1    actual damages analysis, that's what he explained, correct?

2    A.   I think that's consistent with his testimony.

3    Q.   Right.  And so -- but you didn't measure Cox's economic

4    incentives here?  You did an actual damages analysis, correct?

5    A.   I did an analysis of the harm, the actual harm.

6    Q.   Actual harm.  Actual harm, right.  But you did so without

7    knowing the whole universe of distributions?  You didn't factor

8    any of that into your damages analysis?  You didn't attribute

9    any monetary amount for that, correct?

10   A.   That's correct.  I don't think it's necessary.

11   Q.   Okay.  Well, sir, we have plenty of time to --

12            THE COURT:  Ask --

13            MR. ZEBRAK:  Well, we can stop now.

14            THE COURT:  Don't testify, yeah.  All right.

15            All right, let's take our lunch break, and we'll come

16   back about five minutes after 2:00.  I have a matter while

17   we're all at -- you're all at lunch here.  So if you hear some

18   rumbling in the courtroom, there's something going on, but it's

19   not this case.

20            So you're excused.  Have a good lunch.  Thank you.

21   We'll see you at five minutes after 2:00.  All right.

22            NOTE:  At this point the jury leaves the courtroom;

23   whereupon the case continues as follows:

24   JURY OUT

25            THE COURT:  All right.  So I have a plea at 1:10.  So

2836

1    just clear the front table, would be all we need.

2          Anything before we break?

3          MR. ZEBRAK:  I don't believe so from the plaintiffs,

4    Your Honor.

5          THE COURT:  All right.  Let's leave the binders where

6    they are and not take them out of the courthouse -- courtroom.

7          All right.  We're in recess.

8          NOTE:  The morning portion of the proceedings on

9    December 17, 2019, is concluded.

10         ----------------------------------------------

11

12

13

14

15                 CERTIFICATE OF COURT REPORTERS

16

17

18

19         We certify that the foregoing is a true and
           accurate transcription of our stenographic notes.

20

21                    _____
                        /s/  Norman B. Linnell
22                     Norman B. Linnell, RPR, CM, VCE, FCRR

23

24

25                    _____
                        /s/  Anneliese J. Thomson
                      Anneliese J. Thomson, RDR, CRR