2837

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
      -vs-                     :    Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  11  (P.M. Portion)

TRIAL TRANSCRIPT

December 17, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2838

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFFS:        MATTHEW J. OPPENHEIM, ESQ.
                                SCOTT A. ZEBRAK, ESQ.
                                JEFFREY M. GOULD, ESQ.
 4                              MICHAEL J. DRUCKMAN, ESQ.
                                ANDREW L. GUERRA, ESQ.
 5                              LUCY G. NOYOLA, ESQ.
                                JIA RYU, ESQ.
 6                              Oppenheim + Zebrak, LLP
                                4530 Wisconsin Avenue, N.W.
 7                              5th Floor
                                Washington, D.C. 20015
 8

 9   FOR THE DEFENDANTS:        THOMAS M. BUCHANAN, ESQ.
                                GEOFFREY P. EATON, ESQ.
10                              Winston & Strawn LLP
                                1700 K Street, N.W.
11                              Washington, D.C. 20006-3817
                                  and
12                              SEAN R. ANDERSON, ESQ.
                                MICHAEL S. ELKIN, ESQ.
13                              THOMAS P. LANE, ESQ.
                                CESIE C. ALVAREZ, ESQ.
14                              Winston & Strawn LLP
                                200 Park Avenue
15                              New York, NY 10166-4193
                                  and
16                              JENNIFER A. GOLINVEAUX, ESQ.
                                THOMAS J. KEARNEY, ESQ.
17                              Winston & Strawn LLP
                                101 California Street, 35th Floor
18                              San Francisco, CA 94111-5840
                                  and
19                              MICHAEL L. BRODY, ESQ.
                                Winston & Strawn LLP
20                              35 West Wacker Drive
                                Chicago, IL 60601
21                                and
                                DIANA HUGHES LEIDEN, ESQ.
22                              Winston & Strawn LLP
                                333 South Grand Avenue
23                              Suite 3800
                                Los Angeles, CA
24

