2934

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,       :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.       :
                               :
-------------------------------:
```

VOLUME  12

TRIAL TRANSCRIPT

December 18, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

Norman Linnell and Anneliese Thomson - EDVA-OCRs  (703)549-4626

2935

1    APPEARANCES:

2

3    FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                   SCOTT A. ZEBRAK, ESQ.
                                   JEFFREY M. GOULD, ESQ.
4                                  MICHAEL J. DRUCKMAN, ESQ.
                                   ANDREW L. GUERRA, ESQ.
5                                  LUCY G. NOYOLA, ESQ.
                                   JIA RYU, ESQ.
6                                  Oppenheim + Zebrak, LLP
                                   4530 Wisconsin Avenue, N.W.
7                                  5th Floor
                                   Washington, D.C. 20015

8

9    FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
                                   GEOFFREY P. EATON, ESQ.
10                                 Winston & Strawn LLP
                                   1700 K Street, N.W.
11                                 Washington, D.C. 20006-3817
                                     and
12                                 SEAN R. ANDERSON, ESQ.
                                   MICHAEL S. ELKIN, ESQ.
13                                 THOMAS P. LANE, ESQ.
                                   CESIE C. ALVAREZ, ESQ.
14                                 Winston & Strawn LLP
                                   200 Park Avenue
15                                 New York, NY 10166-4193
                                     and
16                                 JENNIFER A. GOLINVEAUX, ESQ.
                                   THOMAS J. KEARNEY, ESQ.
17                                 Winston & Strawn LLP
                                   101 California Street, 35th Floor
18                                 San Francisco, CA 94111-5840
                                     and
19                                 MICHAEL L. BRODY, ESQ.
                                   Winston & Strawn LLP
20                                 35 West Wacker Drive
                                   Chicago, IL 60601
21                                   and
                                   DIANA HUGHES LEIDEN, ESQ.
22                                 Winston & Strawn LLP
                                   333 South Grand Avenue
23                                 Suite 3800
                                   Los Angeles, CA

24

25

2936

1

2                          I N D E X

3

Closing Argument by Mr. Oppenheim:            Page 2938

4

Closing Argument by Mr. Elkin:                Page 2977

5

Rebuttal Argument by Mr. Oppenheim:           Page 3021

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2937

P R O C E E D I N G S

1

2          NOTE:  The December 18, 2019, portion of the

3     case begins in the absence of the jury as follows:

4     JURY OUT

5          THE COURT:  All right.  Good morning.  I see all

6     counsel are here.  Good morning to each of you.

7          Ready for our jury?

8          MR. OPPENHEIM:  Yes, sir.

9          THE COURT:  Okay.  Joe, let's get our jury, please.

10          NOTE:  At this point, the jury returns to the

11     courtroom; whereupon, the case continues as follows:

12     JURY IN

13          THE COURT:  All right.  Please have a seat.

14          Good morning, ladies and gentlemen.

15          THE JURORS:  Good morning.

16          THE COURT:  All right.  Can I have a nod of heads

17     that you-all didn't do any research, investigation, or talk to

18     anybody?

19          NOTE:  Jurors nodding heads.

09:08:50 20          THE COURT:  Thank you so much.

21          All right.  We'll proceed with closing arguments.

22     Mr. Oppenheim, please, sir.

23          MR. OPPENHEIM:  Thank you, Your Honor.

24          THE COURT SECURITY OFFICER:  Counsel, is that okay?

25          MR. OPPENHEIM:  Yes.

2938

```
 1              CLOSING ARGUMENT
 2              BY MR. OPPENHEIM:
 3         Good morning.  When this case began, I said this is a
 4    case about an Internet provider that was swarming in piracy,
 5    that said one thing but did another, and that put its profits
 6    above the law.  So now we've spent the last two-and-a-half
 7    weeks hearing evidence in this case, and what we have heard and
 8    seen demonstrates those three points clearly and unequivocally.
 9              Under the law, Cox cannot knowingly contribute to
10    copyright infringement, nor can Cox profit from infringement it
11    has the right and ability to stop.  But that is precisely what
12    Cox did over and over and over again.
13              Throughout this trial, Cox has focused its attention
14    to issues that are wholly irrelevant to the case.  Cox would
15    much prefer that the jury spend its time thinking about privacy
16    and CAS and providing Internet for critical infrastructure,
17    instead of focusing on the massive infringement that was on its
18    network, that it knew was there but chose not to do anything
19    about because it didn't want to hurt its huge profit line.
20              Before I go any further, let me take a moment to
21    thank and appreciate each of you for your commitment, focus,
22    and attention during these last few weeks.  I also would like
23    to thank and appreciate the court- -- courtroom staff, the
24    courthouse staff who have worked tirelessly to move this case
25    forward; opposing counsel, some of whom I have known for very
```

09:09:51 (line 10)
09:10:34 (line 20)

2939

1 many years; and my team, who demonstrate the maxim that a

2 successful team is a group of many hands but of one mind in

3 representing our clients, who we believe passionately in.

4        Let me also acknowledge my clients in the music

5 industry.  There are many representatives of them in the

6 courtroom today.  This case, as I have said before, is

7 critically important to them, and their presence throughout the

8 trial and here today is testament to their passion for music,

9 the rule of law, and the desire for justice.

09:11:35 10        Let me take a moment to give you a road map of the

11 points I will be covering during this closing.  First, I'm

12 going to discuss what this case is about.  Then I'm going to go

13 through the elements of the claims.  We're going to talk about

14 Cox's failed policies.  Then we're going to touch on what this

15 case is not about, and finally turn to the issues of

16 willfulness, damages, and the verdict.

17        So as I indicated before, the P2P on the Cox network

18 was overwhelming.  You heard testimony from experts that there

19 were hundreds of millions of infringements on BitTorrent each

09:12:18 20 day and that over 99 percent of that infringement was -- of

21 that content was infringing.

22        Mr. Bahun from MarkMonitor testified about GDPI

23 checks; you may recall that; and based on those GDPI checks, he

24 testified that on Cox's network alone, there was more than

25 10,000 infringements per day of plaintiffs' works.

2940

1          The number of infringements that were the subject of

2     notices was lengthy.  You have seen this list during the trial

3     and will recall that it shows over 270,000 infringement notices

4     between 2012 and 2014, but we know from the testimony -- excuse

5     me, we know from the testimony that the list of infringements

6     on the entirety of what was being infringed is much greater

7     than that.

8          In 2010, the RIAA sent an e-mail to Cox with a

9     spreadsheet showing all of the infringements it was finding on

09:13:25 10    the Cox network but could not send to Cox because of the caps

11    that were imposed.  Based on what the RIAA found, Mr. Marks

12    approximated that in 2009 to 2010, there were over 280,000

13    infringements that the RIAA was not permitted to send notices

14    on.

15         If you extrapolate that out for the claim period in

16    this case, it means that there were roughly 1.1 million

17    infringements on the Cox network of plaintiffs' works for which

18    there were no notices.  And these numbers are just the

19    infringements of the plaintiffs' companies.  If you add in all

09:14:06 20    of the infringements of all of the other copyright holders who

21    you have heard about during the course of this case, you can

22    see that Cox's network was swarming in piracy.

23         Cox said one thing but did another, and as I said

24    previously, this was a habit of Cox.  Cox told subscribers

25    copyright infringement was prohibited but then allowed repeated

2941

1   copyright infringement.  Cox told copyright owners it would

2   stop the infringement but implemented rules that did anything

3   but stop the infringement.  Cox said it wanted to educate

4   customers but rarely forwarded infringement notices to those

5   customers.  This defies common sense.

6        Cox said it had a policy that led to termination but

7   created an unwritten policy that undid terminations, and then

8   they stopped terminating altogether.  Cox said it took

9   copyright infringement seriously, but Cox's abuse team treated

09:15:19 10  the issue with anything but respect.

11       And Cox now says, as you heard during Cox's opening

12  statement, that Internet service was too precious to terminate

13  lightly.  It was an essential service.  But then Cox terminated

14  over 600,000 customers when they didn't pay.

15       Keep all of this in mind and think critically when

16  you hear more talk and argument from Cox in its closing.  Pay

17  attention to what Cox did, not what Cox now says it did.

18       Cox put its profits above the law.  In e-mail after

19  e-mail, we saw what motivated Cox.  It was profits.  Cox

09:16:08 20  prioritized customer payments over all else in deciding whether

21  to terminate.

22       You have seen both of these e-mails during the course

23  of this trial:  Mr. Sikes indicating that this customer pays

24  over $400 a month and will likely cancel services if

25  terminated, every terminated customer becomes lost revenue; or

2942

 1    Mr. Zabek's e-mail to his abuse group, advising them to try to

 2    keep customers and gain more RGUs, revenue-generating units.

 3            Remember Mr. Bakewell?  He testified that if Cox had

 4    terminated customers, it would have lost monthly billings.

 5            That is putting profits ahead of the law.

 6            As Cox was getting crushed by DMCA notices -- and

 7    that's their term.  Remember in the e-mail, they said they were

 8    getting crushed by notices.  It slashed its TOC, the call

 9    center responsible for dealing with infringement calls.  It

09:17:13  10    slashed the staffing there from nine to four, and the abuse

11    team was slashed from five to two.

12            When you think about the size of Cox and its over

13    20,000 employees, it is beyond baffling that it would not staff

14    up a real team of real employees to address these infringement

15    issues.  It is even more baffling that it cut the staff as the

16    problem was growing.

17            Cox wasn't concerned with complying with the law.  It

18    was concerned about keeping its costs down and its profits up.

19            Cox refuses to accept responsibility.  Listening to

09:17:55  20    Cox at this trial, everyone else is to blame but Cox.

21    MarkMonitor doesn't work properly.  Peer-to-peer users lie

22    about bitfield and fake content.  Plaintiffs should have sued

23    tens of thousands of Cox's subscribers anonymously, as though

24    Cox didn't do anything wrong.  Plaintiffs should have sued

25    other ISPs.  The RIAA should have sent more notices, but other

2943

1   copyright owners sent too many.  Net neutrality prevented Cox

2   from acting responsibly.  CAS didn't do enough, but it cost too

3   much for Cox to participate.  Rightscorp shouldn't have made

4   settlement offers in its infringement notices.

5          Instead of accepting responsibilities for its

6   failings, Cox blames the victims.

7          Let's turn to the issue, the elements of the claims.

8   One of the Cox's main arguments in opening was to say that

9   there was no evidence of direct infringement.  This is absurd.

09:19:13 10   Just saying something without backing it up means nothing.  The

11   evidence of infringement was overwhelming, and more

12   importantly, it was documented.

13          For all of Cox's efforts to deny that the

14   infringement occurred, it cannot point to any documentation to

15   support its argument.  Importantly, while Cox now argues that

16   the infringement was not happening, Cox never told the RIAA at

17   the time that the infringement notices were inadequate or

18   inaccurate.

19          In fact, Mr. Zabek even testified that when Cox

09:19:51 20   received an RIAA notice, it assumed they were valid, and

21   Mr. Carothers similarly testified that he took the RIAA

22   allegations to be fair and proper infringement notices.

23          So as we consider the evidence of direct

24   infringement, remember it includes both downloading, which is

25   copying or reproduction, and uploading, which is distribution

2944

1    or sharing.  In this case, we have evidence of both.

2            So what is that evidence?  Recall Mr. Bahun, who

3    worked for MarkMonitor.  This is the gentleman who the FBI, the

4    Department of Justice, and Homeland Security brings in to train

5    their agents on peer-to-peer issues.

6            And as a company, MarkMonitor is used by some of the

7    largest and most well-known companies in the world:  movie

8    studios, book publishers, Google, Apple, Nissan, Coca-Cola,

9    banks, professional sports leagues.  MarkMonitor is the gold

09:20:56 10   standard when it comes to antipiracy, and its process is

11   precise and meticulous.

12           MarkMonitor goes on to a peer-to-peer network.  It

13   downloads and confirms a file is infringing.  It then collects

14   evidence on users distributing that infringing file by

15   connecting to a peer and beginning the download process.  By

16   downloading all of the information, that indicates that the

17   peer is actively distributing the infringing file and how.

18           Once all of that is confirmed and documented,

19   MarkMonitor sends an infringement notice to the relevant ISP,

09:21:36 20   and in this case, that was Cox.

21           Mr. Bahun went through numerous data packages of

22   evidence, and ultimately, as you saw, all of that data came

23   together to demonstrate why MarkMonitor's evidence collection

24   process worked.

25           And you will recall that Ms. Frederiksen-Cross

2945

1    testified as a technology expert.  Now, she has spent a

2    lifetime looking under the hood at real systems in the real

3    world, and she testified that she reviewed the MarkMonitor

4    process, the MarkMonitor and Audible Magic source code, and the

5    evidence collected in the case, among other things, and her

6    conclusions were clear.

7           She determined that the MarkMonitor system accurately

8    detected peers that are copying and distributing the

9    plaintiffs' copyrighted works, and that it prepares and sends

09:22:27 10  accurate notices about that infringement activity that it

11   detects.

12          During the course of Mr. Bahun's and

13   Ms. Frederiksen-Cross's testimony, they were asked about a

14   couple of different data fields that looked like it had certain

15   hashes that had two different recordings associated with them.

16   Do not be misled.  These are litigation games.  Cox is

17   desperate to find a glitch, but it can't.

18          You may recall that one of them was a file mislabeled

19   by a user as a Taylor Swift track, when Audible Magic had

09:23:02 20  reported that, in fact, it was a Lady Gaga song.  We then

21   played the song in court, and lo and behold, it was Lady Gaga,

22   "Poker Face."  That was one of the three examples.

23          That is no different than somebody putting the Lady

24   Gaga CD in the Taylor Swift CD case.  This is not an error.

25   Notably, not a single Cox witness, fact or expert, testified at

2946

1    all about these data fields.  Not a single Cox witness

2    indicated that there was an issue.

3         And you will recall that many of the songs that were

4    raised were not even in the case.  Efforts like this by Cox and

5    its counsel implying that there is a problem with the evidence

6    by pointing to a line or two of data out of millions of data

7    entries are nothing more than smoke and mirrors.  Use your

8    common sense.  Don't be misled by these efforts to distract you

9    by the mountains of evidence before you.

09:24:05  10         Defendants have also claimed that because plaintiffs

11   did not re-download the infringing works from each and every

12   customer, there is no evidence of direct infringement.  This is

13   one of those after-the-fact arguments that defies common sense.

14        Cox is now claiming that despite all of its own

15   internal documents about the infringement on its network, all

16   of the notices from all of the copyright owners, and all of the

17   evidence that's been presented, that the infringement wasn't

18   actually happening.  Frankly, it's like claiming that there's

19   no moon and stars in the sky, when everyone can look up and see

09:24:44  20   it plainly.

21        Both Mr. Bahun and Ms. Frederiksen-Cross testified

22   that a second download was totally unnecessary.  Mr. Bahun

23   testified in response to a question about it by Cox's counsel:

24   Well, we've already downloaded the file in its entirety when we

25   initially found it.  So we know what the file is, and we have

2947

1   the unique file identifier that guarantees what that file is,

2   and it's unique to that specific file.  And so when we

3   communicate with the peer, they tell us what they have, which

4   confirms the file, and they tell us what they're distributing.

