# Exhibit B

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
          Plaintiffs,          :
                               :
     -vs-                       :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
          Defendants.           :
                               :
-------------------------------:
```

VOLUME  1

TRIAL TRANSCRIPT

December 2, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1   lot of change in how you actually generate revenue and make

2   money.  But it was a 45s business.  It was a singles business

3   on vinyl which eventually moved to LPs, eight-tracks, if any of

4   us remember that, to cassettes, to CDs, to digital downloads,

5   and now to streaming.

6          And so, you know, there has been a lot of different

7   ways to legally obtain music throughout the years.  And that

8   has changed dramatically from the way that consumers actually

9   listen to and experience music.

10          But all of those different components, even today,

11   other than maybe eight-tracks and cassettes, still make up, you

12   know, how we make money in the business, including vinyl.

13   Q.   And you referred to downloads.  How are sound recordings

14   available for sale as downloads in this era?

15   A.   So they would be available in a download store, it would

16   be a retail environment for purchase.  And they typically would

17   be available as individual tracks or also as albums.

18   Q.   And for what length of time has that been the case,

19   roughly speaking?

20   A.   Roughly, early 2000s.  I mean, the biggest, most prominent

21   store that everyone recognizes is the Apple iTunes store,

22   download store.

23   Q.   I would like to explore with you now some of the costs

24   that record companies typically incur.  Can you at a high level

25   list the more significant categories of those costs.

139

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  2  (A.M. Portion)

TRIAL TRANSCRIPT

December 3, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

|          |    |                                                           |
|----------|----|-----------------------------------------------------------|
|          | 1  | NOTE:  The witness is sworn.                              |
|          | 2  | THE COURT:  All right.  Good morning, Mr. McMullan.       |
|          | 3  | THE WITNESS:  Good morning.                               |
|          | 4  | THE COURT:  Please proceed, Mr. Oppenheim.                |
|          | 5  | ALASDAIR McMULLAN, called by counsel for the              |
|          | 6  | plaintiff, first being duly sworn, testifies and states:  |
|          | 7  | DIRECT EXAMINATION                                        |
|          | 8  | BY MR. OPPENHEIM                                          |
|          | 9  | Q.   Good morning, Mr. McMullan.  Where do you work?      |
| 11:17:07 | 10 | A.   I work at Universal Music Group.                     |
|          | 11 | Q.   And what is your position?                           |
|          | 12 | A.   Senior vice president of legal and business affairs. |
|          | 13 | Q.   How long have you had that role?                     |
|          | 14 | A.   Since late 2012.                                     |
|          | 15 | Q.   How long have you worked in the music industry?      |
|          | 16 | A.   Since December 1995.                                 |
|          | 17 | Q.   I'm going to ask you to speak up a little.  It's a big |
|          | 18 | courtroom.                                                |
|          | 19 | A.   I'm a little hoarse, so I am going to lean in.       |
| 11:17:35 | 20 | Q.   Okay.  I will as well, apparently.                   |
|          | 21 | Why did you get into the music industry?                  |
|          | 22 | A.   I think like a lot of people in the music industry, music |
|          | 23 | was always my passion.  I grew up in a musical household.  We |
|          | 24 | listened to music.  I played music.  I played music in   |
|          | 25 | symphonic bands and marching bands and rock bands.  And it was |

A. McMullan - Direct

1    just a natural place for me to go as a lawyer.

2    Q.    Do you still play?

3    A.    Mostly now just teaching my seven-year-old twins how to

4    play the piano.

5    Q.    Other than working at Universal Music Group, have you had

6    other positions within the music industry?

7    A.    Prior to being at a music company, I worked at a law firm

8    that we did a good amount of music work, we represented

9    artists, we represented companies in different aspects of music

11:18:31 10   law.

11   Q.    When was that?

12   A.    From graduating from law school in 1988 through the end of

13   1995.

14   Q.    And what did you do after that?

15   A.    I went into a music company called EMI Music, which was

16   the smallest of the large record companies at the time.  It was

17   the home of the Beatles, and the Beach Boys, and Frank Sinatra,

18   and Nat King Cole.  Really a lot of the music I grew up with, a

19   lot of the music my parents grew up with, and it was just an

11:19:08 20   ideal job for me, really.

21   Q.    And at some point did you leave EMI?

22   A.    It was acquired by Universal in late 2012.

23   Q.    Sorry, when was that?

24   A.    Late 2012.

25   Q.    And was that when you transitioned?

A. McMullan - Direct

220

1  A.   That's when I transitioned.

2  Q.   Are there UMG companies that are plaintiffs in this case?

3  A.   There are two.  UMG Recordings, Inc., and Capital Records,

4  LLC.

5  Q.   And what kind of companies are those?

6  A.   Those are what we traditionally call record companies that

7  make, market, sell, get to consumers records, recorded music.

8  Q.   And what is the distinction -- or can you explain the

9  distinction between UMG Recordings and UMPG, or Universal Music

11:20:04 10  Publishing Group?

11  A.   So the Publishing Group owns, markets musical

12  compositions, the songs themselves that are written by

13  songwriters.

14          The record company side, UMG Recordings, Inc.,

15  Capital Records, LLC, owns, markets the recorded music, the

16  music you hear on the radio.

17          So Lennon and McCartney wrote the Beatles songs.

18  Their compositions might be owned and controlled by a

19  publishing company, which is actually not a Universal company,

11:20:38 20  it's a Sony company.  We own and control the Beatles

21  recordings, the performances you hear that are embodied on

22  records.

23  Q.   Are UMG Recordings and UMPG ultimately owned by the same

24  entity?

25  A.   Ultimately they are owned by a parent company.

A. McMillan - Direct

221

1    Q.    And what is that parent company?

2    A.    The ultimate parent is called Vivendi SA.

3    Q.    And does that parent company own -- strike that.

4          What entities does Vivendi SA own, that you know?

5    A.    They operate a number of businesses.  They operate a -- or

6    they own a large advertising agency called Havas.  A movie

7    studio called Canal+.  I think they have some video game

8    companies.  I'm not familiar with their full portfolio.

9    Q.    As between UMG Recordings and UMPG, can you describe how

11:21:50 10   they are structured in terms of employees and operations?

11   A.    They operate separate businesses.  There is a CEO of the

12   publishing company, and it has its own legal department and

13   artists, A&R department, or artists and repertoire department.

14   It has its own facilities.

15         The record company side of the business operates

16   quite a number of different record labels that each have their

17   own CEO and marketing people and promotion people and

18   salespeople.  And that rolls up into a parent recorded music

19   company.

11:22:27 20   Q.    I am sorry, I didn't mean to interrupt you.

21         Can you describe several of the record labels that

22   UMG owns.

23   A.    Well, it now owns EMI, which is Capital Records.  It owns

24   Interscope, Decca, Verve, Republic.  I mean, it owns many, many

25   record companies.

A. McMullan - Direct

222

1  Q.   And what kind of genres of music does UMG have within its
2  catalog?
3  A.   Oh, it spans all genres of music.  It obviously has some
4  of the most popular music of today, pop music.  It has a large
5  rap/hip hop catalog.  It has a classical catalog.  It has a
6  phenomenal jazz catalog, Blue Note, Verve, Decca.  Country
7  music, we have a business in Nashville.  Latin music, we have a
8  business in Miami.
9  Q.   I'm sorry, did you say Blue Note?
11:23:30 10  A.   Blue Note.
11  Q.   Can you just describe for the jury what Blue Note is?
12  A.   Blue Note was -- is a historic jazz label that dates back
13  to 1939.  Some of the most iconic and famous jazz recording
14  artists recorded for Blue Note.  And it's a label that, you
15  know, we are pretty proud that it still operates today, still
16  puts out music today.
17  Q.   Do you recall some of the artists in the Blue Note
18  catalog?
19  A.   Herbie Hancock, John Coltrane.  I mean, Norah Jones.  I
11:24:00 20  mean, again, it spans decades of musical history.
21  Q.   Are you familiar with some of the works that are asserted
22  were infringed in this case?
23  A.   I am.
24       MR. OPPENHEIM:  Your Honor, we would like to publish
25  PX 1, which has already been admitted.

| | |
|---|---|
| 1 | THE COURT:  Right.  Go ahead. |
| 2 | BY MR. OPPENHEIM: (Continuing) |
| 3 | Q.   Mr. McMullan, have you seen this document before? |
| 4 | A.   I have. |
| 5 | Q.   And can you describe what it is for the jury, please. |
| 6 | A.   It's a list of the recordings that the plaintiffs in this |
| 7 | case contend were infringed by defendant in this case. |
| 8 | Q.   And I have asked that we flip to the pages of the UMG |
| 9 | recordings.  And are these some of the UMG recordings that are |
| 11:24:55 10 | in this case? |
| 11 | A.   Those are, yes. |
| 12 | Q.   And are you familiar with some of these recordings? |
| 13 | A.   I am familiar with many of them. |
| 14 | Q.   And why? |
| 15 | A.   These -- many of these are very popular recordings that I |
| 16 | am familiar with either through working in the business or just |
| 17 | familiar with through being a fan of music. |
| 18 | Q.   Were you involved in the preparation of a medley of some |
| 19 | of these recordings for purposes of the jury? |
| 11:25:21 20 | A.   I was. |
| 21 | MR. OPPENHEIM:  Your Honor, permission to play a |
| 22 | short medley. |
| 23 | THE COURT:  Any objection? |
| 24 | MR. BUCHANAN:  No, Your Honor.  I will have to listen |
| 25 | to the music first, and then I may have an objection. |

1          MR. OPPENHEIM:  I think --

2          THE COURT:  All right.  Let's go ahead.

3          MR. OPPENHEIM:  I think he's going to like it, Your

4   Honor.

5          NOTE:  A music excerpt is played.

6   BY MR. OPPENHEIM: (Continuing)

7   Q.   Mr. McMullan, can you describe the importance of

8   recordings like the ones we just heard to UMG?

9   A.   That's some very key hit music that UMG has helped bring

11:27:55 10   to the world.  I mean, some of those are iconic pieces of our

11   culture.  I heard music that I used to play in a bar band when

12   we did covers.  I heard my prom song in there, "Wonderful

13   Night."

14          I mean, it's just very important music from very

15   important recording artists.

16   Q.   So let me turn now away from the legitimate recordings

17   that we just listened to and turn to the infringing ones.

18          Have you had occasion to listen to any of the

19   infringing recordings in this case?

11:28:29 20   A.   I did.

21   Q.   How many?

22   A.   I listened to 100 of them.

23   Q.   And do you recall how the 100 recordings were selected?

24   A.   They were picked randomly by a computer.

25   Q.   And why did you listen to them?

1    A.    I understood that during the course of this case there was

2    some issue raised about whether the recordings were in fact

3    copies of our recordings.  We believe that the technology used

4    to find and select them is essentially infallible, but, you

5    know, I wanted to listen for myself and put aside any possible

6    doubt.  And I listened to 100 of them.

7    Q.    And when you say the issue was raised, do you know -- who

8    do you understand raised the issue?

9    A.    Oh, I understand it was raised by Cox.

11:29:27 10    Q.    And was there a reason you didn't listen to all of the UMG

11    recordings in this case?

12    A.    Well, it's thousands of recordings, I think.  So --

13    Q.    And after you listened to them, what conclusion did you

14    come to?

15    A.    They were exact copies of our copyrighted sound

16    recordings.

17    Q.    How did they sound?

18    A.    They sounded great.  They sounded like exact copies of our

19    sound recordings.

11:29:52 20    Q.    In your position at Universal Music Group, do you deal

21    with piracy issues?

22    A.    Unfortunately, I do.

23    Q.    So at a high level, can you describe for the jury what

24    piracy is.

25    A.    Piracy is essentially the theft of our content.  It's the

A. McMullan - Direct

226

1    unauthorized copying, distribution, exploitation of the

2    recordings that we own and what we market and what our business

3    is founded on.

4    Q.   And are there different types of piracy?

5    A.   There are different types.  There have historically been

6    different types.  There was a time where piracy consisted of

7    vinyl bootlegs of recordings.  There was a time where cassette

8    piracy, people copying albums on cassettes and selling them was

9    the problem.

11:30:39 10          And then as with the development of the Internet,

11   Internet piracy grew as a huge problem.

12   Q.   And are you familiar with -- when you say "Internet

13   piracy," can you describe several of the types of Internet

14   piracy you're familiar with.

15   A.   Well, there's Internet piracy where someone might just put

16   up a website and be offering copies to directly download.  And

17   there's Internet piracy like we're talking about in this case,

18   where there are peer-to-peer systems.

19   Q.   And are peer-to-peer systems -- how do peer-to -- how does

11:31:14 20   peer-to-peer piracy differ from the older types of piracy that

21   you use to deal with, say, for instance, vinyl or cassettes

22   that you were describing?

23   A.   Well, in those cases someone needed to make copies of our

24   recordings and get them one-to-one out to somebody who wanted

25   to acquire a pirated copy.

A. McMullan - Direct

227

1    Q.   Let me interrupt you.  When you say "one-to-one," what do

2    you mean by that?

3    A.   Well, like a copy would be made in a factory or somewhere

4    and it had to get into someone's hand.  With Internet piracy,

5    peer-to-peer piracy, unlimited copies can be generated and

6    distributed across the Internet.

7    Q.   Can you describe, at a consumer level, how peer-to-peer

8    piracy works?

9    A.   So if -- well, at a user level, someone might have a copy

11:32:07 10   of the recording on their computer, on their hard drive, as

11   well as software that allows them to connect into a

12   peer-to-peer system.  And it allows them to distribute a copy

13   of that recording to anyone else who has that peer-to-peer

14   software client installed and connected to that system.

15           So that user can upload it into a system where

16   millions of people can have illegal access to the recording.

17   Q.   When -- strike that.

18           I think you said earlier that the business of UMG is

19   to sell recordings; is that right?

11:32:52 20   A.   Yeah, to sell, distribute, license, market recordings.

21   Q.   When UMG sells recordings through a service like iTunes or

22   Amazon, what rights does UMG give the consumer to distribute

23   the recordings on a peer-to-peer service?

24   A.   The consumer gets no rights to do that.

25   Q.   Why not?

A. McMullan - Direct

228

1    A.    Because that would allow a consumer to be in direct

2    competition with our legitimate sales of that music.

3    Q.    In the course of your personal work and time within the

4    music industry, how has peer-to-peer piracy impacted the

5    companies you've worked at?

6    A.    It had a very severe impact.  I was at a record company at

7    the time that the first peer-to-peer service launched, it was

8    called Napster, and then multiple other large services allowing

9    millions and millions of people to illegally distribute our

11:33:56 10    recordings developed.

11          And it had a devastating impact on our business, on

12    the finances of our business, on our ability to invest in new

13    content.  And it was all happening at a time when we were

14    trying to figure out what's the best and safest way to sell,

15    market, distribute music through the Internet.  And here we

16    were doing it in competition with millions of folks who were

17    giving it away and taking it for free.

18    Q.    When these peer-to-peer networks were first launched, how

19    did the record industry deal with it?

11:34:32 20    A.    We sued Napster.  And then we sued another set of

21    services, Kazaa and Grokster.  That case actually went to the

22    Supreme Court.  And then we sued another company called

23    LimeWire.

24          We engaged in educational programs to try to educate

25    consumers that they shouldn't be doing this.  And we worked

A. McMullan - Direct

229

```
 1   hard to develop a legitimate business to try to compete with

 2   this distribution of free music illegally.

 3   Q.   You mentioned a moment ago that Grokster and Kazaa went to

 4   the Supreme Court.  What happened there?

 5   A.   We won that case unanimously.  And, you know, each of

 6   those companies and businesses, Napster, Grokster, Kazaa,

 7   LimeWire, they were all eventually shut down through an

 8   expensive legal process.

 9   Q.   Are you familiar with the peer-to-peer networks at issue

10   in this case?

11   A.   I am.

12   Q.   Can you list them?

13   A.   I think there is BitTorrent, Ares, eDonkey -- BitTorrent,

14   Ares, eDonkey -- there might be others.  Those are the ones I

15   remember.

16   Q.   With respect to those --

17   A.   Gnutella, I think, is one.

18   Q.   So eDonkey, Ares, Gnutella, and BitTorrent.  With respect

19   to those four peer-to-peer networks at issue in this case, why

20   hasn't the music industry just sued those entities?

