**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT, *et al.*, <br> *Plaintiffs*, <br><br> v. <br><br> COX COMMUNICATIONS, INC, *et al.*, <br><br> *Defendants*. | Civil No. 1:18-cv-950 (LO / JFA) |

**COX'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR**
**REMITTITUR OR, IN THE ALTERNATIVE, A NEW TRIAL**
**UNDER FEDERAL RULE OF CIVIL PROCEDURE 59(A)**

# TABLE OF CONTENTS

Page

STANDARD ................................................................................................................. 1

ARGUMENT ............................................................................................................... 1

I.    The $1 billion award is a miscarriage of justice; it is shockingly excessive and unlawfully punitive, and should be remitted or result in a new trial. ................................. 1

    A.    This Court has inherent power to remit a grossly excessive statutory damages award. .................................................................................................................. 2

    B.    Remittitur is required here; the $1 billion verdict is completely divorced from the trial evidence and constitutes a miscarriage of justice. ..................................... 2

        1.    The award is grossly excessive in light of statutory damages awards in other copyright cases. ............................................................................ 3

        2.    The $1 billion award is grossly excessive in light of the evidence and the damages factors the jury was instructed to consider. ............................ 6

        3.    A substantial remittitur is warranted here. .................................................. 17

II.    The jury award is so "wholly disproportioned to the offense" that it violates Cox's right to due process of law. ............................................................................................ 19

    A.    The magnitude of the award is shocking. ............................................................. 19

    B.    Cox's "offense" lacks the reprehensibility that would warrant such a massive damage award. ................................................................................................... 20

    C.    Combined, the shockingly large size of the award and nature of Cox's "offense" establish that the award must be reduced as a matter of due process.................................................................................................................. 21

III.    The award is a product of Plaintiffs' efforts to encourage the jury to "punish" a "deep-pocketed" defendant. .......................................................................................... 23

    A.    At Plaintiffs' urging, the jury was instructed to "punish" Cox. ............................ 23

    B.    At Plaintiffs' insistence, the jury was instructed to consider and improperly heard evidence relating to Cox's "total profits." .................................................. 26

    C.    The award was based on irrelevant and highly prejudicial evidence of Cox's revenues untethered to the infringement. ............................................................. 29

CONCLUSION .......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atlantic Recording v. Media Group Inc.*,
  00-CV-6122 (Aug. 23, 2002), 2002 Jury Verdicts LEXIS 52291 ........................................3, 4

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
  758 F. Supp. 1522 (S.D.N.Y. 1991)...................................................................................28

*Benedict v. Hankook Tire C*o.,
  2018 WL 3352952 (E.D. Va. July 9, 2018) ........................................................................6

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
  149 F. Supp. 3d 634 (E.D. Va. 2015) ........................................................................ *passim*

*BMW of North America v. Gore*,
  517 U.S. 559 (1996)...............................................................................................15, 20

*Capitol Records v. Thomas-Rasset*,
  680 F. Supp. 2d 1045 (D. Minn. 2010) ..................................................................... *passim*

*Cline v. Wal-Mart Stores, Inc.*,
  144 F.3d 294 (4th Cir. 1998) .............................................................................................1

*Columbia Pictures Indus. v. Krypton Broad. of Birmingham, Inc.*,
  259 F.3d 1186 (9th Cir. 2001) ......................................................................................4, 25

*Columbia Pictures Television v. Krypton Broadcasting of Birmingham, Inc.*,
  106 F.3d 284 (9th Cir. 1997) ..........................................................................................25

*Cretella v. Kuzminski*,
  640 F. Supp. 2d 741 (E.D. Va. 2009) ................................................................................17

*Dimick v. Scheidt*,
  293 U.S. 474 (1935)...........................................................................................................2

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
  371 F. Supp. 3d 708 (C.D. Cal. 2019) ................................................................................4

*Disney Enters., Inc. v. Vidangel, Inc.*,
  16-cv-04109-AB-PLA, 2019 WL 4565168 (Sept. 5, 2019) ..............................................3, 4

*Ez-XBRL Sols, Inc. v. Chapke*,
  No. 1:17-cv-700, 2018 U.S. Dist. LEXIS 224803 (E.D. Va. Sep. 25, 2018),
  *adopted in full by* 2018 U.S. Dist. LEXIS 224325 (E.D. Va. Oct. 22, 2018)............................5

*F.W. Woolworth Co. v. Contemporary Arts*,
  344 U.S. 228 (1952)........................................................................................... *passim*

*Gentry v. East West Partners Club Management Co..*,
816 F.3d 228 (4th Cir. 2016) ..................................................26

*Golan v. FreeEats.com*,
930 F.3d 950 (8th Cir. 2019) ....................................19, 21, 22

*Golan v. Veritas Entertainment*,
2017 WL 3923162 (E.D. Mo. Sept. 7, 2017)..................21, 22

*Graduate Mgmt. Admission Council v. Raju*,
267 F. Supp. 2d 505 (E.D. Va. 2003) ......................................5

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
327 F. Supp. 3d 606 (S.D.N.Y. 2018).........................5, 27, 28

*King v. McMillan*,
594 F.3d 301 (4th Cir. 2010) ...........................................1, 17

*LifeNet Health v. LifeCell Corp.*,
93 F. Supp. 3d 477 (E.D. Va. 2015) ........................................6

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
658 F.3d 936 (9th Cir. 2011) ..................................................5

*Lowry's Reports, Inc. v. Legg Mason, Inc.*,
271 F. Supp. 2d 737 (D. Md. 2003).......................................25

*Maryland v. Universal Elections Inc.*,
862 F. Supp. 2d 457 (D. Md. 2012)........................................2

*N.A.S. Imp., Corp. v. Chenson Enterprises, Inc.*,
968 F.2d 250 (2d Cir. 1992) ..................................................24

*Nat'l Football League v. PrimeTime 24 Joint Venture*,
131 F. Supp. 2d 458 (S.D.N.Y. 2001).....................................5

*Oracle Corp. v. SAP AG*,
765 F.3d 1081 (9th Cir. 2014) ..............................................17

*Parker v. Time Warner Entertainment Co.*,
331 F.3d 13 (2d Cir. 2003)................................................5, 20

*Sara Lee Corp. v. Bags of New York, Inc.*,
36 F. Supp. 2d 161 (S.D.N.Y. 1999).....................................28

*Sony BMG Music Entm't v. Tenenbaum*,
2012 WL 3639053 (D. Mass. Aug. 23, 2012) .......................22

*Sony BMG Music Entm't v. Tenenbaum*,
660 F.3d 487 (1st Cir. 2011)...................................................2

*Sony BMG Music Entm't v. Tenenbaum*,
    719 F.3d 67 (1st Cir. 2013) .......................................................................20, 22, 24

*St. Louis, I.M. & S. Railway Co. v. Williams*,
    251 U.S. 63 (1919) .............................................................................19, 20, 21, 22

*Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*,
    74 F.3d 488 (4th Cir. 1996) ...................................................................................24

*S. Union Co. v. Irvin*, 563 F.3d 788, 790 (9th Cir. 2009) ............................................23

*TVB Holdings (USA), Inc. v. HTV Int'l Ltd.*,
    No. 16-CV-1489, 2018 U.S. Dist. LEXIS 41323 (E.D.N.Y. Mar. 9, 2018) .............5

*U.S. Equal Employment Opportunity Comm'n v. Consol Energy, Inc.*,
    860 F.3d 131 (4th Cir. 2018) ...................................................................................1

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
    2000 U.S. Dist. LEXIS 17907 (S.D.N.Y. Nov. 14, 2000) .......................................3

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000) ....................................................................3, 4

*Warner Records, Inc. et al. v. Charter Communications, Inc.*,
    Case No. 1:19-cv-00874-RJB-MEH (D. Colo.) ...................................................30

**Other Authorities**

Fed. R. Civ. P. 50(b) ....................................................................................................1

Fed. R. Civ. P. 59(a) ....................................................................................................1

4 Nimmer on Copyright § 14.04 (2019) .......................................................................3

6 Patry on Copyright § 22:208 ....................................................................................3

Defendants Cox Communications, Inc. and CoxCom, LLC ("Cox") respectfully move for remittitur or, in the alternative, a new trial, pursuant to Fed. R. Civ. P. 59(a).[1]

## STANDARD

Federal Rule of Civil Procedure 59(a) permits a district court to award a new trial for "any reason for which a new trial has heretofore being granted in an action at law in federal court." Fed. R. Civ. P. 59(a). The power to grant a new trial includes within it the power to order remittitur of an excessive verdict and, if the plaintiff rejects the remittitur, award a new trial. *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998).

