# Exhibit B

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  1



TRIAL TRANSCRIPT

December 2, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

D. Kooker - Direct

119

1    courtroom, people would not recognize.

2    Q.    Can you describe the importance of those artists and

3    recordings to Sony Music.

4    A.    Yes.  They are absolutely vitally important.  You know, at

5    the time that we sign an artist, we believe every one of them

6    are going to be enormously successful.  But based on business

7    experience, we also know that is not going to be true.

8              And, you know, but every single artist is equally

9    important and vitally important to the company because it is

10   what we do.

11   Q.    And did you have any reaction when you looked through the

12   list of the repertoire that is there?

13   A.    Just that it was incredibly expansive.  You know, I looked

14   at some artists that are near and dear to my heart, and I saw

15   complete, almost complete discographies, like their entire

16   life's work contained in this exhibit.

17   Q.    And what happens if the copyright protecting those

18   recordings is not enforced?

19   A.    Well, ultimately if it is not enforced, I am not even sure

20   the recordings ever get made because the investment can't be

21   made, and ultimately the business doesn't exist because the

22   copyright and enforcement of that copyright and monetization of

23   that copyright is the bedrock of our business.

24             MR. ZEBRAK:  Thank you.  No further questions.

25             THE COURT:  All right, thank you.  Let's break for

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
    -vs-                       :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  2  (A.M. Portion)

TRIAL TRANSCRIPT

December 3, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

D. Kokakis - Direct

159

1   strategies for how to enforce the rights of our songwriters and

2   to reach out to people in those instances to try to put

3   licenses in place or find commercial solutions or, as a last

4   resort, to litigate when we're essentially ignored or can't

5   come to terms with the party who has infringed.

6   Q.    And from that work, do you think that peer-to-peer piracy

7   was a problem for Universal Music Publishing Group in the years

8   2013 and 2014?

9   A.    Undoubtedly.  It was a problem for the entire music

09:41:23 10  industry.  And, yes, Universal felt pain during that time, as

11   did all of our clients.

12   Q.    Why was it a problem?

13   A.    It was a problem because you, essentially, had platforms

14   that allowed for the consumption of music without there being

15   any payment for that.  It's like I just had the lovely

16   experience of going to WalMart on Black Friday, and if people

17   can envision what that experience is like, imagine if

18   everything was actually free and you could just run through the

19   store, you know, and take whatever you want.

09:41:58 20           That's what a peer-to-peer file sharing environment

21   is like.  It's the Wild West.  It's a complete free-for-all

22   where people's property is just stolen at will.

23   Q.    And are there particular challenges associated with

24   peer-to-peer piracy versus other types of piracy?

25   A.    Well, yes, there's some unique aspects to it in that you

D. Kokakis - Direct

160

1    can't identify much of the time, most of the time who is

2    actually engaging in the activity, meaning who's stealing the

3    property.  There are millions of those individuals involved or

4    entities involved.  So it's untenable to go after everybody.

5    You just can't enforce your rights that way.

6           So the anonymity of it and the just sheer volume of

7    it makes it very difficult to manage our rights, to enforce our

8    rights.

9    Q.   Has Universal Music Publishing Group ever tried to

09:42:59 10   calculate its harm or losses from peer-to-peer piracy?

11   A.   You know, I've been asked that in different contexts.

12   And, you know, the example I give is that if the house is on

13   fire, you don't stop to measure the temperature that the flame

14   is burning at.  You put the fire out, and you know it's doing

15   damage.

16          And that's kind of what this is.  It's very difficult

17   to quantify because, again, there's anonymity.  You don't know

18   what the volume of activity is going on behind the scenes.  But

19   some things are self-evident.  And this is one of those things.

09:43:34 20   If you have property available for free or goods available for

21   free, you know people are stealing them, you can't quite tell

22   how many, but it's clearly doing damage.

23          So in direct response, no, we haven't run specific

24   analyses of this, but we don't have to to know that there's

25   damage being done.

A. McMullan - Direct

228

1   A.   Because that would allow a consumer to be in direct

2   competition with our legitimate sales of that music.

3   Q.   In the course of your personal work and time within the

4   music industry, how has peer-to-peer piracy impacted the

5   companies you've worked at?

6   A.   It had a very severe impact.  I was at a record company at

7   the time that the first peer-to-peer service launched, it was

8   called Napster, and then multiple other large services allowing

9   millions and millions of people to illegally distribute our

11:33:56 10   recordings developed.

11        And it had a devastating impact on our business, on

12   the finances of our business, on our ability to invest in new

13   content.  And it was all happening at a time when we were

14   trying to figure out what's the best and safest way to sell,

15   market, distribute music through the Internet.  And here we

16   were doing it in competition with millions of folks who were

17   giving it away and taking it for free.

18   Q.   When these peer-to-peer networks were first launched, how

19   did the record industry deal with it?

11:34:32 20   A.   We sued Napster.  And then we sued another set of

21   services, Kazaa and Grokster.  That case actually went to the

22   Supreme Court.  And then we sued another company called

23   LimeWire.

24        We engaged in educational programs to try to educate

25   consumers that they shouldn't be doing this.  And we worked

290

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,       :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.       :
                               :
-------------------------------:
```

VOLUME 2 (P.M. Portion)



TRIAL TRANSCRIPT

December 3, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

S. Marks - Direct

310

1    accept more than this many notices; in other words, they put a

2    cap.  So after we had gone through the discussion of the form

3    of the notice and that we were going to be sending them, Cox

4    told us:  And we'll only accept up to 200 notices per day.

5    Q.   And that was for who?

6    A.   That was 200 notices for -- I mean, we were representing

7    85 percent of the entire recording music industry, so the, the

8    hundreds and hundreds of record labels that existed and owned

9    all that music combined would get 200 notices.

10   Q.   What was RIAA's perspective on that?

11   A.   We were surprised by it and felt it was not really in the

12   spirit of trying to address what was a very serious problem for

13   our industry.  I mean, there's just no way that you could

14   counter all of the infringement by only sending 200 notices.

15   Q.   So what did you do?

16   A.   We asked if they would take more, and unfortunately, we

17   were shut down.  And then we asked again later, and we got a

18   little bit of a bump from 200 to 400, and then later on again

19   from 400 to 600.  So -- but over many years.

20   Q.   I direct you, Mr. Marks, to tab 2 in your binder.  It's

21   PX 234.

22   A.   Yes.

23   Q.   Do you recognize this document?

24   A.   Yes.

25            MR. GOULD:  I move to admit PX 234.

S. Marks - Direct

318

1          MR. ELKIN:  No objection.

2          THE COURT:  Received.

3    BY MR. GOULD:

4    Q.   And what is PX 327?

5    A.   So it's a request some years later than the previous

6    e-mails we were looking at, about three years later, asking for

7    an increase from the 400 per day limit to something higher, and

8    it was, it was requested again directly from Ms. Sheckler on my

9    team to Mr. Cadenhead.

10   Q.   And remind the jury, who's Ms. Sheckler?

11   A.   She's -- her title is deputy general counsel at RIAA.  So

12   she, she was on the legal team and reported directly to me.

13         MR. GOULD:  And if you could scroll up to -- all

14   right.  Pull up the bottom e-mail, please.

15   BY MR. GOULD:

16   Q.   And what does Ms. Sheckler ask here?

17   A.   She's asking for that increase from 400.  So we'd like to

18   increase the number of P2P notices that we send to Cox.  The

19   current limit is 400 per day, and we'd like to increase it.

20         MR. GOULD:  And can we scroll up to Mr. Cadenhead's

21   response?

22   BY MR. GOULD:

23   Q.   Could read that for the jury, please?

24   A.   We have a fairly hard limit on the number of calls from

25   customers that our team can handle in a day, but within those

S. Marks - Direct

319

1    parameters, we would be happy to discuss the number of notices

2    that we accept from you.  Can you give me some sense of what

3    you are thinking?

4    Q.    And Ms. Sheckler replies?

5    A.    She, she said:  How about 500 or 600 per weekday?

6    Q.    Was this before or after the pie charts we just looked at?

7    A.    It was after.

8              MR. GOULD:  And if you scroll up to Mr. Cadenhead's

9    response?

10   BY MR. GOULD:

11   Q.    And could you read what he says?

12   A.    I've checked with our technical team.  We do want to be as

13   helpful as we can, but we have to be mindful of the call volume

14   that notices generate.  They think that we can try accepting

15   600 per day, subject to unexpected call concerns that might

16   arise.  Does that sound okay?

17   Q.    And do you see how Ms. Sheckler responds?

18   A.    Yes.  She said:  Thanks.

19   Q.    Was this an agreement in your mind, sir?

20             MR. ELKIN:  Objection.

21             THE COURT:  Yeah.  What's his understanding of this

22   negotiation?  Sustained.

23   BY MR. GOULD:

24   Q.    Mr. Marks, what was your understanding of this discussion?

25   A.    Well, again, we're operating in a world where Cox was

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```


VOLUME  4  (P.M. Portion)




TRIAL TRANSCRIPT

December 5, 2019

Before:  Liam O'Grady, USDC Judge


And a Jury

G. McCabe - Cross

861

1          THE COURT:  He's asking you about, you know --

2          THE WITNESS:  I guess I don't have -- I can't -- I

3    don't have that information.

4    BY MR. BUCHANAN:

5    Q.   So in the bigger numbers, like 13-plus and 14-plus, the

6    13, that can relate to an internet service provider that had a

7    subcontract with us and then had, you know, 100,000

8    subscribers, right?

9    A.   All I know is what was in the data that I have.  I don't

10   know what it could have been.  I know what was in the data.

11   Q.   Okay.  So you didn't look behind the data to see if it was

12   a residential subscriber, a business subscriber, or what type

13   of business subscriber, right?

14   A.   I did not.

15   Q.   Okay.

16          James, can you -- okay.

17          So you've talked about report -- repeat infringing,

18   or repeat infringers.  This shows that as you move along,

19   there's fewer and fewer people repeating, right?

20   A.   That's correct.

21   Q.   The more notices they get, the fewer additional notices?

22   A.   That would always be true for data displayed in this way.

23   Q.   And that's what Lynn Weber's data showed, right?

24   A.   I don't recall.

25   Q.   Okay.  And I think, isn't it your view that -- I guess you

G. McCabe - Cross

862

1    didn't look at it for the claims period, but do you recall when

2    I asked you in your deposition about isn't it true that over

3    time, that you had -- most people had one or two and then some

4    had three, some had four; it just sort of then decreased,

5    right?

6    A.   That's correct.

7         MR. BUCHANAN:   Okay.  So could you go to the next

8    slide, please?  Go down a couple.  The next one, please, James.

9    Thank you.

10   BY MR. BUCHANAN:

11   Q.   So here again, we're outside the claims period by one

12   month on one side and a year on the other side, right?

13   A.   That's correct.

14   Q.   And you think your counsel asked you to do that?

15   A.   That's the data that I was given.

16   Q.   Okay.  And you were asked to do this, right?  You didn't

17   do this on your own.  You were told to do this, right?

18   A.   I was told to do a repeat infringer analysis.

19   Q.   So your 13,400, obviously, that number of the subscribers

20   that got tickets before the claim period, these are subscribers

21   that got a ticket during the claim period, at least one?

22   A.   That's correct.

23   Q.   Okay.  So they got one during the period 2013 and '14, and

24   then you're saying they got at least one in 2012?

25   A.   Or before February 1, 2013.

1009

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
      -vs-                      :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  5  (P.M. Portion)

TRIAL TRANSCRIPT

December 6, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

L. Trickey - Cross

1049

1   Q.   So I'm going to turn to another subject that was raised on

2   direct, this issue of caps, notice caps.  Was there a limit on

3   the number of notices that -- notices of copyright infringement

4   that CATS could accept on a daily basis?

5   A.   Yes.  So the, the team, whomever it was, you know, years

6   ago had established caps of 200 per, per day or per weekday, I

7   think, and that was in order -- because there were multiple

8   senders that were sending in tickets, and so they wanted to be

9   able to have it be a manageable amount of tickets received

15:04:23  10   across the board, because when you would send notices out to

11   consumers, it could result in a -- customer, not consumer,

12   sorry -- customer, it could result in someone calling back in

13   and saying, I don't understand what's going on.  Help me.

14        And you don't want people sitting on hold for hours,

15   waiting to talk to somebody about what this thing is that they

16   received.

17   Q.   What if a copyright owner wanted to send more notices than

18   the default limit?

19   A.   So it started at 200.  There were some copyright holders

15:05:03  20   that did ask to send more than the 200 per day.  There were

21   several, I believe, that asked.  And, you know, before I was

22   responsible for this, I know that Mr. Cadenhead worked with the

23   safety team to say, can we absorb additional notices coming in?

24   And they, they raised the caps for quite a few.

25   Q.   Can you think of any examples?

L. Trickey - Cross

1050

1  A.   Yeah.  I know, well, RIAA, who was the agent sending on

2  behalf of the parties here, they asked for -- to have their

3  caps raised, and so at one point, Cox doubled it to 400 per

4  day.  They also asked, you know, several years later, I think,

5  to -- I think they maybe even asked for a higher number, but

6  Cox said, no, we really can't accommodate right now, but back

7  again.

8          They checked back again and they said, well, can you

9  raise to 500 or 600 a day?

15:05:58  10          And Cox said -- you know, went back and looked at the

11  analysis of how many complaints were coming in and the call

12  volume and everything, and they said, yeah, we think we can

13  accommodate 600 per day.  So they actually went to the upper

14  limit of that.

15          And there were other copyright holders that asked for

16  additional, their caps to be raised, too.

17  Q.   Okay.  Now, we talked about processing notices.  Are there

18  circumstances under which Cox would refuse to process copyright

19  notices?

15:06:26  20  A.   Yeah.  So as I discussed this morning, when we became

21  aware of complaints that had language in there that was

22  demanding the payment of money to settle the matter, you know,

23  we felt that that was, you know, preying upon people's lack of

24  understanding or knowledge, and sometimes people don't

25  understand that if they clicked on the link in that notice,

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                               :
      -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                               :
-------------------------------:
```


