**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

SONY MUSIC ENTERTAINMENT, *et al.*,

      Plaintiffs,

v.

COX COMMUNICATIONS, INC., *et al.*,

      Defendants.

Case No. 1:18-cv-00950-LO-JFA

## <u>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO</u>
## <u>COX'S MOTION FOR REMITTITUR OR NEW TRIAL</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

LEGAL STANDARDS ......................................................................................... 2

ARGUMENT ........................................................................................................ 4

   I.    Remittitur or new trial is not warranted. ..................................................... 4

       A.    The evidence overwhelmingly supports the jury's award. ..................... 4

          1.    P2P infringement on Cox's network was overwhelming, Cox knew it, and Cox never questioned the reliability of the infringement notices. .................... 4

          2.    Cox paid lip service to copyright enforcement but its assurances of compliance were meaningless............................................................................ 6

          3.    As infringement on Cox's network skyrocketed, Cox gutted the abuse department and relaxed its infringement policies. ............................................. 7

             i.    Cox slashed the abuse team. ................................................................ 7

             ii.    Cox ignored the first notice to each subscriber. .................................... 8

             iii.    Cox imposed arbitrary caps on the number of notices it would accept.. 8

             iv.    Cox blacklisted complainants and deleted millions of notices............... 9

             v.    Cox infinitely extended the graduate response program. .................... 10

             vi.    Cox limited daily suspensions. ............................................................ 11

             vii.    Cox manufactured "unwritten semi-policies" on termination............. 12

          4.    Cox prioritized profits over limiting infringement. ........................................ 13

          5.    Cox's profits were staggering, both overall and from infringement.............. 14

       B.    The statutory damages factors and relevant caselaw make clear that the jury's award is justified and should stand. ....................................................................... 15

       C.    The jury already rejected Cox's numbers games. .................................... 19

       D.    The facts of this case are what matter in assessing the verdict. ............................. 21

   II.    The jury's verdict is constitutionally sound. .................................................. 22

  III.    Cox's attack on the jury instructions and evidentiary rulings is meritless. .................... 26

       A.    Copyright statutory damages allow for consideration of the need to punish........ 27

       B.    Cox's total profits, including dividends paid to its owners, are relevant to deterrence. ..................................................................................................... 30

CONCLUSION................................................................................................... 30

## TABLE OF AUTHORITIES

**CASES**

*Agence France Presse v. Morel*,
No. 10-CV-2730 AJN, 2014 WL 3963124, at *11 (S.D.N.Y. Aug. 13, 2014) ........................ 18

*Arista Records LLC v. Usenet.com, Inc.*,
No. 07 Civ. 8822(HB), 2010 WL 3629587, at *4-*5 (S.D.N.Y. Sept. 16, 2010) .................. 25

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
199 F. Supp. 3d 958 (E.D. Va. 2016) .................................................................................... 27

*Builders, Inc. v. Dan Chase Taxidermy Supply Co.*,
74 F.3d 488 (4th Cir.1996) .................................................................................................... 16

*Capitol Records, Inc. v. Thomas-Rasset*,
692 F.3d 899 (8th Cir. 2012) ............................................................................................. 3, 16

*Cass Cty. Music Co. v. C.H.L.R., Inc.*,
88 F.3d 635 (8th Cir. 1996) .................................................................................................. 29

*Davis v. The Gap, Inc.*,
246 F.3d 152 (2d Cir. 2001) .................................................................................................. 28

*Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*,
948 F.3d 261 (5th Cir. 2020) ................................................................................................ 17

*F.W. Woolworth Co., v. Contemporary Arts*,
344 U.S. 228 (1952) .............................................................................................................. 16

*Feltner v. Columbia Pictures Television, Inc.*,
523 U.S. 340 (1998) .............................................................................................................. 28

*Fitzgerald Pub. Co. v. Baylor Pub. Co.*,
807 F.2d 1110 (2d Cir. 1986) ............................................................................................... 29

*Golan v. FreeEats.com*,
930 F.3d 950 (8th Cir. 2019) ................................................................................................ 25

*Kepner-Tregoe, Inc. v. Vroom*,
186 F.3d 283 (2d Cir. 1999) ................................................................................................. 17

*Lord & Taylor, LLC v. White Flint, L.P.*,
849 F.3d 567 (4th Cir. 2017) ................................................................................................ 27

*Lowry's Reports, Inc. v. Legg Mason, Inc.*,
302 F.Supp.2d 455 (D.Md. 2004) ........................................................................................ 16

*Noel v. Artson*,
641 F.3d 580 (4th Cir.2011) ................................................................................................. 27

*Parker v. Time Warner Entertainment Co., L.P.*,
331 F.3d 13 (2d Cir. 2003) ................................................................................................... 24

*Psihoyos v. John Wiley & Sons, Inc.*
748 F.3d 120 (2d Cir. 2014) ................................................................................................. 17

ii

*Sony BMG Music Entm't v. Tenenbaum,*
660 F.3d 487 (1st Cir. 2011) ................................................................................ 15, 16

*Sony BMG Music Entm't v. Tenenbaum,*
No. CIV.A. 07-11446-RWZ, 2012 WL 3639053, at *2 (D. Mass. Aug. 23, 2012) ........... 3, 21

*St. Louis, I.M. & S. Railway Co. v. Williams,*
251 U.S. 63 (1919) .................................................................................................. 3, 23

*Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.,*
74 F.3d 488 (4th Cir. 1996) .................................................................................... 16, 28

*Superior Form New Form, Inc. v. Tekila Films, Inc.,*
357 Fed.Appx. 10 (9th Cir.2009) ................................................................................ 16

*Teague v. Bakker,*
35 F.3d 978 (4th Cir.1994) ......................................................................................... 27

*Terrier Media Buyer, Inc. d/b/a Cox Media Group v. Dish Network, L.L.C.,* 20-cv-583, ECF
No. 1, ¶ 1 (N.D. Ill. Jan. 24, 2020) ............................................................................. 2

*U.S. Equal Employment Opportunity Comm'n v. Consol Energy, Inc.,*
860 F.3d 131 (4th Cir. 2017) ...................................................................................... 2

Vanskike v. Union Pac. R.R. Co.,
725 F.2d 1146 (8th Cir.1984) ...................................................................................... 22

*Warner Bros. Entm't v. X One X Prods.,*
840 F.3d 971 n.2 (8th Cir. 2016) ................................................................................ 24

*Warner Bros. Inc. v. Dae Rim Trading, Inc.,*
877 F.2d 1120 (2d Cir. 1989) ..................................................................................... 16

*Zomba Enters., Inc. v. Panorama Records, Inc.,*
491 F.3d 574 (6th Cir. 2007) .................................................................................. 3, 23

**STATUTES**

17 U.S.C. § 504 .................................................................................................. 4, 16, 28

**RULES**

Fed. R. Civ. P. 59 ...................................................................................................... 2

## **INTRODUCTION**

For years, Cox knowingly facilitated piracy of Plaintiffs' copyrighted works on a massive scale.  Cox's conduct was not that of a single, rogue employee.  It was endemic to the culture of a company that systematically helped infringers, openly mocked the copyright laws, and lied to copyright owners about its allegedly "gold standard" policies.  Cox did this to maximize its billions of dollars of profits—with utter disregard for the law and copyright owners.

Against this backdrop, the jury returned a verdict well within the permissible statutory damages range set by Congress—roughly $500 million *below* the maximum permitted.  Cox now attacks the jury for its hard work and considered judgment, going so far as to accuse it of seeking "retribution."

But this was no runaway jury.  As the Court will recall, the jury was attentive and took copious notes over the 12-day trial.  The jury considered the Court's detailed instructions, engaged in substantial deliberations, and appropriately found Cox liable for willful contributory and vicarious copyright infringement of 10,017 copyrighted works.  Based on the evidence presented, the jury understood the value of the music.  The jury recognized the massive scope of the infringement, Cox's profits from the infringement, the harm to Plaintiffs, and the need to deter future wrongful conduct.  And the jury delivered its verdict.

