# Exhibit C

139

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
    -vs-                        :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  2  (A.M. Portion)

TRIAL TRANSCRIPT

December 3, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

A. McMullan - Direct

227

1    Q.    Let me interrupt you.  When you say "one-to-one," what do

2    you mean by that?

3    A.    Well, like a copy would be made in a factory or somewhere

4    and it had to get into someone's hand.  With Internet piracy,

5    peer-to-peer piracy, unlimited copies can be generated and

6    distributed across the Internet.

7    Q.    Can you describe, at a consumer level, how peer-to-peer

8    piracy works?

9    A.    So if -- well, at a user level, someone might have a copy

11:32:07 10    of the recording on their computer, on their hard drive, as

11    well as software that allows them to connect into a

12    peer-to-peer system.  And it allows them to distribute a copy

13    of that recording to anyone else who has that peer-to-peer

14    software client installed and connected to that system.

15           So that user can upload it into a system where

16    millions of people can have illegal access to the recording.

17    Q.    When -- strike that.

18           I think you said earlier that the business of UMG is

19    to sell recordings; is that right?

11:32:52 20    A.    Yeah, to sell, distribute, license, market recordings.

21    Q.    When UMG sells recordings through a service like iTunes or

22    Amazon, what rights does UMG give the consumer to distribute

23    the recordings on a peer-to-peer service?

24    A.    The consumer gets no rights to do that.

25    Q.    Why not?

1  A.   Because that would allow a consumer to be in direct

2  competition with our legitimate sales of that music.

3  Q.   In the course of your personal work and time within the

4  music industry, how has peer-to-peer piracy impacted the

5  companies you've worked at?

6  A.   It had a very severe impact.  I was at a record company at

7  the time that the first peer-to-peer service launched, it was

8  called Napster, and then multiple other large services allowing

9  millions and millions of people to illegally distribute our

11:33:56 10  recordings developed.

11        And it had a devastating impact on our business, on

12  the finances of our business, on our ability to invest in new

13  content.  And it was all happening at a time when we were

14  trying to figure out what's the best and safest way to sell,

15  market, distribute music through the Internet.  And here we

16  were doing it in competition with millions of folks who were

17  giving it away and taking it for free.

18  Q.   When these peer-to-peer networks were first launched, how

19  did the record industry deal with it?

11:34:32 20  A.   We sued Napster.  And then we sued another set of

21  services, Kazaa and Grokster.  That case actually went to the

22  Supreme Court.  And then we sued another company called

23  LimeWire.

24        We engaged in educational programs to try to educate

25  consumers that they shouldn't be doing this.  And we worked

290

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
              Plaintiffs,       :
                                :
      -vs-                      :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
              Defendants.        :
                                :
--------------------------------:
```

VOLUME 2 (P.M. Portion)

TRIAL TRANSCRIPT

December 3, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1          THE COURT:  It's received.  Go ahead.

2          MR. GOULD:  We can call this Plaintiff's

3   Demonstrative Exhibit -- what are we up to?  Why don't we say 5

4   to be safe.

5          THE COURT:  Okay.

6          MR. GOULD:  We'll try to backfill when we figure it

7   out.

8          THE COURT:  Okay.

9   BY MR. GOULD:

10  Q.   And, Mr. Marks, can you explain what this -- what you've

11  summarized in this slide?

12  A.   Yeah.  It's a pie chart showing the total number of

13  infringements that we found on February 23, 2010, which was,

14  you know, shortly before this e-mail, and how many of those --

15  so there were 4,051 total infringements that we found on that

16  day, and we had sent notices to Cox totaling 445, so roughly,

17  you know, a little more than 10 percent, 11-12 percent of the

18  total.

19          So 3,606 infringements we were not able to send a

20  notice to Cox because they had instituted this unilateral cap.

21  Q.   Was every day this big a difference?

22  A.   Yes, pretty much.  I mean, it may have varied from day to

23  day, but it was generally a small fraction of what the total

24  was.

25  Q.   Some days more, some days less?

S. Marks - Direct

316

1          MR. ELKIN:  Objection.

2          MR. GOULD:  Withdrawn.

3          THE COURT:  If he knows.

4          MR. GOULD:  Yeah, withdrawn.

5          THE COURT:  Ask your next question.

6          MR. GOULD:  Turn to the next slide, please.  Thank

7    you.

8    BY MR. GOULD:

9    Q.   And what does the second slide show?

10   A.   It's the same -- it's showing basically the same thing

11   except instead of looking just at the one day, it's looking at

12   a complete year.  So we had found more than 366,000

13   infringements on the Cox network, and we were only able to send

14   84,000 notices during that year period.  So, you know, it's

15   roughly -- well, it's less than a quarter, 20 to 22 percent or

16   23.  I'm not sure of the exact amount, but, again, a small

17   fraction.

18   Q.   Do you know if the RIAA always sent up to the full amount

19   of the cap?

20          MR. ELKIN:  Objection.  Foundation.

21          THE COURT:  Yeah, lay a foundation.

22   BY MR. GOULD:

23   Q.   You were involved to some degree with the RIAA notice

24   program?

25   A.   Yes.

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                       Alexandria Division


    --------------------------------:
                                    :
    SONY MUSIC ENTERTAINMENT, et al.,:
                 Plaintiffs,        :
                                    :
         -vs-                       :   Case No. 1:18-cv-950
                                    :
    COX COMMUNICATIONS, INC., et al.,:
                 Defendants.        :
                                    :
    --------------------------------:




                            VOLUME  3  (A.M. Portion)




                         TRIAL TRANSCRIPT

                         December 4, 2019


                 Before:  Liam O'Grady, USDC Judge


                         And a Jury

B. Frederiksen-Cross - Direct

452

1  A.   No, no.  That all happens automatically, just like the

2  distribution.  You know, as soon as a user computer gets a

3  piece, it can be sharing that piece with others, and as soon

4  as it gets all the pieces, a little icon pops up that that

5  song is fully assembled, and you can play it now.

6  Q.   And I see a reference on the slide to a peer swarm.  What

7  does that refer to?

8  A.   Well, this -- there's only so much room on a slide.  You

9  know, I showed four peers here.  A typical swarm is larger

10  than that, and the actual number of computers that might be

11  trading in a particular piece of music at a particular time

12  can be in the tens of thousands.

13  Q.   I see.  And you -- this slide depicts -- now it depicts

14  more computers.

15  A.   A few more joined the swarm.

16  Q.   And do you have an understanding about the number of

17  users that are on the BitTorrent network?

18  A.   The most recent reputable study I found was by IEEE, and

19  it's a few years old.  It indicates that at any one point in

20  time, there'll be between maybe 15 and 27 million peers

21  exchanging content on the internet, and it's -- that's at any

22  one point in time.

23  Q.   Is there an official place one can go to see exact

24  measurements of how many users there are on the BitTorrent

25  network?

B. Frederiksen-Cross - Direct

453

1    A.    No, there is not.

2    Q.    And why is that?

3    A.    Well, the communication for any of these computers -- any

4    of the peers is between the peers, and some of these

5    peer-to-peer systems use a tracker, so if you were to put a

6    test tracker up with the right monitoring stuff, you could see

7    the transactions maybe that were going to that tracker, but

8    you still couldn't see everything else that was going on in

9    the network.

10   Q.    So, so there's nowhere you can go to see the number of

11   users on the network overall; is that correct?

12   A.    That's correct.  By design, these systems are extremely

13   robust and these machines talk directly to each other without

14   central control.

15   Q.    What about if I went to the Cox user that downloaded and

16   is then distributing files to others?  Could I uncover the

17   number of times that Cox user distributed files from a review?

18   A.    Not in any practical way, no.

19   Q.    What do you mean by that?

20   A.    Well, if you just went to a user's computer and inspected

21   it forensically, you might have some evidence of their

22   activity, but you would not have evidence of all of their

23   activity.

24   Q.    Let me ask you --

25   A.    And you would, you would have to actually do a forensic

B. Frederiksen-Cross - Direct

454

1   examination of that machine to get any information.

2   Q.   Let me ask it to you this way:  Are logs kept with --

3   from the software otherwise of the number of times that user

4   distributes a file?

5   A.   No.

6   Q.   Okay.  Can you explain a little bit about the other three

7   peer-to-peer networks that were identified in MarkMonitor's

8   infringement notices to Cox?

9   A.   Sure.  Can we go on to the next slide?

10  Q.   Okay.  And so these are the other three?  Is that the

11  Ares logo?

12  A.   Yes, Ares, Gnutella, and eDonkey.

13  Q.   Okay.  And I see again the, the file hash value image

14  we're using.  Why is that there?

15  A.   Again, all of these systems rely on hash to authenticate

16  and identify files.  That's a really important technology.

17  That's one of the foundation technologies of these systems.

18  Q.   And there's a bunch of icons under file types.  What is

19  that meant to convey?

20  A.   Again, these networks can be used to distribute any kind

21  of file.  Anything that's in an electronic form can be

22  transmitted on BitTorrent, so electronic books, movies, music,

23  if I want to send a video of my dog chasing her tail, any of

24  that can be distributed on the -- using BitTorrent across the

25  internet to others.

538

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                               :
-------------------------------:
```

VOLUME  3  (P.M. Portion)

TRIAL TRANSCRIPT

December 4, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

S. Bahun - Direct

613

1    Q.   And are you aware of the four peer-to-peer networks at

2    issue in this case?

3    A.   Yes.

4    Q.   And what are they?

5    A.   BitTorrent, eDonkey, Gnutella, and Ares.

6    Q.   And in your experience, to what extent of the content on

7    those networks is infringing or is piratical?

8              COURT REPORTER:  I am sorry, counsel?

9              MR. BRODY:  Objection.

16:16:38 10              MR. OPPENHEIM:  I said piratical, but I'll go with

11   piracy.  Maybe that's a little easier.

12              THE COURT:  All right.  Overruled.

13              THE WITNESS:  I'm sorry.  Can you repeat the

14   question?

15   BY MR. OPPENHEIM: (Continuing)

16   Q.   In your experience on those four networks --

17   A.   Yeah.

18   Q.   -- to what extent is the content piracy?

19   A.   It'd be difficult for me to quantify it.  But the

16:16:58 20   overwhelming majority of the content we see on those networks

21   is pirated content.

22   Q.   In the course of your work, do you monitor what's

23   happening on peer-to-peer networks?

24   A.   Yes.

25   Q.   And how do you do that?

S. Bahun - Direct

632

1   know, for that type of an analysis, it's extremely accurate.

2   Q.   Now, you're not using this data to send notices, are you?

3   A.   No, never.

4   Q.   And so, in the -- in the period at issue in the contract

5   that's in front of you, PX 4, did you have GDPI data for Cox?

6   A.   Yes.

7   Q.   And do you have a recollection of what that GDPI data

8   showed?

9   A.   I do.  I don't recall the exact number, but I remember

16:45:38 10   there being more than 10,000 infringements per day that we

11   observed across that data set related to subscribers or, you

12   know, Cox customers.

13   Q.   Now, you said per day, right?

14   A.   Correct.

15   Q.   Now, Appendix A, is that -- are those figures per day?

16   A.   No.  Those are -- those are monthly volumes.

17   Q.   So roughly speaking, if you were sending notices 20 days

18   in a month at 10,000 a day, what would that have been, the

19   volume?

16:46:17 20   A.   I'm sorry, 10,000 a day?

21   Q.   Yeah --

22   A.   For 20 days?

23   Q.   For 20 days in a month, what would that volume have been?

24   A.   So 200,000.  Testing my math skills.

25   Q.   You passed.  Are you familiar with how the MarkMonitor

S. Bahun - Direct

636

1  specified process that the peer-to-peer network has

2  established.

3          Each of those communication steps are logged in the

4  evidence that we store for that instance of infringement.

5  Q.   If you don't connect to a peer, can you see what a peer on

6  the swarm is doing?

7  A.   Can you clarify?  Sorry.

8  Q.   I think you testified that when a peer comes into the

9  swarm, you connect to them, and so you can exchange

16:52:01 10  information.  Are you able to see what one peer is doing with

11  another peer if you're not connected to them?

12  A.   No.

13  Q.   And why is that?

14  A.   It's the design of the protocols.  So we can have full

15  visibility into what the peer is doing if we are connected

16  directly to them, but we don't have visibility of their

17  communication with other peers.

18  Q.   And what is it that -- the process of connecting to the

19  peer that you engage in, what is that called?

16:52:36 20  A.   Oftentimes we call it the handshake.

21  Q.   And what is the handshake?

22  A.   So it's essentially a process, you can think of it as a

23  digital handshake where there's an exchange of certain messages

24  from our side and from the other peer's side, and kind of that

25  mutual exchange of messages is what we refer to as the

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
           Plaintiffs,         :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
           Defendants.         :
                               :
-------------------------------:
```

VOLUME  4  (A.M. Portion)

TRIAL TRANSCRIPT

December 5, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1 Q. Sure. If any of these 57,600 Cox subscribers had

2 copyright infringement tickets prior to January 1, 2012, would

3 that be depicted here in your analysis?

4 A. Prior to January 1, 2012?

5 Q. Yes.

6 A. Yeah, they would be included.

7 Q. Well, but you just said a moment ago that your -- that the

8 data only is for 2012 to '14, correct?

9 A. I'm sorry, yes. I had it reversed.

12:56:55 10   So it does not include data before -- the Cox data

11 that we have starts 2012, ends 2014, those entire three years.

12 And anything outside that range, I did not have data for those.

13 Q. Okay. So let's move on to your -- and so, relating these

14 two slides, out of the 57,600, the Cox ticket data showed you

15 that Cox terminated only 13 of that pool; is that correct?

16 A. That's what the data say, yes.

17 Q. And that's -- and the ticket distribution includes those

18 that received ten or more, 13 or more, 14, correct?

19 A. That's correct.

12:57:46 20 Q. So -- okay. So out of the -- let's turn to your next --

21 the third of your five areas.

22   THE COURT: You know, what don't we stop here before

23 you get into the third area.

24   MR. ZEBRAK: Oh, sure.

25   THE COURT: We're almost at 1 o'clock.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :    Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                               :
-------------------------------:
```

VOLUME  5  (P.M. Portion)

TRIAL TRANSCRIPT

December 6, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

R.L. Vredenburg - Direct

1108

1     A.   Yes.

2     Q.   Including at times whether to terminate the service of

3     repeat copyright infringers, correct?

4     A.   That's correct.

5     Q.   When you weren't sure whether to terminate a customer who

6     might have been at that stage of consideration in the graduated

7     response, you might reach out to Mr. Sikes and say, what should

8     I do here?

9     A.   Correct.

16:46:38 10   Q.   Those gentlemen, Mr. Zabek and Mr. Sikes, set the tone for

11    the abuse group, correct?

12    A.   Yes.

13    Q.   Mr. Zabek and Mr. Sikes provided guidance and the

14    direction for the TOC team handling abuse issues on a

15    day-to-day basis, correct?

16    A.   Correct.

17    Q.   Now, when you started at Cox in 2004 as a 2.0 tech -- as a

18    2.0 tech, you said?  I am sorry, let me ask --

19    A.   Tier 2.

16:47:07 20   Q.   Tier 2.  Thank you.

21         And when you first started with Cox around 2004,

22    there was a three-strike policy for copyright infringement and

23    the customers were terminated, correct?

24    A.   No.

25    Q.   Mr. Vredenburg, there was a three-strike policy for

R.L. Vredenburg - Direct

1110

1     MR. BUCHANAN:  Got it.

2     MR. OPPENHEIM:  Tab 13.

3     MR. BUCHANAN:  Show it to him?

4     MR. GOULD:  No.

5     THE COURT:  He is impeaching him, not trying to

6  refresh his recollection.

7  BY MR. GOULD: (Continuing)

8  Q.   Mr. Vredenburg, in your sworn -- that was in December

9  2015 --

16:49:04 10     THE COURT:  Just ask him what question he was asked

11  and what his answer was.

12  BY MR. GOULD: (Continuing)

13  Q.   Were you asked this question and did you give this answer,

14  Mr. Vredenburg:  And when you started -- excuse me -- all

15  right.  So when you started in 2004, you were a 2.0 TOC; is

16  that correct?

17         When I started in 2004, I was 2.0 tech.

18         And when you started, there was a three-strike policy

19  for copyright infringement notices and the customer was

16:49:28 20  terminated; is that correct?

21         As far as I know, yes, there was a three-strike.

22         Are you changing your testimony, sir?

23  A.   No, I am not changing.  There was never an actual

24  three-strike policy.

25  Q.   And you recall over time Cox's graduated response was

R.L. Vredenburg - Direct

1115

```
 1   BY MR. GOULD:  (Continuing)
 2   Q.   Do you recall testifying previously that there were around
 3   14 Tier 2 reps in 2010?
 4   A.   Are you referring to Tier 2 or TOC reps?
 5   Q.   I am sorry.  Do you recall testifying previously that
 6   there were around 14 Tier 2.5 reps in 2010?
 7            MR. BUCHANAN:  When he is referring to testifying,
 8   today or --
 9            THE COURT:  Yeah.  I interrupted the line of
16:55:57 10   questioning.  So start again.  Just ask him does he recall
11   whether -- how many reps there were on a date that you want to
12   use.
13   BY MR. GOULD:  (Continuing)
14   Q.   Mr. Vredenburg, you recall there were about 14 Tier 2.5
15   reps around the year 2010, correct?
16   A.   Yes, sir, that sounds quite right.
17   Q.   And at that time, 2010, the TOC or the level 2.5 group was
18   staffed around the clock, 24 hours, seven days a week, correct?
19   A.   Yes.
16:56:29 20   Q.   And then there came a time in 2011 when the TOC, the tier
21   2.5 group, was really slashed materially, wasn't it?
22   A.   Yes.
23   Q.   And you said in 2010 it was about 14.  So now we get to
24   sometime -- do you recall it was about April of 2011 that that
25   group was cut to four people?
```

1    A.   I don't believe -- I don't know the exact date, but, yes,

2    it was cut to four people.

3    Q.   It was cut to four.  You agree with that part?

4    A.   Yes, sir.

5    Q.   And 14 to four is -- I'm no mathematician, but more

6    than -- I won't embarrass myself with math.  Let's leave it at

7    that.

8         It is a reduction of eight -- no, see, I did it.

9    It's a reduction from 14 to 4.  I will leave it at that.

16:57:22 10        MR. OPPENHEIM:  Ten.

11   Q.   It's ten, correct?

12   A.   Yes.

13        MR. OPPENHEIM:  Sorry, Your Honor.

14        THE COURT:  Friday evening.

15        MR. GOULD:  It's late on a Friday, I apologize.

16   BY MR. GOULD: (Continuing)

17   Q.   And after the reduction of the TOC from -- down to four,

18   the hours changed too, correct?

19   A.   If I remember correctly, yes, they did.

16:57:41 20   Q.   So while it was once 24/7 people could reach the TOC and

21   get access to customer service, those hours were reduced to

22   something less than that, right?

23   A.   Yes.

24   Q.   And all of those changes meant you're going to have to

25   work a little bit harder to keep up with the work loads, right?

