# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

SONY MUSIC ENTERTAINMENT, *et al.*,

     Plaintiffs,

v.

COX COMMUNICATIONS, INC., *et al.*,

     Defendants.

Case No. 1:18-cv-00950-LO-JFA

## MEMORANDUM IN OPPOSITION TO COX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

LEGAL STANDARDS ............................................................................................................. 1

ARGUMENT ............................................................................................................................. 2

I.   Abundant evidence supports the jury's finding of direct infringement by Cox's subscribers. . 2

    A.   The MarkMonitor evidence and supporting testimony provided sufficient proof of direct infringement. ...................................................................................................... 2

    B.   Plaintiffs presented sufficient evidence of unauthorized distributions. ........................... 3

    C.   Plaintiffs presented sufficient evidence of unauthorized reproductions. ........................... 6

II.   Abundant evidence supports the jury's finding of contributory liability. ................................ 7

III.   Abundant evidence supports the jury's finding of vicarious liability ...................................... 9

    A.   There was ample evidence of Cox's direct financial benefit from the infringement. ........ 9

    B.   Plaintiffs were not required to prove "draw." ................................................................ 11

    C.   In any event, Plaintiffs presented sufficient evidence of "draw." .................................. 12

IV.   There is no factual or legal basis for Cox's challenge to the number of works entitled to statutory damage awards ...................................................................................................... 13

    A.   Cox failed to develop sufficient facts at trial to support its theories. .............................. 14

    B.   There is no factual or legal basis for Cox's statutory damages argument regarding separate copyrighted works that are separately owned. .................................................. 17

        1.   Cox presented no evidence concerning any relationship between recordings in suit and songs in suit. ............................................................................................ 17

        2.   The jury's award comports with the plain text of the statute. ................................. 18

        3.   The Dictionary Act does not apply in the circumstances here. ............................... 19

    C.   There is no factual or legal basis for Cox's statutory damages argument regarding individual tracks that also appear on albums. ................................................................ 21

        1.   Cox presented no evidence regarding compilations. ............................................... 21

        2.   The evidence at trial shows the works were sold as individual tracks. .................... 21

        3.   Sound recordings issued as tracks are entitled to individual awards, even if they also appear on albums ................................................................................. 22

V.   Cox is not immune from secondary liability for its business subscribers' infringement. ....... 23

    A.   Cox failed to develop sufficient facts at trial to support its theories concerning business subscribers. .................................................................................................... 23

B.  Abundant evidence supports the jury's finding of vicarious liability for Cox business subscribers' infringement. ............................................................................................... 24

C.  Abundant evidence supports the jury's finding of contributory liability for Cox business subscribers' infringement ................................................................................. 28

CONCLUSION ....................................................................................................................... 30

# TABLE OF AUTHORITIES

**CASES**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ............................................................................... 24

*Arista Records, LLC v. Lime Grp, LLC*,
No. 06-cv-5936, 2011 WL 1311771 (S.D.N.Y. Apr. 4, 2011) ............................... 22

*Arista Records, LLC v. Usenet.com, Inc.*,
633 F.Supp.2d 124 (S.D.N.Y. 2009) ....................................................................... 8

*Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*,
99 F.3d 587 (4th Cir. 1996) ...................................................................................... 2

*Azar v. Allina Health Services*,
139 S.Ct. 1804 (2019) ............................................................................................ 20

*Blackman v. District of Columbia*
633 F.3d 1088 (D.C. Cir. 2011) ............................................................................ 20

*BMG Rights Mgm't (US) LLC v. Cox Commc'ns, Inc.*,
149 F. Supp. 3d 634 (E.D. Va. 2015),
*aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018) ("*BMG I*") ............... 2, 4, 5, 8, 25, 28

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
199 F. Supp. 3d 958 (E.D. Va. 2016),
*aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018), ..................................... 1, 8

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
881 F.3d 293 (4th Cir. 2018) .................................................................................. 29

*Bryant v. Media Right Prods., Inc.*,
603 F.3d 135 (2d Cir. 2010) .............................................................................. 22, 23

*Capitol Records, Inc. v. Thomas*,
579 F. Supp. 2d 1210 (D. Minn. 2008) ................................................................... 2

*Capitol Records, LLC v. ReDiGi, Inc.*,
934 F. Supp. 2d 640 (S.D.N.Y. 2013) ..................................................................... 8

*Chesapeake Paper Prods v. Stone & Webster Eng'g Corp.*,
51 F.3d 1229 (4th Cir. 1995) ............................................................................ 14, 15

*Cobbler Nevada, LLC v. Gonzalez*,
901 F.3d 1142 (9th Cir. 2018) .......................................................................... 28, 29

*Durham v. Jones*,
737 F.3d 291 (4th Cir. 2013) .................................................................................. 15

*Ellison v. Robertson*
357 F.3d 1072 (9th Cir. 2004) ...................................................................... 11, 12, 13

*Elusta v. Rubio*,
418 Fed. Appx. 552 (7th Cir. 2011) ....................................................................... 15

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC,*
844 F. 3d 79 (2d Cir. 2016)........................................................................... 20, 23

*First Nat'l Ban in St. Louis v. Missouri,*
263 U.S. 640 (1924) .......................................................................................... 19

*First Union Commercial Corp. v. CATX Capital Corp.,*
411 F.3d 551 (4th Cir. 2005)............................................................................... 1

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
76 F.3d 259 (9th Cir. 1996).................................................................... 8, 11, 12

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*
118 F.3d 199 (4th Cir. 1997)........................................................................... 5, 6

*LifeNetHealth v. LifeCell Corp.,*
93 F. Supp. 3d 477 (E.D. Va. 2015).................................................................... 2

*London-Sire Records, Inc. v. Doe 1,*
542 F. Supp. 2d 153 (D. Mass. 2008) ................................................................ 5

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,*
545 U.S. 913 (2005)............................................................................... 9, 12, 24

*Nelson-Salabes, Inc. v. Morningside Dev., LLC,*
284 F.3d 505 (4th Cir. 2002)............................................................................ 24

*Newton v. Diamond,*
204 F. Supp. 2d 1244 (C.D. Cal. 2002) ............................................................ 18

*Ortiz v. Jordan,*
562 U.S. 180, (2011) ......................................................................................... 15

*Paez v. Gelboym,*
578 Fed. App. 407 (5th Cir. 2014) .................................................................... 15

*Perfect 10, Inc. v. Amazon.com, Inc.,*
508 F.3d 1146 (9th Cir. 2007).............................................................................. 8

*Reed Elsevier, Inc. v. Muchnick,*
559 U.S. 154 (2010) .......................................................................................... 22

*Roe v. Howard,*
917 F.3d 229 (4th Cir. 2019)............................................................................... 1

*Rowland v. California Men's Colony, Unit II Men's Advisory Council,*
506 U.S. 194 (1993)........................................................................................... 20

*Shapiro, Bernstein & Co., Inc. v. H.L. Green Co., Inc.*
316 F.2d 304 (2d Cir. 1963)............................................................................... 12

*TeeVee Toons, Inc. v. MP3.com, Inc.,*
134 F. Supp. 2d 546 (S.D.N.Y. 2001)................................................................ 19

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC,*
384 F. Supp. 3d 743 (W.D. Tex. 2019) ............................................................... 5

*US v. Hayes*,
555 U.S. 415 (2009) ................................................................................................ 19

*Varghese v. Honeywell Int'l Inc.*,
424 F.3d 411 (4th Cir. 2005) .......................................................................... 14, 15

*Xoom Inc. v. Imageline, Inc.*,
323 F.3d 279 (2003) ........................................................................................ 22, 23

## STATUTES

1 U.S.C. § 1 ...................................................................................................... 21, 22

17 U.S.C. § 101 ...................................................................................................... 20

