**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| |
|---|
| SONY MUSIC ENTERTAINMENT, *et al.*, *Plaintiffs*, <br><br> v. <br><br> COX COMMUNICATIONS, INC, *et al.*, <br><br> *Defendants*. |

Civil No. 1:18-cv-950 (LO / JFA)

**COX'S REPLY IN SUPPORT OF ITS MOTION FOR REMITTITUR**
**OR, IN THE ALTERNATIVE, A NEW TRIAL**
**UNDER FEDERAL RULE OF CIVIL PROCEDURE 59(A)**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

ARGUMENT .......................................................................................................................... 1

I.   Plaintiffs Have Offered No Viable Justification for the Historically Excessive $1
     Billion Award.................................................................................................................. 2

     A.   Plaintiffs do not dispute that the $1 billion award vastly exceeds awards in
          comparable cases. ................................................................................................... 2

     B.   The statutory damages factors, as delineated in the jury instruction, do not
          support the extraordinary award. ........................................................................... 5

          1.   The evidence of Cox's profits and Plaintiffs' losses from the
               infringement does not support a $1 billion award. ..................................... 6

          2.   Plaintiffs offered no evidence to suggest that the $1 billion award
               was necessary for deterrence. ..................................................................... 9

          3.   Cox's conduct was not sufficiently culpable to warrant a $1 billion
               punishment.................................................................................................. 11

     C.   A substantial remittitur is warranted here. ........................................................... 15

II.  The jury award is so "wholly disproportioned to the offense" that it violates Cox's
     right to due process of law. .......................................................................................... 15

     A.   The existence of a statutory range does not immunize the award from due
          process review........................................................................................................ 15

     B.   Cox's conduct was not reprehensible, making the massive award
          unconstitutionally disproportionate. ..................................................................... 16

III. The instructions and evidence that encouraged the jury to punish Cox for profits
     and dividends unrelated to the infringement and warrant a new trial........................... 18

     A.   Plaintiffs' "need to punish" instruction was highly prejudicial. ........................... 18

     B.   The "total profits" instruction and evidence triggered an excessive award.......... 19

CONCLUSION....................................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Affilias Plc v. Architelos, Inc.*,
    2016 WL 1245006 (E.D. Va. March 23, 2016) ....................................................................2

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
    199 F. Supp. 3d 958 (E.D. Va. 2016) .............................................................................3

*BMW v. Gore*,
    517 U.S. 559 (1996).....................................................................................3, 10, 11

*Capitol Records, Inc. v. Thomas-Rasset*,
    2011 WL 6359886 (8th Cir. Dec. 6, 2011) .............................................................4

*Capitol Records, Inc. v. Thomas-Rasset*,
    692 F.3d 899 (8th Cir. 2012) .................................................................3, 4, 17

*Dancy v. McGinley*,
    843 F.3d 93 (2d Cir. 2016).....................................................................................2

*Ebersole v. Kline-Perry*,
    2012 WL 3776489 (E.D.Va. Aug. 29, 2012) ............................................................2

*Energy Intelligence Group v. Kayne Anderson Capital Advisors*
    948 F.3d 261 (5th Cir. 2020) ...............................................................................9

*F.W. Woolworth Co. v. Contemporary Arts*,
    344 U.S. 228 (1952)............................................................................... *passim*

*Filkind v. McAllister Bros., Inc.*,
    695 F. Supp. 845 (E.D. Va. 1988) .............................................................................2

*G.G. v. Grindle*,
    665 F.3d 795 (7th Cir. 2011) ..............................................................................2

*Golan v. FreeEats.com*,
    930 F.3d 950 (8th Cir. 2019) ...............................................................................17

*Hair Club for Men, LLC v Ehson*,
    2016 WL 6780310 (E.D. Va. Nov. 14, 2016)......................................................2

*Haley v. Pan Am. World Airways, Inc.*,
    746 F.2d 311 (5th Cir. 1984) ..............................................................................2

i

*John Wiley & Sons v. Book Dog Books*
    327 F. Supp. 3d 606 (S.D.N.Y. 2018)................................................................5, 9

*Jones v. Southpeak Interactive Corp.*,
    982 F. Supp. 2d 664 (E.D. Va. 2013) ...........................................................................2

*Kepner-Tregoe, Inc. v. Vroom*
    186 F.3d 283 (2d Cir. 1999)...........................................................................................9

*King v. McMillan*,
    594 F.3d 301 (4th Cir. 2010) ......................................................................................15

*Limone v. United States*,
    579 F.3d 79 (1st Cir. 2009).............................................................................................3

*McCarthy v. United States*,
    870 F.2d 1499 (9th Cir. 1989) .......................................................................................3

*Neyer v. United States*,
    845 F.2d 641 (6th Cir. 1988) .........................................................................................3

*Perfect 10, Inc. v. Giganews, Inc.*,
    847 F.3d 657 (9th Cir. 2017) .........................................................................................1

*Psihoyos v. John Wiley & Sons*
    748 F.3d 120 (2d Cir. 2014)...........................................................................................5

*Sony BMG Music Entm't v. Tenenbaum*,
    2010 WL 976010 (D. Mass. Feb. 8, 2010) ...................................................................4

*Sony BMG Music Entm't v. Tenenbaum*,
    2012 WL 12850137 (D. Mass. Jan. 27, 2012) .........................................................4

*Sony BMG Music Entm't v. Tenenbaum*,
    660 F.3d 487 (1st Cir. 2011) ........................................................................ *passim*

*St. Louis, I.M. & S. Railway Co. v. Williams*,
    251 U.S. 63 (1919)..................................................................................................16, 17

