**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| SONY MUSIC ENTERTAINMENT, *et al.*, <br> *Plaintiffs*, <br><br> v. <br><br> COX COMMUNICATIONS, INC, *et al.*, <br><br> *Defendants*. | Civil No. 1:18-cv-950 (LO / JFA) |

**COX'S REPLY IN SUPPORT OF ITS RENEWED MOTION FOR**
**JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL**
**UNDER FEDERAL RULES OF CIVIL PROCEDURE 50(b) AND 59(a)**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

ARGUMENT ........................................................................................................... 1

I.    Plaintiffs' Evidence Is Insufficient to Hold Cox Vicariously Liable for Direct
      Infringements ................................................................................................. 1

      A.    Plaintiffs' lack of evidence of a direct financial benefit to Cox is fatal to
            their vicarious liability claim. ................................................................ 1

            1.    Evidence of a "draw" is required, and Plaintiffs offered none. .................. 1

            2.    Plaintiffs' evidence fails to show a "direct" financial benefit to Cox
                  from the infringement. ............................................................... 4

            3.    No evidence connects any financial benefit to infringement of
                  *Plaintiffs'* works at issue. ........................................................ 6

      B.    Plaintiffs lack any evidence of vicarious liability as to Cox Business
            subscribers. ...................................................................................... 7

      C.    A finding for Cox on vicarious liability requires a new trial on damages. ............ 8

II.   Cox Is Entitled to JMOL Limiting Certain of Plaintiffs' Works to a Single
      Statutory Award. ............................................................................................ 9

      A.    Cox's Motion is both proper and properly supported. ............................................ 9

            1.    Cox is entitled to JMOL on the purely legal issue that Plaintiffs are
                  not entitled to duplicative recovery for single "works." ............................ 9

            2.    The record contains ample evidence to support limiting Plaintiffs'
                  damages to one award for a musical composition and its derivative
                  sound recording. ...................................................................... 9

            3.    The record contains ample evidence to support limiting Plaintiffs'
                  damages to one award per album registered as a derivative work. ............ 11

      B.    A musical composition and its derivative sound recording are one work
            for purposes of statutory damages, and entitled to a single award. ..................... 11

            1.    1 U.S.C. § 1 governs the interpretation of the Copyright Act .................. 12

            2.    Plaintiffs' urged interpretation is inconsistent with the Copyright
                  Act. ................................................................................... 13

            3.    No other authority supports Plaintiffs' urged interpretation. .................... 14

C.      Compilations, such as sound recordings registered as works made for hire, are "one work" for purposes of § 504(c). ........................................................... 14

III.    Plaintiffs' Evidence with Respect to Cox Business Subscriber Accounts Is Insufficient to Hold Cox Liable for the Acts of Unidentified Direct Infringers ............... 16

IV.     Plaintiffs' Evidence of Direct Infringement is Insufficient ............................................. 18

A.      Plaintiffs' evidence of direct infringement by reproduction is insufficient. ......... 18

B.      Plaintiffs' evidence of direct infringement by distribution is insufficient. ........... 18

V.      Plaintiffs' Evidence is Insufficient to Hold Cox Liable as a Contributory Infringer ........ 20

CONCLUSION ..................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adobe Sys. v. Canus Prods.*,
    173 F. Supp. 2d 1044 (C.D. Cal. 2001) .............................................................2, 3, 4

*Arista Records LLC v. USENET.com*,
    633 F. Supp. 2d 124 (S.D.N.Y. 2009)..........................................................................5

*Blackman v. Dist. of Columbia*,
    633 F.3d 1088 (D.C. Cir. 2011) ................................................................................12

*BMG Rights Mgm't (US) LLC v. Cox Commc'ns, Inc.*,
    149 F. Supp. 3d 634, 676 (E.D. Va. 2015) .............................................2, 6, 19, 20

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014)..................................................................................................12

*Capitol Records, Inc. v. Thomas*,
    579 F. Supp. 2d 1210 (D. Minn. 2008)......................................................................19

*Cobbler Nevada, LLC v. Gonzales*,
    901 F.3d 1142 (9th Cir. 2018) ............................................................................16, 17

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2005) .......................................................................... *passim*

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996) ........................................................................................2

*Gustafson v. Alloyd Co.*,
    513 U.S. 561, 115 S. Ct. 1061 (1995)......................................................................14

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*,
    118 F.3d 199 (4th Cir. 1997) ....................................................................................19

*Marobie-FL, Inc. v. National Association of Fire Equipment Distributors*,
    983 F. Supp. 1167 (N.D. Ill. 1997) ............................................................................2

*Newton v. Diamond*,
    204 F. Supp. 2d 1244 (C.D. Cal. 2002) ....................................................................14

*Perfect 10, Inc. v. Giganews, Inc.*,
    847 F.3d 657 (9th Cir. 2017) ......................................................................................7

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)........................................................................................10

*Religious Technology Center v. Netcom On-line Communications Services*,
    907 F. Supp. 1361 (N.D. Cal. 1995) ...............................................................2

*Rowland v. California Men's Colony, Unit II Men's Advisory Council*,
    506 U.S. 194 (1993)........................................................................................13

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
    316 F.2d 304 (2d Cir. 1963)...........................................................................5

*Sony Discos, Inc. v. E.J.C. Family P'ship*,
    No. H-02-3729, 2010 U.S. Dist. LEXIS 33435 (S.D. Tex. Mar. 31, 2010) ............3

*U.S. v. Hayes*,
    555 U.S. 415 (2009)........................................................................................12

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
    No. A-17-CA-365-LY, 2018 WL 1096871 (W.D. Tex. Feb. 28, 2018)...................4

*Varhese v. Honeywell Int'l, Inc.*,
    424 F.3d 411 (4th Cir. 2005) ..........................................................................9

