# Cited Trial Exhibits

# DX 63

FINAL
7/6/2011

### MEMORANDUM OF UNDERSTANDING

Whereas:

- Copyright infringement (under Title 17 of the United States Code) on the Internet ("Online Infringement") – including the illegal distribution of copyrighted works such as music, movies, computer software, gaming software, e-books and the like via Peer-to-Peer ("P2P") file exchanges and other illegal distribution via Internet file hosting, streaming or other technologies – imposes substantial costs on copyright holders and the economy each year. Online Infringement also may contribute to network congestion, negatively affecting users' Internet experiences. The availability of copyrighted content, including live and recorded programming, from pirated sources harms legitimate content creation and distribution. Content creators are taking steps to make lawful content more available online. The lawful online distribution businesses are vibrant and growing and they are harmed by infringement. In addition, law enforcement is pursuing opportunities to enhance its ability to investigate, prosecute, and ultimately punish and deter those who violate copyright law.

- While the government maintains a critical role in enforcing copyright law, it should be readily apparent that, in an age of viral, digital online distribution, prosecution of individual acts of infringement may serve a purpose, but standing alone this may not be the only or best solution to addressing Online Infringement. If Online Infringement is to be effectively combated, law enforcement must work with all interested parties, including copyright holders, their licensees, artists (and the guilds, unions and other organizations that represent them), recording companies, movie studios, software developers, electronic publishers, Internet Service Providers ("ISPs"), public interest groups, other intermediaries and consumers on reasonable methods to prevent, detect and deter Online Infringement. Such efforts must respect the legitimate interests of Internet users and subscribers in protecting their privacy and freedom of speech, in accessing legitimate content, and in being able to challenge the accuracy of allegations of Online Infringement. This work should include an educational component because evidence suggests that most informed consumers will choose lawful services and not engage in Online Infringement. This work also should include the development of solutions that are reasonably necessary to effectuate the rights that are granted by copyright without unduly hampering the legitimate distribution of copyrighted works online or impairing the legitimate rights and interests of consumers and ISPs. Such efforts serve not only the shared interests of creators and distributors of creative works, but also the interests of Internet users who benefit from constructive measures aimed at education and deterrence in lieu of litigation with its attendant costs and legal risk.

- A reasonable, alert-based approach may help to protect legal rights granted by copyright and stem the unlawful distribution of copyrighted works, while

CONFIDENTIAL

CONFIDENTIAL

**Exhibit**

**DX 63**

Plaintiffs_00286200
DX0063-0001

FINAL
7/6/2011

providing education, privacy protection, fair warning and an opportunity for review that protects the lawful interests of consumers. The efficiencies gained from such a cooperative model may benefit all interested parties, including consumers.

- Enforcement and consumer education programs alone may not be able to fully address the issue of Online Infringement. In addition, it is important for content and copyright owners to continue to make available an array of lawful alternatives for consuming movies, music, and other content online, including new distribution models that make it easy and attractive for consumers to lawfully obtain online the content they want. ISPs can assist in these efforts by encouraging subscribers to seek legal alternatives for obtaining content. The widespread availability of lawful content will benefit consumers, content owners and ISPs.

Whereas, the Content Owner Representatives, the Participating ISPs, and the members of the Participating Content Owners Group (all, as defined in Section 1 below) and independent record labels and film production companies (Independent Content Owners , as defined in Section 5C below) represented by the American Association of Independent Music ("A2IM") and the Independent Film and Television Alliance ("IFTA"), respectively, seek to establish a consumer-focused process for identifying and notifying residential wired Internet access service customers of the Participating ISPs ("Subscribers") (other than dial-up Subscribers) who receive multiple notifications of allegations of Online Infringement made via P2P networks and applications ("P2P Online Infringement"), in an effort to educate consumers, deter Online Infringement, and direct consumers to lawful online legitimate sources of content.

Whereas, having considered the desirability of implementing such a process as a means to encourage lawful and legitimate use of copyrighted content, the Parties (as defined in Section 1 below) hereby voluntarily enter into this Memorandum of Understanding (the "Agreement").

IT IS HEREBY UNDERSTOOD AND AGREED AMONG THE PARTIES THAT:

1.    Parties to the Agreement

The parties to this Agreement (the "Parties") are The Recording Industry Association of America, Inc. ("RIAA"), The Motion Picture Association of America, Inc. ("MPAA" and together with RIAA, the "Content Owner Representatives"); the entities set forth in Attachment A (as may be amended from time to time) (collectively, the "Participating ISPs"); and solely for the purposes of Sections 2(E), 4(C), 4(D), 4(H), 4(I), 5(A), 5(C), 6, 7, 8, 9(E), 9(F), and 10 of this Agreement, MPAA members Walt Disney Studios Motion Pictures, Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Twentieth Century Fox Film Corporation, Universal City Studios LLC, and Warner Bros. Entertainment Inc. (such MPAA members, together with MPAA, the "MPAA Group"), RIAA members UMG Recordings, Inc., Warner Music Group, Sony Music

CONFIDENTIAL                    2

Plaintiffs_00286201
**DX0063-0002**

FINAL
7/6/2011

Entertainment, and EMI Music North America (such RIAA members, together with RIAA, the "RIAA Group" and together with the MPAA Group, and any other entities set forth in Attachment B (as may be amended from time to time), the "Participating Content Owners Group").

2.    Establishment of CCI

A.    Not later than sixty (60) days after the Effective Date (as defined in Section 8(A) below), the Content Owner Representatives and the Participating ISPs will establish the Center for Copyright Information ("CCI") to assist in the effort to combat Online Infringement by, among other things, (i) taking an active role in educating the public about the laws governing the online distribution of works protected by copyright, including educating the public regarding civil and criminal penalties for Online Infringement; (ii) interfacing with third party stakeholders on issues and questions of common interest to the Content Owner Representatives and the Participating ISPs pertaining to Online Infringement and related matters; (iii) assisting in the design and implementation of a process that provides for consumer and Subscriber education through the forwarding of Copyright Alerts to, and application of Mitigation Measures (as defined in Section 4(G)(iii) below) on, Subscribers engaged in persistent P2P Online Infringement, including reviewing the accuracy and efficacy of Content Owner Representative processes for identifying instances of P2P Online Infringement and ISP processes for identifying the Subscriber accounts associated with such P2P Online Infringement; (iv) periodically reviewing the effectiveness and impact of such processes as further described in Section 9 below; (v) collecting and disseminating to interested parties and the public data regarding Online Infringement and the lawful means available to obtain non-infringing copyrighted works; and (vi) facilitating the involvement of non-participating ISPs in the work of CCI and in the Copyright Alert program (as defined in Section 4(G) below).

B.    CCI will be governed by a six (6) member executive committee (the "Executive Committee") that will be selected as follows:  three (3) members to be designated collectively by the Content Owner Representatives, and three (3) members to be designated collectively by the Participating ISPs.  Each member shall serve without compensation for a term of two (2) years, which may be renewed.

C.    The members of the Executive Committee shall be selected within forty-five (45) days of the Effective Date (as defined in Section 8(A) below).  The Executive Committee shall hold an initial meeting and designate an individual to serve as its Executive Director.  The Executive Director shall not be one (1) of the six (6) members of the Executive Committee.

D.    The Executive Committee shall also establish a three (3) member advisory board to the Executive Committee (the "Advisory Board").  The Content Owner Representatives shall select one (1) member of the Advisory Board, the Participating ISPs shall select one (1) member of the Advisory Board, and the two (2) selected Advisory Board members shall select the third member.  Each of the members of the

CONFIDENTIAL                              3

Plaintiffs_00286202
**DX0063-0003**

Advisory Board shall be drawn from relevant subject matter expert and consumer interest communities and, unless otherwise agreed in writing, shall not be employees or agents of the Content Owner Representatives nor of the Participating ISPs. The Advisory Board shall be consulted on any significant issues the Executive Committee is considering relating to the design and implementation of the Notice Process and the Copyright Alert program (as defined in Section 4(C) and Section 4(G), respectively), and shall provide recommendations to the Executive Committee as appropriate. The Advisory Board may also provide recommendations regarding the CCI educational program described in Section 3 below, upon the Executive Committee's request.

E.      Funding for CCI will be provided fifty percent (50%) by the Participating Content Owners Group and fifty percent (50%) by the Participating ISPs. The initial CCI budget shall be presented to and approved by the Executive Committee within ninety (90) days of the Effective Date (as defined in Section 8(A) below) and shall be funded by the Participating Content Owners Group and the Participating ISPs promptly thereafter according to the apportionment set forth in this Section 2(E). The Executive Committee shall also oversee and approve by majority all matters regarding the corporate formation of CCI and the further development of its internal structure. CCI shall be governed by its articles of incorporation and bylaws to be filed in connection with its corporate formation in the State of Delaware. The bylaws shall, inter alia, include a mechanism for adding parties to this Agreement.

3.      CCI Educational Program

In conformance with its budget, CCI shall develop an educational program to inform the public about laws prohibiting Online Infringement and lawful means available to obtain digital works online and through other legitimate means. CCI will also establish, host and maintain an online information center where educational material will be available to the general public. The Content Owner Representatives and the Participating ISPs shall contribute to CCI any applicable educational materials already developed by the respective Content Owner Representatives and Participating ISPs, and CCI shall facilitate the dissemination of such educational materials through online or other media. Such educational materials shall include, among other things, information about the technical means Subscribers can use to secure their computers and networks to avoid unwittingly assisting others in Online Infringement. Any Content Owner Representative or Participating ISP may add additional educational materials to the online information center subject to the prior permission of the Executive Committee.

4.      System for Reducing Instances of P2P Online Infringement

A.      The Content Owner Representatives will develop and maintain written methodologies, which shall be adopted by the applicable Content Owner Representative, for identifying instances of P2P Online Infringement that are designed to detect and provide evidence that the identified content was uploaded or downloaded or copied and offered on a P2P network to be downloaded through a bit torrent or other P2P technology. Each Participating ISP will develop and maintain methodologies, which

CONFIDENTIAL                                    4

DX0063-0004

shall be adopted by the applicable Participating ISP, to match Internet Protocol ("IP") addresses identified by the Content Owner Representatives to the Participating ISP Subscribers' accounts, to keep a record of repeat alleged infringers, and to apply Mitigation Measures (as defined in Section 4(G)(iii) below). Such Content Owner Representative and Participating ISP methodologies are collectively referred to herein as the "Methodologies". The goal of these Methodologies shall be to ensure that allegations of P2P Online Infringement, related records, and the application of any Mitigation Measures are based on reliable, accurate, and verifiable processes and information.

      B.     In conformance with its budget, CCI shall retain an independent and impartial technical expert or experts (the "Independent Expert") to review on a periodic and ongoing basis the Methodologies and any modifications thereto, and recommend enhancements as appropriate, with the goal of ensuring and maintaining confidence on the part of the Content Owner Representatives, the Participating ISPs, and the public in the accuracy and security of the Methodologies. If a Content Owner Representative Methodology is found by the Independent Expert to be fundamentally unreliable, the Independent Expert shall issue a confidential finding of inadequacy ("Finding of Inadequacy") to the affected Content Owner Representative to permit the affected Content Owner Representative to modify or change the Methodology for review. The selection of the Independent Expert shall require approval by a majority of the members of the Executive Committee. The Content Owner Representatives and the Participating ISPs agree to provide reasonable cooperation to the Independent Expert and provide to the Independent Expert a copy of their respective Methodologies, and any technical or other information reasonably related to their respective Methodologies needed to undertake this review process. As a condition of retention, the Independent Expert shall agree in writing to keep confidential any proprietary or other confidential information provided by the Content Owner Representatives and the Participating ISPs as part of the Independent Expert's review. The Content Owner Representatives and each Participating ISP shall exchange general descriptions of their respective Methodologies upon request. At the direction of CCI, the Independent Expert may consult with each Content Owner Representative or Participating ISP concerning the implementation and ongoing operation of that Representative's or ISP's Methodology. In addition, the Independent Expert will (i) review the Methodologies with recognized privacy experts agreed to by a majority of the Executive Committee and (ii) recommend enhancements to the Methodologies as appropriate to address privacy issues, if any, identified by the privacy experts. Failure to adopt a recommendation of the Independent Expert shall not amount to a breach under this Agreement. The Independent Expert's recommendations must be shared with each of the Content Owner Representatives and the affected Participating ISP, but may not be disclosed to other parties, including Participating ISPs other than the affected Participating ISP, without the express written permission of each Content Owner Representative and the affected Participating ISP and any disclosure to such other third parties shall not include any proprietary or otherwise confidential information of the Content Owner Representative(s) or Participating ISP affected.

      C.     The Content Owner Representatives may send notices pursuant to this Agreement and the implementation agreements described in Section 5(A) of this

CONFIDENTIAL          5

Plaintiffs_00286204
**DX0063-0005**

FINAL
7/6/2011

Agreement (the "Implementation Agreements") to the Participating ISPs of instances of alleged P2P Online Infringement (each an "ISP Notice"), and the Participating ISPs shall accept and process such notices involving the Participating ISPs' Subscribers (such Content Owner Representative and Participating ISP actions being, together, a "Notice Process"). The Content Owner Representatives agree to generate ISP Notices only for instances of P2P Online Infringement identified through the use of the Content Owner Representative Methodologies that have been reviewed and evaluated by the Independent Expert, and that have not been issued a Finding of Inadequacy. For purposes of generating ISP Notices, the Content Owner Representatives further agree to focus on instances of P2P Online Infringement involving files or data consisting primarily of infringing material or containing unauthorized copyrighted works in complete or substantially complete form and to avoid instances of P2P activity in which *de minimis* amounts of allegedly infringing material are incorporated into files or data consisting primarily of non-infringing material. The Content Owner Representatives will also endeavor to generally send the ISP Notices within twenty-four (24) hours of confirmed identification of the alleged activity described in the ISP Notice. ISP Notices shall be generated and sent solely by the Content Owner Representatives or their service providers (including on behalf of the Participating Content Owners Group, the Independent Content Owners (as defined in Section 5(C) below), the RIAA Group's members' distributed labels and those entities set forth in Attachment D hereto). The individual members of the Participating Content Owners Group; IFTA and A2IM; the Independent Content Owners (as defined in Section 5(C) below); the RIAA Group's members' distributed labels; and those entities set forth in Attachment D hereto shall not generate or send ISP Notices.

