**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT, *et al.*,     ) | |
|     ) | |
| *Plaintiffs*,     ) | |
|     ) | Case No. 1:18-cv-950-LO-JFA |
| v.     ) | Hon. Liam O'Grady |
|     ) | |
| COX COMMUNICATIONS, INC., *et al.*,     ) | |
|     ) | |
| *Defendants*.     ) | |
|     ) | |

## MEMORANDUM OPINION & ORDER

Before the Court are Defendants Cox Communications, Inc. and CoxCom, LLC's

("Defendants" or "Cox") post-trial motions: Renewed Motion for Judgment as a Matter of Law

("Renewed JMOL" or "Rule 50 Motion") (Dkt. 681); and Motion for Remittitur or, in the

Alternative, a New Trial Under Federal Rule of Civil Procedure 59(a) ("Rule 59 Motion") (Dkt.

683).[1] Both post-trial motions are fully briefed, and the Court dispensed with oral argument, as

it would not aid in the decisional process. The Court first will address the issues in the Renewed

JMOL before proceeding to Cox's Rule 59 Motion, which challenges the jury's statutory

damages award.

---

[1] The Court issued a ruling on the Parties' twenty-one motions *in limine* on November 19, 2019, indicating an opinion to follow to address certain matters in further detail. Dkt. 590. Considering evidentiary rulings from the bench during trial proceedings, as well as the content of the discussion herein, said *in limine* matters are sufficiently addressed and no longer require separate analysis.

## I.   BACKGROUND [2]

On July 31, 2018, over fifty members of the music industry ("Plaintiffs" or "Sony"),

including groups under Sony, Universal, and Warner, filed this action against Defendants.[3] The

plaintiff group comprises sixteen Record Company Plaintiffs who collectively produce,

manufacture, distribute, sell, and license sound recordings. The group also contains thirty-seven

Publisher Plaintiffs asserting protected musical compositions, which they acquire, license, and

otherwise commercially exploit. Plaintiffs own or control exclusive rights to the copyrights to

some of the most famous music, both classic and contemporary. Their claims are for vicarious

liability and contributory infringement arising out of alleged copyright infringement by

Defendants' subscribers.[4] While the exact number fluctuated before trial, the total number of

---

[2] The facts herein are consistent with the trial record and based largely on Plaintiffs' Amended
Complaint (Dkt. 136), Defendants' Answer (Dkt. 21), Plaintiffs' Summary Judgment brief (Dkt.
325) and Defendants' Response (Dkt. 394), and Defendants' Summary Judgment brief (Dkt.
330) and Plaintiffs' Response (Dkt. 392).

[3] Plaintiffs include, alphabetically: Arista Music; Arista Records, LLC; Atlantic Recording
Corporation; Bad Boy Records LLC; Capitol Records, LLC; Colgems-EMI Music Inc.; Cotillion
Music, Inc.; Elektra Entertainment Group Inc.; EMI Al Gallico Music Corp.; EMI Algee Music
Corp.; EMI April Music Inc.; EMI Blackwood Music Inc.; EMI Consortium Music Publishing
Inc. d/b/a EMI Full Keel Music; EMI Consortium Songs and d/b/a EMI Longitude Music; EMI
Feist Catalog Inc.; EMI Miller Catalog Inc.; EMI Mills Music, Inc.; EMI Unart Catalog Inc.;
EMI U Catalog Inc.; Fueled by Ramen LLC; Intersong USA, Inc.; Jobete Music Co. Inc.; LaFace
Records LLC; Music Corporation of America Inc. d/b/a Universal Music Corp.; Polygram
Publishing, Inc.; Provident Label Group, LLC; Rightsong Music Inc.; Roadrunner Records, Inc.;
Screen Gems-EMI Music Inc.; Songs of Universal, Inc.; Sony Music Entertainment (SME);
Sony Music Entertainment US Latin; Sony/ATV Music Publishing LLC; Stone Agate Music
Stone Diamond Music Corp.; Unichappell Music Inc.; Universal Music-MGB NA LLC;
Universal Music – Z Tunes LLC; Universal Music Corp.; Universal Music Publishing Inc.;
Universal Music Publishing AB; Universal Music Publishing, Ltd; Universal Music Publishing
MGB Ltd.; Universal/Island Music Limited; Universal/MCA Music Publishing Pty. Ltd.; UMG
Recordings, Inc.; W.C.M. Music Corp. f/k/a W.B.M. Music Corp.; Warner Chappell Music, Inc.
f/k/a Warner/Chappell Music, Inc.; Warner Records, Inc. f/k/a W.B.M. Music Corp.; Warner-
Tamerlane Publishing Corp.; WB Music Corp.; Volcano Entertainment III, LLC; and Zomba
Recordings LLC.

[4] The Digital Millennium Copyright Act ("DMCA") provides a safe harbor to limit liability for
internet service providers. 17 U.S.C. § 512(a). When various other requirements are met, an ISP
will not be liable for "transmitting, routing, or providing connections for" infringing material.

copyrights presented to the jury—including both musical compositions and sound recordings—was 10,017. The claim period for most Plaintiffs spans approximately twenty-two months from February 1, 2013, to November 26, 2014 ("Claim Period").

Cox is a broadband communications and entertainment company, providing internet, telephone, and home security services; for purposes of this litigation, Cox is an internet service provider ("ISP"). Cox Communications is "a wholly-owned subsidiary of Cox Enterprises, a privately-held, family-owned corporation with $20 billion in annual revenues (2016)." Cox: Cox Communications Fact Sheet, https://newsroom.cox.com/company-overview (last visited May 15, 2020); *see also* Trial Tr. 882:9-12 (Trickey). It is the largest telecom company in the United States, with approximately 20,000 employees serving approximately 6 million customers.

The Recording Industry Association of America ("RIAA") is the Record Company Plaintiffs' trade association. The RIAA engages in a variety of anti-piracy endeavors, including hiring third party vendors to scan the internet for potentially infringing file-sharing activity, such as the anti-piracy company MarkMonitor. MarkMonitor serves over half of the Fortune 100 companies, operating online in an effort to protect brands and content across industries like fashion, technology, entertainment, and pharmaceuticals. Dkt. 325 at 4.

---

*Id.* The ISP is only eligible for this safe harbor if it "has adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." *Id.* at § 512(i)(1)(A). In 2015, this Court held that Cox's repeat infringer policy was inadequate under § 512(i), and thus failed to qualify for the safe harbor. *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 662 (E.D. Va. 2015), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018) ["*BMG I*," *aff'd* "*BMG III*"] [*BMG I, II, III* collectively "*BMG*"]. The Fourth Circuit affirmed in 2018. *Id.* 881 F.3d at 303. As the Claim Period here coincides with the period of ineligibility for Cox's policy, the DMCA safe harbor was not at issue in the instant case and Cox faces these secondary liability claims without qualification.

In this case, MarkMonitor searched for digital files potentially infringing Plaintiffs' copyrights. The alleged infringement occurred on peer-to-peer ("P2P") networks, and the specific claims—while predominantly from BitTorrent—involved four P2P protocols: BitTorrent, Gnutella, eDonkey, and Ares. One aspect of digital infringement on a P2P network is that the pirated files are "perfect digital copies," and there is no loss of quality, as there can be in other forms of piracy. Trial Tr. 277 (Marks). Central to MarkMonitor's evidence-gathering process for these perfect digital copies is a file's cryptographic hash value. A cryptographic hash value ("hash value" or "hash") is an alphanumerical representation of the contents of a file, and two files with the same hash value will almost invariably contain the same content, regardless of when downloaded.[5]

Upon the first instance of encountering a file, MarkMonitor downloaded the full file. It coordinated with Audible Magic, a major content recognition service, in large part by "fingerprinting" technology to identify a file's contents. Audible Magic used the file's fingerprint data to check its reference database for a match; a match generated artist, album, and track data that MarkMonitor then associated with the file's hash value.

Whether encountering a file for the first time or one with a known hash, MarkMonitor engaged in a so-called handshake with the potentially infringing peer. The MarkMonitor software connected with the subscriber to confirm the subscriber was online, running a file sharing program, and downloading or distributing a file, identified by its hash value; the Cox

---

[5] Cox disputes that the hash value "is a representation of a file's contents," claiming there is no evidentiary basis that reported hash values are accurate. Dkt. 394 at 4 (citing Kearney Decl. ¶ 15, Ex. K8; ¶ 25, Ex. K15). The trial record suggests otherwise. Furthermore, the digital files identified by hash value in MarkMonitor's notices of infringement were produced in discovery. *See infra* Part II.B.1, explaining that "in the wild" the hash values will always match, and there is a one in one trillion-trillion chance of the files having different content.

subscribers in suit that engaged in the handshake reported percentages of shared files with

MarkMonitor.[6]  Dkt. 325 at 5-6.  MarkMonitor used this information as "evidence packages" to

generate infringement notices sent to Cox.  In the Claim Period, MarkMonitor sent Cox 163,148

infringement notices.  *Id.* at 7.  The notices included, *inter alia*, the subscriber's IP address, the

specific date and time of the infringing act, the cryptographic hash value, and the P2P protocol

used.

Every Cox subscriber agrees to an Acceptable Use Policy ("AUP") as a condition of

access to Cox's network.  Subscribers relevant to the underlying facts either agreed to the Cox

AUP or the Cox Business AUP.  Both prohibit users from infringing intellectual property,

including copyrights, and allow Cox to suspend or terminate service upon violation of the

agreement.  *See, e.g.*, PX 178 ("Complaints and AUP Violations").  Defendants employed the

Cox Abuse Tracking System ("CATS") to receive and process infringement notices and other

content related to AUP violations and reported abuse of the network.  Specifically, Cox created

the CATS system in the early 2000s to handle customer-facing internet related issues.  Dkt. 394

at 2.  During the Claim Period, CATS implemented a graduated response system to address the

reported infringing activity; the graduated response involved a thirteen-strike policy, or "13-

plus," given that the customer-facing action generally began at the second notice.  The first seven

notices resulted in an email warning to the subscriber's account; the eighth and ninth notices

required the user to click an agreement before accessing the internet again; the tenth and eleventh

would suspend service until the subscriber called Cox for reactivation; the twelfth and thirteenth

notices were also suspensions, though the thirteenth made the user eligible for termination.  The

---

[6] Because of how the peer connections operate, MarkMonitor's technology could not gather
direct evidence of a peer's file sharing activity with any P2P user other than MarkMonitor.

point person overseeing CATS during the Claim Period explained that Cox referred to DMCA as synonymous with copyright infringement. Trial Tr. 1275:5-6 (Zabek; "Q: And by DMCA, you were referring to copyright infringement? A: It was interchangeable as we would speak."). Ultimately, termination was rare.

Cox's Abuse Team, which has been renamed as the Customer Safety Team, managed and operated the CATS system. During the Claim Period, a relatively small Abuse Team had to handle complaints relating to phishing, spam, malware, copyright infringement, among other issues.[7] Trial Tr. 1635:4-10; 1640:8-12 (Sikes Vid. Dep.). It is undisputed that Cox's desire to reduce the volume of calls to the abuse team representatives motivated, at least in part, expanded leniency within its graduated response system. Trial Tr. 1301:20-23 (Zabek Vid. Dep.). Between 2008 and 2010, CATS implementation allowed additional infringement notices against a single account before considering termination of internet service. Trial Tr. 1651:17-19 (Sikes Vid. Dep.).

To control the overall number of complaints or notices it received from certain sources, Cox used hard limits, or caps. Cox raised the cap for RIAA incrementally, eventually holding it at 600 notices per day, though RIAA requested more. *See* PX 234 (requesting the cap be at least 800 or 1000). Internal correspondence at Cox included the abuse team's enthusiasm toward caps, such as one email in reference to hundreds of daily DMCA complaints from Fox: "WE NEED TO CAP THESE SUCKERS!" 1653:6-9 (referencing PX 251, Bates No. COX_SONY_520018). Another email—this one from the head of the Abuse Team—targeted the statute, the Digital Millennium Copyright Act, rather than a particular complainant: "F the

---

[7] In April 2011, Cox reduced the number of technical operations center employees handling abuse complaints from nine to four. Cox rejected multiple requests for additional personnel to handle volume. *See* Trial Tr. 1329-30 (Zabek Vid. Dep.).

dmca!!!" *See* Trial Tr. 1656:6-10 (referencing PX 335, Feb. 19, 2010 email from Jason Zabek). The team remarked, "we told each copyright holder to limit [the notices] or give us money to hire people." Trial Tr. 1656:11-12 (*Id.*).

Plaintiffs brought suit to challenge the CATS procedure and Cox's conduct as it related to Cox subscribers' copyright infringement of Plaintiffs' protected works. The Court denied the Parties' cross summary judgment motions in large part, but established: (1) Plaintiffs owned all of the copyrights in suit within the meaning of the Copyright Act; and (2) Cox had sufficient knowledge of the alleged infringement to satisfy the knowledge element of the contributory infringement claim. The Parties also filed, collectively, nine *Daubert* motions and twenty-one motions *in limine*. The Court ruled on all thirty of these pre-trial motions.[8]

There was a twelve-day jury trial in December 2019, and Defendants moved for judgment as a matter of law at the close of evidence, pursuant to Federal Rule of Civil Procedure 50(a).[9] The Court denied the motion. After deliberation, the jury returned a special verdict that held Cox both vicariously and contributorily liable for willful infringement of all 10,017 claimed works. Plaintiffs elected statutory damages under 17 U.S.C. § 504(c), thus the damages had to fall within the statutory range under § 504(c)(2) for willful infringement of $750-$150,000 per work. The jury awarded Plaintiffs $99,830.29 for each of the works in suit for a total of $1 billion in statutory damages. Cox now moves the Court under both Rule 50 and Rule 59 for post-verdict relief.

---

[8] Based on Cox's opening statement to the jury, it became clear that Defendants would frame their case much more broadly than anticipated. As such, and upon Sony's oral motion to reconsider, the Court vacated its conditional grant of Defendants' Motion *in limine* No. 9. Dkt. 626.

[9] Defendants renewed this motion post-verdict, pursuant to Fed. R. Civ. P. 50(b); that motion is now before the Court.

## II.   RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. Legal Standard

Federal Rule of Civil Procedure 50(a) allows a motion for judgment as a matter of law if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). A party may renew its motion under Rule 50(b) after the jury verdict. "On a renewed motion for judgment as a matter of law, a court must affirm a verdict '[i]f, viewing the facts in the light most favorable to the non-moving party, there is sufficient evidence for a reasonable jury to have found in the non-moving party's favor.' *First Union Commercial Corp. v. GATX Capital Corp.*, 411 F.3d 551, 556 (4th Cir. 2005) (alteration omitted). If, by contrast, 'the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party,' it must grant the motion." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 969 (E.D. Va. 2016), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018) ["*BMG II*"] (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)).

"In denying a summary judgment motion, the district court . . . 'decides only one thing—that the case should go to trial.'" *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1236 (4th Cir. 1995) (quoting *Switzerland Cheese Ass'n, Inc. v. E. Horne's Market, Inc.*, 385 U.S. 23, 25 (1966)) (additional citation omitted). As a general matter, then, "bifurcating summary judgment decisions based on law and fact is unnecessary because a party that believes the district court committed legal or factual error in denying summary judgment has adequate remedies," such as judgment as a matter of law under Rule 50 and subsequent appellate review. *Chesapeake Paper*, 51 F.3d at 1236 (citing *Watson v. Amedco Steel*, 29 F.3d 274, 279 (7th Cir. 1994)). A district court's "judgment after a full trial is superior to a pretrial decision because the factfinder's verdict depends on credibility assessments that a pretrial paper record

8

simply cannot allow." *Chesapeake Paper*, 51 F.3d at 1236 (citing *Johnson Intn'l Co. v. Jackson Nat'l Life Ins. Co.*, 19 F.3d 431, 435 (8th Cir. 1994)).

## B. Discussion

Defendants' Renewed JMOL reiterates, in large part, the same claims from their Motion for Summary Judgment (Dkt. 328), which was denied (Dkt. 610).[10] Cox claims the evidence at trial was insufficient regarding, in modified order: (I) Direct Infringement; (II) Infringement by Cox Business Subscribers; (III) Vicarious Liability; (IV) Contributory Liability; and (V) Statutory Damages per Work. The Court examines each in turn.

