**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT, *et al.*, | |
| *Plaintiffs*, | Civil No. 1:18-cv-950 (LO / JFA) |
| v. | |
| COX COMMUNICATIONS, INC, *et al.*, | |
| *Defendants*. | |

**COX'S POST-TRIAL RESPONSE BRIEF REGARDING DERIVATIVE**
<u>**AND DROPPED WORKS**</u>

<u>**PUBLIC VERSION**</u>

## TABLE OF CONTENTS

TABLE OF SUPPORTING DOCUMENTS ................................................................................... ii

INTRODUCTION ............................................................................................................................ 1

BACKGROUND .............................................................................................................................. 2

    A.    Evidence Delineating the Works in Suit ................................................................ 2

    B.    Plaintiffs' Reliance on Title Matching to Prove Their Liability Case ........................ 5

    C.    Works for Which Plaintiffs Were Awarded Statutory Damages but Were Dropped from *Charter* ............................................................................................................ 8

ANALYSIS ...................................................................................................................................... 9

    I.    UNDER THE COURT'S JMOL RULING, 2,370 DERIVATIVE WORKS MUST BE REMOVED FROM THE STATUTORY DAMAGES AWARD ........................................ 9

    A.    Comparing the unique titles on PX-1 and PX-2 shows that 2,220 sound recordings are derivative of compositions in suit. ............................................................................ 11

    B.    For 150 of the non-unique titles, the derivative nature of the sound recording in suit is readily determined using the registration certificates in evidence. ............................. 15

    C.    It is Plaintiffs' burden to prove that they are entitled to statutory damages for every work in suit.  They cannot. ........................................................................................ 19

    II.    SIXTY-SEVEN OF THE 88 WORKS THAT PLAINTIFFS DROPPED FROM THE *CHARTER* LITIGATION SHOULD BE REMOVED FROM THIS CASE. ................... 20

    III.    THE NUMBER OF WORKS IN SUIT SHOULD BE REDUCED BY ONE TO ELIMINATE A DUPLICATE. ...................................................................................... 25

CONCLUSION ............................................................................................................................... 25

**TABLE OF SUPPORTING DOCUMENTS**

| Attachment | Description |
|---|---|
| Appendix I | PX-1 (Plaintiffs' Sound Recordings in Suit) |
| Appendix II | PX-2 (Plaintiffs' Musical Compositions in Suit) |
| Schedule 1 | Derivative Works with Unique Track Names |
| Schedule 2 | Non-Derivative Works with Unique Track Names |
| Schedule 3 | Derivative Works with Non-Unique Track Names |
| Schedule 4 | Registrations that Cover Multiple Asserted Sound Recordings |
| Schedule 5 | Works Dropped From *Charter* For Which Plaintiffs Obtained Statutory Damages in This Case |
| Exhibits 1-2370 ND Exhibits 1-52[1] | Plaintiffs' registration certificates and information from the U.S. Copyright Office's Public Catalog organized by exhibit number and annotated to correspond to Schedule 1, Schedule 2, and Schedule 3 |
| Exhibit A | *Sony Music Entm't, et al. v. Cox Commc'ns, Inc., et al.*, Trial Transcript Excerpts |
| Exhibit B | *Sony Music Entm't, et al. v. Cox Commc'ns, Inc., et al.*, November 26, 2019 Hearing Transcript Excerpts |
| Exhibit C | Reply Report of George P. McCabe, PhD, dated June 19, 2019 |
| Exhibit D | Report of George P. McCabe, PhD, dated April 10, 2019 |
| Exhibit E | *Warner Records Inc., et al. v. Charter Commc'ns, Inc.*, 1:19-cv-00874-RBJ-MEH (D. Colo.), February 19, 2020 Hearing Transcript Excerpts |
| Exhibit F | Discogs.com entry for album *Songs About Jane (10th Anniversary Edition)* |
| Exhibit G | PX 1437 and PX-7008 |
| Exhibit H | Discogs.com entry for album *Williams on Williams* |
| Exhibit I | Discogs.com entry for album *Frank* |

[1] Filed via hard drive, as opposed to ECF, pursuant to ECF 710.

| Attachment | Description |
| --- | --- |
| Exhibit J | Discogs.com entry for album *Bad Blood* |
| Exhibit K | PX-7244 and PX-2300 |
| Exhibit L | Discogs.com entry for album *Scissor Sisters* |

## INTRODUCTION

Following this Court's June 2 order, there can be no real dispute that Plaintiffs can claim an award of statutory damages for only 7,579 works.

In its order, the Court directed the parties to propose a final number of works in suit in response to (1) the Court's determination that Plaintiffs may recover only one award for overlapping sound recordings and musical compositions and (2) developments in related litigation showing that Plaintiffs do not own all the works they have claimed here.  ECF 707 at 52.

As to the first, this Court held that overlapping sound recordings and musical compositions count as only one work eligible for a damages award under 17 U.S.C. § 504(c)(1).  It then asked Cox to "prepare a list of overlapping works in suit," identifying which sound recordings on PX-1 correspond to which musical compositions on PX-2.  ECF 707 at 52.  The Court invited Cox to support its proposed number of works with additional documentation "if Cox finds it appropriate." *Id*.

Cox presents the results of that analysis here.  Cox has identified 2,272 works whose titles appear exactly once on both PX-1 and PX-2, and so are presumptively derivative under the Court's order, unless Plaintiffs can "produce sufficient evidence to demonstrate which, if any, pairings or groupings should remain separate works."  *Id*.  Cross-checking those 2,272 overlapping works against Plaintiffs' copyright registrations confirms that 2,220 are, in fact, derivative.  Plaintiffs cannot object to this methodology, for Plaintiffs have endorsed it themselves.  Indeed, key elements of their liability case turned on the notion that a sound recording is derivative of a composition if the titles match and that the registration certificates can resolve any ambiguity.

For another 150 titles that appear more than once on one or both of PX-1 and PX-2—for example, the title "Angel," which appears four times on PX-1 and three times on PX-2—the

overlapping pairs can be confirmed using information from the corresponding registration certificates.  The total number of derivative works at issue is thus 2,370.

Second, an additional 67 works must be removed from the suit because Plaintiffs have confirmed, in their representations in *Warner Records, Inc. et al. v. Charter Communications, Inc*., No. 1:19-cv-00874 (D. Colo.) ("*Charter*"), that they cannot establish ownership over them.

Third, the number of works in suit should be reduced by one to remove a musical composition that Plaintiffs included twice.

Removing the 2,370 derivative works, the 67 works Plaintiffs dropped from the *Charter* litigation, and one duplicative work—a total of 2,438 works—results in a final number of works tally of 7,579.   At $99,830.29 per work, that translates to a total damages award of $756,613,767.91.

