# Exhibit C

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,       :
                               :
    -vs-                       :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.       :
                               :
-------------------------------:
```


VOLUME  1




TRIAL TRANSCRIPT

December 2, 2019

Before:  Liam O'Grady, USDC Judge


And a Jury

22

1      of any witness, you may take into consideration the appearance,

2      attitude, and behavior of the witness; the interest of the

3      witness in the outcome of the trial; the relation of the

4      witness to any party in the case; the inclination of the

5      witness to speak truthfully or not; the probability or

6      improbability of the witness's statement, and all other facts

7      and circumstances in evidence.  Thus, you may give the

8      testimony of any witness the weight and value that you

9      determine that testimony is entitled to receive.

10           Please pay careful attention to the testimony of the

11     witnesses because contrary to what you've seen on television,

12     it's not possible to call a witness back or to read their

13     testimony back to you after you have begun deliberating.

14           This is a civil case.  As I've stated, the plaintiff

15     has the burden of proving this case by what's called a

16     preponderance of the evidence.  That means the plaintiff has to

17     produce evidence which considered in light of all the facts,

18     leads you to believe that what the plaintiff claims is more

19     likely true than not.  To put it differently, if you were to

20     put the plaintiffs' and defendants' evidence on opposite sides

21     of the scales, plaintiff would have to make the scales tip

22     somewhat on her side.  If the plaintiff fails to meet this

23     burden, the verdict must be for the defendant.

24           Those of you who have sat on criminal cases will have

25     heard "proof beyond a reasonable doubt."  That requirement does

23

1    not apply to civil cases; and therefore, you should not be

2    concerned with it.

3              You'll be hearing some different terms, and let me

4    give you a brief sketch of what you'll be hearing about with a

5    little more particularity than you've heard so far in the

6    introductions.

7              A copyright is a set of rights granted by federal law

8    to the owner of an original work of authorship.  The owner of a

9    copyright has the exclusive right, among other things, to

10   reproduce the copyrighted work, to prepare derivative works

11   based on the copyrighted work, to distribute copies or phone

12   records of the copyrighted work to the public by sale or other

13   transfer of ownership by rental, lease, or lending.

14             The term "owner" includes the author of the work, the

15   assignee, and any exclusive licensee.  In this case, we are

16   focused on two kinds of copyrighted works:  sound recordings,

17   which are recorded music; and musical compositions, which

18   include music and lyrics.

19             In this case, plaintiffs claim that Cox is

20   contributorily and vicariously liable for the infringement of

21   10,017 copyrighted works by users of Cox internet service.  As

22   I said to you previously, Cox denies that is the case and has

23   asked you to fully consider the defenses that they have.

24             We -- prior to your beginning your service, certain

25   decisions were made by me that plaintiffs have established that

1    they are the owners of the 10,017 copyrighted works in issue --

2    at issue in the case and that the copyright and registration in

3    each of those is valid.  They have also -- plaintiffs have also

4    established the knowledge element of contributory infringement;

5    that is, plaintiffs have established that Cox had specific

6    enough knowledge of the infringement occurring on its network

7    that Cox could have done something about it.

8              Direct infringement is -- well, in order to prove

9    contributory or vicarious copyright infringement, plaintiffs

10   must first establish by preponderance of the evidence that the

11   users of Cox's internet service used that service to infringe

12   plaintiffs' copyrighted works.

13             "Contributory infringement" means that a copyright

14   may be infringed by contributory infringing, and with certain

15   exceptions, a person is liable for copyright infringement by

16   another if the person knows or was willfully blind to specific

17   instances of the infringing activity and induces, causes, or

18   materially contributes to that activity.

19             "Vicarious infringement" means that a copyright may

20   be infringed by vicariously infringing.  A person is liable for

21   copyright infringement by another person if that person has a

22   financial interest and a right in the ability to supervise the

23   infringing activity, whether or not the person knew of the

24   infringement.

25             You may hear testimony or see documents referring to

25

1    infringement and infringement notices.  As I've just gone over

2    briefly in the description of the contributory and vicarious

3    liability instructions, infringement is an issue of fact that

4    you will ultimately decide based on the facts that you hear,

5    but the word "infringement" and "infringement notices" are

6    words that you'll hear often during the case.

7         Infringement notices are notices sent to Cox that are

8    evidence that you may consider.  It's evidence of infringement,

9    but just the fact that there are infringement notices

10   themselves is not alone -- standing alone ultimate proof of

11   infringement without any other evidence.  So it's evidence you

12   may consider and give it the weight that you believe that it

13   deserves, but as a matter of law, it does not prove

14   infringement.

15        You'll also hear testimony and see documents that

16   refer to the Digital Millennium Copyright Act, known as the

17   DMCA.  The DMCA provides that an internet service provider,

18   like Cox, may have a defense to liability arising from

19   infringement on its network and that there is a defense called

20   a safe harbor defense, which is included in the DMCA in part of

21   the statute.  It's not a defense for Cox in this case.

22   However, the failure or the fact that the safe harbor provision

23   does not apply does not bear adversely on the consideration of

24   a defense by the service provider that the service provider's

25   conduct is not infringing under the remainder of the title or

674

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                         Alexandria Division


    -------------------------------:
                                   :
    SONY MUSIC ENTERTAINMENT, et al.,:
                Plaintiffs,         :
                                   :
         -vs-                      :    Case No. 1:18-cv-950
                                   :
    COX COMMUNICATIONS, INC., et al.,:
                Defendants.         :
                                   :
    -------------------------------:



                         VOLUME  4  (A.M. Portion)




                         TRIAL TRANSCRIPT

                         December 5, 2019


              Before:  Liam O'Grady, USDC Judge


                         And a Jury

S. Bahun - Redirect

774

1    majority of those are done at a Level 4.  And the reason is, is

2    that once you have collected all of the data and information

3    using Level 4 with full verification of the file that is being

4    distributed, it's unnecessary to take any additional steps.

5    You have all the information.

6         You've downloaded the song in its entirety and done a

7    full inspection of that file to determine that it is, in fact,

8    an infringing copy of the song that you were looking for.

9         You've then gone back to the network and had -- you

12:08:33 10    can think of it as direct conversations with the individual

11    peers.  And they have told us, we have this file.

12         We then take that hash, match it over here, and we

13    can say, this is definitely the file that we downloaded and

14    expected.

15         And then they're telling us, we have this file and

16    this is how much we're distributing.

17         So at that point you have a full view of the evidence

18    and the data involved.  So going beyond that point for notice

19    sending, it would be -- it's just unnecessary.

12:09:07 20    BY MR. OPPENHEIM: (Continuing)

21    Q.   Based on the documents that you went through with

22    Mr. Brody, the information you saw, and your past experience,

23    has any of that caused you to believe that the evidence that

24    you collected was in any way inaccurate or inadequate?

25    A.   No.

S. Bahun - Redirect

775

1          MR. OPPENHEIM:  No further questions, Your Honor.

2          THE COURT:  All right.  May this witness be excused?

3          All right.  You are excused with our thanks.  Please

4   don't discuss the testimony you have given with anyone until

5   our trial is over.  All right?

6          THE WITNESS:  All right.

7          THE COURT:  Have a good day.

8          THE WITNESS:  Thank you.

9          NOTE:  The witness stood down.

12:10:04 10          THE COURT:  All right.  Next witness.

11          MR. ZEBRAK:  Plaintiffs call Dr. George McCabe.

12          NOTE:  The witness is sworn.

13          THE COURT:  All right.  Good afternoon, Mr. McCabe.

14          Please proceed, Mr. Zebrak.

15          MR. ZEBRAK:  Thank you, Your Honor.

16          GEORGE McCABE, called by counsel for the plaintiffs,

17   first being duly sworn, testifies and states:

18      DIRECT EXAMINATION

19   BY MR. ZEBRAK:

12:11:02 20   Q.   Good day, Dr. McCabe.

21   A.   Good day.

22   Q.   For the record, will you please state your full name.

23   A.   George McCabe.

24   Q.   Where do you work, sir.

25   A.   Purdue University.

S. Bahun - Redirect

776

1   Q.   What is your position at Purdue University?

2   A.   I'm a professor of statistics.

3   Q.   And who retained you in this litigation?

4   A.   Plaintiffs' counsel.

5   Q.   And at a very high level, could you please tell the jury

6   what you were retained to do.

7   A.   Yes.  I was asked to complete two analyses.

8   Q.   And what were they, at just a high level, sir?

9   A.   One was a work in suit analysis.  And the second was a

12:11:43 10   repeat infringer analysis.

11   Q.   And were you able to form any opinions on those two topics

12   that you were asked to research?

13   A.   Yes, I was.

14   Q.   Okay.  Well, let's explore your background, and then we

15   are going to dive into those analyses you have done.

16        Dr. McCabe, I'm going to hand up to you what has

17   already been marked as PX 526.

18   A.   Thank you.

19   Q.   Do you recognize that document, sir?

12:12:18 20   A.   I do.

21   Q.   And what is it?

22   A.   It is a document I prepared.  It's called a CV, and it

23   basically lists my background and my accomplishments as a

24   statistician.

25   Q.   And is it an accurate summary?

S. Bahun - Redirect

777

```
 1    A.    It is.

 2              MR. ZEBRAK:  Okay.  Your Honor, we move its admission

 3    as evidence.

 4              THE COURT:  Any objection?

 5              MR. BUCHANAN:  No, Your Honor.

 6              THE COURT:  All right.  It's received.

 7              MR. ZEBRAK:  Thank you, Your Honor.

 8              Mr. Duval, if you could publish the document, please.

 9    BY MR. ZEBRAK: (Continuing)
```

12:12:51 10    Q.    Dr. McCabe, this is a 38-page document, correct?

```
11    A.    I believe so.

12    Q.    So we're not going to go through it in detail.  It has

13    been a long day already.  But I would just like to spend a few

14    moments on your background before we move into your analysis.

15              Could you start by telling the jury your educational

16    history?

17    A.    Yes.  I have a bachelor's degree in mathematics from

18    Providence College.  And I have a Ph.D. from Columbia

19    University in mathematical statistics.
```

12:13:22 20    Q.    And has your entire career involved statistics?

```
21    A.    Yes, it has.

