# Exhibit 7

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```


VOLUME  2  (A.M. Portion)




TRIAL TRANSCRIPT

December 3, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

Case 1:18-cv-00950-PTC-JFA  Document 738-8  Filed 12/23/21  Page 3 of 38 PageID# 23466
Case 1:18-cv-00950-LO-JFA  Document 629  Filed 12/04/19  Page 3 of 153 PageID# 25815
D. Kokakis - Direct

163

1    knew that our songs were being infringed upon because they

2    overlapped with the sound recordings that were subject to the

3    notices that were delivered to Cox.

4    Q.   Can you explain more by what you mean by "overlap"?

5    A.   Every time you have a sound recording of a song, you have

6    a song involved.  Again, two distinct rights, two distinct

7    creative works, but you can't have a sound recording of a song

8    without the song itself being implicated.

9           So when I say they overlap, I mean that if Cox is

09:46:53 10   receiving notices on behalf of a sound recording, then that

11   sound recording naturally contains a composition or a song,

12   many of which were ours that are listed here in this list that

13   we just went through.

14   Q.   Are you familiar with the allegedly infringing files in

15   this case?

16   A.   Yes, I am.

17   Q.   Have you listened to any of those files?

18   A.   I did to spot check the song titles that are on this list.

19   Q.   And what did you determine after listening to those files?

09:47:25 20   A.   That the songs indicated on this list, at least the ones

21   that I spot checked, were accurately reflected here.  And that

22   Universal Music Publishing Group did indeed own or control

23   those songs.

24   Q.   Mr. Kokakis, why did Universal Music Publishing Group file

25   this lawsuit against Cox?

Case 1:18-cv-00950-PTG-JFA Document 738-8 Filed 02/23/24 Page 4 of 38 PageID# 23467
Case 1:18-cv-00950-PTG-JFA Document 629 Filed 11/04/19 Page 86 of 151 PageID# 23876
A. McMullan - Direct

224

1          MR. OPPENHEIM:  I think --

2          THE COURT:  All right.  Let's go ahead.

3          MR. OPPENHEIM:  I think he's going to like it, Your

4    Honor.

5          NOTE:  A music excerpt is played.

6    BY MR. OPPENHEIM: (Continuing)

7    Q.   Mr. McMullan, can you describe the importance of

8    recordings like the ones we just heard to UMG?

9    A.   That's some very key hit music that UMG has helped bring

11:27:55 10   to the world.  I mean, some of those are iconic pieces of our

11   culture.  I heard music that I used to play in a bar band when

12   we did covers.  I heard my prom song in there, "Wonderful

13   Night."

14          I mean, it's just very important music from very

15   important recording artists.

16   Q.   So let me turn now away from the legitimate recordings

17   that we just listened to and turn to the infringing ones.

18          Have you had occasion to listen to any of the

19   infringing recordings in this case?

11:28:29 20   A.   I did.

21   Q.   How many?

22   A.   I listened to 100 of them.

23   Q.   And do you recall how the 100 recordings were selected?

24   A.   They were picked randomly by a computer.

25   Q.   And why did you listen to them?

Case 1:18-cv-00950-PTG-JFA Document 738-8 Filed 02/23/21 Page 5 of 38 PageID# 23468
Case 1:18-cv-00950-LO-JFA Document 629 Filed 12/04/19 Page 87 of 151 PageID# 23877
A. McMullan - Direct

225

1   A.   I understood that during the course of this case there was

2   some issue raised about whether the recordings were in fact

3   copies of our recordings.  We believe that the technology used

4   to find and select them is essentially infallible, but, you

5   know, I wanted to listen for myself and put aside any possible

6   doubt.  And I listened to 100 of them.

7   Q.   And when you say the issue was raised, do you know -- who

8   do you understand raised the issue?

9   A.   Oh, I understand it was raised by Cox.

11:29:27 10   Q.   And was there a reason you didn't listen to all of the UMG

11   recordings in this case?

12   A.   Well, it's thousands of recordings, I think.  So --

13   Q.   And after you listened to them, what conclusion did you

14   come to?

15   A.   They were exact copies of our copyrighted sound

16   recordings.

17   Q.   How did they sound?

18   A.   They sounded great.  They sounded like exact copies of our

19   sound recordings.

11:29:52 20   Q.   In your position at Universal Music Group, do you deal

21   with piracy issues?

22   A.   Unfortunately, I do.

23   Q.   So at a high level, can you describe for the jury what

24   piracy is.

25   A.   Piracy is essentially the theft of our content.  It's the

Case 1:18-cv-00950-PTG-JFA Document 738-8 Filed 12/27/21 Page 6 of 38 PageID# 32469
Case 1:18-cv-00950-LO-JFA Document 629 Filed 12/04/19 Page 151 of 151 PageID# 25941
S. Marks - Direct

289

1    over the years.  But I run a much tighter show than evidently

2    some Courts do.  And I'll continue to yack up here, which is

3    not productive if necessary.  But I hope that this is enough

4    information for you to -- that you'll look at your outlines and

5    modify questions.

6            Anything else we need to talk about before break?

7            MR. OPPENHEIM:  Not from plaintiffs, Your Honor.

8            MR. ELKIN:  No, Your Honor.

9            THE COURT:  All right.  We're in recess.

13:14:41 10            NOTE:  The morning portion of the case on December 3,

11    2019, is concluded.

