# Exhibit 14

1

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2
   Case No. 19-cv-874-RBJ-MEH
3  _____

4  WARNER RECORDS, INC., et al.,

5       Plaintiffs,

6  vs.

7  CHARTER COMMUNICATIONS, INC.,

8       Defendant.
   _____
9

10         Proceedings before MICHAEL E. HEGARTY, United

11 States Magistrate Judge, United States District Court for the

12 District of Colorado, and REGINA M. RODRIGUEZ,

13 Court-Appointed Special Master, commencing at 9:18 a.m.,

14 February 23, 2021, in the United States Courthouse, Denver,

15 Colorado.
   _____
16
17 WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN
   TYPOGRAPHICALLY TRANSCRIBED. . .
18 _____

19                           APPEARANCES

20         JONATHAN M. SPERLING, JEFFREY M. GOULD, SHIRA

21 POLIAK, MATTHEW J. OPPENHEIM, ALEX KAPLAN, STACEY GRIGSBY,

22 ANDERS LIDEROT, J. HARDER EHLERS, Attorneys at Law, appearing

23 for the Plaintiffs.

24 _____

25     IN COURT HEARING: UNRESOLVED DISCOVERY DISPUTES
```

46

1   first time -- if I can approach again, Your Honor.  The first

2   document we handed to you, Your Honor, is the actual

3   privilege log produced by MarkMonitor.

4           The second document is the same document

5   reformatted with headings and we put in, obviously, lines so

6   that it can be easier to follow.

7           So what does this say, okay?  So what is

8   illuminating?  Several things about this log.

9           The first thing is that if you look at the second,

10  the third, the fourth entry, right, Audible Magic apparently

11  put a legal hold in place at the request of Oppenheim &

12  Zebrak in July of 2018, two years after they were first

13  retained to do this work -- two years after they were

14  retained to do this work -- right.

15          THE COURT:  Well --

16          MR. ROSENTHAL:  And what else do we know, Your

17  Honor --

18          THE COURT:  Well, they're talking about it two

19  years later, but are you saying that's only when the hold

20  arose?

21          MR. ROSENTHAL:  That's -- we just got this

22  privilege log on Friday.

23          THE COURT:  Well, I know, but just because they're

24  talking about it doesn't mean the hold hasn't been there for

25  a while, right?

Case 1:19-cv-00874-RBJ-MEH   Document 400   Filed 03/07/21   USDC Colorado   Page 47 of
Case 1:18-cv-00950-PTG-JFA   Document 738-56   Filed 12/27/21   Page 4 of 19 PageID# 32565
255

47

1            MR. ROSENTHAL:  Well, Your Honor, there is no other

2    hold on this log.

3            THE COURT:  Okay.

4            MR. ROSENTHAL:  They haven't disclosed another

5    hold.  If there is another hold, we would like to know about

6    it.

7            THE COURT:  All right.

8            MR. ROSENTHAL:  All right.  But what do we know

9    about it, right?  This is the first time we heard about this,

10   and two years later, right.

11           And second, MarkMonitor has produced zero e-mails

12   to or from MarkMonitor from the period of time that

13   MarkMonitor was hired in anticipation of litigation to the

14   date of the litigation hold.  It has produced some e-mails

15   afterwards, but none during the relevant time period.

16           What else do we know?  That plaintiffs -- that

17   there are no entries on this log relating to any of the

18   information sent or received from Audible Magic, except for

19   the Hash Report, right.

20           So we're now at a point where this has been a --

21   let me finish -- this has been a chase, right.  Not only a

22   chase involving us and our expenses and time, but the

23   Court's.

24           MR. SCHAPIRO:  Can I just --

25           MR. ROSENTHAL:  Oppenheim & Zebrak knew exactly

48

1  where this information is, they knew what didn't exist and

2  what existed, and they forced a chase around.  The only place

3  this information exists is in the Hash Report.  It's directly

4  relevant to this case.  It's not privileged, and it should be

5  produced.

6          Now, Mr. Schapiro is going to add a little more to

