# Exhibit 17

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| |  |
|---|---|
| WARNER RECORDS INC. (f/k/a/ Warner Bros. Records, Inc.), *et al.*,<br><br>   Plaintiffs,<br><br>*v.*<br><br>CHARTER COMMUNICATIONS, INC.,<br><br>   Defendant. | Case No. 1:19-cv-00874-RBJ-MEH |

**<u>CHARTER COMMUNICATIONS, INC.'S RESPONSE TO PLAINTIFFS' OBJECTIONS
TO FEBRUARY 23, 2021 DISCOVERY ORDERS</u>**

  Magistrate Judge Hegarty and Special Master Rodriguez have ordered Plaintiffs to produce discovery fundamental to testing their liability theory and billion-dollar claim for damages: (1) the full results of a 2016 investigation, part of which Plaintiffs intend to use to prove direct infringement at trial, but the rest of which they have selectively withheld; and (2) information showing Plaintiffs' revenues from the works-in-suit during the Claims Period. The Orders requiring production of these materials were entirely appropriate, and certainly not clear error. Plaintiffs' Objections should be overruled.

  Plaintiffs knew long before filing suit that they would be required to prove direct infringement of their works if Charter is to be held secondarily liable. That is why, in 2016, Plaintiffs hired third-party MarkMonitor to generate the "evidence" of alleged direct infringement that Plaintiffs neglected to collect or retain when Plaintiffs were sending notices to Charter between 2012 and 2015. MarkMonitor searched the internet for files that Plaintiffs allege Charter's subscribers had shared years earlier, and, with the help of another third-party, attempted to match those files to works owned by Plaintiffs. Where a file was downloaded and a match was

1

purportedly made, the 2016 investigation will be used by Plaintiffs as evidence of direct infringement. But Plaintiffs refuse to produce any results showing that ***thousands of files could not be found or matched to a work owned by Plaintiffs***—critical information bearing on the reliability of Plaintiffs' direct infringement evidence and casting doubt on the trustworthiness of notices sent by Plaintiffs during the Claims Period. The Magistrate Judge and Special Master rightly deemed Plaintiffs' "work product" claim over this selectively withheld material to be "dubious" and determined that Charter had shown a substantial need for the information and its unavailability from any other source.

Similarly, Plaintiffs have long understood the relevance of track-level financial data, as they were ordered to produce the information in at least one prior case, *Sony v. Cox*.[1] The Order of the Magistrate Judge and Special Master requires Plaintiffs to supplement their production from *Cox* with the requested information for the twenty percent of works that are unique to this case, and for the years 2015 and 2016, because the information is necessary to Charter's expert analysis and defense. This discovery is not a "massive burden," but rather the foreseeable result of Plaintiffs' decision to engage in serial litigation against numerous ISPs, seeking billion-dollar damages for thousands of works.

## ARGUMENT

### I.   REQUIRING PRODUCTION OF THE HASH REPORT IS NOT CLEAR ERROR.

Plaintiffs must prove Charter's subscribers directly infringed the works-in-suit if Charter is to be held secondarily liable for copyright infringement. In other words, Plaintiffs must produce

---

[1] *Sony Music Entm't., Inc. et al. v. Cox Commc'ns, Inc. et al.,* Case No. 1:18-cv-00950 (E.D. Va.) ("*Cox*").

2

evidence showing what each subscriber purportedly shared during the Claims Period and tie that evidence to the notices sent to Charter. But it is undisputed that 

Realizing they were missing crucial evidence, Plaintiffs decided to generate their direct infringement evidence in 2016 (after the Claims Period) The results of these 2016 efforts to recreate evidence not retained during the Claims Period (the "2016 Download Project") are contained in the "Hash Report," an excel spreadsheet that identifies the files searched and indicates whether those files were located and whether they did or did not match to a work-in-suit.[2]

Plaintiffs admit they will rely on files purportedly verified by the 2016 Download Project to try to prove direct infringement. (Pl. Br. at 12).[3] Yet, they continue to withhold information

---

[2]  The Hash Report is so-named because it contains a list of 7,200 "hash values" that MarkMonitor used to search for allegedly infringing files. The hash value (or simply "hash") is a string of characters that identify a file or collection of files shared through peer-to-peer networks on the internet. Although Charter believes no further technical understanding is needed for purposes of the present motion, a complete explanation of the technological processes related to MarkMonitor and hash values can be found at Dkt. 267, pages 2-7.

