# Exhibit 18

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

WARNER RECORDS INC., *et al.*,
    Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,
    Defendant

Case No. 19-cv-00874-RBJ-MEH

## PLAINTIFFS' OBJECTIONS TO FEBRUARY 23, 2021 DISCOVERY ORDERS

Plaintiffs object to two orders from a February 23, 2021 hearing that reversed, without valid justification, earlier orders on the identical issues. The first order compels Plaintiffs to produce financial documents of limited probative value that will require a massively burdensome effort, despite this Court's prior order that such information need not be produced and would not realistically be used at trial. The second order improperly invades Plaintiffs' protected work product. Both orders were issued at a hearing on February 22-23, 2021 where Judge Hegarty and the Special Master sat in unison (the "February Hearing").

When a party objects to a magistrate judge's order on a non-dispositive matter, "[t]he district judge . . . must . . . modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). Reversal is appropriate if "on the entire evidence [the reviewing court] is left with the definite and firm conviction that a mistake has been committed." *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir. 1988).

**I.    The Magistrate Judge Clearly Erred By Reversing This Court's Previous Order Denying Charter's Request For Comprehensive Track-Level Revenue Data.**

Plaintiffs object to Judge Hegarty's February 23, 2021 Order (the "February 23 Order") requiring Plaintiffs to provide track-level revenue data for all works in suit. Judge Jackson previously rejected Charter's request for this information and required Plaintiffs to produce only data previously produced in *Sony Music Entertainment, Inc. et al. v. Cox Communications, Inc.*

1

*et al.*, Case No. 1:18-cv-00950 (E.D. Va.). ECF No. 159 at 5. Contrary to that order, the February 23 Order requires burdensome collection and production of financial data for (1) thousands of additional works; and (2) an additional eighteen-month period beyond for all 11,000 works in suit, including those that were at issue in *Cox*. *See* ECF No. 386 at 1.

The February 23 Order should be reversed for two reasons. *First*, neither Charter nor the February 23 Order provide any reason to override this Court's April 2020 order rejecting this precise request. *Second*, the April 2020 order correctly recognized that the burden involved in producing this data vastly outweighs its limited probative value, while the February 23 Order does not account for this massively disproportionate burden.

> **A. This Court Has Already Ruled On This Issue And Denied Charter's Request For Track-Level Revenue Data.**

At the February Hearing, Charter sought to relitigate a motion that it lost in April 2020. Specifically, in October 2019, Judge Hegarty ruled that Charter's request for track-level financial information was limited to "relevant material from the related Cox lawsuit." ECF No. 76 at 1. In so ordering, Judge Hegarty had before him declarations from each Plaintiff setting forth the enormous burden to collect the requested revenue information, as well as arguments explaining why Plaintiffs' revenue information bears little, if any, relation to assessment of statutory damages against Charter.

Charter objected to Judge Hegarty's decision, ECF No. 84, and this Court denied the objection, agreeing that Plaintiffs need only produce the track-level revenue data already produced in the *Cox* case for works that also are at issue here. *See* ECF No. 159 at 4–5. The Court explained that the overlapping information from *Cox* sufficiently allowed Charter to draw inferences about Plaintiffs' 11,000 works, and that in no event would trial proceed on a work-by-work basis:

2

> It is inconceivable that a jury could examine that number of works individually and calculate damages separately on a work by work basis. That might be defendant's litigation position, but it is unrealistic from a practical standpoint.

*Id.* at 4–5. To be sure, the Court acknowledged that Charter could pursue discovery of *other* types of damages information: "if the existence of additional relevant damages information is revealed by deposition testimony or otherwise, discovery of *that information* is not foreclosed." *Id.* at 5 (emphasis added). But nowhere did the Court invite reconsideration—or disregard—of its ruling regarding discovery of additional track-level revenue data.

