# Exhibit 27

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:18-cv-00950-LO-JFA |
| COX COMMUNICATIONS, INC., *et al.*, | |
| *Defendants*. | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ............................................................................................................. 1

II.   BACKGROUND ............................................................................................................... 2

III.  LEGAL STANDARD ....................................................................................................... 2

IV.  PLAINTIFFS REFUSE TO PROVIDE MEANINGFUL FINANCIAL INFORMATION CONCERNING THE WORKS-IN-SUIT ....................................................... 3

    A.    Cox's Requests and Plaintiffs' Responses ............................................................. 3

    B.    The requested information is relevant and Plaintiffs have asserted no specific burden ................................................................................................ 5

V.   DOCUMENTS CONCERNING OWNERSHIP AND VALIDITY OF THE WORKS-IN-SUIT ............................................................................................................. 8

    A.    Documents concerning chain-of-title ................................................................... 9

    B.    Work-for-hire agreements ................................................................................... 11

    C.    Plaintiffs have articulated no legitimate burden in searching for and producing these documents ................................................................. 12

VI.  DOCUMENTS CONCERNING COX ........................................................................... 13

VII.  DOCUMENTS CONCERNING THE COPYRIGHT ALERT SYSTEM ("CAS") AND THE ACTIONS OF OTHER ISPS ................................................................. 14

    A.    Cox's Requests and Plaintiffs' Responses ........................................................... 15

    B.    Documents and information concerning the CAS and the actions of other ISPs are highly relevant .......................................................... 15

VIII.  DOCUMENTS CONCERNING MARKMONITOR ....................................................... 19

    A.    Cox's Requests and Plaintiffs' Responses ........................................................... 19

    B.    Plaintiffs' communications with MarkMonitor, and documents concerning it, are highly relevant .......................................................... 20

IX.  DOCUMENTS CONCERNING AND COMMUNICATIONS WITH THE RIAA ........ 22

X.   THE EFFECT OF INFRINGEMENT ON PEER-TO-PEER NETWORKS .................... 24

XI.  CONCLUSION ............................................................................................................... 27

# I. INTRODUCTION

It has become clear that Plaintiffs—57 individually named record companies and music publishers—believe that they can file this suit, produce copyright registrations and alleged infringement notices, and enter this Court armed with the jury verdict in *BMG Rights Management (US) LLC et al. v. Cox Enterprises, Inc. et al.*, No. 1:14-cv-01611-LO-JFA ("*BMG*"), to demand over $1.6 billion in statutory damages. But Plaintiffs should be required to produce documents—unquestionably in their possession—that are directly relevant to the claims and defenses in this action.

With this motion, Cox seeks the following key categories of documents and information:

- Basic financial information regarding Plaintiffs' revenue and profits related to the works-in-suit that is readily available and directly relevant to statutory damages;

- Information concerning the ownership and validity of the works-in-suit, including ownership agreements, challenges to ownership or validity, and work-for-hire agreements;

- Documents about Cox, including those that pertain to copyright infringement, beyond the unreasonable limitations insisted upon by Plaintiffs;

- Documents concerning the Copyright Alert System ("CAS"), an inter-industry agreement concerning standards for addressing online copyright infringement through Internet Service Providers ("ISPs"), to which many of the Plaintiffs are signatories;

- Documents concerning MarkMonitor, the vendor whose system purportedly identified the alleged direct infringements at issue in this case;

- Documents concerning the Recording Industry Association of America ("RIAA"), Plaintiffs' agent and the entity who managed the MarkMonitor policing program and is centrally involved in policing and enforcing Plaintiffs' alleged rights;

- Documents concerning the effect on Plaintiffs from the use of peer-to-peer networks, including from infringement and legitimate uses.

Each of these categories is directed at highly relevant information. Despite Cox's efforts, Plaintiffs have clung to their unreasonable objections. Cox respectfully requests that the Court grant this motion.

## II.    BACKGROUND

Cox served its first set of document requests and interrogatories on November 19, 2018—nearly two months ago. Since that time, the parties have had multiple, multi-hour meet and confer calls regarding Plaintiffs' objections and responses.[1] Throughout this process, Plaintiffs have refused to respond to many requests that seek documents and information about which there can be no question of relevance. For others, Plaintiffs have insisted upon inappropriate limitations.[2]

Cox has spent hours discussing and corresponding with Plaintiffs over these and other requests, in an effort to resolve disputes without burdening the Court.[3]

## III.   LEGAL STANDARD

The Federal Rules establish a broad right to discovery of "any non-privileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1); *see also Gilbertson v. Jones*, No. 3:16-cv-255, 2016 WL 6518659, at *33 (E.D. Va., Sept. 22, 2016) ("Within the bounds of proportionality, Rule 26(b)(1) grants broad discovery of all relevant information unprotected by

---

[1] *See* Declaration of Jennifer A. Golinveaux ("Golinveaux Decl."), ¶ 2
[2] Golinveaux Decl., ¶¶ 2-3.
[3] Golinveaux Decl., ¶¶ 2-3.

privilege."); *JTH Tax, Inc. v. Aime*, No. 2:16-cv-279, 2016 WL 9223926, at *2 (E.D. Va. Dec. 13, 2016) ("The Federal Rules contemplate the broadest discovery possible in the search of the truth"). The Federal Rules also "place the burden of objecting to discovery requests with specificity squarely on the producing party rather than the requesting party." *Cappetta v. GC Servs. Ltd. P'ship*, No. CIV. A. 3:08CV288, 2008 WL 5377934, at *3 (E.D. Va. Dec. 24, 2008); *see also Kinetic Concepts, Inc. v. ConvaTec Inc.*, 268 F.R.D. 226, 243-44 (M.D.N.C. 2010) (collecting Fourth Circuit cases in which courts "have repeatedly ruled that the party or person resisting discovery, not the party moving to compel discovery, bears the burden of persuasion").

## IV. PLAINTIFFS REFUSE TO PROVIDE MEANINGFUL FINANCIAL INFORMATION CONCERNING THE WORKS-IN-SUIT

Plaintiffs refuse to produce the most basic financial information. At a minimum, this includes Plaintiffs' per-work, per-channel revenue from the works-in-suit and other information bearing on Plaintiffs' profits per work. Plaintiffs claim this information is irrelevant because they now elect statutory damages.[4] That position is contrary to black-letter copyright law.

### A. Cox's Requests and Plaintiffs' Responses

Cox originally requested each plaintiff's revenue, profit, and expenses per work-in-suit for each of the last ten years, by medium.[5]

---

[4] While Plaintiffs seek both statutory and actual damages in their Complaint, Compl. ¶¶ 111, 120, they now say that they are electing statutory damages. *See* Golinveaux Decl., Ex. 3 (Plaintiffs' Responses and Objections to Cox's First Set of Requests for Production ("RFPs") (Resp. to RFP Nos. 28-29). When referring to Plaintiffs' Objections or Responses to Cox's requests, Cox will refer to Exhibits 3 and 4 to the Golinveaux Declaration, which are Plaintiffs' combined Responses and Objections to Cox's RFPs and Interrogatories, respectively, and note the relevant request number and whether it is referring to either Plaintiffs' Response ("Resp.") or Objection (Obj.").
[5] Golinveaux Decl., Ex. 1 (RFP No. 41); *see also id.* RFP Nos. 43-44 (same request but for profit and expenses); Ex. 2 (Cox Communications, Inc.'s First Set of Interrogatories, Interrogatory No. 2); *see also id.* (Interrogatory No. 3) (requesting profit).

