# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

SONY MUSIC ENTERTAINMENT, *et al.*,

      Plaintiffs,

v.

COX COMMUNICATIONS, INC., *et al.*,

      Defendants.

Case No. 1:18-cv-00950-LO-JFA

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO COX'S MOTION FOR RELIEF FROM THE JUDGMENT UNDER RULE 60(B)(3) AND REQUEST FOR INDICATIVE <u>RULING UNDER RULE 62.1</u>

## (REDACTED VERSION)

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 1

LEGAL STANDARD............................................................................................... 3

FACTUAL BACKGROUND.................................................................................... 5

    I.    The Master Agreement Between RIAA and MarkMonitor. ...........................5

    II.   The Statements of Work for a "P2P Notice Program." .................................5

    III.  MarkMonitor's Process for Detecting Infringement and Sending Notices. ................6

    IV.  Retention Requirements Under the Notice Program. .....................................7

    V.   Files That Have Matching Hash Values Are Identical (Same Files, Same Content). ...7

    VI.  Execution of the 2016 SOW in Anticipation of Litigation. ...........................9

    VII.  Cox's January 2019 Omnibus Motion to Compel and Discovery Hearing. ...............10

    VIII. Cox Received Extensive Discovery, Including the Hard Drive Files and 2016 SOW. ...................................................................................11

    IX.  Cox Took 28 Depositions and Asked No Questions about the Hard Drive or 2016 SOW...................................................................................12

    X.   Cox's Failed Attempts to Exclude Admission of the Hard Drive. ...............12

    XI.  Status of the Case from Jury Verdict Through the Present...........................13

ARGUMENT........................................................................................................... 13

    I.    Cox's Motion Is Untimely. .........................................................................13

    II.   Cox Has Not Proven Misconduct, Let Alone by Clear and Convincing Evidence. ....15

          A.   Cox Ignores Hash Values, Discovery, and Its Litigation Choices....................... 15

          B.   There Is No Merit to Cox's Laundry List of Alleged Misconduct. ..................... 16

    III.  Cox Cannot Demonstrate that the Alleged Misconduct Prevented It from Fully and Fairly Presenting its Defense. .................................................................22

          A.   Cox's Cases Are Inapposite. .................................................................... 22

          B.   Cox Ignores the Proven Significance of Identical Hash Values as Well as the Evidence the Jury Considered........................................................ 23

          C.   Cox Had Knowledge of What It Claims Was Concealed. .................................. 24

          D.   Rule 60(b) Is Not a Tool for Reconsideration. ..................................... 25

    IV.  Cox Cannot Show That It Has a Meritorious Defense. ...............................26

    V.   The Need for Finality Eclipses Cox's Rule 60(b) Request...........................27

    VI.  Cox's Request for Discovery Is Improper and Unnecessary.......................28

CONCLUSION....................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ackermann v. United States*,
    340 U.S. 193 (1950) ................................................................................................. 25, 28

*Aldridge ex rel. Unites States v. Corp. Mgmt. Inc.*,
    No. 1:16-CV00369 HTW-LRA, 2021 WL 1521697 (S.D. Miss. Apr. 16, 2021) .................. 29

*Al-Sabah v. Agbodjogbe*,
    No. 20-2375, 2021 WL 5176463 (4th Cir. Nov. 8, 2021) ...................................................... 25

*Am. Lifeguard Ass'n, Inc. v. Am. Red Cross*,
    No. 92-2460, 1994 WL 144321 (4th Cir. 1994) .................................................................... 25

*Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*,
    944 F.3d 225 (4th Cir. 2019) ................................................................................................ 26

*Boyd v. Bulala*,
    905 F.2d 764 (4th Cir. 1990) .......................................................................................... 26, 27

*Cent. Operating Co. v. Util. Workers of Am.*,
    491 F.2d 245 (4th Cir. 1974) ................................................................................................ 13

*Colorado v. New Mexico*,
    467 U.S. 310 (1984) ............................................................................................................... 4

*Columbia Commc'ns Corp. v. EchoStar Satellite Corp.*,
    2 F. App'x 360 (4th Cir. 2001) ......................................................................................... 4, 26

*Compton v. Alton S.S. Co.*,
    608 F.2d 96 (4th Cir. 1979) .................................................................................................... 3

*Consol. Masonry & Fireproofing, Inc. v. Wagman Constr. Corp.*,
    383 F.2d 249 (4th Cir. 1967) ................................................................................................ 14

*Coomer v. Coomer*,
    No. 98-2236, 217 F.3d 838, 2000 WL 1005211 (4th Cir. 2000) ............................................. 3

*Doe v. Pub. Citizen*,
    749 F.3d 246 (4th Cir. 2014) ................................................................................................ 29

*Downing v. Lee*,
    No. 1:16-cv-1511, 2018 WL 10247588, at *1 n.1 (E.D. Va. Jan. 22, 2018) ...................... 3, 26

*Ebersole v. Kline-Perry*,
    292 F.R.D. 316 (E.D. Va. 2013) .......................................................................................... 23

*Evans v. United Life & Accident Ins. Co.*,
  871 F.2d 466 (4th Cir. 1989) ................................................................... 25

*Fharmacy Recs. v. Nassar*,
  No. 05-72126, 2010 WL 11545040 (E.D. Mich. Feb. 18, 2010)............................ 29

*Griggs v. Provident Consumer Disc. Co.*,
  459 U.S. 56 (1982)................................................................................. 29

*Ind. Inv. Protective League v. Touche Ross & Co.*,
  607 F.2d 530 (2d Cir. 1978)...................................................................... 28

*Kincer v. First Am. Nat'l Bank*,
  No. 2:02CV00037, 2004 WL 57085  (W.D. Va. Jan. 12, 2004) ........................... 14

*Kravitz v. U.S. Dep't of Commerce*,
  382 F. Supp. 3d 393 (D. Md. 2019) .............................................................. 5

*Levin v. Alms & Assocs., Inc.*,
  634 F.3d 260 (4th Cir. 2011) .................................................................... 29

*Long v. Hooks*,
  972 F.3d 442 (4th Cir. 2020) .................................................................... 26

*Mayfield v. NASCAR, Inc.*,
  674 F.3d 369 (4th Cir. 2012). ..................................................................... 3

*McLawhorn v. John W. Daniel & Co.*,
  924 F.2d 535 (4th Cir. 1991) ...................................................... 4, 13, 15, 22

*Metlyn Realty Corp. v. Esmark, Inc.*,
  763 F.2d 826 (7th Cir. 1985) .................................................................... 28

*Midwest Franchise Corp. v. Metromedia Rest. Grp.*,
  177 F.R.D. 438 (N.D. Iowa 1997) .............................................................. 30

*Moses v. Joyner*,
  815 F.3d 163 (4th Cir. 2016) .................................................................... 13

*Pearson v. First NH Mortg. Corp.*,
  200 F.3d 30 (1st Cir. 1999)....................................................................... 30

*Richardson v. Boddie-Noell Enters.*,
  78 F. App'x 883 (4th Cir. 2003). .................................................................. 4

*Schultz v. Butcher*,
  24 F.3d 626 (4th Cir. 1994) ...................................................................... 23

*Tunnell v. Ford Motor Co.*,
   245 F. App'x 283 (4th Cir. 2007) ........................................................................ 4, 24

*United States v. Ali*,
   874 F.3d 825 (4th Cir. 2017) .................................................................................... 4

*United States v. Coyne*,
   387 F. Supp. 3d 387 (D. Vt. 2018) ........................................................................... 8

*United States v. Hall*,
   664 F.3d 456 (4th Cir. 2012) ................................................................................... 15

*United States v. Kerr*,
   855 F. App'x 883 (4th Cir. 2021) ............................................................................ 14

*United States v. Larman*,
   547 F. App'x 475 (5th Cir. 2013) .............................................................................. 8

*United States v. Thomas*,
   No. 5:12-cr-37, 2013 WL 6000484 (D. Vt. Nov. 8, 2013) ...................................... 8

*United States v. Villarini*,
   238 F.3d 530 (4th Cir. 2001) ................................................................................... 27

*United States v. Wellman*,
   663 F.3d 224 (4th Cir. 2011) ..................................................................................... 8

*United States v. Williams*,
   674 F.2d 310 (4th Cir. 1982) ................................................................................... 26

*United States v. Youngblood*,
   No. 20-6085, 2021 WL 2910667 (4th Cir. July 12, 2021)...................................... 15

*Warner Records, Inc. et al. v. Charter Communications, Inc.*,
   Case No. 1:19-cv-00874-RBJMEH (D. Colo.).................................................. 14, 15

*Wells Fargo Bank, N.A. v. AMH Roman Two NC, LLC*,
   859 F.3d 295 (4th Cir. 2017) ................................................................................. 3, 4

*Zahariev v. Hartford Life & Accident Ins. Co.*,
   No. 9:20-cv-1072-RMG-MHC, 2021 WL 1431389 (D.S.C. Mar. 16, 2021)......................... 13

**INTRODUCTION**

Cox's Rule 60(b)(3) motion (the "Motion") asserting that Plaintiffs procured their victory unfairly is meritless. The Motion is as counter-factual and disingenuous as Cox's failed litigation strategy to portray itself as an ISP that respected copyrights, acted reasonably, and addressed repeat infringers effectively. Cox vigorously litigated this case pursuant to that strategy and lost. Cox is not entitled to a "do-over." Its last-ditch, say-anything attempt, based on smearing Plaintiffs, Plaintiffs' counsel, Plaintiffs' expert, and a third-party fact witness, should be swiftly rejected.

