UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**SONY MUSIC ENTERTAINMENT,**          :
                                       :
                **et al.,**            :  Civil Action
                                       :  No. 1:18-cv-0950
                **Plaintiffs,**        :
                                       :
        **v.**                         :
                                       :  March 18, 2022
**COX COMMUNICATIONS, INC.,**          :  10:15 a.m.
                                       :
                **et al.,**            :
                                       :
                                       :
                **Defendants.**        :
                                       :
.............................. :

**TRANSCRIPT OF MOTION HEARING PROCEEDINGS**
**BEFORE THE HONORABLE LIAM O'GRADY,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

  For the Plaintiffs:          **Matthew J. Oppenheim, Esq.**
                               Oppenheim & Zebrak, LLP
                               4530 Wisconsin Avenue, NW
                               5th Floor
                               Washington, DC 20016
                               202-480-2999
                               Email: Matthew@oandzlaw.com

                               **Scott Alexander Zebrak, Esq.**
                               Oppenheim & Zebrak, LLP
                               4530 Wisconsin Avenue, NW
                               5th Floor
                               Washington, DC 20016
                               202-450-3758
                               Fax: 866-766-1678
                               Email: Scott@oandzlaw.com

```
APPEARANCES:   (Cont.)

For the Plaintiffs:          Jeffrey M. Gould, Esq.
                             Oppenheim & Zebrak, LLP
                             4530 Wisconsin Avenue, NW
                             5th Floor
                             Washington, DC 20016
                             202-480-2999
                             Email: Jeff@oandzlaw.com


For the Defendants:          J. Tyler McGaughey, Esq.
                             Winston & Strawn (Chicago)
                             1901 L Street, NW
                             Washington, DC 20036
                             202-282-5306
                             Email: TMcGaughey@winston.com

                             Michael S. Elkin, Esq.
                             Winston & Strawn (NY)
                             200 Park Avenue
                             New York, NY 10166
                             212-294-6729
                             Email: Melkin@winston.com

                             Jennifer Ann Golinveaux, Esq.
                             Winston & Strawn (CA)
                             101 California Street
                             35th Floor
                             San Francisco, CA 94111
                             415-591-1400
                             Email: Jgolinveaux@winston.com

Court Reporter:              Scott L. Wallace, RDR, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             401 Courthouse Square
                             Alexandria, VA  22314-5798
                             Office: 703.549.4626
                             Cell: 202.277.3739
                             Email: Scottwallace.edva@gmail.com
```

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1          **MORNING SESSION, MARCH 18, 2022**

2    (10:15 a.m.)

3          THE COURTROOM CLERK:  The Court calls *Sony Music*

4    *Entertainment, et al. versus Cox Communications, Inc., et al.*,

5    Case Number 1:18-cv-950.

6          May I have appearances, please, first for the plaintiff.

7          MR. ZEBRAK:  Good morning, Your Honor.  Scott Zebrak for

8    the plaintiffs.  With me are my colleagues, Matthew Oppenheim and

9    Jeffrey Gould.

10         THE COURT:  All right.  Good morning.  Good morning to

11   each of you.

12         MR. McGAUGHEY:  Good morning, Your Honor.  Tyler McGaughey

13   on behalf of the defendants, Cox Communications and Cox Comm.

14         I have with me at Counsel's table my colleague,

15   Michael Elkin.  He's going to be handling the motion today, and

16   he's going to introduce himself and the rest of the team.

17         THE COURT:  All right.  Thank you, Mr. McGaughey.

18         Good morning, Mr. Elkin.

19         MR. ELKIN:  Good morning, Your Honor.  The other

20   appearances from our side are Jennifer Golinveaux and

21   Sean Anderson from Winston & Strawn, counsel for the defendants,

22   together with a representative of Cox, Nicole Warrior.

23         THE COURT:  All right.  Good morning to each of you.  All

24   right.  This comes on a motion by Cox for relief from judgment,

25   and I've read the pleadings, and I've looked at the pleadings in

1  the Colorado action, and I appreciate your coming in this

2  morning.  I really wanted to, you know, hear any further thoughts

3  that you had.  I mean, you really got down in the weeds in the

4  pleadings and specifically about the source code that was

5  developed in the -- information of it was developed in the

6  *Charter* case and that MarkMonitor utilized, but I really brought

7  you here this morning just to ask you to focus on what you think

8  the important points are and any new thoughts that you've had

9  since the pleadings were generated.

10         So, Mr. Elkin, I'll hear from you first, sir.  And I don't

11  need to separate out these two sets of motions.  I think they all

12  dovetail.

13         MR. ELKIN:  I understand.  Your Honor, first, it's a

14  pleasure to be back in your courtroom, and we appreciate your

15  holding the hearing.

16         THE COURT:  All right.  Certainly.

17         MR. ELKIN:  I'm going to focus on the key issues, but I

18  just want to set the stage for a minute or two before I do that.

19  Your Honor, plaintiffs misled the Court and misled the jury, and

20  they misled opposing counsel as to the providence of key evidence

21  in the case.  Specifically, the audio files that plaintiffs

22  falsely claimed were downloaded from the Internet prior to

23  sending Cox the infringing notices -- the infringement notices,

24  and they did so because they wanted to plug material gaps in

25  their linear presentation of direct infringement proofs.  They

1    did so as they wanted to avoid being cited for recreating

2    evidence after the fact.  They did so to cover their tracks.

3    They did so to overcome obvious foundational issues that may well

4    have resulted in the evidence not coming in.  They did so to

5    prevent opposing counsel from being able to successfully

6    introduce material-impeaching evidence, and they did so to

7    prevent opposing counsel from attacking the weight of their

8    evidence in a more effective manner.  And they did all of this in

9    a carefully orchestrated manner by carefully wordsmithing their

10   pleadings, by inducing nuanced testimony from fact and expert

11   witnesses, and by their slight-of-hand maneuvering in court

12   arguments.

13        And Your Honor, one of the things I want to talk about

14   this morning, if I'm permitted, is to address why it all

15   mattered.

16        The Court did not have in front of it the truth, and the

17   defendants did not have the ability to address the deficiencies

18   in plaintiffs' proofs.

19        And if there's any doubt about this, and I realize Your

20   Honor already mentioned that you've examined the record in

21   *Charter*, what's happened in the *Charter* case is that the

22   plaintiffs have had to embark on an entirely different strategy

23   in presenting the proofs because all of this has come out, and

24   the Court has recently specifically permitted the defendant there

25   to attack the holes in plaintiffs lineal aggression of evidence.

1    To be clear, we do not treat this, our Rule 60 obligations

2    to the Court lightly.  We don't do that.  We understand the

3    magnitude of the relief that we're seeking.  And it's for that

4    reason we assembled the robust record that's before the Court.

5    That's why it was as significant as it was.

6    Before going through the record as to the key elements, I

7    just want to preview very quickly for the Court the -- those

8    points, and we have a couple of demonstratives on the screen just

9    to help coincide with the presentation.

10   With the Court's permission, I would like to address these

11   points this morning:  How plaintiffs sought to prove direct

12   infringement, what plaintiffs used to prove direct infringement,

13   how plaintiffs misrepresented the MarkMonitor evidence to prove

14   infringement, why did plaintiffs misrepresent the evidence, why

15   these misrepresentations are material.  And finally, why relief

16   is appropriate.

17   I'm going to be focusing, Your Honor, just on the first

18   Rule 60 motion.  I'm happy to address questions with respect to

19   the second as to the source code, and I'll mention it very

20   briefly at the end if I'm permitted.

21   THE COURT:  All right.  Go ahead.

22   MR. ELKIN:  Turning to the next slide, as Your Honor was

23   aware, plaintiffs asserted in this case two secondary

24   infringement claims, the contributory infringement and the

25   vicarious infringement claims.  And they each share a unitary

1    element, the notion that they had to establish direct

2    infringement.  So this -- this element, this direct infringement,

3    a lot was devoted to the actual discovery in the case.  And after

4    the Court denied plaintiffs' motion for summary judgment as to

5    the direct evidence, it became a focal point at the trial,

6    together with other issues, but it consumed a lot of the trial

7    days, as Your Honor may remember.

8         And, of course, a lot of these cases regarding ISPs and

9    secondary copyright infringement involved circumstantial

10   evidence.  You don't have screenshots showing people what they're

11   doing as they're doing it, but plaintiffs in this particular case

12   didn't have the contemporaneous capture proof of the contents

13   being infringed like Your Honor observed in the *Sony BMG* case.

14   Rather, the plaintiffs relied on linking together several pieces

15   of circumstantial evidence to prove this foundational element.

16   And central to all of this as Your Honor, I'm sure, remembers,

17   was the evidence sourced by the plaintiffs' vendor, MarkMonitor.

18        So, several pieces that are critical to our motion, that

19   were critical to the trial, were the specific pieces of

20   MarkMonitor evidence at issue that plaintiffs used to tell this

21   narrative.  First, the MarkMonitor spreadsheet itself was

22   represented to be the verification of the audio files allegedly

23   infringed by Cox's subscribers, and Your Honor admitted this

24   spreadsheet as PX11.  It was referred to a lot in discovery and

25   motions in limine, as I think the 431 spreadsheet.

1          Second piece were the copies of the infringing files on

2    the MarkMonitor spreadsheet which were produced on a hard drive

3    which Your Honor admitted as PX39.

4          So how do they present these -- their direct infringement

5    evidence using these core areas?  They told a linear narrative

6    and they told us in the beginning.  They told it in discovery,

7    they told it in their experts, they presented this at trial.  The

8    linear narrative is that they methodically, one, downloaded the

9    allegedly infringing peer-to-peer files; two, verified that those

10   files contained the copyrighted content through the Audible Magic

11   verification process; three, generated a list of allegedly

12   verified peer-to-peer files; four, sent notices based on the

13   peer-to-peer users sharing those verified files, and finally,

14   tied these notices to Cox subscribers audifying that Cox could be

15   secondarily liable for those acts.  But the reality behind this

16   linear, methodical progression of evidence is much different, and

17   I want to take the Court through that right now.

18          Plaintiffs actually did not have the underlying infringing

19   files on which they based verifications and notices.  They didn't

20   come to court with those.  And plaintiffs did not have the

21   underlying verification data of the later obtained files that

22   they actually put into evidence, they only had the MarkMonitor

23   spreadsheet which wasn't tied to any of the files in evidence.

24   Through concerted efforts, the plaintiffs were able to fill these

25   gaps with evidence that they had generated after they had sent

1    notices to Cox, a fact that is not part of and doesn't fit into

2    the narrative that they told at trial.

3          And we have specifically laid out, and I'm confident that

4    Your Honor has reviewed the brief, page 17, where we talk about

5    the eight acts of misconduct, but they all sort of are rooted in

6    two core issues.  First, plaintiffs, we submit, misrepresented

7    the MarkMonitor spreadsheet.  They represented that the

8    MarkMonitor spreadsheet contained verifications of the files in

9    evidence, when, in fact, the verifications were of files that

10   plaintiffs now admit MarkMonitor failed to retain.  And they

11   misrepresented the hard drive, that the hard drive contained the

12   files that were verified before the notices were sent, those that

13   were contained on the MarkMonitor spreadsheet.

14         In doing so, they failed to disclose that they were

15   actually downloaded in 2016, years after the notices were sent.

16   And the specific misrepresentations that Cox demonstrates are as

17   follows -- and I'll walk the Court very briefly through them in a

18   moment.

19         They withheld the 2016 Statement of Work and project

20   despite Judge Anderson's order.  They withheld and didn't log the

21   PCAP files, which I'll explain the significance of in a second,

22   that would have confirmed the 2016 origins of the files on the

23   hard drive and otherwise concealed their existence.  They

24   withheld and did not log the Hash Report summarizing

25   MarkMonitor's record of Audible Magic's 2016 attempts to

 1    authenticate and verify those files and otherwise concealed this

 2    existence.  They allowed Audible Magic and MarkMonitor to destroy

 3    evidence of these attempts despite having these attempts being

 4    generated in anticipation of litigation.  They concealed the 2016

 5    project to the Court when they elicited a sworn statement for

 6    MarkMonitor's percipient witness, Sam Bahun, B-A-H-U-N, that

 7    quote, "The RIAA MarkMonitor did not enter into a separate SOW

 8    concerning the litigation program," closed quote.  They again

 9    concealed the 2016 project when they represented to the Court

10    that there was no effort to validate the data in the MarkMonitor

11    spreadsheet after the claims period in anticipation of trial.

12    They caused two of their trial witnesses, Ms. Frederiksen-Cross

13    their technology expert, and Sam Bahun to give testimony that

14    mischaracterized the hard drive's contents.  And finally, they

15    submitted a declaration and made arguments prior to trial to the

16    same effect.

17          Just very specifically on each of these points, as it

18    related to Judge Anderson's hearing and the order that he issued

19    on January 25th, 2019.  Plaintiffs did not produce the 2016

20    Statement of Work, despite Judge Anderson's order that they

21    produce all of their contractual obligations with MarkMonitor.

22          Judge Anderson explained in his order, encompassed the

23    following -- this is right in the transcript that Your Honor has

24    part of the record.  Quote, "If plaintiffs signed a contract with

25    MarkMonitor, if you had a written agreement, if you have an

1    understanding, a letter agreement that says you're going to do

2    this, we'll pay you for this, you provide me with these services,

3    these are your obligations, these are my obligations, that kind

4    of an agreement or description of the relationship between

5    MarkMonitor and plaintiffs' clients," closed quote.

6         Plaintiffs now take the position that Judge Anderson's

7    order was limited to the notice program that put Cox on notice of

8    the alleged infringements but the record doesn't reflect that.

9    There is nothing in Cox's underlying request, the parties'

10   dispute over that request, Judge Anderson's order that supports

11   plaintiffs' post-hoc argument in an attempt to demonstrate the

12   completeness of their proposed production, plaintiffs represented

13   at the hearing to Judge Anderson that they would be producing,

14   and I'm quoting from the record, "the evidence that MarkMonitor

15   has captured for purposes of the case which included all the

16   music."  That's what they said, known to plaintiffs at the time,

17   Your Honor, but not to us, not to Cox.  The files with all of the

18   music were those downloaded pursuant to the 2016 project.  There

19   was no basis for plaintiffs to withhold the very agreement that

20   gave rise to that evidence.

21        Secondly, plaintiffs heavily lean on their counsels'

22   clarification regarding the program at issue in the case, but

23   it's very clear reading the transcript what they were referring

24   to in the hearing with Judge Anderson, was this notion that

25   MarkMonitor and the RIAA had entered into unrelated programs

1    related to universities or projects that concerned trademarks.

2         Third, plaintiffs expressly agreed and Judge Anderson

3    expressly ordered that plaintiffs produce information beyond the

4    2012 and 2014 range regarding MarkMonitor's reliability or issues

5    plus the agreement and relationship.  Judge Anderson could not

6    have been more clear that the timeframe related to other

7    discovery did not extend to agreements with MarkMonitor.

8         The plaintiffs claim that the 2016 project was not an

9    audit or an investigation as to the reliability of the

10   MarkMonitor system, as it only pertained to downloading certain

11   files in anticipation of litigation, but they ignore that the

12   2016 Statement of Work not only required MarkMonitor to attempt

13   to re-download files purportedly that were referenced in the

14   spreadsheet, it also required MarkMonitor and Audible Magic to

15   reverify those downloads.

16        And if you take a look at the excerpts from the Statement

17   of Work, it -- it -- it's right there.  They successf- -- "To

18   successfully download files with those hashes will be processed

19   against Audible Magic fingerprinting for identification and

20   verification."

21        We submit, Your Honor, that plaintiffs' act of downloading

22   and verifying the files in 2016 plainly calls into question the

23   notion that plaintiffs did not try to go back or verify the

24   Audible Magic fingerprints, or at least some evidence -- at least

25   some evidence of an audit and accordingly responsive to Cox's

1    discovery request.

2         THE COURT:  Well, they had the hashtag, so they had the

3    same numbers consistently throughout, right?

4         MR. ELKIN:  Right.  The hashtags, for purposes of this

5    argument -- and I know this was an issue that we discussed at

6    some length at the trial.  I do remember.  The hashtags, we're

7    not just talking about right now the fallibility or infallibility

8    of the hash-matching process, but what's at issue in the case in

9    every copyright case, as Your Honor knows, is:  Are the works

10   that -- are the works that are being sued on, are those the works

11   that were copied?  And so the hash numbering has to actually

12   reflect the recordings that the -- or music compositions that the

13   plaintiffs are being put into the case.

14        In this particular instance, what you had was as follows:

15   You have the MarkMonitor spreadsheet, the 431 spreadsheet which

16   has hashes, and it is -- you know, it cross-referenced hashes

17   that allegedly were -- were verified, but the files that were

18   verified were not the files that existed relative to the

19   verification itself.  Those files were destroyed.  There's no

20   question about that, and we did not know that.  The files, and

21   Your Honor admitted the spreadsheet in relationship to the actual

22   audio files themselves that were contained in the hard drive that

23   had those hash numbers and those -- those particular recordings

24   themselves, they were not verified by the spreadsheet that Your

25   Honor admitted into evidence.  They were purportedly verified in

 1   a way -- by documents that have been destroyed.  So you had two

 2   mismatched halves.

 3          THE COURT:  All right.

 4          MR. ELKIN:  So while you do have numbers that one could

 5   compare it to, we don't know specifically what those numbers

 6   reflect.  We'd have to take their word as to what it is, and

 7   that's not how they presented their case, Your Honor.  It's not

 8   the case that they presented to us.  It's not the case they

 9   presented to the jury.  It was not the case they presented to

10   Your Honor.  It was a different case.

11          THE COURT:  Tell me.  There was -- when you use the word

12   "verification," there were different verifications, and I recall

13   testimony about a witness having actually listened to some of the

14   music to make sure that the hashtag and that the file reflected

15   the actual music of the entertainer, and I didn't go back and

16   actually read that trial testimony, but there was some

17   verification by that means as well sporadically through the --

18   and, of course, in their -- you know, we started with 12,000 or

19   however many other and then ultimately arrived at 10,017 or

20   whatever, but that was obviously a moving target for a

21   significant length of time.  But as to actually -- Sony witnesses

22   listening, how does that fit into your argument?

23          MR. ELKIN:  Well, it -- it -- it's -- it -- it's largely

24   not relevant at all for reasons I'll get to in a moment.  Your

25   Honor actually admitted the hard drive.  There was a statement at

1    sidebar by opposing counsel that represented to Your Honor that

2    all of the files on the hard drive went through digital

3    listening.  Digital listening was referenced, obviously, by the

4    Audible Magic fingerprinting process.  That was a misstatement, a

5    misrepresentation that was specifically made to Your Honor to get

6    the hard drive files into evidence.  That was -- the

7    representation that a Sony witness here and a UMJ witness there,

8    and a Warner witness somewhere else listened to some files, I

9    can't sit here and say that was done purely for theatrics.  I

10   don't know what their purpose was, but that wasn't the basis upon

11   which they laid a foundation for the admission of those audio

12   files.

13        So, yes, there was testimony by certain of their

14   representatives, to be clear, that they listened to them.  One

15   witness said, "I listened to a hundred," some, "I listened to a

16   few," but that wasn't -- it's not the equivalent of digital

17   listening in the *Charter* case, what they were able -- what they

18   did once all of this came out.  They hired eight different

19   listeners and they hired some professor at NYU to study

20   wavelength, and, to be clear, we won't get into the specifics of

21   that case, but there were significant challenges, you know, with

22   regard to that process, and -- and -- and in that case they're

23   seeking now to reverify files for the third time.  But, no,

24   the -- there -- there was testimony to that effect, but it was

25   not the basis on which they sponsored the hard drive of audio

1    files.

2         THE COURT:  Thank you.  Go ahead.

3         MR. ELKIN:  Thank you.  So just sort of continuing.  Their

4    production of the 2016 Statement of Work does not somehow absolve

5    MarkMonitor -- there's a statement in their papers that

6    MarkMonitor actually produced the Statement of Work, and that's

7    true, and we looked at it, and we couldn't make heads or tails of

8    it because there was nothing on the face of tha- -- of that

9    document that suggested that it was anything other than forward

10   looking.  It didn't suggest -- it wasn't contextualized.  It

11   didn't state that it was done for purposes of recreating

12   evidence.

13        And so, yes, we didn't ask a question about it because we

14   didn't understand it.  There was nothing on the face of it that

15   reflected that it had anything to do with this case, and it

16   wasn't produced by the plaintiffs.  They were required by Judge

17   Anderson to produce all agreements, and they didn't do it.

18        But just turning now to the Hash Report and the PCAPs and

19   the disclosure of the disruption of the Audible Magic

20   verifications, plaintiffs also failed to produce the other fruits

21   of the 2016 project.  And I refer to fruits, Your Honor, because

22   they produced the audio files that came in, but they didn't

23   produce the correlative PCAPs in the Hash Report which was

24   fundamentally part of the same project.

25        They didn't disclose that the 2016 Audible Magic

1   verifications were not retained.  The PCAPs, which I understand

2   stands for Packet Captures, are files that would confirm when and

3   where each of the audio files on the drive was downloaded.  So

4   Your Honor probably remembers the testimony at trial, but when

5   were these files downloaded?  Had they produced the PCAPs, we

6   would have known that.  They didn't produce them.  The Hash

7   Report, Cox understands from an order issued by Judge Jackson, a

8   district court judge in the *Charter* case, that the Hash Report is

9   a document -- this is pursuant to his public order, quote, "that

10   indicates which of the files had previously been the subject of

11   notices could no longer be identified or verified," closed quote.

12   That's ECF in the *Charter* case 436 at 5.

13       This information clearly bears on the 2016 hard drive

14   files, and the accuracy of plaintiffs' processing for verifying

15   files before sending notices.

16       I'm reminded, there was also a document that we weren't

17   able to get in -- there was a motion in limine that we argued for

18   at least an hour before trial -- related to a competing

19   spreadsheet that we wanted to get into evidence -- we called it

20   the 236 Spreadsheet -- before trial in order to highlight the

21   problematic origins of the foundation of the MarkMonitor

22   spreadsheet, including that it lacked any of the underlying

23   Audible Magic verification data.  So we sought to introduce a

24   version of that document that had been produced by Audible Magic

25   which was compiled after the claims period and contained some of

1   the Audible Magic transaction data that plaintiffs and

2   MarkMonitor failed to retain.

3       We thought that was important.  We had our expert, Dr.

4   Feamster, opine on that.  He couldn't opine at the trial because

5   that was struck, but Cox argued that this post-claims period

6   showed that a substantial percentage -- that our position that we

7   argued to Your Honor at the time showed that a substantial

8   percentage of the files allegedly comprising the infringed works

9   were, in fact, determined by Audible Magic not to be verified.

10  You can see that is why we wanted to get that in.

11      At the hearing on motions -- plaintiffs' motions to

12  preclude the admission of the document, Your Honor sought

13  plaintiffs' assurance whether, quote, "there is any evidence in

14  the case that the purpose for compiling this post-claims period

15  data was to go back and look at the accuracy of the MarkMonitor

16  document for information," closed quote.  That is Cox Exhibit 12.