25
```

2839

<u>INDEX</u>

| <u>WITNESS</u> | <u>EXAMINATION</u> | <u>PAGE</u> |
|---|---|---|
| CHRISTIAN D. TREGILLIS (Resumed) | | |
| | CROSS | 2840 |
| | REDIRECT | 2852 |
| TERRENCE PATRICK McGARTY | | |
| | DIRECT | 2864 |
| | CROSS | 2887 |

COURT'S JURY INSTRUCTIONS

  THE COURT                                            2912

2840

1                  A F T E R N O O N   S E S S I O N

2              NOTE:  The December 17, 2019, afternoon portion of

3     the case begins in the absence of the jury as follows:

4     JURY OUT

5              THE COURT:  Ready for the jury?

6              MR. ZEBRAK:  Yes, Your Honor.

7              THE COURT:  Okay.  Joe, let's get our jury, please.

8              NOTE:  At this point, the jury returns to the

9     courtroom; whereupon, the case continues as follows:

10    JURY IN

11             THE COURT:  All right.  Please have a seat.

12             Mr. Zebrak, please continue, sir.

13             MR. ZEBRAK:  Thank you, Your Honor.

14           CHRISTIAN D. TREGILLIS, DEFENDANTS' WITNESS,

15                     PREVIOUSLY SWORN, RESUMED

16                     CROSS-EXAMINATION (Cont'd.)

17    BY MR. ZEBRAK:

18    Q.   Good afternoon, Mr. Tregillis.

19    A.   Hi.

20    Q.   Do you recall that just before the lunch break, we were

21    talking about your damages calculations?

22    A.   I think it was an analysis of economic harm; that's

23    right.

24    Q.   With respect to your analysis of economic harm, you

25    multiplied the infringement notices times a royalty rate,

C. D. Tregillis - Cross

2841

1    correct?

2    A.    Right.  The revenue share that would go to the

3    plaintiffs, a dollar.

4    Q.    Okay.  So before lunch, we already talked about what you

5    used for the quantity.  I'd like to now talk about the royalty

6    rate that you applied.  Okay?

7    A.    Okay.  Great.

8    Q.    Now, you used a dollar per notice, right?

9    A.    Right.

10   Q.    Okay.  And you used the dollar because that was your

11   calculation, sort of the average cost of a single-track

12   download from iTunes, correct?

13   A.    Not exactly.  A single-track download from iTunes is

14   somewhere between $0.79 and $1.29.  In production, you and

15   your clients provided information that told me how much of

16   that you get, and for sound recordings, you get up to about

17   $0.90, and for musical compositions, you get $0.10.  So I used

18   all of that, assuming you get all of the musical compositions

19   and all sound recordings, even though those -- that's not

20   actually the case, but that's where those come from, is your

21   disclosures.

22   Q.    All right.  The activity for which that rate applied was

23   the single-track download for digital download from iTunes,

24   correct?

25   A.    It's based on the $0.79 up to a $1.29 for a single-track

C. D. Tregillis - Cross

2842

1    download, that's right.

2    Q.   Right.  And you looked to the single-track download rate

3    because you understood that these tracks were available for

4    purchase on an individual basis on iTunes, correct?

5    A.   Right.

6    Q.   Now, in choosing a royalty rate, it's true, is it not,

7    sir, that it's important that the royalty rate fit the

8    economic realities of the situation that you're applying it

9    toward, correct?

10   A.   Yes.

11   Q.   And the single-track download rate when someone buys a

12   track from iTunes, that's the rate for obtaining the track for

13   personal use, correct?

14   A.   Yes.

15   Q.   That price is not the price for authorization to

16   distribute it to countless people through a peer-to-peer

17   network, correct?

18   A.   That's right.  It's for an individual to purchase and use

19   that track.  That's my understanding of it.

20   Q.   Right.  And it's also your understanding, sir, that

21   plaintiffs have never granted a license for anyone to

22   distribute their music all across peer-to-peer networks on an

23   unlimited basis, correct?

24   A.   That's right.

25   Q.   The cost of that would be enormous, correct?

C. D. Tregillis - Cross

2843

1   A.   I don't think so in this situation for the fact -- like

2   you just described, the economic realities of this, what's

3   happening here, which I talked about somewhat in my direct --

4   Q.   So --

5   A.   -- I don't think -- I don't think it would call for an

6   enormous rate at all.

7            I think my rate is appropriate.

8   Q.   All right.  Well, again, we just reviewed, your rate is

9   the rate for, for the activity of someone buying a

10  single-track download for their own personal use, right?

11  That's what we talked about?

12  A.   That's right.  That's what I was able to observe is that

13  rate.

14  Q.   Right.  I understand.

15           I'd like to run through a few of your slides with

16  you, sir.

17           Mr. Duval, would you please call it up on the

18  screen, beginning with slide 20?  Next slide, please.  Thank

19  you.

20           Now, is this a slide that you participated in the

21  preparation of?

22  A.   I did it all myself actually.

23  Q.   So this is the rate you used, right?

24  A.   It's the basis for the rate.  I used the rate that's

25  reflected in the $0.90 and $0.10 over to the right on the

C. D. Tregillis - Cross

2844

1    bottom.

2    Q.    Right.  But it's for this activity of somebody making a

3    lawful purchase of that single digital download, right?

4    A.    Exactly, yeah, through Channel 1 is what I tried to call

5    it.

6    Q.    Right.  For their personal use, correct?

7    A.    Right.

8    Q.    Now, during your direct testimony, I think you said this

9    case is about Cox's policy, right?  That was your wording?

10   A.    That's my understanding.  That's right.

11   Q.    Right.  Well, the unlawful uploading and downloading --

12   well, sir, do you have an understanding that the uploading and

13   downloading of plaintiffs' music on peer-to-peer to unlawful?

14   A.    That's my understanding.

15   Q.    All right.  And so the situation we're talking about in

16   this case is your analysis of situation 1, but, sir, this is

17   what we're referring to as what this case is really about is

18   this unlawful BitTorrent activity.  That's slide 2 here,

19   right?  Do you see that?

20   A.    Yeah, yeah.  Channel 2 was the way I referred to it, or

21   Path 2, I guess you could call it.

22   Q.    Right.

23            Could you, Mr. Duval, jump to slide 5, please?

24            You recall this slide, right?  This is another slide

25   you prepared?

C. D. Tregillis - Cross

2845

1    A.    I didn't prepare this one.  This is, like I said, sort of

2    above my graphics level.

3    Q.    Okay.  So -- now this slide, right, this is here that all

4    these dots and lines, this is the peer-to-peer network, right,

5    showing all the users and the music flying around, right?

6    A.    That's the idea, right.  That's what it was intended.

7    Q.    Right.  And now you call -- this slide, it says Transfer

8    of a Single File.

9         Do you see that?

10   A.    Yes.

11   Q.    Now, each time a music file goes from, let's say, this

12   person to this person and then this person gives it to him and

13   he gives another copy to this person and, you know, it's just

14   like wildfire, you know, that involves copying, doesn't it?

15   A.    That's my understanding, right.

16   Q.    Right.

17   A.    For purpose of my analysis, that's what I understand

18   happens in a peer-to-peer network.  I think it can be pieces

19   of files, but ultimately the files -- pieces are assembled at

20   each location, and then the file exists at that place in an

21   unlawful and unauthorized way.

22   Q.    Right.  And you understand people go to these networks to

23   obtain for free what they otherwise would pay for when they're

24   viewing this unlawful download, correct?

25   A.    I'm not expressing an opinion on that, but I think I

C. D. Tregillis - Cross

2846

1    heard your argument that it's heavily focused in peer-to-peer

2    networks, that a lot of the content is unauthorized.

3    Q.   Now -- and again, the rate you used is -- let's say this

4    is iTunes right here, which would be the cost for this one Cox

5    subscriber to get the one download that you attribute to the

6    notice, right?  Yes or no, sir?

7    A.   No, I think you're misinterpreting what's reflected on

8    the slide.  First, you're drawing the arrow in the wrong

9    direction, so this implies that the person would be sending it

10   to Cox.

11          What I intended to express is the computer in the

12   middle is getting it -- getting pieces from Cox and the

13   others, so that's what I tried to depict.

14   Q.   And I apologize, my question was a little imprecise since

15   you're depicting a peer-to-peer network here.

16   A.   I tried.

17   Q.   My point was a simple one, which is when someone buys a

18   single-track download from iTunes, they get, we've already

19   talked about, that one copy for their personal use, right?

20   A.   Right.  It's not like peer-to-peer, getting it in pieces

21   along this network.  You just buy it individually from iTunes,

22   and they send it to you, and you pay $1.29, and the plaintiffs

23   get their piece of that.  That's right.

24   Q.   Now, I'm famous at home for my lousy handwriting.  It's

25   even worse with these little boards.

C. D. Tregillis - Cross

2847

1        But let's say this is the Cox subscriber here.

2   Okay?

3   A.   Okay.

4   Q.   And they get it from somebody else on the peer-to-peer

5   network.  Now, this subscriber starts sending it in all

6   different directions, and just so the jury is not confused,

7   all those distributions, you didn't calculate any amount for

8   that because data doesn't exist for that, correct?

9   A.   No, that's not right.  It's for different reasons.

10  Q.   Well, you calculated your economic harm based on the

11  infringement notices we talked about, right?

12  A.   That's right, but that's not -- that's not the reason for

13  not counting those downloads you're talking about.

14  Q.   Well, you didn't attribute an amount for distributions to

15  others around the network because you didn't have data for

16  that.  It doesn't exist.

17  A.   You basically just asked the same question, and I'll give

18  you the same answer.  It's true I did not calculate a value

19  for additional downloads.  It's not because the data aren't

20  available.  It's because economically I don't think it's

21  appropriate.

22  Q.   Well --

23  A.   Would you like me to explain why?

24        THE COURT:  No.  Wait for the next question, sir.

25  BY MR. ZEBRAK:

C. D. Tregillis - Cross

2848

1  Q.   Yeah.  So you don't take issue with the concept that the

2  music industry is entitled to be paid when somebody obtains a

3  copy of their work, do you?

4  A.   No.

5  Q.   Okay.  And just at a high level, you calculated a rate

6  for a person getting a track from iTunes compared to the --

7  multiplied that against the infringement notices, correct?

8  A.   Right.  It's not just the notices.  It's the track

9  notices.  So if an infringement notice has five tracks on it,

10  then they get a dollar for each of the tracks that is covered

11  by a copyright.

12  Q.   Right.  And it is your understanding, sir -- I know

13  you're not a technical expert, correct?

14  A.   Right.

15  Q.   And you're not providing legal testimony here today

16  either, correct?

17  A.   Also correct.

18  Q.   So you do know, at least have the basic understanding, I

19  assume, that when MarkMonitor sends an infringement notice to

20  Cox, it's because MarkMonitor observed the Cox customer on a

21  peer-to-peer network, reporting that they were sharing a known

22  infringing file?

23  A.   That's consistent generally with my understanding.

24  Q.   Right.

25  A.   It was available for sharing on that day at that

C. D. Tregillis - Cross

2849

1    location.

2    Q.   Right.

3    A.   And you're right, I did have to have a working

4    understanding to do my analysis.

5    Q.   Sure.  Right.  But nobody has information about the

6    number of different times that Cox subscriber that was

7    observed on that date sharing a known infringing file gave it

8    to other people.  That data doesn't exist.  You don't have

9    access to that, correct?  It's a yes-or-no question, if you

10   can answer it.

11   A.   I can't exactly answer it in a yes-or-no way.  I'm really

12   close to agreeing with you, but I -- I'm almost there, so I

13   can't quite answer it in a yes-or-no way as you ask it.

14   Q.   Well, let's try having you look at a specific example.

15   That might be more assistive.  Okay?

16   A.   Okay.

17            MR. ZEBRAK:  Let's look at slide 28, Mr. Duval.

18   BY MR. ZEBRAK:

19   Q.   Do you remember this slide?

20   A.   Yes.

21            MR. ZEBRAK:  Now, Mr. Duval, could you highlight the

22   bottom five rows?

23   BY MR. ZEBRAK:

24   Q.   First of all, Mr. Tregillis, do you see the column that

25   says "ICOMS"?

2850

1          It's the fourth one in.

2    A.    Yes.

3    Q.    You understand that to be a unique reference to a Cox

4    subscriber, correct?

5    A.    Right, exactly.

6    Q.    Okay.  And am I correct, sir, that this data that you

7    have here shows that three different Cox subscribers were

8    observed engaging in file sharing with respect to this file

9    that Cox reported to -- that MarkMonitor reported to Cox,

10   correct?

11   A.    Close.  It's four.  There's -- the first four lines all

12   represent unique --

13   Q.    Thank you.

14   A.    -- ICOMS IDs.

15   Q.    Thank you.

16   A.    And one of them, the last one, it's appearing five times,

17   so it's four unique individual.

18   Q.    Right.  I appreciate the clarification.  Thank you.

19          So here we're seeing that in the bottom five rows,

20   that's one, that's one unique Cox subscriber there, right, by

21   the ICOMS number?

22   A.    Exactly.  You can see this all throughout October of

23   2014.

24   Q.    Sure.

25   A.    You can see it, I think, five times on that one computer

C. D. Tregillis - Cross

2851

1   and then three times on other computers.

2   Q.   Right.  And you understand that a songwriter wrote this

3   song?

4   A.   That's my understanding.

5   Q.   And an artist performed this song?

6   A.   Right.  In this case, there's a sound recording, not a

7   musical composition, so --

8   Q.   Okay.

9   A.   -- I think it covers, as I understand it, that recording

10  by Jamiroquai.

11  Q.   And October 1, 2014, MarkMonitor sends an infringement

12  notice to Cox -- or, excuse me, infringement detected

13  October 1; and October 2, MarkMonitor sends an infringement

14  notice to Cox about this Cox subscriber.  That's correct?

15  That's the first row?

16  A.   That's what this means as I understand it, that's right,

17  from having spent time and looking at this data.

18  Q.   Okay.  And then 16 days later on the 17th, another

19  infringement notice is sent to Cox indicating that the same

20  Cox subscriber is still engaging in file sharing on the

21  peer-to-peer network for this recording, right?

22  A.   Exactly.

23  Q.   Okay.

24  A.   See it -- see it five times actually.

25  Q.   Right.  And it happened not just on the, on the first two

C. D. Tregillis - Redirect

2852

1   times, but really throughout the remainder of the month, there

2   were several more instances.  You see that?

3   A.   I do.  I can see it, like I said, five times in that

4   month.  There are none after that, but for that month, you can

5   see there are five times.

6   Q.   And you have no idea about the extent to which other

7   individuals on a peer-to-peer network downloaded some or all

8   of this file from this Cox subscriber during that window of

9   time, correct?

10  A.   Exactly.  You're right.

11          MR. ZEBRAK:  Right.  Your Honor, no further

12  questions with this witness.

13          THE COURT:  All right.  Thank you.

14          Redirect?

15                  REDIRECT EXAMINATION

16  BY MR. BUCHANAN:

17  Q.   Good afternoon, Mr. Tregillis.

18  A.   Hello.

19  Q.   You were asked a couple questions about some prior

20  testimony in which you've testified as an expert but then the

21  ultimate testimony was not allowed by the Court.  Do you

22  recall that?

23  A.   Close.  It was not all of my testimony that was not

24  allowed.  There was a part that was not allowed in the two

25  cases, one in 2005, one in 2007.

C. D. Tregillis - Redirect

2853

1    Q.    Okay.  And could you explain what happened in those cases

2    to the jury?

3    A.    Sure.  In the first one that Mr. Zebrak asked me about,

4    it's a case called Grupo Televisa; and in that case, there is

5    a, what's called a telenovela, or Mexican soap opera; and

6    there was a star who was at one place and moved to a

7    competitor; and there was a lawsuit; and it was about what was

8    the value of losing that star from Televisa and having him go

9    somewhere else; and in that case, I used a survey; and the

10   judge concluded that that survey wasn't reliable.

11          So as a result, because I couldn't use that survey,

12   I wasn't allowed to testify about anything that used that

13   survey.  There was other parts I could testify about, but

14   there was a determination that that didn't provide a solid

15   foundation.

16          And the second case really was very similar.  It was

17   a case for what's called The Sugar Association against the

18   makers of a product called Splenda; and in that case, it was

19   related to a tagline called "Made from sugar, so it tastes

20   like sugar"; and the sugar people said it's not made from

21   sugar, so you shouldn't be able to say that on the packages.

22          And in that case, I looked at a survey that the

23   Splenda people had used and done to quantify the value of the

24   harm relating to that use of that tagline; and the judge said

25   it was okay to use it for part of the analysis, for the

C. D. Tregillis - Redirect

2854

1    packets, not okay to use it when you use Splenda like in a

2    Coke can; and so again, the judge said, you can't use that

3    survey, so any part of that survey for value of Splenda in

4    Coke cans, can't talk about that part.

5              So again, in both cases, it was a piece of evidence

6    that I couldn't use; and so anything that used that evidence,

7    I couldn't testify about.

8    Q.   And how many times have you testified in court?

9    A.   Forty-nine, I think it is.  It might be 50 here today.  I

10   don't know.

11   Q.   And those are the only two examples where your testimony

12   was somewhat limited?

13   A.   For anything like that.  There have been times,

14   procedural issues, like in this case even, there are

15   situations where there are certain things that I can and can't

16   testify about, but, but similar to what you've talked about,

17   no, those are the only two.

18   Q.   Okay.  I think you testified that it's not necessary to

19   factor in the potential impact of uploads.  Why is that?

20   A.   Because if you have a peer-to-peer network that has many,

21   many, many copies of a file available for people on that

22   peer-to-peer network to copy and then you say, if you add or

23   remove a Cox subscriber from a supply of many, many files that

24   are identical, there is no indication that there would be any

25   more or fewer downloads.

2855

1          MR. ZEBRAK:  Objection, Your Honor.  Lack of

2    foundation.  He doesn't understand the extent of the

3    infringement.  It's pure speculation.

4          THE COURT:  Sustained.

5          Ask your next question.

6    BY MR. BUCHANAN:

7    Q.   Okay.  You were asked questions about the value of a

8    license to distribute, and I think Mr. Zebrak said:  Why do

9    you think -- why do you think a rate -- or he said:  Isn't a

10   rate for a license to distribute, wouldn't that be enormous?

11         I think you said no.  Do you recall that?

12   A.   Yes.

13   Q.   Okay.  And could you elaborate?  You weren't given the

14   chance to elaborate.  Could you elaborate on that?

15   A.   Yes.  It is because of a lack of evidence that the

16   plaintiffs would have gotten more downloads if the Cox

17   subscriber was or was not on the network.

18   Q.   Okay.  And could you explain why you were unable to

19   answer Mr. Zebrak's question about the availability of data of

20   other downloads?

21   A.   It's really the same idea.  The reason that I did not

22   perform an analysis that included value on downloads is due to

23   a lack of evidence that in a world in which Cox behaved

24   differently, there would be more downloads to go to the

25   plaintiffs.  It's a necessary part of a calculation of

2856

1    economic harm, and there's not -- and that's it.

2             MR. BUCHANAN:  Okay.  Thank you.  No further

3    questions.

4             MR. ZEBRAK:  Your Honor, one question.

5             THE COURT:  No.  No, we're done.  Thank you.

6             Your testimony is complete.  Thank you, sir.

7             THE WITNESS:  Thank you.

8             THE COURT:  Have a good afternoon.

9             THE WITNESS:  Thank you.

10            NOTE:  The witness stood down.

11            MR. ELKIN:  Your Honor, may we have a very brief

12   sidebar to cover some matters?

13            THE COURT:  Certainly.

14            NOTE:  A sidebar discussion is had between the Court

15   and counsel out of the hearing of the jury as follows:

16   AT SIDEBAR