5   So there's no need to go further than what -- excuse me, no

6   need to go further than that when they've confirmed it.

7          Cox's argument on direct infringement comes in two

8   pieces.  First, Cox suggests that all of its subscribers

9   brought legal copies into the peer-to-peer swarms; in other

09:25:47 10   words, the subscribers did not download the infringing

11   recordings illegally from the swarm.

12          So let me give you an analogy here to help understand

13   the absurdity of this argument.  Imagine a college class with

14   hundreds or thousands of students.  They are all asked to write

15   an essay, and they all come into class with their essays, and

16   those essays are exactly the same, not just word for word the

17   same, but every space and line break is exactly the same.  Cox

18   would have you believe that each one of those students

19   independently wrote those essays and that they weren't copying

09:26:27 20   from each other.

21          Remember that because these files on the swarms all

22   had the same hash, they were precisely the same, down to the

23   last bit and byte.  If everyone on a swarm had the exact same

24   file, they copied it from one another.  That is reproduction.

25          Cox's second argument is that there's no evidence

2948

1    that the Cox subscriber was actively distributing the file

2    because peers may be lying about their files and you cannot

3    rely on hash identification.  This is the same hash

4    identification that is used by financial institutions to

5    conduct business.

6              So this is Dr. Feamster's story.  It's an absurd

7    theory.  It requires a willing suspension of disbelief to

8    believe it.

9              So let me turn to Dr. Feamster.  He is a

09:27:24  10    well-credentialed man, no doubt, but to put it mildly, he's not

11    credible and was hardly disinterested.  Dr. Feamster authored a

12    paper that sought to improve BitTorrent.  He wanted to improve

13    BitTorrent for popular files.

14             Now, he said the popular files were Linux and not

15    Lady Gaga, but you can use your own common sense to realize

16    what he was really saying.

17             And in that paper, he indicated that he wanted to

18    give BitTorrent users plausible deniability.  That's not

19    something people do legitimately.

09:28:03  20             And Dr. Feamster at his deposition wouldn't even

21    agree that copyright infringement is unlawful.  And then you

22    saw video clip after video clip of Dr. Feamster's conflicting

23    testimony during the trial.  He'd say one thing in his

24    deposition and another thing when he was on the witness stand

25    before you.

2949

1          Remember one of Dr. Feamster's slides where he said

2    that there was no reliable evidence of infringement?  Let's

3    think about this slide.  Professor Feamster admitted that he

4    could not find a single inaccurate notice to Cox.  The sole

5    basis for his conclusion that there was no reliable evidence

6    was his theories about lying bitfields and corrupted files, and

7    he claimed that that amounted to 1 percent of the time, but he

8    couldn't even -- he couldn't cite to a single analysis or study

9    that supported that 1 percent conclusion.

09:29:06 10          If everyone on a BitTorrent swarm were lying and all

11   the files were corrupted, BitTorrent wouldn't work.  BitTorrent

12   wouldn't have tens of millions of users.  Dr. Feamster's

13   testimony is all about theoretical possibilities, with no

14   evidence that it actually occurred, not once.

15          What makes Cox's argument on direct infringement all

16   the more bewildering is all of Cox's own statements.  Don't

17   just take plaintiffs' word for it that there's infringement on

18   the -- Cox's network.  Remember what Cox's own employees said.

19   Recall Mr. Zabek in an e-mail said:  99 percent of the DMCA

09:29:48 20   violations is from people using P2P on purpose, not Trojan

21   activity.

22          And Mr. Vredenburg in his e-mail to Mr. Zabek:

23   Here's another example of a customer who is a habitual abuser.

24          We could go on and on with these e-mails.  We saw

25   many of them.  Those are just two.

2950

1            Think about what Mr. Cadenhead said.  Now,

2    Mr. Cadenhead no longer works for Cox, but he worked there for

3    a great many years and was the legal counsel responsible for

4    overseeing the abuse program.  And what he said was:  Cox

5    recognized that there was a real problem with copyright

6    infringement and that the recording industry had proper

7    concerns about it.  He testified that Cox almost certainly knew

8    that some of its customers were infringing and needed to stop.

9            So you've heard and seen a lot of evidence on direct

09:30:48 10   infringement, and at the end of the day, you will need to use

11   your common sense.  MarkMonitor sent over 270,000 infringement

12   notices.  There really can be no doubt that those subscribers

13   were downloading and uploading plaintiffs' music on Cox's

14   network.

15           So now we've covered the issue of direct

16   infringement.  Let's turn to the other elements.  Two of the

17   other elements have been taken care of for you.  The judge has

18   instructed -- instructed you last night that the plaintiffs

19   have already established that they own 10,017 works at issue in

09:31:28 20   this case and that the copyright and its registration in each

21   of those works is valid.

22           The judge has also instructed you that plaintiffs

23   have also established the knowledge element of the contributory

24   infringement claim; that is, plaintiffs have established that

25   Cox had specific enough knowledge of infringement occurring on

2951

1    its network that Cox could have done something about it.

2            Let me turn to the elements of material contribution

3    and right and ability to supervise.  There really can be no

4    doubt about either of these.  They're not a high bar.

5            Cox built its network and provided routing services

6    and switches to direct data and content flow.  Cox sold access

7    to that high-speed internet service to infringing subscribers.

8    And Cox then continued to provide unfettered service to those

9    that Cox knew were repeatedly infringing.  Cox knew its

09:32:33  10    subscribers were infringing and yet knowingly let them continue

11    using the service.

12            Beyond creating and providing the service itself, Cox

13    provided anonymity to its subscribers.  A copyright owner has

14    no ability to look at a network and tell who a particular

15    subscriber is, who may be infringing using a particular IP

16    address.  Cox is the only one who knows that an IP address is

17    assigned to a particular subscriber at a particular date and

18    time.

19            And Cox testified, you heard Ms. Trickey testify that

09:33:13  20    Cox will not disclose the identity of its subscribers absent a

21    subpoena.  That means a lawsuit.

22            All of that easily meets the low threshold of

23    material contribution.

24            Cox's AUP, the Acceptable Use Policy, both

25    residential and business, expressly grants Cox the right to

2952

1    terminate or suspend a subscriber's account for infringement,

2    and we know, because we've seen it, that Cox has the ability to

3    terminate subscribers.  It terminated 13 for purposes of

4    plaintiffs' notices for copyright infringement and 600,000 for

5    nonpayment.  We clearly know they have an ability to terminate.

6    That is the right and ability to supervise the infringing

7    activity.

8            While the judge does not explain in the instructions

9    what "supervise" means, you can see that because Cox can

09:34:12 10  suspend or stop the infringement, that is the essence of

11   supervision.

12           The second element of the vicarious infringement

13   claim is direct financial benefit.  Here the evidence was

14   clear.  Mr. Zabek admitted that financial considerations were a

15   factor in making decisions about whether to terminate an

16   infringing subscriber.  And, of course, we saw e-mail after

17   e-mail where Cox decided that it was not going to stop a

18   subscriber from infringing because Cox wanted to collect

19   monthly fees.

09:34:47 20          This is the textbook definition of direct financial

21   benefit.  Cox kept the infringing customer on its network so

22   that it could keep the money coming.

23           Apart from all of the internal e-mails, Dr. Lehr also

24   did an analysis of the value to Cox of the infringing

25   subscribers based on the number of tickets that that subscriber

2953

had been the subject of.  By not terminating the accounts of
infringing subscribers, Cox was able to collect hundreds of
millions of dollars from them.

        Mr. Bakewell criticized Dr. Lehr's analysis as flawed
because he included revenues from other services, such as
television and telephone, but Mr. Bakewell ignored that Cox's
entire business strategy revolves around bundling and the
demonstrated fact that when Cox terminates subscribers for
infringement, the customer tends to discontinue all services.

        Cox's Acceptable Use Policy demands enforcement.  By
not enforcing it, Cox was making money.  That's direct
financial benefit.

        But we can look at specific examples as well.  This
is an example you saw before during the trial of a fraternity
that had a business account through Cox, and after the 13th
notice, when even under Cox's policy, it should have been
subject to termination, it continued to receive service, and
Cox collected $12,500 over the course of the next
two-and-a-half years because -- from that customer by not
terminating.

        Or let's consider a residential customer.  This one,
same situation, more than 13 infringement notices.  This
residential customer Cox collected $8,500 from by virtue of not
terminating.

        Now, we're not going to go through 57,000 examples

2954

1   like this, but this is what you'll see when you look at these

2   examples.

3        Now, Cox will undoubtedly claim that no matter what

4   examples I put up before you, that they're outliers, but,

5   ladies and gentlemen, not all of the evidence that Cox doesn't

6   like can be an outlier.

7        We've previously talked about how the burden of proof

8   is preponderance of evidence.  Before we leave our discussion

9   of the elements of claims, I want to make sure that we come

09:37:32 10   back to this, the burden issue.

11       Remember, this is not a case where plaintiffs need to

12   demonstrate proof beyond a reasonable doubt.  You've heard

13   evidence from both sides.  The question for you to decide is

14   what is more likely.  Do you think it is more likely that the

15   infringement plaintiffs claimed happened on Cox's network

16   actually happened, or is it more likely that the plaintiffs

17   just made it up?

18       Remember the burdens here.  The plaintiffs need only

19   have 50.1 percent compared to the defendants' 49.9 percent.  A

09:38:09 20   feather more of evidence is enough under the preponderance of

21   evidence standard.  Of course, here it's not even close.  The

22   plaintiffs' evidence is overwhelmingly more compelling,

23   documented, and accurate than anything that Cox has put

24   forward.

25       Let's turn to Cox's failed policies.  As we've

2955

1    discussed, Cox's policies were a sham.  Cox's Acceptable Use

2    Policy strictly forbids infringement, all infringement.  You

3    heard Ms. Trickey testify that the Acceptable Use Policy didn't

4    allow even just a little bit of infringement.

5           Importantly, the Acceptable Use Policy also obligated

6    subscribers to be responsible for what happened on their

7    account on both the residential and the business side.  And we

8    saw when we looked at the Acceptable Use Policy with

9    Ms. Trickey on the business side that even business customers

10   had an obligation to be responsible for the end users and

11   impose on the end users the Acceptable Use Policy that Cox had.

12          And we even saw that Cox required that, that any

13   commercial ISP that was reselling service have a one-step

14   graduated response policy, that they needed to suspend end

15   users right away upon learning about any infringement notice.

16          So that was the AUP.  Well, during the trial,

17   Mr. Negretti, Cox's marketing executive, testified that giving

18   AUPs to customers but not enforcing it amounts to fraud, but

19   that is precisely what Cox did.  It had a policy that it did

20   not enforce in any way whatsoever.  Mr. Negretti said it and I

21   agree:  It's fraud.  Cox's AUP was a hollow statement made by

22   Cox to give the appearance that it was going to obey the law.

23          As you know, the team responsible for implementing

24   the AUP was the abuse team.  It was a team that created the

25   graduated response policy and watered it down year after year

09:39:15 (line 10)
09:40:07 (line 20)

2956

1    after year.  Remember, it began with three strikes, but over

2    time, as the number of notices mounted, Cox amended its policy

3    to 10 steps, then to 12 steps, then to 14 steps.

4         As the problem got worse and worse, Cox didn't

5    tighten up its ship to address the problem; it did just the

6    opposite.  Cox changed the rules.  Those rules helped Cox.  It

7    helped Cox avoid friction, friction with its customers.

8         You'll remember that Mr. Negretti used that term,

9    "friction," that Cox wanted to avoid friction with its

09:41:21 10   customers.  By changing the rules, Cox didn't have to warn,

11   suspend, or terminate its customers, but changing those rules

12   hurt the copyright owners.  Despite knowing that its

13   subscribers were infringing, Cox didn't want to stop the

14   infringement because it would have led to friction.  For Cox,

15   it was a decision to put its own financial interests ahead of

16   that of the copyright owners.

17         I want to pause for a moment on the idea that Cox had

18   a 14-step policy.  Let's even assume they actually implemented

19   that policy.  We've discussed 14 steps so much during the

09:42:01 20   course of this trial, when we say it now, it almost sounds like

21   an acceptable reality, but it really isn't.

22         We're not here to -- giving infringers 14 instances

23   of being caught before Cox would stop the infringement, it

24   makes no sense.  Think about whether there's anywhere else in

25   the law where you're given 14 opportunities to obey the law

2957

 1    before anything's done.  That doesn't exist, and there's a

 2    reason it doesn't exist.  It makes a mockery of the law.

 3         Now, we're not here to say what Cox's policy should

 4    have been, but I can guarantee you it shouldn't have been this.

 5         But the 14 steps wasn't the half of it, because

 6    remember, Cox gamed its own policy.  And in opening, I

 7    described for you five ways that it gamed its policy, but then

 8    I actually listed six.  So I'm going to list six now.

 9         The first one was they had a mandatory termination

09:43:04 10    provision when it began, and they got rid of that and they went

11    to discretionary termination, a pretend termination policy with

12    an excuse not to terminate.

13         And you heard Dr. McGarty yesterday talk about having

14    ambiguity in policies, and how for an ISP, that doesn't work.

15         The second way Cox gamed its own policy is that it

16    ignored the first notice it received with respect to any

17    infringing subscriber.  Now, contrary to repeated claims that

18    it wanted to educate, Cox more often than not wouldn't even

19    forward the notices it was receiving.

09:43:48 20    Cox's own interpretation of the Digital Millennium

21    Copyright Act obligated it to forward the notices.  Its own

22    policy said they had to forward the notices.

23         This wild ignore-the-first-notice concept was the

24    brainchild of Mr. Carothers, who you heard testify, and he

25    indicated that he had conducted a study to justify this policy,

2958

1    but you saw no study.

2            Think about all the evidence you saw, and then think

3    about the critical study that he referred to that he

4    conveniently never produced for purposes of this litigation.

5    It's a farce, and you should not be fooled by it, nor the

6    nonsensical notion that not sending a notice to someone is as

7    effective as sending a notice, which is what he was saying.

8    The idea that by not sending a notice, Cox was going to

9    effectively stop the infringement is absurd.

09:44:50 10          The third way Cox gamed its system was with daily

11   suspension limits.  This was another gimmick.  As Cox's daily

12   limit of 300 suspensions per day would routinely be hit by

13   9 a.m., Cox gave infringing subscribers a free pass in its

14   graduated response policy.  But let's look at how that actually

15   played out with two examples.

16           So the top is -- these are both residential

17   subscribers.  The top one was the subject of five tickets.  I

18   wanted to pick something that Cox could clearly claim was not

19   an outlier.  It was five tickets.

09:45:29 20          Three of those tickets were listed as hard limits,

21   and you'll recall that hard limits means that they were

22   received by a copyright owner who had exceeded the threshold;

23   and here, because of that, you'll see that this Cox subscriber,

24   even though they had been caught and reported five times, was

25   never warned by Cox a single time.

2959

1          On the bottom, you see a subscriber who is the

2    subject of ten infringement notices, at least ten, because

3    remember, tickets sometimes are less than notices because they

4    bundle them up together, assuming they even accept them.  Here

5    ten tickets, seven hard limits, no warnings.