21   A.   There's no company to sue.  There's no entity.  This is

22   now -- peer-to-peer moved to a decentralized model where,

23   again, consumers have software on their computers and simply

24   communicate with each other.  Nothing goes through a central

25   server.  There's no central company to sue.
```

11:35:27 (line 10)
11:35:56 (line 20)

A. McMullan - Direct

230

1          MR. BUCHANAN:  Your Honor, can we approach?

2          THE COURT:  Yes, sir.

3          NOTE:  A sidebar discussion is had between the Court

4   and counsel out of the hearing of the jury as follows:

5   AT SIDEBAR

6          MR. BUCHANAN:  So I just wanted to make sure that

7   this witness -- none of the testimony of the prior witness was

8   revealed to this witness before he testified.

9          MR. OPPENHEIM:  No.  If you think that we haven't

11:36:54 10  discussed this issue for ten years with these witnesses, you'd

11  be kidding yourself.

12          MR. BUCHANAN:  It just seemed to me --

13          THE COURT:  Well, what do you want me -- you want me

14  to have Mr. Oppenheim ask whether he spoke to Mr. --

15          MR. BUCHANAN:  Well, if he represents that he didn't

16  talk to him before he -- just now and testifying and discussed

17  with him Mr. Kokakis' testimony, then I accept that.

18          MR. OPPENHEIM:  Okay.  I did not disclose any of

19  Mr. Kokakis' testimony to Mr. McMullan.

11:37:23 20          MR. BUCHANAN:  All right.

21          THE COURT:  Okay.  Thank you.

22          NOTE:  The sidebar discussion is concluded; whereupon

23  the case continues before the jury as follows:

24  BEFORE THE JURY

25          THE COURT:  Please proceed.

A. McMullan - Direct

231

BY MR. OPPENHEIM: (Continuing)

Q.   A moment ago, Mr. McMullan, you described a variety of different things that the industry has done in response to peer-to-peer piracy.  Did the industry also sue individual peer-to-peer users?

A.   There was a time where we did do that.

Q.   Can you explain why the industry did that.

A.   At that time, I think there were a couple -- there were a couple of reasons for it.  One, we needed to establish in this sort of new form of piracy that this was illegal and that you should not do it.  So we needed the legal precedent to do that.

        And secondly, peer-to-peer piracy became such a phenomenon that we were in danger of a generation of people believing that music is free, does not have to be paid for. And we wanted to send that -- a message that that is not the case.  And we wanted to change behavior and perception on that point.

Q.   And did there come a point in time where the industry stopped filing those types of suits on a regular basis?

A.   There did.

Q.   And why?

A.   I think we found other ways.  You know, we don't sue anyone lightly.  We're a music business, we're not a litigation/lawsuit business.  And we believed that there were -- the precedence were sufficiently established and that there

A. McMullan - Direct

232

1    were other means by which we could deal with this type of

2    piracy without having to clog the courts with hundreds of

3    lawsuits.

4    Q.    And what were those other means?

5    A.    Well, we -- again, we engaged in educational means.  But

6    one of the means was sending notices to Internet service

7    providers notifying them of repeat infringers on their systems.

8    Q.    Well, you said notifying them of repeat infringers.

9    A.    Well, notifying them of infringers on their systems and,

11:40:10 10  by nature, infringers who would continue to do it repeatedly.

11   Despite the fact that we had already engaged in a large

12   litigation program against consumers and had established

13   precedence against peer-to-peer networks, there were people

14   that continued to do this.

15   Q.    Were you able to identify who was a repeat infringer and

16   who was not when you were sending notices?

17   A.    No.  I think our notices were just -- were just

18   identifying there is someone infringing this content on an ISP,

19   and the ISPs can identify who's a repeat infringer.

11:40:47 20  Q.    So what role do the ISPs play in peer-to-peer piracy?

21   A.    Well, the ISPs provide the network by which the piracy

22   occurs and have the ability to -- when notified about it, to

23   stop it.

24   Q.    And so what does -- what did the record industry expect an

25   ISP, like Cox, to do to address peer-to-peer piracy?

1    A.   Well, we expected them to do something.  We expected them

2    to work with their customers that were infringing to stop the

3    infringement.  And if a customer continued to do it, ultimately

4    they might have to lose their service and be terminated.

5    Q.   All right.  Are you familiar with the term "infringement

6    notice"?

7    A.   I am.

8    Q.   Can you describe for the jury, at a high level, what an

9    infringement notice is.

11:41:41 10    A.   It's a notice to a company or to someone that on their

11    system there is infringement occurring of a particular work.

12    Q.   Have you ever heard the term "take-down notice"?

13    A.   Take-down notice, yes.

14    Q.   And is an infringement notice and a take-down notice the

15    same thing, or are they different?

16    A.   Well, I mean, a take-down notice might also notify you of

17    infringement.  But a take -- the purpose of a take-down notice

18    really has to do with the DMCA.  And it's a -- you know, a

19    notice to a company like YouTube, saying, we found this content

11:42:20 20    on your system, take it down.

21         And if they do comply with taking it down within the

22    parameters of the law, then, you know, YouTube can avoid a

23    liability for that infringement that it has been notified of.

24    Q.   Are infringement notices, in your experience, typically

25    successful?

A. McMullan - Direct

234

1 A.   Infringement notices are successful if the company that's

2 receiving them takes them seriously and acts upon them.

3 Q.   And what is -- what does the record industry expect an ISP

4 to do in response to an infringement notice?

5 A.   Again, we -- what we expect them to do is take them

6 seriously, notify their customer, and work with that customer

7 to make the infringement stop.

8 Q.   Are you familiar with the Copyright Alert System?

9 A.   I am.

11:43:24 10 Q.   And what was -- let me ask you this.  Is the Copyright

11 Alert System still in effect?

12 A.   No.

13 Q.   Okay.  So what was the Copyright Alert System?

14 A.   The Copyright Alert System was an attempt by some content

15 owners and some ISPs to work together to see if they could

16 educate and inform consumers within the parameters of a

17 program, to see what impact it might have on infringement

18 across those particular ISPs' networks.

19        And to provide some learnings back that might help in

11:44:04 20 understanding this consumer behavior and how to curb

21 infringement through this consumer behavior.

22 Q.   From a time frame perspective, do you know when CAS began

23 roughly and ended roughly?

24 A.   I'm thinking 2013 to very early 2017.

25 Q.   And were you involved -- I am sorry.

A. McMullan - Direct

235

1    How long did it take to -- do you know how long it
2    took to negotiate the agreement to start CAS?
3    A.   I believe it took a number of years to put that in place.
4    Q.   And were you involved in any way in those negotiations?
5    A.   I didn't -- I certainly didn't negotiate anything
6    directly.  I was informed of them from time to time.
7    Q.   And at the time those negotiations were going on, where
8    were you working?
9    A.   At the time of the negotiations, the bulk of them, I would
10   have been working at EMI.
11   Q.   And then when you moved to Universal Music Group, were you
12   involved at all?
13   A.   I think when I moved to Universal Music Group, by that
14   time CAS had just -- would have just launched.  You know, our
15   company was acquired in late 2012, and I think maybe it
16   launched in 2013, shortly thereafter.
17   Q.   And was UMG a participant in CAS?
18   A.   It was.
19   Q.   Who else do you recall was a participant in CAS?
20   A.   Other record companies, Sony and Warner.  The movie
21   companies were involved.  And then a number of ISPs were
22   involved.
23   Q.   When you say "movie companies," what do you mean by that?
24   A.   Film, the film industry, movie studios.
25   Q.   Like Sony Pictures?

11:45:02  10
11:45:35  20

A. McMullan - Direct

236

1    A.    Disney, Sony, Warner Brothers.

2    Q.    And you said several ISPs?

3    A.    And several ISPs.  I know -- I think Verizon --

4    Q.    Do you recall --

5    A.    -- Time Warner, Comcast.

6    Q.    Did Cox participate?

7    A.    No, Cox did not participate.

8    Q.    Do you know whether there were any music publishers who

9    participated in the CAS?

11:46:23 10    A.    No, music publishers were not involved in CAS.

11    Q.    Can you explain how CAS sought to address peer-to-peer

12    infringement.

13    A.    You know, CAS established a board.  It established an

14    executive committee.  It created a full educational program.

15    And then it prescribed some parameters that the ISPs could use

16    to deal with notices that were given to them by the content

17    owners of infringements occurring on their system.

18    Q.    Do you recall whether there was a -- what's called a

19    graduated response within CAS?

11:47:16 20    A.    I guess it was a graduated response.  There were

21    educational steps where they would tell a consumer or one of

22    their customers, hey, we have -- this infringement has occurred

23    on your system.

24          There were -- there was an increased step where they

25    would force the consumer to interact with them and acknowledge

A. McMullan - Direct

237

1    they got these notices.

2    Q.   What do you mean by "interact with them"?

3    A.   I guess it might put up -- if you tried to use your

4    Internet, it might put up a page saying, you've gotten this

5    infringement notice and, you know, click here and acknowledge

6    it.

7         They had a call center where they might require

8    people to call in.  Part of what CAS was was operating a, you

9    know, a call center to field questions.

11:48:04 10      And then there were, I guess, what you call

11   mitigation measures if it escalated further that might throttle

12   down your bandwidth of your Internet connectivity or slow it

13   down, something to get a user's attention even more.

14   Q.   And do you recall how many steps there were within the CAS

15   graduated response?

16   A.   I think there were these sort of three areas of education,

17   acknowledgement, mitigation.  But I think it took you

18   through -- it could be either five or six steps.  The

19   parameters were given, but each ISP could implement them in a

11:48:45 20  slightly different way based upon what they were interested in,

21   and that would give different learnings on how consumers might

22   react to different methods of communications to them.

23   Q.   When the record industry was sending notices in CAS, did

24   you know how many steps the infringer in the notice had already

25   gone through?

A. McMullan - Direct

238

1    A.    No.

2    Q.    Can you explain that?

3    A.    Well, we were identifying that an infringement occurred

4    and sending that notice to the ISP.  But it is the ISP that

5    knows, well, who that infringer is and how many times they have

6    been caught doing this before.

7    Q.    Well, if you didn't know, was it possible -- do you

8    understand it was possible that an ISP may have received a

9    notice for a subscriber which would have been past the sixth

11:49:53 10    step?

11    A.    They could easily have gotten notices past the sixth step.

12    Q.    And what did you understand that CAS obligated the ISPs --

13    excuse me.  What did you understand that the ISPs had to do

14    with notices that were past the sixth step?

15    A.    Past the sixth step, CAS didn't deal with it.  CAS was

16    looking at with these six steps, what has occurred and what can

17    we learn from that.  Past the sixth step, the ISPs had to

18    comply with the law.

19          Just like they had to comply with the law for notices

11:50:31 20    they might be getting from other copyright holders like the

21    publishers outside of CAS.

22    Q.    What obligations did an ISP participating in CAS have to

23    terminate repeat infringers?

24    A.    Well, CAS' six steps didn't have anything to do with

25    terminating infringers.  That's not what it was looking at.

A. McMullan - Direct

239

1    But all of these companies had policies that noted that users

2    could be terminated if they engaged in repeat infringement.

3    Q.   In the course of the discussions to create CAS, do you

4    recall there ever being a discussion about having a 14-step

5    graduated response policy?

6    A.   That I don't recall.

7    Q.   Do you -- do you recall how many steps the record industry

8    wanted CAS to have?

9    A.   I believe we wanted three steps.  We believed three steps

11:51:36 10    was something that we had seen in graduated response programs

11    in other countries that had been effective.

12    Q.   Can you describe that a little more.

13    A.   There were certain countries, in France there was a

14    program called HADOPI that mandated three steps before

15    termination.  And the learnings we received from that was that

16    greatly reduced peer-to-peer piracy across networks that were

17    participants in HADOPI.

18         I think there were similar programs in New Zealand

19    and some other countries.

11:52:15 20    Q.   Sorry, I didn't mean to interrupt you.

21    A.   That's okay.

22    Q.   Do you think CAS was effective?

23    A.   I don't think CAS proved to be a solution to anything.

24    Some learnings may have come out of it that were useful.  If it

25    were -- if it were highly effective, we would still be

A. McMullan - Direct

240

1   operating it today.  Certainly as compared with an ISP's

2   obligation at law to deal with notices, I don't think the CAS

3   construct added anything to it that was particularly useful.

4   Q.   Can you explain a little -- maybe a little more clearly

5   for us what you mean by obligations within CAS and obligations

6   within the law.

7   A.   Well, CAS, again, was looking at --

8        MR. BUCHANAN:  I am going to object, Your Honor.  He

9   is giving legal opinions now.

11:53:15 10        THE COURT:  Well, let's see where he goes.

11   Overruled.  His understanding of what obligations are, he can

12   testify to that.

13   A.   CAS was looking at this set of notices within this

14   graduated response, seeing what the consumer behavior was when

15   different mitigation measures were -- and educational measures

16   were employed.

17        At law, my understanding is if someone is notified

18   that their system is being used to infringe and they are

19   notified that that is happening repeatedly, they need to act to

11:53:54 20   stop that.  That's certainly what we expect of the company.

21   BY MR. OPPENHEIM:  (Continuing)

22   Q.   I believe you testified earlier that CAS was terminated.

23   Were you involved in that decision?

24   A.   I was.

25   Q.   And can you describe why CAS was terminated?

1   A.    Well, again, I just think the experiment had concluded.

2   We had developed whatever information we could out of it.  And

3   I just don't -- it was not viewed as a solution to this type of

4   piracy.

5   Q.    And did the record industry send notices to Cox?

6   A.    It did.

7   Q.    And were those notices within CAS?

8   A.    No.

9   Q.    Why not?

11:54:48  10   A.    Because Cox didn't participate in CAS.

11   Q.    Do you know who actually physically sent the notices to

12   Cox in this case?

13   A.    I believe our trade association, RIAA, the Recording

14   Industry Association of America.

15   Q.    Keep your voice up.

16   A.    I know.  I am just getting a little hoarse.  Sorry.

17   Q.    What is UMG's relationship with RIAA?

18   A.    We are a member of RIAA.

19   Q.    And is UMG involved in operating the RIAA?

11:55:30  20   A.    Well, no, the RIAA has its own president and officers,

21   et cetera, but we are on the Board of the RIAA.  We fund the

22   RIAA.

23   Q.    So what was the goal of sending notices to Cox,

24   infringement notices to Cox?

25   A.    To inform them that infringement was happening on their

1    system and to get them to act to stop it.

2    Q.    And why did UMG bring this lawsuit?

3    A.    Because in response to those notices, our understanding is

4    Cox did essentially nothing to stop or curb the infringement of

5    these users across its system.

6    Q.    Why not sue the individual infringers instead?

7    A.    One, we don't know who they are.  They are Cox customers.

8    Again, we were trying to avoid having multiple lawsuits against

9    multiple unknown people when we believed we had another

11:56:30  10    alternative that would avoid litigation.  Which is notifying

11    Cox and having Cox deal with their infringing customers to stop

12    the infringement.

13    Q.    Why does Universal Music Group enforce its copyrights?

14    A.    They are our sole assets, essentially.  They are the

15    engine of our business.  If we don't enforce our copyrights and

16    allow anyone to simply copy our recordings and use them, then

17    we don't have a business because we are competing with someone

18    giving away our product for free.

19    Q.    Is this case important to the music industry?

11:57:09  20    A.    This case is very important to the music industry.

21    Q.    Why?

22    A.    Again, this is about a big company that did not take steps

23    to stop the wholesale theft of our copyrights on its system.

24    And we need to do this to protect our business, our employees,

25    our artists, all of whom rely on the revenue generated by our

A. McMullan - Cross

243

1   sale of, marketing, distribution of recordings.

2           MR. OPPENHEIM:  I pass the witness, Your Honor.

3           THE COURT:  All right.

4           All right.  Mr. Buchanan, cross-examination.

5           MR. BUCHANAN:  Yes, Your Honor.

6       CROSS-EXAMINATION

7   BY MR. BUCHANAN:

8   Q.   We have a couple of binders here.

9           Good afternoon, Mr. McMullan.

11:58:14 10  A.   Good afternoon.

11  Q.   I just have a few questions for you.  I would appreciate

12  it, if possible, if you could give yes or no answers.  If it

13  calls for a yes or no answer, could you do that for me?

14  A.   Sure.

15  Q.   Okay.  So how many sound recordings are involved in this

16  case that are owned by UMG?

17  A.   I would have to look at the list --

18  Q.   I just need a no or --

19  A.   To get a number.  I don't know the number off the top of

11:58:50 20  my head.

21           MR. OPPENHEIM:  Mr. Buchanan, if you could let him

22  finish answering, that would be great.

23  Q.   You don't know?

24  A.   Off the top of my head, I don't know.  I mean, they just

25  showed a chart that has them all listed.  So you could -- we

A. McMullan - Cross

244

1    could figure out the number.  I think it was thousands.

2    Q.   Okay.  And how many -- so that exhibit that you looked at,

3    those sound recordings are attached to the lawsuit, are they

4    not?

5    A.   Attached to the complaint in the lawsuit?

6    Q.   Yes.

7    A.   Yes.

8    Q.   And you reviewed that before it was filed?

9    A.   I did.

11:59:24 10   Q.   So did you not look and determine how many sound

11   recordings were on there that were --

12   A.   I just don't remember the count.  Again, we could look at

13   it and count.

14          THE COURT:  All right.  Let's move on.  He's answered

15   your question.

16   Q.   So you think it is thousands.  So how many sound

17   recordings does UMG own total?

18   A.   I don't know.  Hundreds of thousands.  Possibly millions.

19   Q.   Are you the legal counsel for the company, right?

11:59:49 20   A.   I am one of the legal counsels for the company.

21   Q.   So you don't know whether it is hundreds of thousands or

22   millions?

23          THE COURT:  He's answered the question.  Let's not --

24   BY MR. BUCHANAN:  (Continuing)

25   Q.   Okay.  So you talked about lawsuits against individual --

A. McMullan - Cross

245

1    what I call subscribers or file sharers, that they -- there was

2    a lot of lawsuits filed during a period of time against

3    individuals; is that right?

4    A.    There were a number of lawsuits filed at -- during a

5    period of time against individuals, yes.

6    Q.    Do you know how many?  Was it thousands?

7    A.    Hundreds, could have been thousands.

8    Q.    And these were -- involved not only your company, but

9    other sound recording companies?

12:00:36 10    A.    Yes.

11    Q.    Okay.  And did you assist in this litigation when you were

12    at EMI or --

13    A.    Which litigation?

14    Q.    The litigation against the individual subscribers.

15    A.    I testified in a couple of those cases, in one, yeah.

16    Q.    Okay.  So you're familiar that there were thousands of

17    them?

18    A.    There were many cases filed.

19    Q.    Okay.  So you -- a minute ago, you testified that you

12:01:02 20    weren't bringing these types of lawsuits presently because you

21    couldn't find who they were.

22    A.    Well, no, that's not the only reason.  We --

23    Q.    But did you testify to that just a minute ago?

24    A.    I said we don't know who they are.

25    Q.    Okay.  And so -- but you can find out who they are, can't

A. McMullan - Cross

246

1   you, by suing and then asking the Internet service provider to

2   give you the name because you have the IP address?

3   A.   I believe we could do that and file what are known as John

4   Doe lawsuits.

5   Q.   Right.  That's what you did in those 5,000 lawsuits?

6   A.   Yeah.  And when we were doing that, the ISPs complained

7   mightily that they didn't like us --

8   Q.   But you got the information --

9   A.   -- pursuing their subscribers.

12:01:48 10   Q.   So you got -- you were able to get the information

11   ultimately through the courts, who they were?

12   A.   Ultimately through a cumbersome process --

13   Q.   Okay.

14   A.   -- of having to file many, many litigations, we were able

15   to -- we were able to do that.

16   Q.   Okay.  So -- and in -- for instance, in this case, you and

17   the other sound recording companies utilized MarkMonitor,

18   right?

19   A.   Yes.

12:02:15 20   Q.   And MarkMonitor is able, through its detection

21   capabilities, to find out the IP address for anybody that's

22   infringing on one of these peer-to-peer networks, is it not?

23   A.   I think that's right.

24   Q.   Right.  And that goes into the notice, does it not?

25   A.   I think that's right.

A. McMullan - Cross

247

```
 1   Q.   And then Cox can tell from the IP address who the
 2   infringer is?
 3   A.   Cox can tell.
 4   Q.   Right.  So -- and is that the process you used with these
 5   5,000 lawsuits to find out who these individual subscribers
 6   were?
 7             THE COURT:  Mr. Buchanan, I didn't hear the number
 8   5,000.  He said hundreds, maybe thousands.  So let's not put
 9   information in the record, please, in your question which is
10   not in evidence.
11             MR. BUCHANAN:  Okay.
12   BY MR. BUCHANAN: (Continuing)
13   Q.   For all those lawsuits that were filed, whether it was
14   hundreds or thousands, is that how you determined who the
15   subscriber was?
16   A.   I don't recall.
17   Q.   Okay.  Now, you testified that you wanted Cox to do
18   something about this infringement, right?
19   A.   I did.
20   Q.   Okay.  And Cox is, according your counsel's opening, the
21   eighth largest Internet service provider?
22   A.   I did not hear his opening.
23   Q.   I know.  But do you agree that it's eighth, or do you not
24   know?
25   A.   I have no idea.
```

```
 1   Q.   Okay.  Do you know if Verizon is bigger?

 2   A.   Do you want me to guess on the size of different

 3   companies?  Verizon might be bigger.  I don't know.

 4   Q.   Well, you testified that you were familiar with the

 5   Copyright Alert System that involved Verizon and a bunch of

 6   other ISPs, right?

 7   A.   I did.

 8   Q.   Okay.  And so, do you know who those other ISPs were,

 9   other than Verizon and Comcast?

12:03:55 10  A.   There was -- Time Warner was in there.

11   Q.   AT&T?

12   A.   I think so.

13   Q.   Cablevision?

14   A.   I don't recall, but maybe.

15   Q.   Basically the five largest ISPs, right?

16   A.   If you say so.

17   Q.   No, I -- do you know?

18   A.   There were five large ISPs.

19   Q.   Okay.  And the other participants in this Copyright Alert

12:04:12 20  System were all the plaintiffs in this case, correct?

21   A.   No.

22   Q.   The recording companies?

23   A.   The recording plaintiffs in this case, yes.

24   Q.   Okay.  And how much of the sound recordings in the United

25   States do those plaintiffs own?  85 percent?
```

A. McMullan - Cross

249

```
           1   A.   I've heard that number.  I don't know, today, how much

           2   the --

           3   Q.   And you --

           4   A.   -- three majors own.

           5   Q.   -- said Disney was involved?

           6   A.   I think that the large movie companies were involved, like

           7   Disney and Warner and --

           8   Q.   Right.

           9   A.   -- Sony Pictures.

12:04:49  10   Q.   Okay.  And so, essentially, all the large entertainment

          11   companies were Disney, Sony, that not only music, but film and

          12   other rights, copyrights regarding entertainment?

          13   A.   I think only recording companies and audio/visual film

          14   were involved.

          15   Q.   So essentially it covered a vast majority of the

          16   entertainment companies and a vast majority of the Internet

          17   service providers, correct?

          18   A.   It included who it included, which were --

          19   Q.   Okay.

12:05:22  20   A.   -- large movie companies, large record companies, and

          21   large ISPs, and some consumer groups.

          22   Q.   And you said that negotiations went on for two years?

          23   A.   It went on for years.  I don't remember how many years.

          24   Q.   So lots of lawyers and lots of business people were

          25   involved?
```

A. McMullan - Cross

250

```
 1   A.   I think there were lawyers involved at the trade
 2   associations.  I think they kept lawyers informed at their
 3   trade association members, and I assume the ISPs had lawyers
 4   involved.
 5   Q.   Right.  And the Recording Industry Association of America,
 6   who represents the sound recording companies, they were
 7   involved?
 8   A.   They were involved.
 9   Q.   Okay.  And then actually, ultimately, a new entity was
10   created, right?  The Center for Copyright Infringement?
11   A.   That was --
12        MR. OPPENHEIM:  Objection.  If I heard that right,
13   that's certainly not the name of it.  And it's an inappropriate
14   question.  It wasn't the Center for Copyright Infringement,
15   which is what I heard.  Maybe I misheard it.
16        THE COURT:  Okay.
17        THE WITNESS:  It would be a terrible name for any
18   kind of business.
19   BY MR. BUCHANAN:  (Continuing)
20   Q.   Center for Copyright Information?
21   A.   Okay.
22   Q.   Was that -- you're familiar with that?
23   A.   Yes, something was created that had a --
24   Q.   And they were located in Washington, D.C.?
25   A.   I assume that's where they were located.
```

A. McMullan - Cross

251

1   Q.   Do you know who was the head of it?

2   A.   I don't off the top of my head, no.

3   Q.   But it was funded by all these entities that were part of

4   CAS?

5   A.   I think it was funded half by the content owners and half

6   by the --

7   Q.   Right.

8   A.   -- Internet service providers.

9   Q.   And so, you said that you wanted them to do three, at

12:06:59 10   least do -- take three notices and then terminate; is that

11   right?

12   A.   We think a three-notice graduated response would be very

13   effective in curbing infringement of this nature.

14   Q.   Okay.  So three notices and then what?  That's what I

15   don't get.  What happens after three?

16   A.   Well, after three, if a subscriber simply will not stop

17   using these peer-to-peer systems to infringe our content, we

18   think that the Internet service provider should terminate them.

19   Q.   So you said three.  And if they continued, how many more

12:07:41 20   infringement notices before you really think they should shut

21   down the family, or the hospital, or the military base,

22   whatever might --

23            MR. OPPENHEIM:  Objection.

24            THE COURT:  Sustained.  Ask the question,

25   Mr. Buchanan.

A. McMullan - Cross

252

1          MR. BUCHANAN:  Okay.

2   BY MR. BUCHANAN: (Continuing)

3   Q.   So we're talking about a residential home, okay?  At what

4   point should they cut off their Internet service?

5   A.   I think that if the ISP takes appropriate action to notify

6   and inform its customer what's happening on the system that

7   through their household is illegal and shouldn't happen, we

8   think that if that continues to occur and it occurs three

9   times, I do think it might be appropriate to terminate that

12:08:34 10  customer.

11          But we would hope it doesn't get to that.  We're not

12   here to require terminations.  We want responsible companies to

13   do responsible things, to work with their customers to stop

14   infringements.

15          And certainly in the -- as to what Cox did, they fell

16   down on that responsibility entirely.

17   Q.   Okay.  So I want to get back to the three.  What you

18   negotiated under CAS was six steps, or alerts rather, right?

19   A.   I think --

12:09:15 20  Q.   Each step had an alert with it that got a little bit

21   different, depending on the content owner?

22   A.   The alert was what the ISP sent to its customer.

23   Q.   Right.  That was a notice, right?

24   A.   No, the notice was what we sent to the ISP.

25   Q.   Yeah.  So do you know, did the alert attach the notice?

A. McMullan - Cross

253

1   A.   I believe the first -- I believe in -- however CAS was

2   implemented by an ISP, the first alert probably attached the

3   notice.

4   Q.   So didn't -- and so with Cox -- are you familiar with Cox?

5   We would take the notice that, say, your company sent, and we

6   would attach an e-mail with that and then send it by e-mail.

7   Did that --

8           MR. OPPENHEIM:  Objection.

9   A.   My understanding is Cox --

12:10:03 10         THE COURT:  He just asked whether it's his

11  understanding.  Overruled.

12  BY MR. BUCHANAN: (Continuing)

13  Q.   I just said, did your -- did you ever see the e-mail that

14  Cox forwarded along with the notice?

15  A.   My understanding is the first notice that Cox received of

16  infringement of a subscriber, it did not forward.

17  Q.   Okay.  Let's go to the next one.  Do you know why they

18  didn't forward them?  Do you know why?  Do you know why

19  because --

12:10:25 20  A.   I can't fathom why they wouldn't forward the first notice.

21  Q.   Do you know that in fact, that because 50 percent --

22          THE COURT:  He said he didn't know.

23          MR. BUCHANAN:  Okay.

24          THE COURT:  Now you're testifying again.  We're going

25  to get into trouble here, Mr. Buchanan.

A. McMullan - Cross

254

| 1 | MR. BUCHANAN:  Okay. |

                    MR. BUCHANAN:  Okay.

                    THE COURT:  Ask questions, please.

BY MR. BUCHANAN: (Continuing)

Q.   So the second notice, we'll just talk about the second

notice.

A.   Okay.

Q.   There's an e-mail, it goes along and it accompanies the

notice, an e-mail from Cox accompanying the copyright notice

from the content owner.  Are you aware of that?

12:10:55  A.   Not really, but okay.

Q.   So -- okay.  Did you ever see the e-mail warning that Cox

would send that -- did you ever see that?

A.   I don't recall seeing it.  I may have seen it.

Q.   Okay.  So I'm just wondering, did you see the alert or

e-mail that the ISPs that are a part of CAS, that they sent

along with their notice?

A.   Well, I think those were negotiated as part of the

program.

Q.   Right.  But did you actually see the -- what the alert

12:11:25  said?  You know, in other words, the information in the e-mail

that was sent by the ISP along with the notice from MarkMonitor

or whoever sent it?

A.   Did I see it?  No.

Q.   No.  Okay.  So you couldn't compare the two, you don't

know either one?

A. McMullan - Cross

255

1    A.   Without looking at something, I could not compare the two.

2    Q.   Okay.  I was just wondering if you looked at it at the

3    time.  So you've said three and do something.

4         But what was negotiated with the ISPs that -- you

5    know, that -- I think you admitted that controlled a large

6    percentage of the Internet service provider market, they said

7    six --

8         MR. OPPENHEIM:  Objection.  That misstates

9    Mr. McMullan's testimony.

10        THE COURT:  Yeah, sustained.

11        MR. OPPENHEIM:  Can we stop this?

12        THE COURT:  Sustained.

13        MR. BUCHANAN:  Okay.

14   BY MR. BUCHANAN: (Continuing)

15   Q.   All right.  So the five large Internet service providers

16   that were part of CAS, okay, they negotiated with all these

17   music companies, entertainment companies, six, six alerts or

18   notices, correct?

19   A.   They negotiated a program --

20   Q.   Right.

21   A.   -- that included a lot of things.  It included funding a

22   CCI.  It included creating an educational program.  And it

23   included -- and it included a graduated response type program

24   where we would look at what happened when they engaged in this

25   process, which could have been five or six notices across these

A. McMullan - Cross

256

```
         1   sort of three areas of escalation.

         2   Q.   Okay.  Right.  And so, they would send -- it was one a

         3   week per subscriber, right, every seven days?

         4   A.   I don't recall that.

         5   Q.   Okay.  Would you take my word for it, or do you want me to

         6   show you the document?

         7            THE COURT:  He said he doesn't know the answer.

         8            MR. BUCHANAN:  Okay.

         9            THE COURT:  You're testifying -- please, ask your

12:13:12 10  next question.

        11            MR. BUCHANAN:  I just didn't want to waste the

        12   Court's time with showing the document.

        13   BY MR. BUCHANAN:  (Continuing)

        14   Q.   Okay.  So you don't know --

        15            THE COURT:  Well, you know the way to do it.  If you

        16   want to try and refresh his recollection, do so.

        17   Q.   All right.  So do you know -- so you are not aware of

        18   that.  Do you know that they did not terminate?  There was an

        19   agreement not to terminate?

12:13:32 20  A.   There wasn't an agreement not to terminate.  For those six

        21   notices, there was no termination required.  But, I mean, the

        22   program itself didn't impact what they had to do under the law.