A district court may order remittitur or a new trial if it determines that the verdict was against the "clear weight" of the evidence or "will result in a miscarriage of justice." *See U.S. Equal Employment Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2018). In that circumstance, the court "*must* set aside the verdict … and grant a new trial." *King v. McMillan*, 594 F.3d 301, 314-315 (4th Cir. 2010) (emphasis added).

## ARGUMENT

**I.    The $1 billion award is a miscarriage of justice; it is shockingly excessive and unlawfully punitive, and should be remitted or result in a new trial.**

The award of $1 billion appears to be the largest award of statutory copyright damages in history. This is not by a matter of degree. It is the largest such award by a factor of eight. It is the largest such award for secondary copyright infringement by a factor of 40. It is the largest jury

---

[1] For the reasons set forth in Cox's Renewed Motion for Judgment as a Matter of Law Or, in the Alternative, A New Trial Under Federal Rules of Civil Procedure 50(b) and 59(a), filed this date, as well as for the reasons set forth in Cox's memoranda in support of and in opposition to summary judgment, Cox respectfully submits that the evidence in this case did not support the jury's findings of direct, contributory, or vicarious liability as to any of the works in suit, and that at least 8,000 of the works in suit should not have been considered by the jury. Notwithstanding these fundamental flaws in the verdict, Cox submits this motion seeking remittitur of the statutory damages award or, in the alternative, a new trial because, even if all other defects in the verdict are ignored, the jury's award was shockingly excessive and unsupported by the evidence and the law.

verdict in the history of this District by a factor of more than 30. It is by any measure a shocking verdict, wholly divorced from any possible injury to Plaintiffs, any benefit to Cox, or any conceivable deterrent purpose. Principles of remittitur and due process require that this baseless award be substantially reduced, or that Cox be granted a new trial on damages.

### A.     This Court has inherent power to remit a grossly excessive statutory damages award.

The district courts' power to remit excessive damages awards is an established aspect of U.S. common law. More than 80 years ago, the Supreme Court explained that remittitur "has been accepted as the law for more than a hundred years and uniformly applied in the federal courts during that time." *Dimick v. Scheidt*, 293 U.S. 474, 484-485 (1935). This well-established principle applies equally to statutory damages. *See, e.g.*, *Capitol Records v. Thomas-Rasset*, 680 F. Supp. 2d 1045, 1051 (D. Minn. 2010) (judgment vacated on other grounds, 692 F.3d 899 (8th Cir. 2012)) (noting that "there is no authority for Plaintiffs' assertion that the Court does not have the power to remit an award of statutory damages" and remitting damages of $80,000 per work to $2,250); *Sony BMG Music Entertainment v. Tenenbaum*, 660 F.3d 487, 508 (1st Cir. 2011); *Maryland v. Universal Elections Inc.*, 862 F. Supp. 2d 457, 466 (D. Md. 2012). Indeed, the First Circuit has held that the district courts are *required* to consider common-law remittitur before addressing any due process-based challenge to an excessive award. *See Tenenbaum*, 660 F.3d at 508.

### B.     Remittitur is required here; the $1 billion verdict is completely divorced from the trial evidence and constitutes a miscarriage of justice.

The $1 billion verdict in this case is a shocking miscarriage of justice. It vastly exceeds any previous statutory damages award under the Copyright Act. It is wholly disproportionate to the evidence of harm to Plaintiffs, benefit to Cox, or any demonstrated need for deterrence, and is unsupportable under the Court's jury instruction on damages. It should be vacated for retrial, or remitted down the largest dollar amount consistent with the trial evidence.

### 1. The award is grossly excessive in light of statutory damages awards in other copyright cases.

The gross excessiveness of the $1 billion award is vividly illustrated by comparison not just to analogous statutory damages awards but to every statutory damages award ever rendered. Until now, the largest award of copyright statutory damages to survive appeal was $136 million—roughly one-eighth of the verdict here. *See Atlantic Recording v. Media Group Inc.*, 00-CV-6122 (Aug. 23, 2002), 2002 Jury Verdicts LEXIS 52291. The second-largest award was $62.4 million. *See Disney Enters., Inc. v. Vidangel, Inc.*, 16-cv-04109-AB-PLA, 2019 WL 4565168, at *1 (Sept. 5, 2019). The third-largest was $53.4 million. *See UMG Recordings, Inc. v. MP3.Com, Inc.*, 2000 U.S. Dist. LEXIS 17907 (S.D.N.Y. Nov. 14, 2000). Even that amount drew sharp criticism from the leading copyright scholar, who wrote: "[a]bsent any nexus between damage to plaintiff and benefit to defendant at any magnitude even roughly comparable to that awarded, the result is to introduce randomness or worse into the litigation calculus …. By any reasonable metric, the award in *UMG v. MP3.Com* seems … disproportionate." 4 Nimmer on Copyright § 14.04 (2019); *see also* 6 Patry on Copyright § 22:208 (describing award as "so monstrous as to shock anyone's conscience"). That "monstrous" award was approximately one-twentieth of the jury verdict here.

In fact, according to a recent study of copyright damages, the verdict in this case exceeds the *aggregate* dollar amount of *every* statutory damages award rendered in the years 2009-2016 *by more than four hundred million dollars*. *See* Lex Machina, Copyright Damages Report 2016, at Fig. 27 (Jan. 2017) (attached as Ex. A) (calculating that from January 1, 2009 through September 30, 2016, there were 1,338 awards of statutory damages with a total value of $568,996,344).

Importantly, the three largest statutory damages verdicts described above were rendered against direct infringers—people who actually misappropriated the copyrighted material for their own use and profit. In most cases, those infringers were conducting businesses based upon

copyright infringement; they were adjudicated pirates. For example, the defendant in *Vidangel* was found to use software to bypass anti-piracy measures to copy hundreds of films from DVDs and stream the copied films to customers for a fee. *See Disney Enterprises, Inc. v. VidAngel, Inc.*, 371 F. Supp. 3d 708, 712 (C.D. Cal. 2019). The defendant in *Atlantic Media* was a CD manufacturing plant that willfully made and sold copies of 1,514 copyrighted songs. *See Atlantic Recording v. Media Group Inc.*, Case No. 00-CV-6122 (C.D. Cal.), ECF No. 57. And the defendant in *UMG Recordings, Inc. v. MP3.Com, Inc.* "purchased tens of thousands of popular CDs in which plaintiffs held the copyrights, and, without authorization, copied their recordings onto its computer servers so as to be able to replay the recordings for its subscribers." *See* 92 F. Supp. 2d 349, 350 (S.D.N.Y. 2000).

Cox did none of these things. It is not accused of direct infringement. It is not alleged to have exploited Plaintiffs' copyrighted works. It is not in the business of distributing content, and its product offerings—internet service, television service, and voice calling services—have a nearly infinite array of non-infringing uses. Cox's financial stake in its subscribers' use of Plaintiffs' works is indirect, and (as discussed below) minuscule by any relevant metric.

Awards rendered against secondary infringers like Cox are systematically smaller than awards against direct infringers. The largest statutory damages jury award against a secondary infringer appears to be $31.68 million, rendered against the owners of a group of three television stations that aired copyrighted programs without paying licensing fees. *Columbia Pictures Indus. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1191 (9th Cir. 2001). In fact, *Columbia Pictures* was essentially a direct-infringement case: the secondary infringer owned and controlled the direct infringers, and so benefited directly from their infringement. The largest statutory damages against a secondary infringer *situated like Cox* is $25 million in *BMG Rights Mgmt. (US)*

4

*LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634 (E.D. Va. 2015) ("*BMG*").[2] The $1 billion award thus appears to be the largest ever against an infringer situated like Cox—by a factor of 40.

Nor does the analysis change if the jury's award is considered on a per work basis. For one thing, the courts to have considered the question have observed in analogous circumstances that a per work analysis is not necessarily apposite for assessing the proportionality of a verdict where high volumes of infringement are at issue, ballooning five- or six-figure per work damages awards into aggregate awards in the hundreds of millions of dollars, or, in this case, $1 billion. *Cf. Capitol Records*, 692 F.3d at 909-910 (discussing due process limitations on damages); *Parker v. Time Warner Entertainment Co.*, 331 F.3d 13, 22 (2d Cir. 2003) (same).