VOLUME  6  (A.M. Portion)




TRIAL TRANSCRIPT

December 9, 2019

Before:  Liam O'Grady, USDC Judge


And a Jury

Norman Linnell and Anneliese Thomson - EDVA-OCRs  (703)549-4626

M.J. Flott - Direct

1195

1    decades that we've been in business and, you know, our

2    competitors in some cases longer than that, if we didn't have

3    the trust of our artists that they were going to get paid, then

4    we wouldn't be able to continue to sign and develop and attract

5    artists year in and year out.

6    Q.    In your role as executive vice-president and chief

7    financial officer, are you familiar with peer-to-peer piracy?

8    A.    I am.

9    Q.    Has Warner Music Group been impacted by peer-to-peer

10:22:01 10    piracy?

11   A.    We have.

12   Q.    What has been that impact?

13   A.    It has been -- it's been enormous and significant.  In a

14   period of time when music consumption has risen year in and

15   year out, as an industry we've seen revenues decline over that

16   period, over a period of time from its peak to where we are

17   today.

18   Q.    What were the consequences of this revenue decline to the

19   music industry as a whole?

10:22:46 20   A.    Well, first and foremost, you know, artists were not

21   getting paid.  Copyright holders weren't getting paid, as well

22   as union members, as well the musicians working on those

23   records.

24         We, as Warner Music Group, had to rationalize our

25   infrastructure or the labels that we had, and we've had to go

M.J. Flott - Direct

1196

1   through at different points in time and either close labels

2   down, merge them together.

3        Probably the clearest example I could give you would

4   be two of our kind of founding labels of Atlantic and Elektra

5   being merged together to rationalize their costs simply because

6   of the revenue decline.

7        You know, Elektra is the home of artists like "The

8   Doors" and "The Eagles" and "Anita Baker" and others like that.

9   So we also had to lay off people just in terms of looking at

10:23:57 10   what our revenue base could afford and what we wanted to return

11   to our owners.

12   Q.   I'd like to hand up the witness a copy of an exhibit

13   that's been premarked as PX 486.  Thank you.

14        Mr. Flott, have you seen this document before?

15   A.   I have.

16   Q.   And at a high level, what is this document?

17   A.   It reflects the revenues of the U.S. recorded music

18   business over a period of time.

19   Q.   Where does this document come from?

10:24:39 20   A.   It comes from the RIAA, which is our U.S. industry

21   association.

22   Q.   And how is it that you come across this type of document?

23   A.   It is regularly published, and it's a document that I look

24   at on a regular basis.

25        With the RIAA, we do a regularly quarterly call where

M.J. Flott - Direct

1197

1    we go through performance.  It's also on their Web site as

2    well.

3              MS. NOYOLA:  I'd like to move PX 486 into evidence.

4              THE COURT:  Any objection?

5              MR. BUCHANAN:  No, Your Honor.

6              THE COURT:  It's received.

7    BY MS. NOYOLA: (Continuing)

8    Q.   Mr. Flott, can you describe what this chart shows.

9    A.   This chart is reflecting the U.S. recorded music revenues.

10:25:28 10   If I look at the left most column, that's marked as the year

11   2000 where industry revenues were in excess of $14 billion.

12             It continues to the right to 2014 where the revenues

13   are just under $7 billion.

14   Q.   And is this chart specific to Warner Music Group?

15   A.   No, it's the U.S. recorded music revenues.

16   Q.   Tell us what these different colors on this chart show.

17   A.   Each color represents a different format.  So the largest

18   color that you see on the left side of the page being orange,

19   that's the compact disc.

10:26:15 20            And as you move to the right, you'll see other

21   formats as they came into play.  So in 2004, you start to see

22   purple.  That is the -- that's a download, and the different

23   shades are the different forms of whether it was a single or an

24   album.

25             And then we start to see in 2005 green start to come

M.J. Flott - Direct

1198

1    in.  And that is streaming and the different types of streaming

2    revenues that come through.

3    Q.   Are you familiar with the term "music consumption"?

4    A.   Yes, I am.

5    Q.   What does that term mean?

6    A.   Music consumption means the number of hours that a

7    consumer is -- generally commits to listening to music.

8    Q.   And in your day-to-day work, have you become familiar with

9    the volume of music consumption over this time frame of 2000 to

10:27:19 10   2014?

11   A.   Yes.

12   Q.   And how so?

13   A.   In additional reports that either I've seen come from the

14   RIAA or other published articles, there's reference made to the

15   number of hours that a consumer, you know, has committed and

16   how it's grown from 2000 through to today.

17   Q.   What is your understanding of the volume of music

18   consumption from 2000 to 2014?

19   A.   It has continued to increase year over year, and I think

10:27:58 20   towards the end of this chart, I believe consumers are

21   committing almost a week a year -- a week a -- sorry.  A day a

22   week to consuming music.

23   Q.   So how does that trend of music consumption compare to the

24   trend that's shown here about -- on recorded music revenues?

25   A.   Well, in a normal business model, you would expect -- as

1293

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :    Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME 6 (P.M. Portion)




TRIAL TRANSCRIPT

December 9, 2019

Before:  Liam O'Grady, USDC Judge


And a Jury

J. Zabek deposition - Examination

1358

1    give them to help explain it more, or even websites sometimes,

2    we would pass that information along also, too.  But it depends

3    on what it really was.

4              If they needed help securing some of their equipment,

5    we would do the best we could.  We didn't know every piece of

6    equipment out there, but we would try to help them also secure

7    it also, too, so violations didn't happen, if that's where they

8    were originating from.

9    Q.   To what extent, if any, did the role of education play in

10   speaking to customers?

11   A.   I really determined that our job was really a customer

12   service and education field.  The folks out there buying

13   internet access in a lot of areas are not computer geniuses.

14   They just want to plug in and talk to their families and do

15   well at, you know, Facebook and all that stuff, and that's all

16   they want to do.

17             They don't know about firewalls and routers and, you

18   know, antivirus and things like that.  So we would -- well, we

19   would try to educate them as much as possible.

20             In fact, we even had after we would talk to them,

21   again, depending on the situation, we'd have follow-up letters

22   that would describe everything that we talked about and say try

23   these certain things and hopefully that will help you.

24             But again, in a lot of cases, every situation can be

25   different.  Yeah.

1581

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                 :
SONY MUSIC ENTERTAINMENT, et al.,:
           Plaintiffs,           :
                                 :
     -vs-                         :   Case No. 1:18-cv-950
                                 :
COX COMMUNICATIONS, INC., et al.,:
           Defendants.           :
                                 :
--------------------------------:
```

VOLUME  7  (P.M. Portion)

TRIAL TRANSCRIPT

December 10, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

M. Carothers - Cross

1591

```
 1    response program at Cox originated?

 2    A.    I do.

 3    Q.    Could you tell the jury.

 4    A.    I invented it.

 5    Q.    And why did you develop this?

 6    A.    It's the most effective way of communicating with

 7    subscribers.

 8    Q.    When did you develop it?

 9    A.    Early 2000s, probably 2002/2003 time frame.

10    Q.    What is the purpose of engaging in escalating steps with

11    customers related to copyright infringement?

12    A.    We need to make sure that we reach the actual account

13    holder, and sometimes that can be tricky.

14    Q.    And what, if anything, have you done to determine whether

15    the graduated response at Cox was effective?

16    A.    I have run a number of queries in the CATS database to

17    check repeat offense rates.

18    Q.    When did you do that?

19    A.    I did it throughout my time.  It was something that I did

20    just as the normal course of my job.

21    Q.    How often would you do it?

22    A.    It wasn't a set schedule, but I would say quarterly,

23    probably.