In asking the Court to reduce the amount of that verdict or, alternatively, grant a new trial, Cox ignores large and critical portions of the trial record, recasts others through creative *post hoc* damages calculations, and raises ineffectual objections to the Court's instructions and evidentiary rulings.  Cox not only fails to provide a legal basis for the Court to upset the jury's considered verdict, but also fails to explain why some other amount of statutory damages is appropriate here.  Cox simply wants to pay less.

Cox argues by *ipse dixit* that because the damage award is larger than other copyright damage awards, it must be improper.  That is not how it works.  Courts evaluating a post-trial motion like this one must evaluate the jury's award in the context of the particular facts presented.  Cox's hollow protests about an "excessive" verdict are divorced from the extensive trial record and Cox's flagrant disregard for the law.  And, once again, Cox's utter refusal to accept any responsibility for its egregious conduct is on full display.  A review of the particular facts of *this* case amply supports the jury's verdict:  This case involved more copyrights than any other in history that we know of (10,017); a larger, more profitable Defendant than most other copyright cases (nearly $20 billion in revenue and over $8 billion in profit in the claim period alone); and appalling misconduct on a large scale over a number of years by an unapologetic company that embraced its own misdeeds to the very end, and sought to blame everyone else.  A mountain of evidence supports the jury's award, and it is consistent with the limits of the Copyright Act and the Constitution.  To the extent the jury considered the concept of punishment and Cox's total profits in assessing statutory damages, that was entirely proper.[1]

## LEGAL STANDARDS

A district court may not grant a new trial under Federal Rule of Civil Procedure 59(a) unless the verdict is against the clear weight of the evidence, based upon false evidence, or will result in a miscarriage of justice.  *U.S. Equal Emp't Opportunity Comm'n v. Consol. Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2017).

---

[1] Cox changes its approach to punishment as an element of copyright damages as it suits the moment.  In this case, Cox contends that punishment has "no place in civil copyright law."  Roughly one month ago, however, Cox filed a lawsuit in which the very first paragraph of the complaint concedes that "[t]he Copyright Act expressly provides for enhanced statutory damages to punish and deter such brazen and knowing violations of the law."  *Terrier Media Buyer, Inc. d/b/a Cox Media Group v. Dish Network, L.L.C.*, Case No. 20-cv-583, ECF No. 1, ¶ 1 (N.D. Ill. Jan. 24, 2020) (attached as Exhibit A).

The standard for remitting damages (or, alternatively, ordering a new trial) based on an allegedly excessive verdict is a "formidable" one.  *Sony BMG Music Entm't v. Tenenbaum*, Case No. 07-cv-11446-RWZ, 2012 WL 3639053, at *2 (D. Mass. Aug. 23, 2012), *aff'd*, 719 F.3d 67 (1st Cir. 2013) (denying remittitur of jury verdict against willful peer-to-peer copyright infringer).  Considering the evidence "in the light most favorable to the party who received the verdict . . . a trial court will not disturb a jury verdict for damages which have been impartially rendered and are dependent upon competent evidence." *Fairshter v. Am. Nat. Red Cross*, 322 F. Supp. 2d 646, 658 (E.D. Va. 2004) (denying motion to set aside jury verdict as excessive); *see also Shepard v. Capitol Foundry of Virginia, Inc.*, 554 S.E.2d 72, 75 (Va. 2001) (same and explaining verdict should only be set aside if "the jury has been motivated by passion, corruption or prejudice, or has misconceived or misconstrued the facts or the law" or the verdict "is not the product of a fair and impartial decision").

Constitutional review of a statutory damage award is similarly stringent.  *St. Louis, I.M. & S. Railway Co. v. Williams*, 251 U.S. 63, 67 (1919).  Given Congress's "wide latitude of discretion" in setting statutory damages, a within-range award violates due process only if it is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 907 (8th Cir. 2012) (quoting *Williams,* 251 U.S. at 67) (rejecting due process challenge to statutory damages against willful peer-to-peer copyright infringer).  Review of the jury's award here is "extraordinarily deferential—even more so than in cases applying abuse-of-discretion review." *Zomba Enters., Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 587 (6th Cir. 2007).

## ARGUMENT

**I.     Remittitur or new trial is not warranted.**

### A.  The evidence overwhelmingly supports the jury's award.

After determining that Cox willfully infringed, the jury was permitted to return a verdict anywhere from $750 to $150,000 per copyright.  17 U.S.C. § 504(c).  The jury carefully considered the evidence and instructions and returned a verdict of $99,830.29 per work—for a total of $1 billion for the 10,017 copyrighted works in suit.  The jury's verdict was well below the maximum amount of $150,000 permitted per work—which would have added up to $1,502,550,000 in damages, or more than 50% higher than the actual award.

Cox does not like the result.  But its arguments ignore mountains of evidence the jury considered.  Instead, Cox relies on hyperbole, facts and verdicts in unrelated cases, and its selective review and self-serving interpretation of the evidence.  This is plainly insufficient: to succeed on its motion, Cox must confront the worst evidence against it, viewed in the light most favorable to Plaintiffs, and justify a reduction or new trial based on *that*.  Cox has failed in this regard; indeed, it has failed even to address much of the evidence.  But the evidence was bountiful and damning and more than justified the within-range statutory award.

### 1.  P2P infringement on Cox's network was overwhelming, Cox knew it, and Cox never questioned the reliability of the infringement notices.

The jury heard compelling evidence that P2P infringement on Cox's network was overwhelming.  Nearly 13% of traffic on Cox's network was attributable to P2P activity, Tr. 1705:12-15 (Fuenzalida), and over 99% of P2P traffic is infringing, Tr. 1747:24-1748:13 (Lehr); PX 439.[2]  From 2012 to 2014, MarkMonitor alone sent Cox approximately 270,000 infringement

---

[2] Referenced trial exhibits have been submitted to the Court on a hard drive as Exhibit B, pursuant to ECF No. 696. Referenced trial testimony excerpts are attached hereto as Exhibit C.

notices, including more than 160,000 during the February 2013 through November 2014 claim period.  PX 14.  In total, Cox received nearly *5.8 million* infringement notices during the claim period, not counting millions more it blocked from Rightscorp.  PX 353 at 12-16; Tr. 1405:20-1406:4 (Beck).  Even this was a mere fraction of the true scope of infringement occurring through Cox's network.  All the witnesses (including Cox's experts) agreed that it is impossible to measure the true amount of infringement because of the viral nature of P2P distribution and the lack of a logging function.  Tr. 613:1-21 (Bahun); Tr. 452:16-454:5 (Frederiksen-Cross); Tr. 2834:8-23 (Tregillis); Tr. 2467:10-16 (Bakewell); Tr. 1752:13-1753:7 (Lehr).  And yet MarkMonitor still collected data showing "more than 10,000 infringements per day . . . related to subscribers or, you know, Cox customers."  Tr. 632:9-12 (Bahun).

It also is undisputed that P2P traffic is overwhelmingly infringing, and Cox knew that too.  The unrebutted evidence was that more than 99% of BitTorrent traffic is infringing.  PX 439 at 29-30; PX 521 at 36; Tr. 1749:25-1750:4 (Lehr).  The head of Cox's abuse department, Jason Zabek, confirmed as much when he said, "99 percent of DMCA violations is from people using peer-to-peer on purpose."  PX 264; Tr. 1265:22-1266:1 (Zabek).  Or as Zabek put it more pointedly:  "Bittorrent is used for one thing only ... and I would know. ;-)"  PX 318.