R.L. Vredenburg - Direct

1117

```
 1   A.   Correct.

 2   Q.   You had to work harder because you had to do more with

 3   less?

 4   A.   Correct.

 5   Q.   If you could turn to Tab 1 in your binder, please.

 6        Do you recognize the document -- PX 10 for the

 7   record.  Do you recognize the document at tab 1 of your binder,

 8   PX 10?

 9   A.   This particular document?

10   Q.   This type of document.

11   A.   This type of document, yes.

12   Q.   And what is it?

13   A.   It looks like a record of abuses by a customer.

14   Q.   It's a CATS ticket, right?

15   A.   CATS ticket, correct.

16   Q.   When you open up CATS to go work tickets, this is what you

17   see, right?

18   A.   Pretty much, yes.

19        MR. GOULD:  I move to admit PX 10, Your Honor.

20        THE COURT:  Any objection?

21        MR. BUCHANAN:  No, Your Honor.

22        THE COURT:  It's received.

23   BY MR. GOULD: (Continuing)

24   Q.   Now, in your work as a Level 2.5 rep, when you log into

25   CATS to go work a ticket, you see something that looks like
```

16:58:41 (line 10)
16:59:08 (line 20)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
          Plaintiffs,          :
                               :
     -vs-                       :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
          Defendants.          :
                               :
-------------------------------:
```

<u>VOLUME  6  (A.M. Portion)</u>

TRIAL TRANSCRIPT

December 9, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

M.J. Flott - Direct

1195

1  decades that we've been in business and, you know, our

2  competitors in some cases longer than that, if we didn't have

3  the trust of our artists that they were going to get paid, then

4  we wouldn't be able to continue to sign and develop and attract

5  artists year in and year out.

6  Q.    In your role as executive vice-president and chief

7  financial officer, are you familiar with peer-to-peer piracy?

8  A.    I am.

9  Q.    Has Warner Music Group been impacted by peer-to-peer

10:22:01 10  piracy?

11  A.    We have.

12  Q.    What has been that impact?

13  A.    It has been -- it's been enormous and significant.  In a

14  period of time when music consumption has risen year in and

15  year out, as an industry we've seen revenues decline over that

16  period, over a period of time from its peak to where we are

17  today.

18  Q.    What were the consequences of this revenue decline to the

19  music industry as a whole?

10:22:46 20  A.    Well, first and foremost, you know, artists were not

21  getting paid.  Copyright holders weren't getting paid, as well

22  as union members, as well the musicians working on those

23  records.

24        We, as Warner Music Group, had to rationalize our

25  infrastructure or the labels that we had, and we've had to go

 1    through at different points in time and either close labels

 2    down, merge them together.

 3            Probably the clearest example I could give you would

 4    be two of our kind of founding labels of Atlantic and Elektra

 5    being merged together to rationalize their costs simply because

 6    of the revenue decline.

 7            You know, Elektra is the home of artists like "The

 8    Doors" and "The Eagles" and "Anita Baker" and others like that.

 9    So we also had to lay off people just in terms of looking at

10:23:57 10   what our revenue base could afford and what we wanted to return

11    to our owners.

12    Q.   I'd like to hand up the witness a copy of an exhibit

13    that's been premarked as PX 486.  Thank you.

14            Mr. Flott, have you seen this document before?

15    A.   I have.

16    Q.   And at a high level, what is this document?

17    A.   It reflects the revenues of the U.S. recorded music

18    business over a period of time.

19    Q.   Where does this document come from?

10:24:39 20   A.   It comes from the RIAA, which is our U.S. industry

21    association.

22    Q.   And how is it that you come across this type of document?

23    A.   It is regularly published, and it's a document that I look

24    at on a regular basis.

25            With the RIAA, we do a regularly quarterly call where

M.J. Flott - Direct

1197

 1    we go through performance.  It's also on their Web site as

 2    well.

 3                MS. NOYOLA:  I'd like to move PX 486 into evidence.

 4                THE COURT:  Any objection?

 5                MR. BUCHANAN:  No, Your Honor.

 6                THE COURT:  It's received.

 7    BY MS. NOYOLA: (Continuing)

 8    Q.   Mr. Flott, can you describe what this chart shows.

 9    A.   This chart is reflecting the U.S. recorded music revenues.

10:25:28 10   If I look at the left most column, that's marked as the year

11    2000 where industry revenues were in excess of $14 billion.

12                It continues to the right to 2014 where the revenues

13    are just under $7 billion.

14    Q.   And is this chart specific to Warner Music Group?

15    A.   No, it's the U.S. recorded music revenues.

16    Q.   Tell us what these different colors on this chart show.

17    A.   Each color represents a different format.  So the largest

18    color that you see on the left side of the page being orange,

19    that's the compact disc.

10:26:15 20               And as you move to the right, you'll see other

21    formats as they came into play.  So in 2004, you start to see

22    purple.  That is the -- that's a download, and the different

23    shades are the different forms of whether it was a single or an

24    album.

25                And then we start to see in 2005 green start to come

1    revenue, but it wasn't our main strong point in looking at

2    that.

3    Q.   Mr. Zabek, isn't it in fact true that you, in this

4    declaration in 2015, testified that when you implemented the

5    graduated response procedure, you would keep in mind the effect

6    on Cox's business, including the potential loss of revenue?

7    A.   We would keep that in mind.  We would keep it in mind.

8    Q.   And you understood that when their rights were infringed,

9    that that was a violation of federal law, right?

12:19:56 10   A.   If -- I think if we could prove that, possibly with a due

11   process, to look through their computers.  But again, we've got

12   good faith on one side, we've got good faith on the other side

13   with the customer also, too.

14        When we would assist these customers, you know, we

15   try to help them to see, are they using these products, you

16   know, legitimately?  Are they using it nefariously?  Are they

17   even aware of any of the issue also -- any of these issues.

18   Q.   I'm handing you what's been marked as Plaintiff's

19   Exhibit 260, which is an e-mail exchange between you and

12:20:33 20   Terran, T-e-r-r-a-n, Williams in August of 2010.  And this

21   document is Bates labeled Cox_Sony_00005212.

22        Mr. Zabek, in your e-mail exchange with Ms. Williams,

23   didn't you in fact say at the bottom of your e-mail:

24   99 percent of DMCA violations is from people using peer-to-peer

25   on purpose and not Trojan activity; correct?

J. Zabek - By Deposition

1266

1   A.   Back then, yes, I did state that.

2   Q.   And yet you also understood that Cox didn't want to lose

3   customers over copyright violations, correct?

4   A.   Well, Cox didn't want to lose customers over almost

5   anything that we could help to avoid it if there was something

6   that we could assist that customer with.  I don't know a

7   business that does want -- that wants to lose customers.  And,

8   no, we did not want to lose customers.

9   Q.   What were the factors that the abuse department would

12:21:52 10   consider in deciding whether or not to terminate a customer?

11   A.   There are many.  I can't -- it's been so long.  Um, to

12   give you those.  A lot of things we would look at would be, you

13   know, was -- did the customer have any violations for, again,

14   malware.  You know, any kind of proxy.  Could we assist them,

15   you know.  Was there -- was there any software on the computer

16   that they may not have been aware of that maybe somebody else

17   put on there.  Or, again, if they were enacted by a hacker and

18   being used to actually transport that data through them also,

19   too.

12:22:34 20        So we would look at many different -- several

21   different factors on there too.  We'd also interview, of

22   course, the customer also, too, on that.

23   Q.   You just described -- I asked you --

24   A.   Yeah.

25   Q.   -- what were the factors that the abuse department would

1    A.    People handling the tickets or phone calls coming in.

2    Q.    And the subject of the e-mail was DMCA Terminations,

3    correct?

4    A.    Yes.

5    Q.    And by DMCA, you were referring to copyright infringement?

6    A.    It was interchangeable as we would speak.

7    Q.    The DMCA was interchangeable for copyright infringement?

8    A.    Yeah.

9    Q.    And in this e-mail you headed off in bold language --

12:35:17 10    bolded -- excuse me -- language, that says:  Proprietary Info!

11    This is not to be shared about outside of Cox or abuse reps.

12    It is not to be passed to Tier 1 or Tier 2.  This info stays

13    within Tier 2.5 only; correct?

14    A.    That is what it stated.

15    Q.    So this was a document that you were sending out that was

16    not only internal to Cox, but internal to just Cox 2.5 reps,

17    correct?

18    A.    It would be to our highest level of reps.

19    Q.    And in this document you go on to indicate that:  As we

12:36:00 20    move forward in this challenging time, we want to hold on to

21    every subscriber we can; correct?

22    A.    It does state that.

23    Q.    And by we, you're referring to Cox, correct?

24    A.    In this one I believe I am.

25    Q.    And then you say:  With this in mind, if a customer is

J. Zabek - By Deposition

1276

1  terminated for DMCA or copyright infringement, you are able to

2  reactivate them after you give them a stern warning about

3  violating our AUP and the DMCA.

4        Do you see that?

5  A.    I do.

6  Q.    And that's what you wrote, right?

7  A.    That's what I typed out, yeah.

8  Q.    And then you went on to tell the team that:  We still must

9  terminate in order for us to be in compliance with safe harbor,

12:36:50 10  but once the termination is complete, we have fulfilled our

11  obligation; correct?

12  A.    That is what is stated there.

13  Q.    And then you say that:  After you reactivate them, the

14  DMCA counter restarts; the procedure restarts with the sending

15  of warning letters, just like a first offense; correct?

16  A.    That is stated there.

17  Q.    And by that, what you meant was that after somebody was

18  terminated, if they were reactivated, they wouldn't be

19  suspended or terminated for another notice, they would be

12:37:24 20  subject to another e-mail, and potentially seven other e-mails,

21  before they would be suspended again, correct?

22  A.    Not in every case.  Again, we had given the flexibility to

23  our folks that they could absolutely suspend off another single

24  one.  Things that we had talked about within our weekly

25  meetings.  You know, again, if anything wasn't clear and they

1   would ask on them, we would clear it up later.

2   Q.   But here what you were saying was that the procedure was

3   to restart with warning letters?

4   A.   That we could restart.

5   Q.   It doesn't say, could, does it?

6           It says:  The procedure restarts with sending of

7   warning letters.

8           Right?

9   A.   It does say that.

12:38:03 10   Q.   It doesn't say, use your best judgment to do what's best

11   for the copyright holders, does it?

12   A.   It does not say that specifically.

13   Q.   Well, it doesn't even infer it, does it?

14   A.   Yes.

15   Q.   Yes, it doesn't?

16   A.   Correct.

17   Q.   And this e-mail says:  This is to be an unwritten

18   semi-policy; right?

19   A.   Yes.

12:38:28 20   Q.   We do not talk about it or give the subscriber any

21   indication that reactivating them is normal; right?

22   A.   Correct.

23   Q.   Now, this new policy you say in here only pertains to

24   copyright infringement, not to spammers or hackers, correct?

25   A.   In this case, yes.  Our folks would not be able to look at

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```


VOLUME 6 (P.M. Portion)




TRIAL TRANSCRIPT

December 9, 2019

Before:  Liam O'Grady, USDC Judge


And a Jury

1313

1   Q.   Do you know what an auto-suspend limit is?

2   A.   I've heard -- yeah, I've heard the term.  Absolutely.

3   Q.   Was an auto-suspend limit the -- a limit on the number of

4   suspensions that Cox would implement in a day?

5   A.   Yes, for those.  Yes.

6   Q.   I'm sorry.  I didn't want to cut you off.  For those --

7   A.   For any abuse issue.

8   Q.   Right.  So an auto-suspend limit would cap the number of

9   suspensions that Cox would do in a day across all types of

10  abuse, right?

11  A.   Yes.

12  Q.   And if Cox received an infringement notice that would have

13  normally called for a suspension under the graduated response

14  policy but the auto-suspend limit had been hit, then Cox would

15  just send an e-mail to the customer instead of doing a

16  suspension, right?

17  A.   I gotta tell you, I'd have to go back through the

18  procedures.  It's been a while since I've even looked at those.

19  I'm sorry.

20  Q.   The normal auto-suspend limit was set at 300 suspensions

21  per day, right?

22  A.   Okay.  The number sounds familiar, but I can't be a

23  hundred percent.

24  Q.   Mr. Zabek, you've been handed what's been previously

25  marked as Plaintiffs' 74, which is an e-mail exchange among

J. Zabek deposition - Examination

1314

1    people in the abuse department in December of 2009, and if

2    we -- if you start at the back of the e-mail exchange --

3    A.    Um-hum.

4    Q.    -- you'll see Chris Burns is e-mailing Brent Beck and you,

5    and he says:  We've been hitting the 300 suspension limit

6    fairly regularly now.

7              Do you see that?

8    A.    I do.

9    Q.    Does that refresh your recollection that the auto-suspend

10   limit was normally set at 300 suspensions per day?

11   A.    Back in 2009, yes.  Yes.

12   Q.    And that in this e-mail exchange, in fact, Mr. Burns is

13   complaining that there was going to be a decrease in staffing

14   over the next several days?

15   A.    Um-hum.

16   Q.    And that there was a problem with handling the call

17   volume, and asked whether or not the auto-suspend limit could

18   be reduced to 250 per day, right?

19   A.    Um-hum.  That's what he is requesting here, yes.

20   Q.    And you go ahead and you authorize the auto-suspend limit

21   to be dropped to 250, correct?

22   A.    I do.

23   Q.    And then in January, you ask whether or not it can be

24   raised back up to 300 again, right?

25   A.    Asking Chris Burns, yes.  Again, with these, these are

1   line 5, you were asked the question:  How many employees were

2   in the abuse group prior to you BMG manager?

3            Your answer:  Five.

4   A.   Um-hum.

5   Q.   Question:  Do you know why -- or do you have an

6   understanding of why the number of employees in the abuse group

7   was reduced from five to two?

8            Answer:  No.

9            Question:  Who made a decision to reduce the number

10  of employees in the abuse group?

11           Answer:  Somebody well above me, and it came down

12  through my leadership that the change was happening.

13           Question:  It came down through whom?

14           Answer:  Matt Carothers.

15           Does that -- was that testimony true and accurate

16  when you gave it?

17  A.   Yes, that does help to refresh.

18  Q.   Was that testimony accurate when you gave it?

19  A.   Yes.  To the best of my knowledge, yes.

20  Q.   The abuse team, the one that had been reduced from five to

21  two, would handle escalations from the TOC and from NSC,

22  correct?

23  A.   Yes.

24  Q.   As the manager of the abuse team, you would inform the TOC

25  and NSC of policies and procedures for handling infringement

1    Answer:  Yes.

2    Question:  But was the abuse group expanded?

3  A.    Um-hum.

4  Q.    Answer:  I'd have to go back to look to be accurate.

5    Question:  To be accurate about whether the abuse

6  group was expanded?

7    Answer:  Oh, maybe I misunderstood the question.  I'm

8  sorry.

9    Question:  Was the abuse group expanded?

10    Answer:  My apologies.  No.

11    And was that testimony that you provided in June of

12  2015 accurate?

13  A.    To my knowledge, yes.

14  Q.    And, in fact, quite apart from the abuse group, in 2011,

15  Cox downsized the TOC, or the technical operations center,

16  correct?

17  A.    They did reduce the numbers, yes.

18  Q.    And this was during a period when the number of

19  infringement notices was fairly high, correct?

20  A.    I was going to say they were always high.  But yes, they

21  were, they were one of our larger issues coming in.

22  Q.    In, in -- specifically in April of 2011, Cox reduced the

23  number of TOC employees handling abuse complaints from nine to

24  four, correct?

25  A.    During that time, yes.

B. Beck - Direct

1392

1    just blocked them at the e-mail level, right?

2    A.   There was a time where they were rejected at the e-mail

3    server level.

4    Q.   So this wasn't an instance where the e-mail came in, you

5    looked at it, did something with it, and then said we don't

6    want to do this.  For the Rightscorp notices, they just -- they

7    never even made it into the e-mail inbox, right?

8    A.   At a particular period in time, yes, that became

9    necessary.

10   Q.   And you're aware, Mr. Beck, that Rightscorp claims that in

11   the 2012 to 2014 period, it sent Cox over 9 million copyright

12   infringement notices?

13   A.   In the -- can you repeat the time frame, please?

14   Q.   You're aware that in the 2012 to 2014 time frame,

15   Rightscorp claims to have sent Cox over 9 million infringement

16   notices?

17   A.   That's quite a lot.

18   Q.   You're aware that that's their position, right, that

19   they've said that?

20   A.   I believe I have heard that.

21   Q.   In fact, didn't you state that in a sworn declaration in a

22   prior matter?

23   A.   Possibly.

24   Q.   But you can't verify that number, can you?

25   A.   How many they had sent to us?  So if they were rejected at

B. Beck - Direct

1394

1  Q.   Now, setting aside the number of notices that Rightscorp

2  may have sent, Cox didn't forward any of those to its

3  customers, correct?

4  A.   Sorry, setting aside -- can you repeat that?

5  Q.   Setting side whether it was 1 million or 10 million or

6  50 million, Cox didn't forward to customers the blocked

7  Rightscorp notices, correct?

8  A.   No.  Those were, those were blocked for reasons, yes.

9  Q.   It didn't send them to the customers?

10 A.   Correct.

11 Q.   And Cox didn't suspend any subscribers based on

12 infringement allegations received from Rightscorp, correct?

13 A.   No, not if they were blocked.

14 Q.   And Cox didn't ask any customers or subscribers to call in

15 and talk to the abuse department about allegations of

16 infringement based on Rightscorp notices that Cox blocked,

17 correct?

18 A.   No, not if the notices were blocked.

19 Q.   And Cox didn't take any customer facing action at all with

20 respect to those --

21          THE COURT:  Well, they weren't received, so naturally

22 that's the answer.  So let's move on.

23 BY MR. GOULD:

24 Q.   Cox doesn't know what customers were referenced in those

25 infringement notices, does it?

B. Beck - Direct

1396

1    A.    Okay.  Yes.

2              MR. GOULD:  I move PX 335 into evidence.

3              THE COURT:  Any objection?

4              MS. GOLINVEAUX:  No objection, Your Honor.

5              THE COURT:  It's received.

6              MR. GOULD:  If you could pull up the top e-mail from

7    Mr. Beck.

8    BY MR. GOULD:

9    Q.   Mr. Beck, this is an e-mail chain from February 2014 with

10   several of your colleagues and folks at CenturyLink, some --

11   and this continues from a chain earlier.  I want to focus on

12   your language at the top, starting with "Sources."  You say:

13   Sources like Digital Rights Corp are blacklisted with us, so we

14   silently delete the e-mail messages without any

15   parsing/ticketing/etc.  As soon as our POP3 client recognizes

16   the From address in the headers as blacklisted, we delete the

17   message without retrieving its message body."

18             Do I read that correctly?

19   A.   I believe so, if I followed along.

20   Q.   Now, Mr. Beck, you're asking describing a different kind

21   of blacklisting than we talked about a few minutes ago with

22   Rightscorp, aren't you here?

23   A.   Earlier we discussed rejecting at the mail server

24   platform.

25   Q.   Earlier we discussed rejecting at the mail server

B. Beck - Direct

1397

1   platform, and here you're describing the blacklist process

2   where you actually receive e-mails and then delete them, right?

3   A.    They're received to the inbox.

4   Q.    And then silently deleted?

5   A.    They are deleted if the sender matches the -- a

6   blacklisted sender.

7   Q.    And you wrote here that they're silently deleted; is that

8   right?

9   A.    That is the phrasing, yes.

10  Q.    And this process relates to other blacklisted parties but

11  not to Rightscorp, right?

12  A.    This, this applied to Rightscorp initially.

13  Q.    For a short time until they moved to blocking at the mail

14  server level?

15  A.    Yes.

16  Q.    So respectively, at this point in time, there were two

17  kinds of blacklists, one for blocking e-mails coming in and one

18  for receiving and deleting e-mails?

19  A.    So rejecting in the mail server was specifically in

20  regards to an event with Rightscorp.  It wasn't really

21  something that we had built and designed to do that.  It's not

22  something we applied to any other sender at any time.  So that

23  was more of a, a failure mitigation step.

24        The blacklisting method within CATS, where we're

25  actually seeing the messages in the inbox, that has been

B. Beck - Direct

1404

1  Notices Not Stored in CATS," the second one, deleted notices,

2  those are the notices that Cox deleted, correct?

3  A.   Those were deleted by CATS, yes.

4  Q.   And the notices from Rightscorp that were blocked don't

5  appear in these charts?

6  A.   That's correct.

7  Q.   Okay.  And then this third column, it looks like it's a

8  small exception about a small number that I think we can just

9  move past.

10        Now, the last sentence of the narrative says that for

11  a particular month, the sum of those columns reflect all e-mail

12  notices received at abuse@cox.net in that month that relate to

13  alleged copyright infringement, correct?  Basically, you could

14  do the math horizontally and figure out the total notices per

15  month?

16  A.   Yes.  Yes, that should be correct.

17  Q.   Now, if we could just go to the chart, please, and just

18  kind of -- let's go to the next page and zoom up a little bit,

19  and then just kind of scroll down slowly, and let's look and

20  eyeball the figures in the first two columns:  notices in CATS

21  and deleted notices, and do you see that over time, Mr. Beck,

22  keep going, the deleted notices start to increase?

23        Let's go to the next page, please.

24        Do you see that by 2013, the deleted notices starting

25  in February 2013 start to increase a bit more into the 114,000,

B. Beck - Direct

1405

1   123,000, 109,000?  Do you see that?

2   A.   Yes.

3   Q.   And you see that as the months continue, that the deleted

4   notices actually exceed the number of notices that CATS

5   accepted?

6   A.   That is the case for some of the months, yes.

7   Q.   Isn't it the case for all of the months there shown in

8   2013, sir?

9   A.   No, it's not.

10  Q.   No, it's not?  Is there one that you see where the deleted

11  notices are smaller than the accepted notices?

12           Oh, you're right.  May 2013, there were about 10,000

13  more accepted than deleted.  And the other months, the deleted

14  exceeded the accepted, correct?

15  A.   Yes.  That matches what I'm seeing.

16  Q.   Now, I've done the math here, and I counted the number of

17  deleted notices in the years shown in this chart, and it's

18  about 5 million.  And is there any reason to doubt my math?

19  A.   I would have to run the numbers myself to speak to that.

20  Q.   Okay.  And then I did the same for the claims period.

21           And if we could pull up the first slide of the

22  demonstrative?

23           What this slide shows, sir, is the claim period,

24  February 2013 through November 2014, for the information we

25  just looked at, including the accepted notices, the deleted

B. Beck - Direct

1406

1    notices, and the total notices.

2           Do you see that the total number of notices was about

3    5.7, 5.8 million that Cox received in this time period?

4    A.    Based on the document, yes.

5    Q.    Assuming the math is correct.

6    A.    That's right.

7    Q.    And do you see that the number that Cox accepted was just

8    over 2 million, and that comes to about 36 percent of that

9    total?

10   A.    I see.

11   Q.    And do you see, Mr. Beck, that the number that Cox deleted

12   is about 3.68 million, which comes to about 63 percent of the

13   notices?

14   A.    I see that.

15   Q.    So according to this sworn information that Cox provided,

16   Cox deleted over 63 percent of the infringement notices it

17   received in 2013 and 2014, correct?

18   A.    Based on the numbers we're looking at.

19   Q.    And not one of those would have received a customer facing

20   action of any kind, correct?

21   A.    For the deleted notices.  They may have received notices

22   from non-blacklisted senders, however.

23   Q.    Of those 3.68 million, not a single customer faced any

24   action, correct?

25   A.    For those particular notices.

B. Beck - Direct

1412

1   Q.   But that's out of 315,000 tickets, right?

2   A.   Yes.  570,000 is the count of the number of actions, and a

3   given ticket could have multiple action entries.

4   Q.   Sometimes a ticket has multiple entries because it might

5   say sent a reply for one entry and then closed the ticket on

6   another entry?

7   A.   That is correct.  That is one possible.

8   Q.   So in order to understand the number of actions taken out