17 U.S.C. § 102 ...................................................................................................... 20

17 U.S.C. § 512 ...................................................................................................... 14

## RULES

Fed. R. Civ. P. 50 ....................................................................................... 4, 17, 18, 26

Fed. R. Civ. P. 59 .......................................................................................................... 4

## INTRODUCTION

After a 12-day trial, and nearly two full days of deliberations, the jury found Cox liable for willful contributory and vicarious copyright infringement.  Displeased with the outcome, Cox now asks this Court to overturn the jury's verdict based largely on the same grounds it already litigated and lost.  At summary judgment, the Court found that Plaintiffs presented sufficient evidence to create a triable issue of fact, and, accordingly, denied Cox's motion on all counts.  At trial, the jury heard substantially more evidence supporting Plaintiffs' case and rightfully ruled in Plaintiffs' favor on all counts.  The evidence supporting the jury's verdict was abundant and legally sufficient—multiple times over.  Cox's motion should be denied in its entirety.[1]

## LEGAL STANDARDS

A motion for judgment as a matter of law may only be granted if "a party has been fully heard . . . and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party."  Fed. R. Civ. P. 50(a)(1).  A court must affirm a verdict "if, viewing the facts in the light most favorable to the non-moving party, there is sufficient evidence for a reasonable jury to have found in the non-moving party's favor."  *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 969 (E.D. Va. 2016) (*aff'd in part, rev'd on other grounds*) ("*BMG II*") (alterations omitted).  The Court is "likewise obliged to accord the prevailing party the benefit of all reasonable inferences to be drawn from the evidence."  *Roe v. Howard*, 917 F.3d 229, 233 (4th Cir. 2019).

Rule 59(a)(1)(A) allows the Court, on motion, to grant a new trial after a jury trial only if "the verdict is against the clear weight of the evidence, or . . . will result in a miscarriage of

---

[1] In addition to rehashing its losing summary judgment arguments, Cox also rehashes several arguments the Court resolved against it in the *BMG v. Cox* case.

justice, even though there may be substantial evidence which would prevent the direction of a verdict." *LifeNetHealth v. LifeCell Corp.*, 93 F. Supp. 3d 477, 488 (E.D. Va. 2015) (citing *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)).

## ARGUMENT

### I.     Abundant evidence supports the jury's finding of direct infringement by Cox's subscribers.

Plaintiffs presented overwhelming evidence of direct infringement at trial and Cox is not entitled to supplant the jury's fact determinations with its own preferred interpretations. "[Plaintiffs] may establish direct infringement using circumstantial evidence that gives rise to an inference that Cox account holders or other authorized users accessed its service to directly infringe." *BMG Rights Mgm't (US) LLC v. Cox Commc'ns, Inc.,* 149 F. Supp. 3d 634, 663 (E.D. Va. 2015), *aff'd in part, rev'd in part,* 881 F.3d 293 (4th Cir. 2018) ("*BMG I*"); *see also Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1225 (D. Minn. 2008) ("[D]irect proof of actual dissemination is not required by the Copyright Act.  Plaintiffs are free to employ circumstantial evidence to attempt to prove actual dissemination.").  When Plaintiffs and Cox each moved for summary judgment on the issue of direct infringement, the Court determined that fact questions existed that required resolution by a jury.  ECF No. 610 at 26.  After a 12-day trial, the jury decided those questions of fact in Plaintiffs' favor.  Construing that evidence in the light most favorable to Plaintiffs, as is required at this stage, the jury's determination must be upheld.

### A.  The MarkMonitor evidence and supporting testimony provided sufficient proof of direct infringement.

Cox argued in its summary judgment motion that the MarkMonitor evidence on which Plaintiffs relied was insufficient to establish direct infringement.  This Court denied that motion, and the issue went to the jury, which found direct infringement.  Now Cox is back, with a

familiar refrain:  the MarkMonitor evidence was insufficient to establish direct infringement.

Mot. at 24-29.  That argument should be rejected, for the third and final time.

The jury credited Plaintiffs' evidence that, MarkMonitor, one of the top anti-piracy firms

in the world, identified Cox subscribers using peer-to-peer ("P2P") file sharing programs to

upload and download files that were confirmed to be copies of Plaintiffs' copyrighted works.

There was extensive evidence of this activity.  *See, e.g.*, PX 11 (spreadsheet of Audible Magic

confirmations); PX 14 (spreadsheet of information included in notices sent to Cox); PX 16

(index of hard drive of infringing files from P2P networks); PX 17 (notices sent to Cox); PX 33

(evidence packages); PX 39 (hard drive of infringing files from P2P networks).[2]

Plaintiffs' expert, Barbara Frederiksen-Cross, reviewed the MarkMonitor System, its

source code, and the relevant infringement evidence.  Tr. 420:9-421:8; 460:16-461:8.  She found

that the "system both accurately detects acts of copying and distribution on the internet on these

peer-to-peer systems, and it also provides and produces accurate notices that can be sent to an

ISP like Cox to notify them of that activity."  Tr. 423:12-20 (Frederiksen-Cross).  Two other

independent experts reached similar conclusions.  *See* DX 89 at 1; DX 130 at 3-4.

**B.  Plaintiffs presented sufficient evidence of unauthorized distributions.**

The trial evidence was more than sufficient to support the jury's verdict that Cox users

violated Plaintiffs' distribution right.  The evidence showed that MarkMonitor connected with

each Cox subscriber identified in the infringement notices and verified that he or she was online,

running BitTorrent or another P2P file sharing program, and "sharing" 90-100% of a file with the

same hash value as a previously confirmed infringing file.  Tr. 467:17-470:1, 477:16-478:19

---

[2] Referenced trial exhibits have been submitted to the Court on a hard drive as Exhibit A,
pursuant to ECF No. 696.  Referenced trial testimony excerpts are attached hereto as Exhibit B.

(Frederiksen-Cross); Tr. 635:10-637:18 (Bahun).  Unrebutted evidence confirmed that these P2P networks are hotbeds for infringement, with more than 99% of BitTorrent activity known to be infringing.  Tr. 1747:24-1750:13 (Lehr); PX 439.  The evidence further showed that P2P networks are designed for users to constantly distribute content as they download it from others.  Tr. 487:21-488:14 (Frederiksen-Cross).  And it was not just MarkMonitor that identified those infringers to Cox.  At least 17,729 (30.8%) of the same subscribers in MarkMonitor's notices were the subject of at least one infringement notice to Cox from another copyright owner.  Tr. 811:17-812:11 (McCabe).  The foregoing is more than sufficient evidence to support the jury's verdict.[3]

Cox's hyper-technical argument that proof of distribution requires "actually download[ing] that recording directly from the subscriber's computer," Mot. at 26, ignores the law and how P2P networks function.  Distribution can be proven with circumstantial evidence to "show an actual dissemination of a copyrighted work."  *BMG I*, 149 F. Supp. 3d at 670.  *See also UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC,* 384 F. Supp. 3d 743, 765 (W.D. Tex. 2019) (reinforcing actual dissemination can be shown by circumstantial evidence and that direct proof is not required).  Plus, with BitTorrent, the download would typically come in pieces distributed by multiple users, rather than by a single Cox subscriber.

---

[3] Cox's own documents provided additional support for the jury's finding of unauthorized distributions.  P2P traffic accounted for 47% of traffic upstream from Cox subscribers.  PX 214 at 23.  The massive scale of such P2P uploading traffic on Cox's network made it more likely that Cox subscribers in MarkMonitor's notices actually disseminated infringing copies of Plaintiffs' works.  Tr. 1747:24-1750:13 (Lehr); PX 439.  Indeed, even Cox's employees acknowledged that its customers were infringing.  *See, e.g.*, PX 264 ("99 percent of DMCA violations is from people using peer-to-peer on purpose"); Tr. 1265:22-1266:1 (Zabek); PX 346 ("This customer is well aware of his actions and is upset that 'after years of doing this' he is now getting caught"); Tr. 1685:6-20 (Sikes); Tr. 2080:4-11, 2084:15-18 (Cadenhead) ("Cox recognized that there was a real issue and a real problem with, with copyright infringement;" "some customers were infringing and almost certainly knew they were infringing and needed to stop").