*Superior Form Builders v. Dan Chase Taxidermy Supply Co.*
    74 F.3d 488 (4th Cir. 1996) ....................................................................................5, 19

*Terrier Media Buyer d/b/a Cox Media Group v. Dish Network, L.L.C.*,
    No. 20-cv-583 (N.D. Ill. Jan. 24, 2020)...............................................................1, 10

**Statutes**

17 U.S.C. § 504(c) ...............................................................................................8, 18

**Other Authorities**

Fed. R. Civ. P. 50(b) ............................................................................................................8

Restatement (Second) Torts § 908 ...................................................................................10

## INTRODUCTION

Plaintiffs' opposition confirms the need for remittitur to reduce the historically excessive damage award, which undisputedly dwarfs any previous award in a comparable case—or indeed in any case. They have exploited their purported inability to calculate their damages into a claim for essentially infinite damages, unmoored in any evidence of their own losses from the infringement; any evidence that deterrence is necessary here, or if so, what amount would be sufficient to achieve it; or any evidence that would justify "punishing" Cox to the tune of $1 billion for conduct that Plaintiffs allowed CAS-member ISPs to engage in with impunity.[1]

Plaintiffs strove to convince the jury that the 10,017 infringements they could prove were evidence of millions more infringements they could *not* prove, and that the appropriate measure of damages was the harm not to Plaintiffs from Cox's infringement but to the entire music industry from *all* infringement. But an infringement action "is a specific lawsuit by a specific plaintiff against a specific defendant about specific copyrighted [works]; it is not a lawsuit against copyright infringement in general." *Perfect 10, Inc. v. Giganews, Inc*., 847 F.3d 657, 673 (9th Cir. 2017). And the broad range of statutory damages is not a justification for a massive award that is vastly out of proportion to the evidence of Plaintiffs' harm, Cox's gain, or the culpability of the infringing conduct. A substantial remittitur is warranted, and is well within the Court's discretion.

## ARGUMENT

Plaintiffs do not dispute this Court's power to remit an excessive statutory damages award. The only question is thus whether the jury's $1 billion award is so excessive as to effect a

---

[1] Plaintiffs' opening footnote accusing Cox of "chang[ing] its approach to punishment as an element of copyright damages as it suits the moment" based upon the Complaint in *Terrier Media Buyer d/b/a Cox Media Group v. Dish Network, L.L.C.*, No. 20-cv-583 (N.D. Ill. Jan. 24, 2020) is mistaken and misleading. Although the plaintiff in that case was previously a Cox subsidiary, the complaint itself explains that Cox sold most of its stake in the company in December 2019 and played no role in filing of referenced complaint. *Id*. at §22.

"miscarriage of justice." *Hair Club for Men, LLC v Ehson*, 2016 WL 6780310, at *1 (E.D. Va. Nov. 14, 2016). If so, it is "the power and duty of the trial judge to set [it] aside." *Jones v. Southpeak Interactive Corp.*, 982 F. Supp. 2d 664, 673 (E.D. Va. 2013) (citations omitted). This Court has not hesitated to exercise that discretion to order remittitur of verdicts less shocking than this one. *See, e.g., id.* at *6; *Jones*, 982 F. Supp. 2d at 673; *Affilias Plc v. Architelos, Inc.*, 2016 WL 1245006, at *11 (E.D. Va. March 23, 2016); *Ebersole v. Kline-Perry*, 2012 WL 3776489, at *9 (E.D. Va. Aug. 29, 2012). It should do so again here.

## I.      Plaintiffs Have Offered No Viable Justification for The Historically Excessive $1 Billion Award.

### A.      Plaintiffs do not dispute that the $1 billion award vastly exceeds awards in comparable cases.

Plaintiffs do not dispute the historic size of the $1 billion award. It is the largest award of statutory damages ever by a factor of eight. It is the largest such award for secondary infringement by a factor of 40. It exceeds the aggregate total of statutory damages awarded in all cases for the seven-year period 2009-2016. Mot. 3. Even on a per-work basis, it is the largest statutory damages award in a file-sharing case by a factor of four, and exceeds the award in the similar *BMG* case by more than a factor of five. *Id.*

Plaintiffs' only response is to suggest that comparing jury verdicts is inappropriate. Opp. 21. Not so. The overwhelming weight of authority holds that, as this Court has explained, "[p]rior awards are an aid and may be reviewed to determine whether an award is excessive" or "out of line compared to other awards in similar cases." *Filkind v. McAllister Bros., Inc.*, 695 F. Supp. 845, 850 (E.D. Va. 1988). "When a damage award is not rationally proportionate to awards assessed in similar cases for similar injuries, the award is excessive" and must be remitted. *Id.*; *see also, e.g.*, *G.G. v. Grindle*, 665 F.3d 795, 799 (7th Cir. 2011); *Haley v. Pan Am. World Airways, Inc.*, 746 F.2d 311, 319 (5th Cir. 1984); *Dancy v. McGinley*, 843 F.3d 93, 113 (2d Cir. 2016);

*Limone v. United States*, 579 F.3d 79, 104 (1st Cir. 2009); *Neyer v. United States,* 845 F.2d 641 (6th Cir. 1988); *McCarthy v. United States*, 870 F.2d 1499, 1500 (9th Cir. 1989). Indeed, the Eighth Circuit—the source of Plaintiffs' only authority on this issue, Opp. 22—appears to be the *only* Circuit that discourages comparative analysis of excessive compensatory damages.[2]

Here, the $1 billion award is so disproportionate to all comparables as to constitute a miscarriage of justice. Plaintiffs do not dispute that in cases most closely resembling this one, awards are substantially lower, both in aggregate and per-work terms. In the most closely analogous case, the *BMG* jury awarded $25 million, or $17,895 per work. *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958 (E.D. Va. 2016). The other major cases involving peer-to-peer infringement of music copyrights, although involving much smaller numbers of works, also place a much lower value on the infringement. In *Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487 (1st Cir. 2011), the plaintiffs were awarded $22,500 per work, and in *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899 (8th Cir. 2012), $9,250.