*VHT, Inc. Zillow Grp., Inc.*,
    918 F.3d 723, 747 (9th Cir. 2019) ..................................................................16

*Xoom, Inc. v. Imageline, Inc.*,
    323 F.3d 279 (4th Cir. 2003) ..........................................................................16

*Xoom, Inc. v. Imageline, Inc.*,
    93 F. Supp. 2d 688 (E.D. Va. 1999) ..............................................................16

**Statutes**

1 U.S.C. § 1...............................................................................................12, 13

17 U.S.C. § 101........................................................................................13, 15

17 U.S.C. § 108(h)(2)(C) ...............................................................................13

17 U.S.C. § 504(c) ...........................................................................12, 14, 15

17 U.S.C. § 504(c)(1)......................................................................................14

**Other Authorities**

Goldstein on Copyright § 7.5.1 (3d ed. 2012 Supp.) ....................................20

S. Rep. 105-190 (1998) ................................................................................................................ 1, 2

S. Rep. No. 94-473 (1975) ................................................................................................................ 13

## INTRODUCTION

Plaintiffs' opposition attempts to paper over fatal flaws in key parts of Plaintiffs' case by proposing novel legal theories, ignoring settled law, substituting argument for evidence, and appealing to inapposite and overruled legal decisions. Their arguments fail, and the Court should grant JMOL to Cox on each of these issues or, in the alternative, a new trial.

## ARGUMENT

## I.   Plaintiffs' Evidence Is Insufficient to Hold Cox Vicariously Liable for Direct Infringements

Plaintiffs' attempts to avoid JMOL on vicarious liability ignore the universally agreed principle that flat monthly fees for providing Internet service do not constitute the "direct" financial benefit required for vicarious liability, *unless* the plaintiff proves that the ability to infringe acted as a "draw" to the service, in the sense that "the value of the service lies in providing access to infringing material." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2005) (quoting S. Rep. 105-190, at 44 (1998)). Plaintiffs do not dispute that Cox's revenues come from flat monthly fees that are the same for infringers and non-infringers alike. Accordingly, Cox cannot be vicariously liable unless the ability to infringe Plaintiffs' works in suit was the "draw" for subscribers to buy its service. Because Plaintiffs offered no evidence that the ability to infringe Plaintiffs' works was such a "draw," Cox is entitled to JMOL of no vicarious liability.

### A.   Plaintiffs' lack of evidence of a direct financial benefit to Cox is fatal to their vicarious liability claim.

#### 1.   Evidence of a "draw" is required, and Plaintiffs offered none.

Plaintiffs' arguments that they need not show a "draw" are contrary to the overwhelming weight of authority. Plaintiffs concede that the only revenue Cox receives from alleged infringers is in the form of flat monthly fees, and as this Court recognized in *BMG,* "Cox's receipt of monthly fees is *only* evidence of direct financial benefit if some portion of those fees is generated from

-1-

subscribers that are *drawn to Cox's service* at least in part *because* of the infringing activity alleged in [the] case. Without that evidence, the requisite causal connection between the benefit and the infringing activity is not established." *BMG Rights Mgm't (US) LLC v. Cox Commc'ns*, Inc., 149 F. Supp. 3d 634, 676 (E.D. Va. 2015), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018) ("*BMG I*") (first emphases added; collecting cases).

None of Plaintiffs' authorities support their contrary position. Plaintiffs' reliance on the Ninth Circuit's *Fonovisa* decision, *see* Opp. 11, is misplaced. *Fonovisa, Inc. v. Cherry Auction,* Inc., 76 F.3d 259 (9th Cir. 1996). *Fonovisa* predates, and so *informs* (not contradicts) Congress's guidance that "[i]n general, a service provider conducting a legitimate business would not be considered to receive a 'financial benefit directly attributable to the infringing activity' where the infringer makes the same kind of payment as non-infringing users of the provider's service," unless "the value of the service lies in providing access to infringing material." S. Rep. 105-90 (1998). More relevant authorities are those that, like *Ellison* and *BMG*, post-date Congress's guidance and address vicarious liability by ISPs, rather than flea markets.[1] In addition, because *Fonovisa* analyzed the adequacy of the plaintiff's allegations on a motion to dismiss, it lacks relevance to this Court's assessment of the adequacy of Plaintiffs' trial evidence.

In any event, far from supporting "a broader consideration of causation," *Fonovisa* is generally recognized to be an example of a court *requiring* evidence of a "draw" from the infringement of specific works at issue. *See, e.g.*, *Adobe Sys. v. Canus Prods.*, 173 F. Supp. 2d 1044, 1051 (C.D. Cal. 2001); *Sony Discos, Inc. v. E.J.C. Family P'ship*, No. H-02-3729, 2010 U.S.

---

[1] In discussing vicarious liability, Congress approvingly cited *Religious Technology Center v. Netcom On-line Communications Services*, 907 F. Supp. 1361 (N.D. Cal. 1995) and *Marobie-FL, Inc. v. National Association of Fire Equipment Distributors*, 983 F. Supp. 1167 (N.D. Ill. 1997). Both held that online defendants (an ISP and a website) whose only revenues came from periodic payments that did not depend on the payer's activities could not be held vicariously liable.

Dist. LEXIS 33435, at *10-11 (S.D. Tex. Mar. 31, 2010). Indeed, as one court recognized, "[w]ithout the requirement that the counterfeit goods provide the main customer 'draw' to the venue, *Fonovisa* would provide essentially for the limitless expansion of vicarious liability into spheres wholly unintended by the court." *Adobe Sys.*, 173 F. Supp. 2d at 1051. So too here.