      D.     The Content Owner Representatives agree that each ISP Notice provided to a Participating ISP as part of the Notice Process shall clearly identify: (i) the copyrighted work that allegedly has been infringed and the owner of such work; (ii) a description of the basis upon which the notifying Content Owner Representative or its agent asserts the right to enforce the particular affected copyright on behalf of the person or entity who owns or controls the copyright and/or exclusive distribution rights in the copyright (a "Copyright Owner"), (iii) a statement that the notifying Content Owner Representative or its agent has a good faith belief that use of the material is not authorized by the Copyright Owner, its agent, or the law; (iv) a statement that the information in the ISP Notice is accurate and that, under penalty of perjury, the Content Owner Representative is authorized to act on behalf of the Copyright Owner whose rights were allegedly infringed; and (v) technical information necessary for the Participating ISP to identify the Subscriber (*e.g.*, IP address, date, time and time zone of the alleged P2P Online Infringement, and such additional information as may be necessary as the Participating ISPs transition to IPv6). The Content Owner Representatives and the Participating Content Owners Group agree that all notices of P2P Online Infringement generated by them or on their behalf and delivered to the Participating ISPs shall meet the requirements for ISP Notices hereunder, shall comply with the terms hereof and shall be governed exclusively by this Agreement and the Implementation Agreements.

      E.     Reserved.

CONFIDENTIAL           6

Plaintiffs_00286205
**DX0063-0006**

FINAL
7/6/2011

F. Each Participating ISP agrees to communicate the following principles in its Acceptable Use Policies ("AUP") or Terms of Service ("TOS"): (i) copyright infringement is conduct that violates the Participating ISP's AUP or TOS and for which a Subscriber may be legally liable; (ii) continuing and subsequent receipt of Copyright Alerts (as defined in Section 4(G) below) may result in the Participating ISP taking action by the application of Mitigation Measures (as defined in Section 4(G)(iii) below); and (iii) in addition to these Mitigation Measures, the Participating ISP may also adopt, in appropriate circumstances, those measures specifically authorized by section 512 of the Digital Millennium Copyright Act ("DMCA") and/or actions specifically provided for in the Participating ISP's AUP and/or TOS including temporary suspension or termination, except that nothing in this Agreement alters, expands, or otherwise affects any Participating ISP's rights or obligations under the DMCA.

G. Each Participating ISP will develop, implement and independently enforce a Copyright Alert program as described in this Section 4(G) (each such program a "Copyright Alert Program"), provided that each Participating ISP shall not be required to exceed the notice volumes pertaining to its Copyright Alert Program as established in Section 5 of this Agreement. Each Participating ISP's Copyright Alert Program will be triggered by the Participating ISP's receipt of an ISP Notice that can be associated with a Subscriber's account and will result in the Participating ISP sending one (1) or more alert notices to the applicable Subscriber concerning the ISP Notice, as further described below (each such alert notice a "Copyright Alert").

Each Participating ISP's Copyright Alert Program shall be comprised of six (6) Copyright Alerts, except that a Participating ISP may elect to send a single Educational Step Copyright Alert (as defined in Section 4(G)(i) below). However, to give an affected Subscriber time to review each Copyright Alert pertaining to such Subscriber's account and to take appropriate steps to avoid receipt of further Copyright Alerts, a Participating ISP and its Subscriber will be afforded a grace period of seven (7) calendar days after the transmission of any Copyright Alert before any additional Copyright Alerts will be directed to the account holder (the "Grace Period"). The same Grace Period shall apply following the sending of a Mitigation Measure Copyright Alert (as described in Section 4(G)(iii) and (iv) below) and during the pendency of any review requested by a Subscriber following the receipt of either such Copyright Alert. During such Grace Period, any further ISP Notices received by the Participating ISP that the Participating ISP determines to be associated with the applicable Subscriber's account will be handled as described in sub-paragraphs (i), (ii), (iii), and (iv) below.

Each Participating ISP shall use commercially reasonable efforts to develop a Copyright Alert Program in accordance with this Section 4(G), and shall work in good faith to complete all technical development work necessary for implementation of its Copyright Alert Program by a target launch date set forth in the applicable Implementation Agreement (each Participating ISP's target launch date referred to herein as its "Copyright Alert Program Launch Date").

CONFIDENTIAL                                              7

CONFIDENTIAL

FINAL
7/6/2011

Each Participating ISP's Copyright Alert Program shall be substantially similar to the following four (4) step sequential framework, which shall include an educational step (the "Initial Educational Step"), an acknowledgement step (the "Acknowledgement Step"), a mitigation measures step (the "Mitigation Measures Step"), and a post mitigation measures step (the "Post Mitigation Measures Step") as further described below.  Under this framework, each Participating ISP will send Copyright Alerts with escalating warning language to Subscribers who are the subject of continuing ISP Notices.  Specifically, each Participating ISP (1) shall send the Subscriber up to two (2) Copyright Alerts during the Initial Educational Step; (2) shall send two (2) more Copyright Alerts during the Acknowledgement Step; (3) shall send one (1) Mitigation Measure Copyright Alert (as defined in Section 4(G)(iii) below) during the Mitigation Measures Step and shall apply the specified Mitigation Measure (as defined in Section 4(G)(iii) below), subject to the Subscriber's right to challenge (or the Participating ISP's discretion to waive) the Copyright Alert(s) at this step; and (4) during the Post Mitigation Measures Step, shall send one (1) Mitigation Measure Copyright Alert and shall apply the specified Mitigation Measure, and may, at the Participating ISP's sole discretion, send additional Mitigation Measure Copyright Alerts and apply additional Mitigation Measures, subject to the Subscriber's right to challenge Copyright Alerts at this step.

Each Participating ISP's Copyright Alert Program shall follow the following format:

>    (i)    Initial Educational Step:  Upon receipt of an ISP Notice associated with a Subscriber's account and taking into account the parameters of the Grace Period (if applicable), the Participating ISP shall direct a Copyright Alert to the account holder (an "Educational Step Copyright Alert").  The Educational Step Copyright Alert shall notify the Subscriber of receipt of an ISP Notice alleging P2P Online Infringement and shall include, at a minimum, the information contained in the ISP Notice regarding the alleged infringement and shall inform the Subscriber that:  (a) copyright infringement is illegal as well as a violation of the Participating ISP's AUP or TOS, (b) users of the Subscriber's account must not infringe copyrighted works, (c) there are lawful methods of obtaining copyrighted works, (d) continuing and subsequent receipt of Copyright Alerts may result in the Participating ISP taking action by the application of Mitigation Measures, (e) in addition to these Mitigation Measures, the Participating ISP may also adopt, in appropriate circumstances, those measures specifically authorized by section 512 of the DMCA and/or actions specifically provided for in the Participating ISP's AUP and/or

CONFIDENTIAL                                    8

—

FINAL
7/6/2011

TOS including temporary suspension or termination,[1] (f) the Subscriber will have an opportunity to challenge any Copyright Alerts associated with the Subscriber's account before a Mitigation Measure is applied and may therefore wish to preserve records or information that could be used to show that the Subscriber's conduct was non-infringing, and (g) additional information regarding the Copyright Alert program may be found at CCI's web site. The number of Educational Step Copyright Alerts shall be at the discretion of the Participating ISP, not to exceed two (2) Copyright Alerts per Subscriber account, taking into account the parameters of the Grace Period. The second Educational Step Copyright Alert shall note specifically that it is in fact the Subscriber's second Educational Step Copyright Alert.

If the Participating ISP receives one (1) or more additional ISP Notices attributable to such Subscriber's account during the Grace Period associated with one of the Educational Step Copyright Alerts, the Participating ISP may at its discretion emphasize the educational and warning nature of its Copyright Alert Program by directing to the account holder additional Copyright Alerts that are similar in style to the Educational Step Copyright Alert. Such supplemental Copyright Alerts sent during the Grace Period shall not count toward the limit of two (2) Educational Step Copyright Alerts.

(ii) Acknowledgement Step: At the Acknowledgement Step, upon receipt of further ISP Notices determined to be associated with a Subscriber's account and taking into account the parameters of the Grace Period, the Participating ISP shall direct two (2) Copyright

---

[1]    The Parties acknowledge and agree that the limitations on ISP liability under the DMCA are conditioned on an ISP's adoption and reasonable implementation of a policy that provides for the termination in appropriate circumstances of subscribers and account holders who are repeat infringers ("DMCA Termination Policy"). Notwithstanding the foregoing, (1) this Agreement does not and is not intended to create any obligation on a Participating ISP to adopt, implement, enforce, or otherwise take any action in furtherance of a DMCA Termination Policy; (2) the adoption, implementation, enforcement, or other action in furtherance of a DMCA Termination Policy is not part of any step of the Copyright Alert program or enforceable under this Agreement; and (3) entering into this Agreement is not, by itself, intended to address whether a Participating ISP has adopted and reasonably implemented a DMCA Termination Policy. This Agreement does not and is not intended to establish any legal inference regarding any ISP that does not participate in the Copyright Alert program or to address whether or not any ISP has adopted and reasonably implemented a DMCA Termination Policy. All references in this Agreement to the possibility of termination of a subscriber account are intended solely as an informational element of the Copyright Alerts required by the Copyright Alert program.

CONFIDENTIAL

**DX0063-0009**

Alerts to the account holder that, as further described below, will require acknowledgement of receipt (but not require the user to acknowledge participation in any allegedly infringing activity) (each such Copyright Alert an "Acknowledgement Step Copyright Alert"). Each such Acknowledgement Step Copyright Alert shall state that the Subscriber, by acknowledging the notice, agrees immediately to cease, and/or agrees to instruct other users of the Subscriber's account to cease infringing conduct, if any exists. Each such Copyright Alert shall also state that, upon receipt of lawful process requiring production of records or pursuant to a qualifying claim that the Subscriber has made via the Independent Review Program (as defined in Section 4(H) below and Attachment C hereto), the Participating ISP may provide relevant identifying information about the Subscriber and the Subscriber's infringing conduct to third parties, including Content Owner Representatives or their agents and law enforcement agencies.

The mechanism provided for the Subscriber to acknowledge an Acknowledgement Step Copyright Alert may be in the form of (a) a temporary landing page to which the Subscriber's browser is directed prior to permitting general access to the Internet ("Landing Page") that shall state that the Subscriber has received prior warnings regarding P2P Online Infringement, and shall require the user of the Subscriber's account to acknowledge receipt by clicking through the page prior to accessing additional web pages, (b) a "pop-up" notice which shall be designed to persist until the user of the Subscriber's account acknowledges receipt by clicking through the pop-up notice, or (c) such other format as determined in the Participating ISP's reasonable judgment which shall require acknowledgement of receipt of the Acknowledgement Step Copyright Alert.

If the Participating ISP receives one (1) or more additional ISP Notices attributable to such Subscriber's account during the Grace Period associated with one of the Acknowledgement Step Copyright Alerts, the Participating ISP may at its discretion emphasize the educational and warning nature of its Copyright Alert Program by directing to the account holder additional Copyright Alerts that are similar in style to the Educational Step Copyright Alert or the Acknowledgement Step Copyright Alert Such supplemental Copyright Alerts sent during the Grace Period shall not count toward the limit of two (2) Acknowledgement Step Copyright Alerts.

(iii)    Mitigation Measures Step:  At the Mitigation Measures Step, upon receipt of further ISP Notices determined to be associated with a

Plaintiffs_00286209
**DX0063-0010**

7/6/2011

Subscriber's account and taking into account the parameters of the Grace Period, the Participating ISP shall direct a Copyright Alert (a "Mitigation Measure Copyright Alert") to the account holder that (a) requires acknowledgement of receipt of the Copyright Alert as described in the Acknowledgement Step, (b) shall state that the Subscriber has received prior warnings regarding alleged P2P Online Infringement, and (c) informs the Subscriber that, per the Participating ISP's AUP and/or TOS and as set forth in prior Copyright Alerts, additional consequences shall be applied upon the Subscriber's account as described more fully in this subparagraph (iii) (each such measure a "Mitigation Measure").

The Mitigation Measure Copyright Alert shall set forth the specific Mitigation Measure to be applied and shall inform the Subscriber that, unless the Subscriber has requested review under one of the dispute resolution mechanisms specified in Section 4(H) below, the Participating ISP shall apply the selected Mitigation Measure after the expiration of a notice period of ten (10) business days or fourteen (14) calendar days from the time the Mitigation Measure Copyright Alert is delivered. The term of the notice period (i.e., ten (10) business days or fourteen (14) calendar days) shall be at the Participating ISP's discretion. If no review is requested by the Subscriber, the Participating ISP shall apply the specified Mitigation Measure on the applicable Subscriber's Internet access service account after such ten (10) business day or fourteen (14) calendar day period has expired.