### 1. Direct Infringement

An ISP is not generally a direct infringer. But, "[w]hen a widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor of the copying device for secondary liability on a theory of contributory or vicarious infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 929–30 (2005) (citing *In re Aimster Copyright Litigation*, 334 F.3d 643, 645-46 (7th Cir. 2003)). Indeed, an ISP allows transmission of data and information, and "is itself totally indifferent to the material's content, . . . [but] [w]ith additional facts, of course, an ISP could become *indirectly* liable." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004) (emphasis original). These "additional facts" supporting indirect liability are those at issue *infra* Part II.B.2 for vicarious liability and contributory infringement. Here, Cox argues that the requisite direct

---

[10] As such, the Court is familiar with the Parties' arguments surrounding the major issues in Defendants' brief, as well as the relevant evidentiary requirements, and will recite them as needed for discussion herein.

infringement by its subscribers is not sufficiently proven and, therefore, cannot support either type of secondary infringement claim.

To establish direct infringement, a plaintiff must prove: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Id.* at 549; *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). In the instant case, the Court found that Plaintiffs demonstrated ownership of valid copyrights at summary judgment; consequently, the second element—copying of original works—was the only direct infringement question for the jury. Infringement in this case involved two of the exclusive rights granted to copyright holders in section 106 of the Copyright Act: the distribution right; and the reproduction right. Cox argues Sony failed to provide evidence of either.

As a general matter, before addressing specific exclusive rights, Defendants attack the sufficiency of MarkMonitor evidence. The Court deemed the MarkMonitor evidence admissible pre-trial, and the jury subsequently heard and saw extensive evidence related to MarkMonitor's practices. Cox is adamant that MarkMonitor's procedures are inadequate to show infringement, and specifically that the failure to download a full infringing file before generating any infringement notice is fatal to Plaintiffs' allegations. As it is undisputed that MarkMonitor only downloaded a full file once, when it encountered that file's cryptographic hash value for the first time, Defendants contend that the majority of MarkMonitor's evidence packages are—in several ways—deficient to show direct infringement. This attack is largely the same as it was both before and at trial, and the Court is not compelled to disturb the evidence or the jury's verdict.

The method of infringement in this case poses several challenges to the production of direct evidence. Expert testimony explained that P2P networks enable enormous volumes of infringements. "While piracy did happen and has been a problem forever – you know, when

people did discs . . . did copyright CDs, that just wasn't quite the same thing." Trial Tr. 1750:19-21 (Lehr). What is more, policing infringing conduct is significantly limited in scope, as peer-to-peer activity "is kind of like piracy on steroids." Trial Tr. 1750:18 (Lehr). As infringing digital files in the P2P context are fundamentally different from books and CDs and the like, Cox has not shown that Plaintiffs' evidence packages and cryptographic hash values are invalid or inadequate.

A reasonable jury could hold that the MarkMonitor evidence established direct infringement of Plaintiffs' works. To begin, "[c]ourts have routinely rejected the argument that evidence of infringement gathered by a copyright owner's investigative agent cannot be used to establish infringement." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 664 (E.D. Va. 2015), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018) ["*BMG I*"] (collecting cases). Further, a plaintiff "may establish direct infringement using circumstantial evidence that gives rise to an inference that Cox account holders or other authorized users accessed its service to directly infringe." *Id.* at 663 (citing *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1225 (D. Minn. 2008) ("Plaintiffs are free to employ circumstantial evidence to attempt to prove [a violation].") (alteration original)).

As explained *supra* Part I, MarkMonitor's approach embraces the reliability of hash values as identification markers. Cox maintains that hash values are not sufficient to prove infringement of the file, but, as Plaintiffs' expert said, "[t]here is about a one in a trillion-trillion chance mathematically as an abstract possibility that two files with [] different contents could generate the same hash. That's 1 followed by 24 zeroes." Trial Tr. 507:20-23 (Frederiksen-Cross). Hash values can be effective evidence—direct or circumstantial, depending on the application—in the P2P context.

11

a. The Distribution Right

The Copyright Act defines the exclusive right to distribute as the right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). The Fourth Circuit held, when considering unauthorized copying of a microfiche among library collections, that when an individual or entity "makes the work available to the borrowing or browsing public, it has completed all the steps necessary for distribution to the public." *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997). Courts have struggled to define the scope of the holding in *Hotaling*. But this Court has held, and now maintains:

> *Hotaling* did not announce a rule of general applicability, but instead articulated a principle that applies only in cases where it is impossible for a copyright owner to produce proof of actual distribution. *See [Atl. Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 982 (D. Ariz. 2008)] (explaining *Hotaling* as reaching instances where proof of use by the public was impossible to produce); *Arista Records, Inc. v. MP3Board, Inc.*, No. 00 Civ. 4660, 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002) ("While a copyright holder may not be required to prove particular instances of use by the public when the proof is impossible to produce because the infringer has not kept records of public use, *see Hotaling*, 118 F.3d at 204, in the present case there has been no showing that the record companies did not have access to such data.").

*BMG I*, 149 F. Supp. 3d at 666.

*Hotaling* has limited applicability in the instant case because it is possible to collect evidence of infringing activity, even if only for a fraction of the actual infringement occurring on BitTorrent and other P2P networks. Even a court that expressly declined to adopt a "deemed-disseminated theory" from *Hotaling* held that direct proof of dissemination is unnecessary to bring a claim under the Copyright Act. "Plaintiffs are free to employ circumstantial evidence . . . Overall, it is apparent that implementation of Congress's intent through a plain meaning interpretation of § 106(3) will not leave copyright holders without recourse when infringement occurs over a peer-to-peer network." *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d at 1225.

12

Cox argues that the evidence can only support the conclusion that Plaintiffs' works were available for sharing, not actually disseminated. Emphasizing that *Hotaling* is not directly applicable to these facts, Defendants reject the notion that either direct or indirect evidence is sufficient in the record. Testimony from Ms. Frederiksen-Cross explained MarkMonitor's P2P interactions, and how, as Cox says, the evidence conveyed what the peer had available to share rather than what was in fact shared.

Plaintiffs assert the validity of the MarkMonitor evidence as it relates to the nature of direct infringement on P2P networks. The four P2P protocols—BitTorrent, Ares, Gnutella, and eDonkey—at issue in this case have "this notion of exchange, that it's two peers exchanging content." Trial Tr. 488:13-14 (Frederiksen-Cross). They "are all designed to prioritize exchanges with peers that are, are downloading to you . . . if you're not also uploading, the tit-for-tat system kind of puts you at the back of the line." Trial Tr. 488:2-9 (Frederiksen-Cross). The testimony gave the jury no reason to "think [] that there is any lack of proof that the Cox clients were participating in these file sharing networks and were providing content that based on its hash identification is plaintiffs' content." Trial Tr. 487:2-5 (Frederiksen-Cross). Cox's expert confirmed, "[i]n the BitTorrent protocol, any participating peer will generally be downloading or retrieving pieces of the file, as well as providing." Trial Tr. 2364:20-22 (quoting deposition).

Further, over ninety percent of the infringement notices in suit reference allegedly infringing conduct on BitTorrent. *See* PX 11 (Plaintiffs_00286431). Plaintiffs' expert Dr. William Lehr cited what he called a fairly comprehensive report, QUANTIFYING GLOBAL TRANSFERS OF COPYRIGHTED CONTENT USING BITTORRENT, finding that "only .55 percent . . . about half a percent of the content in BitTorrent is not copyright infringing and potentially legitimate." Trial Tr. 1748:10-13 (Lehr). Out of 12,500 torrents analyzed in that study, only two

13

files offered non-infringing content.[11]  Trial Tr. 1750:1-4 (Lehr).  Peer users in BitTorrent engaged with MarkMonitor, offering infringing files—as indicated by hash value—in an environment where approximately 99.45% of the content is pirated.  In other words, the P2P protocols themselves provided overwhelming circumstantial evidence that comfortably supports direct infringement liability from distribution alone, and a reasonable jury could find as much.

    b.  <u>The Reproduction Right</u>

       Much of the reasoning regarding the distribution right also applies to reproduction. Cox's core argument against infringement of the reproduction right is that Plaintiff failed to show where the Cox subscriber first obtained the allegedly infringing file.  The Cox subscribers could have purchased Plaintiffs' works legally on iTunes or Amazon, Defendants say, and then created torrents and shared on a P2P network thereafter.  Ms. Frederiksen-Cross rejected this notion as very unlikely, though Cox contends she could only speak to a small percentage of the evidence.  But the argument that alleged infringers bought a lawful copy of a song to share via a torrent file *is* unsupported.  Where Defendants speculate as to the source of the P2P files, Plaintiffs produced evidence to support illegitimate downloads by Cox subscribers.

       Defendants heard—and failed to disprove—evidence from Dr. Lehr that over 99% of P2P content is pirated.  What is more, Cox's abuse team knew that "99% of DMCA violations is from people using P2P on purpose and not Trojan activity," and did not state or suggest that those P2P infringement notices were erroneous.  PX 264 at 1 (Aug. 4, 2010 email from Jason Zabek to abuse team members).  The head of Cox's abuse team said in an email, "Bittorrent is used for one thing only... and I would know. ;-)" PX 318.  Indeed, the evidence indicated that all Cox subscribers in suit were *probably* distributing and copying, but for fifteen percent of them, they

---

[11] This does not speak to the other P2P platforms; the BitTorrent data is most relevant and available.

*were* doing both. The data underlying the infringement notices for those fifteen percent showed an increase over time from less than the full file to 100% of the file. For these users, it was "a fact that they were downloading copies." Trial Tr. 487:19-20. Cox knew that "Bittorrent [was] used for one thing only..." and those peer downloads were not from iTunes or Amazon Music. [12]

Put another way, the circumstantial evidence of reproduction against Cox users remains strong, and for about fifteen percent of instances the evidence is direct and even more compelling. Cox characterizes this as *limiting* all cognizable infringing conduct to the fifteen percent, which is contrary to the record. Dkt. 682 at 24-25. Cox's position turns a blind eye to the evidence; the Court cannot do the same. There is sufficient evidence to uphold the jury's finding.

### 2. *Secondary Liability for Copyright Infringement*

#### a. Infringement by Cox Business Subscribers

Defendants' motion repeats the argument set forth at summary judgment: Cox Business subscribers cannot support claims of vicarious liability or contributory infringement against Cox. The Court rejected these arguments at summary judgment, and declines to reconsider them in

---

[12] A guy walked into a bar, and then the Parties' jokes diverged. The Court attempts to clarify an analogy from trial, as both Parties perpetuate it in their briefs, and in different ways. Cox argued that music files might be bought lawfully from a vendor and *then* added to BitTorrent to disseminate unlawfully. To dispute that, Ms. Frederiksen-Cross used an analogy for the P2P network: "it's kind of like saying you walk into a bar and there's a guy there with a beer in his hand. Where did he get it? Well, he probably bought it at the bar." Trial Tr. 485:5-7 (Frederiksen-Cross). Ms. Frederiksen-Cross simply meant that, just as we know bars distribute drinks, we know P2P networks distribute infringing content – over 99% of the time. In other words, just like transferring a file from iTunes to BitTorrent, it is highly unlikely that the guy bought his beer at a store or a different bar and *then* came to this bar to drink it. Cox, however, reinterprets the bar setting altogether, asking the Court to ignore the evidence of overwhelming infringing activity. Essentially, Cox proffers that the evidence of 99% infringing activity on BitTorrent does not give Sony any favorable presumption of infringement: "[i]f Plaintiffs want to claim that some of them are drinking unlawfully obtained beer, it is Plaintiffs' burden to prove which of them did." Dkt. 682 at 25 n.15. Cox's suggestion clearly cannot stand.

great depth here.  As an overall matter, for both vicarious liability and contributory infringement, the law does not discriminate between residential and business subscribers the way that Cox contends.  While *Cobbler Nevada, LLC v. Gonzalez* is a non-binding case, the Court maintains that Cox misapplies it to the underlying facts.  901 F.3d 1142 (9th Cir. 2018); *see* Am. Mem. Op. & Order, ECF No. 610 at 21-26.

A reasonable jury could find vicarious liability on these facts because, for the reasons stated *infra* Part II.B.2.b, Cox received direct financial benefit from its Cox Business subscribers. Further, Cox had the right and ability to terminate both business subscribers and individual subscribers alike.  The first numbered provision of the Cox Business Acceptable Use Policy ("AUP") addresses "Illegal or Infringing Activity," clearly stating "[c]ustomer may also not use the Services in a manner that infringes on the copyright, trademark, moral rights, patent, rights of privacy, rights of publicity or any other intellectual property right of any third party."  PX 178 at 1.  Further, the Cox Business AUP states, "[i]f Cox Business receives a complaint against Customer or believes there is a violation of this AUP, Cox Business *will* investigate and if appropriate, inform Customer of the complaint." [13]  *Id.* at 9 (emphasis added).  Where parties fail to resolve certain issues under the AUP, "Cox Business may suspend the Services."  *Id.*  The Cox Business AUP contemplates both suspension and termination, as it includes a disclaimer: "Cox Business is not liable for suspension or termination of Services arising from an alleged or actual violation of this AUP."  *Id.*  Cox's right and ability to terminate is well-supported in the record.

Moreover, the evidence supports a reasonable finding that there was contributory infringement with respect to business subscribers.  At summary judgment, the Court found that

---

[13] This response is Cox Business' baseline policy, independent of any agreements with RIAA and MarkMonitor to relay infringement notices.

Sony satisfied the knowledge prong of the contributory infringement claim. There is nothing to disturb that holding post-trial, as the infringement notices included sufficient non-generalized information such that "the defendant could *do* something about [each one]." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 311 (4th Cir. 2018) ["*BMG III*"] (emphasis original). Even if the business subscriber only acts as the conduit to the specific infringing end-user, the Cox Business AUP anticipates that and should be enforced as such. *See, e.g.*, PX 178 at 1 ("This Acceptable Use Policy [] applies to all Cox Business Internet-related services, including without limitation services provided through WiFi [].").   Indeed, the fact that businesses agree to accept varying levels of risk of liability does not *ipso facto* weaken Plaintiffs' copyright protections or render them less enforceable.  The material contribution element of contributory liability is supported for the reasons stated in relation to all subscribers. *See infra* Part II.B.2.c.

   b.  Vicarious Liability

   "[V]icarious liability holds a defendant accountable for third-party infringement if he '(1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited copyrighted materials.'" *BMG I*, 149 F. Supp. 3d at 673 (quoting *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002)). Cox argues that the instant record does not support either element of Sony's vicarious liability claim.

   The jury found Cox liable on both elements, and there is sufficient evidence in the record to support that finding.  The right and ability to supervise the infringing activity is supported, as Cox had both a contractual and actual ability to stop or limit ongoing infringement by modifying or terminating an account.  Trial Tr. 886:2-888:25 (Trickey) (explaining the obligatory Acceptable Use Policy for Cox's high-speed internet services, which prohibits all copyright infringement through the services and allows Cox to immediately suspend or terminate access to

the service and/or the Cox account entirely). The Court finds, therefore, that for this prong, "vicarious liability . . . is 'manifestly just' [because] the defendant can 'control the use of copyrighted works by others.'" *BMG III*, 881 F.3d at 310 (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 437 (1984)); *see also Grokster*, 545 U.S. at 930 n.39 ("One . . . infringes vicariously by profiting from direct infringement *while declining to exercise a right to stop or limit it*." (emphasis added) (citation omitted)).

A finding of direct financial benefit from the infringement—prong two—also survives a Rule 50 motion based on the record. Cox focuses primarily on the aspect of "draw" as an element of the financial benefit, but, as Plaintiffs emphasize, Sony was not required to prove "draw" according to Cox's proffered standard. In *BMG I*, this Court held that the financial benefit element "requires a 'causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits.'" 149 F. Supp. 3d at 675 (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)). Indeed, courts have discussed access to infringing activity as an initial, introductory draw to the relevant service as evidence of the causal connection, as cited in Defendants' briefs. But *Ellison* emphasized that a "draw" need not be substantial, and that the inquiry must show "a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of *how substantial* the benefit is in proportion to a defendant's overall profits." *Id.* (emphasis original).

As Defendants point out, Congress and several courts have said that flat-fee subscription services would not be sufficient to establish the causal relationship unless the value of the service was derived from providing access to the infringing material. *See* S. Rep. 105-190, at 44 (1998); *Ellison*, 357 F.3d at 1079. What Defendants fail to include is the Senate's primary instruction

18

immediately before the "flat periodic payments" comment: "In determining whether the financial benefit criterion is satisfied, courts should take a common-sense, fact-based approach, not a formalistic one." S. Rep. 105-190 at 44. Immediately after addressing flat fees, it continues: "[direct financial benefit] would however, include *any such fees* where the value of the service lies in providing access to infringing material." *Id.* (emphasis added). It follows that any such flat periodic payments may satisfy the direct financial benefit element; there is no bright line prohibition.