## BACKGROUND

### A.      Evidence Delineating the Works in Suit

Plaintiffs asserted, and were awarded statutory damages on, 10,017 works.  The Record Company Plaintiffs asserted 6,734 sound recordings.  The Music Publisher Plaintiffs asserted 3,283 music compositions.  There are two primary sources of evidence describing the works in suit: Plaintiffs' own PX-1 and PX-2, which list the asserted sound recordings and music compositions, respectively, and approximately 7,000 copyright registration documents relating to those recordings and compositions.[2]

---

[2] For ease of reference, Plaintiffs' PX-1 and PX-2 are attached hereto as Appendix I and Appendix II, respectively.  The total number of registration certificates exceeds the total number of unique registrations because Plaintiffs included on their exhibit list multiple copies of registrations.  *See, e.g.*, ECF 280-1 (PX-645 and PX-4608, which are both for SR0000330440).

### 1.    Plaintiffs' lists of asserted works—PX-1 and PX-2

The list of asserted sound recordings was admitted as exhibit PX-1.  That exhibit identifies each asserted sound recording by track title, artist name, and Copyright Office registration number. The list of asserted music compositions was admitted as PX-2, which identifies each composition by track title and Copyright Office registration number.  Plaintiffs represented to the Court that the works listed in PX-1 and PX-2 are covered by the corresponding registration certificates identified in those exhibits. Cox's analysis relies on that representation,[3] which was a basis for the Court's decision granting summary judgment to Plaintiffs on both the validity and ownership of the works.[4] Plaintiffs are thus estopped from now asserting, inconsistently with their previous representations,

---

[3] Ex. A (Trial Tr. at 105:20-21) (Plaintiffs' counsel to Court) ("[PX-1 is] the list of the record companies' list of sound recordings in the case."); *id.* at 106:12-14 (Kooker Direct) (Q: And do you recognize what's there?  A: Yes.  This is a list of plaintiffs' copyrighted sound recordings in this case."); *id.* at 156:11-13 (Kokakis Direct) ("Q: And what is PX 2 at a high level?  A: It's a list of compositions that are subject to this litigation."); *id.* at 157:7-13 (Kokakis Direct) ("Can you identify a couple tracks that -- and the different columns that are shown here, can you go through them very quickly?  A: Certainly.  It shows the song title, which is listed under Track.  It shows the corporate entity that owns or controls that composition.  And it shows the copyright registration number in the third right-hand column.").

[4] In support of summary judgment, Plaintiffs submitted declarations in which they represented that their works in suit were identified by these registration numbers and the corresponding certificates.  *See* ECF 325-3 (Leak Decl.), ¶ 5, n.1 ("Each of the Copyrighted Recordings is identified in the Second Amended Exhibit A to Plaintiffs' First Amended Complaint (ECF No. 172).");  *see also* ECF 325-9 (McMullan Decl.)., ¶ 5, n.1 (same); ECF 325-5 (Poltorak Decl.), ¶ 5, n.1 (same); ECF 325-4 (Patel Decl.), ¶ 5, n.1 ("Each of the Copyrighted Compositions is identified in the Second Amended Exhibit B to Plaintiffs' First Amended Complaint (ECF No. 172-2).");  *see also* ECF 325-8 (Kokakis Decl.), ¶ 6, n.1 (same); ECF 325-10 (Blietz Decl.), ¶ 6, n.2 (same).  Plaintiffs also provided the Court with the copyright registration certificates (or information from the Copyright Office's website) for the registration numbers referenced on Plaintiffs' Second Amended Exhibit A and B.  *See, e.g.*, ECF 325-3 (Leak Decl.), ¶ 5 ("Appendices SME-12 – SME-58, corresponding to paragraphs 12 through 58 of this declaration, contain charts listing the 3,231 sound recordings (the "Copyrighted Recordings") for which the Sony Music Plaintiffs seek to recover damages from Defendants for copyright infringement in this litigation.  All of the Sony Music Plaintiffs' Copyrighted Recordings have been registered with the U.S. Copyright Office. Appendices SME-12 – SME-58 list the starting Bates number for the corresponding registration certificate (or public catalog information) produced by Plaintiffs in discovery.  In addition, true and correct copies of the registration certificates, and/or copyright registration information obtained from the U.S. Copyright Office's public catalogs, are attached to this Declaration as Exhibits SME-12A – SME-58A.");  *see also* ECF 325-9 (McMullan Decl.), ¶ 5 (same); ECF 325-5 (Poltorak Decl.), ¶ 5 (same).

and the Court's order on summary judgment, that any of the registration certificates listed in PX-1 and PX-2 as corresponding to a particular work in suit do not in fact cover that work.

Based on Cox's review, PX-1 and PX-2 include 2,272 overlapping titles—that is, identical titles that appear no more than once on PX-1 and no more than once on PX-2.  Among many other examples, the title "Locked Out of Heaven" appears exactly once on PX-1 and exactly once on PX-2.  *See, e.g.*, PX-1 (row 5513) and PX-2 (row 3052); *see also* Schedule 1, Ex. 1083.[5]

The titles of some sound recordings and musical compositions appear more than once on each of PX-1 and PX-2.  For example, PX-1 includes four sound recordings with the title "Angel," and PX-2 lists three musical compositions with that same title.  *See* PX-1, lines 141, 1806, 3575, 4378; PX-2, lines 197, 904, 959.

### 2.    Copyright registration certificates

The record also includes more than 7,000 copyright registration certificates—some for individual works, others for compilations of songs—admitted as PX-612 through PX-8478.[6]

Sound recording registrations are issued on Form SR, which generally includes at least the work title, artist, date of publication, work-for-hire designation, date of first publication, date of

---

[5] Schedule 1 is a chart that identifies derivative works with unique titles, that is, titles that appear only once on PX-1 and only once on PX-2.  For each such work, Schedule 1 identifies the "Track" (the song title shared by the recording and composition) as it appears on PX-1, the Artist (as it appears on PX-1), the line numbers from PX-1 and PX-2 where the two works are located, the sound and music compositions recording registration numbers upon which Plaintiffs relied at summary judgment, and which were admitted at trial, the trial exhibit numbers for those registrations, and a brief explanation as to how the sound recording and music composition are related (e.g., same recording artist identified on both certificates, same album identified on both certificates, etc.).  Schedule 1 also references a "Cox Submission Ex. No.," which corresponds to the exhibits on the hard drive Cox submitted in connection with this filing (*see* ECF 710) (the "Cox Hard Drive").  There is an individual folder for each Cox Submission Ex. No. on the Cox Hard Drive.  Within each folder are Plaintiffs' trial exhibit registration certificates.  The certificates are in turn highlighted to reflect information further supporting the derivative nature of the sound recording.