22    Q.    And where have you spent your career after you obtained a

23    Ph.D. in mathematical statistics?

24    A.    I came to Purdue University, and I have been there ever

25    since.
```

S. Bahun - Redirect

778

1   Q.   And for roughly how long has that been that you have been

2   working at Purdue University?

3   A.   It will be 50 years in June.

4   Q.   All right.  Congratulations.

5   A.   Thank you.

6   Q.   So at a high level, what responsibilities have you had as

7   a professor of statistics at Purdue University?

8   A.   My responsibilities basically consist of three tasks,

9   teaching, research, and service.  Sometimes service is called

12:14:13 10   engagement.

11   Q.   And what has been the subject matter or matters for your

12   teaching?

13   A.   I've taught statistics courses, primarily for graduate

14   students, graduate students, both those getting Master's

15   degrees and Ph.D.s in statistics, and also graduate students in

16   other departments who need to use statistics in their own work.

17   Q.   And what generally has been the subject of your research?

18   A.   Most of my research has been collaborative.  So I work

19   with other researchers who have data that needs to be analyzed.

12:14:52 20   And I'm the one who analyzes their data for them.

21   Q.   Okay.  Well, we'll get into that in a little more detail

22   in a moment.  But I believe you said there was a third area?

23   A.   Yes, the third area would be engagement.  So for most of

24   my career, from 1970 to 2004, I was the director of an

25   organization called the Statistical Consulting Service, which

S. Bahun - Redirect

779

1    provided help for people who needed to use statistics within

2    the university.  That includes faculty, graduate students, and

3    other people who might need the work, but all internal to

4    Purdue.

5    Q.   Okay.  Let's turn your attention back to your CV, sir.

6         Is that an accurate recitation of your professional

7    experience?

8    A.   Yes, it is.

9    Q.   And, Mr. Duval, if you could pan down a little lower.

12:15:57 10        And does that list your teaching positions?

11   A.   Excuse me?

12   Q.   Dr. McCabe, does that list your teaching positions on the

13   first page?

14   A.   Yes.

15   Q.   And if you could turn to the next page of the document,

16   Mr. Duval, underneath Professional Activities.

17        And does this list your professional activities and

18   other honors and societies you've been a part of throughout

19   your career?

12:16:36 20   A.   Yes, it does.

21   Q.   And by the way, where have you been a professor besides

22   Purdue in terms of teaching experience?

23   A.   Yeah, I hold an adjunct professorship at the National

24   University of Ireland in Galway.  I've had sabbaticals at

25   several different places, I think they're listed on the first

S. Bahun - Redirect

780

1    page.  I was at Princeton.  I've been at something called

2    CSIRO, which is a research organization in Australia.  A

3    visiting position at University of Berne in Switzerland.

4    Several other places for shorter periods of time.

5    Q.    Thank you, Dr. McCabe.  And I apologize, I asked you

6    before whether this was a 38-page document, but what page,

7    though, does it begin at with its numbering?

8    A.    Oh, page 12.

9    Q.    And what does it say at the top of this document?

12:17:44 10    A.    Appendix 1.

11    Q.    And why does it begin -- well, first of all, what was it

12    an appendix to?

13    A.    I don't remember.

14    Q.    Well, did you provide a written expert report in this

15    matter?

16    A.    Yes.

17    Q.    And did that include a copy of your CV?

18    A.    That's correct.

19    Q.    Okay.  Okay.  Thank you, Dr. McCabe.

12:18:06 20            So have you written any books in the fields of --

21    field of statistics?

22    A.    Yes, I have.

23    Q.    Mr. Duval, if you could pan over to that.

24            Are those listed here on your CV?

25    A.    Yes, they are.

S. Bahun - Redirect

781

1   Q.   Could you tell the jury something about one of your books.

2   A.   Yeah.  So the first book listed there, actually the first

3   two entries refer to the same book, but we added a different

4   coauthor.

5            So it's a book that's in its ninth edition.  The

6   first edition was in 1989, and we're working on the tenth

7   edition now.  It's used by a large number of colleges and

8   universities, both in the United States and elsewhere.  It's

9   been translated into several foreign languages.

12:18:59 10   Q.   Thank you, Dr. McCabe.

11            And, Mr. Duval, if you could turn to the list of

12   publications on what's numbered page 15.

13            Dr. McCabe, is this an accurate list of publications

14   you've authored during your career?

15   A.   Yes, it is.

16   Q.   And that begins on page 15 and runs all the way through

17   page 30, about 229 of them; is that correct?

18   A.   That's correct.

19   Q.   And do these all involve the field of statistics?

12:19:26 20   A.   Yes, they do.

21   Q.   Have you testified as an expert in litigation previously?

22   A.   Yes, I have.

23   Q.   And in what field?

24   A.   In a variety of fields.  Initially, in several suits

25   related to equal employment opportunities, salary, promotion,

S. Bahun - Redirect

782

1   hiring.  More recently, I testified in an issue related to the

2   recall of pet foods that were contaminated.

3   Q.   Well, putting aside the subject area of the disputes, what

4   was the purpose for your involvement in those litigations in

5   terms of what you brought to them?

6   A.   Basically my job was to take data, analyze it, present the

7   results of my analysis to people who needed to use those

8   results.

9   Q.   Were you testifying in the field of statistics in those

12:20:35 10   matters?

11   A.   Yes.

12   Q.   And in -- apart from expert work in litigation, applying

13   statistics and your work at Purdue, did you have other

14   experience in the field of statistics?

15   A.   Yes, I have.

16   Q.   And could you elaborate on that a little bit.

17   A.   Yeah.  So some recent work was on women's bone health and

18   osteoporosis, and the use of botanicals like plums and

19   blueberries to prevent bone loss.

12:21:13 20        I've also recently worked on a project on the use of

21   some plants that are grown by Native Americans in North

22   Carolina that have potential benefits for Parkinson's patients

23   to help with their symptoms.

24   Q.   I'm sorry.  I didn't --

25   A.   Yes, and, you know, many other things.

S. Bahun - Redirect

783

1   Q.    And in those matters that you've been referring to, are

2   you the subject area expert, For instance, in Parkinson's

3   disease or in the other issues you were mentioning?

4   A.    No, I'm not.

5   Q.    And what is the expertise that you brought to bear in

6   those matters?

7   A.    It's my background in applied statistics, which I use to

8   work on the data provided by those people.

9   Q.    Sure, and -- well, first of all, let me take a step back.

12:22:05 10  You just mentioned applied statistics, and I'm going to get to

11  that.  But can you start off and -- you know, many of us --

12  many of us have probably heard the word "statistics" before.

13        But as a -- someone who has taught in the field for a

14  very long time, could you explain what statistics is.

15  A.    Yes.  The way I view it is I use mathematics and I use

16  computing to study data.  The study involves analyses that I

17  perform.  And part of my role also is then to take the results

18  of my analyses and present them to people who would need to

19  make decisions.  That could be the -- a national workshop or a

12:22:57 20  peer review journal.  Or, as today, a jury who might -- needs

21  to make a decision.

22  Q.    Have you done work on government panels previously?

23  A.    Yes, I have.

24  Q.    And in what capacity?

25  A.    Again, as a statistician or a statistical expert.  I

S. Bahun - Redirect

1    worked on the school lunch program, and then several other

2    issues related to health generally.

3    Q.   Thank you, Dr. McCabe.  Could you explain why statistics

4    is valuable.

5    A.   Yes.  I think it's valuable because we need to have a

6    solid foundation for our decisions.  So some statistics is

7    labeled as decision analysis.

8          Today, we also hear about evidenced-based medicine

9    that when people are treated, we need to have a sound

12:23:55 10  foundation for that treatment.  We need to know that it works,

11   and that process involves statistics.

12          So, in general, there's an idea that statistics is

13   used to assist people in making decisions.

14   Q.   And, Dr. McCabe, are you being paid for the time you spend

15   working in this case?

16   A.   Yes, I am.

17   Q.   And are you being paid by the hour?

18   A.   Yes.

19   Q.   And how much do you charge per hour?

12:24:34 20  A.   $450.

21   Q.   Thank you, Dr. McCabe.  Is the payment of your fees in any

22   way dependent upon the substance of whatever opinion or

23   opinions you provide?

24   A.   No, it is not.

25   Q.   And is the payment of your fees in any way contingent upon

S. Bahun - Redirect

785

1    the outcome of this case?

2    A.    No.

3    Q.    And, Dr. McCabe, do you have an understanding of roughly

4    how many hours you've spent working on this case thus far?

5    A.    Yes.  It's more than 200.

6    Q.    Your Honor, I would move -- well, I'm -- let me take one

7    step before I proceed there.

8             Dr. McCabe, you mentioned the term "applied

9    statistics."  What is that?

12:25:22 10   A.    That involves what I described, that it primarily involves

11   collaboration with other researchers who have data that needs

12   what I am able to do for them.

13             MR. ZEBRAK:  Your Honor, I would offer Dr. McCabe as

14   an expert in the field of statistics, and allow him to testify

15   as such.

16             THE COURT:  All right.  Any objection?

17             MR. BUCHANAN:  No objection.

18             THE COURT:  All right.  He will be received for that

19   purpose.

12:25:47 20   BY MR. ZEBRAK: (Continuing)

21   Q.    Dr. McCabe, just to be clear, are you providing a legal

22   opinion here today?

23   A.    No.

24   Q.    Are you an expert in the field of copyright law?

25   A.    I am not.

S. Bahun - Redirect

786

1    Q.   Are you an expert in the field of -- or are you an expert

2    in peer-to-peer technology?

3    A.   No.

4    Q.   But your experience, statisticians are oftentimes retained

5    to apply their statistical expertise on data in which they're

6    not an expert in, you know, the content of that data; is that

7    correct?

8              MR. BUCHANAN:  Leading, Your Honor.

9              THE COURT:  I'll allow it for --

12:26:25 10  A.   That's correct.

11   BY MR. ZEBRAK: (Continuing)

12   Q.   Dr. McCabe, did you make any assumptions about any data

13   you reviewed as part of your analysis in this case?

14   A.   Yes, I did.

15   Q.   And why is that?

16   A.   In order to do my analysis, the starting point was

17   collection of data sets.  And I assumed that the data speak for

18   themselves, that they -- I took them at face value.  I did not

19   collect the data or verify or establish anything else about

12:26:57 20  them.  I take them as given at face value.

21   Q.   In your experience, is it unusual for you as a

22   statistician to take the data that you're collecting and

23   analyzing at face value?

24   A.   That would be the usual standard, yes.

25   Q.   Dr. McCabe, do you have any reason to believe that the

S. Bahun - Redirect

787

1    data that you were given for purposes of your analysis in this

2    case is not reliable?

3              MR. BUCHANAN:  Objection, Your Honor.  He just said

4    he assumed it was accurate.

5              THE COURT:  Yeah, sustained.

6              MR. ZEBRAK:  We don't need to -- we can just move on.

7              THE COURT:  And we don't need -- you know, counsel

8    have all been making comments about matters today.  Let's just

9    ask our questions and not comment on answers or speak back and

12:27:55 10  forth to each other.  It is confusing to the jury.

11             Please.  Thank you.

12             MR. ZEBRAK:  Yes, Your Honor.  We're moving right on.

13   BY MR. ZEBRAK:  (Continuing)

14   Q.   Dr. McCabe, did you prepare any slides to assist you in

15   your testimony today?

16   A.   I did.

17   Q.   And are those demonstrative slides an accurate summary of

18   your analysis in this case?

19   A.   They are.

12:28:17 20            MR. ZEBRAK:  Okay.  Your Honor, permission to publish

21   the slides.

22             THE COURT:  Any objection?

23             MR. BUCHANAN:  No, Your Honor.

24             THE COURT:  All right, go ahead.

25   BY MR. ZEBRAK:  (Continuing)

S. Bahun - Redirect

788

1  Q.   Dr. McCabe, let's turn to the first slide.  I believe you

2  said you did -- you had two assignments in this case, a works

3  in suit analysis and a repeat infringer analysis, correct?

4  A.   That's correct.

5  Q.   Okay.  So let's review assignment one, the works in suit

6  analysis.  Would you explain to the jury what your assignment

7  was with respect to the works in suit analysis.

8  A.   Yeah, so the first line below the title defines the scope

9  of my analysis.  Sometimes we -- or I would call that a frame,

12:29:04 10  it's a statistical term.  So the frame here is what are called

11  the works in suit.  And there are 10,017 of those works.

12          There are four icons below that.  And these are the

13  requirements that I used or applied to accomplish the works in

14  suit task.

15          So the first requirement is that the work -- and this

16  is analysis about the works in suit.  Again, it's the 10,017

17  works that we're talking about.  So that work must in an

18  infringement notice -- an infringement notice during the claim

19  period.

12:29:54 20          The second is that the work in suit should be in a

21  notice that is the third or later notice for a particular

22  subscriber.

23          In other words, I labeled the notices as a first, a

24  second, a third, et cetera.  So I only looked at third or later

25  notices.

S. Bahun - Redirect

789

1    Next, the infringing notice must contain the work in

2    suit.

3    And the fourth requirement is that the infringing

4    file is on a hard drive that was created by MarkMonitor.

5  Q.   Dr. McCabe, I would like to draw your attention to the

6    third bullet.  A moment ago I believe you said the infringed --

7    well, could you explain what that third bullet is in a little

8    more detail.

9  A.   Yes.  So the notice contains information.  And the

12:30:54 10   information, depending upon the protocol, points either to one

11   work in suit or it can -- in the case of BitTorrent, it can

12   refer to a collection of works.

13  Q.   What is the significance to the reference to "infringing

14   file" in that third bullet?

15  A.   The infringing file is part of the notice.  And that

16   points to -- through these hashes, it points -- it gets us to

17   the works in suit.

18  Q.   Do you have an understanding as to whether the infringing

19   file is identified in the notice?

12:31:34 20  A.   Yes, it is.

21  Q.   And by the way, when we talk about notices, what are we

22   referring to here?

23  A.   They are the e-mails sent by MarkMonitor to Cox.

24  Q.   Okay.  And were you able to form any -- and, first of all,

25   you said that you're not providing any -- you're not testifying

S. Bahun - Redirect

790

1    as a legal expert today, correct?

2    A.    That's correct.

3    Q.    So these requirements that you applied here, where did you

4    come up with those requirements?

5    A.    In consultation with plaintiffs' counsel.

6    Q.    Okay.  Who set these requirements?

7    A.    These were set as part of my assignment, if you will.

8    Q.    Thank you, Dr. McCabe.  Let's turn to your conclusions.

9          Were you able to form any conclusions with respect to

12:32:24 10   your works in suit analysis?

11   A.    Yes.

12   Q.    And did you prepare a slide to overview those conclusions?

13   A.    Yes.

14   Q.    With respect to the top bar labeled Findings, would you

15   please explain to the jury what your overall findings are?

16   A.    Yes.  So that top line is a summary of my findings that

17   all of the 10,017 works in suit were qualified.

18         In other words, they satisfied the four requirements

19   that are described on the previous slide and are illustrated on

12:33:02 20   this slide.

21   Q.    And could you walk us through this slide one component at

22   a time.  What's the checked box next to Claim Period signify?

23   A.    So that means that -- if you recall, the previous slide

24   said the first requirement was that the work in suit should

25   appear in a notice during the claim period.

S. Bahun - Redirect

791

1        So on this slide, the claim period is denoted or

2   described by the yellow bar at the top.  It starts February 1,

3   2013, and ends November 26, 2014.

4        And the checkmark means that all of the 10,017 works

5   in suit did correspond to a notice during this claims period.

6   Q.   Was the claim period the same claim period for every

7   single plaintiff group in this case?

8   A.   No.  There is a note below the bars for the years that --

9   for the Sony ATM/EMI claims, the start of the claim period was

12:34:24 10  August 1, 2013, rather than February 1, 2013.  But that period

11  was the same, the ending date of the claims period for Sony

12  ATM/EMI was the same as for all the others.

13  Q.   And, Dr. McCabe, would you briefly walk the jury through

14  the remaining three checked boxes on this slide.

15  A.   Yes.  So the second is that -- this issue of the third or

16  later notice for a particular subscriber.  So that was

17  satisfied for all of the 10,017 works.

18       That the infringing file in the notice contains the

19  work in suit.

12:35:11 20  And that there is a copy of the work on a hard drive

21  created by MarkMonitor.

22       So all of these -- the four requirements are

23  satisfied.  And the term I'm using is that means those works in

24  suit were qualified.

25  Q.   Dr. McCabe, what data sources did you use for your

S. Bahun - Redirect

792

1    analysis in this case?

2    A.   Yes, I think I prepared a slide for that.  That should be

3    the next one.

4    Q.   Or actually, Dr. McCabe, let me ask you a question.  A

5    moment ago when you were explaining each of the four

6    requirements for your analyses were satisfied, you used the

7    term "qualified."

8         What does that mean?

9    A.   It basically means that the work in suit is connected to a

12:36:23 10   notice.  So we could view it the other way around.  You start

11   with the notice, it points to the work in suit.  So there is a

12   direct connection between those two.

13        And that's what I'm calling qualified, that I can

14   draw the link from the notice to the work in suit.

15   Q.   Okay.  Well, let's turn back to your data sources, and I

16   can ask you a few questions about that.

17        So what is being depicted in the left column with

18   respect to data sources?

19   A.   The left column describes the source of the data sets.  So

12:37:04 20   there are three sources, MarkMonitor, Cox, and the plaintiffs.

21   Q.   And what data from MarkMonitor was within your analysis in

22   this matter?

23   A.   So MarkMonitor is the top data source there.  And there

24   are three files listed to the right.  The first is the notices

25   or the -- actually, I didn't have the notices, but I had a file

S. Bahun - Redirect

793

1    that lists the notices and the information contained in each

2    notice.  So all that -- these are all data files that I had.

3            So there is a file for notices from MarkMonitor.

4    There is a file for the downloads that MarkMonitor downloaded.

5    And there is a file from MarkMonitor about the Audible Magic

6    procedure or connections to go from hashes to works.

7    Q.   And what is depicted with respect to Cox in terms of data

8    from Cox that you considered within your analysis?

9    A.   So Cox also provided three data sets.  The first one

12:38:25 10    listed there is subscriber identification.  So the Cox CATS

11    system has identifiers for subscribers.  It was necessary to

12    have that information to be able to perform my analysis.

13            So it's the file itself connected subscriber IDs with

14    notices.

15            The second file is what I have called the ticket

16    file.  It's the large file that contains the tickets that Cox

17    recorded in their CATS system.

18            And the third is a file that identifies Cox

19    subscribers as -- I used it to distinguish residential from

12:39:17 20    business subscribers.

21    Q.   And when you say the third file, was that the billing

22    information file?

23    A.   I am sorry, the billing information file, yes.

24    Q.   And, finally, to the right of plaintiffs, there is an

25    Exhibit A and B.  What are those two files?

S. Bahun - Redirect

794

1    A.   Right.  These two files comprise the works in suit.  So

2    the first is a collection of sound recordings, and the second

3    is list of compositions.

4    Q.   And I apologize, Dr. McCabe, but would you please

5    elaborate slightly on looking back to the MarkMonitor box, what

6    the middle file is that says Downloads.

7    A.   The downloads are the works that -- or it's a list of the

8    works that are on -- that have been downloaded and are on the

9    MarkMonitor generated drive that they prepared.

12:40:16 10   Q.   I see.  Okay.  Thank you, Dr. McCabe.

11             And what did you do with these data sources once you

12    received them?

13    A.   My first task was to connect them.  And I think the next

14    slide gives an idea of what that involved.

15    Q.   And before we turn to that slide, Dr. McCabe, what does it

16    mean to connect data sources generally?

17    A.   What that involved was to take -- in each step take two

18    data sets and combine the information into a single data set.

19    So there needs to be a connector to track the information that

12:41:02 20   is shared.  There needs to be some sharing of information to

21    merge the files together, basically.

22    Q.   And what benefit, if any, is there in being able to

23    connect data sets with respect to then analyzing data?

24    A.   That was the way that I performed my analysis, it was

25    necessary to make those connections.  In other words, to go

S. Bahun - Redirect

795

1    from the top notices all the way to the bottom recordings, I

2    had to make a series of connections all the way through.

3    Q.   Well, let's look at the next slide then.

4          So these are the data sources that you considered

5    that we just reviewed on the last slide, correct?

6    A.   That's correct.

7    Q.   Okay.  And can you give us some examples of how you

8    connected -- I know it has been a long day already.  We are not

9    going to go through all of these.  But if you could connect

12:42:03 10  some of these for the jury.

11   A.   Yes.  So the simplest one would be the one across the top

12   with the three Cox files.  So there is a variable or an

13   identifier, it is a piece of the file that identifies a Cox

14   subscriber, and it's called an ICOMS ID.

15         So that identifier is in the left most data file,

16   which is the copy infringement tickets.  That's the large

17   ticket file.

18         It's also in the billing information.  And the

19   connector is in this subscriber ID, which is the way to connect

12:42:47 20  those three files -- I am sorry -- it's the ICOMS ID.  Yeah.

21   Q.   Okay.  And so what is the purpose of these lines that we

22   see on this?  So prior to the animation coming up, we just have

23   your data sources.

24         What's the significance of the lines that then

25   appears when the animation pops up?

S. Bahun - Redirect

796

1   A.   So those are the -- those identify the variable that is

2   used to connect the data sets.  Basically, we're merging data

3   sets to combine -- to create a new file that combines the

4   information for the two source files.

5   Q.   And then, Dr. McCabe, once you've -- and were you able to

6   make a connection between these data sources to go from the top

7   to the bottom as you described it?

8   A.   So going from, let's say, the Cox domain to the

9   MarkMonitor domain, we have notice IDs and subscriber IDs.  So

12:43:52 10  there -- that's the way to connect the notices with the

11  subscribers.

12        The notices themselves do not contain an identifier

13  for the subscriber.  So we obtained a subscriber ID file from

14  Cox to attach that identifier to the notices.

15  Q.   But once you connected all these different data sources,

16  what did you then do with respect to analyzing the data?

17  A.   So the analysis is basically to connect the notices with

18  the works in suit.  And that's the bottom line of what -- of

19  what I did.  And to satisfy these four criteria.

12:44:42 20  Q.   Okay.  And just before we move on to your second

21  assignment in terms of the repeat infringer analysis, can you

22  remind the jury of your overall finding with respect to the

23  works in suit.

24  A.   Yes.  My overall finding is at the top of this slide, that

25  all 10,017 works in suit did correspond to a work that

1    satisfied these four requirements.

2    Q.   Okay.  Let's turn to your second assignment, which you

3    referred to as a repeat infringer analysis.

4              Would you explain to the jury at a high level what

5    your repeat infringer analysis involved.

6    A.   Yes.  So in contrast to the first task, which was about

7    works or works in suit, this task was about Cox subscribers.

8    In particular, as indicated on the slide, the frame here, if

9    you will, is the 57,600 subscribers that were reported by

12:45:55 10   MarkMonitor.  So that's the frame.

11             And again, the analysis is an analysis of those

12   57,600 subscribers and their repeats.  So I created a file and

13   counted infringement No. 1, infringement No. 2, et cetera, to

14   be able to look at the repeat pattern of infringements.

15   Q.   And are these -- what's the significance of these items

16   that appear below the frame that you defined of the 57,600

17   subscribers reported by MarkMonitor?

18   A.   So my task was to describe and analyze the patterns of

19   repeat infringers.  That's what I did.  So the five icons there

12:46:57 20   indicate five summaries that I generated as part of my

21   analysis.  The first is what's the distribution of tickets,

22   meaning how many had one ticket, how many had two tickets,

23   et cetera.

24             I looked at the entries that identified subscriber

25   terminations in the Cox ticket data.

S. Bahun - Redirect

798

1          I think I mentioned above, the distinction between

2   residential versus business subscribers.

3          And there are also in the Cox data, there were

4   tickets for notices from other rights holders.

5          So again, these are still the 57,600 subscribers

6   reported by MarkMonitor, but my analysis included notices or

7   tickets generated by notices from other rights holders.  And it

8   also included, as noted on the last entry, it included tickets

9   that occurred or that were generated before the claim period.

12:48:03 10  Q.  Dr. McCabe, you've been discussing use of tickets for this

11  repeat infringer analysis.  Whose data is the ticket data that

12  you're analyzing?

13  A.  The ticket data is the Cox CATS data.

14  Q.  And so, these are Cox's records as to the subscribers who

15  are the subject of MarkMonitor notices; is that correct?

16  A.  That's correct.

17  Q.  Okay.  And let's take these one by one.  Let's first look

18  at your slide on distribution of tickets.

19          So would you walk the jury through this slide, first

12:48:47 20  starting at the -- where it appears in black:  All tickets.

21  A.  So again, that's the frame I use.  It's the 57,600

22  subscribers.  And I looked at all tickets for those that were

23  contained in the -- what I call the ticket data, the Cox data.

24          The red bar at the top indicates the range of dates

25  that are included in that ticket data file that I received from

1    Cox.

2              So the start date is January 1, 2012, and the end

3    date is December 31, 2014.  So there are three years, 2012, '13

4    and '14 that are covered by this analysis.

5    Q.   Dr. McCabe, let me ask you a question, if I could draw

6    your attention in blue where it says:  Cox Copyright

7    Infringement Tickets.

8              Do you see that?

9    A.   I do.

12:49:44 10   Q.   How does that relate to all tickets on the top?  And

11   I'm sorry, that was a clumsy question.

12             When you say you considered all tickets for this pool

13   of 57,600 subscribers reported by MarkMonitor --

14   A.   Yes.

15   Q.   -- is it the case that this includes copyright

16   infringement tickets generated from notices from others in

17   addition to MarkMonitor?  Is that the --

18   A.   That's correct, yes.

19   Q.   Okay.  And let's take it one frame at a time.

12:50:23 20   So what's being depicted in the column that says 3+

21   with the number beneath it?

22   A.   So again, there are -- there's a picture, three or more,

23   and -- there's a picture of three, sorry.  And the 3+ means

24   that I counted the number of subscribers that had three or more

25   tickets.  And that number is 31,628, given in black below the

S. Bahun - Redirect

800

1    3+ and the three icons.

2            So of the 57,600 subscribers that are the frame for

3    my analysis, 31,628 had three or more tickets.

4    Q.   Okay.  And what about the -- if you could move to the next

5    column.  Is the idea there that the top bar represents the

6    number of copyright infringement tickets for the 16,818 Cox

7    subscribers depicted beneath it?

8    A.   That's correct.  So there is -- that's the number, 16,818

9    is the number of subscribers who had six or more tickets.

12:51:43 10   Q.   And, Dr. McCabe, is a copyright infringement ticket --

11   what's your understanding of how that relates to an

12   infringement notice?

13   A.   My understanding is that when MarkMonitor sent an

14   e-mail -- an e-mail notice, if you will, to the Cox system,

15   that caused a ticket to be generated.

16   Q.   Do you know what happens if Cox receives multiple

17   infringement tickets for the same subscriber -- strike that.

18            Do you know what happens when -- in a scenario where

19   Cox receives multiple infringement notices from different

12:52:24 20   parties on a single day for a single subscriber?

21            MR. BUCHANAN:  I'm just going to object.  I don't

22   think he has been offered as an expert on the system, just on

23   data.

24            THE COURT:  All right.  Lay a foundation if you want

25   him to testify to that.  Sustained.

S. Bahun - Redirect

801

1            MR. ZEBRAK:  Sure.

2   BY MR. ZEBRAK: (Continuing)

3   Q.   Dr. McCabe, what's your understanding of what a copyright

4   infringement ticket is?

5   A.   My understanding is that it is generated by a notice.  I

6   believe it can correspond to more than one notice, but I don't

7   recall a lot of details about that part of the structure.

8            In terms of the data, I treated the entry of a ticket

9   as the basic piece of information that I use to compute this

12:53:30 10  distribution.

11  Q.   So this repeat infringer analysis is an analysis of Cox's

12  records?  It's its ticket data, however Cox generates that

13  data; is that correct?

14  A.   That's correct.

15  Q.   Okay.  And can you walk the jury through the successive

16  three columns, starting at 10+?

17  A.   So for ten or more tickets, we had 8,495 subscribers.  For

18  13 or more tickets, there were 5,120 subscribers.  And for 14

19  or more tickets, there were 4,404 tickets.

12:54:16 20  Q.   Okay.  And, Dr. McCabe, I believe you indicated there were

21  a total of five characteristics of these 57,600 subscribers you

22  looked at?

23  A.   That's correct.

24  Q.   And we just reviewed the first one, distribution of

25  tickets; is that correct?

S. Bahun - Redirect

802

1    A.    Yes.

2    Q.    Okay.  Let's turn your attention to the next one.  What --

3    could you walk the jury through what -- through your analysis

4    that's depicted in this slide.

5    A.    Yes.  As I mentioned before, I looked at the Cox data and

6    looked at the entries corresponded to terminations.  When I did

7    that, I found 13 terminations.  So this graphic is an attempt

8    to make a picture out of that finding.

9          So again, we start with the frame, if you will, the

12:55:06  10    57,600 subscribers, and that's the bar on the left-hand side.

11          If you look on the right-hand side, it's a blown-up

12    version of the upper right-hand corner square for the 57,600.

13    And the squares colored yellow with the little icons

14    representing people, they represent subscribers.  Actually,

15    those are the 13.

16    Q.    And what was the time frame for which you had this Cox

17    ticket data that's the subject of your repeat infringer

18    analysis?

19    A.    It's the time frame for the ticket data that we had, which

12:55:56  20    was the three years, 2012, '13 and '14.

21    Q.    So turning your attention back to the slide of the

22    distribution of tickets, in -- these don't consider whatever

23    notices, if any, these 57,600 Cox subscribers may have received

24    prior to 2012; is that correct?

25    A.    Could you repeat that?  I didn't --

S. Bahun - Redirect

803

1    Q.   Sure.  If any of these 57,600 Cox subscribers had

2    copyright infringement tickets prior to January 1, 2012, would

3    that be depicted here in your analysis?

4    A.   Prior to January 1, 2012?

5    Q.   Yes.

6    A.   Yeah, they would be included.

7    Q.   Well, but you just said a moment ago that your -- that the

8    data only is for 2012 to '14, correct?

9    A.   I'm sorry, yes.  I had it reversed.

12:56:55 10        So it does not include data before -- the Cox data

11   that we have starts 2012, ends 2014, those entire three years.

12   And anything outside that range, I did not have data for those.

13   Q.   Okay.  So let's move on to your -- and so, relating these

14   two slides, out of the 57,600, the Cox ticket data showed you

15   that Cox terminated only 13 of that pool; is that correct?

16   A.   That's what the data say, yes.

17   Q.   And that's -- and the ticket distribution includes those

18   that received ten or more, 13 or more, 14, correct?

19   A.   That's correct.

12:57:46 20   Q.   So -- okay.  So out of the -- let's turn to your next --

21   the third of your five areas.

22        THE COURT:  You know, what don't we stop here before

23   you get into the third area.

24        MR. ZEBRAK:  Oh, sure.

25        THE COURT:  We're almost at 1 o'clock.

S. Bahun - Redirect

804

1          MR. ZEBRAK:  Yes, sir.

2          THE COURT:  So let's take our lunch break.  We'll

3     come back at 2 o'clock.  All right.

4          Thank you, you're excused.

5          NOTE:  At this point the jury leaves the courtroom;

6     whereupon the case continues as follows:

7     JURY OUT

8          THE COURT:  All right.  So anything before we recess?

9     Okay.  Then we have a --

12:58:56 10          MS. LEIDEN:  Sorry, Your Honor.

11          THE COURT:  Yes.

12          MS. LEIDEN:  One issue from defendants, briefly.

13          Plaintiffs intend to call by video deposition Jason

14     Zabek.  And depending on witnesses that go today, that video

15     may be at least started today.

16          The parties have exchanged designations and various

17     objections, and we have -- we are going to try to work out any

18     remaining objections that we have prior to the video

19     deposition.  But we wanted to raise to your attention that

12:59:24 20     there may be remaining objections to deposition testimony and

21     exhibits that we will need to resolve with Your Honor before

22     the video begins to be played.

23          THE COURT:  Okay.  So any of the text of the video

24     that you still object to, get it to me as soon as you can and

25     give me an opportunity to look at it and rule on it.  And if

S. Bahun - Redirect

805

1    you need -- if you want to be able to argue it, I'll give you a

2    brief time to do that.

3         And for the other deposition designations that are

4    still being worked on, try and get them to me the night before

5    so that you have an opportunity to splice and put them together

6    not at the last -- they're videos, right?  They're not just

7    transcripts?

8         MR. OPPENHEIM:  They are, Your Honor.  And this, in

9    part, is plaintiffs' fault because last night we tried to cut

13:00:20 10  back and shorten that video because it's far too long for, I

11   think, anybody's desire.

12        So that's why we didn't get it to you in advance.

13   Our apologies.

14        THE COURT:  Okay.  All right.  So -- yes, sir.

15        MR. ELKIN:  A related point, Your Honor, is that

16   currently as it stands, it's about four hours.  And I'm not

17   being critical of it.  But all I'm suggesting is the following.

18   We have from Atlanta and from Hampton Roads, I think, we've got

19   Ms. Trickey, Mr. Carothers --

20        THE COURT:  Mr. Cadenhead.

21        MR. ELKIN:  -- Mr. Vredenburg.  And if it's going to

22   be a four-hour video and these witnesses are already here --

23   and I'm mindful of the fact that it's their strategy, they want

24   to put the witnesses in their order, and I respect that, but if

25   these witnesses are already here out of town.  I would just ask

806

1   the Court to consider how that -- how we proceed.

2          THE COURT:  Yeah.  If putting this video on before

3   those witnesses involves having that jury sit and twiddle their

4   thumbs while we're going through objections, then I'm not going

5   to permit it.  We're going to do it with live witnesses.

6          And after they're done, after we send the jury home,

7   we can go through the deposition designation objections.

8          This case has been going on a long time, and the last

9   thing that I'm going to permit is us to have the jury sitting

13:01:52 10   around while we're yakking about whether something is

11   objectionable.

12          So thank you for bringing that to my attention.

13          All right.  So I have a plea.  The defendant is in

14   custody.  So the, you know, pencils and that kind of stuff

15   probably aren't a good idea.

16          All right.  We're in recess.

17          NOTE:  The morning portion of the case on December 5,

18   2019, is concluded.

19   ------------------------------------------

CERTIFICATE OF COURT REPORTERS

20

21          We certify that the foregoing is a true and
             accurate transcription of our stenographic notes.

22

23          /s/  Norman B. Linnell
            Norman B. Linnell, RPR, CM, VCE, FCRR

24

25          /s/  Anneliese J. Thomson
            Anneliese J. Thomson, RDR, CRR

807

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
      -vs-                      :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

<u>VOLUME  4  (P.M. Portion)</u>

TRIAL TRANSCRIPT

December 5, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

808

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                  SCOTT A. ZEBRAK, ESQ.
 3                                JEFFREY M. GOULD, ESQ.
                                  MICHAEL J. DRUCKMAN, ESQ.
 4                                ANDREW L. GUERRA, ESQ.
                                  LUCY G. NOYOLA, ESQ.
 5                                JIA RYU, ESQ.
                                  Oppenheim + Zebrak, LLP
 6                                4530 Wisconsin Avenue, N.W.
                                  5th Floor
 7                                Washington, D.C. 20015


 8
     FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
 9                                Winston & Strawn LLP
                                  1700 K Street, N.W.
10                                Washington, D.C. 20006-3817
                                    and
11                                SEAN R. ANDERSON, ESQ.
                                  MICHAEL S. ELKIN, ESQ.
12                                THOMAS P. LANE, ESQ.
                                  CESIE C. ALVAREZ, ESQ.
13                                Winston & Strawn LLP
                                  200 Park Avenue
14                                New York, NY 10166-4193
                                    and
15                                JENNIFER A. GOLINVEAUX, ESQ.
                                  THOMAS J. KEARNEY, ESQ.
16                                Winston & Strawn LLP
                                  101 California Street, 35th Floor
17                                San Francisco, CA 94111-5840
                                    and
18                                MICHAEL L. BRODY, ESQ.
                                  Winston & Strawn LLP
19                                35 West Wacker Drive
                                  Chicago, IL 60601
20                                  and
                                  DIANA HUGHES LEIDEN, ESQ.
21                                Winston & Strawn LLP
                                  333 South Grand Avenue
22                                Suite 3800
                                  Los Angeles, CA 90071
23

24

25
```