12            ---------------------------------------

13

14

15                    CERTIFICATE OF COURT REPORTERS

16

17

18            We certify that the foregoing is a true and
        accurate transcription of our stenographic notes.

19

20

21            /s/  Norman B. Linnell
        Norman B. Linnell, RPR, CM, VCE, FCRR

22

23

24            /s/  Anneliese J. Thomson
        Anneliese J. Thomson, RDR, CRR

25

Case 1:18-cv-00950-PTG-JFA   Document 738-8   Filed 12/27/21   Page 7 of 38 PageID# 32470
Case 1:18-cv-00950-LO-JFA   Document 637   Filed 12/10/19   Page 1 of 159 PageID# 20061

399

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
    -vs-                       :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  3  (A.M. Portion)

TRIAL TRANSCRIPT

December 4, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

Case 1:18-cv-00090-LO-JFA   Document 732-8   Filed 12/27/21   Page 8 of 38 PageID# 33471

1              MR. BUCHANAN:  This is -- he's going to be handling

2        the examination this morning.

3              THE COURT:  All right.  Good morning, Mr. Brody.

4        Welcome.  I know you've been watching the trial, and nice to

5        see you here at counsel table.

6              MR. BRODY:  Thank you very much, Your Honor.

7              THE COURT:  All right.

8              MR. BRODY:  One just quick one, just to preserve our

9        record, I'm expecting that the '431 spreadsheet, which was the

10       subject of a number of motions previously, will be coming up

11       today.  I'd just like to renew our motions in limine and court

12       preclusion with respect to that.

13             THE COURT:  All right.  They're so noted.  Your

14       exceptions are noted, and your -- I think your record is very

15       adequately protected, sir.  All right.  Thank you.

16             MR. BRODY:  I'm guessing we didn't change your mind.

17             THE COURT:  I'm sorry?

18             MR. BRODY:  I said I'm guessing we didn't change

19       your mind this morning.

20             THE COURT:  Yeah, that's not -- that didn't happen,

21       no.

22             All right.  Joe, let's get the jury in, please.

23             NOTE:  At this point, the jury returns to the

24       courtroom; whereupon, the case continues as follows:

25       JURY IN

Case 1:18-cv-00950-PTG-JFA Document 638-8 Filed 12/27/21 Page 9 of 38 PageID# 32472
Case 1:18-cv-00950-PTG-JFA Document 637 Filed 12/10/19 Page 11 of 139 PageID# 26477
B. Frederiksen-Cross - Cross

515

1            James, can we get slide 15 from

2    Ms. Frederiksen-Cross's deck up?

3            This is the verification module, right?

4    A.    Correct.

5    Q.    First I just wanted to make sure -- and this is partly

6    going back to our checklist -- when it says that there's a

7    download of full files, that's the step you reference there in

8    the middle.

9    A.    Yes.

10   Q.    Those are the files that are on that hard drive that we

11   were talking about before?  Is that your understanding?

12   A.    The files on the hard drive were produced, it's my

13   understanding, by MarkMonitor, and they are downloaded files,

14   yes.

15   Q.    Right.  They're the files that were captured during that

16   downloading step in the process?

17   A.    Yeah.  They are the files associated with the known

18   infringing hashes, the ones that have been verified.  It's my

19   understanding that MarkMonitor captures new files whenever

20   they encounter them, but I think that all of them on that hard

21   disc, it's my understanding, are ones that have already been

22   through the verification process.

23   Q.    And so that actually raises two questions.  The first is

24   those are the files that are sent to Audible Magic, right, or

25   the files that are fingerprinted and the fingerprints are sent

Case 1:18-cv-00950-PTG-JFA   Document 338-8   Filed 12/23/21   Page 10 of 38 PageID# 22473
Case 1:18-cv-00950-PTG-JFA   Document 637   Filed 12/10/19   Page 118 of 139 PageID# 26178
B. Frederiksen-Cross - Cross

516

1    to Audible Magic?

2    A.    They are files who would have been fingerprinted at some

3    point in time and gone to Audible Magic or at least copies of

4    those files.  I imagine they were just copied from the system

5    onto the hard drive.

6    Q.    Okay.  And then --

7    A.    And if I can clarify, I'm just -- these are not the

8    reference files.  They are the files that were unknown and

9    were identified just for the jury's benefit.

10   Q.    Right.  These are the -- these are the files that

11   MarkMonitor finds out on the internet, it downloads them onto

12   a hard drive at its system, it fingerprints them and sends

13   that fingerprint to Audible Magic for matching, right?

14   A.    And gets back a confirmation, yes.

15   Q.    Well, or a disconfirmation, depending.

16   A.    Yeah.  Thank you.

17   Q.    Okay.  And that's what's on the hard drive.  The ones

18   that were downloaded, matched, those were all saved to the

19   hard drive, and that's what you inspected?

20   A.    Yeah.  A copy of those files are on the hard drive.

21   Q.    Now, when Mark -- I'm sorry, when Audible Magic does its

22   matching of the fingerprints, you're aware that there are a

23   variety of levels of matching that Audible Magic can perform.

24   There's Level 1, Level 2, Level 3, I think, are the poetically

25   named choices.

Case 1:18-cv-00950-PTG-JFA Document 338-8 Filed 12/23/21 Page 11 of 38 PageID# 22457
Case 1:18-cv-00950-PTG-JFA Document 683 Filed 12/10/19 Page 159 of 159 PageID# 26199
B. Frederiksen-Cross - Cross

537

1    ours with them this morning.  This is a live demonstration.

2            THE COURT:  That's what I said.  I assume you shared

3    with them --

4            MR. ZEBRAK:  Yes, sir.

5            THE COURT:  Okay.  I mumble also, so I apologize.

6            MR. ZEBRAK:  No, that's my fault.

7            THE COURT:  So let's do that.  Before we resume,

8    let's -- you know, if you need to eat the ham sandwich out on

9    the courthouse steps, then let's get that done so that we can

10   come back at 5 minutes to two.

11           Mr. Buchanan, if you want to address that -- the

12   issue you raised this morning, we can do that right away when

13   we come back as well.  Okay?

14           MR. OPPENHEIM:  Thank you.

15           THE COURT:  All right.  We're in recess.

16           NOTE:  At this point, the December 4, 2019, morning

17   portion of the case is concluded.