7  that.

8          THE COURT:  Okay.

9          MR. SCHAPIRO:  I didn't mean to cut off my

10 colleague.  I was just going to make one other point that

11 troubles us about the log that we just received that seems to

12 indicate that, even though this was supposedly all done in

13 preparation for litigation, there was no hold.  And that's

14 probably why there are no documents.

15         But the thing that is troubling is, we received

16 that document in an unusual format, given the way parties

17 have been exchanging documents in this case; and that is, it

18 was locked so that you could not, in its native format, sort

19 it in chronological order, but we don't do that when we

20 present documents.

21         So the way we were able to put this together and

22 see, okay, 2016, there is this first entry and then later on

23 in 2018, you'll see the numbers don't match.  They're not in

24 order, just the numbers on the side.  We had to have

25 word-processing go through, reenter it all manually so that

Case 1:19-cv-00874-RBJ-MEH   Document 400   Filed 03/07/21   USDC Colorado   Page 50 of 256
Case 1:18-cv-00950-PTG-JFA   Document 738   Filed 12/27/21   Page 6 of 19 PageID# 32567

50

1    consultant, who is not a litigation consultant; it's a

2    testifying expert, right, to testify at trial.  They're going

3    to have to present that same evidence here, right.  They're

4    going to try and shoestring this person as a fact person.

5          THE COURT:  Well, did you try --

6          MR. ROSENTHAL:  If they're a fact --

7          THE COURT:  Did you try to inquire -- did you try

8    to -- did you argue to the judge in Virginia that this person

9    is not a fact witness; it should be -- they should be

10   designated as an expert, they should produce a report, they

11   should comply with Rule 26?

12         FEMALE SPEAKER:  Your Honor, the plaintiffs did not

13   produce the 2016 consulting agreement in Cox, even though

14   such agreements were ordered by the magistrate.  So we were

15   not aware of the project in Cox, so it was a very different

16   setup.

17         THE COURT:  No, no.  But he said Mark -- somebody

18   from MarkMonitor testified in the case, but the person wasn't

19   involved in the claims period with anything.  They were

20   completely post-claims period, kind of forensic review of

21   these hashes and yet, he was allowed to testify as a fact

22   witness and not an expert?

23         FEMALE SPEAKER:  He testified as to the system and

24   how reliable the system was and the files that they got as

25   part of that 2016 project, which are the files that they

66

1          That brings us to 2016, Chapter 2.  Look at the
2    body of evidence that generated over these prior years and
3    determine, Wow, they really did nothing.  Charter did
4    nothing.  Their recidivism was off the charts.  We're going
5    to go forward with litigation.
6          In that very month, January of 2016, at direction
7    of counsel, RIAA and MarkMonitor entered the Statement of
8    Work that Mr. Rosenthal presented today.  A short (inaudible)
9    that has -- asks MarkMonitor to go look for and download
10   files associated with infringing hashes.  That contract, Your
11   Honor, on its face says, "anticipation of litigation."
12         Chapter 1, notice program, no litigation.  Chapter
13   2, hash download program, litigation.  So the notion out of
14   the gate that there is anything untoward or spoliation or
15   failure to obtain something from the notice program is simply
16   a nonstarter.  It has no -- it has no merit, it's a
17   distraction, and it's contrary to the facts and prior
18   findings of other courts.
19         THE COURT:  Well, okay, but you are suing for the
20   period 20-, what, '13 to '16?
21         MR. GOULD:  The claim period, yes, March 2013 to
22   mid-2016.
23         THE COURT:  So it is true that whatever MarkMonitor
24   was doing between 2012 and 2015 involved information that's
25   relevant to this case, correct?

67