[3]  Plaintiffs confuse this issue by claiming they "are not relying on … the fact of having conducted an investigation in 2016." (Pl. Br. at 14). But "the 2016 downloads" resulting from that

regarding ███████████████████████████████████████



██████████████████████████████████ (Ex. A 93:11-13). This information is fundamental to challenging the reliability—and establishing the unreliability—of Plaintiffs' recreation of direct infringement evidence. The Hash Report's probative value also goes further: Plaintiffs intend to argue at trial that ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ (Ex. A 73:20-75:15). Crucial to Charter's defense will be evidence that, when Plaintiffs realized they had no contemporaneous evidence substantiating their notices, they tried to recreate the process in 2016, but were unable to locate thousands of files or to reliably match them to a work they owned. This evidence of the *quality* of notices must be considered aside Plaintiffs' representations regarding the *quantity* of notices if Charter is to receive a fair trial. This is precisely the aspect of the 2016 Download Project Plaintiffs seek to shield: the Hash Report. (Ex. A 93:11-13).

After extensive argument at the February 23, 2021 hearing, spanning more than 70 pages of transcript, both the Magistrate Judge and Special Master unequivocally concluded the Hash Report should be produced, noting that the 2016 data could not be obtained from any other sources, expressing "concerns about the loss of data," finding Plaintiffs' claim of work product to be "suspect" and "dubious," and noting that Charter had shown substantial need for the document. (Ex. A 109:11-19; 110:25-111:15). This Court reviews the decision for clear error, *see* Fed. R. Civ. Pro. 72(a), which cannot be found in the Magistrate Judge and Special Master's well-supported decision. *See Smith v. Dwire Co.*, 2006 WL 8454325, at *1 (D. Colo. Mar. 2, 2006).

---

investigation will be the key evidence used to prove direct infringement. (*Id.* at 12).

### A.   Prior Orders On The Hash Report Did Not Foreclose Future Discovery.

Earlier orders of the Magistrate Judge and Special Master recognized the importance of the Hash Report, but indicated that Charter should first attempt to gather the information contained within it from other sources. (Ex. A 98:25-99:4 (Special Master noting prior suggestion that the information be first retrieved from Audible Magic or MarkMonitor to the extent possible); *see also* Dkt. 332 at 1 (Hegarty, M.J.) ("[Charter] reserves the ability to challenge Plaintiff's treatment of the Hash Report and/or again seek to compel its production.")). Charter did in fact attempt to find the information elsewhere. (*See, e.g.*, Ex. B, Feb. 3, 2020 Email from Audible Magic; *see also* Ex. C (Hearing Slides); *see also* Ex. A 37:22-38:17, 39:18-40:22, 43:19-48:7, 106:1-107:3 (discussing Plaintiffs' ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉).[4] But, as the Magistrate Judge and Special Master acknowledged at the hearing, the information does not exist outside the Hash Report. (Ex. A 111:3-10).

The Order compelling the Hash Report did not result from an attempt by Charter to improperly re-litigate an issue it lost, or to inject confusion into the proceeding, as Plaintiffs suggest. (Pl. Br. at 9-10). Indeed, it was Plaintiffs who sought clarification of the Magistrate Judge's ruling on the Hash Report, requesting declaratory-style relief to confirm they would still be allowed to use evidence "from the 2016 MarkMonitor download project," while at the same

---

[4]   Only one business day before the February 22-23, 2021 hearing, MarkMonitor produced a privilege log showing that Plaintiffs' outside counsel (Oppenheim + Zebrak LLP) did not send a litigation hold notice to MarkMonitor until July 2018, more than two and a half years after MarkMonitor was retained "in anticipation of litigation." (Ex D). MarkMonitor's privilege log does not list any communications from the 2016-2017 time period aside from the Hash Report. Thus, it appears MarkMonitor did not retain data or correspondence underlying the 2016 Download Project (aside from the Hash Report).