At the February Hearing, Charter simply sought a do-over, repeating the same arguments that this Court rejected ten months earlier. *See* ECF No. 386 at 1. Charter did not raise a single new fact to justify overriding this Court's Order. *See* ECF No. 378. Yet the Magistrate Judge and Special Master ordered Plaintiffs to produce precisely the discovery that this Court previously denied, *i.e.*, track-level revenue data for the remaining thousands of works in suit, as well as for all works for the additional eighteen months covering the Claim Period. ECF No. 386 at 1. The February 23 Order should be reversed because it is directly contrary to this Court's April 2020 order on the identical issue.

### B. Charter Does Not Provide Any New Or Valid Arguments.

Aside from the procedural impropriety, Charter's request for track-level revenue data should be denied because it is overly burdensome and disproportionate to the needs of this case.

#### 1. Charter Offers Nothing New.

Charter has put forth no new evidence showing the data from *Cox* that Plaintiffs have produced is insufficient. This Court stated in April 2020, "unless and until a qualified expert can convince [the Court] otherwise, [] a roughly 80% sample is statistically enough to permit

3

reasonable inferences to be drawn about the remaining 20%." ECF No. 159 at 4. Charter failed to explain why it cannot draw inferences from the *Cox* data and other information produced here.

Charter argues that it requires additional track-level revenue data for additional years to "understand how . . . shifts in music consumption" towards streaming affected Plaintiffs' revenue from the works-in-suit, ECF No. 378 at 3. But that ignores that Plaintiffs have produced "[their] total annualized U.S. revenues . . . for the years 2010 through 2016" and "top-end financial data that includes streaming revenues for 2017, 2018, and 2019," which provides Charter the information it needs to understand how the shift toward streaming affected Plaintiffs' overall revenues. *See* Ex. 1 at 25 (Pls.' Am. Resp. to RFP 12). And, as discussed below, it ignores that Plaintiffs' revenues are irrelevant to assessing statutory damages against Charter.

### 2. The Request Remains Extremely Burdensome To Compile.

The immense burden in preparing the additional track-level revenue data, even for the same data types produced in *Cox*, is impracticable and not proportional to the needs of the case, particularly at this late stage.

Charter does not and cannot dispute that compiling the additional data would likely take up to several months for Plaintiffs. *See* ECF No. 89 at 9–12; ECF Nos. 89-2–89-6 (McMullan Decl. ¶ 14; Leak Decl. ¶ 14; Blietz Decl. ¶ 12; Abitbol Decl. ¶ 11; Flott Decl. ¶ 13). Compiling the same data in *Cox* took several months and diverted significant internal resources from other parts of Plaintiffs' businesses. *See* ECF Nos. 89-2–89-6. Charter's request would require Plaintiffs to repeat this exercise for all 11,000 works for an additional eighteen-month period (and for four full years for the thousands of works not in *Cox*). This exercise would require at least hundreds of hours of Plaintiffs' employees' time and still necessarily be incomplete. *See* ECF No. 383 at 4. It is infeasible to complete this request at this late stage; if Charter wanted reconsideration of this Court's April 2020 order, the time to seek it was then, not now.

4

### 3. The Requested Information Does Not Establish A Work's Value.

Plaintiffs' earnings from legitimate sales for a brief snapshot in time sheds no light on the damages suffered because of Charter's subscribers' infringement. Pirating copyrighted works displaces revenue that might otherwise be earned, ECF No. 89 at 14. Thus, revenues collected do not assist the factfinder in understanding what was *not* collected. Moreover, the negative revenue impact from infringement increases as the amount of infringement increases. Because peer-to-peer copyright infringement is viral and capable of unlimited distribution, the negative revenue impact is unknowable.

In addition, even if Charter were correct in principle (it is not), the information sought would still be of limited, if any, probative value. The February 23 Order requires Plaintiffs to produce the same type of information provided in *Cox*, which means that it would *not* include all revenue associated with the tracks in suit. For the Record Company Plaintiffs, it includes only limited data related to release as a "single," *i.e.*, no revenue from sales of albums or physical media. Given that (as Plaintiffs have explained before) the data "may not capture all sources of revenue associated with a given work," ECF No. 89 at 11, its limited probative value cannot justify the immense burden involved in compiling it.