Cox also requested Plaintiffs' profits per work-in-suit and documents concerning the effect on these profits from infringement over peer-to-peer file sharing sites.[6]

In response to Cox's requests for per-work revenue data, Plaintiffs objected that their "revenues are not relevant to liability or damages."[7] Plaintiffs also objected that the term "medium" could encompass a range of physical products, as well as digital products, including downloads, live streams, and on-demand streams.[8] Cox explained during a meet and confer that this revenue information is relevant because Cox's expert needs the data in order to estimate Plaintiffs' actual damages. Cox also proposed several compromises, including to limit its requests to the years 2010 to 2014[9] and explained that if Plaintiffs did not maintain revenue data per *medium*, that it would accept it per *channel* (e.g., physical media, digital downloads, streaming, licensing royalties).[10] Plaintiffs rejected this compromise.[11] Cox also pointed Plaintiffs to this Court's ruling in *BMG*, in which the Court ordered BMG and Round Hill to produce the same information.[12]

In response to Cox's requests for data relating to Plaintiffs' profits, Plaintiffs have represented that they do not maintain per-work profit and loss statements.[13] Cox therefore requested that Plaintiffs produce any information or analyses in their possession regarding the

[6] Golinveaux Decl., Ex. 1 (RFP Nos. 27-29, 36, 43); Ex. 2 (Interrogatory No. 3).
[7] Golinveaux Decl., Ex. 3 (Obj. to RFP No. 41); *see also id.* (Obj. to RFP Nos. 43-44) (same objection with respect to Cox's requests for profit and expense information); Ex. 4 (Resp. to Interrogatory Nos. 2-3).
[8] Golinveaux Decl., Ex. 3 (Obj. to RFP Nos. 41, 43-44); Ex. 4 (Resp. to Interrogatory Nos. 2-3).
[9] Plaintiffs' claim period ends in November 2014.
[10] Golinveaux Decl., Ex. 5 (Cox's Dec. 7, 2018 Ltr. to Plaintiffs); Ex. 7 (Cox's Dec. 26, 2108 Ltr. to Plaintiffs).
[11] Golinveaux Decl., Ex. 6 (Plaintiffs' Dec. 10, 2018 Ltr. to Cox); Ex. 8 (Plaintiffs' Dec. 28, 2018 Ltr. to Cox).
[12] Golinveaux Decl., Ex. 7 (Cox's Dec. 26, 2018 Ltr. to Plaintiffs).
[13] Golinveaux Decl., Ex. 7 at 2-3.

4

profits earned for any of the works at issue, any artist whose work is at issue, or, if a Plaintiff's works are divided into different labels or divisions, information relating to the profits earned by those labels or divisions. *Id.*

But Plaintiffs maintained their objections, instead only offering to provide a "proffer of financial information," in lieu of the requested information. Although they first indicated they expected to provide this proffer more than a month ago, Plaintiffs have yet to do so, nor will they say when it will be produced.[14] When pressed to describe the proffer, Plaintiffs said that it will be a "range" of each Plaintiff's digital download revenue during the years 2010-2014. *Id.* But, according to Plaintiffs, the proffer would neither be specific to the works-in-suit, nor would it include the requested revenue from physical sales, streaming, and licensing royalties. Plaintiffs also refused to produce any of the data upon which the proffer is based. *Id.* Such a proffer, if it is ever provided, is woefully inadequate.

**B.  The requested information is relevant and Plaintiffs have asserted no specific burden**

Contrary to Plaintiffs' assertion, an assessment of actual damages is directly relevant to statutory damages. *See Seoul Broad. Sys. Int'l, Inc. v. Young Min Ro*, No. 1:09CV433 LMB/IDD, 2011 WL 3207024, at *8 (E.D. Va. July 27, 2011) (a court begins by assessing "the underlying economic realities of the situation, including the actual damages suffered by the plaintiff, any expenses saved by the defendant in avoiding a licensing arrangement, and any profits reaped by the defendants in connection with the infringement") (citing *Olde Mill Co., Inc. v. Alamo Flag, Inc.*, No. 1:10cv130, 2010 WL 3430917 (E.D. Va. Aug. 27, 2010)); *see also EMI April Music, Inc. v. White*, 618 F. Supp. 2d. 497, 508-09 (E.D. Va. 2009); Nimmer on Copyright § 14.04[B] at 14-41 (actual damages, including revenues lost, should be considered in awarding statutory damages).

---

[14] Golinveaux Decl., Ex. 7 at 3; Ex. 18 (Cox's Jan. 11, 2018 Ltr. to Plaintiffs at 1-2).

This is because "statutory damages should bear some relation to the actual damages suffered." *Dae Han Video Prod., Inc. v. Chun*, No. CIV. A. 89-1470-A, 1990 WL 265976, at *7 (E.D. Va. June 18, 1990) (considering actual damages suffered for setting the applicable range of statutory damages).

As noted above, in *BMG*, this Court ordered the plaintiffs to produce the same type of information, namely the revenue derived from each work by distribution channel (e.g., physical sales, digital downloads, streaming, and license royalties). Golinveaux Decl., Ex. 9 (June 29, 2016 Hr'g Tr. at 33:24-25, *BMG* ECF No. 113). BMG's counsel also made many of the same objections Plaintiffs assert here. For example, BMG's counsel argued that "no one is sure how [Cox is] going" to calculate actual damages. *Id.* at 26:2-12; *see also id.* at 28:23-25 ("[Y]ou can't prove a but for, but for this one download we would have lost income related to the album sales, or digital downloads, or streaming, or licensing."). Cox responded that it was taking the burden of performing this analysis, not the rights holders. *Id.* at 29:3-8. And if the rights holders wanted to challenge the strength of the analysis, they could do so before or during trial. *Id.*[15]

As in *BMG*, the requested data is relevant here to the issue of damages in several important ways. For example, it is relevant to a determination of a proper statutory damages award *per work*. If an individual plaintiff's revenue from one work is small, and there is no evidence that this work was infringed disproportionately more than any other work, Cox should be entitled to argue to the

---

[15] Any argument that this would be unhelpful to the jury also fails. In *BMG*, BMG moved to exclude Cox's expert's analysis with respect to actual damages before trial. *BMG* ECF Nos. 466, 690, 676. Judge O'Grady denied that motion, allowing Cox's expert to testify regarding his estimates of BMG's actual damages, which was based on BMG's per-work, per-channel revenue data. *Id.* And in their recent motion to compel, Plaintiffs explicitly argued that "the standard for discovery is relevance, not hypothetical concerns about the downstream impact such discovery might have at trial," as such concerns can be addressed through motions *in limine*. *See* ECF No. 65 at 109. The same arguments apply here.

jury that this plaintiff is not entitled to the same level of statutory damages for the work as compared to a high-revenue-generating work. In addition, Plaintiffs have produced the infringement notices they sent to Cox regarding the works-in-suit.[16] Cox has also served a subpoena on MarkMonitor for documents that identify all alleged instances of infringement by Cox subscribers, regardless of whether those instances were documented in notices that were sent to Cox.[17] While Cox does not concede that the copyright infringement notices or alleged observations constitute evidence of direct infringement, this information can nevertheless be used as a data point in estimating Plaintiffs' actual damages. In other words, if one assumed that each observation of an alleged infringement displaced a legitimate sale, then a more precise estimation of Plaintiffs' damages could be calculated with Plaintiffs' per-work, per-channel revenue data.