Rule 60(b) relief is "extraordinary" and reserved for "exceptional" circumstances—even in the absence of a pending appeal, as here. Cox ignores that standard. Cox also ignores that a movant must satisfy several predicate requirements before a district court will even consider a movant's entitlement to relief under Rule 60(b). The Fourth Circuit has described those predicate requirements as "onerous" and mandates that district courts "rigorously examine" them. If a moving party can surpass that onerous threshold, the movant still must demonstrate that it is entitled to relief under one of Rule 60(b)'s subsections. Subsection (b)(3) requires among its elements that the movant prove misconduct by "clear and convincing" evidence.

Cox's Motion fails for multiple independent grounds.

*First*, Cox bears the burden of showing that it brought its Rule 60(b) Motion on a timely basis. It failed. A Rule 60(b)(3) motion must be filed *both* within a reasonable time *and* no later than one year from entry of judgment. Cox's Motion is untimely because it re-argues issues Cox raised and lost on during the case. Cox tries to evade the timeliness requirement by basing its Motion on disclosures its counsel received on November 9, 2020—more than two months before entry of judgment on January 12, 2021. Even after entry of judgment, Cox waited until December 27, 2021 to file its Motion. The Fourth Circuit has held multiple times that unexplained delays as

short as three or four months from discovery of the alleged basis for a Rule 60(b)(3) motion are unreasonable.  Cox's delay is triple that time, and it has no excuse for its lengthy delay.

*Second*, Cox fails to prove any alleged misconduct, and certainly fails to do so by clear and convincing evidence.  Cox offers revisionist history in contending that Plaintiffs violated a discovery order and made misrepresentations concerning when copies of infringing files on a hard drive produced to Cox in discovery were downloaded.  Cox's purported "factual background" strings together snippets of statements without context, omits key aspects of the pre-trial and trial records, and is filled with errors and contradictions.  Plaintiffs, their counsel, and the witnesses met their obligations and told the truth.  There was no misconduct.

*Third*, Cox fails to demonstrate—because it cannot demonstrate—that any of the alleged misconduct prevented it from fully and fairly presenting its defense.  The dates of file downloads simply do not matter in the context of this case because, as fully explained to the jury, files with matching hash values are identical regardless of when downloaded.  This was a foundation of MarkMonitor's detection system.  And it was on this basis that the jury appropriately found direct infringement by Cox subscribers, whom MarkMonitor detected sharing files with hash values that matched hash values of confirmed infringing files.

Nor did Plaintiffs conceal the allegedly withheld information from Cox.  Cox received the agreement describing what MarkMonitor did, knew the hard drive files had 2016 metadata, and even challenged the evidence before and during trial, on the same failed basis advanced again here.  Thus, Cox had every opportunity to explore these issues and conduct robust cross-examination in depositions and at trial in fully and fairly presenting its defense.  Rule 60(b)(3) is not a vehicle to revise an ineffective litigation strategy and retry a case with the benefit of hindsight.

*Fourth*, Cox cannot carry the burden to show that it has a meritorious defense.  To do so,

the movant must proffer *something* supported by at least *some* evidence and cannot rely solely on conclusory statements as Cox has done here.

    *Fifth*, even if Cox satisfies both the predicate and Rule 60(b)(3) requirements, the Court must then balance the strong public policy favoring finality of judgments against the need to do justice before granting relief.  Cox's Motion should not even reach this stage.  But the balancing analysis overwhelmingly favors rejecting Cox's request.  Nothing Cox argues comes close to rising to the level necessary to disturb the jury's verdict or the progress of the pending appeal.

## **LEGAL STANDARD**

    Rule 60(b) relief from judgment is an "extraordinary remedy."  *Mayfield v. NASCAR, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012).  Before a court will even review a party's entitlement to such relief, the moving party must establish four threshold requirements: "(1) timeliness, (2) a meritorious defense, (3) a lack of unfair prejudice to the opposing party, and (4) exceptional circumstances."  *Wells Fargo Bank, N.A. v. AMH Roman Two NC, LLC*, 859 F.3d 295, 299 (4th Cir. 2017); *accord Mayfield*, 674 F.3d at 378 (Rule 60(b) relief "should not be awarded except under exceptional circumstances").  Because of the "exceptional" nature of this remedy and the strong policy favoring litigation finality, a court "must rigorously examine these four predicate requirements" and consider the movant's Rule 60(b) arguments only in the "unlikely event" the movant satisfies this "onerous four-part threshold."  *Coomer v. Coomer*, 217 F.3d 838, 2000 WL 1005211, at *4 (4th Cir. 2000); *Compton v. Alton S.S. Co.*, 608 F.2d 96, 102 (4th Cir. 1979)); *accord Downing v. Lee*, 2018 WL 10247588, at *1 n.1 (E.D. Va. Jan. 22, 2018).

    Rule 60(b)(3) provides, in relevant part, that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing

party."  The movant must "prove the misconduct complained of by clear and convincing evidence and demonstrate that such misconduct prevented him from fully and fairly presenting his claim or defense." *McLawhorn v. John W. Daniel & Co.*, 924 F.2d 535, 538 (4th Cir. 1991).  "To be clear and convincing, evidence must 'place in the ultimate factfinder an abiding conviction that the truth of the party's factual contentions are highly probable.'" *United States v. Ali*, 874 F.3d 825, 831 n.2 (4th Cir. 2017) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)) (cleaned up).

Even if a movant carries the heavy burden to demonstrate misconduct by clear and convincing evidence, Rule 60(b)(3) relief may only be warranted if the withheld material was "essential to [the moving party's] position" such that its absence "metaphorically tie[d] one hand behind [its] back." *Richardson v. Boddie-Noell Enters.*, 78 F. App'x 883, 889 (4th Cir. 2003). Regardless of the importance of the evidence, however, a court must deny a Rule 60(b)(3) motion if the moving party is "able to fully prepare and present his case notwithstanding the adverse party's misconduct." *Tunnell v. Ford Motor Co.*, 245 F. App'x 283, 288 (4th Cir. 2007); *accord Columbia Commc'ns Corp. v. EchoStar Satellite Corp.*, 2 F. App'x 360, 367 (4th Cir. 2001) (affirming Rule 60(b)(3) denial because evidence at issue was "merely cumulative").

Because the Fourth Circuit has listed the Rule 60(b) threshold factors and Rule 60(b)(3) elements "in the conjunctive, [the movant] must meet them all," and a court should deny a Rule 60(b)(3) motion where the movant fails to satisfy any one factor or element. *See, e.g.*, *Wells Fargo Bank*, 859 F.3d at 299.  Should the moving party somehow navigate both the threshold requirements and Rule 60(b)(3) elements successfully, the court must then "balance[] the policy favoring finality of judgments against the need to do justice to the moving party to determine whether a new trial is appropriate." *Tunnell*, 245 F. App'x at 288.

On top of all this, as Cox acknowledges, its Fourth Circuit appeal is ripe and set for

4

argument on March 9, 2022.  For *this* Court to grant Cox's Rule 60(b) motion, then, this Court would have to issue an indicating ruling stating that (1) it would grant the motion if the Court of Appeals were to remand for that purpose, or (2) the motion raises a "substantial issue."  Fed. R. Civ. P. 62.1(a).[1]   Cox's Motion—a stale, warmed-over rehash of old arguments in new packaging—raises no such "substantial issue," and it can and should be denied.