17  This is the November 12, 2019 hearing before Your Honor, page 5,

18  lines 18 to 21; page 6, lines 1 to 8.

19      Plaintiffs' counsel represented to Your Honor that, quote,

20  "There is no indication that that's the case at all," closed

21  quote.  That's at page 6, lines 9 and 10.  And Your Honor

22  thereafter sustained plaintiffs' objection.

23      Cox admits that the 2016 project was exactly that, an

24  effort after the claims period to re-download and reverify files

25  reflected on the MarkMonitor spreadsheet, and if the data on the

1   MarkMonitor spreadsheet was sufficient and did not need to be

2   checked, there would have been no reason to have done that.

3        Moreover, plaintiffs did not inform the Court at the time

4   that there, in fact, had been an effort after the fact to

5   reverify the files.  That was never mentioned to Your Honor.

6        Prior to trial -- this has to do with the hard drive prior

7   to trial.  Prior to trial, we tried to -- we challenged the hard

8   drive's foundation because it was being offered to support

9   notices sent between the 2012 and 2014 timeframe, though its

10  metadata, Your Honor may remember, said that it was created in

11  2016.  So we're trying to figure that out.

12       Plaintiffs submitted a declaration from Sam Bahun from

13  MarkMonitor, in which he described the hard drive files as

14  containing, quote, "audio files that were the subject of

15  Audible Magic identifications and as copies of the actual audio

16  files," closed quote, used for this purpose.

17       Given the extensive representations that plaintiffs made

18  as to how they were going to prove infringement, this sworn

19  statement, we submit, can only be read to mean that the audio

20  files on the hard drive were the ones captured before the claims

21  period.  And, of course, plaintiffs studiously avoided stating

22  when the files were first downloaded.

23       We submit, our position, is that this submission, Your

24  Honor, was highly misleading because plaintiffs had concealed the

25  entire 2016 project, the Statement of Work, the PCAPs, the Hash

 1    Report.  The only Audible Magic identifications disclosed at the

 2    time were those performed prior to notices being sent between

 3    2012 and 2014 and documented on the MarkMonitor spreadsheet.  The

 4    only reasonable inference for MarkMonitor's sworn statement was

 5    that the audio files were the files verified in that period, and

 6    let's talk about what happened at trial.

 7         Plaintiffs admitted the hard drive at trial based on

 8    testimony from Bahun, that it contained copies of all of the

 9    music files related to the recordings on the MarkMonitor

10    spreadsheet.  And this testimony is set forth in Exhibit 7 to our

11    moving Rule 60 motion, it's the trial transcript, page 643, lines

12    3 to 12.

13         On cross-examination, Cox asked Bahun, when were those

14    songs put on the hard drive.  Bahun testified consistent with the

15    hard drive metadata that he thought it was created at the end of

16    2015, beginning of 2016, around that timeframe.

17         Cox then moved to strike the exhibit on the basis that it

18    was made two years after the downloading of the files.  Your

19    Honor denied the motion holding that just the timing of when the

20    drive was created doesn't make it any more or less reliable.  But

21    at the Court's invitation to probe further, Cox inquired at that

22    time when the files of the hard drive -- where it came from and

23    how they were put on the hard drive.  Bahun respond to Mr.

24    Brody's questions that the files were on one of the MarkMonitor

25    systems where it would have been stored -- where it would have

1    stored them.

2         Cox followed up and asked, when the files were stored on

3    your system, to which Bahun responded that they were stored on

4    different dates and agree that some of them were stored on

5    MarkMonitor's system when they were first downloaded from the

6    Internet, first downloaded from the Internet.

7         And as for the others, he explained that he wasn't sure

8    when, but some of them were downloaded multiple times throughout

9    the course of time that we're talking about here.  That is during

10   or before the 2012, the 2014 time period when the notices were

11   sent.

12        We submit, Your Honor, that this testimony was false.

13   Plaintiffs knew they were false.  Counsel knew they were false

14   because Mr. Bahun and plaintiffs' counsel knew that all of this

15   was done in January of 2016.  There's no other way that he could

16   have answered that question.  They knew that the earlier files

17   were not retained.  There could not have been any confusion, as

18   it was plaintiffs' outside counsel who hired Bahun to do this,

19   and it was plaintiffs' counsel and Bahun that worked on this

20   project.

21        Trying to avoid what was clearly false testimony,

22   plaintiffs argue now that Bahun actually offered testimony that

23   Cox states was withheld, but plaintiffs are wrong.  The reference

24   in the trial transcript, many pages earlier and the day earlier

25   on the direct testimony, merely describes -- Bahun was merely

1    describing the composition of the MarkMonitor hard drive and,

2    specifically, why it didn't include files from the Gnutella

3    peer-to-peer network.  The only time the question at issue was --

4    was raised and Mr. Bahun answered it was on cross-examination.

5         Why did they do all of this?  Why did they misrepresent

6    the MarkMonitor evidence?  Why did they go out of their way to do

7    this if the hash versus the hash is golden?  Then why would they

8    go out of their way to do this?

9         When plaintiffs decided to file this lawsuit, Your Honor,

10   in 2016, they realized they had a few problems.  Number one,

11   MarkMonitor had not retained copies of the files for which they

12   had sent notices.  They didn't do it.

13        .  Secondly, the MarkMonitor spreadsheet that Your Honor

14   admitted, a document that they claimed represented that the files

15   identified in the notices contained the copyrighted works, did

16   not include any evidence of the underlying Audible Magic

17   verification-related files that plaintiffs would put into

18   evidence.

19        And while it was too late for plaintiffs to download

20   from -- the files from Cox the way that the plaintiffs did, had

21   Rightscorp do for BMG, they recognized that they needed to fill

22   in the evidentiary gaps to avoid unfavorable discovery, rulings,

23   and potentially a verdict.  And why does it matter?  Why does any

24   of this matter?

25        We submit, Your Honor, that these misrepresentations were

1    material because they prevented Cox from adequately attacking

2    this direct infringement evidence.  It led to the admission of

3    evidence elemental to their direct infringement case, the hard

4    drive, and the MarkMonitor spreadsheet, and, frankly, it provided

5    a false narrative to the Court and the jury in the case against

6    Cox.

7        Related to this preclusion of the alternate version of the

8    spreadsheet that we tried to get in, the Court sustained

9    plaintiffs' objection to Cox's proffered admission of the

10   alternate version of the MarkMonitor spreadsheet that contained

11   data raising issues about the mark reli- -- the reliability of

12   the MarkMonitor system, and we don't know whether Your Honor

13   still would have precluded it.  I suspect that Your Honor may not

14   know at this stage how you would have ruled.  We don't know.  But

15   if the Court had known that the MarkMonitor spreadsheet that was

16   admitted did not represent verification of files on the hard

17   drive, were versions that they failed to retain, and that

18   plaintiffs had indeed re-downloaded and reverified those files

19   after the claims period but those verifications had also been

20   destroyed, it may -- the Court may have overruled the objection

21   and allowed the admission of the evidence.  We don't know.

22       As to the admission of the hard drive and the MarkMonitor

23   spreadsheet, there is no question, in our view, that the hard

24   drive and MarkMonitor spreadsheet were essential to plaintiffs'

25   direct evidence case.  Their data expert, Professor McCabe, who

1    provided the basis for plaintiffs to argue that all of the works

2    in suit had been infringed, Professor McCabe testified that

3    unless a file allegedly comprising a work in suit was located on

4    the hard drive, it could not meet one of its four requirements

5    needed to verify the infringement.

6         And their technical expert, Barbara Frederiksen-Cross,

7    pointed to the hard drive over and over and over again in her

8    testimony when opining as to the reliability of the MarkMonitor

9    and Audible Magic systems.  I don't blame her.  I don't think

10   that she knew, but we don't know what -- what the interactions

11   were.

12        At trial, Cox sought on numerous occasions to preclude the

13   admission of the hard drive, as Your Honor may remember -- they

14   were relentless -- on the basis that its 2016 metadata undermined

15   its foundation, and there was no evidence that anyone had

16   comprehensively listened to the files.

17        In response to one such objection, plaintiffs' counsel

18   represented at sidebar, and I referred to this earlier, quote,

19   that "every one of the files went through Audible Magic which did

20   essentially the equivalent of digital listening," closed quote,

21   and that is contained, Your Honor, in Exhibit 7 to our moving

22   brief, trial transcript page 647, lines 16 to 21.

23        As a result of that exchange, that colloquy, Your Honor

24   ultimately was able to -- admitted that hard drive in.  But of

25   course the representation told to Your Honor was only a half

```
 1   truth.  While the files of the hard drive did go through
 2   Audible Magic, those verifications were destroyed.  Counsel did
 3   not disclose that to Your Honor, and the verifications contained
 4   on the MarkMonitor spreadsheet, the evidence to which counsel
 5   pointed for the purporting digital listening were for files that
 6   were also destroyed.  Counsel also did not inform Your Honor
 7   about that.
 8           And by the way, if plaintiffs had disclosed the truth,
 9   their trial narrative would have been quite different.  For this
10   reason, their primary argument in opposition that the download
11   date of a particular copy of the file doesn't change, that the
12   copies of files with the same hash values are identical -- that
13   was their argument in response to our Rule 60 motion -- we submit
14   rings hollow.
15           As I mentioned, they're presenting a different case in
16   Charter, so they've appeared to have abandoned the MarkMonitor
17   spreadsheets and it's purported verifications, a centerpiece of
18   their trial evidence here.  They have also undermined their
19   acclaimed interchangeability of the files and verifications, a
20   position both contrary to their trial strategy here and in
21   opposition to our motion, and we submit that development alone
22   demonstrates that Cox was unable to fully address this.  Let me
23   just spend a moment on why the relief is warranted, and then I'll
24   sit down, unless the Court has any further questions.
25           We think that the plaintiffs, Your Honor, should be
```

1   required to accurately present -- they should have been required

2   to accurately present their evidence to the jury.  Plaintiffs

3   would be required to proceed -- should have been required to

4   proceed on a case that would have issued a showing, a real

5   showing, and that real showing would have included the following:

6   That they failed to retain the original files downloaded by

7   MarkMonitor and verified by Audible Magic, that the MarkMonitor

8   spreadsheet does not contain verification of any of the files in

9   evidence, that the hard drive files were downloaded after the

10  claims period, and that no one listened to or verified the hard

11  drive files in the manner plaintiffs have undertaken in *Charter*.

12      A retrial, essentially, Your Honor, would require

13  plaintiffs to present their case differently, one where Cox would

14  be able to attack plaintiffs' much-diminished evidence.

15      Very briefly on the second Rule 60 motion.  Before

16  concluding, I just want to touch quickly on the second motion

17  which talks about the -- concerns the source code that we think

18  is elemental to the MarkMonitor system that was wrongfully

19  withheld during discovery in this case.

20      On the eve of a deadline to file their opposition to

21  *Charters*' motion for spoliation sanctions in the *Charter* case

22  based on missing -- a missing piece of the source code, they

23  disclosed to -- plaintiffs disclosed to *Charters*' counsel that

24  MarkMonitor had, indeed, located that source code; albeit they

25  had found it months earlier, but they told us just a couple of

1    days -- told *Charters*' counsel just a couple of days before they

2    had to file their opposition.

3         That missing source code, which Cox subpoenaed, also

4    called for here, relates to how the MarkMonitor system

5    incorporated data from Audible Magic to verify whether the

6    allegedly infringing files contained plaintiffs' copyright works

7    and sued.  The purported accuracy of MarkMonitor system, in

8    particular, its ability to use Audible Magic fingerprint matching

9    technology to ensure that only legitimate allegations of

10   infringement were made was essential to plaintiffs' direct

11   infringement case.

12        With our second motion, we request that we -- that Your

13   Honor, if so inclined to issue an indicative ruling under 62.1,

14   if it's inclined, you grant Cox's motion for relief from the

15   judgment or, at a minimum, that Cox's motion raises a substantial

16   issue that warrants further consideration.

17        Just in summing up in two sentences, Your Honor, we

18   respectfully request that the record before Your Honor supports

19   the relief under Rule 60(b).  We cited cases in our argument I'm

20   not going to repeat, but the *Schultz*, the *Eversole*, the

21   *Square Construction* cases, among others, demonstrate where there

22   are misrepresentations and failures to produce obviously

23   pertinent, requested discovery and the actions prevented the

24   moving party from fully presenting its case, where it has a

25   meritorious defense, relief is warranted.

1      We submit, Your Honor, that the record before the Court

2  represents a concerted effort, not just once, not just twice, but

3  over and over and over again, a concerted effort to withhold the

4  existence of the 2016 project and the fact that portions of their

5  direct infringement evidence were created years after the

6  discovery.

7      Plaintiffs' responses, their representations to the Court,

8  their presentation to the jury aligned with that effort.  It was

9  a strategy.  We submit the plaintiffs crossed the line at many

10 points in trying to sustain this facade.  We submit that Rule 60

11 provides for relief in these circumstances and Cox respectfully

12 submits that it is warranted here.

13     THE COURT:  Thank you, Mr. Elkin.

14     MR. ELKIN:  Thank you, Your Honor.  I Appreciate your

15 time.

16     THE COURT:  I don't have any questions now.  All right.

17     MR. OPPENHEIM:  May I, Your Honor?

18     THE COURT:  Yes, sir.

19     MR. OPPENHEIM:  That may have been the hardest thing I've

20 ever had to listen to in court.  Like many, I have kids.  They

21 play sports, and, not surprisingly, from time to time, despite my

22 best efforts, they lose games.  And inevitably, they come to me

23 afterwards and they say, "ah, the ref made bad calls, the other

24 team cheated."  And even though they're upset over losing, I have

25 to sit them down and tell them, "It wasn't the ref's fault.  The

1   other team didn't cheat.  It may have been that you just didn't

2   have a great day, you didn't have a great game plan.  Or maybe,

3   just maybe, the other team was better."  And I'm sure that

4   conversation that I've had with my kids is the same conversation

5   that millions of parents have had with their kids, and the

6   lessons we teach as a parent are lessons that we often fail to

7   follow ourselves.

8         Here, Cox didn't lose because plaintiffs cheated or

9   because the Court made mistakes on admitting evidence.  Cox lost

10  this case because Cox's actions in the way it treated copyright

11  holders and copyright infringement was shameful.  Cox created

12  sham policies to try to give the appearance of abiding by the

13  copyright laws, but when those policies and Cox's actions were

14  exposed in the light of day, Cox's culpability was obvious.  We

15  appreciate, Your Honor, to be heard today.

16        Cox's motion and Mr. Elkin's presentation this morning has

17  some fairly pointed claims of misconduct by plaintiffs, their

18  counsel, experts, and fact witnesses.  While I understand that

19  Mr. Elkin may desperately want to escape responsibility for a

20  billion dollar verdict against his client, that doesn't give him

21  license to make accusations of misconduct that everybody knows

22  who reads the record that they lack foundation.

23        My colleagues and I take our responsibility to this Court,

24  to the bar, and to our reputation very seriously.  The suggestion

25  that we have lied, hid evidence, told mistruths or half truths,

1    or misled the Court is without basis, and, frankly, surprising

2    from a firm like Winston & Strawn.  Your Honor, I will address

3    the first Rule 60 motion and allow my colleague, Mr. Gould, to

4    address the second one briefly.

5         Cox has not come remotely close to meeting the threshold

6    requirements necessary to justify a Rule 62.1 indicative ruling.

7    I won't go through all of the eight elements that Cox must meet

8    in order to succeed on its motion.  The Court is aware of them

9    and has the papers.  I'd like to focus today on three of them.

10   One is timing.  The second is Cox's claim that it was prevented

11   from fully and fairly presenting its defense; and third, that

12   there was fraud or misconduct by clear and convincing proof.

13        First, on the issue of timing.  So, the rule requires that

14   Cox file its motion, both within a reasonable time -- and it

15   can't be more than a year after entry of judgment -- and Cox

16   bears the burden of demonstrating.  And the case law generally

17   says three to four months after becoming aware of the misconduct

18   is too long for filing that motion.  There are even some cases,

19   like the *Consul Masonry* case, the fireproofing case, that say

20   two-and-a-half months is too long.

21        Here, it's very clear that Cox sat on its motion since at

22   least March 2021 but probably even November 2020.  Cox's initial

23   motion pointed to several pieces of information that it claims

24   were newly discovered as a basis for its Rule 60 motion, and it

25   points primarily to three things:  One, is the 2016 Statement of

1   Work, which Cox had, because MarkMonitor produced it to them on

2   March 26, 2019.  They had secondly, a declaration from me in the

3   *Charter* case that they point to on November 9th, 2020, and they

4   had a transcript from a hearing in the *Charter* case on

5   February 23rd, 2021.  Those are the three primary things they

6   point to in their motion.  Put that in context from a timing

7   perspective.  The jury's verdict in this case was on

8   December 19, 2019.

9        The Court would have been justified in entering verdict

10  the day the jury -- excuse me, entering judgment the day the jury

11  rendered its verdict.  If the Court had done that, Cox wouldn't

12  have even met the one-year deadline by years.

13       The judgment, though, was entered on January 12th, 2021.

14  But remember, the thrust of Cox's motion is based on

15  November 2020.  So that means that Cox had the evidence that it's

16  pointed to in its motion before Your Honor even entered the

17  judgment.

18       Cox easily could have come to this Court at that time to

19  raise the issues it is now raising.  Instead, it waited until

20  after judgment was entered and waited until after they noticed

21  its appeal and waited and waited and waited.

22       In response to plaintiffs' opposition motion which points

23  out that Cox hasn't carried its burden of showing that the motion

24  was timely, Cox admits that it delayed filing its motion.  That's

25  its defense.  It says, we delayed.  Cox tries to attempt to

1   justify its delay by saying they were waiting for fact discovery

2   in the *Charter* case to come to a close or at least near to a

3   close because they didn't actually wait for it to come to a full

4   close.  But that's not legally a justification for waiting.  The

5   rule says, you can't wait.  You have to file within a reasonable

6   time, and they point to no case law and no statute that says that

7   you meet your burden of showing that you're timely if you're

8   waiting to see other evidence.

9        Secondly, even if they were waiting, they admit that they

10  already had the evidence that they were going to rely on.  And

11  finally, they say they were waiting because they wanted discovery

12  in the *Charter* case to come to a close, but that discovery was

13  subject to a protective order so they wouldn't be allowed to use

14  that discovery in this case anyway.

15       In the intervention motion that Cox filed in the *Charter*

16  case, Cox explained that it intended to file its Rule 60 motion

17  whether or not the *Charter* court allowed Cox to intervene.  That

18  means that in September of 2021 when it filed that motion, Cox

19  already knew that it had sufficient arguments, it believed, for a

20  Rule 60 motion.  And yet, it did not file it.  And then in

21  November 2021 the *Charter* Court denied Cox's intervention motion,

22  but Cox then waited again until December 27th, 2021.

23       Since Cox had already said it was going to file the

24  Rule 60 motion whether or not the intervention motion was

25  granted, it was surprising that Cox waited another

1    four-and-a-half weeks.  Four and a half weeks may not seem like

2    much delay but when you consider it in the context of its

3    decision to hold off from November 2020 to September 2021, then

4    the decision to hold off from September 2021 to November 2021 and

5    then wait until December 2021, in the aggregate Cox waited over

6    13 months from when it claims it first had a basis for the motion

7    to file it.

8         So this District Court's motto is, "Justice delayed is

9    justice denied," and where delay is not tolerated.  Cox has not

10   and cannot carry its burden in showing that its motion is timely.

11        But to be clear, Your Honor, plaintiffs don't want to win

12   this just on timeliness.  Cox hasn't demonstrated that the

13   alleged misconduct presented it from fully and fairly presenting

14   its defense.  Cox's argument in its motion gets the facts wrong

15   and relies on cases that are totally inapposite.  More

16   importantly, Cox totally ignores the critical role of hash values

17   and MarkMonitor's reliance on hash values during the trial.

18        Cox's motion argues that if it had known -- and Mr. Elkin

19   said this this morning -- if it had known the providence of the

20   files on the hard drive, it would have aided its objections to

21   the admission of the hard drive or at least would have given them

22   a fruitful area of cross-examination.  Put a pin in the question

23   of whether Cox really did know that the files on the hard

24   drive -- where they came from.  We'll come back to that in a

25   minute.  But let's talk about the admission of the hard drive.

1    The Court properly admitted the hard drive.  At trial,

2  MarkMonitor's witness, Sam Bahun, laid a foundation explaining

3  that the song files contained on the hard drive had been produced

4  in the case, that they were copies of the songs, and they

5  corresponded to the hashes in PX11, the list of hashes contained

6  in plaintiffs' notices to Cox.

7    That was a sufficient basis for the Court to admit the

8  hard drive.  We moved its admission.  There was a sidebar.  And

9  at that sidebar, both Mr. Brody and Mr. Elkin objected to the

10  admission of the hard drive.  And what the Court said -- and

11  Mr. Elkin said it, but he said it quickly and I want to focus on

12  it for a minute -- what the Court said was, "Just the timing of

13  when it was made doesn't make it any more or less reliable."

14  That's the key, Your Honor, whether the files were reliable

15  copies of what Cox's subscribers had infringed.  They were, and

16  there's no doubt about it.

17    Plaintiffs built their entire case around the idea of

18  hashes and that hashes were unique identifiers, and that if you

19  found two files that had the same hash, those files were exactly

20  bit-for-bit perfect replicas of each other.

21    MarkMonitor described its process for identifying

22  infringers, and Mr. Elkin described it, but he described it

23  without mentioning hashes.  It's hard to describe the MarkMonitor

24  process without mentioning hashes, but he did, and he did it for

25  a reason; because he doesn't want the Court to focus on them.

```
1        MarkMonitor would search peer-to-peer networks for

2   infringing files, he'd download them, confirm they were

3   infringing and then log the files in the hashes in what were in

4   the files.  MarkMonitor would then go out on the peer-to-peer

5   networks and look for individual subscri- -- users who were

6   distributing files with that exact same hash.  MarkMonitor would

7   connect to that user long enough to identify the user, confirm

8   that the hash of the file that they were distributing had -- was

9   the same, and then they would disconnect.  MarkMonitor said that

10  it never downloaded the file again, and the reason MarkMonitor --

11  excuse me, both Mr. Bahun and Ms. Frederiksen-Cross explained why

12  it wasn't necessary to download the file again.  They both

13  described that because you knew that the hashes were the same,

14  you knew it was the exact same infringing file.  This was all put

15  in front of a jury.  The jury heard at length about the

16  uniqueness of hashes, the reliance of hashes in the MarkMonitor

17  system.

18        Cox claims in its brief, both its opening brief and its

19  reply brief, that they contested the -- the concept that hashes

20  were unique and reliable.  But if you look at Cox's arguments in

21  their briefs, they will citation to that.  They can't cite to

22  anything in the record where they say they disputed the

23  reliability of hashes and -- and frankly they couldn't.  Courts

24  have regularly held that hash values are more unique than DNA.

25  U.S. versus Thomas is an example.
```

```
 1        Before we came in this morning, Your Honor, before we
 2   appeared this morning, Your Honor, there was a child pornography
 3   case, I think.  Well, child pornography cases regularly rely on
 4   hashes to identify criminals, and prosecutors rely on hash values
 5   for convictions, U.S. versus Larman.
 6        There can be no doubt that the use of hash values to
 7   confirm that files are identical is reliable.  So why is this
 8   important?  The entire basis for Cox's argument that it was
 9   prevented from fully and forward putting forward its defense is
10   that the 2016 downloads were not reliable copies of the
11   infringing files.  But we know that's not true because they all
12   had the exact same hashes, and that was the testimony.
13        So whether MarkMonitor had stored the infringing files on
14   its server when it had originally downloaded them or
15   re-downloaded them from peer-to-peer networks three years later,
16   it doesn't matter.  They are perfectly identical copies of the
17   infringing files.  And so when the Court asked the question as to
18   whether the files were reliable, the answer is yes, they were.
19        So let me step back and look at the bigger picture of this
20   for a moment.  All of Cox's substantive arguments seek to call
21   into question the evidence of direct infringement by Cox's
22   subscribers, but none of the evidence that Cox is claiming newly
23   discovered dispute that the direct infringement occurred.  This
24   isn't like the Schultz case that Cox cites where the evidence
25   that was withheld included a Coast Guard report that fully
```

1   exonerated the defendants.