17            MR. ELKIN:  Thank you, Your Honor.

18            THE COURT:  Yes, sir.

19            MR. ELKIN:  We are about to rest.  I just wanted to

20   take up a couple little matters not in the presence of the

21   jury.

22            THE COURT:  Did you want to make your Rule 50 motion

23   now or --

24            MR. ELKIN:  Yes.  I do have my Rule 50 motion,

25   which --

2857

1          THE COURT:  Do you want to give them -- do you want

2    me to excuse the jury, give them 15 minutes, and we'll --

3    where are we going after your preliminary?

4          MR. ELKIN:  I just wanted to make a, just make a

5    brief, quick proffer regarding the sound recordings and music

6    publishing, if I can, with regard to the, what's in the

7    record.

8          THE COURT:  Yes, sir.

9          MR. ELKIN:  I'll be quick about it.

10         THE COURT:  No, that's fine.

11         MR. ELKIN:  So this is based on the exhibits that

12   Your Honor provisionally admitted subject to their review.

13         THE COURT:  This is the 7,200?

14         MR. ELKIN:  Yes.  So with regard to -- so I have two

15   examples, two exemplars.  One is the sound recordings, and one

16   is the publishing.

17         So what you have here under Plaintiff's Exhibit

18   4281, this is a sound recording for -- the title is "Dookie,"

19   Green Day, which is a -- covered by a separate registration,

20   and it has nine different sound recordings on it, and there is

21   another -- yes, so this is with regard to the -- this is --

22   all of these tracks, Your Honor, are actually part of the

23   works in issue in the case.

24         THE COURT:  All right.

25         MR. ELKIN:  And then with regard to -- I can hand

2858

1   this out to, to Your Honor.

2           THE COURT:  Thank you.

3           MR. ELKIN:  Then with regard to the publishing

4   example of that, and this is Plaintiff's Exhibit 369, this

5   is -- the title of the work is Chris Brown, "I Can Transform

6   Ya," and this is a music composition.

7           And there is in the case under Plaintiff's Exhibit

8   1833 a sound recording which is owned by Sony Music which has

9   the Chris Brown song "I Can Transform Ya."  So I wanted to

10  hand that up for consideration.

11          THE COURT:  Are these exhibits admitted previously

12  or we'll consider that in a minute?

13          MR. ELKIN:  They were provisionally --

14          THE COURT:  These are part of the 7,200

15  registrations?

16          MR. OPPENHEIM:  It's part of the 7,200 registrations

17  that we'll file something on after we review them posttrial.

18          MR. ELKIN:  I just wanted to make the proffer, Your

19  Honor, before we rest.

20          THE COURT:  Okay.

21          MR. ELKIN:  That was the only purpose of this.

22          MR. OPPENHEIM:  Can we --

23          MR. ELKIN:  I'm not trying to sandbag anyone.  I

24  just wanted to make sure, we understood Your Honor reserved

25  your decision on the issue from last night, and I wanted to

2859

1    make sure that we at least got that in.

2           THE COURT:  Okay.

3           MR. ELKIN:  And then the other thing is with regard

4    to the Rule 50 motion, let me just cover the --

5           MR. OPPENHEIM:  I'm sorry, can I just have a

6    question?  Is this not --

7           MS. GOLINVEAUX:  Yeah, cross that out.

8           MR. OPPENHEIM:  Okay.  Thank you.  Sorry.  Go ahead.

9           MR. ELKIN:  That was a holdover.

10          So there were six issues that we moved under:  the

11   504(c) on derivative works; the 504(c) on compilations; on

12   direct infringement, both distribution and reproduction;

13   contributory, no material contribution; vicarious both as to

14   no direct financial interest and no ability to supervise; and

15   then finally, no direct infringement by business owners, sort

16   of keying off of the Cobbler case.  Those are the --

17          THE COURT:  Right.  Do you want to preserve your --

18   by Rule 50, yes.

19          Do you want to respond?

20          MR. OPPENHEIM:  We also would like to make a Rule 50

21   motion, Your Honor.  If you want to excuse the jury, that's

22   fine, or I'll do it right now orally.

23          THE COURT:  Yeah, go ahead.  Do it now.

24          MR. OPPENHEIM:  Your Honor, we believe that pursuant

25   to Rule 50, plaintiffs have demonstrated both their

2860

1    contributory and vicarious infringement claims such that a

2    reasonable jury couldn't rule otherwise.  With respect to both

3    claims, the evidence that's been submitted of direct

4    infringement by Mr. Bahun and documentation that's been

5    submitted to the Court and supported by testimony by

6    Barbara Frederiksen-Cross was not subject to any reasonable

7    dispute as to -- as to the direct infringement that occurred

8    by Cox -- on Cox's network.

9         With respect to contributory infringement, of

10   course, the Court has already found knowledge, so the only

11   remaining element is material contribution.  The testimony

12   unequivocally has shown that Cox provides a high-speed

13   network, routers, switches, and accounts, as well as anonymity

14   to all of their subscribers, and all of those easily meet the

15   very low threshold that's needed to demonstrate material

16   contribution.

17        On the issue of vicarious infringement, Your Honor,

18   the evidence on direct financial benefit has been clear.  The

19   defendants do not dispute the documents that have come in that

20   shows that Cox makes -- has made decisions not to terminate

21   infringers because of a desire to collect money, and the

22   defendants do not dispute that Cox has collected monies from

23   subscribers who were known repeat infringers.  We believe that

24   this easily fulfills the financial -- direct financial benefit

25   requirement.

2861

1              And that finally, with respect to right and ability

2    to supervise, obviously, the right is contained within each of

3    the AUPs both on the business side and on the residential

4    side, and the ability to terminate has been terminated by the

5    over 600,000 terminations that Cox has engaged in.

6              THE COURT:  All right.  I'm going to deny both of

7    the Rule 50 motions.  I find there's issues of fact to the

8    plaintiffs on each of those issues.  There may not be -- there

9    is some evidence on each of the issues, and they're not

10   undisputed.  For instance, there's, you know, testimony by

11   experts about error rates, even though not significant, in the

12   MarkMonitor system, and also we have different theories on why

13   customers weren't terminated, and the jury has heard evidence

14   of that and they may consider that other than the economic

15   incentive.  So your exception is noted.

16             Your -- yes, go ahead.

17             MR. ELKIN:  No, thank you, Your Honor.  I was just

18   going to say so with that, we -- defendants rest.

19             THE COURT:  Okay.

20             MR. ELKIN:  I did want to make a comment, if I

21   could, just in terms of the timing.

22             THE COURT:  Yeah.

23             MR. ELKIN:  I don't know the official scorecard in

24   terms of the timing.  I think they're close to 34 hours, and

25   we're about a little shy of 30.7.  So they're really edging up

2862

1    against what the Court at least provisionally assigned, and I

2    just wanted to inquire whether we were going to be still going

3    forward with the closings today.

4         THE COURT:  Well, what's your plan for rebuttal?

5         MR. OPPENHEIM:  I believe we'll call one witness.  I

6    believe that his testimony will be relatively short.  It will

7    be Dr. McGarty.

8         THE COURT:  Okay.

9         MR. OPPENHEIM:  I don't know how long the cross will

10   go.  Obviously, that's not in my control.

11        THE COURT:  Let's see how far we go.  We need to

12   finalize instructions and the verdict form.

13        MR. OPPENHEIM:  Right, obviously.

14        THE COURT:  So I've heard from one juror that he or

15   she wants to leave here at 5:30 and they can't stay late, and

16   that may be an issue.  So maybe -- let's see where we go with

17   the witness and how long it takes for us to finalize the jury

18   instructions and verdict form.

19        Mr. Buchanan?

20        MR. BUCHANAN:  Yes, thank you, Your Honor.  On

21   Dr. McGarty, I just want to know what area he's going to

22   testify on because you have a ruling about what he can and

23   can't testify to.  So that might give us some guidance.

24        MR. OPPENHEIM:  I think we went through this

25   yesterday, Your Honor.  It's a rebuttal witness, and he'll be

2863

1    touching on some of the issues that have been presented during

2    defendants' case.  I don't -- as I said yesterday, the

3    question of effectiveness we're not going to ask him to

4    testify to, and I don't believe he will.  We instructed him

5    not to.  But again, it should be short, Your Honor.

6              THE COURT:  Well, that -- as a rebuttal witness,

7    we'll have 14 sidebars, as we did with today's witnesses.  So

8    we'll see where we go.  Let's just put it on and let's roll.

9              MR. OPPENHEIM:  Can I ask one quick question?

10             THE COURT:  Do you want to formally rest your case

11   before the jury?

12             MR. ELKIN:  Sure.  I'll be happy to do that.

13             MR. OPPENHEIM:  Do you have a draft verdict form we

14   can look at while we're doing this?  I'm not trying to rush

15   you.

16             THE COURT:  Yeah.  I don't because I've got a couple

17   of questions.

18             MR. OPPENHEIM:  Okay.

19             THE COURT:  I mean, it's essentially do you find by

20   a preponderance of the evidence that you've proven vicarious

21   and/or contributory infringement separately broke out?

22             And -- but a couple issues I want to address.

23             MR. OPPENHEIM:  Very well.

24             THE COURT:  Okay.  Thank you.

25             MR. ELKIN:  Thank you, Your Honor.

2864

1            NOTE:  The sidebar discussion is concluded;

2    whereupon, the case continues before the jury as follows:

3    BEFORE THE JURY

4            MR. ELKIN:  Your Honor, defendants rest.

5            THE COURT:  All right.  Thank you, Mr. Elkin.

6            All right.  Rebuttal testimony?

7            MR. ZEBRAK:  Yes, Your Honor.  Plaintiffs are

8    calling Dr. Terrence McGarty.

9            THE COURT:  Okay.

10           MR. ZEBRAK:  Please come up, sir.

11           THE COURT:  Either way is fine.

12              TERRENCE PATRICK McGARTY, JR., PH.D.,

13                   PLAINTIFFS' WITNESS, SWORN

14           THE COURT:  Good afternoon, sir.

15           Please, Mr. Zebrak, go ahead.

16           MR. ZEBRAK:  Thank you, Your Honor.

17                      DIRECT EXAMINATION

18   BY MR. ZEBRAK:

19   Q.   Good afternoon, Dr. McGarty.

20   A.   Good afternoon.

21   Q.   Can you hear me okay?  I've been told I'm not speaking

22   loud enough into the microphone at times.

23   A.   Am I speaking too loud?

24   Q.   No.  No, you're fine.

25   A.   Okay.

2865

1   Q.   Thank you.

2        Would you please state your full name for the

3   record.

4   A.   My name is Terrence Patrick McGarty, Jr.

5   Q.   And where do you work, sir?

6   A.   I work at the Telmarc Group.

7   Q.   And who retained you in this case?

8   A.   I'm sorry?

9   Q.   Why are you here today?

10  A.   I'm testifying for the plaintiff.

11  Q.   And what were you asked to do, at just a high level,

12  please?

13  A.   At a high level, I was asked to do two tasks.  One is to

14  provide insight and my knowledge about high-speed internet

15  access in IP, and the second was to examine the capabilities

16  of Cox's system to handle MarkMonitor tickets and the like.

17  Q.   And let's start with some basic background.  Would you

18  tell us your educational history, sir?

19  A.   I went to college at Manhattan College in the Bronx.  I

20  received a degree in electrical engineering.  I then went on

21  to MIT, where I received a Ph.D. in Electrical Engineering and

22  Computer Science.

23  Q.   And have you spent your career in a specific field?

24  A.   My primary focus in my career has been

25  telecommunications.  My first employment out of MIT was here

2866

1    in Washington at COMSAT.

2    Q.    And what is COMSAT, sir?

3    A.    COMSAT was Communications Satellite Corporation; and

4    there I was executive director of what was called Equipment

5    Integration Group; and Equipment Integration built network

6    monitoring, management, satellite launch control centers; and

7    amongst my many tasks, I got the opportunity to put the first

8    two international connections for the ARPANET up from Edam,

9    West Virginia; Trondheim, Norway; and to Goonhilly in the UK;

10   and they went up, I think, in 1975-'76.

11   Q.    And just very briefly, what is ARPANET?  I heard you

12   mention that a moment ago.

13   A.    The ARPANET is the predecessor to the internet; and in

14   the mid-'70s, DARPA, which was Defense Advance Research

15   Project Agency, wanted to put together a computer network so

16   they could have multitasking computers; and the head of that

17   was a fellow by the name of Bob Kahn, who was subsequently

18   honored by the government for its efforts, and they started

19   out by putting these networks across the United States and

20   universities.

21          Bob came to me and said:  Could we get outside of

22   the United States?

23          And like a good engineer, I said:  Sure.  We can do

24   anything.

25          And we went and did it.

T. McGarty - Direct

2867

1  Q.   And how long did you work at COMSAT, roughly?

2  A.   About six years.

3  Q.   And -- actually, I'd like to hand the witness a binder.

4  Could I have Dr. McGarty's binders?  Well, we'll do that in a

5  moment.

6  A.   Thank you, sir.

7  Q.   You don't need to -- and could you look in that binder,

8  please, and --

9  A.   Yes, sir.

10  Q.   -- let me know if you see your CV in there?

11        It should be behind tab 1?

12  A.   Yes, I am.

13  Q.   And does that accurately reflect your education and work

14  history?

15  A.   Yes, it does.

16  Q.   Does it also include a list of publications and books and

17  work experiences?

18  A.   Yes, it does.

19        MR. ZEBRAK:  Your Honor, I'd move the admission of

20  PX 533.

21        THE COURT:  Any objection?

22        MR. BUCHANAN:  No objection.

23        THE COURT:  It's received.

24  BY MR. ZEBRAK:

25  Q.   Looking at your CV, I see you worked at Warner

T. McGarty - Direct

2868

1    Communications.  What was Warner Communications?

2    A.   Warner Communications owned a subsidiary called Warner

3    Cable; and I initially started working at the Warner Cable

4    operation early 1980s, '80-'81, and then subsequently got

5    promoted to a group, president in charge of interactive

6    services, if you will; and so we were doing the first two-way

7    cable.  We actually tried home shopping, home banking, home

8    travel.  So it was the early days of cable, and we were doing

9    interactive cable services.

10   Q.   And I also see on your CV that you spent some time at

11   NYNEX, now Verizon; is that right?

12   A.   That's correct.

13   Q.   And at a high level, could you tell the jury a little bit

14   about your role there?

15   A.   Yeah.  Two things I did at NYNEX.  First, I was head of

16   R&D; and amongst R&D, one of my key responsibilities was

17   network management; and it was the first time that we

18   developed integrated network management.

19         I then became the chief operating officer of NYNEX

20   Mobile, which had become Verizon Wireless; and there I was

21   responsible for all operations, which included network

22   management, billing, customer service, etc.

23   Q.   And you mentioned you're currently with Telmarc Group.

24   What is Telmarc?

25   A.   Telmarc Group is something we formed back actually in the

T. McGarty - Direct

2869

1  mid-'80s.  We are a management and investment company.  We

2  basically have done about 30 venture investments, some of

3  which I've actually run myself.

4  Q.   And I see a reference on your CV to Zephyr

5  Telecommunications.  What is that?

6  A.   Zephyr Communications or Telecommunications was started

7  out as a voiceover IP company into Central Europe.  We

8  expanded into a fiber backbone in countries from Russia,

9  Poland, Czech Republic, Slovakia, Romania, Hungary, Bulgaria,

10  about 15-20 countries; and we became the dominant fiber-based

11  IP company, providing both commercial and end user high-speed

12  ISP services.

13  Q.   And you were the founder and CEO of that company; is that

14  correct?

15  A.   I founded the company, and I was a CEO and chairman.

16  Q.   And again, just at a high level, would you tell the jury

17  a little bit about your teaching experience?

18  A.   I've held various positions after my Ph.D.  I remained at

19  MIT until '75 on the faculty and research staff.  I spent a

20  year at Columbia in the business school teaching

21  telecommunications, finance, and policy.  At George Washington

22  University here, I taught various engineering courses, I was a

23  professor level; and then I also was at Polytechnic

24  University, which is now part of NYU, teaching

25  telecommunications policy.

T. McGarty - Direct

2870

1    Q.   And at a high level, could you characterize what your

2    publications generally involve that are listed on your CV?

3    A.   My publications have been characterized as idiosyncratic.

4    They're all over the map.  They range from guidance of

5    aircraft to data release, which I collaborate with a Russian

6    author on, and I've done a real wide swath.  Most of them have

7    been in telecommunications, both in engineering and in policy.

8    Q.   Thank you, Dr. McGarty.

9         Are you being compensated for your time on this

10   matter?

11   A.   Yes, I am.

12   Q.   On an hourly basis, is that correct?

13   A.   That's correct.

14   Q.   And what is your hourly rate?

15   A.   $700 an hour.

16   Q.   And do your opinions, are they in any way dependent on

17   the substance of the opinions you provide?

18   A.   Not at all.

19   Q.   Strike that.

20        Your payment is not in any way contingent on your

21   opinions, correct?

22   A.   That's correct.

23   Q.   Thank you.

24        And likewise, I assume your payment in this matter

25   is not in any way contingent on the outcome of the matter?

T. McGarty - Direct

2871

1    A.   Right.

2    Q.   And what are you currently doing with your time at

3    Telmarc?

4    A.   For the last two years -- about two years ago, we stopped

5    doing investments, and now what -- I basically run Telmarc by

6    myself.  It has become a philanthropic thing.  I support

7    cancer research at Columbia Medical Center; and so I am

8    putting entrepreneurial teams, if you will, postdocs together;

9    and we're focusing on four or five different cancer areas.

10             MR. ZEBRAK:  Your Honor, we would move the

11   admission -- excuse me.  We would move to qualify Dr. McGarty

12   to testify as an expert in the design, implementation, and

13   operation of internet telecommunication networks, including

14   ISPs, and the operations of companies that use such networks.

15             THE COURT:  Any objection?

16             MR. BUCHANAN:  No, Your Honor.

17             THE COURT:  All right.  He's received for those

18   purposes.

19   BY MR. ZEBRAK:

20   Q.   Dr. McGarty, were you able to reach a conclusion as to

21   your assignment concerning Cox's ability to receive, process,

22   and respond to copyright infringement notices?

23   A.   Yes, I was.

24   Q.   Just at a high level, so we're going to explore this in

25   more detail, could you tell the jury what your conclusion was

T. McGarty - Direct

2872

1   there?

2   A.   From my perspective as an operator, somebody who's done

3   the business and been responsible for it, and using that

4   background over the years, I came to basically two

5   conclusions, that -- one, that Cox's system has the capability

6   of processing MarkMonitor or other complaints, identifying the

7   customer, kept putting that information in a database and

8   tracking the number of complaints per customer over some

9   period of time.

10          My second observation is that the ability of that

11   system to reach an end result was problematic.  They had

12   certain rules on the front end which limited the number of

13   complaints coming in; and on the back end, it was a, in my

14   opinion, a complicated process; and the biggest complication,

15   very simple terms, is ambiguity; and it said at 13 sets,

16   consider termination.

17          And one of the things I do as an operator is I try

18   to avoid ambiguity.  You either do it or you don't.  If you're

19   sailing a ship, you turn to the starboard or you don't.

20          So the ambiguity issue was a key issue in my view

21   with regards to the inability of the system to function

22   properly.

23   Q.   And, Dr. McGarty, am I correct you're not here today to

24   testify as to what Cox should have done?  Is that right?

25   A.   I'm sorry?

T. McGarty - Direct

2873

1    Q.   You're not here testifying as to what Cox should have

2    done?

3    A.   Oh, no.  What Cox should do is Cox's decision.

4    Q.   Right.  You're comparing Cox's capabilities to what it

5    actually did; is that correct?

6    A.   That's correct.