6          So this was a customer who was caught and reported

7    ten times for copyright infringement, and what did Cox do to

8    educate that customer?  Zero.  Nothing.

9          What possible justification can Cox come up for this

09:46:23 10    policy other than helping itself?  The answer is none.  This

11    unwritten policy had a double positive effect for Cox.  It

12    suspended fewer customers, which led to less friction, and it

13    reduced the inbound call volume, which reduced Cox's costs.

14    Unfortunately for the plaintiffs, this policy compounded the

15    infringement problem.

16          Let's turn to the issue of caps.  Cox set hard limits

17    on the number of notices that it was willing to receive from

18    different copyright owners.  The effect of this was staggering.

19    It had the effect of ignoring tens of thousands of notices,

09:47:07 20    with no customer-facing action.

21          And you can see from Mr. Sikes' e-mail how seriously

22    they took this:  We need to cap these suckers.

23          Yeah, that's respectful.

24          The impact was twofold.  Some copyright owners abided

25    by the limits by only sending the limit or less.  Others sent

2960

1    more, but Cox would simply log the notice and do nothing with

2    it.

3            The notion that an ISP can put its hands over its

4    ears so it does not hear about the infringement on its network

5    has no place in the law.  Cox does not get to tell the

6    copyright owners that they are limited to the amount of theft

7    that they report.  What Cox did with caps is not legal, it's

8    not ethical, and not how a company that cares about copyright

9    acts.

09:48:03  10            Let's turn to the issue of blacklisting.  You heard

11    Cox admit that it blacklisted rights holders in two ways:  It

12    took notices in and it silently deleted them, or it simply

13    rejected notices at the mail server.

14            Now, Cox wants you to believe that these notices were

15    threatening and bordered on blackmail, but a copyright owner

16    has a right to offer to resolve an infringement dispute with an

17    infringer.  That's not blackmail.

18            Cox deleted millions of notices from blacklisted

19    parties, millions of notices ignored, millions of infringement

09:48:42  20    ignored with a free pass to the subscriber.  These notices, had

21    Cox looked at them, would have helped Cox to identify and

22    address the infringement on its network.

23            Let's turn to the last issue of reactivation.  Now,

24    you've seen this e-mail several times already, but I want to go

25    through it one more time because it brings together so many of

2961

1  Cox's misdeeds in one place.  So this was an e-mail that Jason

2  Zabek said to -- sent to his abuse team, and you'll recall that

3  it was labeled as proprietary info not to be shared outside of

4  Cox or abuse reps.

5           Well, as soon as you see something like that, you

6  gotta wonder what they're going to say.  Well, and he tells the

7  motive for the e-mail right up front:  Cox wants to hold on to

8  every subscriber that it can.

9           And then he describes the actual policy, the

09:49:43 10 unwritten policy that undoes the actual policy:  If a customer

11 is terminated for DMCA, you're able to activate them after you

12 give them a stern warning.

13          And then he explains:  Well, we still have to

14 actually terminate them in order to get -- be in compliance

15 with the safe harbor, but once the termination is complete,

16 we've fulfilled our obligation, and then we can just restart

17 the counter again.

18          And he reminds everybody:  This is an unwritten

19 semi-policy.

09:50:11 20         And then we get the best line of all:  Remember to do

21 what is right for our company and subscribers, not to do what

22 he's obligated to do under the law.

23          Mr. Vredenburg then commented on this new policy in

24 an e-mail, where he said:  This gives the customer ten chances

25 to share files before they even have to talk to us again.

2962

1          Let's, let's look at what the impact of Cox's

2    suspensions and reactivations was.  So here are two examples.

3    Again, hopefully Cox won't claim these are outliers.

4          The first one had 18 tickets and had four

5    suspensions.  Obviously, given Cox's policies, this has to be a

6    situation where there were significant number of copyright

7    infringement notices before the 2012 date, when infringement

8    notices began in this case.

9          So there are four suspensions.  All of them ended in

09:51:18 10   reactivations.  The average reactivation time?  Seven minutes.

11   The one below, we got three reactivations.  The average time to

12   reactivate?  Twelve minutes.

13          If suspensions and reactivations were happening this

14   quickly, it begs the question of how much education was

15   actually occurring and whether Cox's suspensions had any impact

16   on Cox's infringing customers at all.

17          And Mr. Vredenburg testified as to what he viewed his

18   role within the TOC, and he said that termination was the

19   farthest thing from his mind.

09:51:57 20          All of this demonstrates that Cox was not trying to

21   stop the infringement.  Despite the AUPs and the graduated

22   response policy, Cox did everything it could to avoid

23   terminating.

24          Let's talk about how 14 steps wasn't really 14 steps.

25   Now, Mr. Carothers, you heard him testify that he believed that

2963

1  Cox's graduated response policy was very effective.  Of course,

2  no witness produced any e-mails, studies, or analyses from 2010

3  to 2014 that showed anything of the sort.

4          If a multi-billion-dollar company builds a system

5  that was actually intent on stopping infringement, wouldn't you

6  expect to see some testing or analysis of its program?

7  Wouldn't you expect to see some contemporaneous evaluation of

8  what they were doing?

9          Cox claims its system was effective, but since you

09:53:01 10  saw no data or analysis to support this claim, you should

11  question that statement.  The reason those analyses don't exist

12  is because Cox didn't want to do them, because Cox knew what

13  those analyses would show.  It would confirm precisely what we

14  have seen during this trial.  Cox's system was horribly flawed.

15          You may recall the testimony of Dr. Weber.  She did

16  an after-the-fact statistical analysis of what happened on the

17  Cox network.  The problem with her analysis was that it was

18  blatantly skewed.  Dr. Weber ignored the data to supposedly

19  eliminate bias, but in so doing, she eliminated 15,000

09:53:50 20  customers.  That is bias.

21          She dropped the 15,000 subscribers who had the

22  longest history of infringement in order to do her analysis.

23  And not surprisingly, when she did that, she got better numbers

24  than Professor McCabe did.

25          But even with her flawed analysis and exclusion of

2964

1   the worst data, her conclusions still confirm that Cox had a

2   massive infringement problem that it was not stopping.

3   Dr. Weber concluded that there were over eighteen-and-a-half

4   thousand subscribers based on the RIAA notices that were the

5   subject of three or more tickets.  There were over 10,000

6   subscribers who were the subject of five or more tickets.

7         Weber's own analysis shows that after each step of

8   Cox's graduated response, a substantial percentage of

9   subscribers continued to infringe.  Dr. Weber in her testimony

09:54:51  10   sought to focus on those subscribers who were the -- who were

11   not the subject of further notices.  But this case is not about

12   those subscribers who may have stopped infringing.  This case

13   is about the subscribers who continued infringing and Cox

14   didn't stop.

15         Moreover, even when Dr. Weber saw that a particular

16   subscriber was not the subject of any more notices, that

17   doesn't mean that the subscriber stopped infringing.  Let me

18   try using an analogy.  Think about speeding tickets.  Just

19   because somebody doesn't get a speeding ticket doesn't mean

09:55:28  20   they aren't speeding.  There are only so many policemen out

21   there.  There are only so many tickets they're giving.  There

22   are many, many people who speed who don't get tickets, but

23   Dr. Weber would have you believe that just because there was no

24   ticket, there was no infringement.

25         Unlike Dr. Weber, Professor McCabe looked at the

2965

1    entire dataset of fifty-seven-and-a-half thousand subscribers,

2    and what he found was that over half of them were the subject

3    of three or more infringement notices.

4            Let's turn to the business customers.  Cox's policies

5    with respect to businesses were even more outrageous than with

6    the residential subscribers.  For business customers, Cox had

7    no graduated response for copyright infringement.  Cox's own

8    policies recognized that there may be excessive violations of

9    the policy and that yet, Cox was not likely to terminate a

09:56:34 10  business customer for DMCA violations.

11           Let's think about that for a minute.  Cox's own

12   policy acknowledged that it was going to permit the

13   infringement to continue even though Cox knew it would be

14   excessive.

15           As you know, Cox didn't terminate a single business

16   customer.  Cox claims that the reason for this is because those

17   services were too essential to cut off, yet Cox had no problem

18   terminating nearly 22,000 business customers for nonpayment.

19           The impact of not terminating business customers was

09:57:19 20  dramatic.  Over 2,800 subscribers have been caught and reported

21   and yet not terminated, and when you look at the number of

22   notices they received in this chart, it is baffling.

23           Now, Cox has tried to defend this policy by claiming

24   that these businesses are using Internet service for essential

25   functions like police and fire, but they have no evidence that

2966

1    they've put forward to demonstrate that.  The only evidence in

2    the record is that Cox has no idea what its customers use the

3    service for, except for the one hospital that filed something

4    in this case where they said that they use the service for

5    public WiFi.

6              Moreover, you heard Dr. McGarty yesterday explain

7    that military bases, hospitals, police stations typically use

8    Internet2, not a commercial ISP.

9              The reality is that most of these customers could

09:58:14 10   never be described as critical infrastructure.  As you look at

11   this chart, you'll see just some examples of the types of

12   business customers that are on the list.  Some of them are

13   hotels.  Some of them are pizza parlors.  Some of them are auto

14   repair.  Some of them are fraternities.

15             One of the things that you'll note in this chart is

16   that the number of warnings does not line up with the number of

17   tickets.  According to Cox's policy, we should have seen a

18   warning for virtually every ticket other than the first, but

19   it's not even close.  Cox wasn't even following their own

09:58:55 20   policy.

21             Cox's graduated response did not work.  Just look at

22   the numbers.  They're ridiculous.  There is no way you can read

23   this chart that you saw before and believe that Cox was even

24   trying to stop the infringement.  Under the graduated response,

25   there was essentially no subscriber terminations.  It's

2967

 1    literally .0003 percent.

 2          Even if omit -- even if you take out the deleted

 3    blacklisted notices, Cox ignored, ignored 70 percent of the

 4    notices.  Leave aside the termination issue.  They weren't even

 5    acting on the vast majority of the notices they were receiving.

 6          Ladies and gentlemen, responsible companies don't act

 7    like this.  They simply don't.  The law is clear, but Cox

 8    ignored it.

 9          So I've told you now what the case is about.  Let's

10:59:54 10    turn to what this case is not about.

11          Cox claims that it should not be held liable for the

12    actions of its customers.  Remember Cox's opening slide and

13    Matt Carothers' testimony -- excuse me, Mr. Carother's

14    testimony?  Internet service is so precious, it will only

15    terminate in extreme circumstances.

16          There are two problems with this argument.  First,

17    Cox ignores and has not addressed the fact that the law

18    provides for a legal way for Cox to avoid liability, and you've

19    seen it in the documents and heard it from Judge O'Grady that

10:00:30 20    the DMCA contains a provision that allows ISPs to avoid

21    liability.

22          What that means in basic English is that for Cox to

23    not be held liable for subscribers who infringe a copyright

24    while the material is transported through Cox's system, we must

25    have a policy that provides for termination of service in

2968

1    appropriate circumstances for repeat infringement.  That's

2    Cox's language.  That's Cox's language.

3         But in this case, Cox does not get the safe harbor.

4    So even though Cox had every opportunity to avoid liability had

5    it abided by the law, Cox wants you to give them that same free

6    pass as though they did.

7         Second, Cox does not treat internet connectivity as

8    precious when it doesn't get paid.  It terminates almost

9    immediately.  Cox's process for nonpayments is aggressive.

10:01:38  10    They send employees to the home to knock on doors to collect

11   payments.  You don't hear them doing that to deal with

12   copyright infringement, do you?

13        Cox cannot both claim on the one hand that internet

14   connectivity is too precious to terminate, then simultaneously

15   terminate hundreds of thousands of subscribers in 30 to 44 days

16   after a bill remains unpaid.  The takeaway from this is clear.

17   If Cox's money is at risk, Cox acts.  If a copyright owner's

18   money is at risk, Cox doesn't act.  We saw this double standard

19   over and over again throughout this trial.

10:02:28  20        What this case is not about, No. 2, CAS.  CAS is a

21   side show.  Nothing about it bears one iota on any of the

22   elements of the claim.  The only real takeaway from CAS is that

23   Cox refused to participate, like the other large ISPs in the

24   country.  CAS did not define what was acceptable under the law,

25   did not define how an ISP should act under the law, and did not

2969

1    speak to the issue of whether Cox's policies were appropriate.

2            When Professor Almeroth testified that CAS was an

3    industry standard, he admitted he had zero idea of what the

4    industry was actually doing.  He didn't know what other ISPs

5    were doing.  He didn't know what the CAS ISPs were doing

6    outside of CAS.  He didn't know any of that.

7            Respectfully, Professor Almeroth was in no position

8    to testify about what an industry standard was since he has no

9    idea what's happening in the industry.

10:03:30  10            Now, Cox says that CAS is relevant because it shows

11   that education is good and graduated response is good and no

12   termination is good, but here's the problem with their

13   argument:  CAS does not erase the infringement that happened on

14   their network.  CAS does not change the harm that was done to

15   the plaintiffs.  And Cox can't use CAS as an excuse for their

16   violating the law, but that's what they're doing.

17           And remember the testimony that you heard.  Even

18   Mr. Cadenhead, their former legal counsel for Cox, acknowledged

19   that CAS wasn't replacing the law.  Mr. Marks, who led the

10:04:15  20   negotiations on behalf of the music industry, said the same.

21   And Mr. McMullan said that CAS didn't impact what ISPs had to

22   do under the law.  And Mr. Zabek in an e-mail to his superiors

23   admitted that Cox had a more lenient policy than CAS.

24           What this case is not about:  No. 3, spying and

25   privacy.  This is a misleading nonissue, ladies and gentlemen.

2970

1          Ms. Trickey testified that there were no privacy or

2    security issues associated with the RIAA notices.  Privacy is,

3    by the way, another example of Cox saying one thing but then

4    doing another.  Cox claims that privacy is critical to the

5    company, but then on cross-examination, it was revealed that

6    Cox allowed a privacy breach that was substantial enough to

7    warrant a federal investigation and a settlement.

8          And then Cox came in here and you heard them testify

9    that the disclosure of their subscribers' information, private

10:05:31  10   information was quaint.

11         All of these arguments -- CAS, spying and privacy,

12   and the desire to get a free pass -- are just an attempt by Cox

13   to distract you from the real issues in the case and the

14   elements of the claims.

15         Let me now turn to the issue of willfulness.  After

16   determining that Cox is liable for either contributory

17   infringement or vicarious infringement, you will be asked to

18   determine if its conduct was willful.  As the judge has

19   informed you in his instructions, the legal question for

10:06:15  20   willfulness is whether Cox knew that its subscribers were

21   infringing or acted with reckless disregard for the

22   infringement of plaintiffs' copyrights.

23         There can be no doubt that Cox knew that its

24   subscribers were infringing.  You've seen it in e-mail after

25   e-mail and testimony after testimony.  Cox received hundreds of

2971

1    thousands of notices but did all it could to avoid terminating.

2    Cox's policies were a complete sham, and it did virtually

3    nothing.