        23   Q.   Okay.  But --

        24   A.   They were presumably receiving notices other than the ISP

        25   notices that the particular participants in CAS were receiving.
```

A. McMullan - Cross

257

| | |
|---|---|
| 1 | They were probably receiving notices from book publishers and |
| 2 | gaming companies and music publishers. |
| 3 | THE COURT:  Okay.  All right.  You have answered the |
| 4 | question.  Wait for the next question, please. |
| 5 | THE WITNESS:  Sure. |
| 6 | BY MR. BUCHANAN:  (Continuing) |
| 7 | Q.   Okay.  So during the CAS program, what -- do you know |
| 8 | if -- whether it was pursuant to CAS or outside of that, |
| 9 | whether these five Internet service providers were terminating |
| 12:14:24 10 | anyone that was receiving notices from your client and the |
| 11 | other recording companies that were part of CAS? |
| 12 | A.   I'm sorry, I just didn't get the question. |
| 13 | Q.   Okay.  Do you know if Verizon and Comcast, Time Warner, |
| 14 | AT&T, or Cablevision, who were all part of the MOU that made up |
| 15 | CAS, whether they were terminating anybody in response to the |
| 16 | notices from the other members, the content owners who were |
| 17 | members of the CAS? |
| 18 | A.   I don't know. |
| 19 | Q.   Okay.  So MarkMonitor is the -- I think you might have |
| 12:15:04 20 | said this already -- was the investigative infringement company |
| 21 | used in this case, right? |
| 22 | A.   Right.  They provided technology for us. |
| 23 | Q.   And they were the same company that was used under CAS to |
| 24 | investigate infringement by the five large ISPs and to send |
| 25 | notices, correct? |

A. McMullan - Cross

258

A.    MarkMonitor was used to generate notices as to Cox.

MarkMonitor was used to generate notices within the CAS

program.

Q.    Okay.  So -- and the RIAA was assisting you in both,

correct, by you meaning your company and the other copyright

owners?

A.    I think the notices actually came from RIAA after the

information was generated by --

Q.    So during this --

        THE COURT:  Wait, let him answer the question.

        MR. BUCHANAN:  Sorry.

BY MR. BUCHANAN: (Continuing)

Q.    So during this five-year period that CAS was in play, in

operation, how many notices were sent by MarkMonitor to the

five ISPs by the copyright owners like your company?

A.    I don't think it was a five-year period.  I think it might

have been a four-year period.  But I don't know how many

notices were sent.

Q.    So you don't know -- was it one notice or was it millions?

A.    It wasn't one notice.  That would have been horrific.

Q.    I'm thinking -- do you know how many?

A.    I don't, no.  I just said I don't know how many.

Q.    Okay.  I was just trying to see.  Do you -- did you get

any data from the ISPs that came through the RIAA or

MarkMonitor that would show you how many notices were sent out?

A. McMullan - Cross

259

1    A.    I am sure RIAA received data.  I don't recall the numbers

2    of notices that were sent during the course of this program.

3    Q.    And you haven't -- and I think you said you don't know if

4    they ever terminated anyone pursuant to the notices that you

5    sent, however many they were?

6    A.    I don't know.

7    Q.    Okay.  And you haven't sued -- that is, when I say "you,"

8    I apologize, I don't mean you personally, but your company and

9    the other recording companies or music publishing companies, if

12:17:16 10  you are aware of them -- none of them have sued Verizon,

11   Comcast, AT&T, Time Warner, or Cablevision with regard to any

12   of those notices that were sent to the works in suit in this

13   case during that five-year period?

14          MR. OPPENHEIM:  Objection, vague and ambiguous.  I

15   don't understand what he is talking about inside of CAS,

16   outside of CAS.

17          THE COURT:  Overruled.  I am going to allow it.  If

18   he knows who has been sued and who hasn't, he can answer that

19   question.

12:17:42 20         THE WITNESS:  I apologize, Your Honor.  That was a

21   long question.  We have not sued Verizon, Comcast, Cablevision.

22   What was the other company you mentioned?

23   BY MR. BUCHANAN:  (Continuing)

24   Q.    Time Warner.

25   A.    We have not sued those -- we have not sued those

A. McMullan - Cross

260

1   companies.

2   Q.   I may have asked this.  I apologize if I did.  But I

3   thought you testified that as part of the CAS, information

4   would be gathered by the ISPs and shared, you know, with RIAA

5   and your company and the other companies that were copyright

6   owners that were part of CAS.

7   A.   I think -- I think some information was shared, yeah.

8   Q.   Like a lot of data would be gathered and shared?

9   A.   I think some data would be gathered and shared.

12:18:37 10   Q.   Did you review any of the data?

11   A.   I did not.

12   Q.   Do you know anyone in your company that reviewed it?

13   A.   I believe that it was looked at at the RIAA level.

14   Q.   Okay.  Do you know what the value -- I think you testified

15   about Vivendi, the parent company.

16   A.   What's the question?

17   Q.   Is Vivendi the parent company?

18   A.   Vivendi is the ultimate parent company.

19   Q.   And what is the value of Vivendi?

12:19:25 20   A.   I don't know.

21   Q.   Okay.  If I showed you a report by, say, JPMorgan with a

22   number, would that -- would you be able to look at that and

23   determine whether that was close to being accurate?

24   A.   No.

25   Q.   So you have no idea?

A. McMullan - Cross

261

1    A.    It's a publicly traded company.  I assume its value is

2    known.

3    Q.    Okay.  What about UMG, what is the value of your company?

4    A.    We are not a publicly traded company, so I don't know its

5    value.

6    Q.    Okay.  What are your -- what are your annual revenues?

7    A.    I don't know.

8    Q.    You have no idea?  Okay.

9    A.    I am not in the finance department.  I just don't know.

12:20:13 10   Q.    So you mentioned that you terminated CAS or CAS was

11   terminated.  But it was -- in your view, it was just an

12   educational program; is that right?

13   A.    I mean, it was a program -- it was a cooperative program

14   with a large educational component to evaluate consumer

15   behavior and to evaluate the methods that were employed in CAS.

16   Q.    So -- well, you said to evaluate the behavior.  How was

17   that evaluation documented?

18   A.    I think CCI, you know, generated some information about

19   behavior across the systems of the CAS participants.

12:21:07 20   Q.    Okay.  And what was -- what was the data or the

21   information that they generated?  Did you see it?

22   A.    Over the years, I think I did see it from time to time.

23   My takeaway was using those methods was not as effective as

24   just relying on ISPs to respond to our notices as they are

25   required to under the law.

A. McMullan - Cross

262

1    Q.   But that's -- with CAS you were sending notices, you know,

2    thousands of notices, you know, by all the companies, and they

3    were supposed to respond, right?

4    A.   They were supposed to do what the CAS program outlined for

5    them to do.

6    Q.   But they still had to comply with the DMCA, right?

7    A.   Well, if they wanted the safe harbor, they would need to

8    comply with the DMCA.  They also needed just to comply with the

9    obligation not to infringe our content.

12:21:56 10  Q.   Right.  Well, that in the first instance was their

11   subscribers, and that's why you would send them the notices,

12   right?

13   A.   Well, once the ISP like Cox is notified that its

14   subscribers are infringing, and since they have the ability to

15   control it, they make the money from it, they need to do

16   something.  That's the whole reason why we're here.

17   Q.   Okay.  On CAS, in terms of -- you had this system, CAS,

18   but I think you have even talked about that the DMCA was beyond

19   that.

12:22:27 20       And so, for all those ISPs, even if they complied

21   with CAS, you could still sue them if they weren't terminating

22   people for infringement?

23   A.   I'm not understanding the question.  If they complied --

24   Q.   CAS was --

25   A.   Okay.  CAS was CAS, and we wanted them to apply with CAS.

A. McMullan - Cross

263

1    And we wanted them to understand what was coming out of CAS.

2    And was there an effective way of dealing with consumers,

3    educating consumers, engaging in mitigation, engaging in

4    throttling, did that work, what did that do?

5    Q.   Okay.  I am asking you aside from CAS, okay -- and I think

6    you testified to this -- that these ISPs that were part of CAS

7    still had to comply with the law?  In other words, you could

8    still sue them for copyright infringement, correct?

9    A.   Well, those are two different things.  Do they still have

10   to comply with the law?  Of course they have to comply with the

11   law.

12   Q.   And that meant --

13   A.   You have the music publishers that might be noticing.  All

14   CAS was doing was saying, for these six notices, in some cases

15   they implemented it as five notices, this is what you have to

16   do so we can look at that.

17          But if a user is getting a hundred notices, well,

18   yeah, they are in a different bucket.

19   Q.   Okay.  How many got a hundred?

20   A.   I don't know.  How many where got a hundred?  In Cox, my

21   understanding --

22   Q.   Well -- excuse me, sir.

23          THE COURT:  Hold on.  Hold on.  Wait for the next

24   question.

25          He said, I don't know.  What is your next question?

A. McMullan - Cross

264

BY MR. BUCHANAN:   (Continuing)

Q.   All right.  But then he said, I don't know which -- who I am talking about.

A.   Yeah, I said I don't know who you are talking about.

Q.   Okay.  I'm talking about -- I thought I was clear, but maybe I wasn't.  I was talking not about Cox, but about those members of CAS, those ISPs that were members of CAS.

And you pointed out several times that Cox is not part of CAS, right?

A.   Cox is not part of CAS.

Q.   So what I want you to tell me is how many subscribers of the members of CAS received over a hundred infringement notices from the copyright owners that were part of CAS?

A.   I don't know.

Q.   How many received over 50?

A.   I don't know.

Q.   How many received just one?

A.   I don't -- I don't know.  I imagine there was some that received just one.

Q.   All right.  And in making determinations whether to terminate somebody, you would distinguish a business, say, like a hospital, from a residence, would you not?

A.   I have never thought about it.

Q.   Well, let me -- you know, since you -- well, let me ask you.  Say a hospital got three notices over three months.

A. McMullan - Cross

1  Would you terminate the hospital?

2  A.   I mean, is it the --

3         THE COURT:  I'm sorry, I'm sorry.  Lay a foundation

4  as to how he would know that a hospital got a notice in his

5  position before you ask that next question.

6  BY MR. BUCHANAN:  (Continuing)

7  Q.   Okay.  I mean, you -- do you know that there is both

8  residential subscribers and business subscribers?

9  A.   I imagine an ISP has different types of subscribers.

12:25:41 10  Q.   And what I'm asking you is:  Do you -- in terms of how

11  many notices to -- before you would terminate, if there is a

12  distinction from your standpoint between a residence and, say,

13  a business, like a hospital?

14  A.   Again, we don't want anybody terminated.  What we want is

15  Cox to work with its subscribers to stop the infringement.

16  Q.   Okay.

17  A.   When you say generically a hospital, is it the hospital's

18  public WiFi?  Is it the -- like, I don't know.  Cox should be

19  in the position, once they are notified, hey, there's a

12:26:15 20  business --

21         MR. BUCHANAN:  Your Honor, I would --

22         THE COURT:  No.

23         MR. BUCHANAN:  He's not --

24         THE COURT:  He does not know the answer.  You're

25  asking him what I -- what the -- Cox or an ISP knows and what

A. McMullan - Cross

266

        1    they should do and he doesn't know.  And he has told you he

        2    doesn't know.  So let's move on.

        3              MR. BUCHANAN:  Okay.

        4    BY MR. BUCHANAN: (Continuing)

        5    Q.   So what about with regard to a residential?  I think

        6    you've said three and maybe more.  I wasn't sure exactly what

        7    you said.

        8              But does it matter, for example, if they got three

        9    notices in a week and it was for the same song and there was

12:26:52 10  some kid that was 12 years old that did it?

       11    A.   I think --

       12              MR. OPPENHEIM:  We --

       13              THE COURT:  Yeah, I'm going to allow the question.

       14    A.   I think in your hypothetical, if Cox knows that it's one

       15    kid getting three notices over the period of one week, it

       16    should be able to work with that subscriber to figure out how

       17    to stop that.

       18              MR. BUCHANAN:  All right.  No further questions,

       19    Your Honor.

12:27:37 20            THE COURT:  All right, thank you.  Redirect.

       21              MR. OPPENHEIM:  I think it's a good time for lunch,

       22    Your Honor.  We have no further questions.

       23              THE COURT:  Well, we're going to keep going for about

       24    another --

       25              MR. OPPENHEIM:  All right.

A. McMullan - Cross

267

```
            1          THE COURT:  -- for a little while longer.  So we'll
            2   break closer to 1:00.
            3          MR. OPPENHEIM:  My apologies.
            4          THE COURT:  You have no redirect?
            5          MR. OPPENHEIM:  We'll pass the witness, Your Honor,
            6   or the witness is excused.
            7          THE COURT:  All right.  May Mr. McMullan be excused?
            8          MR. OPPENHEIM:  Yes.
            9          THE COURT:  All right.  Mr. McMullan, thank you, sir.
12:27:56   10   You're excused at this time.  Please do not discuss the
           11   testimony you've given during the trial here with anyone until
           12   our trial is over.  All right?
           13          THE WITNESS:  Yes, Your Honor.
           14          THE COURT:  All right.  Have a good day.
           15          THE WITNESS:  You too.
           16          NOTE:  The witness stood down.
           17          MR. OPPENHEIM:  Apologies for assuming lunch was at
           18   12:30, Your Honor.
           19          THE COURT:  Next witness.
12:28:14   20          MR. OPPENHEIM:  We will call Steven Marks, Your
           21   Honor.
           22          NOTE:  The witness is sworn.
           23          THE COURT:  All right.  Good afternoon, sir.
           24          Mr. Gould, please proceed.
           25          MR. GOULD:  Thank you, Your Honor.
```

290

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :  Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

<u>VOLUME 2 (P.M. Portion)</u>

TRIAL TRANSCRIPT

December 3, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

S. Marks - Direct

332

1    getting an ambulance for a life-threatening, you know,

2    situation.  So that was still allowed.

3    Q.    Just to be clear, was termination required under CAS?

4    A.    Termination was not required under CAS.

5    Q.    Why not?

6    A.    Well, we very much wanted it, but it was just not possible

7    to get that in the negotiation.  The ISPs that we were

8    negotiating with wouldn't agree to that as part of the system.

9    Q.    Why would you agree to a graduated response program that

10   didn't include termination?

11   A.    We didn't have a lot of alternatives is the truth.  That's

12   one thing.  You know, we, we needed the cooperation of the ISPs

13   to try to address the problem.  But second and, you know, maybe

14   really more importantly is that the agreement itself, we were

15   getting a lot of other things in the agreement.  So, of course,

16   the specifics of the notice program were important, but things

17   like the creation of CCI that I mentioned earlier, where we

18   were -- you know, that organization on behalf of both the music

19   industry and the ISPs were talking about the seriousness of the

20   problem, how people could avoid infringing by securing their

21   wireless, so it was educating people in that way, and putting

22   together programs.

23          I mean, CCI, for example, put together a curriculum

24   for elementary and middle schoolers, which was something that

25   was really important, because a lot of the people who were

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  3  (A.M. Portion)

TRIAL TRANSCRIPT

December 4, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

B. Frederiksen-Cross - Direct

453

1   A.   No, there is not.

2   Q.   And why is that?

3   A.   Well, the communication for any of these computers -- any

4   of the peers is between the peers, and some of these

5   peer-to-peer systems use a tracker, so if you were to put a

6   test tracker up with the right monitoring stuff, you could see

7   the transactions maybe that were going to that tracker, but

8   you still couldn't see everything else that was going on in

9   the network.

10  Q.   So, so there's nowhere you can go to see the number of

11  users on the network overall; is that correct?

12  A.   That's correct.  By design, these systems are extremely

13  robust and these machines talk directly to each other without

14  central control.

15  Q.   What about if I went to the Cox user that downloaded and

16  is then distributing files to others?  Could I uncover the

17  number of times that Cox user distributed files from a review?

18  A.   Not in any practical way, no.

19  Q.   What do you mean by that?

20  A.   Well, if you just went to a user's computer and inspected

21  it forensically, you might have some evidence of their

22  activity, but you would not have evidence of all of their

23  activity.

24  Q.   Let me ask you --

25  A.   And you would, you would have to actually do a forensic

B. Frederiksen-Cross - Direct

454

1    examination of that machine to get any information.

2    Q.   Let me ask it to you this way:  Are logs kept with --

3    from the software otherwise of the number of times that user

4    distributes a file?

5    A.   No.

6    Q.   Okay.  Can you explain a little bit about the other three

7    peer-to-peer networks that were identified in MarkMonitor's

8    infringement notices to Cox?

9    A.   Sure.  Can we go on to the next slide?

10   Q.   Okay.  And so these are the other three?  Is that the

11   Ares logo?

12   A.   Yes, Ares, Gnutella, and eDonkey.

13   Q.   Okay.  And I see again the, the file hash value image

14   we're using.  Why is that there?

15   A.   Again, all of these systems rely on hash to authenticate

16   and identify files.  That's a really important technology.

17   That's one of the foundation technologies of these systems.

18   Q.   And there's a bunch of icons under file types.  What is

19   that meant to convey?

20   A.   Again, these networks can be used to distribute any kind

21   of file.  Anything that's in an electronic form can be

22   transmitted on BitTorrent, so electronic books, movies, music,

23   if I want to send a video of my dog chasing her tail, any of

24   that can be distributed on the -- using BitTorrent across the

25   internet to others.

B. Frederiksen-Cross - Direct

469

1   specific peer, that's essentially the commencement of a

2   download process, and so certain information is exchanged back

3   and forth between the MarkMonitor system and a peer at that

4   time, and the purpose of this exchange of information is to

5   verify that the peer is online, actively running a BitTorrent

6   client or one of the other clients that we've discussed,

7   actively responding to requests for a particular hash value

8   that has been verified to have known content that is some of

9   plaintiffs' copyrighted works.

10          And then, you know, because this is, is using the

11  hash which is what the BitTorrent system itself uses, at that

12  point, instead of downloading content, it breaks off the

13  connection because there's no need to -- the peer has already

14  said, yes, I have the hash, I have these pieces of the hash.

15  So at that point, the system breaks the connection and creates

16  an evidentiary record that's -- that records that exchange of

17  communication.

18  Q.   What -- it says:  Hash match (no need to re-download).

19          Why is that on your slide?

20  A.   Just to remind me to point out, A, that it doesn't

21  actually download the file, it doesn't create another copy of

22  the file, but it has used that hash, that is, the fingerprint

23  of the file, just as any BitTorrent client would, to say this

24  is the file.

25          Yes, I've -- and the peer is responding, yes, I have

B. Frederiksen-Cross - Direct

470

1  that file or I have pieces of that file.

2  Q.   And when you say re-download it, is that because in the

3  -- one step earlier in the verification module, MarkMonitor

4  already downloaded a file that has that hash?

5  A.   That's correct, yes.  It's a known hash here, so there's

6  no need to download it.

7           THE COURT:  Can we stop here for our morning break?

8  Does that work?

9           MR. ZEBRAK:  Of course, Your Honor.

10          THE COURT:  All right.

11          MR. ZEBRAK:  We don't have that much more.

12          THE COURT:  Okay.  Then let's take 15 minutes.

13  We'll come back and continue the testimony.  Thank you.

14  You're excused.

15          NOTE:  At this point, the jury leaves the courtroom;

16  whereupon, the case continues as follows:

17  JURY OUT

18          THE COURT:  All right.  Anything before we break?

19          MR. ZEBRAK:  No, Your Honor.

20          THE COURT:  Okay.  All right.  Let's take 15 minutes

21  then.  We're in recess.

22          NOTE:  At this point, a recess is taken; at the

23  conclusion of which the case continues in the absence of the

24  jury as follows:

25  JURY OUT

B. Frederiksen-Cross - Direct

475

1  time.  And so it provides some rich information about what

2  happened during that exchange.

3         And then the content information is important

4  because that's where it passes back that BitTorrent -- bit

5  field or the size, the amount of the file that that particular

6  peer has, and that information is used later in the

7  processing, so I wanted to just point to that's where that

8  comes from.

9  Q.   And are hash values involved in this size or bit field

10  data at all?

11  A.   Not in the size data itself, but it is the hash of a

12  particular requested file or requested torrent, which is a

13  collection of files that the bit field pertains to.  And the

14  hash is recorded in the evidence logs as well.

15  Q.   And Cox's counsel in their opening statement made

16  reference to the word "spying."  Do you recall that?

17  A.   I think I heard that word a couple of times in their

18  opening presentation, yeah.

19  Q.   In this process when MarkMonitor goes to a peer-to-peer

20  network to request a file -- well, first of all, do you have

21  an understanding of whether that process involves spying?

22  A.   No.  The MarkMonitor software acts like just any other

23  peer with two exceptions.  It creates a record of what it's

24  done, and it doesn't typically download -- at least in the use

25  that we see in this case, it doesn't download the file.

B. Frederiksen-Cross - Direct

481

1    every client -- or every peer on the network that could be

2    exchanging information that they weren't entitled to exchange.

3    Q.   And why -- I'm sorry.

4    A.   It's just, it's just the sheer size of the network.  You

5    know, again, you're talking about a network that has hundreds

6    of millions of users, and at any point in time, there's 15,

7    20, 30 million of them active.  It's just not feasible to have

8    one person monitor that much traffic.  Technically, it's a

9    problem.

10   Q.   In a moment -- well, could you remind the jury about your

11   overall conclusions about the accuracy and reliability of the

12   MarkMonitor system?

13   A.   Yes.  I find that the system accurately detects peers

14   that are copying and distributing the plaintiffs' copyright

15   works, and I find that it prepares and sends accurate notices

16   about that infringement activity that it detects.

17   Q.   And Cox's counsel in Cox's opening statement said that

18   there's, I believe, no proof that plaintiffs -- that a Cox

19   customer actually possessed a copy of plaintiffs' works.  Do

20   you have a reaction to that?

21   A.   I completely disagree.

22   Q.   And could you explain why?

23   A.   The evidence that I saw was, first of all, voluminous in

24   nature.  The evidence -- I examined about 175,000 evidence

25   cases.  Every one of those cases included hash information for

482

1    the file that the peer itself had reported that it was making

2    available to distribute, and these peers, recall, are on this

3    peer-to-peer file-sharing network.

4            This is not just some random search of people's

5    computers, but it's actual activity that the peer running the

6    client software is responding to a request for a file with

7    information about the file it has to share.

8            And the, the information I looked at was very

9    internally consistent.  For instance, I could take a hash from

10   a notice and trace it all the way back to a hash in a record

11   that MarkMonitor had about when that information was collected

12   from that peer, and I could match up other pieces of the

13   notice.  You have the time matches; you have the title

14   matches.

15           I could also use the hash to match it to that copy

16   of the infringing work that was on the disc and play the music

17   for myself and say, yes, you know, this is, this is this song.

18   I can go out to iTunes and verify that.

19           And when I looked at the whole set of the evidence I

20   got, it was logically consistent from end to end, from song to

21   detection to notice, and so based on that, you know, I'm very

22   confident that these -- this is reliable information and

23   accurately documents what those clients were doing.

24   Q.   So Cox's counsel in Cox's opening statement said that

25   there's no proof that the files that MarkMonitor identified in

B. Frederiksen-Cross - Direct

484

1   down.

2          MR. ZEBRAK:  Sure.  Let me --

3          THE COURT:  Thank you.  Go ahead.

4   BY MR. ZEBRAK:

5   Q.   Well, let me rephrase the question as Your Honor

6   suggested.

7          When MarkMonitor identifies a peer, a Cox subscriber

8   on one of these file sharing networks with a file on their

9   computer, is MarkMonitor able to identify whether that's a

10  copy of a file that the peer obtained lawfully?

11         MR. BRODY:  Objection, Your Honor.

12         MR. ZEBRAK:  I could say it differently, Your Honor.

13         THE COURT:  Yeah.  Sustained.

14         MR. ZEBRAK:  Sure.

15  BY MR. ZEBRAK:

16  Q.   When MarkMonitor identifies a peer, a Cox subscriber on a

17  network with a file, can it tell if the peer obtained it from

18  another peer on the network as opposed to a legitimate source

19  like iTunes or Amazon or something like that?

20  A.   Well, in the evidence I examined, it was often the case

21  that the -- I mean, in approximately, I think, 15 percent of

22  the records, the peer was still collecting the evidence.  So

23  they only had part of the file, you know, 90 percent but not

24  100 percent.  So that certainly tells me that in those

25  instances, that peer was not getting it off of Amazon.

B. Frederiksen-Cross - Direct

485

1              And with respect to the, you know, the implication

2    that all of these peers might have gotten something legally

3    and then gone out there and created torrents for it

4    presumably -- because if they got it legally, they wouldn't

5    have a torrent -- it's kind of like saying you walk into a bar

6    and there's a guy there with a beer in his hand.  Where did he

7    get it?  Well, he probably bought it in the bar.

8              Is it possible that one of those guys or two of

9    those guys were the ones who first created a torrent?  As a

10   hypothetical, that could be possible, but it's improbable.

11             MR. BRODY:  Your Honor, I object.  That's

12   speculation.

13             THE COURT:  Hold on, hold on.  No, overruled.  I'm

14   going to allow her to use the example.  Go ahead.

15             THE WITNESS:  I'm just saying it would be extremely

16   improbable to think that that could happen on such a massive

17   scale, that somehow all of these people bought something and

18   then created torrents for it so they could give it away to

19   total strangers en masse.  That's just a nonsensical

20   interpretation of the evidence.

21   BY MR. ZEBRAK:

22   Q.   And even -- let's take -- call that a nonsensical

23   interpretation of the evidence, that somebody would -- well,

24   let me not --

25   A.   And I didn't mean any disrespect by that, but it just --

B. Frederiksen-Cross - Direct

486

1    it flies in the face of reason.

2    Q.    Sure.  No, I understand.

3          Let's take that hypothetical scenario where it was

4    something that someone obtained from, let's say, iTunes and,

5    you know, was on the network with it.  What, what would happen

6    for anyone else on the network who wanted that file from that

7    person?

8    A.    Well, they would start downloading it if they opened the

9    torrent that was associated with the file, or at least at some

10   point, they would begin downloading that content.  Because

11   once the torrent is out there, that makes the file able to be

12   downloaded by other peers.

13   Q.    And final, final question before we quickly cover the

14   CATS system:  Do you recall during Cox's counsel's opening

15   statement an assertion was made that there's no proof that

16   Cox's customers actually provided copies of the files to

17   others that they were reported for -- in these notices to Cox?

18   Do you recall that?

19   A.    I do recall that.

20   Q.    And do you have a reaction to that?

21   A.    I disagree with that statement, again, based on the

22   evidence that I've reviewed and my knowledge of how the

23   BitTorrent and Ares, Gnutella, and eDonkey software works, and

24   the fact that you cannot accidentally share a file via

25   BitTorrent, and it's extremely unlikely to do so, in my

B. Frederiksen-Cross - Direct

487

1    opinion, via the other three products.

2            I just don't think that, that there is any lack of

3    proof that the Cox clients were participating in these file

4    sharing networks and were providing content that based on its

5    hash identification is plaintiffs' content.

6    Q.   Sure.  And for those Cox subscribers that were reported

7    in these notices that hadn't yet obtained 100 percent of the

8    file, I think you said there were about 15 percent of them

9    that had somewhere between 90 to 100 percent of the file; is

10   that correct?

11   A.   Yes.

12   Q.   What were -- what's your understanding, if any, of what

13   those peers were engaged in at that time of detection?

14   A.   Well, I'm sure that they were probably distributing as

15   well as copying, but for at least some of them, when I went

16   through the evidence records, I could see that over time, the

17   amount of the file that they had moved from less than 100

18   percent when it was detected on one detection to later moving

19   to 100 percent of the file.  So I know for a fact that they

20   were downloading copies.

21   Q.   Sure.

22   A.   And because of the tit-for-tat way that BitTorrent works,

23   it's almost impossible to conceive that they were not also

24   uploading those copies to others.

25   Q.   What do you mean by the tit-for-tat way of BitTorrent?

B. Frederiksen-Cross - Direct

488

1   A.    BitTorrent and the other three protocols that we

2   discussed earlier are all designed to prioritize exchanges

3   with peers that are, are downloading to you.  So if I have ten

4   peers asking me for content, I'm going to give content -- I'm

5   going to download from and give content to those four peers or

6   three peers that are giving me the best content exchange

7   possible.  So I'm uploading as well as downloading.

8         And if you're not also uploading, the tit-for-tat

9   system kind of puts you at the back of the line, and although

10  it's still possible to get content if you're not uploading,

11  it's not the way these systems are designed to work, it's not

12  the way the protocols are designed to work.  All of them have

13  built into them this notion of exchange, that it's two peers

14  exchanging content.

15  Q.    Thank you.  I'd like to turn your attention now to the

16  Cox CATS system, okay?

17  A.    Okay.

18  Q.    You said you had an opportunity to review the CATS system

19  in your work in this case?

20  A.    Yes, I have.

21  Q.    Okay.  And at a high level, what did your review involve?

22  A.    It involved, again, looking at the source code of the Cox

23  CATS system, some of the configuration data related to how

24  that system was set up to operate.  I looked at copies of some

25  of the policies that the CATS system was intended to implement

538

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
           Plaintiffs,          :
                                :
      -vs-                      :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
           Defendants.          :
                                :
--------------------------------:
```

VOLUME  3  (P.M. Portion)

TRIAL TRANSCRIPT

December 4, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1    computer --

2            If we could get slide 18 up.  Okay.  There we go.

3            When MarkMonitor connects to the peer computer, it

4    collects information off of the computer about the peer-to-peer

5    file that the peer has, right?