Moreover, even considered on a per work basis, this award was excessive. Awards of damages approaching $100,000 per work are all but unheard-of in cases involving more than a handful of works—until this one.[3] In cases involving the infringement of digital music files, no award has exceeded $25,000 per work. The most closely analogous precedent is *BMG*, in which the jury awarded $17,895 per work, or less than one-fifth of the present per-work award.

Finally, if allowed to stand, the verdict will also be the largest award in the history of this District by a factor of almost 30. Excluding awards that were later remitted, reversed, or vacated,

---

[2] The $46.14 million judgment in *TVB Holdings (USA), Inc. v. HTV Int'l Ltd.,* No. 16-CV-1489, 2018 U.S. Dist. LEXIS 41323, at *20-21 (E.D.N.Y. Mar. 9, 2018) ($30,000 per work) included liability for direct *and* secondary infringement of more than 1,500 television programs.

[3] *See, e.g.*, *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 635 (S.D.N.Y. 2018) ($100,000 per work for 142 works); *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 940 (9th Cir. 2011) ($150,000 per work for two works); *Graduate Mgmt. Admission Council v. Raju*, 267 F. Supp. 2d 505, 511-12 (E.D. Va. 2003), *report and recommendation adopted*, *Graduate Mgmt. Admission Council v. Raju*, 267 F. Supp. 2d 505, 507 (E.D. Va. 2003) ($150,000 per work for 22 works); *Nat'l Football League v. PrimeTime 24 Joint Venture*, 131 F. Supp. 2d 458, 479-80 (S.D.N.Y. 2001) ($100,000 per work for 18 works); *Ez-XBRL Sols, Inc. v. Chapke*, No. 1:17-cv-700, 2018 U.S. Dist. LEXIS 224803, at *26-27 (E.D. Va. Sep. 25, 2018) (Magistrate's Report & Recommendation), *adopted in full by* 2018 U.S. Dist. LEXIS 224325 (E.D. Va. Oct. 22, 2018) (Brinkema, D.J.) ($150,000 per work for five works).

the largest jury verdict ever in this District appears to be $34.7 million. *See LifeNet Health v. LifeCell Corp.*, 93 F. Supp. 3d 477 (E.D. Va. 2015), *aff'd*, 837 F.3d 1316 (Fed. Cir. 2016). If remitted verdicts are included, the largest is $37.7 million. *See Benedict v. Hankook Tire Co.*, 2018 WL 3352952, at *28 (E.D. Va. July 9, 2018) (remitting award from $37.8 million to $37.7 million). If not vacated or remitted, the $1 billion verdict will be the largest damages award ever in this District by approximately 2,600%. By any measure, the $1 billion award is extraordinary. It is also out of all proportion to statutory damages awards in other cases.

### 2. The $1 billion award is grossly excessive in light of the evidence and the damages factors the jury was instructed to consider.

The Copyright Act's statutory damages provision is not a license to award massive damages unmoored in the trial evidence or the policies underlying the Copyright Act, and absent "any nexus between damage to plaintiff and benefit to defendant at any magnitude even roughly comparable to that awarded, the result is to introduce randomness or worse into the litigation calculus." *See Nimmer*, *supra*. The Court instructed the jury on the factors to be considered in rendering their award, which are designed to ensure that any award is sufficiently rooted in the evidence and consistent with the purposes of statutory damages—namely, "restitution of profit," "reparation for injury," and "discourag[ing] wrongful conduct." *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233 (1952).

Specifically, the Court's damages instruction listed a series of factors that broadly correspond to those purposes, including "the profits Cox earned" and "expenses Cox saved" "because of the infringement"; the revenues that Plaintiffs lost because of the infringement and the difficulty of proving Plaintiffs' actual damages; the "circumstances of the infringement"; "deterrence of future infringement"; and "in the case of willfulness, the need to punish Cox." In addition, the instruction stated that in considering deterrence, "you may consider Cox's total profits

and the effect the award may have on Cox in the marketplace."[4] ECF No. 671, Instr. 28; *see also* Tr. 2927:8-2928:1.[5]

Properly applied, these factors could have sufficed to tie the damages award to the trial evidence and ensure that it served the purposes of disgorgement of illicit profits, compensating for injury, and "discourag[ing] wrongful conduct" going forward. As applied by the jury, however, they resulted in an award that bore no relationship to these considerations, and was so grossly excessive as to constitute a miscarriage of justice. Because the extraordinary $1 billion verdict cannot be supported by the factors the jury was instructed to consider or the evidence informing those factors, Cox is entitled to a substantial remittitur or a new trial.

> a)   **"The profits Cox earned because of the infringement" do not support the award.**

Plaintiffs urged the jury to award massive damages based, in large part, on assertions of Cox's massive profits. *See, e.g.*, Tr. 2938:5-6 (Cox "put its profits above the law"); Tr. 2938:19 (Cox's "huge profit line"); Tr. 2941:19 ("[W]e saw what motivated Cox. It was profits."); Tr. 2974:5-6 ("[C]onsider Cox's profits from its high-speed internet business …. It was $8.3 billion" [sic]); Tr. 2974:11 ("Cox's profits were so excessive"); Tr. 2974:23 ("Cox's profits were massive"). But Plaintiffs were careful never to introduce evidence—let alone argue to the jury regarding—what the instructions required: Cox's "profits *because of the infringement*"; although they acknowledged before trial that it was only the profits Cox earned "because of the infringement" that the jury could consider on the damages issue.[6] And the evidence that Plaintiffs

---

[4] As discussed in Section III, Cox maintains that the instructions allowing consideration of Cox's total profits and "need to punish" should not have been included in the charge. For purposes of this section, we assume that the charge as given was appropriate.

[5] Relevant excerpts from the trial transcript are attached hereto as Exhibit B.

[6] Both parties' proposed jury instructions on statutory damages included "profits because of the infringement" as a factor. *See* ECF No. 602-2, Instr. 30; ECF No. 645-1, Instr. 30.

*did* introduce for other purposes—specifically, to show Cox's "economic and financial incentive" to "tolerate having infringing subscribers on their network," Tr. 1775:1-5 (Lehr direct)—showed that Cox's profits *from the infringement* were a tiny fraction of the billion-dollar award.

Plaintiffs introduced two kinds of evidence bearing on "the profits Cox earned because of the infringement." *First*, Plaintiffs presented evidence of Cox's revenues generated, not by the infringement itself, but by the Cox subscribers who repeatedly committed direct infringement. *See* Am. Compl., (ECF No. 136) ¶ 10; ECF No. 590 at 3 (pretrial ruling limiting Plaintiffs to "measur[ing] harms commensurate with the set of subscribers identified in three or more notices").[7] Lehr testified that 31,514 subscribers received three or more infringement notices, and that those subscribers generated $208 million in revenues from February 2013-2016. Lehr Trial Demonstrative 14; Tr. 1776:18-1777:1.[8] That $208 million included revenues from broadband, television, and telephone services–not *profits* from those revenues. Tr. 1767:13-1768:14.

The Court's order on the *in limine* motions held narrowly that "valuations considering bundled services are relevant and admissible to help the jury understand the context of [the] business decisions at issue." ECF No. 590 at 3. The Court did not admit this evidence for proving profits attributable to the infringement. *Id*. Lehr provided the information necessary to disaggregate from the service bundle revenues only the revenues from the high-speed internet service that was the basis for Plaintiffs' allegations of secondary infringement. According to Lehr,

---

[7] Notably, Plaintiffs adduced evidence of the $307 million of revenue associated with all infringers, including those who received only one or two notices and whose infringement is not alleged to have been a basis for Cox's liability. Plaintiffs were allowed to adduce this evidence solely (though we believe erroneously) for the purpose of proving vicarious liability, but the Court specifically ruled that it could not be considered for damages purposes. *See* ECF No. 590 at 3.
[8] Referenced trial demonstratives are attached hereto as Exhibit C.

high-speed internet services generated approximately 34% of Cox's total revenues.[9] *Id.* Applying that 34% to the $208 million in total revenues yields high-speed internet revenues from repeat infringers of $71 million. Again, that $71 million figure represents gross revenues, not profits. Lehr testified that Cox's profit margin on internet services was 59.8%. Tr. 1768:25-1769:1. Thus, applying Lehr's analysis, Cox's total profits from high-speed internet services to repeat-infringing subscribers was $42.6 million for the four-year period from February 2013 through 2016. Reducing that figure by half to account for profits earned outside the Claims Period, results in profits "earned from the infringement" of $21.3 million.