24    Q.    And what did you observe when you ran those queries?

25    A.    The program was very effective.  The vast majority of
```

1592

1 customers never made it past the e-mail warning stage.

2 Q.   Now, how do you know that?

3 A.   I ran the numbers myself.

4 Q.   Does CATS sometimes aggregate complaints or notices into a

5 single ticket?

6 A.   It does.

7 Q.   What does that mean, to aggregate complaints?

8 A.   So when the first allegation comes in against a

9 subscriber, it generates a ticket in the CATS system.  And then

10 for 24 hours any subsequent allegations that we get are

11 appended to that one ticket rather than generating a new

12 ticket.

13 Q.   But why does CATS aggregate complaints rather than

14 treating each one as a separate incident?

15 A.   Fairness for the customers.  If every single notification

16 generated a new ticket, then we could potentially have someone

17 go through all steps of the program up through termination

18 within a few minutes before they had even had a chance to look

19 at the issue.

20 Q.   How many copyright notices will CATS aggregate?

21 A.   There is no set limit.

22 Q.   Do you know whether Cox also has a limit on the number of

23 customers CATS can automatically suspend?

24 A.   It does.

25 Q.   Why was there -- why was a suspension limit imposed, if

M. Carothers - Cross

1602

1    know whether CATS will know whether there had been two

2    complaints?

3    A.    It will.

4    Q.    Okay.  Was there a limit on the number of copyright

5    notices that CATS would accept on a daily basis?

6    A.    There was.

7    Q.    Why did CATS permit that?

8    A.    Well, the main reason is so that we can predict what

9    resources we need.

10          The idea is that we have a steady flow coming in.  If

11   we have the same number every day, then we know exactly how

12   many people we need to hire, we know how many people need to be

13   in the office that day.

14          The second reason is also for fairness.  So if one

15   particular sender bombards us with thousands of e-mails on one

16   day, we don't want that one to be able to shove all of the

17   other rights holders out of the way.

18   Q.    Do you know whether a sender would know if they have

19   exceeded the limit?

20   A.    They would.

21   Q.    What happens?

22   A.    The CATS system sends them an e-mail back telling them

23   that they have exceeded their cap for the day and they should

24   resend the following day.

25   Q.    What does Cox do if a company needs to submit more

M. Carothers - Cross

1603

1   copyright infringement notices?

2   A.   We negotiate that limit with them and we generally grant

3   them more.

4   Q.   Now, are you aware of any instances where Cox has actually

5   done that?

6   A.   Yes.

7   Q.   Can you give an example?

8   A.   Well, specifically for the RIAA, they asked for 5 or 600,

9   and we granted them 600.

10  Q.   Mr. Oppenheim made reference in some questions to you on

11  direct with regard to a company by the name of Rightscorp.

12         Who is Rightscorp?

13  A.   Rightscorp was a company that sent us copyright

14  allegations.

15  Q.   Now, at some point I believe you testified that Cox began

16  receiving copyright notices from Rightscorp?

17  A.   Yes, that's correct.

18  Q.   Do you know whether Cox forwarded Rightscorp's notices to

19  Cox's customers?

20  A.   It didn't.

21  Q.   Why not?

22  A.   We didn't consider them to be valid notices.  They had a

23  lot of extra stuff in them that we call settlement language.

24  The language was very threatening.  It asked the customers for

25  money.  And it also included URLs.

1713

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  8  (A.M. Portion)

TRIAL TRANSCRIPT

December 11, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1720

1   pieces from articles or reports that he read, and they're not

2   in evidence, they're not admissible.

3               THE COURT:  Okay.  4, 5 -- I'm with you.  Go ahead.

4               MR. BUCHANAN:  Okay.

5               MR. GOULD:  Your Honor, would you like to go issue

6   one by one or --

7               THE COURT:  Well, I don't know how many there are.

8   So how many do you have?

9               MR. BUCHANAN:  Just a handful, Your Honor.

09:11:36 10              THE COURT:  Okay.  Then go ahead.

11              MR. BUCHANAN:  9:  Cox paid billions in cash

12  dividends to its owners.  That wasn't in his report and it's

13  not relevant, that they paid dividends to the owners.

14              The profits of the company, revenues, they have that

15  in the slide, but this is something different.  It wasn't in

16  his reports.  He did three reports.

17              Also, the 17, 18, 19 rely on ICOMS billing data

18  that's not in evidence.

19              That's it, Your Honor.

09:12:55 20              THE COURT:  All right.  Thank you.

21              Mr. Gould.

22              MR. GOULD:  Thank you, Your Honor.  I can start at

23  the beginning.

24              The two slides that excerpt economic market studies

25  are certainly permissible things that Dr. Lehr can consider

1740

1   plaintiffs suffer, you know, in this matter or even more

2   generally with any kind of precision.

3   Q.   And your third opinion, Dr. Lehr?

4   A.   When you look at Cox's business, you can understand, first

5   off, that where they sit now, they're a highly profitable

6   business.  And that having infringing subscribers on their

7   network has contributed significantly to their business and

8   their profitability.

9   Q.   And your fourth opinion, Dr. Lehr.

09:40:38  10   A.   The fourth opinion is that Cox has a significant economic

11   incentive and derives a financial benefit from having

12   infringing subscribers on its network, retaining those

13   subscribers on its network.

14   Q.   Now, let's turn to your first opinion.

15        Dr. Lehr, could you walk us through the bases for

16   your opinion, please.

17   A.   Yeah.  I mean, the basic economics of copyright, and sort

18   of the economic theory that underlies it, is pretty straight

19   forward.  Copyright exists so that rights holders have a legal

09:41:15  20   protection and an opportunity to realize the value of the

21   content that they hold the copyright to.

22        And if -- what piracy does is it forces them, in

23   trying to realize the value of their copyrighted content, to

24   compete against zero priced goods, free goods.  And that is

25   fundamentally disruptive to their ability to recover it.

W.H. Lehr - Direct

1741

1               And what that means is that in a world with piracy,

2       their revenues are significantly lower.  And as a consequence,

3       their profitability is significantly lower.

4               And so, you can understand that by going through the

5       various pieces of what is involved in computing what their --

6       what the effect on their revenues is.

7       Q.   So what does -- what do you mean by displaced legitimate

8       sales in the first bullet on your slide?

9       A.   So you can break down revenues into two pieces.  You can

09:42:11 10     look at what it is, how many units they sell and how they sell

11      them, and you can look at what the prices are.

12              So if people are downloading lots of or getting

13      available access to lots of free illegal copies, then those

14      illegal copies out there are competing and displacing sales,

15      legal sales, unit sales of the content by all the different

16      ways that those legal sales might take place.

17              So there's the -- there's a cannibalization so that

18      the number of sales they can make is lower.  That's the first

19      effect.  That's sort of the Q or quantity effect.

09:42:48 20     Q.   And the second -- so the first talks about the quantity.

21      The second bullet:  Piracy negatively impacts pricing.

22              What do you mean by that?

23      A.   That the pricing at which they're able to sell legal sales

24      is driven down.  So the prices they can charge for the sales

25      they're still able to make in a world with piracy are lower

W.H. Lehr - Direct

1742

1    because they're always competing against free goods.

2          And so, both the P and the Q are lower in a world

3    where piracy exists.  And so, the product of them are, in a

4    sense, doubly lower.  So revenues are lower because of both of

5    those effects in a world where they're having to deal with

6    piracy.

7    Q.   You talked about P and Q.  And just to clarify, what's the

8    P and what's the Q?

9    A.   The P is the price that they can sell.  Now, they sell in

09:43:37 10   many different ways, so there's actually lots of prices.  But

11   like the price for the box sets, the price for the DVDs, the

12   price for the streaming content, all of that, all of those

13   prices are adversely impacted by having to compete with the

14   fact that people can get the thing for free if they're willing

15   to steal it.

16   Q.   And Q is quantity?

17   A.   Q is the quantity, the number of sales of all the

18   different categories of things they sell.

19   Q.   Now, this third bullet point:  Copyright holders incur

09:44:06 20   substantial enforcement costs.

21          What do you mean by that, sir?

22   A.   Well, setting side sort of the revenue implications, by

23   avoiding having to deal with infringing subscribers directly,

24   you're avoiding having to incur the enforcement costs.  Which

25   includes sending notices, handling the calls, staffing your

W.H. Lehr - Direct

1743

1  department that deals with this.  Those sorts of costs are

2  examples of costs that are avoided.

3  Q.   So for the copyright holders, you're talking about the

4  copyright holders' enforcement costs?

5  A.   Oh, sorry.  The copyright holders actually have been

6  forced to do a lot in that it's -- you know, they've had to

7  pursue litigation.  They've actively had to pursue enforcement

8  and try to address this directly.

9       And then, of course, it's had a big disruption effect

09:44:54 10  on their business models.  So, for example, you know, copyright

11  holders are more reticent, for example, to release really high

12  resolution versions, digital versions of their content into a

13  world where it could easily be pirated.  Because a digital

14  copy, once it gets out there, can be replicated, you know,

15  perfectly.  And if it's a high resolution copy, then, you know,

16  it's a more dangerous copy out there by pirates.

17       So their ability to pursue different ways to build

18  out their business models has been adversely affected.

19  Q.   And the last point:  Piracy defers -- deters future

09:45:37 20  investments and reduces incentives to create.

21       What do you mean by that?

22  A.   Yeah, the impact of piracy, you know, plays out over time

23  because the incentives of copyright holders to invest in new

24  artists and incurring the risky costs of, you know, helping

25  manage those artists' careers, producing the musical

W.H. Lehr - Direct

1752

1   to do that, nor does it actually exist.

2   Q.   So there are three points on your slide here.  Can you

3   just walk through and just briefly explain why this data

4   doesn't exist.

5   A.   Sure.  So the first issue, problem, if you try to estimate

6   the revenues -- so I'm trying to figure out how much lower

7   revenues were as a consequence of the piracy.  That's what I

8   would have needed to have done if I was going to try and

9   estimate what the economic harm to plaintiffs would be.

09:58:10  10        It was clear to me, after looking at the evidence and

11   what was available in the literature, that evidence did not

12   exist.  So I didn't attempt to do that.

13        But if you -- the first thing you would have to do is

14   estimate that Q, how many unit sales would they have sold in a

15   world without piracy.  So to do that, the first thing you have

16   to do is figure out how many illegal copies are out there as a

17   consequence of the piracy.

18        So in this case, the data we have is evidence of

19   infringement using peer-to-peer by subscribers repeatedly, you

09:58:42  20  know, engaging in infringing activity.  We don't observe how

21   many actual copies were distributed by those subscribers, nor

22   could we given the way the data was actually collected.  So

23   that at best we have a lower bound estimate of the amount of

24   infringing activity.

25        So MarkMonitor, which is the principal source of the

W.H. Lehr - Direct

1753

1   data, wasn't surveying every Cox subscriber all the time.  And

2   the -- so they wouldn't have known everything that was going

3   on.

4              And a file, even potentially more important, a file

5   that is distributed illegally, once it gets out there virally,

6   how many illegal copies that copy can spawn.  You would --

7   there is no way to precisely estimate that.

8              So that's the Q.  You don't know what the Q is.  And

9   the data in the case doesn't allow you to reliably estimate

09:59:43 10  that, the number of illegal copies.

11             Now, that number of illegal copies isn't -- doesn't

12  equate directly to the number of sales that would have

13  happened.

14  Q.   Why not?

15  A.   Because the second thing you have to know is you have to

16  know how many of those illegal copies would have -- had they

17  not existed, would have translated into legal sales.

18             Now, if you say the legal sales would have taken

19  place at a zero price, then it's okay.  But if you say it's a

10:00:11 20  non-zero price, some of the things that went out there

21  illegally might not have been bought.

22             So you have to figure out what was the purchasing

23  behavior of the subscribers, what they would have done if they

24  hadn't been able to get the pirated copies.  And that data

25  doesn't exist.  We don't have detailed data on Cox's

W.H. Lehr - Direct

1759

1    a total of $19.5 billion.

2         So round numbers, they're basically a $10 billion

3    company.  And that comports with sort of what you would expect

4    given sort of what I have already said.

5         The other point to recognize, and this slide

6    demonstrates, is they're a quite profitable company.  So when

7    you take -- using Cox's financial internal documents, you take

8    off all the costs, except for taxes and interest that Cox

9    incurs in realizing those revenues -- so they have to maintain,

10:08:45 10  you know, a networking engineering department, and marketing

11   department, and they have to have people doing their accounting

12   and personnel, take all those costs out, in 2013, they earned

13   $4 billion.  And in 2014 they earned $4.3 billion.  For a total

14   of $8.3 billion.

15        So the profit margin, just talking about the cash

16   flow that's flowing to the business and that they can then, you