Cox knew it had a staggering infringement problem, as the rate of incoming DMCA notices increased exponentially year over year.  PX 240.  Cox's senior security architect, Matt Carothers, observed that "[w]e are getting crushed" by DMCA notices reporting infringement on Cox's network.  *Id*.  And he confirmed that Cox "took those allegations to be fair and proper infringement notices" and never questioned their accuracy or reliability.  Tr. 1609:21-1610:3 (Carothers).  According to Randall Cadenhead, Cox's internal lawyer overseeing the company's so-called "graduated response" program, "Cox recognized that there was a real issue and a real

problem with, with copyright infringement" and "customers were infringing and almost certainly knew they were infringing and needed to stop." Tr. 2080:5-6, 2084:16-18 (Cadenhead).

> **2. Cox paid lip service to copyright enforcement but its assurances of compliance were meaningless.**

The trial evidence repeatedly showed that Cox said one thing and did another. The examples are legion. Cox had an Acceptable Use Policy ("AUP") that prohibited use of its network for copyright infringement. PX 175, PX 178. But the evidence showed that Cox allowed subscribers to infringe unfettered.[3] Cox said it had a policy that led to termination. But the evidence showed that Cox applied an unwritten policy that undid terminations, and then stopped terminating for infringement altogether. *E.g.*, PX 253, PX 316, PX 351 at 25-27. Cox said internet service was too precious to terminate lightly and it could never terminate business customers because they include hospitals and schools. But the evidence showed that Cox terminated over 619,000 customers—including 22,000 business customers—who were a month or so late on their bills. Tr. 2754:17-21 (Mencher); PX 365 at 17.

Cox also told copyright owners that it "takes all reported abuse complaints seriously" and "if we find that a Customer is in violation of [our] policies, that we will take the necessary action to stop the activity in question." PX 7. The evidence directly contradicted this. What Cox actually did was delete *3.7 million* (or 64%) of the 5.8 million notices it received during the claim period, and took *no customer facing action at all for an astonishing 90% of notices it*

---

[3] *See, e.g.*, PX 547 (infringement ticket history of residential customer with 67 tickets, 28 warnings, 23 hard limit replies with no customer-facing action, 9 suspensions, 9 reactivations, 0 terminations); PX 545 (infringement ticket history of residential customer with 72 tickets, 7 warnings, 1 suspension, 1 reactivation, 0 terminations, and no warnings at all on first 23 tickets); PX 549 (infringement ticket history of fraternity/business customer with 67 tickets, 48 warnings, 9 hard limit replies with no customer-facing action, 0 suspensions and 0 terminations); Tr. 1442:3-1453:24 (Beck).

*received.*  PX 351, PX 353, PDX Beck at 2.[4]  For the cherry on top, Mr. Zabek and his top lieutenant crowed "f the dmca!!!" and "F the DRC!" (Digital Rightscorp) when celebrating the "silent deletion" of infringement notices and Cox's imposition of hard limits on all complainants. PX 335.  And Cox's own head of marketing, Sidd Negretti, agreed that creating an AUP but refusing to enforce it to provide more value to customers, as the evidence showed Cox did here, "essentially builds to fraud."  Tr. 1920:22-1922:20 (Negretti).  It is hard to imagine taking abuse complaints any less seriously or disrespecting copyright laws any more, and the jury agreed.

### 3.  As infringement on Cox's network skyrocketed, Cox gutted the abuse department and relaxed its infringement policies.

#### i.  Cox slashed the abuse team.

Rather than expanding its abuse team to address the onslaught of infringement and DMCA notices, Cox did the opposite.  It slashed the Technical Operations Center ("TOC") abuse team from 14 to nine members and, ultimately, a piddly four.  PX 197; Tr. 1115:14-1116:4 (Vredenburg); Tr. 1330:14-25 (Zabek).  It also reduced the TOC operating hours, Tr. 1116:20-1117:4 (Vredenburg), and cut the corporate abuse team that handled escalations from TOC from five to two.  Tr. 1326:5-23 (Zabek).  Cox knew it had a problem, so "[t]o deal with the decrease in personnel, Corp Abuse has placed more automation on DMCA complaints…. increase[ing] the number of times a customer can 'self re-activate' for a DMCA complaint …"  PX 197 at 3. All the while, Cox had more than 20,000 employees companywide and was reaping billions in revenues and profits.  PX 451; PX 443.  It clearly had enough resources for adequate staffing; instead it stripped the teams to a skeleton crew to increase its already outsized profits.

---

[4] PDX refers to Plaintiffs' Demonstrative Exhibits, which are attached hereto as Exhibit D.

### ii.   Cox ignored the first notice to each subscriber.

Cox relieved some of the burden on its decimated abuse team by ignoring the first infringement notice to each subscriber.  Cox's purported rationale for this was Mr. Carothers' unsupported say-so that doing nothing was as effective as doing something.  PX 240; Tr. 1559:19-1560:8, 1610:22-24, 1615:5-1616:22 (Carothers).  The jury understood the patent absurdity of this theory, including why Cox conveniently produced no documents to support it—because there are none.  That Cox would ignore *any* notices contradicts its claim that its graduated response system was designed to "educate" subscribers.  It is also directly at odds with Cox's statement to its customers that "Cox is responsible under the Digital Millennium Copyright Act, DMCA, to advise when we receive a notice asserting infringement by you."  PX 32A; Tr. 1419:14-1420:25 (Beck).  It clearly did not do that.

### iii.   Cox imposed arbitrary caps on the number of notices it would accept.

Cox ignored the first notice to each subscriber, but it couldn't ignore all of them.  So instead it capped the number of notices it would accept from any copyright holder to a default limit of 200 per day, reluctantly increasing it to 600 for the RIAA over time.  Cox then ignored all notices sent over a complainant's cap, closing those tickets automatically with no customer-facing action.  Tr. 1412:17-1414:19 (Beck).  As a result, Cox gave the subscribers identified in Plaintiffs' infringement notices *46,997 free passes* based on Cox's hard limits.  Tr. 1412:20-1413:7 (Beck); PX 19.  That is 46,997 times that Cox failed to pass on an infringement notice to the subscriber, failed to warn, failed to suspend, failed to educate about the perils of their infringement, failed to terminate, and failed to advance the subscriber to the next stage of Cox's graduated response.  Tr. 1412:17-1419:14 (Beck).

RIAA even told Cox that it was finding vastly more infringements than the cap allowed. For example, in a single day RIAA identified "3,606 infringements [for which] we were not able to send a notice to Cox because they had instituted this unilateral cap," Tr. 315:19-20 (Marks), and over the course of a year Cox prevented RIAA from sending notices for fully 77% of infringements found.  PX 257; PDX Marks; Tr. 316:9-17 (Marks).  Extrapolated over the claim period, that's nearly a million notices not sent to Cox due to the cap.

One example illustrates the damaging consequences:  in a single day, one copyright owner sent Cox 3,700 notices about Cox's subscribers' infringements.  The hard limit at the time was 200, PX 310, so Cox ignored *3,500 tickets* with no customer-facing action.  Mr. Beck, Cox's lead software engineer handling abuse issues, described this as "no big deal" because it was not causing a technical problem for the Cox Abuse Tracking System (CATS).  PX 310; Tr. 1415:16-1417:12 (Beck).  But it was a huge deal for the copyright holder whose rights were infringed. And as Dr. Terrence McGarty explained, "the system from a technical perspective could have easily handled a substantially larger number of complaints."  Tr. 2883:11-17 (McGarty).  Yet instead of processing more notices and addressing infringement, Cox's approach was simply "TO CAP THESE SUCKERS!"  PX 251; Tr. 1653:3-9 (Sikes).  Cox had no justifiable reason for setting hard limits.  But it amply demonstrated the company's deep disrespect for copyrights.

### iv.   Cox blacklisted complainants and deleted millions of notices.

Cox also blacklisted complainants based on its meritless contention that a copyright holder's proposed settlement of infringement claims within a DMCA notice was, somehow, an extortionist "shakedown."  Based on this blacklist, Cox "silently deleted" nearly *3.7 million* notices—*64% of all notices*— that Cox received during the claim period.  PX 353 at 13-16; PDX

9

Beck; PX 335; Tr. 1396:9-1397:9 (Beck).  That's 3.7 million DMCA notices that Cox ignored, excluding the millions more it blocked from Rightscorp.  Tr. 1392:10-20, 1394:5-18 (Beck).