9   of the number of tickets, we really want to look at it out of a

10  function of 315,000, correct?

11  A.   Possibly.  It depends on what we're looking at.

12  Q.   Let's do that.  So we have 48,000 instances of sent reply

13  out of these 315,000 tickets.  Now, "sent reply" is the

14  language that Cox and CATS uses typically when CATS receives an

15  e-mail that exceeds a given sender's hard cap limit, correct?

16  A.   Depends on the action content form here.

17  Q.   And you see on the action content form in column I, they

18  all look like hard limit complaints?

19  A.   For this particular page, yes.

20  Q.   I think there might be a couple of other ones, but let's,

21  let's do this:  Let's unselect and just select hard limit

22  complaints.  So for all of those hard limit complaints, it's

23  46,997?

24  A.   Yes.

25  Q.   Okay.  So just about 47,000 times that Cox sent a hard

1413

1    limit reply to a sender.  Am I correct, sir, that means that

2    Cox sent an e-mail back to whoever sent it, closed the ticket,

3    and did nothing as to the customer?

4    A.   I can't say that we did nothing, but yes, we did not take

5    a customer facing notification at that time.

6    Q.   So you took no customer facing notification.

7    A.   Correct.

8    Q.   Didn't send the customer a warning for those 47,000,

9    correct?

10   A.   No, but it will serve as their first step in our graduated

11   response program if they haven't received any other complaints.

12   Q.   So this might replace the ignore hold for all?

13   A.   The hold for more, yes.

14   Q.   So this might replace the ignore hold for more, but other

15   than that exception, this doesn't bump them up in the graduated

16   response step, correct?

17   A.   No.  It can take the place of the hold for more, but

18   there's no additional customer facing action on those.

19   Q.   This would not give the customer a warning e-mail, would

20   it?

21   A.   No.

22   Q.   They wouldn't be suspended based on this, right?

23   A.   No.  That would be a customer facing.

24   Q.   There would be no customer call, correct?

25   A.   That would be customer facing action.

B. Beck - Direct

1414

1   Q.   There would be no suspension?

2   A.   Also customer facing action.

3   Q.   And no termination?

4   A.   That would be very much a customer facing action.

5   Q.   And as for the graduated response, I want to make sure I

6   understand how that works.  So ordinarily, when CATS receives a

7   notice that it takes a customer facing action, it might bump up

8   the customer in the graduated response, correct?

9   A.   Conversationally speaking, yes.

10  Q.   Conversationally speaking.  That's -- that works for me.

11          Say a customer is on their fifth ticket under the

12  graduated response and then they get their sixth ticket.

13  Ordinarily if it it's a notice -- if it's a ticket that Cox

14  processes and recognized, it would bump that customer up to the

15  sixth step, correct?

16  A.   Yes.

17  Q.   Okay.  But if it's a hard limit reply, that customer just

18  stays at the fifth?

19  A.   Yes.

20  Q.   They essentially get a free pass on the graduated

21  response, don't they?

22  A.   I don't know that I would call it a free pass.  The

23  complainant can resend the complaint at a later time if they

24  have a lower volume spot.

25  Q.   Can we pull up -- actually in your binder, please, take a

1415

1    look at 310, PX 310, tab 10.  PX 310.

2         Mr. Beck, this is a two-page e-mail that you're

3    included on.  Let me know if you can -- if you recognize that,

4    sir.

5    A.   Okay.  Give me just a moment to review.

6    Q.   Sure.

7    A.   Okay.

8         MR. GOULD:  I'd move to admit PX 310.

9         THE COURT:  Any objection?

10         MS. GOLINVEAUX:  No objection, Your Honor.

11         THE COURT:  It's received.

12         MR. GOULD:  So if we pull that up and start at the

13   second page, please, just zoom in on the whole e-mail, if you

14   could.

15   MR. GOULD:

16   Q.   So, Mr. Beck, here you're sending an e-mail to the

17   corporate abuse and data ops - CATS teams, and the subject is

18   High Complaint volume for Universal Studios, correct?

19   A.   Yes.

20   Q.   And you say:  We have a "hard limit" of 200/day applied

21   for Universal's complaints to us, but we're seeing quite a bit

22   more than that coming in.  In general it isn't a big deal

23   really (we create closed tickets once the limit is exceeded

24   each day), but this complainant in particular has had daily

25   complaint volumes as high as 3,700+ lately.  Does that seem

B. Beck - Direct

1416

1    excessive to you?

2              Do I read that correctly?

3    A.    I believe so, if I followed along correctly.

4    Q.    I'm sorry, I didn't hear that.

5    A.    I said I believe so, if I followed along correctly.

6    Q.    And what's happening here, Mr. Beck, is you're explaining

7    that Universal Studios is sending a great deal of copyright

8    infringement notices above its 200 per day cap, correct?

9    A.    Yes, above what it -- if I'm reading and remember this

10   right, it's probably a statement that their current volume may

11   be higher than it's been in the past, so it's basically a

12   pattern change, something that catches our eye.

13   Q.    And as to the particular content, the point is that

14   they're well over the 200 per day cap?

15   A.    Yes.

16   Q.    And you say it's no big deal because you just close the

17   tickets, right?

18   A.    Those are the words here, yes.

19   Q.    But what you mean there, Mr. Beck, is it's no big deal for

20   Cox; isn't that right?

21   A.    No, it's not.  What I'm saying here is that it's not --

22   Q.    Mr. Beck --

23              THE COURT:  Let him finish.  Let him finish the

24   answer.

25              THE WITNESS:  I was basically just saying that when I

B. Beck - Direct

1417

1    say it's not a big deal here, I'm saying it's not causing,

2    like, a system-impacting issue.  It's not causing a degradation

3    of CATS' ability to handle notices and such.

4    BY MR. GOULD:

5    Q.    It's not causing a big deal for Cox's computer systems?

6    A.    For the CATS platform.

7    Q.    It's not causing a big deal for CATS?

8    A.    Correct.

9    Q.    You certainly don't mean that it's no big deal for the

10   copyright owner?

11   A.    No, that's not the implication here.  This is about system

12   availability.

13   Q.    And those 3,500 notices above Universal Studios' cap

14   ordinarily might trigger a hard limit reply like we saw if

15   there was an e-mail address to send to, right?

16   A.    Yes.

17   Q.    But if you look down at this chart on the bottom, do you

18   see that the complainant has a reply address that says no

19   reply?

20   A.    Yes.

21   Q.    And doesn't that mean, sir, that CATS doesn't send a reply

22   to them?

23   A.    Yes, that's correct.  We assume it would bounce, that it's

24   not a serviceable address.

25   Q.    So in this case, Cox and CATS not only takes no customer

1  facing action; it also takes no action as to the complainant;

2  isn't that right?

3  A.   The complainant hasn't given us a valid way to reach them

4  for these.

5  Q.   And you asked the abuse team whether this seems excessive?

6  A.   Those were the words, yes.

7  Q.   And on the next page, Mr. Sikes replies and says:  Yes,

8  this does seem a bit excessive?

9  A.   Yes.

10  Q.   Mr. Beck, is it excessive to report massive theft or to

11  ignore notice of it?

12  A.   I think I alluded to it earlier, when I said excessive, I

13  think I meant that does this seem like an unusually high volume

14  compared to what we've normally received from them.

15  Q.   Now, I want to turn back to the ticket data, PX 19.

16  Actually, one of the fields -- one of the fields in the ticket

17  data is sent warning, correct?

18  A.   That is one of the actions, yes.

19  Q.   And we could figure out the number of warnings sent to

20  those customers, correct?

21  A.   Yes.

22  Q.   Now, I want to pull up a document that I'm going to call

23  PX 32A, which is not in your binder.  It's the first of the

24  compilation of warning e-mails that Cox sent to its customers,

25  and I have one open for you to look at because I did not plan

B. Beck - Direct

1419

1    ahead on this one.  I apologize.

2           Mr. Beck, you're familiar with the e-mail warnings

3    that Cox sends to its customers, correct?

4    A.   Yes, generally.

5    Q.   You've seen those before?

6    A.   Um-hum, yes.

7           MR. GOULD:  PX 32A is a single one of those warnings,

8    and I move to admit PX 32A.

9           THE COURT:  Any objection?

10          MS. GOLINVEAUX:  No objection, Your Honor.

11          THE COURT:  All right.  It's received.

12          MR. GOULD:  If you could pull up PX 32A.

13   BY MR. GOULD:

14   Q.   Now, Mr. Beck, this is an example of one of the warning

15   e-mails that CATS sends to customers, correct?

16   A.   It does appear to be so, yes.

17   Q.   And this message is to advise that Cox has received a

18   notice of infringement.  And I want to look at the second

19   paragraph -- actually, the third paragraph.  Let's blow that

20   up.

21          In the third paragraph, Cox says to its customers:

22   As an internet provider, Cox is responsible under the Digital

23   Millennium Copyright Act, DMCA, to advise when we receive a

24   notice asserting infringement by you.  We are also required to

25   take appropriate action if further claims are received that you

B. Beck - Direct

1420

1    do not resolve.

2              Did I read that correctly?

3    A.    If I followed along, yes.

4    Q.    Now, we just looked at a number of categories of instances

5    where Cox actually doesn't advise a customer when it receives a

6    notice asserting infringement, didn't we?

7    A.    Can you repeat?  I'm sorry?

8    Q.    We just looked at a number of categories of, categories of

9    procedures where Cox actually doesn't advise the customer when

10   it receives an infringement allegation against them; isn't that

11   right?

12   A.    For various different reasons, yes.

13   Q.    Yeah.  We talked about hard limits, right?

14   A.    Hard limits, yes.

15   Q.    We talked about two kinds of blacklists, right?

16   A.    Yeah.  The blacklists, we would believe something to be

17   improper with the complaint.

18   Q.    And we talked about how multiple notices might roll up

19   into a single ticket?

20   A.    Yes.

21   Q.    So, in fact, Cox doesn't advise the customer when it

22   receives a notice asserting infringement by you in all cases;

23   isn't that right?

24   A.    Not every single notice will be passed directly to the

25   customer.

1429

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

<u>VOLUME  7  (A.M. Portion)</u>

TRIAL TRANSCRIPT

December 10, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

B. Beck - Direct

1442

1    A.    There would have been no customer-facing notifications,

2    yes.

3    Q.    Now, I want to take a look at the ticket history of

4    several customers to see what it looked like on an individual

5    basis.  Sir, I've handed you what's been marked as PX 547.

6          Do you see that?

7    A.    I do, yes.

8    Q.    And you understand this is a -- an excerpt from the larger

9    set of ticket data that you prepared, correct?  This is an

10   excerpt for a single ICOMS ID, No. 436526627504?

11   A.    Yep.

12   Q.    I'm sorry, did you say yes, sir?

13   A.    Okay.

14         MR. GOULD:  I'd move to admit PX 547.

15         THE COURT:  Any objection?

16         MS. GOLINVEAUX:  No objection, Your Honor.

17         THE COURT:  It's received.

18         MR. GOULD:  If we could publish that?

19   BY MR. GOULD:

20   Q.    So what we've pulled up here is a soft copy, an Excel

21   version of the ticket excerpt that we just produced, and this

22   is for a residential customer, sir?  Does that sound right to

23   you?

24   A.    I would have to look up the account number in the billing

25   system to find out.

B. Beck - Direct

1443

1   Q.   Well, I'll represent to you that based on the data, this

2   is a residential customer.  Any reason to doubt that?

3   A.   I would have to look it up to be able to know.

4   Q.   And you could look, sir, and figure out -- could you

5   scroll up to the top, please? -- the number of -- can you

6   freeze the top row?

7        You could look up the number of -- you could figure

8   out the number of tickets, correct, by counting the individual

9   ticket IDs?

10  A.   Yes.  The second column would be the ticket IDs.

11  Q.   I realize this is a bit long.  We've done the count.  You

12  can scroll through -- if you could just scroll down gently?

13       You see that there are tickets for this customer

14  beginning in April 2012.  Do you see that?  Tickets beginning

15  in April 2012 and tickets lasting until, all the way at the

16  bottom, December 2014?

17  A.   I see.

18  Q.   And do you recall the period of data that you provided was

19  2012 to 2014, correct?

20  A.   Yes, that's correct.

21  Q.   Again, we don't know what happened with this customer

22  after 2012 -- after 2014.

23       And you could do the ticket count, but we counted.

24  Do you agree that there are 67 tickets for this customer?

25  A.   I'd have to go through and count them, but yes.

B. Beck - Direct

1444

1   Q.   You would have to count them?

2   A.   Yes.

3           MR. GOULD:   Okay.  And then let's go up to the top,

4   Mr. Duval, and run some filters on the Action column, column H.

5   Column H.  And let's filter first for warnings.

6   Q.   So this customer out of 67 tickets received, if you can

7   look at the bottom left, there's a number there -- oh, I want

8   to back up.  My colleague said that I may have said 57 tickets.

9   This was 67 tickets for this customer.

10          You can see that this customer had 28 warnings,

11  correct?

12  A.   I'm seeing 28 on the screen.

13  Q.   And now let's filter on hard limits.  Thank you.  That was

14  my fault.

15          It looks like this customer had 23.  Again, if you're

16  looking at the screen, you can look at the bottom left.  You

17  see the number that came up on the filter, 23 hard limits,

18  correct?

19  A.   I see 23 on the screen.

20  Q.   And this customer would not have received any

21  customer-facing action in response to those 23, correct?

22  A.   That's correct.

23  Q.   Okay.  And let's do another filter.  Clear that one.

24          On column H, this time for suspension.  And you see

25  that this customer, sir, was suspended nine times in response

B. Beck - Direct

1445

1   to some of these 67 tickets?

2   A.   Yes.  It's over about two years.

3   Q.   And the suspensions span from the fall of 2012 into the

4   winter of 2014, correct?

5   A.   Yes, about 26 months.

6   Q.   Okay.  And then if we filter column H again for

7   reactivated, please?

8        So remember there were nine suspensions, right?

9   Let's see how many times this customer was reactivated.

10       Nine.

11       Now, the other thing we talked about yesterday is you

12   can actually see the time differential between suspension and

13   reactivation, correct?  That data exists?

14  A.   Yes.

15  Q.   We did the math for this customer.  Would it surprise you,

16  sir, to learn that the average time between suspension and

17  reactivation for these nine suspension-reactivations was about

18  86 minutes?

19  A.   No, that wouldn't surprise me.  It's not meant to be a

20  punishment or a -- it's not meant to keep them offline for a

21  period of time.  It's meant to get their attention and then

22  bring them educational information.

23  Q.   Let's take a look at another ticket.  Oh, I'm sorry,

24  there's one more, if you could pull that one back up.  I

25  apologize.  Let's run one more filter and see if we can see how

B. Beck - Direct

1446

1    many times this customer was terminated on column H.

2            It doesn't look like termination is an option.  Do

3    you agree that's because this customer was never terminated in

4    this time period?

5    A.   Yeah.  If there was a termination logged in CATS during

6    this time period, it would be in the report.

7    Q.   Okay.  You can set that aside.

8            Let's take a look at another residential customer.

9    We'll call this one PX 545.  Sir, this is another ticket

10   excerpt of the kind we just looked at, labeled PX 545.

11           We would move to admit PX 545.

12           THE COURT:  Any objection?

13           MS. GOLINVEAUX:  Foundation, Your Honor.

14           THE COURT:  Is this another customer?

15           MR. GOULD:  Same type for ICOMS 131055410901.  This

16   is an excerpt for PX 19, a larger ticket data set.

17           THE COURT:  It will be received.

18   BY MR. GOULD:

19   Q.   This is a similar-looking excerpt from the larger ticket

20   data.  Do you understand that, sir?

21   A.   Yes.

22   Q.   And we could run the same kinds of filters analysis,

23   correct?

24   A.   Yes.

25   Q.   And this customer is another residential customer who had

1   72 tickets.  Do you agree with that?

2   A.   I would have to go through and count them.

3   Q.   You'd have to count them.  Let's run a couple of filters.

4   I think we can get through these a little bit more quickly.

5   Let's look at column H for action.  There we go.  Let's look

6   for warnings.  Let's see how many times this customer with 72

7   tickets was warned.

8         Oh, we don't even need to look on the bottom.  We can

9   just count them.  It's seven warnings out of 72 tickets,

10  correct?

11  A.   I see seven on the screen, yes.

12  Q.   Okay.  Let's look at hard limits.  See if we can see how

13  many hard limits there are.  Actually, you know what?  This

14  customer doesn't have any hard limits.

15        Let's move to suspensions.  How many suspensions for

16  this customer with 72 tickets?  One suspension, okay?

17        And let's look at how many reactivations.  One

18  suspension, one reactivation, correct?

19  A.   That's what I see, yes.

20  Q.   And let's see if there's any terminations for this

21  customer.  It looks like that's not an option.  No terminations

22  for this customer, correct?

23  A.   None that I see in this document.

24  Q.   And this was a residential customer.  You understand that?

25  A.   I'd have to look that up in the billing system.

B. Beck - Direct

1448

1    MR. GOULD:  If you could clear the filter on that?  I
2    want to go back to the top.
3    Q.   So if you look, sir, you'll see that the first through
4    line 23, there's -- every entry says changed status to closed.
5    If you could just highlight those first 23 rows.
6    Do you see that, sir?
7    A.   I see.
8    Q.   And you see in response to those first 23 copyright
9    infringement tickets in this period, there's not a single
10   warning to the customer?
11   A.   Are we also representing this to be a residential account?
12   Q.   Yes, sir.
13   A.   Okay.  Yes, I see.
14   Q.   So in response to the first 23 copyright infringement
15   notices to this residential customer starting in 2012, Cox
16   didn't send a single warning, correct?
17   A.   No.  That's uncommon.
18   Q.   Certainly that's what the data you've provided shows,
19   right?
20   A.   For this customer, yes.
21   Q.   And so the first warning this customer got was in May
22   2012, after 23 -- I guess I counted the header -- after 22
23   prior notices, right?
24   A.   After 21 prior, discounting the --
25   Q.   I miscounted again.  21?

B. Beck - Direct

1449

1   A.   Yes.

2   Q.   Okay.  And then let's scroll -- leave that one highlighted

3   and just scroll down, if you would.  Let's see when the next

4   warning occurred.

5        There we go.  So now we're at line 66, right?

6   A.   Um-hum.

7   Q.   So we saw that customer's first warned on their 22nd

8   warning, and now we're up to -- if you count for the header and

9   the one we're on, it's probably the 64th copyright infringement

10  notice to this customer, right?

11  A.   Yeah.  That would probably be the 64th on the list, yes.

12  Q.   So this residential customer got 64 copyright infringement

13  tickets, which we've established is fewer than the number of

14  notices, potentially, correct?

15  A.   Potentially.

16  Q.   And got a second warning after 64 tickets, correct?

17  A.   That's what I'm seeing here, yes.

18  Q.   You can set that one aside.  I just want to take a look at

19  one more.

20       All right.  Let's see if I have a third copy -- oh,

21  here it is.  I apologize, we'll do the best we can.  I've given

22  my only spare copy to your counsel.  I'll represent to you,

23  sir, that it's another ticket extract of the same type for a

24  business customer for ICOMS ID 580070866401.

25       THE COURT:  Any objection?

1    MS. GOLINVEAUX:  Objection, Your Honor.  The witness

2    doesn't have a copy of the document.

3    THE COURT:  Well, he's going to see it on the screen

4    if we admit it.  If we don't admit it, then it's not --

5    MS. GOLINVEAUX:  No objection.

6    THE COURT:  All right.  It's received.

7    MR. GOULD:  Thank you.  If we could produce --

8    publish -- do we have, is it 549?  I may be short on this one.

9    I could pull it up on the Elmo.

10    Oh, you have 549?

11    THE WITNESS:  You brought me two a moment ago.  One

12    of them was 549.

13    MR. GOULD:  If I could be so bold as to ask one of

14    you to borrow it so I can display it for the jury?  Because I

15    don't think I have this one --

16    THE COURT:  Joe, can we get one copy back from

17    Mr. Beck, please?

18    MR. GOULD:  Thank you.

19    So I'm going to go back in time a little and do this

20    one manually.

21    BY MR. GOULD:

22    Q.   Do you see, sir -- and it's a little hard to see, I

23    apologize, because it's a bit small.  Do you see this is

24    similar in kind to the documents we've just been looking at,

25    and it's a ticket extract for Cox Business customer with the

B. Beck - Direct

1451

1    ICOMS that he's shown in this column?

2            You found it?  All right, let's pull it up.  We found

3    it.

4            I got it.  Beautiful, thank you.  It takes a village.

5            So on this third one, on the business customer, sir,

6    this was a fraternity based on the information that Cox

7    provided, so let's see what the fraternity did.

8    A.   If we found the -- a copy, do you mind if I get the paper?

9    Q.   Oh, yes.  Absolutely, sir.  And this is PX 549.

10   A.   I appreciate it.

11   Q.   So similar in kind, we've counted the number of tickets

12   for this fraternity business customer, and it was 67 tickets,

13   and you could figure that out by counting the unique number of

14   ticket IDs, correct?

15   A.   That can be determined by counting the ticket IDs, yes.

16   Q.   Okay.  So let's go to column H and filter again.  Let's

17   filter for warnings.

18           So out of 67 infringement notice tickets, if you look

19   on the bottom left, sir, you see that it's 48 warnings to the

20   customer?

21   A.   Yes, I see.

22   Q.   Okay.  And then if we filter for hard limits, that would

23   be instances where notice or tickets rejected for being over a

24   complainant's cap, with no customer-facing notice, correct?

25   A.   Yes, subject to possibly hold for more.  Yes.

B. Beck - Direct

1452

1    Q.    Nine hard limit replies with no customer-facing action,

2    correct?

3    A.    That's what I see.

4    Q.    And -- okay.  If you could clear that and go back to

5    column H, and let's look for suspensions or terminations.

6          We don't see any suspensions or terminations of the

7    fraternity, right?

8    A.    No.

9    Q.    And likewise, we don't see any terminations for the

10   fraternity?

11   A.    No, we do not.

12   Q.    Okay.  And if we could go, unfilter again, and look the

13   tickets range from March 2012, correct?

14   A.    Starting in March 2012.

15   Q.    All the way through November 2014, correct?

16   A.    Yes.

17   Q.    And we don't know what happened after that.  We don't know

18   what happened in 2015 because we don't have the data, right?

19   A.    Correct.  Yes, this report was scoped 2012, 2013, 2014.

20   Q.    And so for any tickets received but they received no

21   warning and no hard limit reply, do you know what happened to

22   those?  I think the count would be about 19.

23   A.    Do we have a way to filter for those?

24   Q.    We don't -- I mean, we could filter for -- on H for --

25   well, changed status to closed would be overinclusive.

1  A.   Yeah, that would -- they would all eventually --

2  Q.   An entry that's closed with no other action, those are

3  just closed, right?

4  A.   Those are just closed, yes, but given that this is a

5  business customer, that could have been a phone call.

6  Q.   Could have been.  It doesn't show here.

7  A.   Yeah, phone calls are not a tracked action in CATS, so

8  those won't show up here.  And with business customers, the

9  level of support they get oftentimes is a phone call.

10           MR. GOULD:  Okay.  If we could pull up the third

11  slide from the demonstrative?  We're going to just summarize

12  what happened with the fraternity.

13           Oh, put that down, please.

14           MR. OPPENHEIM:  Pull that down, please.  Sorry.

15  Apologies, Your Honor.  Wrong exhibit.

16           THE COURT:  All right.

17  BY MR. GOULD:

18  Q.   Here we saw the fraternity had 67 tickets, 48 warnings,

19  9 hard limit replies, no suspensions, and no terminations.

20  Correct?

21  A.   That's correct.

22  Q.   With infringement tickets spanning the entire period,

23  virtually the entire period of the data set?

24  A.   Yeah, short a few months.  Yes.

25  Q.   Now, Mr. Beck, do you understand that Cox has argued that

M. Carothers - Direct

1559

1  two self-reactivations in the walled garden before requiring a

2  call-in, right?

3  A.   Yes, that's correct.

4  Q.   So that's extending the graduated response by two more

5  steps, correct?

6  A.   By one more step.

7  Q.   By one more step?

8  A.   Yes.

9  Q.   And then the next thing that Cox said it was going to

10  do -- I'm sorry, and that was soft-walled garden, correct?

11  A.   Yes, that's correct.

12  Q.   And the soft-walled garden is where a user can just look

13  on their computer and click on an "okay" and get back on the

14  internet, correct?

15  A.   They can see the list of infringing works and acknowledge