Apart from the foregoing, there is another separate and independent basis for why the evidence is sufficient to establish that Cox users violated Plaintiffs' distribution rights—as this Court will recall from *BMG I*.  In *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, the Fourth Circuit held that a distribution occurs where the defendant "makes the work available" and "has completed all the steps necessary for distribution to the public[,]" without the need to show more—otherwise "a copyright holder would be prejudiced by a [defendant] that does not keep records of public use, and the [defendant] would unjustly profit."  118 F. 3d 199, 203 (4th Cir. 1997); *see also London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 169 (D. Mass. 2008) (where the direct infringer "has completed all the necessary steps for a public distribution, a reasonable fact-finder may infer that the distribution *actually took place*") (emphasis in original).

In *Hotaling*, a library added infringing copyrighted materials to its collection, listed the works in its catalog system, made them available to the public, but kept no records of transactions. 118 F. 3d at 201-02.  This Court found that *Hotaling* is intended to apply "where it is impossible for a copyright owner to produce proof of actual distribution."  *See BMG I*, 149 F. Supp. 3d at 666. That is precisely the circumstance presented here.  The facts here fall squarely within this Court's reading of *Hotaling*, since, by design, P2P networks neither create nor maintain records of the illegal disseminations.  Quite to the contrary, the P2P networks in this case are decentralized and designed to make it impossible for anyone to observe the interactions between two peers, other than those two peers themselves.  Tr. 452:23-453:14 (Frederiksen-Cross); Tr. 636:8-17 (Bahun). Nor do the P2P clients maintain records depicting how many times a peer distributes an infringing file.  Tr. 453:15-454:5 (Frederiksen-Cross).  It is therefore impossible to know how many distributions took place.  Tr. 1752:13-1753:13 (Lehr); Tr. 2834:21-23 (Tregillis).

Cox ignores the teaching of *Hotaling* and elevates form over substance, by claiming that proof of actual dissemination was not impossible to produce because Plaintiffs could have downloaded the files from the Cox subscribers.  In *Hotaling*, the Fourth Circuit found distribution without faulting the plaintiffs for not going to the library and signing out each book.  Here, MarkMonitor already downloaded the infringing files and recorded their unique hash values. When later identifying Cox's subscribers with those confirmed infringing files, there was no need to download the file again.  The contents were already identified.  Moreover, with BitTorrent, the download would typically come in pieces distributed by multiple users.  And any such download would have been to MarkMonitor, without any records as to how many times the Cox subscriber distributed copies of the infringing file to other peers.

### C.  Plaintiffs presented sufficient evidence of unauthorized reproductions.

The trial evidence was also more than sufficient to support the jury's verdict that Cox users violated Plaintiffs' reproduction right.  Based on MarkMonitor's same peer connections and data collection, the evidence showed that many Cox subscribers were caught with less than 100% of an infringing file.  Tr. 484:16-25 (Frederiksen-Cross).  Due to the nature of P2P file sharing, this demonstrates that these Cox subscribers were in the process of downloading the file—*i.e.*, reproducing.  *Id.*  Some subscribers were even identified on different dates with increasing percentages of the same file, ultimately amassing 100% of the file.  Tr. 487:6-20 (Frederiksen-Cross).  This is compelling evidence that those users were illegally reproducing the infringing files. *Id.*[4]  The jury reasonably could infer that subscribers with 100% of an infringing file downloaded it illegally through P2P.  Tr. 451:24-452:5 (Frederiksen-Cross).

---

[4] Cox misleadingly contends this accounts for, at most, 15% of the works.  Mot. at 25.  Cox misunderstands that the 15% pertains to detected instances of infringements, not works in suit.

Nothing in the trial record supports Cox's speculation that the files its subscribers distributed were lawful copies or downloaded by Cox users through another ISP or someone else's internet service, such as McDonalds' public WiFi or a hotel.  Mot. at 24.  Cox's assertions post-trial are contradicted by what it said at the time.  *See supra* at n.4.  Suggesting that Cox's infringing subscribers "bought something and then created torrents for it so they could give it away to total strangers en masse… [is] just a nonsensical interpretation of the evidence."  Tr. 485:15-20 (Frederiksen-Cross).  Cox demands certainty of downloads when circumstantial evidence to support a reasonable inference is all that is required.  Ms. Frederiksen-Cross provided an example that demonstrates the point:  if "you walk into a bar and there's a guy there with a beer in his hand.  Where did he get it?  Well, he probably bought it in the bar."  Tr. 485:5-7.  This is no different.  Each Cox subscriber was in the bar with a beer in his or her hand.  And, as one witness explained to the jury, even with respect to a (hypothetical) lawful copy, a Cox subscriber would have lacked authorization to distribute copies to others on a P2P network.  Tr. 227:21-24 (McMullan).

## II.     Abundant evidence supports the jury's finding of contributory liability.

Cox spends a page and a half arguing that there was insufficient evidence for the jury to find that Cox materially contributed to the underlying infringement.  Mot. at 29-30.  This Court has already addressed this issue directly with respect to Cox, when it concluded in the *BMG* case that Cox materially contributed to its users' infringement by providing repeat infringers with internet service.  *BMG II*, 199 F. Supp. 3d at 979.

---

Tr. 484:16-25 (Frederiksen-Cross).  It also ignores the jury's logical inference, based on this evidence, that all participants in the overwhelmingly infringing P2P swarms downloaded the files illegally in the same manner.  That 85% of them had already completed their infringing downloads when MarkMonitor caught them does nothing to undermine that reasonable inference.

In rejecting a virtually identical post-trial motion there, the Court explained that "*[t]here can be no question* that the provision of high-speed internet service materially contributes to infringement via BitTorrent and that Cox had the means to withhold that assistance upon learning of specific infringing activity." *BMG II*, 199 F. Supp. 3d at 979 (emphasis added).  Cox provided that internet service, without which its customers would not have been able to copy and distribute Plaintiffs' works.  Tr. 436:1-8; 455:1-12 (Frederiksen-Cross).  It is well established that "providing the site and facilities for known infringing activity is sufficient to establish contributory liability."  *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996); *see also BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 306 (4th Cir. 2018) ("Google's image search engine 'substantially assists websites to distribute their infringing copies' of copyrighted images, and thus constitutes a material contribution, even though 'Google's assistance is available to all websites, not just infringing ones'") (quoting and explaining holding of *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007)); *Capitol Records, LLC v. ReDiGi, Inc.*, 934 F. Supp. 2d 640, 659 (S.D.N.Y. 2013); *Arista Records, LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124, 155 (S.D.N.Y. 2009).

Cox contends that it did not materially contribute to the infringement because it undertook "active efforts to discourage infringement" that were "largely successful."  Mot. at 30.  But the jury clearly found otherwise:  the evidence showed that Cox had knowledge of the particular repeat infringers, continued to provide them with the tool being used to infringe, and created a safe haven for these infringers.  *See* Remittitur Opp. Section I.A.[5]  At summary

---

[5] Plaintiffs incorporate by reference as if set forth fully herein the discussion of Cox's misconduct in their opposition to Cox's Remittitur Motion.  It contains additional detail regarding the material contribution Cox provided to its users' infringement.

judgment, this Court found "genuine factual issues that properly can be resolved only by a finder of fact" on the issue of Cox's material contribution.  ECF No. 610 at 3, 26. The jury did so and there is no basis to disturb the its reasonable interpretation of the evidence.