Plaintiffs make no attempt to justify the 458% increase in per-work damages—never mind the 3900% increase in aggregate damages—from *BMG* to this case. Indeed, Plaintiffs are noticeably quiet about *BMG*, which they cite only once. Opp. 27. It is a striking omission, given that the conduct accused of infringement in the two cases was substantially similar.

Plaintiffs do attempt to address *Tenenbaum* and *Capitol Records*, going so far as to suggest that "those cases *support* the verdict here," because "if an award of $22,500 per work has been

---

[2] The Supreme Court mandates that *punitive* damages always be considered in light of comparable cases. *BMW v. Gore*, 517 U.S. 559 (1996). Given Plaintiffs' erroneous insistence that statutory damages are "primarily" punitive, it is incongruous for them to argue that statutory damages are not subject to a comparable-verdict check. In any event, as the preceding paragraph shows, the overwhelming conclusion of American courts is that comparative analysis is appropriate for *both* compensatory and punitive damages. There is no reason that statutory damages, which Plaintiffs argue serve both compensatory and punitive purposes, would be different.

3

sustained against an individual, then an award of $99,830.39 per work against a multi-billion-dollar company … is proportionate and fully warranted." Opp. 26 n. 9 (emphasis added). But in those cases, Plaintiffs argued that noncommercial defendants should *not* be considered less culpable than commercial defendants—and won. *See* Plaintiffs' Response in Opposition to Defendant Joel Tenenbaum's Motion for New Trial or Remittitur, *Sony BMG Music Ent'mnt v. Tenenbaum*, 2010 WL 976010 (D. Mass. Feb. 8, 2010); Opening Brief of Appellants/Cross-Appellees, *Capitol Records, Inc. v. Thomas-Rasset*, 2011 WL 6359886, at *50 (8th Cir. Dec. 6, 2011). Indeed, as Plaintiffs explained in *Tenenbaum*, the First Circuit "has squarely rejected" the commercial/noncommercial distinction Plaintiffs rely on here. *See* Plaintiffs' Memorandum of Points and Authorities, *Sony BMG Music Ent'mnt v. Tenenbaum*, 2012 WL 12850137, at 11 and n.5 (D. Mass. Jan. 27, 2012) (citing *Tenenbaum*, 660 F.3d at 497-501). And at Plaintiffs' urging, the Eighth Circuit in *Capitol Records* rejected it too. *See Capitol Records*, 692 F.3d at 908-909. Having successfully defeated remittitur in those cases by arguing that commercial and non-commercial infringers are equally culpable, Plaintiffs should not be heard to argue against remittitur here by taking the opposite position.

At a minimum, the damage awards in *Tenenbaum* and *Capitol Records* are relevant "reference points" for determining the reasonableness of the vastly larger award at issue here.[3] Taken together with *BMG*, those cases strongly suggest that a reasonable value of each infringement is between $9,250 and $22,500, with the $17,895 awarded in *BMG* providing the most analogous value—with the critical caveats that the *BMG* judgment was reversed on appeal, and (as demonstrated below) would be significantly too high here in light of the trial evidence.

---

[3] Those awards are not particularly modest: they are 12 and 30 times greater, respectively, than the statutory minimum for willful infringement.

Finally, the cases Plaintiffs cite to support the award are so readily distinguishable that the contrast actually supports Cox's right to remittitur. For example, *Superior Form Builders v. Dan Chase Taxidermy Supply Co.* (cited in Opp. 16-17) involved a defendant that "became the largest taxidermy supplier in the country by consistently and deliberately copying competitors' forms in disregard of the copyright laws." 74 F.3d 488, 497 (4th Cir. 1996). Plaintiffs' assertion that "Cox is no different" (Opp. 17) is absurd. Cox's conduct here would be analogous to the defendant's conduct in *Superior Form Builders* if Cox were a record label that copied the plaintiffs' music catalogs, passed their songs off as its own, and used those songs to become the dominant player in the music industry. Cox's conduct could scarcely be more different.

Similarly, *Psihoyos v. John Wiley & Sons* (Opp. 17) involved direct misappropriation and exploitation of the plaintiffs' works for the benefit of a defendant that was in the business of publishing others' works. 748 F.3d 120 (2d Cir. 2014). And in *John Wiley & Sons v. Book Dog Books*, the district court denied remittitur for a defendant bookseller who was known in the industry "to be one of the most prevalent suppliers of counterfeit books," who had already settled one infringement suit by the plaintiff and "mere days" later began infringing again, who intentionally "delayed implementing formal anti-counterfeiting procedures for years," and who "continued to infringe even days before trial" began. 327 F. Supp. 3d 606 (S.D.N.Y. 2018). The defendant in *Book Dog Books*, that is, was a pirate—and a recidivist pirate at that. The case bears no resemblance to this one, and offers no justification for sustaining the enormous award at issue here.

### B.     The statutory damages factors, as delineated in the jury instruction, do not support the extraordinary award.

The analogous precedents establish that the $1 billion award is extraordinary by any measure. Rather than contest that fact, Plaintiffs argue that the extraordinary award is justified by what they insist are extraordinary facts. Most of that effort consists of a lengthy recitation of their

infringement case, liberally sprinkled with shaded language ("outrageous," "egregious," "flagrant," "sham") intended to cast Cox's conduct as exceptionally culpable. But adjectives are not facts, and indignation is not evidence. Fair consideration of the record establishes that the $1 billion award is excessive, not only by comparison to analogous awards, but in light of the trial evidence on which it must be based.