Thus, to prevail on vicarious liability, Plaintiffs had to produce evidence that infringement was a "draw" to Cox's service. They have offered none. The suggestion that "the scale of the infringement" is enough to meet the "draw" standard (Opp. 12) is pure *ipse dixit*, unsupported by either authority or logic. Even if it is true that P2P usage constitutes 13% of the traffic on Cox's network and 99% of that usage is infringing, the overwhelming value of Cox's service is in its *non*-infringing uses. In the absence of any evidence that any subscribers came to Cox *because* of the ability to infringe, the "scale of the infringement" suggests that infringement was a classic "added benefit" of subscribing, not a "draw." *Ellison*, 357 F.3d at 1079.

Nor does evidence that "Cox aggressively advertised its network speeds as an enhancement to subscribers' ability to download music" establish the required "draw." *Id*. High bandwidth is content-neutral: a subscriber who bought higher bandwidth in order to infringe would pay exactly the same monthly fees as a subscriber who bought higher bandwidth to speed up his iTunes downloads. The existence of a weak correlation between infringing subscribers' ticket totals and their payment amounts does not establish a direct *causal* relationship between infringement and Cox's revenue, and certainly does not make infringement "the value of the service" that Cox provides. Absent any direct evidence that any higher-bandwidth users subscribed for the purpose of infringing, Cox's advertisements do not establish the required causal relationship.[2]

---

[2] By contrast, Plaintiffs' CAS system advised the public in its website FAQ that CAS "does not, in any circumstance, require the ISP to terminate a subscriber account." DX-66 at 4. A user seeking an ISP for the purpose of infringement would have been "drawn" to a CAS ISP, not to Cox.

Finally, Plaintiffs' claim that Cox's "retention of subscribers" is proof of a draw under *Ellison* is meritless. There is no evidence that Cox retained subscribers *because* of their ability to infringe. There is only evidence that Cox retained subscribers *despite* infringement that could have led to their termination. The former would be evidence that the subscribers were *drawn* to remain with Cox in order to infringe. The latter is only evidence that subscribers were *allowed* to remain with Cox, regardless of what drew them there. It does not suggest that infringement constituted the "value of the service" that drove them to subscribe. *Ellison*, 357 F.3d at 1079.

Plaintiffs' novel, expansive theory of "draw" is untethered to traditional requirements of causation (and even Article III standing), and would presumptively make *any* commercial ISP service vicariously liable for *all* infringement occurring over its network. *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, No. A-17-CA-365-LY, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018), *report and recommendation adopted*, 2018 WL 1905124 (W.D. Tex. Mar. 28, 2018) (dismissing vicarious liability claim, since permitting claim based on allegations "that the existence of music and the BitTorrent protocol is the draw … would impose liability on every ISP, as the music at issue is available on the Internet generally, as is the BitTorrent protocol, and is not something exclusively available through Grande's services."); *Adobe Sys.*, 173 F. Supp. 2d at 1051 (noting that relaxing "the requirement that the counterfeit goods provide the main customer 'draw' to the venue… would provide essentially for the limitless expansion of vicarious liability"). The Court should grant JMOL to Cox on this issue.

### 2.    Plaintiffs' evidence fails to show a "direct" financial benefit to Cox from the infringement.

Faced with overwhelming authority precluding vicarious liability for defendants who, like Cox, obtain their revenues from flat monthly fees that are identical for non-infringing and infringing subscribers, and recognizing that their evidence is insufficient to show the necessary

"draw," Plaintiffs strain to recharacterize those flat fees as "direct" benefits from infringement. But they cannot. The relevant section of their brief (Opp. 9-11) includes no citations to any authority, and for good reason: the financial benefits on which they rely are precisely the kind of *indirect* benefits that cannot support a judgment of vicarious liability.

Much of Plaintiffs' evidence of "direct financial benefit" consists of evidence that Cox continued to collect revenue from subscribers after receiving notice of the infringement. Opp. at 9, 10. But those revenues were not *direct* revenues from the infringement, in the sense that the revenues were an immediate result of the infringements, and changed depending on the *amount* of infringement that was occurring.[3] Rather, they were payments for internet service, paid equally by infringing and non-infringing subscribers alike. The fact that Cox receives the same revenue from a subscriber *whether that subscriber infringes or not* precludes a finding that Cox receives a "direct financial benefit" from the infringement, unless the plaintiff proves that infringement is a "draw." Every court to consider the issue has so found. *See* Mot. 3-4 and n.2.

Plaintiffs' suggestion that Cox's ability to terminate the subscriber somehow changes this result is meritless. Plaintiffs' position would gut the universally accepted principle that flat-fee-for-subscription relationships—which the provider always has the ability to terminate—do not provide "the requisite causal connection between the benefit and the infringing activity" needed to establish vicarious liability. *BMG I* at 676. Plaintiffs' position would also allow the ability to terminate to (in their view) establish both the "ability to supervise" and the "direct financial

---

[3] *See, e.g., Arista Records LLC v. USENET.com*, 633 F. Supp. 2d 124, 156 (S.D.N.Y. 2009) (finding vicarious liability where "Defendants' revenues increased depending on their users' *volume* of [infringing] downloads" and distinguishing that from evidence of a "draw" from the availability of infringing content) (emphasis added); *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 308 (2d Cir. 1963) (finding defendant's "share of the gross receipts from … sales" of infringing records gave it "a most definite financial interest" in the infringing activity).

benefit" prongs of vicarious liability. There is no authority to support Plaintiffs' argument. Plaintiffs fare no better with their assertion that Cox received a direct financial benefit from the infringement because if it had terminated infringers, "its service would have been less attractive for those who wanted to use it to infringe." Opp. at 10. Plaintiffs' argument proves too much: the same would be true for any "content-neutral commercial service that makes a wide selection of services and activities available to its subscribers … [and] charges the same flat monthly fees to its users" and has the ability to terminate subscribers. *BMG I* at 676. But those are precisely the characteristics of a financial relationship that does ***not*** confer a "direct financial benefit" on the service provider. *Id*. And of course, Plaintiffs' "attractiveness" argument is really a thinly disguised argument that infringement is a "draw" to Cox's network. But there is no evidence that Cox's network was any more "attractive" to would-be infringers than any other ISP; and in any event, the fact that the ability to infringe might make an ISP more attractive for infringers does not transform the ability to infringe into "the value of the service." *Ellison*, 357 F.3d at 1079.