The Mitigation Measure applied at the Mitigation Measures Step shall be one of the following, determined by the Participating ISP and applied in a manner reasonably calculated, in the Participating ISP's reasonable discretion, to help deter P2P Online Infringement: (a) temporary reduction in uploading and/or downloading transmission speeds; (b) temporary step-down in the Subscriber's service tier to (1) the lowest tier of Internet access service above dial-up service that the Participating ISP makes widely available to residential customers in the Subscriber's community, or (2) an alternative bandwidth throughput rate low enough to significantly impact a Subscriber's broadband Internet access service (e.g., 256 - 640 kbps); (c) temporary redirection to a Landing Page until the Subscriber contacts the Participating ISP to discuss with it the Copyright Alerts; (d) temporary restriction of the Subscriber's Internet access for some reasonable period of time as determined in the Participating ISP's discretion; (e) temporary redirection to a Landing Page for completion of a meaningful educational instruction on copyright; or (f) such other temporary Mitigation Measure as may be applied by the Participating ISP in its

CONFIDENTIAL

FINAL
7/6/2011

discretion that is designed to be comparable to those Mitigation Measures described above. Participating ISPs shall not be obligated to apply a Mitigation Measure that knowingly disables or is reasonably likely to disable a Subscriber's access to any IP voice service (including over-the-top IP voice service), e-mail account, or any security service, multichannel video programming distribution service or guide, or health service (such as home security or medical monitoring) while a Mitigation Measure is in effect.

The foregoing provisions notwithstanding, the Participating ISP will retain the discretion, on a per Subscriber account basis, (a) to decide whether appropriate circumstances exist to waive such Mitigation Measure (a "Waiver"), provided that the Participating ISP will only issue one (1) such Waiver per Subscriber account, or (b) instead of applying the Mitigation Measure specified in the Mitigation Measure Copyright Alert, to apply an alternate Mitigation Measure on the Subscriber's Internet access service account and to so inform the Subscriber.

If the Participating ISP elects to use a Waiver, the Participating ISP will direct to the account holder a final warning (a "Fifth Warning Copyright Alert") that will contain each of the elements contained in the Mitigation Measure Copyright Alert as described in this Section 4(G)(iii) and will inform the Subscriber that, in the event that the Participating ISP receives one (1) or more further ISP Notices from a Content Owner Representative, the Subscriber's Internet access service account will be subject to a Mitigation Measure per the Participating ISP's AUP and/or TOS and as set forth in prior Copyright Alerts, unless the Subscriber requests review under one of the dispute resolution mechanisms specified in Section 4(H). If, after the expiration of the Grace Period following issuance of a Fifth Warning Copyright Alert, a Participating ISP receives one (1) or more further ISP Notices determined to be related to a Subscriber's account for which a Waiver has been granted, the Participating ISP will proceed with the transmission of a Mitigation Measure Copyright Alert and the associated activities described above.

(iv)   Post Mitigation Measures Step:  In the event that a Participating ISP receives a further ISP Notice determined to be associated with a Subscriber's account after a Mitigation Measure has been applied on that Subscriber's account, the Participating ISP shall direct a further Mitigation Measure Copyright Alert to the account holder and after ten (10) business days or fourteen (14) calendar days, as applicable, either re-apply the previous Mitigation Measure or

CONFIDENTIAL                                  12

Plaintiffs_00286211
**DX0063-0012**

apply a different Mitigation Measure, unless the Subscriber requests review under one of the dispute resolution mechanisms specified in Section 4(H). The Mitigation Measure Copyright Alert at this step shall also inform the Subscriber that the Subscriber may be subject to a lawsuit for copyright infringement by the Copyright Owners and that continued infringement may, in appropriate circumstances, result in the imposition of action consistent with section 512 of the DMCA and/or actions specifically provided for in the Participating ISP's AUP and/or TOS including temporary suspension or termination. Upon completion of the Post Mitigation Measures Step, a Participating ISP may elect voluntarily to continue forwarding ISP Notices received for that Subscriber account, but is not obligated to do so. The Participating ISP will, however, continue to track and report the number of ISP Notices the Participating ISP receives for that Subscriber's account, so that information is available to a Content Owner Representative if it elects to initiate a copyright infringement action against that Subscriber.

(v)  Reset: If a Participating ISP does not receive an ISP Notice relating to a Subscriber's account within twelve (12) months from the date the Participating ISP last received an ISP Notice relating to that same Subscriber's account, (a) the next ISP Notice associated with that Subscriber's account shall be treated as the first such ISP Notice under the provisions of this Copyright Alert Program and the Subscriber may be afforded an additional Waiver as set forth in Section 4(G)(iii) above; and (b) the Participating ISP may expunge all prior ISP Notices and Copyright Alerts from the Subscriber's account.

(vi)  Transmission of Copyright Alerts to Subscribers: Copyright Alerts should be directed by the Participating ISP to the account holder by means that are designed to ensure prompt receipt (*e.g.*, via email, physical mail, auto-dialer notification, ISP account management tool pop-ups requiring user click through, electronic or voice communications with Subscribers or such other means of delivery as the Participating ISP deems commercially practicable), and the Participating ISP shall design such Copyright Alerts in a manner reasonably calculated, in the Participating ISP's discretion, to be received by the Subscriber. Each Copyright Alert after the initial Educational Step Copyright Alert will include the educational and general information required in the Educational Step Copyright Alert and in any other Copyright Alerts that were forwarded to the Subscriber after the Educational Step, together with a summary of the pertinent information regarding the alleged P2P Online Infringement related to prior ISP Notices or a link or

CONFIDENTIAL

other mechanism by which the Subscriber can access or obtain such information. Each Participating ISP will provide the form of its Copyright Alerts to the Independent Expert as part of the Independent Expert's review of each Participating ISP's Methodology, and will in good faith consider any suggestions from the Independent Expert.

(vii) Notification of Ability to Request Review: Copyright Alerts directed to account holders at the Mitigation Measures Step and the Post Mitigation Measures Step shall inform the Subscriber of the Subscriber's ability to request review within ten (10) business days or fourteen (14) calendar days, as applicable, under one of the dispute resolution mechanisms described in Section 4(H). If the Subscriber requests such review, the Participating ISP shall, upon receiving notice of the request for such review and pending a final decision via the chosen dispute resolution mechanism, defer taking any further action under its Copyright Alert Program.

H.    Independent Review Program

(i)    A Subscriber may seek review of a Mitigation Measure Copyright Alert via the dispute resolution program set forth in Attachment C (the "Independent Review Program") or as otherwise permitted in the Participating ISP's AUP or TOS or as permitted by law, at the election of the Subscriber. The Independent Review Program shall allow for the Subscriber to remain anonymous to the Content Owner Representatives and the members of the Participating Content Owners Group, except in cases where the Subscriber elects a defense in which the Subscriber's identity will be disclosed. The decision from the Independent Review Program shall be binding on the Parties solely for purposes of the Notice Process and the affected Copyright Alert Program but shall have no force or effect beyond the Notice Process and the affected Copyright Alert Program, and shall not be deemed to adjudicate any rights outside of this limited context. In any judicial proceeding between a Subscriber and a Copyright Owner concerning subject matter that is or has been the subject of the Independent Review Program, as provided in the procedures governing the Independent Review Program, neither the Subscriber nor the Copyright Owner shall seek to enter into evidence, or otherwise refer to or cite, either the fact of the Independent Review or any outcome of the Independent Review.

(ii)    The costs of establishing and administering the Independent Review Program shall be borne fifty percent (50%) by the Participating Content Owners Group and fifty percent (50%) by the Participating ISPs.

I.    Generation of Monthly Reports

Within ten (10) business days of the end of each calendar month during the term of this Agreement, each Participating ISP shall provide reporting of non-personally

Plaintiffs_00286213
DX0063-0014

FINAL
7/6/2011

identifiable information to the Content Owner Representatives identifying, on an anonymized basis and in the format set forth in the Participating ISP's Implementation Agreement, information about those Subscribers who have received Copyright Alert(s) during the applicable calendar month and the total number of alleged P2P Online Infringements by each such Subscriber. Such reporting may be done via Automated Copyright Notification System ("ACNS") standards or other available methods as mutually agreed in the Participating ISP's Implementation Agreement. The Parties may not (i) use or disclose such data to governmental entities (absent lawful process) or other third parties, unless prior approval for each such use or disclosure is received from a majority of the CCI Executive Committee and the data is disclosed only on an aggregated, anonymized basis, or (ii) use such reports or any of the data that is included in or may be extrapolated from such reports to attempt to obtain the identity of a Subscriber; except that (1) the Parties may use the reports or data to analyze the effectiveness of the Copyright Alert program; and (2) the Content Owner Representatives or any other member of the Participating Content Owners Group may use such reports or data as the basis for seeking a Subscriber's identity through a subpoena or order or other lawful process. For the avoidance of doubt, the Parties agree that the Content Owner Representatives may share such reports with the other members of the Participating Content Owners Group, provided such Parties agree to abide by the limitations set forth in this Section 4(I).

5.      Technical Operations; Implementation Agreements

        A.      The Content Owner Representatives and each Participating ISP (and the members of the Participating Content Owners Group, as necessary) will work together in good faith to establish and agree upon standardized forms and procedures for a Notice Process (for example, by incorporating ACNS or other mutually agreeable standard(s), and endeavoring to include identification of Methodologies used, if practical). The foregoing sentence notwithstanding, the Parties acknowledge that a common interface between the Content Owner Representatives and the Participating ISPs may not be technically or financially practical. The Content Owner Representatives and each Participating ISP (and the members of the Participating Content Owners Group, as necessary) will document the standards contemplated in this Section 5(A), notice volumes, and other pertinent details concerning the technical operation of the Notice Process and Copyright Alert Program between the Content Owner Representatives and the applicable Participating ISP in an Implementation Agreement. The Content Owner Representatives and the Participating ISPs shall agree to a form of the Implementation Agreement, including the terms and conditions of such agreement, that shall be used by all of the Participating ISPs. Each Participating ISP and the Content Owner Representatives (and the members of the Participating Content Owners Group, as necessary) shall make reasonable efforts to execute their Implementation Agreement no later than three (3) months after the Effective Date (as defined in Section 8(A) below).

        B.      Reserved.

CONFIDENTIAL                    15

Plaintiffs_00286214
DX0063-0015

C.     The MPAA Group and the RIAA Group will allocate the number of ISP Notices that each shall be entitled to send to each Participating ISP per month (i) on behalf of their members, the RIAA Group's members' distributed labels, and those entities set forth in Attachment D hereto; and (ii) on behalf of independent record labels and film production companies that are members of the American Association of Independent Music ("A2IM") and the Independent Film and Television Alliance ("IFTA"), respectively (collectively, the "Independent Content Owners"), provided that IFTA, A2IM, and the Independent Content Owners (as applicable) agree to be bound by written agreement (for so long as such agreement remains in effect) to the terms set forth in Sections 4(C), 4(D), 4(H)(i), 4(I), 5(A), 5(C), 6, 7, 8, 9(E), 9(F), and 10 of this Agreement that apply to all members of the Participating Content Owners Group (collectively or individually) and certain designated provisions of each Participating ISP's Implementation Agreement as set forth therein.

D.     Each Participating ISP may temporarily cease processing ISP Notices or reduce the number of ISP Notices being processed if, in the sole discretion of the Participating ISP, (i) the Participating ISP receives more ISP Notices than its business processes and systems can reasonably address, (ii) the Participating ISP receives more calls from Subscribers regarding Copyright Alerts than its designated customer service representatives can reasonably address (taking into account the other demands on Participating ISP customer service representatives for unrelated purposes), or (iii) other demands on the Participating ISP's business processes and systems, such as requests from law enforcement, must be given precedence. If the Participating ISP temporarily ceases processing ISP Notices for any of the foregoing reasons, the Participating ISP shall promptly notify the Content Owner Representatives, subject to any limitations on such notice as may be imposed in law or regulation, and shall work cooperatively with the Content Owner Representatives and, if agreed by all affected Parties, the Independent Expert, to resolve any issues relating to the over-provisioning of ISP Notices.

6.     Consent to Receive Notices

A.     Entry into this Agreement by a Participating ISP shall constitute consent by that Participating ISP to receive ISP Notices from the Content Owner Representatives (or their service providers) on behalf of the Participating Content Owners Group, those entities set forth in Attachment D (as such attachment may be amended from time to time) (or in the case of the RIAA Group, on behalf of the RIAA Group's members' distributed labels), and the Independent Content Owners upon implementation by the Participating ISP of its Copyright Alert Program, subject to all of the terms and limitations set forth in this Agreement and the Participating ISP's Implementation Agreement. The members of the Participating Content Owners Group may change from time to time upon mutual written agreement of the Parties, provided that MPAA and RIAA shall remain Parties to this Agreement and, provided further, that in no event shall such changes increase the notice volumes applicable to each Participating ISP under this Agreement and each Participating ISP's Implementation Agreement, unless this Agreement or the Participating ISP's Implementation Agreement is modified with the

CONFIDENTIAL                          16

**DX0063-0016**

FINAL
7/6/2011

written consent of the Participating ISP to increase the number of ISP Notices that may be sent. Nothing in this Agreement shall require a Participating ISP to accept notices from any third party or restrain it from doing so. No ISP Notices or other notices of P2P Online Infringement directed to Subscribers shall be sent to the Participating ISP by or on behalf of the members of the Participating Content Owners Group, the Independent Content Owners, and those entities set forth in Attachment D of this Agreement (as such attachment may be amended from time to time) (or in the case of the RIAA Group, on behalf of the RIAA Group's members' distributed labels) except pursuant to this Agreement and the Participating ISP's Implementation Agreement.