Moreover, the summation of the Ninth Circuit's "draw" analysis states there was no direct financial benefit in *Ellison* because "[t]he record lack[ed] evidence that AOL attracted or retained subscriptions because of the infringement or lost subscriptions because of AOL's eventual obstruction of the infringement." *Id.* Ultimately, the *Ellison* standard upon which Defendants—and various other non-binding cases—rely does not limit the "draw" inquiry to facts or conduct *prior* to the initial subscription. Rather, it suggests that retention of subscriptions and potential losses from obstructions to customer infringement are relevant considerations to establish this causal connection.

Here, there was ample evidence for a reasonable jury to conclude, as this jury did, that Cox gained *some* direct financial benefit from the infringement, no matter how small. The Court agrees with Plaintiffs' argument that Cox's treatment of repeat infringer accounts suffices as a causal connection between the infringement and financial gain. Internal emails among Defendants clearly establish a connection between infringing accounts and continued collection of revenue rather than termination. *See* Dkt. 699 at 10.[14] The jury heard that Cox looked at

---

[14] Sony's Opposition cites several compelling examples, including PX 347 at 1, discussing a repeat infringer: "This customer will likely fail again, but let's give him one more change [sic]. He pays 317.63 a month."

customers' monthly payments when considering whether to terminate them for infringement. *See, e.g.* Trial Tr. 1271:1-19. (Zabek); *see also* Tr. 1275:15-1277:9 (Zabek explaining instructions to upper management to terminate or suspend for DMCA compliance purposes, then immediately reactivate account and reset the graduated response, because "in this challenging time, we want to hold on to every subscriber we can." (citing Pl's Ex. 263, Bates label Cox_Sony_00005514)).

In sum, the evidence allows a reasonable jury to find Cox vicariously liable in this case, and the Court declines to disturb the verdict on this issue.

c. Contributory Infringement

"A contributory infringer is one who, (1) 'with knowledge of the infringing activity,' (2) 'induces, causes or materially contributes to the infringing conduct of another.'" *BMG I*, 149 F. Supp. 3d at 670 (quoting *CoStar Grp., Inc.*, 373 F.3d at 550; *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971)). The question before the Court is limited to whether a reasonable jury could find that Cox materially contributed to the underlying infringement.

In the Ninth Circuit, "a 'computer system operator' is liable under a material contribution theory of infringement 'if it has *actual* knowledge that *specific* infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works.'" *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 671 (9th Cir. 2017) (emphasis original) (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) (internal citations and quotation marks omitted)). In back-to-back cases in 2007, the Ninth Circuit held that financial institutions that processed credit card payments to allegedly infringing websites were *not* liable for material contribution to underlying infringement, but that an internet search engine *was* for knowingly assisting worldwide

20

infringers and failing to take simple steps to avoid further harm. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 796-800 (9th Cir. 2007); *Amazon.com*, 508 F.3d at 1172. The *Visa* court noted, "[w]hile Perfect 10 has alleged that [the financial institutions] make it easier for websites to profit from this infringing activity, the issue here is reproduction, alteration, display and distribution, which can occur without payment. Even if infringing images were not paid for, there would still be infringement." *Visa*, 494 F.3d at 796 (citing *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001)). Further, the *Amazon* court said, Google substantially assists worldwide distribution of infringing products, and "[w]e cannot discount the effect of such a service on copyright owners, even though Google's assistance is available to all websites." *Amazon*, 508 F.3d at 1172.

Here, Cox distinguishes itself from these and other similar cases – Defendants argue there can be no liability because of Cox's policy actively discouraging copyright infringement. Cox took simple measures to prevent infringement through its graduated response system, Defendants say, and that should not be construed against them. Defendants also note that internet access is available from several sources, and that P2P infringement can occur without Cox.

In *BMG*, this Court found enough evidence for a reasonable jury to hold Cox responsible for the infringement among its subscribers given its failure to address specific infringement occurring on its network. *BMG II*, 199 F. Supp. 3d at 980. So too here. In the light most favorable to Sony, a reasonable jury could find that Cox substantially assisted widespread infringement with actual knowledge of the conduct on specific subscribers' accounts. Further, Defendants' high-speed internet services were necessary to the infringing actions in this case; unlike the financial institutions in *Visa*—which participated after the infringement at issue—Cox was indispensable to each instance of P2P infringement on its network. Defendants' claimed

21

anti-infringement efforts are well-established in the record, yet the jury held Cox liable for willful secondary infringement. The Court cannot opine as to the jury's measure of witness credibility or characterization of Cox's efforts.

The Court recognizes valid arguments on both sides of this issue, and, accordingly, defers to the jury as the proper finder of fact. The contributory liability finding is reasonably supported by the evidence.

### 3. *Statutory Damages per Work*

The Court denied Cox's summary judgment motion on the issues of statutory damages awards as they pertained to the number of works in suit. There are two questions still before the Court: (1) whether "compilations" of certain songs render them ineligible for individual awards; and (2) where Plaintiffs allege infringement of both a musical composition ("MC") and a sound recording ("SR") in the same song, whether Plaintiffs are limited to one statutory award. If either question is answered in the affirmative, the $1 billion jury award is subject to reduction.

In *Sony BMG Music Entertainment v. Tenenbaum*, the First Circuit commented on the courts' role when applying the Copyright Act, independent of the parties' proposed rationale:

> The Supreme Court has expressly instructed that courts apply the Copyright Act to new technologies. In *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 [] (1984), the Court instructed that courts must "[a]pply[] the copyright statute, as it now reads, to the facts as they have been developed" even though Congress might ultimately "take a fresh look at this new technology, just as it so often has examined other innovations in the past." *Id.* at 456.

660 F.3d 487, 501 (1st Cir. 2011) (alterations original). While the First Circuit was discussing the identification of proper defendants for infringing file sharing, the same instruction applies to statutory damages; the Court "must 'apply the copyright statute, as it now reads, to the facts as they have been developed'" in this case. *Id.* (internal alterations omitted).

Statutory damages pursuant to the Copyright Act are available to a "copyright owner [who] elect[s], at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work." 17 U.S.C. § 504(c)(1). Awards for willful infringement may be as high as $150,000.00 per work infringed. *Id.* § 504(c)(2). And, most important to the instant inquiry, "[f]or the purposes of this subsection, all the parts of a compilation or derivative work constitute one work." *Id.* § 504(c)(1). Indeed, "[a]lthough parts of a compilation or derivative work may be 'regarded as independent works for other purposes[,]' for purposes of statutory damages, they constitute one work." *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 (4th Cir. 2002) (quoting H.R. Rep. No. 94-1476, at 162 (1976)).

While compilations and derivative works are enumerated in this statutory limitation, copyright registrations are not.[15] It is established in the Fourth Circuit that a single copyright registration may include multiple, individually cognizable copyrights for purposes of statutory damages under 17 U.S.C. 504(c). *See Xoom*, 323 F.3d at 285 (finding it true that "the language of the Copyright Act does not bar multiple awards for statutory damages when one registration includes multiple works."). The question before the Court is whether individually copyrighted works are *also* incorporated into a compilation or derivative work, as defined in the Copyright Act.[16] The individual copyrights for each song included in the jury award are not disputed.

---

[15] Cox argues that, to calculate statutory damages, "the process would have been simple, since the jury needed only to award statutory damages for each unique registration number..." but the Fourth Circuit and seemingly all circuits agree that this is incorrect. Dkt. 704 at 11.

[16] The Copyright Act defines these terms in section 101:

A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

Accordingly, compilations or derivative works must be established in the record to determine if any works in suit were ineligible for their own award. The Court addresses compilations and derivative works in turn.

a. Compilations

The total number of "'compilation[s]' for purposes of statutory damages pursuant to Section 504(c)(1) of the Copyright Act is a mixed question of law and fact.'" *Tattoo Art, Inc. v. TAT Intn'l, LLC*, 794 F. Supp. 2d 634, 651 (E.D. Va. 2011) (quoting *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 140 (2d Cir. 2010) (citing *Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1116 (1st Cir. 1993)), *cert. denied*, 131 S. Ct. 656 (2010)); *see also Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255 (11th Cir. 2015) (holding that because it is a mixed question, the court would only review the district court's application of the law to the facts *de novo*). Regarding this mixed question, courts have differed in their interpretations and outcomes. Several United States Courts of Appeals apply the "independent economic value" test; but the Second Circuit expressly declined to do so, emphasizing the plain meaning of the statutory language. There remains a circuit split with respect to the independent economic value test, "though the dividing lines are far from absolute." *Sullivan v. Flora, Inc.*, 936 F.3d 562, 569 (7th Cir. 2019).

---

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C. § 101.

i.    *The Independent Economic Value Test*

Following the independent economic value test, the First, Seventh, Ninth, Eleventh, and

D.C. Circuits have adopted the premise that individual copyrights are not distinct works unless

they are able to "live their own copyright life."[17]  *Walt Disney Co. v. Powell*, 897 F.2d 565, 569

(D.C. Cir. 1990).  "The test set forth in *Walt Disney* is a functional one, with the focus on

whether each expression . . . has an independent economic value and is, in itself, viable."

*Gamma Audio & Video*, 11 F.3d at 1116-17.  Indeed, analyzing independent economic value

requires that the record include factual information about the copyrights as they operate in the

market:

> To stop at the Second Circuit's inquiry does not allow a possibility Congress made
> available in § 504(c)(1)—a situation where a copyright holder encounters
> infringement on multiple works available in the market as a group but where
> discernable value lies at the level of a particular individual work—for example, at
> the level of a particular photo or song which, although released as part of an album,
> is likewise marketed and available at the individual level. Sellers regularly allow
> buyers to acquire a part of a whole and the market assigns value accordingly.

*Sullivan v. Flora, Inc.*, 936 F.3d at 571-72.

As noted above, the independent economic value test is not clearly defined, and its

application varies. The test "focuses on whether each expression . . . is, in itself, viable." *MCA*

*TV, Ltd. v. Feltner*, 89 F.3d 766, 769 (11th Cir. 1996) (citing *Gamma Audio & Video*, 11 F.3d at

1116; *Walt Disney*, 897 F.2d at 568).  Cases that discuss independent economic value have

considered the method of registration, and the connection of the content among the constituent

parts. *See Feltner*, 89 F.3d at 769-70 (considering individual copyrights and the absence of a

plot arc across episodes in a television series).  This approach has given weight to how the

---

[17] *See, e.g., Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106 (1st Cir. 1993); *Sullivan v. Flora*, 936 F.3d 562 (7th Cir. 2019); *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723 (9th Cir. 2019); *MCA Television Ltd. v. Feltner*, 89 F.3d 766 (11th Cir. 1996); *Walt Disney Co. v. Powell*, 897 F.2d 565 (D.C. Cir. 1990).

constituent parts were produced, and the method of consumption of the works – e.g. watching

one or twenty television episodes in one sitting, or not watching certain episodes at all. *Gamma*

*Audio & Video*, 11 F.3d at 1117. In addition to licensing arrangements and marketing efforts,

one court considered the individual effort put into each individual image in a collection: "each

image represents a singular and copyrightable effort concerning a particular model,

photographer, and location." *Playboy Enterprises, Inc. v. Sanfilippo*, No. 97-0670-IEG (LSP),

1998 WL 207856, at *5 (S.D. Cal. Mar. 24, 1998). The format of the registration appears to be

no more persuasive than other factors. The factual record in *Yellow Pages*, for instance,

supported a conclusion based on revenue-generating units, and the manner in which the works

were registered "also support[ed] the conclusion." *Yellow Pages* at 1277 (awarding statutory

damages based on subject matter headings rather than underlying photos where "to make his

photos relevant and marketable, [plaintiff] spent a lot of years working with customers to

determine what headings generate revenue and what headings generate usage." (internal quotes

omitted)).

This mix of inquiries presents a fluid body of law. Unsurprisingly, the *Sullivan v. Flora*

court noted, the Fourth Circuit in *Xoom* gave an answer on this issue "with mixed signals." *Id.* at

571. The individual, disputed clip-art images in *Xoom* were attached to the registration

application for the SuperBundle copyright but not specifically enumerated on the registration.

Recognizing that § 504(c) does not bar multiple awards for multiple copyrights on the same

registration, the Fourth Circuit said, ". . . we find that, *given the facts of the instant case*,

Imageline is only entitled to a maximum of two awards of statutory damages." *Xoom*, 323 F.3d

at 285 (emphasis added). "The registration covered SuperBundle in its entirety; there was no

specific mention of the individual clip-art images." *Id.* at 281.

The analysis in *Xoom* does not include much factual detail beyond the registrations themselves, and the independent economic value of the specific clip-art images is expressly ignored. As discussed further below, though, the Fourth Circuit did not discuss or reject the independent economic value test or lack thereof. While the *Xoom* decision "appears to side with the Second Circuit's approach in *Bryant*," it left open the possibility of a different outcome on different facts. *Tattoo Art*, 794 F. Supp. 2d at 652.

ii.     *The Plain Statutory Language Approach*

Courts that have relied—in large part—on the plain language of § 504(c)(1) have been critical of the independent economic value test. While the question of what constitutes a "compilation" for statutory damages is still a mixed question of law and fact, courts like the Second Circuit have determined that when it comes to music, "[a]n album falls within the Act's expansive definition of compilation." *Bryant*, 603 F.3d at 140. "Based on a plain reading of the statute, therefore, infringement of an album should result in only one statutory damage award." *Id.* at 141. The *Bryant* court found separate copyrights for individual songs irrelevant to the analysis. *Id.* The district court in *UMG Recordings, Inc. v. MP3.Com, Inc.*, declined to consider the factual arguments related to the treatment of individual songs "in the face of the unequivocal statutory language and plaintiffs' own assertion that what the defendant actually copied were the complete CDs." 109 F. Supp. 2d 223, 225 (S.D.N.Y. 2000). What is more, the *UMG* court said, "[w]hen, as here, Congress' statement is clear, to disregard that message would be nothing less than an unconstitutional arrogation of power by the judiciary." *Id.*

The Second Circuit's emphasis on the statutory language over independent economic value is a departure from that court's application of the *Walt Disney* approach in *Robert Stigwood Grp. Ltd. v. O'Reilly*, 530 F.2d 1096 (2d Cir. 1976). There, separately copyrighted songs from the *Jesus Christ Superstar* musical received individual statutory awards because each

27

song could "live [its] own copyright life." *Bryant* at 142 n.7 (quoting *Robert Stigwood*, 530 F.2d at 1104-05 (alteration original)).  The Second Circuit said the holding in *Robert Stigwood* was no longer applicable, however, because it pre-dated the one-award restriction for compilations in the Copyright Act of 1976.  Notwithstanding that, the Second Circuit has awarded per-episode and per-song statutory damages since the 1976 amendment.  *See Twin Peaks Prods., Inc. v. Publ'ns. Int'l Ltd.*, 996 F.2d 1366, 1381 (2d Cir. 1993); *WB Music Corp. v. RTV Comm. Group, Inc.*, 445 F.3d 538, 541 (2d Cir. 2006).  But those cases, the Second Circuit maintains, are readily distinguishable from *Bryant*.

The Second Circuit's express rebuke of the independent economic value test asserts that "[t]he Act specifically states that all parts of a compilation must be treated as one work for the purpose of calculating statutory damages," and there is "no exception for a part of a compilation that has independent economic value." *Bryant*, 603 F.3d at 142.  Importantly, *Bryant* directs the inquiry to the copyright holder's conduct.  The court distinguished *Bryant* from *Twin Peaks* and *WB Music* because of how the copyright holders *issued* the works.  603 F.3d at 140-41.  For instance, in *WB Music* "[i]t was the *defendant* who issued the songs in album form," whereas in *Bryant*, "it [wa]s the copyright holders who issued their works as 'compilations'; they chose to issue Albums." *Id.* at 141 (emphasis original).

While the act of "issuing" a work was somewhat vague in the *Bryant* discussion, the holding in *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, brought more clarity.  844 F.3d 79 (2d Cir. 2016), *cert. denied sub nom. Robertson v. EMI Christian Music Grp., Inc.*, 137 S. Ct. 2269 (2017).  In *EMI Christian*, the Second Circuit awarded "separate statutory damages awards for songs that the plaintiffs issued as singles, even if those songs were also made available on albums." *Id.* at 101.  Further, the record confirmed that "all the songs in question were made

available as singles on the date of infringement." *Id.* (emphasis omitted). This market-availability approach was described in contrast with "[m]aterials that are *sold* as part of a compilation, such as songs on an album." *Id.* (emphasis added). Indeed, in this sense *EMI Christian* is consistent with each of the Second Circuit cases, including the cautionary, statute-driven holding in *UMG*. The copyright holders in *UMG* only distributed physical copies of CDs, and the *defendants* at MP3.com digitized the individual files.