[6] Ex. A (Trial Tr. 2690:5-2707:18) (colloquy resulting in admission of the exhibits).  As the Court's opinion notes, the registrations were provisionally admitted subject to Plaintiffs filing a supplemental pleading objecting to the admission of some or all of them.  ECF 707 at 50.  Plaintiffs filed no such pleading.  *Id.*

registration, and copyright claimant.  There are 1,453 sound recording registrations evidencing the 6,734 asserted sound recordings.  *See* PX-1 (count of unique registration numbers).  The reason why there are more sound recordings than registrations is that many of the sound recordings were registered together as part of a compilation, with the registration certificate typically listing one or more of the album's constituent tracks and the co-registered songs sharing the same registration number.  *Compare* PX-3462 (registration for the album "Iowa" and listing individual tracks) *with* PX-1925 (registration for the sound recording of Mariah Carey's single "#Beautiful").[7]  A total of 6,075 sound recordings in suit are registered on the same certificate as another sound recording in suit; they are listed on PX-1 with the same registration numbers as other works on the same certificate.  *See* Schedule 4 (identifying 6,075 sound recordings in suit that share a single registration number with other sound recordings in suit).[8]

Music composition registrations are issued on form PA, which generally includes work title, author, date of first publication, date of registration, work-for-hire designation, and copyright claimant.  *See, e.g.*, PX-2943 (registration for the musical composition of Mariah Carey's "#Beautiful").[9]

### B.    Plaintiffs' Reliance on Title Matching to Prove Their Liability Case

The relationship between the titles of sound recordings and musical compositions was central to several aspects of this case, including whether Cox had knowledge that the musical compositions were infringed, whether those compositions were in fact infringed, and the number of works for which Plaintiffs could claim a separate damage award.  In each instance, Plaintiffs

---

[7] For ease of reference, these registration certificates can also be located within Cox Submission Ex. No. 1 & 5, respectively.

[8] In addition, the final column in Schedule 1 notes whether the sound recording at issue is registered on the same certificate as other sound recordings in suit.

[9] *See also* Cox Submission Ex. No. 5.

demonstrated that the relationship between a sound recording and a musical composition could be established by comparing their titles and, where there was any doubt, looking to the registration certificates.

First, Plaintiffs argued that the MarkMonitor infringement notices Cox received established knowledge of infringed musical compositions sufficient for summary judgment on contributory liability, even though the notices listed only the titles of sound recordings.  That was so, they said, because "the compositions are contained within sound recordings," such that notice of the sound recording title conveyed notice of the underlying musical composition.  Ex. B (Nov. 26, 2019 Hr'g Tr. at 41:15-42:11); *id.* at 42:9-11 ("It would be the exact same infringer, the exact same date and time, on the exact same network.  It would be exactly the same.").  And to establish that each of Plaintiffs' works—including the musical compositions—were subject to the infringement notices, Plaintiffs relied at summary judgment on the declaration of their infringement expert, George P. McCabe, PhD.  ECF 325 at 7-8 ¶ 16.  McCabe showed that musical compositions were the subject of infringement notices by comparing the titles of musical compositions on PX-2 to the titles of sound recordings in the Audible Magic data, turning to the registration certificates only to resolve ambiguity stemming from duplicative titles.  As McCabe put it in his export report, he "reviewed the works in Exhibit B [PX-2] and the Audible Magic Data to identify instances where there was only one composition with a particular *track* title in Exhibit B and only one sound recording with same title in the Audible Magic Data, such that [he] could make a match using the *track* title."  Ex. C (McCabe Reply Rpt., June 19, 2019), ¶ 17 (emphasis original); *see also* Ex. D (McCabe Rpt., April 10, 2019), ¶¶ 34-39 (confirming that McCabe's analysis matched the infringement notices to sound recordings listed in PX-1 by "cross-referenc[ing] on *artist* and *track*" and to compositions by "cross-referenc[ing] on *track*," i.e., title)

(emphasis in original).   Where there was "ambiguity" in title matching because "some compositions share the same title," McCabe referred to the copyright registrations to "disambiguate" the "duplicative titles."   Ex. C (McCabe Reply Rpt., June 19, 2019), ¶¶ 9, 14 (noting the need to "disambiguate between compositions with the same title"); *see also* Ex. D (McCabe Rpt., April 10, 2019), ¶¶ 40-45.

Second, at trial, Plaintiffs relied on this same methodology to demonstrate that the musical compositions were infringed.   They had no choice: it was the only methodology their infringement expert ever disclosed.   Without McCabe's title-matching analysis, in the great majority of cases, Plaintiffs had no independent evidence that the overlapping compositions were infringed.

Third, when it came to the number of works, Plaintiffs themselves compared the sound recording titles in PX-1 and music composition titles in PX-2 to determine the number of "[c]orresponding" works in their proposed trial exhibit PX-38:

### Sound Recordings and Musical Compositions

| Works In Suit | |
|---|---|
| Sound Recordings | 7,031 |
| Musical Compositions | 3,402 |
| Total Works | 10,433 |
| | |
| **Intersection of Works In Suit** | |
| Works Claimed Only As Sound Recordings | 4,475 |
| Works Claimed Only As Musical Compositions | 882 |
| Works Claimed With Corresponding Sound Recordings and Musical Compositions | 2,556 |

Source: PX 1, PX 2

PX-38 (cited in ECF 682 at 12).   When Cox relied on that document to support summary judgment on the number of works, Plaintiffs did not protest.   *See* ECF 329 at 40; ECF 392 at 38-40.   Only *after* relying on McCabe's title-matching analysis to win summary judgment on the knowledge

element of contributory infringement did Plaintiffs withdraw exhibit PX-38 and begin representing to the Court that the very analysis their own expert had performed was impossible.[10]

### C. Works for Which Plaintiffs Were Awarded Statutory Damages but Were Dropped from *Charter*

In its Rule 59 motion, Cox explained that, in the very similar *Charter* litigation, Plaintiffs were ordered by the court to produce ownership documents that were not produced in this case. Rather than produce those documents, Plaintiffs amended the *Charter* complaint to remove from consideration more than 400 works, 88 of which were works for which Plaintiffs were awarded statutory damages in this case.[11]   Alerted to evidence that some percentage of the works in suit might have ownership, registration, or chain-of-title problems, the *Charter* court pressed Plaintiffs' counsel on Plaintiffs' ability—or lack thereof—to prove ownership of each individual work in suit:

> Is it acceptable in a federal court after a jury renders a verdict that there may be a 5 percent – I'm going to throw out a number, a 5 percent rate that the collective plaintiffs had no right to the works so that that's $50 million?  Is that an acceptable way to proceed in federal court in a damages case, that you get that $50 million, even though as a technical matter you weren't entitled to it?  Is that proper?