809

INDEX

WITNESS                          EXAMINATION      PAGE

GEORGE P. McCABE
                                 DIRECT           810
                                 CROSS            816
                                 REDIRECT         865

LINDA TRICKEY
                                 DIRECT           877

G. McCabe - Direct

810

```
 1                  A F T E R N O O N   S E S S I O N

 2              NOTE:  The December 2, 2019, afternoon portion of the

 3      case begins in the absence of the jury as follows:

 4      JURY OUT

 5              THE COURT:  All right.  Ready for our jury?

 6              Okay.  Joe, let's get our jury, please.

 7              NOTE:  At this point, the jury returns to the

 8      courtroom; whereupon, the case continues as follows:

 9      JURY IN

10              THE COURT:  All right.  Please have a seat.

11            GEORGE P. McCABE, PH.D., PLAINTIFFS' WITNESS,

12                      PREVIOUSLY SWORN, RESUMED

13              THE COURT:  All right.  Let's continue, please.

14              MR. ZEBRAK:  Thank you, Your Honor.

15                    DIRECT EXAMINATION (Cont'd.)

16      BY MR. ZEBRAK:

17      Q.   Good afternoon, Dr. McCabe.  Right before we broke for

18      lunch, you were in -- we were discussing your assignment to the

19      repeat infringer analysis, and I believe we were just about to

20      jump into this slide.  Would you please explain to the jury

21      what's being depicted in this slide?

22      A.   Yes.  So for this slide, I classified the, the 57,600

23      subscribers, which I'm calling the frame.  I classified them as

24      residential subscribers or business subscribers.  So there were

25      54,732 residential subscribers, and there were 2,868 business
```

811

1    subscribers.

2            The pie chart depicts that -- those numbers expressed

3    as percents.  So 95 percent of the subscribers were

4    residential, and 5 percent were business.

5    Q.   And, Dr. McCabe, what is the source of the data records

6    you used to assess the breakdown of the Cox subscribers who

7    were the subject of MarkMonitor's notices?

8    A.   Could we go back to the slide that has the datasets on it?

9    Q.   Sure.  That would be -- please let me know when I'm there.

10   A.   Yeah, that's fine.  So it's along the top.  So it's Cox

11   data, and it's the third file, which is -- in this display is

12   called billing information.  So billing information is the

13   connector for the defining residential versus business.

14   Q.   I'm going to, if it's okay, bring us back to the slide we

15   were just on.  Is there anything else about this slide that --

16   A.   I think that's it.  95 percent versus 5 percent, yeah.

17   Q.   Okay.  And would you please explain to the jury what's

18   being depicted in this slide with respect to your repeat

19   offender analysis?

20   A.   Yes.  So here I looked at the -- excuse me -- I looked at

21   the, the source of the, of the notice.  So the notices that I

22   have recorded from, as infringers -- I'm sorry -- the notices

23   from going back to MarkMonitor, for those rights holders, my

24   understanding is they're the plaintiffs in this suit, but the

25   Cox file also contains notices from other rights holders.

G. McCabe - Direct

812

1          So basically here what I did was look again at

2   subscribers, so it's a subscriber analysis, and

3   17,729 subscribers had notices from other rights holders.

4          So, again, 17,729 out of 57,600, that's depicted in

5   the pie chart as 30.8 percent.  So 30.8 percent of the

6   subscribers had notices from other rights holders.