18
                    CERTIFICATE OF COURT REPORTERS
19

20           We certify that the foregoing is a true and
            accurate transcription of our stenographic notes.
21

22                  /s/  Norman B. Linnell
                Norman B. Linnell, RPR, CM, VCE, FCRR
23

24                  /s/  Anneliese J. Thomson
                Anneliese J. Thomson, RDR, CRR
25

538

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  3  (P.M. Portion)

TRIAL TRANSCRIPT

December 4, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

Case 1:18-cv-00950-PTG-JFA   Document 738-8   Filed 12/23/21   Page 13 of 38 PageID# 22476
Case 1:18-cv-00950-PTG-JFA   Document 638   Filed 12/10/19   Page 101 of 136 PageID# 26300
S. Bahun - Direct

638

1    notice gets sent out to the ISP of the peer that we've observed

2    or collected.

3    Q.   And would that notice also sometimes be called an

4    infringement notice?

5    A.   Yes.  Sorry, yeah, infringement notice.

6    Q.   And in the case of RIAA, how would the infringement notice

7    be sent?

8    A.   In the case of this program we're talking about, we were

9    sending them through e-mail.

16:55:07 10  Q.   And who was the sender?

11   A.   MarkMonitor.

12   Q.   Did the RIAA participate in that process?

13   A.   They, I believe, provided us with an e-mail address that

14   they wanted us to send it from.  But we were the ones carrying

15   out the actual sending of the notices.

16   Q.   And was that e-mail address a MarkMonitor address or an

17   RIAA address?

18   A.   I believe it was an -- yeah, it was an RIAA address.

19   Q.   Let me turn to the records that you kept for this process.

16:55:43 20       I believe PX-11 is already in evidence, Your Honor.

21   I'd ask to publish.

22            THE COURT:  Yes, go ahead.  You may publish any

23   exhibit that's already in evidence that you choose.

24            MR. OPPENHEIM:  Thank you, Your Honor.

25   BY MR. OPPENHEIM:  (Continuing)

Case 1:18-cv-00950-PTG-JFA   Document 738-8   Filed 12/23/21   Page 14 of 38 PageID# 22477
Case 1:18-cv-00950-PTG-JFA   Document 638   Filed 12/10/19   Page 102 of 136 PageID# 26301

S. Bahun - Direct

639

1   Q.   Do you recognize this document?

2   A.   Yes.

3   Q.   And can you just briefly -- is this a MarkMonitor

4   document?

5   A.   Yes.  This is a spreadsheet that we produced containing

6   the records of all of the song files that we downloaded and

7   verified using Audible Magic.

8   Q.   Okay.  I see there are four tabs.

9   A.   Yes.

16:56:33 10   Q.   And they relate to each of the networks; is that right?

11   A.   Correct.

12   Q.   If we look through the four tabs, would they generally

13   look similar?

14   A.   Yes.

15   Q.   Okay.  Can you just quickly walk across this spreadsheet

16   and describe what's in it.

17   A.   Sure.  So we're on the first tab, meaning BitTorrent.  So

18   all of these files were downloaded from BitTorrent.

19          The first column is a Torrent ID, it's just a unique

16:57:09 20   identifier that we attach to a specific torrent file.

21          The next column is Info Hash.  So this is the SHA-1

22   hash value or the unique identifier for the torrent.

23          The next column is Matched As.  This shows you the

24   key words that we matched when we were looking for the

25   potentially infringing file.

Case 1:18-cv-00950-PTG-JFA  Document 738-8  Filed 12/23/21  Page 15 of 38 PageID# 22472
Case 1:18-cv-00950-PTG-JFA  Document 638  Filed 12/10/19  Page 103 of 138 PageID# 26302
S. Bahun - Direct

1   Q.   So that was what you were searching for?

2   A.   Correct.

3   Q.   In the first step?

4   A.   Correct.  The next is Verified Type Name.  This is simply

5   a flag in our database to indicate that the file has been

6   confirmed as real.  So you'll see "real" in there.

7   Q.   Mr. Duval, could you just scroll up and show that there --

8   on this tab.

9        Mr. Bahun, would you ever see on a spreadsheet like

16:58:06 10   this, this column ever have anything other than "real"?

11   A.   No.

12   Q.   And why is that?

13   A.   Because this data set is for files that were contained in

14   the notices sent to Cox.  And no notice would have been sent on

15   a file that wasn't identified as "real."

16   Q.   And "real" meaning it was confirmed as what?

17   A.   It was a confirmed infringing copy of the song.

18   Q.   Okay.  Sorry.  I got us off the titles.  There you go.

19   Can you continue on E, please.

16:58:43 20   A.   Sure.  So then you have First File Name.  That's the name

21   of the individual song the first time we saw it.

22        The next is File Size --

23   Q.   Can I just stop on that First File Name?

24   A.   Oh, I'm sorry.  Yeah.

25   Q.   Is that first file name generated by Audible Magic?

Case 1:18-cv-00950-PTG-JFA Document 738-8 Filed 12/23/21 Page 16 of 38 PageID# 22470
Case 1:18-cv-00950-PTG-JFA Document 638 Filed 12/10/19 Page 105 of 136 PageID# 26304

S. Bahun - Direct

642

1    bundled together in a single torrent.

2            So for purposes of displaying the data in this

3    spreadsheet, each row represents an individual song, but this

4    whole group was part of one torrent that you could download on

5    BitTorrent.

6    Q.   So all of these Black Sabbath recordings would have been

7    in a single torrent?

8    A.   Yes.

9    Q.   Okay.  Next column, please.

17:00:39 10  A.   Next is the Torrent Name.  So this is the name of the

11   torrent file that would allow the user to download the content.

12   Q.   Now, that again -- is that generated by Audible Magic?

13   A.   No.  That's a value that we capture when we collect it.

14   Q.   When you say "we capture it," it's not created by

15   MarkMonitor, is it?

16   A.   Not created, no.  It's an existing name of a file when we

17   discover it on BitTorrent.