```
 1            MR. GOULD:  Absolutely.  And the evidence generated
 2   has been produced.  We haven't claimed privilege or work
 3   product over communications with MarkMonitor from those
 4   times.  The RIAA has produced lots of documents which RIAA
 5   was communicating with MarkMonitor during the 2012 to 2015
 6   timeframe.
 7            Those communications were not claimed as privileged
 8   nor work product.  They've been logged on -- RIAA logged --
 9   I'm sorry.  They have not been logged on the RIAA log because
10   they were not privileged.
11            THE COURT:  Okay.  So you withheld no information
12   that you have prior to January 2016 concerning what
13   MarkMonitor has done, any communication with MarkMonitor, et
14   cetera?
15            MR. GOULD:  I'm not aware, Your Honor, that we have
16   withheld either -- that either the plaintiffs or the RIAA
17   have withheld relevant and responsive communications with
18   MarkMonitor during the notice period.
19            THE COURT:  All right.
20            MR. GOULD:  That brings us to 2016.
21            2016 MarkMonitor engages under this 2016 hash
22   download work in a one-month process of looking to download
23   files associated with the verified infringing hashes.
24            We talked about this, Your Honor.  There is a
25   difference between what kind information you might retain and
```

68

1  save as part of a preliminary investigation and what kind of

2  information you would save and either bring forward as

3  admissible evidence in this a lawsuit.  In fact, brought this

4  on December 18.

5       We gave the example of an investigator looking at a

6  website who identified the landscape and later with the

7  intent to sue, going back and collecting forensic evidence.

8  Mr. Schapiro gave you an example where he disagreed and said

9  an investigator watching on an eyewitness basis, that the

10 perks walking in and out of the door wouldn't necessarily be

11 required to identify for the other side every one, even those

12 who had no relevance.  And you wisely disagreed with that

13 analogy and said, No, you have to identify the ones that

14 matter, that you will present at trial, okay.

15      So 2016, MarkMonitor goes and tries to download

16 files.  Downloads some.  We've produced them.  Doesn't

17 download, because it didn't find others.  Didn't produce

18 them.  Produced what was found and what we have.  And we

19 didn't produce what we didn't find and don't have.

20      This notion that we're cherrypicking what to

21 produce is -- is not correct.  We produced everything -- the

22 good, bad and ugly.

23      THE COURT:  Wait.  I mean, so you just said you

24 produced searches that resulted in a positive findings, but

25 it is relevant, searches that resulted in failures.  That's

Case 1:19-cv-00874-RBJ-MEH   Document 400   Filed 03/07/21   USDC Colorado   Page 69 of 256
Case 1:18-cv-00950-PTG-JFA   Document 738-15   Filed 12/27/21   Page 10 of 19 PageID# 32571

69

1   relevant to the defendants from, what I understand,

2   because --

3           MR. GOULD:  Well, I understand -- I'm sorry, go

4   ahead.

5           THE COURT:  But you did produce the searches that

6   resulted in failures?

7           MR. GOULD:  We didn't produce files that we didn't

8   find; that's correct.  We talked about this at length on the

9   18th.

10          THE COURT:  Right, right.

11          MR. GOULD:  The notion -- the argument was, you

12  have to produce a Hash Report because you've produced the

13  downloaded files.  That waiver argument is misguided because

14  it is an argument that we are relying on the Hash Report,

15  while using it as a sword and shield, and that is not --

16  that's not the case.  We are relying on downloaded files with

17  hash values that correspond to the notices-in-suit.

18          We are not relying on the Hash Report.  The Hash

19  Report was an attorney-driven project, based on opinions

20  counsel -- counsel's opinion, based on its analysis of

21  infringement data as to what kinds of additional evidence

22  they might want -- might want to collect and pursue.

23          Some are met, some are much of which have no

24  bearing on any notice ever sent to Charter.  So this was done

25  on a (inaudible).

Case 1:19-cv-00874-RBJ-MEH   Document 400   Filed 03/07/21   USDC Colorado   Page 72 of 256
Case 1:18-cv-00950-PTG-JFA   Document 738-15   Filed 12/27/21   Page 11 of 19 PageID# 32572

72

1   reason all of this is important is because that fact alone
2   doesn't bear on this dispute; but it bears, Your Honor, on
3   the reliability of the information that you're receiving from
4   a team of lawyers from two separate firms who are not
5   coordinating and seem not to know the information
6   (inaudible).  I don't say that as an attack.  It is
7   consistent with guidance we've got from this Court before.
8   So respectfully, I need to correct the record.
9           This notion that the plaintiffs in the Cox case
10  didn't produce the 2016 contract wholly ignores that
11  MarkMonitor produced it.  They had it and they had every
12  opportunity to explore it.  There was no allegation of Cox