5

time withholding the Hash Report. (Dkt. 363 at 6). This stemmed from the Magistrate Judge's warning to Plaintiffs in his January 7, 2021 Order:

> Plaintiffs cannot make affirmative use of a portion of the results of the Hash Report and shield the remainder as work product … I would go further and suggest to Judge Jackson that if he finds Plaintiffs in violation of their representation to me [that the 'fruit of every aspect of MarkMonitor's 2016 efforts …. they intend to use at trial has been produced'], he should strike any such evidence they attempt to introduce and enter further orders as necessary to preserve the integrity of the judicial process.

(Dkt. 332 at 1-2). The instant Objection is Plaintiffs' second attempt to seek judicial endorsement of a trial strategy the January 7, 2021 Order clearly forbids.[5] (Dkt. 363 at 6; Pl. Br. at 15).

### B. The Hash Report Is Not Protected Work Product.

The Magistrate Judge and Special Master did not clearly err in finding Plaintiffs' assertion of work product protection over the Hash Report ▬▬▬▬▬▬▬▬▬▬▬ (Ex. A 109:11-19, 110:25-111:15). Although Plaintiffs claim that outside counsel selected which hashes should be searched and that this selection constitutes "opinion work product," Plaintiffs did not convince the Magistrate Judge or the Special Master that an Excel file of 7,200 hashes searched by MarkMonitor contains legal theories or opinions held by Plaintiffs' counsel.[6] *See Chevron Corp. v. Stratus*

---

[5] Plaintiffs' suggestion that the Magistrate Judge and Special Master became confused at the discovery hearing and "[u]pon this confusion … reversed their earlier written orders" is inaccurate. (Pl. Br. at 10). Together, these decision makers have overseen numerous rounds of briefing over the course of months and probed the issue extensively during a two-day discovery hearing. (*See, e.g.*, Ex. A 37:17-111:23). The ultimate decision was not uninformed.

[6] Plaintiffs' reliance on *United States v. J-M Manufacturing Co.*, 2013 WL 424782 (D. Colo. Feb. 4, 2013) and similar cases is misplaced. (Pl. Br. at 10-11). In *J-M Manufacturing*, the Court held that "[t]he selection of a particular test methodology or testing sample or set of samples to test could" lead to "inferences" that, "in turn, could reveal attorney opinions, theories, or strategies." *Id*. at *4. But that scenario is not relevant here. The information sought does not reveal any significant inferences about counsel's thought process—the ***results*** of whether MarkMonitor or Audible Magic could download or verify any particular file are simply facts, and Plaintiffs intend to rely on a portion of those factual results.

6

*Consulting, Inc.*, 2010 WL 3923092, at *6, 10 (D. Colo. Oct. 1, 2010) (work product doctrine "does not protect facts concerning the creation of work product"); *see also Res. Tr. Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995) ("A mere allegation that the work product doctrine applies is insufficient.").

Nor could they. Plaintiffs' assertion that the Hash Report was created by counsel and only "supplemented with additional information" from MarkMonitor is flatly contradicted by Plaintiffs' and MarkMonitor's ***own privilege logs***. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ In any event, merging the factual results of MarkMonitor's investigation with counsel's instructions, even if the latter is deemed protected, does not render the facts generated by MarkMonitor protected, especially when they exist in a separate, producible format such as the Hash Report. *Chevron*, 2010 WL 3923092, at *6 (the work product doctrine does not protect "facts within the product.").[7] Put simply, if Plaintiffs intend to use the results of the 2016 Download Project as their evidence of direct infringement at trial, Charter is entitled to everything stemming from it, warts and all, including the Hash Report. (*Id.*).

---

[7] Plaintiffs argue in the alternative that the "mental impressions" that purportedly can be gleaned from the Hash Report should be redacted. (Pl. Br. at 14 n.1). Notably, however, Magistrate Judge reviewed the Hash Report *in camera*—and did not conclude that it contained any mental impressions of counsel that would need to be redacted prior to production. (*See, e.g.*, Ex A 110:25-111:15). Thus, Charter respectfully submits that no redactions are warranted.