Accordingly, the Court should reaffirm its April 2020 order and reverse the February 23 Order requiring Plaintiffs to produce additional track-level revenue data.

## II. The Magistrate Judge Clearly Erred By Requiring Production Of Plaintiffs' Protected Work Product.

In preparing to assert claims against several Internet Service Providers ("ISPs"), including Charter, Plaintiffs' counsel analyzed data and directed Plaintiffs' antipiracy vendor, MarkMonitor, to collect certain evidence. Plaintiffs produced all of the evidence collected from that project on which they will rely. Plaintiffs' counsel's analysis also resulted in an internal

5

spreadsheet—the "Hash Report"—that counsel created based on *its own internal analysis and strategic judgment* and which MarkMonitor supplemented with additional information. The Hash Report is protected opinion work product and Plaintiffs will not rely on it at trial.

Charter has no substantial need for the Hash Report because it is not "essential to" or "greatly probative" of any issues. To the extent portions of the Hash Report might be relevant, other files and information Plaintiffs have produced allow Charter to obtain the substantial equivalent of that information without undue hardship. Nor have Plaintiffs waived work-product protection over the Hash Report by producing the evidence on which they intend to rely.

After full briefing, argument, and *in camera* review, Judge Hegarty issued a written order on January 7, 2021 agreeing with the Special Master's earlier ruling that the Hash Report is protected work product and holding that Charter failed to satisfy its burden to pierce Plaintiffs' work-product protection. ECF No. 332. Charter neither moved for reconsideration nor appealed. That should have been the end of the matter.

At the February Hearing, Charter reargued its motion by introducing inaccurate and misleading facts that confused the issues. Judge Hegarty, sitting together with Special Master Rodriguez, reversed his prior order, finding that Plaintiffs' work-product claim was "dubious" and that Charter had shown a substantial need for the Hash Report. This reversal was clearly erroneous and contrary to law, and the original, fully considered written order should stand.

**A. Plaintiffs' Counsel Created The Hash Report In Anticipation Of Litigation.**

From 2012-2015, the Recording Industry Association of America ("RIAA") engaged MarkMonitor, on behalf of the Record Company Plaintiffs, to monitor and detect infringement of Plaintiffs' copyrighted music on peer-to-peer networks and send infringement notices to ISPs, including Charter (the "RIAA Notice Program"). Nov. 9, 2020 Decl. of Matthew J. Oppenheim

¶ 3, ECF No. 287-1 ("Oppenheim Decl.") (attached). The goal of the RIAA Notice Program was to provide notice to ISPs, including Charter, of specific instances of infringement by IP addresses on Charter's network so Charter could take appropriate action, since only Charter can link IP addresses to subscribers. MarkMonitor only sent notices after confirming a subscriber was actively infringing Plaintiffs' works. Pursuant to this program, RIAA sent more than 700,000 infringement notices to Charter. *Id.* The notices contained, among other things, a cryptographic hash used by BitTorrent to uniquely identify the infringing file Charter's subscriber was illegally distributing. *Id.* ¶ 4. A "hash" is a unique identifier generated by an algorithm that serves as a file's "digital fingerprint." *Id.* Files with the same hash value contain identical content. *Id.*

The RIAA Notice Program did not contemplate litigation. Had Charter acted on the infringement notices to stop the infringing behavior, no litigation would have been necessary. The prospect of litigation arose in 2016 when Plaintiffs analyzed data from the RIAA Notice Program and learned that Charter was continuing to provide service to known repeat infringers.



7

███████████████████████████████████████████████

████████████████████████████████████████ The resulting "Hash Report" is a spreadsheet created by and at the direction of counsel. *Id*. ¶ 8. This process was undertaken solely to inform litigation strategy for this and other possible lawsuits. *Id*. ¶ 5.

In discovery, Plaintiffs produced all of the discovery that is appropriate to the claims, including, among other things, the following:

- A digital copy of the authentic work for every sound recording in suit.