Plaintiffs have not represented that they do not maintain this data, nor that it would be unduly burdensome to produce it. Indeed, Plaintiffs would be hard-pressed to assert any burden in producing this data that is disproportionate to the needs of this case where the 57 separate plaintiffs collectively seek more than $1.6 billion in damages. Cox should be permitted discovery regarding each plaintiff's actual damages to inform the jury's decision on statutory damages.

And with respect to Plaintiffs' documents bearing on their profits, with Plaintiffs' proposed "proffer" of financial information, Plaintiffs concede that their actual revenue is relevant to this case. Even more relevant than revenue is data pertaining to Plaintiffs' *actual* profits from the works-in-suit, as it is the operative variable when determining Plaintiffs' actual damages. *See Seoul Broad. Sys. Int'l, Inc.*, No. 1:09CV433 LMB/IDD, 2011 WL 3207024, at *8 (to make an

---

[16] Golinveaux Decl., Ex. 8 at 7.
[17] Golinveaux Decl., Ex. 10 (MarkMonitor RFP Nos. 8-11).

Case 1:18-cv-00950-LO-JFA   Document 538-28   Filed 12/27/21   Page 11 of 32 PageID#
32921
Case 1:18-cv-00950-LO-JFA   Document 73   Filed 01/18/19   Page 100 of 31  PageID# 950

assessment of statutory damages, courts generally begin by considering plaintiffs' actual damages).

Underscoring the relevance of profit data, in *BMG* this Court asked plaintiffs' counsel, "[w]hy aren't they (Cox) entitled to get some sense as to what has been the profit for each copyrighted work as opposed to merely just the revenue." Golinveaux Decl., Ex. 9 (Hr'g Tr. at 27:10-12). When counsel represented that BMG does not have data on profits per work, this Court observed that Cox could use BMG's general profit margins to reduce their per-work revenue in order to "ballpark" a profit per work. *Id.* at 32:11-33:7. Plaintiffs' relevance objections are unfounded and they should be compelled to produce this information.

## V. DOCUMENTS CONCERNING OWNERSHIP AND VALIDITY OF THE WORKS-IN-SUIT

Before they can pursue $150,000 in statutory damages on each work-in-suit, it is indisputably each plaintiff's burden to establish that it owned a valid copyright at the time of infringement. *See Keeler Brass Co. v. Cont'l Brass Co.*, 862 F.2d 1063, 1065 (4th Cir. 1988); *see also Princeton Payment Sols., LLC v. ACI Worldwide, Inc.*, 2014 WL 4104170, at *4 (E.D. Va. Aug. 15, 2014) (plaintiff must own the copyrights at issue in order to have standing to sue).

Here, Plaintiffs will only agree to produce registration certificates (or what Plaintiffs purport to be adequate substitutes)[18] and "documents *sufficient* to demonstrate that Plaintiffs are the legal and/or beneficial owners of an exclusive right under copyright to their respective copyrighted works in suit … ."[19] From Cox's review to date of Plaintiffs' validity and ownership-

---

[18] Plaintiffs have represented that "if a certificate is not *readily accessible*, a look-up page evidencing registration printed from the U.S. Copyright Office's website [will be produced]. Alternatively, for some older copyrighted works, Plaintiffs will produce a copy of the Copyright Office's card-catalogue entry evidencing registration" will be produced. *See, e.g.*, Golinveaux Decl., Ex. 3 (Resp. to RFP 6) (emphasis and alteration added).

[19] Golinveaux Decl., Ex. 3 (Resp. to RFP Nos. 15, 21-22) (emphasis added).

related documents, it appears that the vast majority are either registration certificates or printouts from the Copyright Office's website showing the registration number, the title of the work, the artist(s), and the copyright claimant. Golinveaux Decl., ¶ 10. Moreover, for one plaintiff group, "Sony Music Entertainment," which comprises eight separate plaintiffs who collectively assert over 3,000 works in this case and demand nearly $500 million in statutory damages,[20] Plaintiffs have produced only a spattering of what appear to be chain-of-title documents and they deal with only a small number of the relevant artists. Golinveaux Decl., ¶ 11.

In light of Plaintiffs' unequivocal refusal to produce all relevant documents, the contents of their actual production, and the parties' burden with respect to this critical issue, including the scrutiny the Court is to place on it, Plaintiffs should be compelled to produce documents responsive to Cox's requests.

### A.   Documents concerning chain-of-title

In addition to registration certificates, Cox has requested Plaintiffs' assignments and licenses for the works-in-suit for the last ten years and documents concerning *challenges* to the validity or their ownership of the works-in-suit.[21] Based upon their unilateral representation that they have produced documents "sufficient" to demonstrate their ownership of the works-in-suit, Plaintiffs have flatly refused to produce their licenses and assignments and asserted that they will not produce any documents concerning challenges unless Cox first "identifies specific works for which it has a good faith basis to question validity or ownership."[22] That is not how discovery in a copyright case works.

---

[20] Golinveaux Decl., Ex. 11 (Plaintiffs' Rule 26 Disclosures, Appendix 1).
[21] Golinveaux Decl., Ex. 1 (RFP No. 15-16, 18, 21-22).
[22] Golinveaux Decl., Ex. 8 at 6.