## FACTUAL BACKGROUND

### I.      The Master Agreement Between RIAA and MarkMonitor.

In an effort to combat online piracy, the Record Company Plaintiffs' trade association, the Recording Industry Association of America (the "RIAA"), hired an anti-piracy company named MarkMonitor (formerly known as DtecNet) to send copyright infringement notices to ISPs.  In December 2011, RIAA and MarkMonitor entered into a Master Agreement, setting the framework for RIAA "to obtain from [MarkMonitor] certain services ('Services') as described in one or more statements of work (each a 'SOW')."  PX 3 ("2011 MSA").[2]

### II.     The Statements of Work for a "P2P Notice Program."

RIAA and MarkMonitor then entered into an SOW each year from 2012–2015 setting forth the services MarkMonitor would perform in connection with a "P2P notice program" (the "Notice Program").  PX 4 ("2012 SOW").[3]  The purpose of the Notice Program was to provide *notice* to ISPs, like Cox, of specific instances of infringement by IP addresses so that the ISPs could take

---

[1] *See, e.g.*, *Kravitz v. U.S. Dep't of Commerce*, 382 F. Supp. 3d 393, 399–400 (D. Md. 2019) (finding "substantial issue" under Rule 62.1 where newly discovered evidence revealed damning information that partisan strategist played significant role in concocting Commerce Secretary's pretextual rationale for adding citizenship question to census).

[2] All exhibits ("Ex.") are attached to the Declaration of Jeffrey M. Gould unless stated otherwise. PX and DX are trial exhibits. Exhibits attached to Cox's Motion are labeled "Cox Ex."

[3] The 2013, 2014, and 2015 SOWs are nearly identical.

appropriate action, since only the ISPs know which subscribers are associated with which IP addresses. Ex. 2 ("Trial Tr.") 296:14–297:10. The SOWs defined the "Monitoring and Notice sending" services and distinguished between "notice" and "litigation" programs by expressly providing that the parties "will enter into a separate SOW, if mutually agreeable" concerning, among other things, a "corporate p2p litigation program." 2012 SOW at 23. The Notice Program ran from January 2012 through March 31, 2015.

### III.   MarkMonitor's Process for Detecting Infringement and Sending Notices.

The Notice Program worked as follows:

*File verification*: On the first instance of encountering a potentially infringing file, MarkMonitor downloaded the full file. It then used digital fingerprinting technology from Audible Magic, a leading content recognition service, to identify the file's contents by artist name and sound recording title. For each file that Audible Magic verified as one of Plaintiffs' copyrighted works, MarkMonitor logged in its database (i) the file's unique hash value and (ii) information from Audible Magic identifying the artist, track, and album for the copyrighted works contained in the infringing file. Trial Tr. 461:13–463:8, 633:20–634:9, 641:21–643:2.

*Infringement verification*: To detect P2P users infringing Plaintiffs' works, MarkMonitor's proprietary system connected with P2P users, including Cox subscribers, to confirm that the subscriber was online, running a file-sharing program, and in the process of distributing a confirmed infringing file identified by its unique hash value. MarkMonitor relied on the file's hash value to confirm that the file was identical to one that MarkMonitor verified was infringing using Audible Magic. MarkMonitor captured this material in "evidence packages" and stored records of these infringement detections in its internal databases. *Id.* at 468:21–470:6, 473:17–475:14, 635:5–637:18.

*Notices*: Through this process, MarkMonitor sent notices to ISPs, including Cox, from January 2012 through March 31, 2015. The notices identified the subscriber by IP address, date and time of the infringing act, name of the file containing the infringing recordings, a hash value uniquely identifying that file, a representative sample of what was infringed by title and artist, and the P2P network used. MarkMonitor saved records of the notices. *Id.* at 476:6–480:12, 659:3–18.

## IV. Retention Requirements Under the Notice Program.

Pursuant to the Notice Program SOWs, MarkMonitor agreed to maintain (i) a "Verified Hash Database" to "record the hash values of all titles to build a database of infringing titles," and (ii) a "File Database" to "capture and maintain . . . all other pertinent details concerning the identified infringement and related notices ('evidence packages')." 2012 SOW at 24–25, 34.

The Notice Program SOWs further detail "Data Capture and Storage" requirements for "certain data to be captured and maintained" in those databases. *Id.* The list of 19 items includes the ISP name, IP address and port number of the infringer, P2P network used, name of the infringing file (based on file name or hash value), verified hash value of the infringing file, date and time the infringement was detected, log files associated with evidence packages, full repertoire details (including artist name and track), and several other categories. *Id.* at 33–34.

The Notice Program SOWs did not call for MarkMonitor to retain copies of the infringing files. MarkMonitor had no need to go back to those files once Audible Magic verified their contents and MarkMonitor recorded those verifications—along with the file's hash value—in a database of known infringing titles. MarkMonitor relied on the file's unique hash value to confirm that the file a Cox subscriber was distributing was identical to one already verified as infringing.

## V. Files That Have Matching Hash Values Are Identical (Same Files, Same Content).

Hash values are a widely used and proven mechanism for file identification. As the

evidence here and in other cases established, a hash value is the "digital fingerprint" of a file, consisting of a unique combination of alphanumeric characters based on a mathematical algorithm that identifies only that particular file. *See, e.g.*, *United States v. Wellman*, 663 F.3d 224, 226 n.2 (4th Cir. 2011). Hash values are "more reliable than DNA (in that the likelihood of two individuals coincidentally sharing the same DNA is greater than the likelihood that more than one file will have the same [hash] value)." *United States v. Thomas*, 2013 WL 6000484, at *3 (D. Vt. Nov. 8, 2013); *see also* Nat'l Inst. of Standards & Tech., U.S. Dep't of Com., NIST SP 800-175B Rev. 1, Guideline for Using Cryptographic Standards in the Federal Government: Cryptographic Mechanisms, at 21 (2020), https://doi.org/10.6028/NIST.SP.800- 175Br1.[4]

Because hash values are a function of the bits and bytes of a file, a file with a hash value of XYZ123 is identical to any other copy of a file with that same XYZ123 hash value regardless of when downloaded. Plaintiffs' technical expert, Barbara Frederiksen-Cross, testified to this in detail at trial, without challenge. Trial Tr. 436:1–441:10; 507:3–514:23; 598:17–599:11.[5]

---

[4] The federal government has recognized the importance and reliability of hash values in law enforcement. For example, Congress has authorized the use of hash values to combat production and distribution of child pornography—illegal content commonly available on the same online platforms as pirated music. *See* 18 U.S.C. § 2258C(a) (permitting the National Center for Missing & Exploited Children ("NCMEC") to provide "hash values or other unique identifiers associated with a specific visible depiction [of child pornography]" to electronic communication service providers "for the sole and exclusive purpose of permitting that provider to stop the online sexual exploitation of children"); *United States v. Coyne*, 387 F. Supp. 3d 387, 400 (D. Vt. 2018) ("Section 2258C specifically authorizes the hash value technology used in PhotoDNA [NCMEC's child pornography detection program]."). Indeed, courts and juries have based verdicts requiring proof beyond a reasonable doubt on hash value evidence. *See, e.g.*, *United States v. Larman*, 547 F. App'x 475, 480 (5th Cir. 2013) (holding that evidence consisting mainly of hash values supported the jury's finding that the prosecution had proven the defendant's receipt of child pornography beyond a reasonable doubt).

[5] Cox confusingly refers to Plaintiffs' data expert, George McCabe, as an "infringement expert." Cox Mem. 25. That is not correct. Professor McCabe is a statistician; he did not analyze or opine on infringement, nor did he "conclude that a work was infringed" or "verify infringement." Cox

Cox's technical expert, Nicholas Feamster, did not dispute the fundamental reliability of hash values or Frederiksen-Cross's testimony on how they operate. Feamster instead criticized MarkMonitor's reliance on hashes for "infringement verification." Feamster's view was that infringement verification requires downloading each file from each Cox subscriber before sending an infringement notice as to that infringer. *Id.* at 2244:18–2246:2.

## VI. Execution of the 2016 SOW in Anticipation of Litigation.

On December 17, 2015, a jury in *BMG v. Cox* found Cox contributorily liable for its subscribers' infringements of musical works on P2P networks. That case was the first of its kind to establish an ISP's liability for such claims. It revealed Cox's practices concerning copyright infringement and repeat infringers. In early 2016, Plaintiffs then began to contemplate litigation.

On January 29, 2016, ██████████████████████████████████████ ████████. Cox Ex. 16 ("2016 SOW"). Unlike the Notice Program SOWs, the 2016 SOW indicated it was "in anticipation of litigation." The 2016 SOW did not involve sending notices or identifying new infringements. Nor was it a "corporate P2P litigation program." Instead, after the Notice Program ended, ██████████████████████████████████████ ████████████████████████████. *Id.* The availability of these downloaded files would enable a jury to listen to copies of files bearing the same hashes as those in Plaintiffs' notices, as well as provide Cox the opportunity to review the contents of those infringing files.