2        The evidence of infringing activity on Cox's network was

3   overwhelming.  We had admissions by Cox's own employees that the

4   infringement was happening.  We had admissions by Cox's users

5   that the infringement was happening.  There were millions of

6   notices of infringement, not just from the plaintiffs but from

7   many, many other rights holders indicating that Cox's network was

8   ripe with infringement.

9        To the extent that Cox is arguing that it was prevented

10  from putting on a defense because there's some question about the

11  underlying direct infringement -- whether the underlying direct

12  infringement occurred, that argument is just without any support.

13  The overwhelming evidence shows that there was direct

14  infringement.

15       The argument that Cox could not fully defend itself

16  because it did not know that the song files had been downloaded

17  in 2016, what Mr. Elkin just said, it's just not credible, Your

18  Honor.  They had the 2012 to '15 Statement of Works from

19  MarkMonitor, and those Statement of Works described the notice

20  program and set forth in detail exactly what was going to be

21  preserved, such as the notices, the log files, the evidence

22  packages.  Those SOWs did not require the preservation of the

23  infringing files.  Cox also had the 2016 SOW that described the

24  downloading process in 2016.  And, Your Honor, I'm happy to hand

25  up Exhibit 16 from -- is it plaintiffs' opposition, no it's from

```
 1    Cox's motion, unless Your Honor already has it.

 2         THE COURT:  Present.

 3         MR. OPPENHEIM:  It's just Exhibit 16.  Thank you.

 4         This is the 2016 Statement of Work that Mr. Elkin said

 5    they didn't know what it was.  Well, if you look at this in the

 6    first paragraph, Your Honor, it says on the third line that this

 7    was entered pursuant to the Master Services Agreement dated

 8    December 2011.  Well, they knew that that was the same Master

 9    Service Agreement that -- under which the 2012 to '15 SOWs were

10    entered.

11         So they knew this was related to the exact same Master

12    Services Agreement.  And if you look at the second paragraph it

13    specifically says in the last sentence, "The services are being

14    provided in anticipation of litigation."

15         And then if you look at the scope of work, it describes

16    the four protocols covered by MarkMonitor P2P solutions for the

17    project, and those are the exact same networks at issue in the

18    case.

19         Respectfully, Your Honor, nobody could have looked at this

20    and reasonably come to the conclusion that it had nothing to do

21    with the case.  Cox also had the hard drive with the files, and,

22    Your Honor, if you look at Plaintiff's Exhibit 3 to its

23    opposition which I'm happy to hand up as well.  Sorry.  This is

24    my last one.  I apologize for that.  This is the e-mail that my

25    colleague, Mr. Gould sitting at Counsel's table sent to
```

1    Ms. Golinveaux, counsel for the plaintiffs, among others.  And it

2    describes that the hard drive had been sent and he describes it,

3    which contains copies of the infringing files.  It said right up

4    front, they were copies of infringing files, and then they had

5    the files, and the files had the 2016 metadata.  Well, let's

6    think about that for a minute.

7         Cox new the case had been filed in 2018.  Discovery had

8    been promulgated in 2018.  The hard drive was produced to them in

9    2018.  What did Cox think about the fact that they had -- that

10   the files had 2016 metadata?  Cox didn't care, Your Honor, and

11   the reason Cox didn't care is because Cox knew that it made

12   absolutely no difference.  They knew whether the files had been

13   downloaded in 2010 or 2016, it didn't matter because they had the

14   exact same hashes as the hashes in the notices and in the log

15   files.

16        But even if you accept Cox's claim that it didn't know

17   that the files had been downloaded in 2016, you had to expect Cox

18   to at least ask a question about it.  They had all of these

19   materials.  They had the 2016 SOW.  They had the infringing files

20   before they took a single deposition of a single witness.  And

21   yet, they did not ask a single question.  And the law is clear

22   that if you are given the opportunity to ask the question and

23   find the evidence, that is enough of a basis to reject a Rule 60

24   motion.

25        Let me turn, Your Honor, to the last issue I want to

1   address today, which is the most difficult one to address,

2   because it is outrageous:  The claim that plaintiffs, plaintiffs'

3   counsel and plaintiffs' witnesses engaged in fraud or misconduct.

4   Cox hasn't met its burden of showing it, yet alone it's burden of

5   showing it by clear and convincing evidence.

6        Plaintiffs' brief goes through each and every one of the

7   alleged misstatements and shows why those statements were

8   truthful.  Taken at face value, Cox's motion, if you believe it,

9   was Mr. Elkin's argument, was that plaintiffs lied, plaintiffs'

10  counsel lied, MarkMonitor's witnesses lied and plaintiffs'

11  experts lied.  So contrary to Cox's claims, there was no massive

12  conspiracy or cover up.  The statement by plaintiffs' counsel and

13  the witnesses were truthful and accurate.  I'm happy to go

14  through each of the alleged eight alleged acts of misconduct

15  separately, but let me just hit a few, and I'm happy to answer

16  your questions on any others.

17       Accusation 3.  Let's start there.  Plaintiffs withheld the

18  2016 SOW despite a court order.  First and foremost, they had the

19  SOW, Your Honor, and they can't deny that.  They not only had it

20  they admitted they saw it.  That's what Mr. Elkin said today.

21       The claim that it was buried -- in their briefs they

22  actually claimed it was buried in irrelevant documents.  That is

23  hogwash.  It was one of 33 documents in the production.  Now,

24  sometimes there can be really big documents.  These weren't --

25  those 33 documents were 240 pages, and we know that Cox reviewed

1    that production because they used other documents from that

2    production in depositions.  You know what they haven't done?

3    They haven't put forward a declaration in this case to Your Honor

4    to say, we didn't see it, now we hear that they couldn't, or we

5    didn't know what it was, and they haven't explained why they

6    didn't ask any questions about it.

7         Cox complains that it was misconduct that plaintiffs

8    hadn't produced it.  It is true that plaintiffs didn't produce

9    it, but this was not an agreement with the plaintiffs.  As Your

10   Honor can see looking at it, it was an agreement between the RIAA

11   and MarkMonitor.

12        Cox complains that plaintiffs were ordered to produce it.

13   That's not true.  Plaintiffs were ordered to produce agreements

14   between plaintiffs and MarkMonitor relating to the program at

15   issue.  And I was listening to Mr. Elkin's presentation and one

16   of the things he said, quote, "Judge Anderson ordered plaintiffs

17   to produce all of their written obligations to MarkMonitor."

18   Well, that's not true, Your Honor.  That's a misstatement.

19   Judge Anderson's order limited to the program at issue and

20   limited it to the plaintiffs.  Plaintiffs fully complied not only

21   with the letter of Judge Anderson's ruling but the spirit of it.

22   But even if there was a question, it certainly doesn't

23   demonstrate misconduct by clear and convincing evidence.  Again,

24   Cox had the SOW.  Based on *Tunnell versus Ford Motor Company*,

25   Your Honor, if Cox had the information, it could have pursued it

1    in discovery, and that's a basis to deny the Rule 60 motion.

2         Accusation number 4, Your Honor, plaintiffs concealed the

3    significance of the 2016 SOW and on this Cox points to a

4    statement by Mr. Bahun, quote, "The RIAA MarkMonitor did not

5    enter into a separate SOW concerning any litigation program."

6    Well, that is, in fact, a statement in Mr. Bahun's declaration.

7    It fully takes out of context what Mr. Bahun was talking about in

8    the preceding sentences.  The declaration was talking about the

9    2012 SOW that has a reference in it to a quote, "Corporate P2P

10   litigation program," and that reference says that "if the RIAA

11   intends to pursue that, it will need to do so under a separate

12   SOW," and Mr. Bahun was explaining there was no separate SOW for

13   that litigation program.

14        Even if one were to think that Mr. Bahun's statement was

15   vague or ambiguous, which I don't believe it even comes remotely

16   close to that, Your Honor, because in context it's very clear, it

17   certainly does not demonstrate that he was engaged in fraud and

18   misleading by clear and convincing evidence.

19        Accusation number 5, Your Honor, that plaintiffs

20   misrepresented that there was no effort to validate the data in

21   the MarkMonitor 236 spreadsheet, and Mr. Elkin referred to this

22   in his argument as well and to the statement that I made at

23   sidebar to the Court.  This is simply not true, and the answer

24   was -- that I gave, was and is correct.  The 236 spreadsheet was

25   never an effort to validate data, and Cox has no support for

1    that.  Cox goes on to say, well the use -- excuse me, "The

2    requirement of MarkMonitor to run the files in 2016 through

3    Audible Magic was obviously yet another effort to validate the

4    data, and they -- we had an obligation to put that forward."  The

5    -- the language in Cox's brief is that it -- the SOW required

6    MarkMonitor and Audible Magic to, quote, "reverify the downloads

7    to ensure they contain copies of plaintiffs' copyrighted works."

8    This is the kind of advocacy that undermines Cox's credibility.

9        If you look at Exhibit 16, there's nothing in SOW that

10   says anything about reverifying.  Nothing that talks about

11   ensuring.  What it says is that the process would -- "The files

12   would be processed against Audible Magic for identification and

13   verification."  It does not say why that was done, and Cox's

14   effort to suggest why it was done has no credibility.

15       Now, Your Honor, the reason it was done is work product,

16   and I am happy on a sidebar in camera to explain it to Your Honor

17   so it is not a waived issue, but there is no credibility to the

18   suggestion that the reason it was put through -- the files were

19   put through Audible Magic was because there was an effort to

20   reverify them.

21       In Cox's brief on page 16, it says the reason that

22   MarkMonitor was contracted to do an Audible Magic look up, and it

23   then contains a quote about verification.  I look at this over

24   and over again.  There's -- there's no cite in the quote and that

25   quote doesn't exist anywhere.  Never -- nobody, ever, ever, ever

44

1   has said that 2016 Audible Magic look ups were done for purposes

2   of verification.  They took words out of another quote from

3   another person somewhere without citing it, put them together and

4   decided that was a legitimate way to brief the issue.  It's not.

5          Accusations 1 and 2, that the plaintiffs caused -- one,

6   that the plaintiffs caused MarkMonitor witness and an expert to

7   give testimony that mischaracterized the hard drive's contents,

8   and two, that the plaintiffs submitted a declaration and made

9   arguments that mischaracterized the hard drive.  These both go to

10  the same issue.  The statements by the witnesses were accurate

11  and truthful as set forth in our opposition.  I don't need to go

12  through them word-for-word.  They stated that the files were

13  copies of the infringing recordings, and we already established

14  at trial in 2019, if they had the same hash, they were bit for

15  bit perfect copies.  But the gist of the acquisition is that Cox

16  only learned from discovery in the *Charter* case that the files on

17  the hard drive were from 2016.

18         The argument Cox is putting forward is that it wasn't

19  until the *Charter* case that they realized that, but we already

20  went through.  They had the 2012 through '15 SOWs which described

21  what would be preserved in what pot.  They had the 2016 SOW, they

22  had the files with the metadata, and they knew that the case had

23  been filed in 2018, and they knew that the metadata was from

24  2016.  Cox absolutely should have known and frankly they probably

25  did know that the files had been downloaded in 2016.  Your Honor,

1    before I turn over to my colleague Mr. Gould who will address the

2    discovery piece of the first one as well because they're the

3    same.

4         THE COURT:  Okay.

5         MR. OPPENHEIM:  Cox's Rule 60 motion lacks any merit.  The

6    reason that we are here is not because plaintiffs or their

7    counsel or their witnesses said or did anything wrong, we're here

8    because a jury held Cox responsible to the tune of a billion

9    dollars for its completely outrageous behavior.  We're here

10   because counsel for Cox decided to try this case in a manner that

11   obviously didn't work, and they desperately want a do-over

12   thinking that that might change the outcome, but the jury didn't

13   render a billion dollar verdict because the plaintiffs misled

14   them on the providence of the recordings.  The jury rendered a

15   billion dollar verdict against Cox because Cox was an obvious,

16   massive, willful infringer, and nothing Cox has said in its

17   motions changed that fact.

18        THE COURT:  Thank you.  All right.  Mr. Gould.

19        MR. GOULD:  Good morning, Your Honor.  May it please the

20   Court.  Nice to be back in your courtroom, sir.  I want to

21   address largely the second Rule 60 motion, but there's an overlay

22   with the first and that, as a sort of soft ball at the end,

23   *Charter* asked -- excuse me -- Cox asked for some unspecified

24   discovery in connection with the first motion.  So, the second

25   Rule 60 motion should be denied outright for multiple reasons.

1    First, Cox concedes it cannot meet the Rule 60 elements.  That

2    should be the end of the matter.  This is really just a motion to

3    compel discovery.  But nothing in Rule 60 authorizes postjudgment

4    discovery, and even if it did, Cox's appeal divested this Court

5    of jurisdiction to alter status of the case and the record

6    pending on appeal.

7         As to the first point, they filed this motion on the eve,

8    I think the day -- the night before the one-year deadline.  Rule

9    60 has a very rigid one-year deadline for 60(b) motions.  Cox

10   concedes in its papers that it can't establish those elements,

11   specifically to show that the new evidence would likely change

12   the outcome.  If you read its papers closely, it argues that it's

13   spec- -- if its speculation pans out, it might warrant relief in

14   the future, and the opening memo at page 1 says, "New information

15   may warrant further relief."  There's similar references

16   throughout their two papers.  By any measure they failed to

17   satisfy the hide burden of Rule 60 and yet, oddly at page 9 of

18   their reply brief in ECF 768 they criticize plaintiffs for,

19   quote, "wrongly focusing on the merits of Cox's anticipated

20   Rule 60(b)2 motion," end quote.

21        It's not an anticipation -- anticipated motion.  ECF 748

22   clearly states in bold, capital letters, "motion for relief from

23   judgment under rules 60(b)2 and 60(b)3 and requests for

24   indicative relief -- excuse me, indicative ruling under rule

25   62.1."  Respectfully, we think this one's a bit easy.  They filed

1    a motion seeking extraordinary relief, they can't satisfy the

2    burden.  The motion should be denied.

3         Recognizing this, Cox asks the Court to instead consider

4    its motion a placeholder, hold that motion in abeyance, authorize

5    the discovery, fishing expedition based on speculation and hope,

6    and permit Cox to re-file an amended Rule 60 motion, while

7    outside 60(b)'s one-year time bar.  At heart, Your Honor, this is

8    a Rule 37 motion to compel three years after the close of

9    discovery, and our request to toll or relieve it from Rule 60's

10   one-year time bar.

11        The Court should deny this, too.  There's no discovery

12   provision in Rule 60.  Cox cites no case anywhere in the 4th

13   Circuit, not the 4th Circuit or any District Court within the

14   Circuit that has granted or endorsed the idea of Rule 60

15   discovery.  The mandate is with the 4th Circuit and this Court

16   lacks jurisdiction to alter that record on appeal.  And they

17   offer no basis to toll this Rule 60 deadline in any event.

18        Now, in its papers Cox sort of indistinctly conflates two

19   issues.  One is the right to Rule 60 discovery generally, and one

20   is the Court's authority to order discovery given that the

21   mandate is now with the 4th Circuit.

22        Under both scenarios, the result is the same, but it's

23   important to address both of them and so -- so I will.  I'll talk

24   first briefly, Your Honor, about divestiture.  It's -- it's

25   fairly black letter law that filing of appeal divests the

1   District Court of jurisdiction over most aspects of the case.  We

2   cite numerous 4th Circuit and Supreme Court cases at our brief,

3   and with good reason.  As the 4th Circuit explained in

4   *Doe versus Public Citizen*, quote, "A district court does not act

5   in aid of an appeal when it alters the status of the case, as it

6   rests before the Court of Appeals," end quote.  So, to use a more

7   technical term, Your Honor, it basically mucks up the appeal.  It

8   creates a confused record with a moving target, and Cox again

9   cites nothing in the 4th Circuit endorsing anything otherwise or

10   any discovery while the case is on appeal and overwhelmingly

11   courts find that discovery on these -- in this posture is

12   unwarranted and inappropriate.

13       See with the rules, Your Honor, the only basis that I'm

14   aware of is a motion to compel under Rule 37, and what Rule 37(b)

15   says is that "such a motion must be made in the court where the

16   action is pending."  Well this case is closed, retains limited

17   jurisdiction to entertain certain types of ancillary issues and

18   certainly to enter a 62.1 indicative ruling, but not to entertain

19   a 37 motion to compel.  And if you look at Rule 62.1(c), even in

20   the event of an indicative ruling, if you look at 62.1(c), it

21   says, upon remand, excuse me, it says, "The District Court may

22   decide the motion if the Court of Appeals remands for that

23   purpose," and now the motion there clearly refers to a Rule 60

24   motion and remand for that purpose clearly refers to entering an

25   order under Rule 60.

 1          Now, even absent an appeal and divestiture nothing in Rule

 2    60 authorizes discovery, and the only case within the 4th Circuit

 3    that either party has identified that addresses this issue at all

 4    is a Maryland -- a district Maryland 2016 case called

 5    *United States versus Higgs*, and what that court found was -- this

 6    was a Rule 60(b) motion for fraud on the court.  Rule 60(b) has

 7    no discovery provision, and the Court has found none from this

 8    circuit to support his request for such discovery.  60(b)2 and

 9    60(b)3 of course are the -- are the same.

10          Now, admittedly outside of the 4th Circuit a few courts

11    have granted Rule 60 discovery, but it's heavily disfavored and

12    it's exceedingly rare.  And that makes sense where parties have

13    had a full and fair opportunity to litigate their case and

14    respecting the finality of judgments.

15          Cox cites a few outlier case from out of circuit, but none

16    change the results here, and I want to address them briefly

17    because I think this is-

18          THE COURT:  No, I don't need you to do that.

19          MR. GOULD:  Thank you, Your Honor.

20          I -- I don't think I need to get to the merits too deep on

21    the second motion, but I want to touch on one point.  So, the

22    basis -- and I'll remind the Court that Cox's claim for this new

23    found source code that purports to relate to the file

24    verification step in MarkMonitor's process, and I know you read

25    the papers you referred already to getting in the weeds here so

1    I'll stay at a high level.

2         At a high level MarkMonitor sends a file -- a fingerprint

3    of a file to Audible Magic, Audible Magic does a matching

4    algorithm, generates a response and sends it to MarkMonitor.

5    Now, on page 1 of Cox's second Rule 60 motion, Cox describes the

6    code as relating to how MarkMonitor system, quote, "incorporated

7    data from Audible Magic to verify whether an alleged infringing

8    file contains plaintiffs' copyrighted work."

9         Now it's worth pausing briefly on that because it's not

10   actually Audible Magic's code that's doing the matching that is

11   newly disclosed.  Audible Magic produced this code and Cox's

12   experts inspected it.  So according to Cox, this is MarkMonitor's

13   ancillary code that receives -- receives and adjusts Audible's

14   responses.  Now, Cox argues in its reply that we somehow put the

15   code and its function at issue by talking about it in the brief

16   but ignores the fact that we adop- -- used and adopted their own

17   characterization of it, so we took that at face value and argued

18   the point.

19        Now, I really want to focus on two substantive points

20   briefly.  One is -- you know a lot of these factors start to

21   blend a little bit exceptional circumstances, was it material, is

22   it cumulative, would it change the outcome, were they prevented

23   from fully and fairly?  I'm not going to go through each of

24   those, but I want to mention a couple of points that I think

25   check quite a few of those boxes in a totality type of regime.

```
 1          First, and this is new, Your Honor, it's not in the

 2    papers, and I think it's really important context.  You're aware

 3    that the Charter and Brighthouse cases are ongoing.  Marching

 4    towards trial, and you're aware that Mr. Elkin and Ms. Golinveaux

 5    and Ms. Anderson -- Mr. Anderson and their colleagues at Winston

 6    represent those parties.  That's why we're all here today.

 7    They've had access to all this information in all these other

 8    cases.

 9          What's happening here demonstrates this is purely an

10    opportunistic move, Your Honor.  It's not really a concern about

11    something material that would change the outcome here, and let me

12    explain to you why.  They've taken the exact opposite position in

13    those cases with respect to this new -- this new disclosed code.

14    Mr. Elkin argues here that Charter code disclosed two years after

15    the trial is so essential that Cox was denied a fair trial, and

16    he speculates that the existence of this code would change the

17    outcome of this case.

18          Now, in the Brighthouse and Charter case, the same code

19    came to light after discovery but seven and nine months before

20    trial; two years after trial, seven and nine months before trial.

21          Now, MarkMonitor immediately offered to make that code

22    available for Charter and Brighthouse's expert's inspection.  And

23    not only did Mr. Elkin's clients refuse to review the code, but

24    Mr. Elkin and Ms. Golinveaux signed a Rule 37 motion sanctions

25    motion against plaintiffs and MarkMonitor to preclude any use or
```

1    reference to this newly disclosed code at any motion, at any

2    hearing, or any trial.  They've argued that inserting into the

3    record in those cases seven and nine months before trial, this

4    new code would be so unduly prejudicial, so disruptive to the

5    case record that the only fair outcome is total preclusion, and

6    they offer to throw in some other sanctions on our backs in the

7    mix.  "It's too late," they told the courts.

8         There is no way, Your Honor, to reconcile those two

9    positions from pleadings signed by Mr. Elkin.  The same code

10   found nine months before trial must be excluded on fairness

11   grounds and never inspected by anyone, but here the very same

12   code whose absence Cox ignored during discovery and trial, as we

13   set forth in our papers, found two years after trial is so

14   essential, so material, that it requires overturning a verdict

15   and a judgment.

16        I'm going to skip some of these things that I have a sense

17   you're well aware of.  So -- another point too, to the extent

18   there's any -- okay, I'm -- claim that plaintiffs are somehow --

19   need to be held accountable for MarkMonitor -- strike that.  Let

20   me pause for a moment, Your Honor.  The second part of Cox's

21   rule, second Rule 60 motion is a B-3 request based again on fraud

22   or misrepresentation and it's even more speculative and flawed.