7    Q.   Okay.  At a high level, because the jury's heard a bunch

8    about network management already, could you explain your, your

9    perspective on what network management is in the context of

10   ISPs?

11   A.   Network management is something that I've lived with for

12   40 years and seen it evolve, so very simply, network

13   management is the ability to manage, control, monitor all of

14   the elements that go into providing the services to the

15   customer.

16        And there are three levels of network management

17   that I look on:  performance, that is, is the network doing

18   what it's supposed to be doing in the right manner; quality,

19   is the customer getting the service they want.  In cellular,

20   in the early days, there were dropped calls.  We had to solve

21   the quality problem.

22        And then finally is the issue of compliance; and

23   compliance means that we live in an environment where there's

24   a lot of legal regulations; and having worked in 20 different

25   countries, I'm aware of them.  You have to make sure that

T. McGarty - Direct

2874

1    whatever the policies are are being complied with.

2              So those three elements focus on network management:

3    the quality, the performance, and the compliance.

4    Q.   Again, at a high level, Dr. McGarty, would you tell the

5    jury what your understanding is of the technical

6    infrastructure that Cox relies on for delivering its internet

7    service to customers?

8    A.   I'm sorry, could you --

9    Q.   Sure.  Could you briefly -- do you have an understanding

10   of Cox's -- the technical infrastructure that it needs to

11   provide internet service to its customers?

12   A.   Yeah.  Basically the Cox technical infrastructure is very

13   consistent with other current cable environments.  For

14   high-speed internet, they connect to some backbone tier 1

15   carrier probably; and there's a lot of them out there now,

16   such as AT&T and Google and CenturyLink.

17             They then take those connections and, as I think

18   I've seen over the course of this trial, distribute them down

19   through routers eventually into the consumer and then modem.

20   And the consumers have a cable modem, a DOCSIS modem, if you

21   will, and that modem is the interface between the Cox network,

22   which is carrying the IP traffic, and the customer's premise

23   and their users.  So it's a fairly simple, straightforward

24   system.

25   Q.   Dr. McGarty, do you have an understanding of whether an

2875

1    ISP such as -- whether Cox, given its role in the internet

2    ecosystem, whether it would be providing internet service to

3    critical -- or likely be providing internet service to

4    critical infrastructure such as a large university hospital or

5    a military base?

6              MR. BUCHANAN:  Yes, Your Honor, I'm going to object.

7    This is beyond the scope of his testimony.

8              THE COURT:  Is that correct?

9              MR. BUCHANAN:  Could we approach, Your Honor?

10             THE COURT:  All right.

11             MR. BUCHANAN:  I know --

12             NOTE:  A sidebar discussion is had between the Court

13   and counsel out of the hearing of the jury as follows:

14   AT SIDEBAR

15             THE COURT:  The question was, are you aware whether

16   Cox has subscribers who are hospitals?  Is that it?

17             MR. ZEBRAK:  That's the gist of it.  With his

18   knowledge of the internet infrastructure, just by way of

19   understanding where this is headed is that large military

20   bases or large university hospitals wouldn't be receiving

21   their internet connection from an entity like Cox, and it's

22   direct rebuttal testimony to a lot of the testimony and themes

23   we've heard throughout.

24             And, you know, he --

25             THE COURT:  He's run these networks all over the

T. McGarty - Direct

2876

1    world.

2              MR. ZEBRAK:  Yes, Your Honor.

3              THE COURT:  So why don't you ask him instead not

4    about Cox, but ask him whether he's aware of how the military

5    installations use, develop their internet systems.

6              MR. ZEBRAK:  Yes, sir.

7              THE COURT:  Yes, sir.

8              MR. BUCHANAN:  Your Honor, there is nothing about --

9    from this issue in any of his reports.  We had an opening

10   report.  He had a rebuttal report.  He rebutted our experts.

11             He talked about business customers.  I examined him

12   in his deposition.  He didn't do a lot of work on the business

13   customer side, even, you know, made comments about, you know,

14   he would fire a guy if he cut off the service, like the

15   firemen's, and we think he's the son of a cop.  And so he

16   offered no testimony.

17             Now he's coming in as an expert about the

18   connection? He was never offered.  That's none of his

19   opinions.  Even when he asked him what his opinions are, his

20   opinions have nothing to do with whether Cox can provide

21   internet service to a hospital.  There's nothing there.  And

22   so what's applied with me with the other witnesses should

23   apply to them.

24             MR. ZEBRAK:  Quite frankly, I don't need -- if it's

25   permissible, Your Honor, I don't even need to ask in

T. McGarty - Direct

2877

1    relationship to Cox.  I could just have him explain the

2    internet infrastructure, where there's actually three

3    internets.  There's the internet, there's something called the

4    MILNET, and there's Internet2, which is what large military

5    bases and university hospitals are on.  I don't need to tie it

6    to Cox.

7             THE COURT:  And is that within the testimony of his

8    reports?

9             MR. ZEBRAK:  Well, I mean, it's general background

10   on the internet infrastructure, which he testified in great

11   length about; and in his personal background, he actually

12   helped build Internet2, working --

13            MR. OPPENHEIM:  But, Your Honor, as we have

14   discussed, he's a rebuttal witness.  Cox has put forward --

15            THE COURT:  Yeah, but it doesn't mean -- I mean --

16            MR. OPPENHEIM:  No, I agree, Your Honor, he doesn't

17   get to do anything he wants; but Cox has put forward to the

18   jury that there's a critical infrastructure issue; and they've

19   done that, frankly, somewhat duplicitly, because the list of

20   business subscribers doesn't contain one of the fields which

21   indicates whether it's for WiFi or not.  They have told the

22   jury this is military, this is hospitals.

23            And what Dr. McGarty will testify to is that's not

24   how the systems work.  And he will describe -- he's sat on

25   presidential commissions involved in these kinds of things.

T. McGarty - Direct

2878

 1          THE COURT:  Yeah, yeah, yeah.  I want to know

 2   whether it's reasonable within the confines of what his

 3   reports were about, that he would look at different

 4   infrastructures and identify how the internet works in these

 5   infrastructures.

 6          MR. BUCHANAN:  So in his reports, he has, like, five

 7   pages of the network and infrastructure; and then he talks

 8   about Cox's; and he says, just like he did there, their CATS

 9   was fine.  Then he went through step by step the policies and

10   how he believed that they didn't --

11          THE COURT:  This witness?

12          MR. BUCHANAN:  Yeah.  That's what he did in his

13   reports.  Then he had something on Procera, which they

14   dropped.  He never offered an opinion.  And we -- he knew

15   about the business customers.

16          I actually asked him, would you terminate a nursing

17   home?  Would you terminate -- I don't know if I used hospital,

18   a military base, and he responded not with, hey, that that's

19   not relevant because they could never connect with any of

20   them.  There's nothing in his report where he, he opines on

21   the ability of Cox's network to connect and provide service to

22   a military base or anything like that, zero.

23          THE COURT:  All right.

24          MR. ZEBRAK:  So respectfully, he explains the

25   internet infrastructure.  He says:  My role here is two-part.

T. McGarty - Direct

2879

1    One is to explain the background technology.

2          I admit he didn't delineate MILNET, Internet2,

3    internet.  That issue was well out there --

4          MR. BUCHANAN:  Oh --

5          MR. ZEBRAK:  Excuse me, me sir.  And he responded to

6    Mr. Buchanan's deposition questions not by saying it's an

7    irrelevant question, but by saying the same thing he said

8    here:  I'm not here to dictate what Cox should have done.

9          It's just --

10         THE COURT:  Okay.  So he's not permitted to testify

11   about whether Cox and its internet system was capable or not

12   capable of operating in a military base or a hospital.  You

13   can ask him the general infrastructure in a multiple-tier

14   system, and he can explain that.  He's not going to tie it

15   into his testimony.

16         MR. ZEBRAK:  I will do my best to avoid that.  Thank

17   you.

18         NOTE:  The sidebar discussion is concluded;

19   whereupon, the case continues before the jury as follows:

20   BEFORE THE JURY

21   THE COURT:  Please proceed.

22         MR. ZEBRAK:  Thank you, Your Honor.

23   BY MR. ZEBRAK:

24   Q.   Dr. McGarty, I'm going to ask you some questions now just

25   about the background technology.  I'm not asking you about,

T. McGarty - Direct

2880

1    anything about Cox specifically, okay?

2    A.   Yes, sir.

3    Q.   Are you familiar with something called MILNET?

4    A.   MILNET?

5    Q.   Yes, sir.

6    A.   MILNET was an offshoot of the ARPANET in the late 1980s,

7    and what happened is that MILNET was the DoD's private secure

8    version of the internet.  What was left over became what we

9    now call the public internet.

10          And MILNET has evolved over time.  It was under DCA,

11   Defense Communications Agency -- I think that's what it was --

12   and then it went into DISA.  So it's now distributed amongst

13   DOD in various agencies.  Homeland Security also has an

14   element of this secure network.

15          So it's, it's to some degree a separate network that

16   provides secure internet connections for DOD and other

17   entities.

18   Q.   When you say "DOD," you're referring --

19   A.   Department of Defense.

20   Q.   Yes, sir.  And are you familiar with something called

21   Internet2?

22          MR. BUCHANAN:  Your Honor, I would just renew my

23   objection.

24          THE COURT:  Yeah, overruled.

25          MR. BUCHANAN:  In the report, there's nothing --

T. McGarty - Direct

2881

1          THE COURT:  I've ruled.

2          MR. BUCHANAN:  All right.

3          THE COURT:  Your exception is noted.

4          Are you familiar with Internet2?  Is that the

5  question?

6          MR. ZEBRAK:  Yes, Your Honor.

7          THE WITNESS:  May I answer?

8          THE COURT:  Yes, sir.

9  BY MR. ZEBRAK:

10  Q.  Yes, please.

11  A.   Okay.  Internet2 is a consortium of universities,

12  hospitals, and organization -- there's now more than a

13  thousand of them -- that have their own parallel internet

14  network.  So for example, the three universities in Georgia:

15  Georgia Tech, University of Georgia, they're members of

16  Internet2.  MIT, Harvard are members of Internet2.

17          I work with one of my partners, Mr. Hauser, and

18  together we did pro bono work connecting internet to, also to

19  hospitals and other facilities.  I worked with the World Bank

20  and Institute of Peace.

21          So it's a separate internet parallel to the common

22  internet that universities and other types of organizations

23  join, and it provides them high-speed internet access at

24  substantially lower price, and most of these organizations now

25  participate in that effort.

T. McGarty - Direct

2882

1   Q.   Does the military run MILNET?

2   A.   The military MILNET has evolved into multiple networks

3   within various DoD elements, but MILNET was the seed founder

4   in, I think, 1988 or '87.  I was -- at that time, I was doing

5   things at NYNEX where we work with something called NYSERNet,

6   which was New York State's element that was -- became part of

7   Internet2.  So there was a, actually a trifurcation occurring

8   at that time between commercial, Internet2, and the military.

9   Q.   And just so there's no confusion, you said there's the

10  internet, Internet2, and MILNET, correct?

11  A.   MILNET and its subsequent players.

12  Q.   Three separate --

13  A.   Three separate, different fibers, different connections,

14  and generally they do interconnect at certain levels, but the

15  point is security is a key point.

16  Q.   Okay.  Thank you, Dr. McGarty.

17          Dr. McGarty, turning back to the opinion that you

18  provided in this matter, could you elaborate on that a little

19  bit more, starting first with your opinion with respect to

20  Cox's actions versus capabilities on the residential side?

21  A.   Well, Cox's technical capabilities were there.  It was,

22  in my opinion, a fairly simple and straightforward system of

23  collecting e-mails, finding out who they were sent -- you

24  know, related to, IP address to customer, recording those

25  complaints in a database and then doing something about it.

T. McGarty - Direct

2883

1          So from the technical perspective, it was a fairly

2     simple and straightforward process.

3     Q.   You mentioned front-end limits and back-end limits

4     before.  Do you recall that?

5     A.   Yeah.  The front end, the front end is when they would

6     accept incoming complaints, all right; and Cox did throttle

7     some of the front-end complaints because there were certain

8     entities that were capable of putting in many more complaints

9     than Cox would accept.  So therefore, there was a throttling

10    on the number of complaints that came in on that front end.

11          And if you follow the record, you can see that there

12    was a -- somewhat of a continual request to try to increase

13    that over a period of time; and, you know, in my opinion, the

14    system from a technical perspective could have easily handled

15    a substantially larger number of complaints.  So it was not,

16    in my opinion, based upon my experience, a technical

17    bottleneck, because many of these systems are very scalable.

18    Q.   What do you mean when you say the system is "scalable"?

19    A.   You can add additional capacity and capability.  You

20    could do cloud computing or a bunch of other things that would

21    allow you to handle a substantially larger number of incoming

22    complaints.  So you were not technologically limited at the

23    front end, especially in this time frame which -- that we're

24    looking at.

25          At the back end, I think to follow up on your

2884

1    question, there's an issue of policy, and Cox decides what

2    their policy is.  I'm not here to tell anybody what they

3    should do.  I'm just observing it.

4            And for a while, Cox did terminate people who had

5    multiple complaints, and then there was a period where they

6    ended up with -- having sat here, I've seen the various

7    descriptions of these complaints, and in various technicolor

8    of presentations, but basically it is that 13th complaint that

9    it says:  Consider for termination.

10           Ambiguity, as I said earlier, is a serious problem.

11   You either terminate or you don't terminate.  Do you terminate

12   on the 14th?  Do you terminate on the 15th?  I don't know, but

13   you gotta do something.  Okay?  It's -- you know, the ship is

14   going towards the shoals.  Turn the wheel.  All right?  That's

15   the only thing I can think of.

16           And generally in my operations, I always try to

17   avoid ambiguity.

18   Q.   Dr. McGarty, just a few more questions.  You just spoke

19   to the residential side.  Could you explain your analysis with

20   respect to the business side in terms of the customer base?

21   A.   You want me to discuss the business side?

22   Q.   Yeah.  I mean, the observations you just made, was there

23   a limitation for Cox with respect to acting with respect to

24   its business subscribers?

25   A.   My observations on the business side is that they

T. McGarty - Direct

2885

1   apparently let most of the businesses just skate in terms of

2   these notices, and so they were much more lenient in my

3   observation with their business customers.

4   Q.   Not necessarily with respect to copyright infringement

5   per se, but in running your various businesses, did you have

6   occasion to work with business customers on compliance issues?

7   A.   In, in my European operations, probably 70 percent of my

8   business was business customers; and, you know, spanning

9   multiple countries in multiple legal environments, I had

10  probably as many lawyers as, as employees at this point

11  because every country had a different set of laws; and

12  compliance -- being compliant with the law is a very critical

13  factor.

14            So with the business customers, we typically entered

15  into contracts.   There were the AUP-type things that went in

16  there that says:   This is an acceptable use.

17            And each country had its own little changes in

18  acceptable use; and we managed to successfully navigate those

19  waters by having good contracts, good acceptable use policies.

20  We basically maintained our ability to verify that they were

21  being followed, and that went fairly well.

22  Q.   Dr. McGarty, you were here when Dr. Almeroth testified

23  for Cox, correct?

24  A.   Yes, sir.

25  Q.   I'm not saying his words precisely, but do you recall

T. McGarty - Direct

2886

1    when he said that he considered Cox's policy but didn't really

2    need to focus so much on Cox's implementation of the policy

3    when he compared it to the Copyright Alert System?

4    A.   Yes, I do.

5    Q.   Do you have a view about whether implementation of a

6    policy is important with respect to network management?

7    A.   Implementation of the policy is critical.  I mean, as the

8    CEO of the business, you've got the responsibility to make

9    sure that your company is being run compliant with all rules

10   and regulations.  I can have a quality service, I can have the

11   lowest cost, but if I don't comply with laws, I'm in trouble.

12   And in some of the countries I operated in, I didn't want to

13   have a Borscht diet for the next 20 years, so I was very, very

14   cautious.

15   Q.   Dr. McGarty, I know you mentioned you've been in the

16   courtroom for a number of days.

17   A.   I'm sorry?

18   Q.   You mentioned you've been in the courtroom for a number

19   of different days throughout the trial; is that correct?

20   A.   Yes.

21   Q.   And where does the money go that you make in your time

22   working on this matter?

23   A.   It -- basically the money for this trial goes to support

24   postdocs.  Our current project is bladder cancer.  And so I

25   have one in Columbia.  I have one I'm bringing on at MIT Koch

T. McGarty - Cross

2887

1    Cancer Center.  I have one coming on most probably from

2    Harvard, the Brigham.

3             MR. ZEBRAK:  Thank you, Dr. McGarty.

4             THE WITNESS:  Thank you.

5             MR. ZEBRAK:  Pass the witness.

6             THE COURT:  All right.  Redirect?

7             MR. BUCHANAN:  Cross, Your Honor.

8             THE COURT:  Oh, yes.  I'm sorry.

9             MR. BUCHANAN:  You've got me on the wrong side.

10            THE COURT:  Yeah.

11                       CROSS-EXAMINATION

12   BY MR. BUCHANAN:

13   Q.   Dr. McGarty.

14   A.   Mr. Buchanan.

15   Q.   How are you doing?

16   A.   I'm fine.

17   Q.   Okay.  I've just got a few questions.  You were talking

18   about Cox's throttling of complaints that come in.  So I would

19   like to talk to you a little bit about the plaintiffs.

20   A.   About what?

21   Q.   I'm sorry, the plaintiffs and their notices that came in.

22   A.   Yes.

23   Q.   Okay.  So you understand that they had a cap that they

24   negotiated with Cox of 600 per day?  Do you know that?

25   A.   That's correct.

T. McGarty - Cross

2888

1   Q.   And that they never hit that cap in the entire claims

2   period.  Do you know that?

3   A.   I don't recall that's --

4          MR. ZEBRAK:  Objection, Your Honor.  Counsel is

5   testifying.

6          THE COURT:  Well, is he -- you can ask him whether

7   he's aware that they ever hit the cap.

8          THE WITNESS:  I don't recall right now.

9   BY MR. BUCHANAN:

10  Q.   Okay.  So you didn't examine that information before you

11  came in to testify?

12  A.   I examined them.  I believe I was more aware of them back

13  when the deposition was taken.  I just have not focused on the

14  MarkMonitor numbers.  I was -- my current focus primarily has

15  been from receipt of the notice to actions thereof.

16  Q.   So are you aware that, that the plaintiffs had a -- had

17  been provided a one-complaint-per-day cap per subscriber?  Are

18  you aware of that, that they could send one notice a day per

19  subscriber?

20         MR. ZEBRAK:  Objection.

21         THE COURT:  Each company?

22  BY MR. BUCHANAN:

23  Q.   Yeah, just from -- the plaintiffs could send through the

24  RIAA, MarkMonitor, one notice per day per complainant.

25         MR. ZEBRAK:  Your Honor, there's no foundation for

T. McGarty - Cross

2889