4              These -- the evidence speaks for itself, but let me

5    review just a few of them.  Recall the e-mail from Mr. Zabek

6    where he said:  I know the P2P battle versus the copyright

7    holders is lost, but I have to do my job.

8              Or Mr. Zabek's e-mail about:  Guidelines are meant to

9    be broken or changed if it does not help the customer.

10:07:09 10            Or his e-mail:  DMCA equals reactivate.

11             Or Mr. Sikes, who sent an e-mail that said:  This

12   customer is well aware of his actions and is upset that after

13   years of doing this, he's now been caught.

14             Or the customer who said:  I have a uTorrent

15   application on my computer that's been there for a couple of

16   years.  If P2P is illegal, kiss my -- you know what.

17             And last but not least:  This will be the third time

18   that her son has reinstalled the BitTorrent client after she

19   has uninstalled it.

10:07:47 20            And then they reactivated the customer.

21             There can be no doubt as to willfulness in this case.

22             As Judge O'Grady has explained to you, there are two

23   different statutory damage ranges, depending on your

24   determination of willfulness.  If you determine that the

25   conduct was non-willful, you will be allowed to award damages

2972

between 750 and 30,000 dollars per work.  If you determine that
Cox's conduct was willful, then you will be allowed to
determine damages per work between 750 up to 150,000 per work.

          The judge has listed for you in his instruction a
series of factors that you should look at in considering
damages, and you should look at all of those factors because we
believe that each and every one of them weighs heavily on the
side of the plaintiffs, but let me speak quickly to just three
of them.

10:08:52          You heard from several representatives from the
plaintiffs, Mr. Kooker, Mr. Kokakis, and Mr. Flott, who told
you how peer-to-peer had harmed their business and that between
2004 and 2014, while music consumption was going up and up and
up, the music industry -- the record industry's revenues were
going down and down and down.

          This was not a slow-down; this was a slaughter.  Lost
jobs, lost labels, lost revenue.

          Now, Cox, of course, can't possibly imagine losses
like this, so Cox brings in an expert, Mr. Tregillis, who did
10:09:29 an analysis that is shamefully inaccurate.  Mr. Tregillis
claimed that the actual harm was only roughly $600,000 or so
because that was the number of notices that were sent.

          Do you remember from my opening that I described that
each peer-to-peer user was like a private digital record store?
Mr. Tregillis would have you believe that each one of those

2973

1    stores only sold one record.  Absurd.

2            We have no logs, so we cannot count.  Even

3    Mr. Tregillis admitted that.  He says he has no idea how many

4    downloads there were.  Notwithstanding, he put forward his

5    analysis.  It's shameful.

6            We would love to be able to tell you the full and

7    precise amount of the harm that Cox's conduct inflicted on us.

8    Unfortunately, we can't because of the type of conduct at

9    issue, and that's why the law has statutory damages.  You, the

10:10:26 10   jury, can award damages in the absence of information about the

11   precise harm and consider all of the factors listed in the jury

12   instructions.

13           But it is useful to consider one of Mr. Tregillis's

14   slides about Katy Perry and the track "Hot and Cold."

15           NOTE:  Audio clip played.

16           MR. OPPENHEIM:  I had to play some music.  It is a

17   case about music, after all.

18           THE COURT:  You're at about an hour now.

19           MR. OPPENHEIM:  I'm almost done, Your Honor.  Thank

10:11:05 20   you.

21           In this slide, Mr. Tregillis shows that the same user

22   was caught distributing the same song over the course of a year

23   and two months.  I ask you, how many free copies of that

24   incredibly popular song you just heard could this subscriber

25   had distributed in a year and two months?

2974

1          Let's turn quickly to Cox's revenues and profits.

2     Please pay attention to the end of jury instruction No. 28,

3     where the Court will instruct you that you may consider the

4     amount to have a deterrent effect, and when you consider that,

5     consider Cox's profits from its high-speed internet business

6     between 2013 and '14.  It was $8.3 billion.  That is a big, big

7     number.  All of Cox's focus on retaining customers and cutting

8     costs worked, or at least worked for Cox.

9          Mr. Bakewell criticized Dr. Lehr's analysis for not

10:12:00 10     considering costs, but these profit numbers account for them.

11     Cox's profits were so excessive that between 2013 and 2014, Cox

12     paid $2.9 billion, billion with a "B," in cash dividends to its

13     owners.  This is after costs, taxes, interest, and capital

14     investment.

15          If you remember nothing else about Cox's finances,

16     remember Cox had so much free cash on hand, it could pay its

17     shareholders 1 to 1.5 billion dollars a year while continuing

18     to grow the business and while the infringement continued

19     unabated.

10:12:38 20          Given Cox's conduct, how much of those profits should

21     the Cox family get to retain, and how much should be turned

22     over to the plaintiffs?

23          Cox's profits were massive.  In fact, even if you

24     awarded the maximum statutory damages under willfulness, it's

25     not clear that even that would have a deterrent effect because

2975

1    Cox has so much cash.

2           Nobody should accept Cox's after-the-fact excuses and

3    word games.  This was not a momentary lapse.  What happened at

4    Cox took place over a period of years.  Just when you thought

5    Cox's conduct was bad, you see something else and you learn

6    that it got worse.  Cox's decisions were made and ratified by

7    Cox's executives and employees from multiple departments at

8    multiple levels.

9           Cox's decision to put its own interest ahead of the

10:13:31 10   law is part of Cox's culture and thinking, and that needs to

11   change.  While they may not have accepted responsibility during

12   this trial, you will have an opportunity to send a message and

13   force them to take responsibility going forward.

14          On the damages question, we leave it to you, the

15   jury, to determine the appropriate damages award.  We believe

16   it should be at the high end of the range.

17          Before I conclude, I want to harken back to a point I

18   made in my opening that's important for your consideration.

19   This is not a case just about the record companies and music

10:14:07 20   publishers.  It's about the musicians and everyone around them

21   that help create the magic of music that's part of our lives.

22          As I said, for every Justin Timberlake, there are 20

23   or 100 other artists who have recordings and songs that people

24   listen to who do not have the fame and success.  For every

25   Rolling Stones, there's a team of other creatives from union

2976

1    musicians to digital production engineers who rely on the

2    revenue that comes from selling music.  There are scores of

3    people who create the music that has become a part of our lives

4    and history.  These are the people who lose out each time music

5    is shared illegally on Cox's network.  These are the people who

6    will get paid by virtue of this justice being done here today.

7            On behalf of our clients, our artists, and all of the

8    creative people in the music industry, thank you.

9            THE COURT:  All right, thank you.

10:15:00  10            All right.  Let's take a ten-minute recess, and then

11    we'll come back and we'll hear further argument.  All right.

12    You're excused.  Thank you.

13            NOTE:  At this point, the jury leaves the courtroom;

14    whereupon, the case continues as follows:

15    JURY OUT

16            THE COURT:  All right.  Anything before we recess?

17            MR. OPPENHEIM:  My apologies for going over, Your

18    Honor.

19            THE COURT:  That's all right.  I just wanted to let

10:15:46  20    you know.  I wasn't sure how much more you had left.

21            All right.  Let's take ten minutes.  We're in recess.

22            NOTE:  At this point, a recess is taken; at the

23    conclusion of which the case continued in the absence of the

24    jury as follows:

25    JURY OUT

2977

```
 1                THE COURT:  All right.  Joe, let's get our jury,
 2   please.
 3                NOTE:  At this point, the jury returns to the
 4   courtroom; whereupon the case continues as follows:
 5   JURY IN
 6                THE COURT:  All right.  Please be seated.
 7                Mr. Elkin, please proceed.
 8                          CLOSING ARGUMENT
 9                       BY MR. ELKIN:
10                May it please the Court.  Counsel.  Ladies and
11   gentlemen of the jury.
12                Wow, it's been a whirlwind.  I'm sure over the --
13   when you walked into the doors of the courthouse almost three
14   weeks ago, at least two-and-a-half weeks ago, you probably
15   didn't quite know what to expect.  Some of us didn't either, by
16   the way.  And now the only thing standing between you and the
17   holidays is your deliberations and returning a verdict.
18                And before I forget, I want to wish each and every
19   one of you a very happy holiday.  I know you've worked hard.
20   The lawyers, the Court has worked hard, as Mr. Oppenheim
21   mentioned.  And I'm personally looking forward to spending the
22   time as well with my family.
23                One of the great things that I get to do this time of
24   the year is to spend time with my father-in-law, who is 93
25   years old, great guy.  He's part of the greatest generation,
```

2978

1   and I spend a lot of time talking to him about his life.  And

2   one of the things that he always sort of harkens back to is the

3   time that he spent in the service.  He signed up, along with a

4   number of his buddies, after Pearl Harbor, and he enlisted in

5   the Navy.  And after spending a little time in Hollywood,

6   Florida, to learn how to become a radio man, he was dispatched

7   to the Pacific theater.

8         And he flew in one of those countless missions, those

9   TBF, Grumman TBF aviators, the three-man airplane that we have

10  a gunner and a pilot and a radio man, sort of like the one

11  George H. W. Bush sort of flew in.  And he would tell me -- and

12  he still goes back to these stories, it's like the most

13  important thing in his life, other than his family -- about how

14  he was sort of stationed in the belly of the tail on this bench

15  with the -- doing the radio thing and having a -- and the gun

16  out of the airplane, and being there for hours.

17        And I would say, how did you do that?  What was this

18  all about?  How could you sustain yourself?  And he said, I

19  wouldn't really think about it.  We were all very patriotic, we

20  cared about our country, we signed up and we served.  And we've

21  got precious freedoms.

22        And I think about that every time I have the honor to

23  address a jury.  It's an honor for me to be able to stand

24  before you.  This is a great, great hallmark of our democracy,

25  to be able to take men and women from the community, different

2979

1    sections of life, and come together and hear an important case

2    for both sides, and you get to make that decision.  There's no

3    other country in the world that allows this.

4          And make no mistake about it, I believe this with

5    every sort of fiber in my being.  This is not simply

6    platitudinal.  You know, this is what you all are, this is

7    democracy in action.  Thank you for your service.

8          I'm going to highlight some of the evidence in the

9    case, and I want to focus on the quality of the evidence, not

10   simply evidence.  You can't divorce yourself from the quality

11   of the evidence compared to just snippets on slides, whether

12   that's the case for me or opposing counsel.  It's not about

13   feathers and it's not about music medleys.  It's about equity,

14   fairness, and justice.

15         Now, as you consider the evidence, consider what each

16   of us said at the beginning of the case.  What was our promise?

17   What was each side's promise?  And did we delivery on that

18   promise?

19         We promised that you would not see sufficient

20   evidence with regard to the material contribution, or that

21   there would be control over the infringements.  And we focused

22   on the reliability, not whether there is infringements, but the

23   reliability of the MarkMonitor system as applied to Cox.

24         The other side talked about swarming with piracy, and

25   said one thing and did another, and put its profits above the

2980

1    law.  And we just heard that refrain again.

2              But you were here, you saw the witnesses, one after

3    the next.  Were they credible?  Were they substantial?  Some of

4    these men and women from Cox had been with the -- has been with

5    the company 15, 20, 25 years.  You heard their testimony, you

6    heard them on cross-examination.

7              I want to focus on the two claims initially, the

8    contributory and vicarious infringement.  Specifically, I'll

9    start with contributory liability.  And the judge has given you

10   a definition of that in your jury instructions.  It includes

11   inducing, causing, or materially contributing to infringing

12   activity.

13             This case is not about inducement or causing, it's

14   about material contribution.  And that's what both sides have

15   focused on.

16             With regard to the material contribution, in terms of

17   reviewing the evidence, there are five key facts that I would

18   call to your attention:  First, Cox provides an essential

19   service.

20             Number two, Cox doesn't know what its subscribers are

21   doing on the internet.

22             Three, what Cox decided to do in addressing copyright

23   infringement on its internet was to develop a graduated

24   response program.

25             Fourth, the plaintiffs, as it turned out, that was

2981

1    their response.  When they had an opportunity to negotiate with

2    the ISP community, that's what they ultimately chose, graduated

3    response.

4            And then fifth, the system that Cox put into place

5    was effective, it was extraordinarily effective.  And I'm going

6    to review the evidence with you today.

7            So going through those five elements in terms of what

8    the facts are, I'll start with Cox provides an essential

9    service.  I don't think anyone disputes that, and I'm not going

10   to recount all the different ways that all of us use the

11   internet because that's self-evident.

12           Secondly, Cox provides a gateway to the internet.

13   That's what they do.  They don't edit content.  They don't host

14   content.  It provides a mechanism for individuals to access the

15   internet.

16           And as you've heard from many witnesses, Cox doesn't

17   track what its customers do online.

18           Now, Mr. Carothers, in his testimony, took you

19   through that.  I asked him:  Does Cox track what its users are

20   doing online with Cox's broadband system?

21           Answer:  It doesn't.

22           Question:  Why not?

23           Two reasons, one is lack of technical capability to

24   do so, and the second is that we have very strong privacy

25   policies.

2982

1          And Cox would not spy.  And I would say to you,

2    ladies and gentlemen, today's day and age, with data privacy

3    being more and more important, Cox shouldn't have to track what

4    its customers do online.

5          Now, Linda Trickey, who was Cox -- who is Cox's

6    privacy counsel, in her testimony stressed the importance of

7    privacy.

8          She also explained that Cox couldn't block internet

9    traffic or throttle bandwidths.  Both she and Dr. Almeroth

10   explained to you that net neutrality was very much an issue

11   during 2013 and 2014 despite some earlier court action.

12         And you know, trials are a funny thing.  There's

13   always something very unexpected that happens.  And the most

14   un-expecting things can create a window of insight.

15         When Ms. Trickey was on the stand after her

16   cross-examination, when she was confronted on cross-examination

17   by opposing counsel with a long list of notices related to

18   infringement of a customer, which turned out to be a university

19   housing customer, she didn't know what question I was going to

20   ask her.  She thought I was going to blurt out the name.  And

21   which she said, and this is in the transcript:  I need -- I

22   just want to say something.  I don't know where you guys ended

23   up on this, but you shouldn't say the name of a customer.  You

24   can say the type of customer, but you shouldn't say the name.

25         Even when it benefitted her, even when she was

2983

1    probably dying for everybody to know the name, she was very

2    careful for me not to elicit that.

3            As you heard from Matt Carothers, the internet can be

4    dangerous in so many ways.  He developed CATS and graduated

5    response to deal with this.  And let's be clear, it was first

6    in time and best in class.  This mechanism was licensed to

7    other ISPs, including Spectrum.  And as Mr. Carothers said,

8    this -- he was -- this was -- Cox was the first to develop

9    graduated response.

10           And Ms. Trickey also commented on this in her

11   testimony that Cox was the first ISP to roll out graduated

12   response.

13           And as you've heard from all the testimony, graduated

14   response at Cox was quite robust.  There were tickets.  There

15   were warnings.  There were soft-walled and hard-walled gardens.

16   There was intensified discussions with skilled folks who could

17   have those discussions.  There were suspensions.  And in

18   certain circumstances there were terminations.