6    A.   Right.

7    Q.   The Cox subscriber?

8    A.   Correct.

9    Q.   And one thing you say here is that:  Hash match (no need

15:00:09 10  to redownload.)

11           And what you meant by that was that MarkMonitor looks

12   to see what the hash is on the Cox subscriber's computer, it

13   downloads the hash, but it does not download any of the file,

14   right?  Any of the payload, if you will, the content, the

15   music?

16   A.   There were a few exceptions in the evidence I saw where

17   the connection had not been broken in time and some small

18   portion of the song was downloaded.

19           But generally the design of this system for this

15:00:49 20  particular scanning was not to download the files, that's

21   correct.  To rely on the hash.

22   Q.   And, in fact, both you and our expert, Mr. --

23   Dr. Feamster, you guys looked at all 175,000 evidence packages,

24   and I think there are 143 or something, 144, where there's a

25   little bit of data downloaded.

Barbara Frederiksen-Cross - Cross

581

1          But all the rest of them have nothing downloaded from

2    the peer computer, no content?

3    A.   That's correct.

4    Q.   And I think you even told me that the MarkMonitor software

5    is written so that it assures that the MarkMonitor computer

6    will break off the connection with the peer before any content

7    is downloaded?

8    A.   Well, it breaks off the connection very quickly, which

9    typically would result in that, yes.

15:01:39 10  Q.   Well, but the -- I mean, it -- the -- it's designed to

11   avoid downloading content?

12   A.   With the particular variant of the software that I was

13   looking at that was what was used in this case, yes, it

14   attempts to break connection very quickly.

15   Q.   So if anybody said -- if I were to say to you that I

16   believe that MarkMonitor actually downloaded pieces of the

17   files on the peer computers, you would tell me I was wrong,

18   wouldn't you?

19   A.   In what context?

15:02:16 20  Q.   This context.

21   A.   So specifically in the software as it was configured to

22   run for the RIAA in this litigation?

23   Q.   Exactly.

24   A.   And can you repeat back your question again?  I just want

25   to make sure I was --

Barbara Frederiksen-Cross - Cross

582

1    Q.    Sure.  If I told you or anybody told you that MarkMonitor

2    was downloading the content of the files from the peer

3    computers, not just the hash and not just, you know, the other

4    data associated with the file, but the file itself, if somebody

5    said, MarkMonitor was doing that, downloading pieces of the

6    file, you would tell them they were wrong, right?

7    A.    With the exception of that little tiny fraction where the

8    connection is not broken in time that we just spoke of, they

9    would be mistaken, yes.

15:03:08 10   Q.    Well, it's a little stronger than that.  You looked at

11   170-odd thousand files, and none of them had any downloaded

12   content, or 143 or '4 had some, right?

13   A.    There was no downloaded content present in the evidence

14   packages that I examined.  I don't recall if I checked every

15   single record to see if there had been any and they simply

16   weren't a part of the package.

17         But my recollection is that aside from 143 files,

18   there was no downloaded content.

19   Q.    Could we have -- one of the things you looked at in

15:03:46 20   preparing your report was a document that MarkMonitor prepared

21   for RIAA to explain how they were going to perform this work,

22   and they did it in -- I think it was April of 2012.  Do you

23   recall that?

24   A.    I recall looking at several documents they prepared for

25   RIAA.  I'd be happy to take a look at the one you're talking

674

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
           Plaintiffs,          :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
           Defendants.          :
                                :
--------------------------------:
```

VOLUME  4  (A.M. Portion)

TRIAL TRANSCRIPT

December 5, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1          So on this slide, the claim period is denoted or

2     described by the yellow bar at the top.  It starts February 1,

3     2013, and ends November 26, 2014.

4          And the checkmark means that all of the 10,017 works

5     in suit did correspond to a notice during this claims period.

6     Q.   Was the claim period the same claim period for every

7     single plaintiff group in this case?

8     A.   No.  There is a note below the bars for the years that --

9     for the Sony ATM/EMI claims, the start of the claim period was

12:34:24 10     August 1, 2013, rather than February 1, 2013.  But that period

11     was the same, the ending date of the claims period for Sony

12     ATM/EMI was the same as for all the others.

13     Q.   And, Dr. McCabe, would you briefly walk the jury through

14     the remaining three checked boxes on this slide.

15     A.   Yes.  So the second is that -- this issue of the third or

16     later notice for a particular subscriber.  So that was

17     satisfied for all of the 10,017 works.

18          That the infringing file in the notice contains the

19     work in suit.

12:35:11 20          And that there is a copy of the work on a hard drive

21     created by MarkMonitor.

22          So all of these -- the four requirements are

23     satisfied.  And the term I'm using is that means those works in

24     suit were qualified.

25     Q.   Dr. McCabe, what data sources did you use for your

S. Bahun - Redirect

793

1    that lists the notices and the information contained in each

2    notice.  So all that -- these are all data files that I had.

3             So there is a file for notices from MarkMonitor.

4    There is a file for the downloads that MarkMonitor downloaded.

5    And there is a file from MarkMonitor about the Audible Magic

6    procedure or connections to go from hashes to works.

7    Q.   And what is depicted with respect to Cox in terms of data

8    from Cox that you considered within your analysis?

9    A.   So Cox also provided three data sets.  The first one

12:38:25 10   listed there is subscriber identification.  So the Cox CATS

11   system has identifiers for subscribers.  It was necessary to

12   have that information to be able to perform my analysis.

13            So it's the file itself connected subscriber IDs with

14   notices.

15            The second file is what I have called the ticket

16   file.  It's the large file that contains the tickets that Cox

17   recorded in their CATS system.

18            And the third is a file that identifies Cox

19   subscribers as -- I used it to distinguish residential from

12:39:17 20   business subscribers.

21   Q.   And when you say the third file, was that the billing

22   information file?

23   A.   I am sorry, the billing information file, yes.

24   Q.   And, finally, to the right of plaintiffs, there is an

25   Exhibit A and B.  What are those two files?

924

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,        :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                                :
--------------------------------:
```

VOLUME  5  (A.M. Portion)

TRIAL TRANSCRIPT

December 6, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

L. Trickey - Direct

964

 1    business -- strike that.

 2              Your Honor, I would move to strike that last answer.

 3              THE COURT:  Overruled.  It will be allowed.

 4              MR. OPPENHEIM:  Do you know --

 5              THE COURT:  You asked her a hypothetical, and she

 6    answered.

 7              MR. OPPENHEIM:  Okay.

 8    BY MR. OPPENHEIM: (Continuing)

 9    Q.   Are you aware of whether or not there were any critical

12:05:46 10   hospitals provided high speed Internet service in this case

11    other than public WiFi, and are you aware whether that

12    information was ever produced to the plaintiffs?

13              MR. ELKIN:  Objection.

14              THE COURT:  Sustained.  Okay.  We're not going to get

15    into discovery production issues with -- let's move along.

16              MR. OPPENHEIM:  Okay.

17    BY MR. OPPENHEIM: (Continuing)

18    Q.   So you believe there are circumstances under which a Cox

19    Business customer could receive 50 notices and you would still

12:06:15 20   attempt to be -- still be attempting to educate them; is that

21    correct?

22    A.   I can't answer that question.  I don't know what the

23    circumstances are.  I mean, if you have a hospital, you are

24    talking about hundreds of users.

25    Q.   What about if there were hundreds of notices?

L. Trickey - Direct

965

1    A.   Again, I think you're going to work with that customer.

2    But, again, you -- I don't know -- we have customers that range

3    from the smallest, you know, coffee shop, retail store, up into

4    the largest hospitals, government buildings.  I mean --

5    Q.   Fair enough.  What if you had an apartment building that

6    had hundreds of notices.  Do you think you would still be

7    trying to educate them?

8    A.   You know, that's a hypothetical I can't answer.  I don't

9    know what all the circumstances are.

12:06:56 10   Q.   What about --

11   A.   And that -- and that could -- I don't know if that's

12   residential or business.  I mean, there's an infinite number of

13   variables.  But we would certainly work to try to stop any kind

14   of that behavior.

15   Q.   What about a fraternity that was the subject of dozens and

16   dozens of notices?  Are you still trying to educate the

17   fraternity?

18   A.   Well, I don't know.  At what point?  I mean, is a

19   fraternity -- are you talking about as a business account or a

12:07:22 20   residential account?  So --

21   Q.   So to be clear, Ms. Trickey, the AUP for business

22   customers says zero infringement, zero tolerance, correct?

23   A.   Well, the documents at that point in time -- no, actually

24   it -- which document are we referring to again, the AUP?

25   Q.   Acceptable Use Policy.

1    A.    No, we had a good relationship with RIAA.

2    Q.    You thought that Cox had a good relationship with RIAA,

3    right?

4    A.    Yes.

5    Q.    So just to be clear, because I guess I wasn't, there are

6    basically two kinds of blacklist, one where the notices come in

7    but don't get forwarded, and one where the notices never get

8    in; is that accurate?

9    A.    Right.  And then there's the third where the notices do

12:40:18 10  come in and get forwarded.

11   Q.    Earlier we were talking about commercial customers.  And

12   you indicated the situation where a hospital might have -- be a

13   Cox Business customer, correct?

14   A.    Correct.

15   Q.    That hospital, as a business, may have Internet for, let's

16   say, its doctors and nurses, correct, its staff?

17   A.    Yeah, and patients, and family members, and workers.

18   Q.    Okay.  But that hospital may also have a public WiFi

19   system that is different than what the doctors use, right?

12:40:53 20  A.    Yes, they could.

21   Q.    And in fact, most hospitals these days, modern hospitals

22   do have a public WiFi system, right?

23   A.    That's probably the case.  I would think so.

24   Q.    The cardiac surgeons working in the hospital don't have to

25   go onto the public WiFi system, do they?

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
    -vs-                        :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  5  (P.M. Portion)

TRIAL TRANSCRIPT

December 6, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

L. Trickey - Cross

1020

1    been designed to protect our service, our subscribers, and the

2    internet community from inappropriate, illegal, or otherwise

3    objectionable activities.

4    Q.   And what's your understanding as to the purpose of that

5    statement?

6    A.   Well, that's to -- you know, there are many parties in the

7    internet ecosystem, and so this was to put customers on notice

8    that the, what we have said in the AUP is designed to protect,

9    you know, us and our network as well as them and the internet

14:22:00 10  community from activities that they shouldn't be doing.

11   Q.   Okay.  If you skip the next sentence, could you read the

12   following sentence that begins with:  Violation of any term?

13   A.   Violation of any term of this AUP may result in the

14   immediate suspension or termination of either your access to

15   the Service and/or your Cox account.

16   Q.   Okay.  What is your understanding as to the purpose of

17   that statement?

18   A.   That's to put customers on notice that if they misuse the

19   service, that they could lose the privilege of the service.

14:22:35 20  Q.   And does Cox believe that this statement obligates Cox to

21   suspend or terminate a subscriber's access to the internet if

22   they violate any term of the AUP?

23   A.   No, I think the word "may" is in there because the

24   circumstances will, will vary, and so this is to put them on

25   notice that you, you could lose your service.

L. Trickey - Cross

1    Q.   So in circumstances where a customer violates the AUP, do

2    you have an understanding as to what steps Cox will take?

3    A.   Yes.

4    Q.   And what are they?

5    A.   So if they violate the AUP and we become aware of it,

6    typically the, the goal is to reach out and to educate and to

7    modify behavior, to coach, to help them try to figure out

8    what's going on, how they can, you know, fix the problem, close

9    the open WiFi.  I mean, there's a lot of things that we walk

14:23:31 10  through.  So we try to educate and get them to, you know,

11   change behavior.

12   Q.   Okay.  On direct, I think there were questions that were

13   put to you as to the AUP related to a, I think, a zero

14   tolerance policy.  How did you view the AUP relative to any

15   notion of zero tolerance?

16   A.   Well, the -- you want to make sure your subscribers

17   understand in strong language, you know, what they can and

18   can't do using the service, but I did not believe that the AUP

19   required a zero tolerance because there are a variety of

14:24:12 20  circumstances that could be at play.

21   Q.   Well, wouldn't it have been easier if Cox just terminated

22   these subscribers if there was a violation of the AUP?

23   A.   Well, not really because, you know, internet access is a

24   very important part of our society, and people need it to, you

25   know, work, to shop, to do all kinds of things online.  Now we

L. Trickey - Cross

1024

1    A.   Well, let's see.  It starts out with your privacy rights.

2    There's an annual privacy notice that's actually included, and

3    then --

4    Q.   I'm sorry to interrupt you.  That was a bad question.

5    A.   Oh.

6    Q.   Let me direct you to the first page of the exhibit.  This

7    Cox Business policies, do you see the effective date of when

8    this particular policy went into effect?

9    A.   It says it was updated November 18, 2011.

14:28:00 10   Q.   And then let me direct your attention to the fourth page

11   of this exhibit.  In the middle of the page, do you see any

12   other new effective policy AUP for the business for Cox?

13   A.   Yes.  There's a Cox Business Acceptable Use Policy.  It

14   says it was updated October 1, 2012.

15   Q.   Do you know whether or not these were the Cox Business

16   AUPs that were in effect during the 2013 and 2014 time frame?

17   A.   I think so, yes.  I don't think there was a later business

18   one after this.

19   Q.   Does Cox view the business AUP violations differently than

14:28:50 20   residential AUP violations?

21   A.   Well, so how we treat the potential violations, we do have

22   different processes.

23   Q.   Why is that?

24   A.   Well, because business customers are very different from

25   residential customers, and as I stated earlier this morning,

L. Trickey - Cross

1025

1    business customers range from, you know, a very small business

2    up to very large businesses, but they are businesses, and they

3    are largely reliant on their internet service.

4            You also have many businesses that have users of the

5    internet service who they may not even know who the person

6    actually is, because they could be a doctor's office that

7    offers WiFi, or it could be -- you know, we talked about a

8    hospital.  We've got government buildings, you know, police,

9    fire, all kinds of different buildings, and so you don't always

14:29:45 10  know who the actual -- the identity of who the actual users

11   are.

12   Q.   Okay.  You can take that down, James.

13           I want to turn to a different subject, if I may.  Do

14   you know whether there was a particular group at Cox that dealt

15   with copyright infringement claims during 2013 and 2014?

16   A.   Yes.  That was the customer safety team.

17   Q.   And what was the customer safety team's role and

18   responsibility for this?

19   A.   So that, that team would ingest the complaints that came

14:30:21 20  in from the copyright holders into our -- what we called our

21   CATS system, the Cox abuse tracking system.  It would sign a

22   ticket, and they were responsible for carrying out the

23   graduated response.

24   Q.   Do you know what the focus of the customer safety team was

25   in dealing with customers who were accused of copyright

L. Trickey - Cross

1053

1    Q.   Does Cox provide information in response to a copyright
2    owner that follows that procedure?
3    A.   Yes.  If we received a subpoena, we would fulfill the
4    subpoena.
5    Q.   Do you know whether Cox ever had a practice whereby it
6    would turn a blind eye to copyright infringement of its
7    customers?
8    A.   No.  I mean, you know, I think that the fact that we were
9    the first ISP to actually create a graduated response process
10   before anybody else to me shows we did not turn a blind eye,
11   and this was a very complex issue with a lot of people in the
12   internet ecosystem that you had to balance, and so, you know,
13   my position is that I felt like this evolved over time
14   according to the needs of, you know, customers, Cox, and the
15   copyright holders.
16        But I do not believe, I mean, the fact that you're
17   first creating a process that nobody else had even done yet to
18   me shows you didn't turn a blind eye.  You actually took it
19   seriously.  We had a gentleman, Matt Carothers wrote the code
20   for the whole CATS system.
21             MR. ELKIN:  No further questions, Your Honor.
22             THE COURT:  All right.  Thank you.
23             Redirect or cross.  You may lead.  Thank you.
24             MR. OPPENHEIM:  Call it whatever you want, Your
25   Honor.

1138

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
           Plaintiffs,         :
                               :
     -vs-                       :    Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
           Defendants.          :
                               :
-------------------------------:
```

VOLUME  6  (A.M. Portion)

TRIAL TRANSCRIPT

December 9, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

M.J. Flott - Direct

1188

|          | 1  | THE WITNESS:  Good morning. |
|----------|----|-----------------------------|

1     THE WITNESS:  Good morning.

2     THE COURT:  Please proceed.

3     MATTHEW J. FLOTT, called by counsel for the

4  plaintiffs, first being duly sworn, testifies and states:

5     DIRECT EXAMINATION

6  BY MS. NOYOLA:

7  Q.   Good morning, sir.  Please state your full name for the

8  jury.

9  A.   Matthew James Flott.

10:08:19 10  Q.   Mr. Flott, where do you work?

11  A.   I work at Warner Music Group.

12  Q.   What is your position at Warner Music Group?

13  A.   I am the executive vice-president and chief financial

14  officer for the Recorded Music Division.

15  Q.   Is the Recorded Music Division, that houses the record

16  labels of Warner Music?

17  A.   Yes.

18  Q.   What are your general responsibilities as executive

19  vice-president and chief financial officer?

10:08:44 20  A.   I have the responsibility for managing the overall

21  financial performance for the Recorded Music Division.  That

22  includes reporting our actual results, forecasting our

23  performance, budgeting.  It also includes responsibility over

24  our deal process.  It includes as well comparisons to market

25  trends, our competitors, and generally supporting the Warner

1 Music senior team in reporting to the Board of Directors and

2 our external reporting.

3 Q.   How long have you held this role at Warner Music?

4 A.   A little over four, four total years.

5 Q.   What is your educational background?

6 A.   I have a bachelor of science in accounting.

7 Q.   And how long have you worked in the music industry?

8 A.   A little over 25 years.

9 Q.   How much of that time has been at Warner Music?

10:09:53 10 A.   16.

11 Q.   What other roles have you had at Warner Music?

12 A.   I first started in 1983 as a staff accountant.  When I

13 returned in 2016, I was the CFO for the independent label

14 group.

15       I then moved to be the CFO for our Warner Music Group

16 distribution.  I then moved to be the international CFO for

17 Recorded Music.  Came in for the first time to the CFO for --

18 over all recorded music.  And then I became the chief financial

19 officer for global financial analysis and operations.

10:10:37 20 Q.   And then where did you work before you joined Warner

21 Music?

22 A.   I joined -- I worked -- just prior to coming back, I

23 worked for Take-Two Interactive in the video game business for

24 three years.  I was at BMG Entertainment for four years.  I was

25 at Caroline Records for six years.  I spent five years at Sony

M.J. Flott - Direct

1190

1  Video on the movie side of the business.  And I did an odd year

2  at Exxon as an analyst on the oil and gas side of the business.

3  Q.   All right.  Let's turn back to Warner Music Group.  Can

4  you tell us a little bit about your company and how it fits in

5  the music industry.

6  A.   Sure.  Warner Music, within the music business, is

7  considered one of the three global majors.  And, you know, we

8  operate like everyone else, trying to find the most talented

9  artists and partnering with them to build their brands and, you

10:11:54 10  know, develop their careers around the globe.

11  Q.   I think you said majors.  What do you mean by majors?

12  A.   Majors are generally, if you look at the size of one's

13  market share, so Universal, Sony, and ourselves, the three of

14  us have market share that would be considered, you know, larger

15  than the other smaller, independent companies.

16  Q.   What are some of the record labels in Warner Music Group?

17  A.   The three primary labels that we were built off of were

18  Atlantic Records, Warner Brothers Records, now Warner Records,

19  and Elektra Records.

10:12:39 20       We also have a variety of other labels that come

21  underneath each of those labels from Nonesuch, to Roadrunner,

22  to Fueled By Ramen, just to name a few.  But there are hundreds

23  of labels that we have around the world.

24  Q.   Are any of the plaintiffs in this case Warner Music Group

25  record labels?

1191

```
 1    A.    Yes.

 2    Q.    Did you assist in the preparation of a demonstrative for

 3    your testimony today?

 4    A.    I did.

 5    Q.    I would like to pass up to the witness a copy of that

 6    demonstrative.

 7              THE COURT:  Any objection to publishing that?

 8              MR. BUCHANAN:  No objection.

 9              THE COURT:  All right.  Thank you.

10:13:30 10   BY MS. NOYOLA: (Continuing)

11    Q.    Mr. Flott, what does this slide show?

12    A.    This slide shows six of our labels that are in the suit.

13    Q.    May I refer to all six of these entities as the Warner

14    Music plaintiffs?

15    A.    Yes.

16    Q.    All right.  You can take that down, Mr. Duval.

17              Mr. Flott, are you familiar with the Warner Music

18    plaintiff sound recordings at issue in this case?

19    A.    I am.

10:14:03 20   Q.    I would like to publish PX 1, which has already been

21    received into evidence.