Moreover, that $21.3 million figure for profits from internet service necessarily and materially overstates the actual benefit to Cox "because of the infringement," as it attributes the entire value of Cox's profits from infringing subscribers to their ability to use the service to infringe. There is no evidence to support that highly implausible assumption. Instead, the evidence suggests that Cox subscribers, like all ISP subscribers, use their high-speed internet access for an infinite number of non-infringing activities: email, shopping, following friends on Facebook, and streaming movies from Netflix, videos from YouTube, and music from Spotify. *See, e.g.*, Tr. 1358:9-16 (Zabek); Tr. 1892:7-18 (Negretti); Tr. 2423:7-15, 2434:4-11 (Bakewell). Cox's profits from its high-speed internet service reflect the value of all those activities, not just the infringement of Plaintiffs' works, and any calculation of Cox's profit from the infringement should have accounted for that fact; though the jury's obviously did not.

The *second* kind of evidence from Plaintiffs that offers a method of calculating Cox's profits cures many of the deficiencies of their revenue evidence because it recognizes that the

---

[9] Lehr testified that the revenues attributable to television services, high-speed internet service, and voice services were $4.2 billion, $2.8 billion, and $1.1 billion. The sum of those figures is $8.1 billion, of which $2.8 billion is 34.5%. Tr. 1767:22-1768:5.

relevant question for determining the benefit to Cox of the infringing subscribers was not how much profit Cox received from them, but how the profit derived from repeat-infringing subscribers compared incrementally to the profit Cox derived from *non*-repeat-infringing subscribers, who reaped all the benefits of Cox's internet service *except* the opportunity to repeatedly infringe.

Asked to calculate "the relative value" of repeat infringing subscribers versus other subscribers, Lehr concluded that a "statistically significant increase" could be detected for the monthly "data billed and revenues paid" by subscribers who were the subject of 20 or more tickets, as compared to those who were the subject of only one or two. Tr. 1792:11-1793:5. The size of that "statistically significant increase" was 8%, or $6.50 per month. Tr. 1793:6-25. For the 22 month claims period, $6.50 comes to $143.00 per subscriber. Lehr did not provide the number of subscribers who were the subject of 20 or more tickets, but the evidence, viewed most favorably to Plaintiffs, was that only 4,400 Cox subscribers were the subject of 14 or more tickets. McCabe Trial Demonstrative 7 (admitted into evidence). At $143.00 each, the "relative value" to Cox of the "statistically significant" increase in data charges paid by "high volume infringers" (assuming that this group includes not just the recipients of 20 or more notices, but also the recipients of 14 or more) was $629,000. Using Lehr's figures, the profits on those charges would be $376,262.

The key point is that, whether the appropriate figure for Cox's profits from the infringement is some fraction of $21.3 million, $376,262, or something in between, that figure bears no relationship to the "massive," "excessive," multi-billion-dollar profits on which Plaintiffs urged the jury to base its award. There is not even a remote connection between the profits earned by Cox from the infringement and the $1 billion damages award.

**b)** **"The expenses Cox saved because of the infringement" do not support the award.**

There was no evidence sufficient to show that Cox saved any expenses because of the infringement. Lehr testified broadly that "Cox saved costs by not addressing copyright infringement," Tr. 1770:13-23, but he made no attempt to quantify that savings. *See* Tr. 1795:19-1796:4; *see also id.* at 1800:11-1803:16. Notably, Lehr did not testify that it was *impossible* to quantify the alleged savings; only that he did not do it. *Id.* Broad, unsupported assertions of "savings" that Plaintiffs chose not to quantify provide no support for the massive jury award.

The only potentially relevant evidence of actual savings related to the cost of terminating a subscriber, which Cox arguably "saved" indirectly by failing to terminate more infringing accounts. That cost was "not more than 20 or 30 dollars" per customer. Tr. 2722:21-25 (Mencher direct). Viewing the evidence most favorably to Plaintiffs, the jury could have found that Cox "should" have terminated the 31,514 customers who received three or more notices. Assuming $30 per termination, the expenses Cox saved "because of the infringement" by retaining those accounts were, at an absolute maximum, $945,420.

**c)** **"The revenues that Plaintiffs lost because of the infringement" do not support the award.**

Plaintiffs refused to calculate the revenues lost from the alleged infringements, arguing that lost revenues were impossible to determine. Their witnesses testified only about the global harm to their industry from internet piracy generally—testimony that naturally had the effect of vastly expanding the frame of reference for a potential damage award.[10] Cox moved *in limine* to exclude

---

[10] *See, e.g.*, Tr. 1196:12-1198:2 and PX-486 (Flott direct) (testimony and demonstrative showing decline in industry financial results from 2000 to 2014 from around $14 billion to $7 billion) ;Tr. 1740:22-1741:3 (Lehr direct) (stating that the revenues and profits of "rights holders" are "significantly lower" "in a world with piracy"); Tr. 1742:19-1743:18 (Lehr direct) (stating in general terms that piracy causes "a big disruption effect on their business models"); Tr. 119:17-

this evidence, and filed a *Daubert* motion to preclude Plaintiffs' expert from discussing it, but was

rebuffed. *See* ECF No. 590 at 2-3; ECF No. 589 at 4. In closing, Plaintiffs urged the jury to rely

on this generic evidence of loss—wholly unconnected to the infringements at issue—in

considering the "Plaintiffs' loss of revenue" damages factor:

> You heard from several representatives from the plaintiffs … who
> told you how peer-to-peer had harmed their business and that
> between 2004 and 2014 … the record industry's revenues were
> going down and down and down. This was not a slow-down; this
> was a slaughter. Lost jobs, lost labels, lost revenue.

Tr. 2972:10-17. But evidence of that industry-wide "slaughter" cannot support the jury's award:

general assertions of unspecified losses caused by a worldwide phenomenon do not provide a

valid basis for holding an individual defendant liable for those losses.

The only concrete evidence on this topic came from Cox's expert Christian Tregillis, who

testified that Plaintiffs' lost revenue from "displaced downloads" of the works at issue was

$692,000. Tr. 2777:15-23. The jury was not required to agree with Mr. Tregillis's testimony, but

in the absence of any contrary evidence relating to the harm allegedly caused by Cox's subscribers

during the Claim Period (as opposed to the industry generally by all P2P infringers since Napster

in 1999), it was also not permitted to use this damages factor to support a massive damages award.

### d)   "The difficulty of proving Plaintiffs' actual damages" does not support the award.

Plaintiffs leveraged the purported impossibility of calculating their losses into an argument

for infinite damages. Plaintiffs repeatedly suggested that every documented infringement was

---

23 (Kooker direct) (stating that if copyrights are not protected, "ultimately the business doesn't exist"); Tr. 159:6-160:22 (Kokakis direct) (stating that piracy "was a problem for the entire music industry"); Tr. 228:3-17 (McMullen direct) (stating that piracy has "had a very severe impact," including by impacting "the finances of our business"); Tr. 1195:9-17 (Flott direct) (stating that the impact from piracy has "been enormous and significant") (referenced trial exhibits are attached hereto as Exhibit D).

somehow evidence of many more undocumented infringements, for which Plaintiffs deserved compensation from Cox.[11] For example, Lehr testified that the infringement data in the case does not show "how many actual copies were distributed by those subscribers …." Tr. 1752:18-24. Lehr also stated that "a file that is distributed illegally, once it gets out there virally, how many illegal copies that copy can spawn … there is no way to predictably estimate that." Tr. 1753:4-7.[12]

These issues, however, do not justify the jury's award. The difficulty of quantifying damages is a justification for the existence of statutory damages. *See F.W. Woolworth*, 344 U.S. at 232 (noting that the purpose of statutory damages is "to give the owner of a copyright some recompense for injury done him, in cases where the rules of law render difficult or impossible proof of damages").[13] It is not a justification for awarding damages for acts of infringement that the rights holder cannot prove. The difficulty of proving damages in the abstract provides no guidance for where an award should fall within the statutory range—and certainly no justification for the largest statutory damages award in the history of copyright law by an order of magnitude.

e)   **"The circumstances of the infringement" do not support the award.**

The "circumstances of the infringement" factor weighs heavily against the jury's unprecedented verdict. Cox did not engage in counterfeiting or piracy, or even direct infringement.