17   know, use to invest in the business or do other things with,

18   that's, you know, a margin around 43 percent.

19   Q.   So I want to understand a couple of terms you used.  What

10:09:26 20  is revenue just at a high level?

21   A.   Revenue was the total receipts they get from their

22   subscribers.

23        So as I said, they send bills to subscribers, and

24   some of the subscribers have discounted service for the first

25   couple of months or whatever.  And so, that's all factored in.

W.H. Lehr - Direct

1760

1   It's what the customers actually pay.  That's the money coming

2   in.

3               And then money that goes out is what they have to pay

4   their employees to make this whole engine work and --

5   Q.   And what is net profit?

6   A.   Net profit the revenues minus those costs.  And it's --

7   here, what net profit is is the operating cash flow.  So it's

8   taking out their operating costs.  It's not taking out their --

9   the interest expenses and some things that, you know,

10:10:15 10  accountants may use if they're computing something like net

11  income.

12  Q.   And you used another term, "margin."  What does margin

13  mean, and how does that relate to this slide?

14  A.   Margin, again, is just a measure of profitability.

15  There's many ways in which one might assess profitability.  So

16  margin, here, is just very simply net profit divided by

17  revenue.  It gives you an idea.

18              The higher that number is, it tells you, if I get a

19  dollar in and my margin's really high, I'm going to keep most

10:10:41 20  of that dollar that I get in and be able to flow it down to the

21  bottom line, and then use it to build my business or make the

22  people that gave me the money to run the business happy to go

23  do whatever they want to do.

24  Q.   Now, did you consider any other measure of profitability?

25  I think this might be on your next slide.

W.H. Lehr - Direct

1761

1    A.    Well, I mean, one of the -- I mean, when you look at

2    something like operating -- the operating cash flow, that's

3    something that, as an economist, when you consider a business,

4    is very important.

5         And so, if a business is growing and trying to

6    execute their model, they have to basically keep a bunch of the

7    money they -- profit they make, so that they continue to make

8    profit in the future years.  So they have to reinvest in the

9    business.  Okay.

10:11:24  10        But if you own stocks or, you know, invest in the

11   market, there's two ways you can make money.  One is the stock

12   value appreciates and you can sell the stock at a higher value

13   later.

14        Another way is the company sends you dividends.  And

15   if they send you dividends, you can take that money and do

16   whatever you want with it.  You can go on a vacation, you can

17   buy a car, you can do whatever you want.

18        So what this is showing is Cox's dividends in 2012,

19   2013, and 2014.  And you can see that they were able to pay

10:11:59  20   dividends of a billion dollars and more out of their net

21   profits and still, you know, maintain their business and invest

22   in their business and grow their business as they thought

23   appropriate.  So this is money they thought they could safely

24   take out of the business.

25        Now, if you think of a start-up company or something

W.H. Lehr - Direct

1762

1    like that, most of the time they're under water because they're

2    consuming more cash building their business than they're

3    producing.

4           That's not the case with Cox.  Cox is very, very

5    profitable.

6    Q.   And just for clarity, what's a cash dividend?

7    A.   A cash dividend basically is a -- you know, you give the

8    money in cash.  You haven't said, oh, here's -- you know,

9    here's a nice button or something like that that we value.

10:12:43 10   It's actual dollars.  This was a billion dollars or more that

11   they were pulling out of the business to do other things with.

12          And what my concern here is, to understand the

13   business of Cox and how that operates to, you know, create

14   value for Cox.  I mean, to make that business work.

15          And this is saying that, you know, of the 4 billion,

16   they don't need 4 billion every year.  You know, they're --

17   they can keep 3 billion in the business roughly and --

18   Q.   Do you have an understanding of whether Cox was growing

19   over these years?

10:13:20 20   A.   Yeah, Cox was.  Cox was continuing to grow.

21   Q.   And how does this cash dividend relate to that notion?

22   A.   Well, this is totally separate.  This is not money that

23   they were using to grow their business.

24   Q.   They were growing even after paying these dividends?

25   A.   Yes, yes.  So the other costs, for example, the payment on

W.H. Lehr - Direct

1763

1   interest and things like that, the taxes and, you know, other

2   stuff like that, that's not in the net profit, you know, that's

3   covered by the other stuff that still allowed them to pay these

4   dividends.

5   Q.   And you say:  Cash dividends to its owners.  Do you know

6   who the owners are?

7   A.   I don't know specifically.  But it's a privately held

8   company, and as I understand, it's relatively closely held.  So

9   it's the Cox family mostly, and friends.

10:14:06 10   Q.   Now, you've been talking about Cox's profitability and

11   margins.  Did you compare Cox's margins and profitability to

12   any other metrics, to any other industries?

13   A.   Yeah.  Well, I mean, to -- you know, and it's also

14   relevant in the context of this case to look at, you know,

15   who -- what -- how does Cox's business compare to the

16   plaintiffs'.

17          So, you know, what this slide does is it looks,

18   again, from the, you know, the publicly available documents for

19   the plaintiffs.  So I have Sony Music, Sony/ATV, Universal

10:14:41 20   Music Group, and Warner Music Group.  And Sony Music and

21   Sony/ATV are split because Sony Music is the recording company

22   and Sony/ATV is the music publishing.  In the case of Universal

23   Music Group and Warner Music Group, they've consolidated those.

24          And so, you can see that if you go and look at this,

25   Cox is an order of magnitude larger, you know, than any of the

1767

1  the alleged infringing subscriber accounts, 95 percent of those

2  are residential.  So I believe it's especially important to

3  understand how residential subscribers behave.

4       Although the business subscribers are also very

5  important because even though there are fewer numbers, there's

6  a lot more revenue associated with business subscribers on a

7  per account basis.  Which, you know, if you -- the original --

8  the numbers in revenues were about 10 billion.  The total

9  revenues that are earned by the products, the principal

10:19:48 10  products that are sold to residential households, is

11  8.2 billion.  This is for 2014.

12  Q.   Now, why have you demonstrated this slide showing the

13  different revenues, profits, and margins by service type?

14  A.   Well, this is telling us a couple things.  One, is it's

15  telling us, you know, something about how the residential

16  subscribers -- the business model works.

17       So the business model, again, is you have this

18  network that goes by, and then you sell -- and the costs of

19  doing that, most of those costs are, I got the network by the

10:20:20 20  building, and I'm ready to sell them services.  Then you sell

21  them as many services as you can.

22       And the three services that are principally bought,

23  there's some other ancillary ones I won't talk about, are

24  high-speed Internet or broadband service.  And so, the total

25  revenues for their residential subscribers associated with

W.H. Lehr - Direct

1768

1    their high-speed Internet/broadband business is 2.8 billion.

2              They also sell video services to their residential

3    subscribers, and they get $4.2 billion for that.

4              And then for their voice services, they sell those

5    and they get $1.1 billion for that.

6              Now, the typical subscriber of Cox purchases multiple

7    services.  So I believe in 2014, two-thirds of their

8    subscribers bought at least another service, one of these other

9    services.

10:21:10 10          42 percent of the subscribers bought all three.  So

11    the typical way in which subscribers buy services and the way

12    in which Cox wants to sell them to subscribers is to get them

13    to buy this, they sometimes refer to it as the Triple Play.  So

14    you sell them this.

15              The other thing to notice about this is that the

16    margins differ by these services.  And the calculations of

17    these margins and the net profit is based on Cox's internal

18    profit and loss statements by product segment.  So this is the

19    way they think about it.  It is consistent with the investment

10:21:49 20  community, Wall Street analysts think about it, and other folks

21    that analyze this industry do.

22              But these numbers are calculated using Cox's own

23    internal profit and loss statements.  And what it shows you is

24    that they view their high-speed Internet service as the highest

25    margin, most profitable of these services.  It has a margin of

W.H. Lehr - Direct

1768

1   their high-speed Internet/broadband business is 2.8 billion.

2           They also sell video services to their residential

3   subscribers, and they get $4.2 billion for that.

4           And then for their voice services, they sell those

5   and they get $1.1 billion for that.

6           Now, the typical subscriber of Cox purchases multiple

7   services.  So I believe in 2014, two-thirds of their

8   subscribers bought at least another service, one of these other

9   services.

10:21:10 10           42 percent of the subscribers bought all three.  So

11  the typical way in which subscribers buy services and the way

12  in which Cox wants to sell them to subscribers is to get them

13  to buy this, they sometimes refer to it as the Triple Play.  So

14  you sell them this.

15           The other thing to notice about this is that the

16  margins differ by these services.  And the calculations of

17  these margins and the net profit is based on Cox's internal

18  profit and loss statements by product segment.  So this is the

19  way they think about it.  It is consistent with the investment

10:21:49 20  community, Wall Street analysts think about it, and other folks

21  that analyze this industry do.

22           But these numbers are calculated using Cox's own

23  internal profit and loss statements.  And what it shows you is

24  that they view their high-speed Internet service as the highest

25  margin, most profitable of these services.  It has a margin of

W.H. Lehr - Direct

1769

1    59.8 percent.

2            The next most profitable service is their voice

3    service, which has a margin of 52.5 percent.

4            And then the least profitable of these services is

5    their video or television service, which still has a margin of

6    21.5 percent.  Compare that to the 8.6 percent that the record

7    industries get.  The reason it's 21.5 percent and the reason

8    the video business in that sense is more expensive for Cox is

9    because Cox has to pay for the programming it delivers to the

10:22:41 10  subscribers on a per subscriber basis.

11           So some of that $4.2 billion is going to the -- you

12   know, people like HBO and other folks that are providing the

13   programming.

14   Q.   Now, Dr. Lehr, does the understanding of this business and

15   Cox's financials tie into your next opinion about Cox's

16   economic incentives in this case?

17   A.   Yeah, absolutely.  You can see that the basic business

18   here is to acquire subscribers, sell them a bunch of services,

19   and keep them on your network.  So Cox has a strong incentive

10:23:19 20  to do that.

21           And Cox likes to keep all subscribers that are

22   profitable on its network.  As in, if you pay your bills,

23   you're profitable, in this business.  And there is evidence

24   from Cox's own billing records that keeping infringing

25   subscribers on its network was very profitable to Cox.

W.H. Lehr - Direct

1770

1    Q.    Now, could you just walk through the bases for your

2    opinion on incentives here, and then we'll go through each one.

3    So at this step just touch on them, please.

4    A.    Sure.  So first off, there is evidence in this case about

5    the, you know, subscribers who are -- have been identified as

6    infringing.  And those subscribers, Cox billed $307 million, so

7    we're talking about a lot of money, between February 2013 and

8    2016.

9          Two, there is evidence from multiple sources that

10   suggests that Cox infringers actually paid more for Internet

11   service on average and are likely to have purchased more

12   expensive Internet plans than your average subscriber.

13         Three, that Cox saved costs by not addressing the

14   copyright infringement.  I talked a little bit about that at

15   the very beginning, you know.  And so these -- this is

16   referring to the costs that Cox avoided as opposed to the costs

17   that the plaintiffs incurred in trying to do their -- you know,

18   what they could to fight privacy.  But Cox saved costs by not

19   addressing copyright infringement.

20         And that by not addressing copyright infringement,

21   Cox was able to maintain a larger subscriber base over time

22   than they would have had they been more aggressive in dealing

23   with the infringement by subscribers on the Cox network.

24   Q.    So let's turn to your first opinion that Cox billed

25   subscribers 307 million in the time frame you've identified.

10:24:21  (line 10)

10:25:05  (line 20)

1775

1   what is their economic incentive to knowingly tolerate having

2   infringing subscribers on their network.

3         And I believe the $307 million gives you an idea that

4   they had a very large economic and financial incentive from

5   that.

6   Q.   Now, when Cox would have considered the value of these

7   direct infringing subscribers in the context of this economic

8   incentive opinion, would Cox have considered just some of the

9   value of that customer, or more of the value of that customer,

10  or the entire value of that customer?

11  A.   Cox is in a continuous business of trying to get

12  customers, trying to hold on to the customers it has.  And

13  that's especially valuable because it costs money to acquire

14  customers.  And if you already have them, it is much more

15  profitable to keep them.  And so Cox was continuously doing

16  that.  And so, as I said, the economic basic data shows that.

17        This data shows that in fact they were capturing