### v.  Cox infinitely extended the graduate response program.

Cox also set up sham policies and procedures that provided a safe haven for infringers. In 2004, Cox had a three-strike policy, pursuant to which a subscriber caught infringing three times would be terminated.  PX 203 at 4-5; Tr. 1110:13-21 (Vredenburg).  In the ensuing years, Cox extended the policy for residential subscribers to 10 strikes, then 12 strikes, and ultimately 13 strikes before it would even *consider* termination.  PX 165 at 11; PX 174 at 13; PX 179 at 11.

By 2012, Cox had expanded its graduated response for residential customers to 14 steps, including: (i) ignoring the first notice; (ii) combining multiple notices into a single ticket; (iii) sending automated, warning emails for the next seven notices; and (iv) issuing faux "suspensions" of customers for the next four notices to a so-called "walled garden," from which the customer could self-reactivate with a simple click-through or call to Cox.  Shortly after announcing some of these changes, Mr. Zabek described them honestly in an email to the abuse team: "I think we didn't help anyone with this action (expect [sic] the law breaking customers)." PX 242.  The evidence overwhelmingly demonstrates that Cox knew its customers were breaking the law and that its ever-more-accommodating policies were fostering the infringement.

For business customers, the policy was even more outrageous.  There, Cox moved from a mandatory four-strike policy where "the account is terminated with no recourse to get their HSI [High Speed Internet] service back" to a never-suspend and never-terminate policy.  *See* Tr. 1641:4-23, 1642:11-1645:8 (Sikes); PX 164 at 5-6; PX 172 at 5-7; PX 181 at 5-7; PX 19.  Cox acknowledged in the policy that "there may be excessive violations" by business customers but "it is not likely that we would terminate a CB [Cox Business] customer for DMCA violation."

PX 181 at 7.  The net result was impunity to infringe, with residential subscribers infringing up

to a hundred times and business customers infringing hundreds or thousands of times in the years

at issue.  Tr. 1781:14-20, 1783:17-25 (Lehr).

Cox's consistent refrain was that its business customers represent "critical infrastructure,"

such as hospitals and military bases, that could not be subjected to suspensions or terminations.

The trial evidence revealed Cox's argument, much like its copyright abuse policies, to be a sham.

The overwhelming majority of its business customers were entities like Sal's Seafood and

Chicken, Underground Audio, or fraternities.  DX 358; Tr. 2510:13-2512:14 (Jarchow).  The

*only* evidence presented was that Cox had no idea how its business customers used Cox's

network, with one exception:  one hospital used Cox's service for public WiFi only—not for any

lifesaving, patient-facing applications.  Tr. 2516:11-24 (Jarchow).  Moreover, as Plaintiffs'

expert, Dr. McGarty, explained, hospitals tend to "have their own parallel internet network"

called "Internet2," while the Department of Defense has a "private secure version of the internet"

called MILNET—both of which operate separate and apart from commercial internet services

like Cox.  Tr. 2880:3-20, 2881:4-25 (McGarty).

### vi.   Cox limited daily suspensions.

Cox's "14-strike" program was further nullified when the company set a daily limit of

300 for the maximum number of suspensions it would issue per day across all abuse types.  PX

235; Tr. 1313:1-1314:11 (Zabek).  That limit was routinely hit by 9 a.m., after which subscribers

who should have been suspended got a free pass with a simple email warning.  PX 237.

Although Mr. Zabek confirmed "[t]hese customers really should be suspended," he instructed his

team to simply "send a warning letter" to avoid getting "really backed up" on customer care

calls.  *Id.*  As he explained it, Cox could "send them 1000 warning letters" to "put off the inevitable for a while (suspension)."  PX 236.

### vii.   Cox manufactured "unwritten semi-policies" on termination.

Cox had several internal-only policies that made a mockery of terminations for copyright infringement.  For years, it imposed "soft terminations" with immediate reactivation and, incredibly, a clean slate for infringers.  PX 253; Tr. 1275:19-1277:19 (Zabek); Tr. 1676:16-1677:23 (Sikes).  As Mr. Zabek told his abuse team, "[a]s long as our process of warnings, suspendtion [sic], then termination is followed, we can turn the customer back on and start the DMCA count over."  PX 245.  Mr. Zabek explained that "This is to be an unwritten semi-policy... We do not talk about it or give the subscriber any indication that reactivating them is normal."  PX 253.  He candidly explained Cox's motivation:  "[t]his way, we can collect a few extra weeks of payments for their account. ;-)."  PX 266.  Cox knew "[t]his gives the customer 10 chances to share files before they even have to talk to us…again."  PX 316.  Cox could not have cared less about the rights of copyright holders—it only wanted "to do what is right for our company and subscribers."  PX 253.

Cox eventually shifted from this absurd reactivation policy.  As Joseph Sikes, the second in command of the abuse group, explained: "[n]ow, when we terminate Customers, we REALLY terminate the Customer (for 6 months)."  PX 322.  But this new policy came with another change:  Cox simply stopped terminating infringing subscribers altogether.  The result:  Cox received nearly 5.8 million infringement notices in the claim period and terminated a total of 20 subscribers for copyright infringement.  PX 351 at 26-27; PDX Beck at 2.  Between 2012 and 2014, of the roughly 57,600 Cox customers identified in Plaintiffs' infringement notices, Cox

terminated just 13.  PX 19; Tr. 803:13-19 (McCabe).  Even with Cox's limits on infringement

notices, thousands of Cox's customers appeared in a dozen or more notices from Plaintiffs.  *Id.*

### 4.  Cox prioritized profits over limiting infringement.

Time and time again, Cox made clear that it unreasonably prioritized collecting

subscription fees from infringers over addressing its rampant infringement problem.  Email after

email from Cox's abuse team demonstrated this:  "This customer will likely fail again, but let's

give him one more change [sic]. he pays 317.63 a month."  PX 347.  In another example, Mr.

Sikes explained that "[t]his Customer pays us over $400/month and if we terminate their internet

service, they will likely cancel the rest of their services."  PX 342 at 3.

The examples go on.  A top-level abuse engineer, Roger Vredenberg, presented Mr.

Zabek with "another example of an habitual abuser.  In a year was terminated twice and turned

back on.  I suspended him again…."  Mr. Zabek responded: "It is fine.  We need the customers."

PX 277.  Mr. Sikes also repeatedly explained that Cox was "'soft terminating' for DMCA

because we didn't want to loose [sic] the revenue," PX 305, and described a "soft termination" as

"a suspension that is called a termination with the likelihood of reactivation for DMCA - we do

not want to loose [sic] the revenue."  PX 303.

Mr. Zabek instructed the Cox abuse team to give repeat infringers a "clean slate"

following Cox's soft termination and reactivation so that Cox "could collect a few extra weeks of

payments for their account ;-)."  PX 266.  He instructed his team "to hold on to every subscriber

we can" and to "keep customers and gain more RGU's" (*i.e.*, revenue generating units, otherwise

known as subscribers).  PX 253, PX 245.  With this guidance, Messrs. Zabek and Sikes "set the

tone for the abuse group" and provided "direction for the TOC team handling abuse issues on a

day-to-day basis."  Tr. 1108:10-16 (Vredenburg).