16  that they've seen it in order to click themselves out, yes.

17  Q.   One click, suspension is gone, right?

18  A.   That's correct.

19  Q.   Okay.  The next thing that you say Cox is going to do to

20  stem the flow is to ignore auto-close the first complaint

21  against each customer, even if they have a cox.net e-mail

22  address, right?

23  A.   Yes, that's correct.

24  Q.   So previously under Cox's policy, if Cox had a cox.net

25  e-mail address, Cox would forward the notice, right?

M. Carothers - Direct

1560

1   A.    Yeah, that's correct.

2   Q.    But now, at this meeting, you decided in order to stem the

3   flow, you were going to ignore the first notice, right?

4   A.    Yes.

5   Q.    Okay.  And you actually explain in the e-mail that you

6   only do it for -- you currently only do it for customers

7   without a cox.net e-mail and so now you're extending it, right?

8   A.    Yes.

9   Q.    Okay.  The third thing that you guys decide to do is to

10  institute hard limits for all senders, right?

11  A.    That's correct.

12  Q.    And so you go on to explain that you had only high -- hard

13  limits on certain senders before this, but now you're going to

14  have hard limits on everybody, right?

15  A.    Yes.

16  Q.    And you say that any notice over that limit will be

17  automatically closed with a response back to the sender, right?

18  A.    Yes.

19  Q.    And if we look at Cox -- excuse me, CATS, C-A-T-S, data,

20  when -- under this new policy, if somebody had sent in -- if a

21  copyright owner or a vendor had sent in too many notices, there

22  would be a reply to the rights owner that said hard limit for

23  sender.  That's what you see in CATS data, right?

24  A.    Yes.

25  Q.    And there would be no notification whatsoever of the

1581

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  7  (P.M. Portion)

TRIAL TRANSCRIPT

December 10, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

M. Carothers - Cross

1609

1          Now, Mr. Carothers, as you look at steps two through

2   seven, that means the second time there is a notice with

3   respect to a subscriber, a third time there is a notice with

4   respect to the same subscriber, fourth time, fifth time, sixth

5   time, seventh time, there is no steps up, correct?  It's the

6   exact same e-mail that goes out each time, right?

7   A.   Yes.

8   Q.   So that is not more intrusive, is it?

9   A.   I meant that warnings, suspensions, and hard suspensions,

10  each one of those was more intrusive than the last.  Not that

11  the individual e-mails were more intrusive than each other.

12  Q.   So it would be more intrusive, Mr. Carothers, right, if it

13  was a warning, a suspension, and then a termination, right?

14  Each step would be more intrusive, correct?

15  A.   Yes.

16  Q.   I believe you testified in response to Mr. Elkin's

17  question that the reason that Cox set suspension limits was

18  because of false allegations that it had received with respect

19  to particular subscribers; is that correct?

20  A.   That's one reason.

21  Q.   You've never indicated to anybody that the RIAA complaints

22  or notices were false allegations, have you?

23  A.   I have not.  I suspect that they could be, but I don't

24  have evidence to that.

25  Q.   Based on what you knew when Cox received those

1    allegations, you took those allegations to be fair and proper

2    infringement notices, correct?

3    A.   Yes.

4    Q.   If Cox is receiving false allegations from a rights owner,

5    those false allegations could concern the first notice, the

6    second notice, the third notice, it could concern any notice

7    with respect to a particular subscriber, correct?

8    A.   Technically possible, yeah.

9    Q.   So you have no information as you testify today to suggest

10   that it's more likely to have a false allegation with respect

11   to the first notice with respect to a subscriber than you would

12   the tenth notice with respect to a subscriber, correct?

13   A.   No, that's not correct.

14   Q.   In your response to Mr. Elkin's questions you indicated

15   that the term "ignore" for describing the decision to hold for

16   more on the first notice was inaccurate, correct?

17   A.   Yes.

18   Q.   But that was your term, right?

19   A.   It was.

20   Q.   You used the term "ignore" in your e-mail, correct?

21   A.   I did use that word, yeah.

22   Q.   Now, you testified that you did some analysis to decide to

23   engage in the decision to ignore and hold for more, correct?

24   A.   That's correct.

25   Q.   When did you do that analysis?

M. Carothers - Cross

1615

1   the case continues before the jury as follows:

2   BEFORE THE JURY

3           THE COURT:  All right.  Please proceed.

4   BY MR. OPPENHEIM: (Continuing)

5   Q.   Mr. Carothers, a moment ago you indicated that your

6   analysis was contained within e-mails; is that right?

7   A.   That's correct.

8   Q.   Were you asked to provide those e-mails to counsel for

9   purposes of this case and producing them to plaintiffs?

10  A.   I wasn't.

11  Q.   Other than containing them within e-mails, did you

12  otherwise memorialize this study in any way?

13  A.   I don't think so.  I think I only spoke about it verbally.

14          THE COURT:  Just for the record, there were no

15  e-mails produced which contained any analysis that

16  Mr. Carothers had authored.

17  BY MR. OPPENHEIM: (Continuing)

18  Q.   To be clear, Mr. Carothers, no documentation has been

19  provided to plaintiffs or this Court to support the fact that

20  you claim that you did an analysis that supported this hold for

21  more decision, correct?

22  A.   Correct.

23  Q.   And, in fact, the document we looked at from January 2010

24  says that you decided to ignore the first notice because you

25  were trying to stem the flow, right?

M. Carothers - Cross

1616

1   A.   That was part of it.

2   Q.   Can we pull up PX 32A, please.  And scroll down.  I

3   believe it is the third paragraph we are looking for.

4        Can you please highlight that third paragraph,

5   please.

6        Mr. Carothers, can you read that paragraph, please,

7   out loud.

8   A.   As an Internet service provider, Cox is responsible under

9   the Digital Millennium Copyright Act, DMCA, to advise when we

10  receive a notice asserting infringement by you.  We are also

11  required to take appropriate action if further complaints are

12  -- excuse me, if further claims are received that you do not

13  resolve.

14  Q.   So when Cox decides to ignore the first notice, Cox is not

15  doing what this e-mail from Cox says it will do, correct?

16  A.   I wouldn't say that.

17  Q.   Well, this e-mail very clearly says that as an ISP Cox is

18  responsible to advise when it receives a notice asserting

19  infringement, right?

20  A.   It does.

21  Q.   And yet when Cox receives the first notice with respect to

22  any particular customer, Cox does not advise the customer of

23  that infringement, correct?

24  A.   That is true.

25  Q.   Nor does Cox provide any notice to a customer of

J. Sikes - Video Deposition

1641

1   Mr. Thompson handled both residential and Cox Business abuse

2   complaints, correct?

3   A.   Correct.  We -- yes.

4   Q.   Were you also involved in the decisions of whether to

5   terminate the service of Cox Business customers?

6   A.   There -- yes.  Not for copyright infringement, but for --

7   if we had cases of Cox Business customers that were basically

8   spammers, and Jason handled a lot of those because Jason came

9   from the Cox Business side of Cox.

10          So -- but, yes, I was involved in terminating at

11  least one Cox Business subscriber.

12  Q.   For what?

13  A.   For, for being a spammer.  For basically setting up mail

14  servers and blasting spam all over the Internet.

15  Q.   Do you recall a Cox Business customer ever being

16  terminated for abuse complaints related to copyright

17  infringement?

18  A.   No.

19  Q.   Do you know why Cox wasn't terminating business customers

20  for copyright infringement abuse?

21  A.   I don't know exactly -- well, that was just -- that was

22  the longstanding policy.  We didn't suspend Cox Business

23  customers either unless we couldn't get in touch with them.

24          But in most cases a lot of our Cox Business customers

25  were hotels, universities, resellers of Cox service.  So, you

1    know, we -- we generally would not terminate those, those

2    businesses.

3           Also, in my experience, I found that a lot of Cox

4    Business customers were highly responsive when you speak to a

5    manager or the owner of a business, and usually they have an IT

6    staff or someone to help them trouble-shoot or identify the

7    issue.

8           I mean, there wasn't -- in most cases that I was

9    aware of, there -- Cox Business customers were highly

10   cooperative and compliant.

11   Q.   It was Cox's policy not to terminate or suspend Cox

12   Business customers for copyright infringement abuse, correct,

13   during the 2013/'14 time frame?  Yes or no?

14   A.   I don't know.  So what I do know when I started assisting

15   with Cox Business abuse concerns in around maybe 2006, I was

16   just told, we don't suspend.

17          No one has ever said, we don't terminate Cox Business

18   customers for copyright infringement.  That was never told to

19   me.  I never read any documents that said that, or I don't

20   remember any, but I do remember being told, we do not suspend

21   the customer, we call them for every abuse complaint.

22   Q.   Mr. Sikes, I've handed you what's marked as Exhibit 116.

23   Do you recognize it?

24   A.   Yes.

25   Q.   This is a Customer Safety and Abuse Operations Ticket

J. Sikes - Video Deposition

1643

1    Handling Procedures for Cox Business abuse, correct?

2    A.   Correct.

3    Q.   And the revision history on the front page shows that this

4    was last revised in May 2013, correct?

5    A.   Yes.

6    Q.   You and your team had oversight of the Cox Business abuse

7    team that implemented these procedures, correct?

8    A.   We consulted with them, yes.

9    Q.   Were you involved in developing the Cox Business abuse

10   ticket handling procedures?

11   A.   I contributed to this document.

12   Q.   How did you contribute?

13   A.   I don't recall.

14   Q.   If you would turn to page 8.  It shows Copyother.  Does

15   that refer to copyright infringement abuse?

16   A.   Yes.

17   Q.   On page 9 at the top, it describes action items for

18   resolving copyright infringement notices to Cox Business

19   customers, correct?

20   A.   Correct.

21   Q.   And the first step is to -- within a six-month period is

22   to hold for more and close the ticket, correct?

23   A.   Correct.

24   Q.   That's the same process that we saw earlier which

25   Mr. Carothers described as ignoring the first ticket, correct?

J. Sikes - Video Deposition

1644

1   A.   Correct.

2   Q.   And then at 6.0 it shows that for the second complaint and

3   beyond, and it has some action items.  Do you see that?

4   A.   Yes.

5   Q.   And do you see at the top of that box for second complaint

6   and beyond, those are the procedures for -- that would be for

7   the second complaint, correct?

8   A.   Yes.

9   Q.   And the third?

10   A.   Yes.

11   Q.   And the tenth, correct?

12   A.   Assuming so, yes.

13   Q.   And the 50th complaint, correct?

14   A.   Perhaps, yes.

15   Q.   It would indicate a serious problem to you if a Cox

16   Business customer received 50 takedown notices, correct?

17   A.   Yes.  And it would indicate a serious problem to the

18   customer as well.  I don't think any business would want to

19   have thousands of complaints caused by activity on their

20   network.

21   Q.   Are you aware that there are Cox Business customers who

22   received hundreds of copyright infringement notices?

23   A.   I don't remember.

24   Q.   Are you aware that there are Cox Business customers in the

25   2012 to 2014 time frame who received thousands of copyright

J. Sikes - Video Deposition

1645

1    infringement abuse notices?

2    A.    I don't seem to recall that, no.

3    Q.    Would it concern you if you learned that a Cox Business

4    customer was the subject of hundreds or thousands of copyright

5    infringement notices?

6    A.    Yes.

7    Q.    Do you think Cox should be doing something about that?

8    A.    Absolutely.

9    Q.    Like what?

10   A.    Work with that customer.  Work with that customer to

11   identify the source of the issue and offer suggestions to

12   mitigate the problem.  Because, like I said, I don't think any

13   Cox Business customer would want that level of complaints being

14   caused by activity from their network.

15          I mean, first of all, it could -- you know, it sounds

16   like they could have a serious virus or compromise on their

17   network.  Anyway, there's a lot of -- there's a lot of concerns

18   in addition to the large volume of copyright infringement

19   complaints.

20   Q.    You don't know if there is something Cox could have done

21   to prevent thousands of instances of copyright infringement

22   occurring by its Cox Business customers through Cox's network?

23   A.    What I do know is that Cox can work with a customer and

24   consult with the customer on identifying the issue.  If the

25   customer, himself or herself, is the one that's causing that

J. Sikes - Video Deposition

1653

1   Fox, if desirable?

2   A.   Yes, I see that.

3   Q.   You respond to Brent's idea of adding a hard limit and

4   say:  We will see what Jason says; correct?

5   A.   Yes.

6   Q.   You say:  I'm sure he will agree.

7           And then you say in all caps, in all capital letters:

8   We need to cap these suckers, exclamation point.

9   A.   Yes.

10  Q.   Do you know what you meant there?

11  A.   I was being playful, being crass.  I don't remember.

12  Q.   Didn't you mean set a hard limit on the number of DMCA

13  complaints that Cox would receive from Fox?

14  A.   Yeah, I mean, assuming that's what he's talking about with

15  the hard limit.  But before we would set any limit, we would

16  discuss it with the complainant.

17          So it wasn't like it was just, ahh, we're going to

18  cap those suckers right now.

19          I mean, basically anytime we would cap a complainant,

20  as I recall, we would reach out to them, talk to their legal

21  counsel.  Basically we come to an agreement.

22          So I don't remember what happened with Fox, if we

23  actually did cap them, but -- but, yeah, that was -- for --

24  Q.   Let me ask you the question.  What does it mean to

25  blacklist a copyright complainant?

1      Do you see that?

2  A.   Yes.

3  Q.   And this time Mr. Zabek says:  Do it, they've had plenty

4  of chances.

5      Do you see that?

6  A.   Yes.

7  Q.   And Ms. Dameri, another TOC Level 2.5 rep, correct?

8  A.   Yes.

9  Q.   Replies and says:  Please ensure when terminating a

10  customer for real that we remove the CHSI charges, correct?

11  A.   Yes.

12  Q.   CHSI is Cox high-speed Internet?

13  A.   I believe so, yes.

14  Q.   And then you reply December 12, 7:33 p.m.  And could you

15  read your response, please.

16  A.   Yep.  Good point, Andrea.  Now when we terminate

17  customers, we really terminate the customer (for six months).

18  Q.   And REALLY is in all caps, is that why you emphasized it

19  in your reading?

20  A.   Yes, as in the service is removed from the customer's

21  account, the HSI service is removed, as Andrea mentions below.

22  Q.   And you describe that as a real termination or really

23  terminating, correct?

24  A.   It's not a -- it's not a soft termination.  And I -- I

25  regret to use that word because, like I said, that's my own --

1   that's not our process?  But, yes, it's a -- it's a termination

2   where the high-speed Internet service was removed from the

3   account.

4   Q.   So you're making a distinction in Exhibit 132 between a

5   soft termination and a real termination, correct?

6   A.   Well, a soft termination, I mean, you know, as we

7   discussed, basically there is a possibility that the customer

8   may be reactivated.

9           So this -- in this case, this customer apparently

10  had -- had been through the process however many times and was

11  a candidate to have their service cut off.  Basically we worked

12  with them, exhausted all efforts and, you know, had to make the

13  decision to -- to terminate them from the Cox network and cut

14  them off from Internet services.

15  Q.   So just to be clear, when you talk about really

16  terminating in 132, you're drawing a distinction between a soft

17  termination and a real termination, correct?

18  A.   Correct, yes.

19  Q.   And so, by looking at a real termination, that gives you

20  some context to understand what you were describing as a soft

21  termination before, correct?

22  A.   Correct.  Yes.  The CHSI service was removed from their

23  account.

24  Q.   But continued offenses occurred -- the continuing offenses

25  section of the procedures occurred on the 14th notice, correct?

J.C. Fuenzalida - Video Deposition

1705

1  peer-to-peer usage was forecasted to increase year over year?

2  A.   Yes.

3  Q.   And if you could turn to the High Household Profile

4  section of this excerpt.

5        Do you see that?

6  A.   Yes.

7  Q.   Does this reflect that inCode forecasted to Cox that for

8  those that engage in peer-to-peer activity, that their overall

9  data consumption for peer-to-peer would increase in each of the

10  years for 2011 to 2015?

11  A.   Yes.

12  Q.   In 2011 the Procera data showed that 12-and-a-half percent

13  of the data of Cox's network was being used for peer-to-peer

14  file -- file usage, correct?

15  A.   Yes.

16      EXAMINATION

17  BY MS. LEIDEN:

18  Q.   Could you first turn to the document that Mr. Zebrak

19  marked earlier as Exhibit 94.  That's the hard copy of the

20  spreadsheet that you were looking at electronically.

21  A.   Okay.

22  Q.   Just a couple of clarifying questions on this data.  If

23  you flip to the second tab after the first blue page, the page

24  titled Summary of Data Usage.

25  A.   Yes.

1713

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  8  (A.M. Portion)

TRIAL TRANSCRIPT

December 11, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

A.    Yeah.  I mean, one of the more recent or latest -- I
forget the precise date of it, reviews of the literature, but
it was -- I believe it was after the 2014, said that they found
26 studies of whether or not there was economic harm to rights
holders, and they found that something like 23 out of those --
out of the 26 studies found significant economic harm.

        Now, when you say "significant," what you mean is
that you're actually able to demonstrate it within the dataset
using statistical methods to basically sort of pass muster.

        So it's not like I found evidence, but it's not
statistically significant.  So it doesn't mean that's
meaningless, it just means that, you know, it doesn't cross
that higher bar that academics try and set for themselves in
published literature.

        So when they say 23 out of 26 studies found
significant harm, that's -- you know, I would say, you know, a
demonstration of almost universal consensus in the profession.

Q.    And did you agree with that consensus?

A.    Absolutely.  And I think all the other evidence I
considered in this matter just goes to confirming that.

Q.    Have you prepared a slide excerpting one of the studies
you reviewed?

A.    Yes.

Q.    Could you tell us about this study and why you've put this
slide here, Dr. Lehr?

W.H. Lehr - Direct

1748

A.    Yeah.  This is one of the studies that I cited, and the
title of the study is Quantifying Global Transfers of
Copyrighted Content Using BitTorrent.

And it's by Alexandria Mateus and John Peha.  And
I've highlighted, you know, excerpts from this.  So the first
excerpt is that 10.7 songs were transferred using BitTorrent
for every song sold.

And then also, that the vast majority of music and
video content transferred using BitTorrent is copyrighted.

And they find that only .55 percent, less than, you
know, 1 percent, about half a percent of the content in
BitTorrent is not copyright infringing and potentially
legitimate.

So they conclude that BitTorrent transfers result in
hundreds of millions of copyright violations worldwide per day,
and the copyright holders fail to realize significant revenues
as a result.

What these guys did in the study was they looked in
some detail and care at actually what's going on in BitTorrent
traffic.  And, you know, it's a fairly comprehensive study, I
think, in doing that.

And what they're saying here is essentially this
research says that the number of illegal copies that are out
there -- because almost all these copies that are going by
BitTorrent are illegal, that's what this is saying, is that

1  it's copyrighted material that are being shared over the

2  BitTorrent network -- it's ten times what the legal sales are.

3  Q.  Now, Dr. Lehr, there is a document in front of you,

4  PX 439.

5  A.  Yes.

6  Q.  Do you recognize that?

7  A.  Yes.

8      MR. GOULD:  I'd move to admit PX 439.

9      THE COURT:  Any objection?

09:53:32 10      MR. BUCHANAN:  Yes, Your Honor, I would -- no

11  objection.

12      THE COURT:  All right.  Your exception is noted

13  previously.

14      MR. GOULD:  If we could pull up--

15      THE COURT:  The exhibit is received.

16      MR. GOULD:  Actually, you know what, I have got a

17  slide, so it's fine.

18  BY MR. GOULD:  (Continuing)

19  Q.  Dr. Lehr, what is PX 439?

09:53:47 20  A.  This is another one of the, you know, documents that I

21  reviewed in reaching my opinions.  It was, you know, a study

22  that looked at -- it was another study also looking at some of

23  the same issues that were touched on in the paper I just saw,

24  looking at what's actually in BitTorrent traffic.

25      And so, what they did was they only identified out of

W.H. Lehr - Direct

1750

1   the torrent files, out of 12,500 torrents analyzed, there were

2   only two files that they offered -- or two torrents that --

3   files that offered non-infringing content.  So that results in

4   them including that 99.97 percent of content was infringing.

5         So this is another example of research of the sort

6   that was relied upon by analysts and academics trying to think

7   about this question of does, you know, peer-to-peer file

8   sharing result in piracy that harms rights holders?

9         And, you know, it goes to the point of, you know,

09:54:52 10   people that actually looked at this, documents what was, I

11   would say, commonly known by people that were thinking about

12   these issues at the time that, you know, of course, the

13   traffic, peer-to-peer traffic is almost all illegal copyright.

14   Q.   So how does this -- how do these two articles and the body

15   of literature tie in with your opinion that this peer-to-peer

16   infringement causes economic harm?

17   A.   Well, what the peer-to-peer does is it basically makes it

18   extremely easy.  So it is kind of like piracy on steroids.

19   While piracy did happen and has been a problem forever -- you

09:55:35 20   know, when people did discs, you know, did copyright CDs, that

21   just wasn't quite the same thing.

22         But if someone can put on the Internet a copy via

23   broadband connection, especially via a high-speed broadband

24   connection a copy, the number of times that can be shared is

25   potentially unlimited.

W.H. Lehr - Direct

1751

1        So the viral nature of file sharing and the way

2    peer-to-peer networks work means that it's an extremely

3    dangerous, you know, from the perspective of rights holders,

4    vehicle for, you know, producing illegal copies.

5    Q.   Now, moving to your second opinion that the quantity is --

6    you can't quantify the harm.  Could you walk us through the

7    basis for that opinion.

8    A.   Yeah.  So the first, you know, opinion is that, you know,

9    the evidence and, you know, sort of universally the people that

09:56:37 10    have looked at it, the economists and other analysts, have

11    concluded that there is a really significant harm to rights

12    holders.

13        It turns out that, you know, if you want to try and

14    quantify that in dollar terms, like what is the economic damage

15    that plaintiffs would suffer in a case like this, that data

16    just doesn't exist.

17        To an economist trying to estimate something like

18    economic harm, what you're trying to do is figure out, here is

19    the way the world exists today, so I know what sales are in

09:57:11 20    today's world, but what would sales have been in the but-for

21    world where the piracy problem that I'm worried about did not

22    exist.

23        So I'm trying to estimate what the profits and

24    revenues might have been to rights holders in a world where

25    piracy did not exist.  And I fundamentally do not have the data

W.H. Lehr - Direct

1752

1    to do that, nor does it actually exist.

2    Q.   So there are three points on your slide here.  Can you

3    just walk through and just briefly explain why this data

4    doesn't exist.

5    A.   Sure.  So the first issue, problem, if you try to estimate

6    the revenues -- so I'm trying to figure out how much lower

7    revenues were as a consequence of the piracy.  That's what I

8    would have needed to have done if I was going to try and

9    estimate what the economic harm to plaintiffs would be.

09:58:10  10         It was clear to me, after looking at the evidence and

11    what was available in the literature, that evidence did not

12    exist.  So I didn't attempt to do that.

13         But if you -- the first thing you would have to do is

14    estimate that Q, how many unit sales would they have sold in a

15    world without piracy.  So to do that, the first thing you have

16    to do is figure out how many illegal copies are out there as a

17    consequence of the piracy.

18         So in this case, the data we have is evidence of

19    infringement using peer-to-peer by subscribers repeatedly, you

09:58:42  20    know, engaging in infringing activity.  We don't observe how

21    many actual copies were distributed by those subscribers, nor

22    could we given the way the data was actually collected.  So

23    that at best we have a lower bound estimate of the amount of

24    infringing activity.

25         So MarkMonitor, which is the principal source of the

1753