### III.   Abundant evidence supports the jury's finding of vicarious liability.

Cox's conduct rendered it vicariously liable because it "profit[ed] from direct infringement while declining to exercise a right to stop or limit it."  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).  Cox argued at the summary judgment stage that Plaintiffs could not prove vicarious liability because they could not establish the requisite "direct financial interest" in the infringement.  This Court sent that disputed issue of fact to the jury, which found vicarious liability.  Now Cox is back, making the same argument. Mot. at 2-6.  Cox is wrong again.  The evidence supporting the jury's verdict was legally sufficient by any measure, *see* Remittitur Opp. Section I.A.4 & 5, and the Court should reject Cox's claim of insufficient proof.[6]

### A.   There was ample evidence of Cox's direct financial benefit from the infringement.

Cox received substantial subscription revenues it would not have otherwise collected by continuing to provide known repeat infringers with access to its network so that they could continue to infringe.  Cox affirmatively decided not to terminate or suspend its infringing subscribers so that it could collect what amounted to at least hundreds of millions of dollars.  Tr.

---

[6] Cox does not challenge the sufficiency of Plaintiffs' evidence that Cox possessed the right and ability to stop or limit the infringement by Cox's residential subscribers.  Cox separately raises arguments regarding its vicarious liability for its business subscribers' infringement, which Plaintiffs address in a later section.  *See infra* Section V.

1771:22-1777:5 (Lehr); PDX Lehr at 14.[7]  As long as infringing subscribers paid, Cox was all too happy to support their infringement.

Cox's economic incentives were squarely aligned with continued provision of service to known infringers.  Cox's own employees' emails overwhelmingly demonstrated that Cox intentionally decided against termination in order to maximize corporate profits.  *E.g.*, PX 342 at 3 (declining to terminate because "[t]his Customer pays us over $400/month and if we terminate their internet service, they will likely cancel the rest of their services"); PX 277 (declining to terminate "habitual abuser" who was previously terminated twice in a year because "[w]e need the customers"); PX 303 at 1 (explaining that a "soft termination" is "a suspension that is called a termination with the likelihood of reactivation for DMCA [because] we do not want to loose [sic] the revenue"); PX 347 at 1 ("This customer will likely fail again, but let's give him one more change [sic]. he pays 317.63 a month."); *see also* PX 245 at 1; PX 253; PX 266 at 1-2; PX 305 at 1.  And Cox kept changing its policies to avoid having to terminate paying subscribers. *See* PX 203 at 4-5; Tr. 1110:13-21 (3 strikes); PX 165 at 11 (10 strikes); PX 174 at 13 (13 strikes).  Had Cox taken action to address the infringement as they told the copyright owners they would, either by terminating accounts or causing unwanted friction in the form of additional emails and suspensions, Cox would have obtained less revenue and its service would have been less attractive for those who wanted to use it to infringe.  Tr. 1792:11-1795:16 (Lehr); Tr. 1918:8-1919:11 (Negretti); Tr. 2465:16-22 (Bakewell); Tr. 2742:12-16 (Mencher).

In addition, the evidence showed that Cox's revenues varied based on the manner or purpose for which its subscribers used its service, and repeat infringers were particularly profitable.  Cox's business model is built on charging customers increased fees for higher data

---

[7] PDX refers to Plaintiffs' Demonstrative Exhibits, which are attached hereto as Exhibit C.

usage.  Tr. 1786:20-1788:9 (Lehr); Tr. 1702:22-1703:10 (Fuenzalida); Tr. 2741:5-10 (Mencher).

There was ample evidence that the infringing P2P activity consumes significant bandwidth and

creates the need for subscribers to purchase more expensive plans, with higher monthly

payments for Cox.  Tr. 1788:15-1791:4 (Lehr); Tr. 2467:17-25 (Bakewell); PX 214.  The billing

data for Cox's infringing subscribers is corroborative.  Subscribers with greater numbers of

infringement tickets paid Cox more, on average, than subscribers with fewer infringement

tickets.  Tr. 1792:11-1793:10 (Lehr).  This is a separate and independent basis for showing Cox's

direct financial benefit.

### B.  Plaintiffs were not required to prove "draw."

Contrary to Cox's suggestion, there is no bright-line rule that requires evidence of "draw"

to demonstrate financial benefit.  Mot. at 2-6.  *Ellison v. Robertson*, upon which Cox heavily

relies, states that "draw" is "*sufficient* to state the financial benefit element of the claim for

vicarious liability"—not that it is required.  357 F.3d 1072, 1078 (9th Cir. 2004) (citing

*Fonovisa*, 76 F.3d at 263-64) (emphasis added).  The legislative history of the Digital

Millennium Copyright Act, cited in *Ellison*, specifically instructs that "[i]n determining whether

the financial benefit criterion is satisfied, courts should take a common-sense, fact-based

approach, not a formalistic one."[8]  Cox acknowledges that the *Ellison* principle is at best only a

"general" rule.  ECF No. 330 at 33.

---

[8] S. Rep. 105-190, at 44 (1998); H.R. Rep. 105-551, pt. 2, at 54 (1998).  The DMCA safe harbors
create certain conditional defenses to monetary liability for copyright infringement.  One
condition is that the service provider "does not receive a financial benefit directly attributable to
the infringing activity, in a case in which the service provider has the right and ability to control
such activity."  17 U.S.C. § 512(c)(1)(B).  While secondary copyright infringement claims are
the product of common law, not statute, *Ellison* and others have looked to the DMCA legislative
history in examining what suffices for a direct financial benefit for vicarious liability.

In *Fonovisa* (from which *Ellison* derives the concept of "draw"), the court considered other evidence in determining whether the plaintiff sufficiently alleged direct financial benefit. *See* 76 F.3d at 263-64 (stating that in addition to rental fees, admission fees, and incidental payments, the court's finding was "fortified" by the "draw" from sale of pirated recordings). Notably in *Fonovisa*, the causal connection between the availability of infringing music and general admission fees to a flea market was inferred to be a draw.  This broader consideration of causation is consistent with cases dating back to the landmark case of *Shapiro, Bernstein & Co., Inc. v. H.L. Green Co., Inc.* (which the Supreme Court cited approvingly in *Grokster*, 545 U.S. at 930), which stated that the relevant question is whether the defendant has "an obvious and direct financial interest in the exploitation of copyrighted materials."  316 F.2d 304, 307 (2d Cir. 1963).

### C.  In any event, Plaintiffs presented sufficient evidence of "draw."

The jury was also presented with evidence sufficient to find that subscribers were drawn to Cox by the ability to infringe.  First, the scale of the infringement shows that it was no mere afterthought (or inconsequential added value) to the subscriber.  The evidence showed that roughly 13% of Cox's network traffic was attributable to P2P activity, and that over 99% of P2P usage was infringing.  *See* Tr. 1705:12-15 (Fuenzalida); Tr. 1747:24-1750:13 (Lehr); PX 439. The evidence also showed that P2P activity was a bandwidth-intensive category of use, that more data requires more speed, and that Cox aggressively advertised its network speeds as an enhancement to subscribers' ability to download music.  Tr. 1788:15-1791:4 (Lehr); Tr. 2467:17-25 (Bakewell); Tr. 1934:21-1935:6 (Negretti); PX 214.  Even with its practices of capping notices and blacklisting complainants, the evidence showed that Cox received millions of infringement notices, including hundreds of thousands from Plaintiffs involving the works in suit.  PX 353; Tr. 1405:20-1406:4 (Beck); PX 14.  The high volume of this infringing activity

supports the reasonable inference that the ability to infringe was a draw—especially as to subscribers who, after countless notices, understood that there would be no consequence to their continued infringement.