Faced with Cox's detailed demonstration that the statutory damages factors on which the jury was instructed cannot support the $1 billion award, Plaintiffs effectively argue that the instruction's factors do not matter, because they are "non-exhaustive," and the jury was free to render any award it found to be "fair under the circumstances." Opp. 15. But the factors listed in the Court's instruction are necessary to ensure that the award comports with what the Supreme Court has identified as the purposes of statutory damages: "restitution of profit," "reparation for injury," and "discourag[ing] wrongful conduct." *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233 (1952). Plaintiffs want to avoid those considerations, because they necessarily require an award rooted in evidence of Cox's profits from the infringement, Plaintiffs' injuries, and the need for deterrence. As Plaintiffs' opposition brief itself demonstrates, the $1 billion verdict is wholly untethered to Plaintiffs' evidence on those issues.

### 1. The evidence of Cox's profits and Plaintiffs' losses from the infringement does not support a $1 billion award.

Plaintiffs' claims to the contrary, Cox does *not* argue that "the availability of statutory damages is [ ] contingent on the demonstration of actual damages." Opp. 16. Cox's challenge is not to the *availability* of statutory damages, but to the extraordinary *quantum* of statutory damages awarded here. That "no actual damages are proven or [ ] are difficult to calculate" is a justification for the existence of statutory damages, not a justification for any particular amount of damages within the statutory range. Under both *F.W. Woolworth* and the jury instructions, the financial

impact of infringement on both Cox and Plaintiffs is highly relevant to determining where in the statutory range of $7.5 million to $1.5 billion the damages should fall.

As Plaintiffs admit, their own expert testified that Cox subscribers who received three or more infringement notices generated $208 million in gross revenues from bundled services. Opp. 14. Both *F.W. Woolworth* and the jury instructions require consideration of Cox's *profits* from the infringement, not its revenues. Plaintiffs' expert testified that Cox's profit on all services was 43%. One need not engage in "acrobatic calculations" (Opp. 19) to determine that Cox's profits on $208 million in revenues were a maximum of $89.4 million. Cox has explained in detail that the $89.4 million figure massively overstates Cox's profits from the infringement because it improperly (i) includes profits from unrelated services and profits earned after the Claims Period, and (ii) attributes the full value of Cox's services to the infringement, rather than to the myriad non-infringing uses for which those services are used. Mot. 8-9. Plaintiffs have not responded.

There are many ways to break down the evidence of Cox's profits; Cox's opening brief offered two that resulted in profits from the infringement of $21.3 million and $376,262, respectively. The point is that however they are measured, Cox's profits from the infringement were orders of magnitude below $1 billion, and cannot justify the jury award.

The same is true of Plaintiffs' evidence of their own losses. Having repeatedly disclaimed any ability to quantify their losses from infringement by Cox subscribers, they can offer no rebuttal to Mr. Tregillis' testimony that their actual losses from the infringement of the 10,017 works in suit amounted to $692,000. That's roughly $69 per work—almost 70 times the market value of a single downloaded song. Assuming for purposes of this motion that 10,017 is the correct number

of works in suit,[4] that $692,000 figure would result in a statutory damages award of at least $7.5 million—more than 10 times the amount of loss. Plaintiffs' complaint that Mr. Tregillis' analysis fails to account for the unknowable "quantity of infringing downloads or distributions by Cox users over the P2P networks" ignores the fact that statutory damages resulting from Mr. Tregillis' analysis compensate Plaintiffs for 10 times the amount of infringement they were able to prove.

That 10x multiple is not enough for Plaintiffs, who insist that the award properly reflects evidence of Plaintiffs' "multi-billion dollar losses, the shuttering of record labels and publishing companies, and mass layoffs across the music industry." Opp. 22. But there is an enormous evidentiary and causal gap between the 10,017 infringements at issue here and the losses of *an entire industry* over a multi-year period that extends beyond the damages period by more than a decade. No evidence connects Cox's conduct with the industry's "multi-billion dollar losses," never mind "mass layoffs." Moreover, the jury instruction did not permit the jury to consider losses by the record industry as a whole from all copyright infringement, and Plaintiffs cite no authority rendering Cox liable for infringement of which it was not accused. Instead, the jury was instructed to consider "the revenues that *Plaintiffs* lost" from *Cox's* copyright infringement. Doc. 671, Instr. 28 (emphasis added). Plaintiffs offered no evidence on that issue, and the fact that (they claim) their losses were indefinite does not somehow render them infinite.[5] The jury was not required to

---

[4] As Cox explains in its Rule 50(b) motion, under 17 U.S.C. § 504(c) the number of works should have been substantially reduced to prevent duplicative recovery for individual "works."

[5] Plaintiffs' suggestion that their losses from the infringement should include "the value of a blanket license to upload music recordings to the internet for public consumption," Opp. 21, does not support the jury's award. Cox did not upload any music recordings to the internet, making the hypothetical cost of such a hypothetical license irrelevant. In addition, the assertion that the cost of such a license would be "enormous" provides no guidance at all for determining a jury award: $1 billion is an "enormous" sum, but so are $100 million and $10 million.

accept Mr. Tregillis' analysis, but as the *only* evidence of Plaintiffs' actual losses, it is a relevant consideration in determining whether the jury's award is excessive.

In short, the type of compensable injury contemplated by *F.W. Woolworth* and the jury instructions cannot support the extraordinary damage award or any award close to it.