### 3. No evidence connects any financial benefit to infringement of *Plaintiffs'* works at issue.

Absent from Plaintiffs' analysis is evidence that the ability to infringe copyright, and in particular *Plaintiffs'* copyrights, directly generated any revenue for Cox or factored into any subscriber's decision to subscribe to Cox's service, continue to subscribe, or purchase faster service. *See* Opp. 9-10. As this Court recognized in *BMG*, vicarious liability requires evidence that "some portion of [such] fees is generated from subscribers that are drawn to Cox's service at least in part *because* of the infringing activity alleged in this case. Without that evidence, the requisite causal connection between the benefit and the infringing activity is not established." *Id.* A copyright "action is a specific lawsuit by a specific plaintiff against a specific defendant about specific copyrighted [works]; it is not a lawsuit against copyright infringement in general[.]"

*Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017) (noting that a rule that would allow a court to find liability for works *not* in suit is, "[a]t the very least, … in significant tension with Article III's standing requirement."). Without evidence that Cox obtained a direct financial benefit from the works in suit, Plaintiffs cannot establish vicarious liability.

### B.  Plaintiffs lack any evidence of vicarious liability as to Cox Business subscribers.

Rather than address the additional reasons why Plaintiffs' evidence is insufficient to hold Cox vicariously liable for alleged infringements by Cox Business subscribers, Plaintiffs simply reiterate their failed arguments in favor of vicarious liability for subscribers generally. First, they miss the mark with an irrelevant argument that Cox lacks evidence to show which works at issue were "only" infringed by Cox Business subscribers. But it is not Cox's burden to prove that certain works were *not* infringed. Second, Plaintiffs fail to address any of the obvious differences between direct infringements committed by an individual ISP subscriber, and alleged infringements (which could be direct or indirect) by end users of the ISP's business subscribers. Plaintiffs simply recycle their arguments that the ability to terminate an *account* for any reason is the same thing as the ability to supervise direct infringers. But the ability to indiscriminately terminate internet access for dozens, hundreds, or thousands of a commercial account's end users is not the same as the ability to supervise the infringing activity of a single end user among the multitude.[4]

Third, Plaintiffs' claim that there is a "readily apparent" causal nexus between the flat fees paid by Cox Business subscribers, and infringement committed by the end users of the business's network, does not withstand scrutiny. Their argument that Cox benefitted from the collection of monthly fees from business subscribers, regardless of whether the account was used for

---

[4] Indeed, Plaintiffs have no evidence that even a single end user of any Cox Business customer was a repeat infringer, have no evidence of how prevalent infringement was among such end users, and made no attempt to obtain such information.

infringement or not, is *precisely* the type of "evidence" that requires showing a "draw" from infringement—but there is no evidence of a draw. Nor do Plaintiffs even attempt to argue that there is, thereby waiving any opposition on this issue.

Finally, there is no merit to Plaintiffs' theory that Cox may be held vicariously liable for "knowingly allowing [Cox Business subscribers'] infringement to continue unabated," since that is (if anything) a theory of contributory infringement, not vicarious liability.

### C.   A finding for Cox on vicarious liability requires a new trial on damages.

Plaintiffs do not dispute that basic fairness dictates a new trial on damages should the Court find Cox not vicariously liable. Instead, they argue that "the jury's award was per work infringed," with no "multiplier based on liability for both claims, rather than one." Plaintiffs' self-serving position simply ignores the reality that finding liability on *two* counts instead of one would almost certainly lead a jury to award higher damages.[5] This is particularly true given the instruction requiring the jury to consider Cox's "profits earned from the infringement": a jury that unreasonably found a direct financial benefit flowing from infringement would almost certainly place improper weight on the "profits earned because of infringement" factor, necessitating a new trial. In addition, if the vicarious liability issue had been taken from the jury at the Rule 50(a) stage, Cox would have been entitled to have the jury instructed to disregard aspects of Plaintiffs' evidence that were admitted solely for their relevance to that issue, including evidence of the "value" of infringing subscribers and revenue from bundled services. *See* ECF 590 at 3. Removing that evidence would have altered the jury's consideration of damages.

---

[5] By way of comparison, the *BMG* jury found that Cox was a contributory infringer, but *not* vicariously liable, and awarded the plaintiff $25 million. That result, which was vacated on appeal, is nonetheless instructive.

## II.   Cox Is Entitled to JMOL Limiting Certain of Plaintiffs' Works to a Single Statutory Award.

### A.   Cox's Motion is both proper and properly supported.

Plaintiffs' argument that "[a] Rule 50 motion must be based on evidence adduced at trial"

is wrong, as it ignores binding Fourth Circuit law mandating the procedure Cox follows here.

#### 1.   Cox is entitled to JMOL on the purely legal issue that Plaintiffs are not entitled to duplicative recovery for single "works."

Cox moved for summary judgment on two purely legal issues, which the Court denied.