B.  Prior to the Copyright Alert Program launch date for the applicable Participating ISP, such Participating ISP shall continue to process notices concerning P2P Online Infringement in accordance with such Participating ISP's then current policies or practices or, if applicable, agreements with any member of the Participating Content Owners Group.

7.  Force Majeure

No Party shall be liable to any other Party for any delay, failure in performance, loss or damage due to fire, explosion, interruption of power supplies, earthquake, flood, the elements, strike, embargo, labor disputes, failure of public transit or other public infrastructure, acts of civil or military authority, war, terrorism, acts of God, acts of the public enemy, acts or omissions of carriers or suppliers, acts of regulatory or governmental agencies, or other causes beyond such Party's reasonable control, whether or not similar to the foregoing and whether or not the Parties contemplate such circumstances at the time of entering into this Agreement.

8.  Term; Withdrawal

A.  This Agreement shall become effective upon the date all of the Parties have executed this Agreement (the "Effective Date"). This Agreement shall remain in effect for a period of four (4) years following the Effective Date.

B.  Any Party may withdraw as a Party from this Agreement prior to its expiration (i) if such Party reasonably determines that continued participation in this Agreement is not technically, commercially, operationally or otherwise practical; (ii) if such Party is subject to a complaint before any administrative agency, court, or other governmental entity challenging the lawfulness of the Copyright Alert program, a Participating ISP's Copyright Alert Program, the Agreement, or an Implementation Agreement to which it is a party or any conduct taken under such agreements or programs; (iii) if another Party to this Agreement is subject to a complaint before any administrative agency, court, or other governmental entity challenging the lawfulness of the Copyright Alert program, a Participating ISP's Copyright Alert Program, or the Agreement or any conduct taken under such agreements or programs; or (iv) if a government entity enacts or establishes a government-sponsored program or judicial, administrative, or executive process concerning P2P Online Infringement that imposes

CONFIDENTIAL                    17

materially different obligations than those set forth in this Agreement.

9.      Records and Evaluation

        A.      Consistent with its general policies and business practices for retaining
Internet access service subscriber records, each Participating ISP agrees to keep
reasonable records pertaining to its Copyright Alert Program. Each Participating ISP also
agrees to use reasonable efforts to provide semi-annual reports to CCI of the results of its
Copyright Alert Program, which shall include, in an aggregated, anonymized form, non-
personally identifiable information regarding the ISP Notices received and Copyright
Alerts sent and such other aggregated, anonymized data as the Participating ISPs may
from time to time agree to provide.

        B.      Consistent with its general policies and business practices for retaining
records regarding Online Infringement, each Content Owner Representative agrees to
keep reasonable records pertaining to its participation in the Notice Process under this
Agreement including records of the Methodology(ies) currently and previously in use and
the effective date(s) of such use. Each Content Owner Representative agrees to use
reasonable efforts to provide semi-annual reports to CCI of the results of its Notice
Process, which shall include, in an aggregated, anonymized form, non-personally
identifiable information regarding the ISP Notices sent to the Participating ISPs
concerning activities relating to P2P Online Infringement by the Participating ISPs'
Subscribers and such other aggregated, anonymized data as the Content Owner
Representatives may from time to time agree to provide. Such reports shall be in a form
to be determined by each Content Owner Representative in its discretion.

        C.      CCI shall keep confidential all records and data relating to the Notice
Process and Copyright Alert Programs. None of the records and data relating to the
Notice Process and Copyright Alert Programs shall be made publicly available by CCI
without prior approval by a majority of the Executive Committee.

        D.      CCI shall review on an annual basis, beginning on the twelve (12) month
anniversary of the Effective Date and occurring each subsequent year thereafter on the
anniversary of the Effective Date, the number of Copyright Alerts sent by the
Participating ISPs to each Subscriber's account at each step of the Copyright Alert
Programs. Based on the information that CCI receives from the Participating ISPs and
the Content Owner Representatives, pursuant to Sections 9(A) and 9(B), in order to
assess the effectiveness of the Copyright Alert program, CCI shall assess among other
things (i) the proportion of Subscribers of each Participating ISP who ceased receiving
Copyright Alerts at each step of the Copyright Alert Program; (ii) the average overall
number of P2P Online Infringements detected for Content Owner Representative assets
over a weekly or monthly period (in general, and by Participating ISP); (iii) the number
of ISP Notices received and the number of corresponding Copyright Alerts sent; (iv) the
number and percentage of individual Subscribers who, after receiving one (1) or more
Copyright Alerts, did not receive additional Copyright Alerts corresponding to their
accounts (in general, and by Participating ISP); (v) the number of Subscribers who

CONFIDENTIAL                            18

Plaintiffs_00286217
DX0063-0018

requested a review under the Independent Review Program, and at what step they requested it; and (vi) the number and percentage of Independent Reviews which resulted in a decision in favor of the Subscriber – and why such decisions were made. As part of its annual review, CCI shall also examine whether Copyright Alerts are successfully reaching account holders. The Parties shall consider in good faith any recommendations made by CCI resulting from such review and assessment.

      E.    The Content Owner Representatives, those members of the Participating Content Owners Group and Independent Content Owners selected by the Content Owner Representatives, and the Participating ISPs shall establish a working group under the auspices of CCI, which will consist of appropriate representatives of each Party, who will meet regularly (at least quarterly during the eighteen (18) months following the Effective Date and then at least semi-annually thereafter) to assist in the initiation and implementation of this Agreement, assess its ongoing operation, and thereafter recommend to the Parties on a non-binding basis any suggested amendments to this Agreement to improve its scope or effectiveness. The working group may consult with the Independent Expert as appropriate.

      F.    CCI shall maintain any reports or other information provided by any Party hereunder in the strictest confidence and shall not disclose such reports or information to any third party or any Party other than the Party which originated the report or information, absent written consent from the originating Party or as otherwise required by law. In the event CCI receives a subpoena or other legal process seeking the disclosure of such reports or information, CCI shall immediately notify the Party whose reports or information is subject to the subpoena or other legal process and provide such Party with the opportunity to seek a protective order or otherwise to oppose disclosure. If authorized by the Executive Committee, CCI shall also seek a protective order or oppose disclosure.

10.    Miscellaneous

      A.    The Content Owner Representatives, the members of the Participating Content Owners Group, the Independent Content Owners, and the Participating ISPs appreciate that alternatives to obtaining and sharing music, movies, and other copyright-protected works by means other than unlawful digital distribution should be encouraged. The Content Owner Representatives will undertake appropriate efforts to ensure the widespread communication of lawful alternatives for consuming content through online distribution methods and encourage the public to utilize these alternatives. Each Participating ISP will, via Copyright Alerts and other avenues, encourage Subscribers to seek legal alternatives to obtain copyrighted materials.

      B.    This Agreement shall be governed by the laws of the State of New York, without regard to any conflict of law principles. The Parties hereby consent to the exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan, New York over any judicial proceedings arising out of or related to this Agreement and agree that all claims in respect of such judicial proceedings shall be heard in such state or

CONFIDENTIAL          19

CONFIDENTIAL

FINAL
7/6/2011

federal courts in the Borough of Manhattan, New York. The Parties further agree that any such proceeding shall be filed in the United States District Court for the Southern District of New York if such court has jurisdiction over the proceeding.

C.    Nothing expressed or implied in this Agreement is intended, or may be construed, to confer upon or give any person or entity other than the Parties hereto any rights or remedies hereunder. This Agreement may only be amended by written agreement signed by all Parties hereto.

D.    This Agreement is subject to any laws or regulations that may be enacted by Congress or adopted by the Federal Communications Commission (or any other federal or state administrative, regulatory or legislative body). If any future law or regulation makes unlawful any provision of this Agreement, that provision will be severed from this Agreement. If any Participating ISP, Content Owner Representative, or member of the Participating Content Owners Group reasonably concludes that such invalidated provision is material to the Agreement or that severing such provision is otherwise impracticable, such Party may immediately terminate its participation in the Agreement.

E.    Headings herein are for convenience of reference only and shall in no way affect interpretation of this Agreement.

F.    This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all proposals, oral or written, all negotiations, conversations or discussions, and all past dealings or industry customs between the parties relating to the subject matter hereof.

G.    This Agreement may be executed in two or more counterparts and duplicate originals, each of which will be deemed an original and all of which together will constitute one and the same instrument. An executed copy of this Agreement transmitted via facsimile or email by the executing party and received via facsimile or email by the other party shall have the same legal force as an executed original version of this Agreement.

H.    The waiver by a party of any breach of this Agreement by the other party in a particular instance shall not operate as a waiver of subsequent breaches of the same or different kind. Failure of a party to exercise any rights under this Agreement in a particular instance shall not operate as a waiver of such party's right to exercise the same or different rights in subsequent instances.

*[The rest of this page is intentionally left blank.]*

CONFIDENTIAL                                20

CONFIDENTIAL

Plaintiffs_00286219

**DX0063-0020**

FINAL
7/6/2011

Agreed as of July 6, 2011:

The Motion Picture Association of America, Inc.

By: Dan Robbins
Name:
Title: SVP & Associate GC

The Recording Industry Association of America, Inc.

By:
Name:
Title:

Walt Disney Studios Motion Pictures

By:
Name:
Title:

Paramount Pictures Corporation

By:
Name:
Title:

Sony Pictures Entertainment Inc.

By:
Name:
Title:

Twentieth Century Fox Film Corporation

By:
Name:
Title:

Universal City Studios LLC

By:
Name:
Title:

Warner Bros. Entertainment Inc.

PRIVILEGED AND CONFIDENTIAL    21

From:9704761647     06-JUL-2011 15:11

CONFIDENTIAL

Plaintiffs_00286220

DX0063-0021

FINAL
7/6/2011

Agreed as of July 6, 2011:

The Motion Picture Association of America, Inc.

By: _____
Name: _____
Title: _____

The Recording Industry Association of America, Inc.

By: _Steve M. Mark_
Name: _Steven M. Marks_
Title: _EVP & General Counsel_

Walt Disney Studios Motion Pictures

By: _____
Name: _____
Title: _____

Paramount Pictures Corporation

By: _____
Name: _____
Title: _____

Sony Pictures Entertainment Inc.

By: _____
Name: _____
Title: _____

Twentieth Century Fox Film Corporation

By: _____
Name: _____
Title: _____

Universal City Studios LLC

By: _____
Name: _____
Title: _____

CONFIDENTIAL                    21

Plaintiffs_00286221
DX0063-0022

FINAL
7/6/2011

Agreed as of July 6, 2011:

The Motion Picture Association of America, Inc.

By:_____
Name:_____
Title:_____

The Recording Industry Association of America, Inc.

By:_____
Name:_____
Title:_____

Walt Disney Studios Motion Pictures

By: _____
Name:  ALAN  BRAVERMAN
Title:  EXEC. V-P & GENERAL COUNSEL

Paramount Pictures Corporation

By:_____
Name:_____
Title:_____

Sony Pictures Entertainment Inc.

By:_____
Name:_____
Title:_____

Twentieth Century Fox Film Corporation

By:_____
Name:_____
Title:_____

Universal City Studios LLC

By:_____
Name:_____
Title:_____

Warner Bros. Entertainment Inc.

PRIVILEGED AND CONFIDENTIAL     21

CONFIDENTIAL

Agreed as of July 6, 2011:

The Motion Picture Association of America, Inc.

By: _____
Name: _____
Title: _____

The Recording Industry Association of America, Inc.

By: _____
Name: _____
Title: _____

Walt Disney Studios Motion Pictures

By: _____
Name: _____
Title: _____

Paramount Pictures Corporation

By: _____
Name: _____ MICHAEL D. FRICKLAS
Title: _____ EVP

Sony Pictures Entertainment Inc.

By: _____
Name: _____
Title: _____

Twentieth Century Fox Film Corporation

By: _____
Name: _____
Title: _____

Universal City Studios LLC

By: _____
Name: _____
Title: _____

Warner Bros. Entertainment Inc.

21

CONFIDENTIAL

Plaintiffs_00286223

DX0063-0024

**FINAL**
**7/6/2011**

Agreed as of July 6, 2011:

The Motion Picture Association of America, Inc.

By: _____
Name: _____
Title: _____

The Recording Industry Association of America, Inc.

By: _____
Name: _____
Title: _____

Walt Disney Studios Motion Pictures

By: _____
Name: _____
Title: _____

Paramount Pictures Corporation

By: _____
Name: _____
Title: _____

Sony Pictures Entertainment Inc.

By: _____
Name: _____Leah Weil_____
Title: _____Sr. EVP / General Counsel_____

Twentieth Century Fox Film Corporation

By: _____
Name: _____
Title: _____

Universal City Studios LLC

By: _____
Name: _____
Title: _____

Warner Bros. Entertainment Inc.

PRIVILEGED AND CONFIDENTIAL     21

Plaintiffs_00286224

**DX0063-0025**

**FINAL**
**7/6/2011**

Agreed as of July 6, 2011:

The Motion Picture Association of America, Inc.

By:_____
Name:_____
Title:_____

The Recording Industry Association of America, Inc.

By:_____
Name:_____
Title:_____

Walt Disney Studios Motion Pictures

By:_____
Name:_____
Title:_____

Paramount Pictures Corporation

By:_____
Name:_____
Title:_____

Sony Pictures Entertainment Inc.