The *EMI Christian* analysis, therefore, essentially treats the act of "issuing" as the act of selling or offering the work in the marketplace during the period in question; to be sure, the copyright registration itself cannot answer the "compilation" question. In sum, every court considering "compilations" under § 504(c)(1) would consider factual sales information to determine—at least in part—statutory damages awards.

There is sparse, but some, additional case law rejecting the per-song notion.[18] With such weight given to the method of sale in determining "compilations" for statutory damages awards, though, the applicability to the instant facts is limited.

iii. *Discussion*

To begin, there is very little binding case law in this endeavor to apply § 504(c)(1) to music copyright infringement—of music available for sale in multiple mediums and through streaming subscriptions—via unlawful file sharing on P2P networks. There is no dispute, however, that it is a mixed question of law and fact. As such, beyond registration information, defining "compilations" within the meaning of § 504(c)(1) relies on factual support with respect

---

[18] For instance, the Third Circuit has yet to take a position, though a district court in New Jersey adopted a rule established in the Southern District of New York: statutory damages are properly calculated on a "per-CD" basis rather than a "per-song" basis. *Arista Records, Inc. v. Flea World, Inc.*, Civ. No. 03-2670 (JBS), 2006 WL 842883, at *21-22 (D.N.J. Mar. 31, 2006).

to the copyrights in the marketplace.[19]  The Court denied summary judgment on the issue,

leaving the findings of fact for the jury.  "Once the case proceeds to trial," as here, "the full

record developed in court supersedes the record existing at the time of the summary-judgment

motion."  *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011).  Accordingly, the trial record governs the

discussion herein.

A reasonable jury could find on these facts that each song was eligible for its own

statutory award.  Ultimately, the Court agrees with the Second Circuit to the extent that it

approaches the mixed question of law and fact for "compilations" by applying the plain meaning

of § 504(c)(1) to the copyright holder's chosen commercial distribution of each copyrighted

work.  The format of sale will generally delineate each work for purposes of statutory damages.

Considerations like "the precise method by which the copyright holder registers his work," and

"the existence of separate copyrights for each constituent element of a copyrighted work" are

informative, but not dispositive.  *Tattoo Art*, 794 F. Supp. 2d at 654.  The emphasis on how a

work is issued to consumers is most persuasive in defining "compilation" under 504(c)(1).  The

Court sees no need to hypothesize as to independent economic values for units not for individual

sale.  Rather, each work will be already "living its own copyright life"—proving its viability—to

warrant an individual award.

As this Court noted in *BMG II*, the most applicable Fourth Circuit law comes from *Xoom*.

There, as noted above, Imageline had a copyright for "SuperBundle," a CD-ROM containing

1,580 clip-art images, and for "Master Gallery," a database with over 9,000 images in black and

---

[19] The Court is cognizant of Cox's continued arguments regarding copyright registrations indicating "works made for hire."  Citing the Act's definitions in § 101, Defendants insist that certain copyright registrations at issue necessarily create "compilations" that preclude individual awards for songs therein.  The Court does not find registration information to be dispositive in this inquiry, and collective registrations do not carry material weight in the instant case.

white line-art in varying file formats. *Xoom*, 323 F.3d at 281. These two copyright registrations covered the collections in their entireties, encompassing the underlying clip-art images as a protected set – not individually. Xoom's subsequent "Web Clip Empire" products included hundreds of thousands of clip-art images, some allegedly overlapping with those in SuperBundle and Master Gallery.

The *Xoom* court first opined on the relationship between the copyrighted compilation and the protection extended to the underlying parts of the compilation. Declining to address clip-art images individually, the Fourth Circuit held that "[i]f Xoom improperly used *any* copyrightable image contained in SuperBundle and Master Gallery, new or preexisting, that usage would give rise to potential statutory damages." *Id.* at 284 (emphasis original). When the court reached the statutory damages question, it concluded, "given the facts of the instant case," statutory damages were limited to the two compilation registrations. *Id.* at 285. The opinion emphasized that the action in *Xoom* was based on "the products in their entirety *and* the underlying preexisting works contained therein in which Imageline also owned copyright," not the parts of the compilation individually. *Id.* (emphasis original). The holding expressly declined to address a copyright action—like this one—with enumerated, individually registered constituent parts of an alleged compilation.

At its core, the legal issue in *Xoom* was about the relationship between a sub-set of underlying content and an overarching compilation copyright. Unlike the instant case, *Xoom* began its inquiry with packaged software, and declined to consider any individual copyrights in the relevant sub-set. Had Sony put forth works by album, and sought separate statutory awards for unnamed underlying songs, *Xoom* would govern. But the instant suit presents the inverse: Plaintiffs assert over 10,000 discrete copyrighted songs, and Defendants contend those songs are

31

*also* included in compilations for purposes of statutory damages. Ultimately, *Xoom* was structured differently from the instant action.

Several years later, the Second Circuit considered the facts in *Bryant*. There, a pair of songwriters created and produced two albums and registered the albums with the US Copyright Office. "They also separately registered at least some of the twenty songs on the Albums." *Bryant*, 603 F.3d at 138. The copyright holders then entered into an agreement for marketing and ultimate distribution of the albums through Orchard, a music wholesaler. The albums were physically provided for sale by the copyright holders, and the wholesale agreement with Orchard involved only physical copies of recordings. *Id.* "In 2006, Appellants discovered that digital copies of the Albums were available online." *Id.* at 139. Upon this discovery, they sought statutory damages for infringement.

As explained above, the court distinguished this case based on the copyright holders' choice to issue albums. The copyright holders only sold or contracted to sell complete, physical albums. While the facts are reversed, the reasoning is consistent with the Second Circuit's holding in *WB Music*, because the infringing conduct of the defendant does not alter the treatment of the original work under § 504(c)(1). Whereas in *WB Music* the defendant compiled individual songs—which received individual awards—into an album in the infringing action, the facts in *Bryant* were the inverse. In *Bryant*, the defendant divided up the albums—which each received a single award—into individual songs for digital sale. The infringing conduct does not affect the ultimate statutory award; here, Plaintiffs' choice to offer each individual song for online sales is not disturbed when calculating the total number of works.

It is somewhat misleading to state, as Cox does, that "the fact remains that *Xoom* did follow *Bryant*, and the Fourth Circuit has not revisited the issue." Dkt. 682 at 18. *Xoom* did not

follow the *Bryant* holding as Cox seeks to impose it here. First, it could not, as it predated *Bryant* by more than seven years. And while the two holdings are generally compatible, the connection between *Bryant* and *Xoom* is undeveloped. *Bryant* cites to *Xoom* once, in a footnote, characterizing the holding as follows: "plaintiff could receive only one statutory damage award for its computer clip art software, which contained many individual pieces of clip art, because plaintiff had packaged and sold the clip art in one piece of software, and thus the software constituted a compilation." *Bryant*, 603 F.3d at 141 n.6. Ultimately accurate, the summary does not capture the fact that the "pieces of clip art" were never individually counted, named, or considered for their own statutory damages. It certainly does not convey a possibility, as the Court finds here, that the *Bryant* holding can be consistent with a per-song award.[20]

A per-song award is also consistent with the holding in *Tattoo Art*, where this district thoroughly addressed a similar "compilation" question for statutory damages. There, the copyright holder organized his tattoo designs for copyright registration *and sale* into books, each consisting of fifty "tattoo flash sheets." *Id.* at 639. There were several images on each sheet, and the plaintiff sought to recover for 212 such images as individual works. Without expressly adopting or rejecting a test, the court said, "[t]he Fourth Circuit's decision in *Xoom* appears to side with the Second Circuit's approach in *Bryant.*" *Id.* at 652. *Tattoo Art* proceeded to analyze the facts based on the assumptions "that neither the precise method by which the copyright holder registers his work nor the existence of separate copyrights for each constituent element of

---

[20] This holds true even considering the Second Circuit's observation in *Bryant*: "[w]e cannot disregard the statutory language simply because digital music has made it easier for infringers to make parts of an album available separately." 603 F.3d 135, 142. Indeed, the infringing activity of the defendant cannot bolster an argument for a "compilation." Cox's argument that the *Bryant* court failed to award damages to individual songs "even though *the accused infringers sold* the album's songs individually," therefore, is irrelevant. Dkt. 682 at 15 (emphasis added) (internal quotation omitted).

a copyrighted work is dispositive of the work's status as a 'compilation' for purposes of statutory damages." *Id.* at 654. Acknowledging that the copyright holder in *Tattoo Art* sometimes sold individual images, "it [did] not appear from [the] testimony that he *issued* those sheets in any economically meaningful way—i.e., for sale or licensing—on a separate, sheet-by-sheet or image-by-image basis." *Id.* In sum, the tattoo art was issued in books, the record did not support meaningful sales in other units, thus statutory damages were awarded by book.

Even where courts have purported to reject "the Second Circuit's more limited approach in *Bryant*," the "more functional" inquiry still places substantial weight on the *Bryant* considerations – how the works are marketed and offered for sale. *Sullivan v. Flora*, 936 F.3d at 571. In *Sullivan v. Flora*, the Seventh Circuit criticized the Second Circuit's inquiry for failing to recognize "where discernible value lies at the level of a particular individual work – for example, at the level of a particular photo or song which, although released as part of an album, is likewise marketed and available at the individual level." *Id.* at 572. As the Court interprets *Bryant* and its progeny, however, this example of an individual song "marketed and available at the individual level" would not be ineligible for an individual award. It is where the emphasis shifts from the copyright holder's decision-making to the consumer's or defendant's— "requir[ing] a focus on where the market assigns value"—that the independent economic value inquiry departs from the plain meaning of the statute.

Ultimately, the Court finds the Second Circuit's holding in *EMI Christian* to be persuasive and consistent with the Copyright Act. It is also consistent with this Court's finding in *BMG*, upholding a per-song award where "[t]here was no evidence that BMG issued any of the works in album form only." *BMG II*, 199 F. Supp. 3d at 984. In line with these cases, the statutory language in § 504(c)(1) is applied to the factual circumstances surrounding commercial

34

sales or availability in the marketplace. In *EMI Christian*, defendant MP3tunes sold, at MP3tunes.com, MP3 versions of music files as well as a data storage service for a fee. *EMI Christian*, 844 F.3d at 86. Similar to *BMG*, there was evidence at trial from record company executives that the plaintiff made all relevant songs available as singles on the date of infringement, thus the court "properly allowed separate statutory damages awards for songs that the plaintiffs issued as singles, even if those songs were also made available on albums." *Id.* at 101. The Court agrees, and finds this to be consistent with *BMG*, *Xoom*, *Bryant*, *Tattoo Art*, *UMG*, and *WB Music*, among others.

Here, the evidence on "compilations" is minimal. In keeping with the Court's findings herein, the method of infringement—P2P file sharing—is not material to the inquiry. Rather, the inquiry requires evidence of the marketing and sales of the individual songs. At trial, just as in *EMI Christian*, Plaintiffs' executives testified to the works as available on a per-song basis. Dennis Kooker, head of the global digital business and U.S. sales group at Sony Music Entertainment, testified about the retail environment for purchase and that sound recordings "typically would be available as individual tracks or also as albums," such as in the Apple iTunes download store. Trial Tr. 112:16-17. Matthew Flott, Warner Music Group's executive vice president and chief financial officer for the recorded music division, testified that sound recordings are sold, *inter alia*, "in digital formats, downloads, and streaming," as well as "in mobile formats, ring back tones." Trial Tr. 1194:11-12. Defendants elicited additional testimony from Mr. Flott about quantifying per-song sales. Trial Tr. 1205:21-25 ("Q: If someone goes to iTunes and buys a song, it's treated as one sale. A: Right."). Ultimately, Defendants confirmed with Mr. Flott the concept of "the disaggregation of the album," meaning consumers "could now pick and choose whatever individual song [they] wanted," and could go

35

"to iTunes and pay[] a dollar for their favorite song." Trial Tr. 1225:5-14. Here, no doubt, Plaintiffs "*issued* [their songs] in an[] economically meaningful way." *Tattoo Art*, 794 F. Supp. 2d at 654.

Plainly, Cox accepted the possibility of the per-song purchase premise throughout the trial. Furthermore, Defendants' own expert witness on damages assumed and analyzed track-by-track data. Christian Tregillis, an eminently qualified forensic financial analyst for the defense, testified to the economic harm to Plaintiffs. Mr. Tregillis assumed that, had the infringing downloads been legitimate purchases, they would have been for $0.79-$1.29 as "iTunes types of purchases." Trial Tr. 2811: 17-25 (Tregillis). Plaintiffs clarified: "Q: ... And you looked to the single-track download rate because you understood that these tracks were available for purchase on an individual basis on iTunes, correct? A: Right." Trial Tr. 2842:2-5 (Tregillis). Further, Mr. Tregillis' analysis of royalties was also by individual recording or composition, and was not presented to the jury by any other metric. Any argument that Defendants used the per-track format simply because that was the best data available only goes to support the conclusion that the works were issued and treated individually in the market.

Based on the trial record, a reasonable jury could find that Plaintiffs issued songs as individual works pursuant to § 504(c)(1). This is a mixed question of law and fact, and Cox did not put facts in evidence to recharacterize or rebut the individual characterization of these works. The Court does not find cause to modify the number of works in suit based on "compilations."

b. Derivative Works

Determining the number of statutory damages awards for derivative works might be a more complex thought exercise than for compilations, but both outcomes generally align with the focus of § 504(c)(1): the one work that is the subject of the infringing conduct. The discussion above addresses copyrighted songs as individual works that can be included in albums or other

compilations.  Now the inquiry zooms in further, considering whether a single work that

envelops multiple copyrights may warrant separate statutory awards where there are separate

copyright owners of those multiple copyrights.

To bring an infringement action as a copyright holder, one must hold at least one

exclusive right to the copyrighted work as enumerated in § 106 of the Copyright Act.  These

exclusive rights include:

> (1) to reproduce the copyrighted work in copies or phonorecords;
> (2) to prepare derivative works based upon the copyrighted work;
> (3) to distribute copies or phonorecords of the copyrighted work to the public by
> sale or other transfer of ownership, or by rental, lease, or lending;
> (4) in the case of literary, musical, dramatic, and choreographic works,
> pantomimes, and motion pictures and other audiovisual works, to perform the
> copyrighted work publicly;
> (5) in the case of literary, musical, dramatic, and choreographic works,
> pantomimes, and pictorial, graphic, or sculptural works, including the
> individual images of a motion picture or other audiovisual work, to display the
> copyrighted work publicly; and
> (6) in the case of sound recordings, to perform the copyrighted work publicly by
> means of a digital audio transmission.

17 U.S.C. § 106.  Exclusive rights in a copyright may be transferred in whole or in part and

owned separately, and "[t]he owner of any particular exclusive right is entitled, to the extent of

that right, to all of the protection and remedies accorded to the copyright owner by this title." *Id.*

§ 201(d).  To recover statutory damages, the copyright must be registered, *inter alia*, pursuant to

the prerequisites in § 412.

A copyright owner bringing suit pursuant to an exclusive right in the infringed work has a

choice between recovering actual or, as an alternative, statutory damages.  The plaintiff may

elect statutory damages "at any time before final judgment is rendered."  § 504(c)(1).  It is

generally accepted that a plaintiff may "elect[s] statutory damages, 'regardless of the adequacy

of the evidence offered as to his actual damages and the amount of the defendant's profits.'"

*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1194

(9th Cir. 2001), *cert. denied sub nom, Feltner v. Columbia Pictures Tel., Inc.*, 534 U.S. 1127

(2002) (citing 4 Nimmer on Copyright § 14.04[A]).  If, however, a copyright holder elects

statutory damages—and the potential benefit of the relaxed evidentiary requirements—there is a

clear limitation on the unit of recovery: "[f]or the purposes of this subsection, all the parts of a

compilation or derivative work constitute one work."  § 504(c)(1).

> The Copyright Act defines a derivative work:
>
> A "derivative work" is a work based upon one or more preexisting works, such as
> a translation, musical arrangement, dramatization, fictionalization, motion picture
> version, *sound recording*, art reproduction, abridgement, condensation, or any other
> form in which a work may be recast, transformed, or adapted. A work consisting of
> editorial revisions, annotations, elaborations, or other modifications which, as a
> whole, represent an original work of authorship, is a "derivative work."