Ex. E (*Charter*, Feb. 19, 2020 Hr'g Tr.) at 27:22-28:4.  Following up on its own question, the *Charter* court pointedly asked Plaintiffs' counsel Mr. Oppenheim whether he believed that "every

---

[10] At trial, asked by the Court to explain why Cox witness Christian Tregillis could not just "add up the number of sound recordings and musical compositions," Plaintiffs' counsel successfully precluded the Tregillis testimony by arguing, in part, that Tregillis' review of only PX-1 and PX-2 meant that he had "not looked at the underlying registration[s], [so] he can't do that analysis." Ex. A (Trial Tr. 2697:6-18).  But as counsel knew, Plaintiffs' expert McCabe had done precisely "that analysis," ███████ ████████████████████████████████████ *See supra* at 7.  Later, in opposing Cox's motion for JMOL, Plaintiffs argued that "there are simply too many separate musical compositions that happen to have the same title to have any certainty" as to which recordings derive from which compositions without going outside the record evidence.  ECF 699 at 17, n.10.  As Plaintiffs knew from McCabe's analysis,████ ███████████████ *See* Ex. D (McCabe Rpt., Apr. 10, 2019), ¶¶ 42-43 (noting that ████████████████████████████████████████████ ████████████████████████████████████).  *see also id.*, ¶ 37 ██████████████████████████████.

[11] *Charter*, ECF 111.

plaintiff that prevailed in the [Cox] case …was the correct legal entity having the correct legal ownership right and [was] entitled to" statutory damages on every work in suit. *Id.* at 30:6-12. After several attempts to avoid answering directly, Mr. Oppenheim finally admitted that "I can't answer that question." *Id.* at 31:2.

The Court's JMOL order invited Cox to identify which, if any, of the works dropped from the *Charter* case were not properly before this Court. ECF 707 at 52. Cox has identified 88 works for which Plaintiffs received statutory damages in this case but which—when pressed for proof of ownership—Plaintiffs dropped from the *Charter* litigation. Those works are listed in Schedule 5.

## ANALYSIS

**I.   Under the Court's JMOL Ruling, 2,370 Derivative Works Must Be Removed from the Statutory Damages Award.**

It is undisputed that Plaintiffs' works in suit include derivative works. Under the Court's order and Section 504(c)(1), Plaintiffs are not entitled to statutory damages for those works. The only questions are how many overlapping works are reflected in the record evidence, and whether Plaintiffs can carry their burden to "produce sufficient evidence to demonstrate which, if any, pairings or groupings should remain separate works" for purposes of statutory damages. ECF 707 at 52.

Per the Court's request, Cox has "prepare[d] a list of overlapping works in suit, identifying which copyrights in PX 1 correspond with which copyrights in PX 2" and accounting for "[e]ach of the 10,017 copyrights asserted at trial." ECF 707 at 52. That list is contained within Schedule 1, Schedule 2, and Schedule 3.

Schedule 1 lists 2,220 works whose unique titles overlap—that is, works that appear exactly once on PX-1 (sound recordings) and exactly once on PX-2 (musical compositions), and

9

for which Plaintiffs' registration certificates either confirm or support the conclusion that the sound recording is derivative of the musical composition.[12]

Schedule 2 lists 52 works whose unique titles overlap but where Cox has determined that the sound recordings in suit are not derivative of the musical compositions in suit bearing the same unique title[13]   That these sound recordings are not derivative of the music compositions in suit bearing the same title is evident from registration certificates in all but two instances,[14] and for those two instances the certificate is consistent with the conclusion that the sound recording is not derivative of the musical composition in suit bearing the same unique title.[15]   Because these sound recordings are not derivative of the music compositions in suit bearing the same title, Cox does not include them in its count of derivative works.

---

[12] For certain of Plaintiffs' works in suit, Plaintiffs did not include registration certificates on their trial exhibit list, or included a certificate that was incorrect or incomplete.  Cox has obtained correct and complete copies of these certificates from the Copyright Office's website and requests the Court take judicial notice of them or, in the alternative, rely on the summary judgment record.  Plaintiffs relied upon these certificates, either by attaching or referencing the certificate's registration number, in support of their motion for summary judgment.  The Court has previously taken judicial notice of these types of documents, ECF 467, and separately noted that the registrations upon which Plaintiffs relied for summary judgment are a part of the record.  ECF 707 at 50-51.  The documents of which Cox requests the Court take judicial notice are contained in Cox Submission Ex. Nos. 113, 174, 222, 299, 303, 346, 384, 386, 389, 514, 549, 552, 566, 781, 825, 844, 871, 977, 1006, 1038, 1095, 1168, 1222, 1236, 1250, 1273, 1587, 1696, 1777, 1815, 1848, 1867, 1879, 1903, 1937, 1972, 2024, 2084, 2219, 2282, and 2285.

[13] Certificates demonstrating these non-derivative ("ND") title matches are contained on the Cox Hard Drive with the prefix "ND Ex.," and correspond to the ND Ex. No. listed on Schedule 2.  In some instances, Cox relies on registration information from the U.S. Copyright Office's website to demonstrate that these sound recordings are not derivative of the music compositions in suit bearing the same title.  The information from the U.S. Copyright Office's website for which Cox seeks the Court take judicial notice is located within the following exhibits: ND Ex. 3, 4, 7, 8, 10, 13, 15, 19, 25, 26, 33, 37-40, and 49.

[14] Schedule 2 includes a brief description of how the registration certificates demonstrate that the sound recording is not derivative of the music composition bearing the same title, either because there is a different musical composition certificate for the sound recording in suit or because the first publication date listed on the sound recording registration is significantly earlier than the first publication date listed on the musical composition certificate, among other stated bases.

[15] *See, e.g.*, Schedule 2, ND Ex. 23 & 31.

Schedule 3 lists 150 non-unique overlapping titles—that is, works whose titles appear more than once on PX-1, PX-2, or both. For these, the registration certificates also confirm that the sound recordings are derivative of the musical compositions. *See* Schedule 3.[16]

Together, then, the record evidence includes 2,370 sound recordings that are derivative of musical compositions in suit and must be cut from the total number of works eligible for awards of statutory damages (the total of Schedule 1 and Schedule 3). Plaintiffs cannot carry their burden to "produce sufficient evidence to demonstrate which, if any, pairings or groupings" Cox has identified here "should remain separate works" for purposes of statutory damages. ECF 707 at 52.

### A.   Comparing the unique titles on PX-1 and PX-2 shows that 2,220 sound recordings are derivative of compositions in suit.