7   Q.   So out of the 57,600 Cox subscribers reported in

8   MarkMonitor's notices, a little less than a third of them were

9   also the subject of notices that led to tickets as reported by

10  the rights holders?  Is that what you're saying?

11  A.   That's correct.

12  Q.   Okay.  And is this also based on Cox's records, the ticket

13  data that you described earlier?

14  A.   That's correct.

15  Q.   Okay.  Looking at the next slide you have here, would you

16  explain to the jury what the purpose of this slide is?

17  A.   Yeah.  The purpose is to depict the analysis that I did

18  related to claims -- or notices, sorry, notices before the

19  claim period.  So if you look at the timeline on the bottom in

20  yellow there, the bar with arrows at the end, that's the

21  definition of a claim period, February 1, 2013, to November 26,

22  2014, with a caveat that there's a different start time for the

23  one plaintiff.

24          Superimposed on that in the gray is the time frame

25  for the Cox ticket data.  So for the Cox ticket data, that

813

1    spans the years 2012, '13, and '14.  So it overlaps -- or the

2    claims period is a subset of that time frame.

3              So if we look at the, the notices before the

4    beginning of the claim period, that is, before February 1,

5    2013, there were 13,441 subscribers who had one or more tickets

6    in that before claim period, the period to the, the left of the

7    center cut in the slide.

8    Q.   Dr. McCabe, I'd like to ask you a question that contrasts

9    this with the works in suit analysis, and looking back at the,

10   if you wouldn't mind going back to the original slide, the

11   works in suit analysis was a third or later notice for a

12   subscriber in the claim period; is that correct?

13   A.   That's correct.

14   Q.   Okay.  But then looking -- and the repeat infringer

15   analysis is the who, it's the people; is that correct?

16   A.   The subscribers, yes.

17   Q.   Okay.  Well -- and then -- oops.

18             And so this -- is there anything else about this

19   slide that you'd like to explain?

20   A.   No.  But just as, as you mentioned or as I mentioned, it

21   depicts the contrast between the claims period and the larger

22   period of time covered by the Cox data that I used for the

23   repeat infringer analysis.

24   Q.   So the 23.3 percent, is it correct that Cox received

25   notices from them both during the claim period and prior to the

1  period?  Is that essentially what this slide is showing?

2          MR. BUCHANAN:  Asked and answered and leading.

3          THE COURT:  All right.  I'll allow the question.

4  BY MR. ZEBRAK:

5  Q.   Would you like me to repeat the question?

6          THE COURT:  Well, just ask him:  What does this data

7  depict?

8          MR. ZEBRAK:  Sure.

9          THE WITNESS:  So, yes.  It's -- again, it's a count

10 of subscribers.  The frame is the 57,600 subscribers reported

11 by MarkMonitor.  Of those 57,600, 13,441 had tickets before the

12 claim period, so to the left of this time frame.  That 13,441

13 represents 23.3 percent of the 57,600, and that's what's

14 depicted in the, in the pie chart there, the 23.3 percent.

15 BY MR. ZEBRAK:

16 Q.   And whose records is this data based on?

17 A.   It's based on the ticket data from Cox.

18 Q.   Okay.  And are you familiar with someone by the name of

19 Christian Tregillis?

20 A.   Yes, I am.

21         MR. BUCHANAN:  Objection, Your Honor.  This is an

22 expert.

23         THE COURT:  Well, I think we've got a preview of a

24 slide with his name on it, but I don't know what that --

25         MR. BUCHANAN:  He hasn't testified yet, so -- I'm

G. McCabe - Direct

815

1   anticipating it would be rebuttal.  And so you're going to ask

2   him questions about his report when he hasn't testified yet.

3          THE COURT:  Okay.  Overruled.  I think that's proper.

4   Mr. Tregillis will have an opportunity to address issues.

5   Well, let's see where you're going with this.

6          MR. ZEBRAK:  Yeah, they had received the slides, and

7   I hadn't heard of an objection, but I'm happy to proceed.

8   BY MR. ZEBRAK:

9   Q.   Are you familiar with who Christian Tregillis is?

10  A.   Yes.

11         THE COURT:  Is he going to critique his report at

12  this stage, or is this something else?

13         MR. ZEBRAK:  No, Your Honor.

14         THE COURT:  Okay.  Go ahead.

15         MR. ZEBRAK:  May we have a quick sidebar?

16         THE COURT:  Yeah.

17         MR. ZEBRAK:  Thank you.

18         NOTE:  A sidebar discussion is had between the Court

19  and counsel out of the hearing of the jury as follows:

20  AT SIDEBAR

21         THE COURT:  All right.  So we don't rebut somebody's

22  testimony based on the report.  We wait until they testify, and

23  then we report -- rebut their testimony if you feel it's

24  proper.

25         MR. ZEBRAK:  Yes, sir.

G. McCabe - Cross

816

1          THE COURT:  So what have you got here?

2          MR. ZEBRAK:  Well, we thought it would just be useful

3   for the jury to understand that Mr. Tregillis agrees that over

4   95 percent of the works in suit match to infringement notices.

5   It's really just showing -- you know, it's sort of

6   provisionally indicating that Mr. Tregillis agrees, but, quite

7   frankly, I mean, if Your Honor wants to do that, we can --

8          THE COURT:  Yeah, let's move on beyond that.  You can

9   cross-examine Mr. Tregillis on that.

10          MR. ZEBRAK:  Yeah.  We just thought it would be

11   useful for the jury, but we can move on.

12          THE COURT:  Okay.

13          MR. ZEBRAK:  Thank you.

14          THE COURT:  All right.  Thank you.

15          NOTE:  The sidebar discussion is concluded;

16   whereupon, the case continues before the jury as follows:

17   BEFORE THE JURY

18          THE COURT:  All right.  Please go ahead.

19          MR. ZEBRAK:  We pass the witness at this point, Your

20   Honor.

21          THE COURT:  All right.

22          MR. ZEBRAK:  Thank you.

23          THE COURT:  Cross-examination, Mr. Buchanan?

24          MR. BUCHANAN:  Yes, please, Your Honor.

25                         CROSS-EXAMINATION

1    BY MR. BUCHANAN:

2    Q.    Good afternoon, Dr. McCabe.  How are you?

3    A.    Fine.

4    Q.    I promise there will be no spreadsheets here for this

5    examination.

6            So you, as I understand it, have been associated with

7    Purdue University for 50 years; is that right?

8    A.    That's correct.

9    Q.    Okay.  And from 2004 to 2018, you were a dean of a

10   department; is that right?

11   A.    I was an associate dean for the College of Science.

12   Q.    And you also taught courses at the same time?

13   A.    I had a reduced teaching load.

14   Q.    Okay.  And you spent, I think, 75 percent of your time on

15   administrative work related to being a dean?

16   A.    That's correct.

17   Q.    And then other time you were teaching as well a course a

18   semester?

19   A.    I was primarily doing research, but, yeah, I did --

20   Q.    Okay.  So is it fair to say that over the last ten years,

21   you've done very little expert testimonial work?

22   A.    Over the last?

23   Q.    Ten years.

24   A.    In court or related matters, I'm not sure.  I have --

25   Q.    It would be a very small amount of work in the last

G. McCabe - Cross

818

1    ten years that related to expert work, right?

2    A.   Probably the same amount during my 50 years.  I think it's

3    been a small amount throughout my career.

4            MR. BUCHANAN:  Can we give him the binder?

5    BY MR. BUCHANAN:

6    Q.   So I'd ask you to take a look at your deposition

7    testimony, page 81.

8            Can we pull that up, transcript 81, lines 3 through

9    8?

10           And maybe this would help you refresh your

11   recollection.

12           MR. ZEBRAK:  Excuse me, Your Honor.

13           THE COURT:  Yeah.

14           MR. ZEBRAK:  This is --

15           THE COURT:  Take the -- take it down.  Ask him --

16   let's not put it up on the screen.

17           MR. BUCHANAN:  Okay.

18           THE COURT:  Just ask him whether that refreshes his

19   recollection.

20           MR. BUCHANAN:  Okay.

21           THE COURT:  Ask him to read the section that you want

22   him to read.

23           MR. BUCHANAN:  Okay.

24           THE COURT:  Everybody does refreshing recollection

25   and past recollection recorded a little differently, so this is

G. McCabe - Cross

819

1    the way I would like to do it, Mr. Buchanan.  So if you'd just

2    identify the segment where you're looking and see whether it

3    refreshes his recollection.

4    BY MR. BUCHANAN:

5    Q.   Okay.  So if you look at your deposition transcript, do

6    you see that lines 3 through 8 on page 81?

7    A.   Page 81, lines 3 through 8?

8    Q.   Right.

9    A.   I'm not sure of the context of the question that I can get

10   from those -- I'm speaking --

11   Q.   If you look at, start with line 21:  Okay.  How about over

12   the last ten years?

13           MR. ZEBRAK:  Excuse me, Your Honor, Mr. Buchanan

14   understands the objection.

15           THE COURT:  No, he's focusing on a, on a specific

16   sentence.

17           MR. BUCHANAN:  That's -- I've given him the line.

18           THE COURT:  Yeah, that's proper.

19           MR. ZEBRAK:  Thank you, Your Honor.

20           THE WITNESS:  I see.  So if it's strictly speaking as

21   an expert witness, I have done very -- relatively little of

22   that, I'd say a dozen times or so over my career in court as an

23   expert witness.  I don't know if you count depositions or --

24   BY MR. BUCHANAN:

25   Q.   No, the, the question I had was in the last ten years, how

G. McCabe - Cross

820

1   much -- isn't it true that you've done a very small amount of

2   work as an expert witness?

3   A.   Yes.  I have done a small amount of work.

4   Q.   Okay.  Thank you.

5             And I know you -- and on your direct, you mentioned

6   some of the work you had done as an expert witness, and I think

7   you mentioned some equal employment cases; isn't that right?

8   A.   That's correct.

9   Q.   Okay.  Wasn't the last time you testified in court in

10  1996?  It was a case down in South Carolina?  You testified for

11  the Medical College of Charleston in a discrimination case?

12  A.   I recall that case.  I believe I testified in Kansas on a

13  food -- a pet food recall case.  I'm not sure that the issue

14  there was whether or not -- I can't remember the details, but I

15  did testify before a judge, not before a jury, and it was a

16  matter of whether there should be a separate trial in Kansas

17  versus the Kansas issues combined with a larger group of

18  plaintiffs.

19            So I don't know if that's called expert witness

20  testimony or not, but that was the last time I spoke in a court

21  with a judge.

22  Q.   Okay.  And you testified, I think, in some other

23  discrimination cases in the '70s and '80s?

24  A.   Yes.

25  Q.   Okay.  Isn't that sort of the last time you actually

G. McCabe - Cross

821

1    testified in court, in those cases for General Motors and

2    Michigan State University in class action discrimination cases?

3    A.   That would have been most of my in-court testimony, yes.

4    Q.   And you were representing Michigan State, General Motors,

5    the State of South Carolina against the plaintiffs, right?

6    A.   I'm not sure about the word "represented," but I was

7    employed by them.

8    Q.   Okay.  And I think you admitted or testified on direct

9    that you have never testified prior to this case in a case

10   involving copyright infringement or peer-to-peer networks;

11   isn't that right?

12   A.   That's correct.

13   Q.   Okay.  You're not an expert in any of those areas; is that

14   right?

15   A.   I'm not an expert in those areas.

16   Q.   Other than this case, you've never been retained by a

17   music company to testify; is that correct?

18   A.   By a music company?

19   Q.   Like one of the plaintiffs in this case, a recording

20   company, recording label?

21   A.   To testify in court, no.

22   Q.   Okay.  So you have been retained before by the plaintiffs'

23   counsel, have you not?

24   A.   That's correct.

25   Q.   And that was a case involving analyzing inventory of a dog

G. McCabe - Cross

822

1    books dog store and tracking the inventory and books going in

2    and out, right?

3    A.   That's correct.

4    Q.   Okay.  And how much did you get paid in that case; do you

5    recall?

6    A.   I don't recall.  It was a while ago.  It was relatively a

7    short, very specific task that I was asked to do there.

8    Q.   And how much have you been paid in this case?  I know

9    you -- you gave your hourly rate, and you said the hours.

10   What's the total, about 100,000?

11   A.   That would be correct in round numbers.

12   Q.   And you've been sitting in the courtroom for the last two

13   or three days, is that right, watching this?

14   A.   That's correct.

15   Q.   Okay.  Have you been paid for that?

16   A.   Yes.

17   Q.   Okay.

18   A.   I haven't been paid yet for that.  I assume I will be.

19   Q.   I hope you bill.  Okay.

20        So you're not an expert on, like, businesses and how

21   they operate and procedures of businesses, are you?

22   A.   I am not.

23   Q.   And I think you've actually acknowledged to me in your

24   deposition that you've never taken a business course; is that

25   correct?

823

1    A.    That's correct.

2    Q.    Okay.  And your report, I think there were four reports,

3    were there not, that you wrote?

4    A.    I would have to verify that.  That sounds reasonable.

5    Q.    Did you write all those reports, or did you just outline

6    them?

7    A.    I wrote the reports.  They're my work.

8    Q.    Okay.  Could you take a look at your transcript, at

9    page 78, lines 5 through 15?

10   A.    Page 78, line 5?

11   Q.    Line 5 through 15.

12   A.    It says:  I outlined the report.

13   Q.    Okay.  And could you look at your same transcript, at 261,

14   line 21?

15   A.    Page 261?

16   Q.    Yeah.

17             THE COURT:  Do you have an objection?

18             MR. ZEBRAK:  Your Honor, I don't understand this

19   would be an impeachment issue.  He's just asking him --

20             THE COURT:  Well, let's just see where it goes.

21             MR. BUCHANAN:  Your Honor, if I might?

22             THE COURT:  Proceed.

23             MR. BUCHANAN:  All right, thank you.

24   BY MR. BUCHANAN:

25   Q.    So you have --

G. McCabe - Cross

824

1    A.   I'm sorry.  I'm not there yet.

2            Okay.  261?

3    Q.   Yes.

4            THE COURT:  What line?

5    BY MR. BUCHANAN:

6    Q.   21.

7    A.   I say:  In my view, I am the author.  I started with the

8    outline.

9    Q.   Okay.  So you said you wrote the reports, and I asked you

10   if you just outlined them.  So did you outline them or did you

11   write them?

12   A.   I wrote them.  I outlined them and I wrote them.  I always

13   start with an outline.

14   Q.   And if you look at your testimony there, doesn't it

15   describe that you had other people fill in the pieces and add

16   footnotes and add other text?  All that happened?

17   A.   Yes.

18   Q.   And did lawyers helped write it?

19   A.   Excuse me?

20   Q.   Did lawyers contribute to the reports?

21   A.   Well, there -- yeah, there are types of footnotes that I

22   don't know how to do properly, so in terms of you can see

23   there's technical legal things included in the report.

24   Q.   So --

25   A.   I --

G. McCabe - Cross

825

1  Q.   You testified that you were assigned a specific task here

2  and that at least the fundamental part of that task was to look

3  at all the ticket data that was given to you for the claim

4  period and determine how many notices were provided to Cox

5  subscribers by the plaintiffs for their works in suit after

6  they had received two; is that correct?

7           MR. ZEBRAK:  Objection, Your Honor.  That

8  mischaracterizes his prior testimony.

9           THE COURT:  Okay.  Why don't you ask him what his

10  understanding of what his assignment was.

11           MR. BUCHANAN:  Could we pull up their, their

12  demonstratives?  Yeah.  If you could go to the next?

13  BY MR. BUCHANAN:

14  Q.   So, so why don't you repeat again what your task was.

15  A.   My first task was to do a works in suit analysis.

16  Q.   So did you have a certain number of notices that you

17  looked at to try to determine whether someone was a so-called

18  repeat infringer?  I think you used that term.  That was three

19  or later, right?

20           MR. ZEBRAK:  Objection.  Mischaracterizes --

21           THE WITNESS:  I'm not sure if you're talking about

22  the works in suit analysis or the repeat infringer analysis.

23  BY MR. BUCHANAN:

24  Q.   Okay.  So you looked at -- what is the claims period in

25  this case?

G. McCabe - Cross

826

1   A.   It's on the slide --

2   Q.   No, I'm just asking you, do you know what it is?

3   A.   February 1, 2013, until November 26, 2014.  I'd have to

4   double-check that.  I'm sorry.

5   Q.   Okay.  So as I understand it, when you -- you were asked

6   to look at that time period and determine and to locate those

7   Cox subscribers that received a notice from the plaintiffs

8   after they had received two prior notices; is that right?

9   A.   That's right.  The third or more, and that's depicted as

10  the second bullet on this page.