18   Q.   Is it only as reliable as the user who named it?

19   A.   Yes.

17:01:08 20  Q.   Okay.  Next column.

21   A.   The next is -- actually the next four are values that we

22   capture from Audible Magic.  Audible Magic provides these to

23   us.  So the first is the Audible Magic info ID, which is a

24   unique identifier.  And then they give us artist, track, and

25   album.

Case 1:18-cv-00950-PTG-JFA Document 738-8 Filed 12/23/24 Page 17 of 38 PageID# 32480
Case 1:18-cv-00950-PTG-JFA Document 638 Filed 12/10/19 Page 106 of 136 PageID# 26365
S. Bahun - Direct

643

1        So these are kind of what they have confirmed the

2   file as being.

3   Q.   Now, for the recordings on this spreadsheet, listed on

4   this spreadsheet, did MarkMonitor -- does MarkMonitor have

5   copies of them?

6   A.   Yes, we have, I believe, most of the songs that are in

7   this spreadsheet, they're -- we have copies of the songs, yeah.

8   Q.   And were those produced in this case?

9   A.   Yes.

17:02:01 10   Q.   Your Honor -- and how -- just how were they produced?

11   A.   So we provided a drive, a hard drive containing all of the

12   music files related, yeah.

13        MR. OPPENHEIM:  Actually, can we open -- which is the

14   directory of the hard drive?  16, I think 16 is in.  So publish

15   PX-16, please.

16        THE COURT:  Is that in?  Is that already admitted?

17        MR. OPPENHEIM:  I thought it was if I -- yes?  Yes.

18        THE COURT:  Okay.

19        MR. OPPENHEIM:  I believe it's in.

17:02:42 20        MR. BRODY:  The directory is in, yes.

21        MR. OPPENHEIM:  Is this it?  I am sorry.  I am having

22   trouble seeing it.

23   BY MR. OPPENHEIM: (Continuing)

24   Q.   Do you recognize this?

25   A.   Yes.

Case 1:18-cv-00950-PTG-JFA   Document 738-8   Filed 12/23/21   Page 18 of 38 PageID# 22481
Case 1:18-cv-00950-PTG-JFA   Document 638   Filed 12/10/19   Page 110 of 136 PageID# 26309
S. Bahun - Direct

647

1    and say, you don't have everything, or you have at too much,

2    but that is entirely up to him.

3            THE COURT:  He doesn't want you to represent on

4    direct examination that it contains everything.

5            MR. OPPENHEIM:  I don't believe I have.

6            THE COURT:  I know you haven't so far.

7            MR. OPPENHEIM:  Okay.

8            MR. ELKIN:  Your Honor, just one point.  One issue

9    that we have with regard to the hard drive is that there hasn't

17:07:21 10    been any evidence that anyone at MarkMonitor has actually

11    listened to what it is.

12            There has been no foundation that Mr. Bahun has even

13    listened to what it is being offered for.  I think there is a

14    foundational issue that I did address at summary judgment that

15    I don't think this testimony has overcome.

16            MR. OPPENHEIM:  Every one of the files went through

17    Audible Magic, which did essentially the equivalent of a

18    digital listening.  And Mr. McMullan testified that he listened

19    to a sample of them.  And other witnesses -- as did -- excuse

17:07:57 20    me -- Barbara Frederiksen-Cross said she did.  So did

21    Mr. Kokakis.

22            So that is simply not accurate.

23            MR. BRODY:  At the same time, during

24    Ms. Frederiksen-Cross' examination, we saw examples where the

25    files that were identified in 16, the Audible Magic

Case 1:18-cv-00950-PTG-JFA   Document 738-8   Filed 12/23/21   Page 19 of 38 PageID# 22482
Case 1:18-cv-00950-PTG-JFA   Document 638   Filed 12/10/19   Page 111 of 136 PageID# 26310

S. Bahun - Direct

648

1    spreadsheet, didn't match what was on that spreadsheet.

2           So, you know, it's --

3           THE COURT:  Your exception is noted.  I am going to

4    let it in.  You clear up the fact that it -- what it is and

5    what -- where it came from.  And I think that's sufficient.

6           All right.  Your exceptions are noted.

7           MR. ELKIN:  Thank you.

8           NOTE:  The sidebar discussion is concluded; whereupon

9    the case continues before the jury as follows:

17:09:23 10  BEFORE THE JURY

11          THE COURT:  All right.  That exhibit will be

12   received.

13          And please proceed.

14          MR. OPPENHEIM:  Mr. Duval, can you bring up PX 39.  I

15   will apologize in advance, it's not a document.  It's a big

16   hard drive of music files.

17          THE COURT:  Okay.

18   BY MR. OPPENHEIM: (Continuing)

19   Q.   Do you recognize this directory, Mr. Bahun?

17:09:48 20  A.   Yes.

21   Q.   And do you know where this -- and do you know what's

22   within this directory?

23   A.   Yes.  So there is -- we've organized it by a series of

24   folders.  And inside of each folder are the song files that

25   were downloaded from the corresponding peer-to-peer networks.

Case 1:18-cv-00950-PTG-JFA   Document 738-8   Filed 12/23/21   Page 20 of 38 PageID# 22403
Case 1:18-cv-00950-PTG-JFA   Document 638   Filed 12/10/19   Page 112 of 136 PageID# 26311
S. Bahun - Direct

1    Q.   And was this produced by MarkMonitor?

2    A.   Yes.

3    Q.   Can we -- so it looks like that there is one folder that

4    is labeled Ares; is that right?

5    A.   Correct.

6    Q.   Mr. Duval, could you just open that, please.

7              Can you describe what's in this file, please, or this

8    folder.

9    A.   Yes.  For Ares, there were four audio files that we

17:10:51 10   downloaded and placed on the drive.  So, yeah, there's -- you

11   see four separate MP3 files here.