13  that those plaintiffs didn't produce what they needed to
14  produce.
15          Next, Mr. Rosenthal is very interested --
16  Mr. Rosenthal has great interest in Mr. Oppenheim, it's
17  clear.  We can't get enough of Mr. Oppenheim.  And now what
18  he wants is to look at Mr. Oppenheim's e-mails.
19          So, Ms. Rodriguez, you will certainly appreciate
20  that there have been three or four attempts to get at Mr.
21  Oppenheim's e-mails.  And each instance you issued carefully
22  tailored orders that account for the issues presented and the
23  facts as they are.
24          RFP 55 was last ruled on, I think in May of 2020.
25  That ruling was not appealed.  Charter took another shot at

Case 1:19-cv-00874-RBJ-MEH   Document 400   Filed 03/07/21   USDC Colorado   Page 102 of 256
Case 1:18-cv-00950-PTG-JFA   Document 738-15   Filed 12/27/21   Page 12 of 19 PageID# 32573

102

1            Last thing -- last thing is we produced all the
2    downloaded works, whether they are for works-in-suit or not.
3    The notion that we won't produce their works-in-suit is not
4    quite right.
5            THE COURT:  Well, here's my main -- here's the
6    final answer for me, the major fact dispute.
7            Typically, as I view it, if the defense could
8    reconstruct something that you did, then there is not
9    substantial need; but they have to have the same source data
10   to do it.  So they have to have access to everything you had
11   access to in order to reconstruct.
12           And I still don't think we have a clear answer
13   whether they had -- they do now, right now, using whatever
14   resources they can drum up, have access to the same
15   information that you used to create the Hash Report for which
16   you're now claiming attorney work product?
17           MR. SCHAPIRO:  The clear answer is, we don't.  We
18   don't.
19           MR. ROSENTHAL:  As Audible Magic's attorney, you
20   have the document.  They said they don't have the data.
21           THE COURT:  Right.  So I want to ask Mr. Gould that
22   because you seem like a very reasonable person.
23           MR. GOULD:  I appreciate that.
24           What's the question?
25           THE COURT:  All right.  So, typically, if one party

Case 1:19-cv-00874-RBJ-MEH   Document 400   Filed 03/07/21   USDC Colorado   Page 103 of
256
Case 1:18-cv-00950-PTG-JFA   Document 738-15   Filed 12/27/21   Page 13 of 19 PageID# 32574

103

1   wants something from another party, then -- all right, if the
2   defense wants something from the plaintiff and the plaintiff
3   has it because they used their ingenuity to come up with a
4   conclusion -- a report, data, whatever -- but the defense
5   could run their own analysis and come up with an answer
6   themselves, I'm not going to require production, go do it
7   yourself.
8           Judge Jackson may disagree with that, because I
9   think I relied on that once and he said, Produce it anyway.
10  Or maybe something about that.
11          But anyway, so I'm asking you, do they have the
12  source information from which they could -- if they had the
13  wherewithal, re-create the efforts that MarkMonitor engaged
14  in for you in 2016?
15          MR. GOULD:  For every single thing that pertains to
16  Charter and the Charter case and the Charter notices, yes.
17          THE COURT:  And what else would be relevant,
18  besides what pertains to Charter?  I mean --
19          MR. GOULD:  Absolutely nothing.  That's the
20  carve-out as to other ISPs and notices to other ISPs that
21  might have had hashes that never went to Charter.
22          MR. SCHAPIRO:  And so I --
23          MR. GOULD:  The only thing that -- hashes that went
24  to Charter.  Hashes that went to Charter.  Hashes that went
25  to Charter.  Charter knows what hashes went to Charter.

104

1   Charter knows what hashes we downloaded and produced.  And
2   Charter knows what hashes went to Charter and we didn't
3   download and produce.
4             MR. ROSENTHAL:  What we don't know is which of
5   those hashes are reliable.  They're hiding this evidence.
6   That is what is on the Hash Report.  And, Your Honor --
7             THE COURT:  But how did they found out --
8             MR. ROSENTHAL:  Your Honor --
9             THE COURT:  -- Mr. Rosenthal, how did they find out
10  which of those hashes are reliable?
11            MR. ROSENTHAL:  Well, they --
12            THE COURT:  That's what you want from them.
13            MR. ROSENTHAL:  Because Audible Magic didn't keep
14  the data that they conveyed to Oppenheim & Zebrak who put it
15  on the Hash Report.  That's the only place it exists.
16            THE COURT:  The data from 2012 and 2015?
17            MR. ROSENTHAL:  No.
18            THE COURT:  No, what?
19            MR. ROSENTHAL:  No, they didn't.
20            THE COURT:  But that's what we're referring to --
21            MR. ROSENTHAL:  I'm sorry.
22            THE COURT:  -- the data --
23            FEMALE SPEAKER:  Your Honor, it's the data from
24  2012, when they went up -- when MarkMonitor went up and tried
25  to find those files, they either found them or didn't.

105