Finally, any protection the Hash Report might have received as work product has been waived by Plaintiffs' stated intent to rely on the results of the 2016 Download Project to prove direct infringement. (Pl. Br. at 12). "Fundamental fairness precludes" use of work product protections where, as here, Plaintiffs seek to shield disclosure of communications while at the same time using the communication's conclusions "as a multi-billion dollar damages sword." *Chevron*, 2010 WL 3923092, at *10; *see also Martensen v. Koch*, 301 F.R.D. 562, 582 (D. Colo. 2014) (party "cannot use the work product doctrine as both a sword and a shield by selectively using the privileged documents to prove a point but then invoking the privilege to prevent an opponent from challenging the assertion."). Here, Plaintiffs improperly seek to use the facts generated by the 2016 Download Project that help them, while at the same time concealing those that hurt them.

### C. Charter Has Shown Substantial Need For The Hash Report.

Where factual work product is not available from another source, and the party has a substantial need for it, the work product doctrine does not shield its disclosure. *See* Fed. R. Civ. P. 26(b)(3). As discussed above, for the 7,200 hashes listed in the report, whether MarkMonitor successfully downloaded them, or whether Audible Magic successfully matched them, are purely matters of fact. The remainder of the test is satisfied on the record below.

Charter has shown substantial need for the information. The Magistrate Judge and the Special Master elicited from Plaintiffs an admission ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ (*See* Ex. A at 84:22-85:2; 95:13-96:7). In their brief to this Court, Plaintiffs acknowledge that they "will prove direct infringement by showing … the 2016 downloads contain infringing copies of Plaintiffs' authentic works[.]" (Pl. Br. at 12). Charter and the Court should not be forced to take Plaintiffs (and their hired agents) at their word that the 2016 Download Project

8

unambiguously supports their claims, when there exists factual information that would allow Charter to test those assertions.

The information is also necessary to rebut inferences Plaintiffs will make from the quantity of notices sent to Charter during the claims period—inferences that were used by Plaintiffs in *Cox* and will admittedly be used in this case for intended eye-popping and prejudicial effect. (Ex. A 73:11-75:15) (admitting Plaintiffs will ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Although Charter believes that the Court should preclude such evidence and argument and confine the scope of trial to the works-in-suit, if any evidence and argument regarding the overall volume of notices sent to Charter is admitted, the Hash Report is critical to Charter's ability to show that notices can be unreliable as indicators of infringement. This will serve to temper Plaintiffs' argument that ISPs like Charter should have automatically terminated their subscribers.

The Hash Report is the only source of this information, as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. A 111:3-10). Charter has been unable to obtain the results of MarkMonitor's and Audible Magic's 2016 efforts from either third-party, (Ex. B; Ex A 110:10-12). Undue hardship necessary to overcome work product protection exists in these circumstances. *Henderlong v. Allstate Ins. Co.*, 2009 WL 82493, at *2 (D. Colo. Jan. 13, 2009) ("Here, the undue hardship element is met, as it is quite apparent that the sought-after information is not available elsewhere.").

Plaintiffs' suggestion that Charter can create the information itself is incorrect and refuted by the record below. (Ex. A 109:16-19 (Judge Hegarty: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9



)).  Even if Charter could somehow recreate the 2016 Download Project for each of the 700,000 notices, this information would have none of the probative force of the Hash Report because it would not show that *Plaintiffs* were aware that ▮

▮

▮ to substantiate their excessive damages claim.  (Ex. A 98:12-24, 78:23-79:1).

As the Special Master explained, ▮

▮ (Ex. A 88:15-20, 89:1-3 (Special Master: ▮

▮ )).  It was only after the Magistrate Judge and Special Master determined the information could be gathered from no other source, and that Charter had a substantial need for the facts contained in the Hash Report, that it was ordered to be produced.  The Order was the result of agreement between two decision-makers who closely followed this issue for months, allowed both parties to argue the law and facts extensively, and provided multiple grounds for the decision.  This is not clear error.

## II. REQUIRING PRODUCTION OF TRACK-LEVEL REVENUE FOR THE WORKS-IN-SUIT IS NOT CLEAR ERROR.

The Order compelling production of track-level revenue data does not constitute clear error and should be upheld.  Charter's renewed request for track-level financial information first arose during a hearing on February 1, 2021, and was ruled on by the Magistrate Judge during a subsequent hearing on February 22-23, 2021.  (Ex. F, Feb. 1, 2021, Hr'g. Tr. 71:13-78:23; Ex. A 17:12-35:24).  Over the course of the two hearings, the Magistrate Judge and Special Master appropriately balanced Charter's need for the evidence against Plaintiffs' burden to produce it. (*See, e.g.*, Ex. A 17:12-35:24).  The record supports this decision.