- A hard drive containing all of the hash files downloaded pursuant to the 2016 SOW, which included, for each sound recording in suit, copies of the infringing files that were the subject of Plaintiffs' infringement notices.

- PCAP files (or packet capture logs) showing when and where the files associated with the hashes in the 2016 SOW were downloaded.

- Four indices for the hard drive of folders and infringing files, named and organized by hash, such that Charter can easily identify the included hashes.

- The 2016 SOW demonstrating that MarkMonitor was engaged for this project "in anticipation of litigation." ECF No. 268 Ex. 4 at 1.

Oppenheim Decl. ¶¶ 9–10.

### B. Charter Has Repeatedly Sought The Hash Report And Was Repeatedly Denied Before The Magistrate Judge Orally Ordered Production.

On August 12, 2020, the Special Master denied Charter's first request to obtain the Hash Report. ECF No. 230 at 36. Charter then moved Judge Hegarty to compel its production. ECF No. 266. Judge Hegarty heard lengthy argument on December 18, 2020, including an *ex parte*

session in which Plaintiffs described the Hash Report in detail. Plaintiffs also submitted a copy for *in camera* review.

Judge Hegarty issued a written order on January 7, 2021 denying Charter's motion, stating he "agree[s] with the Special Master's analysis at ECF 230 and make[s] the independent determination that the Hash Report constitutes attorney work product, and, at least at the present, Defendant has not established sufficient need to overcome the claim of privilege." ECF No. 332 at 1. Judge Hegarty added that Plaintiffs cannot affirmatively use the Hash Report while withholding it. *Id.* at 1–2.

Charter neither moved for reconsideration nor appealed. Rather, Charter subsequently argued that Judge Hegarty's order precluded Plaintiffs from relying on *any* evidence from MarkMonitor's 2016 efforts. Ex. 2 at 35:3–14 (Jan 28, 2021 Hr'g Tr.). Charter's misreading of the order prompted Plaintiffs to seek to clarify and "confirm that Plaintiffs' assertion of privilege over the Hash Report does not preclude Plaintiffs from introducing and relying on the evidence that Plaintiffs have produced from the 2016 MarkMonitor download project." ECF No. 374 at 6.

At the February Hearing, Charter reargued its motion to compel the Hash Report while raising misleading and irrelevant issues. For example, Charter represented that Plaintiffs have not designated MarkMonitor as a fact witness, that the plaintiffs in the *Cox* case called Audible Magic as a witness at trial and would do so, and that the 2016 SOW was never produced in the *Cox* case, all of which are incorrect. *See* Ex. 3 at 49:16–50:4; 50:12–16; 51:25–52:4 (Feb. 23, 2021 Hr'g Tr.). Charter also argued that attorney-client privilege did not apply to the Hash

9

Report, *id.* at 51:6–52:4, causing confusion (and a lengthy tangent) as Plaintiffs have only asserted work-product protection over the Hash Report.

Upon this confusion, Judge Hegarty and Special Master Rodriguez reversed their earlier written orders, concluding the Hash Report's status as work product was "somewhat dubious" and that Charter had demonstrated substantial need because the 2016 Audible Magic look-ups could not be obtained elsewhere. *Id.* at 110:21–111:15.

### C. The Hash Report Is Protected Work Product Under Rule 26.

The oral decision that the Hash Report's status as work product is "somewhat dubious" is clearly erroneous and contrary to law.  The Hash Report clearly satisfies Rule 26's requirements for work product—and both Judge Hegarty's and Special Master Rodriguez's prior written orders correctly concluded as much. ECF No. 332 at 1; ECF No. 230 at 36.