Although a registration certificate (where it exists) can provide a presumption of ownership, the Fourth Circuit encourages courts to "consider and assess other relevant indicia of ownership, such as the parties' intent and the terms of transfer agreements and other documents establishing a chain of title." *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 428 (4th Cir. 2010), as amended (Aug. 24, 2010). This is because there are myriad issues that undermine a copyright plaintiff's ability to assert copyright infringement. *See, e.g., Big E. Entm't, Inc. v. Zomba Enterprises, Inc.*, 453 F. Supp. 2d 788, 800 (S.D.N.Y. 2006), *aff'd sub nom. Big E. Entm't, Inc. v. Zomba Enterprises, Inc.*, 259 F. App'x 413 (2d Cir. 2008) (dismissing copyright infringement claim where the plaintiff "failed to show undisputed evidence of its copyright ownership"); *Moran v. London Records, Ltd.*, 642 F. Supp. 1023, 1025 (N.D. Ill. 1986), *aff'd*, 827 F.2d 180 (7th Cir. 1987) (granting motion to dismiss upon finding that because plaintiff "was never part of the chain of title to the copyright" he lacked standing to sue for its infringement); *Optima Tobacco Corp. v. US Flue-Cured Tobacco Growers, Inc.*, 171 F. Supp. 3d 1303, 1306 (S.D. Fla. 2016) (dismissing case where plaintiff did not own the copyrights at issue); *Ez-Tixz, Inc. v. Hit-Tix, Inc.*, 919 F. Supp. 728, 735 (S.D.N.Y. 1996) (dismissing claim for statutory damages where copyright was registered after the infringing activity).

Moreover, when a plaintiff does produce a registration certificate, which is *prima facie* evidence of ownership, "the burden shifts to the defendant to prove that the claimed copyrights are invalid." *See Universal Furniture Int'l, Inc.*, 618 F.3d at 428. As demonstrated in *BMG* on summary judgment, there can be no question that such documents are highly relevant in a case like this. *See, e.g., BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 649-50 (E.D. Va. 2015), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018) ("'Considering the preeminence of exclusive rights in copyright cases, it is axiomatic that if the … Agreement did not

10

specify that exclusive rights were being transferred, no such rights were in fact transferred.'") (quoting *John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d 262, 278 (S.D.N.Y. 2014)).

Plaintiffs should thus be compelled to produce the requested documents, which bear directly on chain-of-title, including all assignments and licenses and any documents concerning challenges to either the validity or their ownership of the works-in-suit.[23]

### B.    Work-for-hire agreements

As outlined above, Plaintiffs must prove that they possess the exclusive or beneficial right to the works-in-suit.  Based upon Cox's review of Plaintiffs' registration certificates to date, a very significant number of Plaintiffs' works appear to have been registered as works-for-hire. Golinveaux Decl., ¶ 11.  While Plaintiffs have produced some agreements and other documents relating to their chain-of-title, which they unilaterally claim is "sufficient" to demonstrate their ownership, they have outright refused to produce documents responsive to Cox's requests for work-for-hire agreements.[24]  However, these agreements are essential to Plaintiffs' ability to assert the relevant works-in-suit.

Under the Copyright Act, a work cannot be considered one for hire unless there is a written agreement in place, *at the time of creation*, that the work was made for hire.  *See* 17 U.S.C. § 101(a); *see also Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992) ("The writing must precede the creation of the property in order to serve its purpose of identifying the (noncreator) owner unequivocally."); *Gladwell Gov't Servs., Inc. v. Cty. of Marin*, 265 F. App'x 624, 626 (9th Cir. 2008) ("The plain language of the [Copyright Act] indicates that a work-for-hire agreement cannot apply to works that are already in existence."); *Morgan, Inc. v. White Rock Distilleries, Inc.*, 230 F. Supp. 2d 104, 108-09 (D. Me. 2002) (dismissing a copyright action

---

[23] Golinveaux Decl., Ex. 1 (RFP Nos. 10, 15-16, 21-22).
[24] Golinveaux Decl., Ex. 3 (Obj. and Resp. to RFP Nos. 13-14).

because the registration that indicated proper author but not "work made for hire" ownership as to plaintiff was invalid, even if omission was a misstatement, and despite later written agreement).

While registration certificates are *prima facie* evidence of validity, that presumption is directly rebutted when it is demonstrated that there was no work-for-hire agreement in place when the work was registered.  *See, e.g.*, *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 667 (3d Cir. 1990) ("It has been consistently held that a plaintiff's knowing failure to advise the Copyright Office of facts which might have led to the rejection of a registration application constitutes grounds for holding the registration invalid and incapable of supporting an infringement action.").

Here, in order for Plaintiffs to establish that their registration of a work-for-hire is valid, and that they are entitled to assert infringement in this action, they must produce work-for-hire agreements that were in effect at the date of creation.  But Plaintiffs flatly refuse to do so, demurring that they have produced documents "sufficient" to demonstrate validity and ownership. Cox is entitled to challenge Plaintiffs' ability to assert the works-in-suit.  In order to do so it must be able to meaningfully examine the documents relevant to Plaintiffs' claims to these works. Plaintiffs should be compelled to produce their work-for-hire agreements for the works-in-suit.

**C.     Plaintiffs have articulated no legitimate burden in searching for and producing these documents**

Plaintiffs have also failed to articulate a disproportionate burden in responding to Cox's requests that seek information fundamental to any copyright case.  For example, with respect to Cox's requests for documents concerning challenges to Plaintiffs' copyrights, Plaintiffs have merely represented that none of the Plaintiffs maintain central files regarding challenges to validity

or ownership.[25]   But Plaintiffs did not articulate why it would be unduly burdensome to collect and search for such documents.

In a case alleging infringement of nearly 11,000 works, if an individual plaintiff cannot meet its burden to establish that it owns one, the consequence is to *remove the work from the case*—and to eliminate up to $150,000 in potential statutory damages for that work.  Documents concerning validity and ownership are critically relevant to any copyright case.  Plaintiffs should be compelled to respond to Cox's outstanding requests.

## VI.   DOCUMENTS CONCERNING COX

Cox requested the following documents concerning Cox:

> **RFP No. 64:** All documents that mention, refer to, or relate to Cox that were created, received, or sent from 2013 to present.

> **RFP No. 65:** All documents concerning communications with Cox regarding copyright infringement.[26]

Plaintiffs initially objected on the grounds that these requests might encompass irrelevant documents, such as those concerning Plaintiffs' "telecom needs."[27]   During discussions, Cox explained that it was not interested in Plaintiffs' monthly invoices for Cox's services.[28]   Cox also agreed, at Plaintiffs' request, that Plaintiffs need not log responsive privileged documents strictly between the parties-in-suit and their outside litigation counsel of record created after January 29, 2016.[29]   Despite this narrowing, Plaintiffs have only agreed to produce limited categories of

---

[25] Golinveaux Decl., Ex. 8 at 6.

[26] Cox has also sought all Plaintiffs' documents concerning Cox's Cox Abuse Tracking System (or "CATS") and documents concerning Plaintiffs' attempts to contact Cox's subscribers concerning allegations of copyright infringement.  Golinveaux Decl., Ex. 1 (RFP Nos. 128-129, 134-135).

[27] Golinveaux Decl., Ex. 3 (Obj. to RFP Nos. 64-65).

[28] Golinveaux Decl., Ex. 18 (Cox's Jan. 11, 2019 Ltr. to Plaintiffs at 2-3).