---

Mem. 6, 25. Rather, he linked together and analyzed various data sets to conclude that the data reflected that (i) each work in suit involved a third or later notice for a specific Cox subscriber; (ii) that third or later notice was sent during the Claims Period; (iii) the verified infringing file listed in that notice by hash value contained the work; and (iv) a file with the same hash value listed in the notice is on the Hard Drive produced to Cox. Trial Tr. 788:5–792:16. Contrary to Cox's claim, Professor McCabe never testified that these elements were requirements to "conclude that a work was infringed." Cox Mem. 6.

**VII.    Cox's January 2019 Omnibus Motion to Compel and Discovery Hearing.**

On January 18, 2019, Cox moved to compel initial or further responses to 59 of 175 requests for production and two interrogatories.  ECF 75.  Plaintiffs opposed, describing, in pertinent part, the categories of documents they were producing regarding MarkMonitor.  ECF 82.

In addressing the scope for Cox's demanded production relating to MarkMonitor at the hearing, Cox's counsel stated, "They have agreed to give us certain documents from 2012 to 2014. They have expanded that to 2010 to 2014."  Ex. 1 ("Jan. 25 Tr.") 64:4–5.  Cox's counsel added, "[I]f they are going back to 2010 … then we do not have an issue."  *Id.* at 64:14–17.  Cox's counsel did not push for Plaintiffs' production to extend into 2015 or 2016.

Magistrate Judge Anderson then clarified with Plaintiffs "whether you're going back to 2010 or not on the search."  *Id.* at 64:19.  Magistrate Judge Anderson added:

> [H]elp me understand why you limited the expansion of the results of your search to 2010 only having to do with the reliability issue.  Is that what you indicated? That otherwise you were going from 2012 to 2014, but for documents relating to the reliability of the way that MarkMonitor generated the notices and sent the notices, you were going back to 2010.  Is that what you are saying?

*Id.* at 66:14–21.  In responding, Plaintiffs' counsel confirmed that Plaintiffs' production would be limited to the 2012–2014 claim period, except for documents concerning MarkMonitor's reliability, which would not be restricted to that period.  *Id.* at 66:22–67:7; *see also id.* at 65:14–15 ("To the extent that, obviously, that we can get access to those old documents.").

Magistrate Judge Anderson next asked what Plaintiffs would produce and whether it would include Plaintiffs' agreements with MarkMonitor.  *Id.* at 67:11–13.  Plaintiffs' counsel explained that the production would include, *inter alia*, Plaintiffs' agreements with MarkMonitor, and confirmed with the Court that it would consist of those agreements "[a]s it relates to this program," which was clarified as "the program at issue in this case."  *Id.* at 67:14, 74:1–2.

10

The hearing proceeded to a discussion of documents relating to the RIAA.  Cox's counsel repeatedly reinforced that Cox wanted to expand the date range for responsiveness to 2010–2014, rather than 2012–2014.  *Id.* at 76:7–25, 83:12–84:5.  The Court ultimately required production of RIAA-related documents from 2011 to 2014.  *Id.* at 84:6–8, 84:18–85:5, 85:23–86:2.

## VIII.   Cox Received Extensive Discovery, Including the Hard Drive Files and 2016 SOW.

During discovery, Cox received voluminous materials from the Notice Program.  For file verification, records were extracted from MarkMonitor's internal database of confirmed infringing files and produced to Cox in a spreadsheet referred to as the "MarkMonitor Spreadsheet" (PX 11).  Those records include, among other things, the hash value for confirmed infringing files and Audible Magic's identification of the artist, album, and track for those copyrighted works.  For infringement verification, Cox received copies of evidence packages available from MarkMonitor's File Database that contained, among other things, the steps of MarkMonitor's investigation, MarkMonitor's communications with infringing Cox subscribers, the list of files shared, and the trace route mapping the flow of connections between MarkMonitor and the infringing Cox subscriber.  Trial Tr. 652:3–657:21; *see also* 2012 SOW at MM 33.  Cox received further raw data from MarkMonitor's database as to the infringement detections, including as to hundreds of thousands of notices generated as the output of MarkMonitor's process.  Cox also received copies of the 2011 MSA and the Notice Program SOWs.  Gould Decl. ¶ 4.

In addition, in February 2019, Plaintiffs provided Cox with a hard drive containing copies of the infringing audio files that Cox subscribers downloaded and distributed (the "Hard Drive") (PX 39).  *See* Ex. 3.  The Hard Drive contained music files with 2016 metadata, *see* Cox Mem. 4 (citing ECF 489 at 4–6), and Cox knew that "[t]hese audio files match to the infringement notices by hash value."  Cox Ex. 4, App. A ¶ 24; *see also* Trial. Tr. 788:5–789:20.

11

On or before March 26, 2019, MarkMonitor produced the 2016 SOW between RIAA and MarkMonitor.  Gould Decl. ¶ 5.   Cox complains it did not notice the document or recognize its significance, *see* Cox Mem. 15, implying that this 3-page agreement was a needle in a haystack. Cox's argument is contrived.  The 2016 SOW was entered into pursuant to the 2011 MSA, states that the services were "being provided in anticipation of litigation," and sets forth the work to be undertaken.  That entire production from MarkMonitor contained just 33 documents, consisting of 240 pages in total.  Gould Decl. ¶ 5.  And Cox's claim that the 2016 SOW was hidden amongst "facially nonresponsive agreements" that were "clearly unrelated to the case," Cox Mem. 15, is at odds with Cox's actual view of the production at the time.   Cox used another supposedly "nonresponsive agreement[] ... unrelated to the case" from the same production in the RIAA deposition and on its trial exhibit list.  *See* Ex. 4 (RIAA Dep.) 7:12-14; Ex. 5.

## IX.    Cox Took 28 Depositions and Asked No Questions About the Hard Drive or 2016 SOW.

Extensive fact and expert depositions occurred between April 5 and July 2, 2019.  Cox deposed two MarkMonitor Rule 30(b)(6) witnesses.  Cox also took Rule 30(b)(6) depositions of the RIAA, Audible Magic, and all Plaintiffs.  Cox deposed multiple other third parties, as well as all of Plaintiffs' experts.  In total, Cox deposed 28 witnesses—all of which took place after the production of the Notice Program SOWs, the Hard Drive with 2016 metadata, and the 2016 SOW—and Cox never asked a single witness a single question about the Hard Drive files or the 2016 SOW.  Gould Decl. ¶ 6.

## X.    Cox's Failed Attempts to Exclude Admission of the Hard Drive.

Cox moved *in limine* and at trial to exclude the Hard Drive, arguing that Plaintiffs could not lay an adequate foundation for what it contains.  ECF 488.  Cox argued that because the Hard Drive files were *from 2016*, they could not support claims of infringement from years earlier.  The

Court denied Cox's motion.  ECF 590 at 3.  At trial, over Cox's renewed and repeated objections, the Court admitted the Hard Drive.  Trial Tr. 643:24–648:12, 706:12–707:22, 709:15–16.

## XI.    Status of the Case from Jury Verdict Through the Present.

Following a nearly three-week trial, the jury found Cox liable on all claims and awarded statutory damages per work infringed on December 19, 2019.  ECF 669.  Cox filed multiple post-trial motions, which were briefed throughout 2020, all of which the Court denied.  The Court entered final judgment on January 12, 2021, consistent with the verdict.  Cox noticed an appeal. The parties completed appellate briefing on September 8, 2021, and oral argument is scheduled for March 9, 2022.  Cox filed the instant Motion on December 27, 2021.

## ARGUMENT

## I.    Cox's Motion Is Untimely.

Cox's Motion should be rejected as untimely.  Rule 60(b)(3) motions "must be made within a reasonable time" ***and*** made "no more than a year after the entry of the judgment or order or date of the proceeding" from which the movant requests relief.  Fed. R. Civ. P. 60(c)(1).  The moving party "bears the burden of showing timeliness."  *Moses v. Joyner*, 815 F.3d 163, 166 (4th Cir. 2016).  The movant "must offer a 'satisfactory explanation' for any delay." *Zahariev v. Hartford Life & Accident Ins. Co.*, 2021 WL 1431389, at *3 (D.S.C. Mar. 16, 2021) (quoting *Cent. Operating Co. v. Util. Workers of Am.*, 491 F.2d 245, 253 (4th Cir. 1974)) (holding 3.5 month delay unreasonable).  Under Fourth Circuit law, Cox failed to move within a reasonable time.