23        Now for this Cox must prove misconduct by a party, by

24   clear and convincing evidence.  Now they don't allege any

25   misconduct by a party let alone by clear and convincing they say

1    nonparty MarkMonitor didn't produce some code that they think it

2    should have.  It hasn't showed any misconduct or violation by

3    MarkMonitor.  Now the records show that during the case

4    MarkMonitor produced the code that identified and believed was

5    responsive.  The parties disagree about whether it was responsive

6    to the subpoena and Cox in the first place.  I'm happy to talk

7    about that, Your Honor, I just encourage you to take a close look

8    at the two different pieces --

9         THE COURT:  Yeah, I need to --

10        MR. GOULD:  Thank you.  More importantly, this has nothing

11   to do with the plaintiffs.  When plaintiffs learned of this new

12   code in the *Charter* case, you know what they did, Your Honor?

13   Immediately, the day they learned they told the other side.

14   Didn't wait to figure out what happened, why, where was it going,

15   what else was found.  Immediately, the day of, within hours

16   there's a declaration in the record signed by me attesting to

17   when plaintiffs learned and when we disclosed.  This notion of

18   misconduct again is farfetched and now they try -- they speculate

19   and ask for discovery to explore the extent to which we were --

20   plaintiffs were responsible for the nondisclosure and the late

21   disclosure.  There's no -- there's no there, there.

22        They knew we had no control over the source code.  They

23   sought it from us in the first place, we objected because we

24   lacked possession and control.  They understood that and they

25   served a subpoena on MarkMonitor, they moved to compel

1     MarkMonitor.  Plaintiffs didn't appear in that ancillary -- that

2     miscellaneous subpoena case in California.

3          Now they say we have a contract, plaintiffs have a

4     contract with MarkMonitor as a consultant to cooperate.  True.

5     But if you look at that and an exhibit to the papers, it's 739-9

6     on ECF.  It's a consulting agreement that obligates MarkMonitor

7     to produce some data, affidavits if needed, and court and

8     deposition appearances.  It doesn't say anything about obligating

9     us -- obligation them to produce their proprietary secret sauce

10    and source code, and the contract that sets forth the

11    relationship in the first instance, this is the master agreement

12    between the parties which is PX3 in the trial record, isn't in

13    these papers, sets very clearly that MarkMonitor at all times

14    retains all right, control, access, everything over its source

15    code.  The idea that we somehow engineered this is -- is

16    farfetched.

17         Lastly, finality.  Even if Cox satisfies its elements, the

18    Court still must balance the policy of favoring finality.  Here

19    there's no misconduct, certainly by clear and convincing

20    evidence.  This last ditch hail Mary by a losing party as the

21    clock runs out should be denied.

22         Now, I want to talk just briefly about the specific

23    discovery sought, and here I'll talk about the two motions.

24         THE COURT:  No, I don't need to hear.  I don't want to

25    hear about the specific discovery.

```
1          MR. GOULD:  Thank you, Your Honor.  If you have any

2    questions I'm happy to answer them.

3          THE COURT:  I don't.  Thank you.  All right.  Mr. Elkin,

4    brief reply.

5          MR. ELKIN:  Thank you, Your Honor, I'll just be brief I'm

6    not going to touch on all the points that I think were adequately

7    covered by the papers.  I do want to mention several -- first

8    having to do with the timing, why did we wait until the time that

9    we waited?

10         The November 2020 declaration from Mr. Oppenheim, first of

11   all is reacted, and secondly, did not contain the serious

12   disclosures that did not occur until the spring of 2021.  We were

13   just about headed into fact and expert discovery with these

14   issues were going to be fully fleshed out, and we didn't have an

15   opportunity to really go into them, and we wanted to make just

16   one Rule 60 motion if we were going to make it.  And so that was

17   a decision we wanted to have the most robust record we possibly

18   could, and clearly, we would have had to have sought relief --

19   Cox would have had to have sought relief under the protective

20   order in the *Charter* case.  An effort was made to -- to do that,

21   it was not granted, and we repositioned our motion as quickly as

22   we possibly could.  That is our good faith and good reason for

23   why we did what we did.

24         With regard to the hash values, the issue is -- first of

25   all, I haven't taken issue with the notion of hash values in this
```

1    argument, and I haven't taken issue with them in our motion

2    papers.  The issue for us, first of all, is that's not the case

3    they presented.  They specifically presented a case with this

4    hash technology but predicated on the MarkMonitor spreadsheet and

5    the -- and the audio files.  That was the case they presented.

6    That's the case Your Honor heard.  It's the case the jury heard,

7    it's the case that was presented to us.  And nowhere in

8    Mr. Oppenheim's argument did he specifically reference the notion

9    that the -- that the hashes themselves at some point have to be

10   tethered to the audio files.  And that does not exist in the

11   record.  I suspect that one could actually just match hash

12   numbers and hash numbers, but that's not the case they presented,

13   and the case would have been certainly subject to far more

14   rigorous review, especially given the burden that they have with

15   regard to establishing what they are and how they are.

16        Mr. Oppenheim's reference to the testimony of Mr. Bahun in

17   terms of the metadata on the 2016 hard drive conflated the

18   questions that we put to the witness with regard to the date of

19   the audio files with the date of the hard drive, so that's really

20   of no moment.  And they -- with regard to the preservation of the

21   evidence under the 2016 Statement of Work, first of all the

22   2000- -- the fact that there's a 2011 master agreement, there are

23   so many different Statements of Work that had nothing to do with

24   this case.  The mere fact that there was a reference to -- and a

25   preamble about May 2008 was of no particular moment, but,

1   frankly, even if it was, would it be -- the issue is not whether

2   we could have asked a question, we should have asked a question

3   in a deposition about what are these audio files or tell us about

4   this agreement.  The issue is -- is the misconduct that we have

5   tried to present to the Court, not whether or not we could have

6   been clever to have asked one question or the other question or

7   somehow we should have caught their practice in some way, shape,

8   form, or otherwise.  And the notion -- the only agreement with

9   regard to all of the agreements that the plaintiffs entered into

10  with MarkMonitor that they produced, they're all with the RIAA,

11  they're not with the individual plaintiffs.  The only agreement

12  that wasn't with the RIAA was the 2018 agreement between

13  Oppenheim and Zebrak and MarkMonitor.  That was the so-called,

14  you know, work product special servicing that they -- that they

15  did for them.

16          In terms of the misconduct, the -- Bahun's declaration --

17          THE COURT REPORTER:  I'm sorry?

18          MR. ELKIN:  Yes.  Bahun's declaration, B-A-H-U-N, his

19  declaration of MarkMonitor that somehow the notice program of

20  2012 to 2015, that was, you know -- that somehow the 2016

21  Statement of Work didn't relate to the 2012 and 2015 notice

22  program just really can't be reconciled.  The reason why they did

23  the 2016 project as we now know, was to create, recreate the

24  files in the record with respect to that notice program, so the

25  fact that he could make the sworn statement to the contrary, I

1    think is worth noting.

2        And there was a statement that was made in Counsel's

3    argument with regard to the fact that if -- that we should have

4    known that the files were downloaded in 2016.  I can assure you

5    that if we knew that the audio files were downloaded in 2016, we

6    certainly would have argued that to Your Honor.  We would have

7    made a big deal about that to the jury.  We would have asked

8    Your Honor to revisit some of the other rulings --

9        THE COURT:  Well, isn't the question whether you had it or

10   not and could have looked at it and chose not to look at it

11   versus what you would have done had you known?

12       MR. ELKIN:  Well, there's nothing in the indication --

13   Your Honor, there's nothing in the audio files themselves that

14   indicated when they were sourced.  That information was in the

15   PCAPs.  They did not produce the PCAPs.  They produced the audio

16   files pursuant to the 2016 project, but they did not give us the

17   correlative evidence that would have given us the ability to know

18   that.  We tried to find that information.  We -- initial- -- we

19   were suspicious, we wanted to find that information.  We asked

20   whether the significance of the 2016 metadata on the hard drive,

21   and Your Honor asked us to probe further, which we did, and

22   Mr. Bahun lied in his testimony.  So yes, if we would have -- if

23   the evidence would have been there, of course we should have, but

24   it wasn't there, Your Honor.  It just wasn't.

25       I -- the a -- so I -- I just -- and -- and at the end of

1    the day, with regard to the statements, they did all they could

2    to camouflage.  They made statements from the very beginning of

3    the case through the end of the trial, gavel-to-gavel that the

4    audio files that MarkMonitor went and captured occurred prior to

5    the notice program some time in the 2000s, and then on the basis

6    of that they had those files verified by Audible Magic and

7    they -- MarkMonitor then went to scour the Internet downloading

8    these peer-to-peer protocols on ISP networks to be able to notice

9    subscribers.  That was their linear progression of evidence.

10   They didn't say, oh by the way the audio files really didn't

11   occur during the period of time we said, it occurred, you know,

12   many years after we sent the notices.  They didn't say that, so

13   we had no basis to understand that that was the case.

14        So the last thing I want to mention is with regard to this

15   source code.  We think it is elemental to this case given the

16   fact that the verifications that they claim occurred had nothing

17   to do with the audio files in evidence at all.  Audible Magic's

18   source code is -- is not the issue.  The issue was the extent to

19   which MarkMonitor's system interacted with Audible Magic and that

20   would be lodged with the MarkMonitor source code itself.  I'm not

21   going to get into some of the reasons why various correspondence

22   that's not before the record exist, except for to say that at the

23   time the source code was actually produced, all of the expert

24   depositions in the case had been conducted.  All of the fact

25   witness testimony had been conducted.  The motions for summary

1    judgment had all but been briefed, and it's a completely

2    different context in which to be able to evaluate whatever

3    statements that Mr. Gould described to counsel in that case.

4         The last point I want to make Your Honor before resting,

5    unless Your Honor has any questions, is whether about this is a

6    case of being a sore loser, and whether this was a situation

7    where Cox had acted badly and somehow we're trying to get a

8    second bite at the apple.  This is not about Cox's conduct, and

9    this is not about at the end of the day being concerned about

10   whether a particular strategy worked or it didn't work.  The

11   issue with that is whether or not the plaintiffs' conduct had a

12   deleterious effect on our ability to be able to present our case.

13   A cornerstone of this trial was all about the direct

14   infringements.  We spent a lot of time, as Your Honor remembers,

15   I'm sure, going over the bonafides of the MarkMonitor system, the

16   technology, the infringing files.  We heard recordings from start

17   to finish.  The issue, I would respectfully urge the Court to

18   consider in deliberating over this motion, is whether or not

19   their misrepresentations, the plaintiffs' misrepresentations and

20   misconduct affected our ability to raise material points that we

21   think are consistent with our rights to be able to have

22   adjudicated in your courtroom.

23        THE COURT:  All right.  All right.  Thank you, Mr. Elkin.

24        MR. ELKIN:  Thank you, Your Honor.

25        THE COURT:  Thank you, counsel.  We'll take it under

1    consideration.  I appreciate you coming in and the arguments that

2    you've made and the pleadings have been very professionally done.

3    I remember the case well.  I have a case in limine and *Daubert*

4    motions this afternoon with 31, and it pails in comparison to the

5    litigation that you all undertook.  You looked very closely at

6    all the issues, and it was obviously an interesting case from a

7    legal standpoint and very well handled at the trial level and now

8    at this level.  So I appreciate that, and we'll get you out a

9    decision shortly.  All right.  Have a good weekend.  We're in

10   recess.

11        (Proceedings adjourned at 11:59 a.m.)

12                **C E R T I F I C A T E**

13

14            I, Scott L. Wallace, RDR-CRR, certify that the
     foregoing is a correct transcript from the record of proceedings
15   in the above-entitled matter.

16        /s/ Scott L. Wallace                    3/22/22
          ------------------------------     ----------------
17     **Scott L. Wallace, RDR, CRR**          **Date**
        **Official Court Reporter**

18

19

20

21

22

23

24

25

**'**

**'15** [3] - 37:18; 38:9; 44:20

**/**

**/s** [1] - 61:16

**1**

**1** [4] - 18:18; 44:5; 46:14; 50:5
**10** [1] - 18:21
**10,017** [1] - 14:19
**101** [1] - 2:14
**10166** [1] - 2:11
**10:15** [2] - 1:7; 3:2
**11:59** [1] - 61:11
**12** [3] - 18:16; 20:12
**12,000** [1] - 14:18
**12th** [1] - 31:13
**13** [1] - 33:6
**16** [5] - 24:22; 37:25; 38:3; 43:9, 21
**17** [1] - 9:4
**18** [3] - 1:7; 3:1; 18:18
**19** [1] - 31:8
**1901** [1] - 2:7
**1:18-cv-0950** [1] - 1:5
**1:18-cv-950** [1] - 3:5

**2**

**2** [1] - 44:5
**200** [1] - 2:11
**2000** [1] - 56:22
**2000s** [1] - 59:5
**20016** [3] - 1:17, 21; 2:4
**20036** [1] - 2:8
**2008** [1] - 56:25
**2010** [1] - 39:13
**2011** [2] - 38:8; 56:22
**2012** [10] - 12:4; 19:9; 20:3; 21:10; 37:18; 38:9; 42:9; 44:20; 57:20
**2014** [4] - 12:4; 19:9; 20:3; 21:10
**2015** [3] - 20:16; 57:20
**2016** [51] - 9:15, 19, 22, 25; 10:4, 9, 19; 11:18; 12:8, 12, 22; 16:4, 21, 25; 17:13; 18:23; 19:11, 25; 20:16; 21:15; 22:10; 24:14; 28:4; 30:25; 36:10; 37:17, 23-24; 38:4; 39:5, 10, 13, 17, 19; 40:18; 42:3; 43:2; 44:1, 17, 21, 24-25; 49:4; 56:17, 21; 57:20, 23; 58:4, 16, 20
**2018** [5] - 39:7-9; 44:23; 57:12
**2019** [5] - 10:19; 18:17; 31:2, 8; 44:14
**202-282-5306** [1] - 2:8
**202-450-3758** [1] - 1:22
**202-480-2999** [1] - 1:18; 2:4
**202.277.3739** [1] - 2:20

**2020** [5] - 30:22; 31:3, 15; 33:3; 55:10
**2021** [11] - 30:22; 31:5, 13; 32:18, 21-22; 33:3-5; 55:12
**2022** [2] - 1:7; 3:1
**21** [2] - 18:18; 24:22
**212-294-6729** [1] - 2:12
**22314-5798** [1] - 2:19
**236** [3] - 17:20; 42:21, 24
**23rd** [1] - 31:5
**240** [1] - 40:25
**25th** [1] - 10:19
**26** [1] - 31:2
**27th** [1] - 32:22

**3**

**3** [3] - 20:12; 38:22; 40:17
**3/22/22** [1] - 61:16
**31** [1] - 61:4
**33** [2] - 40:23, 25
**35th** [1] - 2:15
**37** [4] - 47:8; 48:14, 19; 51:24
**37(b** [1] - 48:14

**4**

**4** [1] - 42:2
**401** [1] - 2:19
**415-591-1400** [1] - 2:16
**431** [2] - 7:25; 13:15
**436** [1] - 17:12
**4530** [3] - 1:16, 20; 2:3
**4th** [9] - 47:12, 15, 21; 48:2, 9; 49:2, 10

**5**

**5** [3] - 17:12; 18:17; 42:19
**5th** [3] - 1:17, 21; 2:3

**6**

**6** [2] - 18:18, 21
**60** [32] - 6:1, 18; 20:11; 25:13; 26:15; 28:10; 30:3, 24; 32:16, 20, 24; 39:23; 42:1; 45:5, 21, 25; 46:1, 3, 9, 17; 47:6, 12, 14, 17, 19; 48:23, 25; 49:2, 11; 50:5; 52:21; 55:16
**60's** [1] - 47:9
**60(b** [3] - 46:9; 49:6
**60(b)** [1] - 27:19
**60(b)'s** [1] - 47:7
**60(b)2** [3] - 46:20, 23; 49:8
**60(b)3** [2] - 46:23; 49:9
**62.1** [4] - 27:13; 30:6; 46:25; 48:18
**62.1(c** [2] - 48:19
**643** [1] - 20:11
**647** [1] - 24:22

**7**

**7** [2] - 20:10; 24:21
**703.549.4626** [1] - 2:20
**739-9** [1] - 54:5
**748** [1] - 46:21
**768** [1] - 46:18

**8**

**8** [1] - 18:18
**866-766-1678** [1] - 1:22

**9**

**9** [2] - 18:21; 46:17
**94111** [1] - 2:15
**9th** [1] - 31:3

**A**

**a.m** [3] - 1:7; 3:2; 61:11
**abandoned** [1] - 25:16
**abeyance** [1] - 47:4
**abiding** [1] - 29:12
**ability** [5] - 5:17; 27:8; 58:17; 60:12, 20
**able** [10] - 5:5; 8:24; 15:17; 17:17; 24:24; 26:14; 59:8; 60:2, 12, 21
**above-entitled** [1] - 61:14
**absence** [1] - 52:12
**absent** [1] - 49:1
**absolutely** [2] - 39:12; 44:24
**absolve** [1] - 16:4
**accept** [1] - 39:16
**access** [2] - 51:7; 54:14
**acclaimed** [1] - 25:19
**according** [1] - 50:12
**accordingly** [1] - 12:25
**accountable** [1] - 52:19
**accuracy** [3] - 17:14; 18:15; 27:7
**accurate** [2] - 40:13; 44:10
**accurately** [2] - 26:1
**accusation** [2] - 40:17; 42:2, 19
**accusations** [2] - 29:21; 44:5
**acquisition** [1] - 44:15
**act** [2] - 12:21; 48:4
**acted** [1] - 60:7
**action** [2] - 4:1; 48:16
**Action** [1] - 1:4
**actions** [3] - 27:23; 29:10, 13
**activity** [1] - 37:2
**acts** [3] - 8:15; 9:5; 40:14
**actual** [4] - 7:3; 13:21; 14:15; 19:15
**address** [13] - 5:14, 17; 6:10, 18; 25:22; 30:2, 4; 40:1; 45:1, 21; 47:23; 49:16
**addresses** [1] - 49:3

**adequately** [2] - 23:1; 55:6
**adjourned** [1] - 61:11
**adjudicated** [1] - 60:22
**adjusts** [1] - 50:13
**admission** [11] - 15:11; 18:12; 23:2, 9, 21-22; 24:13; 33:21, 25; 34:8, 10
**admissions** [2] - 37:3
**admit** [3] - 9:10; 32:9; 34:7
**admits** [2] - 18:23; 31:24
**admitted** [11] - 7:23; 8:3; 13:21, 25; 14:25; 20:7; 22:14; 23:16; 24:24; 34:1; 40:20
**admittedly** [1] - 49:10
**admitting** [1] - 29:9
**adop** [1] - 50:16
**adopted** [1] - 50:16
**advocacy** [1] - 43:8
**affected** [1] - 60:20
**affidavits** [1] - 54:7
**afternoon** [1] - 61:4
**afterwards** [1] - 28:23
**aggregate** [1] - 33:5
**aggression** [1] - 5:25
**agree** [1] - 21:4
**agreed** [1] - 12:2
**Agreement** [3] - 38:7, 9, 12
**agreement** [14] - 10:25; 11:1, 4, 19; 12:5; 41:9; 54:6, 11; 56:22; 57:4, 8, 11
**agreements** [4] - 12:7; 16:17; 41:13; 57:9
**ahead** [2] - 6:21; 16:2
**aid** [1] - 48:5
**aided** [2] - 2:22; 33:20
**al** [4] - 1:4, 8; 3:4
**albeit** [1] - 26:24
**Alexander** [1] - 1:19
**Alexandria** [1] - 2:19
**algorithm** [1] - 50:4
**aligned** [1] - 28:8
**allegations** [1] - 27:9
**allege** [1] - 52:24
**alleged** [6] - 11:8; 33:13; 40:7, 14; 50:7
**allegedly** [7] - 7:22; 8:9, 11; 13:17; 18:8; 24:3; 27:6
**allow** [1] - 30:3
**allowed** [4] - 10:2; 23:21; 32:13, 17
**alone** [3] - 25:21; 40:4; 52:25
**alter** [2] - 46:5; 47:16
**alternate** [2] - 23:7, 10
**alters** [1] - 48:5
**ambiguous** [1] - 42:15
**amended** [1] - 47:6
**ancillary** [3] - 48:17; 50:13; 54:1
**anderson** [1] - 51:5
**Anderson** [9] - 3:21; 10:22; 11:13, 24; 12:2, 5; 16:17; 41:16; 51:5
**Anderson's** [7] - 9:20; 10:18, 20; 11:6, 10; 41:19, 21
**Ann** [1] - 2:13

**answer** [4] - 36:18; 40:15; 42:23; 55:2
**answered** [2] - 21:16; 22:4
**anticipated** [2] - 46:19, 21
**anticipation** [5] - 10:4, 11; 12:11; 38:14; 46:21
**anyway** [1] - 32:14
**apologize** [1] - 38:24
**appeal** [9] - 31:21; 46:4, 6; 47:16, 25; 48:5, 7, 10; 49:1
**Appeals** [2] - 48:6, 22
**appear** [1] - 54:1
**appearance** [1] - 29:12
**APPEARANCES** [2] - 1:14; 2:1
**appearances** [3] - 3:6, 20; 54:8
**appeared** [2] - 25:16; 36:2
**apple** [1] - 60:8
**Appreciate** [1] - 28:14
**appreciate** [5] - 4:1, 14; 29:15; 61:1, 8
**appropriate** [1] - 6:16
**area** [1] - 33:22
**areas** [1] - 8:5
**argue** [2] - 21:22; 24:1
**argued** [6] - 17:17; 18:5, 7; 50:17; 52:2; 58:6
**argues** [4] - 33:18; 46:12; 50:14; 51:14
**arguing** [1] - 37:9
**argument** [16] - 11:11; 13:5; 14:22; 25:10, 13; 27:19; 33:14; 36:8; 37:12, 15; 40:9; 42:22; 44:18; 56:1, 8; 58:3
**arguments** [7] - 5:12; 10:15; 32:19; 35:20; 36:20; 44:9; 61:1
**arrived** [1] - 14:19
**aspects** [1] - 48:1
**assembled** [1] - 6:4
**asserted** [1] - 6:23
**assurance** [1] - 18:13
**assure** [1] - 58:4
**attack** [2] - 5:25; 26:14
**attacking** [2] - 5:7; 23:1
**attempt** [3] - 11:11; 12:12; 31:25
**attempts** [3] - 9:25; 10:3
**attesting** [1] - 53:16
**Audible** [36] - 8:10; 9:25; 10:2; 12:14, 19, 24; 15:4; 16:19, 25; 17:23; 18:1, 9; 19:15; 20:1; 22:16; 24:9, 19; 25:2; 26:7; 27:5, 8; 43:3, 6, 12, 19, 22; 44:1; 50:3, 7, 10-11; 59:6, 17, 19
**Audible's** [1] - 50:13
**audifying** [1] - 8:14
**audio** [21] - 4:21; 7:22; 13:22; 15:11, 25; 16:22; 17:3; 19:14, 19; 20:5; 56:5, 10, 19; 57:3; 58:5, 13, 15; 59:4, 10, 17
**audit** [2] - 12:9, 25
**authenticate** [1] - 10:1
**authority** [1] - 47:20
**authorize** [1] - 47:4
**authorizes** [2] - 46:3; 49:2
**available** [1] - 51:22
**Avenue** [4] - 1:16, 20; 2:3, 11