```
 1    the question.  It misstates the evidence.
 2              THE COURT:  Yeah, that's a confusing one.
 3              Do you understand the question?
 4              THE WITNESS:  Answer the question?  Okay.
 5              THE COURT:  If you understand it.
 6              THE WITNESS:  I'm sorry?
 7              THE COURT:  If you understand it.
 8              THE WITNESS:  I think I did.
 9              THE COURT:  Okay.
10              THE WITNESS:  And if I may rephrase it, Your Honor,
11    perhaps we can clarify it.
12    BY MR. BUCHANAN:
13    Q.   Do you know if there was -- if there was a limitation
14    that the CATS system had in Cox on how many notices could come
15    in per subscriber per day for the plaintiffs or anyone else?
16    A.   To my, my recollection, Cox would accept one complaint
17    per day per subscriber.
18    Q.   Okay.  So do you know if the plaintiffs ever hit that cap
19    on a single day during the claims period?
20    A.   Exceeded one complaint per day per subscriber?
21    Q.   Do you know if they ever did that?
22    A.   I'm not aware of that, no.
23    Q.   So you talked about the end of the Cox graduated
24    response, the 13 strikes.  Do you recall your testimony about
25    that?
```

T. McGarty - Cross

2890

1   A.   The back end of the system?

2   Q.   Yeah.

3   A.   Yes, sir.

4   Q.   And then you said it was ambiguous because it said they

5   may terminate?

6   A.   The ambiguity that I indicated was the statement that is

7   associated with that 13th step, which is consider to terminate

8   or consider for termination, and just from my personal

9   experience, having done a few companies, I try to avoid

10  ambiguity.  So that when you say consider, it's like consider

11  to turn to the starboard.  You either turn or you don't turn.

12         So there is an issue here, and Cox, of course, has

13  the control of their policy.  I'm not here to tell Cox what to

14  do, but in my experience as an operator, I try to avoid

15  ambiguity, and that phrase to me is ambiguous because the user

16  doesn't know -- how do I consider?  What does "consider" mean?

17  At least that's my reading of the term.

18  Q.   So you never managed a Copyright Alert System involving

19  copyright notices of infringement, have you?

20  A.   My experience in terms of dealing with regulation falls

21  in a wide variety of legal areas but not specifically

22  copyright notification.

23  Q.   So did, did -- are you aware that when Cox would send a

24  notice, it would be accompanied with an e-mail that would go

25  to the subscriber in question?

T. McGarty - Cross

2891

1   A.   I'm aware that one of the procedures meant that if the

2   notice came in, it worked its way through the Cox system, then

3   one of the outputs was an e-mail that would be sent to the

4   user who that notice was directed towards.

5   Q.   And so are you aware that subscribers would respond often

6   to those e-mail notices and copyright notices with an e-mail

7   of their own back to Cox?

8   A.   I was aware at certain of those steps that the consumer

9   could respond by e-mail.

10  Q.   Do you -- did you happen to review any of the 1,700

11  e-mails that have been put into evidence in this case that

12  reflect the responses of subscribers of Cox in response to

13  DMCA notices from the plaintiffs?

14  A.   I recall some of the e-mails that were sent back from

15  subscribers to Cox in -- I believe it was in one of the

16  reports that I had reviewed.

17  Q.   Okay.  So don't you think in a system like this where

18  you're cutting someone's internet service off, that you ought

19  to give them a chance to respond and to consider that

20  response, either in a phone call or an e-mail, and to listen

21  to them, that maybe they have a reason?

22  A.   Again, you're asking me to speculate about Cox's policy

23  and what it should be.  I can think of various things that I'd

24  like to see, but basically it's fundamentally Cox's decision

25  as to what that should be, not mine to opine on.

T. McGarty - Cross

2892

1   Q.   Okay.  So if Cox has -- and its people there, management

2   and the people on the ground dealing with the calls and the

3   e-mails, have developed a system based on what they see on the

4   ground and what they hear from people, you would -- wouldn't

5   you believe that that would be part of the process, that that

6   should be considered in making a determination when to set a

7   certain point in time where someone should be terminated?

8   A.   Again, looking at that as Cox's policy and process, it is

9   a step that I have seen in other similar types of processes

10  where complaints have been remediated in some way, shape, or

11  form.  I had that in the cellular world with my customer

12  service report.  So in my experience, I've had consumer

13  interaction in remediation efforts underway in various

14  environments.  Again, you know, Cox has its policy and

15  procedures.  I've had my policy and procedures.

16              MR. BUCHANAN:  No further questions.

17              THE WITNESS:  Thank you, sir.

18              THE COURT:  All right.  Redirect?

19              MR. ZEBRAK:  No, thank you, Your Honor.

20              THE COURT:  Okay.  All right, thank you.  You're

21  excused at this time.  Have a good afternoon.

22              THE WITNESS:  Thank you, sir.  Thank you, Your

23  Honor.

24              NOTE:  The witness stood down.

25              MR. OPPENHEIM:  With that, Your Honor, plaintiffs

2893

1    rest their rebuttal case.

2          THE COURT:  All right.  All right, that concludes

3    the evidence in the case.  We have a couple of matters to talk

4    about, and I'll be able to give you word about whether we're

5    going to try and get in the closing arguments tonight or first

6    thing in the morning and just do part of the, the legal

7    instructions tonight.

8          I understand that some, some of you would like to

9    finish at 5:30, and I think if we try and do the entire

10   closing arguments and the instructions on the law, we're

11   looking at, we're looking at 6:30 or so, so that -- let me

12   finish up what we need to finish up, and then I'll ask Joe to

13   come in and we'll ask you whether you want to just do part of

14   it, as in the legal instructions tonight, and have closings

15   tomorrow, or you want to finish everything tonight.

16         So give us a little chance to finish up a few items,

17   and we'll check back with you shortly.  Thank you.  You're

18   excused.

19         NOTE:  At this point, the jury leaves the courtroom;

20   whereupon, the case continues as follows:

21   JURY OUT

22         THE COURT:  All right.  Have a seat.  I have two

23   issues that I want to raise on the jury instructions.  One is

24   whether there's been any evidence, evidence of mitigation that

25   the jury could consider, and second, whether there has been

2894

1    any evidence that the jury could consider whether to give one

2    statutory damages award for the works that include a song and

3    the music composition.

4              So, Mr. Elkin, tell me, where are you there, sir?

5              MR. ELKIN:  Sure.  Any particular order?

6              THE COURT:  Either one.  It doesn't matter.

7              MR. ELKIN:  So at sidebar, as Your Honor knows, I

8    took the Court through a proffer of both the sound recording

9    and the music composition --

10             THE COURT:  A couple instances of that, yeah.

11             MR. ELKIN:  Right, the 504(c)(1).

12             I believe that there is -- the registrations having

13   been provisionally admitted, and there are other documents

14   that reference those registrations as well that have been in

15   evidence, could give the jury with instructions the ability to

16   identify the limitations with respect to the compilations and

17   derivative works.

18             With regard to the sound recording compilation

19   issue, the -- on the face of the certificates are, one can

20   identify the specific, you know, works, and to the extent that

21   they're part of a compilation, I believe that is sufficient

22   evidence clearly that I think under the, the copyright

23   statute, I believe Article IV gives copyright claim, it's the

24   ability to proffer to the U.S. Copyright Office certificates

25   of registration for collective works and additions.

2895

1          Under Section 101, the definition under the

2    copyright statutes, collective works are defined as

3    compilations, and so I think there's an adequate basis for

4    that, and I showed Your Honor an exemplar at sidebar.

5          With respect to the -- and, of course, look, the --

6    examining the evidence, and I don't want to sit here and get

7    in over my skis, but based on the transcripts that we've

8    reviewed, the only evidence that came in, even if one were to

9    consider independent economic value, even if that were

10   something that would be considered in the circumstances, once

11   you have the facial evidence from the certificates of

12   registration, there is nothing that the, that the plaintiffs

13   have come up with other than a couple of very vague lines in

14   Mr. Kooker's testimony with respect to the Sony.  I don't

15   think anything could remotely be identified as something that

16   would rise to that level.

17         On the mitigation issue, I would take Your Honor

18   through the following.  And this is sort of consistent with

19   the order, I believe, that the Court rendered with regard to

20   the affirmative defenses and specifically with respect to

21   mitigation.  I believe what Your Honor had stated in the

22   decision is that there could be evidence that the plaintiffs

23   could have taken actions such as filing of lawsuits against

24   the subscribers that they believed should have been terminated

25   or something that Cox should have done about.

2896