19           And CATS, as you've heard from Mr. Beck, CATS could

20   handle a lot of complaints, millions on a yearly basis, from

21   all sources.  And you heard witness after witness discuss how

22   seriously Cox took copyright infringement notices and how the

23   system worked.

24           Now, Randy Cadenhead testified about this.

25           Okay.  Well, let's just move on.

2984

1          He talked about how the human touch was fundamental.

2    When he was asked the question by opposing counsel:  If Cox

3    really wanted to stop the infringement on its network, wouldn't

4    it want to learn as much of the infringement as it could so it

5    could respond to as much of this as it could?

6          And he responded:  I know that the human touch was

7    part of the process, was a fundamental thing, that Cox believed

8    that was the most effective way in the long term to get

9    results.  And you may disagree -- referring to opposing

10   counsel -- but there are, I know, anecdotally of instances in

11   which human contact made a difference and some indications in

12   which, unfortunately, bad things happened before human contact

13   occurred.

14         Now, Jason Zabek discussed how seriously he took his

15   responsibilities.

16         I guess that's not being played either.

17         Question:  Would you have done this job had you not

18   wanted to take copyright infringement seriously?

19         Answer:  I love this job.  I would have done it no

20   matter what.  You could have probably paid me less, I would

21   have done it.

22         These folks worked hard.  They were demonized over

23   and over and over again.  These guys worked really hard, and

24   they spent years and years and years toiling in the vineyards

25   at Cox, working with customer abuse.

2985

1          And the safety team was always trying to do the right

2     thing.  A question put to Mr. Zabek:  Do you know whether Cox

3     could automatically terminate a subscriber based on a copyright

4     infringement complaint?

5          Answer:  We always want a human to review.

6          Question:  Why?  Why is that?

7          Answer:  To make sure that we were doing the right

8     thing.

9          Now, Carothers analyzed the numbers of reducing

10    infringement and found the system very effective in stopping

11    infringement.  Question -- he testified:  The program was very

12    effective.  That the vast majority of customers never made it

13    past the e-mail warning stage.

14         And I asked him how he knew that.  And he said he ran

15    the numbers himself.  And you heard the testimony, the

16    specifics about how he ran the queries.  He went into great

17    technical detail.

18         There's some insinuation today that somehow because

19    there was no formal report or study, someone is incapable of

20    actually running a bunch of queries and ensuring themselves

21    that, in fact, the numbers are going down.  But we have an

22    independent study, which I'll get to in a moment.

23         The inventor of the system, Mr. Carothers, agreed

24    that the safety team took infringement notices seriously.  He

25    hired these folks.  He wanted this to be a success.  He was

2986

1    proud of what he did.

2          Now, Ms. Trickey, who helped to oversee the -- this

3    program, she attested to the seriousness with which Cox took

4    infringement issues.  And she stated before you, she testified

5    in response to a question by opposing counsel:  Do you know

6    whether Cox ever had a practice whereby it would turn a blind

7    eye to copyright infringement of its customers?  I believe that

8    was my question.

9          She said:  The fact that you're creating a process

10   that no one else had even done that yet shows that you didn't

11   turn a blind eye, you actually took it seriously.

12         Now, we've heard at opening argument and closing

13   argument today, and now throughout the trial, that the

14   plaintiffs criticize Cox's system in a number of ways.  They

15   have a number of complaints, and I will address some of them

16   here in the interests of time.  But I would submit to you all

17   that this is, respectfully and advisedly, disingenuous and

18   pretextual.

19         First, they talk about Cox not processing notices.

20   That's a big refrain.  But there's no question that Cox

21   processed all of the RIAA notices.  They processed all of the

22   notices that were sent in this case.  That fact is un-rebutted.

23         And you heard Randy Cadenhead testify how seriously

24   he took the RIAA and their concerns.  He was asked at the

25   beginning of the claims period by Ms. Sheckler of the RIAA, who

2987

1   wanted to go from the existing 400 to 500 to 600 notices a day,

2   and he responded, and you have this e-mail:  I checked with our

3   technical team.  We do want to be as helpful as we can.  They

4   think we can try accepting 600 per weekday.  Does that sound

5   okay?  That's how he responded.

6            And in response to my question at his deposition why

7   he simply didn't accept 500 a day when that was her initial

8   request and instead go up to 600, he said:  I had a lot of

9   respect for her and for the people she works for, and their

10  concerns and their needs, and I was trying to be helpful.

11           Does this seem like a company who doesn't care about

12  the recording industry?  And he was in charge of supervising

13  the safety team at the time.

14           You saw the correspondence between Cadenhead and

15  Sheckler.  They agreed to 600 notices a day for the claims

16  period.

17           And the truth is, as you saw from Dr. Weber's

18  analysis, on average during the claims period they didn't even

19  get to 600.  It was like 450 notices per day, and all of them

20  were processed.

21           Then, next complaint, they complain about rolling up

22  the complaints, aggregating the complaints.

23           But Carothers explained why Cox does that.  Question:

24  Why does CATS aggregate complaints rather than treating each

25  one as a separate incident?

2988

1           Answer:  Fairness for the customers.  If every single

2    notification generated a new ticket, then we could potentially

3    have someone go through all the steps of the program through

4    termination within a few minutes before they even had a chance

5    to look at the issue.

6           What's interesting is that under CAS there was a

7    seven-day grace period built in so that they would give

8    customers an opportunity to do something about it.  They didn't

9    want to flood customers.

10          So they're complaining about Cox actually aggregating

11   complaints when this was the system that they proposed and

12   accepted on an industry-wide protocol.

13          Now, the hold for more, the so-called -- we only send

14   out a warning to customers after they get the second one, Mr.

15   Carothers testified in detail about this:  The hold for more

16   was justified given no statistical significance between the

17   first and second notices.

18          And Lynne Weber's study, which I'm going to get to in

19   a moment, confirms this.

20          And Mr. Carothers testified:  The finding was that

21   there almost no difference in the number of customers who

22   repeated -- who repeat offended between those who had, who had

23   received a first notice and those who had not -- and those who

24   had not received a first notice.

25          Question:  Did you personally do this work yourself?

2989

```
1              Answer:  I did.
2              There is a reason why a lot of the notices didn't go
3      out after the first complaint.  Because there was never a
4      second complaint.  If there was not a second complaint, then of
5      course no notice would go out.
6              But he looked at the tickets and he determined that
7      it was wasteful to do that and of no moment.  And that policy
8      had been in effect for many, many years before the claims
9      period.
10             Then, then, you heard it today, they complain that
11     moving folks from the Tier 2.5 to Tier 2.0 is proof positive
12     that Cox didn't care about infringement.  But Mr. Zabek
13     explained that that's wrong, that they were using more and more
14     automation, which was approximately 90 percent of processing
15     all of the tickets.
16             Then Mr. Vredenburg, who was part of the 2.5, told
17     you in open court that when folks were shifted from 2.5 to 2.0
18     where they could still handle copyright tickets, it didn't
19     affect their ability at all to process the complaints.
20             Then another complaint, they complain that Cox was
21     obligated to terminate under its agreements, but didn't follow
22     its rules.  But this grossly mischaracterizes what happened, as
23     Ms. Trickey testified to you.  Question:  In the circumstances
24     when a customer violates the AUP, do you have an understanding
25     as to what steps Cox will take?
```

1          Answer:  The goal is to reach out and to educate and

2     modify behavior.  She said that consistently.

3          And under cross-examination, Ms. Trickey testified

4     about the lengths to which they would try to educate customers

5     and try to work with their customers:  And so, under this

6     policy as it existed on November 1, 2012, et cetera, et cetera,

7     you know, shouldn't you just terminate them?

8          Answer:  You prefer to try to work with them and,

9     again, educate them, modify their behavior, and help them.  You

10    never want to terminate anyone.

11         You want to fault Cox for that?  Fine.  But that's

12    what they were trying to do.

13         And you heard from Joe Sikes, also explaining the

14    importance of working with customers to change their behavior.

15    Mr. Sikes testified that:  The number of subscribers that were

16    reaching, you know, the point of the process were pretty

17    limited.  It was a small amount.  So I didn't really see it so

18    much as saving every little -- every single little customer.

19         And he goes on to say:  I mean, that was what was

20    important to us.  We wanted -- we wanted them to understand the

21    importance and that they needed to take action.

22         Now, Mr. Vredenburg, who lived in this world, lived

23    in the Tier 2.5 world, explained that it was worth working with

24    the customers.  He didn't want to terminate them if he could

25    avoid it.  It was the last resort.  And there were plenty of

2991

1    good reasons for it.  There were plenty of good reasons for it.

2              You have got back in the jury room some 1,700

3    complaints, customers' responses where they went on record when

4    they received notices from Cox.  The notion that somehow every

5    ticket is an infringement and we should just accept it, is

6    really beyond the pale.

7              Here is one example that was sent during the claims

8    period from a customer who was accused of copyright

9    infringement:  We are senior citizens, 77 and 74, and wouldn't

10   even begin to know how to do what is set forth below.

11             Here is another one during the same time frame:  I

12   have read this e-mail and found the content and deleted both

13   the source and material.  I am 61 years old and not in the

14   habit of allowing my nephews to use my computer; however, not

15   anymore.

16             Now, Joe Sikes explained why he wasn't prepared to

17   take quick action to terminate permanently.

18             NOTE:  At this point a portion of a video recording

19   is played into the record as follows:

20   Q.   Do you think that reactivating a customer who has twice

21   been terminated for copyright abuse is an effective way to

22   defer -- deter that customer from further copyright

23   infringement?

24   A.   In most cases the customer, the account holder, the

25   subscriber wasn't the person that was responsible for the

1   activity or that was causing the activity.  It was usually

2   someone in their home, someone outside of their home, someone

3   who had access to a network.  In some cases it was a computer

4   virus.  We didn't feel like it was fair to -- to punish a

5   customer that was in that situation.  Now, if it was a customer

6   that said, yes, I'm doing this and you can't stop me, any case

7   that I was aware of in that circumstance, the customer was

8   terminated.

9           NOTE:  The video recording is concluded.

10          MR. ELKIN:  And then, and then, and then there is the

11  complaint about Rightscorp.  Here you have a chorus, a chorus

12  of Cox folks who were quite animated about their feelings

13  because of what -- how they perceived this particular notice

14  sender.

15          Linda Trickey noted when she testified that:  They

16  were the ones -- that they also -- that they had a demand for

17  money in their notice.  And, you know, we told them we wouldn't

18  process it.  They even offered us a scheme at one point where

19  they said, if you process these with the demands, you know,

20  we'll give you essentially a kickback.

21          Mr. Carothers characterized these notices as

22  threatening.  He thought it was a shakedown.  And he said in

23  addition to that, it invited unsuspected Cox customers to hit a

24  link, and who knows what would have happened from that point

25  forward.

2993

1          Mr. Carothers further testified that after turning

2    down this scheme, Rightscorp intentionally flooded CATS with

3    notices.

4          Question:  What happened next?

5          Answer:  They offered to cut us in for a piece, and

6    we turned them down too.

7          Question:  Then what happened?  We had to block them

8    because it was a denial of service attack on CATS.

9          And then -- and poor Mr. Beck.  They shut his system

10   down.  The volume -- he testified:  The volume of complaints

11   that we received from Rightscorp shot up dramatically and went

12   to -- went up to the high enough volume that we were no longer

13   able to take in any new abuse complaints from any senders for

14   any type of abuse at all.

15         And, of course, they brutalized Jason Zabek and

16   Joe Sikes for their intemperate e-mails about Rightscorp.  And

17   it's true, they were upset.  And, yes, they said some goofy

18   things in those e-mails.  I have said goofy things in e-mails

19   when I have been upset.

20         I run a law firm of 1,000 lawyers, and I will tell

21   you, I've seen and continue to see a lot of goofy e-mails,

22   sometimes even from my partners, who I love.

23         But at the end of the day, there are good and

24   sufficient reasons why they were upset.  And if you want to

25   hold those intemperate e-mails against Cox, then I don't know

1  what I can say about that.  But they were quite upset.

2          And, of course, the plaintiffs agreed years after Cox

3  rolled out its system of graduated response that lo and behold,

4  that's a pretty good idea.  We are going to do it ourselves.

5          And this was -- they reached an agreement with --

6  we're talking about the RIAA, 85 percent of the music industry.

7  And you've got these five ISPs, AT&T, Verizon, Comcast, Time

8  Warner Cable, and Cablevision, basically 70 percent of the ISP

9  community.  If this is not an industry standard, I don't know

10  what is.

11         And this wasn't some fly-by-night experiment.  This

12  was something that was negotiated for years, lasted for years,

13  and was extended six times.

14         And CAS will -- I asked Mr. Marks about this.  Let's

15  be clear, CAS was all about, all about repeat infringement.  He

16  knew it was pervasive infringement.

17         And plaintiffs thought CAS went beyond education to

18  enforcement.  He testified in direct, and I asked him again on

19  cross-examination, and he testified that, yes, it had teeth in

20  it.  And we all know from listening to the testimony that they

21  were guided in this effort by Cox's success.

22         Mr. Cadenhead made an extensive presentation, and you

23  saw it, and he stated:  I felt like we had a pretty good

24  example of one way that ISPs could respond fairly, and what we

25  felt was effectively to a problem that needed addressing.

2995

1                  Now, Cox didn't participate because it felt it had a
2         better graduated response program.  And he stated, and you
3         heard:  I felt like the process we had designed was better.
4                  Let me show you an e-mail that I think was just
5         exhibited on closing argument.  And they used this e-mail both
6         with Mr. Zabek and Dr. Almeroth, but they omitted key language
7         from this e-mail that has a bearing on this particular issue.
8                  This was an e-mail that Mr. Zabek sent to others at
9         Cox on February 28, 2013.  And what they left out, and this is
10        referencing the Copyright Alert System:  Luckily, 80 percent of
11        our customers, meaning Cox's customers, that share copyrighted
12        material, stop by the second warning.  At each step we educate
13        them on the illegal activity and our AUP.  What this new
14        Copyright Alert System has done is copy what we have been doing
15        for years with some slight modification with each ISP.
16        Randy Cadenhead was part of the discussions surrounding this
17        new system.  He helped to mold part of that agreement.
18                  That's what they didn't share with you when they
19        showed you that document.
20                  Now, CAS, let's be clear, has fewer steps than Cox.
21        And we believe that's a fault, not a benefit.  There is -- you
22        don't have anywhere near the kind of customer interaction and
23        intensity.  And, frankly, it's just not as robust as Cox's
24        graduated response.
25                  They agreed, basically, to warnings.  And then after

2996

1   the sixth notice, they just gave up.  There was no termination

2   of internet service or anything beyond the initial mitigation

3   step.

4          Now, Marks admitted, Steven Marks of the RIAA

5   admitted in his testimony that there were limits on the number

6   of notices that ISPs had to accept, just like in the Cox

7   system.  And while they didn't want a limit, they accepted it.

8          And not only was the MOU explicit on this, it further

9   provided that the ISPs, even with the notice limits, even with

10  the notice limits, could further reduce how many notices they

11  would receive based on the business and technical constraints,

12  including pressure on customer call centers.  Does that sound

13  familiar?