22              MR. BUCHANAN:  No objection.

23              MS. NOYOLA:  I also have a copy for the witness.

24    BY MS. NOYOLA: (Continuing)

25    Q.    Mr. Flott, I would like to direct your attention to
```

M.J. Flott - Direct

1192

1        page 112, starting at lines 5446 to the very last page.

2                  What do these entries show?

3        A.   These show the sound recordings that are included as being

4        infringed in this case of the Warner -- our Warner copyrights.

5        Q.   And about how many sound recordings of the Warner Music

6        plaintiffs are listed in this exhibit and at issue in this

7        case?

8        A.   Approximately 1,300.

9        Q.   All right.  You can put that to the side.

10:15:14 10                  Did you assist in the preparation of a demonstrative

11       medley of some of the works in this case?

12       A.   Yes.

13                  MS. NOYOLA:  Your Honor, with your permission, I'd

14       like to play that medley.

15                  NOTE:  The audio recording is played.

16       BY MS. NOYOLA: (Continuing)

17       Q.   Mr. Flott, I noticed you nodding your head to music there.

18       Are you familiar with the sound recordings that we just played?

19       A.   Yeah, I am.

10:17:35 20       Q.   And how are you familiar with them?

21       A.   Many of them from when I was growing up.  You know, one in

22       particular, "Cashmere," was one of the first concerts I ever

23       went to out at the Capital Center.  You know, being the

24       youngest of 13 kids, that was, you know, one of the first ones

25       that I could really go to see.

M.J. Flott - Direct

1193

1         So brings back a lot of good memories.

2   Q.   And how -- what do these sound recordings represent to

3   Warner Music Group?

4   A.   They're some of the most iconic songs in our catalog and,

5   you know, we want to make sure they're protected.

6   Q.   Have you listened to any of the infringing music files in

7   this case?

8   A.   I have.

9   Q.   How many?

10:18:19 10  A.   I listened to 100.

11  Q.   And how were those 100 selected?

12  A.   It was a random statistical sample.

13  Q.   And why did you listen to a sample of the infringing music

14  files in this case?

15  A.   I wanted to make sure that I familiarized myself with what

16  was being infringed and whether they were in fact our songs.

17  Q.   And what did you conclude after listening to those files?

18  A.   That they are in fact our songs listed within the exhibit.

19  Q.   All right.  Let's turn to the revenues generated from

10:18:55 20  Warner Music's -- Warner Music Group's sound recordings.

21         What are the different ways that Warner Music makes

22  money from its sound recordings?

23  A.   We will sell our music in various formats to customers.

24  And we will also license music into sound tracks, into

25  commercials, films.

M.J. Flott - Direct

1194

                    We will license them to competitors in some cases to
put together compilations and other works.

                    It will also lead to what we call artist services and
expanded rights.  So those are other ancillary rights that we
might have in concert promotion, in merchandise, and some other
areas like that.

Q.   You mentioned formats.  What are the different types of
formats that Warner Music Group sells with sound recordings?

A.   Sure.  We sell records in a physical format, so that would
be either a compact disc or a vinyl record.  They may also come
in a box set.  We sell it in digital formats, downloads, and
streaming.  We also sell it in mobile formats, ring back tones.

                    Those are the primary formats that we sell music in.

Q.   What is Warner Music Group's view on paying its artists?

A.   We see it as fundamental to our business.  Our initial
relationship is with the artist.  We have to build the trust
that they know that we're going to help them develop their
careers and that they know that they will be -- they will be
paid for the sales that we do on their behalf and our behalf.

Q.   How would you react if someone said that the Warner Music
Group record labels are not collection agents for their
artists, but that they actually just collect money for
themselves?

A.   I would say they're misinformed and patently wrong.
Fundamental to how and why we've been in business for the

M.J. Flott - Direct

1195

1   decades that we've been in business and, you know, our

2   competitors in some cases longer than that, if we didn't have

3   the trust of our artists that they were going to get paid, then

4   we wouldn't be able to continue to sign and develop and attract

5   artists year in and year out.

6   Q.    In your role as executive vice-president and chief

7   financial officer, are you familiar with peer-to-peer piracy?

8   A.    I am.

9   Q.    Has Warner Music Group been impacted by peer-to-peer

10:22:01 10   piracy?

11   A.    We have.

12   Q.    What has been that impact?

13   A.    It has been -- it's been enormous and significant.  In a

14   period of time when music consumption has risen year in and

15   year out, as an industry we've seen revenues decline over that

16   period, over a period of time from its peak to where we are

17   today.

18   Q.    What were the consequences of this revenue decline to the

19   music industry as a whole?

10:22:46 20   A.    Well, first and foremost, you know, artists were not

21   getting paid.  Copyright holders weren't getting paid, as well

22   as union members, as well the musicians working on those

23   records.

24        We, as Warner Music Group, had to rationalize our

25   infrastructure or the labels that we had, and we've had to go

1    through at different points in time and either close labels

2    down, merge them together.

3            Probably the clearest example I could give you would

4    be two of our kind of founding labels of Atlantic and Elektra

5    being merged together to rationalize their costs simply because

6    of the revenue decline.

7            You know, Elektra is the home of artists like "The

8    Doors" and "The Eagles" and "Anita Baker" and others like that.

9    So we also had to lay off people just in terms of looking at

10:23:57 10    what our revenue base could afford and what we wanted to return

11    to our owners.

12   Q.   I'd like to hand up the witness a copy of an exhibit

13   that's been premarked as PX 486.  Thank you.

14            Mr. Flott, have you seen this document before?

15   A.   I have.

16   Q.   And at a high level, what is this document?

17   A.   It reflects the revenues of the U.S. recorded music

18   business over a period of time.

19   Q.   Where does this document come from?

10:24:39 20   A.   It comes from the RIAA, which is our U.S. industry

21   association.

22   Q.   And how is it that you come across this type of document?

23   A.   It is regularly published, and it's a document that I look

24   at on a regular basis.

25            With the RIAA, we do a regularly quarterly call where

M.J. Flott - Direct

1197

1  we go through performance.  It's also on their Web site as

2  well.

3           MS. NOYOLA:  I'd like to move PX 486 into evidence.

4           THE COURT:  Any objection?

5           MR. BUCHANAN:  No, Your Honor.

6           THE COURT:  It's received.

7  BY MS. NOYOLA: (Continuing)

8  Q.   Mr. Flott, can you describe what this chart shows.

9  A.   This chart is reflecting the U.S. recorded music revenues.

10:25:28 10  If I look at the left most column, that's marked as the year

11  2000 where industry revenues were in excess of $14 billion.

12           It continues to the right to 2014 where the revenues

13  are just under $7 billion.

14  Q.   And is this chart specific to Warner Music Group?

15  A.   No, it's the U.S. recorded music revenues.

16  Q.   Tell us what these different colors on this chart show.

17  A.   Each color represents a different format.  So the largest

18  color that you see on the left side of the page being orange,

19  that's the compact disc.

10:26:15 20           And as you move to the right, you'll see other

21  formats as they came into play.  So in 2004, you start to see

22  purple.  That is the -- that's a download, and the different

23  shades are the different forms of whether it was a single or an

24  album.

25           And then we start to see in 2005 green start to come

M.J. Flott - Direct

1198

1   in.  And that is streaming and the different types of streaming

2   revenues that come through.

3   Q.   Are you familiar with the term "music consumption"?

4   A.   Yes, I am.

5   Q.   What does that term mean?

6   A.   Music consumption means the number of hours that a

7   consumer is -- generally commits to listening to music.

8   Q.   And in your day-to-day work, have you become familiar with

9   the volume of music consumption over this time frame of 2000 to

10:27:19 10   2014?

11   A.   Yes.

12   Q.   And how so?

13   A.   In additional reports that either I've seen come from the

14   RIAA or other published articles, there's reference made to the

15   number of hours that a consumer, you know, has committed and

16   how it's grown from 2000 through to today.

17   Q.   What is your understanding of the volume of music

18   consumption from 2000 to 2014?

19   A.   It has continued to increase year over year, and I think

10:27:58 20   towards the end of this chart, I believe consumers are

21   committing almost a week a year -- a week a -- sorry.  A day a

22   week to consuming music.

23   Q.   So how does that trend of music consumption compare to the

24   trend that's shown here about -- on recorded music revenues?

25   A.   Well, in a normal business model, you would expect -- as

M.J. Flott - Direct

1199

1    consumption grows, you would expect revenues to grow in line

2    with it.  There may be some shifts as things go, but generally

3    the trend that we've seen with other formats as they've come in

4    is that you've seen revenue growth, not revenue decline.

5    Q.   So how do you explain the revenue decrease over this time

6    period if music consumption is increasing over the same time

7    period?

8    A.   At this same point in time where we made the turn of the

9    century is really when peer-to-peer piracy was starting to grow

10:29:04 10   at just increasing rates.  And peer-to-peer piracy, by its

11   nature, is not a sale.  It's actually -- it's stealing music.

12   None of those tracks that are being shared peer-to-peer are

13   being paid for.

14        And as a byproduct, artists, copyright holders,

15   union, and the rest of the people within the music industry

16   aren't being paid for those illegal transactions.

17   Q.   And has Warner Music Group ever tried to calculate its

18   harm from peer-to-peer piracy?

19   A.   We've not, other than on a macro -- you know, a macro

10:29:54 20   basis.

21   Q.   And why haven't you calculated -- why haven't you been

22   able to calculate Warner Music Group's harm?

23   A.   The nature of peer-to-peer piracy is it's viral, and

24   probably maybe the best way I can try and explain how viral it

25   works is if we use an example of a pebble going into a pond and

M.J. Flott - Direct

1200

1    it's starting to create ripples.  It's not about the first

2    transaction or the first infringement that takes place.  Once

3    that track gets put up on a site that can be shared, it's then

4    shared amongst, you know, whoever wants to take it and whoever

5    then they share it with and they share it with.

6            So if you kind of think about that initial pebble

7    coming in, and then the next person taking it and their pebble

8    dropping in, it creates just these multiple waves.  So the

9    viral nature of it, just trying to understand where that wave

10   stops is -- has not been -- it's not something that we've been

11   able to do.

12   Q.   When users illegally download and distribute works on

13   these peer-to-peer networks, how do record companies get paid?

14   A.   We don't because they're stolen and they don't -- they're

15   not paying anyone.

16   Q.   And how did --

17   A.   Including our artists, including our copyright holders,

18   including, you know, all of the other people within the chains,

19   the union musicians, the marketing people, and, you know, the

20   artists themselves.  You know, ultimately no one is getting

21   paid from those transactions.

22            MS. NOYOLA:  Thank you, Mr. Flott.

23            Pass the witness.

24            THE COURT:  Cross-examination.

25            MR. BUCHANAN:  Yes, Your Honor.

1       CROSS-EXAMINATION

2    BY MR. BUCHANAN:

3    Q.   So the -- good morning, Mr. Flott.

4    A.   Good morning.

5    Q.   My name is Tom Buchanan.  I have a few questions for you.

6    A.   Okay.

7    Q.   This -- the source of this information is your lobbying

8    group, RIAA; is that right?

9    A.   It's our industry association, yes.

10:32:17 10   Q.   And I think you said you're the executive vice-president

11   and CFO of Warner Music Group?

12   A.   Of the Recorded Music Division.

13   Q.   Okay.  Did you prepare a chart like this like on a

14   quarterly or annual basis for your Board?

15   A.   No, we would've leveraged this schedule since it's put

16   together for the overall industry.

17   Q.   So the answer is, you did not present a chart like this to

18   your Board during this period of time?

19   A.   I don't know during this period of time.

10:32:51 20   Q.   Okay.  When I say, this period of time, I'm talking about

21   2000 to 2014, those 14 or 15 years.  Was this something that

22   you as the CFO of the company would typically would prepare and

23   present to the Board of Directors so they would know what was

24   going on in the market?

25   A.   During this period of time from 2000 to 2006, I was not

M.J. Flott - Cross

1202

1   with the company.  And in 2014 is when I initially took the CFO

2   for Recorded Music job.

3   Q.   Okay.

4   A.   So it may have -- it may have been presented prior, but I

5   -- during this period of time, I would not -- I did not present

6   it.

7   Q.   Okay.  When did you start with the company?

8   A.   Initially or?

9   Q.   Initially.

10:33:36 10   A.   1983.

11   Q.   Okay.  And so, what period of time were you there from

12   2000 to 2014?

13   A.   2006 through 2014.

14   Q.   Okay.  So do you recall this type of data being presented

15   to the Board of Directors while you were there?

16   A.   I don't know.

17   Q.   You don't know?  Did you ever do it?

18   A.   I did not do it on --

19   Q.   Okay.

10:33:58 20   A.   -- you know, for the Board.  They may have gotten it from

21   the existing management team at the time.

22   Q.   Okay.  So have you ever -- you prepared for this trial to

23   come in and testify, correct?

24   A.   Yes.

25   Q.   So this says RIAA.  I am asking you now, did you go back

M.J. Flott - Cross

1203

1    and try to determine from all the financial records that you

2    have access to by computer to determine whether this sort of

3    data was gathered considering its importance and present it to

4    the Board of Directors at any time?

5    A.    I did not, no.

6    Q.    Okay.  So this is -- this covers the globe, right, this

7    data?

8    A.    No.

9    Q.    Okay.  So these are U.S. sales, right, of your company?

10   A.    No.  This is U.S. sales of the recorded music.

11   Q.    Okay.  So what I'm getting at in terms of the impact of

12   piracy only, that would be global, right?

13   A.    That's correct.

14   Q.    Okay.  So that would be China, India, the Far East, South

15   America, the entire world?

16   A.    That's correct.

17   Q.    Okay.  Do you know what the impact of piracy by people

18   outside of the United States, how that impacted this?

19   A.    Well, the United States is the largest market and has been

20   the largest market in the world for as long as I can recall.

21   And --

22   Q.    So do you -- but there are, obviously, a lot of other

23   people out there with computers that could access music through

24   BitTorrent, correct?

25   A.    Sure.

10:34:45 (line 10)
10:35:15 (line 20)

1 Q.    There are billions out there, right?

2 A.    Sure.

3 Q.    Okay.  I am wondering, does this in any way distinguish

4 between the impact of piracy on the sales of CDs or whatever

5 else and the peer-to-peer piracy?  Does this chart capture the

6 impact of those people outside the United States versus those

7 in?

8 A.    This chart wouldn't because it only reflects legitimate

9 sales.

10:35:57 10 Q.    Okay.  But the piracy, you're trying to capture the impact

11 of piracy on revenues, right?

12 A.    That's correct.

13 Q.    Okay.  So if people outside the United States are

14 downloading music illegally, that doesn't distinguish between

15 the people who did it in the United States?  This is just a

16 chart that shows the numbers going down.

17        So do you know who, in fact, is doing this, you know,

18 outside the United States?  Do you have any idea of the impact

19 on peer-to-peer networks of illegal downloading outside the

10:36:28 20 United States during this time period?

21        MS. NOYOLA:  Objection, Your Honor.

22        THE COURT:  This document doesn't capture any piracy

23 numbers.  So your question is confusing.  Reframe it, please.

24        MR. BUCHANAN:  Okay.  All right.

25 BY MR. BUCHANAN: (Continuing)

1   Q.   So this document just shows revenues for these different

2   types of products sold by your company and other record label

3   companies in the United States, correct?

4   A.   That's correct.

5   Q.   Okay.  And the point you're making here, is it not, by

6   this chart is try to show the impact of piracy on sales?

7   A.   All this chart does is reflects the trend, what has

8   happened to our revenues from 2000 to 2014 by the formats that

9   we operated.

10:37:08 10   Q.   Okay.  So you don't know what is driving this revenue

11   down?  Say the great recession, 2007, 2008, 2009, you don't

12   have any idea how that impacted these particular sales that are

13   reflected on this chart?

14   A.   Well, we do know that while -- well, we do know that if

15   you look at music consumption and in a normal business model,

16   you would not expect revenue decline in a period when you have

17   consumption increasing.

18   Q.   Okay.  So increased consumption could be someone goes on

19   iTunes, buys a song, listens to it all week long.  How does

10:37:47 20   that affect the revenues on here, that increased consumption?

21   A.   If someone goes to iTunes and buys a song, it's treated as

22   one sale.

23   Q.   Right.

24   A.   Regardless of how many times they listen to it, it's still

25   in this chart and would only be reflected as one song.

M.J. Flott - Cross

1206

1  Q.   Okay.  And isn't that a very common way for people to

2  listen to music today or in the last five years, is on their

3  phones and with head pieces?

4  A.   It is, but that consumption has changed from a download to

5  more of a streaming market as evidenced by the way the bars are

6  going.

7  Q.   Right.  And streaming is going up dramatically, it has

8  been going up dramatically for years, correct?

9  A.   That's correct.

10:38:31 10  Q.   And that is reflected on this chart?

11  A.   That's right.

12  Q.   And you're capturing revenue from streaming?

13  A.   We are.

14  Q.   Right.  And that's a natural consequence, right?  That

15  people that are switching from, say CDs, which are bulky and

16  cost a lot of money, to switch to streaming; isn't that true?

17  A.   That's one, that's one factor.  But while you -- while you

18  look at that, at the same time you would not expect in a market

19  where consumption is increasing, for your revenue to decrease.

10:39:00 20       We want to make sure that consumers have the ability

21  to enjoy their music in whichever medium and whichever format

22  they have.  If you go back to when other formats have been

23  introduced over time, when the CD came in, when other formats

24  have come in, we have not seen a decline in revenue the way

25  that we're seeing here.

M.J. Flott - Cross

1207

1      And if you look at the increase in peer-to-peer

2 activity and what it has done on consumption, you're not seeing

3 revenue correlate with the increased demand for music overall.

4 Q.   So in terms of the decrease of CD sales in this chart,

5 isn't it true that there was an industry where people were

6 actually manufacturing CDs and basically stealing them?

7 A.   That was a type of piracy similar to people buying

8 cassettes back in the '70s and '80s and creating their own mix

9 tapes.

10:40:14  10 Q.   So is that reflected in this chart, the impact of piracy

11 on sales versus people's downloading music illegally versus

12 manufacturing illegally CDs?

13 A.   Again, any illegitimate sale, any, you know, element of

14 piracy, whether it's physical piracy, whether it is download

15 piracy, whether it is -- now what we're dealing with is stream

16 ripping, none of those are sales.  So we would not have

17 collected any revenue, paid our artists, and they wouldn't be

18 reflected within the revenue of this chart.

19 Q.   So the illegal downloading that you've referenced, that

10:40:55  20 takes place by subscribers do that who are on ISPs who have

21 access to Internet service, correct?

22 A.   Yes.

23 Q.   Okay.  And I believe in your deposition you said there are

24 sort of three approaches that you take to try to stop this --

25      MS. NOYOLA:  Objection, Your Honor.

1208

```
         1    Q.    Peer-to-peer, is one --

         2          THE COURT:  I'm sorry, there is an objection.  Just

         3    ask him straight out.

         4          MR. BUCHANAN:  Okay.

         5    BY MR. BUCHANAN: (Continuing)

         6    Q.    Isn't it true that there are sort of three approaches that

         7    you take at your company to try to stop this illegal

         8    downloading, education, legislation, litigation, right?

         9    A.    That's correct.

10:41:33 10   Q.    Okay.  And your company for years sued individual

        11    subscribers, did it not?

        12          MS. NOYOLA:  Objection, Your Honor, outside the scope

        13    of direct.

        14          THE COURT:  Overruled.  I will allow it.

        15    BY MR. BUCHANAN: (Continuing)

        16    Q.    Isn't that true?

        17    A.    Yes.

        18    Q.    Okay.  And how many years did you pursue that strategy of

        19    suing individual subscribers?

10:41:54 20   A.    I don't recall the specific, but for a number of years.

        21    Q.    Maybe ten?  Do you know?

        22    A.    I don't know.

        23    Q.    Okay.  And it didn't matter who the individual subscriber

        24    was, whether it was a grandmother, a kid, a student, you would

        25    sue them for illegal downloading, right?
```

          1          MS. NOYOLA:  Objection, Your Honor.  The witness has

          2   testified he doesn't know.

          3          THE COURT:  Yeah.  Sustained.

          4   BY MR. BUCHANAN: (Continuing)

          5   Q.   So do you know when you stopped that strategy of suing

          6   individual subscribers?

          7   A.   I don't recall the specific year, no.

          8   Q.   Okay.  Do you know why you stopped it?

          9   A.   Our preference has always been not to act to litigate.

10:42:31 10   Our preference would be to deal with education and with

         11   legislation, and to, you know, work with those networks, the

         12   ISPs, to make sure that their customers are educated and

         13   understand that there are consequences to performing illegal

         14   activity.

         15   Q.   So if your preference was education, why did you have a

         16   campaign for at least five years of suing individual

         17   subscribers?

         18          MS. NOYOLA:  Objection, Your Honor, again --

         19          THE COURT:  Sustained.  Facts not in evidence.  He

10:43:05 20   just said he didn't know how long.  So revise your question,

         21   please.

         22   BY MR. BUCHANAN: (Continuing)

         23   Q.   So forget the years part.  You testified that you had a

         24   campaign where you sued individual subscribers for a number of

         25   years, you don't know how many.

1    And so I am saying, at what point in time did you

2 decide -- did the company decide the preference wasn't to sue

3 individual subscribers but to educate?

A.   Well, all three of those go hand in hand.  You know,

5 education, legislation, and litigation.  Our preference was not

6 to go through and to litigate.  But, you know, at that

7 particular point in time there was a question as to the

8 legality of the point.  So we had to protect our artists'

9 rights, and we needed to make sure that individuals understood

10:44:03 10  that if they were -- if they were stealing, that they needed to

11 understand that there were consequences.

12    You wouldn't, you wouldn't walk into -- I don't think

13 anyone would think that if you walked into a car dealership and

14 they gave you the keys, that you could just drive off.  And

15 intellectual property is not any different than that.

Q.   So my question is, as you said, you had legislation,

17 education, and litigation.  So we talked about the litigation

18 against individual subscribers.

19    What were you doing education-wise while the campaign

10:44:38 20  to sue individual subscribers was going on?

A.   The RIAA had a number of different programs.  We have

22 information that was put within our CDs, information on our

23 website.

24    So I know that I, myself, you know, would talk to my

25 kids' friends who would come over and try and get them to

1 understand that it's stealing.  And, you know, it was not the

2 most comfortable conversations in my house with their friends,

3 and some of them wouldn't come back.

4 Q.   So isn't the reason -- isn't the reason that your company

5 stopped suing individual subscribers, file sharers, is because

6 of the bad publicity?

7 A.   No.

8 Q.   You don't believe that's the case at all?

9 A.   I believe that our strong preference is not to litigate

10:45:38 10 and -- but we also needed to make sure that individuals

11 understood the consequences of doing things illegally.  And

12 we've tried to move forward from there and, you know, continue

13 with education and legislation.

14 Q.   So part of that education process was when your company

15 and the other record labels entered into the Copyright Alert

16 System with five of the major --

17          MS. NOYOLA:  Objection, Your Honor, outside the

18 scope.  And counsel is testifying as to facts not in evidence.

19          MR. BUCHANAN:  It's cross.

10:46:17 20          THE COURT:  I am going to allow it.  It is beyond the

21 scope of direct examination.  I will allow you to redirect if

22 you think it's appropriate.

23          If he is aware of it.

24          MR. BUCHANAN:  Right.

25 BY MR. BUCHANAN:  (Continuing)

```
 1   Q.    So you talked about education being important?

 2   A.    Yes.

 3   Q.    And the Copyright Alert System was based not on litigation

 4   but on education, right?

 5   A.    Yes.

 6   Q.    Okay.  And your company and other record label companies

 7   spent years studying the ability for the CAS program to work,

 8   right, before they entered into these memorandum of

 9   understandings?

10   A.    I believe so.

11   Q.    Okay.  And so, did you look at any of the due diligence

12   that was done by the record label companies before they entered

13   into CAS, the data that went into it, to indicate that this

14   education system by using notices versus termination or

15   litigation would work?

16   A.    I didn't, but it's not in my area of responsibility.

17   That's, you know, for our business and legal affairs team.

18   Q.    Right.  But the decision to enter into CAS was very

19   important to your shareholders and to your artists, right?

20   A.    Yes.

21   Q.    Because you were making a decision as a company, along

22   with the other record label companies, to stick with alerts and

23   notices and not termination or litigation, right?

24               MS. NOYOLA:  Objection, Your Honor, foundation.

25               THE COURT:  Yeah, there's no foundation.  Sustained.
```

BY MR. BUCHANAN: (Continuing)

Q.   Okay.  Do you understand CAS, that it didn't require termination, right?

A.   I have a general understanding of it.  Our legal department is really the area where that is handled.

Q.   Okay.  So you understand with an education program, it didn't require termination of a subscriber, right?

            MS. NOYOLA:  Objection, vague, Your Honor.

A.   I don't know that.

            THE COURT:  Okay.  He answered.  He said, I don't know.

BY MR. BUCHANAN: (Continuing)

Q.   All right.  So again, you agree, though, that this was a major step because you're basically foregoing litigation and you're going toward education with the ISPs, right?

A.   I don't think we were foregoing litigation.  Our preference was to go education.

Q.   Okay.

A.   But, again, it's not my area of responsibility.

Q.   Right.

A.   It's the responsibility of our general counsel and our business and legal affairs department.

Q.   So are you aware that under CAS, they would -- the ISPs would collect all the data that came in from the -- as to the subscribers, all the notices per subscriber per day, and they

M.J. Flott - Cross

1214

1  would collect that data and they would send it back to your

2  company?

3          MS. NOYOLA:  Objection, Your Honor, same issue,

4  foundation.

5          THE COURT:  Yeah, let's --

6          MS. NOYOLA:  He has already asked and answered that

7  he doesn't have any familiarity --

8          THE COURT:  Stop, stop.  Do you understand the

9  question?  The specifics of the -- he's indicated he doesn't

10:49:26 10  have any personal familiarity, it's not his area of the

11  company.  And you're hitting with a pretty broad question.

12          MR. BUCHANAN:  Okay.

13          THE COURT:  So ask him whether he's familiar with

14  what CAS was doing with any data.

15  BY MR. BUCHANAN: (Continuing)

16  Q.  So I'm asking you, as the CFO of Warner Music Group, did

17  you get any data pursuant to CAS, either you or anyone in the

18  company, pursuant to CAS that showed the effectiveness of this

19  education program that was so important to your artists?

10:50:05 20  A.  So just to correct, the CFO for Recorded Music, not Warner

21  Music.

22  Q.  Okay.

23  A.  It is possible it went into our legal department.  I don't

24  have knowledge of whether we received it or what was done with

25  it.

1215

1    Q.   So you were deposed in this case, correct?

2    A.   Yes.

3    Q.   And you prepared for your testimony here today, right?

4    A.   I did.

5    Q.   So is it -- and you're saying that in doing both of those

6    things, you never looked at the data that you got pursuant to

7    this CAS program from the ISPs to see if it was effective --

8              MS. NOYOLA:   Objection, asked and answered.

9    Q.   -- and that they were actually stopping --

10             THE COURT:   Hold on.

11   BY MR. BUCHANAN: (Continuing)

12   Q.   They were actually stopping infringement --

13             THE COURT:   Overruled.

14   BY MR. BUCHANAN: (Continuing)

15   Q.   Did you --

16             THE COURT:   He may answer.

17             THE COURT REPORTER:   I'm sorry, Your Honor.

18             THE COURT:   Yeah, I apologize.   If you understand the

19   question.

20             But he wasn't the CFO at the time during CAS, so

21   let's be clear about that as well.

22             MR. BUCHANAN:   Right.

23             THE COURT:   But back in -- if you want to direct him

24   to 2010 and ask him whether he was aware -- go ahead.

25   BY MR. BUCHANAN: (Continuing)

1216

1    Q.   So do you know if the data that CAS was collecting on the

2    effectiveness of this education program to protect the rights

3    of all these artists you talked about, whether that was

4    provided to your company?

5    A.   I don't personally know.

6    Q.   Have you attempted to look for that information as part of

7    your coming into court today and to testify to the Court and

8    the jury?

9    A.   My understanding was that's not what I was being asked to

10   be here to testify to.

11   Q.   Okay.  So are you aware of the members of CAS, that it was

12   Verizon, and Comcast, Cablevision, Time Warner, AT&T?

13   A.   Again, I have a general understanding of CAS.  I don't

14   have the specific understanding of CAS.

15   Q.   Did you know that those companies were the other members

16   with your company and the other record label companies that

17   made up CAS?

18   A.   Again, I don't know.  So I'm not going to say that I do

19   know.  I apologize.

20   Q.   Would you agree that -- you just gave an example about

21   someone going into a used car dealership or something and

22   stealing a car.

23         So would you agree that if those five, those five

24   ISPs that were part of CAS, whether -- if they were basically

25   for five years given the opportunity to process notices but not

M.J. Flott - Cross

1217

1   terminate anybody for five years, would that not create a

2   market for infringement?

3           THE COURT:  That was a totally improper question.

4   And the objection is sustained.

5           Let's move on.

6           MR. BUCHANAN:  Okay.

7   BY MR. BUCHANAN: (Continuing)

8   Q.   So do you have any idea of -- you know, you talked about

9   in that chart what you believe is the impact of illegal

10  downloading on U.S. sales.  And do you recall you testified

11  that you believed that consumption was going up and that

12  American citizens were the main people that are consuming music

13  in the world comparatively; is that right?

14  A.   I believe what I said is the U.S. is the largest

15  territory.  But this schedule here just reflects the U.S.

16  recorded music business.

17  Q.   And so, for a U.S. -- person in the United States to

18  illegally download music, they would have to use an ISP in the

19  United States, right?

20  A.   That would be one way that they could, yes.

21  Q.   So did you attempt to determine how much of the illegal

22  downloading took place during the five years of CAS by the five

23  ISPs that were part of CAS?

24          MS. NOYOLA:  Objection, Your Honor.

25          THE COURT:  Sustained.

M.J. Flott - Cross

1218

```
 1              MR. BUCHANAN:  Okay.
 2   BY MR. BUCHANAN: (Continuing)
 3   Q.   Do you know if there was any information about -- and you
 4   may not know this either, but with regard to CAS, any data, was
 5   it -- do you know if it was ever shared with the artist?
 6              MS. NOYOLA:  Objection.  Your Honor, we would like a
 7   sidebar.
 8              THE COURT:  I'm sorry?
 9              MS. NOYOLA:  We would like a sidebar, please.
10              THE COURT:  Yes.
11              NOTE:  A sidebar discussion is had between the Court
12   and counsel out of the hearing of the jury as follows:
13   AT SIDEBAR
14              MS. NOYOLA:  Your Honor, Mr. Buchanan has had some
15   questioning of the witness material times on CAS, and he's
16   already testified that he has no personal knowledge about the
17   specifics of CAS.  And he was not CFO during the negotiations
18   of the CAS.
19              THE COURT:  Where are you going?
20              MR. BUCHANAN:  Well, where I was going is he
21   basically testified as an expert about, you know, the music
22   industry, how it was going down, the impact of piracy, the
23   American consumption of music, even though he is the CFO for
24   this short period of time.  So how does he get all of that
25   information?  Okay.  The RIAA gives it to him.  And he makes
```

M.J. Flott - Cross

1219

1   this chart.

2           What I'm trying to show is, well, look, if that's so

3   important, okay, if it's the ISPs out there that are allowing

4   this infringement, what are you doing with regard to the five

5   that you didn't take any action against and you basically gave

6   them a free pass?  That created a market for everybody to go

7   to, arguably --

8           THE COURT:  Yeah, but he doesn't have that

9   information.

10          MR. BUCHANAN:  Okay.

11          THE COURT:  I mean, he's different than the other

12  people who were up here.  He is a CFO -- and he wasn't the CFO

13  during the CAS period of time.

14          MR. BUCHANAN:  Right.

15          THE COURT:  He has answered.  I mean, frankly, I

16  thought you had been asking these questions just so I'll object

17  and it will somehow look like I'm trying to preserve the

18  witness from having to testify.

19          MR. BUCHANAN:  No, no.

10:56:18 20          THE COURT:  But this is way off his plate.

21          MR. BUCHANAN:  Okay.  All right.

22          THE COURT:  So your objection is sustained.  Let's

23  move on to something else.

24          MR. BUCHANAN:  All right.

25          MR. OPPENHEIM:  Does this mean there will be no

```
  1    further questions on CAS with this witness?  Because this has

  2    become --

  3              THE COURT:  Yes, yes, no more CAS.

  4              NOTE:  The sidebar discussion is concluded; whereupon

  5    the case continues before the jury as follows:

  6    BEFORE THE JURY

  7              THE COURT:  I was trying to finish up this witness

  8    before our break, but would you like a break now or --

  9              A JUROR:  I could use it.

 10              THE COURT:  You would like a break now?

 11              Okay.  All right.  Let's take 15 minutes right now.

 12    We have got a couple of heads shaking that they would like it

 13    now.