---

[11] Cox moved *in limine* and under *Daubert* to exclude evidence of infringements that were not represented by the notice data, but the Court denied those motions in relevant part. *See* ECF No. 306; ECF No. 482; ECF No. 590 at 2-3; ECF No. 589 at 4.

[12] *See also, e.g.*, Tr. 159:23-160:5, 160:16-22 (Kokakis direct).

[13] Indeed, the statutory minimum in this case mandated an award of at least $7.5 million; that is, more than 10 times the only actual calculation of Plaintiffs' demonstrated loss. And the actual award was more than 1,000 times that number.

As noted above, courts have systematically treated secondary infringement as less culpable than direct infringement for profit.

Here, there is no evidence that Cox induced its subscribers' infringement, encouraged it, or did anything to exacerbate it. To the contrary, the evidence undisputedly showed that Cox invented, developed, and implemented a program aimed at *reducing* infringement—and even Plaintiffs' evidence demonstrated that the program worked. Tr. 861:17-862:6 (McCabe cross); McCabe Trial Demonstrative 7 (showing reduction in notices over the course of graduated response); *see also* Tr. 1591:14-1592:3 (Carothers direct); Tr. 1962:1-1963:9 (Weber direct); PX-325 at 3. It is also undisputed that throughout the Claim Period, Cox continually engaged with Plaintiffs' agents about Cox's graduated response program, was transparent about its limitations, and where feasible, accommodated Plaintiffs' requests. *See, e.g.*, Tr. 310:16-19, 318:4-319:18 (Marks direct); PX-327; Tr. 1049:17-1050:16 (Trickey direct); 1602:25-1603:9 (Carothers direct).

Even if the jury concluded that Cox's infringement-reduction efforts were inadequate because they did not include enough terminations or other measures, there is no dispute that Cox did not itself engage in any unlawful copying or distribution; that Cox made efforts to restrain the infringement of which it was made aware; or that Cox's efforts were similar to—and in many ways more robust than—the anti-infringement efforts mounted by other major ISPs in the CAS system, which Plaintiffs expressly approved. Even the handful of cases sustaining low eight-figure awards for secondary infringement did not involve comparable evidence of affirmative efforts to curtail the infringement in dispute. For these reasons, the great weight of the evidence supports the

conclusion that "the circumstances of the infringement" do not support the jury's award but that it would favor an award lower than the awards assessed against other secondary infringers.

### f)   "Whether Cox acted willfully or intentionally" does not support the award.

The jury's willfulness finding moves the potential damages into the higher statutory range. It does not support any particular damages within the permitted range; nor does it mandate increased damages. The jury's willfulness finding thus provides a basis for the jury's extraordinary award only to the extent that the other factors do. The only case involving a jury determination of willful infringement under analogous facts is *BMG*, which resulted in a verdict that is one-fortieth of this one. And even in that instance, the evidence was that Cox refused to process the notices received by *BMG*, whereas, here, Cox did process the RIAA notices, and abated a substantial portion of the recurring infringement.

### g)   "Deterrence of future infringement" does not support the award."

The need to "discourage wrongful conduct" is a core function of statutory damages, and may warrant damages that exceed the rights holder's loss and the infringer's gain. *F.W. Woolworth*, 344 U.S. at 233-234. But the deterrence function is not a blank check for awarding massive damages untethered to the evidence. As the Supreme Court has explained, a massive award "cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal." *BMW of North America v. Gore*, 517 U.S. 559, 584-585 (1996). The quantum of damages justified by deterrence equals the amount necessary to deter the conduct—no less, but also no more.

Here, Plaintiffs offered no evidence of the damages necessary to deter Cox's infringement. Having argued for and won an instruction allowing the jury to consider the effect of Cox's "total profits" on deterrence, they simply urged the jury to base their award on that enormous number:

> [W]hen you consider [deterrence], consider Cox's profits from its high-speed internet business between 2013 and '14. It was $8.3 billion. That is a big, big number…. In fact, even if you awarded the maximum statutory damages under willfulness, it's not clear that even that would have a deterrent effect because Cox has so much cash.

Tr. 2974:4-7, 2974:23-2975:1. Counsel's statement inflated the profits from Cox's internet services business by more than 140%—according to Plaintiffs' own expert, the correct number was $1.7 billion in 2014.[14] Lehr Trial Demonstrative 11. But even the correct total-profits number tells us nothing about the damages necessary to *deter the infringement*. Well-established economic principles teach that a rational commercial enterprise will stop an activity when its costs substantially exceed its benefits. *See, e.g.*, ("[I]f the expected costs of wrongdoing exceed the expected gains, wrongdoing will normally be deterred, whatever the corporation's wealth."). Absent evidence that Cox would irrationally continue the accused conduct despite a damage award that made the conduct a financial negative, the deterrence objective justifies no larger award—and there is no such evidence here.[15] In addition, there is no evidence that there is any *current* threat of infringement that warrants deterrence.

Given the evidence quantifying Plaintiffs' injury and Cox's benefit from the infringement, the need to deter cannot justify damages even remotely close to the magnitude of the jury's award.

### h)   "The need to punish Cox" does not support the award.

The jury was encouraged to punish Cox, and punish Cox it did. But like deterrence, punishment is not an uncabined invitation to inflate damages. In addition to constitutional considerations (addressed below), principles of common law dictate that the punitive portion of

---

[14] Lehr did not provide a profit number for 2013. Assuming that number was similar to the 2014 number, Cox's total profit from internet service during the Claims Period was $3.4 billion, or less than one-half the figure counsel urged the jury to use.

[15] To the contrary, the evidence showed that Cox is a rational economic actor. *See, e.g.*, Tr. 2721:5-2722:1 (Mencher direct).

the damages should have been constrained by "the reasonableness between the damages sustained and the amount of the award and measurement of punishment required, whether the award will amount to double recovery, the proportionality between the compensatory and punitive damages, and the ability of the defendant to pay." *Cretella v. Kuzminski*, 640 F. Supp. 2d 741, 766 (E.D. Va. 2009).

Here, the only *Cretella* factor that even arguably support an elevated award is Cox's ability to pay. All the others are neutral or weigh in favor of a vastly smaller award—one that is proportional to any injuries that Plaintiffs provably sustained, the modest benefits to Cox, and the indirect and relatively low-culpability nature of the infringement.

### 3.   A substantial remittitur is warranted here.

Where a jury award is grossly excessive, the trial court "must" set aside the verdict and either remit the award or grant a new trial. *King*, 594 F.3d at 324. The proper amount of a remittitur is "the maximum amount sustainable by the proof." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094 (9th Cir. 2014). Here, the necessary "proof" relates to the factors the jury was instructed to consider: (1) Cox's profits earned and (2) expenses saved "because of the infringement," (3) Plaintiffs' lost revenues "because of the infringement" and (4) the difficulty of proving them, (5) the circumstances of the infringement, (6) willfulness, (7) the need for deterrence, and (8) the "need to punish" Cox.

As explained above, most of the factors support an award of no more than the statutory baseline for willful infringement—$7.5 million. The only evidence of Plaintiffs' losses from the infringement at issue (as opposed to P2P infringement as a general phenomenon) shows a loss of less than $1 million. The difficulty of proving those lost revenues justifies the choice of statutory over actual damages (which provided a 10 times multiplier at the minimum $750 per work baseline), but does not justify any further enhancement within the statutory range. The fact of

17

willfulness allows, but is not an independent basis for, enhancement beyond the $750 per work statutory baseline for willfulness. The circumstances of the infringement, when compared to the defendant's culpability in cases of willful infringement where elevated damages have been awarded—those involving true piracy—do not support a significant increase in damages.

The only factors that could even theoretically support an increase over the statutory minimum are Cox's gains from the infringement, deterrence, and punishment. But the evidence shows that Cox's profits earned "because of the infringement" were not less than $376,262 (the marginal value of repeat-infringing subscribers over other subscribers) and not more than some fraction of $21.3 million (all profits from repeat-infringing subscribers attributable to all internet service during the Claims Period). Also, Cox arguably realized a gain from "cost savings" attributable to the infringement of, at a maximum, $950,000. Together, that yields a total gain to Cox of not less than $1.3 million or more than some fraction of $22.25 million.