18  significant revenue from infringing subscribers.  And the fact

19  that I catch you at some certain point in your career doesn't

20  mean you weren't infringing before.  I don't have ticket data

21  about what -- some of these subscribers that may have been

22  subscribers before 2012.  I only have data of these subscribers

23  and the tickets they received between 2012 and 2014.  That's a

24  sliding window.  And I don't have the revenue from before.

25        So, these subscribers and the benefit to Cox is

10:32:27 (line 10)
10:33:05 (line 20)

1776

1    greater than the evidence that I have here.

2    Q.   Now, looking again at the time frame.  If you had limited

3    this to just the claim period, February 2013 to November 2014,

4    would that impact your opinion?

5    A.   Well, it wouldn't impact my opinion that Cox had a very

6    significant economic benefit.  It would change the numbers

7    because, for example, it would make the billing charges that

8    are reported here go down.

9         And just one other point here.  These numbers are the

10:33:58 10    billing charges.  The evidence shows and the testimony by Cox

11    is that the actual revenues received by Cox were almost

12    99 percent of what was billed.

13         So it's not like this is what was billed, but maybe a

14    bunch of these people didn't pay their bills.  No, most of

15    these people did pay their bills.  And so, the difference

16    between what was actually received and the billing charges,

17    it's very close.

18    Q.   Okay.  So I just want to make sure we understand.  What

19    does the 3+ and 5+ show?

10:34:36 20    A.   So, again, my purpose with this is to sort of give you

21    some sense of what is going on in the data and what we see.

22         So if you say, take that dataset and then only look

23    at the total billings associated with the subset of subscribers

24    that had three or more DMCA tickets, the 57,279 subscribers

25    goes down to 31,514 subscribers.  And then the billed charges

W.H. Lehr - Direct

1777

1    also goes down to 208 million.

2         And then if you ask the question about, okay, well,

3    what about 5+ DMCA subscribers, that number goes down to 20,189

4    subscribers, and their total billed charges were $164 million.

5    So, you know, still a very large number.

6    Q.   And so, the 5+ is direct infringers who received -- are

7    there 20,000 direct infringers with 5+ tickets?

8    A.   Identified in the subsample of total infringements by the

9    RIAA that is already, you know, by all reasonable estimates

10:35:45 10   expected to be a subsample of the total amount of infringing

11   activity and infringing subscribers that exist on Cox's

12   network.

13   Q.   You talked earlier, sir, about the bundling of products.

14   How does that factor into this analysis?

15        Can you tell the jury what kinds of services the

16   customers represent in this slide, subscribed to and paid for.

17   A.   Well, this, again, is looking at all the services those

18   subscribers paid for.  So it's not just looking at, you know,

19   what revenue did they get from these subscribers associated

10:36:16 20   with their high-speed Internet service.  Because that's not how

21   the service is sold.

22        Customers buy a bundled service.  When you buy a

23   bundled service, you get a different price.  In fact, you get a

24   discount.  And consumers want to buy bundled services because

25   it gives them one point of contact, because it's simpler, they

W.H. Lehr - Direct

1792

1  customers were in.  And so, I didn't have that data, but I do

2  have the ICOMS data and the ticket data.  So there are things I

3  can infer from that.

4  Q.   So just remind us, sir, what's the ICOMS data?

5  A.   The ICOMS data is the internal billing system.  So they

6  keep this for all their subscribers.  But, you know, the subset

7  of the data we got was for those subscribers who had been

8  identified as infringing subscribers in the CATS data with one

9  or more DMCA tickets.  And then we had their revenue payments

11:17:55 10  from 2012 to 2016.

11  Q.   And were you able to look, sir, at the Cox billing data

12  for the direct infringers in this case and draw conclusions

13  about their relative value?

14  A.   Yeah.  So one of the things you can do is you can say,

15  let's look at the data payments.  So not all the revenues they

16  billed, but the data payments which shows up in two different

17  elements within the dataset for each customer.  And you can

18  say, what was the average of only those subscribers, the

19  average billing per month for only those subscribers that

11:18:32 20  received one to two tickets?  And we can -- can we compare it

21  to subscribers that received more tickets.

22      And so, for example, can we compare it to subscribers

23  who got 20 or more tickets?  So if you got 20 or more tickets,

24  the evidence is showing you are, by the evidence, assuming the

25  evidence straightly maps directly to your infringing behavior,

W.H. Lehr - Direct

1793

1   that you're a heavier infringer.

2            When you do that comparison and you apply statistical

3   tests, you find that there is a statistically significant

4   increase in the data billed and revenues paid by the more heavy

5   infringers.

6            So this is data from a limited subsample of Cox's own

7   internal billing of these infringing subscribers that have been

8   identified as infringing that statistically shows that there is

9   a large, 8 percent increase in the data billings to those

11:19:30 10   subscribers.

11            And that, you know, goes as consistent with the other

12   stuff, stuff their internal documents and what you would

13   otherwise infer.

14   Q.    What do you mean by statistically significant?

15   A.    You apply statistical tests and say, given the size of the

16   sample I have and the variability in that sample, is this a

17   difference that looks as if it could be explained as just

18   random, or does it look like it's actually, you know,

19   statistically significant.

11:19:56 20   Q.    And it looks like -- the 8.4 percent increase, what

21   charges does that relate to?

22   A.    That's just the charges associated with their payment for

23   data services.

24   Q.    And it looks like it's about a six-and-a-half or so dollar

25   incriminate.  $6 doesn't seem like that big of a difference.

W.H. Lehr - Direct

1795

1 and that it's incentives were greater when these repeat

2 infringers -- there is evidence suggesting that they were even

3 heavier infringers.

4 Q.   I want to move to the next part of this opinion.

5       You said that Cox saved by not addressing

6 infringement.  What do you by that, sir?

7 A.   Well, I talked a little bit about that in my opening

8 statement.  So had Cox addressed the infringement more

9 aggressively, you know, they would have probably had to deal

11:22:10 10 with more customer service calls.  They would have had to mail

11 more notices and had more interactions to deal with

12 subscribers.  They would have incurred direct costs associated

13 with the response.

14       They probably couldn't have gotten away with reducing

15 the personnel of the department that was dealing with the abuse

16 stuff, as they actually -- as I understand they actually did.

17       But, you know, so they would have incurred additional

18 costs.

19 Q.   Were able to quantify the costs saved by Cox by not

11:22:44 20 addressing the infringement?

21 A.   I wasn't able to quantify these because, first off, I'm

22 not offering an opinion here about what more and specifically

23 Cox should have done.  And what Cox specifically might have

24 done would affect what the incremental costs would have been.

25       But certainly they should have done more than they

W.H. Lehr - Direct

1796

1    did do.  My opinion is that their economic incentive was not to

2    do anything, that's what I am testifying about.  And part of

3    that is to avoid the costs, but I don't have an estimate of

4    what those costs would have been.

5    Q.   And moving to your last point, Dr. Lehr:  Cox maintained a

6    larger subscriber base.

7         How does this tie into your economic incentive

8    opinion?

9    A.   Well, you know, in any sort of business like this, there

11:23:27 10  is a certain amount of churn.  Customers move, customers leave,

11   and sometimes you have an incentive to get rid of customers.

12        In my comments today I have emphasized that Cox has a

13   strong financial economic incentive to retain subscribers on

14   their network that are profitable.

15        So Cox doesn't want to retain subscribers on their

16   network that are not profitable.

17        And so, it's also worth looking at, was Cox willing

18   and able without, for example, rocking the boat of their

19   general cost structure, able to terminate numbers of

11:24:04 20  subscribers when it wasn't in their interest.

21        And so, I looked also at Cox termination behavior

22   between 2013 and 2014.  And I did this for a couple reasons.

23   First off, the evidence shows that between 2013 and 2014, Cox

24   was willing to terminate and did terminate over 600,000

25   subscribers for non-payment of their bills.  619,711

W.H. Lehr - Cross

1800

1   Q.   Such as --

2   A.   I mean, I wouldn't call that saving revenues, but --

3   Q.   Okay.  Avoiding costs?

4   A.   The costs they would have incurred, had they adopted a

5   more effective strategy, were contingent costs.  And they

6   avoided incurring those contingent costs.

7   Q.   Okay.  So you said, mailing more notices, that was an

8   example.  Do you know that they did not mail notices, they

9   e-mailed them?  Did you know that?

11:30:07 10   A.   Yes.

11   Q.   Okay.  So what is the cost to e-mail a notice through the

12   CATS system?

13   A.   I don't know precisely.  I know that, were one to think

14   about that, one would want to consider the fully loaded costs.

15   So what are the costs of the personnel and systems that are

16   operating and all of that.  Once you've got those costs

17   incurred, the incremental costs of selling -- sending an

18   individual e-mail might be relatively low.

19        But the repercussions of sending such a communication

11:30:42 20   to a customer is likely to translate into additional customer

21   service calls and all that sort of stuff.  I did not have data

22   to allow me to estimate precisely what those effects would be.

23        And so, I didn't because I wouldn't know exactly what

24   the content or text of the e-mail would be.

25        So, for example, if you were to mail a customer

W.H. Lehr - Cross

1801

1    something that basically says, you know, we got a notice that

2    you're infringing, you know, that's it, the customer may not do

3    anything with it, may just ignore it.

4            If you mail one that says, you are violating the law,

5    this is a serious problem, and the customer had to read it, and

6    then the customer might call.  So I don't -- you know, I don't

7    have an opinion about that.

8            But had they done more, it likely would have affected

9    the number of customer service calls they would have gotten.

11:31:27 10   Q.   Okay.

11   A.   The personnel they would have needed to do that, you know,

12   and all that sort of stuff.

13   Q.   So -- and just yes or no, Dr. Lehr.  Did you attempt to

14   quantify the cost of mailing more notices by e-mail to the CATS

15   system if Cox had a more aggressive policy in dealing with

16   infringement?

17           Yes or no, did you quantify it?

18   A.   I can't answer that as a simple yes or no question because

19   I would say --

11:31:53 20           THE COURT:  Okay.  Just say, I can't answer that yes

21   or no.

22           THE WITNESS:  I'm sorry.  Okay.  I can explain.

23           THE COURT:  So if you can answer a question yes or

24   no --

25           THE WITNESS:  Okay.

W.H. Lehr - Cross

1802

1      THE COURT:  -- or I can't answer it as asked, please
2  do that.  And then your counsel will follow up if he think it's
3  appropriate.  All right?
4      THE WITNESS:  Okay.  Thank you, Your Honor.
5      THE COURT:  All right.  Thank you.  Go ahead.
6  A.   I can't answer that yes or no.
7  BY MR. BUCHANAN: (Continuing)
8  Q.   Did you attempt to quantify it?
9  A.   I can't answer that as a yes or no question.  I can
11:32:24 10  explain to you what I did and how I thought about that problem.
11  It's not a yes or no question.
12  Q.   Okay.  So you said that you understand it goes through an
13  automated system, the e-mail that comes in, right?
14  A.   Yes.
15  Q.   The notice?  Okay.  And you know that -- you looked at the
16  notice, right, that's prepared by the RIAA and sent to Cox?
17  You reviewed that?
18  A.   I looked at some of those, yes.
19  Q.   And the CATS system doesn't need to do anything with that
11:32:50 20  notice, it just needs to forward it after it reads it, right?
21      MR. GOULD:  Objection, Your Honor, foundation, and
22  outside the scope.
23      THE COURT:  If he knows, he can answer.  If you
24  looked at that.
25  A.   I don't know precisely how the CATS system operates

W.H. Lehr - Cross

1803

1    because as an economist, I wouldn't think that this was this

2    thing that you just put out there as this box and it's all

3    completely automated.  There were interactions -- and when I

4    talk -- when I say something, so there's no misunderstanding,

5    when I say something like they would've dealt with the

6    copyright infringement, you know, more aggressively, it

7    wouldn't be just turn a dial on the CATS system.  It might be

8    modifying the CATS system, modifying the content of the notes,

9    changing the staffing of those groups, all those sorts of

11:33:31 10  things.

11        And so, I did consider those sorts of things and

12   concluded that those costs would likely be material.  But I did

13   not try and come up with a dollar estimate of those because to

14   do so would have required me to formulate an opinion about

15   specifically what Cox should have done, and I didn't do that.

16   BY MR. BUCHANAN: (Continuing)

17   Q.   Right.  So you're not saying that Cox should have

18   terminated after one notice, are you?

19   A.   No.

11:34:00 20  Q.   Okay.  Now, before we get to that, I believe you testified

21   that piracy was a global problem, right?  Piracy involving file

22   sharing and piracy with regard to copyright infringement was a

23   global problem?

24   A.   Well, I don't believe I testified to that.  But I wouldn't

25   disagree with that.  I believe it is a global problem.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,        :
                                :
     -vs-                       :    Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                                :
--------------------------------:
```