By contrast, Cox did not hesitate to terminate users when its profit motives were not being served, *i.e.*, for non-payment.  In 2013 and 2014 alone, Cox disconnected internet service for almost 620,000 subscribers, or approximately 25,000 per month, for failure to pay their bills.  PX 365 at 17.  In comparison, and notwithstanding receiving millions of infringement notices, Cox terminated just 32 subscribers in the same period for copyright infringement.  PX 365 at 12.[5]

### 5.  Cox's profits were staggering, both overall and from infringement.

The result of all these decisions was to line Cox's coffers with billions of dollars each year.  In 2013-2014 alone, Cox earned $19.5 billion in revenues and $8.3 billion in net profits from its residential and business customers—a staggering 43% profit margin.  Tr. 1759:5-18 (Lehr).  "For the years ended December 31, 2014, 2013 and 2012, Cox paid dividends to its shareholders of $1.0 billion, $1.5 billion and $1.4 billion, respectively."  PX 443 at 49.  Those billions in dividends represent the "cash that Cox was able to take out of the business as it was growing in the 2012 to 2014 period."  Tr. 2753:19-22 (Mencher).  Even subtracting the $1 billion in damages the jury assessed, Cox will retain $18.5 billion in net profits for the claim period alone, including an astonishing $2.9 billion in cash dividends paid out to its owners.  The jury understood how profitable Cox's business is and reasonably could have considered that in assessing an award that would have a sufficient deterrent effect on Cox.

As Dr. William Lehr explained, actual damages in this case are impossible to quantify for numerous reasons, including because the full extent of infringement is unknown and unknowable.  Tr. 1751:5-1755:11 (Lehr).  Cox's expert Christian Tregillis, concurred.  Tr. 2831:22-2832:11, 2834:21-23 (Tregillis).  The jury remained free to consider the evidence before

---

[5] Sixteen of those 32 terminations occurred in the 4th quarter of 2014, after the *BMG* case was filed on November 26, 2014.

it that weighed on Plaintiffs' economic harm and Cox's gains from the infringement—including Dr. Lehr's observation that Cox received $208 million in revenue from the subscribers caught infringing at least three times in just a couple years.  Tr. 1776:18-1777:5 (Lehr); PDX Lehr at 14.

It was also undisputed that, by not terminating the accounts of known repeat infringers, Cox received substantial additional subscription revenues that it would not have otherwise obtained, and avoided costs it would have otherwise incurred.  Tr. 1770:1-1799:6 (Lehr); Tr. 2461:10-2466:12 (Bakewell).  For example, Cox billed a residential subscriber who was the subject of at least 101 infringement notices $8,594 from February 2013 through 2016—all of which Cox billed *after* it received at least 13 infringement notices for that subscriber.  Tr. 1780:13-1782:21 (Lehr); PDX Lehr at 17.  Dr. Lehr presented other similar examples of business customers billed $706,434 and $12,525, respectively, after those customers received 13 infringement notices.  Tr. 1783:17-1784:21 (Lehr); PDX Lehr at 18-19.  The jury understood that "there's a number like this for each of the different subscribers" and there "were close to 60,000 subscribers that have a different number like this."  Tr. 1782:22-1783:14 (Lehr).  The jury reasonably could have concluded *all* of that was attributable to the infringement.

### B.  The statutory damages factors and relevant caselaw make clear that the jury's award is justified and should stand.

The Court properly instructed the jury on a list of non-exhaustive factors it "may consider" and that it "should award as statutory damages an amount that you find to be fair under the circumstances."  Tr. 2927:8-2928:1.  *See also Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 503-04 (1st Cir. 2011) (approving instructions that jury should consider what was "just" in assessing statutory damages, guided by a "set of non-exhaustive factors").  Cox's tactic of comparing the overall verdict to individual statutory factors in a vacuum ignores this proper instruction, the totality of the circumstances, and the purpose of statutory damages.

15

Congress drew a plain distinction between actual and statutory damages, making clear—contrary to Cox's suggestion—that the availability of statutory damages is *not* contingent on the demonstration of actual damages, including lost revenue, illicit profits or any other particularized measure of harm. *See* 17 U.S.C. § 504. A key function of statutory damages is to address situations where "no actual damages are proven or they are difficult to calculate." *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1126 (2d Cir. 1989). Indeed, statutory damages are available even for "uninjurious and unprofitable invasions of copyright." *F.W. Woolworth Co., v. Contemporary Arts*, 344 U.S. 228, 233 (1952).[6] The jury thus has "wide" discretion, and the "necessary flexibility to do justice in the variety of situations which copyright cases present[,]" so long as it stays within the statutory range. *Id.* at 232.

*Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488 (4th Cir. 1996), is instructive and controlling here. After a jury awarded maximum statutory damages against a willful copyright infringer, the defendant argued that "statutory damages must bear some reasonable relationship to the amount of actual damages and 'should not amount to a windfall or punishment.'" *Id.* at 496. The defendant further argued that his gross revenue from the sale of the allegedly infringing items was "roughly $10,200," the plaintiff could not prove any damages, and the jury award of $400,000 was more than double the combined net income of the defendant for a two-year period. *Id.* at 496. The Fourth Circuit rejected those contentions, holding that the "jury had ample evidence from which to conclude that illegal copying of

---

[6] The courts of appeal universally recognize that there is no required relationship between actual and statutory damages under 17 U.S.C. § 504(c). *See Capitol Records*, 692 F.3d at 909; *Tenenbaum*, 660 F.3d at 507; *Superior Form New Form, Inc. v. Tekila Films, Inc.,* 357 Fed.Appx. 10, 11–12 (9th Cir. 2009); *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.,* 74 F.3d 488, 496–97 (4th Cir. 1996); *see also Lowry's Reports, Inc. v. Legg Mason, Inc.,* 302 F.Supp.2d 455, 460 (D. Md. 2004).

competitors['] mannequins was a course of business for [defendant] and that the maximum statutory damages was suitable." *Id.* at 497.  Cox is no different:  its knowing facilitation of mass infringement "was a course of business" for Cox, the statutory award was less than Cox's profits by any measure, and the jury stopped well short of maximum statutory damages.

*Psihoyos v. John Wiley & Sons, Inc.* 748 F.3d 120, 126 (2d Cir. 2014), is also on point. There, the defendant argued that copyright statutory damages awards of $100,000 and $30,000 per work "bears no rational relationship to the plaintiff's actual loss," and is "an epitome of a run-away award"—the identical argument Cox makes here.  *Id.* at 126.  Affirming the awards, the Second Circuit explained that although "revenue lost is one factor to consider, we have not held that there must be a direct correlation between statutory damages and actual damages.  To suggest otherwise is to ignore the various other factors a court may consider and the purposes of statutory damages in the willful infringement context."  *Id.* at 127.

Apart from harm, a jury may also consider the need for deterrence.  Where the award is within the statutory range, as here, the need for deterrence can comfortably justify the award. *See, e.g.,  Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261, 273 (5th Cir. 2020) (collecting cases and explaining deterrent effect on infringer may be considered); *Kepner-Tregoe, Inc. v. Vroom*, 186 F.3d 283, 289 (2d Cir. 1999) (affirming award of maximum statutory damages and attorneys' fees for willful infringement as "in line with the statutory goal of deterrence"); *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 634 (S.D.N.Y. 2018) (denying remittitur of $100,000 per work statutory award for willful copyright infringement, stating that "[s]tatutory damages serve multi-faceted purposes, including compensating the owner, penalizing the infringer, and deterring future infringement.").