1    data, wasn't surveying every Cox subscriber all the time.  And

2    the -- so they wouldn't have known everything that was going

3    on.

4              And a file, even potentially more important, a file

5    that is distributed illegally, once it gets out there virally,

6    how many illegal copies that copy can spawn.  You would --

7    there is no way to precisely estimate that.

8              So that's the Q.  You don't know what the Q is.  And

9    the data in the case doesn't allow you to reliably estimate

09:59:43 10  that, the number of illegal copies.

11             Now, that number of illegal copies isn't -- doesn't

12   equate directly to the number of sales that would have

13   happened.

14   Q.   Why not?

15   A.   Because the second thing you have to know is you have to

16   know how many of those illegal copies would have -- had they

17   not existed, would have translated into legal sales.

18             Now, if you say the legal sales would have taken

19   place at a zero price, then it's okay.  But if you say it's a

10:00:11 20  non-zero price, some of the things that went out there

21   illegally might not have been bought.

22             So you have to figure out what was the purchasing

23   behavior of the subscribers, what they would have done if they

24   hadn't been able to get the pirated copies.  And that data

25   doesn't exist.  We don't have detailed data on Cox's

W.H. Lehr - Direct

1754

1    subscribers' music-purchasing behavior.  So we don't know what

2    the displacement effect would have been given a number of

3    illegal sales.

4         So I need to know the number of illegal sales and

5    then I need to have an estimate, a reliable estimate of the

6    displacement effect to figure out what the change in Q, the

7    quantity of units sold, would be.

8         And the third thing is, as I mentioned earlier, the

9    prices.  What would the prices have to have been or could have

10   been -- would have been in a world without the piracy taking

11   place.  The prices I observe have been driven down because of

12   the existence of the piracy.

13        So I don't have any of those core elements.  So I

14   can't reliably estimate the revenues that were lost because of

15   the piracy.

16   Q.   So you talked about all this data you don't have.  Why

17   can't you just look at the number of notices that the

18   plaintiffs sent and estimate damages based on that?

19   A.   Well, first off, I'm not here testifying about how you go

20   from the notices to the details of figuring out what some

21   number of infringements are.  That's not stuff I'm talking

22   about.

23        But the notices were part of a complex process that,

24   as I have already said, did not detect, nor could be expected

25   to detect, every element of infringement.

W.H. Lehr - Direct

1755

1        So the number of times, like the subscribers who may
2   have been infringing, it's reasonable to believe there were,
3   that might not have been detected.  So they've never been --
4   it's possible no notice at all.
5        And the notices were of an observation that a file
6   was being made available, a copyrighted file was being made
7   available at a particular IP address.  But it doesn't tell you
8   how many times that file may have been shared.  And, you know,
9   all the other ways.  That data -- no one has.  BitTorrent
10:02:28 10   doesn't have it.  Cox doesn't have it.  And certainly the
11   rights holders don't have it.
12   Q.   I want to turn to your next opinion about the industry
13   economics and Cox's revenue and profits.
14        Before we go -- as we go into that, can you describe
15   a little bit the economic nature of Cox's business as an
16   Internet service provider?
17   A.   Yeah.  To think through and understand the financials of
18   Cox and come to the opinions that I have, you have to
19   understand a little bit about the nature of that business at a
10:03:06 20   high level and even at a level with some more detail.  And
21   that's something I have spent a lot of my time doing.
22        I mean, Cox is a provider of telecommunications
23   network services using a complex network that they have built
24   up that allows them to offer a range of services that we'll be
25   talking about.

1   a total of $19.5 billion.

2         So round numbers, they're basically a $10 billion

3   company.  And that comports with sort of what you would expect

4   given sort of what I have already said.

5         The other point to recognize, and this slide

6   demonstrates, is they're a quite profitable company.  So when

7   you take -- using Cox's financial internal documents, you take

8   off all the costs, except for taxes and interest that Cox

9   incurs in realizing those revenues -- so they have to maintain,

10:08:45 10  you know, a networking engineering department, and marketing

11  department, and they have to have people doing their accounting

12  and personnel, take all those costs out, in 2013, they earned

13  $4 billion.  And in 2014 they earned $4.3 billion.  For a total

14  of $8.3 billion.

15        So the profit margin, just talking about the cash

16  flow that's flowing to the business and that they can then, you

17  know, use to invest in the business or do other things with,

18  that's, you know, a margin around 43 percent.

19  Q.   So I want to understand a couple of terms you used.  What

10:09:26 20  is revenue just at a high level?

21  A.   Revenue was the total receipts they get from their

22  subscribers.

23        So as I said, they send bills to subscribers, and

24  some of the subscribers have discounted service for the first

25  couple of months or whatever.  And so, that's all factored in.

W.H. Lehr - Direct

1770

1  Q.   Now, could you just walk through the bases for your

2  opinion on incentives here, and then we'll go through each one.

3  So at this step just touch on them, please.

4  A.   Sure.  So first off, there is evidence in this case about

5  the, you know, subscribers who are -- have been identified as

6  infringing.  And those subscribers, Cox billed $307 million, so

7  we're talking about a lot of money, between February 2013 and

8  2016.

9        Two, there is evidence from multiple sources that

10:24:21 10  suggests that Cox infringers actually paid more for Internet

11  service on average and are likely to have purchased more

12  expensive Internet plans than your average subscriber.

13        Three, that Cox saved costs by not addressing the

14  copyright infringement.  I talked a little bit about that at

15  the very beginning, you know.  And so these -- this is

16  referring to the costs that Cox avoided as opposed to the costs

17  that the plaintiffs incurred in trying to do their -- you know,

18  what they could to fight privacy.  But Cox saved costs by not

19  addressing copyright infringement.

10:25:05 20        And that by not addressing copyright infringement,

21  Cox was able to maintain a larger subscriber base over time

22  than they would have had they been more aggressive in dealing

23  with the infringement by subscribers on the Cox network.

24  Q.   So let's turn to your first opinion that Cox billed

25  subscribers 307 million in the time frame you've identified.

W.H. Lehr - Direct

1771

1     Can you -- what information did you consider in

2  forming this opinion?

3  A.   So I actually -- in this case I actually got, it was

4  closed, a subsample of Cox's data about the levels of

5  infringement.  So excerpts from their CATS system that

6  documented the -- you know, matched the tickets to subscriber

7  accounts from 2012 to 2014.

8     So I know what -- how many tickets and when those

9  tickets arrived for those subscribers in that data.

10:26:11  10     I also received for that subsample of subscribers

11  from Cox's billing system all of the bills that were billed and

12  paid by Cox subscribers identified in the CATS data, that

13  subsample we got, from 2012 to 2016.

14     So I have like month by month this is how much they

15  paid for the services they got.  So I had that data and I

16  matched that up.

17     And when you match that data up -- there were a few

18  missing records, you know, in terms of things, but basically

19  there were 57,279 subscribers that were identified as

10:27:05  20  infringing.  In other words, they had received at least one

21  ticket, for which I had billing data.

22  Q.   And for those 57,000-odd subscribers, what did you

23  determine Cox billed those customers?

24  A.   Well, then having matched those datasets up, you can go

25  through and you can sum the revenue over whatever period you

W.H. Lehr - Direct

1772

1   want.  And the period that I summed it over for this table was

2   from February 2013 to December 2016.  And that number for all

3   those subscribers in that -- those 57,279, it is $307 million

4   that were billed.

5   Q.   Now, this time frame that you've identified here, why did

6   you use that time frame?

7   A.   I used that time frame because I think it's -- one, it's

8   the claim period in this case and it's illustrative of this.  I

9   could have used a different time period.  I mean, I could have

10:28:02 10   shown even more, the numbers would be bigger.

11         And I didn't -- I wouldn't -- I didn't -- I stopped

12   at 2016 because that's all the data I had.  I believe a number

13   of these subscribers were still subscribers and were still

14   producing revenue.  So that would drive the number up if I had

15   been given data up to the present.

16         And presumably also, since the ticket data ends at

17   2014, a number of those subscribers received additional tickets

18   and it's possible that additional, you know, subscribers would

19   have been provided.

10:28:32 20         So this number here is what the data is.  I am

21   showing you what's in the data and give you an idea of what

22   it's telling you.

23   Q.   I'll turn to 3+ and 5+ in a moment.  But I want to

24   understand what do the amounts that Cox billed and collected

25   from these customers tell you about Cox's incentives or

1  benefits in respect to infringement or infringing customers?

2  A.   Well, there is various standards one might have to

3  determine, you know, what's infringing.  But this is evidence

4  that I believe -- I think the evidence in this case

5  demonstrates credibly that Cox knew they had a significant

6  number of infringing subscribers on their network.

7          And we will talk about other things.  Like for

8  example, they knew they had a lot of peer-to-peer traffic on

9  their network.  And they also knew that peer-to-peer traffic is

10 almost all infringing traffic.

11         But this is data from their own billing system of

12 subscribers that were identified to them by the RIAA in the

13 messages sent to them as these are subscribers engaging in

14 infringement.  And Cox continued to bill these subscribers even

15 though they were infringing, deriving a direct financial

16 benefit from these subscribers that is in the hundreds of

17 millions of dollars.

18 Q.   Why have you included in your slide here, Dr. Lehr, an

19 entry showing direct infringers with just one ticket?  How does

20 that demonstrate Cox's economic incentives versus a direct

21 infringer who had just one ticket in Cox's system?

22 A.   Well, first off, I think to understand what's going on

23 here, you ought to have some sense of the dataset.  So the

24 dataset begins with infringers that have one or more tickets.

25 So I think that's the first reason you absolutely want to show

W.H. Lehr - Direct

1774

1    it.

2            But the other is because you're trying to get a

3    handle on evidence that shows that Cox actually benefitted,

4    that its incentives -- what the theory tells you comports with

5    what the evidence actually shows and is demonstrated by Cox's

6    actual behavior.

7            So the theory tells you that a business operates to

8    generate profits and do the right things.  And so, it's in

9    Cox's incentive to retain profitable subscribers.

10:31:00 10            Cox, indeed, retained profitable subscribers.  And it

11   chose to retain and earn significant revenues and profits from

12   subscribers that were identified as infringing.

13            Now, you know, whether or not these -- you should

14   say, oh, you know, those subscribers that only got one ticket

15   weren't really infringing, I'm not arguing with that.  Although

16   the data suggests that the fact that they got one ticket, given

17   what I said earlier and given what we know about the nature of

18   the sampling of the data, means that there is maybe a bunch of

19   people that never got a ticket that were infringing merrily.

10:31:42 20   They got one ticket and they infringed a lot more, but didn't

21   get subsequent tickets.  And we don't know how many

22   infringements are associated with the subscriber that got

23   identified.

24            So I'm not trying to tell you how to map to a number

25   of infringements.  That's not my testimony here.  It's about

W.H. Lehr - Direct

1775

1    what is their economic incentive to knowingly tolerate having

2    infringing subscribers on their network.

3          And I believe the $307 million gives you an idea that

4    they had a very large economic and financial incentive from

5    that.

6    Q.   Now, when Cox would have considered the value of these

7    direct infringing subscribers in the context of this economic

8    incentive opinion, would Cox have considered just some of the

9    value of that customer, or more of the value of that customer,

10:32:27 10    or the entire value of that customer?

11    A.   Cox is in a continuous business of trying to get

12    customers, trying to hold on to the customers it has.  And

13    that's especially valuable because it costs money to acquire

14    customers.  And if you already have them, it is much more

15    profitable to keep them.  And so Cox was continuously doing

16    that.  And so, as I said, the economic basic data shows that.

17          This data shows that in fact they were capturing

18    significant revenue from infringing subscribers.  And the fact

19    that I catch you at some certain point in your career doesn't

10:33:05 20    mean you weren't infringing before.  I don't have ticket data

21    about what -- some of these subscribers that may have been

22    subscribers before 2012.  I only have data of these subscribers

23    and the tickets they received between 2012 and 2014.  That's a

24    sliding window.  And I don't have the revenue from before.

25          So, these subscribers and the benefit to Cox is

W.H. Lehr - Direct

1776

1 greater than the evidence that I have here.

2 Q.   Now, looking again at the time frame.  If you had limited

3 this to just the claim period, February 2013 to November 2014,

4 would that impact your opinion?

5 A.   Well, it wouldn't impact my opinion that Cox had a very

6 significant economic benefit.  It would change the numbers

7 because, for example, it would make the billing charges that

8 are reported here go down.

9        And just one other point here.  These numbers are the

10:33:58 10 billing charges.  The evidence shows and the testimony by Cox

11 is that the actual revenues received by Cox were almost

12 99 percent of what was billed.

13        So it's not like this is what was billed, but maybe a

14 bunch of these people didn't pay their bills.  No, most of

15 these people did pay their bills.  And so, the difference

16 between what was actually received and the billing charges,

17 it's very close.

18 Q.   Okay.  So I just want to make sure we understand.  What

19 does the 3+ and 5+ show?

10:34:36 20 A.   So, again, my purpose with this is to sort of give you

21 some sense of what is going on in the data and what we see.

22        So if you say, take that dataset and then only look

23 at the total billings associated with the subset of subscribers

24 that had three or more DMCA tickets, the 57,279 subscribers

25 goes down to 31,514 subscribers.  And then the billed charges

1777

1   also goes down to 208 million.

2          And then if you ask the question about, okay, well,

3   what about 5+ DMCA subscribers, that number goes down to 20,189

4   subscribers, and their total billed charges were $164 million.

5   So, you know, still a very large number.

6   Q.   And so, the 5+ is direct infringers who received -- are

7   there 20,000 direct infringers with 5+ tickets?

8   A.   Identified in the subsample of total infringements by the

9   RIAA that is already, you know, by all reasonable estimates

10:35:45 10   expected to be a subsample of the total amount of infringing

11   activity and infringing subscribers that exist on Cox's

12   network.

13   Q.   You talked earlier, sir, about the bundling of products.

14   How does that factor into this analysis?

15          Can you tell the jury what kinds of services the

16   customers represent in this slide, subscribed to and paid for.

17   A.   Well, this, again, is looking at all the services those

18   subscribers paid for.  So it's not just looking at, you know,

19   what revenue did they get from these subscribers associated

10:36:16 20   with their high-speed Internet service.  Because that's not how

21   the service is sold.

22          Customers buy a bundled service.  When you buy a

23   bundled service, you get a different price.  In fact, you get a

24   discount.  And consumers want to buy bundled services because

25   it gives them one point of contact, because it's simpler, they

W.H. Lehr - Direct

1778

1    get a lower price.  And that's how Cox wants to sell the

2    service.

3            And typically when subscribers move, if they decide,

4    oh, I don't like this, they move often everything.

5            So the reason it's appropriate, I believe, to look at

6    the total bills to these customers is because that represents a

7    measure of the value to Cox of retaining these subscribers on

8    its network.

9    Q.   Did you consider any of Cox's internal writings or e-mails

10:37:08   10    or communications in connection with this opinion that Cox had

11    an economic incentive to tolerate infringement?

12    A.   Sure.  So like I said, from the basic number, they have an

13    incentive.  But their internal documents, some of which -- you

14    know, when I was sitting in court the other day, I heard

15    testimony about -- you know, showed that when they thought

16    about like whether or not they should address the

17    infringement -- like whether or not, for example, they should

18    terminate particular subscribers, they definitely considered,

19    you know, how profitable these subscribers were.

10:37:41   20            So these are excerpts from two e-mails.  One, the

21    first one from March 27, 2014, from Joe Sikes who worked in

22    their -- you know, the group that was supposed to be addressing

23    copyright abuse.  He said:  This customer pays us over $400 a

24    month.  And if we terminate their Internet service, they will

25    likely cancel the rest of their services.

W.H. Lehr - Direct

1779

1          So this is a statement from Sikes saying they

2     recognize what was commonly known in the business, that

3     basically you sell and attract customers on the basis of a

4     Triple Play.

5          And also, it's worth noting this guy is paying over

6     $400 a month.  The average revenue captured from the average

7     subscriber at Cox was like $130 per month in 2014.  This is

8     $400.  So this more than, you know, a regular number.

9          And so, don't terminate this subscriber, that's what

10:38:31 10    this e-mail tells me they were saying.

11         The second one also from him is -- well, this is an

12    e-mail.  This is a communication that was documented, is

13    talking about the soft termination.

14         So Cox did have, you know, a plan they said was how

15    they dealt with copyright abuse.  And that called for

16    terminating subscribers after some number of messages and back

17    and forth.

18         But what they actually did was, evidence suggests is

19    they would -- if they terminate a subscriber, they wouldn't

10:39:07 20    actually like -- basically, okay, that subscriber is no longer

21    ours, you know, get them out of the system.

22         No, they would basically turn off his service and

23    then turn it right back on again.  That was what they meant by

24    soft termination.

25         And it says:  For DMCA, we don't want to lose/loose,

W.H. Lehr - Direct

1780

1    you know, finger typing, you know, the revenue.

2         So basically they're caring about how much revenue a

3    subscriber is delivering, how profitable a subscriber is, when

4    they are evaluating whether or not they should adhere to their

5    own public statements of what they do about copyright

6    infringers.  And --

7    Q.   Now -- I'm sorry, I didn't mean to interrupt.

8    A.   Yeah, sorry.  You know, he says, it's a new policy, this

9    soft termination is a relatively new way for them to not have

10:39:55 10   to deal with losing customers who are actually -- you know,

11   that they have knowledge of, significant knowledge of being

12   repeat infringers.

13   Q.   Now, we looked at the aggregate value of the direct

14   infringers in a slide a couple moments ago.  Did you also

15   consider the value of individual subscribers that Cox would

16   have considered in forming your view of economic incentive to

17   tolerate infringement?

18   A.   Yes, I did.  So when I described that dataset, visualizing

19   what that looks like might be a little bit problematic for

10:40:34 20   people.  So you can look at individual records.  I mean, if you

21   really want to, you can look at 57,000 records that have month

22   by month by month by month the revenues and when the tickets

23   came in.

24        But I've -- you know, just to give you an idea of

25   sort of what some of the customers that are in that dataset

W.H. Lehr - Direct

1781

 1    looked like, I pulled a couple of examples.  And I pulled

 2    examples for subscribers that had at least 13 tickets

 3    because -- you know, as I'll explain in a minute.  So this --

 4    Q.   So, Dr. Lehr, can you explain for us what's shown in this

 5    slide 17?

 6    A.   Okay.  So this chart is just showing by month -- so months

 7    are on X axis, the lower axis going from 2012 to 2016.  And

 8    then on the Y axis is showing you dollar amounts.  And the cap

 9    here on this slide is $250.  And so, it's basically showing the

10:41:30 10    cash flows by month.

11         And then it's -- I've marked out in these black flags

12    highlighted when in the dataset it shows they had received a

13    certain number of tickets.

14         So this customer is identified as Customer ID

15    580702666207, was a residential subscriber that in the

16    dataset -- within the dataset from 2012-2014, had received 101

17    tickets associated -- DMCA tickets that were in the CATS

18    database that Cox maintained.  They had received the fifth

19    ticket already by early in 2012, and the 13th ticket already

10:42:14 20    relatively early in 2012.

21    Q.   And why did you highlight those ticket numbers, the 13th

22    in particular?

23    A.   Well, there's some discussion about what Cox's graduated

24    response or way of dealing with this was.  And one of -- you

25    know, a later version of this was that, well, after 13 tickets,

W.H. Lehr - Direct

1782

1    this is a customer that, you know, we think should be

2    terminated.  And then, you know, we -- you know, the other one

3    says, they had this sort of soft termination process.  But the

4    details of that, that changed over time.

5         But basically, even by Cox's admissions, it's hard to

6    argue that a subscriber that has gotten 13 tickets, Cox is --

7    doesn't think is a repeat infringer, you know, and that they

8    don't have a knowledge of this.  Yet they're continuing to bill

9    that subscriber.  They could have been billing this subscriber

10:43:00 10   since before 2012.  They were certainly billing them through

11   this period of time.

12        But what I'm showing you here in these bars is

13   starting in February 1, 2013 -- and you can see in each month,

14   those bars, and they're relatively flat, around $200.  There's

15   one out here where there's an arrow, that means that it was --

16   that month, they billed that subscriber more than $250 and

17   something up there.

18        But that if you add up all those bars in there, that

19   subscriber was billed $8,594 by Cox.

10:43:34 20   Q.   So this is just one residential subscriber?

21   A.   This is one residential subscriber.

22   Q.   So how does looking at one residential subscriber tie into

23   your earlier opinion about the aggregate value of all of the

24   direct infringers?

25   A.   Well, you can -- you know, there's a number like this for

W.H. Lehr - Direct

1783

1     each of the different subscribers.  And there are some that

2     billed lower amounts and some that billed higher amounts.  And,

3     you know, this is a subscriber that billed a fair amount.

4           It turns out that this amount is not that different

5     than sort of what you might think the average value of

6     subscriber would be over their lifetime.  You know, it's order

7     of magnitude.  It's okay, it's a little bit more valuable.  So

8     this is -- you know, this also would go to a thing of like,

9     geez, a 101 ticket subscriber also billed $8,594 in the

10:44:25 10    subsample of the data that I'm showing.

11          You know, that shows this is an infringing subscriber

12    that Cox is deriving a direct financial benefit from.  And they

13    were close to 60,000 subscribers that have a different number

14    like this.

15          But, you know, you look at them and I showed other

16    ways to think about that with the --

17    Q.   But this is a residential.  Did you consider a couple of

18    business customers to demonstrate?

19    A.   Yeah, the business -- yes, I did, and the next one is the

10:44:48 20    business subscriber.  The business subscribers were, as I said,

21    a smaller number, but they account for a lot more dollars per

22    account typically.  And this one was one of the observations

23    that had one of the highest numbers of tickets in the whole

24    dataset to give you an idea.

25          So this one got eventually 4,074 tickets.  And they

W.H. Lehr - Direct

1784

1   also had received their 13th ticket by early in 2012.  And this