Second, if Cox terminated the accounts of known repeat infringers, it would have, by definition, lost those subscriptions. Cox retained those subscribers (and their monthly fees) only by not terminating their accounts and allowing their infringement to continue, with a wink. That retention of customers suffices under *Ellison* as draw—*i.e.*, retaining subscribers by not obstructing the infringement. *Cf: Ellison*, 357 F.3d at 1079 (finding no financial benefit without evidence that AOL "attracted or *retained* subscriptions because of the infringement or lost subscriptions because of AOL's eventual obstruction of the infringement") (emphasis added).

\* \* \*

Finally, Cox contends that if the Court grants either JMOL or a new trial on vicarious liability, it should also order a new trial on damages. Mot. at 6. Cox's request is groundless. For the reasons stated above, neither JMOL nor a new trial is appropriate. The jury's verdict should stand as is. Moreover, Cox's argument that the award would be lower if based on only contributory infringement is nothing more than self-serving speculation. The jury's award was per work infringed. There was not a multiplier based on liability for both claims, rather than one.

## IV.    There is no factual or legal basis for Cox's challenge to the number of works entitled to statutory damage awards.

Section 504(c)(1) of the Copyright Act indicates that "the copyright owner may elect … statutory damages for all infringements involved in the action, with respect to one work," and, for purposes of this subsection, "all the parts of a compilation or derivative work constitute one work." 17 U.S.C. § 504(c)(1). Arguing over what constitutes "one work" under Section 504(c), Cox focuses on the relationship between sound recordings and musical compositions, and

between individual tracks and compilations.  Mot. at 9-20.  However, based on how Cox tried its

case, neither issue is appropriately before the Court.  Cox presented ***no*** evidence to the jury on

either issue.  For that reason, the Court properly declined to instruct the jury on what constitutes

one work for purposes of statutory damages.  Tr. 2905:11-19.  Cox's arguments also fail as a

matter of law.

### A.  Cox failed to develop sufficient facts at trial to support its theories.

Cox attempts to relitigate its failed motion for summary judgment, citing *Chesapeake*

*Paper Prods. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229 (4th Cir. 1995), and *Varghese v.*

*Honeywell Int'l Inc.*, 424 F.3d 411 (4th Cir. 2005), for the proposition that it may preserve in a

Rule 50 motion "discrete legal issues" raised in a prior summary judgment motion.  Mot. at 1, 9-

17.  Cox then regurgitates the same legal arguments the Court rejected at summary judgment

based on the determination that they turned on disputed facts—belying the notion that this

motion raises only "discrete legal issues."  *See* ECF 610 at 26.  Cox also points to largely the

same pretrial evidence it offered at summary judgment—most of which was stricken on

summary judgment and none of which was admitted at trial—to fill the gaps, while falsely

contending those facts are undisputed.  Cox clearly misapprehends how this works.

As the Fourth Circuit explained in *Chesapeake* and *Varghese*, "[r]eviewing a pretrial

denial of summary judgment after a full trial is inappropriate because the denial was based on an

undeveloped, incomplete record, which was superseded by evidence adduced at trial."  *Varghese*,

424 F.3d at 421 (quoting *Chesapeake*, 51 F.3d at 1236).  Here, Cox's motion points largely to the

same pretrial evidence it cited at summary judgment—most of which was stricken on summary

judgment and none of which was admitted at trial.  Because Cox's motion relies on the pretrial

summary judgment record, it effectively asks the Court to "review… the pretrial denial of a

motion for summary judgment after a full trial and final judgment on the merits," contrary to the holdings of *Chesapeake* and *Varghese*. *Varghese*, 424 F.3d at 421 (quoting *Chesapeake*, 51 F.3d at 1237).

A Rule 50 motion must be based on evidence adduced at trial.  Fed. R. Civ. P. 50(a)(1)(A).  Indeed, the Supreme Court has made clear that post-trial motions must be adjudicated based on the trial record, not the pretrial record.  "Once trial has been had, however, the availability of [a defense] should be determined by the trial record, not the pleadings nor the summary judgment record."  *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011) (ruling that a qualified immunity defense post-trial must be evaluated in light of the evidence received at trial) (internal quotations omitted); *see also Elusta v. Rubio*, 418 Fed. Appx. 552, 554-55 (7th Cir. 2011) (refusing to consider appellant's argument about the scope of Illinois' intentional infliction of emotional distress law based solely on pretrial record); *Paez v. Gelboym*, 578 Fed. App. 407, 408 n.1 (5th Cir. 2014) (denying motion for new trial, stating that "[w]e do not consider evidence that was not presented to the jury").  "Whatever artful affidavits might have suggested at summary judgment, we examine here the trial record, not a hypothetical rumination on what could have or might have transpired."  *Durham v. Jones*, 737 F.3d 291, 302 (4th Cir. 2013) (affirming denial of Rule 50(b) motion based on examination of trial record).

Cox did not present *any* admissible evidence at trial to support its argument concerning the number of works eligible for a statutory damages award.  Cox's argument on this score cites the trial record just three times, none of which support its arguments.[9]  Nothing Cox cites

---

[9] Cox cites in footnotes two references to proffers by counsel made at sidebar—one an example of an allegedly overlapping musical composition and sound recording, and one an example of a sound recording registration that included nine sound recordings in suit.  Mot. at 12 n.9, 16 n.12. Of course, proffers are not evidence, the jury never heard them, and these proffers arose

informed the jury *how many* or *which* of the 10,017 copyrighted works in suit allegedly are compilations, works made for hire, or derivative works under Cox's (incorrect) interpretation of the law.  As the Court recognized in denying Cox's request for a jury instruction on the overlap between sound recordings and musical compositions, "I just don't see that there's evidence from which [the jury] could collect and cull and determine whether they wanted to combine the statutory damages award for those works that are -- contained both sound recordings and musical compositions."  Tr. 2905:11-15.  On this basis alone, Cox's motion must be denied.

Even if it were appropriate for the Court to consider the summary judgment records Cox cites (which it is not), the evidence it presents is inadmissible or simply incorrect.  First, Cox's brief cites its own summary judgment brief, ECF No. 329 at 36, 38, for the number of copyrighted sound recordings that were registered as works made for hire, albums, or both.  Mot. at 16.  Both of those pages of Cox's summary judgment brief cite Cox's Statement of Undisputed Facts ¶ 9, which references a series of paragraphs and exhibits accompanying an attorney declaration Cox submitted in support of its summary judgment motion.  However, the Court struck all paragraphs and exhibits underlying SUF ¶ 9 that purport to provide evidence about the number of works that were registered as works made for hire, albums, or both.  ECF No. 521 (striking portions of the Kearney Declaration).  Cox has therefore failed to point to *any* admissible evidence before the Court, much less the jury, regarding the number of works it claims were registered as works for hire or albums.

---

precisely because Cox lacked admissible evidence on the issues.  Cox also cites testimony of three record company witnesses, arguing only one (Dennis Kooker) testified that individual sound recordings (as opposed to full albums) were available for purchase.  Mot. at 19.  Cox is wrong.  First, Mr. Kooker's testimony related to the record industry as a whole.  Tr. 111:20-112:22 (Kooker).  Second, Matthew Flott said the same in his testimony.  Tr. 1225:3-17.  Finally, Cox's own expert testified that Plaintiffs' works were available for purchase individually on iTunes.  Tr. 2841:22-2842:5 (Tregillis).