> ## 2.    Plaintiffs offered no evidence to suggest that the $1 billion award was necessary for deterrence.

Cox demonstrated in its opening brief that the record contains no evidence to support the conclusion that a $1 billion award was necessary to deter Cox from future infringement. Mot. 15-16. In opposition, Plaintiffs confirm the absence of any such evidence: they identify no evidence relevant to deterrence beyond Cox's profits and its owners' dividends—two factors with no meaningful connection to the conduct that Plaintiffs seek to deter. *See* Opp. 17-19.

Instead, they assert that "[w]here the award is within the statutory range, the need for deterrence can comfortably justify the award." Opp. 17. But none of the authorities they cite (at Opp. 17) supports that sweeping proposition. *Energy Intelligence Group v. Kayne Anderson Capital Advisors* merely confirms that deterrence is an appropriate goal of statutory damages. 948 F.3d 261, 273 (5th Cir. 2020). *Kepner-Tregoe, Inc. v. Vroom* affirms without a discussion an award of attorney fees "in line with the statutory goal of deterrence." 186 F.3d 283, 289 (2d Cir. 1999). And *John Wiley & Sons v. Book Dog Books* denies remittitur of a $34 million award on the ground that "only a large award would effectively promote deterrence" in light of "defendants' lengthy history of infringement" and evidence that "Defendants continued to infringe even days before trial." 327 F. Supp. 3d 606, 634 (S.D.N.Y. 2018). None of these authorities suggests that the award is justified by the need for deterrence in circumstances resembling these.

Plaintiffs acknowledge that "deterrence by its nature is designed to be forward-looking," Opp. 18—a damning admission, because they offered *no evidence at all* that the conduct giving

rise to Cox's liability for 2013-2014 still requires deterrence six years later. Further, the only evidence of Cox's "motivation" to engage in the infringing conduct was the evidence of the extent to which Cox profited from that conduct. Any award beyond what was necessary to erase that motivation would be sufficient to deter any rational actor from repeating the behavior at issue. Mot. 16. But Cox's profits *from the alleged infringement* were, as explained above, between $384,000 and $21.3 million; that is, between one-fiftieth and one-two thousandth of this award.

That is why Plaintiffs attempt to shift the focus from the need to deter Cox to the need to deter "other businesses similarly situated." Opp. 18. But the Court's jury instruction on deterrence permitted the jury to consider only "the effect the award may have on *Cox* in the marketplace"— not its effect on third parties. Doc. 671, Instr. 28 (emphasis added). Plaintiffs requested an instruction permitting consideration of "the effect the award may have on other Internet service providers in the marketplace," but the Court rejected it. Tr. 2654:22-2655:10 (replacing Plaintiffs' requested instruction with one allowing consideration of "the effect the award may have on Cox"). Having sought and been denied a damages instruction that would have permitted jury consideration of the award's deterrent effect on third parties, Plaintiffs cannot rely on that effect to support the award now.

Finally, Plaintiffs argue that the Supreme Court's statement in *Gore* that a massive award "cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal" (*Gore*, 517 U.S. at 584-585) is inapposite here because "*Gore* sets the standard for constitutional review of punitive damages, not review of a statutory damage award." Opp. 18. This is misdirection. It is true that *Gore* establishes the standard for assessing the constitutionality of punitive damages, but Plaintiffs' insistence on a "need to punish" instruction made *this* award explicitly punitive.  And the amounts

awarded for deterrence *are* punitive. *See, e.g.*, Restatement (Second) Torts § 908 (stating that the purposes of punitive damages are to punish and deter outrageous conduct). Accordingly, the extent to which a statutory award should be based in an amount sufficient to achieve the required deterrence is properly assessed using the *Gore* standard. Deterrence is deterrence, and the fair-notice concerns that some courts have held make *Gore* inapplicable to statutory damages do not change the deterrence calculus. Rather, the principle expressed in *Gore* demands remittitur where, as here, a historically large award is necessarily based in part on the need to deter, and where Plaintiffs adduced no evidence of the amount of damages that would be necessary to "achieve that goal." *Gore*, 517 U.S. at 584-585.

### 3.   Cox's conduct was not sufficiently culpable to warrant a $1 billion punishment.

Having won a jury instruction encouraging the jury to "punish Cox," Plaintiffs are curiously silent on how the "need to punish" factor supports the award. Their position seems to be that the "need to punish" justifies a massive award because Cox's conduct was so culpable that a massive punishment is warranted, without regard for the need for compensation or deterrence.

But the evidence does not support that conclusion. Most of the conduct that Plaintiffs paint as "outrageous" or evidence of "sham" anti-infringement policies either does not apply to Cox's conduct in this case, was expressly permitted under Plaintiffs' agreement with other ISPs, or both. Conduct that is unrelated to the infringements at issue and that the Plaintiffs expressly allowed others to engage in is not the kind of reprehensible conduct that warrants a massive, punitive award.

For example, Plaintiffs complain repeatedly that Cox "failed to take any customer-facing action on 90% of the notices it received in the claim period." Opp. 6, 19. But that 90% figure refers not to Plaintiffs' notices, but to all notices—and consists primarily of millions of coercive Rightscorp notices that Cox blocked as violations of its notice policy. As the Court is well aware,

Cox's treatment of the Rightscorp notices was addressed in the *BMG* trial. Cox has already paid a price for it, and should not be forced to pay again (in a vastly larger amount) for the same conduct.