First, Cox moved for summary judgment on the issue of whether Plaintiffs are entitled to only one

award for statutory damages for a music composition in suit and the derivative sound recording in

suit. Second, Cox moved on the issue of whether Plaintiffs are entitled to only one award of

statutory damages for a compilation of sound recordings, as opposed to separate awards for each

individual track. Because these are pure legal issues, regarding which no facts were in dispute at

the time of summary judgment, this motion is the proper mechanism for preserving these in light

of the Court's denial of Cox's motion for summary judgment. *See Varhese v. Honeywell Int'l, Inc.*,

424 F.3d 411, 423 (4th Cir. 2005). And because Plaintiffs have never disputed that a significant

number of the works in suit are either derivative of other works in suit or are parts of compilations,

if Cox's legal arguments on these issues are correct, then a judgment based on 10,017 works in

suit cannot stand. To the extent there is a genuine dispute about the correct numbers of works in

suit, a new trial would be necessary to determine the number of works and associated damages.

In any event, as described in more detail below, the evidence necessary for the

determination of these issues was presented at trial.

#### 2.   The record contains ample evidence to support limiting Plaintiffs' damages to one award for a musical composition and its derivative sound recording.

Plaintiffs do not dispute that PX-1 and PX-2, which are both in evidence, list the sound

recordings in suit and music compositions in suit, respectively. Yet they claim that these exhibits cannot demonstrate where a music composition in suit is embedded in a sound recording in suit because "there are simply too many separate musical compositions that happen to have the same title[.]" Opp. at 17, n.10. Not so. While there are some music compositions that do have the same title, the vast majority do not, rendering the determination of whether works on PX-1 share the same title as works on PX-2 straightforward.[6]

Plaintiffs also argue that Cox's Motion is improper because the jury heard no evidence about how these works overlapped. They are mistaken: the overlap is evident on the face of the exhibits. Expert testimony is not required to determine whether a song title that appears in PX-1 also appears in PX-2. As Cox's counsel explained, the jury could have, but was precluded from so doing, compared the titles of sound recordings and music compositions to determine the overlap. Tr. 2857:4-23 (noting separate registrations for specific musical composition and specific sound recording of the same work). This is sufficient to support Cox's renewed motion for judgment as a matter of law. In considering JMOL, the court is required to consider "all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The evidence necessary to make the JMOL determination at issue was in the record, and is properly considered here. More simply, Plaintiffs admitted in their own exhibit PX-38 that the vast majority of the music compositions in suit overlapped with derivative sound recordings in suit.[7] At the summary

---

[6] Even if a few cases remained ambiguous (for which there is no evidence), Plaintiffs do not dispute that the determination could readily be made for the vast majority of overlapping works.

[7] Plaintiffs argue that PX-38 is not part of the record because they unilaterally withdrew it before trial, but do not dispute that it was made part of the summary judgment record and did not dispute its accuracy at that time. As for Plaintiffs' assertion that "the Court struck all paragraphs and exhibits underlying SUF ¶ 9 that purport to provide evidence about the number of works that were registered as works made for hire, albums, or both," that assertion is incorrect. The Court struck what it determined to be improper "testimony" in the Kearney Declaration, and certain summary exhibits. It did not strike the underlying exhibits on which Cox's argument relied (Exhibits 6, 8,

judgment stage, all but 882 of the total 3,402 were admittedly embedded in sound recordings. *See* PX-38; *see also* Opp. 17 (Plaintiffs do not dispute that PX-38 is accurate).

> **3.    The record contains ample evidence to support limiting Plaintiffs' damages to one award per album registered as a derivative work.**

Plaintiffs claim that Cox did not introduce evidence "as to whether a sound recording in suit is part of a compilation or the effect that might have on the works in suit." Opp. at 21. This is incorrect for reasons also discussed above. As a preliminary matter, PX-1 (the list of sound recordings in suit) demonstrates on its face that multiple sound recordings were registered together on the same certificates, which Plaintiffs admit means that they were released as part of the same album or compilation. *See* ECF 396 at 4. It is not a challenging exercise to simply tally the 1,498 unique registration numbers on PX-1. This is the factual foundation upon which the jury could have determined how many awards of statutory damages to apply. The process would have been simple, since the jury needed only to award statutory damages for each unique registration number on PX-1, as opposed to each individual track. Further, as Cox explained to the Court, not only PX-1 but also the admitted registration certificates themselves denote which works in suit were registered together as part of albums or compilations. Tr. 2857:4-23 (noting specific registration for an album, registered as a work made for hire, which covers nine different sound recordings).

> **B.    A musical composition and its derivative sound recording are one work for purposes of statutory damages, and entitled to a single award.**

Under the Copyright Act, "the copyright owner may elect … statutory damages … with respect to any one work," and "all the parts of a … derivative work constitute one work." 17 U.S.C. § 504(c). Plaintiffs attempt to evade this limit by arguing that the term "copyright owner" must be

---

20, and 21). *See* ECF 521 at 2, ECF 506 at 14-15. And, as discussed above, Plaintiffs' own trial exhibits and admissions establish that they asserted overlapping works, and that the vast majority of their sound recordings were registered as compilations.

interpreted to reach only the case of a single copyright owner, so that if the different "parts" of a derivative work have different owners, each such owner may separately seek a statutory award. Plaintiffs' proposed interpretation is contrary to Congress's express instructions on interpreting statutory language, inconsistent with the way the term is used in the Copyright Act, contrary to available authority, and would lead to absurd results.

### 1.       1 U.S.C. § 1 governs the interpretation of the Copyright Act

Plaintiffs argue that 1 U.S.C. § 1, the so-called Dictionary Act, "does not apply in the circumstances here." Opp. 19. They are wrong. As the Supreme Court recently recognized, courts "**must** consult [§ 1] in determining the meaning of any Act of Congress[.]" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 707 (2014) (emphasis added, internal quotation marks and citation omitted). Plaintiffs' citation to *U.S. v. Hayes* is not to the contrary: notwithstanding a footnote in that case referring to "the rare occasions" when the Court "relied on" the Dictionary Act, the bulk of *Hayes* is devoted to analyzing whether the statutory term "element" included the plural "elements." 555 U.S. 415, 422 n.5 (2009); Opp. at 19.