By:_____
Name:_____
Title:_____

Twentieth Century Fox Film Corporation

By: _Ronald C. Wheeler / by Rhyberg_
Name: _Ronald C. Wheeler_
Title: _Assistant Secretary_

Universal City Studios LLC

By:_____
Name:_____
Title:_____

Warner Bros. Entertainment Inc.

PRIVILEGED AND CONFIDENTIAL     21

Plaintiffs_00286225

**DX0063-0026**

Agreed as of July 6, 2011:

The Motion Picture Association of America, Inc.

By:_____
Name:_____
Title:_____

The Recording Industry Association of America, Inc.

By:_____
Name:_____
Title:_____

Walt Disney Studios Motion Pictures

By:_____
Name:_____
Title:_____

Paramount Pictures Corporation

By:_____
Name:_____
Title:_____

Sony Pictures Entertainment Inc.

By:_____
Name:_____
Title:_____

Twentieth Century Fox Film Corporation

By:_____
Name:_____
Title:_____

NBCUniversal Media, LLC

By: _____
Name: RICHARD COTTON
Title: Executive VP and General Counsel

Warner Bros. Entertainment Inc.

PRIVILEGED AND CONFIDENTIAL    21

Plaintiffs_00286226

DX0063-0027

FINAL
7/6/2011

By: _____
Name: _____
      John Rogovin
Title: _____
      EVP & General Counsel

UMG Recordings, Inc.

By: _____
Name: _____
Title: _____

Warner Music Group

By: _____
Name: _____
Title: _____

Sony Music Entertainment

By: _____
Name: _____
Title: _____

EMI Music North America

By: _____
Name: _____
Title: _____

SBC Internet Services, Inc., BellSouth Telecommunications, Inc., Southwestern Bell
Telephone Company, Pacific Bell Telephone Company, Illinois Bell Telephone
Company, Indiana Bell Telephone Company, Incorporated, Michigan Bell Telephone
Company, Nevada Bell Telephone Company, The Ohio Bell Telephone Company,
Wisconsin Bell, Inc., The Southern New England Telephone Company, and BellSouth
Telecommunications, Inc. (the AT&T Inc. companies)

By: _____
Name: _____
Title: _____

Verizon Online LLC, Verizon Online LLC – Maryland, and Verizon Online
Pennsylvania Partnership (the Verizon companies)

By: _____
Name: _____
Title: _____

PRIVILEGED AND CONFIDENTIAL    22

CONFIDENTIAL

Plaintiffs_00286227

**DX0063-0028**

**FINAL**
**7/6/2011**

Warner Bros. Entertainment Inc.

By:_____
Name:_____
Title:_____

UMG Recordings, Inc.

By:_____
Name: Jeffrey Harleston
Title: General Counsel, EVP Business & Legal Affairs

Warner Music Group

By:_____
Name:_____
Title:_____

Sony Music Entertainment

By:_____
Name:_____
Title:_____

EMI Music North America

By:_____
Name:_____
Title:_____

SBC Internet Services, Inc., BellSouth Telecommunications, Inc., Southwestern Bell
Telephone Company, Pacific Bell Telephone Company, Illinois Bell Telephone
Company, Indiana Bell Telephone Company, Incorporated, Michigan Bell Telephone
Company, Nevada Bell Telephone Company, The Ohio Bell Telephone Company,
Wisconsin Bell, Inc., The Southern New England Telephone Company, and BellSouth
Telecommunications, Inc. (the AT&T Inc. companies)

By:_____
Name:_____
Title:_____

CONFIDENTIAL                    22

Plaintiffs_00286228

**DX0063-0029**

FINAL
7/6/2011

Warner Bros. Entertainment Inc.

By: _____
Name: _____
Title: _____

UMG Recordings, Inc.

By: _____
Name: _____
Title: _____

Warner Music Group Corp.

By: _____
Name: Paul Robinson
Title: EVP and General Counsel

Sony Music Entertainment

By: _____
Name: _____
Title: _____

EMI Music North America

By: _____
Name: _____
Title: _____

SBC Internet Services, Inc., BellSouth Telecommunications, Inc., Southwestern Bell
Telephone Company, Pacific Bell Telephone Company, Illinois Bell Telephone
Company, Indiana Bell Telephone Company, Incorporated, Michigan Bell Telephone
Company, Nevada Bell Telephone Company, The Ohio Bell Telephone Company,
Wisconsin Bell, Inc., The Southern New England Telephone Company, and BellSouth
Telecommunications, Inc. (the AT&T Inc. companies)

By: _____
Name: _____
Title: _____

CONFIDENTIAL                    22

Plaintiffs_00286229
**DX0063-0030**

**FINAL**
**7/6/2011**

Warner Bros. Entertainment Inc.

By:_____
Name:_____
Title:_____

UMG Recordings, Inc.

By:_____
Name:_____
Title:_____

Warner Music Group

By:_____
Name:_____
Title:_____

Sony Music Entertainment

By: *[signature]*
Name: *Julie Swidler*
Title: *EVP Business Affairs +*
       *General Counsel*

EMI Music North America

By:_____
Name:_____
Title:_____

SBC Internet Services, Inc., BellSouth Telecommunications, Inc., Southwestern Bell Telephone Company, Pacific Bell Telephone Company, Illinois Bell Telephone Company, Indiana Bell Telephone Company, Incorporated, Michigan Bell Telephone Company, Nevada Bell Telephone Company, The Ohio Bell Telephone Company, Wisconsin Bell, Inc., The Southern New England Telephone Company, and BellSouth Telecommunications, Inc. (the AT&T Inc. companies)

By:_____
Name:_____
Title:_____

CONFIDENTIAL                    22

Plaintiffs_00286230

**DX0063-0031**

**FINAL**
**7/6/2011**

Warner Bros. Entertainment Inc.

By:_____
Name:_____
Title:_____

UMG Recordings, Inc.

By:_____
Name:_____
Title:_____

Warner Music Group

By:_____
Name:_____
Title:_____

Sony Music Entertainment

By:_____
Name:_____
Title:_____

EMI Music North America

By: _Paul Kahn_____
Name: _PAUL KAHN_____
Title: _CFO_____

SBC Internet Services, Inc., BellScuth Telecommunications, Inc., Southwestern Bell
Telephone Company, Pacific Bell Telephone Company, Illinois Bell Telephone
Company, Indiana Bell Telephone Company, Incorporated, Michigan Bell Telephone
Company, Nevada Bell Telephone Company, The Ohio Bell Telephone Company,
Wisconsin Bell, Inc., The Southern New England Telephone Company, and BellSouth
Telecommunications, Inc. (the AT&T Inc. companies)

By:_____
Name:_____
Title:_____

CONFIDENTIAL                    22

**DX0063-0032**

FINAL
7/6/2011

Warner Bros. Entertainment Inc.

By:_____
Name:_____
Title:_____

UMG Recordings, Inc.

By:_____
Name:_____
Title:_____

Warner Music Group

By:_____
Name:_____
Title:_____

Sony Music Entertainment

By:_____
Name:_____
Title:_____

EMI Music North America

By:_____
Name:_____
Title:_____

SBC Internet Services, Inc., BellSouth Telecommunications, Inc., Southwestern Bell
Telephone Company, Pacific Bell Telephone Company, Illinois Bell Telephone
Company, Indiana Bell Telephone Company, Incorporated, Michigan Bell Telephone
Company, Nevada Bell Telephone Company, The Ohio Bell Telephone Company,
Wisconsin Bell, Inc., The Southern New England Telephone Company, and BellSouth
Telecommunications, Inc. (the AT&T Inc. companies)

By:_____
Name:____Wayne Watts_____
Title:____Sr. Exec Vice President & General Counsel
_____AT&T Inc.

CONFIDENTIAL                         22

**DX0063-0033**

FINAL
7/6/2011

Verizon Online LLC, Verizon Online LLC – Maryland, and Verizon Online
Pennsylvania Partnership (the Verizon companies)

By: *Randal S. Miller*
Name: *Randal S. Miller*
Title: *E VP & General Counsel*

Comcast Cable Communications Management, LLC

By:_____
Name:_____
Title:_____

CSC Holdings, LLC

By:_____
Name:_____
Title:_____

Time Warner Cable Inc.

By:_____
Name:_____
Title:_____

CONFIDENTIAL                    23

CONFIDENTIAL

Plaintiffs_00286233

DX0063-0034

**FINAL**
**7/6/2011**

Verizon Online LLC, Verizon Online LLC – Maryland, and Verizon Online
Pennsylvania Partnership (the Verizon companies)

By:_____
Name:_____
Title:_____

Comcast Cable Communications Management, LLC

By: *Catherine Avgiris*
Name: CATHERINE AVGIRIS
Title: SVP GM Communications and Data Services

CSC Holdings, LLC

By:_____
Name:_____
Title:_____

Time Warner Cable Inc.

By:_____
Name:_____
Title:_____

23

CONFIDENTIAL

Plaintiffs_00286234

**DX0063-0035**

Verizon Online LLC, Verizon Online LLC – Maryland, and Verizon Online
Pennsylvania Partnership (the Verizon companies)

By:_____
Name:_____
Title:_____

Comcast Cable Communications Management, LLC

By:_____
Name:_____
Title:_____

CSC Holdings, LLC

By:_____
Name:   Tom Rutledge
Title:   COO

Time Warner Cable Inc.

By:_____
Name:_____
Title:_____

23

CONFIDENTIAL

Plaintiffs_00286235

DX0063-0036

**FINAL**
**7/6/2011**

Verizon Online LLC, Verizon Online LLC – Maryland, and Verizon Online
Pennsylvania Partnership (the Verizon companies)

By:_____
Name:_____
Title:_____

Comcast Cable Communications Management, LLC

By:_____
Name:_____
Title:_____

CSC Holdings, LLC

By:_____
Name:_____
Title:_____

Time Warner Cable Inc.

By:_____
Name: _JEFF ZIMMERMAN_
Title: _SUP + DEPUTY GC_

CONFIDENTIAL                    23

**FINAL**
**7/6/2011**

## Attachment A – Participating ISPs

The Participating ISPs are the following:  SBC Internet Services, Inc., BellSouth Telecommunications, Inc., Southwestern Bell Telephone Company, Pacific Bell Telephone Company, Illinois Bell Telephone Company, Indiana Bell Telephone Company, Incorporated, Michigan Bell Telephone Company, Nevada Bell Telephone Company, The Ohio Bell Telephone Company, Wisconsin Bell, Inc., The Southern New England Telephone Company, and BellSouth Telecommunications, Inc. (the AT&T Inc. companies); Verizon Online LLC, Verizon Online LLC – Maryland, and Verizon Online Pennsylvania Partnership (the Verizon companies); Comcast Cable Communications Management, LLC; CSC Holdings, LLC (solely with respect to its cable systems operating in New York, New Jersey, and Connecticut) (the Cablevision systems); and Time Warner Cable Inc.

CONFIDENTIAL            24

CONFIDENTIAL

Plaintiffs_00286237

**DX0063-0038**

FINAL
7/6/2011

## Attachment B – Participating Content Owners Group

The members of the Participating Content Owners Group are the following:

1. MPAA and the following MPAA members:  Walt Disney Studios Motion Pictures, Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Twentieth Century Fox Film Corporation, Universal City Studios LLC, and Warner Bros. Entertainment Inc., and their successors and assigns.

2. RIAA and the following RIAA members:  UMG Recordings, Inc., Warner Music Group, Sony Music Entertainment, and EMI Music North America, and their successors and assigns.

CONFIDENTIAL

CONFIDENTIAL

Plaintiffs_00286238

DX0063-0039

FINAL
7/6/2011

## Attachment C – Independent Review Program

The Independent Review Program described below is intended to provide an alternative, fast, efficient and low-cost means for Subscribers and Copyright Owners to obtain independent resolution of genuine disputes that may occur in connection with the Copyright Alert program outlined in the Agreement. Its purpose is to provide a Subscriber with a non-exclusive procedure to seek review of Copyright Alerts associated with the Subscriber's account in the event a Mitigation Measure is about to be applied on the Subscriber's account.

The Independent Review process shall be just one avenue of appeal for Subscribers challenging such measure. This Independent Review process does not prevent Subscribers or Copyright Owners from addressing disputes through the courts, and that is the proper forum for addressing issues that are beyond the scope of this Independent Review process.

1. Grounds for Independent Review. Once a Subscriber has received a Copyright Alert stating that a Mitigation Measure is about to be applied, the Subscriber may request an Independent Review of that Copyright Alert and prior Copyright Alerts (as described in paragraph 4.1.4) on the following grounds:

    (i)    Misidentification of Account – that the ISP account has been incorrectly identified as one through which acts of alleged copyright infringement have occurred.

    (ii)   Unauthorized Use of Account – that the alleged activity was the result of the unauthorized use of the Subscriber's account of which the Subscriber was unaware and that the Subscriber could not reasonably have prevented.

    (iii)  Authorization – that the use of the work made by the Subscriber was authorized by its Copyright Owner.

    (iv)  Fair Use – that the Subscriber's reproducing the copyrighted work(s) and distributing it/them over a P2P network is defensible as a fair use.

    (vi)  Misidentification of File – that the file in question does not consist primarily of the alleged copyrighted work at issue.

    (vii)  Work Published Before 1923 – that the alleged copyrighted work was published prior to 1923.

All determinations shall be made by an independent "Reviewer" as described below, and the determinations shall have the effect set forth herein.