*Id.* at § 101 (emphasis added).  As sound recordings "are works that result from the fixation of a

series of musical, spoken, or other sounds," they often encompass other copyrightable material,

such as musical compositions.  *Id.*

In this litigation, the Court has already held that a single digital file may contain both a

copyrighted sound recording and a separately copyrighted musical composition.  *See Newton v.*

*Diamond*, 204 F. Supp. 2d 1244, 1248-49 (C.D. Cal. 2002) ("Sound recordings and their

underlying musical compositions are separate works with their own distinct copyrights." (citing

17 U.S.C. § 102(a)(2), (7))).  As such, two or more copyright holders may have legitimate claims

arising from infringement of the same derivative work if the owners of the underlying work or

works are different from that of the derivative.  Indeed, the copyright in a derivative work

"extends only to the material contributed . . . as distinguished from the preexisting material

employed in the work."  § 103(b).  Courts have clarified:

> [T]he copyright in the derivative work "does not affect" the ownership or subsistence of copyright protection in the preexisting material. § 103(b). Therefore, "[a]ny elements that the author of the derivative work borrowed from the underlying work . . . remain protected by the copyrights in the underlying work." *Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1112 (1st Cir. 1993); *accord* [1] Nimmer, § 3.05, at 3-34.30 n.2.1. Thus, even if the infringer copies underlying material only from the derivative work, the copyright owner of the underlying material has a cause of action against the infringer. *Montgomery v. Noga*, 168 F.3d 1282, 1292-93 (11th Cir. 1999); *accord* Nimmer § 3.05, at 3-34.31; *cf. Richmond Homes Mgmt., Inc. v. Raintree, Inc.*, 66 F.3d 316 (4th Cir. 1995) ("Because RHMI cannot assert the [underlying] copyright, it may claim damages based solely on the aspects of the Louisa 'distinguished from the preexisting material employed in the work.'" (emphasis added) (quoting § 103(b)))."

*Lennar Homes of Tex. Sales & Mktg. v. Perry Homes*, LLC, 117 F. Supp. 3d 913, 928-929 (S.D. Tex. 2015). This, of course, assumes the absence of any ownership transfers or exclusive licensing.[21]

The upshot is that multiple copyright owners may have a cause of action against a defendant when there are compilations or derivative works involved in the infringement action. The Court does not believe any of this fundamental copyright law to be controversial. Reasonable minds differ, however, in its application under § 504(c)(1).

The Court understands the statute as follows. If multiple copyright owners, as plaintiffs, can apportion the injury from the infringement in the suit based on their separate exclusive interests in the work, they are free to do so, and collect actual damages from the defendant for the infringement in suit. On the other hand, if they elect not to demonstrate actual damages, either as a matter of preference or of difficulty, they can recover statutory damages; but the language governing statutory damages tells them, clearly, "[f]or the purposes of this subsection,

---

[21] By the "derivative work" definition, the derivative copyright holder would be infringing the underlying work without permission from the original copyright holder. Licensing arrangements or other contractual permissions are beyond the reach of this discussion.

all the parts of a compilation or derivative work constitute one work." § 504(c)(1). To reiterate, "[a]lthough parts of a compilation or derivative work may be 'regarded as independent works for other purposes[,]' (*e.g.* having a statutory cause of action), for purposes of statutory damages, they constitute one work." *Xoom*, 323 F.3d at 285 (quoting H.R. Rep. No. 94-1476, at 162).

Accordingly, the Court finds § 504(c)(1) is most accurately construed to limit statutory damages to a single award for each compilation or derivative work, regardless of the number or identity of copyright owners that may have claims to that one work.

i.    *The Legal Landscape*

There are two general interpretations among the courts when addressing this question. To appreciate each, a brief summary of select case law is useful.

One approach says that multiple statutory damages awards are possible for copyrights incorporated into the same derivative work. In such a case, duplicate awards are allowed where "a separate plaintiff allegedly owns the copyright on the music composition from the plaintiff that owns the copyright on the sound recording." *TeeVee Toons, Inc. v. MP3.com, Inc.*, 134 F. Supp. 2d 546, 548 (S.D.N.Y. 2001). If the owners were to have to share one award, the *TeeVee Tunes* court said, it would lead to an absurdity: "it would permit separate copyrightholders of the composition and the recording, if suing separately, to each recover statutory damages, but if suing in the same action to be limited to a single award of statutory damages." *Id.* (citing 2 Paul Goldstein, Copyright § 12.2.2.1(b), at 12:52 (2d ed. 2000); 4 Nimmer on Copyright § 14.04[E][1], at 14-70 to 14-70.2 (2000)). Rather, the *TeeVee Tunes* court said, the statute uses "copyright owner" singularly because Congress assumed a single owner of all parts of the derivative work. *Id.* (relying on legislative history to confirm that Congress "simply meant to preclude an author from recovering multiple statutory damages for infringements of several

different versions of a single work.") (citing 4 Nimmer § 14.04[E][1], at 14-70 to 14-70.1; *see* 2 Goldstein § 12.2.2.1(b), at 12:52).

Years later, in *Beastie Boys v. Monster Energy Co.*, the district court adopted the presumption that if the musical composition and sound recording copyrights in the same song had the same owner, then only one statutory damages award was permitted. 983 F. Supp. 2d 354 (S.D.N.Y. 2014). Otherwise, there would be two awards in that case, because the musical composition and sound recording had purportedly different copyright owners. As the court accepted this interpretation as true, it offered no legal analysis. Quoting *Teevee Toons*, the court allowed the defendant "to 'attempt[ ] to prove at trial that [the Beastie Boys Partnership and Brooklyn Dust] are so closely affiliated as to be considered one company for statutory damages purposes.'" *Beastie Boys*, 983 F. Supp. 2d at 368 (quoting *TeeVee Tunes*, 134 F. Supp. 2d at 548 n.1). In a similar way, a district court in Maine implied that ownership was material to statutory damages when it supported a single award with "the fact that a single copyright holder holds the rights to both the sound recording and the musical composition of [the song]." *Spooner v. EEN, Inc.*, No. 08-cv-262-P-S, 2010 WL 1930239, at *4 (D. Me. May 11, 2010).

On the other hand, courts say, there is a clear limit to one statutory award as applied to every part of a derivative work. The statute does not address or expressly contemplate whether a work's copyright owners are unified or diversified. The Second Circuit held that, in accord with a plain reading of the Copyright Act's text, "the plaintiffs could recover only one statutory damages award for a musical composition and its corresponding sound recording, even where the composition and the recording were owned by separate plaintiffs." *EMI Christian*, 844 F.3d at 94. Holding the same, several courts have found "Professor William Patry's criticism of the *TeeVee Toons* rule persuasive." *Capitol Records, Inc. v. MP3tunes, LLC*, 28 F. Supp. 3d 190,

192 (S.D.N.Y. 2014). Professor Patry offers an anthology of poems as an analogy, saying there is no reason to differentiate it from the derivative sound recording: "no one would dispute that there is one award, no matter how many different [artists'] works are embodied therein." *Id.* (quoting 6 Patry on Copyright § 22:186); *see also EMI Christian*, 844 F.3d at 95 (citing 6 Patry on Copyright § 22:186 ("Sound recordings are defined in section 101 as a species of derivative work of the underlying musical composition, and, as such, both fall within the one work, one award rule for statutory damages that only award[s] for infringement of both works . . . regardless of whether there are different owners.")).

The Second Circuit has walked back on certain aspects of its holding in *Robert Stigwood Group, Ltd. v. O'Reilly*, explaining that *Stigwood* was an application of the Copyright Act of 1909, not 1976. 530 F.2d 1096 (2d Cir. 1976). Of course, it was "the Copyright Act of 1976[] in which '[t]he one-award restriction for compilations was introduced.'" *Tattoo Art*, 794 F. Supp. 2d at 652 (quoting *Bryant*, 603 F.3d at 142 n.7). But these revisions mostly involve the "independent economic value test" which is not the focus here. Rather, the Second Circuit's position in *Stigwood*—a single award for overlapping copyrights in one work—was only *confirmed* by the 1976 Act. Operating under the 1909 Act, the court considered a song from the rock opera *Jesus Christ Superstar* that included: Musical Excerpts Complete Libretto; Libretto and Additional Words; and a Vocal Score. "While the point is not altogether clear, it appears to us that infringement of performing rights of overlapping copyrights on substantial parts of the entire work should be considered as a single infringement" for statutory damages. *Stigwood*, 530 F.2d at 1104. *Stigwood* effectively asked Congress for more clarity on this issue on January 19, 1976. The Copyright Act of 1976 took effect soon after on January 1, 1978, stating "all the parts of a compilation or derivative work constitute one work." § 504(c)(1).

Facing a complex and splintered litigation with multiple copyright holders, one court asserted a single award as defined by § 504(c)'s statutory range:

> There is nothing that can be discerned in the statutory scheme to require that recovery by one owner of a particular exclusive right precludes the recovery for infringement by the owner of another exclusive right, as long as the infringer's liability on these statutory damages does not exceed the maximum amount provided in Section 504(c) with the limitation that the minimum amount remains that specified in Section 504(c).

*Kamakazi Music Corp. v. Robbins Music Corp.*, 534 F. Supp. 69, 75 (S.D.N.Y. 1982). It is not before the Court whether statutory awards in multiple forums might allow cumulative damages in excess of the statutory cap. The *Kamakazi* court's overall intent, however, is consistent with the theme of § 504(c)(1): to limit the infringer's liability to one statutory award for the conduct in suit.

The counter arguments to these single-award cases are generally captured in *TeeVee Tunes*, and supplemented in Plaintiffs' briefs. The Court considers this legal landscape in its analysis.

*ii.    The Statutory Language*

Plaintiffs argue that the jury's award comports with the plain text of the statute because MCs and SRs are separate and distinct as copyrightable works. Section 504(c)(1) precludes the same singular "copyright owner" from recovering multiple statutory damages, Sony says, and the singular nature of the owner "necessarily limits its application to such cases." Dkt. 699 at 18. Sony addresses the Dictionary Act, 1 U.S.C. § 1, which states, "unless the context indicates otherwise – words importing the singular include and apply to several persons, parties, or things." Plaintiffs contend that, in this case, "the context indicates otherwise," and thus "copyright holder" cannot be construed to include multiple owners. It is the rare occasion that invokes the Dictionary Act to carry out the intent of the statute, Sony maintains. Plaintiffs argue

that the singular owner is necessary to avoid the "perverse incentive" discussed in *Blackman v. District of Columbia*, 633 F.3d 1088 (D.C. Cir. 2011) to bring multiple suits to avoid a fee cap rather than have plaintiffs litigate together — as was the argument in *TeeVee Tunes*. *Blackman*, 633 F.3d at 1092. Finally, Plaintiffs caution against Cox's reliance on legislative history and treatises, arguing that legislative history, in particular, detracts from the clarity of the statutory language.

Cox's examination of the statutory language produces, unsurprisingly, a different result. To begin, 1 U.S.C. § 1 is more widely applicable than Sony suggests, Defendants say, and its application to the Copyright Act—assuming the singular can also be plural—comports with the intent of the statute. Citing to legislative history, Cox continues that Congress was well aware of the possibility that multiple copyright owners could have rights in a single work infringed by a defendant. The policy argument related to multiple suits cannot overturn a result the statute demands, Defendants say, and, regardless, this argument is weak. The *Blackman* case addressed a specific issue regarding class actions that is not relevant here, and Plaintiffs' reading is simply inconsistent with the statute as a cohesive Act; the absurdity, Cox argues, would result from Sony's interpretation.

The Court generally agrees with Defendants. It is contrary to the language and structure of the Copyright Act to construe "copyright owner" as strictly singular, refusing to acknowledge the possibility of multiple copyright owners in the infringement of one work. Section 201 begins, "Copyright in a work protected under this title vests initially in the author *or authors* of the work. *The authors of a joint work are coowners* of copyright in the work." § 201(a) (emphasis added). Accordingly, Plaintiffs would suggest that upon infringement of this original, multi-authored work, there is no statutory language recognizing the "coowners of the copyright."

44

It is difficult to believe that Congress has such an aversion to creative collaboration. Section 504(c)(1) must assume a pluralization of "owner" to accommodate the joint-authors, and neither Party has offered or supported the idea that the singular can be pluralized, but only selectively. What is more, the Act expressly provides, "[t]he ownership of *a copyright* may be transferred in whole *or in part...*" but does not indicate that transferring a part of that copyright destroys or so complicates the ability to enforce the remaining rights. § 201(d)(1) (emphasis added). Exactly the opposite. The section continues, "exclusive rights comprised in a copyright . . . may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded the copyright owner by this title." § 201(d)(2). In sum, "copyright holder" may be pluralized in the Copyright Act.

Considering the statutory damages provision as a whole, the effect of § 504(c)(1) is to protect the infringer's risk exposure. This is demonstrated at least three different ways. First, the statute specifies that one statutory damages award applies to "all infringements involved in the action, with respect to any one work," thereby limiting liability regardless of repetitive infringing conduct. *Id.* at § 504(c)(1). Thus, the "number of 'awards' of statutory damages that a plaintiff may recover in any given action against a single defendant depends on the number of *works* that are infringed," not the number of infringements, "and the number of individually liable *infringers* and is unaffected by the number of *infringements* of those works." *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 194 (1st Cir. 2004) (emphasis original).

Then, to solidify the idea that the number of infringers is also measured by the work infringed, Congress specifies that the "infringer is liable individually, or [] any two or more infringers are liable jointly and severally." § 504(c)(1). Accordingly, the Act refuses to expand

45

liability by the number of infringers involved, no matter how many there are inside a nesting-doll-like defendant; the mirror of this, of course, is to limit the statutory award where there might be scores of copyright holders hiding in a nesting-doll-like compilation or derivative work.

Indeed, the third infringer-focused protection built into § 504(c)(1) addresses the limitation on the infringed work or works involved in the suit. "One work," as it is used in § 504(c)(1), defines the scope of the infringement action and limits the multiplication of awards. "One work" appears twice in § 504(c)(1): first, the scope of the infringement itself is limited to "any *one work*;" and second, "all the parts of a compilation or derivative work constitute *one work*." *Id.* (emphasis added). If that "one work" is a sound recording, for instance, which by definition embodies an underlying work, then § 504(c)(1) does not recognize the underlying work separately for purposes of statutory damages. In other words, if a sound recording is the "one work" infringed, an underlying musical composition cannot escape inclusion in the sound recording's award. All of that said, even if the singular copyright holder argument prevailed, the last sentence of § 504(c)(1) will always operate as a potential limitation on liability.

Lastly, the court in *EMI Christian*, like many other courts, and Cox, pointed to the House and Senate Reports accompanying the Copyright Act in support of the single award limit. While the Court is wary to rely on legislative content outside the statute itself, it is worthy of note from a broader perspective. As just explained based on the statute, the overall intention of the report on this issue is, also, to shield a defendant's potential liability from undue multiplication:

> [A]lthough the minimum and maximum amounts are to be multiplied where multiple "works" are involved in the suit, the same is not true with respect to multiple copyrights, multiple owners, multiple exclusive rights, or multiple registrations. This point is especially important since, under a scheme of divisible copyright, it is possible to have the rights of a number of owners of separate "copyrights" in a single "work" infringed by one act of a defendant.

H.R. Rep. No. 94-1476, at 162 (1976); S. Rep. No. 94-473, at 144 (1975).

### iii.   *Policy Considerations in Copyright Litigation*

Similar to the statutory language, many policy arguments align with this intent to prevent undue multiplication of damages. In addition to the overall liability exposure, there are several concerns about multiple awards and sliding amounts of statutory damages that would accompany them. What is more, a single copyright owner could construct a scheme to recover more than the maximum amount Congress provided: "[i]f separate ownership of composition and sound recording rights permitted multiple awards, then an entity that owned both rights in a song could recover 150% of the statutory damages by licensing out one of the rights in exchange for a 50% share in any damages." *Capitol Records v. MP3tunes*, 28 F. Supp. 3d at 192.