As the Court's order suggests, "prepar[ing] a list of overlapping works in suit" requires "identifying which copyrights in PX 1 correspond with which copyrights in PX 2." ECF 707 at 52. Accordingly, for the track titles that appear only once on PX-1 and once on PX-2, Cox has compared the "copyrights in PX 1" to the "copyrights in PX 2" and determined that 2,220 sound recordings in suit are derivative of music compositions in suit bearing the same title. Plaintiffs are in no position to dispute this because their own liability case depended upon unique-title-matching of exactly this kind. And in any event, for 95% of the title matches, the corresponding registration

---

[16] There are three additional non-unique derivative works that Cox cannot confirm utilizing PX-1, PX-2, and Plaintiffs' registration certificates. Though these sound recordings in suit are in fact derivative of the music compositions in suit, Cox is not counting them here. For reference, those works are: "Devour," by Shinedown, listed on PX-1 at line 5862, which is derivative of the musical composition with the same title listed on PX-2 at line 506; "I Want You," by CeeLo Green, listed on PX-1 at line 6029, which is derivative of the musical composition with the same title listed on PX-2 at line 239; "Someone Like You," by Boys Like Girls, listed on PX-1 at line 943, which is derivative of the musical composition with the same title listed on PX-2 at line 135.

certificates confirm that the works are derivative.  Of the remaining 5%, the certificates of the

unique pairs are consistent with the conclusion that the works are derivative.

> ### 1.    The "list of overlapping works in suit" identifies 2,272 unique compositions that overlap with exactly one asserted recording.

Cox performed the comparison called for by the Court's order, cross-referencing the titles

that appear exactly once in PX-2 against the titles that appear exactly once in PX-1 and determining

those sound recordings in suit that are derivative of the music composition in suit bearing the same

title.  The resulting list, which is attached as Schedules 1 and 2, reveals an overlap of 2,272 unique

sound recordings, of which 2,220 are derivative of musical compositions that share the same title.

*See* Schedule 1.[17]

The following example is illustrative.  The sound recording "Locked Out of Heaven"

appears once in PX-1, at line 5513, listing Bruno Mars as the artist, Atlantic Recording Corp. as

the plaintiff owning the registration, and a registration number of SR0000715738.

### *Fig. 1* – Excerpt from PX-1 (Sound Recordings)

| 5512 | Bruno Mars | Gorilla | Atlantic Recording Corporation | SR0000715738 |
|------|------------|---------|-------------------------------|--------------|
| 5513 | Bruno Mars | Locked Out of Heaven | Atlantic Recording Corporation | SR0000715738 |
| 5514 | Bruno Mars | T | Atlantic Recording Corporation | SR0000715738 |

The musical composition "Locked Out of Heaven" appears once in PX-2, at line 3052,

listing various Warner entities as the plaintiffs owning the registration and a registration number

of PA0001869823.

---

[17] As noted above, the 52 titles that appear exactly once on PX-1 and exactly once on PX-2, for which Cox has determined the sound recording in suit is not derivative of the music composition in suit bearing the same title, are listed on Schedule 2.

**Fig. 2 – Excerpt from PX-2 (Music Compositions)**

| 3052 | Locked Out of Heaven | WB Music Corp. / Warner-Tamerlane Publishing Corp. / W.B.M. Music Corp. | PA0001869823 |
|------|----------------------|----|----|

Because there is exactly one track titled "Locked Out of Heaven" on each of PX-1 and PX-2, the sound recording "Locked Out of Heaven" on PX-1 and the musical composition "Locked Out of Heaven" on PX-2 are "overlapping works in suit" for purposes of the Court's order. Schedule 1 lists 2,220 overlapping works in the following format:

**Fig. 3 – Excerpt from Schedule 1**

| Cox Submission Ex. No. | Track | Artist | PX-01 # | PX-02 # | Reg. No. (SR) | SR Ex. No. | Reg. No. (MC) | MC Ex. No. | Link | Multiple Works Asserted as Part of Same Compilation |
|---|---|---|---|---|---|---|---|---|---|---|
| Ex. 1083 | Locked Out of Heaven | Bruno Mars | 5513 | 3052 | SR0000715738 | PX-3305 (RC) PX-7807 (PC) | PA0001869823 | PX-3651 (RC) | Same artist and album identified on both certificates | X |

Schedule 1, at Ex. 1083.

Plaintiffs have no basis to dispute that a sound recording whose title appears exactly once on PX-1 is derivative of the musical composition whose matching title also appears exactly once on PX-2. As discussed above, they did not dispute it in opposing Cox's motion for summary judgment, their own infringement expert relied on precisely the same inference in his infringement analysis, and their lead counsel relied on it to argue (successfully) that Plaintiffs' infringement notices for the recordings also provided notice as to the corresponding compositions. *See supra* at 5-8.

The overlap of unique titles between PX-1 and PX-2, together with Plaintiffs' consistent reliance on that overlap to prove their infringement case for the compositions, is more than sufficient to establish a prima facie case that the overlapping works are derivative and thus are "one work" for purposes of statutory damages.

**2.     The derivative nature of 2,220 of those overlapping unique works is confirmed by the corresponding copyright registration certificates.**

Cox need not make any additional showing to further confirm that the uniquely overlapping titles are derivative; Plaintiffs, after all, did not.  But if additional evidence were necessary, it can be found in the registration certificates for the overlapping works.

As Schedule 1 demonstrates, for 2,119 of the 2,220 unique titles that Cox has determined are overlapping, the corresponding registration certificates conclusively confirm that the sound recording is derivative of the musical composition—generally by confirming that the two works share the artist, album, ownership information, or publication date.  The "Link" column in Schedule 1 identifies the certificate information that confirms the overlap.  The case of "Locked Out of Heaven" is again exemplary.  For that title, both the sound recording registration certificate and musical composition registration certificate associated with that title in PX-1 and PX-2, respectively, show that the artist and author of the work is Bruno Mars, that the song is associated with the album "Unorthodox Jukebox," and that the date of first publication was December 11, 2012.  *See* Schedule 1, Ex. 1083 (*compare* PX-3305 (sound recording registration) *with* PX-3651 (musical composition registration)).