11  Q.   So --

12  A.   I'm sorry, three or more.  Is that what I said?

13  Q.   Pardon me?

14  A.   I'm not sure if I said two or more or three or more.  I

15  meant three or more.

16  Q.   Were you able to determine -- when you did that, were you

17  able to determine how many of the three were from a third-party

18  content owner as opposed to one of the plaintiffs?

19  A.   I did not do that analysis.

20  Q.   Okay.  Did you do the analysis to determine how many

21  received just one notice during the claim period?

22  A.    I did calculate the number that received one, two, three,

23  four, every possible number.  I, I computed the actual number

24  and the --

25  Q.   Okay.

G. McCabe - Cross

827

1   A.   Yes.  So --

2   Q.   How many Cox subscribers received just one notice during

3   the claim period?

4   A.   I don't have that number stored in my memory.

5   Q.   Okay.

6   A.   I computed it.

7   Q.   How about two?  Do you know how many received just two

8   during the claim period?

9   A.   No, I don't --

10  Q.   But you did --

11  A.   -- recall.

12  Q.   -- compute it?

13  A.   I computed it for every number, one, two, three, four, up

14  to however many there were.

15  Q.   But -- so you didn't include it in your report or your

16  testimony because you were told not to; isn't that true?

17  A.   No.

18        MR. ZEBRAK:  Objection, Your Honor.  Compound.

19        THE COURT:  He answered the question no.

20  BY MR. BUCHANAN:

21  Q.   Okay.  Could you take a look at your deposition transcript

22  at page 91, please?  Line 14.

23  A.   I'm sorry, I'm not there yet.

24  Q.   Okay.

25  A.   Okay.  I'm on page 91.

G. McCabe - Cross

828

1   Q.   Okay.  Line 14 through 17, could you read that, please?

2   A.   And why did you not include the first and second notice?

3            MR. ZEBRAK:  Your Honor, may we have a sidebar?

4            THE COURT:  Well, no.

5            Does that refresh your recollection as to why you did

6   not include one and two?

7            THE WITNESS:  Line 14 just has a question why.

8            THE COURT:  All right, let's come to the sidebar.

9            NOTE:  A sidebar discussion is had between the Court

10  and counsel out of the hearing of the jury as follows:

11  AT SIDEBAR

12           THE COURT:  Okay.  What's the objection?

13           MR. ZEBRAK:  Well, on two fronts.  First of all,

14  Mr. Buchanan is a well-experienced attorney.  He knows how to

15  do impeachment.  And what he's doing is he purports to be

16  refreshing recollection, yet he's just asking him to read his

17  transcript into the record.

18           Number one, I believe that to be improper.  Number

19  two, he's conflating the repeat infringer analysis with the

20  works in suit analysis, and specifically he's already testified

21  that plaintiffs set the criteria for the works in suit

22  analysis, and now he's saying, in the works in suit analysis,

23  why didn't you look presumably for those works infringed in a

24  person's first or second notice, whereas plaintiffs, you

25  know --

829

1          THE COURT:  He's framing what he was asked to do in

2   his report, and if that came from instructions from plaintiff,

3   that came from instructions from plaintiff.  If it didn't and

4   he made that decision independently, he can testify about that.

5   What's wrong with that?  I don't understand this.

6          MR. ZEBRAK:  Sir, there's nothing wrong with that,

7   and I don't object on that basis.  What I was saying is that he

8   already testified that plaintiffs' counsel gave him the four

9   criteria, and I just think that -- I have an issue with having

10  him just read his transcript into the record, and I think the

11  whole line of questioning is confusing because it's imprecise

12  between the two analyses.

13         THE COURT:  Okay.  So I've already asked that you --

14  if you're going to refresh his recollection, just point to the

15  page and line and let him read it and say, does that refresh

16  your recollection?  If it doesn't, then you can go to past

17  recollection recorded, and didn't you say previously, and then

18  he's allowed to read it into the record.

19         Is that -- am I missing something here?

20         MR. OPPENHEIM:  May I ask a -- offer an idea here?

21  Dr. McCabe is not an experienced witness, unlike a lot of the

22  experts here, and that's fine.

23         THE COURT:  Yeah.

24         MR. OPPENHEIM:  He doesn't understand that he's not

25  supposed to read it into the record when he's asked to refresh

830

1    his recollection.  Maybe we could just instruct him that, have

2    him read it to himself --

3              THE COURT:  Okay.

4              MR. OPPENHEIM:  -- so we do this properly.

5              He can either impeach him or he can refresh his

6    recollection, but, you know, there's a way to do this, and

7    Mr. Buchanan knows how to do it.

8              THE COURT:  Okay.  Understood.  I'll so educate him.

9    All right?

10             MR. OPPENHEIM:  Thank you, Your Honor.

11             NOTE:  The sidebar discussion is concluded;

12   whereupon, the case continues before the jury as follows:

13   BEFORE THE JURY

14             THE COURT:  All right.  So, Dr. McCabe, when counsel

15   asks you to -- when counsel asks you to look at a certain page

16   or paragraph to see whether that refreshes your recollection,

17   you don't need to read that into the record.  You just need to

18   read it to yourself and say yes or no, and then we'll follow up

19   from there.  Okay?

20             THE WITNESS:  Thank you.

21             THE COURT:  Does that work?

22             THE WITNESS:  Yes.

23             THE COURT:  All right.  Thank you.

24             Please proceed, Mr. Buchanan.

25   BY MR. BUCHANAN:

831

1   Q.   So I'll ask the question again:  Why didn't you include

2   those subscribers who received one or two notices in terms of

3   linking them to the works owned by the plaintiffs?

4   A.   Are we talking about the repeat infringer analysis or the

5   works in suit analysis?

6   Q.   We'll start with the works in suit.

7   A.   Okay.  So the works in suit analysis, yes, this talks

8   about linking notices with works in suit, and there I was told

9   that, and that was on the slide, that I should look at third or

10  later infringement.

11  Q.   Okay.

12  A.   So I counted the first infringement and second

13  infringement, but in works in suit, I looked at only those

14  infringements corresponding to a third or later infringements,

15  and, yes, I was told that was part of my assignment, if you

16  will, or the framework of what I was asked to do.

17  Q.   So you were told in that particular situation not to

18  include the one and two?

19  A.   I included them in that I counted them, and that's how I

20  determined which one was the third.  So, yes, they were

21  included in the analysis.  I need to know that there is a one

22  and a two to define what No. 3 is, etc.

23  Q.   But you didn't include it in your report, correct?

24  A.   It's not in a report of the works in suit.

25  Q.   So could we go to your expert report, your first one?

G. McCabe - Cross

832

1    It's tab 2, and look at paragraph 16a.

2              Do you have that?

3    A.    I do.

4    Q.    Okay.  So that section says Cox's copyright abuse ticket

5    records indicate that it received at least 315,054 notices

6    between January 1, 2012, and December 1, 2014.  Of those,

7    42,000 were sent regarding --

8              THE COURT:  Slow down a little bit so we make sure we

9    get this on the record, please.

10             MR. BUCHANAN:  Okay.

11   BY MR. BUCHANAN:

12   Q.    Of those, 42,236 were sent regarding a subscriber for whom

13   Cox had previously received at least one other notice.

14             Do you see that?

15   A.    I do.

16   Q.    So if you subtract 42,236 from 315,054, you get about

17   272,000 notices, right?

18   A.    I'll assume that your arithmetic is correct.

19   Q.    But those that -- that can't be right, could it, because

20   we have 57,000 subscribers, so you couldn't have 272,000

21   notices that went to 57,000 subscribers and just got one

22   notice.  That math is not right, is it?

23   A.    I'm not following your math or your argument.

24   Q.    Okay.  You say there that there were 315,000 notices,

25   right?

G. McCabe - Cross

833

1          THE COURT:  Notices or tickets?

2          MR. BUCHANAN:  Notices.

3          THE COURT:  Okay.

4    BY MR. BUCHANAN:

5    Q.   Do you see that?  And you have --

6    A.   Yes.

7    Q.   -- 42,000 notices were sent to a subscriber for whom Cox

8    had previously received at least one other notice.

9    A.   At least one other --

10   Q.   Okay.

11   A.   -- notice.

12   Q.   So that means the difference went to the other

13   subscribers, right, the ones that just got one, those that

14   didn't get more than one, right?

15   A.   At least one other means two or more.

16   Q.   Okay.  So 42,000 of the 315,000 notices were sent to

17   someone that had at least two.  So that means the difference is

18   270,000, and that went to those that had one, right?

19   A.   We're talking about notices, not subscribers, right?

20   Q.   It said -- you wrote it.  It says notices.

21   A.   Notices.

22   Q.   Okay.  So you can't --

23   A.   But your arithmetic was doing subscribers, right?

24   Q.   I'm just -- I'm doing your math.  315,000 notices,

25   42,000 notices went to subscribers who had two or more.  That

G. McCabe - Cross

834

1   means the difference went to the others, which would be those

2   with one.  And you can't send 270,000 notices to 57,000 people

3   and have one for one, can you?

4   A.   This isn't counting people.  The other displays were

5   counting subscribers.  This is notices.

6   Q.   Well --

7   A.   And the arithmetic doesn't match because it's --

8   Q.   But you wrote this.  I'm just asking you --

9   A.   Yeah, I'm not disputing what I wrote.  I don't understand

10   why it's inconsistent with something else I wrote concerning

11   subscribers.

12   Q.   Well, I don't know what else -- you say you're referring

13   to some other thing you wrote.  I'm just looking at this, the

14   summary of your opinions, the very first one in this report

15   that you spent, looked at all that data and analyzed it, and

16   the very first one doesn't seem to me to make any sense.

17   A.   So it says -- so I -- I don't understand what doesn't make

18   sense.  You took the 315,000 and subtracted 40,000, and what

19   doesn't make sense about that subtraction?

20   Q.   Because that means 42,000 of the 315,000 notices went to

21   people that had two or more, which means the difference,

22   270,000, went to those that had one, but if you have 57,000

23   subscribers and there's 270,000 notices, that is not one for

24   one.

25           All right.  Why don't we go to another calculation.

G. McCabe - Cross

835

1          MR. OPPENHEIM:  There's no answer.

2          THE COURT:  Yeah, let him answer.  Do you want to

3    explain that?

4          THE WITNESS:  No, I'm still a little confused about

5    what, what you're --

6          THE COURT:  Okay.  All right.  Please proceed,

7    Mr. Buchanan.

8    BY MR. BUCHANAN:

9    Q.   Okay.  Could you turn to paragraph 50 of your report?

10         So here's one of your findings --

11   A.   I'm sorry, I'm not there yet.

12   Q.   Okay.  It's page 10.

13   A.   Got it.

14   Q.   Paragraph 50, you talk about some action content data, and

15   what I'm focusing on, you have hard limits for complaints with

16   24 percent, and you cite appendix 6.  Do you see that?

17   A.   I do.

18   Q.   Okay.  Let's look at appendix 6.  Hard limit for

19   complaints is about 47,000, right?

20   A.   I'm sorry, where -- you're at appendix 6?

21   Q.   This is your appendix, right?  You created this?

22   A.   We're on appendix 6?

23   Q.   Yeah.  You created this document, right?

24   A.   Yes.

25   Q.   Okay.  Hard limits for complaints, do you see that,

836

1    47,000?

2    A.   46,997, yes.

3    Q.   Okay.  Can we use 47,000?

4    A.   Yes.

5    Q.   Okay.  So you're saying the hard limit for complaints

6    was -- this 47,000 was 27 percent of 315,000 unique tickets,

7    right?

8            Go back to paragraph 50 on page 10.  Do you see the

9    24 percent?

10   A.   Yes.

11   Q.   And it's actually 14 percent if you divide 315,000 into

12   47,000, is it not?

13   A.   I'm not following what you're saying, but I think you're

14   addressing the missing values.  Is that --

15   Q.   Do you see paragraph 10?  It says hard limits for

16   complaints was 24 percent of 315,000.

17            Correct?

18   A.   Hard limits for complaints was 24 percent.  Yes.

19   Q.   But 47,000 --

20            THE COURT:  Hold on.  Let him look at it.

21            MR. BUCHANAN:  Okay.

22            THE WITNESS:  I see it says 24 percent there, yes.

23   BY MR. BUCHANAN:

24   Q.   Okay.  So that's 24 percent of 315,000, right?

25   A.   Where are you getting the 315 from?

G. McCabe - Cross

837

1  Q.   48, paragraph 48.

2  A.   Oh, I'm sorry, where on paragraph 48?

3  Q.   So we were at paragraph 50.  Now we're trying to get the

4  calculations that you did, you know, using the applied

5  statistics.

6  A.   Okay.  So in paragraph 48, where --

7  Q.   It says --

8  A.   You're taking the number 315,054 --

9  Q.   Right.

10  A.   -- unique tickets.

11  Q.   So if you divide 315,000 into 47,000, it's not 24 percent,

12  is it?

13  A.   I don't think that's the arithmetic that we're -- I don't

14  think we're on the same page there.  Because you're talking

15  about the number of unique tickets?  So a particular ticket

16  could have more than one action content form entries, I

17  believe.  So I don't think the -- you can, you can do that.

18  I'm not sure.

19  Q.   So where did you -- what is the 47,000 hard limits, what

20  is that 24 percent of?

21  A.   Of the --

22  Q.   Okay.  Take --

23  A.   It would be of the appendix 6 --

24       THE COURT:  Hold on, let him finish.  Go ahead.

25  Finish, Doctor.

G. McCabe - Cross

838

1          THE WITNESS:  If you look at appendix 6, and this is
2  a standard thing in the output, the last line there says:
3  Frequency missing, 369,284.
4          So that's the number of entries in the Cox ticket
5  data that had nothing in the field action content form.  Action
6  content form could have any of these things listed in
7  appendix 6, or it could have nothing.
8          So the percent was computed -- which one were we
9  talking about?  The --
10         THE COURT:  24 percent.
11         THE WITNESS:  The 24 percent for hard limit for
12 complaints, and that's given in this output.  So it's
13 23.4 percent.  That's of the non-missing entries for the field
14 action content form, 24 percent or 23.4 percent of those had
15 the words "hard limit for complaints" entered into that field.
16 BY MR. BUCHANAN:
17 Q.   So --
18 A.   So that's what's computed here.
19 Q.   So, I'm sorry, you divided what number into the 47,000?
20 A.   The -- I didn't divide.  This is what the software
21 produces, standard output for this kind of data.  You look at
22 the entries that are not missing, and you divide out by the
23 total number of those.
24         So if you take the column Frequency in appendix 6 and
25 add up all of those, that's the denominator that's used as the

G. McCabe - Cross

839

1    basis for the, for the 24 percent.  That number is not given on

2    the output.  What is given is just the -- at the bottom with an

3    asterisk the number of missing or it calls it null, null values

4    for action content form.

5    Q.   So you're saying that if you divide 370,000 into 46,000,

6    it comes to 24 percent?

7    A.   Could you say that again?

8    Q.   We can move on.

9           Why don't I direct your attention to your transcript,

10   page 194.  See if that refreshes your recollection that we

11   discussed that in your deposition.

12   A.   194?

13   Q.   Yes, line 7, 7 through 11.

14   A.   I'm sorry, I'm not there yet.

15   Q.   Okay.

16   A.   Page 194, line 7.

17   Q.   So read, read the question and answer there, and tell me

18   if that doesn't refresh your recollection as to how we did the

19   calculation during your deposition, when you were -- you were

20   also under oath there as well.

21   A.   I recall the conversation that we had, and my

22   understanding is that it's exactly the same as the conversation

23   that we just had.

24   Q.   Okay.

25   A.   I explained to you what the software does, that that's a

G. McCabe - Cross

840

1    standard output for a categorical variable.  When you compute

2    percents, you divide by the number of non-missing values.

3    There would be an option to divide by some other number if you

4    would like to divide by some other number, but that's not what

5    the, the default or standard calculation is.

6    Q.   So if I may just read the Q&A of this, that's --

7         THE COURT:  Is it inconsistent with what he just

8    talked about?

9         MR. BUCHANAN:  It is inconsistent.

10        THE COURT:  Go ahead.

11   BY MR. BUCHANAN:

12   Q.   Okay.  So what I asked you -- by the way, there's two

13   lawyers that are objecting, you know.

14        THE COURT:  I haven't heard any objection.

15        MR. BUCHANAN:  All right.

16        THE COURT:  And let's be calm and quiet here unless

17   you have a formal objection.  Then stand up and say, "Object,"

18   okay?

19        MR. OPPENHEIM:  Yes, sir.

20        THE COURT:  Okay.

21   BY MR. BUCHANAN:

22   Q.   So there you say -- I asked you:  Okay.  So a hard limit

23   for complaints of 46,997 is not 24 percent of 315,000, is it?