12   Q.   Okay.  Can we go back to the main directory, Mr. Duval.

13             And there are a lot of BitTorrent ones, just like

14   No. 7, let's go down.

15             And so, what is this we are seeing right now,

16   Mr. Bahun?

17   A.   Yes.  So BitTorrent functions a little bit differently.

18   You will see some differences by peer-to-peer network.  And so,

19   for BitTorrent, within each folder there is an individual

17:11:27 20   folder named what the hash value is for the infringing file.

21             So if you open one of those, inside you will see, in

22   this case, two files.  There could be multiple though.  If you

23   have a -- if you have a full album or something like that, you

24   may see a whole -- a larger set of files.

25             In this particular case, you see the MP3 file and

Case 1:18-cv-00950-PTG-JFA Document 738-8 Filed 12/23/21 Page 21 of 38 PageID# 22424
Case 1:18-cv-00950-PTG-JFA Document 638 Filed 12/10/19 Page 128 of 136 PageID# 26327
S. Bahun - Direct

665

1    A.   Yeah.   Yeah.   We do see files on the networks that are

2    mislabeled at times.   This could be called anything.   You know,

3    in this particular case, the file was called or was mislabeled

4    as Taylor Swift, "Love Story" in the file name.   But when we

5    downloaded it and processed it, it was positively matched to

6    the song "Poker Face" by Lady Gaga.

7    Q.   Okay.   Mr. Duval, PX 39, please.   The hard drive that we

8    looked at earlier.

9         Okay.   And we were on eDonkey tab.   So let's look in

17:37:29 10  eDonkey here, part one, please.   And can you look for the one

11   that has a file named Taylor Swift, "Love Story."

12   A.   Yes.

13   Q.   Is that -- would that correlate back to what we were just

14   looking at on the other spreadsheet, Mr. Bahun?

15   A.   It appears to.   Could you switch back to the other file

16   just for a second?

17        Yes, it does correspond to this file.

18   Q.   And how do you know?

19   A.   I was looking at the hash value in the file name.   So we

17:38:04 20  append that here.   We add the hash value as the unique

21   identifier.   So I am able to -- yeah, to determine that based

22   on that.

23   Q.   Okay.   So let's go back to the hard drive, please.   And

24   Mr. Duval, let's listen and see whether it is Taylor Swift or

25   Lady Gaga.

Case 1:18-cv-00950-PTG-JFA Document 738-8 Filed 12/23/21 Page 22 of 38 PageID# 22495
Case 1:18-cv-00950-PTG-JFA Document 638 Filed 12/10/19 Page 129 of 136 PageID# 26328
S. Bahun - Direct

666

1      NOTE:  A music excerpt is played.

2      BY MR. OPPENHEIM: (Continuing)

3      Q.   Mr. Bahun, do you recognize that recording?

4      A.   Yes, I do.

5      Q.   You recognize that recording?

6      A.   Yes.

7      Q.   Now, was that Taylor Swift or Lady Gaga?

8      A.   That was -- that was Lady Gaga.

9      Q.   Let's turn to PX 12, please.  I am sorry.

10          Did you -- just the first page of it.

11          So we have a stipulation on the first page of PX 12.

12          THE COURT:  All right.

13          MR. OPPENHEIM:  So if you could publish just the

14     first page, please, Mr. Duval.

15     BY MR. OPPENHEIM:  (Continuing)

16     Q.   Do you recognize this document, Mr. Bahun?

17     A.   Yes.

18     Q.   Can you describe what it is?

19     A.   This is a summary of the notices that we sent to Cox

17:39:51 20     between 2012 and 2015.

21     Q.   And did you assist in the preparation of this summary?

22     A.   Yes.

23     Q.   And can you describe the difference between the column

24     that says Full Data Set and the column that says February 1,

25     2013, to November 26, 2014?

Case 1:18-cv-00950-PTG-JFA  Document 738-8  Filed 12/23/21  Page 23 of 38 PageID# 22486
Case 1:18-cv-00950-LO-JFA  Document 638  Filed 12/10/19  Page 136 of 136 PageID# 26355

673

1

2
                    CERTIFICATE OF COURT REPORTERS

3

4

5          We certify that the foregoing is a true and
       accurate transcription of our stenographic notes.

6

7

8

9              /s/  Norman B. Linnell
           Norman B. Linnell, RPR, CM, VCE, FCRR

10

11

12

13             /s/  Anneliese J. Thomson
           Anneliese J. Thomson, RDR, CRR

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :    Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```


VOLUME   4   (A.M. Portion)


TRIAL TRANSCRIPT

December 5, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

Case 1:18-cv-00650-PTG-JFA   Document 738-8   Filed 12/27/21   Page 25 of 38 PageID# 23498
Case 1:18-cv-00650-LO-JFA   Document 639   Filed 12/10/19   Page 32 of 133 PageID# 20367

S. Bahun - Cross

705

1   program, right?

2   A.   I know that -- I know that that was the type that was

3   being used, yes.

4   Q.   And they selected Level 3 for the CAS program, correct?

5   A.   I believe so.

6   Q.   Do you know why the RIAA chose a higher level for CAS than

7   it chose for Cox?

8   A.   No.

9            MR. OPPENHEIM:   Objection to the use of the term

09:46:17 10  "higher."   He hasn't established that Level 3 was higher than

11   Level 1.

12           THE COURT:   All right.   Sustained.   He's --

13   BY MR. BRODY:   (Continuing)

14   Q.   Do you know why RIAA chose Level 3 for CAS and Level 1 for

15   Cox?

16   A.   No.

17   Q.   I want to ask a series of questions that kind of start

18   with the hard drive that we looked at yesterday.

19           We played some songs off a hard drive that you folks

09:47:02 20  created, and I think that's Exhibit -- Plaintiff's Exhibit 39.