```
1              THE COURT:  Right.
2              FEMALE SPEAKER:  If they found them, they sent them
3    over to Audible Magic to check, and both those datasets got
4    put on the Hash Report.
5              THE COURT:  And if they didn't find them, they
6    disregard -- they disregard- -- they just threw out that
7    information?
8              FEMALE SPEAKER:  We don't know because we haven't
9    seen the Hash Report.
10             THE COURT:  Okay.
11             MR. SCHAPIRO:  And I think there's nar- -- I think
12   we're actually in agreement on the foundation here, I think,
13   from hearing what Mr. Gould said.  And maybe Mr. Gould can
14   agree, yes, it is possible -- we would contend legally it is
15   not our obligation, given how much of a burden it would be.
16   It is possible for us to back out and at least determine
17   which items on the notices that we received are not in the
18   case now.  And we can assume that those ones also were in the
19   Hash Report.
20             But that's not the thing that we're particularly
21   interested in about the Hash Report.  What we're interested
22   in is, when you sent these out, what did MarkMonitor and
23   Audible Magic find?  I believe they will tell us, We have no
24   basis, without the Hash Report, of determining what
25   MarkMonitor or Audible Magic found.
```

Case 1:19-cv-00874-RBJ-MEH   Document 400   Filed 03/07/21   USDC Colorado   Page 109 of
256
Case 1:18-cv-00950-PTG-JFA   Document 738   Filed 12/27/21   Page 16 of 19 PageID#
32577

109