### A. Prior Orders Contemplated A Renewed Request For This Information.

The initial ruling on track-level financial data was rendered on October 29, 2019, when Magistrate Judge Hegarty required Plaintiffs to produce the track-level financials previously provided in *Cox*. (Dkt. 76 at 2). Since this information did not include approximately twenty percent of the works at issue or information for years 2015 and 2016 of the Claims Period, the ruling was without prejudice to Charter renewing its request for more complete information if the circumstances warranted. (*See* Ex. G, Oct. 29, 2019 Hr'g Tr. 12:15-13:14; 23:22-24:12). This Court affirmed the ruling, specifically noting that "Judge Hegarty left the door open to ordering production of additional work-by-work information if [Charter] can establish, perhaps in a Rule 30(b)(6) deposition, that there is more to be found." (Dkt. 159 at 3). This is precisely the procedural path taken by Charter. Further discovery, including the commencement of depositions, has supported Charter's need for the information.

### B. Track-level Financial Data Is Necessary And Relevant.

In the event liability is found, the track-level financial information will be necessary to assist the jury in calculating a just level of statutory damages, which may range from $750 to $150,000 per work in suit.[8] While Charter does not intend to present the jury with revenues for each work, the information will be synthesized by an expert and the results will be presented to

---

[8] Plaintiffs' disagreement regarding the weight that should be attributed to the information as a metric for a work's value is not a basis to preclude discovery. The Court has already ruled that "it is reasonable for the jury to have some understanding of the level of actual losses plaintiffs allegedly incurred," and that "[t]he information that was ordered to be produced in the *Cox* case might be a means of providing such an understanding." (Dkt. 159 at 4); *see also Stampin' Up!, Inc. v. Hurst,* 2018 WL 2018066, at *6 (D. Utah May 1, 2018) (value of copyright relevant factor to "[be] consider[ed] in determining the statutory damages"); *New Atlas Dot Com, Inc. v. Pizza Inn I-40 W., Inc.*, 2013 WL 425038, at *3 (W.D. Okla. Feb. 4, 2013) ("the value of the copyright" may guide the discretion of determining statutory damages).

11

the jury in a digestible way. (Ex. A 19:18-21). Given that Charter has now begun working with its experts to prepare for depositions, and the outstanding works for which Charter has no track-level financial information represent hundreds of millions of dollars in potential statutory damages, the need for the information has become acute and the Magistrate Judge and Special Master did not clearly err in so finding. (Ex. A 19:5-11; 20:9-20).

Charter also needs the financial information for cross-examination purposes. For example, in another mass copyright trial in the Southern District of New York, which was brought by many of the same publisher Plaintiffs and defended by some of the same attorneys in this case, the defendants were able to use track-level data in cross-examinations by pointing to the best examples to show the variance in income amongst the works, as well as to highlight entire categories of works for which revenues were extremely low throughout the claims period. *See ABKCO Music, Inc., et al. v. William Sagan, et al*, Case No. 15 Civ. 4025 (S.D.N.Y.) As was argued to Magistrate Judge Hegarty, this was effective in contributing to a verdict at or near the lowest available statutory damages for the works-in-suit. (Ex. F, Feb. 1, 2021, Hr'g Tr. 72:18-74:2).

Here, Charter is missing data for all works-in-suit during the years of 2015 and 2016, which represents a significant amount of the Claims Period of March 24, 2013 through May 17, 2016. For approximately twenty percent of the works, Charter has no track-level data at all. This lack of information hamstrings Charter's ability to provide a complete and persuasive analysis to the jury across any category of works for nearly half the Claims Period, and in any way at all for a significant portion of the works for which Plaintiffs are attempting to recover. While Charter's expert could attempt to extrapolate from the information that was prepared for *Cox*, the time period for which data is missing is critical, as it encompasses years when Plaintiffs' streaming revenue

12

experienced explosive growth, as noted on the record below. (Ex. A 17:24-18:3).[9] Charter needs to understand how these shifts in music consumption, when compared to the alleged infringement in this case, affected Plaintiffs' revenue from the works-in-suit. (*Id.*).