Further, the Hash Report reflects opinion work product and is therefore absolutely protected. "Opinion work product reveals the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." *Nevada v. J-M Mfg. Co.*, 555 F. App'x 782, 785 n.12 (10th Cir. 2014) (internal quotation marks omitted). "Opinion work product is absolutely privileged." *Id.* (citing *In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1186 (10th Cir. 2006)). In revealing which hashes to include and why and what analysis to conduct, the Hash Report reflects counsel's opinions and legal theories. *United States v. J-M Mfg. Co.*, No. 11-CV-01691-MSK-MJW, 2013 WL 424782, at *4 (D. Colo. Feb. 4, 2013)

10

(test report was opinion work product where "selection of a particular test methodology or testing sample or set of samples to test . . . could reveal attorney opinions, theories, or strategies"); *Vardon Golf Co. v. BBMG Golf Ltd.*, 156 F.R.D. 641, 648 (N.D. Ill. 1994) (upholding work product protection where "[t]he selection of the tests and test data would surely reflect the attorney's strategy . . . .").

### D. Reversing The Prior Written Decisions And Concluding That Charter Has Overcome Its Burden To Pierce Work-Product Protection Was Clear Error.

Even if the Hash Report were purely factual, Charter cannot "show that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). "A substantial need exists where the information sought is *essential* to the party's defense, is *crucial* to the determination of whether the defendant could be held liable for the acts alleged, or carries *great probative value* on contested issues." *J-M Mfg. Co.*, 555 F. App'x at 785 (internal quotation marks omitted) (emphasis added). "Nor does a showing of potential relevance mean that [the movant] has demonstrated a substantial need." *Id.* (internal quotation marks omitted).

Charter focuses on two pieces of the Hash Report: (i) the list of hashes Plaintiffs' counsel identified but MarkMonitor did not download, and (ii) the Audible Magic identifications of the files MarkMonitor did download. Charter cannot satisfy its burden in either case.

#### 1. Charter Has No Need For Hashes Investigated But Not Downloaded in 2016 and Can Easily Obtain Their Substantial Equivalent.

Charter argues it needs to know which hashes MarkMonitor looked for in 2016 but did not find in order to test the reliability of Plaintiffs' notices. Charter wants to argue that, if MarkMonitor did not download a file in 2016, that file must not exist and therefore Plaintiffs' notices were false. That argument fails for three reasons.

11

*First*, Charter has no substantial need for the hashes counsel selected to investigate but did not download in 2016 because whether a hash was downloaded in 2016 shows nothing about whether a file existed and was distributed by a Charter subscriber years earlier.

*Second*, nothing about the hashes counsel selected to investigate but that were not downloaded in 2016 bears on establishing or refuting infringement of the works in suit. Plaintiffs will prove direct infringement by showing (1) the 2016 downloads contain infringing copies of Plaintiffs' authentic works, and (2) Plaintiffs' notices identify files whose hashes match those of infringing files downloaded in 2016. Nothing about the hashes counsel selected to investigate but that were *not* downloaded in 2016 carries any, let alone great, probative value on these points.

*Third*, Charter concedes that it can obtain, without undue hardship, the substantial equivalent of the hashes in Plaintiffs' notices that were not downloaded. Plaintiffs produced (1) *all* of the infringement notices they sent Charter, which identify all of the infringing files by hash, and (2) *all* of the files downloaded in 2016, with indices identifying the files by hash. Determining the hashes in Plaintiffs notices that were not downloaded in 2016 is a simple matter of comparing hashes from the notices to hashes from the 2016 downloaded files. At the hearing, Charter admitted it could do this analysis. Ex. 3 at 105:16–18 (Feb. 23, 2021 Hr'g Tr.) ("It is possible for us to back out and at least determine which items on the notices that we received are not in the case now.").

### 2. Charter Has No Substantial Need For The 2016 Audible Magic Look-Ups And Can Readily Obtain Their Substantial Equivalent.

Charter argues it needs the 2016 Audible Magic results to identify files that Plaintiffs allege were infringing but that Charter claims were not. That argument also fails.

12

*First*, Charter has no need for the 2016 Audible Magic look-ups because it can obtain the substantial equivalent without undue hardship.  Charter has copies of the *actual files* used to conduct those look-ups and can conduct its own analysis on those files—including running them through any content identification service or listening to the files themselves to see if they are the same as Plaintiffs' authentic works.  Charter has argued that performing new content identification analysis *today* will not assess the reliability of look-ups performed in connection with the 2012-2015 RIAA Notice Program; of course, the same is true of the *2016* look-ups, which likewise postdate the RIAA Notice Program.