[29] This is the date that Plaintiffs' counsel sent a letter to counsel for Cox regarding their purported claims in this case.

documents about Cox that (1) concern analyses of the MarkMonitor system between 2012-2014;
(2) documents relating to Cox's response to receiving an infringement notice sent by or on behalf
of Plaintiffs between 2012-2014; and (3) documents concerning the number of infringement
notices Cox would accept from Plaintiffs or on behalf of Plaintiffs.[30]

This limitation is entirely inappropriate, as it eliminates highly relevant categories of
documents such as those concerning Cox's copyright policy and how it compared to others in the
industry, including the effectiveness of Cox's copyright policies.  It would also not encompass *any*
documents created after 2014 that discuss Cox's receipt of copyright infringement notices or any
other relevant event that transpired during that time period.  Plaintiffs have asserted no good-faith
basis to limit this request to the narrow categories identified in their Supplemental Responses and
should be compelled to respond to Cox's narrowly tailored requests.

## VII.   DOCUMENTS CONCERNING THE COPYRIGHT ALERT SYSTEM ("CAS") AND THE ACTIONS OF OTHER ISPS

Plaintiffs' Complaint is replete with allegations characterizing Cox's actions with respect
to alleged copyright infringement as unreasonable, "arbitrary," or that Cox somehow stands apart
from the industry in this respect.   As a result, Cox has requested documents concerning the
Copyright Alert System ("the CAS"), the CAS Agreement (an inter-industry agreement addressing
copyright infringement on the Internet), and the actions of other ISPs in response to copyright
notices.  Plaintiffs have flatly refused to produce *any* documents responsive to these requests on
the grounds that "CAS was a private agreement in which Cox refused to participate" and that "[i]t
has no bearing on Cox's liability or damages for the claims alleged in this case."[31]   These
documents are highly relevant and should be produced.

---

[30] Golinveaux Decl., Ex. 20 (Supp. Resp., RFP Nos. 64-65).
[31] *See, e.g.*, Golinveaux Decl., Ex. 3 (Obj. to RFP Nos. 165-174).

## A.   Cox's Requests and Plaintiffs' Responses

Cox's requests are narrowly tailored and straightforward.  Cox seeks Plaintiffs' documents concerning the CAS, including but not limited to negotiations related to the CAS's formation and implementation, and reviews and assessments concerning the CAS and any technological system used in connection with CAS.[32]  Cox has also requested that Plaintiffs identify whether they were signatories to the CAS.[33]  Cox also seeks Plaintiffs' documents concerning other ISPs' responses to infringement notices, including those ISPs' policies and practices regarding termination and suspension, and Plaintiffs' communications or negotiations with other ISPs regarding the number of copyright infringement notices they would accept.[34]  Plaintiffs have refused to produce any of these documents.[35]

## B.   Documents and information concerning the CAS and the actions of other ISPs are highly relevant

In February 2013, a number of copyright owners, entertainment industry associations, and ISPs collectively entered into the CAS Agreement to establish the CAS.[36]  The CAS Agreement set out a system (the CAS) by which participating copyright owners would send notices to participating ISPs and the ISPs would in turn send those notices to the relevant subscriber.  *Id.*, Ex. 12.  The CAS also established limits to the number of notices an ISP was required to process and further provided that an ISP could temporarily cease processing notices if it received more than its business processes and systems could reasonably address.  *Id.*, Ex. 13.  In addition, the

---

[32] Golinveaux Decl., Ex. 1 (RFP Nos. 165-174).
[33] Golinveaux Decl., Ex. 2 (Interrogatory No. 8).
[34] Golinveaux Decl., Ex. 1 (RFP Nos. 118, 126-127, 130-131).
[35] Golinveaux Decl.., Ex. 3 (Resp. to RFP Nos. 118, 126-127, 130-131, 165-174); Ex. 4 (Resp. to Interrogatory No. 8); *see also* Ex. 6 (Plaintiffs' Dec. 10, 2018 Ltr. to Cox at 9).
[36] Golinveaux Decl., Ex. 12 at 3, n.4; Ex. 13 at 2-3.

CAS Agreement did not require ISPs to terminate subscribers who were accused of infringement and who continued to receive notices. *Id.* at 9, n.1.

As an inter-industry agreement addressing standards for copyright owners and ISPs to address copyright infringement on the Internet, the CAS Agreement is relevant to what copyright claimants and ISPs considered reasonable and appropriate for such standards during Plaintiffs' claim period. In May 2014, RIAA Chairman and CEO Cary Sherman described the CAS's parent organization, the Center for Copyright Information, as "a model for success," and lauded "the [CAS] and all its accomplishments," including that it was "moving the needle" in combating copyright infringement because "there were fewer and fewer Alerts sent at each level."[37]

Following the termination of the CAS in 2017, the Center for Copyright Information also disbanded.[38] A number of Plaintiffs in this case were signatories to the CAS Agreement and thus likely possess documents and information responsive to Cox's outstanding requests. Golinveaux Decl., ¶ 19.[39] Because Cox was not a signatory to the CAS Agreement, it is not in possession of such documents. *Id.*

Beyond the role the CAS played in the industry, Plaintiffs' Complaint also demonstrates that documents concerning the CAS and other ISPs' practices are relevant to this case, as it is full of allegations concerning Cox's actions with respect to the acceptance and processing of

---

[37] Cary Sherman, "CCI: A Model for Success," RIAA.com (May 28, 2014), *available at* https://www.riaa.com/cci-a-model-for-success/ (last visited Jan. 18, 2019).

[38] The CAS and the CAS Agreement were terminated on January 27, 2017. *See* Golinveaux Decl., Ex. 14.

[39] Based upon information and belief, Sony Music Entertainment and UMG Recordings, Inc. were each signatories to the CAS Agreement. Golinveaux Decl., ¶ 19. In addition, upon information and belief, all of the other Plaintiffs were affiliates, subsidiaries, or successors of signatories to the CAS Agreement. *Id.* Importantly, the RIAA was also a signatory to the CAS Agreement and many of the Plaintiffs are members of the RIAA. *Id.* Cox has specifically requested each Plaintiff to identify whether it is a signatory to the CAS but Plaintiffs have collectively refused to do so on relevance grounds. *See* Golinveaux Decl., Ex. 4 (Obj. to Interrogatory No. 8).

infringement notices and the actions that it took with its own subscribers.  *See, e.g.*, Compl., ¶¶ 2, 8, 92, 97, 99-100, 102, 108, 116.  Indeed, Plaintiffs go so far as to allege that Cox's decision to limit the number of notices it would accept was "arbitrary."  *Id.*, ¶¶ 2, 8, 92, 99.  Agreements entered into as part of the CAS are relevant to testing those allegations.  Plaintiffs also repeatedly allege that Cox's actions somehow served as an incentive for its subscribers to infringe or even to attract would-be infringers to its services.[40]  Documents concerning other ISPs and the CAS are also relevant to testing that assertion.  Moreover, Plaintiffs' own discovery requests seek similar information from Cox, which clearly demonstrates that Plaintiffs view this issue as relevant.[41]

Plaintiffs' documents concerning the CAS and other ISPs' treatment of copyright infringement notices are likely to bear on these issues.  For example, as signatories to the CAS Agreement (or subsidiary agreements to it), Plaintiffs are likely to have internal communications relating to the number of copyright infringement notices that they or other rights holders believe are acceptable, what other ISPs are willing to accept, how other rights holders are handling these considerations, and how, if at all, the number impacts alleged instances of infringement and consumer choice (whether legitimate or illegitimate).  Plaintiffs are also likely to have documents that concern the reasonableness of an ISP's actions when one of its subscribers receives multiple

---

[40] *See, e.g.*, Compl., ¶¶ 2-3, 8-9; *see also id.*, ¶ 88 (alleging that "Cox condoned the illegal activity because it was popular with subscribers and acted as a draw in attracting and retaining subscribers"), ¶ 3 ("Cox's profits increased dramatically as a result of the massive infringement that it facilitated"), ¶ 85 (alleging that infringing on Cox's network "is a primary motivation for subscribing on Cox's service"), ¶ 86 (alleging that Cox's practice of not engaging in "bandwidth throttling" attracted would-be infringers), ¶¶ 92, 100-102, 107.