The Fourth Circuit has "held on several occasions that a Rule 60(b) motion is not timely brought when made three to four months after the original judgment and no valid reason is given for the delay."  *McLawhorn v. John W. Daniel & Co., Inc.*, 924 F.2d 535, 538 (4th Cir. 1991); *accord United States v. Kerr*, 855 F. App'x 883, 886 n.4 (4th Cir. 2021); *Consol. Masonry &*

*Fireproofing, Inc. v. Wagman Constr. Corp.*, 383 F.2d 249, 251 (4th Cir. 1967) (upholding denial of 60(b) motion for untimeliness when it was filed two and a half months after judgment); *see also Kincer v. First Am. Nat'l Bank*, 2004 WL 57085, at *2 (W.D. Va. Jan. 12, 2004) ("The plaintiffs here do not disclose when they discovered [the favorable evidence]. In any event, they admit that the [evidence] was always in their possession but they simply overlooked it. . . . The plaintiffs clearly have not shown that they acted with diligence and accordingly, [the court] cannot find that the plaintiffs filed their motion for relief within a reasonable time.").

Cox ignores the timeliness requirement completely. The reason for that is simple: Cox cannot satisfy it. Although Cox attempts to portray its Rule 60(b) Motion as something "new," it recycles arguments made before and during trial. And even under Cox's own narrative, it "discovered" the alleged grounds for its Motion no later than November 9, 2020, via the publicly-filed Declaration of Matthew J. Oppenheim that Cox's counsel received in a similar case against another ISP—*Warner Records Inc. et al. v. Charter Communications, Inc.*, No. 1:19-cv-00874-RBJMEH (D. Colo.) (the "*Charter*" case). Cox Mem. 9–10.[6] That was two months *before* entry of judgment in this case on January 12, 2021. Yet, Cox waited over 13 months from November 2020, and nearly 12 months from the entry of judgment, before filing this Motion. Cox offers no explanation for this delay, despite bearing the burden to show timeliness.[7]

---

[6] The facts underlying Cox's Rule 60(b) Motion were reiterated again and again in public filings in the *Charter* case, where Cox's Winston & Strawn lawyers in this action are among counsel of record for Charter. *See* Cox Mem. 10 (quoting *Charter* transcript from February 23, 2021 hearing—filed publicly on the *Charter* docket on March 7, 2021—discussing the 2016 SOW); *see also id.* (quoting *Charter* order of April 8, 2021 discussing work under the 2016 SOW).

[7] Cox may point to delays associated with its failed effort to obtain discovery from the *Charter* case to use in its Rule 60(b) Motion here. But Cox first sought relief from the *Charter* court on September 21, 2021—more than 10 months after it claims to have learned of the basis for its Rule 60(b) Motion and more than eight months after entry of judgment. Moreover, nothing prevented Cox from filing its Rule 60(b) motion in parallel with those efforts.

## II.     Cox Has Not Proven Misconduct, Let Alone by Clear and Convincing Evidence.

Cox must establish misconduct by clear and convincing evidence.  *McLawhorn*, 924 F.2d at 538.  "Clear and convincing [evidence] has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable.'"  *United States v. Youngblood*, 2021 WL 2910667, at *1 (4th Cir. July 12, 2021) (quoting *United States v. Hall*, 664 F.3d 456, 461 (4th Cir. 2012)).  Cox fails to demonstrate *any* evidence of misconduct, let alone by clear and convincing evidence.

### A.  Cox Ignores Hash Values, Discovery, and Its Litigation Choices.

Cox's core allegation—that Plaintiffs lied about what the Hard Drive and the MarkMonitor Spreadsheet contained, *see* Cox Mem. 3—fails on its face.  As demonstrated herein:

- Plaintiffs have consistently and accurately described the Hard Drive as containing copies of infringing files distributed by Cox subscribers, whose unique hash values match those listed in Plaintiffs' notices to Cox.

- Plaintiffs have consistently and accurately described the MarkMonitor Spreadsheet as containing records of infringing files that MarkMonitor downloaded and verified using Audible Magic, including the hash value pertaining to the file and the artist, track, and album information from Audible Magic.

In arguing the Hard Drive does not contain "copies of files that were downloaded from the Internet before notices were sent between 2012-2014," Cox Mem. 3, Cox continues to ignore the significance of hash values, which the jury well understood.  Copies of files with the same hash value are identical.  Thus, the Hard Drive files are indeed copies of files that were downloaded before MarkMonitor sent notices to Cox.

Despite Cox's misguided accusations of fraud, nothing was "concealed."  Cox received the SOWs that described the Notice Program.  Those SOWs—and many other documents and testimony—explain that when MarkMonitor first encountered a potentially infringing file, it

downloaded the file and verified its contents.  They further explain that upon such verification, MarkMonitor would record the hash value pertaining to the file and store it in MarkMonitor's database of confirmed infringing files.  MarkMonitor did just that.

Cox complains that Plaintiffs "tiptoed around the question of when the [Hard Drive] files were downloaded."  Cox Mem. 5.  Not so.  Copies of files with the same hash values are the same—with identical contents—regardless of when the files are downloaded, as MarkMonitor witness Sam Bahun (and others) explained.  *E.g.*, Trial Tr. 710:18–711:16 ("Q. Well, it's the same file because they all share the same SHA-1 hashes, right?  A. I mean, that -- that proves that they are identical.").  As noted above, Congress and the courts have also recognized the reliability of hash values.

In any event, Plaintiffs allegedly "tiptoe[ing]" around an issue is far from clear and convincing grounds for Rule 60 relief.  Plaintiffs complied with their obligations and told the truth. Plaintiffs are not responsible for ensuring Cox's teams of lawyers and experts review the documents produced in discovery and ask questions to understand the evidence to their satisfaction.  With a substantial and experienced team of lawyers pursuing Cox's chosen litigation strategy, Cox chose not to ask a single deponent about the Hard Drive files or the 2016 SOW.

**B.  There Is No Merit to Cox's Laundry List of Alleged Misconduct**.

Cox alleges "eight occasions" of alleged misconduct.  Cox Mem. 17–24.  None are valid, and the scattershot approach is telling.  Plaintiffs squarely refute each allegation below.[8]

**1.  There Were No Misrepresentations as to the Hard Drive Files at Trial.**

Plaintiffs' technical expert Barbara Frederiksen-Cross and MarkMonitor's Sam Bahun

---

[8] Cox's alleged misrepresentations 6 and 7 have substantial overlap.  Plaintiffs address them together in subsection B.6 below.

each were on the stand for many hours.  They testified truthfully, competently, and credibly.
Neither mischaracterized the Hard Drive files.

Ms. Frederiksen-Cross is a technical expert who analyzed and opined on evidence.  She
did not sponsor the files on the Hard Drive.  While describing her "test-run" of Audible Magic
using files from the Hard Drive, she relayed her correct understanding that the Hard Drive
"contains *copies of* the infringed works that were downloaded from the internet and identified by
hash."  Trial Tr. 464:24–25 (emphasis added).  On cross, she explained that: (1) "[t]he files on the
hard drive were produced, it's my understanding, by MarkMonitor," *id.* at 515:12–13; "[t]hey are
the *files associated with the known infringing hashes*, the ones that have been verified," *id.* at
515:17–18 (emphasis added); and (2) "[t]hey are files who would have been fingerprinted at some
point in time and gone to Audible Magic *or at least copies of those files*," *id.* at 516:2–4 (emphasis
added).  Cox's counsel asked Frederiksen-Cross, "And that's what's on the hard drive.  The ones
that were downloaded, matched, those were all saved to the hard drive, and that's what you
inspected?"  *Id.* at 516:17–19.  In response, she answered, "Yeah.  *A copy of those files* are on the
hard drive."  *Id.* at 516:20 (emphasis added).

A different witness, Mr. Bahun from MarkMonitor, laid the foundation for the Hard
Drive's admission.  He described the Hard Drive as containing "*copies of*" "most of the songs that
are in this [MarkMonitor Spreadsheet]."  *Id.* at 643:3–9 (emphasis added).  He explained that
"we've organized [the Hard Drive] by a series of folders. And inside of each folder are the song
files that were downloaded from the corresponding peer-to-peer networks."  *Id.* at 648:23–25.
Asked why the drive does not have a folder for the Gnutella P2P network (even though it was part
of the notice program and infringing files were downloaded from it), Bahun responded:

> At the time when we loaded these songs onto the drive, there are a lot of songs that
> we can find that exist on multiple networks.  So I believe that there was just overlap

17

of a lot of those songs.  So the ones from Gnutella probably were contained in, most likely because of the size here, probably the BitTorrent folders.