**avoid** [3] - 5:1; 21:21; 22:22
**avoided** [1] - 19:21
**aware** [7] - 6:23; 30:8, 17; 48:14; 51:2, 4; 52:17

# B

**B-3** [1] - 52:21
**backs** [1] - 52:6
**bad** [1] - 28:23
**badly** [1] - 60:7
**bahun** [1] - 42:4
**Bahun** [20] - 10:6, 13; 19:12; 20:8, 13-14, 23; 21:3, 14, 18-19, 22, 25; 22:4; 34:2; 35:11; 42:7, 12; 56:16; 58:22
**BAHUN** [2] - 10:6; 57:18
**Bahun's** [4] - 42:6, 14; 57:16, 18
**balance** [1] - 54:18
**ball** [1] - 45:22
**bar** [3] - 29:24; 47:7, 10
**Barbara** [1] - 24:6
**based** [8] - 8:12, 19; 20:7; 26:22; 31:14; 41:24; 47:5; 52:21
**basis** [18] - 11:19; 15:10, 25; 20:17; 24:1, 14; 30:1, 24; 33:6; 34:7; 36:8; 39:23; 42:1; 47:17; 48:13; 49:22; 59:5, 13
**bears** [2] - 17:13; 30:16
**became** [1] - 7:5
**becoming** [1] - 30:17
**BEFORE** [1] - 1:13
**beginning** [3] - 8:6; 20:16; 59:2
**behalf** [1] - 3:13
**behavior** [1] - 45:9
**behind** [1] - 8:15
**best** [1] - 28:22
**better** [1] - 29:3
**between** [7] - 11:4; 19:9; 20:2; 41:10, 14; 54:12; 57:12
**beyond** [1] - 12:3
**big** [2] - 40:24; 58:7
**bigger** [1] - 36:19
**billion** [4] - 29:20; 45:8, 13, 15
**bit** [6] - 34:20; 44:14; 46:25; 50:21
**bit-for-bit** [1] - 34:20
**bite** [1] - 60:8
**black** [1] - 47:25
**blame** [1] - 24:9
**blend** [1] - 50:21
**BMG** [2] - 7:13; 22:21
**bold** [1] - 46:22
**bonafides** [1] - 60:15
**boxes** [1] - 50:25
**brief** [14] - 9:4; 24:22; 35:18; 40:6; 43:5, 21; 44:4; 46:18; 48:2; 50:15; 55:4
**briefed** [1] - 60:1
**briefly** [9] - 6:20; 9:17; 26:15; 30:4; 47:24; 49:16; 50:9, 20; 54:22
**briefs** [2] - 35:21; 40:21

**Brighthouse** [2] - 51:3, 18
**Brighthouse's** [1] - 51:22
**Brody** [1] - 34:9
**Brody's** [1] - 20:24
**brought** [1] - 4:6
**built** [1] - 34:17
**burden** [9] - 30:16; 31:23; 32:7; 33:10; 40:4; 46:17; 47:2; 56:14
**buried** [2] - 40:21

## C

**CA** [2] - 2:14
**California** [2] - 2:14; 54:2
**camera** [1] - 43:16
**camouflage** [1] - 59:2
**cannot** [2] - 33:10; 46:1
**capital** [1] - 46:22
**capture** [1] - 7:12
**captured** [3] - 11:15; 19:20; 59:4
**Captures** [1] - 17:2
**care** [2] - 39:10
**carefully** [2] - 5:9
**carried** [1] - 31:23
**carry** [1] - 33:10
**case** [95] - 4:6, 21; 5:21; 6:23; 7:3, 11, 13; 11:15, 22; 13:8, 13; 14:7-10; 15:17, 21-22; 16:15; 17:8, 12; 18:14, 20; 23:3, 5, 25; 25:15; 26:4, 13, 19, 21; 27:11, 24; 29:10; 30:16, 19; 31:3, 7; 32:2, 6, 12, 14, 16; 34:4, 17; 36:3, 24; 38:18, 21; 39:7; 41:3; 44:16, 19, 22; 45:10; 46:5; 47:12; 48:1, 5, 10, 16; 49:2, 4, 13, 15; 51:17; 52:5; 53:3, 12; 54:2; 55:20; 56:2, 5-7, 12-13, 24; 59:3, 13, 15, 24; 60:3, 6, 12; 61:3, 6
**Case** [1] - 3:5
**cases** [11] - 7:8; 27:19, 21; 30:18; 33:15; 36:3; 48:2; 51:3, 8, 13; 52:3
**caught** [1] - 57:7
**caused** [3] - 10:12; 44:5
**Cell** [1] - 2:20
**centerpiece** [1] - 25:17
**central** [1] - 7:16
**certain** [3] - 12:10; 15:13; 48:17
**certainly** [7] - 4:16; 41:22; 42:17; 48:18; 54:19; 56:13; 58:6
**certify** [1] - 61:13
**challenged** [1] - 19:7
**challenges** [1] - 15:21
**change** [7] - 25:11; 45:12; 46:11; 49:16; 50:22; 51:11, 16
**changed** [1] - 45:17
**characterization** [1] - 50:17
**Charter** [25] - 4:6; 5:21; 15:17; 17:8, 12; 25:16; 26:11, 21; 31:3; 32:2, 12, 15, 17, 21; 44:16, 19; 45:23; 51:3, 14, 18, 22; 53:12; 55:20
**Charters'** [3] - 26:21, 23; 27:1

**cheat** [1] - 29:1
**cheated** [2] - 28:24; 29:8
**check** [1] - 50:25
**checked** [1] - 19:2
**Chicago** [1] - 2:7
**child** [2] - 36:2
**chose** [1] - 58:10
**Circuit** [10] - 47:13-15, 21; 48:2, 9; 49:2, 10
**circuit** [2] - 49:8, 15
**circumstances** [2] - 28:11; 50:21
**circumstantial** [2] - 7:9, 15
**citation** [1] - 35:21
**cite** [3] - 35:21; 43:24; 48:2
**cited** [2] - 5:1; 27:19
**cites** [4] - 36:24; 47:12; 48:9; 49:15
**citing** [1] - 44:3
**Citizen** [1] - 48:4
**Civil** [1] - 1:4
**claim** [8] - 12:8; 30:10; 39:16; 40:2, 21; 49:22; 52:18; 59:16
**claimed** [3] - 4:22; 22:14; 40:22
**claiming** [1] - 36:22
**claims** [15] - 6:24; 10:11; 17:25; 18:5, 14, 24; 19:20; 23:19; 26:10; 29:17; 30:23; 33:6; 35:18; 40:11
**clarification** [1] - 11:22
**clear** [16] - 6:1; 11:23; 12:6; 15:14, 20; 30:12, 21; 33:11; 39:21; 40:5; 41:23; 42:16, 18; 52:24; 54:19
**clearly** [7] - 17:13; 21:21; 46:22; 48:23; 54:13; 55:18
**CLERK** [1] - 3:3
**clever** [1] - 57:6
**client** [1] - 29:20
**clients** [2] - 11:5; 51:23
**clock** [1] - 54:21
**close** [8] - 30:5; 32:2-4, 12; 42:16; 47:8; 53:7
**closed** [8] - 10:8; 11:5; 17:11; 18:16, 20; 19:16; 24:20; 48:16
**closely** [2] - 46:12; 61:5
**Coast** [1] - 36:25
**code** [32] - 4:4; 6:19; 26:17, 22, 24; 27:3; 49:23; 50:6, 10-11, 13, 15; 51:13, 16, 18, 21, 23; 52:1, 4, 9, 12; 53:1, 4, 12, 22; 54:10, 15; 59:15, 18, 20, 23
**coincide** [1] - 6:9
**colleague** [4] - 3:14; 30:3; 38:25; 45:1
**colleagues** [3] - 3:8; 29:23; 51:5
**colloquy** [1] - 24:23
**Colorado** [1] - 4:1
**coming** [3] - 4:1; 5:4; 61:1
**Comm** [1] - 3:13
**COMMUNICATIONS** [1] - 1:7
**Communications** [2] - 3:4, 13
**Company** [1] - 41:24
**compare** [1] - 14:5
**comparison** [1] - 61:4

**compel** [5] - 46:3; 47:8; 48:14, 19; 53:25
**competing** [1] - 17:18
**compiled** [1] - 17:25
**compiling** [1] - 18:14
**complains** [2] - 41:7, 12
**completely** [2] - 45:9; 60:1
**completeness** [1] - 11:12
**complied** [1] - 41:20
**composition** [1] - 22:1
**compositions** [1] - 13:12
**comprehensively** [1] - 24:16
**comprising** [2] - 18:8; 24:3
**computer** [1] - 2:22
**computer-aided** [1] - 2:22
**concealed** [6] - 9:23; 10:1, 4, 9; 19:24; 42:2
**concedes** [2] - 46:1, 10
**concept** [1] - 35:19
**concern** [1] - 51:10
**concerned** [2] - 12:1; 60:9
**concerning** [2] - 10:8; 42:5
**concerns** [1] - 26:17
**concerted** [3] - 8:24; 28:2
**concluding** [1] - 26:16
**conclusion** [1] - 38:20
**conduct** [2] - 60:8, 11
**conducted** [2] - 59:24
**confident** [1] - 9:3
**confirm** [4] - 17:2; 35:2, 7; 36:7
**confirmed** [1] - 9:22
**conflated** [1] - 56:17
**conflates** [1] - 47:18
**confused** [1] - 48:8
**confusion** [1] - 21:17
**connect** [1] - 35:7
**connection** [1] - 45:24
**consider** [3] - 33:2; 47:3; 60:18
**consideration** [2] - 27:16; 61:1
**consistent** [2] - 20:14; 60:21
**consistently** [1] - 13:3
**conspiracy** [1] - 40:12
**Construction** [1] - 27:21
**Consul** [1] - 30:19
**consultant** [1] - 54:4
**consulting** [1] - 54:6
**consumed** [1] - 7:6
**Cont** [1] - 2:1
**contain** [2] - 26:8; 43:7; 55:11
**contained** [8] - 8:10; 9:8, 11, 13; 13:22; 17:25; 20:8; 22:15; 23:10; 24:21; 25:3; 27:6; 34:3, 5
**containing** [1] - 19:14
**contains** [3] - 39:3; 43:23; 50:8
**contemporaneous** [1] - 7:12
**content** [1] - 8:10
**contents** [3] - 7:12; 10:14; 44:7
**contested** [1] - 35:19
**context** [6] - 31:6; 33:2; 42:7, 16; 51:2;

60:2
**contextualized** [1] - 16:10
**continuing** [1] - 16:3
**contract** [4] - 10:24; 54:3, 10
**contracted** [1] - 43:22
**contractual** [1] - 10:21
**contrary** [3] - 25:20; 40:11; 57:25
**contributory** [1] - 6:24
**control** [3] - 53:22, 24; 54:14
**conversation** [2] - 29:4
**convictions** [1] - 36:5
**convincing** [7] - 30:12; 40:5; 41:23; 42:18; 52:24; 54:19
**cooperate** [1] - 54:4
**copied** [1] - 13:11
**copies** [14] - 8:1; 19:15; 20:8; 22:11; 25:12; 34:4, 15; 36:10, 16; 39:3; 43:7; 44:13, 15
**copy** [1] - 25:11
**copyright** [6] - 7:9; 13:9; 27:6; 29:10, 13
**copyrighted** [4] - 8:10; 22:15; 43:7; 50:8
**core** [2] - 8:5; 9:6
**cornerstone** [1] - 60:13
**Corporate** [1] - 42:9
**correct** [2] - 42:24; 61:14
**correlative** [2] - 16:23; 58:17
**corresponded** [1] - 34:5
**correspondence** [1] - 59:21
**counsel** [25] - 3:21; 4:20; 5:5, 7; 15:1; 18:19; 21:13, 18-19; 24:17; 25:2, 4, 6; 26:23; 27:1; 29:18; 39:1; 40:3, 10, 12; 45:7, 10; 60:3, 25
**Counsel's** [3] - 3:14; 38:25; 58:2
**counsels'** [1] - 11:21
**couple** [4] - 6:8; 26:25; 27:1; 50:24
**course** [7] - 7:8; 14:18; 19:21; 21:9; 24:25; 49:9; 58:23
**Court** [55] - 2:17; 3:3; 4:19; 5:16, 24; 6:2, 4, 7; 7:4; 8:17; 9:17; 10:5, 9; 19:3; 23:5, 8, 15, 20; 25:24; 28:1, 7; 29:9, 23; 30:1, 8; 31:9, 11, 18; 32:21; 34:1, 7, 10, 12, 25; 36:17; 42:23; 45:20; 46:4; 47:3, 11, 13, 15; 48:1, 6, 21-22; 49:7, 22; 54:18; 57:5; 60:17; 61:17
**court** [11] - 5:11; 8:20; 17:8; 28:20; 32:17; 40:18; 48:4, 15; 49:5; 54:7
**Court's** [4] - 6:10; 20:21; 33:8; 47:20
**Courthouse** [1] - 2:19
**courtroom** [4] - 4:14; 45:20; 60:22
**COURTROOM** [1] - 3:3
**courts** [4] - 35:23; 48:11; 49:10; 52:7
**cover** [2] - 5:2; 40:12
**covered** [2] - 38:16; 55:7
**COX** [1] - 1:7
**Cox** [104] - 3:4, 13, 22, 24; 4:23; 8:14; 9:1, 16; 11:7, 17; 17:7; 18:5, 16, 23; 20:13, 17, 21; 21:2, 23; 22:20; 23:1, 6; 24:12; 25:22; 26:13; 27:3; 28:11; 29:8,

11; 30:5, 7, 14-15, 21; 31:1, 11, 15, 18, 23-25; 32:15-18, 22-23, 25; 33:5, 9, 12, 16, 23; 34:6; 35:18; 36:22, 24; 37:9, 15, 23; 38:21; 39:7, 9-11, 17; 40:4, 25; 41:7, 24-25; 42:3, 25; 43:1; 44:15, 18, 24; 45:8, 10, 15-16, 23; 46:1; 47:3, 6, 12, 18; 48:8; 49:15; 50:5, 12, 14; 51:15; 52:12, 23; 53:6; 54:17; 55:19; 60:7
**cox** [2] - 41:12; 46:9
**Cox's** [41] - 7:23; 11:9; 12:25; 23:9; 27:14; 29:10, 13-14, 16; 30:10, 22; 31:14; 32:21; 33:14, 18; 34:15; 35:20; 36:8, 20-21; 37:2-4, 7; 38:1; 39:16; 40:8, 11; 43:5, 8, 13, 21; 45:5; 46:4, 19; 49:22; 50:5, 11; 52:20; 60:8
**create** [1] - 57:23
**created** [5] - 19:10; 20:15, 20; 28:5; 29:11
**creates** [1] - 48:8
**credibility** [3] - 43:8, 14, 17
**credible** [1] - 37:17
**criminals** [1] - 36:4
**critical** [3] - 7:18; 33:16
**criticize** [1] - 46:18
**cross** [4] - 13:16; 20:13; 22:4; 33:22
**Cross** [3] - 10:12; 24:6; 35:11
**cross-examination** [2] - 20:13; 22:4; 33:22
**cross-referenced** [1] - 13:16
**crossed** [1] - 28:9
**CRR** [3] - 2:17; 61:13, 17
**culpability** [1] - 29:14
**cumulative** [1] - 50:22

# D

**data** [14] - 8:21; 10:10; 17:23; 18:1, 15, 25; 23:11, 25; 27:5; 42:20, 25; 43:4; 50:7; 54:7
**date** [3] - 25:11; 56:18
**Date** [1] - 61:17
**dated** [1] - 38:7
**dates** [1] - 21:4
**Daubert** [1] - 61:3
**days** [3] - 7:7; 27:1
**DC** [4] - 1:17, 21; 2:4, 8
**deadline** [5] - 26:20; 31:12; 46:8; 47:17
**deal** [1] - 58:7
**December** [4] - 31:8; 32:22; 33:5; 38:8
**decide** [1] - 48:22
**decided** [3] - 22:9; 44:4; 45:10
**decision** [4] - 33:3; 55:17; 61:9
**declaration** [12] - 10:15; 19:12; 31:2; 41:3; 42:6, 8; 44:8; 53:16; 55:10; 57:16, 18
**deep** [1] - 49:20
**defend** [1] - 37:15
**defendant** [1] - 5:24

**Defendants** [2] - 1:10; 2:6
**defendants** [4] - 3:13, 21; 5:17; 37:1
**defense** [6] - 27:25; 30:11; 31:25; 33:14; 36:9; 37:10
**deficiencies** [1] - 5:17
**delay** [2] - 32:1; 33:2, 9
**delayed** [1] - 31:24; 33:8
**deleterious** [1] - 60:12
**deliberating** [1] - 60:18
**demonstrate** [4] - 11:11; 27:21; 41:23; 42:17
**demonstrated** [1] - 33:12
**demonstrates** [3] - 9:16; 25:22; 51:9
**demonstrating** [1] - 30:16
**demonstratives** [1] - 6:8
**denied** [8] - 7:4; 20:19; 32:21; 33:9; 45:25; 47:2; 51:15; 54:21
**deny** [3] - 40:19; 42:1; 47:11
**deposition** [3] - 39:20; 54:8; 57:3
**depositions** [2] - 41:2; 59:24
**describe** [1] - 34:23
**described** [9] - 19:13; 34:21; 35:13; 37:19, 23; 44:20; 60:3
**describes** [5] - 21:25; 38:15; 39:2; 50:5
**describing** [1] - 22:1
**description** [1] - 11:4
**desperately** [2] - 29:19; 45:11
**despite** [5] - 9:20; 10:3, 20; 28:21; 40:18
**destroy** [1] - 10:2
**destroyed** [5] - 13:19; 14:1; 23:20; 25:2, 6
**detail** [1] - 37:20
**determined** [1] - 18:9
**developed** [2] - 4:5
**development** [1] - 25:21
**devoted** [1] - 7:3
**difference** [1] - 39:12
**different** [11] - 5:22; 8:16; 14:10, 12; 15:18; 21:4; 25:9, 15; 53:8; 56:23; 60:2
**differently** [1] - 26:13
**difficult** [1] - 40:1
**digital** [5] - 15:2, 16; 24:20; 25:5
**diminished** [1] - 26:14
**direct** [7] - 4:25; 6:11; 7:1, 5; 8:4; 21:25; 23:2, 25; 27:10; 28:5; 36:21, 23; 37:11, 13; 60:13
**disagree** [1] - 53:5
**disclose** [3] - 9:14; 16:25; 25:3
**disclosed** [9] - 20:1; 25:8; 26:23; 50:11; 51:13; 52:1; 53:17
**disclosure** [2] - 16:19; 53:21
**disclosures** [1] - 55:12
**disconnect** [1] - 35:9
**discovered** [2] - 30:24; 36:23
**discovery** [38] - 7:3, 24; 8:6; 12:7; 13:1; 22:22; 26:19; 27:23; 28:6; 32:1, 11-12, 14; 39:7; 42:1; 44:16; 45:2, 24;

46:3; 47:5, 9, 11, 15, 19-20; 48:10;
49:2, 7-8, 11; 51:19; 52:12; 53:19;
54:23, 25; 55:13

**discussed** [1] - 13:5
**disfavored** [1] - 49:11
**dispute** [2] - 11:10; 36:23
**disputed** [1] - 35:22
**disruption** [1] - 16:19
**disruptive** [1] - 52:4
**distributing** [2] - 35:6, 8
**District** [5] - 2:18; 33:8; 47:13; 48:1, 21
**district** [3] - 17:8; 48:4; 49:4
**DISTRICT** [3] - 1:1, 13
**ditch** [1] - 54:20
**divested** [1] - 46:4
**divestiture** [2] - 47:24; 49:1
**divests** [1] - 47:25
**DNA** [1] - 35:24
**do-over** [1] - 45:11
**document** [7] - 16:9; 17:9, 16, 24;
18:12, 16; 22:14
**documented** [1] - 20:3
**documents** [6] - 14:1; 40:22-25; 41:1
**Doe** [1] - 48:4
**dollar** [3] - 29:20; 45:13, 15
**dollars** [1] - 45:9
**done** [12] - 15:9; 16:11; 19:2; 21:15;
31:11; 41:2; 43:13-15; 44:1; 58:11; 61:2
**doubt** [3] - 5:19; 34:16; 36:6
**dovetail** [1] - 4:12
**down** [3] - 4:3; 25:24; 28:25
**download** [7] - 12:13, 18; 18:24;
22:19; 25:10; 35:2, 12
**downloaded** [22] - 4:22; 8:8; 9:15;
11:18; 17:3, 5; 19:22; 21:5, 8; 23:18;
26:6, 9; 35:10; 36:14; 37:16; 39:13, 17;
44:25; 58:4
**downloading** [5] - 12:10, 21; 20:18;
37:24; 59:7
**downloads** [3] - 12:15; 36:10; 43:6
**Dr** [1] - 18:3
**drive** [48] - 8:2; 9:11, 23; 13:22; 14:25;
15:2, 6, 25; 17:3, 13; 19:6, 13, 20; 20:7,
14-15, 20, 22-23; 22:1; 23:4, 17, 22, 24;
24:4, 7, 13, 24; 25:1; 26:9, 11; 33:20,
24-25; 34:1, 3, 8, 10; 38:21; 39:2, 8;
44:9, 17; 56:17, 19; 58:20
**drive's** [3] - 10:14; 19:8; 44:7
**during** [6] - 21:9; 26:19; 33:17; 52:12;
53:3; 59:11

## E

**e-mail** [1] - 38:24
**easily** [1] - 31:18
**EASTERN** [1] - 1:2
**easy** [1] - 46:25
**ECF** [4] - 17:12; 46:18, 21; 54:6
**effect** [3] - 10:16; 15:24; 60:12