```
 1              I think the following evidence has come into this
 2     case:  No. 1, there is a basis for the plaintiffs to identify
 3     who the subscribers are.  MarkMonitor provided the
 4     identification by IP protocol address.  Ms. Trickey testified
 5     that it was the custom and practice of Cox to be able to
 6     respond to subpoenas with regard to providing information that
 7     had been done repeatedly.
 8              We had Mr. Marks and the other representatives of
 9     the plaintiffs who testified that they had filed for some
10     period of time literally thousands of lawsuits, including the
11     so-called John Doe lawsuits, where they had issued subpoenas
12     to ISPs to identify specific subscribers, so they had the
13     ability to do that.
14              If you take a look at the -- just by way of interest
15     in terms of the lack of interest that the, that the record
16     companies had, if you take a look at the MOU, they
17     specifically required the ISPs to identify and track the
18     individual subscriber information so that they would be in a
19     position to file lawsuits.
20              The FAQ, which is in evidence, from the Center of
21     Copyright Information, further identified that that
22     information would be culled and provided so that lawsuits can
23     be filed.
24              I asked Mr. Marks on cross-examination whether any
25     lawsuits had been filed, and he said no.  We know from
```

2897

1  Mr. Kokakis's cross-examination that they had abandoned, that

2  is to say, the music industry had abandoned their efforts to

3  go after so-called grandmothers, students, and children, and,

4  of course, Mr. Marks on cross-examination did finally admit

5  that there are PR issues which, you know, prompted them not to

6  do that.

7        Now, I'm not suggesting that they should do that,

8  and I'm not sitting here suggesting that they had the ability

9  or they should have gone after, you know, tens of thousands of

10  subscribers, but one of the issues that I think is important

11  is whether or not they're in a position, as I said in the

12  opening, to go after the worst of the worst.

13        We're not talking about necessarily the kind of

14  scale that would be -- which I personally think would be

15  difficult to argue, but if we're talking about the worst of

16  the worst, the people that they truly believe that Cox should

17  have terminated, could they have in a position to do

18  something?  They had the ability to get the information, they

19  did it in the past, they elected not to do it, and I think it

20  squares -- you know, squares within the ambit of what Your

21  Honor permitted in your summary judgment decision.

22        THE COURT:  How would, how would the jury in this

23  case with this evidence calculate a reduction in the statutory

24  damages award with what they have?

25        MR. ELKIN:  So what they would be able to do, Your

2898

1    Honor, is to, is to make a decision as to whether the failure

2    to mitigate affects the subscribers who they believe Cox

3    should have, should have terminated or they should have taken

4    action to prevent access to the works, and they may determine

5    that they shouldn't have had any obligation to do that, that

6    they could have just let them stay on, but to the extent that

7    they shouldn't, they could make a determination based on the

8    evidence that they have here.

9            I think statutory damages --

10           THE COURT:  This isn't about Cox.  This is about

11   plaintiffs' failing to mitigate.

12           MR. ELKIN:  Right.

13           THE COURT:  Right?

14           MR. ELKIN:  So the issue here is could they have

15   taken the actions on their own, realizing the -- how many

16   notices had been sent in respect of the IP addresses.  Did

17   they try to file any lawsuits, as they had in the past from

18   2004 to 2009, and filed, you know, these John Doe lawsuits,

19   and try to issue subpoenas?  If they really thought that the

20   infringement not only was pervasive on Cox and other networks,

21   they could have done something about it.

22           Mr. Marks testified that, of course, they didn't

23   pursue Time Warner Cable or Cablevision or Comcast or AT&T or,

24   you know, Verizon for the very same reasons.

25           So there's an issue, they're pursuing Cox here for

2899

1    secondary infringement.  It's a copyright infringement case,

2    where mitigation, we've argued, as Your Honor knows, should

3    be, should be a defense.

4           We didn't try to put on any other mitigation

5    evidence in the case because we, obviously, abided by Your

6    Honor's dictates.  There are other things that we would have

7    liked to have done, but we limited it to the, to the lawsuits

8    issues, and I think a jury can fairly determine in the

9    circumstances whether or not mitigation should, you know,

10   prevent an award or somehow affect, you know, where in the

11   continuum of $750 to $30,000 per work or if they find

12   willfulness, up to $150,000 dollars, an appropriate statutory

13   damages award should lie.

14           THE COURT:  All right.  Thank you.

15           MR. ELKIN:  Thank you, Your Honor.

16           MR. OPPENHEIM:  Thank you, Your Honor.  If I may,

17   I'll start with mitigation since that's what we were just

18   speaking of.

19           THE COURT:  All right.

20           MR. OPPENHEIM:  So as I, as I argued yesterday, Your

21   Honor, I still think it remains true that if you -- if

22   defendants' theory of mitigation is right, which is that a

23   plaintiff in a secondary liability case has some obligation to

24   sue the direct infringers, it undoes the notion of secondary

25   liability, because what it says is that there is a -- there is

1    a thumb on the scale that says you really have to sue the

2    direct infringers, not the secondary infringers, and that's

3    not what the courts have thought.

4            And while Your Honor pointed out yesterday that the

5    Grokster decision didn't directly address a mitigation

6    defense, it's clear that --

7            THE COURT:  Well, you've each cited lots of cases

8    and -- on the issue, some secondary liability cases, some --

9    most of them at summary judgment, and we have, I guess, the

10   Bossalina case and some other, but, you know, I was convinced

11   to allow the mitigation instruction in the BMG case to the

12   extent that defendants could show a -- that there was a way

13   for the jury to determine, quantify.

14           MR. OPPENHEIM:  I do think it's instructive, Your

15   Honor, to look at your draft instruction on this point,

16   because in the, in the last sentence, you articulate the legal

17   standard to be met.

18           THE COURT:  A burden of proving a preponderance of

19   the evidence that failed to use reasonable efforts to mitigate

20   damages; and two, the amount in which the damages would have

21   been mitigated, right?

22           MR. OPPENHEIM:  There's zero proof before the jury

23   about that latter issue.  I mean, no -- nothing's been

24   presented such that the jury would know what to do with that,

25   the amount of damages that would have been mitigated.

2901

1          So I think right there, you can say the jury would

2     have no idea what to do with it, but I think more

3     fundamentally, Your Honor, the decision of which tortfeasor to

4     sue is not mitigation.  That's the option copyright

5     fundamentally gives to a copyright owner when there are

6     multiple infringers.

7          So I think, I think for that reason, it's wrong.

8     And ultimately, it really does smack of blaming the victim

9     here.  You know, the record companies and music publishers

10    should have the option of suing who they want to sue, without

11    having it thrown in their face, oh, you should have sued the

12    other guy, which is, which is what's being claimed here.

13         So Your Honor ruled on summary judgment and, and

14    eliminated two of the three mitigation defenses.  We've not

15    objected to the presentation of evidence on the issue.  That

16    evidence is before the jury.  The jury obviously under the

17    statutory damage factors can consider anything it wants, it

18    can consider that, but a mitigation instruction is a step too

19    far, Your Honor, I believe.

20              THE COURT:  Okay.

21              MR. OPPENHEIM:  With respect to the, I guess, the

22    first issue you raised, which is the album track issue, I

23    believe -- we had lengthy argument on this morning, and I

24    don't want to repeat that, but I believe that what Your Honor

25    said was that you would conditionally admit it subject to our

2902

 1   submitting something posttrial on it but that the parties were
 2   not permitted to use those documents for purposes of the trial
 3   with respect to witnesses and in closing.
 4           And I think what I understand Mr. Elkin to be saying
 5   is now something somewhat contrary, which is, well, the jury
 6   can look at this in the back.
 7           I don't see how they could do that.  It's only been
 8   conditionally admitted.  Certainly we don't expect them to go
 9   through 7,200 different registrations, which we haven't even
10   reviewed yet.
11           So I don't think that there's anything that the jury
12   has presented to them on the registration issue.  They do,
13   however, have evidence and testimony repeatedly on these
14   issues that are favorable to the plaintiffs and contrary to
15   the defendants' arguments.  Mr. Kokakis testified at some
16   great length about the difference between sound recordings and
17   published works and that they have independent economic value,
18   they have different licensing schemes, different revenues,
19   different owners.  He testified at that at some length.
20           We always had experts, such as Mr. Tregillis, who
21   testified that every work in this suit was offered
22   individually on iTunes, showing that they're individually
23   marketed.
24           So the plaintiffs have a record to support the
25   positions that they've taken with respect to these two

2903

1    copyright issues.  The defendants could have presented

2    evidence on it.  They chose not to.  I don't believe giving an

3    instruction to the jury on those issues right now will leave

4    the jury with any sense what to do with them because they have

5    nothing in front of them to understand what they mean.

6            THE COURT:  All right.  Mr. Elkin?

7            MR. ELKIN:  Thank you, Your Honor.  I'll be brief.

8    There was a reference to last night's charging conference, and

9    I think Mr. Oppenheim just doubled down on this notion of

10   joint tortfeasors.  This is not a situation where Cox and the

11   subscribers are jointly being pursued for direct infringement.

12   There's a different standard for secondary infringement.

13           It then -- what the standard is for direct

14   infringement, I'm not going to -- Your Honor knows the

15   additional requirements, so he's really comparing apples to

16   oranges.

17           I don't want to repeat and rehash the same

18   arguments.  I think you have it.  I just -- I do think in the

19   circumstances, we did not question Mr. Tregillis on the issues

20   about which you instructed us not to.  The notion that somehow

21   his testimony could be used against us when we were precluded

22   from producing the information is ironic, but I just harken

23   back to the argument that I made with regard to the

24   certificates.  I didn't think that Your Honor had precluded

25   the certificates to be a bar to -- for us to pursue this.  It

2904

1   had to do more with the bar to using it in the case, and we

2   declined, of course, and pursuant to Your Honor's order, did

3   not even go there.

4            THE COURT:  Well, I make rulings on individual

5   pieces of evidence, and you-all map out how you want to put

6   your case on, what witnesses you want to put in, and what

7   testimony you believe is appropriate and admissible, and then

8   I look at the end of the case to see what's there and what's

9   not there, and so I -- and when you have experts testifying,

10  as I've demonstrated, I think they should be held to the

11  confines of their reports.  They get, you know, rebuttal

12  reports.  They get beginning reports, rebuttal, surrebuttal

13  reports.  There shouldn't be any surprises.  So the

14  limitations I've imposed on expert testimony is based on, on

15  the notice requirements under Rule 26.

16           And the registrations, obviously, we looked at them

17  at the issue when it was, when it was initially offered on

18  summary judgment and ownership and registration issues, and

19  then it comes up again yesterday with these 7,200, which

20  there's just no testimony as to what's in that pile.

21           And so to now somehow expect the jury to pluck out

22  the works that are both sound recordings and music

23  compositions or allow you to, I guess, in closing arguments

24  just say, listen, there's 4,000 of these or 3,000 of these are

25  both one and the other, that, I think, is improper.

2905

1            I expected that there would be testimony about how

2    many of these sound recordings were also music compositions,

3    and the jury would be -- would have that evidence through the

4    witness stand when they were deliberating.

5            I mean, it's a close issue even to begin with as to

6    whether in this day and age, when the courts have clearly been

7    looking at the independent value of the works versus whether

8    they're music compositions and sound recordings, and I'm not

9    sure that Mr. Oppenheim isn't correct that we shouldn't even

10   be looking at the traditional Second Circuit analysis that

11   you've cited and is one of the governing cases, but I just

12   don't see that there's evidence from which they could collect

13   and cull and determine whether they wanted to combine the

14   statutory damages award for those works that are -- contained

15   both sound recordings and music compositions.

16           So I'm going to find that they should be allowed to

17   deliberate on the 10,017 individual works, regardless of

18   whether they're compositions or sound recordings, and your

19   exception, of course, is noted.

20           The other issue on mitigation, you know, I didn't

21   know how that would go in the course of the trial, but, you

22   know, clearly we had the instruction that I gave in BMG

23   talking about the -- that the mitigation instruction included

24   both that plaintiffs had failed to use reasonable efforts to

25   mitigate damages and also that the amount by which damages

2906

1   would have been mitigated, and there's absolutely an absence

2   of any evidentiary testimony about, you know, how they would

3   look at that.

4          I mean, the worst of the worst -- that's no standard

5   from which they could say, okay, there is -- and there's no

6   testimony about who are the worst the worst.  I mean, there

7   are a couple of isolated occasions where there were a hundred

8   or more or a thousand for business customers where the

9   testimony was about, but that's not a standard that they could

10  look at and reasonably deliberate on, on where's that line

11  drawn.

12         So I'm not going to give the mitigation instruction,

13  either, and again, your exception is noted.  I don't find that

14  the evidence -- you know, there is the Trickey testimony.

15  There was the John Doe lawsuits, and so that evidence is out

16  there, but when you compare that to what the jury would be

17  asked to deliberate, and I think that mitigation instruction

18  is the correct instruction to give to the jury, I find that

19  none of that evidence weighs on those issues.

20         So again, your exception is noted.

21         MR. ELKIN:  I understand, Your Honor.  May I just

22  clarify two issues on Your Honor's last ruling?

23         THE COURT:  Yes, sir.

24         MR. ELKIN:  One is with regard to the mitigation,

25  just to be clear, I don't know this is going to alter Your

2907

1    Honor's decision or consideration of it, but when we submitted

2    our original jury instruction, it wasn't quite formulated

3    squarely with regard to damages we found.

4            THE COURT:  Okay.  Just a bar to an award.

5            MR. ELKIN:  Well, some or all, and we took that from

6    Fourth Circuit precedent.  So we -- some of what Your Honor

7    identified at a high level sort of informed us with regard to

8    the instruction.

9            So I'm not unmindful of your admonition there, but I

10   just want to be clear with regard to statutory damages,

11   this -- I assume that like all copyright infringement cases

12   where juries consider factors, they are entitled to consider a

13   variety of factors, including mitigation.  I think that's

14   always been one of the factors that juries can consider.

15   That's consistent with what I understand Mr. Oppenheim

16   identified, and I don't think that's cutting new ground here,

17   but I just want to make sure that, that I haven't missed

18   anything.

19           THE COURT:  So the question is are you allowed to

20   still argue that Sony took -- and the music industry took

21   different tacks and they could have continued to pursue suits

22   against subscribers and they did not do that and you should

23   consider that in the statutory damages award?

24           MR. ELKIN:  Right.  Not as an affirmative defense.

25           THE COURT:  Right.

2908

1          MR. ELKIN:  Not as an affirmative defense, but in

2     their consideration of statutory damages, they're going to

3     argue, you know, whatever they're going to argue with regard

4     to those factors.  But even given Your Honor's ruling on the

5     defense, I think as a defendant looking at this potential

6     exposure, to not be able to present whatever record evidence

7     there is for them to consider, where on the continuum the

8     statutory damages award should lie, that we shouldn't be

9     handcuffed on that.

10          THE COURT:  I don't think you should be barred from

11     identifying the evidence in the trial and fashion it as, you

12     know, that they could have and did make different decisions

13     earlier on and that they stopped because in part it was a

14     public relations disaster and that they should consider that.

15          MR. ELKIN:  Thank you, Your Honor.

16          THE COURT:  All right.

17          All right.  How do you want to -- so we can turn the

18     jury instructions around quickly and the verdict form is

19     ready.

20          Joe, ask them -- so I've got a half an hour of

21     instructions probably, which would take us until, to 4:30, and

22     for them to get the case tonight, they would have to agree to

23     stay between 6:30 and probably 6:45.  So would you go ask them

24     whether they're willing to do that?

25          THE COURT SECURITY OFFICER:  One of the jurors has

2909