14         And there was no requirement to terminate for a

15  repeat infringer.  That is true under all -- I showed you all

16  of the implementation agreements with Verizon, and Time Warner,

17  and Comcast, and Cablevision, and AT&T, no requirements at all.

18         And a typical provision that you see in the Verizon

19  implementation agreement is that after the notices, there is a

20  temporary redirection to a landing page until the subscriber

21  contacts the participating ISP, and then they continue to go

22  on.

23         And while plaintiffs believe that CAS -- and also

24  they believed -- this was not something that they were trying.

25  They believed that graduated response was going to have the

2997

1    effect of getting rid of what I refer to as the worst of the

2    worst.

3           They -- the Center for Copyright Infringement, and

4    this is in evidence, posted on their Web site frequently asked

5    questions.  And they state right then and there that:  We

6    anticipate that very few subscribers, after receiving multiple

7    alerts, and there was a total of six, will persist or allow

8    others to persist in the content theft.

9           Now, let's compare the two programs related to the

10   evidence that you have, CATS versus CAS.  Under the Copyright

11   Alert System, you've got, again, six steps.

12          And I asked Mr. Marks:  The implementation agreements

13   with the five ISPs did not require, by the terms of those

14   agreements, anything for the ISPs to do after the sixth alert;

15   is that correct?

16          Answer:  Yes.

17          That was done.  What Cox provided for were e-mail

18   warnings, suspensions with limited warning pages, suspensions

19   and requirement to call a support technician, suspension and

20   required to call to a specialized technician, and then

21   consideration for termination.

22          And if you take a look just at -- just checking the

23   boxes in terms of some of the characteristics, there is nothing

24   that CATS didn't do that CAS did.  It did a lot more.  It also,

25   actually, even considered for termination and did terminate in

2998

1  certain cases.

2          And CAS, let's be -- CAS was in effect during the

3  entire claims period and beyond.  It was negotiated for years,

4  as I mentioned.  It lasted for years.  And it was extended six

5  times.

6          So if both Cox and the plaintiffs agree, if they both

7  agree, which they did, that graduated response was the answer,

8  how did they do?  How did Cox do?

9          Mr. Carothers testified before you, very effective.

10  He ran the numbers himself.

11          And then you've got Dr. Weber's study.  She found the

12  success rate was 98 percent, 98 percent after going through the

13  process of the steps laid out in Cox's graduated response.

14          I would say it was extraordinarily effective.  And

15  this accounts for the notices during the claims period.

16          And contrary to what you heard, she testified and she

17  took you through all of the additional steps that she

18  implemented in order to address any claim so-called bias.

19          And specifically she found that with one or more

20  tickets, you started out with 42,025.  Three or more tickets,

21  18,600.  So you see the precipitous drop-off between one and

22  three.

23          And then when you get to five, it's 10,208.  Major

24  reduction.  And by the time you get to 13-plus tickets, it's

25  1,330.  That's a huge reduction.  Anybody saying the system

2999

1    didn't work is just not paying attention.

2           Now, her opinions of -- some of her opinions included

3    that after each step in Cox's graduated response, fewer

4    subscribers continued to be the subject of copyright

5    infringement notices.  And by the 12th notice, the notices

6    stopped for the vast majority of subscribers.  That was her

7    finding.

8           So, question, what happens after CAS runs its course?

9    Well, Mr. Marks testified:  We continued to send notices.

10          Well, that's good.  But Cox continues to engage.  Cox

11   continues to engage and ratchet up the level of intensity with

12   its customers to try to get a better result.  Why?  Why do they

13   do that?

14          As you heard from Carothers, from Trickey, from

15   Sikes, from Zabek, from Cadenhead, it works.  Mr. Cadenhead

16   again stated:  I know that human touch, as part of the process,

17   was a fundamental thing.  Cox believed that was the most

18   effective way in the long term to get results.

19          Now, even their expert, even Dr. McCabe attests to

20   the significant run-off.  His was not 98 percent.  His was

21   92 percent-plus, after the repeat infringers go through the

22   gamut of graduated response steps.

23          So what are plaintiffs left with?  What are they left

24   with at the end of the day in the face of these results?  Cox

25   had 49 subscribers with 100-plus tickets.  How many times have

3000

1    you heard that over and over and over again?  But let's examine

2    the evidence on these so-called 49 customers that they keep

3    showing to you over and over and over again.

4           Of these 49, 15 are ISPs.  Ten are university student

5    housing.  Nine are hotels.  Six are apartment complexes.  Three

6    are military housing.  Three are retail.  Two is multifamily.

7    And one is a single family.  And that's the subscriber that

8    they keep going over and over and over again as if, somehow,

9    you should believe that this was the entirety of Cox's

10   subscribership.

11          And Mr. Beck testified that 20 to 30 percent of the

12   tickets of the RIAA during this period related to business

13   customers.

14          Now, I'm going to turn to vicarious infringement.

15   There's a definition, of course, that you'll have to address.

16   Which is that in order to find vicarious infringement, you'd

17   have to find that Cox received a direct financial benefit from

18   infringing activity that Cox had both the right and ability to

19   control or supervise.

20          And we'll get to this in a bit, but at the end of the

21   day Cox was not supervising any infringing activity, had no

22   ability to monitor it, had no ability to verify it, period.

23          And in terms of financial benefit, simply because

24   revenue was recorded because somebody wasn't terminated,

25   doesn't create any causation.  There is that word "direct."

3001

1   Direct means causal.

2           So the notion that somehow, well, you were benefiting

3   because you could have terminated these, that's not the

4   standard.

5           Now, the RIAA wants you to believe that -- the

6   plaintiffs want you to believe that somehow Cox is manipulating

7   the subscribers to continue to infringe, and they promote it.

8   But the reality is that, as you've heard over and over again,

9   Cox had no control.

10          I want to point out the following with regard to

11  the -- what the evidence has shown here:  Number one,

12  peer-to-peer piracy is pervasive.  We all agree to that as a

13  basis.

14          Two, Cox doesn't track.  There's no evidence to the

15  contrary with regard to that.

16          Three, you heard Mr. Negretti, head of product

17  marketing for this product, Cox does not market or advertise

18  infringing activity at all.  No promotion.

19          And fourth, there was no direct financial benefit.

20          We'll go through the evidence, but Dr. Lehr's

21  evidence that he relied on from Mr. -- was taken away by Mr.

22  Mencher's testimony yesterday, completely contrary to what's

23  before you, and certainly no linkage.  And he doesn't even

24  profess that there should be one.

25          In terms of whether peer-to-peer was an epidemic, I

3002

1    think we can all agree that piracy, dating back to 1999, was a

2    problem.

3           In terms of peer-to-peer, Barbara Frederiksen-Cross

4    admitted that there were 30 million users of peer-to-peer at

5    any given time.  Who knows what they're doing?  There's no

6    question that there aren't legitimate uses of peer-to-peer.  Is

7    it the vast majority?  I don't know.  Probably not.  But to

8    suggest that somehow it's known, that can't be a correct

9    assumption.  And in the meantime, you can't block peer-to-peer

10   for the reasons that were identified.

11          Now, Marks -- Mr. Marks, the other -- from the RIAA,

12   discussed all of the experiments that were undertaken by the

13   recording industry since 1999.  Let's -- they sued Napster,

14   they put them out of business.  And then Grokster.  Then they

15   sued individual file sharers for five or six years.  Then they

16   engaged in this notice program.  And now they're suing the

17   ISPs.

18          And I asked them:  What's going to be the next

19   experiment?  This problem isn't going away.  And as I posed at

20   the beginning, and I'll get to in a few minutes, this is a

21   shared responsibility.  Everybody has got to play their part,

22   even the plaintiffs.

23          Now, the following evidence is completely

24   un-rebutted.  Cox can't control the activity.  It can't block

25   sites.  It can't throttle speeds.  It doesn't track, it doesn't

1    have the ability.  And even if it did, it wouldn't do it

2    because of the privacy concerns.  And as you have heard, not

3    all peer-to-peer activity infringes.

4              And Mr. Carothers testified that Cox doesn't block.

5              And Ms. Trickey testified that they can't block Web

6    sites or throttle bandwidths.

7              And Carothers confirmed, that didn't happen.

8              And Trickey explained in detail all about this.

9              Carothers testified that Cox lacked the ability and

10   wouldn't do it anyway due to the privacy concerns.

11             And Ms. Trickey agreed.  She stated:  Why don't you

12   spy on your customers?  Because we believe they have a privacy

13   right in what they're doing online.  We do not track or spy,

14   you know, the Web sites that they go to.

15             Now, there is no -- we talked about putting aside

16   control, you also have to find that they received a direct

17   financial benefit where they do control.  Let's assume that

18   they do control, which they don't.  There's no causal activity

19   here between receiving money and promoting or piracy.  There is

20   no evidence that Cox promoted or advertised service to

21   infringe.

22             They had Mr. Negretti on the stand, they could have

23   asked him all kinds of questions.  They didn't get one answer

24   that would have provided any scintilla of evidence to support

25   any such notion.

1          Mr. Bakewell eviscerated Dr. Lehr's analysis, as you

2    heard.  And Mr. Mencher discussed how Dr. Lehr had all the

3    wrong facts with respect to Cox's expenses and the

4    infrastructure and all of that.

5          Now, Mr. Mencher explained that Cox, by the way,

6    would never do this.  It's repugnant to the values of this

7    120-year-old institution.

8          A company, if you think about it for a moment -- and

9    Mr. Oppenheim is right, you can't -- you have to keep your

10   common sense here.  Why would a company that is as profitable

11   as they say Cox is, and it's a great company, try to make a few

12   extra bucks on some infringing customers?  Was it a head fake

13   that they were just trying to work with them and speak to them

14   and have all of these conversations with them with all of the

15   success that they achieved?  It doesn't make any sense.

16         Mr. Negretti, who testified before you, head of the

17   internet product marketing, stressed this in his testimony:

18   Question:  To what extent was Cox advertising lawful versus

19   unlawful downloading?

20         Answer:  100 percent lawful, 0 percent unlawful.  We

21   don't create a marketing message in any away for customers who

22   are using it in any way other than in the most ethical ways.

23         And he further explained that advertising speeds

24   are -- is completely unrelated to any notion for -- as to a

25   draw for infringement.  He explained that most of this has to

3005

1    do with the streaming videos and streaming activities, and that

2    every single ISP is going to market speed and high-speed

3    internet.  That's what you market.

4            In terms of direct financial benefit.  Again, the

5    evidence is clear.  There was no incentives to foster

6    infringement.

7            To the contrary, Cox introduced -- if there's any

8    doubt about that, Cox introduced graduated response and was

9    successful at it in actually reducing infringement.

10           There's no connection to customers staying online so

11   that somehow they could infringe.

12           Now, Sikes is -- they make some reference to some of

13   the e-mails of the customers, of the safety team, like Joe

14   Sikes.  And he makes a reference to, let's be really careful,

15   this person pays X dollars a month.  That's a far cry from

16   suggesting this company was in business to do this.

17           You saw Mr. Sikes on video.  You saw an earnest guy

18   who was really working hard to do this.  They can take snippets

19   out of context in e-mails and try to paint a different picture,

20   but think about the quality of the evidence, the quality of the

21   evidence, please.

22           And in terms of direct infringement proof, I want to

23   turn to that, and what is in the case and what is not in the

24   case.  And specifically, I think there's a little bit of an

25   inadvertent mischaracterization of what we said at the

3006

1    beginning of the case.  We never said that there were no

2    infringements through Cox's system.  To the contrary, that has

3    never been suggested.

4            What's been suggested is that the proof that they've

5    presented here or were going to present here and have presented

6    here is of a system, the MarkMonitor system, which otherwise is

7    good, but applied to Cox was bad because it didn't use the

8    mechanisms that they use under CATS.  They use, under CAS, a

9    process called hash checking where you actually do the

10   downloads from the offending subscribers' computers.

11           Here they did hash matching, and that's the problem.

12   They're conflating the two, and that's our issue here.

13           First of all, there were no downloads, no e-mails,

14   and no screenshots.

15           So what we're left with is the MarkMonitor evidence.

16   And again, I think MarkMonitor may be a great company, but

17   the -- they're only as good as the technology that they employ.

18   And they did not use the same technology that they used in CAS

19   here.  It's demonstrably unreliable for that particular -- in

20   this particular case.

21           And the operational audits that you've seen confirmed

22   that.  They were supposed to hash check.  They just hash

23   matched.  And the auditor warned the plaintiffs about this.

24           And there is an incentive for them to cut corners

25   when they didn't have to do it.  They had to do it under

3007

1    CATS -- CAS, but they didn't have to do it with Cox.  So they

2    cut corners.

3           If you take a look at this Appendix C, this RIAA rate

4    card, they decided to go cheap on this because they didn't

5    really care as much.  They probably didn't think about a

6    lawsuit back in the day when this happened.

7           But at any rate, MarkMonitor's witness confirms that

8    they knew the difference.  Mr. Paszkowski, who testified from

9    Lithuania, or wherever he was, basically stated that

10   downloading would be Level 5, and they applied Level 4.

11          Now, they elected not to do this, that was their

12   choice -- fine, by the way, they can do that -- except for 143

13   out of the 175,000-plus files.  So for the vast majority, they

14   didn't do Level 5.  I mean, nearly the entirety.

15          The MarkMonitor system of hash matching versus hash

16   checking is fallible.  Let's be clear, you've heard it from

17   different experts.  MarkMonitor relied on the notion, they

18   relied on the notion that something was what it purported to

19   be.  But that turns out, as you've heard, to be a wrong

20   assumption.

21          And plaintiffs own expert, Barbara Frederiksen-Cross,

22   she had to admit that.  Question:  And what happened was we

23   searched on the SHA-1 hash and got two different works, right?

24          Answer:  Or at least we got two different

25   identifications.

3008

1              Answer:  There does appear to be some error here,

2       yes, counsel.

3              And then she was confronted again and had to admit it

4       again.  Question:  We searched on the SHA-1 hash in the Audible

5       Magic spreadsheet, and we found Tammy Wynette, right?

6              Answer:  That's my recollection, yes.

7              Question:  Can we search on that hash -- referring to

8       some exhibit -- title and artist in the spreadsheet is "Lovely

9       Day" by Bill Withers, right?

10             She answers:  Yes.

11             Now, Dr. Feamster explained to you why simply relying

12      on hash matching is deceptive.  BitTorrent users lie.  That's

13      how the system is set up.

14             Now, because it didn't check, MarkMonitor couldn't

15      tell whether the file possessed by a Cox subscriber was real or

16      fake.

17             And by the way, this analogy to teacher that I just

18      heard about the essay, a better analogy would be if you

19      actually -- if a teacher saw two essay papers and she had, for

20      example, similar fonts and type size, whether it would be the

21      same.  It has nothing to do with the content, it has to do with

22      the file size itself.

23             And Dr. Feamster confirmed, it's quite likely that a

24      peer -- quite likely that a peer does not have what it claims

25      to be.