 14              So let's take 15 minutes and we'll come back.

 15              NOTE:  At this point the jury leaves the courtroom;

 16    whereupon the case continues as follows:

 17    JURY OUT

 18              THE COURT:  All right.  Anything before we break?

 19              MR. BUCHANAN:  No, Your Honor.

 20              THE COURT:  Okay.  Then we're going to take

 21    15 minutes.

 22              Mr. Flott, you're in the middle of your testimony, so

 23    don't discuss the testimony you've given so far while you're on

 24    break.  All right, sir?

 25              All right.  Thank you.
```

10:56:54 (line 10)

10:57:37 (line 20)

1       All right, we're in recess.

2       NOTE:  At this point a recess is taken; at the

3  conclusion of which the case continues in the absence of the

4  jury as follow:

5  JURY OUT

6       THE COURT:  All right.  Are we ready for our jury?

7       MS. NOYOLA:  Your Honor, we wanted to raise an issue

8  regarding the scope of Mr. Buchanan's cross-examination.  We

9  understand he may raise some questions about current streaming,

11:16:53 10  current -- and Warner Music's current revenues.

11       We do not believe these are relevant to the issues in

12  the case.  It is outside the bounds of the direct examination,

13  outside the bounds of this case.

14       THE COURT:  So present day streaming numbers?

15       MR. BUCHANAN:  Well, the witness testified that

16  streaming -- when it started and how it progressed, and it came

17  up to the present.

18       THE COURT:  And he had the graph.

19       MR. BUCHANAN:  In addition, Dr. Lehr has all this

11:17:19 20  comparisons between the current value of Cox, you heard that in

21  opening, how much we were worth.  And so, you know, we have a

22  right to compare what these companies are worth.

23       THE COURT:  Hasn't this testimony already came in --

24  come in for the other plaintiffs in the case?

25       MR. OPPENHEIM:  Not the current -- so I think the

 1    issue is current revenues and streaming revenue, not relevant.

 2             Cox's revenues are clearly relevant under the factors

 3    for statutory damages.  But the plaintiffs, during the time at

 4    issue, absolutely.  But beyond the time at issue, not.

 5             At a high level, do we care?  But it's outside the

 6    scope.  But I believe that what's going to be elicited here,

 7    just based on some documents that we are seeing, is we are in

 8    the trends of streaming revenues now and what's happening.  And

 9    all of what happened after 2014 in terms of revenue trends, is

11:18:17 10    outside the scope of this case.

11             MR. ELKIN:  Your Honor, very briefly, not to rehash

12    everything.

13             THE COURT:  Mr. Elkin.

14             MR. ELKIN:  I don't think that Mr. Buchanan is going

15    to get very much into this, really if at all, but I just want

16    to put a bookmark here.  It has come in through Kooker, it has

17    come in through other witnesses.  Quite a number of witnesses

18    so far have either touched upon it directly or indirectly.

19             As I mentioned when this issue cropped up earlier in

11:18:44 20    the trial, I do think to the extent they are seeking willful

21    copyright infringement and seeking statutory damages,

22    deterrence is an issue.  The market has changed, I don't think

23    it's really in dispute.

24             I don't want to belabor the other points, I just

25    wanted to make sure that we had that reminder.

```
 1              THE COURT:  Okay.  Thank you.

 2              MR. OPPENHEIM:  One last point, if I may, Your Honor.

 3              THE COURT:  Yeah.

 4              MR. OPPENHEIM:  In the opening, if we could just pull

 5     up the slide, this is the slide that was put up in the opening

 6     by Cox.

 7              THE COURT:  I understand.  And I allowed the general

 8     revenues to come in for the point that Mr. Elkin just made,

 9     which is the industry has gone away from P2P -- that's a

10     misstatement.

11              The industry has moved on to different ways to

12     transfer digital music, and that it may relate to whether or

13     not there is a likelihood of future infringement given the

14     marketplace.

15              So if it's not clear to you what I just said --

16              MR. OPPENHEIM:  So if what Your Honor is getting at

17     is the issue of deterrence under the -- as one of the factors

18     in statutory damages --

19              THE COURT:  Right.

20              MR. OPPENHEIM:  -- what the current revenues

21     structure is for the plaintiffs is not a reflection of the harm

22     that is potentially done from a particular type of piracy.

23              So let's say we had a new format, and that new format

24     was USB hard drives that got sold in stores.  That would be

25     entirely -- you know, if it happens after the point in time, it
```

1224

1  is irrelevant to the question of the deterrence of Cox.

2          The peer-to-peer piracy may be the reason that

3  downloads are down.  I mean, they could elicit that.  But going

4  into what a new format is is entirely irrelevant.

5          All they are trying to do is say, look, these

6  companies are now making a lot of money because they are

7  finding ways to deal with the piracy that we're allowing.

8  That's not a place this case should go.

9          THE COURT:  Well, it is of marginal relevance.  I'll

10 allow you to ask whether he is aware of the revenues, whether

11 they have recovered using different methods, and then let's

12 move on.  Okay?

13         All right, thank you.  Your exception is noted --

14         MR. OPPENHEIM:  Thank you, Your Honor.

15         THE COURT:  -- Mr. Oppenheim.

16         All right.  Let's get our jury, Joe.

17         NOTE:  At this point the jury returns to the

18 courtroom; whereupon the case continues as follows:

19 JURY IN

20         THE COURT:  All right.  Please have a seat.

21         And let's continue, Mr. Buchanan.

22 BY MR. BUCHANAN:  (Continuing)

23 Q.  A few more questions, sir.

24         On this chart, it starts in 2000, correct?

25 A.  Yes.

M.J. Flott - Cross

1225

1   Q.   And 1999 was the advent of Napster; is that correct?

2   A.   In that area, yes.

3   Q.   Okay.  And in 2001 you had iTunes and Apple?

4   A.   No, it -- iTunes started late 2003, early 2004.

5   Q.   Okay.  And that led to what they call the disaggregation

6   of the album, the CD album, correct?

7   A.   It created a different format.

8   Q.   Right.  And the format was you could now pick and choose

9   whatever individual song you wanted, you didn't have to go buy

11:23:01 10   a CD with 26 songs that cost 25 bucks; isn't that right?

11   A.   If a consumer chose to do that, yes, but they still had

12   the ability to buy music in whichever way that they wanted to.

13   Q.   Right.  But they could make a choice between going on to

14   iTunes and paying a dollar for their favorite song versus going

15   to a record store and paying $25 for an album that had 25 songs

16   and really only wanted one, right?

17   A.   That is -- was their option, yes.

18   Q.   So one of the other things that, as I understand it, that

19   your company did to counter the loss of CD sales due to piracy

11:23:42 20   and downloading was to sign artists up to what they call

21   360 deals; is that right?

22   A.   That's correct.

23   Q.   And they involved basically trying to find artists at the

24   beginning of their career and then expanding the rights that

25   your company would own vis-à-vis that artist, right?

1226

1   A.   We approached artists, not just at the beginning of their

2   career, but during their career as well.

3   Q.   But the 360 deals, didn't you sort of use those to expand

4   the rights that would be owned by your company versus the

5   artists' rights, right?

6   A.   They still were the artists' rights, we just created

7   whatever the contractual relationship would be as to how much

8   they would get paid from us working those rights for them.

9   Q.   Okay.  So it basically -- and I read this in the financial

11:24:32 10   statement about these expanded rights, what it meant was that

11   you then would have a greater return of the return on their

12   product, correct?

13   A.   That's not necessarily the case.  You would have to look

14   at each right and how we shared those different revenues.

15   Q.   Okay.  So -- but isn't it true that under these 360 deals,

16   you went to artists and you then tried to capture an interest

17   in more of what you were doing for them to increase revenues

18   for your company?

19   A.   We didn't do anything that any business would do.  We were

11:25:10 20   trying to acquire the maximum amount of rights that we could --

21   Q.   Okay.

22   A.   -- and they benefit both the artist and ourselves.

23   Ultimately, it's the artist's decision as to whether they

24   wanted to sign up with us and have us work those rights for

25   them.

M.J. Flott - Cross

1227

```
 1   Q.   Right.  So you talked about the work you do for artists.

 2   It's true that you had disputes over ownership and collections

 3   with your artists over the years, haven't you?

 4            MS. NOYOLA:  Objection, Your Honor, outside the

 5   scope.

 6            THE COURT:  Sustained.

 7            MR. BUCHANAN:  Okay.  Your Honor --

 8            THE COURT:  This whole field is off.

 9   BY MR. BUCHANAN: (Continuing)

11:25:53 10   Q.   Okay.  So I want to ask you some questions about the

11   financials of the company.  And I have -- do you have a binder

12   there?

13            First of all, Warner Music Group, you are owned by

14   Access Industries; is that correct?

15   A.   Currently, yes.

16   Q.   And that's a private equity company?

17   A.   Yes.

18   Q.   Okay.  And who is the major shareholder in that company?

19   A.   Len Blavatnik.

11:26:33 20   Q.   And he is a Ukranian; is that right?

21            MS. NOYOLA:  Objection, Your Honor.

22            THE COURT:  Relevance is sustained.  I said you could

23   get into the revenues in just kind of a conclusory manner, and

24   you may do that, please.

25   BY MR. BUCHANAN: (Continuing)
```

M.J. Flott - Cross

1228

1    Q.   And do you know what price that Access Industries paid for

2    Warner Music Group?

3             MS. NOYOLA:  Objection, Your Honor.

4             THE COURT:  You may answer the question if you know.

5    A.   It was a little over $3 billion.

6    BY MR. BUCHANAN: (Continuing)

7    Q.   Okay.  And when did that take place?

8    A.   I believe it was July of 2011.

9    Q.   Okay.  And what is the approximate worth of your company

11:27:18 10   today?

11   A.   We don't -- we don't trade external debt.  So you would --

12   if you are asking me just about the Recorded Music Division

13   versus overall Warner Music Group?

14   Q.   What is -- do you know what the current value is of Warner

15   Music Group?

16   A.   I don't because it -- there is multiple factors that would

17   go into what the value would be currently.

18   Q.   That is not something that you calculate for the Board or

19   for the --

11:27:55 20   A.   I don't.  The corporate, the corporate group does that.

21   Q.   All right.  But you don't know that information?

22   A.   I -- you know, there are different valuations that are

23   done at different points in time.  I don't have the current

24   value.

25   Q.   So you understand that the claim period here is

1   February 2013 through November 2014; is that right?

2   A.   That's my understanding.

3   Q.   All right.  And do you know the amount of revenue that WMG

4   generated for the fiscal year 2014?

5   A.   I believe it's in one of these documents, right?

6   Q.   Right.  So I can show you the document, but is it about

7   $3 billion?  Would that be about right?

8   A.   Again, I would want to look at the exhibit.

9   Q.   Okay.  That's fine.  Why don't you look at tab 6.

11:28:46 10   A.   Okay.

11   Q.   And see if you can -- I would look at page 44, the big

12   number down at the bottom, DX 2844.

13   A.   Okay.

14   Q.   Do you see the Total Revenue column?

15   A.   I do.

16   Q.   It says for 2014, three billion?

17   A.   I do.

18   Q.   And then 2013, 2.8 billion?

19   A.   That's correct.

11:29:22 20   Q.   And for 2012, 2.7 billion; is that correct?

21   A.   2.8, yes.

22   Q.   All right.  Now, you mentioned streaming before.

23   Streaming is a large, significant part of the revenue that has

24   been coming into the company for the last two or three years,

25   is it not?

```
 1   A.   It is.

 2   Q.   Okay.  And do you know how much -- the percentage that

 3   revenue from streaming has gone up over, say, the last year or

 4   two?

 5   A.   The last year being which period of time?

 6   Q.   Say 2019, are you aware that the streaming revenue was up

 7   23 percent in 2019 over 2018?

 8   A.   That sounds like it's right from our external reporting we

 9   just did.

10   Q.   Right.  And for streaming, active streaming, for people to

11   stream, they need a high speed internet service, correct?

12   A.   They don't have to have it, but it makes the experience

13   better if they do.

14        MR. BUCHANAN:  I think that's all the questions I

15   have.  Thank you.

16        THE COURT:  All right.  Redirect.

17   REDIRECT EXAMINATION

18   BY MS. NOYOLA:

19   Q.   Mr. Flott, as chief financial officer for Warner Music

20   Group, what sort of information do you regularly provide to the

21   Board of Directors?

22   A.   We provide the performance of the company on a periodic

23   basis.  Normally looking at kind of current quarter and our

24   fiscal years to date.  And comparing that as well to our prior

25   periods on either an as-reported or a constant-currency basis.
```

11:30:17 (line 10)
11:30:57 (line 20)

M.J. Flott - Redirect

1231

1  Q.    Does the information you provided to the Board include

2  market trends?

3  A.    It does.

4  Q.    Why do you as chief financial officer look at music

5  consumption levels and compare that to revenues?

6  A.    Based on normal consumption, we are trying to determine

7  whether or not the market is growing.  And it gives us an

8  indication as to whether we are growing at the same level or

9  whether there are other factors impacting our growth.

11:32:07 10  Q.    Do you recall some questions regarding CD piracy?

11  A.    That's correct.

12  Q.    How does CD piracy compare to the peer-to-peer piracy that

13  is at issue in this case?

14  A.    If you look at kind of CD piracy, it's a -- it's having to

15  do with a physical copy and, you know, it is a, you know, a

16  machine-to-machine basis.

17         Peer-to-peer, it can be done in almost any digital

18  format through phone, through computer, through tablet, through

19  any other sources, and then can spread.  You know, it's a

11:32:59 20  virtual copy that then can be spread and shared seamlessly and

21  much easier than CD piracy.

22  Q.    And with peer-to-peer piracy, how can you tell how many

23  copies are further made or distributed after that first copy?

24         MR. BUCHANAN:  I am going to object, Your Honor.  I

25  don't think he is an expert in this area.  He already went

M.J. Flott - Redirect

1232

         1   through this.

         2            THE COURT:  Lay a foundation.

         3            MS. NOYOLA:  I will move on to the next question.

         4   BY MS. NOYOLA: (Continuing)

         5   Q.   Do you recall your testimony, your being asked questions

         6   about the prices of CDs back in the '90s and early 2000s?

         7   A.   Yes.

         8   Q.   What was the general price point of CDs during that time

         9   frame?

11:33:42 10   A.   There really wasn't a general price point.  If you looked

        11   at between box sets, which could be sold in, you know, the

        12   upper hundred dollars to a normal -- if you took a standard CD,

        13   it would sell probably somewhere in the 15 to $16 range per, at

        14   retail.

        15   Q.   If we could please pull up PX 486.

        16            Mr. Flott, where on this chart does it reflect

        17   peer-to-peer piracy levels?

        18   A.   It doesn't.

        19   Q.   You can take that down.

11:34:35 20            Counsel asked you some questions about a transaction

        21   between Access Industries and the acquisition of Warner Music

        22   Group.  Do you recall a three billion number?

        23   A.   Yes.

        24   Q.   What did that three billion transaction cover in terms of

        25   the geographical areas and the divisions of Warner Music Group?

1233

```
         1   A.   It covered the world.  It also encompassed all of the

         2   companies within Warner Music, which is the Recorded Music

         3   Division as well as the Music Publishing Division, and the

         4   companies that exist underneath each of those divisions.

         5   Q.   And a similar question with respect to the 10k that

         6   Mr. Buchanan asked you about.  I believe that you provided some

         7   numbers regarding the total revenues --

         8   A.   Yep.

         9   Q.   -- over 2012 to 2014; is that right?

11:35:30 10  A.   Yes.

         11  Q.   And what geographical areas did those revenues cover?

         12  A.   That's the world.

         13            MS. NOYOLA:  No further questions, Your Honor.

         14            THE COURT:  All right.

         15            MR. BUCHANAN:  I just would move in DX 28, Your

         16  Honor.

         17            THE COURT:  Any objection to DX 28?

         18            MS. NOYOLA:  That's fine, Your Honor.

         19            MR. OPPENHEIM:  No objection, Your Honor.

11:35:51 20            THE COURT:  It will be received.

         21            All right.  May Mr. Flott be excused?

         22            All right, you are excused with our thanks, sir.

         23  Please don't discuss the testimony you have given with anyone

         24  until our trial is over.  All right?

         25            THE WITNESS:  Okay.
```

1234

|  | 1 | THE COURT:  All right.  Have a good day. |

```
           1        THE COURT:  All right.  Have a good day.

           2        THE WITNESS:  Thank you.

           3        NOTE:  The witness stood down.

           4        THE COURT:  All right.  Next witness.

           5        MR. OPPENHEIM:  Your Honor, at this point the

           6   plaintiffs and the defendants have agreed to the deposition of

           7   Mr. Zabek.

           8        THE COURT:  Okay.

           9        MR. OPPENHEIM:  So we will play it.  It includes,

11:36:23  10   obviously, both sides.

          11        THE COURT:  All right.  So we are going to hear

          12   testimony by deposition.  And Mr. Zabek's deposition was taken

          13   in lieu of his appearing here in court.  You should consider it

          14   just the way you would consider the testimony of a live

          15   witness.

          16        All right.  Are you all set up?

          17        And again, it's a witness that is being called by

          18   plaintiffs, but also giving testimony on behalf of Cox as well.

          19   So it's a witness for both the plaintiff and defendant.

11:37:06  20        MR. GOULD:  Your Honor, would it be helpful to give

          21   the jury a sense of how long this video might go so they can

          22   mentally prepare for it?

          23        THE COURT:  Sure.

          24        MR. GOULD:  This video is approximately four hours

          25   long.
```

J. Zabek deposition - Examination

1336

1  kind of surgery.  We can't -- we were unable to pinpoint -- not

2  looking at every data that's coming out of our customers'

3  locations to see, was it that, was it their full network, who

4  was actually doing this.  You're talking thousands of people on

5  something like that.

6          So we're erring on the side of caution, talk to our

7  legal department and see where we can go from there.

8  Q.    So do you think that there's any instance where it's

9  appropriate for Cox to allow a business subscriber to be the

10  subject of thousands of infringement notices without Cox

11  terminating the account?

12  A.    I can't think of a situation at the present time.  If

13  there's a public WiFi, they may not even know what's going on,

14  even after we contacted them.  There's a lot of gray possible

15  area in there, but we don't want copyright infringement

16  happening on any of our networks, whether it was CB or even

17  HSI.

18  Q.    Mr. Zabek, I'm going to hand you what's been marked as

19  Plaintiffs' 276, which is an e-mail exchange between you and an

20  individual by the name of Jason Barnhardt in March of 2011.

21  Did I mispronounce that name?

22  A.    No, not at all.

23  Q.    And this is an e-mail exchange -- excuse me, the Bates

24  label on this is COX_SONY_00005540 through 41.

25          In this, it appears that Mr. Barnhardt is sending you

1429

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,        :
                                :
     -vs-                       :  Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                                :
--------------------------------:
```

VOLUME 7 (A.M. Portion)

TRIAL TRANSCRIPT

December 10, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

B. Beck - Cross

1472

1    address from the complaint.

2            And since IPs can change over time, they are

3    technically dynamic, for the most part, they -- almost all of

4    them are going to typically be dynamic.

5            Then we're going to use that date and time that the

6    complaint says the event occurred, and we're going to use that

7    combined with the IP and possibly the port and see if we can

8    match up, you know, find a record where the IP at that

9    particular time, you know, which device was that associated

10   with, which customer account is that, in turn, associated with.

11   So that's typically the flow that we're going to follow.

12   Q.   And, Mr. Beck, does determining the account also determine

13   the user that engaged in the alleged behavior?

14   A.   No, that's not really possible.

15   Q.   Why not?

16   A.   That's -- it's not really a technically possible sort of

17   thing.  I mean, we can -- the IP will match up to most likely a

18   cable modem or something of that nature, and then that modem

19   is, of course, you know, associated to a particular customer

20   account.  But, you know, within a customer's home, you know,

21   there could be multiple people.  We don't really know who's

22   actually using the internet at that time.  It could be any

23   number of situations.  I mean, typically, it's going to have

24   multiple people in it.

25           Basically if you see a car speed down the road, you

B. Beck - Cross

1473

1  can report the tag, but you don't really know if the owner of

2  the car was driving or their spouse or their kid or their

3  neighbor or their guest.

4  Q.   Well, and is it possible for someone other than a family

5  or household member to use an account service?

6  A.   Oh, certainly.  So, you know, you could have people

7  visiting, of course.  You could have guests in the home.  You

8  could have a neighbor on the WiFi, especially if you, you know,

9  bought a new router, plugged it in, and didn't realize that the

10  default password was "password."  That happens.  So your

11  neighbors may figure that out and get on there and think that

12  they get free internet by just riding on top of yours.  So

13  there are certainly cases where that can happen, and that's

14  just in the residential space.

15        If we get into other use cases, you could see

16  certainly other people involved with business use cases, that

17  sort of thing.

18  Q.   Well, does Cox have both residential and business

19  subscribers for its internet service?

20  A.   Absolutely.  We certainly do.

21  Q.   And does CATS receive copyright notices directed to Cox

22  Business subscribers as well as residential subscribers?

23  A.   Certainly.  Absolutely.

24  Q.   And might a business account also have multiple users?

25  A.   Even more so, I would say.  Absolutely.

1474

1   Q.   Can you give us an example?

2   A.   Sure.  I mean, even if we just start with a small

3   business, you know, all of their employees.  It could be -- you

4   know, any of those employees could be using the internet.  I

5   would imagine most of them probably would just in day to day.

6            But, I mean, working up the, up the line with

7   business, you have all sorts of these cases.  So they may offer

8   guest WiFi services, you know, maybe they have a guest WiFi in

9   their waiting room and -- or it's a small restaurant or

10  something, maybe they have WiFi in their cafe.

11           But then you get into larger use cases with

12  commercial, too.  So you could have situations like

13  universities.  You could have situations like military bases.

14  You could have hospitals.  We certainly have a number of

15  hospitals as customers.

16           So even -- there are even hospitality cases like

17  convention centers.  That's going to be a huge number of users

18  really.  So there are definitely some, some situations like

19  that.

20  Q.   Now, once CATS identifies the subscriber, is Cox able to

21  contact the subscriber?

22  A.   Yeah, typically.  A customer account is going to typically

23  have contact information on it, yeah.

24  Q.   And once a ticket is created in CATS, what does CATS do

25  with the complaint?

1531

1    comply with this AUP.  Customer is responsible for ensuring

2    that all accounts, sub-accounts, and alternative account names

3    associated with Customer's principal account comply with this

4    AUP.  In the event of a suspected violation of this AUP,

5    Customer will cooperate with Cox Business and will promptly

6    provide Cox Business with information about Customer's

7    end-users upon request from Cox Business.

8            Did I read that correctly?

9    A.   I was doing a little bit of reading of my own at the same

10   time.

11   Q.   You understand, sir, that this says that the Cox Business

12   customer is responsible for the end user's activity through

13   their account?