The deterrence factor should reflect the amount necessary to deter Cox from conduct that earned or saved Cox that amount over two years and which injured Plaintiffs in the amount of $692,000 over the same period, plus a multiplier to accommodate the discounted probability that additional conduct would be identified. The punishment factor must itself be tied somehow to the evidence of actual harm in order to survive due process review and should reflect the low culpability of Cox's conduct compared to that of other willful infringers.

The appropriate award should account for the maximum benefit to Cox (as calculated by Lehr) for providing broadband services to the accused infringers and any savings reaped "because of the infringement," and Plaintiffs' losses from "displaced downloads" of the 10,017 works at issue. It should include a multiplier to account for the deterrence and punishment factors, but that multiplier should have some rational basis in the trial evidence as represented in the other factors.

18

Finally, the award should be at least commensurate with the damages awarded in similar cases. An award rooted in these principles would amply serve the statutory purposes of "restitution of profit," "reparation for injury," and "discourag[ing] wrongful conduct." *See F.W. Woolworth Co.,* 344 U.S. at 233.  Under no circumstances could such an award reach $1 billion, or anything close to it.

## II.   The jury award is so "wholly disproportioned to the offense" that it violates Cox's right to due process of law.

Like punitive damages, statutory damages are constrained by the constitutional requirement of due process. The governing standard was established by the Supreme Court in *St. Louis, I.M. & S. Railway Co. v. Williams*, 251 U.S. 63 (1919), in which the Court "declared that damages awarded pursuant to a statute violate due process only if they are 'so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.'" *Capitol Records,* 692 F.3d at 907 (quoting *Williams*, 251 U.S. at 67).

*Williams* requires a proportionality analysis. It considers the relationship between two variables: the magnitude of the award and the nature and egregiousness of the "offense." *See Golan v. FreeEats.com*, 930 F.3d 950, 962-963 (8th Cir. 2019) (applying *Williams* by "compar[ing] … the conduct of" the defendant to the "shockingly large" statutory damage award). Performing that proportionality analysis here confirms that the $1 billion award violates Cox's right to due process.

### A.   The magnitude of the award is shocking.

As set forth at length above, the $1 billion award in this case is unprecedented. It is the largest copyright statutory damages award in history by a factor of eight and is 40 times larger than the verdict awarded (and ultimately vacated) in the very similar *BMG* case. It exceeds by more than $400 million the aggregate dollar value of *all* copyright statutory damages awards from 2009-2016. It exceeds by more than $100 million the total profits earned in 2014 by the parent companies

of the 53 plaintiffs.[16] Even considered on a per-work basis, the award is extreme: the $99,830.29

per-work award is the largest ever given for infringement of digital music files. Every previous

case that we have been able to identify involving similar infringements has ultimately awarded

per-work damages of $9,000 to $22,500.[17]

Multiple courts have recognized that due process limitations may be triggered where, as

here, the aggregation of many individual statutory damages awards results in a grossly

disproportionate total award. For example, in *Parker v. Time Warner Entertainment Co*., 331 F.3d

13, 22 (2d Cir. 2003), the Second Circuit considered "the effects of combining a statutory scheme

that imposes minimum statutory damages awards" with a "mechanism that aggregates many

claims." The court reasoned that "[s]uch a combination may expand the potential statutory

damages so far beyond the actual damages suffered that the statutory damages come to resemble

punitive damages." *Id*. In a "sufficiently serious case," the court concluded, "the due process clause

might be invoked … to nullify that effect and reduce the aggregate damage award." *Id*. (citing

*State Farm* and *Gore*); *see also Capitol Records*, 692 F.3d at 910 ("[t]he absolute amount of the

award, not just the amount per violation," is relevant to disproportionality under *Williams)*.

If the billion-dollar verdict at issue here, untethered to any conceivable compensatory or

deterrent purpose, is not a "sufficiently serious case" to trigger due process limitations, it is

difficult to know what would be. *Parker,* 331 F.3d at 22.

**B.     Cox's "offense" lacks the reprehensibility that would warrant such a massive damage award.**

On the other side of the proportionality calculus is the "offense" for which Cox was found

liable. The contrast with the magnitude of the award is sharp. Cox was found liable for secondary

---

[16] According to Plaintiffs' expert Lehr, Plaintiffs' combined profits in 2014 were $883 million. *See* Tr. 1759:16-1760:20 and Lehr Demonstrative Slide 10.

[17] *See BMG* ($17,895); *Tenenbaum* ($22,500); *Capitol Records* ($9,250).

infringement, not direct infringement. Cox misappropriated nothing, and any benefit it received from its subscribers' infringements was indirect. There is no evidence that Cox knew that its own conduct—providing internet service to subscribers, forwarding infringement notices to them upon receipt, and putting accused subscribers through a multi-step graduated response process that was designed to (and did) discourage infringement without termination—was unlawful. Indeed, in the time period at issue there was no authority to suggest that an ISP's failure to terminate a subscriber could or would give rise to secondary liability. Cox has engaged in no litigation misconduct. And in this case the undisputed evidence showed not only that Cox devoted significant resources to a program that was designed to—and did—discourage its subscribers' infringement, but also that Plaintiffs had endorsed a very similar program employed by other ISPs.

**C.    Combined, the shockingly large size of the award and nature of Cox's "offense" establish that the award must be reduced as a matter of due process.**

The radical disjunction between the massive award and Cox's low culpability require the conclusion that the award is so "disproportioned to the offense" that it violates due process.

The Eighth Circuit's recent decision reducing statutory damages on due-process grounds in *Golan v. FreeEats.com*, 930 F.3d 950 (8th Cir. 2019) is instructive. There, the defendants were found to have made more than three million phone calls in violation of the Telephone Consumer Protection Act ("TCPA"). The TCPA provides for statutory damages of $500 per violation, resulting in a total statutory damage award of more than $1.6 billion. *Golan v. Veritas Entertainment*, 2017 WL 3923162, at *4 (E.D. Mo. Sept. 7, 2017). Applying *Williams*, the district court found that amount "obviously unreasonable and wholly disproportionate to the offense." *Id.*

It ordered the judgment reduced to $10 per offense, for an aggregate award of $32,424,930. In so deciding, the court observed that this amount:

> [R]eflects the severity of the offense, a six-day telemarketing campaign which placed 3.2 million telephone calls, as well as respecting the purposes of the TCPA to have a deterrent effect and to account for unquantifiable losses … .

*Id*. On appeal, the Eighth Circuit affirmed. It noted the "obvious" fact that "$1.6 billion is a shockingly large amount," and that "compare[d] to the conduct" of the defendant—a commercial advertising firm that made more than three million robocalls in one week but "plausibly believed it was not violating the TCPA"—the statutory award was "wholly disproportioned to the offense and obviously unreasonable" under *Williams*. *Golan,* 930 F.3d at 962-963.

Like *Golan*, this case contrasts strongly with two decisions that applied *Williams* to copyright statutory damages awards and found no violation of due process. *See Tenenbaum*, 719 F.3d at 71; *Capitol Records*, 692 F.3d at 909. The awards in those cases were minuscule compared the $1 billion at issue here: $675,000 in *Tenenbaum* ($22,500 per work) and $222,000 in *Capitol Records* ($9,250 per work). The defendants in both cases were direct infringers who intentionally misappropriated the plaintiffs' intellectual property for their own benefit, directly depriving the plaintiffs of their property's value. Both persisted despite knowing that their conduct was illegal. *See Sony BMG Music Ent'mnt v. Tenenbaum*, 2012 WL 3639053, at *3 (D. Mass. Aug. 23, 2012); *Capitol Records*, 680 F. Supp. 2d at 1053. Both lied in court proceedings and attempted to shift blame to others, including innocent children. *Tenenbaum*, 2012 WL 3639053, at *3; *Capitol Records, Inc.*, 680 F. Supp. 2d at 1053. Both cases*,* in short, involved relatively small awards and relatively high levels of culpability. The opposite is true here.