<u>VOLUME  8  (P.M. Portion)</u>

TRIAL TRANSCRIPT

December 11, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

Norman Linnell and Anneliese Thomson - EDVA-OCRs  (703)549-4626

S. Negretti - Direct

1892

1   A.   Well, what we'll do is we'll create messages and images on

2   the marketing pieces, for example, that depict, for example,

3   people -- a group of people sitting in their living room on

4   their tablets or their laptops watching streaming video,

5   posting to social media, doing electronic gaming, things like

6   that.

7   Q.   And have you learned the types of internet activities that

8   speed is important for?

9   A.   Yes, absolutely.

10  Q.   What are they?

11  A.   Yeah, it's not a surprise because I've said it a couple

12  times, but by far and away, people want to be able to consume

13  content, and when I mean consume content, things like streaming

14  video, being able to watch Netflix.  People like posting to

15  social media, being able to post to Facebook.  People like

16  being able to use their electronic gaming machines to --

17  particularly the younger generation, to be able to play video

18  games.

19  Q.   Mr. Negretti, have you assisted in the preparation of

20  certain slides to illustrate the different activities in which

21  speed is used with your internet service?

22  A.   Yes, absolutely.

23  Q.   Okay.  I'd like to ask you to take a look at your, your

24  slides and take the jury through what you've presented.

25  A.   Sure.  And I thought it was helpful to go through some

L. Weber - Direct

1962

1  Q.   And could you explain how you reached conclusions in this

2  opinion?

3  A.   Okay.  So the opinion is that after each step in Cox's

4  graduated response, fewer subscribers continued to be the

5  subject of copyright infringement notices, and by the 12th such

6  notice, the notices stop for the vast majority of subscribers.

7          So that's the opinion, and I got to that opinion by

8  analysis of the RIAA notices as well as the Cox tickets.

9  Q.   Okay.  You used the term "vast majority."  What do you

10 mean by that?

11 A.   So I mean it's not -- it's more than half and it's

12 not just a little bit more than half.  It's, it's the vast

13 majority.  It's -- and for the cases I'm going to talk about,

14 it's over 90 percent.

15 Q.   Do you have additional slides that show your analysis and

16 your results?

17 A.   Yes, I do.  So, so the first thing I looked at was I

18 looked at the RIAA notices.  These are the notices that are in

19 the database that MarkMonitor allegedly sent to Cox.  And the

20 49 percent of the at-issue subscribers here only got one

21 notice -- were only the subject of one notice from the RIAA in

22 the relevant period, which is roughly February 2013 through the

23 end of November 26, 2014.  So almost half only got one.

24         When we go to three or fewer notices, 78 percent, or

25 more than three-quarters of the at-issue subscribers got one,

L. Weber - Direct

1963

1   two, or three notices, were the subject of one, two, or three

2   notices from the RIAA.

3        When we get to five, 88 -- 87 percent of the at-issue

4   subscribers were the subject of five or fewer notices from the

5   RIAA.  We go up a little bit more and we see that by the time

6   we get to 12 notices, that 98 percent of the at-issue

7   subscribers were the subject of no more than 12 notices from

8   the RIAA.  So that means that 2 percent got -- were the subject

9   of 13 or more notices from the RIAA in this relevant period.

10  Q.   Okay.  Did you analyze this data in any other way?

11  A.   I did.

12  Q.   Did you put it on a slide?

13  A.   I did.  So, so the -- I have two issues with this data,

14  and the first issue is the set of subscriber accounts is

15  biased.

16  Q.   Which set of accounts?

17  A.   The set of accounts that are in the data, both in the RIAA

18  notice data and also, more importantly, in the, in the Cox

19  ticket data.  That set of subscriber accounts is biased.

20  Q.   Okay.  And you say you took a deeper dive to determine

21  this bias.  First, explain the bias.

22  A.   Sure.  So, I mean, you might think, how can it be biased?

23  It just is the set of at-issue subscribers, right?  You would

24  think it's not biased, but it is biased, and let me see if I

25  can explain how.

2126

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
              Plaintiffs,      :
                               :
       -vs-                    :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
              Defendants.      :
                               :
-------------------------------:
```

VOLUME  9  (P.M. Portion)

TRIAL TRANSCRIPT

December 12, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2317

1    or 99 cents a song, or 79 cents a song, whatever he's going to

2    argue -- and he can argue that.  And in both of those cases the

3    courts observed exactly what I am suggesting to Your Honor now,

4    which is that the jury should be told that they should award

5    statutory damages whether or not there is evidence of actual

6    damages suffered by the plaintiffs.  And that the not -- the

7    statutory damage award need not be based on the actual damages.

8    Because the whole concept of statutory damages is to encompass

9    all of these other factors.

10            THE COURT:  Yeah, understood.  Okay.

11            MR. OPPENHEIM:  Okay.  So that was issue one.  I'll

12   try to move more quickly through the other three issues that

13   were hit, Your Honor.

14            Deterrence and punishment.  Those are two very, very

15   different things.  Go back to our old philosophy days from

16   college, Hobbs talked about deterrence.  Others -- you know,

17   and punishment.  They're very different things.  And the jury

18   should get to consider them differently.

19            What it takes to punish a defendant is very different

20   than what it may take to deter a defendant.  And so, courts are

21   generally instructed on both.  And we're happy to submit some

22   authority to the Court over the weekend on this issue to help

23   advise it, if the Court would like.

24            THE COURT:  Yeah, that'd be fine if you want.

25            MR. OPPENHEIM:  On the issue of --

2329

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,        :
                                :
      -vs-                      :     Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                                :
--------------------------------:
```

VOLUME 10  (A.M. Portion)

TRIAL TRANSCRIPT

December 16, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

C. Bakewell - Direct

2423

1    downloaded a song, and then that might be accused, it might not

2    be.  For purposes of here, let's say that it's accused.

3           Out of everything that's been provided to this

4    household over a long period of time, that only occurred, as we

5    saw, the animation happened over a, you know, relatively small

6    moment in time, and I think that consideration is important.

7           This is another way of representing that, is that if

8    you're streaming in a bunch of information through the

9    Internet, and this could include video and voice services, too,

10   you can see there's all kinds of content that is provided to a

11   household from sources like Netflix and Pandora.  People play

12   games that stream data and they're super data intensive.