17

Cox concedes deterrence is an appropriate factor, but then inappropriately relies on *BMW of North America v. Gore*, 517 U.S. 559 (1996), to argue a lower deterrent award is required. Mot. at 15. But *Gore* sets forth the standard for constitutional review of *punitive* damages, not review of a *statutory* damage award. *See, e.g.*, *Capitol Records*, 692 F.3d at 909 (holding that application of *Gore* to statutory damages would be "nonsensical"); *John Wiley & Sons*, 327 F. Supp. 3d at 636 (finding *Gore* "inapplicable to statutory damages awards" and citing cases). Statutory damages do not implicate *Gore*'s concern that a defendant have fair notice of the severity of the potential penalty, *see* 517 U.S. at 574, because the statute itself provides fair notice. *Tenenbaum*, 719 F.3d at 70; *Capitol Records*, 692 F.3d at 907-08.[7]

Cox also argues that the award is far too high to be justified by deterrence because "a rational commercial enterprise will stop an activity when its costs substantially exceed its benefits." *Id.* at 16. But Cox ignores that it did not act remotely rationally—it willfully flouted the laws, denies to this day that it did anything wrong, and still blames the victims and everyone else in sight. Regardless, deterrence by its nature is designed to be forward-looking, a signal to other infringers or potential infringers. Cox already did what it did, and is facing the consequences. And now that other businesses similarly situated to Cox understand those consequences, they may well act rationally and stop facilitating or ignoring infringement on their systems. *See. e.g., Agence France Presse v. Morel*, Case No. 10-CV-2730 AJN, 2014 WL 3963124, at *11 (S.D.N.Y. Aug. 13, 2014) (denying remittitur of copyright statutory damages,

---

[7] *Gore*'s "guideposts cannot logically apply to an award of statutory damages under the Copyright Act." *Tenenbaum*, 719 F.3d at 71. For example, applying the ratio of punitive damages to actual harm inflicted to a statutory damages award makes no sense because "statutory damages are designed precisely for instances where actual harm is difficult or impossible to calculate." *Capitol Records*, 692 F.3d at 908. Nor does it make sense to consider the difference between the award and the authorized civil penalty, because "an award of statutory damages is by definition an authorized civil penalty." *Id.*

noting that the factors to be considered include "the deterrent effect on the infringer and third parties"); *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, Case No. 13-cv-816, ECF No. 435 at 3117:13-15 (S.D.N.Y. Apr. 4, 2018) (instructing jury that "[i]n considering what amount would have a deterrent effect, you may also consider defendants' total profits and the effect the award may have on other sellers in the marketplace.").

Cox next argues that the circumstances of the infringement "weigh[] heavily" against the jury's verdict, and it dismisses the jury's willfulness finding with the curious suggestion that its misconduct was even worse in the *BMG* case. Mot. at 13-15. But what Cox re-casts as its "infringement-reduction efforts," the jury rightly saw as the worst of Cox's misconduct. And its misconduct in the *BMG* case was also on display here. Cox rigged its system so that it could profit as a safe haven for infringers. It failed to take any customer-facing action on 90% of the notices it received in the claim period and deleted 64% (or 3.7 million) of them. Cox wants credit for "processing" some RIAA notices, but has no idea how many it threw away concerning the same subscribers identified in Plaintiffs' notices. And it cannot defend the nearly 50,000 free passes it gave the infringing subscribers at issue based on its senseless "hard limit" policy, its decision to "ignore" the first notice to each subscriber, its never-suspend and never-terminate policies towards business subscribers, or any of its other self-serving decisions.

To put it bluntly, Cox's policies and procedures were a sham. The jury rightly understood that because of Cox's actions and decisions, repeat infringement carried virtually no consequence and Cox profited handsomely as a result.

## C. The jury already rejected Cox's numbers games.

Cox presents the Court with a series of acrobatic calculations supposedly addressing Plaintiffs' economic harm and Cox's ill-gotten gains. Mot. 7-11, 17-18. Most of these

calculations were never presented to the jury and should be rejected on that basis alone.  Instead, Cox presented the jury with other dizzying financials through its experts, Christian Tregillis and Christopher Bakewell.  Cox also attacked Plaintiffs' expert, Dr. Lehr, and his analysis.  The jury considered all the evidence and rejected Cox's positions, and Cox is not entitled to a do-over.

Nonetheless, Cox argues that the evidence showed that its profits from the infringement were a "tiny fraction of the billion-dollar award" and there was "no evidence" to show Cox saved any expenses or Plaintiffs lost any revenues.  On the contrary, the evidence showed that Cox earned hundreds of millions of dollars from infringing subscribers, including substantial payments from subscribers *after* repeated infringement.  *See supra* Section I.A.5.  The evidence showed that Cox "wouldn't have billed or collected any revenue for internet service" from subscribers that it terminated.  Tr. 2461:10-15 (Bakewell).  The evidence showed that MarkMonitor's infringement notices represented just a snapshot of the larger infringing activity occurring, Tr. 632:9-12 (Bahun); that 13% of Cox's total network traffic was from P2P activity, Tr. 1705:12-15 (Fuenzalida); and that 99% of P2P activity is infringing.  PX 439.  The evidence showed that infringing P2P activity consumes significant bandwidth and creates the need for subscribers to purchase more expensive plans, with higher monthly payments for Cox.  Tr. 1788:15-1791:4 (Lehr); Tr. 2467:17-25 (Bakewell); PX 214.  The billing data for Cox's infringing subscribers is corroborative, as subscribers with lots of infringement tickets paid Cox more, on average, than subscribers with few.  Tr. 1792:11-1793:10 (Lehr).  And the evidence showed that Cox saved costs by not taking infringement seriously—including at least through reduced personnel and customer service costs and the avoided cost to purchase an unlimited license for its subscribers to infringe.  Tr. 1795:5-1796:4 (Lehr).  The net result of this and other

Case 1:18-cv-00950-LO-JFA   Document 697   Filed 02/28/20   Page 25 of 35 PageID# 30260

evidence is that the jury was justified in concluding that Cox earned substantially greater profits from infringement than the available data revealed.

Due to the nature of the infringement, there was no single overall figure before the jury as to Cox's profits from the infringement, Plaintiffs' lost revenues from the infringement, or the expenses Cox saved because of the infringement. Nor could there be. Records simply do not exist as to the quantity of infringing downloads or distributions by Cox users over the P2P networks. Plaintiffs' and Cox's technical, financial and other witnesses testified unanimously on that point. *See, e.g.*, 2834:21-23 (Tregillis); 1752:13-1753:7 (Lehr). Even Cox's damages expert agreed that he conducted his woefully low actual harm analysis "without knowing the whole universe of distributions" and he "didn't attribute any monetary amount for that." Tr. 2835:3-10 (Tregillis). "The jury also heard evidence from which it could rationally conclude that the value of a blanket license to upload music recordings to the internet for public consumption would be 'enormous.'" *Tenenbaum*, 2012 WL 3639053, at *2; *see also* Tr. 227:21-228:2 (McMullan) (licensing consumers to distribute via P2P would directly compete with legitimate sales).

**D. The facts of *this* case are what matter in assessing the verdict.**

There is no merit to Cox's contention that the jury's damage award must be remitted to align with other copyright cases it cites. Mot. at 2-6. Cox provides no precedent for its request that the Court reduce the award to be commensurate with "similar cases," nor has it even tried to explain how this case is remotely similar to the cases it cites—nor could it. Each case is unique and must be tried and decided on the facts and merits presented in *that case*, not another. Indeed, comparing jury verdicts in different cases is "not greatly helpful because each case must be evaluated as an individual one, within the framework of its distinctive facts." *See Vanskike v.*

*Union Pac. R.R. Co.,* 725 F.2d 1146, 1150 (8th Cir. 1984) (rejecting new trial request and invitation to compare verdicts from other cases).

Cox still fails to grapple with the distinctive facts of this case or its alarming misconduct that was fully on display: this case involves over *10,000 copyrighted works*, numerous Plaintiffs, and a willfully infringing defendant with many billions in profits per year. Cox's willful misconduct spanned years and caused incalculable monetary losses and other harms to Plaintiffs and their artists and songwriters, including due to the viral nature of the infringing activity. *See supra* Section I.A. The jury also heard evidence about devastating industry harms and could reasonably infer that the infringement on Cox's network was a component of Plaintiffs' multi-billion dollar losses, the shuttering of record labels and publishing companies, and mass layoffs across the music industry. Tr. 1195:9-1196:11, 1197:8-15 (Flott); PX 486. Against this backdrop, the figures Cox puts forward in arguing for remittitur are nonsensically low.

There is also no basis for Cox's argument that secondary infringers should inherently face lower awards than direct infringers. Mot. at 3-5. Secondary infringers are infringers. They do not pay "secondary" damages. They pay damages, full stop. Even Cox did not request a special instruction to account for this false distinction. In fact, some secondary infringers ought to face higher damages. While a direct infringer may be innocent, non-willful or impecunious, Cox was the hub that knowingly facilitated and profited from widespread infringement of many, despite having the right and ability to stop it.