2   particular account is a reseller of Cox's broadband services.

3   So it might -- you know, it could be like one of these like

4   WiFi resellers that's selling, you know, access.  Cox billed

5   that customer $706,000.

6          And if you look at this, there are some things that

7   look a little strange.  So you see these arrows like around

8   2015, and then the numbers drop way down.  We don't know

9   precisely what's going on there.  But what it looks like is

10:45:48 10  that this customer prepaid for like a year of service.  And so,

11  they didn't get billed in subsequent months because they had --

12  that's sort of what I would interpret that means.

13         But this is what the data looks like.

14  Q.   And did you look at another business customer?

15  A.   Sure.

16  Q.   And what does this show us?

17  A.   Well, this just shows you, again, this turns out to be a

18  fraternity, surprise, surprise, that had 67 tickets and had

19  gotten its 13th ticket in 2012, also.  That Cox billed, you

10:46:18 20  know, from February 2013 to 2016, $12,525 to this account, you

21  know.  So --

22  Q.   And why did you select these examples, Dr. Lehr?

23  A.   Because I understand there has been testimony here about,

24  you know, characterize the nature of their business customers

25  and their residential customers.  And the fact of the matter

W.H. Lehr - Direct

1785

1  is, is that Cox wants to sell service to all the customers that

2  it can make money from and is profitable.  That's a normal

3  business, you know, proposition, and Cox does that.

4          And it sells it to its infringing customers, and many

5  of its business customers and many of its residential customers

6  are, you know, all kinds of different businesses, and there's a

7  lot of heterogeneity.  The thing that's clear is that the vast

8  majority of their customers, including their infringing

9  customers, are highly profitable to Cox.  Some are more

10 profitable than others.  But almost all of them are profitable

11 to Cox.

12 Q.  Now, I want to turn to your next opinion, Dr. Lehr, that

13 repeat infringers are --

14          THE COURT:  Let me stop you there.

15          The -- let's take our morning break now.  So let's

16 take 15 minutes and we'll come back and continue our testimony.

17 Thank you all.

18          NOTE:  At this point the jury leaves the courtroom;

19 whereupon the case continues as follows:

20 JURY OUT

21          THE COURT:  All right.  I got the signal from one of

22 the jurors that it was time for a break.

23          Anything before we go?

24          All right.  Let's take 15 minutes then.  We're in

25 recess.

10:47:16
10:48:10

1    NOTE:  At this point a recess is taken; at the

2  conclusion of which the case continues in the absence of the

3  jury as follow:

4  JURY OUT

5    THE COURT:  All right.  Joe, let's get our jury,

6  please.

7    NOTE:  At this point the jury returns to the

8  courtroom; whereupon the case continues as follows:

9  JURY IN

11:09:45 10    THE COURT:  All right.  Please be seated.

11    Mr. Gould, continue, sir.

12    MR. GOULD:  Thank you, Your Honor.

13  BY MR. GOULD:  (Continuing)

14  Q.   Dr. Lehr, did you reach any conclusions about the relative

15  value and benefit to Cox of retaining repeat infringing

16  subscribers?

17  A.   Yes, I did.  There's -- I considered several types of

18  evidence to -- regarding this matter.

19  Q.   And could you walk us through the basis for this opinion.

11:10:11 20  A.   Yeah.  First off, when Cox sells its broadband service, it

21  doesn't have just a single, you know, broadband service.  It

22  offers different tiers.  You know, like a -- you know, a low

23  tier service that's less expensive, provides a lower data rate

24  and tells the customers that, you know, their data allowance is

25  going to be less.  And that's suitable for people that are

W.H. Lehr - Direct

1787

1    going to be really light broadband users.

2            And then it has higher tiers.  And the higher the

3    tier, the higher the price for the service, the more you get.

4            So it's like a lot of things.  So it is sort of if

5    you want to get a fully-loaded car, you pay more for the

6    extras.  You want to have broadband that runs really fast and

7    has a big data cap, supports multiple users in your household,

8    these sorts of things, you get a higher tier service.  So --

9    Q.   You talked about data, but you also just mentioned speed.

10   What does this -- how does the speed impact the tiers?

11   A.   Well, they --

12   Q.   Or relate to the tiers.

13   A.   They -- when they define the nature of the service, they

14   also tell you what its likely performance is going to be, you

15   know, so what -- they'll say a data rate up to this certain

16   speed, and sort of what's the average data rate you could

17   expect.

18           And so, for certain activities, for example,

19   downloading files, having something like BitTorrent work and

20   having a usable experience, you need -- the faster your service

21   is, the faster the files will download, the better the

22   experience you'll have if, for example, you're using it to

23   infringe, which is what it's principally used for, and the

24   better the experience other subscribers in the BitTorrent, you

25   know, world will have when they pull the file from you, you

11:11:08  (line 10)
11:11:34  (line 20)

1 know.

2       So if you try to basically, you know, download a file

3 and the connection is too small, it's like trying to drive on

4 the highway in a Model T Ford, you know.  It's not going to be

5 a pleasant experience.

6       You know, whereas if you have a very fast speed

7 service, you'll download files quickly, you can download more

8 of them.  And you'll also, you know, have -- it won't interfere

9 with other things that you're doing.

11:12:23 10 Q.   Now, on this notion of -- the second and third point:  P2P

11 consumes more bandwidth and was a key driver of Cox's

12 bandwidth.

13       Did you prepare a slide showing some of the

14 information you considered?

15 A.   Yeah, I did.  I mean, what's important to understand is

16 that it -- you know, the broad -- the companies that provide

17 broadband service have to manage their network and provision

18 their network for the peak traffic loads.  And they also want

19 to look at sort of what people are doing and what -- you know,

11:12:55 20 what kind of services they have so they can give those

21 customers the experience those customers, you know, want and

22 expect.

23       And so, they look at the different types of traffic.

24 And if you have someone that all they're doing is e-mail

25 occasionally, they're not moving a lot of data and they're

W.H. Lehr - Direct

1789

1      not -- they don't need a very fast high speed service.

2            If someone's doing something like peer-to-peer,

3      that's one of the most intensive -- bandwidth intensive

4      services, both on the upload and the download, that broadband

5      subscribers do.

6            And this slide is -- you know, pieces out of a

7      consultancy report that was prepared by this company, inCode

8      that, you know, provided advice to Cox on sort of, you know,

9      what they should be expecting in the future, what traffic

11:13:45 10   looked like in the Internet, what traffic looked like, and what

11      other, you know, broadband providers around the country were

12      doing.

13            And what this one says is basically what I've been

14      saying.  Is that peer-to-peer is the most bandwidth intensive

15      category.  And this one shows that, you know, peer-to-peer

16      households were 13 percent of all broadband households.  Which

17      is a much higher number, for example, than the 60,000

18      subscribers that have been identified here relative to the

19      4.5 million broadband subscribers that Cox had.

11:14:19 20          So 60,000 over 4.5 million is well less than

21      13 percent.  Which would suggest and is consistent with the

22      inference I make that we were only observing a subset of the

23      actual infringement that was happening on the network.

24            But this is -- this one is showing that this is a

25      heavy use thing.

1  Now, the lower chart is showing the forecast that

2  these consultants prepared for sort of the typical household's

3  monthly usage.  And so, there are three lines here.  There's a

4  yellow line, a red line, and a green line.  And in its models

5  for coming up with these forecasts, it characterizes what these

6  firms -- you know, what these types of households do.

7  So the yellow lines are households that are doing --

8  you know, using the Internet relatively lightly.  And their

9  bandwidth demand is relatively low.  And they're candidates for

11:15:11 10  this Starter or Essential tier, the lower priced services, you

11  know, these lower dark blue bands that run across.

12  But if you're in the red band, you need to be in the

13  Preferred tier.

14  And if you're a green type of customer, you need to

15  be the Premiere band or the Ultimate tier because your

16  utilization doesn't fit with the experience you have.

17  Now, the users of peer-to-peer are most likely to be

18  in this green band or the red band, but certainly not in this

19  yellow band.

11:15:39 20  So just understanding the character of what

21  peer-to-peer is and what people are doing, and understanding

22  that peer-to-peer is almost all infringing activity, Cox is,

23  you know, listening to and knows -- this is evidence that Cox

24  internally knew that the customers that were doing peer-to-peer

25  were more likely to be customers and candidates for its more

1   expensive broadband services.

2        So that's a piece of evidence.  That's some of the

3   evidence that goes with the general understanding of how the

4   business operates.

5   Q.   And how does this tie in, Dr. Lehr, to your opinion that

6   Cox had an economic incentive to tolerate infringement?

7   A.   Well, these customers that are providing and are in the

8   higher tier services are more profitable than the lower tier

9   services because almost all the costs of providing the service

11:16:28 10  to the customers is fixed, it doesn't really depend upon the

11  actual use of the customers.

12       So, for example, when customers are heavy users, they

13  may not be heavy users during the peak period, which is when

14  they size the network.

15       It's like you figure out how big a pipe do I need

16  during my busiest hour to make sure that the customers that I

17  promised service to get the service they expect.  But if

18  customers use that pipe when it's not particularly busy, then

19  that doesn't cost me anything because I have the pipe there

11:17:00 20  anyways.

21  Q.   Now, did you have any access to Cox data that reported the

22  actual tier, the actual tier that the direct infringing

23  subscribers in this case subscribed to?

24  A.   No, I don't, because the ICOMS billing data just says what

25  they were billed, but it doesn't tell me what tier those

W.H. Lehr - Direct

1792

1 customers were in.  And so, I didn't have that data, but I do

2 have the ICOMS data and the ticket data.  So there are things I

3 can infer from that.

4 Q.    So just remind us, sir, what's the ICOMS data?

5 A.    The ICOMS data is the internal billing system.  So they

6 keep this for all their subscribers.  But, you know, the subset

7 of the data we got was for those subscribers who had been

8 identified as infringing subscribers in the CATS data with one

9 or more DMCA tickets.  And then we had their revenue payments

11:17:55 10 from 2012 to 2016.

11 Q.    And were you able to look, sir, at the Cox billing data

12 for the direct infringers in this case and draw conclusions

13 about their relative value?

14 A.    Yeah.  So one of the things you can do is you can say,

15 let's look at the data payments.  So not all the revenues they

16 billed, but the data payments which shows up in two different

17 elements within the dataset for each customer.  And you can

18 say, what was the average of only those subscribers, the

19 average billing per month for only those subscribers that

11:18:32 20 received one to two tickets?  And we can -- can we compare it

21 to subscribers that received more tickets.

22         And so, for example, can we compare it to subscribers

23 who got 20 or more tickets?  So if you got 20 or more tickets,

24 the evidence is showing you are, by the evidence, assuming the

25 evidence straightly maps directly to your infringing behavior,

W.H. Lehr - Direct

1793

1    that you're a heavier infringer.

2            When you do that comparison and you apply statistical

3    tests, you find that there is a statistically significant

4    increase in the data billed and revenues paid by the more heavy

5    infringers.

6            So this is data from a limited subsample of Cox's own

7    internal billing of these infringing subscribers that have been

8    identified as infringing that statistically shows that there is

9    a large, 8 percent increase in the data billings to those

11:19:30 10   subscribers.

11           And that, you know, goes as consistent with the other

12   stuff, stuff their internal documents and what you would

13   otherwise infer.

14   Q.   What do you mean by statistically significant?

15   A.   You apply statistical tests and say, given the size of the

16   sample I have and the variability in that sample, is this a

17   difference that looks as if it could be explained as just

18   random, or does it look like it's actually, you know,

19   statistically significant.

11:19:56 20   Q.   And it looks like -- the 8.4 percent increase, what

21   charges does that relate to?

22   A.   That's just the charges associated with their payment for

23   data services.

24   Q.   And it looks like it's about a six-and-a-half or so dollar

25   incriminate.  $6 doesn't seem like that big of a difference.

W.H. Lehr - Direct

1794

1    Why does that matter here?

2    A.   Well, first off, you know, as an economist and someone who

3    cares about looking at the data, it is statistically

4    significant.  So that matters.  8 percent is a big difference.

5    That is more an trivial amount.

6         And six bucks does make a difference.  It makes a

7    difference to individual subscribers.  I would certainly care

8    if my bill was $6 more or less for this.

9         And if you have 60,000 subscribers that there might

11:20:45 10   be this kind of difference or incentive, or, you know, some

11   number of subscribers -- you remember, Cox is dealing in

12   subscriber numbers that are in the millions, hundreds of

13   thousands, tens of thousands.  You multiple that, that's a big

14   number.  That's a big additional incentive.

15        It's not like the subscriber that charges 43 bucks or

16   even 30 bucks a month in data services isn't profitable for Cox

17   and Cox doesn't want to retain that subscriber.  It's just that

18   they really want to retain these subscribers that are more

19   valuable.  And if they're higher infringing, it looks like

11:21:19 20   they're valuable.

21   Q.   How does that tie into your opinion that Cox benefited

22   from retaining these direct infringers?

23   A.   Well, it speaks to the economic incentive that Cox had to

24   retain, you know, repeat infringers on its network even when it

25   knew, you know, that it had -- these were repeat infringers,

1    and that it's incentives were greater when these repeat

2    infringers -- there is evidence suggesting that they were even

3    heavier infringers.

4    Q.   I want to move to the next part of this opinion.

5         You said that Cox saved by not addressing

6    infringement.  What do you by that, sir?

7    A.   Well, I talked a little bit about that in my opening

8    statement.  So had Cox addressed the infringement more

9    aggressively, you know, they would have probably had to deal

10   with more customer service calls.  They would have had to mail

11   more notices and had more interactions to deal with

12   subscribers.  They would have incurred direct costs associated

13   with the response.

14        They probably couldn't have gotten away with reducing

15   the personnel of the department that was dealing with the abuse

16   stuff, as they actually -- as I understand they actually did.

17        But, you know, so they would have incurred additional

18   costs.

19   Q.   Were able to quantify the costs saved by Cox by not

20   addressing the infringement?

21   A.   I wasn't able to quantify these because, first off, I'm

22   not offering an opinion here about what more and specifically

23   Cox should have done.  And what Cox specifically might have

24   done would affect what the incremental costs would have been.

25        But certainly they should have done more than they

1796

1  did do.  My opinion is that their economic incentive was not to

2  do anything, that's what I am testifying about.  And part of

3  that is to avoid the costs, but I don't have an estimate of

4  what those costs would have been.

5  Q.   And moving to your last point, Dr. Lehr:  Cox maintained a

6  larger subscriber base.

7       How does this tie into your economic incentive

8  opinion?

9  A.   Well, you know, in any sort of business like this, there

11:23:27 10  is a certain amount of churn.  Customers move, customers leave,

11  and sometimes you have an incentive to get rid of customers.

12       In my comments today I have emphasized that Cox has a

13  strong financial economic incentive to retain subscribers on

14  their network that are profitable.

15       So Cox doesn't want to retain subscribers on their

16  network that are not profitable.

17       And so, it's also worth looking at, was Cox willing

18  and able without, for example, rocking the boat of their

19  general cost structure, able to terminate numbers of

11:24:04 20  subscribers when it wasn't in their interest.

21       And so, I looked also at Cox termination behavior

22  between 2013 and 2014.  And I did this for a couple reasons.

23  First off, the evidence shows that between 2013 and 2014, Cox

24  was willing to terminate and did terminate over 600,000

25  subscribers for non-payment of their bills.  619,711

W.H. Lehr - Direct

1797

1    subscribers were terminated.

2           Of those, 597,796 were residential subscribers, and
3    21,915 were business subscribers.

4           So like any business, if you're selling to someone a
5    repeat service and they stop paying their bills, the reasonable
6    thing to do is stop selling them service.  And Cox does that.
7    Cox has to do that on a fairly regular basis because not
8    everybody pays their bills.  This is on the order of 25,000 a
9    month, is sort of what their terminations are.

11:25:10  10           And they were able to do that level of terminations
11   and still come up with the profit and loss accounting data that
12   I looked at.

13           So terminating customers, you know, at some number,
14   you know, that's below 25,000 a month, is probably not going to
15   move their costs much because they've accounted for that.

16           It's also worth comparing that to what they actually
17   did for copyright infringement.  So over that period, they only
18   terminated 32 customer accounts.  32 of them were residential,
19   0 were business.

11:25:47  20           And of those 32, I believe the ones that are
21   associated with the 60,000 notices, roughly 60,000 notices that
22   are associated with the RIAA, was 13.  So 13 of something like
23   57,000, that's all the terminations they did for copyright.

24           So this is additional evidence that I believe
25   supports the contention that Cox is more than willing to make

1   decisions about termination when they see a clear financial

2   benefit to doing that.

3          When they see it's copyright infringement, apparently

4   they don't see it in their best interest to terminate those

5   subscribers.  But they are more than willing to do that when

6   there is evidence that it's not in their financial benefit,

7   like, for example, when those customers are not paying their

8   bills.

9   Q.   I think you said out of 57,000 notices.  Did you mean out

11:26:40 10   of 57,000 direct infringing customers?

11   A.   Sorry.  Out of 57,000 subscribers that are identified with

12   the, you know, 270,000 or whatever it is notices that they

13   received.

14   Q.   Dr. Lehr, can you just briefly summarize.

15   A.   Yeah.  So what I have been explaining here is that

16   evidence, I believe, shows very clearly that copyright

17   infringement causes very significant harm to copyright holders.

18   This is I think, you know, by any reasonable basis, the

19   consensus opinion that comports with what you would expect

11:27:17 20   theoretically and what is demonstrated in the empirical

21   evidence.

22          And having said that, it's also the case that you

23   can't precisely quantify what that financial harm is to the

24   plaintiffs in a particular case.

25          The second point is that Cox's business, when you

1  understand it, is quite profitable and is throwing off a lot of

2  money when they retain subscribers.  And they have a strong

3  economic incentive, I believe the evidence shows, to tolerate

4  the infringement on their network, to retain infringers for

5  which they have significant evidence are repeat infringers.

6  And to, you know, continue that -- those business practices.

7          MR. GOULD:  Thank you, Dr. Lehr.  No further

8  questions at this time.

9          I would move to admit PX 521, which I forgot to do

11:28:10 10  earlier.  That's the Mateus and Peha study that Dr. Lehr looked

11  at.

12          THE COURT:  All right.  Any objection?

13          MR. BUCHANAN:  No, Your Honor.

14          THE COURT:  All right.  It is received.

15          All right.  Mr. Buchanan.

16      CROSS-EXAMINATION

17  BY MR. BUCHANAN:

18  Q.   Good afternoon, Dr. Lehr.

19  A.   Good afternoon.

11:28:58 20  Q.   So you mentioned that by not taking more action as to

21  infringement, Cox saved itself money with regard to customer

22  calls and mailing more notices; is that right?

23  A.   I think that's close to right.  It avoided incurring costs

24  that it would have incurred had it addressed the copyright

25  infringement more aggressively than it did.

1866

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

<u>VOLUME  8  (P.M. Portion)</u>

TRIAL TRANSCRIPT

December 11, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

S. Negretti - Cross

1920

1   service for copyright infringement, right?

2   A.   That's correct.

3   Q.   Your view, am I correct, is that if a company has a set of

4   rules but it doesn't enforce those rules because it thinks that

5   not enforcing those rules will give its customers some added

6   value, that that would be a company engaging in fraud, correct?

7   A.   That is not my view, no.

8   Q.   Well, sir, do you recall when I took your deposition in

9   this matter?  Do you recall that?

10  A.   Sure, absolutely.

11  Q.   It was on June 14 of this year?

12  A.   That's correct.

13  Q.   You had Cox's counsel with you at that deposition, right?

14  A.   I did, yes.

15  Q.   And you took an oath to tell the truth in that deposition,

16  right?

17  A.   To the best of my ability to the understanding of the

18  questions being asked, correct.

19  Q.   And you took that oath seriously and told the truth,

20  right?

21  A.   Absolutely.

22  Q.   So I'm going to now read you beginning at page 140 of your

23  deposition, at line 17.

24       Question:  Are you aware of whether Cox considers not

25  enforcing its authorized usage policy as something as a means

S. Negretti - Cross

1921

1    for giving added value to customers?

2           Now, here's your answer:  That's a funny statement.

3    I have to be honest, because you're saying -- you're literally

4    saying that we say the Acceptable Use Policy that we give and

5    distribute to every one of our customers, that we ask for the

6    customer compliance on, we would not enforce that as a way of

7    delivering added value, and that statement doesn't make a whole

8    lot of sense.  That statement essentially builds to fraud, and

9    I don't know that a company could stay in business very long if

10   we were to conduct ourselves in a way that, you know, willfully

11   commits fraud.

12   A.    Correct.

13   Q.    That was your accurate testimony, correct, sir?

14   A.    That was my testimony.

15           MR. ELKIN:  Objection.  He misread.  He left out a

16   few words that were important.

17           MR. ZEBRAK:  Well, I'm happy to read it again.  I

18   don't think I did, but I'll read it more slowly this time.

19           THE COURT:  All right.  Do so.

20   BY MR. ZEBRAK:

21   Q.    Okay.  I'm going to try and read it more slowly.

22           Let's play the video.  This way there will be no

23   issue about it.  We have that teed up.  Would you play that,

24   Mr. Duval?

25   VIDEO EXCERPT PLAYED AS FOLLOWS

S. Negretti - Cross

1922

BY MR. ZEBRAK:

Q.   Are you aware of whether Cox considers not enforcing its

authorized usage policy as something -- as a means for giving

added value to customers?

A.   That's a funny statement.  I have to be honest because

you -- you're saying -- you're literally saying would we say

the Acceptable Use Policy that we give and distribute to every

one of our customers, that we ask for the customer compliance

on, would we not enforce that as a way of delivering added

value, and that statement doesn't make a whole lot of sense.

That statement essentially builds to fraud, and I don't know

that a company could stay in business very long if we were to

conduct ourselves in a way that, you know, willfully commits

fraud.

END OF VIDEOTAPE EXCERPT

BY MR. ZEBRAK:

Q.   That was your -- that was you in the testimony that, that

you just saw and that I tried to read correctly, right?

A.   Yes.  That's the same testimony that you just read,

correct.

Q.   And, and -- well, let's just move on.

         Sir, you're aware that copyright infringement is

unlawful, correct?

A.   That is correct.  I've stated that, yes.

Q.   Are you aware that Cox has received dozens or more

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```


<u>VOLUME  9  (A.M. Portion)</u>



TRIAL TRANSCRIPT

December 12, 2019

Before:  Liam O'Grady, USDC Judge


And a Jury

R. Cadenhead Deposition - Examination

2080