Second, Cox relies on a proposed *and withdrawn* trial exhibit, PX 38, for the number of musical compositions in suit that are embodied in sound recordings in suit.  Mot. at 11-12.  To be clear, PX 38 was on an early version of Plaintiffs' exhibit list, Cox objected to its admission on nine separate grounds, ECF No. 282-1 at 3, and Plaintiffs withdrew it prior to trial, *see* ECF 612-1 at 2.  Neither Plaintiffs nor Cox sought to introduce PX 38 at trial.  And, as Cox concedes, the numbers referenced in PX 38 are incorrect.  Mot. at 10 n.6.[10]

Finally, Cox relies upon an analysis by its expert Christian Tregillis concerning purported the relationship between sound recordings and musical compositions that was not presented to the jury.  Mot. at 10 n.6.  Indeed, the Court appropriately excluded it because Mr. Tregillis had never performed, let alone disclosed, that kind of analysis in his expert report at any point previously.  Tr. 2713:3-18.  Cox does not challenge that evidentiary ruling, but nevertheless asks the Court to consider Mr. Tregillis's never-offered analysis for the purpose of its motion.  Obviously, that request is improper, as the trial record is what governs.

**B. There is no factual or legal basis for Cox's statutory damages argument regarding separate copyrighted works that are separately owned.**

**2. Cox presented no evidence concerning any relationship between recordings in suit and songs in suit.**

As explained above, Cox did not introduce any evidence as to whether a sound recording in suit has a corresponding musical composition in suit at trial.  That failure precludes Cox's current challenge as to what constitutes "one work" under Section 504(c).

---

[10] Nor, as Cox contends, is it a "ministerial" task of comparing PX 1 and PX 2 to determine the number of overlapping works.  Such an assertion displays a fundamental misunderstanding of how the analysis must be performed.  As one example, there are simply too many separate musical compositions that happen to have the same title to have any certainty whether a sound recording with the same title corresponds to the musical composition without referencing data not found in PX 1 and PX 2.  If it were a ministerial function, Cox would have done it, and presented it at trial.

### 3.  The jury's award comports with the plain text of the statute.

Cox also misreads the applicable statute.  Sound recordings and musical compositions are distinct copyrights.  *See* 17 U.S.C. § 102(a)(2) & (a)(7).  They are separate works and separately registered.  *See Newton v. Diamond*, 204 F. Supp. 2d 1244, 1248-49 (C.D. Cal. 2002) ("Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights").  Section 101 of Title 17 explains that a sound recording is an example of a derivative work based on one or more preexisting works.  But it is not the case that there can only be one award where a sound recording in suit embodies a musical composition in suit.

Section 504(c)(1) of the Copyright Act indicates that "the copyright owner may elect … statutory damages for all infringements involved in the action, with respect to any one work," and that, "[f]or purposes of this subsection, all the parts of a compilation or derivative work constitute one work."  17 U.S.C. § 504(c)(1).  The plain language of Section 504(c) precludes the same "copyright owner" (singular) from recovering multiple statutory damages awards when the owner holds multiple copyrights in the same work (such as in a derivative work and the original work on which it is based).  The repeated use of the singular term "copyright owner" in Section 504 assumes that the same person owns multiple copyrights implicated by the same infringement, and necessarily limits its application to such cases.

The trial evidence established that the record company Plaintiffs and the music publisher Plaintiffs are separate and distinct companies that own different works, that monetize those works in different ways, and each has suffered its own harm. Tr. 101:12-102:24, 103:21-104:9, 111:20-112:12 (Kooker); Tr. 146:23-148:2, 148:15-150:4, 153:5-155:22, 159:6-160:22 (Kokakis); Tr. 220:8-22, 221:9-19, 226:19-227:16 (McMullan); Tr. 1193:21-1194:2, 1195:9-1196:11, 1197:8-

1200:21 (Flott); PX 486. Thus, even in Cox's scenario of a sound recording in suit embodying a musical composition in suit, Section 504(c) allows for separate awards.

### 4. The Dictionary Act does not apply in the circumstances here.

Cox asserts that Plaintiffs' argument fails because the Dictionary Act automatically pluralizes "copyright owner." Mot. at 13. But that argument is incorrect. Where "the context indicates otherwise," as is the case here, the Dictionary Act does not require treating the singular as the plural. 1 U.S.C. § 1.

Under the plain statutory text, the "one work" language, however interpreted, applies only to a single lawsuit ("for all infringements in the action"). 17 U.S.C. § 504(c)(1). Accordingly, the owner of the derivative work and the owner of the underlying work could avoid the harsh outcome that Cox seeks by bringing separate lawsuits. But requiring separate lawsuits would achieve nothing except to increase burdens on the courts and the parties. It would be an absurd result if suing separately allowed rights holders to each recover their own statutory damages award, but suing in the same action limited multiple rights holders to a single award. *TeeVee Toons, Inc. v. MP3.com, Inc.*, 134 F. Supp. 2d 546, 548 (S.D.N.Y. 2001). Indeed, the Supreme Court expressly warned that it has relied on the Dictionary Act only "[o]n the rare occasions" where "doing so was necessary to carry out the evident intent of the statute." *US v. Hayes*, 555 U.S. 415, 422 n.5 (2009) (quoting *First Nat'l Bank in St. Louis v. Missouri*, 263 U.S. 640, 657 (1924)) (internal citations omitted). It simply cannot be Congress' "evident intent" to require duplicative and costly litigation as Cox's atextual theory would require. *See id.*

Cox contends that the "context" to be considered is limited to the text of the Act only. Mot. at 13-14. But the Supreme Court has explained that the classic instance in which "context indicates otherwise" under the Dictionary Act is one "where Congress provides no particular definition, but

the definition in 1 U.S.C. § 1 seems not to fit." *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 200 (1993).

*Blackman v. District of Columbia* is strikingly on point.  633 F.3d 1088 (D.C. Cir. 2011). There, questions arose on whether, under 1 U.S.C. § 1, certain words within fee cap legislation ought to be pluralized.  The statute provided for a fee cap of $4,000 per "party" in an "action."  *Id.* at 1091.  The issue was whether the cap applied per party (singular) or whether there would be an overall $4,000 cap in a class action with multiple plaintiff parties.  *Id.*  The D.C. Circuit refused to pluralize the singular, finding the context indicated otherwise.  *Id.*  at 1092.  Notably, pluralizing the singular would have provided a "perverse incentive" for breaking a single action "into inefficient multiple actions."  *Id*.  That "perverse incentive" is precisely what Cox advocates.

Cox relies on *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 94-95 (2d Cir. 2016), which held that a derivative work and underlying work are "one work" for statutory damages, even if owned separately.  *MP3tunes* is not binding on this Court, nor should this Court adopt its result.  The panel in that case supported its conclusion with reference not to the statute, but to a treatise and some legislative history.  *Id.*  "But legislative history is not the law."  *Azar v. Allina Health Services*, 139 S.Ct. 1804, 1814 (2019) (quoting *Epic Systems Corp. v. Lewis*, 138 S.Ct. 1612, 1631 (2018)).  Nor did the *MP3tunes* court address the argument Plaintiffs assert here as to the statutory text.  *MP3tunes*, 844 F.3d at 94-95.  The Court should not permit "ambiguous legislative history to muddy clear statutory language."  *Azar*, 139 S.Ct. at 1814.  The statutory language governs, the language supports Plaintiffs' construction, and Cox's contrary reading would lead to an absurd result that Congress could not possibly have intended.

### C. There is no factual or legal basis for Cox's statutory damages argument regarding individual tracks that also appear on albums.

Cox next asserts that "a large majority of the works in suit" are "parts of a compilation," because they were on albums or because they were "'works made for hire' that covered multiple songs." Mot. at 14-20. According to Cox, this means that if multiple sound recordings in suit are part of a compilation, Plaintiffs may receive only a single award per compilation rather than separate awards for each individual track. Cox's argument fails.

#### 1. Cox presented no evidence regarding compilations.

As explained above, Cox failed to introduce any admissible evidence at trial as to whether a sound recording in suit is part of a compilation or the effect that might have on the works in suit. And also as above, rather than focus on the trial record, Cox offers attorney argument on what it says is "not disputed" and relies upon its statement of facts from summary judgment. Accordingly, Cox lacks any factual foundation for its request that the Court reduce the number of statutory awards. That failure alone disposes of Cox's motion on this issue.