*Plaintiffs'* notices—the notices actually at issue in this case—were not ignored, but were processed in accordance with Cox's policies. Of course, Cox's policies are the object of much of Plaintiffs' argument that Cox's anti-infringement efforts were a "sham"—but most of them are identical to, or more restrictive than, the policies that Plaintiffs themselves endorsed as part of the CAS system. For example, Plaintiffs attack the "arbitrary caps" that Cox placed on the number of notices it would accept. Opp. 8. But the ISPs in CAS were also permitted to impose such caps. *See* DX-63 at 16.[6] Plaintiffs complain that Cox sent 13 notices before considering termination. Opp. 10. But the ISPs in CAS were required to send only six alerts, no matter how many times a subscriber was the subject of infringement notices, and CAS did "not, *in any circumstance*, require the ISP to terminate a subscriber account." DX-63 at 7 (emphasis added); DX-66. Plaintiffs complain that the "walled garden" suspensions that Cox imposed after the sixth notice were "faux," because they allowed subscribers to self-reactivate with "a call to Cox." Opp. 10. But the "Mitigation Measures" required by CAS after the 4th notice were no different: the ISP could choose any of six temporary measures, including "temporary redirection to a Landing Page until the Subscriber contacts the Participating ISP to discuss" the notices. DX-63 at 11.

Plaintiffs call it "incredible" that Cox allowed terminated subscribers to return to Cox's service with "a clean slate," Opp. 12, but CAS too allowed a "reset" for an infringing subscriber after a period without notices, no matter how many times that subscriber had previously infringed (and without requiring that the subscriber ever be terminated). DX-63 at 13. And Plaintiffs' claim

---

[6] Moreover, Plaintiffs cannot deny that they agreed to the caps and rarely hit them, never mind exceeded them.

that Cox's "never-suspend and never terminate" policy for business customers "was even more outrageous" rings hollow given that CAS imposed no obligations at all with respect to ISPs' business customers. *See id.* at 2 (stating that CAS "establish[es] a consumer-focused process for identifying and notifying *residential* wired Internet access service customers") (emphasis added). Even Cox's blocking of millions of Rightscorp notices because they were "flooding the system," Tr. 987:8, was permissible under CAS, which allows ISPs to "temporarily cease processing" infringement notices "or reduce the number of ISP notices being processed if … it receives more ISP Notices than its business process and systems can reasonably address." DX-63 at 16.

Of course, some objects of Plaintiffs' ire are not covered by CAS. For example, they point to the fact that Cox "set a daily limit of 300 for the maximum number of suspensions it would issue per day across all abuse types." Opp. 11. But it is difficult to understand why Plaintiffs find this objectionable, given that (a) CAS did not require suspensions at all, and (b) Plaintiffs' whole argument in this case is that notices and suspensions are inadequate measures, and that termination is the only sanction sufficient to avoid liability. Put another way: even if Cox had suspended every subscriber who reached the suspension stage of graduated response, Plaintiffs' liability argument would have been exactly the same. Plaintiffs cannot both claim that suspensions are useless and that Cox's limitation on daily suspensions is evidence of outrageous conduct.

None of this is to suggest (at least for purposes of this motion) that the close parallels between CATS and CAS eliminate Cox's liability for secondary infringement. But those parallels strongly suggest that Cox's conduct was not "outrageous," and that its policies were not a "sham" demonstrating a "flagrant disregard for the law." Opp. 2, 10, 11, 19. Even if those policies were not as successful in deterring infringement as the Cox and the CAS participants hoped (and Plaintiffs' own expert admitted that they *were* successful in reducing infringement by all but a

13

small number of subscribers[7]), they are not evidence of the kind of highly culpable conduct that might warrant an exceptionally punitive award. The fact that Cox could have joined CAS and thereby avoided any liability for the conduct at issue here (it is undisputed that Plaintiffs have not sued any of the ISPs who signed onto CAS) makes readily apparent the gross disproportion between the culpability of its conduct and the $1 billion award.[8]

Plaintiffs' other major argument in defense of the $1 billion verdict is that the "staggering" amount of infringement warrants a massive award. Opp. 5, 22. They point to the "over 10,000 copyrighted works, numerous Plaintiffs, and a willfully infringing defendant with many billions in profits" and argue that these factors make "the figures Cox puts forward … nonsensically low." Opp. 22. But copyright damages are assessed on a per-work basis, so any jury award within the statutory range necessarily accounts for the "over 10,000 copyrighted works" in suit. Similarly, the number of plaintiffs has no bearing on damages: we doubt that Plaintiffs would have lowered their damages demand if there had been 26 of them rather than 53 (and in any event, the 53 plaintiffs here all belong to just four corporate families). And Plaintiffs do not really dispute that the willfulness finding merely sets a floor and a ceiling for the award. It offers no guidance on where within that range the award should fall, which is all that is at issue here.

Plaintiffs' bluster about Cox's "utter disregard for the law" does not comport with the evidence. Even if Cox's conduct was sufficient to support the jury's findings of liability and willfulness, that conduct did not warrant the jury's enormous, punitive award.

---

[7] Tr. 861:17-862:6 (McCabe cross); McCabe Trial Demonstrative 7 (showing reduction in notices over the course of graduated response); *see also* Tr. 1591:14-1592:3 (Carothers direct); Tr. 1962:1-1963:9 (Weber direct); PX-325 at 3.

[8] Cox chose not to join CAS because Cox "already had a system in place and working" and did not want to give the CAS call center "access to our customers or their info" and pay for the privilege. PX-0325.0003.