*Blackman v. Dist. of Columbia*, a case involving attorneys' fees in a class action context, gives Plaintiffs' argument no support. 633 F.3d 1088 (D.C. Cir. 2011). *Blackman* involved an attempt to apply the Dictionary Act to pluralize the terms "an attorney" and "a party" in a provision capping at $4000 the fees "of *an attorney* who represents *a party* in *an action*" under the Individuals with Disabilities Education Act. *Id*. at 1090 (emphasis added). The result would have been to cap at $4000 the available attorney fees for a class action involving more than 6,000 plaintiffs. The court declined to pluralize "an attorney" and "a party" under the Dictionary Act because the context *of the statute itself* "required otherwise": it was undisputed that the key phrase "an action" was intended to be singular, making pluralization of the other nouns in the provision incongruous. *Id*. at 1092. Just as important, the plural reading violated "the 'evident intent' of the

statute," which was "to address individual IDEA proceedings, not class actions." [8] *Id.*

Here, Plaintiffs have pointed to nothing within the Copyright Act itself to suggest that the phrase "copyright owner" should not include the plural. Accordingly, they have no basis for arguing that "the context requires" that the Dictionary Act not apply. *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199 (1993) (holding that the relevant "context" for purposes of 1 U.S.C. §1 is "the text of the Act of Congress surrounding the word at issue, or the texts of other related Congressional Acts"). Nor have they identified any basis for concluding that "the evident intent" of the Copyright Act was to limit "copyright owner" to the singular. To the contrary, the relevant legislative history says exactly the opposite. H.R. Rep. No. 94-1476, at 162 (1976); S. Rep. No. 94-473, at 144 (1975).

### 2.      Plaintiffs' urged interpretation is inconsistent with the Copyright Act.

In fact, Plaintiffs' legally defective "singular only" argument is inconsistent with how the singular term "copyright owner" is used throughout the Copyright Act, in contexts that cannot reasonably be limited as Plaintiffs suggest. For example, the Act provides that the term "'Copyright owner', with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right." 17 U.S.C. § 101. In this context, the term "owner" necessarily includes both the singular and plural, since any "particular right" under the Copyright Act may have multiple owners. *And see, e.g.*, 17 U.S.C. § 108(h)(2)(C) ("No reproduction, distribution, display, or performance is authorized under this subsection if … *the copyright owner* or *its agent* provides notice…"). Plaintiffs do not provide even a single example supporting their reading, which would make a hash of the Copyright Act by requiring the same phrase to have different

---

[8] The *Blackman* court's statement on which Plaintiffs rely—that the defendant's interpretation would have created "a perverse incentive for breaking single class actions into inefficient multiple actions to generate larger counsel fees in direct contradiction of Congress's apparent goal at reducing costs"—was as an additional reason for the holding, not the primary reason. *Id.* at 1092.

-13-

meanings in different sections. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 570, 115 S. Ct. 1061, 1067 (1995) (observing "the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.").

### 3. No other authority supports Plaintiffs' urged interpretation.

Plaintiffs' only proposed authority for the contrary result is a decades-old district court decision that was recently rejected by the governing Second Circuit.[9] *See* Opp. at 13; Mot. at 13. As discussed in detail in Cox's Motion, that case is not good law, and is inapposite here. *Id.* Finally, Plaintiffs argue that it would be "absurd" to require the copyright owners of a musical composition and its derivative sound recording to sue separately in order to obtain separate damages awards, but fail to explain what is absurd in holding copyright plaintiffs to the foreseeable consequences of their tactical pleading decisions. *See* Mot. at 14.

### C. Compilations, such as sound recordings registered as works made for hire, are "one work" for purposes of § 504(c).

It is black letter law that a "compilation," no matter how many "parts" or separate works it may contain, constitutes "one work" and is entitled to only a single statutory damages award pursuant to statute. 17 U.S.C. § 504(c)(1). And Plaintiffs do not dispute that many of their works at issue were registered and initially issued as albums, which are unquestionably "compilations" of the sound recordings they contain. Nor do Plaintiffs dispute that thousands of their claimed sound recordings were registered as works made for hire, on registrations claiming multiple sound recordings. As Cox's Motion explained in detail, Plaintiffs' registrations of multiple sound recordings as "works made for hire" are compilations *by definition* under the Copyright Act, and

---

[9] Plaintiffs also cite to *Newton v. Diamond* for the here-irrelevant fact that musical compositions and sound recordings can be protected by separate copyrights. *See* Opp. 18, citing 204 F. Supp. 2d 1244 (C.D. Cal. 2002). *Newton*, in which only a single musical composition copyright was at issue, is mute on how overlapping works should be treated for statutory damages purposes. *Id.*

the component sound recordings are indisputably the "parts" of that compilation. 17 U.S.C. § 101; Mot. 15-16. Nothing in Plaintiffs' opposition is to the contrary: all their cited authorities concern judicial efforts to interpret the term "one work" in the *absence* of statutory guidance. Those cases lack relevance here, where the statute explicitly defines the term: "**all the parts of a compilation … constitute one work**." 17 U.S.C. § 504(c) (emphasis added).

Contrary to Plaintiffs' contention, this legal issue concerning albums expressly registered as works made for hire has never been "resolved" as Plaintiffs propose, by this Court or any other court that Cox is aware of. *See* Opp. 22. Plaintiffs' attempt to rely on the *BMG* holding is unavailing for multiple reasons: the works in *BMG* were musical compositions, which the Copyright Act treats very differently from sound recordings; there was no issue of the musical compositions at issue having been published in album form; there was no issue vis-à-vis "work made for hire" registrations covering multiple works.