2. Standard of Review.

CONFIDENTIAL                26

Plaintiffs_00286239
**DX0063-0040**

2.1. Misidentification of Account. A Subscriber shall prevail on this defense if the Participating ISP's and/or Copyright Owner's records indicate, upon Independent Review, that a factual error was made in (1) identifying the IP address at which the alleged copyright infringement occurred and/or (2) correlating the identified IP address to the Subscriber's account. In reviewing the Participating ISP's or Copyright Owner's records, automated systems for capturing IP addresses or other information in accordance with Methodologies have a rebuttable presumption that they work in accordance with their specifications, unless the Independent Expert's review of any such Content Owner Representative Methodology resulted in a Finding of Inadequacy in which event such rebuttable presumption shall not apply to such Content Owner Representative Methodology.

2.2. Unauthorized Use of Account. A Subscriber shall prevail on this defense if the Subscriber adequately and credibly demonstrates that the alleged activity was the result of unauthorized use of the Subscriber's account by someone who is not a member or invitee of the household (e.g., via an unsecured wireless router or a hacked Internet connection) of which the Subscriber was unaware and that the Subscriber could not reasonably have prevented. The foregoing sentence notwithstanding, the Reviewer may in his or her discretion conclude that a Subscriber is entitled to prevail under this defense despite the Subscriber's failure to secure a wireless router if the Reviewer otherwise concludes that the Subscriber adequately and credibly demonstrates that the alleged activity was the result of unauthorized use of the Subscriber's account by someone who is not a member or invitee of the household of which the Subscriber was unaware. In determining whether this standard has been satisfied, the Reviewer shall consider the evidence in light of the educational messages previously provided by the Participating ISP. Except as set forth herein, this defense may be asserted by a Subscriber only one (1) time to give the Subscriber the opportunity to take steps to prevent future unauthorized use of the Subscriber's account. Any subsequent assertion of this defense by a Subscriber shall be denied as barred, unless the Subscriber can show by clear and convincing evidence that the unauthorized use occurred despite reasonable steps to secure the Internet account and that the breach of such security could not reasonably have been avoided.

2.3. Authorization. A Subscriber shall prevail on this defense if the Subscriber adequately and credibly demonstrates with written or other documented evidence that the Subscriber's alleged activity was actually specifically authorized by the Copyright Owner or its authorized representative. Such written or other documented evidence typically must include a true and unaltered copy of the agreement or communication asserted to grant the claimed authorization. Such evidence shall not be deemed adequate and credible if, among other things, (i) the evidence on its face does not support a claim of authorization, (ii) the evidence does not appear authentic, or (iii) a reasonable person in the Subscriber's position would not have concluded that the communication was in fact authorizing the specific use made of the work and that such authorization came from the actual Copyright Owner or by someone authorized to act on his/her behalf. The defense shall fail if the Copyright Owner has demonstrated: (x) that the specific use of the work made by the Subscriber was not in fact authorized by the Copyright Owner; (y) if the

CONFIDENTIAL                                27

FINAL
7/6/2011

alleged authorization did not come directly from the Copyright Owner, that the person purporting to grant authorization was not authorized to act on behalf of the Copyright Owner for purposes of authorizing the specific use made of the work by the Subscriber; or (z) that the documentary evidence submitted by the Subscriber likely is not authentic or has been altered in a material manner.

2.4. Fair Use. A Subscriber shall prevail on this defense if the Subscriber adequately and credibly demonstrates fair use of the copyrighted work under prevailing principles of copyright law (which shall be identified as described in section 6).

2.5. Misidentification of File. A Subscriber shall prevail on this defense if the Subscriber adequately and credibly demonstrates that a factual error was made in identifying the file at issue as consisting primarily of the alleged copyrighted work. In making this determination, the Content Owner Representative Methodology used to identify the file shall have a rebuttable presumption that it works in accordance with its specifications, unless the Independent Expert's review of any such Content Owner Representative Methodology resulted in a Finding of Inadequacy in which event such rebuttable presumption shall not apply to such Content Owner Representative Methodology.

2.6. Work Published Before 1923. A Subscriber shall prevail on this defense if the Subscriber adequately and credibly demonstrates that the alleged copyrighted work in question was actually published prior to 1923.

3. Effect of Decision. If the Reviewer's decision is in favor of the Subscriber for a particular Copyright Alert, that Copyright Alert shall be deemed invalid, the filing fee described in paragraph 4.1.6 shall be promptly refunded to the Subscriber, and the Participating ISP shall remove that Copyright Alert from the Subscriber's account records and refrain from applying any Mitigation Measures based on the invalidated Copyright Alert(s). All other Copyright Alerts shall remain valid, and shall count toward future Mitigation Measures. If the Reviewer's decision for a particular Copyright Alert is in favor of the Copyright Owner, that Copyright Alert shall be deemed valid, and if applicable, the Mitigation Measure shall be applied promptly. The Reviewer's decision will be binding solely for the purposes of the Copyright Alert program. By participating in the Independent Review, the Subscriber, the Participating ISP, and the Copyright Owner agree to waive all rights to challenge the Reviewer's decision for purposes of the Copyright Alert program. The Reviewer's decision shall have no effect outside of the Copyright Alert program, shall not act as res judicata or collateral estoppel or any similar bar, and shall not have any precedential impact for other Independent Reviews with respect to other Subscribers within the Copyright Alert program. In any judicial proceeding between a Subscriber and a Copyright Owner concerning subject matter that is or has been the subject of Independent Review, neither the Subscriber nor the Copyright Owner shall seek to enter into evidence, or otherwise refer to or cite, either the fact of the Independent Review or any outcome of the Independent Review.

4. Independent Review Procedure.

CONFIDENTIAL                     28

Plaintiffs_00286241
**DX0063-0042**

4.1.  How to Initiate an Independent Review.

4.1.1.  *ACIR Form.*  When the Participating ISP sends a Copyright Alert stating that the Subscriber's account is subject to a Mitigation Measure, the Participating ISP will also make available to the Subscriber access to an online Application to Commence Independent Review ("ACIR") form and related materials.  The ACIR form and related materials will permit the Subscriber to review all of the Copyright Alerts applicable to the Subscriber's account that have not previously been subject to review, as further described in paragraph 4.1.4.  The ACIR form will identify all of the information necessary for the Subscriber to invoke an Independent Review, including each defense asserted as to each work identified in a Copyright Alert under review, and also include space for provision of the Subscriber's contact information.

4.1.2.  *Authorization.*  The ACIR form will contain an authorization by the Subscriber to disclose relevant personal information to the Reviewer and to the Participating ISP.  Such information includes: (1) information contained on the ACIR form, (2) information in the Participating ISP's possession, custody or control identifying the Subscriber or relating to any Copyright Alert sent to the Subscriber by the Participating ISP concerning alleged infringement, (3) information regarding the Participating ISP's matching of the IP address in an ISP Notice to the Subscriber's account, and (4) details of actions taken or proposed to be taken as Mitigation Measures by the Participating ISP with respect to the Subscriber's account.  Except as explained in the next sentence or as required by judicial order or other legal process, all Subscriber personal information will be held in confidence and not disclosed to the Copyright Owner.  If the Subscriber's defense is based on authorization, then the Reviewer may, in his or her discretion, disclose to the Copyright Owner only such personal information concerning the Subscriber as is reasonably necessary to permit the Copyright Owner to rebut a claim of authorization if that information is required for such purposes.  The ACIR form will contain an authorization by the Subscriber to disclose relevant personal information to the Copyright Owner in the circumstances described in the immediately preceding sentence.

4.1.3.  *Information Required.*  The Subscriber must (1) identify the defenses asserted as to each work identified in each Copyright Alert at issue by checking the proper boxes on the ACIR form, (2) explain the specific basis for each defense, and (3) provide the corresponding back-up material to support such grounds.  In the case of a defense of authorization, the ACIR form must be accompanied by the applicable written or other documented evidence that the Subscriber's alleged activity was specifically authorized by the Copyright Owner or its authorized representative, as described in paragraph 2.3.  In the case of a defense of fair use, the ACIR form must (1) be accompanied by a true and unaltered copy of each content file that the Subscriber asserts to be a fair use under prevailing principles of copyright law; and (2) an explanation of each use

CONFIDENTIAL                              29

the Subscriber made of the file, including any distribution or downloading identified in the Copyright Alert(s), and the basis for claiming each such use as a fair use.

4.1.4. *Copyright Alerts Subject to Review*. The Subscriber shall have the right to invoke Independent Review for the last Copyright Alert sent as well as prior Copyright Alerts, provided that the right to have a particular Copyright Alert reviewed shall be waived if that right is not invoked the first time the Copyright Alert becomes eligible to be reviewed. Accordingly, when a Subscriber first receives a Mitigation Measure Copyright Alert, the Subscriber may invoke the Independent Review process as to any prior Copyright Alert, but if any of those Copyright Alerts is not reviewed at that time it will thereafter be unreviewable.

4.1.5. *Multiple Works Identified in a Copyright Alert*. In cases in which a Copyright Alert alleges infringing activity with respect to multiple works, the Independent Review process may be invoked by a Subscriber only if the Subscriber offers a defense as to every work cited in the Copyright Alert. A Copyright Alert will be considered valid and provide a basis for the application of a Mitigation Measure if the Subscriber is found to have no valid defense as to any one work cited in the Copyright Alert, unless the Independent Review establishes a pattern of invalid allegations in the Copyright Alert sufficient to cast substantial doubt on the Copyright Alert's remaining allegations.

4.1.6. *Filing Fee*. The Subscriber shall be required to pay a filing fee of thirty-five dollars ($35) in order to invoke the Independent Review, unless the Subscriber qualifies for a waiver or reduction in the filing fee in accordance with the procedures of the Administering Organization (as defined in paragraph 5.1 below). This fee will be refunded to the Subscriber in the event that the Reviewer decides in favor of the Subscriber as to any Copyright Alert eligible for review.

4.1.7. *Deadline*. The ACIR form, related materials and filing fee ("ACIR Package") must be submitted electronically within ten (10) business days after receipt of the relevant Copyright Alert. Except as contemplated in paragraph 5.6 below, failure to properly submit an ACIR form by the due date shall be deemed a waiver of the right to seek Independent Review regarding the applicable Mitigation Measure.

4.1.8. *Submission of ACIR Package*. The Subscriber must submit the ACIR Package to the Administering Organization. The Administering Organization shall immediately send a copy of the ACIR Package to the applicable Participating ISP.

4.1.9. *Effect of Filing for Independent Review*. A Subscriber's filing of the ACIR form stays implementation of any Mitigation Measure. A Subscriber's failure to file an ACIR or otherwise challenge an allegation of copyright

Plaintiffs_00286243
**DX0063-0044**

FINAL
7/6/2011

infringement shall not be construed as an admission or waiver in any other forum or context.

## 4.2 Process for Independent Review.

4.2.1. *Selection of Reviewer.* All Independent Reviews shall be resolved by one (1) individual serving as an independent Reviewer. The Reviewer will be selected by the Administering Organization from a panel of neutrals, as further described in paragraph 5.2.

4.2.2. *Initial Review of ACIR Package.* A Reviewer will review the ACIR package within five (5) business days of receipt to determine whether it is substantially complete. To be considered substantially complete, (1) the ACIR Package must include a substantially completed ACIR form; (2) the ACIR form must assert a defense as to each work identified in the relevant Copyright Alert subject to Independent Review; (3) for each defense asserted as to each work, the ACIR Package must include sufficient information as described in paragraph 4.1.3 to permit the Independent Review to proceed meaningfully and to potentially result in a decision in favor of the Subscriber; and (4) the ACIR Package must include the required payment as provided in paragraph 4.1.6. If the ACIR Package is not substantially complete, the case will be denied. The first time an ACIR Package is denied, such a denial shall be without prejudice to afford the Subscriber one additional opportunity to correct any mistakes or omissions in the ACIR Package. In such a case, the Reviewer shall notify the Subscriber of the relevant defects and afford the Subscriber five (5) business days to remedy the defects by submitting a substantially complete ACIR Package. Otherwise (except as provided in paragraph 5.6 below), such a denial shall be with prejudice. Either a denial without prejudice that is not remedied within 5 business days or a denial with prejudice shall have the same effects as a denial on the merits (see section 3).

4.2.3. *Verification that Defense of Unauthorized Use of Account is not Barred.* In the case of any defense of unauthorized use of account, the Reviewer's initial review will also consider whether that defense is barred because the Administering Organization's records indicate that the Subscriber previously asserted that defense in another Independent Review. If so, the defense shall be denied, unless the Subscriber can show by clear and convincing evidence that the unauthorized use occurred despite reasonable steps to secure the Internet account and that the breach of such security could not reasonably have been avoided. If for any reason the Administering Organization's records are inconclusive as to this question, the Reviewer will request clarification from the Participating ISP pursuant to paragraph 4.2.4.

4.2.4. *Collection of Standard Information from Participating ISP and Copyright Owner.* If the ACIR Package is substantially complete, the Reviewer will, if needed, request standard relevant information from the Participating ISP

CONFIDENTIAL                                    31

Plaintiffs_00286244
**DX0063-0045**

FINAL
7/6/2011

and/or Copyright Owner to assess the grounds for review. Details of the standard information to be provided by the Participating ISP and/or Copyright Owner for different types of defenses shall be determined by mutual agreement of representatives of the Administering Organization, Participating ISPs and Copyright Owners as implementation proceeds, with the goal of having provision of this standard information be a straightforward and largely automated process. In the case of a defense of misidentification of account, information to be provided by the Participating ISP is anticipated to consist of information in the Participating ISP's possession, custody, or control relating to (1) ISP Notices received by the Participating ISP and matched to the Subscriber's account, (2) Copyright Alerts sent to the Subscriber by the Participating ISP, and (3) the Participating ISP's matching of IP addresses on ISP Notices received by the Participating ISP to the Subscriber's account. Information to be provided by the Copyright Owner is anticipated to consist of all or part of the evidence package(s) (*i.e.*, information relating to the alleged access to copyrighted material) for one (1) or more Copyright Alerts that are the subject of the Independent Review. The Participating ISP and Copyright Owner, as applicable, will provide the relevant information to the Reviewer within ten (10) business days after receipt of the request.