In response to Plaintiffs and the contrary case law, the Court respectfully disagrees with the notion that—beyond possessing the right to sue—the copyright holder's identity is material to defining the work within the meaning of § 504(c). Judge Rakoff's "absurd" hypothetical in *TeeVee Tunes* might not be quite as absurd as he suggests. Suing separately, the scenario went, separate owners could each recover, but if together, they could only recover once. This potential oddity may carry some weight, but not a lot. To begin, it is not clear that the second suit is permissible under the laws of preclusion and rules of civil procedure. *See, e.g.*, Fed. R. Civ. P. 19(a) (requiring, if within the court's jurisdiction, "[a] person . . . must be joined as a party if: . . . that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."). Advocates of multiple recoveries in this context do not dispute that the defendant would be repeatedly liable for the same infringing conduct of the same protected content in each suit.[22]

---

[22] Even Nimmer addresses this topic timidly in his leading treatise, stating "[a] full treatment of that doctrine of law is beyond the scope of this [copyright] treatise, but certain tentative

And as a practical matter, multiple infringement actions will rarely be economically feasible or appealing for copyright holders, as the initial suit rarely is. It seems unlikely that any absurdity would ever begin.[23]

A few examples are instructive. Suppose a defendant infringes a digital music file of a three-minute song non-willfully. In this scenario, the MC and SR are owned by the same artist, exposing the defendant to a minimum of $750-$30,000. In the next scenario, a defendant infringes on a three-minute song, but that song is a "mash-up" containing samples of ten different copyrighted recordings, each with separately copyrighted compositions. The second

---

conclusions may be suggested." 4 Nimmer on Copyright § 14.04[E][2][b] (2019). He continued by saying:

> May a plaintiff avoid this limitation by simply suing the same infringer in a number of separate actions, each for a particular infringement, and thus recover at least the statutory damages minimum in each such action? Nothing in the Copyright Act would appear to prevent a plaintiff from resorting to this means of multiplying the number of statutory damages awards which he may recover. If there is a limitation on the plaintiff's ability to resort to such a device, it is to be found in the law of *res judicata*, and perhaps by judicious transfer of venue and joinder (for cases still pending).

*Id.* (internal footnotes omitted). It is also not for this Court to determine herein whether, *arguendo*, if multiple lawsuits were permitted, the total statutory award across plaintiffs would have to fall within Congress' statutory range. District courts have said, "[i]f Plaintiffs sue separately, they may of course collect separately 'as long as the infringer's liability on these statutory damages does not exceed the amount provided in Section 504(c).'" *Capitol Records, Inc. v. MP3tunes, LLC*, 28 F. Supp. 3d at 192 (quoting *Kamakazi Music*, 534 F. Supp. at 75 (allowing separate awards where the defendant successfully compelled arbitration against one copyright holder, but not the others)).

[23] Steven Marks, former General Counsel of RIAA until 2018, testified to the industry's challenges with infringement lawsuits against individuals in the *first* instance. While there were efforts to engage in this litigation from 2004 to 2008, he testified, "they weren't as straightforward as you might think because we did not know who the – the identity of the people using the software." Trial Tr. 284:14-16. Some ISPs, including Cox, only revealed individuals' identities upon court order. Trial Tr. 285:17-22. The instant litigation is an exceptional undertaking supported by the largest members of the entire industry. In short, if the music industry offers any indication, multiple suits for the exact same works would be extraordinary.

song exposes the defendant to a minimum of $15,000-$600,000 in statutory damages. With the popularity of digital sampling, the twenty-fold increase may be an underestimate. It is difficult to fathom that Congress intended such dramatic discrepancies in liability for substantially the same conduct. As willful infringement exposes the defendant to a maximum of $150,000.00 per work infringed, that three-minute mash-up could cost a defendant $3 million.

Moreover, the "mash-up" example's nonsensical outcome is not new. To the contrary, the same applies where advances in technology are not as pronounced. For instance, no one would dispute that there is one award for an anthology of poems, no matter how many different works are included. *See* 6 Patry on Copyright § 22:186). The same if a copyrighted photograph was of a nature scene, commanding a single award, but another photograph captured a scene at an art fair, including protected works of fifteen other artists. Reprinting the former without permission exposes the infringer to significant liability. Reprinting the latter, Plaintiffs argument goes, likely bankrupts most defendants. These kinds of "gotcha" scenarios raise several issues like problems with fair notice and a desired consistency in application of copyright laws.

Finally, a court should not have to make a wager on a statutory award. A judge or jury might want to reduce damages if the defendant may be sued time and time again, adjusting for factors relative to cumulative harm and deterrence. Again, this level of uncertainty is contrary to consistent administration of the law.

### iv.   *Procedural Considerations and Re-Calculation*

Plaintiffs begin their argument with evidentiary considerations, stating that Cox presented no evidence to the jury on the issue of the number of works for purposes of statutory damages. Sony emphasizes the fact that a Rule 50 motion must be based on evidence adduced at trial. Fed. R. Civ. P. 50(a)(1)(A). Plaintiffs also argue that Defendants' expert Christian Tregillis never

testified as to an overlap between MCs and SRs, because he was precluded from doing so based on the way Cox tried its case. Dkt. 699 at 17.

Defendants contend that the overlapping copyrights on the same songs are evident on the face of the exhibits, and that no additional evidence was necessary, as this is a pure question of law. Cox claims it can rely on the entire record when arguing a JMOL, as, "in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). On the final day of trial, though certain demonstratives were excluded from Mr. Christian Tregillis' testimony, [24] the Court provisionally admitted registration evidence into the record: PX 612-8478. As these exhibits were not on Defendants' exhibit list for trial, the evidence was admitted provisionally, and not for use in any further testimony at trial. The Court allowed Sony "an opportunity to actually look at what's in there and file any supplemental pleading [if] they think [it] is appropriate." Trial Tr. 2707:11-13. To the Court's knowledge, Sony has not filed anything with regard to PX 612-8478 as of the date of this opinion and order.

Unlike for "compilations" within the meaning of § 504(c)(1), the question of overlapping copyrights in a single work can—or should be able to—be determined by the requisite copyright

---

[24] In concert with the expert testimony of Mr. Tregillis, Defendants proposed demonstratives that displayed numbers of individual musical compositions and sound recordings, as well as the number of works that contained both. Defendants claimed that the numbers could be derived from the underlying data in Mr. Tregillis' expert report, because he included the distinctions in portions of the report and an attached schedule. Plaintiffs objected to the foundation for the final calculations, arguing that PX 1 and PX 2 did not include enough information to make these determinations, that *post hoc* calculations were improper, and the analysis was not disclosed prior to trial. The Court granted Plaintiffs' motion to exclude exhibits which contain the lower portion of slides 13, 21, 22, 23, 26, and the last two. Trial Tr. 2713:3-5. The Court found that the analysis was not done in Mr. Tregillis' expert reports, and there was a lack of notice to Plaintiffs. "[A]lthough they're not, as Mr. Buchanan pointed out, the most resounding modifications, they are modifications, and they do change the dynamics of his report, and [] it's impermissible to do that [] on the last day of trial." Trial Tr. 2713:13-17.

registration, and any other proof of ownership, that may be needed to bring a copyright infringement suit. The Court held that Plaintiffs met this requirement at summary judgment, and said ownership was not an issue for trial; then at the end of trial, Defendants moved and the Court admitted approximately 7200 electronic exhibits containing registration information, as discussed above. *See* Dkt. 610 at 15. As such, the record holds all registration and contractual evidence. While calculation of works in suit was premature at that time, *see supra* Part II.B.3.a, the compilation question is now settled; the ownership documentation should allow the Parties to identify overlapping copyrights within individual songs.

There are still 10,017 copyrights in suit, but the verdict form does not quantify copyrights. The jurors expressly determined that the amount of statutory damages to "award for each *work* contributorily or vicariously infringed" was $99,830.29. Dkt. 669 at 2 (Verdict Form) (emphasis added). Using the adjusted number of works in suit after combining those MCs and SRs that overlap in one work, the multiplier will remain, as the jury set, at $99,830.29.

Sony will almost certainly oppose the adjustment to the number of works in suit as a matter of law. If there are two copyrights incorporated into one work, Plaintiffs might say, the jury may have weighted the award differently. Or, if the jury's aggregate award reflected the amount commensurate with the overall conduct and everything in the trial record, Sony might say that a reduction distorts the verdict. But these arguments fail, as they fly in the face of the very statutory discussion herein. The Supreme Court found that "the Seventh Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages under § 504(c) of the Copyright Act, including the amount itself." *Feltner v. Columbia Pictures TV*, 523 U.S. 340, 355 (1998). The Copyright Act discusses "one work," not total works, thus the issues, as *Feltner* says, "pertinent to . . . § 504(c)" have already been before and decided by a jury.

51

Cox proffers that comparing PX 1 and PX 2 is a "ministerial" task to determine the number of overlapping works, but Sony disagrees. It seems no unreasonable burden, then, that Cox shall prepare a list of overlapping works in suit, identifying which copyrights in PX 1 correspond with which copyrights in PX 2. Each of the 10,017 copyrights considered at trial shall be listed, whether Cox proposes them to be independent works or paired with another copyright in one work. Cox shall calculate and propose a new number of works in suit for purposes of statutory damages within sixty days of the date of this opinion. The proposal may include supporting documentation if Cox finds it appropriate.[25] Plaintiffs shall have sixty days to produce sufficient evidence to demonstrate which, if any, pairings or groupings should remain separate works under 17 U.S.C. § 504(c)(1). The Court will determine the final number of works in suit as it deems appropriate based on both Parties' submissions.

Cox's footnote 23 at the end of its JMOL motion notes Cox will seek discovery to determine whether the works withdrawn from *Warner Records, Inc. et al. v. Charter Communications, Inc.* (No. 1:19-cv-00874-RJB-MEH (D. Colo), ECF No. 100, should be withdrawn from this case as well. There is nothing currently before the Court addressing the specific works or documentation thereof. Should the Parties take up this challenge in the final tally of the works in suit, the Court will review relevant documentation.

### C. **Conclusion: Renewed Motion for Judgment as a Matter of Law**

For these reasons, Defendants Renewed Motion for Judgment as a Matter of Law is granted in part and denied in part.

---

[25] At the very least, Cox shall provide an itemized representation of the 2,556 (less any works removed from the case before trial) musical compositions it references in its motion. Dkt. 682 at 10-12.

### III.    MOTION FOR A NEW TRIAL UNDER RULE 59

Defendants also move under Rule 59(a) for remittitur or, in the alternative, a new trial.
For the following reasons, the motion must fail.

#### A.  Legal Standard

A court may grant a new jury trial upon a motion by a party "for any reason for which a
new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P.
59(a)(1)(A). Specifically, a Rule 59(a) motion will be granted if "(1) the verdict is against the
clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a
miscarriage of justice, even though there may be substantial evidence which would prevent the
direction of a verdict." *Atlas Food Sys. and Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d
587, 594 (4th Cir. 1996).

Looking at the evidence in the light most favorable to the party who received the verdict,
a trial court generally "will not disturb a jury verdict for damages which have been impartially
rendered and are dependent upon competent evidence." *Fairshter v. Am. Nat. Red Cross*, 322 F.
Supp. 2d 646, 658 (E.D. Va. 2004) (additional citations omitted). Where a plaintiff in a
copyright case elects a jury trial, "although the [Copyright Act] is silent on the point, the Seventh
Amendment provides a right to a jury trial, which includes a right to a jury determination of the
amount of statutory damages." *Feltner*, 523 U.S. at 342. The Court exercises caution when
asked to upset any damages award within a statutory range. "[L]ong before the enactment of the
Copyright Act of 1909, 35 Stat. 1075, it was settled that the protection given to copyrights is
wholly statutory . . . [and] [t]he remedies for infringement 'are only those prescribed by
Congress.'" *Sony Corp.*, 464 U.S. at 431 (internal citation omitted) (quoting *Thompson v.
Hubbard*, 131 U.S. 123, 151 (1889)). Where Congress sets the range and a jury decides an
award within it, courts offer deference to both.

"A motion for a new trial is governed by a different standard from a directed verdict motion," as Rule 59 allows a trial judge to weigh the evidence and consider the credibility of witnesses. *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989) (quoting *Wyatt v. Interstate & Ocean Transp. Co.*, 623 F.2d 888, 891 (4th Cir. 1980)).

Regarding the constitutional challenge to the statutory damages award, the parties agree that *St. Louis, I. M. & S. Ry. Co. v. Williams* governs the constitutional inquiry here.[26] 251 U.S. 63 (1919). As established in *Williams*, even if primarily intended to punish the defendant and paid directly to a private party, a statutory penalty:

> [I]s not contrary to due process of law; for, as is said in *Missouri Pacific Ry. Co. v. Humes*, 115 U. S. 512, 523 [1885], 'the power of the state to impose fines and penalties . . . and the mode in which they shall be enforced . . . and what disposition shall be made of the amounts collected, are merely matters of legislative discretion.' Nor does giving the penalty to the aggrieved passenger require that it be confined or proportioned to his loss or damages; for, as it is imposed as a punishment for the violation of a public law, the Legislature may adjust its amount to the public wrong rather than the private injury, just as if it were going to the state. *See Marvin v. Trout*, 199 U. S. 212, 225 [1905].

*Williams*, 251 U.S. at 66. The discretion is not limitless, but "the limitation only [operates] where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *Id.* at 66-67 (collecting cases).

---

[26] When reviewing the constitutionality of a statutory damages award such as this, *Williams* is the appropriate standard rather than the test for punitive damages set out in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). In *Tattoo Art, Inc. v. TAT Int'l LLC*, the Fourth Circuit—as many other courts have—rejected arguments based on *Gore* and similar authority, distinguishing punitive damages from statutory damages, "where Congress has limited the district court's discretion by establishing a statutory range." 498 Fed. App'x 341, 348 (4th Cir. 2012) (unpublished).

## B. **Discussion**

### *1. Inherent Power of the Court; Remittitur*

The broad discretion of the court—whether the fact finder is the judge or jury—is well-established in awarding statutory damages. "[I]n every case the assessment must be within the prescribed limitations, that is to say, neither more than the maximum nor less than the minimum. Within these limitations the court's discretion and sense of justice are controlling." *L. A. Westermann Co. v. Dispatch Printing Co.*, 249 U.S. 100, 106-07 (1919).

This discretion is appropriate for copyright law, the Supreme Court observed, as there are "[f]ew bodies of law [that] would be more difficult to reduce to a short and simple formula than that which determines the measure of damage recoverable for actionable wrongs." *F. W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 232 (1952). This difficulty is clearly illustrated by peer-to-peer file sharing abilities, where it established that "a file that is distributed illegally, once it gets out there virally, how many illegal copies that copy can spawn . . . there is no way to precisely estimate that." Trial Tr. 1753:4-7 (Lehr). And where there is no way to produce an estimate, there is certainly no way to make a calculation. Trial Tr. 1751:13-16 (Lehr) ("[I]f you want to try and quantify that in dollar terms, like what is the economic damage that plaintiffs would suffer in a case like this, that data just doesn't exist."). As a result of these impediments, "[t]he necessary flexibility to do justice . . . can be achieved only by exercise of the wide judicial discretion within limited amounts conferred by this [copyright] statute." *Woolworth*, 344 U.S. at 232.

When a copyright plaintiff elects a jury trial, the discretion lies with the jury, not the judge. In *Feltner v. Columbia Pictures TV*, the Supreme Court held, "although the [Copyright Act] is silent on the point, the Seventh Amendment provides a right to a jury trial, which includes a right to a jury determination of the amount of statutory damages." 523 U.S. at 342.

55

*Feltner* emphasized the common law rule at "'the adoption of the Constitution' [] that 'in cases where the amount of damages was uncertain[,] their assessment was a matter so peculiarly within the province of the jury that the Court should not alter it.'" *Id.* at 353 (quoting *Dimick* v. *Schiedt*, 293 U.S. 474, 480 (1935)). "Thus, if the jury was presented with evidence justifying a finding of willful infringement, it is given broad discretion to award up to $1[5]0,000 for each work copied."[27] *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 496 (4th Cir. 1996).

To guide the Court's inquiry, "[a] fundamental and long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) (citing *Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Engineering, P. C.*, 467 U. S. 138, 157-158 (1984)); *see also Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981) ("[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision."). As such, in reviewing statutory damages under the Copyright Act, remittitur arguments precede any analysis of Due Process challenges. *See Sony BMG v. Tenenbaum*, 660 F.3d at 511. The Court, therefore, begins with Defendants' Rule 59 arguments.

a. Against the Weight of the Evidence

Cox's assertion that the Court has authority to remit damages is undisputed. But, here, the weight of the evidence reasonably supports the jury's verdict.