For the remaining 101 overlapping unique titles, the certificates are at least consistent with the conclusion that the unique overlapping titles are the same "work."  That is, the musical composition certificate includes the title of the corresponding sound recording, and includes no information to suggest that the sound recording is *not* derivative of the composition.  Indeed, in many instances, the first publication dates for the sound recording and musical composition are in close proximity to one another.  *See, e.g.*, Schedule 1, Ex. 662 (*compare* PX-1931, which is the registration certificate for sound recording "Give A Little More," by the band Maroon 5, with a first publication date of August 17, 2010, *with* PX-2946, which is the registration certificate for

14

the musical composition "Give A Little More," with a first publication date of September 21, 2010). In contrast, for the 52 other overlapping titles for which Cox's examination of the certificates revealed that the sound recording is *not* derivative of the music composition, Cox excluded those titles from its calculation of derivative works, as noted above.[18]

To the extent that Plaintiffs can produce evidence sufficient to demonstrate that other overlapping unique titles may be separate works, they would be entitled to retain the damages for such works. Unless and until Plaintiffs produce such evidence, however, the overlap of unique titles on both PX-1 and PX-2, together in most cases with the corresponding registration certificates, establishes that 2,220 of the sound recordings in suit are derivative of the composition with the same title, making the two a "single work" under Section 504(c)(1). The Plaintiffs recovered twice for each of those "single works," in violation of the damages limitation imposed by the statute. The Court should remove those 2,220 works from the statutory damages calculation.

**B.     For 150 of the non-unique titles, the derivative nature of the sound recording in suit is readily determined using the registration certificates in evidence.**

For recordings and compositions that do not share a unique title—that is, for which the same title occurs more than once on either PX-1, PX-2, or both—the correspondence between a

---

[18] For example, there is exactly one sound recording in suit and exactly one music composition in suit titled "Animal." *See* PX-1 (row 3942) and PX-2 (row 1572). The certificate for the sound recording "Animal" states that it is recorded by Ellie Goulding and references her album "Bright Lights (Deluxe). *See* Schedule 2, ND Ex. 3 (PX-7971). The certificate for the music composition "Animal" states that it was contained on a Pearl Jam album. *Id.* (PX-4264). Thus, the certificates offer reason to believe that the two tracks titled "Animal" may not refer to the same underlying work. Although the certificates do not *dispositively* establish that the works are unrelated—and although it is Plaintiffs' burden, not Cox's, to prove that they are entitled to statutory damages on each work—Cox took a conservative approach and excluded "Animal" from its list of derivative works. Cox has also confirmed that there is a separate copyright certificate for the musical composition "Animal," authored by Ellie Goulding, which is not a work in suit, (*see id.* (PA0001786670)), further confirming that the sound recording in suit titled "Animal" by Ellie Goulding is not derivative of the music composition in suit titled "Animal" by Pearl Jam.

particular composition and a particular sound recording is readily demonstrated by cross-referencing PX-1 and PX-2 with the corresponding registration certificates.

For example, there are four asserted sound recordings and three asserted musical compositions with the track title "Angel":

*Fig. 4*

| Sound Recordings (PX-1) | | | | | Musical Compositions (PX-2) | | | |
|---|---|---|---|---|---|---|---|---|
| Title | Artist | Reg. # | PX-1 Line | | Title | Reg. # | PX-2 Line | |
| "Angel" | Dave Matthews Band | SR0000300313 | 141 | | "Angel" | PA0001738403 | 197 | |
| "Angel" | Jennifer Hudson | SR0000674220 | 1806 | | "Angel" | PA0001046461 | 904 | |
| "Angel" | Aerosmith | SR0000085369 | 3575 | | "Angel" | PA0000342822 | 959 | |
| "Angel" | Jack Johnson | SR0000653690 | 4378 | | | | | |

The relationship between any of the "Angel" sound recordings and any of the "Angel" compositions is evidenced by a simple cross-reference to the associated registration certificates. For instance, a review of the registration certificate for the Dave Matthews Band recording "Angel" (SR0000300313, reproduced in Figure 5 below) and the registration certificate for the musical composition "Angel" (PA0001046461, reproduced in Figure 6 below) show that they have same title ("Angel"), performing artist ("Dave Matthews Band"), and first publication date (February 27, 2001). *See* Ex. 2221 (*compare* PX-7115 (sound recording certificate) *with* PX-4591 (musical composition certificate)).

**Fig. 5 – Excerpt from PX-7115**

| | |
|---:|:---|
| **Type of Work:** | Sound Recording |
| **Registration Number / Date:** | SR0000300313 / 2001-08-13 |
| **Title:** | Everyday / Dave Matthews Band. |
| **Imprint:** | c2001. |
| **Publisher Number:** | RCA Records 07863 67988-2 |
| **Description:** | Compact disc. |
| **Copyright Claimant:** | © ℗ on sound recording & artwork; BMG Entertainment (employer for hire) |
| **Date of Creation:** | 2001 |
| **Date of Publication:** | 2001-02-27 |
| **Contents:** | Did it -- When the world ends -- The space between -- Dreams of our fathers -- So right -- If I had it all -- What you are -- Angel -- Fool to think -- Sleep to dream her -- Mother father -- Everyday. |
| **Other Title:** | The space between |
| **Names:** | Dave Matthews Band |
| | BMG Entertainment |

**Fig. 6 – Excerpt from PX-4591**

*Angel.*

| | |
|---:|:---|
| **Type of Work:** | Music |
| **Registration Number / Date:** | PA0001046461 / 2001-05-11 |
| **Title:** | Angel. |
| **Appears in:** | Everyday. RCA/BMG 077863 67988-2, c2001. Compact disc |
| **Publisher Number:** | RCA/BMG 077863 67988-2 |
| **Performer:** | Performed by Dave Matthews Band. |
| **Copyright Claimant:** | Universal-MCA Music Publishing (a division of Universal Studios, Inc.), Aerostation Corporation & Colden Grey, Ltd. |
| **Date of Creation:** | 2001 |
| **Date of Publication:** | 2001-02-27 |
| **Authorship on Application:** | words & music: Glen Ballard & David John Matthews. |
| **Names:** | Ballard, Glen |
| | Matthews, David John |
| | Dave Matthews Band |
| | Universal-MCA Music Publishing |
| | Aerostation Corporation |
| | Colden Grey, Ltd. |
| | Universal Studios, Universal-MCA Music Publishing |

The overlap of the performer (the Dave Matthews Band) and date of first publication (February 27, 2001) demonstrates that the asserted Dave Matthews Band recording is derivative of the asserted composition bearing the same title.