24        That's correct.

25        So -- it's 14 -- it's about --

G. McCabe - Cross

841

1          It's necessary to read it very carefully.  So 16a

2    says -- and then you talk about the copyright, and then --

3          MR. ZEBRAK:  Objection, Your Honor.  He's not reading

4    it.

5          THE COURT:  Overruled.

6    BY MR. BUCHANAN:

7    Q.   So, so you read that?  I ask you:  So a hard limit for

8    complaints of 46,997 is 24 percent of 315,000?

9          And you said:  That's correct?

10   A.   I'm sorry, what line are you on?  I'm having trouble

11   following you.

12   Q.   Line 7.

13   A.   Line 7, okay.  This says 24 percent is not something, and

14   that's just arithmetic you're saying, right?

15   Q.   Right.  That's how we started out as doing that

16   calculation, and here you agreed that the arithmetic worked,

17   and you didn't dispute the numbers in the calculation, did you?

18   A.   If you take 46,000 and divide by 350,000, you don't get 24

19   percent.  I agree.  I think that's what I was -- it's hard to

20   take this out of context, so yeah.  But that --

21   Q.   Could, could you take a look at your report, paragraph 49

22   and 50?  We were just there.

23          And you have a lot of data here, part of your

24   findings, 49 and 50, we went over one part of it, but isn't it

25   true when you put that information in there, that you didn't

G. McCabe - Cross

842

1    understand what it was?

2    A.    No.

3    Q.    Okay.  Could you look at paragraph -- page 189 of your

4    deposition?  So --

5    A.    I'm not there yet.

6    Q.    Okay.

7    A.    Okay.

8    Q.    All right.  So if you look at page 189 of your deposition,

9    line 3, can you just read down and over to the next page, down

10   to 14?

11   A.    Wait.  So read page 189, starting on line 3?

12   Q.    At line 1 -- or line 3, yes.  And then if you go over

13   to --

14   A.    I don't understand what it's referring to, starting on

15   line 1 or line 3, because it says:  You're not suggesting that

16   means --

17   Q.    Okay.

18   A.    I don't know what that refers to.

19   Q.    Okay.  Go back -- just a little higher and start with

20   line 16 on 188, where it says:  Then if you look at sent

21   warning, changed status to closed.

22          All right?

23   A.    Okay.  I need to do this a little bit slowly because I

24   haven't looked at this in a while.

25   Q.    Okay.  That's fine.  And then if you need to, you can go

843

1   back to paragraphs 49 and 50 of your report and see if that's

2   not what we're discussing there.

3   A.   So I -- you asked me a question:  Do you have any idea why

4   they're using that terminology?

5           And I said:  No, I don't know why Cox is using that

6   terminology in their data file.  All I know is that the

7   relative frequency of the different terms that they used -- and

8   that's what I reported in that appendix, or No. 6.  I don't

9   know if --

10  Q.   So --

11  A.   But I don't know anything more than what those words said,

12  and I, you know, had the computer read those words and put them

13  in, in the summary.

14  Q.   So my question was those are more findings that you made

15  using the applied statistics, and what I was asking you is even

16  though you put those findings in there, you didn't really know

17  what they meant.  And are you agreeing with that?

18          THE COURT:  What they meant to Cox?

19          MR. BUCHANAN:  What they meant to him in reading

20  them.

21          THE WITNESS:  What they meant to me was that they

22  were different entries in the computer file.

23  BY MR. BUCHANAN:

24  Q.   But you didn't --

25  A.   As I said, I took the data at face value.  This is Cox's

844

1    data, and I made a table of the different possible entries that

2    could be in that column and counted them.

3    Q.   Okay.  These are findings, and isn't it true that you put

4    these findings in there even though you didn't know what the

5    data meant?  Isn't that what that passage is I just showed you?

6    Doesn't it say --

7    A.   I did not have any definition of those terms; that's

8    correct.

9    Q.   Okay.  So if you don't have a definition, that means you

10   don't know what they mean.

11   A.   Not necessarily, but I would -- as I said, I don't, I

12   don't know why they're using that terminology.

13   Q.   Okay.

14   A.   I don't know the meaning of those things.  I was just

15   trying to describe the data that was given to me by Cox.

16   Q.   And didn't you actually ask people -- in fact, you asked a

17   lot of people what that meant, but you couldn't get any

18   answers; isn't that right?

19   A.   No.

20   Q.   Isn't that what -- go read the passage again.  See if it

21   doesn't say that.

22   A.   That it says I asked a lot of people?  I didn't see that.

23            MR. BUCHANAN:  Can I read or no?

24            THE WITNESS:  Where are you?

25            THE COURT:  Direct him to a line and --

G. McCabe - Cross

845

1   BY MR. BUCHANAN:

2   Q.   Okay.  Line 1, page 190:  -- tell me what they mean, give

3   me definitions.  Give me -- we even have words for that.  In

4   some computer statistical packages --

5              And you say you called it a code book?

6              MR. ZEBRAK:  Your Honor?

7              THE COURT:  Yes, sir.

8              MR. ZEBRAK:  I'm not sure what's happening now.

9              THE COURT:  All right.

10             MR. ZEBRAK:  This is --

11             THE COURT:  Well, let's go back, the question was --

12  did you ask -- he asked you whether you had asked lots of

13  people.  He directed you to this specific reference in the page

14  and line, and does that refresh your recollection?

15             THE WITNESS:  No, not, not what I read on page 190.

16             THE COURT:  Okay.  All right.  Next question.

17             MR. BUCHANAN:  I'm sorry, I didn't hear that.

18             THE COURT:  He said no, it doesn't refresh his

19  recollection.  I don't know what's on the page.  Do you want

20  to -- do you want to --

21             MR. BUCHANAN:  Am I allowed to --

22             THE COURT:  Yeah, you can now use the statement and

23  ask him did he not -- did I not ask you this question and did

24  you not say the following?

25             MR. BUCHANAN:  All right.

G. McCabe - Cross

846

```
 1              THE COURT:  Please go ahead.

 2   BY MR. BUCHANAN:

 3   Q.   So, so we'll start there, and at the top, it says -- you

 4   actually answered my question about did you try to find --

 5              THE COURT:  Let's ask questions and see if he

 6   answered it inconsistently with what he's saying today.

 7   BY MR. BUCHANAN:

 8   Q.   Okay.  The question I asked you earlier was, you already

 9   said you didn't know the definitions of the words and you just

10   put them in there as your findings, and I asked you didn't you

11   actually go try to find out the answers to that?

12              And you made a reference to, like, the code book in

13   applied statistics, that that's what you're looking for.

14              THE COURT:  None of that's in the record.  It's all

15   stricken.

16              MR. BUCHANAN:  All right.

17              THE COURT:  And I know you're trying to explain the

18   setting here, but that is not the way this works, because now

19   you're testifying again, and we went through that.

20              MR. BUCHANAN:  All right.

21              THE COURT:  It assumes facts not in evidence.  But if

22   you have a question and an answer which is inconsistent with

23   what he's said today, you certainly may impeach him with that,

24   but not the following paragraphs and see if you don't get a

25   sense of this or that.
```

847

1          THE WITNESS:  If I could clarify my answer, I

2     think --

3          THE COURT:  No, let's wait for --

4          MR. BUCHANAN:  I can, I can read what he testified to

5     now, right?

6          THE COURT:  If there's a question that you asked him

7     and he answered inconsistently, you certainly can read that and

8     say, didn't you say that previously?

9          MR. BUCHANAN:  All right.

10          THE COURT:  Sure.

11          MR. BUCHANAN:  He says he doesn't remember, but the

12     passage says what he says.

13          THE COURT:  Didn't you say in your deposition when

14     you were asked the following question and the following answer?

15     BY MR. BUCHANAN:

16     Q.   Now, I'll ask it again, and this is how we started, and I

17     asked you -- you gave me one answer, that -- about you didn't

18     have the definition.  I asked you:  Did you ask people that you

19     were working with, including, you know, all the people you're

20     working with, whether, in fact, you sought from them what those

21     words meant that went into those two findings?

22          And are you saying that you didn't ask anyone?

23     A.   I can explain.  I apologize that I answered too quickly.

24     I did not read all of page 190.  I felt a little bit rushed.  I

25     read the top part; I didn't read the bottom part.

G. McCabe - Cross

848

1          So there is a question that was asked to me, and I

2     answered:  I always asked everybody give me what I would call

3     the code book.

4          That answer refers to my general behavior or

5     procedures when I get data, and that is, can you give me the

6     code book?  That code book is particular jargon for a

7     statistical package called SPSS, and it does exactly what --

8     the kind of things we were talking about.  It would give me the

9     list of possible values for those fields that are given in

10    that, that appendix, and what each of them means.

11         I said:  Do you have that?  I asked plaintiffs'

12    counsel:  Do you have a code book that explains all these

13    variables?

14         The answer was no.

15         So -- but the context of did I ask everybody, I

16    always ask everybody:  Can you give me some data, tell me what

17    I need to know about each of the fields and the meaning of

18    those, those entries.

19         THE COURT:  All right.  Thank you, sir.

20         All right.  Next question.

21    BY MR. BUCHANAN:

22    Q.   Okay.  And I think you -- okay.  So you said that you

23    asked for it, and you didn't receive it, and I think -- do you

24    recall that you don't know why you never received it?

25    A.   I don't think it exists.

G. McCabe - Cross

849

1    Q.   Why don't you take a look at your testimony there and tell

2    me if, in fact, you say that, that it doesn't exist.  Why don't

3    you read where it starts, line 11:  So I never received that,

4    and I don't know why.

5              And then read the rest after that.

6    A.   I had a lot of other things to do, and I never pursued

7    this any further than to summarize in the summary that I gave

8    in this report.

9    Q.   So you had a lot of -- those are findings in your report,

10   and you had -- you're saying you had a lot of other things to

11   do, and so you just moved on.

12   A.   That's a fair summary of what I said, I believe.

13   Q.   Okay.  All right, can we pull up their slides?

14             Okay.  Let's go to slide 7.  Now, the claims period,

15   I think you correctly testified, is in February 2013 to

16   November 2014.  Do you remember that?

17   A.   I do.

18   Q.   Okay.  This goes beyond that, a year earlier and a month

19   later, right?

20   A.   That's correct.

21   Q.   Okay.  So did you actually analyze this same data for the

22   claims period which is at issue in this case?

23   A.   No.

24   Q.   Okay.  And is that because you were told not to do it?

25   A.   No.

G. McCabe - Cross

850

1    Q.    You just decided not to do it?

2    A.    I didn't decide not to do things.  I decided to do things.

3    Q.    Okay.  In fact, you did run the numbers.

4          THE COURT:  Let him finish answering.

5          MR. BUCHANAN:  Okay.

6          THE COURT:  Were you finished, sir?

7          THE WITNESS:  I think so.

8    BY MR. BUCHANAN:

9    Q.    You did run those numbers, though, right?

10   A.    No.

11   Q.    You never did.

12         So let's start with January 1, 2012.  You have 31,000

13   that had three or more, right?

14   A.    That's what the display says, yes.

15   Q.    How many had three?

16   A.    It's not given on this chart.

17   Q.    Well, I see that.  I'm sorry.  But did you calculate that?

18   A.    Yes.

19   Q.    Okay.  What is it?

20   A.    I don't recall.

21   Q.    Okay.  So this -- if you have 57,000 subscribers and

22   31,000 had three or more, how many had one or two?

23   A.    The number is not on the chart.  I computed it, and I

24   don't have it in my memory.

25   Q.    Okay.  Well, I'm just -- I was asking you to do the math

G. McCabe - Cross

851

1    for me.  57,000 minus 31,000 is about 26,000.

2    A.    The difference would be the number who had two or one.

3    Q.    Okay.  That's statistics, right?  That's sort of --

4    A.    It's arithmetic.

5    Q.    Okay.  So that means of all these subscribers, or all

6    tickets, which means we're talking about a three-year period, a

7    year beyond the claims period, right, and 26,000 had one or

8    two; is that right?

9    A.    Approximately, yes.

10   Q.    And do you know how many of those 26,000 had one?

11   A.    As I said, I don't.

12   Q.    Okay.  And so then you go to six-plus, so again we're

13   talking about three years, and all ticket data means notices

14   from everyone that came into the tickets for that three-year

15   period, right, from the plaintiffs and from other content

16   holders that sent notices, right?

17   A.    Correct.

18   Q.    Okay.  So if we go to six-plus, if you take -- subtract

19   31,000 from 16,000, we get 15,000 that had five or less,

20   correct?

21   A.    You're doing 57 minus --

22   Q.    31,000 minus --

23   A.    -- 16?

24   Q.    -- 16,000, trying to get to those who had five or less.

25            Maybe you could do it for me.

852

1   A.   To get five or less?  I don't think you can recover that

2   from here.

3   Q.   Well, if you have six-plus had 16 and you have 31,000 that

4   had three-plus, isn't the difference those that are in between?

5   A.   Four or five.

6   Q.   Yes.

7   A.   But you said five, I thought.

8   Q.   Oh, I said five or less.

9   A.   Five or less.  Yes, you could do that subtraction.

10  Q.   Okay.  So that would be 41,000 that had five, four, three,

11  two, or one, right?

12  A.   You're saying 57,000 minus 16,000, okay.  Is that what

13  you're saying?

14  Q.   No.  So what I'm getting at, if we get 31,000, 57,000,

15  that gave us 26,000 that had one or two?

16  A.   You know, you're reading, it, and I can't process it that

17  fast; I'm sorry.  I could write it down if you want or if you

18  want to write it down, but I -- you're just throwing numbers at

19  me.  I can't do that.

20  Q.   Okay.  Just -- okay.  Tell me how many had five or less

21  based on your chart.  Can you calculate that?

22  A.   That would be the difference between the total and the

23  number who have six or more, yes.

24  Q.   And so how many would that be?

25            THE COURT:  He just said he can -- if you want him to

G. McCabe - Cross

853

1    write it down and subtract it, he'll do it.  Otherwise, he's

2    given you his answer.

3              MR. BUCHANAN:  Okay.

4              THE COURT:  He's answered your question.  Move on to

5    the next question.

6              MR. BUCHANAN:  Okay.

7              THE COURT:  Unless you want to give him a number and

8    ask him whether that sounds reasonable.  I assume you have done

9    the math, and he's not here to do math, okay?  I mean, he's not

10   here to do this function of the math.  So if you have the

11   number --

12             MR. BUCHANAN:  All right.  Okay, Your Honor.  I did,

13   I thought I tried to calculate.

14   BY MR. BUCHANAN:

15   Q.   It's 41,000 that had five or less, right?

16   A.   Yes, that looks right.

17   Q.   Okay.  And then isn't it nine or less, isn't it almost

18   50,000?

19   A.   You do the complement of those numbers; that's correct.

20   Whatever that number, that arithmetic gives you, yes.

21   Q.   So if you had nine or less, that could be three a year,

22   three in 2012 through three in 2013, three in 2014, right?

23   A.   I wouldn't draw that conclusion.  You say an average of

24   three or --

25   Q.   Do you know when these notices came in?

G. McCabe - Cross

854

1   A.   No.

2   Q.   Do you know whether they relate to a business subscriber

3   or a home?

4   A.   No.

5   Q.   So you don't know if they're, like, a hotel or -- a hotel

6   or a hospital versus a residence?

7   A.   I was not given that information.

8   Q.   Okay.  But you, you do know how many business subscribers

9   there were, correct?

10  A.   Yes.

11  Q.   Okay.  And you originally calculated that like 1800, and

12  then you increased it in your supplement report to 2800, right?

13  A.   I don't recall all those numbers, I'm sorry.

14  Q.   So do you recall the average amount of notices that a

15  business subscriber received during this time period?

16  A.   I don't believe I calculated that kind of summary, but I

17  could have.

18  Q.   All right.  So, so could you go to your reply report?  I

19  think it's tab, tab 4, paragraph 23.  If you read that

20  paragraph of your report -- you wrote this, right?

21  A.   Yes.

22  Q.   Okay.  So you say there's 2,868 business subscribers, and

23  what's the mean or the average?

24  A.   I said I replicated Dr. Weber's calculation finding -- and

25  the median is given as 4 and the mean is given as 15.9.  This

G. McCabe - Cross

855

 1   is a classic example why the mean is not a good descriptor of

 2   the center of a distribution.  It's highly skewed.

 3   Q.   I asked you if you calculated the mean.  That's all.

 4   A.   That's what it says.

 5   Q.   That's what it says.  You did that, right?

 6   A.   Yes.

 7   Q.   Okay.  So when we go over here, if you apply the business

 8   subscribers to the 13-plus and the 14-plus, they average 16?