21           Do you recall that generally?

22   A.   Yes.

23   Q.   Okay.   When was that hard drive created?   When were those

24   songs put on that hard drive?

25   A.   I believe it was -- I can't tell you for certain, but I

Case 1:18-cv-00950-PTG-JFA   Document 736-8   Filed 12/27/21   Page 26 of 38 PageID# 23489
Case 1:18-cv-00950-LO-JFA   Document 639   Filed 12/10/19   Page 33 of 133 PageID# 20368
S. Bahun - Cross

706

1  think it was the end of 2015, beginning of 2016, around that

2  time frame.

3  Q.   So that would have been two years after the end of the

4  notice period here?

5  A.   Yes.

6         MR. BRODY:  Your Honor, may I approach the bench?

7         THE COURT:  Yes, sir.

8         NOTE:  A sidebar discussion is had between the Court

9  and counsel out of the hearing of the jury as follows:

09:47:54 10  AT SIDEBAR

11         THE COURT:  All right.

12         MR. BRODY:  Your Honor, I move to strike Exhibit 39.

13         It was identified as copies of the recordings that

14  were downloaded, but it obviously was made two years after they

15  were downloading the files.

16         MR. OPPENHEIM:  That's not what he asked the -- I'm

17  sorry, Your Honor.  I didn't mean to interrupt you.

18         THE COURT:  Well, that's an insufficient basis for

19  striking it.  Just the timing of when it was made doesn't make

09:48:20 20  it any more or any less reliable unless you can establish that,

21  right?

22         MR. BRODY:  Maybe I misunderstood, but I thought the

23  testimony was that these were the files that they downloaded

24  and then sent to Audible Magic and then, you know, put in the

25  notices.  So these were supposed to be, if we want to know what

Case 1:18-cv-00950-PTG-JFA   Document 738-8   Filed 12/27/21   Page 27 of 38 PageID# 23490
Case 1:18-cv-00950-LO-JFA   Document 639   Filed 12/10/19   Page 84 of 133 PageID# 20369
S. Bahun - Cross

707

| | |
|---|---|
| 1 | Audible Magic checked, we're supposed to be able to listen to |
| 2 | these files.  But that can't be the case because they were -- |
| 3 | the files were made and saved two years after, four years after |
| 4 | the notices were sent.  And they were submitted to Audible |
| 5 | Magic. |
| 6 | MR. OPPENHEIM:  First off, the infringing recordings |
| 7 | aren't submitted to Audible Magic.  So that's incorrect. |
| 8 | MR. BRODY:  The fingerprints, I'm sorry. |
| 9 | MR. OPPENHEIM:  But all he asked the witness was when |
| 10 | were these put on the hard drive. |
| 11 | THE COURT:  Right. |
| 12 | MR. OPPENHEIM:  He hasn't established anything that |
| 13 | he just said. |
| 14 | THE COURT:  That's an insufficient basis.  Your |
| 15 | motion is denied.  Your exception is noted. |
| 16 | MR. BRODY:  Okay. |
| 17 | THE COURT:  I mean, if you want to continue to a |
| 18 | probe further -- |
| 19 | MR. BRODY:  I will. |
| 20 | THE COURT:  -- that's fine. |
| 21 | MR. BRODY:  We'll find out. |
| 22 | THE COURT:  Okay.  Thank you. |
| 23 | NOTE:  The sidebar discussion is concluded; whereupon |
| 24 | the case continues before the jury as follows: |
| 25 | BEFORE THE JURY |

09:49:02
09:49:17

Case 1:18-cv-00950-PTG-JFA   Document 738-8   Filed 12/27/21   Page 28 of 38 PageID# 23481
Case 1:18-cv-00950-LO-JFA   Document 639   Filed 12/10/19   Page 35 of 133 PageID# 20370
S. Bahun - Cross

708

```
 1              THE COURT:  All right, please proceed.

 2     BY MR. BRODY:  (Continuing)

 3     Q.   Mr. Bahun, how did the files get onto the hard drive?

 4     Audible Magic -- I am sorry -- MarkMonitor put them there?

 5     A.   Yes.

 6     Q.   And where did you put them there from?  Where were they

 7     when you put them there?

 8     A.   One of our systems where we would -- where we would have

 9     stored the files.

10     Q.   Okay.  So you had them -- and when did they go onto your

11     system?

12     A.   I'm sorry, I don't quite understand the question.

13     Q.   You said that they were -- they would have come from some

14     place in your system where you stored the files.  I just wanted

15     to know when they were stored on your system, wherever they

16     were stored.

17     A.   I don't know the exact date.  I mean, they would have been

18     different dates.

19     Q.   Would they have been stored on the system when they were

20     first downloaded from the Internet -- from a peer-to-peer

21     network?

22     A.   Possibly some of them.  I don't recall the specific

23     details.  I mean, they are -- they are the files based on the

24     hash value, you can determine that.

25     Q.   I understand.  I mean, they are files and they have hash
```

09:50:11 (line 10)
09:50:46 (line 20)

Case 1:18-cv-00950-PTG-JFA   Document 738-8   Filed 12/27/21   Page 29 of 38 PageID# 23492
Case 1:18-cv-00950-LO-JFA   Document 639   Filed 12/10/19   Page 30 of 133 PageID# 20371
S. Bahun - Cross

```
 1    value and, you know, that matches or it doesn't.

 2             What I was trying to ask and understand was where

 3    they -- how you came to possess them?

 4    A.   So we downloaded them from the peer-to-peer networks.

 5    Q.   And you downloaded them at different times?

 6    A.   Yes.

 7    Q.   Some of them were downloaded the first time you found a

 8    file, and some of them were downloaded at other times?

 9    A.   Yes.

09:51:43 10  Q.   And I think you said you weren't sure what those other

11    times might have been?

12    A.   Right.  And some files are downloaded multiple times, you

13    know, throughout the course of the time period we are talking

14    about.

15             MR. BRODY:  Your Honor, I would renew my objection.

16             THE COURT:  Denied.

17    BY MR. BRODY: (Continuing)

18    Q.   Now, the files that you downloaded and stored on your

19    system, were some of them downloaded from BitTorrent?

09:52:27 20  A.   Yes.

21    Q.   Were some of them downloaded from eDonkey?

22    A.   Yes.

23    Q.   Were some of them downloaded from Gnutella?

24    A.   Yes.  I don't think that any of the Gnutella files -- in

25    the form that we produced the drive, I don't think there were
```