```
1               MR. GOULD:  -- Your Honor, I think Mr. Oppenheim

2   needs one minute to get back to (inaudible).  If you'll

3   indulge me, can I please check with him.

4               THE COURT:  Well, I see him.

5               MR. GOULD:  Oh, then I'm mistaken.  Never mind.

6               THE COURT:  Yeah.

7               MR. OPPENHEIM:  I'm here.  I was being unusually

8   quiet.

9               THE COURT:  All right, that's about to change.  All

10  right.

11              So our determination -- and I know you'll believe

12  you have a bigger basis to appeal, and I'm positive there

13  will be one, which is fine, because judges get appealed all

14  the time and reversed and affirmed -- and that is, we're

15  suspect of the work product claim, we're concerned about the

16  loss of data.  By plaintiffs' own admission, the defense

17  doesn't have the same body of information from which they

18  could re-create the effort and we believe that the Hash

19  Report should be produced.

20              Okay, what's the next issue?

21              MR. GOULD:  Your Honor, may I ask, notwithstanding

22  Mr. Rosenthal's discontent, a clarifying question?  When you

23  say that concerned about loss of data, could you clarify what

24  you have in mind, because we're not aware of any.

25              THE COURT:  Well, it was our understanding that
```

Case 1:19-cv-00874-RBJ-MEH   Document 400   Filed 03/07/21   USDC Colorado   Page 110 of 256
Case 1:18-cv-00950-PTG-JFA   Document 738-15   Filed 12/27/21   Page 17 of 19 PageID# 32578

110

1   MarkMonitor did not keep some of the results of the work that
2   they did in 2016.
3           MR. GOULD:  That's not correct.
4           THE COURT:  Is that your understanding?
5           MR. ROSENTHAL:  Audible Magic.
6           THE COURT:  Audible Magic.  Somebody didn't.
7           MR. ROSENTHAL:  And then -- and then --
8           THE COURT:  What about Audible Magic?
9           SPECIAL MASTER:  Can I --
10          MR. GOULD:  Audible Magic disclosed recently that
11  they could not find the lookups that pertain to this project,
12  that's correct.
13          MR. ROSENTHAL:  So we have a couple of things.
14  One, we have of the Audible Magic data.  Two, we have a legal
15  hold that did not go into place until 2018, even though they
16  were -- MarkMonitor was retained in 2016.  They have not
17  logged a single e-mail in that time period.  So we believe
18  that information has either been lost or hasn't been logged.
19  We would like it all logged so we can make an evaluation as
20  to whether or not it was lost or not.
21          SPECIAL MASTER:  Okay.  Let us just deal with the
22  first issue, which is the request for the Hash Report, the
23  full Hash Report.  Our order is that the Hash Report should
24  be produced.
25          Number one, we do believe that the claim of work

Case 1:19-cv-00874-RBJ-MEH   Document 400   Filed 03/07/21   USDC Colorado   Page 111 of
256
Case 1:18-cv-00950-PTG-JFA   Document 738-15   Filed 12/27/21   Page 18 of 19 PageID#
32579

111

1   product is somewhat dubious here.  It is not entirely clear
2   whose work product protection this is, who's claiming it, et
3   cetera.  But even assuming that work product protection would
4   cover the Hash Report, there is a substantial need for this
5   evidence, as set forth by the defendants; and that this
6   information is not available from another source,
7   particularly given that Audible Magic no longer has the
8   underlying data and defendants have attempted to obtain the
9   underlying data from third-party sources, in particular
10  MarkMonitor and Audible Magic.
11          Therefore, it is our opinion that the substantial
12  need test, if a work product protection even did exist in
13  this situation, that showing has been met.  Therefore, we
14  determined that the document in question, that is, the hash
15  tag report, should be produced.
16          THE COURT:  And at the end of today, again, we're a
17  going to talk about timing.  Timing would include a stay of
18  any particular order to permit you to appeal, but it's going
19  to be a tight timeline because, as Mr. Sperling said, you
20  know, I think you guys want a trial sooner than later.  And
21  so in light of that, you'll have tight timelines for you to
22  appeal anything tighter than the rules, the Local Rules,
23  okay.
24          MR. SCHAPIRO:  All right.  So next -- I think we
25  can just go back to our chart, if that's acceptable to --

256

1               TRANSCRIBER'S CERTIFICATION

2   I certify that the foregoing is a correct transcript to the

3   best of my ability to hear and understand the audio recording

4   and based on the quality of the audio recording from the

5   above-entitled matter.

6

7   /s/ Dyann Labo                        March 1, 2021

8   Signature of Transcriber              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25