Moreover, use of an incomplete data set produced in an entirely separate case has only served to inject confusion into Charter's depositions.



With the track-level data ordered to be produced, deponents will continue to be confused when asked about a list of works that varies from those they know to be in this suit; a list prepared for an entirely different litigation; and a list distinguished from this litigation by their counsel.

### C. Plaintiffs' Burden Arguments Lack Merit.

Plaintiffs' claim that the Magistrate Judge failed to "account for this massively disproportionate burden" is belied by the record—the Magistrate Judge undertook a lengthy inquiry into the burden that would result from production (Ex. A 25:4-37:10, 242:18-245:25),

---

[9] *See, e.g.*, Hugh McIntyre, *Global Streaming Music Revenues Grew 45% In 2015*, FORBES (Apr. 15, 2016), https://www.forbes.com/sites/hughmcintyre/2016/04/15/global-streaming-music-revenues-grew-45-percent-in-2015/?sh=624c7c2872e0.

13

which included statements rebutting declarations of burden previously proffered by Plaintiffs. (Ex. A 26:1-27:12, 33:18-25). Throughout this inquiry, Plaintiffs' counsel indicated that the burden was minimal for Music Publisher Plaintiffs:

- ███████████████████████████████████████████████████████████████████████████ (Ex. A at 29:4-6)
- ███████████████████████████████████████████████████████████████████████████ (*Id.* at 243:4-6)
- ██████████████████████████████████████████████ (*Id.* at 245:12-13)

Additionally, employees of the Record Label Plaintiffs previously testified in *Cox* that ████ ███████████████████████████████████████████████████████████████████████████████ ████ (Ex. A 26:1-27:12, 33:18-25). But even assuming the request would be slightly more burdensome for Record Label Plaintiffs, the Magistrate Judge did not err in finding the production was proportional to the size and scope of the claims. For one, the entire production would be spread out amongst more than 60 separate Plaintiffs and, therefore, would be proportional to the number of works each Plaintiff is asserting. Further, Plaintiffs have consistently claimed that ██ ██████████████████████████████████ (Ex. A 22:19-24, 245:7). Given that what remains to be produced in this case is far less than the entire production in *Cox*, Plaintiffs offer no reason why production cannot be made in a matter of weeks. Indeed, Charter's original request for more extensive data has been narrowed—the Magistrate Judge cabined his ruling to the same data types produced in *Cox* to ensure the burden remained proportional to the case and feasible for the remaining discovery period. (*See* Dkt. 386 at 1). Plaintiffs cannot show that the Magistrate Judge failed to consider the burden of production or clearly erred in doing so.

14

# CONCLUSION

For the foregoing reasons, Charter requests that Plaintiffs' Objections be overruled.

Dated: March 10, 2021

Jennifer A. Golinveaux
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111
(415) 591-1506 (telephone)
(415) 591-1400 (facsimile)
Email: jgolinveaux@winston.com

Erin R. Ranahan
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071
Tel: (213) 615-1933
Email: eranahan@winston.com

Craig D. Joyce
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, CO 80202
(303) 830-2400 (telephone)
(303) 830-1033 (facsimile)
Email: cjoyce@fwlaw.com

Respectfully submitted,

/s/ Andrew H. Schapiro
Andrew H. Schapiro
QUINN EMANUEL URQUHART & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400 (telephone)
(312) 705-7401 (facsimile)
Email: andrewschapiro@quinnemanuel.com

Charles K. Verhoeven
David Eiseman
Linda J. Brewer
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: (415) 875-6600
Email: charlesverhoeven@quinnemanuel.com
Email: davideiseman@quinnemanuel.com
Email: lindabrewer@quinnemanuel.com

*Counsel for Charter Communications, Inc.*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 10, 2021, I caused a true and correct copy of CHARTER COMMUNICATIONS, INC.'S RESPONSE TO PLAINTIFFS' OBJECTIONS TO FEBRUARY 23, 2021 DISCOVERY ORDERS and all supporting materials thereto to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Andrew H. Schapiro*
Andrew H. Schapiro