*Second*, Charter has no substantial need for the 2016 Audible Magic look-ups because Plaintiffs will not rely on the 2016 Audible Magic look-ups to prove anything at trial, including direct infringement, and they are not "crucial to the determination" of any issue.  Charter mistakenly told Judge Hearty and the Special Master that plaintiffs in the *Cox* case put forward Audible Magic as a fact witness, and that Plaintiffs here planned to do so using the information from the Hash Report.  Ex. 3 at 49:16–50:4 (Feb. 23, 2021 Hr'g Tr.).  That is simply false.  Defendant Cox deposed Audible Magic, but the plaintiffs in *Cox* did not affirmatively offer testimony from Audible Magic at trial and Plaintiffs do not expect to offer it here.  Plaintiffs' direct infringement claims will stand or fall based on the evidence Plaintiffs present, which Charter will have every opportunity to challenge.

*Third*, any need for the Audible Magic look-ups cannot justify production of the *entire* Hash Report.  Audible Magic look-ups in the Hash Report exist only for files MarkMonitor *downloaded* in 2016.  Even if Charter had a substantial need for Audible Magic look-ups, that could not justify producing the list of hashes not downloaded for which no Audible Magic look-

13

up exists. The order requiring production of the *entire* Hash Report based on a finding that Charter has a substantial need for the Audible Magic look-ups was clearly erroneous.[1]

### E. Plaintiffs Have Not Waived Protection Over The Hash Report By Putting The Hash Report At Issue or Selectively Disclosing Protected Material.

In determining whether a party has waived work-product protection, "[t]he primary inquiry is whether the party claiming privilege will assert the allegedly protected material in aid or in furtherance of its claims or defenses." *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-CV-00047-MSK-MEH, 2010 WL 3923092, at *10 (D. Colo. Oct. 1, 2010). That is not the case here: Plaintiffs are not relying on the protected material in the Hash Report at all or the fact of having conducted an investigation in 2016. *See Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 704 (10th Cir. 1998) (no waiver where plaintiff "did not rely on the work product in any manner to justify its right to recovery or to respond to [the defendant's] defense"). To the extent Plaintiffs rely on anything from the 2016 download project, it is only the downloaded files that Plaintiffs have already produced.

Plaintiffs have not waived work-product protection over the Hash Report by producing the files that were downloaded in 2016 while withholding the Hash Report. The downloaded copies of the infringing files themselves—which Charter has and can independently test—are distinct from the specific selection of hashes ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ For these reasons, despite having considered the issue several times, neither the Magistrate Judge nor the Special Master found any wavier.

---

[1] The Hash Report contains certain fields unrelated to the identity of the hashes listed, irrelevant to any of the reasons Charter has stated for seeking the Hash Report, and which bear on counsel's strategic thinking. At the hearing, Charter's counsel conceded, "[i]f there is something in there that says why specifically a lawyer wants you to look at this one, there would be a perfectly good argument, I'm sure, that that should be redacted." If production of the Hash Report is ordered—and it should not be— the order should permit Plaintiffs to redact two columns that bear on *why* counsel selected the hashes.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court (i) reverse the Magistrate Judge's Order requiring Plaintiffs to produce additional track-level revenue data; (ii) reverse the Magistrate Judge's Order granting Charter's Motion to Compel Production of the Hash Report; and (iii) confirm that Plaintiffs' assertion of work-product protection over the Hash Report does not preclude Plaintiffs from introducing and relying on the evidence that Plaintiffs have produced from the 2016 MarkMonitor download project.

Dated: March 3, 2021

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com

Respectfully submitted,

*/s/ Matthew J. Oppenheim*
Matthew J. Oppenheim
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Fl.
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 3, 2021 I caused the foregoing document and all supporting materials thereto to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

*/s/ Matthew J. Oppenheim*