[41] *See* Golinveaux Decl., Ex. 15 (Plaintiffs' RFP Nos. 19-21, 23-24, 26, 30, 43) (broadly seeking policies on handling copyright infringement notices, including documents concerning "caps or quotas" and Cox's actions against its subscribers); Ex. 16 (Plaintiffs' Interrogatory Nos. 4-5) (responses to notice, including Cox's actions against its subscribers).

infringement notices.  As noted above, the CAS Agreement did not require an ISP to terminate an alleged repeat infringer, but it could take other mitigating action.

In *BMG*, this Court recognized the probity of these types of documents when it ordered the *BMG* plaintiffs to produce documents concerning Rightscorp's relationship with other ISPs, including documents that relate to whether the *BMG* plaintiffs and Rightscorp treated Cox differently from other ISPs.  Golinveaux Decl., Ex. 9 (Hr'g Tr. at 19:13-17, 20:2-9).  This Court also recognized that the *BMG* plaintiffs' and Rightscorp's statements regarding other ISPs that differ from statements or positions they made with respect to Cox would be relevant and admissible as party admissions.  *See id.* at 19:13-17, 20:2-9; *see also* Fed. R. Evid. 801(d)(2)(D).  The Court thus ordered the production of these documents because "given the nature of the case ... [the Court] can't say that it wouldn't be discoverable information."  Golinveaux Decl., Ex. 9 (Hr'g Tr. at 21:5-7).  As it was critical in *BMG* that the parties develop these issues during discovery, the same is true here.  *See, e.g.*, *BMG* ECF No. 998 (precluding Cox from introducing at trial evidence regarding the actions of other ISPs because "it would be unfairly prejudicial to permit Cox to present testimony in support of a theory that BMG did not have the opportunity to test in discovery").

Cox is entitled to discovery of documents that may allow it to refute and contextualize Plaintiffs' allegations as weighed against industry standards.  But without the documents—which are in the possession of at least certain of the Plaintiffs—Cox is unable to do so.  Plaintiffs should be compelled to produce documents responsive to these requests.

## VIII.   DOCUMENTS CONCERNING MARKMONITOR

### A.   Cox's Requests and Plaintiffs' Responses

Plaintiffs have represented that MarkMonitor is the entity that the RIAA worked with to identify the alleged copyright infringements in this case and to send notices to Cox.[42]  Documents concerning MarkMonitor, and the nature and reliability of its monitoring system and monitoring agreements with Plaintiffs, are therefore highly relevant to Plaintiffs' ability to establish direct infringement in this case.   Accordingly, Cox has requested Plaintiffs' communications with MarkMonitor and documents concerning MarkMonitor, including analyses and other documents related to its system, a necessarily limited universe of documents.[43]

While Plaintiffs initially refused to produce documents in response to certain of these requests on the basis of burden and relevance, they agreed only to meet and confer on others.[44] During the parties' subsequent discussions, Cox asked what about these requests rendered them overbroad or unduly burdensome.  Cox explained that if Plaintiffs used MarkMonitor for other types of services unrelated to policing of the copyrights (such as trademark watching services), Plaintiffs need not produce documents concerning unrelated services, thus narrowing the requests. But Cox further explained that "[a]ny correspondence concerning MarkMonitor relating in any manner to copyright policing or monitoring services, Cox, or this litigation must be produced."[45]

In Plaintiffs' Supplemental Responses, served nearly two months after Cox served these discovery requests, and after the several rounds of discussions and letters outlined above, Plaintiffs refuse to produce any documents in response to these requests other than the following:

---

[42] Golinveaux Decl., Ex. 4 (Resp. to Interrogatory Nos. 4-5) (the RIAA, "through MarkMonitor, sent copyright infringement notices to Cox regarding Plaintiffs' works upon which Plaintiffs will rely in this litigation."); *see also* Ex. 11 (Plaintiffs' Rule 26 Disclosures at 5).
[43] Golinveaux Decl., Ex. 1 (RFP Nos. 136, 139, 141, 144-148, 156, 159).
[44] Golinveaux Decl., Ex. 3 (Objs. & Resp. to RFP Nos. 136, 139, 156, 162, 163); Ex. 6 at 8.
[45] Golinveaux Decl., Ex. 19 at 3.

(1) notices of infringement in their possession, custody, or control that are related to the copyrighted works in suit and were sent to Cox by or on behalf of Plaintiffs, (2) downloads of the unauthorized copies of the copyrighted works infringed by Cox's subscribers, (3) documents sufficient to show information concerning infringement of the copyrighted works in suit by Cox's subscribers or customers, (4) for the period 2012-2014, documents concerning analysis of the reliability of the MarkMonitor system used to produce the copyright notices sent to Cox upon which Plaintiffs will rely in this litigation, (5) for the period 2012-2014, documents relating to Cox's response to receiving an infringement notice sent by or on behalf of Plaintiffs, and (6) documents concerning the number of infringement notices Cox would accept from Plaintiffs or on behalf of Plaintiffs.

Limiting responsive documents to these narrow categories is inappropriate and insufficient.

**B.      Plaintiffs' communications with MarkMonitor, and documents concerning it, are highly relevant**

Plaintiffs' Supplemental Responses to these requests are unacceptable for several reasons.

First, Plaintiffs limit their production to documents concerning any analyses created between 2012 and 2014 regarding the MarkMonitor system used to generate the notices that were sent to Cox. This limitation would exclude all Plaintiffs' communications and documents concerning MarkMonitor that do not qualify as an "analysis," do not fall within this date range, and do not pertain to the system used to generate notices.  Moreover, depending on Plaintiffs' unilateral definition of "analysis," Plaintiffs' limitation does not encompass statements about MarkMonitor's purpose, the efficacy of its system, how it compares to other monitoring services, whether it is advisable to utilize MarkMonitor in light of any public blowback, and Plaintiffs' potential recovery through the use of MarkMonitor.