*Id.* at 651:1–7.  He testified consistently on cross, explaining that "I can't tell you for certain [when the songs were put on the Hard Drive], but *I think it was the end of 2015, beginning of 2016, around that time frame*."  *Id.* at 705:25–706:2 (emphasis added).  Bahun confirmed that it would have been after the end of the notice period here.  *Id.* at 706:3–5.

In sum, Bahun properly identified the Hard Drive files as "copies of" the songs that were downloaded from peer-to-peer networks.  *Id.* at 643:7.  And contrary to Cox's allegation that Bahun "chose to provide false testimony to deflect from the origins" of the Hard Drive files, Bahun specifically described MarkMonitor "find[ing]" the Hard Drive files on multiple P2P networks "[a]t the time when we loaded these [files] onto the drive," *id.* at 651:1–3, at "*the end of 2015, beginning of 2016, around that time frame*," *id.* at 706:1–2 (emphasis added).  The Court and jury thus heard the very evidence that Cox claims was concealed.

Searching for a misrepresentation that does not exist, Cox points to a confused line of cross-examination concerning when files with the hash values "go into your system."  *Id.* at 708:10–11.  Bahun indicated that "I don't quite understand the question."  *Id.* at 708:12.  Cox's counsel continued with the vague inquiry, indicating "I just wanted to know when they were stored on your system[.]"  *Id.* at 708:14–15.  Bahun responded with answers showing he understood the questions to concern when such files would have been downloaded as part of MarkMonitor's overall file verification process, as opposed to downloads in early 2016.[9]

---

[9] Bahun stated: "I don't know the exact date.  I mean, they would have been different dates."; "I don't recall the specific details" but "they are the files based on the hash value, you can determine that."; "[S]ome files are downloaded multiple times, you know, throughout the course of the time period we are talking about."  Trial Tr. 708:17–18; 708:22–24; 709:12–14.  In contrast, Bahun had

### 2. There Were No Misrepresentations as to the Hard Drive Files in Pre-Trial Motion Practice.

Cox takes issue with a declaration Plaintiffs submitted in opposing a motion *in limine*, in which Bahun described the Hard Drive as containing ███████████████████████████ ████████████████████████████████████████████████. Cox Mem. 4–5, 17. Bahun's statements were correct. The Hard Drive files are copies of audio files that were the subject of Audible Magic identifications. The testimony and case law on hash values for file identification both establish this. *See supra* at 15–18; *infra* at 23–24.

### 3. Cox Was Not Deprived of the 2016 SOW in Violation of a Discovery Order.

Cox received the 2016 SOW between MarkMonitor and the RIAA in discovery from MarkMonitor before taking a single deposition. Cox nevertheless seeks extraordinary Rule 60(b)(3) relief based on its mistaken contention that Plaintiffs violated a discovery order from the January 25, 2019 hearing by not also producing the same 2016 SOW. Cox is wrong.

*First*, as set forth at the hearing, the Court determined that the time-period for general responsiveness was 2012 to 2014. *See supra* at 10–11. While the period was broader for documents concerning the reliability of MarkMonitor's system, for which Cox sought documents going back to 2010, the 2016 SOW is from 2016. In any event, Cox makes up from whole cloth that the 2016 SOW was an audit or investigation as to the reliability of MarkMonitor's system. The 2016 SOW pertained to downloading certain files in anticipation of litigation.

*Second*, the scope of the discovery order concerned the "program at issue" in this case. *See supra* at 10. The "program at issue" is the Notice Program that put Cox on notice of specific

---

already testified that, at the time MarkMonitor put those copies on the drive, it found them on multiple P2P networks and did so at the end of 2015 or early 2016. *Id.* at 651:1–3, 706:1–2. The Court invited Cox to pursue these issues on cross-examination to its satisfaction. *Id.* at 707:17–20. Bahun's testimony was proper.

instances of infringement by specific infringers.  The 2016 SOW was for downloading files in anticipation of litigation, without sending any notices, and it was not the "program at issue" here.

Finally, the discovery order concerned only Plaintiffs' production of agreements between MarkMonitor and Plaintiffs, not agreements between MarkMonitor and the RIAA, which were separately produced by non-parties MarkMonitor and RIAA in response to Cox's Rule 45 subpoenas.  Gould Decl. ¶ 7.

### 4. An Unrelated Declaration Statement Did Not Conceal the 2016 SOW.

There is no merit to Cox's argument that Plaintiffs concealed the significance of the 2016 SOW when they submitted a declaration from MarkMonitor's Bahun stating that ███████████ ████████████████████████████████████████████████████████████  Cox Mem. 15–17, 22.  Cox quotes Bahun's statement out of context, with the effect of changing its meaning.

Bahun submitted the declaration in support of Plaintiffs' opposition to Cox's motion for spoliation sanctions, demonstrating, in pertinent part, that the Notice Program was a "P2P notice program," not a "litigation" program. *See supra* at 5–7.  Read as a whole, the declaration could not be clearer that Bahun was simply stating that, while litigation was identified in the SOW as a possibility, there was never a subsequent "corporate P2P litigation program":

> The SOW specifically provided that "the parties understand and agree that they will enter into a separate SOW, if mutually agreeable, concerning P2P notices to universities and/or concerning *a corporate p2p litigation program*." (RIAA 00000017.) ████████████████████████████

Cox Ex. 4, App. 1 ¶ 11 (emphasis added).  At worst, out of context, Bahun's statement could be viewed as ambiguous.  Read in context, its meaning is clear.  Through no lens is it clear and convincing evidence of a misrepresentation.

### 5.   Unrelated Statement at In Limine Hearing Did Not Conceal the 2016 SOW.

Cox contends that Plaintiffs concealed the significance of the 2016 SOW when they informed the Court that there was no effort to validate the data in the MarkMonitor Spreadsheet after the Claims Period and in anticipation of trial.  Cox Mem. 17, 22.  Cox conflates separate issues; there was no misrepresentation.  Plaintiffs' statement was made at a hearing on November 12, 2019, in relation to Plaintiffs' Motion *in Limine* (No. 5) to exclude a specific document—an alternate version of the MarkMonitor Spreadsheet called the "'236 Spreadsheet," which contained confusing, extraneous information.  The question, in context, was whether *the information in the '236 Spreadsheet* reflected an effort to check the accuracy of data in the MarkMonitor Spreadsheet. It did not.  In addition to ignoring this, Cox recasts the 2016 SOW as an "audit" of, or some kind of effort to validate data in, the MarkMonitor Spreadsheet.  That is incorrect.  The 2016 SOW was an attempt to downloads copies of certain files by hashes over a 30-day period in early 2016.  The purpose was to gather audio files with hashes corresponding to earlier notices for use in litigation.

### 6.   Non-responsive PCAP Files and the Hash Report Did Not Conceal the 2016 Origins of the Hard Drive Files.

Cox complains that Plaintiffs withheld and did not log PCAP files and a Hash Report that would have disclosed the 2016 origins of the Hard Drive files, and otherwise concealed their existence.  Cox Mem. 11, 17.  Cox's argument is meritless.  Nothing was concealed.  The 2016 PCAP files and Hash Report are incidental to the 2016 downloads, are outside the scope of the January 25, 2019 discovery order, and do not concern the reliability of the MarkMonitor system. Cox had the Notice Program SOWs, with retention requirements that did not call for retention of the downloads of the infringing files.  Cox had the Hard Drive files with 2016 metadata.   On top of that, Cox had the 2016 SOW all along.  The 2016 SOW expressly described ██████████ ██████, and Cox never asked for or about those materials.

21

### 7.   Non-responsive Audible Magic Data Did Not Conceal the 2016 SOW

Finally, Cox contends that Plaintiffs allowed Audible Magic and MarkMonitor to destroy evidence of attempts to verify the contents of the 2016 downloads and concealed the fact that they had even tried.  Cox Mem. 7, 9–12, 17.  This argument fares no better for Cox.  First, Cox again ignores that the 2016 SOW plainly disclosed ███████████████████████████████████████ ███████ ; there was no concealment.  Second, Cox had the 2016 downloads all along and could analyze them any way it wanted, including through Audible Magic or another content identification service or by listening to them.  Third, Plaintiffs had no obligation to produce the 2016 Audible Magic results because they are outside the time-period for responsiveness.  Once again, Cox reflexively conjures its refrain that the purpose of the 2016 project was to "verify evidence of the reliability of the notices sent" earlier.  Cox Mem. 24.  It was not.  The purpose was to gather audio files with hashes corresponding to earlier notices for use in litigation.