**effective** [1] - 5:8
**effort** [12] - 10:10; 18:24; 19:4; 28:2, 8;
42:20, 25; 43:3, 14, 19; 55:20
**efforts** [2] - 8:24; 28:22
**eight** [4] - 9:5; 15:18; 30:7; 40:14
**either** [1] - 49:3
**element** [3] - 7:1, 15
**elemental** [3] - 23:3; 26:18; 59:15
**elements** [5] - 6:6; 30:7; 46:1, 10;
54:17
**elicited** [1] - 10:5
**Elkin** [20] - 2:10; 3:15, 18; 4:10; 28:13;
29:19; 33:18; 34:9, 11, 22; 37:17; 38:4;
40:20; 42:21; 51:4, 14, 24; 52:9; 55:3;
60:23
**ELKIN** [13] - 3:19; 4:13, 17; 6:22; 13:4;
14:4, 23; 16:3; 28:14; 55:5; 57:18;
58:12; 60:24
**Elkin's** [4] - 29:16; 40:9; 41:15; 51:23
**Email** [7] - 1:18, 23; 2:5, 9, 12, 16, 21
**embark** [1] - 4:8
**employees** [1] - 37:3
**encompassed** [1] - 10:22
**encourage** [1] - 53:7
**end** [9] - 6:20; 20:15; 45:22; 46:2, 20;
48:6; 58:25; 59:3; 60:9
**endorsed** [1] - 47:14
**endorsing** [1] - 48:9
**engaged** [2] - 40:3; 42:17
**engineered** [1] - 54:15
**ensure** [2] - 27:9; 43:7
**ensuring** [1] - 43:11
**enter** [3] - 10:7; 42:5; 48:18
**entered** [7] - 11:25; 31:13, 16, 20;
38:7, 10; 57:9
**entering** [3] - 31:9; 48:24
**entertain** [2] - 48:17
**entertainer** [1] - 14:15
**Entertainment** [1] - 3:4
**ENTERTAINMENT** [1] - 1:3
**entire** [3] - 19:25; 34:17; 36:8
**entirely** [1] - 5:22
**entitled** [1] - 61:14
**entry** [1] - 30:15
**equivalent** [2] - 15:16; 24:20
**escape** [1] - 29:19
**especially** [1] - 56:14
**Esq** [6] - 1:15, 19; 2:2, 6, 10, 13
**essential** [4] - 23:24; 27:10; 51:15;
52:14
**essentially** [2] - 24:20; 26:12
**establish** [2] - 7:1; 46:10
**established** [1] - 44:13
**establishing** [1] - 56:15
**et** [4] - 1:4, 8; 3:4
**evaluate** [1] - 60:2
**eve** [2] - 26:20; 46:7
**event** [2] - 47:17; 48:20
**Eversole** [1] - 27:20

**evidence** [66] - 4:20; 5:2, 4, 6, 8, 25;
6:13; 7:5, 10, 15, 17, 20; 8:5, 16, 22-23,
25; 9:9; 10:3; 11:14, 20; 12:24; 13:25;
15:6; 16:12; 17:19; 18:13; 22:6, 16, 18;
23:2, 21, 25; 24:15; 25:4, 18; 26:2, 9,
14; 28:5; 29:9, 25; 31:15; 32:8, 10;
36:21, 24; 37:2, 13, 21; 39:23; 40:5;
41:23; 42:18; 46:11; 52:24; 54:20;
56:21; 58:17, 23; 59:9, 17
**evidentiary** [1] - 22:22
**exact** [7] - 35:6, 14; 36:12; 38:11, 17;
39:14; 51:12
**exactly** [3] - 18:23; 34:19; 37:20
**examination** [3] - 20:13; 22:4; 33:22
**examined** [1] - 5:20
**example** [1] - 35:25
**exceedingly** [1] - 49:12
**except** [1] - 59:22
**exceptional** [1] - 50:21
**excerpts** [1] - 12:16
**exchange** [1] - 24:23
**excluded** [1] - 52:10
**excuse** [6] - 31:10; 35:11; 43:1; 45:23;
46:24; 48:21
**Exhibit** [7] - 18:16; 20:10; 24:21;
37:25; 38:3, 22; 43:9
**exhibit** [2] - 20:17; 54:5
**exist** [3] - 43:25; 56:10; 59:22
**existed** [1] - 13:18
**existence** [4] - 9:23; 10:2; 28:4; 51:16
**exonerated** [1] - 37:1
**expect** [1] - 39:17
**expedition** [1] - 47:5
**expert** [8] - 5:10; 10:13; 18:3; 23:25;
24:6; 44:6; 55:13; 59:23
**expert's** [1] - 51:22
**experts** [4] - 8:7; 29:18; 40:11; 50:12
**explain** [3] - 9:21; 43:16; 51:12
**explained** [6] - 10:22; 21:7; 32:16;
35:11; 41:5; 48:3
**explaining** [2] - 34:2; 42:12
**explore** [1] - 53:19
**exposed** [1] - 29:14
**expressly** [2] - 12:2
**extend** [1] - 12:7
**extensive** [1] - 19:17
**extent** [4] - 37:9; 52:17; 53:19; 59:18
**extraordinary** [1] - 47:1

## F

**facade** [1] - 28:10
**face** [4] - 16:8, 14; 40:8; 50:17
**fact** [21] - 5:2, 10; 9:1, 9; 18:9; 19:4;
28:4; 29:18; 32:1; 39:9; 42:6; 45:17;
50:16; 55:13; 56:22, 24; 57:25; 58:3;
59:16, 24
**factors** [1] - 50:20
**facts** [1] - 33:14

**fail** [1] - 29:6
**failed** [7] - 9:10, 14; 16:20; 18:2; 23:17; 26:6; 46:16
**failures** [1] - 27:22
**fair** [3] - 49:13; 51:15; 52:5
**fairly** [5] - 29:17; 30:11; 33:13; 47:25; 50:23
**fairness** [1] - 52:10
**faith** [1] - 55:22
**fallibility** [1] - 13:7
**false** [5] - 21:12, 21; 23:5
**falsely** [1] - 4:22
**far** [1] - 56:13
**farfetched** [2] - 53:18; 54:16
**fault** [1] - 28:25
**favoring** [1] - 54:18
**Fax** [1] - 1:22
**Feamster** [1] - 18:4
**February** [1] - 31:5
**few** [6] - 15:16; 22:10; 40:15; 49:10, 15; 50:25
**figure** [2] - 19:11; 53:14
**file** [21] - 14:14; 22:9; 24:3; 25:11; 26:20; 27:2; 30:14; 32:5, 16, 20, 23; 33:7; 35:8, 10, 12, 14; 47:6; 49:23; 50:2, 8
**filed** [6] - 32:15, 18; 39:7; 44:23; 46:7, 25
**files** [122] - 4:21; 7:22; 8:1, 9-10, 12-13, 19, 21, 23; 9:8, 12, 21-22; 10:1; 11:17; 12:11, 13, 18, 22; 13:17-20, 22; 15:2, 6, 8, 12, 23; 16:1, 22; 17:2, 5, 10, 14-15; 18:8, 24; 19:5, 13-14, 16, 20, 22; 20:5, 9, 18, 22, 24; 21:2, 16; 22:2, 11, 14, 17, 20; 23:16, 18; 24:16, 19; 25:1, 5, 12, 19; 26:6, 8-9, 11; 27:6; 33:20, 23; 34:3, 14, 19; 35:2-4, 6; 36:7, 11, 13, 17-18; 37:16, 21, 23; 38:21; 39:3-5, 10, 12, 15, 17, 19; 43:2, 11, 18; 44:12, 16, 22, 25; 56:5, 10, 19; 57:3, 24; 58:4, 13, 16; 59:4, 6, 10, 17; 60:16
**filing** [3] - 30:18; 31:24; 47:25
**fill** [2] - 8:24; 22:21
**finality** [3] - 49:14; 54:17
**finally** [4] - 6:15; 8:13; 10:14; 32:11
**fingerprint** [2] - 27:8; 50:2
**fingerprinting** [2] - 12:19; 15:4
**fingerprints** [1] - 12:24
**finish** [1] - 60:17
**fireproofing** [1] - 30:19
**firm** [1] - 30:2
**first** [29] - 3:6; 4:10, 13; 6:17; 7:21; 9:6; 19:22; 21:5; 30:3, 13; 33:6; 38:6; 40:18; 45:2, 22, 24; 46:1, 7; 47:24; 51:1; 53:6, 23; 54:11; 55:7, 10, 24; 56:2, 21
**fishing** [1] - 47:5
**fit** [2] - 9:1; 14:22
**flawed** [1] - 52:22
**fleshed** [1] - 55:14
**Floor** [4] - 1:17, 21; 2:3, 15

**focal** [1] - 7:5
**focus** [6] - 4:7, 17; 30:9; 34:11, 25; 50:19
**focusing** [2] - 6:17; 46:19
**follow** [1] - 29:7
**followed** [1] - 21:2
**following** [2] - 10:23; 26:5
**follows** [2] - 9:17; 13:14
**FOR** [1] - 1:2
**Ford** [1] - 41:24
**foregoing** [1] - 61:14
**foremost** [1] - 40:18
**form** [1] - 57:8
**forth** [5] - 20:10; 37:20; 44:11; 52:13; 54:10
**forward** [6] - 16:9; 36:9; 41:3; 43:4; 44:18
**foundation** [6] - 15:11; 17:21; 19:8; 24:15; 29:22; 34:2
**foundational** [2] - 5:3; 7:15
**four** [5] - 8:12; 24:4; 30:17; 33:1; 38:16
**Four** [1] - 33:1
**four-and-a-half** [1] - 33:1
**Francisco** [1] - 2:15
**frankly** [5] - 23:4; 30:1; 35:23; 44:24; 57:1
**fraud** [5] - 30:12; 40:3; 42:17; 49:6; 52:21
**Frederiksen** [3] - 10:12; 24:6; 35:11
**Frederiksen-Cross** [3] - 10:12; 24:6; 35:11
**front** [3] - 5:16; 35:15; 39:4
**fruitful** [1] - 33:22
**fruits** [2] - 16:20
**full** [2] - 32:3; 49:13
**fully** [11] - 25:22; 27:24; 30:11; 33:13; 36:9, 25; 37:15; 41:20; 42:7; 50:23; 55:14
**function** [1] - 50:15
**fundamentally** [1] - 16:24
**future** [1] - 46:14

## G

**game** [1] - 29:2
**games** [1] - 28:22
**gaps** [3] - 4:24; 8:25; 22:22
**gavel** [2] - 59:3
**gavel-to-gavel** [1] - 59:3
**generally** [2] - 30:16; 47:19
**generated** [4] - 4:9; 8:11, 25; 10:4
**generates** [1] - 50:4
**gist** [1] - 44:15
**given** [7] - 19:17; 33:21; 39:22; 47:20; 56:14; 58:17; 59:16
**Gnutella** [1] - 22:2
**golden** [1] - 22:7
**Golinveaux** [5] - 2:13; 3:20; 39:1; 51:4, 24

**Gould** [7] - 2:2; 3:9; 30:3; 38:25; 45:1, 18; 60:3
**GOULD** [4] - 45:19; 49:19; 53:10; 55:1
**grant** [1] - 27:14
**granted** [4] - 32:25; 47:14; 49:11; 55:21
**great** [1] - 29:2
**grounds** [1] - 52:11
**Guard** [1] - 36:25

## H

**hail** [1] - 54:20
**half** [5] - 24:25; 29:25; 30:20; 33:1
**halves** [1] - 14:2
**hand** [3] - 5:11; 37:24; 38:23
**handled** [1] - 61:7
**handling** [1] - 3:15
**happy** [8] - 6:18; 37:24; 38:23; 40:13, 15; 43:16; 53:6; 55:2
**hard** [50] - 8:2; 9:11, 23; 10:14; 13:22; 14:25; 15:2, 6, 25; 17:13; 19:6, 13, 20; 20:7, 14-15, 22-23; 22:1; 23:3, 16, 22-23; 24:4, 7, 13, 24; 25:1; 26:9; 33:20, 23, 25; 34:1, 3, 8, 10, 23; 38:21; 39:2, 8; 44:7, 9, 17; 56:17, 19; 58:20
**hardest** [1] - 28:19
**hash** [20] - 13:8, 11, 23; 22:7; 25:12; 33:16; 34:19; 35:6, 8, 24; 36:4, 6; 44:14; 55:24; 56:4, 11
**Hash** [6] - 9:24; 16:18, 23; 17:6, 8; 19:25
**hash-matching** [1] - 13:8
**hashes** [20] - 12:18; 13:16; 34:5, 18, 23-24; 35:3, 13, 16, 19, 23; 36:4, 12; 39:14; 56:9
**hashtag** [2] - 13:2; 14:14
**hashtags** [2] - 13:4, 6
**headed** [1] - 55:13
**heads** [1] - 16:7
**hear** [5] - 4:2, 10; 41:4; 54:24
**heard** [5] - 29:15; 35:15; 56:6; 60:16
**hearing** [8] - 4:15; 10:18; 11:13, 24; 18:11, 17; 31:4; 52:2
**HEARING** [1] - 1:12
**heart** [1] - 47:7
**heavily** [2] - 11:21; 49:11
**held** [3] - 35:24; 45:8; 52:19
**help** [1] - 6:9
**hid** [1] - 29:25
**hide** [1] - 46:17
**Higgs** [1] - 49:5
**high** [2] - 50:1
**highlight** [1] - 17:20
**highly** [1] - 19:24
**himself** [1] - 3:16
**hired** [3] - 15:18; 21:18
**hit** [1] - 40:15
**hoc** [1] - 11:11

**hogwash** [1] - 40:23
**hold** [3] - 33:3; 47:4
**holders** [2] - 29:11; 37:7
**holding** [2] - 4:15; 20:19
**holes** [1] - 5:25
**hollow** [1] - 25:14
**Honor** [107] - 3:7, 12, 19; 4:13, 19; 5:13, 20; 6:17, 22; 7:7, 13, 16, 23; 8:3; 9:4; 10:23; 11:17; 12:21; 13:9, 21, 25; 14:7, 10, 25; 15:1, 5; 16:21; 17:4; 18:7, 12, 17, 19, 21; 19:5, 10, 24; 20:19; 21:12; 22:9, 13, 25; 23:12; 24:13, 21, 23, 25; 25:3, 6, 25; 26:12; 27:13, 17-18; 28:1, 14, 17; 29:15; 30:2; 31:16; 33:11; 34:14; 36:1; 37:18, 24; 38:1, 6, 19, 22; 39:10, 25; 40:19; 41:3, 10, 18, 25; 42:2, 16, 19; 43:15; 44:25; 45:19; 47:7, 24; 48:7, 13; 49:19; 51:1, 10; 52:8, 20; 53:7, 12; 55:1, 5; 56:6; 58:6, 8, 13, 21, 24; 60:4, 14, 24
**HONORABLE** [1] - 1:13
**hope** [1] - 47:5
**hour** [1] - 17:18
**hours** [1] - 53:15
**hundred** [1] - 15:15

## I

**idea** [3] - 34:17; 47:14; 54:15
**identical** [3] - 25:12; 36:7, 16
**identification** [2] - 12:19; 43:12
**identifications** [2] - 19:15; 20:1
**identified** [4] - 17:11; 22:15; 49:3; 53:4
**identifiers** [1] - 34:18
**identify** [2] - 35:7; 36:4
**identifying** [1] - 34:21
**ignore** [1] - 12:11
**ignored** [1] - 52:12
**ignores** [2] - 33:16; 50:16
**immediately** [3] - 51:21; 53:13, 15
**impeaching** [1] - 5:6
**important** [5] - 4:8; 18:3; 36:8; 47:23; 51:2
**importantly** [2] - 33:16; 53:10
**inapposite** [1] - 33:15
**inappropriate** [1] - 48:12
**Inc** [1] - 3:4
**INC** [1] - 1:7
**inclined** [1] - 27:13
**include** [2] - 22:2, 16
**included** [3] - 11:15; 26:5; 36:25
**including** [1] - 17:22
**incorporated** [2] - 27:5; 50:6
**indeed** [2] - 23:18; 26:24
**indicated** [1] - 58:14
**indicates** [1] - 17:10
**indicating** [1] - 37:7
**indication** [2] - 18:20; 58:12
**indicative** [6] - 27:13; 30:6; 46:24;

48:18, 20
**indistinctly** [1] - 47:18
**individual** [2] - 35:5; 57:11
**inducing** [1] - 5:10
**inevitably** [1] - 28:22
**infallibility** [1] - 13:7
**inference** [1] - 20:4
**inform** [2] - 19:3; 25:6
**information** [11] - 4:5; 12:3; 17:13; 18:16; 30:23; 41:25; 46:14; 51:7; 58:14, 18
**infringed** [5] - 7:13, 23; 18:8; 24:2; 34:15
**infringement** [29] - 4:23, 25; 6:12, 14, 24-25; 7:2, 9; 8:4; 19:18; 23:2; 24:5; 27:10; 28:5; 29:11; 36:21, 23; 37:4-6, 8, 11-12, 14
**infringements** [2] - 11:8; 60:14
**infringer** [1] - 45:16
**infringers** [1] - 34:22
**infringing** [19] - 4:23; 8:1, 9, 18; 27:6; 35:2, 14; 36:11, 13, 17; 37:2, 23; 39:3, 19; 44:13; 50:7; 60:16
**initial** [2] - 30:22; 58:18
**inquired** [1] - 20:21
**inserting** [1] - 52:2
**inspected** [2] - 50:12; 52:11
**inspection** [1] - 51:22
**instance** [2] - 13:14; 54:11
**instead** [2] - 31:19; 47:3
**intended** [1] - 32:16
**intends** [1] - 42:11
**interacted** [1] - 59:19
**interactions** [1] - 24:10
**interchangeability** [1] - 25:19
**interesting** [1] - 61:6
**Internet** [4] - 4:22; 21:6; 59:7
**intervene** [1] - 32:17
**intervention** [3] - 32:15, 21, 24
**introduce** [3] - 3:16; 5:6; 17:23
**investigation** [1] - 12:9
**invitation** [1] - 20:21
**involved** [1] - 7:9
**irrelevant** [1] - 40:22
**ISP** [1] - 59:8
**ISPs** [1] - 7:8
**issue** [27] - 7:20; 11:22; 13:5, 8; 22:3; 27:13, 16; 30:13; 38:17; 39:25; 41:15, 19; 43:17; 44:4, 10; 49:3; 50:15; 55:24; 56:1; 57:1, 4; 59:18; 60:11, 17
**issued** [3] - 10:18; 17:7; 26:4
**issues** [11] - 4:17; 5:3; 7:6; 9:6; 12:4; 23:11; 31:19; 47:19; 48:17; 55:14; 61:6
**itself** [4] - 7:21; 13:19; 37:15; 59:20

## J

**Jackson** [1] - 17:7
**January** [3] - 10:19; 21:15; 31:13

**jeff@oandzlaw.com** [1] - 2:5
**Jeffrey** [2] - 2:2; 3:9
**Jennifer** [2] - 2:13; 3:20
**jgolinveaux@winston.com** [1] - 2:16
**judge** [2] - 17:8; 41:19
**JUDGE** [1] - 1:13
**Judge** [14] - 9:20; 10:18, 20, 22; 11:6, 10, 13, 24; 12:2, 5; 16:16; 17:7; 41:16, 21
**judgment** [11] - 3:24; 7:4; 27:15; 30:15; 31:10, 13, 17, 20; 46:23; 52:15; 60:1
**judgments** [1] - 49:14
**jurisdiction** [4] - 46:5; 47:16; 48:1, 17
**jury** [14] - 4:19; 14:9; 23:5; 26:2; 28:8; 31:10; 35:15; 45:8, 12, 14; 56:6; 58:7
**jury's** [1] - 31:7
**Justice** [1] - 33:8
**justice** [1] - 33:9
**justification** [1] - 32:4
**justified** [1] - 31:9
**justify** [2] - 30:6; 32:1

## K

**key** [4] - 4:17, 20; 6:6; 34:14
**kids** [3] - 28:20; 29:4
**kind** [2] - 11:3; 43:8
**known** [8] - 11:16; 17:6; 23:15; 33:18; 44:24; 58:4, 11
**knows** [2] - 13:9; 29:21

## L

**lack** [1] - 29:22
**lacked** [2] - 17:22; 53:24
**lacks** [2] - 45:5; 47:16
**laid** [2] - 9:3; 15:11; 34:2
**language** [1] - 43:5
**largely** [2] - 14:23; 45:21
**Larman** [1] - 36:5
**last** [6] - 38:13, 24; 39:25; 54:20; 59:14; 60:4
**lastly** [1] - 54:17
**late** [3] - 22:19; 52:7; 53:20
**law** [4] - 30:16; 32:6; 39:21; 47:25
**laws** [1] - 29:13
**lawsuit** [1] - 22:9
**lean** [1] - 11:21
**learned** [4] - 44:16; 53:11, 13, 17
**least** [7] - 12:24; 17:18; 30:22; 32:2; 33:21; 39:18
**led** [1] - 23:2
**legal** [1] - 61:7
**legally** [1] - 32:4
**legitimate** [2] - 27:9; 44:4
**length** [3] - 13:6; 14:21; 35:15
**less** [2] - 20:20; 34:13

**lessons** [2] - 29:6
**letter** [3] - 11:1; 41:21; 47:25
**letters** [1] - 46:22
**level** [4] - 50:1; 61:7
**liable** - 8:15
**LIAM** [1] - 1:13
**license** [1] - 29:21
**lied** [6] - 29:25; 40:9-11; 58:22
**light** [2] - 29:14; 51:19
**lightly** [1] - 6:2
**likely** [1] - 46:11
**limine** [3] - 7:25; 17:17; 61:3
**limited** [4] - 11:7; 41:19; 48:16
**line** [2] - 28:9; 38:6
**lineal** [1] - 5:25
**linear** [5] - 4:25; 8:5, 8, 16; 59:9
**lines** [5] - 18:18, 21; 20:11; 24:22
**linking** [1] - 7:14
**list** [2] - 8:11; 34:5
**listen** [1] - 28:20
**listened** [7] - 14:13; 15:8, 14-15; 24:16; 26:10
**listeners** [1] - 15:19
**listening** [7] - 14:22; 15:3, 17; 24:20; 25:5; 41:15
**litigate** [1] - 49:13
**litigation** [8] - 10:4, 8; 12:11; 38:14; 42:5, 10, 13; 61:5
**LLP** [3] - 1:16, 20; 2:2
**located** [2] - 24:3; 26:24
**lodged** [1] - 59:20
**log** [5] - 9:20, 24; 35:3; 37:21; 39:14
**look** [18] - 12:16; 18:15; 35:5, 20; 36:19; 38:5, 12, 15, 22; 43:9, 22-23; 44:1; 48:19; 53:7; 54:5; 58:10
**looked** [5] - 3:25; 16:7; 38:19; 58:10; 61:5
**looking** [2] - 16:10; 41:10
**lose** [2] - 28:22; 29:8
**loser** [1] - 60:6
**losing** [2] - 28:24; 54:20
**lost** [1] - 29:9

## M

**machine** [1] - 2:22
**Magic** [33] - 8:10; 10:2; 12:14, 19, 24; 15:4; 16:19, 25; 17:23; 18:1, 9; 19:15; 20:1; 22:16; 24:9, 19; 25:2; 26:7; 27:5, 8; 43:3, 6, 12, 19, 22; 44:1; 50:3, 7, 11; 59:6, 19
**Magic's** [3] - 9:25; 50:10; 59:17
**magnitude** [1] - 6:3
**mail** [3] - 38:24
**mandate** [2] - 47:15, 21
**maneuvering** [1] - 5:11
**manner** [4] - 5:8; 26:11; 45:10
**MARCH** [1] - 3:1
**March** [3] - 1:7; 30:22; 31:2