```
1    to be at a function at seven today.
2                THE COURT:  Okay.  All right.  Well, unless it's
3    next door at the Hyatt, I guess we're not going to do
4    closings, and I won't force parties to break the closings in
5    part.
6                So we're going to take a recess, I'll get final
7    instructions and a copy of the verdict form, and we'll -- I'll
8    just charge the jury tonight, and then we'll let them go.
9                Have you got issues?
10               MR. OPPENHEIM:  I just -- to preserve rights, Your
11   Honor, and as you take the jury instructions back, I believe
12   in instruction No. 10, the second paragraph can probably be
13   removed out with respect to affirmative defenses.
14               Sorry, I'll -- and then we just want to reserve our
15   rights, Your Honor, with respect to --
16               THE COURT:  You've already preserved your rights on
17   the other ones.
18               MR. OPPENHEIM:  Okay.  That's fine.
19               THE COURT:  Which ones do you think need to be
20   modified?
21               MR. OPPENHEIM:  I believe that's --
22               THE COURT:  I didn't hear what you said from over
23   there.
24               MR. OPPENHEIM:  I'm sorry.  In instruction No. 10,
25   Your Honor --
```

2910

```
1              THE COURT:  10.

2              MR. OPPENHEIM:  -- I think the second paragraph now

3    is obsolete and unnecessary because there is no affirmative

4    defense.

5              THE COURT:  Okay.  All right.

6              MR. EATON:  Your Honor, he's correct.

7              THE COURT:  Okay.  All right.  Thank you.

8              Anything else?

9              MR. OPPENHEIM:  No, just the other changes which

10   Your Honor has already gone through.

11             THE COURT:  Meaning the -- pulling the mitigation

12   instruction?

13             MR. OPPENHEIM:  Yes, Your Honor.

14             THE COURT:  Okay.  And then not modifying the fact

15   that there are 10,017 works at issue.

16             MR. OPPENHEIM:  Correct, Your Honor.

17             THE COURT:  All right.  We'll make those changes.

18   We'll get you out a final copy, and we'll come back and charge

19   the jury, and we'll -- I'll try and get you the verdict form

20   as well, but if, if you have problems with the verdict form,

21   we can continue to talk about that.  That doesn't have to go

22   back right away.