1          And again, the outside auditor picked up on this when

2     they did the testing.  They were worried about a dishonest

3     BitTorrent client.

4          Now, we have gone through the evidence with regard to

5     material contribution.  And that is to say, contributory

6     infringement and vicarious infringement.  As we turn to

7     damages, I would like to -- and before I get to the specific

8     issues related to the economic loss that Dr. Feamster -- that

9     Chris Tregillis took you through yesterday, I want to talk

10    about the issue, what the plaintiffs could have done to try to

11    address the harm they now complain about.  And that is pursuing

12    the so-called subscribers who are the worst of the worst.

13         The answer is that they could have done something

14    here if they really wanted to do something with the repeat

15    infringers or the ones that they're complaining about here.

16    They were set up to do it, they have done it in the past, and

17    they did not do it here.

18         First, as you can see from this call out, under the

19    MOU, there's -- with CAS, with the ISPs, the owners could

20    have -- they specifically carved out there ability to sue

21    customers.

22         And if you take a look at the FAQ, they specifically

23    say right on their Web site that:  Copyright owners may seek

24    remedies directly against the owner of an internet account

25    based on evidence they may collect.

3010

1              And as I mentioned, and as you heard from Mr. Marks

2    and other plaintiffs' representatives when they testified,

3    plaintiffs have a lot of experience in doing this.

4              And when they did this in the past and served Cox

5    with subpoenas to get the names of subscribers, unlike what

6    you've heard, Cox complies.  Ms. Trickey testified that if

7    there is a John Doe complaint and there is a request for

8    customer information so that the record companies can sue them,

9    they provide that information.

10             Now, the plaintiffs have a wall of lawsuits.  They

11   know how to do this.  They filed more than 5,000 lawsuits

12   against individuals.  Sony confirmed as well that they have

13   filed plenty of suits.

14             And it's Mr. Marks of the RIAA who led the company,

15   he ran the campaign when he was at the RIAA.  And Marks

16   testified that despite getting the repeat infringer subscriber

17   information under CAS, they elected not to pursue them.  And,

18   of course, they didn't pursue them against Cox either.

19             A question I put to him:  Do you recall whether or

20   not the RIAA on the record labels' behalf ever instituted any

21   action here against any subscriber of each of these five ISPs

22   based on the information that was provided?

23             Answer:  We did not.

24             He then goes on to say they didn't sue any of the

25   ISPs, unlike Cox, there as well.

3011

1          Then another FAQ, they specifically identify a

2    mechanism to actually get the data.  And they specifically tell

3    the community the following:  As provided under current law,

4    copyright owners may also seek remedies directly against the

5    owner of an internet account based on evidence they may

6    collect.  Because the vast majority of subscribers observe

7    copyright laws as a matter of course, and the participating

8    ISPs and content companies believe that even more will do so if

9    the Copyright Alert System is effective, it is reasonable to

10   expect that very few subscribers will ever face this situation.

11         That's what they were saying.  But the truth is, as

12   we heard from Mr. Marks, they stopped doing this years ago.

13   They gave up on it.  Which is fine, it's their prerogative,

14   their choice.  But if they really wanted to go after the worst

15   of the worst, the ones that they felt still were doing it, they

16   had the ability to do something.

17         But we know why they didn't.  Here is a second window

18   of insight in the trial.  When Mr. Kokakis was on

19   cross-examination, he told us:  They don't want to go after the

20   tens of millions of individual students and children and

21   grandmothers.  That's not something we want to do.

22         And by the way, I respect that, but they're the ones

23   that have made that choice.

24         Then Mr. Kokakis doubles down on that and states

25   that, look, it's his right, their right to choose what they

3012

1    want to do.  And that's fine.

2            Mr. Marks agreed that it was bad PR.

3            So we are not saying, again, that they should go

4    after all of the subscribers.  But if they truly had a problem,

5    again, with the worst of the worst, there are remedies here.

6    And that should have a bearing at how you look at the case.

7            Now, turning to economic loss.  Of all of the factors

8    in your instructions that would guide you to where you would

9    award statutory damages -- and, again, I would ask you not even

10   to worry about that if you find -- in the circumstances where

11   you were to find Cox not secondarily liable for vicarious

12   infringement or contributory infringement.  If you find that

13   Cox is not liable for contributory or vicarious infringement,

14   you need not consider, as the judge instructs, anything related

15   to damages.

16           But to the extent that you find that, and I would

17   urge you not to do that, if you agree with the case that we

18   have put on, of all of the factors that relate to statutory

19   damages that I suggest you consider, I would take a look at the

20   evidence pertaining to the loss attributable here to the

21   infringing activity.

22           It has got to be -- any notion of loss has to be

23   tethered to something that relates to the infringing activity.

24   It just can't be anything.

25           Now, we asked witness after witness on the

1  plaintiffs' side whether they could come up with any evidence,

2  any testimony, anything related to economic loss.  As you see

3  from this snippet here, there wasn't any.  And there is no

4  obligation for them to do so, but they could have tried to do

5  something.

6         But we did.  We -- Mr. Tregillis provided a study.

7  He demonstrated to you the specifics of how he did this.  He

8  did it yesterday.  And he took you through -- he gave credit

9  for every single song that was in issue here, which was the

10  only proof that exists in terms of their potential loss.

11         And the talk about so-called displaced record sales,

12  we heard that from an earlier witness on the plaintiffs' side.

13  If you believe that, that they are displaced record sales, then

14  this is an appropriate way to look at this.  And I will return

15  to this as we concern -- as we consider the verdict sheet.

16         Look -- and, by the way, we have no doubt that the

17  piracy causes issues to intellectual property.  We -- that's

18  not why we're here.

19         But the tale of woes, I would suggest, is a bit

20  misplaced.  One of the factors that you are instructed to

21  consider, if you get to this point in the case of willfulness

22  is the issue of deterrence.

23         And during this claim period, 2013 and '14, the world

24  changed, and digital downloads were overtaken by internet

25  interactive streaming.  Which now, of course, has -- from the

3014

1   Spotifys and the Pandoras and the Apples of the world, the

2   world has changed quite a bit.

3          And you heard different witnesses, from -- Mr.

4   Kokakis of UMG Publishing testify to that.  And he specifically

5   talked about how there was an increase in digital in 2013.

6          And then I asked Mr. Kooker in his -- my examination

7   of him about whether or not this is even applicable anymore

8   given how streaming has taken over the world.  And he stated

9   that in 2018 Sony had a 22.3 percent increase over the prior

10  year.  And their 2 billion out of the $3.9 billion that Sony

11  makes is based on things that no longer are even a part of this

12  case.

13         And in an irony, in an irony, he states that, in

14  fact, the popularity of the streaming services depends on the

15  widespread availability of broadband internet connections,

16  which is the ISP community.

17         I want to turn to some final points before I wrap up

18  here, which is as follows.  And these are just things that I

19  would ask you to think about as you return for your -- for the

20  deliberations.

21         As I posed in the opening and as I made reference

22  earlier, this online copyright infringement is an epidemic.

23  There is no one party that can control this.  It's a shared

24  responsibility.

25         And I submit, based on the evidence that we have

3015

1    presented, and I hope that you conclude, that Cox did what it

2    thought was appropriate in the circumstances to discharge

3    whatever responsibility it felt it had.  Clearly as much, if

4    not more, than what they expected from ISPs under an

5    industry-wide agreement during this same period of time.

6           Plaintiffs have dealt with a number of experiments

7    over the years.  That's fine, I get that.  But Cox recognized

8    the problem early.  Cox recognized the problem before the other

9    ISPs, and actually did something about it.

10          And we cooperated with them on their notice program.

11   You saw the testimony of Mr. Cadenhead.

12          Now they try to shift all the policing to Cox.  And I

13   just -- I would ask you to consider that when you go back in

14   the jury room and deliberate.

15          Another point that I ask you to think about is the

16   internet and what they're really asking you to consider,

17   cutting off someone's internet service.  I would submit that

18   termination usually is not the answer, usually not the answer.

19   And Cox came to that conclusion as well.

20          If somebody wants to terminate -- you terminate

21   somebody, they walk across the street and sign up for Comcast

22   or -- what are we doing?  The plaintiffs didn't require it

23   under the Copyright Alert Service.

24          And, frankly, we don't disagree with them.  The worst

25   of the worst would not have been deterred.  They could have

3016

1    sued them.  They decided not to.  Fine.  They had the data,

2    they could have done it.  They never did it with the infringers

3    related to the other ISPs in CAS or here.  But they expect Cox

4    to terminate subscribers even, as you've heard from Linda

5    Trickey, that we're talking about here are universities and the

6    like.  They didn't require it under the CAS, and they didn't go

7    after any of the repeat infringers there.

8            The record companies don't want to sue them, the

9    grandmothers, the children, the students.  Okay.  Okay.  But

10   let's consider that in the context of asking Cox to shut these

11   folks off of the internet.

12           Another point I would like to raise with you is --

13   has to do with Cox's graduated response.  If what Cox did in --

14   Cox worked to try to reduce infringement through its graduated

15   response program.  I would submit if what Cox did in carrying

16   out its job was fostering infringement, that's what they say,

17   then the record company, who was plagued with piracy, we don't

18   disagree with that, was complicit with the majority of the ISP

19   industry in contributing to infringement by adopting and

20   implementing CAS.

21           We don't think they were.  The ISPs to CAS obviously

22   were not enabling infringement through graduated response, and

23   neither was Cox.

24           I want to talk for a moment, if I can, and call to

25   your attention and ask you to consider the effectiveness of the

1    graduated response system.

2            Here is Dr. Weber's picture in case you forgot her.

3    And what did Cox actually do relative to copyright infringement

4    claims?  They developed a robust, first in time, best in class,

5    graduated response program that by all accounts was extremely

6    effective.

7            And according to plaintiffs' own expert, McCabe, the

8    number of Cox subscribers stopping infringement after going

9    through the gamut of graduated response was above 92 percent.

10           According to our expert, and you saw her, draw your

11   own conclusions, I thought she was not only credible, but

12   persuasive, the percentage of subscribers under her study who

13   stopped at this same point was 98 percent.  98 percent.

14           I don't know about you, and it has been awhile since

15   I have been in school, but back when I was in school, a 98

16   wasn't a C, or a B, or even an A minus.  It was an A+.

17           Worried about the DMCA.  You heard it a lot.  It was

18   mentioned again.  I just want to repeat this, although it's in

19   the Court's instructions.  This is not an issue in this case.

20   Whatever e-mails you have seen making a reference to that, we

21   have got an obligation under this, we have an obligation under

22   that, it's irrelevant because there is nothing to do here --

23   the fact than an ISP like Cox could claim a safe harbor by

24   terminating all kinds of repeat infringers based on someone's

25   say so, is nothing you should even consider.  It has no bearing

3018

1    on this case.

2            And, frankly, it has no bearing at all on the CAS.

3    As you can see from reading the MOU, it was excluded.

4            So where does this leave us?  The verdict.  You will

5    have the verdict sheet to fill out.  The Court is going to give

6    you instructions.  I just want to review with you what this is

7    going to look like.

8            How do I reduce this a little bit?  Is there a way

9    down?  Thank you.

10           All right.  So this is the verdict sheet you're going

11   to given.  And if you agree with Cox that plaintiffs did not

12   prove by a preponderance of the evidence that Cox was

13   contributorily liable, you would check "no."

14           And if you agree with Cox that plaintiffs did not

15   prove by a preponderance of the evidence that Cox was

16   vicariously liable for infringement, you would check "no" to

17   that.

18           And then you are -- if you do that and that's your

19   verdict, you're done.  You don't have to consider anything

20   else.

21           If you don't, then you're asked to consider the

22   infringement claims for 10,017 works, and how many of those

23   works should Cox be tagged with.

24           And then the next page is willful:  Do you find by a

25   preponderance of the evidence that Cox's contributory or

3019

1    vicarious infringement was willful?

2              I would hope that, first of all, that you answer no

3    to the first questions.  But if you don't, that you would at

4    least, in the circumstances, find that they were not willful.

5              And then with regard to the statutory damages amount.

6    Given the fact that you're constrained by going to at least a

7    minimum of $750 a work, if you were to multiply that by the

8    10,000 or so works, if you were to find that many was

9    infringed, that gets you to roughly more than ten times the

10   economic loss of the only evidence that's been presented in

11   this case.  So it would be $750.  That's how you would fill

12   that out if you agree with us.

13             But again, you need not consider that in the

14   circumstances were you to find for us.

15             And finally, finally, I want to make just one last

16   point, if I can.  As I mentioned at the outset, this is a huge

17   responsibility.  Everybody thanks you for it.  I'm thanking you

18   again for it.

19             Our system of democracy depends on you, and I know

20   you will take it to heart.  The plaintiffs said this case was

21   important to them, and I don't doubt it.

22             I also asked Cox, through Mr. Carothers, whether this

23   case was important to Cox.  This is what he said:  Critically

24   important.  We are concerned that it will set a precedent that

25   ISPs will be required to monitor their subscribers and try to

3020

1    determine whether we are violating copyright -- whether they

2    are violating copyright.  We're also concerned about the

3    precedent that ISPs might be responsible for crimes committed

4    by their customers.  So if we, as an ISP, are responsible when

5    our customers violate copyright, what else might we be might--

6    what else might we be responsible for?

7          Now, what I would suggest to you is not whether this

8    case is important to the plaintiffs or, frankly, whether it's

9    important for Cox.  I would rather ask you to consider the fact

10   that this case is important to all of us.  The wrong message

11   here could have the effect of requiring ISPs to monitor what we

12   all do online.  Cox did its level best in dealing with the

13   concerns of the music industry.  Please do not punish them for

14   that.

15         Thank you.

16         THE COURT:  All right.  Rebuttal.

17         MR. OPPENHEIM:  Your Honor, can we take a very short

18   break?

19         THE COURT:  Do you want a break?

20         MR. OPPENHEIM:  Please.

21         THE COURT:  All right.  All right, let's take ten

22   minutes, and we'll come back and hear our rebuttal argument.

23         NOTE:  At this point, the jury leaves the courtroom;

24   whereupon the case continues as follows:

25   JURY OUT

3021

```
 1              THE COURT:  All right.  Let's take ten minutes.
 2    We're in recess.
 3              NOTE:  At this point, a recess is taken; at the
 4    conclusion of which the case continues in the absence of the
 5    jury as follows:
 6    JURY OUT
 7              THE COURT:  All right.  Joe, let's get our jury,
 8    please.
 9              MR. OPPENHEIM:  Thank you, Your Honor.
10              NOTE:  At this point, the jury returns to the
11    courtroom; whereupon the case continues as follows:
12    JURY IN
13              THE COURT:  All right.  Please have a seat.
14              Rebuttal, Mr. Oppenheim.
15              MR. OPPENHEIM:  Thank you, Your Honor.
16                        REBUTTAL ARGUMENT
17                        BY MR. OPPENHEIM:
18              We're right in the home stretch.
19              I want to pick up with where Mr. Elkin left off.  In
20    conclusion, Mr. Elkin said to you, that this was an important
21    case for Cox because he's worried about it setting a precedent
22    that ISPs would have to monitor what their subscribers were
23    doing.