14   A.   As stated here, yes.

15   Q.   Thank you.

16            Now, you testified about, something about military

17   bases, customers who are military bases, but you understand,

18   sir, that Cox doesn't provide internet service to the military

19   base itself, correct?  In fact, Cox provides perhaps internet

20   service to housing on a military base?

21   A.   I can't say that we do or don't do base versus

22   residential.  I know we have military customers.  I know we

23   have military bases that are customers.

24   Q.   You think that Cox has military bases that are actual

25   customers?

B. Beck - Redirect

1532

1  A.    It's possible.  I don't know.

2  Q.    You don't know.

3  A.    I mean, I don't know the distinction.  I know that we have

4  military bases that are customers.  I don't know what the

5  individual situations are of the users that are using those

6  services.

7  Q.    Would it surprise you if those services were provided to

8  housing on the military bases?

9  A.    No.

10 Q.    And you would agree that U.S. government and the military

11 both prohibit copyright infringement?

12 A.    That's what we're discussing here, I'm sure.

13 Q.    You testified about a number of e-mails that Cox received

14 from customers in response to infringement notices from the

15 plaintiffs.  Do you recall that?

16 A.    Yes.

17 Q.    Do you see, Mr. Beck, that DX 455 is actually an e-mail

18 from Cox?

19 A.    Yes.  That's from abuse@cox.net.

20 Q.    And it may have an e-mail from the customer down below, so

21 this is a response likely to a customer?

22 A.    From the highlighted sections, I can't tell who the

23 response is to.

24 Q.    Well, we can scroll down and take a look.  Do you see that

25 the customer's name is redacted for confidentiality?  Let's

1543

1  business customer typically communicated about that notice?

2  A.    Yes, I am.

3  Q.    And can you describe that for us?

4  A.    For business customers, due to the nature of their

5  business, we usually want to work directly with them if we can.

6  We try our best to avoid suspending them if we can because that

7  can have an impact on -- a heavy impact on their business.  So

8  with a business customer, although we'll often send them an

9  e-mail, it's often as a follow-up to a phone call.  They prefer

10 to call business customers directly and speak with them

11 directly to deal with issues like that.

12 Q.    And, Mr. Beck, are you aware of the total number of RIAA

13 notices that came in to Cox Business customers?

14 A.    For business customers, generally speaking, our business

15 customer complaint volume, you're going to be looking at 20 to

16 30 percent of the volume of RIAA's complaints are for business

17 customers.

18 Q.    Okay.  And with respect to the set of 1,700 e-mails that

19 counsel was asking about, those are the written responses from

20 Cox customers to Cox in response receiving a notice, the

21 business customers may be calling back in; is that right?

22 A.    That is true.  Even the residential customers will often

23 pick up the phone.  Especially in this day and age, with this

24 much phishing and stuff goes on, if they see an e-mail that

25 says something is going on with the Cox service, they may be

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
          Plaintiffs,           :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
          Defendants.           :
                                :
--------------------------------:

VOLUME  7  (P.M. Portion)

TRIAL TRANSCRIPT

December 10, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1    response program at Cox originated?

2    A.    I do.

3    Q.    Could you tell the jury.

4    A.    I invented it.

5    Q.    And why did you develop this?

6    A.    It's the most effective way of communicating with

7    subscribers.

8    Q.    When did you develop it?

9    A.    Early 2000s, probably 2002/2003 time frame.

10   Q.    What is the purpose of engaging in escalating steps with

11   customers related to copyright infringement?

12   A.    We need to make sure that we reach the actual account

13   holder, and sometimes that can be tricky.

14   Q.    And what, if anything, have you done to determine whether

15   the graduated response at Cox was effective?

16   A.    I have run a number of queries in the CATS database to

17   check repeat offense rates.

18   Q.    When did you do that?

19   A.    I did it throughout my time.  It was something that I did

20   just as the normal course of my job.

21   Q.    How often would you do it?

22   A.    It wasn't a set schedule, but I would say quarterly,

23   probably.

24   Q.    And what did you observe when you ran those queries?

25   A.    The program was very effective.  The vast majority of

1592

1   customers never made it past the e-mail warning stage.

2   Q.   Now, how do you know that?

3   A.   I ran the numbers myself.

4   Q.   Does CATS sometimes aggregate complaints or notices into a

5   single ticket?

6   A.   It does.

7   Q.   What does that mean, to aggregate complaints?

8   A.   So when the first allegation comes in against a

9   subscriber, it generates a ticket in the CATS system.  And then

10  for 24 hours any subsequent allegations that we get are

11  appended to that one ticket rather than generating a new

12  ticket.

13  Q.   But why does CATS aggregate complaints rather than

14  treating each one as a separate incident?

15  A.   Fairness for the customers.  If every single notification

16  generated a new ticket, then we could potentially have someone

17  go through all steps of the program up through termination

18  within a few minutes before they had even had a chance to look

19  at the issue.

20  Q.   How many copyright notices will CATS aggregate?

21  A.   There is no set limit.

22  Q.   Do you know whether Cox also has a limit on the number of

23  customers CATS can automatically suspend?

24  A.   It does.

25  Q.   Why was there -- why was a suspension limit imposed, if

M. Carothers - Cross

1606

1   Q.   Why?

2   A.   We're concerned that it will set a precedent that ISPs

3   will be required to monitor their subscribers and try to

4   determine if they are violating copyright.

5        We are also concerned about the precedent that ISPs

6   might be responsible for crimes committed by their customers.

7        So if we, as an ISP, are responsible when our

8   customers violate copyright, what else might we be responsible

9   for?  If one of our customers uses our service to buy drugs,

10  are we drug dealers now?

11       MR. ELKIN:  Pass the witness.

12       THE COURT:  All right, Mr. Oppenheim.

13       MR. OPPENHEIM:  Thank you, Your Honor.

14       REDIRECT EXAMINATION

15  BY MR. OPPENHEIM:

16  Q.   Mr. Carothers, you testified at some length about security

17  issues in response to Mr. Elkin's questions, correct?

18  A.   Yes.

19  Q.   There were no security concerns with the notices that were

20  received from the RIAA, were there?

21  A.   No, none that I am aware of.

22  Q.   Do you believe that Cox takes copyright infringement

23  notices seriously?

24  A.   Absolutely.

25  Q.   So when you testified in response to Mr. Elkin's questions

J.C. Fuenzalida - Video Deposition

1704

1  there's something that's 6 or 7 or 8 inside of that.

2  Q.   And it says the data set was validated against Cox

3  high-speed Internet Procera data.

4        Could you explain what that means?

5  A.   Yes.  So the -- I'm just checking the year.  Yeah, it says

6  2011.  It's not -- it's not labeled there.

7        So this is basically our what we'll call, outside-in

8  view that I've described with leveraging some of the

9  third-party data.

10        The middle column is our estimate as to what we

11  believe Cox's demand would be.  Right?

12  Q.   Uh-hum.

13  A.   So we had taken the national -- the national forecasts,

14  came up with our own view, and possibly adjusted it thinking

15  about Cox's footprint.  So that was a view that we developed,

16  you know, entirely or almost entirely on our own.

17  Q.   And is it correct that this data that inCode provided to

18  Cox showed Cox that at least in terms of the forecast, was that

19  the downstream data consumption for those that engage in

20  peer-to-peer was forecast to increase in each of the years from

21  2011 through 2015, correct?

22  A.   Correct.

23  Q.   And in this data that inCode provided to Cox, with respect

24  to upstream traffic, it reflects that in each of the years from

25  2011 to 2015 data consumption demand for those that engaged in

1  peer-to-peer usage was forecasted to increase year over year?

2  A.   Yes.

3  Q.   And if you could turn to the High Household Profile

4  section of this excerpt.

5        Do you see that?

6  A.   Yes.

7  Q.   Does this reflect that inCode forecasted to Cox that for

8  those that engage in peer-to-peer activity, that their overall

9  data consumption for peer-to-peer would increase in each of the

10  years for 2011 to 2015?

11  A.   Yes.

12  Q.   In 2011 the Procera data showed that 12-and-a-half percent

13  of the data of Cox's network was being used for peer-to-peer

14  file -- file usage, correct?

15  A.   Yes.

16      EXAMINATION

17  BY MS. LEIDEN:

18  Q.   Could you first turn to the document that Mr. Zebrak

19  marked earlier as Exhibit 94.  That's the hard copy of the

20  spreadsheet that you were looking at electronically.

21  A.   Okay.

22  Q.   Just a couple of clarifying questions on this data.  If

23  you flip to the second tab after the first blue page, the page

24  titled Summary of Data Usage.

25  A.   Yes.

J.C. Fuenzalida - Video Deposition

1706

1   Q.   And I believe that you testified earlier that this

2   broadband consumption analysis took place predominantly in

3   2012, correct?

4   A.   Yes.

5   Q.   And does the 2011 data here reflect actual data?

6   A.   No.  This is our view of what actual data would be.  It

7   was then subsequently compared against Cox's Procera tool, but

8   this is our outside-in view, as you call it.

9   Q.   And when you say, outside-in view, is that because the

10  data is based on information from the third-party sources?

11  A.   Yes.

12  Q.   Such as Cisco?

13  A.   Yes.

14  Q.   And for the other years on this spreadsheet, 2012 through

15  2015, you testified that those were forecasts that inCode had

16  come up with, correct?

17  A.   Yes, based on, you know, the third-party research.

18  Q.   And going back to the 2011 data, and specifically talking

19  about this page of this spreadsheet for now, was any of this

20  data under 2011 a reflection of the broadband consumption of

21  Cox subscribers specifically?

22  A.   Well, the -- the -- in a few of the fields we gained

23  insights from Cox to help form this.  Okay.  I believe in the

24  peer-to-peer session usage, I'll call it, as I pointed out

25  earlier, and there may have been others, but it was more of

J.C. Fuenzalida - Video Deposition

1707

1  a -- a -- getting a variety of inputs that then fed our model,

2  which was primarily based on external research.

3  Q.   Thank you.  And for this specific page of the spreadsheet,

4  just to make sure I understand, for the 2011 data, are these

5  figures the data that inCode first received from external third

6  parties, such as Cisco, and compared to the Procera data?

7  A.   Well, we -- we developed the bottoms-up view, the usage

8  per application or this category we called it, and developed

9  this -- the numbers on this page through primarily the outside

10  sources, fed a little bit through some -- some inCode subject

11  matter experts, and a little bit from -- from Cox's -- the

12  interviews that we did with Cox.  Developed these numbers.  And

13  then as one event towards the end of the project, compared it

14  with Cox's Procera data.

15  Q.   And would it be your testimony that this data -- and

16  again, just talking for now about the data on this tab of the

17  spreadsheet -- well, I believe that you testified that it was

18  national data, correct?

19  A.   Yes, I believe that the -- here on the total yearly

20  traffic, it's an -- it's an estimate for national data.

21  Q.   And that would be the same for the 2011 data as well as

22  the 2012 through 2015 forecasts?

23  A.   Yes.

24  Q.   And if you could flip to the next tab of the after the

25  next blue page, the page titled Summary of Activity Types.

J.C. Fuenzalida - Video Deposition

1708

```
 1              I would just like to clarify essentially the same
 2    question.  Which is that the 2011 data reflected here is -- was
 3    that data also based on inCode's review of third-party data
 4    from Cisco and other sources?
 5    A.   Yes, primarily.
 6    Q.   Could you explain what you mean by primarily?
 7    A.   So this is the -- in the spreadsheet you'll see notes as
 8    to the source of different components of the analysis.  The
 9    primary sources were Cisco, Analysis Mason, and the other one,
10    the one that we went through.  Here we go.  Informa.
11              But we used other sources as well.  And as I
12    indicated, for a couple of the drivers we interviewed Cox and
13    got some inputs that then fed into this model.
14              But the overall compilation of this analysis was, you
15    know, our summary view of the average traffic per household,
16    you know, across the United States.
17    Q.   And again, for this tab of this spreadsheet, that would be
18    the same for the 2011 actual data and the 2012 through 2015
19    forecasted data?
20    A.   Yes.
21    Q.   None of this data in this document that you have in front
22    of you then reflects solely activity of Cox subscribers,
23    correct?
24    A.   None of it does.
25              NOTE:  The video deposition is concluded.
```

1713

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  8  (A.M. Portion)

TRIAL TRANSCRIPT

December 11, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

W.H. Lehr - Direct

1788

1     know.

2              So if you try to basically, you know, download a file

3     and the connection is too small, it's like trying to drive on

4     the highway in a Model T Ford, you know.  It's not going to be

5     a pleasant experience.

6              You know, whereas if you have a very fast speed

7     service, you'll download files quickly, you can download more

8     of them.  And you'll also, you know, have -- it won't interfere

9     with other things that you're doing.

11:12:23  10   Q.   Now, on this notion of -- the second and third point:  P2P

11    consumes more bandwidth and was a key driver of Cox's

12    bandwidth.

13             Did you prepare a slide showing some of the

14    information you considered?

15    A.   Yeah, I did.  I mean, what's important to understand is

16    that it -- you know, the broad -- the companies that provide

17    broadband service have to manage their network and provision

18    their network for the peak traffic loads.  And they also want

19    to look at sort of what people are doing and what -- you know,

11:12:55  20   what kind of services they have so they can give those

21    customers the experience those customers, you know, want and

22    expect.

23             And so, they look at the different types of traffic.

24    And if you have someone that all they're doing is e-mail

25    occasionally, they're not moving a lot of data and they're

W.H. Lehr - Direct

1789

1    not -- they don't need a very fast high speed service.

2          If someone's doing something like peer-to-peer,

3    that's one of the most intensive -- bandwidth intensive

4    services, both on the upload and the download, that broadband

5    subscribers do.

6          And this slide is -- you know, pieces out of a

7    consultancy report that was prepared by this company, inCode

8    that, you know, provided advice to Cox on sort of, you know,

9    what they should be expecting in the future, what traffic

11:13:45 10  looked like in the Internet, what traffic looked like, and what

11   other, you know, broadband providers around the country were

12   doing.

13         And what this one says is basically what I've been

14   saying.  Is that peer-to-peer is the most bandwidth intensive

15   category.  And this one shows that, you know, peer-to-peer

16   households were 13 percent of all broadband households.  Which

17   is a much higher number, for example, than the 60,000

18   subscribers that have been identified here relative to the

19   4.5 million broadband subscribers that Cox had.

11:14:19 20        So 60,000 over 4.5 million is well less than

21   13 percent.  Which would suggest and is consistent with the

22   inference I make that we were only observing a subset of the

23   actual infringement that was happening on the network.

24         But this is -- this one is showing that this is a

25   heavy use thing.

W.H. Lehr - Direct

1790

1        Now, the lower chart is showing the forecast that
2   these consultants prepared for sort of the typical household's
3   monthly usage.  And so, there are three lines here.  There's a
4   yellow line, a red line, and a green line.  And in its models
5   for coming up with these forecasts, it characterizes what these
6   firms -- you know, what these types of households do.
7        So the yellow lines are households that are doing --
8   you know, using the Internet relatively lightly.  And their
9   bandwidth demand is relatively low.  And they're candidates for
11:15:11 10   this Starter or Essential tier, the lower priced services, you
11   know, these lower dark blue bands that run across.
12        But if you're in the red band, you need to be in the
13   Preferred tier.
14        And if you're a green type of customer, you need to
15   be the Premiere band or the Ultimate tier because your
16   utilization doesn't fit with the experience you have.
17        Now, the users of peer-to-peer are most likely to be
18   in this green band or the red band, but certainly not in this
19   yellow band.
11:15:39 20        So just understanding the character of what
21   peer-to-peer is and what people are doing, and understanding
22   that peer-to-peer is almost all infringing activity, Cox is,
23   you know, listening to and knows -- this is evidence that Cox
24   internally knew that the customers that were doing peer-to-peer
25   were more likely to be customers and candidates for its more

W.H. Lehr - Direct

1791

1    expensive broadband services.

2          So that's a piece of evidence.  That's some of the

3    evidence that goes with the general understanding of how the

4    business operates.

5    Q.   And how does this tie in, Dr. Lehr, to your opinion that

6    Cox had an economic incentive to tolerate infringement?

7    A.   Well, these customers that are providing and are in the

8    higher tier services are more profitable than the lower tier

9    services because almost all the costs of providing the service

11:16:28 10    to the customers is fixed, it doesn't really depend upon the

11    actual use of the customers.

12          So, for example, when customers are heavy users, they

13    may not be heavy users during the peak period, which is when

14    they size the network.

15          It's like you figure out how big a pipe do I need

16    during my busiest hour to make sure that the customers that I

17    promised service to get the service they expect.  But if

18    customers use that pipe when it's not particularly busy, then

19    that doesn't cost me anything because I have the pipe there

11:17:00 20    anyways.

21    Q.   Now, did you have any access to Cox data that reported the

22    actual tier, the actual tier that the direct infringing

23    subscribers in this case subscribed to?

24    A.   No, I don't, because the ICOMS billing data just says what

25    they were billed, but it doesn't tell me what tier those

1   customers were in.  And so, I didn't have that data, but I do

2   have the ICOMS data and the ticket data.  So there are things I

3   can infer from that.

4   Q.   So just remind us, sir, what's the ICOMS data?

5   A.   The ICOMS data is the internal billing system.  So they

6   keep this for all their subscribers.  But, you know, the subset

7   of the data we got was for those subscribers who had been

8   identified as infringing subscribers in the CATS data with one

9   or more DMCA tickets.  And then we had their revenue payments

11:17:55 10   from 2012 to 2016.

11   Q.   And were you able to look, sir, at the Cox billing data

12   for the direct infringers in this case and draw conclusions

13   about their relative value?

14   A.   Yeah.  So one of the things you can do is you can say,

15   let's look at the data payments.  So not all the revenues they

16   billed, but the data payments which shows up in two different

17   elements within the dataset for each customer.  And you can

18   say, what was the average of only those subscribers, the

19   average billing per month for only those subscribers that

11:18:32 20   received one to two tickets?  And we can -- can we compare it

21   to subscribers that received more tickets.

22          And so, for example, can we compare it to subscribers

23   who got 20 or more tickets?  So if you got 20 or more tickets,

24   the evidence is showing you are, by the evidence, assuming the

25   evidence straightly maps directly to your infringing behavior,

W.H. Lehr - Direct

1793

1    that you're a heavier infringer.

2          When you do that comparison and you apply statistical

3    tests, you find that there is a statistically significant

4    increase in the data billed and revenues paid by the more heavy

5    infringers.

6          So this is data from a limited subsample of Cox's own

7    internal billing of these infringing subscribers that have been

8    identified as infringing that statistically shows that there is

9    a large, 8 percent increase in the data billings to those

11:19:30 10   subscribers.

11         And that, you know, goes as consistent with the other

12   stuff, stuff their internal documents and what you would

13   otherwise infer.

14   Q.   What do you mean by statistically significant?

15   A.   You apply statistical tests and say, given the size of the

16   sample I have and the variability in that sample, is this a

17   difference that looks as if it could be explained as just

18   random, or does it look like it's actually, you know,

19   statistically significant.

11:19:56 20   Q.   And it looks like -- the 8.4 percent increase, what

21   charges does that relate to?

22   A.   That's just the charges associated with their payment for

23   data services.

24   Q.   And it looks like it's about a six-and-a-half or so dollar

25   incriminate.  $6 doesn't seem like that big of a difference.

1 Why does that matter here?

2 A.   Well, first off, you know, as an economist and someone who

3 cares about looking at the data, it is statistically

4 significant.  So that matters.  8 percent is a big difference.

5 That is more an trivial amount.

6         And six bucks does make a difference.  It makes a

7 difference to individual subscribers.  I would certainly care

8 if my bill was $6 more or less for this.

9         And if you have 60,000 subscribers that there might

11:20:45 10 be this kind of difference or incentive, or, you know, some

11 number of subscribers -- you remember, Cox is dealing in

12 subscriber numbers that are in the millions, hundreds of

13 thousands, tens of thousands.  You multiple that, that's a big

14 number.  That's a big additional incentive.

15         It's not like the subscriber that charges 43 bucks or

16 even 30 bucks a month in data services isn't profitable for Cox

17 and Cox doesn't want to retain that subscriber.  It's just that

18 they really want to retain these subscribers that are more

19 valuable.  And if they're higher infringing, it looks like

11:21:19 20 they're valuable.

21 Q.   How does that tie into your opinion that Cox benefited

22 from retaining these direct infringers?

23 A.   Well, it speaks to the economic incentive that Cox had to

24 retain, you know, repeat infringers on its network even when it

25 knew, you know, that it had -- these were repeat infringers,

W.H. Lehr - Direct

1795

1    and that it's incentives were greater when these repeat

2    infringers -- there is evidence suggesting that they were even

3    heavier infringers.

4    Q.   I want to move to the next part of this opinion.

5         You said that Cox saved by not addressing

6    infringement.  What do you by that, sir?

7    A.   Well, I talked a little bit about that in my opening

8    statement.  So had Cox addressed the infringement more

9    aggressively, you know, they would have probably had to deal

10   with more customer service calls.  They would have had to mail

11   more notices and had more interactions to deal with

12   subscribers.  They would have incurred direct costs associated

13   with the response.

14        They probably couldn't have gotten away with reducing

15   the personnel of the department that was dealing with the abuse

16   stuff, as they actually -- as I understand they actually did.

17        But, you know, so they would have incurred additional

18   costs.

19   Q.   Were able to quantify the costs saved by Cox by not

20   addressing the infringement?

21   A.   I wasn't able to quantify these because, first off, I'm

22   not offering an opinion here about what more and specifically

23   Cox should have done.  And what Cox specifically might have

24   done would affect what the incremental costs would have been.