For these reasons, the $1 billion award, considered in light of Cox's conduct, violates Cox's right to due process of law. The Court should remit the award to the largest constitutionally permissible amount[18]

### III.   The award is a product of Plaintiffs' efforts to encourage the jury to "punish" a "deep-pocketed" defendant.

The jury's shocking and unprecedented $1 billion award did not emerge from a vacuum. It was the product of a calculated effort by Plaintiffs to skew the damages upward by encouraging the jury to punish a deep-pocketed defendant for supposed transgressions far beyond the limited acts of infringement actually alleged in the case.

### A.   At Plaintiffs' urging, the jury was instructed to "punish" Cox.

The jury's verdict can only be understood as an act of retribution—an act the jury was encouraged to take by Plaintiffs' insistence on a jury instruction urging the jurors to "punish Cox." The result speaks for itself: a jury award of unprecedented magnitude with no conceivable basis tied to Plaintiffs' harm, any benefit to Cox, or any need for deterrence. What remains is simply a desire for retribution that has no place in civil copyright law. Even if a punishment instruction could be appropriate in some circumstances, there was no basis for it here.

In successfully arguing for the punishment instruction, Plaintiffs relied primarily on the Supreme Court's decision in *F.W. Woolworth*. But *F.W. Woolworth* says nothing about punishment. Rather, it simply states that statutory damages are designed both to compensate the rights holder and to "discourage wrongful conduct." *Id.* at 233; *accord BMG*, 149 F. Supp. 3d at 677 n.31 ("[s]tatutory damages under the Copyright Act are *not* penal. Instead, they are aimed at compensating copyright owners and deterring future infringing conduct.") (emphasis added). That

---

[18] Note that if the Court remits the award on due process grounds, it is not required to offer Plaintiffs the alternative of a new trial on damages. *See, e.g.*, *S. Union Co. v. Irvin*, 563 F.3d 788, 790 (9th Cir. 2009).

is, *F.W. Woolworth* supports the use of statutory damages for *deterrence*—a function that Plaintiffs insisted to the Court is a "very, very different thing" than punishment. Tr. 2317:14-23; *see also* Tr. 2646:16-20, Tr. 2652:1-5. And the Court's instruction on damages already included consideration of deterrence. ECF No. 671, Instr. 28. To the extent punishment is relevant to damages' capacity to deter, then the instructions already covered it. To the extent punishment serves some function *other* than deterrence, its inclusion in the instruction finds no support in *F.W. Woolworth*.

Consistent with the Supreme Court's guidance, no Court of Appeals employs a "need to punish" factor in assessing statutory damages.[19]  Although some of the Circuits' model instructions recite "penaliz[ing] the infringer" as one of the purposes of statutory damages, none allows consideration of punishment as a separate factor in determining the quantum of damages.[20]  To the extent the listed factors allow consideration of the need to "penalize" the infringer, it is only through consideration of deterrence. *See, e.g.*, Eleventh Circuit Civil Jury Instruction 9.32 (noting that "purposes" of statutory damages include "penaliz[ing] the infringer" but allowing no consideration of punitive factors other than "deterrence of future infringement").[21]

---

[19] *See, e.g., Sony BMG Music Entm't v. Tenenbaum*, 719 F.3d 67 (1st Cir. 2013) (listing factors but not punishment); *N.A.S. Imp., Corp. v. Chenson Enterprises, Inc.*, 968 F.2d 250, 252–53 (2d Cir. 1992) (same); *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 496 (4th Cir. 1996) (same); Seventh Circuit - Federal Civil Instructions of the Seventh Circuit, Prepared by The Committee on Pattern Civil Jury Instructions of the Seventh Circuit, Instr. 12.8.4 (same); Ninth Circuit – Manual of Model Civil Jury Instructions, Instr. 17.35 (same); Eleventh Circuit – Judicial Council of the United States Eleventh Judicial Circuit, Instr. 9.32 (same). Excerpts of the referenced model jury instructions are attached hereto as Exhibit E.

[20]  In pressing for a punishment-based instruction, Plaintiffs' counsel represented that the *Tenenbaum* case "did include as a [damages] factor punishment—I know, I litigated the case." Tr. 2651:11-13. Counsel's memory of *Tenenbaum* is faulty: the jury instruction in that case makes no mention of punishment. *See* Trial Transcript, *Sony BMG Music Ent'mnt v. Tenenbaum*, Nos. 03-11661 and 07-11446 (D. Mass. July 31, 2009) at 101:18-102:22 (attached as Ex. F). The relevant part of that instruction refers only to "the need to deter."

[21] To the extent some decisions in the Courts of Appeals state that statutory damages are punitive, none of those cases suggest that such damages have a punitive purpose independent of the deterrence function authorized by the Supreme Court in *F.W. Woolworth*.

The overwhelming majority of copyright jury instructions emphasize the need for deterrence, and do not permit the jury to consider "the need to punish" as a factor in determining damages. While there are a handful of cases where the court allowed consideration of punishment in addition to deterrence, it is unclear whether there was any authority to support such an instruction; and, in any event, none of those cases involve facts anything like this one. Instead, they involve infringers who are plausibly viewed as pirates—people who exploit others' intellectual property for their own direct personal or commercial gain. For example, in *Lowry's Reports, Inc. v. Legg Mason, Inc.,* 271 F. Supp. 2d 737 (D. Md. 2003), the court permitted the jury to consider punishment where the defendant had a single subscription to plaintiffs' proprietary investment reports but disseminated them widely throughout its international organization; used the unauthorized copies of the plaintiffs' reports to further its own commercial purposes; and continued to disseminate the reports after receiving a cease-and-desist letter and agreeing to stop. *Id*. Similarly, in *Columbia Pictures v. Krypton Broadcasting*, the defendant television stations continued to broadcast copyrighted television shows after the termination of their licensing agreement with the plaintiff, after receiving multiple cease-and-desist letters, and after the infringement suit was filed, willfully misappropriating the rights holder's property for its direct commercial gain. *Columbia Pictures Television v. Krypton Broadcasting of Birmingham, Inc*., 106 F.3d 284 (9th Cir. 1997), *rev'd on other grounds*, *Feltner v. Columbia Pictures Television*, 523 U.S. 340 (1998); *see also Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham, Inc.,* 259 F.3d 1186 (9th Cir. 2001).

This case involves none of the culpability that arguably warranted a punishment instruction in *Lowry's Reports* and *Columbia Pictures*. Cox was accused of secondary infringement on the basis that it provided internet access to others who infringed. Cox did not itself misappropriate or

exploit Plaintiffs' intellectual property. It cooperated with the recording industry, forwarding infringement notices to its subscribers and, where feasible, accommodating the industry's requests to increase the number of notices it would process daily. Cox did not induce, cause, or encourage its subscribers' infringement. To the contrary, it actively discouraged infringement via notices, warnings, suspensions, and—in extreme cases—terminations. These facts simply cannot be reconciled with a "need to punish" Cox beyond what is necessary to deter future infringement.

There is no reasonable question that Cox was prejudiced by Plaintiffs' "need to punish" instruction, in that there is "a reasonable probability" that the instruction "affected the outcome of the trial" and resulted in a "miscarriage of justice." *Gentry v. East West Partners Club Management Co..*, 816 F.3d 228, 237 (4th Cir. 2016). Given the total disjunction between any conceivable loss to Plaintiffs or gain to Cox, and the absence of any evidence suggesting that a billion-dollar award was necessary to deter future infringement, the jury's award could only have been based upon a desire to punish that was permitted and encouraged by the instruction. Accordingly, Cox is entitled to a remittitur or a new trial.

### B.    At Plaintiffs' insistence, the jury was instructed to consider and improperly heard evidence relating to Cox's "total profits."

Even with the instruction to "punish" Cox for secondary infringement, the jury could not have reached its $1 billion verdict had it not been supplied with "evidence" framing damages in billion-dollar terms. The Plaintiffs gave the jury that guidance by repeatedly invoking Cox's revenues: in closing argument, their counsel used the word "billion" at every opportunity. *See, e.g.*, Tr. 2963:4 ("multi-billion-dollar company"), 2974:1-6 (misrepresenting Cox's profits from Internet in 2014 as "8.3 billion"); 2974:9-19 (Cox paid "$2.9 billion, with a 'B', in cash dividends"); 3028:25-3029:2 ("Cox literally puts billions and billions of dollars in its pockets"). There is no evidentiary connection between those billions and the infringements at issue here.