13   People use Facebook and stream information there.  That

14   sometimes can be very data intensive.  YouTube, Hulu, Amazon,

15   there's all kinds of things that are going on.

16          The accused activities are relatively small, right?

17   There's -- I have the same sort of graphic where the alleged

18   wrongful act occurs just at a moment in time.  But there's

19   other value that's being provided to this household that is

20   significant, and Dr. Cox didn't -- excuse me, Dr. Lehr didn't

21   separate any of that information out when he presented his

22   financials.

23   Q.   So what -- all those services that Cox provides, utilizing

24   Dr. Lehr's one -- assuming, you know, one notice and then

25   you're out, what happens to all those services, when that

C. Bakewell - Direct

2434

1    one component, downloading music?  What are other things that
2    people use internet service?  I think you had a chart, and if
3    you could just summarize those?
4    A.   Right.  There's lots of other reasons why you would use
5    internet.  So I'm not saying that, hey, if you take a third of
6    any of Dr. Lehr's numbers, then you have boiled things down to
7    the alleged infringement.  There are still other things that
8    are going on when you -- when internet is being provided to Cox
9    subscribers.  We talked about that earlier, for example,
10   Netflix being something that's not accused or Facebook and the
11   like.
12   Q.   Okay.  I think now we'll talk about disregarding
13   inappropriate costs.  I think that was the next item.
14   A.   Right.
15   Q.   I think you talked about that a little bit, but could you
16   explain in more detail again?
17   A.   Sure.  So Dr. Lehr was asked about whether he included
18   costs and what the costs -- the profit margin would be, and as
19   I said at the beginning of my testimony, I think that for
20   purposes of our discussion here, Dr. Lehr and I have agreed
21   from his slides at least that the applicable profit margin is
22   40 percent, yet the slide that he put up where he said "value"
23   didn't include costs.  It was only billings or revenues.
24   Q.   Okay.  So in terms of the points you've made about the
25   assumptions on one, three, and five, the claim period versus

2483

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  10   (P.M. Portion)

TRIAL TRANSCRIPT

December 16, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2646

1    issue is the punishment issue, Your Honor.

2              THE COURT:  Yes.

3              MR. OPPENHEIM:  We've submitted -- I think we both

4    submitted bench memos on this, Your Honor.

5              On the issue of punishment, and I gave a brief

6    overview of this on Thursday evening --

7              THE COURT:  Yeah, I read your brief, so -- and the

8    cases.  So I'm on it.

9              MR. OPPENHEIM:  I'm sorry?

18:48:00 10        THE COURT:  I'll hear anything you want to say.  I

11   don't want you to go over what you argued in your brief.

12             MR. OPPENHEIM:  Right.  I won't -- I think, look,

13   Your Honor, the Supreme Court, First Circuit, Second Circuit,

14   Eighth Circuit, Ninth Circuit have all spoken to this, clearly,

15   and it's in there.

16             And in this context, you know, the way punishment

17   might be mete out is different than the way -- than deterrence

18   might be thought of by the jury.

19             And so, I think the jury should be allowed to

18:48:32 20   consider both.  And I think that's what the weight of the law

21   suggests the jury should consider.  I mean, I think the memos

22   speak at this at length.

23             I will say that with respect to the defendants' memo,

24   they cite to the Patry treatise.  The Patry treatise cites to

25   an 1899 Supreme Court case called <u>Brady versus Daly</u>.  Needless

2651

1          I haven't seen any precedent for actually instructing

2     the jury to punish the defendant.  And we strongly object to

3     the inclusion of that language.

4          THE COURT:  All right.  Thank you.

5          MR. OPPENHEIM:  Your Honor, what counsel failed to

6     refer the Court to is the Feltner decision out of the Supreme

7     Court.  And the Feltner decision out of the Supreme Court says,

8     quote:  An award of statutory damages may serve purposes

9     traditionally associated with legal relief, such as

18:54:42 10   compensation and punishment.

11         As to the Tenenbaum case, Your Honor, the Court there

12    did include as a factor punishment.  I know, I litigated the

13    case.

14         So the picking and the choosing the issue of

15    punishment from the First Circuit as it related to a due

16    process challenge is inapt.

17         As for the fact that the argument that we didn't cite

18    to any jury instructions -- well, jury instructions are a

19    product of the case law.  And they should -- the jury

18:55:25 20   instructions, obviously -- and I am not telling you anything

21    Your Honor hasn't known for many, many years -- the jury

22    instructions should be built off of what the case law is.

23         And if the case law says, as we have cited and

24    believe it does say, that punishment is a factor, then

25    punishment should be included in the jury instructions.

2652

1          And the idea that punishment only exists in the law

2    in order to deter is just flat wrong.  There are times where --

3    that in order to punish somebody, you may level a much larger

4    or a much smaller award than what you would level when you're

5    trying to deter somebody.  They call for different things.

6          And culpability, the notion that culpability is not

7    related to punishment, is, I think, just wrong.  You only

8    punish those who are culpable.  That's why we consider

9    culpability, in order to punish them.

18:56:23 10          So I think that opposing counsel has not cited cases

11    I believe that go the other way.  I also think though, it's, I

12    will admit, somewhat of a difficult road to get there, the

13    Gonzalez decision out of the Fourth Circuit, which does talk

14    about punitive measures, does have some applicability here.

15    It's not in the context of the statutory damages regime, but it

16    does talk about the monetary assessments serving punitive

17    purposes.

18          So on that, I think we've presented to Your Honor

19    everything that is in our brief already.

18:57:01 20          THE COURT:  All right.  Well --

21          MR. EATON:  Your Honor, if I may.

22          THE COURT:  Yes, sir.

23          MR. EATON:  I will be quick.

24          THE COURT:  Yeah.

25          MR. EATON:  Your Honor, with respect to Feltner,

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
    -vs-                        :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  11  (A.M. Portion)

TRIAL TRANSCRIPT

December 17, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

S. Mencher - Direct

2721

1    A.    I would say it's, it's absolutely not built around

2    promoting copyright infringement.  I would go so far as to say

3    copyright infringement, other than the fact that it's illegal,

4    goes 180 degrees the opposite of the values of our business.

5    Q.    Does it affect your business in other respects?

6    A.    Yeah.  Well, if you really think about the concept of

7    copyright infringement and illegally downloading music or

8    videos, movies, we have a video business.  We've invested a lot

9    of money over the years in building a Video on Demand platform,

10   a Pay Per View platform.

11           We sell video.  To the extent that copyright

12   infringement allows customers or allows people to get that

13   stuff for free, it actually competes with our core video

14   product itself.

15   Q.    Do you know whether Cox wants to earn revenue from

16   subscribers who are using the internet to commit infringement?

17   A.    No.  We've never had that conversation as the leadership.

18   We don't want to make money off people who are doing things

19   illegally.

20   Q.    Well, doesn't it matter to Cox if they lose customers

21   because they're terminated for infringement?

22   A.    You know, we're a big business.  We're a $10 billion

23   business in the time frame you're talking about, and we'd just

24   as soon, you know, terminate a customer and really then worry

25   about it from a how does it impact our brand and how we view

2722

1    ourselves and the values of our business.

2    Q.   I'm going to focus the next few questions about when Cox

3    actually terminates customers.  What are the expenses

4    associated when Cox actually does terminate a customer?

5    A.   Well, anytime we disconnect a customer, there's really two

6    things that go into it.  No. 1 is typically if a customer

7    calls, we'll answer the phone, and we'll process the

8    disconnect.

9         No. 2, we'll oftentimes, and usually I'll say, send a

10   field technician to the house itself and disconnect services at

11   the premise.

12   Q.   Do you know whether Cox builds in any variance within its

13   projected budget for subscribers leaving?

14   A.   Of course we do.  So we're, we're a high-transaction

15   business, right?  We probably connect upwards of 1.8 million

16   customers every single year, and we disconnect close to 1.8

17   million customers every year.

18        So part of my role as the leader of financial

19   planning is to ensure that we are budgeting for those millions

20   and millions of transactions in our plan.

21   Q.   By the way, you just made a reference earlier to the steps

22   that it takes for Cox to terminate a customer.  What does all

23   that cost on a per customer basis?

24   A.   It's probably no more than 20 or 30 dollars to disconnect

25   a customer.

C.D. Tregillis - Direct

2777

1          Why don't you just go through and summarize them.

2  A.    Okay.  So I think you read it accurately, and that is what

3  I intend to -- intended to depict here.  I put these slides

4  together in an attempt to explain my opinions.

5          And so, this one relates to the idea that Dr. Lehr

6  has offered opinions that in some instances, like I said, I

7  find to be not supported, not supported by facts, and in some

8  situations are not tied to the accused wrongful acts of Cox.

9          I think I'll explain that in more detail when we get

10 into it.  But he talks about things that are more general harms

11 about piracy generally, but not related to what I understand to

12 be at issue in this lawsuit.  That's what that first one

13 relates to.

14 Q.    Okay.  And the second one?

15 A.    The second is using the infringement notices sent by the

16 RIAA, and assuming that each notice represents a displaced

17 legitimate digital download of each track with a copyright in

18 suit, I've calculated what I've referred to as displaced

19 downloads of $692,000.

20          So for all of the notices, each one, if that was to

21 have a $1 price tag associated with it, that adds up to

22 $692,000, if you pick up each of the tracks that has a

23 copyright in suit in those notices.

24 Q.    And your third opinion?

25 A.    The third is that many users and tracks had few notices.

2837

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,     :
                                :
    -vs-                     :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.     :
                                :
--------------------------------:
```

VOLUME 11  (P.M. Portion)

TRIAL TRANSCRIPT

December 17, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2927

1          The amount awarded must be between 750 and $30,000

2  for each copyrighted work that you find to be infringed.

3          If plaintiffs prove that Cox acted willfully in

4  contributorily or vicariously infringing plaintiffs'

5  copyrights, you may, but are not required to, increase the

6  statutory damage award to a sum as high as $150,000 per

7  copyrighted work.

8          You should award as statutory damages an amount that

9  you find to be fair under the circumstances.  In determining

10 the appropriate amount to award, you may consider the

11 following factors:  The profits Cox earned because of the

12 infringement.

13          The expenses Cox saved because of the infringement.

14          The revenues that plaintiffs lost because of the

15 infringement.

16          The difficulty of proving plaintiffs' actual

17 damages.

18          The circumstances of the infringement.

19          Whether Cox acted willfully or intentionally in

20 contributorily or vicariously infringing plaintiffs'

21 copyrights.

22          Deterrence of future infringement.

23          In the case of willfulness, the need to punish Cox.

24          In considering what amount would have a deterrent

25 effect, you may consider Cox's total profits and the effect

2928

1    the award may have on Cox in the marketplace.

2          Plaintiffs are not required to prove any actual

3    damage suffered by plaintiffs to be awarded statutory damages.

4    You should award statutory damages whether or not there is

5    evidence of the actual damage suffered by plaintiffs, and your

6    statutory damage award need not be based on the actual damages

7    suffered by plaintiffs.

8          Cox's contributory or vicarious infringement is

9    considered willful if plaintiffs prove by a preponderance of

10   the evidence that Cox had knowledge that its subscribers'

11   actions constituted infringement of plaintiffs' copyrights,

12   acted with reckless disregard for the infringement of

13   plaintiffs' copyrights, or was willfully blind to the

14   infringement of plaintiffs' copyrights.

15         You must follow these rules while deliberating and

16   returning your verdict.  First, when you go to the jury room,

17   you must select a foreperson.  The foreperson will preside

18   over your discussions and speak for you here in court.

19         Second, it's your duty as jurors to discuss this

20   case with one another in the jury and try to reach an

21   agreement.  Each of you must make your own conscious decision,

22   but only after you have considered all the evidence, discussed

23   it fully with the other jurors, and listened to the views of

24   the other jurors.

25         Do not be afraid to change your opinions if the

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
              Plaintiffs,       :
                                :
     -vs-                       :    Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
              Defendants.       :
                                :
--------------------------------:
```