## II.     The jury's verdict is constitutionally sound.

Cox's constitutional challenge fails for largely the same reasons as above. In light of Cox's egregious misconduct, the award appropriately balances the statutory goals of compensation, deterrence and penalty against constitutional concerns of due process.

As Cox acknowledges, the standard that governs a due process review of a copyright statutory damage award was set forth in *St. Louis, I.M. & S. Railway Co. v. Williams*, 251 U.S. 63, 67 (1919). *See also Tenenbaum*, 719 F.3d at 70-71 (applying *Williams* standard, rejecting *Gore*-line of punitive damage due process cases); *Capitol Records*, 692 F.3d at 907-08 (same); *Zomba*, 491 F.3d at 587-88 (6th Cir. 2007) (same). Review of a jury's damage award under *Williams* "is extraordinarily deferential—even more so than in cases applying abuse-of-discretion review." *Zomba*, 491 F.3d at 587.

In *Williams,* the Supreme Court considered a challenge to an Arkansas statute that subjected railroads to penalties of $50 to $300, plus costs, for each offense of charging passengers fares that exceeded legal limits. 251 U.S. at 64. After the railroad collected from two passengers a fare of 66 cents more than the law allowed, the passengers sued. *Id.* Each passenger obtained a judgment of $75, plus fees. Recognizing that legislatures possess "wide latitude of discretion" in setting statutory damage ranges, *Capitol Records*, 692 F.3d at 907 (quoting *Williams*), the Supreme Court affirmed awards that were roughly 113 times the illicit charge and well within the statutory range. *Williams*, 251 U.S. at 66-67. *Williams* teaches that statutory damages are "imposed as a punishment for the violation of a public law, [and] the Legislature may adjust its amount to the public wrong rather than the private injury, just as if it were going to the state." *Capitol Records*, 692 F.3d at 909. Congress did just that in setting the range for copyright damages and Cox has identified no basis to depart from the jury's measured judgment in light of the evidence. *See John Wiley & Sons*, 327 F. Supp. 3d at 635 (jury "exercised its discretion in awarding $100,000 out of a possible $150,000 on Plaintiffs'

copyright claims.  Under these circumstances, an award of this magnitude was foreseeable and is not 'so severe and oppressive as to be ... obviously unreasonable.'".[8]

Cox argues, based solely on its own say-so, that the verdict is "untethered to any conceivable compensatory or deterrent purpose."  Mot. at 20.  This completely ignores that "Congress placed an upper bound on the damages that a jury can award, which mitigates the risk of a truly untethered award."  *Morel*, 2014 WL 3963124, at *15 (affirming maximum statutory award for willful copyright infringement).  Cox's declaration of its "low culpability" could not be more antithetical to what the jury observed and considered.  Cox maintains it "misappropriated nothing" and any benefit "was indirect."  But the jury specifically found that Cox derived a "direct financial benefit" in holding Cox vicariously liable.  Cox also maintains that "there was no authority to suggest that an ISP's failure to terminate a subscriber could or would give rise to secondarily liability."  Mot. at 21.  That contention is downright frivolous: secondary liability squarely prohibited Cox's actions in knowingly assisting infringers and profiting therefrom; and Cox's sole reason for pretending to comply with the DMCA was to avoid that liability.

Cox next contends that the award "may be" disproportionate because it aggregates many individual statutory awards.  Mot. at 20.  In support, Cox cites dicta in *Parker v. Time Warner Entertainment Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003), to shoehorn *Gore*'s punitive considerations into the statutory damages context.  But *Parker* does not remotely support Cox's

---

[8] Cox also repeats its mistaken argument that a constitutional challenge requires comparison to other damage awards.  It does not.  *E.g., Warner Bros. Entm't v. X One X Prods.*, 840 F.3d 971, 977 n.2 (8th Cir. 2016) (rejecting argument that statutory damage awards must be compared to those in other cases to comport with due process); *Capitol Records*, 692 F.3d at 906-10 (analyzing whether an award of statutory damages comported with due process without considering awards in other cases).

contentions and *Gore* does not apply.  *See supra*.  The concern in *Parker* was unique to the prospect of a mammoth class action, with potential class members totaling 12 million in 23 states.  *Id.* at 21.  Even then, the court found the potential due process concern "hypothetical." *Id.* at 22; *see also Arista Records LLC v. Usenet.com, Inc.*, No. 07 Civ. 8822(HB), 2010 WL 3629587, at *4-5 (S.D.N.Y. Sept. 16, 2010) (rejecting due process challenge to copyright statutory damages award and distinguishing *Parker* as only relevant to class actions).

Cox cites a single case finding a statutory damage award unconstitutionally excessive under *Williams*, Mot. at 21-22 (citing *Golan v. FreeEats.com*, 930 F.3d 950 (8th Cir. 2019)).  But *Golan* is inapposite.  If anything, it actually supports the jury's verdict here, both in light of statutory differences and the facts.  The Telephone Consumer Protection Act ("TCPA") imposes a *flat* statutory award of $500 per violation, with no room for variation based on factual circumstances.  This meant that the *Golan* jury had no flexibility to adjust the $500 per violation award to reflect the particularized misconduct at issue.  The TCPA's sheer inflexibility led the Eighth Circuit to find that the aggregate award of *$1.6 billion* based on *one week's* worth of robocalls to *willing participants* would violate due process in *Golan*.  *Id.* at 962-63.

The Copyright Act is quite different.  Copyright statutory damages awards can range anywhere from $750 to $150,000 per work infringed (or even down to $200 per work for innocent infringement).  Congress's scheme confers on the jury broad discretion to reduce or increase the award based on numerous factors, including the defendant's culpability.  Unlike in *Golan*, the jury here was able to employ its discretion as it performed its factfinding, followed the Court's instructions, and set a reasoned damage award within the permissible range.

*Golan* also differs from this case for other reasons.  The unlawful activity in *Golan* took place within a single week, a far cry from Cox's multi-year pattern of misconduct.  The

defendant in *Golan* had prior permission to call the recipients of its robocalls, thus establishing a

plausible basis to believe its conduct was lawful.  Cox engaged in unlawful behavior on a willful

basis, as set forth in detail above.  In addition, 93% of the robocall recipients in *Golan* hung up

by the third question, thus minimizing any harm.  As a result of Cox's misconduct, in contrast,

its network was a safe haven for infringers for years.  Cox users illegally uploaded and

downloaded Plaintiffs' works, with no limits on further downstream distributions, after Cox

knew they were infringing but did nothing.  Finally, Cox is a massive, multi-billion dollar

company—the eighth largest ISP in the nation—thus, triggering different issues than in *Golan*

concerning the amount needed for deterrence.[9]

### III.   Cox's attack on the jury instructions and evidentiary rulings is meritless.

Cox next seeks remittitur based on challenges to two of the non-exhaustive factors listed

in the Court's statutory damages instructions (punishment and deterrence) and one evidentiary

ruling (admitting evidence of Cox's total profits).[10]  Mot. at 23-29.  Cox is wrong.  District

courts have broad discretion to manage jury trials, and the Court properly instructed on a non-

exhaustive range of factors it "*may* consider" in determining the appropriate amount.  Those

rulings were correct when given and should remain undisturbed.  *See Lord & Taylor, LLC v.*

---

[9] For many of the same reasons, Cox's attempt to compare the per-work award here to those in *Tenenbaum* and *Rasset-Thomas* cases should be rejected.  Mot. at 20 and n.17.  Those cases were not similar in any regard.  Each involved a "consumer infringer of limited means who committed illegal song file-sharing for her own personal use." *Capitol Records, Inc. v. Thomas–Rasset*, 799 F.Supp.2d 999, 1001 (D. Minn. 2011).  If anything, those cases support the verdict here.  If an award of $22,500 per work has been sustained against an individual, then an award of $99,830.29 per work against a multi-billion dollar company that willfully facilitated massive infringement for many years, as Cox did here, is proportionate and fully warranted.  Even Cox concedes that per-work awards in the $100,000 range are common, *see* Mot. at 5 n.3, and it cites no authority for the notion that the per-work award should be reduced because a losing defendant infringed many works.