```
1   that's -- I hope that answers your question.
2   Q.   So why, why did Cox have a graduated response program?
3   What was the purpose of it?
4   A.   I'll give you my opinion because I don't speak for Cox,
5   but my opinion was that Cox recognized that there was a real
6   issue and a real problem with, with copyright infringement, and
7   that your clients, the recording industry, had some, some
8   proper concerns about it, and that our customers needed to
9   understand better why that was a problem and that -- and that
10  copying music, let's say, without paying for it was not the
11  right thing to do.
12            And so we, we wanted to -- I think Cox wanted to find
13  a way to help your clients and our customers understand -- I'm
14  sorry -- your clients with this problem and our customers with
15  some ignorance, understand what was the right thing to do,
16  and -- so they tried to design a system that would deal with
17  that, would fix it.
18  Q.   So you began your answer, Mr. Cadenhead, by saying your
19  opinion, but you don't speak for Cox.  Just to be clear, I want
20  to know what you understood at the time you were at Cox was the
21  purpose of the graduated response program.
22  A.   That's what I think it was.
23  Q.   So you understood that the purpose was to address real
24  problems with copyright infringement that copyright owners
25  had --
```

R. Cadenhead Deposition - Examination

2084

1    Q.    Why not?

2    A.    Because you're, you're describing it as if Cox was doing

3    something actively, and I, I don't remember that being the

4    case.

5    Q.    What do you recall it being?

6    A.    When Cox got a notice, it started its graduated response

7    process.

8    Q.    And during that process, did Cox find a way to prevent the

9    subscriber from infringing?

10   A.    The process was meant, as I understood it, to educate the

11   customer so that the customer would not do that.

12   Q.    So as you oversaw the graduated response program, you

13   recognized that some of Cox's subscribers may be infringing

14   copyrights intentionally, correct?

15   A.    Well, I, I oversaw it from a legal standpoint, and I, I

16   think the program -- the process recognized that some customers

17   were infringing and almost certainly knew they were infringing

18   and needed to stop, and we tried to get them to stop.

19   Q.    Was there a point in time when Cox instituted a policy --

20   a graduated response policy that had a specific number of steps

21   before a customer would be terminated?

22   A.    Cox began with notifying the customer through several

23   means and steps, which varied over time.  Cox required that

24   there be an actual communication between a knowledgeable

25   representative at Cox and the customer at least once and

2329

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
    -vs-                        :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME 10 (A.M. Portion)

TRIAL TRANSCRIPT

December 16, 2019

Before: Liam O'Grady, USDC Judge

And a Jury

C. Bakewell - Cross

2461

1    off the slide.  I'll permit it, and ask it again.

2    BY MR. GOULD:

3    Q.   You understand, sir, that under Cox's graduated response,

4    even Cox under its elaborate system would consider termination

5    of subscribers after 13 tickets that it processed, correct?

6    A.   I'm aware that the process changed over time.  There were

7    different thresholds that were considered, and the overall

8    direction was towards education.  I would have to see something

9    specific to be more specific in my answer.

10   Q.   Taking a look at the customer history shown on the slide

11   on your screen, you would agree that if Cox had terminated this

12   customer's internet service after 13 tickets, it wouldn't have

13   collected any -- it wouldn't have billed or collected any

14   revenue for internet service, correct?

15   A.   Correct.

16   Q.   You take issue with including billings and video and

17   voice, and we'll get to that, but for the purposes of this

18   question, you agree that after termination, they wouldn't bill

19   and collect those payments, correct?

20   A.   I'll agree with that.  I don't think that's totally right

21   because you can reinstate somebody after they've been

22   terminated, but setting aside reinstatement and the possibility

23   for that, then that's true.

24   Q.   So if this infringer -- sorry.  So if this infringer had

25   been reactivated immediately based on Cox's then in place

C. Bakewell - Cross

2462

1  policy, they might continue to collect revenue from them?

2  A.   It depends.  You need to know what the circumstances are

3  for reactivation and whether or not it was a situation where

4  reeducation was permitted and there was some comfort that the

5  behavior was going to change.

6  Q.   And likewise --

7  A.   You have to know more.

8  Q.   I didn't mean to interrupt, I'm sorry.

9  A.   No, fair enough.

10  Q.   Are you finished?

11  A.   Yes.

12  Q.   And --

13        MR. BUCHANAN:  Your Honor, can we have a sidebar,

14  please?

15        THE COURT:  Yes, sir.

16        NOTE:  A sidebar discussion is had between the Court

17  and counsel out of the hearing of the jury as follows:

18  AT SIDEBAR

19        MR. ELKIN:  Your Honor, the -- we're talking about

20  the claims period.  The reactivation stopped from and after

21  December 2012.  He solicited testimony in his question,

22  assuming the reactivation occurred immediately.  There's no

23  testimony to that.

24        In fact, we know from the testimony that that

25  practice, about which Your Honor had written extensively on

1    summary judgment in the prior case, had stopped, and he's got

2    to confine his question to the time frame where that's

3    happened.

4           MR. GOULD:  I think the question was general and fair

5    that if he's reactivated, they get back on.  There's -- I also

6    don't think there's any foundation or testimony in the record

7    about when that process stopped.

8           THE COURT:  I'm not sure it's in this record.  I

9    don't recall hearing it in this record.  Who do you think --

10          MR. ELKIN:  It happened in my direct of Mr. Zabek.  I

11   asked him that question.

12          THE COURT:  Okay.  All right.  Then your question did

13   suggest that there was a reactivation taking place, the way I

14   heard it said.

15          MR. GOULD:  Immediately?

16          THE COURT:  Yeah, immediately.  So let's -- what was

17   his answer?

18          MR. GOULD:  It was long, and I'm not sure it answered

19   the question or whether I remember it, very frankly.

20          THE COURT:  If -- yeah, it was if you assume that it

21   reactivated right away, then your answer is correct.

22          I'll just say that the reactivation issue is --

23          MR. OPPENHEIM:  Your Honor, on this issue --

24          THE COURT:  Um-hum.

25          MR. OPPENHEIM:  -- I'd like an opportunity to look at

C. Bakewell - Cross

2464

1    the Zabek transcript because I -- my recollection is not the

2    same as Mr. Elkin, but I'd like to check it before we say

3    anything.

4            THE COURT:  I'm just going to tell them this last

5    question was a hypothetical and didn't assume any specific

6    facts in evidence, okay?

7            MR. BUCHANAN:  All right.  Your Honor, can I just --

8    I mean, they're examining this witness as if he's an expert on

9    graduated response.

10           THE COURT:  I mean, they've asked two questions.  So

11   are you going to continue on with -- he knows a whole lot more

12   about the Cox's system than you suggested early on in his -- in

13   this cross.  So he studied --

14           MR. BUCHANAN:  But I didn't ask -- what he might know

15   has nothing to do with what he testified to and what he was

16   responding to.

17           THE COURT:  But if he's disregarding what --

18           MR. BUCHANAN:  But he just took Dr. Lehr's one,

19   three, and five.  That's all he focused on.  Dr. Lehr didn't --

20           THE COURT:  And he said it makes no sense and it's

21   arbitrary.

22           MR. BUCHANAN:  Right.

23           THE COURT:  He can't get any stronger than arbitrary,

24   except it's nonsense.  And so I think that identifying what

25   Sony believes should have been other information that he should

C. Bakewell - Cross

2465

1  have considered is relevant, and it may -- you know, I mean,

2  he's answered -- I don't -- it doesn't change my opinion, but I

3  think it's in the wheelhouse.  So I'm going to allow it.

4          MR. ELKIN:  All right.  Thank you, Your Honor.

5          THE COURT:  All right.  Thank you.

6          NOTE:  The sidebar discussion is concluded; whereupon

7  the case continues before the jury as follows:

8  BEFORE THE JURY

9          THE COURT:  All right.  You've heard some testimony

10  about, you know, getting back into graduated response and when

11  Cox took -- may have taken certain actions.  Those were

12  hypothetical questions and not assuming facts in evidence.  So

13  just consider them as that, okay?  Thank you.

14          All right.  Please continue, Mr. Gould.

15  BY MR. GOULD:

16  Q.   Sir, you also agree that if Cox had terminated this

17  customer after three or five tickets, it wouldn't have billed

18  or received internet revenue from that customer during the

19  period of that termination, correct?

20  A.   In that hypothetical, during whatever that period of

21  termination would be, however that's defined, that would be

22  true by definition.

23  Q.   And I want to take a look at one more of these charts,

24  sir, a similar chart for a business customer that was a

25  fraternity.  You recall this slide and testimony about it?

2466

1   A.   Yes, I do.

2   Q.   And you don't dispute that Cox billed this customer over

3   $12,000 in the period after Cox had received and processed

4   13 tickets for the customer?

5   A.   I don't take issue with that.

6   Q.   And you agree that if Cox had terminated this customer

7   after 3 or 5 or 13, Cox wouldn't have billed or received any

8   revenue for the internet service for the period during the

9   termination?

10  A.   Only during the part where you say during the termination,

11  whatever that might be, I'd agree with because it's terminated

12  for whatever that period might be.

13  Q.   And your point, I think, is that if they sign back up,

14  then they would resume billing and revenue?

15  A.   You can terminate somebody and then reinstate.  Like, if

16  you discuss with them that their behavior is going to change

17  and you get some assurance, then you can -- they'd be

18  reinstated, and I'm sure everybody would be fine with that.

19  Q.   You understand, sir, that Dr. Lehr provided no opinions on

20  when Cox should have terminated customers?

21  A.   I agree.  I raised that as an issue.

22  Q.   And you understood his testimony to demonstrate in his

23  opinion for the jury, the different scenarios of what might

24  occur if Cox terminated at different scenarios?

25  A.   I don't think he quite said that, but I can accept that.

1   I don't think that's exactly right, but for purposes of moving

2   things along, I'll accept it.

3   Q.   You recall this slide, sir?

4   A.   Yes.

5   Q.   And when you talked about this slide, you talked about

6   that the infringing activity was a small amount of the user's

7   activity or something along those lines, right?

8   A.   I don't think I actually said that, but I did say that

9   context is important, yes.

10  Q.   Well, I may have misheard because I didn't expect it, but

11  I thought you did.  You didn't do any measurement or analysis

12  or study to determine the amount of peer-to-peer activity

13  occurring on Cox's network, did you?

14  A.   I know the subscribers, I know some information that I've

15  read, but I haven't done, like, created an equation with that

16  in it.

17  Q.   And you don't dispute or disagree that peer-to-peer is a

18  highly bandwidth-intensive activity, do you?

19  A.   When it's done, it's bandwidth intensive.  The question

20  is, like, when it's done relative to everything else that's

21  happening --

22  Q.   And you -- I'm sorry.

23  A.   -- that might be -- might go to what you're asking.

24        But when it's done, it takes a fair amount of data,

25  yes.

2483

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
      -vs-                      :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

<u>VOLUME  10  (P.M. Portion)</u>

TRIAL TRANSCRIPT

December 16, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

F. Jarchow - Cross

2510

1    Q.    And Cox hasn't provided the names of the residential

2    customers, correct?

3    A.    It has not.

4    Q.    You understand that the business customers were given an

5    opportunity to object in court to the disclosure of their

6    names?

7    A.    Yes.

8    Q.    And you mentioned, I think, two that you said did?

9    A.    Yes, sir.

14:39:52 10         MR. GOULD:  Could you pull up DX 358, please?

11              Please scroll to the top, please.

12   BY MR. GOULD:

13   Q.    Mr. Jarchow, this is DX 358, which has the bulk of those

14   customers' names, correct?

15   A.    Yes, sir.

16   Q.    I think it was about 2,700 or so that were on this

17   particular spreadsheet, give or take.

18   A.    Yes.

19   Q.    Now, if we look at some of the names of the business

14:40:32 20  customers, No. 5 is Olympia Skate Center, and right below that

21   is a Computers & More, right?  And you keep going down and you

22   can see there's a college, and one's a fire station.

23              If you keep scrolling down, towards the bottom,

24   Margaritas, let's see, line 21 says Margaritas Mexican Bar &

25   Grill.  And right below that is Cars R Us.

2511

1          Did I read those correctly?

2   A.    That's what I'm reading, yes, sir.

3          MR. GOULD:  If you could just click down another

4   page?

5   BY MR. GOULD:

6   Q.    Let's take a look at some of the other names.  There's a

7   couple of Starbucks, right?

8   A.    Yes.

9   Q.    And there's an art gallery, correct, at line 49?

14:41:27 10  A.    Yes.

11  Q.    Let's take a look at another page, okay?  Line 79, there's

12  something called Crystal Chandelier, right?  And then an

13  infirmary and a diner and a coffee shop, and then at 87, you

14  see Sal's Seafood and Chicken.

15          Did I read those correctly?

16  A.    Yes, sir.  And 86, Staybridge Suites.

17  Q.    Let's take a look at another page.  At line 103, you have

18  5 Minute Oil Change Shop.  Below that is a barbershop, and then

19  at 106, there's a Pipes R Us Plumbing, correct?

14:42:09 20  A.    Yes, sir.

21  Q.    Okay.  Let's take a look at another page.  At the top,

22  you've got a nail and spa, right?

23  A.    Yes, sir.

24  Q.    And at 117, there's a restaurant and oyster bar?

25  A.    And 116, Benchmark Communications.

2512