#### 5. The evidence at trial shows the works were sold as individual tracks.

All the evidence at trial supports the conclusion that Plaintiffs published or monetized their works individually. Unrebutted testimony showed that Plaintiffs' catalogues were available for purchase as individual tracks on services like iTunes and other retailers. Tr. 112:13-22 (Kooker); Tr. 1225:3-17 (Flott); PX 486. The evidence also showed that Plaintiffs' catalogues were available for streaming, which necessarily involves one individual track at a time. Tr. 102:14-21; 102:25-103:4; 103:15-20; 122:23-123:6 (Kooker); Tr. 197:22-198:6 (Kokakis); Tr. 1194:7-13 (Flott); PX 486. In addition, Cox's own expert, Mr. Tregillis, conducted his damages analysis using the royalty rate and sales figures for the record company Plaintiffs' *individual* works sold on iTunes

as digital downloads of *tracks*. Tr. 2841:22-2842:5 (Tregillis). There was absolutely no evidence that Plaintiffs published or monetized any of their works in suit in album form only.[11]

> **6.  Sound recordings issued as tracks are entitled to individual awards, even if they also appear on albums.**

Cox observes that statutory damages are available only for infringed "works," and by statute, "all the parts of a compilation … constitute one work." Mot. at 14; *see also* 17 U.S.C. § 504(c)(1). Cox relies upon *Bryant*, which held that "[a]n album falls within the Act's expansive definition of compilation … [and] [b]ased on a plain reading of the statute, therefore, infringement of an album should result in only one statutory damage award" and, further, that the Act "provides no exception for a part of a compilation that has independent economic value[.]" *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 140-41, 142 (2d Cir. 2010). Significantly, however, Cox omits that this Court has already agreed with those decisions holding that "[n]othing in the Copyright Act bars a plaintiff from recovering a statutory damage award for a sound recording [or musical composition] issued as an individual track, simply because that plaintiff, at some point in time, also included that sound recording [or composition] as part of an album or other compilation." *BMG II*, 199 F. Supp. 3d at 984 (quoting *Arista Records, LLC v. Lime Grp. LLC*, No. 06-cv-5936, 2011 WL 1311771, at *2–3 (S.D.N.Y. Apr. 4, 2011)). When Cox lost this and other issues in the *BMG* case, it appealed a number of issues to the Fourth Circuit, but not that legal conclusion. As such, the issue has been fully resolved by this Court as to Cox.

Further, Cox neglects to mention that the case it relies upon for its other statutory damage argument, *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, reached the same conclusion as this

---

[11] Evidence of registration of multiple works on a single form does not show that Plaintiffs issued their works only as part of albums, without issuance at the track level. *Xoom Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 n.8 (2003) (abrogated on other grounds by *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010)).

Court on the per-track versus per-album issue. 844 F.3d at 101.  *MP3tun*es held that the relevant analysis was "whether the plaintiff—the copyright holder—issued its works separately, or together as a unit."  *Id.* (quoting *Bryant*, 603 F.3d at 141).  Determining that the Plaintiffs had shown that their works were issued overwhelmingly as singles as well as albums, the Court affirmed a per-track statutory damages award.  *Id.*

MP3tunes* is not in conflict with either *Bryant* or the Fourth Circuit case of *Xoom v. Imagineline*, 323 F.3d 279 (2003), which *Bryant* cites.  The scenario presently here on Cox's motion addresses works made available to the public and exploited individually that, at some point in time, were also included within an album.  As explained above, nothing in the Copyright Act bars a plaintiff from recovering a statutory damage award for a sound recording issued as an individual track simply because that plaintiff, at some point in time, also included it as part of an album or other compilation.

## V.   Cox is not immune from secondary liability for its business subscribers' infringement.

### A.   Cox failed to develop sufficient facts at trial to support its theories concerning business subscribers.

In its motion, Cox challenges both elements of the vicarious liability claim with respect to Cox's business customers. Mot. at 6-9.  Putting aside for the moment the legal infirmities in Cox's argument that there should be any distinction between residential and business customers, Cox tried its case in a manner that precludes these challenges and it may not rehash its failed summary judgment motion here.  *See supra* Section IV.A.

Cox made no attempt to equip the jury with information as to which, if any, works in suit were infringed only by its business subscribers (and not by residential subscribers).  It points to 25% of *notices* related to its business subscribers.  Mot. at 7.  But, Cox concedes that it failed to

present evidence "that would allow the Court to determine which of the works at issue were infringed by residential subscribers" only.  *Id.*  So even if the jury wanted to adopt Cox's argument that Cox is immune from vicarious liability for its business subscribers' infringement, the jury had no way of applying that logic to the works in suit.  Cox tellingly did not even seek a jury instruction on the issue.

Cox must live with its decisions on how it tried the case.  No "reasonable jury" could find on the basis of evidence not presented.  Fed. R. Civ. P. 50(a)(1)(A); *see supra* Section IV.A.

**B. Abundant evidence supports the jury's finding of vicarious liability for Cox business subscribers' infringement.**

**1. There was ample evidence that Cox had the right and ability to supervise its business subscribers' infringement.**

Cox resorts to dictionary definitions of the word "supervise," Mot. at 8, in an attempt to avoid the abundant case law that exists regarding the control element of vicarious infringement. There is no need for assistance from dictionaries.  The "control" element is determined by the defendant's "right and ability to supervise the direct infringer."  *Grokster,* 545 U.S. at 930 n.9. And we know what that means:  "The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001); *see also Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 514 (4th Cir. 2002) (affirming district court's finding of infringement where defendant possessed "the right and ability to supervise the infringing activity").  As this Court explained in *BMG*:

> Cox has a contractual relationship with its users and that relationship gives Cox the legal right to withhold service in the face of infringing conduct.  Cox also provides a crucial service to the infringements alleged in this case, which gives Cox the practical ability to stop or limit infringement.

*BMG I*, 149 F. Supp. 3d at 675.  This is so regardless of whether the user is using residential or business internet subscription.

Cox argues that it had "neither the legal right nor the ability to supervise the actions of Cox Business end-users whose identities Cox did not even know."  Mot. at 8.  But Cox's argument is hollow: Cox could have obstructed the infringement—it just preferred not to.  Cox could have terminated or suspended the account of its business subscriber being used to infringe.  PX-178 at 9.  That alone is enough to establish Cox's ability to supervise.  Cox also had options beyond termination.  Upon receiving notices, Cox could have worked with its business customers to investigate and remediate the infringement rather than let it continue unabated.  Cox's own documents specifically contemplated this approach.

The Cox Business Acceptable Use Policy ("Cox Business AUP") prohibits use of Cox's service to infringe copyrights.  PX 178 at 1.  It further requires business customers to cooperate in addressing suspected violations by, among other things, "promptly provid[ing] Cox Business with information about Customer's end-users upon request."  PX 178 at 2-3.  That Cox Business AUP also provides that, "if Customer becomes aware of a violation of the AUP by any of its end-users, Customer shall suspend the Services to such end-user and shall notify Cox Business in writing as soon as reasonably practicable."  PX 178 at 3.  Cox's witnesses confirmed this understanding of the Cox Business AUP, Tr. 947:16-953:1 (Trickey), and Dr. Terrence McGarty explained that strong AUPs are essential to ensure compliance with the law when dealing with businesses.  Tr. 2885:4-21 (McGarty).  Cox even acknowledged in its abuse handling procedures that "there may be excessive [copyright] violations" by business customers but "it is not likely that we would terminate a CB customer for DMCA violation."  PX 181 at 7.  Cox could, it just didn't.