14

### C.   A substantial remittitur is warranted here.

Where a jury award is grossly excessive, the trial court "must" set aside the verdict and either remit the award or grant a new trial. *King v. McMillan*, 594 F.3d 301, 324 (4th Cir. 2010). Cox has offered several approaches for reaching an award that is properly rooted in the *F.W. Woolworth* factors and the jury instruction and is commensurate with jury awards in analogous cases. Assuming that the correct number of works in suit is 10,017, those approaches result in an award between the statutory minimum of $7.5 million (which represents a substantial multiple of the actual harm to Plaintiffs from the 10,017 "displaced downloads" at issue here) and $22.25 million (which represents a substantial multiple over the actual profits Cox obtained from the infringement and any expenses saved). Mot. 17-18. Awards in comparable cases involving vastly smaller numbers of works are themselves excessive in light of the evidence in this case, but strongly suggest that the jury's award is vastly more so, and should be substantially remitted.

## II.   The jury award is so "wholly disproportioned to the offense" that it violates Cox's right to due process of law.

Plaintiffs do not dispute that due process requires proportionality between the "offense" and the magnitude of the statutory damages award. *See* Mot. 19-20. Nor do they dispute that the magnitude of the statutory award here is extraordinary. The only issue is whether Cox's conduct was so reprehensible that the extraordinary award is proportional to the conduct. It was not, and that disproportion renders the massive award "so severe and oppressive as to be … obviously unreasonable" in violation of Cox's right to due process. *St. Louis, I.M. & S. Railway Co. v. Williams*, 251 U.S. 63, 67 (1919). Plaintiffs' arguments to the contrary are without merit.

### A.   The existence of a statutory range does not immunize the award from due process review.

First, Plaintiffs suggest that the award is necessarily constitutional because it is within the statutory range, noting that the existence of "an upper bound on the damages that a jury can award"

under the statute "mitigates the risk of a truly untethered award." Opp. 24 (quotation omitted). Plaintiffs are wrong: if the existence of a statutory cap on damages were sufficient to insulate an award from constitutional scrutiny, all statutory damages awards would be constitutional. The Supreme Court's decision in *Williams* squarely disposes of any such claim.

### B.     Cox's conduct was not reprehensible, making the massive award unconstitutionally disproportionate.

Although Plaintiffs do not dispute that the culpability of Cox's "offense" is the key issue in determining the constitutionality of the extraordinary award, they devote just two sentences to that issue in opposition, asserting in conclusory fashion that "Cox's declaration of its 'low culpability' could not be more antithetical to what the jury observed and considered." Opp. 24.

Cox has already explained why its conduct, even if willful, was not sufficiently culpable to warrant the jury's historically punitive award. In short, Cox's infringement involved no misappropriation or exploitation of Plaintiffs' works; was a tiny and incidental part of an otherwise lawful, socially valuable activity (providing high-speed internet access); was similar in most key respects to conduct that Plaintiffs expressly allowed other ISPs to engage in; and occurred in spite of Cox's active efforts to discourage direct infringement via warnings, soft suspensions, hard suspensions, and—in rare cases—terminations. To confirm that Cox's conduct fell far short of the kind of reprehensibility that would be necessary to support the $1 billion award, one need only consider an alternative world where Cox directly stole copyrighted works for its own benefit; where its business consisted entirely of stealing copyrighted materials; where its behavior was far outside of accepted industry norms; and where it employed policies designed to encourage others' infringement, rather than discourage it. In that case, the infringing conduct might warrant an exceptionally large award. But this is not that case.

In that sense, this case resembles the Eighth Circuit's recent decision finding statutory damages unconstitutionally excessive. *Golan v. FreeEats.com*, 930 F.3d 950 (8th Cir. 2019) differs from this case in some respects. But the core of both cases is the same: where a defendant is found to have engaged in conduct that violated the law, but was relatively non-culpable in light of the evils that the statute is intended to remedy, a shockingly large award is a violation of due process.

*Golan* also illustrates the principle that it is "[t]he absolute amount of the award, not just the amount per violation," that matters in determining disproportionality under *Williams*. *Golan*, 930 F.3d at 963 (quoting *Capitol Records*, 692 F.3d at 910). The fixed $500 award per violation of the TCPA is plainly not disproportionate of itself. The aggregation of more than three million violations, however, resulted in a "severe and oppressive" award, in violation of the defendant's due process rights. *Id*. So too here:  regardless of whether an award of nearly $100,000 per work is inherently disproportionate, an aggregation of $1 billion worth of $100,000 awards is so shocking in relation to the conduct at issue that it breaches constitutional limits.

The focus on the aggregate amount of damages is particularly important here, where—if Plaintiffs are to be believed—there is essentially no limit on the potential number of infringements that could be alleged. If it is true that MarkMonitor "collected data showing more than 10,000 infringements per day" by Cox subscribers alone, Opp. 5 (it is not)[9], then under Plaintiffs' theory, the exact conduct that makes Cox liable for $1 billion over two years would also be sufficient to make Cox liable for $1 billion *per day*—on an annualized basis, roughly the gross domestic product of Ireland—without running afoul of constitutional limits. That outcome is absurd. This is

---

[9] As MarkMonitor's Samuel Bahun admitted on cross-examination, that 10,000 per day figure is based upon high-level "pulse checks" that do not gather sufficient information to prove infringement. Tr. 631:13-632:3. Nor is there any evidence that the 10,000 related to Plaintiffs' works. The pulse check numbers are not proof copyright infringement, any more than FBI crime statistics are proof of a crime, and do not provide a valid basis for the jury's award.

not tobacco litigation, or a mass toxic tort case. An aggregate award of $1 billion is so disproportional to Cox's "offense" that it violates Cox's right to due process of law.

### III.   The instructions and evidence that encouraged the jury to punish Cox for profits and dividends unrelated to the infringement and warrant a new trial.