Instead of meeting and responding to Cox's actual arguments, Plaintiffs simply ignore the plain statutory language that precludes them from garnering separate statutory awards for each "part" of each registered compilation, and urge the Court to hold that a copyright owner may recover a separate statutory award for every part of a compilation that has "economic value," as long as those parts were "issued" separately. Opp. 22. Cox does not dispute the general proposition that infringement of only one *part* of an album or compilation may constitute copyright infringement under appropriate circumstances. But where *multiple* parts of a *single* compilation are the subject of the same lawsuit, the Fourth Circuit has spoken loud and clear on the question: "[a]lthough parts of a compilation … may be 'regarded as independent works for other purposes[,]' for purposes of statutory damages, **they constitute one work**." *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 (4th Cir. 2003) (emphasis added) (quoting H.R. Rep. No. 94-1476, at 162 (1976))

(abrogated on other grounds).[10] *Xoom* is particularly relevant because in that case—as is also true here—the form of registration for the works at issue established that they were in fact compilations, not simply individual images that had been registered together for convenience. And there—as here—the defendant had allegedly infringed multiple "parts" of the compilations. *See Xoom, Inc. v. Imageline, Inc.*, 93 F. Supp. 2d 688, 691 (E.D. Va. 1999) (abrogated on other grounds) (noting that defendant had allegedly infringed "approximately 2,966 of the approximately 11,200 clip art images contained in two registered works"). On these facts, the Fourth Circuit limited the plaintiff to one award *per compilation*, notwithstanding that the alleged infringement "took place … with respect to particular, individual … images." *Id.* at 692. That result is required here as well. Because this is a purely legal issue, and undisputed, a reasonable jury could not have held otherwise.

### III.   Plaintiffs' Evidence with Respect to Cox Business Subscriber Accounts Is Insufficient to Hold Cox Liable for the Acts of Unidentified Direct Infringers

Secondary liability for infringement can attach only if a plaintiff succeeds in linking the defendant to underlying direct infringement by proving all required elements of contributory infringement or vicarious liability. Plaintiffs failed to provide evidence sufficient to prove that any Cox Business subscriber was a direct or indirect infringer, and failed to provide evidence sufficient to hold Cox liable for direct infringements by end users of such Cox Business subscribers.

In opposition, Plaintiffs focus on the Ninth Circuit's *Cobbler Nevada* decision, arguing that it "does not apply here" because *Cox* is not similarly situated to the business owner defendant in *Cobbler*. Opp. 28; *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142 (9th Cir. 2018). But that is incorrect for the reasons stated in Cox's opening brief, which Plaintiffs fail to address. *See* Mot. 20-23. The application of *Cobbler* to this case is straightforward, and contrary to Plaintiffs'

---

[10] *See also VHT, Inc. Zillow Grp., Inc.*, 918 F.3d 723, 747 (9th Cir. 2019) (explaining that "consideration of the independent economic value factor does not answer the question whether something is a compilation.")

misleading argument, concerns knowledge, not "identity."[11] In *Cobbler*, the Ninth Circuit held, in keeping with well-established principles of secondary liability, that merely sending copyright infringement notices alleging that a business's IP address was used for infringement is insufficient to state a claim for either direct *or* contributory infringement against the business. 901 F.3d at 1145. So too here, where Plaintiffs' notices directed to Cox Business subscribers were insufficient to establish that the subscriber was a direct or contributory infringer.

Plaintiffs' argument that Cox is "differently situated" from the defendant in *Cobbler* thus lacks both merit and relevance. But even if their argument were well taken as to Cox itself, there can be no dispute that the *Cox Business* subscribers in this case are similarly situated to the business owner defendant in *Cobbler*. As *Cobbler* demonstrates, even if one assumes that end users of a business subscriber's internet account are using their access to infringe copyrights through the account, that alone is insufficient to show that the business owner is a direct infringer. Furthermore, merely receiving infringement notices associated with an IP address is insufficient, without more, to give the business subscriber the requisite knowledge to make them a contributory infringer with respect to direct infringement by an unidentified user. That is precisely what occurred here. Accordingly, Cox cannot be liable for the unproven conduct of any Cox Business subscriber.

The *only* way Plaintiffs can show that Cox was a contributory infringer in these circumstances is by showing that Cox somehow obtained actual knowledge of specific acts of infringement by the Cox Business owners' end users. But Plaintiffs fail even to suggest any means by which Cox could have obtained such knowledge, particularly when Cox was even further

---

[11] Plaintiffs' citation to *BMG I* is inapposite, since that decision concerned the unrelated, and here irrelevant, issue of whether a *residential* subscriber could be held liable for direct infringement if someone other than the named subscriber (such as a family member) was actually infringing. The BMG case did not address the distinctions between business and residential subscribers.

removed from the direct infringement than the Cox Business subscribers. No reasonable jury could find that Cox was a contributory infringer as to Cox Business subscribers on these facts.

## IV.   Plaintiffs' Evidence of Direct Infringement is Insufficient

Plaintiffs' entire direct infringement case rests on inadequate and incomplete evidentiary records, none of which contain any copies of Plaintiffs' (or anyone else's) downloaded content.