4.2.5. *First Substantive Review*. Within five (5) business days from receipt of the relevant standard information from the Participating ISP and/or the Copyright Owner, the Reviewer will review the case record substantively to determine if additional information from the Participating ISP and/or Copyright Owner is required, or whether it is apparent without soliciting further information that the Subscriber will not prevail as to all works cited in any one (1) or more Copyright Alerts.

4.2.6. *Supplemental Information*. The Reviewer shall have the discretion to request supplemental information from the Participating ISP, Copyright Owner or Subscriber within the five (5) business day period referred to in paragraph 4.2.5, if such information would likely be material to a just resolution of the Independent Review. If the Reviewer makes such a request, the applicable party(ies) shall have ten (10) business days to respond. If the Subscriber asserts a defense of authorization or fair use and the Reviewer determines that the defense may have merit, then the Copyright Owner shall receive all relevant information about the defense from the Reviewer and be afforded an opportunity to provide evidence to rebut the defense within ten (10) business days from receipt of such information. Such information shall include (1) in the case of a defense of authorization, all substantiating evidence and explanation submitted by the Subscriber as to each relevant work and the Subscriber's identifying information, unless the Reviewer concludes that the Copyright Owner does not need to know the identity of the Subscriber to evaluate the Subscriber's claim that his or her activity was authorized; and (2) in the case of a defense of fair use, the content file submitted by the Subscriber as to each relevant work and an explanation of why the Subscriber believes each use of that content file to be a fair use.

CONFIDENTIAL

Plaintiffs_00286245
**DX0063-0046**

4.2.7. *Final Assessment and Issuance of Decision.* Within ten (10) business days of receipt of all requested information, including any supplemental information provided pursuant to paragraph 4.2.6, or passage of the relevant time to provide supplemental information in the event no supplemental information is received, the Reviewer shall assess the complete case record and enter a final decision. In doing so, the Reviewer shall determine the relevance, materiality and weight of all evidence based on the available record. The proceedings will take place exclusively on the written record, and there shall be no live hearings. For a Copyright Alert alleging infringement of multiple copyrighted works, in order to find in favor of the Subscriber with respect to the Copyright Alert, the Reviewer must consider and find in favor of the Subscriber as to a defense for each individual work referenced in the Copyright Alert or must find a pattern of invalid allegations in the Copyright Alert sufficient to cast substantial doubt on all allegations in the Copyright Alert. Upon reaching a final decision, the Reviewer will notify the Subscriber, Participating ISP and Copyright Owner of the outcome, and if the decision is a denial of the Subscriber's defense, the Reviewer will also include a short description of the rationale for the denial.

4.2.8. *Withdrawal of Notice by Copyright Owner.* A Copyright Owner may withdraw an ISP Notice at any time during the Independent Review process, which shall have the same effect as a finding for the Subscriber as to the withdrawn Copyright Alert (see section 3).

4.2.9. *Communications Among Parties.* Except as specifically described in these rules (*e.g.*, in the case of requests for information as described in paragraphs 4.2.4 and 4.2.6), there will be no communication between the Reviewer and the Participating ISP, Copyright Owner or Subscriber concerning the Independent Review. There is to be absolutely no discovery between the parties to the dispute, and no party shall have any obligation to respond to any request for information or to provide any particular information, except as described herein.

5. Administration of Independent Review Process.

5.1. In General. The Independent Review process shall be coordinated by the administering organization selected by the CCI Executive Committee ("Administering Organization"). The Independent Review process shall be governed exclusively by these rules.

5.2. Selection of Reviewers. The Administering Organization shall have mechanisms for establishing a panel of neutrals and for ensuring their continuing neutrality, their compliance with these rules, and their adherence to the governing principles of copyright law as provided in section 6. Reviewers must be lawyers, but need not necessarily have the legal or case management expertise that would qualify them to act as arbitrators of more complex disputes in a broader-ranging alternative

CONFIDENTIAL                                    33

FINAL
7/6/2011

dispute resolution process. The Administering Organization shall provide Reviewers training in this Independent Review process and governing principles of copyright law determined as described in section 6. Reviewers may be staff employees of the Administering Organization if the volume of disputes subject to the Independent Review process so warrants.

5.3. Automation. The Administering Organization shall implement automated processes for managing the workflow of cases proceeding through the Independent Review process, including means for seeking and obtaining information from Participating ISPs and Copyright Owners in a manner that minimizes the associated workload on Participating ISPs and Copyright Owners and is automated to the maximum extent practicable.

5.4. Records of Subscriber History of Invoking Independent Review. The Administering Organization will maintain a secure database of Subscribers' history of invoking the Independent Review process, which will be available to Reviewers when evaluating future disputes involving the relevant Subscribers. Thus, for example, it should be possible for a Reviewer to determine from this database whether a Subscriber has previously asserted a defense of unauthorized use of account, and a Reviewer may consider a Subscriber's Independent Review history in evaluating the credibility of claims under review.

5.5. Recordkeeping and Review. The CCI Executive Committee and Administering Organization will establish processes for (1) maintaining records concerning proceedings, (2) periodically reviewing anonymous, aggregated information about issues and outcomes so that trends can be identified and addressed if warranted, and (3) confidentially auditing decisions for purposes of evaluating the performance of Reviewers and the Administering Organization. Except to the extent necessary to maintain records of outcomes of proceedings for purposes of operation and review of the Independent Review process or as otherwise expressly set forth herein, Reviewers shall not prepare written decisions in the cases they decide. The Parties to the Agreement agree to negotiate in good faith as to adjustments in the Independent Review process if such adjustments are warranted by actual experience in operating the Independent Review process.

5.6. Provision of Information. Fair and efficient administration of the Independent Review process depends upon timely provision of information requested by the Reviewer at various steps of the process, as described in paragraph 4.2. Whenever these rules set forth a timeframe for provision of information requested by the Reviewer, the Reviewer may grant reasonable extensions of such period (not to exceed ten (10) business days) for substantial good cause shown. In the absence of the requested information at the deadline for providing the same, the following provisions will apply:

5.6.1. *Delays in Providing Standard Information.* If the Reviewer properly requests a standard package of information from a Participating ISP or Copyright Owner, as described in paragraph 4.2.4, and the Participating ISP or

CONFIDENTIAL                                34

Plaintiffs_00286247
**DX0063-0048**

Copyright Owner does not provide the requested information as to some or all claims or works on a timely basis, (1) the Reviewer shall promptly notify the Participating ISP or Copyright Owner and the Participating ISP or Copyright Owner shall have a further five (5) business days to provide the requested information; and (2) the Administering Organization shall reflect such deficiency in reports to be provided periodically to the CCI Executive Committee. Recurring failure of a Participating ISP or Copyright Owner to provide requested standard information during the initial period identified in paragraph 4.2.4, in other than isolated instances, will be considered a breach of its obligations under the Agreement. If a Participating ISP or Copyright Owner does not provide available requested information within a further five (5) business days, (a) the dispute will proceed to the next step of decision making based on the available record without such information, giving the Subscriber the benefit of any doubt concerning the missing requested information; (b) the Administering Organization shall reflect such deficiency in reports to be provided periodically to the CCI Executive Committee; and (c) the Participating ISP or Copyright Owner will be considered in breach of its obligations under the Agreement.

5.6.2. *Delays in Providing Supplemental Information.* If the Reviewer properly requests supplemental information from a Participating ISP, Copyright Owner or Subscriber pursuant to paragraph 4.2.6, and the Participating ISP, Copyright Owner or Subscriber does not provide the requested information as to some or all claims or works on a timely basis, the dispute will proceed to the next step of decision making based on the available record without such information. If the Reviewer believes that the position of a party to the proceeding other than the one that has failed to provide the requested information is otherwise meritorious, the Reviewer shall give such party the benefit of any doubt concerning the missing requested information.

6. Legal Principles to Be Applied in Independent Review. The Independent Review process will, to the extent relevant, apply prevailing legal principles as determined by United States federal courts. The Administering Organization will commission an accepted, independent expert on copyright law, who is approved by the CCI Executive Committee, to outline prevailing legal principles of fair use for purposes of deciding defenses of fair use, and any other legal principles necessary for resolution of issues within the scope of this Independent Review process. Such outline will be updated from time to time as necessary. If additional material questions of law arise as the Independent Review process is implemented, they may be referred to an accepted, independent expert approved by the CCI Executive Committee as needed. The Administering Organization will advise the Parties to the Agreement of issues referred to, and principles determined by, such an expert, and provide a process for the Parties to the Agreement to provide input concerning the issues, so as to ensure that the expert's determinations are fully-informed and reflect prevailing law as determined by United States federal courts.

CONFIDENTIAL                    35

DX0063-0049

FINAL
7/6/2011

CONFIDENTIAL                    36

CONFIDENTIAL

Plaintiffs_00286249

**DX0063-0050**

FINAL
7/6/2011

## Attachment D – MPAA Member Company Affiliates

The MPAA member companies' affiliates are entities under the control of an MPAA member company. For purposes of this <u>Attachment D</u>, "control" is defined as (1) the ownership of at least fifty percent (50%) of the equity or beneficial interest of the controlled entity, (2) the right to vote for or appoint a majority of the board of directors or other governing body of such entity (if the board or governing body may exercise authority with less than a majority, then the right to vote or appoint the number of directors necessary to exercise that authority), or (3) the right or authority to grant, approve or withhold, directly or indirectly, financial resources necessary to the operation of the controlled entity. As of the Effective Date of this Agreement, the following entities are MPAA member company affiliates:

- Disney Enterprises, Inc., entities controlled, directly or indirectly, by Disney Enterprises, Inc. (together, "<u>Disney Enterprises Entities</u>"), and such other entities as have authorized the foregoing to send Copyright Alerts on their behalf with respect to works distributed by Disney Enterprises Entities.
- Fox Entertainment Group, Inc., entities controlled, directly or indirectly, by Fox Entertainment Group, Inc., (together, "<u>Fox Entertainment Entities</u>") and such other entities as have authorized the foregoing to send Copyright Alerts on their behalf with respect to works distributed by Fox Entertainment Entities.
- NBCUniversal Media LLC, entities controlled, directly or indirectly, by NBCUniversal Media LLC, (together, "<u>NBCU Entities</u>") and such other entities as have authorized the foregoing to send Copyright Alerts on their behalf with respect to works distributed by NBCU Entities.
- Sony Pictures Entertainment Inc., entities controlled, directly or indirectly, by Sony Pictures Entertainment Inc. (together, "<u>SPE Entities</u>"), and such other entities as have authorized the foregoing to send Copyright Alerts on their behalf with respect to works distributed by SPE Entities.
- Turner Entertainment Networks, Inc., entities controlled, directly or indirectly, by Turner Entertainment Networks, Inc. (together, "<u>Turner Entities</u>"), and such other entities as have authorized the foregoing to send Copyright Alerts on their behalf with respect to works distributed by Turner Entities.
- Viacom, Inc., entities controlled, directly or indirectly, by Viacom, Inc. (together, "<u>Viacom Entities</u>"), and such other entities as have authorized the foregoing to send notices on their behalf with respect to works distributed by Viacom Entities.
- Walt Disney Studios Motion Pictures, entities controlled, directly or indirectly, by Walt Disney Studios Motion Pictures (together, "<u>Walt Disney Studios Entities</u>"), and such other entities as have authorized the foregoing to send notices on their behalf with respect to works distributed by Walt Disney Studios Entities.
- Warner Bros. Entertainment Inc., entities controlled, directly or indirectly, by Warner Bros. Entertainment Inc. (together, "<u>Warner Bros. Entities</u>"), and such other entities as have authorized the foregoing to send notices on their behalf with respect to works distributed by Warner Bros. Entities.

CONFIDENTIAL                    37

# DX 66

**FAQ's**
**on**
**The Center for Copyright Information**
**And**
**Copyright Alert System**

### 1. How significant is online content theft?

- Content theft is estimated to cost the U.S. economy $58 billion, 373,000 American jobs and $16 billion in lost employee earnings every year, and to cost federal, state and local governments $2.6 billion each year in lost tax revenue. However, data suggests[1] that most users (up to 70%) would stop content theft once alerted that it is occurring, that it is illegal and that there are consequences associated with continuing to engage in it. A new educational center and system of alerts – similar to credit card fraud alerts – will help address this problem. The alerts will let subscribers know when their accounts have been identified for possible content theft, advise subscribers of the serious consequences associated with it, and encourage them to stop it from occurring again.

### 2. What is the Center for Copyright Information?

- The Center for Copyright Information ("CCI") will focus on educating subscribers about the importance of copyright protection and lawful ways to obtain movies and music online. The Center will also help to develop and confirm "best-practices" for a new system of progressive Copyright Alerts, similar to credit card fraud alerts, which will alert subscribers when potential content theft is identified on their Internet accounts. The Center is being established jointly by the film, music, and television industries in partnership with Internet Service Providers (ISPs) and will benefit from guidance by consumer advocates and technical experts serving on its advisory committee or providing other expert services.