Based on the factors the jury was instructed to consider for the statutory award, Cox argues the ultimate award is grossly excessive in light of the evidence. Defendants focus on the

---

[27] The Copyright Act was amended in 1999 to raise the maximum statutory damages for willfulness from $100,000.00 to $150,000.00. Digital Theft Deterrence and Copyright Damages Improvement Act of 1999, PL 106–160, 113 Stat 1774 (1999).

language that connects the statutory damages factors to the infringement – that the statistical and financial evidence in support of the award had to be "because of the infringement," and related to the repeat infringing subscribers. High speed internet service is only one of Cox's product offerings, Defendants say, and the repeat infringers at issue in this case only make up a fraction thereof. Based on expert testimony, Cox contends the profits from the infringement were "some fraction of $21.3 million, $376,262, or something in between, [and] that figure bears no relationship to the 'massive,' 'excessive,' multi-billion-dollar profits on which Plaintiffs urged the jury to base its award." Dkt. 685 at 10. The argument is similar for Cox's alleged expenses saved and Plaintiffs' alleged revenues lost. The lack of data to calculate actual numbers does not justify unproved infringing acts, Cox continues, and "[t]he difficulty of proving damages in the abstract provides no guidance for where an award should fall in the statutory range." *Id.* at 13 (citing *Woolworth*, 344 U.S. at 232). Defendants maintain that emphasis on improper evidence led to an inflated award untethered to these smaller or non-existent data points.[28]

Cox also characterizes its conduct pursuant to CATS as effectively deterring and stopping infringement. It compares its conduct to that of other defendants in copyright infringement cases, arguing that having a graduated response program to process infringement notices precludes a finding of misconduct here to the degree reflected in the $1 billion award. This argument also discusses the weight of the evidence by comparisons with other cases, which are addressed *infra* Part III.B.1.b.i.

---

[28] Additionally, Cox relies on well-established economic principles of deterrence and *Gore*—a punitive damages case—to attack the deterrence factor, and on another punitive damages case in response to the jury instruction that said, "in the case of willfulness, the need to punish Cox." Deterrence and punishment are discussed *infra* Part III.B.1.b.ii.

In short, Plaintiffs note that there was ample evidence of misconduct and unlawful activity to support the award, and Cox's proportionality argument does not stand up to case law. The jury is justified in basing an award on many factors beyond the infringement-related profits and percentages of Defendant's overall business.

As for the jury's measure of Cox's conduct, Sony provides an array of evidentiary examples from trial to argue that Cox's graduated response program essentially was a charade. The undisputed backdrop for Defendants' conduct included P2P activity as "[n]early 13% of traffic on Cox's network," where ninety-nine percent of P2P traffic is infringing, and hundreds of thousands of infringement notices from Plaintiffs – Cox never questioned the accuracy or reliability of the information in the infringement notices, but only accepted a fraction of them.[29] Dkt. 697 at 4-5. In essence, Plaintiffs point to evidence to say that, despite having CATS in place, and an overall graduated response program, Cox understaffed its groups to address infringement, made continued efforts to keep infringing customers, and indeed continued to serve nearly all of them. The sham policy, Sony says, included "soft terminations" with immediate reactivation, clean slates for repeat infringers, and a clear prioritization of customer retention and revenue generation over the DMCA. *Id.* at 11-13. When terminations were to be enforced for longer periods of time, Cox allegedly just stopped terminating infringing subscribers altogether. *Id.* (20 terminations for copyright infringement out of 5.8 million total notices during the Claim Period). Plaintiffs note the contrast in 2013 and 2014, between terminations for copyright infringement, 32, and terminations for failure to pay bills, approximately 620,000.

---

[29] With caps on the number of notices Cox would receive from each source like RIAA, Sony notes that Cox still received, in total, "nearly *5.8 million* infringement notices during the claim period." Dkt. 697 at 5 (emphasis original).

With respect to the appropriate measure of profits and the punitive nature of the award, Cox's arguments fall flat.[30] Cox leans on the Supreme Court in *Woolworth* to say that the inability to prove actual damages is a justification for the existence of statutory damages, but not for awarding damages for acts of infringement that the copyright holder cannot prove. Dkt. 685 at 13. But *Woolworth* repeatedly says, "'the court's discretion and sense of justice are controlling, but it has no discretion . . . to go outside of [the statutory range].'" 344 U.S. at 232 (citing *L.A. Westermann*, 249 U.S. at 106-07). Contrary to Defendants' claim that there is no justification for damages where infringement is not proven, the Supreme Court said that a statutory award would be "one based on a necessarily somewhat arbitrary estimate within the limits permitted by the Act." *Id.* at 232.

The jury heard evidence about Cox's services beyond the internet, and how they factored into corporate decision making. Indeed, Cox's services are generally bundled, intertwining revenue streams from each service such that a reasonable jury could consider the effect of one service on another. *See* Trial Tr. 1777:17-1778: 4 (Lehr) (explaining the economic benefit of bundled services to Cox and its customers). Cox did not consider its customers in silos by service; to the contrary, the abuse team looked at the total revenue coming from each subscriber when considering possible suspension or termination. *See, e.g.*, PX 347 (Jun. 12, 2014 email from Andrew Thompson (CCI-Atlanta) to the abuse team: "This customer will likely fail again, but let's give him one more change [sic]. [H]e pays 317.63 a month."); PX 342 at 3 (Mar. 27, 2014 email from Joseph Sikes to abuse team members, counseling to try to avoid terminating because "[t]his Customer pays us over $400/month and if we terminate their [sic] internet services, they will likely cancel the rest of their services.").

---

[30] The jury instruction including "the need to punish Cox" is discussed *infra* Part III.B.1.b.ii.

Cox also elevated the company's overall interests over those of copyright holders, protecting its network by allocating resources away from DMCA enforcement. *See* PX 245 (Jan. 17, 2010 email from Jason Zebrak to abuse team members, explaining that they could just start the DMCA count over again because "DMCA does not hurt the network like DOS attack, spam or hacking. It is not something we advertise, however."). Cox's policy was, in essence, "DMCA = reactivate." Trial Tr. 1665:10-11 (referencing Bates No. COX_SONY_510844-46). Overall, Cox's individual conduct could reasonably support the jury's measure of damages within the statutory scheme.

Finally, it was not improper for Sony to present evidence of industry-wide harms. This is not a new consideration. In *Thomas-Rasset* the district court stated:

> All of the potential ills caused by unauthorized peer-to-peer networking and illegal downloading are relevant to the damages award. The Court does not discount that, in aggregate, illegal downloading has caused serious, widespread harm to the recording industry. These facts justify a statutory damages award that is many multiples higher than the simple cost of buying a CD or legally purchasing the songs online.

*Capitol Records Inc. v. Thomas-Rasset*, 680 F. Supp. 2d 1045, 1054 (D. Minn. 2010), *rev'd on other grounds*, 692 F.3d 899 (8th Cir. 2012). While the district court in *Thomas-Rassett* was reversed for an alternative damages theory, its attention to industry-wide harms was affirmed. The Eighth Circuit reiterated that copyright protection "is meant to achieve an important public interest." *Id.*, 692 F.3d at 908 (citing *Sony Corp.*, 464 U.S. at 429). The court noted the problem of online file-sharing to the recording industry as a whole, including lost industry jobs and an overall reduction in the number of artists and albums released. *Id.* (citing *Sony BMG v. Tenenbaum*, 660 F.3d at 492). Dr. Lehr, a telecommunications internet industry economist focused on the evolution of broadband distribution of digital media, explained at a high level, "[p]iracy just sucks oxygen out of the whole ecosystem and means that there's less money

60

available and less of an incentive to use the money to invest in creative content." Trial Tr. 1744:6-8 (Lehr). Plaintiffs adequately connected Defendants' conduct to the injury to said ecosystem, thus the jury could reasonably award additional damages for the far-reaching adverse effects of piracy.

For the reasons stated herein and the evidence cited in Plaintiffs' brief, the jury's award is reasonably supported by the evidence and based on a range of relevant financial concerns.

b. Miscarriage of Justice

Per-work damages here are $99,830.29 out of $150,000.00, or more than $50,000.00 below the statutory maximum. "'[I]n the specific context of statutory damages under the Copyright Act [and Lanham Act], Congress has placed an upper bound on the damages that a jury can award, which mitigates the risk of a truly untethered award.'" *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 635 (S.D.N.Y. 2018) (alteration original) (quoting *Agence Fr. Presse v. Morel*, No. 10-cv-2730 (AJN), 2014 WL 3963124, at *15 (S.D.N.Y. Aug. 13, 2014)).

Also notable—bewildering, even—in framing this discussion is that Defendants argue, "in the time period at issue there was no authority to suggest that an ISP's failure to terminate a subscriber could or would give rise to secondary liability." Dkt. 685 at 21. Before and during the Claim Period, Cox's employees and the Copyright Act, say otherwise. *See, e.g.*, PX 253 (Aug. 12, 2009 email from Jason Zabek to abuse team leadership: "[I]f a customer is terminated for DMCA, you are able to reactivate them after you give them a stern warning about violating our AUP and the DMCA. *We still must terminate in order for us to be in compliance with safe harbor* but once the termination is complete, we have fulfilled our obligation.") (emphasis added); PX 245 at 1 (Jan. 17, 2010 email from Jason Zabek to abuse team members: "We have been turning customers back on . . . As long as our process of warnings, suspensions, then

termination is followed, we can turn the customer back on and start the DMCA count over."); PX 264 at 1 (Aug. 4, 2010 email from Jason Zabek to abuse team members: "Per legal, we are doing this. No one is really happy with the DMCA process…"); PX 282 at 3 (Apr. 18, 2011 email from Jason Zabek to abuse team members: "We can not just close the ticket due to the DMCA and Cox's responsibility under the law."). The DMCA and the potential for liability clearly shaped Cox's conduct, and the Court finds the DMCA to be compelling authority. Neither the inability to invoke the safe harbor in this litigation nor the timing of adjudication make Cox any less culpable.

### i.   Comparisons to Other Cases

Cox argues that the $1 billion award is grossly excessive relative to statutory damages awards in other copyright cases.[31] Defendants provide an array of statutory damages amounts, claiming that this award cannot stand because it is so much larger than the others. Additionally, Cox contends that its conduct as a secondary infringer should be relevant, as direct infringers should be subject to larger judgments. Because of this distinction, Cox says *BMG* is most applicable, as Cox was similarly situated as an ISP in that case. The per-work award in *BMG* was $17,895.00. Dkt. 685 at 5.

In short, Plaintiffs counter that these numbers are not relevant to this case, as every case has its own facts. This case involved a significant portion of the music industry as plaintiffs, and the jury heard competent evidence illustrating the extensive harm to the industry due to the viral piracy at issue. Dkt. 697 at 22. There is no support, Sony continues, to say that secondary

---

[31] Defendants' brief includes additional numbers and calculations, but a few examples are representative: $1 billion exceeds any other copyright statutory damages ever awarded; $1 billion is more than $400 million larger than the aggregate of all statutory damages awarded between 2009 and 2016; to date, the largest statutory damages award for copyright infringement to survive appeal was $136 million. Dkt. 685 at 3.

infringers should pay "secondary" damages. Moreover, Cox did not seek a jury instruction for this false distinction.

To begin, Congress did not set aggregate damages caps for copyright infringement, nor did it indicate any unit beyond "one work" by which to measure damages. Section 504(c) gives careful attention to the singular work infringed, and damages awards are determined accordingly. The cumulative total is relevant to a Rule 59 inquiry, but the per-work award is emphasized, as it is expressly contemplated in the statute.

The Court understands Cox to claim that remittitur is warranted here because different cases had different outcomes. This is minimally persuasive. "[C]omparing jury verdicts for similar injuries in different cases is 'not greatly helpful because each case must be evaluated as an individual one, within the framework of its distinctive facts.'" *Capitol Records Inc. v. Thomas-Rasset*, 680 F. Supp. 2d at 1055 (quoting *Vanskike v. Union Pac. R.R. Co.*, 725 F.2d 1146, 1150 (8th Cir. 1984) (citation omitted)). Other jury trials have not only different parties, evidence, and facts presented, but also different fact finders. *See Vanskike*, 725 F.2d at 1150 ("Assessment of damages is within the sound discretion of the jury. Each case is evaluated by a different, randomly selected group of individual jurors."). Awarding maximum damages for each of several works infringed, this court has noted, "[w]hen a defendant's acts are 'clearly willful,' courts in this district have been willing to grant maximum statutory damages." *Ez-XBRL Sols, Inc. v. Chapke*, No. 1:17-cv-700 (LMB/TCB), 2018 WL 5808724, at *9 (E.D. Va. Sep. 25, 2018), *report and recommendation adopted*, 2018 WL 5809406 (E.D. Va. Oct. 22, 2018). The award at bar is essentially just two-thirds of what the total damage could have been according to Congress' chosen parameter.

Cox's emphasis on the *BMG* award is overstated for multiple reasons, including different plaintiff groups and a new jury. To start, Cox asserts the "critical caveat[] that the *BMG* judgment was reversed on appeal." Dkt. 703 at 4. It is true that the judgment was reversed and the case was remanded for a new trial, but the Fourth Circuit's reversal was based on an erroneous jury instruction; it never suggested that the magnitude of the damages had an effect on the decision, and the Court declines to forge that inference here.

What is more, Defendants fail to consider that the jury in *BMG* found Cox liable for contributory infringement, but *not* for vicarious liability. *BMG*, 1:14-cv-1611, ECF No. 754 (Verdict Form). The jury in the instant case found Cox liable for both. This is a significant difference, making it even more difficult to extrapolate a meaningful comparison between the two cases. The jury's finding of vicarious liability against Defendants is also germane to Cox's argument that secondary infringers are generally less liable than direct infringers. Cox cites to *Columbia Pictures v. Krypton*, in part to illustrate what Defendants describe as behavior worse than its own because the defendants were plausibly viewed as pirates. 259 F.3d at 1195; Dkt. 685 at 25. In *Columbia Pictures*, however, the Ninth Circuit upheld the damages award based on the statutory range and substantial evidence in support of the willfulness finding. There is no basis on which to infer that the secondary nature of the willful conduct had any bearing on the examination of the jury's award. Indeed, Defendants' argument for degrees of culpability is unavailing, as "[e]ven in copyright cases, in which the touchstones of benefit and control have become the defining elements for vicarious liability, we nevertheless are considering 'the broader problem of identifying the circumstances in which it is just to hold one individual accountable for the acts of another.'" *Polygram Int'l Publ'g, Inc. v. Nevada/TIG, Inc.*, 855 F. Supp. 1314, 1325 (D. Mass. 1994) (quoting *Sony Corp.*, 464 U.S. at 435). In short, the thesis of

vicarious liability is holding one accountable for the acts of another; here, the jury held Cox
accountable without qualification.

ii.     *Consideration of Total Profits and Dividends*

Defendants say "the notion that Cox's total wealth is relevant to the deterrence factor is
inconsistent with basic principles of damages," noting that it offers television and telephone
services as well as high speed internet, and deterrence cannot affect provision of those services.
Dkt. 685 at 28. The dollar value of cash dividends paid to Cox's owners during the claims
period was irrelevant and prejudicial, Defendants continue, as they are too attenuated from the
relevant conduct in the case and the Cox owners are not party to the suit. Since only profits may
be used for deterrent purposes, Cox claims, the dividend amounts – "1 to 1.5 billion a year," as
Plaintiffs' counsel put it, were inappropriate.

Plaintiffs argue it is axiomatic that a wealthier defendant will require a greater sanction to
have a deterrent effect. As one court said, "[t]he wealth of the defendant has been widely
recognized as relevant to the deterrent effect of a damages award." *Lowry's Reports, Inc. v. Legg
Mason, Inc.*, 302 F. Supp. 2d 455, 461 (D. Md. 2004) (collecting cases). In *Basic Books, Inc. v.
Kinko's Graphics Corp.*, Plaintiffs note, the court "conclude[d] that substantial damages [were]
necessary to deter Kinko's from repeating the conduct proved," considering not only the
company's net income ($3 million), but also its total assets ($15 million). 758 F. Supp. 1522,
1545 (S.D.N.Y. 1991).

The overall size and wealth of the defendant is a valid consideration for a statutory
damages award. Indeed, the jury is justified in finding that a "'sizeable award . . . is both
suitable and necessary to punish and deter a corporation of this size.'"  *Lowry's Reports*, 302 F.
Supp. 2d at 461 (quoting *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 485 (7th Cir.2003)).
The distinction Cox makes between consideration of profits and dividends is contrary to the idea

of capturing the big picture for purposes of deterrence, not just profit.  To the extent that the

damages serve a punitive function, discussed below, courts have compared a defendant's wealth

to the award.  "Recognizing that the defendant's wealth can also be a factor in assessing the ratio

. . . [t]he award was [not] out-of-line with defendant's net worth. . . . The ratio of the award is not

excessive in view of this financial picture." *Swinton v. Potomac Corp.*, 270 F.3d 794, 818–19

(9th Cir. 2001) (internal quotation omitted).  The whole "financial picture" is more helpful in

assessing deterrence than fractions thereof.  Additionally, as described above, Cox's services are

generally bundled together.  This blends motivations for and specific effects of business

decisions, making it difficult if not impossible for a jury to ascertain the true relative values of

Cox's services.