The same method shows that the Aerosmith sound recording "Angel" (registered on certificate SR0000085369, reproduced as Figure 7 below) derives from the musical composition "Angel" (registered on certificate number PA0000342822, reproduced as Figure 8 below):

*Fig. 7 – Excerpt from PX-6858*



*Fig. 8 – Excerpt from PX-4204*



Once again, the musical composition certificate confirms that the composition "Angel" was performed by Aerosmith, directly linking that composition to the sound recording "Angel" listed at line 3575 of PX-1 and registered on certificate number SR0000085369.  *See* Ex. 2222 (*compare* PX-6858 (sound recording certificate) *with* PX-4204 (musical composition certificate)).[19]

_____

[19] The other two sound recordings titled "Angel," by Jennifer Hudson and Jack Johnson, respectively, do not appear to correspond to any asserted musical compositions, so far as can be discerned from the record

This analysis applies to 150 of the asserted recordings that cannot be definitively identified as derivative using just PX-1 and PX-2.  Schedule 3 sets forth the 150 non-unique sound recordings that are derivative of a composition in suit and identifies the registration evidence that demonstrates the derivative relationship.

For the three remaining works with non-unique titles, registration information alone does not confirm the correspondence between the asserted sound recording and the asserted musical composition.  *See supra* n.16.  Although publicly available information about the songwriter shows that the recordings are indeed derivative of the compositions, and although it is Plaintiffs' burden to show separate status, Cox has excluded these three works from its list of derivative works.

### C.    It is Plaintiffs' burden to prove that they are entitled to statutory damages for every work in suit.  They cannot.

As the Court correctly instructed the jury, "Plaintiffs have the burden of proving their case by a preponderance of the evidence."  ECF 671 at 10.  Plaintiffs elected to pursue statutory damages, which are available only "with respect to any one work."  17 U.S.C. § 504(c)(1).  To prevail, Plaintiffs bore the burden of proving not only infringement but also the number and identity of "works" eligible for statutory damages under Section 504(c)(1).

Here—and as this Court has already recognized in its JMOL Order—it is ultimately Plaintiffs' burden "to produce sufficient evidence to demonstrate which, if any, pairings or groupings [of works in suit] should remain separate works under 17 U.S.C. §504(c)(1)."[20]  ECF 707 at 52; *see also EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 101 (2d Cir.

---

evidence.  Cox therefore does not submit that those two sound recordings are derivative of any music composition in suit, and (for purposes of this brief only) does not object to their inclusion in the case.

[20] Because the ultimate burden on this issue lies with Plaintiffs, and Cox has not yet seen the evidence (if any) on which Plaintiffs will rely to meet that burden, Cox may seek leave to file a reply brief if necessary to challenge that evidence.

2016) (placing the burden on the copyright owner to show that works are separate as opposed to parts of compilations).

For all the reasons already given, Plaintiffs cannot meet that burden. They cannot challenge Cox's methodology because they used the same method to make their case for liability: they relied on unique title-matching to prove that Cox had knowledge of, and was liable for, its subscribers' infringement of compositions. *Supra* at 5-8. Indeed, they insisted that only where PX-1 and PX-2 had multiple title matches was it necessary to look for additional information to discern the overlap. Cox is also relying on Plaintiffs' methodology—and their own registration certificates—to establish the derivative status of 150 non-unique titles and to confirm that that 2,220 unique overlapping pairs that Cox has identified include a derivative work. Because Plaintiffs cannot carry their burden of proof, the number of works in the statutory damages calculation must be reduced by 2,370.

## II.     Sixty-Seven of the 88 Works That Plaintiffs Dropped from the *Charter* Litigation Should Be Removed from This Case.

Based on Cox's review of the docket in *Charter*, Plaintiffs received statutory damages in this case for 88 works that they dropped from *Charter* after they were asked to produce ownership and related documentation that they did not produce in this case (the "Dropped Works"). Those works fall into two categories: (A) 50 works for which there is affirmative evidence that Plaintiffs do not own them, or for which there is insufficient proof of copyright validity and ownership in the record, and (B) 38 works that the Court can infer were dropped based on lack of ownership absent sufficient countervailing evidence.

Of the 88 works dropped from *Charter* but claimed here, there is affirmative evidence that Plaintiffs do not own 50 of them, or did not adduce sufficient evidence on summary judgment to establish their ownership.

- The *Charter* plaintiffs dropped "I Always Get What I Want," by Avril Lavigne. *See* Schedule 5, row one.[21]  Plaintiffs in this case claim the work is registered on the U.S. Copyright Office certificate with the registration number SR0000332312. *See* ECF 325-3 (Leak Decl.), ¶ 19.  But that certificate is for the album "Under My Skin," which does not contain the track "I Always Get What I Want."[22]

- The *Charter* plaintiffs dropped nine sound recordings by the group Maroon 5.  *See* Schedule 5, rows 36-41, 43-45.  Plaintiffs in this case claim the works are registered on the U.S. Copyright Office certificate with the registration number SR0000702833.  ECF 325-9 (McMullan Decl.), ¶ 24.  However, that certificate is for "Songs About Jane (10th Anniversary Edition),"[23] a registration from which these particular recordings appear to be excluded, as they are included on "CD 1" of the two-CD set and were previously registered on a separate certificate.[24]

- The *Charter* plaintiffs dropped "Sweetest Goodbye," by Maroon 5.  *See* Schedule 5, row 42.  Plaintiffs in this case claim the work is registered on the U.S. Copyright Office certificate with the registration number SR0000664148.  ECF 325-9 (McMullan Decl,), ¶ 24.  But that certificate is for a "live" version of this track,

---

[21] Schedule 5 identifies the works the *Charter* plaintiffs dropped but for which Plaintiffs received statutory damages in this case.  Schedule 5 includes the information from PX-1 and PX-2 in addition to a reference to the *Charter* plaintiffs' original list of works in suit (*Charter*, ECF 1-1 and 1-2).  These works are missing from the *Charter* plaintiffs' amended list of works in suit (*Charter*, ECF 111-1 and 111-2).  For ease of reference, attached as Appendix 1 and Appendix 2 to Schedule 5 are the *Charter* plaintiffs' original and amended lists of works in suit.

[22] *See* PX-7193.  For ease of reference, PX-7193 is also contained within Ex. 817.

[23] *See* PX-1932.  For ease of reference, PX-1932 is also contained within Ex. 1243.

[24] Ex. F (https://www.discogs.com/Maroon-5-Songs-About-Jane-10th-Anniversary Edition/release/8077928).

which was first published in 2012.[25]  The studio version of this song, for which Plaintiffs apparently sue,[26] was first published in 2002.