 9   A.   I didn't -- I said I replicated Dr. Weber's calculation.

10   Q.   And who is Dr. Weber?

11   A.   One of your experts, I believe.

12   Q.   She calculated numbers like you did in terms of --

13   A.   I calculated what she reported and verified the accuracy

14   of her arithmetic.

15   Q.   So you just -- is there a footnote to her report here?

16        All right.  So you just took her number and put it in

17   your report, but you agree with it, right?

18   A.   I verified the arithmetic that she performed.

19   Q.   And then you used it in your report, so it must have had

20   some significance, right?

21        MR. OPPENHEIM:  Your Honor, Dr. Weber has not

22   testified.

23        THE COURT:  Stop.  You're testifying, and he has a

24   right to ask why he put it in the report.

25        Ask him, do you recall -- you may testify as to why

G. McCabe - Cross

856

1    that is put in your report.  I think you just testified that

2    you were testing her math; is that right?

3              THE WITNESS:  That's correct.

4              THE COURT:  All right.  And is that why it's in the

5    report?

6              THE WITNESS:  Yes.

7              THE COURT:  All right.  Let's move on.

8    BY MR. BUCHANAN:

9    Q.   Okay.  So the question I have for you is did you

10   determine, like, for those who had 14 or more, how many of

11   those were business subscribers considering that they averaged

12   16 notices?

13   A.   I didn't --

14   Q.   Okay.

15   A.   -- do that calculation to the best of my knowledge, no.

16   Q.   So when we get to, like, 14, what percentage of 4,400 is

17   of 57,000?

18             So in other words, if you've calculated how many

19   subscribers had dropped off at this point were no longer

20   getting notices at the 14 level, is that about 90-some percent,

21   95 percent?

22   A.   You're asking me to compute 4,400 divided by 57,600?

23   Q.   Yes.

24   A.   I don't have my phone or I would do it.

25   Q.   Okay.

G. McCabe - Cross

857

1   A.   I can't do that -- I don't do arithmetic in my head

2   particularly with a microphone in my face.

3   Q.   Okay.  You could do -- 5,700 of 57,000 would be 10

4   percent, right?

5   A.   In rough, round numbers, yeah.

6   Q.   So that would be 90 percent.  So 4,400 would be more like

7   93, 94 percent?

8   A.   If you say so.

9   Q.   Okay.

10  A.   I don't doubt it.

11           MR. BUCHANAN:  All right.  We'd like to move this

12  into evidence, Your Honor.

13           THE COURT:  All right.  This exhibit with the

14  highlights is a new exhibit?

15           MR. BUCHANAN:  This demonstrative.

16           THE COURT:  Okay.  Is there any objection?

17           MR. ZEBRAK:  Well --

18           MR. BUCHANAN:  It's their exhibit.

19           THE COURT:  Yeah.

20           MR. ZEBRAK:  It's fine, but is his entire set of

21  slides going into evidence?

22           MR. BUCHANAN:  I'm just moving this one.

23           MR. ZEBRAK:  Well, if we move it all into evidence,

24  we're fine with that, Your Honor.

25           THE COURT:  Yeah.  All right.  I'll consider that.

G. McCabe - Cross

858

1    We'll talk about that later.

2              MR. BUCHANAN:  Okay.  Could we go to the next slide?

3    Next one?  Oh, go back to that one.  Thanks.  Sorry.

4    BY MR. BUCHANAN:

5    Q.   These 13 terminated subscribers, they only relate to these

6    particular notices, right?  They don't relate to other notices

7    that we got during the time period?  In other words, you're

8    just talking about --

9    A.   They refer to the ticket data that I have.

10   Q.   Beyond this, beyond this 57,000 subscribers, you didn't

11   look at data beyond that to see how many terminated subscribers

12   there were for this period beyond these particular works in

13   suit or these particular subscribers, right?

14   A.   These 13 are a subset of the 57,600, yes.

15   Q.   All right.  Can we go to the next slide, please?

16             So earlier -- you just -- when I was asking you about

17   the subscribers, business subscribers, and then you calculated

18   it here, right?

19   A.   Yes.

20   Q.   And is this Dr. Weber's number?

21   A.   I don't know.

22   Q.   Okay.

23   A.   I don't know if she had -- I didn't -- these are my

24   numbers.

25   Q.   Okay.  Let's go to the -- so on this one, 17,729

G. McCabe - Cross

859

1  subscribers had tickets for notices from other rights holders,

2  right?  So, so how many, how many tickets are we talking about

3  from these other rights holders?  Are we talking about one for

4  the 57,000, you've determined that there was at least one

5  ticket relating to another rights holder for the subscribers in

6  question?

7  A.   For each of the 57,600 subscribers, I computed a variable,

8  yes or no.  Yes, they had a notice corresponding to another

9  rights holder, or no, they did not have a notice from another

10 rights holders.  And this is the proportion of yeses for that

11 calculation.

12 Q.   So when you actually did the task that you were to do,

13 which was to determine how many -- during the claim period, how

14 many Cox subscribers received a notice from the plaintiffs for

15 a work in suit after receiving two others, that two others

16 could be -- both those two others could be from some third

17 party, right?

18 A.   That's correct.

19 Q.   Did you determine how many of the 57,000 received two out

20 of the three from somebody else, like, you know, Amazon, HBO,

21 Disney?

22 A.   I did not perform that calculation.

23 Q.   And did you determine when these notices regarding the

24 17,729, did they come in in 2012, '13, or '14?

25 A.   I did not calculate that.

G. McCabe - Cross

860

1  Q.   And in terms of the notices that we talked about, did you

2  determine whether they were with regard to the same musical

3  composition or sound recording?  Well, actually forget musical

4  composition.  Sound recording.  Did you determine whether any

5  of those -- how many came into the particular subscriber that

6  related to the same song or album?

7  A.   I'm not sure I understand the question.

8          MR. BUCHANAN:  Can we back up?  Keep going.  One

9  more.  Thanks, James.

10 BY MR. BUCHANAN:

11 Q.   So the people that got one or two, did you determine

12 whether it related to the same song or not?

13 A.   I just counted tickets.

14 Q.   Okay.

15 A.   I did not look at the song.

16 Q.   So the people that got three, they could have gotten -- it

17 could be all -- it could be a kid that downloaded a Disney

18 game, and the family got three notices for the same downloaded

19 game over three days, right?

20 A.   I believe so.

21         MR. ZEBRAK:  Your Honor --

22         THE WITNESS:  I don't have -- I know what's in the

23 data.  That's all.

24         THE COURT:  Overruled.  If you can answer.

25         THE WITNESS:  Yes.

 1          THE COURT:  He's asking you about, you know --

 2          THE WITNESS:  I guess I don't have -- I can't -- I

 3  don't have that information.

 4  BY MR. BUCHANAN:

 5  Q.   So in the bigger numbers, like 13-plus and 14-plus, the

 6  13, that can relate to an internet service provider that had a

 7  subcontract with us and then had, you know, 100,000

 8  subscribers, right?

 9  A.   All I know is what was in the data that I have.  I don't

10  know what it could have been.  I know what was in the data.

11  Q.   Okay.  So you didn't look behind the data to see if it was

12  a residential subscriber, a business subscriber, or what type

13  of business subscriber, right?

14  A.   I did not.

15  Q.   Okay.

16          James, can you -- okay.

17          So you've talked about report -- repeat infringing,

18  or repeat infringers.  This shows that as you move along,

19  there's fewer and fewer people repeating, right?

20  A.   That's correct.

21  Q.   The more notices they get, the fewer additional notices?

22  A.   That would always be true for data displayed in this way.

23  Q.   And that's what Lynn Weber's data showed, right?

24  A.   I don't recall.

25  Q.   Okay.  And I think, isn't it your view that -- I guess you

G. McCabe - Cross

862

1    didn't look at it for the claims period, but do you recall when

2    I asked you in your deposition about isn't it true that over

3    time, that you had -- most people had one or two and then some

4    had three, some had four; it just sort of then decreased,

5    right?

6    A.   That's correct.

7           MR. BUCHANAN:  Okay.  So could you go to the next

8    slide, please?  Go down a couple.  The next one, please, James.

9    Thank you.

10   BY MR. BUCHANAN:

11   Q.   So here again, we're outside the claims period by one

12   month on one side and a year on the other side, right?

13   A.   That's correct.

14   Q.   And you think your counsel asked you to do that?

15   A.   That's the data that I was given.

16   Q.   Okay.  And you were asked to do this, right?  You didn't

17   do this on your own.  You were told to do this, right?

18   A.   I was told to do a repeat infringer analysis.

19   Q.   So your 13,400, obviously, that number of the subscribers

20   that got tickets before the claim period, these are subscribers

21   that got a ticket during the claim period, at least one?

22   A.   That's correct.

23   Q.   Okay.  So they got one during the period 2013 and '14, and

24   then you're saying they got at least one in 2012?

25   A.   Or before February 1, 2013.

G. McCabe - Cross

863

1  Q.  Okay.  So that's three.  So do you know the -- you know,

2  what time period they received the three notices?

3  A.  For a particular --

4  Q.  Yeah.

5  A.  -- subscriber?

6       I mean, I have that information.  I didn't summarize

7  that or report it.

8  Q.  Did you distinguish between a business subscriber or a

9  residential subscriber?

10 A.  I did not in this analysis.

11 Q.  So this would be about 80 percent of the subscribers in

12 question in this case got no notices -- or got no tickets in

13 the year 2012 in the month of January prior to the claims

14 period, right?

15 A.  That's correct.

16 Q.  So 80 percent for 13 months got no tickets, and that would

17 mean including a notice from the plaintiffs or any other rights

18 holder that sent a notice in?

19 A.  You're using 80 percent as the complement of 23 percent?

20 Q.  Yes.  I know it's 77.

21 A.  Yes.  So yes.

22 Q.  Okay.

23       Is there another slide here?  We can move that.

24       So Cox -- are you aware that Cox had 4.5 million

25 subscribers?

G. McCabe - Cross

864

1   A.   No.

2   Q.   Okay.  You were here for the testimony of

3   Dr. Barbara Frederiksen-Cross, right?

4   A.   I heard some of her testimony.  I don't think I was here

5   for all of it.

6   Q.   Did you hear when she said there were 30 million people on

7   BitTorrent and these other sites on a daily basis?

8   A.   I don't recall storing that information.

9   Q.   Okay.  So you testified at the beginning of your direct

10  examination that you accepted all of the data that was given to

11  you on face value, right?

12  A.   That's correct.

13  Q.   You didn't look behind it, correct?

14  A.   That's correct.

15  Q.   So if it was unreliable, then your, your analysis or

16  conclusions would be unreliable, right?

17  A.   My understanding is that the data -- that somebody else

18  was responsible for the reliability of the data.  I was not

19  responsible for it.

20  Q.   But the question was if that data turns out to be

21  incorrect or inaccurate and you relied on it, then that would

22  make your conclusions potentially inaccurate?

23  A.   Yes.

24           MR. BUCHANAN:  Okay.  I have no further questions,

25  Your Honor.

G. McCabe - Redirect

865

1          THE COURT:  All right.  Thank you.

2          Redirect?

3          MR. ZEBRAK:  Yes, Your Honor.  Thank you.

4          Could you pull up the demonstratives, Mr. Duval?

5                    REDIRECT EXAMINATION

6   BY MR. ZEBRAK:

7   Q.   Let's first start, Dr. McCabe, with the time you spent

8   working on this matter.  Would you describe this -- how would

9   you characterize the degree of how hard you worked on this

10  matter?

11         MR. BUCHANAN:  Your Honor, I -- that's way beyond the

12  scope of cross.

13         THE COURT:  Oh, no.

14         MR. BUCHANAN:  Okay.

15         THE COURT:  I'll permit it.

16  BY MR. ZEBRAK:

17  Q.   Before the objection, sir, I asked you how would you

18  characterize how hard you worked on this matter?

19  A.   I worked very often from early, very early in the morning

20  until late at night.

21  Q.   Did you have to work at nights?

22  A.   Yes.

23  Q.   Weekends?

24  A.   Yes.

25  Q.   Did you have to travel?

G. McCabe - Redirect

866

1    A.   Limited travel, yeah.

2    Q.   When you arrived here to testify this week, did you know

3    exactly what day you would have to testify?

4    A.   I did not.

5    Q.   Did you know how long plaintiffs' counsel or Cox's counsel

6    would take questioning witnesses?

7    A.   I did not.

8    Q.   Do you enjoy being away from your family for this matter?

9            THE COURT:  All right, let's move on.  This is

10   beyond -- I thought you were going to ask what he did during

11   the 100 or more hours that he worked on the case, and this is

12   outside of that.  So let's move on.

13           MR. ZEBRAK:  Yes, Your Honor.  I'll move on.

14   BY MR ZEBRAK:

15   Q.   Counsel asked you questions about the mechanics of the

16   preparation of your report.  Do you recall that?

17   A.   Yes.

18   Q.   Asked you questions about who typed particular words or

19   footnotes going from your outline and revisions?  Do you recall

20   that?

21   A.   I recall the questions.

22   Q.   Whose work product is reflected in that report?

23   A.   It's my report.

24   Q.   Do you stand behind that work product?

25   A.   I do.

G. McCabe - Redirect

867

1   Q.   Does anything from counsel's questions today cause you to

2   doubt the accuracy and reliability of your findings?

3   A.   No.

4   Q.   Now, I'm going to ask you not just about your reports but

5   about -- let's start with your demonstrative slides.  Does

6   anything from counsel's questions today cause you to doubt the

7   accuracy and reliability of those slides?

8   A.   No.

9   Q.   Does anything from counsel's questions today cause you to

10  doubt the accuracy and reliability of the testimony you've

11  given?

12  A.   No.

13  Q.   Now, let me ask you some other questions.  Counsel asked

14  you a series of fast questions about several pages of your

15  deposition testimony, and I believe they, they concerned

16  warnings.  Do you recall that -- those questions?

17            MR. BUCHANAN:  I'm going to object to that.

18            THE COURT:  Warnings?

19            MR. ZEBRAK:  Well, I'm framing the question, Your

20  Honor.

21            THE COURT:  Well, you're testifying.  Ask him --

22            MR. ZEBRAK:  Yes, Your Honor.

23            THE COURT:  -- whether he agrees or disagrees with

24  something that was brought to his attention.

25            MR. ZEBRAK:  Sure.

G. McCabe - Redirect

868

1   BY MR ZEBRAK:

2   Q.   I'd like to bring your attention, sir, to your deposition

3   testimony that counsel referred you to, at page 188 to 191.

4   I'd like to just remind yourself what he was questioning you

5   about.  I'm going to ask a follow-up question.

6           MR. BUCHANAN:  Your Honor, this is improper.

7           THE COURT:  No, I think he's asking whether he would

8   like to further explain questions -- whether to further -- he

9   would like to amplify his answer to questions you asked on

10  direct where he was limited.

11          Is that right?

12          MR. ZEBRAK:  That's exactly what I'm doing, Your

13  Honor.  I'd like to give the witness an opportunity to look at

14  those pages so he understands the subject matter of the

15  questions from Cox's counsel, and I'm going to follow up.

16          THE COURT:  Where do you want him to read?

17          MR. ZEBRAK:  Oh, it was page -- I had done that

18  before the objection.  It was --

19          THE COURT:  188 to 191?

20          MR. ZEBRAK:  Yes, sir.

21          THE COURT:  All right.  Please review those pages,

22  Dr. McCabe.

23          THE WITNESS:  Yes, I'm familiar with those pages.

24  BY MR. ZEBRAK:

25  Q.   Are you familiar with what the phrase "sent warning"

G. McCabe - Redirect

869

1    refers to?

2    A.   Not in fine detail.

3    Q.   Does anything about your demonstrative slides today

4    address warnings?

5    A.   It does not.

6    Q.   Did anything about your testimony on direct involve a

7    calculation of the number of warnings Cox sent to customers?

8    A.   I don't believe so.

9    Q.   Now, I want to bring up one of your demonstrative slides,

10   sir.  So we're back in the repeat infringer analysis.  This is

11   the who, the repeat infringers, correct?

12   A.   Correct.

13   Q.   Okay.  Now, the source of the information for this

14   analysis are whose records?

15   A.   The --

16          MR. BUCHANAN:  Your Honor, I'm going to object.  He

17   asked -- asked and answered on direct, so I never asked

18   anything about it.

19          THE COURT:  You asked lots of questions of where --

20   of the dates of the data and what the data represented, so I

21   think it falls within redirect.  Ask your question.

22          MR. ZEBRAK:  Thank you, Your Honor.  I was just

23   framing the question to follow so it had some context before

24   the objection.

25          THE COURT:  Go ahead.

870

BY MR. ZEBRAK:

Q.   Let me start again.  Whose records are you analyzing with respect to repeat infringers?

A.   This is the Cox ticket data.

Q.   And these are ticket records concerning -- that stem from copyright infringement notices, correct?

A.   That's right.

Q.   Okay.  Now, do you know for what years Cox produced ticket data for the 57,600 subscribers who were the subject of MarkMonitor's notices?