Case 1:18-cv-00950-PTG-JFA Document 738-8 Filed 12/23/21 Page 30 of 38 PageID# 22493
Case 1:18-cv-00950-PTG-JFA Document 639 Filed 12/10/19 Page 115 of 138 PageID# 26450
S. Bahun - Redirect

788

Q.   Dr. McCabe, let's turn to the first slide.  I believe you
said you did -- you had two assignments in this case, a works
in suit analysis and a repeat infringer analysis, correct?

A.   That's correct.

Q.   Okay.  So let's review assignment one, the works in suit
analysis.  Would you explain to the jury what your assignment
was with respect to the works in suit analysis.

A.   Yeah, so the first line below the title defines the scope
of my analysis.  Sometimes we -- or I would call that a frame,
12:29:04 it's a statistical term.  So the frame here is what are called
the works in suit.  And there are 10,017 of those works.

There are four icons below that.  And these are the
requirements that I used or applied to accomplish the works in
suit task.

So the first requirement is that the work -- and this
is analysis about the works in suit.  Again, it's the 10,017
works that we're talking about.  So that work must in an
infringement notice -- an infringement notice during the claim
period.

12:29:54 The second is that the work in suit should be in a
notice that is the third or later notice for a particular
subscriber.

In other words, I labeled the notices as a first, a
second, a third, et cetera.  So I only looked at third or later
notices.

S. Bahun - Redirect

789

                    Next, the infringing notice must contain the work in

 2   suit.

 3                  And the fourth requirement is that the infringing

 4   file is on a hard drive that was created by MarkMonitor.

 5   Q.   Dr. McCabe, I would like to draw your attention to the

 6   third bullet.  A moment ago I believe you said the infringed --

 7   well, could you explain what that third bullet is in a little

 8   more detail.

 9   A.   Yes.  So the notice contains information.  And the

10   information, depending upon the protocol, points either to one

11   work in suit or it can -- in the case of BitTorrent, it can

12   refer to a collection of works.

13   Q.   What is the significance to the reference to "infringing

14   file" in that third bullet?

15   A.   The infringing file is part of the notice.  And that

16   points to -- through these hashes, it points -- it gets us to

17   the works in suit.

18   Q.   Do you have an understanding as to whether the infringing

19   file is identified in the notice?

20   A.   Yes, it is.

21   Q.   And by the way, when we talk about notices, what are we

22   referring to here?

23   A.   They are the e-mails sent by MarkMonitor to Cox.

24   Q.   Okay.  And were you able to form any -- and, first of all,

25   you said that you're not providing any -- you're not testifying

Case 1:18-cv-00950-PTG-JFA Document 738-8 Filed 12/23/21 Page 32 of 38 PageID# 22495
Case 1:18-cv-00950-PTG-JFA Document 639 Filed 12/10/19 Page 118 of 138 PageID# 26453
S. Bahun - Redirect

791

1    So on this slide, the claim period is denoted or

2    described by the yellow bar at the top.  It starts February 1,

3    2013, and ends November 26, 2014.

4    And the checkmark means that all of the 10,017 works

5    in suit did correspond to a notice during this claims period.

6    Q.    Was the claim period the same claim period for every

7    single plaintiff group in this case?

8    A.    No.  There is a note below the bars for the years that --

9    for the Sony ATM/EMI claims, the start of the claim period was

12:34:24 10   August 1, 2013, rather than February 1, 2013.  But that period

11   was the same, the ending date of the claims period for Sony

12   ATM/EMI was the same as for all the others.

13   Q.    And, Dr. McCabe, would you briefly walk the jury through

14   the remaining three checked boxes on this slide.

15   A.    Yes.  So the second is that -- this issue of the third or

16   later notice for a particular subscriber.  So that was

17   satisfied for all of the 10,017 works.

18   That the infringing file in the notice contains the

19   work in suit.

12:35:11 20   And that there is a copy of the work on a hard drive

21   created by MarkMonitor.

22   So all of these -- the four requirements are

23   satisfied.  And the term I'm using is that means those works in

24   suit were qualified.

25   Q.    Dr. McCabe, what data sources did you use for your

Case 1:18-cv-00950-PTG-JFA Document 738-8 Filed 12/23/21 Page 33 of 38 PageID# 22496
Case 1:18-cv-00950-PTG-JFA Document 639 Filed 12/10/19 Page 113 of 138 PageID# 26452
S. Bahun - Redirect

792

1  analysis in this case?

2  A.   Yes, I think I prepared a slide for that.  That should be

3  the next one.

4  Q.   Or actually, Dr. McCabe, let me ask you a question.  A

5  moment ago when you were explaining each of the four

6  requirements for your analyses were satisfied, you used the

7  term "qualified."

8        What does that mean?

9  A.   It basically means that the work in suit is connected to a

12:36:23 10  notice.  So we could view it the other way around.  You start

11  with the notice, it points to the work in suit.  So there is a

12  direct connection between those two.

13        And that's what I'm calling qualified, that I can

14  draw the link from the notice to the work in suit.

15  Q.   Okay.  Well, let's turn back to your data sources, and I

16  can ask you a few questions about that.

17        So what is being depicted in the left column with

18  respect to data sources?