Moreover, Plaintiffs' proposed limitation would not capture analyses and the documents concerning them that were created before or after this date, which may also relate to the system(s) or any component(s) of the system(s) that were used to generate the notices sent to Cox.  For example, analyses and the documents concerning them created before or after this time period are

relevant to MarkMonitor and the way in which it operates as a *company* and analysis of its system leading up to Plaintiffs engaging MarkMonitor to begin sending notices to Cox.   And these documents bear not only on MarkMonitor, which is a key third party in this action, but also on Plaintiffs (and their agent, the RIAA) in their decision to hire MarkMonitor to perform this work.

Plaintiffs' offer to produce documents concerning Cox's receipt of copyright infringement notices, including the number that it would receive, is also inappropriately limited.  While there may be communications with and documents concerning MarkMonitor that also relate to these issues, documents concerning other ISPs' responses to receiving copyright infringement notices, including the number that they would accept, are also directly relevant to this action and would not be captured by Plaintiffs' limited agreement.  Plaintiffs' limitations would also not capture highly relevant documents concerning other ISPs' actions and statements regarding processing copyright notices, including their treatment of subscribers who receive copyright infringement notices or are suspected to be engaging in infringing activity.

Beyond those categories of documents, it is also likely that Plaintiffs are in possession of documents that comprise statements by either the RIAA, MarkMonitor, or Plaintiffs concerning the facts in dispute in this case, which may be admissible as party admissions.  *See* Fed. R. Evid. 801(d)(2)(D).[46]  As outlined above, this Court ordered in *BMG* the production of communications between BMG and Rightscorp concerning Rightscorp's relationship with other rights holders and ISPs on the basis that it was relevant and could be admissible for that reason.  The same rationale applies here.  Plaintiffs should be compelled to produce documents responsive to Cox's requests.

---

[46] Even if these statements are ultimately not admissible, they are nevertheless discoverable. *See, e.g.*, Fed. R. Civ. P. 26(b)(1) ("Information within this scope of discovery need not be admissible in evidence to be discoverable.").

## IX.    DOCUMENTS CONCERNING AND COMMUNICATIONS WITH THE RIAA

Cox is requesting Plaintiffs' communications with and documents concerning the RIAA as it relates to Cox, copyright infringement, the works-in-suit, and MarkMonitor, including Plaintiffs' documents and communications concerning their agreement(s) with the RIAA.[47]

The RIAA is Plaintiffs' agent for purposes of managing MarkMonitor and the copyright infringement notice program.[48]  While Plaintiffs originally agreed during meet and confer to produce documents concerning, and communications with, the RIAA as it relates to Cox, this lawsuit, and MarkMonitor (and refused only to produce documents concerning the works-in-suit),[49] Plaintiffs have now refused in their Supplemental Responses to produce *any* documents other than those outlined above in connection with Cox's requests concerning MarkMonitor (namely, analyses regarding MarkMonitor between 2012-2014 and documents concerning Cox's response to receiving copyright infringement notices).[50]

Upon receiving Plaintiffs' Supplemental Responses, Cox offered to further narrow its request to all documents and communications with the RIAA concerning "relationships, agreements, and communications that pertain to this lawsuit, the works-in-suit, Cox, or MarkMonitor and/or any other system used to monitor and or police copyrights."[51]  Cox further narrowed this request by stating that "to the extent the relationship, agreement, and communication refers to the works-in-suit, Cox is only seeking such documents that relate to validity, ownership, BitTorrent, peer-to-peer file sharing sites, or copyright infringement."[52]  Cox also narrowed its request for Plaintiffs' communications with the "sender" of the copyright infringement notices at

---

[47] Golinveaux Decl., Ex. 1 (RFP Nos. 153-155, 158, 162).
[48] Golinveaux Decl., Ex. 11 (Plaintiffs' Rule 26 Disclosures at 5).
[49] Golinveaux Decl., Ex. 3 (Resp. to RFP Nos. 153-155).
[50] Golinveaux Decl., Ex. 19 (Supp. Resp. to RFP Nos. 153-155, 162).
[51] Golinveaux Decl., Ex. 20 (Cox's Jan. 15, 2019 Ltr. to Plaintiffs at 4-6).
[52] Golinveaux Decl., Ex. 20 (Cox's Jan. 15, 2019 Ltr. to Plaintiffs at 3-4).

issue (here, also the RIAA) to "any correspondence with anyone who sent copyright infringement notices to Cox on a plaintiffs' behalf that concerns, in any way, copyright infringement (whether actual or potential)."[53]

As outlined above in connection with Cox's requests concerning MarkMonitor, Plaintiffs' proposed production is woefully deficient. Cox will not receive any documents concerning and communications with the RIAA as it relates to MarkMonitor outside of an "analysis," as unilaterally defined by Plaintiffs, and further limited to the time period 2012-2014. Thus, Cox cannot expect to receive documents concerning other ISPs' use of MarkMonitor and any statements made by any relevant party concerning MarkMonitor's system. Moreover, Cox will not receive any documents concerning MarkMonitor outside of the two-year window, including documents that directly bear on the system that was used to generate the notices at issue.

In addition, Plaintiffs' proposed limitation would not encompass any non-privileged documents that concern the RIAA's role as Plaintiffs' agent, including its role in policing for alleged infringement, monitoring or otherwise analyzing infringement on peer-to-peer file sharing sites, including BitTorrent, and the validity of Plaintiffs' copyrights. Plaintiffs' limitation would also not encompass documents that concern other ISPs' reactions to copyright infringement notices and the number of notices they are willing to accept. These documents may relate to the impact on Plaintiffs' business due to the RIAA's efforts monitoring for infringement or otherwise enforcing Plaintiffs' rights, the impact on the amount of infringement from the RIAA's or other ISPs' actions, and other related impacts regarding music consumption on the Internet. These issues are directly related to Plaintiffs' claims regarding the consequences of Cox's alleged actions and inactions. Indeed, these issues are also relevant to Plaintiffs' claims that it has been harmed and

---

[53] Golinveaux Decl., Ex. 20 (Cox's Jan. 15, 2019 Ltr. to Plaintiffs at 3-4).

Cox has benefited from the alleged conduct. Plaintiffs should be compelled to produce responsive documents.

## X.      THE EFFECT OF INFRINGEMENT ON PEER-TO-PEER NETWORKS

Cox seeks documents concerning the effects of copyright infringement on Plaintiffs. After negotiations, Plaintiffs have only agreed to produce a subset of documents. Plaintiffs' proposed production is insufficient and they should be compelled to respond to Cox's already narrowly tailored requests.

*First*, Cox requested documents concerning the effect of copyright infringement over peer-to-peer file sharing sites on Plaintiffs' *actual* revenue and profits and on their *projected* revenue and profits during their claim period.[54] Plaintiffs have limited their proposed response only to documents concerning the effect on actual revenue from the works-in-suit.[55] Cox's request is not so limited. Rather, Cox seeks documents concerning the effect on Plaintiffs' businesses generally—including profits, projections, and the effects on other works. This is because documents that would likely pertain to the effects of infringement on peer-to-peer file sharing sites would not be so limited. Allowing Plaintiffs to splice their request as they offer ensures that they will come back empty-handed. Plaintiffs are a group of 57 record companies and music publishers. It is thus highly probable that they possess documents responsive to these requests, which are directly relevant to this case.