### III.   Cox Cannot Demonstrate That the Alleged Misconduct Prevented It from Fully and Fairly Presenting Its Defense.

A Rule 60(b)(3) motion fails unless the movant proves that the alleged "misconduct prevented him from fully and fairly presenting his claim or defense."  *McLawhorn v. John W. Daniel & Co.*, 924 F.2d 535, 538 (4th Cir. 1991) (internal quotation omitted).  Cox fails here.

### A.  Cox's Cases Are Inapposite.

Cox cites only two cases to support its argument that it was prevented from fully and fairly presenting its defense.  *See* Cox Mem. 25–28.  Neither case supports Cox's contentions.

In *Schultz v. Butcher*, the Fourth Circuit granted a defendant's Rule 60(b)(3) motion in a boating accident case because the plaintiff had withheld a U.S. Coast Guard report that exonerated the appellant-defendant and assigned all blame for the accident to another defendant.  24 F.3d 626, 630 (4th Cir. 1994).  The opinion lists little evidence to begin with, and the withheld document

was "so favorable to an adversary" on "a close question."  *Id.* at 630–31.

Similarly, in *Ebersole v. Kline-Perry*, the district court in a defamation suit granted the defendant's Rule 60(b)(3) motion on grounds of withheld video evidence that apparently showed the plaintiff, an owner of a pet care center, abusing dogs, which was the very substance of the alleged defamation.  292 F.R.D. 316, 318 (E.D. Va. 2013).  The videos proved the testimony of the defendant's witnesses concerning the plaintiff's maltreatment of dogs in his care, which the plaintiff had denied on the stand.  *Id.* at 319.  The withheld evidence went "directly towards establishing the truth of Defendant's statements about Plaintiff's alleged abuse of dogs" (*i.e.*, the defendant's primary defense).  *Id.* at 322–23.  Like the district court in *Schultz*, the court observed that "[w]hen previously tried, this case was close."  *Id.* at 322.

In both cases, the withheld evidence directly contradicted the withholder's position on a dispositive issue in a close case.  By contrast, Cox has not shown how the alleged misconduct weakens Plaintiffs' case or how this "new" information is material.  The date on which the copies of the Hard Drive files were downloaded does not exonerate Cox from liability; it is irrelevant.  It does not alter the contents of files that have a particular hash value.  Nor does it alter whether Cox subscribers distributed those files.  Plaintiffs established that Cox's subscribers distributed files with identical hash values, *i.e.*, that they unlawfully distributed Plaintiffs' copyrighted works.  Nothing in Cox's Motion changes those proven facts.

### B. Cox Ignores the Proven Significance of Identical Hash Values as Well as the Evidence the Jury Considered.

Cox's arguments for why it supposedly was denied a full and fair opportunity to defend itself ignore the reliability of hash values for file identification.  In doing so, Cox argues that, but for the alleged misconduct, it "could have *stated as fact* that the files were *not* those used to generate the [infringement] notices" and "could have moved to exclude the MarkMonitor

Spreadsheet on the ground it did not reflect the verification of the files in evidence." Cox Mem. 26–28 (emphasis in original). Cox then hypothesizes that the Court "might well have granted Cox's motion to exclude the Hard Drive. *Id.* at 26. But Cox is wrong because, as the experts acknowledge, copies of files with the same hash value are identical. One is a perfect copy of the other, with identical contents. The download date of a particular copy of that file does not change that. Moreover, the data in the MarkMonitor Spreadsheet are properly authenticated business records, admissible in any event and without regard to any Hard Drive files.

Cox argues that "Plaintiffs' direct infringement and trial narrative would have been significantly weakened" because, but for the alleged misconduct, "Plaintiffs would have been forced to connect the Hard Drive files to the notices by arguing that the matching hash values effectively made them the same." Cox Mem. 26–27. Here, Cox forgets that Plaintiffs did exactly that at trial—matching hash values in precisely that manner was the foundational premise of Plaintiffs' case, with or without the Hard Drive. MarkMonitor detected Cox subscribers infringing by matching the hashes of files they distributed to hash values of verified infringing files. Cox's primary defense, recycled here, was that hash matching is unreliable. The jury heard this defense and rejected it, accepting as truth that "matching hash values effectively made them the same."

### C.  Cox Had Knowledge of What It Claims Was Concealed.

Courts deny Rule 60(b)(3) motions where, as here, the movants had knowledge of the substance of the evidence or could have discovered it on their own through ordinary diligence. *See, e.g.*, *Tunnell v. Ford Motor Co.*, 245 F. App'x 283, 288 (4th Cir. 2007) (affirming denial of Rule 60(b)(3) relief because the plaintiff "had learned much of the information contained in the undisclosed . . . documents from other sources during discovery" and "this independent knowledge enabled [him] to pursue any further development of the evidence he desired"); *Al-Sabah v.*

*Agbodjogbe*, 2021 WL 5176463, at *2 (4th Cir. Nov. 8, 2021) (unpublished) (affirming denial of Rule 60(b)(3) relief in part because the defendant "admitted that he was aware prior to trial of nearly all the facts surrounding" the allegedly withheld information).

Cox had the Hard Drive files and 2016 SOW long before a single deposition and never asked about either in discovery. *See supra* at 11–12.  At trial, Cox asked muddy questions it now portrays as clear.  *See* Trial Tr. 708:12 ("I don't quite understand the question.").  Cox never asked any witnesses the straightforward question of why the Hard Drive files have 2016 metadata, rather than metadata from 2012–2015.  Cox also knew that the Notice Program SOWs did not include copies of the infringing files among the materials that MarkMonitor was required to retain.

Unfortunately for Cox, neither an attorney's misapprehension, nor a misdirected litigation strategy entitles a party to relief under Rule 60(b)(3).  *See, e.g.*, *Evans v. United Life & Accident Ins. Co.*, 871 F.2d 466, 472 (4th Cir. 1989) (holding that "a lawyer's ignorance or carelessness do not present cognizable grounds for relief under 60(b)"); *Am. Lifeguard Ass'n, Inc. v. Am. Red Cross*, 1994 WL 144321, at *2 (4th Cir. 1994) (unpublished) ("Perhaps the most salient example of behavior that cannot constitute grounds for Rule 60(b) relief is the purposeful litigation decision of a party.").  It is axiomatic that a party cannot retry a case merely because it regrets its decisions before and during trial.  *See Ackermann v. United States*, 340 U.S. 193, 198 (1950) (holding that a litigant "cannot be relieved of [a calculated and deliberate] choice because hindsight seems to indicate to him that his decision . . . was probably wrong").

### D.  Rule 60(b) Is Not a Tool for Reconsideration.

Cox cannot carry its Rule 60(b)(3) burden by making arguments that "were briefed and argued at length before and during trial," *Columbia Commc'ns Corp. v. EchoStar Satellite Corp.*, 2 F. App'x 360, 367 (4th Cir. 2001), but that is exactly what it aims to do here.  *Compare* Cox

25

Mem. 4–8, 13–16, 18–20, *with* ECF 488 *and* Trial Tr. 643:24–648:12; 706:12–707:22; 709:15–16.  Cox has had its trial on the merits and is now vigorously pursuing a Fourth Circuit appeal.  Its 13th-hour gambit to reargue the case should be rejected.  *See United States v. Williams*, 674 F.2d 310, 313 (4th Cir. 1982) ("Where the motion is nothing more than a request that the district court change its mind . . . it is not authorized by Rule 60(b).").

## IV.    Cox Cannot Show That It Has a Meritorious Defense.

Cox has not shown that it will have a meritorious defense if the Court were to grant the indicative ruling Cox requests.  Although Cox "is not required to establish a meritorious claim by a preponderance of the evidence, [Cox] must still make a proffer of evidence that would permit a finding in [its] favor."  *Downing v. Lee*, 2018 WL 10247588, at *1 n.1 (E.D. Va. Jan. 22, 2018).  A Rule 60(b) movant must "demonstrate that granting that relief will not in the end have been a futile gesture."  *Boyd v. Bulala*, 905 F.2d 764, 769 (4th Cir. 1990).  Although Cox offers a paragraph of conjecture on what "could" happen if it were to obtain a favorable ruling, *see* Cox Mem. 29, "statements of a lawyer are not evidence."  *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 241 n.15 (4th Cir. 2019); *accord Long v. Hooks*, 972 F.3d 442, 463 (4th Cir. 2020) (en banc) ("it is elemental" and "literally black letter law" that "counsel's arguments are not evidence in a case").  Thus, Cox "has not pointed to evidence in the record that would permit a finding in [its] favor."  *Downing*, 2018 WL 10247588, at *1 n.1.