**Marching** [1] - 51:3
**mark** [1] - 23:11
**MarkMonitor** [97] - 4:6; 6:13; 7:17, 20-21; 8:2, 22; 9:7, 10, 13; 10:2, 7, 10, 21, 25; 11:5, 14, 25; 12:7, 10, 12, 14; 13:15; 16:5; 17:21; 18:2, 15, 25; 19:1, 13; 20:3, 9, 24; 22:1, 6, 11, 13; 23:4, 10, 12, 15, 22, 24; 24:8; 25:4, 16; 26:7, 18, 24; 27:4, 7; 31:1; 34:21, 23; 35:1, 4, 6, 9-10, 16; 36:13; 37:19; 38:16; 41:11, 14, 17; 42:4, 21; 43:2, 6, 22; 44:6; 50:2, 4, 6; 51:21, 25; 52:19; 53:1, 3-4, 25; 54:1, 4, 6, 13; 56:4; 57:10, 13, 19; 59:4, 7, 20; 60:15
**MarkMonitor's** [11] - 9:25; 10:6; 12:4; 20:4; 21:5; 33:17; 34:2; 40:10; 49:24; 50:12; 59:19
**Mary** [1] - 54:20
**Maryland** [2] - 49:4
**Masonry** [1] - 30:19
**massive** [2] - 40:11; 45:16
**Master** [3] - 38:7, 11
**master** [2] - 54:11; 56:22
**match** [1] - 56:11
**matching** [4] - 13:8; 27:8; 50:3, 10
**material** [8] - 4:24; 5:6; 6:15; 23:1; 50:21; 51:11; 52:14; 60:20
**material-impeaching** [1] - 5:6
**materials** [1] - 39:19
**matter** [6] - 22:23; 36:16; 39:13; 46:2; 61:14
**mattered** [1] - 5:15
**Matthew** [2] - 1:15; 3:8
**matthew@oandzlaw.com** [1] - 1:18
**McCabe** [2] - 23:25; 24:2
**McGaughey** [4] - 2:6; 3:12, 17
**mean** [2] - 4:3; 19:19
**means** [3] - 14:17; 31:15; 32:18
**measure** [1] - 46:16
**meet** [4] - 24:4; 30:7; 32:7; 46:1
**meeting** [1] - 30:5
**melkin@winston.com** [1] - 2:12
**memo** [1] - 46:14
**mention** [4] - 6:19; 50:24; 55:7; 59:14
**mentioned** [3] - 5:20; 19:5; 25:15
**mentioning** [2] - 34:23
**mere** [1] - 56:24
**merely** [2] - 21:25
**merit** [1] - 45:5
**meritorious** [1] - 27:25
**merits** [2] - 46:19; 49:20
**met** [2] - 31:12; 40:4
**metadata** [9] - 19:10; 20:15; 24:14; 39:5, 10; 44:22; 56:17; 58:20
**methodical** [1] - 8:16
**methodically** [1] - 8:8
**Michael** [2] - 2:10; 3:15
**might** [2] - 45:12; 46:13
**millions** [2] - 29:5; 37:5

**minimum** [1] - 27:15
**minute** [4] - 4:18; 33:25; 34:12; 39:6
**miscellaneous** [1] - 54:2
**mischaracterized** [3] - 10:14; 44:7, 9
**misconduct** [18] - 9:5; 29:17, 21; 30:12, 17; 33:13; 40:3, 14; 41:7, 23; 52:23, 25; 53:2, 18; 54:19; 57:4, 16; 60:20
**misleading** [2] - 19:24; 42:18
**misled** [5] - 4:19; 30:1; 45:13
**mismatched** [1] - 14:2
**misrepresent** [2] - 6:14; 22:5
**misrepresentation** [2] - 15:5; 52:22
**misrepresentations** [6] - 6:15; 9:16; 22:25; 27:22; 60:19
**misrepresented** [4] - 6:13; 9:6, 11; 42:20
**missing** [3] - 26:22; 27:3
**misstatement** [2] - 15:4; 41:18
**misstatements** [1] - 40:7
**mistakes** [1] - 29:9
**mistruths** [1] - 29:25
**mix** [1] - 52:7
**moment** [9] - 9:18; 14:24; 25:23; 36:20; 52:20; 56:20, 25
**months** [8] - 26:25; 30:17, 20; 33:6; 51:19; 52:3, 10
**moreover** [1] - 19:3
**MORNING** [1] - 3:1
**morning** [16] - 3:7, 10, 12, 18-19, 23; 4:2, 7; 5:14; 6:11; 29:16; 33:19; 36:1; 45:19
**most** [3] - 40:1; 48:1; 55:17
**MOTION** [1] - 1:12
**motion** [77] - 3:15, 24; 6:18; 7:4, 18; 17:17; 20:11, 19; 25:13, 21; 26:15, 21; 27:12, 14-15; 29:16; 30:3, 8, 14, 18, 21, 23-24; 31:6, 14, 16, 22-24; 32:15, 18, 20-21, 24; 33:6, 10, 14, 18; 38:1; 39:24; 40:8; 42:1; 45:5, 21, 24-25; 46:2, 7, 20-22; 47:1, 4, 6, 8; 48:14, 19, 22-24; 49:6, 21; 50:5; 51:24; 52:1, 21; 55:16, 21; 56:1; 60:18
**motions** [9] - 4:11; 7:25; 18:11; 45:17; 46:9; 54:23; 59:25; 61:4
**Motor** [1] - 41:24
**motto** [1] - 33:8
**move** [1] - 51:10
**moved** [3] - 20:17; 34:8; 53:25
**moving** [5] - 14:20; 20:11; 24:21; 27:24; 48:8
**MR** [23] - 3:7, 12, 19; 4:13, 17; 6:22; 13:4; 14:4, 23; 16:3; 28:14, 17, 19; 38:3; 45:5, 19; 49:19; 53:10; 55:1, 5; 57:18; 58:12; 60:24
**much-diminished** [1] - 26:14
**mucks** [1] - 48:7
**multiple** [2] - 21:8; 45:25
**music** [6] - 11:16, 18; 13:12; 14:14; 20:9

**MUSIC** [1] - 1:3
**Music** [1] - 3:3
**must** [5] - 30:7; 48:15; 52:10, 23; 54:18

# N

**narrative** [6] - 7:21; 8:5, 8; 9:2; 23:5; 25:9
**near** [1] - 32:2
**necessary** [2] - 30:6; 35:12
**need** [9] - 4:11; 19:1; 42:11; 44:11; 49:18, 20; 52:19; 53:9; 54:24
**needed** [3] - 22:21; 24:5; 54:7
**network** [3] - 22:3; 37:2, 7
**networks** [5] - 35:1, 5; 36:15; 38:17; 59:8
**never** [5] - 19:5; 35:10; 42:25; 43:25; 52:11
**new** [9] - 4:8; 39:7; 46:11; 49:22; 51:1, 13; 52:4; 53:11
**New** [2] - 2:11; 46:14
**newly** [4] - 30:24; 36:22; 50:11; 52:1
**next** [1] - 6:22
**nice** [1] - 45:20
**Nicole** [1] - 3:22
**night** [1] - 46:8
**nine** [4] - 51:19; 52:3, 10
**nobody** [2] - 38:19; 43:25
**nondisclosure** [1] - 53:20
**none** [3] - 36:22; 49:7, 15
**nonparty** [1] - 53:1
**nothing** [15] - 11:9; 16:8, 14; 38:20; 43:9; 45:16; 46:3; 48:9; 49:1; 53:10; 56:23; 58:12; 59:16
**notice** [8] - 11:7; 37:19; 57:19, 21, 24; 59:5, 8
**noticed** [1] - 31:20
**notices** [20] - 4:23; 8:12, 14, 19; 9:1, 12, 15; 17:11, 15; 19:9; 20:2; 21:10; 22:12, 15; 34:6; 37:6, 21; 39:14; 59:12
**noting** [1] - 58:1
**notion** [7] - 7:1; 11:24; 12:23; 53:17; 55:25; 56:8; 57:8
**November** [8] - 18:17; 30:22; 31:3, 15; 32:21; 33:3; 55:10
**nowhere** [1] - 56:7
**nuanced** [1] - 5:10
**Number** [1] - 3:5
**number** [3] - 22:10; 42:2, 19
**numbering** [1] - 13:11
**numbers** [6] - 13:3, 23; 14:4; 56:12
**numerous** [2] - 24:12; 48:2
**NW** [4] - 1:16, 20; 2:3, 7
**NY** [2] - 2:10
**NYU** [1] - 15:19

# O

**O'GRADY** [1] - 1:13
**objected** [2] - 34:9; 53:23
**objection** [4] - 18:22; 23:9, 20; 24:17
**objections** [1] - 33:20
**obligates** [1] - 54:6
**obligating** [1] - 54:8
**obligation** [2] - 43:4; 54:9
**obligations** [5] - 6:1; 10:21; 11:3; 41:17
**observed** [1] - 7:13
**obtained** [1] - 8:21
**obvious** [3] - 5:3; 29:14; 45:15
**obviously** [6] - 14:20; 15:3; 27:22; 43:3; 45:11; 61:6
**occasions** [1] - 24:12
**occur** [2] - 55:12; 59:11
**occurred** [5] - 36:23; 37:12; 59:4, 11, 16
**oddly** [1] - 46:17
**OF** [2] - 1:2, 12
**offer** [2] - 47:17; 52:6
**offered** [3] - 19:8; 21:22; 51:21
**Office** [1] - 2:20
**Official** [2] - 2:18; 61:17
**often** [1] - 29:6
**once** [2] - 15:18; 28:2
**one** [34] - 5:13; 8:8; 14:4; 15:14; 20:24; 22:10; 24:4, 17, 19; 26:10, 13; 30:4, 10, 25; 31:12; 38:24; 40:1, 6, 23; 41:15; 42:14; 44:5; 45:2; 46:8; 47:7, 10, 19; 49:21; 50:20; 55:16; 56:11; 57:6
**one's** [1] - 46:25
**one-year** [5] - 31:12; 46:8; 47:7, 10
**ones** [1] - 19:20
**ongoing** [1] - 51:3
**opening** [2] - 35:18; 46:14
**opine** [2] - 18:4
**opining** [1] - 24:8
**OPPENHEIM** [4] - 28:17, 19; 38:3; 45:5
**Oppenheim** [1] - 1:15, 20; 2:2; 3:8; 55:10; 57:13
**Oppenheim's** [2] - 56:8, 16
**opportunistic** [1] - 51:10
**opportunity** [3] - 39:22; 49:13; 55:15
**opposing** [4] - 4:20; 5:5, 7; 15:1
**opposite** [1] - 51:12
**opposition** [8] - 25:10, 21; 26:20; 27:2; 31:22; 37:25; 38:23; 44:11
**orchestrated** [1] - 5:9
**order** [16] - 9:20; 10:18, 20, 22; 11:7, 10; 17:7, 9, 20; 30:8; 32:13; 40:18; 41:19; 47:20; 48:25; 55:20
**ordered** [4] - 12:3; 41:12, 16
**original** [1] - 26:6
**originally** [1] - 36:14
**origins** [2] - 9:22; 17:21

**otherwise** [4] - 9:23; 10:1; 48:9; 57:8
**ourselves** [1] - 29:7
**outcome** [6] - 45:12; 46:12; 50:22; 51:11, 17; 52:5
**outlier** [1] - 49:15
**outrageous** [2] - 40:2; 45:9
**outright** [1] - 45:25
**outside** [3] - 21:18; 47:7; 49:10
**overcome** [1] - 5:3
**overlay** [1] - 45:21
**overruled** [1] - 23:20
**overturning** [1] - 52:14
**overwhelming** [2] - 37:3, 13
**overwhelmingly** [1] - 48:10
**own** [2] - 37:3; 50:16

# P

**P2P** [2] - 38:16; 42:9
**packages** [1] - 37:22
**Packet** [1] - 17:2
**page** [10] - 9:4; 18:17, 21; 20:11; 24:22; 43:21; 46:14, 17; 50:5
**pages** [2] - 21:24; 40:25
**pails** [1] - 61:4
**pans** [1] - 46:13
**papers** [13] - 16:5; 30:9; 46:10, 12, 16; 47:18; 49:25; 51:2; 52:13; 54:5, 13; 55:7; 56:2
**paragraph** [2] - 38:6, 12
**parent** [1] - 29:6
**parents** [1] - 29:5
**Park** [1] - 2:11
**part** [4] - 9:1; 10:24; 16:24; 52:20
**particular** [7] - 7:11; 13:14, 23; 25:11; 27:8; 56:25; 60:10
**parties** [4] - 9:4; 12; 51:6; 53:5; 54:12
**parties'** [1] - 11:9
**party** [5] - 27:24; 49:3; 52:23, 25; 54:20
**pause** [1] - 52:20
**pausing** [1] - 50:9
**pay** [1] - 11:2
**PCAP** [1] - 9:21
**PCAPs** [7] - 16:18, 23; 17:1, 5; 19:25; 58:15
**peer** [16] - 8:9, 12-13; 22:3; 35:1, 4; 36:15; 59:8
**peer-to-peer** [8] - 8:9, 12-13; 22:3; 35:1, 4; 36:15; 59:8
**pending** [2] - 46:6; 48:16
**people** [1] - 7:10
**percentage** [2] - 18:6, 8
**percipient** [1] - 10:6
**perfect** [2] - 34:20; 44:15
**perfectly** [1] - 36:16
**performed** [1] - 20:2
**period** [11] - 10:11; 17:25; 18:5, 14, 24; 19:21; 20:5; 21:10; 23:19; 26:10;

59:11
**permission** [1] - 6:10
**permit** [1] - 47:6
**permitted** [3] - 5:14, 24; 6:20
**person** [1] - 44:3
**perspective** [1] - 31:7
**pertained** [1] - 12:10
**pertinent** [1] - 27:23
**picture** [1] - 36:19
**piece** [3] - 8:1; 26:22; 45:2
**pieces** [5] - 7:14, 18-19; 30:23; 53:8
**pin** [1] - 33:22
**place** [2] - 53:6, 23
**placeholder** [1] - 47:4
**plainly** [1] - 12:22
**plaintiff** [1] - 3:6
**Plaintiff's** [1] - 38:22
**plaintiffs** [91] - 3:8; 4:19, 21; 5:22, 25;
6:11-14, 23; 7:11, 14, 20; 8:18, 20, 24;
9:6, 10; 10:19, 24; 11:6, 12, 16, 19, 21;
12:2, 8, 23; 13:13; 16:16, 20; 18:1;
19:3, 12, 17, 21, 24; 20:7; 21:13, 22-23;
22:9, 17, 19-20; 23:18; 24:1; 25:8, 25;
26:2, 11, 13, 23; 28:9; 29:8, 17; 33:11;
34:17; 37:6; 39:1; 40:2, 9, 17; 41:7-9,
12-14, 16, 20; 42:2, 19; 44:5, 8; 45:6,
13; 46:18; 51:25; 52:18; 53:11, 17, 20;
54:1, 3; 57:9, 11
**Plaintiffs** [3] - 1:5, 15; 2:2
**plaintiffs'** [34] - 5:18; 7:4, 17; 11:5, 11;
12:21; 17:14; 18:11, 13, 19, 22; 21:14,
18-19; 23:9, 24; 24:17; 26:14; 27:6, 10;
28:7; 31:22; 34:6; 37:25; 40:2, 6, 9-10,
12; 43:7; 50:8; 60:11, 19
**plan** [1] - 29:2
**play** [1] - 28:21
**pleadings** [7] - 3:25; 4:4, 9; 5:10; 52:9;
61:2
**pleasure** [1] - 4:14
**plug** [1] - 4:24
**plus** [1] - 12:5
**point** [10] - 7:5; 31:3, 6; 32:6; 46:7;
49:21; 50:18; 52:17; 56:9; 60:4
**pointed** [5] - 24:7; 25:5; 29:17; 30:23;
31:16
**points** [12] - 4:8; 6:8, 11; 10:17; 28:10;
30:25; 31:22; 42:3; 50:19, 24; 55:6;
60:20
**policies** [2] - 29:12
**policy** [1] - 54:18
**pornography** [2] - 36:2
**portions** [1] - 28:4
**position** [5] - 11:6; 18:6; 19:23; 25:20;
51:12
**positions** [1] - 52:9
**possession** [1] - 53:24
**possibly** [2] - 55:17, 22
**post** [3] - 11:11; 18:5, 14
**post-claims** [2] - 18:5, 14
**post-hoc** [1] - 11:11

**postjudgment** [1] - 46:3
**posture** [1] - 48:11
**pot** [1] - 44:21
**potentially** [1] - 22:23
**practice** [1] - 57:7
**preamble** [1] - 56:25
**preceding** [1] - 42:8
**preclude** [3] - 18:12; 24:12; 51:25
**precluded** [1] - 23:13
**preclusion** [2] - 23:7; 52:5
**predicated** [1] - 52:4
**prejudicial** [1] - 52:4
**Present** [1] - 38:2
**present** [6] - 8:4; 26:1, 13; 57:5; 60:12
**presentation** [5] - 4:25; 6:9; 28:8;
29:16; 41:15
**presented** [11] - 8:7; 14:7-9; 33:13;
56:3, 5, 7, 12
**presenting** [5] - 5:23; 25:15; 27:24;
30:11; 33:13
**preservation** [2] - 37:22; 56:20
**preserved** [2] - 37:21; 44:21
**prevent** [2] - 5:5, 7
**prevented** [6] - 23:1; 27:23; 30:10;
36:9; 37:9; 50:22
**preview** [1] - 6:7
**previously** [1] - 17:10
**primarily** [1] - 30:25
**primary** [2] - 25:10; 31:5
**probe** [2] - 20:21; 58:21
**problematic** [1] - 17:21
**problems** [1] - 22:10
**proceed** [2] - 26:3
**Proceedings** [2] - 2:22; 61:11
**PROCEEDINGS** [1] - 1:12
**proceedings** [1] - 61:14
**process** [9] - 8:11; 13:8; 15:4, 22;
34:21, 24; 37:24; 43:11; 49:24
**processed** [2] - 12:18; 43:12
**processing** [1] - 17:14
**produce** [6] - 10:19, 21; 12:3; 16:17,
20, 23; 17:6; 27:22; 41:8, 12-13, 17;
53:1; 54:7, 9; 58:15
**produced** [16] - 2:22; 8:2; 16:6, 16, 22;
17:5, 24; 31:1; 34:3; 39:8; 41:8; 50:11;
53:4; 57:10; 58:15; 59:23
**producing** [1] - 11:13
**product** [2] - 43:15; 57:14
**production** [5] - 11:12; 16:4; 40:23;
41:1
**professionally** [1] - 61:2
**Professor** [2] - 23:25; 24:2
**professor** [1] - 15:19
**proffered** [1] - 23:9
**program** [13] - 10:8; 11:7, 22; 37:20;
41:14, 19; 42:5, 10, 13; 57:19, 22, 24;
59:5
**programs** [1] - 11:25
**progression** [2] - 8:16; 59:9

**project** [14] - 9:19; 10:5, 9; 11:18;
12:8; 16:21, 24; 18:23; 19:25; 21:20;
28:4; 38:17; 57:23; 58:16
**projects** [1] - 12:1
**promulgated** [1] - 39:8
**proof** [2] - 7:12; 30:12
**proofs** [3] - 4:25; 5:18, 23
**properly** [1] - 34:1
**proposed** [1] - 11:12
**proprietary** [1] - 54:9
**prosecutors** [1] - 36:4
**protective** [2] - 32:13; 55:19
**protocols** [2] - 38:16; 59:8
**prove** [6] - 6:11-13; 7:15; 19:18; 52:23
**provide** [1] - 11:2
**provided** [3] - 23:4; 24:1; 38:14
**providence** [3] - 4:20; 33:19; 45:14
**provides** [1] - 28:11
**provision** [2] - 47:12; 49:7
**public** [1] - 17:9
**Public** [1] - 48:4
**purely** [2] - 15:9; 51:9
**purported** [2] - 25:17; 27:7
**purportedly** [2] - 12:13; 13:25
**purporting** [1] - 25:5
**purports** [1] - 49:23
**purpose** [5] - 15:10; 18:14; 19:16;
48:23
**purposes** [4] - 11:15; 13:4; 16:11; 44:1
**pursuant** [4] - 11:18; 17:9; 38:7; 58:16
**pursue** [1] - 42:11
**pursued** [1] - 41:25
**put** [16] - 8:22; 11:7; 13:13; 20:14, 23;
22:17; 31:6; 33:22; 35:14; 41:3; 43:4,
18-19; 44:3; 50:14; 56:18
**putting** [3] - 36:9; 37:10; 44:18
**PX11** [2] - 7:24; 34:5
**PX3** [1] - 54:12
**PX39** [1] - 8:3

# Q

**questions** [9] - 6:18; 20:24; 25:24;
28:16; 40:16; 41:6; 55:2; 56:18; 60:5
**quickly** [4] - 6:7; 26:16; 34:11; 55:21
**quite** [2] - 25:9; 50:25
**quote** [27] - 10:7, 24; 11:5; 17:9, 11;
18:13, 16, 19, 21; 19:14, 16; 24:18, 20;
41:16; 42:4, 9; 43:6, 23-25; 44:2; 46:19;
48:4, 6; 50:6
**quoting** [1] - 11:14

# R

**raise** [2] - 31:19; 60:20
**raised** [1] - 22:4
**raises** [1] - 27:15
**raising** [2] - 23:11; 31:19

**range** [1] - 12:4
**rare** [1] - 49:12
**rather** [1] - 7:14
**RDR** [2] - 2:17; 61:13, 17
**RDR-CRR** [1] - 61:13
**re** [5] - 12:13; 18:24; 23:18; 36:15; 47:6
**re-download** [2] - 12:13; 18:24
**re-downloaded** [2] - 23:18; 36:15
**re-file** [1] - 47:6
**reacted** [1] - 55:11
**read** [5] - 3:25; 14:16; 19:19; 46:12; 49:24
**reading** [1] - 11:23
**reads** [1] - 29:22
**real** [2] - 26:4
**reality** [1] - 8:15
**realize** [1] - 5:19
**realized** [2] - 22:10; 44:19
**really** [13] - 4:2, 6; 33:23; 40:24; 46:2; 50:19; 51:2, 10; 55:15; 56:19; 57:22; 59:10
**reason** [13] - 6:4; 19:2; 25:10; 34:25; 35:10; 39:11; 43:15, 18, 21; 45:6; 48:3; 55:22; 57:22
**reasonable** [3] - 20:4; 30:14; 32:5
**reasonably** [1] - 38:20
**reasons** [3] - 14:24; 45:25; 59:21
**receives** [2] - 50:13
**recently** [1] - 5:24
**recess** [1] - 61:10
**recognized** [1] - 22:21
**recognizing** [1] - 47:3
**reconcile** [1] - 52:8
**reconciled** [1] - 57:22
**record** [23] - 5:20; 6:4, 6; 9:25; 10:24; 11:8, 14; 27:18; 28:1; 29:22; 35:22; 46:5; 47:16; 48:8; 52:3, 5; 53:16; 54:12; 55:17; 56:11; 57:24; 59:22; 61:14
**recordings** [6] - 13:12, 23; 20:9; 44:13; 45:14; 60:16
**records** [1] - 53:3
**recreate** [1] - 57:23
**recreating** [2] - 5:1; 16:11
**ref** [1] - 28:23
**ref's** [1] - 28:25
**refer** [1] - 16:21
**reference** [7] - 21:23; 42:9; 52:1; 56:8, 16, 24
**referenced** [3] - 12:13; 13:16; 15:3
**references** [1] - 46:15
**referred** [4] - 7:24; 24:18; 42:21; 49:25
**referring** [1] - 11:23
**refers** [2] - 48:23
**reflect** [3] - 11:8; 13:12; 14:6
**reflected** [3] - 14:14; 16:15; 18:25
**refuse** [1] - 51:23
**regard** [9] - 15:22; 55:24; 56:15, 18, 20; 57:9; 58:3; 59:1, 14
**regarding** [3] - 7:8; 11:22; 12:4