23             All right.  We're going to take a brief recess.

24   Let's take 15 minutes.

25             NOTE:  At this point, a recess is taken; at the
```

2911

1   conclusion of which the case continues in the absence of the

2   jury as follow:

3   JURY OUT

4           THE COURT:  All right.  Any final comments before I

5   charge the jury?

6           MR. OPPENHEIM:  The jury instructions look good to

7   plaintiffs, Your Honor.

8           We have a suggestion on the verdict form, but we can

9   deal with that after we charge the jury and let them go.

10          THE COURT:  Okay.  That's fine.

11          All right.  Then, Joe, let's get our jury, please.

12          MR. EATON:  Your Honor, just from our point of view,

13  we agree about the verdict form, that won't be hard to fix.

14          We are fine with the jury instructions.

15          And at the risk of being belts and braces, I just

16  want to make sure we have fully preserved all of our

17  objections.

18          THE COURT:  Certainly, you are preserved.

19          MR. EATON:  Thank you, sir.

20          MR. OPPENHEIM:  And similarly plaintiffs.

21          THE COURT:  Yeah, similarly plaintiffs.

22          Yes, sir, now we're ready, Joe.

23          If you kind of head towards the podium, Mr. Eaton --

24  Mr. Eaton, if you head towards the podium, then I understand

25  there's something that you want to -- want say.  And I look

2912

1    around and my signal is that somebody is heading towards the

2    podium.

3              MR. EATON:  Sorry.  Understood.

4              THE COURT:  No, that's all right.

5              NOTE:  At this point the jury returns to the

6    courtroom; whereupon the case continues as follows:

7    JURY IN

8              THE COURT:  All right, please have a seat.

9              So this will take a little awhile.  And I don't do

10   this for a living, fortunately.

11             So I'll read the instructions to you.  The good news

12   is you'll have copies of the instructions when you are

13   deliberating, we'll send several copies back for you to refer

14   to if you need it.  But I appreciate you trying to listen

15   while I go through them tonight.

16             And then, as you know, we're going to excuse you for

17   the evening and then come back and have closing arguments in

18   the morning.

19             Does 9 o'clock work for you all in the morning?

20   Okay, then we'll plan on coming back at 9 a.m. for closing

21   arguments, and then you'll get the case for deliberation.

22             All right.  Now that you've heard the evidence in

23   the case, it's my duty to instruct you on the applicable law.

24   It is your duty to follow the law as I state it.  You must

25   apply the law to the facts as you find them from the evidence

2913

1    in the case.  Do not single out one instruction as stating the

2    law, but consider the instructions as a whole.  Do not be

3    concerned about the wisdom of any rule of law.  You must

4    follow and apply the law.

5           The lawyers may refer to some of the governing rules

6    of law in their arguments.  If there is any difference between

7    the law as stated by me versus by the lawyers, you must follow

8    these instructions.

9           Nothing I say in these instructions indicates that I

10   have an opinion about the facts of the case.  You're not --

11   you, not I, have the duty to determine the facts.

12          You must perform your duties as jurors without bias

13   or prejudice as to any party.  The law does not permit you to

14   be controlled by sympathy, prejudice, or public opinion.  All

15   parties expect that you will carefully and impartially

16   consider all the evidence, follow the law as it is now being

17   given to you, and reach a just verdict regardless of the

18   consequences.

19          Unless you're otherwise instructed, the evidence in

20   the case consists of the sworn testimony of the witnesses,

21   including deposition testimony, regardless of who called the

22   witness, all exhibits received in evidence regardless of who

23   may have produced them, and all facts and events that may have

24   been admitted to or stipulated to.

25          Statements and arguments by the lawyers are not

2914

1    evidence.  The lawyers are not witnesses.  What they have said

2    in their opening statements or what they will say in closing

3    arguments and at other times is intended to help you

4    understand the evidence, but it's not the evidence.  However,

5    when the lawyers on both sides stipulate or agree on the

6    existence of a fact, unless otherwise instructed, you must

7    accept the stipulation and regard that fact as proved.

8            If I have taken judicial notice of a fact or

9    instructed you that certain facts have already been

10   established, you must accept it as true.

11           Any evidence to which I have sustained an objection

12   and evidence that I have ordered stricken must be entirely

13   disregarded.

14           If a lawyer asks a witness a question that contains

15   an assertion of fact, you may not consider the assertion as

16   evidence of the fact.  The lawyer's questions and statements

17   are not evidence.

18           During the trial I may sometimes ask a witness

19   questions.  Please do not think I have any opinion about the

20   subject matter of my questions.  I may ask a question simply

21   to clarify a matter, not to help one side of the case or harm

22   the other side.

23           Remember at all times that you as the jurors are the

24   sole judges of the facts in the case.

25           It's my duty to caution or warn an attorney who does

1   something I believe is not in keeping with the rules of

2   evidence or procedure.  You are not to draw any inference

3   against the side I may caution or warn during the trial.

4          Testimony exhibits -- and exhibits may be admitted

5   into evidence during the trial only if they meet certain

6   criteria or standards.  It's the lawyer's duty to object when

7   the other side offers testimony or an exhibit that a lawyer

8   believes is not properly admissible under the rules of law.

9   Only by offering an objection can a lawyer request and obtain

10  a ruling from me on the admissibility of the evidence being

11  offered by the other side.  You should not be influenced

12  against any lawyer or the client because the lawyer has made

13  objections.

14         Do not attempt to interpret my rulings on objections

15  as somehow indicating how I think you should decide the case.

16  I'm simply making a ruling on a legal question.

17         There's nothing particularly different in the way

18  that a juror should consider the evidence in a trial from that

19  which any reasonable and careful person would deal with any

20  very important question that must be resolved by examining

21  facts, opinions, and evidence.  You are expected to use your

22  good sense in considering and evaluating the evidence in the

23  case.  Use the evidence only for those purposes for which it

24  has been received, and give the evidence a reasonable and fair

25  construction in the light of your common knowledge of the

2916

1   natural tendencies and inclinations of human beings.

2            If any reference by the Court or by counsel to

3   matters of testimony or exhibits does not coincide with your

4   own recollection of that evidence, it's your recollection

5   which should control during your deliberations and not the

6   statements of the Court or of counsel.

7            As I said, you're the judges of the evidence

8   received in the case.

9            Sometimes evidence may be admitted for a particular

10  purpose and not generally for all purposes.  You may recall

11  that during the course of this trial I instructed you that

12  I've admitted certain evidence for a limited purpose.  You

13  must consider this evidence only for the limited purpose for

14  which it was admitted.

15           Plaintiffs have the burden of proving their case by

16  what's called the preponderance of the evidence.  That means

17  plaintiffs have to prove to you, in light of all the evidence,

18  that what they claim is more likely so than not so.

19           To say it differently, if you were to put the

20  evidence favorable to plaintiffs and the evidence favorable to

21  defendants on opposite sides of the scale, plaintiffs would

22  have to make the scales tip somewhat on their side.

23           If you find after considering all the evidence that

24  a claim or fact is more likely so than not so, then the claim

25  or fact has been proved by a preponderance of the evidence.

1    This standard does not require proof of an absolute certainty

2    since proof of an absolute certainty is seldom possible in any

3    case.

4           In determining whether any fact in issue has been

5    proved by a preponderance of the evidence, unless otherwise

6    instructed, you may consider the testimony of all witnesses

7    regardless of who may have called them, all exhibits received

8    in evidence regardless of who may have produced them.

9           You may have heard of the term "proof beyond a

10   reasonable doubt."  That's a stricter standard applicable in

11   criminal cases.  It does not apply in civil cases such as

12   this.  And you should, therefore, not consider it.

13          Generally speaking, there are two types of evidence

14   presented during a trial, direct and circumstantial evidence.

15   Direct evidence is proof that does not require an inference,

16   such as testimony of someone who claims to have personal

17   knowledge of a fact.

18          Circumstantial evidence is proof of a fact or a

19   series of facts that tends to show that some other fact is

20   true.

21          As an example, direct evidence that it is raining is

22   testimony from a witness who says, I was outside a minute ago

23   and I saw it raining.

24          Circumstantial evidence that it is raining is the

25   observation of someone entering a room carrying a wet

2918

1    umbrella.

2            The law makes no distinction between the weight or

3    value to be given to either direct or circumstantial evidence.

4    A greater degree of certainty is not required of

5    circumstantial evidence.

6            In reaching your verdict, you should consider all

7    the evidence in the case, including both direct and

8    circumstantial evidence.

9            You are to consider only the evidence in the case.

10   However, you are not limited to the statements of the

11   witnesses.  You may draw from the facts you find that have

12   been proved such reasonable inferences as seemed -- as seem

13   justified in light of your experience.

14           Inferences are deductions or conclusions that reason

15   and common sense lead you to draw from facts established by

16   the evidence in the case.

17           You are the sole judges of the credibility of the

18   witnesses and the weight that their testimony deserves.  You

19   may be guided by the appearance and conduct of a witness, or

20   by the manner in which a witness testifies, or by the

21   character of the testimony given, or by evidence contrary to

22   the testimony.

23           You should carefully examine all the testimony

24   given, the circumstances under which each witness has

25   testified, and every matter in evidence tending to show

2919

1    whether a witness is worthy of belief.  Consider each witness'

2    intelligence, motive and state of mind, and demeanor or manner

3    while testifying.

4            Consider the witness' ability to observe the matters

5    to which the witness has testified, and whether the witness

6    impresses you as having an accurate recollection of these

7    matters.  Also, consider any relation each witness may have

8    with either side of the case, the manner in which each witness

9    might be affected by the verdict, and the extent to which the

10   testimony of each witness is either supported or contradicted

11   by other evidence in the case.

12           Inconsistencies or discrepancies in the testimony of

13   a witness or between the testimony of different witnesses may

14   or may not cause you to discredit such testimony.  Two or more

15   witnesses -- persons seeing an event may see or hear it

16   differently.

17           In weighing the effect of a discrepancy, always

18   consider whether it pertains to a matter of importance or an

19   unimportant detail, and whether the discrepancy results from

20   innocent error or intentional falsehood.

21           After making your own judgment, you'll give the

22   testimony of each witness such weight, if any, that you think

23   deserves.  In short, you may accept or reject the testimony of

24   any witness in whole or in part.

25           In addition, the weight of the evidence is not

2920

1    necessarily determined by the number of witnesses testifying

2    to the existence or non-existence of any fact.  You may find

3    that the testimony of a small number of witnesses as to any

4    fact is more credible than the testimony of a larger number of

5    witnesses to the contrary.

6         A witness may be discredited or impeached by

7    contradictory evidence or by evidence that at some other time

8    the witness said or did -- or has said or done something, or

9    has failed to say or do something that is inconsistent with

10   the witness' present testimony.

11        If you believe any witness has been impeached and

12   thus discredited, you may give the testimony of that witness

13   such credibility, if any, you think it deserves.

14        If a witness is shown knowingly to have testified

15   falsely about any material matter, you have a right to

16   distrust such witness' other testimony, and you may reject all

17   the testimony of that witness or give it such credibility as

18   you think it deserves.

19        An act or omission is knowingly done if the act is

20   done voluntarily and intentionally, and not because of mistake

21   or accident or innocent reason.

22        The rules of evidence ordinarily do not permit

23   witnesses to testify as to opinions or conclusions.  There is

24   an exception to this rule for expert witnesses.

25        An expert witness is a person who by education and

2921

experience has become expert in some art, science, profession, or calling.  Expert witnesses may state their opinions as to matters in which they profess to be expert, and may also state their reasons for their opinions.

You should consider each expert opinion received in evidence in this case and give it such weight as you think it deserves.  If you should decide the opinion of an expert witness is not based on sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you feel the expert's opinion is outweighed by other evidence, you may disregard the opinion entirely.

During the trial certain testimony has been presented by way of deposition.  The deposition consisted of sworn, recorded answers to questions asked of the witnesses in advance of the trial by attorneys for the parties in the case. The testimony of a witness who, for some reason, is not present to testify from the witness stand may be presented in writing under oath or on a videotape.  Such testimony is entitled to the same consideration and is to be judged as to credibility, weighed, and otherwise considered by you, insofar as possible, in the same way as if the witness had been present and had testified from the witness stand.

Each party has introduced into evidence certain interrogatories; that is, questions together with answers,

2922

1   signed and sworn to by another party.  A party is bound by its

2   sworn answers.

3          By introducing an opposing party's answers to

4   interrogatories, the introducing party does not bind itself to

5   these answers.  The introducing party may challenge the

6   opposing parties' answers in whole or in part or may offer

7   contrary evidence.

8          As I stated in my initial instructions at the

9   beginning of the case, you have heard testimony now and seen

10  documents that refer to the Digital Millennium Copyright Act,

11  known as the DMCA.  The DMCA provides that an internet service

12  provider, like Cox, may have a defense to liability arising

13  from infringement on its network and that there is a defense

14  called a safe harbor defense, which is included in the DMCA in

15  part of that statute.  It's not a defense for Cox in this

16  case.

17         However, the fact that the safe harbor provision

18  does not apply does not bear adversely on the consideration of

19  a defense by Cox that Cox's conduct is not infringing under

20  the Copyright Act or any other defense.

21         I will be sending the exhibits that have been

22  received in evidence during the trial back to you, and you

23  will have them while you deliberate.

24         A copyright is a set of rights granted by federal

25  law to the owner of an original work of authorship.  The owner

2923

1    of a copyright has the exclusive right to:  One, reproduce the

2    copyrighted work.

3            Two, prepare derivative works based upon the

4    copyrighted work.

5            Three, distribute copies or phone records --

6    phonorecords of the copyrighted -- to the public by sale or

7    other transfer of ownership or by rental, lease, or lending.

8            Four, perform publicly a copyrighted literary work,

9    musical work, dramatic work, choreographic work, pantomime

10   work, or motion picture.

11           Five, display publicly a copyrighted literary work,

12   music work, dramatic work, choreographic work, pantomime work,

13   pictorial work, graphic work, sculptural work, or the

14   individual images of a motion picture.

15           The term "owner" includes the author of the work, an

16   assignee, and an exclusive licensee.

17           This case involves two kinds of copyrighted works:

18   Sound recordings, i.e., recorded music, and musical

19   compositions, which include music and lyrics.

20           In this case, plaintiffs contend that Cox is

21   contributorily and vicariously liable for the infringement of

22   plaintiffs' 10,017 copyrighted works by users of Cox's

23   internet service.

24           Plaintiffs have already established that they are

25   the owners of the 10,017 copyrighted works as issue -- at

2924

1    issue in this case, and that the copyright and registration in

2    each of these 10,017 works is valid.

3         Plaintiffs have also established the knowledge

4    element of their contributory infringement claim.  That is,

5    plaintiffs have established that Cox had specific enough

6    knowledge of the infringement occurring on its network that

7    Cox could have done something about it.

8         In order to prove contributory or vicarious

9    copyright infringement, plaintiffs must first establish by a

10   preponderance of the evidence that users of Cox's internet

11   service used that service to infringe plaintiffs' copyrighted

12   works.

13        Plaintiffs are not required to prove the specific

14   identities of the infringing users.

15        A copyright owner's exclusive right to distribute,

16   reproduce, and copy its copyrighted work is infringed by the

17   downloading or uploading of the copyrighted work without

18   authorization.

19        If you find that users of Cox's internet service

20   uploaded or downloaded all or part of plaintiffs' copyrighted

21   works at issue without authorization, then plaintiffs have

22   established that the users of Cox's internet service have

23   infringed plaintiffs' copyrighted works.

24        A copyright may be infringed by contributory

25   infringing.  With certain exceptions, a person is liable for

2925

1    copyright infringement by another if the person knows or was

2    willfully blind to the infringing activity and induces,

3    causes, or materially contributes to the activity.

4            Plaintiff has the burden of proving each of the

5    following by a preponderance of the evidence:  First, that

6    there was direct infringement of plaintiffs' copyrighted works

7    at issue by users of Cox's internet service.

8            Second, that Cox knew of specific instances of

9    infringement or was willfully blind to such instances.

10           And, third, that Cox induced, caused, or materially

11   contributed to the infringing activity.

12           The second element, that Cox knew of the specific

13   instances of infringement, has already been established.  As

14   such, there is no need to consider this knowledge element in

15   your deliberations.

16           A copyright may also be infringed by vicariously

17   infringing.  A person is liable for copyright infringement by

18   another if the person has a financial interest and the right

19   and ability to supervise the infringing activity, whether or

20   not the person knew of the infringement.

21           In order to prove vicarious copyright infringement,

22   plaintiffs have the burden of proving each of the following by

23   a preponderance of the evidence:  First, that there was direct

24   infringement of plaintiffs' copyrighted works by users of

25   Cox's internet service.

2926

1          Second, that Cox had a direct financial interest in
2    the infringing activity of its users.
3          And, third, that Cox had the right and ability to
4    supervise such infringing activity.
5          The fact that I'm instructing you on the proper
6    measure of damages should not be considered as indicating any
7    view of mine as to which party is entitled to your verdict in
8    the case.  Instructions as to the measure of damages are given
9    for your guidance only in the event you should find in favor
10   of the plaintiffs from a preponderance of the evidence in the
11   case in accordance with the other instructions.
12         If you find that Cox is liable for contributory
13   infringement or you find Cox is liable for vicarious
14   infringement, then you should consider the amount of money to
15   award the plaintiffs.
16         If you find that Cox is neither liable for
17   contributory or vicarious infringement, then you should not
18   consider this issue.
19         Plaintiffs seek an award of statutory damages under
20   the United States Copyright Act.  Statutory damages are
21   damages that are established by Congress in the Copyright Act
22   because actual damages in copyright cases are often difficult
23   to establish with precision.  The purposes are to compensate
24   the copyright owner, penalize the infringer, and deter future
25   copyright law violations.

2927

1            The amount awarded must be between 750 and $30,000
2     for each copyrighted work that you find to be infringed.
3            If plaintiffs prove that Cox acted willfully in
4     contributorily or vicariously infringing plaintiffs'
5     copyrights, you may, but are not required to, increase the
6     statutory damage award to a sum as high as $150,000 per
7     copyrighted work.
8            You should award as statutory damages an amount that
9     you find to be fair under the circumstances.  In determining
10    the appropriate amount to award, you may consider the
11    following factors:  The profits Cox earned because of the
12    infringement.
13           The expenses Cox saved because of the infringement.
14           The revenues that plaintiffs lost because of the
15    infringement.
16           The difficulty of proving plaintiffs' actual
17    damages.
18           The circumstances of the infringement.
19           Whether Cox acted willfully or intentionally in
20    contributorily or vicariously infringing plaintiffs'
21    copyrights.
22           Deterrence of future infringement.
23           In the case of willfulness, the need to punish Cox.
24           In considering what amount would have a deterrent
25    effect, you may consider Cox's total profits and the effect

2928

1    the award may have on Cox in the marketplace.

2            Plaintiffs are not required to prove any actual

3    damage suffered by plaintiffs to be awarded statutory damages.

4    You should award statutory damages whether or not there is

5    evidence of the actual damage suffered by plaintiffs, and your

6    statutory damage award need not be based on the actual damages

7    suffered by plaintiffs.

8            Cox's contributory or vicarious infringement is

9    considered willful if plaintiffs prove by a preponderance of

10   the evidence that Cox had knowledge that its subscribers'

11   actions constituted infringement of plaintiffs' copyrights,

12   acted with reckless disregard for the infringement of

13   plaintiffs' copyrights, or was willfully blind to the

14   infringement of plaintiffs' copyrights.

15           You must follow these rules while deliberating and

16   returning your verdict.  First, when you go to the jury room,

17   you must select a foreperson.  The foreperson will preside

18   over your discussions and speak for you here in court.

19           Second, it's your duty as jurors to discuss this

20   case with one another in the jury and try to reach an

21   agreement.  Each of you must make your own conscious decision,

22   but only after you have considered all the evidence, discussed

23   it fully with the other jurors, and listened to the views of

24   the other jurors.

25           Do not be afraid to change your opinions if the

2929

1    discussion persuades you that you should.  But do not make a

2    decision simply because other jurors think it's right or

3    simply to reach a verdict.

4         Remember at all times that you are judges of the

5    facts.  Your sole interest is to seek the truth from the

6    evidence in the case.

7         Third, if you need to communicate with me during

8    deliberations, you may send a note to me through the --

9    through Joe, and signed by one or more of the jurors.  I will

10   respond as soon as possible, either in writing or orally by

11   having you all come back into open court.

12        Remember, you should not tell anyone, including me,

13   how your votes stand numerically.

14        Fourth, your verdict must be based solely on the

15   evidence and the law that I have given you in these

16   instructions.  The verdict must be unanimous.  Nothing I have

17   said or done is intended to suggest what your verdict should

18   be, that's entirely for you to decide.

19        Finally, we will have a verdict form that is the

20   written notice of the decision you reach.  The form will have

21   a place for you to indicate "yes" or "no" whether plaintiffs

22   have proven either vicarious or contributory infringement by a

23   preponderance of the evidence.  And, you know, either check

24   the "yes" or the "no" box.  And then there will be a box for

25   willfulness.  And then there will be a box for damages.  And

2930

1    then the form must be dated and signed by the foreperson.

2              When you have reached a verdict, you will let Mr.

3    Ruelas know.  And then when you are ready, we will bring you

4    back into court and return the verdict in the courtroom.

5              Okay.  That completes the instructions.  And so, I

6    am going to release you now for the evening.  And remember,

7    the same rule applies, no investigation, no research, no

8    talking to anybody about the case.

9              And enjoy the evening, and we'll see you back here

10   at 9 o'clock tomorrow morning for closing arguments.

11             All right.  Thank you, you are excused.

12             NOTE:  At this point the jury leaves the courtroom;

13   whereupon the case continues as follows:

14   JURY OUT

15             THE COURT:  All right.  Suggested modification to

16   the verdict form?

17             MR. OPPENHEIM:  This truly qualifies as minor, Your

18   Honor, but I just want to make sure that whatever form we

19   submit to the jury is as simple as possible.

20             After question 3, as you turn the page, the first

21   italicized comment there:  If you answered "no" to both

22   questions 1 and 2, do not answer any more questions.

23             I think that probably should go between 2 and 3, and

24   may eliminate the need in 3 for where we say:  If you answered

25   yes to question 1 or 2 ...

2931

1          Just as a matter of simplicity.

2          MR. EATON:  You mean about the latter point.  But I

3     think that's correct, Your Honor.  I think that -- I think

4     that would be a good fix.

5          THE COURT:  Yeah, I definitely think we should put

6     the sentence at the top of page 2 after number 2.

7          And you don't want the redundancy in question 3,

8     just eliminate that?

9          MR. OPPENHEIM:  Yeah.  I don't think we need it,

10    Your Honor, anymore if we move that up.

11         THE COURT:  So we should say:  Plaintiffs have

12    asserted infringement claims for 10,017 works.  How many works

13    -- how many of the works did Cox vicariously and

14    contributorily infringe?

15         MR. OPPENHEIM:  I think that works, Your Honor.

16         MR. EATON:  Your Honor, could you -- I couldn't hear

17    that.  Forgive me.  Could you repeat what you just --

18         THE COURT:  So if we take out the, "If you answered

19    yes to question 1 or 2," then all that's left is:  Plaintiffs

20    have asserted infringement of 10,017 works.

21         MR. EATON:  Yeah, you're right.

22         THE COURT:  How many of the works did Cox

23    vicariously or contributorily infringe?

24         MR. EATON:  That's true.  I think that's the correct

25    way to do it, Your Honor.

2932

1          THE COURT:  Okay.  I'm happy to make those changes.

2          All right.  Anything else tonight then?

3          MR. OPPENHEIM:  One moment, Your Honor.

4          I think we're fine, Your Honor, with the changes you

5    suggested.  I think it will be fine.

6          THE COURT:  Okay.

7          MR. ELKIN:  Nothing here, Your Honor.

8          THE COURT:  All right, thank you.

9          All right, then we're --

10         MR. GOULD:  Your Honor, if I could just ask, could

11   you maybe e-mail it to us tonight so we could look at it fresh

12   with the changes?

13         THE COURT:  They're so dramatic, I know you're going

14   to spend at least an hour looking at it carefully.  We'll be

15   happy to do that.

16         MR. GOULD:  Thank you, sir.

17         MR. ZEBRAK:  We promise not to pass any notes.

18         THE COURT:  Okay.  Then we'll see you all at

19   9 o'clock tomorrow morning.

20         We're in recess.

21         NOTE:  The December 17, 2019, portion of the case is

22   concluded.

23         --------------------------------------------

24

25

2933

1

2                     CERTIFICATE OF COURT REPORTERS

3

4          We certify that the foregoing is a true and
      accurate transcription of our stenographic notes.
5

6
                          /s/  Norman B. Linnell
7                   Norman B. Linnell, RPR, CM, VCE, FCRR

8

9                          /s/  Anneliese J. Thomson
                    Anneliese J. Thomson, RDR, CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25