24              That's not what this case is about, not even in the
25    slightest.  It's not even close.  And the plaintiffs have never
```

3022

1    suggested anything of the sort.

2              This is not about monitoring, and the plaintiffs

3    haven't asked Cox to monitor.

4              Nor is it about spying.  I told you during my closing

5    argument that one of the three things that this case was not

6    about was spying.  And where did Mr. Elkin go immediately in

7    his closing?  Spying.

8              This isn't about spying.  It's not about privacy.

9    This is about copyright infringement.

10             This case is also not about the Copyright Alert

11   System.  Mr. Elkin spent quite a bit of time talking about the

12   Copyright Alert System.

13             But several of the things that he said to you were

14   misleading, to say the least.  He said, well, look, this

15   industry agreed, it was an industry standard that agreed on six

16   steps, and there was no termination.

17             That's not what the evidence said.  You heard witness

18   after witness say that what happened in CAS was the following.

19   There was an educational program for six steps.  After the six

20   steps, then the ISPs had to abide by the law.

21             So for Mr. Elkin to suggest to you that CAS said, no

22   terminations, and they're done after six steps, is to

23   misrepresent the testimony that was put before you.  Please

24   don't go there.

25             They also presented the notion that, well, under CAS

3023

1  there were caps.  And so, it's all right for Cox to have capped

2  the number of notices that it would receive.

3          I'd like pull up an exhibit that we looked at before

4  because I want us to really dig in on this for just one second.

5          Could you pull up PX 6, please.

6          This is the MarkMonitor agreement with the RIAA.  And

7  I've asked to pull up the appendix, which shows the volume --

8  the anticipated notice volume for each of the ISPs.  This is

9  the agreement for 2014.

10         And if you look at the top ISPs, you'll see that it

11 lists the CAS ISPs.  And you'll see that those numbers per

12 month range anywhere from, at the low end, 17,000 a month to

13 57,000 notices per month.

14         Now, those were anticipated volumes, and that's what

15 Mr. Bahun told you.  It wasn't caps.  He told you that these

16 were anticipated volumes.  Which is what the document actually

17 says.  He said the only one that was a cap was Cox.

18         And if you look at Cox on the third line down in the

19 second section, you see it's 2,000 a month -- excuse me, 9,000.

20         To suggest that that's even remotely similar is to

21 mislead.  It's not.

22         You can take that down.  Thank you.

23         In his closing Mr. Elkin also referred to the fact

24 that Cox couldn't throttle because of net neutrality.  There

25 are two problems with that.  One is, you've heard testimony

3024

1    that ISPs do throttle, other ISPs.  It came up during the

2    trial.

3           The other thing is net neutrality.  You heard the

4    testimony that there was an effort by the FCC in 2009 to fine

5    Charter Communications -- excuse me, Comcast, I apologize, for

6    bandwidth throttling for P2P usage.  Which is exactly what

7    we're talking about here.  And the FCC fined them.  And it went

8    into court, and the D.C. Court of Appeals in 2011, and this

9    came out in the testimony, the D.C. Court of Appeals in 2011

10   said that the FCC did not have authority to fine the ISP for

11   doing that.

12          So the notion that net neutrality restricted Cox's

13   ability to take action here is just not true.

14          I want to move off of the issue of the Copyright

15   Alert System and now turn to the issue of whether or not

16   graduated response was effective, which Cox claims that it was.

17          The analysis that you were shown was from Dr. Weber's

18   numbers.  And we've already talked about how those numbers were

19   skewed.  If you take out a third of the data that is the worst

20   for you, your numbers aren't going to look very good.

21          But there's actually a more fundamental problem.

22   Right?  Your data -- your analysis is only as good as your

23   data.  And if you've got a filter that limits the amount of

24   data that you're looking at in the first place, then that's

25   going to impact what you see.

3025

1          So if what you're looking to see, as Mr. Elkin

2    presented, whether there's repeat infringers, having a filter

3    that limits the number of notices that come into the dataset in

4    the first instance has a dramatic impact on that.

5          So if you think about the speeding analogy that I

6    gave you earlier, a car is going down the road.  You know, it

7    may or may not get caught speeding, depending on the number of

8    police officers who are out there.   Right?

9          Well, now if you say that the police officers are

10   only allowed to be out there between 9:00 and 11:00 a.m.,

11   they're going to catch a lot less speeders.  And they're going

12   to catch a lot less speeders repeating their speeding.

13         So the caps that Cox put in place has a massive

14   impact on this data analysis that they show.

15         As does blacklists, millions of notices.  Now, they

16   can say, oh, it was a DOS attack.  You heard Dr. McGarty say,

17   you can scale infrastructure, you add servers, it's not

18   difficult.  And we all know that's just true.

19         They didn't want the notices.  And the reason they

20   didn't want the notices is because they knew what they wanted

21   to happen here.

22         But even under Dr. Weber's numbers, the amount of

23   repeat infringement is totally unacceptable.  You can say at 13

24   notices, it was 98 percent, and that's an A+.  Why are we

25   looking at 13 notices?  Where in the world do you get 13

3026

1   chances to screw up?  It's -- so Cox originally had a

2   three-strike policy.  Why don't we look at the three number?

3            I want to turn to the DMCA.  So Cox talks about a

4   shared responsibility.  Well, the way that shared

5   responsibility works is when they get notices, they act on

6   them.  That's how shared responsibility works.

7            See, that's why it's not asking Cox to monitor.  All

8   they got to do is respond to the notices they get.  And that's

9   what the DMCA contemplates, and you can see that in the law

10  that was put before you.

11           And Mr. Elkin says, well, you know, the DMCA, it's

12  just somebody says so.  It's not somebody, it's Congress.  It's

13  the law of the land.

14           So we're not asking Cox to police their network.

15  We're not asking them to monitor their network.  But when they

16  get notices, you don't get to throw them in the trash.  And you

17  don't get to say, don't send me notices.

18           Let me turn to the issue of right and ability to

19  control.  This one, to me, seems so fundamental.  You've got an

20  agreement with every one of your customers that gives you the

21  right to say, you're terminated as soon as you're caught

22  infringing, even once.  And all the witnesses agreed to that.

23  And you know that they have the ability to flip the switch and

24  terminate them.  Case done on that element, it's easy, we're

25  there.

1            And material contribution, similarly.  Without the

2     service that Cox provides, these subscribers would not be

3     infringing on the network.

4            And it's not -- you can't just say, oh, they might

5     infringe elsewhere.  That's like saying, well, you know, why

6     arrest them in this county because they could commit the crime

7     in another county?  It doesn't make sense.  It's not an excuse.

8     It's saying, we shouldn't be held responsible for responding to

9     notices.

10           Cox says that it didn't believe that it was

11    facilitating infringement.

12           Can you pull up PX 242, please.

13           Do you remember this document?  After a number of

14    changes that they made in the graduated response policy, Jason

15    Zabek sends this out.  And focus on the bottom, the second half

16    of that sentence:  I think we didn't help anyone with this

17    action, expect -- he means except -- except the law-breaking

18    customers.

19           They knew exactly what they were doing every time

20    they changed the policy.  It was in their culture, it was what

21    was driving them because they wanted customers and revenue.

22           And Cox presented in their closing all this

23    testimony, we really want to do the right thing, it's important

24    to us.  And it's easy to say that now after the fact and

25    testimony.  The question is, what were they saying at the time

3028

 1     when they weren't in front of a judge and a jury?

 2               Well, what did they say?  Let's look at PX 335.

 3               This was their respect for the law.  This is what

 4     they said:  "F" the DMCA.

 5               And then when somebody saw that that was in the

 6     e-mails, they responded.  Let's go to the next one, please.

 7               Mr. Carothers said:  Please stop sending e-mails out

 8     that say "F" the DM -- "F" the law or "F" some company.  If we

 9     get sued, those e-mails are discoverable and would not look

10     good in court.

11               That's what they were worried about.  Not whether or

12     not they had an effective system.

13               I want to respond to the notion that a $750-a-work

14     statutory damage award would be appropriate and put it in

15     context.

16               Everybody agreed, there's no ability to measure the

17     number of downloads that happened here.  We heard it from every

18     witness.  Even the experts agreed on that.  So we have no idea

19     what the total harm was.

20               But what Cox wants to have to pay, what they want the

21     award to be is the same amount that they're paying one of their

22     experts for one hour.  That's for the entire recording as much

23     as it was used, the entire musical composition for as much as

24     it was used for years.

25               So Cox literally puts billions and billions of

3029

1    dollars in its pockets, and it wants to give one hour's worth

2    of their expert's time to an artist for unlimited theft of that

3    recording or composition.

4          Let me close on this.  We have seen something

5    important and telling during this trial.  To this day, Cox

6    still refuses to accept responsibility.  It refuses to

7    acknowledge that what it did was wrong.

8          Think about Cox's opening.  Think about the evidence

9    that was presented.  Think about the questions that were asked

10   and the testimony of the witnesses on both sides.  Has anyone

11   on behalf of Cox said, you know what, we made mistakes?  Not

12   one.

13         Cox refuses to recognize that what it did was wrong.

14   They call e-mails goofy.  That's what they say, they're goofy.

15   That's not goofy.  When you say the things they've said, you're

16   telling the world what you think.

17         Cox refuses to acknowledge the wholesale failure to

18   abide by its own policies.  They set their policies, we didn't.

19   They didn't abide by their own policies.

20         Copyright infringement is not a victimless crime, but

21   Cox refuses to acknowledge that its actions harmed copyright

22   owners.  It harmed recording artists.  It harmed songwriters.

23   It harmed everybody in the ecosystem.  It harmed the back-up

24   musicians, the union musicians, the digital engineers.  It

25   harmed everybody in that process.  And Cox refuses to

3030

1    acknowledge that its focus has been on its bottom line.

2              In Cox's opening slides they had a question:  Is it

3    right?  And I ask you, is what Cox has done right?  From our

4    perspective, the answer is clear.  And we ask you to use your

5    common sense and judgment to do justice here.

6              I thank you for your service and your time.

7              THE COURT:  All right, thank you.

8              All right.  As I've indicated last evening in the

9    instructions that I read, you will have copies of the

10   instructions that will be sent back to you, as well as the

11   exhibits.

12             And as I also said, your first order of business will

13   be to select a foreperson, who will be your represent -- leader

14   here in the -- maybe not in the deliberations.  You all have an

15   equal part in the deliberations.  But as far as sending any

16   communications to me in writing, your foreperson or other

17   member of the jury can send me a note and say, we would like

18   some information.  And I will do what I can to respond.

19             I don't say that that's -- I believe that's, you

20   know, necessary.  But if you believe it's necessary, then you

21   certainly have the ability to send me a note, and I will either

22   respond back in writing or I will bring you all out here

23   together in the courtroom and respond in that manner.

24             So if you have questions, we're here to respond to

25   them.

3031

1           Remember that your notebooks are for your own

2   consideration and refreshing your own recollection, but aren't

3   to be shared with other members of the jury.

4           Remember also, of course, that you should decide the

5   case yourselves, but after you listen to the -- your fellow

6   jurors and consider the opinions that they have voiced, and

7   work on being able to come back with a verdict.  But, again, it

8   must be based on your own individual decisions.

9           Remember, your verdict must be unanimous.  And that

10  when you have reached a verdict, you sign the verdict form, the

11  foreperson will sign it and date it, and then you will bring it

12  back into court.

13          You will get the evidence in a moment as well.  And

14  please take the time that you need to carefully deliberate as

15  we've -- as we know that you will.  And we will not bother you

16  in the meantime.

17          You may take your lunch whenever you would like to

18  take your lunch.  Just let Joe know.  And remember, do not

19  deliberate unless all of you are present.

20          You may decide to go home for the evening at

21  5 o'clock or 5:30.  What you -- you decide now when you leave

22  or when you come back in the morning.  And I'm not saying

23  that -- I'm not trying to tell you how long your deliberations

24  should take.  They should take as long as you believe it's

25  necessary for you to reach a verdict.  But I just want to keep

3032

1   tabs on you through Mr. Ruelas just to have an idea what you're

2   doing.

3           So when you decide to take breaks, when you -- just

4   let Mr. Ruelas know.  He will be on the other side of the door

5   and be happy to accommodate any requests you may have if we can

6   do so.

7           All right, thank you all.  You are excused at this

8   time to begin your deliberations.

9           NOTE:  At this point, 12:18 p.m., the jury leaves the

10  courtroom to begin their deliberations; whereupon the case

11  continues in the absence of the jury as follows:

12  JURY OUT

13          THE COURT:  All right.  Just let Joe know where you

14  are and how to get in touch with you in case we have a question

15  so that we can reassemble.

16          I have some hearings.  I have one at 1:00 and I have

17  one at 2:00, so we need to clear the front tables.

18          Anything we need to talk about before we recess?

19  Yes, sir.

20          MR. OPPENHEIM:  Just a process issue, Your Honor.

21          With respect to the filing on this 7,200 works, is

22  there a need to get that done during the holidays, or can we

23  defer that until after?

24          THE COURT:  No, we can defer that.

25          MR. OPPENHEIM:  Thank you, Your Honor.

3033

```
1              THE COURT:  Okay.  All right, we're in recess.
2              NOTE:  At this point, a recess is taken; whereupon at
3    3:36 p.m. the case continues in the absence of the jury as
4    follow:
5    JURY OUT
6              THE COURT:  All right.  Good afternoon everyone.
7              We have a request from the jury, which reads, for the
8    record:  May we have a copy of Black's Law Dictionary, please?
9              And I have given you what I've proposed as a
10   response, but I'm interested in your responses as well.
11             So does anybody have any ideas how to modify or
12   change the response?
13             MR. ELKIN:  Good afternoon, Your Honor.
14             THE COURT:  Good afternoon.
15             MR. ELKIN:  Defendants are fine with your proposed
16   reply.
17             THE COURT:  Okay.  All right, thank you.
18             Mr. Oppenheim.
19             MR. OPPENHEIM:  We agree, Your Honor.
20             THE COURT:  Okay.  All right.  I mean, we could open
21   up the Internet to them if you want and go from there, but I
22   think this is probably a more --
23             MR. OPPENHEIM:  Would that include peer-to-peer
24   access, Your Honor, or not?
25             THE COURT:  All right.  Then I'm going to sign and
```

3034

1    send this back to them.

2           And hopefully this is just one of these initial

3    gathering-of-information type questions, but we will know that

4    soon enough.

5           All right.  Then thank you all for assembling.

6           And we're in recess until we need to get together

7    again.  Thank you.

8           NOTE:  At this point a recess is taken; whereupon no

9    further matters are heard and the December 18, 2019, portion of

10   the case is concluded.

11          ---------------------------------------------

12

13                    CERTIFICATE OF COURT REPORTERS

14

15

16          We certify that the foregoing is a true and
           accurate transcription of our stenographic notes.

17

18

19                  /s/  Norman B. Linnell
                    Norman B. Linnell, RPR, CM, VCE, FCRR

20

21

22                  /s/  Anneliese J. Thomson
                    Anneliese J. Thomson, RDR, CRR

23

24

25