25        But certainly they should have done more than they

1866

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
          Plaintiffs,           :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
          Defendants.           :
                                :
--------------------------------:
```

VOLUME  8  (P.M. Portion)

TRIAL TRANSCRIPT

December 11, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

S. Negretti - Direct

1897

1  Q.   And did the Cox product marketing team play any role in
2  the preparation of this study?
3  A.   Yes.  We were the customer for a document like this.
4  Q.   And was this study conducted by Cox in the ordinary course
5  of its business?
6  A.   Absolutely.
7  Q.   And was this document maintained by Cox in the ordinary
8  course of business?
9  A.   Absolutely.
10        MR. ELKIN:  Your Honor, I would offer into evidence
11  Defendants' Exhibit 239.
12        THE COURT:  Any objection?
13        MR. ZEBRAK:  No objection, Your Honor.
14        THE COURT:  It's received.
15        MR. ELKIN:  Thank you, Your Honor.
16  BY MR. ELKIN:
17  Q.   Mr. Negretti, could you just explain to the jury what this
18  study is?
19  A.   Yeah, absolutely.  So this document that we're looking at
20  here was done, like many documents, to understand different
21  ways that we could package our internet services.  As the
22  environment became more and more competitive, as we spoke about
23  earlier, it became important for us to understand are there
24  different things that we could package together in our internet
25  service to make our internet service more attractive to the

S. Negretti - Direct

1898

1    consumers in the marketplace.

2    Q.    Okay.   And what's the date of this?

3    A.    This was done in August of 2014.

4    Q.    Okay.   Turn to the second page of this exhibit, and can

5    you read the second sentence under the word "Objectives"?

6    A.    Starting with "Cox management"?

7    Q.    Yes, sure.

8    A.    Sure.   Cox management seeks to explore alternative ways of

9    packaging its internet services to both increase appeal among

10   key consumer segments and simplify decision making.

11   Q.    Why did Cox management want to do this?

12   A.    Again, the environment continues to be competitive in the

13   marketplace, and at this time, it was very competitive, with

14   alternative sources of high-speed internet available to them,

15   and so Cox wanted to make sure that we had the best products

16   and services for the customers to choose from in the

17   marketplace, and so this was --

18   Q.    And how did this study concern itself with understanding

19   how Cox's customers use the internet?

20   A.    There's a couple different ways.   It asks them when you're

21   making a selection for your internet provider, what's important

22   to you?   And then when you're using the internet, what's

23   important to you?   And then it asks them to give us answers

24   based off of that.

25   Q.    Okay.   Turn to the sixth page of this exhibit.   It should

1   the consumer is actually using inside their home.

2           So this talks about, again, a stack ranking based on

3   choices that the consumer was given about what they're using

4   the internet for.

5   Q.   And how does streaming audio and video relate to

6   downloading in terms of what's more prevalent --

7   A.   Well, first of all --

8   Q.   -- that's depicted on this slide?

9   A.   -- as you see here, it's actually 20 percent more

10  important to a consumer in terms of what they're using the

11  internet for than downloading speeds, for example, downloading

12  things.

13  Q.   And have you observed trends in your work at Cox in how

14  consumers use the internet to consume music?

15  A.   Sure, absolutely.

16  Q.   Could you comment on that?

17  A.   Sure.  Again, then, just as today, there are services such

18  as iHeartRadio, Pandora, and Spotify available to a consumer to

19  allow them to stream music services into their home, not only

20  onto their, you know, laptops and tablets, but also on their

21  phones so they can use inside and outside of the home to be

22  able to listen to music.

23          MR. ELKIN:  Okay.  You can take that down, James.

24  BY MR. ELKIN:

25  Q.   In your job, did you ever review at any time any surveys

S. Negretti - Direct

1904

1  A.   Yes.  So this is a relatively simple document.  This is a

2  rate card basically.  This tells us internally at Cox

3  Communications the different rates that we charged in 2013,

4  according to this sheet here, and then there's a second tab for

5  2014, that we charged for our internet services.

6          And the simple way to read this is on the left-hand

7  side or the left axis, the Y axis, was a list of all the

8  different cities in which we offered our high-speed internet

9  service in 2013.  Then along the top of the page, or the X

10  axis, was a list of the five or six different internet tiers

11  that we offered our consumers -- our customers at that point in

12  time.  There were starter and essential tiers, which were lower

13  speed tiers, on up to premium and ultimate, which were higher

14  speed tiers.

15          And then this simply is a rate card that lists out

16  the rates that we charge for a customer who had other services

17  with us as well as internet, such as cable TV and/or telephone

18  service or just purchased internet by itself.

19  Q.   And what were the years covered by these rack rates?

20  A.   I'm sorry, say that again?

21  Q.   What were the years covered?  What years?

22  A.   Yes.  So again, this is 2013 on this page here.  There's a

23  subsequent tab at the bottom that shows the rack rates for

24  2014.

25  Q.   And why are there different -- on the left-hand side of

1  each of these two pages, there are different locations.  Why,

2  why do you have different locations?

3  A.   Yeah.  So we serve different parts of the country with our

4  internet services, and so at that point in time, these

5  individual markets, as we call them, or cities all had their

6  own responsibility for creating these internet services and

7  distributing them to our customers, and so this shows the

8  different rates that were charged.  A lot of them started to be

9  the same, but there are some differences in different parts of

10 the -- in different parts of the geography.

11 Q.   Will the rack rates vary by geographic region?

12 A.   Yes.  There are some examples here, for example, where in

13 Kansas, Arkansas, we charge 46.99 for our essential product,

14 and in Tulsa, Oklahoma, we charge 44.99 for the same product.

15 Q.   Okay.  And what are the differences among the different

16 tiers of services?

17 A.   Sure.  There are two key differences.  Key difference

18 number one, as I mentioned, is the download speed or the speed

19 of internet service.  So again, the starter and the essential

20 tiers, they were slower tiers; and then the higher you go

21 across this page, the faster those internet service speeds

22 would be.

23          And then the second difference would be the amount of

24 data consumption that you would get with each of these tiers.

25 Q.   And could you take the jury through the differences in the

1   amount of data that a subscriber can use for different tiers of

2   service?

3   A.   Yes.  So I don't have the exact amounts of data off the

4   top of my head, but what I'll say is similar to the speeds, the

5   more speed you purchase and the more you pay for your service,

6   the more data consumption that you are allotted for each of

7   those tiers.

8   Q.   Was there a limit on the amount of data that they could

9   use?

10  A.   There was a limit.

11  Q.   Do you know whether or not those limits were enforced

12  during the 2013 to 2014 period?

13  A.   Unfortunately, they were not enforced.

14  Q.   So in your experience, what factors are the most important

15  in driving consumer preference -- you can take that down.

16  Sorry.  Withdrawn.

17          In your experience, what factors are the most

18  important in driving consumer preferences for increased speed?

19  A.   Again, we've been talking a lot about this in the last

20  half-hour or so, but it comes down to the speed and the price

21  that they pay for the service based on what they want to use it

22  for, being able to use it in their home to be able to get to

23  things like Netflix, streaming video through their iPhone or

24  their tablet, for example.

25  Q.   So in your -- in your knowledge and capacity in product

S. Negretti - Cross

1930

1    deposition, right?

2    A.    That's correct.

3    Q.    Did you see that document in the few weeks you spent

4    preparing for today's trial as well?

5    A.    I did not, no.

6    Q.    So could you turn -- well, first of all, in this final

7    readout, inCode had verified its, its analyses by matching it

8    against actual Cox usage data, right?

9    A.    I do recall that, right.

10   Q.    Can you turn to page 4 of this document, sir?  So -- and

11   specifically, if you could look under where it says Data Usage

12   Trends and look at the third bullet point?

13          If you could highlight that, Mr. Duval?

14   A.    Sure.

15   Q.    Excuse me, the second bullet point.  My apologies.  I'm

16   looking sideways.  That's my fault.

17          Do you see where it begins with:  The average

18   household?

19   A.    Yes.

20   Q.    So here it says the average household in 2011 used 37.3

21   gigabytes per month of traffic, right?

22   A.    That is correct.

23   Q.    And so that's less than half of the average peer-to-peer

24   household, right?

25   A.    Well, yes, by mathematical standards, that's correct.

1931

1   Q.    Right.  And to -- the more data that you use, the more

2   speed you need, right?

3   A.    I'm sorry, could you repeat that?

4   Q.    More data requires more speed, right?

5   A.    Yes.  Usually, yes.

6   Q.    Right.

7   A.    It's not a requirement, but usually people who want more

8   data will get more speeds.

9   Q.    Right.  And could you turn, sir, to page 25 of this

10  document?  So this slide is profiling online activities for Cox

11  to use as inputs for a data calculator, right?

12  A.    This is correct.

13  Q.    And a data calculator is where Cox tells its customers by

14  engaging in the following type of activity, you use the

15  following kind of data, and it helps them forecast what tier to

16  subscribe to, right?

17  A.    Yes.  It's a very helpful visual to be able to get a

18  customer to understand what they could use the internet for,

19  correct.

20  Q.    Sure.  And can you look at the right column that says Life

21  Style Activities?

22  A.    Yes.

23  Q.    And do you see where it says P2P BitTorrent?

24  A.    I do see that.

25  Q.    Does Cox regard P2P and BitTorrent as a lifestyle

1   Q.   Okay.  Sir, I'm going to remind you of something you said

2   when I deposed you, which we've already established that you

3   tried to tell the truth and were under oath, right?

4   A.   That's correct.

5   Q.   Okay.  So page 65 of your deposition, beginning at line 7:

6   So is downloading of music one of the online activities that

7   Cox has advertised in terms of activities where speed can be

8   used?

9        So when downloading music was part of the consumer as

10  a whole, their need to access internet, the internet, when that

11  was important and popular, then that was a marketing message

12  that became effective for us to use.

13  A.   That's correct.

14  Q.   Okay.  So marketing your service to download music has

15  been effective for Cox, correct?

16  A.   Has been effective at different points in time but is not

17  currently an effective message that we use.

18  Q.   So you're saying that today, Cox doesn't advertise

19  downloading music?

20  A.   That's correct.

21  Q.   So why don't we look at -- well, are you aware, sir, that

22  Cox for many years has tried to sell its service by relating

23  speed to downloading music in the form of a hundred songs in

24  three seconds?

25  A.   That's correct.  That is the visual imagery that we were

S. Negretti - Cross

1935

1   trying to connote when it came to music.

2   Q.   Right.  So you admit that for many years, including 2013

3   and '14, Cox has advertised speed in relation to downloading

4   music, correct?

5   A.   I don't know if it was many years, but definitely during

6   that time frame is correct.

7   Q.   And that includes --

8   A.   It was in association with our gig internet products, yes.

9   Q.   And that includes downloading a hundred songs in three

10  seconds, right?

11  A.   Correct.

12  Q.   Right.  And by doing the simply math, a hundred songs in

13  three seconds would be a thousand songs in thirty seconds,

14  would it not?

15  A.   That's correct.

16  Q.   Okay.  Sir, I'm going to show you a document that's

17  already been admitted as evidence in this case as PX 1, and I'm

18  just going to actually just pull it up on the screen.  It's not

19  in the binder that you have in front of you.

20          And I'm going to ask Mr. Duval to scroll through

21  that -- or actually, excuse me, Mr. Ruelas is helping me out,

22  making me look good.

23          Why don't you take a few seconds and look at what's

24  behind tab 1.  That's a list of the sound recordings that are

25  at issue in this case, and there's 6,734 of them.  Take a look

L. Weber - Direct

1962

1    Q.    And could you explain how you reached conclusions in this

2    opinion?

3    A.    Okay.  So the opinion is that after each step in Cox's

4    graduated response, fewer subscribers continued to be the

5    subject of copyright infringement notices, and by the 12th such

6    notice, the notices stop for the vast majority of subscribers.

7           So that's the opinion, and I got to that opinion by

8    analysis of the RIAA notices as well as the Cox tickets.

9    Q.    Okay.  You used the term "vast majority."  What do you

10   mean by that?

11   A.    So I mean it's not -- it's more than half and it's

12   not just a little bit more than half.  It's, it's the vast

13   majority.  It's -- and for the cases I'm going to talk about,

14   it's over 90 percent.

15   Q.    Do you have additional slides that show your analysis and

16   your results?

17   A.    Yes, I do.  So, so the first thing I looked at was I

18   looked at the RIAA notices.  These are the notices that are in

19   the database that MarkMonitor allegedly sent to Cox.  And the

20   49 percent of the at-issue subscribers here only got one

21   notice -- were only the subject of one notice from the RIAA in

22   the relevant period, which is roughly February 2013 through the

23   end of November 26, 2014.  So almost half only got one.

24          When we go to three or fewer notices, 78 percent, or

25   more than three-quarters of the at-issue subscribers got one,

L. Weber - Direct

1963

1  two, or three notices, were the subject of one, two, or three

2  notices from the RIAA.

3         When we get to five, 88 -- 87 percent of the at-issue

4  subscribers were the subject of five or fewer notices from the

5  RIAA.  We go up a little bit more and we see that by the time

6  we get to 12 notices, that 98 percent of the at-issue

7  subscribers were the subject of no more than 12 notices from

8  the RIAA.  So that means that 2 percent got -- were the subject

9  of 13 or more notices from the RIAA in this relevant period.

10 Q.   Okay.  Did you analyze this data in any other way?

11 A.   I did.

12 Q.   Did you put it on a slide?

13 A.   I did.  So, so the -- I have two issues with this data,

14 and the first issue is the set of subscriber accounts is

15 biased.

16 Q.   Which set of accounts?

17 A.   The set of accounts that are in the data, both in the RIAA

18 notice data and also, more importantly, in the, in the Cox

19 ticket data.  That set of subscriber accounts is biased.

20 Q.   Okay.  And you say you took a deeper dive to determine

21 this bias.  First, explain the bias.

22 A.   Sure.  So, I mean, you might think, how can it be biased?

23 It just is the set of at-issue subscribers, right?  You would

24 think it's not biased, but it is biased, and let me see if I

25 can explain how.

L. Weber - Direct

1979

1   the last bill or the end of the, of the claim period.

2   Q.   So do you have anything else with regard to your second

3   opinion?

4   A.   I don't think so.  I think that's it.

5   Q.   So let's go to your third opinion.  Do you have a

6   demonstrative?

7   A.   I do.

8   Q.   Okay.

9   A.   So the third opinion is -- you've heard some in this trial

10  already about some subscribers with a lot of tickets, so I

11  chose to look at the subscribers with the most tickets and

12  notices, and it turns out that the subscribers with 100 or more

13  tickets over the three-year period that we have ticket data

14  for, they're almost all commercial subscribers, and the

15  subscribers with 50 or more notices from the RIAA in that

16  relevant period, they are all, all of them -- there aren't that

17  many, but they're all of them commercial.

18  Q.   Have you prepared a demonstrative for this?

19  A.   Yes.  So I'm going to focus on the, on the first one, the

20  subscribers with 100 or more tickets.  So first you have to

21  understand the population in general.  I think actually -- I

22  think Dr. McCabe actually already testified that 95 percent of

23  the at-issue subscribers are single family residential.  5

24  percent of them are commercial.

25           There's a teeny, tiny sliver that you can't even see

2126

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,        :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                                :
--------------------------------:
```

VOLUME   9   (P.M. Portion)

TRIAL TRANSCRIPT

December 12, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

N. Feamster - Direct

2246

1    Cox?

2    A.    Not for Cox.

3    Q.    Let's talk about step four.

4    A.    Can I clarify my -- no, please go ahead, I'm sorry.

5    Q.    Trust me, you'll get plenty of questions related to

6    verification.

7    A.    Thank you.

8    Q.    So let's talk about step four.  What -- what happens in

9    step four of the Cox -- or really either of the systems?

10   A.    Right.  So we talked about this already, so I'll just

11   briefly recap.  Right.

12         So the process -- at some point the process is

13   reaching a conclusion that some machine on the Internet, some

14   peer has an infringing file in whole or in part, and that it's

15   sitting on an IP address that is part of the Cox network.

16   Okay.

17         If it reaches that conclusion, then the e-mail notice

18   is sent.  And a notice is sent to the ISP, to Cox in this case.

19   Q.    Okay.  And have you prepared a slide illustrating how

20   that -- what happens in that process for a business subscriber

21   to Cox?

22   A.    Sure, yeah.  Let's talk about that.

23   Q.    What does this slide show?

24   A.    Okay.  So on the Internet there is -- there are devices,

25   hosts, machines, homes, et cetera, connected to the network.

N. Feamster - Direct

2247

1    And in its simplest form, you know, any connected device has an

2    IP addresses and -- let me back up.

3              What -- the goal, right, is ultimately to match the

4    IP address to a subscriber, an individual, somebody who is

5    basically doing the infringement.  However, there is technology

6    in the Internet, there's something called network address

7    translation, or NAT, right, that allows a single IP address to

8    basically, you know, act as the connection point for many, many

9    other individuals and devices.

10             So actually most home networks even operate like

11   this, but more importantly, you know, a business might be

12   behind a NAT.

13   Q.   Okay.  And when a notice is directed to an IP address that

14   is a NAT, where does the notice go?  What's illustrated on this

15   slide about where the NAT goes?

16   A.   On this slide, what we're looking at here is basically a

17   school or some kind of organization, but the organization

18   basically is buying Internet service from Cox.  That

19   organization may have many, you know, many connected end

20   points.  And the notice is basically going to some, presumably

21   some e-mail address that's associated with that organization.

22   Q.   And have you prepared a variation on this slide that

23   illustrates what information that notice gives you about the

24   individuals who are actually doing, supposedly doing the

25   infringing?

```
 1    A.    Sure.

 2    Q.    What does the notice show?

 3    A.    Right.  So that, that individual IP address says nothing

 4    about, you know, who behind that NAT actually is engaging in

 5    that behavior.

 6    Q.    Okay.  Have you prepared a slide that summarizes your

 7    concerns about the way the MarkMonitor system was implemented

 8    for Cox?

 9    A.    Yes.

10    Q.    What does this slide show?

11    A.    So to summarize, and to contrast with the -- with what

12    MarkMonitor did for CAS, the first two steps were substantially

13    the same.  The problems come in the subsequent steps.  And in

14    particular, the failure to verify that a Cox subscriber was

15    actually sharing a piece of an infringing work, in particular

16    the failure to download content, which is a prerequisite for

17    doing that verification, is a critical missing link in this

18    process.

19    Q.    And finally, did you prepare a slide that states your

20    conclusion about the MarkMonitor system as implemented for Cox?

21    A.    Yes, I did.  Based on what I just summarized, it's my

22    opinion there's no reliable evidence that Cox subscribers were

23    sharing copies of the plaintiffs' works.

24          MR. BRODY:  I tender the witness, Your Honor.

25          THE COURT:  All right, thank you.
```

2483

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  10  (P.M. Portion)

TRIAL TRANSCRIPT

December 16, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

F. Jarchow - Direct

2503

1   A.   It could be public WiFi, it could be secure WiFi, or both.

2   Q.   Well, is there information in the ICOMS system from which

3   you could determine if a customer's managed WiFi service was

4   public WiFi or was part of their secure network?

5   A.   No.  We just sell the managed WiFi service.

6   Q.   Mr. Jarchow, to what extent does ICOMS store subscribers'

7   addresses?

8   A.   We maintain an address for every location that we serve.

9   Q.   Would that include both residential and Cox Business

10  customers?

11  A.   That would.

12  Q.   To what extent does the ICOMS system distinguish between

13  residential and business customers?

14  A.   We have a clear delineation between the bill-type code.

15  For the residential subscribers, we use the S bill type, and

16  for the business subscribers, we use the C bill type.

17  Q.   And at what time in the account creation process does

18  ICOMS create a record of a subscriber's name?

19  A.   When we acquire a customer and sell them services.

20  Q.   Does ICOMS store that account name and address information

21  in the ordinary course of business?

22  A.   It does.

23  Q.   Does ICOMS system contain information that would show

24  whether a subscriber's internet service was used for public

25  WiFi?

14:30:24

14:30:54

F. Jarchow - Direct

2504

1   A.   It does not.

2   Q.   Does ICOMS contain information that would show whether a

3   subscriber's internet service was limited to particular

4   categories of end users like employees, contractors, guests, or

5   the like?

6   A.   It does not.

7   Q.   In addition to ICOMS, does Cox also have other databases

8   and systems?

9   A.   We have very many, many databases and systems, yes.

14:31:36 10   Q.   Mr. Jarchow, to what extent do you have knowledge of Cox's

11   other databases and systems beyond ICOMS?

12   A.   My primary job responsibilities are related to ICOMS.   I

13   have one or two ancillary databases that I have access to.

14   Q.   And, sir, are you personally aware of any database or

15   system at Cox with information about whether a subscriber uses

16   its Cox internet service for public WiFi versus for a secure

17   computer network or for both?

18   A.   No, I do not.

19   Q.   Mr. Jarchow, in connection with this lawsuit, were you

14:32:09 20   asked to retrieve information about certain subscribers from

21   the ICOMS system?

22   A.   Yes.

23   Q.   And how do you identify the subscribers whose information

24   you were asked to retrieve?

25   A.   A list of account numbers was provided by Brent Beck, and

F. Jarchow - Cross

2513

```
 1              MS. GOLINVEAUX:  Objection, Your Honor.  Scope.

 2              MR. GOULD:  Your Honor, this witness is listed on our

 3       exhibit list as well.

 4              THE COURT:  Yeah, I'm going to allow the question.

 5       Your exception is noted.  Thank you.

 6       BY MR. GOULD:

 7       Q.   Sir, do you understand that Cox has argued in this case

 8       that it can't be expected to terminate internet service for

 9       business customers for copyright violations if those customers
```
14:44:14
```
10       may include critical infrastructure or health care services?

11       A.   I understand.

12       Q.   And I think you testified that the ICOMS database from

13       which this information came doesn't actually tell Cox what the

14       customer uses that service for, correct?

15       A.   That is correct.

16       Q.   It could include a field here that says it's used for

17       WiFi, right?

18       A.   Managed WiFi.  If we sold them managed WiFi service.

19       Q.   You could include a field that says this customer used our
```
14:44:43
```
20       service for WiFi, correct?

21       A.   If we sold them managed WiFi service.

22       Q.   But there's no way to distinguish based on the billing

23       records or the ICOMS database whether those WiFi users were

24       using some secured private network or a public WiFi network,

25       correct?
```

F. Jarchow - Cross

2514

1    A.    That is correct.

2    Q.    And likewise, for a hospital client or a volunteer fire

3    station, there's similarly no way to tell on your end whether

4    the customer is using Cox's service for some secured private

5    network to, say, provide emergency services or in a lobby,

6    correct?

7    A.    The ICOMS system does not have records that represent

8    secured or private or --

9    Q.    Now, I've looked through these three exhibits.  Would it

14:45:28 10  surprise you if I told you that of the 2,800 or so, there's by

11   name alone approximately 68 that appeared to potentially maybe

12   relate to some sort of health or infrastructure-type service?

13   A.    Hard to say.  I didn't count specific categories.

14   Q.    But you looked through this whole list, and we've just

15   scanned through some pages, correct?

16   A.    Yes.  I've reviewed the entire list.  I didn't

17   specifically count.

18   Q.    Now, as the director of information technology, your job

19   duties focus on the technical support of the business systems

14:46:06 20  that Cox Communications uses to provide its services, correct?

21   A.    I manage the configurations of the ICOMS billing database.

22        MR. GOULD:  I'm sorry, I handed you the wrong

23   document.  I apologize.

24   BY MR. GOULD:

25   Q.    Sir, I want to show you a document and ask you if it

2837

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  11  (P.M. Portion)

TRIAL TRANSCRIPT

December 17, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2857

```
1          THE COURT:  Do you want to give them -- do you want
2    me to excuse the jury, give them 15 minutes, and we'll --
3    where are we going after your preliminary?
4          MR. ELKIN:  I just wanted to make a, just make a
5    brief, quick proffer regarding the sound recordings and music
6    publishing, if I can, with regard to the, what's in the
7    record.
8          THE COURT:  Yes, sir.
9          MR. ELKIN:  I'll be quick about it.
10         THE COURT:  No, that's fine.
11         MR. ELKIN:  So this is based on the exhibits that
12   Your Honor provisionally admitted subject to their review.
13         THE COURT:  This is the 7,200?
14         MR. ELKIN:  Yes.  So with regard to -- so I have two
15   examples, two exemplars.  One is the sound recordings, and one
16   is the publishing.
17         So what you have here under Plaintiff's Exhibit
18   4281, this is a sound recording for -- the title is "Dookie,"
19   Green Day, which is a -- covered by a separate registration,
20   and it has nine different sound recordings on it, and there is
21   another -- yes, so this is with regard to the -- this is --
22   all of these tracks, Your Honor, are actually part of the
23   works in issue in the case.
24         THE COURT:  All right.
25         MR. ELKIN:  And then with regard to -- I can hand
```

2858

 1   this out to, to Your Honor.

 2          THE COURT:  Thank you.

 3          MR. ELKIN:  Then with regard to the publishing

 4   example of that, and this is Plaintiff's Exhibit 369, this

 5   is -- the title of the work is Chris Brown, "I Can Transform

 6   Ya," and this is a music composition.

 7          And there is in the case under Plaintiff's Exhibit

 8   1833 a sound recording which is owned by Sony Music which has

 9   the Chris Brown song "I Can Transform Ya."  So I wanted to

10   hand that up for consideration.

11          THE COURT:  Are these exhibits admitted previously

12   or we'll consider that in a minute?

13          MR. ELKIN:  They were provisionally --

14          THE COURT:  These are part of the 7,200

15   registrations?

16          MR. OPPENHEIM:  It's part of the 7,200 registrations

17   that we'll file something on after we review them posttrial.

18          MR. ELKIN:  I just wanted to make the proffer, Your

19   Honor, before we rest.

20          THE COURT:  Okay.

21          MR. ELKIN:  That was the only purpose of this.

22          MR. OPPENHEIM:  Can we --

23          MR. ELKIN:  I'm not trying to sandbag anyone.  I

24   just wanted to make sure, we understood Your Honor reserved

25   your decision on the issue from last night, and I wanted to

2859

1    make sure that we at least got that in.

2              THE COURT:  Okay.

3              MR. ELKIN:  And then the other thing is with regard

4    to the Rule 50 motion, let me just cover the --

5              MR. OPPENHEIM:  I'm sorry, can I just have a

6    question?  Is this not --

7              MS. GOLINVEAUX:  Yeah, cross that out.

8              MR. OPPENHEIM:  Okay.  Thank you.  Sorry.  Go ahead.

9              MR. ELKIN:  That was a holdover.

10             So there were six issues that we moved under:  the

11   504(c) on derivative works; the 504(c) on compilations; on

12   direct infringement, both distribution and reproduction;

13   contributory, no material contribution; vicarious both as to

14   no direct financial interest and no ability to supervise; and

15   then finally, no direct infringement by business owners, sort

16   of keying off of the Cobbler case.  Those are the --

17             THE COURT:  Right.  Do you want to preserve your --

18   by Rule 50, yes.

19             Do you want to respond?

20             MR. OPPENHEIM:  We also would like to make a Rule 50

21   motion, Your Honor.  If you want to excuse the jury, that's

22   fine, or I'll do it right now orally.

23             THE COURT:  Yeah, go ahead.  Do it now.

24             MR. OPPENHEIM:  Your Honor, we believe that pursuant

25   to Rule 50, plaintiffs have demonstrated both their

2934

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,        :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                                :
--------------------------------:
```

VOLUME  12

TRIAL TRANSCRIPT

December 18, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2951

1   its network that Cox could have done something about it.

2        Let me turn to the elements of material contribution

3   and right and ability to supervise.  There really can be no

4   doubt about either of these.  They're not a high bar.

5        Cox built its network and provided routing services

6   and switches to direct data and content flow.  Cox sold access

7   to that high-speed internet service to infringing subscribers.

8   And Cox then continued to provide unfettered service to those

9   that Cox knew were repeatedly infringing.  Cox knew its

10  subscribers were infringing and yet knowingly let them continue

11  using the service.

12       Beyond creating and providing the service itself, Cox

13  provided anonymity to its subscribers.  A copyright owner has

14  no ability to look at a network and tell who a particular

15  subscriber is, who may be infringing using a particular IP

16  address.  Cox is the only one who knows that an IP address is

17  assigned to a particular subscriber at a particular date and

18  time.

19       And Cox testified, you heard Ms. Trickey testify that

20  Cox will not disclose the identity of its subscribers absent a

21  subpoena.  That means a lawsuit.

22       All of that easily meets the low threshold of

23  material contribution.

24       Cox's AUP, the Acceptable Use Policy, both

25  residential and business, expressly grants Cox the right to

2952

1    terminate or suspend a subscriber's account for infringement,

2    and we know, because we've seen it, that Cox has the ability to

3    terminate subscribers.  It terminated 13 for purposes of

4    plaintiffs' notices for copyright infringement and 600,000 for

5    nonpayment.  We clearly know they have an ability to terminate.

6    That is the right and ability to supervise the infringing

7    activity.

8           While the judge does not explain in the instructions

9    what "supervise" means, you can see that because Cox can

10   suspend or stop the infringement, that is the essence of

11   supervision.

12          The second element of the vicarious infringement

13   claim is direct financial benefit.  Here the evidence was

14   clear.  Mr. Zabek admitted that financial considerations were a

15   factor in making decisions about whether to terminate an

16   infringing subscriber.  And, of course, we saw e-mail after

17   e-mail where Cox decided that it was not going to stop a

18   subscriber from infringing because Cox wanted to collect

19   monthly fees.

20          This is the textbook definition of direct financial

21   benefit.  Cox kept the infringing customer on its network so

22   that it could keep the money coming.

23          Apart from all of the internal e-mails, Dr. Lehr also

24   did an analysis of the value to Cox of the infringing

25   subscribers based on the number of tickets that that subscriber