26

Over Cox's objection, those ten-digit numbers were in evidence, and at Plaintiffs' urging the jury was instructed to and did consider them in determining "what amount would have a deterrent effect." ECF No. 671, Instr. 28. This evidence was irrelevant and highly prejudicial. Plaintiffs' instruction should have been rejected, together with anything adduced to support it.

First, Plaintiffs' total-profits instruction—which, like the punishment instruction, the Court *did not* include in its *BMG* instructions, despite the very similar posture of that case—was inappropriate in this case. Although total profits or overall wealth may be relevant in determining *punitive* damages, copyright statutory damages (as explained above) "are not penal." *BMG*, 149 F. Supp. 3d at 677 n.3. Accordingly, the retributive purposes to which total profits may be relevant are not applicable here. In any event, the instruction did not relate to the need to punish Cox, but the need to deter future infringement. Cox's total profits from its internet, television, and many other services are not relevant to deterring infringing conduct that relates to a tiny fraction of those businesses.

Plaintiffs have never cited any authorities that actually addressed the propriety of a "total profits" jury instruction. Nor have they identified authorities that use such an instruction the way it was used here—as a kind of free-standing invitation to charge Cox massive damages wholly divorced from the infringement. *See* Plaintiffs' Bench Mem. Regarding Statutory Damages (Ex. G). In general, the cases employing a total-profits instruction involve direct infringers who were in the business of distributing copyrighted content, such that there was a direct relationship between the defendant's misappropriation of the plaintiffs' copyrighted materials and its profits. For example, the defendants in *John Wiley & Sons, Inc. v. Book Dog Books, LLC,* 327 F. Supp. 3d 606 (S.D.N.Y. 2018) were book sellers accused of selling counterfeit copies of the plaintiffs' textbooks. *Id.* (cited in Ex. G at 7). The jury instruction that allowed the jury to consider

"Defendants' total profits" was given in light of evidence "from Plaintiffs' expert that [the infringing] practices *led Defendants to earn* $53,800,000 in profit in a four-year period." *Id*. at 634-635 (emphasis added). That is, there was a close and direct relationship between the infringing conduct and the defendants' overall profits. The same is true of *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522 (S.D.N.Y. 1991), which involved a defendant for whom copying written materials, and particularly academic textbook materials for university professors, was its core business. *Id.* (cited in Ex. G at 7). Its $3 million in profits therefore included profits directly attributable to the alleged infringement. And *Sara Lee Corp. v. Bags of New York, Inc*., 36 F. Supp. 2d 161 (S.D.N.Y. 1999) (cited in Ex. G at 7) actually cuts *against* the inclusion of a "total profits" instruction, for a similar reason. In *Sara Lee*, the court considered not the defendant's *total* profits, but the profits *from its counterfeiting operation*. *Id*. at 169.

This case is very different. The relationship between the alleged infringement and Cox's total profits is highly attenuated. Cox is not in the business of distributing copyrighted content. Nor did it misappropriate Plaintiffs' property for its own commercial gain. Cox's profits flow from the provision of services, including internet access, cable television, and telephone connectivity. The connection of the profits on those services to the alleged infringements is so distant and indirect as to be meaningless.[22] For that reason, the notion that Cox's total wealth is relevant to the deterrence factor is inconsistent with basic principles of damages. The damages necessary to deter a company from engaging in conduct X are a function of the value to the company of *engaging in conduct X*—not its profits derived from unrelated conduct A through W, plus Y and Z. The amount necessary to deter may be some multiple of that amount, to ensure that infringement is a net

---

[22] For this reason, Cox moved *in limine* to exclude evidence of Cox's profits from any service other than high-speed internet. The Court denied that motion in relevant part without discussion. *See* ECF No. 485 at 7-8; ECF No. 590 at 2-3.

negative activity, and not just a neutral one. But the total wealth of the defendant can be deemed relevant to that calculus only by hypothesizing an irrational defendant.

In short, even if wealth or total profits may in some circumstances be relevant to determining punitive damages, it is not relevant to the need for deterrence of the accused conduct, which, as discussed above, is the only "punitive" purpose served by enhanced statutory damages under the Copyright Act. Plaintiffs' jury instruction prejudiced Cox by encouraging the jury to award damages based not on the need for deterrence, but on the size of Cox's bank accounts.

## C.  The award was based on irrelevant and highly prejudicial evidence of Cox's revenues untethered to the infringement.

Even if the total profit instruction was correct, Plaintiffs should not have been permitted to present evidence (over Cox's objection) of Cox's resources that was not even arguably related to deterring future infringement: the dollar value of dividends Cox's owners received during the Claims Period. *See* Lehr Trial Demonstrative 9; Tr. 1720:11-16, 1761:14-1763:9. It is surely no coincidence that the value of those dividends—"1 to 1.5 billion dollars a year," as Plaintiffs' counsel put it during closing—is the dollar amount in evidence closest to the jury's $1 billion award. Tr. 2974:9-2975:1. Plaintiffs' counsel openly urged the jury to base their award on those dividends. After telling the jurors that "Cox paid $2.9 billion, billion with a 'B', in cash dividends to its owners," he asked "[g]iven Cox's conduct, how much of those profits should the Cox family get to retain, and how much should be turned over to the plaintiffs?" *Id*.

The profits that "the Cox family" "get to retain" from the entire business—and which Lehr suggested they might use to "go on a vacation" or "buy a car," Tr. 1761:14-24—have no bearing on the need to deter future infringement, which is the only purpose for which the jury was instructed to consider profits. Cox's owners are not parties. There is no evidence that Cox's owners have any direct role in the management of the company, never mind management of its copyright

enforcement policies. Further, the profits from Cox's entire business represent the profits earned on the services provided to roughly 4.5 million broadband subscribers, not to mention the millions of subscribers to video and voice services alone. This case, at the most, involves conduct by approximately 31,000 alleged repeat infringers. The actions of those 31,000 subscribers are so far removed from Cox's enterprise-level corporate dividends as to bear no rational relationship at all—never mind one that should form a basis for the jury's verdict.

The dividends, in short, had no relevance to any issue before the jury, and had no conceivable purpose except to incite the jury to punish a deep-pocketed owner by using a yardstick that did not even purport to measure the benefit obtained from the alleged infringement. The evidence was both irrelevant and highly prejudicial, and warrants remittitur or a new trial before a jury untainted by such evidence.

## CONCLUSION

For all these reasons, Cox requests that Court grant remittitur reducing the damages award to an amount supported by the trial evidence and the requirements of due process or, in the alternative, vacate the judgment and order a new trial on damages.[23]

---

[23] On January 15, 2020, Plaintiffs, after being ordered by the court in their infringement litigation against Charter Communications to produce ownership documents that were not produced in this case, *Warner Records, Inc. et al. v. Charter Communications, Inc.*, Case No. 1:19-cv-00874-RJB-MEH (D. Colo.), ECF No. 100, amended the Charter complaint to remove from consideration approximately 100 works for which Plaintiffs were awarded statutory damages here. *See Warner Records, Inc.*, ECF No. 111. A spot check indicates that at least some of those works were the subjects of infringement notices during the Charter litigation claims period. Cox is aware of no reason that Plaintiffs would withdraw those works from the Charter case unless the documents they refused to produce here identified defects in their claim to ownership of the withdrawn works. Cox will seek discovery to determine whether the works withdrawn from the Charter case were properly before the Court in this case. This Rule 59 motion is without prejudice to any future motion to alter or amend the judgment in this case to remove those works.

Dated: January 31, 2020

Respectfully submitted,

*/s/ Thomas M. Buchanan*
Thomas M. Buchanan (VSB No. 21530)
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.*
*and CoxCom, LLC*

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
Sean R. Anderson (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email:  melkin@winston.com
Email:  tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
Thomas J. Kearney (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA  94111-5840
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
Email:  jgolinveaux@winston.com
Email: tkearney@winston.com

Michael L. Brody (*pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
Email: mbrody@winston.com

Geoffrey P. Eaton (*pro hac vice*)
WINSTON & STRAWN LLP

1700 K St. NW
Washington, DC 20006-3817
Tel: (202) 282-5705
Fax: (202) 282-5100
Email: geaton@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750
Email:  dhleiden@winston.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 31, 2020, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users.

<u>/s/ Thomas M. Buchanan</u>
Thomas M. Buchanan (VSB No. 21530)
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.*
*and CoxCom, LLC*