VOLUME  12

TRIAL TRANSCRIPT

December 18, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2938

```
 1                      CLOSING ARGUMENT

 2                   BY MR. OPPENHEIM:

 3            Good morning.  When this case began, I said this is a

 4   case about an Internet provider that was swarming in piracy,

 5   that said one thing but did another, and that put its profits

 6   above the law.  So now we've spent the last two-and-a-half

 7   weeks hearing evidence in this case, and what we have heard and

 8   seen demonstrates those three points clearly and unequivocally.

 9            Under the law, Cox cannot knowingly contribute to

10   copyright infringement, nor can Cox profit from infringement it

11   has the right and ability to stop.  But that is precisely what

12   Cox did over and over and over again.

13            Throughout this trial, Cox has focused its attention

14   to issues that are wholly irrelevant to the case.  Cox would

15   much prefer that the jury spend its time thinking about privacy

16   and CAS and providing Internet for critical infrastructure,

17   instead of focusing on the massive infringement that was on its

18   network, that it knew was there but chose not to do anything

19   about because it didn't want to hurt its huge profit line.

20            Before I go any further, let me take a moment to

21   thank and appreciate each of you for your commitment, focus,

22   and attention during these last few weeks.  I also would like

23   to thank and appreciate the court- -- courtroom staff, the

24   courthouse staff who have worked tirelessly to move this case

25   forward; opposing counsel, some of whom I have known for very
```

2941

1    copyright infringement.  Cox told copyright owners it would

2    stop the infringement but implemented rules that did anything

3    but stop the infringement.  Cox said it wanted to educate

4    customers but rarely forwarded infringement notices to those

5    customers.  This defies common sense.

6         Cox said it had a policy that led to termination but

7    created an unwritten policy that undid terminations, and then

8    they stopped terminating altogether.  Cox said it took

9    copyright infringement seriously, but Cox's abuse team treated

10   the issue with anything but respect.

11        And Cox now says, as you heard during Cox's opening

12   statement, that Internet service was too precious to terminate

13   lightly.  It was an essential service.  But then Cox terminated

14   over 600,000 customers when they didn't pay.

15        Keep all of this in mind and think critically when

16   you hear more talk and argument from Cox in its closing.  Pay

17   attention to what Cox did, not what Cox now says it did.

18        Cox put its profits above the law.  In e-mail after

19   e-mail, we saw what motivated Cox.  It was profits.  Cox

20   prioritized customer payments over all else in deciding whether

21   to terminate.

22        You have seen both of these e-mails during the course

23   of this trial:  Mr. Sikes indicating that this customer pays

24   over $400 a month and will likely cancel services if

25   terminated, every terminated customer becomes lost revenue; or

2963

1    Cox's graduated response policy was very effective.  Of course,

2    no witness produced any e-mails, studies, or analyses from 2010

3    to 2014 that showed anything of the sort.

4           If a multi-billion-dollar company builds a system

5    that was actually intent on stopping infringement, wouldn't you

6    expect to see some testing or analysis of its program?

7    Wouldn't you expect to see some contemporaneous evaluation of

8    what they were doing?

9           Cox claims its system was effective, but since you

10   saw no data or analysis to support this claim, you should

11   question that statement.  The reason those analyses don't exist

12   is because Cox didn't want to do them, because Cox knew what

13   those analyses would show.  It would confirm precisely what we

14   have seen during this trial.  Cox's system was horribly flawed.

15          You may recall the testimony of Dr. Weber.  She did

16   an after-the-fact statistical analysis of what happened on the

17   Cox network.  The problem with her analysis was that it was

18   blatantly skewed.  Dr. Weber ignored the data to supposedly

19   eliminate bias, but in so doing, she eliminated 15,000

20   customers.  That is bias.

21          She dropped the 15,000 subscribers who had the

22   longest history of infringement in order to do her analysis.

23   And not surprisingly, when she did that, she got better numbers

24   than Professor McCabe did.

25          But even with her flawed analysis and exclusion of

2972

1    between 750 and 30,000 dollars per work.  If you determine that

2    Cox's conduct was willful, then you will be allowed to

3    determine damages per work between 750 up to 150,000 per work.

4           The judge has listed for you in his instruction a

5    series of factors that you should look at in considering

6    damages, and you should look at all of those factors because we

7    believe that each and every one of them weighs heavily on the

8    side of the plaintiffs, but let me speak quickly to just three

9    of them.

10          You heard from several representatives from the

11   plaintiffs, Mr. Kooker, Mr. Kokakis, and Mr. Flott, who told

12   you how peer-to-peer had harmed their business and that between

13   2004 and 2014, while music consumption was going up and up and

14   up, the music industry -- the record industry's revenues were

15   going down and down and down.

16          This was not a slow-down; this was a slaughter.  Lost

17   jobs, lost labels, lost revenue.

18          Now, Cox, of course, can't possibly imagine losses

19   like this, so Cox brings in an expert, Mr. Tregillis, who did

20   an analysis that is shamefully inaccurate.  Mr. Tregillis

21   claimed that the actual harm was only roughly $600,000 or so

22   because that was the number of notices that were sent.

23          Do you remember from my opening that I described that

24   each peer-to-peer user was like a private digital record store?

25   Mr. Tregillis would have you believe that each one of those

2974

1          Let's turn quickly to Cox's revenues and profits.

2    Please pay attention to the end of jury instruction No. 28,

3    where the Court will instruct you that you may consider the

4    amount to have a deterrent effect, and when you consider that,

5    consider Cox's profits from its high-speed internet business

6    between 2013 and '14.  It was $8.3 billion.  That is a big, big

7    number.  All of Cox's focus on retaining customers and cutting

8    costs worked, or at least worked for Cox.

9          Mr. Bakewell criticized Dr. Lehr's analysis for not

10   considering costs, but these profit numbers account for them.

11   Cox's profits were so excessive that between 2013 and 2014, Cox

12   paid $2.9 billion, billion with a "B," in cash dividends to its

13   owners.  This is after costs, taxes, interest, and capital

14   investment.

15         If you remember nothing else about Cox's finances,

16   remember Cox had so much free cash on hand, it could pay its

17   shareholders 1 to 1.5 billion dollars a year while continuing

18   to grow the business and while the infringement continued

19   unabated.

20         Given Cox's conduct, how much of those profits should

21   the Cox family get to retain, and how much should be turned

22   over to the plaintiffs?

23         Cox's profits were massive.  In fact, even if you

24   awarded the maximum statutory damages under willfulness, it's

25   not clear that even that would have a deterrent effect because

2975

1   Cox has so much cash.

2         Nobody should accept Cox's after-the-fact excuses and

3   word games.  This was not a momentary lapse.  What happened at

4   Cox took place over a period of years.  Just when you thought

5   Cox's conduct was bad, you see something else and you learn

6   that it got worse.  Cox's decisions were made and ratified by

7   Cox's executives and employees from multiple departments at

8   multiple levels.

9         Cox's decision to put its own interest ahead of the

10  law is part of Cox's culture and thinking, and that needs to

11  change.  While they may not have accepted responsibility during

12  this trial, you will have an opportunity to send a message and

13  force them to take responsibility going forward.

14        On the damages question, we leave it to you, the

15  jury, to determine the appropriate damages award.  We believe

16  it should be at the high end of the range.

17        Before I conclude, I want to harken back to a point I

18  made in my opening that's important for your consideration.

19  This is not a case just about the record companies and music

20  publishers.  It's about the musicians and everyone around them

21  that help create the magic of music that's part of our lives.

22        As I said, for every Justin Timberlake, there are 20

23  or 100 other artists who have recordings and songs that people

24  listen to who do not have the fame and success.  For every

25  Rolling Stones, there's a team of other creatives from union

3028

1   when they weren't in front of a judge and a jury?

2           Well, what did they say?  Let's look at PX 335.

3           This was their respect for the law.  This is what

4   they said:  "F" the DMCA.

5           And then when somebody saw that that was in the

6   e-mails, they responded.  Let's go to the next one, please.

7           Mr. Carothers said:  Please stop sending e-mails out

8   that say "F" the DM -- "F" the law or "F" some company.  If we

9   get sued, those e-mails are discoverable and would not look

10  good in court.

11          That's what they were worried about.  Not whether or

12  not they had an effective system.

13          I want to respond to the notion that a $750-a-work

14  statutory damage award would be appropriate and put it in

15  context.

16          Everybody agreed, there's no ability to measure the

17  number of downloads that happened here.  We heard it from every

18  witness.  Even the experts agreed on that.  So we have no idea

19  what the total harm was.

20          But what Cox wants to have to pay, what they want the

21  award to be is the same amount that they're paying one of their

22  experts for one hour.  That's for the entire recording as much

23  as it was used, the entire musical composition for as much as

24  it was used for years.

25          So Cox literally puts billions and billions of

3029

1    dollars in its pockets, and it wants to give one hour's worth

2    of their expert's time to an artist for unlimited theft of that

3    recording or composition.

4             Let me close on this.  We have seen something

5    important and telling during this trial.  To this day, Cox

6    still refuses to accept responsibility.  It refuses to

7    acknowledge that what it did was wrong.

8             Think about Cox's opening.  Think about the evidence

9    that was presented.  Think about the questions that were asked

10   and the testimony of the witnesses on both sides.  Has anyone

11   on behalf of Cox said, you know what, we made mistakes?  Not

12   one.

13            Cox refuses to recognize that what it did was wrong.

14   They call e-mails goofy.  That's what they say, they're goofy.

15   That's not goofy.  When you say the things they've said, you're

16   telling the world what you think.

17            Cox refuses to acknowledge the wholesale failure to

18   abide by its own policies.  They set their policies, we didn't.

19   They didn't abide by their own policies.

20            Copyright infringement is not a victimless crime, but

21   Cox refuses to acknowledge that its actions harmed copyright

22   owners.  It harmed recording artists.  It harmed songwriters.

23   It harmed everybody in the ecosystem.  It harmed the back-up

24   musicians, the union musicians, the digital engineers.  It

25   harmed everybody in that process.  And Cox refuses to