[10] Cox seeks remittitur while accepting the Court's charging instructions in one place but disputing them in another.  *Compare* Mot. at 7 n.4 with 23-29.

*White Flint, L.P.*, 849 F.3d 567, 572 (4th Cir. 2017), *as amended* (Mar. 7, 2017) (a district court's jury instructions and evidentiary rulings are reviewed for abuse of discretion only).

As this Court explained in the *BMG* case, the "Fourth Circuit has directed that 'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 981 (E.D. Va. 2016), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018) (quoting *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011)). While a trial court has broad discretion in putting together jury instructions, the instructions must, "taken as a whole, adequately state the controlling law." *Id.* (quoting *Teague v. Bakker*, 35 F.3d 978, 985 (4th Cir. 1994)). Cox fails to identify any error of law, nor does it explain how any purported errors trump the overall instructions or why the Court's admission of total profits evidence was improper.

### A. Copyright statutory damages allow for consideration of the need to punish.

Cox attributes the jury award to a punishment instruction because, in its view, the award has "no conceivable basis tied to Plaintiffs' harm, any benefit to Cox, or any need for deterrence." Cox's view is extreme revisionist history. As explained above, there was evidence before the jury on each of these elements. And as explained below, Cox misapprehends the law.

Cox contends that the Supreme Court's decision in *F.W. Woolworth* provides for deterrence, but says nothing about punishment. Mot. at 23. That is incorrect. The Supreme Court expressed concern about making sure there was "an effective sanction for enforcement of the copyright policy." *F. W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233, 73 S. Ct. 222, 225, 97 L. Ed. 276 (1952). Tellingly, the dissent complained that the Supreme Court was affirming a "judgment for statutory damages in an amount that smacks of punitive qualities." *Id.* at 236 (Black, J., dissenting).

The Fourth Circuit adopted *Woolworth*'s rationale in affirming a statutory damages award in *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.,* 74 F.3d at 496 (4th Cir. 1996)*.*  There, the Fourth Circuit endorsed the following instruction language:

> [A]ny evidence that the defendants have a history of copyright infringement; any evidence that the defendants are apparently impervious to either deterrence or rehabilitation; the extent of the defendant's knowledge of the copyright laws; any misleading or false statements made by the defendants; . . . and any factor which the jury believes evidences the defendants knew, had reason to know, or recklessly disregarded the fact that its conduct constituted copyright infringement.

*Id.* (citing *Woolworth*).  Importantly, these considerations are all directed to the defendant's culpability, reflecting that the assessment is designed, in part, to be punitive in nature.

Cox acknowledges that some model instructions discuss "penaliz[ing]" the infringer, but claims it must be addressed only within the "consideration of deterrence."  Mot. at 24.  But numerous courts have recognized that statutory damages serve a punitive function, even apart from deterrence.  The Supreme Court explained that "an award of statutory damages may serve purposes traditionally associated with legal relief, such as compensation and punishment."  *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352 (1998).  The First Circuit agreed that "statutory damages . . . have both a compensatory and punitive element."  *Tenenbaum*, 660 F.3d at 514 (reversing district court's reduction of jury's statutory damages award and reinstating original award).  The Second Circuit has likewise held that "[t]he purpose of punitive damages—to punish and prevent malicious conduct—is generally achieved under the Copyright Act through the provisions of 17 U.S.C. § 504(c)(2), which allow increases to an award of statutory damages in cases of willful infringement."  *On Davis v. The Gap, Inc.*, 246 F.3d 152, 172 (2d Cir. 2001), *as amended* (May 15, 2001); *see also Fitzgerald Pub. Co. v.*

*Baylor Pub. Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986) ("Awards of statutory damages serve two purposes—compensatory and punitive.").

The Eighth Circuit agrees: "it is plain that another role has emerged for statutory damages in copyright infringement cases: that of a punitive sanction on infringers." *Cass Cty. Music Co. v. C.H.L.R., Inc.*, 88 F.3d 635, 643 (8th Cir. 1996). The Eighth Circuit further stated, in affirming a statutory damages award in favor of music companies:

> [S]tatutory damages have evolved and now are intended not only to put the plaintiff in the position he would have been but for the infringement, but also, and arguably preeminently, to punish the defendant (especially where, as here, the music companies had very little actual damage and C.H.L.R. reaped few profits from the infringements), we think it especially appropriate to leave the decision to the jury's discretion and sense of justice.

*Id.* (internal quotations omitted). More recently, in reinstating a statutory damages award in favor of music companies, the Eighth Circuit held that "[b]ecause the damages award 'is imposed as a punishment for the violation of a public law, the Legislature may adjust its amount to the public wrong rather than the private injury, just as if it were going to the state.'" *Capitol Records*, 692 F.3d at 909 (vacating district court's reduction of jury's statutory damages award and reinstating award); *see also Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983, 992 (9th Cir. 2009) ("Statutory damages further compensatory and punitive purposes, and help sanction and vindicate the statutory policy of discouraging infringement."). The instructions here firmly accord with clearly established law.[11]

---

[11] Cox deems its behavior less culpable than the investment firm in *Lowry's Reports* and the television stations in *Columbia Pictures*—cases in which Cox concedes the instructions "allowed consideration of punishment in addition to deterrence." Mot. at 25. Once again, this is nothing more than Cox trying to falsely define the narrative of its conduct. The jury assessed the evidence and stayed well within the range set by Congress for these violations. In any event, even if the punishment factor was improper (and it was not), the jury's award was nevertheless justified in light of the other factors, and any error was therefore harmless.

**B. Cox's total profits, including profits paid to Cox's owners, are relevant to deterrence.**

The jury was properly instructed that it "may consider" Cox's total profits.  That instruction and the related evidence of Cox's total profits were relevant to the statutory damages objective of deterrence.  It is axiomatic that the wealthier the defendant is, the greater the sanction must be to have a deterrent effect.  A billionaire would not even notice the effect of an award that would bankrupt a middle-class defendant.  Accordingly, courts regularly consider the defendant's total resources in weighing deterrence.  *See, e.g.*, *Lowry's Reports*, 302 F. Supp. 2d at 461 (finding that jury correctly considered defendant's wealth in considering deterrent role of statutory damages, as "[t]he wealth of the defendant has been widely recognized as relevant to the deterrent effect of a damages award"); *John Wiley & Sons*, 327 F. Supp. 3d at 634 (rejecting remittitur of statutory damages award where jury was instructed to consider, *inter alia*, "[d]efendants' total profits"); *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1545 (S.D.N.Y. 1991) (considering defendant's net income and assets in concluding that "substantial damages are necessary to deter [defendant] from repeating the conduct proved in this case").  This Court acted well within its broad discretion in permitting evidence of Cox's overall profits, including how much Cox paid its owners, and Cox has articulated no reason to question that.  *See Lord & Taylor,* 849 F.3d at 572.

## CONCLUSION

For the reasons stated above, Cox's motion for remittitur or, alternatively, new trial should be denied.[12]

---

[12] In a closing footnote, Cox expresses an intention to seek post-trial discovery in the hopes of supporting a motion to alter or amend the judgment to remove certain works.  The footnote is based on pure speculation and does not warrant a substantive response.

Respectfully submitted,

Dated February 28, 2020

/s/ Scott A. Zebrak
Scott A. Zebrak (38729)
Matthew J. Oppenheim (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20015
Tel:  202-480-2999
scott@oandzlaw.com
matt@oandzlaw.com
jeff@oandzlaw.com

*Attorneys for Plaintiff*