```
              1    Q.    Yeah.  And at 122, we have Cairo Cafe?

              2    A.    That's correct.

              3    Q.    There's a TGI Fridays right at the bottom?

              4    A.    Yes.

              5    Q.    Let's just look at one more page to get a sense here.  At

              6    155, you have Smooth Movers, correct?

              7    A.    That's correct.

              8    Q.    And 166, something called Underground Audio?  Did I read

              9    that correctly?

14:43:01     10    A.    That's correct.

             11    Q.    And these are fairly representative of the types of

             12    customers and names that are listed in these three exhibits,

             13    correct?

             14    A.    In general, yes.

             15    Q.    And there's also a handful of hospitals, doctor's offices

             16    or medical centers, right?

             17    A.    Doctors' offices, medical centers, library, government

             18    facilities, yeah.

             19    Q.    Saw a couple of volunteer fire stations, correct?  Sound

14:43:34     20    familiar?  You've looked at these?

             21    A.    Yes.

             22    Q.    You understand, sir, that Cox has argued in this case that

             23    it can't be expected to terminate Internet service of business

             24    customers for copyright violations if those customers are

             25    hospitals, police, fire, or other critical infrastructure?
```

F. Jarchow - Cross

2516

 1    used their internet service to provide emergency services,

 2    correct?

 3    A.    I don't manage any other systems at Cox.  I communicate

 4    with leaders that do manage those other systems, yes.

 5    Q.    You just don't know?

 6    A.    I don't know.

 7    Q.    And the same is true of whether any of these customers

 8    provide critical infrastructure services through Cox's internet

 9    services, correct?

14:48:41 10    A.    That's not subject to my --

11    Q.    I think you testified that you have reviewed an objection

12    to disclosure of the customer's name from a hospital to whom

13    Cox provides internet service, correct?

14    A.    I have reviewed that.

15    Q.    And I wasn't sure I understood what you said.  I want to

16    make sure I got it correctly.  I think you said that the

17    hospital reported that its internal secured network for

18    employees and health services was operated by someone different

19    than Cox, correct?

14:49:14 20    A.    That is what was filed.

21    Q.    And the hospital said that -- the only thing that the

22    hospital said in its statement was that it purchased internet

23    access that it used for public WiFi from Cox, correct?

24    A.    That was what was in the filing, yes.

25              MR. GOULD:  I have no further questions.

2686

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,        :
                                :
     -vs-                       :    Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                                :
--------------------------------:
```

VOLUME  11  (A.M. Portion)

TRIAL TRANSCRIPT

December 17, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2753

1    $1 billion, $1.5 billion, and $1.4 billion, respectively.

2         Correct?

3    A.   Yes.

4    Q.   And those are cash dividends paid out of -- paid out from

5    Cox Communications' free cash flow?

6    A.   Yes.

7    Q.   And free cash flow is essentially what's left from Cox's

8    operating cash after accounting for taxes and capital

9    investments and interest payments, correct?

10   A.   Yes, in addition.  There are some other --

11   Q.   Some other things.  Depreciation?

12   A.   Investments.

13   Q.   Investments.  So the dividends come out of the free cash

14   available after Cox pays all of those things, correct?

15   A.   Yes.

16   Q.   So when you think of the dividend, the cash dividend, it's

17   cash paid out, what you have left over afterwards, right?

18   A.   I'm not sure I understand the question.

19   Q.   Well, I'll ask a better question.  The cash dividend shown

20   here is cash that Cox was able to take out of the business as

21   it was growing in the 2012 to 2014 period, correct?

22   A.   Yes.

23   Q.   When Cox bills its customers -- I'm shifting gears here a

24   little, just to give you a heads-up.  When Cox bills its

25   customers, it does a pretty good job collecting on the amounts

1    billed, correct?

2    A.   I would say yes.

3    Q.   In general, Cox collects about 98 to 99 percent of the

4    bills issued, correct?

5    A.   Yes.

6            MR. GOULD:  Pull up PX 365.

7    BY MR. GOULD:

8    Q.   Mr. Mencher, I want to talk about disconnects for

9    nonpayment.

10           Page 11, please.

11           You testified about this in direct, but we didn't

12   look at the numbers.  So I want to make sure we're on the same

13   page here.

14           If you could pull up just the two paragraphs,

15   including the yellow?  That's fine.

16           And the jury has seen this before, so I'll move

17   quickly.  You agree, sir, that Cox has reported disconnecting

18   the internet service for roughly 600,000 and change residential

19   customers, and 21,000 and change business customers, in the

20   years 2013 and 2014, correct?

21   A.   Yes.

22   Q.   And you understand, sir, that Cox has argued in this case

23   that it can't be expected to terminate internet service of

24   business customers for copyright infringement violations

25   because they might include hospitals or fire stations?

C.D. Tregillis - Cross

2831

1   A.   I think those are the correct words.  I think you read

2   that accurately.  Like I said, I'll -- I won't expand on that

3   since you're not asking me to.

4   Q.   Well, yes, sir.  I mean, you understand the roles for --

5        THE COURT:  He answered the question.

6   Q.   Okay.  And likewise, I correctly read that the Court

7   indicated that your testimony was not based on sufficient facts

8   or data as well, correct?

9   A.   I think that's what -- that's what I thought you said

10  before, and I agreed with you before.

11  Q.   Okay.  And that wasn't the only time where testimony of

12  yours has been rejected by a federal court, has it?

13  A.   That's correct.

14  Q.   In another case, a Court similarly concluded that your

15  testimony on damages was not the product of a reliable

16  methodology?

17  A.   I think that might be the way the Court phrased it, that

18  might be in that opinion.

19  Q.   Now, you've reviewed Dr. Lehr's opinions during the course

20  of this litigation, right?

21  A.   Yes.

22  Q.   And you criticize him for -- well, first of all, you

23  understand that he concluded that data doesn't exist to do an

24  actual damages analysis here, correct?

25  A.   Yes.

2832

1   Q.   Right.  And the reason he has concluded that is because

2   the universe of all the distributions by these Cox subscribers

3   is unknown, correct?

4   A.   Yes.

5   Q.   And that's because records aren't kept of how many times

6   each of these Cox subscribers distribute those files all around

7   the world, correct?

8   A.   Right.

9   Q.   Right.  And you agree with his analysis that that data

10  doesn't exist, right?

11  A.   Yes, I do.

12  Q.   Right.

13  A.   I think that there is a subset.  Which is, when you have a

14  distribution that shows up at another computer, then if it is

15  seen at that other computer in the future, that's evidence of a

16  distribution.

17  Q.   Right.

18  A.   But it won't be all of them, but you will see some of

19  them.

20  Q.   Right.  And I think you -- your position is that when you

21  see lots of infringement evidence across different Cox

22  subscribers, you can make the inference that when you see it on

23  date A and date B, that the person got it from an earlier one?

24  Was that your testimony previously?

25  A.   Not necessarily, because a Cox subscriber could get it

C.D. Tregillis - Cross

2834

1   Q.   That's what you said, right?

2   A.   No.  I think the data are available to instruct on that.

3   And they tell us that that viral idea you're talking about

4   isn't happening.  But I appreciate the concept.

5   Q.   Well, sir, that -- what you just mentioned wasn't part of

6   your analysis in this case, was it?

7   A.   Yes, it was.

8   Q.   Sir, a few moments ago I asked you whether you agreed with

9   Dr. Lehr that actual damages -- that we can't calculate them

10  because the universe of distributions is unknown.  And you

11  agreed with me, correct?

12          And that's a yes or no.

13          MR. BUCHANAN:  I don't think that was the question,

14  about actual damages, Your Honor.

15          THE COURT:  He's --

16          MR. ZEBRAK:  Let me move on, Your Honor.

17          THE COURT:  He can't determine -- yeah, reask the

18  question.

19          MR. ZEBRAK:  Yeah.

20  BY MR. ZEBRAK: (Continuing)

21  Q.   Nobody knows how many distributions occurred here,

22  correct?

23  A.   I agree with you on that.

24  Q.   Right.  And it was for that reason that Dr. Lehr was

25  looking at Cox's economic incentives, rather than just doing

2835

1   actual damages analysis, that's what he explained, correct?

2   A.   I think that's consistent with his testimony.

3   Q.   Right.  And so -- but you didn't measure Cox's economic

4   incentives here?  You did an actual damages analysis, correct?

5   A.   I did an analysis of the harm, the actual harm.

6   Q.   Actual harm.  Actual harm, right.  But you did so without

7   knowing the whole universe of distributions?  You didn't factor

8   any of that into your damages analysis?  You didn't attribute

9   any monetary amount for that, correct?

10  A.   That's correct.  I don't think it's necessary.

11  Q.   Okay.  Well, sir, we have plenty of time to --

12          THE COURT:  Ask --

13          MR. ZEBRAK:  Well, we can stop now.

14          THE COURT:  Don't testify, yeah.  All right.

15          All right, let's take our lunch break, and we'll come

16  back about five minutes after 2:00.  I have a matter while

17  we're all at -- you're all at lunch here.  So if you hear some

18  rumbling in the courtroom, there's something going on, but it's

19  not this case.

20          So you're excused.  Have a good lunch.  Thank you.

21  We'll see you at five minutes after 2:00.  All right.

22          NOTE:  At this point the jury leaves the courtroom;

23  whereupon the case continues as follows:

24  JURY OUT

25          THE COURT:  All right.  So I have a plea at 1:10.  So

2837

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  11  (P.M. Portion)

TRIAL TRANSCRIPT

December 17, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

T. McGarty - Direct

2880

1    anything about Cox specifically, okay?

2    A.    Yes, sir.

3    Q.    Are you familiar with something called MILNET?

4    A.    MILNET?

5    Q.    Yes, sir.

6    A.    MILNET was an offshoot of the ARPANET in the late 1980s,

7    and what happened is that MILNET was the DoD's private secure

8    version of the internet.  What was left over became what we

9    now call the public internet.

10            And MILNET has evolved over time.  It was under DCA,

11   Defense Communications Agency -- I think that's what it was --

12   and then it went into DISA.  So it's now distributed amongst

13   DOD in various agencies.  Homeland Security also has an

14   element of this secure network.

15            So it's, it's to some degree a separate network that

16   provides secure internet connections for DOD and other

17   entities.

18   Q.    When you say "DOD," you're referring --

19   A.    Department of Defense.

20   Q.    Yes, sir.  And are you familiar with something called

21   Internet2?

22            MR. BUCHANAN:  Your Honor, I would just renew my

23   objection.

24            THE COURT:  Yeah, overruled.

25            MR. BUCHANAN:  In the report, there's nothing --

T. McCarty - Direct

2881

```
1              THE COURT:  I've ruled.

2              MR. BUCHANAN:  All right.

3              THE COURT:  Your exception is noted.

4              Are you familiar with Internet2?  Is that the

5    question?

6              MR. ZEBRAK:  Yes, Your Honor.

7              THE WITNESS:  May I answer?

8              THE COURT:  Yes, sir.

9    BY MR. ZEBRAK:

10   Q.   Yes, please.

11   A.   Okay.  Internet2 is a consortium of universities,

12   hospitals, and organization -- there's now more than a

13   thousand of them -- that have their own parallel internet

14   network.  So for example, the three universities in Georgia:

15   Georgia Tech, University of Georgia, they're members of

16   Internet2.  MIT, Harvard are members of Internet2.

17             I work with one of my partners, Mr. Hauser, and

18   together we did pro bono work connecting internet to, also to

19   hospitals and other facilities.  I worked with the World Bank

20   and Institute of Peace.

21             So it's a separate internet parallel to the common

22   internet that universities and other types of organizations

23   join, and it provides them high-speed internet access at

24   substantially lower price, and most of these organizations now

25   participate in that effort.
```

T. McGarty - Direct

2883

1    So from the technical perspective, it was a fairly

2  simple and straightforward process.

3  Q.   You mentioned front-end limits and back-end limits

4  before.  Do you recall that?

5  A.   Yeah.  The front end, the front end is when they would

6  accept incoming complaints, all right; and Cox did throttle

7  some of the front-end complaints because there were certain

8  entities that were capable of putting in many more complaints

9  than Cox would accept.  So therefore, there was a throttling

10  on the number of complaints that came in on that front end.

11    And if you follow the record, you can see that there

12  was a -- somewhat of a continual request to try to increase

13  that over a period of time; and, you know, in my opinion, the

14  system from a technical perspective could have easily handled

15  a substantially larger number of complaints.  So it was not,

16  in my opinion, based upon my experience, a technical

17  bottleneck, because many of these systems are very scalable.

18  Q.   What do you mean when you say the system is "scalable"?

19  A.   You can add additional capacity and capability.  You

20  could do cloud computing or a bunch of other things that would

21  allow you to handle a substantially larger number of incoming

22  complaints.  So you were not technologically limited at the

23  front end, especially in this time frame which -- that we're

24  looking at.

25    At the back end, I think to follow up on your

2927

1              The amount awarded must be between 750 and $30,000

2    for each copyrighted work that you find to be infringed.

3              If plaintiffs prove that Cox acted willfully in

4    contributorily or vicariously infringing plaintiffs'

5    copyrights, you may, but are not required to, increase the

6    statutory damage award to a sum as high as $150,000 per

7    copyrighted work.

8              You should award as statutory damages an amount that

9    you find to be fair under the circumstances.  In determining

10   the appropriate amount to award, you may consider the

11   following factors:  The profits Cox earned because of the

12   infringement.

13             The expenses Cox saved because of the infringement.

14             The revenues that plaintiffs lost because of the

15   infringement.

16             The difficulty of proving plaintiffs' actual

17   damages.

18             The circumstances of the infringement.

19             Whether Cox acted willfully or intentionally in

20   contributorily or vicariously infringing plaintiffs'

21   copyrights.

22             Deterrence of future infringement.

23             In the case of willfulness, the need to punish Cox.

24             In considering what amount would have a deterrent

25   effect, you may consider Cox's total profits and the effect

2928

1    the award may have on Cox in the marketplace.

2              Plaintiffs are not required to prove any actual

3    damage suffered by plaintiffs to be awarded statutory damages.

4    You should award statutory damages whether or not there is

5    evidence of the actual damage suffered by plaintiffs, and your

6    statutory damage award need not be based on the actual damages

7    suffered by plaintiffs.

8              Cox's contributory or vicarious infringement is

9    considered willful if plaintiffs prove by a preponderance of

10   the evidence that Cox had knowledge that its subscribers'

11   actions constituted infringement of plaintiffs' copyrights,

12   acted with reckless disregard for the infringement of

13   plaintiffs' copyrights, or was willfully blind to the

14   infringement of plaintiffs' copyrights.

15             You must follow these rules while deliberating and

16   returning your verdict.  First, when you go to the jury room,

17   you must select a foreperson.  The foreperson will preside

18   over your discussions and speak for you here in court.

19             Second, it's your duty as jurors to discuss this

20   case with one another in the jury and try to reach an

21   agreement.  Each of you must make your own conscious decision,

22   but only after you have considered all the evidence, discussed

23   it fully with the other jurors, and listened to the views of

24   the other jurors.

25             Do not be afraid to change your opinions if the