Beyond its rights under the Cox Business AUP, Cox was also aware as early as 2010 of software that could be used by "customers/hotel/business/etc. in stop [sic] [copyright] violations."  PX 258 at 1 ("Yeah that is something that users frequently do with our software"). Cox clearly had the right and ability under the Cox Business AUP to ensure compliance and prevent copyright infringement, and was aware of tools that it could encourage its end users to adopt to block P2P infringement.  By refusing to suspend, terminate, or work with its business customers to stop infringement, Cox simply chose to ignore its legal obligations.  PX 172 at 6-7 (Cox Business Ticket Handling Procedures showing "Hold for more" on "First Offense" and "Call/Warn" for "2nd Complaint and up").

Based solely on its say-so, Cox makes broad statements such as its business subscribers "include large and small organizations whose networks may be used by dozens, hundreds, or thousands of end users."  Mot. at 20.  Cox never offered any evidence about the size of the organizations, the size of the location for which Cox provided internet service, or the number of end users.  Cox called its employee, Paul Jarchow, to provide a foundation for exhibits listing business customer names, account numbers, and service addresses for Cox business subscribers who were the subject of Plaintiffs' infringement notices.  DX 358; DX 359; DX 360.  Mr. Jarchow's testimony was notable only for how little he knew about Cox's business subscribers. He confirmed that Cox had no information about the categories of people of who might have been using the subscriber's internet service; whether the service was public, secured, or both; and whether the service was used for critical infrastructure.  Tr. 2504:2-6, 2504:14-18, 2513:7-15, 2515:22-2516:4.  Of course, Cox's ignorance is only because it failed to exercise its rights under its business subscriber AUP.  *See* PX 178.  But the evidence introduced at trial shows that, contrary to Cox's assertions, many of Cox's business subscribers were relatively small, including one

fraternity which was the subject of 67 tickets, for which it sent 48 email warnings, but never suspended and never terminated.  *See* PX 549; Tr. 1451:11-1452:16 (Beck).

### 2.  There was ample evidence that Cox obtained a direct financial benefit from its business subscribers' infringement.

None of Cox's scattershot arguments specific to the direct financial benefit requirement and Cox's business subscribers has any merit.  Mot. at 6-7.  The causal nexus between the infringing activity and Cox's direct financial benefit is readily apparent.  *See supra* Section III.A.  In particular, rather than work with its business subscribers to stop or limit the infringement by their end users, Cox kept collecting their sizable monthly payments while knowingly allowing their infringement to continue unabated.  Cox did so because it had an economic incentive to collect monthly fees, no questions asked.  "Business subscribers"—which include fraternities, Sal's Seafood and Chicken, Pipes R Us Plumbing, and more—generated higher fees than residential subscribers, and, despite their extensive infringement, Cox never suspended or terminated a single account.  Tr. 1783:17-22, 1797:16-19 (Lehr); Tr. 2510:13-2512:14 (Jarchow); DX 358; DX 359; DX 360.  Obstructing the ongoing infringement risked losing revenue by terminating accounts, incurring additional administrative costs, and becoming less attractive as a result of friction with subscribers.[12]

---

[12] Cox's specific arguments, mentioned very briefly in its memorandum, are meritless.  First, while financial benefit can be proven by showing difference in revenue from infringing versus non-infringing users, that is not the only means of doing so.  *See supra* Section III.A.  Second, Cox's financial interests obviously do not depend on whether its business subscriber is liable for the infringement of its end users.  Cox has confused them unnecessarily (and presumed the business subscriber is not the infringer).  Third, the fact that payments are from Cox's business subscriber rather than their end users is immaterial.  Payment from the end user to Cox is not required.  What matters is that there was sufficient evidence for a reasonable jury to find a causal relationship between the infringement and Cox's financial benefit.  *See supra* Section III.A.

### C. Abundant evidence supports the jury's finding of contributory liability for Cox business subscribers' infringement.

In its motion, Cox makes another argument that this Court already rejected.  Twisting a non-binding Ninth Circuit case, *Cobbler Nevada, LLC v. Gonzalez*, 901 F.3d 1142 (9th Cir. 2018), Cox argues that it cannot be contributorily liable for direct infringement via one of its business subscriber's accounts unless Plaintiffs can show that the business subscriber itself is the direct infringer.  Mot. at 20-22.  The law requires no such thing.

This Court recognized at summary judgment that *Cobbler* does not apply here.  *Cobbler* did not hold, as Cox states, that "[p]roving the predicate act of direct infringement necessarily requires proof that a particular person did the infringing."  Mot. at 20.  The Court rejected Cox's argument, explaining that, unlike this case, *Cobbler* concerned "finding and naming the right defendant."  ECF No. 610 at 23.  *Cobbler* did not create the staggering rule that Cox advances here, that proceeding against a contributory infringer requires uncovering the precise identity of the direct infringer.  Rather, the Ninth Circuit held that bringing a claim of direct infringement against an adult foster care home required something more than a mere allegation that the direct infringement occurred through an IP address assigned to the defendant.  901 F.3d at 1146–47.

This Court has correctly recognized that "[w]hile identity is a key issue in many individual infringement suits, it has little relevance in a large-scale secondary liability suit."  *BMG I*, 149 F. Supp. 3d at 664.  For Cox's contributory liability, what matters is the existence of a direct infringement, not the precise identity of the direct infringer.  Unlike the defendant in *Cobbler*, who was apparently unaware of who to cut off to stop the infringement, Cox knew exactly which of its business accounts were being repeatedly used to infringe.  Per the Fourth Circuit, Cox had to "*do something*" but chose not to.  *BMG v. Cox*, 881 F.3d at 312.

Cox and the defendant in *Cobbler* are also differently situated.  Cox is an ISP, whereas the defendant in *Cobbler* was "a subscriber to internet service."  That difference weighs heavily.  In *Cobbler*, the court's concern was not to create "an affirmative duty for private internet subscribers to actively monitor their internet service for infringement [because] [i]mposing such a duty would put at risk any purchaser of internet service who shares access with a family member or roommate, or who is not technologically savvy enough to secure the connection to block access by a frugal neighbor."  *Cobbler*, 901 F.3d at 1149.  For Cox, none of those concerns apply.  Cox is a sophisticated, technologically savvy company in the business of providing access to its network to customers and it purported to have policies and procedures to receive infringement notices, work with subscribers to stop the infringement, and terminate accounts of repeat infringers.

Finally, Cox disingenuously raises the Fourth Circuit's *BMG* decision, contending that direct infringement occurring on the networks administered by Cox's business customers amounts to nothing more than "generalized knowledge … that infringement was occurring somewhere on its network."  Mot. at 22; *see also BMG v. Cox*, 881 F.3d at 311.  In making that argument, Cox casts aside all the evidence before the jury.  Cox had specific knowledge of specific direct infringement.  Plaintiffs' notices identified the account being used for infringement, the infringing file, a representative copyrighted work in the file, the day and time of the infringement, and the port number.  Tr. 479:8-480:12 (Frederiksen-Cross); Tr. 659:22-661:21 (Bahun); PX 17; PX 537.  As the Court already concluded in granting summary judgment on the knowledge element, that is not generalized knowledge of infringement occurring in some unknown location.  ECF No. 610 at 19-21.  While Cox conveniently portrays itself as powerless to *do something* about such direct infringement, the evidence before the jury showed otherwise.

## **<u>CONCLUSION</u>**

Cox's motion improperly seeks to supplant the jury's reasonable determination of the facts in dispute with its own.  For the reasons stated above, Cox's renewed motion for judgment as a matter of law or new trial should be denied in its entirety.

Respectfully submitted,

Dated February 28, 2020

/s/ Scott A. Zebrak
Scott A. Zebrak (38729)
Matthew J. Oppenheim (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Tel:  202-480-2999
scott@oandzlaw.com
matt@oandzlaw.com
jeff@oandzlaw.com

*Attorneys for Plaintiff*