Plaintiffs' success in obtaining an instruction regarding the "need to punish" Cox was surprising, in light of the Court's omission of any such instruction in *BMG* and its statement in that case that "[s]tatutory damages under the Copyright Act are *not* penal," but are "aimed at compensating copyright owners and deterring future infringing conduct." *BMG*, 149 F. Supp. 3d at 677 n.31 (emphasis added). The same is true of the instruction to consider Cox's "total profits," which was also not included in the *BMG* instructions but included here over Cox's objection. The effect of those changes is clear: the widening of the damages calculus to include both "punishment" and "total profits" resulted in a massive expansion of damages—by a factor of more than five on a per-work basis, and by a factor of 40 on an aggregate basis. Given that the conduct at issue in both cases was substantially the same, there is little question that the changed jury instructions materially affected the outcome. The only question is whether Plaintiffs are correct that they were legally appropriate in the context of this case. They were not.

### A.   Plaintiffs' "need to punish" instruction was highly prejudicial.

The "need to punish" instruction that the Court gave at Plaintiffs' insistence was inappropriate on the facts of this case. Neither the Supreme Court nor the Fourth Circuit has ever sanctioned a retribution-based jury instruction for copyright infringement, and this Court should not do so now. As Cox has previously explained, neither the Supreme Court's decision in *F.W. Woolworth* nor the Fourth Circuit's decision in *Superior Form Builders*—the only two binding decisions on which Plaintiffs rely—says anything to suggest that juries should be encouraged to "punish" copyright defendants beyond the need to deter future infringement. Indeed, no Court of

Appeals has ever approved such an instruction. Even if it were correct to suggest that punishment of misconduct beyond the need to deter it is an appropriate purpose of statutory damages, there is a significant legal and practical gap between the relevance of punishment as a general principle and an instruction that expressly points to "the need to punish" the defendant. Such an instruction is an open invitation to an excessive award rooted solely in the defendant's ability to pay.

There is also a dangerous precedent to be set here. Plaintiffs do not dispute that to date, punishment-based instructions have been given only in cases involving defendants whose conduct could plausibly be described as piratical—defendants who directly exploited others' intellectual property for their own gain. *See* Mot. 25-26; *cf.* Opp. 29 n.11. As Cox has explained both in its motion and here, this is a very different case. Allowing the punishment instruction to stand here would normalize a very significant change in the way juries are instructed on copyright damages— a change the significance of which is readily apparent in the contrast between the award in this case and the award in *BMG*.

**B.      The "total profits" instruction and evidence triggered an excessive award.**

The "total profits" instruction all but forced the jury to render a massive award: having been instructed to consider Cox's total profits in assessing the need to deter, the jury had no reason to consider the amount necessary to deter *the infringement actually at issue here*, which represented—even according to Plaintiffs' experts—a small fraction of the activity that generated those profits. As Cox explained in its motion, the cases on which Plaintiffs rely to support the total-profits instruction all involve direct infringers who were in the business of distributing copyrighted content, such that there was a direct relationship between the defendant's misappropriation and its profits. *See* Mot. 27-28. Here, there is no such direct relationship between the infringing activity and Cox's total profits, making the instruction inappropriate

Faced with this deficiency in their position, Plaintiffs offer no response: their opposition makes no attempt to address the differences between this case and the ones on which they rely. The failure is telling: despite having several months to research the issue, they have found no authority for using a total-profits instruction in a case resembling this one.

Finally, Plaintiffs make no attempt at all to address Cox's argument that even if the "total profits" instruction was appropriate, the evidence of dividends paid to Cox's owners was not appropriate under that instruction, was highly prejudicial, and should have been excluded from evidence. The causal connection between Cox's profits from the 0.7% of its broadband subscribers (31,000 out of 4.5 million) for whose conduct Cox was found liable in this case and Cox's total profits from all video, telephony and broadband services provided to all subscribers is itself highly attenuated. The causal connection between the dividends paid out of those profits and those 31,000 Cox subscribers is even more so, and the connection of those dividends to any need to deter Cox's infringing conduct with respect to those few subscribers—namely, the provision of broadband service—is so attenuated as to be completely meaningless. Plaintiffs' failure to even respond to this point is sufficient proof that it is correct. The evidence should have been excluded, and its admission—heavily exploited by Plaintiffs in closing argument—was severely prejudicial and resulted in the excessive verdict. The Court should order a new trial on damages to obtain an award untainted by this evidence.

## CONCLUSION

For all these reasons, Cox requests that Court grant remittitur reducing the damages award to an amount supported by the trial evidence and the requirements of due process or, in the alternative, vacate the judgment and order a new trial on damages.

Dated: March 13, 2020

Respectfully submitted,

/s/ Thomas M. Buchanan
Thomas M. Buchanan (VSB No. 21530)
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.
and CoxCom, LLC*

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
Sean R. Anderson (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email:  melkin@winston.com
Email:  tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
Thomas J. Kearney (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA  94111-5840
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
Email:  jgolinveaux@winston.com
Email: tkearney@winston.com

Michael L. Brody (*pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
Email: mbrody@winston.com

Geoffrey P. Eaton (*pro hac vice*)
WINSTON & STRAWN LLP

1700 K St. NW
Washington, DC 20006-3817
Tel: (202) 282-5705
Fax: (202) 282-5100
Email: geaton@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750
Email:  dhleiden@winston.com

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 13, 2020, the foregoing was filed and served electronically

by the Court's CM/ECF system upon all registered users.

<u>/s/ Thomas M. Buchanan</u>
Thomas M. Buchanan (VSB No. 21530)
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.*
*and CoxCom, LLC*