### A.   Plaintiffs' evidence of direct infringement by reproduction is insufficient.

As to direct infringement of the reproduction right, Plaintiffs concede that, at best, approximately 15% of the records they rely on contain evidence indicating that a targeted Cox subscriber was engaged in copying anything, let alone copies of Plaintiffs' works in suit. Plaintiffs argue that the jury could nonetheless "reasonably … infer" copying in the vast majority of cases (approximately 85%) for which Plaintiffs lack even that much evidence. But they provided no survey or sample evidence, no other direct evidence of copying, and no testimony from any expert qualified to opine about whether it was reasonable to extrapolate from Plaintiffs' cherry-picked yet incomplete data to the entire universe of allegedly infringed works. Opp. 6-7. The supporting opinion of Plaintiffs' expert is insufficient since she lacks relevant expertise.[12]

Moreover, even if the meager evidence they provided were sufficient to support an inference that some of the works at issue were directly infringed—which it is not—Plaintiffs to this day have failed to provide any evidence about *which* works, or even *how many* works, that evidence implicates. *See* Opp. 6.

### B.   Plaintiffs' evidence of direct infringement by distribution is insufficient.

This Court's decision in *BMG I* teaches that a plaintiff who brings secondary infringement

---

[12] See, for example, Ms. Frederiksen-Cross's comment that it is "nonsensical" to think that an individual "bought something and then created torrents for it so they could give it away to total strangers en masse." Opp. 7. This view is itself "nonsensical": obviously, P2P content online must have originated from *somewhere* in the first place.

claims based on a distribution theory must have at least *some* evidence that direct infringement actually occurred, in the form of actual transmissions of works-in-suit. This is not, as Plaintiffs claim, a "hyper-technical argument"—it is the law. Plaintiffs cite *BMG I* to argue that they are entitled to rely on circumstantial evidence to show actual downloads, but fail to provide even the quantum of evidence that the Court found sufficient to avoid summary judgment in that case. Plaintiff in *BMG* survived summary judgment on this issue because the Court found that its agent, Rightscorp, had *actually* downloaded 100,000 copies of the works at issue "from Cox subscribers using Cox's internet service[.]" *Id.* at 670. Plaintiffs point to no cases where such claims survived summary judgment in the absence of at least that much evidence.

Unable to point to any evidence (even circumstantial) of an actual dissemination, Plaintiffs argue for a discredited theory of "deemed distribution" based on *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199 (4th Cir. 1997). *See* Opp. at 5. This Court rejected that theory in *BMG*: for the same reasons, it fares no better here. Plaintiffs' claim that this case is "squarely within this Court's reading of *Hotaling*," Opp. 5, is simply incorrect, and ignores the host of recent decisions—including this Court's *BMG* decision—that have rejected applying *Hotaling* to allegations of P2P infringement virtually indistinguishable from Plaintiffs' here. *See BMG I* at 665, 668; *and see, e.g.*, *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1224 (D. Minn. 2008).

Plaintiffs' claim that P2P protocols are "designed to make it impossible for anyone to observe the interactions between two peers" fails to address Plaintiffs' fatal failure to provide *any* evidence, even circumstantial evidence, of distribution. Plaintiffs lack any direct or circumstantial evidence of "actual dissemination" because they chose not to collect it, not because it was "impossible" to do so. And their argument that it is "impossible to know how many distributions took place," Opp. 5, is irrelevant: a direct infringement claim does not depend on "how many

-19-

times" infringement occurred, but whether infringement occurred at all. Finally, "deemed distribution" applies (if at all) only "when the proof is impossible to produce because *the infringing [defendant] has not kept records of public use.*" *BMG I* at 666 (emphasis added, quoting Goldstein on Copyright § 7.5.1 (3d ed. 2012 Supp.)). *Plaintiffs* failed to collect, preserve, or produce data that could have supported (or refuted) their direct infringement claims, and so lack sufficient evidence to support those claims. No reasonable jury could find otherwise.

## V.      Plaintiffs' Evidence is Insufficient to Hold Cox Liable as a Contributory Infringer

Plaintiffs have no answer to Cox's argument that, far from "engag[ing] in … conduct that encourages or assists the infringement" at issue—as required to support a finding of contributory infringement—Cox actively *dis*couraged infringement. Instead of making any effort to show how the evidence in this case shows that Cox's conduct with respect to Plaintiffs' works at issue met that legal standard, or attempting to address the numerous facts distinguishing this case from those they rely on, Plaintiffs simply string-cite decisions that rested on substantially different evidence. Those decisions are inapposite here, where Cox took demonstrably (and indisputably) effective simple measures to discourage infringing uses of its general-purpose ISP service for infringement, and Cox's service provided access to the Internet for a myriad of uses unrelated to infringement.

Plaintiffs' contention that Cox's effective efforts to discourage infringement are irrelevant, because the jury "found otherwise," begs the question: the jury's finding must be set aside where, as here, its finding was not reasonable. Plaintiffs failed to provide evidence from which a reasonable jury could conclude that Cox materially contributed to the direct infringements at issue in this case, and Cox is entitled to JMOL of no liability on this issue.

## CONCLUSION

For the reasons set forth in Cox's Motion and this Reply, the Court should grant Cox judgment as a matter of law or, in the alternative, a new trial, on each of these issues.

Dated: March 13, 2020

Respectfully submitted,

*/s/ Thomas M. Buchanan*
Thomas M. Buchanan (VSB No. 21530)
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.*
*and CoxCom, LLC*

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
Sean R. Anderson (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email:  melkin@winston.com
Email:  tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
Thomas J. Kearney (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA  94111-5840
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
Email:  jgolinveaux@winston.com
Email: tkearney@winston.com

Michael L. Brody (*pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
Email: mbrody@winston.com

Geoffrey P. Eaton (*pro hac vice*)
WINSTON & STRAWN LLP
1700 K St. NW
Washington, DC 20006-3817
Tel: (202) 282-5705
Fax: (202) 282-5100
Email: geaton@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750
Email:  dhleiden@winston.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 13, 2020, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users.

*/s/ Thomas M. Buchanan*
Thomas M. Buchanan (VSB No. 21530)
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.*
*and CoxCom, LLC*