### 3. What are Copyright Alerts?

- Copyright Alerts are part of a thoughtful and effective system to educate subscribers about copyright, advise them about the consequences of inadvertent or intentional online content theft, and deter those who receive repeated alerts from allowing their accounts to be used for content theft. Alerts will be progressive, in the sense that successive alerts will reinforce the seriousness of content theft and

---

[1] This data represents of an average of the following surveys: Ifop. "*Les Français et le Téléchargement Illégal*", snep (2009): France; Synovate. "*Movie File Sharing Amongst Young New Zealanders*", NZFACT (2009): NZ; Norstat A.S. "*Survey Regarding Norwegians' Music Habits on the Internet*", Ifpi and GramArt (2009): Norway; and Entertainment Media Research. "*2009 Digital Entertainment Survey*", Wiggin (2009): UK

DEPOSITION
EXHIBIT
27

CONFIDENTIAL

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Exhibit

DX 66

COX_BMG00003720

COX_SONY_00006140
**DX0066-0001**

inform the recipient how to address the activity that is precipitating the alerts. For users who repeatedly fail to respond to alerts, the alerts will inform them of steps that will be taken to mitigate the ongoing content theft.

- Under this system, an ISP, in response to a notice from a copyright holder, will send an alert to a subscriber notifying the subscriber that his/her account may have been misused for online content theft, that content theft is illegal and a violation of the Terms of Service (TOS), Acceptable Use Policy (AUP) or other policies of their ISP (hereinafter referred to as "published policies"), and that consequences could result from any such conduct. Today, when fraud is detected on a consumer's credit card account, the credit card company notifies the consumer by an email, a text message or a phone call. These alerts are intended to be similar to credit card fraud alerts.

- Subsequent alerts may include notifications in the form of pop-ups or redirection to a special page displaying the alert. Failure to respond to these alerts will lead to additional steps designed to ensure that the account comes into compliance. These steps, referred to as "Mitigation Measures," might include, for example: temporary reductions of Internet speeds, redirection to a landing page until the subscriber contacts the ISP to discuss the matter or reviews and responds to some educational information about copyright, or other measures that the ISP may deem necessary to help resolve the matter. These steps will only be taken after multiple alerts and a failure by the subscriber to respond. This system consists of at least five alerts.

- Data suggests that most users would stop content theft once alerted that it is occurring, that it is illegal and that there are consequences associated with continuing to engage in it. We anticipate that very few subscribers, after having received multiple alerts, will persist (or allow others to persist) in the content theft.

### 4. Why do subscribers need to get Copyright Alerts about alleged online content theft?

- Subscribers may not know that their Internet account is being used for possibly illegal purposes that could expose them to legal liability and other consequences under published policies of the ISP. Online content theft also can expose a family's home network and the computers that are connected to it to dangerous viruses, spyware and identity theft. Today, many ISPs forward notifications to their subscribers that they receive from content owners about alleged content theft – generally by email. Until now, however, there has not been a common framework of "best practices" for effectively alerting subscribers, protecting copyrighted content and promoting access to legal online content.

  Also, many Internet subscribers may be unfamiliar with the concept of copyright and the consequences of content theft. Subscribers may not be aware that family

CONFIDENTIAL

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

members and others who have access to their Internet accounts may be engaged in content theft; for example, a parent or caregiver may not know that a child is illegally downloading music and movies.  Also, some subscribers may not realize that their home network is insufficiently secured and that, for example, unauthorized individuals may be using their wireless network to engage in content theft.  In some cases, subscribers may know that content theft is illegal and a violation of published policies, but believe they are immune from any exposure or consequences.  The system of Copyright Alerts is intended to ensure that subscribers get this critical information in easily understandable ways with clear guidance on what they can do to address the problem.

5.  **What happens the first time a subscriber's account appears to have been used for online content theft?**

- An ISP, in response to a notice from a copyright holder, will send an alert to a subscriber notifying the subscriber that his/her account may have been misused for online content theft, that content theft is illegal and a violation of the published policies of the ISP, and that consequences could result from any such conduct.

6.  **What happens if the subscriber's account again appears to have been used for online content theft?**

- If the alleged content theft persists despite the receipt of the first alert, the subscriber may get a second similar alert that will underscore the educational messages, or the ISP may – in its discretion – proceed to the next alert.

7.  **What happens if the subscriber's account again appears to have been used for online content theft after being sent educational alerts?**

- If the alleged content theft persists after educational alerts are sent, then an additional alert will be sent which will include a conspicuous mechanism (such as a click-through pop-up notice, landing page, or other mechanism) asking the subscriber to acknowledge receipt of the alert.  This is designed to ensure that the subscriber is aware of the copyright alert – and reminds the subscriber that content theft conducted through their account could lead to consequences under the law and published policies.

- If, after this alert asking for acknowledgment, the subscriber's account again appears to have been used in connection with online content theft, the subscriber will be sent yet another alert that again will require the subscriber to acknowledge receipt.

8. **What if after acknowledging receipt of these Copyright Alerts (as many as four at this point) the subscriber's account still appears to be engaged in online content theft?**

CONFIDENTIAL

COX_BMG00003722

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

COX_SONY_00006142

**DX0066-0003**

- If, after these educational and acknowledgment alerts, the subscriber's account still appears to be engaged in content theft, the ISP will send yet another alert. At this time, the ISP may take one of several steps, referred to as "Mitigation Measures" reasonably calculated to stop future content theft. These Mitigation Measures may include, for example: temporary reductions of Internet speeds, redirection to a landing page until the subscriber contacts the ISP to discuss the matter or reviews and responds to some educational information about copyright, or other measures (as specified in published policies) that the ISP may deem necessary to help resolve the matter. ISPs are not required to impose any Mitigation Measure which would disable or be reasonably likely to disable the subscriber's voice telephone service (including the ability to call 911), e-mail account, or any security or health service (such as home security or medical monitoring). The ISP may also waive the Mitigation Measure. Any and all steps an ISP may take will be specified by their published policies.

### 9. What if after this alert, the subscriber's account appears to persist in online content theft?

- If, after this latest alert, the subscriber's account still appears to be engaged in content theft, the ISP will send yet another alert and will implement a Mitigation Measure as described above. We anticipate that very few subscribers, after repeated alerts, will persist (or allow others to persist) in the content theft.

### 10. Is termination of the subscriber's account part of this program?

- No. This alert system does not, in any circumstance, require the ISP to terminate a subscriber account. This alert system is intended to notify and educate the subscriber. However, section 512 of the Digital Millennium Copyright Act requires that the ISPs have in place a termination policy for repeat copyright infringers as a condition of availing themselves of the Act's "safe harbor" provision. This is why subscribers have a right to know if it has been alleged that content theft is taking place on their accounts, and a right to respond. As provided under current law, copyright owners may also seek remedies directly against the owner of an Internet account based on evidence they may collect. Because the vast majority of subscribers observe copyright laws as a matter of course, and the participating ISPs and content companies believe that even more will do so if the Copyright Alert system is effective, it is reasonable to expect that very few subscribers will ever face this situation.

### 11. What if the subscriber believes that he or she is not engaged in copyright infringement?

- Before a Mitigation Measure is imposed, a subscriber may request independent review. To request an independent review, there is a $35 filing fee, which is

CONFIDENTIAL

COX_BMG00003723

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

COX_SONY_00006143

**DX0066-0004**

waivable. This is a non-exclusive procedure, and any subscriber may choose to challenge any action in a court of law.

**12. How does Independent Review work?**

- A qualified, independent entity, separate from the Center for Copyright Information, will be engaged to establish and operate the Independent Review mechanism. Under this system, before a Mitigation Measure is imposed, a subscriber may request independent review to invalidate the alert and avoid any Mitigation Measure on the basis that the online activity in question is lawful (e.g. protected by fair use or authorized by the owner of the copyrighted material) or that the subscriber's account was identified in error. This is a non-exclusive alternative, and subscribers retain the right to challenge any action in a court of law. An independent reviewer will have access to expert advice on copyright law.

**13. How is this different than what is done today to advise consumers?**

- Many ISPs currently forward to subscribers notifications that they receive from content owners about alleged content theft – generally by email. Until now, however, there has not been a common framework of "best practices" for effectively alerting subscribers, protecting copyrighted content and promoting access to legal online content. A shared system of best practices will help to better ensure that a subscriber fully understands allegations of content theft and what they can do to address it.

- The Center for Copyright Information provides a new consumer-focused resource for copyright-related education.

- This system also provides a first-of-its-kind independent review alternative for subscribers to seek review of allegations by content owners of content theft using the Internet subscriber's account.

**14. How is this different than international examples such as "Three Strikes" laws?**

- Contrary to some press reports, this program is unlike so-called "three strikes" as it creates no new laws or formal legal procedures, nor does this system require account suspension or termination. Rather, it is a voluntary cooperative effort among ISPs and leading U.S. content providers. Neither the copyright owners nor the ISPs will take any new actions that are not already authorized under existing law. The goal is to enhance awareness and deter content theft through education and constructive communications, and direct subscribers to legitimate sources of content.

**15. How do ISPs and content companies know who downloaded a pirated movie or song?**

CONFIDENTIAL

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

COX_BMG00003724

COX_SONY_00006144

**DX0066-0005**

- Content companies don't know who downloaded and shared a pirated movie or song. When files are distributed on the Internet over peer-to-peer (P2P) networks, the IP address associated with the subscriber's account is visible by design to other users on the network. Leading technology companies have developed state-of-the-art software that participates in these P2P networks to identify pirated film, TV and music content and the IP addresses associated with the illegal distribution of that content. Content owners provide these IP addresses to ISPs along with additional information about the uploaded file. The ISP is then able to associate the IP address with the account on their network, and can forward the alert to that subscriber. It is important to note that ISPs never provide any personally identifiable information to copyright holders – as part of the alert process or for any other reason -- without a properly issued subpoena or court order.

### 16. How will this system of Copyright Alerts change the online experience for most Internet subscribers?

- Since most subscribers do not download or upload pirated content, the vast majority of subscribers likely will never see a Copyright Alert. However, when subscribers' accounts have been identified as being involved in content theft, subscribers are likely to receive one or more Copyright Alerts.

### 17. Is the purpose of this program to punish subscribers who download pirated movies and music?

- No. The purpose is to educate subscribers about copyright and the many sources of legal content, as well as to help them guard against the risks and consequences associated with content theft. When subscribers repeatedly fail to respond to alerts, ISPs will impose Mitigation Measures, the purpose of which is to educate and stop the alleged content theft in question, not to punish. No ISP wants to lose a customer or see a customer face legal trouble based on a misunderstanding, so the alert system provides every opportunity to set the record straight. As noted above, only a small fraction of all subscribers are likely to ever face a Mitigation Measure due to their online activity – they are far more likely to address the problem based on the initial alerts. It has been found that notification programs are most effective when subscribers truly understand that there are consequences associated with content theft. The number-one goal of content owners and ISPs is to encourage subscribers to enjoy all the legal content they want from legitimate sources.

### 18. Is there a blacklist?

- No. At no time will ISPs share subscribers' personal information (name, address, etc.) with anyone else (including the content owners or other ISPs) except pursuant to a properly issued subpoena or court order. All information provided to copyright holders is in a form that guarantees anonymity. The Center for

CONFIDENTIAL

COX_BMG00003725

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

COX_SONY_00006145

DX0066-0006

Copyright Information will work very closely with privacy and consumer advocates to enhance methods of protecting subscriber privacy every step of the way.

**19. Isn't this just about ISPs trying to reduce online traffic?**

- No. The fastest-growing segment of web traffic is legal online content that subscribers will be encouraged to use. Access to lawful content services is expanding rapidly, and ISPs are seeing more households add broadband service and TV service at the same time. According to Nielsen, the number of households with both a broadband connection and a home television subscription increased in the last year from 61% to 66% of households.

**20. Isn't content theft driven by the fact that consumers can't get legal movies and music online?**

- Vastly more music, movies, and TV shows are available online from legitimate sources than ever before. MOG, Pandora, Rhapsody, Amazon MP3, Napster and Vevo are just a few examples of growing businesses delivering music to consumers digitally. Apple's iTunes is virtually ubiquitous. Cable, phone and satellite companies are offering "TV Everywhere"-type services. Web based services from Netflix, Amazon and Apple TV are booming – in fact, Netflix is now one of the largest video distributors in America today with more than 20 million customers, and it offers nearly 20,000 streaming content titles to consumers. The boom in smartphones and tablets has put digital music, TV and film in the pocket of most Americans. There are many legitimate options for consumers who want their movies, TV shows and music online and on the go.

**21. Does this system require mandatory filtering of web traffic?**

- No. The process of identifying potential online content theft is described above. It is in place and has been the basis for consumer notices for several years. As has been the case with earlier notices, alerts are triggered only when an ISP receives a notice from a copyright holder or its representative. There is no filtering or monitoring of any user accounts. There is no caching of "click data." The ISP matches the IP address identified by the copyright holder with a subscriber account, and then forwards a Copyright Alert to the subscriber account as described above. No ISPs will share any personally identifiable information with another ISP or with a copyright owner, unless required to do so by properly issued subpoenas or court orders.

**22. What are the risks of peer-to-peer file sharing ("P2P")?**

CONFIDENTIAL

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- In addition to exposure from violating copyright law and published policies, viruses, malware and spyware described above, the use of P2P applications can expose a consumer's bank account numbers, tax returns, and sensitive health information to other P2P users.

CONFIDENTIAL

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

COX_BMG00003727

COX_SONY_00006147

**DX0066-0008**