Furthermore, Cox cannot escape the broader financial picture when its own

representations to the jury extended far beyond the infringing conduct at issue.  Cox did not

introduce itself within the framework of the infringing actions at bar.  Rather, Defendants opened

their case by saying Cox "has tens of thousands of employees and owns television and radio

stations, newspapers, cable, security, and automotive business throughout the United States."

Trial Tr. 66:19-21.  Defendants did not clarify where within or what portion of this enormous

company the jury should limit its consideration, nor whether they were referring to Cox

Enterprises or its subsidiaries.  The evidence at trial did not give the jury a reason to doubt that

Cox was the large and long-standing fixture of the industry it claimed to be.  Further, throughout

trial Defendants framed the termination discussion by emphasizing the importance of the internet

in all aspects of consumers' daily lives.  But the jury was free to interpret this as an emphasis on

the durability of Cox's market position given nearly inelastic demand for internet services.  The

Court cannot divine the jury's intentions, though it would be reasonable for deterrence to factor significantly in the award.

   iii.    *Punishment as a Statutory Damages Consideration*

In addition to profits and cash dividends, Defendants object to "the need to punish Cox" as a factor to consider for statutory damages in the jury instructions.

Under the Copyright Act, as amended, "the Supreme Court has found that the statutory damages provision of the Copyright Act does 'not merely compel[ ] restitution of profit and reparation for injury but also is designed to discourage wrongful conduct.'" *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 442 (4th Cir. 2011) (citing *E. & J. Gallo Winery*, 286 F.3d 270, 278 (5th Cir. 2002) (quoting *Woolworth*, 344 U.S. at 233)). The Supreme Court did not stop at discouragement, as, in *Feltner* it said, "an award of statutory damages may serve purposes traditionally associated with legal relief, such as compensation and *punishment*." *Feltner*, 523 U.S. at 352–53 (emphasis added) (additional citations omitted). Through the twentieth century "[t]he Supreme Court . . . reaffirmed that '[e]ven for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy.'" *Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 502 (1st Cir. 2011) (quoting *Woolworth*, 344 U.S. at 233). Vindication of the statutory policy, as an aim, appears to extend beyond deterrence.

It is established that a plaintiff under the Copyright Act may elect either actual or statutory damages. 17 U.S.C. § 504. There is no discrete punitive option:

> As a general rule, punitive damages are not awarded in a statutory copyright infringement action. *See* 4 *Nimmer* § 14.02[B], at 14–23 to 24; *Oboler v. Goldin*, 714 F.2d 211, 213 (2d Cir.1983). The purpose of punitive damages—to punish and prevent malicious conduct—is generally achieved under the Copyright Act through the provisions of 17 U.S.C. § 504(c)(2), which allow increases to an award of statutory damages in cases of willful infringement. *See* 4 *Nimmer* § 14.02[B], at

14–23 to 24; *Kamakazi Music Corp. v. Robbins Music Corp.*, 534 F.Supp. 69, 78 (S.D.N.Y.1982).

*On Davis v. The Gap, Inc.*, 246 F.3d 152, 172 (2d Cir. 2001), *as amended* (May 15, 2001).

In accordance with statutory damages' far-reaching objectives, a judge or jury in the Fourth Circuit may assign weight to a range of factors when determining a statutory award for copyright infringement, including but not limited to:

> [A]ny evidence that the defendants have a history of copyright infringement; any evidence that the defendants are apparently impervious to either deterrence or rehabilitation; the extent of the defendant's knowledge of the copyright laws; any misleading or false statements made by the defendants; . . . and any factor which the jury believes evidences the defendants knew, had reason to know, or recklessly disregarded the fact that its conduct constituted copyright infringement.

*Superior Form Builders*, 74 F.3d at 496 (additional citations omitted). In cases of willful infringement, courts have emphasized not only the defendant's culpability for the infringing conduct and deterrence thereof, but also the defendant's patterns of behavior and general attitude as applied to the case:

> (1) the defendant's history of copyright infringement, *see, e.g., Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 496–497 (4th Cir. 1996); (2) deterrence against future violations of copyright infringement, *see, e.g., International Korwin Corp. v. Kowalczyk*, 855 F.2d 375, 383 (7th Cir. 1988); (3) the defendant's purpose and intent, *see, e.g., Sony BMG Music Entertainment v. Tenenbaum*, 660 F.3d 487, 503–4 (1st Cir. 2011); and (4) the attitude and conduct of the parties, *see, e.g., Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1126 (2d Cir. 1989).

*Spanski Enterprises, Inc. v. Telewizja Polska S.A.*, No. 12-CV-957 (TSC), 2017 WL 598465, at *1 (D.D.C. Feb. 14, 2017), *aff'd*, 883 F.3d 904 (D.C. Cir. 2018).

Ultimately, beyond actual harm, and "beyond deterrence, '[i]n a case where a defendant's infringement is found to be willful, the act contemplates that the award may, in the judge's discretion, punish the wrongdoer.'" *EMI April Music, Inc. v. White*, 618 F. Supp. 2d 497, 508

(E.D. Va. 2009) (Davis, J.) (quoting *Music City Music v. Alfa Foods, Ltd.*, 616 F. Supp. 1001, 1003 (E.D. Va. 1985)); *see also John Wiley & Sons*, 327 F. Supp. 3d at 635 ("Statutory damages serve multi-faceted purposes, including compensating the owner, penalizing the infringer, and deterring future infringement.").

Insisting that the punitive verdict is untethered to the evidence, Cox cites, *inter alia*, to *Woolworth* for the repeated assertion that the purposes of statutory damages are restitution of profit, reparation for injury, and discouraging wrongful conduct. Dkt. 703 at 6 (citing *Woolworth*, 344 U.S. at 233). Defendants maintain that *Woolworth* "says nothing about punishment." Dkt. 685 at 23. The Court is hesitant to accept this conclusion, as the very paragraph Cox cites includes: "[e]ven for uninjurious and unprofitable invasions of copyright the court may, if it deems just, impose a liability within statutory limits to sanction and vindicate the statutory policy." *Woolworth*, 344 U.S. at 233.

For these reasons, and due consideration of the Parties' additional arguments, overall profit evidence and "the need to punish Cox" instruction were both within the bounds of the law for the jury's consideration.

Accordingly, the Court will not upset the jury's measure of $99,830.29 per work based on Federal Rule of Civil Procedure 59.

### 2. *Violation of Due Process*

Having rejected Defendants' arguments thus far, the Court proceeds to consider Cox's constitutional claims. In *St. Louis, I. M. & S. Ry. Co. v. Williams*, the Supreme Court upheld an Arkansas state statutory damages award against a railroad company charging rates above what the statute prescribed. 251 U.S. 63 (1919). The *Williams* court acknowledged that the damages were "essentially penal," and, even if the award is paid to private parties rather than the state, "nor does . . . [that] require that it be confined or proportioned to his loss or damages." *Id.* at 66.

69

The states contravene the Fourteenth Amendment, the court said, "only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *Id.* at 66-67.

Cox frames *Williams* to say that statutory damages awards *can* be unconstitutional if they are so severe, oppressive, and disproportioned to the offense they they are obviously unreasonable. *Id.* Cox argues that the award is shocking, and that the constitutional inquiry must include proportionality between the offense and the magnitude of the statutory damages award. Defendants also claim that Cox's underlying conduct was not so reprehensible as to warrant a $1 billion award. Defendants say,

> In short, Cox's infringement involved no misappropriation or exploitation of Plaintiffs' works; was a tiny and incidental part of an otherwise lawful, socially valuable activity (providing high-speed internet access); was similar in most key respects to conduct that Plaintiffs expressly allowed other ISPs to engage in; and occurred in spite of Cox's active efforts to discourage direct infringement via warnings, soft suspensions, and—in rare cases—terminations.

Dkt. 703 at 16. Defendants cite to *Golan v. Freeeats.com, Inc.*, a Telephone Consumer Protection Act (TCPA) case, where the Eighth Circuit affirmed a finding that the statutory damages were unconstitutional. 930 F.3d 950 (8th Cir. 2019). Cox describes itself and the *Golan* defendants as "relatively non-culpable in light of the evils that the statute is intended to remedy." Dkt. 703 at 17.

The aggregate damages are especially important to consider when facing a due process challenge, Defendants continue, because it amplifies disproportionate damages to make them "severe and oppressive" under *Williams*. The absolute amount is what matters, Cox says, as in the *Golan* case, where the Eighth Circuit found a $1.6 billion award wholly disproportioned and obviously unreasonable based on the offense.

On the other hand, Sony cites *Williams* as an instance where the Supreme Court upheld an award approximately 113 times the $0.66 violation, showing great deference to legislative guidance, and recognizing that the award may address "the public wrong rather than the private injury." *Id.* at 66; *see* Dkt. 697 at 23 (quoting *Capitol Records*, 692 F.3d at 909). Sony also reiterates the extraordinarily deferential standard of review. In this case, where the award is more than $50,000.00 below the statutory cap, "an award of this magnitude was foreseeable and is 'not so severe and oppressive as to be . . . obviously unreasonable.'" *John Wiley & Sons*, 327 F. Supp. 3d at 635 (alteration original) (quoting *Williams*, 251 U.S. at 67-68). Plaintiffs argue there are salient differences between the facts at bar and those in Cox's cited authorities—which are based on inapposite statutory schemes and divergent conduct.

"Because Congress specifically determined the appropriate statutory range for damages in trademark and copyright actions, a court's review of such a reward 'is *extraordinarily* deferential.'" *John Wiley*, 327 F. Supp. 3d at 635 (emphasis added) (quoting *Zomba Enters., Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 587 (6th Cir. 2007)). But Defendants are correct to say there is a possibility, however slight, for statutory awards within the established range to be unconstitutional; the underlying award here is not.

While not *per* se constitutional, an award within range, such as "awarding $100,000 out of a possible $150,000 on Plaintiffs' copyright claims . . . [is] foreseeable." *John Wiley*, 327 F. Supp. 3d at 635. Congress published an infringer's potential liability on the face of the statute in § 504(c), providing clear notice and undercutting Cox's repeated arguments that "the magnitude of the award is shocking." *See, e.g.*, Dkt. 685 at 19. Whereas a defendant ignorant of the statute might be shocked by a similar outcome, there is ample support that Cox knew about both the number of infringement notices and the requirements of the DMCA. *See, e.g.*, PX 335, Feb. 19,

2010 email from Jason Zabek (lamenting Cox's copyright compliance obligations, the head of the Abuse Team wrote, "F the dmca!!!").  As there is no potential ambiguity in construing the statutory dollar amounts, and Cox was keenly aware of the volume of infringement notices it received, the product of these two values was reasonably foreseeable.  The $99,830.29 per-work award is well below Congress's $150,000.00 cap.

Cox cites to *Golan* in its representation "that it is '[t]he absolute amount of the award, not just the amount per violation,' that matters in determining disproportionality under *Williams*." Dkt. 703 at 17 (quoting *Golan*, 930 F.3d at 963 (quoting *Capitol Records*, 692 F.3d at 910)).  But Defendants overstate the emphasis on the absolute amount.  Cox asserts, "it is '[t]he absolute amount of the award . . . ' that matters," whereas the *Golan* court actually quotes *Capitol Records* to say, "[t]he absolute amount of the award . . . is relevant."  *Id.*  To be clear, though the absolute amount is not all that matters, it is relevant to the constitutional inquiry, and the Court treats it as such here.

What is more, Defendants support their absolute amount, not per-work, argument by asking the Court to consider an alternative world.  Cox claims that, were Plaintiffs to prevail on this issue—and based on the volume of infringement MarkMonitor was detecting—Cox might be liable "for $1 billion *per day*—on an annualized basis, roughly the gross domestic product of Ireland—without running afoul of constitutional limits." Dkt. 703 at 17. "That outcome," Cox says, "is absurd." *Id.*  In response, the Court need not go further than to say this very hypothetical is impossible, and Cox made sure of it by capping the number of infringement notices it would accept from Plaintiffs, significantly limiting the number of infringements and works in suit.  It would be arguably absurd for the Court to alter a jury award on this basis.

Cox also cites to *Parker v. Time Warner Entertainment Co., L.P.,* for the proposition that

combining the effects of "'a statutory scheme that imposes minimum statutory damages awards'

with a 'mechanism that aggregates many claims'" may invoke the Due Process clause. Dkt. 685

at 20 (quoting *Parker v. Time Warner Entertainment Co., L.P.,* 331 F.3d 13, 22 (2d Cir. 2003)).

Plaintiffs accurately explain that *Parker* is inapposite to the instant case. Aside from the fact that

*Parker* was not a copyright case and operated under a distinct damages scheme, the main

disconnect is that *Parker* was discussing class certification; the "mechanism" to which the

*Parker* court refers is a class action, and there is no such "mechanism" here.

Further, the award is lawful based on the conduct and related data and information in the

record. The jury had broad discretion to characterize Cox's conduct, as the jurors observed each

witness and assigned credibility to the evidence put before them. As discussed *supra* Part II.B,

the jury's findings of vicarious liability, contributory liability, and willfulness are reasonable on

the trial record. Even so, Defendants again contend that the "offense," or underlying conduct, in

this case does not merit the damages, as there is a lack of proportionality.

*Golan* is instructive, Defendants say, because the court found $1.6 billion to be a

"shockingly large amount" and in violation of *Williams.* But Defendants cannot claim to be

aligned with the defendant in *Golan,* where the statutory damages were fixed, the defendant

"plausibly believed it was not violating the TCPA," the violation lasted approximately six days,

and "the harm to the recipients was not severe." *Id.* at 962-63; *see also id.* at 959 ("The harm

here was the receipt of two telemarketing messages without prior consent."). Cox faced damages

that were not fixed, but rather flexible to the tune of $149,250.00, the violations continued over a

period of years, and the evidence allowed a reasonable jury to determine that the harm to

Plaintiffs was willful and severe.

Moreover, Cox refers to itself as "relatively non-culpable in light of the evils that the statute is intended to remedy." Dkt. 703 at 17. Cox's leadership, however, effectively summarized its supposed termination policy for repeat infringers in an internal email: "DMCA = reactivate." Trial Tr. 1665:10-11 (Sikes) (referencing Bates No. COX_SONY_510844-46). This suggests conduct in direct and deliberate contravention of the statute's intentions.

Ultimately, Defendants offer hypothetical examples of unlawful things Cox did *not* do, but fail to demonstrate why the trial record cannot support the damages award. The Court is not compelled to find the award unconstitutional because, setting the actual facts aside, in Cox's words, "consider[ing] an alternative world," the conduct could have been worse. Dkt. 703 at 16.

The Court has considered these and Defendants' additional arguments, none of which are availing against an in-range award with competent evidentiary support.[32] The aggregate award, while substantial, is not unconstitutional.

### C. Conclusion: Motion for Remittitur, or, in the Alternative, a New Trial

In sum, Plaintiffs were well within their rights to elect both a jury trial and statutory damages. After significant deliberation, the jury awarded $99,830.29 per work, well within the Act's statutory range of $750.00-$150,000.00. 17 U.S.C. § 504(c)(2).

The jury heard evidence justifying its finding of willful infringement, and, therefore, acted within the appropriate statutory range. In light of all facts of the case, the jury could lawfully consider a range of factors and objectives, including, *inter alia*, to sanction and to punish. There is nothing before the Court to suggest that the per-work award is improper; the Court cannot usurp the broad discretion afforded a statutory damages award simply because the

---

[32] In affirming a $20,000.00 per-work award within the $750.00-30,000.00 range, the Fourth Circuit simply said the argument in that case that an "award[] within the statutory range [is] constitutionally excessive []" is an unavailing argument." *Tattoo Art*, 498 Fed. App'x at 348.

case is no longer with the jury.  There is no basis on which to disturb the reasonable findings of the jury, and, therefore, the Court defers to the verdict rendered.

### IV.   CONCLUSION

For the reasons stated herein, and upon due consideration, Defendants' Renewed Motion for Judgment as a Matter of Law (Dkt. 681) is hereby **GRANTED IN PART AND DENIED IN PART**.  Pursuant to Part II.B.3.b.iv of this opinion, *Procedural Considerations and Re-Calculation*, the number of works in suit shall be re-calculated to address multiple copyrights asserted in one work as indicated in 17 U.S.C. § 504(c)(1).

The Motion for Remittitur or, in the Alternative, a New Trial (Dkt. 683) is hereby **DENIED**.  Total statutory damages shall be the product of the total number of works in suit and $99,830.29.

Judgment shall enter once the number of works in suit is finalized.

It is **SO ORDERED**.

June __2__, 2020                                    _____
Alexandria, Virginia                           Liam O'Grady
                                               United States District Judge