- The *Charter* plaintiffs dropped "The Imperial March from the Empire Strikes Back," by John Williams.  *See* Schedule 5, row 29.  Plaintiffs in this case claim the work is registered on the U.S. Copyright Office certificate with the registration number SR0000233783.  ECF 325-3 (Leak Decl.), ¶ 28.  Yet that certificate is for "Williams on Williams: The Classic Spielberg Scores,"[27] an album on which this track does not appear.[28]

- The *Charter* plaintiffs dropped "Someone to Watch Over Me," by Amy Winehouse. *See* Schedule 5, row 30.  Plaintiffs in this case claim the work is registered on the U.S. Copyright Office certificate SR0000614121.  ECF 325-9 (McMullan Decl.), ¶ 20.  This certificate is for the album "Frank."[29]  However, "Someone to Watch Over Me" is not included on this version of the album.[30]

- The *Charter* plaintiffs dropped "Bad Blood (Live Piano Version)," by the band Bastille.  *See* Schedule 5, row 31.  Plaintiffs in this case claim the work is registered on the U.S. Copyright Office certificate SR0000753441.  ECF 325-9 (McMullan

---

[25] *See* PX-1937.  For ease of reference, PX-1937 is also contained within Ex. 1784.

[26] Plaintiffs do not identify "Sweetest Goodbye (live)" on PX-1.  Further, in reviewing Plaintiffs' data of alleged infringement, the "live" version of this track does not appear.

[27] *See* PX-1437 and PX-7008.  For ease of reference, these trial exhibits are attached hereto as Exhibit G.

[28] Ex. H (https://www.discogs.com/John-Williams-4-The-Boston-Pops-Orchestra-Williams-On-Williams-The-Classic-Spielberg-Scores/master/1226921).

[29] *See* SR0000613567, which is contained within Ex. 1696.

[30] *See* Ex. I (https://www.discogs.com/Amy-Winehouse-Frank/release/716019).

Decl.), ¶ 23. That certificate is for the U.S. version of the album "Bad Blood,"[31] on which "Bad Blood (Live Piano Version)" does not appear.[32]

- The *Charter* plaintiffs dropped "Get It Get It," by the Scissor Sisters. *See* Schedule 5, row 46. Plaintiffs in this case claim the work is registered on the U.S. Copyright Office certificate SR0000355220. ECF 325-9 (McMullan Decl.), ¶ 19. That certificate is for the album "Scissor Sisters,"[33] on which this track does not appear.[34]

- The *Charter* plaintiffs dropped 26 sound recordings by the group Bone Thugs-n-Harmony. *See* Schedule 5, rows 3-28. In this case, on summary judgment, Plaintiffs claimed that Sony Music Entertainment ██████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████ ECF 325-3 (Leak Decl.), ¶ 49. The referenced Distribution Agency Agreement, however, ████████████████ *See id.*, Ex. SME-49B (SME_00000361 & SME_00000357). Plaintiffs have never produced any evidence establishing continuing rights to these works, up to and including the period during which Plaintiffs claim Cox's subscriber(s) infringed these works.

---

[31] *See* PX-2147. For ease of reference, PX-2147 is contained within Ex. 152.

[32] *See* Ex. J (https://www.discogs.com/Bastille-Bad-Blood/release/4879295).

[33] *See* PX-7244 and PX-2300. For ease of reference, these trial exhibits are attached hereto as Exhibit K.

[34] Ex. L (https://www.discogs.com/Scissor-Sisters-Scissor-Sisters/release/10436828).

- The *Charter* plaintiffs also dropped nine music compositions asserted by Universal Music Corporation in this case. *See* Schedule 5, rows 75-79, 81-83, and 86. In this case, on summary judgment, Plaintiffs claimed that ███████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████ ECF 325-8 (Kokakis Decl.), ¶ 59. ██

███████████████████████████████ *Id.*, Ex. UMPG-59B (UMPG_00003957). ███████████████████████

███████████████████████. *Id.* Plaintiffs produced no evidence to show that ████████████████. Without such evidence, the administration agreement on its face demonstrates that the agreement is no longer in force, depriving "UMC" of the rights that it claimed at summary judgment. Plaintiff has not met its burden of showing its continued ownership of the rights to these works.

The remaining 38 Dropped Works should be excluded here, too. The fact that Plaintiffs withdrew them in *Charter* after being prompted for proof of ownership strongly suggests that Plaintiffs do not own them. It is Plaintiffs' burden to prove the contrary. If they cannot do so, all 88 Dropped Works should be removed from the damages calculation here. Because 21 of those Dropped Works are also derivative works included in the analysis in Section I above, they should not be counted twice; thus, if the Court agrees to remove all 2,370 derivative works, the total number of Dropped Works that must be removed from the damages award is 67.

III.     **The Number of Works in Suit Should Be Reduced by One to Eliminate a Duplicate.**

Finally, the total actual number of works asserted in this case is only 10,016, as opposed to the 10,017 that went to the jury.  As evidenced by rows 3031 and 3032 on Plaintiffs' PX-2, Plaintiffs listed the musical composition "Shine" twice.  The second listing appears to be a duplicate, as the Track, asserting Plaintiffs, and registration number are identical.  Thus, Plaintiffs' verdict should be reduced by this one "work" as well.  Cox's final count excludes it.

## CONCLUSION

The analysis set forth herein is straightforward, consisting entirely of manual comparisons of PX-1, PX-2, and the registration certificates for the works in suit.  That analysis demonstrates that 2,370 works in suit are derivative of other asserted works, and so are not eligible for statutory damages under the Court's order and Section 504(c)(1).  Removal of the Dropped Works for which Plaintiffs lack proof of ownership or registration eliminates an additional 67 works, accounting for the fact that some of the Dropped Works are derivative and, therefore, already excluded by Cox's analysis.  The total number of works to be removed from the damages award under the Court's order is thus 2,438, leaving 7,579 works in suit that are eligible for statutory damages.

Applying the per-work award of $99,830.29 to the 7,579 remaining works in suit, the statutory damages award should be reduced from $1 billion to $756,613,767.91.

Dated: August 3, 2020                              Respectfully submitted,

                                                            */s/ Thomas M. Buchanan*
                                                            Thomas M. Buchanan (VSB No. 21530)
                                                            WINSTON & STRAWN LLP
                                                            1900 L Street, NW
                                                            Washington, DC 20036
                                                            Tel: (202) 282-5787
                                                            Fax: (202) 282-5100
                                                            Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.
and CoxCom, LLC*

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
Sean R. Anderson (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email:  melkin@winston.com
Email:  tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
Thomas J. Kearney (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA  94111-5840
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
Email:  jgolinveaux@winston.com
Email: tekearney@winston.com

Michael L. Brody (*pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
Email: mbrody@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750
Email:  dhleiden@winston.com

Geoffrey P. Eaton
WINSTON & STRAWN LLP
1901 L Street NW
Washington, DC 20036

Telephone: (202) 282-5000
Facsimile: (202) 282-5100
Email: geaton@winston.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 3, 2020, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users.

*/s/ Thomas M. Buchanan*
Thomas M. Buchanan (VSB No. 21530)
1901 L Street, NW
Washington, DC 20036
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.*
*and CoxCom, LLC*