A.   The framework is the years 2012, '13, and '14.

Q.   Now, do you know if -- do you know whether Cox produced ticket data for 2009 in this litigation?

A.   I have not seen any data from 2009.

Q.   Do you know if Cox produced ticket data for 2010 in this litigation?

A.   I have not seen that.

Q.   Do you know if Cox produced ticket data for 2011 for that year?

A.   I don't know.

Q.   If that information existed, would that be something -- do you have an objection?

          THE COURT:  Go ahead.

BY MR. ZEBRAK:

Q.   If that information existed, would that be something that

G. McCabe - Redirect

871

1    you would include in a repeat infringer analysis to bring above

2    the fold what copyright infringement tickets Cox received for

3    the subscribers reported by MarkMonitor's notices in the claim

4    period?

5            MR. BUCHANAN:  Objection, Your Honor.

6            THE COURT:  Yes, sustained.

7            MR. BUCHANAN:  Pure speculation.

8            THE COURT:  Sustained.  Let's move on.

9            MR. BUCHANAN:  And just for -- if I may, I would also

10   object because the Court is the one that provided what data

11   would be produced, and so I don't want to testify, but he's

12   suggesting that somehow --

13           THE COURT:  Understood.  Let's go.  That's why I

14   think it's an improper line of questioning.  So let's move

15   along.

16   BY MR. ZEBRAK:

17   Q.   As a statistician, do you choose to discard data that may

18   be relevant to your analysis?

19   A.   No.  I'm very sensitive about doing the best that I can

20   with all of the data that's available to me, no matter what the

21   circumstances.

22           MR. ZEBRAK:  Thank you, Your Honor.  No further

23   questions.

24           THE COURT:  All right.  May Dr. McCabe be excused?

25           All right.  You're excused with our thanks,

872

1  Dr. McCabe.  Please don't discuss the testimony you've given

2  with anyone until our trial is over.  All right?

3           THE WITNESS:  Thank you, yes.

4           THE COURT:  All right.  Thank you, sir.  Have a good

5  afternoon.

6  WITNESS EXCUSED

7           THE COURT:  All right.  We're going to take our

8  mid-afternoon break.  We'll take 15 minutes and we'll come back

9  and we'll be, we'll be adjourning at 5 p.m.  All right?

10          So you're excused.  Thank you.

11          NOTE:  At this point, the jury leaves the courtroom;

12  whereupon, the case continues as follows:

13  JURY OUT

14          THE COURT:  All right.  Why don't you-all discuss

15  what you want to do with demonstratives now that Mr. Buchanan

16  made the motion to admit one of the slides.  As you all know,

17  jurors are always interested in the demonstratives, so discuss

18  that at break and see if you can resolve that, and then we'll

19  talk about it when we come back.

20          Anything else before we break?  Where are we on --

21  are we playing a deposition now?

22          MR. OPPENHEIM:  We're going to call Linda Trickey

23  next, Your Honor.  Frankly, we didn't think we were going to go

24  so long with Dr. McCabe.

25          THE COURT:  Okay.

2686

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
           Plaintiffs,         :
                               :
      -vs-                     :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
           Defendants.         :
                               :
-------------------------------:
```

VOLUME  11   (A.M. Portion)

TRIAL TRANSCRIPT

December 17, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2712

```
 1                THE COURT:  Well, they identify -- beginning back on
 2     28, where it's an SR plaintiff and then MC plaintiff and SR 1
 3     and MC 1, I'm not sure what those figures -- so he does
 4     identify works which contain both an SR and an MC, right, in 29
 5     and --
 6                MR. OPPENHEIM:  There is one individual example or
 7     two individual examples --
 8                THE COURT:  30, 34.
 9                MR. OPPENHEIM:  -- and now they want to claim that
10     because he referenced that in the context of a discussion about
11     notices, that now because he references a couple of examples,
12     that he gets to put in something that he did no analysis for?
13     Yesterday, they were saying, look at Schedule 6.
14                We looked at Schedule 6.  It's not what it is.
15                And now they're saying, oh, no, no, no.  Let's try
16     this.
17                Your Honor, this is exactly what isn't supposed to
18     happen.  You've been -- you've restricted the plaintiffs to
19     presenting their experts, constrained by the reports and their
20     testimony.  The rules should apply equally.  It's -- this
21     analysis is not here.
22                And the fact that it's an ever-moving target of
23     numbers, I mean, Mr. Buchanan said, you know:  We fly-spec'd it
24     last night.
25                That analysis was not done at the time of his report.
```

2713

1    That's the question, was the analysis done at the time of his

2    report, and the answer is no.

3              THE COURT:  All right.  All right.  The motion to

4    preclude the exhibits which contain the lower portions of 13

5    and 21, 22, 23, 26, and the last two, the motion is granted.

6    Those will be amended -- or not presented.  I find that the --

7    in going over the reports, and in particular, the pages that

8    defendants have pointed to, that the analysis was not done.

9    There has been no notice that Mr. Tregillis was going to

10   testify about those matters.

11             This is clearly outside of the report, the summaries

12   that he gave of what his testimony was going to be, and

13   although they're not, as Mr. Buchanan pointed out, the most

14   resounding modifications, they are modifications, and they do

15   change the dynamics of his report, and that's -- it's

16   impermissible to do that this late in the -- on the last day of

17   trial.  So the motion is granted to just -- those will be --

18   exhibits will either be redacted or they won't be used.

19             All right.  What else do we have this morning?

20             MR. OPPENHEIM:  I don't think anything else at the

21   moment, Your Honor.

22             THE COURT:  Okay.  All right.  What -- does that --

23   who is -- Tregillis is the next witness?  Is that --

24             MR. ELKIN:  No, Your Honor.  We're calling

25   Mr. Mencher.

2714

1              THE COURT:  Okay.  All right.  Are we ready for our
2    jury then?
3              MR. ELKIN:  Yes, Your Honor.
4              THE COURT:  All right.  Joe, let's get our jury,
5    please.
6              THE COURT SECURITY OFFICER:  Yes, sir.
7              NOTE:  At this point, the jury returns to the
8    courtroom; whereupon, the case continues as follows:
9    JURY IN
10             THE COURT:  All right.  Good morning, ladies and --
11   please have a seat, everyone.  Sorry again for the delay.
12   Hopefully you were comfortable.
13             Thank you for coming in on time, and please give me
14   that nod of heads that you didn't do any research or
15   investigation or talk to anybody.
16             NOTE:  All jurors nodding heads.
17             THE COURT:  Thank you, sir.  Thank you-all.
18             All right.  Next witness?
19             MR. ELKIN:  Thank you, Your Honor.  The defendants
20   call Sanford Mencher.
21             THE COURT:  All right.
22             SANFORD MENCHER, DEFENDANTS' WITNESS, SWORN
23             MR. ELKIN:  May I inquire?
24             THE COURT:  Yes.  Good morning, sir.
25             Please proceed, Mr. Elkin.

2837

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  11  (P.M. Portion)

TRIAL TRANSCRIPT

December 17, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2892

1    Q.   Okay.  So if Cox has -- and its people there, management

2    and the people on the ground dealing with the calls and the

3    e-mails, have developed a system based on what they see on the

4    ground and what they hear from people, you would -- wouldn't

5    you believe that that would be part of the process, that that

6    should be considered in making a determination when to set a

7    certain point in time where someone should be terminated?

8    A.   Again, looking at that as Cox's policy and process, it is

9    a step that I have seen in other similar types of processes

10   where complaints have been remediated in some way, shape, or

11   form.  I had that in the cellular world with my customer

12   service report.  So in my experience, I've had consumer

13   interaction in remediation efforts underway in various

14   environments.  Again, you know, Cox has its policy and

15   procedures.  I've had my policy and procedures.

16             MR. BUCHANAN:  No further questions.

17             THE WITNESS:  Thank you, sir.

18             THE COURT:  All right.  Redirect?

19             MR. ZEBRAK:  No, thank you, Your Honor.

20             THE COURT:  Okay.  All right, thank you.  You're

21   excused at this time.  Have a good afternoon.

22             THE WITNESS:  Thank you, sir.  Thank you, Your

23   Honor.

24             NOTE:  The witness stood down.

25             MR. OPPENHEIM:  With that, Your Honor, plaintiffs

2893

1   rest their rebuttal case.

2          THE COURT:  All right.  All right, that concludes

3   the evidence in the case.  We have a couple of matters to talk

4   about, and I'll be able to give you word about whether we're

5   going to try and get in the closing arguments tonight or first

6   thing in the morning and just do part of the, the legal

7   instructions tonight.

8          I understand that some, some of you would like to

9   finish at 5:30, and I think if we try and do the entire

10  closing arguments and the instructions on the law, we're

11  looking at, we're looking at 6:30 or so, so that -- let me

12  finish up what we need to finish up, and then I'll ask Joe to

13  come in and we'll ask you whether you want to just do part of

14  it, as in the legal instructions tonight, and have closings

15  tomorrow, or you want to finish everything tonight.

16         So give us a little chance to finish up a few items,

17  and we'll check back with you shortly.  Thank you.  You're

18  excused.

19         NOTE:  At this point, the jury leaves the courtroom;

20  whereupon, the case continues as follows:

21  JURY OUT

22         THE COURT:  All right.  Have a seat.  I have two

23  issues that I want to raise on the jury instructions.  One is

24  whether there's been any evidence, evidence of mitigation that

25  the jury could consider, and second, whether there has been

2894

1    any evidence that the jury could consider whether to give one

2    statutory damages award for the works that include a song and

3    the music composition.

4              So, Mr. Elkin, tell me, where are you there, sir?

5              MR. ELKIN:  Sure.  Any particular order?

6              THE COURT:  Either one.  It doesn't matter.

7              MR. ELKIN:  So at sidebar, as Your Honor knows, I

8    took the Court through a proffer of both the sound recording

9    and the music composition --

10             THE COURT:  A couple instances of that, yeah.

11             MR. ELKIN:  Right, the 504(c)(1).

12             I believe that there is -- the registrations having

13   been provisionally admitted, and there are other documents

14   that reference those registrations as well that have been in

15   evidence, could give the jury with instructions the ability to

16   identify the limitations with respect to the compilations and

17   derivative works.

18             With regard to the sound recording compilation

19   issue, the -- on the face of the certificates are, one can

20   identify the specific, you know, works, and to the extent that

21   they're part of a compilation, I believe that is sufficient

22   evidence clearly that I think under the, the copyright

23   statute, I believe Article IV gives copyright claim, it's the

24   ability to proffer to the U.S. Copyright Office certificates

25   of registration for collective works and additions.

2895

1          Under Section 101, the definition under the

2    copyright statutes, collective works are defined as

3    compilations, and so I think there's an adequate basis for

4    that, and I showed Your Honor an exemplar at sidebar.

5          With respect to the -- and, of course, look, the --

6    examining the evidence, and I don't want to sit here and get

7    in over my skis, but based on the transcripts that we've

8    reviewed, the only evidence that came in, even if one were to

9    consider independent economic value, even if that were

10   something that would be considered in the circumstances, once

11   you have the facial evidence from the certificates of

12   registration, there is nothing that the, that the plaintiffs

13   have come up with other than a couple of very vague lines in

14   Mr. Kooker's testimony with respect to the Sony.  I don't

15   think anything could remotely be identified as something that

16   would rise to that level.

17         On the mitigation issue, I would take Your Honor

18   through the following.  And this is sort of consistent with

19   the order, I believe, that the Court rendered with regard to

20   the affirmative defenses and specifically with respect to

21   mitigation.  I believe what Your Honor had stated in the

22   decision is that there could be evidence that the plaintiffs

23   could have taken actions such as filing of lawsuits against

24   the subscribers that they believed should have been terminated

25   or something that Cox should have done about.

2903

1    copyright issues.  The defendants could have presented

2    evidence on it.  They chose not to.  I don't believe giving an

3    instruction to the jury on those issues right now will leave

4    the jury with any sense what to do with them because they have

5    nothing in front of them to understand what they mean.

6              THE COURT:  All right.  Mr. Elkin?

7              MR. ELKIN:  Thank you, Your Honor.  I'll be brief.

8    There was a reference to last night's charging conference, and

9    I think Mr. Oppenheim just doubled down on this notion of

10   joint tortfeasors.  This is not a situation where Cox and the

11   subscribers are jointly being pursued for direct infringement.

12   There's a different standard for secondary infringement.

13             It then -- what the standard is for direct

14   infringement, I'm not going to -- Your Honor knows the

15   additional requirements, so he's really comparing apples to

16   oranges.

17             I don't want to repeat and rehash the same

18   arguments.  I think you have it.  I just -- I do think in the

19   circumstances, we did not question Mr. Tregillis on the issues

20   about which you instructed us not to.  The notion that somehow

21   his testimony could be used against us when we were precluded

22   from producing the information is ironic, but I just harken

23   back to the argument that I made with regard to the

24   certificates.  I didn't think that Your Honor had precluded

25   the certificates to be a bar to -- for us to pursue this.  It

2904

1    had to do more with the bar to using it in the case, and we

2    declined, of course, and pursuant to Your Honor's order, did

3    not even go there.

4           THE COURT:  Well, I make rulings on individual

5    pieces of evidence, and you-all map out how you want to put

6    your case on, what witnesses you want to put in, and what

7    testimony you believe is appropriate and admissible, and then

8    I look at the end of the case to see what's there and what's

9    not there, and so I -- and when you have experts testifying,

10   as I've demonstrated, I think they should be held to the

11   confines of their reports.  They get, you know, rebuttal

12   reports.  They get beginning reports, rebuttal, surrebuttal

13   reports.  There shouldn't be any surprises.  So the

14   limitations I've imposed on expert testimony is based on, on

15   the notice requirements under Rule 26.

16          And the registrations, obviously, we looked at them

17   at the issue when it was, when it was initially offered on

18   summary judgment and ownership and registration issues, and

19   then it comes up again yesterday with these 7,200, which

20   there's just no testimony as to what's in that pile.

21          And so to now somehow expect the jury to pluck out

22   the works that are both sound recordings and music

23   compositions or allow you to, I guess, in closing arguments

24   just say, listen, there's 4,000 of these or 3,000 of these are

25   both one and the other, that, I think, is improper.

2905

1          I expected that there would be testimony about how

2   many of these sound recordings were also music compositions,

3   and the jury would be -- would have that evidence through the

4   witness stand when they were deliberating.

5          I mean, it's a close issue even to begin with as to

6   whether in this day and age, when the courts have clearly been

7   looking at the independent value of the works versus whether

8   they're music compositions and sound recordings, and I'm not

9   sure that Mr. Oppenheim isn't correct that we shouldn't even

10   be looking at the traditional Second Circuit analysis that

11   you've cited and is one of the governing cases, but I just

12   don't see that there's evidence from which they could collect

13   and cull and determine whether they wanted to combine the

14   statutory damages award for those works that are -- contained

15   both sound recordings and music compositions.

16          So I'm going to find that they should be allowed to

17   deliberate on the 10,017 individual works, regardless of

18   whether they're compositions or sound recordings, and your

19   exception, of course, is noted.

20          The other issue on mitigation, you know, I didn't

21   know how that would go in the course of the trial, but, you

22   know, clearly we had the instruction that I gave in BMG

23   talking about the -- that the mitigation instruction included

24   both that plaintiffs had failed to use reasonable efforts to

25   mitigate damages and also that the amount by which damages

2906

1  would have been mitigated, and there's absolutely an absence

2  of any evidentiary testimony about, you know, how they would

3  look at that.

4          I mean, the worst of the worst -- that's no standard

5  from which they could say, okay, there is -- and there's no

6  testimony about who are the worst the worst.  I mean, there

7  are a couple of isolated occasions where there were a hundred

8  or more or a thousand for business customers where the

9  testimony was about, but that's not a standard that they could

10 look at and reasonably deliberate on, on where's that line

11 drawn.

12         So I'm not going to give the mitigation instruction,

13 either, and again, your exception is noted.  I don't find that

14 the evidence -- you know, there is the Trickey testimony.

15 There was the John Doe lawsuits, and so that evidence is out

16 there, but when you compare that to what the jury would be

17 asked to deliberate, and I think that mitigation instruction

18 is the correct instruction to give to the jury, I find that

19 none of that evidence weighs on those issues.

20         So again, your exception is noted.

21         MR. ELKIN:  I understand, Your Honor.  May I just

22 clarify two issues on Your Honor's last ruling?

23         THE COURT:  Yes, sir.

24         MR. ELKIN:  One is with regard to the mitigation,

25 just to be clear, I don't know this is going to alter Your