19  A.   The left column describes the source of the data sets.  So

12:37:04 20  there are three sources, MarkMonitor, Cox, and the plaintiffs.

21  Q.   And what data from MarkMonitor was within your analysis in

22  this matter?

23  A.   So MarkMonitor is the top data source there.  And there

24  are three files listed to the right.  The first is the notices

25  or the -- actually, I didn't have the notices, but I had a file

S. Bahun - Redirect

793

 1    that lists the notices and the information contained in each

 2    notice.  So all that -- these are all data files that I had.

 3              So there is a file for notices from MarkMonitor.

 4    There is a file for the downloads that MarkMonitor downloaded.

 5    And there is a file from MarkMonitor about the Audible Magic

 6    procedure or connections to go from hashes to works.

 7    Q.   And what is depicted with respect to Cox in terms of data

 8    from Cox that you considered within your analysis?

 9    A.   So Cox also provided three data sets.  The first one

12:38:25 10    listed there is subscriber identification.  So the Cox CATS

11    system has identifiers for subscribers.  It was necessary to

12    have that information to be able to perform my analysis.

13              So it's the file itself connected subscriber IDs with

14    notices.

15              The second file is what I have called the ticket

16    file.  It's the large file that contains the tickets that Cox

17    recorded in their CATS system.

18              And the third is a file that identifies Cox

19    subscribers as -- I used it to distinguish residential from

12:39:17 20    business subscribers.

21    Q.   And when you say the third file, was that the billing

22    information file?

23    A.   I am sorry, the billing information file, yes.

24    Q.   And, finally, to the right of plaintiffs, there is an

25    Exhibit A and B.  What are those two files?

Case 1:18-cv-00950-PTG-JFA Document 738-8 Filed 12/23/21 Page 35 of 38 PageID# 22498
Case 1:18-cv-00950-PTG-JFA Document 639 Filed 12/10/19 Page 33 of 138 PageID# 26468
S. Bahun - Redirect

806

1    the Court to consider how that -- how we proceed.

2           THE COURT:  Yeah.  If putting this video on before

3    those witnesses involves having that jury sit and twiddle their

4    thumbs while we're going through objections, then I'm not going

5    to permit it.  We're going to do it with live witnesses.

6           And after they're done, after we send the jury home,

7    we can go through the deposition designation objections.

8           This case has been going on a long time, and the last

9    thing that I'm going to permit is us to have the jury sitting

13:01:52 10   around while we're yakking about whether something is

11   objectionable.

12          So thank you for bringing that to my attention.

13          All right.  So I have a plea.  The defendant is in

14   custody.  So the, you know, pencils and that kind of stuff

15   probably aren't a good idea.

16          All right.  We're in recess.

17          NOTE:  The morning portion of the case on December 5,

18   2019, is concluded.

           -------------------------------------------

19

                    CERTIFICATE OF COURT REPORTERS

20

21          We certify that the foregoing is a true and
         accurate transcription of our stenographic notes.

22

23          /s/  Norman B. Linnell
         Norman B. Linnell, RPR, CM, VCE, FCRR

24

25          /s/  Anneliese J. Thomson
         Anneliese J. Thomson, RDR, CRR

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                       :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```


VOLUME  6  (A.M. Portion)




TRIAL TRANSCRIPT

December 9, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

Case 1:18-cv-00950-PTG-JFA  Document 726-8  Filed 12/27/21  Page 37 of 38 PageID# 30560
Case 1:18-cv-00950-LO-JFA  Document 649  Filed 12/17/19  Page 36 of 158 PageID# 27018

M.J. Flott - Direct

1193

1    So brings back a lot of good memories.

2    Q.   And how -- what do these sound recordings represent to

3    Warner Music Group?

4    A.   They're some of the most iconic songs in our catalog and,

5    you know, we want to make sure they're protected.

6    Q.   Have you listened to any of the infringing music files in

7    this case?

8    A.   I have.

9    Q.   How many?

10:18:19 10   A.   I listened to 100.

11   Q.   And how were those 100 selected?

12   A.   It was a random statistical sample.

13   Q.   And why did you listen to a sample of the infringing music

14   files in this case?

15   A.   I wanted to make sure that I familiarized myself with what

16   was being infringed and whether they were in fact our songs.

17   Q.   And what did you conclude after listening to those files?

18   A.   That they are in fact our songs listed within the exhibit.

19   Q.   All right.  Let's turn to the revenues generated from

10:18:55 20   Warner Music's -- Warner Music Group's sound recordings.

21   What are the different ways that Warner Music makes

22   money from its sound recordings?

23   A.   We will sell our music in various formats to customers.

24   And we will also license music into sound tracks, into

25   commercials, films.

J. Zabek - By Deposition

1292

marked Plaintiff's 81 --

1  marked Plaintiff's 81 --

2          THE COURT:  Why don't we stop here since you have got

3  a new document, and it's 1 o'clock.

4          All right.  We are going to break for an hour, and we

5  will come back and continue to listen to the deposition.

6          So have a good lunch, and we will see you at

7  2 o'clock.

8          Thank you, you are excused.

9          NOTE:  At this point the jury leaves the courtroom;

10  whereupon the case continues as follows:

11  JURY OUT

12          THE COURT:  Okay.  Anything before we break?

13          MR. ELKIN:  Not here, Your Honor.

14          MR. OPPENHEIM:  Not from the plaintiffs, Your Honor.

15          THE COURT:  All right.  We're in recess for one hour.

16          NOTE:  The morning portion of the case on December 9,

17  2019, is concluded.

18          -------------------------------------------

19

20                  CERTIFICATE OF COURT REPORTERS

21          We certify that the foregoing is a true and
        accurate transcription of our stenographic notes.

22                          /s/  Norman B. Linnell

23                  Norman B. Linnell, RPR, CM, VCE, FCRR

24                          /s/  Anneliese J. Thomson

25                  Anneliese J. Thomson, RDR, CRR