*Second*, Cox requested documents concerning the "permitted or authorized uses" of peer-to-peer file sharing sites and the works-in-suit and the potential diminished or diminishing use of peer-to-peer file sharing sites as it relates to the works-in-suit.[56] While Plaintiffs have agreed to

---

[54] Golinveaux Decl., Ex. 1 (RFP Nos. 50-51).
[55] Golinveaux Decl., Ex. 21 (Supp. Resp., RFP Nos. 50-51).
[56] Golinveaux Decl., Ex. 1 (RFP Nos. 54-55).

produce documents in response to these requests, they offer only to produce documents for the years 2012 to 2014.  This limitation is inappropriate.  Plaintiffs' documents concerning these topics, whenever created, are highly relevant to Plaintiffs' allegations concerning, among other issues, the impact of infringement on Plaintiffs' business, the reasonableness of ISPs' actions, the incentive to the public to infringe via peer-to-peer file sharing sites, how members of the public decide where to get their Internet, and how the assessment of any these issues has changed or evolved during the relevant time period.  Plaintiffs should be compelled to produce responsive documents outside of this limited time period.

*Third*, Cox requested documents concerning (1) peer-to-peer file sharing sites as it relates to infringement (whether actual or potential) of the works-in-suit; and (2) documents concerning the sampling of musical works (whether actual or potential) as it relates to the works-in-suit.[57] Plaintiffs have agreed only to produce the following types of documents, many of which are non-responsive:

> **Supplemental Response to RFP Nos. 52-53:** … (1) notices of infringement in their possession, custody, or control that are related to the copyrighted works in suit and were sent to Cox by or on behalf of Plaintiffs, (2) downloads of the unauthorized copies of the copyrighted works infringed by Cox's subscribers, (3) documents sufficient to show information concerning infringement of the copyrighted works in suit by Cox's subscribers or customers through BitTorrent, (4) for the period 2012-2014, documents concerning analysis of the reliability of the MarkMonitor system used to produce the copyright notices sent to Cox upon which Plaintiffs will rely in this litigation, (5) for the period 2012-2014, documents relating to Cox's response to receiving an infringement notice sent by or on behalf of Plaintiffs, and (6) documents concerning the number of infringement notices Cox would accept from Plaintiffs or on behalf of Plaintiffs.

---

[57] Golinveaux Decl., Ex. 1 (RFP Nos. 52-53).

In addition, Plaintiffs have outright refused to produce documents in response to the following three requests concerning Plaintiffs' use of BitTorrent or the *benefit* of their works being made available through it:

> **RFP No. 56:** All documents concerning the benefit to any Plaintiff due to that Plaintiff's Copyright Work being made available, whether for download or otherwise, over peer-to-peer file sharing sites during Plaintiffs' Claim Period.

> **RFP No. 57:** All documents concerning Your use of peer-to-peer file sharing sites or technology including but not limited to BitTorrent.

> **RFP No. 58:** All documents concerning Your use of peer-to-peer file sharing sites or technology to promote, market, or otherwise benefit You, any of the Copyright Works, and/or any of the artists who created the Copyright Works

As a preliminary matter, by agreeing to produce documents (in partial response) concerning the *negative* effects of infringement on peer-to-peer sharing sites (*see* RFP Nos. 50-51), Plaintiffs acknowledge that documents concerning the effect must be relevant, which would necessarily include the positive effect. Aside from that concession, Plaintiffs' own allegations demonstrate that they are likely in possession of documents that concern the positive effect, or benefit, of their artists' works being made available on peer-to-peer file sharing sites. *See, e.g.*, Compl. ¶ 1 (alleging that Plaintiffs, through their financial investments and creative efforts, have "developed and marketed the world's most famous and popular music" and "shaped the musical landscape as we know it").

Moreover, these documents are clearly relevant to Plaintiffs' claims that Cox in some way incentivized its own subscribers to infringe Plaintiffs' copyrighted works or, as Plaintiffs allege, encouraged would-be infringers to choose Cox over another ISP. *See, e.g.*, Compl. ¶¶ 85-88, 99, 100, 102, 108, 116. Plaintiffs' documents may demonstrate that an ISP's offered Internet speed or infringement policing efforts has no bearing on a music consumer's choice of ISP, as Plaintiffs

repeatedly allege in their Complaint, *see, e.g.*, *id.* ¶¶ 85-88, but rather it is the specific artist or the availability of that artist through other means (such as streaming, YouTube, physical media, etc.), that contributes to infringement.  Because Plaintiffs are seeking damages based on a massive and secondary liability theory of infringement, any documents bearing on these issues are relevant.

Furthermore, Plaintiffs cannot assert a legitimate burden in producing these documents, as they have already agreed to search for and produce related documents, namely those concerning the negative effects of infringement.   Plaintiffs should be compelled to produce responsive documents.

## XI.     CONCLUSION

For all of these reasons, Cox respectfully requests the Court grant its motion to compel Plaintiffs to respond to these outstanding discovery requests.


Dated: January 18, 2019                               Respectfully submitted,

                                                      */s/ Thomas M. Buchanan /*
                                                      Thomas M. Buchanan (VSB No. 21530)
                                                      WINSTON & STRAWN LLP
                                                      1700 K Street, NW
                                                      Washington, DC 20006-3817
                                                      Tel: (202) 282-5787
                                                      Fax: (202) 282-5100
                                                      Email: tbuchana@winston.com

                                                      *Attorney for Defendants Cox*
                                                      *Communications, Inc. and CoxCom, LLC*

Case 1:18-cv-00950-LO-JFA   Document 758-28   Filed 12/27/21   Page 31 of 32 PageID#
32941
Case 1:18-cv-00950-LO-JFA   Document 753   Filed 01/18/19   Page 30 of 31 PageID# 30976

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Tel: (212) 294-6700
Fax: (212) 294-4700
Email: melkin@winston.com
Email: tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA  94111-5840
Tel: (415) 591-1000
Fax: (415) 591-1400
Email: jgolinveaux@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Tel: (213) 615-1700
Fax: (213) 615-1750
Email: dhleiden@winston.com

Case 1:18-cv-00950-PTG-JFA   Document 738-28   Filed 12/27/21   Page 31 of 32 PageID#
32942
Case 1:18-cv-00950-LO-JFA   Document 753   Filed 01/18/19   Page 31 of 31 PageID# 9977

## CERTIFICATE OF SERVICE

I certify that on January 18, 2019, a copy of the foregoing DEFENDANTS'

MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL was filed

electronically with the Clerk of Court using the ECF system, which will send notifications to

ECF participants.

/s/ Thomas M. Buchanan
Thomas M. Buchanan (VSB No. 21530)
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.
and CoxCom, LLC*