Cox claims that a new trial would not be a "futile gesture," but again with only conjecture for support.  *See* Cox Mem. 29.  Cox's cases provide it no assistance.  In *Central Operator Co. v. Utility Workers of Am.*, 491 F.2d 245, 252 n.8 (4th Cir. 1974), "[t]he purpose of the [Rule 60(b)] motion was only to open the default judgment so that there may be a trial on the merits."  *Id.* at 252 n.8; *accord id.* ("Therefore, we are of the view that a party satisfies his burden of

demonstrating a meritorious defense when he introduces *uncontradicted testimony* which, if believed, establishes facts constituting a meritorious defense." (emphasis added)). In *Boyd v. Bulala*, 905 F.2d 764 (4th Cir. 1990) (per curiam), the Court upheld denial of a *post-trial* Rule 60(b) motion because the grounds underlying the motion were unlikely to affect the outcome in a new trial. *See id.* at 769 ("Here, essentially for the same reasons that we found the granting of a new trial because of erroneous jury instructions not warranted, *i.e.*, that a new trial on damages would not yield damages totalling less than the cap, we think the circumstance of this claimant's early death not an exceptional one warranting relief from that judgment.").

Cox has not cited to any evidence or even articulated any non-conclusory assertions for how this "new" information—dates of download for the Hard Drive files—will move the needle at all in its favor for a new trial, overcoming the overwhelming evidence in the prior trial which ended in a verdict for Plaintiffs. *See Boyd*, 905 F.2d at 769.

## V.     The Need for Finality Eclipses Cox's Rule 60(b) Request.

In the unlikely event a movant satisfies both the predicate requirements and the elements of a Rule 60(b) subsection, a court will order a new trial only if the prejudice suffered prevented the movant from receiving a fair trial. *Cf. United States v. Villarini*, 238 F.3d 530, 536 (4th Cir. 2001) (holding a new trial is warranted only "if the resulting prejudice was so great that it denied . . . the appellants a fair, as distinguished from a perfect, trial" internal quotation marks omitted)). Only prejudice of this severity will outweigh the important public policy of finality of litigation. *Cf. Marathon Res. Mgmt. Grp., LLC v. C. Cornell, Inc.*, 2020 WL 6370987, at *4 (E.D. Va. Oct. 29, 2020) ("Rule 60 is not meant to eviscerate the finality of judgments where the reasons for further consideration are less than compelling." (internal quotation marks omitted)).

The Second Circuit has similarly opined that "there probably will never be a perfect pretrial

discovery proceeding, any more than a perfect trial." *Ind. Inv. Protective League v. Touche Ross & Co.*, 607 F.2d 530, 534 n.5 (2d Cir. 1978). The policy favoring finality is particularly weighty in the context of alleged discovery misconduct, as these purported Rule 60(b)(3) motions are often attempts to reargue issues already "briefed and argued at length before and during trial." *Columbia Commc'ns*, 2 F. App'x at 367. Further, "[i]t is the rare trial in which no one speaks falsely (if only by accident) in any particular, and a heavy burden is necessary here (as we explained above) to protect the finality of judgments against efforts to turn the vicissitudes of litigation into grounds for more litigation still." *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 832 (7th Cir. 1985).

Cox has not shown that it suffered any prejudice, let alone prejudice severe enough to warrant a new trial. *See supra* at 22–26. Cox's Motion is not about seeking justice. The evidence is overwhelming that Cox knew about the massive infringing activity for years, supported it, and assisted specific known repeat infringers to continue to infringe. Cox had every opportunity and procedural safeguard in discovery and at trial to build its defense, but it lost. The jury understood that copies of files with the same hash values are the same files.

Without contesting any of this, Cox introduces a new theme about "re-creating evidence" and seeks to re-litigate this case in hopes of a different outcome. But neither Cox's displeasure with the outcome nor its second-guessing its failed litigation strategy justifies a new trial. As the Supreme Court has observed, "[t]here must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from." *Ackermann*, 340 U.S. at 198.

## VI.     Cox's Request for Discovery Is Improper and Unnecessary.

Generally, "the filing of an appeal 'confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.'" *Levin v. Alms & Assocs., Inc.*, 634 F.3d 260, 263 (4th Cir. 2011) (quoting *Griggs v. Provident Consumer*

*Disc. Co.*, 459 U.S. 56, 58 (1982)); *accord Doe v. Pub. Citizen*, 749 F.3d 246, 258–59 (4th Cir. 2014) (holding that "an effective notice of appeal divests a district court of jurisdiction" and "[a] district court does not act in aid of an appeal when it alters the status of the case as it rests before the court of appeals" (alterations & internal quotation marks omitted)).   While this Court has limited authority to issue an indicating ruling under Rule 62.1, it does not have the authority to grant a discovery request.  Cox, in fact, does not argue otherwise.  In any event, even apart from the pending appeal, Cox's request should be denied.

Cox has cited no case in which any court in the Fourth Circuit has endorsed the notion of Rule 60(b) discovery.[10]  Courts elsewhere consistently declare that post-judgment discovery is, and should be, extraordinarily rare and thus deny it.  *See, e.g., Fharmacy Recs. v. Nassar*, 2010 WL 11545040, at *2, 4 (E.D. Mich. Feb. 18, 2010) (denying discovery where "the Court has rendered its judgment on the merits, dealt extensively with at least fourteen of the plaintiffs' post-judgment motions, . . . the matter is now on appeal before the Sixth Circuit . . . [and t]here is no reason to believe that what [the movant] belatedly seeks would be useful."); *Aldridge ex rel. United States v. Corp. Mgmt. Inc.*, 2021 WL 1521697, at *3 (S.D. Miss. Apr. 16, 2021)).  The lack of precedent for Rule 60(b) discovery makes sense as a matter of law and logic, including due to the strong need for finality of judgments and to avoid the havoc that such discovery could cause, both generally and even more so while an appeal is pending.

Cox's reliance on *Pearson v. First NH Mortg. Corp.*, 200 F.3d 30 (1st Cir. 1999), and *Midwest Franchise Corp. v. Metromedia Rest. Grp.*, 177 F.R.D. 438 (N.D. Iowa 1997), is

---

[10] Plaintiffs' counsel found only one case in the Fourth Circuit that discussed the post-judgment discovery question at any length.  *See United States v. Higgs*, 193 F. Supp. 3d 495 (D. Md. 2016) (stating "Rule 60(d) has no discovery provision, and [movant] offers no cases, and the Court has found none from this Circuit to support his request for such discovery").  The court looked at two standards used by other courts, without adopting either, as the movant failed both. *Id.* at 515.

misplaced.   Those decisions highlight how post-judgment discovery is only granted (in other circuits) in extremely unique factual circumstances entirely unlike those here.

*Pearson* is a dense bankruptcy case involving a Chapter 7 debtor who sought to set aside an order dismissing his motion for relief from a settlement, claiming fraud on the court "by his former chapter 7 counsel, the chapter 7 trustee, and [the bank]."   *See* 200 F.3d at 32.   The bankruptcy judge applied the wrong standard in assessing post-order relief, where no discovery had been previously provided, and thus the First Circuit set it aside.   *Id.* at 35.   Nothing about this out-of-circuit case endorses the notion of Rule 60(b) discovery generally, let alone while an appeal is pending and where the party seeking relief had already taken extensive discovery.

*Midwest Franchise Corp.* also is inapposite.   In that case, the plaintiff discovered after trial that a material witness in the case was engaged in employment negotiations with defendants at the time he testified.   *See* 177 F.R.D. at 440.   The court found "these exceptional circumstances" warranted "the taking of [the witness's] deposition," as the witness had given "less than forthright answers to the repeated questions by counsel for the defendants as to his third party objectivity," and his testimony "countered a substantive issue in the case."   *Id.* at 441–42.   In contrast, Cox has had every opportunity to depose and cross-examine witnesses, who answered forthrightly.   And the issue Cox pursues—when the copies of the drive were downloaded—is of no significance.

Finally, and importantly, the discovery that Cox seeks is both cumulative and futile.   The discovery sought is cumulative of the November 2020 declaration from Plaintiffs' counsel, which is already before this Court.   And the discovery is futile because there is no possibility for it to have any possible impact on Cox's Rule 60(b) Motion.

## **CONCLUSION**

For the foregoing reasons, Cox's Rule 60(b)(3) Motion should be denied in full.

Respectfully submitted,

Dated February 9, 2022

/s/ Scott A. Zebrak
Scott A. Zebrak (38729)
Matthew J. Oppenheim (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Tel:  202-480-2999
scott@oandzlaw.com
matt@oandzlaw.com
jeff@oandzlaw.com

*Attorneys for Plaintiffs*