**regime** [1] - 50:25
**regularly** [2] - 35:24; 36:3
**reject** [1] - 39:23
**relate** [2] - 49:23; 57:21
**related** [8] - 10:18; 12:1, 6; 17:18; 20:9; 22:17; 23:7; 38:11
**relates** [1] - 27:4
**relating** [2] - 41:14; 50:6
**relationship** [4] - 11:4; 12:5; 13:21; 54:11
**relative** [1] - 13:18
**relentless** [1] - 24:14
**relevant** [1] - 14:24
**reli** [1] - 23:11
**reliability** [5] - 12:4, 9; 23:11; 24:8; 35:23
**reliable** [7] - 20:20; 34:13; 35:20; 36:7, 10, 18
**reliance** [2] - 33:17; 35:16
**relied** [1] - 7:14
**relief** [15] - 3:24; 6:3, 15; 25:23; 27:14, 19, 25; 28:11; 46:13, 15, 22, 24; 47:1; 55:18
**relies** [1] - 33:15
**relieve** [1] - 47:9
**rely** [3] - 32:10; 36:3
**remand** [2] - 48:21, 24
**remands** [1] - 48:22
**remember** [6] - 7:7; 13:6; 19:10; 24:13; 31:14; 61:3
**remembers** [3] - 7:16; 17:4; 60:14
**remind** [1] - 49:22
**reminded** [1] - 17:16
**remotely** [2] - 30:5; 42:15
**render** [1] - 45:13
**rendered** [2] - 31:11; 45:14
**repeat** [1] - 27:20
**replicas** [1] - 34:20
**reply** [4] - 35:19; 46:18; 50:14; 55:4
**report** [1] - 36:25
**Report** [6] - 9:24; 16:18, 23; 17:7; 20:1
**reported** [1] - 2:22
**REPORTER** [1] - 57:17
**Reporter** [2] - 2:17; 61:17
**repositioned** [1] - 55:21
**represent** [2] - 23:16; 51:6
**representation** [2] - 15:7; 24:25
**representations** [2] - 19:17; 28:7
**representative** [1] - 3:22
**representatives** [1] - 15:14
**represented** [8] - 7:22; 9:7; 10:9; 11:12; 15:1; 18:19; 22:14; 24:18
**represents** [1] - 28:2
**reputation** [1] - 29:24
**request** [8] - 11:9; 13:1; 27:12, 18; 47:9; 49:8; 52:21
**requested** [1] - 27:23
**requests** [1] - 46:23
**require** [2] - 26:12; 37:22

**required** [8] - 12:12, 14; 16:16; 26:1, 3; 43:5
**requirement** [1] - 43:2
**requirements** [2] - 24:4; 30:6
**requires** [2] - 30:13; 52:14
**respect** [2] - 6:18; 51:13; 57:24
**respectfully** [5] - 27:18; 28:11; 38:19; 46:25; 60:17
**respecting** [1] - 49:14
**respond** [1] - 20:23
**responded** [1] - 21:3
**response** [4] - 24:17; 25:13; 31:22; 50:4
**responses** [2] - 28:7; 50:14
**responsibility** [2] - 29:19, 23
**responsible** [2] - 45:8; 53:20
**responsive** [3] - 12:25; 53:5
**rest** [1] - 3:16
**resting** [1] - 60:4
**rests** [1] - 48:6
**result** [2] - 24:23; 47:22
**resulted** [1] - 5:4
**results** [1] - 49:16
**retain** [4] - 9:10; 18:2; 23:17; 26:6
**retained** [3] - 17:1; 21:17; 22:11
**retains** [2] - 48:16; 54:14
**retrial** [1] - 26:12
**reverified** [1] - 23:18
**reverify** [6] - 12:15; 15:23; 18:24; 19:5; 43:6, 20
**reverifying** [1] - 43:10
**review** [2] - 51:23; 56:14
**reviewed** [2] - 9:4; 40:25
**revisit** [1] - 58:8
**RIAA** [7] - 10:7; 11:25; 41:10; 42:4, 10; 57:10, 12
**rights** [2] - 37:7; 60:21
**Rightscorp** [1] - 22:21
**rigid** [1] - 46:9
**rigorous** [1] - 56:14
**rings** [1] - 25:14
**ripe** [1] - 37:8
**rise** [1] - 11:20
**RMR** [1] - 2:17
**robust** [2] - 6:4; 55:17
**role** [1] - 33:16
**rooted** [1] - 9:5
**Rule** [43] - 6:1, 18; 20:11; 25:13; 26:15; 27:19; 28:10; 30:3, 6, 24; 32:16, 20, 24; 39:23; 42:1; 45:5, 21, 25; 46:1, 3, 8, 17, 20; 47:6, 8-9, 12, 14, 17, 19; 48:14, 19, 23, 25; 49:1, 6, 11; 50:5; 51:24; 52:21; 55:16
**rule** [4] - 30:13; 32:5; 46:24; 52:21
**ruled** [1] - 23:14
**rules** [2] - 46:23; 48:13
**ruling** [6] - 27:13; 30:6; 41:21; 46:24; 48:18, 20
**rulings** [2] - 22:22; 58:8

run [1] - 43:2
runs [1] - 54:21

# S

Sam [4] - 10:6, 13; 19:12; 34:2
San [1] - 2:15
sanctions [3] - 26:21; 51:24; 52:6
sat [1] - 30:21
satisfies [1] - 54:17
satisfy [2] - 46:17; 47:1
sauce [1] - 54:9
saw [1] - 40:20
scenarios [1] - 47:22
Schultz [2] - 27:20; 36:24
scope [1] - 38:15
Scott [6] - 1:19; 2:17; 3:7; 61:13, 16
scott@oandzlaw.com [1] - 1:23
scottwallace.edva@gmail.com [1] - 2:21
scour [1] - 59:7
screen [1] - 6:8
screenshots [1] - 7:10
Sean [1] - 3:21
search [1] - 35:1
second [16] - 6:19; 8:1; 9:21; 26:15; 27:12; 30:4, 10; 38:12; 45:21, 24; 49:21; 50:5; 52:20; 60:8
secondarily [1] - 8:15
secondary [2] - 6:23; 7:9
secondly [5] - 11:21; 22:13; 31:2; 32:9; 55:11
secret [1] - 54:9
see [4] - 18:10; 32:8; 41:4, 10
See [1] - 48:13
seek [1] - 36:20
seeking [3] - 6:3; 15:23; 47:1
seem [1] - 33:1
sending [2] - 4:23; 17:15
sends [2] - 50:2, 4
sense [2] - 49:12; 52:16
sent [11] - 8:12, 25; 9:12, 15; 19:9; 20:2; 21:11; 22:12; 38:25; 39:2; 59:12
sentence [1] - 38:13
sentences [2] - 27:17; 42:8
separate [5] - 4:11; 10:7; 42:5, 11
separately [1] - 40:15
September [3] - 32:18; 33:3
serious [1] - 55:11
seriously [1] - 29:24
served [1] - 53:25
server [1] - 36:14
Service [1] - 38:9
services [2] - 11:2; 38:13
Services [2] - 38:7, 12
servicing [1] - 57:14
SESSION [1] - 3:1
set [5] - 4:18; 20:10; 37:20; 44:11; 52:13

sets [3] - 4:11; 54:10, 13
seven [3] - 51:19; 52:3
several [4] - 7:14, 18; 30:23; 55:7
sham [1] - 29:12
shameful [1] - 29:11
shape [1] - 57:7
share [1] - 6:25
sharing [1] - 8:13
shorthand [1] - 2:22
shortly [1] - 61:9
show [2] - 46:11; 53:3
showed [3] - 18:6; 53:2
showing [9] - 7:10; 26:4; 31:23; 32:7; 33:10; 40:4
shows [2] - 37:13; 40:7
side [2] - 3:20; 53:13
sidebar [6] - 15:1; 24:18; 34:8; 42:23; 43:16
signed [4] - 10:24; 51:24; 52:9; 53:16
significance [3] - 9:21; 42:3; 58:20
significant [3] - 6:5; 14:21; 15:21
similar [1] - 46:15
simply [1] - 42:23
single [3] - 39:20
sit [3] - 15:9; 25:24; 28:25
sitting [1] - 38:25
situation [1] - 60:6
skip [1] - 52:16
slide [1] - 6:22
slight [1] - 5:11
slight-of-hand [1] - 5:11
so-called [1] - 57:13
soft [1] - 45:22
solutions [1] - 38:16
sometimes [1] - 40:24
somewhere [2] - 15:8; 44:3
song [2] - 34:3; 37:16
songs [2] - 20:14; 34:4
SONY [1] - 1:3
Sony [4] - 3:3; 7:13; 14:21; 15:7
sore [1] - 60:6
sorry [2] - 38:23; 57:17
sort [4] - 9:5; 16:3; 45:22; 47:18
sought [8] - 6:11; 17:23; 18:12; 24:12; 53:23; 54:23; 55:18
source [14] - 4:4; 6:19; 26:17, 22, 24; 27:3; 49:23; 53:22; 54:10, 14; 59:15, 18, 20, 23
sourced [2] - 7:17; 58:14
SOW [14] - 10:7; 37:23; 39:19; 40:18; 41:24; 42:3, 5, 9, 12; 43:5, 9; 44:21
SOWs [3] - 37:22; 38:9; 44:20
spec [1] - 46:13
special [1] - 57:14
specific [4] - 7:19; 9:16; 54:22, 25
specifically [12] - 4:4, 21; 5:24; 9:3; 10:17; 14:5; 15:5; 22:2; 38:13; 46:11; 56:3, 8
specifics [1] - 15:20

speculate [1] - 53:18
speculates [1] - 51:16
speculation [2] - 46:13; 47:5
speculative [1] - 52:22
spend [1] - 25:23
spent [1] - 60:14
spirit [1] - 41:21
spoliation [1] - 26:21
sponsored [1] - 15:25
sporadically [1] - 14:17
sports [1] - 28:21
Spreadsheet [1] - 17:20
spreadsheet [32] - 7:21, 24-25; 8:2, 23; 9:7, 13; 10:11; 12:14; 13:15, 21, 24; 17:19, 22; 18:25; 19:1; 20:3, 10; 22:13; 23:4, 8, 10, 15, 23-24; 25:4; 26:8; 42:21, 24; 56:4
spreadsheets [1] - 25:17
spring [1] - 55:12
Square [2] - 2:19; 27:21
stage [2] - 4:18; 23:14
standpoint [1] - 61:7
stands [1] - 17:2
start [3] - 40:17; 50:20; 60:16
started [1] - 14:18
state [1] - 16:11
Statement [13] - 9:19; 10:20; 12:12, 16; 16:4, 6; 19:25; 30:25; 37:18; 38:4; 56:21; 57:21
statement [12] - 10:5; 14:25; 16:5; 19:19; 20:4; 40:12; 42:4, 6, 14, 22; 57:25; 58:2
statements [5] - 40:7; 44:10; 59:1; 60:3
Statements [1] - 56:23
states [2] - 21:23; 46:22
States [2] - 2:18; 49:5
STATES [2] - 1:1, 13
stating [1] - 19:21
status [2] - 46:5; 48:5
statute [1] - 32:6
stay [1] - 50:1
step [2] - 36:19; 49:24
still [2] - 23:13; 54:18
stored [6] - 20:25; 21:1-4; 36:13
strategy [4] - 5:22; 25:20; 28:9; 60:10
Strawn [5] - 2:7, 10, 14; 3:21; 30:2
Street [2] - 2:7, 14
strike [2] - 20:17; 52:19
struck [1] - 18:5
studiously [1] - 19:21
study [1] - 15:19
subject [4] - 17:10; 19:14; 32:13; 56:13
submission [1] - 19:23
submit [1] - 9:6; 12:21; 19:19, 23; 21:12; 22:25; 25:13, 21; 28:1, 9
submits [1] - 28:12
submitted [3] - 10:15; 19:12; 44:8

**subpoena** [3] - 53:6, 25; 54:2
**subpoenaed** [1] - 27:3
**subscri** [1] - 35:5
**subscribers** [5] - 7:23; 8:14; 34:15; 36:22; 59:9
**substantial** [3] - 18:6; 27:15
**substantive** [2] - 36:20; 50:19
**succeed** [1] - 30:8
**successf** [1] - 12:17
**successfully** [2] - 5:5; 12:18
**sued** [2] - 13:10; 27:7
**sufficient** [3] - 19:1; 32:19; 34:7
**suggest** [2] - 16:10; 43:14
**suggested** [1] - 16:9
**suggestion** [2] - 29:24; 43:18
**suit** [2] - 24:2
**summarizing** [1] - 9:24
**summary** [2] - 7:4; 59:25
**summing** [1] - 27:17
**support** [4] - 19:8; 37:12; 42:25; 49:8
**supports** [2] - 11:10; 27:18
**Supreme** [1] - 48:2
**surprising** [2] - 30:1; 32:25
**surprisingly** [1] - 28:21
**suspect** [2] - 23:13; 56:11
**suspicious** [1] - 58:19
**sustain** [1] - 28:10
**sustained** [2] - 18:22; 23:8
**sworn** [4] - 10:5; 19:18; 20:4; 57:25
**system** [11] - 12:10; 21:3, 5; 23:12; 26:18; 27:4, 7; 35:17; 50:6; 59:19; 60:15
**systems** [2] - 20:25; 24:9

## T

**table** [2] - 3:14; 38:25
**tails** [1] - 16:7
**talks** [2] - 26:17; 43:10
**target** [2] - 14:20; 48:8
**teach** [1] - 29:6
**team** [4] - 3:16; 28:24; 29:1, 3
**technical** [2] - 24:6; 48:7
**technology** [4] - 10:13; 27:9; 56:4; 60:16
**term** [1] - 48:7
**terms** [2] - 56:17; 57:16
**testified** [2] - 20:14; 24:2
**testimony** [19] - 5:10; 10:13; 14:13, 16; 15:13, 24; 17:4; 20:8, 10; 21:12, 21-22, 25; 24:8; 36:12; 44:7; 56:16; 58:22; 59:25
**tethered** [1] - 56:10
**tha** [1] - 16:8
**theatrics** [1] - 15:9
**themselves** [4] - 13:22, 24; 56:9; 58:13
**thereafter** [1] - 18:22
**they've** [4] - 25:16; 51:7, 12; 52:2

**thinking** [1] - 45:12
**third** [4] - 12:2; 15:23; 30:11; 38:6
**Thomas** [1] - 35:25
**thoughts** [2] - 4:2, 8
**three** [7] - 8:11; 30:9, 17, 25; 31:5; 36:15; 47:8
**threshold** [1] - 30:5
**throughout** [3] - 13:3; 21:8; 46:16
**throw** [1] - 52:6
**thrust** [1] - 31:14
**tied** [2] - 8:14, 23
**timeframe** [3] - 12:6; 19:9; 20:16
**timeliness** [1] - 33:12
**timely** [3] - 31:24; 32:7; 33:10
**timing** [6] - 20:19; 30:10, 13; 31:6; 34:12; 55:8
**TMcGaughey@winston.com** [1] - 2:9
**today** [6] - 3:15; 29:15; 30:9; 40:1, 20; 51:6
**together** [4] - 3:22; 7:6, 14; 44:3
**tolerated** [1] - 33:9
**toll** [2] - 47:9, 17
**took** [3] - 39:20; 44:2; 50:17
**total** [1] - 52:5
**totality** [1] - 50:25
**totally** [2] - 33:15
**touch** [3] - 26:16; 49:21; 55:6
**towards** [1] - 51:4
**tracks** [1] - 5:2
**trademarks** [1] - 12:1
**transaction** [1] - 18:1
**TRANSCRIPT** [1] - 1:12
**transcript** [8] - 2:22; 10:23; 11:23; 20:11; 21:24; 24:22; 31:4; 61:14
**transcription** [1] - 2:22
**treat** [1] - 6:1
**treated** [1] - 29:10
**trial** [44] - 7:5, 19; 8:7; 9:2; 10:11, 15; 13:6; 14:16; 17:4, 18, 20; 18:4; 19:6; 20:6, 11; 21:24; 24:12, 22; 25:9, 18, 20; 33:17; 34:1; 44:14; 51:4, 15, 20; 52:2, 10, 12-13; 54:12; 59:3; 60:13; 61:7
**tried** [4] - 19:7; 23:8; 57:5; 58:18
**tries** [1] - 31:25
**true** [7] - 16:7; 36:11; 41:8, 13, 18; 42:23; 54:4
**truth** [3] - 5:16; 25:1, 8
**truthful** [3] - 40:8, 13; 44:11
**truths** [1] - 29:25
**try** [4] - 12:23; 29:12; 45:10; 53:18
**trying** [4] - 19:11; 21:21; 28:10; 60:7
**tune** [1] - 45:8
**Tunnell** [1] - 41:24
**turn** [2] - 39:25; 45:1
**turning** [2] - 6:22; 16:18
**twice** [1] - 28:2
**two** [21] - 4:11, 18; 6:23; 8:9; 9:6; 10:12; 14:1; 20:18; 27:17; 30:20; 34:19; 44:8; 46:16; 47:18; 50:19; 51:14, 20;

52:8, 13; 53:8; 54:23
**two-and-a-half** [1] - 30:20
**Tyler** [2] - 2:6; 3:12
**type** [1] - 50:25
**types** [1] - 48:17

## U

**U.S** [2] - 35:25; 36:5
**ultimately** [2] - 14:19; 24:24
**UMJ** [1] - 15:7
**unable** [1] - 25:22
**under** [12] - 27:13, 19; 38:9; 42:11; 46:23; 47:22; 48:14, 25; 55:19; 56:21; 60:25
**underlying** [7] - 8:18, 21; 11:9; 17:22; 22:16; 37:11
**undermined** [2] - 24:14; 25:18
**undermines** [1] - 43:8
**understood** [1] - 53:24
**undertaken** [1] - 26:11
**undertook** [1] - 61:5
**unduly** [1] - 52:4
**unfavorable** [1] - 22:22
**unique** [3] - 34:18; 35:20, 24
**uniqueness** [1] - 35:16
**unitary** [1] - 6:25
**UNITED** [2] - 1:1, 13
**United** [2] - 2:18; 49:5
**universities** [1] - 12:1
**unless** [4] - 24:3; 25:24; 38:1; 60:5
**unrelated** [1] - 11:25
**unspecified** [1] - 45:23
**unwarranted** [1] - 48:12
**up** [8] - 21:2; 27:17; 37:25; 38:23; 39:3; 40:12; 43:22; 48:7
**ups** [1] - 44:1
**upset** [1] - 28:24
**urge** [1] - 60:17
**user** [2] - 35:7
**users** [3] - 8:13; 35:5; 37:4
**utilized** [1] - 4:6

## V

**VA** [1] - 2:19
**vague** [1] - 42:15
**validate** [4] - 10:10; 42:20, 25; 43:3
**value** [2] - 40:8; 50:17
**values** [8] - 25:12; 33:16; 35:24; 36:4, 6; 55:24
**various** [1] - 59:21
**vendor** [1] - 7:17
**verdict** [8] - 22:23; 29:20; 31:7, 9, 11; 45:13, 15; 52:14
**verification** [15] - 7:22; 8:11, 21; 12:20; 13:19; 14:12, 17; 17:23; 22:17; 23:16; 26:8; 43:13, 23; 44:2; 49:24

**verification-related** [1] - 22:17
**verifications** [12] - 8:19; 9:8; 14:12; 16:20; 17:1; 23:19; 25:2, 17, 19; 59:16
**verified** [14] - 8:9, 12-13; 9:12; 13:17, 24-25; 17:11; 18:9; 20:5; 26:7, 10; 59:6
**verify** [5] - 10:1; 12:23; 24:5; 27:5; 50:7
**verifying** [2] - 12:22; 17:14
**version** [3] - 17:24; 23:7, 10
**versions** [1] - 23:17
**versus** [8] - 3:4; 22:7; 35:25; 36:5; 41:24; 48:4; 49:5; 58:11
**vicarious** [1] - 6:25
**view** [1] - 23:23
**violation** [1] - 53:2
**VIRGINIA** [1] - 1:2

## W

**wait** [5] - 32:3, 5; 33:5; 53:14; 55:8
**waited** [9] - 31:19-21; 32:22, 25; 33:5; 55:9
**waiting** [5] - 32:1, 4, 8-9, 11
**waived** [1] - 43:17
**walk** [1] - 9:17
**Wallace** [4] - 2:17; 61:13, 16
**Warner** [1] - 15:8
**warrant** [2] - 46:13, 15
**warranted** [3] - 25:23; 27:25; 28:12
**warrants** [1] - 27:16
**Warrior** [1] - 3:22
**Washington** [4] - 1:17, 21; 2:4, 8
**wavelength** [1] - 15:20
**weeds** [2] - 4:3; 49:25
**weekend** [1] - 61:9
**weeks** [2] - 33:1
**weight** [1] - 5:7
**willful** [1] - 45:16
**win** [1] - 33:11
**Winston** [6] - 2:7, 10, 14; 3:21; 30:2; 51:5
**Wisconsin** [3] - 1:16, 20; 2:3
**withheld** [7] - 9:19, 24; 21:23; 26:19; 36:25; 40:17
**withhold** [2] - 11:19; 28:3
**witness** [11] - 10:6; 14:13; 15:7, 15; 34:2; 39:20; 44:6; 56:18; 59:25
**witnesses** [9] - 5:11; 10:12; 14:21; 29:18; 40:3, 10, 13; 44:10; 45:7
**word** [4] - 14:6, 11; 44:12
**word-for-word** [1] - 44:12
**words** [1] - 44:2
**wordsmithing** [1] - 5:9
**works** [8] - 13:9; 18:8; 22:15; 24:1; 27:6; 43:7
**Works** [2] - 37:18
**worth** [2] - 50:9; 58:1
**written** [2] - 10:25; 41:17
**wrongfully** [1] - 26:18
**wrongly** [1] - 46:19

## Y

**year** [6] - 30:15; 31:12; 46:8; 47:7, 10
**years** [10] - 9:15; 20:18; 28:5; 31:12; 36:15; 47:8; 51:14, 20; 52:13; 59:12
**York** [1] - 2:11

## Z

**Zebrak** [6] - 1:16, 19-20; 2:2; 3:7; 57:13
**ZEBRAK** [1] - 3:7